# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

WARNER BROS. RECORDS INC., *et al.*,

      Plaintiffs,

v.

CHARTER COMMUNICATIONS, INC.,

      Defendant.

C.A. No.: 19-cv-00874-MSK-MEH

## DEFENDANT CHARTER COMMUNICATIONS, INC.'S MOTION TO DISMISS PLAINTIFFS' CLAIM FOR VICARIOUS LIABILITY

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

FACTS ....................................................................................................................................3

ARGUMENT...........................................................................................................................5

    A.     Burden of Proof ..............................................................................................5

    B.     Elements ........................................................................................................6

    C.     Elements Not Supported by Complaint............................................................7

          1.     Plaintiffs seek to stretch the doctrine of vicarious liability far beyond the narrow construction applied by courts......................................................7

          2.     Plaintiffs fail to allege a causal connection between the alleged infringement and Charter's profits; any benefit is, therefore, too indirect to state a claim.........................................................................................9

          3.     Plaintiffs also fail to plausibly allege Charter maintained the right and ability to control infringement by its subscribers.....................................14

CONCLUSION.......................................................................................................................17

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc*,
   149 F. Supp. 3d 634 (E.D. Va. 2015), aff'd in part, rev'd in part, 881 F.3d 293
   (4th Cir. 2018)................................................................................................................16

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
   881 F.3d 293 (4th Cir. 2018) ........................................................................................16

*Coach, Inc. v. Swap Shop, Inc.*,
   2012 WL 12887010, at *8 (S.D. Fla. Sept. 21, 2012)....................................................8

*Dennis v. Watco Cos., Inc.*,
   631 F.3d 1303 (10th Cir. 2011)......................................................................................6

*Diversey v. Schmidly*,
   738 F.3d 1196 (10th Cir. 2013)..................................................................................6, 8

*Ellison v. Robertson*,
   357 F.3d 1072 (9th Cir. 2004) ..................................................................................9, 11

*Fonovisa v. Cherry Auction Inc.*,
   76 F.3d 259 (9th Cir. 1996) .......................................................................................8, 16

*Gallagher v. Shelton*,
   587 F.3d 1063 (10th Cir. 2009)......................................................................................6

*Io Grp., Inc. v. Veoh Networks, Inc.*,
   586 F. Supp. 2d 1132 (N.D. Cal. 2008).......................................................................16

*Packingham v. North Carolina*,
   137 S. Ct. 1730 (2017) .................................................................................................13

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ................................................................... 14, 15, 16, 17

*Perfect 10, Inc. v. CCBill LLC*,
   488 F.3d 1102 (9th Cir. 2007) .......................................................................................9

*Perfect 10, Inc. v. Giganews, Inc.*,
   847 F.3d 657 (9th Cir.), *cert. denied*, 138 S. Ct. 504, 199 L. Ed. 2d 385 (2017).........9, 10, 11

*Perfect 10, Inc. v. Visa Intern. Service Ass'n.*,
   494 F.3d 788 (9th Cir. 2007) ........................................................................................16

*Ridge at Red Hawk, LLC v. Schneider,*
  493 F.3d 1174 (10th Cir. 2007)........................................................................6, 14

*Robbins v. Okla. ex rel. Okla. Dep't of Human Servs.,*
  519 F.3d 1242 (10th Cir. 2008)........................................................................6, 13

*Shapiro, Bernstein & Co. v. H. L. Green Co.,*
  316 F.2d 304 (2d Cir. 1963) .....................................................................................7

*Shell v. Am. Family Rights Ass'n,*
  2010 WL 1348548 (D. Colo. Mar. 31, 2010) ..........................................................9

*Sony Corp. of Am. v. Universal City Studios,*
  464 U.S. 417 (1984) ...........................................................................................7, 13

*Sony Music Entm't v. Cox Comm. Inc.,*
  2018 WL 6059386 (E.D. Va. Nov. 19, 2018).........................................................1

*Thomson v. HMC Grp.,*
  2014 WL 12589313 (C.D. Cal. July 25, 2014).................................................9, 10

*Tomelleri v. Zazzle, Inc.,*
  2015 WL 8375083 (D. Kan. Dec. 9, 2015) ............................................................8

*UMG Recordings, Inc., et al v. Bright House Networks,*
  LLC, No. 8:19-cv-00710-MSS-TGW (M.D. Fla. Mar. 3, 2019)............................1

*UMG Recordings Inc., et al. v. Grande Comm.,*
  2018 WL 1096871 (W.D. Tex. Feb. 28, 2018)................................... 1, 11, 12, 13

*UMG Recordings, Inc. v. Veoh Networks Inc.,*
  2009 WL 334022 (C.D. Cal. Feb. 2, 2009), *aff'd sub nom. UMG Recordings,
  Inc. v. Shelter Capital Partners LLC,* 667 F.3d 1022 (9th Cir. 2011), *opinion
  withdrawn, superseded, and aff'd on reh'g,* 718 F.3d 1006 (9th Cir. 2013)...........9

*Viesti Assocs., Inc. v. Pearson Educ., Inc.,*
  2013 WL 4052024 (D. Colo. Aug. 12, 2013) .........................................................6

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(6)........................................................................5

Aaron Smith, "Searching for Work in the Digital Era," Pew Research Center
  (Nov. 19, 2015), https://www.pewinternet.org/2015/11/19/1-the-internet-and-
  job-seeking/........................................................................................................5

Economic Advisers Issue Brief, "The Digital Divide and Economic Benefits of
  Broadband Access," (March 2016),
  https://obamawhitehouse.archives.gov/sites/default/files/page/files/20160308_
  broadband_cea_issue_brief.pdf.............................................................................................5

*In re Inquiry Concerning Deployment of Advanced Telecommunications Capabil-
  ity to All Americans in a Reasonable and Timely Fashion*, 2018 Broadband
  Deployment Report, 33 FCC Rcd 1660 ¶ 1 (Feb. 2, 2018) .....................................................5

*In re Promoting Telehealth for Low-Income Consumers*,
  Notice of Inquiry, 33 FCC Rcd 7825 .......................................................................................5

Remarks of Commissioner Jessica Rosenworcel, Federal Communications
  Commission, 20 Years of Connecting Schools and Libraries: Policy Summit,
  (Jan. 24, 2018), https://docs.fcc.gov/public/attachments/DOC-320122A1.pdf.......................5

Defendant Charter Communications, Inc. by and through its attorneys Fairfield and Woods, P.C. and Winston and Strawn LLP, hereby moves to dismiss the second claim for relief (vicarious liability), and as grounds therefor states as follows:

## INTRODUCTION

This suit is the latest effort in the music industry's campaign to hold Internet Service Providers ("ISPs") liable for copyright infringement, allegedly carried out by internet subscribers, for merely providing internet access. *See, e.g.*, *Sony Music Entm't v. Cox Comm. Inc.*, 2018 WL 6059386 (E.D. Va. Nov. 19, 2018); *UMG Recordings Inc., et al. v. Grande Comm.*, 2018 WL 1096871 (W.D. Tex. Feb. 28, 2018); *UMG Recordings, Inc., et al v. Bright House Networks*, LLC, No. 8:19-cv-00710-MSS-TGW (M.D. Fla. Mar. 3, 2019). ISPs such as Charter Communications, Inc. ("Charter") provide access to the internet, enabling subscribers to access the vast array of information available on the world wide web, including critical information during storms or national emergencies, job search sites, educational resources, news sites, as well as entertainment. There are a variety of threats involved with internet access, including hackers, spammers, and infringers who utilize evolving technology to facilitate illegal activity. Rather than view ISPs as other victims of these abusers—or allies in the fight against them—Plaintiffs accuse ISPs like Charter of infringement for merely providing access to the internet.

Plaintiffs assert two claims for secondary liability against Charter—contributory infringement and vicarious liability, each having separate elements. Both claims will ultimately fail for many reasons, including the fact that Plaintiffs cannot establish the predicate direct infringement of their copyrights. In this motion, however, Charter seeks only to dismiss the vicarious liability claim. Vicarious liability requires a defendant to profit directly from infringement that it has both a right and ability to control. Plaintiffs' effort to hold the wrong party accountable for vicarious

liability out of convenience—seeking vast windfalls in statutory damages—is inherently flawed in this context. Specifically, Plaintiffs' vicarious liability claim is foreclosed as a matter of law by Plaintiffs' failure to make plausible allegations that Charter has directly enjoyed a financial benefit from the allegedly infringing activity or has the ability to control subscribers allegedly infringing activity in the first place. That claim must therefore be dismissed.

First, Plaintiffs fail to make plausible allegations that Charter received any financial benefit *directly* from the alleged infringements of its subscribers. For example, Plaintiffs do not allege that Charter itself owns or operates any file-sharing service, that Charter encourages or directs traffic to BitTorrent or other peer-to-peer file sharing protocols, that Charter receives any compensation from the use of such protocols, or that the revenue that Charter receives from allegedly infringing subscribers varies in any way based on whether they infringe while using the internet—which, of course, has a host of important noninfringing uses. Nor do Plaintiffs allege that Charter specifically targets subscribers who infringe, that to infringe copyrights more easily infringers seek out Charter over competing providers, or that, but for Charter's conduct, its subscribers would not use its internet services. Even crediting Plaintiffs' allegations that subscribers can use Charter's internet access service for allegedly infringing purposes, Plaintiffs do not, and cannot, allege that such allegedly infringing purposes act as a draw for subscribers to purchase Charter's internet access service. Indeed, as other courts have recognized in distinguishing between general-purpose ISPs like Charter and file-sharing protocols like BitTorrent or Napster, Plaintiffs' profit theory is far too attenuated to support imposing vicarious liability here.

Second, Plaintiffs do not plausibly allege that Charter maintains the right and ability to stop users from engaging in infringing activity. Charter cannot monitor and control its subscribers' use of the internet, and its ability to terminate subscribers altogether does not prevent them

from committing acts of infringement from other connections. Nor do Plaintiffs allege that Charter can block access to peer-to-peer file sharing protocols, which can be used for both infringing and non-infringing purposes.

In sum, Plaintiffs' claim that Charter is complicit in copyright infringement stretches vicarious liability beyond the breaking point. That claim should be dismissed with prejudice.

## FACTS

Plaintiffs, some of the largest labels and publishers in the music industry, have regularly engaged in litigation alleging the unauthorized distribution of their works. Compl. ¶¶ 13, 33, 82. Plaintiffs' allegations here stem from internet users' alleged proliferation of infringing material using "peer-to-peer ("P2P") distribution systems" and "most notably a protocol called 'Bit-Torrent.'" Compl. ¶ 79. BitTorrent is a file-sharing service that permits users to upload and download content. *Id.* ¶¶ 79-81.

Plaintiffs' agents regularly send auto-generated copyright notices to ISPs regarding subscriber activity in droves. *Id.* ¶ 85. A typical notice indicates the ISP associated with the IP address involved in the alleged infringing activity, the work allegedly infringed, and the date and time of the alleged infringement. *Id.* ¶ 85. Notably, however, a notice does not amount to a finding or proof of infringement—it is merely an allegation that infringement has occurred. That is why Plaintiffs carefully plead that notices identify when activity has been "detected" rather than "confirmed." *Id.* ¶ 86. Plaintiffs do not provide any further details concerning that detection, how any infringement occurred, and most importantly, how it was authenticated. *See id.*; ¶ 88 (alleging only that specific IP addresses were "identified" in various notices without further detailing the alleged infringement or verification thereof).

Charter is one of the nation's largest providers of high-speed internet access. *Id.* ¶ 74. Charter has never charged its subscribers based on the amount of downloaded content; Charter utilizes flat-fee subscription rates with graduated rate tiers for faster connections. *Id.* Importantly, Plaintiffs do not allege—because they cannot—that Charter has any connection to any file-sharing websites or technology. Plaintiffs do not allege that Charter has had any corporate relationship with, or financial interest in, BitTorrent at any point. Nor do Plaintiffs allege that Charter has ever promoted or offered any file-sharing services to subscribers—services freely available on the internet.

Plaintiffs acknowledge that Charter utilizes a DMCA program to track, catalog, and respond to the notices it receives in an effort to curtail infringement. *Id.* ¶ 76. Nonetheless, Plaintiffs claim that Charter "turns a blind eye" to the alleged infringement because its "failure to police its infringing subscribers adequately was a draw to subscribers to purchase Charter's services." *Id.* ¶ 91. Notably, however, Plaintiffs' "draw" theory lacks allegations that competing ISPs were terminating subscribers such that Charter's supposed failure to do so attracted them. As pled, Plaintiffs also assume that P2P abuses are committed by the account holder who subscribed to Charter's services instead of other household members, visitors, or people who have accessed Charter's service in an unauthorized manner (or, with commercial accounts, those who use the service without having decision-making authority over the account).[1]

---

[1] If the allegedly infringing activity is committed by a person other than the individual in a household who makes the decision regarding to which ISP service the household subscribes, then it goes without saying that such activity cannot be a draw to subscribe to Charter's service.

Further, Plaintiffs recognize that Charter's only ability to prevent or limit any infringe-ment occurring on its network stems from its technical ability to "suspend or terminate a cus-tomer's [i]nternet access." *Id.* ¶ 89.[2] But as discussed below, the ability to terminate does not give Charter the ability to control infringing activity on the internet.

## ARGUMENT

### A.    Burden of Proof

A claim should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) where the plaintiff has failed to state a claim for which relief can be granted. While a plaintiff need plead only sufficient facts to state a claim to relief that is plausible on its face, the facts must be pled in sufficient detail to "give the court reason to believe that this plaintiff has a reasonable

---

[2] It goes without saying that in the modern world disconnecting a subscriber's internet access is a drastic remedy. The federal government has recognized that having internet access is critical for people to participate in the modern world economy. *See, e.g.*, *In re Inquiry Concerning Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, 2018 Broadband Deployment Report, 33 FCC Rcd 1660 ¶ 1 (Feb. 2, 2018) ("Fixed and mobile broadband services provide Americans, especially those in rural and remote areas of the country, access to numerous employment, education, entertainment, and health care opportunities."); Council of Economic Advisers Issue Brief, "The Digital Divide and Economic Benefits of Broadband Access," at 1 (March 2016), https://obamawhitehouse.archives.gov/sites/default/files/page/files/20160308_broadband_cea_issue_brief.pdf) ("Broadband provides numerous socio-economic benefits to communities and individuals, improving labor market outcomes for subscribers, increasing economic growth, providing access to better health care, and enhancing civic participation."); Aaron Smith, "Searching for Work in the Digital Era," Pew Research Center (Nov. 19, 2015), https://www.pewinternet.org/2015/11/19/1-the-internet-and-job-seeking/ ("Digital resources are now more important than ever to Americans' ability to research and apply for jobs," and "the proportion of Americans who research jobs online has doubled in the last ten years."); Remarks of Commissioner Jessica Rosenworcel, Federal Communications Commission, 20 Years of Connecting Schools and Libraries: Policy Summit, (Jan. 24, 2018), https://docs.fcc.gov/public/attachments/DOC-320122A1.pdf (noting "seven in ten teachers now assign homework that requires access to broadband" and raising concern that the lack of access is creating a "Homework Gap"); *In re Promoting Telehealth for Low-Income Consumers*, Notice of Inquiry, 33 FCC Rcd 7825 ¶ 1 (Aug. 3, 2018) ("High-quality health care has become increasingly reliant on the widespread availability of high-speed connectivity, and broadband-enabled telehealth services are assuming an increasingly vital role in providing care.").

likelihood of mustering factual support for these claims." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original).

"Plausibility" in the Tenth Circuit "refer[s] to the scope of the allegations in a complaint." *Robbins v. Okla. ex rel. Okla. Dep't of Human Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008). Allegations are not sufficient "if they are so general that they encompass a wide swath of conduct, much of it innocent." *Id.* (internal quotations omitted). "The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Id.* "This requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them." *Id.* at 1248. Thus, the allegations must "'nudge[] [the] claims across the line from conceivable to plausible.'" *Dennis v. Watco Cos., Inc.*, 631 F.3d 1303, 1305 (10th Cir. 2011) (quotation omitted). Conclusory allegations are insufficient. *Gallagher v. Shelton*, 587 F.3d 1063, 1068 (10th Cir. 2009).

### B.      Elements

Vicarious liability requires a plaintiff to "establish that a defendant *directly* benefitted from the third parties' infringement and *had the ability to control the third parties' infringing conduct.*" *Viesti Assocs., Inc. v. Pearson Educ., Inc.*, 2013 WL 4052024, at *8 (D. Colo. Aug. 12, 2013) (quoting *MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 914 (2005)) (emphasis added); *see also Diversey v. Schmidly*, 738 F.3d 1196, 1204 (10th Cir. 2013). Courts in this circuit follow Ninth Circuit precedent in assessing the defendant's ability to control infringing conduct—the defendant must have "both a legal right to stop or limit the directly infringing conduct, *as well as the practical ability to do so.*" *Viesti*, 2013 WL 4052024, at *8 (quoting *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir.  2007)) (emphasis added).

### C.     Elements Not Supported by Complaint

Plaintiffs fail to adequately plead vicarious liability:  the Complaint lacks plausible allegations that Charter (1) received a direct financial benefit from the alleged infringement, or (2) had the practical ability to stop it. Thus, their claim for vicarious liability must be dismissed.

### 1.     Plaintiffs seek to stretch the doctrine of vicarious liability far beyond the narrow construction applied by courts.

Vicarious copyright liability is a theory of *implied secondary liability* that must be narrowly construed. *Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417, 431 (1984) (citing several Supreme Court decisions reflecting the "recurring theme" that courts "must be circumspect in construing the scope of [the] rights" created by implied copyright liability and "reluctan[t] to expand the[ir] protections … without explicit legislative guidance"). The doctrine originated in *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304 (2d Cir. 1963), a Second Circuit decision that distinguished between two lines of cases detailing agency-type relationships:  landlord-tenant situations and "dance hall" cases. *Id.* at 307; *see Sony*, 464 U.S. at 437 n.18 (discussing *Shapiro*). The court there explained that if a "landlord lets his premises without knowledge of the impending infringement by his tenant, exercises no supervision over him, charges a fixed rental and receives no other benefit from the infringement, and contributes in no way to it, it has been held that the landlord is not liable for his tenant's wrongdoing." *Shapiro*, 316 F.2d at 304 By contrast, the court explained, dance hall operators would be "liable for the infringement of copyright resulting from the performance of a musical composition by a band or orchestra whose activities provide the proprietor with a source of customers and enhanced income." *Id.* at 307.

The reason is obvious:  When a landlord leases premises to someone, it is understood that the lessee will use the property for various purposes, at least some of which are plainly lawful, so

it makes little sense to attribute the financial benefit that the landlord receives from the tenant directly to the lessee's infringing activity as opposed to the lessee's general use of the premises. By contrast, a dance-hall operator is directly benefitting financially not from general use of the premises, many of the uses of which are lawful, but from dance-hall activities involving copyright infringement. And this case—where Charter provides general internet services which all subscribers will use for plainly lawful purposes—is akin to the former, not the latter.

More recently in *Coach, Inc. v. Swap Shop, Inc.*, a federal district court in Florida expounded upon this direct/indirect distinction in the context of a swap meet. 2012 WL 12887010, at *8 (S.D. Fla. Sept. 21, 2012).[3] The plaintiff there brought direct infringement claims against retailers selling knock-off Coach bags at a swap meet and secondary claims against the swap meet operator and the landlord of the property where the swap meet was held. *Id.* Drawing a distinction between the defendants, the court held that the swap meet operator had "a direct financial interest in the infringing activities because [the operator] receive[d] rents from [its] vendors, including those selling fake Coach products, along with parking and concession fees, which are fueled in large part by the draw created by the widespread availability of fake Coach products at the Flea Market," whereas the landlord merely received the rent of the operator and therefore experienced no direct financial benefit.[4] *Id.*

---

[3] The court in *Coach* relied on *Fonovisa v. Cherry Auction Inc.*, 76 F.3d 259, 263 (9th Cir. 1996), to form the basis of its analysis. *Fonovisa* has been cited favorably by the Tenth Circuit and district courts in this Circuit for analyses of vicarious liability. *See, e.g.*, *Diversey*, 738 F.3d at 1204.

[4] The outcome in *Coach* is consistent with precedent in this district dismissing claims of vicarious liability against the operator of an online marketplace on summary judgment where any financial benefit was too attenuated. *See Tomelleri v. Zazzle, Inc.*, 2015 WL 8375083, at *15 (D. Kan. Dec. 9, 2015) (dismissing vicarious liability claim where infringement was not a "draw" to users). Dismissal is appropriate at this phase in light of Plaintiffs' failure to allege a causal connection between any benefit received by Charter from infringement of Plaintiffs' works.

### 2.    Plaintiffs fail to allege a causal connection between the alleged in-fringement and Charter's profits; any benefit is, therefore, too indi-rect to state a claim.

To adequately plead vicarious liability, Plaintiffs must allege that Charter received a "di-rect financial interest in the exploited copyrighted materials." *Shell v. Am. Family Rights Ass'n,* 2010 WL 1348548, at *16 (D. Colo. Mar. 31, 2010). Critically, the infringing activity must be more than an "added benefit" to a subscription; it must be the attracting factor, the "draw" for subscribers. *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 674 (9th Cir. 2017), *cert. de-nied*, 138 S. Ct. 504, 199 L. Ed. 2d 385 (2017); *see also Ellison v. Robertson*, 357 F.3d 1072, 1079 n.10 (9th Cir. 2004) (plaintiff must establish that an ISP attracted subscriptions "because of" the infringement to establish a direct financial benefit); *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1117-18 (9th Cir. 2007) (finding no vicarious liability because evidence that "[de-fendant] 'hosts' websites for a fee" was too sparse to show a direct financial benefit and thus not "a draw" to subscribers); *UMG Recordings, Inc. v. Veoh Networks Inc.*, 2009 WL 334022, at *6 (C.D. Cal. Feb. 2, 2009), *aff'd sub nom. UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022 (9th Cir. 2011), *opinion withdrawn, superseded, and aff'd on reh'g*, 718 F.3d 1006 (9th Cir. 2013) (dismissing vicarious liability claim where financial benefit was too attenu-ated to be direct); *Thomson v. HMC Grp.*, 2014 WL 12589313, at *4 (C.D. Cal. July 25, 2014) (dismissing vicarious liability claim where infringing content was not the draw for defendant's patients).

This case presents the digital version of Coach's physical-world analog. As pled, the P2P technologies and related websites at issue function as a digital swap meet. *See Coach*, 2012 WL 12887010, at *8. Allegedly infringing subscribers act as the directly infringing retailers by ex-changing infringing material using the swap meet (P2P technology) as the vehicle for such ex-change. Charter, however, is akin to the landlord—not the operator—as it merely provides the

digital space—internet access—in which the alleged direct infringers operate. Just as the land-lord-defendant in *Coach* could not be held vicariously liable for the swap meet, Charter cannot, as a matter of law, be held vicariously liable for the acts of the alleged infringers—in both cases the financial benefit is too attenuated. *See id.* Charter is even further removed from the alleged direct infringers than the landlord at issue in *Coach*, as it merely provides a means of *access* to the internet and does not in any manner control the "premises" of the internet. Any direct financial benefit from the alleged infringement would pass to providers of unlawful services, while only indirect benefits—subscription fees instead of rent, and flat-fee rates at that—would flow to Charter. Such indirect benefits are insufficient to support vicarious liability as a matter of law.

Consider *Perfect 10 v. Giganews*, for example, where a copyright owner sued an operator of Usenet servers, an online distributed discussion system enabling user-generated content, for infringement of images posted by users onto online bulletin boards. 847 F.3d at 674. As the Ninth Circuit recognized, Giganews could not be held vicariously liable unless the plaintiff established that "Giganews attracted subscriptions *because of* the infringing Perfect 10 material." *Id.* (emphasis added). Perfect 10 failed to do so, offering only evidence that some subscribers joined Giganews to access infringing materials generally. *Id.* Thus, the fact that a user may have accessed the copyrighted material was as best an added benefit to the subscription, not the draw sufficient to support a finding of vicarious liability. *Id.*

Likewise, here Plaintiffs fail to allege a plausible causal connection between any alleged direct infringement and the subscription fees received by Charter. For example, Plaintiffs do not allege that infringers specifically chose Charter over other providers so they could infringe Plaintiffs' copyrights, or that other ISPs were terminating subscribers, leading them to seek out Charter as a safe haven. Nor do they, or can they, allege that Charter itself owns or operates any file-

sharing service, that Charter promotes or directs traffic to BitTorrent, or that Charter receives any compensation from peer-to-peer file sharing services. The only financial benefit that Charter receives is a flat fee for the provision of internet services, which is insufficient to state a claim. *Ellison*, 357 F.3d at 1079 (holding that "flat periodic payments for service" cannot establish a direct financial benefit for vicarious liability).

At most, Plaintiffs assert that subscribers are able to utilize their internet connection for illegal activity as an added benefit to the subscribers, not the draw. *Giganews*, 847 F.3d at 674; *Ellison*, 357 F.3d at 1079; *see also Grande*, 2018 WL 1096871, at *10. Plaintiffs allege that "[m]any of Charter's subscribers are primarily drawn to its service because it allows them to use Charter's network to download music and other copyrighted content—including unauthorized content—as efficiently as possible." Compl. ¶ 75. Without more, however, it is not plausible that subscribers subscribe to Charter's internet service—as compared to many other sources of internet service available to them—for the primary purpose of committing infringement.[5]

This is precisely why another district court found the allegations of vicarious liability deficient in a recent case that many of the same Plaintiffs brought against a smaller regional ISP, Grande Communications. *See Grande*, 2018 WL 1096871. As the court in *Grande* recognized in dismissing the plaintiffs' vicarious liability claim with prejudice on the pleadings, allegations of "the existence of music and the BitTorrent protocol" were insufficient to plead a draw, because "that would impose liability on every ISP, as the music at issue is available on the [i]nternet generally, as is the BitTorrent protocol, and is not something exclusively available through Grande's services." *Id*. at *10. Absent more particularized allegations of a causal connection between the

---

[5] Amendment cannot cure this defect because Plaintiffs' theory that infringing activity is the draw is factually implausible in light of the multitude of noninfringing uses of the internet, access to which is critical for individuals in contemporary society. *See, e.g.*, *infra*., note 2.

ISPs' alleged conduct and the alleged direct infringement, the plaintiffs failed to adequately plead that "the availability of infringing material act[ed] as a draw for customers." *Id.*

Plaintiffs make substantially the same allegations here. They do not allege that Charter specifically targeted infringing subscribers, or that Charter's flat-rate revenues depend on whether its subscribers use its internet services for infringing activity versus lawful purposes. Plaintiffs do allege that Charter offers a tiered pricing structure based on the speed of the internet service. However, such allegations are immaterial. First, Plaintiffs fail to plead with specificity that Charter encourages subscribers to purchase a faster package for the purpose of infringing or markets its faster tiers to those who infringe Plaintiffs' copyrights. *See* Compl. ¶ 75 (failing to suggest Charter markets its services for unlawful purposes). Nor do Plaintiffs plead that infringing subscribers disproportionately subscribe to higher speed tiers as compared to noninfringing subscribers. *Cf.* ¶ 75 (noting only that Charter's service permits subscribers to "download just about anything instantly" and "download 8 songs in 3 seconds."). Moreover, Plaintiffs do not, and cannot, allege that those who illegally download music want faster speeds than those who do so legally, much less than those who download considerably larger movie or other files. Such allegations would be implausible, as subscribers paying for higher tiers of service for lawful uses want to download content just as fast as those doing so illegally. In any event, the financial benefit must be *direct*, and the theory here would not be that Charter directly charges more to those who access file-sharing sites like BitTorrent or even to those who download more material, but rather that Charter, at most, indirectly benefits from the possibility that those who illegally share music may want faster internet speeds.

Instead, Plaintiffs allege generally that Charter's high-speed internet service facilitates the downloading of copyrighted materials, which in turn "has served to draw, maintain, and generate higher fees from paying subscribers to Charter's service." Compl. ¶¶ 4, 75, 105. But if those allegations were enough to support vicarious liability, such a view "would impose liability on every ISP," as the cited technological capabilities are "available on the [i]nternet generally"— not "exclusively available through [Charter's] services." *Grande*, 2018 WL 1096871, at *10. As pled, therefore, the allegations would allow a copyright holder to sue ISPs for the mere provision of internet access—services which provide "the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017); *see also supra* n.3. Given the "wide swath of conduct" that is innocent, Plaintiffs claims are implausible. *Robbins*, 519 F.3d at 1247. Such allegations are insufficient to support vicarious liability. *Grande*, 2018 WL 1096871 at *10; *Sony*, 464 U.S. at 431.

Plaintiffs attempt to cure the pleading defect highlighted by the court in *Grande*; however, this effort is futile because Plaintiffs cannot establish any plausible casual connection between the alleged infringement and any financial benefit received by Charter. *Compare Grande*, 2018 WL 1096871, at *10 *with* Compl. ¶ 91. Specifically, Plaintiffs allege that "Charter's failure to police its infringing subscribers adequately drew subscribers to purchase Charter's services, so that the subscribers could then use those services to infringe Plaintiffs' (and others') copyrights." Compl. ¶ 91. Yet, Plaintiffs allege no facts that plausibly assert *how* subscribers knew, learned, or had reason to believe that Charter was not terminating subscribers, or, equally importantly, how Charter received any more of a benefit from these subscribers than others. Plaintiffs also fail to plead that other ISPs were terminating subscribers based upon notifications alleging that such

13

subscribers were committing copyright infringement, such that Charter's failure to do so (implausibly assuming such failure was known by consumers selecting an ISP service and that such knowledge guided their purchase decision, neither of which is alleged – nor could they be – by Plaintiffs) was material to its subscribers' purchasing decisions.

Absent such allegations, the notion that Charter received a "direct financial benefit" by merely providing internet service is not plausible, as Plaintiffs do not assert how an alleged failure to terminate account holders plausibly served as the draw for new subscribers. *Ridge at Red Hawk*, 493 F.3d at 1177 ("[T]he mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."). Amendment cannot cure the deficiencies in Plaintiffs pleadings on vicarious liability, because plaintiffs cannot, as a matter of law, muster factual support for this theory. *Id.* Thus, Plaintiffs' efforts to plead vicarious liability are inherently flawed in this context, and the vicarious liability claim should be dismissed with prejudice.

### 3. Plaintiffs also fail to plausibly allege Charter maintained the right and ability to control infringement by its subscribers.

Dismissal is independently warranted because Plaintiffs also fail to plausibly allege that Charter had the right and ability to control the alleged infringing activity of its subscribers. "[A] defendant exercises control over a direct infringer when he has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Amazon.com*, 508 F.3d at 1173 (citing *Grokster*, 545 U.S. 930). Plaintiffs have failed to allege that Charter exercises any practical ability to control the online activity of the allegedly infringing subscribers here, and that too warrants dismissal of their vicarious liability claim.

Plaintiffs allege in conclusory fashion that Charter's "ability to control and supervise" its subscribers arises from its ability to terminate customers. *See, e.g.*, Compl. ¶ 86. But the fact that Charter has the general capability to terminate subscriber accounts *altogether* does not mean it has the ability to halt infringement in particular. Indeed, Plaintiffs do not (and cannot) allege that outright terminating access from Charter would restrict that subscriber's access to the infringing content. Such an allegation would be farfetched given the availability of other networks and providers of internet access to the same material. The Complaint does not allege that Charter has the "right and ability to control and supervise" its subscribers' conduct online generally, or that Charter can "stop or limit [subscribers] from reproducing, displaying, and distributing infringing copies of [Plaintiffs' works] on the [i]nternet." *See, e.g.*, *Amazon.com*, 508 F.3d at 1157.

The Complaint's deficiency in this regard confirms that Plaintiffs are leveling their claims at the wrong entity. Courts have specifically distinguished between general-purpose ISPs like Charter or Google and file-sharing protocols and websites like BitTorrent or Napster. *Id.* For instance, in *Amazon.com*, the Ninth Circuit held that because "Napster had a closed system requiring user registration, and could terminate its users' accounts and block their access to the Napster system, Napster had the right and ability to prevent its users from engaging in the infringing activity of uploading file names and downloading Napster users' music files through the Napster system." *Id*. As it further explained, however, Google had no such ability—and therefore no liability. As the court recognized, although Google could curtail some infringement indirectly by terminating accounts, that was insufficient to establish vicarious liability as it did not exercise the supervisory powers required to establish the claim. *Id.* ("Google cannot stop any of the third-party websites from reproducing, displaying, and distributing unauthorized copies of Perfect 10's images because that infringing conduct takes place on the third-party websites. Google cannot

terminate those third-party websites or block their ability to host and serve infringing full-size images on the [i]nternet.") (internal quotation omitted). As the court explained, this distinguished Google's service from both Napster (which had the ability to control infringing conduct by searching its own index for infringing files) and the swap meet operator in *Fonovisa* (which had the ability to identify and police infringing activity on its own premises). *Id.* at 1174. In contrast to these closed systems, Plaintiffs cannot plausibly allege that Charter has the ability to identify and police infringing activity on the internet at large.

The Ninth Circuit reaffirmed this reasoning in *Perfect 10, Inc. v. Visa Intern. Service Ass'n.*, 494 F.3d 788 (9th Cir. 2007). There, Perfect 10 sued credit card companies for failing to terminate member merchant accounts that were profiting from alleged copyright infringement. *Id.* at 803. Relying on *Amazon.com*, the court held that although the credit card companies had the authority to terminate merchant accounts that engaged in illegal activity, such termination did not equate to the right and ability to control required for vicarious infringement. *Id.* The court reasoned that while terminating such member accounts could have some "indirect effect on the infringing activity," a "defendant must have the right and ability to *supervise and control the infringement*, not just affect it." *Id.* at 805[6]; *see also Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1151 (N.D. Cal. 2008) ("[T]he pertinent inquiry is not whether [the defendant] has the right and ability to control [its] system, but rather, whether it has the right and ability to

---

[6] Although in *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc*, 149 F. Supp. 3d 634, 674–75 (E.D. Va. 2015), aff'd in part, rev'd in part, 881 F.3d 293 (4th Cir. 2018), the court declined to grant summary judgment to Cox on vicarious liability, ultimately the jury found no such liability. *See BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 300 (4th Cir. 2018). Moreover, that court's conclusion that the ability to terminate subscribers could give Cox the ability to control infringing activity is fundamentally faulty because it presumes that terminating subscribers would halt infringement. *Id.* Here, Plaintiffs cannot plausibly allege that Charter has the ability to control its subscriber's allegedly infringing activity, or that terminating subscribers will stop infringement.

control the infringing activity."). Plaintiffs' theory is further attenuated on this prong because, unlike Veoh, which operates a closed system network requiring user registration, Charter merely provides a pipeline to the internet and has no control over activity on the internet.

Like Google and Visa, Charter has no practical ability to control subscribers' general access to infringing content available using P2P protocols or the allegedly infringing conduct online. Moreover, Plaintiffs' termination remedy suffers from "imprecision and overbreadth" based on the inability to confirm allegations in a notice, the extremity of the measure, and the failure to halt infringing activity from another source. *Amazon.com*, 508 F.3d at 1175. Charter's terminations may have some indirect effect on copyright infringement, but indirect effects do not satisfy the standard. Plaintiffs' vicarious liability claim should thus be dismissed.

## CONCLUSION

For the foregoing reasons, Charter respectfully requests that Plaintiffs' vicarious liability claim be dismissed. Because Plaintiffs cannot remedy the defects in that claim with further allegations, amendment would be futile and dismissal should be with prejudice.

WHERFORE, Defendant Charter Communications, Inc. prays that this Court dismiss the second claim for relief (vicarious infringement) with prejudice, and grant Charter such other and further relief as the Court deems just and proper. A proposed Order is submitted herewith.

Respectfully submitted this 28th day of May, 2019.

Respectfully submitted,


By: *s/ Craig D. Joyce*
Craig D. Joyce
John M. Tanner
Fairfield and Woods, P.C.
1801 California Street, Suite 2600
Denver, Colorado 80202

17

Phone: 303.830.2400
Fax: 303.830.1033
E-mail: cjoyce@fwlaw.com
E-mail: jtanner@fwlaw.com

Michael S. Elkin
Thomas Patrick Lane
Seth E. Spitzer
Stacey Foltz Stark
Winston & Strawn LLP
200 Park Avenue
New York, New York 10166-4193
Phone: 212.294.6700
Fax: 212.294.4700
E-mail: melkin@winston.com
E-mail: tlane@winston.com
E-mail: sspitzer@winston.com
E-mail: sfstark@winston.com

Jennifer A. Golinveaux
Winston & Strawn LLP
101 California Street
San Francisco, California 94111
Phone: 415.591.1000
Fax: 415.591.1400
E-mail: jgolinveaux@winston.com

*Counsel for Defendant*
*Charter Communications, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 28th day of May, 2019, a true and correct copy of the foregoing **DEFENDANT CHARTER COMMUNICATIONS, INC.'S MOTION TO DISMISS PLAINTIFFS' CLAIM FOR VICARIOUS LIABILITY** was served electronically via CM/ECF E-Filing system as follows unless otherwise indicated:

Mitchell A. Kamin
Neema T. Sahni
Rebecca G. Van Tassell
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643

Jonathan M. Sperling
Jacqueline C. Charlesworth
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405

Benjamin M. Leoni
Janette Lee Ferguson
LEWIS BESS WILLIAMS & WEESE P.C.
1801 California Street, Suite 3400
Denver, CO 80202

Matthew J. Oppenheim
Scott A. Zebrak
Jeffrey M. Gould
Kerry M. Mustico
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave. NW, 5th Floor
Washington, DC 20016

*s/ Kristin Hurley*
Kristin Hurley