**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 19-cv-00874-RBJ-MEH

**WARNER RECORDS INC., et al.**

       Plaintiffs,

v.

**CHARTER COMMUNICATIONS, INC.**

       Defendant.

---

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS PLAINTIFFS' CLAIM FOR VICARIOUS LIABILITY**

---

## PRELIMINARY STATEMENT

Since 2012, hundreds of thousands of defendant Charter Communications, Inc.'s subscribers have illegally distributed Plaintiffs' music through online file-sharing programs like BitTorrent, with some users pirating hundreds of Plaintiffs' songs. Pursuant to the Digital Millennium Copyright Act, Plaintiffs provided Charter with clear notice of this illegal activity—including which subscriber accounts were implicated. Yet, despite knowing of this infringement—and having both the legal right and practical ability to stop it—Charter did nothing to stem its subscribers' illegal conduct. The reason for Charter's refusal to act is simple: by tolerating users' infringement, Charter reaps millions of dollars in subscription fees that it would have to forgo if it terminated infringing users' accounts.

Plaintiffs brought this action to hold Charter responsible not, as Charter contends, "for merely providing internet access," (Mot. at 1), but for engaging in conduct that gives rise to textbook secondary liability under the Copyright Act. The Court should deny Charter's motion to dismiss Plaintiffs' cause of action for vicarious infringement because Plaintiffs have more than adequately pled both elements of that claim: that Charter has the right and ability to control its users' infringing activity, and that it receives a direct financial benefit from such infringement.

*First*, Charter unquestionably has the right and ability to control its users' infringing conduct. Pursuant to its terms of service, Charter reserves the right to terminate users' accounts if they engage in copyright infringement. As courts have repeatedly held, it does not matter that Charter cannot prevent users from accessing infringing material online through *other* means. Rather, liability obtains as long as a defendant can stop *or limit* infringement, which Charter can plainly do by exercising its right to terminate users' access to the Internet *through Charter* once

it obtains knowledge of those users' infringing acts.  *See, e.g.*, *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 2018 WL 1096871, at *10 (W.D. Tex. Feb. 28, 2018); *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 674-75 (E.D. Va. 2015).

*Second*, Plaintiffs have alleged sufficient facts to show that Charter receives a direct financial benefit from its users' infringement.  As Charter concedes, a defendant receives a direct financial benefit whenever its customers are drawn to its service by the availability of infringing content.  Here, Plaintiffs have adequately alleged that at least some of Charter's users are drawn to its service by the ability to download and distribute music illegally.  Indeed, as the Complaint alleges, Charter has sought to draw subscribers to its Internet service by touting specific features of that service that are attractive to copyright infringers, including its "blazing-fast . . . speeds" that allow users to download up to "8 songs in 3 seconds."  The Complaint further explains that hundreds of thousands of users, in turn, have utilized these features to distribute Plaintiffs' works illegally, permitting the reasonable inference that at least *some* of these users were attracted to Charter by the ability to illegally download and distribute Plaintiffs' works.

Separate and apart from the *draw* of infringement, Charter also receives a direct financial benefit from users' infringing conduct by refusing to terminate users' accounts after learning of their infringement.  By tolerating such users' illegal activity, Charter increases its revenue, pocketing substantial subscription fees that Charter otherwise would have to forgo if it properly terminated infringing accounts.  Because Charter has "an economic incentive to tolerate infringing conduct," it reaps a direct financial benefit from such conduct, subjecting it to liability.  *Capitol Records, LLC v. Escape Media Grp., Inc.*, 2015 WL 1402049, at *42 (S.D.N.Y. Mar. 25, 2015).

Charter offers a litany of arguments for why it purportedly receives no direct financial benefit from users' infringement, all of which are unavailing.  For example, Charter faults Plaintiffs for failing to allege that Charter subscribers sign up for Charter "for the primary purpose of committing infringement."  (Mot. at 11.)  But the law requires no such allegation; courts routinely hold that the draw of infringement "need not be the primary, or even a significant, draw" to impose liability.  *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 157 (S.D.N.Y. 2009).  Charter also argues that the Complaint omits any allegations that Charter "target[s]" infringing users or "encourages [them] to purchase . . . faster package[s] for the purpose of infringing."  (Mot. at 12.)  But the law does not require these allegations either— and in all events, they involve facts that are uniquely within Charter's possession and thus cannot be used as a basis for dismissing Plaintiffs' claim.

For these and other reasons, Charter's motion to dismiss should be denied.

## FACTUAL BACKGROUND

Plaintiffs are record companies and music publishers that produce, manufacture, distribute, sell, and license commercial sound recordings and musical compositions.  (Compl. ¶ 1.)  Through enormous investments of money, time, and creative effort, Plaintiffs—and the recording artists and songwriters they represent—have developed and marketed some of the world's most famous and popular music.  (*Id.*)  Collectively, Plaintiffs own or control the copyrights to millions of musical compositions and sound recordings, which is one of their primary sources of income.  (*Id.* ¶ 72.)

In recent years, Plaintiffs' interest in—and exclusive right to reproduce and distribute— their copyrighted works has come under increasing attack from online peer-to-peer file-sharing

programs, like BitTorrent.  (Compl. ¶¶ 78-81.)  BitTorrent is a file-sharing protocol that allows

users to transfer music and other files directly to one another over the Internet.  Although peer-

to-peer file sharing is nothing new, what makes BitTorrent unique is that it allows users to

download files from multiple "peers" at once—even peers who possess only a small piece of the

file.  (*Id.* ¶ 80.)  The efficiencies gained from this type of file sharing have led to an explosion in

online piracy.  A January 2011 report, for example, estimated that 11.4% of all Internet traffic at

the time involved the unauthorized distribution of copyrighted works through BitTorrent.  (*Id.*

¶ 81.)  Plaintiffs' own copyrighted works have been distributed millions of times through

BitTorrent, depriving Plaintiffs of untold millions of dollars in legitimate music sales.  (*Id.* ¶ 92.)

Defendant Charter is one of the largest Internet service providers ("ISPs") in the country,

with more than 22 million subscribers nationwide.  (*Id.* ¶ 74.)  Charter provides high-speed

Internet service to its customers in exchange for monthly subscription fees, with higher

download speeds available for higher monthly fees.  (*Id.* ¶¶ 2, 74.)

As set forth in Plaintiffs' Complaint, Charter seeks to draw subscribers to its high-speed

Internet service—including subscribers who wish to download and distribute music illegally

through online file-sharing programs, like BitTorrent—by touting "blazing-fast . . . speeds" that

allow users to "download just about anything instantly," including up to "8 songs in 3 seconds."

(*Id.* ¶¶ 75, 105.)  Users, in turn, have utilized these speeds to pirate a "staggering" amount of

Plaintiffs' works.  (*Id.* ¶¶ 78-79, 85.)  Between 2012 and 2015, for example, Plaintiffs and their

representatives identified *hundreds of thousands* of specific instances in which Charter

subscribers utilized peer-to-peer systems to distribute and copy Plaintiffs' songs illegally.  (*Id.*

¶ 85.)  Tens of thousands of these subscribers were *serial* infringers, with some users pirating *hundreds* of Plaintiffs' songs over the course of several months.  (*Id.* ¶ 88.)

Charter's "Terms of Service/Policies" expressly prohibit users from engaging in copyright infringement and reserve to Charter the right to terminate users' accounts for participating in piracy.  (*Id.* ¶ 89.)  Notwithstanding this policy, Charter has turned a blind eye to the repeated infringement that occurs over its network.  (*Id.* ¶¶ 77, 91.)  Between 2012 and 2015, Charter ignored hundreds of thousands of statutory infringement notices that Plaintiffs and others submitted to it, each of which detailed specific acts of infringement committed by specific Charter subscribers.  (*Id.* ¶¶ 85, 91.)

The reason for Charter's failure to act is simple: Charter derives significant income from the fees its infringing users pay, and Charter does not want to lose the revenue that it generates from these subscribers by terminating their accounts. (*Id.* ¶ 91.)  Nor does Charter want to devote the resources necessary to track repeat infringers and respond to infringement notices.  (*Id.*)

As the Complaint specifically alleges, Charter's refusal to terminate infringing users' accounts acts as a further draw to its service, as users come to understand that they can download music and other files illegally over Charter's network without fear that Charter will terminate their Internet access.  (*Id.* ¶¶ 77, 91, 105.)  Moreover, Charter's conduct encourages its customers to purchase even more bandwidth from the Company and continue using—and paying subscription fees for—Charter's services.  (*Id.* ¶ 77.)

Having tried unsuccessfully to work with Charter to address its users' infringement, Plaintiffs filed two claims, one for contributory infringement and one for vicarious infringement, based on Charter's refusal to curb repeat infringement activity on its network.  Charter concedes

that Plaintiffs have adequately pled a claim for contributory infringement, and it moves to dismiss only Plaintiffs' vicarious infringement claim.  The Court should deny the motion.

## LEGAL STANDARD

To withstand a motion to dismiss, a complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Gordon v. Chipotle Mexican Grill, Inc.*, 344 F. Supp. 3d 1231, 1239-40 (D. Colo. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678).  Plausibility is not a probability standard, and thus courts recognize that "a given set of actions may well be subject to diverging interpretations, each [one] of which is plausible." *In re Zinc Antitrust Litig.*, 2016 WL 3167192, at *11 (S.D.N.Y. June 6, 2016).  When this occurs, "the Court may not choose between two plausible inferences," *id.*, but must instead "liberally construe the pleadings and make all reasonable inferences in favor of the [plaintiff]," *Brokers' Choice of Am., Inc. v. NBC Univ., Inc.*, 861 F.3d 1081, 1105 (10th Cir. 2017).

## ARGUMENT

A defendant is vicariously liable for third parties' copyright infringement where it "has the right and ability to supervise the infringing activity" and has an "obvious and direct financial interest" in the infringement. *Diversey v. Schmidly*, 738 F.3d 1196, 1204 (10th Cir. 2013) (citation omitted).  Plaintiffs' Complaint plausibly alleges both of these elements.  Charter's

arguments to the contrary misunderstand the substantive law of infringement, the pleading standard, or both.  Accordingly, Charter's motion should be denied.

## I.     PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT CHARTER HAS THE RIGHT AND ABILITY TO SUPERVISE ITS USERS' INFRINGING CONDUCT.

Plaintiffs' allegations adequately plead the first prong of the vicarious infringement test: that Charter has both the right, and the practical ability, to terminate users' access to the Internet for engaging in copyright infringement.

It is well-established that the right and ability "to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001).  As Charter acknowledges, blocking access entails both "a legal right to stop or limit the directly infringing conduct . . . [and] the practical ability to do so."  (Mot. at 14 (quoting *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007)).)  In the Internet context, this means that an ISP will be liable for its users' infringing conduct where it has the contractual right to "terminate [users'] accounts" and "revoke [access] privileges," *Escape Media*, 2015 WL 1402049, at *42, and the practical ability to "terminate, suspend or restrict users' subscriptions, thereby limiting their access to uploading or downloading," *Usenet*, 633 F. Supp. 2d at 157.

There can be no dispute that Charter has the contractual *right* to terminate users' access to the Internet if they engage in infringement.  As a condition of service, Charter's subscribers must agree to Charter's Copyright Policy, which states that "[i]f Charter receives more than one Notice of Copyright Infringement on the customer's part, the customer may be deemed a 'repeat copyright infringer,'" and Charter "reserves the right to terminate [her] account."  (Compl. ¶ 89.)

Charter also has the "*practical ability*" to stop or limit infringement.  As courts have recognized, "[f]ile-sharing programs are completely dependent on the internet to facilitate the download and upload of files," and thus an ISP's termination of users' accounts "stops or limits infringement." *Cox*, 149 F. Supp. 3d at 674.  After all, "[w]ithout the internet, individuals cannot upload or download illegal content." *Id.* at 675; *see also Grande*, 2018 WL 1096871, at *10 ("[ISP] can stop or limit the infringing conduct by terminating its subscribers' internet access.").

Charter contends that it lacks the "practical ability" to stop users' infringement because, although it can block users' access to the Internet *through Charter*, it cannot prevent them from accessing the Internet through other means.  This argument misses the mark for several reasons.  First, Charter's argument misunderstands both the nature and scope of Plaintiffs' claim.  Plaintiffs are not seeking to hold Charter accountable for hypothetical acts of infringement that occur on the Internet *writ large*; rather, they are seeking to hold Charter liable for a discrete and historical set of infringing acts that were committed by Charter users over Charter's Internet network.  (Compl. ¶ 5.)  Charter undoubtedly had the ability to stop *these* infringing acts, which is all that is required to state a claim.  *See, e.g.*, *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 660 (S.D.N.Y. 2013) (holding that defendant's ability to control "infringement that occurred *outside* [defendant's] service" was irrelevant to the vicarious infringement test).

Even if users' ability to access infringing content through services other than Charter were relevant to the analysis, Charter's argument *still* fails, as courts have never required a defendant to be able to *completely* stop infringement in order to impose liability.  Rather, liability obtains as long as a defendant may "stop *or limit*" infringing conduct, including by making it more difficult.  *Amazon*, 508 F.3d at 1173 (emphasis added).  Here, Charter can plainly make

users' infringement more difficult by blocking users' access to the Internet *through Charter*, thereby eliminating a key tool that Charter subscribers use to distribute music illegally. *Cox*, 149 F. Supp. 3d at 675 (holding that ISPs have "the practical ability to stop or limit infringement").

Accordingly, courts have repeatedly rejected the precise argument that Charter offers here. In *Grande*, for example, the court held that an ISP had sufficient control over its users' infringing activity by virtue of its ability to terminate users' accounts, notwithstanding that some users may be able to "obtain [Internet] service from another ISP." *Grande*, 2018 WL 1096871, at *10. Similarly, in *Cox*, the court held that an ISP could control its users' conduct, notwithstanding that the ISP's "current architecture would [not] allow it to exercise physical control" over users' infringement over other ISPs' networks. *Cox*, 149 F. Supp. 3d at 674-75. These cases make clear that, as long as an ISP can stop or limit infringing conduct *through its own network*, it satisfies the supervision and control prong of the vicarious infringement test.

Charter's cases are not to the contrary. Charter cites *Amazon* for the proposition that an ISP's ability to "curtail some infringement indirectly by terminating [users'] accounts" is "insufficient to establish vicarious liability." (Mot. at 15 (citing *Amazon*, 508 F.3d at 1175).) *Amazon*, however, says no such thing. To the contrary, the Ninth Circuit held in *Amazon* that Google was not vicariously liable for websites' infringement because Google's contracts allowed it to terminate only its *advertising* relationships with the websites in question, not access to the Internet or the websites themselves. *Amazon*, 508 F.3d at 1173-74. In reaching this decision, the *Amazon* court expressly *distinguished* situations like this one, in which a defendant's contracts allow it to block users' access to infringing content altogether. *Id.* at 1174.

Charter's reliance on *Perfect 10, Inc. v. Visa International Service Association*, 494 F.3d 788 (9th Cir. 2007), is also unavailing.  (Mot. at 16-17.)  There, plaintiffs sued a vendor that processed credit card payments to websites accused of direct infringement—an ancillary service that did not give the vendor the right or ability to block users' access to the websites in question. *Visa*, 494 F.3d at 804-05.  The court reasoned that while the vendor could "block access to its payment system," blocking such access would do nothing more than create "indirect economic pressure" on the websites to stop infringing—a type of control the court deemed too attenuated to impose liability.  *Id.* at 805.  Here, unlike in *Visa*, there is nothing "indirect" about Charter's ability to police its users' conduct.  When Charter terminates a subscriber's account, it blocks that user's access to the Internet, thereby directly "preclud[ing] [him or her] from participati[ng] in the infringing activity." *Cox*, 149 F. Supp. 3d at 675.  Indeed, the *Visa* court expressly acknowledged that if Visa *had* the capacity to "block [infringers'] access to the Internet," liability would arise.  *Visa*, 494 F.3d at 804.  *Visa* thus counsels in favor of—not against—imposing liability on Charter.

## II.   PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT CHARTER RECEIVES A DIRECT FINANCIAL BENEFIT FROM ITS USERS' INFRINGEMENT.

### A.   *Plaintiffs' Allegations Permit the Reasonable Inference that Charter Receives a Direct Financial Benefit from Its Users' Infringement.*

Plaintiffs have also adequately alleged that Charter receives a "direct financial benefit" from its users' infringing conduct, thereby satisfying the second element of a vicarious infringement claim.

To establish a direct financial benefit, a plaintiff need only show that "there is a causal relationship between the infringing activity and *any* financial benefit a defendant reaps." *Ellison*

*v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) (emphasis added).  Such a relationship does not require a defendant to receive a financial benefit that is "tied directly to sales of the infringing goods."  *Arista Records LLC v. Lime Grp.*, 784 F. Supp. 2d 398, 435 (S.D.N.Y. 2011).  Rather, a benefit exists whenever "the availability of infringing material acts as a 'draw' for [the defendant's] customers," *Napster*, 239 F.3d at 1023, or when the defendant "has an economic incentive to tolerate infringing conduct."  *Escape Media*, 2015 WL 1402049, at *42.

In an attempt to avoid liability, Charter repeatedly misstates the financial benefit standard.  For example, Charter maintains that Plaintiffs have failed to show that it receives a financial benefit from users' misconduct because Plaintiffs do not allege that its users subscribe to Charter "for the primary purpose of committing infringement."  (Mot. at 11.)  "[T]he law is clear," however, "that to constitute a direct financial benefit, the 'draw' of infringement need not be the primary, or even a significant, draw."  *Escape Media*, 2015 WL 1402049, at *42; *Usenet*, 633 F. Supp. 2d at 157 (same); *see also Ellison*, 357 F.3d at 1079 (explaining that the "draw" of infringement need not be "substantial").  Instead, a direct financial benefit exists as long as "some percentage" of a defendant's customers "were drawn" to its services, "at least in part," by the availability of infringing content.  *Cox*, 149 F. Supp. 3d at 676.  The standard is permissive and imposes liability even for "remote" and "unquantifiable" benefits.  *See Disney Enters., Inc. v. Hotfile Corp.*, 2013 WL 6336286, at *39 (S.D. Fla. Sept. 20, 2013).

Charter also cites the Ninth Circuit's decision in *Ellison* for the proposition that an ISP can *never* receive a direct financial benefit from infringement where it charges users a "flat fee for the provision of internet services."  (Mot. at 11.)  In reality, however, *Ellison* states that "flat periodic fees" *can* and *do* "constitute . . . direct financial benefit[s]," when "the value of [a

defendant's] service lies in providing access to infringing material." *Ellison*, 357 F.3d at 1079.

Charter, in other words, asks this Court to embrace a financial benefit standard that no court has

ever endorsed, and that multiple courts have expressly rejected.

Construed under the proper standard, Plaintiffs' allegations plainly plead a direct

financial benefit. *First*, Plaintiffs' Complaint plausibly alleges that at least "some percentage" of

Charter's subscribers "were drawn" to its service by the availability of infringing content. *Cox*,

149 F. Supp. 3d at 676. Specifically, the Complaint alleges that infringing subscribers "are

motivated to subscribe" to Charter by company advertisements that tout specific features of its

service that are attractive to infringers, including that the company's "high-speed service enables

subscribers to . . . 'download 8 songs in 3 seconds.'" (Compl. ¶ 75.) The Complaint also pleads

underlying facts that allow for a reasonable inference that these allegations are true. In

particular, the Complaint alleges that Charter users have *utilized* the advertised features of

Charter's service to pirate Plaintiffs' works on a "staggering" scale. (*Id.* ¶¶ 78, 85.) Between

2012 and 2015, for example, Plaintiffs identified "hundreds of thousands" of instances in which

Charter subscribers used Charter's service to distribute Plaintiffs' songs illegally. (*Id.* ¶ 85.)

Based on these numbers, there can be no doubt that "pirating music" is something that at least

*some* Charter users want to do over the Internet. Finally, Plaintiffs allege that when presented

with evidence of users' infringement, Charter did nothing to stop it. (*Id.* ¶¶ 90-91.) From

Charter's failure to act, users came to understand that they could infringe Plaintiffs' works with

impunity, which constituted a further draw to the service. (*Id.* ¶ 91.) Indeed, Plaintiffs allege

that once users realized that Charter did not intend to police their conduct, users "purchased more

bandwidth" from Charter, allowing them to pirate Plaintiffs' songs in greater volumes and at

faster rates.  (*Id.* ¶ 77.)  Based on these facts, it is entirely reasonable to infer that at least "some

percentage" of Charter's users selected Charter's service or remained Charter subscribers, "at

least in part," because they wanted to download Plaintiffs' songs illegally.  Courts have drawn

such common-sense conclusions in comparable infringement contexts.  *See, e.g.*, *Fonovisa, Inc.*

*v. Cherry Auctions, Inc.*, 76 F.3d 259, 263-64 (9th Cir. 1996) (inferring customers were

"draw[n]" to a defendant's swap meet because of infringing material, based on the fact that

infringing material was both available and sold at swap meet); *Marvel Enters, Inc. v. NCSoft*

*Corp.*, 2005 WL 878090, at *3-4 (C.D. Cal. Mar. 9, 2005) (inferring users were "draw[n]" to

online gaming platform because of infringing material, based on allegations that a "significant

number" of users created characters that infringed on plaintiffs' copyrights).

   *Second*, separate and apart from the draw of infringement, Charter receives a direct

financial benefit from users' misconduct because it derives revenue from infringing users and

has a financial incentive not to terminate their accounts.  As the court explained in *Escape*

*Media*, "evidence of financial gain is not necessary to prove vicarious liability as long as the

service provider has an economic incentive to tolerate infringing conduct."  2015 WL 1402049,

at *42.  Here, Charter plainly has a financial incentive not to terminate users' accounts for

engaging in infringement, as infringing users pay substantial subscription fees to Charter each

month for the ability to use Charter's service.  Despite knowing who these infringing users are—

as well as the specific acts of infringement they committed—Charter has declined to terminate

these users' accounts, since termination would result in Charter forgoing the subscription fees

these infringing users pay.  (Compl. ¶¶ 90-91.)  Charter's reticence to enforce its Copyright

Policy *against known infringers* evidences the premium it places on the fees generated by infringing users—a fact that makes Charter vicariously liable for such users' infringement.

The court's decision in *Grande* is not to the contrary.  In *Grande*, the court dismissed a vicarious infringement claim against an ISP on the ground that plaintiffs had "failed to plead facts showing that Grande receives a direct financial benefit from its subscribers' infringing conduct."  2018 WL 1096871 at *10.  In doing so, the court emphasized that the *only* fact that plaintiffs had pled in favor of a direct financial benefit was that "the availability of music—and particularly [plaintiffs'] music—acts as a powerful draw for user's [sic] of Grande's service."  *Id.* The court found this allegation to be too conclusory to allow the matter to proceed, as the allegation simply parroted the elements of a vicarious infringement claim.  *Id.*

Here, Plaintiffs have pled far more than that.  Specifically, Plaintiffs have alleged that Charter drew infringers to its service by touting specific features of its service that are attractive to copyright infringers and by adopting a policy of non-enforcement, *and* that these features "motivated" a subset of users to sign up for, or remain with, the company.  (Compl. ¶ 75.) Plaintiffs have also alleged that Charter has a financial incentive not to terminate the accounts of infringing users, (*id.* ¶ 91)—an allegation buttressed by the fact that Charter has declined to terminate users' accounts despite receiving repeated notices of specific users' infringement. Nothing more is required at the pleading stage.[1]

---

[1] The court's analysis in *Grande* erroneously stated the law in multiple respects.  For example, the court faulted plaintiffs for failing to establish that access to infringing material is "something exclusively available through Grande's services" and not accessible through other ISPs.  *See* 2018 WL 1096871, at *10.  But to be held vicariously liable, a defendant is not required to provide "exclusive[]" access to infringing material.  If that were the case, ISPs could *never* be liable for vicarious infringement, as defendants could always argue that users have some *other*

B.   *Charter's Attacks on the Sufficiency of Plaintiffs' Allegations Misunderstand Both the Law of Infringement and the Pleading Standard.*

Recognizing that Plaintiffs' allegations are more robust than those in *Grande*, Charter attacks Plaintiffs' allegations about how Charter drew subscribers by touting the ability to quickly download music through Charter's Internet service, arguing that such allegations do not adequately plead "draw" because non-infringing users also supposedly value fast download speeds.  (Mot. at 12-13.)  Contrary to Charter's assertion, however, there is no requirement that a product or service be *exclusively* appealing to copyright infringers in order to impose vicarious liability.  Indeed, in *Lime Group*, the court rejected the argument that the owners of LimeWire, an online file distribution program, were shielded from liability because both infringing and non-infringing users utilized the service.  *Lime Grp.*, 784 F. Supp. 2d at 435-36.[2]

Charter's attacks on Plaintiffs' allegations also fail because they misunderstand the pleading standard.  As explained above, on a motion to dismiss, the Court's analysis is limited to the allegations in the complaint, and all reasonable inferences must be drawn in plaintiffs' favor. *Collins*, 656 F.3d at 1215.  Yet Charter's motion introduces a factual assertion not pled in the

---

way to access infringing material over the Internet.  Not surprisingly, then, other courts have rejected this argument.  *See, e.g.*, *Cox*, 381 F. Supp. 3d at 676.

[2] Charter's argument that Plaintiffs seek to hold it liable for the "mere provision of internet access" and that if Plaintiffs' "allegations were enough to support vicarious liability," the Court "would [be] impos[ing] liability on every ISP," is similarly unavailing.  (Mot. at 13.)  The inquiry on a motion to dismiss is not whether a plaintiff's allegations suffice to "impose" liability on a defendant, but rather whether a plaintiff has pled sufficient facts to "raise a reasonable expectation that discovery will reveal evidence of [liability]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  In any event, Plaintiffs' allegations are not applicable to all ISPs, but rather point to specific features of Charter's service, how Charter has marketed them, and myriad instances in which Charter users have *utilized* these features to download Plaintiffs' works illegally.  (Compl. ¶¶ 75, 78, 85.)  These facts are specific to Charter and do not impose liability on "every ISP."

Complaint—that both infringing and non-infringing users value fast download speeds—and then asks the Court to draw the inference (in Charter's favor) that Charter's touting of this service was not a draw to infringers. (Mot. at 12.) This approach simply inverts the pleading standard. At best, Charter has identified another plausible inference from the facts, but "the Court may not choose between plausible inferences" on a motion to dismiss. *Zinc*, 2016 WL 3167192, at *11.

Charter also attempts to argue that Plaintiffs' allegations are insufficient by rattling off a list of *additional* allegations that Plaintiffs have not made. For example, Charter faults Plaintiffs for failing to allege (i) that "Charter specifically target[s] infringing subscribers," (Mot. at 12); (ii) that infringing users "cho[o]se Charter over other [Internet service] providers," (*id.* at 10); (iii) that "Charter encourages subscribers to purchase . . . faster package[s] for the purpose of infringing," (*id.* at 12); and (iv) that "infringing subscribers disproportionately subscribe to [Charter's] higher speed tiers as compared to noninfringing [users]," (*id.*).

This argument is a red herring. *First*, to the extent these allegations are even relevant to Plaintiffs' claim—and, to be clear, many of them are not[3]—their omission from the Complaint does not bear on whether Plaintiffs have stated a claim. In order to survive a motion to dismiss, a plaintiff need not "plead all the factual evidence sufficient to establish a prima facie case." *Graessle-Mercer Co. v. Nat'l Horseman, Inc.*, 2016 WL 8467180, at *3 (D. Ariz. Sept. 30, 2016). Rather, the question is whether the plaintiff has pled sufficient factual content to "raise a reasonable expectation that discovery will reveal evidence" of a defendant's wrongdoing.

---

[3] For example, Charter's claim that Plaintiffs omit allegations about whether "Charter promotes or directs traffic to BitTorrent" or whether it "owns or operates a[] file-sharing service"—are irrelevant because they do not speak to whether users are drawn to Charter's service because of infringement. (Mot. at 10-11.)

*Twombly*, 550 U.S. at 556; *see also Arista Records LLC v. Doe 3*, 604 F.3d 110, 120-21 (2d Cir. 2010) ("[W]e reject [the] contention that *Twombly* and *Iqbal* require the pleading of specific evidence or extra facts beyond what is needed to make the claim plausible.").  Plaintiffs have done so.

*Second*, the information that Charter faults Plaintiffs for not expressly pleading is "peculiarly within [Charter's] knowledge or control."  *United States v. Lab. Corp. of Am. Holdings*, 2015 WL 7292774, at *4 (S.D.N.Y. Nov. 17, 2015).  Courts "relax [the] pleading requirements where the relevant facts are known only to the defendant."  *Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995); *see also Jones v. Nat'l R.R. Passenger Corp.*, 2018 WL 4501133, at *6 (N.D. Cal. Sept. 18, 2018) ("Plaintiff cannot be expected to allege specific facts related to Defendants' disability training at this stage in the litigation because that information is [in] Defendants' control.").  As the Complaint alleges, the identity of Charter's infringing users are known only to Charter.  (Compl. ¶ 86 (noting that while Plaintiffs know infringing users' IP addresses, "[o]nly Charter . . . ha[s] the information required to match the IP address to a particular subscriber").)  Thus, for example, whether Charter "specifically target[s] infringing subscribers" depends on facts that must be discovered *from Charter*.  Similarly, the extent to which infringers "cho[o]se Charter over other providers so that they [can] infringe Plaintiffs' copyrights" cannot be fully understood without surveying or seeking targeted discovery from such subscribers, whose identities are currently known only to Charter.

*Cox*, a factually similar action from the Eastern District of Virginia, provides a useful example of what such discovery can yield.  There, the court denied the defendant ISP's motion for summary judgment on the ground that discovery had yielded sufficient evidence of Cox's

receipt of a direct financial benefit, including "a survey conducted by its expert" that showed that approximately 10% of Cox's users subscribed to Cox, at least in part, because they wanted to "download or upload free digital music through sites" that facilitated infringement.  149 F. Supp. 3d at 676.  The *Cox* plaintiffs further introduced company emails evidencing the importance that Cox officials placed on the subscription fees that infringing users paid each month.  *See, e.g.*, *id.* at 655-58.  Of course, the *Cox* plaintiffs did not have this evidence at the pleading stage, but obtained it through discovery.  Plaintiffs here should be afforded the same opportunity to conduct discovery and "flesh out" the plausible inferences that may be drawn from the facts that they have already alleged.  *See, e.g.*, *McManemy v. Roman Catholic Church of Diocese of Worcester*, 2 F. Supp. 3d 1188, 1195 (D.N.M. 2013) ("[D]iscovery is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support.").[4]

Consistent with this standard, of the cases Charter cites in support of its argument that Plaintiffs' allegations are insufficient to state a claim, almost all were disposed of at summary judgment, not on motions to dismiss.  *See, e.g.*, *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 672-74 (9th Cir. 2017) (affirming district court's grant of summary judgment on vicarious infringement claim); *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1117-18 (9th Cir. 2007) (affirming district court's grant of summary judgment on copyright infringement claims);

---

[4] In fact, Plaintiffs have already served discovery requests seeking the information that Charter argues that Plaintiffs failed to include in their Complaint.  Accordingly, in the event that Charter's motion to dismiss is granted, Plaintiffs should be afforded leave to amend their Complaint, consistent with the Federal Rules and Judge Jackson's Practice Standards, which favor liberal amendments of pleadings.  *See, e.g.*, Practice Standards, Judge R. Brooke Jackson ("I realize that you may not have had an opportunity to explore all possible claims . . . when you submit your initial pleading, and I will liberally allow amendments of pleadings as the case is further developed.").

*Ellison*, 357 F.3d at 1079 (affirming district court's grant of summary judgment on vicarious infringement claim).  Charter cannot procure dismissal of Plaintiffs' claim by insisting that Plaintiffs plead factual information that they are entitled to elicit in discovery and that is uniquely within Charter's control.[5]

C.      *Charter's Attempt to Analogize Itself to a Landlord Does Not Shield It from Liability.*

Finally, Charter argues that it cannot be held vicariously liable for users' infringement because it is analogous to a landlord—a class of defendants that is generally immune from vicarious infringement claims.  (Mot. 7-10.)  Specifically, Charter argues that it is not liable for users' infringement because, much like a landlord, it charges subscribers a flat monthly fee and provides a service that can be used for both infringing and non-infringing purposes.  (*Id.* at 9-10.) Charter, however, misidentifies the attributes of a landlord that shield it from liability.  For example, Charter cannot argue that a landlord's receipt of flat monthly fees shields it from liability because courts have expressly rejected the view that a benefit must be "directly tied to

---

[5] *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 2009 WL 334022 (C.D. Cal. Feb. 2, 2009), and *Thomson v. HMC Grp.*, 2014 WL 12589313 (C.D. Cal. July 25, 2014)—cases that Charter cites in its brief and that *were* dismissed at the pleading stage—are distinguishable.  In *Veoh*, for example, the court dismissed a vicarious infringement claim against investors in a website that hosted infringing content where the only financial benefit the investors allegedly received was that "each [would] profit from their investments through the sale of Veoh to a potential acquiring company" in the future.  2009 WL 334022, at *6.  The court determined that this hypothetical, *future* benefit was too attenuated to state a claim.  *Id.*  In *Thomson*, the court dismissed a vicarious infringement claim brought by an architect against a hospital that allegedly infringed on his copyrighted designs.  2014 WL 12589313, at *4.  The court held that the architect had not pled a direct financial benefit because he had not alleged that patients were drawn to the hospital by virtue of his designs.  *Id.*  Although the architect alleged that the hospital had "sav[ed] costs" by refusing to pay him, the court determined that "[s]aving costs" is "not equivalent to [receiving] a 'direct financial benefit.'"  *Id.*  Here, Plaintiffs are proceeding under an entirely different theory of financial benefit, and thus *Thomson* is inapposite.

the sale of particular infringing items" to impose liability.  *Fonovisa*, 76 F.3d at 263.  Indeed, numerous cases—including those cited by Charter—impose liability on defendants who charge flat fees in exchange for their services.  *See id.* at 261 (holding that defendant swap meet operator received a direct financial benefit from infringement, notwithstanding that it charged infringing and non-infringing vendors the same fixed fee to rent space at swap meet); *Coach, Inc. v. Swap Shop, Inc.*, 2012 WL 12887010, at *8 (S.D. Fla. Sept. 21, 2012) (same).  Nor are landlords shielded from liability because they lease "general-use" properties.  To the contrary, Charter's argument conflicts with the cases cited above, which expressly hold that defendants are *not* excused from vicarious infringement claims even though their services permit "substantial non-infringing uses."  *Lime Grp.*, 784 F. Supp. 2d at 435.

Instead, the factor that drives courts' decisions not to impose liability on landlords is the low level of control that landlords exercise over their infringing tenants.  *See, e.g.*, *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963) (explaining landlords are immune from secondary infringement claims because "the landlord lets his premises without knowledge of the impending infringement by his tenant, *exercises no supervision over him*, . . . and contributes in no way to it" (emphasis added)); *Coach*, 2012 WL 12887010, at *8 (holding that landlord was not vicariously liable for infringement because landlord did not meet "the supervise and control prong").  By contrast, as described above, Charter *has* the ability to supervise its users' conduct, and has chosen to profit from infringing conduct by drawing infringers to its service and permitting known infringers to continue using the service.

## CONCLUSION

For the foregoing reasons, Charter's motion to dismiss should be denied.

Dated: July 1, 2019

*/s/ Mitchell A. Kamin*
Mitchell A. Kamin
Neema T. Sahni
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
mkamin@cov.com
nsahni@cov.com

Jonathan M. Sperling
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
jsperling@cov.com

Janette L. Ferguson, Esq.
Benjamin M. Leoni, Esq.
LEWIS BESS WILLIAMS & WEESE, P.C.
1801 California Street, Suite 3400
Denver, CO 80202
Telephone: (303) 861-2828
Facsimile: (303) 861-4017
jferguson@lewisbess.com
bleoni@lewisbess.com

Matthew J. Oppenheim
Scott A. Zebrak
Jeffrey M. Gould
Kerry M. Mustico
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave. NW, 5th Floor
Washington, DC 20016
Telephone: (202) 621-9027
matt@oandzlaw.com
scott@oandzlaw.com
jeff@oandzlaw.com
kerry@oandzlaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies on this 1st day of July, 2019, a true and correct copy of the foregoing *Plaintiffs' Opposition to Defendant Charter Communications, Inc.'s Motion to Dismiss Plaintiffs' Claim for Vicarious Liability* was served electronically via CM/ECF on the following:

Craig D. Joyce
John M. Tanner
FAIRFIELD & WOODS, P.C.
1801 California St., Ste. 2600
Denver, CO 80202

Michael S. Elkin
Thomas Patrick Lane
Seth E. Spitzer
Stacey Foltz Stark
WINSTON & STRAWN LLP
200 Park Ave.
New York, NY 10166

Jennifer A. Golinveaux
WINSTON & STRAWN LLP
101 California St.
San Francisco, CA 94111

*/s/ Mitchell A. Kamin*
Mitchell A. Kamin