1

```
 1          IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
 2
    Case No. 19-cv-00874-MSK-MEH
 3   _____

 4   WARNER BROS. RECORDS, INC., et al.,

 5        Plaintiffs,
    vs.
 6

 7   CHARTER COMMUNICATIONS, INC.

 8        Defendant.
    _____
 9

10          Proceedings before MICHAEL E. HEGARTY, United

11   States Magistrate Judge, United States District Court for the

12   District of Colorado, commencing at 10:41 a.m., June 12,

13   2019, in the United States Courthouse, Denver, Colorado.

14   _____

15          WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17   _____

18                      APPEARANCES

19          MITCHELL KAMIN and NEEMA SAHNI, Attorneys at Law,

20   appearing for the Plaintiffs.

21          JACK TANNER, MICHAEL ELKIN and THOMAS LANE,

22   Attorneys at Law, appearing for the Defendant.

23   _____

24                   SCHEDULING CONFERENCE

25
```

```
 1                    P R O C E E D I N G S

 2              (Whereupon, the within electronically recorded

 3    proceedings are herein transcribed, pursuant to order of

 4    counsel.)

 5              THE COURT:  Case Number 19-cv-874, Warner Brothers

 6    Records, Inc., and a whole lot of other entities, vs.

 7    Communications, Inc.

 8              Make your appearances please.

 9              MR. KAMIN:  Good morning, Your Honor.  Mitch Kamin

10    for the plaintiffs.

11              THE COURT:  Thank you.

12              MS. SAHNI:  Good morning, Your Honor.  Neema Sahni

13    for the plaintiffs.

14              THE COURT:  Thank you.  You may be seated.

15              MR. ELKIN:  Good morning, Your Honor.  Michael

16    Elkin, Winston & Strawn, counsel for the defendant, Charter

17    Communications, Inc.

18              THE COURT:  Thank you.

19              MR. TANNER:  Good morning.  Jack Tanner --

20              THE COURT:  Jack, good to see you again.

21              MR. LANE:  Thomas Lane for defendant.

22              THE COURT:  Thank you, you may be seated.

23              So do you guys have an understanding about Judge

24    Krieger's status?

25              Mr. Tanner, do you have an understanding?
```

1           MR. TANNER:  I understand she's the senior judge

2    assigned to the case.  I don't have understanding beyond

3    that.

4           THE COURT:  Really?

5           MR. TANNER:  Correct.

6           MR. KAMIN:  Nor do we.

7           THE COURT:  All right.

8           MR. KAMIN:  No.

9           THE COURT:  You know, I have a case over in Utah

10   with Covington & Burling, I think out of Los Angeles as

11   well.  It's a -- are you on that case?

12          MR. KAMIN:  I -- I am, Your Honor --

13          THE COURT:  You're on that case.  I've seen you on

14   that one, right?

15          MR. KAMIN:  I've been in this courtroom for the

16   U.S. Olympic Committee.

17          THE COURT:  Oh, no.  I mean on -- I mean with --

18   with the --

19          MR. KAMIN:  Pro bono case with Rebecca Van Tassel

20   from my office.

21          THE COURT:  Oh.  I'm -- I'm talking about --

22          MR. KAMIN:  Starling Marshal?

23          THE COURT:  Starling.

24          MR. KAMIN:  She's from the New York office.

25          THE COURT:  Right.  But you have got LA and San

1    Francisco lawyers who are on the case, too?

2              MR. KAMIN:   Correct.   And we also have the --

3              THE COURT:   Okay.

4              MR. KAMIN:   -- Olympic Committee case with Your

5    Honor.

6              THE COURT:   Okay.   And who do you represent in

7    that one?

8              MR. KAMIN:   The Olympic Committee.

9              THE COURT:   Okay.   That's the -- the --

10             MR. KAMIN:   Taekwondo.

11             THE COURT:   Taekwondo.   Okay.   So do you like

12   Colorado?

13             MR. KAMIN:   Love it.

14             THE COURT:   You don't live here though?

15             MR. KAMIN:   No.   I live in Los Angeles.

16             THE COURT:   Okay.

17             MR. KAMIN:   We're both from the Los Angeles

18   office.

19             THE COURT:   Okay.   Right, but which -- because you

20   don't even have a Colorado office, do you?

21             MR. KAMIN:   We do not, no.

22             THE COURT:   So --

23             MR. KAMIN:   I'm working on it.

24             THE COURT:   Well, are you really?

25             MR. KAMIN:   No.   We're not -- it's not in the

1    plans at the moment, but we're here quite a bit.

2            THE COURT:  Well, it -- it's a big legal market,

3    isn't it?  And especially, you know, for intellectual

4    property, we now have a Patent Trade Office here as of two

5    or three years ago?

6            MR. TANNER:  Three years ago.

7            THE COURT:  Three years ago.  And we have how many

8    -- are they called judges?  Patent -- what are they called?

9    Referees?  I don't know what they're called.

10           MR. TANNER:  I have no idea.

11           THE COURT:  Yeah.  I think there's nine of them

12   here, or whatever they are called.

13           So tell me about your case.

14           MR. KAMIN:  Well, Your Honor, as you saw from the

15   lengthy list of plaintiffs, we represent all of the major

16   record labels and publishers.  These are companies that hold

17   rights to songs, both in the sound recording and in the

18   composition.  And over the course of many years, although

19   we've limited our case to three years, between 2013 and

20   2016, subscribers of the defendant, of Charter, have

21   illegally downloaded works to which my clients have the

22   rights, notwithstanding --

23           THE COURT:  So what does Charter do?

24           MR. KAMIN:  Charter's an ISP.

25           THE COURT:  Okay.

1            MR. KAMIN:  So it has subscribers who sign up for

2    Internet services.

3            THE COURT:  Is that what -- it operates as a

4    d/b/a, Charter?  Is it called Charter?

5            MR. KAMIN:  It's -- in this case, Your Honor, it's

6    Charter Communications, Inc.

7            THE COURT:  Right.

8            MR. KAMIN:  And that's the name of the company.

9            THE COURT:  Okay.

10            MR. KAMIN:  But they have operations in Colorado

11    and there are a number of infringing subscribers in

12    Colorado.

13            But in any event, we, over many years, have had

14    companies that monitor Internet activity for the industry.

15    In this case, the company's named Mark Monitor and they have

16    a computer program that crawls throughout the Internet,

17    tracks infringing activity and assists with sending

18    infringement notices under the Digital Millennium Copyright

19    Act.

20            So between 2013 and 2016, I don't have the precise

21    number, but it was in the hundreds of thousands of notices

22    were sent to Charter alleging copyright infringement on the

23    part of individual subscribers.  We -- we don't have the

24    names of the subscribers; we have their IP address.

25            THE COURT:  Tell me how they do that.

1          MR. KAMIN:  They -- it's a computer program that

2     tracks Internet activity and I can't -- at some point --

3          THE COURT:  No, no.  How do the -- how do their

4     customers download the material?

5          MR. KAMIN:  Oh.  They use peer-to-peer programs,

6     such as Bittorrent and --

7          THE COURT:  Yeah, okay.  So they swarm it and

8     gather this --

9          MR. KAMIN:  Yeah.

10          THE COURT:  -- up?

11          MR. KAMIN:  Right.

12          And so they -- you know, they have the service

13     from Charter.  It gives them the, you know, the blazing fast

14     Internet download speeds and all that.

15          THE COURT:  Right.

16          MR. KAMIN:  And they can access technology, such

17     as Bittorrent --

18          THE COURT:  Okay.

19          MR. KAMIN:  -- and download songs.

20          THE COURT:  So one of the things you guys also

21     need to know is Judge Daniel and I previously handled all

22     Bittorrent cases --

23          MR. KAMIN:  Oh.

24          THE COURT:  -- because they apparently thought I

25     developed some pretty good procedures.  So they used to be

1    filed by the hundreds a year here --

2           MR. KAMIN:  Right.

3           THE COURT:  -- because of some particular adult

4    content website that had an attorney who was willing to file

5    such lawsuits, so.

6           Anyway, at that time Judge Daniel and I got all

7    the cases.  Upon Judge Daniel's passing, Judge Krieger is

8    going to take over all those.

9           MR. KAMIN:  Uh-huh.

10          THE COURT:  So any Bittorrent case filed in this

11   district, it's going to be assigned to Judge Krieger and to

12   me.

13          MR. KAMIN:  Right.

14          THE COURT:  Just FYI.

15          MR. KAMIN:  Okay.  Okay.

16          Well, that -- that -- that makes sense, Your

17   Honor.  So you're familiar with --

18          THE COURT:  I am.

19          MR. KAMIN:  -- the technology, although --

20          THE COURT:  Yep.

21          MR. KAMIN:  -- our case is not against Bittorrent,

22   it's against Charter for not fulfilling --

23          THE COURT:  Understood.

24          MR. KAMIN:  -- its obligations.

25          THE COURT:  Well, none of the cases are against

1    Bittorrent; they're all against individuals who --

2            MR. KAMIN:  Right.

3            THE COURT:  -- download content.

4            MR. KAMIN:  Right.  And our case is also not

5    against individuals.

6            THE COURT:  Right.

7            MR. KAMIN:  This is a secondary liability case,

8    vicarious and contributory infringement.

9            THE COURT:  Understood.  Yeah, it's -- it's not a

10   German company who helps you track IP, is it?  They always

11   used the German company to track IP addresses.

12           MR. KAMIN:  No.  Mark Monitor is not German, but I

13   don't remember where they're incorporated.

14           We have nearly 12,000 works at issue, which are in

15   the addendum to the complaint.  These are works where they

16   were illegally downloaded by Charter subscribers, who had

17   repeatedly illegally downloaded at least five times.  And

18   while we didn't state that in the complaint and it's not a

19   prerequisite for a repeat infringer to have at least five

20   infringements, but we wanted to ensure we had a strong

21   representative sample.  And that's what we have here with

22   nearly 12,000 works that were illegally downloaded by

23   Charter subscribers.

24           THE COURT:  And did you have presuit negotiations

25   of any kind?  Did you approach them on this case?

1            MR. KAMIN:  Yes.  Those were undertaken by other

2     counsel.

3            THE COURT:  Okay.

4            MR. KAMIN:  But with Mr. Elkins, and pursuant to

5     those negotiations, a tolling agreement was entered for each

6     of the major groups:  Warner Music, Universal Music and Sony

7     Music.  And they're slightly different dates, but they're

8     all in 2016.  So tolling agreements have been in place since

9     mid-2016 for -- to allow negotiations and those negotiations

10    were not successful --

11           THE COURT:  Okay.

12           MR. KAMIN:  -- and so here we are.

13           THE COURT:  Were they close?

14           MR. KAMIN:  It doesn't sound like it.

15           THE COURT:  Okay.  And who -- who was involved on

16    the plaintiff's side on that?

17           MR. KAMIN:  Our co-counsel in this case, Matt

18    Oppenheim from Oppenheim and Zebrak.  It's a firm based in

19    -- IP firm in Washington DC.

20           THE COURT:  Oppenheim and what?

21           MR. KAMIN:  Zebrak.  Z-E-B-R-A-K.  First name is

22    Scott.

23           THE COURT:  Okay.  I see it.  Okay.

24           Do you guys want to add anything?  It's not that

25    it's critical, I just want to understand what's going on.

1        MR. ELKIN:  Well, first of all, Your Honor.  It's

2   a pleasure to be in your courtroom.

3        THE COURT:  Thank you.

4        MR. ELKIN:  Thank you for having us and we do

5   enjoy coming to Denver.  We do not have a Denver office

6   either, although food for thought.

7        THE COURT:  Well, with weather like this, who

8   wouldn't enjoy coming to Denver?

9        MR. ELKIN:  Exactly.

10        THE COURT:  But we're not -- it's not that we're

11   inviting you guys to stay, we've got too many people

12   already.

13        MR. ELKIN:  Okay.  So --

14        THE COURT:  Unless you're -- you're -- as long as

15   you're the tax-paying, law-obeying type, yeah, you can come

16   here and invest.  But we have way too many of a different

17   kind of people who are coming here right now.

18        MR. ELKIN:  Well, we've worked with Mr. Tanner and

19   Mr. Joyce in the past and we always enjoy their company.

20        So Charter actually goes by a name -- trade-name

21   that you probably have heard of now:  Spectrum?

22        THE COURT:  Okay.  Sure.  I figured -- I never

23   heard of Charter, so I thought they might be a d/b/a of some

24   kind.

25        MR. ELKIN:  Charter, I think the -- some of the

1    services that have historically been provided were under the

2    Charter name at some point.  But Charter, back a couple of

3    years ago, acquired both TimeWarner Cable and Brighthouse

4    Networks and together with Charter, decided to rebrand all

5    of the services under the name Spectrum.  And I think that's

6    a name that's been bandied about a little bit so if that's

7    -- that helps.

8              THE COURT:  Okay.

9              MR. ELKIN:  Charter is, in terms of some of the

10   services that it provides that are applicable here, is the

11   broadband that it -- its commercial and residential

12   subscribers have.  And the -- there is no ability for

13   Charter to identify infringing activity that its subscribers

14   engage in through using its network.

15             It doesn't have the ability to identify it, to

16   locate it, to access it, to disable access to it.  It can

17   receive, as in this case, notices from the plaintiffs'

18   technology providers.  They are based, in this particular

19   case, Mark Monitor, they do have some representation in the

20   U.S., but they are, I think, principally based in terms of

21   operations in Europe.  I think, in particular, Eastern

22   Europe, for whatever that's worth.

23             Our client is going to defend his case --

24             THE COURT:  Vigorously.

25             MR. ELKIN:  Sorry?

1          THE COURT:  Vigorously.

2          MR. ELKIN:  Vigorously.

3          THE COURT:  You forgot that word.

4          MR. ELKIN:  -- on -- on a variety of grounds.  As

5    Mr. Kamin has indicated to Your Honor, there are two

6    secondary liability theories upon which the claims are

7    based, vicarious liability and contributory liability.

8          The first issue, of course, is the extent to which

9    they can prove the underlying direct infringement.  We

10   believe that there are significant issues they have to be

11   able to prove the direct infringement upon which our clients

12   have willingly engaged in any kind of secondary infringement

13   and then there are issues with regard to the extent to

14   which, from the contributory liability point of view,

15   whether our client had actual knowledge of specific

16   instances of infringement for which is provided material

17   assistance, you know, the various elements under

18   contributory liability.  And for vicarious liability,

19   assuming that there was direct liability proved, whether or

20   not they received a direct financial benefit where they had

21   both the right and the ability to control the infringing

22   activity.  There are quite a number of hurdles.

23          We've also --

24          THE COURT:  What about the hundreds of thousands

25   of notices that we know about?

1          MR. ELKIN:  Right.  So with regard to the hundreds

2     of thousands of notices that they claim were sent, our

3     client had a practice -- a voluntary practice where it would

4     receive those notices and send them to the subscribers and,

5     at certain points, escalated the degree to which they

6     warrant --

7          THE COURT:  So is this the case where a subscriber

8     downloads legally and then puts them on the Internet for

9     everybody to swarm with the Bittorrent program?

10          MR. ELKIN:  Well, we don't -- I guess it may be

11     different for different subscribers.

12          We don't know, obviously, how the particular

13     subscriber -- my understanding, in terms of the nature of

14     the claims here, is that their technology company vendor

15     identified certain torrents that were associated with the IP

16     addresses connected to the network service that Charter

17     provided during the period of time.

18          And what, I believe, they've attempted to identify

19     is the fact that those IP addresses were associated with

20     subscribers of Charter for which they have sent one or more

21     notices.  And our client addressed those notices without

22     being able to, really, identify what is actually -- what

23     they're trafficking in, as it were.

24          Getting back to the defenses, we have also

25     asserted in this case safe harbor provisions, under Section

1    512 of the Digital Millennium Copyright Act.  So assuming

2    that there was actual liability, which we vehemently deny,

3    we believe that, even assuming there was infringing activity

4    of a secondary nature, all of that is addressed by way of

5    the safe harbor that -- to which our client has lain claim.

6         So that -- in a nutshell, that is what our sort of

7    position is.  I would be remiss if I didn't call to your

8    attention, because at some point Your Honor will learn, that

9    coincident with the filing of this case by the plaintiff

10   through -- against Charter, they filed an action in Tampa,

11   Florida and the District Court there, by the same -- or

12   substantially the same plaintiffs, against Brighthouse

13   Networks, another company that is owned by Charter.  So

14   you've got these two proceedings that are going in parallel.

15        And the last thing I would offer up before getting

16   to the issue of settlement discussions to which Your Honor

17   made reference in your questioning of Mr. Kamin's is the

18   fact that this is the latest in a series of cases that

19   content owners, in particular, the Recording Industry

20   Association of America and their members, have brought

21   against ISPs.

22        The first case was brought against Cox

23   Communication in the Eastern District of Virginia several

24   years back.  That case wound its way through the trial and

25   through the Fourth Circuit and then a remand.  And then

1    three weeks before the case was set to be tried for a second

2    time, the same plaintiff, or substantially the same

3    plaintiff, brought an action against Cox.  That case is

4    proceeding and that case will -- it's likely to be tried in

5    the fall of this year.

6              THE COURT:  What happened to the trial in the

7    Eastern District, then?

8              MR. ELKIN:  The -- the first trial resulted in a

9    finding of liability on contributory infringement, not on

10   vicarious infringement.  That case was argued to the Fourth

11   Circuit and it was reversed on -- on grounds related to the

12   underlying jury charges on contributory liability and was

13   sustained with regard to so much of the decision by the

14   trial court and summary judgment dealing with the safe

15   harbors.

16             So the case was set to be retried on contributory

17   liability, and I think we settled it a day or two before.

18             THE COURT:  So at least the Fourth Circuit

19   determined it was a viable theory, it's just that the judge

20   misinstructed the jury?

21             MR. ELKIN:  Correct.

22             THE COURT:  Okay.

23             MR. ELKIN:  There was another case at -- ending in

24   Texas.  I believe it's the Southern District of Texas

25   against -- by the -- by the -- the record company plaintiffs

1    in this case against an ISP called Rondez.  So that's a case

2    that's also pending under various case decisions that

3    ultimately Your Honor will review in connection with

4    whatever applications there are.

5           In terms of the prior reference to settle the

6    matter, it is true that I had conversations with opposing

7    counsel, co-counsel, at the time these claims originally

8    surfaced.  What I would say to Your Honor is that we were,

9    sort of orders -- orders of magnitude, off from any

10   potential resolution.

11          THE COURT:  Sure.

12          MR. ELKIN:  We did agree to toll those claims and

13   they're the ones that are presented here.

14          THE COURT:  What was the verdict amount in Eastern

15   District?

16          MR. ELKIN:  Before it was reversed, it was

17   $25,000,000.

18          THE COURT:  Okay.  And what was -- what was the

19   prayer?

20          MR. ELKIN:  Well, they had claims that if you

21   would have given them credit for willful infringement to the

22   extent of $150,000 per work, it could have amounted to

23   approximately $220,000,000.

24          THE COURT:  All right, but did -- what -- were you

25   at the trial?

1          MR. ELKIN:  I didn't handle the trial.  I was

2      retained to handle the appeal and the retrial.

3          THE COURT:  Okay.  What did they seek in front of

4      the jury?

5          MR. ELKIN:  They sought $150,000 per work based on

6      the works at issue, so that was the amount that they were

7      seeking.

8          THE COURT:  Okay.  The -- the $200,000,000 --

9          MR. ELKIN:  I don't -- please don't hold me to the

10     actual amount, but it was at or around that.

11         THE COURT:  All right.  So --

12         MR. ELKIN:  I think they were somewhere in the

13     neighborhood of 1390-some odd music composition works.  It

14     was BMG Rights, which was the music publishing company.

15         THE COURT:  So did the people involved view it as

16     a win for the plaintiff or the defendant?

17         MR. ELKIN:  I'm sorry, Your Honor?

18         THE COURT:  The people involved, did they view

19     that as a victory for the plaintiff or the defendant?

20         MR. ELKIN:  Well, I think the -- I think it's a

21     matter of degree.  I think that the -- the plaintiffs, given

22     the fact that they were able to find willful secondary

23     infringement, could have viewed that amount to be less than

24     what they were seeking.

25         I think, ultimately, it came to be approximately,

1    I don't know, like $15,000 per work and they were seeking

2    $150,000 per work, so you could make an argument that it was

3    substantially less.  But I wasn't counsel to the plaintiff,

4    so I can't -- I can't say --

5              THE COURT:  Sure.  Are there fees attached to the

6    statute?

7              MR. ELKIN:  Yes.  So there was attorney's fees

8    award that also was reversed by the Fourth Circuit that was

9    north of $8,000,000.

10             THE COURT:  Okay.  All right, that's good

11   information.

12             Anything that you want to say to -- about that?

13             MR. KAMIN:  No.  Just in -- yes.

14             Just in terms of order of magnitude in the Cox

15   case in the Eastern District of Virginia, there were about

16   1400 works at issue.  Here, we have over 4 -- 11,000.  So,

17   you know, we have elected, in our initial disclosures, to

18   seek statutory damages.  We have alleged willful

19   infringement.  We're not committing --

20             THE COURT:  Is that two time statutory, then?

21             MR. KAMIN:  No.  It's up to $150,000 per work.

22   For the --

23             THE COURT:  No -- for the liquidated.

24             Oh, I mean --

25             MR. KAMIN:  Statutory --

1            THE COURT:  Willful -- willful damages are --

2            MR. KAMIN:  The range is up to $150,000.  So it's

3    not --

4            THE COURT:  So what are the straight damages?

5            MR. KAMIN:  Straight damages are up to 30-.

6            THE COURT:  30-?  And if it's willful, up to 150-?

7            MR. KAMIN:  Yes.

8            THE COURT:  Okay.  All right.

9            Everybody satisfied with your Rule 26(a)(1)

10   disclosures?

11           MR. KAMIN:  Yes, Your Honor.

12           THE COURT:  You are?

13           MR. ELKIN:  Yes, Your Honor.

14           THE COURT:  Okay.  So what are the fact disputes

15   as the plaintiff sees them that will be the subject of

16   discovery?

17           MR. KAMIN:  Well, as Mr. Elkin just articulated,

18   we agree that -- that we'll be looking at whether there was

19   primary infringement and then the different bases for

20   secondary infringement and the elements of those, as well as

21   the application of the DCMA safe harbor, which we don't --

22   obviously, we don't agree would apply, based on the manner

23   in which the repeat infringer policy was administered by the

24   company.

25           So those are the, I think, the primary factual

1   disputes.  There are some minor issues that may not be

2   disputed and -- you know, at the end of the day, but at the

3   moment, we weren't able to agree on undisputed facts to put

4   in the initial disclosure -- in the initial case management

5   order.

6          THE COURT:  Okay.  Let's see.  I -- you're

7   agreeing to file a motion for a protective order today?

8          MR. KAMIN:  We -- it won't be filed today and I

9   apologize for that.  But we are working on a draft and

10  working cooperatively with defense counsel on that so we

11  expect to file something shortly.

12         THE COURT:  And are you -- are you contending

13  damages or continuing?

14         MR. KAMIN:  No.  We've cabined the period for

15  damages to between 2013 and 2016.

16         THE COURT:  Okay.

17         MR. KAMIN:  And the exact dates are in the

18  complaint.

19         THE COURT:  All right.  So what's been going on

20  since 2016?  Any change in the manner in which people are

21  obtaining these works illegally?

22         MR. KAMIN:  Well, there has been some ongoing --

23  there have been notices sent since that time, but we've --

24  we've cut off our claims at the date of the corporate

25  transaction that Mr. Elkin referred to where Charter

1    absorbed TimeWarner and Brighthouse.

2              THE COURT:  Okay.  I have discovery cutoff May of

3    2020.  I guess that's okay.

4              All right, Judge Krieger holds her own final

5    pretrial proceedings, so no need to set a date for those.

6    Everything is covered that needs to be covered in the

7    proposed scheduling order, so that's fine.

8              Anything else to discuss with me?

9              MR. KAMIN:  Nothing from the plaintiffs, Your

10   Honor.  Thanks very much.

11             THE COURT:  Okay.  How about you guys?

12             MR. ELKIN:  Nothing here, Your Honor.

13             THE COURT:  Don't think I'll need a special master

14   for this case, do you?

15             MR. KAMIN:  I don't think so.

16             THE COURT:  All right.

17             MR. KAMIN:  We don't -- I mean, if we do, we'll

18   raise the issue with Your Honor --

19             THE COURT:  I understand.

20             MR. KAMIN:  -- but so far, as I mentioned, things

21   have been going fine.

22             THE COURT:  Okay.

23             MR. KAMIN:  We served our first discovery, they

24   served their first motion to dismiss.

25             THE COURT:  All right.  So these other cases --

 1    the first case I've ever used a special master in --

 2              MR. KAMIN:  In the USSC case?

 3              THE COURT:  Yeah.

 4              MR. KAMIN:  Yeah.

 5              THE COURT:  Is that going okay?

 6              MR. KAMIN:  Yes.  It's actually -- it's -- it's

 7    streamlined things significantly --

 8              THE COURT:  Okay.

 9              MR. KAMIN:  -- to have her, so we --

10              THE COURT:  Good.  Well, it's not my inclination

11    but, as necessary, I would consider it.

12              MR. KAMIN:  Yeah.  I don't anticipate we'll need

13    her, but we'll let you know if that changes.

14              THE COURT:  Very good.  Thank you.

15              MR. ELKIN:  We would -- we agree with that.

16              I -- it may be useful at some point, if the past

17    is any guide to maybe even have a standing session with Your

18    Honor to go over discovery disputes maybe once a month or --

19    or whatever's convenient.

20              THE COURT:  You know what?  I mean, I -- I -- I'm

21    available on an on-call basis.  We can usually do something

22    same day or next day.

23              So I don't mind that, but why don't we see what

24    the near future holds and, if it's necessary, we'll do that.

25    But, you know, you can get on the calendar very easily and

1    very quickly.  It's not a problem.

2            I try to be pretty timely and responsive to the

3    parties' needs, so --

4            MR. ELKIN:  Thank you.

5            THE COURT:  -- I'll commit to that.

6            MR. ELKIN:  Okay.

7            THE COURT:  Okay.  Anything else from you guys?

8    All right.  Thanks.  Looking forward to working with you.

9            MR. KAMIN:  Thanks.

10           MR. ELKIN:  Thanks.

11           THE COURT:  Take care.

12           (Whereupon, the within hearing was then in

13    conclusion at 11:09 a.m.)

14

15                    TRANSCRIBER'S CERTIFICATION

16    I certify that the foregoing is a correct transcript to the

17    best of my ability to hear and understand the audio recording

18    and based on the quality of the audio recording from the

19    above-entitled matter.

20

21    /s/ Dyann Labo                    July 8, 2019

22    Signature of Transcriber              Date

23

24

25