# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

WARNER BROS. RECORDS INC., *et al.*,

      Plaintiffs,

v.

CHARTER COMMUNICATIONS, INC.,

      Defendant.

**Civil Action No. 19-cv-00874-RBJ-MEH**

## DEFENDANT CHARTER COMMUNICATIONS, INC.'S OBJECTION TO RECOMMENDATION BY MAGISTRATE JUDGE TO DENY CHARTER'S MOTION TO DISMISS PLAINTIFFS' CLAIM FOR VICARIOUS LIABILITY

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     INTRODUCTION .........................................................................................................1

II.    LEGAL STANDARD...................................................................................................2

III.   THE COURT SHOULD OVERRULE THE RECOMMENDATION.............................3

     A.    Allegations That an ISP Merely Advertised and Charged for High Speed Internet Service Does Not Satisfy the Financial Benefit Prong of Vicarious Copyright Infringement .......................................................................................3

     B.    Charter Does Not Have the Practical Ability to Control the Infringing Activity Necessary to Satisfy the Second Prong of Vicarious Liability...............11

IV.   CONCLUSION .........................................................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A & M Records v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001)..............................................................................................10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................... 2, 3, 8, 11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................ 3, 8, 11

*BMG Rights Management v. Cox Communications*,
  149 F. Supp. 3d 634 (E.D. Va. Dec. 1, 2015)....................................................................13

*Coach, Inc. v. Swap Shop, Inc.*,
  2012 WL 12887010 (S.D. Fla. Sept. 21, 2012) ...................................................................6

*Ellison v. Robertson*,
  357 F.3d 1072 (9th Cir. 2004).......................................................................................6, 10

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005) ..........................................................................................................12

*Papasan v. Allain*,
  478 U.S. 265 (1986) .............................................................................................................3

*Perfect 10, Inc. v. CCBill LLC*,
  488 F.3d 1102 (9th Cir. 2007)..............................................................................................6

*Perfect 10, Inc. v. Giganews, Inc.*,
  847 F.3d 657 (9th Cir. 2017)........................................................................................5, 7, 8

*Perfect 10 v. Amazon.com*,
  508 F.3d 1146 (9th Cir. 2007)......................................................................................12, 13

*Robbins v. Okla. ex rel. Okla. Dep't of Human Servs.*,
  519 F.3d 1242 (10th Cir. 2008).............................................................................................3

*Shapiro, Bernstein & Co. v. H. L. Green Co.*,
  316 F.2d 304 (2d Cir. 1963).................................................................................................6

*Thomson v. HMC Grp.*,
  2014 WL 12589313 (C.D. Cal. July 25, 2014)....................................................................7

*Tomelleri v. Zazzle, Inc.*,
    No. 13-CV-02576-EFM-TJJ, 2015 WL 8375083 (D. Kan. Dec. 9, 2015) .........................8, 9

*UMG Recordings, Inc. v. Grande*,
    2018 WL 1096871 (Feb. 28, 2018) ........................................................................... 10, 11

*UMG Recordings, Inc. v. Veoh Networks Inc*.,
    2009 WL 334022 (C.D. Cal. Feb. 2, 2009), *aff'd sub nom.*
    *UMG Recordings, Inc. v. Shelter Capital Partners LLC,*
    667 F.3d 1022 (9th Cir. 2011), *opinion withdrawn, superseded, and aff'd on*
    *reh'g*, 718 F.3d 1006 (9th Cir. 2013)....................................................................................7

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) .................................................................................................2, 3

Defendant Charter Communications, Inc. ("Charter"), by and through its attorneys Fairfield and Woods, P.C. and Winston & Strawn, LLP, hereby objects to the October 21, 2019 Recommendation to deny Charter's motion to dismiss Plaintiffs' claim for vicarious liability by Magistrate Judge Hegarty (the "Recommendation"), and as grounds therefor states as follows:

## I.    INTRODUCTION

Charter respectfully requests that the Recommendation be overruled for at least one of the following two reasons.  First, the Recommendation reflects a fundamental misapplication of the financial benefit prong of vicarious copyright liability.  It holds that Plaintiffs' allegations against an internet service provider ("ISP"), like Charter here, could plausibly satisfy the pleading standard for this prong based on allegations that Charter advertised fast speed (like every ISP) and charged customers for increasing bandwidth (like every ISP).  But any financial benefit sufficient to establish this prong of vicarious liability must be direct, not merely incidental. The allegations set forth in Plaintiffs' Complaint and relied on in the Recommendation are insufficient, even if true, to show a *direct* financial benefit.  Charter earns the same amount of money for a subscription, commensurate with the level of bandwidth, regardless of whether a subscriber accesses the internet for lawful or infringing uses.  Plaintiffs' Complaint is bereft of any specific allegations that users were drawn to Charter's services to infringe Plaintiffs' copyrights, as opposed to efficiently access the internet, including to access music generally, which of course, users can do lawfully.  Under long-standing precedent, this renders any financial benefit from any alleged infringement incidental, not direct, and thus insufficient as a matter of law to satisfy the financial benefit prong of vicarious liability.  By relaxing the direct financial benefit prong to something far more attenuated than what is required, the Recommendation threatens to open the floodgates for massive liability against ISPs for merely advertising and making available high speed internet to the general public.

Second, the Recommendation also implausibly presumes that Charter has the practical ability to halt the alleged infringements, based solely on allegations that its user agreement allows Charter to terminate internet access for violation of its policies. Charter does not host the allegedly infringing content, but merely provides a pipe to connect subscribers to the internet. Thus, Charter cannot access or disable any allegedly infringing content and the Complaint does not allege otherwise. Plaintiffs' suggestion, adopted in the Recommendation, that Charter should have simply responded to each notice by terminating internet access altogether is also a drastic measure that would cut off internet access not only for the accused infringer but for everyone else using the internet through that subscriber's account. The Recommendation's proposed termination of internet access would take place before any copyright infringement is proved, and regardless of the extent to which legitimate use occurs through the same account. Indeed, Charter's subscribers include businesses, libraries, universities, military bases, families and others where only one or a small fraction of affected internet users (e.g., those who would have their internet access terminated) might have used such access to infringe copyrights. Termination of internet access is a blunt tool. It does not give Charter the practical ability to control any alleged infringement, as it cannot prevent Charter's customers (or those who used Charter's customers' accounts to allegedly infringe) from finding internet access to infringe elsewhere.

For the reasons stated herein, Charter respectfully objects to the Recommendation, and requests that the District Court grant Charter's motion to dismiss Plaintiffs' claim for vicarious liability.

## II.    LEGAL STANDARD

As Charter's motion was brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, "[t]o survive," Plaintiffs' Complaint "must contain sufficient factual matter, accepted as true, to "state a claim" for relief that "is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  "The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Robbins v. Okla. ex rel. Okla. Dep't of Human Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008).

Here, in denying Charter's motion to dismiss, the Recommendation relies on allegations[1] that fail, as a matter of law, to set forth sufficient facts to establish the requisite elements for vicarious liability.

## III.   THE COURT SHOULD OVERRULE THE RECOMMENDATION

### A.   Allegations That an ISP Merely Advertised and Charged for High Speed Internet Service Does Not Satisfy the Financial Benefit Prong of Vicarious Copyright Infringement

Courts have long held that in order to satisfy the first prong of vicarious liability, a defendant must profit *directly,* rather than incidentally, from the alleged infringements.  Plaintiffs allege that Charter advertised its "high speed" internet service as "enable[ing] subscribers to ... download 8 songs in 3 seconds."  (Rec. at 11; Compl. ¶ 75.)  The Complaint further alleges that "[m]any of Charter's customers are motivated to subscribe to Charter's service because it allows them to download music and other copyrighted content—including unauthorized content—as efficiently as possible." (Compl. ¶ 75.)  Of course, being "motivated" to "download music" as

---

[1] Even though Charter's Motion is brought pursuant to Rule 12(b)(6), which requires assessing the sufficiency of the allegations in the Complaint, the Recommendation does not cite to Plaintiffs' Complaint.  Instead, the Recommendation only cites Plaintiffs' allegations as characterized in Plaintiffs' Opposition to Charter's Motion to Dismiss, which in multiple cases, as noted herein, is not an accurate recitation of what is actually alleged in the Complaint.

"efficiently as possible" does not equate to being "drawn" to Charter's internet services to infringe, as there are many lawful means to download copyrighted music such as through authorized services like iTunes. This allegation as set forth in the Complaint does not even say that users are actually drawn to Charter's service to download unauthorized content, but merely that Charter's service would "allow" the downloading of music, which would "include[e][] unauthorized content." *(Id.)* Nevertheless, the Recommendation relies on the allegation that these advertisements "motivated" some unnamed subset of Charter's users to subscribe to Charter. (*Id.* at 9-11.) These allegations utterly fail to establish that *infringing* activity was a draw to subscribe to Charter's service.

The Recommendation also relies on Plaintiffs' purported allegations about the efficiency of infringing through "BitTorrent" programs that are generally available on the internet, but which Charter has nothing to do with. (Rec. at 3-4.) The Recommendation relies on the allegation that some users accessing the internet through Charter subscriptions have used such service to "pirate"[2] Plaintiffs' works (Rec. at 11), and Plaintiffs' alleged identification between 2012 and 2015 of "hundreds of thousands" of instances in which users that were traced to Charter's subscriber accounts used Charter's high speed internet service to distribute Plaintiffs' songs.

The Recommendation also relies on Plaintiffs' characterization of its allegation as set forth in its Opposition (ECF 50 at 12) that "once [Charter's] subscribers realized that [Charter] did not intend to stop or control the infringement," the subscribers were encouraged to "purchase more bandwidth" which meant more subscription fees for Charter. (Rec. at 12.) But Plaintiffs' Complaint does not actually allege this; rather it merely alleges that "Charter's customers, in turn,

---

[2] The word "pirate," though quoted in the Recommendation, does not appear in Plaintiffs' Complaint, but appears repeatedly in Plaintiffs' Opposition to Charter's Motion to Dismiss.

purchased more bandwidth and continued using Charter's services to infringe Plaintiffs' copyrights," because Charter "condoned" the illegal activity. (*See* Compl. at ¶ 77.) The Complaint does not allege that because Charter's subscribers realized that Charter did not "stop or control the infringement" such subscribers then purchased more bandwidth. Nevertheless, the Recommendation found these purely speculative "allegations"—never actually alleged in the Complaint—"sufficient to demonstrate a causal relationship between the infringing activity alleged in this case and any financial benefit the [Charter] reaps in this case." *See Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 673 (9th Cir. 2017).

There are also no allegations that infringing material, much less unauthorized access to Plaintiffs' alleged works, acted as a draw to subscribe to Charter's internet service. Indeed, there is no allegation (nor could there be) that Charter would have earned any less in subscriber fees for the legitimate uses of high-speed internet as opposed to any infringing use through the same account. For instance, many accounts are paid for by a business, a library, a military base, or a family. Subscribers and users of those accounts have used Charter's high speed internet service for countless legitimate purposes that are vital to how our society functions today—from information gathering, to work purposes, to education, to emergency services, to social interaction. Charter charges the same price to subscribers regardless of whether some subset of a subscriber's users allegedly use their Charter internet access to infringe Plaintiffs' works. (*See* Comp. at ¶ 74.) Plaintiffs do not allege otherwise. *Id.* This renders any financial connection between Charter's subscribers and the alleged infringement attenuated and indirect, and insufficient to plausibly satisfy the financial benefit prong of vicarious liability.

Despite a detailed discussion in Charter's motion to dismiss (ECF 38 at pp. 7-10 (footer)) (the "Motion"), the financial benefit analysis in the Recommendation makes no mention of the

fundamental principles from which vicarious liability originated—clearly articulated in dance hall and swap meet cases that show that courts have consistently applied these same principles over the last fifty years.  The vicarious liability copyright cases began with *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 309-310 (2d Cir. 1963), where the court found no sufficient direct financial benefit by a landlord who provided the space and access to property yet collected the same amount of rent from tenants regardless of the allegedly infringing activity taking place on the premises. Conversely, a dance hall operator who was taking advantage of the use of infringing music was sufficiently obtaining a direct financial benefit.

More recently, *Coach, Inc. v. Swap Shop, Inc.*, 2012 WL 12887010, at *8 (S.D. Fla. Sept. 21, 2012) articulated the difference between a direct financial benefit and an indirect one.  The *Swap Shop* court found on the one hand that a swap meet operator who organized the retailers selling knock off purses was sufficiently alleged to have a direct financial benefit from infringement through obtaining rents directly from the known infringer vendors, as well as increased parking and concession fees fueled by the sale of known infringing purses.  *Id.*  On the other hand, the landlord of the swap meet—who earned the same amount of money in rent for infringing and non-infringing uses, and was not directly supervising the infringing activities—was found to *not* have a direct financial benefit from the infringing activity.  *Id.*

By failing to acknowledge these cases and their import for the direct financial benefit prong of vicarious liability, the Recommendation misconstrues the basic principles of vicarious liability. It instead essentially carves out a new, lesser standard for the direct financial benefit prong at odds with the jurisprudence that has been consistently applied across the nation for decades, and more recently to ISPs.  *See Ellison v. Robertson*, 357 F.3d 1072, 1079 n.10 (9th Cir. 2004) (an ISP must attract subscriptions "because of" the infringement to establish a direct financial benefit); *Perfect*

*10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1117-18 (9th Cir. 2007) (finding no vicarious liability because evidence that "[defendant] 'hosts' websites for a fee" was too sparse to show a direct financial benefit and thus not "a draw" to subscribers); *UMG Recordings, Inc. v. Veoh Networks Inc.*, 2009 WL 334022, at *6 (C.D. Cal. Feb. 2, 2009), *aff'd sub nom. UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022 (9th Cir. 2011), *opinion withdrawn, superseded, and aff'd on reh'g*, 718 F.3d 1006 (9th Cir. 2013) (dismissing vicarious liability claim where financial benefit was too attenuated to be direct); *Thomson v. HMC Grp.*, 2014 WL 12589313, at *4 (C.D. Cal. July 25, 2014) (dismissing vicarious liability claim where infringing content was not the draw for defendant's patients).

While the Recommendation does cite *Perfect 10* with respect to its draw analysis, it misapplies it. (Rec. at 9.) Critically, the infringing activity must be more than an "added benefit" to a subscription; it must be *the* attracting factor, or the "draw" for subscribers. *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 674 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 504, 199 L. Ed. 2d 385 (2017).

An ISP charging for high speed internet—or digital access— is analogous to the landlords in *Shapiro* and *Coach,* who are paid for the commensurate amount of physical space that they provide regardless of whether copyright infringement occurs in that space. Charter, like any ISP, earns the same amount from subscribers, including higher payments for increased bandwidth speeds (analogous to higher rent for larger physical space), regardless of whether the customer uses the internet access purchased through Charter to infringe. This is true no matter how much bandwidth a customer purchases—it does not affect Charter's revenues whether a subscriber (or others using that subscriber's internet access) uses the internet to infringe copyrights, and/or for legitimate purposes, such as to seek out information, for education, to find news, to perform job

searches, to complete work tasks, to communicate, and for other social and entertainment uses, including the lawful downloading of music.

The Recommendation also relies on *Perfect 10* for the proposition that the "[t]he size of the 'draw' relative to a defendant's overall business is immaterial" and that "[t]he essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits." *Id.* But the *Perfect 10* court goes on to explain that the allegation must be about a draw specifically relating to the plaintiff's work at issue—and *cannot* be a draw based upon "copyright infringement in general." *Id.* As the court explained, the direct financial benefit prong of the vicarious infringement test "demands more than evidence that customers were 'drawn' to [the defendant ISP] to obtain access to infringing material in general," but for a "specific copyrighted" work owned by the plaintiff. *Id.*

At best, Plaintiffs' allegation regarding Charter's customers "motivation" to subscribe to Charter's internet service is that users were drawn to Charter to efficiently download music, which may generally include copyrighted music. Specifically, Plaintiffs allege that "[m]any of Charter's customers are motivated to subscribe to Charter's service *because it allows them to download music and other copyrighted content—including unauthorized content—as efficiently as possible.*" (Compl. ¶ 75 (emphasis added).) There is no allegation that a subscriber was "motivated" to subscribe to Charter's internet service to specifically infringe any of Plaintiffs' copyrighted works. Conclusory, speculative allegations of a "draw" are not enough to be plausible. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.

The Recommendation further relies on *Tomelleri's* statement that "[t]he financial benefit may be established [ ] 'by showing that users are attracted to a defendant's product because it

enables infringement *and* that [] use of the product for infringement financially benefits the defendant.'" *Tomelleri v. Zazzle, Inc.*, No. 13-CV-02576-EFM-TJJ, 2015 WL 8375083, at *15 (D. Kan. Dec. 9, 2015) (emphasis added). *Tomelleri* found there was no draw under the financial benefit prong where a fish illustrator sued a website operator that allowed users to create and sell customized products. *Id.* at *3-4. The plaintiff alleged that sixty-two of his designs had been copied on the defendant's website without his authorization. *Id.* at *4. But even in a case where the website was offering the very tools to facilitate the alleged infringement, *Tomelleri* found no direct financial benefit existed because users were not "drawn" to the site because they could infringe, but because they could make their own products. *Id.* at *15.

Likewise, here, there are no plausible allegations that subscribers are drawn to Charter's high speed internet service to infringe Plaintiffs' copyrights; they are drawn to Charter's internet service to obtain high speed internet that assists with nearly every facet of their life. The fact that such access could also make music downloading faster in general, which could incidentally make infringement occur faster (as it would make nearly everything online operate faster), is not enough to plausibly allege that the financial benefit to Charter from any infringements is direct. Instead, any such alleged benefit is merely an incidental, added benefit that flows from the general draw of high speed internet access. And even if Plaintiffs had alleged a plausible "draw" (which they have not), once again, the "use of the product"—Charter's high speed internet—"for infringement" does not "financially benefit[] the defendant," as Charter's receipt of monthly subscription fees is the same regardless of whether the access it provides is used in part to infringe copyrights. *Id.*

The Recommendation cites the *Ellison* case in analyzing the financial benefit prong, but omits the following explanation from *Ellison*:

> There are, however, cases in which customers value a service that does 'not act as a draw.' **Accordingly, Congress cautions courts**

> that 'receiving a one-time set-up fee and flat periodic payments
> for service... [ordinarily] would not constitute receiving a
> 'financial benefit directly attributable to the infringing activity.'
> S Rep. 105-190, at 44. But 'where the value of the service lies in
> providing access to infringing material,' courts might find such a
> 'one-time set-up and flat periodic' fees to constitute a direct
> financial benefit. *Id.* at 44-45. **Thus, the central question of the
> 'direct financial benefit' inquiry in this case is whether
> infringing activity constitutes a draw for subscribers, not just an
> added benefit.**

*Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) (emphasis added).

This case is precisely the type that Congress cautioned about. There are no plausible allegations that the value of Charter's high speed internet access lies in infringing activity. Any infringement would be an "added benefit" to the value of internet access for consumers—not a draw. *Ellison* also discusses a distinction highly pertinent to this case between the "draw" of customers to Napster and AOL. Distinguishing *A & M Records v. Napster, Inc.,* 239 F.3d 1004, 1013 (9th Cir. 2001) (*Napster II*)—*Ellison* noted that virtually "all of Napster's 'draw' of customers resulted from Napster providing access to infringing material" and the "relatively insignificant draw" present when considering the "vast array of products and services" offered by the defendant AOL. 357 F.3d at 1078. Because there was nothing to support the allegation that "AOL attracted or retained subscriptions because of the infringement or lost subscriptions because of AOL's eventual obstruction of the infringement," the plaintiffs' vicarious liability claim failed. *Id.* at 1079. Similarly, here, the vast array of uses and services available to Charter's customers through its high speed internet offerings likewise renders any "draw" from infringement "relatively insignificant." *Id.* at 1078.

*UMG Recordings, Inc. v. Grande*, 2018 WL 1096871, at *10 (W.D. Tex. Feb. 28, 2018) ("*Grande*") dismissed the plaintiffs' vicarious liability claim, explaining that when considering the "plausible, non-conclusory allegations" of the complaint:

> The closest that the Complaint comes to addressing this issue is the allegation that 'the availability of music, and particularly UMG's music—acts as a powerful draw for users of Grande's service, who use that service to download infringing music files using BitTorrent protocols…' This is not sufficient to show the 'direct financial interest' necessary to support a vicarious infringement claim. There are no allegations that Grande's actions in failing to adequately police their infringing subscribers is a draw to subscribers to purchase its services, so that they can use those services to infringe on UMG's (and others) copyrights. Instead UMG only alleges that the existence of music and the BitTorrent protocol is the draw. **But that would impose liability on every ISP, as the music at issue is available on the Internet generally, as is the BitTorrent protocol, and it is not something exclusively available through Grande's services.**

*Id.* (emphasis added).

While the very same concerns apply here, the Recommendation attempts to distinguish *Grande* on the grounds that there were "no allegations that Grande's actions in failing to adequately police their infringing subscribers is a draw to subscribers to purchase its services." Here, the Recommendation notes that Plaintiffs alleged that Charter's "failure to stop or take other action in response to notices of infringement is a draw to current and prospective subscribers to purchase and use Charter's internet service to 'pirate' Plaintiffs' copyrighted works," though such allegations are found nowhere in the Complaint. And the only remotely similar allegations in ¶ 91 are entirely conclusory and speculative. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.

Plaintiffs have not plausibly alleged the direct financial benefit prong of vicarious liability.

## B.   Charter Does Not Have the Practical Ability to Control the Infringing Activity Necessary to Satisfy the Second Prong of Vicarious Liability

With respect to the right and ability to control the infringing activity as a practical matter, the Recommendation relies solely upon Charter's user policy, which contractually provides Charter the right to terminate accounts accused of infringement. The Recommendation finds that even after receiving multiple notices, Charter "declin[ed] to exercise a right to stop or limit the

infringing activity..." (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005)).  There are no (and could be no) allegations, however, that Charter could have accessed or disabled the infringing content, or prevented those using its internet services from simply infringing on another internet service.

Even crediting Plaintiffs' allegations that Charter has the "right" to terminate subscriber's access to Charter's service, that does not mean that Charter has the practical ability to control infringing activity, as required to state a claim for vicarious liability. It is not possible for Charter to control infringing activity involving content that it never touches, cannot see, cannot disable, and cannot track.  The Recommendation does not analyze these facts in connection with this claim, but instead focuses solely on Charter's ability to terminate accounts.  But with internet access being ubiquitous, Charter is clearly unable to prevent any former customer—or one user or some subset of users on that customer's account—from simply finding another source of internet access to continue infringing Plaintiffs' works.

The Recommendation also makes no mention of courts analyzing this element that specifically distinguish between general-purpose ISPs like Charter or Google and "closed system" file-sharing protocols and websites like BitTorrent or Napster.  *See, e.g., Perfect 10 v. Amazon.com*, 508 F.3d 1146, 1157 (9th Cir. 2007).  For instance, in *Amazon.com*, the Ninth Circuit held that because:

> Napster had a closed system requiring user registration, and could terminate its users' accounts and block their access to the Napster system, Napster had the right and ability to prevent its users from engaging in the infringing activity of uploading file names and downloading Napster users' music files through the Napster system.

*Id.*

In contrast, the court found that an ISP like Google that simply offers internet service and provides users the freedom to use that access as they see fit, had no such ability—and therefore no

liability.  *Id.* at 1174-1175.  While the court recognized that Google had the ability to curtail some infringement indirectly by terminating accounts, that ability was insufficient to establish vicarious liability as it did not exercise the supervisory powers required to establish the claim.  *Id*. at 1174 ("Google cannot stop any of the third-party websites from reproducing, displaying, and distributing unauthorized copies of Perfect 10's images because that infringing conduct takes place on the third-party websites. Google cannot terminate those third-party websites or block their ability to host and serve infringing full-size images on the [i]nternet.")

That distinction is squarely relevant here, but overlooked by the Recommendation.  Unlike with closed systems, Plaintiffs cannot plausibly allege that Charter has the practical ability to identify and police infringing activity on the internet.  The Recommendation does not address this line of cases, again striking a new path that threatens to expand potential liability exponentially for general purpose ISPs, who simply provide access to the internet.

The Recommendation relies on *BMG Rights Management v. Cox Communications*, 149 F. Supp. 3d 634 (E.D. Va. Dec. 1, 2015) and *Grande*, decisions that focused almost exclusively on the "right" to control as set forth in user agreements.  Those cases found the "practical ability to control" to be the ability to terminate entirely the internet access of accounts accused of infringement, without regard for whether such action would actually halt the infringement (given that presumably an infringer could continue to do so elsewhere), and without regard to what legitimate uses it would inevitably also be terminating.

Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." There is no plausible theory that Charter has the practical ability to control the infringing activity, offering an independent basis to overrule the Recommendation and grant Charter's motion to dismiss.

## IV.     CONCLUSION

WHEREFORE Charter requests that this Court overrule the Recommendation, and grant Charter's motion to dismiss Plaintiffs' claim for vicarious liability for copyright infringement.

Given the import of the legal issues presented, Charter also once again respectfully requests oral argument on this matter.

Dated: November 4, 2019                    Respectfully submitted,


                                           By: _s/ Craig D. Joyce_____
                                           Craig D. Joyce
                                           John M. Tanner
                                           Fairfield and Woods, P.C.
                                           1801 California Street, Suite 2600
                                           Denver, Colorado 80202
                                           Phone: 303.830.2400
                                           Fax: 303.830.1033
                                           E-mail: cjoyce@fwlaw.com
                                           E-mail: jtanner@fwlaw.com

                                           Michael S. Elkin
                                           Thomas Patrick Lane
                                           Seth E. Spitzer
                                           Winston & Strawn LLP
                                           200 Park Avenue
                                           New York, New York 10166-4193
                                           Phone: 212.294.6700
                                           Fax: 212.294.4700
                                           E-mail: melkin@winston.com
                                           E-mail: tlane@winston.com
                                           E-mail: sspitzer@winston.com
                                           E-mail: sfstark@winston.com

                                           Jennifer A. Golinveaux
                                           Winston & Strawn LLP
                                           101 California Street
                                           San Francisco, California 94111
                                           Phone: 415.591.1000
                                           Fax: 415.591.1400
                                           E-mail: jgolinveaux@winston.com

14

Erin R. Ranahan
Shilpa A. Coorg
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA  90071
(213) 615-1700 (telephone)
(213) 615-1750 (facsimile)
Email: eranahan@winston.com
Email: scoorg@winston.com

*Counsel for Defendant*
*Charter Communications, Inc.*

## CERTIFICATE OF SERVICE

I certify that on November 4, 2019, a true and correct copy of the foregoing was filed

with the Court via CM/ECF which will send a notice of electronic filing to the parties of record.

| | |
|---|---|
| Matthew J. Oppenheim<br>Scott A. Zebrak<br>Jeffrey M. Gould<br>Kerry M. Mustico<br>OPPENHEIM + ZEBRAK, LLP<br>4530 Wisconsin Ave. NW, 5th Floor<br>Washington, DC 20016<br>Tel: (202) 621-9027<br>matt@oandzlaw.com<br>scott@oandzlaw.com<br>jeff@oandzlaw.com<br>kerry@oandzlaw.com<br>*Attorneys for Plaintiffs* | Mitchell A. Kamin<br>Neema T. Sahni<br>Mark Y. Chen<br>COVINGTON & BURLING LLP<br>1999 Avenue of the Stars, Suite 3500<br>Los Angeles, CA 90067-4643<br>Tel: (424) 332-4800<br>mkamin@cov.com<br>nsahni@cov.com<br>mychen@cov.com<br>*Attorneys for Plaintiffs* |
| Janette L. Ferguson<br>Benjamin M. Leoni<br>LEWIS BESS WILLIAMS & WEESE, P.C.<br>1801 California Street, Suite 3400<br>Denver, CO 80202<br>Tel: (303) 861-2828<br>jferguson@lewisbess.com<br>bleoni@lewisbess.com<br>*Attorneys for Plaintiffs* | Jonathan M. Sperling<br>William E. O'Neil<br>COVINGTON & BURLING LLP<br>620 Eighth Avenue<br>New York, NY 10018-1405<br>Tel: (212) 841-1000<br>jsperling@cov.com<br>woneil@cov.com<br>*Attorneys for Plaintiffs* |

| | Megan M. O'Neill<br>COVINGTON & BURLING LLP<br>850 Tenth Street, NW<br>Washington, DC 20001-4956<br>Tel: (202) 662-5416<br>moneill@cov.com<br>*Attorneys for Plaintiffs* |
|---|---|

_s/ Kristin Hurley_
Kristin Hurley