**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

| | |
|---|---|
| WARNER BROS. RECORDS INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CHARTER COMMUNICATIONS, INC., <br><br> Defendant. | C.A. No.: 19-cv-00874-RBJ-MEH |

**BRIEF AMICI CURIAE OF COPYRIGHT LAW PROFESSORS**
**IN SUPPORT OF DEFENDANT'S OBJECTION**
**TO MAGISTRATE'S RECOMMENDATION**

I. Interest of Amici and Introduction

Amici are 23 intellectual property law professors from law schools throughout the United States who regularly teach, research, and write about copyright law and secondary liability, including their application to online platforms, services, and conduits like Internet Service Providers (ISPs).[1] Amici have no direct financial interest in the parties to or the outcome of this case. They do share a professional and academic interest in ensuring that copyright law develops in ways that properly balance the rights of copyright-owners with consumer welfare, innovation, and privacy.

Amici submit this brief because they are concerned that Magistrate Hegarty's October 13, 2019, Recommendation ("the Recommendation") misapplies the legal standard for the direct financial benefit prong of the vicarious liability test and improperly loosens the pleading standard in a way that would impose unprecedented risks of liability and make it nearly impossible for any ISP to win dismissal of bare, conclusory, and speculative allegations at the 12(b)(6) stage. If the Recommendation is adopted by this Court, those errors will harm other ISPs, Internet users, and the public at large and reduce consumer welfare and privacy.

II. The Recommendation Misapplies the Direct Financial Benefit Requirement

The Recommendation misapplies the legal requirement of a direct financial benefit from infringement in two main ways. First, it fails to properly apply the requirement that any financial benefit be direct rather than indirect. Specifically, infringing material must act as the actual "draw"

---

[1] A full list of the amici can be found in the Appendix. Amici wish to thank Stanford Law School Certified Law Student Mondee Lu for her substantial assistance in the preparation of this brief.

1

– the "because" – for customers to subscribe to Charter's services. Simply being an "added benefit" of being able to use the service – in this case, to access the Internet – is insufficient to establish a direct financial benefit. Second, the Recommendation adopts Plaintiffs' novel argument that the alleged failure to police infringement can constitute the draw for subscribers, and then erroneously credits bare assertions and implausible labels and conclusions to find that direct financial benefit has been sufficiently alleged in the Complaint.

The Recommendation begins in the right place by citing *Ellison* and *Perfect 10* and acknowledging the former's conclusion that the "'essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps . . . .'" *See* Recommendation at 10-11 (quoting *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004)); *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 673 (9th Cir. 2017). But it is not merely but-for causation that is at issue. In fact, "the central question of the 'direct financial benefit' inquiry . . . is whether the infringing activity constitutes a draw for subscribers, not just an added benefit." *Ellison*, 357 F.3d at 1079. Regarding what constitutes a draw, *Ellison* observed that because "there is usually a substantial overlap between aspects [of a service] that customers value and aspects [of a service] that ultimately draw the customer . . . Congress cautions courts that 'receiving a one-time set-up fee and flat periodic payments for service … [ordinarily] would not constitute receiving a 'financial benefit directly attributable to the infringing activity.'"" *Id.* (quoting S. Rep. 105-190, at 44). Instead, it is only in cases where "the value of the service lies in providing access to infringing material [that] courts might find [such] fees to constitute a direct financial benefit." *Id.* (quoting S. Rep. 105-190, at 44) (internal quotation marks omitted). Because there was no evidence that the defendant (AOL) "attracted or

2

retained subscriptions because of the infringement or lost subscriptions because of AOL's eventual [blocking] of the infringement," there was no direct financial benefit from providing access to infringing material. *Id*.

*Perfect 10* confirms that direct financial benefit requires that the availability of infringing material act as a draw for subscribers. 847 F.3d at 673. It also requires that, for infringing activity to constitute a "draw", any profit to the ISP must be the result of the infringement of "the plaintiff's own copyrighted works" rather than of infringement in general. *Id*. at 673-74 ("Perfect 10 was required to provide evidence that customers were drawn to Giganews's services because of the infringing Perfect 10 material at issue."). Because there was no evidence that Giganews "attracted subscriptions" or that "anyone subscribed" to it because of specific infringing Perfect 10 material, but rather only that "some subscribers joined . . . to access infringing material generally," there was no direct financial benefit. *Id.* at 674.

These cases, and one other relied on in the Recommendation, *UMG Recordings, Inc. v. Grande Communications Networks, LLC*, should resolve the instant case in favor of dismissal. *See* No. A-17-CA-365-LY, 2018 WL 1096871 (W.D. Tex. Feb. 28, 2018), report and recommendation adopted by 2018 WL 1905124 (Mar. 28, 2018). In *UMG*, a case much like this one, the court dismissed vicarious infringement claims against an ISP by a group of record labels because allegations that "the availability of music—and particularly UMG's music—acts as a powerful draw for users of Grande's service, who use that service to download infringing music files using BitTorrent protocols," were not sufficient to establish a direct financial benefit from infringement. *Id.* at *10. As in the current case, allegations that infringement was the "draw" for subscribers were insufficient; finding otherwise "would impose liability on every ISP, as the music at issue is

3

available on the Internet generally, as is the BitTorrent protocol, and is not something exclusively available through Grande's services." *Id*.

At the core of these and prior cases is the distinction between aspects of a service that are just an "added benefit" as opposed to a "draw" for consumers. This distinction is especially critical for ISPs like Charter whose service is providing access to the entire Internet. There is no plausible basis to believe that "the value of [Charter's] service lies in providing access to infringing material," *Ellison*, 357 F.3d at 1079, rather than in providing access to the Internet's vast array of information, platforms, communications, tools, services, functionalities, and more that all subscribers value in varying degrees for varying reasons. Access to this universe of content and services is the draw for subscribers, and the use by some subscribers of some portion of that service to download infringing material can only plausibly be seen as an added benefit of the service. This is especially true with ISPs, like Charter, because subscribers pay the same flat monthly rate for a particular level of service irrespective of whether, or how often, they infringe.

The Recommendation errs when it misapplies these requirements for the direct benefit prong to the Complaint in this case. The allegations on which the Recommendation relies fall far short of showing the necessary direct, causal relationship between infringing activity and financial benefit. Rather, most of them describe legal, efficient, and socially desirable features of Charter's service. *See, e.g.,* Recommendation at 11; Compl. ¶ 75 (Charter's ads tout its "blazing-fast" speeds that allow users to download "just about anything" efficiently, and customers are motivated to subscribe to obtain that high-quality service "for everything you do online" at a flat monthly fee). Any ISP that seeks to give its customers high-quality Internet access – in other words, every successful ISP – will provide and advertise features like these because they are valued by all

4

Internet users whether they engage in infringement or not. ISPs that enable access to all content on a neutral basis are merely conduits, and offering faster, more robust transmission of content is essential for them to provide excellent customer service and to remain competitive.[2]

In the face of the inability to show that "the value of [Charter's] service lies in providing access to infringing material," Plaintiffs attempt an end-run around the direct financial benefit requirements. They rely on a single line in the *UMG* opinion to construct the novel argument that Charter's alleged failure to police significant infringing activity by its subscribers itself constitutes the draw for subscribers. Compl. ¶ 91. The Recommendation adopts this approach and seeks to distinguish this case from *UMG*, *Ellison,* and *Perfect 10* on this basis. See Recommendation at 12 (finding *UMG* distinguishable because the *UMG* court noted that the plaintiffs in that case did not allege that Grande's failure to police infringement acted as a draw to subscribers). But *UMG* did not conclude that such allegations, had they been made, *would have been sufficient* to make infringement the draw for subscribers,[3] nor did it evaluate what sorts of allegations might be necessary to constitute the required direct causal link. Nor has any other court.

---

[2] *See BMG Rights Mgmt. (US) LLC v. Cox Communs*, 199 F.Supp.3d 958, 992 (E.D. Va. 2016), *rev'd in part on other grounds*, 881 F.3d 293, 298 (4th Cir. 2018) (upholding jury's finding of no direct financial benefit where ISP Cox charged a flat monthly fee, and noting the fact that "a certain percentage of its subscribers use peer-to-peer software to acquire music does not, without more, establish that those same subscribers were drawn to Cox's service on that basis or that Cox has a financial interest in that activity. The same is true of Cox advertisements that promoted fast download speeds. . . . [H]igh speed is a concern of virtually all consumers in selecting Internet service . . . .").

[3] The Recommendation also relies on *Tomelleri v. Zazzle, Inc*., No. 13-CV-02576-EFM-TJJ, 2015 WL 8375083 (D. Kan. Dec. 9, 2015), to support its ruling. But that court found there was "no evidence that infringement is a draw to zazzle.com users" even though Zazzle failed to police infringement that was reported to it and profited from that infringement. *Id*. at *3-5, *15.

In any event, the Recommendation errs in finding Plaintiffs' allegations sufficient to plead that Charter's infringement policies were a draw to subscribers. First, most of the allegations on which it relies state two separate facts or events but do not allege an actual causal connection from one to the other. For example, the Complaint alleges that: Charter condoned infringement and Charter's customers "*in turn*, purchased more bandwidth and continued using Charter's services to infringe," Compl. ¶ 77 (no specific allegation of causation); that subscribers are "motivated" by Charter's ads about its fast service, Recommendation at 11 (same); that subscribers "have used [Charter's] service to 'pirate,'" Compl. ¶ 77 (same); Recommendation at 12 (same); that the greater the bandwidth used for infringement, "the more money [Charter] made," Compl. ¶ 77 (same); Recommendation at 12 (same); and that infringing subscribers "knew" of Charter's alleged policies and subsequently either remained subscribers or purchased increased bandwidth. Compl. ¶¶ 77, 91; Recommendation at 12 (same). But even assuming these assertions of consumer behavior or knowledge of the policies are true, the Complaint does not allege that infringing subscribers gave any consideration of, or weight to, them in their decisions to either begin, continue, or upgrade their Internet subscriptions. Plaintiff's allegations are too general because the bottom line for Internet users – the "draw" for them to subscribe – is that speed and bandwidth are increasingly essential for everything that users do online, quite apart from any alleged infringement.

Second, the handful of allegations that do try to suggest a direct causal link contain nothing more than conclusory assertions or "threadbare recitals," "supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). *See, e.g.*, Compl. ¶ 77 ("the illegal activity . . . acted as a draw to attract and retain new and existing subscribers"); Compl. ¶ 91 (Charter's "failure to police its infringing subscribers adequately was a draw to subscribers to

6

purchase Charter's services"). These allegations are at best "labels and conclusions," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), designed to avoid the clear holdings of *Ellison*, *Perfect 10*, *UMG*, and other cases. There are no plausible, credible allegations in the Complaint that Charter's alleged failure to police infringement was a deciding factor that caused individuals to start, continue, or upgrade their subscriptions (if they even had a choice of ISP in the first place), nor that there is a causal link between the alleged infringement of defendants' music (as opposed to infringement generally) and any financial benefit in the form of new or incremental revenue for Charter.

III. **The Recommendation's Reasoning Would Harm Other ISPs, Internet Users, and the Public at Large and Reduce Consumer Welfare and Privacy**

The Recommendation's misapplication of the direct financial benefit analysis would cause considerable harm to other ISPs, consumers, and the public. One reason vicarious liability doctrine has thus far evolved in a measured and cautious way is that enforcement and deterrence at the ISP conduit level would have far more wide-reaching negative consequences than enforcement and deterrence at the individual infringer, content-host, or application-provider levels (e.g., individual websites or platforms like YouTube, Napster, etc.). Conduits like ISPs do not host content or channel customers to specific web sites; they should pass all Internet traffic along in a neutral fashion. ISPs should not be forced into the role of copyright enforcers. But infringement litigation initiated by large copyright owners like Plaintiffs has progressed from targeting platforms and hosting providers to targeting ISPs, as in this case, *BMG*, and *UMG*.

Under the relaxed pleading standard adopted by the Recommendation, it would be difficult or impossible for any ISP accused of vicarious infringement to have the claims dismissed at the 12(b)(6) stage, no matter how meritless the claim of direct financial benefit. A plaintiff could

7

prevent an ISP defendant from efficiently ending a vicarious infringement case by doing nothing more than adding a threadbare, conclusory or speculative allegation that failure by the ISP to terminate infringers acted as a "draw" to infringement. ISPs would be forced either to endure protracted, expensive and burdensome litigation beyond the 12(b)(6) stage or, to avoid that burden, to over-enforce and over-deter possible infringing activity by users.

But just like telephone or power companies, ISPs are poorly positioned to police illegal use of their services. To avoid vicarious liability, ISPs would be compelled to undertake content and activity policing functions for which they are ill-suited. Unlike hosting companies, which can take down particular content once it is identified as infringing, ISPs have a very limited set of actions they can take to control alleged infringement. Their primary tool, to terminate accused subscribers from the Internet altogether – basically to turn service off or on – will lead to remedies disproportionate to any violation. Consumers, whether they personally engage in infringing conduct or not, could be subject to wholesale termination of their Internet access based on unproven allegations of infringement occurring at the IP address through which they connect to the Internet. And entities through which multiple users connect to the Internet through an IP address, such as shared residences, schools, businesses, libraries, etc., could lose their entire access due to alleged infringement by a single user. The impact of such a severe response is especially worrisome given how central the Internet is to communication, public discourse, work, education, commerce, civic participation, and more.

Moreover, ISPs could be forced to engage in privacy-invasive monitoring of their subscribers' Internet activity. It is very difficult to distinguish between legitimate and illegitimate traffic of content without invasively examining the content of all traffic to discern whether it is

8

legitimate or not. As a result, the personal activities and data of all subscribers – the vast majority of whom do not infringe, as well as the non-infringing traffic of those who sometimes do – could suffer serious privacy harms by being indiscriminately monitored and scrutinized as part of these enforcement efforts. ISPs should not be compelled to violate their subscribers' important privacy interests in this way.

For the foregoing reasons, amici respectfully urge the Court to overrule the Magistrate's Recommendation.

November 11, 2019

    /s/  Phillip R. Malone
Phillip R. Malone
Juelsgaard Intellectual Property
   and Innovation Clinic
Mills Legal Clinic
   at Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
Telephone: 650-724-1900
pmalone@law.stanford.edu

*Attorney for Amici Curiae*

# APPENDIX

Amici curiae are the law professors listed below. Affiliation is provided for identification purposes only; all signatories are participating in their individual capacity and not on behalf of their institutions.

**Professor John R. Allison**
University of Texas at Austin

**Professor Ann Bartow**
University of New Hampshire School of Law

**Professor Michael A. Carrier**
Rutgers Law School

**Professor Andrew Chin**
University of North Carolina School of Law

**Professor Brian L. Frye**
University of Kentucky College of Law

**Professor Deborah R. Gerhardt**
UNC School of Law

**Professor Jim Gibson**
University of Richmond School of Law

**Professor Eric Goldman**
Santa Clara University School of Law

**Professor Stacey M. Lantagne**
The University of Mississippi Law School

**Professor Mark A. Lemley**
Stanford Law School

**Professor Yvette Joy Liebesman**
Saint Louis University School of Law

**Professor Mark McKenna**
Notre Dame Law School

**Professor Viva R. Moffat**
University of Denver College of Law

**Professor Tyler Ochoa**
Santa Clara University School of Law

**Professor Blake E. Reid**
Colorado Law School

**Professor Michael Risch**
Charles Widger School of Law
Villanova University

**Professor Guy A. Rub**
Michael E. Moritz College of Law
The Ohio State University

**Professor Pamela Samuelson**
University of California
Berkeley Law School

**Professor David E. Sorkin**
UIC John Marshall Law School
The University of Illinois at Chicago

**Assistant Clinical Professor Erik Stallman**
University of California
Berkeley Law School

C

**Professor Madhavi Sunder**
Georgetown University Law Center

**Professor Rebecca Tushnet**
Harvard Law School

**Professor Jennifer M. Urban**
University of California
Berkeley Law School

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 11th day of November, 2019, a true and correct copy of the foregoing MOTION OF AMICI CURIAE COPYRIGHT LAW PROFESSORS FOR LEAVE TO FILE AMICI BRIEF IN SUPPORT OF DEFENDANT'S OBJECTION TO MAGISTRATE'S RECOMMENDATION and BRIEF OF AMICI CURIAE COPYRIGHT LAW PROFESSORS IN SUPPORT OF DEFENDANT'S OBJECTION TO MAGISTRATE'S RECOMMENDATION were served electronically via cm/ecf e-filing system:

Mitchell A. Kamin
Neema T. Sahni
Rebecca G. Van Tassell
Mark Y. Chen
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643

Jacqueline C. Charlesworth
Jonathan M. Sperling
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405

Megan O'Neill
COVINGTON & BURLING, LLP
One City Center
850 Tenth Street NW
Washington, DC 20001-4956

Benjamin M. Leoni
Janette Lee Ferguson
LEWIS BESS WILLIAMS & WEESE P.C.
1801 California Street, Suite 3400
Denver, CO 80202

Matthew J. Oppenheim
Scott A. Zebrak
Jeffrey M. Gould
Kerry M. Mustico
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave. NW, 5th Floor
Washington, DC 20016

Craig D. Joyce
John M. Tanner
FAIRFIELD & WOODS, P.C.
1801 California St., Ste. 2600
Denver, CO 80202

Michael S. Elkin
Thomas Patrick Lane
Seth E. Spitzer
Stacey Foltz Stark
WINSTON & STRAWN LLP
200 Park Ave.
New York, NY 10166

Jennifer A. Golinveaux
WINSTON & STRAWN LLP
101 California St.
San Francisco, CA 94111

By: s/ Phillip R. Malone
Phillip R. Malone
*Counsel for Amici Curiae*

Dated: November 11, 2019