# EXHIBIT 6

1

```
1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2
     Case No. 19-cv-00874-MSK-MEH
3    _____

4    WARNER BROS. RECORDS, INC., et al.,

5         Plaintiffs,

6    vs.

7    CHARTER COMMUNICATIONS, INC.

8         Defendant.

9    _____

10            Proceedings before MICHAEL E. HEGARTY, United

11   States Magistrate Judge, United States District Court for the

12   District of Colorado, commencing at 1:33 p.m., October 29,

13   2019, in the United States Courthouse, Denver, Colorado.

14   _____

15            WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17   _____

18                         APPEARANCES

19            NEEMA SAHNI, MEGAN O'NEIL and JEFF GOULD, Attorneys

20   at Law, appearing for the Plaintiffs.

21            ERIN RANAHAN, ALLISON SKOPEC and JACK TANNER,

22   Attorneys at Law, appearing for Defendant.

23   _____

24               TELEPHONIC DISCOVERY CONFERENCE

25
```

2

```
1                    P R O C E E D I N G S

2              (Whereupon, the within electronically recorded

3    proceedings are herein transcribed, pursuant to order of

4    counsel.)

5              THE COURT:  Thank you very much.  Okay.

6              Case Number 19-cv-00874, Warner Records, Inc,  v.

7    Charter Communications, Inc.  Why don't we go ahead, just

8    one more time, and have all plaintiffs' counsel enter their

9    appearance, please.

10             MS. SAHNI:  Hi.  This is Neema Sahni, and I'm with

11   my colleague Megan O'Neil of Covington & Burling on behalf

12   of the plaintiffs.

13             THE COURT:  Okay.

14             MR. GOULD:  Jeff Gould from Oppenheim & Zebrak on

15   behalf of the plaintiffs as well.

16             MS. RANAHAN:  Erin Ranahan for defendant Charter

17   from Winston & Strawn.

18             MS. COORG:  Shilpa Coorg from Winstron & Strawn.

19             THE COURT:  And Mr. Tanner, right?

20             MR. TANNER:  Your Honor, I believe there is one

21   other person from Winstron & Strawn, Allison Sckopec.

22             THE COURT:  Okay.

23             MR. TANNER:  And yes, I'm also on the phone, Your

24   Honor.  It's Jack Tanner.

25             THE COURT:  Okay.  So I know very little about
```

3

1   what your needs are, so if somebody wants to take the lead,

2   that's fine.

3           MS. RANAHAN:  Sure.  Hi, this is Erin Ranahan

4   again.  We represent the defendants.

5           We have met and conferred about a few discovery

6   issues that we have reached an impasse on with plaintiff,

7   and under the Court rules, we understand we were required to

8   meet out -- to attempt to meet and confer and to attempt to

9   schedule a call with the Court in advance of filing a motion

10  to compel.

11          THE COURT:  Right.

12          MS. RANAHAN:  So we have done that here, so we are

13  happy to discuss the issues or get the clearance on filing

14  the motion.  I believe we are on the same page with

15  plaintiffs that these issues are not things that we can

16  agree upon.

17          THE COURT:  Okay.

18          MS. RANAHAN:  And we actually resolved one of the

19  issues and over the course of this, discussing this

20  conference, so even having this, it's proved productive in

21  that sense.  But if you like to get into the issues, I'm

22  happy to go over those.  Otherwise, we are just attempting

23  to, you know, comply with the procedure before the filing.

24          THE COURT:  Well, no -- no, it's a -- it's a real

25  process.  So we don't just make you phone call in just for

4

1    the sake of it and then let you have permission to file a

2    motion.  95 percent of the time there's no motion.

3              So go ahead and present to me your issues, please.

4              MS. RANAHAN:  Okay.  So there's three issues that

5    remain.  And the first one is basic financial information,

6    including profits and revenues regarding the works in suit.

7    So -- and this is responsive to a host of different

8    requests, which I can cite for you, or go over for you.

9              But, essentially, in a copyright case where a

10   plaintiff is suing a defendant, there's a huge range of

11   statutory damages that could -- a jury could land on.  It

12   can be as low as $200, and in a case in infringement, it can

13   be as high as $150,000 per work -- in a case of willful

14   infringement.  Or the jury can really land anywhere in

15   between.

16             So even in a case where statutory damages is

17   elected, which we understand plaintiffs haven't formally

18   done yet, but they -- they have indicated that they are

19   leaning towards potential statutory damages, there's case

20   law out there that holds that a jury is still entitled to

21   have some sense of where actual damages would have fallen to

22   help inform the jury about where on the huge scale of the

23   statutory damages to land.

24             And, here, we are dealing with a case where

25   plaintiffs are seeking upwards of a billion dollars if they

5

1   seek the maximum statutory damages for each of the works in

2   suit, which I imagine plaintiffs will plan to do.

3            So what we are trying to seek is just some basic

4   profits and revenues on a per-work basis.  And plaintiffs

5   have -- even though in a prior case with the same counsel

6   and the same plaintiff, they were ordered to produce this

7   work level -- this work level financial data, they have

8   refused to do it here.

9            THE COURT:  Okay.

10           MS. SAHNI:  Your Honor, would you like me to

11   respond or would you like her to go through all of the

12   issues at once?

13           THE COURT:  No.  One issue at a time, please.

14           MS. SAHNI:  I'm sorry, Your Honor, what was that?

15           THE COURT:  One issue at a time.

16           MS. SAHNI:  Okay, great.  So, Your Honor, this is

17   Neema Sahni again on behalf of the plaintiffs.

18           And just taking a step back, as you may recall

19   from our scheduling conference, this is a case where the

20   plaintiffs are major record labels and publishers and they

21   own or control rights to a number of works.  And this case

22   is about Charter, as alleged in our complaint, being

23   secondarily liable for massive illegal downloading and

24   uploading on it -- on it services and its failure to stop

25   repeating infringers from downloading work using bitcoins

6

1    and other such technologies.

2            So where we are in discovery, as counsel noted,

3    there have been cases like this that have come before it,

4    but I think where we departed, that the rulings in that case

5    are very different than how -- how defendant is paraphrasing

6    them here.

7            Here in discovery, Charter served over 80 RFPs and

8    12 rogs that were seeking very extensive discovery and we

9    have three issues, I believe, that we are now down to.  We

10   have been meeting and conferring on all the others.  And we

11   will have a couple of issues that will be raised with the

12   Court as well.

13           So on the financial information piece, you know,

14   we strongly disagree that this is basic financial

15   information.  So first, we have agreed to produce company

16   financials, including total annual revenues, profits and

17   expenses for plaintiff entities that issue.

18           What Charter is seeking is per work financial

19   information which is incredibly burdensome to produce and

20   highly irrelevant for a number of reasons.

21           Also the requests are not simply limited as -- as

22   Ms. Ranahan articulated to just, you know, one category.

23   They are seeking profit, expense and revenue information per

24   work for a period of ten years.

25           And as they have described it, this would include

7

1   internal accounting documents, licenses and agreements,

2   royalty statements, internal analyses.  This is essentially

3   every activity in the business of a music company because

4   every activity relates to income generation and expenses.

5           And as we have told Charter and as Charter knows

6   from the Cox (ph) case that I -- that was previously

7   mentioned where it's the same counsel for that IFC versus

8   this IFC, much of this information does not exist.  And

9   plaintiffs don't maintain, for example, per-work profit

10  information or per-work expense information or even

11  per-album profit or experience information.  That's just not

12  how my clients track this information at all.

13          And for the information that they do have, very

14  limited categories, it's incredibly burdensome to produce;

15  it's not in a single data base.  It requires substantial

16  manpower and hours of a week to pull this.  And in the Cox

17  case where they sought overbroad requests, as they are doing

18  here, the Court limited them to one single category of

19  information, which was per-work revenue information by

20  medium and that was an incredibly complicated and burdensome

21  process to try to pull and we -- there was a number of

22  complicating factors.

23          Here, we have even more work than in that case.

24  We have -- we are dealing with around 11,000 works.  And so

25  we have to pull that information, which is exceptionally

8

1  burdensome.  We also disagree that this is in any way

2  relevant.  The burden that we -- that I have just described

3  is just simply not justified or proportional when weighed

4  against the minimal relevance of this data.

5       So as Ms. Ranahan noted, we have very clearly

6  indicated that we are pursuing only statutory damages, and

7  statutory damages need not bear any relationship at all to

8  actual damages.

9       And even if it did, even if there was a nexus

10  between the two, the information they are seeking is really

11  not at all relevant to calculating actual damages.  It's --

12  it's simply unascertainable in a case like this to be able

13  to calculate the actual damages suffered by plaintiffs.

14       And these are the sorts of cases where statutory

15  damages come into play because you need to be able to

16  identify the lost revenue, say, per given work, times the

17  number of infringements at issue.

18       And as we have noted in our complaint, as you

19  might recall from the some scheduling conference, Your

20  Honor, this is a massive scale of infringement and it's

21  simply unknown how many infringements of the plaintiffs'

22  works are at issue.

23       So there's some real problems with the type of

24  information they are seeking, both on relevance and on

25  burden.

1           THE COURT:  What -- what -- what financial records

2  are you prepared to produce?

3           MS. SAHNI:  We are willing to produce, and have

4  already agreed to produce, company financials, which

5  includes total annual revenue, profits and expenses for the

6  plaintiff companies.

7           THE COURT:  For what period?

8           MS. SAHNI:  We have agreed to produce since 2010

9  to 2016, which is three years beyond the claimed period at

10 issue.

11          THE COURT:  Okay.  Okay, I understand.  Any reply?

12          MS. RANAHAN:  Yes, thank you.

13          Again, Your Honor, this is a case that's upwards

14 of a billion dollars in damages, and the way it works a

15 per-work assessment, so the jury wouldn't necessarily just

16 pick a number and apply it across the board.  It would look

17 at that individual work for which they are seeking one

18 individual award and decide what makes sense for that work.

19 So it does have to be on a work-by-work basis for it to be a

20 meaningful discovery attempt.

21          While counsel stated that it need not bear any

22 relation to actual damages, it can.  It's up to the jury to

23 decide:  Does it make sense here to take into account how

24 much has been earned from these works?

25          And counsel represented that the labels do not

10

 1    track their profits on a work-by-work basis, which I find

 2    that incredibly hard to believe, based on litigating against

 3    labels for many years.

 4              In fact, there's several different ways that they

 5    track individual-work-by-work revenues.  They have, you

 6    know, physical sales, digital downloads, interactive

 7    streaming, compulsory public performance licenses,

 8    synchronization licenses, which is where, for instance, if

 9    you are linking up a song to go to a movie, you would charge

10    a sync license.

11              So there's all sorts of ways that labels make

12    money from individual work.  So the idea that they are not

13    tracked, I don't know if the implication is that it's by

14    album or some other way, but experts are certainly capable

15    of looking at the data and drawing some conclusions.

16              And then plaintiffs' counsel is certainly free to

17    argue why it's not a perfect system, why there's flaws in

18    the way that this is being calculated.  But for us not to be

19    able to look at financials on a work-by-work basis in a case

20    where plaintiffs are seeking upwards of, again, a billion

21    dollars in damages, it's -- it's -- it's just simply unfair

22    for discovery purposes.

23              As far as the burden, obviously, you know,

24    counsel's represented it's burdensome.  Again, it was

25    ordered on a work-by-work basis in the prior recent case,

1   against, again, the same counsel, same plaintiff, and we

2   have no sense of the actual burden.  We haven't been told,

3   you know, it will cost this much money for plaintiffs to do

4   it or this many hours or what it actually entails.

5           And I would submit to you, Your Honor, in a case,

6   which I know I keep harping on it, but it's a billion

7   dollars.  So if you can consider proportional relevance

8   based on how much damages plaintiffs are going to seek based

9   on these works, then defendant, you know, Charters would

10  certainly be entitled to at least make its best case to the

11  jury.

12          I mean, Charter is providing Internet access.

13  Charter is not the one who are alleged to have been pirating

14  through, you know, these systems that plaintiffs are

15  accusing them of.  This is a company that is providing

16  Internet access to businesses.

17          And many of these instances where these

18  high-volume alleged infringements are public businesses or a

19  military basis or some other place where Charter is

20  providing Internet access.  So to then assess some huge

21  damages of a billion dollars, without even giving Charter a

22  chance to look at what was actually lost by plaintiffs, it's

23  a windfall.

24          And there's -- and if, you know, we are permitted

25  to file briefing or giving you case law, there are numerous

12

1    cases that have said, to not connect the damages and not

2    have it bear some relation to actual damages would -- would

3    be a windfall and what the jury needs to decide in a

4    statutory case of what is just, under the circumstances.

5    And we should be able to at least get discovery and make our

6    arguments for the jury.

7         THE COURT:  I understand.

8         So it's not my practice to make either side create

9    information or information that did not previously exist.

10   Based on plaintiff counsel's representations that a lot of

11   this information doesn't exist, then I'm not going to order

12   it produced.  However, you disbelieve that, based on what

13   you just said.  So what I --

14        MS. RANAHAN:  Yes.

15        THE COURT:  -- think should happen is that you

16   ought to do a properly worded, maybe even broad 30(b)(6) of

17   how the -- you know, maybe a sampling of how these record

18   companies do keep track of profits and whether they have an

19   idea of amount per work.  And if you can then show me that,

20   in fact, they -- plaintiffs' counsel was incorrect, and that

21   they do have a way of doing this, then it's a different

22   ballgame.

23        MS. RANAHAN:  Okay.

24        THE COURT:  So that would be without prejudice to

25   you getting some more information and showing me this is

13

1   something they can do easily and -- and if they provide the

2   right documents, any expert can reasonably calculate.  All

3   right?

4           MS. RANAHAN:  Okay.  Your Honor, could I make one

5   more point about that.

6           There's about 80 percent overlap in the work that

7   were in the prior case where this information was produced.

8   So there can be absolutely no burden on them reproducing for

9   this case what was produced about the same work in that

10  case, and, obviously, if they produce in that if that

11  exists.  So at the very least, we would request that they be

12  ordered to produce the work-ordered financials that they

13  produced in the other case that relate to the exact same

14  work at issue here.

15          THE COURT:  So you were counsel in that case --

16  were you counsel in that case?

17          MS. RANAHAN:  We were, we -- our firm was.  I

18  personally wasn't, just Jeff Gould on the phone was, for

19  plaintiff.

20          THE COURT:  So what was produced?

21          MS. SAHNI:  Your Honor, could I mention --

22          MR. GOULD:  Thank you, Your Honor.

23          MS. SAHNI:  Sorry, go ahead, Jeff.

24          MR. GOULD:  Thank you, Your Honor.  This is Jeff

25  Gould from Oppenheim & Zebrak.  I'm counsel for plaintiffs

14

1   in both the Cox case and this Charter case.

2          Plaintiffs produced tract-level revenue

3   information to the extent it was -- existed and available.

4   It was less than the Court wanted -- asked -- asked the

5   plaintiffs to produce, but it was everything that plaintiffs

6   could reasonably identify, ascertain and pull together.

7          Let me give you a little more context for that, if

8   you don't mind, Your Honor.

9          The process took eight week or more.  A number of

10  personnel from each of the six group plaintiff companies

11  committed substantial amount of time and money resources to

12  collecting that information, pulling from various live

13  legacy databases to pull this information at great expense

14  and burden.

15         And I just want to put a little more context in

16  it, though, because after that exercise what Ms. Ranahan's

17  firm did with that was absolutely nothing.  They put the

18  plaintiffs in that case to this tremendous burden, this

19  tremendous expense on the thinnest of relevance and did

20  absolutely nothing with it.  The information that was

21  produced in those reports is currently just an objective

22  live motion in limine to exclude at the upcoming trial in

23  the Cox case.

24         The really, really critical point, even separate

25  and apart from the big burden, Your Honor, is that this

15

1    information simply does not, nor permit Charter to do what

2    Ms. Ranahan has described.

3              What she wants to do is provide an actual damages

4    analysis.  But there is no way that, looking at historic

5    revenue of what plaintiffs made on their lawful sales,

6    allows Ms. Ranahan or her experts to determine what they

7    lost through her client's substantial infringement.

8              Looking at what the plaintiffs made in the past

9    does not answer what they lost through the -- through the

10   defendant's misconduct.

11             So, respectfully, it is true that the Eastern

12   District of Virginia ordered one piece of the many

13   categories Ms. Ranahan has described.  That information was

14   produced at great burden and nothing was done with it.

15             THE COURT:  Yes.

16             MS. RANAHAN:  If I could respond to that, Your

17   Honor?

18             THE COURT:  Yes.

19             MS. RANAHAN:  Trial hasn't -- trial is coming up

20   and I see this described, he's now arguing his motion in

21   limine to exclude it.  So I don't know how he can argue with

22   us that we have done nothing with it, but the jury hasn't

23   even been seated yet so, you know, TBD.  Obviously, he has

24   raised a motion in limine, but in that case, the data came

25   in.

1          There's absolutely no burden from him reproducing

2    the 80 percent of the same information for this case.  And

3    we can do what --

4          THE COURT:  Wait a minute, hold on.  What's --

5    what's the time period for that case?

6          MS. SAHNI:  That's exactly -- I wanted to address

7    that, Your Honor.

8          It's not a perfect identity, and so they -- what

9    they are seeking here is much broader than what was actually

10   produced in that case, both for the reasons Jeff noted that

11   we -- that it was impossible to pull some of this data, but

12   also because there are several pieces of what they're

13   demanding here that weren't at issue there.

14         So that was a three-year period that -- or that

15   was being asked for and here, they have asked for ten years.

16   That was only revenue data.  And even then, we weren't able

17   to pull everything that they were asking for.

18         And here, they are asking for revenue, profits,

19   expenses and much of which, as I mentioned, we don't

20   maintain in that form.  So --

21         THE COURT:  Well, let me ask this.

22         MS. SAHNI:  -- it's much more limited.

23         THE COURT:  Hold on, let me ask the plaintiff's

24   counsel.

25         If they already have some information, they say

17

1    80 percent, I guess, I don't know, of what they want, why

2    can't there be an agreement just to have that available in

3    this lawsuit and leave it up to Judge Jackson whether it's

4    admissible, just like this Judge in the Eastern District of

5    Virginia will have to decide.

6              MR. GOULD:  If I can respond to that, Your Honor.

7              THE COURT:  Yes.

8              MR. GOULD:  First of all, that information is --

9    it's highly sensitive financial information of the

10   plaintiff, that's information that's not shared lightly and

11   generally not at all.  It was produced under Court order and

12   subject to protective order.  So while Ms. Ranahan's firm

13   knows the information, it is not yet a part of the record in

14   Charter.

15             THE COURT:  I understand, but that -- but I'm

16   proposing that it can be under a similar protection as the

17   case in Virginia.

18             MR. GOULD:  Understood, Your Honor.  That still

19   doesn't quite address the relevance problem.

20             THE COURT:  Well, so it's -- it's a matter of

21   discoverability, not admissibility at this point.

22             So can I see somebody standing up in front of a

23   jury and saying, Members of the Jury, the plaintiffs are

24   asking for $500 million in this case when -- for these works

25   when, collectively, their total profit for this time period

18

1    was barely twice that for everything that they do?

2            I don't know what she might say, but there might

3    be some way that a district judge, or whoever the trial

4    judge is, would decide that that's admissible.

5            So if the burden is virtually nonexistent because

6    the order would simply be that what was produced in that

7    case will be deemed as having been produced in this case

8    under Court order and it's subject to a protective order and

9    it can't see the light of day, absent some decision by a

10   Federal Judge, then there is just very little risk on part

11   of the plaintiff.  Right?

12           MR. GOULD:  I respectfully disagree, but I

13   understand your point, Your Honor.

14           THE COURT:  Okay.

15           MR. GOULD:  So I won't belabor the point.

16           THE COURT:  Very good.

17           MR. GOULD:  Point in question?

18           THE COURT:  Go ahead.

19           MR. GOULD:  If you are inclined to make that

20   order, could I -- could I ask -- there are -- there is not a

21   perfect unity of works in dispute between the two cases.

22           There are -- there is some under-inclusive -- some

23   under and some over.  So to the extent, could we limit the

24   production to just the overlapping works?  In other words,

25   can we strip out the works in suit from the Cox case that

1    are not at issue in the Charter case?

2            THE COURT:  Well, how much work would that be?  I

3    mean, you wanted to put work on yourself.  What would be the

4    expense of that?

5            MS. SAHNI:  I think that's what we were

6    suggesting, Your Honor, is that this just be limited to the

7    overlapping work.

8            THE COURT:  Well, I'm sure, yeah.

9            MS. SAHNI:  If the other 3000 works --

10           THE COURT:  Absolutely.

11           MS. SAHNI:  -- we need to go back and do that full

12   pull.

13           THE COURT:  Right.  Otherwise, it wouldn't be

14   material at all.  I'm just wondering, is that easily done?

15           MS. SAHNI:  That information for the other 3000

16   work?  No, Your Honor, that goes back to many of those same

17   burden issues.

18           THE COURT:  Right.

19           MS. RANAHAN:  I think this that -- so what Your

20   Honor is asking is whether -- you are saying that only

21   produce -- we already have all of it, right?  So the

22   question is what is the point of now stripping back some of

23   those?  We can -- it's on us to now go through, if we can

24   use it for this case, and figure out which ones are still at

25   issue and it would be -- the burden would be on us.

20

1           So it doesn't really -- I'm -- I'm having trouble

2    understanding what the --

3           THE COURT:  No, I --

4           MS. RANAHAN:  -- what the request is.

5           THE COURT:  I agree with that to the extent that

6    Judge Jackson just will not allow introduction of evidence

7    that relates to works that aren't at issue in the case.

8           MS. RANAHAN:  Right.  And we don't --

9           THE COURT:  So some --

10          MS. RANAHAN:  -- want that work.  We wouldn't use

11   it.  Why would we want to use it?  We have no use for it.

12          THE COURT:  I agree.  So you know, it's too much

13   data and who pays for making it fit our size of the case

14   here?  And I would think that the plaintiffs would want to

15   have the defense pay for that because the defense counsel

16   already knows about all of the information.

17          MS. RANAHAN:  That's --

18          THE COURT:  Why not let them be the ones that pare

19   it down and then maybe show the plaintiff the end product

20   and let the plaintiff be in position to object that it's

21   still overbroad or whatever.  I think that's the way it

22   should go.

23          MS. RANAHAN:  Right.  And then that -- this

24   defense counsel, Your Honor, we would agree with that and

25   that's fine with us.

1           We would also, Judge, submit -- your original

2   inclination was based on their representation that they

3   didn't have this data.  Now, it's very clear that they have

4   -- at some burden, they have it.  They have to go through a

5   burden to do -- at least they did in the other case.  They

6   had to go through some steps to get it.  They have it

7   already for 80 percent of the work that are at issue in this

8   case so far.

9           We would request that for the other 20 percent or

10  so that, the same information they were able to pull in that

11  case also be produced for this case on --

12          THE COURT:  Right.  I'm not willing to go there

13  for a couple of the reasons.

14          Foremost is 80 on percent is a very statistically

15  significant sample if you've ever studied statistics.

16          MS. RANAHAN:  Right.

17          THE COURT:  So I don't think you need 100 percent

18  in order to make the point that you need to make in front of

19  the jury and I don't want to create undue expense here.  So

20  I still believe let's go with what we have, okay?

21          MS. RANAHAN:  Okay.  What about an update?  What

22  -- Jeff -- Mr. Gould, do you know exactly what timeframe

23  that data cut off?

24          MR. GOULD:  Not off top of my head.

25          MS. SAHNI:  That was -- that was a limited -- a

1    more limited period of years.  Again, it was a much narrower

2    ruling than what you are seeking here.

3              THE COURT:  I'm still --

4              MS. SAHNI:  Going back for that -- for that

5    additional years would add -- would add significant burden.

6              THE COURT:  Regardless, if 80 --

7              MS. SAHNI:  Okay.

8              THE COURT:  -- percent of the works were at issue

9    in that case and if we have at least two or three years'

10   worth of time also overlapping, that's simply going to be

11   enough to give the plaintiffs -- or the defense what they

12   need to argue in front of a jury.

13             So what's the next issue?

14             MS. RANAHAN:  Okay, Your Honor --

15             MR. GOULD:  Your Honor, I apologize.  Could I --

16   could I ask one last question --

17             THE COURT:  Yes, go ahead.

18             MR. GOULD:  -- regarding the ruling?

19             I would like the opportunity for my client to

20   extract from the previously produced information their

21   financial information about works not in suit to be included

22   in the record in this case.  They are not on the phone, so

23   it's hard for me to assess how strongly they will feel about

24   that, but if there's a thousand works or 1500 works for

25   which we have provided financial revenue information in the

23

1    Cox case and those works are not at issue in the Charter

2    case, my clients may feel strongly that they don't want to

3    expand the universe in which that information is looked at

4    and utilized.

5          THE COURT:  Well, I don't understand.  The defense

6    already volunteered to do that, subject to your review of it

7    and objection and correction.  So it would be the defense

8    that's spending the money, with you having authority to say

9    yeah or nay, this is not correct or this is including

10   information that is not relevant, and I would oversee that

11   process, what's wrong with that?

12         MR. GOULD:  That may work.  I misunderstood,

13   perhaps, what Ms. Ranahan was suggesting went to -- in the

14   course of the case, they would not seek to utilize --

15         THE COURT:  No, no, no.

16         MS. SAHNI:  -- the information about this --

17         THE COURT:  No, they will reduce the universe that

18   is -- that is brought over or transported to this case and

19   show you what the end product is.  Okay.

20         MR. GOULD:  Yes.  Thank you, sir.

21         THE COURT:  All right, next issue.

22         MS. RANAHAN:  Okay.  And just to clarify, so this

23   is still without prejudice to bring this back, once we take

24   a 30(b)(6), finding out what other types of agreements and

25   underlying information we --

24

1           THE COURT:  Well, yeah.  I mean, I think you still

2  ought to that probably, but now --

3           MS. RANAHAN:  Okay.

4           THE COURT:  -- now that we are getting you

5  probably 60 or 70 percent of what you would need as far as a

6  whole universe of data that would comprise profit or an

7  amount of the income per work, I don't know.  I don't know

8  what I would do.

9           MS. RANAHAN:  Okay.

10           THE COURT:  So I'm altering that in a sense.  I'll

11  still make it without prejudice to asking for it in more

12  complete form.

13           MS. RANAHAN:  Right.

14           THE COURT:  But I --

15           MS. RANAHAN:  And also some of -- I'm sorry, Your

16  Honor.

17           THE COURT:  No, I'm done.

18           MS. RANAHAN:  Also as to some of the underlying

19  backup, we would prefer to have a chance to at least ask

20  about it and find out what is available --

21           THE COURT:  That's fine.

22           MS. RANAHAN:  -- before we are foreclosed

23  basically from it.

24           THE COURT:  That's fine.  You know where my mind

25  is so . . .

1          MS. RANAHAN:  Yes.

2          THE COURT:  All right, what's next?

3          MS. RANAHAN:  Okay.  So the next issue is

4    ownership information.

5          So one of the main burdens that a plaintiff has in

6    a copyright case is to show it's the owner of the work.

7    It's classic discovery to produce underlying ownership

8    information in a copyright case.

9          Plaintiff here has offered to produce -- and, by

10   the way, the Certificate of Registration is -- an actual

11   Certificate of Registration is a prima facie case.  And if

12   plaintiffs produce that for each work, it's then -- the

13   burden shifts.

14         But plaintiff is still required to produce

15   underlying ownership information so that defendants can

16   assess is whether there is any hole in ownership or chain of

17   title.  And there are several type of documents that -- that

18   go to this, including -- there's work for hire agreement.

19   And if they were entered into after the registration was

20   filed, they are null, they don't count.  So oftentimes, the

21   plaintiff record labels will not want to provide this work

22   for hire agreement per work because they don't want to show

23   that there is -- there's holes in the production of this

24   unit title.

25         And, Your Honor, when there are this many works at

1    issue, it -- in every single case I have been involved in

2    like this, which is a massive amount of copyrights being

3    alleged, whenever ownership documents are ordered, a

4    significant number of the works fall out.  Plaintiff will

5    withdraw them.  They will amend their complaint because they

6    know they do not have the chain of title to actually prove

7    up that they own the work.

8            And that's because copyright ownership is very

9    complicated; it involves, you know, transfers and work for

10    hire agreements and co-ownership agreements and all sort of

11    time charges and record changes and artists' agreements.

12            So we want, Your Honor, the full chain of title

13    for each work in suit, which again, this is a billion dollar

14    case, $150,000 per work.  This is a bare minimum for any

15    copyright case for plaintiff to prove that they are the

16    owners of the work.

17            And what they have offered to produce is very

18    limited.  It's not even a copyright registration for each

19    work.  But, besides that, we want the underlying chain of

20    the title, the assignment agreements, the work for hire

21    agreements, the -- any documents that show a dispute in

22    ownership.

23            And what plaintiff has suggested is that it would

24    be -- we would have to identify -- or we would have to

25    somehow figure out where there are holes in the chain of

1    title before they would be willing to even search for any

2    documents like this.

3              But this type of production is very standard in a

4    copyright case and we would just request that Your Honor

5    allow us to investigate ownership.  There is a burdenship

6    that happens, but we are entitled to discovery to assess

7    that.

8              THE COURT:  Okay.

9              MS. SAHNI:  Your Honor, this is Neema Sahni for

10   the plaintiff.

11             So, first of all, I want to clarify what we have

12   agreed to produce.  We have agreed to produce copyright

13   registration certificates or printouts from Copyright Office

14   evidencing that we -- the plaintiff entity owns each work.

15   And where there is a discrepancy between the copyright

16   registration and the entity claiming the work, we will

17   provide the requisite information to make that linkage.

18             In addition, if Charter raises a dispute as to any

19   particular work, we have agreed to work with them on that as

20   well.

21             The case law on this issue is very clear.

22   Copyright Registration Certificates are prima facie evidence

23   of ownership, as Ms. Ranahan just noted.  And so it is

24   sufficient for us to provide that information and if they

25   have any concerns, they can come to us and we can work

28

1    through those.

2           Disputes are quite rare and if they do actually

3    occur and if they were successful, that would be evidenced

4    by a copyright registration.  So this is our core business,

5    our clients own and control rights in music and they are in

6    the business of obtaining copyrights and registering with

7    the Copyright Office.

8           And, again, Your Honor, this is an issue where

9    they are relitigating what they lost in the Cox case, in the

10   concurrent litigation.  They made this exact argument and

11   Court there said, No, you are not entitled to anything

12   beyond the prima facie evidence of ownership, the plaintiffs

13   are agreeing to produce the exact same category that we have

14   agreed to produce here.  And the Court said, No, you can't

15   get more than that.  And there was -- there was a number of

16   other courts and we would be happy to submit briefing or

17   case law on this issue that make clear that discovery beyond

18   copyright certificates is not required.

19          And in addition, Your Honor, there is, again, a

20   burden issue here.  So not only is it not relevant because

21   they -- we are providing them the prima facie evidence they

22   need to then identify any potential gaps they may want to

23   come back to us on.  In addition, the burden of providing

24   this information is significant.

25          As Ms. Ranahan noted, there can be several

1   different components, complicated -- it's a complicated

2   structure of documents, none of which is, again, in a

3   centralized database.  So this would require a significant

4   undertaking to produce.

5          So again, here, you have a case where they are

6   relitigating an issue that they have lost and it's a current

7   litigation by the same counsel and a number courts have

8   rejected where the case law is clear and weighed against

9   that is a substantial they are trying to impose on

10  plaintiffs.

11         MS. RANAHAN:  Your Honor, if I could, I would just

12  like to address that the case law is actually very clear on

13  our side.  It wasn't a focus of a prior case as much as I

14  would liked it to have been, again I wasn't involved in that

15  case.  But I have been litigating copyright cases for 15

16  years, I have never been involved in a case that didn't have

17  ownership granted and I have a whole slew of the cases that

18  I could cite to you.  And at the very least, would -- would

19  request that we submit briefing on this issue because it is

20  very clear there's all sort of cases that say you cannot

21  have a prima facie rebuttable presumption become

22  irrebuttable.  And that's a quote from these cases, even

23  though it sounds like it might not even be a word.  But it's

24  actually very clear that we are entitled to look at this

25  stuff.  They cannot just produce -- and, Your Honor, they

30

1    have suggested it would be printouts, not even copyright

2    certificates for each works.

3              But the -- the bulk of the case law is absolutely

4    in our favor on this.  And, again, every case I have ever

5    been involved in, I have never not had ownership documents

6    granted.  And I do submit to you that there was some limited

7    stuff not granted in the last case.  It wasn't a focus of

8    briefing, like we want to make it a real central issue here.

9    It's classic for tons of work to pull out after it's ordered

10   and that's because plaintiffs know that they -- they will

11   start searching for the chain of title and they realize they

12   don't have a complete chain of title.

13             So there's -- and I can read you some case cites,

14   Your Honor, if you would like to look at this.  The Naster

15   (ph) court ordered it.  They said, Your Honor, it was

16   disinclined to allow Napster -- the plaintiffs were suing

17   Napster to just railroad into huge steps towards damages

18   without even proving a basic ownership.

19             A Certificate of Registration is a prima facie

20   case that we have the right to rebut, but we cannot rebut it

21   without getting the underlying data.  And you have to

22   have --

23             THE COURT:  Well, hold on a second.  I need to ask

24   some questions.  Is this Ms. Ranahan speaking?

25             MS. RANAHAN:  Yes.

1          THE COURT:  Okay, have you ever been involved in a

2   case that went to some judgment?

3          MS. RANAHAN:  That went to summary judgment?

4          THE COURT:  No.  Some kind of judgment, either a

5   bench or a jury trial.

6          MS. RANAHAN:  Yes.

7          THE COURT:  And in those cases, does a jury --

8   discuss the decider of fact actually consider each work and

9   assign a separate damages value to each work?  Or do they

10  just decide on a damages number per work?  Or some kind of

11  total work?

12         MS. RANAHAN:  You mean do they -- right.  Do you

13  mean do they pick the same number?  Or do they go

14  work-by-work?  Is that what you are saying?

15         Like, so the -- when we submit a verdict form, we

16  always separate them out by one-by-one and we request that a

17  jury pick a different amount.  And they do oftentimes.

18  Other times they don't.

19         If we are not given the data to make the case --

20  as far as ownership documents, though, Your Honor, these are

21  resolved before it gets to the jury, for the most part.

22  These are resolved as issues of law before Your Honor on

23  summary judgment, stipulation.  We are not going to force

24  the jury to, you know, look at a whole bunch of ownership

25  information.  Those would be more issues of law for the

1    Court to decide.

2              THE COURT:  Okay.

3              MS. RANAHAN:  So these chain of title are not

4    usually subject to the jury.

5              THE COURT:  I understand.  So what percentage of

6    works do you, in your experience, drop out --

7              MS. RANAHAN:  Yes.

8              THE COURT:  -- during the process?

9              MS. RANAHAN:  Sure.  So we have -- in the briefing

10   we have prepared, Your Honor, we have countless samples that

11   are example of that.  I would say it's about 15 -- 10 to

12   15 percent of work that even in -- I mean I can -- I can

13   read you some actual cases that were published on this

14   issue, but it happens every time --

15             THE COURT:  All right.

16             MS. RANAHAN:  -- and then in the cases that I have

17   been involved in.

18             THE COURT:  So nothing that you do in this case,

19   short of the ultimate verdict, will have to deal with

20   whether it's 8, 9, 10, 10,500 or 11,000 works, agreed?

21             MS. RANAHAN:  I'm sorry, Your Honor.  It will

22   matter because statutory damages are per work, yes.

23             THE COURT:  Yes, I know that, I know that.

24             MS. RANAHAN:  So to --

25             THE COURT:  Only as to damages, short of that,

1   none of your briefing will matter contingent on the number

2   of works at issue, correct?

3           MS. RANAHAN:  I see what you are saying.

4           So you are saying summary judgment -- well, we --

5   that's not true because we have an issue of underlying

6   direct infringements that has to be proven.  So the number

7   of the works would come into play there --

8           THE COURT:  How.

9           MS. RANAHAN:  -- how many actually were proven.

10          THE COURT:  Describe that.

11          MS. RANAHAN:  Right.  So for instance, in the

12  other case, there's an issue about whether, you know,

13  plaintiff maintained underlying copy of the work at issue

14  when they were investigating these claims.  Because, keep in

15  mind, Your Honor, we are an Internet company.  We don't ever

16  touch this alleged infringement.  So we don't actually have

17  a copy of it that we can disable safe or take down, like

18  some of the other cases I work on.

19          It's an Internet company, so the data is out there

20  with the user, and the customer and the companies that

21  plaintiff have hired to attempt to track this.  So whether

22  there's underlying infringements, it could come into play

23  how many were actually proven.

24          But as far as your point -- I'm trying to -- so --

25  so what matters is basically us being able to eliminate the

1   number, though, and plaintiffs conceding that, you know, a

2   certain -- significant percentage from the damages

3   perspective are not relevant.

4          THE COURT:  But that's only for damages purposes.

5          MS. RANAHAN:  And --

6          THE COURT:  So what I'm saying is, this fight can

7   wait until there's something to fight about.  And right now,

8   there's not.  So, for example, if you get, let's say that

9   you go ahead and -- well, and let me say this.

10          Under Rule 11, if plaintiff's counsel has signed a

11   complaint that lists 11,000 works, they are representing to

12   the Court that, after an inquiry reasonable under the

13   circumstances, each one of these works is at issue and is

14   owned by their client, that is counsel's representation to

15   the Court by Rule 11.

16          So what I'm assuming, justifiably so, is that

17   there has been a reasonable inquiry, under the

18   circumstances, and plaintiffs' counsel is representing to

19   this Court that their clients have the ownership of each of

20   these.  And if at such point information comes to

21   plaintiffs' counsel that any one of these works shouldn't be

22   there, they have to amend in some manner.

23          So along with this list comes plaintiffs'

24   counsel's assurance to us that, after reasonable inquiry and

25   good faith belief, each of these is owned.

1          That's number one.

2          Number two.  Let's say there an ultimate judgment

3    of $10,000 per work.  Why not at that time require the

4    plaintiff to come forward with evidence of ownership more

5    than copyright registration in order to get the $10,000 for

6    a particular work?  Then, that kind of reward would justify

7    the work.

8          But at this point, it might be a lot of work for

9    nothing.  So I'm saying that this inquiry, although

10   potentially relevant, can wait for the proper moment when

11   there's actually something to fight about.

12         Does that make sense?

13         MS. RANAHAN:  If I could just respond a couple of

14   the reasons, Your Honor, that would concern defendant.

15         One is it takes months for our end -- and I have

16   overseen these projects, which is when we get in all of this

17   chain of the title, which is a significant amount of the

18   information, we then have to review it all and analyze it

19   all and decide which ones I can uphold and then challenge

20   those.  And the work that they don't own should never make

21   it to the jury.  A jury should never decide that a certain

22   song is entitled to a $10,000 award and be prejudiced by

23   hearing about 1500 extra works the plaintiff didn't own.

24         So Your Honor, I submit that that's -- that's not

25   the typical way --

36

1          THE COURT:  No.

2          MS. RANAHAN:  -- that it's been done in a

3    copyright case.  I understand the concern, but the idea

4    that --

5          THE COURT:  There is no just no way -- there is no

6    way that you are going to be permitted to produce evidence

7    during a trial about each one of 11,000 works.  That's not

8    going to happen.  That would be a ten-year trial.

9          MS. RANAHAN:  I agree.

10         THE COURT:  So, I --

11         MS. RANAHAN:  I agree with that.

12         THE COURT:  -- I disagree with what you are

13   saying.  The jury won't get into the minute detail whether a

14   particular work has been violated.  That's my point.  I

15   mean, let's bring some practicality to this.  Okay.

16         So whether they --

17         MS. RANAHAN:  Well, I would say --

18         THE COURT:  Let's say -- let's say it's -- on the

19   high-end, you said 10 to 15 percent.  So on the high end,

20   that's maybe 1600 works out of 11,000.  9400 versus 11,000

21   is not going to be material to a jury as far as what damages

22   to award, in my view of litigation.

23         So I have got to take some kind of pragmatic view

24   and apply some kind of proportionality, although I agree a

25   billion dollars -- but I will tell you in the last six

1    months, I settled a $2.5 billion case for $65 million.  So

2    there is demands and then there is what's practically

3    available, too.

4           So, again, I'm not -- I don't want to go into this

5    just accepting ya-all's view on what the potential demand

6    is, but really what happens in these sort of suits.

7           MS. RANAHAN:  Right.

8           THE COURT:  But in any event --

9           MS. RANAHAN:  Right.

10          THE COURT:  -- I think we could construct a

11   process at the end of this case where the plaintiff would

12   have to come forward with information for each work for

13   which damages may be have been awarded and say, yes, this is

14   our work.  I don't disagree, in principle, they have to do

15   that because how could anybody not agree with that?  You

16   can't just throw 11,000 title into a lawsuit, take

17   plaintiff's word for it, these are all my clients, and the

18   defense lawyer is required to accept that.

19          I agree with you on that.  But at the same time,

20   let's do something that makes sense in relation to how the

21   case will actually be tried.

22          MS. RANAHAN:  Well, Your Honor, I would just

23   submit that we need the time -- we need months to go through

24   that information.  So to say this is a jury trial, now

25   figure out all of the problems after they have produced,

1   that could delay the whole thing another six months when,

2   you know, we really wanted -- we do not want the jury to be

3   prejudiced by hearing about 11,000 works, when it could be

4   only 7 or, you know, it could be significantly reduced.  It

5   makes a difference when the jury hears all those other

6   titles.  And if the jury has to hear evidence about damages

7   for all those titles, that would be a complete waste if

8   plaintiffs don't own it.

9           And I would say, Your Honor, I don't doubt that

10  plaintiffs' counsel, right now sitting here, believes that

11  they own all of them and that they're clients believe it.

12          It's not until they are required to actually look

13  under the hood and look for the chain of title that they

14  even take the time to say, Oh, wait a minute, we don't have

15  an assignment here.  These works for hire are invalid

16  because they were entered before Certificate of

17  Registration.

18          So there are -- I would request, Your Honor, that

19  we, at least, present briefing on this issue because it is

20  very well established and your -- I understand it that you

21  are saying it's relevant.  But the timing just wouldn't

22  work -- and you're talking practicality, it wouldn't work

23  because we wouldn't have time to go through it and to make

24  all of these hard analyses.

25          And I understand you don't want to do

1    unnecessarily burdensome productions, but, again, in a

2    billed dollar case, plaintiff has to be, you know, required

3    to at least prove ownership.  And it's basic, it's so basic

4    in a copyright case and we are entitled to the discovery.

5           So to suggest that we have to wait until a damages

6    award has been assessed against a work that plaintiffs don't

7    own is, in our view, backwards.

8           I appreciate the Court's attempt to find a more

9    practical way, but sometimes when you are speaking a billion

10   dollars, you have to do some work; there is some discovery

11   that has to be done.

12          And if Your Honor is inclined to propose an

13   alternative, I would just request that we submit briefing on

14   this so you can see the authority on both sides.  I believe

15   we have -- the bulk of the authority is well on our side on

16   this case and there are plenty of examples that have

17   (inaudible) about the number of works that drop out.

18          And it's really just the timing of that analysis

19   and scope.  The burden is really on us.  Like they grab it,

20   they produce all of this information that they have and then

21   we have to analyze it, we have to find the holes and actual.

22          THE COURT:  I have heard enough on that.

23          Anything else from the plaintiff on this one?

24          MS. SAHNI:  No, Your Honor.

25          I just would reiterate that we are specifically

1  saying, you know, thousands of documents on ownership, and

2  that will give them more than enough to cast any doubt for

3  inconsistencies that they want to address.  And it is a

4  significant burden that we don't -- we shouldn't have to

5  bear.  The case law is clear that a copyright certificate

6  should be sufficient for -- to prove a case about ownership.

7        THE COURT:  Okay.

8        MS. SAHNI:  So we will be getting a lot of

9  documents.  If they have questions, we will be happy to

10  address them.

11        THE COURT:  All right.  So I want -- I want the

12  defendant to designate 110 works, that's 1 percent sample,

13  ask for those documents.  If you have a statistically

14  significant amount that cannot be proven to be owned by the

15  plaintiffs, then you have something to talk about.  Until

16  then, not.  Okay.

17        MS. RANAHAN:  Okay, Your Honor.

18        MS. SAHNI:  Sorry, Your Honor.

19        THE COURT:  So defendant gets to designates 110

20  works and seek ownership documents from those 110 works.

21        MS. RANAHAN:  Okay.  And when you -- that is the

22  complete chain of title work for hire, and then we will see

23  what comes back once we analyze those?

24        THE COURT:  Right.

25        MS. RANAHAN:  If they are a statistically

1   significant number of works that drop out or that plaintiffs

2   withdraw upon getting the 110, then we will revisit whether

3   to expand it to the remaining works?

4           THE COURT:  That is correct.

5           MS. RANAHAN:  Okay.

6           MR. GOULD:  If I may, Your Honor.

7           MS. SAHNI:  If I may --

8           MR. GOULD:  I'm sorry.

9           MS. SAHNI:  Go ahead, Jeff.

10          MR. GOULD:  I was just going to clarify what the

11  scope -- what the scope is -- what you are telling plaintiff

12  they need to produce for those 1 percent.  I'm not sure how

13  clear it is.

14          THE COURT:  Well, let's talk about that.  Ms.

15  Ranahan, go ahead and list that.

16          MS. RANAHAN:  So we want the complete chain of

17  title which shows all of the assignment agreements from when

18  you first obtained right to the work.  Any work for hire

19  agreement, any information about a dispute regarding that

20  work.  If there's a third party challenging it and sends a

21  cease and desist.  So everything related to ownership of

22  that work.  And that goes to either proof of it or any

23  deficiencies in that ownership.

24          THE COURT:  Well, why don't you -- here's what we

25  will do.  Why don't you go ahead and list that in a letter.

42

1       If plaintiffs object to any particular part of it, you can

2       go ahead and email me with the issue and then we will see

3       where we are going to go from there, okay?

4               MS. RANAHAN:  Okay.

5               MS. SAHNI:  And, Your Honor, and also just to

6       clarify, in terms of that 1 percent sample, is there -- is

7       there any guidance or metric about that or does there

8       defendant just get to pick any 110 that they want?

9               THE COURT:  Well, I say give them their best shot.

10      That's my opinion, so . . .

11              MR. GOULD:  Your Honor, this is Jeff Gould again,

12      just a little bit of context.

13              So Ms. Ranahan's firm has examined the 80 percent

14      overlap at length in the Cox case and I have no doubt, in

15      their experience, they will pick those that they believe are

16      ones they can demonstrate an issue with.

17              So, you know --

18              THE COURT:  How would they know that, Mr. Gould?

19      How would they know that?

20              MR. GOULD:  Well, I don't know what they know.

21      But I know that we have just been through lengthy summary

22      judgment exercises in the Cox case on ownership.

23              THE COURT:  Okay.

24              MS. RANAHAN:  And Ms. Ranahan's firm has spent a

25      fair bit of time examining the volume of documents that were

43

1    produced in the Cox case that enable her firm to lodge what

2    they deemed to be sufficient challenges to the plaintiffs'

3    ownership.

4             THE COURT:  Well, so I don't think -- I don't want

5    to be redundant of anything that has already been done.  So

6    if they already had information about particular works, they

7    can already show to me.

8             MS. RANAHAN:  No, no, Your Honor.  The point is it

9    wasn't ordered. All that was ordered in that case was a --

10   and I will submit to you it was not a focus of the prior

11   briefing.  It was part of the Spurly (ph) argument.  And as

12   we got to trial in that case, we realized we didn't have the

13   work for hire agreements that we really needed to challenge

14   a lot of it, so that was the subject of some debate.  We are

15   making sure that we don't have that hole here, so we don't

16   it in the other case.  There is the overlap that plaintiff

17   mentioned, but we don't have the underlying chain of title.

18   We have copyright registration.

19            THE COURT:  Okay, so --

20            MR. GOULD:  That's not correct.  That's not

21   correct.  In the Cox case was produced registration --

22   evidence of registration, and we produced chain of title

23   documents demonstration of the contractual -- or chain of

24   privity between the named claimant on the registration and

25   plaintiff in the suit.

44

```
1              And the law is clear that in order to demonstrate

2    ownership, Your Honor, you need to show that you are the

3    owner or have the exclusive license to control the copyright

4    or demonstrate the link between the named claimant on the

5    registration and the plaintiff.

6              And that's exactly what we produced in Cox.

7    That's exactly what we have agreed to produce in this case.

8    That's exactly what Magistrate Judge in Cox said was

9    sufficient.

10             And in response to this specific argument that Ms.

11   Ranahan has said here today, said, Okay, well, I think what

12   they have agreed to produce today is going to be sufficient.

13   If there is any specific question that you have got that

14   relate to the specific issues of the copyright works, then I

15   will consider dealing with the issue on a

16   copyrighted-work-by-copyrighted-work basis.  Or if it's in

17   any copyrighted work that are subject to similar work or a

18   work for hire or something like that.  But, you know, at

19   this point in time the idea that for all 11,000 copyrighted

20   works in three areas you have asked for or are have now made

21   clear in your reply brief that you are asking for, I don't

22   see that being appropriate under the circumstances of this

23   case, and I'm going to deny the motion as to compel count.

24             THE COURT:  Right, well --

25             MS. SAHNI:  And if I may just amplify that, Your
```

45

1    Honor --

2            THE COURT:  No, I -- I --

3            MS. SAHNI:  Just one additional point is they then

4    tested, right?  And they asked questions about it and they

5    had full briefing and summary judgment on it.  They were

6    fully able to do that with the information that was

7    provided.  So it's unclear why they need more here when they

8    have briefed these issues significantly in the Cox case and

9    submitted declarations where they tried to poke holes in the

10   ownership information.  And so the Court there rejected it

11   and it's -- the same should happen here.  There is no reason

12   that they should get more.

13           THE COURT:  I understand.  But, you know what, we

14   have 530 magistrate judges in the United States, this is a

15   different one.  And so I think a small sampling will just

16   provide me a foundation for testing what you guys are saying

17   about all of this.  And -- and if you are right, then that's

18   the end of it, you know, maybe then we will brief.  If at

19   the end of the testing the sampling, nobody's position has

20   changed, then I will -- I will let you guys brief it.  Okay.

21           MS. RANAHAN:  Thank you, Your Honor.

22           And I would just submit that to the extent that we

23   know which ones that have issues and that's all the more

24   productive as far as removing ones that they done really

25   have the right to, it's the work for hire agreements that

1   were not ordered in that case and were not a focus of that

2   case that we need and that we realize we needed when we were

3   close to trial in the other case.  So that will be --

4           THE COURT:  You have to describe to me.  I don't

5   know for a work for hire agreement is.  What is it, please?

6           MS. RANAHAN:  Right.  So it's an underlying

7   agreement that an artist will enter with a record label, for

8   instance.  And if it's not entered by a certain date,

9   meaning before -- if it's not entered before the copyright

10  registration is entered, it's invalid.  So it matters.

11          THE COURT:  Stop there.  Stop, stop, stop.

12          MS. RANAHAN:  The date of that agreement --

13          THE COURT:  Stop there.  Does plaintiffs' counsel

14  agree with that statement?

15          MS. SAHNI:  Sorry, Your Honor, the legal matter?

16          THE COURT:  Yes.

17          MS. SAHNI:  As to the timing issue, correct.

18          THE COURT:  Okay.  All right, I understand.  So my

19  original order stands.

20          What is our next issue?

21          MS. RANAHAN:  Okay, there is one more issue, Your

22  Honor.

23          So there's an industry agreement called CAST (ph)

24  that plaintiffs entered with a bunch of cable internet

25  companies, like similar -- similarly situated to Charter and

1    other companies.  And in that agreement, there was certain

2    provisions that made rules about what was expected, as far

3    as terminations and other aspects of what would be expected

4    as industry appropriate at the time.

5         Charter was not a party to the agreement, but

6    plaintiffs were.  So we have requested information about

7    that agreement and emails regarding that agreement because

8    it goes to show what plaintiffs actually thought was

9    reasonable at the time which can, you know, go to the

10   damages amongst -- amongst other things and plaintiffs have

11   refused to produce anything.

12        THE COURT:  Okay.

13        MS. SAHNI:  Your Honor, just for getting a little

14   bit of background, this was an agreement -- a private

15   agreement between private parties, nearly 30 parties, none

16   of which includes Charter.  And that -- in no way that

17   agreement and the documents surrounding it that form it, had

18   nothing to do with what the legal obligations of the

19   participants.

20        In this case, we are seeking to hold Charter

21   liable for failing to meet its legal obligations.  And

22   Charter has to demonstrate whether it complied with the law

23   or not, and that -- the question of what was agreed to in

24   this private agreement between entities not involving

25   Charter is utterly irrelevant to that question.

48

1          Nowhere in our complaint do we say that Charter

2     violated the law because it wasn't doing what other IFCs

3     were doing.  We don't purport to rely on any industry

4     standard.

5          Even if we did have itself the copyright alert

6     system, the documentation that formed that -- that system

7     makes very clear that it does not establish an industry

8     standard.

9          The Memorandum of Understanding in that case,

10    which we are going to produce, it's a public document, makes

11    clear that CAST was not imposing any legal obligation and

12    that IFCs were separately required to abide by their legal

13    obligations under DMCA or otherwise.  So how is this simply

14    irrelevant because it doesn't actually answer the question

15    of:  Did Charter violate the law?  Did it fail to meet its

16    own legal obligation by accepting thousands and thousands

17    and hundreds of thousands of the notices and doing nothing

18    to curb infringement on its network?

19         So there is not relevance for this information and

20    again, the requests are overbroad.  They are seeking all

21    documents related to this -- this private agreement that

22    didn't involve them.

23         And the negotiations span years and the

24    negotiations to kind of create CASTs through the end of the

25    CAST system.  We are talking about eight years and it's a

 1   real burden.  They are seeking every documents relates --

 2   that relates to CAST.  That's actually one of their request,

 3   all documents concerning CAST.

 4          In addition, there's an additional burden because

 5   the agreement, the agreement at issue, which is only a

 6   subset of what they are asking for, involve parties not

 7   before the Court.  So we would have to go back and get

 8   consent from third parties, given confidentiality concerns.

 9          And, again, they are trying to relitigate

10   something that they lost on in this Cox case where there

11   were a very limited set of the documents that were ordered

12   to be produced there.  And here, they are asking for every

13   document over an eight-year period relating to a private

14   agreement that they weren't involved in, that doesn't

15   establish an industry standard and that has nothing to do

16   with whether Charter met its legal obligation.

17          MS. RANAHAN:  Sorry.

18          THE COURT:  Okay.  Any reply?

19          MS. RANAHAN:  Sorry, Your Honor.

20          So what this goes to is if our clients were

21   relying on their entering this agreement and including

22   provisions that we do not expect, as long as you are

23   following these basic steps, to have you terminate us under,

24   there are other provisions which we believe are in there,

25   then plaintiffs' state of mind and they're saying all of you

50

1  other companies, just like Charter, it's okay if you operate

2  like this, but we are going to hold Charter to a different

3  standard.

4         Now, I'm not suggesting it's a legal standard that

5  they are bound by or that's the state of the law.  It just

6  goes to what our client's, you know, understanding their

7  state of mind, and plaintiffs' state of mind was, and why

8  they waited so long to sue us, why they are charging

9  Charter.

10        I mean, it does -- it is critical, especially when

11  one of the provisions is whether Cox -- or sorry, whether

12  Charter was expected to do terminations.  And that's one of

13  the main central issues in this case.

14        If there was a agreement that says, We don't

15  expect companies like to this to do termination and our

16  company relied on that in believing that it was protecting

17  itself and doing all of the correct steps that were

18  expected, then what plaintiffs' state of mind was in doing

19  that is relevant.

20        And we have no idea how burdensome this is.  We

21  don't know if -- I don't think plaintiffs have looked for it

22  either, so I don't think they know if there really is a true

23  burden here.

24        But whether it's over eight years, we would expect

25  it to be over a small period of time or a small number of

51

1    documents because it's relating to the entering of that one

2    agreement.  It's not an eight-year process.  So I don't

3    think that it's particular unduly burdensome and it is

4    relevant to one of central issues in this case, which is

5    what was expected of a company like Charter.

6            THE COURT:  Well, whatever your client was relying

7    on, whatever their state of mind was, they are in control of

8    that.  So if they relied on some document they were aware of

9    or some rumors or whatever, that's already what they relied

10   on.  And I don't see the relevance or admissibility of this

11   agreement.  So I'm with the plaintiffs on this one, okay.

12           MS. RANAHAN:  Okay.

13           THE COURT:  So follow up with me as needed and be

14   glad that you are not here in 10-degree weather with a

15   snowstorm going on and the city shutting down.

16           Okay.  Everybody take care.

17           MR. GOULD:  Your Honor, thank you for your time.

18           MS. RANAHAN:  Thank you, Your Honor.

19           MS. SAHNI:  Thank you, Your Honor.

20           (Whereupon, the within hearing was then in

21   conclusion at 2:31 p.m.)

22

23

24

25

52

1                TRANSCRIBER'S CERTIFICATION

2     I certify that the foregoing is a correct transcript to the

3     best of my ability to hear and understand the audio recording

4     and based on the quality of the audio recording from the

5     above-entitled matter.

6

7     /s/ Carol Patterson                November 1, 2019

8     Signature of Transcriber                   Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25