**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 19-cv-00874-RBJ-MEH

**WARNER RECORDS INC., et al.**

       Plaintiffs,

v.

**CHARTER COMMUNICATIONS, INC.**

       Defendant.

---

**PLAINTIFFS' RESPONSE TO DEFENDANT CHARTER COMMUNICATIONS INC.'S
OBJECTION TO RECOMMENDATION BY MAGISTRATE JUDGE TO DENY
CHARTER'S MOTION TO DISMISS PLAINTIFFS' CLAIM FOR VICARIOUS
LIABILITY**

---

## PRELIMINARY STATEMENT

This lawsuit seeks to hold Charter Communications, Inc. ("Charter") responsible for turning a blind eye to its users' rampant infringement of Plaintiffs' copyrighted works, despite receiving clear, repeated notice of its users' infringing conduct and having both the right and ability to stop it.  In a thorough and well-reasoned recommendation (the "Recommendation"), Magistrate Judge Hegarty (the "Magistrate Judge") evaluated the sufficiency of Plaintiffs' allegations and determined that, at this early stage of the litigation, they plausibly establish both elements of a vicarious infringement claim: that Charter has the right and ability to control its users' infringing conduct, and that it receives a direct financial benefit from such infringement. The Recommendation comports with the decisions of other courts, which have allowed similar vicarious infringement claims to proceed.  Indeed, this past Friday, the United States District Court for the Eastern District of Virginia denied an Internet service provider's ("ISP") motion for summary judgment on a vicarious infringement claim premised on substantially the same allegations as the claim at issue here.  *See Sony Music Entm't v. Cox Commc'ns*, No. 18-cv-950 (E.D. Va.) ("*Sony* Action") (Dkt. No. 586).  If the claim in *Sony* is sufficient to survive a motion for summary judgment, then Plaintiffs' claim surely survives a motion to dismiss.  Nothing in Charter's Objection calls the Magistrate Judge's sound reasoning on that score into question.

*First*, the Magistrate Judge correctly concluded that Charter has the "practical ability" to control its users' infringement over its Internet service.  As every court that has considered the issue has determined, ISPs like Charter can stop or limit their users' infringing conduct by terminating their access to the Internet.  Charter's *sole* argument to the contrary is that it cannot prevent its users from accessing infringing material through *other ISPs* after it terminates them

from Charter.  But as the Magistrate Judge recognized, liability obtains as long as a defendant can stop *or limit* infringing conduct, which Charter can plainly do by terminating infringing users' access to the Internet *through Charter*.

*Second*, the Magistrate Judge correctly determined that Plaintiffs have adequately pled that Charter's receives a direct financial benefit from its users' infringement.  It is well-established that a defendant receives a direct financial benefit whenever its customers are drawn to its service by the availability of infringing content—regardless of "how substantial" the draw of infringement is.  Here, Plaintiffs have adequately pled that some Charter subscribers are drawn to its service by the ability to infringe, which is supported by allegations that (i) Charter's advertisements tout specific features of its service that are attractive to infringers, including the ability to download up to "8 songs in 3 seconds," and that (ii) Charter's users have utilized these features to pirate Plaintiffs' works hundreds of thousands of times.  These and other allegations permit the reasonable inference that at least some Charter users are drawn to its service by the ability to infringe, which is all that is necessary to state a claim.

The court's recent decision in *Sony* provides yet another reason to affirm the Magistrate Judge's Recommendation.  In that case, plaintiffs sought to hold an ISP vicariously liable for its users' infringement, reasoning that the ISP received a direct financial benefit from infringement to the extent that it "chose not to stop [infringing conduct] on its network . . . in order to collect revenues that it would lose if it terminated the particular accounts that were repeatedly the subject of infringement notices."  *Sony* Action, Dkt. No. 396, at 33.  The defendant ISP in that case moved for summary judgment on this claim, but the court denied the motion.  *Sony* Action, Dkt. No. 586.  Here, Plaintiffs' allegations are substantially identical to those in *Sony*, and this

Court should thus deny Charter's motion to dismiss for the same reasons that the Virginia court denied the *Sony* motion.  For these and other reasons, Charter's Objection should be overruled.

## LEGAL STANDARD

The Magistrate Judge's recommendation to deny Charter's motion to dismiss is reviewed de novo.  Fed. R. Civ. P. 72(b)(3).  To withstand a motion to dismiss, a complaint need only "contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  In assessing plausibility, the Court must "liberally construe the pleadings and make all reasonable inferences in favor of [the plaintiff]." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1105 (10th Cir. 2017).

## ARGUMENT

## I.   THE RECOMMENDATION CORRECTLY CONCLUDED THAT PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT CHARTER HAS THE RIGHT AND ABILITY TO SUPERVISE ITS USERS' INFRINGEMENT.

The Magistrate Judge correctly found that Plaintiffs' allegations adequately plead the first element of a vicarious infringement claim: that Charter has both the legal right and practical ability to control its users' infringement by terminating users' accounts.

It is well-established that the right and ability "to block infringers' access to a particular environment . . . is evidence of [a defendant's] right and ability to supervise." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001).  Blocking access entails both "a legal right to stop or limit the directly infringing conduct . . . [and] the practical ability to do so." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007).  In the Internet

context, this means that an ISP will be liable for users' infringement where it has the contractual right to "terminate [users'] accounts," *Capitol Records, LLC v. Escape Media Grp.*, 2015 WL 1402049, at *42 (S.D.N.Y. Mar. 25, 2015), and the practical ability to "terminate, suspend or restrict users' subscriptions, thereby limiting their access to uploading or downloading," *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 157 (S.D.N.Y. 2009).

Charter does not contest that it has the *contractual right* to terminate users' accounts for engaging in copyright infringement.  (Obj. at 12.)  Instead, Charter contends that the Magistrate Judge erred in finding that it has the *practical ability* to limit infringement by *exercising* this contractual right and terminating users' accounts.  (*Id.*)  This argument is unavailing.  As every court that has considered the issue has recognized, "[f]ile-sharing programs," like BitTorrent, "are completely dependent on the internet to facilitate the download and upload of files." *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 674 (E.D. Va. 2015).  For this reason, an ISP like Charter can necessarily "stop or limit infringing conduct by terminating its subscribers' internet access." *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 2018 WL 1096871, at *10 (W.D. Tex. Feb. 28, 2018).  After all, "[w]ithout the internet, individuals cannot upload or download illegal content." *Cox*, 149 F. Supp. 3d at 675.

Conceding this basic principle, Charter instead argues that that it lacks the practical ability to stop infringement because, although it can block users' access to the Internet *through Charter*, it cannot prevent them from accessing the Internet through other means.  (Obj. at 12.)  This argument fails for several reasons.

*First*, Charter's argument misunderstands the scope of Plaintiffs' claim.  Plaintiffs are not seeking to hold Charter responsible for *any* act of infringement that occurs through *any* ISP;

rather, they are seeking to hold Charter liable for a discrete set of infringing acts that were committed by Charter users through Charter's Internet service between 2013 and 2017.  (Compl. ¶ 5.)  Charter undoubtedly had the ability to stop or limit *these* infringing acts, which is sufficient to state a claim.  (*See* Opp'n to Mot. to Dismiss, Dkt. No. 50 ("Opp'n"), at 8.)

*Second*, even if users' ability to access infringing content through other ISPs were relevant to the analysis, Charter's argument *still* fails, as courts have never required that a defendant be able to completely stop infringement in order to impose liability.  Rather, liability obtains as long as a defendant may "stop or limit" infringing conduct, including by making it more difficult to infringe.  *Amazon*, 508 F.3d at 1173.  Here, Charter can plainly make its users' infringement more difficult by blocking their access to the Internet *through Charter*, eliminating a key tool that Charter users use to download music illegally.  *See Cox*, 149 F. Supp. 3d at 675.

*Finally*, Charter's argument conflicts with well-established case law—including the *Cox* and *Grande* decisions—which rejects the precise argument that Charter is making here.  In its Objection, Charter attempts to distinguish these cases by claiming that they "focus[] almost exclusively on [those ISPs'] 'right to control'" infringing conduct—not on their practical ability to do so—but this is not true.  (Obj. at 13.)  Both the *Cox* and *Grande* courts considered the "practical ability" prong, and each held that the ISP defendant in those cases had the practical ability to control infringing conduct, notwithstanding that some terminated users might be able to access the Internet through other means.  (*See* Opp'n at 9.)

*Amazon*—the sole case that Charter cites in support of its position—is not to the contrary. In *Amazon*, the Ninth Circuit held that the search engine Google was not vicariously liable for certain websites' infringement because the most that Google could do to limit those websites'

infringement was to terminate its *advertising relationships* with the websites in question. 508 F.3d at 1173-74. Because terminating these *advertising relationships* would not stop the websites from "reproducing, displaying, and distributing" plaintiff's works, the Ninth Circuit held that Google could only *indirectly* control the websites' infringing conduct by incentivizing them to stop infringing, but it lacked the practical ability to stop or limit the websites' infringing conduct. *Id.* Here, by contrast, Charter has the ability to stop its users from reproducing or distributing Plaintiffs' works by terminating their accounts.[1] Indeed, in a case decided shortly before *Amazon*, the Ninth Circuit opined that if a defendant could "block [infringers'] access to the Internet," it would be liable for those infringers' conduct. *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 804 (9th Cir. 2007). Charter plainly meets this test.[2]

## II. THE RECOMMENDATION CORRECTLY CONCLUDED THAT PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT CHARTER RECEIVES A DIRECT FINANCIAL BENEFIT FROM ITS USERS' INFRINGEMENT.

The Magistrate Judge also correctly found that Plaintiffs have adequately alleged that Charter receives a "direct financial benefit" from its users' infringement. Although Charter raises a litany of arguments against the Recommendation, its objections are without merit.

---

[1] Charter contends that *Amazon* turns on whether a defendant is a "closed system" or "general-purpose ISP[]." (Obj. at 12.) This is not true. To the extent that *Amazon* invoked the terminology of a "closed system," it was to note only that such systems have the ability to block users' access to the environment in which infringement is occurring. *Amazon*, 508 F.3d at 1174. Charter, too, has this ability.

[2] Charter argues that the termination of users' accounts is a "blunt tool" to control infringement and faults the Magistrate for demanding that it "respond[] to each notice [of infringement]" by immediately "terminating [users'] internet access." (Obj. at 2.) This argument is unavailing, as nothing in the case law suggests that a defendant's ability to control infringement is limited to instances in which enforcement can be narrowly tailored. Nor is Charter prohibited from offering its users a "carrot" to stop infringing before applying the "stick" of termination.

A.      *The Magistrate Judge Applied the Correct Legal Standard.*

Charter first contends that the Magistrate Judge erred by applying the incorrect legal standard to Plaintiffs' allegations about Charter's receipt of a direct financial benefit.  (Obj. at 6-7.)  Charter is wrong.  As the Magistrate Judge correctly recognized, a direct financial benefit exists as long as there is "a causal relationship between the infringing activity alleged in th[e] case and any financial benefit [a] Defendant reaps."  (Rec. at 12 (citing *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 673 (9th Cir. 2017)).)  Such a relationship does not require a defendant to receive a financial benefit that is "tied directly to the sales of . . . infringing goods." *Arista Records LLC v. Lime Grp.*, 784 F. Supp. 2d 398, 435 (S.D.N.Y. 2011).  Rather, a benefit exists whenever "the availability of infringing material acts as a 'draw' for [the defendant's] customers," *Napster*, 239 F.3d at 1023, or when the defendant "has an economic incentive to tolerate [users'] infringing conduct," *Escape Media*, 2015 WL 1402049, at \*42.

Charter—not the Magistrate Judge—misstates the financial benefit standard.  For example, Charter maintains that Plaintiffs' vicarious infringement claim must fail because Plaintiffs have not alleged that the availability of infringing content is "*the* attracting factor" to Charter's Internet service.  (Obj. at 7.)  "[T]he law is clear," however, "that to constitute a direct financial benefit, the 'draw' of infringement need not be the primary, or even a significant, draw"—"it need only be 'a' draw." *Escape Media*, 2015 WL 1402049, at \*42.  Liability obtains as long as "some percentage" of a defendant's customers "were drawn" to its service, "at least in part," by the availability of infringing content. *See Cox*, 149 F. Supp. 3d at 676.

Charter also misstates the standard insofar as it claims that Plaintiffs must allege *both* a "draw" to Charter's service *and* a financial gain to Charter.  (Obj. at 9.)  In reality, *either* suffices

to state a claim. *See GC2 Inc. v. Int'l Game Tech.*, 255 F. Supp. 3d 812, 825 (N.D. Ill. 2017) ("[A] financial benefit exists where there is evidence of a direct financial gain *or* that the availability of infringing material acts as a draw for [a defendant's] customers." (emphasis added)).[3]   Indeed, even if they were not relying on the draw of infringement to state a claim, Plaintiffs would *still* not be required to plead a financial gain to Charter, as "evidence of financial gain is not necessary to prove vicarious liability as long as the service provider has an economic incentive to tolerate infringing conduct." *Escape Media*, 2015 WL 1402049, at *42.[4]

      B.      *Plaintiffs' Allegations Permit the Reasonable Inference that Users Are Drawn to Charter's Service by the Availability of Infringing Content.*

Charter next contends that the Magistrate Judge erred in finding that Plaintiffs' allegations plausibly state that Charter has a direct financial interest in the alleged infringing activity.  (Obj. at 3-5.)  Charter's objection is meritless.

To be clear, Plaintiffs' Complaint provides ample support for the Magistrate Judge's conclusion that Charter plausibly receives a direct financial benefit from its users' infringing conduct.  As the Magistrate Judge acknowledged, Plaintiffs' Complaint alleges that:

- Infringing subscribers "are motivated to subscribe" to Charter by advertisements that tout specific features of Charter's service that are attractive to infringers, including the company's "fast" download speeds, which "enable[] subscribers to . . . 'download [up to] 8 songs in 3 seconds,'" (Compl. ¶ 75);

---

[3] To the extent that *Tomelleri v. Zazzle, Inc.*, 2015 WL 8375083, at *15 (D. Kan. Dec. 9, 2015), suggests the contrary, the case conflicts with the weight of authority, which holds that a "financial benefit need not be tied directly to sales of the infringing goods." *Lime Grp.*, 784 F. Supp. 2d at 435.  Indeed, Plaintiffs submit that the better reading of *Tomelleri* is that when users are drawn to a service by infringement, its owner generally receives a financial gain.  This is true of Charter, which receives fees from users drawn to its service by infringement.

[4] This alternative theory of benefit, which was a driving force in *Sony*, is discussed *infra*.

- Charter subscribers have utilized these speeds to "pira[te]"[5] Plaintiffs' works "hundreds of thousands" of times, (*id.* ¶¶ 2, 77, 85, 90);

- Despite receiving notices of its users' infringement, Charter did nothing to stop it, (*id.* ¶ 2); and

- Charter's "failure to police its infringing subscribers . . . was a draw" to subscribers, who "purchased more bandwidth" from Charter, allowing them to download Plaintiffs' songs in greater volumes and at faster rates, (*id.* ¶¶ 77, 91).

The Magistrate Judge correctly determined that these allegations—and the inferences drawn therefrom—"plausibly state that Defendant has a direct financial interest in the alleged infringing activity." (Rec. at 9.) The Recommendation's analysis comports with that of other courts. (*See* Opp'n at 13 (collecting cases).)

Charter attempts to subvert the Magistrate Judge's reasoning by ascribing two errors to his Recommendation, neither of which is availing.

*First*, Charter contends that the Magistrate erred in crediting Plaintiffs' allegation that certain subscribers are "motivated" to subscribe to Charter by advertisements touting users' ability to download music quickly through Charter. (Obj. at 3-4.) According to Charter, these advertisements do not permit the inference that certain of its users were motivated to subscribe to Charter by the ability to infringe, as fast download speeds can be used for "countless legitimate purposes." (*Id.* at 5.) This argument fails for myriad reasons. First, it is well-established that the fact that a service is capable of "substantial non-infringing uses" does not shield a defendant from liability. *Lime Grp.*, 784 F. Supp. 2d at 435. In *Lime Group*, for example, the court

---

[5] Charter faults the Magistrate Judge for using the word "pirate" in his Recommendation. (Obj. at 4, n. 2.) Contrary to Charter's suggestion, however, the word "piracy" appears multiple times in the Complaint. (Compl. ¶¶ 77, 78, 82.)

rejected the argument that the owners of Lime Wire, an online file distribution program, were shielded from liability because both infringing and non-infringing users utilized the service. *Id.* Second, Charter's argument elides the fact that its advertisements specifically single out users' ability to download music quickly through Charter. The ads do not enumerate the "countless" other purposes for which Charter's service can purportedly be used. Finally, Charter's focus on allegations about the *speed* of its Internet service ignores other allegations that render Plaintiffs' claim plausible. Specifically, Charter ignores Plaintiffs' allegations that (i) online copyright infringement is pervasive, accounting for 11% of all Internet traffic in 2011, and (ii) Charter subscribers have engaged in infringement "hundreds of thousands" of times. (*Id.* ¶¶ 81, 85.) Based on these numbers, it is reasonable to infer that "pirating music" is something that at least some Charter users seek to do through Charter, supporting Plaintiffs' theory of draw.

*Second*, Charter accuses the Magistrate Judge of inventing facts to support his conclusions. (Obj. at 4-5.) Specifically, Charter contends that the Magistrate Judge made up the fact that Charter subscribers "purchase[d] more bandwidth" from Charter "once [they] realized that [Charter] did not intend to stop or control the[ir] infringement." (*Id.*) This allegation, however, comes directly from the Complaint. Specifically, Plaintiffs allege that infringing subscribers "knew [that] Charter would not terminate their [Internet] accounts" for engaging in infringement, and that users, "in turn, purchased more bandwidth [from Charter]" to continue infringing. (Compl. ¶¶ 77, 91.) At worst, the Magistrate Judge has drawn a reasonable inference in favor of Plaintiffs, which is permissible at the pleading stage.[6]

---

[6] Charter suggests that if Plaintiffs' allegations suffice to plead a claim for vicarious infringement, it will "open the floodgates for massive liability against ISPs." (Obj. at 1.) This

C.     *The Magistrate Judge Did Not Misapply Relevant Case Law.*

Charter next contends that the Magistrate Judge misapplied relevant case law when

evaluating Plaintiffs' vicarious infringement claim.  This objection fails as well.

1.     The Magistrate Judge Did Not Misapply *Giganews*.

Charter first contends that the Magistrate Judge misapplied *Giganews*—a Ninth Circuit

decision without binding effect on this Court—to the extent that he failed to properly consider

whether Charter's users were "drawn" to Charter's service by the ability to pirate Plaintiffs'

copyrighted works, as distinguished from copyrighted works *in general*.  (Obj. at 8.)  This

argument fails for two reasons.

*First*, to the extent that *Giganews* holds that a "draw" exists only insofar as customers are

attracted to a defendant's service because of the specific works in suit, the decision conflicts with

the weight of authority, which holds that a direct financial benefit exists as long as customers are

drawn to a defendant's service by the *general* ability to infringe.  *See, e.g.*, *Escape Media*, 2015

WL 1402049, at *43; *Lime Grp.*, 784 F. Supp. 2d at 435.

*Second*, even if *Giganews* articulates the correct standard, Plaintiffs have met it.  As

alleged in the Complaint, Plaintiffs, who are among the "largest" music companies in the world,

own or control the copyrights to "millions" of sound recordings, including "some of the world's

---

fear is unfounded.  First, the inquiry on a motion to dismiss is whether a plaintiff has pled
sufficient facts to "raise a reasonable expectation that discovery will reveal evidence of
[wrongdoing]," not whether a defendant is "liable."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,
556 (2007).  Second, Plaintiffs' allegations do not apply to "every ISP." (Obj. at 11.)  Instead,
Plaintiffs point to specific features of Charter's service, how Charter has marketed them, and the
many instances in which Charter users have utilized the features to download Plaintiffs' works
illegally.  (Compl. ¶¶ 75, 85.)  These facts are unique to Charter and do not subject "every ISP"
to vicarious infringement claims.

most famous and popular music." (Compl. ¶¶ 1, 13, 33.) Based on the volume and popularity of

Plaintiffs' copyrights, it is more than reasonable to infer that at least some of Charter's users

were drawn to its service by the ability to infringe Plaintiffs' works *in particular*. In this respect,

Plaintiffs are differently situated than the *Giganews* plaintiff, who was a single purveyor of

pornographic images. *Giganews*, 847 F.3d at 664.

> 2. The Magistrate Judge Did Not Misapply *Ellison*.

Charter next contends that the Magistrate Judge misapplied *Ellison*, another Ninth Circuit

decision without binding effect. But again, Charter is the one that misapplies that case.

*First*, Charter contends that *Ellison* holds that a defendant cannot be liable for its users'

infringement when it charges users a flat fee for its service. (Obj. at 5, 9-10.) In reality,

however, *Ellison* holds that "flat periodic fees" *can* and *do* "constitute . . . direct financial

benefit[s]" when "the value of [a defendant's] service lies in providing access to infringing

material." *Ellison*, 357 F.3d at 1079. This is precisely what Plaintiffs allege.

*Second*, Charter faults the Magistrate Judge for missing a "highly pertinent" distinction in

*Ellison* that Charter claims is critical to the case. (Obj. at 10.) Specifically, Charter claims that

*Ellison* instructed courts to distinguish between two types of entities when assessing a direct

financial benefit: (i) entities like Napster, for whom "virtually 'all of [their] "draw" to customers

result[s] from . . . providing access to infringing material,'" and (ii) entities like AOL and

Charter, which provide a "'vast array of products and services.'" (*Id.* (quoting *Ellison*, 357 F.3d

at 1078).) According to Charter, the fact that it provides many products and services renders the

"draw" of infringement "relatively insignificant" in comparison to other, legitimate draws of its

service, thereby shielding Charter from liability. (*Id.*) In fact, *Ellison* holds precisely the

opposite.  According to *Ellison*, "[t]he essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of *how substantial* the benefit is in proportion to a defendant's overall profits." 357 F.3d at 1079.  Construed correctly, *Ellison* counsels in favor of—not against—a finding of direct financial benefit, regardless of the significance of the draw alleged.[7]

### 3.    The Magistrate Judge Did Not Misapply *Grande*.

Charter maintains that the Magistrate Judge misinterpreted *Grande*, another non-binding authority.  (Obj. at 10-11.)  In *Grande*, the court dismissed a vicarious infringement claim against an ISP on the ground that plaintiffs in that case pled only one conclusory fact in support of the defendant's receipt of a direct financial benefit.  2018 WL 1096871, at *10.  Plaintiffs, however, have pled far more than that, including allegations that Charter touted specific features of its service that were attractive to infringers, and that Charter's policy of non-enforcement "motivated" users to sign up for or remain with the company.  Charter claims these allegations are conclusory too, but that argument fails for the reasons discussed above.  *See supra* at 8-10.[8]

---

[7] The *Ellison* court ultimately affirmed the district court's grant of summary judgment after finding that the plaintiff had failed to present evidence that infringement was a draw to AOL's service—even an "insignificant" one. 357 F.3d at 1079.  In the absence of such evidence, the court characterized the alleged infringement as an "added benefit" to AOL subscribers, not a draw.  *Id.*  Contrary to Charter's suggestion, however, the *Ellison* court did not opine on how to distinguish between "draws" and "added benefits" *at the pleading stage*.  To the contrary, the court recognized that "there is usually substantial overlap" between draws and added benefits, *id.*—a concession that counsels in favor of allowing Plaintiffs' claim to proceed.  *See In re Zinc Antitrust Litig.*, 2016 WL 3167192, at *11 (S.D.N.Y. Jun. 6, 2016) (courts "may not choose between two plausible inferences" from alleged facts at the pleading stage).

[8] The court's analysis in *Grande* also misstates the law, including insofar as it faulted plaintiffs for failing to allege that infringing material is "something exclusively available through Grande's service." 2018 WL 1096871, at *10.  To be held vicariously liable, a defendant is not required to provide "exclusive[]" access to infringing material.  (*See* Opp'n at 14 n.1.)

4.   <u>The Magistrate Judge Did Not Ignore Plaintiffs' Landlord Cases</u>.

Finally, Charter contends that the Magistrate Judge erred by ignoring the cases it cited in its motion concerning landlords' liability for vicarious infringement claims.  (Obj. at 7-8.)  These cases, however, are inapposite.

Although Charter spills significant ink attempting to analogize itself to a landlord—a class of defendants generally immune from vicarious infringement—Plaintiffs have already explained why the analogy fails.  (Opp'n at 19-20.)  Specifically, although Charter, like a landlord, charges flat fees to customers and provides a service that is capable of both infringing and non-infringing uses, neither of these attributes shields a landlord from liability.  (*Id.*)

Instead, the factor that drives courts' decisions not to impose liability on landlords is their low level of control over infringing tenants.  *See, e.g.*, *Coach, Inc. v. Swap Shop, Inc.*, 2012 WL 12887010, at *8 (S.D. Fla. Sept. 21, 2012) (declining to impose liability on landlord because it did not meet "the supervise and control prong").  Because Charter *has* the ability to control its infringing users, *see supra* at 4-6, these landlord-tenant cases are immaterial to the analysis.[9]

---

[9] Charter also maintains that the Magistrate Judge misapplied *Tomelleri*, but this argument lacks merit, as *Tomelleri* is yet another case disposing of a vicarious infringement claim at summary judgment, not on a motion to dismiss.  *See* 2015 WL 8375083, at *1, 15.  Moreover, in deciding *Tomelleri*, the court emphasized that the only user of defendant's service who "testified in this case stated that what drew him to [the defendant] was the fact that Defendant maintains the products to which he can apply his own artwork," *not* the ability to infringe.  *Id.* at *15.  Plaintiffs should be afforded the same right to discovery as Tomelleri had, including the right to question Charter users.  Indeed, this type of discovery is common in vicarious infringement suits, including *Cox*.  *See, e.g.*, *Cox*, 149 F. Supp. 3d at 676 (allowing vicarious infringement claim against ISP to proceed to trial based on "a survey conducted by [plaintiffs'] expert" showing that approximately 10% of ISP's users subscribed to ISP because they wanted to "download or upload free digital music through sites" that facilitated infringement).

     D.     *A Financial Benefit Exists Because Charter Has an "Economic Incentive" to Tolerate Infringement.*

Finally, although the Magistrate Judge found that Plaintiffs' allegations about "draw" are sufficient to overcome Charter's motion to dismiss, Plaintiffs have also adequately pled a direct financial benefit to Charter for the independent reason that Charter has an economic incentive not to terminate infringing users' accounts.  As the court explained in *Escape Media*, "evidence of financial gain is not necessary to prove vicarious liability as long as the service provider has an economic incentive to tolerate infringing conduct."  2015 WL 1402049, at *42.  Here, Charter plainly has an incentive not to terminate infringers' accounts, as these users pay substantial fees to Charter each month for the ability to access Charter's service.  (Compl. ¶ 91.)

Indeed, plaintiffs in *Sony* made precisely the same argument with respect to the ISP defendant in that case, which, like Charter, "chose not to stop the infringement on its network precisely in order to collect revenues that it would lose if it terminated the particular accounts that were repeatedly the subject of infringement notices."  *Sony* Action, Dkt No. 396, at 33.  The ISP moved for summary judgment on this vicarious infringement claim, but just last Friday, the court denied the motion.  *See Sony* Action, Dkt. No. 586.  This Court should do the same.

## CONCLUSION

For the foregoing reasons, the Court should overrule Charter's Objection and adopt the Magistrate Judge's Recommendation in its entirety.

Dated: November 18, 2019

*/s/ Mitchell A. Kamin*
Mitchell A. Kamin
Neema T. Sahni
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
mkamin@cov.com
nsahni@cov.com

Jonathan M. Sperling
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
jsperling@cov.com

Janette L. Ferguson, Esq.
Benjamin M. Leoni, Esq.
LEWIS BESS WILLIAMS & WEESE,
P.C.
1801 California Street, Suite 3400
Denver, CO 80202
Telephone: (303) 861-2828
Facsimile: (303) 861-4017
jferguson@lewisbess.com
bleoni@lewisbess.com

Matthew J. Oppenheim
Scott A. Zebrak
Jeffrey M. Gould
Kerry M. Mustico
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave. NW, 5th Floor
Washington, DC 20016
Telephone: (202) 621-9027
matt@oandzlaw.com
scott@oandzlaw.com
jeff@oandzlaw.com
kerry@oandzlaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies on this 18th day of November, 2019, a true and correct copy of the foregoing *Plaintiffs' Response to Defendant Charter Communications, Inc.'s Objection to Recommendation by Magistrate Judge to Deny Charter's Motion to Dismiss Plaintiffs' Claim for Vicarious Liability* was served electronically via CM/ECF on the following:

Craig D. Joyce
Jack M. Tanner
FAIRFIELD & WOODS, P.C.
1801 California St., Ste. 2600
Denver, CO 80202

Michael S. Elkin
Thomas Patrick Lane
Seth E. Spitzer
Stacey Foltz Stark
WINSTON & STRAWN LLP
200 Park Ave.
New York, NY 10166

Jennifer A. Golinveaux
WINSTON & STRAWN LLP
101 California St.
San Francisco, CA 94111

Erin R. Ranahan
Shilpa A. Coorg
WINSTON & STRAWN LLP
333 South Grand Ave.
Los Angeles, CA 90071

*/s/ Mitchell A. Kamin*
Mitchell A. Kamin