**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 19-cv-00874-RBJ-MEH

**WARNER RECORDS INC.,** *et al.*,

        Plaintiffs,

v.

**CHARTER COMMUNICATIONS, INC.,**

        Defendant.

---

**PLAINTIFFS' RESPONSE TO DEFENDANT CHARTER COMMUNICATION INC.'S
OBJECTIONS TO MAGISTRATE JUDGE HEGARTY'S OCTOBER 29, 2019
DISCOVERY ORDER**

---

## I.      INTRODUCTION

Plaintiffs filed this case against Defendant Charter Communications, Inc. ("Charter") to seek redress for Charter's involvement in the widespread infringement of Plaintiffs' copyrighted works occurring on Charter's internet services.  It is thus *Charter*'s actions (or more accurately, its complete inaction in the face of known infringement) that is at the heart of this lawsuit; yet, in its over 90 discovery requests, Charter seeks wide-ranging discovery into literally every element of *Plaintiffs*' business and demands highly sensitive information involving internet service providers ("ISPs") *other than itself*.  In his October 29, 2019 Discovery Order, Magistrate Judge Hegarty correctly curbed this inappropriate and intrusive fishing expedition, rejecting Charter's attempt to compel Plaintiffs to produce documents that are both irrelevant to the claims and potential defenses at issue in this case, and extraordinarily burdensome to produce.  Charter's Objections to that sound discovery ruling should be overruled on all counts.

*First*, Charter requests that this Court reverse Magistrate Judge Hegarty's decision to deny Charter's demands for highly detailed track-by-track and medium-by-medium profit, expense, and revenue data for all of the works in suit—much of which Plaintiffs do not maintain in the ordinary course of business—along with all documents related to the valuation of these works. Though Magistrate Judge Hegarty ordered the production of a set of track-by-track *revenue* data that has already been produced in similar litigation against another ISP, Cox Communications, Inc. ("Cox"), he recognized that the burden of collecting and processing massive amounts of additional financial data, which encompass virtually every element of Plaintiffs' businesses, far outweighed any potential benefit. Indeed, the financial information Charter seeks in order to purportedly calculate Plaintiffs' "actual damages" is largely irrelevant here, since Plaintiffs have elected to pursue statutory damages. And even if Plaintiffs' actual damages *were* relevant to statutory damages, the information Charter seeks would still not yield any meaningful evidence concerning those actual damages.

*Second*, Charter asks this Court to reverse Magistrate Judge Hegarty's ruling that Plaintiffs need not produce a massive body of documents relating to the Copyright Alert System ("CAS"), a private agreement among a number of copyright holders and certain ISPs—notably, *not* including Charter. Whatever agreements Plaintiffs entered into with other parties to attempt to protect Plaintiffs' intellectual property, which Charter did not enter into itself, have no bearing on Charter's failure to uphold its own legal obligations, as Magistrate Judge Hegarty correctly concluded. Moreover, the documents sought by Charter are largely subject to CAS's complicated confidentiality provisions, disclosure of which would require the agreement of numerous other CAS signatories, including Charter's competitors. Thus, in addition to being

irrelevant, production of these documents would also be incredibly burdensome, and therefore disproportionate to the needs of this case given their irrelevance to any issues in dispute.

## II.    FACTUAL BACKGROUND

Charter served its First Sets of Interrogatories and Requests for Production on June 25, 2019.  *See* Declaration of Neema T. Sahni ("Sahni Decl."), Exs. A & B.  Plaintiffs timely served objections and responses to those discovery requests on July 25, 2019, in which they agreed to produce, among other things, documents sufficient to demonstrate Plaintiffs' total annualized U.S. revenues, expenses, and profits for the years 2010 through 2016.  *Id.*, Exs. C & D.

After exchanging correspondence regarding purported deficiencies in Plaintiffs' responses, the parties met and conferred in person on September 19, 2019.  Sahni Decl. ¶¶ 6–7. At the meet and confer, Plaintiffs reiterated their agreement to produce company financial records.  *Id.* ¶ 7.  However, they objected to providing the level of track-by-track financial detail Charter sought.  *Id.*  Plaintiffs also objected that Charter's overly broad CAS-related requests, including for "[a]ll documents concerning CAS," were inappropriate.  *Id.*; *see also id.*, Ex. D at Request No. 68.  The parties met and conferred once again on October 22, 2019, but they were unable to resolve their differences.  Sahni Decl. ¶ 8.

On October 29, 2019, Magistrate Judge Hegarty held a conference on various Charter requests for production, including those at issue in Charter's Objections.  *See* Courtroom Minutes—Telephonic Discovery Conference, Dkt. 76 (Oct. 29, 2019).  After hearing argument from both sides regarding the relevance of, and burden involved in producing, CAS-related documents, Magistrate Judge Hegarty refused to compel the production of any such documents, explaining that he "d[id]n't see the relevance or admissibility of" these materials.  Sahni Decl.,

Ex. E ("Conf. Tr.") at 51:6–11; *see also* Dkt. 76, at 3.  In an attempt to compromise, Plaintiffs

agreed at the conference to produce the publicly available CAS Memorandum of Understanding

("MOU"), though they maintained that the document was irrelevant.  Conf. Tr. at 48:9–10.

Recognizing the immense burden that Charter's demands for financial data would impose

on Plaintiffs, Magistrate Judge Hegarty also denied most of Charter's requests for such

information.  *See* Dkt. 76, at 2; Conf. Tr. at 12:8–12, 21:17–20.  He ordered Plaintiffs to produce

only the track-by-track revenue data that had already been produced in similar litigation filed by

certain of the Plaintiffs against Cox, a case that involves many of the works also at issue here.

Dkt. 76, at 2; *see generally Sony Music Entm't., et al. v. Cox Commc'ns. Inc., et al.*, Case No.

1:18-cv-00950-LO-JFA (E.D. Va.) (the "*Cox* case").  Magistrate Judge Hegarty's decision was

without prejudice to a renewed request from Charter for additional financial information, if

Charter learned through later discovery that Plaintiffs' assertions regarding the burden of

producing this financial information were incorrect.  *See* Conf. Tr. at 12:15–13:3; 24:10–12.

On November 12, 2019, Charter filed its objections to Magistrate Judge Hegarty's Order.

Dkt. 84 ("Obj's").  Charter objected only to Magistrate Judge Hegarty's rulings on financial

information and documents related to CAS.  *Id.* at 1.[1]

---

[1]     Before it filed its Objections, Charter sent a procedurally improper letter to Magistrate
Judge Hegarty, requesting that he reconsider his ruling on documents related to CAS.  *See* Sahni
Decl. ¶ 12.  Despite Magistrate Judge Hegarty's unequivocal ruling that Plaintiffs were not
required to produce any CAS-related documents, Charter asked the judge to order Plaintiffs
to produce the CAS implementation agreements, through which parties to CAS documented their
agreement to participate in the program.  *See id.*  Plaintiffs responded to that letter, explaining
that Charter's request was improper and, in any case, failed for the reasons explained—and
accepted by Magistrate Judge Hegarty—at the discovery conference.  *See id.* ¶ 13.  Plaintiffs also
explained that Charter's descriptions of the implementation agreements, which were designated
as Highly Confidential in the *Cox* case, violated the Stipulated Protective Order in that case.  *See*

### III.    LEGAL STANDARD

#### A.    Discovery Is Limited to Matters That Are Relevant and Proportional.

Federal Rule of Civil Procedure 26 provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).  In determining whether a discovery request is proportional to the needs of the case, courts must consider "whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.*  Accordingly, while discovery rules are generally interpreted broadly, *see Strating v. Abound Solar, Inc.*, No. 10-cv-02344-LTB-MEH, 2012 WL 882407, at *3 (D. Colo. Mar. 15, 2012), courts may "forbid the disclosure or discovery, specify terms for the disclosure or discovery, forbid inquiry into certain matters, or limit the scope of disclosure or discovery to certain matters to protect a party from undue burden and expense." *Deardurff v. Lamond*, No. 08-cv-00569-WDM-KLM, 2010 WL 685793, at *1 (D. Colo. Feb. 23, 2010).

When a discovery request "is overly broad on its face or when relevancy is not readily apparent, the party seeking the discovery has the burden to show the relevancy of the request." *Philippus*, *v. Aetna Health, Inc.*, No. 07–cv–02682–JLK–KLM, 2009 WL 2766720, at *2 (D. Colo. Aug. 27, 2009).  When a party seeks discovery that "appears relevant," the opposing party "has the burden to establish the lack of relevancy by demonstrating that the requested discovery (1) does not come within the scope of relevance as defined under Fed.R.Civ.P. 26(b)(1), or (2) is

---

*id.* ¶ 13 & Ex. G at ¶ 3 (providing that confidential discovery information "shall be used solely for the purpose of preparation, trial, and appeal of this litigation and for no other purpose, and shall not be disclosed except in accordance with the terms hereof").  Magistrate Judge Hegarty has not made any ruling in response to Charter's request. *Id.* ¶ 14.

of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure." *Id.* (quoting *Simpson v. Univ. of Colorado*, 220 F.R.D. 354, 350 (D. Colo. 2004)).

> **B.**     **Non-Dispositive Orders By a Magistrate Judge May Be Overruled Only Where Clearly Erroneous or Contrary to Law.**

A district court may modify or set aside a non-dispositive order by a magistrate judge only if the district court finds that the magistrate judge's order "is clearly erroneous or is contrary to law." *Vreeland v. Schwartz*, No. 13-CV-03515-PAB-KMT, 2017 WL 2627824, at *1 (D. Colo. June 16, 2017) (quoting Fed. R. Civ. Pro. 72(a)). Review for clear error in this context is "significantly deferential." *Chung v. Lamb*, No. 14-CV-03244-WYD-KLM, 2017 WL 10777327, at *1 (D. Colo. Sept. 27, 2017) (quoting *United States v. Gallegos*, 314 F.3d 456, 462 n.3 (10th Cir. 2002)). "An order is clearly erroneous when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Cook v. Rockwell Int'l Corp.*, 147 F.R.D. 237, 243 (D. Colo. 1993).

## IV.   ARGUMENT

> **A.**     **Plaintiffs Should Not Be Required to Compile the Burdensome, Irrelevant Track-By-Track Financial Data and Valuation Documents Charter Seeks.**

Charter misleadingly frames its request for track-by-track financial data and valuation documents related to the works in suit as mere "[b]asic financial information." Obj's at 3. In reality, Plaintiffs have already agreed to produce all of the basic financial information that is relevant to their claims. *See, e.g.*, Sahni Decl., Ex. D at Response No. 17. Instead, Charter is seeking incredibly detailed information about Plaintiffs' profits, revenues, and expenses, organized on a recording-by-recording and composition-by-composition basis, *and* according to

medium, for each of the over 11,000 works at issue in this case.  Obj's at 4.  Charter has not

limited these already burdensome requests to the period for which Plaintiffs seek damages, but

instead demands this extensive data "for each of the last ten (10) years."  Sahni Decl., Ex. B at

Request Nos. 18–19.  Charter also broadly seeks all "documents relating to the valuation of the

works-in-suit," an incredibly extensive set of materials that encompasses essentially all

documents related to Plaintiffs' businesses.  Obj's at 7.

     The information sought by Charter has no relevance to Plaintiffs' claims or Charter's

potential defenses.  Further, Plaintiffs do not generally maintain much of the requested financial

information on a track-by-track and medium-by-medium basis in the regular course of business,

and it would be practically impossible to provide *all* documents and agreements vaguely related

to "valuation" of the more than 11,000 works in suit.  Charter's requests for financial data are

thus unduly burdensome and not proportional to the needs of the case.

## 1.     Charter's Requests for Production at Issue

     Charter asks this Court to compel Plaintiffs to produce "information regarding Plaintiffs'

profits, revenues, and expenses on a per-work basis, as well as underlying agreements relevant to

those calculations."  Obj's at 4.  However, Charter's recitation of the Requests for Production

relevant to this category of discovery indicates that Charter is moving on Requests for

Production Nos. 9, 12, 14, 16, 17, 18, 19, 21, 26, and 59, which together seek documents on a far

broader set of topics.  *Id.*; *see also* Sahni Decl., Ex. D (objecting to the aforementioned

Requests).  Charter's failure to specifically address Requests for Production seeking documents

that go beyond "information regarding Plaintiffs' profits, revenues, and expenses on a per-work

basis, as well as underlying agreements and other documents relevant to those calculations"—

both at the discovery conference with Magistrate Judge Hegarty and in its Objections—mandates the denial of any request to compel production of those additional documents.

### 2.   Plaintiffs' Response to Charter's Argument

Charter's Objections to the portion of Magistrate Judge Hegarty's order regarding the production of financial information should be overruled for at least three reasons.

### a)   Plaintiffs Do Not Maintain Track-by-Track Financial Data in the Regular Course of Business.

Charter has sought, through the Requests for Production identified above, spreadsheets containing vast amounts of data—specifically, profits, revenues, and expenses—for each of the over 11,000 works at issue in this case, broken up by medium (*e.g.*, downloading, streaming, CD sales), for an entire decade.  Plaintiffs have repeatedly explained to Charter, including at the discovery conference, that they do not maintain information reflecting profits and expenses at the track-by-track—or even album-by-album—level, in the regular course of their business.  Conf. Tr. at 7:5–12.[2]  While Plaintiffs do maintain certain aspects of raw revenue, this information is not kept in the format sought by Charter here, and is not centralized or easily searchable, as described below.  *See* Conf. Tr. at 7:13–16.[3]  Charter's insistence that Plaintiffs produce track-

---

[2]      *See also* Declaration of Michael Abitbol ("Abitbol Decl.") ¶ 5; Declaration of Wade Leak ("Leak Decl.") ¶ 5; Declaration of Alasdair McMullan ("McMullan Decl.") ¶ 5; Declaration of Jeremy Blietz ("Blietz Decl.") ¶ 5; Declaration of Matthew Flott ("Flott Decl.") ¶ 5.

[3]      Charter's accusation that Plaintiffs' counsel somehow misrepresented during the discovery conference the types of data Plaintiffs maintain is baseless.  *See* Obj's at 6.  As Charter itself acknowledges in its Objections, Plaintiffs' counsel stated that Plaintiffs do not maintain "much" of the requested information.  *See id.* (citing Conf. Tr. at 16:18–20).  Before Magistrate Judge Hegarty, Plaintiffs' counsel explained that Plaintiffs "don't maintain . . . per-work profit information or per-work expense information," and that the information Plaintiffs do maintain is "burdensome to produce."  *Id.* at 7:8–16.  Plaintiffs' counsel also clearly acknowledged that the *Cox* court had required the production of some "per-work revenue information by medium," and

by-track profits, revenues, and expenses, along with all agreements and documents potentially relevant to calculations that they do not normally perform, thus ignores the realities of Plaintiffs' businesses and record-keeping practices.  *See* Abitbol Decl. ¶¶ 5–12; Leak Decl. ¶¶ 5–17; McMullan Decl. ¶¶ 5–17; Blietz Decl. ¶¶ 5–15; Flott Decl. ¶¶ 5–16.

### b) Charter's Demands Are Unduly Burdensome and Not Proportional to the Needs of the Case.

As Plaintiffs' counsel explained in detail at the discovery conference, *see* Conf. Tr. at 6:25–7:4, nearly all facets of Plaintiffs' business operations, including those related to creating, marketing, and exploiting sound recordings and musical compositions, are involved in generating income or expenses related to those works.  *See* Abitbol Decl. ¶¶ 8–9; Leak Decl. ¶¶ 8–9; McMullan Decl. ¶¶ 8–12; Blietz Decl. ¶¶ 8–9; Flott Decl. ¶¶ 8–9.  To comply with Charter's demands, Plaintiffs would thus be obligated to dedicate significant resources, including diverting significant numbers of staff, to collect and review relevant documents, and to ultimately generate the profit, revenue, and expense data (if even available) in the format sought by Charter.  *See* Abitbol Decl. ¶¶ 5–12; Leak Decl. ¶¶ 5–17; McMullan Decl. ¶¶ 5–17; Blietz Decl. ¶¶ 5–15; Flott Decl. ¶¶ 5–16; *see also* Conf. Tr. at 7:13–16.  In particular, it is essentially impossible for Plaintiffs to collect much of this data in a systematic or automated manner, due to the highly dispersed nature of the data and the large variety of databases involved, meaning the data would need to largely be collected manually for the thousands of works in suit.  *See* Abitbol Decl. ¶¶ 5–6, 8–11; Leak Decl. ¶¶ 5–6, 8–12; McMullan Decl. ¶¶ 5–6, 8, 10–13, 15; Blietz Decl. ¶¶ 5–6, 8–11, 13; Flott Decl. ¶¶ 5–6, 8–12.

---

explained that the compilation of even this limited set of data had been a "burdensome process." *Id.* at 7:16–21.

Charter also demands "documents relating to the valuation of the works-in-suit," explaining that this massive set of materials includes "internal accounting documents, licenses and other agreements with third parties, royalty statements, internal analysis regarding profitability (or lack thereof) of various works or catalogues, and/or valuations." Obj's at 7, 13. These documents, which are spread throughout different departments, offices, and labels, span the entire breadth of Plaintiffs' businesses, such that Plaintiffs would face the incredible burden of searching for and producing documents that involve nearly all aspects of their operations. *See* Abitbol Decl. ¶¶ 5–12; Leak Decl. ¶¶ 5–17; McMullan Decl. ¶¶ 5–17; Blietz Decl. ¶¶ 5–15; Flott Decl. ¶¶ 5–16. Moreover, even if Plaintiffs could locate and produce these materials, it is highly doubtful that Charter would be able to create, from the voluminous documents that would ultimately be produced, meaningful profit and loss estimates for each of the thousands of works in suit. The complexities involved in compiling accurate profit, revenue, and expense data for each work are significant, essentially touching on Plaintiffs' entire businesses.

In the *Cox* case—similar litigation filed by many of the same Plaintiffs in this case, but against a different ISP—the Eastern District of Virginia ordered the plaintiffs to produce track-by-track *revenue* data for a period of four years, 2011 through 2014. *See* Sahni Decl., Ex. F at 32:1–5. Here, Charter seeks not just revenue, but also profits and expenses, and it demands this information for ten, rather than four, years. In addition, Charter has demanded all documents relating to the valuation of the works in suit. Thus, even for works that overlap with the works in the *Cox* case, Plaintiffs would face the huge burdens described above with respect to (1) profit and expense data, (2) all data for an additional six years (2010, and 2015 through 2019), and (3) all documents relating to valuation.

Even if Charter is now limiting its requests to track-by-track *revenue* data for all works in suit (which is not clear from its Objections[4]), Charter's demands do not comply with Federal Rule of Procedure 26(b), which does not countenance such highly costly document collections and productions.  The exercise of collecting, compiling, and producing such data for the years 2011 through 2014 in the *Cox* case made clear the burden required by these requests.  Personnel from the six Plaintiff groups spent many weeks and in some cases multiple months, and incurred substantial costs to comply with the court's order, diverting significant resources from their normal operations to this endeavor.  *See* McMullan Decl. ¶ 14; Leak Decl. ¶ 14; Blietz Decl. ¶ 12; Abitbol Decl.  ¶ 11; Flott Decl. ¶ 13; *see also* Conf. Tr. at 14:9–14.  Due to the different revenue systems utilized by different Plaintiff entities, discrepancies in song titles, and the use of product codes or other unique identifiers—which cannot always be matched to tracks in an automated manner—to track revenue, compiling track-by-track revenue for the *Cox* case was a largely manual process.  *See* Flott Decl. ¶¶ 11, 14–15; Blietz Decl. ¶¶ 11–13; Leak Decl. ¶¶ 12–14; McMullan Decl. ¶¶ 13–15; Abitbol Decl. ¶¶ 5, 11.  Even this manual calculation process is subject to inherent limitations, as it may not capture all sources of revenue associated with a given work.  *See* McMullan Decl. ¶ 13; Leak Decl. ¶ 13; Flott Decl. ¶ 12.

Instead of granting Charter's overbroad and cumbersome requests, Magistrate Judge Hegarty reasonably limited the requests, ordering Plaintiffs to produce only the track-by-track revenue data that had already been produced in *Cox*, which encompasses a majority of the works

---

[4]     *Compare* Obj's at 4 ("Charter seeks information regarding Plaintiffs' *profits*, revenues, and *expenses* on a per-work basis.") (emphasis added), *with id.* at 10 (section on track-by-track data labeled as "*Revenues* on Per-Work Basis and Per-Channel Basis, and Physical Downloads, Streaming, and Licensing Data") (emphasis added).

at issue in this case.  Dkt. 76, at 2.  In doing so, Magistrate Judge Hegarty relied on the immense

burden that Charter's requests—if granted in full—would impose on Plaintiffs.  *See* Conf. Tr. at

12:8–10 (pointing to the burden of "mak[ing] either side create information . . . that did not

previously exist").  Magistrate Judge Hegarty also explained that the extensive overlap between

the works in suit in *Cox* and the works in suit in this case provided Charter with sufficient data to

present its damages arguments to the jury.  *Id.* at 21:17–19, 22:8–12.  Although Charter resists

Magistrate Judge Hegarty's pragmatic conclusion that data on approximately 80 percent of the

works in suit is sufficient, *see* Obj's at 12–13, it has provided no explanation as to why it needs

more information.  Similarly, though Charter complains that Magistrate Judge Hegarty's Order

encompasses revenue data only for the years 2011–2014, instead of the 2013–2016 claim period

in this case, *see id.* at 12, Charter has not articulated any basis as to why data from the 2015–

2016 time period would provide additional information necessary to present its arguments.

　　　For these reasons, there is no basis to disturb Magistrate Judge Hegarty's reasoned

decision appropriately weighing the "undue expense" to Plaintiffs against the minimal benefit of

the proposed discovery.  Conf. Tr. at 21:19; *see also* Fed. R. Civ. Pro. 26(b)(1).

　　　　　　**c)　　The Documents Demanded by Charter Have Limited or No Relevance.**

　　　Regardless of the burden on Plaintiffs to produce the financial information sought by

Charter, this data has limited or no relevance to the issues in this case.  Plaintiffs have elected

statutory damages.  *See* Conf. Tr. at 8:5–6.[5]  Charter claims that even where a plaintiff has

---

[5]　　　Charter appears to argue that Plaintiffs need to make a more formal election, but that is
not correct.  *See Smith v. Thomas*, 911 F.3d 378, 382 (6th Cir. 2018) (holding that to elect
statutory damages, the plaintiff, "at any point before final judgment," simply "inform[s] the

elected statutory damages, a court must allow discovery on actual damages.  It contends that the jury must be allowed to assess actual damages when awarding statutory damages, and that there must be some correlation between the two types of damages in order to provide a statutory damages award.  Obj's at 10.  Charter is incorrect.

As the Supreme Court explained in *F.W. Woolworth Co. v. Contemporary Arts*, statutory damages are not required to correlate with actual damages:

> The statutory rule, formulated after long experience, not merely compels restitution of profit and reparation for injury but also is designed to discourage wrongful conduct.  The discretion of the court is wide enough to permit a resort to statutory damages for such purposes.  *Even for uninjurious and unprofitable invasions of copyright* the court may, if it deems it just, impose a liability within statutory limits to sanction and vindicate the statutory policy.

344 U.S. 228, 233 (1952) (emphasis added).  This Court has agreed that a plaintiff asserting copyright infringement need not prove actual damages in order to receive statutory damages. *See Purzel Video GmbH v. St. Pierre*, 10 F. Supp. 3d 1158, 1163, 1170 (D. Colo. 2014) (adopting recommendations of magistrate judge to strike defense that plaintiff suffered no damages "because actual damages are irrelevant to a claim for statutory damages"); *Purzel Video GmbH v. Smoak*, 11 F. Supp. 3d 1020, 1024, 1031 (D. Colo. 2014) (same); *see also La Resolana Architects, PA v. Clay Realtors Angel Fire*, 416 F.3d 1195, 1199 (10th Cir. 2005)*, abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010) ("[W]hen actual damages are difficult to ascertain or a work has seemingly little extrinsic value, statutory damages are available under 17 U.S.C. § 504.").

---

court—either orally or in writing—of his intent to seek them") (citing 6 William F. Patry, Patry on Copyright § 22:171 (2018)).

Moreover, Charter's discovery requests are so tenuously connected to any damages analysis Charter might undertake in this case that they lack the relevance required by Federal Rule of Procedure 26(b).  Charter's requests relate to only one aspect of the relevant equation, *i.e.*, the amounts that Plaintiffs ultimately earned in connection with the works in suit.  But in order to conduct any meaningful damages assessment with these figures, Charter must also know the number of illicit uploads and downloads that occurred on Charter's network.  That figure— the overall amount of infringement taking place on Charter's network—is unknown, and, while undoubtedly massive, cannot be determined due to the viral nature of peer-to-peer distributions. Because Charter is unable to multiply Plaintiffs' track-by-track revenue or profits by the number of infringements, the information that Charter has demanded is largely worthless.  It is exactly situations such as this where an award of statutory damages is appropriate.

Even if Charter *could* somehow quantify the amount of infringing activity on its network, the information Charter seeks would not provide it with an accurate measure of Plaintiffs' damages.  While lost revenues can be relevant to awards of statutory damages, *see Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 144 (2d Cir. 2010), there is no way for Charter to ascertain Plaintiffs' *lost* revenues by reference to Plaintiffs' *earned* revenues, expenses, or profits for a given work, regardless of the detail provided.  The actual numbers have themselves been negatively impacted by infringement on peer-to-peer networks.  Further, calculating Plaintiffs' true lost revenues in this case would require establishing a fee for which Plaintiffs would grant a license to Charter allowing Charter's customers to distribute Plaintiffs' copyrighted works in an unlimited fashion via peer-to-peer networks.  Of course, no such license exists.

Charter's request for Plaintiffs' licensing agreements (Obj's at 13) is also particularly

egregious.  Charter makes no attempt to explain why these sensitive agreements, the production

of which would implicate the interests of numerous third parties, are relevant to the computation

of statutory or actual damages.  These agreements set forth the terms of licenses Plaintiffs have

granted for the lawful use of Plaintiffs' works in limited circumstances.  They have no bearing

on the financial harm caused to Plaintiffs by the kind of unfettered, viral infringement at issue in

this case.

For these reasons, courts have rejected requests for the type of information sought by

Charter.  *See Capitol Records Inc. v. MP3Tunes*, No. 07 Civ. 9931 (WHP), Dkt. 168 (S.D.N.Y.

Apr. 12, 2010)[6] (declining to compel production of historical profitability data, taking into

consideration plaintiffs' election of statutory damages and the limited utility of this type of data

in calculating actual damages); *Io Grp. Inc. v. GLBT Ltd*., No. C-10-01282 MMC DMR, 2011

WL 3443773, at *3–4 (N.D. Cal. Aug. 8, 2011) (rejecting defendant's motion to compel the

production of profit and revenue data for infringed works, finding that this information is

irrelevant to the issue of statutory damages).  Magistrate Judge Hegarty's Order denying

Charter's attempt to compel this information was entirely consistent with this precedent.

Because that Order was not clearly erroneous or contrary to law, the Court should not disturb it.

     **B.**     **Charter's Request for CAS-Related Discovery Should Be Denied Because the Information Sought Is Irrelevant and Unduly Burdensome, and Because It Would Impinge on Confidentiality Agreements Entered Into by Nonparties.**

CAS was a private agreement between copyright owners in the record and movie

industries, their respective trade associations, and certain ISPs—notably *not* including Charter.

*See* Conf. Tr. at 47:13–16.  The purpose of this experimental program was to educate consumers,

---

[6]     A copy of this Order is provided at Sahni Decl., Ex. H.

deter online infringement, and direct consumers to lawful online sources of content.  Leak Decl. ¶ 19; Bell Decl. ¶ 6; McMullan Decl. ¶ 19.  CAS was not intended to—and expressly did not—establish a legal or industry standard for ISP conduct regarding infringement.  Leak Decl. ¶ 21; Bell Decl. ¶ 8; McMullan Decl. ¶ 21; *see also* Conf. Tr. at 47:16–19.

The creation of CAS, and of the Center for Copyright Information ("CCI"), a separate corporate entity that administered and oversaw CAS, involved dozens of individuals at several companies in multiple industries.  Leak Decl. ¶¶ 19–20; Bell Decl. ¶¶ 6–7; McMullan Decl. ¶¶ 19–20.  After several years of negotiations, the CAS signatories formalized their agreement in a July 6, 2011 MOU, which is public, and a number of implementation agreements, which are not. Leak Decl. ¶¶ 20–21, 24; Bell Decl. ¶¶ 7–8; 11; McMullan Decl. ¶¶ 20–21, 24.  These agreements contain strict confidentiality provisions that govern the handling of the participating members' sensitive business information and records, as well as data relating to the CAS notice program.  Leak Decl. ¶¶ 20, 24; Bell Decl. ¶¶ 7, 11; McMullan Decl. ¶¶ 20, 24.

Despite the immateriality of CAS to this case, and the sensitivities implicated by these materials, Charter has demanded a wide array of documents related to CAS.  Charter appears to have altered its requests from those contained in its initial Requests for Production and discussed at the discovery conference, which included extraordinarily broad demands such as "[a]ll documents concerning CAS."  *See*, *e.g.*, Sahni Decl., Ex. D at Request No. 68.  Yet it still demands vast swaths of documents, which would be unduly burdensome for Plaintiffs to produce: the CAS implementation agreements, "communications with ISPs during the negotiation of the CAS or CAS MOU," "reviews and assessments prepared or reviewed in connection with any technology system used in the CAS," and "notifications sent pursuant to the

CAS, CAS MOU, or Implementation Agreement, during the relevant Claim Period" (none of which went to Charter).[7]  Obj's at 17.  During the discovery conference, Magistrate Judge Hegarty rightfully determined that documents relating to CAS need not be produced, because he did not "see the relevance or admissibility of this agreement."  Conf. Tr. at 51:10-11.  There is no reason to disturb this sound decision.

**1.     CAS Policies Have No Bearing on Charter's Liability in This Action.**

Plaintiffs contend that Charter violated its legal obligations by materially contributing to its subscribers' infringement of Plaintiffs' copyrighted works.  *See, e.g.,* Complaint, Dkt. 1, ¶ 2.  Despite Charter's claims to the contrary, *see* Obj's at 17–18, and as Plaintiffs discussed at the discovery conference, Plaintiffs do not attempt to establish Charter's liability on the basis of any purported "industry standard" regarding allegedly reasonable ISP behavior.  *See* Conf. Tr. at 47:20–48:4.  Neither do Plaintiffs base their theory of liability on comparisons between Charter and other ISPs, including those that were involved in CAS.  Plaintiffs instead rely solely on Charter's actions and inactions in facilitating online piracy on its network.

Courts have consistently held that parties to suits under the Copyright Act cannot rely on industry custom or standards to excuse themselves of their own legal obligations.  *See, e.g., Dun*

---

[7]     Charter is inconsistent throughout its Objections regarding exactly which CAS-related documents it seeks.  *Compare* Obj's at 17 (seeking, *inter alia*, "communications with ISPs during the negotiation of the CAS or CAS MOU . . . and notifications sent pursuant to the CAS, CAS MOU, or Implementation Agreement, during the relevant Claim Period"), *with id.* at 20 (seeking, *inter alia*, "all communications discussing the termination requirement for repeat infringers; all communications regarding the expectations regarding responding to notices of infringement under CAS; and documents constituting a representative sample of notices sent pursuant to CAS during the Claims Period"), *and id.* (seeking, *inter alia*, "communications discussing the requirement that ISPs terminate alleged 'repeat infringers,' and appropriate responses to notices of alleged copyright infringement").

*& Bradstreet Software Servs., Inc., v. Grace Consulting, Inc.,* 307 F.3d 197, 211 (3d Cir. 2002) ("A defense of industry custom and practice in the face of the protective provisions of the Copyright Act could undermine the purposes and objectives of the statute and reduce it to rubble."); *Famous Music Corp. v. Seeco Records, Inc.*, 201 F. Supp. 560, 566 (S.D.N.Y. 1961) ("Custom and usage may not be invoked to relieve defendant of the clear cut obligations imposed by the application of the statute."). Charter cannot circumvent accountability for its own misconduct by claiming that other ISPs acted in similar, or worse, fashion. Its behavior must be measured against its own legal obligations, not against the actions of others. Magistrate Judge Hegarty correctly recognized this in denying Charter's attempt to compel this information at the discovery conference. *See* Conf. Tr. at 51:6–8 ("[W]hatever [Charter] was relying on, whatever their state of mind was, they are in control of that.").[8]

Further, CAS did not attempt to establish—nor did it actually establish—an industry standard for ISPs with respect to copyright infringement or policies on terminating the accounts of infringing subscribers. Neither did CAS seek to codify or impose legal obligations on its signatory ISPs. Indeed, the MOU that created CAS expressly states that it does not constitute an interpretation of the legal obligations of ISPs, and that CAS is not intended to address whether an "ISP has adopted and reasonably implemented a [Digital Millennium Copyright Act] Termination Policy." *See* Memorandum of Understanding (July 6, 2011), at 9 n.1, *available at*

---

[8]      The *Cox* court recently ruled that Cox could introduce evidence regarding CAS at trial. *See* Sahni Decl., Ex. I at 7. However, the court did not explain its reasoning, rendering the order of little use to this Court in its analysis of Charter's overbroad requests. *See id.* Moreover, the CAS materials produced in that case were far more limited than what Charter seeks here, encompassing only the CAS MOU, CAS implementation agreements, and documents sufficient to show Plaintiffs' membership in CAS. *See* Sahni Decl., Ex. F at 61:22–62:9.

https://info.publicintelligence.net/CCI-MOU.pdf.

Consequently, the policies voluntarily adopted and agreed to by certain ISPs pursuant to CAS, as part of a compromise arrangement with content owners, have no effect on Charter's own legal obligation to refrain from materially contributing to its subscribers' infringement of the works in suit.  Because CAS lacks any "relevance or admissibility," Conf. Tr. at 51:10–1, the Court should uphold Magistrate Judge Hegarty's ruling denying Charter's request to compel the production of CAS-related documents.

> ### 2.   Producing the Requested Discovery Would Impose an Undue Burden on Plaintiffs and Nonparties.

Even if CAS were relevant to this litigation, the Court should still overrule Charter's Objections because the burden and expense of the proposed discovery clearly outweigh its questionable benefit.  CAS was a complicated agreement among thirty diverse entities, including many nonparties.  Leak Decl. ¶ 20; Bell Decl. ¶ 7; McMullan Decl. ¶ 20.  It was the result of a lengthy, multi-year negotiation process, and it remained in existence for several years before it was dissolved.  Leak Decl. ¶ 20; Bell Decl. ¶ 7; McMullan Decl. ¶ 20.  The production of the materials sought by Charter would be a major undertaking, encompassing documents and communications spanning seven years and involving dozens of companies and individuals.  Leak Decl. ¶ 23; Bell Decl. ¶ 10; McMullan Decl. ¶ 23.  These efforts would require searching for and producing millions of infringement notices—none of which were sent to Charter—along with the voluminous communications involved in the negotiation and creation of an independent corporation, CCI, which was formed to administer the complex CAS system.  Leak Decl. ¶ 20, 22; Bell Decl. ¶ 7, 9; McMullan Decl. ¶ 20, 22.

Further, CAS's strict confidentiality provisions govern the handling of the participating

entities' sensitive business information and records, as well as records and data relating to the CAS notice program.  Leak Decl. ¶¶ 20, 24; Bell Decl. ¶¶ 7, 11; McMullan Decl. ¶¶ 20, 24.  Much of the information sought by Charter—including the CAS implementation agreements—cannot be disclosed without the prior written consent of the thirty parties involved in CAS.  Leak Decl. ¶¶ 19–20, 24; Bell Decl. ¶¶ 6–7, 11; McMullan Decl. ¶¶ 19–20, 24; *see also* Conf. Tr. at 49:4–8.  Although the Plaintiffs in *Cox* produced the implementation agreements, *see* Sahni Decl., Ex. F at 61:22–62:9, the consents that Plaintiffs obtained for that production were limited to the *Cox* case only.  Leak Decl. ¶ 24; Bell Decl. ¶ 11; McMullan Decl. ¶ 24.  Plaintiffs would thus need to undertake the burdensome process of obtaining new written consents for any disclosure of CAS-related materials in *this* case.  In addition, CAS has been dissolved, and CCI, CAS's administering entity, no longer exists, further adding to the burden of obtaining the consents necessary to produce this highly sensitive information.  Leak Decl. ¶ 20; Bell Decl. ¶ 7; McMullan Decl. ¶ 24.  Moreover, certain of the nonparties that were involved in CAS are Charter's competitors, and so may object to the disclosure of documents in which they have a confidentiality interest.  Leak Decl. ¶ 24; Bell Decl. ¶ 11; McMullan Decl. ¶ 24.

The imbalance between the burden on Plaintiffs and nonparties to produce the requested discovery, and the questionable benefit to Charter if the materials are produced, thus provides an additional reason for the Court to reject Charter's Objections to Magistrate Judge Hegarty's Order denying discovery of documents related to CAS.

## V.      CONCLUSION

For the foregoing reasons, Charter's Objections to Magistrate Judge Hegarty's October 29, 2019 Discovery Order (Dkt. No. 84) should be overruled.

Dated:  November 26, 2019

*/s/ Mitchell A. Kamin*
Mitchell A. Kamin (*pro hac vice*)
Neema T. Sahni (*pro hac vice*)
Mark Chen (*pro hac vice*)
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
mkamin@cov.com
nsahni@cov.com
mychen@cov.com

Jonathan M. Sperling (*pro hac vice*)
William O'Neill (*pro hac vice*)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
jsperling@cov.com
woneill@cov.com

Megan M. O'Neill (*pro hac vice*)
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
moneill@cov.com

Janette L. Ferguson, Esq.
Benjamin M. Leoni, Esq.
LEWIS BESS WILLIAMS & WEESE, P.C.
1801 California Street, Suite 3400
Denver, CO 80202
Telephone: (303) 861-2828
jferguson@lewisbess.com
bleoni@lewisbess.com

Matthew J. Oppenheim (*pro hac vice*)
Scott A. Zebrak (*pro hac vice*)
Jeffrey M. Gould (*pro hac vice*)
Kerry M. Mustico (*pro hac vice*)
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave. NW, 5th Floor

Washington, DC 20016
Telephone: (202) 621-9027
matt@oandzlaw.com
scott@oandzlaw.com
jeff@oandzlaw.com
kerry@oandzlaw.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 26, 2019, I caused the foregoing document and all supporting materials thereto to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record registered with CM/ECF.

*/s/ Mitchell A. Kamin*
Attorney