IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 19-cv-00874-RBJ-MEH

**WARNER RECORDS INC. et al.,**

    Plaintiffs,

v.

**CHARTER COMMUNICATIONS, INC.,**

    Defendant.

---

### DECLARATION OF CHRISTOPHER BELL IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANT CHARTER COMMUNICATIONS, INC.'S OBJECTIONS TO MAGISTRATE JUDGE HEGARTY'S OCTOBER 29, 2019 DISCOVERY ORDER

---

I, Christopher Bell, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1. I am currently employed as Vice President, Technology and Anti-Piracy for Warner Music Group ("WMG"). I have held that position for over two years. I have personal knowledge of the facts set forth below and/or have learned of these facts as a result of my position and responsibilities at WMG. If called upon and sworn as a witness, I could and would testify competently as to the matters set forth herein.

2. Plaintiffs Atlantic Recording Corporation, Bad Boy Records LLC, Elektra Entertainment Group Inc., Fueled By Ramen LLC, Nonesuch Records Inc., Roadrunner Records, Inc., Warner Records Inc., and WEA International Inc. (collectively, "Warner Music") are individual companies within WMG.

1

3. I am generally familiar with Warner Music's anti-piracy efforts and other efforts to enforce its copyrights covering its sound recordings.

4. I understand this declaration is to be submitted to the Court in support of Plaintiffs' Response to Defendant Charter Communications, Inc.'s ("Charter") Objections to Magistrate Judge Hegarty's October 29, 2019 Discovery Order (Dkt. 84).

5. I understand that Charter seeks production of a vast array of documents relating to the Copyright Alert System ("CAS").

6. CAS was a private agreement between 18 private parties (30 parties in total when including all affiliated entities), including trade groups, copyright holders, and ISPs designed to educate consumers, deter online infringement, and direct consumers to lawful online legitimate sources of content. Charter did not participate in CAS.

7. Negotiations leading up to the formation of CAS spanned years. A separate corporate entity called the Center for Copyright Infringement, Inc. ("CCI") was created to administer and oversee CAS. The creation and administration of CCI and CAS involved dozens of individuals at dozens of companies from multiple industries engaged in dialogue over the course of years. Each participating company was involved in the oversight and activities of CCI. The terms and agreement implementing CAS contain strict confidentiality provisions governing the handling of the participating members' sensitive business information and records and data relating to the CAS notice program. Certain information cannot be disclosed without the prior written consent of all parties involved. CCI has since dissolved.

8. CAS did not establish, nor attempt to establish, an industry standard. The publicly-available Memorandum of Understanding ("MOU") setting forth CAS's framework acknowledged that "the limitations on ISP liability under the DMCA are conditioned on an ISP's

2

adoption and reasonable implementation of a policy that provides for the termination in appropriate circumstances of subscribers and account holders who are repeat infringers." (Memorandum of Understanding (7/6/2011), Section 4.G.i n.1, https://info.publicintelligence.net/CCI-MOU.pdf.) The MOU further acknowledged that "entering into this Agreement is not, by itself, intended to address whether a Participating ISP has adopted and reasonably implemented a DMCA Termination Policy." *Id.*

9. MarkMonitor was engaged to conduct monitoring and notice sending on behalf of the record companies and movie studios in connection with CAS. In that context, MarkMonitor sent millions of infringement notices to five major ISPs who contractually agreed to participate in CAS. None of those notices involved Charter. Many of those notices would have pertained to Warner Music works (including works in suit in this action), as well as to the works of other third parties, including movie studios whose copyrights are not at issue in this case.

10. Searching for and producing all the documents sought by Charter's overbroad requests concerning CAS and other ISPs would be a major undertaking and significant burden. The search for documents would span roughly seven years and involve documents and communications concerning dozens of companies, dozens of individuals, the negotiations and creation of an independent corporation, the operation of that corporation, and millions of infringement notices to ISPs *other* than Charter.

11. The prior production of the CAS implementation agreements in the *Sony Music Entertainment et al. v. Cox Communications, Inc.*, Case No. 1:18-cv-950 (E.D. Va.) ("*Cox*") case would do little to alleviate this burden. As discussed above, CAS was governed by strict confidentiality provisions. Producing the implementation agreements in the *Cox* litigation required securing consents from numerous third parties to disclose that information. These

3

consents pertained to that litigation only—meaning further consent agreements would have to be secured to reproduce those same materials in this litigation. Additionally, certain of the third parties involved with CAS are other ISPs, who I understand to be direct competitors of Charter and thus may have reservations concerning the disclosure of sensitive CAS information to Charter.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____
Christopher Bell

Executed this 22nd day of November, 2019, in California.