IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 19-cv-00874-RBJ-MEH

**WARNER RECORDS INC., et al.,**

    Plaintiffs,

v.

**CHARTER COMMUNICATIONS, INC.,**

    Defendant.

---

**DECLARATION OF JEREMY BLIETZ IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANT CHARTER COMMUNICATIONS, INC.'S OBJECTIONS TO MAGISTRATE JUDGE HEGARTY'S OCTOBER 29, 2019 DISCOVERY ORDER**

---

I, Jeremy Blietz, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1. I am currently employed as Senior Vice President of Administration at Warner Chappell Music, Inc. (previously known as Warner/Chappell Music, Inc.) ("Warner Chappell"). I have held that position since spring of this year and have been employed with Warner Chappell for over 25 years. I have personal knowledge of the facts set forth below and/or have learned of these facts as a result of my position and responsibilities at Warner Chappell and could and would testify competently thereto if called as a witness.

2. Plaintiffs Warner Chappell and its affiliates and subsidiaries Warner-Tamerlane Publishing Corp., W Chappell Music Corp. d/b/a WC Music Corp. (previously known as WB Music Corp.), W.C.M. Music Corp. (previously known as W.B.M. Music Corp.), Unichappell Music Inc., Rightsong Music Inc., Cotillion Music, Inc., and Intersong U.S.A., Inc., (collectively,

"Warner Chappell") are full-service music publishing companies that collectively exploit a diverse catalog of over one million musical compositions, including numerous pop hits, American standards, folk songs, and motion picture and theatrical compositions.

3. I am generally familiar with Warner Chappell's practices and procedures for acquiring, administering, publishing, licensing, and otherwise exploiting its catalogue of musical compositions and the costs and revenues associated therewith. I am also generally familiar with the process by which Warner Chappell accounts for income and costs in connection with its catalog of musical compositions and the manner in which Warner Chappell and its affiliates and subsidiaries keep, maintain, and account for its records with respect to such income and expenses.

4. I understand this declaration is to be submitted to the Court in support of Plaintiffs' Response to Defendant Charter Communications, Inc.'s ("Charter") Objections to Magistrate Judge Hegarty's October 29, 2019 Discovery Order (Dkt. 84).

5. In the ordinary course of its business, Warner Chappell does not maintain summary financial documents reflecting the financial information Charter seeks on a track-by-track or even album-by-album basis. Warner Chappell does not have profit or loss statements (or data) at the level of individual musical compositions. Nor does it maintain such financial data for albums. Indeed, except for the track-by-track revenue data that Warner Chappell compiled when ordered to do so in another litigation, *Sony Music Entertainment et al. v. Cox Communications, Inc.*, Case No. 1:18-cv-950 (E.D. Va.) ("*Cox*"), Warner Chappell does not in the ordinary course of its business maintain comprehensive track revenue information on a per-work basis, medium-by-medium, in a manner that can be easily queried without significant manual intervention.

6. As explained below, production of the categories of documents Charter seeks would be a massive undertaking—taking up hundreds if not thousands of hours—from Warner Chappell employees to locate, identify, and review such documents. Such an effort would likely impose expenses on Warner Chappell in the hundreds of thousands of dollars. The burden and expense are further compounded by the fact that much of Warner Chappell's business is conducted by email. Consequently, as explained below, the task of locating responsive documents (particularly electronic communications) is magnified dramatically as a result of the fact that the electronic files of hundreds of Warner Chappell employees could conceivably have documents falling within the broad categories of documents requested by Defendants.

7. My understanding of the incredible burden involved in collecting this data is not speculation, but is rather based on prior experience in attempting to collect and produce even a subset of this data in the *Cox* case. When Warner Chappell produced per-work revenue data in *Cox* (which is only a subset of what Charter seeks here)—for a different but partially overlapping set of musical works, and for a different claim period—it was an enormous undertaking that required the efforts of at least ten different employees, working for at least a month. The collective amount of time they spent—time which would otherwise have been devoted to other duties—totaled in the hundreds of hours.

8. Any effort to identify and unearth every document or piece of financial data that would be needed to calculate profit or loss figures per composition would be a nearly impossible undertaking. Given the thousands of works at issue in this lawsuit, locating, collecting, and reviewing all the financial documentation Charter requests, including all documents related to the valuation those works, would be unending. Charter apparently seeks full documentation about the costs and revenues involved in acquiring, administering, publishing, licensing, and

3

otherwise exploiting songs—the whole of Warner Chappell's business. It would require a full-time staff working many months, with thousands of hours of employee time, and additional time from in-house and outside attorneys to oversee such a process.

9. Creating, publishing, and/or administering a song is a lengthy and complicated process that involves many categories of both income and expenses. At each stage, each source of income and cost is documented in myriad ways, including through email communications, documents and/or different databases or systems, by innumerable employees in offices located across the country.

10. Identifying and processing revenue and cost data with respect to a given song would be extremely complicated. Some of the types of revenue and costs include those related to: acquiring musical compositions or songwriters; administering mechanical, synchronization, performance, and print licenses; and maintenance and payment of royalties to songwriters, co-publishers, and other copyright holders in connection with income generated from the exploitation of their copyrighted works. The royalty statements Warner Chappell generates and distributes can be complex and contain massive amounts of data (sometimes totaling millions of line items). These statements often are not limited to royalties for any one particular musical compositions, and instead often cover hundreds of thousands of uses for thousands of other compositions that are administered by Warner Chappell.

11. Because of the different revenue systems involved in the various companies, it is largely impossible to collect this data in a systematic, automated way. Many companies within Warner Chappell use unique identifiers per work to track revenue, but these identifiers cannot be indexed with particular tracks in any automated fashion. As a result, attempting to compile track-by-track revenue is largely a manual process. Minor discrepancies in track titles—such as

4

use of punctuation, misspellings, etc.—also make it impossible to sort or search in an automated way. Further manual intervention would also be required to analyze the proper revenue to allocate to individual tracks, because tracks are often sold as parts of an album, bundle, or compilation, and individualized analysis would be required to first determine how each track was sold, and to then decipher the appropriate amount of revenue from the larger album (or bundle, or compilation) sale to allocate to that particular track.

12. To provide even a subset of the data requested by Charter, this burdensome, time-consuming, and inherently incomplete manual calculation process must then be repeated thousands of times to capture all of the works in suit. In *Cox*, there were over 7,000 tracks in total. For the Warner Chappell works, the process took over a month to complete, and involved at least ten employees working nearly 1000 hours over a month on this project alone. This represented a significant cost to the company and interference to Warner Chappell's business because those employees could not work on other matters during that time.

13. Although Warner Chappell already produced in *Cox* some financial information pertaining to works in suit in this case, the burden to produce financial data for the remaining works would be substantial. Because there is no centralized database from which to extract song-level information, Warner Chappell would be required to follow the same cumbersome and burdensome steps to produce the financial data for the thousands of additional works in total that are at issue in this case.

14. As noted above, the claim period in *Cox* is different from the claim period at issue here, so even for works also in suit in *Cox*, updating the data produced in that case to cover the operative claim period here would be highly burdensome and require the same manual process

5

described above. In addition, in *Cox*, Plaintiffs only produced data pertaining to revenues; none of the other types of financial information requested by Charter was produced.

15. Given the incredible burden of collecting the detailed financial information Charter is requesting, Warner Chappell has provided its parent company's annual 10-K reports for the years 2010 through 2016. These reports include annual revenues from recorded music (broken down by physical sales, digital sales, licensing, and other) and music publishing (broken down by performance, mechanical, digital, sync, and other), cost of revenues (such as A&R costs); selling, general and administrative expense (for both recorded music and music publishing); interest and tax expense; and net profit/loss, among other financial information. In addition, I understand that, per the Magistrate Judge's discovery ruling, the financial information compiled through the time-intensive process described above and produced in the *Cox* case will be made available in this case. As explained above, it would be extremely difficult and burdensome to provide the additional detailed financial information Charter seeks.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

*Jeremy Blietz*
Jeremy Blietz

Executed this 25 day of November, 2019 in Los Angeles, California.