# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.: 19-cv-00874-RBJ-MEH

**WARNER RECORDS INC., et al.,**

    Plaintiffs,

v.

**CHARTER COMMUNICATIONS, INC.,**

    Defendant.

---

## DECLARATION OF ALASDAIR MCMULLAN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANT CHARTER COMMUNICATIONS, INC.'S OBJECTIONS TO MAGISTRATE JUDGE HEGARTY'S OCTOBER 29, 2019 DISCOVERY ORDER

---

I, Alasdair McMullan, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1. I am currently employed as Senior Vice President and Global Head of Litigation for Universal Music Group. I have held that position or a similar position at all times relevant to this declaration. I have worked in the music industry for over twenty years. I have personal knowledge of the facts set forth below and/or have learned of these facts as a result of my position and responsibilities at Universal Music Group. If called upon and sworn as a witness, I could and would testify competently as to the matters set forth herein.

2. Universal Music Group ("UMG") is the colloquial name given to the group of music-related companies owned by Vivendi S.A. UMG is one of the largest music groups in the world and consists of record companies, music publishing companies, and manufacturing and distribution companies. Plaintiffs UMG Recordings, Inc. and Capitol Records, LLC (collectively

the "UMG Record Companies"); and Universal Music Corp., Universal Music – MGB NA LLC, Universal Music Publishing Inc., Universal Music Publishing AB, Universal Music Publishing Limited, Universal Music Publishing MGB Limited, Universal Music – Z Tunes LLC, Universal/Island Music Limited, Universal/MCA Music Publishing Pty. Limited, Universal – Polygram International Tunes, Inc., Universal – Songs of Polygram International, Inc., Universal Polygram International Publishing, Inc., Music Corporation of America, Inc. d/b/a Universal Music Corp., Polygram Publishing, Inc., Rondor Music International, Inc., and Songs of Universal, Inc. (collectively, "UMPG") are companies or divisions within UMG.  UMG develops, exploits, and distributes sound recordings under the auspices of various record labels, including Capitol Records, Def Jam Recordings, Island Records, and Universal Music Group Nashville, and many others.

3. I am generally familiar with UMG's practices and procedures for creating, distributing, and otherwise exploiting its copyrighted sound recordings and musical compositions, as well as the costs and revenues associated with those activities.  I am also generally familiar with the process by which UMG accounts for income and costs in connection with the copyrighted works it produces, distributes, and offers for sale to the public, and the manner in which UMG and its affiliates keep and maintain their accounting records with respect to such income and expenses. I am also familiar with UMG's anti-piracy efforts and other efforts to enforce its copyrights.

4. I understand this declaration is to be submitted to the Court in support of Plaintiffs' Response to Defendant Charter Communications, Inc.'s ("Charter") Objections to Magistrate Judge Hegarty's October 29, 2019 Discovery Order (Dkt. 84).

**Discovery Concerning the UMG Plaintiffs' Financial Information**

5. In the ordinary course of business, UMG does not maintain documents with the financial information Charter seeks at the sound recording or musical composition level. UMG does not create profit and loss statements at the level of individual sound recordings or compositions. Nor does it maintain financial data at the individual album level. Indeed, except for the materials that UMG compiled when ordered to do so in another litigation, *Sony Music Entertainment et al. v. Cox Communications, Inc.*, Case No. 1:18-cv-950 (E.D. Va.) ("*Cox*"), UMG does not in the ordinary course of its business comprehensively track revenue information on a per-work basis, based upon the manner or method of exploitation. This information, to the extent even available, does not exist in a manner that can be easily queried or generated without significant manual intervention.

6. As explained below, production of the categories of documents Charter seeks would be a massive undertaking—literally requiring thousands of hours of time from UMG employees to locate, identify, and review such documents  Such an effort would likely impose expenses on UMG in the form of overtime wages and the loss of employee time that could otherwise be devoted to other duties, which could amount to hundreds of thousands of dollars.

7. My description of the incredible burden involved in collecting this data is not speculation, but is rather based on prior experience in attempting to collect and produce even a subset of this data in the *Cox* case. When UMG produced per-work revenue data in *Cox* (which is only a subset of what Charter seeks here)—for a different but partially overlapping set of musical works, and for a different claim period—it was an enormous undertaking that required the efforts of dozens of individuals across departments, hundreds of hours, and huge costs.

3

8. Any effort to identify and unearth every document or piece of financial data that would be needed to calculate profit or loss figures per sound recording or composition would be a significantly burdensome undertaking. Given the high number of works at issue in this lawsuit, locating, collecting, and reviewing all the financial documentation Charter requests, including all documents related to the valuation those works, would be unending. Charter apparently seeks full documentation about the revenues and costs involved in the creation, marketing, administration and exploitation of recorded music and compositions—the whole of UMG's business. It would require a full-time staff working many months, with thousands of hours of employee time, and additional time from in-house and outside attorneys to oversee such a process.

9. To put the effort into perspective, in the rare instance in which UMG has attempted to conduct a profit and loss analysis for a single album or song, UMG's finance department generally requires 8-10 weeks to do so because the work involved is that significant. For even a single recording or album, the process requires coordination of voluminous amounts of information across multiple departments at the company (including central finance, label artist and repertoire ("A&R") administration, artist royalties, copyright royalties, manufacturing and logistics, among others). To do so for this case, the substantial effort involved in creating a single profit and loss analysis would then be multiplied by the more than a thousand UMG/UMPG works at issue here. This would be hugely disruptive to UMG's business operations.

10. Creating, marketing, exploiting, and/or administering a sound recording or musical composition is an extremely time-intensive and complex process that involves many categories of both income and expenses. At each stage, each source of income and cost is documented in myriad ways, including through email communications, documents and/or in different databases or systems, by innumerable employees in offices located across the country. The task of locating

4

responsive documents (particularly electronic communications) is magnified as a result of the fact that the electronic files of numerous UMG employees could conceivably have documents falling within the broad categories of documents requested by Defendants.

11.     Identifying and processing cost data with respect to a given sound recording (or the album or EP on which it appears) would be extremely complicated.  Some of the types of costs include: recording costs, such as payments or advances to artists; direct payments to recording studios for recording session time; payments to producers, engineers, mixers, and other creative contributors to the process; costs of goods sold, such as manufacturing and distribution costs and royalty payments to artists, producers, and music publishers; marketing costs, such as publicity, advertising and video production costs; independent promotion costs; costs related to artist publicity tours and appearances, tour support, digital marketing; and overhead costs.  Many of these costs are not allocated within UMG's financial systems on a track-by-track or even album-by-album basis.  Revenue data would be similarly voluminous and include documents or information relating to the millions of track and album sales made each year, as well as licensing revenues from television and movie studios, satellite and cable services, and more.

12.     On the music publishing side, the data generated or received in the course of acquiring, administering, publishing, licensing, or otherwise exploiting UMPG's catalogue of hundreds of thousands of musical compositions is similarly vast.  This would include financial information related to, at minimum: acquiring song catalogs or entering new songwriter deals, including advances paid in connection therewith; administering mechanical, public performance, synchronization, and other licenses; and maintenance and payment of royalties to songwriters, co-publishers, and other copyright holders in connection with income generated from the exploitation of their copyrighted works.

5

13. Even the *revenue* data requested by Charter cannot be collected in a systematic, automated way. Minor discrepancies in song titles—such as use of punctuation, misspellings, etc.—can make it very difficult to sort or search in an automated way. Furthermore, even a manual calculation process does not accurately capture all track revenue for a given work, as it would not typically include revenue associated with the track to the extent such revenue was received as part of a sale or distribution that included other works, such as the sale or distribution of EPs, LPs, digital or video bundles, etc. It is also highly complicated to calculate track revenue for physical sales, because physical products such as CDs and records are generally sold at the album level, not as single tracks.

14. To provide even a subset of the data requested by Charter, this burdensome, time-consuming, and inherently incomplete manual calculation process must then be repeated for each of the works in suit. In *Cox*, there were over 7,000 total tracks in suit. For UMG works, the process took over several months to complete, and involved the efforts of dozens of employees, as well as legal staff to oversee the process.

15. Although UMG already produced in *Cox* some financial information pertaining to works in suit in this case, the burden to produce financial data for the remaining works would be substantial. Because there is no centralized database from which to extract song-level information, UMG would be required to follow the same cumbersome and burdensome steps to produce the financial data for the many additional works that are at issue in this case.

16. Moreover, as noted above, the claim period in *Cox* is different from the claim period at issue here, so even for works also in suit in *Cox*, updating the data produced in that case to cover the operative claim period here would be highly burdensome and require the same manual process

described above.  In addition, in *Cox*, Plaintiffs only produced data pertaining to revenues; none of the other types of financial information requested by Charter was produced.

17.     Given the practical impossibility of collecting the detailed financial information Charter seeks, UMG has provided its parent company's annual financial reports for the years 2010 through 2016.  These reports include UMG's annual revenues from music publishing and recorded music (broken down by physical sales, digital sales, licensing and other), operating expenses, interest and tax expenses, and net income (or profit), among other financial information.  In addition, I understand that, per the Magistrate Judge's discovery ruling, the financial information compiled through the time-intensive process described above and produced in the *Cox* case will be made available in this case.  As explained above, it would be extremely difficult and burdensome to provide the additional detailed financial information Charter seeks for each individual work in this lawsuit.

### Discovery Concerning the Copyright Alert System and Third-Party ISPs

18.     I understand that Charter seeks production of a vast array of documents relating to the Copyright Alert System ("CAS").

19.     CAS was a private agreement between 18 private parties (30 parties, including all affiliated entities), including trade groups, copyright holders and ISPs designed to educate consumers, deter online infringement, and direct consumers to lawful online legitimate sources of content.  Charter did not participate in CAS.

20.     Negotiations leading up to the formation of CAS spanned years.  A separate corporate entity called the Center for Copyright Infringement, Inc. ("CCI") was created to administer and oversee CAS.  The creation and administration of CCI and CAS involved dozens of individuals at dozens of companies from multiple industries engaged in dialogue over the course

7

of years.  Each participating company was involved in the oversight and activities of CCI.  The terms and agreements implementing CAS contain strict confidentiality provisions governing the handling of the participating members' sensitive business information and records and data relating to the CAS notice program.  Certain information cannot be disclosed without the prior written consent of all parties involved.  CCI has since dissolved.

21. CAS did not establish, or attempt to establish, an industry standard.  The publicly-available Memorandum of Understanding setting forth CAS's framework acknowledged that "the limitations on ISP liability under the DMCA are conditioned on an ISP's adoption and reasonable implementation of a policy that provides for the termination in appropriate circumstances of subscribers and account holders who are repeat infringers."  (Memorandum of Understanding (7/6/2011), Section 4.G.i n.1, https://info.publicintelligence.net/CCI-MOU.pdf.)  The MOU further acknowledged that "entering into this Agreement is not, by itself, intended to address whether a Participating ISP has adopted and reasonably implemented a DMCA Termination Policy."  *Id.*

22. MarkMonitor was engaged to conduct monitoring and notice sending on behalf of the record companies and movie studios in connection with CAS.  In that context, MarkMonitor sent millions of infringement notices to five major ISPs who contractually agreed to participate in CAS.  None of those notices involved Charter.  Many of those notices would have pertained to UMG works (including works in suit in this action), as well as the works of other third parties, including movie studios whose copyrights are not at issue in this case.

23. Searching for and producing all the documents sought by Charter's overbroad requests concerning CAS and other ISPs would be a major undertaking and significant burden.  The search for documents would span roughly seven years and involve documents and

communications concerning dozens of companies, dozens of individuals, the negotiations and creation of an independent corporation, the operation of that corporation, and millions of infringement notices to ISPs *other* than Charter.

24. The prior production of the CAS implementation agreements in the *Cox* case would do little to alleviate this burden. As discussed above, CAS was governed by strict confidentiality provisions. Producing the implementation agreements in the *Cox* litigation required securing consents from numerous third-parties to disclose that information. These consents pertained to that litigation only—meaning further consent agreements would have to be secured to reproduce those same materials in this litigation. Additionally, certain of the third-parties involved with CAS are other ISPs, who I understand to be direct competitors of Charter and thus may have reservations concerning the disclosure of sensitive CAS information to Charter.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Alasdair McMullan

Executed this 25 day of November, 2019 in Los Angeles, California.