# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.: 19-cv-00874-RBJ-MEH

**WARNER RECORDS INC., et al.,**

    Plaintiffs,

v.

**CHARTER COMMUNICATIONS, INC.,**

    Defendant.

---

## DECLARATION OF WADE LEAK IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANT CHARTER COMMUNICATIONS, INC.'S OBJECTIONS TO MAGISTRATE JUDGE HEGARTY'S OCTOBER 29, 2019 DISCOVERY ORDER

---

I, Wade Leak, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1.    I am currently employed as Senior Vice President and Deputy General Counsel for Plaintiff Sony Music Entertainment. I have held that position or a similar position at all times relevant to this declaration. I have worked in the music industry for over twenty years. I have personal knowledge of the facts set forth below and/or have learned of these facts as a result of my position and responsibilities at Sony Music Entertainment. If called upon and sworn as a witness, I could and would testify competently as to the matters set forth herein.

2.    Plaintiffs Arista Music, Arista Records LLC, LaFace Records LLC, Provident Label Group, LLC, Sony Music Entertainment US Latin, Volcano Entertainment III, LLC, Zomba Recordings LLC are companies or divisions within Sony Music Entertainment (collectively, "Sony Music"). Sony Music develops, exploits, and distributes sound recordings under the auspices of

various record labels, including Epic Records, Jive Records, Columbia Records, RCA Records, Sony Music Nashville, Sony Music Latin, and many others.

3. I am generally familiar with Sony Music's practices and procedures for producing, marketing, exploiting, and distributing sound recordings, and the costs and revenues associated therewith. I am also generally familiar with the process by which Sony Music accounts for revenue and costs in connection with the sound recordings it produces, distributes, and offers for sale to the public, and the manner in which Sony Music and its labels keep, maintain, and account for their records with respect to such income and expenses. I am also familiar with Sony Music's anti-piracy efforts and other efforts to enforce its copyrights.

4. I understand this declaration is to be submitted to the Court in support of Plaintiffs' Response to Defendant Charter Communications, Inc.'s Objections to Magistrate Judge Hegarty's October 29, 2019 Discovery Order (Dkt. 84).

**Discovery Concerning the Sony Music Plaintiffs' Financial Information**

5. In the ordinary course of business, Sony Music does not maintain summary financial documents reflecting the financial information Charter seeks on a track-by-track basis. Sony Music does not have profit or loss statements (or data) at the level of individual sound recordings. Nor did it historically maintain such financial data at the individual album level. Indeed, except for the materials pertaining to download-streaming revenues and sound recording licensing revenues, on a per-track basis for a limited time period, which Sony Music compiled—with significant effort on the part of numerous employees—when ordered to do so in another litigation, *Sony Music Entertainment et al. v. Cox Communications, Inc.*, Case No. 1:18-cv-950 (E.D. Va.) ("*Cox*"), Sony Music does not in the ordinary course of business comprehensively track

2

and maintain revenue information on a per-work basis, medium-by-medium, in a manner that can be easily queried without significant manual intervention.

6. As explained below, production of all of the categories of documents Charter seeks would be a significant undertaking—requiring hundreds if not thousands of hours of time from Sony Music employees to locate, identify, and review such documents. Such an effort would likely impose expenses on Sony Music in the hundreds of thousands of dollars. The burden and expense are further compounded by the fact that much of Sony Music's business is conducted by email. Consequently, as explained below, the task of locating responsive documents (particularly electronic communications) is magnified dramatically as a result of the fact that the electronic files of numerous Sony Music employees could conceivably have documents falling within the broad categories of documents requested by Defendants. Moreover, Charter's requests, read literally, would even require production of materials, like certain license agreements, that are not even maintained electronically and would need to be collected from off-site storage facilities.

7. My understanding of the incredible burden involved in collecting this data is not speculation, but is rather based on prior experience in attempting to collect and produce even a subset of this data in the *Cox* case. When Sony Music produced per-work revenue data in *Cox* (which is only a subset of what Charter seeks here)—for a different but partially overlapping set of sound recordings , and for a much smaller time period than requested here—it was a significant undertaking that required the efforts of a number of individuals across departments, hundreds of hours, and substantial costs.

8. Any effort to identify and unearth every document or piece of financial data that would be needed to precisely calculate profit or loss figures per sound recording would be an extremely difficult—if not impossible—undertaking. Given the number of works at issue in this

lawsuit, locating, collecting, and reviewing all the financial documentation Charter requests, including all documents that Charter asserts would be expected to reflect the "value of the musical works" (*e.g.*, internal accounting documents, licenses, royalty statements, internal analyses, valuations), *see* Charter Obj's at 13, would be unending.  Charter apparently seeks full documentation about the costs and revenues involved in the creation, marketing, and exploitation of recorded music—the whole of Sony Music's business.  It would require a substantial amount of employee time and additional time from in-house and outside attorneys and vendors to oversee such a process.  This would be highly disruptive to Sony Music's business operations.

9. Creating, marketing, distributing, and/or administering a sound recording is an extremely lengthy process that involves many different types of expenses, which results in myriad sources of revenues.  At each stage, each source of income and cost is documented in many different ways, including through email communications, documents and/or in different databases or systems, by a large number of employees in different departments, including at Sony Music's various record labels located across the country and at various "shared services" departments.

10. Sound recording revenue is generated from many different types of exploitation – including physical sales, digital downloads, interactive streaming, statutory webcasting, licensing for advertisements, games, movies and television and other ancillary uses (even into greeting cards), and licensing for including portions of Sony's sound recordings into a third party's own sound recordings (which is known as "sampling").  Determining all the revenue generated on a track-by-track basis (or even worse, including albums or "EPs") in a particular time period going back a number of years is extremely time consuming, even if the inquiry is limited to U.S. revenue.  Since digital distribution has proliferated, the number of files sent to Sony by its digital partners reporting revenue has exploded.  Some digital reports contain millions of lines of data each month.

4

Revenues are often tracked in different databases – for example, revenues generated from licenses to third parties for use on television, movies or in advertisements are stored in a separate system than digital revenues. Further, licensing revenue and agreements related thereto reside in a number of databases, files, and formats, depending on the type of license; for example sample licensing is tracked separately from product licensing or master use synchronization licensing, by separate departments. And if Charter truly seeks all licenses with third parties, some of those licenses exist only in hard copy and are stored off-site. A given sound recording can be the subject of numerous different kinds of licensing agreements, potentially implicating even thousands of licenses, and tracking the revenues from all such agreements for even one song is a complicated, laborious process involving accessing multiple databases. And if Charter is truly demanding "all" related documentation, this would also encompass items such as invoices and shipping and payment related documents from numerous physical wholesalers and retailers.

11. Identifying and processing cost data with respect to a given sound recording (or the album or EP on which it appears) would be extremely complicated. Some of the types of costs include: recording costs, such as payments or advances to artists, payments for studio time, producers, engineers, mixers, and other contributors; costs associated with the negotiation, drafting, and ultimate execution of the recording agreement; costs of goods sold, such as manufacturing costs and royalty payments to artists, producers, and publishers; marketing costs, such as video production costs; independent promotion costs; costs related to publicity tours and appearances, tour support, digital marketing, and physical advertising; and necessary overhead costs, which would include the salaries of the label marketing employees, hard IT costs and shared services costs such as the cost of the digital business unit that is responsible for our digital

distribution deals. Many of these costs are not allocated within Sony Music's financial systems on a track-by-track or even album-by-album basis.

12. As to revenues, because of the different revenue systems maintained and used by the various Sony Music companies, it is largely impossible to collect even the requested *revenue* data in a systematic, automated way. Many companies within Sony Music use product codes to track revenue, but these product codes cannot be indexed with particular tracks in any automated fashion. As a result, attempting to compile track-by-track revenue has a large manual component. Minor discrepancies in song titles—such as use of punctuation, misspellings, etc.—also make it impossible to sort or search in an automated way.

13. Moreover, even this manual calculation process does not accurately capture all track revenue for a given work, as it would not typically include revenue associated with the track to the extent such revenue was received as part of a sale or distribution that included other works, such as the sale or distribution of EPs, LPs, digital or video bundles, etc. It is also essentially impossible to calculate track revenue for physical sales, because physical products such as CDs and records are generally sold at the album level, not as single tracks.

14. To provide even a subset of the data requested by Charter, this burdensome, time-consuming, and inherently incomplete manual calculation process must then be repeated for each of the many works in suit. In *Cox*, completing this process for Sony Music works took more than a month, and involved a number of employees working hundreds of hours in total, and did not even capture certain categories of revenue sought by Charter here due to the practical impossibility of pulling such data. The effort represented a major cost to Sony Music, as those employees were unable to work on other duties while completing this task.

15. Although Sony Music already produced certain financial information in *Cox* for works in suit in that case which are also in suit here, the burden to produce financial data for the remaining works would be substantial. Given the manual nature of the data pull, Sony Music would be required to follow the same cumbersome and burdensome steps to produce the financial data for the many additional recordings at issue in this case.

16. Moreover, as noted above, the claim period in *Cox* is different from the claim period at issue here, so even for works also in suit in *Cox*, updating the data produced in that case to cover the operative claim period here would be highly burdensome and require the same manual process described above. In addition, in *Cox*, Plaintiffs only produced data pertaining to revenues; none of the other types of financial information requested by Charter was produced.

17. Given the extreme difficulty of collecting the detailed financial documentation Charter seeks, Sony Music intends to produce a summary profit or loss statement for the years 2010 through 2016. Such statement includes the following annual U.S.-based financial detail for Sony Music: total revenue; total cost of sales; gross profits; sales, general, and administrative expense; operating income; interest and tax expense; and net income, among other financial income. In addition, I understand that, per the Magistrate Judge's discovery ruling, the financial information compiled through the time-intensive process described above and produced in the *Cox* case will be made available in this case. As explained above, it would be extremely difficult, expensive, and burdensome to provide the additional detailed financial information Charter seeks.

### Discovery Concerning the Copyright Alert System

18. I understand that Charter seeks production of a vast array of documents relating to the Copyright Alert System ("CAS").

19. CAS was a private agreement between 18 private parties (30 parties, including all affiliated entities), including trade groups, copyright holders and ISPs designed to educate consumers, deter online infringement, and direct consumers to lawful online legitimate sources of content. Charter did not participate in CAS.

20. Negotiations leading up to the formation of CAS spanned years. A separate corporate entity called the Center for Copyright Infringement, Inc. ("CCI") was created to administer and oversee CAS. The creation and administration of CCI and CAS involved dozens of individuals at dozens of companies from multiple industries engaged in dialogue over the course of years. Each participating company was involved in the oversight and activities of CCI. The terms and agreements implementing CAS contain strict confidentiality provisions governing the handling of the participating members' sensitive business information and records and data relating to the CAS notice program. Certain information cannot be disclosed without the prior written consent of all parties involved. CCI has since dissolved.

21. CAS did not establish, or attempt to establish, an industry standard. The publicly available Memorandum of Understanding setting forth CAS's framework acknowledged that "the limitations on ISP liability under the DMCA are conditioned on an ISP's adoption and reasonable implementation of a policy that provides for the termination in appropriate circumstances of subscribers and account holders who are repeat infringers." (Memorandum of Understanding (7/6/2011), Section 4.G.i n.1, https://info.publicintelligence.net/CCI-MOU.pdf.) The MOU further acknowledged that "entering into this Agreement is not, by itself, intended to address whether a Participating ISP has adopted and reasonably implemented a DMCA Termination Policy." *Id.*

22. MarkMonitor was engaged to conduct monitoring and notice sending on behalf of the record companies and movie studios in connection with CAS. In that context, MarkMonitor sent millions of infringement notices to five major ISPs who contractually agreed to participate in CAS. None of those notices involved Charter. Many of those notices would have pertained to Sony Music works (including works in suit in this action), as well as the works of other third parties, including movie studios whose copyrights are not at issue in this case.

23. Searching for and producing all the documents sought by Charter's overbroad requests concerning CAS would be a major undertaking and significant burden. The search for documents would span roughly seven years and involve documents and communications concerning dozens of companies, dozens of individuals, the negotiations and creation of an independent corporation, the operation of that corporation, and millions of infringement notices to ISPs *other* than Charter.

24. The prior production of the CAS implementation agreements in the *Cox* case would do little to alleviate this burden. As discussed above, CAS was governed by strict confidentiality provisions. Producing the implementation agreements in the *Cox* litigation required securing consents from numerous third-parties to disclose that information. These consents pertained to that litigation only—meaning further consent agreements would have to be secured to reproduce those same materials in this litigation. Additionally, certain of the third-parties involved with CAS are other ISPs, who I understand to be direct competitors of Charter and thus may have concerns disclosing sensitive CAS information to Charter.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____
Wade Leak

Executed this 26th day of November, 2019 in New York, New York.