# EXHIBIT F

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 2
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 1 of 87 PageID# 2062

1

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                         Alexandria Division




--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
              Plaintiffs,       :
                                :
     -vs-                       :     Case No. 1:18-cv-950
                                :
                                :
COX COMMUNICATIONS, INC., et al.,:
              Defendants.       :
                                :
--------------------------------:
```

HEARING ON MOTIONS


January 25, 2019


Before:  John F. Anderson, U.S. Mag. Judge


<u>APPEARANCES:</u>

Matthew J. Oppenheim, Scott A. Zebrak, Jeffrey M. Gould,
and Kerry M. Mustico, Counsel for the Plaintiffs

Thomas M. Buchanan, Jennifer A. Golinveaux, and
Sean R. Anderson, Counsel for the Defendants

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 3
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 2 of 87 PageID# 2063

2

1          NOTE:  The case is called to be heard at 10:01 a.m.

2    as follows:

3          THE CLERK:  Sony Music Entertainment, et al. versus

4    Cox Communications, Inc., et al., civil action number

5    18-cv-950.

6          THE COURT:  Go ahead, introduce yourselves, please.

7          MR. ZEBRAK:  Good morning, Your Honor.  Scott Zebrak,

8    counsel for the plaintiffs.  With me today are my colleagues

9    Matthew Oppenheim, Kerry Mustico, Jeffrey Gould.  My colleague,

10   Matthew Oppenheim, will be arguing.

11         MR. BUCHANAN:  Good morning, Your Honor.  Thomas

12   Buchanan on behalf of the defendant Cox.  With me today are my

13   colleagues Jennifer Golinveaux and Sean Anderson.  We will be

14   splitting the arguments.  I'll be arguing the plaintiffs'

15   motion to compel, and then we're splitting the other argument.

16         THE COURT:  Well --

17         MR. BUCHANAN:  With regard to our motion to compel.

18         THE COURT:  When you say "splitting," help me

19   understand what you mean by that.

20         MR. BUCHANAN:  So I think there is six motions to

21   compel.  I guess if we relate to the evidence --

22         THE COURT:  Well, there is one motion to compel.

23         MR. BUCHANAN:  Right, six parts.

24         THE COURT:  There are a number of components parts to

25   that motion to compel.

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 4
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 3 of 87 PageID# 2064

3

1          MR. BUCHANAN:  Right.  So Ms. Golinveaux will be

2     arguing the motion to compel with regard to financial

3     information, with regard to the validity and ownership of the

4     copyrights, and with regard to the Cox documents.

5          And then the next four I will be arguing.

6          THE COURT:  Okay.  All right.  We'll see how that

7     goes.

8          All right.  I am going to take up the Sony motion

9     first.

10          I've read, certainly for the Sony motion, I have read

11     all the materials that were filed.  I can't say that I've read

12     each and every exhibit from beginning to end, certainly in the

13     moving papers on the Cox.

14          But, Mr. Oppenheim, let me hear when you have got to

15     say about your motion to compel.

16          MR. OPPENHEIM:  Good morning, Your Honor.  The

17     plaintiffs' motion to compel, Your Honor, is seeking to require

18     Cox to disclose the number of subscribers it terminate -- Cox

19     terminated for violations of its Acceptable Use Policy or

20     failure to pay for the limited time period of 2010 to 2014.

21          And what we're moving to compel, Your Honor, are two

22     specific interrogatories, interrogatory number 6 and

23     interrogatory number 11, that we issued to the defendants.

24          I believe through the coerce of briefing that

25     we've -- we've narrowed down really what the dispute is here.

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 5
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 4 of 87 PageID# 2065

4

1   There is -- there is apparently no dispute by the defendants as

2   to burden or privilege.  And the sole question before the Court

3   is whether or not the requested information is relevant to the

4   case.

5           THE COURT:  Well, why is the level of detail that

6   you're asking necessary?  And, you know, if you look at the

7   Acceptable Use Policy, your request to break it down by, you

8   know, area, really doesn't make any sense.

9           Because if you look at the Acceptable Use Policy, it

10  says, you know, we have the right to violate you for any breach

11  of law.  And then it outlines a number of different other areas

12  in which you could be terminated.

13          And so, your request to do it by month, is that

14  right, and my category in the Acceptable Use Policy, just -- I

15  don't understand why you would ask for that level of detail.

16          MR. OPPENHEIM:  So let me take those as two pieces.

17          Your Honor, the month-by-month request is so that it

18  will match up to the information that the defendants provided

19  us with respect to copyright terminations.

20          THE COURT:  Well, what -- so what use is that?

21          MR. OPPENHEIM:  Your Honor, what we would like to be

22  able to do is put in front of the jury or the Court, right, a

23  chart which shows month by month, here is the number of

24  warnings they received -- excuse me, notices they received.

25  Here are the number of warnings they sent.  Here are the number

1   of terminations for AUP violations.

2          We don't need to break down all the AUP violations

3   outside of the copyright.  So we're not -- to the extent that

4   there was any lack of clarity on this, we're not asking for

5   this person was terminated for spamming.  This person -- we're

6   not asking for that, Your Honor --

7          THE COURT:  Well, yes, you are.  I mean, that's what

8   your motion asks for.

9          MR. OPPENHEIM:  Well, Your Honor, what we're asking

10  for is broken down.  We have copyright, they've given us that.

11         THE COURT:  Right.

12         MR. OPPENHEIM:  We want AUP as a category.  And then

13  we want terminations for -- for non-payment month by month so

14  it fits in the same chart they have already given us on the

15  copyright policy.

16         And the reason, Your Honor, we believe this is

17  important, it goes both to the issue of liability and the issue

18  of damages.

19         THE COURT:  Well, you don't even ask for that in your

20  interrogatory.  For the terminations for non-payment, you only

21  asked for it by quarter, right?

22         MR. OPPENHEIM:  Yes, Your Honor, but that was before

23  we had received the information, the documents from the

24  defendants that gave it month by month on the copyright basis.

25  We want to be able to match up, Your Honor.

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 7
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 6 of 87 PageID# 2067

6

1          If all they want to do is do it quarter by quarter, I

2    suppose that is what we asked, Your Honor.  But we are just

3    trying to get a consistent spreadsheet so that we have one easy

4    set of data that we can put before the Court and the jury.

5          And I don't believe that they've articulated that the

6    month-by-month or -- is burdensome.  Or that by -- by type of

7    violation, that is AUP or non-payment, is burdensome.  All they

8    have said is it's not relevant.  They can do it, they can do it

9    without burden.

10          And the question on relevance, Your Honor, is, okay,

11   should a jury know how easily and how quickly they terminate

12   subscribers when it fits their purpose.  Right.

13          THE COURT:  Nobody knows how easy it is.

14          MR. OPPENHEIM:  Well --

15          THE COURT:  Giving you the number of people that were

16   terminated doesn't tell you it was easy or hard, how long the

17   process went through.  It is that was the end point of the

18   process.

19          MR. OPPENHEIM:  But if they've terminated significant

20   volumes of users on the basis of non-payment or on the basis of

21   AUP violations as compared to copyright violations, then they

22   will be hard pressed, Your Honor, to put somebody on the stand

23   and say, well, it's quite burdensome to do these terminations

24   because the data will show otherwise.

25          And a jury has the right to know, to the extent that

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 8
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 7 of 87 PageID# 2068

7

1  Cox decides to put its own interests ahead of that of the

2  copyright owners in weighing the culpability.

3           THE COURT:  I understand.  Why 2010, '11, and '12 and

4  not just 2013 and 2014?

5           MR. OPPENHEIM:  Your Honor, the data that Cox

6  provided on the copyright violations was --

7           THE COURT:  Well -- okay.  They had that in the can

8  from the other thing.  They said, okay, we'll just give that to

9  you.  That then doesn't drive the answer as to whatever else

10  you are entitled to get.

11          MR. OPPENHEIM:  There is a marked change in the way

12  Cox terminated between those years, 2010 to 2014.  And we want

13  to see -- excuse me, on the copyright side there is a marked

14  change.  We want to see whether there is a marked change with

15  respect to the AUP violations and then on payment violations.

16          Again, they're not saying that it's burdensome.

17  They're just saying, well, it's not relevant.

18          Your Honor, I believe that a jury will want to know

19  what it is that Cox was doing to serve its own purpose while it

20  was undermining what the copyright owners were asking it to do

21  to serve their purposes and to abide by the law.

22          THE COURT:  All right.  I think I understand your

23  argument.

24          So this one --

25          MR. OPPENHEIM:  Any --

8

1          THE COURT:  -- Mr. Buchanan, are you -- you're

2    responding to this one?

3          MR. BUCHANAN:  I'll be brief, Your Honor.

4          First of all, counsel didn't really address the

5    relevance of these documents.  He focused on the issue that a

6    jury should be able to hear this and that somehow we would say

7    it's very burdensome to terminate.

8          Well, in their complaint, and in their papers they've

9    cited to our Accepted Use Policy.  And as you've just pointed

10   out, it lists the reasons we can terminate people, violations

11   on a whole number of reasons.  And there is no question we did

12   terminate people for these.  But how is it relevant to the

13   issue of willfulness or the issue of whether we infringed

14   vicariously.  That we could supervise our customers and our

15   subscribers.  Whether in fact we terminated people more often

16   for phishing and to obtain someone's financial information and

17   possibly destroy their financial record and their name, and

18   identity theft, and whether they did it by hacking.

19          How, if you put those numbers up, is it relevant

20   whether we had 13 steps to terminate someone for copyright

21   infringement when someone could actually go copy that for a

22   dollar-seventeen.  So I just -- I don't see the issue of

23   relevance.

24          How does it prove willfulness, that we knew of a

25   specific act of infringement?  How does it show that we could

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 10
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 9 of 87 PageID# 2070

9

1   supervise and control our customers when the policy states,

2   which they have, that we can terminate?  So they already have

3   that.  They know that we can terminate for these reasons.

4            They just want to know, get the numbers up there up

5   there to say, look how greedy and corrupt they are.  They

6   terminated when someone didn't pay, but then they took all

7   these steps to terminate when someone was infringing our rights

8   and our copyrights.

9            THE COURT:  How does Cox maintain the data for

10  terminations?  My question is, if I decide to require Cox to

11  produce some information as to terminations, how difficult is

12  it to do on a quarterly versus annual basis?

13           MR. BUCHANAN:  First of all, we only have the

14  information back to 2012 for what they requested.  I have

15  checked on that.  So we don't go back -- they have asked to go

16  back to 2008, 2010.

17           And I think, obviously, it would be easy for us do it

18  annually and biannually than quarterly or monthly.  So that's

19  certainly the case.

20           But we did not argue that it would be overly

21  burdensome to do this.  But certainly that would be easier for

22  us to do.

23           THE COURT:  Okay.  Thank you.

24           All right, I think I understand the issues and have

25  read all the briefs.  What I'm going to do is I am going grant

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 11
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 10 of 87 PageID# 2071

10

 1    the motion in part.  I'm going to require Cox to produce

 2    for years 2013 and 2014 only quarterly.  So not monthly,

 3    quarterly, the number of people terminated for violation of the

 4    Accepted -- Except -- Acceptable Use Policy.  So -- and the

 5    number of people terminated for failure to pay.

 6            Just so that it's clear, for those two years, '13 and

 7    '14 on a quarterly basis.  You don't have to break down the

 8    category on the Acceptable Use Policy.  It's just the total

 9    number of people.  And I assume that would also include people

10    who were terminated for copyrights.  So you will have to back

11    out those numbers.

12            So if the first quarter of 2013 had 10,000 people as

13    having been terminated, you've already got the information as

14    to the three months in 2013, and then you can do the math and

15    figure out for what other reasons.

16            But it will be granted in part as to those two years

17    only on a quarterly basis without having to break it down by

18    category in the Acceptable Use Policy.

19            MR. OPPENHEIM:  Your Honor, may I ask one clarifying

20    question?  Are you ordering that they produce a list of

21    terminations of AUP policy as one set of numbers and failure to

22    pay as a separate set of numbers?

23            THE COURT:  Right.  No, there are two separate

24    interrogatories.

25            MR. OPPENHEIM:  Very well, thank you.

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 12
of 88
Case 1:18-cv-00950-LO-JFA   Document 99   Filed 02/01/19   Page 11 of 87 PageID# 2072

11

1          THE COURT:  For the interrogatory number 6, they need

2     to provide that information for the Acceptable Use Policy.  For

3     interrogatory number 11, they need to provide that information

4     for the failure to terminate on the financial reasons.

5          Okay.  All right.  So I'll now take up Cox's motion

6     to compel.

7          I guess I can do this -- again, I guess, let me -- I

8     am going to, I guess, do it -- there are seven different

9     categories.  And it's Cox's intention to divide this up in

10    motions.  Let me -- let me make sure I understand how that

11    works.

12         MR. BUCHANAN:  Yes, Your Honor.  So that the -- the

13    first -- in the first component --

14         THE COURT:  The financial, the ownership, are going

15    to be argued by who?

16         MR. BUCHANAN:  By Ms. Golinveaux.

17         THE COURT:  Okay.

18         MR. BUCHANAN:  And as well as the information

19    regarding Cox, Cox documents, that was the third one.

20         THE COURT:  All right.

21         MR. BUCHANAN:  Then I'm arguing the next four.

22         THE COURT:  Okay.

23         MR. BUCHANAN:  Which have to do with MarkMonitor,

24    RIAA, peer-to-peer information, and CAS.

25         THE COURT:  Okay.  All right, well, let's take them

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 13
of 88
Case 1:18-cv-00950-LO-JFA   Document 99   Filed 02/01/19   Page 12 of 87 PageID# 2073

12

1   up -- we will take up -- I'll do the arguments item by item.

2   So I'll hear argument from Cox first, and then I'll hear

3   argument from the plaintiffs, and then I'll decide that issue,

4   and then we'll move on to the second one.

5            So we'll take up the financial, the revenue and

6   profits information.  And I -- you know, I -- one thing that

7   concerns me about this is that you filed a motion, you outlined

8   a number of document requests that you were asking me to order

9   them to produce documents in response to it, which are far

10  beyond what you now say in your reply brief that we got last

11  night that you're really looking for.

12           I mean, you say, we're not looking for profit and

13  loss information, but you include in your motion requests that

14  only ask for profit and loss information.

15           You know, you say that the plaintiff has, you know,

16  made all these arguments that are not necessary to be made.

17  Well, you actually include in your motion document requests

18  that are specifically only asking for profit and loss

19  information.

20           I don't -- I'm confused about that.  I mean, I spent

21  a lot of time going through your document requests that ask for

22  profit and loss information because you put them in your motion

23  and said, I want this to be a part of, you know, what you rule

24  on.  And then we get this reply brief and you say, you know,

25  oh, never mind.

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 14
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 13 of 87 PageID# 2074

13

1          Help me understand that.

2          MS. GOLINVEAUX:  Yes, Your Honor.  So Cox's initial

3     request, the document request, sought profit, expenses, and

4     revenue per work per medium because that's what our expert has

5     told us would be most useful.

6          We spent -- we've spent a number of hours on the

7     phone with plaintiffs, and they said they don't maintain the

8     profit and loss information by work.  They don't do it.

9          So as part of the process to compromise, we offered

10    during the meet and confers to narrow those requests to just

11    their revenue per work per channel because they said they also

12    didn't keep it by medium.

13         So we tried to make that clear in our -- in our

14    opening motion, that what we're moving on is what we think they

15    likely do have.

16         THE COURT:  Well then, why would you include in your

17    list of document requests that you were moving this Court on:

18    Your detailed and itemized profit and loss statements or

19    reports provided in readable and useable format organized by

20    each of the copyrighted works for each of the last ten years?

21         MR. BUCHANAN:  Because, Your Honor, those were the

22    initial requests.  And during the process of meeting and

23    conferring, we narrowed them because plaintiffs explained to us

24    that they didn't maintain the data that way.

25         THE COURT:  Well, you don't -- you know, narrow them

1    and completely rewriting them are completely different things.

2            I mean, you know, there are other requests that cover

3    financial information.  But that's neither here nor there, I

4    guess.  I just -- all right.

5            Also help me understand why you think this

6    information is readily available, which you've indicated in

7    your pleadings.

8            MS GOLINVEAUX:  Your Honor, plaintiffs have told us

9    specifically that the profit and loss statements per work is

10   not available, they don't maintain their records that way.

11           But they've never said they don't have revenue per

12   work.  And they don't say that in their opposition brief.

13           And in fact, that's just what BMG produced in the

14   last case.  And Your Honor may recall because that issue was up

15   in --

16           THE COURT:  Well, they voluntarily did it.  I didn't

17   order them to produce it.  They said, we have this and we'll

18   produce it.  So the idea that I ordered them to produce it I

19   think is an overstatement.

20           MS. GOLINVEAUX:  Fair enough, Your Honor.  There

21   was -- there was an order with respect to the scope of that

22   production.

23           THE COURT:  Right.

24           MS. GOLINVEAUX:  And our expert, who has -- our

25   financial expert, who we've disclosed to the plaintiffs, who

1   has dealt with this issue in a number of cases, believes also

2   that this would be a way that the major -- the labels and the

3   music publishers would keep the information.

4        And, Your Honor, if you look at the declarations they

5   put in with their opposition, they never say they don't keep

6   that information.

7        THE COURT:  Well, one of them hints at it, but the

8   others talk about profit and loss.  One does make a mention as

9   to revenue.

10       MS. GOLINVEAUX:  And that's Mr. Abithol, I think,

11  Your Honor, who seems to indicate that the revenue numbers do

12  exist, at least for Sony ATV.  But nowhere have they said those

13  don't exist.  If they don't -- we have been on the phone with

14  them for hours now.  They could have told us that, we would

15  have worked something out.

16       We're not trying to put them to a lot of work to

17  organize documents in a way -- or data in a way that doesn't

18  exist.  We're just trying to get meaningful data for our

19  financial expert.

20       THE COURT:  Right.  And when you say, "revenue by

21  work and by channel," help me understand what you mean by

22  "channel," given that there is some indication that there is

23  many different channels or types of revenue streams having to

24  do with TV commercials and other things.

25       And I am trying to understand how granular you need

16

 1    that information for your purposes in this case.

 2            MS. GOLINVEAUX:  Well, Your Honor, we initially

 3    requested by medium, which they said they didn't have.  By

 4    channel, which is what we moved to because it sounds like that

 5    may be the way the data is maintained, what we mean by that is

 6    the different channels through which they distribute these

 7    works.  And that would be physical sales, which would be CDs or

 8    records.  Digital downloads would be another channel.

 9    Streaming would be another.  And licensing would be another.

10            THE COURT:  Okay.  So if you get -- I understand your

11    argument on revenue by work by channel.  Okay.  I don't

12    understand how you think any other aggregate information will

13    be useful as far as profits go.

14            So, profit by artist, you know, profit by something

15    that is a much larger than by work information, I don't see how

16    that can be used.

17            Breaking it down, maybe in an overall sense as to,

18    you know, this type of industry, what things are.  But having

19    them go through the process of saying how much a certain artist

20    might do when only one or two of his or her works are part of

21    here, how that comes into play and how that is, I would say,

22    important to the issue at stake and how it would be used in

23    resolving an issue at stake, and the level of detail it would

24    take to do that.

25            MS. GOLINVEAUX:  Right.  Your Honor, we agree with

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 18
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 17 of 87 PageID# 2078

17

1    you that that would not -- if we can get the revenue by

2    channel, by work, that's more directly relevant.  And we don't

3    need to you put them through the task of that -- of those other

4    data points.  Really, those were, if we can't get that

5    information, we really have nothing else to go on.  That would

6    be a proxy.  But if we could get the revenue by work, that

7    would be acceptable.

8            THE COURT:  All right.  And you're asking for it from

9    2010 to 2014; is that right?  That's what the limited --

10           MS. GOLINVEAUX:  That's correct, Your Honor.

11           THE COURT:  Okay.  And help me understand why we're

12   going three years beyond the claim period -- the claim period

13   I'm -- I know it's only 22 months, but I'm saying it is 2013

14   through 2014.  So you're asking for 2010, 2011, and 2012.

15           MS. GOLINVEAUX:  Your Honor, certainly the most

16   relevant information would be for the claim period.  We have

17   asked for the three years prior as well because it would be

18   relevant to showing trends in terms of how these works were

19   distributed.

20           The music industry in terms of distribution has

21   changed dramatically over that time period in terms of whether

22   people were primarily downloading these works versus streaming

23   them, for example.  And that type of data would help us show

24   that.

25           If the plaintiffs say, well, going back to 2010

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 19
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 18 of 87 PageID# 2079

18

1    really gets more difficult because it's not maintained as

2    readily, I think we could certainly live with going two years

3    back before the claim period.

4            THE COURT:  Okay.  Thank you.

5            I will hear plaintiffs' response.  First of all, have

6    you filed something with the Court that specifically limits

7    your damages to statutory damages?

8            MR. OPPENHEIM:  Not with the Court.  But we have

9    given an affirmation --

10           THE COURT:  Well, you need to do that, and you need

11   to do that right away.

12           MR. OPPENHEIM:  Yes, Your Honor, we can do that.

13           THE COURT:  And, you know, I don't want there to be

14   any backtracking.  I don't want there to be any, you know,

15   rethinking of that issue.  I'm now deciding this case as if you

16   have filed with the Court a binding stipulation that you are

17   only seeking statutory damages.

18           Are you comfortable with that?

19           MR. OPPENHEIM:  Absolutely, Your Honor, we have

20   elected statutory damages and we've informed the defendants of

21   that both orally and in writing, Your Honor, and we will file

22   something with the Court.  Not an issue.

23           THE COURT:  And you plan to have your expert serve

24   his or her report on damages by April 10; is that correct?

25           MR. OPPENHEIM:  I don't have the schedule in front of

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 20
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 19 of 87 PageID# 2080

19

1  me.  Whatever the schedule is, Your Honor, that is our --

2          THE COURT:  I believe that's the date for the initial

3  expert reports.

4          MR. OPPENHEIM:  Very well, Your Honor.

5          THE COURT:  I assume you've got an expert that you're

6  going to have on damages; is that right?

7          MR. OPPENHEIM:  We are still working through all of

8  our expert issues, Your Honor, but I assume we will have some

9  experts who will speak to financial issues.

10          THE COURT:  Okay.  All right.

11          MR. OPPENHEIM:  If I -- I'm sorry, Your Honor.

12          THE COURT:  Go ahead.  And now I need you to address

13  the -- why I shouldn't require the plaintiffs in this case, who

14  decided to bring this case, decided to bring this case alleging

15  11,000 works with various different entities, you made that

16  decision, and why they shouldn't be required to produce revenue

17  by work by channel for a period of time.

18          MR. OPPENHEIM:  And, Your Honor, let me answer that.

19  Once again, I want to address your first point first.

20          Your Honor, in the defendants' proposed order that

21  they filed with their motion, they actually asked the Court to

22  compel production of all of those requests for production --

23          THE COURT:  Well, it also says, as modified by my --

24  by their memorandum.  And I don't know what that means.  So,

25  I'm --

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 21
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 20 of 87 PageID# 2081

20

1          MR. OPPENHEIM:  Anyway.  You understand -- we

2    appreciate Your Honor understands that.  Very well.

3          THE COURT:  I was confused, you were confused, but we

4    are going to deal with these issues directly.

5          MR. OPPENHEIM:  Very well.  So the defendants want

6    this information, they say, because they want to put an actual

7    damages analysis in front of a jury.  So they say, let us get

8    the historical revenue information.  That, Your Honor, however,

9    it's a non sequitur.  Right.  The fact that they want an actual

10   damages analysis has nothing to do with the historical revenue

11   streams.  Right.  Historical revenue streams won't help anybody

12   do an actual damages analysis.

13          If you want to do an actual damages analysis and you

14   want to figure out what the lost revenues were, you would say,

15   okay, what would be the revenues per, per lost digital download

16   or per lost stream, multiplied times the number of losses.

17   Right.  How many distributions did each of their subscribers

18   make.  And it's a calculus, it's a simple mathematical

19   equation.  And there are two -- there are two variables.

20          So the historical information doesn't help inform

21   either one of those variables.

22          THE COURT:  It may.  I mean, if there is a

23   copyrighted work in which there has been no revenue for four

24   years, don't you think that's going to be significant?

25          MR. OPPENHEIM:  No, Your Honor, because if there is

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 22
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 21 of 87 PageID# 2082

21

1    -- if there are illegal distributions of it, right, and that

2    work was -- was displaced sales.  Maybe that's why there were

3    no sales, because their subscribers were massively infringing

4    it.

5            Now, in reality, we're talking about 11,000 works.

6    The overwhelming majority of them are very well known because

7    they are distributed by one of the major record companies or

8    music publishers in this country.

9            But, Your Honor, what -- we've tried to work with the

10   defendants to get at what they want here.

11           THE COURT:  All right.  Well, they want revenue by

12   work by channel.

13           MR. OPPENHEIM:  But the historical revenue, Your

14   Honor, doesn't inform that first variable.

15           What does inform that first variable is what would be

16   the lost revenue for each one of the distribution.  Leave

17   aside, they're never going to get the second variable, that is

18   how many distributions there were, they can't tell us, nobody

19   can tell us.  Right.  But even if they want that first

20   variable, we've given them a proffer, Your Honor, a detailed

21   proffer from each of the entities of what that -- what that

22   lost revenue per work is.  Right.

23           We didn't have to do that.  We did that to address

24   their request.  So we went ahead and we did that.  And that

25   actually informs on that one variable.

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 23
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 22 of 87 PageID# 2083

22

1         So we've -- we've done what they need for their

2    purposes.  Now they come and they say, well, we want historical

3    revenue data on 11,000 works.

4         And we have declarations from every one of the

5    companies saying, this would be a massively burdensome --

6         THE COURT:  No, you don't.  And I went through, after

7    I got the reply last night, to see what your declarations say.

8    And they talk about how profit and loss information and how to

9    decide how much money you would take from the gross revenues to

10   determine, you know, all those other kinds of things is

11   difficult and would take a long time.

12        Nowhere does anybody say, we don't keep profit and --

13   we don't keep revenue by work data.

14        MR. OPPENHEIM:  And, Your Honor, to be clear, I'm not

15   saying that they say that they don't keep it.  But there is a

16   huge distinction between they don't keep it and how burdensome

17   it would be to collect it.

18        THE COURT:  All right.  Show me --

19        MR. OPPENHEIM:  So Mr. Leak's --

20        THE COURT:  -- in any one of the declarations.

21        MR. OPPENHEIM:  Sure.

22        THE COURT:  -- where they say it's burdensome to

23   produce revenue by work by channel.

24        MR. OPPENHEIM:  So in Mr. Leak's declaration,

25   paragraph 9, Your Honor.

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 24
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 23 of 87 PageID# 2084

23

 1              THE COURT:  Which -- which exhibit is he?

 2              MR. OPPENHEIM:  Let me see which declaration that is.

 3    It's 82-8, Your Honor, in the filing, if that helps.

 4              THE COURT:  82-8.  Okay.

 5              MR. OPPENHEIM:  And I am just going to turn as one

 6    example, paragraph 9, Your Honor.  It says in the second

 7    sentence:  Determining all the revenue generated on a

 8    track-by-track basis (or even worse, including albums or EPs)

 9    in a particular time period going back a number of years is

10    extremely time consuming, even if the inquiry is limited to

11    U.S. revenue.

12              THE COURT:  Where are we?

13              MR. OPPENHEIM:  I am sorry, the second sentence of

14    paragraph 9.

15              THE COURT:  The second sentence:  Determining all the

16    revenue generated on a track-by-track basis -- okay.

17              MR. OPPENHEIM:  It goes on, Your Honor, and it

18    discusses the difficulty in gathering this.

19              Or, Your Honor, I mean, I can go through --

20              THE COURT:  All right.  You know, that's the one that

21    I think discussed difficulty, but doesn't really put any meat

22    on the bones as to extremely difficult, a lot of different

23    things to do, and then puts the caveat, they're demanding all

24    related documentation, that would include certain things, which

25    they're not.  They just want to know now the revenue by

1   channel.

2          MR. OPPENHEIM:  Your Honor --

3          THE COURT:  Okay.

4          MR. OPPENHEIM:  We had to respond on many numerous

5   requests, including profit and loss, because they included

6   everything in their works.  We did this on a two-day basis.

7   They did it on a holiday weekend.  To the extent you want

8   supplemental declarations on the burden, we're happy to provide

9   them.

10         Every one of these declarations, I can go through

11  them, Your Honor, Mr. McMullan's declaration for Universal

12  Music -- give me that number, please.  Similarly in paragraph

13  11 says:  Revenue data --

14         THE COURT:  Hold on, I want to get it because I tried

15  to go through here and find out where any of these things

16  focussed on the issue of -- all right, what paragraph do you

17  say?

18         MR. OPPENHEIM:  82-2, sorry, in paragraph 11.

19         THE COURT:  I have got it.  Cost data with respect to

20  given sound recordings.  It's complicated, costs include, and

21  then he goes through and talks about that.  Many of the

22  costs -- revenue data would be voluminous and include documents

23  or information related to millions of tracks each year, as well

24  as licensing and so and so.

25         It doesn't say -- it would be voluminous, of course,

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 26
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 25 of 87 PageID# 2086

25

1    you have got a 11,000 copyrights, so --

2              MR. OPPENHEIM:  Well, he says --

3              THE COURT:  So, you know, no doubt that is going to

4    be voluminous.

5              MR. OPPENHEIM:  Well, he says revenue data would be

6    similarly voluminous, and include documents or information

7    relating to millions and millions of track and album sales made

8    each year, as well as licensing deals and television and movie

9    studios, retailers, streaming service, satellite and cable

10   service.

11             By the way, the request for licensing deals, when --

12   that a record company or a music publisher does a deal with a

13   movie studio to put a track on a movie, how that is relevant, I

14   have no idea.

15             But every one of these declarations discussions the

16   burden associated with providing this revenue data.  And when

17   you compare that burden with the relevance for what they are

18   using it, that is to show actual damages in a statutory damage

19   case where we've given them a proffer, which they haven't even

20   explored yet with any witnesses, Your Honor, seems to go too

21   far.

22             So we have -- so the burden has to be measured in

23   comparison to the relative value of the discovery in this

24   context.

25             I'm happy to go through other declarations, Your

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 27
of 88
Case 1:18-cv-00950-LO-JFA   Document 99   Filed 02/01/19   Page 26 of 87 PageID# 2087

26

1    Honor, but --

2            THE COURT:  No, I mean --

3            MR. OPPENHEIM:  -- they have -- so, Your Honor, there

4    are statements by each one of the plaintiff groups in this case

5    describing that providing this revenue data would be

6    burdensome.  It would require an enormous amount of pulling of

7    information.  It is described as to each plaintiff group.  And

8    that burden needs to be measured as against the value of it.

9            Your Honor, to be clear, we're not saying that the

10   data doesn't exist, but it doesn't exist in a single system

11   where it's just a computer-generated printout.  If that were

12   the case, then we would just simply be arguing relevance.

13           But it would require an enormous amount of effort and

14   time and money to extract all of this information for -- for a

15   purpose that the defendants haven't explained.

16           THE COURT:  Well, I think they have explained the

17   purpose for it.  I don't think -- and again, I'm focusing on a

18   very limited aspect of what was requested in the various

19   document requests, 27, 28, 29, 36, 41, 43, and 44, and

20   interrogatories 2 and 3.

21           You know, I think under the circumstances -- and, you

22   know, I -- you know, there is no reasonable argument that

23   revenues do come into play even when you have statutory

24   damages.  So that puts it in the realm of we don't just get to

25   wash our hands of, you know, profit and loss information and

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 28
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 27 of 87 PageID# 2088

27

1     revenues and lost revenues and things like that, just because

2     we have statutory damages.

3          And I understand that getting revenues doesn't

4     translate directly into it, but it gives one a sense of how one

5     could calculate on an industry basis what one could expect a

6     general range of profit and loss to be based on revenues.

7          MR. OPPENHEIM:  So, Your Honor, what's interesting is

8     that the defendants pointed to the BMG case and what happened

9     in that case.  We went back and looked.  And without seeing

10    exactly what data was produced, we do know what their expert

11    said and did.

12         And all he did -- he didn't actually point to the

13    revenues, lost revenue per track.  What he did is he did an

14    analysis to determine the proportion of revenue from digital

15    downloads versus streaming.  So he took -- he got all of this

16    massive historical data and then he came up with just a simple

17    percentages.

18         That is, frankly, if that's all the expert wants,

19    that's publicly available information.  You don't need to ask

20    for historical revenue data to figure out the proportion of

21    streaming to downloads.  IFPI issues international reports on

22    those kinds of statistics, and their expert, I am sure, has

23    them or can easily find them.

24         So they argued for it, ultimately agreed, BMG agreed

25    to provide all that historical data in light of the motion, but

1    then it wasn't even -- wasn't even used.

2           He did nothing whatsoever, Your Honor, with

3    information with respect to licenses or physical sales.  The

4    only information the expert in BMG used was downloads and

5    streams, and only for developing proportional information.

6           THE COURT:  Well, that -- are you indicating that if

7    I was to order it, that I should only order it for downloading

8    and streaming and not for physical sales and licenses revenue?

9           MR. OPPENHEIM:  So, Your Honor, I don't -- to be

10   clear, we think that you should deny it outright.

11          But if Your Honor were going to go down the road of

12   ordering something here, what I would -- what I would think to

13   do is start with a sample.  Pick -- if what they want to get is

14   a sense of what the revenue per track is on streaming or on

15   downloading, let's pick 50 compositions, 50 sound recordings

16   and provide that on those two categories.  And then let them

17   ask questions.

18          And if that sample shows anything to justify more

19   information, then we can certainly have a discussion about

20   that.

21          But the idea, given the burden and the relative use

22   here, I think the idea of asking us to produce all of the

23   historical revenue information for all 11,000 tracks when Cox

24   in the past didn't use it after asking for it --

25          THE COURT:  Well, you know, I told you all this every

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 30
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 29 of 87 PageID# 2090

29

1    time you come in here, this is not the BMG case.  You've got

2    different counsel representing Cox, you know.  So, you know,

3    this is different counsel representing the plaintiffs in this

4    case who are different plaintiffs.  So this is not just a redo

5    of the BMG case.

6              MR. OPPENHEIM:  Absolutely, Your Honor, we agree, we

7    absolutely agree.  But we've put forward, Your Honor,

8    declarations of burden.  The defendants in their reply brief

9    say we haven't.  We absolutely have, Your Honor, and they are

10   there.

11             THE COURT:  All right.  All right, quickly.  Why

12   shouldn't I limit it to downstream -- to downloading and

13   streaming before I provide the revenue information?

14             I mean, licensing, I don't see how that one could

15   come into play significantly in someone who is allegedly using

16   peer-to-peer software to download certain individual

17   copyrighted works and who was doing licensing it to be used in

18   a movie or something like that.

19             Physical sale probably is a little bit closer, but

20   let me hear why I shouldn't just limit it to downloading and

21   streaming, those channels.

22             MS. GOLINVEAUX:  Yes, Your Honor.  For the licensing

23   royalty, I really think goes to the point Your Honor made about

24   the value of these individual works.  Some of them, the

25   plaintiffs enjoy far more revenue than others.  And the

1    licensing royalty would be relevant to that, and that would be

2    relevant to an appropriate level of statutory damages.

3            I think it is more attenuated than the physical

4    sales, the digital downloads, and the streaming revenue, but

5    that's the relevance of the licensing revenue.

6            And with physical sales -- with physical sales, the

7    expert would use those in the same way that he would use the

8    download and streaming revenue to look at the relative

9    proportions.  And because we don't know if -- but for the

10   alleged infringement in the case, how that person would have

11   enjoyed the track otherwise.

12           THE COURT:  Well, you know, I'm pretty ignorant in

13   this issue, so you'll have to help me understand.

14           But a copyrighted work that you're saying being

15   infringed, let's just say it's one song by an artist.  If that

16   song is included in a CD that includes many other songs, how

17   would one know that the physical purpose -- purchase of a CD

18   would relate to that individual copyrighted work and what

19   percentage of it would apply to that individual sale of a

20   physical CD.

21           MS. GOLINVEAUX:  Well, Your Honor, with alleged

22   infringement, it's an issue in the case, there are -- there

23   will likely be users who are downloading albums as opposed to

24   songs.  So I think it is relevant to the alleged infringements.

25           THE COURT:  But they're also, I assume, individual

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 32
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 31 of 87 PageID# 2092

31

1  songs as well, right?

2          MS. GOLINVEAUX:  Your Honor, I think that is likely

3  true, yes.

4          THE COURT:  Okay.  Well, again, one does not strive

5  for perfection in ruling on these things.  One tries to rule

6  and move on and let the parties try and do things as best they

7  can given the information that they will have and have to do.

8          You're going to get their expert report on April 10,

9  it is going to have damages information.  So my ruling is not

10 going to preclude you from seeking more information once you

11 get their expert report and provide -- come to me and say, you

12 know, based on their expert, my expert needs X.

13         I'll tell you that if your expert report comes in and

14 it has a lot of information that you say was too hard to get,

15 too tough to do, couldn't do it, all that kind of stuff, your

16 expert may not be able to testify.

17         I mean, I will consider a motion that would preclude

18 him or her from testifying if your representations that you and

19 your clients have made were only to defend against discovery

20 and not to prepare your own case.

21         MR. OPPENHEIM:  Understood, Your Honor.

22         THE COURT:  So you're going to be stuck with that.

23         You know, in reading through the declarations, you

24 know, I don't find that they are adequate to support a

25 proportionality argument relating to revenue information by

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 33
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 32 of 87 PageID# 2093

32

1   work.  I think that a time period from 2011 through 2014 of

2   providing revenue by work is appropriate.  And I think under

3   the circumstances of doing it, I'm going to at this point in

4   time, going to go ahead and do it by channel, including

5   physical sales, downloads, streaming, and licensing.

6            I mean, I think, you know, that's certainly

7   information that is relevant.  Whether it is highly relevant, I

8   think arguably probably doesn't meet the highly relevant

9   component, but I do think it's relevant.  And I am going to

10  require them to produce that information.

11           So it's going to be from 2011 through 2014, revenue

12  by work by channel, including those four channels, physical,

13  downloads, streaming, and licensing.  Okay?  Thank you.

14           MR. OPPENHEIM:  May I ask a question, Your Honor?

15           THE COURT:  Okay.

16           MR. OPPENHEIM:  I guess I don't understand why the

17  information from 2011 and 2012 would be required.

18           Cox isn't required to provide termination information

19  for those years, but we have to provide revenue information for

20  those years?  Clearly to the extent they are trying to show

21  actual damages, that revenue information wouldn't be relevant.

22           THE COURT:  Well, it shows trends, so --

23           MR. OPPENHEIM:  But similarly with respect to the AUP

24  terminations, we asked for it for purposes of showing trends

25  and changes and what their behavior --

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 34
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 33 of 87 PageID# 2094

33

1    THE COURT:  Well, no.  I mean, the real reason you're

2    getting that information is to show that they have the

3    authority to do something and they exercised that authority

4    during the time period.

5    I'm not going to let you reargue this.  I have

6    decided it.  You know, if you need clarification on what the

7    actual ruling is -- but that's the ruling.  That's what your

8    client is going to be required to do.  Okay?

9    MR. OPPENHEIM:  Very well, Your Honor.

10   THE COURT:  Okay.  Ownership and validity.  Let me

11   hear your argument on why you need more than what they're

12   doing.  Why it isn't appropriate to -- if you have specific

13   concerns about specific works not being -- them not having

14   standing to pursue the damages that they're claiming for

15   specific works, why shouldn't that be done on an individual

16   specific basis after you've gone through and seen their

17   information and raised it as opposed to this, we want all

18   documents concerning everything?

19   MS. GOLINVEAUX:  Yes, Your Honor.  With our motion

20   we're seeking three categories of documents.  Number one are

21   the work-for-hire agreements for the works in suit.

22   With respect to the work for hire --

23   THE COURT:  What basis do you have that they aren't

24   in existence?  I mean, they have a valid copyright -- I mean,

25   they're providing you with copyright registrations, which is a

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 35
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 34 of 87 PageID# 2095

34

1   presumption that they have the rights that they are pursuing.

2           MS. GOLINVEAUX:  Yes.

3           THE COURT:  What basis do you have to go behind that

4   and say, I want every work-for hire agreement?

5           MS. GOLINVEAUX:  Your Honor, two issues.  Number one,

6   plaintiffs' responses are concerning because what they

7   specifically say in their written responses is that we'll

8   provide you with chain of title documents that they, quote,

9   deem sufficient to demonstrate ownership.  So we don't know

10  what they deem sufficient.  And that's not the proper standard.

11          The reason we need the work-for-hire agreements is

12  that the plaintiffs have now produced a number of the

13  registration certificates.  It looks like a good many of them

14  were filed to be registered as works for hire.

15          And under the Copyright Act, in order for a copyright

16  claimant to file -- to register a work as a work for hire,

17  there has to be a work-for-hire agreement in place when the

18  work is created.  It can't be created down the road, unlike an

19  assignment or a license.

20          So we can't know, without getting those work-for-hire

21  agreements, whether or not was in place or not.  So that's the

22  issue with the work-for-hire agreements.

23          THE COURT:  Well, if in fact -- go ahead.

24          MS. GOLINVEAUX:  Would you like me to go to the next

25  category, Your Honor?

35

1          THE COURT:  Sure.

2          MS. GOLINVEAUX:  So the next category is the core

3    chain of title documents, the assignments and licenses by which

4    plaintiffs took title to the works in suit.

5          Maybe they're producing them.  The problem is, we

6    don't know if they're cherry picking and producing some and not

7    others, or if when we don't get them for one of the 10,000-plus

8    works in suit, it's because they didn't have it.  We can't know

9    that.

10         So it's much more practical to simply order them to

11   produce the assignments and licenses to the extent they have

12   them and then we can take it from there.  If they don't produce

13   them for certain ones, we can deal with that in deposition.

14         But they have got to show that they actually took

15   title to the work.  And then --

16         THE COURT:  It's their burden.  If you don't think

17   they've met their burden, then you can attack it.

18         MS. GOLINVEAUX:  Well, it's our burden to challenge

19   the prima facie presumption they enjoy from the copyright

20   registration certificate, Your Honor.  And without seeing --

21   for copyrights, unlike some other IP, it requires a written

22   instrumentality to transfer ownership.

23         So we should be able to get those written

24   instrumentalities.  And they've really articulated no burden,

25   no specific burden with respect to simply producing the

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 37
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 36 of 87 PageID# 2097

36

1    assignments and the licenses by which they took title if

2    they -- if they have them.

3              THE COURT:  And your third category?

4              MS. GOLINVEAUX:  The third category is documents

5    concerning challenges to their ownership or the validity of the

6    copyrights that they are claiming in the case.

7              So if people are coming in -- if artists are coming

8    in and saying, you registered -- you included this album or

9    track in a group registration or you registered for it, but

10   that wasn't part of our deal, that's highly relevant to this

11   case.

12             THE COURT:  Why, if it got resolved in their favor

13   and they still have the copyright?  Why is that -- I mean,

14   you're asking for that forever.  You know, somebody who had a

15   dispute eight years ago -- if somebody filed a lawsuit saying,

16   you know, you this copyrighted work was really my work because

17   I did something, I was the one who came up with it, and that

18   dispute got resolved and, you know, the plaintiffs are still

19   the copyright owner, why does that dispute have any

20   significance at all?

21             MS. GOLINVEAUX:  Your Honor, we would be limit that

22   going back to 2010.

23             THE COURT:  Okay.  So it got resolved in 2012.  Why

24   does that have any relevance?

25             MS. GOLINVEAUX:  Well, we don't know, we don't even

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 38
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 37 of 87 PageID# 2098

37

1    know what has been challenged without getting those documents,

2    is the problem, Your Honor.  And they haven't articulated a

3    clear burden with that, or even let us -- told us how those

4    documents are maintained.

5              THE COURT:  Help me understand what you're going to

6    do -- if I was to order all of that information, what are you

7    going to do with it?

8              MS. GOLINVEAUX:  Well, Your Honor, when you have got

9    this number of works in the case and they're seeking up to

10   $150,000 in statutory damages per work, then if we dropped --

11             THE COURT:  If they get to willfulness, that's what

12   they would be titled to on the upper realm.

13             MS. GOLINVEAUX:  And their complaint, Your Honor, is

14   all about willfulness.  So it's --

15             THE COURT:  So you're going to try and challenge --

16             MS. GOLINVEAUX:  Correct, Your Honor.

17             THE COURT:  -- in the trial of this case whether they

18   have standing for 11,000 individual copyrights?

19             MS. GOLINVEAUX:  We're not as to each and every

20   copyright, Your Honor, but we are entitled to see the documents

21   where third parties are saying that you didn't actually -- you

22   improperly registered it, you don't own it, particularly for

23   that limited time period.  Because even if we knock out ten of

24   those, that's $1.5 million in the case.  That certainly

25   proportional to whatever burden it would take for the client --

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 39
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 38 of 87 PageID# 2099

38

1    for the plaintiffs to produce those documents.

2            THE COURT:  All right.  Thank you.

3            Tell me what it is you're producing as far as

4    ownership and validity materials.

5            MR. OPPENHEIM:  So, Your Honor, we're producing all

6    the documents -- first of all, all the copyright registrations

7    or proof of registration.  And then to the extent that that

8    registration is in the name other than the plaintiff, we're

9    producing the chain of title to show the connection between the

10   plaintiff and the registrant.

11           And that's exactly what, Your Honor, Judge O'Grady

12   ruled on his summary judgment decision in the BMG case.  I know

13   we're plowing our own course here, but the law is the law.

14   There is no -- so what Judge O'Grady said is there is no basis

15   for Cox's argument that the chain of title must relate back to

16   the author instead of the original plaintiff.

17           We're producing that --

18           THE COURT:  That was on a summary judgment motion.

19   This is a discovery motion.

20           MR. OPPENHEIM:  Absolutely.  And we have said

21   repeatedly in the meet and confer process with the defendants,

22   if there is a work for which you have any basis whatsoever, any

23   colorable basis to say that there is an issue, tell us and

24   we'll go and look.

25           But what they're doing is just purely speculative, we

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 40
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 39 of 87 PageID# 2100

39

1    want all of these documents.  They have no basis to believe

2    there are any issues.  They haven't even reviewed what we've

3    produced or allowed us to produce everything to them that they

4    have asked for already.

5         And yet they're here and they're asking the Court,

6    you know, because we don't think we're going to get necessarily

7    what we want, we want you to order it before we have even

8    looked at what they're going to produce.

9         And, by the way, in the -- they did ask for way more

10   in their motion than they are now asking for again, Your Honor.

11        THE COURT:  All right.  Well, again, I think I

12   understand this issue well enough.  You know --

13        MS. GOLINVEAUX:  Your Honor, may I have a brief point

14   in response?

15        THE COURT:  Okay.

16        MS. GOLINVEAUX:  Mr. Oppenheim referred to Judge

17   O'Grady's order.  We're not seeking chain of title going all

18   the way back to the original creator.  We are seeking the

19   assignments of licenses that put it in the name of the

20   plaintiffs.  We know that they don't -- they are employees.

21   These are not created by employees of the plaintiff.  So that's

22   what we're seeking, and that's the distinction with what Judge

23   O'Grady ruled.

24        THE COURT:  Okay.  Well I think what they have agreed

25   to produce to date is going to be sufficient.  If there is any

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 41
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 40 of 87 PageID# 2101

40

1    specific questions that you've got that relate to specific

2    issues for copyrighted works, then I'll consider dealing with

3    this issue on a copyrighted work-by-copyrighted work basis.  Of

4    if it's a many copyrighted works that are subject to a similar

5    work or a wire for hire or something like that.

6            But, you know, at this point in time the idea that

7    you know, for all 11,000 copyrighted works, you know, the three

8    areas that you've asked for or have now made clear in your

9    reply brief that you're asking for, I don't -- I don't see that

10   being appropriate under the circumstances of this case.

11           So I'm going to deny the motion to compel as to this

12   second category.

13           All right.  So now we're dealing with these narrowly

14   tailored requests that include a request such as:  All

15   documents that mention, refer to, or relate to Cox that were

16   created, received, or sent from 2013 to the present.

17           That was described in your motion as a narrowly

18   tailored request.

19           MS. GOLINVEAUX:  Your Honor, we think all documents

20   the plaintiffs have talking about Cox are relevant in this

21   case.  They have been targeting Cox for years.  They have been

22   tracking the BMG litigation.

23           We met and conferred with them and discussed this.

24   They said there are certain categories that would make that

25   burdensome.  And we asked them what those might be.  And they

1    said, for example, monthly invoices.  We said, we don't want

2    monthly invoices.

3            Now for the first time in their opposition they say,

4    well, we are producing documents concerning Cox and copyright

5    infringement.  That may be sufficient, Your Honor, but that's

6    not what their written supplemental responses say.

7            The written supplemental responses say, in response

8    to these requests, we'll give you the notices of infringement

9    that we sent you, downloads that our agent captured, and a

10   couple of other categories that would not at all get the

11   correspondence about Cox and copyright infringement that we're

12   entitled to.

13           THE COURT:  Okay.  Well, let me hear from the

14   plaintiffs as to what it is you actually are -- and I share

15   Cox's confusion as to what it really means.  I mean, you said

16   in the meet and confer, we're doing this.  And then it sounds

17   to me like what you've said in your opposition is more

18   expansive than what you actually said in the meet and confers.

19           MR. OPPENHEIM:  The defendants' description of the

20   meet and confer process, we couldn't disagree with more, Your

21   Honor.

22           They have never -- in none of these meet and confers,

23   with rare exception, have they ever said, no, we're not seeking

24   that.  They will say, yes, we'll take that.  But they never

25   limit what they want.  Which is exactly what they did in their

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 43
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 42 of 87 PageID# 2103

42

1    motion.  They moved on everything, and then they scale back and

2    say, but this is what we're really focussed on.

3            But, Your Honor, so just to understand, a number of

4    these requests we're working on trying to produce reasonable

5    responses and we've wanted to engage in a discussion about ESI

6    and search terms.  The defendants have refused to have that

7    dialog.

8            But that's the dialog you need to have to resolve

9    these disputes so we're not doing it, Your Honor, in front of

10   you, with you.  No offense intended, I don't think this is a

11   valuable use of our time.

12           THE COURT:  No offense taken, believe me.

13           MR. OPPENHEIM:  Or your time.  So, for instance, when

14   you run the term "Cox" through the system, there are artists

15   who have the name Cox.  There are employees who have the name

16   Cox.  Right.  There are e-mails that have the Cox domain.

17   Right, so just searching on Cox alone doesn't work.

18           And so, you have to search on Cox with some subject

19   matter and some restrictions.  That's the dialog we need to

20   have with them, but they've refused to have with us.

21           So we are working on the searches that are set forth

22   in our document.  We are happy to sit down and have an ESI

23   discussion with them about search terms that is bilateral.

24   They have refused to do that.

25           So in the meantime, we are trying to search on "Cox"

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 44
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 43 of 87 PageID# 2104

43

1   and "copyright infringement" without necessarily pulling

2   documents that are wholly unrelated to this case.  An artist by

3   the name of Cox whose work was infringed, but, having nothing

4   to do with this case or nothing at all.  Right.

5           So we're trying to find the very specific searches

6   that will get at what they want, but really it's got to be a

7   search term dialog, Your Honor.

8           THE COURT:  Well, but it also has to be a, what do

9   you do after you get -- what documents are you actually

10  producing once you do that search and get the hits.

11          And I think their concern is that if you get hits

12  from a reasonable search using search terms such as "Cox" and

13  "copyright infringement," what are you going to take out of

14  that.  And is it going to be only those documents that are, you

15  know, as you outlined in your meet and confer letters, or is it

16  going to be a broader set that relates to Cox and copyright

17  infringement.

18          MR. OPPENHEIM:  So there are some categories, Your

19  Honor, which I think we're going to get at shortly, for

20  instance, the Copyright Alert System, which the CAS system,

21  where I think there is a dispute about whether or not that's

22  relevant.

23          So without getting to that issue in this, to the

24  extent that we find documents that are not privileged that

25  relate to Cox or the relevant time period in copyright

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 45
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 44 of 87 PageID# 2105

44

1    infringement, our goal is to attempt to produce them.  But we

2    wouldn't include that as a backdoor effort to try to get at

3    things like the CAS system.  Right?  Or things that have

4    nothing to do with the claims in this case.

5            The problem is that their document requests are so

6    broad that you can't -- you can't even start with them.  And

7    then they move on them, but then they don't even move on them,

8    Your Honor.  You know, they're in their motion papers, we've

9    got to respond to it, and then they try to narrow in the motion

10   papers.

11           I feel like I'm trying to grab Jello, Your Honor, and

12   I can't figure out where it's going next.

13           So again, I'm happy to have this dialog, but it has

14   to be within the construct of a back and forth, I think, Your

15   Honor.

16           THE COURT:  All right.

17           MR. OPPENHEIM:  Which we regularly do with opposing

18   counsel all the time.  I'm not why search terms here is

19   different and why we can't have that dialog here.

20           THE COURT:  Okay.  Well, again, I'm still not

21   understanding completely what it is you intend to do once you

22   get the results of your searches of what you believe are

23   reasonable custodians using search terms and get documents

24   concerning "Cox" and "copyright infringement."

25           Is it only those items that have to do with notices

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 46
of 88
Case 1:18-cv-00950-LO-JFA   Document 99   Filed 02/01/19   Page 45 of 87 PageID# 2106

45

1    of infringement, downloads of unauthorized copies of the

2    copyrighted works, documents sufficient to show information

3    concerning the infringement, documents concerning the analysis

4    of the reliability, documents concerning Cox's response to

5    receiving an infringement notice, and documents concerning the

6    number of infringement notices Cox accept from plaintiffs?

7            MR. OPPENHEIM:  So I'm sorry, just to file -- you're

8    on page 16 of our opposition?

9            THE COURT:  I'm looking at your opposition where you

10   say, those are the six items.  And then you say:

11   Notwithstanding this, plaintiffs are conducting reasonable

12   search terms to target non-privileged documents concerning

13   "Cox" and "copyright infringement," but it doesn't really tell

14   me what you're going to do once you do that.

15           MR. OPPENHEIM:  Well, Your Honor, that's part of the

16   process.  Is we have to see what we sweep up, and have no idea

17   what we haven't thought of that is going to get captured in

18   that, that would be entirely irrelevant.

19           So we would exclude the CAS documents, Your Honor, we

20   know that, which we've indicated.  We would exclude any

21   privileged documents, right, Your Honor.

22           But other than that, at the moment we're not aware of

23   what else we would be excluding.  But that's got to be part of

24   the process as we examine the searches.

25           But, look, what we tried to do, Your Honor, we took

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 47
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 46 of 87 PageID# 2107

46

1    their incredibly broad requests, which they have refused to

2    meet and confer on, and we tried to come up with a concrete set

3    of things to produce.  I mean, we are informatively trying to

4    resolve this dispute, but -- but really can't do it in a

5    vacuum.

6              THE COURT:  Well, however along are you in the

7    process of producing these documents?

8              MR. OPPENHEIM:  We've collected from custodians and

9    run the searches, and we're now having a team of lawyers review

10   those documents to see what's there.  In terms of the time

11   frame, Your Honor, at the moment I don't know.  But we -- I

12   know we have a good group of people working on it every day

13   right now.

14             THE COURT:  Okay.  All right.  Well, you know, on

15   this one, I'm not quite sure this one is really ripe yet to be

16   decided, to be honest with you.

17             I have heard from counsel for the plaintiffs that

18   they are in the midst of doing their searching, that they are

19   providing or looking for and will be producing documents that

20   concern "Cox" and "copyright infringement" with certain

21   restrictions as to -- and we'll get to the CAS documents later.

22   But beyond that, and I guess the time period, I guess is the

23   other issue that probably I can address today.

24             Why any time after 2014?  Let me hear from --

25             MS. GOLINVEAUX:  Your Honor, two things.  One, it's

1    not clear to me if they have got documents where their clients

2    are -- that are non-privileged that -- where the clients are

3    discussing Cox and copyright infringement and they also happen

4    to be discussing CAS, why those wouldn't be produced.  Those

5    seem highly relevant.

6            If they are comparing Cox's policies, for example, to

7    CAS, how is that not relevant?  Putting aside the dispute we

8    have about the relevance of CAS generally.

9            So what I seem to hear now is that the plaintiffs

10   will do these searches, but then they will cherry-pick the

11   categories of the documents that they're going to produce, and

12   we don't have visibility about that.  So that's the concern.

13           With respect to the date range, Your Honor, the

14   reason we asked for it up to current time is even if there are

15   documents discussing how Cox's policies stack up against the

16   industry, with respect to the relevant time period in the case,

17   even if they were discussing that in 2017 or 2018, those are

18   still highly relevant, highly relevant and not burdensome to

19   search for.

20           And with all due respect, Mr. Oppenheim's example

21   about the artist who might have the last name of Cox, when

22   we're talking about Cox and copyright infringement, we're

23   talking about the defendants in the case.

24           So that limitation would not sweep up anyone who

25   happened to have the last name Cox.

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 49
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 48 of 87 PageID# 2109

48

1          THE COURT:  All right.  Well, this one I am afraid I

2    am going to really at this point deny without prejudice.

3          I think the time period of 2014 is appropriate for

4    the cutoff period for the plaintiffs to be producing these

5    documents.  They are in the midst of producing the documents.

6    I think we need to see what it is they actually produce.

7          If issues come up, you find out that their production

8    hasn't been as complete, then you need to tell them what it is.

9    I mean, I'm not talking about a privilege log issue.  But to

10   the extent that you are finding categories of documents that

11   otherwise would be done and you're not producing them -- again,

12   I'm not, you know, document-by-document basis, but I think

13   there has to be some transparency as to, you know, what it

14   actually is that you're producing and what you're not

15   producing.

16         And then once you all have had a chance to be a

17   little bit more specific in your discussions about them, then

18   you can raise this issue with me again.

19         But this -- you know, there are plenty of things to

20   fight about in this case and, you know, I think focusing on

21   some of the more merit-based issues are probably a better

22   expenditure of your clients' resources than some of these other

23   things.

24         But go ahead and continue your production.  Be as

25   transparent as you can as far as, you know, what you have

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 50
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 49 of 87 PageID# 2110

49

1    gotten, what you have -- the process that you've taken to

2    search the results from your search terms, and what types of

3    information that have been categoried out of the production.

4    Okay?

5              So that one --

6              MS. GOLINVEAUX:  Your Honor, may I ask one point of

7    clarification?

8              THE COURT:  Okay.

9              MS. GOLINVEAUX:  In what forms do you -- would you

10   anticipate that would take place, that they would provide us

11   with information about the categories?

12             THE COURT:  Informal.  I mean, discussions, letters.

13             MS. GOLINVEAUX:  Oh, letters.  Thank you, Your Honor.

14             THE COURT:  Something like that.  It's not something

15   that I'm going to have them file with the Court at this time.

16   If it becomes the subject of a motion, then we will do it, but

17   after that.  Okay.

18             So I guess now we're to your areas, Mr. Buchanan.

19             MR. BUCHANAN:  Yes, Your Honor.  We're now discussing

20   the defendants' motion to compel documents concerning CAS and

21   the Copyright Alert System, which was established in February

22   of 2013 on 18 companies involved in the copyright industry,

23   including vendors and ISPs, as well as Sony and

24   other defendants -- or other plaintiffs.

25             So there is no real issue about burden here.  It's --

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 51
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 50 of 87 PageID# 2111

50

1   there is one short paragraph and three declarations that really

2   just says, the discussions and the negotiations went on for a

3   long time.

4        The plaintiffs refuse to produce any documents with

5   regard to CAS.  And you just heard from plaintiffs' counsel to

6   suggest that they don't want to search "Cox" and "CAS"

7   together.  Suggesting that that's going to produce documents

8   which we think are relevant, as Ms. Golinveaux just pointed

9   out.

10        And they are relevant because throughout the

11   complaint in this matter the plaintiffs assert that the manner

12   by which Cox handled the notices of infringement were

13   unreasonable and arbitrary and a violation of the copyright

14   laws.

15        I can just read you just briefly --

16        THE COURT:  Well --

17        MR. BUCHANAN:  Well, I won't read.

18        THE COURT:  I understand the argument.

19        MR. BUCHANAN:  Okay.  So they go on and on, paragraph

20   after paragraph, how arbitrary and unreasonable we were in the

21   parameters that we set up, and the notices and the limitations

22   on them.

23        So we know that through CAS all of these entities got

24   together, you know, copyright owners and vendors and ISPs, and

25   they came up with a formula by which it would be acceptable to

51

1   the copyright owners, like the plaintiffs, many of the

2   plaintiffs, and the ISPs.  And they put caps on the number of

3   notices that would be acceptable and whether they needed to

4   terminate or not.  And we believe that they didn't require them

5   to terminate.

6           So the plaintiffs' counsel in their papers suggest

7   that that's meaningless because it's not a legal standard.

8   Well, there is no legal standard.  There is no statute or

9   regulation that states you must accept so many notices in a

10  day, and you must act on them in a certain fashion, and you

11  must accept so many per complainant or subscriber.

12          THE COURT:  Or that you can turn down any notices.  I

13  mean, there is no legal standard that you can only accept a

14  certain amount as opposed to a legal standard that you're not

15  required to accept every copyright notice, every notice of

16  infringement.

17          MR. BUCHANAN:  Right, correct.  So but if the

18  plaintiffs and 18 others in the industry, including most of the

19  ISPs, had an agreement during the time period in question that

20  said, look, accept this amount of notices, and Sony is a big

21  player, they are driving the train, accept 500 a day, that

22  works, and you don't need to terminate, just work with us.

23          Then they come into court and argue for the jury, and

24  it's all through their complaint, 200, 300, 500 was arbitrary,

25  it was unreasonable, they just did it to save money, they are

1    totally greedy, and they don't care, and they only pass on so

2    many notices and only terminate so many people.

3              Well, if that's what they're saying is an

4    unreasonable and arbitrary standard and, therefore, we should

5    be hit with a billion dollars in damages involving deterrence

6    because they're saying you need to deter them because they're

7    unreasonable and arbitrary in the way they handled the notices

8    and how many they processed, then we suggest -- we think that

9    these documents are reasonable and that they be produced and

10   they are relevant.

11             And the Court in BMG found the same thing with regard

12   to BMG and Rightscorp.  They found that the plaintiffs in that

13   case needed to produce documents that showed that the

14   plaintiffs may have had different communications and different

15   requirements and treated other ISPs differently than they were

16   treating Cox.  So we already have a prior ruling that is almost

17   directly on point.

18             And this is not burdensome.  It's very limited

19   documents.  We want the master contract, the agreements they

20   had with the other ISPs, maybe eight or ten of them, the

21   communications that led up, and just the documents that just

22   show what's the standard they were utilizing.  Because if they

23   are going to tell them these guys are the outliers, they did it

24   different than anyone else -- because if we did it the same as

25   everyone else and it was acceptable to them, how can it not be

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 54
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 53 of 87 PageID# 2114

53

1    acceptable in this case?

2              THE COURT:  Well, it's --

3              MR. BUCHANAN:  They didn't sue any of those people.

4              THE COURT:  That doesn't make it right.  I mean, two

5    wrongs don't make a right.

6              MR. BUCHANAN:  No, it doesn't, but also it suggests

7    that you can't argue to the jury that you're arbitrary and

8    unreasonable when you negotiate and do side deals with all the

9    others where you don't even require them to terminate.

10   Certainly it's relevant at this stage of the case, Your Honor.

11             THE COURT:  All right.  Let me -- give me an

12   understanding as to -- and it's unclear to me how this worked.

13             Apparently there was a memorandum of understanding

14   and then there may be certain implementation agreements.  Are

15   there separate documents, or was there a memorandum of

16   understanding that people would sign on to or not?

17             MR. OPPENHEIM:  Here is my understanding, Your Honor.

18   Over the course of many years there was a negotiation with

19   movie studios, record companies, ISPs, and technology companies

20   about creating an entity that would have a couple different

21   components to it, an educational component, and a technology

22   component, and a notice component with respect to copyright

23   infringement.

24             Those entities negotiated for several years, created

25   a corporate entity.  That corporate entity was run by

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 55
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 54 of 87 PageID# 2115

54

1   representatives from all the different industries.  And that

2   entity used vendors to send millions and millions of notices

3   and engage in an education campaign.  All of which, I

4   understand, the details of which are subject to confidentiality

5   agreements to that entity, which has now been dissolved because

6   it doesn't exist anymore.

7           So I presume those confidentiality obligations now

8   exist, you would have to get some kind of approval from each of

9   the different movie studios and other entities involved.

10          So it was a lengthy effort from negotiation to its

11  creation of the entity.  The entity existed for several years,

12  and then there --

13          THE COURT:  From when to when?

14          MR. OPPENHEIM:  I don't have the exact dates, Your

15  Honor.  I am not privy to them as I stand here.  It was several

16  years.

17          THE COURT:  Well, apparently there is some indication

18  of a memorandum of understanding that was signed on July 6,

19  2011, is that --

20          MR. OPPENHEIM:  I think that's right, Your Honor.

21          THE COURT:  Okay.

22          MR. OPPENHEIM:  And then, so it operated for several

23  years and then was dissolved.  And dissolved in 2017.  And the

24  dissolution, I think negotiations went on for quite sometime as

25  well.

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 56
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 55 of 87 PageID# 2116

55

1          So I think that's an overview.  I think there is --

2     as I understand it, it could, based on the defendants'

3     requests, which again are massively overbroad --

4          THE COURT:  Right, and we're focusing on -- not all

5     documents relating to, not all documents concerning certain

6     things.

7          MR. OPPENHEIM:  So -- okay.  So I have a few more

8     details --

9          THE COURT:  Okay.

10          MR. OPPENHEIM:  -- with the benefit of my colleague.

11     Thank you, Mr. Gould.

12          The negotiations went on between 2009 and 2011.  The

13     program itself existed from 2013 to 2017.  Dissolved in 2017.

14     I know that the negotiations over the dissolution took quite

15     some time as well.

16          But the point here, Your Honor, is -- is Mr. Buchanan

17     made a legal point that's just not right.  He said, there is no

18     legal standard on notices.  And there is a hundred years of

19     case law on what somebody is supposed to when they receive a

20     notice of infringement.  It goes back to -- to cases where, you

21     know, somebody found an entity playing music that they

22     shouldn't, and they sent a cease and desist letter, and then

23     that entity didn't respond.  There is a huge number of cases

24     over a long, long period of time.

25          And in none of those cases do courts say, well, it

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 57
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 56 of 87 PageID# 2117

56

 1   was okay for that bar to continue to play that music because

 2   other bars were violating the law and not getting a license,

 3   for example.

 4           Or for a movie theatre to say -- to say, it was okay

 5   for us to show a pirated copy of a movie because other movie

 6   theatres did that.  That's the argument that the defendants are

 7   making here, that their legal obligation should be measured by

 8   a comparison to others.

 9           And that's not the law.  And that's not -- we don't

10   say anything about Cox as compared to others in the industry in

11   our complaint.  It is nowhere to be seen, contrary to their

12   statements.

13           Their conduct is measured against the legal standards

14   which are well-known and have been articulated by the Supreme

15   Court.  And those standards don't ask for a comparison to the

16   rest of the industry.

17           So that's number one, Your Honor.

18           Number two, they say that we have not articulated a

19   burden in our documents, and that's not true.  In Wade Leak's

20   declaration from Sony, just by way of example, we have it,

21   there is an entire paragraph about the burden.

22           But you don't even need to look at that declaration

23   to see that.  All you have to do is look at the ridiculous

24   number of requests and the overbreadth of those requests to

25   understand the burden.  I mean, they are moving on things that

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 58
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 57 of 87 PageID# 2118

57

1    on their face are just ridiculously overbroad and burdensome

2    and certainly not proportional.

3            So, Your Honor, I think you don't need to get to the

4    burden or proportionality issues because I think as a matter of

5    law the legal standards don't look at what others are doing.

6            But if you -- if you want to look at burden and

7    proportionality, it's on its face a ridiculous request.  And

8    the idea that they have narrowed it in their papers is, again,

9    not the way this should work.

10           THE COURT:  Well, help me understand that.  We -- and

11   I am frustrated with this often in dealing with these types of

12   motions.

13           The Court requires the parties to have a good faith

14   consultation in order to try and narrow the issues.  So you

15   send out arguably what may be a very broad, sweeping document

16   request.  In the scope of those negotiations, the propounding

17   party agrees to narrow it to a certain subset of what was

18   initially requested.

19           As much as the Court would like to be able to look

20   and just say, well, you have got to stand by the document

21   request that you sent out and, you know, I can't order them to

22   produce it, that would ignore the requirement of the parties

23   having to go through a good faith consultation.

24           So, you know, it can't be, well, you know, if that's

25   really what you want, you have got to go back and ask for it

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 59
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 58 of 87 PageID# 2119

58

1    again.

2              MR. OPPENHEIM:  So I have two responses to that, Your

3    Honor.  One is the way I think it's supposed to work.  Right.

4              First off, you shouldn't issue -- the requests as

5    they were issued were grossly overbroad to begin with.  I mean,

6    we're the plaintiffs in the case.  Cox's conduct is at issue.

7    We issued half the number of document requests that Cox did,

8    just by comparison.

9              THE COURT:  Okay.

10             MR. OPPENHEIM:  So they same at it both fists -- or I

11   should say octopus style, Your Honor.

12             But beyond that, in the meet and confer process, if

13   you're going to narrow, you then memorialize that in writing,

14   have a discussion about that narrowing, and then you move to

15   compel on that narrowed request.  They moved to compel on the

16   underlying request.

17             And they never narrowed in the meet and confers.  We

18   would repeatedly ask them to narrow and they would never

19   concede an inch of territory.

20             Having said that, Your Honor, we're happy to have

21   those meet and confers and we're happy to work on it.  It

22   shouldn't happen in front of the Court, in my view.

23             Now, we were here in December on our motion with

24   respect to notices Cox had received from other ISPs.  And we

25   had a discussion and you said, our request is too broad.  If we

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 60
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 59 of 87 PageID# 2120

59

1    had issued a request with respect to just the IP addresses at

2    issue in the case, well, then maybe that, you know, would be

3    acceptable.

4            So Your Honor didn't allow us to narrow it, didn't

5    order them.  So we issued new requests.  They still haven't

6    responded to them.

7            THE COURT:  Well, we will deal with those when the

8    time comes.

9            MR. OPPENHEIM:  So anyway, getting back -- somehow we

10   got afield.  I apologize if that was my -- my doing, Your

11   Honor.

12           But with respect to CAS, if we're going to create a

13   whole kind of separate trial on how Cox is compared to the rest

14   of the industry, we are moving -- we are totally changing over

15   100 years of case law here.  There is -- there is -- there are

16   notice cases where they say that you compare to what the rest

17   of the industry was doing.

18           The Supreme Court articulated what the contributory

19   and vicarious standards were in the Grokster case.  And those

20   standards, nowhere in them do they -- do they look to other

21   courts or other -- other players to justify conduct.

22           MR. BUCHANAN:  Your Honor, just briefly.

23           THE COURT:  All right.

24           MR. BUCHANAN:  In terms of the meet and confer, yes,

25   we did issue 13 broad and narrow requests regarding CAS.  And

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 61
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 60 of 87 PageID# 2121

60

1    the response from the plaintiffs in every meet and confer was

2    you get zero documents on CAS.

3             In terms of that paragraph that was supposed to

4    educate the Court about the burden, I will just read it

5    briefly.  It says:  CAS was a private agreement between 18

6    parties.  30 parties, including all entities, including trade

7    groups, copyrighted holders, ISPs, designed to educate

8    consumers, deter online infringement, and direct consumers to

9    lawful online legitimate sources and content.  Cox did not

10   participate in CAS.

11            There is nothing, the word "burden" --

12            THE COURT:  Sure.  You go to paragraph 24, it talks

13   about everything that you've asked for:  All documents

14   concerning CAS or the copyright system as well as copyright

15   infringement practices of other ISP providers, including all

16   documents concerning a multitude of topics such as, and then

17   they outline those eight topics.

18            And then they go in paragraph 25 and say:  All

19   documents concerning a host of issues.

20            So, I mean, they certainly -- the negotiations

21   spanned years.  Each participating company, 30 parties

22   involved.  I mean, the idea that they don't talk about the

23   burden --

24            MR. BUCHANAN:  Well, they say the length of time.

25   But if you look at what we're asking for, what we're asking for

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 62
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 61 of 87 PageID# 2122

61

```
 1    is very simple.  It's just the master agreement, the individual

 2    agreements, and any correspondence that relates to it.  And

 3    that's what we said in the meet and confer.  That's what we

 4    want.  It can't be that many documents.

 5             We don't want the whole history of every phone call

 6    and every e-mail.  What we want is what ultimately happened

 7    because in their complaint, as I said before --

 8             THE COURT:  All right.

 9             MR. BUCHANAN:  -- they constantly say, we're

10    arbitrary, unreasonable in the way we handled complaints and

11    notices.

12             So it is pretty narrow, and we narrowed it in our

13    reply to try to capture and boil down what we thought was

14    ultimately relevant.

15             Thank you, Your Honor.

16             THE COURT:  All right.  Well, I think many of the

17    document requests that were served relating to this are

18    certainly overbroad, unduly burdensome, and I wouldn't require

19    additional responses.

20             The ones that do have some more, I would say,

21    reasonable basis for consideration or narrowing are 167 and 168

22    and 169.  Taking those ones into consideration, I am going to

23    require that the plaintiffs produce a copy of the memorandum of

24    understanding concerning CAS, which I assume is this July 6,

25    2011 memorandum of understanding, their -- if it's in their
```

1    possession, custody, or control.

2            Any implementation agreements that they may have had

3    with CAS.  So if the individual plaintiffs had any other

4    implementation agreements with CAS, they should be provided.

5            And documents that would be sufficient to show.  And

6    that is not all documents relating to, but documents sufficient

7    to show whether they were a signatory or member of this CAS

8    organization from 2013 and 2014, at any time during that time

9    period.

10           Yes, sir.

11           MR. OPPENHEIM:  Your Honor, we -- they already have

12   the memorandum of understanding, we provided it.

13           But with respect to the last point you made, whether

14   they were a participant, you are referring to the plaintiff

15   parties, not the defendant -- I'm just trying to understand.

16           THE COURT:  No, I know the defendant wasn't a party

17   to it.  And there are multiple plaintiffs in the case.  So we

18   need -- each plaintiff needs to get on the record as to whether

19   they were or weren't part of this.  Okay.

20           MR. OPPENHEIM:  Understood, Your Honor, we will

21   provide that in the form of an interrogatory type affirmation,

22   be all right, Your Honor?

23           THE COURT:  I think so.  The documents, obviously,

24   you need to -- the implementation agreements and the memorandum

25   of understanding, if there are any implementations.

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 64
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 63 of 87 PageID# 2124

63

1          MR. OPPENHEIM:  I am sorry, Your Honor, just one

2   logistics issue.  Under -- I believe under the logistics --

3   excuse me, under the implementation agreement, we have to serve

4   notice on each of the participants before we can produce it.

5   So we will go through that process expeditiously, Your Honor.

6          THE COURT:  Okay.

7          MR. OPPENHEIM:  I wanted to make the Court aware.

8          THE COURT:  All right, MarkMonitor.

9          MR. BUCHANAN:  Your Honor, this is, I think you've

10  acknowledged with some others, is a bit of a moving target.

11         THE COURT:  Have you -- are you doing third-party

12  discovery on MarkMonitor?

13         MR. BUCHANAN:  Yes, Your Honor.

14         THE COURT:  Well, what -- let's focus on what you

15  think you need to get from the plaintiffs versus what you're --

16  and where is that going to take place?  I know you served them

17  on counsel, but where is MarkMonitor actually located?

18         MR. BUCHANAN:  I think they are in California.

19         THE COURT:  California.  So any issues having to do

20  with the scope and production are going to be in California,

21  not here, is that --

22         MR. BUCHANAN:  That's correct, Your Honor.

23         THE COURT:  Okay.

24         MR. BUCHANAN:  So we've narrowed it to sort of four

25  categories.  Documents relating to Cox, the present litigation,

64

1    the relationship between the plaintiffs and MarkMonitor, and

2    copyrighting policy or monitoring services.  So that sort of

3    goes to the contract, what they were doing.

4            They have agreed to give us certain documents from

5    2012 to 2014.  They have expanded that to 2010 to 2014.  And

6    then they responded that they are also conducting reasonable

7    searches to target non-privileged documents concerning

8    MarkMonitor and a broad array of topics and keywords.

9            That's the first we have heard of that.  I am sure

10   they will say, well, we didn't discuss keywords in the meet and

11   confer, but that's neither here nor there.

12           So I think maybe it would be helpful if plaintiffs'

13   counsel identified what those keywords and topics that they

14   were utilizing to do the search, and if they are going back to

15   2010.  If they are doing that and the keywords that they are

16   utilizing capture the four categories I just outlined, then we

17   do not have an issue.

18           THE COURT:  Okay.  All right.  Well, let's clarify

19   whether you're going back to 2010 or not on the search.

20           MR. OPPENHEIM:  Sorry, Your Honor, I am trying to

21   understand --

22           THE COURT:  There is a lot going on in these motions.

23           MR. OPPENHEIM:  There is, Your Honor.

24           THE COURT:  So I understand.

25           MR. OPPENHEIM:  And as I said, it seems to be a

1    moving target.  We would love to have a bilateral discussion

2    about search terms and ESI, Your Honor.  We come back to that

3    over and over again.

4            Again, the requests that they issued here were

5    prolific and broad.  We made an effort to describe categories

6    that -- of documents that we were going to produce, and that's

7    on page 24 of our opposition brief, Your Honor.  We laid out

8    six, six categories.

9            We said that we would produce documents for the

10   period of 2012 to 2014, but we extended that period for one

11   category, and that was to the extent that the defendants wanted

12   documents about the reliability of the MarkMonitor system, that

13   we would not time restrict that.

14           To the extent that, obviously, that we can get access

15   to those old documents.  But, yes, we -- so that's the time

16   frame that we've agreed to produce, Your Honor.

17           As you noted, I mean, many of these requests should

18   probably better be directed to MarkMonitor, who has their own

19   counsel, and I presume is responding to the subpoena that was

20   issued to them.

21           So -- but to be clear, Your Honor, kind of,

22   MarkMonitor, these requests seek a lot of things, a lot of

23   documents that have nothing to do with the MarkMonitor program

24   that was involved in sending notices to Cox.

25           So MarkMonitor has been involved in a variety of

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 67
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 66 of 87 PageID# 2127

66

1  different enforcement programs over the years for the

2  plaintiffs.  And so, just searching kind of generically for

3  MarkMonitor documents pulls up a lot of -- a lot of documents

4  that are wholly irrelevant and, frankly, would reveal

5  anti-piracy efforts that would be highly confidential, Your

6  Honor.

7         So we have tried to -- to target what is appropriate

8  here.  If the defendants want to have a bilateral ESI

9  discussion, I think that would be great.  We ought to do that.

10  Maybe Your Honor would encourage that to happen.  I don't -- I

11  am not in a position to do what Mr. Buchanan asks and have a

12  discussion through Your Honor of our ESI search terms here

13  today.

14         THE COURT:  Well, why -- help me understand why you

15  limited the expansion of the results of your search to 2010

16  only having to do with the reliability issue.

17         Is that what you indicated?  That otherwise you were

18  going from 2012 to 2014, but for documents relating to the

19  reliability of the way that MarkMonitor generated the notices

20  and sent the notices, you were going back to 2010.  Is that

21  what you are saying?

22         MR. OPPENHEIM:  So on the issue of -- I don't know

23  word to use other than reliability, but how effective the

24  MarkMonitor system was, we recognize that that's a generic,

25  overall, over-encompassing issue and agreed to produce that

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 68
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 67 of 87 PageID# 2128

67

1    without time restriction.

2          For the other requests, categories, they seem to be

3    directed at the issue of plaintiffs' claims against the

4    defendants, which are restricted to a restricted period of

5    time.  And so, for the exact same reasons that we have

6    restricted other things to the period of the claims, we

7    restricted it here.

8          I mean, we would be happy to pursue claims that

9    predate 2012 and provide the documents for those, but I suspect

10   the defendants would object to that.

11         THE COURT:  Well, what are you producing?  I mean,

12   are you producing your agreements with MarkMonitor showing your

13   relationships with MarkMonitor?

14         MR. OPPENHEIM:  As it relates to this program, Your

15   Honor --

16         THE COURT:  Yes.

17         MR. OPPENHEIM:  I believe we are.  And we have

18   already produced all of the notice data that we have --

19         THE COURT:  Okay.

20         MR. OPPENHEIM:  -- from MarkMonitor.

21         THE COURT:  So 280,000 of your 300,000 documents that

22   you produced are the notices.  So, right?

23         MR. OPPENHEIM:  I don't know if those numbers are

24   correct, Your Honor.  We are producing on a rolling basis, and

25   have been very active in trying to get the defendants what they

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 69
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 68 of 87 PageID# 2129

68

1    have asked for.

2                THE COURT:  Okay.  So you have provided them with the

3    notices.  What other information have you provided to them that

4    is responsive to their requests relating to MarkMonitor.

5                MR. OPPENHEIM:  So on page 24, Your Honor, we

6    describe -- we either have produced or are going to produce

7    downloads of the unauthorized copies of the copyrighted works

8    infringed by Cox's subscribers.  Documents sufficient to --

9                THE COURT:  What does that have to do with

10   MarkMonitor?  I mean, MarkMonitor says these are the

11   downloaded -- this is what our investigation has resulted in

12   this work having been improperly downloaded.  And then you are

13   providing them with a copy of the downloaded work, right?

14               MR. OPPENHEIM:  It's the evidence that MarkMonitor

15   has captured for purposes of the case.  It's great, they get to

16   play all the music.

17               THE COURT:  Okay.

18               MR. OPPENHEIM:  Documents to show the information

19   concerning the infringement of the copyrighted works in suit by

20   their subscribers.  Documents concerning the reliability of the

21   MarkMonitor system.  Documents relating to Cox's response to

22   receiving infringement notices.

23               All right.  So, we -- MarkMonitor would forward the

24   notice.  We would get responses back from Cox, we have those.

25   And documents concerning the number of infringement notices

Case No. 1:19-cv-00874-RBJ-MEH  Document 89-13  filed 11/26/19  USDC Colorado  pg 70
of 88
Case 1:18-cv-00950-LO-JFA  Document 93  Filed 02/01/19  Page 69 of 87 PageID# 2130

69

1   that Cox was taking.

2           So, you know, if there are other search terms and

3   categories, narrowed categories that they want to discuss,

4   happy to have that ESI discussion, Your Honor.  I really -- I

5   come back to, I think this isn't the way to do this.  We're

6   trying our best.

7           THE COURT:  I don't see anything in here that talks

8   about your agreement or relationship -- documents sufficient to

9   describe your relationship with MarkMonitor.

10          MR. OPPENHEIM:  One moment, Your Honor.

11          So, Your Honor, it's not listed, but we have agreed

12   and I believe told them in the meet and confer, that the

13   agreement concerning this program with MarkMonitor either has

14   been or will be produced.  Okay.

15          So, Your Honor, we actually had a two-step process in

16   our responding to their requests on MarkMonitor.  We initially

17   agreed to produce certain documents.  We then met and

18   conferred.  We then provided a supplemental response and agreed

19   in the supplemental response to provide the six categories

20   here.

21          So the agreement to provide the underlying agreement

22   was in our initial response, not the supplemental response.

23   More detailed than Your Honor probably wanted.

24          THE COURT:  Okay.  Mr. Buchanan, what --

25          MR. BUCHANAN:  Just briefly, Your Honor.  The

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 71
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 70 of 87 PageID# 2131

70

1    plaintiffs at no time indicated that they were going to give us

2    the contractual documents regarding MarkMonitor either as to

3    this case or to other matters.

4              We think it's important that we -- you know, they

5    listed the eight search terms here that they are utilizing,

6    which they came up with those for the first time in their

7    opposition.

8              And again, my question at the inception was as to the

9    four categories of documents that we've identified in our reply

10   brief, were they going to search for those?  And if they are,

11   then we don't have an issue.

12             But, for example, MarkMonitor may have been using a

13   system to detect infringement with regard to Cox that was

14   different than what they used for, say, the other CAS members

15   or other ISPs that they were hired by the plaintiffs to

16   investigate.  We think that's significant.

17             In their search terms they should search for all

18   communications about Cox.  I am sure there is discussion about

19   Cox in there with regard to MarkMonitor as to that we didn't

20   join CAS, and then they're going to go looking for us, and they

21   are going to come at us, and here is what you should do, here

22   is what you should look at.  All those sort of comments about

23   Cox, why they are pursuing Cox and nobody else.  You know, the

24   effort they took the means, they took, those discussions are

25   relevant.

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 72
of 88
Case 1:18-cv-00950-LO-JFA   Document 99   Filed 02/01/19   Page 71 of 87 PageID# 2132

71

1          And discussions about the present litigation that are

2     not attorney/client privilege.  They should search for those.

3     And what were the discussions when with MarkMonitor about how

4     to pursue Cox, how to make the case, how to develop the case,

5     how to investigate them and prove the case.  If those aren't

6     privileged, we should get those documents.

7          THE COURT:  How to investigate the case, why wouldn't

8     that be work product?

9          MR. BUCHANAN:  I said if there were attorneys

10    involved that hired MarkMonitor and they had discussions with

11    them, yes.  But if it's business-to-business people saying,

12    these guys didn't join CAS, let's zero in on them and you go

13    pursue them, and here is what you want to do, that wouldn't be

14    work product unless there were lawyers involved.  And there may

15    well be.  That's why I said, if it was not privileged.

16         THE COURT:  Okay.

17         MR. BUCHANAN:  But we identified these categories in

18    our reply brief.  And the question for counsel was, are you

19    going to include those in your search?  And he said, well, we

20    can talk about it, we will look for it, we're doing --

21         THE COURT:  Well, he got the reply brief last night

22    at 5 o'clock.  So, you know --

23         MR. BUCHANAN:  I understand, Your Honor.  You got --

24    there was -- there is way too much information submitted on

25    this.

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 73
of 88
Case 1:18-cv-00950-LO-JFA   Document 99   Filed 02/01/19   Page 72 of 87 PageID# 2133

72

1          THE COURT:  And I --

2          MR. BUCHANAN:  We should have done a better job of

3   resolving this issue.

4          THE COURT:  You know -- well, let me just -- we have

5   the ability to use the expedited briefing schedule on motions.

6   It's not required that the parties do that.

7          And, you know, this is a motion that upon further

8   reflection might have been better presented on a regular

9   briefing schedule during a non-holiday week that would have

10  given the parties an opportunity to fully prepare an

11  opposition, to have several days to prepare a reply as opposed

12  to a very busy 20 hours that I suspect people were working hard

13  to get a very substantial reply put in.  And then, you know,

14  for the parties to review the reply and see if they couldn't

15  have narrowed the issues a little bit more before they actually

16  had to come in and argue it.

17         So, you know, you had the right to do it.  It doesn't

18  mean you have got to do it.  So, just --

19         MR. BUCHANAN:  I agree, Your Honor.  I agree that the

20  way you suggested is the way it should have been done and

21  that's how we'll proceed.  Because if it is a narrow issue,

22  then that's -- the expedited path is correct.

23         But that would have given us time to resolve some of

24  these, correct, and it put too much burden on the Court.  And I

25  apologize for that.

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 74
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 73 of 87 PageID# 2134

73

1          THE COURT:  Well, on this one -- and again, I really
2    try not to do this very often, but I think this is another one
3    in which I think other than making it clear that I am requiring
4    a production of the documents that are sufficient to show the
5    relationship between MarkMonitor and each individual plaintiff.
6          So again, I don't know -- you know, we have a number
7    of different plaintiffs here.  And so, if there are individual
8    agreements with MarkMonitor or understandings.
9          But, you know, there has to be some documents that
10   are sufficient to show the relationship, which would be I think
11   probably 156 is the one that -- the relationship agreements,
12   not all communications, but the relationships and agreements
13   between the plaintiff and MarkMonitor.  So --
14          MR. OPPENHEIM:  I am sorry, can I ask -- I feel like
15   I am always getting --
16          THE COURT:  It's like your contractual obligation.  I
17   mean, if you signed a contract with them, if you have a written
18   agreement, if you have an understanding, you know, a letter
19   agreement that says you're going to do this, we will pay you
20   this, you provide me with these services, these are your
21   obligations, these are my obligations, that kind of agreement
22   or description of the relationship between MarkMonitor and your
23   clients.
24          MR. OPPENHEIM:  As it respect -- with respect --
25          THE COURT:  With respect to --

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 75
of 88
Case 1:18-cv-00950-LO-JFA   Document 99   Filed 02/01/19   Page 74 of 87 PageID# 2135

74

1          MR. OPPENHEIM:  -- to the program at issue in this

2     case.

3          THE COURT:  -- the program at issue in this case,

4     right.

5          MR. OPPENHEIM:  Very well, Your Honor.

6          THE COURT:  All right.  The other issues I think are

7     really at this point more of a moving target than something

8     that I can deal with.  I mean, I think they are doing the

9     search.  They again need to be transparent in what they are

10    producing as far as the results of the search terms and what it

11    is that they are and aren't producing as a result of those

12    search terms.

13          And if there is a need to, you know, I -- they have

14    at least indicated in their opposition some of the search terms

15    that they are having.  I didn't hear that you have actually

16    suggested anything more to them at this point in time.  But you

17    all are going to need to talk about that one some more before I

18    do that.

19          So other than the documents specifying, which I don't

20    think are included in items 1 through 6 in the opposition on

21    page 24, obviously they need to produce what they agreed to

22    produce in this opposition, including the information that goes

23    beyond the 2012-2014 range for the reliability or issues, plus

24    the agreement and relationship.  Okay?

25          MR. BUCHANAN:  The next component, Your Honor, is a

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 76
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 75 of 87 PageID# 2136

75

1    motion to compel regarding documents concerning communications

2    with RIAA.  And as the Court is aware, they are the plaintiffs'

3    agents for the purposes of managing MarkMonitor and the

4    copyright infringement notices program.

5           I believe we had five document requests that are

6    relevant.  I think they are all pretty narrow.  They go to,

7    essentially, the relationship between RIAA and the plaintiffs

8    with regard to this litigation and Cox.

9           We have tried to narrow it further, make it more

10   simpler in our reply brief by --

11          THE COURT:  Well, let me just -- I hate to do this,

12   but when you say, we have served five narrow document requests,

13   one of which you're saying is:  All documents concerning the

14   RIAA in either this lawsuit, Cox, and/or copyright works.

15          That really isn't narrow, is it?  All documents

16   concerning RIAA and this lawsuit, Cox, and/or the copyrighted

17   works?

18          MR. BUCHANAN:  I would say that you're correct that

19   as to copyrighted works, may be broad.

20          As to this case, or this lawsuit and Cox, I would

21   think RIAA's discussions and communications with the

22   plaintiffs -- you know, they wouldn't be talking about Cox

23   other than in the context of what we were doing vis-à-vis the

24   copyrights.

25          And, you know, we are talking about the copyright

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 77
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 76 of 87 PageID# 2137

76

1    works in question.  I am sure RIAA is not having a lot of

2    discussions about these individual copyright works with the

3    plaintiffs except in the context of this litigation.  Or they

4    may be.  But if we tied that together, I think it is narrow.

5            But the way it's written, maybe it is a little too

6    broad in terms of copyright works and discussions.

7            But the others go really to Cox, the lawsuit,

8    copyright works, MarkMonitor.  We are trying to, essentially,

9    get all their documents and communications that relate to the

10   relationship generally.  And then, but more importantly, to

11   this case, this litigation, Cox and how they are looking at

12   Cox, examining Cox, preparing to investigate Cox, and the steps

13   they took.

14           So -- and we outlined that in the reply brief,

15   documents relating to the present lawsuit, Cox, MarkMonitor,

16   and the systems used to monitor/police copyrights.

17           So they indicated in their opposition that they were

18   now expanding their search, and they are going to be searching

19   for non-privileged documents concerning RIAA and Cox during the

20   period 2012 to 2014.

21           So what does that mean?  If they come up and say,

22   look, yes, Your Honor, we will pursue the documents that are

23   contained in these requests, particularly focus on Cox, the

24   lawsuit, MarkMonitor, and the systems and monitoring police

25   copyrights, I think then we're in agreement.

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 78
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 77 of 87 PageID# 2138

77

1          THE COURT:  Okay.  Again, the relationship issue is

2   another one on RIAA.  I mean, are all the plaintiffs a member

3   of RIAA?

4          MR. OPPENHEIM:  I will answer that.

5          THE COURT:  Yeah.

6          MR. OPPENHEIM:  So the answer is no, Your Honor.  The

7   music publishers are not members of the Recording Industry

8   Association, which is a trade association for record companies.

9          So in this case we have a group of record companies,

10  we have a group of music publishers.

11         Your Honor, just by way of background because it

12  seems like -- a little level set here.

13         So the RIAA is a trade association.  They do a lot of

14  things.  They handle anti-piracy for the entire record

15  industry.  They handle anti-piracy on all of the works that are

16  typically pirated of the record companies, including,

17  undoubtedly, thousands, no, millions of notices on the 11,000

18  works at issue here outside of the Cox case.  And the requests

19  here would subsume every single -- probably every single

20  anti-piracy investigation that the RIAA has engaged in over the

21  last whatever years.

22         The other thing the RIAA does is they certify all

23  gold and platinum albums and diamond albums and other

24  achievements by artists on recordings.  And this request would

25  require disclosure of every one of those documents.  Right.

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 79
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 78 of 87 PageID# 2139

78

1          So the RIAA also engages in work before the Copyright

2     Office on behalf of the record industry.  Work in Congress on

3     the copyright -- work with the copyright Czar.

4          So they do a lot of different things, Your Honor,

5     that have absolutely nothing to do with this case.  And the

6     defendants managed to draft their request that would capture

7     virtually every single function of what the RIAA does.

8          So this one, in my mind, rung the bell for the

9     broadest requests.

10          THE COURT:  Well, what is it that you are intending

11     to produce?

12          MR. OPPENHEIM:  So on page 27 of our opposition, Your

13     Honor, I think we describe three categories of documents that

14     we are working to produce.

15          I will note that there is some overlap here, right,

16     with the MarkMonitor and CAS issues.  So, you know, even though

17     we may not list things in -- on page 27 within those three

18     categories, they may be subsumed by the other -- other requests

19     that we've discussed.

20          So on page 27 we describe at the bottom of the page:

21     Documents concerning analysis of the reliability of the

22     MarkMonitor system as it relates to this case.  Documents

23     relating to Cox's response to receiving infringement notices.

24     Documents concerning the number of infringement notices Cox

25     would accept from plaintiffs on behalf of plaintiffs.

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 80
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 79 of 87 PageID# 2140

79

1          Again, we -- we are happy to engage in an ESI

2     discussion.  I feel like this is now my chorus, it is a music

3     case, so I can use that expression, this is my chorus on this

4     motion.

5          And an ESI, bilateral ESI discussion would resolve a

6     lot of these issues.  And we are happy to do that.

7          I will also note that they have served a subpoena on

8     the RIAA.  The RIAA is not just an agent for the plaintiffs in

9     this respect, but they also serve as counsel because there are

10    attorneys there that manage this program, and they serve as

11    counsel for the plaintiffs on many of these matters.

12         THE COURT:  Well, a lot of what you just indicated

13    looks like it's a search for MarkMonitor information and not

14    RIAA information.

15         I mean, you're saying we're already giving them this

16    information about MarkMonitor, we're already giving them the

17    information that MarkMonitor sent them about infringement

18    notices, we're already giving them the information about the

19    number of infringements.  I don't see anything that goes beyond

20    what you're doing in relation to MarkMonitor for the RIAA.

21         MR. OPPENHEIM:  Well, so I'm -- kind of a two-part

22    response to that, Your Honor.

23         The first is, that's really the only thing the RIAA

24    was involved in with respect to this case was their interaction

25    with MarkMonitor, right, and the sending of the notices.

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 81
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 80 of 87 PageID# 2141

80

1   Right.  I don't know what else they're looking for in that

2   respect.

3          And, you know, their document requests certainly

4   don't help us to understand what would be reasonably relevant

5   to this case outside of that.

6          But we are searching to see what documents hit both

7   RIAA and Cox.  As part of our Cox searches, I guess you would

8   call them part of our RIAA searches, right, but we have yet to

9   see what's going to come up on that outside of what we've

10  already described, Your Honor.

11         THE COURT:  All right.  All right.  Well, Mr.

12  Buchanan, other than making them produce information that -- as

13  to which plaintiffs have relationships, sufficient to show the

14  relationship of RIAA, their search that they're doing with what

15  they're going to provide you, why shouldn't I just also defer

16  on this issue until you get what they have?  Again, they have

17  to be somewhat transparent in the -- what they have gotten and

18  what they are withholding from their production.

19         MR. BUCHANAN:  Well, Your Honor, rather than -- maybe

20  we could expand that a little bit and just get those documents

21  -- because as the Court just pointed out, they repeatedly offer

22  us MarkMonitor analysis documents like in response to every

23  request we have, whether it is MarkMonitor, RIAA, and the

24  peer-to-peer documents, they just offer the same things.  And

25  it's just documents that they're going to use in their case in

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 82
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 81 of 87 PageID# 2142

81

1    chief.  So it's not really helping.

2           But to answer your question, to move this along, if

3    we could get those documents, they could search for the ones

4    between the plaintiffs, RIAA, relating to this litigation

5    relating to Cox.  If you could add that in there because that

6    could -- you know, because, obviously, if they are just -- RIAA

7    is discussing Cox with the plaintiffs, and it's about this

8    litigation or about Cox and about copyright infringement, on

9    Cox, they can run those search terms pretty easy and capture a

10   lot of the information we're looking for beyond just the

11   contractual documents.

12          THE COURT:  What would be the issue with producing

13   non-privileged documents between RIAA and the plaintiffs

14   relating to Cox and this lawsuit?

15          MR. OPPENHEIM:  First of all, Your Honor, I think

16   what that would produce is 100 percent privileged documents.  I

17   can't imagine anything that wouldn't be privileged there.

18          So we would -- I mean, it would be a huge effort to

19   then they demand a lengthy log.

20          But, Your Honor, I guess the question is --

21          THE COURT:  Haven't you all agreed to limit the log?

22          MR. OPPENHEIM:  We have had discussions on the log,

23   Your Honor, and I think we have been working on that.

24          But, Your Honor, I think that the question is with

25   respect to these requests on the RIAA, outside of the

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 83
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 82 of 87 PageID# 2143

82

1   MarkMonitor relationship, right, and overseeing MarkMonitor,

2   how do these documents relate to any of the defendants' -- any

3   of plaintiffs' claims or defendants' defenses.  And that's

4   where I am struggling.

5          I mean, leave aside that I don't think that there is

6   anything that directly relates to this litigation that won't be

7   privileged, I just can't understand how what they're asking us

8   to search for is related to their defenses.

9          THE COURT:  All right.  Well, I'm going to defer that

10  issue.  When you talk about this litigation, that does give one

11  pause as to it would probably -- given that they were their

12  agent, probably would involve a substantial amount of

13  privileged documents.  I am not so sure that whatever might not

14  fall within that net, however little it might be, would be the

15  worth the time and effort to cull it out.

16         So again, that one is going to be for a later day

17  once you get their response, have a little bit more discussion

18  with them.  If there are specific items that you need, you need

19  to talk to them about those specific items and then focus only

20  on those specific items if I have to deal with the issues at a

21  later time.

22         MR. BUCHANAN:  So -- thank you, Your Honor.  Just on

23  that, to close that out.  I assume that if we propose to them

24  certain keywords, such as "RIAA" and "Cox" and "infringement,"

25  to run something like that so the focus is on discussions about

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 84
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 83 of 87 PageID# 2144

83

1    Cox, infringement, and with the other plaintiffs, that's

2    obviously not privileged, that that would be something that

3    would be reasonable?

4              THE COURT:  Well, you all -- I mean, I'm not going to

5    sit here today and decide on what search terms are reasonable.

6    Okay.

7              So, all right, let's hear -- well, at long last there

8    was one that there is an agreement as to at least two of the

9    document requests, 50 and 51 are no longer part of this issue.

10             What really -- what is it that you're looking for on

11   the peer-to-peer issue?

12             MR. BUCHANAN:  I think where we -- if they can expand

13   it to -- they have agreed to go 2012, 2014, most of these, and

14   they indicated that they are subsumed or covered by other

15   responses.

16             I think that if can get them to go back to 2010.  And

17   then, you know, what we're looking for is this -- their

18   utilization of BitTorrent.  Both, you know, not only in terms

19   of investigating BitTorrent, but in determining whether the

20   utilization of BitTorrent by subscribers to ISPs was negatively

21   impacting them.  But whether there was -- their clients or

22   musical artists for whose works they own, whether those people

23   were using BitTorrent to sell or promote their work.

24             So what we're really looking for now, I guess into

25   all these categories, is to go back to 2010.  We think that

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 85
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 84 of 87 PageID# 2145

84

1   that period is important because it shows not only the trend,

2   but the overall -- an overall picture leading up to the time

3   period in question and through it.

4          And so, that's what we're looking for here, Your

5   Honor.

6          THE COURT:  Okay.  All right.  So if we're talking

7   about doing what you're doing but doing it from 2010 to 2014 as

8   opposed to 2012 to 2014.

9          MR. OPPENHEIM:  I'm a little confused.  I apologize,

10  Your Honor.

11         So the defendants are saying that 50 and 501 are not

12  an issue anymore, so I suppose they are not moving on them

13  anymore.

14         On 52 and -- and I hate to do this, but I feel like

15  we have to go through this request by request.  52 and 53, as

16  we look at them, they are horribly overbroad.  They would

17  request virtually every infringement --

18         THE COURT:  Well, what he has suggested is that what

19  you have agreed to provide, that you provide that, but for a

20  longer time period than what you have indicated.

21         So as I understand Mr. Buchanan's position, and

22  maybe I'm -- Mr. Buchanan, if I misstate it, let me know, is

23  what you have agreed to produce so far in response to this

24  information, if you have done it -- you have agreed to do it

25  from 2012 to 2014.  What his suggestion is, to resolve this,

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 86
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 85 of 87 PageID# 2146

85

1    that it should be from 2010 to 2014.

2            So plaintiffs agreed to produce documents concerning

3    any permitted or authorized uses of plaintiffs' copyrighted

4    works, so and so, during the 2012 to 2014 period.

5            What his proposal is is to make that 2010 to 2014.

6            MR. OPPENHEIM:  So, Your Honor, let me take the one

7    sliver of that, the 2015 period after the period of our claims,

8    I'm not sure how that would bear any relevance.

9            THE COURT:  All right.  So 2010 to 2014.

10           MR. OPPENHEIM:  And then with respect to the earlier

11   years, again, different reason, but I still don't think it's

12   relevant to the claims and defenses here.

13           And then search -- so could we do it?  Yes.  But I

14   don't -- it would produce more documents and more searching,

15   probably unnecessary.

16           This notice program that is at issue -- the notice

17   program is not at issue, I apologize.  The notice program that

18   was used to develop evidence against Cox for this case started

19   in 2012.  So predating 2012 for these documents, I'm not sure I

20   understand.

21           But 2012 through 2014, we would agree to do that,

22   Your Honor.

23           THE COURT:  All right.  Well, on this one I'm going

24   to split the difference.  It is going to be from 2011 -- to the

25   extent the documents exist, that as you've indicated that you

Case No. 1:19-cv-00874-RBJ-MEH   Document 89-13   filed 11/26/19   USDC Colorado   pg 87
of 88
Case 1:18-cv-00950-LO-JFA   Document 93   Filed 02/01/19   Page 86 of 87 PageID# 2147

86

1    are going to be producing in your opposition on page 29, the

2    time period now needs to be 2011 to 2014 for that.

3            Okay.  Thank you, counsel.

4            MR. OPPENHEIM:  May I ask one last question, Your

5    Honor?

6            During the course of today's proceedings you have

7    asked that the plaintiffs be transparent in what we're

8    producing and not producing to response to keyword searches,

9    which we absolutely will, Your Honor.

10           I assume that that obligation is a bilateral

11   obligation --

12           THE COURT:  I deal with the motions that are in front

13   of me.  That's -- you know, that's not an issue that is front

14   of me today.  Counsel should work -- try and work together to

15   resolve as many of these issues as you can.  If it needs to

16   talk through -- part of the good faith consultation would be

17   to, you know, what you're doing and how you're doing it and why

18   you're doing it.

19           MR. OPPENHEIM:  Very well, Your Honor.

20           THE COURT:  Okay.

21           MR. OPPENHEIM:  Thank you for your time, Your Honor.

22           THE COURT:  Thank you.  Court will be adjourned.

23           NOTE:  The hearing concluded at 12:05 p.m.

24           -------------------------------------------------

25

87

1

2          C E R T I F I C A T E  of  T R A N S C R I P T I O N

3

4

5          I hereby certify that the foregoing is a true and

6   accurate transcript that was typed by me from the recording

7   provided by the court.  Any errors or omissions are due to the

8   inability of the undersigned to hear or understand said

9   recording.

10

11          Further, that I am neither counsel for, related to,

12   nor employed by any of the parties to the above-styled action,

13   and that I am not financially or otherwise interested in the

14   outcome of the above-styled action.

15

16

17

18

19

20                    /s/ Norman B. Linnell

21                    Norman B. Linnell

22                    Court Reporter - USDC/EDVA

23

24

25