**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

WARNER BROS. RECORDS INC., *et al.*,

     Plaintiffs,

v.

CHARTER COMMUNICATIONS, INC.,

     Defendant.

**Civil Action No.  19-cv-00874-RBJ-MEH**

---

**AFFIDAVIT OF ERIN R. RANAHAN IN SUPPORT OF DEFENDANT CHARTER
COMMUNICATIONS, INC.'S REPLY BRIEF IN SUPPORT OF ITS OBJECTION TO
MAGISTRATE JUDGE HEGARTY'S OCTOBER 29, 2019 DISCOVERY ORDER**

| County of Los Angeles | ) | |
|---|---|---|
| | ) | ss. |
| State of California | ) | |

     The affiant, being of lawful age and duly sworn upon her oath, states and deposes as follows:

I, Erin R. Ranahan, hereby declare:

1.   I am a partner of the firm Winston & Strawn LLP, attorneys of record for Defendant Charter Communications, Inc. ("Charter").  I submit this declaration in support of Charter's Reply Brief in Support of Its Objection to Magistrate Judge Hegarty's October 29, 2019 Discovery Order.  I have personal knowledge of all facts stated in this declaration, and if called upon as a witness, I could and would competently testify thereto.

2.   Attached hereto as **Exhibit 1** is a true and correct copy of the *Sony Music Entmt. et al.* Hearing Transcript from a motion to compel hearing on January 25, 2019, where the Court hears extensive argument about the per-work financial data by channel at 12:5-33:9.  The following excerpts can be found at 19:13-17, 26:21-27:2, 32:6-13, where the court

1

ultimately compels per-work financial information for physical, downloads, streaming, and licensing from 2011 through 2014:

> [Court to Plaintiffs' counsel] I need you to address why I shouldn't require the plaintiffs in this case, who decided to bring this case, decided to bring this case alleging 11,000 works with various different entities, you made that decision, and why they shouldn't be required to produce revenue by work by channel for a period of time.

> …revenues do come into play even when you have statutory damages. So that puts it in the realm of we don't just get to wash our hands of, you know, profit and loss information and revenues and lost revenues and things like that, just because we have statutory damages.

> …I mean, I think, you know, that's certainly information that is relevant…I do think it's relevant. And I am going to require them to produce that information. So it's going to be from 2011 through 2014, revenue by work by channel, including those four channels, physical, downloads, streaming, and licensing.

3. Attached hereto as **Exhibit 2** is the November 19, 2019 Order, in *Sony Music Entmt et al. v. Cox Communications, Inc. et al.* (Dkt. 590, E.D. Va. 1:18-cv-00950-LO-JFA) ("*Cox*") denying the plaintiffs' motion *in limine* to exclude documents regarding the Copyright Alert System ("CAS"), allowing evidence and argument relating the CAS to be introduced at trial.

4. As the trial in *Cox* is presently underway, evidence regarding the CAS has been featured not only in opening statements, but has been raised in the testimony of several witnesses. Attached hereto as **Exhibit 3** is a true and correct composite of trial transcript excerpts from the *Cox* trial showing samples of testimony related to the CAS.

AmericasActive:14254439.2

Erin R. Ranahan

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

Subscribed and sworn to before me on this 10th date of December, 2019, by, Erin R. Ranahan, proved to me on the basis of satisfactory evidence to be the person who appeared before me.



ROBERT GONZALEZ
Notary Public - California
Los Angeles County
Commission # 2247512
My Comm. Expires Jul 21, 2022

Signature _____
Signature of Notary Public

*Seal*
*Place Notary Seal Above*

3

# EXHIBIT 1

1

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                        Alexandria Division


--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
              Plaintiffs,        :
                                :
    -vs-                         :    Case No. 1:18-cv-950
                                :
                                :
COX COMMUNICATIONS, INC., et al.,:
              Defendants.        :
                                :
--------------------------------:




                        HEARING ON MOTIONS


                        January 25, 2019


             Before:  John F. Anderson, U.S. Mag. Judge






APPEARANCES:

Matthew J. Oppenheim, Scott A. Zebrak, Jeffrey M. Gould,
and Kerry M. Mustico, Counsel for the Plaintiffs

Thomas M. Buchanan, Jennifer A. Golinveaux, and
Sean R. Anderson, Counsel for the Defendants

1    up -- we will take up -- I'll do the arguments item by item.

2    So I'll hear argument from Cox first, and then I'll hear

3    argument from the plaintiffs, and then I'll decide that issue,

4    and then we'll move on to the second one.

5           So we'll take up the financial, the revenue and

6    profits information.  And I -- you know, I -- one thing that

7    concerns me about this is that you filed a motion, you outlined

8    a number of document requests that you were asking me to order

9    them to produce documents in response to it, which are far

10   beyond what you now say in your reply brief that we got last

11   night that you're really looking for.

12          I mean, you say, we're not looking for profit and

13   loss information, but you include in your motion requests that

14   only ask for profit and loss information.

15          You know, you say that the plaintiff has, you know,

16   made all these arguments that are not necessary to be made.

17   Well, you actually include in your motion document requests

18   that are specifically only asking for profit and loss

19   information.

20          I don't -- I'm confused about that.  I mean, I spent

21   a lot of time going through your document requests that ask for

22   profit and loss information because you put them in your motion

23   and said, I want this to be a part of, you know, what you rule

24   on.  And then we get this reply brief and you say, you know,

25   oh, never mind.

1          Help me understand that.

2          MS. GOLINVEAUX:  Yes, Your Honor.  So Cox's initial

3    request, the document request, sought profit, expenses, and

4    revenue per work per medium because that's what our expert has

5    told us would be most useful.

6          We spent -- we've spent a number of hours on the

7    phone with plaintiffs, and they said they don't maintain the

8    profit and loss information by work.  They don't do it.

9          So as part of the process to compromise, we offered

10   during the meet and confers to narrow those requests to just

11   their revenue per work per channel because they said they also

12   didn't keep it by medium.

13         So we tried to make that clear in our -- in our

14   opening motion, that what we're moving on is what we think they

15   likely do have.

16         THE COURT:  Well then, why would you include in your

17   list of document requests that you were moving this Court on:

18   Your detailed and itemized profit and loss statements or

19   reports provided in readable and useable format organized by

20   each of the copyrighted works for each of the last ten years?

21         MR. BUCHANAN:  Because, Your Honor, those were the

22   initial requests.  And during the process of meeting and

23   conferring, we narrowed them because plaintiffs explained to us

24   that they didn't maintain the data that way.

25         THE COURT:  Well, you don't -- you know, narrow them

1    and completely rewriting them are completely different things.

2         I mean, you know, there are other requests that cover

3    financial information.  But that's neither here nor there, I

4    guess.  I just -- all right.

5         Also help me understand why you think this

6    information is readily available, which you've indicated in

7    your pleadings.

8         MS GOLINVEAUX:  Your Honor, plaintiffs have told us

9    specifically that the profit and loss statements per work is

10   not available, they don't maintain their records that way.

11        But they've never said they don't have revenue per

12   work.  And they don't say that in their opposition brief.

13        And in fact, that's just what BMG produced in the

14   last case.  And Your Honor may recall because that issue was up

15   in --

16        THE COURT:  Well, they voluntarily did it.  I didn't

17   order them to produce it.  They said, we have this and we'll

18   produce it.  So the idea that I ordered them to produce it I

19   think is an overstatement.

20        MS. GOLINVEAUX:  Fair enough, Your Honor.  There

21   was -- there was an order with respect to the scope of that

22   production.

23        THE COURT:  Right.

24        MS. GOLINVEAUX:  And our expert, who has -- our

25   financial expert, who we've disclosed to the plaintiffs, who

1  has dealt with this issue in a number of cases, believes also

2  that this would be a way that the major -- the labels and the

3  music publishers would keep the information.

4        And, Your Honor, if you look at the declarations they

5  put in with their opposition, they never say they don't keep

6  that information.

7        THE COURT:  Well, one of them hints at it, but the

8  others talk about profit and loss.  One does make a mention as

9  to revenue.

10       MS. GOLINVEAUX:  And that's Mr. Abithol, I think,

11  Your Honor, who seems to indicate that the revenue numbers do

12  exist, at least for Sony ATV.  But nowhere have they said those

13  don't exist.  If they don't -- we have been on the phone with

14  them for hours now.  They could have told us that, we would

15  have worked something out.

16       We're not trying to put them to a lot of work to

17  organize documents in a way -- or data in a way that doesn't

18  exist.  We're just trying to get meaningful data for our

19  financial expert.

20       THE COURT:  Right.  And when you say, "revenue by

21  work and by channel," help me understand what you mean by

22  "channel," given that there is some indication that there is

23  many different channels or types of revenue streams having to

24  do with TV commercials and other things.

25       And I am trying to understand how granular you need

1    that information for your purposes in this case.

2         MS. GOLINVEAUX:  Well, Your Honor, we initially

3    requested by medium, which they said they didn't have.  By

4    channel, which is what we moved to because it sounds like that

5    may be the way the data is maintained, what we mean by that is

6    the different channels through which they distribute these

7    works.  And that would be physical sales, which would be CDs or

8    records.  Digital downloads would be another channel.

9    Streaming would be another.  And licensing would be another.

10        THE COURT:  Okay.  So if you get -- I understand your

11   argument on revenue by work by channel.  Okay.  I don't

12   understand how you think any other aggregate information will

13   be useful as far as profits go.

14        So, profit by artist, you know, profit by something

15   that is a much larger than by work information, I don't see how

16   that can be used.

17        Breaking it down, maybe in an overall sense as to,

18   you know, this type of industry, what things are.  But having

19   them go through the process of saying how much a certain artist

20   might do when only one or two of his or her works are part of

21   here, how that comes into play and how that is, I would say,

22   important to the issue at stake and how it would be used in

23   resolving an issue at stake, and the level of detail it would

24   take to do that.

25        MS. GOLINVEAUX:  Right.  Your Honor, we agree with

17

1    you that that would not -- if we can get the revenue by

2    channel, by work, that's more directly relevant.  And we don't

3    need to you put them through the task of that -- of those other

4    data points.  Really, those were, if we can't get that

5    information, we really have nothing else to go on.  That would

6    be a proxy.  But if we could get the revenue by work, that

7    would be acceptable.

8           THE COURT:  All right.  And you're asking for it from

9    2010 to 2014; is that right?  That's what the limited --

10          MS. GOLINVEAUX:  That's correct, Your Honor.

11          THE COURT:  Okay.  And help me understand why we're

12   going three years beyond the claim period -- the claim period

13   I'm -- I know it's only 22 months, but I'm saying it is 2013

14   through 2014.  So you're asking for 2010, 2011, and 2012.

15          MS. GOLINVEAUX:  Your Honor, certainly the most

16   relevant information would be for the claim period.  We have

17   asked for the three years prior as well because it would be

18   relevant to showing trends in terms of how these works were

19   distributed.

20          The music industry in terms of distribution has

21   changed dramatically over that time period in terms of whether

22   people were primarily downloading these works versus streaming

23   them, for example.  And that type of data would help us show

24   that.

25          If the plaintiffs say, well, going back to 2010

18

1    really gets more difficult because it's not maintained as

2    readily, I think we could certainly live with going two years

3    back before the claim period.

4              THE COURT:  Okay.  Thank you.

5              I will hear plaintiffs' response.  First of all, have

6    you filed something with the Court that specifically limits

7    your damages to statutory damages?

8              MR. OPPENHEIM:  Not with the Court.  But we have

9    given an affirmation --

10             THE COURT:  Well, you need to do that, and you need

11   to do that right away.

12             MR. OPPENHEIM:  Yes, Your Honor, we can do that.

13             THE COURT:  And, you know, I don't want there to be

14   any backtracking.  I don't want there to be any, you know,

15   rethinking of that issue.  I'm now deciding this case as if you

16   have filed with the Court a binding stipulation that you are

17   only seeking statutory damages.

18             Are you comfortable with that?

19             MR. OPPENHEIM:  Absolutely, Your Honor, we have

20   elected statutory damages and we've informed the defendants of

21   that both orally and in writing, Your Honor, and we will file

22   something with the Court.  Not an issue.

23             THE COURT:  And you plan to have your expert serve

24   his or her report on damages by April 10; is that correct?

25             MR. OPPENHEIM:  I don't have the schedule in front of

19

1   me.  Whatever the schedule is, Your Honor, that is our --

2            THE COURT:  I believe that's the date for the initial

3   expert reports.

4            MR. OPPENHEIM:  Very well, Your Honor.

5            THE COURT:  I assume you've got an expert that you're

6   going to have on damages; is that right?

7            MR. OPPENHEIM:  We are still working through all of

8   our expert issues, Your Honor, but I assume we will have some

9   experts who will speak to financial issues.

10           THE COURT:  Okay.  All right.

11           MR. OPPENHEIM:  If I -- I'm sorry, Your Honor.

12           THE COURT:  Go ahead.  And now I need you to address

13  the -- why I shouldn't require the plaintiffs in this case, who

14  decided to bring this case, decided to bring this case alleging

15  11,000 works with various different entities, you made that

16  decision, and why they shouldn't be required to produce revenue

17  by work by channel for a period of time.

18           MR. OPPENHEIM:  And, Your Honor, let me answer that.

19  Once again, I want to address your first point first.

20           Your Honor, in the defendants' proposed order that

21  they filed with their motion, they actually asked the Court to

22  compel production of all of those requests for production --

23           THE COURT:  Well, it also says, as modified by my --

24  by their memorandum.  And I don't know what that means.  So,

25  I'm --

20

1          MR. OPPENHEIM:  Anyway.  You understand -- we

2     appreciate Your Honor understands that.  Very well.

3          THE COURT:  I was confused, you were confused, but we

4     are going to deal with these issues directly.

5          MR. OPPENHEIM:  Very well.  So the defendants want

6     this information, they say, because they want to put an actual

7     damages analysis in front of a jury.  So they say, let us get

8     the historical revenue information.  That, Your Honor, however,

9     it's a non sequitur.  Right.  The fact that they want an actual

10    damages analysis has nothing to do with the historical revenue

11    streams.  Right.  Historical revenue streams won't help anybody

12    do an actual damages analysis.

13         If you want to do an actual damages analysis and you

14    want to figure out what the lost revenues were, you would say,

15    okay, what would be the revenues per, per lost digital download

16    or per lost stream, multiplied times the number of losses.

17    Right.  How many distributions did each of their subscribers

18    make.  And it's a calculus, it's a simple mathematical

19    equation.  And there are two -- there are two variables.

20         So the historical information doesn't help inform

21    either one of those variables.

22         THE COURT:  It may.  I mean, if there is a

23    copyrighted work in which there has been no revenue for four

24    years, don't you think that's going to be significant?

25         MR. OPPENHEIM:  No, Your Honor, because if there is

1   -- if there are illegal distributions of it, right, and that

2   work was -- was displaced sales.  Maybe that's why there were

3   no sales, because their subscribers were massively infringing

4   it.

5          Now, in reality, we're talking about 11,000 works.

6   The overwhelming majority of them are very well known because

7   they are distributed by one of the major record companies or

8   music publishers in this country.

9          But, Your Honor, what -- we've tried to work with the

10  defendants to get at what they want here.

11         THE COURT:  All right.  Well, they want revenue by

12  work by channel.

13         MR. OPPENHEIM:  But the historical revenue, Your

14  Honor, doesn't inform that first variable.

15         What does inform that first variable is what would be

16  the lost revenue for each one of the distribution.  Leave

17  aside, they're never going to get the second variable, that is

18  how many distributions there were, they can't tell us, nobody

19  can tell us.  Right.  But even if they want that first

20  variable, we've given them a proffer, Your Honor, a detailed

21  proffer from each of the entities of what that -- what that

22  lost revenue per work is.  Right.

23         We didn't have to do that.  We did that to address

24  their request.  So we went ahead and we did that.  And that

25  actually informs on that one variable.

22

1          So we've -- we've done what they need for their

2     purposes.  Now they come and they say, well, we want historical

3     revenue data on 11,000 works.

4          And we have declarations from every one of the

5     companies saying, this would be a massively burdensome --

6          THE COURT:  No, you don't.  And I went through, after

7     I got the reply last night, to see what your declarations say.

8     And they talk about how profit and loss information and how to

9     decide how much money you would take from the gross revenues to

10    determine, you know, all those other kinds of things is

11    difficult and would take a long time.

12         Nowhere does anybody say, we don't keep profit and --

13    we don't keep revenue by work data.

14         MR. OPPENHEIM:  And, Your Honor, to be clear, I'm not

15    saying that they say that they don't keep it.  But there is a

16    huge distinction between they don't keep it and how burdensome

17    it would be to collect it.

18         THE COURT:  All right.  Show me --

19         MR. OPPENHEIM:  So Mr. Leak's --

20         THE COURT:  -- in any one of the declarations.

21         MR. OPPENHEIM:  Sure.

22         THE COURT:  -- where they say it's burdensome to

23    produce revenue by work by channel.

24         MR. OPPENHEIM:  So in Mr. Leak's declaration,

25    paragraph 9, Your Honor.

23

1          THE COURT:  Which -- which exhibit is he?

2          MR. OPPENHEIM:  Let me see which declaration that is.

3  It's 82-8, Your Honor, in the filing, if that helps.

4          THE COURT:  82-8.  Okay.

5          MR. OPPENHEIM:  And I am just going to turn as one

6  example, paragraph 9, Your Honor.  It says in the second

7  sentence:  Determining all the revenue generated on a

8  track-by-track basis (or even worse, including albums or EPs)

9  in a particular time period going back a number of years is

10  extremely time consuming, even if the inquiry is limited to

11  U.S. revenue.

12          THE COURT:  Where are we?

13          MR. OPPENHEIM:  I am sorry, the second sentence of

14  paragraph 9.

15          THE COURT:  The second sentence:  Determining all the

16  revenue generated on a track-by-track basis -- okay.

17          MR. OPPENHEIM:  It goes on, Your Honor, and it

18  discusses the difficulty in gathering this.

19          Or, Your Honor, I mean, I can go through --

20          THE COURT:  All right.  You know, that's the one that

21  I think discussed difficulty, but doesn't really put any meat

22  on the bones as to extremely difficult, a lot of different

23  things to do, and then puts the caveat, they're demanding all

24  related documentation, that would include certain things, which

25  they're not.  They just want to know now the revenue by

24

1   channel.

2          MR. OPPENHEIM:  Your Honor --

3          THE COURT:  Okay.

4          MR. OPPENHEIM:  We had to respond on many numerous

5   requests, including profit and loss, because they included

6   everything in their works.  We did this on a two-day basis.

7   They did it on a holiday weekend.  To the extent you want

8   supplemental declarations on the burden, we're happy to provide

9   them.

10          Every one of these declarations, I can go through

11  them, Your Honor, Mr. McMullan's declaration for Universal

12  Music -- give me that number, please.  Similarly in paragraph

13  11 says:  Revenue data --

14          THE COURT:  Hold on, I want to get it because I tried

15  to go through here and find out where any of these things

16  focussed on the issue of -- all right, what paragraph do you

17  say?

18          MR. OPPENHEIM:  82-2, sorry, in paragraph 11.

19          THE COURT:  I have got it.  Cost data with respect to

20  given sound recordings.  It's complicated, costs include, and

21  then he goes through and talks about that.  Many of the

22  costs -- revenue data would be voluminous and include documents

23  or information related to millions of tracks each year, as well

24  as licensing and so and so.

25          It doesn't say -- it would be voluminous, of course,

25

1    you have got a 11,000 copyrights, so --

2              MR. OPPENHEIM:  Well, he says --

3              THE COURT:  So, you know, no doubt that is going to

4    be voluminous.

5              MR. OPPENHEIM:  Well, he says revenue data would be

6    similarly voluminous, and include documents or information

7    relating to millions and millions of track and album sales made

8    each year, as well as licensing deals and television and movie

9    studios, retailers, streaming service, satellite and cable

10   service.

11             By the way, the request for licensing deals, when --

12   that a record company or a music publisher does a deal with a

13   movie studio to put a track on a movie, how that is relevant, I

14   have no idea.

15             But every one of these declarations discussions the

16   burden associated with providing this revenue data.  And when

17   you compare that burden with the relevance for what they are

18   using it, that is to show actual damages in a statutory damage

19   case where we've given them a proffer, which they haven't even

20   explored yet with any witnesses, Your Honor, seems to go too

21   far.

22             So we have -- so the burden has to be measured in

23   comparison to the relative value of the discovery in this

24   context.

25             I'm happy to go through other declarations, Your

1   Honor, but --

2          THE COURT:  No, I mean --

3          MR. OPPENHEIM:  -- they have -- so, Your Honor, there

4   are statements by each one of the plaintiff groups in this case

5   describing that providing this revenue data would be

6   burdensome.  It would require an enormous amount of pulling of

7   information.  It is described as to each plaintiff group.  And

8   that burden needs to be measured as against the value of it.

9          Your Honor, to be clear, we're not saying that the

10  data doesn't exist, but it doesn't exist in a single system

11  where it's just a computer-generated printout.  If that were

12  the case, then we would just simply be arguing relevance.

13         But it would require an enormous amount of effort and

14  time and money to extract all of this information for -- for a

15  purpose that the defendants haven't explained.

16         THE COURT:  Well, I think they have explained the

17  purpose for it.  I don't think -- and again, I'm focusing on a

18  very limited aspect of what was requested in the various

19  document requests, 27, 28, 29, 36, 41, 43, and 44, and

20  interrogatories 2 and 3.

21         You know, I think under the circumstances -- and, you

22  know, I -- you know, there is no reasonable argument that

23  revenues do come into play even when you have statutory

24  damages.  So that puts it in the realm of we don't just get to

25  wash our hands of, you know, profit and loss information and

27

1   revenues and lost revenues and things like that, just because

2   we have statutory damages.

3            And I understand that getting revenues doesn't

4   translate directly into it, but it gives one a sense of how one

5   could calculate on an industry basis what one could expect a

6   general range of profit and loss to be based on revenues.

7            MR. OPPENHEIM:  So, Your Honor, what's interesting is

8   that the defendants pointed to the BMG case and what happened

9   in that case.  We went back and looked.  And without seeing

10  exactly what data was produced, we do know what their expert

11  said and did.

12           And all he did -- he didn't actually point to the

13  revenues, lost revenue per track.  What he did is he did an

14  analysis to determine the proportion of revenue from digital

15  downloads versus streaming.  So he took -- he got all of this

16  massive historical data and then he came up with just a simple

17  percentages.

18           That is, frankly, if that's all the expert wants,

19  that's publicly available information.  You don't need to ask

20  for historical revenue data to figure out the proportion of

21  streaming to downloads.  IFPI issues international reports on

22  those kinds of statistics, and their expert, I am sure, has

23  them or can easily find them.

24           So they argued for it, ultimately agreed, BMG agreed

25  to provide all that historical data in light of the motion, but

28

1   then it wasn't even -- wasn't even used.

2          He did nothing whatsoever, Your Honor, with

3   information with respect to licenses or physical sales.  The

4   only information the expert in BMG used was downloads and

5   streams, and only for developing proportional information.

6          THE COURT:  Well, that -- are you indicating that if

7   I was to order it, that I should only order it for downloading

8   and streaming and not for physical sales and licenses revenue?

9          MR. OPPENHEIM:  So, Your Honor, I don't -- to be

10  clear, we think that you should deny it outright.

11         But if Your Honor were going to go down the road of

12  ordering something here, what I would -- what I would think to

13  do is start with a sample.  Pick -- if what they want to get is

14  a sense of what the revenue per track is on streaming or on

15  downloading, let's pick 50 compositions, 50 sound recordings

16  and provide that on those two categories.  And then let them

17  ask questions.

18         And if that sample shows anything to justify more

19  information, then we can certainly have a discussion about

20  that.

21         But the idea, given the burden and the relative use

22  here, I think the idea of asking us to produce all of the

23  historical revenue information for all 11,000 tracks when Cox

24  in the past didn't use it after asking for it --

25         THE COURT:  Well, you know, I told you all this every

29

1  time you come in here, this is not the BMG case.  You've got

2  different counsel representing Cox, you know.  So, you know,

3  this is different counsel representing the plaintiffs in this

4  case who are different plaintiffs.  So this is not just a redo

5  of the BMG case.

6          MR. OPPENHEIM:  Absolutely, Your Honor, we agree, we

7  absolutely agree.  But we've put forward, Your Honor,

8  declarations of burden.  The defendants in their reply brief

9  say we haven't.  We absolutely have, Your Honor, and they are

10  there.

11          THE COURT:  All right.  All right, quickly.  Why

12  shouldn't I limit it to downstream -- to downloading and

13  streaming before I provide the revenue information?

14          I mean, licensing, I don't see how that one could

15  come into play significantly in someone who is allegedly using

16  peer-to-peer software to download certain individual

17  copyrighted works and who was doing licensing it to be used in

18  a movie or something like that.

19          Physical sale probably is a little bit closer, but

20  let me hear why I shouldn't just limit it to downloading and

21  streaming, those channels.

22          MS. GOLINVEAUX:  Yes, Your Honor.  For the licensing

23  royalty, I really think goes to the point Your Honor made about

24  the value of these individual works.  Some of them, the

25  plaintiffs enjoy far more revenue than others.  And the

1   licensing royalty would be relevant to that, and that would be

2   relevant to an appropriate level of statutory damages.

3          I think it is more attenuated than the physical

4   sales, the digital downloads, and the streaming revenue, but

5   that's the relevance of the licensing revenue.

6          And with physical sales -- with physical sales, the

7   expert would use those in the same way that he would use the

8   download and streaming revenue to look at the relative

9   proportions.  And because we don't know if -- but for the

10  alleged infringement in the case, how that person would have

11  enjoyed the track otherwise.

12         THE COURT:  Well, you know, I'm pretty ignorant in

13  this issue, so you'll have to help me understand.

14         But a copyrighted work that you're saying being

15  infringed, let's just say it's one song by an artist.  If that

16  song is included in a CD that includes many other songs, how

17  would one know that the physical purpose -- purchase of a CD

18  would relate to that individual copyrighted work and what

19  percentage of it would apply to that individual sale of a

20  physical CD.

21         MS. GOLINVEAUX:  Well, Your Honor, with alleged

22  infringement, it's an issue in the case, there are -- there

23  will likely be users who are downloading albums as opposed to

24  songs.  So I think it is relevant to the alleged infringements.

25         THE COURT:  But they're also, I assume, individual

31

1   songs as well, right?

2   　　　　MS. GOLINVEAUX:  Your Honor, I think that is likely

3   true, yes.

4   　　　　THE COURT:  Okay.  Well, again, one does not strive

5   for perfection in ruling on these things.  One tries to rule

6   and move on and let the parties try and do things as best they

7   can given the information that they will have and have to do.

8   　　　　You're going to get their expert report on April 10,

9   it is going to have damages information.  So my ruling is not

10  going to preclude you from seeking more information once you

11  get their expert report and provide -- come to me and say, you

12  know, based on their expert, my expert needs X.

13  　　　　I'll tell you that if your expert report comes in and

14  it has a lot of information that you say was too hard to get,

15  too tough to do, couldn't do it, all that kind of stuff, your

16  expert may not be able to testify.

17  　　　　I mean, I will consider a motion that would preclude

18  him or her from testifying if your representations that you and

19  your clients have made were only to defend against discovery

20  and not to prepare your own case.

21  　　　　MR. OPPENHEIM:  Understood, Your Honor.

22  　　　　THE COURT:  So you're going to be stuck with that.

23  　　　　You know, in reading through the declarations, you

24  know, I don't find that they are adequate to support a

25  proportionality argument relating to revenue information by

32

1    work.  I think that a time period from 2011 through 2014 of

2    providing revenue by work is appropriate.  And I think under

3    the circumstances of doing it, I'm going to at this point in

4    time, going to go ahead and do it by channel, including

5    physical sales, downloads, streaming, and licensing.

6           I mean, I think, you know, that's certainly

7    information that is relevant.  Whether it is highly relevant, I

8    think arguably probably doesn't meet the highly relevant

9    component, but I do think it's relevant.  And I am going to

10   require them to produce that information.

11          So it's going to be from 2011 through 2014, revenue

12   by work by channel, including those four channels, physical,

13   downloads, streaming, and licensing.  Okay?  Thank you.

14          MR. OPPENHEIM:  May I ask a question, Your Honor?

15          THE COURT:  Okay.

16          MR. OPPENHEIM:  I guess I don't understand why the

17   information from 2011 and 2012 would be required.

18          Cox isn't required to provide termination information

19   for those years, but we have to provide revenue information for

20   those years?  Clearly to the extent they are trying to show

21   actual damages, that revenue information wouldn't be relevant.

22          THE COURT:  Well, it shows trends, so --

23          MR. OPPENHEIM:  But similarly with respect to the AUP

24   terminations, we asked for it for purposes of showing trends

25   and changes and what their behavior --

33

```
 1          THE COURT:  Well, no.  I mean, the real reason you're

 2   getting that information is to show that they have the

 3   authority to do something and they exercised that authority

 4   during the time period.

 5          I'm not going to let you reargue this.  I have

 6   decided it.  You know, if you need clarification on what the

 7   actual ruling is -- but that's the ruling.  That's what your

 8   client is going to be required to do.  Okay?

 9          MR. OPPENHEIM:  Very well, Your Honor.

10          THE COURT:  Okay.  Ownership and validity.  Let me

11   hear your argument on why you need more than what they're

12   doing.  Why it isn't appropriate to -- if you have specific

13   concerns about specific works not being -- them not having

14   standing to pursue the damages that they're claiming for

15   specific works, why shouldn't that be done on an individual

16   specific basis after you've gone through and seen their

17   information and raised it as opposed to this, we want all

18   documents concerning everything?

19          MS. GOLINVEAUX:  Yes, Your Honor.  With our motion

20   we're seeking three categories of documents.  Number one are

21   the work-for-hire agreements for the works in suit.

22          With respect to the work for hire --

23          THE COURT:  What basis do you have that they aren't

24   in existence?  I mean, they have a valid copyright -- I mean,

25   they're providing you with copyright registrations, which is a
```

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |  |
|---|---|---|
| SONY MUSIC ENTERTAINMENT, *et al.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-950-LO-JFA |
| | ) | Hon. Liam O'Grady |
| COX COMMUNICATIONS, INC., *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

### <u>ORDER</u>

This matter comes before the Court on the Parties' motions *in limine* to exclude certain evidence at trial. Defendants Cox Communications, Inc., *et al.* ("Defendants" or "Cox") filed ten separate motions, which are listed below. Dkts. 471, 474, 478, 482, 487, 490, 493, 496, 499, 502. Plaintiffs Sony Music Entertainment, *et al.*, filed an Omnibus Motion *in Limine* (Dkt. 470) comprising eleven distinct requests to the Court, which are also detailed below. The matters are all fully briefed, and the Court heard oral argument on November 12, 2019. A memorandum opinion will follow to address certain matters in further detail.

As to Defendants' motions, the Court finds the following:

*1. To Preclude Evidence and Testimony Relating to the BMG Litigation.* To the extent that disputed testimony related to BMG and the relevant Claim Period arises at trial, the Court will rule when presented with the evidence at trial. The Court recognizes that this is a separate action with different Plaintiffs, and finds that the most efficient way to deal with these objections is to rule on admissibility of offered testimony under Fed. R. Evid. 801, 804, Fed. R. Civ. P. 32 and any other rules deemed relevant at the time of trial. The Court disagrees with any argument

that Fed. R. Evid. 404 is applicable here.  Accordingly, Defendants' Motion *in Limine* No. 1

(Dkt. 471) is hereby **DENIED WITHOUT PREJUDICE**.

 *2. To Preclude Evidence and Testimony Relating to Third-Party Infringement Notices*.

The third-party infringement notices are relevant and admissible.  Cumulative notices of

infringement—particularly those targeted at the same subscribers receiving notices from

Plaintiffs—are relevant for the many reasons in Plaintiffs' Opposition (Dkt. 538).  As such,

Defendants' Motion *in Limine* No. 2 (Dkt. 474) is hereby **DENIED**.

 *3. To Preclude Evidence and Testimony Relating to Emails and Communications with No*

*Connection to Alleged Infringement of Plaintiffs' Works*.  This evidence is clearly probative and

relevant to actual knowledge and willfulness in this case, as well as Defendants' internal policies

and approach to the protection of Plaintiffs' works.

 Defendants argue that communications not directed at *specific* infringement of works in

suit are rendered inadmissible, and that this is improper propensity evidence.  Neither assertion

can be true.  These communications are directly relevant circumstantial evidence regarding the

policies and employees at issue.  Plus, they are offered as evidence of continuing conduct, not

any past action that could support a propensity argument.  For these and other reasons stated in

Plaintiff's Opposition, Defendants' Motion *in Limine* No. 3 (Dkt. 478) is hereby **DENIED**.

 *4. To Preclude Evidence and Testimony of Infringement and Harm Other Than That*

*Allegedly Represented by the RIAA Notices*.  This motion aligns in several ways with

Defendants' Motion to Exclude the Testimony of William H. Lehr, Ph.D.  Dkt. 306.  In that

sense, the Court will allow Dr. Lehr to testify to harms outside the RIAA notices to the extent

relevant to economic forces bearing on the Parties.  Dr. Lehr's testimony has been subject to

scrutiny for many years, is generally admissible under Federal Rule of Evidence 702, and will allow Defendants an opportunity to raise Cox's arguments on cross examination.

But Dr. Lehr's testimony is subject to limitation. Specific damages-related valuations offered to the jury may not include notices unrelated to infringement of works in suit. As such, notices to subscribers with fewer than three notices may only be offered as evidence of Cox's knowledge of infringement, not a basis for statutory damages, unless the work identified in the notice is a work in suit. The Court finds it appropriate that Plaintiffs measure harms commensurate with the set of subscribers identified with three or more notices. The "value" of subscribers receiving fewer than three notices may be quantified for purposes of showing Cox's purported economic incentives to tolerate infringement for vicarious liability, but not for actual damages specific to this litigation. Similarly, notices from outside the Claim Period are inadmissible to inform actual damages unless sent to subscribers that serve to define the set of works in suit. Quantifying total infringement notices within the Claim Period and overall revenue trends is permissible, as the Court finds that context for the notices in suit is relevant.

Bundling services is a main part of Cox's business plan, and valuations considering bundled services are relevant and admissible to help the jury understand the context of business decisions at issue. Pulse checks are not excluded at this time. The Court will consider any further objections at trial.

With these qualifications, Defendants' Motion *in Limine* No. 4 (Dkt. 482) is hereby **GRANTED IN PART AND DENIED IN PART**.

*5. To Exclude Plaintiffs' Exhibit Number 39.* The admissibility of the hard drive will be determined at trial. Plaintiffs will need to lay a proper foundation for the Court to consider its admissibility. Defendants' Motion *in Limine* No. 5 (Dkt. 487) is hereby **DENIED**.

3

*6. To Exclude Certain MarkMonitor Evidence.*  The MarkMonitor evidence will be
admissible at trial should Plaintiffs lay a proper foundation at that time.  The data at issue is not a
summary within the meaning of Fed. R. Evid. 1006, as Defendants claim, but rather an extraction
of data that is not materially altered since the time of its collection.  Further, it qualifies as a
business record under Rule 803(6).  The Court agrees that "'[p]roducing limited data from a
larger database is more akin to reviewing a set of documents in response to a discovery request
and producing only responsive documents ... a smaller subset of data provided as evidence from
[a] database' is admissible under Rule 803(6) if all the rule's elements are met."  *Branch v. Gov't
Employees Ins. Co.*, 286 F. Supp. 3d 771, 778 (E.D. Va. 2017) (quoting *Health Alliance
Network, Inc. v. Cont'l Cas. Co.*, 245 F.R.D. 121, 129 (S.D.N.Y. 2007)).  With proper
authentication, the MarkMonitor evidence satisfies the elements of Rule 803(6), and, therefore,
Defendants' Motion *in Limine* No. 6 (Dkt. 490) is hereby **DENIED**.

*7. To Preclude Plaintiffs from Relying on Copyright Notices as Proof of Direct
Infringement.*  The Parties agree that the use of "infringement" as a conclusion and "infringement
notice" as evidence of infringement require an instruction to the jury.  The Court will await the
Parties' invitation to collaborate on an acceptable instruction before trial.  Defendants' Motion *in
Limine* No. 7 (Dkt. 493) is **GRANTED IN PART AND DENIED IN PART**.

*8. To Exclude Certain Evidence Relating to Peer-To-Peer Traffic on Cox's Network.*  The
Court finds that Peer-to-Peer ("P2P") traffic is relevant to Cox's business model and spending
decisions, financial incentives, and knowledge of potentially infringing activity.  Plaintiffs'
proposed testimony regarding Procera and other capabilities related to deep packet inspection is
admissible to the extent that it is relevant to Cox's anti-piracy conduct.  Defendants assert "there
is no evidence in the record that Cox could have used Procera to control the infringing activity

alleged in this case. None." Dkt. 585, Hrg. Tr. 58 13:15. The Court is not convinced that the topic is apt for exclusion, given that Jason Zabek's performance review from a year before the Claim Period notes, "[w]e are still getting our feet wet with Procerra [sic], but are excited about how it can assist us in our daily duties." Gould Ex. 15 at 17 (PX-381, Section 4). Defendants are free to offer evidence in rebuttal or to demonstrate corporate policy changes during the Claim Period. As such, Defendants' Motion *in Limine* No. 8 (Dkt. 496) is hereby **GRANTED IN PART AND DENIED IN PART**.

*9. To Preclude Evidence Relating to Terminations for Non-Payment.* Reference to termination for non-payment versus for infringement is too far afield and the evidence is therefore excluded, unless Cox suggests that they terminate lots of customers for cause. If Cox so suggests, then it can be introduced. Accordingly, Defendants' Motion *in Limine* No. 9 is hereby **CONDITIONALLY GRANTED**.

*10. To Exclude Cox Performance Evaluations.* Cox moves to exclude both performance evaluations and separation agreements, specifically those pertaining to Jason Zabek and Joseph Sikes. The Parties will have an opportunity to reach an agreement as to the extent that the credibility of Messrs. Zabek and Sikes will be at issue.[1] The Court will rule after hearing from the Parties as to the admissibility of this evidence, and Defendants' Motion *in Limine* No. 10 (Dkt. 502) is hereby **DENIED WITHOUT PREJUDICE**; Defendants' objection may be renewed at the time the exhibits are sponsored.

Turning to the Plaintiffs' omnibus motion *in limine* (Dkt. 470), the Court finds the following:[2]

---

[1] At oral argument on November 12, 2019, Defendants presented to Plaintiffs and the Court that they will not call Mr. Zabek or Mr. Sikes to testify live at trial.

[2] Roman numerals indicate Plaintiffs' motion numbers both to match their briefs and to distinguish from Defendants' motion numbers.

*I. The Court Should Preclude Evidence or Argument Inconsistent with this Court's Factual Findings in its Summary Judgment Decision Concerning Cos's DMCA Defense in* BMG. The Court will consider this evidence as it is presented at trial, just as discussed above in Defendants' Motion *in Limine* No. 1.  Plaintiffs' Motion *in Limine* is **DENIED** as to issue I.

*II. The Court Should Preclude Evidence and Argument Concerning Cox's Misleading and Unsupported Contention that "96% Stop By 5 Notices."*  There is no adequate foundation for the information presented in the "96% Stop By 5 Notices" evidence.  Defendants have had ample time to produce such a foundation, and failed to do so.  Discrepancies in numbers and figures as detailed in Plaintiffs' briefs raise an alarming number of questions that demand the underlying data be produced, not just the emails Defendants offer in support.  *See* Pls.' Br. Ex. 5, Dkt. 476-7.  The Court does not believe that Defendants can authenticate this evidence in good faith for many reasons, including a preview of proposed authentication and clarification in Defendants' Opposition (Dkt. 543).  Discussing the confusion between "notices" and "tickets," Defendants offer:

> Beck explained at deposition that the chart represents the number of Cox's customer facing actions (i.e. *tickets* memorializing notices sent to customers). His underlying email to Cadenhead thus supports the assertion in DX-74 that it is reporting on just that: "*notices* sent to customers."

*Id.* 5-6 (footnote omitted) (emphasis added).  The Court understands this to mean, in other words, that tickets and notices are apples and oranges, but here, we are talking about apples so they are called oranges.  The Court finds this to be unhelpful.

But even if Cadenhead could, *arguendo*, authenticate the slides, they are still inadmissible hearsay.  The email does not qualify as a business record under Fed. R. Evid. 803(6), nor do the slides that purportedly resulted from it.  "While properly authenticated emails

6

may be admitted into evidence under the business records exception," the evidence is not properly authenticated here, as just discussed. *U.S. v. Cone*, 714 F.3d 197, 220 (4th Cir. 2013). Given the deficiency in underlying data to support the slides, they likewise are inadmissible as a summary under Fed. R. Evid. 1006. Accordingly, Plaintiffs' Motion *in Limine* is **GRANTED** as to issue II.

    *III. The Court Should Preclude Any Evidence or Argument Relating to the Policies or Practices of Other ISPs (Including the Copyright Alert System).*  Defendants are permitted to put on evidence about the Copyright Alert System ("CAS") as well as its own graduated response system, the Cox Abuse Ticket System ("CATS"). Evidence about other ISPs as identified in the Stroz Friedberg Reports will also be admissible to the extent that it is relevant and there is a proper foundation. As such, and for much of the reasoning in Defendants' pleadings, Plaintiffs' Motion *in Limine* is **DENIED** as to issue III.

    *IV. The Court Should Preclude Any Argument that Cox is Not Liable for Infringement Over its Network by Users Other Than Named Account Holders.*  Defendants intend to challenge direct infringement evidence by questioning the identities of actual end users. The Court notes that no specific names are required to establish direct infringement, as Plaintiffs may establish direct infringement using circumstantial evidence. But Cox is not precluded from introducing relevant evidence to weaken the inference of infringement. Business subscribers, however, are not categorically excluded from Defendants' basis of liability. Thus, Plaintiffs' Motion *in Limine* is **GRANTED IN PART AND DENIED IN PART** as to issue IV.

    *V. The Court Should Preclude Any Evidence of Argument Concerning the MarkMonitor '236 Spreadsheet.*  The MarkMonitor '236 Spreadsheet will only confuse the jury in this case, and is largely cumulative of the '431 Spreadsheet. Further, Defendants' claim that the data in the

'236 Spreadsheet casts doubt on the '431 Spreadsheet is unsupported, as Cox makes arguments

based on a largely empty data set. The only conclusion properly drawn, the Court finds, is that

MarkMonitor began keeping more data some time in or after 2015—well after the claim

period—and the later-added data is not relevant. For these and many of the reasons stated in

Plaintiffs' pleadings, Plaintiffs' Motion *in Limine* is hereby **GRANTED** as to issue V.

*VI. The Court Should Exclude the REV0003444 Spreadsheet and Any Related Testimony*

*or Argument.* The Audible Magic Spreadsheet, as the REV00003444 is also called, is

inadmissible. It is unauthenticated, as Cox made a choice not to inquire about it or Audible

Magic's data collection practices more specifically during depositions. Defendants' expert Dr.

Feamster cannot authenticate it, as Cox suggests, simply because he was present at the deposition

in which Mr. Ikezoye from Audible Magic referenced "transaction logs." The foundation for the

data is vague, the data itself is incomplete, and the Parties' attempts to explain its significance

thus far suggest it will not help the jury in its factfinding role. Plaintiffs' Motion *in Limine* is

hereby **GRANTED** as to issue VI.

*VII. The Court Should Preclude Emails Cox Received from Customers Purporting to*

*Respond to Plaintiffs' Infringement Notices.* Defendants intend to offer 1,800 emails at trial as

evidence that Cox's subscribers in some way objected to the emailed infringement tickets from

Cox. The Parties agree that the truth of the content of the email is hearsay, but Defendants offer

additional relevancy regarding: the knowledge element of contributory infringement; a rebuttal

to Plaintiffs' claim that no subscriber disputed an allegation of infringement; and the claim that it

was reasonable for Cox not to terminate repeat infringers. If Defendants can demonstrate that

the emails are relevant to Cox's state of mind during the Claim Period, not retroactively,

Defendants may offer the evidence. Limitations on its admissibility and potential prejudice

8

under Rule 403 will be determined at trial. Plaintiffs' Motion *in Limine* is hereby **GRANTED IN PART AND DENIED IN PART** as to issue VII.

*VIII. Cox Should be Precluded from Presenting Evidence and Argument Concerning Plaintiffs' Track-Level Revenues from the Works in Suit.* Mr. Tregillis' testimony regarding pricing calculations based on track-level data will be permitted, and he can testify to his methodology and findings. The Court is mindful of the sensitive nature of Plaintiffs' proprietary pricing information, though several years old, and thus Mr. Tregillis may testify to summary findings without the underlying documents being admitted into evidence. Defendants are advised to avoid any testimony or demonstratives that might compromise proprietary pricing information as to specific Plaintiffs or works without authorization from the Court. As such, Plaintiffs' Motion *in Limine* is hereby **GRANTED IN PART AND DENIED IN PART** as to issue VIII.

*IX. The Court Should Exercise its Discretion to Preclude Cox from Offering Deposition Testimony from Witnesses it Controls and Could Bring to Trial.* Upon consideration of the Parties' arguments and governing law, the Court does not find that Plaintiffs met their burden to show that Cox has procured the absence of the witnesses in question. Accordingly, Defendants are not compelled to invoke contractual obligations to produce particular witnesses at trial, and Plaintiffs' Motion *in Limine* is hereby **DENIED** as to issue IX.

*X. Cox Should be Precluded from Offering Live Testimony from Four Key Witnesses it Refuses to Make Available for Live Examination in Plaintiffs' Case in Chief.* For the reasons stated from the bench, no deposition testimony shall be offered at trial for a witness who will appear to give live testimony. Plaintiffs' Motion *in Limine* is hereby **GRANTED** as to issue X.

*XI. The Court Should Preclude Testimony from Victoria Sheckler.* Plaintiffs argue that

Defendants should be precluded from calling RIAA employee Victoria Sheckler to testify

because, among other objections, she is not the Fed. R. Civ. P. 30(b)(6) designee. Considering

the Parties' arguments surrounding burdens on the witness and cumulative testimony, the Court

will not preclude Defendants from calling Ms. Sheckler. The fact that Mr. Marks was the

30(b)(6) witness for RIAA does not disqualify Ms. Sheckler as a witness altogether. Further, the

Court trusts that the Parties are capable of coordinating such that the witness would not be torn

away from work for the entirety of the trial. Plaintiffs' Motion *in Limine* is hereby **DENIED** as

to issue XI.

It is **SO ORDERED**.

November 19, 2019
Alexandria, Virginia

Liam O'Grady
United States District Judge

10

# EXHIBIT 3

# *REDACTED*