# Exhibit 13

1

```
1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
2
     Case No. 19-cv-874-RBJ-MEH
3    _____

4    WARNER RECORDS, INC., et al.,

5         Plaintiffs,

6    vs.

7    CHARTER COMMUNICATIONS, INC.,

8         Defendant.
     _____
9

10           Proceedings before MICHAEL E. HEGARTY, United

11   States Magistrate Judge, United States District Court for the

12   District of Colorado, commencing at 1:00 p.m., December 17,

13   2019, in the United States Courthouse, Denver, Colorado.

14   _____

15           WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17   _____

18                         APPEARANCES

19           NEEMA SAHNI, NICHOLAS LAMPROS and JANETTE FERGUSON,

20   Attorneys at Law, appearing for the Plaintiffs.

21           ERIN RANAHAN and CRAIG JOYCE, Attorneys at Law,

22   appearing for the Defendant.

23   _____

24                     DISCOVERY CONFERENCE

25
```

1         MS. RANAHAN:  I object, Your Honor.

2         THE COURT:  Claim period.  The allegation period?

3         MS. RANAHAN:  Yeah.

4         THE COURT:  All right.

5         MR. LAMPROS:  So I want to talk about financial

6 information next, Your Honor.

7         So plaintiffs have requested a variety of financial

8 information from Charter.  So far in response, they've

9 produced their 10Q statements and that's essentially it.

10        What we're looking for here represent narrow

11 versions of the RFPs we served, but there are essentially

12 three -- three asks.

13        One is, we would like to know Charter's average

14 revenue and profits broken down by service from January 2010

15 until May 17, 2016.  We would like to know the actual monthly

16 revenue from all subscribers identified in plaintiff's

17 infringement notices for January 2012 knew the present, and

18 we would like Charter's audited financial statements for that

19 2010 to 2016 period.

20        THE COURT:  Aren't they -- are the audited

21 financial statements part of the release of public

22 information?

23        MS. RANAHAN:  The audited portion is not, but

24 we -- right.  So there is all of the public information that

25 they've received and we told them -- can I just make one

1   work for each year.

2           THE COURT:  Okay, go ahead.

3           MS. RANAHAN:  I'll just add the complication,

4   given the nature of our client's business.  Our client does

5   bundle.  So the way that they bill the clients, and I'm sure

6   you may be familiar with this, but when you have a cable

7   provider, they do your TV, they used to do landlines when

8   people used landlines.  They do your -- this happens to be

9   security, they do your Internet.  So they give you a bundle

10  price and it's not necessarily broken down.  In fact, it's

11  often not, as far as -- it's like a number, it's a total

12  revenue.

13          THE COURT:  No, it isn't broken down for me.  But

14  are you saying that you know, as a matter of fact, Charter

15  does not break it down for accounting purposes on their end?

16          MS. RANAHAN:  In some sense -- in some ways they

17  do, but they do not -- it depends on -- if we're talking

18  about 2010, it changed based on the bundle, so there are --

19          THE COURT:  Well, we aren't talking about 2010,

20  though, unless you want to.

21          MS. RANAHAN:  No, I want to not talk about 2010.

22          THE COURT:  Well, then I wouldn't go there if I

23  were you.

24          MS. RANAHAN:  But I just wanted to add that level

25  of complication because it's not just that we're just hiding

1   the holidays.

2         THE COURT:  Well, end of January is six weeks from

3   now.

4         MS. SAHNI:  We agreed to produce it by end of

5   January, if not sooner.  We are going to start making

6   rolling production before then.

7         To be clear, this was supposed to be a

8   representative sample and Ms. Ranaham had us explain, what we

9   thought they were going to do, is try to figure out the worst

10  possible songs to show --

11        THE COURT:  Understood.

12        MS. RANAHAN:  -- which Your Honor said --

13        THE COURT:  But the ultimate is this, as I hear

14  her.

15        End of January is not necessarily a problem, but

16  she says that's only 1 percent.  They can't tolerate that

17  kind of timeframe, if a judge, me or Judge Jackson -- I or

18  Judge Jackson orders you to produce a broader scope.

19        MS. SAHNI:  Understood, Your Honor.

20        THE COURT:  So I'm telling you, based on the

21  circumstances you've laid out, I don't have a problem with

22  the end of January.  But it's going to be -- in the event

23  that that turns up the information they think it will turn

24  up, then next time it's going to be far more onerous.

25        Does that make sense?

```
1               MS. SAHNI:  I understand, Your Honor.  I also want
2    to flag that there are two important deadlines in January,
3    including our deadline to add plaintiffs to the case and our
4    deadline to amend the exhibits, the works in suit.  It
5    simply doesn't make sense for us to have to produce chain of
6    title information, you know, until after that point.
7               We're actively investigating --
8               THE COURT:  I know, but I'm already agreeing with
9    you, so --
10              MS. SAHNI:  Yeah, I'm just making sure --
11              THE COURT:  Are you trying to talk me out of it?
12              MS. SAHNI:  No, no, Your Honor.
13              MS. RANAHAN:  Well, and the concern, Your Honor,
14   is that we're obviously -- it's very labor-intensive to
15   figure out these problems.  So it's not like we get the
16   documents, we can review 110 chain of titles and turn it
17   around the next day.  So there is a --
18              THE COURT:  Well, I know that but, so -- do you
19   see what you're saying?
20              MS. RANAHAN:  Yeah.
21              THE COURT:  If it's hard for you and difficult and
22   onerous and expensive to even review what they produce,
23   imagine having to create it in the first place.
24              MS. RANAHAN:  No, Your Honor.  We've had these
25   cases before, and every one of them had to produce ownership
```

1    for every single one of them.  They keep them -- the
2    ownership information that they keep --
3             THE COURT:  Okay.  So in the cases that you've
4    been involved, what's the most number of plaintiffs who had
5    to do that in any one case?
6             MS. RANAHAN:  What do you mean, the most number --
7             THE COURT:  You said they all have to produce
8    their chain of title for all works.
9             MS. RANAHAN:  Thousands and thousands.  The last
10   case, Cox, 10,000.
11            MS. SAHNI:  They did not produce for all in Cox.
12            In fact, the Court granted summary judgment on
13   ownership, based on exactly what we've agreed to produce
14   here, copyright registration records and basic chain of title
15   information.
16            He denied discovery in tort for higher agreements.
17   He denied discovery into dispute.  That's not centrally
18   maintained.  We've shown them declarations in the concurrent
19   case against Brighthouse.  We have declarations submitted
20   about how burdensome this is.  And so it's not news to
21   Charter that this is a huge deal for our client.
22            THE COURT:  Understood.
23            Well, anyway, I'm -- I'm satisfied with the end of
24   January timeframe, but it has to be complete as to every
25   single client that they've given you.

1        I don't want any -- don't wait until the end of
2   January and say, it turns out we couldn't do this or this.
3   If you find out something like that or maybe even decide to
4   withdraw a plaintiff, tell them as soon as you know.
5        MS. SAHNI:  Absolutely, Your Honor.
6        MS. RANAHAN:  And so just all the four categories
7   you're producing for what you just mentioned, the work for
8   hire and the disputes?
9        MS. SAHNI:  We're investigating to make sure we
10  can.  I mean, as we said in our letter, if there is anything
11  where we don't have it or where we're concerned, you know,
12  we will raise those issues.  Right now, we told our clients
13  we need these four things for all of these ones.
14       THE COURT:  Right.  But again, don't wait until
15  the end of January to raise every problem.  As problems
16  arise, confer.
17       MS. SAHNI:  Sure.
18       THE COURT:  Okay.  Because I won't be happy if
19  there's a dozen issues that you want to raise with me about
20  this piece of production at the end of January, okay.
21       MS. RANAHAN:  Okay.  So then, Your Honor, if the
22  end of March is our discovery cutoff, what would the -- what
23  would you envision --
24       THE COURT:  That's looking very unlikely to me,
25  but I don't know.  It may be technically true.

1          MS. RANAHAN:  Okay.  So I don't know -- do you
2    know if Judge Jackson is amenable to that type of
3    adjustment?  Some judges are, more or less, so I don't know
4    -- I'm just concerned that we're not going to have time.
5          THE COURT:  He and I are buds.
6          MS. RANAHAN:  What?
7          THE COURT:  We're tight.
8          MS. RANAHAN:  Okay.
9          THE COURT:  He trusts me.
10         MS. RANAHAN:  I mean, I don't even know that our
11   clients or your clients want to move anything at this point.
12   I'm just concerned -- I just want to ensure that if we get
13   to the end of January, we have time to analyze it, come back
14   to you and say that we need all of it and you have time to
15   order it within --
16         THE COURT:  Yeah, but I'm going to give you a
17   short time.
18         MS. RANAHAN:  Yeah.
19         THE COURT:  So what would that be?
20         MS. RANAHAN:  For us to come back for you to
21   produce?
22         THE COURT:  For you to come back.
23         MS. RANAHAN:  I guess it's going to depend on the
24   volume and the -- as they roll in.  So the more that, you
25   know, things can roll in, the quicker we can come back

111

1  because we'll able to analyze them on a rolling basis.  If
2  we get 110 chain of titles on January 30, it's going to take
3  longer than if --
4         THE COURT:  I already asked them do it on a
5  rolling basis --
6         MS. RANAHAN:  Okay.
7         THE COURT:  -- and that way, to dump everything at
8  one time.
9         MS. RANAHAN:  Okay.
10        THE COURT:  So if you receive the documents early
11 January, mid-January, late January, when do you want to talk
12 in case you can't work it out.
13        MS. RANAHAN:  Yeah.  That's a good question, Your
14 Honor.  Maybe -- maybe the third week of February or
15 something and they can -- and then we can just -- how much
16 time would you need to produce the other 99 percent if he
17 ordered it?
18        MS. SAHNI:  You know, that is a huge burden.  I
19 think Your Honor suggested we would come back and talk about
20 it.  I think we still have all of our arguments as to why we
21 don't --
22        THE COURT:  By the way, you need to come armed
23 with burden data as to what I've already ordered had
24 produced so that I can extrapolate that to the group as a
25 whole.

112

```
1              MS. SAHNI:  Absolutely, Your Honor.  And like I
2    said, we've already submitted (inaudible), we articulated
3    the burden very clearly in the separate case and we could do
4    so here as well.
5              THE COURT:  So let's make your deadline January
6    27, which is the last week of January, and we will talk
7    then -- it can be by phone, if you want if it's just this
8    If it's a lot more than this, it's going to be in person.
9    So is a week, is ten days?  What are you asking for?  Two
10   weeks?
11             MS. RANAHAN:  I think two weeks we'll have to just
12   do it.  I mean, obviously if there is an issue where we get
13   everything at the end, we may have to, you know, contact
14   Chambers and say we need more time.
15             THE COURT:  All right.  So I'll set something just
16   so we can have it on the calendar.  So -- what about the --
17   like the Tuesday after that long weekend?  Yeah, but that
18   would be three weeks.
19             MS. RANAHAN:  Oh, before -- okay, so before that
20   would be --
21             THE COURT:  Are you talking about President's Day?
22             MS. RANAHAN:  Yeah.
23             THE COURT:  Well, that would be three weeks
24   after -- I mean, it -- the longer you wait --
25             MS. RANAHAN:  I know.
```

122

```
1              THE COURT:  And that has been done -- does that
2    eliminate claims before they get to trial or is that
3    happening in front of a jury?
4              MS. RANAHAN:  Ideally.  Ideally, you know, they
5    say, oh, look at this, you're right.  And they just take
6    them out.  Otherwise, it's like right now --
7              THE COURT:  But what did happen in the Cox case?
8              MS. RANAHAN:  Again, I'm not on the case.  I know,
9    right now, when I'm reading the transcripts, that the
10   experts are arguing about the percentage and how many of
11   them are actually problematic, so it's an expert battle of
12   the experts.
13             MS. SAHNI:  My understanding is the Cox experts --
14   and I could be wrong, but I understand that they didn't do
15   this full analysis, as Ms. Ranahan is saying that they want
16   to do for all 11,000 works.
17             MS. RANAHAN:  Well, they got samples.
18             THE COURT:  So why don't you just give a guess,
19   approximate.  You just said end of January.
20             MS. SAHNI:  I think it would probably be around
21   the end of January.  It's just, again there are things out
22   of our control.
23             THE COURT:  As a favor to me, try January 27,
24   okay.
25             MS. RANAHAN:  That would give us the time, that's
```

 1  thousands and thousands of agreements.  The umbrella

 2  agreements for digital and streaming are among the most

 3  sensitive agreements in our client's businesses and they

 4  haven't taken any effort to find this information out in any

 5  other way.

 6           My understanding is in Cox there was a negotiated

 7  proffer in which our clients proffered certain information.

 8  They didn't ask for that.  They haven't taken any

 9  depositions.  They haven't done anything except say give us

10  your most sensitive agreements that implicate the rights of

11  third parties and all other agreements that show me your

12  revenue.

13           I mean, it's just beyond burdensome, which we've

14  said in our declarations and articulated very clearly in

15  them, and it's irrelevant, because our earned revenues on

16  those agreements don't show them what we lost because of the

17  widespread infringement happening on its network.

18           So there is a relevance problem and a clear burden

19  problem, and this has been addressed by this Court, we'll be

20  producing what you ordered us to produce this week, and I'm

21  not sure why we have to talk about it.

22           THE COURT:  Well, there are two comments I have

23  and then you can respond.  Number one, I would be interested

24  in -- well, you already knew what you're going to receive

25  because you already have it in the Cox case.