# Exhibit 23

**COVINGTON**

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Neema T. Sahni

Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
T +1 424 332 4757
nsahni@cov.com

*By Electronic Mail*                                                                February 17, 2020

Magistrate Judge Michael E. Hegarty
Alfred A. Arraj United States Courthouse
Courtroom A-501, 5th Floor
901 19th Street
Denver, CO 80294
*hegarty_chambers@cod.uscourts.gov*

>   Re:   *Warner Records Inc., et al. v. Charter Communications, Inc.*, D.
>         Colo. Case No.: 19-cv-00874-RBJ-MEH

Dear Judge Hegarty:

Pursuant to the Court's February 5, 2020 Order (Dkt. 120), we write to submit information Plaintiffs believe will be helpful to the Court in resolving the following issues at the discovery conference scheduled for February 19:

- **Charter's failure to produce documents or information pursuant to the Court's rulings at the December 17 conference (Section I, pages 2-6):** At the December 17 conference, the Court ordered Charter to produce documents and information relevant to core issues in this case, including (i) "ticket log" data for all subscribers identified in Plaintiffs' notices, (ii) documents concerning Charter's policies for handling infringement notices, (iii) data on Charter's termination of subscribers for non-payment, and (iv) revenues received by Charter from infringing subscribers, among other categories. In the two months since, Charter has produced almost no documents related to these core issues.

- **Charter's failure to produce other documents (Section II, page 6):** Plaintiffs served many other document requests that were not the subject of dispute and thus not discussed at the December 17 conference. Despite Charter's stated willingness to produce—and the fact that these requests were served *eight* months ago—Charter has essentially ignored the requests. To date, Charter has produced a total of *72* documents (41 of which were produced this past Friday). Plaintiffs, by contrast, have produced more than a *million* documents to date.

- **Charter's bid for broader ownership discovery (Section III, pages 6-10):** Nothing in the many documents Plaintiffs produced for the 110-work "sample" selected by Charter casts doubt on Plaintiffs' ownership of the works in suit, or justifies Charter's fishing expedition for broader ownership discovery. To the contrary, the 110-sample only reinforces that the documents Plaintiffs have already agreed to produce—copyright registration information and chain-of-title records—are more than sufficient, both to

**COVINGTON**

Magistrate Judge Michael E. Hegarty
February 17, 2020
Page 2

       establish Plaintiffs' *prima facie* ownership and to permit Charter to challenge that ownership.

- **Charter's overbroad request for "umbrella" licensing agreements (<u>Section IV, pages 10-11</u>)**: Charter has demanded an unreasonably broad array of commercially-sensitive licensing agreements that have no relevance to this case. As a compromise, Plaintiffs have proposed to produce catalog-wide licensing agreements that, for each Plaintiff group, collectively account for 90% of their respective download and streaming revenues from audio-only exploitations. This reasonable proposal takes account of the disproportionate burden of producing a substantially greater number of agreements that account for only a small fraction of Plaintiffs' revenue.

- **Extension of the case schedule and provision for discovery of any safe-harbor defense (<u>Section V, pages 11-12</u>)**: The parties agree that the case deadlines should be extended, but cannot agree on a schedule. A significant roadblock is Charter's refusal to state whether it is asserting a safe-harbor defense, which will have a material impact on the scope of discovery and the time needed to conduct it. Charter should be required to disclose whether it is asserting a safe harbor defense—at least as to the contributory infringement claim that Plaintiffs filed a year ago and is not subject to any motion to dismiss—so that an appropriate revised case schedule can be set.[1]

                \*          \*          \*

**I.    Plaintiffs Seek Overdue Discovery from Charter That Was Discussed at the December 17, 2019 Conference.**

       At the December 17 Conference, the Court ordered Charter to produce documents and information responsive to requests concerning (a) data on subscribers terminated for non-payment; (b) subscriber revenue from infringing subscribers; (c) Charter's financial information; (d) Charter's policies and related documents on handling copyright infringement; and (e) documents related to incidents of known infringement—in some instances, pending Charter's demonstration by January 10 of any unreasonable burden in producing certain categories of discovery. Charter has articulated no burden, *and* has produced almost no responsive documents or information in the two months since the conference. Plaintiffs summarize below the discovery that Defendants have *still* failed to provide. Plaintiffs request that the Court order this long-overdue information to be produced within 30 days.

---

[1] Plaintiffs refer herein to the following docket entries and communications with the Court: Plaintiffs' December 16, 2019 Letter to the Court; Transcript of 12-17-2019 Discovery Conference; Courtroom Minutes from 12-17-2019 Discovery Conference, ECF 100; Plaintiffs' 1-10-2020 Letter to the Court; Charter's 1-10-2020 Email to the Court; Plaintiffs' 1-14-2020 Letter to the Court; and Charter's 1-16-2020 Letter to the Court.

COVINGTON

Magistrate Judge Michael E. Hegarty
February 17, 2020
Page 3

### A.   Data on Subscribers Terminated for Non-Payment.

<u>The Court found that Charter must produce this category of discovery, pending proof of unreasonable burden.</u>  At the December 17, 2019 discovery conference, Plaintiffs sought an order compelling Charter to respond fully to Plaintiffs' Interrogatory No. 12, which asks for the number of Subscribers, per month and year, whose internet service Charter has terminated for failing to pay amounts owing on the Subscriber's account, for the period 1/1/2010 to 5/17/2016. At the conference, the Court acknowledged this information is discoverable, including to rebut Charter's claim that it does not have the right or ability to control its subscribers' infringing conduct because internet access is too critical to modern life to terminate lightly.  (Tr. 6:7–17:6). The Court also admonished Charter for not investigating the burden associated with this category of discovery in advance of the Conference (Tr. 13:10–18).  Charter then represented it would "come back" to the Court if it believed the burden of pulling non-payment termination data by month (as compared to by year) was "too much."  (Tr. 15:11–20).

<u>Charter admits there is no undue burden involved, but has failed to produce any documents as ordered by the Court.</u>  Charter wrote in a January 16 letter to the Court that, in connection with this request, Charter is "not seeking to rely on any undue burden argument in this request, but does, however, maintain its relevance objection."

The Court has already determined that this information is discoverable, however. Consequently, the Court should order Charter to respond fully and promptly to Plaintiffs' Interrogatory No. 12 within 30 days.

### B.   Subscriber Revenue from Infringing Subscribers.

<u>The Court found that Charter must produce this category of discovery, pending proof of unreasonable burden.</u>  At the December 17 discovery conference, Plaintiffs sought an order compelling Charter to produce financial documents sufficient to show its monthly revenue from all subscribers identified in Plaintiffs' Infringement Notices for January 1, 2012 through May 17, 2016.  The Court found that Charter's monthly revenue from infringing subscribers is relevant, (Tr. 57:15–58:6), and instructed Charter to determine whether its accounting and data management systems can show a link between the IP addresses of infringing subscribers and Charter's accounting records, so as to show how much revenue Charter has derived from those infringing subscribers (Tr. 54:8–23).

<u>Charter failed to articulate any burden or produce any documents as ordered by the Court.</u> Charter's January 10 letter nowhere asserted that Charter's systems are incapable of determining how much revenue Charter received from infringing subscribers.  Charter has since represented, in its January 16 letter to the Court, that it will provide this information "to the extent Plaintiffs are able to identify subscribers about which Plaintiffs' alleged infringement notices are sent." This is insufficient.  Charter is in exclusive possession of the information it needs to identify the infringing subscribers and their associated revenue, and has never articulated any burden in

**COVINGTON**

Magistrate Judge Michael E. Hegarty
February 17, 2020
Page 4

collecting this information. Accordingly, Charter should be required to provide, within 30 days, documents sufficient to show its actual monthly revenue from *all* subscribers identified in Plaintiffs' infringement notices.

      C.      **Company Financial Information.**

<u>The Court found that Charter must produce this category of discovery, pending proof of unreasonable burden.</u>  At the December 17 Discovery Conference, Plaintiffs sought an order compelling Charter to produce financial documents sufficient to show (i) its average revenue and profits, broken down by service, from January 1, 2010 through May 17, 2016, and (ii) its audited financial statements for the period of January 1, 2010 through May 17, 2016.  Until that point, Charter had agreed only to produce its publicly filed 10-K reports in response to these requests. Regarding item (i), the Court instructed Charter's counsel to determine whether Charter maintains "some internal system of accounting for the internet portion of their business, along with related financial information, even when many subscribers, bundle with other services." (Courtroom Minutes, ECF No. 100; *see also* Tr. 45:14–17).  Regarding item (ii), the parties and the Court discussed what would be included within audited financial statements, and whether these materials would include the financial information requested by Plaintiffs.  (Tr. 35:13–37:12; 41:22–42:25).  The Court asked for written responses by January 10.  (Tr. 45:24–25).

<u>Charter failed to articulate any burden or produce any documents as ordered by the Court.</u> Regarding (i), Charter's January 10 letter did *not*, as the Court ordered, report whether Charter separately accounts for its internet business, even when subscribers bundle their services. Instead, Charter wrote only that it would "provide information that shows calculations of annual internet revenues from 2013-2016."  It has since produced to Plaintiffs a 14-page document (CHA_00001121–34), that fails to respond to Plaintiffs' document request.  The document does not report profits, is unclear as to which of Charter's internet services it pertains, and is unclear as to whether it includes revenues or costs attributable to bundled internet services, or what its figures represent.   Regarding (ii), Charter has stated to Plaintiffs' counsel that "there was no requirement for [it to produce] any 'audited' financials."

      In light of its incomplete productions, Charter must produce documents *sufficient* to show its revenue and profits related to Internet, phone, and video services, without any further delay. Furthermore, it must produce its audited financials, which are obviously maintained in the ordinary course and easily produced.

      D.      **Policies and Related Documents on Handling Copyright Infringement.**

<u>The Court found that Charter must produce this category of discovery, pending proof of unreasonable burden.</u>  At the December 17 Discovery Conference, Plaintiffs requested that the Court enter an order compelling Charter to (i) produce copies of Charter's final copyright or infringement policies without limitation as to time; and (ii) produce drafts thereof, as well as documents describing the effects of those policies, how they were communicated to third parties

and subscribers, and identifying the employees or agents responsible for developing, conceiving, drafting and/or implementing such policies, for the time period of January 1, 2010 through May 17, 2016. At the conference, Charter's counsel represented that Charter could not locate any 2010 or 2011 copyright or infringement policies, and had already produced any policies existing between 2012 and 2016. (Tr. 63:14–64:3, 67:10–12). Charter's counsel also represented that Charter would produce communications about copyright policies by the end of December: "We're also going to be producing *this month*, as we've told them, communications about [copyright-infringement policies]." (Tr. 63:10–13 (emphasis added)). During the hearing, the Court found relevant any remaining un-produced policies from after May 2016, (Tr. 64:10–67:7), and also ordered Charter to produce any documents from 2010-2016, discussing the effects of Charter's copyright infringement policies (Tr. 68:9–15). In the Order that followed, the Court reiterated that Charter must produce "information regarding the discovery request related to their copyright policies as stated on the record." (ECF No. 100).

<u>Charter failed to produce any documents as required by the Court.</u> Despite the Court's Order, Charter has not produced any post-2016 policies, nor the "communications" about policies that it told the Court in December that it would be producing "this month." Charter must produce these documents without delay.

Furthermore, though Charter's counsel represented during the hearing that Charter had produced the single policy it could locate from the 2012 to 2016 timeframe, Charter has produced only a handful of process pages from its intranet and form letters, and has not produced any actual policies. Therefore, Plaintiffs request that the Court require Charter to explain how it has determined that no actual copyright policies exist from 2012 to 2016.

### E. Documents Related to Incidents of Known Infringement.

<u>The Court found that Charter must produce this category of discovery, pending proof of unreasonable burden.</u> At the December 17 Discovery Conference, Plaintiffs requested that the Court require Charter to produce, for the time period of January 1, 2010 through May 17, 2016: (i) logs of all Infringement Notices (or "ticket log" data) pertaining to all of Charter's subscribers who have been identified in Plaintiffs' Infringement Notices, without limitation as to the complainant, (ii) all communications about such Infringement Notices, and (iii) documents sufficient to show all actions taken by Charter to limit, suspend, or terminate the service of subscribers associated with such Infringement Notices. At the conference and in its resulting Order, the Court agreed with Plaintiffs as to the relevance of these materials. (Tr. 78:11–13, 79:2–24, ECF No. 100). Charter's counsel stated that it had "unearthed a bunch of data" and would produce this information, and thus that the issue did not require resolution by the Court. (Tr. 77:10–17, 78:16–19, 79:2–18).

<u>Charter failed to produce any documents as ordered by the Court.</u> Despite representing it had "unearthed a bunch of data," Charter produced no documents responsive to these requests until last Friday, when it produced just 41 documents, which appear to be almost entirely form

**COVINGTON**

Magistrate Judge Michael E. Hegarty
February 17, 2020
Page 6

communications regarding infringement notices. Accordingly, Plaintiffs request that the Court order that this long-overdue information—which the Court already agreed was relevant—be produced within 30 days.

### II. Charter's Failure To Produce Documents Generally.

In addition to the deficiencies previously raised with the Court, there are number of other categories of requests for which Charter *agreed* to produce documents, but for which Plaintiffs have yet to receive a page. In fact, Charter has produced only 72 documents in the eight months since Plaintiffs served their initial discovery requests.[2] And the limited few documents it *has* produced only raise serious questions about the adequacies of Charter's search and collection efforts. For instance, Charter's recent 41-document production appears to be a curated set of communications sent on a small handful of dates—*not* the result of any broad collection of documents from relevant custodians and document repositories. As another example, one of the documents that Charter produced last year references the "SSST Sharepoint," which appears to be a digital repository where Charter stored documents like form letters and policies, including documents related to the DMCA. Charter still has not produced even these apparently readily-available documents.

It is not clear whether Charter is withholding responsive documents (including because of its own unwillingness to state whether it will assert a safe-harbor defense, *see* Section V *infra*), or whether it has not yet begun to collect and review them. Either way, Charter's failure contravenes the unequivocal representation it made at the December Conference that "[w]e have told them we were going to complete the bulk of our production this month, *by December*, so that's still coming." (Tr. at 35:25-36:5 (emphasis added)). In contrast, Plaintiffs have produced over a million documents, including infringement notices and evidence packages, company financials, corporate structure and organizational charts, document retention policies, antipiracy-related documents, chain-of-title documents, and digital music files.

### III. The Court Should Reject Any Request By Charter For Broader Ownership Discovery.

Per the process established by the Court last fall, Plaintiffs have produced a wide array of ownership-related documentation for a 1% sample of works selected by Charter. The results of

---

[2] For a few of these requests, Charter has represented it has searched for but not located responsive documents—raising serious concerns about Charter's document preservation efforts or searches. For example, Charter claims it has been unable to identify *any* documents sufficient to "identify the name, title, and role of each of Defendant's employees or agents involved any manner in receiving, assessing, addressing, responding, and/or implementing any Infringement Notice." If true, that would mean Charter has not retained, for example, any email communications to or from employees charged with processing infringement notices.

**COVINGTON**

Magistrate Judge Michael E. Hegarty
February 17, 2020
Page 7

that 1% sample underscore why the Court should reject Charter's demand for broader ownership discovery.

> A. **The Documentation Produced to Date Regarding Charter's Hand-Picked 110-Work Sample Casts No Doubt on Plaintiffs' Ownership of the Works in Suit.**

<u>Plaintiffs produced substantial documentation for Charter's 110 "sample" works.</u>  Last October, the Court established a process to evaluate the proper scope of discovery concerning Plaintiffs' ownership of the works in suit.  Although Plaintiffs' position—firmly supported in copyright jurisprudence[3]—is that only copyright registration records and basic chain-of-title information are necessary to prove Plaintiffs' ownership, the Court permitted Charter to select 110 works for which Plaintiffs would produce ownership documentation beyond those core materials.  The purpose was to determine whether this broader discovery revealed relevant information *not* contained in the narrower materials Plaintiffs already agreed to produce.

Nearly two months later, Charter presented to Plaintiffs a hand-picked "sample" and demanded a large array of irrelevant documents for the selected works.  Plaintiffs have now produced voluminous documentation concerning those works, including copyright certificates, the recording and music publishing contracts (and other relevant agreements) that are the source of Plaintiffs' ownership or control of the works in suit, "dispute"-related documentation, and other chain-of-title records.[4]

<u>Nothing in the sample, or in Plaintiffs' timely amendment of their works-in-suit lists, casts any doubt on Plaintiffs' ownership of the works in suit.</u>  Without even reviewing the documents Plaintiffs produced, Charter asked the Court to ignore the process it put in place.

---

[3] In the similar litigation *Sony Music Entm't v. Cox Commc'ns Inc.*, No. 1:18-cv-00950-LO-JFA (E.D. Va.), the court denied discovery into most of the categories of documents Charter seeks, and granted summary judgment on the issue of ownership without requiring such burdensome discovery.  *See id.*, 2019 WL 6357963, at *4 (E.D. Va. Nov. 27, 2019); *see also BMG Rights Mgmt. (US) LLC v. Cox Comm'cns, Inc.*, 149 F. Supp. 3d 634, 644-45 (E.D. Va. 2015) (reversed on other grounds, *BMG Rights Mgmt. (US) LLC v. Cox Comm'cns, Inc.*, 881 F.3d 293 (4th Cir. 2018); 3 *Nimmer on Copyright* § 12.11 (2019) ("Once plaintiff satisfies his burden (by submitting the certificate that he himself filed, or proving his chain of title from the previous registrant), the burden shifts to the defendant to establish the invalidity of plaintiff's title from the author."); *Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1196 (10th Cir. 2005) ("A plaintiff's presentation of a certificate of registration from the U.S. Copyright Office usually constitutes prima facie evidence of a valid copyright and of the facts stated in the certificate").

[4] Plaintiffs have identified a small number additional documents related to the 110-sample which they will be producing to Charter today.

**COVINGTON**

Magistrate Judge Michael E. Hegarty
February 17, 2020
Page 8

Instead, Charter argues that Plaintiffs' timely amendment of their works in suit lists somehow demonstrates deficiencies in Plaintiffs' ownership, warranting broader ownership discovery as to all works in suit. Charter is wrong.

Although Plaintiff has adjusted its works in suit list (as specifically contemplated by the case schedule agreed to by the parties and entered by the Court)—including a handful of works within the 110 sample—these changes were made overwhelmingly for reasons having nothing to do with title defects. Indeed, Plaintiffs are entirely free to narrow or modify the universe of works on which they are suing for any number of reasons. This is entirely commonplace in mass infringement cases like this; a plaintiff might drop a work because it does not want to seek recovery on it, because of an artist sensitivity that calls for dropping it, or other reasons.

Even more importantly for purposes of evaluating Charter's demand for broader discovery, however, any possible issues that Charter has raised within the 110 sample are ascertainable *based on the copyright registration information and chain-of-title documentation Plaintiffs have already agreed to provide for all tracks*. For example, Plaintiffs have made the following changes to works within the sample:

- Nine works have been dropped from the lawsuit. Two were dropped because Plaintiffs determined the works were registered after the claim period, meaning Plaintiffs could have sought actual damages, but not statutory damages for their infringement. This has nothing to do with ownership. Six tracks were dropped because Plaintiffs determined in an abundance of caution that the claimed work might not be covered by a specific registration number. This, too, has nothing to do with ownership—it speaks only to whether the current registration information is sufficient to request statutory damages for those works. *All of these issues would have been readily discoverable by Charter based on the registration information and chain-of-title discovery Plaintiffs have already agreed to provide.*

- The plaintiff entity information was amended for 11 works. Plaintiffs in all of these cases had a valid claim of ownership; however, the amendments were made to show a more direct link between the copyright claimant and the work. Seven of these works had their plaintiff entity changed simply to reflect ministerial corporate name changes (*e.g.*, Warner Bros. Records, Inc. to Warner Records Inc.). *Once again, these issues are apparent from copyright registration information and the basic universe of chain-of-title documentation Plaintiffs have agreed to produce.*

- Plaintiffs have amended the registration numbers for eight works, to correct any misalignment between the registration and the work in suit. This was done primarily where Plaintiffs identified that the previously listed registration number pertained to a compilation or special release album, rather than for the

**COVINGTON**

Magistrate Judge Michael E. Hegarty
February 17, 2020
Page 9

      album/release being claimed.  None of these corrections pertain to *whether* Plaintiffs own the applicable works, but rather concern only the registration information associated with the works.  ***These issues, too, are apparent from copyright registration and chain of title documentation.***

    Collectively, the changes Plaintiffs have made to all works within the 110-work sample reinforce that broader discovery is not warranted or necessary, either for Plaintiffs to establish their prima facie ownership of the works in suit *or for Charter to challenge that ownership*.

    This is particularly significant because, as the Court acknowledged at the October 29, 2019 Conference, (Tr. at 42:5-10), Charter's hand-picked "sample" was meticulously selected by Charter over a period of weeks, to identify the set of works over which Charter suspected Plaintiffs' ownership was weakest.  The take-away from the process endorsed by the Court is that even Charter's cherry-picked sample revealed no meaningful ownership defects, much less anything that would warrant discovery beyond the chain-of-title documentation Plaintiffs already agreed to produce.

    **B.    The Broader Discovery Charter Seeks Regarding Plaintiffs' Ownership of the Copyrighted Works Is Disproportionate to the Needs of this Case.**

    In addition, gathering the documents Plaintiffs produced solely for the 110-sample took substantial time and effort on the part of multiple employees to (among other tasks) collect contracts and amendments, review them to determine their relevance and ascertain the works covered thereby, identify additional copyright certificates, coordinate with employees in other departments and offices to identify "ownership dispute" documentation (if any), and compile the information received to track progress.  Collectively, across the six Plaintiff groups, Plaintiffs spent at least *109 hours* reviewing and collecting documents for just the 1% sample.  This total does not account for the additional hours spent by employees in other departments and offices who possessed the underlying information and documentation that needed to be reviewed and collected.

    Extrapolating out from the 1% sample to the full 11,000 works would mean that Plaintiffs would likely need to spend thousands of hours, even accounting for efficiencies, to collect and review the requested discovery for all works.  And this does not even include time spent by outside counsel to then review and verify the information, redact sensitive and irrelevant financial information, and otherwise prepare the materials for production.

    Especially given that the 110-sample exercise only reinforced the sufficiency of the ownership documentation Plaintiffs have agreed to produce, the burden of gathering the additional documentation sought by plaintiffs is grossly disproportionate to its (non-existent)

COVINGTON

COVINGTON

Magistrate Judge Michael E. Hegarty
February 17, 2020
Page 10

relevance.  The Court therefore should not order Plaintiffs to produce all of the ownership documents Charter has sought for all works.[5]

### IV.   The Court Should Adopt Plaintiffs' Proposed Compromise on Charter's Request for "Umbrella" Licensing Agreements.

<u>Charter unreasonably seeks production of *all* "umbrella" licensing agreements.</u>  The Court previously denied Charter's overbroad request for all documents and information related to the purported value of the works in suit.  Charter filed an Objection to that ruling which is currently fully briefed and pending before Judge Jackson.  Yet Charter once again demanded that Plaintiffs produce these documents at the December 17 discovery conference, insisting Plaintiffs be required to provide all of their "umbrella" agreements pertaining to streaming or downloading, notwithstanding the Court's prior ruling and Charter's pending objection.  Charter continues to attempt to re-litigate this issue.  There is no reason to do so.

These agreements should not be compelled for production, because: (1) they are among the most commercially-sensitive agreements in Plaintiffs' business, (2) producing them would impose a significant burden on Plaintiffs, including obtaining consents or providing notice to well over a hundred counter-parties, (3) the agreements are irrelevant to the question of the value of the specific works in suit here, because they apply to Plaintiffs' entire catalog of works, not just the works in suit, (4) Plaintiffs have elected statutory damages, meaning the actual damages Plaintiffs may have lost in theoretical licensing revenue for even the works in suit is not relevant, and (5) the ill-defined category of "umbrella" agreements Charter seeks potentially includes a number of uses, such as music video streaming and licenses to print vinyl records, that are not at all comparable to the infringing downloading of primarily audio-only works here.

At the Discovery Conference, the Court requested additional information on the number of such responsive agreements and the burden involved in producing them.  As reported in Plaintiffs' January 10 letter to the Court, the record company plaintiffs identified 275 responsive agreements, and the music publisher plaintiffs identified approximately 131 responsive

---

[5] In its prior submissions to the Court, Charter has asked the Court to disregard the marginal relevance and undue burden of producing these materials by pointing to a discovery ruling in the separate *Bright House* litigation. But the *Bright House* court clearly erred in ordering additional ownership discovery, because it explicitly refused to consider the burden and lack of proportionality involved in this massive production, and acknowledged instead that it was choosing to authorize a "fishing expedition." *See UMG Recordings, Inc., et al. v. Bright House Networks, LLC*, No. 8:19-cv-710-T-35TGW (M.D. Fla.), Transcript of January 8, 2020 Motions Hearing, 90:11-91:2 (conceding that although Plaintiffs submitted extensive declarations detailing the burden involved in production, the Court "didn't read any of them."); 84:6-8 (acknowledging that "of course" the exhaustive ownership documentation sought by the defendant was a "fishing expedition"); 100:4-11 (rejecting proportionality arguments based on the view that given the potential damages, "you're entitled to fish").

agreements; factoring in subsequent modifications, extensions, or amendments, the total number of agreements increases by at least 800 across all Plaintiffs. Approximately 175 unique counter-parties are implicated by these agreements, almost all of which would need to be notified of any disclosure. This, coupled with the time needed to collect and produce responsive agreements, represents a significant and disproportionate burden, given the agreements' minimal relevance.

<u>The Court should resolve this issue by adopting Plaintiffs' reasonable proposed compromise.</u> The lion's share of the revenue derived from these agreements is concentrated in a small number of the most lucrative agreements. Plaintiffs therefore offered a compromise proposal to Charter, under which Plaintiffs would produce those agreements that collectively account for approximately 90 percent of each Plaintiff group's total U.S. download and streaming revenues from audio-only exploitations. This would provide Charter with the vast majority of revenue information it seeks, while sparing Plaintiffs the disproportionate burden of producing the substantially greater number of agreements which account for only a small fraction of the Plaintiffs' total overall download or streaming revenue.[6]

## V.     Extension of Existing Case Schedule.

As Plaintiffs, Charter, and the Court have observed, the number of outstanding discovery issues to be resolved and productions yet to be made warrant global extensions of the current case schedule. *See* Plfs' Jan. 23 Ltr. at 1; Def's Jan. 31 Ltr. at 1; Tr. at 109:21-25 (Court agreeing it was "looking very unlikely" that the current schedule would hold). Charter has produced just 72 documents. Plaintiffs have been working diligently to meet their discovery obligations; but some of these, like the production of digital copies of the thousands of sound recordings at issue, have proven more time consuming than anticipated. *See* Plfs' Jan. 23 Ltr. at 2.[7] Accordingly, over the last two weeks, the parties have exchanged proposals to extend case deadlines, for the Court's consideration.

It is all but impossible to have meaningful discussions about these deadlines, however, without knowing the scope of anticipated discovery in this case—in particular, whether or not Charter will assert a DMCA safe harbor affirmative defense. If Charter does assert the defense, it puts at issue the measures Charter takes vis-à-vis *all* repeat infringers (and not just those identified in Plaintiffs' infringement notices), and the reasonableness of its repeat infringer

---

[6] In the related *Bright House* case, Plaintiffs have been ordered to produce a wider universe of licensing agreements. That ruling was clearly erroneous and should not be followed, as the *Bright House* court failed to properly consider the relevance and burden considerations described here. Plaintiffs' objection to the Magistrate Judge's ruling in that case, in which they have offered the same compromise proposed here, is pending.

[7] As an update on that effort, Plaintiffs have now produced roughly 5400 digital copies of the recordings in suit, and are working to identify the correct versions to produce for the remaining songs.

**COVINGTON**

Magistrate Judge Michael E. Hegarty
February 17, 2020
Page 12

policies more generally. The scope of discovery is therefore substantially broader if Charter intends to assert this defense.

      Plaintiffs filed their complaint a year ago, and Charter has not moved to dismiss Plaintiffs' contributory infringement claim. Yet Charter refuses to state whether it will assert a safe harbor defense, even as to that count, on the grounds that its answer is not due until the Court rules on its motion to dismiss Plaintiffs' vicarious liability claim. The parties and the Court need to be able to set a discovery schedule regardless. Accordingly, Charter should be required to disclose immediately whether it intends to seek a safe harbor defense.

      Respectfully submitted,

*/s/ Neema T. Sahni*
Neema T. Sahni
Mitchell A. Kamin
Nicholas M. Lampros
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
mkamin@cov.com
nsahni@cov.com
nlampros@cov.com

Jonathan M. Sperling
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
    jsperling@cov.com

*Attorneys for Plaintiffs*

CC:    All Counsel (via email)