# Exhibit C

**Florida A&M University College of Law**
# Scholarly Commons @ FAMU Law

Journal Publications                                                    Faculty Works

2011

# You Don't Own Me: Why Work for Hire Should Not Be Applied to Sound Recordings

William Henslee
*Florida A & M University College of Law*, william.henslee@famu.edu

Elizabeth Henslee

Follow this and additional works at: http://commons.law.famu.edu/faculty-research

 Part of the Contracts Commons, and the Intellectual Property Law Commons

Recommended Citation

William Henslee & Elizabeth Henslee, You Don't Own Me: Why Work for Hire Should Not Be Applied to Sound Recordings, 10 J. Marshall Rev. Intell. Prop. L. 693 (2011)

This Article is brought to you for free and open access by the Faculty Works at Scholarly Commons @ FAMU Law. It has been accepted for inclusion in Journal Publications by an authorized administrator of Scholarly Commons @ FAMU Law. For more information, please contact linda.barrette@famu.edu.

# THE JOHN MARSHALL
# REVIEW OF INTELLECTUAL PROPERTY LAW



### YOU DON'T OWN ME:  WHY WORK FOR HIRE SHOULD NOT BE APPLIED TO SOUND RECORDINGS

### WILLIAM HENSLEE & ELIZABETH HENSLEE

#### ABSTRACT

Many recording artists and songwriters never reap the rewards of their work.  America's first professional songwriter died in poverty at the age of thirty-seven.  At the Congressional level the situation has described recording artists as "one group of creators who get ripped off more than anybody else in any other industry".  As we approach 2013, there will be a new line of cases that deal with authors of sound recordings attempting to terminate their copyright assignment to the record companies.  While the most efficient and frugal solution would be legislative action, the most probable outcome is expensive, fact-intensive litigation.  Congress and the Supreme Court have emphasized the value of predictability in copyright ownership.  In this situation, Congress has fallen short of that goal.  Sound Recordings do not fit the definition of work made for hire under the 1976 Copyright Act.  While analyzing the 2013 terminations, courts should not overlook the congressional intent of creating an inalienable termination right for authors.

Copyright © 2011 The John Marshall Law School



*Cite as* William Henslee & Elizabeth Henslee, *You Don't Own Me: Why Work for Hire Should Not Be Applied to Sound Recordings*, 10 J. MARSHALL REV. INTELL. PROP. L. 695 (2011).

# YOU DON'T OWN ME: WHY WORK FOR HIRE SHOULD NOT BE APPLIED TO SOUND RECORDINGS

## WILLIAM HENSLEE & ELIZABETH HENSLEE

I. INTRODUCTION...........................................................................................696

   A. History of Work for Hire ...............................................................698
      1. 1909.....................................................................................698
      2. 1976.....................................................................................699
      3. 1999.....................................................................................700
      4. 2000.....................................................................................702
      5. New Contractual Language ................................................703
   B. 2013 Terminations ........................................................................703

II. INAPPLICABILITY OF THE ECONOMIC APPROACH ...................................704

   A. Artists Have Non-Economic Interests That Should Be Protected ................705
   B. The Record Company Will Always Have a Greater Ability To Exploit the Work, but Does Not Have an Ability To Create the Work..........................706

III. ARTISTS' SOUND RECORDINGS ARE NOT WORKS FOR HIRE.....................708

   A. Right to Control............................................................................710
   B. Skill Required ...............................................................................711
   C. Relationship Between the Parties..................................................711
   D. Payment Between The Record Company And The Artist ..............712

IV. APPROACH TO RECLAIM ARTISTS' RIGHTS DURING 2013.........................712

V. CONCLUSION............................................................................................714

[10:695 2011]   The John Marshall Review of Intellectual Property Law          696

You Don't Own Me:  Why Work for Hire Should
Not Be Applied to Sound Recordings

William Henslee & Elizabeth Henslee[*]

I. Introduction

Society is filled with glorified visions of rock stars and the rock-star-lifestyle. Generalized in the 2006 hit "Rockstar" by Nickelback, the lyrics state:

> I'm through with standing in line to the clubs I'll never get it/It's like the bottom of the ninth and I'm never gonna win/ This life hasn't turned out quite the way I want it to be/I want a brand new house on an episode of Cribs/And a bathroom I can play baseball in/And a king size tub big enough for ten plus me/I'll need a credit card that's got no limit/And a big black jet with a bedroom in it/ . . . /I want a new tour bus full of old guitars/My own star on Hollywood Boulevard/ . . . /I'm gonna trade this life for fortune and fame/I'd even cut my hair and change my name/'Cause we all just want to be big rock stars/Livin' in hilltop houses driving fifteen cars.[1]

But what the songs and visions of the glamorous life do not tell the young recording artists, is that the signing bonus is quickly spent, and the value of the rock songs you hear on the radio is not really known when you sign your first recording contract.[2]

Many recording artists and songwriters never reap the rewards of their work. America's first professional songwriter died in poverty at the age of thirty-seven.[3]  At the Congressional level the situation has described recording artists as "one group of

---

[*]© William Henslee & Elizabeth Henslee 2011.  William Henslee is an Associate Professor of Law and founding faculty member, Florida A&M University College of Law.  B.A. University of Hawaii, J.D. Pepperdine University School of Law, M.F.A.  University of California, Los Angeles Graduate School of Theater, Film, & Television.  Elizabeth Henslee received her J.D. from Florida A&M University College of Law and her B.A. in Comparative Literature from Emory University.

[1] Nickelback, *Rockstar*, *on* All The Right Reasons (Roadrunner Records 2006).

[2] *See* Emily Burrows, Note, *Termination of Sound Recording Copyrights & the Potential Unconscionability of Work for Hire Clauses*, 30 Rev. Litig. 101, 101–02 (2010) ("The classic story of a young artist entering into an unfair record deal and receiving pennies on the dollar for his work after years of recording a touring resonates throughout the music community."); *Online Entertainment and Copyright Law:  Coming Soon to a Digital Device Near You:  Hearing Before the S. Comm. on the Judiciary*, 107th Cong. 15 (2001) (statement of Don Henley on behalf of the Recording Artists Coalition) ("A new-artist agreement is one-sided in favor of the labels.  A typical artist could sell half a million records and not see one dollar in royalties.").  *See also*, William Henslee, *What's Wrong With U.S.?  Why the Failure of Congress to Pass a Performance Rights Bill Hurts American Record Companies and Recording Artists*, 13 Vand. J. Ent. & Tech. L. 739 (2011).

[3] *Music Licensing Reform:  Hearing Before the Subcomm. on Intellectual Property of the S. Comm. on the Judiciary*, 109th Cong. (2005) (statement of Rick Carnes, President of the Songwriters Guild of Am.) ("Stephen Foster, America's first professional songwriter, died in poverty with 38 cents in his pocket at the age of thirty-seven.").

creators who get ripped off more than anybody else in any other industry."[4]  As we approach 2013, there will be a new line of cases that deal with authors of sound recordings attempting to terminate their copyright assignment to the record companies.

One of the basic tenets of our copyright scheme is that an "author" or owner of a work has many exclusive rights.[5]  These include the right:  (1) to reproduce the copyrighted work;  (2) to prepare derivative works;  (3) to distribute copies or phonorecords to the public;  (4) to perform the copyrighted work publically;  (5) to display the works publically; and (6) "in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission."[6]  These exclusive rights can be transferred by an author.[7]  Usually, a transfer is made for financial compensation, ranging from a single payment buyout to ongoing royalties for the exploitation of the work.[8]  In the case of a work-made-for-hire, the employer is the author.[9]  One of the consequences of creating a work for hire is that the employer is the "author" with all of the rights of ownership, and the person who actually created the work cannot recapture those rights with a valid termination.[10]  Under the 1976 Copyright Act, an artist, or his or her heirs, may recapture his or her copyrights thirty-five years after a contractual assignment.[11]  This right of "termination" causes all rights in the work to revert to the artist or his or her heirs.[12]  Record companies prefer for sound recordings to be considered under the "work-made-for-hire" doctrine because it prevents this right of termination and recapture.[13]  Typical recording contracts include a clause stating that the sound recordings are works made for hire.[14]  The purpose of the right of termination is to allow artists who cannot know the future value of their work, to have greater bargaining power when that value is

---

[4] *United States Copyright Office and Sound Recordings as Work Make for Hire:  Hearing Before the Subcomm. on Courts and Intellectual Property of the H. Comm. on the Judiciary*, 106th Cong. 26 (2000) (statement of Hon. John Conyers, Jr., Rep., State of Mich.).

[5] 17 U.S.C. § 107 (2006).

[6] *Id.*

[7] *Id.* § 201(d).

[8] *United States Copyright Office and Sound Recordings as Works Made for Hire:  Before the Subcomm. on Courts and Intellectual Property of the H. Comm. on the Judiciary*, 106th Cong. 81 (2000) (statement of Marybeth Peters, Register of Copyrights, Copyright Office of the United States, Library of Congress).

[9] 17 U.S.C. § 101.

> A "work made for hire" is—(1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

*Id.*

[10] 17 U.S.C. § 203(a).

[11] *Id.*

[12] *Id.* § 203(b).

[13] Bill Holland, *Works-For-Hire Provision Sparks Artist Furor, Demand For Change*, BILLBOARD, Jan. 22, 2000, at 122.

[14] *See, e.g.*, 25B MICHAEL R. COHEN, WEST'S LEGAL FORMS, INTELLECTUAL PROPERTY § 23:74, ¶ 5(a) (2009).

revealed.[15]  Artists' rights to terminate copyright assignments will begin to vest in 2013, thirty-five years after the first assignments were made under the 1976 Copyright Act.[16]

To understand the current status of the work-made-for-hire doctrine and sound recordings, one must first review the history of the doctrine and its relationship to sound recordings.

### A. History of Work for Hire

#### 1. 1909

Under the 1909 Copyright Act, sound recordings were not protected.[17]  Any protection for sound recordings stemmed from state law.[18]  The 1909 Act granted a twenty-eight year term of copyright protection with a right to renew for an additional twenty-eight year term.[19]  This right to copyright protection and renewal was intended to be exclusive to the author.[20]  The 1909 Act codified common law that indicated that the "employer" was the "author" of "works for hire".[21]  The Act, however, never defined a "work for hire".[22]  The Act also "did not expressly address commissioned works."[23]  Courts generally held that the hiring party owned the copyright to the work.[24]  From the onset, courts were forced to look to the intent of Congress, and found that works prepared in the course of employment were classified as "work for hire."[25]  When determining rights in a case of an independent contractor, the right to direct and supervise the work is a primary factor in determining authorship,[26] while payment of cost,[27] inspiration for the work,[28] and the place of creation[29] were also factors in the test.

---

[15] H.R. REP. 94-1476, at 124–25 (1976) (discussing § 203 "Termination of Transfers and Licenses").

[16] 17 U.S.C. § 203(a)(3).

[17] Peters, *supra* note 8, at 78.

[18] *Id.*

[19] An Act to Amend and Consolidate the Acts Respecting Copyright, Pub. L. No. 60-349, §§ 23–24, 35 Stat. 1075, 1080–81 (1909).

[20] *Id.*

[21] *Id.* § 62.

[22] *See generally id* (expressing tacitly that commissioned works are not included).

[23] Peters, *supra* note 8, at 79.

[24] *Id.*

[25] *See, e.g.*, Murray v. Gelderman, 566 F.2d 1307, 1309–10 (2d Cir. 1978) ("An employer is entitled to the copyright only when the work was created by the employee within the scope of his employment."); Scherr v. Universal Match Corp., 417 F.2d 497, 500 (2d Cir. 1969) ("'Authors and proprietors' . . . are entitled to the copyright off a work of art.  By § 26, 17 U.S.C. § 26, an 'author' is further defined to include 'an employer in the case of works made for hire.' . . . [Section 26] merely creates a rebuttable presumption of copyright in the employer, a presumption which can be overcome by evidence of a contrary agreement between the parties.") (discussing what is now 17 U.S.C. § 101).

[26] *Scherr*, 417 F.2d at 500–01; Donaldson Publ'g Co. v. Bregman, Vocco & Conn, Inc., 375 F.2d 639 (2d Cir. 1967); *Murray*, 566 F.2d at 1310; Picture Music, Inc. v. Bourne, 457 F.2d 1213, 1216 (2d

*2. 1976*

The 1976 Copyright Act still did not define "work for hire," but did clarify that works made within the scope of employment constitute a work for hire only with a writing from both parties rebutting the presumption.[30]  According to a statement of Marybeth Peters, former Register of Copyrights, the revision of the Copyright Act spanned many years, beginning with studies in 1955 from the Copyright Office.[31]  In 1961, the Register of Copyrights recommended copyrights in sound recordings "be protected against unauthorized duplication."[32]  Sound recordings did not receive federal copyright protection until 1971.[33]  The legislative history does not suggest assigning a work made for hire status to sound recordings.[34]  In the history, the legislature points out:

> The copyrightable elements in a sound recording will usually, though not always, involve "authorship" both on the part of the performers whose performance is captured and on the part of the record producer responsible for setting up the recording session, capturing and electronically processing the sounds, and compiling and editing them to make the final sound recording.  There may be cases where the record producer's contribution is so minimal that the performance is the only copyrightable element in the work, and there may be cases . . . where only the record producer's contribution is copyrightable.  As in the case of motion pictures, the bill does not fix the authorship, or the resulting ownership, of sound recordings, but leaves these matters to the employment relationship and bargaining among the interests involved.[35]

When the 1976 Act was created, the work for hire doctrine created two distinct definitions of works.[36]  The first category applies to employees whose works were prepared in the course and scope of their employment.[37]  The second category enumerates types of commissioned works, which include:  a contribution to a collective work, a compilation, an instructional text, a test, answer material for a

---

Cir. 1972) (explaining that the right to direct and supervise the work of more than merely minor importance).

[27] *Murray*, 566 F.2d at 1310; *Scherr*, 417 F.2d at 500–01.

[28] *Murray*, 566 F.2d at 1310 (citations omitted).

[29] *Scherr*, 417 F.2d at 500–01.

[30] 17 U.S.C. § 101 (2006) (defining work for hire to include a "work prepared by an employee within the scope of his or her employment"); *Id* § 201(b).

[31] Peters, *supra* note 8, at 78.

[32] *Id.*

[33] An Act of Oct. 15, 1971, Pub. L. 92-140, 85 Stat. 391 (codified as amended at 17 U.S.C. § 101) (amending the Copyright Act to provide protection for sound recordings).

[34] H.R. REP. NO. 92-487, at 5 (1971); *see* Mary LaFrance, *Authorship and Termination Rights in Sound Recordings*, 75 S. CAL. L. REV. 375, 385–89 (2002).

[35] H.R. REP. NO. 92-487, at 5.

[36] 17 U.S.C. § 101 (2006).

[37] *Id.*

test, and an atlas.[38]   Even in the case of the enumerated commissioned work category, the parties must contractually agree that the person accepting the commission consents in writing that the work will be considered a work for hire.[39] Therefore, the 1976 Copyright Act grants less protection for full-time creative employees, and more protection to the individuals commissioned to create a work.[40] In the case of the second category of works-made-for-hire, "each category was proposed by a particular copyright industry and every category was fully debated."[41] The rationale behind the exceptions was that the works done by freelance authors, at the direction and risk of a publisher, should not be allowed to revert to the creator when the commissioning party took all the risk.[42]   The other exceptions, which include collective works and motion pictures, were created because the "resulting work involved numerous authors and that permitting terminations of grants of rights to such works would [result] in chaos."[43]   It should be noted that sound recordings "were *never* proffered as a category to be added to the list of commissioned works."[44]

### 3. 1999

In 1999, two events occurred that shook the shaky legal precedent that surrounded the legal definition and position of sound recordings.  First, on March 5, 1999, Judge Greenway in *Ballas v. Tedesco* ruled that "sound recordings are not a work-for-hire under the second part of the statute because they do not fit within any of the nine enumerated categories."[45]  Second, on November 29, 1999, the very last day Congress was in session, a work-for-hire amendment was passed without debate, which stated unequivocally that sound recordings were considered works-for-hire.[46] These two acts occurred less than six months apart, and showed the two sides of the sound recording/work-for-hire coin.

The *Ballas* court looked to the nature of sound recordings and found:

> [T]he sound recordings are not a work for hire under the second part of the statute because they do not fit within any of the nine enumerated categories, and because there was no signed written agreement between the parties. . . . The definition does not provide that a sound recording standing alone qualifies as work for hire under § 101(2).[47]

---

[38] *Id.*

[39] 17 U.S.C. § 201(b).

[40] *See* Rochelle Cooper Dreyfuss, *The Creative Employee and the Copyright Act of 1976*, 54 U. CHI. L. REV. 590, 598–00 (1987).

[41] Peters, *supra* note 8, at 87.

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] Ballas v. Tedesco, 41 F. Supp. 2d 531, 541 (D.N.J. 1999).

[46] Intellectual Property and Communications Omnibus Reform Act of 1999, Pub. L. No. 106-113, § 1011, 113 Stat. 1501.

[47] *Ballas*, 41 F. Supp. 2d at 541.

While this quote may not initially seem imposing, the implications are vast. First, it gave (and continues to give) credence to the thought that artists may serve valid terminations on record companies, beginning in 2003,[48] and prove that the record companies own terminable assignments in the sound recordings.[49] Second, it allows artists to argue with precedent that sound recordings do not meet one of the specifically enumerated categories of commissioned work under the work for hire definition.[50] Third, it aids the argument that the superficial language in a recording contract and classifying the sound recording as a "work-made-for-hire" does not mean that it fits the prescribed definition, and under the current definition, a mere agreement to the contrary would not make it a work-made-for-hire under the color of law.[51]

Prior to November 26, 1999, sound recordings were not defined as a work-for-hire, although record companies were pushing for that classification.[52]   Record companies started classifying sound recordings as "works-for-hire" in their contracts with artists around 1970.[53] However, the artists and the artists' community felt that even though there was a clause in the contract that named the sound recordings a work for hire, when the issue was contested, the courts would find that a sound recording simply did not meet that definition.[54]   Marybeth Peters summarized the situation well in 2000:

> My conversations with representatives of both performers and record companies have confirmed my previous understanding:  recording contracts almost always contain provisions, which deem the sound recordings and any contributions to them works made for hire.  Copyright Office records show that claims to copyright for sound recordings filed by record companies in the 1970s named a record company as author by virtue of the work made of hire doctrine and that today featured artists a s well as record companies have filed claims to copyright listing themselves as authors by virtue of the work made for hire doctrine.   However, the fact that work-for-hire agreements and copyright registrations as works for hire have been made does not lead to the legal conclusion that the sound recordings that are the subjects of those agreements and registrations are indeed works made for hire.  If a specially ordered or commissioned work does not fall within one of the categories set forth in the second part of the statutory definition, the agreement of the parties cannot transform it into a work made for hire. With respect to copyright registration, the Copyright Office does not inquire

---

[48] 17 U.S.C. § 203(a)(4)(A) (2006) (stating valid termination notices may be served ten years prior to the date of termination).

[49] *See Ballas*, 41 F. Supp. 2d at 541.

[50] *Id.*

[51] *Id.*

[52] Peters, *supra* note 8, at 90; *see* Holland, *supra* note 13, at 122.

[53] Peters *supra* note 8, at 90.

[54] *Id.*

whether a sound recording meets all the requirements for a work made for hire.[55]

Under these circumstances, the Recording Industry Association of America ("RIAA") felt it needed to assure that sound recordings would be considered works made for hire when the 2013 terminations started to *vest*.[56]   Since notice of terminations can occur up to ten years prior to the actual termination, time was of the essence.[57]   The amendment to the work-for-hire-doctrine was presented to Congress as a technical amendment in an appendix to a bill that was more than 1000 pages.[58]   Overnight, the situation of artists and their sound recordings changed dramatically.   Outraged musicians and the Copyright Office quickly responded to the change in copyright law.[59]   Marybeth Peters approached Congress saying, "I do not consider the recent amendment to have been a technical amendment.   It changed existing law by *adding* sound recordings as a category of commissioned works which may be considered works for hire."[60]   Simultaneously, the RIAA issued a statement stating, "in everybody's view this was a technical issue."[61]   Realizing that the amendment may have been a proper subject for debate, Congress had a brief hearing on the amendment in 2000.[62]

### 4. 2000

Because of the competing interests of the RIAA and sound recording artists, Congress repealed the 1999 amendment.[63]   The repeal, however, came with additional language specifically instructing the courts to disregard both the 1999 legislation and the repeal when determining the merits of a work for hire claim:

> In determining whether any work is eligible to be considered a work made for hire under paragraph (2), neither the amendment contained in section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of Public Law 106-113, nor the deletion of the words added by that amendment—

---

[55] *Id.*

[56] Holland, *supra* note 13, at 122.

[57] 17 U.S.C. § 203 (a)–(b) (2006).

[58] Intellectual Property and Communications Omnibus Reform Act of 1999, Pub. L. No. 106-113, § 1011, 113 Stat. 1501 (1999); Holland, *supra* note 13, at 122.

[59] *See* Holland, *supra* note 13, at 5.

[60] Peters, *supra* note 8, at 91.

[61] Bill Holland, *Acts' Reps Decry C'right Clause*, BILLBOARD, Jan. 15, 2000, at 75 (quoting President/CEO of RIAA, Hilary Rosen).

[62] *See* Bill Holland, *Subcommittee to Hear Witnesses*, BILLBOARD, May 20, 2000, at 1 (stating that the House will hear witnesses on May 25, 2000 regarding the "work made for hire" law).

[63] *See* Work Made for Hire and Copyright Corrections Act of 2000, Pub. L. No. 106-379, § 2(a) 114 Stat. 1444; Kathryn Starshak, *It's the End of the World as Musicians Know it, or Is it?  Artists Battle the Record Industry and Congress to Restore their Termination Rights in Sound Recordings*, 51 DEPAUL L. REV. 71, 72 (2001) (discussing the amendments).

(a) shall be considered or otherwise given legal significance, or

(b) shall be interpreted to indicate congressional approval or disapproval of, or acquiescence in, any judicial determination,

by the courts or the Copyright Office.  *Paragraph (2) shall be interpreted as if both section 2(a)(1) of the Work Made for Hire and Copyright Corrections Act of 2000 and section 1011(d) of the Intellectual Property Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of Public Law 106-113, were never enacted, and without regard to any inaction or awareness by the Congress at any time of any judicial determination.*[64]

With this action, Congress embraced the confusion that surrounded the work made for hire doctrine before the 1999 amendment, and increased the confusion by refusing to take a stance on the issue either way.[65]  The critical issue of the status of the work made for hire definition in regard to sound recordings is now left squarely in the corner of the federal courts.

### 5. New Contractual Language

After the defeat in federal court and in Congress, record companies again modified their contracts to state that the parties agree that the master recordings are to be considered specially commissioned works for inclusion in a compilation, thus making the sound recordings a work for hire.[66]  Again, the unequal bargaining power dictates that the artists include the clause in the contract.  Regardless of the language, "the agreement of the parties cannot transform [the sound recordings] into a work made for hire.[67]

### B. 2013 Terminations

As stated earlier, the initial ownership of copyrighted works vests with the author of work.[68]  Typically, in the case of sound recordings, the author then assigns or licenses the copyrighted work to a record company who then distributes the work.[69]  In most works (works that are not works made for hire) the right to terminate the assignment or license rests with the author or the author's heirs after

---

[64] Work Made for Hire and Copyright Corrections Act of 2000, § 2(a).
[65] *See* Holland, *supra* note 13, at 121–22.
[66] Contracts on file with author.
[67] *United States Copyright Office and Sound Recordings as Works Made for Hire:  Before the Subcomm. on Courts and Intellectual Property of the H. Comm. on the Judiciary*, 106th Cong. 91 (2000) (statement of Marybeth Peters, Register of Copyrights, Copyright Office of the United States, Library of Congress).
[68] 17 U.S.C. § 201(a) (2006).
[69] Brian Day, *In Defense of Copyright:  Record Labels, Creativity, and the Future of Music*, 21 SETON HALL J. SPORTS & ENT. L. 61, 67–68 (2011).

a statutorily determined term of years.[70]   In contrast, the authorship of a work for hire does not reside in the creator in the work, but with the commissioner of the work.[71]   Because the authorship does not reside with the creator of the work, the work is not subject to terminations.[72]

In 2013, artists will attempt to exercise their rights of termination in sound recordings, while record companies will attempt to prove that the sound recordings were commissioned under the work made for hire doctrine.   Litigation between record companies and artists is unavoidable, because the owner of the copyright will be the owner of the income stream from sound recordings.   Both sides are convinced they are correct.


## II. INAPPLICABILITY OF THE ECONOMIC APPROACH

While the Copyright Act can be viewed from many angles,[73] traditionally the Copyright Act has been viewed from two distinct points of view.   The first views the purpose of copyright as enhancing the creative environment, and tends to be an artist-centered approach to copyright.[74]   The second is an economic approach, which focuses on the public's access to creative works.[75]   Regarding the work-made-for-hire doctrine, the economic approach is inapplicable, because the economic approach is based on the concept that "Copyright ownership should go to the party in the better position to exploit the value of the disputed work by bringing it to the public's

---

[70] 17 U.S.C. § 203.

[71] *Id.* § 201.

[72] *Id.* § 203.

[73] *See* David Nimmer, *Queen Anne in the Emperor's Shadow*, 47 HOUS. L. REV. 919, 920 (2010) (stating that Copyright has been viewed from economic, cultural, historical, philosophical, feminist, and religious perspectives); Ralph S. Brown, Jr., *Eligibility for Copyright Protection: A search for Principled Standards*, 70 MINN. L. REV. 579, 589–600 (1985) (indicating that there are three approaches that justify copyright protection: exaltation of authorship, the constitutional approach, and the economic approach).

[74] *See, e.g.*, Julie E. Cohen, *Creativity and Culture in Copyright Theory*, 40 U.C. DAVIS L. REV. 1151, 1177–92 (2007) (indicating social and cultural interaction produce art and culture); Dreyfuss, *supra* note 40, at 590; David Ladd, *To Cope with the World Upheaval in Copyright*, 19 COPYRIGHT 289 (1983).

[75] *See, e.g.*, Alina Ng, *When Users Are Authors: Authorship in the Age of Digital Media*, 12 VAND. J. ENT. & TECH. L. 853, 857 (2010) (noting that traditionally, the economic aspect of copyright is seen to promote authors to create); Paul J. Heald, *Property Rights and the Efficient Exploitation of Copyrighted Works: An Empirical Analysis of Public Domain and Copyrighted Fiction Bestsellers*, 92 MINN. L. REV. 1031, 1031–34 (2008) (approaching Copyright Law from the economic "incentive to create" theory); Matthew J. Sag, *Beyond Abstraction: The Law and Economics of Copyright Scope and Doctrinal Efficiency*, 81 TUL. L. REV. 187, 192–97 (2006) (stating there is a functional approach to the economic incentives of copyright); I.T. Hardy, *An Economic Understanding of Copyright Law's Work-Made-for-Hire Doctrine*, 12 COLUM.-VLA J.L. & ARTS, 181, 189 (1988); Ralph S. Brown, *Eligibility for Copyright Protection: A Search for Principled Standards*, 70 MINN. L. REV. 579, 607 (1985) (noting that the economic approach "admires authorship and creativity—but as public good which should not be constrained by ownership, except where a right to seek a reward is a necessary stimulus to authorship"); Stephen G. Breyer, *The Uneasy Case for Copyright: A Study of Copyright in Books, Photocopies, and Computer Programs*, 84 HARV. L. REV. 281, 281 (1970).

attention."[76]  This should not occur with sound recordings, because record companies will always be in a greater position to exploit the work, but did not have as great of a role in the creation of the work.[77]

The tension between the two philosophies described above has existed since the creation of the 1909 Copyright Act.  Under the 1909 Copyright Act, disputes over ownership of a work in a work for hire situation were almost always settled in favor of the employer.[78]  Several scholars have interpreted this to mean that disputes over copyright ownership arising under the 1909 Act were settled in favor of the party with the greater resources to exploit or market the work.[79]

The 1976 Copyright Act did not resolve the tension between the competing philosophies and the competing interests.[80]  In 1988, although Professor I.T. Hardy of Marshall-Wythe School of Law wrote an analysis that favors an economic approach, he predicted that:

> [A] changing market for copyrightable works will eventually force Congress more affirmatively to favor creators with a narrowed work-for-hire doctrine. Courts, however, will continue to favor the better exploiter to the extent they and do so because in individual cases, the work already exists and the need is for efficient exploitation through marketing and distribution.[81]

Twenty-five years later, Congress has still not created a more narrow approach to the work for hire doctrine.[82]  In regard to sound recordings, Congress has explicitly declined to take a stance on the work for hire doctrine.[83]  However, the courts should not adopt the economic approach to the work for hire doctrine in sound recordings, because it is socially unfair and against public policy.

### A. Artists Have Non-Economic Interests That Should Be Protected

According to Rochelle Cooper Dreyfuss, creative employees have three primary non-pecuniary interests, which make the economic approach incomplete.[84]  The first interest is a possessory interest in their work, which means that the work must fulfill their creative vision.[85]  The second interest is an interest in the integrity of their work.[86]  Dreyfuss states that this interest is endangered with commercial influence.[87]

---

[76] Hardy, *supra* note 75, at 181.

[77] *See* Peters, *supra* note 8, at 124.

[78] *Id.*

[79] Hardy, *supra* note 75, at 181; Dreyfuss, *supra* note 40, at 595 ("The [1909] Act . . . did not define the term 'works made for hire.'  To fill this omission, courts looks to the policies underlying copyright and the notion of 'deemed authorship.'  Starting with the presumption that works prepared in the course of employment were works for hire. . . .").

[80] Dreyfuss, *supra* note 40, at 598; Hardy, *supra* note 72, at 183–85.

[81] Hardy, *supra* note 75, at 227.

[82] 17 U.S.C. § 201 (2006).

[83] *See* H.R. Conf. Rep. 106-464, at 106 (1999) (Conf. Rep.).

[84] Dreyfuss, *supra* note 40, at 605–14.

[85] *Id.* at 605.

[86] *Id.*

The third interest deals with the reputation of the author, which manifests in concern over how the work is presented.[88]   Dreyfuss notes that society recognizes that high quality work enriches cultural heritage.[89]   She also notes that "[artists] purposefully design works that are disturbing to society and difficult to understand" and this in turn creates an indifference to public demand.[90]   Dreyfuss comes to the conclusion that the work for hire definition and statute should be construed and designed in a way to encourage creative efforts.[91]

### B. The Record Company Will Always Have a Greater Ability To Exploit the Work, but Does Not Have an Ability To Create the Work

Sound recording artists usually assign their copyrights in sound recordings to record companies to enjoy the effect of the record companies' ability to exploit their works directly to radio stations and market the artist to a fan base.[92]   Basically, a record company is a bank with the ability to market and distribute music to the public.[93]   Artists contract with record companies to gain their marketing expertise.[94] Record companies still have the ability to turn artists into stars and songs into hits.[95]

The typical recording artist is not an employee of the record company.[96]   A typical recording contract will contain a clause that specifically states that the artist is not an employee and that the artist and the label are not partners.[97]   This clause is designed to limit the label's liability for the bad behavior of the artist and the lawsuits that generally follow acts on tour.[98]

While do-it-yourself ("DIY") is the new model for many independent artists, it is the model for those artists because their prospects for signing with a record label are limited, if they exist at all.[99]   The majority of DIY independent artists would prefer to be signed to a label, if a label would have them.[100]   For that reason, the labels have the upper hand in the negotiations and can demand that certain clauses are non-

---

[87] *Id.*

[88] *Id.*

[89] *Id.* ("High-quality work enriches the cultural heritage; thus it is important to allow and encourage someone with expertise, and an understanding of the vision underlying the work, to protect its integrity.").

[90] *Id.* at 609.

[91] *Id.* at 638–43.

[92] Day, *supra* note 69, at 67–68.

[93] *See, e.g.*, Day, *supra* note 69, at 88, 103; Peters, *supra* note 8, at 124.

[94] Day, *supra* note 69, at 88.

[95] *Id.*

[96] *See* M. WILLIAM KRASILOVSKY & SYNDEY SHEMEL, THE BUSINESS OF MUSIC:   THE DEFINITIVE GUIDE TO THE BUSINESS AND LEGAL ISSUES OF THE MUSIC INDUSTRY 187 (Robert Nirkind et al. eds., 10th ed. 2007).

[97] *See, e.g.*, 4 ALEXANDER LINDEY & MICHAEL LANDAU, LINDEY ON ENTERTAINMENT, PUBL. & THE ARTS § 9:39, ¶ 27 (3d ed. 2011).

[98] *Id.*

[99] *See* Heather D. Rafter et al., *Streaming Into the Future: Music and Video on The Internet, in* 19TH ANNUAL INSTITUTE ON COMPUTER LAW, at 605, 611–12 (Pats., Copyrights, Trademarks, and Literary Prop. Course Handbook Ser. No. G0-004D, 1999), *available at* WL, 547 PLI/Pat 605.

[100] *Id.*

negotiable, like the work for hire clause so that it remains in the contract despite any objections from the artist's lawyer.[101]   The standardization of "360 deals,"[102] where the record company now takes a percentage of the publishing, touring, and merchandise revenue of the artist, is further evidence of the bargaining power the labels wield.[103]   The record labels demand the additional revenue streams because the business has evolved from an album sales model where physical product was sold at record stores, to a single sales model where single songs are sold over the internet.[104]   DIY independent artists can retain most of their rights and reach an audience by marketing themselves on the internet, but, so far, label artists have continued to be more successful.[105]

To stay in business, the record labels have demanded that new artists sign 360 deals.[106]   And while it is possible for an artist to record music and distribute it over the internet, most artists are anxious for a deal with a record label.[107]   Because artists signed to record labels are perceived to be successful or have the ability to be successful, the artists have reluctantly agreed to share all of their income with the label in order to have access to the label's distribution and marketing.[108]   So while it is possible for the artist to record and distribute his or her music without a label, it is generally perceived as preferable for an artist to sign with a label.[109]   In the age of DIY, artists do not have to have a label, but labels cannot exist without artists. Despite that reality, the labels have maintained their bargaining power over most artists.[110]

If courts continue to use an economic approach when determining whether or not a work qualifies as a work for hire, the artist will always lose.[111]   There are scholars who argue that the economic approach is the only way to ensure distribution to the public;[112] however, in reality, reliance on this theory ensures that the record

---

[101] *See* Ryan Ashley Rafoth, Note, *Limitations of the 1999 Work-For-Hire Amendment: Courts Should Not Consider Sound Recordings to be Works-For-Hire When Artists' Terminations Rights Begin Vesting in Year 2013*, 53 VAND. L. REV. 1021, 1022–23 (2000); *see, e.g.*, COHEN, *supra* note 14, § 23:74, ¶ 5(a).

[102] Day, *supra* note 69, at 72–73.

[103] *Id.*; Jeff Carter, Comment, *Strictly Business:  A Historical Narrative and Commentary on Rock and Roll Business Practices*, 78 TENN. L. REV. 213, 248 (2010) (discussing how 360 deals encompass what used to be stand alone contracts).

[104] William Henslee, *Marybeth Peters Is Almost Right: An Alternative to Her Proposals to Reform the Compulsory License Scheme for Music*, 48 WASHBURN L. J. 107 (2008); Day, *supra* note 69, at 78–84.

[105] *Id.* at 71–78.

[106] *Id.* at 72–76 (discussing the rise of 360 deals after record companies had nearly a decade of declining revenue).

[107] *Id.* at 77–78.

[108] *Id.* at 74–76.

[109] *Id.* at 77–78.

[110] *See* Rafter, *supra* note 99, at 611–12.

[111] *See* Hardy, *supra* note 75, at 227.

[112] *See, e.g.*, Assaf Jacob, *Tort Made for Hire—Reconsidering The CCNV Case*, 11 YALE J.L. & TECH. 96 (2009) (arguing to step away from the work for hire test delineated in *CCNV* and for the agency test to include "factors such as the parties' relative incentive to create new works, public accessibility, transaction costs, and the relative ability and motivation to disseminate works to the public."); Hardy, *supra* note 75, at 183–85.

company will own the work as a work made for hire.[113]  In addition, it ensures that the individual or individuals responsible for creating the work never reap the rewards of their creative labor.  While the economic test may be appropriate in other areas delineated as works made for hire, it is not appropriate for sound recordings.

Intellectual property is difficult to value before it is released on the market.[114]  Musicians, and other creative artists, have unequal bargaining power when a deal is made because the creators of the work lack the tools needed to exploit their work.[115]  The right of termination was created by Congress for the purpose of "safeguarding authors against unremunerative transfers . . . because of the unequal bargaining position of the authors, resulting in part from the impossibility of determining a work's [prior] value until it has been exploited."[116]  The premise behind the right of termination is to give artists a second-bite at the apple after their work has matured.[117]  Because artists do not have equal bargaining power on the front end of a record deal negotiation, it seems contrary to public policy and the purpose behind the Copyright Act to allow for the economic test to be used in the work for hire analysis when dealing with sound recordings.

### III. ARTISTS' SOUND RECORDINGS ARE NOT WORKS FOR HIRE

In 1989, the Supreme Court granted certiorari to construe the definition of "work made for hire" in the case, *Community For Creative Non-Violence ("CCNV") v. Reid*.[118]  Justice Marshall opened the opinion of the Court with "To resolve this dispute, we must construe the 'work made for hire' provisions of the Copyright Act of 1976 . . . and in particular, the provision in § 101, which defines as a 'work made for hire' a 'work prepared by an employee within the scope of his or her employment'."[119]  In a unanimous opinion, the Court found the pertinent legal issues were the definitions of "employee" and "scope of employment."[120]  The Court noted that neither "employee" nor "scope of employment" was defined in the Copyright Act and turned to legislative history to determine the intent of Congress.[121]  The Court stated,

> In past cases of statutory interpretation, when we have concluded that Congress intended terms such as "employee," "employer," and "scope of employment" to be understood in light of agency law, we have relied on the

---

[113] *See* Hardy, *supra* note 75, at 227.
[114] Ian McClure, *Termination Rights:  A Second Bite at the Apple*, 56 FED. LAW. 16, 16 (Jan. 2009).
[115] *Id.*
[116] H.R. REP. NO. 94-1476 (1976); *see also* 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 9.02 (2006) ("[U]nlike real property and other forms of personal property, [it] is by its very nature incapable of accurate monetary evaluation prior to its exploitation.").
[117] NIMMER, *supra* note 116, § 9.02.
[118] 490 U.S. 730, 736 (1989).
[119] *Id.* at 732.
[120] *Id.* at 740.
[121] *Id.*

general common law of agency, rather than on the law of any particular State, to give meaning to these terms.[122]

The common law of agency, which the Supreme Court relied upon, enumerates a non-exclusive list of factors to determine whether or not one is an employee or independent contractor:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the matter and means by which the product is accomplished.  Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants' whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.[123]

In the case of sound recordings, the agency test laid out in *CCNV* leads to a conclusion that artists are not employees of the record company and the work for hire doctrine does not apply to sound recordings.[124]   While none of the factors are dispositive, a review of the major criteria reveals that the relationship between a record company and an artist is not the type of relationship anticipated by Congress under the current work for hire doctrine.

---

[122] *Id.*

[123] *Id.* at 751 (citing RESTATEMENT (SECOND) OF AGENCY § 220 (1958)).

[124] *Id.* at 752.   Other scholars and commentators have come to the same conclusion.   *See generally, e.g.,* Daniel Gould, Comment, *Times Up:  Copyright Termination, Work-For-Hire and the Recording Industry,* 31 COLUM. J.L. & ARTS 91 (2007); Mark H. Jaffe, Comment, *Defusing The Time Bomb once Again—Determining Authorship in a Sound Recording,* 53 J. COPYRIGHT SOC'Y U.S.A. 139 (2006); John P. Strohm, Comment, *Writings in the Margin (of Error):  The Authorship Status of Sound Recordings Under United States Copyright Law,* 34 CUMB. L. REV. 156 (2003); LaFrance, *supra* note 34, at 385–89; Randy S. Frisch & Matthew J. Fortnow, *Termination of Copyrights in Sound Recordings:  Is There a Leak in the Record Company Vaults?,* 17 COLUM.-VLA J.L. & ARTS 211, 218–19 (1993).   *But see,* Day, *supra* note 69, at 71 ("[I]t is simply not clear whether Congress intended to give featured vocalists the right to terminate record label ownership of sound recordings. Courts will likely take part in resolving this issue when artists and musicians begin to challenge the work made for hire provisions of their recording agreements in 2013 . . . ."); Abbott Marie Jones, *Get Ready Cause Here They Come:  A Look at Problems on the Horizon for Authorship and Termination Rights in Sound Recordings,* 31 HASTINGS COMM. & ENT. L.J. 127 (2008) (indicating that the position of sound recordings as works made for hire is unclear and calling for Congress to give indication of legislative intent).

## A. Right to Control

The right to control the budget and the ultimate decision on the songs to be released lies with the record company.[125]   The right to control the creative process belongs to the artist.[126]

The record company typically provides a lump sum budget for the artist to record an album.[127]  The recording process begins with the artist preparing a detailed budget for each song to be recorded.[128]   Costs included in a typical song budget include the cost of studio time, the producer's fee, the engineer's fee, the fees for studio musicians, mastering costs, food costs, transportation costs, and miscellaneous costs.[129]   After the budget is submitted, the record label has the right to approve or disapprove of the song budget.[130]   In addition, the label has the right to have a representative present during the recording process.[131]  Ultimately, the label has the right to reject the album, or demand additional songs, if they believe the album is not commercially marketable.[132]

The artist writes the songs, chooses the producer(s) (subject to the approval of the label), chooses the musicians, prepares the arrangement, books the studio, records the master, and participates in the mixing of the song.[133]  The recording is done at the convenience of the recording studio, the musicians, and the producer.[134]  Many recording sessions begin around sunset and end around sunrise.[135]  The hours are not prescribed by the record company or by a set schedule.[136]  The label does not typically dictate when or where the recording takes place, how long it takes to record each song, or who performs on the song.[137]

The artist is responsible for paying the producer, the studio, the engineer, the arranger, paying the musicians, and for the mastering from the budget approved by the label.[138]   The artist acts as an independent contractor, as specified in the contract.[139]

---

[125] MICHAEL A. ACZON, THE PROFESSION MUSICIAN'S LEGAL COMPANION 56 (2005).

[126] E.g., Sample Business Contracts:  Exclusive Recording Contract, ONECLE § 3.1, http://contracts.onecle.com/blue-moon/no-soap-radio.svc.1999.shtml (last visited June 9, 2011).

[127] Day, supra note 69, at 75.

[128] E.g., Exclusive Recording Contract, supra note 126, §§ 3.2, 5.1, 6.02.

[129] See Aczon, supra note 125, at 60–61.

[130] See id. at 56.

[131] E.g., Exclusive Recording Contract, supra note 126, § 3.1.

[132] See Aczon, supra note 125, at 56.

[133] See id.

[134] See, e.g., Ken Nelson, Recording Coldplay's Parachutes, SOUND ON SOUND (Oct. 2000), http://www.soundonsound.com/sos/oct00/articles/ken.htm.   The engineer behind Coldplay's album Parachutes discusses the process of recording the album.

[135] See, e.g., id.

[136] See, e.g., id.

[137] See, e.g., id.; Day, supra note 69, at 74.

[138] DONALD PASSMAN, ALL YOU NEED TO KNOW ABOUT THE MUSIC BUSINESS 81 (7th ed. 2009).

[139] See Comm. for Creative Non-Violence v. Reid, 490 U.S. 730, 750–51 (1989).

### B. Skill Required

The artist is signed to the record label because the label believes the artist has the unique skill to make hit records.  The label's skill rests with its ability to spot talent, nurture the artist through the recording process, market the artist and the artist's music, and distribute the music.[140]  The creative talent resides solely with the artist.  While every artist is not a songwriter or musician, the artist is the voice that the public remembers.[141]  The artist's voice and delivery make songs hits.[142]

### C. Relationship Between the Parties

A typical recording contract between a label and an artist states that the artist is not an employee of the label and the artist is an independent contractor.[143]  When the contract covers the ownership of the masters, it states that the label owns the masters as a work for hire, but in the event that the masters are determined not to be works for hire, the artist agrees to assign the copyrights to the label, and the artist grants the label a power of attorney to transfer the copyrights in the masters from the artist to the label in case the artist refuses to sign the transfer.[144]

The label typically assigns an A&R executive to serve as the liaison between the label and the artist.[145]  The A&R representative is usually the label executive who originally discovered that artist and presented the artist to the label executives who decide whether to sign the artist and how much to spend on developing the artist.[146]  The A&R person provides some creative input on behalf of the label concerning song selection, producers, studios, and collaborators.[147]  While the label executives work closely with the artist, they do not control the artist by dictating a recording schedule, a touring schedule, or songwriting.[148]

---

[140] Patrik Wikstrom, The Music Industry 55–56 (2009).

[141] See Sherri Burr & William Henslee, Entertainment Law:  Cases and Materials of Film, Television, and Music 691 (2004); George Howard, Getting Signed! 15–18 (2004).

[142] See, e.g., Joan McGurk, Dolly Wasn't Parton with Hit Song, Belfast Telegraph (Mar. 25, 2007),       http://www.belfasttelegraph.co.uk/sunday-life/news/dolly-wasnt-parton-with-hit-song-13903099.html.  I Will Always Love You was written by Dolly Parton in 1973.  She first released the song as a single in 1974.  Whitney Houston's 1992 version of the song is one of the fewer than thirty all-time singles to have sold ten million (or more) copies worldwide.  Howard, supra note 141, at 15–18.

[143] Krasilovsky & Shemel, supra note 96, at 187.

[144] Id. at 27.

[145] Richard Schulenberg, Legal Aspects of the Music Industry 25 (2005).

[146] Id. at 21.

[147] Id. at 21–22.

[148] See id. at 25.

### D. Payment Between The Record Company And The Artist

Artists' typically receive a signing advance and a record budget from the label.[149] All of the money advanced by the label is recoupable from the money the label earns from record sales.[150]  If the album recoups its budget, the artist receives royalties from record sales.[151]  If the album does not recoup its budget, the unrecouped amount is typically cross-collateralized with the subsequent albums' budgets and other income received by the label.[152]  If the artist does not sell enough units to recoup the advances and budgets, the artist will not receive any additional money from the label.[153]  In addition to songwriting income, artists' typically support themselves by touring and selling merchandise.[154]   Recording artists are not salaried employees with taxes withheld by the label.  The label issues 1099 forms, not W-2s.


## IV. APPROACH TO RECLAIM ARTISTS' RIGHTS DURING 2013

Because Congress and the Copyright Office have not taken a stance on the construction of the work for hire statute regarding sound recordings, federal courts will make this decision if pushed to litigation by contentious parties.[155]  Record companies will point to the work for hire clause that comes standard with recording contracts.[156]  The typical clause contains language similar to: "[the sound recordings] shall be considered works 'made for hire' for [the record company] within the meaning of the United States Copyright Act."[157]  However, regardless of the language of the contract, only works that fit under the definition set out in § 101 can be considered works made for hire.[158]  Federal Courts are in a position to determine that the standard work for hire clause is unenforceable.

A clear indication of legislative intent and deliberate policy-making by Congress would be the ideal circumstance; however, if Congress continues to remain silent on the issue, the federal courts, circuits, and potentially the Supreme Court will have to determine these issues as they become a pressing issue in the coming years.  In these decisions, federal courts will have to consider the reverberating effects the decision will have on the recording industry.

Record companies will most likely have high-priced, specialized attorneys, with the RIAA behind them.  The record companies will most likely point out that both parties (the recording artist/author and the record company) expect the record

---

[149] *See* Day, *supra* note 69, at 74.

[150] *Id.*

[151] *Id.*

[152] *See, e.g.*, SCHULENBERG, *supra* note 145, at 102–03 (2005).

[153] PASSMAN, *supra* note 138, at 79–80.

[154] *See, e.g.*, GEOFFREY HULL, THOMAS HUTCHINSON & RICHARD STRASSER, THE MUSIC BUSINESS AND RECORDING INDUSTRY 161 (3d ed. 2011) (discussing how artists make money at shows and even sell albums at concerts to roughly ten percent of concertgoers).

[155] Work Made For Hire and Copyright Corrections Act of 2000, Pub. L. No. 106-379, § 2(a) 114 Stat. 1444.

[156] *See, e.g.*, COHEN, *supra* note 14, § 23:74.

[157] *Id.*

[158] 17 U.S.C. § 101 (2006).

company to exploit the copyrighted work for the duration of the copyright. Otherwise, no assignment would have initially been granted to the recording company. Also, the contract that deems all sound recordings as work for hire is standard and typical industry practice. The most obvious and pressing concern for the record companies will be the loss of expected income, which is assured to forever damage an already struggling industry as they battle music piracy and a continually changing business model.

Recording artists should argue that the termination right is inalienable. As Congress stated in 1976, "Termination of the grant may be effected notwithstanding any agreement to the contrary . . . ."[159] The Copyright Act strongly supports a conclusion that the contractual work for hire clause is unenforceable because: (1) sound recordings do not fit into one of the nine enumerated categories of work for hire; and (2) the work for hire clause should be unenforceable due to unequal bargaining power of the record company and recording artist. Recording artists may also claim the work for hire clause is unenforceable due to the unconscionability of the clause.[160] The Uniform Commercial Code ("UCC") states that a court may limit or disregard the application of any unconscionable term to "avoid any unconscionable result".[161] This could be an alternate argument to the unalienable termination right.

As Mary LaFrance points out, however, even if sound recording are found not to fall under the work made for hire statute, there may still be a problem with terminations.[162] Any uncertainty about the authorship of a work may make it difficult to terminate the grant.[163] Thus, if the record companies claim multiple authors contributed to the work, then a majority of authors must join the decision to terminate.[164] La France points to the sections dealing with derivative works and collective works as potential arguments the record company may attempt to use.[165] A record album may be considered a derivative work if the courts consider the sound recording to be a work based on underlying recording contributions of individual performers and producers.[166] While this argument is unlikely to be persuasive, it will entangle sound recording terminations in fact-intensive inquiries that will vary on a case-by-case basis and be unlikely to lead to a bright line rule about the status of sound recordings.

---

[159] *Id.* § 304(c)(5). *See also* Peter S. Menella & David Nimmer, *Judicial Resistance to Copyright Law's Inalienable Right to Terminate Transfers*, 33 COLUM. J.L. & ARTS 227 (2010) (discussing the clearly expressed intent of Congress to allow termination rights to authors and the recent judicial missteps that frustrated that intent); Molly Shaffer Van Houweling, *Author Autonomy and Atomism in Copyright Law*, 96 VA. L. REV. 549, 627–28 (2010) (indicating authors lose autonomy when their termination rights can be contracted away or when record companies achieve "unified ownership" through a work for hire clause).

[160] *See* Burrows, *supra* note 2, at 127.

[161] U.C.C. § 2-302 (2004).

[162] LaFrance, *supra* note 34, at 392–418.

[163] *Id.* at 393–94.

[164] *Id.*

[165] *Id.* at 394.

[166] *Id.*

V. CONCLUSION

As 2013 approaches, the conflict between recording artists and record companies will most likely result in litigation over the status of the copyrighted works. While the most efficient and frugal solution would be legislative action, the most probable outcome is expensive, fact-intensive litigation. Congress and the Supreme Court have emphasized the value of predictability in copyright ownership.[167] In this situation, Congress has fallen short of that goal. Sound Recordings do not fit the definition of work made for hire under the 1976 Copyright Act.[168] While analyzing the 2013 terminations, courts should not overlook the congressional intent of creating an inalienable termination right for authors.

---

[167] *See* Comm. for Creative Non-Violence v. Reid, 490 U.S. 730, 749–50 (1989) (stating Congress' intent in revising the 1976 Copyright Act was "enhancing predictability and certainty of copyright ownership").

[168] *See* 17 U.S.C. § 101 (2006).