# Exhibit D

Document By **WESTLAW**

48 J. Copyright Soc'y U.S.A. 145

**Journal of the Copyright Society of the U.S.A.**
Fall-Winter, 2000

Part III

Article
Corey Field [a1]

Copyright (c) 2000 by Copyright Society of the U.S.A.; Corey Field

# THEIR MASTER'S VOICE?
## Recording Artists, Bright Lines, and Bowie Bonds: The Debate Over Sound Recordings as Works made for Hire

*"The task of line drawing is not unique to any one area of the law; it is an inexorable and sometimes harrowing experience ..."*

*Melville B. Nimmer* [1]

***TABLE OF CONTENTS***

| | | |
|---|---|---|
| I. | Introduction | 146 |
| II. | Technology's Child: The Birth of Copyright and the Emergence of Authors' Rights | 149 |
| III. | Ownership Issues: Natural Authors, Statutory Authors, and Works Made for Hire | 153 |
| | A. The Statutory Framework of Ownership under the Works-Made-for-Hire Doctrine | 153 |
| | B. The Termination Rights Issue | 155 |
| | C. The Legislative History of Works Made for Hire | 157 |
| | D. Statutory Interpretation Issues | 162 |
| | 1. Confusion over the Scope of Commissioned Works | 162 |
| | 2. Transitioning 1909 Case Law Precedent to the 1976 Act | 162 |
| | 3. "Failed" Work-for-Hire Agreements Resulting in Implied Non-exclusive Licenses | 163 |
| | 4. Ambiguity in the Definition of an "Employee": *CCNV v. Reid* | 164 |
| IV. | The Short-lived 1999 Amendment: Sound Recordings as Works Made for Hire | 167 |
| V. | Sound Recordings as Works Made for Hire: Status Year by Year | 169 |
| | A. Sound Recordings Created Prior to February 15, 1972 | 170 |
| | B. Sound Recordings Created Between February 15, 1972, and December 31, 1977 | 170 |
| | C. Sound Recordings Created on or After January 1, 1978 | 171 |
| | 1. Recent Case Law | 173 |
| | 2. Whether Sound Recordings Come Within Collective Works or Compilations | 174 |
| | 3. Registration of a Sound Recording as a Work Made for Hire Is Not Determinative | 175 |
| | 4. Is Omission from the Enumerated List in § 101 "Work Made for Hire" (2) Determinative? | 176 |
| | 5. Is Reliance on Work-Made-for-Hire Status by Recording Artists Determinative? | 178 |
| | D. Sound Recordings Created Between November 29, 1999 and October 27, 2000 | 179 |
| VI. | Strategy, Negotiation, and Reality in Termination of Transfers | 179 |

| | A. | "In Limbo": The Gap Between Notice of Termination and the Making of a New Grant | 179 |
| | B. | A Compromise Proposal: Distinguishing Between Degrees of Intended Authorship | 182 |
| | C. | The Digital Future | 184 |
| | D. | "Bowie Bonds": Redefining the Value of Terminations? | 184 |
| VII. | | Conclusion | 188 |

## *146  I. INTRODUCTION

The iron chisels that ring out and shower down sparks as they engrave copyright laws into granite must have been glowing red-hot during the great millennial works-made-for-hire flip-flop. On November 29, 1999,[2] a  **\*147**  new amendment to the Copyright Act added sound recordings to the list of works that may be specially ordered or commissioned as works made for hire.[3]  By October 27, 2000, the amendment was no more: not merely repealed, but obliterated.[4]  Repeal was retroactive, and accompanied by unusual statutory slate-cleaning: neither the original amendment or its deletion "shall be considered or otherwise given any legal significance, or ... shall be interpreted to indicate congressional approval or disapproval of, or acquiescence in any judicial determination, by the courts or the Copyright Office."[5]

The natural law essence of copyright is that ownership arises upon creation, yet that right must coexist with the works-made-for-hire doctrine, where for practical commercial reasons the law recognizes ownership not in the true "natural" author, but in an employer or commissioning body. To musicians, their sound recordings are their "babies," and the 1999 amendment's sudden statutory shift[6] in the status of sound recordings was thus received as if musicians were being told they might have to give their offspring up for adoption. Sparks flew.

The flip-flop was also a reminder that copyright law's works-for-hire doctrine has a pro-actively paternalistic function: there are some categories of works where the law just won't allow authors to contract away their ownership and the rights that go with it. Whether sound recordings come within this paternalistic protection is the issue that remains unresolved, and now moves from the legislative arena to the courts.

The ambiguous status quo in the music industry arose because sound recording agreements had historically been on a work-for-hire basis, and  **\*148**  the 1976 Copyright Act's paternalism in protecting musicians' ownership claims by omitting sound recordings from the works-made-for-hire doctrine went largely unnoticed in industry practice.[7] Timing provisions in the 1976 Act meant that from 1978 until recently, the problem was far off in the future. If the issue was a sleeping giant, it has now been awakened by the sound of the legislative chisel at work.

Following the repeal of the 1999 amendment, future disputes over whether contractual provisions that specify sound recordings as works made for hire are valid under the Copyright Act will be settled in the courts and not by reference to legislation. This paper will examine the work-made-for-hire debate within the context of the evolution of ownership rights between publishers and authors, and will present an analysis of the work-made-for-hire status of sound recordings in four time periods: First, the period before February 15, 1972, the date when copyright protection was first granted to sound recordings. Second, the period between February 15, 1972 when copyright protection for sound recordings began and December 31, 1977 when the 1909 Act was replaced by the 1976 Act. Third, the period from January 1, 1978 through the present. Finally, we will examine some possible constitutional issues relating to the period between  **\*149**  enactment of the 1999 amendment on November 29, 1999 and its retroactive repeal on October 27, 2000. Also examined will be the strategies behind the future exercise of termination rights, including what may become a powerful new incentive for recording artists to insist on retention of authorship and ownership of their sound recordings, the **securitization** of future royalty assets, also known as "Bowie Bonds."[8]  In conclusion, we will look at unresolved issues in the works-made-for-hire debate, and ask whether a carefully thought out legislative solution, in the spirit of compromise, may still be a viable alternative.

We begin at the beginning, with the invention of the technology that eventually brought the modern author/publisher relationship into being.

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

## II. TECHNOLOGY'S CHILD: THE BIRTH OF COPYRIGHT AND THE EMERGENCE OF AUTHORS' RIGHTS

"*Copyright was technology's child from the start. There was no need for copyright before the printing press.*" [9]

In retrospect, it does seem prescient that the first book ever published in modern Europe was probably a **work made for hire** and was subsequently involved in a lawsuit. [10]  In modern parlance, Johannes Gutenberg's *Forty-two-line Bible* of 1455 (published in Mainz, Germany)  **\*150**  contained copyrightable editorial work by an employee of Gutenberg, based on a public domain source, the Latin Bible. [11]  Such thinking would be very foreign to Gutenberg himself, for if copyright was the child of the technology he invented in 1455, it would be another 255 years before copyright in the Anglo-American tradition brought forth technology's grandchild, the rights of the author. [12]

Gutenberg's genius in inventing the movable-type printing press was in his ability to bring together crafts and skills as diverse as gem cutting, metallurgy, and winemaking, and to apply them to the problem of producing uniform type and mass-produced books. [13]  This meant more than the invention of a single machine, it meant a "new craft involving movable metal type, ink, paper, and press," [14]  in which the functions of the author, editor, investor, printer, and bookseller were combined, in a context where distinctions between employer/investor and employee/creator were virtually nonexistent. Book publishing was so influential and successful that within fifty years the number of books in Europe increased from a few thousand hand-copied codices to more than nine million published editions. [15]  In the fifteenth century, the printing press and printed books represented exciting new technology that could rapidly spread ideas. It was not long before governments took notice and sought to regulate the new industry through the law.

While publishing spread rapidly throughout fifteenth-and sixteenth-century Europe, [16]  it was the subsequent copyright and publishing history in England that ultimately had a direct effect on United States copyright  **\*151**  law. [17]  Royal edicts with the dual goals of controlling publication of books and the ideas expressed within them began with Richard III in 1484, who acted to protect commercial interests by excluding foreigners from the profitable new business and restricting book imports. [18]  Under Henry VIII, the state sought to also control the expression of ideas embodied in allegedly heretical or seditious books via a 1538 proclamation that required a Privy Council license before any book could be published. [19]  By 1557, the royally granted rights to publish and manufacture books containing approved subject matter were administered by the Stationers' Company, a monopolistic London group of publishing and printing tradesmen who, under Royal Charter, kept records of ownership and exclusive licenses to print, and charged fees for registration of a publishers right to a particular "copy" or manuscript (thus the term "copyright") in an administrative model still recognizable in some of today's copyright office procedures. [20]

Conveniently, any infringements of copyright or violations of state and church censorship could only arise from non-members of the Company, so enforcement of copyright in the name of protecting church and state furthered the members' financial monopoly on the English publishing and bookselling markets. Because the Stationers' Company members were publishers and booksellers, the origins of English copyright were a publisher's right, held in perpetuity or at least until the next royal edict from the Court of the Star Chamber. Authors were not represented and would make their own financial arrangements with each publisher when supplying the manuscript. [21]

Because the power of the Stationers' Company derived in part from the organization's role in supporting state censorship, a subsequently more enlightened era, combined with a growing public and parliamentary resentment of the copyright monopoly represented by the Stationers, led to the end of laws protecting the Company in 1694. [22]  Faced with the perils of a wide-open market, the Stationers first made several attempts to restore  **\*152**  the status quo. When these failed, their new strategy, born

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

of desperation, was a lobbying effort to restore their legal protections based not on their old publisher's monopoly but now on a new concept they thought would be more favored by Parliament: statutory rights for authors, who would then in turn transfer their rights to the publishers. [23]

The resulting Statute of Anne of 1710 [24] extended the Stationers' existing copyrights for twenty-one years, but also vested rights to new publications in the authors, and these new rights were for a limited duration of fourteen years, renewable for fourteen years if the author was living. [25] If the author did not survive the initial fourteen-year term, the work went into the public domain. Thus, two new concepts were introduced that complete the "triumvirate" of copyright interests today: publishers' rights, authors' rights, and users' rights (the public domain). This revolutionary Act was capped off with an unmistakable statement of a new policy behind the law; instead of arising from state censorship and business monopoly, the Statute of Anne was entitled "An act for the encouragement of learning, by vesting the copies of printed books in the authors or purchasers of such copies, during the times therein mentioned." [26] Thus, the Stationers' Company, in an effort to restore their rights through authors, created a concept with its own independent life: a new balance of ownership between **\*153** employer/investor and employee/author that continues to evolve today.

It was this policy of author's rights, limited duration of copyright protection, and the public domain that provided the conceptual framework for the Copyright Clause of the United States Constitution [27] and the Copyright Act of 1790, [28] the direct precursor of the Copyright Acts of 1909 [29] and 1976. [30] The preamble to the 1790 Act is closely modeled on the Statute of Anne: "An Act for the encouragement of learning, by securing the copies of maps, charts, and books, to the authors and proprietors of such copies, during the times therein mentioned." [31]

For a further understanding of how the ownership rights of publishers and authors continue to be balanced today, we will examine the legislative history of our current copyright laws.

## III. OWNERSHIP ISSUES: NATURAL AUTHORS, STATUTORY AUTHORS, AND WORKS MADE FOR HIRE

### A. The Statutory Framework of Ownership under the Works-Made-for-Hire Doctrine

Once a work is created that fits within the Copyright Act's statutorily defined subject matter, [32] ownership can be vested in two ways, in two different statutorily defined types of "authors." First is a natural person or persons (in the case of a joint work), [33] clearly labeled by the Act as "the author." [34] We will use the term "natural author." The other type of ownership vests in a natural person or a business entity "considered the author for purposes of this title," defined as "the employer or other person for **\*154** whom the work was prepared." [35] We will use the term "statutory author." [36]

Ownership vests in this statutory author by virtue of his having hired or commissioned a natural author to create the work, which is designated a "work made for hire." [37] A work made for hire is defined in the Act under 17 U.S.C. § 101:

A "work made for hire" is—

(1) a work prepared by an employee within the scope of his or her employment; or

(2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. [38]

So a copyright and authorship of a work will be created in one of two ways — either vested in the natural author who created the work or vested in the statutory author as a work made for hire. If owned by the natural author, he is free to assign, transfer, or license any portion of his exclusive rights under copyright in exchange for fees or future royalties. If it is owned by the statutory author as a work for hire, it will have either been created by an employee of the statutory author within the scope of his employment, or it will have been commissioned from an independent contractor. If commissioned, the work must fit within one of the nine categories of works enumerated in the Act, and both parties must sign an express written work-made-for-hire agreement. [39] There are some works which therefore can never be works for hire, if they were not created by an employee, and also do not fit within any of the nine statutory categories of commissioned works made for hire.

### *155  B. The Termination Rights Issue

The creator of a specially ordered or commissioned work for hire may still receive fees or future royalties, depending on the terms of the written agreement. But he will not be the author of the work, and will not enjoy the exclusive rights of authorship under copyright. [40] Prominent among the rights that are lost is the right to terminate previously made transfers of copyright. Because no one can know the full long-term economic value of a creative work when it is first created, the law gives authors or their heirs a window of opportunity between thirty-five and forty years after the original grant to void unremunerative assignments or transfers of the original copyright and regain ownership. Thus copyright law is one of the few areas in life where one can improve on an earlier bargain and thereby enhance one's own financial position. This is why the termination right is so highly esteemed. For creative works that beat the odds and have substantial long-term financial value, it allows the natural author or his heirs or representatives to have the rare pleasure of "a second bite at the apple." [41]

This loss of termination rights serves one of the basic policies behind the work-made-for-hire doctrine, the reduction in "transaction costs" for the statutory authors. [42] Companies or individuals that hire employees to create copyrightable works, or specially order or commission works, have the right to do so, especially in cases like a motion picture where the result can only be accomplished with the creative participation of many individuals. The work-made-for-hire doctrine allows authorship and ownership to vest in the statutory author, thus allowing clear title and maximum ability to derive the economic benefits to society and access of the public to the work. Otherwise, the rights of termination and reversion held by joint authorship claimants could result in competing non-exclusive licenses that make exclusive exploitation of the work impossible.

For example, in joint works created since January 1, 1978, by two or more authors, § 203 provides that "termination of the grant may be effected by a majority of the authors who executed it," [43] and if any of the authors is no longer living, that right passes to a potentially large group of *156 statutory heirs, including widow(er), children, and grandchildren. [44] Thus, for example, a majority group could exercise termination rights that would bind the minority to a new grant against their will. The number of groups who must then make decisions by a majority can grow exponentially, with great possibility for disputes interrupting exploitation of the copyright. The problem of the division of termination rights becomes more complex where a producer or other joint author executed a separate agreement. Theoretically, while grantor A might choose not to exercise termination rights, grantor B with a separate agreement may choose to terminate unilaterally and make a new grant to a new record company. The result would be the same recording available nonexclusively from two different record companies. [45] Further, for sound recordings made in the period 1972 to 1977 (the period after federal copyright protection for sound recordings began but before the effective date of the 1976 Act), there is no "majority rules" requirement for multiple grantors; the termination right for the extended renewal term may be exercised by each grantor individually "to the extent of a particular author's share in the ownership of the renewal copyright." [46]

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Work-for-hire status is also determinative in the duration of copyright protection, providing instead of the life of the author plus seventy years a term of ninety-five years from publication or 125 years from creation, whichever expires first. [47] As for pre-1978 works in their first term of protection on January 1, 1978, the employer and not the employee may claim the sixty-seven year extended renewal period. [48]

**\*157  *C. The Legislative History of Works Made for Hire***

The House Report for the 1976 Act leaves little doubt that compromise and deliberation were the legislative background behind the enumerated list of works made for hire:

> The work-made-for-hire provisions of this bill represent a carefully balanced compromise ... The status of works prepared on special order or commission was a major issue in the development of the definition of 'works made for hire' in section 101, which has undergone extensive revision during the legislative process. The basic problem is how to draw a statutory line between those works written on special order or commission that should be considered as 'works made for hire,' and those that should not. The definition now provided by the bill represents a compromise which, in effect, spells out those specific categories of commissioned works that can be considered 'works made for hire' under certain circumstances. [49]

The legislative process, which was a unique solution to the problem of "drafting a statute for an area so complicated that no member of Congress could acquire meaningful expertise," [50] began in the 1950's and culminated in passage of the 1976 Act. It consisted of studies, advisory panels, reports, and comments designed to reach compromise between the affected parties before submission to the legislature itself. [51] What is important to understand is that this type of "handmaiden" approach, where much of the statute was drafted by affected parties under the guidance of the Register of Copyrights, is different from a process which reflects solely the intent of the legislature. [52]

Among the most significant compromises were those related to ownership, and many of these ownership disputes involved the scope of the works-made-for-hire doctrine. For example, under the 1909 Act, authors could reclaim the twenty-eight-year renewal term after the initial twenty-eight-year period of protection, but in 1943 the Supreme Court held that authors could pre-assign their expectancy interest in the renewal term, and thereafter most contracts transferring copyright included an assignment of the renewal term. This effectively eliminated the right to claim renewals, unless the author died prior to the twenty-eighth-year of the first term, in **\*158** which case the author's heirs (as defined in the Copyright Act) could claim the renewal term. [53] So in the pre-legislative process that led to the 1976 Act, authors were desirous of gaining statutory termination rights that could not be contracted away under pressure, [54] while employers were desirous of securing expanded statutory ownership in works made for hire. [55] The result was a compromise pursuant to which statutory work-for-hire rights for the employer were clarified and expanded in exchange for termination rights for authors. [56] The Act secured the termination right by making it effective "notwithstanding any agreement to the contrary," [57] meaning the right cannot be waived.

Other examples of copyright compromise in the area of works made for hire include:

1) Under the old law, works by employees were works for hire under a rebuttable presumption that was subject to challenge via analysis of the parties' intent. [58] Under the new law, employers gained more security because works by salaried employees created in the scope of employment were statutorily regarded as works for hire. [59]

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2) Commissioned works were the subject of a compromise that enumerated a list of works, typically by multiple authors, that were considered **\*159** made for hire with ownership vesting in the statutory author, while excluding works such as books by one author, typically produced by natural authors working independently with little bargaining power.[60]

3) Reversion or termination rights could not be exercised against statutory authors of works made for hire, but a new statutory right of termination for natural authors would be created. This new statutory termination right was, however, subject to detailed statutory requirements relating to notice of termination and the ability to make new grants after termination.[61]

The termination notice requirements include an effective date of termination between thirty-five and forty years after the original date of execution of the grant;[62] advance notice in writing,[63] signed by the owner(s) of termination interests under the Copyright Act;[64] such notice to be given not more than ten and not less than two years before the effective termination date;[65] the notice must be recorded in the Copyright Office before the date of termination,[66] and shall comply "in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation."[67]

Further restrictions apply to new grants, or agreements to make such a new grant. New grants are valid only if made after the effective date of termination[68] and if signed by "the same number and proportion of the owners ... as are required to terminate the grant."[69] Thus, in the period of two to ten years between notice of termination and effective date of termination, the natural author may not agree to make or actually make a new grant. The exception to this period in "limbo" allows for an agreement for a new grant to be made with the original grantee or its successor in interest.[70] Thus, the termination right for natural authors is mitigated **\*160** by restrictions on timing and the ability to enter into new agreements that favor the original grantee.

4) To further compromise on the new statutory termination right granted to authors, publishers received an exception to the termination right for any derivative works licensed by the publisher during the thirty-five to forty-year period prior to termination.[71] The exception for previously licensed derivative works protected music publishers as regards income such as mechanical royalties on the sale of recordings prepared and licensed under the original grant,[72] and performance royalties generated by derivative works licensed prior to termination.[73] Under the 1976 Act, motion picture and television studios were also protected as to their derivative use of underlying stories created after January 1, 1978,[74] licensed **\*161** from publishers and authors;[75] and literary publishers received the specific works-for-hire categories most central to their needs, including collective works, translations, instructional texts, and compilations.[76]

It has been argued that because copyright law is based partly on a compromise drafted by the affected parties, courts are deprived of the certainty of legislative intent in making their decisions, which may suffer from inconsistency as a result.[77] In the years following enactment of the 1976 Act, the work-for-hire doctrine was subject to conflicting decisions in federal circuits as to what constituted an employee under the act, and what the standards were for commissioned works.

### **\*162** *D. Statutory Interpretation Issues*

In the work-for-hire doctrine, the law thus endeavors to create a level playing field that gives natural authors an opportunity thirty-five to forty years after the original grant to terminate the grant and strike a new deal, while balancing that right against the needs of statutory authors to establish clear authorship and ownership in order to make effective long-term economic use of the creative work. This seemingly simple statutory and contractual framework has, however, resulted in copious litigation, conflicts among the circuits, a Supreme Court decision, and the "millennial flip-flop." The controversies continue for several reasons, including confusion over what types of commissioned works come within the scope of the doctrine; judicial confusion over case law precedent variations between the 1909 and 1976 Copyright Acts; lack of understanding of the doctrine among parties resulting in non-binding agreements both oral and written; and ambiguity in the statutory definitions of who is an employee.

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

### 1. Confusion over the Scope of Commissioned Works

Under the 1909 Act, the question of ownership of commissioned works was left up to case law and favored the employer over the employee by "generally presum [[ing] that the commissioned party had impliedly agreed to convey the copyright, along with the work itself, to the hiring party." [78]   This expansive view of commissioned works becoming works made for hire is in contrast to the 1976 Act, which protects natural authors by expressly limiting the categories of works that may be considered works made for hire, and further requires an express agreement signed by both parties. Yet agreements in the period 1978-1999 were virtually always drafted wherein sound recordings are stated to be works made for hire despite their omission, in that time period, from the enumerated list in § 101(2). As we shall see, courts have not favored expansion of the statutorily enumerated categories, and claims that sound recordings fit within other categories, for example collective works, have not yet been tested in the courts. [79]

### 2. Transitioning 1909 Case Law Precedent to the 1976 Act

Sixty years of case law under the 1909 Act had built up a store of judicial precedent whose influence spilled over into decisions under the new 1976 Act, despite markedly different rationale and policy behind the 1976 Act. [80]   For example, under the 1909 Act a rebuttable presumption   **\*163**   existed that the hiring party of a commissioned work was the statutory author. [81]   However, under the 1976 Act, certain types of commissioned works, including photography, are excluded from the work-for-hire definition in order to protect their authors from exploitation. Nevertheless, in *Peregrine v. Lauren* the District Court for the District of Colorado held that photographs produced by an independent contractor could be works for hire under the 1976 Act. [82]

### 3. "Failed" Work-for-Hire Agreements Resulting in Implied Nonexclusive Licenses

Where the written commission agreement between the parties fails to follow the statutory guidelines, the hiring party may find that their intent to gain ownership of the commissioned work has been frustrated. This may arise where the subject matter of the work in question does not fit within the nine statutorily defined categories of works for hire, or where it fits but the parties fail to meet the **statute of frauds** requirement of express written agreements creating works for hire signed by both parties. Instead of leaving the hiring party with nothing to show for their payment, the courts may choose to "look at alternatives beyond the parties' intended arrangement" [83]   and find an implicit nonexclusive license, allowing the hiring party to get at least some of the benefit of their bargain by making use of the work on a nonexclusive basis. [84]

### **\*164   4. Ambiguity in the Definition of an "Employee"**: CCNV v. Reid

There is no statutory definition of the crucial word "employee." This ambiguity was to some extent inherited from the 1909 Act. For example, the 1909 Copyright Act provided only that "the word 'author' shall include an employer in the case of works made for hire." [85]   It was left to case law to determine the exact meanings of "employee" and "works made for hire." [86]   The resulting conflicting definitions in the Circuit Courts of Appeal led to the Supreme Court seizing the opportunity of resolving the issue of what is an employee under the work-for-hire doctrine by granting *certiorari* in *Community for Creative Non-Violence v. Reid.* [87]

The Supreme Court's opinion in *Reid* made progress towards clarifying ambiguity in both prongs of the works-made-for-hire definition. First, the court applied a "literal" test in determining whether a work fit within the nine enumerated categories dealing with specially ordered or commissioned works. Next, the court resolved conflicts in the circuit courts by applying a new test to determine whether the author of a work was an "employee" under the Act.

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

*CCNV v. Reid* is ironically a case about ownership of the copyright of a statute which depicts a family that owns nothing. The Community for Creative Non-Violence was a nonprofit unincorporated association based in Washington, D.C., dedicated to helping the plight of the homeless. [88] CCNV made an oral agreement with Baltimore sculptor Earl Reid to create and be paid for an outdoor sculpture depicting a homeless family living on the street, with the intention to exhibit and tour the sculpture in an effort to raise awareness of the issue, and ultimately to raise funds. Eventually, a dispute erupted concerning ownership. CCNV claimed the statue was a work for hire under §201(b), but Reid claimed ownership vested in himself as the author under §201(a).

Analyzing the definition of a work for hire under §101 "work made for hire" (2), the court found that "sculpture is not one of the nine [89] categories of works enumerated in that subsection, and the parties had not agreed in writing that the sculpture would be a work for hire." [90] With that avenue to finding work-for-hire status eliminated, the court turned to **\*165** § 101 "work made for hire" (1), which finds work-for-hire status for works "prepared by an employee within the scope of his or her employment." [91]

Among the conflicting circuit court decisions on the amount of control that created an employer/employee relationship, it was a Fifth Circuit [92] decision that ultimately steered the Supreme Court towards its definition of the employer/employee relationship under the Copyright Act. In *Easter Seal Society for Crippled Children and Adults of Louisiana, Inc. v. Playboy Enterprises*, [93] a **charitable organization** hired a local television station video crew to film staged scenes of New Orleans Mardi Gras parades and jazz concerts, scenes later broadcast as part of a fundraising telethon. [94] When the station loaned the tape to a Canadian producer who used portions of it as location stock footage in an adult film shown on the Playboy cable television channel, the Easter Seal Society sued for copyright infringement, claiming ownership of the original New Orleans footage as a work made for hire. [95]

It was the "literal" interpretation espoused by the Fifth Circuit which the Supreme Court substantially adopted. The two prongs of this "literal" approach included literal adherence to the carefully negotiated categories of works under §101 "work made for hire" (2). If a work did not fit within one of the categories and also satisfy the statute of frauds writing requirement, then it could only qualify as the work of an employee under §101 "work made for hire" (1). It was the innovation of Judge Gee of the Fifth Circuit to enlist the aid of the *Restatement of Agency Law's* "Definition of a Servant" [96] in defining the word "employee" as used in the Copyright **\*166** Act, [97] reasoning that applying agency law outside its normal context of determining liability under *respondent superior* "creates a certain moral symmetry: a buyer is a statutory 'author' if and only if he is responsible for the negligent acts of the seller. For example, a buyer will only be the 'author' of a writing if he would be liable under *respondent superior* in a defamation action based on that writing." [98]

The resulting test articulated by the Supreme Court to determine whether the author is an employee under the work-for-hire provisions of the Copyright Act includes the following factors, no one of which is determinative: [99]

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party. [100]

Applying this test to Reid, the court found that he was an independent contractor and not an employee of CCNV. [101] His statute entitled "Third World America" was therefore not a work for hire. [102] The *Reid* **\*167** test as articulated by the court seemed to settle the issue of how to resolve ownership disputes under the work-for-hire doctrine: "To determine whether a work is for

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

hire under the Act, a court first should ascertain, using principles of general common law of agency, whether the work was prepared by an employee or an independent contractor. After making this determination, the court can apply the appropriate subsection of § 101." [103]

### IV. THE SHORT-LIVED 1999 AMENDMENT: SOUND RECORDINGS AS WORKS MADE FOR HIRE

We have seen that the historical process of balancing the ownership rights of employers/investors with those of employees/creators was reflected in the legislative history of the modern work-for-hire doctrine. In that process, negotiations between affected parties and government representatives and agencies evinced great respect for the concept of authorship and ownership as fundamental constitutional and natural law rights. As noted by the Supreme Court in *Reid*, during the twenty-year revision process leading up to passage of the 1976 Act, the Register of Copyrights intentionally excluded certain categories of works, including musical compositions and choreography, from the enumerated list of works made for hire under §101 "work made for hire" (2):

> An attempt to add "photographic or other portrait[s]," ... to the list of commissioned works eligible for work for hire status failed after the Register of Copyrights objected: "The addition of portraits to the list of commissioned works that can be made into 'works made for hire' by agreement of the parties is difficult to justify. Artists and photographers are among the most vulnerable and poorly protected of all the beneficiaries of the copyright law, and it seems clear that, like serious composers and choreographers, they were not intended to be treated as 'employees' under the carefully negotiated definition in section 101. [104]

While there is no legislative or judicial mandate for enacting changes in copyright law in such a long-term and thoughtful manner, it was nevertheless the precedent for the works-made-for-hire provisions, and a source **\*168** of some judicial pride in the Supreme Court's opinion in *Reid*. [105] So when on November 29, 1999, sound recordings were added to the Copyright Act's list of works eligible for work-for-hire status in § 101 "work made for hire" (2), [106] some members of the copyright community voiced surprise and even indignation that this substantive change was passed in the guise of a technical amendment, and therefore without the studies, reports, advisory panels, negotiation, and compromise which were the hallmarks of the legislative process leading up to the 1976 Act. [107] Quickly identified as a leading issue was the possibility that recording artists would be deprived of their authorship of sound recordings, and therefore also deprived of termination rights under the 1976 Act if their sound recordings were held to be works made for hire, with the record company subsequently becoming the statutory author. [108]

Ninety percent of record companies in the United States are represented by their trade and lobbying organization, the Recording Industry Association of America (RIAA). [109] Lobbying groups can wield enormous influence in Washington, and press reports of the work-for-hire amendment tended to portray the RIAA as a lobbying organization that exercised influence over the legislative process. [110] Following passage of the **\*169** amendment, all parties, including the RIAA, [111] requested congressional hearings, which were held on May 25, 2000 and led ultimately to the amendment's repeal. [112] In his introductory remarks, the Chairman of the Subcommittee on Courts and Intellectual Property of the Committee on the Judiciary, Howard Coble, corrected press reports of a "midnight amendment" and emphasized that the amendment was

> [O]penly discussed before the entire conference staff a few days before the conference concluded. Each conference staffer had the opportunity to review the provision and bring it to the attention of his or her Member. Over the course of the next few days, no objections were raised by staff or Members to the amendment. The Registrar [sic] of Copyrights was also consulted prior to the adoption of the amendment. [113]

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

## V. SOUND RECORDINGS AS WORKS MADE FOR HIRE: STATUS YEAR BY YEAR

Between record companies and recording artists, there are therefore now four distinct types of ownership relationships involving work-for-hire status, based on the copyright statutes in existence when the agreements were made. Although, as we shall see, there have been copyright infringement disputes where the issues included the work-made-for-hire status of a sound recording, there is not yet any case law arising from a fact pattern **\*170** where an author's termination claim was challenged by a record company's work-made-for-hire claim under the 1976 Act. The earliest date at which such claims could lead to adjudication is 2003, where a 1978 assignment can be terminated after thirty-five years (2013), with notice of termination given no more than ten years earlier in 2003. [114]

### A. Sound Recordings Created Prior to February 15, 1972

Prior to February 15, 1972, the effective date of the Sound Recording Act of 1971, sound recordings did not enjoy the protection of federal copyright law. [115] Any agreements prior to February 15, 1972, granting work-for-hire status for sound recordings and transferring full ownership to the record company are governed by applicable state law. Because sound recordings were not copyrightable prior to the date, termination or renewal rights for sound recordings prior to February 15, 1972, do not exist.

### B. Sound Recordings Created Between February 15, 1972, and December 31, 1977

Agreements made between February 15, 1972, and December 31, 1977 (the last date of protection under the 1909 Act), [116] come under the 1909 Act's rebuttable presumption that the hiring party owns the commissioned work. [117] However, if the agreement assigned copyright to the record company but was not a work-made-for-hire agreement, or if the author successfully challenges the work-for-hire status, there is a termination window open from fifty-six to sixty-one years after the grant.

During this five-year window, the author or his heirs may terminate the grant and claim the balance of the extended renewal term of thirty-nine years. [118] Therefore, for 1972 to 1977 works, the authors or their heirs will first be able to challenge the work-for-hire status in an effort to terminate **\*171** the grants between the years 2028 through 2038. [119] Notice may be served ten years before the effective date; therefore the first adjudication of works in this category will occur no earlier than 2018.

The exception to this involves the scenario where the author is no longer living when the renewal term vests. After the initial twenty-eight year term, notwithstanding the author's assignment of the renewal term, the author's heirs are entitled to claim the extended renewal term of sixty-seven years. [120] The last year that any pre-1978 work will complete its initial twenty-eight year term and thus come under this scenario will be 2005. [121]

### C. Sound Recordings Created on or After January 1, 1978

Sound recordings fixed after the effective date of the 1976 Act do not fit within one of the enumerated work-made-for-hire categories, so their status remains subject to competing claims not yet decided in the courts. Remember that there is a two-prong test to determine if a work created under the 1976 Act is a work made for hire: either it was prepared by an employee within the scope of his employment, or it was specially ordered or commissioned and is (a) one of the nine enumerated types of works in the statute, and (b) the subject of an express work-made-for-hire agreement signed by both parties. [122]

As regards the "employee" status of a recording artist, analysis applying the *Reid* "employee" test to recording artists has been published twice, concluding that employee status for recording artists is ambiguous at best. In the classic music industry reference book *This Business of Music*, [123] the *Restatement of Agency* test from *Reid* is applied to recording artists. The analysis notes that application of the *Reid* factors to recording situations is heavily dependent on the exact circumstances of each case,

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

including variables **\*172** such as the location of the work, the duration of the relationship, the extent of the hiring party's discretion over when and how to work, etc. [124] *This Business of Music* concludes that "the results of the application of the 10 factors are not necessarily clear, and the subject is fraught with uncertainty and complexity." [125]

A more unequivocal conclusion that recording artists are independent contractors and not employees was reached by Randy S. Frisch and Mathew J. Fortnow in *The Time Bomb in the Record Company Vaults*, an article cited as influential to the lobbying effort to grant sound recordings work-made-for-hire status. [126] In applying the *Reid* factors to recording artists, Frisch & Fortnow conclude that:

> Many of these factors weigh heavily against a finding that an artist has employee status. A record company may help choose the producer for an artist's album, but this is often all the control the company has over the recording ... [t]ypically, a company provides an artist with a recording budget that the artist spends at a studio of his or her choosing .... artists have great discretion over when and how long they work in preparing such recordings. [127]

Frisch & Fortnow further note that "most recording contracts specifically state that, for liability purposes, the artist is an independent contractor and not an employee of the record company." [128]

 **\*173** As regard the second prong, we will examine the arguments as to whether sound recordings come within the category of specially ordered or commissioned works. First, we will examine recent case law specifically regarding sound recordings as works made for hire. Second, we will discuss whether sound recordings come within the enumerated categories of collective works or compilations. Third, we will consider whether registration of a sound recording as a work made for hire with the Copyright Office is determinative. Next, we will look at the likely reasons why sound recordings were omitted from the enumerated categories of works made for hire. Finally, we will consider whether work-for-hire agreements that recording artists themselves issue to secondary contributors support the argument that sound recordings are works made for hire.

### 1. Recent Case Law

As noted previously, cases specifically based on termination claims by authors challenged by work-made-for-hire claims by record companies cannot arise under the 1976 Act until 2003. However, there are several recent cases based on copyright infringement claims, all of which found that sound recordings are not works made for hire by following the Supreme Court's lead in *Reid* in applying the "literal approach" to the categories enumerated in § 101 "work made for hire" (2) of the act.

In *Lulirama Ltd, Inc. v. Axcess Broadcast Services, Inc.*, [129] the Fifth Circuit in 1997 found error in the District Court's conclusion that sound recordings that might be used as jingles on radio or television came within the "audiovisual work" category of works made for hire. [130] In adhering strictly to the nine categories of works made for hire, the Fifth Circuit held that trying to bring sound recordings within one of the nine categories constituted "imprope[r] expansion (of) the **class** of specially commissioned works that can be works for hire within the meaning of the Copyright Act." [131]

The Fifth Circuit further noted that § 102 of the Act, defining "Subject Matter of Copyright," specifically listed sound recordings as a category separate from audiovisual works, therefore negating the argument that sound recordings come within the category of audiovisual works. [132]

In *Ballas v. Tedesco*, a 1999 sound recording infringement decision based on a specially ordered recording entitled *Titanic Passion*, [133] the District **\*174** Court for the District of New Jersey first found that the recording was not created by an employee within the scope of employment. Turning to the second prong of the test, the court followed the literal interpretation of the statute

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

from *Reid*, stating that "the sound recordings are not a work for hire under the second part of the statute because they do not fit within any of the nine enumerated categories, and because there was no signed written agreement between the parties." [134]

Finally, in *Staggers v. Real Authentic Sound*, [135] in 1999, the District Court for the District of Columbia also followed the literal interpretation of *Reid*, finding that "a sound recording does not fit within any of the nine categories." [136]

### 2. Whether Sound Recordings Come Within Collective Works or Compilations

Alternative claims that sound recordings would be works for hire by virtue of being a "contribution to a collective work" or a compilation consisting of a standard album of songs have also not fared well in published academic scrutiny, nor have any courts issued opinions on point. Collective works (periodicals, encyclopedias, etc.) typically contain works by several authors, unlike most albums which feature one performing artist or group. [137] Frisch & Fortnow argue that because the examples of a collective work given in the Act are works with multiple authors, such as a periodical issue, anthology, or encyclopedia "in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole," a typical album by one recording artist does not come within the collective work definition. [138]

Compilations are distinguishable because they need not contain copyrightable subject matter, and depend on the commissioning party's selection and arrangement of pre-existing material. Therefore most albums, which represent careful selection of material by one performing artist and **\*175** not the record company, would not qualify as compilations or collective works under the Act. [139]

*This Business of Music* notes that a specific type of recording such as "Best Hits of the 80s" might qualify as a work-for-hire compilation, but it must be remembered that works for such a compilation would have had to be specially ordered or commissioned for that compilation use, with both parties agreeing in writing. Thus, until tested in the courts, the weight of scholarly opinion indicates that most sound recordings would not come within collective works or compilations.

### 3. Registration of a Sound Recording as a Work Made for Hire Is Not Determinative

The registration of a sound recording as a work made for hire with the United States Copyright Office has also been cited as evidence that work-for-hire status exists. [140] Under the Act, a certificate of registration "made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." [141] However, while the information stated on the registration form is a public record of the facts contained on the form, this merely helps establish the validity of the copyright and would constitute just one piece of evidence in any litigation of work-for-hire status. It would not be the final deciding factor in determining work-for-hire status. [142]

As for the registration form itself, the instructions for the form merely quote the work-made-for-hire definition in the Act and add an explanatory note that could be offered to support the registration of a work for hire as valid only in the context of an "employee" (the "first prong" of the Act) but not in the context of an independent contractor (the "second **\*176** prong" of the Act). [143] In section 2 of Form SR for a Sound Recording, "Name of Author," the following note of instruction appears:

> NOTE: Under the law, the "author" of a work made for hire is generally the employer, not the *employee* (see instructions). For any part of this work that was "made for hire," check "Yes" in the space provided, give the employer (or other person for whom the work was *prepared*) as "Author" of that part, and leave the space for dates of birth and death blank. [144] [emphasis added].

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

These instructions mirror the language in the first prong of the Act in the use of the key words *employee* and *prepared*: "a work *prepared* by an *employee* within the scope of his or her employment." [145] Nowhere do the instructions on the registration form use language suggestive of the § 101 "work made for hire" (2) definition of a work made for hire by an independent contractor, for example "a work specially ordered or commissioned ...." The Copyright Office Form SR instructions would suggest that the work-made-for-hire declaration on the form is meant to apply to the first prong of the *Reid* test only, *i.e.*, to works prepared by an employee within the scope of his or her employment.

The Copyright Office Circular on registration for sound recordings supports that interpretation by stating that "generally speaking, for a new sound recording to be a work made for hire, it must be made by an employee within his or her scope of employment." [146] The circular further states that "a sound recording is not one of the types of works affected by clause (2) of the definition of "work made for hire" unless it constitutes a supplementary work, collective work, or compilation." [147] As we have seen, few sound recordings are likely to fall within the collective work or compilation categories, and case law on point has not yet arisen to clear up the issue.

### 4. Is Omission from the Enumerated List in § 101 "Work Made for Hire" (2) Determinative?

There are at least two possible reasons why sound recordings were not included in the original nine enumerated categories in §101 "work made for hire" (2): (a) the legislative history indicates that the nine categories **\*177** were very thoroughly considered and the omission was intentional; (b) the work-made-for-hire language was drafted in the 1960's, before sound recordings were granted federal copyright protection in 1972, and the drafters would not enumerate a category that was not under federal copyright protection.

The problem with this second view is the five-year period of time that was available to remedy the omission. The work-made-for-hire provisions were substantially complete by 1966. [148] Sound recordings were granted federal copyright protection five years later via passage of the 1971 Sound Recording Act (which took effect in 1972). The interested parties thus had five years between the 1971 Sound Recording Act and the 1976 Copyright Act to add sound recordings to the list of enumerated works. They did not, so the question is whether that omission was an oversight that lasted for five years, or whether sound recordings remained off the enumerated list because it had previously been agreed by all parties that musicians needed the protections afforded by omission from the list. Remember that inclusion on the list of commissionable works for hire in § 101 "work made for hire" (2) potentially grants authorship and ownership to the commissioning party, if both parties so agree in writing. Omission from the list protects authors who are independent contractors by guaranteeing their authorship and ownership, including the future termination rights, and making it impossible for those rights to be contracted away.

Thus, in the absence of adjudication that, in the same manner as the Supreme Court did in *Reid*, considers the specific legislative history of the work-for-hire doctrine as it relates to sound recordings, it can be debated both ways whether passage of the 1999 amendment was a tacit admission that Congress did not previously intend that work-for-hire status should exist for specially ordered or commissioned sound recordings, or whether passage of the amendment was merely "clarifying" the *de facto* work-for-hire status of sound recordings, which had been omitted from the list due to legislative oversight. [149]

### *178 5. Is Reliance on Work-Made-for-Hire Status by Recording Artists Determinative?

In determining the work-made-for-hire status of sound recordings, many of the arguments are based on bright lines between the status of record company (owner/investor) and recording artist (author/creator), lines which in the music industry are often blurred. Where a recording artist also functions as his own record company or producer and is the owner of the master recording, he may have the same economic and ownership goals as a record company, and desire protection from future authorship claims from "secondary" collaborating musicians, producers, and technicians who participated in the recording. It is artists' use of

the work-for-hire doctrine on their own recordings that was cited by proponents of the 1999 amendment as evidence that pre-amendment recordings are works made for hire, and that the amendment benefited all parties by formally recognizing that status. [150]

One counter argument is that recording artists don't need the work-made-for-hire doctrine to protect themselves against co-ownership claims by secondary contributors to sound recordings. Artists may protect themselves via other types of agreements with collaborative musicians and engineers, for example, "standard producer agreements and standard background musician union agreements that their contributions are made without claim of authorship." [151]

The Copyright Act supports the position that background musicians and other secondary contributors to a sound recording cannot claim they are joint authors of sound recordings in the absence of mutual intent. Joint works are "works prepared by two or more authors *with the intention* that their contributions are merged into inseparable or interdependent parts of a unitary whole," [152] therefore few contributors to a sound recording, other than featured artist or producer royalty recipients under contract, will be able to successfully show the requisite intent and may have indeed signed agreements disclaiming authorship.

However, closer examination of one sample union agreement, the current American Federation of Musicians' Phonograph Record Labor **179** Agreement, [153] shows that the authorship disclaimer is itself a "Works-Made-For-Hire" clause. The use of a works-made-for-hire clause in the AFM Phonograph Record Labor Agreement may have thus been influential in the recording industry's assertion that sound recordings are works made for hire. However, should courts one day hold that sound recordings cannot be works made for hire, such work-for-hire-clauses will be of no effect. In that hypothetical scenario, it would remain to be seen whether such voided work-for-hire-agreements would still have some probative value as evidence of the parties' intent in co-ownership disputes. [154]

### D. Sound Recordings Created Between November 29, 1999 and October 27, 2000

The Constitution prohibits passage of ex post facto laws [155] by the Federal or state governments. What if a record company executed a valid work-for-hire agreement during the brief life of the 1999 amendment, for example on January 1, 2000. If sometime between 2025 and 2033 the record company receives a timely notice of termination effective in 2035, can the record company claim that the October 27, 2000 repeal was an unconstitutional ex post facto law? [156]

## VI. STRATEGY, NEGOTIATION, AND REALITY IN TERMINATION OF TRANSFERS

### A. "In Limbo": The Gap Between Notice of Termination and the Making of a New Grant

Music is truly a labor of love. The greatest musicians perform and compose partly for the money and partly because they must. And a chosen few achieve the type of long-term success [157] and popularity that will **180** bring with it "clout" in contractual negotiations surrounding termination rights. For works copyrighted on or after January 1, 1978, that are not works made for hire, the right to terminate grants of copyright "may be effected at any time during a period of five years beginning at the end of thirty-five years from the date of execution of the grant." [158]

So the lucky ones or their statutory successors in interest [159] will be able to use the right of termination in a financially meaningful way to potentially secure inducements to either stay with the original record company or switch to a new one. [160] In some cases, the termination rights may be so valuable that notice is given at the earliest possible time under statute, which is ten years before termination takes place, or twenty-five years after the original grant. [161]

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

The law, however, creates a gap between notice of termination and the effective date of termination, a period in "limbo" where the future  **\*181**  termination rights vest in the author(s) as of the date of the notice, but cannot be the subject of a new contract until after the actual termination date arrives. [162]  So if notice of termination is given in 2003 for a work originally assigned in 1978, the author will have to be in limbo, without a new grant, until the effective date of termination, which is 2013. [163] An exception to this "limbo" period favors the original grantee. If the terminating parties plan to make the new grant to the original grantee (presumably under better financial terms), then a written agreement to that effect can be made during the limbo period. [164]  Thus, the original record company would have an advantage in negotiating for the post-termination new grant, and the recording artist may be wary of exercising termination rights, because during the limbo period the record company may, understandably, devote less promotional and other resources to a sound recording whose transfer has been terminated.

For the recording artists with less-than-stellar negotiating clout, much will depend on how things stand when the time window for notification rolls around. Is the product available in the currently popular formats? Is it selling and therefore valuable to the record company? What is the realistic market? What are the realistic prospects for growth or a nostalgia boom? If the recording artist is also a composer, does the answer to increased income lie more with the music publisher in the areas of exploitation for film and television than with the record company? What about digital performance rights income from digital transmissions? [165] What about the derivative works exception, which would allow the original record company to continue to exploit derivative works, such as music videos, prepared under the terms of the original grant? [166]  What if in the  **\*182**  future those derivative works whose rights are retained by the record company have more value than the underlying recording?

For those authors whose sales history is such that termination rights will not generate enormous sums in a bidding war, emotion and subjectivity can run high, along with a belief that more and better promotion will get sales moving again. This will sometimes be coupled with emotionally charged situations where the recording artist may no longer be living, and the "torch" is being carried on by loving family members or even non-profit foundations who see the artist's legacy as a trust that rises above mere commercial concerns of expense and profit.

While the first instinct in such a scenario may be to give notice of termination as soon as possible in the belief that a better deal can be obtained, the reality may be that other record companies have little interest in the product, or if they have interest, they may not have the distribution and market clout of the original company. [167]  And remember that, while discussions with new record companies will take place, the "limbo factor" means that negotiations will be hampered by the fact that actual agreements with a new record company cannot be made until the effective date of termination. [168]  Alternatively, new companies may arise that successfully specialize in exploitation of terminated grants in some sort of innovative "oldies" reissue format.

### B. A Compromise Proposal: Distinguishing Between Degrees of Intended Authorship

The "limbo" period that gives record companies a strong strategic advantage in renegotiating agreements and the reality that relatively few recordings will have a major financial impact thirty-five years in the future suggest that for many artists termination rights may be less valuable than anticipated. Thus, the retention of authorship and termination rights by recording artists may not turn out to be the catastrophe that record companies fear or the windfall that recording artists hope for. However, because music is a labor of love, ownership disputes and claims are likely to  **\*183**  occur even where little income is at stake. The true "transaction cost" may be legal costs in dealing with multiple authorship claimants among secondary contributors to the sound recording, a problem shared by record companies and featured recording artists alike. Some music genres are highly collaborative efforts where a musical phrase improvised by a background musician may prove to be an essential creative element, the "hook" upon which a recording's popularity is based. [169]

This suggests a middle ground that would benefit both parties, a compromise in the spirit of the 1976 Act that was recommended by Register of Copyrights Marybeth Peters in her testimony on the work-made-for-hire amendment: [170]  statutory recognition that secondary contributors may come within the work-made-for-hire doctrine, while featured artists remain exempt. Taking

a cue from the AFM agreement, which distinguishes between royalty recipients and those who do not receive royalties,[171] if secondary contributors who do not have the requisite statutory intent[172] to become joint authors execute a written agreement, then an amendment to the Copyright Act clarifying that they can make their contribution as a work made for hire would serve the intent of all parties. The featured royalty-recipient artists would thus retain their authorship and termination **\*184** rights, while the contributions of secondary parties would be regarded as a work made for hire.[173] The result, according to Peters, "would be that the sound recording would be a joint work that is in part a work made for hire and in part a work of individual authors."[174]

Although such a compromise would create a new "second class" of author for sound recordings, it attempts to resolve a fundamental conflict in copyright law: the underlying constitutional mandate to secure exclusive rights to natural authors versus the divestment of those rights represented by the work-made-for-hire doctrine. The Copyright Act's section 101 does not include a definition of the word "author," and the compromise proposal could represent a first step towards that definition.[175] A further benefit would be a new clarity in the law and a lowered transaction cost, because when secondary contributors entered into work-made-for-hire agreements for sound recordings, they would be binding under copyright law.

### C. The Digital Future

The as yet unknown part of the mix involves future changes in the music industry that will be brought about by digital distribution of sound recordings on the Internet, via satellite, and via other future technologies. Future income sources and potential increases in piracy are developing quickly and may totally transform the music industry, as well as the future value of termination rights. Digital distribution, promotion, and piracy may make older recordings worthless or valuable beyond all expectation. Because the default rule is that no one really knows these future values, the best position for those not besieged by offers for their termination rights will be to work closely with the original record company on the assumption that the future rights have increased value and to negotiate a future plan. As for record companies, those perceived to have the best future strategy for exploitation in the new digital universe will be the destination of choice for those who hold termination rights.

### D. "Bowie Bonds": Redefining the Value of Terminations?

The "chosen few" whose works have long-term value may now have another incentive to oppose work-for-hire status for sound recordings. Securitization is a financial vehicle that allows a holder of assets (the "originator") that are expected to generate future income streams (traditionally **\*185** such instruments as mortgages and car leases) to sell the right to collect such income in the form of securities, such as interest-bearing bonds. An anticipated annual revenue stream is thereby converted into a lump sum.[176] The assets are first transferred to an entity called a **Special Purpose Vehicle (SPV)**, which acts as the "middleman" between the originator and the bond holders, and must secure and confirm ownership in the assets so that if the originator declares bankruptcy, the assets are non-recourse, the bond holders retain their security in the assets, and the assets do not become part of the originator's bankruptcy estate.

The bond is then issued by the SPV for a fixed period of time, during which the revenue stream now owned by the SPV is paid to the bond holders, and the original assets act as security. If the payments are not made to the bond holders, the bond holders take over ownership of the original assets. At the end of the term, if the bond holders have received their principal and interest, the SPV transfers the assets back to the originator. A key requirement is that the originator have clear title to the assets so that the SPV's security interest in them has priority. Also, where there is any question of the viability of the future value of the revenue streams represented by the assets, the revenue streams must be guaranteed by a third party, for example, a line of credit from a bank.

The advantage for the originator is that a future income stream is converted to a lump sum that can be structured as a non-taxable loan.[177] The originator will, however, owe tax on royalties as they are earned and the bond holders will pay tax on interest earned.[178] Further, the lump sum allows the originator to diversify by investing in any manner he chooses. Also, a

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

bond issue will realize the full value of the asset in a lump sum, repayable at an attractive interest rate. This compares favorably with other methods of creating liquidity. Banks, for example, might not be will **\*186** ing to loan on the full value of the asset and may charge interest rates higher than the originator will pay to a bond holder. [179]

Because some of the key factors in securitization include clear title held by one entity, a high-dollar-volume, and a predictable revenue stream over many years, securitizations had traditionally been confined to assets such as mortgages and car leases. In the entertainment industry large companies, such as Twentieth Century Fox, Dreamworks SKG, and PolyGram, began in the 1990's to issue bonds based not only on anticipated revenue streams from existing copyrights but also on anticipated revenue from future projects. [180]

While the above securitizations involved large corporations whose status would result in acceptable bond ratings to ensure that investors would have confidence in the bond, there were several obstacles to the contemplation of a successful bond issue based on intellectual-property royalty assets held by an individual musician. As to the requirement of clear ownership of copyrights, the musician would have to have retained ownership in their copyrights and would further have to be the sole copyright owner, with no co-owners whose rights would dilute or otherwise pose potential claims to the future revenue stream. The SPV would therefore first conduct a full **title search** in order to discover any previous mortgages, assignments, or other claims against the copyright, both in the Copyright Office under federal law and under state U.C.C. filings. [181] The SPV would then perfect its security interest in the asset via recordation in **\*187** the Copyright Office, [182] which serves as **constructive notice** of the claim to all persons. [183]

This individual would also ideally have to be a "superstar" with a proven revenue stream. A "Catch-22" existed here because musicians in that financial category may already have renegotiated their recording agreements to their satisfaction. He or she may also have enough income to raise a question of whether they need the liquidity and diversification that are prime reasons behind the securitization of assets and that make the risk involved attractive. For there is a risk involved: if for some reason future revenue does not meet expectations, the assets (the copyrights) are forfeited to the bondholders. This is why either a third party guarantor or over-collateralization [184] would be necessary to make securitization of a recording artist or songwriter's assets viable.

In 1997, all of these factors coalesced in the person of recording artist and songwriter David Bowie. Bowie had retained sole ownership of his copyrights in his sound recordings and compositions; had a substantial and reliable income stream, yet had need of a large lump sum for special projects; [185] did not have title clouded by co-owners; [186] and was able to secure a third-party guarantee for the bond issue in the form of a fifteen-year contract with EMI records and publishing. [187] The bond issue was underwritten by Fahnestock & Co. under the direction of David Pullman, **\*188** who subsequently founded The Pullman Group LLC. [188] Bowie raised fifty-five million dollars in a private issue of asset-backed bonds at an interest rate of 7.9%, reaching **maturity** at fifteen years. All of the bonds were bought by a large institutional investor, Prudential Insurance.

The initial excitement over "Bowie Bonds," and the subsequent issuance of similar bonds for James Brown and other performers, [189] masked the reality that only a very few individuals will be able to bring together the right formula for success. Undaunted, imaginative potential bond issuers have suggested the possibility of creating pools of musicians who would securitize their assets in a group. [190] Because **asset-backed securities** depend on clear ownership of the copyrights, there is thus another possible incentive for recording artists to contest work-for-hire status of their sound recordings.

## VII. CONCLUSION

Until the courts decide a case of first impression, no one really knows if agreements specifying sound recordings as works made for hire are valid under the 1976 Copyright Act. It could be argued that whichever way the copyright law ends up on

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

the question of the classification of sound recordings as works made for hire, the parties can make compensatory adjustments. For example, even if courts hold that such agreements are valid, recording artists are not forced to accept such status in their future agreements; they can simply stand their ground and refuse to sign work-for-hire agreements. In reality, most artists would not enjoy the luxury of standing firm and will prefer a recording deal today to termination rights of uncertain value thirty-five years in the future. However, for those who **\*189** have competent legal representation and whose services are in demand, a normal assignment of copyright preserving the right of termination may be achievable. In some cases, negotiation of work-for-hire status could be an additional bargaining chip, leading to worthwhile concessions from the record company, such as an appreciably larger advance or royalty percentage. Artists have different goals at different stages of their careers, and termination rights will not always be the top priority.

Conversely, courts may one day decide that none of the previous nine categories of commissioned works for hire includes sound recordings. That would end the debates over whether sound recordings are included in the definitions of collective works or compilations, and make it clear that the only way to create work-for-hire status for a sound recording is if it is created by an employee within the scope of their employment. As we have seen, under *Reid*, that would effectively eliminate sound recordings from work-for-hire status, and thus result clarity, albeit at the opposite end of the spectrum.

A third option would be to work towards compromise legislation that recognizes that while royalty-recipient recording artists who are the creators of the sound recording do not come within the work-made-for-hire doctrine, other secondary musicians, arrangers, and producers who by mutual agreement are not royalty recipients and are not intended to be joint authors, should fall within the works-made-for-hire doctrine. This compromise measure would both preserve the rights of recording artists and protect them from unremunerative transfers, while also taking substantial steps towards avoiding any potential "chaos" resulting from ownership and termination claims from secondary contributors to the sound recording.

Clarity would be furthered by all three alternative futures as we await the first wave of work-for-hire termination disputes beginning in 2003. The problem with the judicial process is that copyright law is complex and has led to conflicting decisions in the Circuit Courts of Appeal, [191] and it could be years before a companion case to *Reid* reaches the Supreme Court. We will thus await the future companion case to *Reid*, a distant ancestor of the events put into motion in Johannes Gutenberg's printshop, in a distant time when authors and owners were one.

## Footnotes

[a1]    J.D. Candidate, Widener University School of Law. D. Phil. (Music Composition), The University of York, England. B.A. (Music), The University of California at Santa Barbara. The author is Director of New Media Administration at J.W. Pepper & Son, Inc. of Valley Forge, PA, and was formerly Vice President of European American Music Distributors Corporation. He is currently a member of the Board of Directors of the Music Publishers' Association of the United States. This paper received First Prize in the 2000 ASCAP Nathan Burkan Memorial Competition at Widener University School of Law. The author would like to thank Donald E. Biederman for his comments on the draft of this paper.

[1]    Melville B. Nimmer, *Inroads on Copyright Protection, in* AMERICAN SOCIETY OF COMPOSERS, AUTHORS, AND PUBLISHERS, FOURTH COPYRIGHT LAW SYMPOSIUM 3 (1952).

[2]    *See* The Satellite Home Viewer Improvement Act of 1999, § 1011 (d) Technical Amendments, Pub. L. 106-113 (H.R. 3194), 113 Stat. 1501, \*1501A-544, amending Title 17, §101 "work made for hire" (2). "Section 101 of title 17, United States Code, is amended in the definition relating to work for hire in paragraph (2) by inserting "as a sound recording," after "audiovisual work.""

[3]    17 U.S.C. § 101 "work made for hire" (2) (1994) (definition of "work made for hire").

4    *See* the Work Made For Hire and Copyright Corrections Act of 2000, Pub. L. 106-379 (H.R. 5107), amending Title 17 U.S.C. §§101, 121(a), 705(a), 708(a), 708(b), 710.

5    *Id.*

6    *See* Bill Holland, *Work-For-Hire Provision Sparks Artist Furor, Demand for Change*, Billboard, January 22, 2000, at 5 (Hereinafter *Holland*). *See also* Edward M. Cramer, *Copyright Amendment Should be Repealed*, Id. at 8 (noting that "There were no hearings, no studies, and no requests for comment from interested groups. Anyone interested in the legislative process should be outraged that important, substantive legislation was pushed through without extensive consideration ... The amendment should be repealed immediately, which can be done, and it should be reintroduced and considered in the normal course with an opportunity for proponents and opponents to be heard.").

    *See also See* Timothy White, *Henley Fights for Intellectual Rights*, Billboard on-line, <wysiwyg://15/http://www.billboard.com/specialreport/0403whitepaper.asp> (Visited April 5, 2000).

7    Recording contracts vary in their terms and usually remain confidential, however those sample recording contracts available in entertainment law publications typically have a "fall back" position, stating that the recording is a work for hire, but if found not to be a work for hire under law, the agreement acts as an assignment of the copyright. *See* Jay L. Cooper, *Sample Recording Contract*, in ALI-ABA Course of Study, Entertainment, Arts, and Sports Law at 53 (1999). "If for any reason we shall be deemed not to be the author of those Master Recordings, Audio-Visual Recordings or Art-work, this Contract shall constitute an irrevocable transfer to us of ownership of copyright." Id. at 59. *See also* Bobby Rosenbloum, *A Very Welcome Return: Copyright Reversion and Termination of Copyright Assignments in the Music Business*, 17-SUM Ent. & Sports Law. 3 (1999). In the context of noting that termination rights do not apply in the case of works made for hire, Rosenbloum notes that sound recordings:

    "... do not fall within this category. While record labels and publishers frequently incorporate boilerplate work for hire language in their agreements with authors, in most cases such provisions will not be given effect. This is true because the author typically is not a bona fide employee creating the recording or song within the scope of his or her employment. In addition, recordings and musical compositions generally do not fall within one of the nine categories enumerated in section 101 of the Copyright Act as capable of coming within the definition of a work made for hire when created on commission — despite contractual language in most recording and publishing agreements to the contrary. Consequently, the operative transfer in most such agreements in via the "backup" assignment language, which is stated to take effect in the event that the works in question are not deemed made for hire." *Id.* at 3.

8    Royalty-backed securitization goes by several names, including Celebrity Asset-Backed Securities or "CABS", a term coined by John Jackson in his article *Royalty Securitization: Taking CABS to Bankruptcy Court*, 21 Thomas Jefferson L. Rev. 209; and "Bowie Bonds," a trademark of The Pullman Group, LLC, the firm whose first issue of royalty-backed securities was based on copyrights held by musician David Bowie. *See Pullman Group LLC v. Prudential Insurance of America and others*, <http://www.pullmanco.com/lawfile.htm> (Visited April 7, 2000).

9    PAUL GOLDSTEIN, COPYRIGHT'S HIGHWAY: FROM GUTENBERG TO THE CELESTIAL JUKEBOX 27 (1994).

10    *See* "Gutenberg, Johannes," *Encyclopaedia Britannica Online, at* http://www.eb.com:180/bol/topic?eu=39381&sctn=2&pm=1 (last visited Apr. 10, 2000) [hereinafter Gutenberg]. Had Gutenberg found a way to protect his invention, he might have become one of the wealthiest people of his time. Instead, Gutenberg was a perfectionist whose financial backer lost patience, successfully suing him for breach of contract and ultimately taking possession of the metal type and printing equipment. The first book ever produced under a publisher's imprint, although manufactured with Gutenberg's original equipment, bears the name of the successful litigant and investor Johann Fust, and his son-in-law Peter Schöffer, who learned his craft from Gutenberg. The publishing industry has thus been the subject of financial and ownership legal disputes beginning "literally" with the first book ever published. Despite this seemingly bad omen,

© 2020 Thomson Reuters. No claim to original U.S. Government Works.    

the fundamental nature of Gutenberg's mass-produced printed book has remained popular and virtually unchanged for 550 years.

11    *See* Gutenberg, *supra* note 10. The author's modern assessment of the work-made-for-hire status of the Gutenberg Bible is based on an assumption that a Gutenberg employee, or someone commissioned by Gutenberg, worked from a public domain hand-copied Latin Bible and made editorial decisions that we would recognize as copyrightable subject matter under derivative works. *See* 17 U.S.C. § 101 (1994). "A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work'" *Id.* The point of the illustration is that copyright law has its origins in a model where the functions of employer/investor and employee/creator were indivisible. Copyright began as a publisher's right where all works were made for hire.

12    The Statute of Anne dates from 1710. *See* 8 Anne, ch. 19 (1710).

13    *See supra* note 10.

14    *See generally* "publishing, history of," *Encyclopaedia Britannica Online, at* http://www.eb.com:180/bol/topic?artcl=109461&seq_nbr=1&page=n&isctn=2&pm=1 (last visited Apr. 10, 2000) [hereinafter History of Publishing].

15    *Id.* at 10.

16    *See* History of Publishing, *supra* note 14, at 11-13.

17    *See generally* WILLIAM F. PATRY, COPYRIGHT LAW AND PRACTICE 3-14 (1994). "The United States' earliest statutes and case law were imported from England ...." *Id.* at 3.

18    *See* History of Publishing, *supra* note 14, at 15.

19    *Id.*

20    *See generally* U.S. Copyright Office, *at* http:// lcweb.loc.gov/copyright (last visited Apr. 29, 2000).

21    L. RAY PATTERSON & STANLEY W. LINDBERG, THE NATURE OF COPYRIGHT: A LAW OF USERS' RIGHTS 20 (1991) [hereinafter PATTERSON & LINDBERG].

22    *Id.* at 27. Political and religious changes in sixteenth-and seventeenth-century Britain left behind the era of regular censorship decrees emanating from the Court of the Star Chamber. *Id.*

23    *Id.*

24    8 Anne, ch. 19 (1710).

25    The Statute of Anne's total term of twenty-eight years is still significant, as it was incorporated into the 1909 Copyright Act providing for an initial term of twenty-eight years followed by a renewal term of twenty-eight years. All works under copyright protection today and first published between 1923 and 1977 inclusive (*i.e.*, under the terms of the 1909 Act) retain some connection to the original Statute of Anne period of protection.

26    *See* PATTERSON & LINDBERG, *supra* note 20. In the subsequent litigation known as the "Battle of the Booksellers," the publishers found the limited duration of copyright protection problematic and tried to ignore the twenty-one year limitation of their previously perpetual exclusive rights. They also sought to have a common-law perpetual copyright protection granted to authors, who could then assign to publishers. The most famous case in this effort to expand copyright duration was *Donaldson v. Beckett*, 1 Eng. Rep. 837 (H.L. 1774), involving an Edinburgh publisher who brought out a public-domain edition of a work originally published by Beckett, which was past the twenty-eight year term of copyright protection. At issue was whether the author's common-law copyright in his work was extinguished if the work was published under the statutory twenty-eight year protection granted by the Statute of Anne. The court held

that an author did have a common-law copyright in his work that gave the author exclusive rights until the work was published. But once published under statute, the twenty-eight year limit applied and the work then fell into the public domain. *Id.* 36-46. *See also* MARSHALL LEAFFER, UNDERSTANDING COPYRIGHT LAW 5 (3rd ed. 1999).

27    "The Congress shall have the power ... to Promote the Progress of Science and the Useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. Art. 1, § 8, cl. 8.

28    Act of May 31, 1790, ch. 15, 1 Stat. 124.

29    Copyright Act of 1909, Pub. L. No. 60-349, 35 Stat. 1075.

30    Title 17 U.S.C.

31    1 Stat. 124 (1790).

32    *See* 17 U.S.C. §§ 102-105 (1994) setting forth the requirement of an original work of authorship fixed in any tangible medium of expression within categories of works including literary, musical, dramatic, pantomime, choreographic, pictorial, sculptural, motion pictures, sound recordings, and architectural works. Further delineations of copyright eligibility covered in § § 102-105 include use within a compilation or derivative work, the effect of national origin and international treaties, and the unavailability of copyright protection for works "of the United States Government." *Id.*

33    17 U.S.C. § 201(a) (1994). "Copyright in a work protected under this title vests initially in the author or authors of the work. The authors of a joint work are coowners of copyright in the work." *Id.*

34    *Id.*

35    17 U.S.C. § 201(b) (1994). "In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." *Id.*

36    The terms natural author and statutory author are analogous to author and publisher as discussed in the earlier context of the development of Anglo-American copyright law.

37    The statutory term "work made for hire" will be used interchangeably with "work for hire."

38    17 U.S.C. § 101 (1994).

39    *Id.*

40    17 U.S.C. §106 (1994).

41    17 U.S.C. § 203(a) (1994).

42    *See* Statement of Paul Goldstein, Lillick Professor of Law, Stanford University before the Subcommittee on Courts and Intellectual Property of the Committee on the Judiciary, U.S. House of Representatives, May 25, 2000, at 1, *at* http://www.house.gov/judiciary/gold0525.htm (last visited May 26, 2000). Prof. Goldstein's analysis of the new amendment was prepared "at the request of the RIAA." *Id.*

43    17 U.S.C. § 203(a)(1) (1994).

44    17 U.S.C. § 203(a)(2) (1994).

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

45   *See* Statement of Marybeth Peters, Register of Copyrights, before the House Subcommittee on Courts and Intellectual Property on the Issue of Sound Recordings as Works Made for Hire, May 25, 2000, *at* http:// lcweb.loc.gov/copyright/ docs/regstat52500.html (last visited May 25, 2000).

46   17 U.S.C. § 304(c)(1) (1994).

47   Instead of the life plus seventy years provision for natural authors, copyright protection for statutory authors "endures for a term of 95 years from the year of its first publication, or a term of 120 years from the year of its creation, whichever expires first." 17 U.S.C. § 301(c) (Supp. IV 1998).

48   *See* Title 17 U.S.C. § 304(a)(1)(B)(ii) (1994). "Any copyright, the first term of which is subsisting on January 1, 1978, shall endure for 28 years from the date it was originally secured .... In the case of ... any work copyrighted by a corporate body (otherwise than as assignee or licensee of the individual author) or by an employer for whom such work is made for hire, the proprietor of such copyright shall be entitled to a renewal and extension of the copyright in such work for the further term of 67 years." *Id.* Other consequences, labeled by Professor Nimmer as "mildly exotic," include works made for hire for the United States Government, which are statutorily in the public domain (17 U.S.C. § 105), and loss of protection for works made for hire where the employer is a foreign national of a country not included in international reciprocal copyright treaties (17 U.S.C. § 104). *See* NIMMER ON COPYRIGHT § 5.03 at 1.

49   H.R. REP. NO. 94-1476, at 181 (1976).

50   *See* Jessica D. Litman, *Copyright, Compromise, and Legislative History*, 72 CORNELL L. REV. 857, 879 (1987) [hereinafter Litman].

51   *Id.* at 872.

52   *Id.* at 879.

53   Fred Fisher Music Co. v. M. Witmark & Sons, 318 U.S. 643 (1943).

54   17 U.S.C. § 203(a)(5) (1994). "Termination of the grant may be effected notwithstanding any agreement to the contrary." *Id.*

55   The complexity of multiple co-owners of a copyrighted work such as a motion picture, which may include statutory heirs and others with varying contractual agreements and termination plans, and with no incentive to communicate with each other, shows why the work-for-hire doctrine is so useful and important for certain types of multiple-author works. It should also be remembered that in the traditional studio system, most of the contributors to the production of a motion picture were full time salaried employees whose creative efforts would be owned by the studio, their employer, under the Act.

56   Note that the "termination rights" for pre-1978 and post-1978 works apply to opposite ends of the copyright time continuum. For pre-1978 works where the period of protection is fixed at ninety-five years, the termination right applies to the period of time *at the end* of copyright protection: the thirty-nine year extended renewal term that follows the initial and renewal terms totaling fifty-six years. For post-1978 works where the period of protection is somewhat open-ended because based on the life of the author (an unknowable period of time if the author is still living) plus seventy years, the termination right applies to the period of time thirty-five years *after the beginning* of copyright protection.

57   Title 17 U.S.C. §203(a)(5) (1994).

58   Community for Creative Non-Violence v. Reid, 490 U.S. 730, 743-44 (1989). "As for commissioned works, the courts generally presumed that the commissioned party had impliedly agreed to convey the copyright, along with the work itself, to the hiring party." *Id.*

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

59    *See* Litman, *supra* note 50, at 890.

60    *Reid*, 490 U.S. at 747 n.13.

61    17 U.S.C. § 203(a) (1994 & Supp. IV 1998).

62    17 U.S.C. § 203(a)(3) (1994).

63    17 U.S.C. § 203(a)(4) (1994).

64    17 U.S.C. § 203(a)(1-2) (1994 & Supp. IV 1998).

65    17 U.S.C. § 203(a)(4)(A) (1994).

66    17 U.S.C. § 203(a)(4)(A) (1994).

67    17 U.S.C. § 203(a)(4)(B) (1994). *See also* 37 C.F.R. § 201.10 (*Notices of termination of transfers and licenses covering extended renewal term*). The requirements are set forth in detail as regards contents, signature, service, harmless errors, and recordation. The regulations specify that recordation by itself is not evidence that the regulations have been fully complied with: "Recordation of a notice of termination by the Copyright Office is without prejudice to any party claiming that the legal and formal requirements for issuing a valid notice have not been met." *See* 37 C.F.R. § 201.10(f)(4).

68    17 U.S.C. § 203(b)(4) (1994).

69    17 U.S.C. § 203(b)(3) (1994).

70    17 U.S.C. § 203(b)(4) (1994).

71    17 U.S.C. § 203(b)(1) (1994). "A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant." *Id.*

72    For pre-1978 works where the author or heirs terminated the extended renewal period, the Second Circuit in *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*, 155 F.3d 17 (2nd Cir. 1998), narrowed the scope of the derivative works exception, based on the particular license language at issue in the case. The court held that the publisher who lost the extended renewal period due to termination under Title 17, § 304(c)(6)(A), subsequently retained mechanical royalty rights only for the exact same recordings they had sublicensed under the original grant. So under the facts in *Ahlert*, if a record company re-issued a recording in a new compilation with a new catalog number and under a new mechanical license after the grant had been terminated, it was no longer the exact mechanical license issued under the original grant, and the right to sublicense the new re-issue was held by the heirs (the song at issue was *Bye Bye Blackbird* as sung by Joe Cocker, re-released on the soundtrack CD for the motion picture *Sleepless in Seattle*). This decision (which the court stated also fostered the statutory policy of promoting public access to derivative works) conflicted to an extent with the court's earlier holding in *Mills Music, Inc. v. Snyder*, 469 U.S. 153 (1985), which denied heirs who had exercised extended renewal term termination rights in the song *Who's Sorry Now* any ownership in the 400 derivative works licensed by Mills Music under the original grant of the renewal term of copyright.

73    *See* Woods v. Bourne, 60 F.3d 978 (2d Cir. 1995) (In the portion of *Woods* that dealt with derivative audiovisual works, the court held that the derivative works exception applies to performance royalties generated by television broadcasts of derivative audiovisual works licensed prior to termination. The court's opinion helpfully distinguishes between synchronization licenses for songs used in the production of derivative audiovisual works and subsequent public performance royalties generated by television broadcasts of those works). *Id.* at 984.

© 2020 Thomson Reuters. No claim to original U.S. Government Works.    

74    Although Title 17 § 201(b) grants continued use of *post-1978* works in sub-licensed derivative works after *termination*, the situation is more restrictive in *renewals* of the sixty-seven-year renewed and extended period for *pre-1978* works in their first term on January 1, 1978, claimed by heirs or executors of an author who died before expiration of the first term, pursuant to § 304(a)(1)(C) (emphasis added). In *Stewart v. Abend*, 495 U.S. 207 (1990), the Supreme Court held that where an author assigned the renewal term but died before the renewal term vested, and therefore the executor's assignee became the owner of the renewal term, any first-term sublicenses to create a derivative work returned to the assignee in the renewal term and had to be re-negotiated by the licensee. While this was in theory a financial victory for author's heirs or executor who claimed the renewal period, commentators point out the practical effect will be that users of derivative works such as film and television producers, will in future avoid pre-1978 works in their first term on January 1, 1978. *See* LEAFFER *supra* note 26, at 244-46.

75    *See* Michael H. Davis, *The Screenwriter's Indestructible Right to Terminate Her Assignment of Copyright: Once a Story is "Pitched," a Studio Can Never Obtain All Copyrights in the Story*, 18 CARDOZO ARTS & ENT. L.J. 93 (2000) (noting that writers retain authorship and termination rights in preliminary treatments of movie and TV scripts created before the writer entered into a work-made-for-hire agreement to produce the finished screenplay. Davis also includes a discussion outlining differences between industry practice in contracts and the work-made-for-hire copyright law in the context of termination rights retained by writers, noting that termination rights disputes will await judicial resolution when the rights begin to be claimed. Professor Melville B. Nimmer was for a time a representative of the Writers Guild of America, possibly during a portion of the period up to 1966, when the works-made-for-hire provisions of the 1976 Act were originally being negotiated and drafted, though his participation in these issues is unknown. ("There followed a stint representing the Writers Guild of America, where he pioneered several then-novel concepts that continue today to enrich the well-being (and coffers) of Hollywood's creative talent.") *See* DAVID NIMMER, NIMMER ON COPYRIGHT, § Dedication, Memoriam, and Prefaces at 2. (1999).

76    *See* Litman, *supra* note 50, at n.226. *See also* Title 17 U.S.C. § 101 (1994) (definition of work made for hire).

77    *See generally* Litman, *supra* note 51.

78    Community for Creative Non-Violence v. Reid, 490 U.S. 730, 744 (1989).

79    *See infra* section (V) (C) (2).

80    *See* Litman, *supra* note 50, at 859. "A decade after passage of the 1976 Act, however, the decided cases manifest judicial reluctance to abandon prior doctrine." *Id. See also* Marci A. Hamilton, *Commissioned Works as Works Made for Hire Under the 1976 Copyright Act: Misinterpretation and Injustice*, 135 U. PA. L. REV. 1281 (1987) ("Congress intended not merely to amend the 1909 Act, but rather to overhaul the copyright law."). *Id.* at 1290.

81    *Reid*, 490 U.S. at 743-44. "As for commissioned works, the courts generally presumed that the commissioned party had impliedly agreed to convey the copyright, along with the work itself, to the hiring party."

82    601 F. Supp. 828 (D. Colo. 1985). The approach used by the District Court in *Peregrine* was one of the approaches ultimately disfavored by the Supreme Court in *CCNV v. Reid*.

83    Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 558 (9th Cir. 1990), *quoted in* Scott J. Burnham, *The Interstices of Copyright Law and Contract Law: Finding the Terms of an Implied Nonexclusive License in a Failed Work for Hire Agreement*. 46 J. COPYR. SOC'Y 333 (1999). Burnham's article analyzes the many ways that an intended work-for-hire agreement can fail, and discusses settlement solutions arrived at by the courts. Burnham points out that proper understanding of how works for hire are created along with correct agreement drafting would solve the problem. *See also* Lulirama Ltd, Inc. v. Axcess Broad. Servs., Inc., 128 F.3d 872 (5th Cir. 1997) (finding that where oral agreement did not meet the copyright act's requirement of a writing for exclusive licenses under § 204(a), an implied nonexclusive license existed).

84 *Id.*

85 *Reid*, 490 U.S. at 743, citing to § 62 of the 1909 Copyright Act.

86 "Because the 1909 Act did not define "employee" or "works made for hire," the task of shaping these terms fell to the court." *Id.* at 744.

87 490 U.S. 730 (1989).

88 *Id.* at 733.

89 *Reid* was decided before the 1999 addition and later removal of "sound recordings" as the tenth category of works eligible for work-for-hire status.

90 *Id.* at 736, quoting from the Court of Appeals for the District of Columbia Circuit, 846 F.2d 1485 (D.C. Cir. 1988).

91 17 U.S.C. §101 (1994).

92 Although Judge Gee wrote in his opinion that the Second Circuit was "the *de facto* Copyright Court of the United States," he was no doubt pleased when his Fifth Circuit opinion was later substantially adopted by the Supreme Court in deciding a major copyright issue in *CCNV v. Reid*, 815 F.2d at 325. The remarkable Judge Gee also displayed dry wit, keen memory, and graceful style in his footnote 1:

Thus, this most delightful of case names: *Easter Seal Society for Crippled Children v. Playboy Enterprises*; seriously rivaled, in our judgment, only by *United States v. 11 ¼ Dozen Packages of Article Labeled in Part Mrs. Moffat's Shoo Fly Powders for Drunkenness*, 40 F. Supp. 208 (W.D.N.Y. 1941) (condemnation proceeding under Food, Drug and Cosmetic Act), and *United States ex rel. Mayo v. Satan and his Staff*, 54 F.R.D. 282 (W.D. Pa. 1971) (leave to proceed in forma pauperis denied in view of questions of personal jurisdiction over defendants).

*Id.* at 325.

93 815 F.2d 323 (5th Cir. 1987).

94 *Id.*

95 *Id.*

96 RESTATEMENT OF AGENCY (SECOND) § 220(2).

97 *Easter Seal Soc'y*, 815 F.2d at 326.

98 *Id.* at 325.

99 *Reid*, 490 U.S. at 752.

100 *Id.* at 751.

101 The Court's analysis is as illuminating as it is concise:

Reid is a sculptor, a skilled occupation. Reid supplied his own tools. He worked in his own studio in Baltimore, making daily supervision of his activities from Washington practicably impossible. Reid was retained for less than two months, a relatively short period of time. During and after this time, CCNV had no right to assign additional projects to Reid. Apart from the deadline for completing the sculpture, Reid had absolute freedom to decide when and how long to work. CCNV paid Reid $15,000, a sum dependent on "completion of a specific job, a method by which independent contractors are often compensated." Reid had total discretion in hiring and paying assistants. "Creating sculptures was hardly 'regular business' for CCNV." Indeed, CCNV is not a business at all. Finally, CCNV did not pay payroll or Social Security taxes, provide any employee benefits, or contribute to unemployment insurance or workers' compensation funds.

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

490 U.S. at 752-53 (citations omitted).

102    *Id.* at 753. The Court went on to say that CCNV "may be a joint author if, on remand, the District Court determines that CCNV and Reid prepared the work "with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." In that case, CCNV and Reid would be co-owners of the copyright in the work." *Id.* Note that co-ownership issues arise only where work-made-for-hire status is found not to exist.

103    *Id.* at 750-51.

104    *Id.* at 747.

105    "The Act, which almost completely revised existing copyright law, was the product of two decades of negotiation by representatives of creators and copyright-using industries, supervised by the Copyright Office and, to a lesser extent, by Congress." 490 U.S. at 743. "Strict adherence to the language and structure of the Act is particularly appropriate where, as here, a statute is the result of a series of carefully crafted compromises." *Id.* at 748 n.14.

106    *See* note 2 *supra.*

107    *See* Litman, *supra* note 50.

108    *See* note 4 *supra.*

109    *See generally* RIAA/home, *at* http://www.riaa.org.

110    *See* Bill Holland, *The New Work-For-Hire Law to be Examined: The Arguments from Both Sides*, BILLBOARD, May 20, 2000 (noting that the works-made-for-hire amendment arose during passage of anti-cyber-squatting legislation, in a provision that allows owners of works made for hire to register domain names containing names of individuals otherwise protected by the Act).
*See also* the Anticybersquatting Consumer Protection Act of 1999, Pub. L. No. 106-113, Div. B, § 1000, 113 Stat. 1536: A person who in good faith registers a domain name consisting of the name of another living person, or a name substantially and confusingly similar thereto, shall not be liable under this paragraph if such name is used in, affiliated with, or related to a work of authorship protected under title 17, United States Code, including a *work made for hire as defined in section 101 of title 17*, United States Code, and if the person registering the domain name is the copyright owner or licensee of the work.
*Id.* (emphasis added).
Because the Anticybersquatting Act gave such protection to works made for hire as defined in §101 of the Copyright Act, the intent was to bring sound recordings within the protection of the anti-cyber-squatting legislation via a "technical" amendment to § 101 of the Copyright Act. Thus the sound-recordings-as-works-made-for-hire amendment and the resulting debate have their current origins in the Internet.

111    *See Work for Hire Letter, at* http:// www.riaa.com/musicleg/press/020300.htm (last visited Mar. 16, 2000).

112    Hearing testimony in support of the amendment was presented by Hilary Rosen, President/CEO of the RIAA and Professor Paul Goldstein of Stanford University. Testimony urging reconsideration was presented by Michael Greene, President/CEO of the National Academy of Recording Arts and Sciences; Professor Marci A. Hamilton of the Cardozo School of Law; and recording artist Sheryl Crow. Testimony on behalf of the United States Copyright Office was presented by Marybeth Peters, Register of Copyrights. *See Witness List, at* http://www.house.gov/judiciary/4.htm (last visited May 26, 2000). As of August 8, 2000, all parties had agreed upon a legislative recommendation calling for repeal of the November 29, 1999 amendment and a return to the pre-amendment status quo. *See* Tamara Conniff, *RIAA, Artists Agree on C'right Language*, BILLBOARD, August 19, 2000, at 3.

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

113    *See* Statement of the Honorable Howard Coble, *at* http:// www.house.gov/judiciary/cob10525.htm (last visited May 26, 2000).

114    17 U.S.C. § 203(a), §§ (3), (4) (1994).

115    Sound Recording Act of 1971, Pub. L. No. 92-140, 85 Stat. 391 (repealed effective 1978).

116    The 1976 Act took effect on January 1, 1978.

117    *See* Roth v. Pritikin, 710 F.2d 934 (2d Cir.), *cert. denied*, 464 U.S. 961 (1983) (holding that transactions taking place before 1978 should be governed by the 1909 Act). *See* LEAFFER, *supra* note 26, at 201. *See also* NIMMER ON COPYRIGHT § 1.11 (1999).

118    17 U.S.C. § 304(c)(3) (1994). "In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire ... [t]ermination of the grant may be effected at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later." *Id.*

119    For example, a work assigned in 1972 can be terminated at the earliest fifty-six years later in 2028, with the author or heirs enjoying the thirty-nine years of the extended renewal term which will endure until 2067, ninety-five years after the original assignment. A work assigned in 1977 can be terminated at the latest sixty-one years later in 2038, with the author or heirs enjoying the remaining thirty-four years of the thirty-nine year extended renewal term, which will endure until 2072. In all cases, notice of termination can be served no more than ten and no less than two years before the effective date.

120    17 U.S.C. § 304(a)(1)(C) (Supp. IV 1998).

121    For a work copyrighted in 1977, the initial twenty-eight-year term ends in 2005 (1977 🔑 28 = 2005). Under 17 U.S.C. § 305 (1994) "All terms of copyright provided by sections 302 through 304 run to the end of the calendar year in which they would otherwise expire."

122    17 U.S.C. § 101 "work made for hire" (2) (1994).

123    *See* SIDNEY SHEMEL & M. WILLIAM KRASILOVSKY, THIS BUSINESS OF MUSIC, 190-95 (6th ed. 1990).

124    *Id.* at 192.

125    *Id.*

126    Randy S. Frisch & Matthew J. Fortnow, *The Time Bomb in the Record Company Vaults, in* 1993-94 ENTERTAINMENT, PUBLISHING AND THE ARTS HANDBOOK 111, 115-16 [hereinafter Frisch & Fortnow]. Although Frisch & Fortnow conclude that under the 1976 Copyright Act sound recordings are not works for hire, it was their article's suggestion of an amendment to the Act that was cited by *Billboard* magazine as influential in the lobbying effort leading up to passage of the 1999 amendment. *See* Bill Holland, *supra* note 6, at 122.
The work-for-hire issue has been stirring for almost a decade in record industry legal circles. An article published in the 1994 edition of the *Entertainment, Publishing and the Arts Handbook* warned that "record companies must defuse this time bomb before it is too late" by lobbying for a work-for-hire sound recording amendment to the Copyright Act. *Id.*

127    *Id.* at 115.

128    *Id.* at 116. As an example, Frisch & Fortnow quote the following sample agreement excerpt: "In entering into this agreement and in providing services pursuant hereto ... Artist [has] and shall have the status of independent contractors

and nothing herein contained shall contemplate or constitute ... Artist as XYZ's agents or employees." *Id.* at n.36, quoting from DONALD FARBER, NEGOTIATING CONTRACTS IN THE ENTERTAINMENT INDUSTRY Form 160-1, para. 16.10.

[129]   128 F.3d 872 (5th Cir. 1997).

[130]   *Id.* at 11.

[131]   *Id.*

[132]   *Id.* at 15.

[133]   41 F. Supp. 2d 531 (D.N.J. 1999).

[134]   *Id.* at 541.

[135]   77 F.Supp.2d 57 (D.D.C. 1999).

[136]   *Id.* at 64.

[137]   *See* 17 U.S.C. § 101 (1994).
A "collective work" is a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole .... A "compilation" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term "compilation" includes collective works.
*Id.*

[138]   *See* Frisch & Fortnow, *supra* note 126.

[139]   *Id.*

[140]   *See* Holland, *supra* note 6, at 122. *See also* RIAA Information: *Sound Recordings as Works Made for Hire, at* http:// www.riaa.com/intprop/releases/042400.htm (last visited Apr. 28, 2000).

[141]   17 U.S.C. § 410(c) (1994).

[142]   Author's telephone conversation with Copyright Office staff, May 4, 2000. *See also* Statement of Marybeth Peters, *at* http:// lcweb.loc.gov/copyright/docs/regstat52500.html (last visited May 25, 2000).
[T]he fact that work-for-hire agreements and copyright registrations as works for hire have been made does not lead to the legal conclusion that the sound recordings ... are indeed works made for hire. If a specially ordered or commissioned work does not fall within one of the categories set forth ... the agreement of the parties cannot transform it into a work made for hire.
*Id.* at 8.

[143]   *See* United States Copyright Office, *Form SR For a Sound Recording, at* http://www.loc.gov/forms (last visited Apr. 29, 2000).

[144]   *Id.*

[145]   17 U.S.C. § 101 (1994).

[146]   United States Copyright Office Circular 56, *Copyright Registration for Sound Recordings* (1999).

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

147     *Id.* at 4.

148     *See* Litman, *supra* note 50.

149     *See* RIAA Information: *Sound Recordings as Works Made for Hire, at* http://www.riaa.com/intprop/releases/042400.htm (last visited Apr. 28, 2000). Arguing that collective works and compilation categories include sound recordings, the statement on the RIAA Web site states that passage of the amendment "was not meant to imply that sound recordings were not included already as collective works or compilations, but rather merely specifies them as their own class of works." *Id.*

150     *See Sound Recordings as Works Made for Hire, at* http:// www.riaa.com/intprop/releases/042400.htm (last visited Apr. 28, 2000). *See also* Statement of Hilary Rosen, President and CEO of the RIAA before the House Subcommittee on Courts and Intellectual Property on the Issue of Sound Recordings as Works Made for Hire, May 25, 2000, *at* http:// www.riaa.org (last visited May 25, 2000).

151     *See supra* Holland, *supra* note 6, at 122 (quoting Ron Fierstein of AGF Management).

152     17 U.S.C. § 101 (1994) definition of a joint work (emphasis added).

153     American Federation of Musicians of the United States and Canada, *Phonograph Record Labor Agreement* (1999) at 10. [hereinafter AFM].

154     *See* Rodd McLeod, *The Reeducation of Lauryn Hill*, Salon.com Arts & Entertainment, <http://www.salon.com/ent/music/feature/2000/05/10/pop_ song/print.html> (Visited May 10, 2000) [hereinafter McLeod] (Noting that recording artist Lauryn Hill is being sued by musicians who performed on a recording and who claim their contributions constituted coownership in the underlying compositions.

155     See U.S. Const., Art. II, § 9 (Cl. 3).

156     Thanks to Prof. Joseph Beard for bringing this issue to the author's attention.

157     *See generally* Lionel S. Sobel, *Recording Artist Royalty Calculations: Why Gold Records Don't Always Yield Fortunes (Second Edition)*, 12 ENT. L. REP. 3 (1990) (detailing the financial results from a gold recording selling 500,000 copies and giving examples of how subtle contractual changes result in substantive improvements in royalty payments). *See also* DONALD S. PASSMAN, ALL YOU NEED TO KNOW ABOUT THE MUSIC BUSINESS (New rev. ed. 1997) (detailing financial results from standard music industry income sources, including recordings, touring, merchandising, and publishing). *See also* Bobby Rosenbloum, *A Very Welcome Return: Copyright Reversion and Termination of Copyright Assignments in the Music Industry*, 17 ENT. & SPORTS LAW. 3 (1999).

158     17 U.S.C. § 203(a)(3) (1994). "If a grant covers the right of publication for the work, the period begins at the end of thirty-five years from the date of publication of the work under the grant or at the end of forty years from the date of execution of the grant, whichever term ends earlier." This provision allowing thirty-five years from publication or forty years from the date of execution of the grant covers the period of time which may have existed between signing a book contract and printing of the book, and protects authors from publishers who may be assigned rights and then unconscionably delay production resulting in no income being produced. The publisher is essentially allowed a five year grace period to print the book, thus ensuring that perpetual delays by a publisher in printing a book do not perpetually delay the author's termination rights.

159     Where the author is dead, the termination interest is owned by the author's widow, surviving children, and the surviving children of any dead child, or if none of the above are living, the author's executor, administrator, personal representative, or trustee shall own the entire termination interest. 17 U.S.C. § 203(a)(2) (1994).

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

160    The copyright in the sound recording is distinct from ownership of the master recording. A recording artist who terminates the grant of copyright will of course be able to make copies, but will not take possession of the master recordings themselves. In the era of digital recording where any copy could also serve as a master, this would only be a substantive issue if, for example, the record company held unique and valuable archive recordings of out-takes, alternate versions, etc.

161    17 U.S.C. § 203(a)(4)(A) (1994). The first such termination notices under the 1976 Act will therefore occur in 2003 (1978 🔑 35 - 10 = 2003). The latest that notice can be given is two years before the termination date. A copy of the notice must also be recorded in the Copyright Office to make the termination effective. *Id.*

162    17 U.S.C. § 203(b)(4) (1994). "A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination."

163    *Id.*

164    *Id.* "As an exception, however, an agreement for such a further grant may be made between the persons provided by clause (3) of this subsection and the original grantee or such grantee's successor in title, after the notice of termination has been served as provided by clause (4) of subsection (a)."

165    *See* the Digital Performance Right in Sound Recordings Act of 1995, Pub. L. No. 104-39, 109 Stat. 336 (adding §§ 106(6), 114(d)-(j), 115(c)(3) & (d) to the Copyright Act of 1976). *See also* Corey Field, *New Uses and New Percentages: Music Contracts, Royalties, and Distribution Models in the Digital Millennium*, 7 UCLA ENT. L. REV. 289 (2000) (full version). Also published in 18 ENT & SPORTS LAW. 1 (2000) (condensed and revised version).

166    17 U.S.C. § 203(b)(1) (1994). A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination. Frisch and Fortnow point out that even if an artist terminates the copyright in the sound recording, the record company would still hold the rights to a music video or other derivative work that would then compete with the recording when issued by a new record company: "By exploiting the derivative works exception, an artist's original record company has much more leverage than was first apparent. This increases the likelihood that an artist will renegotiate with his/her original record company when the time arrives that the artist may terminate the transfer." *See* Frisch & Fortnow *supra* note 126, at 118.

167    While digital distribution of sound recordings via the Internet, satellite, etc. may in the future make considerations of market share and merchandise distribution channels less relevant than marketing and promotional issues, for the moment the author is assuming that physical merchandise will still generate significant income in the future.

168    17 U.S.C. § 203(b)(4) (1994).

169    *See* McLeod, *supra* note 154.

170    *See* Statement of Marybeth Peters, Register of Copyrights, before the House Subcommittee on Courts and Intellectual Property on the Issue of Sound Recordings as Works Made for Hire, 106th Congress, May 25, 2000, *at* http://lcweb.loc.gov/copyright/docs/regstat52500.html (last visited May 25, 2000) [hereinafter Peters]. Peters' proposal would exclude "key contributors" from work-for-hire status. Should the law be amended as Peters proposes, recording contracts in the future will clearly delineate key contributors from non-key contributors. As to agreements made before any such revised law took effect, the lines will remain blurred as to who enjoys key contributor status. AFM and other agreements would undoubtedly also be altered to reflect any such new law.

171    *See* AFM, *supra* note 153, at 34. *See also* Peters, *supra* note 170, at 9:
This concept is similar to the approach that has been suggested to me by representatives of performers; the language shown to me would exclude a featured recording artist who is defined as "an artist, whether an instrumentalist or vocalist,

who has a royalty contract with respect to the distribution of the sound recording." This definition may not sufficiently limit the class with termination rights because secondary performers may also receive royalties. *Id.*

172   *See* 17 U.S.C. § 101 (1994). "A 'joint work' is a work prepared by two or more authors *with the intention* that their contributions be merged into inseparable or interdependent parts of a unitary whole." (emphasis added). *See also* Childress v. Taylor, 945 F.2d 500 (2d Cir. 1991) (stating that "equal sharing of rights should be reserved for relationships in which all participants fully intend to be joint authors.") *Id.* at 509.

173   *See* Peters, *supra* note 170.

174   *Id.* at 9.

175   The Act vests copyright in the author or authors of a work in § 201(1), and enumerates categories of original works of authorship in § 102(a), but does not include a definition of the word "author" in § 101 "Definitions." *See* 17 U.S.C. § 101 (1994).

176   *See generally* Lisa M. Fairfax, *When You Wish Upon a Star: Explaining the Cautious Growth of Royalty-backed Securitization*, 1999 COLUM. BUS. L. REV. 441 (1999) [hereinafter Fairfax]. *See also* John Jackson, *Royalty Securitization: Taking CABS to Bankruptcy Court*, 21 THOMAS JEFFERSON L. REV. 209 (1999). *See also* Jennifer Burke Sylva, *Bowie Bonds Sold for Far More than a Song: The Securitization of Intellectual Property as a Supercharged Vehicle for High Technology Financing*, 15 SANTA CLARA COMPUTER & HIGH TECH. L.J. 195 (1999) [hereinafter Sylva]. *See also* Nicole Chu, *Bowie Bonds: A Key to Unlocking the Wealth of Intellectual Property*, 21 HASTINGS COMM/ENT L.J. 469 (1999) [hereinafter Chu]. Note that because of the complex nature of securitization, this article presents an outline of the main issues. The reader is referred to the above articles for further details.

177   *See* Chu, *supra* note 176, at 485-86.

178   *Id.*

179   *Id.*

180   *See* Sylva, *supra* note 176, at 208.

181   As regards perfection of security interests in a copyright, there are conflicting decisions as to the consequences of recordation under federal statute with the Copyright Office. While Copyright Office recordation of the security interest applies to the copyright itself, it may not apply to the security interest in the receivables, or future income, generated by that copyright, which therefore may not need to have been recorded in the Copyright Office in order to be valid. *See* In re Peregrine Entm't Ltd., 116 B.R. 194 (C.D. Cal. 1990) in which recordation of a security interest in a copyright with the Copyright Office was held to also represent perfection of the security interest in the receivables generated by that copyright. *But see* Broadcast Music, Inc. v. Hirsh, 104 F.3d 1163 (9th Cir. 1997) in which the Ninth Circuit held that assignment of future royalties did not equal a security interest in the copyright itself, and could therefore be perfected under state U.C.C. filings without a prior filing with the Copyright Office. The result is that preparatory searches to confirm clear title to copyrights would have to include U.C.C. filings in all fifty states and the District of Columbia in addition to recordations in the Copyright Office. For information on how perfecting security interest in copyright applies to "negative pickup" film financing deals, see Shelly Rothschild, *Preserving Your Rights and Interests in an Entertainment Deal: Lessons from a Recent Negative Pickup Case, in* 1998-99 ENTERTAINMENT, PUBLISHING AND THE ARTS HANDBOOK 295.

182   17 U.S.C. § 205(a) (1994). "Any transfer of copyright ownership or other document pertaining to a copyright may be recorded in the Copyright Office." Under § 101 a "transfer of copyright ownership" includes "an assignment, mortgage,

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright."

183   17 U.S.C. § 205(c) (1994).

184   Over-collateralization provides a more secure issue and a higher credit rating from bond agencies because the assessed value of the future revenue is far in excess of the value of the bond offering. For example, in the offering made by James Brown, it is estimated that the "value of the royalties underlying Mr. Brown's offering was between $40 and $50 million, at least $10 to $20 million more than the bond issuance." *See* Fairfax, *supra* note 176, at 464-65.

185   One of Bowie's reported projects was to buy out the contract of his former manager. *See* Fairfax, *supra* note 176.

186   For his pre-1978 works where, if he died during the 28 year initial term his heirs would become the owners of the copyrights in the extended renewal term, Bowie had his heirs assign their expectancy interest to the SPV. *See* Fairfax, *supra* at 483-484.

187   *See* Fairfax, *supra* note 176, at 458. EMI had a fifteen year license to Bowie's complete catalog of over 250 songs, the duration of the bond was thus also fifteen years, and the rating of the bond was tied to EMI's own rating. The publishing and recording company's participation thus played a crucial role in the deal.

188   For general information on the Pullman Group, including the complaint filed in their lawsuit against their former business partners and attorneys in the Bowie Bond issue, *See* <http://www.pullmanco.com> (last visited April 7, 2000).

189   *See* Fairfax *supra* note 176, at 461-462. Other performers who have issued "Bowie Bonds" include James Brown, Ashford & Simpson, and the Motown songwriters Edward Holland, Brian Holland, and Lamont Dozier. Note that other planned issues organized by firms other than Mr. Pullman's have reportedly not succeeded, and Mr. Pullman has filed a lawsuit against his former partners in the Bowie Bond issue, including Prudential Insurance and Bowie's business manager, claiming they misappropriated his trade secrets in setting up their own companies to offer "Bowie Bonds." *See* Pull-man Group LLC v. Prudential Ins. of Am. and others, *available at* <http://www.pullmanco.com/lawfile.htm> (last visited April 7, 2000).

190   *See* Fairfax *supra* note 176, at 487. *See also* Don Jeffrey, *Securitized Loans are Musicians' Hedge Against the Future*, BILLBOARD, April 29, 2000 at 36 ("Estimates suggest there are more than 1,000 musical artists worldwide who fit the criteria for such loans. The total music market could be $200 million to $400 million a year.").

191   *See* Michael Landau and Donald E. Biederman, *The Case for a Specialized Copyright Court: Eliminating the Jurisdictional Advantage*, 21 HASTINGS COMM/ENT L.J. 717 (1999) (proposing a single specialized court of nationwide jurisdiction for the "highly technical legal doctrines which are so central to copyright law.").

48 JCPS 145

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.