1

```
1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO
2
    Case No. 19-cv-00874-RBJ-MEH
3   _____

4   WARNER BROS. RECORDS, INC., et al.,

5        Plaintiffs,
    vs.
6

7   CHARTER COMMUNICATIONS, INC.

8        Defendant.
    _____
9

10           Proceedings before MICHAEL E. HEGARTY, United

11  States Magistrate Judge, United States District Court for the

12  District of Colorado, commencing at 3:03 p.m., February 19,

13  2020, in the United States Courthouse, Denver, Colorado.

14  _____

15           WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16  ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17  _____

18                      APPEARANCES

19           NEEMA SAHNI, JONATHAN SPERLING and MATT OPPENHEIM,

20  Attorneys at Law, appearing for the Plaintiffs.

21           ERIN RANAHAN, SEAN ANDERSON, CRAIG JOYCE and

22  JENNIFER GOLINVEAUX (via phone), Attorneys at Law, appearing

23  for the Defendant.

24  _____

25                      DISCOVERY CONFERENCE
```

2

```
 1                  P R O C E E D I N G S

 2             (Whereupon, the within electronically recorded

 3   proceedings are herein transcribed, pursuant to order of

 4   counsel.)

 5             THE COURT:  Case Number 19-cv-00874, Warner

 6   Records, et al., vs. Charter Communications, Inc.  Make your

 7   appearances, please.

 8             MS. RANAHAN:  Good afternoon, Your Honor.  Erin

 9   Ranahan for Charter Communication.

10             MR. JOYCE:  Craig Joyce for Charter.

11             THE COURT:  Thank you.

12             MS. SAHNI:  Good afternoon, Your Honor.  Neema

13   Sahni and Jonathan Sperling from Covington & Burling on

14   behalf of the plaintiffs.

15             THE COURT:  Thank you.

16             MR. OPPENHEIM:  Good afternoon, Your Honor.  Matt

17   Oppenheim on behalf of the plaintiffs.

18             THE COURT:  Thank you.  And on the phone, please.

19             MS. GOLINVEAUX:  Jennifer Golinveaux of Winston &

20   Strawn on behalf of defendant Charter Communications.

21             THE COURT:  Okay, thank you.  So a preliminary

22   matter.  This is kind of true confessions time.  Up to about

23   maybe two or three years ago I handled one discovery dispute

24   a month.  This is my third today in court multi-hour

25   discovery dispute.  It's going to be hard to give you guys
```

1  the time you need and you do need time.  The case deserves

2  it.  It's complicated, a lot is at stake, and you deserve

3  better service from your federal courts than what I can

4  probably afford or what any district or magistrate judge

5  could afford to give you.

6           Let me hear your positions respectfully on a

7  Special Master from the plaintiff.

8           MS. SAHNI:  Sure, Your Honor.  So we think that at

9  least on our end there are a handful of issues that have been

10  previously addressed by this Court, and so the remaining

11  issue that we're here to discuss today on the issues related

12  to Charter's sufficient production, which as you've seen in

13  our papers they've produced, you know, 72 documents to date,

14  and there is number of categories where we're still

15  waiting --

16           THE COURT:  Yeah, you're kind of delving into more

17  than I want you to.  You can start throwing accusations here

18  in a minute.  Are you saying that we're -- the discovery

19  disputes are drying up and you don't expect this level of

20  activity to continue?  Is that what you're saying?

21           MS. SAHNI:  Your Honor, as long as we have some

22  clear deadlines for their discovery obligations and some real

23  road marks and benchmarks that allow for us to ensure that

24  we're getting the document productions we need on a rolling

25  basis, then I think that, at least on our end, we should have

4

1    what we need to move forward on this case.

2          THE COURT:  Okay.  So there are about seven or

3    eight issues that have been presented for today.  You think

4    if those are resolved one way or the other, some might be

5    satisfactory to you, some might not, but they're going to be

6    resolved, if and when they are, you do not foresee any other

7    material discovery disputes surfacing?

8          MS. SAHNI:  Well, Your Honor, I think it depends a

9    little bit on how it resolves today.  If we get document

10   production deadlines that are concrete and we get clarity on

11   the issue of whether they intend to assert a safe harbor

12   defense, which is an issue that we've previewed in our papers

13   and is major road block to understanding the scope of

14   discovery, then we might be able to proceed without that.

15         THE COURT:  No, no, but what I'm saying is this,

16   listen very carefully.  There are seven or eight topics we're

17   going to talk about today.  You do not see another topic

18   arising in this case?

19         MS. SAHNI:  Yeah, we just can't say, Your Honor.

20         THE COURT:  Okay.

21         MS. SAHNI:  Depends on what we get from there.

22         THE COURT:  That's fair.  How about you guys?

23         MS. RANAHAN:  We would definitely see more topics

24   arising after today, Your Honor.  We would not commit that

25   this would be all discovery disputes.

1          THE COURT:  Okay.

2          MS. RANAHAN:  The parties just served new requests.

3    We filed a motion to extend the schedule today and we're

4    looking for even another year of discovery, Your Honor.  So

5    if that gets entered, we likely would have time before you,

6    but we're not opposed to getting this off your plate and

7    putting this with a Special Master.

8          THE COURT:  Well, it will never be off my plate.

9          MS. RANAHAN:  Right, that's true.

10         THE COURT:  Because I still maintain responsibility

11   for everything the Special Master does, and as you know,

12   you've probably all used them before, their duties are

13   specifically outlined in an order of the Court and your

14   ability to take matters up with me and then subsequently

15   Judge Jackson would be outlined there as well.  So that --

16   that -- the Article I and III judges always will maintain

17   control over the matter, it's just in the day-to-day you have

18   a resource that can smooth things out.  So that's -- it's

19   worked in the past.  I've only done it twice in 14 years, but

20   like I said, the paradigm has changed in this district.  We

21   now require informal conferral with the magistrate judge

22   before filing a motion.

23         So, but even honestly before I was in court maybe

24   once a month on discovery disputes, but still only had one or

25   two discovery motions a month even though we don't have a

6

1    requirement to come to the Court first.  Whatever else

2    changed to the rules of civil procedure did, they increased

3    discovery disputes.  I think that is, from my viewpoint,

4    objectively true.

5             So, anyway, something I'm considering.  I have

6    someone in mind, but that person is checking on conflicts.

7    So it's a person from a large national firm who would have

8    quite a bit of experience engaging in the breadth of

9    litigation that this would entail, okay.  All right, that's

10   out of the way.

11            So how should we proceed?  Have you guys talked

12   about process for today?

13            MS. SAHNI:  We haven't discussed a process, Your

14   Honor.  We have, like I said, a couple of core issues that

15   have already been resolved by the Court and the issue for

16   today is simply spelling out some dates for document

17   production.  We would like to go through those and then I

18   believe there is other issues on the table that defendants

19   have proposed a well.

20            MS. RANAHAN:  Well, Your Honor, this is originally

21   set, and we're not opposed to going through as much as we

22   can, but point of the original date was to go through the

23   ownership issue.

24            THE COURT:  But we're here.

25            MS. RANAHAN:  So -- we're here and there is much

7

1    more --

2            THE COURT:  I think we ought to do as much as we

3    can, so we don't have to be here more often than we have to.

4            MS. RANAHAN:  Agreed.

5            MS. SAHNI:  Agreed, Your Honor.

6            THE COURT:  So -- by the way -- yes, Chris.  So

7    there is a transcript available from the previous proceeding,

8    all right.  So we'll start with the plaintiff, please.

9            MS. SAHNI:  Thank you, Your Honor.

10           THE COURT:  I will make this comment, I guess.

11           MS. SAHNI:  I'm sorry, Your Honor?

12           THE COURT:  I'm going to make an introductory

13   comment.  One of the major issues from your perspective, the

14   largest issue from your perspective is going to be your

15   obligation to turn over ownership information.  Can we agree

16   on that?

17           MS. SAHNI:  That is one of the issues on the table.

18           THE COURT:  But I mean, from your perspective,

19   that's huge?

20           MS. SAHNI:  That's a huge burden correct, Your

21   Honor.

22           THE COURT:  It seems by your own statements to me

23   that there was an approximately 40 percent rate of something

24   not perfect with regard to the representation of ownership.

25           MS. SAHNI:  Your Honor, I'm going to have my

8

1   colleague, Mr. Sperling, address those issues.

2          THE COURT:  I know you said form each category they

3   could have already found it out, but if you add up the

4   numbers, I thought it reached about 40 percent.

5          MR. SPERLING:  I don't think that's correct, Your

6   Honor.  Maybe you could help me answer your question if you

7   could point to the specific numbers you have in mind.

8          THE COURT:  Sure, I'm just going to read your

9   submission, which is what I barely had time to read already.

10          So the sample was 110.  9 were dropped, 11 were

11   amended, 8 registration amended.  I guess that is less than

12   40.  It's 9, 11 and 8, that's 28.  So about 25 percent.  I

13   overestimated, right?  25 percent not perfect.  Can we agree

14   on that?

15          MR. SPERLING:  Unfortunately we can't, Your Honor,

16   because some of the works were dropped just based on

17   strategic decisions on our part.  For example, some works

18   were dropped because the registrations postdate the

19   infringement.  They predate the lawsuit, that means that

20   we're entitled to sue on them.  There is no issue with the

21   registration, there is no issue with the chain of title.

22   We're not able to pursue statutory damages with respect to

23   those works since the registrations postdate the active

24   infringement.  Nothing would prevent us from seeking actual

25   damages in connection with those works.  We've chosen not to

9

1    for our own purposes.

2           THE COURT:  Actual damages would require a lot more

3    discovery and a lot more proof presumably.

4           MR. SPERLING:  It would require different proof.

5    I'm not sure it would require a lot more given the kind of

6    information that they're seeking in this case anyway.  I

7    don't want to mix issues too much, Your Honor, but since

8    you've ordered us to produce track-by-track revenue anyway,

9    and since we've got a dispute over the umbrella agreements,

10   but our compromised proposal is to produce the umbrella

11   agreements corresponding to 90 percent of the revenue, it's

12   not at all obvious to me that there would be much more in the

13   way of additional discovery in order to establish actual

14   damages.

15          But coming back to your original question, so it's

16   not the case that all of those works that you identified and

17   that we referred to in our letter were dropped because of --

18   or amended, as the case may be, due to any error in how they

19   were first listed in the exhibits.

20          THE COURT:  I didn't say error.  I said for

21   whatever reason it changed, I'll say that.

22          MR. SPERLING:  It did change.

23          THE COURT:  Okay.  So is this changing process

24   something in this type of a lawsuit that occurs throughout

25   the lawsuit up to the very point judgment?

10

1          MR. SPERLING:  Typically not, Your Honor.  It can,

2    there can be additional changes, but we think it's quite

3    unlikely at this point that there would be meaningful

4    additional changes.

5          THE COURT:  Do you think you've dropped everybody

6    you need to drop and added everybody you need to add?

7          MR. SPERLING:  No, we didn't add anybody as part of

8    the amendment in the works-in-suit list.  To be clear, we

9    didn't add any works, although we have added plaintiffs --

10          THE COURT:  I though they said you added 12.

11          MS. RANAHAN:  11 -- 11 plaintiffs were added.

12          MR. SPERLING:  Correct.

13          MS. SAHNI:  Plaintiffs, Your Honor, not works --

14          THE COURT:  No, no, I'm talking about plaintiffs.

15          MR. SPERLING:  Okay, Your Honor.

16          THE COURT:  That's an addition -- I mean, adding

17    plaintiffs is actually different than adding works,

18    obviously.  There is whole new parties here that are entitled

19    to damages.

20          MS. RANAHAN:  And the additions of the parties

21    they've used to fix some of the issues that were problematic

22    in the ownership.

23          THE COURT:  Understand, but again, do you think

24    you've added the last plaintiff?

25          MR. SPERLING:  We believe that we have, Your Honor.

11

1          THE COURT:  Okay.  And do you think you'll do
2  nothing but reduce the number of works, maybe a little, as
3  time goes on, not increase the number of works?
4          MR. SPERLING:  Yes, Your Honor.
5          THE COURT:  Okay.  And the -- will the plaintiff
6  entity information probably continue to be amended somewhat?
7          MR. SPERLING:  We don't anticipate that anymore,
8  Your Honor.
9          THE COURT:  Okay.  And what about registration
10  numbers; will that be amended as time goes on?
11          MR. SPERLING:  That also -- we don't anticipate --
12  there may be, you know, one or two stragglers, but we don't
13  anticipate that.
14          THE COURT:  So even though you amended the
15  registration numbers for eight works out of the 110, you
16  don't expect to do it anymore out of the 11,000?
17          MR. SPERLING:  Correct, Your Honor, because you'll
18  recall that we amended the exhibits and B to the complaint
19  which are the lists of the works in suit.  And in the course
20  of doing that, we undertook to identify any stray errors that
21  there were with respect to registration numbers, not
22  necessarily errors, sometimes there were matters of
23  substituting sort of a better candidate in terms of the
24  infringed work, but that work is complete from our
25  perspective.

12

1           THE COURT:  Okay.

2           MR. SPERLING:  I wish I could represent to the

3  Court that everything we do is perfect all the time.

4           THE COURT:  It won't be.  I'm not going hold you to

5  that standard, just a good faith standard.

6           MR. SPERLING:  Yeah.

7           THE COURT:  So would you say then that the process

8  we engaged in in clarifying the ownership information for the

9  110 sample resulted in a benefit to the lawsuit as a whole?

10           MR. SPERLING:  No, Your Honor.  And let me explain

11  why.

12           THE COURT:  Okay.  That's going to be a tough sell,

13  but give it a shot.

14           MR. SPERLING:  I don't think it will be, Your

15  Honor, once we sort of go back over what's at issue here.

16           THE COURT:  Okay.

17           MR. SPERLING:  So we've already agreed to produce

18  all of the copyright registration certificates and all of the

19  chain of title information.  The point of dispute between the

20  plaintiffs and defendant was whether we should be required to

21  produce two other kinds of documentation.  One is so-called

22  work-for-hire agreements and the other was correspondence

23  regarding any disputes over our ownership.

24           THE COURT:  We're not there right now, I don't

25  think.

13

1          MR. SPERLING:  I think we are, Your Honor, because

2     that was the purpose of the 110 sample.  The purpose of the

3     110 sample, as we understood it, was to determine whether --

4     because that's what we produced for the 110 in the sample --

5          THE COURT:  Okay.

6          MR. SPERLING:  -- that we aren't producing anyway

7     for the remainder of the 11,000 works in suit.  That's the

8     difference.  So the 110 sample was about, if we produce those

9     work-for-hire agreements and any correspondence concerning

10    ownership disputes with respect to those 110, will that

11    identify ownership issues that the plaintiffs -- excuse me,

12    that the defendant Charter could not otherwise ascertain from

13    the documentation we were producing anyway, because if it

14    doesn't, then there is no value to the production of that

15    additional documentation.

16         So that was the purpose of the exercise, Your

17    Honor, and we have a very clear answer.  The answer is, no,

18    it doesn't provide any additional information because none of

19    the changes that you are talking about derive from either

20    work-for-hire agreements or any correspondence of ownership

21    disputes.

22         All of the changes that were made were made on the

23    basis of copyright registrations or chain of title

24    documentation,  with you is what we're producing anyway.

25         THE COURT:  So in your view, all I did was shift

1    the burden from them finding out that information from what

2    you say you're already producing to you declaring it plainly?

3    Does that make sense?

4              MR. SPERLING:  I couldn't hear the last clause of

5    what Your Honor know said.

6              THE COURT:  So basically for the 110, all I did was

7    shift the burden of making the ultimate determination of

8    ownership.  What you said for each of these categories, all

9    these issues would have been readily discoverable by Charter

10   based on the registration information and chain of title

11   discovery plaintiffs have already agreed to provide.

12             Now, you will provide a massive information and

13   they'll be required to figure it out.  What I'm saying is,

14   for the 110 sample, in your view, all I did was shift the

15   burden on finding it out to you for those 110?

16             MR. SPERLING:  No, I don't think -- I don't think

17   that's accurate, Your Honor.  It's not a matter --

18             THE COURT:  Well, you're saying that they can look

19   in the documents and figure it out for themselves?

20             MR. SPERLING:  Correct.

21             THE COURT:  Except you figured it out for these

22   110, right?

23             MR. SPERLING:  We figured -- no, that's not

24   correct, Your Honor.

25             THE COURT:  Okay.

1          MR. SPERLING:  Two things happened simultaneously.

2    One is the 110 sample.  With respect to the 110 sample, we

3    produced the additional documentation that they're demanding

4    for the full 11,000 works that we say is unnecessary, and you

5    said, Well, let's see what that additional documentation

6    shows for this sample.  And I think the Court knows it, but

7    let's remind ourselves, when we say sample, it's 110

8    documents that they chose.

9          THE COURT:  And I know you say they cherrypicked

10   them, and that's fine.

11         MR. SPERLING:  Simultaneously, the scheduling order

12   always contemplated a date by which we wouldn't amend the

13   list of works in suit, Exhibits A and B to the complaint.

14         THE COURT:  What was that date?

15         MS. SAHNI:  January 15, Your Honor, it was set back

16   in June.

17         THE COURT:  So you've done everything you think you

18   are required to do?

19         MR. SPERLING:  Correct, Your Honor.

20         THE COURT:  Okay.

21         MR. SPERLING:  In the course of doing that,

22   amending the list of works in suit, we made changes in

23   certain instances to the name of the claiming plaintiff or to

24   the registration number associated with the infringed work,

25   and in some cases, removed works.

1          Some of those works that were affected by that

2    process were within the sample of the 110, but the 110 sample

3    didn't yield that information, and that's the key point here,

4    because those changes that were made with respect to those

5    works in suit, including the ones within the 110, were based

6    on issues that can be ascertained from the registration

7    certificates, which we're producing for all of the works in

8    suit, and from the chain of title information, which we're

9    again producing for all the works in suit.

10          THE COURT:  And you're using only those two sources

11    of information yourself to engage in the amendment process

12    that you did by January 15?

13          MR. SPERLING:  That's correct, Your Honor.

14          THE COURT:  You didn't use any more information

15    than those two items to do what you were obligated to do?

16          MR. SPERLING:  Correct, Your Honor, because

17    gathering that information would be incredibly burdensome,

18    and when we make that representation to the Court, we mean

19    it.  So it's not the case, Oh, we went, we pulled it, we

20    looked, and then we're going to tell them, Oh, we shouldn't

21    produce it to you.  We didn't look at that stuff.

22          THE COURT:  Well, what kind of person did the 109

23    hours worth of work?  What were they -- what was that cost

24    per hour?  Did you calculate that?

25          MR. SPERLING:  It's difficult to calculate a cost

1  per hour, Your Honor, because those hours don't involve any

2  of the outside counsel time that was involved.  Those were

3  man-hours by employees of the plaintiff entities themselves.

4          THE COURT:  I understand, but give me an hourly

5  rate.

6          MR. SPERLING:  It's impossible for me to do so,

7  Your Honor.  We're happy to go back and get that, but I don't

8  know what these employees are paid and they're not paid on an

9  hourly basis.  They're salaried employees.

10          THE COURT:  No, I understand, but would you say

11  it's plus or minus $25 an hour?

12          MR. SPERLING:  Your Honor, I would love to answer

13  your question.  I have no basis whatsoever to do that.

14          THE COURT:  But I need to know that a little bit

15  because I think it was represented to me, and I saw the

16  verdict myself, that there was a billion dollar verdict in a

17  case fairly similar in Virginia?

18          MR. SPERLING:  Correct, Your Honor.

19          THE COURT:  So if it was $25 an hour, it would cost

20  you roughly $250,000 to engage in this process, because it

21  cost you about an hour per work.  You said 109 hours, there

22  was 110 works.  Am I doing the math roughly correctly?

23  That's even not taking advantage of efficiencies of scale,

24  but that's roughly -- that's the data we have, right?

25          MR. SPERLING:  Well, $25 an hour times 11,000 works

18

1   would be something north of $250,000, right?

2          THE COURT:  20,000 --

3          MR. SPERLING:  25,000 times a 100,000 would be

4   25,000.

5          THE COURT:  Yes.

6          MR. SPERLING:  So 25 times 10,000 would be --

7          THE COURT:  250,000.

8          MR. SPERLING:  250,000.

9          THE COURT:  Yeah, that's what I'm saying, it would

10  be about $260,000 in a billion dollar case.

11         MR. SPERLING:  If we assume the hourly number that

12  Your Honor has conjured up in his hypothetical, but, of

13  course, Your Honor, there is a key consideration, right,

14  which is that you don't get the burden to the issue unless

15  there is some relevance.

16         THE COURT:  Exactly, I'm not there yet, I'm just at

17  the burden.  And so if you engage in any kind of

18  proportionality analysis, if this were a standard $100,000

19  employment case, I would be asking somebody to spend $250 in

20  a $100,000 case.

21         So I don't think I would buy any proportionality

22  argument, but a relevance argument I will certainly

23  entertain, okay.  That's all.

24         MR. SPERLING:  So with respect to relevance, Your

25  Honor, the key point is that again the purpose of this

1    exercise was to determine, does this additional documentation

2    that was produced in connection with the 110 that we're

3    contending should not be produced with respect to the rest of

4    the works in suit --

5            THE COURT:  No, no, I'm very clear on your

6    position.  I'm unclear on their position.  I think I

7    understand yours perfectly.  I need to hear you on that.

8            MS. RANAHAN:  Thank you, Your Honor.

9            So your 40 percent was exactly right based on the

10   additional items that you were quoting what they had conceded

11   based on their amendments.  We've done additional work and

12   found eight work-for-hire problems, so that goes directly to

13   this issue.  And there are also a handful of additional, but

14   if you look on the our briefs, put it up to exactly 40

15   percent where you landed.

16           In 110-work sample, 40 percent, as you described,

17   were not perfect.  Eight of those were work-for-hire issues,

18   so you hadn't raised that yet, but there is no work-for-hire

19   agreement or work-for-hire language for eight of the 110

20   sample.  Extrapolated across, that would impact a significant

21   number of works.

22           And work for hire doesn't go to every work, so it

23   wouldn't actually even be a burden of an hour per work.

24           THE COURT:  Is that mentioned in their letter, the

25   eight not work for hire?

1          MS. RANAHAN:  It's in our letter.

2          THE COURT:  No, no, but I'm look at their letter of

3    February 17.

4          MS. RANAHAN:  No.

5          THE COURT:  To me that issue is addressed on page

6    8.  You're saying that that's not in their letter?

7          MS. RANAHAN:  I don't think so, Your Honor, because

8    we basically had a deadline of Monday and so we were giving

9    our findings at the same time they were submitting their

10   argument so -- but they did produce one other document to try

11   to fix one thing not work-for-hire related after we had

12   submitted the brief, so there is one that may be resolved.

13   Other than that, all the issues, the chain of title problems,

14   the wrong name, the work for hire --

15         THE COURT:  Explain what the work for hire is.

16         MS. RANAHAN:  Right.

17         THE COURT:  That's a one thing I don't fully

18   understand.

19         MS. RANAHAN:  Right.  So we went over this at the

20   original teleconference with you, Your Honor, and not -- so

21   it was the October 29, around there, teleconference, and so

22   there is a work for hire -- if you designate on a copyright

23   registration the work as a work for hire, the record labels

24   do this, they're basically saying we are the original creator

25   and owner and we never again have to have whoever actually

1   contributed to this say or any later down the road where you

2   renew it, you don't really need to get their concept for

3   anything in the future.

4           So it's a -- when they do it on a registration,

5   they're claiming this is ours, we go to the original owner,

6   and you need an agreement to do that.  You can't just --

7           THE COURT:  Give me an actual work, how that works.

8   Give me anything.

9           MS. RANAHAN:  I'm sorry?

10          THE COURT:  An actual --

11          MS. RANAHAN:  So they're recording a song.

12          THE COURT:  Who is "they're"?

13          MS. RANAHAN:  The record company.  So they have

14  publishers who --

15          THE COURT:  Capital Record Company.

16          MS. RANAHAN:  Right.  So let's say -- most of these

17  are sound recordings, which are distinct from composition.

18  So what we -- the sample we went after, the sound recording,

19  because that's where the work-for-hire issue is most enrich.

20  So the work for hire, they will check a box on a copyright

21  registration and say we, this is ours, we're the

22  work-for-hire owners and they can't do that unless they have

23  an underlying work-for-hire agreement with the artist.

24          THE COURT:  So the artist creates a song?

25          MS. RANAHAN:  Yes, and records it with the record

1   label's help, and they have to have a written agreement --

2            THE COURT:  With that artist?

3            MS. RANAHAN:  -- with that artist, that this is

4   ours, we're paying for this.

5            THE COURT:  The record copy is paying for it?

6            MS. RANAHAN:  The copyright interest is ours, it's

7   not yours.  You're yielding to us because we're here to

8   promote you and make you a big star.

9            THE COURT:  And the record company pays the artist

10  how much?

11           MS. RANAHAN:  Not enough if you ask them, you know,

12  but it depends on the artist, depends on the song.

13           THE COURT:  But anyway, that's the last payment the

14  artist ever gets?

15           MS. RANAHAN:  Depends on the artist.

16           THE COURT:  There is no royalties?

17           MS. RANAHAN:  There is royalties, there are

18  royalties.

19           THE COURT:  Okay.

20           MS. RANAHAN:  And then there is also -- but the

21  point being that they declare that and it has to mean

22  something.  They can't just say they're a work for hire if

23  they're not -- if it's not a work for hire.  They have to

24  prove that it's a work for hire.

25           THE COURT:  So a work for hire means we paid for

1    this song?

2          MS. RANAHAN:  And it's ours, and that they never

3    have another claim of copyright.

4          THE COURT:  Okay.

5          MS. RANAHAN:  Now, if they don't have -- if that's

6    inaccurate on the registration, they done have a right to a

7    statutory damage, because that's an invalid registration and

8    then that comes out of the case too, and --

9          THE COURT:  So you're saying eight -- there were

10   eight examples of that, that they determined that for eight

11   works they were filing suit on, they did not have a proper

12   work-for-hire agreement?

13         MS. RANAHAN:  Right, not at all, not even a

14   statement.  They had different agreements, nothing mentioned

15   in the work-for-hire clause, and that's what we want to

16   investigate with the additional works.

17         In addition to that, Your Honor, he mentioned two

18   categories that were something different from what they've

19   already agreed to produce ownership-wise, the work-for-hire

20   agreements, which we believe the sample yielded enough to

21   show that there may be a problem across the works, but also

22   this notion of a dispute document.

23         So if there is a dispute with the artist or someone

24   else saying, Wait a minute, we own this or, you know, the way

25   these entities change, there is some kind of dispute, we got

24

1    zero documents on that.  So to me that's either there is no

2    burden, because they don't have anything.

3            THE COURT:  So they said there were no disputes as

4    to those 110?

5            MS. RANAHAN:  Apparently.  I mean, there was

6    nothing proved to us.  So there is either -- they either

7    didn't look for it or there is no burden -- there is a very

8    minimal burden because they didn't have to gather anything

9    because there wasn't anything.

10           THE COURT:  But they had to inquire --

11           MS. RANAHAN:  I hope so.

12           THE COURT:  -- based on my order presumably.

13           MS. RANAHAN:  I hope so.  I mean, I would like

14   that, you know, that confirmation.

15           THE COURT:  Right.  So if there was nothing

16   produced, that means for that 110 -- the 110 wasn't random,

17   can we agree on that?

18           MS. RANAHAN:  I -- lots of them were knew.  We -- I

19   put it together and I can tell you we did not have any -- if

20   we knew they didn't own them, why would they be in the case,

21   and if they knew we knew, why would they be in the case.

22           THE COURT:  Well, but without getting into your

23   product, are you -- were they purely random?

24           MS. RANAHAN:  I tried to make an intelligent pull

25   this, pull here, but I mean, it was in a large part random.

1  You told us to take our best shot.  It was incredible brain

2  damage to try to come up with a sample that would yield

3  something, but it wasn't some kind of special like, I know

4  all of these are going to have issues, because how we would

5  know that?  And if they're going to --

6          THE COURT:  Well, they said you could know it just

7  by looking at material -- I've got to know if you've said

8  you've already agreed to provide.  Have you provided?

9          MS. RANAHAN:  We didn't have that material by the

10  time --

11          THE COURT:  For everyone of these categories you

12  said the defendants could determine this information through

13  chain of title discovery plaintiffs have already agreed to

14  provide, have you provided it?

15          MR. SPERLING:  The registration numbers were listed

16  on the exhibits, Your Honor, so they could go look at the

17  registrations themselves to try to identify these issues.

18  In.

19          In addition, Your Honor, there is overlap between

20  the works in this case and the works in the Cox case, that's

21  the case that you referred to.

22          THE COURT:  No, no.

23          MR. SPERLING:  But it's the same counsel, Your

24  Honor, so they knew the issues.

25          THE COURT:  I'm asking you a a plain question.  You

1    say you're going to produce registration information and

2    chain of title discovery for every work.  I think that's what

3    you're saying.

4            MR. SPERLING:  Yeah, correct.

5            THE COURT:  You're going to or have you done it?

6            MR. SPERLING:  We are going to, we have done it for

7    a substantial number.

8            THE COURT:  And we're incorporating what you

9    already have done in the other lawsuit?  Yes or no?  You've

10   produced this information previously in the other lawsuit?

11           MS. SAHNI:  We will be producing it again, here,

12   Your Honor.

13           THE COURT:  Okay.

14           MS. SAHNI:  They already have access to it by

15   virtue of that other lawsuit.  We'll take the step of

16   reproducing it here so it's in the record.

17           THE COURT:  But you haven't yet?

18           MS. SAHNI:  Not yet.

19           MS. RANAHAN:  And not the work-for-hire agreements,

20   Your Honor, so that was the --

21           THE COURT:  I know, we're going to get to that.

22           MS. RANAHAN:  And also in Cox, Your Honor, there

23   were works that they just amended out of this case that were

24   subject to the judgment in Cox.  So, you know, the point

25   being that we can get through an entire lawsuit if they're

1    not challenged on things like this and they will go to the

2    end still claiming a right when they -- if they look deeper.

3              THE COURT:  Are you doing anything to challenge

4    that, then, in Cox?

5              MS. RANAHAN:  I would hope so.  I'm not on the Cox

6    team, unfortunately or fortunately, depending on how you look

7    at it, but I believe that's a subject of -- I mean, that --

8    it just happened here, right, and we're looking at it, you

9    know, it's interesting that it would -- and they were ordered

10   to produce the work-for-hire agreements in that case.

11             So I don't know what the reason was that they

12   pursued damages claims which now, looking at the face of the

13   registration so obvious, if it's obvious, why was it in this

14   case.

15             THE COURT:  Let me ask you something.

16             MR. SPERLING:  Yes, Your Honor.

17             THE COURT:  Are you counsel in Cox?

18             MR. SPERLING:  I am not, Your Honor, Mr. Oppenheim.

19             MR. OPPENHEIM:  I was lead counsel for Cox.

20             THE COURT:  Can I ask you this?

21             MR. OPPENHEIM:  Happy to.

22             THE COURT:  Is it acceptable in a federal court

23   after a jury renders a verdict that there may be a 5

24   percent -- I'm going to throw out a number, a 5 percent rate

25   that the collective plaintiffs had no right to the works so

1    that that's $50 million?  Is that an acceptable way to

2    proceed in federal court in a damages case, that you get that

3    $50 million, even though as a technical matter you weren't

4    entitled to it?  Is that proper?

5            MR. OPPENHEIM:  So the answer, I have no idea that

6    that's not the situation in the slightest.

7            THE COURT:  No, but hypothetically, is that proper?

8            MR. OPPENHEIM:  I can't -- Your Honor, I'm not in a

9    position to opine on that.  The plaintiffs in that case were

10   sued works that we had every rights to pursue.  The

11   defendant, counsel on the other side, Winston & Strawn,

12   defended vigorously on the ownership issue, on the

13   registration working, on the work-for-hire issue.  They lost

14   those issues.  We won those issues.

15           THE COURT:  You mean on the discovery?

16           MR. OPPENHEIM:  Not only on discovery, Your Honor,

17   but on summary judgment.  We won summary judgment of

18   ownership on everyone of the works that we moved on.

19   Actually, I take that back, there were a handful of works

20   that we dropped found at the end because of issues, but we're

21   talking about 10 or 12, I believe.

22           On the work-for-hire issue, we had an entire

23   briefing and there was a decision by the Court on the

24   work-for-hire issue, and the Court decided that if a -- if a

25   company -- the designation of a copyright registration, of a

1   work is a work for hire, even if it's not work for hire, does

2   not invalidate the registration.

3           So Ms. Ranahan --

4           THE COURT:  No, she said it just doesn't entitled

5   you to statutory damages, that's what she said.

6           MR. OPPENHEIM:  No, she's simply wrong.  She is

7   (inaudible - away from mic) in this case, Your Honor.  They

8   assert that if a party marks the work as work for hire, and

9   it's not, a copyright registration is invalid, that's the

10  assertion.  They cite to no authority for that proposition,

11  and the reason they cite to no authority for that proposition

12  is because there is no authority for that.  In fact, they are

13  acutely aware that the authority in the Cox case goes the

14  other way and says that not the case.

15          The registration of something where a party may

16  have marked it as work for hire when it's not, does not

17  invalidate.  And in this case, as in Cox, they acknowledge

18  that the plaintiffs ultimately own works.  It's not an issue

19  of ownership.  They're not disputing the ownership and even

20  their letter here said they don't dispute ownership.  They're

21  just saying that there may have been a box checked for eight,

22  or they disagree.  Whether or not -- we could litigate over

23  those eight, but it doesn't matter, the plaintiffs still own.

24          Going back to the Cox case, Your Honor, in the Cox

25  case the Court ruled that we own works and they were properly

30

1    registered and they were before the jury.

2            THE COURT:  Right, and by -- you don't need to

3    stand, but you can.  Have you seen the outcome of this 110

4    sample?

5            MR. OPPENHEIM:  I have, Your Honor.

6            THE COURT:  Okay.  And do you believe now that

7    every plaintiff that prevailed in the Virginia case actually

8    was the correct legal entity, having the correct ownership

9    right, every single one, was the correct legal entity having

10   the correct legal ownership right and is entitled to that

11   money as a matter of law?  Do you believe that sitting here

12   today?

13           MR. OPPENHEIM:  Your Honor, I believe that the

14   judgment --

15           THE COURT:  No, no, that's not what I'm asking you.

16   If you can't answer the question, say you can't answer the

17   question.

18           MR. OPPENHEIM:  Your Honor, I'm not sure -- I

19   can't -- I believe that the judgment that was rendered there

20   on every single work was an appropriate judgment.  I believe

21   that the -- not only by the jury, but by the judge.

22           To the extent that they're now suggesting because

23   certain works were dropped that we did not -- appear to not

24   own the works, there is no evidence to suggest that.

25           THE COURT:  That's not the question I asked you.

1    If you can't answer my question, I appreciate that.

2           MR. OPPENHEIM:  I can't answer your question.

3           THE COURT:  Okay.

4           MS. RANAHAN:  Can I just say one thing about what

5    happened on this issue?

6           THE COURT:  Yes.

7           MS. RANAHAN:  In the Cox case, we didn't have the

8    work-for-hire agreements, so it wasn't before the judge, and

9    the discovery court didn't allow it, but it wasn't raised

10   like I'm raising it now.  It was kind of a side issue that

11   wasn't really emphasized.  Once we got to trial, we realized

12   we needed this, we didn't have them, so now we're going to

13   try to get them in this case.

14          Separately what happened on the Cox rulings for

15   these issues that were presented on summary judgment, is the

16   Court struck our declarations finding them to be getting

17   around the page limit, the attorney declarations trying to

18   make this argument, so just disregarded all of the chain of

19   title issues that we found just as a procedural matter saying

20   these are trying to get around the page number, I'm not going

21   to read it.  I understand it's dry and boring and long stuff,

22   but we had a lot of arguments there that were disregarded

23   procedural.

24          On top of that, plaintiffs were able to cure any --

25   they were able to submit declarations that said, Well, we may

1  not be the party that's on the registration, but we're

2  affiliated with them so it's okay.  I mean, they -- and those

3  declarations were by contrast to ours accepted.

4       So these are issues that are for later, but they

5  haven't been -- there is no authority saying that the

6  work-for-hire issue doesn't matter.  It actually wasn't

7  litigated, we didn't have the work-for-hire agreements.  And

8  what happened in Cox is not a fulsome review of the

9  ownership.

10       MR. OPPENHEIM:  Your Honor, I will allow

11  Mr. Sperling to give you a little more detail and background

12  on this, but one thing Ms. Ranahan said, she wasn't counsel

13  in the Cox case (inaudible - away from mic) and so maybe she

14  doesn't know the record.  There is a written opinion on the

15  work-for-hire issue in the Cox case.  They didn't cite it to

16  you, they should have.  And I don't know why they wouldn't

17  have.

18       It's a lengthy decision.  It not only says -- it

19  goes into detail as to why a work-for-hire agreement still

20  needs to be produced, but it cites to other authority on

21  which the Court came to a similar conclusion.

22       MS. GOLINVEAUX:  Your Honor, I apologize, but I

23  don't know if Mr. Oppenheim is at a microphone, because I'm

24  not able to hear him.

25       THE COURT:  He should be.

1           MS. GOLINVEAUX:  Okay, I apologize.

2           THE COURT:  That's one of the downsides of

3    appearing by phone, I'm sorry.

4           MR. SPERLING:  Your Honor, let me try and work

5    back, okay.

6           THE COURT:  Can I throw out a proposition and I

7    want to hear your reaction to my proposition, that no matter

8    how large a case is with no matter how many plaintiffs and no

9    matter how difficult it is to determine who is entitled to

10   what, this process should be about absolute truth if we can

11   achieve it.  And so a case that -- I reject the proposition

12   that a case can be so large that close enough is good enough.

13   I want to know that you agree with that.

14          MR. SPERLING:  I agree with that, Your Honor.

15          THE COURT:  Okay.

16          MR. SPERLING:  And that's why I think it's useful

17   to talk -- talk a little bit less about the Cox case,

18   although the precedent there is relevant.  Talk about this

19   case.

20          THE COURT:  I agree.  No, I'm not going to rely on

21   anything out there because I have to determine what the law

22   is here and both of you are saying that -- well, none of you

23   are ever going to agree with anything that judge or any judge

24   in this district does, that's 100 percent certain.  We just

25   have to accept that on our side wearing the robes.  But I

34

1   don't want -- I don't believe that a case is ever so large,

2   so burdensome or so expensive that close enough is good

3   enough.  So if it's a 3 percent error rate and maybe there is

4   3 percent of the plaintiffs who were in the wrong name, there

5   is no actual ownership, but that's okay, because it would be

6   too burdensome to figure out proof to an absolute certainty.

7          I don't like that, I don't want that, and I'm not

8   saying we have to go through there and I'm not saying you're

9   there.  I'm just saying that that's what I'm kind of hearing

10  from them in a sense that there is a lot -- not a lot.  We'll

11  say a percentage, and even if it's 3 or 4 percent, when

12  you're talking about a billion dollars, that's 30 or $40

13  million, which is real money to most people.

14         So ultimately if there is a plaintiff, no matter

15  how many there are, that goes to trial or some kind of

16  verdict in our district, that plaintiff has to have the same

17  rights and entitlement to a verdict as if it was the single

18  plaintiff in a single plaintiff case.  They have to have

19  jurisdictional standing.

20         And one of the things you tell me is that, for

21  example, a name was changed from Warner Brothers Records,

22  Inc., to Warner Records, Inc.  Are those two separate

23  entities?  Are those distinctly incorporated entities?

24         MR. SPERLING:  Your Honor, I believe one is the

25  successor to the other.  Successor is probably inaccurate.  I

35

1    believe there was simply a name change.

2              THE COURT:  Okay, and that's fine.

3              MR. SPERLING:  It's not a successor entity.

4              THE COURT:  But if there is not -- so you would

5    agree, though, that if there are two separate corporations,

6    we need to have the correct corporation with the correct

7    ownership interest identified in this case?  You agree with

8    that?

9              MR. SPERLING:  That is our goal, Your Honor.

10             THE COURT:  Yeah, you agree that that is the law?

11             MR. SPERLING:  I agree that that's the law, Your

12   Honor.

13             THE COURT:  Okay.

14             MR. SPERLING:  The owner of the work should be

15   claimant, the plaintiff in the case, have to be.

16             THE COURT:  They have to be.

17             MR. SPERLING:  Have to be.

18             THE COURT:  They wouldn't have standing otherwise,

19   agreed?

20             MR. SPERLING:  Right.  And so what we're focused

21   here therefore is, okay, what sort of discovery do we need to

22   get us there?

23             THE COURT:  Right.

24             MR. SPERLING:  Right.  Is -- are the Cox

25   registrations and the chain of title documents sufficient or

1    would production of the work-for-hire agreements somehow shed

2    more light on that, and so that's the question.

3           And what Ms. Ranahan told you is, Oh, the

4    work-for-hire agreements did shed more light.  Why?  In what

5    way?  So what she said is, and what they said in their papers

6    is, Well, work-for-hire agreement shed light because even

7    though they didn't establish or suggest that the plaintiffs

8    don't own the works, they do call into question, in their

9    view, they do call into question whether the works were

10   properly registered as works for hire.

11          And the key predicate to their whole argument, what

12   Ms. Ranahan told you, is if it's not a work for hire, then

13   even if the plaintiff owns the work, the registration is

14   invalid.  And you can see it in their papers because they

15   said in footnote 9 of their papers that this would not be

16   fatal to plaintiff's right to join force their ownership of

17   their works.  They say the registration is invalid, you have

18   to reregister, and that would be fine for the future, but it

19   turns out that the plaintiffs would be out of luck because

20   the statute of limitations would have run here as against

21   Charter.

22          So what Mr. Oppenheim began to explain to the

23   Court, is that proposition, that if we own the work, but we

24   mistakenly designate it as a work for hire, again, indulging

25   their assertion that that's what happened, that that would

1   result in the copyright registration being invalid, that is

2   unsupported.  They did not cite any authority to you.  The

3   reason they didn't cite any authority to you is because there

4   is no authority.

5          And what they didn't tell you, and Mr. Oppenheim

6   did, is that in the Cox case there is a written ruling, they

7   made the argument that there were works that were improperly

8   designated as work for hire, that that resulted in the

9   registrations being invalid and that therefore the plaintiffs

10  could not proceed on those works.  And the Court said, No,

11  you're wrong because it doesn't call into question the

12  plaintiff's ownership of the work, it's a technical defect

13  that does not invalidate the registration.

14          THE COURT:  But that proposition I can agree.  Is

15  that the only authority out there?

16          MR. SPERLING:  No, Your Honor, because this case

17  cited others.  I'm happy to read the citations to you in the

18  record.

19          THE COURT:  No, I don't need that.  I think in my

20  view actual ownership is the key.

21          MR. SPERLING:  So let me read you --

22          THE COURT:  Actual legal ownership.

23          MR. SPERLING:  -- one the cases that it cited.

24          THE COURT:  But if they -- but that's just my view.

25  If their position is that the statute requires proper

1    registration, well, that's a different matter.

2         MR. SPERLING:  No, so, Your Honor, let me read you

3    an example of a prior case this was cited by the Cox Court.

4         Defendant's idle assertions regarding the possible

5    that these Bob Marley songs were improperly registered as

6    works for hire, as well as defendant's other unsupported

7    evidentiary complaints, are simply insufficient to create a

8    genuine issue of material fact as to plaintiff's ownership of

9    the songs.

10        That's the issue.  They're conflating these things

11   and saying, well, if it turns out it's not a work for hire,

12   then it calls the registration -- it invalidates the

13   registration, but they acknowledge footnote 9, Your Honor,

14   they acknowledge that we own the works.

15        MS. RANAHAN:  No.

16        MR. SPERLING:  And so therefore, even with respect

17   to the work for hire examples that they are pointing to, this

18   exercise did not establish any defect in our ownership of any

19   of the 110 works in the sample.

20        THE COURT:  But is it your position that the

21   statute simply requires actual ownership as opposed to proper

22   registration?  Is that the law?

23        MR. SPERLING:  Your Honor, the law is that

24   technical defects in the registration that don't go to --

25   that are not material do not invalidate the registration.

39

1            THE COURT:  No, no.  An invalid registration even

2     if there is actual ownership would then disqualify the

3     plaintiff from standing; is that correct?

4            MR. SPERLING:  If there was an invalid

5     registration, then we would not be able to sue on the work.

6            THE COURT:  So registration is the lynchpin, not

7     actual ownership?

8            MR. SPERLING:  With respect to the ability to sue

9     on this infringement, yes.

10           THE COURT:  Okay, very good, understand.

11           MS. RANAHAN:  So, Your Honor, a couple of things.

12     Correct, the registration is what matters here for statutory

13     damages and because if it's invalid, then they would have no

14     standing right here today.

15           The ownership question is not something that we've

16     agreed to either.  If there is an artist who recorded

17     something and the record labels, you know, avoided that

18     artist's rights and filed it themselves, there is someone

19     else that could own it, the artist, namely, could be the

20     owner of that work, in fact.  That's the whole point is that

21     they inaccurately without a proper agreement with the artist,

22     they've claimed it as their own when in fact there is another

23     owner out there.

24           THE COURT:  No, hypothetically you're right, but do

25     you see any of that here in this case?

1          MS. RANAHAN:  We have eight works in this case

2     based on the sample ownership production where there was no

3     work-for-hire agreement.  So that would be -- and you're

4     right that we haven't received any dispute information.  I

5     would still like a representation that they looked for that

6     as opposed to just, you know, ignore that category, but it

7     could very well be that the artist has a claim in that and

8     doesn't even realize this is happening and that's happened

9     before.

10          So we didn't see it in what they produced, but I

11    think once we have a work-for-hire issue, we could take the

12    deposition of the artist and find out if there an issue with

13    that --

14          MR. SPERLING:  Your Honor.

15          MS. RANAHAN:  -- or submit a subpoena.

16          THE COURT:  Yeah, hold on, let her finish.

17          MS. RANAHAN:  But there are actual ownership --

18    it's not the -- the registration is what matters here because

19    if that's invalid, there is no right to bring it here.

20          THE COURT:  I think we've established that.

21          MS. RANAHAN:  Right, but it's also an ownership

22    question.

23          THE COURT:  But they disagree with you on what

24    invalidates a registration.

25          MS. RANAHAN:  Right, and that would --

1          MR. SPERLING:  Correct, Your Honor.  And, Your

2    Honor, I point out, you know, the works that they're talking

3    about, these eight works, the artists are, for example, Cold

4    Play, George Michael, Pit Bull, Muse.  You know, their

5    suggestion is that we are out there, we are manufacturing and

6    selling CDs containing these works.  We're selling the

7    downloads on the iTune store, we're licensing it to Spotify

8    and to Amazon for them to issue it through their streaming

9    services, right, and we don't know it.  And somehow Cold

10   Play, Cold Play has failed to notice that we are selling CDs

11   with the song.

12          THE COURT:  Okay.  So in your experience with this

13   kind of litigation, and is it your representation to me that

14   you have never seen that happen in the history of your

15   practice of law?

16          MR. SPERLING:  I personally have never had an

17   instance, Your Honor, where the record company was exploiting

18   sound recording by an artist like this without the rights

19   thereto.

20          THE COURT:  Very good.

21          MR. SPERLING:  But I'll tell you, Your Honor -- but

22   I'll leave it at that.

23          THE COURT:  Okay, I accept that.

24          MS. RANAHAN:  Your Honor, the names that they've

25   withdrawn, you want to talk about some big music names, Elton

42

1   John, Billy Joel, Eric Clapton, M&M, those are works that

2   they have originally named that they have now taken out.

3          THE COURT:  But they've said that they've done that

4   for reasons that are unrelated to the lack of -- any lack of

5   registration.

6          MS. RANAHAN:  Well, their ability to sue on those

7   or we don't know because we didn't get -- they removed,

8   right.  I mean, they didn't produce the ownership documents

9   because they took them out.

10         So the notion that they're always going to be doing

11  the right thing for the artist, we can see based on their own

12  amendments that they asserted claims here that they got --

13         THE COURT:  Well, I'll pose the same question to

14  you.  How long have you been practicing in this field?

15         MS. RANAHAN:  16 years.

16         THE COURT:  So have you seen an example of a record

17  company misappropriating a work and doing what he said,

18  putting it, selling it out there on the market without the

19  permission of the artist?

20         MS. RANAHAN:  You mean from a business perspective?

21         THE COURT:  No, from a legal perspective.

22         MS. RANAHAN:  Unfortunately, I'm not in that type

23  of litigation with disputes between them, but I'm sure that

24  it's happened, Your Honor.

25         THE COURT:  Yeah, but I can't deal on hypotheticals

```
 1   calls --

 2           MS. RANAHAN:  Right.

 3           THE COURT:  -- with litigation disputes, so I

 4   won't.

 5           MS. RANAHAN:  Right, okay.  Well, the work for hire

 6   is a real legal issue.  The Napster Court ordered

 7   work-for-hire agreements.  We cited other several other

 8   cases, the Mixster case where they ordered the work-for-hire

 9   agreements.  This is a real issue that we're entitled to look

10   into.  It doesn't apply it to all 11,000 works.  It applies

11   mostly to the sound recordings.  It was 106 of our 111 works,

12   and once they do --

13           THE COURT:  But he disagrees with the relevance.

14   That's what we've got to figure out.  He says that regardless

15   of -- even if the work-for-hire box is checked and there

16   wasn't an actual agreement does not invalidate the

17   registration, and what's your position on that point?

18           MS. RANAHAN:  It absolutely would, and he cited

19   what the law was, which is if it's a material

20   misrepresentation, it would invalidate it.

21           Now, whether we would have to submit that to the

22   copyright office for an interim decision --

23           THE COURT:  Well, if it's a misrepresentation, it's

24   intentional.

25           MS. RANAHAN:  It's intentional and -- right, and so
```

44

1    that would -- if it's material, is what it is.  So if it's

2    considered a material and if it's intentional, that's

3    correct.  So we believe it would be absolutely invalidate it.

4    There may be an interim step where we present it to the

5    copyright office.

6              THE COURT:  But do you have legal authority to

7    that, to support what you just said?

8              MS. RANAHAN:  The law is that if there is a

9    material omission, it's invalid.

10             THE COURT:  No, no, no.  Do you have precedent

11   establishing that the failure -- incorrectly designating it

12   as a work for hire itself invalidates a registration?

13             MS. RANAHAN:  I mean, we have right now -- I don't

14   know if we have a case that has gone that far either way.

15   There is not -- they cite the Cox, but they didn't have the

16   agreements there so it wasn't an issue.  We have plenty of

17   cases that order it to be produced and then it ends up

18   reducing the number of works.

19             So I do not believe there is an actual Court that

20   has weighed in on that exact question, unless I'm mistaken, I

21   don't think there is a Court, but the point of the law is

22   that if it's a material mistake, and a work for hire is such

23   a major thing, it's a way for them to take the rights away

24   from the artist right where they create the works so they

25   don't have to deal with the renewals or transfers.

1          THE COURT:  Are works-for-hire agreements typically

2     perpetual or are they time limited.

3          MS. SAHNI:  The nature of the work-for-hire

4     agreement, Your Honor, is that it means that the employer so

5     to speak in the work-for-hire context, the person for whom

6     the work for hire is made is the owner ab initio.

7          So it lasts for the duration of the copyright until

8     the copyright expires and the work passes into the public

9     domain.

10          THE COURT:  Okay.

11          MR. SPERLING:  But, Your Honor, I mean, there is no

12     authority -- the reason why Ms. Ranahan can't cite any to you

13     is because there is no authority that is ever held that a

14     registration, right, is invalid because of a work-for-hire

15     designation when in fact the registrant owns the work.  There

16     are several cases that have held to the contrary.

17          MS. RANAHAN:  But that's not true, Your Honor.

18          MR. SPERLING:  If it's not true, then she should

19     cite the case to the Court and we can stop arguing about it.

20          MS. RANAHAN:  It's not true.  There are cases that

21     have found that a work-for-hire omission or mistake is not

22     material and it wouldn't invalidate.  There is nothing that

23     says that.  They're citing to the Cox case that -- we didn't

24     have the agreements to even introduce, but there are cases

25     that hold an intentional misrepresentation, whatever that

46

1   maybe, on a copyright registration, that's enough to

2   invalidate it, so --

3           THE COURT:  But except we can't -- okay.  We can't

4   engage in discovery on all 11,000 works as to whether there

5   was a material misrepresentation on any -- on all the

6   registrations, we can't do that.

7           MS. RANAHAN:  Well, there aren't 11,000 work for

8   hires.  It's a much smaller number, Your Honor.  It's only

9   sound recordings, which is about half, and then only those

10  sound recordings for which there is a work for hire, so the

11  burden is even less.

12          Also, Your Honor, if I could, it's not one per

13  work.  They'll have like a whole album and it will apply to

14  like ten songs at a time.  So it's even less.  They've come

15  up with this structure of like one hour per one song.  That's

16  not how it works.  They have like a compilation album where

17  they will have 12 songs on it.  That's one -- the

18  work-for-hire agreement applies once or to the artist it will

19  apply across the once.

20          THE COURT:  Right, but the registration information

21  you're going to provide, does it identify whether the work is

22  a work for hire or not?

23          MR. SPERLING:  Yeah, the registration certificate

24  will say on its face.

25          THE COURT:  So you'll provide registration

1  certificates for all the works you're suing on?

2          MR. SPERLING:  Correct, Your Honor.

3          THE COURT:  And it will say whether it's a work for

4  hire or not?

5          MR. SPERLING:  Correct.

6          THE COURT:  And then you believe that will be

7  somewhere around 30 or 40 percent of the works from the math

8  you just gave me?

9          MS. RANAHAN:  That's probably -- it's probably most

10 sound recordings.  I mean, they would not know more than I

11 would, but from our sample, for instance, it was 106 out of

12 110 sound recording.  I don't think it would be that way for

13 the compositions, unless I'm mistaken.  I think they only

14 claim it for sound recordings, and sound recordings

15 represent, is it just a little more than -- oh, it's like

16 7,000 or something -- 7,000 of the works, so it wouldn't

17 be -- in addition to that, Your Honor, what I'm trying to

18 convey is that it's not one per work.  It's like the whole

19 artist.  So, say, George Michael, he's produced four albums

20 with them, there is one work-for-hire agreement in everything

21 that he makes after that, and so it's not this --

22          THE COURT:  Again, so we're talking about several

23 thousand work-for-hire agreements total out of the --

24          MS. RANAHAN:  I don't know if they have.  I

25 don't -- they could be checking this box and not have any.  I

1   don't know how many work for --

2            THE COURT:  No, no, for which a box was checked.

3            MS. RANAHAN:  Right.

4            THE COURT:  Several thousand works, they're going

5   to provide registrations and several thousand of those

6   registrations will have the box checked work for hire?

7            MS. RANAHAN:  Correct.

8            THE COURT:  All right.  And you want all of those

9   work for hire agreements out of all those thousands of works?

10           MS. RANAHAN:  To the extent they exist.  There was

11  eight for a sample they don't exist, so we want to know where

12  they don't have them because that's relevant to why they --

13           THE COURT:  So for the sample, eight had

14  registrations that checked work for hire when, in fact, there

15  was no work-for-hire agreement?

16           MS. RANAHAN:  Correct.

17           MR. SPERLING:  So, Your Honor, three important

18  points.  First of all, with respect to the last

19  representation.  That's not correct.  Their own papers

20  reflect that that is not correct.

21           THE COURT:  Okay.  What is correct?

22           MR. SPERLING:  There are some instances in their

23  work-for-hire agreements and they postdate the recording of

24  the track at issue, and as their papers indicate, there is a

25  circuit split as to whether that allows you to claim work for

49

1   hire or not.

2           THE COURT:  So it's grandfathered in potentially?

3           MR. SPERLING:  Correct, Your Honor.  So it's --

4   their own papers reflect that that last representation by

5   opposing counsel is simply not true.  It's not the case that

6   for all eight there are no work-for-hire agreements.

7           THE COURT:  But there were for some?

8           MR. SPERLING:  There are for some, Your Honor.

9   Let's dial back to where we are.

10          The purpose of this exercise, the 110 sample, was

11  to determine whether this additional documentation identifies

12  any gaps in ownership.

13          THE COURT:  Right.

14          MR. SPERLING:  Okay.  And that's what you said,

15  Your Honor, you said two hearings ago:  If you have a

16  statistically significant amount that cannot be proven to be

17  owned by the plaintiffs, then you have something to talk

18  about.

19          There is no suggestion here, you have no suggestion

20  in this courtroom today, Your Honor, that the documentation

21  that we produced calls into question our ownership of those

22  eight works.

23          Instead what you've heard is that even though it

24  doesn't call into question ownership, they have a theory, a

25  theory that has been rejected by every Court that has ever

50

1   considered it, that says that if we own it, but we

2   erroneously designated it as a work for hire, then the

3   registration is invalid.

4          So the purpose of the exercise was to determine

5   gaps in ownership and it's shown none on the basis of that

6   documentation, and they're here on a new issue, with what is

7   essentially a new argument as to why this information should

8   be provided, and that new argument is based on a legal theory

9   that no Court has ever accepted.

10          THE COURT:  Right, but so what is -- did you ever

11   have statistics?

12          MR. SPERLING:  I did not.  I wish that I had.

13          THE COURT:  Did anybody -- I had Stats 1 and 2.

14   Did anybody have stats.

15          UNIDENTIFIED SPEAKER:  I took a basic stats.

16          THE COURT:  All right.  So what would you consider

17   statistically significant to be?

18          MS. RANAHAN:  Well, Your Honor, I think the problem

19   is, as Mr. Sperling noted, is the number eight is inaccurate.

20          THE COURT:  No, I know, forget that.  As a matter

21   of science, what is statistically significant?  It all

22   depends, doesn't it?

23          MS. RANAHAN:  Yeah, it depends on the sample.

24          THE COURT:  I mean, if ten guns -- if one gun out

25   of every 100 used by movie producers actually has a live

1   round in it instead of a dummy round, you would say 1 percent

2   is statistically significant, wouldn't you?

3           MR. OPPENHEIM:  If you said one coffee pot

4   (inaudible - away from mic).

5           THE COURT:  And if you said one cookie out of 100

6   has gluten in it, when in fact they were supposed to be

7   gluten free and the person eating a gluten-filled cookie

8   would die, 1 percent would be statistical significant.

9           MR. SPERLING:  Your Honor, even though I didn't

10  take Statics, here is what I know, 0 out of 110 is not

11  statistically significant.

12          THE COURT:  Exactly, we know that.

13          MR. SPERLING:  And that's the only thing we need to

14  know to resolve this issue.

15          THE COURT:  It's a null set.

16          MR. SPERLING:  It's a null set, Your Honor.  You

17  said let's go through a sample, let's see if it identifies

18  gaps in ownership.  It's a null set.

19          THE COURT:  Yeah, but you even admit that although

20  some of those registrations that had works-for-hire box

21  checked, but they weren't properly -- the registration was

22  incorrect was because that the works-for-hire agreement was

23  dated after that.

24          MS. RANAHAN:  One of them.

25          THE COURT:  I'm asking -- you agree, though that

1    for some of those work-for-hire registrations -- do you agree

2    that any of those works in that sample, the registration was

3    legally invalid?  Do you say that --

4           MR. SPERLING:  The registration was invalid?

5    Absolutely not, Your Honor.

6           THE COURT:  But that's based on your interpretation

7    that even absent a work-for-hire agreement if the box is

8    checked it's still valid.

9           MR. SPERLING:  Correct, which is the interpretation

10    adopted by the Cox Court and the Courts that the Cox Court

11    cited.

12           THE COURT:  You also believe that for everything --

13    every of the 110 that you provided, that purported owner was

14    the actual legal owner?

15           MR. SPERLING:  Yes, Your Honor.

16           THE COURT:  Okay.

17           MS. RANAHAN:  Just to clarify the numbers, it was

18    seven where there was no agreement, one that postdated, which

19    under some circuits is not good enough, under others it, the

20    Tenth Circuit has not weighed in.  But there are seven --

21    which, going back to the 110, seven where there is no

22    work-for-hire agreement, and we take the position that an

23    intentional misrepresentation on the copyright certificate is

24    enough to invalidate.

25           THE COURT:  But you can't know whether it's

53

1    intentional without discovery on every single one because --

2           MS. RANAHAN:  Well, we're going to take discovery

3    of their plaintiff representatives and this will be a

4    30(b)(6) topic, so --

5           THE COURT:  No, I know, but again, you would have

6    to go through every single one of those to see if the

7    omission was intentional.

8           MS. RANAHAN:  Correct, but that is -- Your Honor,

9    as you stated earlier, just because you're bringing this the

10   way that you are doesn't mean that each isn't supposed to be

11   correct.  We want to get to the truth here.

12          So the fact that, yes, we have to go through it,

13   the fact that they brought 65 plaintiffs and 11,000 works

14   doesn't take away.

15          THE COURT:  I'm not saying I would allow that, but

16   if I did, are you willing to pay for the expense on both

17   sides of that discovery?

18          MS. RANAHAN:  Of the work-for-hire agreements?

19          THE COURT:  Yes.

20          MS. RANAHAN:  Your Honor, they're already producing

21   all of the chain of title, they just got a tentative verdict

22   of a billion dollars, they're seeking a billion from us and

23   we have to pay for them to add --

24          THE COURT:  No, no, I'm asking.  I'm not telling

25   you you have to.  I'm asking, if that were the precondition,

54

1   would you accept it?

2          MS. RANAHAN:  Well, I would have to find out how

3   much that costs.  I can't understand how just getting the

4   work-for-hire agreements is all that burdensome given that

5   they're already --

6          THE COURT:  But that's not going to be enough for

7   you, even getting all the work-for-hire agreements because

8   that still doesn't tell you whether the omission was

9   intentional or not.

10         MS. RANAHAN:  Well, we're going to take 30(b)(6)

11  representative depositions where we will ask, so, yes, we

12  will have that opportunity in depositions.

13         THE COURT:  Not for every single one.

14         MS. RANAHAN:  Yes, for every single one.  We go

15  through -- any that we have an issue with, we will ask their

16  30(b)(6) representative about --

17         THE COURT:  Well, I don't think anybody could

18  possibly be educated on every single one of several thousand

19  without spending --

20         MS. RANAHAN:  Well, they have to be because that's

21  what their 30(b)(6) obligation is.

22         THE COURT:  Well, if I allow it.

23         MS. RANAHAN:  Well, I mean, we're going to put the

24  topic in there and we want to investigate -- we want to

25  investigate --

55

1           THE COURT:  But they'll object to the topic and

2    I'll be deciding it.

3           MS. RANAHAN:  If it's not -- it's not just -- it

4    doesn't have to be intentional.  That's one way to invalidate

5    it.  I'm telling you that's one avenue.  There is also just a

6    material misrepresentation that can be reckless, that's also

7    another ground, but --

8           THE COURT:  No.  I get the gravamen of the issue.

9    Do you both of you agree that the critical analysis will be

10   whether this Court, ultimately Judge Jackson, agrees with

11   either of you as to the import of a registration in which

12   there was no -- all of the box work-for-hire was checked,

13   there was no, in fact, work-for-hire agreement, don't you

14   agree that that's an important legal decision that should be

15   made?

16          MR. SPERLING:  It's an important legal issue, Your

17   Honor, it bears on relevance.  You know, Ms. Ranahan just

18   said to you, well, if it was intentional, then that would

19   invalidate the registration, but that too again, Your Honor,

20   is not the law.  I'll read to you, quote:  Neither innocent

21   misstatements nor deliberate, but nonmaterial misstatements,

22   will overcome the presumption of validity.

23          And so since they're not disputing the ownership

24   and there is nothing about what was produced that calls into

25   question the ownership, the error, even if intentional in

56

1    that hypothetical world, still wouldn't invalidate the

2    registration.

3            The case is 720 F.Supp.2d 904 at 914 and it is

4    quoted in the Cox decision, which obviously was endorsing

5    that view, and that's 2019 Westlaw 6357963 at star, if I

6    can -- at star 7, Your Honor.

7            THE COURT:  Okay, okay.

8            MS. RANAHAN:  Your Honor, there is -- we have law

9    on page 8 of out statement which goes through the work for

10   hire and why people have found it relevant in other

11   circumstances.

12           What actually counsel isn't mentioning is that to

13   invalidate a registration, it's actually something that we

14   could ask the copyright office to weigh in and give an

15   interim decision, that happens frequently in these cases

16   where there is an issue about whether the registration itself

17   should be invalidated.  We could --

18           THE COURT:  Are you saying, in essence, certifying

19   a question of law to --

20           MS. RANAHAN:  It's a -- it's a thing that happens

21   in copyright cases when the registration validity is at

22   stake, they will take -- they basically take the question and

23   will issue an interim opinion.

24           THE COURT:  Why haven't you done that already?

25           MS. RANAHAN:  Well, we don't have -- I mean, we

1    don't have -- we just got the work-for-hire agreements last

2    week.  We don't even know the scope of the issues.

3             THE COURT:  No, but you knew this issue was coming.

4             MS. RANAHAN:  No, we have to have specific

5    registrations to do.  We present the registration and say on

6    this -- it's not like an advisory opinion.  It's here a

7    registration where we see a problem, is this material and do

8    you --

9             THE COURT:  Do you agree that -- what entity will

10   do this?

11            MS. RANAHAN:  I'm sorry.

12            THE COURT:  The entity that will do this?

13            MS. RANAHAN:  The copy, the U.S. Copyright Office.

14            THE COURT:  So do you agree the U.S. Copyright

15   Office will render an opinion on those facts?

16            MR. OPPENHEIM:  Your Honor, I've been practicing in

17   the music space for over 20 years.  I've never once ever

18   heard of that, let alone seen it happen, and it has been the

19   majority of my practice for the last 20 some years.

20            THE COURT:  So you don't believe that exists?

21            MR. OPPENHEIM:  I'm not aware of it.  There are

22   situations in the architectural context where there have been

23   disputes.  I've never in the music space, the publishing

24   space or the software space ever seen anything like when

25   Ms. Ranahan has just suggested.

58

 1            THE COURT:  Okay.

 2            MS. RANAHAN:  It's under the Copyright Act, Your

 3    Honor.  I've done in it in cases.  It basically says that the

 4    copyright mandates that in order to invalidate a

 5    registration, the Court shall request that the registrar of

 6    the copyright office advises whether this inaccurate

 7    registration -- or this inaccurate information if known would

 8    have caused the registrar to refuse the registration.  So

 9    that's an actual procedure, I've done it.  I did it in a case

10    two years ago, so I know it exists.  I'm not making this up

11    and it's in the copyright office.  I', sorry, it's in the

12    Copyright Act.

13            THE COURT:  So you've said you've done it before,

14    what's the turnaround time?

15            MS. RANAHAN:  It took about -- it was surprisingly

16    quick, it took a few months.  It wasn't a year or anything,

17    so -- with our extended schedule, we would have time.

18            THE COURT:  So what do you think about that?

19            MR. SPERLING:  Here is what I think, Your Honor.  I

20    would like to propose a shortcut.

21            THE COURT:  Okay.

22            MR. SPERLING:  Since we're dealing with the Cold

23    Plays and the Elton Johns and the Billy Joels in the world,

24    how about we agreed --

25            THE COURT:  By the way, you know the only concert

59

1    I've ever been to in my life --

2            MR. SPERLING:  Yes.

3            THE COURT:  -- was in college to Billy Joel, one

4    concert I've ever been to in my entire life.

5            MR. SPERLING:  Your Honor, what can we do to get

6    you out more.  We appreciate the hard work --

7            THE COURT:  You can come baby-sit my kids.

8            MR. SPERLING:  Your Honor, how about we produce any

9    correspondence with the copyright office in which any of

10   these artist disputes our ownership.  I mean, we're out there

11   selling works for these people.

12           THE COURT:  Well, is there any such thing?  Before

13   you offer that, do you know of one example of that?

14           MR. SPERLING:  I doubt it exists, Your Honor, but

15   that would prove the point.  That's the evidentiary value of

16   it.

17           THE COURT:  Well, the artist would have to have

18   knowledge.

19           MR. SPERLING:  Right, Your Honor, but we're not

20   talking about some solitary songwriter from Zimbabwe that

21   doesn't know it was probative of something.  We're talking

22   about major performers that are out there selling their

23   works.

24           THE COURT:  Well, I know, but how many songs do you

25   suppose that Billy Joel has composed?

1          MR. SPERLING:  Pardon me?

2          THE COURT:  How many songs do you suppose Billy

3    Joel has composed?

4          MR. SPERLING:  I have no idea, Your Honor.

5          THE COURT:  3- or 400, maybe 500,000, I don't know.

6          MR. SPERLING:  The relevant question would be how

7    many has he recorded and does he think that any of the ones

8    that he has recorded have been misappropriated or being sold

9    by our clients instead of by him or somebody else.

10          THE COURT:  So I'm going to take this issue under

11    advertisement, it's very important, it's very expensive and

12    actually I'll probably go talk to Judge Jackson about it,

13    okay.

14          MS. RANAHAN:  I would like to say one thing, Your

15    Honor.  In every case where we've had the opportunity to ask

16    an artist what they know about what's happening, they have no

17    idea what's happening in these lawsuits, who is suing on

18    what, and that I will represent every single time, they are

19    not following this, they don't know.  When they name 11,000

20    songs, and I'm sure Billy Joel didn't get a letter that this

21    song was just withdrawn from the case, he doesn't know it's

22    happening.

23          THE COURT:  No, but the money will mean something,

24    I'm sure.

25          MS. RANAHAN:  I don't know that they've been

1   gettings checks from their lawsuits.  I doubt that as well,

2   Your Honor, but that's --

3        THE COURT:  Well, you haven't paid the billion yet,

4   have you?

5        MS. RANAHAN:  That's not a final judgment, Your

6   Honor.  There is a lot of motions --

7        THE COURT:  All right.

8        MS. RANAHAN:  -- and even then I doubt the artist

9   will see much of that.

10        THE COURT:  Okay.  So I think I'm sufficiently

11   informed on this issue.  What about the next one?

12        MS. RANAHAN:  Well, Your Honor, speaking of -- he

13   just -- the reason that counsel likely just mentioned, how

14   about we produce communications with the copyright office,

15   the Florida judge recently ordered that, they produce ten

16   years of communication with the copyright office on all works

17   in suit.  So one of the issues we had raised with you is just

18   deeming usable.  So they've not only sued our client Charter,

19   but also Brighthouse in Florida.  Same claims, same --

20   Charter now owns Brighthouse, so it's the same, for all

21   central purposes, two lawsuits happening at the same time.

22        So one of the issues was what we just mentioned, so

23   it wasn't any skin off the plaintiff's back to offer that.

24   They also have to produce --

25        THE COURT:  Skin off their nose, I think.

62

1          MS. RANAHAN:  Oh, skin off their nose.

2          THE COURT:  I've never heard of skin off their

3     back.

4          MS. RANAHAN:  Sorry, skin off their nose.  They

5     don't have to -- they already have to produce chain of title,

6     ownership and work-for-hire agreements with respect to all

7     the works at issue there, which is 7,000 -- for which it

8     applies, 7,000 works there.  They already have to produce a

9     whole lot of financial stuff.  So we want to just deem what's

10    being produced for the same works at issue here usable for

11    discovery in this case and let the, you know, later motions

12    in limine deal with that.  But it's not any burden, they're

13    already producing it to the same counsel for the same exact

14    claim period to the same party.

15         So that was -- that was the next issue that we

16    wanted to raise with you.

17         THE COURT:  Well, but that wouldn't get you off the

18    trail in this case if they produced that, would it?

19         MS. RANAHAN:  It wouldn't get us off the work for

20    hires, but they are overlapping.  We're getting a lot of work

21    for hires, we're getting them in Florida already, so that

22    would -- but that does reduce the burden to even less.  We

23    just -- they just amended that complaint, so we don't know

24    exactly how many would even be implicated that aren't already

25    subject to Florida that haven't already been produced in the

63

1   sample, which you have to know the 110 sample isn't just 110

2   works.  It spirals out to being, you know, covering hundreds

3   of works because the nature of how these work.

4           THE COURT:  All right.  What's your response?

5           MR. SPERLING:  Your Honor, with respect to the

6   order of Brighthouse, there is no reason for this Court to

7   follow it for the simple reason that --

8           THE COURT:  I don't want to follow it.  All she is

9   saying is -- is that on appeal?

10          MR. SPERLING:  A portion of it is on appeal, Your

11  Honor.

12          MS. RANAHAN:  Not the work-for-hire agreement.

13          THE COURT:  So you are -- the plaintiffs are going

14  to produce work-for-hire agreements in that case?

15          MR. SPERLING:  Yes, Your Honor.

16          THE COURT:  And so I'm not adopting it.  I'm just

17  as a matter of efficiency and also advising you that if that

18  were to be produced here and, you know, it doesn't advance

19  the ball at all, then I can safely say that I will scale back

20  what you're required to produce in this case, if anything.

21  Do you understand what I'm saying?

22          MR. SPERLING:  I think I do, Your Honor.  I mean,

23  the problem is, it goes to an issue that Ms. Ranahan raised a

24  few minutes ago.  It's not just a matter of producing the

25  documents.  Then they're going to want to depose witnesses

1   about every single one of those documents and ask a whole lot

2   of questions on issues that are actually irrelevant, they

3   don't go to ownership, we'll still have to prepare the

4   witnesses to answer the questions.

5          THE COURT:  So you're saying that's not going to

6   happen if you don't produce those documents.  I think it's

7   still going to happen, right?

8          MR. SPERLING:  I'm not sure how they could ask

9   questions about documents that they don't have.

10          THE COURT:  No.  They're going to keep pursuing it

11   in this case no matter what.  Well --

12          MS. RANAHAN:  So they've sued --

13          MR. SPERLING:  In that case, Your Honor, the

14   magistrate judge in Brighthouse did something I've certainly

15   never seen a judge before in my 25 years of practice, he

16   said, yes, it's a fishing expedition and --

17          THE COURT:  Yeah, I saw, I saw it, and I'm not

18   going to comment on that, but those are words that I would

19   have never used.  At least we all grew up learning that

20   fishing expeditions it's a buzz word for saying, no, you

21   can't have it.

22          All right.  But there is no burden --

23          MS. RANAHAN:  No burden.

24          THE COURT:  -- to produce it in both cases?

25          MR. SPERLING:  The burden, Your Honor, the

1    follow-on of all the consequences until thereafter.  There is

2    no burden in stipulating that they can use the documents in

3    this case with respect to those works that overlap between

4    the two cases.

5            THE COURT:  Okay.  So I want you to do that.  I am

6    not going to use that -- I'm not going to -- by your

7    accommodating this, I am not going to say that now they get

8    even more discovery.  That's just not going to happen.

9            MR. SPERLING:  Thank you, Your Honor.

10           MS. RANAHAN:  So I'm sorry, so what does -- are

11   you --

12           THE COURT:  I want them to do that for the

13   overlapping works.

14           MS. RANAHAN:  Yeah.  So are the --

15           THE COURT:  But it doesn't mean that I'm inviting

16   or agreeing that you'll get the discovery in this case that

17   he says you're seeking in that case as far as depositions.

18   We're not there.

19           MS. RANAHAN:  Okay.  So I think what he was saying

20   is that we should only be able to use -- well, if we're

21   deeming it usable, we want to be able to use it with our

22   experts in both cases and use it with the witnesses who are

23   often going to be the same witnesses between the cases

24   because they've basically sued our client twice.

25           THE COURT:  No.  What he's saying is he doesn't

66

1    want it -- he doesn't want it generating new discovery that

2    would not otherwise have occurred in this case.

3              MS. RANAHAN:  Okay.

4              THE COURT:  And I'm saying for the moment, I agree

5    with it.

6              MS. RANAHAN:  Okay, got, I've got it.  And when --

7              THE COURT:  If he can say that they're now seeking

8    discovery that would not have occurred absent the production

9    of these overlapping works, I will be very sensitive to that

10   proposition.  That's what I'm saying.

11             MS. RANAHAN:  Okay.  Right.  So the only -- so it's

12   just basically now whether -- back to the work-for-hire

13   issue, whether the nonoverlapping works -- perhaps we can

14   crunch of the numbers to find out how many exactly remain.

15   After we --

16             THE COURT:  You can crunch as many numbers as you

17   want.  I don't think they'll object.

18             MS. RANAHAN:  Right.

19             THE COURT:  I'm going to talk to Judge Jackson --

20             MS. RANAHAN:  Okay.

21             THE COURT:  -- about the legal issue of whether the

22   improperly designating it as a work for hire, what that means

23   for us.

24             MS. RANAHAN:  Okay.

25             THE COURT:  Assuming that there are probably some

1    that are improperly designated because we found seven

2    already, okay.

3         MS. RANAHAN:  Okay.  And so can we have -- does

4    this ruling apply to everything that is being produced in

5    Brighthouse for the overlapping works only, meaning the

6    financial information, the copyright communications for ten

7    years, can we have all productions --

8         THE COURT:  I think we should.

9         MS. RANAHAN:  I do too, Your Honor.

10        THE COURT:  There is no other --

11        MS. RANAHAN:  I do too.

12        THE COURT:  Surprised that you did.

13        MR. SPERLING:  So, Your Honor, for example, the

14   financial information that she referred to, that's a subject

15   of a pending objection to the district judge.  So our

16   understanding is that we're only -- we're only agreeing to

17   this with respect to those matters that are not the subject

18   of an objection.

19        THE COURT:  That's fine, but collect it and

20   segregate it, just in case Jackson goes against you.  Does

21   that make sense?

22        MR. SPERLING:  So, Your Honor, I think the easier

23   way to do it is simply to identify it rather than reproduce

24   it.

25        THE COURT:  Well, you may have to produce it though

1    at some point.

2              MR. SPERLING:  Pardon me?

3              THE COURT:  Depending on how that objection goes,

4    you may have to produce it.

5              MS. RANAHAN:  Right.

6              MR. SPERLING:  So I think -- we're talking about

7    two different things, Your Honor.  Not the objection before

8    Judge Jackson.  Ms. Ranahan referred to --

9              THE COURT:  You're saying.

10             MR. SPERLING:  -- referred to a component of the

11   order by the magistrate judge in the --

12             THE COURT:  Oh, that's subject to --

13             MR. SPERLING:  Correct, it's subject to an

14   objection to the district judge.

15             THE COURT:  Yeah.  Obviously if you don't have to

16   produce it there, then there is no -- there is nothing to

17   produce here because you didn't produce it there.

18             MS. RANAHAN:  Right, that's all I was going to

19   say --

20             THE COURT:  Yeah, no.

21             MS. RANAHAN:  -- if they get it somehow

22   interceded -- the deadline is March 16 right now, the

23   objection is pending.  They filed a motion for a

24   reconsideration, which was denied, now there is an objection

25   pending.  The deadline may come before they get a ruling on

1  that, it may not, but if they produce it, that's when we want

2  it.  If they get told they don't have to produce it, then

3  what can we --

4          THE COURT:  I'm not asking you to disturb

5  virgin soil in this case, okay.

6          MR. SPERLING:  Thank you, Your Honor.

7          THE COURT:  What else?

8          MS. RANAHAN:  So the only other issue is, Your

9  Honor, we were going to raise the financial documents

10  separate, but as long as we can have the overlapping, then we

11  don't have to get into that issue with you because it's

12  resolved by getting what the Florida judge ordered produced

13  there.

14          THE COURT:  Would you say -- let me ask this.

15  Would you say that a resolution in the Virginia case is years

16  away?

17          MR. SPERLING:  In the Virginia case, Your Honor,

18  no.  I'll defer to Mr. Oppenheim, but I doubt that that's the

19  case.

20          THE COURT:  A final decision on appeal?

21          MR. OPPENHEIM:  I don't think so, Your Honor.

22  Obviously, I don't know how long the judge is going to take

23  to rule on the 559 motions, but Eastern District of Virginia

24  is, as Your Honor may know, a rocket docket, so things tends

25  to move relatively quickly.

1          THE COURT:  Right.

2          MR. OPPENHEIM:  And the Fourth Circuit is faster

3    than many other circuits.  So --

4          THE COURT:  On average?

5          MR. OPPENHEIM:  My hope would be that within a year

6    or so we would have full resolution of the matter.

7          THE COURT:  But there will be an appeal?

8          MR. OPPENHEIM:  Certainly not by the plaintiffs,

9    Your Honor.

10          MS. RANAHAN:  There will be an appeal, Your Honor.

11          THE COURT:  You're not settling the case in advance

12    of an appeal.

13          MR. OPPENHEIM:  Well, they haven't yet calculated

14    the 6 percent prejudgement and post-judgment interest.  When

15    they do that, maybe they decide to come to the table, Your

16    Honor, but they haven't yet.

17          THE COURT:  All right.  It's 8 percent here.

18          MR. OPPENHEIM:  Great.

19          THE COURT:  Right, Greg?

20          GREG:  Correct.

21          THE COURT:  Colorado is 8 percent.

22          MS. RANAHAN:  So a couple more issue on ours and

23    then we can move on to theirs.

24          This just came up because in recent discussions

25    plaintiffs' counsel has made comments that they wouldn't have

1   to produce e-mails because that's not the type of case this

2   is.  It's our only (inaudible) that would have e-mails.  And

3   that just concerned us, and we thought we would raise it to

4   make sure there is a whole bunch of requests for which they

5   agreed to produce responsive documents, which we would expect

6   e-mails would fall into it.  And so we just wanted to make

7   sure that to the extent e-mails are responsive that those are

8   fair game in this case from plaintiffs.

9          THE COURT:  I shouldn't have to even address that,

10  but I'm definitely going to account on them to produce

11  responsive documents or object.

12         MS. RANAHAN:  They've agreed to produce responsive

13  information, and for ease, this is on page 16 of our brief.

14  The concern was just, we don't have any e-mails from them.

15  We have -- they keep tabbing the size of their production.

16  It's basically the third party notices and digital files,

17  there aren't any e-mails.  And just commenting on recent

18  days, which suggests why should they have to produce e-mails,

19  that was the implication.

20         So I just want to get clarification from the Court

21  that you would expect them to be searching for responsive,

22  you know, information they've agreed to produce, you know,

23  they should be searching for e-mails.

24         MS. SAHNI:  Your Honor, I can confirm that we have

25  collected and are searching and are reviewing for production

1    responsive e-mails.  As to the notion of what we've produced,

2    we've produced over a million documents, that includes

3    infringement notices, evidence packages, corporate structure

4    documents, org charts, company financial information,

5    document retention policies, any piracy documents, other

6    agreements, digital music files and chain of title

7    information.

8            So it's simply incorrect that we have only produced

9    the notices.  We are producing e-mails, we've told them we're

10   producing e-mails.  The concern on our end is that they're

11   the defendants in this case.  The core issue in this

12   litigation is whether Charter did, or what it did or didn't

13   do upon receiving those notices.

14           And so they are the ones that should have a large

15   amount of e-mails that concern how they handled those 600,000

16   notices, and we haven't seen any until last Friday where we

17   got 41 documents that were carefully curated and predate the

18   claim period.

19           So to the extent we're talking about e-mails, the

20   issue is far more one of Charters than for plaintiffs, and I

21   believe that what might be Ms. Ranahan is referring to, but

22   to make utterly clear on the record, we are searching and

23   collecting and searching documents.

24           THE COURT:  Sure.  I would see this as you saying

25   get the log out of the your own eye before you look for the

1   speck in my eye.

2            MS. SAHNI:  That's exactly right, Your Honor.

3            THE COURT:  If you know the reference.  Do you know

4   the reference?

5            MR. OPPENHEIM:  I don't, but I like it.

6            MS. SAHNI:  But I like it.

7            THE COURT:  If we can have a little fun.  From your

8   name, it sounds maybe Jewish.

9            MR. OPPENHEIM:  Yeah.

10            THE COURT:  Well, that's in the Christian Bible.

11   So Jesus said before you worry about the spec in someone

12   else's eye, get the log out of your own eye.

13            MR. OPPENHEIM:  My guess is there is probably a

14   similar Jewish --

15            THE COURT:  There has to be, because he was Jewish.

16   All right, go ahead.

17            MS. RANAHAN:  Well, we've never disputed that we're

18   searching and producing e-mails.

19            THE COURT:  No.  This issue is satisfactory to me.

20            MS. RANAHAN:  Okay.

21            THE COURT:  Okay.

22            MS. RANAHAN:  And that's about it.  So the only

23   other issue is really a timing one, and I think for their

24   issues.  A lot of the issues that they've put in the letter,

25   we've agreed to do, we're in the process of doing, we're

1   planning to produce.  I think what happens with the

2   scheduling motion is going to --

3           THE COURT:  And  while we've been talking I've had

4   it referred to me and I will grant your motion.  It's joint,

5   isn't it?

6           MS. SAHNI:  No, Your Honor, it's opposed.  We will

7   disagree.

8           THE COURT:  Oh, it's opposed?

9           MS. RANAHAN:  We'll take it, Your Honor, thank you.

10          THE COURT:  Hold on, hold on, I take that back.

11          MS. RANAHAN:  We attempted to be joint.

12          THE COURT:  It has been referred to me, so.

13          MS. SAHNI:  We will be submitting a competing

14  schedule, Your Honor.  Their proposal would push trial out in

15  this case by over a year.

16          THE COURT:  8 percent interest.  Try to get that in

17  the money market.

18          MS. SAHNI:  So, Your Honor, we agree some modest

19  extension is warranted.  The precise length of that extension

20  turns on the issue we noted in our papers about whether the

21  scope of discovery will include safe harbor discovery, which

22  is a critical gating question that they have yet to answer.

23          THE COURT:  Right.

24          MS. SAHNI:  So that's part of the dispute about

25  this scheduling issue.  We will be submitting a competing

75

1    schedule that allows --

2            THE COURT:  Then tell me what -- you seek -- what

3    does your close of discovery propose?

4            MS. RANAHAN:  Basically, we want to push it out --

5    so right now it's set to close next month and there has no

6    depositions that have been, tons of discovery.

7            THE COURT:  No, forget about next month.

8            MS. RANAHAN:  We had one -- we basically pushed it

9    out one year.

10           THE COURT:  So what are you asking for?

11           MS. RANAHAN:  Like March to 2021, one year.

12           THE COURT:  So close of all discovery, fact and

13   expert?

14           MS. RANAHAN:  Fact discovery.  Experts come a

15   little bit the later.

16           THE COURT:  Okay.  And what's your proposal going

17   to be?

18           MS. RANAHAN:  We're basically seven months apart on

19   those two issues.

20           THE COURT:  I'm talking to Ms. Sahni.  What's your

21   proposal going to be?

22           MS. SAHNI:  It depends, Your Honor, on the question

23   of the safe harbor issue.  So with safe harbor, we would say

24   September.

25           THE COURT:  You mean, if they claim safe harbor?

1          MS. SAHNI:  If they claim safe harbor, yes, Your

2    Honor, because that will materially expand the scope of

3    discovery.

4          THE COURT:  Okay.

5          MS. SAHNI:  So at would push it out about five

6    months.  So going from March, I guess almost six, to the fact

7    discovery closed in September.  Our proposal without save

8    harbor, which will be significantly less -- September of

9    2020, so this coming year, which is still, you know, a good

10   seven months away from now.

11         THE COURT:  With safe harbor you're proposing what?

12         MS. SAHNI:  September of 2020, Your Honor.

13         THE COURT:  And without you're proposing --

14         MS. SAHNI:  And without it would be July of 2020.

15         THE COURT:  So a two-month difference?

16         MS. SAHNI:  That's right, Your Honor.

17         THE COURT:  You think in invoking safe harbor would

18   only add two months to discovery, that's what you're saying?

19         MS. SAHNI:  So long as we have information now that

20   allows us to actually start receiving that discovery.  To

21   date they've been refusing to provide discovery on anything

22   beyond the infringements identified in our notices.

23         THE COURT:  Right.

24         MS. SAHNI:  And Your Honor ordered already that

25   produced, hasn't been produced.  But we want to go beyond

1    that, if they are asserting a safe harbor defense, because we

2    need to be able to interrogate the reasonableness of its

3    policy generally, and all infringements incurring on its

4    network and how it's dealing with those infringements.

5           THE COURT:  So I just want you to realize what

6    you're saying.  You've produced over a million documents,

7    they've produced under 100 is what I think you told me.  And

8    so you believe that in the next four months you're going to

9    get maybe hundreds of thousands or millions of documents,

10   take dozens of depositions and get all that accomplished by

11   July, even without the safe harbor.  That's what you're

12   saying.

13          MS. SAHNI:  Your Honor, our proposal includes

14   various interim deadlines for certain categories of discovery

15   that would be absolutely necessary to ensure that could

16   happen.  We have a substantial completion production date as

17   well as some interim deadlines by which we would get certain

18   core categories of discovery so that our experts can be given

19   working on them and we can prepare for depositions.

20          THE COURT:  I shouldn't have even asked -- I

21   thought I could resolve that on the bench.  I shouldn't have

22   asked Jackson to give me that motion.

23          MS. RANAHAN:  Well, Your Honor, we had a whole main

24   confer with them last week about this, and actually Mr.

25   Oppenheim asked us, we don't like substantial completion, why

1   don't you come up with some other interim dates, they're more

2   meaningful.  So we spent all this time crunching it down,

3   putting all these interim dates, presenting it to them, and

4   they just stood on the same date that they had before the

5   meet and confer.

6           THE COURT:  Well, I'm going to wait for their

7   motion --

8           MS. RANAHAN:  Yeah, that's fine.

9           THE COURT:  -- their response, so I can't decide

10  the extension.

11          MS. RANAHAN:  If you look at the last page of our

12  motion, it shows the chart about what they proposed.

13          THE COURT:  I promise I'll look at every page.

14          MS. RANAHAN:  Thank you, Your Honor.

15          MS. SAHNI:  Your Honor, I wanted to go back to one

16  issue that Ms. Ranahan raised on the financial and valuation

17  documents from Florida.

18          So in that case Judge Wilson --

19          THE COURT:  The ones that are subject to the

20  objection?

21          MS. SAHNI:  Yes, correct.

22          THE COURT:  Okay.

23          MS. SAHNI:  Judge Wilson respectfully to him

24  ordered what we believe is an incredibly overbroad ruling

25  that literally would encompass almost every document in the

1   revenue-making business of our -- of our clients.  We've

2   proposed in our --

3            THE COURT:  Like how many documents would that be

4   perfect client?

5            MS. SAHNI:  For each plaintiff group?  I can't even

6   come up -- I mean, they've asked for royalty statements,

7   they've asked for anything that relates to any number that

8   could be associated to a work, which is an absurdly

9   overbroad --

10            THE COURT:  How many plaintiff groups are there?

11            MS. SAHNI:  Six plaintiff groups, Your Honor, three

12   record labels, three music publishers.  So that's a very

13   wide --

14            THE COURT:  And a total number of how many

15   plaintiffs?

16            MS. SAHNI:  The total number is something around

17   62, Your Honor.

18            THE COURT:  62, okay, thanks.

19            MS. SAHNI:  And they're broken into these plaintiff

20   groups.  Every time Ms. Ranahan talks about the number of

21   plaintiffs, it's really six plaintiff groups.

22            MS. RANAHAN:  Your Honor, there is a reason that

23   they have 65 different names.  They have tax benefits, they

24   have revenue benefits, they take benefits where they need to

25   by naming themself separately, and then when it's convenient,

1   they want to pretend like they're really only five.

2          There is 65 names there for a reason.

3          THE COURT:  IRS allows that then I would do it too.

4          MS. SAHNI:  Your Honor, the way our companies

5   organize their business is they have different labels that

6   artists are assigned to, and so for the purposes of

7   ownership, identified plaintiffs that own the right that are

8   claimants for the works.  That doesn't change the fact of the

9   matter of how our companies actually organize their music

10  business.

11         THE COURT:  Okay, but let's get to the point.

12         MS. SAHNI:  On the issue of the financial

13  documents, Your Honor, Judge Wilson ordered that overbroad

14  category of discovery which is subject to a pending objection

15  in which we --

16         THE COURT:  Is it fully briefed?

17         MS. SAHNI:  It is briefed, Your Honor, on the

18  objection.

19         THE COURT:  As of when?

20         MS. SAHNI:  As of probably two weeks ago.

21         THE COURT:  And what is your book on the district

22  judge, you how quickly that person turns those around?

23         MS. SAHNI:  This is our first objection with this

24  district judge, Your Honor.  In that objection, we proposed

25  the same compromised proposal that we've laid out here, which

81

1    is that we would provide those umbrella licensing agreements

2    which account for 90 percent of the revenue.

3         THE COURT:  Understood, understood.

4         MS. SAHNI:  Also in that case, Your Honor, Judge

5    Wilson denied their corresponding request for the

6    track-by-track revenue which this Court has ordered for the

7    overlapping works with Cox.  He said to them, You don't need

8    both.

9         So in denying that track-by-track revenue

10   information, he gave them this other category that we think

11   is overbroad, but this Court has already ordered us to

12   produce the track-by-track revenue for the Cox overlapping

13   works.  So there is really no need -- even under Judge

14   Wilson's reasoning, both should not be required.

15        MS. RANAHAN:  Well, Judge Wilson asked us -- I

16   withdrew it because I wanted the RFP so much that I was

17   willing to withdraw it, but he didn't get much into the

18   weeds.  He just said, Wait, do you need both?  I said, No,

19   Your Honor, we'll withdraw that right now.  And he said,

20   okay, you're going to withdraw it.

21        But what you ordered before was basically the

22   financial information that requires no burden.  So they've

23   already produced that in Cox, the overlapping works, which is

24   not even the significant number that we have here, it's like

25   40 percent or something, we get that.  And then for this, we

82

1   get, you know, what they've produced overlapping there.  We

2   still don't have financial information on every work in this

3   case, we still don't have revenues for every work in this

4   case.

5           What we have is some information from Cox, some

6   from Florida --

7           THE COURT:  Well, let's say you had financial

8   information for every work.  How would you use that at trial?

9           MS. RANAHAN:  So our expert would distill it down

10  and try to come up with ways to show -- so some of these

11  valuation documents that we're going after that we just got

12  ordered in Florida that they're talking about, they will put

13  certain works into tiers and value them differently and have

14  rates, again, rates for --

15          THE COURT:  But it still would be a gross

16  statistical analysis --

17          MS. RANAHAN:  Yes.

18          THE COURT:  -- rather than 11,000 different works.

19          MS. RANAHAN:  Right, and we would rely on our

20  expert.

21          THE COURT:  You couldn't possibly present that to a

22  jury.

23          MS. RANAHAN:  Agreed.  So our expert would distill

24  it down, present -- you know, crunch the numbers, say, Here

25  is, you know, the values of these of types of works.  We also

83

1   want the chance to maybe put them in different tiers, as

2   opposed to what happened in Cox, which was put a billion and

3   then divide it by how many works.  We want it to be sort of a

4   forward looking system where we say these are works are lower

5   value, they've brought in this much revenue, these works

6   perhaps are a little bit more.  We want to able to present

7   that to the jury in a way that's not just --

8           THE COURT:  Except all the jury did in Cox was

9   simple math, wasn't it?

10          MS. RANAHAN:  Well, there was a slide --

11          MR. OPPENHEIM:  So, Your Honor, so in Cox, the

12  defendant, again represented by Winston Strawn, did ask for

13  all of the track-by-track revenue.  We objected it. we were

14  ordered to produce it over our objections.

15          THE COURT:  But can you describe me -- remind me

16  what track-by-track revenue means.

17          MR. OPPENHEIM:  So for each track, for each track

18  in the case, for each copyrighted work in the case, we

19  produced of the amount of revenue, and I don't remember the

20  exact period of time, that was generated in terms of pay

21  payments to the plaintiff, either the record company or the

22  publisher.

23          THE COURT:  Publisher.

24          MR. OPPENHEIM:  I mean, we would then pay the

25  artist, that's a different issue, out of that.

1          THE COURT:  Understood.

2          MR. OPPENHEIM:  But what we -- what the record

3    company or the publisher brought in on a track-by-track

4    basis, on I think it was a month-by-month basis, massive

5    spreadsheet, over our objection it was produced.  And we said

6    at the time to the judge, we said, There is a huge burden of

7    doing this, and it was, it was a huge burden, but doing so

8    doesn't get us anywhere.  They're not going to able to use it

9    because it doesn't at all inform what the infringement --

10   what the value of the infringement is.

11         And understand, for instance, track-by-track

12   revenue includes, for instance, what they got from a stream,

13   from Pandora on a track compared to a viral distribution on

14   Cox.  There is just to comparison.

15         Cox insisted they were going to use it, that they

16   wanted to do this financial information, they would put it in

17   buckets, they said all -- many of the same things to the Cox

18   judge.  They had six -- I believe it was six expert witnesses

19   at the Cox trial, okay.  And not a single one of those

20   witnesses testified once about any of that track-by-track

21   revenue.  And you know why?  Because it's not useful to

22   inform.

23         They did speak generally about damages in a lot of

24   different ways, but they never looked at that after putting

25   us to the extreme burden of it.

85

1          THE COURT:  Well, so you already have it --

2          MS. RANAHAN:  We have it, Your Honor, and you've

3   already ordered that we can have track-by-track data.

4          THE COURT:  It was produced in the Cox case?

5          MS. RANAHAN:  Right, and our expert didn't do what

6   our expert now is going to do with it.  We obviously need to

7   change our economic model for the jury, Your Honor.

8          THE COURT:  Well, of course, the definition of

9   insanity is doing the same thing over and over again and

10  expecting different results, so they're going to change the

11  way they're doing things, right, so they don't use another

12  billion.

13         MR. OPPENHEIM:  Well --

14         THE COURT:  I'm just saying --

15         MR. OPPENHEIM:  Fairly, Your Honor, the verdict

16  could have been a billion and a half, so maybe their change

17  goes in the wrong direction.  I'm not sure, Your Honor.

18  There is a half a billion we left on the table.

19         THE COURT:  I don't understand.

20         MS. RANAHAN:  He's talking about how much --

21         MR. OPPENHEIM:  We didn't get the maximum statutory

22  damages, Your Honor.  We got far less than that -- we got --

23  the jury returned about $99,000 per work out of --

24         THE COURT:  Yeah.

25         MR. OPPENHEIM:  -- out of 150.

1          MS. RANAHAN:  So the burden is even less is what

2    he's saying.

3          MR. OPPENHEIM:  So it's not necessary --

4          THE COURT:  But in closing -- did you do the

5    closing?

6          MR. OPPENHEIM:  I did.

7          THE COURT:  What did you ask for?

8          MR. OPPENHEIM:  I didn't, I left it to the jury,

9    Your Honor.  Never asked --

10          THE COURT:  Never filled out a verdict form?

11          MR. OPPENHEIM:  Your Honor, so I didn't fill out a

12    verdict for them.  What I said, Your Honor, was this is the

13    range.  It is up to the jury to decide what the appropriate

14    amount within that range is.  We believe that it should be in

15    the higher end of the range.  That's all I said, Your Honor.

16          THE COURT:  Which they agreed?  Two-thirds is the

17    higher end.

18          MR. OPPENHEIM:  Okay, I suppose it's above the 50

19    percent mark, Your Honor, technically, you're correct.

20          THE COURT:  Got to be careful what you ask for.

21          MS. SAHNI:  He's beating himself up over it, Your

22    Honor.

23          MR. OPPENHEIM:  But the defendants asked for 750

24    per work, Your Honor.

25          THE COURT:  Hundred.

1          MR. OPPENHEIM:  $750.

2          THE COURT:  750.

3          MR. OPPENHEIM:  Per work, which was the same amount

4    as I pointed out to the jury, they were paying their experts

5    on a per-hour basis.

6          THE COURT:  What would their verdict have been at

7    750?

8          MS. RANAHAN:  Like about 7 million, Your Honor.

9          THE COURT:  Okay.

10         MS. RANAHAN:  But what happened in that case was

11   there was a slide that showed a billion dollar dividend that

12   was paid from a family so that is what the jury looked at.

13   And so it's not anything to do with -- I'm sure.

14         THE COURT:  Subliminal messages are very important.

15   If you're a trial lawyer, you know that those subject minimal

16   messages are important.

17         MS. RANAHAN:  Right, right.

18         MS. SAHNI:  Your Honor, I just wanted to make sure

19   the record was clear and what's happening in Florida.  We'll

20   move on to our issues --

21         THE COURT:  Is that the only other litigation

22   besides this one, the Virginia, Florida and Colorado?

23         MS. SAHNI:  There are other litigations not in

24   which we are involved in, and I don't believe Winston are

25   involved.  So the only three in which these counsel are

1    involved or those three lawsuits, Your Honor.

2            THE COURT:  But those are the three bigs?

3            MS. RANAHAN:  Well, there is another one, Grande

4    happening, which if you want to follow it, there is another.

5            THE COURT:  No.

6            MS. RANAHAN:  I think the trial just got moved.  I

7    don't know if anyone is keeping track of that, but there is

8    another one.

9            MR. OPPENHEIM:  There is one in Texas, Grande, the

10   trial will happen now in September, and there is another one.

11           MS. SAHNI:  RCN.

12           MR. OPPENHEIM:  RCN, I believe in New Jersey, which

13   is at the initial stages.

14           MS. RANAHAN:  The Grande one is the one that

15   dismissed the vicarious liability claim on the pleading,

16   unlike Your Honor's recommendation, but --

17           THE COURT:  Okay.  Now where are we?

18           MS. SAHNI:  So, Your Honor, I would like to turn to

19   the issues we raised.  All of these issues that have been

20   previously decided by the Court as to discoverability, and so

21   we're here today simply to make sure we can get some dates

22   certain for these productions because they have been stalling

23   for months.

24           THE COURT:  And you've conferred on that or you

25   still have no satisfaction?

1          MS. SAHNI:  No.  We have sent letters on this, they

2    have not provided any response.

3          MS. RANAHAN:  No.

4          THE COURT:  Well --

5          MS. SAHNI:  We have sent deficiency letters for

6    which they are not -- they have not provided any date

7    certain.

8          THE COURT:  Okay, now you have their letter.

9          MS. RANAHAN:  We just got --

10          THE COURT:  In order to shortcut this, if we can.

11    If we can't, that's fine.

12          MS. RANAHAN:  I agreement we got the letter last

13    week.  It's all subject to the timing.  All of this -- when

14    we can produce it whether the schedule gets pushed out and

15    how much.  I think that's really subject to lot of this.

16          THE COURT:  I don't understand that.

17          MS. RANAHAN:  Well, because some of the production

18    items -- we asked them to make a mutual deadline for

19    everything to be produced and they've ignored that.  They've

20    never asked us, hey, produce something by this date until

21    they sent the letter to the Court, all the sudden because

22    they knew we were going to be before acting like everything

23    is late.  We've never gotten a date from them, we've never

24    gotten a proposal for them.

25          I offered to make a mutual attempted substantial

1  production date, which they ignored.

2          THE COURT:  What was your date?

3          MS. RANAHAN:  December, and they never responded

4  and ignored it.

5          THE COURT:  So you didn't do it just because they

6  didn't respond.

7          MS. RANAHAN:  No, that's not true.  We've been

8  producing and we've been making productions.

9          THE COURT:  But they've said you only produced less

10  than 100 documents.

11          MS. SAHNI:  Your Honor, they produced 72 documents.

12  In December they came into this Court and said, For several

13  of these categories we will be producing them this month,

14  that was in December, December 17.  It is now February 19 and

15  now none of these have been produced.  There are several --

16          MS. RANAHAN:  I can --

17          MS. SAHNI:  These are categories on which Your

18  Honor has already ordered production.  This is not something

19  where we need to meet and confer further.

20          MS. RANAHAN:  Not true.

21          MS. SAHNI:  We're simply waiting on what's been

22  ordered by the Court.

23          THE COURT:  I know this is a passionate for you.

24          MS. RANAHAN:  What has been ordered by the Court,

25  Your Honor, was responses that we provided.  We provided

1   interrogatory responses that had a lot of the data they

2   wanted, which was the subscriber information.

3            THE COURT:  But what you said was --

4            MS. SAHNI:  Your Honor, it might be easier to go

5   through this point by point and I'm happy to point you to the

6   relevant portions of the transcript.

7            THE COURT:  No.  But Ms. Ranahan said on page 35

8   and 36 -- I don't know --

9            MS. RANAHAN:  I said:  Our plan was to produce the

10  bulk of our production this month.  That was the plan.  We've

11  been working diligently to do that.  We've had some things

12  interrupted.

13           THE COURT:  Yeah.  But yeah, I mean, you didn't say

14  plan.  You said:  We have told them --

15           MS. RANAHAN:  Yeah.

16           THE COURT:  -- we were going to complete the bulk

17  of our production this month by December so that's still

18  coming.  Now, that sounds like a promise.

19           MS. RANAHAN:  That's what we had planned and that's

20  what we -- I meant it when I said that, Your Honor, and

21  things have gotten in the way and we've -- we have had not

22  had one discussion about timing on that.

23           MS. SAHNI:  Your Honor, we --

24           MS. RANAHAN:  They also represented --

25           THE COURT:  One at a time.

92

1          MS. RANAHAN:  -- that they produced financial stuff

2   during that day and they haven't produced that either.

3          MS. SAHNI:  Your Honor, we haven't seen any rolling

4   productions since that time --

5          MS. RANAHAN:  We did produce --

6          MS. SAHNI:  -- except on Friday when there was 41

7   documents produced.  There has been nothing along the lines

8   of what was ordered produced by this Court.

9          MS. RANAHAN:  That's not true.

10         MS. SAHNI:  And I can go through it, Your Honor,

11  and --

12         THE COURT:  No, you didn't have to.

13         MS. SAHNI:  -- talk through each category.

14         MS. RANAHAN:  The things that were ordered by this

15  Court I produced.  We produced interrogatory responses, we

16  produced the subscriber information, we produced the

17  financial information.  It's in an interrogatory response so

18  she's acting like it's not anything that was meaningful, but

19  it was a huge amount.

20         MS. SAHNI:  That's not what we raised here, Your

21  Honor.  There are -- there are five issues which we've raised

22  that remain unaddressed.

23         The first is the termination for nonpayment data,

24  which Your Honor said was discoverable.  This is at the

25  transcript at 17.  And Charter was supposed to come back by

1   January 10 with the burden it would take to do that month by

2   month.

3          MS. RANAHAN:  That's not --

4          MS. SAHNI:  They came back with nothing on January

5   10.

6          THE COURT:  Is that your first bullet point?  Are

7   you going by bullet points?

8          MS. SAHNI:  I'm going by the letter, Your Honor.

9          MS. RANAHAN:  This is a letter -- also, Your Honor,

10  you started the last hearing by saying this is not relevant,

11  this is not relevant information, but I see what you want to

12  do, come back if there is significant burden.  We inquired

13  within.  I responded to the letter that we're no longer

14  standing on any burden, but we do maintain our relevance.  We

15  briefed it right after.

16         Your Honor acknowledged that it wasn't relevant.

17  The Court in Florida has since denied that is irrelevant.  So

18  both you and the Florida judge found that the terminations

19  for nonpay was not relevant.

20         MS. SAHNI:  Your Honor, that is just simply

21  inaccurate.

22         MS. RANAHAN:  All that we were ordered to do --

23         MS. SAHNI:  And if I may finish before Ms. Ranahan

24  interrupts me, I would appreciate that.

25         THE COURT:  I'll speak now.  The words "not

94

1   relevant" are not spoken by me whatsoever, at least at the

2   December 17 hearing, because I just searched and I never

3   spoke those words.

4          MS. RANAHAN:  Your Honor --

5          MS. SAHNI:  If you look at page 17.

6          MS. RANAHAN:  -- absolutely, you said it twice.

7          MS. SAHNI:  If you look at page 17, you said:  It's

8   my job to make sure that they have the relevant information

9   to present to Judge Jackson.  Then he determines

10  admissibility.  You also said that --

11         MS. RANAHAN:  It's not relevant in and of itself.

12         MS. SAHNI:  -- you want to use it to show --

13         THE COURT:  Hold on, wait a second.  I just -- if

14  you can point -- I'm going to let the defendants point to one

15  example, Ms. Ranahan, where I said something is not relevant

16  and I ordered it produced anyway.  Show it to me.

17         MS. RANAHAN:  Okay.  You didn't order it produced.

18  You started the hearing by saying:  This doesn't seem

19  relevant, and then right when you were talking about this

20  issue --

21         THE COURT:  That's why we have arguments in here --

22         MS. RANAHAN:  Right, right.

23         THE COURT:  -- is to convince me that I'm wrong.

24         MS. RANAHAN:  Right.  And you said in and of itself

25  it's not relevant.  This termination for nonpay, you said in

1   and of itself it's not relevant.  And you said, but why don't

2   you find if there is a burden and report back -- if there is

3   any burden by January 10.  There was no burden.

4           THE COURT:  Show me where I said that --

5           MS. RANAHAN:  Yes, I'll find it.

6           MS. SAHNI:  Your Honor, I'm happy --

7           THE COURT:  No, I want her to do.  Ms. Sahni, I

8   know you're jumping in and you're excited.  Don't speak

9   anymore until we're done with her.

10          Okay.  So here is what I said on page -- I don't

11  know.  Right, but we are talking about something that is

12  alone irrelevant and that is people who are terminated for

13  failure to pay, which has nothing to do with infringement,

14  nothing at all, but you want to use it to show abilities.  I

15  understand that.  And so we'll do that, but in and of itself

16  it's irrelevant.

17          So what I was saying, I think, was in the context

18  that the plaintiffs wanted it, it's discoverable, that's what

19  I was saying.

20          MS. SAHNI:  That's right, Your Honor.

21          THE COURT:  So that's what I was saying.

22          MS. RANAHAN:  Okay.  And you also started it by

23  saying:  Can't you just stipulate to the abilities.  That's

24  how you started the entire hearing was -- that was the

25  example that you looked at and said, you guys should be able

1    to work some of this out, can't you just stipulate to the

2    abilities, and so we had this whole discussion too, so --

3            THE COURT:  I was wrong, you couldn't work it out.

4            MS. SAHNI:  And then, Your Honor, we talked about

5    all the reasons why it's relevant both to the question of

6    ability to --

7            THE COURT:  Whatever I ordered I ordered.

8            MS. SAHNI:  You ordered it.

9            THE COURT:  And I expect my orders to be complied

10   with.

11           MS. RANAHAN:  The order for us was to come back

12   with a burden.

13           THE COURT:  And where did you do that?  Show me

14   where you did that.

15           MS. RANAHAN:  We came back -- we said there was no

16   burden, but here is all of our relevance, which you agreed

17   with at least in some sense.

18           THE COURT:  Okay.  Well, if I said I want it

19   produced pending your objection on burdensomeness, and you

20   don't do any burdensomeness complaint, then you produce.

21           MS. RANAHAN:  Okay, I didn't read the transcript as

22   telling us what to produce.

23           THE COURT:  I would read it that way.

24           MS. RANAHAN:  Okay.  So what do we need to produce

25   then?  Because what they're asking for --

97

1          THE COURT:  Whatever I said.

2          MS. RANAHAN:  I looked through the transcript, it

3   wasn't in the order, Your Honor, I read the whole transcript.

4          THE COURT:  People who are terminated for failure

5   to pay.

6          MS. RANAHAN:  Right.

7          MS. SAHNI:  It's month-to-month data for a 30-month

8   8-month period, in response to Interrogatory Number 12.

9          THE COURT:  30-month, 8 month --

10         MS. SAHNI:  38-month period.

11         THE COURT:  Okay.

12         MS. SAHNI:  Month to month.  Termination for

13  nonpayment data.

14         THE COURT:  Okay.

15         MS. SAHNI:  In the form of an interrogatory

16  response and we would like it produced within ten days.

17         THE COURT:  And I think the context was they say we

18  really don't have the ability to terminate people, Internet

19  is important, blah blah blah, is that all that?

20         MS. SAHNI:  Correct, Your Honor.

21         THE COURT:  And then you said, but you do, you do

22  terminate people even though it's important for legitimate

23  reasons, and one of those is an inability to pay, but you

24  would also say knowledge that somebody is infringing is a

25  legitimate reason to terminate somebody and that's on the

1    basis I allowed that discovery.

2          So I can see the argument in front of a jury if the

3    defendant asserts that sort of, you know, Internet is too

4    important or it's too difficult for us to terminate, I mean,

5    I get my Internet terminated on a daily basis because we have

6    like 20 devices using the Internet and it crashes every five

7    minutes.

8          Okay.  So I think I wanted the production of that.

9          MS. SAHNI:  And Your Honor, if we could get a time

10   window.  We would propose ten days since this --

11         THE COURT:  Well, I want to see what she proposes

12   because she has to do it.

13         MS. RANAHAN:  I mean -- right, so, Your Honor, we

14   were hoping because we did brief this again before you since

15   this hearing because this wasn't -- and the Florida Court

16   agreed with your initial inclination, which is that

17   terminations for nonpay, people who are terminated because

18   they're not paying their bills is apples to oranges and it

19   has absolutely nothing to do with terminating someone where

20   we get a notice that's not verified and it could apply to

21   like a business where you don't even know who is doing it a

22   and the notion that -- which they did in Cox that you compare

23   this big number of terminations for nonpay with copyright

24   terminations, which is a wholly different inquiry, is highly

25   misleading and just completely irrelevant.

1          And I think your first inclination was, this

2    doesn't seem relevant, the Florida Court agreed with us.  The

3    Cox Court actually originally granted a motion in limine

4    excluding it and then reversed itself with Oppenheim's

5    brilliant argument before him.

6          THE COURT:  Well, hold on a second, I want to read

7    what you said.

8          MS. RANAHAN:  If I could point you to the letter,

9    Your Honor, where we describe this to and we brief it again

10   and maybe you could take this one under advisement because

11   it's very -- this is very sensitive and obviously it's a

12   concern that we -- that the jury is going to be misled into

13   thinking this is just some easy task when it's so different.

14         Terminating for nonpay is very black and white, and

15   it's a basic price of admission.  It's not these very

16   complicated inquiries into who may have really been doing it

17   and if it's warranted.  And even under their own cast

18   structure, there is a whole eight different steps before you

19   remove someone.  So it's not a simple let's just remove them

20   the moment we get a notice, it's not the same.  These are

21   paying customers.

22         And to remove a -- to cancel a library or cancel an

23   airport or just terminate, because, you know, we get a notice

24   that's not verified and oftentimes has the wrong work on

25   it --

1          THE COURT:  Right.

2          MS. SAHNI:  Your Honor, this has been ruled on, it

3    was ruled on in December, it was ruled on again today.  We

4    should move on.  I don't understand how every time we come

5    into this court they seek to relitigate issues that have been

6    settled, and there is simply no reason to do so.

7          All of the issues she just raised go to the weight

8    of the evidence, which is something that they can argue to a

9    jury, but we need to be able to present the evidence, and at

10   minimum it is discoverable, as this Court has already found.

11         I'm happy to move on to the next issue, unless Your

12   Honor would like to address anything else.

13         THE COURT:  No.  I want to read why I said what I

14   said.

15         MS. RANAHAN:  Our January 10 letter, Your Honor,

16   goes through everything you said and our arguments.

17         THE COURT:  Well, so what Ms. Sahni said was:  If

18   for example, they were terminating very few people for

19   nonpayment and that that ratchets up during the claim period,

20   but during the same time they're terminating no one for known

21   infringement activity about which they sent hundreds of

22   thousands of notices --

23         MS. SAHNI:  Your Honor, I think this was related to

24   the issue of the time period, which is not even in dispute

25   anymore.  We're simply talking about the claim period and we

1   would like the month-by-month figures of termination for

2   nonpayment versus termination for copyright infringement.

3           THE COURT:  I think you were willing to provide

4   them on an annual basis, you didn't just want to provide

5   month per month.

6           MS. SAHNI:  That's right.

7           THE COURT:  That's what you said.

8           MS. RANAHAN:  We think it's irrelevant.  At that

9   point I was trying to determine if it would be why it was

10  necessary to distill it down monthly if you were going to

11  order it.  We still obviously do not believe it's relevant

12  and want to object it on that ground.

13          THE COURT:  No, I understand.

14          MS. RANAHAN:  And I think we talked about that then

15  too.

16          THE COURT:  Yeah, I'm not inclined to change an

17  order, but what you said was:  If we were to provide a

18  number, why does it have to be monthly?  Why not just get a

19  yearly termination?  I mean, I can certainly go back, but it

20  seems like it's adding extra.  And I said:  Because there is

21  no difference in the labor involved.  And you said you

22  thought there would be, but you never came back apparently

23  and proved that there would be a material additional burden.

24          MR. SPERLING:  Actually, Your Honor, they came back

25  and said that there wouldn't be, they said they weren't

1    claiming any additional burden.  Your Honor, we can't keep --

2    from our perspective --

3              THE COURT:  No, no, I know, you are already --

4              MS. RANAHAN:  This is in a January --

5              THE COURT:  You're repeating yourself and I get the

6    point.

7              MS. RANAHAN:  This is in a January 16 letter where

8    we came back to you and said:  There is no (inaudible), but

9    we're standing on relevance and raised all these other

10   arguments.

11             THE COURT:  And I understand.

12             MS. RANAHAN:  I just request that you consider it

13   before --

14             THE COURT:  But in the event that I'm just

15   hardheaded and I don't agree with you, how soon can you

16   produce it?

17             MS. RANAHAN:  Well, we probably want the right to

18   object to this one.

19             THE COURT:  You have it at all times.  Anything I

20   do can flow upward.

21             MS. RANAHAN:  Right, okay.  So if we have the time

22   to try to object and get a ruling --

23             THE COURT:  I'm not saying that it's timely,

24   because I think I ordered you to do something --

25             MS. RANAHAN:  No.

1          THE COURT:  -- and they might have that argument,

2     but I'll leave that to Judge Jackson.  How soon can you get

3     it done in the absence of any appeal?

4          MS. RANAHAN:  Let's say 45 days.

5          MS. SAHNI:  Your Honor, it's not clear to me why.

6     She said they could do it annually back in December and  the

7     only question --

8          MS. RANAHAN:  It's not the burden.

9          THE COURT:  I don't want you to rush them for rush

10    sake.

11         MS. SAHNI:  Your Honor, we --

12         THE COURT:  If you can articulate a reason why you

13    need this in order to fit within your potential discovery

14    deadline of July, then that's something to talk about.

15         MS. SAHNI:  Because, Your Honor, they're using

16    these sort of things as a reason to extend the schedule out

17    for a year.  We started discovery --

18         THE COURT:  You didn't hear me, I guess.  Assuming

19    I accept your July deadline without safe harbor, tell me why

20    end of March would interfere with your ability to close

21    discovery in July.

22         MS. SAHNI:  Your Honor, we'll need to be able to

23    ask their deponents about it, we'll need to be able to have

24    our experts look at and compare it against --

25         THE COURT:  Why would you have to ask their

1    deponents about it?  If they provide you terminations -- I'm

2    not going to make this a whole new area of discovery.  I

3    found that the data is relevant, but what would you need

4    beside the data?

5           MR. OPPENHEIM:  Your Honor, the way this arose in

6    the Cox case I think is fairly informative, and that is that

7    it wasn't significant deposition discovery, but there was

8    deposition discovery to understand what did Cox do when its

9    own money was at stake as compared to the music owners' money

10   at stake.

11          And so we did ask and get answers to questions

12   about what was the process they went through when they --

13   there was a nonpayment, how long did they take, what was the

14   next step, how did -- when did --

15          THE COURT:  That sounds like a half an hour worth

16   of questions.

17          MR. OPPENHEIM:  It's not a lot.  It may be that it

18   takes -- in that case I think we had two different deponents

19   we had to get to get the full answers.  It's not a lot of

20   questions, Your Honor, but we will have to take depositions

21   on it just to fill out an understanding.

22          THE COURT:  All right, but even -- even assuming

23   that, if you have the information by the end of March, does

24   it interfere with a July -- what date are you proposing, July

25   31?

1          MR. OPPENHEIM:  There are other discovery areas we

2     haven't gotten to yet, Your Honor --

3          THE COURT:  I know.

4          MR. OPPENHEIM:  -- that are far more critical in

5     terms of timeliness than this.  I think that is certainly

6     true.  So 45 days on this, but, for instance, the log data,

7     we needed that a month ago.

8          THE COURT:  Yeah, that's a good point of

9     discussion.  I'm talking about this one because we're doing

10    these one at time.  So 45 -- March 31 for that, okay.

11         MS. SAHNI:  So the next category that was ordered

12    produced in December was the monthly revenues received for

13    infringing subscribers, and Your Honor said:  Regardless of

14    any relevance objection they may have, you said it was

15    relevant.  This is at the transcript the a 57.  And you asked

16    Charter to come back with a response on whether it could link

17    the financial data to subscriber accounts by January 10, and

18    Charter said at that conference, this is on transcript at 54,

19    that as the mid-November it had all of the information it

20    needed to do this.

21         And so it came back on January 10 again with

22    nothing on burden, and simply said, to the extent plaintiffs

23    are able to identify subscribers about which plaintiffs

24    alleged infringement notices were sent --

25         THE COURT:  What page are you on?

106

1              MS. SAHNI:  This is in their January 16 letter,

2    Your Honor.

3              THE COURT:  Okay.

4              MS. SAHNI:  They said:  To the extent plaintiffs

5    are able to identify subscribers about which plaintiffs

6    alleged infringement notices were sent, Charter can

7    reasonably isolate the subscriber's revenue during the claim

8    period and will provide it within the next 60 days.

9              THE COURT:  How many notices were sent, that you

10   know of?

11             MS. SAHNI:  Roughly around 600,000, a little --

12   660,000.

13             THE COURT:  Sent by Charter to --

14             MS. RANAHAN:  Charter.

15             THE COURT:  -- its subscribers?

16             MS. SAHNI:  No.  These are the notices we sent, the

17   RIAA sent to Charter on behalf of the plaintiff identifying

18   the infringements.  And so the universe --

19             THE COURT:  But were there 600,000 different

20   subscribers.

21             MS. SAHNI:  No, you know Your Honor, they probably

22   aren't, but as we discussed at the last conference, they have

23   the information to link the IP address listed in our notices

24   to accounts in their system.  And Your Honor I think said at

25   the last conference that of course they have that

1    information.

2         And so the issue is that we can't identify the

3    subscribers.  We can only give them the notices which we

4    produced back in November, which is itself puzzling because

5    they should have had them to begin with since we sent them

6    originally in 2013.

7         THE COURT:  Tell me how you originally come across

8    evidence of illegal downloads.

9         MS. SAHNI:  Yes, Your Honor.  So this is on

10   peer-to-peer-sharing sites, which I know you're quite

11   familiar with.

12        THE COURT:  P to P okay, all right.

13        MS. SAHNI:  Let's take Bittorent, for example.

14        THE COURT:  Yeah, I know.

15        MS. SAHNI:  We have a vendor, I think we've talked

16   about this before, who would go out and look for infringing

17   files.

18        THE COURT:  Was it a German company?

19        MS. SAHNI:  It was not a German company.  I think

20   we talked about this once before because you said you had

21   familiarity with the German company.

22        And so we -- they would identify the infringing

23   files, run them through a tool that allowed them to verify

24   that it was a match to one of our plaintiff's works and then

25   would generate an infringement notice that was sent to

1   Charter.  So Charter received these notices in the 2013 to

2   2016 timeframe.

3           THE COURT:  So did you get -- did you have an ISP

4   and the fact that that's hosted by Charter?

5           MS. SAHNI:  Yes, we had an IP address and we were

6   to say that that is Charter and the notice would go to

7   Charter accordingly.

8           THE COURT:  Okay, okay, all right.

9           MS. RANAHAN:  So we've been -- so the notices that

10  we produced stopped in March 2016.  Based on the retention

11  policies, we've been able to identify about 38,000 ticket

12  information data packets for the notices that they provided

13  around 11,000 subscribers, and we're working on the financial

14  data, like I said in this letter that we're going to produce

15  to them, I think -- this was January 16.  So I said within 60

16  days of this we're going to provide for all the subscribers

17  we've been able to isolate we're going to provide the

18  financial information.  We want to do this because we want to

19  isolate the revenues --

20          THE COURT:  They need that faster.  So I would like

21  that March 1, if possible, okay.

22          MS. RANAHAN:  That one -- this is the one that is

23  actually the most -- on this letter we said by March 16.

24  That's actually the most time-consuming.  It would be

25  impossible to do it by March 1, Your Honor.  And they've

1   never taken an issue with this date until today.  I mean,

2   I've literally never heard them complain about the March 16

3   date on this.

4           THE COURT:  All right.  So March 16, what's your

5   response?

6           MR. OPPENHEIM:  So, Your Honor, we're kind of

7   missing the big picture of what we should be getting here.

8   If I can just back up for a second.  When -- when a notice

9   goes to Charter, Charter has a system, they must, where they

10  log the notice came in and they -- they log what they do with

11  the notice and what happens as a result of it.

12          They correlate who the notice is about, which of

13  their subscribers, right, and then they take or don't take

14  some action.

15          THE COURT:  I assume it's all automated?

16          MR. OPPENHEIM:  Yes, it should be --

17          THE COURT:  A human being can't possibly do that

18  all that.

19          MR. OPPENHEIM:  Right, it should be totally

20  automated.  Now, there may be steps in the process down the

21  road on what they do that are manual, but the log-in process,

22  right, should all be there.

23          Charter should have --

24          THE COURT:  Are your notices submitted

25  electronically also?

1            MR. OPPENHEIM:  Yes.  And the company that the

2    music industry retained, MarkMonitor, they are a very well

3    known highly regarded company, right.  They do work for the

4    DOJ and others, okay.

5            So --

6            THE COURT:  That's not such a high praise right

7    now, sorry.  Having come from the DOJ I think I have standing

8    to say that.

9            MR. OPPENHEIM:  So, Your Honor, they should -- the

10   starting point for discovery should be, we should have

11   received immediately, the very first discovery we should have

12   received is a lengthy log file of what they did in response

13   to each of the notices sent by the RIAA.

14           THE COURT:  And you received nothing?

15           MS. RANAHAN:  That's not true, Your Honor.

16           MR. OPPENHEIM:  So --

17           THE COURT:  Why do you think you should have

18   received that?  Give me the foundation for your statement.

19           MR. OPPENHEIM:  Because -- so that is the starting

20   point for everything that they need to do.  So when

21   Ms. Ranahan says there are 11,000 subscribers that have been

22   identified, the only way they can figure that out is by

23   having gone to look at those log files.  So if they're doing

24   that analysis and they know that there are 11,000

25   subscribers, which by the way, if that number is true, one

1  of -- it would be shocking, because that would mean that

2  667,000 notices are attributable to only 11,000 subscribers,

3  the number of repeat infringers there would be astronomical.

4  THE COURT:  Well, it would be 60 per person, 60 per

5  infringer.

6  MR. OPPENHEIM:  But Your Honor, which given that

7  these notice -- that would be a huge number of notices per

8  subscriber.  So, anyway, let's put a pin in that, Your Honor.

9  So the question is, they obviously have these log

10  files they're doing work on them, why haven't they produced

11  them?  Start with that.  Then she says that they only have

12  38,000 ticket information.  Why do they only have ticket --

13  ticket is usually the outcome or what they do in response to

14  a notice.  So they should presumably have 667,000 --

15  THE COURT:  Well, what was produced in Cox?

16  MR. OPPENHEIM:  All of this was produced.

17  THE COURT:  No, but how many?

18  MR. OPPENHEIM:  There were 277,000 notices in that

19  case, and we received log files for all of them.  Now, one of

20  the things we found in Cox is that they -- they capped the

21  certain number of -- actually, we received more than that

22  because they -- they produced for non-RIAA notices as well,

23  but for the 277,000, we had data on what they did with

24  respect to each notice.  And that's what we should have.

25  They appear --

112

1          So I guess the first question is --

2          THE COURT:  You had data for every single notice of

3   277,000?

4          MR. OPPENHEIM:  Yeah.  I mean, it wasn't

5   necessarily good data, I mean, in the sense that sometimes

6   they didn't take action, but it was ordered to be produced

7   and they ultimately produced it.

8          THE COURT:  Well, not taking action is still good

9   data.  It's just not -- it just shows --

10          MR. OPPENHEIM:  Positive.  It's not necessarily

11   positive data.

12          MS. RANAHAN:  Your Honor, if may.

13          MR. OPPENHEIM:  So I guess one question I have is

14   why haven't the log files been produced, they should have

15   been produced.

16          MS. RANAHAN:  I would love to answer.

17          MR. OPPENHEIM:  And suddenly for what time period

18   of time are they looking at because I'm concerned when

19   they're saying 38,000 and 11,000, to me that doesn't compute.

20   So --

21          THE COURT:  Okay.

22          MS. RANAHAN:  Let me address both of those things,

23   which I thought I just said, but I'll do it again.

24          Well, actually let me start with this.  We provided

25   them a sample of the log data and what it would look and

113

1   provided that to them two and a half months ago and said,

2   Does this look good, does this look what you want before you

3   run it for all the tens of thousands that you have, and they

4   never got back to us.

5           THE COURT:  But wait a second, why are you covering

6   new ground if you guys did this in some other district?

7           MS. RANAHAN:  Well, we don't.  It's a different

8   client.  We have completely different data, we have different

9   retention policies.  The time period --

10           THE COURT:  Sorry, who was the different in

11   Virginia?

12           MS. RANAHAN:  Cox.  We're Charter.

13           THE COURT:  I know, but you didn't you buy Cox?

14           MS. RANAHAN:  No, no, no.

15           THE COURT:  Cox and Charter are completely

16   different --

17           MS. RANAHAN:  Completely different, nothing to do

18   with each other.

19           MS. SAHNI:  Your Honor, though, they do have the

20   same tracking system.

21           MS. RANAHAN:  At one point we did, but let me just

22   tell you about the timing of it and why is there is less than

23   they would like.

24           So they are suing for 2013 to 2016.  They sent us

25   notice of this lawsuit in late 2015.  At that time there was

114

1    about a -- there was one set of data there was an 18-month

2    retention policy and another --

3           THE COURT:  Is it a two-year statute of

4    limitations?

5           MS. RANAHAN:  Three-year --

6           THE COURT:  Three years.

7           MS. RANAHAN:  -- statute of limitations, but there

8    was a tolling period entered only at the time of the notice

9    of the lawsuit.  So as of the end of 2015 there was a tolling

10   agreement entered, and at that point everything was -- you

11   know, at that point they started implementing all the --

12          THE COURT:  So it's all of calendar year 2013?

13          MS. RANAHAN:  I'm sorry?

14          THE COURT:  It's all of calendar year 2013, 2014,

15   2015?

16          MS. RANAHAN:  No, no, no.  2015 is when we got

17   notice of the lawsuit.

18          THE COURT:  I know, but the period of time is 2013.

19          MS. RANAHAN:  Right.  So -- right, the claim

20   period -- if they went today they wouldn't have these claims

21   because they make a billion dollars off streaming now and

22   they don't even have the peer-to-peer problem.  So they had

23   to go back in time --

24          THE COURT:  So we won't have to do this again in

25   five years?

115

1          MS. RANAHAN:  No, it's a dinosaur I think as we

2   mentioned last time.

3          THE COURT:  Got that going for us.

4          MS. RANAHAN:  So if we go back to that time period,

5   by the time we got notice of the lawsuit there was only, in

6   some instances, six months worth of data and others 18.  So

7   that means that the notices that they provided us from 2013

8   all the way through 2000 -- March 2015, for the bulk of those

9   notices, the data doesn't exist anymore.  It's not same

10  client that was there in Cox, so there is not as fulsome --

11  there is not the same retention policies, it's a totally

12  different party and --

13         THE COURT:  Which makes the burden easier here?

14         MS. RANAHAN:  Makes it easier, actually makes it

15  easier, except for that, you know, we still have -- we would

16  like to be able to isolate the financial data for all of the

17  notice infringers and we're going to try to do it so we can

18  isolate the revenue.

19         THE COURT:  Well, why can't you do this on a

20  rolling basis?

21         MS. RANAHAN:  Well, the ticket data information

22  which -- again, we waited for them to say this is good, this

23  is the right columns.

24         THE COURT:  Did they say that?

25         MS. SAHNI:  Your Honor --

116

1          MS. RANAHAN:  Never.  They haven't gotten back,

2     they just left us hanging, provided samples.

3          MS. SAHNI:  Your Honor, that's incorrect.  We said

4     we want all of the data you have, all of the fields.  Don't

5     filter it.  Whatever your database has on the tracking of

6     these notices --

7          THE COURT:  In what manner did you say that and

8     when?

9          MS. RANAHAN:  I never heard that.

10         MS. SAHNI:  We said that in many meet and confers.

11    We said we want all of the data.

12         THE COURT:  So all oral, no written?

13         MS. SAHNI:  It might be in one of the letters, I'm

14    sure I can find it, but we definitely said we wanted all of

15    them.

16         THE COURT:  The bottom line is, you rejected what

17    they proposed?

18         MS. RANAHAN:  I didn't --

19         MS. SAHNI:  Just as a sample, they sent us a

20    sample -- Your Honor, the history is helpful here.

21         THE COURT:  No, she said she sent you a sample and

22    asked if is this okay.

23         MS. SAHNI:  They asked us first for a sample notice

24    back in September, we provided it.  They said give us all

25    your notices.  We rushed to provide it, even though they

117

1    should have had them already.  So in November we produced the

2    notices.

3              THE COURT:  All 600,000?

4              MS. SAHNI:  All 667 notices we produced in

5    November.  They sent us a sample, we said, We want all of

6    this.  Then we come into this courtroom and Your Honor said,

7    It's relevant, produce it.  And they said, We're going to be

8    producing it, we're producing the communications, we're

9    producing the ticket log data, we've unearthed a bunch of

10   data.

11             THE COURT:  What page is that again?

12             MS. SAHNI:  So unearthed a bunch of data is exactly

13   Ms. Ranahan's words.

14             MS. RANAHAN:  That was true, because before we --

15   before we got the notices we didn't have the 38,000 that we

16   unearthed.

17             THE COURT:  So page 54:  It wasn't until we got

18   their full universe of notices in November that we were

19   unable --

20             MS. RANAHAN:  We were able to unearth the 38,000

21   notices that --

22             THE COURT:  It says "unable," but you meant able.

23   That we were able to unearth a huge of amount data, and I'll

24   represent before the Court --

25             MS. SAHNI:  And this was in December, Your Honor,

1   and we provided the notices in mid-November.  And so here we

2   in February, we still have not seen a spreadsheet.

3          MS. RANAHAN:  But this is --

4          MS. SAHNI:  All it is is a spreadsheet.

5          THE COURT:  The transcript is going to be really

6   crappy.  I would hate to be the transcriber of this deal.

7          MS. RANAHAN:  Your Honor, this is a report we're

8   creating.  This isn't something that just exists to just turn

9   over, and I know you're not even obligated to create things,

10   but we're doing it.  And so what we did was here is the

11   fields we can pull from the system.  Are these fields

12   satisfactory to you?  They never responded, they did not

13   reject it.  Neema's statement that they said want we want all

14   the fields, I've never heard that until today.

15          MS. SAHNI:  I told you we want all the infringement

16   data that you have.

17          MS. RANAHAN:  Yeah, those are specific things, but

18   we also gave you -- we gave you definitions, we gave you --

19          THE COURT:  Ms. Ranahan, what did you mean when you

20   told me we can go with the date that you just suggested, the

21   January 10 date, what did you mean by that --

22          MS. RANAHAN:  That was for a burden -- was that a

23   burden issue?  I never had said we were going to produce --

24          THE COURT:  Well, I asked:  Do you have all the

25   information we need?  We do now, as of mid-November we do,

119

1    and I think we're talking about this same issue.  Maybe not,

2    I don't know.

3              MS. SAHNI:  Your Honor, there is a couple of

4    related issues.  I just want to make sure it's clear what

5    we're talking about.

6              THE COURT:  That was page 54 at the bottom.

7              MS. SAHNI:  So there is the ticket log data, then

8    there is the monthly revenue from the subscribers for those

9    identified in the ticket log data in the infringement

10   notices.  Then there is communications about the notices, and

11   all of those have been ordered produced.

12             THE COURT:  All right.  Well, I don't care about

13   what -- water under the bridge.  Let's see what you can do.

14   She says it's impossible by March 1.

15             MS. RANAHAN:  It's impossible.

16             THE COURT:  They can do it by March 16.

17             MS. RANAHAN:  And we're talking about the financial

18   data.

19             MR. OPPENHEIM:  Your Honor, I'm sorry, I'm

20   confused.  I thought she just said they've identified 11,000

21   subscribers.  The only way they could do that is if they had

22   log files.  Produce the log files they have.

23             MS. RANAHAN:  Right, we have --

24             MR. OPPENHEIM:  Excuse me, Ms. Ranahan.

25             MS. RANAHAN:  We do, we have 38,000.

1          MR. OPPENHEIM:  Can I finish without being

2   interrupted?

3          THE COURT:  Go ahead.

4          MR. OPPENHEIM:  So if they've identified 11,000

5   subscribers from log files, produce those log files, produce

6   information about those 11,000 subscribers.  If they've

7   identified 38,000 tickets, produce that.  She indicated they

8   have them.

9          The other thing is this retention policy issue,

10  retention of data, 18 months, six months, this today is the

11  very first time we're hearing that.  That shouldn't happen.

12  If they have a problem where they don't have certain data,

13  they should tell us.

14          THE COURT:  All right, let's stop right there.  So

15  have you ever disclosed -- what you said on the record today

16  was that Cox had a different retention policy than Charter.

17  This is a different client, that's what you said.  Have you

18  disclosed to the plaintiff ever that information you know

19  they expect you to produce will not be produced for the

20  full-time period because the documents don't exist?  Have you

21  disclosed that previously?

22          MS. RANAHAN:  I have said that in open court, I

23  have said we don't have all of it.  You can look back at the

24  hearing, the timeframe.  I didn't know specific until this

25  week about the 11,000 subscribers.  That's from a new

1   number -- new information.  We've just understood that there

2   is 11,000.

3          THE COURT:  But whenever said you don't have it,

4   did you link that thought to a document destruction policy?

5   That's what I'm asking.

6          MS. RANAHAN:  We have never had that discussion at

7   all.

8          THE COURT:  Just saying generally we don't have it

9   is not disclosing that the reason you don't is because the

10  information has been destroyed or recycled or written over,

11  whatever you call it.

12         MS. RANAHAN:  Right.

13         THE COURT:  You've never linked those thoughts?

14         MS. RANAHAN:  We haven't, no, we haven't -- well,

15  we have said in open that some of it is so old that we don't

16  retain it anymore.  I've said it numerous times, I've said it

17  in meet and confers.  I haven't ever said that we have 38,000

18  and 11,000 because we just figured that out.

19         THE COURT:  Okay.  So retain is not in the

20  transcript -- the word "retain" is not the transcript at all

21  for December?

22         MS. RANAHAN:  I don't think I used the word

23  "retain," but I would have said the date, some of it is old.

24  If I had a search button, I would find it.  But I definitely

25  said repeatedly to plaintiffs in meet and confers, some of

122

1    this is just so old we don't have it.  We literally went

2    through a whole exercise where we were going to tell them

3    categories where we don't have things anymore and we have.

4              MR. OPPENHEIM:  Your Honor, Ms. Ranahan is very

5    capable of attaching innumerable letters that have been and

6    e-mails that have gone back and forth before between us to

7    you even on things as mundane as a scheduling order.

8              I would like her to submit to the Court and us the

9    e-mails or the transcript sites that indicate that she has

10   previously disclosed that information was destroyed, because

11   this is the very first time any of us have heard it.  It's

12   simply inaccurate.

13             THE COURT:  Let's give her a chance to retract

14   that.  Do you believe in some communication that you could

15   produce to the Court that you've clearly indicated some

16   information does not exist because it is gone?

17             MS. RANAHAN:  Yes, I believe --

18             THE COURT:  Then go ahead and submit that.

19             MS. RANAHAN:  Okay, I'll submit that.

20             THE COURT:  By Monday.

21             MS. RANAHAN:  I mean, it wasn't a specific thing.

22   It was some of this is so sold we don't have anymore and I've

23   said that repeatedly, but it's not this exact data because we

24   didn't know it.

25             THE COURT:  Well, I guess if she said it's so old

123

1    we don't have anymore, that would necessarily mean it's gone.

2              MR. SPERLING:  But, Your Honor, she was

3    more specific than that.

4              MS. RANAHAN:  (Inaudible).

5              MR. OPPENHEIM:  What she actually said is:  We

6    don't have ticket data from Charter -- And I'm reading from

7    75 of the transcript of the transcript, Your Honor, if you

8    want to follow on.

9              THE COURT:  What date?

10             MS. SAHNI:  December 17.

11             MR. SPERLING:  December 17, page 75 beginning at

12   line 4.

13             THE COURT:  I'll trust you.

14             MR. SPERLING:  We don't have ticket data from

15   Charter from 2010, we don't have it from 2011.  We have some

16   data which started at 2012, 2013.  Now she has represented to

17   the Court that they don't have data from 2013 --

18             MS. RANAHAN:  Well, we produced --

19             MR. SPERLING:  -- because -- because of an 18-month

20   or six-month document retention policy, I guess depending on

21   the nature of the material

22             So it's not, Your Honor, a matter of her simply

23   saying some material is so old.  There was at a minimum

24   misdirection by stating affirmatively that there was not data

25   from earlier periods, i.e., years predating the claim period,

124

1    2010, '11, '12.

2             THE COURT:  What page are you on?

3             MR. SPERLING:  I'm on page 75, Your Honor.  It's

4    right at the top, fourth line.

5             THE COURT:  All right.  So we don't have ticket

6    data from Charter from 2010.  We don't have 2011.  You can

7    reasonably assume, meaning it's gone, right?

8             MR. SPERLING:  For those periods.

9             THE COURT:  Yeah.

10            MR. SPERLING:  But, Your Honor, the negative

11   implication especially when she says, We have some data which

12   started at 2012, 2013, the negative implication is that they

13   have not lost data from those years onward.

14            THE COURT:  But she used the word "some."

15            MR. SPERLING:  Yes, Your Honor.

16            THE COURT:  She didn't say, We have data.  If she

17   said, We had data starting in 2012, 2013, that means she's

18   excluding that anything was destroyed.  If she says, We have

19   some, and then she says, We're trying to assess against their

20   notices what we have.  So that to me is close enough saying

21   we're trying to determine what still exists and what don't.

22            MR. SPERLING:  But, Your Honor, the question is not

23   did she make an affirmative misrepresentation that they had

24   data from those periods.  The question that you posed, which

25   was the right question to pose, is whether she ever told us

1    previously that they didn't have data from the claim period.

2    And this sentence or sentences that we just read strongly

3    imply that data was not lost from the claim period because it

4    says there is no data from earlier periods while making no

5    such representation with respect to the claim period.

6              So I'm not accusing Ms. Ranahan of stepping up

7    here, Your Honor, and making an affirmative misrepresentation

8    in December that stuff existed when it didn't, but this

9    supports our point, which is that this is the first time,

10   eight months into this case, that we are learning that they

11   have a serious document retention problem in this matter, and

12   they should have told us a long time ago.  And it explains in

13   part, of course, why they've been dragging their feet on

14   production, why we've gotten so few documents.  Now we're

15   learning they've got a big problem, they don't have documents

16   that they ought to have.

17             THE COURT:  Well, why is that their big problem?  I

18   mean, so far I haven't heard anything that would make me

19   suspicious that it's spoliation.  So everybody can have a

20   reasonable document retention policy, right?

21             MR. SPERLING:  They can, Your Honor.  Of course,

22   we'll need to take discovery about this policy and how it was

23   implemented.

24             But, Your Honor, given all of the disputes going on

25   about the failure to produce documentation, respectfully,

126

1  it's not responsible, it's not way that we or they should be

2  conducting this litigation.  We can fight hard on the merits,

3  but there is certain basic professional responsibilities that

4  we ought to be discharging in going back and forth over

5  discovery, however much we disagree.  This should have been

6  disclosed a long time ago.

7          MR. OPPENHEIM:  May I respond to your question how

8  it impacts the case substantively because it's important,

9  Your Honor?

10          This case is about the continued provision of

11  service to known repeat infringers.

12          THE COURT:  Understood.

13          MR. OPPENHEIM:  Right.  We don't know whether

14  they're going to plead the affirmative defense, the safe

15  harbor, which would require them to have adopted and

16  implemented a repeat infringer provision that provides for

17  termination.

18          If you don't maintain data on which of your

19  subscribers have been the subject of infringement notices,

20  you can't possibly know whether you're continuing to provide

21  service to repeat infringers, because if you erase your

22  memory every, say, six months, you don't know whether they

23  were -- a particular subscriber was the subject of 100

24  notices six months ago.  So it goes directly to the merits of

25  the case, whether or not they bothered to track or cared

127

1  about whether or not they are subscribers or the subject

2  previously of notice.

3         THE COURT:  No, I see that's how information you

4  will use for a jury, but I'm dealing with discovery at the

5  moment.  It's interesting to me, but it's not -- unless you

6  want to file some kind of motion for sanctions or get an

7  adverse infringement instruction or get something like that,

8  it's just not something I want to worry about.

9         MR. OPPENHEIM:  Well, I think we will want

10  discovery, Your Honor, now on all of that because we may well

11  seek an adverse infringement.  I don't know yet, we're a long

12  ways from there, but it certainly raises all kinds of

13  questions that we're going to have.

14         THE COURT:  No doubt, but we're not talking about

15  discovery you're going to have in the future, we're talking

16  about what you've already asked for.

17         MR. OPPENHEIM:  And all of this is still a

18  significant issue, but it still doesn't explain why what they

19  do have.

20         THE COURT:  Understand.

21         MS. SAHNI:  So, Your Honor, to just return to that

22  issue, I think there are several categories, which we now

23  understood they have, the ticket log data, there is

24  communications about the tickets and the infringement notices

25  and there is the monthly subscriber revenue from the

128

1   infringing subscribers and all three have been ordered

2   produced.  We have not seen it to date.  We would like to get

3   a date certain by which they will produce it.

4              THE COURT:  March 16.  Okay.  What next?

5              MS. SAHNI:  The next issue, Your Honor, is policies

6   regarding the handling of copyright infringement.  So this is

7   another issue where --

8              THE COURT:  What bullet point -- what page are you

9   on in your letter?

10             MS. SAHNI:  We're on page 4, Your Honor, 4 to 5.

11             THE COURT:  The policies related to handling

12  copyright information?

13             MS. SAHNI:  That's correct, Your Honor.

14             THE COURT:  Okay.

15             MS. SAHNI:  Your Honor found this information

16  relevant and the discoverable in December and ordered Charter

17  to produce final policies postdating 206, postdating the

18  claim period based on this colloquy that we had back and

19  forth on the feasibility of subsequent remedial measures.

20  And Your Honor also ordered them to produce documents

21  discussing the effective policies they had in place from 2010

22  to 2016.  And this is one in which there was no burden issue.

23  You just said I'm making that ruling and your minute order

24  confirmed this and said that they were to produce information

25  as stated on the record.

129

1            At the conference, Charter is itself represented

2     that it would be producing communications about its policies

3     this month.  That was in December, and it's now February, and

4     we haven't seen anything on those.  So this is another

5     category where we absolutely need a date certain to -- for

6     these two categories of documents.

7            They represented that they produced whatever

8     policies they have for the claim period.  We don't see

9     anything that looks like a policy in what they've produced.

10    There is -- it's heavily redacted, it's mostly procedural

11    documents.  It seems that this may be related to the issue of

12    retention that we're hearing about now.

13           THE COURT:  Well, is Mr. Lampros with you?

14           MS. SAHNI:  Yes, at that that's right.

15           THE COURT:  Mr. Lampros represented that they

16    they've produced the final policy documents.

17           MS. SAHNI:  No, that's not true, Your Honor.  They

18    produced procedural documents, and she said -- Ms. Ranahan

19    said that was one -- they produced one policy, which is all

20    they could find from 2010 through 2016.  If that is indeed

21    the case, then I don't see how they're going to assert a safe

22    harbor defense, but that's a separate issue.

23           But regardless, Your Honor ordered them to produce

24    policies postdating the termination -- the claim period, 201

25    and on, and we haven't heard anything on that, and documents

130

1  discussing the effects of those policies from 2010 to 2016.

2  We haven't even anything on that.  And Ms. Ranahan

3  represented that they would produce communications about the

4  policies in December and we haven't seen anything about that

5  as well.

6        THE COURT:  Here is what I don't understand.  So

7  what I -- what Mr. Lampros said was:  Plaintiffs are seeking

8  Charter's final copyright or infringement policies without

9  limitation as to time period.  That's what we're talking

10  about, right?

11        MS. SAHNI:  There are three categories.

12        THE COURT:  And we're also seeking drafts thereof,

13  et cetera.  So Charter has agreed to produce this information

14  for 2012 through 2016 at least as it concerns the policies.

15  They've produced the final policy documents.  Is that not

16  true?  He misrepresented that they had produced the final

17  policies documents.

18        MS. SAHNI:  Your Honor, that's what they told us,

19  that that is their final policy document.  It doesn't look to

20  be a policy document when you actually look at it.  I think

21  he was reciting what they've told us it is.

22        But regardless, they said that that's all they can

23  find for the claim period.  Whether or not they've adequately

24  searched, that's obviously in question, especially given of

25  the retention issue that we just discussed.  But regardless,

131

1    Your Honor ordered policies postdating 2016 and said that

2    that needed to be produced.  That's transcript at 67, lines 3

3    through 12.

4            And Your Honor also ordered them to produce

5    documents any time in the 2010 to 2016 time period that

6    discussed policies that have existed.  Even though we don't

7    have those policies, the documents discuss it.  Yeah, that's

8    within the zone of relevance.  And that's at 68, Your Honor,

9    9 through 5.  So both of those categories we have not seen.

10           And Ms. Ranahan at that same conference said, and

11   I'm quoting again, this is transcript at 63, that it would be

12   producing communications about the policies this month, which

13   was in December.

14           THE COURT:  Okay.  Go ahead, Ms. Ranahan.

15           MS. RANAHAN:  Thank you.  So the communications

16   which I had understood we were going to be producing turned

17   out not to be responsive.  I had understood there to be some,

18   I looked at them.  What Your Honor ordered was communications

19   about the effects of the policy.  And so far we haven't;

20   located any communications like that.

21           We have inquired about whether we have an internal

22   2017 policy.  By the way, these policies are all public, they

23   could go back, they can use a wayback machine and get them,

24   but we're trying to find if there is an internal version of a

25   post -- of a 2017 one that they're after.

1          THE COURT:  How long have you been trying to find

2    that?

3          MS. RANAHAN:  Well, since the hearing we've been

4    looking for it, because we've searched all of our internal

5    and repository --

6          THE COURT:  That's two months ago.

7          MS. RANAHAN:  Right.

8          THE COURT:  So if you haven't found it in two

9    months, I would say that, I don't know.

10         MS. SAHNI:  Your Honor, obviously we have some

11   questions about the comprehensiveness of those searches.

12         THE COURT:  Yeah, but I can only rely on counsel's

13   representation.

14         MS. SAHNI:  We just would like to -- these were

15   already ordered to be produced.  We would like to have dates

16   by when they will produce everything they have.

17         THE COURT:  Okay.  Well -- so --

18         MS. RANAHAN:  We'll produce any other policy

19   information we find within the next 30 days.

20         THE COURT:  Well, by March 16 I would like you to

21   state plainly that you have searched and there are none, or

22   you are producing whatever, but --

23         MS. RANAHAN:  Okay.

24         THE COURT:  -- I want that to be, absent good

25   cause, the final answer on policies.

133

1          MS. RANAHAN:  Okay, okay.  And we have produced the

2     final policies, Your Honor, so that is accurate.

3          MR. OPPENHEIM:  Two questions, Your Honor.  Are you

4     saying that they'll either say they didn't -- they don't have

5     it or they'll produce it by March 16?

6          THE COURT:  I want them to state plainly this is

7     all they have and there is nothing else, and I want that to

8     be the final answer that you can bank on.

9          Absent -- you know, I was on the verge of trial one

10    time and an employee of my client came to me and said, Oh, we

11    just found a file called Evidence that was in one of our

12    employee's file draws.  And so I had -- right before trial I

13    had to tell the Court, you know, my client has just produced

14    to me a file called Evidence in which they stored every

15    relevant document and never produced it to me.  So I know

16    that happens, but based on your good faith effort, I want

17    that to be the final word, okay.

18         MR. OPPENHEIM:  My other question is, did I

19    understand that Ms. Ranahan just said that if there are

20    e-mails about the policy, they view those as nonresponsive,

21    they only think what's responsive is e-mails about the

22    effects of the policies?  That would be a distinction that I

23    think would be problematic.

24         THE COURT:  Understood.  So what did you mean?

25         MS. RANAHAN:  That's what I believe the record

1    reflected, Your Honor, that we were ordered to produce

2    communications about the effect of the policies, not any

3    mundane drafts or internal -- a lot of that is privileged

4    anyway, but other nonsubstantive correspondence about the

5    policies.  We understood it to be effects of the policy.

6    That's what the transcript reflected.

7              THE COURT:  Well, I mean, if it's relevant

8    information, it needs to be produced, no matter what I said.

9    So what would you consider relevant?

10             MR. OPPENHEIM:  Any, any document inhouse, whether

11   it's e-mail, a posting, anything that is about the policy

12   associated with copyright in any way whatsoever should be

13   produced.  That's what this case is largely going to be about

14   in many respects.  The idea that they think that's

15   nonresponsive to me explains why they only have (inaudible -

16   away from mic) documents six ago, more than six months.

17             THE COURT:  Well, give me an example of a document

18   you think should not have to be produced, even if you're not

19   sure like anything like that exists, propose something that

20   you would say, if this kind of document exists, that would

21   not be something we need to produce.

22             MS. RANAHAN:  Well, the policies are broader than

23   just copyright.  What he just described, which is if it was

24   about the copyright policy or the effect, we would produce

25   it.

135

1          THE COURT:  Okay, there it is, let's stop there.

2          MR. OPPENHEIM:  Okay.  What about -- okay.

3  Policies that have do with other types --

4          THE COURT:  That's as broad as you can get.  If you

5  want to narrow yourself, I he guess.

6          MR. OPPENHEIM:  She said, I believe, and I don't

7  have the request in front of us, is that the policies -- I

8  focused on copyright.  We sought information about policies

9  outside of copyright as well.  So, for example --

10          THE COURT:  Like what?

11          MR. OPPENHEIM:  So if there are policies on how

12  they dealt with customers (inaudible - away from mic) were

13  dramatically different than the policies with respect to how

14  they treated customers who were infringing, that's something

15  that we would want to discovery on, so that we may or we may

16  not put that before the jury to show, again, that they took

17  care of the issues that affected their network, but not the

18  issues that affected our music.

19          MS. RANAHAN:  This is completely not what was

20  discussed last time, Your Honor, which was limited to

21  copyright policies, and now counsel is saying --

22          THE COURT:  Well, on page 59 Mr. Lampros said:

23  Your Honor, we would next like to talk about the policies on

24  handling copyright infringement.  That's the context that the

25  whole discussion was engaged in.  So I don't see that --

136

1          MR. OPPENHEIM:  I apologize, Your Honor.  I

2   understand.  What I just described (inaudible - away from

3   mic) discovery, which they have not yet objected to.

4          THE COURT:  Okay.

5          MR. OPPENHEIM:  So this issue will be joined I'm

6   sure to you.

7          THE COURT:  Or someone else.

8          MS. SAHNI:  Or someone else.

9          MR. OPPENHEIM:  Or someone else.  I'm hoping you,

10  Your Honor.

11         THE COURT:  All right.  So we're passing that over.

12  All right.  What next?

13         MS. SAHNI:  The so the very last issue, Your Honor,

14  is additional financial information.

15         THE COURT:  Wait.  Are you sure the very last?

16  Careful what you say.  Your Honor, this is the last question.

17         MS. SAHNI:  No, this is the last issue we would

18  like to raise today.

19         THE COURT:  Okay.

20         MS. SAHNI:  This is additional financial

21  information.  We've already talked about --

22         THE COURT:  Page?

23         MS. SAHNI:  This is page 4 as well, Your Honor, of

24  the letter.  So we've already talked about the monthly

25  subscriber revenue.  This is the companywide financial

137

 1   information, and we had some discussions about this before

 2   about how we need information about different service lines

 3   and Charter's overall business to be able to say to the jury

 4   that this is -- this is how they value their subscribers and

 5   this is how -- what they're considering when they're thinking

 6   about their policies on copyright infringement for these

 7   different product lines.

 8           And we had a discussion about that and they

 9   produced a document that is completely incomprehensible.

10   It's not clear what it shows.  It's also not clear whether it

11   includes Internet revenue as part of bundled services, which

12   we discussed last time, Charter as many other ISPs, offers

13   Internet as part of a bundle.

14           And so the value of a given subscriber to Charter

15   is not simply the revenue that Charter gets for Internet

16   access, it's the revenue that they get for all of those

17   bundled services.  So if they terminate a subscriber for

18   infringement, they're not just losing the Internet revenue,

19   they're losing the cable/TV revenue and the telephone

20   revenue.

21           And so when thinking about Charter's incentives to

22   tolerate infringement, they are thinking about, they are

23   weighing that tolerating infringement against the revenues

24   they get and the profits they have against that full bundle.

25   And we need to be able to show that to a jury and say here is

138

1  what they're considering when they're thinking about what

2  policies they want to put in place and enforce.

3       And we've only received this information in this

4  incomprehensible document as to Internet revenue.  It's not

5  clear it includes bundled services.  It says nothing about

6  cable or TV and it doesn't allow us to make that argument

7  that's critical to understanding the value of a subscriber to

8  Charter when assessing the costs associated with terminating

9  infringing subscribers.

10       MS. RANAHAN:  Your Honor, we've already provided

11  them obviously the public overall financials.  We now

12  provided them the Internet financials, which is what we

13  understood Your Honor to be asking if we could produce and we

14  did it, and we're telling you that we're going to produce --

15  or we're telling plaintiffs and the Court that we're going to

16  produce the specific subscriber revenue all across the board

17  where they can make this point, but now they're suggesting

18  that they also need -- we had to run a report and try to

19  distill out the Internet from the bundled services.  It

20  wasn't a document that existed, we created it for them.  Now

21  they want to us do that for cable and other services that are

22  not at issue when they can look at the overall financials or

23  the subscriber financials, which we're already agreeing to

24  produce, the ones that are accused, that we still have, you

25  know, the ability to identify.

139

1          THE COURT:  So it sounds like they're asking for

2     revenue companywide versus infringing subscribers and you're

3     saying you're producing it for allegedly infringing

4     subscribers --

5          MS. RANAHAN:  And company -- we have tons of public

6     financials an companywide financials because Charter is

7     public.

8          THE COURT:  Right.  You heard Ms. Sahni just

9     proffer the relevance of what she's seeking.  What's your

10    response to that?

11         MS. RANAHAN:  Well, they have the overall

12    financials.  We've now gone through great pains --

13         THE COURT:  For what, for every year, every period?

14         MS. RANAHAN:  For the whole claim period and one

15    extra year.  So 2012 to 2016.

16         THE COURT:  And that's in the form of what?

17         MS. RANAHAN:  All of the public financials that

18    they have received and that are out there.  Charter is a

19    public company.

20         THE COURT:  Which they didn't have to ask for

21    you -- from you for --

22         MS. RANAHAN:  Right, but in addition to that, we've

23    gone -- we've provided them the subscriber numbers, we've

24    provided them now this Internet -- if they don't think the

25    document makes sense, they can ask about it.  It's very

1  detailed.  It provides 2012, 2013, 2014, 2015, all of the

2  financial information about the Internet revenues, and they

3  can compare that to the overall revenues that they have from

4  the public to say there is other service.

5          THE COURT:  But is all the revenue you get -- the

6  only revenue you would get is from subscribers?  You don't

7  have any other source of revenue?

8          MS. RANAHAN:  Oh, does Charter have other sources

9  of are he have knew pee sides subscribers?  I can't speak to

10  that right now, Your Honor.  I'm not focused on that, but

11  their public financials would reveal that if they took a

12  close look at them.

13          But the only way that this argument makes sense,

14  which she articulated, if it's about the accused subscribers

15  and about -- we're providing all the financial information,

16  about all of them.  The notion that they need companywide

17  cable revenues, well, how does that have any bearing on any

18  of the issues in this case?

19          THE COURT:  Well, she just said it.  I want you to

20  respond to that.  So she said -- let's say, I know what I pay

21  for basic TV, which I don't even use because I had to accept

22  it in order to get the Internet --

23          MS. RANAHAN:  Right.

24          THE COURT:  -- from Comcast.  I pay $146 a month

25  for Internet.  Anyway --

1           MS. RANAHAN:  So we're providing that for all the

2    accused.

3           THE COURT:  I pay 146, but if I -- and maybe there

4    is bundles that pay -- that people pay $200 a month, let's

5    say.  And she is saying if they're infringing through the

6    Internet service, you'll terminate them.  Their Internet

7    portion, as you would account for it, may be $80 of the 200,

8    but you're also going to lose the $120 of the rest of the

9    revenue of the bundle.

10          MS. RANAHAN:  Right, for the accused subscribers.

11          THE COURT:  Pardon?

12          MS. RANAHAN:  For the accused subscribers, which

13   we're agreeing to provide all financial information for them

14   that we have.

15          THE COURT:  Did you --

16          MS. RANAHAN:  She's you talking about the accused

17   subscribers, not everyone of our subscriber's' cable revenue.

18          THE COURT:  I know, I know, I know, I understand.

19          MS. RANAHAN:  So we're providing that for those,

20   we're providing cable --

21          THE COURT:  You're providing for --

22          MS. RANAHAN:  All income that comes in from the

23   accused subscribers, all across the board from any source.

24          THE COURT:  Right, but will they be able to parse

25   out within those accused subscribers what was spent on the

142

1    various components of the bundle?

2            MS. RANAHAN:  Yes.  And at that point what does --

3    I mean, they have the overall amount that those subscribers

4    have earned, so they can make all the arguments they want,

5    but why would it matter what a cable person who has not

6    infringed earned for Charter?

7            THE COURT:  So let me ask you this, Ms. Sahni,

8    listen carefully to my question.  For all infringing

9    subscribers, do you have the raw financial amount as well as

10   Internet only?

11           MS. SAHNI:  We have nothing for the infringing

12   subscribers to date, Your Honor.

13           MS. RANAHAN:  That's what you just ordered us to

14   do.

15           THE COURT:  But if you get that, let's say there is

16   600,000 infringing subscribers, and you get how much those

17   people paid Charter grossly, you also get what amount of that

18   gross was Internet and, therefore, you know what amount of

19   that gross was anything else bundled with Internet, if you

20   know all that, does that get you there?

21           MS. SAHNI:  Your Honor, well, we haven't seen that,

22   so we don't know, but this issue -- this request is

23   different.

24           THE COURT:  But you didn't answer my question.  I

25   really like my questions to be answered.  My question, will

143

1    you answer it be, please.

2            MS. SAHNI:  I think if we got all of the infringing

3    subscribers' revenue for those subscribers and we knew what

4    they were paying for Internet versus the other service lines,

5    that would be responsive to that request.

6            THE COURT:  Okay.  And are you providing that?

7            MS. RANAHAN:  We are providing that.

8            THE COURT:  So what else --

9            MS. RANAHAN:  Can I clarify?  For the infringing

10    subscribers we have so far been able to identify from their

11    notices --

12            THE COURT:  Understood.

13            MS. RANAHAN:  -- based on the retention policy, we

14    have 11,000 so far, we were providing for all of those.  For

15    the remaining, we are going through great lengths to see if

16    we can go back and measure up logs to try to figure out where

17    those subscribers were for where we don't have the ticket

18    data.  It's in our interest to do this.  We want the revenue

19    for only the infringing subscribers to be looked at by the

20    jury.  We don't want all of Charter's revenue for all time --

21            THE COURT:  I understand.

22            MS. RANAHAN:  -- so we're trying do this.

23            THE COURT:  What's your timeframe to do that?

24            MS. RANAHAN:  For the 11,000, we'll do it by March

25    16.

144

1          THE COURT:  Okay.

2          MS. RANAHAN:  For the remaining, it's going to be

3    hugely burdensome, which is another reason why we need more

4    time because it's basically try to recreate through their

5    notices who had the -- who was assigned the IP log at the

6    time, and it's incredibly complicated and tedious, but we

7    want to do it because it's in our interest to do it.

8          THE COURT:  So what else are you talking about?

9          MS. SAHNI:  So, Your Honor, this request concerns

10   the companywide financial, and there is two ways in which

11   it's relevant.  One is it's relevant to statutory damages in

12   which their profits are squarely -- their revenues are

13   squarely at issue and so we should be able to see what their

14   overall company revenue and financials look like.

15         THE COURT:  Did the Cox Court admit gross revenue?

16         MR. OPPENHEIM:  I'll speak to that, Your Honor.

17   Yes.  Not only did they produce their gross revenue, but

18   there was net operating cash flow --

19         THE COURT:  Profit.

20         MR. OPPENHEIM:  -- profit.  And all of that was

21   disclosed in the case.  What I don't understand here --

22         THE COURT:  Well, was it disclosed in other than

23   public filings?

24         MR. OPPENHEIM:  Well, they're a private company,

25   so, yes.

1            THE COURT:  Oh, okay, so it had to be.  But was it

2    the equivalent of one of their public filings that a public

3    company would make?

4            MR. OPPENHEIM:  What we're seeking here is the

5    equivalent of what we sought there is the audited financials.

6    These are documents that Charter provides to anybody they're

7    doing a deal with, to every bank.

8            THE COURT:  If they borrow money, they have to

9    provide it.

10           MR. OPPENHEIM:  This is why they have audited

11   financials.  And they got breakdowns and notes and

12   explanations and --

13           THE COURT:  I've seen audited financials.

14           MS. RANAHAN:  We produced those in the Brighthouse

15   because we have them.  They don't have them in Charter, we

16   have not been able to find them.  We produced them in

17   Brighthouse and they have them.  The public company didn't

18   have them.  They have other types of reports, which is where

19   we got the Internet --

20           THE COURT:  Are you saying Charter doesn't have

21   audited financial statements?

22           MS. RANAHAN:  We have management reports from which

23   we got that Internet subscriber revenue which we produced to

24   them, but we produced to them -- we know what audited

25   financials are, they were here in Cox and they were here in

146

1    Brighthouse.  They don't have a similar document for Charter.

2    We produced information --

3              THE COURT:  Charter doesn't have that document?

4              MS. RANAHAN:  Right, they don't have audited

5    financials.  Nobody knew what we were talking about.  We

6    tried -- we talked to a whole bunch of financial people,

7    where are your audited financials, nobody knew what we were

8    talking about.

9              THE COURT:  Do they have --

10             MS. RANAHAN:  They have other documents, they have

11   a lot of public filings, they have management reports, they

12   have Internet data that we pulled.

13             THE COURT:  Do a 30(b)(6) of their CFO as far as

14   I'm concerned.

15             MR. OPPENHEIM:  They're a public company.  This is

16   beyond comprehension to me, and I'm not even a (inaudible -

17   away from mic) --

18             THE COURT:  I can only accept what she says, even

19   if it's beyond your comprehension.  What else can I do?

20             MR. OPPENHEIM:  Well, what I would do is inquire

21   (inaudible) basis for this cockamamie thing they created to

22   produce to us makes no sense.  Why didn't they just produce a

23   management report?

24             THE COURT:  What's a management report?

25             MR. OPPENHEIM:  I don't know, but that's apparently

147

1    what she said --

2            MS. RANAHAN:  We produced.

3            MR. OPPENHEIM:  Excuse me, Ms. Ranahan, let me

4    finish and I'll give you an opportunity.  Apparently that's

5    what they used to generate the data that she did provide to

6    us.

7            THE COURT:  How do you know that?

8            MR. OPPENHEIM:  Because she just said that.

9            THE COURT:  Oh, you just said the word "management

10   report"?

11           MS. RANAHAN:  The way that we were able to go back

12   and isolate Internet revenues was to rely on these reports.

13   The rest -- we've given them the overall revenue, so the

14   argument they just made --

15           THE COURT:  Tell me what a management report is.

16           MS. RANAHAN:  The management report is where they

17   try to come up with different ways to try to account for

18   different revenues when it's a bundled service.

19           THE COURT:  The company does that?

20           MS. RANAHAN:  Right, and so that's what we -- that

21   is the data that we gave them for the Internet revenue.

22           THE COURT:  The one they said is incomprehensible?

23           MS. RANAHAN:  Which it's -- I mean, I don't find it

24   incomprehensible, but they're free to ask what the witnesses

25   about what it means.  I'm not, you know, the financial person

1    of the company.  I take the information, it looked to be the

2    Internet revenues for the years they wanted it, for the

3    months they wanted it.  They're not happy with it, I don't

4    know what to say.  They can ask the witnesses about it.  It's

5    exactly what they wanted, the Internet revenues.

6            THE COURT:  Well, I think they want information

7    that the company -- historical information the company may

8    have in a form that's usable to them.  That's what they want.

9            MS. RANAHAN:  Well, there is tons of it.  It's a

10   public company.  There is so much financial information out

11   there.

12           THE COURT:  See, I just don't think we're going to

13   get anywhere by this process.  I think you need to do some

14   discovery on what they have and make it be required to be

15   answered under oath.

16           MR. OPPENHEIM:  Maybe we should do an early

17   30(b)(6) on this so that --

18           THE COURT:  I totally agree.

19           MR. OPPENHEIM:  And maybe a subpoena.

20           THE COURT:  Because it sounds very important to

21   you.

22           MR. OPPENHEIM:  I agree, Your Honor.

23           THE COURT:  Okay.

24           MR. OPPENHEIM:  Hopefully there is no objection

25   from Charter to that individual 30(b)(6).

149

```
 1              THE COURT:  Well, I think -- I know enough to be

 2   dangerous as far as audited financial statements and it

 3   would -- it would be surprising to me that if a company

 4   didn't have those because banks maybe do want more than what

 5   was publicly available, but -- but I don't know.  I've not --

 6   I've never been in anything other than a 501(c)(3), so I

 7   don't know.

 8              MS. RANAHAN:  So they don't have something called

 9   that, as far as my investigations, but is what the relevance

10   of this?  We've talked now about the relevance of we've given

11   them the Internet information, they have the overall

12   revenues.  What is the relevance of having a bunch of little

13   notes if it was even available about the financials?

14              THE COURT:  I don't think they know it's

15   irrelevant.  I think --

16              MS. RANAHAN:  But they keep mentioning the notes,

17   like they want the notes.

18              THE COURT:  He's just saying that that is what an

19   audited financial statement has so you can tell if it's some

20   other bird, is that it has those notes by the auditors saying

21   we're making exceptions here, we're covering our behinds here

22   on this note, whatever.

23              MS. RANAHAN:  So what is the relevance to the case?

24              THE COURT:  Well, so what would -- I guess her

25   question is, what do you think might be out there that you
```

1    would use at trial that you don't already have?

2          MR. OPPENHEIM:  I don't believe, Your Honor, that

3    we have internal revenue (inaudible - away from mic)

4    information other than what is scrubbed for purposes of a

5    10K.

6          THE COURT:  But they're violating the law if

7    they're not accurate in those public filings.  It's criminal

8    for them not to do that.

9          MR. OPPENHEIM:  Your Honor, I'm not suggesting --

10   I don't know one way or the other if they're accurate, but I

11   know it's not comprehensive data (inaudible - away from mic).

12         THE COURT:  How do you know that, though, ?for

13   example, Charter, how do you know that?  You surmise that?

14         MR. OPPENHEIM:  I surmise that because generally

15   the types of data that we would see with an ISP internal

16   financial data, would be --

17         THE COURT:  So that's still why you have to do a

18   30(b)(6) because you guys fundamentally disagree.  I can't

19   disagree with him, I can't disagree with you, but we don't

20   know what's out there so you have to do that.

21         MR. OPPENHEIM:  Very well, Your Honor.

22         THE COURT:  Okay.  And I may I agree with you that

23   it's irrelevant.  Okay, what else?

24         MS. RANAHAN:  That was the last issue, remember?

25   They said that was the last issue.

1          THE COURT:  By the way, is it snowing?  Bad?

2          MR. OPPENHEIM:  It is snowing.

3          THE COURT:  Yeah, I know, but are we expecting a

4   bunch overnight?  I settled a case one time early in my

5   career at 11 o'clock at night and there was a foot of snow

6   that had fallen during the day.  It was about Christmas, two

7   days before Christmas too.  Legendary.

8          MS. RANAHAN:  Your Honor, if we could -- if we

9   could have permission to just file -- if you're going to

10  submit the work-for-hire issue to the district judge and get

11  his opinion, if we could get the opportunity to present our

12  arguments and plaintiffs can do the same.

13         THE COURT:  So you haven't done that adequately in

14  your view?

15         MS. RANAHAN:  Well, we've sent several letters to

16  you, nothing is a public filing.  I don't know how that gets

17  to the district court.

18         THE COURT:  It's an important issue, so if you want

19  to file simultaneous three-page briefs by whenever, in the

20  next week.  Does that sound all right?

21         MR. SPERLING:  Certainly, Your Honor, thank you.

22         THE COURT:  Does that sound all right?

23         MR. SPERLING:  We just need a date, Your Honor,

24  date and time.

25         THE COURT:  Yeah.  So the end of next week is the

1    28th of February, 5 o'clock.

2              MR. SPERLING:  Thank you, Your Honor.

3              MS. SAHNI:  And this is a formal filing, Your

4    Honor, or submissions to you?

5              THE COURT:  I would say that you ought to make it

6    of record, you know, because if the Tenth Circuit is going to

7    be looking at this some day, it's -- so it will be

8    simultaneous briefs on the issue on the import of not -- of

9    erroneously designating a work as a work for hire and the

10   impact it has on its legitimacy of its registration.  Is

11   that -- you guys understand what I mean?  I mean, that's we

12   talked about for an hour, all right.

13             And yeah, so that would -- that would tee it up for

14   Judge Jackson, I think.

15             MS. RANAHAN:  Could we have five pages?

16             THE COURT:  Do you want five pages?

17             MR. SPERLING:  We prefer three pages for both

18   sides, Your Honor, just there is a lot of paper.

19             MS. RANAHAN:  Four.

20             MR. SPERLING:  Four pages.

21             THE COURT:  And the only thing that better appear

22   on the fifth page is your signature.

23             MS. RANAHAN:  Thank you.

24             MR. SPERLING:  Your Honor, thank you for the

25   substantial time that you've invested.

153

1          THE COURT:  This is no lie.  When I was at Arnold &

2    Potter -- you guys have dealt with that firm.

3          MR. SPERLING:  From time to time, Your Honor.

4          THE COURT:  But not that firm 25 years okay.

5          MR. OPPENHEIM:  My former colleague (audible).

6          THE COURT:  30 years ago, and I know him.  So 30

7    years ago I was there and -- you can turn the record off.

8          (Whereupon, the within hearing was then in

9    conclusion at 5:42 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

154

1                    TRANSCRIBER'S CERTIFICATION

2    I certify that the foregoing is a correct transcript to the

3    best of my ability to hear and understand the audio recording

4    and based on the quality of the audio recording from the

5    above-entitled matter.

6

7    /s/ Dyann Labo                    February 22, 2020

8    Signature of Transcriber               Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25