IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 19-cv-00874-RBJ-MEH

WARNER RECORDS INC., et al

     Plaintiffs,

v.

CHARTER COMMUNICATIONS, INC.,

     Defendant.

---

## ORDER

---

This case is before the Court on Magistrate Judge Michael E. Hegarty's recommendation, ECF No. 71, on defendant's motion to dismiss, ECF No. 38, defendant's objections to the recommendation, ECF No. 81, and plaintiffs' response to those objections, ECF No. 87. For the following reasons the recommendation is adopted, and the motion to dismiss is denied.

### BACKGROUND

Judge Hegarty provides a detailed account of the factual allegations in this case, and I summarize his findings here. *See* ECF No. 71. The plaintiffs are a collection of record companies and music publishers that produce and distribute commercial sound recordings and musical compositions. *Id.* at 3. Plaintiffs, through the recording artists and songwriters they represent, have created and marketed a large amount of music and recordings which have been registered with the U.S. Copyright Office ("plaintiffs' copyrighted works"). *Id.* Plaintiffs collectively own or control millions of copyrighted musical compositions or sound recordings, which constitute their primary source of income. *Id.*

1

Defendant Charter Communications, Inc. ("Charter") is one of the largest internet service providers ("ISP") in the country, with more than twenty-two million subscribers nationwide. *Id.* Charter provides high speed internet services in exchange for monthly subscription fees. *Id.* Charter customers may purchase higher download speeds for higher monthly fees. *Id.*

Plaintiffs have become aware of persons infringing their copyrighted works through online peer-to-peer file-sharing programs, such as "BitTorrent." *Id.* BitTorrent and similar file-sharing protocols allow users to share music and other files directly with one another over the internet. *Id.* BitTorrent became popular because it facilitates much faster downloading by breaking files into smaller pieces, allowing users to download different pieces from different peers simultaneously. *Id.* at 4. Once a user has downloaded all pieces of a file, the file automatically assembles itself into its complete form and becomes available for playback by the user. *Id.*

The efficiency of this type of file-sharing system proves particularly conducive to online piracy. *Id.* A 2011 report estimated that 11.4 percent of all internet traffic involved unauthorized distribution of copyrighted works through BitTorrent. *Id.* Plaintiffs' copyrighted works have been unlawfully distributed millions of times through BitTorrent. *Id.*

Charter draws customers in part by advertising their "blazing-fast . . . speeds" that allow users to "download just about anything instantly," including up to "8 songs in 3 seconds." *Id.* Subscribers have used these speeds and Charter's services to pirate plaintiffs' works. *Id.* Plaintiffs have identified hundreds of thousands of specific instances in which Charter's subscribers utilized peer-to-peer systems to distribute and copy plaintiffs' songs illegally. *Id.* Plaintiffs and others have submitted to Charter statutory infringement notices detailing specific

infringements committed by specific subscribers, identified by their unique Internet Protocol ("IP") addresses. *Id*. 4–5.

Charter's terms of service prohibit users from engaging in copyright infringement and state that Charter reserves the right to terminate accounts of participants in piracy. *Id*. at 5. Despite this, Charter has not taken any steps to address the reported infringements. *Id*. Charter generates revenue from infringing subscribers and does not want to lose such revenue or risk the possibility of making its service less attractive to subscribers should it start terminating infringing accounts. *Id*. Additionally, tracking and responding to infringement notices would require resources which Charter does not want to spend. *Id*.

Charter's lack of action against known infringers likely draws further subscriptions, as subscribers know they can download infringing content without consequence. *Id*. This approach encouragers subscribers to continue using Charter's service as well as purchase higher bandwidth to facilitate higher download speeds. *Id*. All this activity undercuts the legitimate music market, plaintiffs' primary source of income. *Id*. at 6.

## STANDARD OF REVIEW

### A. <u>Magistrate Judge Recommendation</u>

When a magistrate judge makes a recommendation on a dispositive motion, the district court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3). An objection is sufficiently specific if it "focus[es] the district court's attention on the factual and legal issues that are truly in dispute." *United States v. 2121 E. 30th St.*, 73 F.3d 1057, 1060 (10th Cir. 1996). In the absence of a timely and specific objection, "the district court may review a magistrate's report under any standard it deems appropriate." *Summers v. Utah*, 927 F.2d 1165, 1167 (10th Cir. 1991); *see also* Fed. R.

Civ. P. 72 advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). Legal theories raised for the first time in objections to a magistrate judge's recommendation are deemed waived. *United States v. Garfinkle*, 261 F.3d 1030, 1031 (10th Cir. 2011).

### B.  Motion to Dismiss

To survive a Rule 12(b)(6) motion to dismiss, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While courts must accept well-pled allegations as true, purely conclusory statements are not entitled to this presumption. *Id.* at 678, 681. Therefore, so long as the plaintiff pleads sufficient factual allegations such that the right to relief crosses "the line from conceivable to plausible," she has met the threshold pleading standard. *Twombly*, 550 U.S. at 556, 570.

### ANALYSIS

Judge Hegarty concluded that plaintiffs' complaint sufficiently alleged a claim for vicarious copyright infringement. ECF No. 71 at 15–16. In reaching that conclusion Judge Hegarty found that Charter incurred a direct financial benefit from the alleged infringement, and that Charter had the right and ability to supervise the infringing activities. *Id.* Charter objects to both findings. ECF No. 81. According to Charter, Judge Hegarty misapplied the direct financial benefit standard and implausibly presumed that Charter had the practical ability to control infringement. *Id.* I address each objection in turn.

A. **Direct Financial Benefit**

Charter raises many objections to Judge Hegarty's finding regarding the direct financial

benefit requirement.  I address first the challenges to Judge Hegarty's articulation of the relevant

standard and second the argument that plaintiffs' allegations have not met that standard.

1. Legal Standard

The Tenth Circuit has limited precedent on the issue of vicarious and contributory

copyright liability.  Judge Hegarty therefore appropriately relied on persuasive precedents from a

variety of courts of appeal and other federal courts.  He also correctly noted that the Tenth

Circuit cases that address similar issues cite particular Ninth Circuit cases favorably.  *See*

*Diversey v. Schmidly*, 738 F.3d 1196, 1204 (10th Cir. 2013) (citing *Fonovisa, Inc. v. Cherry*

*Auction, Inc.*, 76 F.3d 259, 261–65 (9th Cir. 1996)), and *La Resolana Architects, PA v. Reno,*

*Inc.*, 555 F.3d 1171, 1181 (10th Cir. 2009) (citing *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th

Cir. 2004)).

Charter challenges Judge Hegarty's conclusion that ability to engage in infringing

conduct need not be the primary draw of defendant's services, but only *a* draw.  ECF No. 81 at

7–18.  Charter interprets *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657 (9th Cir. 2017) and

other Ninth Circuit cases as holding that the ability to infringe on plaintiffs' content must

constitute "*the* attracting factor" for subscribers.  ECF No. 81 at 12.

I agree with Judge Hegarty that Charter's reading of the case law on this issue is

incorrect.  In *Perfect 10* the Ninth Circuit held that a "[f]inancial benefit exists where the

availability of infringing material acts as a draw for customers" and that "[t]he size of the 'draw'

relative to a defendant's overall business is immaterial."  847 F.3d at 673.  The court concluded

that "[t]he essential aspect of the 'direct financial benefit' inquiry is whether there is a causal

relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits." *Id.* This language does not suggest that plaintiffs must show that the draw of infringing activity was "*the* attracting factor" as Charter argues, but rather *an* attracting factor.

In support of its argument that infringing activity must be the attracting factor, Charter points to the language in *Perfect 10* indicating that "infringing activity must be more than an 'added benefit' to a subscription." ECF No. 81 at 12. According to Charter, infringing activity is either *the* attracting factor for a subscriber or merely an added benefit. But this is a false dichotomy. Infringing activity may be merely an added benefit to subscribers and not a draw in itself. It may also be one among several draws to Charter's services. It may also be *the* draw for subscribers to subscribe to Charter. The latter two cases would be sufficient to show that Charter incurred a direct financial benefit from the infringing activity.

Moreover, the discussion of whether infringement was an "added benefit" in *Perfect 10* concerned not the size of the draw, but whether plaintiffs' works in particular served as a draw. The court found that the plaintiff copyright owners failed to allege that their own copyrighted works served as a draw. *Perfect 10*, 847 F.3d at 674. Instead they argued only that the defendant "internet bulletin board" service provider incurred a financial benefit so long as some subscribers joined to access infringing material generally. *Id*. The Ninth Circuit found that plaintiffs had only shown that access to the plaintiff's works were an "added benefit to a subscription," because "there was no evidence indicating that anyone subscribed to [defendant's service] because of infringing Perfect 10 material." *Id*. The court held that plaintiffs must show that *their* works served as a draw. *Perfect 10* does not support Charter's argument that if infringement is not "the attracting factor," it is simply an "added benefit." Instead it supports

plaintiffs' position because these plaintiffs, unlike those in *Perfect 10*, have alleged their works in particular served as a draw.

*Perfect 10* does not require that the plaintiff's materials must be "*the* attracting factor." If subscribers are attracted to Charter's services *in part* because of the ability to infringe on plaintiffs' copyrighted materials in particular, this is sufficient to show that the materials were "a draw" under *Perfect 10*. *Id.* at 673.

Finally, as Judge Hegarty notes, no Tenth Circuit case has relied on *Perfect 10*. The cases on which the Tenth Circuit has relied only confirm Judge Hegarty's conclusions. In *Ellison v. Robertson* the Ninth Circuit distinguished between a draw and an added benefit. 357 F.3d 1072, 1078–79 (9th Cir. 2004). But this distinction is not, as Charter argues, focused on whether infringement is the sole motivating factor for subscribers. Rather the distinction focuses on whether the infringing use was merely something "that customers value" rather than a draw to subscribe. *Id.* Like in *Perfect 10*, this distinction does not suggest that infringing use must be *the* draw, but rather as the court states, only that plaintiffs' work in particular "constitutes *a* draw." *Id.* (emphasis added).

Charter cites *Ellison* for a distinction between services like Napster, where "virtually all" of the draw resulted from Napster's "providing access to infringing material," and AOL, where the draw of infringing material "constitutes a relatively insignificant draw when cast against AOL's vast array of products and services." *Id.* at 1078. However, the language Charter quotes comes from the Ninth Circuit's discussion of the district court's findings on the issue, which it ultimately rejected. *Id.* at 1078–79.

Charter also argues that it does not receive a financial benefit from infringement because "it does not affect Charter's revenues whether a subscriber . . . uses the internet to infringe

copyrights, and/or for legitimate purposes." ECF No. 81 at 9–10, 13. According to Charter, showing that subscribers were drawn to Charter at least in part by the ability to infringe is not enough. However, Charter has provided no case law to support the claim that a service provider must receive a larger financial benefit from infringing users than from non-infringing users. Courts have repeatedly made clear that all that is required to show a direct financial benefit is that subscribers were drawn to defendant's business by the ability to infringe. *See, e.g.*, *Perfect 10*, 847 F.3d at 673 ("[A] [f]inancial benefit exists where the availability of infringing material acts as a draw for customers.") (quoting *Ellison*, 357 F.3d at 1078) (internal quotations omitted).

The *Ellison* court held that the proportion of the defendant's business that comes from infringing use is not relevant to whether the defendant received a financial benefit. 357 F.3d at 1078–79 (rejecting district court's requirement that the financial benefit be "substantial" or even quantified). Instead the court concluded that though the infringing uses constituted a "small 'draw' in proportion to [defendant's] overall profits," this did not insulate the defendant ISP from vicarious liability. *Id.* at 1079. Nor did the *Ellison* court require the defendant ISP to generate higher subscription fees from the infringing users than from the non-infringing users, as Charter suggests. *Id.*; *see also Perfect 10*, 847 F.3d at 673 ("The size of the 'draw' relative to a defendant's overall business is immaterial."); *GC2 Inc. v. Int'l Game Tech. PLC*, 255 F. Supp. 3d 812, 825 (N.D. Ill. 2017); *Capitol Records, LLC v. Escape Media Grp., Inc.*, No. 12-CV-6646-AJN, 2015 WL 1402049, at *42 (S.D.N.Y. Mar. 25, 2015). In sum, the *Ellison* court concluded that a "[f]inancial benefit exists where the availability of infringing material 'acts as a "draw" for customers.'" 357 F.3d at 1078 (quoting *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001), *as amended* (Apr. 3, 2001), *aff'd sub nom.* 284 F.3d 1091, *and aff'd sub nom.* 284 F.3d 1091. I find no case, and Charter has provided no case, suggesting that Charter

must have benefited more from infringing subscribers than from non-infringing subscribers, or that the infringing subscribers paid more than non-infringing subscribers.[1]

Charter also relies on what it characterizes as the "swap meet" and "dance hall" cases which apparently articulate the "fundamental principles from which vicarious liability originated." ECF No. 81 at 7 (citing *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 309–10 (2d Cir. 1963)). Despite this statement, Charter provides no analysis from any federal court of appeal, including the Second Circuit in *Sharpiro, Bernstein & Co. v. H. L. Green Co.* *See* ECF No. 81 at 10–11.

Charter does cite cases from other district courts considering the liability of landlords and swap meet or flea market organizers. *See, e.g., Coach, Inc. v. Swap Shop, Inc.*, No. 12-60400-CIV, 2012 WL 12887010 (S.D. Fla. Sept. 21, 2012). In *Coach, Inc. v. Swap Shop, Inc.* the court found that a landlord did not receive a direct financial benefit from infringement by flea market vendors. *Id.* at *8. The landlord leased to the operators of the flea market who received rents from vendors who sold infringing goods. *Id.* at *8. The court found that the financial benefit to the landlord was "indirect" because the landlord was several layers removed from the infringing activity. *Id.* Charter suggests that it is analogous to the landlord because it earns the same from each customer regardless of whether the customer infringes. ECF No. 81 at 12–13. However, the instant case is not analogous, as Charter's profit comes directly from subscriptions, and it is

---

[1] Both parties cite *Tomelleri v. Zazzle, Inc.*, No. 13-CV-02576-EFM-TJJ, 2015 WL 8375083 (D. Kan. Dec. 9, 2015) for various purposes that have become somewhat opaque in the back-and-forth of the briefs on this issue. *See* ECF Nos. 81 at 14–15, 87 at 8. It suffices to say that *Tomelleri* does not contravene *Ellison* and *Perfect 10* on this point. The district court in *Tomelleri* does state that a financial benefit "may be established by showing that users are attracted to a defendant's product because it enables infringement and that its use of the product for infringement financially benefits the defendant," seeming to indicate that two distinct elements are required to prove the financial benefit prong. *Tomelleri*, 2015 WL 8375083, at *15. However, the opinion goes on to state, quoting *Ellison*, that a direct financial benefit "exists where the availability of infringing material acts as a draw for customers." *Id.* at *15. The court then considered only whether infringement acted as a draw. *Id.*

the subscribers themselves who engage infringement.  Thus, there is only one layer of removal between Charter and the infringing activity, and Charter receives a financial benefit directly from those engaged in infringement.  Even disregarding this distinction, the decision in *Coach* did not depend on the conclusion that the landlord's financial benefit was indirect.  Instead the court chose to rest its decision on its finding that the landlords did not meet the "supervise and control" prong of the vicarious liability test.  *Id.*

Charter's reliance on these landlord/swap meet cases is misplaced given that more recent and more applicable ISP, website host, and downloading service cases are available.  All these precedents are merely persuasive, and because of the factual dissimilarity between Charter, an ISP, and the landlord of a flea market, these cases provide little support for Charter's argument.

I find that Judge Hegarty correctly articulated the standard required to show a direct financial benefit.

2.  Sufficiency of Allegations

Charter also argues that plaintiff's allegations fail to establish the direct financial benefit requirement.  First, Charter argues that the plaintiffs did not allege that Charter subscribers are drawn by the ability to download infringing content specifically, rather than just access high speeds and downloading in general.  ECF No. 81 at 8.  As discussed in the preceding section, plaintiffs must only allege that the ability to download their infringing content served as a draw, not necessarily the only draw to subscribers.

I find that plaintiffs' allegations are sufficient to show that the ability to download infringing content served as a draw.  Plaintiffs allege not only that Charter subscribers have used Charter services to infringe their content, but that subscribers are motivated to subscribe by Charter's advertisement of features attractive to those who seek to infringe, such as fast

download speeds for "just about anything." ECF No. 1 at 15. Plaintiffs allege hundreds of thousands of specific instances in which that Charter subscribers have illegally distributed and copied their works. *Id*. at 19. Plaintiffs also allege that infringing activity accounts for 11% of all internet traffic, indicating that though some subscribers may be drawn by the ability to download authorized content, a significant number of subscribers are likely drawn by the ability to download infringing content. *Id*. at 17–18.

Second, Charter likens its situation to that in *UMG Recordings, Inc. v. Grande*, in which a district court found that plaintiffs failed to establish a draw because there were no allegations that the ISP's failure "to adequately police their infringing subscribers is a draw to subscribers to purchase its services." 2018 WL 1096871, at *10. However, as Judge Hegarty correctly noted, plaintiffs here have alleged that that Charter's "failure to stop or take other action in response to notices of infringement is a draw to current and prospective subscribers." ECF No. 71 at 12. According to Charter, these allegations are conclusory and therefore must be ignored. I disagree. Plaintiffs' factual assertions include that plaintiffs notified Charter of infringers, ECF No. 1 ¶¶ 86–88, including the most egregious abusers, *id*. ¶ 88; that Charter took no steps to intervene, *id*. ¶¶ 89–90; and that this failure to police motivated subscribers to join or purchase more bandwidth, *id*. ¶¶ 77, 90–92.

Third, Charter argues plaintiffs did not allege that subscribers are drawn by the ability to infringe plaintiffs' copyrighted work in particular. Once again, the draw of plaintiffs' copyrighted works need only be *a* draw, and I conclude that plaintiffs have sufficiently alleged that their collective copyrighted works served as such a draw. Plaintiffs allege that they own the rights to "some of the world's most famous and popular music," including both "classical music and contemporary superstars, as well as the copyrights to large catalogs of iconic musical

composition and modern hit songs." *Id*. at 3.  I agree with plaintiffs that the volume and popularity of plaintiffs' copyrighted works, the commonality of infringing downloading, and the frequency that plaintiffs' works in particular are downloaded allow for the reasonable inference that at least some of Charter's subscribers were drawn by the ability to infringe on plaintiffs' works.

### B.  Ability to Supervise Infringing Activities

Charter also challenges Judge Hegarty's finding that plaintiffs plausibly allege Charter had the practical ability to supervise or control its subscribers' infringing activities.

First, Charter argues that though it has the right to terminate user accounts, it lacks the ability to identify and police the infringement its users engage in.  It might be that Charter lacks the ability to identify and terminate all users who infringe on plaintiffs' copyrighted materials.  However, Charter does not argue that it lacked the ability to terminate some users, such as those identified in plaintiffs' infringement notices, and that is enough.  In order to meet the supervision and control prong, the defendant must only exercise the ability "to stop or limit the directly infringing conduct." *Perfect 10 v. Amazon.com*, 508 F.3d 1146, 1173 (9th Cir. 2007).   Charter can "stop or limit" infringement of plaintiffs works by terminating those users about whom it is notified. *See also UMG Recordings, Inc.*, 2018 WL 1096871, at *10 (holding ISP could stop or limit infringement by terminating users); *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 674 (E.D. Va. 2015) (same).

Charter relies on *Perfect 10 v. Amazon.com* to support its argument that it lacks the ability to control infringement.  508 F.3d at 1173.  According to Charter, in *Amazon* the Ninth Circuit distinguished services like Napster, which is "a closed system file-sharing protocol," from services like Google, which "simply offers internet service and provides users the freedom

to use that access as they see fit." ECF No. 81 at 19–20. Charter argues that it and Google are "general-purpose ISPs" that lack sufficient ability to curtail infringing conduct to be held liable. ECF No. 81 at 19–20. In *Amazon* the Ninth Circuit held that Google was not liable for copyright infringement by third-party websites with which it had advertising partnerships. 508 F.3d at 1173–74. Google could terminate its advertising partnership with infringing entities but could not "terminate those third-party websites or block their ability" to host infringing images. *Id*. at 1174. Charter inaccurately portrays its situation as factually identical to Google's though the services in question are materially different. *Amazon* considered Google's engagement in advertising partnerships with websites, while the instant case concerns Charter's provision of internet access to subscribers. Charter, unlike Google, can terminate its users' ability to access the internet through Charter. Google lacks such power.

Second, Charter argues that because it cannot stop subscribers from using other forms of internet access to infringe, it has no ability to supervise or control infringing activity. ECF No. 81 at 18–19. This argument is unavailing. Plaintiffs only seek to hold Charter liable for infringement that occurs through the use of Charter's services, not all infringement that occurs on the internet. As discussed above, though Charter contests its ability to control such infringement, plaintiffs have successfully alleged that Charter can stop or limit infringement engaged in through *its* services. Charter can certainly limit its subscribers' ability to infringe by blocking their access to the internet through Charter. I find that this is sufficient to allege that Charter has the ability to control infringement.

This comports with a variety of cases in which ISPs were found to have the practical ability to stop or limit infringement. In *UMG Recordings* the district court found that an ISP had the ability to stop or limit infringing conduct by terminating subscribers, though the ISP lacked

the ability to stop infringement engaged in through other services.  2018 WL 1096871, at *10.
Similarly, in *BMG Rights Mgmt. (US) LLC*, another district court found that an ISP could stop or
limit infringement by terminating users from its services.  149 F. Supp. 3d at 674.  Charter can
point to no case suggesting that an ISP lacks the ability to control infringement unless it can
control *all* infringement engaged in through any service.

I agree with Judge Hegarty that plaintiffs have sufficiently alleged that Charter had the
right and ability to control infringing activity.  Because plaintiffs have stated a claim for
vicarious copyright infringement, defendant's motion to dismiss must be denied.

## ORDER

1.  Magistrate Judge Hegarty's recommendation, ECF No. 71, is ADOPTED.

2.  Defendant's Motion to Dismiss, ECF No. 38, is DENIED.

DATED this 15th day of April, 2020.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge