# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

WARNER RECORDS INC., *et al*.,

      Plaintiffs,

v.

CHARTER COMMUNICATIONS, INC.,

      Defendant.

Case No. 1:19-cv-00874-RBJ-MEH

**~~PARTIAL~~FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS ~~TO COUNT I OF THE~~ [1]**

**FIRST AMENDED ~~COMPLAINT~~**

**~~PARTIAL~~ ANSWER**

~~Pursuant to the Court's Order at ECF 141,~~ Defendant Charter Communications, Inc. ("Defendant" or "Charter")**,** by and through its counsel, hereby answers the First Amended Complaint~~, as to Count I for contributory liability,~~ of Plaintiffs Warner Records Inc., Atlantic Recording Corporation, Bad Boy Records LLC, Elektra Entertainment Group Inc., Fueled By Ramen LLC, Lava Records LLC, Maverick Recording Company, Nonesuch Records Inc., The All Blacks U.S.A., Inc., Warner Music Inc., Warner Records/SIRE Ventures LLC, WEA International Inc., Warner Chappell Music, Inc., Warner-Tamerlane Publishing Corp., W Chappell Music Corp. d/b/a WC Music Corp., W.C.M. Music Corp., Unichappell Music Inc., Rightsong Music Inc., Cotillion Music, Inc., Intersong U.S.A., Inc., and Chappell & Co. Inc. (collectively, the "Warner Plaintiffs"); and Plaintiffs Sony Music Entertainment, Arista Music, Arista Records LLC, LaFace Records LLC, Provident Label Group, LLC, Sony Music

---

[1] On March 18, 2020, per the Court's Order (ECF 141), Charter answered Plaintiffs' contributory liability claim, asserted affirmative defenses thereto, and brought two counterclaims (ECF 147). Charter hereby amends those pleadings and answers the entirety of Plaintiffs' First Amended Complaint, asserts affirmative defenses thereto, and brings four counterclaims.

Entertainment US Latin, The Century Family, Inc., Volcano Entertainment III, LLC, and Zomba Recordings LLC (collectively, the "Sony Music Plaintiffs"); and Plaintiffs Sony/ATV Music Publishing LLC, EMI Al Gallico Music Corp., EMI Algee Music Corp., EMI April Music Inc., EMI Blackwood Music Inc., Colgems-EMI Music Inc., EMI Consortium Music Publishing Inc. d/b/a EMI Full Keel Music, EMI Consortium Songs, Inc., individually and d/b/a EMI Longitude Music, EMI Entertainment World Inc. d/b/a EMI Foray Music, EMI Jemaxal Music Inc., EMI Feist Catalog Inc., EMI Miller Catalog Inc., EMI Mills Music, Inc., EMI Unart Catalog Inc., EMI U Catalog Inc., Famous Music LLC, Jobete Music Co. Inc., Stone Agate Music, Screen Gems-EMI Music Inc., and Stone Diamond Music Corp. (collectively, the "Sony/ATV and EMI Plaintiffs"); and UMG Recordings, Inc., Capitol Records, LLC, Universal Music Corp., Universal Music – MGB NA LLC, Universal Music Publishing Inc., Universal Music Publishing AB, Universal Music Publishing Limited, Universal Music Publishing MGB Limited, Universal Music – Z Tunes LLC, Universal/Island Music Limited, Universal/MCA Music Limited, Universal/MCA Music Publishing Pty. Limited, Music Corporation of America, Inc., Musik Edition Discoton GmbH, PolyGram Publishing, Inc., and Songs of Universal, Inc. (collectively, the "Universal Plaintiffs," and with the Warner Plaintiffs, Sony Music Plaintiffs, and Sony/ATV and EMI Plaintiffs, the "Plaintiffs"), dated February 14, 2020 (the "First Amended Complaint"), as follows:

## INTRODUCTION[12]

1.     Plaintiffs are record companies that produce, manufacture, distribute, sell, and license commercial sound recordings, and music publishers that acquire, license, and otherwise exploit musical compositions, both in the United States and internationally. Through their

---

[12] For the Court's convenience, Defendant reproduced the headings from the First Amended Complaint. Defendant does not thereby concede, affirm, or otherwise adopt any of those headings.

enormous investments of money, time, and exceptional creative efforts, Plaintiffs and their representative recording artists and songwriters have developed and marketed some of the world's most famous and popular music. Plaintiffs own and/or control exclusive rights to the copyrights to some of the most famous sound recordings performed by classic artists and contemporary superstars, as well as the copyrights to large catalogs of iconic musical compositions and modern hit songs. Their investments and creative efforts have shaped the musical landscape as we know it, both in the United States and around the world.

Answer:        Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 1 of the First Amended Complaint and on that basis denies those allegations.

2.        Charter is one of the largest Internet service providers ("ISPs") in the country. It markets and sells high-speed Internet services to consumers nationwide. Through the provision of those services, Charter has knowingly contributed to, and reaped substantial profits from, massive copyright infringement committed by thousands of its subscribers, causing great harm to Plaintiffs, their recording artists and songwriters, and others whose livelihoods depend upon the lawful acquisition of music. Charter's contribution to its subscribers' infringement is both willful and extensive, and renders Charter equally liable. Indeed, for years, Charter deliberately refused to take reasonable measures to curb customers from using its Internet services to infringe on others' copyrights, including Plaintiffs' copyrights—even after Charter became aware of particular customers engaging in specific, repeated acts of infringement. Plaintiffs' representatives (as well as others) sent hundreds of thousands of statutory infringement notices to Charter, under penalty of perjury. Those notices advised Charter of its subscribers' blatant and systematic use of Charter's Internet service to illegally download, copy, and distribute Plaintiffs'

copyrighted music through BitTorrent and other online file-sharing services. Rather than working with Plaintiffs to curb this massive infringement, Charter did nothing, choosing to prioritize its own profits over its legal obligations.

Answer:        Defendant admits that Charter operates as an Internet service provider, and markets and sells high-speed Internet services to consumers. Defendant admits that it received notices of alleged infringement from third parties, but lacks knowledge or information as to whether and which of these notices were sent on behalf of which Plaintiffs, whether such notices complied with statutory requirements, and whether they were made under penalty of perjury, and on that basis, Charter denies those allegations. Defendant denies the remaining allegations in Paragraph 2 of the First Amended Complaint.

3.       It is well-established law that a party may not assist someone it knows is engaging in copyright infringement. Further, when a party has a direct financial interest in the infringing activity, and the right and practical ability to stop or limit it, that party must act. Ignoring and flouting those basic responsibilities, Charter deliberately turned a blind eye to its subscribers' infringement. Charter failed to terminate or otherwise take meaningful action against the accounts of repeat infringers of which it was aware. Despite its professed commitment to taking action against repeat offenders, Charter routinely thumbed its nose at Plaintiffs by continuing to provide service to subscribers it knew to be serially infringing copyrighted sound recordings and musical compositions. In reality, Charter operated its service as an attractive tool and safe haven for infringement.

Answer:        The first two sentences of Paragraph 3 of the First Amended Complaint constitute Plaintiffs' characterization of copyright law and legal conclusions to which Defendant

4

is not obligated to respond.  Defendant denies the remaining allegations of Paragraph 3 of the Complaint.

4.      Charter has derived an obvious and direct financial benefit from its customers' infringement. The unlimited ability to download and distribute Plaintiffs' works through Charter's service has served as a draw for Charter to attract, retain, and charge higher fees to subscribers. By failing to terminate the accounts of specific recidivist infringers known to Charter, Charter obtained a direct financial benefit from its subscribers' continuing infringing activity. That financial benefit included improper revenue that it would not have received had it appropriately shut down those accounts. Charter decided not to terminate infringers because it wanted to maintain the revenue that is generated from their accounts.

Answer:      Defendant denies the allegations in Paragraph 4 of the First Amended Complaint.

5.      The infringing activity of Charter's subscribers that is the subject of Plaintiffs' claims, and for which Charter is secondarily liable, occurred after Charter received multiple notices of each subscriber's infringing activity. Specifically, Plaintiffs seek relief for claims that accrued between March 24, 2013 and May 17, 2016 for infringement of works by Charter subscribers after those particular subscribers were identified to Charter in multiple infringement notices.[23] These claims have been preserved through tolling agreements entered into with Charter in March, April, and June 2016, as applicable.

---

[23] Specifically, the Universal Plaintiffs seek relief for claims that accrued on or after March 24, 2013; the Sony Music Plaintiffs and Warner Plaintiffs seek relief for claims that accrued on or after April 18, 2013; and the Sony/ATV and EMI Plaintiffs seek relief for claims that accrued on or after June 15, 2013.

Answer:        Defendant lacks knowledge or information sufficient to admit or deny the allegations of Paragraph 5 of the First Amended Complaint regarding the nature of Plaintiffs' claims, but denies that Plaintiffs are entitled to any relief, including for any period of time. Defendant admits that ~~they~~it entered into tolling agreements with certain of the Plaintiffs, but denies that those tolling agreements preserved all of Plaintiffs' claims. Defendant denies the remaining allegations of Paragraph 5 of the First Amended Complaint.

## NATURE OF ACTION

6.        This is a civil action in which Plaintiffs seek damages for copyright infringement under the Copyright Act, 17 U.S.C. § 101, *et seq.*

Answer:        Defendant admits that Plaintiffs have filed this action under the copyright laws of the United States, but denies that there has been any wrongdoing.

7.        This Court has original subject matter jurisdiction over Plaintiffs' copyright infringement claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

Answer:        Defendant admits that this Court has subject matter jurisdiction over Plaintiffs' claims.

8.        This Court has personal jurisdiction over Charter pursuant to Colo. Rev. Stat. § 13- 1-124. Charter continuously and systematically transacts business in Colorado and maintains sizable operations in the state—employing thousands of people, and providing an array of services to customers, within the state. In addition to its physical presence in the state, Charter has deliberately exploited the Colorado market, establishing significant network management operations in this district, selling its services to over 100,000 Colorado customers, and advertising its "blazing-fast Internet speeds" to potential subscribers in the state.

Answer:        Defendant admits that Charter conducts business in Colorado, has employees in Colorado, provides services to customers in Colorado, and maintains network

6

management operations in Colorado. Defendant denies the remaining allegations in Paragraph 8 of the First Amended Complaint.

9.      Moreover, Charter has engaged in substantial activities purposefully directed at Colorado from which Plaintiffs' claims arise, including providing Internet service to Colorado subscribers who used Charter's network to directly and repeatedly infringe Plaintiffs' copyrights; continuing to provide Internet service to, and failing to suspend or terminate the accounts of, Colorado customers, even after receiving multiple notices of their infringing activity; advertising its high-speed Internet services in Colorado to serve as a draw for subscribers who sought faster download speeds to facilitate their direct and repeated infringements; employing individuals within Colorado with responsibility for overseeing its network and subscriber use policies; and/or responding or failing to respond to repeated notices of copyright infringement directed to infringing subscribers located in the state.

Answer:      Defendant admits that it conducts business in Colorado. Defendant denies that there has been any unlawful conduct giving rise to the claims in this case. Defendant denies the remaining allegations in Paragraph 9 of the First Amended Complaint.

10.      Much of the misconduct alleged in this Complaint arises directly from Charter's forum-directed activities—specifically, repeated acts of infringement by specific subscribers using Charter's network; Charter's awareness of those activities; Charter's receipt of and failure to act in response to Plaintiffs' notices of infringement; and Charter's failure to take reasonable measures to terminate repeat infringers.

Answer:      Defendant denies that there has been any unlawful conduct giving rise to the claims in this case. Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 10 regarding the residence or location of any alleged infringers, and on

that basis denies the allegation. Defendant denies the remaining allegations in Paragraph 10 of the First Amended Complaint.

11.     Many of the acts complained of herein occurred in Colorado and in this judicial district. For example, a number of egregious repeat infringers who are Charter subscribers reside in and infringed Plaintiffs' rights in Colorado and this judicial district, using Internet service provided by Charter in the state. Indeed, Plaintiffs have identified over a hundred Charter subscribers who appear to reside in Colorado and who have repeatedly infringed Plaintiffs' copyrighted works. For example, one Charter subscriber believed to be located in Grand Junction, Colorado, with the IP address 72.175.144.149 at the time of the infringing conduct, was identified in infringement notices 63 times between June 26, 2014 and September 28, 2014. Another Charter subscriber believed to be located in Grand Junction, Colorado, with the IP address 98.127.105.135 at the time of infringement, was identified in infringement notices 54 times between May 29, 2014 and March 29, 2015. Yet another Charter subscriber believed to be located in Montrose, Colorado, with the IP address 184.167.217.19 at the time of infringement, was identified in infringement notices 53 times between September 11, 2014 and January 12, 2015. Still another Charter subscriber believed to be located in Canon City, Colorado, with the IP address 72.174.161.193 at the time of infringement, was identified in infringement notices 50 times between October 1, 2014 and March 29, 2015.

Answer:     Defendant denies that there has been any unlawful conduct giving rise to the claims in this case. Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 11 regarding the residence, location or identity of any alleged infringers, and on that basis denies the allegation. Defendant denies the remaining allegations in Paragraph 11.

12.    Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c), and 1400(a). A substantial part of the acts of infringement, and other events and omissions complained of herein, occur or have occurred in this district, and this is a district in which Charter resides or may be found.

Answer:    Defendant denies that there has been any unlawful conduct giving rise to the claims in this case. Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 12 regarding the residence or location of any alleged infringers, and on that basis denies the allegation. Paragraph 12 contains legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the remaining allegations of Paragraph 12.

## PLAINTIFFS AND THEIR COPYRIGHTED MUSIC

13.    Plaintiffs are the copyright owners of, and/or control exclusive rights with respect to, millions of sound recordings (*i.e.*, recorded music) and/or musical compositions (*i.e.*, the songs embodied in sound recordings), including by some of the most prolific and well-known songwriters and recording artists throughout the world.

Answer:    Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 13 of the First Amended Complaint and on that basis denies those allegations.

14.    Plaintiff Warner Records Inc. (f/k/a Warner Bros. Records Inc.) ("WRI") is a Delaware corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

Answer:    Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 14 of the First Amended Complaint and on that basis denies those allegations.

15.     Plaintiff Atlantic Recording Corporation ("Atlantic") is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 15 of the First Amended Complaint and on that basis denies those allegations.

16.     Plaintiff Bad Boy Records LLC ("Bad Boy") is a Delaware Limited Liability Company with its principal place of business at 1633 Broadway, New York, New York 10019.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 16 of the First Amended Complaint and on that basis denies those allegations.

17.     Plaintiff Elektra Entertainment Group Inc. ("Elektra") is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 17 of the First Amended Complaint and on that basis denies those allegations.

18.     Plaintiff Fueled By Ramen LLC ("FBR") is a Delaware Limited Liability Company with its principal place of business at 1633 Broadway, New York, New York 10019.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 18 of the First Amended Complaint and on that basis denies those allegations.

19.     Plaintiff Lava Records LLC ("Lava") is a Delaware Limited Liability Company with its principal place of business at 1633 Broadway, New York, New York 10019.

Answer:        Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 19 of the First Amended Complaint and on that basis denies those allegations.

20.      Plaintiff Maverick Recording Company ("Maverick") is a California general partnership, with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

Answer:        Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 20 of the First Amended Complaint and on that basis denies those allegations.

21.      Plaintiff Nonesuch Records Inc. ("Nonesuch") is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

Answer:        Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 21 of the First Amended Complaint and on that basis denies those allegations.

22.      Plaintiff The All Blacks U.S.A., Inc. ("The All Blacks") is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

Answer:        Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 22 of the First Amended Complaint and on that basis denies those allegations.

23.      Plaintiff Warner Music Inc. ("Warner Music") is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

Answer:          Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 23 of the First Amended Complaint and on that basis denies those allegations.

24.      Plaintiff Warner Records/SIRE Ventures LLC ("Warner Records/SIRE") is a Delaware Limited Liability Company with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

Answer:          Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 24 of the First Amended Complaint and on that basis denies those allegations.

25.      Plaintiff WEA International Inc. ("WEA") is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

Answer:          Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 25 of the First Amended Complaint and on that basis denies those allegations.

26.      Plaintiff Sony Music Entertainment ("Sony") is a Delaware general partnership, the partners of which are citizens of New York and Delaware. Sony's headquarters and principal place of business are located at 25 Madison Avenue, New York, New York 10010.

Answer:          Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 26 of the First Amended Complaint and on that basis denies those allegations.

27.      Plaintiff Arista Music ("Arista Music") is a New York partnership with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:        Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 27 of the First Amended Complaint and on that basis denies those allegations.

28.    Plaintiff Arista Records LLC ("Arista Records") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:        Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 28 of the First Amended Complaint and on that basis denies those allegations.

29.    Plaintiff LaFace Records LLC ("LaFace") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:        Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 29 of the First Amended Complaint and on that basis denies those allegations.

30.    Plaintiff Provident Label Group, LLC ("Provident") is a Delaware Limited Liability Company with its principal place of business at 741 Cool Springs Boulevard, Franklin, Tennessee 37067.

Answer:        Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 30 of the First Amended Complaint and on that basis denies those allegations.

31.     Plaintiff Sony Music Entertainment US Latin ("Sony Latin") is a Delaware Limited Liability Company with its principal place of business at 3390 Mary Street, Suite 220, Coconut Grove, Florida 33133.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 31 of the First Amended Complaint and on that basis denies those allegations.

32.     Plaintiff The Century Family, Inc. ("Century") is a California corporation with its principal place of business at 12706 West Washington Boulevard, Culver City, California 90066.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 32 of the First Amended Complaint and on that basis denies those allegations.

33.     Plaintiff Volcano Entertainment III, LLC ("Volcano") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 33 of the First Amended Complaint and on that basis denies those allegations.

34.     Plaintiff Zomba Recording LLC ("Zomba") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 34 of the First Amended Complaint and on that basis denies those allegations.

35.     Plaintiff UMG Recordings, Inc. ("UMG") is a Delaware corporation with its principal place of business at 2220 Colorado Avenue, Santa Monica, California 90404.

Answer:      Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 35 of the First Amended Complaint and on that basis denies those allegations.

36.     Plaintiff Capitol Records, LLC ("Capitol Records") is Delaware Limited Liability Company with its principal place of business at 1750 N. Vine Street, Los Angeles, California 90068.

Answer:      Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 36 of the First Amended Complaint and on that basis denies those allegations.

37.     Plaintiffs WRI, Atlantic, Bad Boy, Elektra, FBR, Lava, Maverick, Nonesuch, The All Blacks, Warner Music, Warner Records/SIRE, WEA, Sony, Arista Music, Arista Records, LaFace, Provident, Sony Latin, Century, Volcano, Zomba, UMG, and Capitol Records are referred to herein collectively as the "Record Company Plaintiffs."

Answer:      Paragraph 37 of the Complaint does not contain factual allegations to which Defendant is obligated to respond.

38.     The Record Company Plaintiffs are some of the largest record companies in the world, engaged in the business of producing, manufacturing, distributing, selling, licensing, and otherwise exploiting sound recordings in the United States through various media. They invest substantial money, time, effort, and talent in creating, advertising, promoting, selling, and licensing unique and valuable sound recordings embodying the performances of their exclusive recording artists.

Answer:        Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 38 of the First Amended Complaint and on that basis denies those allegations.

39.      Plaintiff Warner Chappell Music, Inc. (f/k/a Warner/Chappell Music, Inc.) ("Warner Chappell") is a Delaware corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

Answer:        Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 39 of the First Amended Complaint and on that basis denies those allegations.

40.      Plaintiff Warner-Tamerlane Publishing Corp. ("Warner-Tamerlane") is a California corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

Answer:        Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 40 of the First Amended Complaint and on that basis denies those allegations.

41.      Plaintiff W Chappell Music Corp. d/b/a WC Music Corp. (f/k/a WB Music Corp). ("WC Music") is a California corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

Answer:        Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 41 of the First Amended Complaint and on that basis denies those allegations.

42.     Plaintiff W.C.M. Music Corp. (f/k/a W.B.M. Music Corp.) ("W.C.M.") is a Delaware corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 42 of the First Amended Complaint and on that basis denies those allegations.

43.     Plaintiff Unichappell Music Inc. ("Unichappell") is a Delaware corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 43 of the First Amended Complaint and on that basis denies those allegations.

44.     Plaintiff Rightsong Music Inc. ("Rightsong Music") is a Delaware corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021. Plaintiff Cotillion Music, Inc. ("Cotillion") is a Delaware corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 44 of the First Amended Complaint and on that basis denies those allegations.

45.     Plaintiff Intersong U.S.A., Inc. ("Intersong") is a Delaware corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 45 of the First Amended Complaint and on that basis denies those allegations.

46.     Chappell & Co. Inc. ("Chappell") is a Delaware corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 46 of the First Amended Complaint and on that basis denies those allegations.

47.     Plaintiff Sony/ATV Music Publishing LLC ("Sony/ATV") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 47 of the First Amended Complaint and on that basis denies those allegations.

48.     Plaintiff EMI Al Gallico Music Corp. ("EMI Al Gallico"), an affiliate of Sony/ATV, is a Delaware corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 48 of the First Amended Complaint and on that basis denies those allegations.

49.     Plaintiff EMI Algee Music Corp. ("EMI Algee"), an affiliate of Sony/ATV, is a Delaware corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 49 of the First Amended Complaint and on that basis denies those allegations.

50.     Plaintiff EMI April Music Inc. ("EMI April"), an affiliate of Sony/ATV, is a Connecticut corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:      Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 50 of the First Amended Complaint and on that basis denies those allegations.

51.     Plaintiff EMI Blackwood Music Inc. ("EMI Blackwood"), an affiliate of Sony/ATV, is a Connecticut corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:      Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 51 of the First Amended Complaint and on that basis denies those allegations.

52.     Plaintiff Colgems-EMI Music Inc. ("EMI Colgems"), an affiliate of Sony/ATV, is a Delaware corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:      Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 52 of the First Amended Complaint and on that basis denies those allegations.

53.     Plaintiff EMI Consortium Music Publishing Inc. d/b/a EMI Full Keel Music ("EMI Full Keel"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:      Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 53 of the First Amended Complaint and on that basis denies those allegations.

54.      Plaintiff EMI Consortium Songs, Inc., individually and d/b/a EMI Longitude Music ("EMI Longitude"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:      Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 54 of the First Amended Complaint and on that basis denies those allegations.

55.      EMI Entertainment World Inc. d/b/a EMI Foray Music ("EMI Entertainment"), an affiliate of Sony/ATV, is a Delaware corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:      Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 55 of the First Amended Complaint and on that basis denies those allegations.

56.      EMI Jemaxal Music Inc. ("EMI Jemaxal"), an affiliate of Sony/ATV, is a Delaware corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:      Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 56 of the First Amended Complaint and on that basis denies those allegations.

57.     Plaintiff EMI Feist Catalog Inc. ("EMI Feist"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 57 of the First Amended Complaint and on that basis denies those allegations.

58.     Plaintiff EMI Miller Catalog Inc. ("EMI Miller"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 58 of the First Amended Complaint and on that basis denies those allegations.

59.     Plaintiff EMI Mills Music, Inc. ("EMI Mills"), an affiliate of Sony/ATV, is a Delaware corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 59 of the First Amended Complaint and on that basis denies those allegations.

60.     Plaintiff EMI Unart Catalog Inc. ("EMI Unart"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:      Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 60 of the First Amended Complaint and on that basis denies those allegations.

61.      Plaintiff EMI U Catalog Inc. ("EMI U"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:      Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 61 of the First Amended Complaint and on that basis denies those allegations.

62.      Plaintiff Famous Music LLC ("Famous Music") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:      Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 62 of the First Amended Complaint and on that basis denies those allegations.

63.      Plaintiff Jobete Music Co. Inc. ("Jobete"), an affiliate of Sony/ATV, is a Michigan corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010. Plaintiff Stone Agate Music ("Stone Agate") is a division of Jobete.

Answer:      Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 64 of the First Amended Complaint and on that basis denies those allegations.

64.     Plaintiff Screen Gems-EMI Music Inc. ("Gems-EMI"), an affiliate of Sony/ATV, is a Delaware corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 64 of the First Amended Complaint and on that basis denies those allegations.

65.     Plaintiff Stone Diamond Music Corp. ("Stone"), an affiliate of Sony/ATV, is a Michigan corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 65 of the First Amended Complaint and on that basis denies those allegations.

66.     Plaintiff Universal Music Corp. ("UMC") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 66 of the First Amended Complaint and on that basis denies those allegations.

67.     Plaintiff Universal Music – MGB NA LLC ("MGB") is a California Limited Liability Company with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 67 of the First Amended Complaint and on that basis denies those allegations.

68.    Plaintiff Universal Music Publishing Inc. ("Universal Music Publishing") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

Answer:        Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 68 of the First Amended Complaint and on that basis denies those allegations.

69.    Plaintiff Universal Music Publishing AB ("AB") is a company organized under the laws of Sweden.

Answer:        Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 69 of the First Amended Complaint and on that basis denies those allegations.

70.    Plaintiff Universal Music Publishing Limited ("Publishing Limited") is a company incorporated under the laws of England and Wales.

Answer:        Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 70 of the First Amended Complaint and on that basis denies those allegations.

71.    Plaintiff Universal Music Publishing MGB Limited ("MGB Limited") is a company incorporated under the laws of England and Wales.

Answer:        Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 71 of the First Amended Complaint and on that basis denies those allegations.

72.    Plaintiff Universal Music – Z Tunes LLC ("Z Tunes") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

Answer:        Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 72 of the First Amended Complaint and on that basis denies those allegations.

73.     Plaintiff Universal/Island Music Limited ("Island") is a company incorporated under the laws of England and Wales.

Answer:        Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 73 of the First Amended Complaint and on that basis denies those allegations.

74.     Plaintiff Universal/MCA Music Limited ("MCA Limited") is a company incorporated under the laws of England and Wales.

Answer:        Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 74 of the First Amended Complaint and on that basis denies those allegations.

75.     Plaintiff Universal/MCA Music Publishing Pty. Limited ("MCA Publishing Limited") is a company organized under the laws of the Australia.

Answer:        Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 75 of the First Amended Complaint and on that basis denies those allegations.

76.     Plaintiff Music Corporation of America, Inc. ("Music Corp.") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

Answer:      Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 76 of the First Amended Complaint and on that basis denies those allegations.

77.      Plaintiff Musik Edition Discoton GmbH ("Musik Edition") is a company incorporated under the laws of Germany.

Answer:      Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 77 of the First Amended Complaint and on that basis denies those allegations.

78.      Plaintiff Polygram Publishing, Inc. ("Polygram Publishing") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

Answer:      Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 78 of the First Amended Complaint and on that basis denies those allegations.

79.      Plaintiff Songs of Universal, Inc. ("Songs of Universal") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

Answer:      Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 79 of the First Amended Complaint and on that basis denies those allegations.

80.      Plaintiffs Warner Chappell, Warner-Tamerlane, WC Music, W.C.M., Unichappell, Rightsong Music, Cotillion, Intersong, Chappell, Sony/ATV, EMI Al Gallico, EMI Algee, EMI April, EMI Blackwood, EMI Colgems, EMI Full Keel, EMI Longitude, EMI

Entertainment, EMI Jemaxal, EMI Feist, EMI Miller, EMI Mills, EMI Unart, EMI U, Famous

Music, Jobete, Stone Agate, Gems-EMI, Stone, UMC, MGB, Universal Music Publishing, AB,

Publishing Limited, MGB Limited, Z Tunes, Island, MCA Limited, MCA Publishing Limited,

Music Corp., Musik Edition, Polygram Publishing, and Songs of Universal are referred to herein

collectively as the "Music Publisher Plaintiffs."

Answer:       Paragraph 80 of the First Amended Complaint does not contain factual

allegations to which Defendant is obligated to respond.

81.    The Music Publisher Plaintiffs are leading music publishers engaged in the

business of acquiring, owning, publishing, licensing, and otherwise exploiting copyrighted

musical compositions. Each invests substantial money, time, effort, and talent to acquire,

administer, publish, license, and otherwise exploit such copyrights, on its own behalf and on

behalf of songwriters and others who have assigned exclusive copyright interests to the Music

Publisher Plaintiffs.

Answer:       Defendant lacks knowledge or information sufficient to admit or deny the

allegations in Paragraph 81 of the First Amended Complaint and on that basis denies those

allegations.

82.    Plaintiffs own and/or control in whole or in part the copyrights and/or exclusive

rights in innumerable popular sound recordings and musical compositions, including the sound

recordings listed on Exhibit A and musical compositions listed on Exhibit B, both of which are

illustrative and non-exhaustive. All of the sound recordings and musical compositions listed on

Exhibits A and B have been registered with the U.S. Copyright Office.

Answer:       Defendant admits that Exhibits A and B to the Complaint purport to list

the works alleged by Plaintiffs in this action. Defendant lacks knowledge or information

sufficient to admit or deny the remaining allegations of Paragraph 82 of the First Amended Complaint and on that basis denies those allegations.

## CHARTER AND ITS ACTIVITIES

83.     Defendant Charter Communications, Inc. is a Delaware corporation, with its principal place of business at 400 Atlantic Street, Stamford, Connecticut 06901. Charter also maintains substantial operations and offices in Colorado, including in Greenwood Village, Colorado.

Answer:      Defendant admits that Charter Communications, Inc. is a Delaware corporation but denies the remaining allegations in the first sentence in Paragraph 83 of the Complaint. Defendant admits that Charter Communications, Inc. operates an office in Colorado but denies the remaining allegations in Paragraph 83 of the Complaint.

84.     Charter is one of the largest ISPs in the country. In 2015, Charter had more than 5 million subscribers and today has more than 22 million subscribers. At all pertinent times, Charter's customers, including those in Colorado, have paid substantial subscription fees for access to its high-speed Internet network, with Charter offering a tiered pricing structure whereby a subscriber can have even higher downloading speeds for a higher monthly fee.

Answer:      Defendant admits that Charter operates as an Internet service provider. Defendant admits that, during the time period relevant to Plaintiffs' allegations, Charter offered various products at different price points. Defendant admits that during 2015, it had approximately 6.7 million subscribers.  Defendant admits that as of December 2019, it had approximately 29.2 subscribers.  Defendant denies the remaining allegations in Paragraph 84 of the First Amended Complaint.

85.     Many of Charter's customers are motivated to subscribe to Charter's service because it allows them to download music and other copyrighted content—including

unauthorized content—as efficiently as possible. Accordingly, in its consumer marketing material, including material directed to Colorado customers, Charter has touted how its service enables subscribers to download and upload large amounts of content at "blazing-fast Internet speeds." Charter has told existing and prospective customers that its high-speed service enables subscribers to "download just about anything instantly," and subscribers have the ability to "download 8 songs in 3 seconds." Charter has further told subscribers that its Internet service "has the speed you need for everything you do online." In exchange for this service, Charter has charged its customers monthly fees ranging in price based on the speed of service.

<u>Answer:</u>        Defendant admits that, during the time period relevant to Plaintiffs' allegations, Charter offered various products at different price points. Defendant denies the remaining allegations in Paragraph 85 of the First Amended Complaint.

86.      At the same time, Charter has consistently and actively engaged in network management practices to suit its own purposes. This includes monitoring for, and taking action against unwanted activity that might otherwise interfere with its provision of Internet service to its subscribers. But Charter has gone out of its way *not* to take action against subscribers engaging in repeated copyright infringement, for its own financial benefit and at the expense of the underlying owners and controllers of copyright interests, including Plaintiffs, ultimately forcing Plaintiffs to bring this litigation.

<u>Answer:</u>        Defendant denies the allegations in Paragraph 86 of the First Amended Complaint.

87.      At all pertinent times, Charter knew that its subscribers routinely used its networks for illegally downloading and uploading copyrighted works, especially music. As described below, Plaintiffs repeatedly notified Charter that many of its subscribers were actively

utilizing its service to infringe their works. Those notices gave Charter the specific identities of its infringing subscribers, referred to by their unique Internet Protocol (or "IP") addresses. Yet Charter persistently turned a blind eye to the massive infringement of Plaintiffs' works occurring over its network. Charter condoned the illegal activity because it was popular with subscribers and acted as a draw to attract and retain new and existing subscribers. Charter's customers, in turn, purchased more bandwidth and continued using Charter's services to infringe Plaintiffs' copyrights. Charter undoubtedly recognized that if it terminated or otherwise prevented repeat infringer subscribers from using its service to infringe, or made it less attractive for such use, Charter would enroll fewer new subscribers, lose existing subscribers, and ultimately lose revenue. For those account holders and subscribers who wanted to download files illegally at faster speeds, Charter obliged them in exchange for higher rates. In other words, the greater the bandwidth its subscribers required for pirating content, the more money Charter made.

Answer:   Defendant denies the allegations in Paragraph 87 of the First Amended Complaint.

## THE GLOBAL P2P PIRACY PROBLEM

### General Landscape

88.   While the digital age has brought many benefits, one notable exception is its facilitation of unprecedented online piracy of music and other copyrighted works. As the Supreme Court has recognized, the level of copyright infringement on the Internet is "staggering." *Metro- Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 923 (2005).

Answer:   Defendant admits that Paragraph 88 includes an accurate one-word quote from the Supreme Court of the United States, but Defendant denies the allegations in Paragraph 88 of the Complaint that reflect the characterization of the Supreme Court's opinion on the basis

that the opinion of the Supreme Court speaks for itself. Defendant denies the remaining allegations in Paragraph 88 of the First Amended Complaint.

89.     Use of peer-to-peer ("P2P") distribution systems has dominated unauthorized downloading and distribution of copyrighted music. P2P is a generic term used to refer to a decentralized network of users whereby each Internet-connected participant (*i.e.*, a "peer" or a "node") can act as both a supplier and consumer of content files. Early P2P services, such as Napster and KaZaA, have been replaced by even more robust and efficient systems, most notably a protocol called "BitTorrent." The online piracy committed via BitTorrent is stunning in nature, speed, and scope. Utilizing a BitTorrent client—essentially a tool that manages the uploading and downloading of files through BitTorrent technology—persons connected to the Internet can locate, access, and download copyrighted content from other peers in the blink of an eye. They download copyrighted music from other network users, usually total strangers, and end up with complete digital copies of any music they desire—including entire catalogues of music—without payment to copyright owners or creators.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 89 of the First Amended Complaint, and on that basis denies those allegations.

90.     BitTorrent is uniquely efficient in the way it facilitates illegal file transfers. On earlier P2P networks, a user wanting to download a music file would have to locate another Internet-connected peer with the desired file and download the entire file from that peer. BitTorrent facilitates much faster downloading by breaking each file into pieces, allowing users to download different pieces of content simultaneously from different peers. At the same time, the system allows users to begin disseminating the copyrighted content before the complete file

has even downloaded. This means that, at any given time, each user connected to the Internet can be both downloading and uploading different pieces of a file from, and to, multiple other users. Once a user has downloaded all the pieces, the file is automatically reassembled into its complete form and available for playback by the user. Needless to say, acquiring copyrighted music in this fashion eliminates the need to obtain it through legitimate channels and eliminates the requirement of paying a fee.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 90 of the First Amended Complaint, and on that basis denies those allegations.

91.     Not surprisingly, then, during the time period in which the claims in this action arose, BitTorrent was used widely as a vehicle to infringe content online. In a report from January 2011, a survey conducted by the firm Envisional estimated that 11.4 percent of all Internet traffic involved the unauthorized distribution of non-pornographic copyrighted content via BitTorrent. In a report from September 24, 2013, another company, NetNames, estimated that 99.97 percent of non-pornographic files distributed via BitTorrent systems infringe copyrights. To illustrate, in one well-publicized incident in 2015, millions of individual BitTorrent users downloaded an episode of HBO's "Game of Thrones" within just 24 hours of its airing.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in the first or third sentences in Paragraph 91 of the First Amended Complaint, and on that basis denies those allegations. Defendant denies the remaining allegations in Paragraph 91 of the First Amended Complaint, and where the allegations in Paragraph 91 refer to reports, Defendant refers the Court to those reports for an accurate rendition of their contents.

**Plaintiffs' Enforcement Activities and Charter's Efforts to Thwart Them**

92.     Over the past two decades, as P2P piracy became widespread, music and other copyright owners have employed litigation and other means to attempt to curtail the massive theft of their copyrighted works. Charter has been keenly aware of those efforts and the use of its network for P2P piracy, including the specific identities of subscribers using its network to infringe Plaintiffs' works.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in the first sentence of Paragraph 92 of the First Amended Complaint, and on that basis denies those allegations. Defendant denies the remaining allegations in Paragraph 92 of the First Amended Complaint.

93.     Indeed, Charter knew subscribers were using its network for such infringing activities as early as 2003. A number of record companies, including some of the Record Company Plaintiffs, initiated a multi-year effort to enforce their copyrights against persons using P2P systems to infringe copyrighted musical works directly. Because the copyright holders could only determine the unique IP addresses of an ISP's infringing subscribers, but not their actual identities, they served subpoenas on Charter and other ISPs to obtain the infringing subscribers' names and contact information. Although Charter's customer agreements allowed it to produce that information, and no real doubt existed as to their customers' underlying infringement, Charter vigorously opposed the subpoenas, undermining the record companies' efforts to curb direct infringement activity.

Answer:     Defendant admits that ~~they~~it received and responded to subpoenas seeking information regarding certain of its subscribers. Defendant denies the remaining allegations in Paragraph 93 of the First Amended Complaint.

94.     As a result, the record companies were forced to pursue the slower and more expensive process of filing "John Doe" lawsuits to ascertain the infringers' identities. In those litigations, Charter was required to provide identifying information about infringing subscribers. As Charter is aware, many of those cases resulted in judgments confirming its subscribers' liability for copyright infringement through Charter's Internet service, including infringement of works owned or exclusively controlled by Plaintiffs.

Answer:     Defendant denies the allegations in Paragraph 94 of the First Amended Complaint.

95.     Thereafter, the Record Company Plaintiffs began sending notices to Charter (and other ISPs) identifying additional specific instances of its subscribers' infringement through P2P activities. From 2012 through 2015, Charter received *hundreds of thousands of notices*, provided under penalty of perjury, detailing specific instances of its subscribers using P2P protocols on its network to distribute and copy Plaintiffs' copyrighted content unlawfully both within, and beyond, the Charter network.

Answer:     Defendant lacks knowledge or information sufficient to admit or deny the allegations in the first sentence of Paragraph 95 of the First Amended Complaint, and on that basis denies those allegations.   Defendant admits that it received notices from third party, the RIAA, of which the only portion stated under penalty of perjury is that the RIAA was authorized to send the notice on behalf of its member companies in matters involving the infringement of their sound recordings, including enforcing their copyrights and common law rights on the Internet. Defendant denies the remaining allegations in Paragraph 95.

96.     The infringement notices provided to Charter identify the unique IP address assigned to each user of Charter's network, and the date and time the infringing activity was

detected. Only Charter, as the provider of the technology and system used to infringe, had the information required to match the IP address to a particular subscriber, and to contact that subscriber or terminate that subscriber's service.

Answer:   Defendant lacks knowledge or information sufficient to admit or deny the allegations in the first sentence in Paragraph 96 of the First Amended Complaint, and on that basis denies those allegations. Defendant admits that Charter generally has the ability to match an IP address, accompanied with the date and time, to particular subscribers, with respect to at least some historic accounts, but denies that Charter has the ability to determine the identity of the individual using the device on its service.   Defendant denies the remaining allegations in Paragraph 96 of the Complaint.

97.   Plaintiffs' infringement notices notified Charter of clear and unambiguous infringing activity by Charter subscribers—that is, unauthorized downloading and distribution of copyrighted music. Charter's subscribers had no legal basis or justification for downloading or distributing digital copies of Plaintiffs' sound recordings and musical compositions to thousands or millions of strangers over the Internet. Tellingly, to the extent that Charter forwarded Plaintiffs' infringement notices to subscribers accused of using Charter's network to infringe, those subscribers did not challenge the claims of infringement by sending counter-notices to Charter contesting those claims (a process that Charter outlined and made available to its users).

Answer:   Defendant lacks knowledge or information sufficient to admit or deny the allegations in the second sentence in Paragraph 97 of the Complaint, on that basis denies those allegations. Defendant admits that Charter generally has the ability to match an IP address, accompanied with the date and time, to particular subscribers, with respect to at least some historic accounts, but denies that Charter has the ability to determine the identity of the

individual using the device on its service.   Defendant denies the remaining allegations in Paragraph 97 of the First Amended Complaint.

98.     Apart from attesting to the sheer volume of the infringing activity on its network, the infringement notices sent to Charter pointed to specific subscribers who were flagrant and serial infringers.   The infringement notices identified tens of thousands of Charter subscribers engaged in blatant and repeated infringement of Plaintiffs' copyrighted works.   To cite just a few specific examples:

- During a 623-day period, Charter's subscriber with IP address 66.189.102.119 was identified in 220 infringement notices, which were sent on at least 184 separate days.

- During a 395-day period, Charter's subscriber with IP address 71.85.202.236 was identified in 206 infringement notices, which were sent on at least 138 separate days.

- During a 547-day period, Charter's subscriber with IP address 68.187.189.36 was identified in 197 infringement notices, which were sent on at least 157 separate days.

- During a 363-day period, Charter's subscriber with IP address 75.130.165.208 was identified in 189 infringement notices, which were sent on at least 123 separate days.

- During a 393-day period, Charter's subscriber with IP address 24.159.16.82 was identified in 174 infringement notices, which were sent on at least 134 separate days.

- During a 304-day period, Charter's subscriber with IP address 98.127.105.135 was identified in 54 infringement notices, which were sent on at least 53 separate days.

These examples and countless others amply illustrate that, rather than terminating repeat infringers—and losing subscription revenues—Charter simply looked the other way.

Answer:     Defendant denies the allegations in Paragraph 98 of the First Amended Complaint.

99.     During all pertinent times, Charter had the full legal right, obligation, and technical ability to prevent or limit the infringements occurring on its network. Under Charter's "Terms of Service/Policies," which its subscribers agreed to as a condition of using its Internet service, Charter was empowered to exercise its right and ability to suspend or terminate a customer's Internet access. Charter could do so for a variety of reasons, including a subscriber's copyright infringement activity. Charter's Copyright Policy expressly provided that "[i]f Charter receives more than *one* Notice of Copyright Infringement on the customer's part, the customer may be deemed a 'repeat copyright infringer . . . [and Charter] reserves the right to terminate the accounts of 'repeat copyright infringers.'" (Emphasis added.)

<u>Answer:</u>     Defendant admits that it maintains a Terms of Service and Acceptable Use Policy, and those documents speak for themselves. Charter denies the remaining allegations in Paragraph 99 of the First Amended Complaint.

100.     Despite these alleged policies, and despite receiving hundreds of thousands of infringement notices from Plaintiffs, as well as thousands of similar notices from other copyright owners, Charter knowingly permitted specifically identified repeat infringers to continue to use its network to infringe. Rather than disconnect the Internet access of blatant repeat infringers to curtail their infringement, Charter knowingly continued to provide these subscribers with the Internet access that enabled them to continue to illegally download or distribute Plaintiffs' copyrighted works unabated. Charter's provision of high-speed Internet service to known infringers materially contributed to these direct infringements.

<u>Answer:</u>     Defendant denies the allegations in Paragraph 100 of the First Amended Complaint.

101.   Charter's motivation for refusing to terminate or suspend the accounts of blatant infringing subscribers is simple: it valued corporate profits over its legal responsibilities. Charter did not want to lose subscriber revenue by terminating accounts of infringing subscribers. Retaining infringing subscribers provided a direct financial benefit to Charter. Nor did Charter want to risk the possibility that account terminations would make its service less attractive to other existing or prospective users. Moreover, Charter was simply disinterested in devoting sufficient resources to tracking repeat infringers, responding to infringement notices, and terminating accounts in appropriate circumstances. Considering only its own pecuniary gain, Charter ignored and turned a blind eye to flagrant, repeat violations by known specific subscribers using its service to infringe, thus facilitating and multiplying the harm to Plaintiffs. And Charter's failure to police its infringing subscribers adequately was a draw to subscribers to purchase Charter's services, so that the subscribers could then use those services to infringe Plaintiffs' (and others') copyrights. The specific infringing subscribers identified in Plaintiffs' notices, including the egregious infringers identified herein, knew Charter would not terminate their accounts despite receiving multiple notices identifying them as infringers, and they remained Charter subscribers to continue illegally downloading copyrighted works.

Answer:   Defendant denies the allegations in Paragraph 101 of the First Amended Complaint.

102.   The consequences of Charter's support of and profit from infringement are obvious and stark. When Charter's subscribers use Charter's network to obtain infringing copies of Plaintiffs' copyrighted works illegally, that activity undercuts the legitimate music market, depriving Plaintiffs and those recording artists and songwriters whose works they sell and license of the compensation to which they are entitled. Without such compensation, Plaintiffs, and their

recording artists and songwriters, have fewer resources available to invest in the further creation and distribution of high-quality music.

Answer:    Defendant denies the allegations in Paragraph 102 of the First Amended Complaint and denies that Plaintiffs are entitled to any relief.

## CLAIMS FOR RELIEF

## Count I – Contributory Copyright Infringement

103.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 102 as if fully set forth herein.

Answer:    Defendant incorporates by reference its responses to Paragraphs 1 through 102 of the First Amended Complaint.

104.    Charter and its subscribers do not have any authorization, permission, license, or consent to exploit the copyrighted sound recordings or musical compositions at issue.

Answer:    Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 104 of the Complaint and on that basis denies those allegations.

105.    Charter's subscribers, using Internet access and services provided by Charter, have unlawfully reproduced and distributed via BitTorrent, or other P2P networks, thousands of sound recordings and musical compositions for which Plaintiffs are the legal or beneficial copyright owners or exclusive licensees. The copyrighted works infringed by Charter's subscribers, which have been registered with the U.S. Copyright Office, include those listed on Exhibits A and B, and many others. The foregoing activity constitutes direct infringement in violation of 17 U.S.C. §§ 106 and 501, *et seq.*

Answer:    Paragraph 95105 contains legal conclusions to which no response is required.  Defendant admits that Exhibits A and B to the First Amended Complaint purport to list the works alleged by Plaintiffs in this action. Defendant lacks knowledge or information

39

sufficient to admit or deny the remaining allegations in Paragraph 105 of the Complaint and on that basis denies those allegations.

106.    Charter is liable as a contributory copyright infringer for the direct infringements described above. Through Plaintiffs' infringement notices and other means, Charter had knowledge that its network was being used for infringement of Plaintiffs' copyrighted works on a massive scale, and also knew of specific subscribers engaged in such repeated and flagrant infringement. Nevertheless, Charter facilitated, encouraged, and materially contributed to such infringement by continuing to provide its network and the facilities necessary for its subscribers to commit repeated infringements. Charter had the means to withhold that assistance upon learning of specific infringing activity by specific users but failed to do so.

Answer:        Paragraph 106 contains legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations contained in Paragraph 106 of the First Amended Complaint.

107.    By purposefully ignoring and turning a blind eye to its subscribers' flagrant and repeated infringements, Charter knowingly caused and materially contributed to the unlawful reproduction and distribution of Plaintiffs' copyrighted works, including but not limited to those listed on Exhibits A and B hereto, in violation of Plaintiffs' exclusive rights under the copyright laws of the United States.

Answer:        Paragraph 107 contains legal conclusions to which no response is required. Defendant admits that Exhibits A and B to the First Amended Complaint purport to list the works alleged by Plaintiffs in this action. To the extent a response is required, Defendant denies the allegations contained in Paragraph 107 of the First Amended Complaint.

108.    Each infringement of Plaintiffs' copyrighted sound recordings and musical compositions constitutes a separate and distinct act of infringement. Plaintiffs' claims of infringement against Charter are timely pursuant to tolling agreements.

Answer:    Paragraph 108 contains legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations contained in Paragraph 108 of the First Amended Complaint.

109.    The foregoing acts of infringement by Charter have been willful, intentional, and purposeful, in blatant disregard of Plaintiffs' rights. Indeed, the sound recordings on Exhibit A and the musical compositions on Exhibit B represent works infringed by Charter's subscribers *after* those particular subscribers were identified to Charter in multiple infringement notices.

Answer:    Paragraph 109 contains legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations contained in Paragraph 109 of the First Amended Complaint.

110.    As a direct and proximate result of Charter's willful infringement of Plaintiffs' copyrights, Plaintiffs are entitled to statutory damages pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 with respect to each work infringed, or such other amount as may be proper under 17 U.S.C. § 504(c). Alternatively, at Plaintiffs' election, Plaintiffs shall be entitled to their actual damages pursuant to 17 U.S.C. § 504(b), including Charter's profits from the infringements, as will be proven at trial.

Answer:    Paragraph 110 contains legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations contained in Paragraph 110 of the First Amended Complaint.

111.   Plaintiffs also are entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

Answer:     Paragraph 111 contains legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations contained in Paragraph 111 of the First Amended Complaint.

### Count II – Vicarious Copyright Infringement

112.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 111 as if fully set forth herein.

Answer:     ~~Pursuant to the Federal Rules of Civil Procedure and the Court's Order, dated March 4, 2020 (Dkt. No. 141), Charter is not yet required to respond to this allegation and reserves its rights accordingly.~~ Defendant incorporates by reference its responses to Paragraphs 1 through 111 of the First Amended Complaint.

113.   Charter and its subscribers have no authorization, license, or other consent to exploit the copyrighted sound recordings or musical compositions at issue.

Answer:     ~~Pursuant to the Federal Rules of Civil Procedure and the Court's Order, dated March 4, 2020 (Dkt. No. 141), Charter is not yet required to respond to this allegation and reserves its rights accordingly.~~ Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 113 of the First Amended Complaint and on that basis denies those allegations.

114.   Charter's subscribers, using Internet access and services provided by Charter, have unlawfully reproduced and distributed via BitTorrent or other P2P services thousands of sound recordings and musical compositions of which Plaintiffs are the legal or beneficial copyright owners or exclusive licensees. The copyrighted works infringed by Charter's subscribers, which have been registered with the U.S. Copyright Office, include those listed on

Exhibits A and B, and many others. The foregoing activity constitutes direct infringement in violation of 17 U.S.C. §§ 106 and 501, *et seq*.

Answer: ~~Pursuant to the Federal Rules of Civil Procedure and the Court's Order, dated March 4, 2020 (Dkt. No. 141), Charter is not yet required to respond to this allegation and reserves its rights accordingly.~~Defendant admits that Exhibits A and B to the First Amended Complaint purport to list the works alleged by Plaintiffs in this action. Defendant lacks knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 114 of the First Amended Complaint and on that basis denies those allegations.

115.    Charter is liable as a vicarious copyright infringer for the direct infringements described above. Charter has the legal and practical right and ability to supervise and control the infringing activities that occur through the use of its network, and at all relevant times has had a financial interest in, and derived direct financial benefit from, the infringing use of its network. Charter has derived an obvious and direct financial benefit from its customers' infringement. The ability to use Charter's high-speed Internet facilities to illegally download Plaintiffs' copyrighted works has served to draw, maintain, and generate higher fees from paying subscribers to Charter's service. Among other financial benefits, by failing to terminate the accounts of specific repeat infringers known to Charter, Charter has profited from illicit revenue through user subscription fees that it would not have otherwise received from repeat infringers, as well as new subscribers drawn to Charter's services for the purpose of illegally downloading copyrighted works. The specific infringing subscribers identified in Plaintiffs' notices, including the egregious infringers identified herein, knew Charter would not terminate their accounts despite receiving multiple notices identifying them as infringers, and they remained Charter subscribers to continue illegally downloading copyrighted works.

Answer:   ~~Pursuant to the Federal Rules of Civil Procedure and the Court's Order, dated March 4, 2020 (Dkt. No. 141), Charter is not yet required to respond to this allegation and reserves its rights accordingly.~~ Paragraph 115 contains legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations contained in Paragraph 115 of the First Amended Complaint.

116.   Charter is vicariously liable for the unlawful reproduction and distribution of Plaintiffs' copyrighted works, including but not limited to those listed on Exhibits A and B hereto, in violation of Plaintiffs' exclusive rights under the copyright laws of the United States.

Answer:   ~~Pursuant to the Federal Rules of Civil Procedure and the Court's Order, dated March 4, 2020 (Dkt. No. 141), Charter is not yet required to respond to this allegation and reserves its rights accordingly.~~ Paragraph 116 contains legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations contained in Paragraph 116 of the First Amended Complaint.

117.   Each infringement of Plaintiffs' copyrighted sound recordings and musical compositions constitutes a separate and distinct act of infringement. Plaintiffs' claims of infringement against Charter are timely pursuant to tolling agreements.

Answer:   ~~Pursuant to the Federal Rules of Civil Procedure and the Court's Order, dated March 4, 2020 (Dkt. No. 141), Charter is not yet required to respond to this allegation and reserves its rights accordingly.~~ Paragraph 117 contains legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations contained in Paragraph 117 of the First Amended Complaint.

118.   The foregoing acts of infringement by Charter have been willful, intentional, and purposeful, in blatant disregard of Plaintiffs' rights. Indeed, the sound recordings on Exhibit A

and the musical compositions on Exhibit B are works infringed by Charter's subscribers *after* those particular subscribers were identified to Charter in multiple prior infringement notices.

Answer: ~~Pursuant to the Federal Rules of Civil Procedure and the Court's Order, dated March 4, 2020 (Dkt. No. 141), Charter is not yet required to respond to this allegation and reserves its rights accordingly.~~ Paragraph 118 contains legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations contained in Paragraph 118 of the First Amended Complaint.

119.    As a direct and proximate result of Charter's willful infringement of Plaintiffs' copyrights, Plaintiffs are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 with respect to each work infringed, or such other amount as may be proper under 17 U.S.C. § 504(c). Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b), Plaintiffs shall be entitled to their actual damages, including Charter's profits from the infringements, as will be proven at trial.

Answer: ~~Pursuant to the Federal Rules of Civil Procedure and the Court's Order, dated March 4, 2020 (Dkt. No. 141), Charter is not yet required to respond to this allegation and reserves its rights accordingly.~~ Paragraph 119 contains legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations contained in Paragraph 119 of the First Amended Complaint.

120.    Plaintiffs are further entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

Answer: ~~Pursuant to the Federal Rules of Civil Procedure and the Court's Order, dated March 4, 2020 (Dkt. No. 141), Charter is not yet required to respond to this allegation and reserves its rights accordingly.~~ Paragraph 120 contains legal conclusions to which no response is

required. To the extent a response is required, Defendant denies the allegations contained in Paragraph 120 of the First Amended Complaint.

## PRAYER FOR RELIEF

Plaintiffs' Prayer for Relief contains legal conclusions to which no response is required. To the extent a response is required, Defendant denies any allegations associated with Plaintiffs' Prayer for Relief and denies that Plaintiffs are entitled to any relief.

## JURY TRIAL DEMAND

Defendant demands a trial by jury of all issues that are so triable.

## FIRST AMENDED AFFIRMATIVE DEFENSES TO COUNT I

Defendant identifies the following affirmative defenses to Count I and reserves the right to raise additional defenses as discovery proceeds. Defendant also reserves the right to assert affirmative defenses to Count II, if and when Charter is required to answer Count II. Defendant does not assume the burden of proof on any issue, however characterized, on which it does not bear that burden. Defendant reserves all affirmative defenses not stated herein under Rule 8(c) of the Federal Rules of Civil Procedure and any other defense at law or in equity that may now exist or in the future be available based upon discovery and further investigation in this case.

1.   The Complaint, and each cause of action within it, fails to state facts sufficient to constitute a cause of action.

2.   The statute of limitations bars Plaintiffs' claims to the extent Plaintiffs allege infringements that accrued outside the three-year limitations period, including any applicable tolling of the limitations period.

3.   Plaintiffs' claims are barred by their failure to join indispensable parties, including pursuant to the Court's April 20, 2020 Order (ECF 163).

1.   ~~4.~~ Plaintiffs' claims are barred or its damages are limited because any infringement was innocent ~~and was not willful.~~

~~5.   Plaintiffs' claims based upon secondary liability are barred because Plaintiffs cannot establish primary liability.~~

~~6.   Plaintiffs' claims based on contributory liability are barred because Defendant did not have the requisite knowledge of the alleged primary infringement and did not cause, encourage, or induce the alleged primary infringement.~~

~~7.   Plaintiffs' claims based on contributory liability are barred because Defendant did not materially contribute to the alleged primary infringement.~~

2.   ~~8.~~ Plaintiffs' claims are barred because Defendant's ISP service has substantial non- infringing uses.

3.   ~~9.~~ Plaintiffs' claims are barred by the doctrine of copyright misuse.

4.   ~~10.~~ Plaintiffs' failure to mitigate damages bars their claims or limits their recovery.

5.   ~~11.~~ The doctrine of ~~unclean hands bars Plaintiffs' claims.~~

~~12.   The doctrines of waiver and~~ estoppel ~~bar Plaintiffs' claims.~~

~~13.   Plaintiffs' claims are barred to the extent they do not own copyrights in the works underlying their claims.~~

~~14.   The Court lacks subject matter jurisdiction over claims that depend upon works for which Plaintiffs have not obtained copyright registrations.~~

~~15.   To the extent that Plaintiffs or their predecessors did not register copyrights before alleged infringements or within three months of first publication of published~~

works, the failure to register timely bars Plaintiffs' claims for statutory damages and attorneys' fees.

6. ~~16.~~ To the extent that Plaintiffs rely upon copyright registrations that rest upon misstatements or fraud, those misstatements or fraud bar Plaintiffs' claims.

7. ~~17.~~ To the extent that Plaintiffs failed to comply with renewal, notice, and registration requirements and/or other formalities, Plaintiffs' claim are barred.

~~18. Plaintiffs' claims are barred because the statutory damages sought are unconstitutionally excessive and disproportionate to any actual damages that may be sustained, in violation of the Due Process clause of the U.S. Constitution.~~

~~19. Application of the Copyright Act and its remedies to the conduct of Defendant and their customers as Plaintiffs request would violate due process.~~

~~20. Plaintiffs' claims are barred by the First Amendment to the United States Constitution.~~

8. ~~21.~~ To the extent that Plaintiffs can establish any underlying direct or secondary infringement, Defendant's liability and Plaintiffs' remedies are limited because Defendant qualifies for "safe harbor" under the Digital Millennium Copyright Act ("DMCA") 17 U.S.C. § 512(a).

## **FIRST AMENDED COUNTERCLAIMS**

Defendant Charter Communications, Inc. ("Charter" or "Defendant"), by and through its counsel, hereby asserts counterclaims to ~~Count I of~~ Plaintiffs' First Amended Complaint against Plaintiffs as follows:

## I. **Introduction**

1. Charter is an Internet service provider ("ISP") that provides its customers access to the Internet. As part of its ISP services, Charter does not store its subscribers' content on its

servers. Charter does not host websites that index infringing files. Charter does not create or distribute peer-to-peer file-sharing software or other file-sharing software. Nevertheless, Plaintiffs seek to impose secondary liability on Charter for alleged copyright infringement by its subscribers, in an effort to create a substantial new set of liabilities and burdens for ISPs.

2. This Court has ~~original~~ subject matter jurisdiction over Charter's counterclaims pursuant to 28 U.S.C. §§ 1331, 1367, and 1338(a).

## II.    Factual Allegations

### A.    Charter's Business

3. Charter is one of the largest communications companies in the country, offering a variety of services, including cable, telephone, and Internet access services.

4. Charter provides Internet service to both residential subscribers and businesses. Its high-speed Internet service provides some ~~twenty-nine~~29 million U.S. customers with Internet connections across 41 states.

5. As an ISP, Charter provides its customers with a gateway to the Internet, which has become virtually indispensable to functioning in the modern world.

6. The Internet provides access to a host of services, some of them critical. Individuals rely on Internet access to obtain services in the areas of healthcare, employment, education, banking, commerce, social interaction, news and entertainment, and many others.

7. As the Supreme Court recently emphasized in the case of *Packingham v. North Carolina*, for many people the Internet provides "the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge." 137 S. Ct. 1730, 1737 (2017).

8.      The critical importance of the Internet has been highlighted in the current COVID-19 global pandemic. With much of the country currently under some form of shelter in place directive or order, hundreds of thousands of people across the country are working or attending classes from home and relying on high speed internet access to make that possible. To ease the strain in this challenging time, Charter is offering free Spectrum broadband internet and Wi-Fi access for 60 days to households with K-12 and/or college students who do not already have a Spectrum broadband subscription. Charter is also opening its Wi-Fi hotspots across its footprint for public use.

9.      8. A subscriber ~~loosing~~losing Internet access can have devastating consequences.

10.      9. As an ISP, Charter provides connections and enables connected computers to access the Internet.

11.      10. Charter provides Internet access service to its residential subscribers for a flat monthly fee.

12.      11. Charter cannot remove third-party material from the Internet unless that material is stored on Charter's own servers. Charter cannot control what its customers store on their own or others' computers.

13      12. Charter has no ability to remove or take down infringing content from its customers' computers. Charter cannot restrict, or even detect, the specific content that its customers access or share.

14      13. Charter cannot supervise the online activities of its customers. Nor can Charter control its customers' conduct online. While Charter could disable its customers' ability to access its ISP system, or terminate customers' accounts, that does not give Charter control over its

customers' conduct online.  For example, a Charter subscriber could access the Internet through other accounts or public networks.

15. 14. Charter also cannot determine whether one of its subscribers is using the network, as opposed to someone else using the subscriber's account, with or without the subscriber's permission to do so.

16. 15. Charter does not control the Internet.

17. 16. The privacy of its customers is of paramount concern to Charter. Internet users frequently transmit private and sensitive information, and trust their ISP to safeguard their privacy and security.

18. 17. Charter does not spy on its customers or monitor their Internet traffic. Even if it could do so—and it cannot—it would not.  Engaging in surveillance in such a fashion would violate Charter's policies, ethics, and corporate culture.

19. 18. Operating an ISP service—and safeguarding customers and other Internet users—entails responding to a number of potential abuses such as security threats, invasion of privacy, identity theft, denial of service attacks, botnets or other malware (such as viruses, spyware, and worms), spam, fraud, phishing scams, copyright infringement, and a host of others.

20. 19. Charter's Subscriber Security Services Team manages issues like these that threaten Charter's network or customers, as well as other abuses of Charter's system. This team is tasked with protecting Charter's customer -facing networks and services by assessing and responding to security threats and attacks, and coordinating threat -mitigation activities with the appropriate organizations and external agencies to ensure a safe and secure communications infrastructure.

21.   20.  Among other things, the Subscriber Security Services Team assists law enforcement and cooperates with other ISPs to combat security and privacy threats, addresses internal security issues, assists customers, and processes copyright infringement notices that Charter receives from copyright owners and their agents.

### B.   Charter's Receipt of Copyright Infringement Notices

22.   21.  When Charter receives a copyright infringement notice alleging copyright infringement from a third party, it reviews the notice to ensure that it complies with Charter's policies. Among other things, Charter requires the sender of a copyright infringement notice to identify the copyrighted work claimed to have been infringed and to identify the material that is claimed to be infringing. Copyright infringement notices must also comply with Charter's other policies, including Charter's privacy policy.

23   22.  Charter reserves the right to terminate subscribers and account holders who repeatedly infringe copyrights, and Charter's policy is to terminate repeat infringers when Charter deems it appropriate to do so. Charter informs its subscribers and account holders of this policy.

24   23.  Charter cannot verify infringement notices that it receives. In particular, Charter cannot verify whether the information in a notice is accurate.

25   24.  Charter cannot itself detect infringement, and cannot determine whether infringing content is crossing its network. Charter cannot control or examine material that is on its subscribers' computers. Even if it could, doing so would violate Charter's policies and violate its users' privacy.

26.   25.  Copyright infringement notices that Charter receives for its ISP service always refer to acts of alleged infringement that occurred in the past. Charter cannot examine the content

a customer allegedly made available in the past, detect what the customer did with that content, or know whether a subscriber was authorized to possess, reproduce, or distribute that content.

27. 26. Charter cannot confirm whether the sender of a notice actually owns the copyright for an allegedly infringed work, nor whether the sender is authorized to send notices on behalf of the true owner. Charter cannot determine the true owner of the copyright for an allegedly infringed work.

28. 27. Charter cannot control alleged infringement on the Internet. Charter cannot supervise or control what its customers store on their computers, and cannot look at, locate, or remove any content that its customers may be uploading, downloading, or accessing through its ISP service.

29. 28. With respect to business customers, terminating an account would sever access to multiple potentially innocent end -users.  This is particularly the case with business customers that may be regional or local ISPs, through which hundreds, thousands, or even tens or hundreds of thousands of potentially innocent end -users' internet access could be severed due to the alleged acts of a single end -user.

## C.    Charter's Abuse Tracking System

30. 29. In this case, Plaintiffs seek relief for claims of infringement that accrued from March 24, 2013 through May 17, 2016 (the "Claim Period").[34]

---

[34] The Universal Plaintiffs seek relief for claims that accrued on or after March 24, 2013; the Sony Music Plaintiffs and Warner Plaintiffs seek relief for claims that accrued on or after April 18, 2013; and the Sony/ATV and EMI Plaintiffs seek relief for claims that accrued on or after June 15, 2013.

31. 30. During the Claim Period, Charter received different types of notifications concerning its ISP system. This included security notices, notices about system issues, copyright infringement notices, and others.

32. 31. Prior to and throughout the Claim Period, Charter utilized a system called "CATS"—Charter Abuse Tracking System—to partially automate the handling of abuse notifications that Charter receives. Among other things, Charter's Subscriber Security Services Team used CATS as a tool for processing and addressing copyright infringement notices. This allowed Charter to process, respond to, and to address such notices more efficiently.

33. 32. Automation is important, because manual processing of incoming abuse complaints is infeasible for all but the smallest ISP networks in light of the automated techniques used by spammers that generate a high volume of abuse complaints. Automation also decreases the risk that complaints from copyright owners could get lost in the flood of other abuse complaints.

34. 33. CATS converted copyright infringement notices that meet Charter's basic requirements into "tickets." CATS also stored a copy of the copyright notices received (if any) per subscriber.

35 34. Accepting and processing notices is both time -consuming and costly, requiring multiple systems and numerous personnel to work in coordination. Charter incurs costs in connection with undertaking these actions, as well.

36 35. During the Claim Period, Charter processed notices received from Plaintiffs, in accordance with its policies and CATS and forwarded those notices to accused subscribers reminding them that infringing copyright violates Charter's Acceptable Use Policy and

emphasizing that they should take immediate action to stop the exchange of any infringing material.

### D.    The Copyright Alert System (CAS)

37.    36. In July 2011, all of the major record companies and movie studios, along with their industry representatives, the RIAA and the Motion Picture Association of America ("MPAA"), and five of the largest ISPs in the United States collectively entered into the Copyright Alert System Memorandum of Understanding ("CAS MOU") to establish a "Copyright Alert System" (the "CAS").

38.    37. Under the CAS, signatory content owners or their representatives, which included the RIAA and MPAA, could send notices of alleged copyright infringement ("ISP Notices") to ISPs. The ISPs would accept and process the ISP Notices.

39    38. If an ISP received an ISP Notice that could be associated with the account of a particular ISP subscriber, then the ISP would send a notification—called a Copyright Alert—to the subscriber.

40    39. Under the CAS MOU, participating ISPs were required to accept and process only a limited volume of ISP Notices. The CAS MOU also provided that a participating ISP could temporarily cease processing ISP Notices if it received more than its business processes and systems could reasonably address.

41.    40. After an ISP had forwarded 6six Copyright Alerts to a single subscriber, the ISP was not required to forward any subsequent Copyright Alerts, regardless of the fact that the subscriber might be the subject of multiple, subsequent infringement notices.

42    41. Further, an ISP was not required to forward more than one Copyright Alert to a single subscriber within a seven-day grace period, to give an affected subscriber time to review

each Copyright Alert pertaining to such subscriber's account and to take appropriate steps to avoid receipt of further Copyright Alerts.

43. 42. The participating ISPs were required to track the number of notices their subscribers received so that the information could be provided to the content owners (or their representatives), so that the content owners could institute infringement actions directly against the subscribers—not the ISPs.

44 43. The CAS did not require ISPs to terminate subscribers who were repeatedly accused of infringement.

45. 44. At least some of Plaintiffs are, and during the Claim Period were, well aware of the provisions of the CAS MOU.

46. 45. On information and belief, all of the Warner Plaintiffs are, or during the Relevant Time Period were, affiliates, subsidiaries, or successors of signatories to the CAS MOU.

47. 46. On information and belief, all of the Sony Music Plaintiffs are, or during the Relevant Time Period were, affiliates, subsidiaries, or successors of signatories to the CAS MOU.

48 47. On information and belief, all of the Sony/ATV and EMI Plaintiffs are, or during the Relevant Time Period were, affiliates, subsidiaries, or successors of signatories to the CAS MOU.

49 48. On information and belief, all of the Universal Plaintiffs are, or during the Relevant Time Period were, affiliates, subsidiaries, or successors of signatories to the CAS MOU.

50. 49. The RIAA was a signatory to the CAS MOU.

51. 50. On information and belief, all of the Record Company Plaintiffs were members of the RIAA during the Relevant Time Period or were affiliates, subsidiaries, or partners of RIAA members.[45]

52. 51. Charter was also aware of the CAS MOU during the Relevant Time Period; however, Charter was not a signatory to the CAS MOU.

53. 52. On information and belief, one goal of the CAS MOU was to establish industry standard practices for entertainment industry copyright owners to submit copyright infringement notices to ISPs, and for ISPs to process such notices and inform their subscribers of infringement allegations against them.

54. 53. Content owners participating in the CAS MOU (including some of Plaintiffs here) and participating ISPs (including SBC Internet Services, Verizon Online, Comcast Cable Communications Management, CSC Holdings, and Time Warner Cable) established the Center for Copyright Information (the "CCI").

55. 54. An express goal of the CCI was "facilitating the involvement of non-participating ISPs in … the Copyright Alert program."

56. 55. In May 2014, RIAA Chairman and CEO Cary Sherman described the Center for Copyright Information CCI as "a model for success."[56] Mr. Sherman lauded "the Alert program and all its accomplishments." He stated that the CAS was "moving the needle," and acknowledged that as the CAS program progressed, "there were fewer and fewer Alerts sent at each level."

---

[45] The "Record Company Plaintiffs" are comprised of Plaintiffs WRI, Atlantic, Bad Boy, Elektra, FBR, Lava, Maverick, Nonesuch, The All Blacks, Warner Music, Warner Records/SIRE, WEA, Sony, Arista Music, Arista Records, LaFace, Provident, Sony Latin, Century, Volcano, Zomba, UMG, and Capitol Records, as defined in Paragraph 37 of Plaintiffs' First Amended Complaint.

[56] Cary Sherman, "CCI: A Model for Success," RIAA.com (May 28, 2014) (available online at https://www.riaa.com/cci-a-model-for-success/).

57. 56. Further, upon information and belief, early reports note that merely sending notices had a meaningful impact on reducing infringement, as evidenced by the fact that fewer subscribers continued to receive subsequent alerts.  Further, the CCI believed that the program would be effective against the vast majority of subscribers engaged in on-line infringement and that "very few subscribers, after repeated alerts, will persist (or allow others to persist) in the content theft."

58. 57. Importantly, the CAS MOU required that the ISPs provide data to the content owners and/or their representatives, so that the participants cancould assess the effectiveness of the program.

**E.   Plaintiffs Withdrawal of Works for Which They Sent Copyright Infringement Notices to Charter**

59. Upon information and belief, the Record Company Plaintiffs claim to own or control the vast majority of music sold in the United States.

60. 58. On information and belief, the Record Company Plaintiffs, through their agent the RIAA, engaged the services of rights -enforcement company MarkMonitor to monitor and detect infringing activity and send notices alleging copyright infringement to Charter. MarkMonitor markets itself as an "antipiracy solution."

61. 59. On March 22, 2019, Plaintiffs sued Charter for contributory infringement and vicarious liability, alleging that Charter's subscribers had infringed at least 11,482 sound recordings and music compositions (the "works in suit").  The works in suit are listed on Exhibits A and B to Plaintiffs' original complaintOriginal Complaint.

62. 60. In connection with these allegations, Plaintiffs claimed that they "own and/or control in whole or in part the copyrights and/or exclusive rights" in the works in suit.

63.   61. In connection with these allegations, Plaintiffs claimed that between March 24, 2013 and May 17, 2016, their "representatives … sent hundreds of thousands of statutory infringement notices to Charter, under penalty of perjury," claiming that Charter's subscribers infringed the works in suit.  The Music Publisher Plaintiffs[67] did not send any notices, however, as the notices were sent only on behalf of the Record Company Plaintiffs' representative, the RIAA.

64   62. On January 15, 2020, Plaintiffs amended the list of works in suit, removing over 450 works from this case (the "Dropped Works").

65.   63. The Record Company Plaintiffs dropped 272 sound recordings and the Music Publisher Plaintiffs dropped 183 music compositions.

66.   64. Upon information and belief, Plaintiffs dropped at least some of these works because, contrary to their allegations, they do not "own and/or control in whole or in part the copyrights and/or exclusive rights" to the works.

67.   For many of the Dropped Works, the claimant listed on the U.S. Copyright Office registration certificate is an entity other than the formerly asserting Plaintiff. Based on review of other publicly available information, these claimant-entities appear independent from the formerly asserting Plaintiff. On information and belief, Plaintiffs sent infringement notices for these Dropped Works despite lacking the right to do so.

---

[67] The "Music Publisher Plaintiffs" is comprised of Plaintiffs Warner Chappell, Warner-Tamerlane, WC Music, W.C.M., Unichappell, Rightsong Music, Cotillion, Intersong, Chappell, Sony/ATV, EMI Al Gallico, EMI Algee, EMI April, EMI Blackwood, EMI Colgems, EMI Full Keel, EMI Longitude, EMI Entertainment, EMI Jemaxal, EMI Feist, EMI Miller, EMI Mills, EMI Unart, EMI U, Famous Music, Jobete, Stone Agate, Gems-EMI, Stone, UMC, MGB, Universal Music Publishing, AB, Publishing Limited, MGB Limited, Z Tunes, Island, MCA Limited, MCA Publishing Limited, Music Corp., Musik Edition, Polygram Publishing, and Songs of Universal, as defined in Paragraph 80 of Plaintiffs' First Amended Complaint.

68. 65. Indeed, Plaintiffs only dropped these works after they were ordered in this case to produce further documentation relating to their purported ownership or ability to assert the works in suit in this case.

69. 66. Despite later dropping these works, the Record Company Plaintiffs, or their agent acting on their behalf, nevertheless sent notices to Charter in connection with the Dropped Works, each claiming that theyto "have identified a user … reproducing or distributing an unauthorized copy of a copyrighted sound recording," and stating that the recipient of the notice "may be liable for infringing activity occurring" on Charter's network. The Record Company Plaintiffs further claimed in their notices that the targeted user's "Internet account was used to illegally copy and/or distribute copyrighted music over the Internet" and that the notice contained "the details of the illegal file-sharing, including the time, date, and a sampling of the music shared."  The Record Company Plaintiffs' notices "assert that the information in the notice is accurate" and that theythe sender had "have a good faith belief that this activity is not authorized by the copyright owner, its agent, or the law."  The notices further stated that "[u]nder penalty of perjury," that "the RIAA is authorized to act on behalf of its member companies in manners involving the infringement of their sound recordings, including enforcing their copyrights and common law rights on the Internet."

70. 67. While the Music Publisher Plaintiffs did not send any notices for the music compositions in suit to Charter, the Music Publisher Plaintiffs' infringement claims in this case purportedly rely on notices sent by the Record Company Plaintiffs to Charter, including those for the Dropped Works.

71 68. Upon information and belief, at least in connection with the Dropped Works, the Record Company Plaintiffs sent notices to Charter with inaccurate information, including but

not limited to the misrepresentation that the RIAA was authorized on behalf of Plaintiffs to send a notice relating to these allegedly infringed works, that the Record Company Plaintiff on whose behalf the notice was sent owned or controlled the work, and that the actions alleged to have been taken by Charter's subscribers constituted infringement of the Record Company Plaintiffs' rights.

72. 69. Upon information and belief, the Record Company Plaintiffs did not own the Dropped Works when they sent notices for them.

73. 70. Upon information and belief, the Record Company Plaintiffs did not have the right to send notices to Charter for the Dropped Works.

74 Upon information and belief, Plaintiffs, as a matter of practice, do not confirm whether they "own and/or control in whole or in part the copyrights and/or exclusive rights" to works before notices are sent to ISPs, like Charter.

75. 71. After Plaintiffs identified the works in suit, including the Dropped Works, Charter investigated Plaintiffs' purported ownership or control of the Dropped Works, or whether the Record Company Plaintiffs otherwise had the right to send notices to Charter for them.

76 72. Many of the same record companies and music publishers that are Plaintiffs in this case pursued damages in *Sony Music Entertainment et al. v. Cox Communications, Inc. et al.*, Case No. 1:18-cv-950 (LO/JFA) (E.D. Va.) ("*Sony*") for certain of the Dropped Works, and the. The jury in the *Sony* case returned a verdict for certain of the Dropped Works in an amount of nearly $100,000 per work.

77. Yet for many other Dropped Works that were also originally asserted in *Sony*, Plaintiffs dropped those works in *Sony* before trial, further demonstrating their belief that they did not possess the right to send notices for these Dropped Works.

78. In this case, Plaintiffs' counsel could not confirm to the Court either that each of the *Sony* record companies and music publishers owned or controlled each of the works at issue in that case or was the correct legal entity to obtain an award of statutory for each of those works.

79. ~~73.~~ Upon information and belief, Plaintiffs devote substantial resources to protecting and exploiting the copyrights they claim to own or control.

80. ~~74.~~ Upon information and belief, at all times, Plaintiffs had or should have had knowledge of the status of their purported ownership or control of copyrights when they sent infringement notices regarding those copyrights, including those at issue in this case.

81. Plaintiffs sent millions of notices to ISPs during the Claim Period, including hundreds of thousands of notices to Charter.

82. Charter could not have discovered that Plaintiffs' notices for the Dropped Works were inaccurate until January 15, 2020, after Plaintiffs dropped the works from this case and Charter analyzed Plaintiffs' notice data.

**F.    The Unreliability of Plaintiffs' Copyright Infringement Notices**

83. ~~75.~~ Notices of alleged copyright infringement, such as those Plaintiffs' agents submitted to Charter, can be unreliable.

84. ~~76.~~ Academic studies have demonstrated that copyright infringement notices sent by third parties to online service providers can be unreliable and are prone to error.

85. ~~77.~~ For example, a 2016 study examined a sample of 288,675 copyright infringement notices that were sent to online service providers between May 1, 2013 and October

31, 2013 (the "Study Period").  Jennifer Urban, et al., *Notice and Takedown in Everyday Practice* (2016) ("Urban Study").[78]

86.  ~~78.~~ The Urban Study found that 4.2% of the infringement claims examined "were fundamentally flawed because they targeted content that clearly did not match the identified infringed work." *Id.* at 88. In addition, 28.4% of notices that the Urban Study examined "had characteristics that raised clear questions about their validity," including notices with "multiple potential issues." *Id.*

87.  ~~79.~~ Because some notices in the sample set for the Urban Study contained multiple requests, these notices together represented over 100 million claims of infringement. *Id.*

88.  ~~80.~~ The RIAA sent notices that were included in the sample that the Urban Study analyzed.

89.  ~~81.~~ MarkMonitor sent notices that were included in the sample that the Urban Study analyzed.

90.  ~~82.~~ The Urban Study also discussed specific instances in which notices sent by MarkMonitor were "clear mismatches" between the allegedly infringed work~~,~~ and the online content that was allegedly infringing. *Id.* at 92.

91.  ~~83.~~ The Urban Study also identified MarkMonitor as having sent tens of thousands of notices during the Study Period alleging infringement by file-sharing websites that had been "dead more than 18 months." *Id.* at 89-90.

92.  ~~84.~~ Multiple news stories, including stories from the time period covered by Plaintiffs' copyright infringement allegations, reported errors in notices sent by MarkMonitor to online service providers. For example, in February and March ~~of~~ 2013, multiple news stories

---

[78] Available online at https://papers.ssrn.com/sol3/Delivery.cfm/SSRN_ID2938642_code1788303.pdf?abstractid=2755628&mirid=1 (last visited March 11, 2020).

highlighted instances in which MarkMonitor (under the name Dtecnet, a division of MarkMonitor) had sent erroneous copyright infringement notices to online service providers.

93. 85. A February 3, 2013 news story reported that Dtecnet, a division of MarkMonitor, had sent copyright infringement notices to Google, alleging that HBO's own website contained infringing copies of HBO's copyrighted content. *See* Ernesto Van der Sar, "HBO Wants Google to censor HBO.com," TorrentFreak (February 3, 2013).[89]

94 86. A March 1, 2013 news story reported that Dtecnet, a division of MarkMonitor, had misidentified a modified version of an online game as a television show, resulting in issuance of multiple incorrect inaccurate copyright infringement notices. *See* Masnick, Mike, "System Used By New Six Strikes CAS, Falsely Identifies Game Mods As NBC TV Shows," TechDirt.com (Mar. 1, 2013).[910]

95 87. MarkMonitor was also the rights -enforcement organization that the CCI employed to detect instances of alleged infringement and send ISP Notices in connection with the CAS.

96 88. In 2012, the CCI hired the firm Stroz Friedberg to perform an assessment of MarkMonitor's technology in connection with the CAS.

97 89. Stroz Friedberg had been retained by the RIAA as a lobbying firm from 2004 through 2009.

98. 90. The Stroz Friedberg assessment contained six recommendations that "focused on improving the accuracy and reliability" of MarkMonitor's processes.

---

[89] Available online at https://torrentfreak.com/hbo-wants-google-to-censor-hbo-com-130203/ (last visited March 11, 2020).

[910] Available online at https://www.techdirt.com/articles/20130224/22341022086/system-used-new-six-strikes-cas-falsely-identifies-game-mods-as-nbc-tv-shows.shtml (last visited March 11, 2020).

99. 91. Among the six recommendations, Stroz Friedberg advised that MarkMonitor should augment the file identification trail. Specifically, Stroz Friedberg stated that the current manual verification process employed by MarkMonitor to review the first instance of an infringed file is key to all subsequent steps in its process. Thus, if a file were to be improperly verified as infringing as a result of improper or incomplete review, it would generate a ripple effect through the entire AntiPiracy workflow, resulting in the collection and generation of notices for non-protected works. MarkMonitor advised that the potential exposure of risk at this juncture warranted supplemental mitigating measures.

100. 92. Stroz Friedberg further explained that MarkMonitor generates notices for allegedly infringing files before it has verified those files as authentic. MarkMonitor stated that this process results in the collection of thousands of files that are later determined to be not infringing. MarkMonitor also stated that this process increases the chances that notices will be generated for non-infringing files.

101. 93. After it was reported that Stroz Friedberg has had been a lobbyist for the RIAA between 2004 and 2009, the CCI hired a second consulting firm, Harbor Labs, to conduct another review of MarkMonitor's system.

102. 94. Harbor Labs did not analyze MarkMonitor's system directly but relied on test results conducted previously by Stroz Friedberg as part of its assessment in 2012.

103. 95. On December 5, 2012, Harbor Labs released its evaluation, in which it stated that MarkMonitor should undergo consistent and regular end-to-end testing, improve its verification approaches, and improve its controls over employee access to sensitive data.

104. 96. Specifically, Harbor Labs noted that MarkMonitor does not maintain any precision-relevant metrics on its live system. In other words, except for in the event a recipient

of a notice complains that the notice is inaccurate, MarkMonitor does not maintain any data confirming its notices are accurate.

105. 97. On information and belief, Plaintiffs have not directly sued providers of P2P software, and/or companies or individuals who host, index, or link to infringing copies of the works in suit.

106. 98. On information and belief, Plaintiffs have not sued any individual direct infringers for the infringements they allege here.

107. 99. Charter brings ClaimClaims I and II for declaratory relief based upon explicit threats and actual litigation by Plaintiffs against Charter. An actual case or controversy exists within the meaning of 28 U.S.C. § 2201 as to whether Charter bears liability pursuant to the claims threatened by Plaintiffs in and out of court. A judicial determination is necessary and appropriate at this time so that the parties may ascertain their respective rights and obligations, if any.

### G.    Plaintiffs' Rampant and Deceptive Enforcement Conduct

108   Upon information and belief, the Record Company Plaintiffs, through their agent the RIAA, send notices of alleged copyright infringement for works they do not own or otherwise have the right to enforce.

109.   The Record Company Plaintiffs, along with the RIAA, have engaged in a decades-long campaign against consumers, threatening expensive, time-consuming litigation, and wielding the prospect of outsized and disproportionate statutory damages.

110.   For example, between approximately 2004 and 2009, the record industry initiated over 30,000 lawsuits against individuals who were alleged to have downloaded music on

peer-to-peer networks. Many of these individuals were forced to settle their suits, out of fear, as one court observed:

> There is a huge imbalance in these cases. The record companies are represented by large law firms with substantial resources. The law is also overwhelmingly on their side. They bring cases against individuals, individuals who don't have lawyers and don't have access to lawyers and who don't understand their legal rights.
>
> Some category of individuals are defaulted because they read the summons, and they haven't the foggiest idea what it means and don't know where to go, so they're defaulted, and they owe money anywhere from $3,000 to $10,000 as a result of these defaults.[11]

111    The Record Company Plaintiffs, through the RIAA, exploit and leverage this imbalance of knowledge and resources in order to extract settlements from the consuming public. Upon information and belief, in order to do so, the Record Company Plaintiffs and/or the RIAA exploit sound recordings beyond their legal entitlement.

112.    The Record Company Plaintiffs' practices also target ISPs, like Charter, whose subscribers are consumers of Plaintiffs' goods.

113.    As an ISP, Charter receives Plaintiffs' notices and, in turn, passes them onto its subscribers. In certain circumstances, the subscribers question the veracity of the notices. As a result, Charter bears the cost and burden of processing Plaintiffs' notices and engaging with its subscribers to address these and other issues as a result of Plaintiffs' actions. To the extent the notices that Charter forwards to its subscribers contain inaccurate allegations of copyright infringement, Charter suffers harm to its reputation and loses the goodwill of its subscribers.

**H.    The Works in Suit Constitute a Small Percentage of Each Plaintiff's Catalogue**

---

[11] *Capitol Records, Inc. et al. v. Noor Alaujan, et al.*, Case No. 03-11661-NG (D. Mass.), June 7, 2008 Mot. Hr'g Tr. at 8:14-25.

114.    Plaintiffs allege to collectively own or control the vast majority of music exploited in the United States, if not the world.

115.    Upon information and belief, Plaintiffs collectively own or control *many millions* of works. Yet in this case, they collectively only assert the alleged infringement of 11,027 works.

116    For example, of the 66 individual Plaintiffs, approximately 45 assert fewer than 100 works each. Many of these Plaintiffs assert only a handful of works and, in some cases, all from the same album(s) and/or recording artist(s).

117.    Even the Plaintiffs that assert the highest numbers of works in suit—*i.e.*, Sony Music Entertainment, Inc. (approx. 2,283), UMG Recordings, Inc. (approx. 1,903), and WC Music Corp. (approx. 822)—assert infringement of only a very small percentage of the total number of works that each of those Plaintiffs owns or controls.

118    Based on the foregoing, it is clear that Plaintiffs are suing on only a small percentage of the total number of works that each owns or controls.

119.    Of this small percentage of works owned or controlled by each Plaintiff asserted in this case, upon information and belief, Plaintiffs have not elected to only sue for infringement of their most popular works.

120    Of this small percentage of works owned or controlled by each Plaintiff asserted in this case, upon information and belief, Plaintiffs have not elected to only sue for infringement of their most profitable works.

121    Of this small percentage of works owned or controlled by each Plaintiff asserted in this case, upon information and belief, Plaintiffs have not elected to only sue for infringement of their works that were allegedly infringed most frequently during the Claim Period.

122.   Plaintiffs instead elected to sue for infringement of those works for which they claim a Charter subscriber infringed after that subscriber was the subject of "multiple" prior infringement notices received by Charter, as they allege. *See, e.g.*, First Amended Complaint, ¶¶ 5, 9, 101, 109, 115, 118.

## CLAIM ONE

### FOR A DECLARATORY JUDGMENT THAT CHARTER IS NOT LIABLE FOR CONTRIBUTORY INFRINGEMENT OF PLAINTIFFS' WORKS AT ISSUE

123   100.   Charter repeats the allegations in Paragraphs 1 through 99122 and incorporates them here.

124   101.   Charter provides high-speed Internet service that enables its subscribers to access the Internet and the myriad of services that Internet access enables and provides. Charter itself does not store its subscribersubscribers's content on its servers in connection with its ISP service, does not host websites that index infringing files, does not and did not promote the ability to infringe on its network, and does not create or distribute peer-to-peer file-sharing software or other file-sharing software.

125.   102.   Charter's ISP system is capable of substantial non-infringing uses.

126.   103.   Charter cannot itself detect infringement occurring on its system or the Internet.

127.   104.   Charter lacked the ability to verify Plaintiffs' allegations of infringement.

128   105.   The systems Plaintiffs used to detect infringement and send copyright infringement notices were unreliable and were known to be unreliable.

129.   106.   Charter lacked knowledge of any acts of copyright infringement by others particularly claimed by Plaintiffs in this action.

130. ~~107.~~ Charter lacked knowledge of any acts of copyright infringement by others generally claimed by Plaintiffs in this action.

131. ~~108.~~ Charter has not materially contributed to any third party's violation of Plaintiffs' exclusive right to reproduce works in copies under 17 U.S.C. § 106(1).

132. ~~109.~~ Charter has not materially contributed to any third party's violation of Plaintiffs' exclusive right to prepare derivative works based upon Plaintiffs' copyrighted works under 17 U.S.C. § 106(2).

133. ~~110.~~ Charter has not materially contributed to any third party's violation of Plaintiffs' exclusive right to distribute copies of Plaintiffs' copyrighted works to the public by sale or other transfer of ownership, or by rental, lease, or lending under 17 U.S.C. § 106(3).

134. ~~111.~~ Charter has not materially contributed to any third party's violation of Plaintiffs' exclusive right to perform Plaintiffs' copyrighted works publicly in copies under 17 U.S.C. § 106(4).

135. ~~112.~~ Charter has not materially contributed to any third party's violation of Plaintiffs' exclusive right to display Plaintiffs' copyrighted works publicly ~~works~~ in copies under 17 U.S.C. § 106(5).

136. ~~113.~~ Charter has not materially contributed to any third party's violation of Plaintiffs' exclusive right to perform Plaintiffs' copyrighted sound recordings publicly by means of a digital audio transmission under 17 U.S.C. § 106(6).

137. ~~114.~~ Charter is entitled to a declaration that it is not liable to Plaintiffs, or any of them, on account of copyright infringement by others.

**CLAIM TWO**

**FOR A DECLARATORY JUDGMENT THAT CHARTER IS NOT LIABLE FOR VICARIOUS INFRINGEMENT OF PLAINTIFFS' WORKS AT ISSUE**

70

138.    Charter repeats the allegations in Paragraphs 1 through 137 and incorporates them here.

139.    At all relevant times, Charter lacked the ability, including the practical ability, to supervise its subscribers.

140    At all relevant times, Charter lacked the ability, including the practical ability, to control its subscribers.

141    At all relevant times, the sole means of control Charter had over a subscriber's use of the Internet was Charter's ability to disable Internet service or terminate the subscriber's account, thereby removing the customer's ability to access the Internet for any purpose.

142    Charter did not, and does not, have a direct financial interest in infringement of Plaintiffs' works, if any, that occurred on Charter's system or network.

143    Charter did not, and does not, receive a direct financial benefit as a result of any copyright infringement that may occur over its network.

144.    Copyright infringement occurring over Charter's ISP system can slow traffic and adversely impact the transmission of data for all users of the system. These effects harm both Charter and its users.

145    At all relevant times, Charter provided Internet access service to its residential subscribers for a flat monthly fee. Charter's fees are not based on the particular uses customers make of its ISP system, including whether that customer is alleged to have infringed.

146    To the extent any of Plaintiffs' works are available to infringe on P2P networks, including the works in suit, they are accessible generally on the Internet, not just by Charter's subscribers.

147.   Because of this fact, Plaintiffs allege that P2P infringement of their works (not limited to their works in suit) has greatly affected their respective businesses. But Plaintiffs do not (and could not) allege that *all* of this alleged infringement occurred using Charter's service.

148.   Further, Plaintiffs only assert that Charter is secondarily liable for the infringement of a small percentage of the total number of works that each Plaintiff owns or controls.

149   Of this small percentage of works owned or controlled by each Plaintiff asserted in this case, upon information and belief, Plaintiffs have not elected to only sue for infringement of either their most popular works, their most profitable works, their works that were allegedly infringed the most by Charter's subscribers during the Claim Period, or their works that were allegedly infringed the most across *all* networks. Instead, Plaintiffs have sued only on those works that were allegedly infringed by Charter's subscribers after that subscriber was the subject of multiple prior infringement notices.

150.   Each Plaintiff cannot demonstrate that infringement of their respective works in suit served as a draw to subscribe to Charter's ISP service, as required to establish vicarious liability. *See, e.g., Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 674 (9th Cir. 2017); *UMG Recordings, Inc. v. Grande Communs. Networks, LLC*, 2018 U.S. Dist. LEXIS 160492, at *9 (W.D. Tex. Sep. 20, 2018).

151.   Charter is entitled to a declaration that it is not vicariously liable to Plaintiffs, or any of them, on account of copyright infringement by others for the works in suit.

### CLAIM THREE

**VIOLATION OF DMCA SECTION 512(f) FOR KNOWINGLY SENDING
MATERIALLY INACCURATE NOTICES OF ALLEGED INFRINGEMENT**

152.    Charter repeats the allegations in Paragraphs 1 through ~~114~~151 and incorporates them here.

153.    ~~115.~~ Upon information and belief, during the Claim Period, the Record Company Plaintiffs sent notices to Charter that contained inaccurate information, including but not limited to the misrepresentation that the RIAA was authorized on behalf of the Record Company Plaintiffs to send a notice relating to these allegedly infringed works, that the Record Company Plaintiff on whose behalf the notice was sent owned or controlled the work, and that the actions alleged to have been taken by Charter's subscribers constituted infringement of the Record Company Plaintiff's rights.

154    ~~116.~~ Upon information and belief, the Record Company Plaintiffs knew or should have known, that the notices contained inaccurate information before they were sent.   For example, the Record Company Plaintiffs knew, or should have known, that they did not own or control certain of the works identified in notices sent to Charter before they were sent.

155.    ~~117.~~ Upon information and belief, the Record Company Plaintiffs became aware of the fact that they did not own or control certain works or, alternatively, they did not have the permission to send infringement notices relating to certain works.   Upon information and belief, Plaintiffs nevertheless sent, or authorized the sending of, notices to Charter, despite this knowledge.

156.    Upon information and belief, the fact that the Record Company Plaintiffs authorized the sending of numerous infringement notices for works that they did not own or control evinces a lack of a good-faith belief that the statements in their notices were accurate.

157    ~~118.~~ During the Claim Period, Charter received notices from the Record Company Plaintiffs that it could not verify.   Specifically, Charter could not verify whether any of the

Plaintiffs owned or controlled the work identified in the notice. Charter also could not verify whether the sender of the notice was authorized to send it. Charter also could not verify whether the activity that was alleged in the notice constitute copyright infringement.

158. ~~119.~~ During the Claim Period, Charter relied on the Record Company Plaintiffs' statement that "the information in the notice is accurate" and that Plaintiffs "have a good faith belief that this activity is not authorized by the copyright owner, its agent, or the law."

159. ~~120.~~ In reliance on these representations, Charter accepted the notices and processed them accordingly.  This includes, but is not limited to, accepting each notice into its CATS, processing it, forwarding it to the referenced subscriber, and taking any further necessary action.

160.   The steps Charter took in response to receiving Plaintiffs' inaccurate notices can result in the "removal or blocking" of the noticed material.

161. ~~121.~~ Charter also incurs costs in implementing its CATS, including when processing Plaintiffs' inaccurate notices.

162. ~~122.~~ Charter is also injured when it processes inaccurate notices, causing it to forward false accusations to its subscribers, to the extent this creates tension with the impacted subscribers, negatively affects goodwill, and causes reputational harm to Charter.

163. ~~123.~~ Charter was ~~also~~additionally injured through its investigation of the veracity of the notices for the Dropped Works, including whether Plaintiffs owned or controlled the works when the Record Company Plaintiffs sent notices for them, including to the extent they relate to the Music Publisher Plaintiffs' Dropped Works, or whether the Record Company Plaintiffs had the right to send notices to Charter for the Dropped Works.

164.    ~~124.~~ Charter was ~~also~~further injured through its defense of the allegations concerning fallacious notices, including determining whether Plaintiffs' own or control the works when the Record Company Plaintiffs sent the notices or whether the Record Company Plaintiffs had the right to send notices to Charter for the Dropped Works, including to the extent they relate to the Music Publisher Plaintiffs' Dropped Works.

165.    Charter could not have discovered that Plaintiffs' notices for the Dropped Works were inaccurate until January 15, 2020, after Plaintiffs dropped the works from this case and Charter subsequently analyzed Plaintiffs' notice data.

**CLAIM FOUR**

**VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT, COLO. REV. STAT. 6-1-101 *et seq.* ("CCPA")**

166.    Charter repeats the allegations in Paragraphs 1 through 165 and incorporates them here.

167    The Record Company Plaintiffs engaged in an unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice in the course of their business, by knowingly or recklessly sending, and causing to be sent, copyright infringement notices concerning works for which they did not own the rights and for which they lacked authorization to send such notices.

168    In the course of their business, the Record Company Plaintiffs caused their agent, the RIAA, to engage in unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent trade practices, as described above.

169.    In the course of Charter's business, it has been injured by the Record Company Plaintiffs' deceptive trade practice described above, including because Charter has incurred costs

in implementing its CATS system and its customer service operations in receiving, processing, and forwarding the Record Company Plaintiffs' inaccurate notices.

170.     Charter was also injured in the course of its business when it processed those inaccurate notices and thereby forwarded false accusations to its subscribers, including to the extent this created tension with the impacted subscribers, negatively affected Charter's goodwill, and caused reputational harm to Charter.

171     Charter was also injured in the course of its business by the cost and burden of investigating the veracity of those inaccurate notices for the Dropped Works, including: investigating whether Plaintiffs owned or controlled the works at the time(s) the Record Company Plaintiffs sent notices for them; investigating the extent to which those works related to the Music Publisher Plaintiffs' Dropped Works; and investigating whether the Record Company Plaintiffs otherwise had the right or were authorized to send notices to Charter for the Dropped Works.

172.     Charter was also injured in the course of its business by being required to defend itself against Plaintiffs' allegations concerning the Dropped Works and the inaccurate notices, including: determining whether Plaintiffs owned or controlled the works at the relevant times, or whether the Record Company Plaintiffs had the right to send notices to Charter for the Dropped Works; and determining the extent to which the sound recordings at issue in the notices related to the Music Publisher Plaintiffs' Dropped Works.

173     On information and belief, the Record Company Plaintiffs own or control a significant share of the recorded music distributed, sold, and publicly performed in the United States. Thus, their conduct in sending inaccurate notices to Charter impacted actual and/or potential consumers of the Record Company Plaintiffs' goods, services, and property.

174.     The Record Company Plaintiffs' actions in sending and causing to be sent inaccurate notices to ISPs like Charter—which notices are in turn forwarded to members of the public—significantly impacts these members of the public, who are falsely led to believe that they have violated the law, and who are instructed to take actions based on inaccurate notices and otherwise coerced to comply with baseless threats based on the inaccurate notices.

175.     The Record Company Plaintiffs' conduct caused injury to Charter, and Charter has been and continues to be irreparably harmed by those actions and has no adequate remedy at law.

176.     Upon information and belief, the Record Company Plaintiffs engaged in the conduct described above in bad faith, and their conduct was fraudulent, reckless, willful, knowing, and/or intentional.

177     The Record Company Plaintiffs' conduct described above constitutes deceptive trade practices in violation of the Colorado Consumer Protection Act, including at least violations of Colo. Rev. Stat. § 6-1-105(1)(e) and (kkk), and § 6-1-105(3).

178     Charter could not have discovered that Plaintiffs' notices for the Dropped Works were inaccurate until January 15, 2020, after Plaintiffs dropped the works from this case and Charter subsequently analyzed Plaintiffs' notice data.

## DEMAND FOR JURY TRIAL

Defendant hereby requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Defendant Charter Communications, Inc. respectfully requests that this Court enter judgment as follows:

a.      Judgment against Plaintiffs and in favor of Defendant on Plaintiffs' claims set forth in the First Amended Complaint and dismissal of such claims with prejudice;

b.      A declaratory judgment, holding that Defendant is not liable for contributory infringement of Plaintiffs' works at issue;

c.      A declaratory judgment, holding that Defendant is not vicariously liable for infringement of Plaintiffs' works at issue;

d      ~~c.~~ For damages, in an amount up to the maximum provided by law, arising from Plaintiffs' violation of 17 U.S.C. 512(f);

e.      For damages, in an amount up to the maximum provided by law, arising from Plaintiffs' violation of Colo. Rev. Stat. 6-1-101 *et seq.*, including but not limited to three times Charter's actual sustained damages and prejudgment interest;

f      ~~d.~~ Ordering Plaintiffs to pay Defendant's reasonable attorneys' fees and costs incurred in connection with this action pursuant to 17 U.S.C. § 505 and/or § 512(f); and

g.      ~~e.~~ Such other and further relief in Defendant's favor as the Court shall deem just and proper.


Dated: ~~March 18~~April 29, 2020                    Respectfully submitted,


                                                          s/ Jennifer A. Golinveaux
Michael S. Elkin ~~(pro hac vice)~~          Jennifer A. Golinveaux ~~(pro hac vice)~~
Thomas Patrick Lane ~~(pro hac vice)~~       WINSTON & STRAWN LLP
Seth E. Spitzer ~~(pro hac vice)~~           101 California Street, 35th Floor
WINSTON & STRAWN LLP                          San Francisco, CA  94111-5840
200 Park Avenue                               (415) 591-1506 (telephone)
New York, NY 10166                            (415) 591-1400 (facsimile)
(212) 294-6700 (telephone)                    E-mail: jgolinveaux@winston.com
(212) 294-4700 (facsimile)
E-mail: melkin@winston.com                    Craig D. Joyce
E-mail: tlane@winston.com                     John M. Tanner
E-mail: sspitzer@winston.com                  Fairfield and Woods, P.C.
                                              1801 California Street, Suite 2600
Erin R. Ranahan ~~(pro hac vice)~~            Denver, Colorado 80202
Shilpa A. Coorg ~~(pro hac vice)~~            (303) 830-2400 (telephone)
WINSTON & STRAWN LLP                          (303) 830-1033 (facsimile)
333 S. Grand Avenue                           E-mail: cjoyce@fwlaw.com
Los Angeles, CA 90071

(213) 615-1933 (telephone)         *Counsel for Defendant*
(213) 615-1750 (facsimile)         *Charter Communications, Inc.*
E-mail: eranahan@winston.com
E-mail: scoorg@winston.com