**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| WARNER BROS. RECORDS INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CHARTER COMMUNICATIONS, INC., <br><br> Defendant. | Case No. 19-cv-00874-RBJ |

**CHARTER'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR LEAVE TO CONDUCT DISCOVERY OUTSIDE THE
DISCOVERY LIMITS AND ON AN EXPEDITED BASIS REGARDING
CHARTER'S SPOLIATION OF ELECTRONIC DATA**

Plaintiffs' motion mischaracterizes facts and correspondence in a transparent attempt to poison the well regarding the inadvertent loss of data voluntarily disclosed by Charter. Plaintiffs' motion is unnecessary, as Charter agreed to provide the majority of the discovery sought by Plaintiffs before the instant motion was filed or threatened. *See* Rosenthal Decl. Ex. 3 at 1-6. After the conclusion of its own investigation, Charter engaged in a transparent dialogue with Plaintiffs concerning Charter's voluntary disclosure that it inadvertently lost emails for custodians who were deemed to have information potentially relevant to Plaintiffs' claims.[1] The parties have exchanged seven letters and eight substantive emails. *See* Rosenthal Decl. Ex. 3. Charter has answered Plaintiffs' 32 written questions (48 including numbered subparts) regarding the loss. *See* Rosenthal Decl. Ex. 2. At no time has Charter denied that Plaintiffs are entitled to take discovery in order to test the bases for Charter's disclosure, subject to reasonable and proportional limits informed, at least in part, by the current, ongoing, nationwide pandemic.

---

[1] *See* Section II, *infra*.

1

Specifically, Charter has *already agreed* to the following:

- ***25 Additional RFPs***. Plaintiffs requested Charter agree to 25 additional Requests for Production specific to the disclosed email loss, with objections and responses due within 15 days and production to begin 15 days after that. Charter agreed to 25 additional Requests for Production (including subparts) specific to the disclosed email loss. *See* Rosenthal Decl. Ex. 3 at 3.

- ***Timing of Production***. Plaintiffs did not previously raise to Charter its current request that Charter's document production should begin 15 days after its written responses, but instead previously insisted that those *responses* should be provided in 15 days, with document production to begin 15 days after that. *See* Rosenthal Decl. Ex. 3 at 6. While Charter will undertake all reasonable steps to produce documents (subject to objections) as soon as practical, the parties may need to meet and confer over the Requests. Moreover, the present Covid-19 circumstances will complicate the production of documents and logs on Plaintiffs' proposed timetable, as many Charter employees, like much of the country, are working remotely. The production of a privilege log within 15 days is particularly problematic as Charter's legal department coordinates the relevant litigation preservation processes, and thus a large number of privilege documents can be expected to be implicated by Plaintiffs' Requests.

- ***Rule 30(b)(6) Deposition re E-Mail Loss***. Plaintiffs requested Charter agree to a 30(b)(6) deposition focused on "Charter's data-destruction issues—including Charter's ticket data deletion policies," and that this deposition not count toward Plaintiffs' 20 deposition limit. Subject to the ability to respond to the notice and a chance to meet and confer over its scope, Charter *agreed* to a 30(b)(6) deposition on the e-mail loss

issues. *See* Rosenthal Decl. Ex. 3. Charter does object to a Rule 30(b)(6) deposition outside the scope of the Scheduling Order regarding ticket data as further addressed below.

- ***Fact Deposition re E-mail Loss***. With respect to taking five fact depositions outside the Scope of the Scheduling Order, Charter suggested that Plaintiffs should first proceed with the agreed additional Rule 30(b)(6) deposition before proceeding with further fact depositions. *See* Rosenthal Decl. Ex. 3 at 3. Certainly, the taking of that Rule 30(b)(6) deposition will inform whether and to what extent additional fact depositions are appropriate. Plaintiffs have not articulated why they believe there is good cause to take the five extra fact depositions they seek before they have asked a single question of the 30(b)(6) designated witness(es) Charter has agreed to produce.

Plaintiffs' inclusion of issues relating to ticket data in its motion is entirely misplaced, and seeks to conflate a reasonable retention policy with the separate loss issues relating to emails. In doing so, Plaintiffs insist that they are also due special discovery in connection with data related to Charter's Copyright Abuse Tracking System ("CATS"). Mot. at 2-8; Sahni Decl. Ex. 1 & 2 (Requests for Production and Rule 30(b)(6) Deposition Notice, both containing questions/topics related to retention of CATS data). Plaintiffs' overreaching efforts to characterize Charter's reasonable retention schedule for CATS data as a "deletion policy," is nothing more than an exercise in smoke and mirrors. Mot. at 5. Charter has already produced to Plaintiffs its detailed retention schedule for the relevant period, and relevant CATS data was maintained in accordance with that schedule. Plaintiffs have not alleged any facts on which to conclude or even suspect that Charter improperly deleted relevant CATS data "that should have been preserved in the anticipation or conduct of litigation." Fed. R. Civ. P. 37(e). Charter has provided extensive

3

discovery as to the CATS data Plaintiffs seek, and there is no basis to expand discovery specific to this issue.[2]

## RELEVANT BACKGROUND

Contrary to the hyperbole of Plaintiffs' Motion, Charter has not "spoliated the vast majority of ESI relevant to this case." Mot. at 1. This mischaracterization is just one of several Plaintiffs advance to support the allegation that they have suffered "severe and oppressive" prejudice, before that issue is properly before the Court, and before the Plaintiffs have even asked a single witness about what the lost ESI might have contained.

**A. Inadvertent Loss of E-mails.**

Though Charter has retained several million emails from the current custodians in this case, Charter voluntarily disclosed the email loss that occasioned Plaintiffs' Motion after conducting, by and through counsel, a thorough investigation into its causes and scope. This investigation revealed that Charter took reasonable steps to preserve for litigation information that might be relevant to the Plaintiffs' claims. Specifically, in response to a threat of litigation from a music publisher, Charter issued a written legal hold, placed on hold custodians likely to have information relevant to the subject-matter of the anticipated litigation, and collected and preserved existing data in the possession of those custodians. Rosenthal Decl. Ex. 2 at 4, Question 7 and Response. This latter data included 506,381 email messages at that time already present within Charter's email preservation storage system which the nine impacted custodians had sent or received. Rosenthal Decl. Ex. 2 at 5, Question 10 and Response. Charter also set its servers to automatically

---

[2] It remains unclear the extent to which the ticket data issue is part of the instant motion. While the proposed Rule 30(b)(6) deposition notice and the request for productions include specifications relating to the ticket data, the instant motion does not directly address that discovery, including whether Plaintiffs are seeking that discovery outside the confines of the Scheduling Order and/or on an expedited basis. Charter intends to object to the ESI related discovery to the extent it is directed at ticket data in due course when it serves its written responses and objections to that discovery.

save to the archive any new email messages that those custodians sent or received after the date the hold was initiated. Rosenthal Decl. Ex. 1 at 2. Plaintiffs subsequently first notified Charter of their intent to file suit approximately three months later, in March 2016, and Charter and the Plaintiffs agreed to toll Plaintiffs' claims over the next few months. Rosenthal Decl. ¶5.

While Plaintiffs' claims were tolled, and independent of this matter, Charter's legal department undertook to change the vendors and software it uses to manage legal holds and archived data subject to those holds. Specifically, it transferred its preserved email data (including the 506,381 messages described above, and any new messages sent or received by the nine impacted custodians between January 2016 and the close of fact discovery on May 17, 2016) for all legal matters to a new archiving system, and it transitioned its legal hold management to a new software tool. Rosenthal Decl. Ex. 1 at 2. In the course of the latter transition, Charter inadvertently failed to transfer the aforementioned legal hold, and a number of others, into the new tool. *Id*. As a result, some unique messages associated with nine custodians relevant to this action, and not otherwise preserved in relation to other legal hold custodians, were inadvertently deleted. *Id*. Contrary to Plaintiffs' assertions, the universe of data lost consists of some of the messages Charter initially preserved for the impacted custodians, plus the volume of new messages preserved for those custodians during the last four months of the Discovery Time Period (March 24, 2012 – May 17, 2016).

Charter also investigated whether any of the lost emails could be restored or, alternatively, replaced from its other legal hold collections. While complete restoration was not possible, Rosenthal Decl. Ex. 1 at 2, Charter was able to replace some portion of the lost volume. Specifically, just as Charter identified the initial 506,281 messages by searching across its then-existing archive for messages that the custodians sent or received, **Charter performed the same**

*search against the current archive and located 1,194,754 messages from within the Discovery Time Period in this case*.  Rosenthal Decl. Ex. 2 at 12, Question 27b and Response.

### B.   Plaintiffs' Unsupported Claim of Prejudice

Charter does not agree that the lost emails described above (a) are *critical* to Plaintiffs' claims or (b) are *all* critical to Plaintiffs' claims.  Plaintiffs showed very little interest in email-based custodial discovery in this case until Charter revealed that it had inadvertently deleted emails.  Plaintiffs rebuffed Charter's invitation during meet and confer discussions to discuss custodians and search terms last Fall, and did not even show curiosity into the *names* of Charter's ESI custodians (and have never so much as asked about search terms) until their letter of March 11, 2020 ("Please identify the 14 custodians that Charter has identified for this matter."), nearly a year into discovery.  Rosenthal Decl. Ex. 2 at 3, Question 5.  Plaintiffs' sudden claim of critical prejudice from missing emails rings hollow.

Further, Charter has no reason to believe that a substantial portion of the missing email are in fact relevant to this action or responsive to Plaintiffs' Requests for Production, just as not all of the 3 million messages available for all 14 custodians have proven to be relevant.[3]  Plaintiffs point to the small number of email messages Charter has produced for the nine impacted custodians as prima facie evidence that key documents must be missing.  Alternatively, and more accurately, this small volume reflects an overall lack of responsive records in Charter's possession.  By way of comparison, five of Charter's fourteen document custodians were not subject to the email archive deletion.  Rosenthal Decl. Ex. 1.  For these custodians, Charter possesses approximately

---

[3] In another stunning mischaracterization, Plaintiffs' Brief twice misquotes correspondence Plaintiffs attached to their own submission.  Twice Plaintiffs recite that Charter, in reference to the 1.2 million messages Charter was able to locate as replacement for some of the lost messages, stated it "did not mean to imply that these messages 'may be relevant to this action.'"  Mot. at 7, n.3 & 10.  In fact, Charter stated it does not "assume that *all* of these 1,264,704 messages may be relevant to this action." Rosenthal Decl. Ex. 2, Question 27 and Response (emphasis added).  Both common experience (it is never the case that *all* of a document custodian's records are relevant and responsive in a given litigation) and the course of discovery in this very case support that qualification.

1.73 million email messages corresponding to the Discovery Time Period. Rosenthal Decl. ¶ 5. Those messages were searched and the results were reviewed for responsiveness to Plaintiffs' Requests for Production, leading to the production of only 41 responsive messages. Rosenthal Decl. ¶ 6. Similarly, Charter searched the approximately 1.2 million messages it was able to use to replace some of the missing messages, and reviewed those search results for responsiveness to Plaintiffs' requests, leading to the production of eight documents.[4] Rosenthal Dec. ¶ 8. If these rates of relevance may be assumed to hold across the nine custodians impacted by the email loss, Plaintiffs may be missing one or two *dozen* messages, not 500,000 as they imply.[5]

### C. Charter Has Not Spoliated Subscriber Infringement Notice, or "Ticket," Data, and That Data Is Entirely Unrelated to Charter's Deleted Emails.

Plaintiffs have sought extensive discovery related to CATS data in this case and there is no justification, whatsoever, for "extra" discovery related to CATS data on either an expedited basis or outside the confines of the Scheduling Order. Plaintiffs are well aware that CATS data was maintained in accordance with Charter's retention schedule. *See*, *e.g.*, Rosenthal Decl. Ex. 2 at 13, Question 31 and Response. Charter has produced available CATS data responsive to Plaintiffs' requests. As Plaintiffs well know, they first notified Charter of the potential claims at issue in this litigation in a letter sent in March of 2016. Because of the date the operative legal hold was issued, and in accordance with Charter's retention schedule, CATS data related to Plaintiffs' notices is available dating back eighteen months to mid-2014[6]. Although Plaintiffs sued on a Claim Period

---

[4] Plaintiffs claim two messages have been produced for the nine impacted custodians. This tally evidently ignores duplication; in fact, at least one of the nine custodians is a duplicate custodian for eight messages produced.
[5] The learned ESI expert Professor Maura Grossman recently testified that, on average, only one percent of a document custodian's records are found to be responsive in a typical litigation. *See* Rosenthal Decl. Ex. 4 at ¶ 14. Even assuming this more generous rate of relevance were applicable, this would mean only a few thousand responsive messages might have been lost.
[6] Plaintiffs' effort to manufacture an issue related to CATS "ticket data" versus "ticket-table data", Mot. at 2 and n.2, is a side show as both refer to data maintained within CATS about which Plaintiffs are free to inquire during the normal course of discovery. CATS stores copyright notice related data in different tables. The various data Charter

running from March 2013 through May 2016, as they are well aware, the last copyright infringement notice they sent to Charter was in **March 2015**. Consequently, only several months of data relevant to Plaintiffs' notices was available in CATS for preservation as of the date of the hold. Plaintiffs' effort to try to reverse the narrative and blame Charter for the limited data available, rather than their own delay in providing notice of their claims, is entirely misguided. CATS data was maintained in line with reasonable retention policies. Plaintiffs' attempt to manufacture a "spoliation" issue in connection with such data is misguided and should be rejected.

> **D. Charter's Disclosure Relating to the E-mail Loss and Subsequent Correspondence Between the Parties.**

Charter disclosed the findings of its investigation to Plaintiffs via letter on March 4, 2020. Rosenthal Decl. at Ex. 1. Charter has endeavored to be transparent in its disclosures to Plaintiffs while respecting the bounds of relevance and the attorney-client privilege. This has included extensive effort to respond to Plaintiffs' questions—generally sent subject to unilateral, short deadlines—concerning the underlying facts of the email loss, which amounted to 48 written interrogatories (including numbered subparts). *See* Rosenthal Decl. Ex. 2. Plaintiffs' assertions notwithstanding, Charter has not "refused to answer" any questions plaintiffs have posed except those that are plainly irrelevant (*e.g.*, the names and titles of the hundreds of employees from whom Charter was able to replace some of the lost email messages—Rosenthal Decl. Ex. 2 at 11-12, Question 27a and Response), while at least some questions Plaintiffs say Charter has "refused to answer," Plaintiffs have never even posed ("Charter has refused to disclose <u>what other holds it deleted in December 2018</u>, or <u>the extent to which the employees responsible for the removal of the holds on the Nine Spoliated Custodians and deletion of their data were aware of Plaintiffs'</u>

---

identified and produced was collected from such tables and reflects the available data responsive to Plaintiffs' discovery requests.

claims against Charter." Mot. at 10 (emphasis added); *but see* Rosenthal Dec. Ex. 2 at 9-10, Question 20 and Response). Throughout this process, Charter consistently and clearly affirmed that the loss of custodial emails from Charter's email archive had no bearing on the availability of subscriber infringement notice data. Rosenthal Decl. Ex. 2 at 13, Question 31 and Response.

On April 24, Plaintiffs requested that Charter agree to certain additional discovery related to lost ESI. Rosenthal Decl. Ex. 3 at 6. Plaintiffs' requests included a total of 15 additional depositions over and above the 20-deposition limit imposed by the Scheduling Order, 25 additional RFPs subject to a 15-day response deadline, a request for Charter's privileged and work-product notes of interviews both with impacted document custodians and with Charter employees who have knowledge of the events precipitating the email loss, and extension of the subject-matter of the above discovery to include retention policies related to Charter's CATS system. *Id*. With the exception of its work-product notes and the unwarranted extension of these discovery measures to cover the CATS system, Charter broadly agreed to provide Plaintiffs extra discovery into the email loss, subject only to reasonable limits. Rosenthal Decl. Ex. 3 at 3-4. Because while Charter agrees that Plaintiffs are entitled to some discovery to test the factual bases for the disclosures Charter has made to date, it does not agree that Plaintiffs are entitled to a discovery into matters only marginally relevant to Plaintiffs' claims.

## ARGUMENT

I.  **PLAINTIFFS HAVE NOT DEMONSTRATED GOOD CAUSE FOR THEIR REQUESTED DEPARTURES FROM THE FEDERAL RULES AND THE SCHEDULING ORDER.**

The party seeking "to depart from the usual discovery procedures" bears the burden of showing good cause for the deviation. *Panorama Consulting Sols., LLC, v. Armitage*, No. 17-cv-01400-RM, 2017 BL 204803 *1 (D. Colo. June 15, 2017). This includes where a party seeks

9

discovery on an "expedited" basis. *CenturyLink, Inc. v. Alpine Audio Now, LLC*, No. 15-cv-01973-MSK-KLM, 2016 BL 12376 *2 (D. Colo. Jan. 15, 2016). A motion for expedited discovery may be appropriate "where a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings," *Ellsworth Assocs., Inc. v. United States*, 917 F. Supp. 841, 844 (D. Colo. 1996), or where "the evidence sought 'may be consumed or destroyed with the passage of time, thereby disadvantaging one or more parties to the litigation.'" *Id*. at *3 (quoting *Qwest Comm'ns Int'l, Inc. v. WorldQuest Networks, Inc.*, 213 F.R.D. 418, 419 (D. Colo. 2003)).

Here, Plaintiffs seek an order requiring Charter to begin producing documents responsive to Plaintiffs' Third Set of Requests for Production within 15 days of serving its objections and responses, which are due June 3, 2020. Plaintiffs have articulated why the information sought is relevant, which Charter conceded when it agreed to respond to the RFPs without counting them against Plaintiffs' 100-request limit. But Plaintiffs have not articulated why it is necessary that Charter should produce documents faster than is required by the Federal Rules. It cannot be so that Plaintiffs can review those documents prior to their deposition of Charter's corporate designee, because on the same day Plaintiffs filed their Motion, they noticed that deposition for June 3.

Plaintiffs have presented no good reason why Charter should have to depart from the usual discovery procedures and have only 15 days to begin producing documents consistent with its objections and responses. The expedited motion here is particularly inappropriate given the circumstance of Covid-19, which complicates the ability to collect, review and produce documents. Similarly, the request to produce a privilege log within 15 days is also unsupportable. Many of the documents at issue are likely to involve privilege actors or privileged information, given that the inadvertent loss occurred when Charter's legal department was migrating legal hold tracking and e-mail archiving systems. Charter will undertake to expedite the production as soon

as practicable under the circumstances, including engaging in rolling productions if feasible. Charter will keep the Plaintiffs apprised of the status of their collection, production and logging efforts. In the event that the Plaintiffs feel that Charter is not moving swiftly enough, the Plaintiffs can always revisit the issue with the Special Master. In short, there is no reason for the expedited production dates called by Plaintiffs' motion.

## II. PLAINTIFFS HAVE NO GOOD CAUSE TO SEEK THE DEPOSITION OF FIVE FACT WITNESSES RELATED TO THE EMAIL ESI LOSS, AND THE DISCOVERY SOUGHT IS NOT PROPORTIONAL TO THE NEEDS OF THE CASE AT THIS TIME.

The scope of all discovery is limited to non-privileged matter that is:

> . . . relevant to any party's claim or defense **and** proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1) (emphasis added). In short, permissible discovery encompasses only that which is relevant and proportional. *Davis v. United States Dep't of Veterans Affairs*, No. 16-CV-00701-CBS, 2017 WL 3608192, at *8 (D. Colo. Aug. 22, 2017), aff'd, 730 F. App'x 571 (10th Cir. 2018) (Shaffer, J.) ("relevancy alone is no longer sufficient – discovery must also be proportional to the needs of the case") (quoting *In re: Bard IVC Filters Prod. Liab. Lit.*, 2016 WL 4943393 at *2 (D. Ariz. Sept. 16, 2016)).

"[T]he proportionality concept seeks to 'eliminate unnecessary or wasteful discovery,' and to impose 'careful and realistic assessment of actual need.'" *XTO Energy v. ATD*, LLC, No. CIV 14–1021 JB/SCY, 2016 WL 1730171, at *18 (D.N.M. April 1, 2016) (quoting Chief Justice John Roberts, *2015 Year–End Report on the Federal Judiciary* at 7 (Dec. 31, 2015)). In other words, even relevant discovery must be worth the effort. *See Vaigasi v. Solow Mgmt. Corp.*, No. 11 Civ.

5088, 2016 WL 616386, at *14 (S.D.N.Y. Feb. 16, 2016) ("Proportionality focuses on the marginal utility of the discovery sought . . . .").

Under the guise of a request for "leave" to conduct discovery and based upon an unfounded assertion that Charter is attempting to "hide" witnesses from discovery, Plaintiffs seek to compel Charter to present witnesses for deposition and to permit additive discovery, in excess of what is permitted by the Scheduling Order, relating to the e-mail loss. Plaintiffs have not articulated good cause as to why the requested discovery is appropriate at this time. Charter has not taken the position that Plaintiffs should never be able to undertake this discovery. Rather, proportionality requires that the burden, inconvenience, and expense of each deposition must be weighed against the expected marginal benefit of each deponent's testimony. Fed. R. Civ. P. 26(b)(1). Charter therefore has maintained that the first step should be to undertake the Rule 30(b)(6) deposition relating to the e-mail loss and attempted remediation. Only then will Plaintiffs and Charter be armed with sufficient information to assess the nature of *each* witness's possible testimony, and whether *each* deposition is of enough independent benefit to justify the burdens of time and cost.[7] It may be that, after the Rule 30(b)(6) deposition, it will be clear that the testimony of one or more of the five individuals is not proportional and of little benefit. Charter respectfully suggests starting with the Rule 30(b)(6) deposition, after which the parties and, if necessary, the Special Master can then determine whether and to what extent additional depositions are appropriate.

III. **PLAINTIFFS HAVE FAILED TO DEMONSTRATE WHY ANY EXPEDITED DISCOVERY OR DISCOVERY OUTSIDE THE CONFINES OF THE SCHEDULING ORDER IS WARRANTED AS TO THE CATS DATA.**

---

[7] These burdens are not insignificant. In normal times, the cost and logistical burdens associated with preparing and taking depositions are large. In these times of a global pandemic, these burdens are even greater. We estimate that it would cost 25 hours of associate time at approximately $600/hour, and 15 hours of partner time at approximately $950/hour, or roughly $29,250, to plan, coordinate, prepare for, and take a *single* remote deposition.

Prior to the obligation to preserve data raises, a party may delete information according to a reasonable records retention schedule. *Arthur Andersen, LLP v. United States*, 544 U.S. 696, 125 S. Ct. 2129, 2135 (2005) ("[i]t is, of course, not wrongful . . . to comply with a valid document retention policy under ordinary circumstances"). Moreover, a duty to preserve records arises only when the party possessing the evidence has notice of the records' relevance in the litigation. *See Nationwide Check Corp. v. Forest Hills Distributors, Inc.*, 692 F.2d 614, 617 (1st Cir. 1982); *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72-73 (S.D.N.Y. 1991); *William T. Thompson Co. v. Gen. Nutrition Corp.*, 593 F. Supp. 1443, 1455 (C.D. Cal. 1984); THE SEDONA CONFERENCE COMMENTARY ON LEGAL HOLDS, SECOND EDITION: THE TRIGGER & THE PROCESS, 20 Sedona Conf. J. 341, 370 (June 2019) ("SEDONA CONFERENCE COMMENTARY ON LEGAL HOLDS") ("The duty to preserve relevant information is certainly triggered *when a complaint is served*, a *governmental proceeding is initiated*, *or a subpoena is received*") (emphasis added).

Plaintiffs have repeatedly conflated Charter's disposal of CATS records before any notice of suit was received with its inadvertent deletion of emails after that notice. Indeed, Plaintiffs have already received discovery on this issue within the limits of the Scheduling Order. The ticket data deletion has no relationship to the e-mail loss and does not warrant any further discovery outside the confines of the Scheduling Order, and certainly not on an expedited basis.

## CONCLUSION

For the forgoing reasons, Plaintiffs' Motion to Conduct Discovery Outside the Discovery Limits and On an Expedited Basis Regarding Charter's Electronic Data should be denied. The parties should be permitted to proceed with the agreed 25 additional RFPs and the Rule 30(b)(6) limited to the e-mail loss issues. If Plaintiffs require additional discovery after that discovery is completed, then Plaintiffs can file the appropriate application with this Court.

Date: May 11, 2020

By: */s/ Michael S. Elkin*
Michael S. Elkin
Thomas Patrick Lane
Seth E. Spitzer
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166-4193
Phone: 212.294.6700
Fax: 212.294.4700
E-mail: melkin@winston.com
E-mail: tlane@winston.com
E-mail: sspitzer@winston.com

Jennifer A. Golinveaux
WINSTON & STRAWN LLP
101 California Street
San Francisco, California 94111
Phone: 415.591.1000
Fax: 415.591.1400
E-mail: jgolinveaux@winston.com

Erin R. Ranahan
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, California 90071
Phone: 213.615.1700
Fax: 213.615.1750
E-mail: eranahan@winston.com

Craig D. Joyce
John M. Tanner
FAIRFIELD AND WOODS, P.C.
1801 California Street, Suite 2600
Denver, Colorado 80202
Phone: 303.830.2400
Fax: 303.830.1033
E-mail: cjoyce@fwlaw.com
E-mail: jtanner@fwlaw.com

*Counsel for Defendant*
*Charter Communications, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 11, 2020, I caused the foregoing document and all supporting materials thereto to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record registered with CM/ECF.

/s/ *Michael S. Elkin*