# EXHIBIT 4

Stephen P. Berzon (SBN 46540)
sberzon@altber.com
Stacey Leyton (SBN 203827)
sleyton@altber.com
P. Casey Pitts (SBN 262463)
cpitts@altber.com
Rebecca C. Lee (SBN 305119)
rlee@altber.com
Andrew Kushner (SBN 316035)
akushner@altber.com
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, California 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

Anthony R. Segall (SBN 101340)
asegall@rsglabor.com
Juhyung Harold Lee (SBN 315738)
hlee@rsglabor.com
ROTHNER, SEGALL & GREENSTONE
510 South Marengo Avenue
Pasadena, California 91101
Telephone: (626) 796-7555
Facsimile: (626) 577-0124

Ethan E. Litwin (*pro hac vice*)
W. Stephen Cannon (*pro hac vice*)
elitwin@constantinecannon.com
scannon@constantinecannon.com
CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor
New York, New York 10017
Telephone: (212) 350-2700
Facsimile: (212) 350-2701

Ann M. Burdick (*pro hac vice*)
aburdick@wgaeast.org
Writers Guild of America, East, Inc.
250 Hudson Street, Suite 700
New York, New York 10013
Telephone: (212) 767-7800
Facsimile: (212) 582-1909

*Attorney for Defendant and Counterclaimant Writers Guild of America, East, Inc.*

*Attorneys for Defendants-Counterclaimants*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WILLIAM MORRIS ENDEAVOR ENTERTAINMENT, LLC, *et al.*, <br><br> Plaintiffs and Counterclaim Defendants, <br><br> v. <br><br> WRITERS GUILD OF AMERICA, WEST, INC., *et al.*, <br><br> Defendants and Counterclaimants, <br><br> and PATRICIA CARR, *et al.* <br><br> Counterclaimants. | Case No. 2:19-cv-05465-AB-AFM <br><br> **SUPPLEMENTAL DECLARATION OF MAURA R. GROSSMAN IN SUPPORT OF DEFENDANTS AND COUNTERCLAIMANTS' MOTION TO COMPEL** |

Pursuant to 28 U.S.C. § 1746, I, Maura R. Grossman, declare:

1. I submit this Supplemental Declaration, on behalf of the Writers Guilds, in Support of Counterclaimants' Motion to Compel, and in response to assertions made by Plaintiffs and Counterclaim Defendants ("Plaintiffs" or the "Agencies") and their experts (the "Agencies' experts") in the Joint Stipulation and its exhibits, in particular, in Ex. U (Declaration of Daniel L. Regard II), Ex. Y (Declaration of Matthew W. Poplawski), and Ex. AA (Declaration of Thomas I. Barnett).

2. The Agencies' experts address only one element of the proportionality equation—the alleged *costs* of producing the email of 15 or more custodians each. Not only are at least two of the experts interested parties with respect to those costs—their own firms are involved in providing at least some of the eDiscovery services at issue—but their estimates are, in my opinion, quite excessive. More importantly, however, the Agencies' experts fail to address any of the other elements of Fed. R. Civ. P 26(b)(1)—the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, and the most critical issues for present purposes—*the importance of the discovery in resolving the issues, and whether the likely benefit outweighs the cost*, when those costs are *properly* estimated.

3. My understanding is that the Agencies have represented to counsel for the Guilds that the business of providing representational services to writers is conducted largely, if not exclusively, at the agent level, and thus, the individual agent custodians would be the sole source of information regarding, among other things, offers made to writers, communications with studios regarding writer wages, pressure to be part of a "package" on a project, threats of blacklisting, and other aspects of the day-to-day representation that writers received. Moreover, because each agent generally represents different writers, the email of each custodian is unlikely to be cumulative and duplicative in that regard.

4. In the course of my 20+ year career as a litigator, and as an eDiscovery expert, I have conducted or supervised more than 200 large-scale TAR reviews for production in matters such as this. I have never seen a matter where the costs reached $100,000 per custodian. While I have personally been involved in numerous matters involving between 20 and 60 million documents, from the files of many more custodians than have been requested here, the cost of the TAR-based discovery in those cases was far below the millions of dollars posited by the Agencies' experts.

5. In the course of my career as a psychologist, litigator, and professor, I have published more than 20 peer-reviewed articles that employ sound statistical analysis. The majority of these articles report on studies of the efficiency and effectiveness of TAR methods.

6. The Agencies' experts have inflated the projected cost of the eDiscovery efforts contemplated in this matter through a variety of means, including by using overstated assumptions about the composition of the data collected from custodians, as well as by proposing an inefficient review process designed to increase projected costs rather than to reap the efficiencies made possible by TAR.

7. *First,* at least one of the Agencies' experts (Barnett Declaration ¶ 35) assumes that TAR will be applied *de novo* to each custodian. Based on my experience, my scientific investigations, and my recognized expertise in TAR, I can state there is no basis whatsoever to conduct TAR in such an inefficient manner. TAR is essentially designed and intended to be trained and applied once across an entire set of data. Training and applying TAR separately to different custodians does not make sense and does not produce any benefits to the Agencies, other than to vastly increase the projected cost of the review effort for the purposes of this motion. I am not aware of any party that has, in fact, used TAR in such an inefficient manner, and there is no legitimate basis to do so. In virtually all of the

2

1  cases of which I am aware, the data from all custodians has been ingested and
2  subjected to a single TAR process, with the exception of the situation where new
3  and dissimilar data was added as a result of rolling collection, and some additional
4  training was necessitated.  Accordingly, it is wrong to state that the cost of a
5  review is directly proportional to the number of custodians.  This flawed
6  assumption not only vastly inflates the projected baseline cost to review 15
7  custodians per Agency, it allows the Agencies' experts to opine—also
8  incorrectly—that the cost to review data collected from 50 custodians would be
9  some multiple of that, and therefore prohibitively expensive, when that is not true.
10         8.     *Second*, the Agencies' experts base their cost estimates on the
11 assumption that the TAR system will be trained using lawyers who bill in excess of
12 $700 per hour.  While I agree that the Agencies should use lawyers who are
13 familiar with the facts of the case to train the TAR tool, the proposed staffing and
14 the attendant hourly rates are unnecessary and excessive.  I have neither conducted
15 nor supervised a TAR review in which training—at $710 or $750 an hour—was
16 used, no less repeated, for each custodian.  In my experience, and as my peer-
17 reviewed research has shown, it is not necessary to train a TAR system with
18 expensive senior lawyers; training by less expensive (but still knowledgeable)
19 attorneys works just as well, if not better.  *See* A. Roegiest, G.V. Cormack, C.L.A.
20 Clarke, and M.R. Grossman, *Impact of Surrogate Assessment of High-Recall*
21 *Retrieval*, 38th Int'l SIGIR Conference on Research and Dev. in Info. Retrieval
22 (2015).  *See also* J. Tredennick, *Subject Matter Experts:  What Role Should They*
23 *Play in TAR 2.0 Training*, E-Discovery Search Blog (Nov. 17, 2013),
24 https://catalystsecure.com/blog/2013/11/subject-matter-experts-what-role-should-
25 they-play-in-tar-2-0-training/ ("these [results] suggest strongly that the traditional
26 notion that only an expert can train a TAR system may not be correct.  On average
27 in these experiments, the review team did as well or better than the experts at
28 judging training documents.").

3

9.      *Third*, the Agencies' experts incorrectly opine that the cost of a TAR review is driven by the number of custodians, rather than the number of documents that require manual review following the application of TAR.  While the Agencies' experts are correct that the cost of reviewing a common collection depends, in part, on the number of custodians and the amount of data collected from those custodians (and thereafter loaded into the TAR tool), ***the primary driver of cost in a TAR review is the number of potentially responsive documents in the collection that must be manually reviewed***.  The Agencies' experts have made ill-conceived guesses about the number of responsive documents that the custodians might possess; those guesses lack any empirical support and are inconsistent with my experience and research.  Without sampling, it is simply impossible to know how many responsive documents reside in the data of each of the proposed custodians. The Agencies' experts, however, have not done such sampling and their overstated assumptions of what might be the case, in a worst case scenario, again serve only to inflate the projected costs of review.

10.     *Fourth*, the Agencies' experts largely discount common methods of mitigating excessive volumes of non-responsive documents before the TAR process is undertaken.  They complain that the costs of processing and hosting are high yet seem to think that can only be addressed by eliminating custodians *in toto*. Without stipulating that volume has been shown to be excessive, I would note that substantial reductions can be achieved by applying date-range restrictions and appropriately tested and validated keywords, to name but two possible culling methods.  "Junk" email from domains such as Amazon.com can also be removed. I have been told that the Guilds have not objected to these culling methods, should they prove necessary, and in my opinion, they would be far more reasonable than arbitrarily excluding custodians acknowledged by the Agencies to have considerable amounts of unique email relevant to the claims and defenses at issue, particularly when the custodians' email is critical to demonstrating a systemic

4

conflict of interest between writers and agents, and the failure to disclose same, as well as a price-fixing conspiracy.

11. While Agency experts Messrs. Regard and Poplawski do incorporate some post-collection culling efforts in their calculations, they opine that these methods will result in only a 20% (Regard Declaration at ¶ 23) and a 50% (Poplawsky Declaration at ¶ 14) reduction in the number of documents to be ingested into the TAR tool for review. Mr. Barnett does not account at all for these common methods of culling in his estimates. Date culling alone would achieve a great reduction in volume, and keyword culling would likely increase this reduction significantly, at the expense of the loss of some number of responsive documents. The Agencies' proposed approach of indiscriminately eliminating 90% or more of the custodians with responsive material at each Agency would, however, necessarily eliminate *90% or more of the responsive documents*. The whole point of TAR and other means of culling is to *reduce the burden of reviewing non-responsive documents, not to eliminate the review of responsive documents.*

12. *Fifth*, the Agencies' experts' errors are compounded by their suggestion that huge volumes of non-relevant data should be stored in the TAR tool for a year, again markedly inflating their cost estimates.

13. One of the Agencies' experts points to Sedona Principle 6 for the proposition that "Responding parties are the best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving their own electronically stored information." (*See* Regard Declaration at ¶¶ 69-71). I agree that the Agencies are well positioned to conduct a proper analysis of which custodians have unique, relevant email and which do not, as well as to generate a statistically valid estimate of the volume of responsive email that will need to be reviewed after appropriate mitigation efforts. Reviews of simple random samples, for example, would yield a valid estimate of the amount of relevant information

5

possessed by various custodians, and thereby inform both the *cost* and *benefit* sides of the equation. Plaintiffs, however, choose not to do this and prefer to rely, instead, on their experts' wild guesses as to the volume of relevant email.

14. I note that the Agencies' experts' estimates of the likely number of responsive documents are as preposterous as their other estimates. In the more than 200 TAR reviews that I have conducted or supervised, the median proportion of responsive documents (after date culling) has been less than 1%, and has seldom reached anywhere near 5% or more—as suggested by the Agencies' experts. *See* M.R. Grossman and G.V. Cormack, *Comments on "Implications of Rule 26(g) on the Use of Technology-Assisted Review*," 7 Fed. Cts. L. Rev. 285, 290 n.24 (2014) ("Our median richness has been less than 1%; we have had very few matters with richness above 3%."). In other words, the Agencies' experts predict that their custodians will have *at least* five times more responsive documents than is typical in my experience.

15. Moreover, if the Agencies' experts are correct that there are indeed 5% or more responsive documents out of many hundreds of thousands of documents per custodian, that would mean there are ***many tens of thousands of responsive documents per custodian***. The fact that a custodian has many tens of thousands of responsive emails should be *prima facie* evidence that their email should be searched and produced. Conversely, if there are custodians that have no or a minimal amount of responsive email, those custodians should be removed from the list of identified custodians so that their email is not collected and reviewed. My understanding, however, is that the Agencies have each refused to identify which custodians have information responsive to the Guilds' requests.

16. All of the declarations (including my own) assume the use of what has been referred to as "TAR 1.0," an older and less efficient and effective method of TAR than state-of-the-art approaches dubbed "TAR 2.0" or "Continuous Active Learning®" ("CAL®"). My proposal for using TAR 1.0 was based on the premise

that Plaintiffs would *not* be manually reviewing the documents after applying TAR. If Plaintiffs do intend to review their documents after TAR, there is no reason they could not use a more efficient approach to TAR than what has been proposed by their experts. One of the Agencies' experts states, without evidence, that using TAR 2.0 would be even more expensive than using TAR 1.0 (Poplawski Declaration at ¶ 12). My experience and peer-reviewed research have shown otherwise. *See* G.V. Cormack and M.R. Grossman, *Evaluation of Machine-Learning Protocols for Technology-Assisted Review in Electronic Discovery*, 37th Int'l SIGIR Conference on Research and Dev. in Info. Retrieval (2014) (showing that TAR 2.0 is more effective and more efficient than TAR 1.0 approaches). Indeed, it is difficult to comprehend why, if Plaintiffs intend to review their documents after applying TAR, they have not chosen to use "*the standard approach in the industry*," as Mr. Barnett describes "continuous active learning" (a.k.a. "TAR 2.0") in ¶ 8 of his Declaration[1]—a description with which I wholeheartedly agree. The only reason for not doing so, in my mind, is that the Agencies' experts prefer to propose a less efficient approach to TAR that will necessarily increase their calculations of the projected costs for the purposes of this motion.

17. Two of the Agencies' experts (Regard Declaration at ¶¶ 96-98 and Barnett Declaration at ¶¶ 37-38) fault me for opining that search of the data of only

---

[1] I will also note in passing that even though Mr. Barnett claims in the same paragraph of his Declaration to have employed "continuous active learning" in 2004, "before such technology became standard in the industry," Gordon V. Cormack first invented and introduced continuous active learning in 2009 (*see* G.V. Cormack and M. Mojdeh, *Machine Learning for Information Retrieval: TREC 2009 Web, Relevance Feedback and Legal Tracks* (2009), https://trec.nist.gov/pubs/trec18/papers/uwaterloo-cormack.WEB.RF.LEGAL.pdf), and he and I first began using it for eDiscovery purposes in early 2010. Page 4 of my résumé (reattached hereto as Ex. 1) shows that Gordon V. Cormack and I own the patents and trademarks to the "continuous active learning" technology that Mr. Barnett claims to have used in 2004.

7

7%, 8%, or less than 12% of the Agencies' custodians with responsive data would be insufficient, and for failing to specify a confidence level or confidence interval. First, one does not need to apply statistics to conclude that a review of so few custodians would be inadequate to produce evidence of systemic conflicts of interest and failure to disclose same, and of a price-fixing conspiracy, particularly when Plaintiffs have been unwilling to disclose which custodians are most likely to have relevant data. Confidence levels and confidence intervals are statistical terms of art that make sense only with respect to a *quantitative* estimate, such as the number of agents that are left handed. Whether or not there are, by way of example only, systemic undisclosed conflicts of interest among agents is a *qualitative* rather than quantitative question that can only be answered by a systematic exploration of the evidence. The fewer custodians that are examined, the more likely a systemic conflict or conspiracy could be overlooked, either because the few handpicked custodians were not involved in it, or because they failed to preserve evidence of their involvement. I have no doubt that if the Guilds were to discover a few instances of conflicted representation and a failure to disclose same to their writer-clients, the Agencies would dismiss those agents as "a few bad apples." But even if one were to pose the discovery issue here as the quantitative question of "how many agents are there that show evidence of being bad apples?," it would be impossible to know in advance how large a sample would be necessary to derive an estimate with a particular confidence interval and confidence level. Messrs. Regard and Barnett appear to hold the common misconception that the sample size required to achieve a given confidence interval and confidence level can be determined beforehand using an online sample-size calculator such as Raosoft (http://www.raosoft.com/samplesize.html). Assuming, *arguendo*, that this were true, a sample of 15 out of 200 custodians would yield ***a margin of error of plus or minus 24%***, with a confidence level of 95%. In other words, it could fail to detect bad apples even if the systemic practice of providing

8

conflicted representation and failing to disclose same were *rampant*. In my opinion, it would be best practice to apply TAR to the custodians that have responsive email, not a tiny fraction of them. Setting aside such best practices in the interest of cost savings, the Guilds offer compromise alternatives that, in my view, have a reasonable chance of demonstrating the existence or nonexistence of systemic undisclosed conflicts or a price-fixing conspiracy. Fifteen custodians—of which many will be executives and business affairs employees, rather than agents—does not.

18. Two of the Agencies' experts (Regard Declaration at ¶ 75 and Barnett Declaration at ¶ 22) mischaracterize my testimony in the *In re Domestic Airline Travel Antitrust Litigation* (Case No. 1:15-MC-01404, D.D.C. (2018)), falsely asserting that I criticized a party for failing to employ manual review after TAR. As a preliminary matter, the fact that United Airlines—a highly sophisticated party with significant resources—chose not to do manual review in a high-stakes litigation belies Mr. Barnett's claim that "producing parties forego post-classification manual review very rarely, and then almost exclusively in the context of productions to government agencies in the anti-trust context and certain other regulatory and enforcement inquiries." While I agree that manual review after TAR is more typical, I did not find fault with United Airlines for its choice not to do a post-TAR manual review. I faulted them for producing 2.9 million non-responsive documents out of 3.5 million documents produced; in other words, producing five times as many non-responsive documents as responsive ones, and expecting Plaintiffs to clean up that mess. In my initial declaration in that case, which Mr. Barnett attaches to his Declaration as Ex. B, and in a supplemental declaration that the Agencies' experts fail to reference (attached hereto as Ex. 2), I state that the problem with United's production was *likely a failure to train the TAR tool sufficiently*, a problem that was exacerbated by the failure to employ manual review after the TAR process to correct the problem, thereby necessitating

the need for additional time for Plaintiffs to review the production. *See* Aug. 24, 2018 Declaration of Maura R. Grossman in Support of Plaintiffs' Motion for an Extension of Fact Discovery Deadlines (Ex. B to Barnett Declaration) at ¶¶ 14, 17; Sept. 2, 2018 Declaration of Maura R. Grossman in Further Support of Plaintiffs' Motion for an Extension of the Fact Discovery Deadline (Ex. 2 hereto) at ¶¶ 12, 16.

19. Finally, at page 47 of the Joint Stipulation, Plaintiffs attribute a quote to me that I never made. I had no involvement in the *In Re Disposable Contact Lens Antitrust Litigation*, Case No. 3:15-MD-2626-J-20JRK, 2016 WL 6518660 (M.D. Fla. Nov. 1, 2016).

20. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 5th day of May, 2020 in Waterloo, Ontario, Canada.

*Maura R. Grossman*
Maura R. Grossman, J.D., Ph.D.