# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

WARNER BROS. RECORDS INC., *et al.*,

     Plaintiffs,

v.

CHARTER COMMUNICATIONS, INC.,

     Defendant

Case No. 19-cv-00874-MSK-MEH

---

## PLAINTIFFS' PARTIAL OBJECTION TO SPECIAL MASTER'S MAY 29, 2020 ORDER RESOLVING DISCOVERY DISPUTES

---

## CERTIFICATION PURSUANT TO D. COLO. L. CIV. R. 7.1(a)

Counsel for Plaintiffs certifies that, pursuant to D. Colo. L. Civ. R. 7.1, they have conferred with counsel for Charter via email, and that Charter declined to consent to the requested relief.

## BACKGROUND

Pursuant to the Order appointing Special Master, Plaintiffs object to the portions of the Special Master's May 29, 2020 Order Resolving Discovery Disputes:  (1) denying Plaintiffs' motion to compel production of "documents sufficient to show the actual monthly revenue [Charter] received from all Infringing Subscribers" from May 17, 2016 to present, ECF 181 at 35-36 (RFP 33); (2) granting Charter's motion to compel "the identification of each notice that corresponds to each of Plaintiffs' works in suit," ECF 181 at 24, ECF 190 at 11 (MPP Interrogatory 15, RCP Interrogatory 14); and (3) granting Charter's motion to compel the identity of which "musical compositions-in-suit were recorded within which of the sound recordings in suit" by July 27, 2020, ECF 181 at 22; ECF 190 at 8-9 (MPP Interrogatories 13-14).[1]

Under the Order Appointing Special Master, "any order, report, or recommendation of the Master on nondispositive motions (unless it involves a finding of fact or conclusion of law) will be deemed a ruling on a procedural matter," reviewable for abuse of discretion.  ECF 143 at ¶ 6.  On the other hand, the "Court will decide de novo all objections to findings of fact or conclusions of law made or recommended by the Master."  *Id.* ¶ 8.

---

[1] The time to object to the Special Master's May 29 Order began to run from July 6, the date the Special Master re-issued that Order.  *See* ECF 190 at 11-12 ("[T]he parties shall file objections to the May 29 Order within five business days of the issuance of this Order.").

A Special Master abuses her discretion when she "fails to articulate a reason for [her] decision . . . or articulates a reason which has no basis in fact[,] or the reason articulated is contrary to law.  The reasons given, however, need not be one that is agreeable to the reviewing court." *Lee v. State Farm Mut. Auto. Ins. Co.*, 249 F.R.D. 662, 671 (D. Colo. 2008).  But the "subordinate role of the master means that the trial court's review for abuse of discretion may be more searching than the review that an appellate court makes of a trial court."  Fed. R. Civ. P. 53, Advisory Committee Notes, 2003 Amendment, Note to Subdivision (g).

## I.   The Special Master abused her discretion in denying Plaintiffs discovery on the revenue Charter received from Infringing Subscribers from 2016 to the present.

RFP 33 seeks documents sufficient to show the money Charter made from May 18, 2016 to the present from subscribers who were the subject of Plaintiffs' notices of infringement.[2]  This critical evidence will demonstrate the fees Charter collected, and in some cases, continues to collect from repeat infringers whose internet service it failed to terminate.  The Special Master's ruling denying such discovery should be overturned for two reasons, both of which dictate that the order be reviewed *de novo*.

*First*, the Special Master reached an erroneous "conclusion of law" by holding that the fees Charter received from infringing subscribers after May 18, 2016 are not relevant to the claims or defenses in this action.  No authority supports the notion that financial benefits from infringement cease on an arbitrary date, limited by the claim period.  Indeed, the law is just the opposite: *any* benefit connected to infringement is relevant.  *Second*, the Order rests on an erroneous "finding of fact" by stating that Charter's "burden of producing such documents

---

[2] RFP 33 sought, "[f]or the time period May 17, 2016 through the present, documents sufficient to show the actual monthly revenue you received from all Infringing Subscribers." Ex. 6 at 8.

outweighs its minimal probative benefit," ECF 181 at 36.  Charter made no burden arguments in its pre-hearing brief or during the hearing, and never disputed that compliance here is a matter of pulling billing records, from a database, for a set of subscribers whom Charter *already* has identified.  These aspects of the Order also mandate reversal under an abuse-of-discretion review, because they "articulate[] a reason which has no basis in fact[,] or the reason articulated is contrary to law."  *Lee*, 249, F.R.D. at 671.

### A.  Background

Plaintiffs' Prior Discovery Request Through 2016.  Last year, Plaintiffs served RFP 19, seeking documents sufficient to show Charter's monthly revenue from all subscribers identified in Plaintiffs' Infringement Notices, from January 1, 2010 to May 17, 2016 (later limited during the meet-and-confer, to January 1, 2012 to May 17, 2016).  Ex. 1 at 2.  Charter objected that Plaintiffs were not entitled to this information, arguing that "receipt of a subscription fee for internet services is insufficient to demonstrate a direct financial benefit, as such receipt is not *directly* tied to the alleged infringement."  Ex. 2 at 17.  At the December 17, 2019 hearing, the Court disagreed, finding this information to be relevant.  Ex. 3 at 57:20-24.  The Court ordered Charter to provide a report, by January 10, on the basis for Charter's *sole burden argument*: to determine whether its accounting and data management systems can link the IP addresses of infringing subscribers and Charter's accounting records, to permit Charter to state the revenue derived from those infringing subscribers.  *Id*.  At the hearing, Plaintiffs specifically reserved their right to seek this information from May 2016 to the present through a new discovery request.  *Id*. at 58:9-59:2.

Charter failed to make any burden showing by January 10, but nonetheless refused to produce the requested revenue information, requiring Plaintiffs to once again move the court to

compel production.  Ex. 4 at 3-4.  At the February 19 hearing, Charter disclosed for the first time

that, due to its policy of deleting ticket data on six- and eighteen-month cycles, it was only able

to identify the subscribers associated with roughly 6 percent of Plaintiffs' 700,000 notices—

which accounted for just 11,000 subscribers in total.  Ex. 5 at 105:11-121:12.  The Court ordered

Charter to produce the revenue Charter received from those subscribers by March 16, 2020.  *Id.*

at 143:2-144:1.  Charter produced a single spreadsheet showing either billings to or revenue

received from most (but not all) of the infringing subscribers it could identify.

  <u>The Instant RFP 33.</u>  As they specifically reserved their right to do, Plaintiffs served

another request seeking the same information for May 2016 to the present.  Ex. 6 at 8 (RFP 33).

Charter again refused, restating the same overruled objections.  Ex. 7 at 13.  At the May 18

hearing before the Special Master, Charter argued that RFP 33 was somehow an "end run over a

ruling that Judge Hegarty already made with respect to RFP 19."  Ex. 8 at 137:16-138:20.  That

was not true, of course; at the December 17 hearing, the Court expressly *acknowledged* that

Plaintiffs had reserved their right to serve a subsequent request for revenues from May 2016 to

the present, Ex. 3 at 58:9-59:2.  Charter made no burden arguments in either its brief to the

Special Master or at the hearing.  Charter did not submit any declaration describing what burden,

if any, updating the billing information would entail.  And Charter did not dispute that "all

Charter needs to do here . . . is export billing data from a database for a bunch of subscribers, and

they did that previously and they can do it again."  Ex. 8 at 136:24-137:9.

  The Special Master's subsequent order summarily denied Plaintiffs' motion, concluding

without any analysis or support that the requested information is not relevant and that the

burdens of producing it outweigh any benefit.  ECF 181 at 35-36.  The Order did, however,

correct Charter's false statement at the hearing that Judge Hegarty had made any statements resolving post-2016 revenues. *Id. at* 36 n.4.

**B. The Special Master's conclusion that revenue post-dating May 17, 2016 "is not relevant" is contrary to law.**

This Court already found that the revenue Charter received from infringing subscribers through May 2016 is relevant to the direct financial benefit Charter received from its subscribers' infringing activity. *See supra* I.A. The Special Master also acknowledged the relevance of that revenue. ECF 181 at 36. Thus, the only relevance question presented by Plaintiffs' RFP 33 is whether Charter's continued receipt of revenue from subscribers it knew were infringers, after the operative Claim Period, also bear on the financial benefit Charter received from the infringement. The answer to that question is yes; the Special Master erred in stating otherwise.

The cases and legislative history on the "financial benefit" element make clear that subscription fees, if connected to infringement through the draw of infringing material or otherwise, are *all relevant*. *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) ("The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and *any financial benefit* a defendant reaps regardless of how substantial the benefit is in proportion to a defendant's overall profits."); S. Rep. 105-190 at 44-45 (financial benefit would include "*any such fees* where the value of the service lies in providing access to infringing material"); *Capitol Records, LLC v. Escape Media Grp., Inc.*, 2015 WL 1402049, at *42 (S.D.N.Y. Mar. 25, 2015) (direct financial benefit exists where service provider has "an economic incentive to tolerate infringing conduct"). Indeed, Judge Hegarty's discussion of the *Ellison* case in addressing Charter's motion to dismiss shows that actions *post-dating the Complaint* could be relevant to whether the defendant obtained a direct financial benefit. ECF 71 at 10 ("AOL's action upon its receipt of plaintiff's complaint of

5

blocking access to the infringing material led the court to find the plaintiff failed to demonstrate the defendant received a direct financial benefit from the infringement alleged in that case").

Judges Hegarty and Jackson have both found that Plaintiffs adequately pleaded this connection between subscription fees and infringement by asserting, *inter alia*, that Charter's subscribers have used its services to illegally distribute Plaintiffs' content; that they were motivated to subscribe by Charter's advertisement of features attractive to peer-to-peer infringers; that despite receiving hundreds of thousands of notices of Charter's subscribers' infringing activity, Charter did nothing to stop it; that Charter's failure to police infringement motivated subscribers to purchased more bandwidth; and that Charter failed to take action against subscribers precisely in order to continuing earning subscription fees. ECF 71 at 11-12 (Judge Hegarty citing these allegations in finding Plaintiffs adequately pleaded direct financial benefit); ECF 157 at 10-11 (same by Judge Jackson).

Having adequately pleaded the connection between infringement and subscription fees, Plaintiffs are entitled to adduce evidence of the full scope of the financial benefits Charter received from its subscribers' infringing conduct. That includes the fees they continued to collect from these subscribers in the years after receiving the 700,000 infringement notices Plaintiffs sent during the Claim Period. Indeed, in the related *Sony v. Cox* matter, the court not only found years of post-Claim Period revenues discoverable, but also admitted them at trial over Cox's objection. Ex. 9 at 2-3. There is even more reason to order the production of such revenue information here. In *Cox*, the defendant produced ticket data and associated revenue for *all* of the infringing subscribers. Here, Charter can only identify the subscribers associated with approximately 6% of Plaintiffs' infringement notices and thus have only produced revenue data for infringing subscribers associated with a tiny fraction of Plaintiffs' notices. Plaintiffs are left

with only a sliver of the revenue information that should have otherwise been available to them; they should at least receive the entirety of that sliver.[3]

Finally, the Special Master's relevance determination is also an abuse of discretion because it is entirely inconsistent with another discovery ruling in which Plaintiffs were ordered to produce their own revenues for 2017, 2018 and 2019.  ECF 164 at 7.  Neither that Order nor the May 29 Order explain why information about *Plaintiffs'* revenues following the Claim Period would be relevant, but *Defendant's* revenues following the Claim Period are not.

### C.  The Special Master's burden finding has no basis in fact.

After stating that "the requested post-claim information is not relevant," the Order concludes that "the burden of producing such documents outweighs its minimal probative benefit."  ECF 181 at 36.  But Charter never put forward any evidence on burden in its pre-hearing brief or at the hearing.  Ex. 10 at 5; Ex. 8 at 133:16-148:14.  Charter has already undertaken the only activity it has ever identified as burdensome for producing revenue from infringing subscribers:  linking the IP addresses of infringing subscribers and Charter's accounting records.  Now that it has done so, it need only query its systems for the same type of information it already provided, but for a different date range.  Charter does not dispute this.  Ex. 8 at 133:16-148:14.  This merits reversal under *de novo* review and also constitutes an abuse of discretion because it "articulates a reason which has no basis in fact."  *Lee*, 249, F.R.D. at 671.

## II.     The Special Master abused her discretion in requiring Plaintiffs to respond to interrogatories that require expert analysis prior to the date of expert reports.

---

[3] As discussed during the December hearing, Charter's revenue from infringing subscribers is also relevant to Plaintiffs' claim for statutory damages. Ex. 3 at 48:5-49:13; *Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc.*, 807 F.2d 1110, 1117 (2d Cir. 1986) (stating that "the expenses saved and the profits reaped by the infringers are considered" in statutory damages awards); *NFL v. PrimeTime24 Joint Venture*, 131 F. Supp. 2d 458, 473 (S.D.N.Y. 2001) (noting that one purpose of statutory damages is restitution of "ill-gotten profits"; also stating that "expenses saved and the profits earned by the defendant" are relevant).

MPP Interrogatory 15 and RCP Interrogatory 14 ask Plaintiffs to identify "each RIAA Notice that references the allegedly infringed file corresponding" to each musical composition or sound recording in suit, respectively.  Ex. 11 at 10; Ex. 12 at 8.  The information sought in these interrogatories is not information that Plaintiffs have at hand, and will require the sort of analysis that will ultimately be undertaken by experts on both sides of the case, based on data that Plaintiffs have already produced.  In ordering Plaintiffs to respond to these Interrogatories, the Special Master abused her discretion in multiple ways.  *First*, the Special Master presumed without any basis that Plaintiffs had already conducted the analysis at issue—they have not.  *Second*, the Special Master improperly concluded that Plaintiffs could more easily conduct the requested analysis than Defendants.  This conclusion is without basis; the burden is the same for both parties, each of which would be working from the same data sets already produced.  *Third*, and critically, the Order effectively requires Plaintiffs to conduct and disclose expert analysis nearly eight months before the deadline for such disclosures.

### A.  Background

Torrents and hashes.  Peer-to-peer ("P2P") networks, including BitTorrent, provide a means for downloading and distributing "torrent" files.  A torrent file can contain one or more music files within it, including complete albums, anthologies, or collections of assorted works.  Each torrent file has a unique identifier called a hash value, and all files with the same hash value are identical.

Notices.  When Plaintiffs' antipiracy vendor, MarkMonitor, detected a Charter subscriber distributing a torrent file that contained infringing copies of Plaintiffs' works—potentially among many other works—it sent a notice to Charter that identified the torrent file by hash and named a representative sample of one sound recording in the torrent.  From 2012-2016,

MarkMonitor sent Charter over 700,000 notices of infringement.  For each notice sent, MarkMonitor recorded certain information from the detected infringement in a database, including the Notice ID, a sample (but not a complete list) of works infringed, and the hash value listed in the notice.  Plaintiff have produced a spreadsheet containing that information for all 700,000-plus notices that MarkMonitor sent to Charter.

<u>Audible Magic Data</u>.  Before MarkMonitor sends a notice on a torrent file that it believes contains infringing works, MarkMonitor downloads the torrent file and runs it through a content-recognition service called Audible Magic.  That service identifies the recordings contained within the torrent file.  MarkMonitor records the results of the Audible Magic look-ups in a database, including information that correlates the hash value of a given torrent file to recordings that the torrent file contains.  Plaintiffs have produced the relevant data from MarkMonitor's database of verified infringing files, including information that correlates hashes to recordings.

<u>Interrogatories at issue</u>.  The information sought by these interrogatories involves (1) first linking two large datasets (the notice data and Audible Magic data) through a common field— hash value—to identify *all* works in a given torrent and thus associated with a given hash, and (2) then correlating each of more than 700,000 infringement notices to each of more than 11,000 works in suit.  Charter possesses the notices, a spreadsheet of relevant data from the notices, the infringing torrent files for the works in suit, and a spreadsheet of works that matches hash values to torrent files.

<u>Expert analysis in *Sony v. Cox*</u>.  In the *Cox* case, where Charter's counsel represented Cox, both parties employed experts to analyze and report on the connection between infringement notices and works in suit.  *See generally*, Ex. 13 (Direct Examination of Dr. George

P. McCabe); Ex. 14 (Direct Examination of Christian Tregillis).  Charter is able to do the same thing here that its counsel did in *Cox*.

Special Master Hearing and Ruling.  At the May 15 hearing, the Special Master, after pages of argument by both parties, initially was "not inclined to require the production of anything further" because she understood that Charter possessed the information needed to conduct the requested analysis.  Ex. 15 at 63:15-16.  After further argument by Charter, she requested supplemental briefing on "what it is you're claiming the notices say and don't say and what the obligation is there."  *Id.* at 68:21-23.  Both parties submitted letter briefs on May 20, 2020.  Exs. 16-17.  Plaintiffs set forth in detail the process required to undertake the requested analysis from their existing document production.  Ex. 16.  Charter's letter brief contained no declaration indicating that it could not conduct the analysis itself or that it would be unduly burdensome to do so.  Rather, Charter conceded it could conduct the analysis itself but claimed it would be easier for Plaintiffs to do so.  Ex. 17 at 2.

The Special Master accepted Charter's incorrect argument that Plaintiffs must have already completed the requested analysis in order to have determined which works to sue on in this litigation.  Because of this, and because a party may only provide a document in lieu of a written response where the burden is the same for either party, the Special Master granted Charter's Motion to Compel.  ECF 181 at 24-45.  In denying Plaintiffs' request for reconsideration, the Special Master concluded that the requested analysis does not appear to be an expert analysis but rather a basic factual one.  ECF 190 at 10.

**B.  The Special Master's burden finding has no basis in fact.**

Underlying the Special Master's Order is the conclusion that "Plaintiffs' burden of producing the requested information is less than Charter's."  ECF 181 at 25.  This conclusion is

clearly erroneous for two reasons.  First, the only support for this is Charter's argument that "Plaintiffs [must] have already completed this analysis" in order to bring the suit.  *Id.* at 24-25.  But that unsupported assertion is simply wrong.  To be sure, in preparing to file this case, Plaintiffs confirmed that each work in suit was supported by *at least one* notice.  But what the Special Master has ordered is far more extensive:  correlation of each of more than 700,000 notices to each of more than 11,000 works in suit.  As Plaintiffs have made clear, "[t]he requested discovery does not exist in Plaintiffs' files."  Ex. 18 at 1.  Charter's speculative assertion to the contrary is not a valid basis for a determination of discovery burden.  *King v. Solvay S.A.*, No. 14-mc-00196-LTB-KLM, 2014 WL 4267457, at * 4 (D. Colo. Aug. 28, 2014) (speculation insufficient to establish burden).

Second, there is likewise no factual support for the Special Master's conclusion that it would be easier for Plaintiffs to undertake the requested analysis than for Charter to do it. Charter has same data that Plaintiffs would use to conduct this analysis.  Moreover, Plaintiffs set forth in detail how to conduct the analysis in their May 20 submission to the Special Master.  Ex. 17.  As that May 20 letter plainly shows, the burden is no different for either party; Charter is equally well situated to conduct the analysis.  *Id.*  Plaintiffs' existing productions and detailed explanation of how to conduct the analysis, as set forth in their May 20 letter, should be deemed a sufficient interrogatory response under Fed. R. Civ. P. 33(d).  *Bayview Loan Servicing, LLC v. Boland*, 259 F.R.D. 516, 519 (D. Colo. 2009) (Rule 33(d) satisfied by production of documents) .

### C.  The Special Master's Order calls for the premature production of expert discovery.

The Scheduling Order set by this Court following briefing by the parties sets expert disclosures for March 1, 2021.  ECF No. 146 at 2.  The Special Master's Order, however, effectively requires Plaintiffs to conduct and disclose expert analysis nearly eight months early.

Relying on a single example set forth in Plaintiffs' May 20 submission, the Special Master erroneously concluded that because the data analysis does not require any particular expertise, the process as a whole does not amount to expert discovery.  ECF 190 at 11.  That ruling, however, ignores the complexity of the analysis required to first correlate approximately *10,000* hashes to individual works, then correlate more than *700,000* infringement notices to each of more than 11,000 works in suit.  In the *Cox* case, similar data analysis was performed by a statistical expert and professor with more than 50 years of experience (Plaintiffs) and a forensic accountant who has testified over 100 times (Cox), respectively.

Nothing Charter has presented warrants treating these interrogatories as basic fact discovery or requiring Plaintiffs to provide expert discovery eight months early.  Charter faces no prejudice from having to wait for Plaintiffs' expert to produce an analysis of notices to works in suit, as the parties have always contemplated.  In the meantime, Charter is free to conduct whatever analysis it wants with the data that has been produced in full.  In the event the Court concludes that Plaintiffs must nevertheless provide the requested discovery, it should be done in accordance with the schedule set for expert discovery.

**III.    The Special Master abused her discretion in requiring Plaintiffs to provide discovery by July 27, 2020 that will improperly influence Charter's counsel's post-trial submission in the *Cox* case on August 3, 2020.**

The Special Master's ruling requiring Plaintiffs to identify *by July 27, 2020* which musical compositions-in-suit are (and are not) embodied by sound recordings-in-suit constitutes an abuse of discretion for three reasons.  *First*, the Special Master's conclusion that Charter is incapable of conducting the analysis is clearly erroneous and has no basis in fact.  *Second*, Charter should bear the burden of conducting the analysis, as the court in *Cox* ordered on the same issue.  *Third*, in requiring Plaintiffs to produce information in response to this request by

July 27, the Special Master ignored the demonstrated risk that this discovery will improperly infect key briefing in the *Cox* case that is due August 3, given that the same counsel represents both Charter and Cox.[4]

## A. Background

Interrogatories at issue.  Charter served two interrogatories asking Plaintiffs to identify which musical compositions in suit correspond with which sound recordings in suit.[5]  Plaintiffs timely objected that Charter could readily undertake the same analysis, as well as on grounds of relevance and burden.  On May 8, Charter asked the Special Master to compel responses to both interrogatories.  Plaintiffs explained that the requested discovery does not exist in Plaintiffs' files, the discovery is not relevant because each individual copyrighted work is subject to an individual statutory damage award, and because Charter can undertake the analysis itself.  As above, the Special Master asked for additional briefing, which the parties provided on May 20.

May 29 Special Master Order.  On May 29, the Special Master ordered Plaintiffs to provide the requested discovery.  ECF 181 at 24.  In relevant part, the Special Master determined that because some compositions share the same title, and some compositions have a title that is not a title of a sound recording, it is not possible to determine which compositions are and are not embodied in a sound recording in suit.  *Id.* at 23-24.

---

[4] Concurrent with this motion, Plaintiffs are filing a motion to stay the July 27 production deadline set forth in the Special Master's July 6 Order.  For the reasons explained therein, absent a stay, Plaintiffs' objection stated here will effectively be mooted, because Plaintiffs will be forced to produce the requested information prior to resolution of this objection and prior to Charter's counsel's submission in the *Cox* case on August 3.

[5] MPP Interrogatory 13 asks Plaintiffs to "[i]dentify which of the music composition(s) [in suit] correspond with (or are embedded within) which of the sound recording(s) [in suit]."  Ex. 11 at 9.  MPP Interrogatory 14 is identical, but seeks the inverse, *i.e.*, which musical compositions in suit "do not correspond with" sound recordings in suit.  *Id.* at 10.

_Sony v. Cox_ ruling.  Shortly after the Special Master's order issued, the court that presided over the December 2019 trial in the materially identical _Sony Music Entertainment v. Cox Communications, Inc._ case issued an opinion on post-trial motions.  1:18-cv-950-LO-JFA, 2020 WL 3121306 (E.D. Va. June 2, 2020).  Judge O'Grady affirmed the jury's verdict but concluded that the number of statutory damages awards Plaintiffs could collect must be redetermined based on the relationship between compositions in suit and sound recordings in suit.  _See id._ at *19-25.  Since that issue had not been resolved at trial, Judge O'Grady ordered Cox to "prepare a list of overlapping works in suit" and to "calculate and propose a new number of works in suit for purposes of statutory damages within sixty days of the date of this opinion," or August 3, 2020.  _Id._ at *26.  Critically, Judge O'Grady put the burden on Cox to undertake the overlap analysis in the first instance because Cox's counsel—the same counsel that represents Charter here—made clear to the court that it was a "ministerial" task to determine the number of overlapping works.  Ex. 19 at 10 n.6.

Request for reconsideration.  In light of Judge O'Grady's opinion, Plaintiffs asked the Special Master to reconsider her May 29 Order on this issue.  Ex. 20 at 3-4.  Plaintiffs' motion was based on two grounds.  First, because Judge O'Grady had required Cox, represented by the same counsel as Charter in this litigation, to bear the burden of providing a "list of overlapping works in suit," Charter should likewise bear the burden in this litigation.  _Id._ at 3.  Second, even if the Plaintiffs would still be required to undertake the analysis, the deadline for providing that analysis should be deferred until after Charter's counsel—which also represents Cox—had completed their submission in the _Cox_ case—at a minimum, past August 3, 2020.  This would protect against any potential or inadvertent use of information provided by Plaintiffs in this litigation to impact the _Cox_ litigation—where the defendant decidedly bears the burden.

14

July 6 Special Master Order.  The Special Master denied Plaintiffs' reconsideration request on July 6.  ECF 190.  In relevant part, the Special Master distinguished the posture of the present case from that in *Cox* as a basis for placing the burden on Plaintiffs here.  ECF 190 at 6-7.  The Special Master further denied Plaintiffs' request to defer slightly the date by which they must produce the information until after Cox submits its August 3 list of overlapping works.  Instead, the Special Master affirmatively required Plaintiffs to respond to the Interrogatory by July 27—one week before Charter's counsel must make its submission on behalf of Cox in the *Cox* matter.  *Id. at* 9.  Neither the Special Master nor Charter identified any prejudice that would result from deferring Plaintiffs' production deadline by approximately one week to avoid the very real risk of interfering with post-trial proceedings in *Cox*.  Nor had Charter even requested the Special Master establish a date certain for the production of the discovery.  Ex. 24 at 5.

**B. The Special Master's Order is logically flawed, and Charter should bear the burden, as ordered in *Cox*.**

In the May 29 Order, the Special Master makes a logical leap to a false conclusion, constituting an abuse of discretion.  The Order first concludes that, because of duplicative composition names, the analysis "does not appear to be as simple as merely comparing two listings to provide potential overlap."  ECF 181 at 24.  Because of this, and because the information is relevant, the Special Master concludes that "Charter cannot discover this information merely by analyzing the documents that Plaintiffs have already produced" in two spreadsheets listing the sound recordings and compositions  *Id.*[6]

But Plaintiffs have produced far more in this litigation than two spreadsheets, including

---

[6] While Plaintiffs disagree that this information is relevant to the issue of statutory damages awards, that is not the basis of the instant request, and Plaintiffs expressly reserve the right to separately challenge in this case the legal issues underpinning that determination at an appropriate procedural stage.

copyright registration information that can identify the performing artist of a musical composition.  For example, one of the compositions entitled "Everything," which the Special Master relied on as an example of a work that Charter allegedly could not on its own match to a sound recording, appears on Plaintiffs' list of compositions (at Exhibit B to the Complaint) with registration number PA0001600375.  The copyright registration for this work that Plaintiffs produced indicates that the performing artist is Michael Bublé.  Ex. 21.  Charter can plainly determine for itself that this composition is embodied in the Michael Bublé sound recording in suit by the same name.  As above, "[t]he requested discovery does not exist in Plaintiffs' files," and Charter is in equal position to perform the analysis.  Ex. 18 at 1.

Nor is there any question that Charter knows how to identify overlap between compositions and sound recordings, because Charter's counsel represented to the *Cox* court that such an analysis was a "ministerial act."  Ex. 19 at 10, n.6.  Judge O'Grady took Charter's counsel at its word, ordering Cox to conduct such an analysis for the *Cox* litigation based expressly on that representation.  2020 WL 3121306, at *26.  Here too, Charter should bear the burden of conducting this analysis, whether by using the documents Plaintiffs have produced, or by expert analysis, as they attempted to do in *Cox*.  Ex. 18 at 57:23-58:3.  A "party cannot ordinarily be forced to prepare its opponent's case."  *Bayview*, 259 F.R.D. at 519.

**C.  The Special Master ignored the demonstrated risk of improper cross-pollination between this case and the *Cox* case in ordering Plaintiffs to provide the requested discovery days before Charter's counsel makes a critical post-trial filing in *Sony v. Cox*.**

The Special Master wholly disregarded the demonstrated risk of improper commingling between discovery in this case and *Cox* in ordering Plaintiffs' production by July 27.  Ignoring that risk was an abuse of discretion and warrants reversal or revision of the date by which Plaintiffs much provide the requested discovery.

Plaintiffs (most of whom are also plaintiffs in *Cox*) need to ensure that discovery on overlapping works produced here cannot be used—even inadvertently—to influence resolution of this issue in *Cox*.  Critical to this are the facts that (i) Cox is represented by the same Winston & Strawn attorneys that represent Charter here, (ii) approximately 80 percent of the works in suit in this case are also at issue in *Cox*, (iii) Cox did not adduce direct evidence on the relationship between sound recordings and musical compositions, and (iv) Cox must make its submission based on the evidentiary record in that case.

The Special Master's Order risks prejudicing the process that District Judge O'Grady established to resolve this post-verdict issue in *Cox*.  If Plaintiffs are required to provide discovery on the "overlap" between sound recordings and musical composition in *Charter* on July 27—before Winston & Strawn files Cox's brief on August 3—there is a meaningful risk that discovery from this case, produced only for the purpose of this litigation, could improperly influence the briefing and outcome in *Cox*.  Hundreds of millions of dollars are potentially at stake in *Cox* based on this precise issue.

Moreover, and critically, *only* this Court (and not Judge O'Grady in *Cox*) is in a position to guard *with certainty* against the risk of improper influence.  To be sure, it is easy enough to determine if defense counsel *expressly* relies upon the information disclosed here in its submission in *Cox*, and to direct any complaints about that to Judge O'Grady.  The issue here, however, is the risk of a less explicit, but no less real, crossover of information from this case to *Cox*, where the evidentiary record is closed.  Simply put, despite defense counsel's very best intentions, there is no way for them to unlearn the information that they learn in this case, nor is there any practical way to determine conclusively the extent to which defense counsel's submission in *Cox* is informed or influenced by what they learn from the information disclosed

17

here.  Indeed, "it is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so." *F.T.C. v. Exxon Corp.*, 636 F.2d 1336, 1350–51 (D.C. Cir. 1980).  Once Charter's counsel is exposed to information that certain compositions are embodied in certain sound recordings, that information will inevitably become part of the *Cox* analysis.

This is no attack on Winston & Strawn's ethics or intentions, and Plaintiffs are mindful that the Stipulated Protective Order prohibits use of confidential discovery for any purpose outside this litigation.  But this is also no idle speculation.  In several instances, Charter's counsel has relied on access to confidential discovery produced in *Cox* to ground discovery demands in this case.  To cite just two examples, Charter's counsel recently questioned Plaintiffs' privilege claims here on the basis that, "Plaintiffs have logged numerous documents as privileged that were produced in *Sony v. Cox*."  Ex. 22 at 3.  Charter also argued in its June 26 submission to the Special Master that "[d]ocuments produced in *Sony* demonstrate" Charter's entitlement to certain discovery.  Ex. 23 at 16.  The *Cox* protective order prohibits this cross-pollination, and yet, it continues to occur.

Even assuming Winston & Strawn refrains from relying openly on the *Charter* discovery in the *Cox* briefing, or using it directly to assist its analysis, those attorneys cannot un-learn what they learned—especially on an issue of such importance.  Nor would it be possible to implement adequate screening measures given the number of overlapping Winston & Strawn attorneys on the two cases.[7]  A simple extension of Plaintiffs' production deadline until after August 3—a mere week beyond that ordered by the Special Master—by contrast, can definitively protect

---

[7] At least the following Winston & Strawn attorneys are actively involved in both the *Cox* and *Charter* cases:  Michael Elkin, Jennifer Golinveaux, Sean Anderson, Thomas Patrick Lane, Michael Brody and Cesie Alvarez.

against these material risks.

Even if the burden remains on Plaintiffs to perform the analysis here, Charter will not suffer any prejudice from a brief delay of the production of the overlap between sound recordings and musical compositions.  Charter's only claim to prejudice if the production is deferred was that Charter "intends to begin serving Rule 30(b)(6) deposition notices on Plaintiff groups in the next week" and "should not be required to put off depositions while awaiting basic discovery for months."  Ex. 24 at 5.  Two weeks have passed since Charter's letter, and it has not served any 30(b)(6) notice.  Nor would a slight deferral in the production of this information require the delay of any deposition.  As explained *supra*, III.B, Charter is perfectly capable of conducting this analysis on its own, or having an expert perform it, as Charter's counsel claimed could be done at the *Cox* trial.

In sum, in the even the Court concludes that Plaintiffs must provide the discovery (and it should not), Plaintiffs' production deadline to do so should be extended until at least after August 3, 2020, the date Cox's post-trial submission is due in that litigation.

## CONCLUSION

For these foregoing reasons, the Court should overturn the Special Master's rulings on Plaintiffs' RFP 33; connecting notices to works in suit (MPP Interrogatory 15 and RCP Interrogatory 14); and the overlap between musical compositions and sound recordings (MPP Interrogatories 13 and 14).

Dated: July 13, 2020

Janette L. Ferguson, Esq.
Benjamin M. Leoni, Esq.
LEWIS BESS WILLIAMS &
WEESE, P.C.

*/s/ Matthew J. Oppenheim*

Matthew J. Oppenheim
Scott A. Zebrak
Jeffrey M. Gould
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave. NW, 5th Floor

1801 California Street, Suite 3400
Denver, CO 80202
Telephone: (303) 861-2828
jferguson@lewisbess.com
bleoni@lewisbess.com


Mitchell A. Kamin
Neema T. Sahni
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Ste. 3500
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
mkamin@cov.com
nsahni@cov.com

Washington, DC 20016
Telephone: (202) 621-9027
matt@oandzlaw.com
scott@oandzlaw.com
jeff@oandzlaw.com


Jonathan M. Sperling
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
jsperling@cov.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 13, 2020, I caused the foregoing document and all supporting materials thereto to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record registered with CM/ECF.

<div align="center" style="margin-left:auto;margin-right:0;width:50%">

*/s/ Matthew J. Oppenheim*
Matthew J. Oppenheim

</div>