Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| WARNER BROS. RECORDS INC., *et al*., | |
| Plaintiffs, | |
| v. | **Civil Action No.  19-cv-00874-RBJ-MEH** |
| CHARTER COMMUNICATIONS, INC., | |
| Defendant. | |

**DEFENDANT CHARTER COMMUNICATIONS, INC.'S STATEMENT OF ISSUES
FOR THE DECEMBER 17, 2019 DISCOVERY CONFERENCE**

**Defendant Charter Communications, Inc. ("Charter"), by and through its attorneys Winston & Strawn LLP and Fairfield and Woods, P.C., hereby submits its statement of issues for the December 17, 2019 discovery conference as follows:**

**I.        INTRODUCTION**

Plaintiffs filed this action against Defendant Charter Communications, Inc. ("Charter") claiming secondary liability for copyright infringement, alleging that users accessed the internet through Charter to infringe more than 11,000 musical compositions and recordings that Plaintiffs claim to own (the "works-in-suit").  Pursuant to the Court's December 3, 2019 Order (Dkt. 92), Charter submits this Statement regarding: (1) Charter's issues with Plaintiffs' discovery responses; and (2) Charter's positions regarding Plaintiffs' issues with Charter's discovery responses.

**II.       CHARTER'S ISSUES WITH PLAINTIFFS' DISCOVERY RESPONSES**

**a.        The CAS Implementation Agreements Should Be Produced**

The Copyright Alert System ("the CAS")—agreed to by major ISPs[1] and Plaintiffs—

---

[1] These ISPs include Comcast, TimeWarner, CableVision, AT&T, and Verizon. *See* https://info.publicintelligence.net/CCI-MOU.pdf.

1

addresses the ways ISPs should appropriately handle notices of alleged copyright infringement, and did *not require ISPs to terminate the accounts of repeat infringers.*[2] The signatories to the CAS entered into five "Implementation Agreements" that set forth how each ISP would implement the CAS.  On November 6, 2019, Charter submitted a letter via email to Your Honor's Chambers seeking consideration of this narrow CAS issue.  Coorg Aff. Ex. 3.  The issues covered by the Implementation Agreements are directly relevant to any underlying contributory liability in this case (which assess how material any contribution by Charter is to the infringement).  This includes Plaintiffs' allegations that Charter should be held liable for failing to terminate alleged infringers upon receiving notices of alleged copyright infringement occurring on their subscribers' accounts. Any burden is minimal, as Plaintiffs and their counsel are certainly in possession of these Implementation Agreements, as are Charter's counsel, as Plaintiffs were ordered to and so produced the Implementation Agreements in the pending case, *Sony Music Entertainment v. Cox Communications* ("*Cox*").[3]

On November 19, 2019, the *Cox* court found that CAS documents were sufficiently relevant to be *admissible at trial*.  Coorg Aff. Ex. 9 (denying the plaintiffs' motion *in limine* and thus allowing CAS evidence and testimony to be introduced at trial without restriction).  The trial in *Cox* is presently underway, and the CAS has been featured in opening statements and during the testimony of several different witnesses.  Coorg Aff. ¶ 5, Ex. 4.

Given the importance of the CAS to Plaintiffs' claims and Charter's defenses, Charter respectfully requests that it not be foreclosed from investigating this key line of defense, and that

---

[2] CAS MOU (7/6/11), https://info.publicintelligence.net/CCI-MOU.pdf.
[3] The *Cox* Court ordered Plaintiffs to produce the CAS MOU, Implementation Agreements and other related documents. Coorg Aff., Ex. 9.  Plaintiffs have only agreed to produce the public CAS MOU here.

the Court order the Plaintiffs to produce the Implementation Agreements.[4]

### b.  Plaintiffs Have Refused to Agree to Produce the 1% Sample Ownership Production Ordered by This Court Within a Reasonable Time

Plaintiffs bear the burden of proving ownership.  *Feist Publ'ns., Inc. v. Rural Tel. Serv. Co., Inc*., 499 U.S. 340, 361 (1991); *Twin Peaks Prods., Inc. v. Publ'ns Int'l Ltd*., 996 F.2d 1366, 1372 (2d Cir. 1993).  As only an exclusive owner has standing to sue for copyright infringement, discovery into ownership is critical.  *Id.; Big E. Entm't, Inc. v. Zomba Enter., Inc*., 453 F. Supp. 2d 788, 800 (S.D.N.Y. 2006) (dismissing copyright infringement claim where plaintiff "failed to show undisputed evidence of its copyright ownership").

The fact that record companies like Plaintiffs assert ownership of certain works does not mean such rights are always properly secured.  *BMG* at 649–50 (denying infringement claims on summary judgment because claimant on copyright registration was not co-owner or exclusive licensee).  Indeed, copyright cases are often streamlined after the plaintiffs are ordered to produce ownership discovery.  In case after case, when record industry plaintiffs in copyright cases are required to search for, collect, and produce complete chain of title and related documentations to establish ownership, they often voluntarily withdraw a substantial number of works. *See, e.g.*, *UMG Recordings, Inc. v. Veoh*, No. 09-55902 (9th Cir. 2011); Coorg Aff. Ex. 17.

Indeed, these same Plaintiffs even amended their complaint in the *Cox* action to drop hundreds of works after being ordered to produce chain of title documentation.  *Compare* Coorg Aff. Ex. 10 with Coorg Aff. Ex. 11.  Similarly, in *UMG Recordings, Inc. v. MP3.com, Inc*., the defendant successfully challenged more than half of the 4,700 copyrights claimed by UMG, thereby reducing potential liability by $65,000,000.  *Compare* No. 00 Civ. 472, 2000 WL 1262568,

---

[4] In order to preserve its objections, and in the event that the Court did not issue a new ruling regarding the CAS Implementation Agreements, Charter filed a Rule 72(a) Objection to Your Honor's ruling on the CAS Implementation Agreements and additional CAS materials. Dkt. 84.

at *6 (S.D.N.Y. Sept. 6, 2000) (noting at least 4,700 copyrights claimed and setting statutory damages at $25,000 per work) *with* 2000 U.S. Dist. LEXIS 17907 at *1 (S.D.N.Y. Nov. 14, 2000) (awarding damages for only 2,136 works).   Because each individual work carries a separate statutory damages award of up to $150,000, this voluntary reduction by Plaintiffs of works-in-suit is significant.   Charter is entitled to discovery regarding chain of title and ownership in order to test the validity of Plaintiffs' assertions of ownership—a basic prerequisite to Plaintiffs' claims.

During the October 29, 2019 teleconference in advance of Charter filing its intended motion to compel on this issue, the Court acknowledged that ownership documents were "potentially relevant," initially ordering Plaintiffs to produce 1% sample of the ownership documents sought by Charter, and the Court would revisit the issue of a full ownership production depending upon the rate of deficiencies in that sample.   Oct. 29, 2019 Hr'g Tr. at 35:8-11; 40:11-16.   Charter has identified to Plaintiffs a sample 1% of 110 works pursuant to the Court's October 29, 2019 Order. Coorg Aff., Ex. 5.   In connection with identifying the sample set, Charter asked Plaintiffs to produce the specified ownership documents for the identified works-in-suit by December 30, 2019.   *Id.*   Plaintiffs have refused to agree to produce the 1% sample until January 31, 2020, and refused to confirm whether they will produce documents with respect to all types of ownership documents sought.   *Id.* at ¶ 6.

Any consideration of burden here must account for the sheer number of separate Plaintiffs, who would share any burden amongst them.   The fact that Plaintiffs have pooled resources in hiring the same counsel does not mean they should be treated as one plaintiff for purposes of analyzing any actual discovery burden.   In Charter's proposed 1% sample of the works-in-suit, of the 110 total works at issue (out of the over 11,000 alleged): (1) Arista Music claims **seven**; (2) Atlantic Recording Corporation claims **four**; (3) Capitol Records, LLC claims **eight;** (4) Elektra

Entertainment Group, Inc. claims **one**; (5) LaFace Records LLC claims **two**; (6) Nonesuch Records Inc. claims **one** work; (7) Provident Label Group, LLC claims **one** work; (8) Sony Music Entertainment claims **thirty-six** works; (9) Sony Music Entertainment US Latin claims **one** work; (10) UMG Recordings, Inc. claims **thirty-five** works; (11) Warner Bros. Records Inc. claims **five** works; (12) WB Music Corp. claims **one** work; (13) WEA International Inc. claims **six** works; and (14) Zomba Recording LLC claims **two** works.  Coorg Aff. Ex. 5.  With twelve out of the fourteen Plaintiffs implicated by this sample *only needing to produce ownership documents for a single digit number of works-in-suit,* and remaining two, only thirty-five and thirty-six works, Plaintiffs' empty claims of burden run particularly hollow.  *See Int'l Bhd. of Teamsters v. Allegiant Travel Co.*, 2012 WL 1801979, at \*7 (D. Nev. Nov. 12, 2014) (granting motion to compel where party failed to demonstrate burden of producing documents).  It should not take more than three weeks to produce documents of this modest volume of works, especially when the relative burden is considered with respect to each Plaintiff.  Yet Plaintiffs propose taking ***over fifty days,*** or until the end of January 2020, to produce ownership documents that reflect a mere 1% of the works at issue. If this timeline were to be extrapolated to the remaining 99% of the works-in-suit—1% every 50 days—Plaintiffs would take over a dozen years to produce the ownership documents, and could not possibly comply with the deadlines in this case, as fact discovery is set to close in March 2020.

Charter has further complied with the Court's instruction to send a letter for confirmation about what categories of ownership documents Charter is seeking for the sample of works at issue. *See* Dkt. 80, Oct. 29, 2019 Hr'g Tr. at 41:24-42:3.  But Plaintiffs have not confirmed whether they are willing to produce all of these categories.  Specifically, Charter's Request for Production ("RFP") 5 seeks all documents concerning ownership, and Charter made clear to Plaintiffs that it specifically seeks: (1) certificates of registration; (2) chain of title documentation demonstrating

that Plaintiffs on the certificates of registration have been lawfully assigned the works-in-suit for the relevant time period; (3) work-for-hire agreements; and (4) documents sufficient to reflect any ownership disputes with third parties regarding the works-in-suit. Oct. 29, 2019 Hr'g Tr. at 25:3-46:19; Coorg Aff. Exs. 1, 5. Plaintiffs should confirm, or this Court should compel, Plaintiffs to produce ownership documents for the 1% sample from these four narrowly tailored categories, described in greater detail below.

**Copyright Certificates**: Though the production of valid copyright registrations, in the plaintiffs' name, provides prima facie evidence creating a presumption of ownership, a defendant is entitled to discovery to rebut that presumption. *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 649–50 (E.D. Va. 2015) ("BMG"), aff'd in part, rev'd in part, 881 F.3d 293 (4th Cir. 2018); see *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532 (11th Cir. 1996).

Here, Plaintiffs have not even agreed to produce a copyright certificate for each work-in-suit to make a prima facie showing of ownership. Instead, Plaintiffs have indicated that they will only produce registrations that are "readily accessible," and for the rest, Plaintiffs intend to provide copies of "look up pages" from the Copyright Office website. Coorg Aff. Ex. 2. But "look up" pages cannot substitute for valid copyright registrations—which are required for a prima facie case. Plaintiffs can obtain any missing registrations (that exist) from the Copyright Office, and should be required to produce a registration certificate for each work-in-suit.

**Chain of Title**: Plaintiffs refuse to provide chain of title documentation, ignoring that the presumption afforded by a valid copyright registration is rebuttable. *In re Napster, Inc. Copyright Litig.*, 191 F. Supp. 2d 1087, 1100 (N.D. Cal. 2002) (noting that "refusing to allow…discovery on the issue of ownership converts the presumption of ownership into an irrefutable one."). In *Napster*, the court stated that it was "reticent" "to allow plaintiffs, merely because of the quantity

of music they control, to railroad Napster into potentially billions of dollars in statutory damages without adequately proving ownership." *Id*. As that court noted, "without reviewing the agreements...it is impossible to determine" the plaintiffs' ownership, and thus the court ordered the plaintiffs to "produce all documentation relevant to their ownership of the works." *Id.*

Similarly here Charter must be able to analyze chain of title documentation, such as assignments, exclusive licenses, publishing agreements and other underlying documentation to show how Plaintiffs allegedly obtained ownership of the more than 11,000 works-in-suit. It would be "impossible to determine" from the registrations (or print-outs) alone whether Plaintiffs own the works, as such rights had to originally be assigned to Plaintiffs by third parties. *Id.*; *Moran v. London Records, Ltd.*, 642 F. Supp. 1023, 1025 (N.D. Ill. 1986), aff'd, 827 F.2d 180 (7th Cir. 1987) (plaintiff lacked standing where he "was never part of the chain of title to the copyright").

**<u>Work-for-Hire Agreements</u>**: Discovery into ownership is especially necessary for any works registered as works-for-hire pursuant to 17 U.S.C. § 101. Under 17 U.S.C. § 101, Plaintiffs must have a work-for-hire agreement that dates from *before* the work was created in order for such registrations to be valid. See *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 413 (7th Cir. 1992) ("The writing must precede the creation of the property in order to serve its purpose of identifying the (noncreator) owner unequivocally"); *Gladwell Gov't Servs., Inc. v. Cty. of Marin*, 265 F. App'x 624, 626 (9th Cir. 2008) ("The plain language of the [Copyright Act] indicates that a work-for-hire agreement cannot apply to works that are already in existence.").

Charter would have no way to test the validity of the alleged works-for-hire (likely claimed for most works-in-suit) without seeing the date and details contained in the underlying work-for-hire agreement (to the extent Plaintiffs actually secured one, which Charter is also entitled to know). Courts thus order work-for-hire agreements as part of ownership discovery. *Arista*

*Records, LLC v. Myxer, Inc*. (granting motion to compel seeking "chain of title documents in plaintiffs' possession, custody or control, directly bearing on the...plaintiffs' ownership of the sound recordings [at issue], including work-for-hire agreements and assignment agreements.").

This discovery is also particularly critical because Plaintiffs are not entitled to seek statutory damages unless they own valid registrations for the asserted works.  17 U.S.C. § 504. The Court *agreed* with Charter during the October 29 call regarding the relevance of work-for-hire agreements, Dkt 80, Oct. 29, 2019 Hr'g Tr. at 46:4-19, yet Plaintiffs still refuse to confirm whether their sample production will confirm work-for-hire agreements.

**Ownership Disputes**:  In response to RFPs 3 and 5, Charter seeks information regarding ownership disputes with respect to the works-in-suit.  Coorg Aff. Ex. 1.  Information about any such disputes with third parties, and communications with the Copyright Office about any ownership disputes, are squarely relevant to Charter's investigation into Plaintiffs' claimed ownership.  Plaintiffs' objection that Charter must first affirmatively identify challenges to be entitled to such discovery is circular, as Charter would have no way to know what works-in-suit are vulnerable to challenge if it is denied the right to investigate the challenges, of which Plaintiffs are aware, and are within Plaintiffs' exclusive control, which this Court recognized.  Dkt. 80, Oct. 29, 2019 Hr'g Tr. at 42:13-22; 45:13-20. (where Magistrate Judge Hegarty stated "how would they know that, Mr. Gould? How would they know that?" with regard to Charter's knowledge of works with ownership issues).

Charter is entitled to the full scope of discovery on ownership and validity for works-in-suit, including copyright registrations, chain of title documentation, work-for-hire agreements, and documents and communications reflecting disputes about ownership.  As Plaintiffs have refused to agree to produce a 1% sample within the time necessary to review the sample, Charter seeks the

Court's assistance to require Plaintiffs to produce the sample documents—and make it possible for Charter to analyze, move to compel and obtain production of the full 100% the requested of ownership documents—before discovery closes in March 2020.  Charter respectfully requests that the Court order Plaintiffs to either (1) produce the 1% sample by **January 6, 2020**; or alternatively (2) order responsive ownership documents for *all* works-in-suit by **January 31, 2020**.

### c.   Plaintiffs Have Agreed but Have Yet to Produce, or Commit to A Date for Producing, Digital Copies of Works-in-Suit

On October 23, 2019, Plaintiffs agreed to produce digital copies of each of the works-in-suit responsive to Charter's Request for Production No. 2—information which is plainly relevant. Coorg Aff. Ex. 7.  *See, e.g., Stern v. Weinstein*, No. CV 09-1986-DMG, 2010 WL 11459354, at *1–2 (C.D. Cal. Aug. 19, 2010) (holding it "obvious, and entirely fair, for defendant to first have access to a copy of the [work in suit]" before being required to construct defense based on work(s)-in-suit).  Since then, however, Charter's counsel has repeatedly asked Plaintiffs' counsel when such information could be expected (which Plaintiffs refused), ultimately Charter proposed December 16, 2019 (which Plaintiffs also refused).  Coorg Aff. Exs. 7, 14.  Charter is thus unable to evaluate whether the production date would provide sufficient time to allow Charter and its expert(s) to conduct the comparative analyses between copies of the works-in-suit against the alleged infringements.  Plaintiffs should not be permitted to delay production until it is too late for Charter to make meaningful use of the works-in-suit. *See Gratton v. Great Am. Commc'n*, 178 F.3d 1373, 1374–1375 (11th Cir. 1999).  Charter respectfully requests that the Court compel Plaintiffs to produce digital copies of the works-in-suit by **January 6, 2020**.

### d.   Charter is Entitled to Financial Discovery

Finally, Plaintiffs have indicated in response to Charter's Objection (Dkt. 89) that Charter did not exhaust its efforts to obtain production of the financial information Charter seeks from

Your Honor.    To the extent that Your Honor is willing to revisit the financial issues notwithstanding Charter's Objection presently pending before Judge Jackson, Charter provides its positions as to the financial information sought, and the reasons that the documents ordered thus far will be insufficient for Charter to conduct a meaningful investigation into damages.

### i.  Basic Financial Information About the Works-in-Suit

Financial information about the works-in-suit relates squarely to damages and value. Charter seeks revenues for 2012-2016,[5] by work and by channel. Plaintiffs have refused to produce this information, and have agreed only to produce total annualized revenues for the Plaintiff entities.   Coorg Aff. Ex. 2.   The *Cox* court found the same information sought by this narrowly-tailored request to be relevant and discoverable, and required these same Plaintiffs to produce revenues ***by work*** and by channel for physical, digital permanent downloads, streaming, and licensing revenue for the period of 2011-2014, the entirety of the claim period in the *Cox* litigation and years before.   Coorg Aff. Ex. 8 (requiring Plaintiffs to produce revenue by work and by channel, physical downloads, streaming, and licensing data); Coorg Aff. Ex. 15 (granting defendants' motion to compel financial information).

Approximately 79% of the works-in-suit are overlapping with *Cox*. Coorg Aff. ¶ 11. Pursuant to the Court's October 29, 2019 Order, Plaintiffs were ordered to allow Charter to use the overlapping materials from *Cox* in this matter, however Charter requires such financial information for all the works-in-suit throughout the Claim Period in order to conduct the work-by-work valuation analysis relevant to this action.   *Adams v. Agrusa,* No. 2:15–cv–07270–SVW–RAO, 2016 WL 7665767, at *3 (C.D. Cal. July 20, 2016); *Religious Tech. Ctr. v. Netcom On-Line Commc'n. Servs*., 923 F. Supp. 1231, 1241 (N.D. Cal. 1995); *see also Nunes v. Rushton*, No.

---

[5] Plaintiffs' Claim Period is March 24, 2013 to May 17, 2016 (Dkt. 1 at ¶ 5). Charter has proposed a discovery period of March 1, 2012 to May 17, 2016 (the "Discovery Period").

214CV00627JNPDBP, 2018 WL 2214593, at *1–2 (D. Utah May 14, 2018) (noting that a jury may consider "a number of factors" including "the amount of any actual damages to the copyright holder. . ."); *City & Cty. of San Francisco v. Tutor-Saliba Corp.*, 218 F.R.D. 219, 221 (N.D. Cal. 2003) (requiring plaintiffs to produce a full assessment of damages and supporting information to allow defendant ability to understand contours of exposure and potential for settlement).

Plaintiffs should be required to update the records for the overlapping works-in-suit, and separately produce records for the subset of works that Plaintiffs have added in the present matter. While Plaintiffs claim that they "do not maintain records of profits, expenses, or revenue, organized by medium and by work as requested," the information sought in this request is largely the same information that was ordered by the *Cox* court to be produced, and Plaintiffs produced it there. Here, the burden is even less, as the production need only be made available again with an update to account for the non-overlapping works and the time difference in the Claim Period.

And of course, any burden would be spread amongst the fifty-four Plaintiffs in this suit, with the information only requiring production for the works relative to the number of works each Plaintiff is asserting. Plaintiffs cannot simply join forces and pool their resources to benefit from filing a massive suit and not expect to comply with corresponding discovery burdens and obligations that come with prosecuting a case on behalf of fifty-four Plaintiffs for over 11,000 works.[6]

Plaintiffs have articulated no valid objection for denying Charter this clearly discoverable

---

[6] *See Sony Music Entm't. v. Cox Communications, Inc.*, No. 1:18-cv-950 Dkt. 93 at 19:13-17, 26:21-27:2, 32:6-13 (E.D. Va. Jan. 25, 2019) (in addressing Plaintiffs' counsel before ordering work-by-work revenue information, the *Cox* court stated: "**I need you to address why I shouldn't require the plaintiffs in this case, who decided to bring this case, decided to bring this case alleging 11,000 works with various different entities, you made that decision, and why they shouldn't be required to produce revenue by work by channel for a period of time**."; "**I think, you know, that's certainly information that is relevant.**"). Coorg Aff. Ex. 8.

information, and have provided no estimate of any burden.  In fact, Plaintiffs *admit* that the value of works at issue is directly relevant, and will require discovery, stating in their initial disclosures that "[a] more detailed computation of damages is premature…because a significant amount of information bearing on…damages—such as…the ***value of Plaintiffs' recordings and musical compositions at issue***…will otherwise be developed during the discovery process."  (emphasis added) *Id*. ¶ 19, Ex. 16.  Plaintiffs should not be entitled to cherry-pick financial documents when Charter has the right to investigate sufficiently to best advocate for a fair amount for any damages.

### ii.   Documents and Information Related to the Value of the Works

To investigate the value of the works and, in turn, assess any alleged or actual damages, Charter seeks information regarding Plaintiffs' distribution and/or license agreements with certain third parties that stream the works-in-suit, including YouTube, Vevo, and DailyMotion, as well as documents sufficient to identify the fees and/or royalties for the works-in-suit.  Assuming *arguendo* that Plaintiffs prove ownership and infringement with respect to any of the works at issue, the information Charter seeks with its narrowed request is relevant to an appropriate assessment of Plaintiffs' damages and the value of the works-in-suit.  This is true regardless of whether Plaintiffs choose to assert actual or statutory damages.  Indeed, even if Plaintiffs elect statutory damages, while Plaintiffs would not have to *prove* damages, Charter is still entitled to make a case to the jury for the lower end of the available statutory damages, which can be as low as $750 or as high as $150,000 per work.  17 U.S.C. § 504(c)(1)-(2).

Plaintiffs may not preclude discovery into any actual damages unless seeking only the minimum statutory damages, because statutory damages "should bear some relation to actual damages suffered."  *RSO Records, Inc. v. Peri*, 596 F. Supp. 849, 862 (S.D.N.Y. 1984).  Otherwise Plaintiffs would obtain a "windfall," which is not the intent of statutory damages.  *Peer Int'l Corp.*

*v. Luna Records, Inc.*, 887 F. Supp. 560, 568–69 (S.D.N.Y.1995); s*ee also BMG v. Global Eagle Order;* Coorg Aff., Ex. 12 (granting motion to compel plaintiff to produce, in a mass copyright case like this one, licensing agreements, revenue information and value information relating to the works-in-suit); *Adams*, 2016 WL 7665767 at *3; *Religious Tech. Ctr.*, 923 F. Supp. 1231 at 1241.

As the party resisting discovery, Plaintiffs bear the burden of "showing that the discovery fails the proportionality calculation mandated by Rule 26(b)." *See Carr v. State Farm Mut. Auto. Ins. Co.*, 312 F.R.D. 459, 469 (N.D. Tex. 2015).   Plaintiffs would be unlikely to face any disproportionate burden in producing responsive documents here.   Under common industry practice, Plaintiffs would not negotiate the sought-after agreements on a work-by-work basis. Rather, Plaintiffs enter "umbrella" agreements with third parties pursuant to which Plaintiffs would agree to the streaming or downloading of the works-in-suit through the third party's platform in exchange for certain licensing fees or royalties.   Some of these agreements would be expected to operate under a tiered pricing structure, which sets forth different payments per stream or download based on the value that Plaintiffs and the third parties have ascribed to the works.   This information is therefore highly relevant to the valuation of the works-in-suit, especially in the context of streaming and downloading (as is alleged here), which is critical to any expert analysis about damages.   As the volume of such materials should be relatively low, there is likely to be minimal burden in producing them.   Plaintiffs have identified no burden to date.   And in any event, any theoretical burden does not outweigh the importance of this discovery to Charter's assessment of damages and the value of the underlying works.

## II.   CHARTER'S POSITIONS REGARDING PLAINTIFFS' ISSUES WITH CHARTER'S DISCOVERY RESPONSES

### A.  Plaintiffs' Interrogatories Nos. 11 and 12

#### i.  Plaintiffs Interrogatory No. 11

Plaintiffs' Interrogatory No. 11 asks for data related to the total number of Charter subscribers from 2010 to 2016.  The total number of subscribers by month are not relevant to Plaintiffs' claims or Charter's defenses, to the extent any historical subscriber data from many years ago is even available.  The scope of infringement in this case is measured by how many of Plaintiffs' works have been infringed, not what percentage of Charter's subscribers were implicated in allegedly infringing Plaintiffs' works (without regard for the amount of other legitimate uses occurring through those accounts).  These raw numbers also cannot possibly speak to the reasonableness of Charter's actions, as they provide no context about how Charter dealt with notices relating to Plaintiffs, the only relevant subscribers at issue here.

This information is not relevant to Plaintiffs' vicarious liability claim because such information does not provide information relevant to any "draw" analysis. *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1117-18 (9th Cir. 2007) (finding no vicarious liability because evidence that "[defendant] 'hosts' websites for a fee" was too sparse to show a direct financial benefit and thus not "a draw" to subscribers); *Shell v. Am. Family Rights Ass'n*, 2010 WL 1348548, at *16 (D. Colo. Mar. 31, 2010) (to demonstrate draw, plaintiff must show defendant received "direct financial interest in the exploited copyrighted materials.").  To show a draw, it would be necessary to show that customers either subscribed *because of* the available infringing material *or canceled subscriptions because it was no longer available.  Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004).  Total aggregate subscriber data, including non-implicated subscribers, does not provide information about either of these inquiries.  The data of how many subscribers Charter had at a given time does not demonstrate whether the availability of infringing material on the internet at large acted as a draw for any of those subscribers.  Such information is also not relevant to contributory infringement, as it is neither relevant to the knowledge of infringement of the

specific works-in-suit or whether Charter materially contributed to the infringement.

### ii.   Plaintiffs Interrogatory No. 12

Though Charter has already agreed to provide termination information numbers for alleged copyright infringement, Plaintiffs' Interrogatory No. 12 seeks the total number of subscribers terminated for non-payment.  Plaintiffs have failed to articulate a theory of relevance for this information.  As a preliminary matter, terminating for non-payment is a black and white inquiry— Charter does not provide free internet services—but charges customers a fee for a pipeline to access the internet, and would deny access to those who have not paid.  The standard Plaintiffs are attempting to invoke against Charter through this lawsuit is far more complicated, suggesting that Charter should have terminated a substantial number of paying customers for allegations before they were proven in court, even where such alleged infringement was by users that were not the subscribers, such as where an account that services a library, an airport, a military base, a hotel, or even a family.  Charter does not control what its customers do on the internet.  Charter is not in any position to view or disable access to alleged infringing conduct, and even if technically feasible (which it is not), Charter is not in the business of spying on its customers.  Terminating internet access altogether for non-payment would not require the judgment calls and invasion of privacy that terminations based on alleged copyright violations involve.

Nor are these materials relevant to Plaintiffs' claims of contributory liability.  Whether Charter terminated subscribers for failing to pay does not bear on whether Charter "materially contributed" to the alleged infringement of its subscribers.  Indeed, this test requires more than bald allegations that Charter merely provided the means to accomplish some infringing activity. *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster*, 545 U.S. 913, 937 (2005).   How many

subscribers were terminated for non-payment has nothing to do with the claims and defenses in this case.

### B.  Plaintiffs' Requests for Financial Information Are Moot, Premature and/or Overbroad

During the course of meet and confer discussions between the parties, Charter agreed to produce available financial data responsive to Plaintiffs' requests from 2012-2016.  *See supra* at pp. 3-4.[7]  Charter proposed that Plaintiffs' counsel evaluate that financial production and then come back to Charter if Plaintiffs still believe more information was necessary.  Rather than await Charter's production—which Charter has indicated will be substantially complete in December—of such information—or indeed even *alert* Charter that Plaintiffs believed such production to be overdue—Plaintiffs have sought the Court's intervention where, for the majority of Plaintiffs' requests, none is necessary.  Charter has agreed to produce available information responsive to most of Plaintiffs' requests for the Claim Period plus one-year prior (March 1, 2012 to May 17, 2016, or the "Discovery Period").  Charter's financial productions will provide Plaintiffs sufficient data to make the determinations they wish to make through analyzing Charter's financial records. The specific RFPs at issue are addressed below.

### i.  Plaintiffs' Request for Production No. 18

Plaintiffs seek documents sufficient to show Charter's total and average revenues and profits by month and year, per service provided.  On December 3, 2019, Charter produced financial information that is responsive to Plaintiffs' request.  Coorg Aff. ¶ 14, Ex. 13.  Plaintiffs have not articulated why they specifically need data that predates 2012, or why they need monthly data by service, which would include services that have nothing to do with the internet access (e.g., cable, home security, and telephone).

---

[7] Plaintiffs have yet to produce any non-public financial information.

The relevant time period for this case is the Claim Period, 2013-2016, and Charter has agreed to search for and produce available data for the Claim Period *and* an additional year prior, 2012, which is more than sufficient. Indeed, this was precisely what was ordered in the similar *Cox* matter, where the court found that the claim period there plus one-year prior was a sufficient time period to meet Plaintiffs' discovery needs. *Id.* at ¶ 9 and Ex. 5. Charter's proposed Discovery Period mirrors the time period found to be relevant in *Cox*. Plaintiffs insist that they need more expansive information to "analyze trends in Charter's financial performance over time." One year prior to the Claim Period should provide Plaintiffs with sufficient data to complete any "trend" analysis they wish to complete. There are no "trends" that are remotely relevant to this case that are from years or more before the Claim Period began.

### ii.   Plaintiffs' Request for Production No. 19

Plaintiffs seek subscriber level financial data for any subscriber accused by Plaintiffs of copyright infringement. In doing so, again, Plaintiffs mischaracterize the standards for vicarious and contributory liability, equating receipt of any monies from subscribers to (1) right and ability to control, and (2) knowledge and material contribution.

But the receipt of a subscription fee for internet services is insufficient to demonstrate a direct financial benefit, as such receipt is not *directly* tied to the alleged infringement. *See* Dkt. 38, at 9-14; *see also Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) (plaintiff must establish that an ISP attracted subscriptions "because of" the infringement to establish a direct financial benefit). Plaintiffs insist that this subscriber level financial data is "directly relevant to the financial-benefit element of Plaintiffs' vicarious infringement claim." Plaintiffs have relied on *Capitol Records, LLC v. Escape Media Grp.*, 2015 WL 1402049, at *42 (S.D.N.Y. Mar. 25, 2015) as "holding that financial benefit exists 'as long as the service provider has an economic incentive

to tolerate infringing conduct."  But as courts have noted, *Congress* has cautioned courts:

> that 'receiving a one-time set-up fee and flat periodic payments for service… [ordinarily] would not constitute receiving a 'financial benefit directly attributable to the infringing activity.' S Rep. 105-190, at 44. But 'where the value of the service lies in providing access to infringing material,' courts might find such a 'one-time set-up and flat periodic' fees to constitute a direct financial benefit. *Id*. at 44-45. Thus, the central question of the 'direct financial benefit' inquiry in this case is whether infringing activity constitutes a draw for subscribers, not just an added benefit. See *Ellison* at 1079.

This case is precisely the type that Congress cautioned about, and Plaintiffs should not be entitled to seek discovery on these attenuated theories.  Any infringement would be an "added benefit" to the value of internet access for consumers—not a draw.  *Ellison* discusses a distinction highly pertinent to this case between the "draw" of customers to Napster and AOL.  Distinguishing *A & M Records v. Napster, Inc*., 239 F.3d 1004, 1013 (9th Cir. 2001) (*Napster II*)—*Ellison* noted that virtually "all of Napster's 'draw' of customers resulted from Napster providing access to infringing material" and the "relatively insignificant draw" present when considering the "vast array of products and services" offered by the defendant AOL. 357 F.3d at 1078.  Because there was nothing to support the allegation that "AOL attracted or retained subscriptions because of the infringement or lost subscriptions because of AOL's eventual obstruction of the infringement," the plaintiffs' vicarious liability claim failed.  *Id*. at 1079. Similarly, the vast array of uses and services available to Charter's customers through its high speed internet likewise renders any "draw" from infringement "relatively insignificant." *Id*. at 1078.

Nor is this material relevant to contributory liability—receipt of subscription fees cannot demonstrate any material contribution to copyright infringement where the product being provided is the internet.  *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster*, 545 U.S. 913, 937 (2005).

### iii.  Plaintiffs' Request for Production No. 20

Plaintiffs' also seek "audited" financial records.  Charter has already produced to Plaintiffs financial records for the relevant periods in which financial information is available—2012, 2013,

2014 and 2015.  Coorg Aff. ¶ 14 and Ex. 13.  Plaintiffs have failed to articulate or demonstrate why they seek "audited" financial records, or what pertinent information would be available in such documents that would not be reflected in the materials already produced to them.  As it is Plaintiffs' burden to demonstrate relevance—which they have not—Plaintiffs' motion as to this request should be denied. *See Gordon v. Coates*, No. 1:19-MC-00090-RM, 2019 WL 5694241, at *1 (D. Colo. Nov. 1, 2019) ("If the relevancy of the discovery sought is not apparent, the party seeking the discovery bears the burden of establishing relevancy of the request.")

### C.  Plaintiffs' Requests for Documents from an Irrelevant Time Period

Plaintiffs' requests for documents from nearly a decade ago, back to 2010 and 2011, are irrelevant.  Only information related to the Claim Period is relevant to the claims or defenses of either party.[8]  Indeed, all of Plaintiffs' cited cases, both in the body of their brief and FN 2, reflect discovery periods that mirror the statute of limitations in those cases.  Charter has proposed a Discovery Period with an extra year predating the Claim Period.  The *Cox* court likewise found that this was the relevant time period for that matter in connection with similar requests on which Plaintiffs now move.  Coorg Aff. Ex. 8.  Plaintiffs' arguments should be rejected as Plaintiffs cannot demonstrate the relevance or proportionality of this time period.  *Handy v. Fisher*, Civ. No. 18-cv-00789-RBJ-SKC, 2019 WL 6038065, at *6 (D. Colo. Nov. 14, 2019) (partially denying plaintiff's motion to compel where information sought was "not relevant or proportional to the needs of the case").  Indeed, Plaintiffs may only recover for claims for their copyrighted works. 17 U.S.C.A. § 507(b).  That a subscriber received a notice from a non-party is of no moment. Plaintiffs' claims are grounded in those notices, not beyond. Charter also provides the following specific responses to each of Plaintiffs' arguments.

---

[8] The statute of limitations in copyright cases is three years from the infringement. Here, the Tolling Agreements, discussed *supra* at p. 10 establish those three years as March 24, 2013 to May 17, 2016.

### iv.   Plaintiffs' Request for Production No. 8

Charter has already produced responsive documents reflecting Charter's policies that were enacted during the Discovery Period.  Coorg Aff. Ex. 13.  Plaintiffs have not provided any rationale as to why documents and information relating to Charter's policies predating Charter's proposed Discovery Period is necessary or relevant.  The only policy enacted by Charter that is relevant to Plaintiffs' claims is the one that was in place during the claims period—the policy under which Plaintiffs' allegations took place.   Charter's responses to the notices were therefore guided exclusively by this policy.

### v.   Plaintiffs' Requests for Production Nos. 2, 4 and 15

Plaintiffs' remaining requests relate to ticket log data maintained by Charter.  Charter has been actively negotiating with Plaintiffs the form and substance of this production, and has consistently informed Plaintiffs that it is willing to produce such available data for notifications sent to subscribers by Plaintiffs.  Coorg Aff. ¶ 16 and Exs. 7, 14.  As Plaintiffs only recently (in mid-November) produced a large volume of notice data that will assist Charter in ascertaining the universe of potential available records (following repeated requests from Charter), Charter is finally in a position to assess the full level of available information and produce the relevant information.

### II.   Conclusion

For the foregoing reasons, Charter respectfully submits this statement of the issues and requests the relief detailed herein.

Respectfully submitted this 16th day of December, 2019.

Michael S. Elkin (pro hac vice)
Thomas Patrick Lane (pro hac vice)
Seth E. Spitzer (pro hac vice)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
(212) 294-6700 (telephone)
(212) 294-4700 (facsimile)
E-mail: melkin@winston.com
E-mail: tlane@winston.com
E-mail: sspitzer@winston.com

Jennifer A. Golinveaux (pro hac vice)
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA  94111-5840
(415) 591-1506 (telephone)
(415) 591-1400 (facsimile)
E-mail: jgolinveaux@winston.com

*s/ Erin R. Ranahan*
Erin R. Ranahan (*pro hac vice*)
Shilpa A. Coorg (*pro hac vice*)
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071
(213) 615-1933 (telephone)
(213) 615-1750 (facsimile)
E-mail: eranahan@winston.com
E-mail: scoorg@winston.com

Craig D. Joyce
John M. Tanner
Fairfield and Woods, P.C.
1801 California Street, Suite 2600
Denver, Colorado 80202
Phone: 303.830.2400
Fax: 303.830.1033
E-mail: cjoyce@fwlaw.com

Counsel for Defendant
Charter Communications, Inc.

## CERTIFICATE OF SERVICE

I certify that on December 16, 2019, a true and correct copy of the foregoing was served on the Court and all Parties via email.

| | |
|---|---|
| Matthew J. Oppenheim<br>Scott A. Zebrak<br>Jeffrey M. Gould<br>Kerry M. Mustico<br>OPPENHEIM + ZEBRAK, LLP<br>4530 Wisconsin Ave. NW, 5th Floor<br>Washington, DC 20016<br>Tel: (202) 851-4526<br>E-mail: matt@oandzlaw.com<br>E-mail: scott@oandzlaw.com<br>E-mail: jeff@oandzlaw.com<br>E-mail: kerry@oandzlaw.com<br>*Attorneys for Plaintiffs* | Mitchell A. Kamin<br>Neema T. Sahni<br>Mark Y. Chen<br>COVINGTON & BURLING LLP<br>1999 Avenue of the Stars, Suite 3500<br>Los Angeles, CA 90067-4643<br>Tel: (424) 332-4800<br>E-mail: mkamin@cov.com<br>E-mail: nsahni@cov.com<br>E-mail: mychen@cov.com<br>*Attorneys for Plaintiffs* |
| Janette L. Ferguson<br>Benjamin M. Leoni<br>LEWIS BESS WILLIAMS & WEESE, P.C.<br>1801 California Street, Suite 3400<br>Denver, CO 80202<br>Tel: (303) 861-2828<br>E-mail: jferguson@lewisbess.com<br>E-mail: bleoni@lewisbess.com<br>*Attorneys for Plaintiffs* | Jonathan M. Sperling<br>William E. O'Neil<br>COVINGTON & BURLING LLP<br>620 Eighth Avenue<br>New York, NY 10018-1405<br>Tel: (212) 841-1000<br>E-mail: jsperling@cov.com<br>E-mail: woneil@cov.com<br>*Attorneys for Plaintiffs* |
| | Megan M. O'Neill<br>COVINGTON & BURLING LLP<br>850 Tenth Street, NW<br>Washington, DC 20001-4956<br>Tel: (202) 662-5416<br>E-mail: moneill@cov.com<br>*Attorneys for Plaintiffs* |

*s/ Erin R. Ranahan*
Erin R. Ranahan