# Exhibit 3

1

1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2
Case No. 19-cv-874-RBJ-MEH
3       _____

4       WARNER RECORDS, INC., et al.,

5            Plaintiffs,

6       vs.

7       CHARTER COMMUNICATIONS, INC.,

8            Defendant.
        _____
9

10             Proceedings before MICHAEL E. HEGARTY, United

11      States Magistrate Judge, United States District Court for the

12      District of Colorado, commencing at 1:00 p.m., December 17,

13      2019, in the United States Courthouse, Denver, Colorado.

14      _____

15             WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16      ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17      _____

18                          APPEARANCES

19             NEEMA SAHNI, NICHOLAS LAMPROS and JANETTE FERGUSON,

20      Attorneys at Law, appearing for the Plaintiffs.

21             ERIN RANAHAN and CRAIG JOYCE, Attorneys at Law,

22      appearing for the Defendant.

23      _____

24                       DISCOVERY CONFERENCE

25

2

1              P R O C E E D I N G S

2              (Whereupon, the within electronically recorded

3    proceedings are herein transcribed, pursuant to order of

4    counsel.)

5              THE COURT:  Case Number 19-cv-00874, Warner

6    Records, Inc., et al., vs. Charter Communications, Inc.

7              Please make your appearances.

8              MS. SAHNI:  Neema Sahni from Covington & Burling

9    on behalf of the plaintiffs.  And I'm here with my colleague

10   Nick Lambros also from Covington and bulger.

11             MS. FERGUSON:  Good afternoon, Your Honor.

12   Janette Ferguson from Lewis Bess Williams & Weese on behalf

13   of the plaintiff.

14             THE COURT:  Okay.

15             MS. RANAHAN:  Good afternoon, Your Honor.  Erin

16   Ranahan for defendant Charter Communications.

17             MR. JOYCE:  I'm Craig Joyce.

18             THE COURT:  Okay, thank you.

19             No one on the phone?

20             UNIDENTIFIED SPEAKER:  No.

21             THE COURT:  Okay.  So what we're doing today is

22   what I'm paid to do, but we're not going to be doing this on

23   a regular basis, I'm just telling you.  You guys are going

24   to work things out better than this in the future, okay.

25             So you're both sets of good lawyers, but for the

3

1    grace of God, you will appear wearing a robe, we all know

2    what litigation is about and I just don't want you fighting

3    over things that are basic.  So maybe as soon as you learn

4    what I think is right and wrong, then that will guide you in

5    the future.

6              Does that sound fair?  Okay.

7              So, for example, let me just bring up something.

8    There is no way that -- I had two settlement conferences

9    yesterday, so there is no way I could go through that much

10   material overnight, all right.  So you're going to have to

11   educate me if you want me to know something.

12             But, for example, one of the reasons that -- some

13   of the reasons that plaintiff believes they need some

14   information, for example, is that, we'll take the terminated

15   subscribers for nonpayment; that if you can terminate for

16   nonpayment, you can terminate for infringing on our rights.

17   That's your position, right, so that's what you want to

18   prove.

19             That shouldn't be a disputed fact.  I don't think

20   you guys will dispute, that if you wanted to you could

21   terminate somebody if you knew they were violating the law,

22   right.

23             MS. RANAHAN:  We're not -- we do not dispute the

24   fact that we can technically terminate.

25             THE COURT:  Right.  So a lot of these things can

4

1    be dealt with with factual stipulations because no one in

2    their right mind would say, we can't terminate somebody

3    because they're violating the law.  You wouldn't say that.

4    So you can agree with that so you don't need that discovery

5    because they can stipulate to that fact.

6            Does that make sense?

7            MS. SAHNI:  Right, Your Honor, but the issue is

8    not simply whether they technically can shut off the

9    Internet access, but there is a number of issues related to

10   whether or not it's reasonable for them to terminate people

11   for nonpayment, but not terminate for known instances of

12   copyright infringement.

13           THE COURT:  That's different, but what you said

14   was the bills will show that Charter had the right to

15   terminate.

16           MS. SAHNI:  And they have disputed the right and

17   ability to control under the vicarious liability prong, and

18   Your Honor rejected those arguments in connection with their

19   motion to dismiss, but that is a disputed issue.

20           They have said that they don't have the right and

21   ability to control under the vicarious liability analysis,

22   and that issue is currently pending in an objection before

23   Judge Jackson.

24           THE COURT:  Okay.

25           MS. RANAHAN:  Your Honor --

5

1          THE COURT:  So you're saying -- all right, just

2    remind me.  They've alleged that they have no right to

3    terminate somebody who they know is infringing somebody's

4    copyright?

5          MS. SAHNI:  That's right, Your Honor.

6          They have argued -- they've taken the position, and

7    Ms. Ranahan can obviously elaborate, but our understanding of

8    the briefing on the vicarious liability count is that they

9    have taken the position that plaintiffs have failed to allege

10   both the right and ability to control, the first prong, as

11   well as the financial benefit prong, and they've -- they've

12   argued in their motion to dismiss papers that neither of

13   those prongs is satisfied.

14         THE COURT:  Your failure, alleged failure to

15   properly plead something is different than their right to do

16   something.  You're required to plead it and they're

17   permitted to say you haven't pled it under the standards

18   that are required, but it doesn't mean they won't stipulate.

19         We're talking about discovery and what you really

20   need and avoiding expensive discovery in case they're willing

21   to stipulate to a certain fact.  Those are different things.

22         So for purposes of the motion to dismiss, they can

23   make those arguments, but for purposes of the eventual trial,

24   they could agree, reserving all rights that they will not

25   oppose -- they will not dispute that they have a legal right

6

 1    to terminate a subscriber who they know is violating the law.

 2              Does that make sense?

 3              MS. SAHNI:  I understand your point, Your Honor.

 4    I -- the point, thus far, is that they haven't, you know,

 5    conceded that they the legal right.

 6              THE COURT:  Have you asked?

 7              MS. SAHNI:  They -- we've been fighting about

 8    this.  And in related litigation, they're expressly making

 9    an argument where they say, we would never -- you know, we

10    can never terminate people because Internet is so vital to

11    the day-to-day lives of subscribers.  And so we need to be

12    able to show that they terminate subscribers regularly for

13    nonpayment when it's in their financial interest to do so.

14              THE COURT:  But they will -- they will stipulate

15    to that.  Why do you need the records?  Wouldn't you

16    stipulate that --

17              MS. RANAHAN:  Yes, Your Honor.

18              THE COURT:  -- that if somebody doesn't pay their

19    bill, you'll terminate them?

20              MS. RANAHAN:  Absolutely.  And that's --

21              THE COURT:  Whether it's 10,000 or 1000 or 100,

22    whoever is not paying, you'll terminate them, right?

23              MS. SAHNI:  But, Your Honor --

24              MS. RANAHAN:  I would just like to make a

25    distinction between the right and ability to control

7

1    infringement and the right to terminate an account.

2            There is a distinction legally between us being

3    able to -- if we get a notice of infringement, we hear that

4    it's on an account which could be used by multiple people, it

5    could be used by a business, it could be used by a library.

6    Knowing who actually committed the infringement is a

7    different question.

8            So when we say we don't have the right and ability

9    to control the infringement, that's because us cutting off --

10   which we concede to your question we can do.  We can cut off

11   the Internet, we can terminate an account if we know someone

12   is not paying, that's a basic price of admission, that's

13   black-and-white inquiry.  We cut it off, of course, yes,

14   we'll stipulate to that.

15           The question that is the right and ability to

16   control infringement is what we're disputing.  And that's a

17   legal issue that's separate from the factual question that's

18   before you right now, Your Honor, which is that if there is

19   a -- we can -- of course, we can do it, we have the right to

20   do it.

21           In this -- in the lawsuit that's going on right

22   now, there were terminations, that's why I do take issue with

23   that statement, that we're making the argument we can't do

24   it.  We have done it in that case.

25           MS. SAHNI:  And I can clarify.  I mean, in that

8

1    Cox litigation, the Court said it was relevant and

2    admissible, and there has been substantial testimony showing

3    that they've terminated, you know, a large number of people

4    for nonpayment and yet, they're not doing the same amount of

5    termination.  And that's a relevant fact for the jury to

6    know, if they know they're constantly terminating people for

7    failure to pay.

8            But in this case, if we were to be able to show the

9    data that says, you terminated X number of people for

10   nonpayment, but you terminated nobody for failure to -- for

11   their repeat infringement, that's obviously a very relevant

12   issue for the jury to know.

13           THE COURT:  That fact, maybe, they can tell you

14   how many people they have terminated in a certain period of

15   time.

16           MS. SAHNI:  They won't do that, Your Honor.

17   That's what this interrogatory asks them to do.

18           THE COURT:  No, that's the records.  Doesn't it

19   seek records?

20           MS. SAHNI:  No.  It's the interrogatory, Your

21   Honor.  This is an interrogatory which asks them to identify

22   the number of subscribers per month and year whose Internet

23   service Charter has terminated for failing to pay.

24           THE COURT:  So just the raw number?

25           MS. SAHNI:  Just the raw number.

9

1          MS. RANAHAN:  Per month and year since 2010 is

2    what they've asked for.  Per month and year.  I mean --

3          THE COURT:  Well, if it doesn't ask for

4    subscriber's information --

5          MS. RANAHAN:  Right, but that's a whole other

6    issue that is not before you right now.

7          THE COURT:  Right, but raw number.

8          MS. RANAHAN:  Raw number -- if it was a one raw

9    number --

10         THE COURT:  Well, if it's a raw number per month?

11   That's just, you know, 60 raw numbers versus one raw number,

12   it's a matter of punching a few keys, isn't it?

13         MS. RANAHAN:  I don't -- I -- we believe that the

14   number of terminations is not relevant.  It's relevant that

15   we can do it and they would say, of course, you can

16   terminate for nonpayment, but why the monthly number for the

17   last, you know, since 2010 is relevant --

18         THE COURT:  Well, if the whole time period in

19   litigation is January 1, 2010 to --

20         MS. RANAHAN:  It's not.  It's the 2013, at the

21   beginning of the claim period.

22         THE COURT:  Okay.  So why are you going back to

23   2010?

24         MS. SAHNI:  Your Honor, for a number of these

25   requests, we're going back to 2010 because it's important to

1    understand how they were acting prior to the claim period.

2              For a number of these requests, the issue is, are

3    they acting unreasonably during the claim period and what

4    they were doing immediately before can be really relevant to

5    that analysis.

6              If, for example, they were terminating very few

7    people for nonpayment and then that rachets up during the

8    claim period, but during the same time they're terminating no

9    one for known infringement activity about which we've sent

10   hundreds of thousands of notices, that's obviously relevant.

11             THE COURT:  Well, why do you think they would

12   suddenly change a policy on one month to the next on whether

13   they terminate somebody for failure to pay?

14             MS. SAHNI:  Your Honor, they haven't even looked.

15   They haven't told us that there is any --

16             THE COURT:  I know, but what you just said doesn't

17   make any sense to me.  What good-faith basis do you have to

18   allege that maybe they've done something different between

19   the period right before the claim period and the period

20   right after?

21             MS. SAHNI:  Well, they haven't told us.  We've

22   asked --

23             THE COURT:  I know that.

24             MS. SAHNI:  -- these questions.

25             THE COURT:  I understand that.  But you have a

1    good-faith basis for believing there is a difference.

2         MS. SAHNI:  Your Honor, we obviously don't have

3    access to their records, right.  We don't know what they

4    were doing.  That's the whole point of discovery, is this is

5    information entirely within their control.

6         THE COURT:  The whole point of discovery is to ask

7    for relevant information.  What you've just said was, oh,

8    they might have been doing this, you know, but you don't

9    know.  And I don't -- go ahead and articulate the argument

10   you would make that somehow between 2012 and 2013 they

11   changed their policy on terminating subscribers for failure

12   to pay.

13        How would you use that fact?

14        MS. SAHNI:  Your Honor, I think our experts could

15   look at the over time for both termination for nonpayment

16   and then termination, if any, for repeat infringement and

17   analyze that trend over that same period.  And then we can

18   use that information to say this number increased or

19   decreased during the claim period to make an argument to the

20   jury about, see how they're behaving when it relates to our

21   multiples notices of infringement.

22        But with respect to this request specifically,

23   obviously, the most important thing for us is getting the

24   month and year for 2013 to 2016.  Ideally, we would like to

25   be able to understand what they were doing before that claim

1    period.

2             THE COURT:  When in 2013?

3             MS. SAHNI:  Sorry?

4             THE COURT:  What month?

5             MS. SAHNI:  January 1, 2013 through the end of the

6    claim period.

7             MS. RANAHAN:  The claim period is March 2013.

8             MS. SAHNI:  No, that's -- all the other requests

9    are 2013 through 2016.

10            THE COURT:  I understand, but what is the claim

11   period?

12            MS. SAHNI:  It's March 1 of 2013 through May 7,

13   2016.

14            THE COURT:  Okay.

15            MS. RANAHAN:  And, Your Honor, I'm -- so if we

16   were to provide a number, why does it have to be monthly?

17   Why not just get a yearly termination?  I mean, I can

18   certainly go back, but it seems like it's adding extra --

19            THE COURT:  Because there is no difference in the

20   labor involved.

21            MS. RANAHAN:  Well, I think there would be.  For

22   us to go figure out monthly, you know, for the 37 months

23   versus providing --

24            THE COURT:  Minutes, minutes of difference.  We're

25   not talking about it a fundamental.  If you have a chart --

13

1    if you have a database that says, in May it was 540, in June

2    it was 680, somebody has to add that up anyway.  The numbers

3    are there, right?  I mean, I presume --

4             MS. RANAHAN:  I mean, we'll find out, Your Honor.

5    If the numbers are there, we'll find out, the numbers are

6    there.

7             THE COURT:  And so in the future --

8             MS. RANAHAN:  To us, we don't think it's relevant,

9    but --

10            THE COURT:  Understood.  In the future, you've got

11   to come -- if we have these again, you've got to come with

12   information about what it would take to do something.  You

13   can't wait until you get to me and then speculate because

14   you don't know, right now, whether it's pressing a couple

15   buttons or not.

16            MS. RANAHAN:  Right.

17            THE COURT:  I need to know that because that's

18   what proportionality is all about.

19            MS. RANAHAN:  Right.

20            THE COURT:  But I'm not going to have these

21   conferences and then have you go off and do more

22   investigation and then come back and have another one about

23   the same thing.

24            So you know what we're going to be talking about

25   because you guys have teed it up.

scheduling@pattersontranscription.com

14

1           Now, maybe you haven't had time since yesterday to

2    do it --

3           MS. RANAHAN:  Right.

4           THE COURT:  -- and that, I can appreciate it, so

5    maybe we have to have material submitted a week in advance

6    so that you do have the time to talk to your client and find

7    out how difficult would it be so I can go into the judge and

8    say, hey, this will cost us $15,000 just for this one piece

9    of information alone.

10          MS. RANAHAN:  Right.

11          THE COURT:  That makes sense and that's what I

12   need to know.

13          MS. SAHNI:  And, Your Honor, we have been

14   discussing these requests for six months, so this is not

15   something that --

16          THE COURT:  Sure.

17          MS. SAHNI:  -- they learned for the first time.

18          THE COURT:  No, and I'm not -- yeah, I understand.

19   So.

20          MS. RANAHAN:  I appreciate that, Your Honor,

21   because we've been asking for similar burden questions on

22   the issues that we're concerned about, so that's -- I

23   appreciate that comment.

24          THE COURT:  Right.

25          MS. RANAHAN:  And I would hope that it would apply

15

1    to both sides.

2            THE COURT:  Okay.  All right.

3            Well, that's just some ground rules on what I would

4    expect in the future, and I'm not going to like overreaching,

5    I'm not going to like over-discovery and I'm not going to

6    like discovery about discovery if you know what that term

7    means.  It's not going to fly.  And it's just going to result

8    in painful experiences initially for me and then for all of

9    you.

10           So --

11           MS. RANAHAN:  So, Your Honor, if we could have --

12   and I appreciate this and I wish I knew today, because,

13   again, we did get the papers yesterday.  But if we could

14   find out from our client the difference between providing a

15   raw number by year versus monthly, if it would require going

16   back to pull records or if it would just be a button, like

17   you described, we will find that out.  We will not bother

18   you again if it's a simple question.

19           If it's a burden that we think is too much, we will

20   come back to you.

21           THE COURT:  Agreed.

22           MS. RANAHAN:  Okay.

23           THE COURT:  But, you know, put your filter on what

24   too much is.  I mean, a reasonable filter.

25           MS. RANAHAN:  Of course, of course, Your Honor.

16

1           THE COURT:  So I would agree that -- so the

2    month-to-month during a three-year-two-month period, so

3    we're talking about roughly 38 months, I mean, if you start

4    out with a couple hundred a month and by the end of that

5    time, you're up to 1,000 a month, it's just maybe a little

6    more information, you know, but if you just give, we

7    terminated -- I mean, how many subscribers are there that

8    you have on any one day?

9           MS. RANAHAN:  A lot of subscribers.

10          THE COURT:  I know, but --

11          MS. RANAHAN:  I don't know on any one day, but

12   it's a million -- I mean, it's a lot of subscribers.

13          THE COURT:  Millions?

14          MS. RANAHAN:  I believe so, but I don't --

15          THE COURT:  Okay.

16          MS. RANAHAN:  I don't know about this period.

17          THE COURT:  So, you know it might be relevant

18   whether it's thousands a day or tens a day or hundreds a day

19   or month, and, you know, maybe there are cycles where there

20   is a lot of terminations in December, very few in January.

21          MS. RANAHAN:  But what is the difference between

22   just giving an annual thing and they -- are they going to

23   present the jury, here's January's termination?

24          THE COURT:  They're going to present to the jury

25   whatever Judge Jackson lets them present.

```
1            MS. RANAHAN:  Right, I appreciate that.

2            THE COURT:  It's my job to make sure that they

3    have the relevant information --

4            MS. RANAHAN:  Right.

5            THE COURT:  -- to present to Judge Jackson, then

6    he determines admissibility.

7            So it's whether it's potentially admissible, I'm

8    not going to deal with before, because I don't -- there is no

9    good-faith basis for asking for that, that has been presented

10   me.  But, yes --

11           MS. RANAHAN:  Okay --

12           THE COURT:  -- ask your client -- I mean, we've

13   jumped ahead to particular piece of information.  But ask

14   your client what it would take to do a month-by-month during

15   those 38 months versus one big number.

16           MS. RANAHAN:  Okay.

17           THE COURT:  Okay.

18           MS. RANAHAN:  And I appreciate the cutting off

19   with three years because that's the other issue that was --

20   2013 is much different than 2010, so I appreciate that.

21           THE COURT:  No, I know, but --

22           MS. RANAHAN:  And we will find out.

23           THE COURT:  -- there may be some thing they

24   seek --

25           MS. RANAHAN:  Yeah, I agree.
```

18

1            THE COURT:  -- where I agree that some pre- --

2            MS. RANAHAN:  And we have agreed --

3            THE COURT:  -- period discovery is relevant.

4            MS. RANAHAN:  -- their time --

5            THE COURT:  It's when I disagree, okay.

6            MS. SAHNI:  And, Your Honor, I would note also on

7    the burden piece, I mean, the Internet service is a monthly

8    charge, so they obviously track subscribers on a monthly

9    basis.  I mean, this is not a case where the service at

10   issue is an annual service.

11           These are subscribers coming on and off every

12   month.  And so it's helpful for us to understand what it

13   looks like on a month-to-month basis because exactly, as you

14   note, there may be different ways that they're dealing with

15   issues on a month-to-month basis, given the subscriptions.

16           THE COURT:  Right, but we are talking about

17   something that is, alone, irrelevant and that is people who

18   are terminated for failure to pay, which has nothing to do

19   with infringement, nothing at all, but you want to use it to

20   show abilities, I understand that.  And so we'll do that,

21   but, in and of itself, it's irrelevant.

22           MS. RANAHAN:  I mean, I will say the Cox judge did

23   grant a motion in limine excluding -- originally grant a

24   motion in limine excluding a failure to pay on a condition

25   and then --

1          MS. SAHNI:  And then reverse that and actually --

2          THE COURT:  Right, but motion in limine is years

3   away for you guys.

4          MS. RANAHAN:  Of course.  I agree with that.

5          THE COURT:  All we're dealing with is discovery.

6          MS. SAHNI:  And, eventually, he found it

7   admissible and let it all in.

8          MS. RANAHAN:  I agree.

9          THE COURT:  So, yeah, I mean judges are not

10  cookie-cutters, so maybe what somebody else did might have

11  some relevance, but it's not going to be that impressive to

12  me.  I'll do what I think is necessary, which is what I'm

13  paid to do, okay.

14         So you both have issues.  Who wants to start?

15         MS. SAHNI:  So, Your Honor, I think we were the

16  ones that requested this conference.

17         THE COURT:  Okay.

18         MS. SAHNI:  And I would just like to start, my

19  colleague Nick Lambros is going to go through a couple of

20  the issues in our letter from yesterday, which we really did

21  try to, you know, streamline and put together the key issues

22  we're moving on.  But we were surprised, frankly, to see

23  their submission, which rehashed a number of issues that we

24  talked about at the last conference, which was an hour-long

25  conference in which you denied discovery on a number of

1    issues and otherwise came to middle grounds on other pieces

2    where they've been fully heard.

3         And they've now filed objections with Judge Jackson

4    in which there has been extensive briefing submitted,

5    substantial declarations from us for -- on burden, which

6    required a lot of time and effort on our part.

7         And for them to now come into Court on, you know,

8    one day's notice and say, actually we want to relitigate all

9    these issues and ignore that full record that has been

10   developed is particularly inappropriate in our view.

11        And, and so we don't think any of those issues

12   should be discussed about purported deficiencies in

13   plaintiff's responses.  We already talked about those.  Your

14   Honor listened to them.  We had an hour-long conference on

15   them and they're pending before Judge Jackson.

16        THE COURT:  Is there a transcript in the record?

17        MS. SAHNI:  Yes.

18        MS. RANAHAN:  Your Honor, if I could speak to

19   that.

20        There were specific issues during that -- first of

21   all, we had a conference call with you before we submitted

22   anything on issues where you specifically told us to follow

23   up and come back with you on, including, for instance, the

24   chain of title, so --

25        THE COURT:  So what she just said is fine, she

21

1    needed to say it.

2              MS. RANAHAN:  Yeah.

3              THE COURT:  But I'm going to decide again on an

4    issue-by-issue basis whether that is correct --

5              MS. RANAHAN:  Okay.

6              THE COURT:  -- with regard to any particular

7    issues.

8              MS. RANAHAN:  I appreciate that.

9              THE COURT:  So I'm going to hear it all.

10             MS. RANAHAN:  Thank you.

11             THE COURT:  I'm not going to preclude anybody from

12   saying anything unless where we get too late.

13             MS. RANAHAN:  Thank you, Your Honor.

14             THE COURT:  Okay.

15             MS. SAHNI:  And, Your Honor, on that note, there

16   is one issue that is a new issue that Your Honor did say we

17   could come back on, although they alerted us of it for the

18   first time on Thursday.  And so there is some specific

19   issues around that, which I would be happy to address as

20   well.

21             But turning to the issues that are identified in

22   our letter, which we've been meeting and conferring on for

23   several months, I'll turn it over to my colleague Nick

24   Lambros, who will discuss those.

25             THE COURT:  Okay.

1          MR. LAMPROS:  Thank you.

2          So, Your Honor, we're here -- plaintiffs are here

3    asking for categories of basic documents that Charter has

4    refused to produce and still, you know, investigating the

5    burden in producing.  These discovery requests were served on

6    June 10.  It's December 17.

7          To date, Charter has produced 30 documents totaling

8    just over a thousand pages, most of which were 10Ks.  So

9    plaintiffs really feel that a lot of that stuff is basic and

10   we really need to get this moving along.

11         There are four categories of documents we would

12   like to talk to you.  We already addressed part of one, which

13   are terminations.

14         The other half of that is basic subscriber

15   information on the number of Charter's subscribers on a

16   monthly/yearly basis.  And then the second category is basic

17   financial information about Charter and revenues that's

18   derived from subscribers.

19         THE COURT:  Let's not go into the future.  Let's

20   stick with the present.

21         MR. LAMPROS:  Okay, okay.

22         THE COURT:  One issue at a time, okay.

23         MR. LAMPROS:  So starting on the subscriber

24   information, plaintiffs are seeking full response to their

25   Interrogatory Number 11, which asks Charter to state their

1   total number of subscribers per month and year for the

2   period of 2010 to 2016.

3        THE COURT:  Right.  So you've already outlined

4   why, so why don't we go ahead and hear the response.

5        MS. RANAHAN:  So, first of all, there is the time

6   period again, which starts at 2010.

7        THE COURT:  Understood.

8        MS. RANAHAN:  The number of subscribers between

9   2010 and 2013 bears no relevance whatsoever.  Just the total

10  number of subscribers, we just don't think is relevant to

11  the case and I don't know how they could actually use it.

12        This is about infringement of plaintiff's works,

13  which they claim, which even -- even an account which has

14  some allegation of infringement from someone using it, there

15  is still a whole lot of use on that Internet which, you know,

16  is for legitimate purposes.

17        So just to give a raw subscriber number, we just

18  don't see the relevance of that at all, especially again by

19  breaking it down by month and year, but it's more about

20  relevance for us than burden.

21        THE COURT:  So, okay.

22        MS. RANAHAN:  And they can get some of this from

23  public data.  We're a public company, it's -- you know, it's

24  out there.  So asking for this monthly breakdown, I don't

25  know --

1          THE COURT:  So would the data contain a snapshot

2    every year of how many subscribers there are or an average

3    number of subscribers?

4          MS. RANAHAN:  I believe so.  That's what the

5    public information that is given, but they want a monthly --

6    monthly breakdown for three years.

7          THE COURT:  I understand.  But do you know that it

8    does?  Have you seen?  I don't know, were you talking about

9    their --

10          MS. RANAHAN:  I mean, they will do press releases

11   and public statements and statements of investors where they

12   talk about subscribership and basic, but I don't think it's

13   for -- I don't think it's a routine thing, but they will

14   work it into certain public filings.

15          THE COURT:  But you've seen those?  Or you think

16   they do?

17          MS. RANAHAN:  I believe that that is what they do,

18   but that is a --

19          THE COURT:  But that's something you really ought

20   to know.

21          MS. RANAHAN:  Right, okay.

22          THE COURT:  Do you understand?

23          MS. RANAHAN:  Yes, I completely understand.

24          THE COURT:  I mean, if you're going to make that

25   argument, it ought to be something that you would have

1   looked at --

2        MS. RANAHAN:  Right.

3        THE COURT:  -- their public filings with the SEC

4   or with the press and see that, at least once or twice a

5   year, they prescribed they --

6        MS. RANAHAN:  Right, that it's public record.

7        THE COURT:  Yeah, so I can't assume that they do,

8   that --

9        MS. RANAHAN:  Right.

10       THE COURT:  -- just because you think that they

11  might.

12       MS. RANAHAN:  Right.

13       MS. SAHNI:  And we have looked at some of that

14  information.  It's not monthly, is part of the issue.

15       THE COURT:  No.  She -- she didn't say it was

16  monthly.  She just says occasionally, maybe.

17       MS. RANAHAN:  It sounds like they know that there

18  are some, more than I do --

19       THE COURT:  Yeah, sure.

20       MS. SAHNI:  I think there may be some time some

21  annual problems, but it's not often specific.

22       THE COURT:  Hold on a second.

23       (Discussion off the record.)

24       THE COURT:  Go ahead, raw number.  We're dealing

25  with raw number.  Go ahead.

1          MR. LAMBROS:  I think our point is, as

2     Ms. Ranahan's has suggested, they do compile a list.  It's

3     no doubt in --

4          THE COURT:  No, no, no.  Go to relevance, I don't

5     care.  We all know she didn't rely on burden, so you don't

6     need to go to burden.

7          MR. LAMPROS:  So I would say this is relevant to a

8     number of issues.  You know, this helps to determine the

9     scope of the infringing activity against their total

10    subscriber base, right.

11         If they're -- you know, if the number of infringing

12    subscribers is a higher percentage of their total subscriber

13    base versus a lower subscriber base, that contextualizes --

14         THE COURT:  So you're going to compare it with

15    other people who provided Internet service?  I'm not sure

16    where you're getting.

17         What would be the context that you could provide to

18    a jury?  Let's say there is a 1000 or 1800 or 18,000

19    violators and they had 15 million customers, is that anything

20    the jury will have any appreciation for or it's relevant?

21         MR. LAMPROS:  Well, I think it depends a little

22    bit on what the numbers look like.  You know, obviously if

23    they're worth, that's one thing.

24         But I think it also goes to the feasibility of the

25    measures that Charter could have been taking to control the

1    infringement going on on its platforms.

2              THE COURT:  You have to put some meat on those

3    bones.  What do you mean, feasibility?  Describe what you

4    might say to a jury.

5              MR. LAMPROS:  So explaining that they, you know --

6    you know that if they were to, for example, terminate the

7    number of subscribers who they were notified were committing

8    repeat infringement of plaintiff's works showing that, you

9    know, that would be a very tiny percentage of their overall

10   subscriber base.  It wasn't the sort of thing where it would

11   be fatal to their business if they were to actually do this;

12   that they could have controlled this and they chose not to.

13             THE COURT:  So how many different examples of

14   publicly disclosed total number of subscribers are you aware

15   of?

16             MR. LAMPROS:  I think they have annual numbers in

17   the 10Ks.  That's all --

18             MS. SAHNI:  Yeah, I'm not sure it's consistent

19   across the board.

20             MR. LAMPROS:  Yeah.

21             MS. SAHNI:  And we've looked -- the 10K passed out

22   information in some years.  In other years, they won't break

23   it down by service line or in a certain way, so it's tough

24   to know for sure.  It's a little inconsistent how they've

25   been reported, but --

1            THE COURT:  Well, give me an example.  How many --

2   you must have in mind the number of subscribers they have.

3   What is that number?

4            MS. SAHNI:  I think Charter at various points had

5   something, you know, in the millions, a couple million

6   subscribers.

7            The issue, Your Honor, is how we can put it

8   together, our experts can use the data with other data.

9            So, for example, you know, there is comparison

10  between the number of infringements in a given month, how

11  many were terminated for infringement, how many were

12  terminated for nonpayment, what is the total adds and

13  subtractions of subscribers for that month.

14           They made an argument, for instance, Your Honor,

15  that there needs to be some drop to the subscription, based

16  on the total number of subscribers they need to -- that draw

17  into Charter service by infringing activity.

18           If, for instance, we learn that bandwidth became

19  cheaper, increased bandwidth became cheaper in a particular

20  month and so a lot of people signed up in that month because

21  they wanted to have more bandwidth to infringe content,

22  that's a relevant fact.

23           There's any number of ways that this information

24  could be used.  But if we don't even have it, it's hard for

25  our experts to be able to compare it against other pieces of

1    information we're seeking.

2            THE COURT:  Go ahead and respond.

3            MS. RANAHAN:  Again, Your Honor, they've

4    acknowledged that there are some annual statements in the

5    public record so we know that there is data out there.

6    Months and months -- if you're looking at a month subscriber

7    number, how would that relate to all of these other issues

8    is very, very tenuous and attenuated.  You cannot look at a

9    subscriber raw number and really determine anything, as far

10   as the scope of infringement, because even one subscriber

11   can have hundreds of users.  Even -- you know, if your

12   neighbor is using your wifi, there could be 30 people on one

13   Internet.

14           So just having a raw subscriber, you're basically

15   asking for a number of how many accounts are open.  That has

16   nothing do with the scope of infringement.

17           The scope of infringement is how much on any one

18   particular account their works were used.  But to just give a

19   raw number of, okay, well, there is some infringing activity

20   on this library once and then just chalking that whole

21   account up as an infringing account is just not accurate and

22   it's highly, you know, misleading.

23           I just -- the way that they're going to suggesting

24   that they're going to use the data doesn't solve any of those

25   problems.  I just don't see how the raw subscriber, given --

1           THE COURT:  Well --

2           MS. RANAHAN:  And they have the annual, so how

3    monthly --

4           THE COURT:  Well, Expedia says you have 26 million

5    customers in 41 states, does that sound odd or does that

6    sound plausible?

7           MS. RANAHAN:  Plausible, but --

8           THE COURT:  Okay.

9           MS. SAHNI:  That's only after a merger with Time

10   Warner Cable that occurred after the claim period, so

11   Charter was much smaller during the claim period, to be more

12   precise about the numbers.

13          MS. RANAHAN:  I mean, that just goes to show how

14   you easy it was for Your Honor to find public data on our

15   subscribership numbers.

16          THE COURT:  Well, of course.

17          MS. RANAHAN:  I mean, we're a public company.  We

18   want to show our investors that we have subscribers.  That's

19   the meat of our business, so --

20          THE COURT:  But they want the information in a

21   form where they know you can't -- will go out of it, but it

22   came from you, which anything that comes from Charter is

23   an --

24          MS. RANAHAN:  Right.

25          THE COURT:  -- admission by a party opponent --

1          MS. RANAHAN:  Right.

2          THE COURT:  -- so it's a --

3          MS. RANAHAN:  As are our 10Ks, as are our public

4   statements to our investors.

5          THE COURT:  Yeah, yeah.  No, true.  It's just, I

6   have no idea what those things say.

7          MS. RANAHAN:  Right.

8          THE COURT:  So if somebody had an example for me,

9   I might actually be able to factor that in, but I don't have

10  an example, so --

11         MS. SAHNI:  Your Honor, again, these are just

12  annual numbers, and I think we explained that we feel we

13  need the monthly information to be able to track against the

14  other information that we're asking for a month-to-month

15  basis.

16         And so nothing in the public record that we've seen

17  has that month-to-month breakdown, and I don't think

18  Ms. Ranahan is suggesting that they do.

19         THE COURT:  Right.  But where do you get the

20  information that at some point, they might have increased

21  bandwidth?  Is that a good-faith representation or is that

22  purely speculation?

23         MS. SAHNI:  Your Honor, there is always new

24  promotions being put out.

25         THE COURT:  No, no.  That's a direct question.

1    Listen to the question.

2           Is that pure speculation or do you have actual

3    evidence in this case about Charter that at some point that

4    might have happened and more people joined up so they could

5    infringe?  That's my question.

6           MS. SAHNI:  We don't have specific evidence

7    because that's within Charter's control and we're seeking it

8    in discovery and they've only produced 30 documents.

9           THE COURT:  So it's pure speculation?

10          MS. SAHNI:  No.  We -- we alleged in the complaint

11   that Charter itself advertised its high speed Internet

12   access as a way -- one of the reasons was to -- for music,

13   that's alleged in the complaint, it was part of Your Honor's

14   reasoning in the motion to dismiss.

15          THE COURT:  Right.  But what you just said is that

16   at some point maybe during the period in time we're dealing

17   with, it changed.  So I want to know whether you know that

18   happened or whether you don't know that happened.

19          MS. SAHNI:  I don't know for sure if that happened

20   during the claim period.

21          THE COURT:  Why are you adding "for sure" to your

22   response?  Why don't you just say I don't know.

23          MS. SAHNI:  I don't know one way or the other,

24   Your Honor.

25          THE COURT:  Okay.

1           MS. SAHNI:  Again, our understanding of how their

2   business works is that these things are often done and so we

3   are seeking discovery --

4           THE COURT:  You mean how its -- that type of

5   business works?  Not how Charter works?  That's what you're

6   saying?

7           MS. SAHNI:  Yes, that's right, Your Honor.

8           THE COURT:  Okay.  So the burden -- again, you

9   don't rely on burden; you do rely on relevance.  And at

10  least a total number of subscribers could be used in some

11  manner by an expert in determining the scope of the problem.

12  You can see that?  I presume you can see that?

13          MS. RANAHAN:  I mean, we would -- our expert would

14  likely disagree with their expert on whether that's --

15          THE COURT:  I would be shocked if they didn't.

16          MS. RANAHAN:  -- whether that is actually

17  possible, Your Honor.

18          THE COURT:  Probably went to the same school,

19  graduated in the same year, worked for the same company and

20  they would still be diametrically opposed.

21          MS. RANAHAN:  Right.  So I'm sure we would -- I

22  would not concede that point, Your Honor.

23          THE COURT:  Right.

24          MS. RANAHAN:  And I'm sure our director will not

25  either.

34

1          THE COURT:  Yeah.

2          MS. RANAHAN:  But what our position is, is they

3   have enough public information about our subscribership,

4   it's no secret, it's in the public records.  For us to go

5   back and break this down monthly when that is not really

6   that usable for the case is our position.  So we just don't

7   believe --

8          THE COURT:  I understand.  But again, you have no

9   idea what the burden would be because you haven't checked?

10          MS. RANAHAN:  Right.  Well, and now that we've cut

11   off three years, it does make a difference.  So -- if we are

12   still -- presumably it's the claim period and not, you

13   know --

14          THE COURT:  So I'm asking you to do the same thing

15   for this, okay.

16          MS. RANAHAN:  All right.

17          THE COURT:  What's your next issue?

18          And we are dealing with March of 2013 to May 17,

19   2016, the infringement period.  We're going to call that

20   infringement period, right?

21          MS. RANAHAN:  No, we do not want to call it the

22   infringement period.

23          THE COURT:  What do you want to call it?

24          MS. RANAHAN:  Claim period.

25          THE COURT:  Claim period, sorry.

1          MS. RANAHAN:  I object, Your Honor.

2          THE COURT:  Claim period.  The allegation period?

3          MS. RANAHAN:  Yeah.

4          THE COURT:  All right.

5          MR. LAMPROS:  So I want to talk about financial

6     information next, Your Honor.

7          So plaintiffs have requested a variety of financial

8     information from Charter.  So far in response, they've

9     produced their 10Q statements and that's essentially it.

10         What we're looking for here represent narrow

11    versions of the RFPs we served, but there are essentially

12    three -- three asks.

13         One is, we would like to know Charter's average

14    revenue and profits broken down by service from January 2010

15    until May 17, 2016.  We would like to know the actual monthly

16    revenue from all subscribers identified in plaintiff's

17    infringement notices for January 2012 knew the present, and

18    we would like Charter's audited financial statements for that

19    2010 to 2016 period.

20         THE COURT:  Aren't they -- are the audited

21    financial statements part of the release of public

22    information?

23         MS. RANAHAN:  The audited portion is not, but

24    we -- right.  So there is all of the public information that

25    they've received and we told them -- can I just make one

1    statement about his original statement, which is that

2    they've only received this modest production thus far?

3            We have told them we were going to complete the

4    bulk of our production this month, by December, so that's

5    still coming.

6            So setting that aside, the audited financial

7    portions that they're asking for are not all public.  There

8    are some statements and comments that are similar and go

9    through that.

10           The 10Ks are very detailed.  Again, this is

11   providing a lot of financial information to our investors.

12   And so we have asked them -- our position in the meet and

13   confer, which we do feel was cut short on this was, we will

14   give you our 10Ks, take a look at them.  Let us specifically

15   know what you need, what you need for your case.  And we

16   understood they were going to that.

17           Then we started getting letters, that, no, we need

18   the audited, we need the audited.  We've asked them what are

19   they looking for from the audited.

20           And by the way, Your Honor, there is a companion

21   case in Florida.  I don't know if you were aware of this.

22   But they've also sued our clients in Florida for a

23   Brighthouse company that has now merged with Charter, but

24   they're suing us up with the same claim period, so these are

25   these companion cases.

37

1          So when we have these meet and confers, we're

2     dealing with both cases at the same time, same counsel, same

3     people because they've merged.

4          So in that case Brighthouse is not a public

5     company, but we did produce the audited financials because

6     that was the most -- that was the best information we could

7     find for that period, so we produced that for the nonpublic

8     company.

9          For the public company where we have all this data

10    out there, all the data they could possibly need for their

11    case, we have it and we've asked them why they need the

12    audited portion and we haven't heard a good reason.

13          THE COURT:  Okay, we'll hear right now.

14          MR. LAMPROS:  So I think just first about the

15    factual background here.  Charter initially told us they

16    were going to produce this stuff in October.  That never

17    what happened.  They only produced it to us in December

18    after we wrote to the Court asking for this conference.

19          THE COURT:  So you do have the --

20          MR. LAMPROS:  No.  They produced the 10Ks --

21          THE COURT:  10Ks?

22          MR. LAMPROS:  -- in December --

23          THE COURT:  Okay.

24          MS. SAHNI:  -- after we wrote to the Court.

25          THE COURT:  And you've looked at them?

1          MR. LAMPROS:  We have looked at them.

2          THE COURT:  And so what -- why are they

3    insufficient?

4          MR. LAMPROS:  I think the critical distinction is

5    they're not broken down by service.  So this -- this case is

6    about Internet service and infringement happening over the

7    Internet.  The 10Ks talk about Charter's total revenue, that

8    Charter also sells phone service, they also sell cable TV

9    service.

10          So we're trying to get the numbers broken down by

11   service.  And also the 10Ks that that we've discussed also

12   focus on annual numbers that we would like the monthly

13   numbers.  That's the critical distinction that we think would

14   be borne out in, you know, the additional information --

15          THE COURT:  I'm not going to --

16          MR. LAMPROS:  -- we're looking for on revenue and

17   profits and audited statements.

18          THE COURT:  I'm not going to give you monthly

19   income, as opposed to these other two categories we talked

20   about.  But if they -- would it be enough that they say, our

21   Internet service is 17 percent, accounts for 17 percent of

22   the 10K?  So that you know exactly, pretty close, what the

23   dollar boils down to?  Is that satisfactory?

24          MS. SAHNI:  Your Honor, we'll need to go back and

25   look at it further.  I mean, in some years, like I said, the

1    reporting is inconsistent.  So in some years, there are

2    certain breakdowns that don't exist in other years.

3         We've told them all along we need it by service, we

4    need to understand what you were making as a company from

5    your Internet business.  That's more to the issue of whether

6    they reached financial benefits.

7         And on a monthly point there is one subset of

8    categories -- documents that I think we haven't turned to yet

9    where monthly is critical.  But with respect to companywide

10   financials in terms of what they're making from their

11   Internet service, we really need to be able to understand

12   what that line looks like for Internet and that's just not in

13   the 10K.

14        MS. RANAHAN:  Your Honor --

15        THE COURT:  I understand.  But I asked -- I posed

16   a question.  You didn't answer my question.

17        If you know --

18        MS. SAHNI:  With respect to -- I would need to

19   look at each of the 10Ks again to know if that would get us

20   everywhere.  I just -- I know on some of the 10Ks, it might

21   be enough, if we would be able to get it by a percentage

22   that we could attach to that number.

23        THE COURT:  Right.

24        MS. SAHNI:  I don't know, sitting here right now,

25   for all -- the years that they've produced, that that would

40

1   work for each year.

2          THE COURT:  Okay, go ahead.

3          MS. RANAHAN:  I'll just add the complication,

4   given the nature of our client's business.  Our client does

5   bundle.  So the way that they bill the clients, and I'm sure

6   you may be familiar with this, but when you have a cable

7   provider, they do your TV, they used to do landlines when

8   people used landlines.  They do your -- this happens to be

9   security, they do your Internet.  So they give you a bundle

10  price and it's not necessarily broken down.  In fact, it's

11  often not, as far as -- it's like a number, it's a total

12  revenue.

13         THE COURT:  No, it isn't broken down for me.  But

14  are you saying that you know, as a matter of fact, Charter

15  does not break it down for accounting purposes on their end?

16         MS. RANAHAN:  In some sense -- in some ways they

17  do, but they do not -- it depends on -- if we're talking

18  about 2010, it changed based on the bundle, so there are --

19         THE COURT:  Well, we aren't talking about 2010,

20  though, unless you want to.

21         MS. RANAHAN:  No, I want to not talk about 2010.

22         THE COURT:  Well, then I wouldn't go there if I

23  were you.

24         MS. RANAHAN:  But I just wanted to add that level

25  of complication because it's not just that we're just hiding

1    it.  It's not a clear accounting number.  And we have

2    revenue numbers, they're not necessarily able to break them

3    down by service for all types because of the way that the

4    bundling is now taken over as far as the revenues come in

5    from an account.  Breaking it down by percentage is not a

6    precise number because of the way that we bill our

7    customers, which is for all services.

8            THE COURT:  I understand.  So -- but again, you're

9    saying you know, for a fact, that Charter does not

10   internally track for accounting purposes.

11           MS. RANAHAN:  That is my understanding.  We've had

12   initial discussions, we've delved deep into as far as the

13   way that our accounting works, and that is my understanding

14   from those discussions.

15           So, yes, I do not believe that we track it -- or

16   that we can accurately track it.  There may be, you know,

17   some ways that they generally try to say there is a pool here

18   and a pool there, but the numbers that they're asking for as

19   far as per service, it's my understanding that we do not have

20   them broken down that way.

21           THE COURT:  Okay.  So how do you respond to that?

22           MS. SAHNI:  Well, I guess my first question would

23   be whether the audited financial statements simply don't

24   include that information.

25           My understanding is oftentimes the audited

1  financials, because of these accounting reasons, the auditors

2  have various notes and additional accompanying documents that

3  help businesses understand how those information -- that

4  information breaks out, which is exactly why we've asked for

5  the audited financial statements because they provide much

6  more information than what Charter might publicly be willing

7  to tell its investors about its services because of the

8  complications of how they account for things internally.

9          But again, Ms. Ranahan has never told us that she

10  has gone and looked at the audited financial statements and

11  can confirm to us that there is no information in there that

12  would allow us to understand how to break it down by service.

13          THE COURT:  Well, have you seen an audited -- I

14  guess you have.

15          MS. RANAHAN:  She's seen it from the Brighthouse.

16  I was just going to say, this is the first we've heard of

17  the specific reason why they want audited financials and

18  I've asked them.

19          So this is the very, very first time that I've

20  heard that the reason they want audited financials is so that

21  they can find the percentage of the service -- this is the

22  first I've heard of this.

23          THE COURT:  Oh, no, they want -- they want dollar

24  amounts.

25          MS. RANAHAN:  Right.

1          THE COURT:  But if you have a raw dollar amount

2    for all services and you apply a percentage to the Internet,

3    you can come up with an approximate dollar amount.  But I

4    understand that bundle argument, if there is no way to parse

5    that out, then the data you're left with is pretty suspect,

6    at least in my view, and I don't know if I would let that

7    kind of information in through an expert because it's not

8    reliable.

9          MS. SAHNI:  But, Your Honor, that's a question

10   for, you know, a later stage in the case.  If they want to

11   attack an expert's report because of some information,

12   that's fine.

13         THE COURT:  No, but, no, we're dealing with

14   whether they can provide it at all and she's saying she

15   can't provide it all.

16         MS. SAHNI:  Ms. Ranahan has never told us in five

17   months that they cannot provide information by service.

18   That is simply not something that has been communicated to

19   us.

20         THE COURT:  So she had never talked to you about

21   this bundling before?

22         MS. SAHNI:  She has never said to us that we

23   cannot identify internally how much of our business accounts

24   for -- is accounted for by our Internet line.

25         THE COURT:  Yeah, but that's not what I asked.

44

1    Again, you're not asking my questions.

2            MS. SAHNI:  I'm sorry, Your Honor, we understand

3    how bundling works.

4            THE COURT:  I know you do, but she has never

5    discussed that prospect with you, that maybe they can't

6    provide accurate information as to the Internet because it's

7    bundled with other services?

8            MS. SAHNI:  I cannot specifically recall whether

9    she raised that in a meet and confer, but she has never

10   represented to us that they have no way internally to

11   understand how much they make from their Internet line of

12   business.  That has never been represented to us.

13           THE COURT:  And you think they can?

14           MS. SAHNI:  I would be shocked that an ISP doesn't

15   know how much of its revenue comes from its Internet line of

16   business, it doesn't have some internal way that they talk

17   internally about those numbers.  That would be very

18   surprising to me.

19           I mean, if Ms. Ranahan is representing to this

20   Court that there is no way that any internal document that

21   Charter looks at that --

22           THE COURT:  No.  You heard what she said.  She's

23   not representing that.

24           MS. SAHNI:  Well, she's saying that they have no

25   way to track how much they make from their Internet service.

1          THE COURT:  Because many times, Internet is

2    bundled with other services.  That's what she said, but many

3    times it's not.  Some people only have Internet from

4    Charter, I'm sure.  And probably those numbers would be easy

5    to find, if people who only have Internet.  If that's what

6    you're interested in, maybe we could do something.

7          MS. SAHNI:  No.  What I'm interested in is both

8    that number, plus however they internally account for those

9    bundled subscribers, if she's saying that they have no way

10   internally that they understand how those subscribers pay

11   for them.

12         THE COURT:  Well, that's another question that

13   we'll have answered.

14         So I would like for you to ask your client, do they

15   maintain some internal system of accounting for the Internet

16   portion of their business, even when many subscribers bundle

17   with other services?  Okay.

18         MS. SAHNI:  Your Honor, I would just note that

19   we've asked these questions for a long time, so I'm

20   concerned that what will happen is she's going to come back

21   again, and say, you know, we're investigating, we're

22   investigating on each of these issues.  I mean, the

23   burden --

24         THE COURT:  No.  I want a written response to each

25   of my questions today by January 10 copied to you --

1          MS. SAHNI:  Okay.

2          THE COURT:  -- and me, okay.

3          MS. SAHNI:  Thank you, Your Honor.

4          THE COURT:  You'll probably have the same burden,

5     too, when I get to what they want from you.

6          MS. RANAHAN:  Thank you, Your Honor, I appreciate

7     it.  I'm excited about that.

8          MR. LAMPROS:  So, Your Honor, that takes us to

9     what is really the most important financial information

10    request here, which is our -- just the second item in our

11    financial request concerns are E19.  We're looking for

12    Charter's actual monthly revenue from the subscribers that

13    they were notified for infringing plaintiff's content.

14         THE COURT:  Sorry, repeat that, please.

15         MR. LAMPROS:  So we're looking for Charter's

16    actual monthly revenue for all subscribers identified in

17    plaintiff's infringement notices.

18         THE COURT:  Where is that in your submission to

19    me?

20         MR. LAMPROS:  It should be under financial

21    information, item number 2.

22         THE COURT:  Upper left page, please.

23         MR. LAMPROS:  Page 2.

24         MS. SAHNI:  It's page 2.  It's middle of the page.

25         THE COURT:  Okay.

47

1          MS. SAHNI:  It's romanette (ii) under Financial
2    Information, Your Honor.
3          THE COURT:  Actual monthly revenue from all
4    subscribers identified in plaintiff's infringement notices,
5    but why did you put January 1, 2012?  I thought you said it
6    was March 1, 2013?  I don't understand.
7          MS. SAHNI:  Your Honor, for all other discovery,
8    we -- we -- they've agreed to go back one year prior to the
9    infringement period.  For financial information, we actually
10   agreed to go back to 2010, which is why we were seeking
11   parity from them so that we could have the same information
12   from them, 2010 to 2016 that we've agreed to produce our
13   financial information.  But for this -- this are critical
14   piece, we decided to agree to the discovery period.  They
15   voluntarily agreed to have 2012 to 2016.
16         THE COURT:  That's fine.  So you identified 18,000
17   in your infringement notice?
18         MS. SAHNI:  We have hundreds of thousands of
19   infringements.
20         THE COURT:  Hundreds of thousands.
21         MS. SAHNI:  And so there are subscribers that are
22   identified in those infringement notices.
23         THE COURT:  Like how many, do you know?
24         MS. SAHNI:  The total number of subscribers, it's
25   probably -- because each one is -- you know, there is

1    five -- at least five infringement notices per subscriber,

2    and there has been 600,000 notices that we've produced.  So,

3    you know, it could be in the hundred-of-thousands range.

4            THE COURT:  Or five figures, more likely?

5            MS. SAHNI:  Exactly.  But this is -- this is the

6    revenue they have actually received from the subscribers by

7    failing to take appropriate action against them.  This is

8    sort of directly relevant --

9            THE COURT:  No, I understand.  Is -- can that be

10   part of the measure of damages under the law?

11           MS. SAHNI:  It's relevant to damages, it's

12   relevant to --

13           THE COURT:  No, no.  Is it part of the measure of

14   damages?

15           MS. SAHNI:  It can be -- what financial benefit

16   they've reaped is directly relevant to the statutory damages

17   analysis in terms of one of the factors.

18           THE COURT:  Okay.  What is that?  Go ahead and

19   paraphrase the statutory damages analysis.

20           MS. SAHNI:  So statutory damages can be within a

21   range.  And one of the factors -- and this is why a lot of

22   this financial information is relevant -- the jury can

23   assess the defendant's financial position and profits

24   based -- as one of the factors in calculating statutory --

25           THE COURT:  Profits from the infringement?

1          MS. SAHNI:  Correct.

2          THE COURT:  Okay.  Do you disagree?

3          MS. RANAHAN:  I'll just say that the statutory

4    damages doesn't have any statutory factors.  It can -- the

5    jury can consider anything, so it's --

6          THE COURT:  But as applied by the courts.

7          MS. RANAHAN:  Right.  The courts have basically

8    said whatever you find just.  And so some courts have found

9    profits, revenues, all sorts of different areas.  But I just

10   want to have a few responses to her point.

11         THE COURT:  I understand, but it's --

12         MS. RANAHAN:  I agree that --

13         THE COURT:  -- and it's logically the case, too.

14         MS. RANAHAN:  Right.  But the jury can consider

15   both financial positions, the charts, all sorts of things,

16   whatever it wants, but it's not a written statute.

17         THE COURT:  Okay.

18         MS. RANAHAN:  As far as the factors the judge

19   made, the jury made.

20         THE COURT:  All right, good.  So what's your

21   response?

22         MS. RANAHAN:  Oh, okay.  So -- were you done?

23         MS. SAHNI:  Well, and we just wanted to make clear

24   that it's both relevant to statutory damages.  It's also

25   relevant to vicarious liability count, but financial

1  benefit, that they receive as a result of not failing to

2  take -- exercise their right and ability to control those

3  subscriber's infringing activity.  It's also relevant to the

4  material contribution, contributory liability analysis

5  because it's relevant to their financial incentives for

6  facilitating that infringement.

7          So it's relevant to every issue of liability and

8  damages.

9          MS. RANAHAN:  So they talked about the notices,

10  Your Honor.  We had been trying for months and had asked

11  them, can we get your notices so that we can look at the

12  notices that you claim are the universe at issue here, and

13  we can then try to link up the accounts and figure out what

14  data we can still pull.  Some of this data is still old,

15  especially from the timeframe that we don't have it anymore.

16          We don't have -- we haven't tracked this stuff back

17  from 2010, 2011.  It wasn't anything that was tracked.  So we

18  to understand which universe of notices they were pointing

19  to.  It's not from them; it's from an agent, RIAAA, so we

20  wanted to.  And they were claiming we've sent at least five.

21  So there is a universe that we needed.

22          We just got that relatively recently in

23  mid-November.  We're processing it.  We've actually been able

24  to use that to find a lot of information and we are literally

25  in the process -- and we have been having regular calls with

1    our clients multiple times a week to try to see the progress

2    that is being made, what we can find.  And this is a question

3    that I told them as soon as we can find out what's

4    available --

5            THE COURT:  Okay.  So you're not opposing it on a

6    fundamental basis?  You just need more time?

7            MS. RANAHAN:  And we might not just be able to

8    link it.  If we can get the data based on what they've given

9    us and we can link the accounts, which is what we're trying

10   to determine, because a lot of these notices, we -- we're

11   just able to uncover all the data based on the subject --

12   it's very complicated.

13           But there is a lot of different systems that these

14   notices were run through over the years during the claim

15   period.  And we also had the separate issue in Florida where

16   it's, you know, a merged company, so we have historic data

17   we're having to pull.  So it's old and we're trying to figure

18   out if we can link these notices with the financial record.

19           THE COURT:  Okay.  So what they provided to you,

20   did they provide a segregated list of subscribers only?

21           MS. RANAHAN:  No.  They've provided the notices

22   themselves, which is hundreds of documents.

23           THE COURT:  Okay.  Then why didn't you segregate

24   out it by subscriber?  Regardless of the number of notices,

25   what you're asking for them is per subscriber, can you

1    provide them a pure subscriber list for whom you provided

2    notices.

3          MS. SAHNI:  But if we don't know their

4    subscribers, Your Honor.  That's the entire point of

5    secondary liability, is that we know IP addresses.  We don't

6    know exactly how that links up to subscribers.

7          THE COURT:  So all you have is IP addresses?

8          MS. SAHNI:  We have IP addresses for subscribers.

9    And we've been able to show that this is a particular IP

10   address with respect to this many times.

11         The entire issue is that they are in exclusive

12   control of all information to link that to subscribers in

13   their system.

14         So we've given them the notices, which to be clear,

15   they have, right.  These were sent in 2013 or 2016, and

16   they -- we sent them a sample notice back in September so

17   they could -- they said they needed a sample notice because

18   they needed to search to find exactly what this notice looks

19   like.  So we provided that in September.

20         Months passed.  Then they come back and say,

21   actually we need all the notices.  So we rush, we get all

22   those 600,000 notices and we produce them.  And then they

23   come back and say, we're still working on it.  I mean, this

24   has been going on for an extended period of time.

25         THE COURT:  I understand.  But it's Charter that

53

1    provides the IP, right?

2            MS. SAHNI:  That links it to a subscriber.

3            MS. RANAHAN:  Right.  So -- and, Your Honor,

4    again, we had been waiting for several months to get the

5    notices so that we can start the process of trying to link.

6            I agree that they wouldn't have the subscriber so

7    they couldn't just give us the subscriber name, so that

8    wouldn't work.  I would love it, trust me.  That would

9    relieve a lot of the brain damage that all we're trying to

10   uncover.

11           THE COURT:  But then, again, you don't want them

12   to have your subscriber list anyway?

13           MS. RANAHAN:  Right, that's the other thing.

14           MS. SAHNI:  That's a separate issue.

15           MS. RANAHAN:  Yeah, that's actually not before you

16   yet.  Hopefully, we can work that one out, I'm hopeful.

17           But that -- so anyway, the point being we were

18   hoping that the sample was going to be enough, and I have not

19   misrepresented this at all.  I mean, we asked for a sample

20   because we thought maybe we could take a sample and find

21   where all these are.  Once we got the notices, we were able

22   to come up with a way to locate them that would work.

23           THE COURT:  Okay.  But she said they gave you a

24   sample in September.

25           MS. RANAHAN:  Right.  And that sample led to

54

1   nothing it.  It didn't work.  I was hoping it was going to

2   work.  We couldn't find it.

3          It wasn't until we got their full universe of

4   notices in November, that we were unable to unearth a huge

5   amount of data.  And I will represent that before the Court

6   because I have been involved in many, many, many, many calls

7   about that.  We've just unearthed it.

8          Now, the question, in addition to finding out all

9   we can about who these subscribers are, we have to now do

10  this very burdensome test of linking it.

11         THE COURT:  I understand.

12         MS. RANAHAN:  Do we have financial data?  So it's

13  not --

14         THE COURT:  But you have all the information you

15  need to do that?

16         MS. RANAHAN:  Now we do.  As of mid-November, we

17  do.

18         THE COURT:  So tell me when you can provide a

19  response.

20         MS. RANAHAN:  About whether we can link the

21  financial data?  We can go with the date that you just

22  suggested, the January 10 date, as far -- because we had

23  preliminary calls --

24         THE COURT:  Well, not whether.  You don't even

25  whether, right now?

1            MS. RANAHAN:  Whether -- I don't know if we can

2    take -- because it's not apples to -- it's a different

3    number, so I don't know if we can -- depends on how much

4    data we have.

5            THE COURT:  You don't know if you can take an IP

6    address and find out how much you have, income you have

7    received from that person.

8            MS. RANAHAN:  Whether we can link it to the

9    billing account.  Like, we can find the notices and find

10   another process.  But it's another step to then to try to

11   find if we can link it to the billing account and for what

12   time period, because again, our -- the timing happens like

13   this.

14           So the note that -- the first cease and desist was

15   sent to them -- to us in 2016.  So we started preserving a

16   lot of the data six months back from that point.  There is a

17   time period from before that.  So there is going to be a

18   2012, 2013 period that we're not sure if we can still link

19   it, because it depends on how much information is still

20   available.

21           THE COURT:  Because of the availability of data?

22           MS. RANAHAN:  Correct.

23           THE COURT:  Not because that you can't?  I mean --

24           MS. RANAHAN:  To the extent it still exists.

25   We're trying to figure out what -- how much of it still

56

1    exists --

2              THE COURT:  Okay.

3              MS. RANAHAN:  -- and whether we can link the

4    accounts to the billing.

5              THE COURT:  Sure.  But that's again just the

6    breadth of the data.  It's not whether providing you an IP

7    address would allow you to determine how much income that

8    person paid.

9              I know you can because I've been the judge in

10   charge of the BitTorrent cases in this district for probably

11   nearly a decade and discovery can be served on Charter that

12   gives you only an IP address and you can respond to that

13   requester and tell who it is.

14             MS. RANAHAN:  Right.  Well, that's one question,

15   you're just using the IP address.  But whether we can link

16   it to what their account number was at the time, we have to

17   make sure we still have that data.  If it was in an early

18   period, 2011 --

19             THE COURT:  I understand.

20             MS. RANAHAN:  -- we may not have it.

21             THE COURT:  But again, that's just connecting the

22   dots.

23             MS. RANAHAN:  Right.  So to the extent that we

24   have that.  So I'm not trying to play games, Your Honor.

25   I'm just saying that because of the --

1              THE COURT:  So by January 10, what would you

2    propose to --

3              MS. RANAHAN:  We will say that we have -- we are

4    able to provide this financial information --

5              THE COURT:  For what period?

6              MS. RANAHAN:  -- this amount of subscribers for

7    this period.

8              THE COURT:  That's fine.

9              MS. SAHNI:  That's fine, Your Honor.

10             I just want to know, though, to make sure I'm

11   understanding because they have maintained a relevance

12   objection and because of their submission yesterday, they

13   raised all these issues as to relevance.  As I understand it

14   now, there is no relevance objection.  The only --

15        Q    (By The Court) No, no.  They may still have a

16   relevance objection.  I'm just wading through the objections

17   and telling you what I'm going to order.  And what I'm going

18   to order is going to depend on what she provides to me

19   January 10.

20             So regardless of the relevance objection, this is

21   relevant.  I'm making that determination, to some extent.

22   But we need that information to determine proportionality,

23   maybe shared expenses and a lot of other things that I have

24   to deal with.

25             Does that make sense?

1          MS. RANAHAN:  Right.  And I will just say we will

2     maintain our relevance objection until the death, but that

3     is not what we're dealing with today.  This is discovery.

4     So we still --

5          THE COURT:  I may disagree with your objection,

6     but I will defend to the death your right to make it.

7          MS. RANAHAN:  Thank you, Your Honor.

8          THE COURT:  Okay.  So what next?

9          MR. LAMPROS:  I do want to apply one thing on the

10    time period here.  So in our note, we indicated we were only

11    seeking this for -- through May 17, 2016.  That's because

12    that is the discovery request we served.

13         We do think that, ultimately, we need this data

14    through the present day because, even though we're only

15    claiming for infringements happening through May 2016, you

16    know, if they received a flurry of infringement notices about

17    a user, didn't cancel that subscriber and continued to

18    collect revenues from that subscriber for another three years

19    after the claim period, that's all relevant, too, because

20    that's additional financial benefit.  And --

21         THE COURT:  So you're reserving your rights?

22         MR. LAMPROS:  You know, we're -- I think we're

23    saying we can certainly serve an additional discovery

24    request, but we wanted to put a pin in that and note, to the

25    extent that comes up, it would be more efficient to resolve

1    that altogether.

2              THE COURT:  Understood.

3              MR. LAMPROS:  I think that is all we need to talk

4    about on financial information.

5              Your Honor, we next would like to talk about the

6    policies on handling copyright infringement, which are at the

7    bottom of page 2 of that letter.

8              THE COURT:  Okay.

9              MR. LAMPROS:  So plaintiffs are seeking Charter's

10   final copyright or infringement policies without limitation

11   as to time period and we're also seek drafts thereof,

12   documents describing the effects of these policies, how they

13   were communicated to third parties and subscribers and

14   identifying the employees involved in drafting and

15   developing those policies for the period of January 1, 2010

16   through May 17, 2016.

17             So Charter has agreed to produce this information

18   for 2012 through 2016, at least as it concerns the policies.

19   They've produced the final policy documents.  They haven't

20   yet produced any drafts, you know, documents relating to, you

21   know, explaining why changes were made to policies,

22   communications, how those policies were communicated.

23             THE COURT:  Well, drafts had nothing to do with

24   changes.  Changes can be determined by taking one active

25   policy and looking at the next active policy and the next

1    active policy, right?  So drafts don't help you there.

2         MR. LAMPROS:  No, but they would -- they would

3    explore if there were alternatives considered for the

4    policies at a given time.

5         I think the reason plaintiffs are seeking this is

6    that if Charter changed its policies during the time period,

7    you know, they perhaps, you know, adopted more stringent

8    policies later on, that would suggest that they could have

9    been documenting those policies earlier, chose not to; that

10   it was unreasonable for them do so.  If Charter made a

11   decision early -- you know, back in 2012 --

12        THE COURT:  So you're trying to take it from a --

13   into the feasibility range, instead of subsequent or

14   remedial measures; is that what you're trying to do?

15        MS. SAHNI:  It goes to reasonableness, Your Honor.

16   It goes both -- both on the front end and on the back end,

17   right.

18        2011 they imposed a less stringent policy and they

19   had a bunch of communication saying, you know, we're losing

20   too many subscribers because we're clamping down on infringe.

21   We need to now have a more lax policy so we're going to let

22   them -- we're going to wait until --

23        THE COURT:  Well, that would deal with memos on

24   that issue, not drafts.

25        MS. SAHNI:  So those are some of the

1    communications we're seeking, communications about these

2    potential policy changes, as well as the final policy.

3            So, you know, if there was a final policy in place

4    in 2011 and then the policy that was in place in 2012 was

5    much more lax, we would like to see that evolution between

6    the 2011 and the 2012, but they only agreed to produce what

7    was in place.

8            THE COURT:  What you're asking for, as I read it,

9    would not be asking for communications about that.  You are

10   seeking copies of final policies and drafts thereof, as well

11   as documents describing the effects of those policies, okay,

12   how they were communicated.  But if -- if there is a

13   document out there that doesn't talk about policies, but

14   only talks about, hey, I'm worried about, you know, clamping

15   down too hard, or something like that, I mean, to me clever

16   interpretation could avoid producing certain documents.

17           The way I would normally see that phrased is,

18   produce all communications concerning discussions regarding

19   how you should approach the issue of infringement and the

20   effect that -- well, anyway.

21           MS. SAHNI:  You know, I think the document is

22   describing the effect of those policies.  That's trying to

23   get at, you know, internal analyses, memos, where they're

24   talking about how these policies are impacting their

25   subscriber base.

1           THE COURT:  Right.  But documents describing the

2    effects of a final copyright or infringement policy, which

3    is those policies refer to Roman numeral I.

4           MS. SAHNI:  Yeah.  And I can look at the request,

5    Your Honor, and maybe --

6           THE COURT:  I don't know if this is a paraphrase

7    or not, but I mean, I think I have it attached, too.  So

8    it's RFP what?

9           MR. LAMPROS:  RFP8.  And I think this was an

10   attempt to narrow the scope.

11          MS. SAHNI:  This was part of our attempt to kind

12   of decrease what we burn up.  We had asked for all documents

13   concerning any copyright or infringement policy applicable

14   to subscribers or users and then including, but not limited

15   to, any draft or final version of such policy, the effects

16   of such policies, including the drafts.

17          And so this one broader, we've been trying to meet

18   and confer and we wanted to try to come up with a more

19   limited scope that would get at a narrower view.

20          THE COURT:  Okay.  Your representation as to what

21   their response has been in your informal conferrals?

22          MS. SAHNI:  So they would agree to produce -- I

23   think this issue -- this one is a specific issue as to time

24   period.  So they've agreed to produce for this more limited

25   time period.  This is one, Your Honor, notwithstanding your

1    comments on the time period in certain instances.  This is

2    one where we think a broader time period is clearly

3    warranted, incredibly probative and relevant to what they

4    were thinking about the policies that were in place during.

5            THE COURT:  To show they may have relaxed the

6    policy from a previous policy.  Okay, what is your response?

7            MS. RANAHAN:  So we've agreed to go back a whole

8    year prior to the claims period, so 2012 --

9            THE COURT:  Do policies change that often?

10           MS. RANAHAN:  No -- I mean, literally we've --

11   we've produced to them all the policy information we can

12   find from that period.  We're also going to be producing

13   this month, as we've told them, communications about them.

14           THE COURT:  So what period have you produced for?

15           MS. RANAHAN:  2000 -- well, everything we can

16   locate between 2012 and 2016.

17           THE COURT:  And during that time period, how many

18   different policies were there?

19           MS. RANAHAN:  Pretty much one policy.  I mean,

20   you've seen the data.  They're not labeled by a year because

21   it's just what we could find from that period.

22           THE COURT:  Okay.  So if there is nothing from

23   2010 or '11, just say that.

24           MS. RANAHAN:  Well, I did try to -- we can't find

25   anything from them, we don't have it.  So we can sit here

1    and speculate about how amazing our policy changes would

2    have been back then, but they don't exist.  We don't have

3    the data.

4            MS. SAHNI:  Well, again, they've never -- we've

5    asked that specific question, tell us exactly what they

6    have.  She's saying now there is nothing from earlier than

7    2012.  That's different than --

8            THE COURT:  Well, not earlier from 2012.  2010 and

9    2011.

10            MS. SAHNI:  As for final policies, we requested

11    for that limitation as to time.  There is also the later

12    policies, they haven't said anything about whether or not

13    there were subsequent changes in 2017, for example, where

14    they said, oh, you know, our policies are too lax, let's get

15    more stringent.  That would be highly relevant, as well, to

16    what's happening in the claims period, and I'm not sure if

17    they searched for that at all.

18            THE COURT:  If they're claiming it wasn't

19    feasible?

20            MS. SAHNI:  If they're claiming it wasn't

21    feasible, but they made all sorts of arguments about we

22    can't cut off people's Internet access.  And so if they

23    changed their policy in some way that undermines those

24    arguments, that would be relevant for us to know.

25            MS. RANAHAN:  Again, we've never said we cannot

1   cut off Internet access.

2          The question is, under what circumstances is it

3   reasonable, and that would be a lovely segue to the class,

4   which is our issue, but what was reasonable to do, given how

5   Internet operates and how these businesses operate and

6   multiple users are on it, and what is reasonable to terminate

7   under the circumstances.  Not whether we can do it, not the

8   feasibility, not the technical ability to shut off the

9   Internet.

10          The policies that we've given them cover the

11   relevant claim period and we're not withholding anything.

12   There is nothing that -- so this one is really, I think a

13   waste of everybody's time because there is nothing else to

14   produce, whether you thought it was relevant or not.

15          THE COURT:  Okay.  So even post-2016?

16          MS. RANAHAN:  Oh, I'm sorry.  The post-2016,

17   that -- so if we have now taken, you know, in light of the

18   -- prior -- the recent lawsuit, why would something that

19   happened in 2017 impact their claims period or what they can

20   say about that?  I mean, they can --

21          THE COURT:  Because the rules of evidence deal

22   with the potential admissibility of subsequent remedial

23   measures in certain circumstances.  So --

24          MS. RANAHAN:  Okay.

25          THE COURT:  So it's just in there, the federal

1    rules evidence.  Do you know what I'm talking about?

2              MS. RANAHAN:  Of course, I know what you're

3    talking about.  I'm trying to think of how -- I'm applying

4    it in my head, I'm sorry.

5              THE COURT:  So what they're saying is, suddenly in

6    2017, you come out with a very strict policy that, based on

7    these two pieces of information, if that comes to your

8    attention, and you establish that it's true, you are going

9    to terminate person, terminate the Internet service.  And

10   why couldn't you have done that a year or two before?

11             MS. RANAHAN:  Okay.  So isn't that again like to

12   that policy of the subsequent remedial measures?

13             THE COURT:  It potentially is, but there are ways

14   to get that information is sometimes, like feasibility.

15             MS. RANAHAN:  But that would discourage the client

16   from ever making any changes.

17             THE COURT:  Well, that's why that rule is there,

18   of course, in the first place.

19             MS. RANAHAN:  Right, exactly.

20             MS. SAHNI:  But there are exceptions to the bar,

21   right?

22             THE COURT:  But it's a rule of admissibility, not

23   a rule of discovery, is the problem.

24             MS. RANAHAN:  Okay, okay.

25             So I take it from your comments that you were

1   leaning towards allowing 2017.

2            THE COURT:  No.  I'm making that ruling, actually.

3            MS. RANAHAN:  Okay.  So I -- if there are any

4   policies, former policies from 2017 --

5            THE COURT:  After --

6            MS. RANAHAN:  Post the claim.

7            THE COURT:  -- May of 2016.

8            MS. SAHNI:  And as to the earlier period, the

9   representation is that there aren't any?

10            MS. RANAHAN:  Not that there were no policies;

11   that we do not have any information to provide, because 2010

12   materials, we don't have anything.  We've searched.

13            THE COURT:  There is nothing in their possession,

14   custody or control that's responsive to their request.

15            MS. SAHNI:  And, specifically, also with respect

16   to the documents describing the effects of those policies,

17   you've run that search for the 2010?

18            MS. RANAHAN:  Well, wait.  I mean, 2010 to 20 --

19   we don't think that's relevant, the policies themselves.  I

20   mean, this is, we can have this discussion.  But there are

21   no -- we have very, very limited data from that time period,

22   so there is nothing what you just described, no.  But I

23   don't know if you want to have this back and forth before

24   the --

25            THE COURT:  Well, yeah.  I mean, I don't want you

1    to have it somewhere else and then have to come back to me.

2            MS. SAHNI:  I just want to make sure, Your Honor,

3    there is two pieces of this request.  There are final

4    policies and they're telling us now that there are no final

5    policies from the period before that they have.  But there

6    is also the drafts of documents describing the effect of

7    those policies.  And I want to make sure that the

8    representation --

9            THE COURT:  So if there is a 2013 document that

10   says, hey, we've got to get -- move -- you know, we have to

11   address our own policy because we're getting hurt by

12   whatever, yeah.  If there is documents any time in the 2010

13   to 2016 time period that discuss policies that have existed,

14   even though we don't those policies, but documents discuss

15   it, yeah, that's within the zone of relevance, okay.

16           MR. LAMPROS:  So, Your Honor, the last category

17   information on our end concern infringement notices, and

18   this is the last, I think, in our letter on page 3.

19           So as we discussed a few times today, plaintiff's

20   agent sent infringement notices to Charter for 2013 through

21   2016 related to particular subscribers that they determine

22   were purging plaintiff's content.

23           We're seeking for all the users identified in those

24   infringement notices, the -- you know, the logs of those

25   notices, or what they called ticket log data, pertaining to

1     all those subscribers without limitation as to complainant.

2             So if those individuals identified in those notices

3     had Charter had received a number of infringement notices

4     from third parties related to those same subscribers --

5             THE COURT:  If Charter did?

6             MR. LAMPROS:  Yeah.  If Charter did, we believe

7     that would be relevant because that -- and we're also

8     seeking this back to 2010 again because earlier acts of

9     infringement by those same subscribers, even if they were

10    admitted that they were infringing copyrighting works of

11    third parties or if they were hacking before the claim

12    period, that informs what Charter did in response to the

13    notices during the claims period.

14            And if you have a subscriber and you've got 25

15    infringement notices from moving companies and, you know,

16    software companies about that subscriber in 2011 and you keep

17    them on, and then in 2013, you get another 20 infringement

18    notices from plaintiff music companies, you know, that --

19    that's all relevant because you were already on notice that

20    that person was infringing content.

21            THE COURT:  So articulate what you believe the

22    legal standard is for a company like Charter when it

23    receives an infringement notice.  What do they have to do

24    with that?

25            MS. SAHNI:  Your Honor, there is two issues there.

1    There is the vicarious liability, it's the right and ability

2    to control.  And then there is the contributory liability.

3    Our allegations is that they materially contributed to this

4    infringement.

5             THE COURT:  No, no, I understand.  But I want you

6    to tell the jury what Charter is supposed to do when they

7    receive an infringement notice about one of their customers.

8    What is their obligation?

9             MS. SAHNI:  Your Honor, we -- I don't think we at

10   this moment, we haven't seen anything about what they've

11   done.  So we need to understand what they were doing with

12   those notices.  Typically, they're supposed to forward the

13   notice on and then they're supposed to --

14            THE COURT:  Forward it to whom?

15            MS. SAHNI:  To the subscriber.

16            THE COURT:  Okay.

17            MS. SAHNI:  And then the subscriber may or may not

18   respond.  And they're supposed to track how many

19   infringement notices they're getting.

20            THE COURT:  So they're supposed to investigate?

21            MS. SAHNI:  They're supposed to -- they're not

22   supposed to actively investigate.  They're supposed to

23   take -- let the subscriber decide if they want to come back

24   and say, you know, no, that wasn't me.  But once they're on

25   notice of multiple acts of infringement, of repeat

1    infringement by the same subscriber, if they fail to do

2    anything to stop that infringement, there is clear case law

3    that that can be considered material contribution to the

4    infringement under the contributory liability standard.

5            And here we are asking for directly relevant

6    information saying how many notices did you get for these

7    subscribers, regardless of whether they're from us or

8    somebody else, and tell us what you did.  Did you suspend

9    them?  Did you limit their Internet access?  Did you

10   terminate them?  What did you do?  So we can look at that and

11   say, was that sufficient.

12           What we do know is that there were a lot of these

13   subscribers that infringed 10, 15, 20 times and from our

14   vantage, they did nothing because they kept getting notices.

15           And so the question of how many notices they got is

16   directly relevant and implicated by these requests because it

17   doesn't matter as to Charter's knowledge, which is one of the

18   things we have to show under the contributory liability

19   standard.

20           If Charter knew about ten acts of infringement for

21   a given subscriber in 2011 and then they received five more

22   notices from us in 2013, that makes their failure to do

23   anything to stop that infringement all the more egregious,

24   and we should able to show that to a jury.

25           THE COURT:  Okay.  And the level of egregiousness

72

1    will govern what?

2           MS. SAHNI:  That could govern the willfulness for

3    statutory damages.  You know, it's directly relevant to

4    knowledge itself of repeat infringement activity for

5    purposes of the contributory --

6           THE COURT:  Was that the limit that you have for

7    exemplary damages is statutory willful?

8           MS. SAHNI:  There are willful damages.

9           THE COURT:  There is no common law punitive?

10          MS. SAHNI:  No, Your Honor.

11          THE COURT:  Okay.

12          MS. SAHNI:  We've elected statutory damages.

13   There is a range for willful infringement, you can go

14   higher, to a higher range.

15          THE COURT:  Okay.  And is that on a pretty

16   frequent basis?

17          MS. SAHNI:  Yeah, per -- per work.

18          THE COURT:  Per work, okay.  So what's your

19   response?

20          MS. RANAHAN:  Okay, so a few things.

21          As far as what they believe are standard, that's

22   why the CAS is so important, which we can talk about next.

23   But they did have an industry agreement with five major ISPs,

24   like us, which never required terminations.  They had like a

25   15-step program and they had --

1            THE COURT:  Who is they?

2            MS. RANAHAN:  Plaintiffs --

3            MS. SAHNI:  Your Honor, we addressed this issue

4    already.

5            THE COURT:  I'm looking for background.

6            MS. RANAHAN:  Plaintiffs, and then major ISPs Time

7    Warner.  I have the footnote which I can get out later, but

8    major ISPs and plaintiffs themselves.

9            So they had come to this agreement about, look, if

10   we can work with the subscribers because often, though they

11   keep saying the subscriber, him, you don't know who is doing

12   the infringement.  That is the whole trick.  It's like you

13   get a notice, you're a library, someone came in and

14   infringed, you're not -- the subscriber isn't the same person

15   as the --

16           THE COURT:  Were some of these potentially a

17   person whose Internet was not password-protected?

18           MS. RANAHAN:  Of course.  Your nextdoor neighbor,

19   you come in and you have the password Password, you know.

20   So the nextdoor neighbor is now fringing all day long.

21           So the point is that you work with -- you get a

22   notice and they agreed -- I just want to stress that they

23   agreed to this with many of the five major ISPs, that there

24   was a system where if you worked with the subscriber, who is

25   not necessarily the infringer, you work with the subscriber,

1   you send notices, you talk with them, you work with them, you

2   see what might be going on.  You go look, something is

3   happening around this time, that gets a better result and

4   that actually reduced infringement more than anything else,

5   termination included.  And they actually had a whole system

6   in place that had about 15 steps that never required

7   termination.

8          So I just want to -- and we will get to that when

9   we talk about the CAS and how incredibly careful they are and

10  how they were featured at the trial that is happening right

11  now (inaudible) because I don't think we were fully heard on

12  that and I do want to revisit that.

13         But aside from that, what we're talking about, we

14  have agreed -- like, this is not even -- I'm surprised that

15  this is even in their papers, because we have been going back

16  and forth on what ticket data we have.  We've given them a

17  sample, we haven't heard back from them.  We've shown them

18  the key.  We haven't heard back if it's okay.

19         So this is not even --

20         THE COURT:  What are you proposing?

21         MS. RANAHAN:  So -- because we had just had the

22  same situation in the prior case where we had agreed to

23  format, we've actually provided them all the data that we

24  have on every subscriber that we can still track based on

25  the notices, because again, it's not a lined-up thing.

1          We have to say, here is the ISP, do we still have

2    information about what happened?  Because we have to see, do

3    we still have the ticket data?

4          We don't have ticket data for Charter from 2010, we

5    don't have it from 2011.  We have some data which started at

6    2012, 2013.  So we're trying to assess against their notices

7    what we have.  We've given them a key, a sample, and said,

8    are these categories good enough for you.  They've said, we

9    don't know what some of these are, will you give us a key.

10         I've now given them a key and heard nothing, it has

11   been weeks.  And now we're here acting as if we just stiffed

12   them on this data, but it's not the case.  We're actually

13   actively discussing these and I don't even think you would

14   deny that.

15         MS. SAHNI:  I think there's two separate issues.

16         One is, are they providing us ticket log data?

17   They provided us a sample.  The two specific issues --

18         THE COURT:  What is a ticket log?

19         MS. SAHNI:  This is a log, Your Honor, that of all

20   the subscribers and linking them up to the number of notices

21   and then what actions were taken as to each notice.

22         THE COURT:  Okay.

23         MS. SAHNI:  What we're here on today is time

24   period and whether that log should include notices set by

25   third parties, not by plaintiffs.  Those are the two

1    specific issues we're raising.

2           THE COURT:  Right.  The time period she just said,

3    you can't do 2010 and '11.  Do you disagree?

4           MS. SAHNI:  Well, again, it's incredibly

5    frustrating because it's the first we're hearing of this.

6    We've been asking and they haven't told us, so she is now

7    saying there is no data for 2010 through 2011.

8           Again, that just seems oddly convenient to me that

9    they have nothing for those two years.  But regardless, there

10   is still the issue of the third-party notices and whether or

11   not they should have to produce within the claim period

12   notices -- information on notices that are linked to the same

13   subscribers identified in our notices.

14          THE COURT:  And what do you believe your response

15   has been to that up to today?

16          MS. SAHNI:  So it has shifted a fair amount.

17          So originally, we thought we had agreement on that

18   and we sort of went along our discovery process, we thought

19   they had agreed to that.  And then there was an e-mail

20   exchange and it's in one of the submissions sent to you, Your

21   Honor, where they said actually, we can't commit to that yet,

22   we need the notices.

23          And we were sort of totally taken by surprise at

24   that point because we thought we had agreement on this, and

25   then she said, We need the notices.  We produced the notices,

1    November 15, a month ago, and we haven't heard anything

2    further.

3              So even today, and in their paper yesterday they're

4    still resisting the third-party notices.

5              So even though they're coming into court and saying

6    all these things, like we've worked through these, their

7    submission yesterday makes clear that they're saying it's not

8    relevant and they don't agree to produce it.

9              THE COURT:  Okay, go ahead.

10             MS. RANAHAN:  That's -- okay, we have never said

11   we're not -- we're in active negotiations with them, and all

12   I said was given -- we do need the notices because, as I

13   described before, we were unable to find a huge volume of

14   information that we've now found, so their notices worked,

15   it actually did work.  I'm before the Court telling you that

16   since we've gotten their notices, we've unearthed a bunch of

17   data.

18             So now, the next -- so we're still trying to figure

19   out the accounting information we can glean from those.  We

20   are creating these ticket reports, which we've given them a

21   sample.  And we want to know before we run the, you know,

22   tens of thousands that we have if it satisfies their needs.

23   We don't know that yet because they've left us hanging on

24   that.  Do these categories work for you?

25             And it's based off of the prior case which we

1   agreed to, so we thought it should be simple enough and what

2   they've asked for.  And we haven't heard that it works.  So

3   we haven't run the full data yet, because we don't know if it

4   works.

5           As far as the time period, she's saying it's

6   convenient for 2010, 2011.  We also don't have a lot of data

7   for 2012 so we're providing what we have, still.  But

8   unfortunately because of the way these ticket log data were

9   captured, it just -- by the time we got notice of the lawsuit

10  in 2016, we weren't maintaining 2012 records on this stiff.

11          THE COURT:  So I agree with the relevance of the

12  third party, but you guys are working it out.  I need to

13  know when that will come to fruition.

14          MS. RANAHAN:  Right.

15          THE COURT:  Give me an idea.

16          MS. RANAHAN:  The date that you had suggested -- I

17  think it was January 10.  That can be part of this, too.  Or

18  we can -- because I don't think we need to even be before

19  you on this.  I think this is a waste of our time.

20          THE COURT:  That's fine.  Yeah, I agree.  I mean,

21  we maybe need to never meet again, depending on what you --

22          MS. RANAHAN:  I don't know if that's true, but on

23  this issue.

24          THE COURT:  Don't say that.  Don't curse this

25  case.  So I agree that not a third party would be relevant,

1    all right.

2              MR. LAMPROS:  Before we leave this topic, Your

3    Honor, I just want to say we are asking for things beyond

4    just ticket log data.  We're also asking for the

5    communications about these notices and --

6              THE COURT:  Communications internally or to the

7    subscriber?

8              MS. SAHNI:  Both, both, Your Honor.

9              MS. RANAHAN:  And we've told them we would produce

10   anything we could locate on that front.

11             THE COURT:  Okay.

12             MR. LAMPROS:  And then we're also asking for

13   documents sufficient to show the actions taken by Charter

14   to -- to limit, suspend or terminate any of these

15   subscribers in response to these notices.

16             THE COURT:  Okay.

17             MS. RANAHAN:  That's part of the ticket data

18   sample that we provided.

19             THE COURT:  I agree as well.

20             MS. RANAHAN:  To the extent we've done anything,

21   it's reflected in the --

22             THE COURT:  Now, subject to proportionality and

23   maybe other considerations, but on the relevance, I agree

24   that it's in the zone, okay.

25             MS. SAHNI:  That's all the issues --

80

1           THE COURT:  You yield the floor?

2           MS. SAHNI:  Yes.

3           MS. RANAHAN:  Okay, thank you, Your Honor.

4           So I alluded to it because I'm most fired about the

5    CAS documents, and that is because I'm reading these

6    transcripts from the trial on a daily basis, and --

7           THE COURT:  So there is a trial going on right

8    now?

9           MS. RANAHAN:  Right now, it's either wrapping

10   today or tomorrow.  It has been going on for two and a half

11   weeks.  They're co-counsel.  Our firm is involved in --

12          THE COURT:  Will you just provide me the verdict

13   when it comes in?

14          MS. RANAHAN:  Of course.  I'm sure both sides will

15   tell you what happened.

16          THE COURT:  E-mail the verdict.  I want to see the

17   verdict.

18          MS. RANAHAN:  The most favorable terms, Your

19   Honor.

20          So the CAS documents, Your Honor, so what we had

21   submitted to you --

22          THE COURT:  C-A-S.

23          MS. RANAHAN:  C-A-S, Copyright Alert System.  And

24   this is what I was telling you about, which is that

25   plaintiffs entered into an agreement, an industry agreement

1   with five major ISPs.  And in that they came up with a

2   system to try to -- it was a mutual, let's work together.

3   And at one point the cable company was not the ire of the

4   record labels.

5        At one point the cable company was untouchable and

6   they were on a different level, they were suing people like

7   YouTube at the time, people who were actually responsible for

8   uploading content, people like Napster, they were drawing

9   content or, you know, loading.  The cable companies were not

10  viewed that way at this time.

11       So they entered into this inter-industry agreement

12  and all these practical considerations were thrown around,

13  like, well, gee, I mean, we're dealing with military basis,

14  we're dealing with schools, we're dealing with libraries,

15  we're dealing with Internet where your neighbor can pick it

16  up.  Is it really fair to terminate access left and right

17  when we don't even -- we need to more work with these people

18  instead of just terminating them.

19       So there was a system with that plaintiff's input,

20  after years and years and years of negotiations was put in

21  place.  It did not require termination.  It required 15 or 16

22  or 17 -- all these steps to try to get at the root of it and

23  root it out working with the subscribers.  But it did not

24  call for what they're asking for us to do, discover during

25  the time period, and it has now been featured with most

1   witnesses in this trial.  You know, my partner, Mike

2   (inaudible) referred to it in the opening.

3          So what we asked -- we had a call with you about

4   this preliminary on October 29.  It was very short.  There

5   was a blizzard that day, I don't know if you recall, but it

6   was the last issue discussed.  We discussed it more briefly

7   than any other issue that day.  And you said, you know, yeah,

8   that doesn't sound relevant to me, but I don't think, you

9   know, the issue is fully heard.

10          Then we sent a letter to Your Honor, four days

11   later, five days later, early in November, saying, Your

12   Honor, what about just the implementation?  It's five

13   agreements, there is no burden.

14          They produced it in Cox, they produced of the five

15   implementation agreements and these implementation agreements

16   are with plaintiff -- like how they implement the CAS with

17   the specific ISPs.

18          There is no burden whatsoever.  We actually have

19   them if they could just deem them usable.  But anyway,

20   they're so important to this case and to our position before

21   the jury about what they actually believed was reasonable

22   during the time period and working with major ISPs and what

23   they thought and all the concerns I described as far as

24   they're chalking up, Look, this is a subscriber, he did this,

25   he did that.  That's not the case.  As I tried to articulate,

1   this is much more complicated than that.  This is Internet

2   access.

3          And if you terminate one family's Internet access

4   because you've got, you know, five notices from the neighbor,

5   you're cutting off Internet access, which is a major, major

6   utility that people rely on for some things.  So it is --

7          THE COURT:  I'm sure it's in the conundrum of the

8   Constitution by now.

9          MS. RANAHAN:  I mean, any day now we're going to

10  have --

11         THE COURT:  We'll recognize in 2023.

12         MS. RANAHAN:  I'm sure, that you have a

13  fundamental right to access the Internet.  We all have it,

14  right.  And to deny it, it must be -- no, but, Your Honor,

15  the point is the due process aspect is that you don't know

16  who is doing it, and to just terminate willy-nilly, and they

17  agreed, because that's what they agreed with the five ISPs,

18  this isn't our own crazy theory.  This is a theory --

19         THE COURT:  Okay, but I'm still not sure where

20  you're going with this.

21         MS. RANAHAN:  I want the five implementation

22  agreements from the CAS is all we're asking for, the five

23  agreements that they produced in that case, which is what

24  they actually entered so that we can use them like we're

25  using them in the trial that's happening right now before

84

1    the jury with the witnesses in the opening, closing.  It's,

2    you know, a huge important issue to us.

3           The judge in Cox denied their motion in limine to

4    exclude it.  So it got all the way to motion in limine.  That

5    judge said, I think it's relevant, it shows what you thought

6    was reasonable during the relevant time period, I'm going to

7    allow it in, we're allow argument and we're allow document.

8    And so I just don't want to be foreclosed here from, even

9    making the arguments before the jury in discovery when all we

10   need is these -- the earlier request was much broader.  It

11   was communications, it was negotiations.  You know, this --

12          THE COURT:  I'm dying to hear what their reason is

13   for not producing those.  Go ahead.

14          MS. SAHNI:  Thank you, Your Honor.

15          So, first, I just want to note that this was

16   something we talked about for, you know, as part of that

17   one-hour long conference.  We discussed that this was a

18   private industry agreement between our clients, in some

19   cases, and up to 30 other parties, notably not including

20   Charter, and that was on October 29, 2019.

21          And very importantly, although Ms. Ranaham keeps

22   referring to this as an industry standard, the CAS, the

23   copyright alert system, was very intentionally and expressly

24   not establishing --

25          THE COURT:  No, no.  You said that -- I'm looking

1   at what you said before.  That system makes it very clear it

2   does not establish an industry standard.

3            MS. SAHNI:  Exactly.

4            THE COURT:  You made that argument.

5            MS. SAHNI:  And so now they've come back, they've

6   asked for reconsideration on this.  They've separately filed

7   objections that are sitting with Judge Jackson.  In

8   connection with, we submitted a response, including

9   substantial declarations from our client talking about the

10  irrelevance and the burden of this material, including the

11  implementation agreement.

12           THE COURT:  What would be the burden?

13           MS. SAHNI:  So these implementation agreements are

14  governed by strict confidentiality provision, which relate

15  to a number of other parties not in this case.  So we had to

16  go and get --

17           THE COURT:  But they've already seen them?

18           MS. SAHNI:  But we had to go get consent for use

19  in that sense.

20           THE COURT:  Right.

21           MS. SAHNI:  Specifically in the Cox case, and the

22  consents that were obtained were specific to that case.  So

23  now we have to go back to all of those parties to get them

24  to be used here.  And that is not an easy process.

25           And again, given the limited relevance of this

86

1    stuff, it's not relevant what others were doing.  What we are

2    seeking to hold Charter liable for is whether its actions

3    were consistent with its own legal obligation.

4            THE COURT:  Do you have an example with one of

5    these agreements, by any chance?

6            MS. SAHNI:  I don't have one with me.

7            THE COURT:  Do you?

8            MS. RANAHAN:  No, because I'm not -- I'm not

9    allowed to use them since I wasn't on the Cox trial and

10   it's -- limited.

11           MS. SAHNI:  No, Your Honor, we're not allowed

12   to --

13           THE COURT:  Internally, they don't have a

14   paragraph that says the agreements can be produced to

15   pursuant lawful Court order.

16           MS. RANAHAN:  That's what she's talking about.

17           MS. SAHNI:  My understanding is they had to go and

18   get consent from third parties in connection with that

19   production in Cox.

20           THE COURT:  No, no.  My question is, do the

21   agreements themselves contain a paragraph that says we're

22   excused from this confidentiality if there is a lawful court

23   order ordering us to produce a document.

24           MS. SAHNI:  Again, that's my understanding, Your

25   Honor.  Again, I haven't seen them.  Just like Ms. Ranaham,

1   I'm not --

2           THE COURT:  So you don't have to go consent if I

3   order --

4           MS. SAHNI:  But we do have to get consent because

5   in that -- whatever the confidentiality restriction was, was

6   even if you have to put produce it in litigation, you have

7   to get consent is my understanding.

8           THE COURT:  Well, there would be notice more than

9   consent.

10          MS. SAHNI:  My understanding is they went and got

11  consent.  Apologies, because neither of us were in that case

12  so we don't have access to the specific language.  But from

13  co-counsel, my understanding is that they have to get

14  consent from third parties to produce it and it was specific

15  to that case.

16          THE COURT:  Right.  But you are the one who has

17  raised mens rea today; that what was in their mind matters.

18  And this relates to what was in their mind as to what their

19  obligations are.  They have to be able to defend your

20  allegations that they knew, they should have known, they had

21  the feasibility to do this, that -- that you want these

22  liquidated damages, statutory damages, but they're not

23  allowed to say, but wait a second, we thought we had a deal.

24  That doesn't -- I mean --

25          MS. SAHNI:  They weren't part of the deal, Your

88

1    Honor.  Just to be clear it --

2              THE COURT:  Why are you saying that you were

3    when --

4              MS. RANAHAN:  No, no.  The parties of the deal

5    were Comcast, Time Warner, Cable vision, ATV, all the other

6    major -- that's why we don't have them.  If we were parties

7    to the deal --

8              THE COURT:  Well, but you were -- was Charter even

9    aware of those?

10             MS. RANAHAN:  Of course, yeah.  Because they

11   were -- it was a public MOU, but the implementation

12   agreements were private.  So there is a public MOU that has

13   the parameters.

14             And, yes, we were aware of them and, of course, we

15   talked the other cable companies.  We actually didn't enter

16   it because we thought we were doing better than CAS.

17             THE COURT:  Right.  So why isn't the public MOU

18   enough for you?

19             MS. RANAHAN:  Because that doesn't show how they

20   implemented these agreements.  But what's being used in the

21   trial shows the repeat infringement policy --

22             THE COURT:  Right.  But they how approach five

23   other different companies, why is that relevant to how they

24   approach --

25             MR. JOYCE:  Because this is what the document that

1    (inaudible) used in the underlying trial aren't with the

2    witnesses, which is this is what you said, this is what you

3    agreed about the repeat infringer.  This is what you thought

4    was reasonable.  So it -- they are being used in the trial

5    right now as we speak and they are hugely important to our

6    clients to be able to introduce.

7         So it's -- the public MOU is like, here is the

8    preamble, here is the goals.  The implementation agreements

9    are what's critical, shows this whole -- from my

10   understanding, because again, we're not allowed to actually

11   hold them or wave them in front of you.

12        But they show the ways in which there was no

13   obligation to actually terminate, 15 steps that were agreed

14   to with each of the providers.  It shows that each of the

15   providers weren't required to terminate.

16        So the MOU -- and our clients were speaking to the

17   other cable company, because they all, you know, make sure --

18        THE COURT:  So is it kind of an unclean hands

19   argument you're making?

20        MS. RANAHAN:  The argument -- they believe it was

21   not -- it wasn't required or reasonable for a cable company

22   to have to terminate.  And they're now trying to hold us to

23   standard that they didn't even think was reasonable.

24        THE COURT:  But the law will determine what's

25   reasonable and what's required, not their opinion.

90

1          MS. RANAHAN:  Well, there is no law -- Your Honor,

2     this is a question --

3          THE COURT:  Well, the jury will be the law.

4          MS. RANAHAN:  It's new, right.  And so the jury

5     should know what they thought was reasonable during the time

6     period.  That's the argument.  That's why the motion in

7     limine --

8          THE COURT:  But the court, Judge Jackson, will

9     have to determine, I'll bet, before trial, whether the

10    proposition should even be submitted to the jury.

11         MS. RANAHAN:  Judge Jackson will decide that, Your

12    Honor.

13         THE COURT:  Yeah.

14         MS. RANAHAN:  All we want is the opportunity to

15    have the evidence, argue it to Judge Jackson, like it was

16    just argued in Cox, where the motion in limine that they

17    brought to exclude the CAS was denied, it was denied in

18    trial, the judge found it relevant.  And so we -- we should

19    not be denied the right to even, you know, raise it before

20    Judge Jackson on a motion -- to defend a motion in limine.

21         THE COURT:  Well, I guess a point for discovery

22    is, as long as you have a protective order in place --

23         MS. RANAHAN:  I understand their concern, Your

24    Honor, is that people have the chance to object, so you

25    could do an order where you say, produce it within this

1   amount of time.  And if someone wants to come in screaming,

2   you can't show this to them, they'll have the chance to do

3   that.

4          I mean, I don't see why that wouldn't solve what

5   Your Honor is discussing as far as, you know -- every single

6   agreement says, by Court order.  Of course, there is an

7   exception, but if they want to come in and explain to you

8   why, you know, something will go wrong if they do it, I mean,

9   you can work that in, but we've got to be able to get ahold

10  of these agreements as far as the relevance goes.

11         MS. SAHNI:  Your Honor, I mean, our primary

12  objection is one of relevance.  I mean, the entire arguments

13  were made before and Your Honor said, whatever their state

14  of mind was, meaning Charter, they are in control of that.

15  It doesn't matter what other ISPs were doing.

16         Charter's action must be measured against each own

17  legal obligations, not against what others were doing.  And

18  so it's not relevant or admissible, it's exactly what you

19  said.

20         I don't see the relevance for admissibility of this

21  agreement.  And that's -- that's absolutely correct, and it's

22  the subject of pending objection before judge Jackson.

23         So if -- I just don't understand why we're back at

24  this again when we had a full discussion of this before we

25  submitted --

1              THE COURT:  Wait.  If it's briefed in front of

2    Judge Jackson, I'm not going to touch it.

3              MS. RANAHAN:  Well, this --

4              MS. SAHNI:  That's exactly the point, Your Honor.

5              MS. RANAHAN:  What's brief in front of Judge

6    Jackson is broader because we -- what happened was you

7    issued that order.  We then sent you letters about just the

8    implementation agreements.  And we told Judge Jackson we

9    hope that if we can just the implementation agreements from

10   Judge Hegarty, we can moot the whole thing.  We will

11   literally withdraw the objections because that's how

12   important these implementation agreements are.

13             THE COURT:  Yeah.  But have you asked Judge

14   Jackson for the implementation agreements?

15             MS. RANAHAN:  We asked for all the CAS -- all the

16   information that we had sought under CAS, so the

17   implementation agreements are the most important.

18             In our call with you we did not articulate the

19   implementation agreements specifically because we had little

20   time on that issue.  All that we talked about on our call

21   with you was the CAS overall and you decided it wasn't

22   relevant.

23             At that point, I didn't even realize that they had

24   been produced in the other case and you were -- during that

25   call when things were produced in the other case, you were

93

1    like, well, just, you know, please, why don't just produce it

2    here.

3           So we came back to Your Honor on just the five

4    knowing that it had been produced in Cox and just asking you

5    to ask them to reproduce it.

6           Now, they've raised -- the burden argument is the

7    same burden in every single agreement that you've ever seen

8    which is, you know, if you're going to disclose this

9    voluntarily, you need to give notice, a court order is

10   accepted.  If they want time to have objections be made,

11   that's fine.

12          But we made clear -- we actually wrote letters and

13   asked you if you could decide this before we raised this

14   issue with -- but we didn't want to waive our right to do it,

15   given that we hadn't heard necessarily.

16          But if you -- if Your Honor will give us those five

17   agreements that we've been asking for, we can withdraw the

18   objection on the CAS to -- to Judge Jackson and lighten his

19   load on that.

20          THE COURT:  So you're saying that I didn't

21   consider that specific narrow request?

22          MS. RANAHAN:  Correct.  And we didn't articulate

23   the five implementation agreements that had already been

24   produced in Cox.  So that is all I'm asking you for right

25   now.

94

1          THE COURT:  And you disagree that I considered

2    that?

3          MS. SAHNI:  I don't know if you considered it

4    specifically.  We definitely talked about the implementation

5    agreements.

6          MS. RANAHAN:  We did not.  We did not.

7          MS. SAHNI:  We talked --

8          MS. RANAHAN:  I didn't even know the importance of

9    them until I --

10         THE COURT:  Yeah, the word "implementation"

11   doesn't even exist in the document transcript.

12         MS. SAHNI:  I think we talked about the fact that

13   there is a public agreement, which we said we would produce.

14   And then there is the other agreements that are between

15   other ISPs and our plaintiffs.

16         MS. RANAHAN:  Your Honor --

17         MS. SAHNI:  So I don't know -- I don't know why --

18   I mean, we -- they sent us an e-mail saying, didn't you

19   agree to produce this?  We didn't.  So they, obviously,

20   thought it was covered.

21         And then they come back to Your Honor with a letter

22   objection.  And that was a second bite at the apple that this

23   discovery conference, which basically, you know, makes all

24   the work we've done since that point to brief this.

25         THE COURT:  No, it's not a second bite.  It's an

95

1    attempt to resolve a dispute by narrowing the request, which

2    you're always under a good-faith obligation to continue to

3    try to engage in narrowing your request and accomplishing

4    this outside requirement of the Court in issuing an order.

5    That's something that you're just -- you have to do.

6            MS. SAHNI:  Understood, Your Honor.

7            THE COURT:  So given -- you don't disagree that

8    the judge in this -- what's the name of the lawsuit that's

9    in trial?

10           MS. RANAHAN:  It's the Cox case, Your Honor.

11           THE COURT:  The judge in the Cox case, not only

12   ordered the production, but also admitted the document, you

13   you agree with that?

14           MS. SAHNI:  He did include -- he did say that the

15   documents were admissible.  He didn't have even any

16   reasoning around them.

17           THE COURT:  And were they admitted?

18           MS. SAHNI:  They were.  He said it was admissible

19   and I believe that have been discussed at the trial.  I

20   don't know if the specific agreements themselves --

21           MS. RANAHAN:  They absolutely were.  He admitted

22   the CAS -- CAS documents without restriction.

23           What was ordered produced in that case was the

24   implementation agreements and the MOU.  They've agreed to

25   produce the public MOU in this case.  We don't have an issue

1   with that.

2          Not only that, we could get it from the public, but

3   what we want is just the five implementation agreements that

4   were ordered produced in Cox and are being featured centrally

5   at trial right now.  And we had not raised that with you

6   before, Your Honor, so that's why we thought a letter on that

7   specific narrow issue was worth it.

8          The only burden again is this notice issue, which I

9   know can be, you know, understandably worked out with the

10  Court's order.

11         MS. SAHNI:  Again, Your Honor, our primary

12  objection is one of relevance.

13         We still -- there is no relevance to what

14  plaintiffs, as part of a compromise with other parties, may

15  have considered for whether or not Charter abided by its

16  legal obligations.

17         There is clear case law which we briefed in the

18  objection before Judge Jackson that says custom and usage

19  evidence like this and what was done in the industry is not

20  relevant to liability under the copyright act.

21         So there is case law supporting our position, not

22  withstanding whatever the judge may have done in Cox, there

23  is clear -- there is clear case law.

24         MS. RANAHAN:  Your Honor, you --

25         MS. SAHNI:  They are relevant.

1          MS. RANAHAN:  Your Honor, you asked counsel, what

2    did you want them do with the notices?  What did you expect

3    them do with the notices?

4          The best answer to that question is these five

5    implementation agreements from our perspective.  That shows

6    exactly what they thought should be done.  They can argue all

7    of this and say --

8          THE COURT:  What they thought should be done, but

9    not what you believed your obligation was.

10         MS. RANAHAN:  It's the same.  I mean, we relied on

11   them.  They knew that's what they expected of the majorized

12   piece.  We knew that.  We relied on the general policies

13   that all the ISPs were abiding by.  We actually didn't --

14         THE COURT:  Well, you relied on the MOU?

15         MS. RANAHAN:  The MOU and what we knew about how

16   they were implementing it, but we didn't have the agreement.

17         So we, you know, had word of what was happening.

18   We knew nobody was doing terminations at the time, except for

19   in very, very rare circumstances, and plaintiffs were the

20   ones that agreed with that.

21         So Your Honor can disagree with how relevant it is

22   or -- you know, but at this stage we're in discovery, we

23   really need to be able to get those before we get to the

24   point of having a motion in limine.

25         THE COURT:  I understand, yeah.  So.

98

1           MS. SAHNI:  Your Honor, if I may respond to that

2     last point.

3           THE COURT:  Yeah, go ahead.

4           MS. SAHNI:  They've been talking about their state

5     of mind, but I mean, what else do they need beyond what they

6     knew at the time?  And what they knew at the time was not

7     what was actually in the implementation agreements because

8     they weren't parties to that.

9           MS. RANAHAN:  It's not only ours --

10          THE COURT:  Well, I mean, there are documents that

11    may be admissible for impeachment purposes and so they might

12    be an impeachment document at trial.  One of your clients

13    says something contrary to something in that document, they

14    could use it for impeachment, right.  Not for admission as

15    an exhibit, but simply to impeach.

16          MS. SAHNI:  But it's simply -- Your Honor, for

17    purposes of whether it's relevant to the claims that are at

18    issue here, I just think -- we don't see the relevance, Your

19    Honor.

20          THE COURT:  Is your client a party to those?  Are

21    your clients parties to those agreements?

22          MS. SAHNI:  Certain of the plaintiffs were.  But

23    again, it's not an industry standard.  And the public MOU

24    says that --

25          THE COURT:  No, I understand, I understand.  But

1    your -- some of your clients were parties to that?

2          MS. SAHNI:  Certain of the parties, correct.

3          THE COURT:  So they are prior statements by your

4    clients, correct?

5          MS. SAHNI:  To the extent that our clients,

6    through the RIAA, may have waited as part of this compromise

7    agreement, there is probably, you know, not a specific

8    admission from our -- from any one person, but there may be

9    something in the -- again, I haven't seen the implementation

10   agreement, so it's hard for me --

11         THE COURT:  The agreements that they entered into

12   could be admissible for all different kind of reasons.

13         And so I understand your relevance objection and,

14   you know, I just think that's going to have to be reserved

15   for Judge Jackson at trial as to admissibility.  But for

16   purposes of the discovery, those five agreements, please go

17   get your consents, okay.

18         MS. RANAHAN:  Thank you, Your Honor.

19         THE COURT:  What else?

20         MS. RANAHAN:  So the second issue is the one that

21   you specifically told us to go back on, which is the

22   ownership issues.

23         THE COURT:  But I do expect you to follow up on

24   your promise to Judge Jackson and take that off his plate.

25         MS. RANAHAN:  I will, I will, Your Honor.  And we

100

1    put that in a footnote that in event we get those five

2    implementation agreements, we will.

3              THE COURT:  By tomorrow.

4              MS. RANAHAN:  We will.

5              THE COURT:  Okay.

6              MS. RANAHAN:  Thank you, Your Honor.

7              Okay.  So ownership.  So Your Honor had proposed,

8    or ordered, that what happens is we look at the 10,000-plus

9    list of infringements, 11,000 and find a 1 percent sample

10   that we could start with for ownership.

11             So we have now on -- we've sent it just after

12   midnight on December 11, so, you know, just last week, mid

13   last week, we provided them the last list, the 1 percent

14   sample for the ownership --

15             THE COURT:  Did I give a deadline?

16             MS. RANAHAN:  No, no deadline.

17             And we were trying to take the benefit of what was

18   happening in other cases as far as ownership and when things

19   were cleaned up and what the Court was ruling.  So that

20   delayed it bit, but there was no deadline.  Obviously, we

21   would have adhered to any deadline that we got, but we

22   didn't.

23             So we proposed that they give us the one -- keep in

24   mind, Your Honor, this is 1 percent of the 100 percent that

25   we ultimately hope to get in this case.

1       So we asked that they provide us confirmation by

2  Friday whether they would agree to the categories that we

3  laid out, which were discussed during the October 29 call.

4  And you advised us to do this, to put it in a letter and they

5  can tell you if they have a problem with that.  And let us

6  know if you can produce the 1 percent of these documents by

7  December 3 -- by the end of the month.

8       Now, these -- there are 55-something plaintiffs,

9  there is a lot of plaintiffs here, and for each plaintiff

10  we've broken it down in our brief.  Only two of them require

11  more than a one -- you know, one digit number of ownership

12  change.  This is not a huge burden.  There is about 35 and 36

13  for two of the plaintiffs.  But all the rest of them, it's

14  like a 1 digit thing.

15       Like, okay, you know -- and I can go through the

16  number, but it's like, inaudible) has to produce two chain of

17  titles based on this ownership thing, given how many

18  plaintiffs they've pulled together to, you know, use the same

19  counsel.

20       So they came back to us and said, you know, you've

21  waited six weeks to give us this information, it's

22  unreasonable.  We can give it to you by the end of January.

23       Your Honor, if we extrapolate how long it will take

24  them to do 1 percent of the ownership production, it would

25  take 13 years at that rate for us to get them all.

102

1          And our goal is to, not only have the chance to get

2     the information, review the information and then come back

3     and convince you that we need 100 percent of the information

4     by March 2020.  So that is the timetable.

5          So our proposal would be, obviously, we would just

6     love to have 100 percent of the documents, we can move

7     forward and not have to bring this to your attention again.

8     So if they want to take until the end of January to produce

9     all of them, that would be great.  But to produce 1 percent

10    in 55 days is not going to --

11         THE COURT:  Tell me how many different clients

12    we're talking about would be 1 percent.

13         MS. RANAHAN:  Yeah, okay.  So I think -- we broke

14    it down in our brief, so let me just find the page, Your

15    Honor.

16         So it's 14 different plaintiffs and I can read it

17    exactly how it goes.

18         Arista Music will have to produce seven.  Atlantic

19    Recording Company, 4.  Capitol records, 8.  Elektr 1.

20    Laface, 2.  Nonesuch Records, 1.  Provident Label Group, 1.

21    Sony Music 36.  That's the big -- the big one is 36.  Sony

22    Music Entertainment, 1.  UMG, 35.  Warner, 5. WB Music Group

23    1.  WEA, 6.  Zomba recording, 2.

24         THE COURT:  What page are you?

25         MS. RANAHAN:  So this is our submission.  It

103

1   starts on the bottom of page 4 through page 5.

2          THE COURT:  All right.  So why don't you just

3   produce those on a rolling basis?

4          MS. SAHNI:  And, Your Honor, that's what we've

5   offered to do.  So I want to take a step back.

6          What they're asking for is every piece of ownership

7   documentation for these 110 words, which is what Your Honor

8   ordered and we pulled that in our response that we will

9   comply with the Court's order.

10         But what happened was for six weeks, they waited to

11   identify a sample until the Thursday before this conference,

12   and then demanded, within one day we get back do them or they

13   would rush to the court.  That's a totally unreasonable

14   deadline.

15         They said they needed to have everything produced

16   by December 30 in the middle of the holidays, knowing full

17   well most of our clients are at a multiweek trial in Virginia

18   and that it's the holidays where all of our clients are shut

19   down.

20         THE COURT:  Okay.

21         MS. SAHNI:  So we came back and said, we can do it

22   end of January, if not sooner and we've already started

23   working with diligently with our clients to start pulling

24   this information.

25         THE COURT:  So you said that when?

104

1          MS. SAHNI:  I said we sent them a letter on

2   Friday, they demanded a response within one day.

3          THE COURT:  Friday, the 13th?

4          MS. SAHNI:  Yes, yes, last Friday.  And they,

5   nonetheless, included it.  We were actively meeting and

6   conferring.  We said, we're investigating with our clients

7   what we can do.  And we reached out to every single one of

8   the client groups.

9          Their numbers are obviously, you know, inflated.

10  They're misleading because a number of record labels are

11  under umbrellas.  So the Sony Music plaintiffs have many more

12  works than the one for Arista and the 35 for Sony.  There is

13  a larger number for plaintiff group.  They're actively

14  working to get this material and we're working on figuring

15  out what we have.

16         THE COURT:  So you communicated with your clients

17  within what period of time after receiving their list?

18         MS. SAHNI:  The very next day we started e-mailing

19  the clients and calling them.  Many of them were in the

20  trial where there is no cell phones allowed all day, but we

21  started e-mailing them.  We sent them a list attributable to

22  each plaintiff group.  We were working with them actively,

23  we were trying to see what we may already have.

24         THE COURT:  Okay, I get the gist of that.  Those

25  are all good arguments, aren't they?

1           MS. RANAHAN:  Well, as far as -- I mean, we're

2    just talking now about the timing.  The letter came in a few

3    minutes after midnight, so there was two business days.

4    They kept saying --

5           THE COURT:  Well, let's ask this question first.

6           Why did you wait six weeks?

7           MS. RANAHAN:  Right.  So we initially planned to

8    do it right away, like everything else.  But then as rulings

9    kept coming down in the Cox case, we were trying to narrow

10   our focus.  I know this is our best chance, like you said at

11   the hearing, to get what we can on this.  So as rulings came

12   down that impacted ownership in Cox, we were refining the

13   list.  So we just continued to refine.  And the most recent

14   ruling that impacted it was just a couple weeks before.  So

15   it was a lot of --

16          THE COURT:  Well, yeah, but you've got to pull the

17   trigger sometime.

18          MS. RANAHAN:  And we did.  I mean, that's when we

19   did, we pulled the trigger.

20          THE COURT:  Right.  But so if you would have done

21   it immediately, that was six weeks ago, you would have been

22   getting the documents now, but you just --

23          MS. RANAHAN:  Well, I don't know.  Six weeks --

24   we've asked for six weeks and they want, you know, 55 --

25          MS. SAHNI:  You asked for 18 days in the middle of

106

1    the holidays.

2            THE COURT:  Well, end of January is six weeks from

3    now.

4            MS. SAHNI:  We agreed to produce it by end of

5    January, if not sooner.  We are going to start making

6    rolling production before then.

7            To be clear, this was supposed to be a

8    representative sample and Ms. Ranaham had us explain, what we

9    thought they were going to do, is try to figure out the worst

10   possible songs to show --

11           THE COURT:  Understood.

12           MS. RANAHAN:  -- which Your Honor said --

13           THE COURT:  But the ultimate is this, as I hear

14   her.

15           End of January is not necessarily a problem, but

16   she says that's only 1 percent.  They can't tolerate that

17   kind of timeframe, if a judge, me or Judge Jackson -- I or

18   Judge Jackson orders you to produce a broader scope.

19           MS. SAHNI:  Understood, Your Honor.

20           THE COURT:  So I'm telling you, based on the

21   circumstances you've laid out, I don't have a problem with

22   the end of January.  But it's going to be -- in the event

23   that that turns up the information they think it will turn

24   up, then next time it's going to be far more onerous.

25           Does that make sense?

1          MS. SAHNI:  I understand, Your Honor.  I also want

2     to flag that there are two important deadlines in January,

3     including our deadline to add plaintiffs to the case and our

4     deadline to amend the exhibits, the works in suit.  It

5     simply doesn't make sense for us to have to produce chain of

6     title information, you know, until after that point.

7          We're actively investigating --

8          THE COURT:  I know, but I'm already agreeing with

9     you, so --

10          MS. SAHNI:  Yeah, I'm just making sure --

11          THE COURT:  Are you trying to talk me out of it?

12          MS. SAHNI:  No, no, Your Honor.

13          MS. RANAHAN:  Well, and the concern, Your Honor,

14     is that we're obviously -- it's very labor-intensive to

15     figure out these problems.  So it's not like we get the

16     documents, we can review 110 chain of titles and turn it

17     around the next day.  So there is a --

18          THE COURT:  Well, I know that but, so -- do you

19     see what you're saying?

20          MS. RANAHAN:  Yeah.

21          THE COURT:  If it's hard for you and difficult and

22     onerous and expensive to even review what they produce,

23     imagine having to create it in the first place.

24          MS. RANAHAN:  No, Your Honor.  We've had these

25     cases before, and every one of them had to produce ownership

108

1   for every single one of them.  They keep them -- the

2   ownership information that they keep --

3           THE COURT:  Okay.  So in the cases that you've

4   been involved, what's the most number of plaintiffs who had

5   to do that in any one case?

6           MS. RANAHAN:  What do you mean, the most number --

7           THE COURT:  You said they all have to produce

8   their chain of title for all works.

9           MS. RANAHAN:  Thousands and thousands.  The last

10  case, Cox, 10,000.

11          MS. SAHNI:  They did not produce for all in Cox.

12          In fact, the Court granted summary judgment on

13  ownership, based on exactly what we've agreed to produce

14  here, copyright registration records and basic chain of title

15  information.

16          He denied discovery in tort for higher agreements.

17  He denied discovery into dispute.  That's not centrally

18  maintained.  We've shown them declarations in the concurrent

19  case against Brighthouse.  We have declarations submitted

20  about how burdensome this is.  And so it's not news to

21  Charter that this is a huge deal for our client.

22          THE COURT:  Understood.

23          Well, anyway, I'm -- I'm satisfied with the end of

24  January timeframe, but it has to be complete as to every

25  single client that they've given you.

1          I don't want any -- don't wait until the end of

2    January and say, it turns out we couldn't do this or this.

3    If you find out something like that or maybe even decide to

4    withdraw a plaintiff, tell them as soon as you know.

5          MS. SAHNI:  Absolutely, Your Honor.

6          MS. RANAHAN:  And so just all the four categories

7    you're producing for what you just mentioned, the work for

8    hire and the disputes?

9          MS. SAHNI:  We're investigating to make sure we

10   can.  I mean, as we said in our letter, if there is anything

11   where we don't have it or where we're concerned, you know,

12   we will raise those issues.  Right now, we told our clients

13   we need these four things for all of these ones.

14         THE COURT:  Right.  But again, don't wait until

15   the end of January to raise every problem.  As problems

16   arise, confer.

17         MS. SAHNI:  Sure.

18         THE COURT:  Okay.  Because I won't be happy if

19   there's a dozen issues that you want to raise with me about

20   this piece of production at the end of January, okay.

21         MS. RANAHAN:  Okay.  So then, Your Honor, if the

22   end of March is our discovery cutoff, what would the -- what

23   would you envision --

24         THE COURT:  That's looking very unlikely to me,

25   but I don't know.  It may be technically true.

110

1          MS. RANAHAN:  Okay.  So I don't know -- do you

2    know if Judge Jackson is amenable to that type of

3    adjustment?  Some judges are, more or less, so I don't know

4    -- I'm just concerned that we're not going to have time.

5          THE COURT:  He and I are buds.

6          MS. RANAHAN:  What?

7          THE COURT:  We're tight.

8          MS. RANAHAN:  Okay.

9          THE COURT:  He trusts me.

10         MS. RANAHAN:  I mean, I don't even know that our

11   clients or your clients want to move anything at this point.

12   I'm just concerned -- I just want to ensure that if we get

13   to the end of January, we have time to analyze it, come back

14   to you and say that we need all of it and you have time to

15   order it within --

16         THE COURT:  Yeah, but I'm going to give you a

17   short time.

18         MS. RANAHAN:  Yeah.

19         THE COURT:  So what would that be?

20         MS. RANAHAN:  For us to come back for you to

21   produce?

22         THE COURT:  For you to come back.

23         MS. RANAHAN:  I guess it's going to depend on the

24   volume and the -- as they roll in.  So the more that, you

25   know, things can roll in, the quicker we can come back

1   because we'll able to analyze them on a rolling basis.  If

2   we get 110 chain of titles on January 30, it's going to take

3   longer than if --

4          THE COURT:  I already asked them do it on a

5   rolling basis --

6          MS. RANAHAN:  Okay.

7          THE COURT:  -- and that way, to dump everything at

8   one time.

9          MS. RANAHAN:  Okay.

10         THE COURT:  So if you receive the documents early

11  January, mid-January, late January, when do you want to talk

12  in case you can't work it out.

13         MS. RANAHAN:  Yeah.  That's a good question, Your

14  Honor.  Maybe -- maybe the third week of February or

15  something and they can -- and then we can just -- how much

16  time would you need to produce the other 99 percent if he

17  ordered it?

18         MS. SAHNI:  You know, that is a huge burden.  I

19  think Your Honor suggested we would come back and talk about

20  it.  I think we still have all of our arguments as to why we

21  don't --

22         THE COURT:  By the way, you need to come armed

23  with burden data as to what I've already ordered had

24  produced so that I can extrapolate that to the group as a

25  whole.

112

 1          MS. SAHNI:  Absolutely, Your Honor.  And like I

 2    said, we've already submitted (inaudible), we articulated

 3    the burden very clearly in the separate case and we could do

 4    so here as well.

 5          THE COURT:  So let's make your deadline January

 6    27, which is the last week of January, and we will talk

 7    then -- it can be by phone, if you want if it's just this

 8    If it's a lot more than this, it's going to be in person.

 9    So is a week, is ten days?  What are you asking for?  Two

10    weeks?

11          MS. RANAHAN:  I think two weeks we'll have to just

12    do it.  I mean, obviously if there is an issue where we get

13    everything at the end, we may have to, you know, contact

14    Chambers and say we need more time.

15          THE COURT:  All right.  So I'll set something just

16    so we can have it on the calendar.  So -- what about the --

17    like the Tuesday after that long weekend?  Yeah, but that

18    would be three weeks.

19          MS. RANAHAN:  Oh, before -- okay, so before that

20    would be --

21          THE COURT:  Are you talking about President's Day?

22          MS. RANAHAN:  Yeah.

23          THE COURT:  Well, that would be three weeks

24    after -- I mean, it -- the longer you wait --

25          MS. RANAHAN:  I know.

113

1          THE COURT:  -- the less I'm going to be interested

2   in your desire to rush things.

3          Does that make sense?

4          MS. RANAHAN:  Right.  Okay.  So maybe before that,

5   maybe like the 12th.

6          THE COURT:  You know how I feel, so you decide.

7          MS. RANAHAN:  I know.  Well, I want to go as

8   quickly as I can, but I want the chance to do it right.  I

9   mean, we need to have the opportunity.

10          THE COURT:  Those are balancing interests, yes.  I

11   can do something on the 12th if you need to.

12          MS. RANAHAN:  What day of the week is that?

13          THE COURT:  It's a Wednesday.

14          MS. RANAHAN:  Okay, let's do that.  Does that

15   sound -- I don't have my calendar, but I'm going to assume

16   I'm going to make that work.

17          MS. SAHNI:  (Inaudible) that should be fine

18   (inaudible).

19          THE COURT:  3 o'clock because I'm going criminal

20   work during that week.

21          MS. RANAHAN:  Is there any way we could just get a

22   few more days on the back end of January, produce by January

23   25 or 22?

24          THE COURT:  She already asked for the 31st and I

25   gave her the 27th.

114

1          MS. RANAHAN:  Okay.  So you cut off a few days.

2          THE COURT:  I've already pressed her very hard.

3          MS. RANAHAN:  Thank you.

4          THE COURT:  And it is the holidays and there are

5     other things going on, so.  Let me -- just for kicks, do you

6     have a case number?  Do you have a case that's being tried.

7          MS. SAHNI:  The case number for the case being

8     tried, the Sony case?

9          THE COURT:  Yes.

10         MR. LAMPROS:  Your Honor, it's 18-cv-00950.

11         THE COURT:  Give me the case number again.

12         MR. LAMPROS:  18-cv-950.

13         THE COURT:  Oh, just today the Court granted a

14    Rule 50 for Cox.  Just kidding.  There was one filed today,

15    motion for judgment as a matter of law by Cox.

16         MS. RANAHAN:  We do include, Your Honor, some of

17    the opening questioning about the CAS case you're interested

18    in with our briefing.  So there is the transcript.

19         THE COURT:  I hate it when it asks me if I want to

20    pay for it.  There must be a lot of people following this

21    because I can't even open --

22         MS. RANAHAN:  The transcripts aren't available yet

23    publicly.

24         THE COURT:  No, no.  I'm just trying to open

25    today's proceedings.  Actually, admitted entries from

1    yesterday.

2              MS. SAHNI:  Our understanding is that they're

3    supposed to close here today or tomorrow.

4              MS. RANAHAN:  Either end of tomorrow -- today or

5    early day tomorrow will be closings, last we heard.  Really

6    fast.

7              THE COURT:  Can't even open the minute entry for

8    the proceedings.  They really want their money there.  Well,

9    I see what stage it's in.  It's Day 10, Day 11, today.

10             MS. RANAHAN:  I just have two more entries, Your

11   Honor.

12             THE COURT:  Go ahead.

13             MS. RANAHAN:  One is very quick.

14             The works in -- so plaintiffs agreed to produce the

15   works in suit, the digital works in suit.  But we've just

16   been asking for a date and we just haven't received even a

17   proposal, so we would just like to get a date for them to

18   produce that so we can just make use of it.

19             THE COURT:  Go ahead.

20             MS. SAHNI:  Your Honor, we still never heard a

21   reason from -- from Ms. Ranahan or anyone at Charter as to

22   why this particular category of information needs a date

23   certain, compared to all other rolling production.

24             Notwithstanding that, we've told her that we're

25   actively working on it.  They would require -- you need

116

1    product codes that were gathered and we would take it to our

2    clients to pull the 11,000 works at issue.

3           We haven't been able to get them a complete date

4    certain, but, again, we're working -- actively working on it,

5    probably around the same timeline for the ownership

6    documentation.

7           Again, there is some complications with our clients

8    during this trial and the holidays.  But, you know, we -- we

9    just haven't been able to identify a specific date because

10   it's taking a little bit longer to get that information and

11   figure out what we need to actually pull the works because

12   there is versions of different songs.  We're trying to make

13   sure we're pulling the right version.

14          So we expect that should happen, you know, in the

15   next few weeks.

16          THE COURT:  So they want from you a list of what

17   you say was infringed?

18          MS. SAHNI:  Not a list.  We provided a list.  They

19   want the actual music files, the MP3s for the 11,000 works

20   in suit.

21          THE COURT:  Okay.  Why?

22          MS. RANAHAN:  And they've agreed.

23          THE COURT:  Okay.  So that aside, that aside.

24          MS. RANAHAN:  So that we can compare it with

25   the -- so they also, at least in the prior case and we

117

1  assume it's going to be similar here, which is they produce

2  an underlying, what they consider the infringement.

3          Because keep in mind, Charter doesn't have access

4  to what is the so-called infringement that's happening on its

5  airwaves.  They never can see it, it's not spying on its

6  customers.

7          This is also happening outside of view of Charter.

8  And by the time it gets to notice, they can't just go say,

9  well, what were they doing?  Let me look onto the Internet of

10 my user to see.  We don't have access to the actual

11 infringements.

12         So they have -- they will produce to us some form

13 of, here is what the infringements are because, presumably,

14 they've been collecting this information.  And then we need

15 to compare, and we have our experts do it -- we did it in the

16 other case -- the infringing files, allegedly infringing

17 files, to what they claim their works on.  And so it is -- it

18 sounds like an intensive thing, but the experts do it.

19         THE COURT:  Wait.  The infringing file to what

20 they claim their works are?  So an actual example of what

21 was illegally downloaded?

22         MS. RANAHAN:  Correct, against what they claim

23 they own.

24         THE COURT:  So you'll take a song that was

25 downloaded and you'll compare it to the song they say was

118

1    stolen --

2           MS. RANAHAN:  Correct.

3           THE COURT:  And that will do what?

4           MS. RANAHAN:  Well, it will knock out works, in

5    our best case scenario, if there was a nonmatch or something

6    that wasn't like that --

7           THE COURT:  Did it knock out works in the Cox

8    case?

9           MS. RANAHAN:  Some, it did, yes.

10          THE COURT:  Like how many?

11          MS. RANAHAN:  Some -- I mean, Your Honor, it's

12   100 -- I don't know the exact number.  I'm not,

13   unfortunately, on that case, but I know it did knock out at

14   least a couple percentage of the work.

15          MS. SAHNI:  Your Honor --

16          MS. RANAHAN:  I think they were actually arguing

17   about -- our experts, in fairness, are -- dispute this and

18   they're --

19          THE COURT:  A couple percentage?

20          MS. SAHNI:  Well, Your Honor, they didn't

21   actually -- in the Cox case, our clients produced only a

22   sample 1600 works or something like that.  So I don't

23   know -- and then here, Ms. Ranaham had pressed us on that

24   and said, we can't just do a sample, we need all of them.

25   And so that was part of our initial meet and confer.

119

1       And then we said, fine, we'll produce all of our

2   11,000 works, it just takes some time to do so.  And now

3   we're just fighting about when we're going to do so.

4       THE COURT:  The works are either music or movies?

5       MS. RANAHAN:  They're all music.

6       THE COURT:  All music?

7       MS. SAHNI:  Music files, audio files.

8       THE COURT:  All right.  And the most by any one of

9   your clients would be how many, roughly?

10      MS. SAHNI:  I would say maybe one of them is

11  probably in the thousands range, right.  We identified

12  those, I think.  Universal may have something in the

13  thousands.

14      THE COURT:  Thousands of songs?

15      MS. SAHNI:  2000, yeah, probably actually more.

16      MR. LAMPROS:  So the clients are structured in six

17  umbrella client groups, and I think each of the six has, you

18  know, 1- to 2000.

19      MS. SAHNI:  Or even more actually, because the

20  sound recording is what we're producing.  So Sony would

21  produce a set, Universal will produce a set, Warner will

22  produce a set, but that's in the thousands range easily.

23      THE COURT:  And somebody is actually going to

24  listen to all of these things?

25      MS. RANAHAN:  Or they're going to try to match

120

1   them up audibly -- so there is a lot of different tests that

2   they do and run.  And plaintiffs didn't actually do their

3   own investigating into this, so they didn't -- they weren't

4   the ones who were pulling the infringing and holding them.

5   They had third-party agents out, which is -- I'm not

6   disputing that thing.  I'm just saying that the data comes

7   from a third party, who uses their own systems of matching

8   these things.  And so we don't even know what they're going

9   to provide us for the actual infringing files in this case.

10          I don't know if it's the same or if they changed

11   their, you know, approach or what it is.  But the point is

12   that we just -- I'm not even asking for necessarily, you

13   know, January 6 or whatever.  We just want a date so that we

14   make sure we didn't get this --

15          THE COURT:  So does it take a human being to

16   actually load a file onto some kind of database or some kind

17   of electronic form that takes that?

18          MS. SAHNI:  Our understanding is we need to feed

19   insert product codes.  Each song, there is different

20   versions, and so we need the specific product codes.  We're

21   in the process of getting a product code.

22          THE COURT:  So somebody has do that thousands and

23   thousands of times?

24          MS. SAHNI:  I don't know if we have to manually --

25   once we get them the codes, I don't think they have to

121

1    manually input it each time, but I don't know -- the

2    databases are very different.

3            There is different plaintiff groups and then within

4    each plaintiff group, the record labels have different

5    system.  So --

6            THE COURT:  But that's going on right now.

7            MS. SAHNI:  We're in the process of getting the

8    codes.  We'll hand it over to the client, then we will get

9    all the files and we will produce them.

10           THE COURT:  And you want everything at once in

11   this regard, probably?

12           MS. RANAHAN:  Right.  I mean, I'm sure that's

13   how -- the only way they'll be able to do it.  Yeah, rolling

14   basis isn't going to be help because we need --

15           THE COURT:  Right.

16           MS. RANAHAN:  And it's digital files, Your Honor.

17   I mean, this is their business now.  They, you know, know

18   how to --

19           THE COURT:  So you're doing to take those and give

20   them to an expert, who will then try to knock out a

21   percentage of the works?

22           MS. RANAHAN:  Correct.  Or find errors in the way

23   that they were trying to track infringement against what

24   their works are or find, you know, some that just don't

25   match at all.

122

1            THE COURT:  And that has been done -- does that

2    eliminate claims before they get to trial or is that

3    happening in front of a jury?

4            MS. RANAHAN:  Ideally.  Ideally, you know, they

5    say, oh, look at this, you're right.  And they just take

6    them out.  Otherwise, it's like right now --

7            THE COURT:  But what did happen in the Cox case?

8            MS. RANAHAN:  Again, I'm not on the case.  I know,

9    right now, when I'm reading the transcripts, that the

10   experts are arguing about the percentage and how many of

11   them are actually problematic, so it's an expert battle of

12   the experts.

13           MS. SAHNI:  My understanding is the Cox experts --

14   and I could be wrong, but I understand that they didn't do

15   this full analysis, as Ms. Ranahan is saying that they want

16   to do for all 11,000 works.

17           MS. RANAHAN:  Well, they got samples.

18           THE COURT:  So why don't you just give a guess,

19   approximate.  You just said end of January.

20           MS. SAHNI:  I think it would probably be around

21   the end of January.  It's just, again there are things out

22   of our control.

23           THE COURT:  As a favor to me, try January 27,

24   okay.

25           MS. RANAHAN:  That would give us the time, that's

1    final.  I just don't want it to be end of March and then

2    we're not --

3            THE COURT:  Right.  And what else?

4            MS. RANAHAN:  The only other -- so this is just a

5    more narrow, this is the other item that's before Judge

6    Jackson, which is the financial question.  So this is the

7    item that we discussed also on October 29.

8            And in that case you ordered that we -- what was

9    produced in Cox we would be able to use for the works in suit

10   here, but we would not expand it out to the relevant claim

11   period or expand it out to the works that are not at issue in

12   Cox and are only at issue here.

13           So I assume that, you know, that that is your

14   position on those things, but we've actually tried to narrow

15   to get some specific agreements, umbrella agreements that

16   would have covered like streaming and downloading for all the

17   works.  So these are not 10,000 agreements.

18           So what happens is the record labels enter these

19   agreements with companies that, you know, have streaming

20   agreements, like they'll enter one with YouTube and here is

21   what our agreement is for these tiered of works and they will

22   have one agreement that covers the period; it's not like

23   10,000.

24           So we're wanting the underlying download and

25   streaming agreements from the relevant time period that would

1    have -- or that would have applied to the relevant time

2    period so that we can use that as part of the damages

3    consideration for the jury as far as what they were charging

4    for these types of works.

5            And it will also perhaps, if they do them in the

6    tiers, like what we expect or we come to know that some of

7    them, like these are top tier works, these are second tier

8    works, that may help the jury think about how to do damages

9    as far as --

10           THE COURT:  Okay, but you say they're agreeing to

11   this.

12           MS. RANAHAN:  No, they're not agreeing to any of

13   that.  The only financial agreements -- the only financial

14   information they've agreed to produce is public.  They've

15   produced and agreed to produce nothing more.

16           MS. SAHNI:  Your Honor, we discussed the specific

17   issue.  On the track-by-track revenue, Your Honor ordered us

18   to produce the track-by-track revenue that was produced in

19   Cox, which gets them 80 percent of the work, and Your Honor

20   addressed specifically the question of, Do they need the

21   balance?  And said, no.  You said, 80 percent gets you

22   enough to get what you need for whatever else you might need

23   it for.

24           Obviously we have articulated both with you at the

25   last conference and in our objection with Judge Jackson --

1    our response to their objection with Judge Jackson why this

2    is irrelevant because we selected statutory damages, and even

3    though lost revenues may be relevant to that analysis, what

4    we actually earn is not the same as lost revenues.

5            So there is a number of relevance problems with

6    this information, but regardless, you've already addressed

7    this issue.  You said produce the track by track, that's part

8    of the production that I expect we're going to make this

9    week.  I don't see any why we need to go beyond that, and you

10   expressly said to them, take depositions, find out what's

11   going on and then come back to me and they haven't done any

12   of that.

13           Sitting before Judge Jackson are significant

14   declarations from our clients talking about the burden of

15   collecting this information in the Cox case.  It took several

16   weeks, up to several months for certain of the client briefs

17   to pull this information together.  It's a largely manual

18   process and it took -- For universal there was one person

19   devoted full time for this diverted from all other tasks.

20   This was an incredibly burdensome exercise.  There is no

21   reason to require us to do more than the 80 percent that

22   they're already getting.

23           As to the agreements, there are not -- they're not

24   just asking for umbrella agreement.  They've asked for all

25   agreements that show licensing revenue, which is implicating

126

1    thousands and thousands of agreements.  The umbrella

2    agreements for digital and streaming are among the most

3    sensitive agreements in our client's businesses and they

4    haven't taken any effort to find this information out in any

5    other way.

6            My understanding is in Cox there was a negotiated

7    proffer in which our clients proffered certain information.

8    They didn't ask for that.  They haven't taken any

9    depositions.  They haven't done anything except say give us

10   your most sensitive agreements that implicate the rights of

11   third parties and all other agreements that show me your

12   revenue.

13           I mean, it's just beyond burdensome, which we've

14   said in our declarations and articulated very clearly in

15   them, and it's irrelevant, because our earned revenues on

16   those agreements don't show them what we lost because of the

17   widespread infringement happening on its network.

18           So there is a relevance problem and a clear burden

19   problem, and this has been addressed by this Court, we'll be

20   producing what you ordered us to produce this week, and I'm

21   not sure why we have to talk about it.

22           THE COURT:  Well, there are two comments I have

23   and then you can respond.  Number one, I would be interested

24   in -- well, you already knew what you're going to receive

25   because you already have it in the Cox case.

1          MS. SAHNI:  That's right.

2          MS. RANAHAN:  Not on the agreements, but on the

3     revenue -- so originally she's referring to the

4     track-by-track information.  We don't have it now for 20

5     percent of the work, which is a huge amount.  I mean, it's a

6     huge amount of statutory damages at issue, and we don't have

7     it for the claim period because the claim periods differ.

8     So what they've given us is, you know, half the claim period

9     for 80 percent of the work.

10          We have nothing to present the jury on 20 percent

11    of the works, and we have, you know, the claim periods cut in

12    half.  So when they're trying to reach back to 2010 on their

13    stuff, they're -- we're now really constricted and only

14    looking at exactly what was produced in Cox without -- they

15    have 55 plaintiffs and they don't know have to do on anything

16    for this case basically.  In fact, you didn't even order them

17    to produce it.  We have to sift through and figure out which

18    ones apply, so that's what the order was.  So they literally

19    not had to lift a finger about any financial discovery in

20    this case except producing public information.

21          So we would just again --

22          THE COURT:  So what are you going be producing

23    then, this week, you say?

24          MS. SAHNI:  We -- they haven't actually told us,

25    but we're trying to figure out which works are overlapping

128

1    with Cox and produce the financial information for them.

2              MS. RANAHAN:  That's -- the order that you ordered

3    wasn't requiring them to actually produce it.  It was we

4    have to go back to the Cox production and go one by one --

5              THE COURT:  Yeah, but she said she's going to.

6              MS. RANAHAN:  That's the first I've heard it.

7              MS. SAHNI:  We're working through it.  We told

8    them we were working through it.  I mean, at the end we told

9    them that.

10             MS. RANAHAN:  But that's -- if I could talk about

11   the agreements, though, because that's different too.

12             THE COURT:  Well, what's before Judge Jackson?

13             MS. SAHNI:  All of these issues.

14             MS. RANAHAN:  Well, actually, they took position

15   in Judge Jackson's -- in the thing that we had not raised

16   the agreements with you, they actually said we haven't

17   exhausted --

18             THE COURT:  They do ask for the agreements with

19   Judge Jackson?

20             MS. RANAHAN:  We requested all financial

21   information because we didn't -- your order was, this is all

22   I'm going to make them do, so we didn't want to waive the

23   right to do it.

24             THE COURT:  That's fine.

25             MS. RANAHAN:  But now we're coming back like the

1   implementation agreements and saying if we can solve some of

2   this with you, given that we didn't really get into it

3   specifically with you, I am sure Judge Jackson would prefer

4   it and obviously we would prefer it too.

5            THE COURT:  Right, but I think -- I don't want to

6   enter another set of rulings that might depend on Judge

7   Jackson's view of the world.  So why don't we just reserve

8   this issue for -- after he analyzes and expresses his

9   opinion on the relevance of all this.

10            MS. RANAHAN:  Okay.

11            THE COURT:  That will inform me better as to what

12   I should do.  This is the whole problem with the dual

13   judge --

14            MS. RANAHAN:  Right.

15            THE COURT:  -- issue, which I may walk off the

16   bench and go address with him.  So we'll see about that.

17            MS. RANAHAN:  Right.  So as far as the -- so we'll

18   see what he rules, and then if there is an avenue to come

19   back on just the narrowed agreements --

20            THE COURT:  Well, within three days of his ruling,

21   I would like you to at least file a joint e-mail with me, a

22   report of some kind -- you don't have to file it, just send

23   it -- on what -- in light of what he has to say what we need

24   to address immediately, okay.  So three business days.

25            MS. RANAHAN:  Okay.  I mean, obviously we -- the

130

1    reason we prefer you deal with him in the first is the

2    standard is, of course, different.  Like he has to, you

3    know, of course, find that your ruling was erroneous, not

4    just the relevance.  We prefer it to be viewed in the

5    relevance prism as opposed to whether you've made an

6    erroneous position or however, you know, more extreme.

7             And again, this is -- I'm actually not expecting

8    you to make a different ruling than you did on the sampling.

9    What I wanted to just give the opportunity was to bring

10   before what they said we hadn't brought to you before, which

11   was those agreements that we had -- they actually made the

12   arguments in the objections that we hadn't actually exhausted

13   our efforts.

14            THE COURT:  And remind me what the agreements are

15   again.

16            MS. RANAHAN:  So this umbrella agreements, which

17   they call their most sensitive agreements, which they --

18   which means, of course, that could be dealt with with

19   protective order issues, but in every case they raise it.

20   It's some vaulted information that came out came out.  But

21   it is streaming agreements that would show how they valued

22   the works at issue during the claim period with these other

23   companies where streaming and downloading was at issue.  So

24   what they would be paid for a stream, what they would be

25   paid for a download for the works at issue.

1          THE COURT:  Per stream, per download?

2          MS. RANAHAN:  Yes, so it would give -- we would

3     have our experts look at it, we would have the jury look at

4     it, and so that would be the only thing that I would ask you

5     to consider today given that the rest of it is before Judge

6     Jackson.  And their argument on those issues was that we

7     hadn't raised it with you.

8          MS. SAHNI:  That wasn't our argument, Your Honor.

9     Our argument on not exhausting was that you had expressly

10    said that there are other ways to get some of this

11    information, including deposition.  Like I said in Cox,

12    there was a proffer that was done.  We haven't explored any

13    other opportunity, other than it be wholesale-produced

14    information that contains a number of irrelevant provision,

15    and we think this is irrelevant to be sure in addition, but

16    they just haven't identified any other way to get this

17    discovery other than us turning over all of our agreements,

18    which is not just a limited set of agreements.

19         THE COURT:  Well, how many agreements are there?

20         MS. SAHNI:  If you include all -- which is what

21    they've asked for, all licensing agreements that show our

22    revenue, I think is what they said in that -- in their

23    objections to Judge Jackson, that -- for a single work could

24    even implicate thousands of agreements.  As for the umbrella

25    agreement, I don't have a specific number, but --

132

1           MS. RANAHAN:  Your Honor --

2           MS. SAHNI:  -- you know, they cover some works,

3    they don't cover other works.  They're incredibly sensitive,

4    and there is just other ways to get this information.

5           Again, in Cox they did it in a specific way, which

6    they haven't even proposed we try to do it that way.  And

7    again, we don't even think it gets them relevant information

8    because it doesn't tell them most of the calculation they

9    would need to say what we actually lost in revenue because it

10   only shows what we can earn on a single download, which is

11   not the same as what we lost by somebody downloading an

12   illegal file.

13          And they can't even do anything with that number

14   because they don't have the number of infringements that

15   happen to multiply that.  So there is all sorts of problems

16   with this purported relevance argument.

17          MS. RANAHAN:  Your Honor, if I could, the

18   declarations that counsel keeps speaking of have no comment

19   on these umbrella agreements.  I'm not talking about the

20   thousands of license agreements right now.  All I'm talking

21   about is the umbrella agreements that cover the cost of --

22   or the prices they charge for downloading and streaming,

23   which cover all their works at once, and so it's not a lot.

24          And so all I want is maybe, Your Honor, at the same

25   date that you require us to get back to on the burden, is

1    that they comport with the burden about the umbrella

2    agreements in particular because that's the heart of what we

3    want, and I don't think it's -- it's probably a handful of

4    agreements like it is with the implementation agreements and

5    not hugely burdensome, but we don't know, and that is exactly

6    how you started today by saying we need to know, we can't

7    just have counsel --

8              THE COURT:  So what information would you be

9    seeking?  The number of umbrella agreements and the burden

10   it would be to produce them?

11             MS. RANAHAN:  Exactly, Your Honor.

12             THE COURT:  Sure.  Just let me know about that.

13   I'm not ordering you to produce it, but by January 10 let me

14   know.  Hopefully Judge Jackson will have an order out.  Is

15   it fully briefed, the objections?

16             MS. SAHNI:  It's fully briefed.

17             MS. RANAHAN:  It's fully briefed.  So it's just

18   the umbrella agreements covering downloading and streaming,

19   covering them during the claim period.  They could have been

20   entered prior, but the ones that cover the rates during the

21   claim period.

22             THE COURT:  Understood, understood.  Okay,

23   anything else?

24             MS. RANAHAN:  No.  Thank you, Your Honor.

25             THE COURT:  Okay.  I want to talk to each very

134

1    briefly up here at the bench separately in the guise of

2    dispute resolution, okay.  So why don't you approach.

3              No, separately, and you can turn the record off.

4              (Discussion off the record.)

5              THE COURT:  Back on the record.  All right, okay.

6    Anything else -- anything else that we can decide on your

7    part?

8              MS. SAHNI:  No, Your Honor.

9              THE COURT:  How about --

10             MS. RANAHAN:  No, Your Honor.

11             THE COURT:  Okay.  So you have your marching

12   orders and, again, let me know about the verdict in the

13   trial, and the information I need by January 10 and then

14   advise me as soon as Jackson -- I don't follow those kind of

15   things, you know.  I have enough on my plate not to follow

16   what some other judge does.  So when he decides, within

17   three business days, let met know whether there is something

18   we need to act on right away.  Okay, thank you, guys.

19             (Whereupon, the within hearing was then in

20   conclusion at 3:45 p.m.)

21

22

23

24

25

135

1              TRANSCRIBER'S CERTIFICATION

2    I certify that the foregoing is a correct transcript to the

3    best of my ability to hear and understand the audio recording

4    and based on the quality of the audio recording from the

5    above-entitled matter.

6

7    /s/ Dyann Labo                    December 20, 2019

8    Signature of Transcriber              Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25