# Exhibit 10



North America   Europe   Asia

101 California Street
34th Floor
San Francisco, CA 94111
T +1 415 591 1000
F +1 415 591 1400

May 13, 2020

**VIA EMAIL**

Special Master Regina Rodriguez
Regina.rodriguez@wilmerhale.com

Re:   *Warner Records, Inc., et al. v. Charter Communications, Inc.*, Case No. 19-cv-00874-RBJ-MEH–Charter's Opposition to Plaintiffs' May 8, 2020 Moving Letter Brief ("Motion")

Dear Ms. Rodriguez:

Defendant Charter opposes Plaintiffs' May 8 Motion as follows.

**I.   Information Concerning *All* Infringement Notices Charter Received**

Plaintiffs move on Interrogatories 13 and 14, seeking the total number of infringement notices Charter received from *any* source for a four plus year period, and the total number of actions Charter took in response to each one by action, respectively.  Charter has already responded to both Interrogatories with respect to *Plaintiffs'* notices, and provided the person most knowledgeable on these issues,[1] but Plaintiffs now insist on the information for *third parties*, which have nothing to do with the alleged infringement of Plaintiffs' works, and would include notices claiming infringement of irrelevant content like movies or television shows. Plaintiffs' only theory of relevance is that this unrelated data goes to whether Charter implemented a reasonable repeat infringer termination policy, but Charter has offered to stipulate that it did not terminate subscribers in response to notices of alleged infringement during the Claim Period.[2]

Compiling this overbroad information would take an inordinate amount of time and is simply not proportional. Charter has already produced its CATS ticket data for any subscriber identified in Plaintiffs' notices ("Accused Subscribers"), which includes data for more than a million third party notices sent to those subscribers. The ticket data Charter produced specifies what "customer facing action" Charter took in response to each of the notices. Plaintiffs' request for all communications concerning all of the notices Charter ever received was rejected as overbroad during the April 24th hearing,[3] and the same is true here. Plaintiffs' reliance on the *Grande* and *Cox* cases, Mot. at 1, is a red herring. The "undisputed" evidence Plaintiffs cite from *Grande* is simply that Grande did not terminate subscribers, which Plaintiffs will have here through stipulation or the RFA response. In *Cox* the undisputed evidence was that Cox *did* terminate dozens of subscribers in response to Plaintiffs' notices and the issue was whether the terminations were in accordance with Cox's policy. Plaintiffs' motion is overbroad and overreaching and should be denied.

**II.   Charter Has Already Produced Relevant Discovery Regarding Its Policies and Practices for Responding to Infringement Notices**

---

[1] *See* Ex. 1 (Charter's Supplemental Responses to Plaintiffs' Second Set of Interrogatories).
[2] Plaintiffs also recently served RFA No. 1 seeking this same information. *See* Ex. 2.
[3] *See* Ex. 3 (Apr. 17, 2020 Hr'g Tr. at 92:3-20 "asking for every communication dealing with every infringement is extremely broad.").



May 13, 2020<br>Page 2

Plaintiffs also move to compel responses to a broad set of RFPs untethered to the claims or defenses at issue. In addition to the CATS data reflecting how Charter responded to the million plus notices to the Accused Subscribers, Charter has already produced its policies and internal processing guidelines for responding to *all* types of abuses on its network.[4] These requests either attempt to circumvent prior rulings or go well beyond the scope of permissible discovery. More specifically:

Request 37. This request seeking "all policies, practices, or capabilities that you considered, formulated, rejected, or adopted" for taking action against accused subscribers, is an attempt to circumvent an unfavorable ruling by Judge Hegarty on related RFP 8.[5] Last year Plaintiffs moved on RFP 8 seeking "final copyright or infringement policies" and "drafts thereof" and argued that drafts were necessary to see the changes in Charter's policies.[6] Judge Hegarty rejected this argument noting that "drafts had nothing to do with changes" and "[c]hanges can be determined by taking one active policy and looking at the next active policy . . . [s]o drafts don't help you there."[7] The Court ordered Charter to produce final policies from 2010-2016, documents discussing policies that had existed, and the effect of those policies.[8] When the issue came up at a later hearing, Judge Hegarty ordered Charter to make any additional production of the ordered policies by March 16, 2020 and confirm it was complete.[9] Charter did so.[10] Plaintiffs should not now be allowed to circumvent the earlier order by pursuing documents Judge Hegarty already denied.

Request 56. This request seeks all work log notes related to *"*any 'ticket' generated by an Infringement Notice" Charter received from 2012-2016. Plaintiffs provide no relevance theory whatsoever for this vastly overbroad request, other than to say that they "would show what Charter actually did." But for *Plaintiffs'* notices, they already have this very information, in the form of the CATS ticket data that has been produced and shows exactly what Charter did in response to each notice.[11] There are tens of thousands of tickets for RIAA tickets and *millions* of third party tickets for the Accused Subscribers. The work log notes contain processing information about the notices that generated these tickets, including subscriber PII, and would take an inordinate amount of time to redact appropriately, even for the subset that actually relate to Plaintiffs' notices. Plaintiffs offer no possible non-redundant relevance to justify this burden.

Request 61. This vastly overbroad request seeks "all documents or communications" in any way

---

[4] *See e.g.,* Ex. 4 (Abuse Playbook and Vulnerabilities Playbook, CHA_00000159).

[5] RFP 8 sought, "all documents concerning any copyright or infringement policy applicable to Subscribers or Users, including but not limited to any draft or final versions of such policies . . . [t]his request includes but is not limited to any DMCA Policy, Repeat Infringer Policy, and/or Acceptable Use Policy." *See* Ex. 5. Plaintiffs minimally narrowed the request in a pre-conference letter to the Court. *See* Ex. 6 at 2-3.

[6] *See* Ex. 7 (Dec. 17, 2020 Hearing Tr. at 59:9-16).

[7] *Id.* at 59:23-60:1.

[8] *Id.* at 66:24-68:15.

[9] *See* Ex. 8 (Feb. 19, 2020 Hearing Tr. at 131:15-133:17).

[10] *See* Ex. 9 (Mar. 16, 2020 Letter, "Charter has searched for and produced all non-privileged copyright policy documents as ordered that it has located in its possession, custody and control through a good faith and reasonable search both in prior productions and with today's production. *See* 2/19/2020 Hr'g. Tr. at 132:20-25. As noted by the Court, however, should any additional responsive non-privileged copyright policies be located, Charter will of course produce those materials expeditiously. Id. at 133:9-17.").

[11] *See* Ex. 10 (Screenshots from CHA_00001273, Column J (accused subscriber ticket data from RIAA notices) and CHA_00001274-CHA_00001283, Column J (accused subscriber ticket data from non-RIAA notices)).



comparing how Charter responded to copyright notices with other unrelated violations of its Acceptable Use Policy (AUP),[12] such as hacking, and spamming. Plaintiffs do not even attempt to offer a theory of relevance for this request and simply cite to an out of context quote from the *Cox/BMG* case. But there the Court relied on the cited email merely to highlight that there the record showed that at some point in time Cox reactivated subscribers terminated for copyright infringement but not for other abuses. There is no similar issue here as Charter did not terminate in response to copyright notices, nor does the *BMG* decision state that such a comparison is necessary, or even relevant, to DMCA safe harbor.[13]

### III.     Plaintiffs' Requested Custodians

Charter has agreed to search *seventeen* custodians (versus Plaintiffs' total of 23 for <u>65</u> Plaintiffs)—including the three added at Plaintiffs' request during recent discussions. Plaintiffs' Motion also misrepresents Charter's productions. Charter *has* produced internal emails discussing copyright infringement, and thousands of communications with subscribers about Plaintiffs' notices. Negotiations are ongoing regarding the scope of responses and search terms. Plaintiffs' demand to add the 17+of additional marginally or irrelevant custodians listed in their Motion is pure overreach and should be denied.

<u>Jeff Erhardt and Adam Taylor.</u> Charter's Rule 26(a)(1) disclosures were served in June 2019, early in this case. At that point, Charter was still actively investigating who would have relevant information, and erred on the side of being over-inclusive in identifying potential witnesses. Certain individuals initially identified were ultimately deemed not to be relevant email custodians given the scope and timing of their employment. Taylor and Erhardt began working for Charter at the very end of or after the period Plaintiffs sent their copyright notices. Plaintiffs sent their last copyright notice to Charter in March 2015. Taylor's hire date was March 30, 2015, and Erhardt started in September 2016, (well after the Claim Period, and more than a year after Plaintiffs sent their last notice). Neither is likely to have relevant information. Indeed, Erhardt lacks *any* discoverable communications given the Discovery Period, which ends in May 2016.

<u>Kirill Abramov and Kelly Starkweather.</u> Mr. Abramov is Charter's in-house counsel managing this litigation and other intellectual property matters. His internal emails are core privileged, and Plaintiffs have failed to explain what non-privileged documents he would have to justify the substantial burden of searching and logging his correspondence on a privilege log.[14] Likewise, although Starkweather was listed on Charter's Initial Disclosures, she is also an attorney who served as privacy counsel for Charter and subsequently labor and employment counsel. She was not involved with drafting Charter's DMCA policy or any other copyright policies, though she provided occasional legal advice that would also be privileged..[15]

<u>Jim Obermeyer, Danyel Schönemann, and departmental representatives</u>. Charter explained to Plaintiffs that Obermeyer and Schönemann were inadvertently identified in an interrogatory response

---

[12] *See e.g.,* Ex. 11 (Charter Communications' 2010 Residential Acceptable Use Policy, CHA_00001342).
[13] Charter *has already produced* its "Abuse and Vulnerability Process Playbook" detailing how Charter responds to all types of AUP violations including, phishing, DoS attacks, copyright infringement, and SPAM. *See* Ex. 4.
[14] *See* Declaration of Kirill Abramov at ¶¶ 2-5.
[15] *Id.* at ¶¶ 6-8. Charter will be serving updated Initial Disclosures pursuant to Rule 26(a).



regarding persons responsible for designing and implementing Charter's copyright protocols.[16] Schönemann is in finance. Obermyer was in the marketing department, is no longer with Charter, and Charter will update its initial disclosures with a new marketing witness. The fact that such individuals may have relevant information, does not mean searching their emails is proportionally relevant. Charter has collected and produced responsive materials directly from the finance department, and would do the same for marketing materials deemed responsive. Plaintiffs fail to identify any requests to justify a search with respect to individuals who had no involvement with Charter's copyright policy or abuse department.

<u>Misc. individuals.</u> Plaintiffs also throw in various others based solely on the fact that they may have been copied on a produced email. Even a cursory review on LinkedIn shows that many are involved in human resources or Charter's technical operations, managers of regional locations, or contractors who started work for Charter long after Plaintiffs' last notice. They may be cc'd on emails, but are not involved in the substance that make the communications relevant. For example, the HR employee was cc'd on an email about an employee modem receiving false notices due to technical error. In Plaintiffs' examples, the individuals at issue are from Charter's Enterprise Security Department, not the Subscriber Security Services Team that handled copyright complaints. The contractors were merely bcc'd on auto-forwards of Plaintiffs' notices, as shown in the final example in Plaintiffs' Ex. 8, and any correspondence received from subscribers was separately stored in CATS. The likelihood that any would have non-redundant relevant information is significantly outweighed by the burden of searching/reviewing their documents.

### IV.     <u>Charter Does Not Have Organizational Charts Responsive to Plaintiffs' Document Requests</u>

Plaintiffs move on RFPs seeking ". . . organizational charts or other documents sufficient to show your organizational structure . . ." and "[d]ocuments sufficient to identify the name, title, and role of each of Defendant's employees or agents involved any manner in receiving, assessing, addressing, responding, and/or implementing any Infringement Notice."[17] As Charter has repeatedly told Plaintiffs, the company does not have responsive organizational charts. It of course has internal databases with employee information, but it does not maintain "organizational charts" or specific documents with the "name[s], title[s], and role[s]" of each of the requested employees and thus does not have documents sufficient to respond to these requests. It is also unclear from the request who Plaintiffs consider to be ". . . persons responsible for addressing copyright infringement complaints, user terms of service, Acceptable Use Policies, privacy policies, and finances, including the identity and title of each job occupant" or "employees or agents involved any manner in receiving, assessing, addressing, responding, and/or implementing any Infringement Notice."[18] If Plaintiffs have specific questions about specific employees and specific departments, they are free to serve an appropriate interrogatory for such information.

### V.     <u>The Requested Financial and Marketing Information is Duplicative and Vastly Overbroad</u>

Plaintiffs seek broad data regarding subscriber revenue and retention, employee compensation, and advertising. Although they claim these overbroad requests are relevant to vicarious liability, the requested

---

[16] Ex. 12 (May 6, 2020 Email from E. Ranahan to Plaintiffs).
[17] *See* Ex. 5, RFPs 7 and 10.
[18] *Id.*

information is either unrelated or, to the extent arguably relevant, already produced.[19] Specifically:

Request 33. Although Charter has already produced the full billing history for the Accused Subscribers for the entire Discovery Period Magistrate Hegarty found relevant, Plaintiffs now seek total revenue received from these subscribers *after* the Discovery Period through the present. They offer no damages or liability theory of relevance but simply state "financial benefits did not stop when the claim period ended." Mot. at 5. This is apparently an obscure reference to the "direct financial benefit" prong of vicarious liability, but that prong is directed at whether infringement was a draw to Charter's service,[20] not generally whether Charter charged subscribers for its service.

Request 43. The impact of the use of BitTorrent on Charter's network is irrelevant to any supposed "financial benefit" Charter would receive from copyright infringement as BitTorrent has a plethora of legitimate uses.[21]

Requests 50, 52, 53. These requests seek irrelevant information concerning the "cost associated with terminating a Subscriber's internet service," the average revenue Charter received per subscriber to the present, and information on subscriber retention. Plaintiffs have failed to address how subscriber attrition was a factor that influenced Charter's copyright policies. Moreover, Plaintiffs have the full billing data for accused subscribers. They can determine how much revenue Charter made from the accused subscribers and how long they were retained as subscribers during discovery period.

Request 57. This overbroad request for how employee compensation was tied to subscriber retention has no relevance. Moreover, as Charter did not terminate subscribers in response to infringement notices, compensation is not possible relevant to decision making to retain infringers as Plaintiffs argue.

Requests 41 and 42. These overbroad requests seek *all* advertising and marketing or strategic plans mentioning use of the Internet to download or stream music. There are ubiquitous legal ways to access music online. Judge Jackson held that vicarious liability requires *"infringing activity"* to be a draw. Dkt. 157 at 6. Ads merely mentioning downloading or streaming music are not probative of infringing activity.

Sincerely,

*/s/Jennifer A. Golinveaux*
Jennifer A. Golinveaux

---

[19] Plaintiffs regularly misleadingly refer to the accused subscribers as "infringing subscribers" but whether these subscribers directly infringed Plaintiffs' copyrights is a legal determination that has not yet been decided.
[20] *See* ECF No. 157 at 7 (Order adopting Judge Hegarty's recommendation).
[21] BitTorrent is simply a communications protocol used to legally distribute content in many ways including by NASA, musicians, and Facebook*. See, e.g.,* "NASA is using BitTorrent for their 'visible earth' project"), *available at,* https://torrentfreak.com/nasa-is-using-bittorrent-for-their-visible-earthproject/; "Thom Yorke Just Released a $6 Album on BitTorrent," *available at* https://www.wired.com/2014/09/radiohead-thom-yorke-bittorrent-album/; "Exclusive: a behind-the-scenes look at Facebook release engineering," *available at* https://arstechnica.com/information-technology/2012/04/exclusive-a-behind-the-scenes-look-at-facebook-release-engineering/.