# Exhibit 13

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                         Alexandria Division


   --------------------------------:
                                   :
   SONY MUSIC ENTERTAINMENT, et al.,:
               Plaintiffs,         :
                                   :
        -vs-                       :   Case No. 1:18-cv-950
                                   :
   COX COMMUNICATIONS, INC., et al.,:
               Defendants.         :
                                   :
   --------------------------------:




                              VOLUME  4  (A.M. Portion)




                              TRIAL TRANSCRIPT


                              December 5, 2019


                       Before:  Liam O'Grady, USDC Judge


                              And a Jury
```

### Page 775

1  MR. OPPENHEIM: No further questions, Your Honor.
2  THE COURT: All right. May this witness be excused?
3  All right. You are excused with our thanks. Please
4  don't discuss the testimony you have given with anyone until
5  our trial is over. All right?
6  THE WITNESS: All right.
7  THE COURT: Have a good day.
8  THE WITNESS: Thank you.
9  NOTE: The witness stood down.
10 THE COURT: All right. Next witness.
11 MR. ZEBRAK: Plaintiffs call Dr. George McCabe.
12 NOTE: The witness is sworn.
13 THE COURT: All right. Good afternoon, Mr. McCabe.
14 Please proceed, Mr. Zebrak.
15 MR. ZEBRAK: Thank you, Your Honor.
16 GEORGE McCABE, called by counsel for the plaintiffs,
17 first being duly sworn, testifies and states:
18 DIRECT EXAMINATION
19 BY MR. ZEBRAK:
20 **Q.** Good day, Dr. McCabe.
21 **A. Good day.**
22 **Q.** For the record, will you please state your full name.
23 **A. George McCabe.**
24 **Q.** Where do you work, sir.
25 **A. Purdue University.**

### Page 776

1  **Q.** What is your position at Purdue University?
2  **A. I'm a professor of statistics.**
3  **Q.** And who retained you in this litigation?
4  **A. Plaintiffs' counsel.**
5  **Q.** And at a very high level, could you please tell the jury
6  what you were retained to do.
7  **A. Yes. I was asked to complete two analyses.**
8  **Q.** And what were they, at just a high level, sir?
9  **A. One was a work in suit analysis. And the second was a**
10 **repeat infringer analysis.**
11 **Q.** And were you able to form any opinions on those two topics
12 that you were asked to research?
13 **A. Yes, I was.**
14 **Q.** Okay. Well, let's explore your background, and then we
15 are going to dive into those analyses you have done.
16 Dr. McCabe, I'm going to hand up to you what has
17 already been marked as PX 526.
18 **A. Thank you.**
19 **Q.** Do you recognize that document, sir?
20 **A. I do.**
21 **Q.** And what is it?
22 **A. It is a document I prepared. It's called a CV, and it**
23 **basically lists my background and my accomplishments as a**
24 **statistician.**
25 **Q.** And is it an accurate summary?

### Page 777

1  **A. It is.**
2  MR. ZEBRAK: Okay. Your Honor, we move its admission
3  as evidence.
4  THE COURT: Any objection?
5  MR. BUCHANAN: No, Your Honor.
6  THE COURT: All right. It's received.
7  MR. ZEBRAK: Thank you, Your Honor.
8  Mr. Duval, if you could publish the document, please.
9  BY MR. ZEBRAK: (Continuing)
10 **Q.** Dr. McCabe, this is a 38-page document, correct?
11 **A. I believe so.**
12 **Q.** So we're not going to go through it in detail. It has
13 been a long day already. But I would just like to spend a few
14 moments on your background before we move into your analysis.
15 Could you start by telling the jury your educational
16 history?
17 **A. Yes. I have a bachelor's degree in mathematics from**
18 **Providence College. And I have a Ph.D. from Columbia**
19 **University in mathematical statistics.**
20 **Q.** And has your entire career involved statistics?
21 **A. Yes, it has.**
22 **Q.** And where have you spent your career after you obtained a
23 Ph.D. in mathematical statistics?
24 **A. I came to Purdue University, and I have been there ever**
25 **since.**

### Page 778

1  **Q.** And for roughly how long has that been that you have been
2  working at Purdue University?
3  **A. It will be 50 years in June.**
4  **Q.** All right. Congratulations.
5  **A. Thank you.**
6  **Q.** So at a high level, what responsibilities have you had as
7  a professor of statistics at Purdue University?
8  **A. My responsibilities basically consist of three tasks,**
9  **teaching, research, and service. Sometimes service is called**
10 **engagement.**
11 **Q.** And what has been the subject matter or matters for your
12 teaching?
13 **A. I've taught statistics courses, primarily for graduate**
14 **students, graduate students, both those getting Master's**
15 **degrees and Ph.D.s in statistics, and also graduate students in**
16 **other departments who need to use statistics in their own work.**
17 **Q.** And what generally has been the subject of your research?
18 **A. Most of my research has been collaborative. So I work**
19 **with other researchers who have data that needs to be analyzed.**
20 **And I'm the one who analyzes their data for them.**
21 **Q.** Okay. Well, we'll get into that in a little more detail
22 in a moment. But I believe you said there was a third area?
23 **A. Yes, the third area would be engagement. So for most of**
24 **my career, from 1970 to 2004, I was the director of an**
25 **organization called the Statistical Consulting Service, which**

**779**

1  provided help for people who needed to use statistics within
2  the university.  That includes faculty, graduate students, and
3  other people who might need the work, but all internal to
4  Purdue.
5  Q.  Okay.  Let's turn your attention back to your CV, sir.
6      Is that an accurate recitation of your professional
7  experience?
8  A.  Yes, it is.
9  Q.  And, Mr. Duval, if you could pan down a little lower.
10     And does that list your teaching positions?
11 A.  Excuse me?
12 Q.  Dr. McCabe, does that list your teaching positions on the
13 first page?
14 A.  Yes.
15 Q.  And if you could turn to the next page of the document,
16 Mr. Duval, underneath Professional Activities.
17     And does this list your professional activities and
18 other honors and societies you've been a part of throughout
19 your career?
20 A.  Yes, it does.
21 Q.  And by the way, where have you been a professor besides
22 Purdue in terms of teaching experience?
23 A.  Yeah, I hold an adjunct professorship at the National
24 University of Ireland in Galway.  I've had sabbaticals at
25 several different places, I think they're listed on the first

**780**

1  page.  I was at Princeton.  I've been at something called
2  CSIRO, which is a research organization in Australia.  A
3  visiting position at University of Berne in Switzerland.
4  Several other places for shorter periods of time.
5  Q.  Thank you, Dr. McCabe.  And I apologize, I asked you
6  before whether this was a 38-page document, but what page,
7  though, does it begin at with its numbering?
8  A.  Oh, page 12.
9  Q.  And what does it say at the top of this document?
10 A.  Appendix 1.
11 Q.  And why does it begin -- well, first of all, what was it
12 an appendix to?
13 A.  I don't remember.
14 Q.  Well, did you provide a written expert report in this
15 matter?
16 A.  Yes.
17 Q.  And did that include a copy of your CV?
18 A.  That's correct.
19 Q.  Okay.  Okay.  Thank you, Dr. McCabe.
20     So have you written any books in the fields of --
21 field of statistics?
22 A.  Yes, I have.
23 Q.  Mr. Duval, if you could pan over to that.
24     Are those listed here on your CV?
25 A.  Yes, they are.

**781**

1  Q.  Could you tell the jury something about one of your books.
2  A.  Yeah.  So the first book listed there, actually the first
3  two entries refer to the same book, but we added a different
4  coauthor.
5      So it's a book that's in its ninth edition.  The
6  first edition was in 1989, and we're working on the tenth
7  edition now.  It's used by a large number of colleges and
8  universities, both in the United States and elsewhere.  It's
9  been translated into several foreign languages.
10 Q.  Thank you, Dr. McCabe.
11     And, Mr. Duval, if you could turn to the list of
12 publications on what's numbered page 15.
13     Dr. McCabe, is this an accurate list of publications
14 you've authored during your career?
15 A.  Yes, it is.
16 Q.  And that begins on page 15 and runs all the way through
17 page 30, about 229 of them; is that correct?
18 A.  That's correct.
19 Q.  And do these all involve the field of statistics?
20 A.  Yes, they do.
21 Q.  Have you testified as an expert in litigation previously?
22 A.  Yes, I have.
23 Q.  And in what field?
24 A.  In a variety of fields.  Initially, in several suits
25 related to equal employment opportunities, salary, promotion,

**782**

1  hiring.  More recently, I testified in an issue related to the
2  recall of pet foods that were contaminated.
3  Q.  Well, putting aside the subject area of the disputes, what
4  was the purpose for your involvement in those litigations in
5  terms of what you brought to them?
6  A.  Basically my job was to take data, analyze it, present the
7  results of my analysis to people who needed to use those
8  results.
9  Q.  Were you testifying in the field of statistics in those
10 matters?
11 A.  Yes.
12 Q.  And in -- apart from expert work in litigation, applying
13 statistics and your work at Purdue, did you have other
14 experience in the field of statistics?
15 A.  Yes, I have.
16 Q.  And could you elaborate on that a little bit.
17 A.  Yeah.  So some recent work was on women's bone health and
18 osteoporosis, and the use of botanicals like plums and
19 blueberries to prevent bone loss.
20     I've also recently worked on a project on the use of
21 some plants that are grown by Native Americans in North
22 Carolina that have potential benefits for Parkinson's patients
23 to help with their symptoms.
24 Q.  I'm sorry.  I didn't --
25 A.  Yes, and, you know, many other things.

783

1  Q.  And in those matters that you've been referring to, are
2  you the subject area expert, For instance, in Parkinson's
3  disease or in the other issues you were mentioning?
4  A.  No, I'm not.
5  Q.  And what is the expertise that you brought to bear in
6  those matters?
7  A.  It's my background in applied statistics, which I use to
8  work on the data provided by those people.
9  Q.  Sure, and -- well, first of all, let me take a step back.
10  You just mentioned applied statistics, and I'm going to get to
11  that.  But can you start off and -- you know, many of us --
12  many of us have probably heard the word "statistics" before.
13      But as a -- someone who has taught in the field for a
14  very long time, could you explain what statistics is.
15  A.  Yes.  The way I view it is I use mathematics and I use
16  computing to study data.  The study involves analyses that I
17  perform.  And part of my role also is then to take the results
18  of my analyses and present them to people who would need to
19  make decisions.  That could be the -- a national workshop or a
20  peer review journal.  Or, as today, a jury who might -- needs
21  to make a decision.
22  Q.  Have you done work on government panels previously?
23  A.  Yes, I have.
24  Q.  And in what capacity?
25  A.  Again, as a statistician or a statistical expert.  I

784

1  worked on the school lunch program, and then several other
2  issues related to health generally.
3  Q.  Thank you, Dr. McCabe.  Could you explain why statistics
4  is valuable.
5  A.  Yes.  I think it's valuable because we need to have a
6  solid foundation for our decisions.  So some statistics is
7  labeled as decision analysis.
8      Today, we also hear about evidenced-based medicine
9  that when people are treated, we need to have a sound
10  foundation for that treatment.  We need to know that it works,
11  and that process involves statistics.
12      So, in general, there's an idea that statistics is
13  used to assist people in making decisions.
14  Q.  And, Dr. McCabe, are you being paid for the time you spend
15  working in this case?
16  A.  Yes, I am.
17  Q.  And are you being paid by the hour?
18  A.  Yes.
19  Q.  And how much do you charge per hour?
20  A.  $450.
21  Q.  Thank you, Dr. McCabe.  Is the payment of your fees in any
22  way dependent upon the substance of whatever opinion or
23  opinions you provide?
24  A.  No, it is not.
25  Q.  And is the payment of your fees in any way contingent upon

785

1  the outcome of this case?
2  A.  No.
3  Q.  And, Dr. McCabe, do you have an understanding of roughly
4  how many hours you've spent working on this case thus far?
5  A.  Yes.  It's more than 200.
6  Q.  Your Honor, I would move -- well, I'm -- let me take one
7  step before I proceed there.
8      Dr. McCabe, you mentioned the term "applied
9  statistics."  What is that?
10  A.  That involves what I described, that it primarily involves
11  collaboration with other researchers who have data that needs
12  what I am able to do for them.
13      MR. ZEBRAK:  Your Honor, I would offer Dr. McCabe as
14  an expert in the field of statistics, and allow him to testify
15  as such.
16      THE COURT:  All right.  Any objection?
17      MR. BUCHANAN:  No objection.
18      THE COURT:  All right.  He will be received for that
19  purpose.
20  BY MR. ZEBRAK: (Continuing)
21  Q.  Dr. McCabe, just to be clear, are you providing a legal
22  opinion here today?
23  A.  No.
24  Q.  Are you an expert in the field of copyright law?
25  A.  I am not.

786

1  Q.  Are you an expert in the field of -- or are you an expert
2  in peer-to-peer technology?
3  A.  No.
4  Q.  But your experience, statisticians are oftentimes retained
5  to apply their statistical expertise on data in which they're
6  not an expert in, you know, the content of that data; is that
7  correct?
8      MR. BUCHANAN:  Leading, Your Honor.
9      THE COURT:  I'll allow it for --
10  A.  That's correct.
11  BY MR. ZEBRAK: (Continuing)
12  Q.  Dr. McCabe, did you make any assumptions about any data
13  you reviewed as part of your analysis in this case?
14  A.  Yes, I did.
15  Q.  And why is that?
16  A.  In order to do my analysis, the starting point was
17  collection of data sets.  And I assumed that the data speak for
18  themselves, that they -- I took them at face value.  I did not
19  collect the data or verify or establish anything else about
20  them.  I take them as given at face value.
21  Q.  In your experience, is it unusual for you as a
22  statistician to take the data that you're collecting and
23  analyzing at face value?
24  A.  That would be the usual standard, yes.
25  Q.  Dr. McCabe, do you have any reason to believe that the

787

1  data that you were given for purposes of your analysis in this
2  case is not reliable?
3          MR. BUCHANAN:  Objection, Your Honor.  He just said
4  he assumed it was accurate.
5          THE COURT:  Yeah, sustained.
6          MR. ZEBRAK:  We don't need to -- we can just move on.
7          THE COURT:  And we don't need -- you know, counsel
8  have all been making comments about matters today.  Let's just
9  ask our questions and not comment on answers or speak back and
10 forth to each other.  It is confusing to the jury.
11         Please.  Thank you.
12         MR. ZEBRAK:  Yes, Your Honor.  We're moving right on.
13 BY MR. ZEBRAK: (Continuing)
14 Q.   Dr. McCabe, did you prepare any slides to assist you in
15 your testimony today?
16 A.   I did.
17 Q.   And are those demonstrative slides an accurate summary of
18 your analysis in this case?
19 A.   They are.
20         MR. ZEBRAK:  Okay.  Your Honor, permission to publish
21 the slides.
22         THE COURT:  Any objection?
23         MR. BUCHANAN:  No, Your Honor.
24         THE COURT:  All right, go ahead.
25 BY MR. ZEBRAK: (Continuing)

788

1  Q.   Dr. McCabe, let's turn to the first slide.  I believe you
2  said you did -- you had two assignments in this case, a works
3  in suit analysis and a repeat infringer analysis, correct?
4  A.   That's correct.
5  Q.   Okay.  So let's review assignment one, the works in suit
6  analysis.  Would you explain to the jury what your assignment
7  was with respect to the works in suit analysis.
8  A.   Yeah, so the first line below the title defines the scope
9  of my analysis.  Sometimes we -- or I would call that a frame,
10 it's a statistical term.  So the frame here is what are called
11 the works in suit.  And there are 10,017 of those works.
12         There are four icons below that.  And these are the
13 requirements that I used or applied to accomplish the works in
14 suit task.
15         So the first requirement is that the work -- and this
16 is analysis about the works in suit.  Again, it's the 10,017
17 works that we're talking about.  So that work must in an
18 infringement notice -- an infringement notice during the claim
19 period.
20         The second is that the work in suit should be in a
21 notice that is the third or later notice for a particular
22 subscriber.
23         In other words, I labeled the notices as a first, a
24 second, a third, et cetera.  So I only looked at third or later
25 notices.

789

1          Next, the infringing notice must contain the work in
2  suit.
3          And the fourth requirement is that the infringing
4  file is on a hard drive that was created by MarkMonitor.
5  Q.   Dr. McCabe, I would like to draw your attention to the
6  third bullet.  A moment ago I believe you said the infringed --
7  well, could you explain what that third bullet is in a little
8  more detail.
9  A.   Yes.  So the notice contains information.  And the
10 information, depending upon the protocol, points either to one
11 work in suit or it can -- in the case of BitTorrent, it can
12 refer to a collection of works.
13 Q.   What is the significance to the reference to "infringing
14 file" in that third bullet?
15 A.   The infringing file is part of the notice.  And that
16 points to -- through these hashes, it points -- it gets us to
17 the works in suit.
18 Q.   Do you have an understanding as to whether the infringing
19 file is identified in the notice?
20 A.   Yes, it is.
21 Q.   And by the way, when we talk about notices, what are we
22 referring to here?
23 A.   They are the e-mails sent by MarkMonitor to Cox.
24 Q.   Okay.  And were you able to form any -- and, first of all,
25 you said that you're not providing any -- you're not testifying

790

1  as a legal expert today, correct?
2  A.   That's correct.
3  Q.   So these requirements that you applied here, where did you
4  come up with those requirements?
5  A.   In consultation with plaintiffs' counsel.
6  Q.   Okay.  Who set these requirements?
7  A.   These were set as part of my assignment, if you will.
8  Q.   Thank you, Dr. McCabe.  Let's turn to your conclusions.
9          Were you able to form any conclusions with respect to
10 your works in suit analysis?
11 A.   Yes.
12 Q.   And did you prepare a slide to overview those conclusions?
13 A.   Yes.
14 Q.   With respect to the top bar labeled Findings, would you
15 please explain to the jury what your overall findings are?
16 A.   Yes.  So that top line is a summary of my findings that
17 all of the 10,017 works in suit were qualified.
18         In other words, they satisfied the four requirements
19 that are described on the previous slide and are illustrated on
20 this slide.
21 Q.   And could you walk us through this slide one component at
22 a time.  What's the checked box next to Claim Period signify?
23 A.   So that means that -- if you recall, the previous slide
24 said the first requirement was that the work in suit should
25 appear in a notice during the claim period.

**791**

1  So on this slide, the claim period is denoted or
2  described by the yellow bar at the top. It starts February 1,
3  2013, and ends November 26, 2014.
4       And the checkmark means that all of the 10,017 works
5  in suit did correspond to a notice during this claims period.
6  Q.  Was the claim period the same claim period for every
7  single plaintiff group in this case?
8  A.  No. There is a note below the bars for the years that --
9  for the Sony ATM/EMI claims, the start of the claim period was
10 August 1, 2013, rather than February 1, 2013. But that period
11 was the same, the ending date of the claims period for Sony
12 ATM/EMI was the same as for all the others.
13 Q.  And, Dr. McCabe, would you briefly walk the jury through
14 the remaining three checked boxes on this slide.
15 A.  Yes. So the second is that -- this issue of the third or
16 later notice for a particular subscriber. So that was
17 satisfied for all of the 10,017 works.
18      That the infringing file in the notice contains the
19 work in suit.
20      And that there is a copy of the work on a hard drive
21 created by MarkMonitor.
22      So all of these -- the four requirements are
23 satisfied. And the term I'm using is that means those works in
24 suit were qualified.
25 Q.  Dr. McCabe, what data sources did you use for your

**792**

1  analysis in this case?
2  A.  Yes, I think I prepared a slide for that. That should be
3  the next one.
4  Q.  Or actually, Dr. McCabe, let me ask you a question. A
5  moment ago when you were explaining each of the four
6  requirements for your analyses were satisfied, you used the
7  term "qualified."
8       What does that mean?
9  A.  It basically means that the work in suit is connected to a
10 notice. So we could view it the other way around. You start
11 with the notice, it points to the work in suit. So there is a
12 direct connection between those two.
13      And that's what I'm calling qualified, that I can
14 draw the link from the notice to the work in suit.
15 Q.  Okay. Well, let's turn back to your data sources, and I
16 can ask you a few questions about that.
17      So what is being depicted in the left column with
18 respect to data sources?
19 A.  The left column describes the source of the data sets. So
20 there are three sources, MarkMonitor, Cox, and the plaintiffs.
21 Q.  And what data from MarkMonitor was within your analysis in
22 this matter?
23 A.  So MarkMonitor is the top data source there. And there
24 are three files listed to the right. The first is the notices
25 or the -- actually, I didn't have the notices, but I had a file

**793**

1  that lists the notices and the information contained in each
2  notice. So all that -- these are all data files that I had.
3       So there is a file for notices from MarkMonitor.
4  There is a file for the downloads that MarkMonitor downloaded.
5  And there is a file from MarkMonitor about the Audible Magic
6  procedure or connections to go from hashes to works.
7  Q.  And what is depicted with respect to Cox in terms of data
8  from Cox that you considered within your analysis?
9  A.  So Cox also provided three data sets. The first one
10 listed there is subscriber identification. So the Cox CATS
11 system has identifiers for subscribers. It was necessary to
12 have that information to be able to perform my analysis.
13      So it's the file itself connected subscriber IDs with
14 notices.
15      The second file is what I have called the ticket
16 file. It's the large file that contains the tickets that Cox
17 recorded in their CATS system.
18      And the third is a file that identifies Cox
19 subscribers as -- I used it to distinguish residential from
20 business subscribers.
21 Q.  And when you say the third file, was that the billing
22 information file?
23 A.  I am sorry, the billing information file, yes.
24 Q.  And, finally, to the right of plaintiffs, there is an
25 Exhibit A and B. What are those two files?

**794**

1  A.  Right. These two files comprise the works in suit. So
2  the first is a collection of sound recordings, and the second
3  is list of compositions.
4  Q.  And I apologize, Dr. McCabe, but would you please
5  elaborate slightly on looking back to the MarkMonitor box, what
6  the middle file is that says Downloads.
7  A.  The downloads are the works that -- or it's a list of the
8  works that are on -- that have been downloaded and are on the
9  MarkMonitor generated drive that they prepared.
10 Q.  I see. Okay. Thank you, Dr. McCabe.
11      And what did you do with these data sources once you
12 received them?
13 A.  My first task was to connect them. And I think the next
14 slide gives an idea of what that involved.
15 Q.  And before we turn to that slide, Dr. McCabe, what does it
16 mean to connect data sources generally?
17 A.  What that involved was to take -- in each step take two
18 data sets and combine the information into a single data set.
19 So there needs to be a connector to track the information that
20 is shared. There needs to be some sharing of information to
21 merge the files together, basically.
22 Q.  And what benefit, if any, is there in being able to
23 connect data sets with respect to then analyzing data?
24 A.  That was the way that I performed my analysis, it was
25 necessary to make those connections. In other words, to go

795

1 from the top notices all the way to the bottom recordings, I
2 had to make a series of connections all the way through.
3 Q.    Well, let's look at the next slide then.
4         So these are the data sources that you considered
5 that we just reviewed on the last slide, correct?
6 A.    That's correct.
7 Q.    Okay. And can you give us some examples of how you
8 connected -- I know it has been a long day already. We are not
9 going to go through all of these. But if you could connect
10 some of these for the jury.
11 A.    Yes. So the simplest one would be the one across the top
12 with the three Cox files. So there is a variable or an
13 identifier, it is a piece of the file that identifies a Cox
14 subscriber, and it's called an ICOMS ID.
15         So that identifier is in the left most data file,
16 which is the copy infringement tickets. That's the large
17 ticket file.
18         It's also in the billing information. And the
19 connector is in this subscriber ID, which is the way to connect
20 those three files -- I am sorry -- it's the ICOMS ID. Yeah.
21 Q.    Okay. And so what is the purpose of these lines that we
22 see on this? So prior to the animation coming up, we just have
23 your data sources.
24         What's the significance of the lines that then
25 appears when the animation pops up?

796

1 A.    So those are the -- those identify the variable that is
2 used to connect the data sets. Basically, we're merging data
3 sets to combine -- to create a new file that combines the
4 information for the two source files.
5 Q.    And then, Dr. McCabe, once you've -- and were you able to
6 make a connection between these data sources to go from the top
7 to the bottom as you described it?
8 A.    So going from, let's say, the Cox domain to the
9 MarkMonitor domain, we have notice IDs and subscriber IDs. So
10 there -- that's the way to connect the notices with the
11 subscribers.
12         The notices themselves do not contain an identifier
13 for the subscriber. So we obtained a subscriber ID file from
14 Cox to attach that identifier to the notices.
15 Q.    But once you connected all these different data sources,
16 what did you then do with respect to analyzing the data?
17 A.    So the analysis is basically to connect the notices with
18 the works in suit. And that's the bottom line of what -- of
19 what I did. And to satisfy these four criteria.
20 Q.    Okay. And just before we move on to your second
21 assignment in terms of the repeat infringer analysis, can you
22 remind the jury of your overall finding with respect to the
23 works in suit.
24 A.    Yes. My overall finding is at the top of this slide, that
25 all 10,017 works in suit did correspond to a work that

797

1 satisfied these four requirements.
2 Q.    Okay. Let's turn to your second assignment, which you
3 referred to as a repeat infringer analysis.
4         Would you explain to the jury at a high level what
5 your repeat infringer analysis involved.
6 A.    Yes. So in contrast to the first task, which was about
7 works or works in suit, this task was about Cox subscribers.
8 In particular, as indicated on the slide, the frame here, if
9 you will, is the 57,600 subscribers that were reported by
10 MarkMonitor. So that's the frame.
11         And again, the analysis is an analysis of those
12 57,600 subscribers and their repeats. So I created a file and
13 counted infringement No. 1, infringement No. 2, et cetera, to
14 be able to look at the repeat pattern of infringements.
15 Q.    And are these -- what's the significance of these items
16 that appear below the frame that you defined of the 57,600
17 subscribers reported by MarkMonitor?
18 A.    So my task was to describe and analyze the patterns of
19 repeat infringers. That's what I did. So the five icons there
20 indicate five summaries that I generated as part of my
21 analysis. The first is what's the distribution of tickets,
22 meaning how many had one ticket, how many had two tickets,
23 et cetera.
24         I looked at the entries that identified subscriber
25 terminations in the Cox ticket data.

798

1         I think I mentioned above, the distinction between
2 residential versus business subscribers.
3         And there are also in the Cox data, there were
4 tickets for notices from other rights holders.
5         So again, these are still the 57,600 subscribers
6 reported by MarkMonitor, but my analysis included notices or
7 tickets generated by notices from other rights holders. And it
8 also included, as noted on the last entry, it included tickets
9 that occurred or that were generated before the claim period.
10 Q.    Dr. McCabe, you've been discussing use of tickets for this
11 repeat infringer analysis. Whose data is the ticket data that
12 you're analyzing?
13 A.    The ticket data is the Cox CATS data.
14 Q.    And so, these are Cox's records as to the subscribers who
15 are the subject of MarkMonitor notices; is that correct?
16 A.    That's correct.
17 Q.    Okay. And let's take these one by one. Let's first look
18 at your slide on distribution of tickets.
19         So would you walk the jury through this slide, first
20 starting at the -- where it appears in black: All tickets.
21 A.    So again, that's the frame I use. It's the 57,600
22 subscribers. And I looked at all tickets for those that were
23 contained in the -- what I call the ticket data, the Cox data.
24         The red bar at the top indicates the range of dates
25 that are included in that ticket data file that I received from

799

1  Cox.
2        So the start date is January 1, 2012, and the end
3  date is December 31, 2014.  So there are three years, 2012, '13
4  and '14 that are covered by this analysis.
5  Q.   Dr. McCabe, let me ask you a question, if I could draw
6  your attention in blue where it says:  Cox Copyright
7  Infringement Tickets.
8        Do you see that?
9  A.   I do.
10 Q.   How does that relate to all tickets on the top?  And
11 I'm sorry, that was a clumsy question.
12       When you say you considered all tickets for this pool
13 of 57,600 subscribers reported by MarkMonitor --
14 A.   Yes.
15 Q.   -- is it the case that this includes copyright
16 infringement tickets generated from notices from others in
17 addition to MarkMonitor?  Is that the --
18 A.   That's correct, yes.
19 Q.   Okay.  And let's take it one frame at a time.
20       So what's being depicted in the column that says 3+
21 with the number beneath it?
22 A.   So again, there are -- there's a picture, three or more,
23 and -- there's a picture of three, sorry.  And the 3+ means
24 that I counted the number of subscribers that had three or more
25 tickets.  And that number is 31,628, given in black below the

800

1  3+ and the three icons.
2        So of the 57,600 subscribers that are the frame for
3  my analysis, 31,628 had three or more tickets.
4  Q.   Okay.  And what about the -- if you could move to the next
5  column.  Is the idea there that the top bar represents the
6  number of copyright infringement tickets for the 16,818 Cox
7  subscribers depicted beneath it?
8  A.   That's correct.  So there is -- that's the number, 16,818
9  is the number of subscribers who had six or more tickets.
10 Q.   And, Dr. McCabe, is a copyright infringement ticket --
11 what's your understanding of how that relates to an
12 infringement notice?
13 A.   My understanding is that when MarkMonitor sent an
14 e-mail -- an e-mail notice, if you will, to the Cox system,
15 that caused a ticket to be generated.
16 Q.   Do you know what happens if Cox receives multiple
17 infringement tickets for the same subscriber -- strike that.
18       Do you know what happens when -- in a scenario where
19 Cox receives multiple infringement notices from different
20 parties on a single day for a single subscriber?
21       MR. BUCHANAN:  I'm just going to object.  I don't
22 think he has been offered as an expert on the system, just on
23 data.
24       THE COURT:  All right.  Lay a foundation if you want
25 him to testify to that.  Sustained.

801

1        MR. ZEBRAK:  Sure.
2  BY MR. ZEBRAK: (Continuing)
3  Q.   Dr. McCabe, what's your understanding of what a copyright
4  infringement ticket is?
5  A.   My understanding is that it is generated by a notice.  I
6  believe it can correspond to more than one notice, but I don't
7  recall a lot of details about that part of the structure.
8        In terms of the data, I treated the entry of a ticket
9  as the basic piece of information that I use to compute this
10 distribution.
11 Q.   So this repeat infringer analysis is an analysis of Cox's
12 records?  It's its ticket data, however Cox generates that
13 data; is that correct?
14 A.   That's correct.
15 Q.   Okay.  And can you walk the jury through the successive
16 three columns, starting at 10+?
17 A.   So for ten or more tickets, we had 8,495 subscribers.  For
18 13 or more tickets, there were 5,120 subscribers.  And for 14
19 or more tickets, there were 4,404 tickets.
20 Q.   Okay.  And, Dr. McCabe, I believe you indicated there were
21 a total of five characteristics of these 57,600 subscribers you
22 looked at?
23 A.   That's correct.
24 Q.   And we just reviewed the first one, distribution of
25 tickets; is that correct?

802

1  A.   Yes.
2  Q.   Okay.  Let's turn your attention to the next one.  What --
3  could you walk the jury through what -- through your analysis
4  that's depicted in this slide.
5  A.   Yes.  As I mentioned before, I looked at the Cox data and
6  looked at the entries corresponded to terminations.  When I did
7  that, I found 13 terminations.  So this graphic is an attempt
8  to make a picture out of that finding.
9        So again, we start with the frame, if you will, the
10 57,600 subscribers, and that's the bar on the left-hand side.
11       If you look on the right-hand side, it's a blown-up
12 version of the upper right-hand corner square for the 57,600.
13 And the squares colored yellow with the little icons
14 representing people, they represent subscribers.  Actually,
15 those are the 13.
16 Q.   And what was the time frame for which you had this Cox
17 ticket data that's the subject of your repeat infringer
18 analysis?
19 A.   It's the time frame for the ticket data that we had, which
20 was the three years, 2012, '13 and '14.
21 Q.   So turning your attention back to the slide of the
22 distribution of tickets, in -- these don't consider whatever
23 notices, if any, these 57,600 Cox subscribers may have received
24 prior to 2012; is that correct?
25 A.   Could you repeat that?  I didn't --

**803**

**1 Q.** Sure. If any of these 57,600 Cox subscribers had
**2** copyright infringement tickets prior to January 1, 2012, would
**3** that be depicted here in your analysis?
**4 A.** Prior to January 1, 2012?
**5 Q.** Yes.
**6 A.** Yeah, they would be included.
**7 Q.** Well, but you just said a moment ago that your -- that the
**8** data only is for 2012 to '14, correct?
**9 A.** I'm sorry, yes. I had it reversed.
**10** So it does not include data before -- the Cox data
**11** that we have starts 2012, ends 2014, those entire three years.
**12** And anything outside that range, I did not have data for those.
**13 Q.** Okay. So let's move on to your -- and so, relating these
**14** two slides, out of the 57,600, the Cox ticket data showed you
**15** that Cox terminated only 13 of that pool; is that correct?
**16 A.** That's what the data say, yes.
**17 Q.** And that's -- and the ticket distribution includes those
**18** that received ten or more, 13 or more, 14, correct?
**19 A.** That's correct.
**20 Q.** So -- okay. So out of the -- let's turn to your next --
**21** the third of your five areas.
**22** THE COURT: You know, what don't we stop here before
**23** you get into the third area.
**24** MR. ZEBRAK: Oh, sure.
**25** THE COURT: We're almost at 1 o'clock.

**804**

**1** MR. ZEBRAK: Yes, sir.
**2** THE COURT: So let's take our lunch break. We'll
**3** come back at 2 o'clock. All right.
**4** Thank you, you're excused.
**5** NOTE: At this point the jury leaves the courtroom;
**6** whereupon the case continues as follows:
**7** JURY OUT
**8** THE COURT: All right. So anything before we recess?
**9** Okay. Then we have a --
**10** MS. LEIDEN: Sorry, Your Honor.
**11** THE COURT: Yes.
**12** MS. LEIDEN: One issue from defendants, briefly.
**13** Plaintiffs intend to call by video deposition Jason
**14** Zabek. And depending on witnesses that go today, that video
**15** may be at least started today.
**16** The parties have exchanged designations and various
**17** objections, and we have -- we are going to try to work out any
**18** remaining objections that we have prior to the video
**19** deposition. But we wanted to raise to your attention that
**20** there may be remaining objections to deposition testimony and
**21** exhibits that we will need to resolve with Your Honor before
**22** the video begins to be played.
**23** THE COURT: Okay. So any of the text of the video
**24** that you still object to, get it to me as soon as you can and
**25** give me an opportunity to look at it and rule on it. And if

**805**

**1** you need -- if you want to be able to argue it, I'll give you a
**2** brief time to do that.
**3** And for the other deposition designations that are
**4** still being worked on, try and get them to me the night before
**5** so that you have an opportunity to splice and put them together
**6** not at the last -- they're videos, right? They're not just
**7** transcripts?
**8** MR. OPPENHEIM: They are, Your Honor. And this, in
**9** part, is plaintiffs' fault because last night we tried to cut
**10** back and shorten that video because it's far too long for, I
**11** think, anybody's desire.
**12** So that's why we didn't get it to you in advance.
**13** Our apologies.
**14** THE COURT: Okay. All right. So -- yes, sir.
**15** MR. ELKIN: A related point, Your Honor, is that
**16** currently as it stands, it's about four hours. And I'm not
**17** being critical of it. But all I'm suggesting is the following.
**18** We have from Atlanta and from Hampton Roads, I think, we've got
**19** Ms. Trickey, Mr. Carothers --
**20** THE COURT: Mr. Cadenhead.
**21** MR. ELKIN: -- Mr. Vredenburg. And if it's going to
**22** be a four-hour video and these witnesses are already here --
**23** and I'm mindful of the fact that it's their strategy, they want
**24** to put the witnesses in their order, and I respect that, but if
**25** these witnesses are already here out of town. I would just ask

**806**

**1** the Court to consider how that -- how we proceed.
**2** THE COURT: Yeah. If putting this video on before
**3** those witnesses involves having that jury sit and twiddle their
**4** thumbs while we're going through objections, then I'm not going
**5** to permit it. We're going to do it with live witnesses.
**6** And after they're done, after we send the jury home,
**7** we can go through the deposition designation objections.
**8** This case has been going on a long time, and the last
**9** thing that I'm going to permit is us to have the jury sitting
13:01:52 **10** around while we're yakking about whether something is
**11** objectionable.
**12** So thank you for bringing that to my attention.
**13** All right. So I have a plea. The defendant is in
**14** custody. So the, you know, pencils and that kind of stuff
**15** probably aren't a good idea.
**16** All right. We're in recess.
**17** NOTE: The morning portion of the case on December 5,
**18** 2019, is concluded.
-------------------------------------------
**19**
CERTIFICATE OF COURT REPORTERS
**20**
**21** We certify that the foregoing is a true and
accurate transcription of our stenographic notes.
**22**
**23**           /s/   Norman B. Linnell
     Norman B. Linnell, RPR, CM, VCE, FCRR
**24**
**25**           /s/   Anneliese J. Thomson
     Anneliese J. Thomson, RDR, CRR

```
                                                              807

                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
                       Alexandria Division




     --------------------------------:
                                     :
     SONY MUSIC ENTERTAINMENT, et al.,:
                  Plaintiffs,        :
                                     :
          -vs-                       :   Case No. 1:18-cv-950
                                     :
     COX COMMUNICATIONS, INC., et al.,:
                  Defendants.        :
                                     :
     --------------------------------:




                              VOLUME  4  (P.M. Portion)




                        TRIAL TRANSCRIPT

                       December 5, 2019

               Before:  Liam O'Grady, USDC Judge

                         And a Jury
```

## Page 808

APPEARANCES:

FOR THE PLAINTIFFS:   MATTHEW J. OPPENHEIM, ESQ.
SCOTT A. ZEBRAK, ESQ.
JEFFREY M. GOULD, ESQ.
MICHAEL J. DRUCKMAN, ESQ.
ANDREW L. GUERRA, ESQ.
LUCY G. NOYOLA, ESQ.
JIA RYU, ESQ.
Oppenheim + Zebrak, LLP
4530 Wisconsin Avenue, N.W.
5th Floor
Washington, D.C. 20015

FOR THE DEFENDANTS:   THOMAS M. BUCHANAN, ESQ.
Winston & Strawn LLP
1700 K Street, N.W.
Washington, D.C. 20006-3817
and
SEAN R. ANDERSON, ESQ.
MICHAEL S. ELKIN, ESQ.
THOMAS P. LANE, ESQ.
CESIE C. ALVAREZ, ESQ.
Winston & Strawn LLP
200 Park Avenue
New York, NY 10166-4193
and
JENNIFER A. GOLINVEAUX, ESQ.
THOMAS J. KEARNEY, ESQ.
Winston & Strawn LLP
101 California Street, 35th Floor
San Francisco, CA 94111-5840
and
MICHAEL L. BRODY, ESQ.
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL 60601
and
DIANA HUGHES LEIDEN, ESQ.
Winston & Strawn LLP
333 South Grand Avenue
Suite 3800
Los Angeles, CA 90071

## Page 809

INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| GEORGE P. McCABE | DIRECT | 810 |
|  | CROSS | 816 |
|  | REDIRECT | 865 |
| LINDA TRICKEY | DIRECT | 877 |

## Page 810

A F T E R N O O N   S E S S I O N

NOTE: The December 2, 2019, afternoon portion of the case begins in the absence of the jury as follows:

JURY OUT

THE COURT: All right. Ready for our jury?

Okay. Joe, let's get our jury, please.

NOTE: At this point, the jury returns to the courtroom; whereupon, the case continues as follows:

JURY IN

THE COURT: All right. Please have a seat.

GEORGE P. McCABE, PH.D., PLAINTIFFS' WITNESS,

PREVIOUSLY SWORN, RESUMED

THE COURT: All right. Let's continue, please.

MR. ZEBRAK: Thank you, Your Honor.

DIRECT EXAMINATION (Cont'd.)

BY MR. ZEBRAK:

Q. Good afternoon, Dr. McCabe. Right before we broke for lunch, you were in -- we were discussing your assignment to the repeat infringer analysis, and I believe we were just about to jump into this slide. Would you please explain to the jury what's being depicted in this slide?

A. Yes. So for this slide, I classified the, the 57,600 subscribers, which I'm calling the frame. I classified them as residential subscribers or business subscribers. So there were 54,732 residential subscribers, and there were 2,868 business

## Page 811

subscribers.

The pie chart depicts that -- those numbers expressed as percents. So 95 percent of the subscribers were residential, and 5 percent were business.

Q. And, Dr. McCabe, what is the source of the data records you used to assess the breakdown of the Cox subscribers who were the subject of MarkMonitor's notices?

A. Could we go back to the slide that has the datasets on it?

Q. Sure. That would be -- please let me know when I'm there.

A. Yeah, that's fine. So it's along the top. So it's Cox data, and it's the third file, which is -- in this display is called billing information. So billing information is the connector for the defining residential versus business.

Q. I'm going to, if it's okay, bring us back to the slide we were just on. Is there anything else about this slide that --

A. I think that's it. 95 percent versus 5 percent, yeah.

Q. Okay. And would you please explain to the jury what's being depicted in this slide with respect to your repeat offender analysis?

A. Yes. So here I looked at the -- excuse me -- I looked at the, the source of the, of the notice. So the notices that I have recorded from, as infringers -- I'm sorry -- the notices from going back to MarkMonitor, for those rights holders, my understanding is they're the plaintiffs in this suit, but the Cox file also contains notices from other rights holders.

## Page 812

1 So basically here what I did was look again at
2 subscribers, so it's a subscriber analysis, and
3 17,729 subscribers had notices from other rights holders.
4 So, again, 17,729 out of 57,600, that's depicted in
5 the pie chart as 30.8 percent. So 30.8 percent of the
6 subscribers had notices from other rights holders.
7 Q. So out of the 57,600 Cox subscribers reported in
8 MarkMonitor's notices, a little less than a third of them were
9 also the subject of notices that led to tickets as reported by
10 the rights holders? Is that what you're saying?
11 A. That's correct.
12 Q. Okay. And is this also based on Cox's records, the ticket
13 data that you described earlier?
14 A. That's correct.
15 Q. Okay. Looking at the next slide you have here, would you
16 explain to the jury what the purpose of this slide is?
17 A. Yeah. The purpose is to depict the analysis that I did
18 related to claims -- or notices, sorry, notices before the
19 claim period. So if you look at the timeline on the bottom in
20 yellow there, the bar with arrows at the end, that's the
21 definition of a claim period, February 1, 2013, to November 26,
22 2014, with a caveat that there's a different start time for the
23 one plaintiff.
24 Superimposed on that in the gray is the time frame
25 for the Cox ticket data. So for the Cox ticket data, that

## Page 813

1 spans the years 2012, '13, and '14. So it overlaps -- or the
2 claims period is a subset of that time frame.
3 So if we look at the, the notices before the
4 beginning of the claim period, that is, before February 1,
5 2013, there were 13,441 subscribers who had one or more tickets
6 in that before claim period, the period to the, the left of the
7 center cut in the slide.
8 Q. Dr. McCabe, I'd like to ask you a question that contrasts
9 this with the works in suit analysis, and looking back at the,
10 if you wouldn't mind going back to the original slide, the
11 works in suit analysis was a third or later notice for a
12 subscriber in the claim period; is that correct?
13 A. That's correct.
14 Q. Okay. But then looking -- and the repeat infringer
15 analysis is the who, it's the people; is that correct?
16 A. The subscribers, yes.
17 Q. Okay. Well -- and then -- oops.
18 And so this -- is there anything else about this
19 slide that you'd like to explain?
20 A. No. But just as, as you mentioned or as I mentioned, it
21 depicts the contrast between the claims period and the larger
22 period of time covered by the Cox data that I used for the
23 repeat infringer analysis.
24 Q. So the 23.3 percent, is it correct that Cox received
25 notices from them both during the claim period and prior to the

## Page 814

1 period? Is that essentially what this slide is showing?
2 MR. BUCHANAN: Asked and answered and leading.
3 THE COURT: All right. I'll allow the question.
4 BY MR. ZEBRAK:
5 Q. Would you like me to repeat the question?
6 THE COURT: Well, just ask him: What does this data
7 depict?
8 MR. ZEBRAK: Sure.
9 THE WITNESS: So, yes. It's -- again, it's a count
10 of subscribers. The frame is the 57,600 subscribers reported
11 by MarkMonitor. Of those 57,600, 13,441 had tickets before the
12 claim period, so to the left of this time frame. That 13,441
13 represents 23.3 percent of the 57,600, and that's what's
14 depicted in the, in the pie chart there, the 23.3 percent.
15 BY MR. ZEBRAK:
16 Q. And whose records is this data based on?
17 A. It's based on the ticket data from Cox.
18 Q. Okay. And are you familiar with someone by the name of
19 Christian Tregillis?
20 A. Yes, I am.
21 MR. BUCHANAN: Objection, Your Honor. This is an
22 expert.
23 THE COURT: Well, I think we've got a preview of a
24 slide with his name on it, but I don't know what that --
25 MR. BUCHANAN: He hasn't testified yet, so -- I'm

## Page 815

1 anticipating it would be rebuttal. And so you're going to ask
2 him questions about his report when he hasn't testified yet.
3 THE COURT: Okay. Overruled. I think that's proper.
4 Mr. Tregillis will have an opportunity to address issues.
5 Well, let's see where you're going with this.
6 MR. ZEBRAK: Yeah, they had received the slides, and
7 I hadn't heard of an objection, but I'm happy to proceed.
8 BY MR. ZEBRAK:
9 Q. Are you familiar with who Christian Tregillis is?
10 A. Yes.
11 THE COURT: Is he going to critique his report at
12 this stage, or is this something else?
13 MR. ZEBRAK: No, Your Honor.
14 THE COURT: Okay. Go ahead.
15 MR. ZEBRAK: May we have a quick sidebar?
16 THE COURT: Yeah.
17 MR. ZEBRAK: Thank you.
18 NOTE: A sidebar discussion is had between the Court
19 and counsel out of the hearing of the jury as follows:
20 AT SIDEBAR
21 THE COURT: All right. So we don't rebut somebody's
22 testimony based on the report. We wait until they testify, and
23 then we report -- rebut their testimony if you feel it's
24 proper.
25 MR. ZEBRAK: Yes, sir.

### Page 816

1  THE COURT: So what have you got here?
2  MR. ZEBRAK: Well, we thought it would just be useful
3  for the jury to understand that Mr. Tregillis agrees that over
4  95 percent of the works in suit match to infringement notices.
5  It's really just showing -- you know, it's sort of
6  provisionally indicating that Mr. Tregillis agrees, but, quite
7  frankly, I mean, if Your Honor wants to do that, we can --
8  THE COURT: Yeah, let's move on beyond that. You can
9  cross-examine Mr. Tregillis on that.
10 MR. ZEBRAK: Yeah. We just thought it would be
11 useful for the jury, but we can move on.
12 THE COURT: Okay.
13 MR. ZEBRAK: Thank you.
14 THE COURT: All right. Thank you.
15 NOTE: The sidebar discussion is concluded;
16 whereupon, the case continues before the jury as follows:
17 BEFORE THE JURY
18 THE COURT: All right. Please go ahead.
19 MR. ZEBRAK: We pass the witness at this point, Your
20 Honor.
21 THE COURT: All right.
22 MR. ZEBRAK: Thank you.
23 THE COURT: Cross-examination, Mr. Buchanan?
24 MR. BUCHANAN: Yes, please, Your Honor.
25                     CROSS-EXAMINATION

### Page 817

1  BY MR. BUCHANAN:
2  Q. Good afternoon, Dr. McCabe. How are you?
3  A. Fine.
4  Q. I promise there will be no spreadsheets here for this
5  examination.
6      So you, as I understand it, have been associated with
7  Purdue University for 50 years; is that right?
8  A. That's correct.
9  Q. Okay. And from 2004 to 2018, you were a dean of a
10 department; is that right?
11 A. I was an associate dean for the College of Science.
12 Q. And you also taught courses at the same time?
13 A. I had a reduced teaching load.
14 Q. Okay. And you spent, I think, 75 percent of your time on
15 administrative work related to being a dean?
16 A. That's correct.
17 Q. And then other time you were teaching as well a course a
18 semester?
19 A. I was primarily doing research, but, yeah, I did --
20 Q. Okay. So is it fair to say that over the last ten years,
21 you've done very little expert testimonial work?
22 A. Over the last?
23 Q. Ten years.
24 A. In court or related matters, I'm not sure. I have --
25 Q. It would be a very small amount of work in the last

### Page 818

1  ten years that related to expert work, right?
2  A. Probably the same amount during my 50 years. I think it's
3  been a small amount throughout my career.
4  MR. BUCHANAN: Can we give him the binder?
5  BY MR. BUCHANAN:
6  Q. So I'd ask you to take a look at your deposition
7  testimony, page 81.
8      Can we pull that up, transcript 81, lines 3 through
9  8?
10     And maybe this would help you refresh your
11 recollection.
12 MR. ZEBRAK: Excuse me, Your Honor.
13 THE COURT: Yeah.
14 MR. ZEBRAK: This is --
15 THE COURT: Take the -- take it down. Ask him --
16 let's not put it up on the screen.
17 MR. BUCHANAN: Okay.
18 THE COURT: Just ask him whether that refreshes his
19 recollection.
20 MR. BUCHANAN: Okay.
21 THE COURT: Ask him to read the section that you want
22 him to read.
23 MR. BUCHANAN: Okay.
24 THE COURT: Everybody does refreshing recollection
25 and past recollection recorded a little differently, so this is

### Page 819

1  the way I would like to do it, Mr. Buchanan. So if you'd just
2  identify the segment where you're looking and see whether it
3  refreshes his recollection.
4  BY MR. BUCHANAN:
5  Q. Okay. So if you look at your deposition transcript, do
6  you see that lines 3 through 8 on page 81?
7  A. Page 81, lines 3 through 8?
8  Q. Right.
9  A. I'm not sure of the context of the question that I can get
10 from those -- I'm speaking --
11 Q. If you look at, start with line 21: Okay. How about over
12 the last ten years?
13 MR. ZEBRAK: Excuse me, Your Honor, Mr. Buchanan
14 understands the objection.
15 THE COURT: No, he's focusing on a, on a specific
16 sentence.
17 MR. BUCHANAN: That's -- I've given him the line.
18 THE COURT: Yeah, that's proper.
19 MR. ZEBRAK: Thank you, Your Honor.
20 THE WITNESS: I see. So if it's strictly speaking as
21 an expert witness, I have done very -- relatively little of
22 that, I'd say a dozen times or so over my career in court as an
23 expert witness. I don't know if you count depositions or --
24 BY MR. BUCHANAN:
25 Q. No, the, the question I had was in the last ten years, how