# Exhibit 14

```
                                                              2686

              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF VIRGINIA
                    Alexandria Division




    --------------------------------:
                                    :
    SONY MUSIC ENTERTAINMENT, et al.,:
               Plaintiffs,          :
                                    :
         -vs-                       :   Case No. 1:18-cv-950
                                    :
    COX COMMUNICATIONS, INC., et al.,:
               Defendants.          :
                                    :
    --------------------------------:




                          VOLUME  11  (A.M. Portion)
                          ─────────────────────────




                          TRIAL TRANSCRIPT


                         December 17, 2019


                   Before:  Liam O'Grady, USDC Judge


                            And a Jury
```

**2763**

1  Q.  You understand that Mr. Sikes was making a termination
2  decision for copyright infringement based on the ability to
3  keep that customer and keep that revenue flowing?
4           MR. ELKIN:  Objection.  Speculation.
5           MR. GOULD:  I asked his understanding.
6           THE COURT:  Yeah.  I'll allow the question.  Your
7  exception is noted.
8           THE WITNESS:  Without talking to Mr. Sikes, I really
9  don't know what he was, what he was implying.
10          MR. GOULD:  No further questions, Your Honor.
11          THE COURT:  All right.  Redirect?
12          MR. ELKIN:  No redirect, Your Honor.
13          THE COURT:  All right.  Then may Mr. Mencher be
14 excused?
15          MR. ELKIN:  (Nodding head.)
16          THE COURT:  All right.  Thank you, sir.  You're
17 excused.  Please don't discuss the testimony you've given with
18 anyone until our trial is over.  All right?
19          THE WITNESS:  All right.
20          THE COURT:  All right.  Have a good day.  Thank you.
21          THE WITNESS:  Thank you, Your Honor.
22          NOTE:  The witness stood down.
23          THE COURT:  All right.  Let's take our mid-morning
24 break, and we'll take 15 minutes, and we'll come back with our
25 next witness.  All right?  You're excused.  Thank you.

**2764**

1           NOTE:  At this point, the jury leaves the courtroom;
2  whereupon, the case continues as follows:
3  JURY OUT
4           THE COURT:  All right.  Anything we need to discuss
5  before we break?
6           MR. OPPENHEIM:  Not from the plaintiffs' perspective.
7           MR. BUCHANAN:  No, Your Honor.
8           THE COURT:  Okay.  All right.  We're in recess.
9           NOTE:  At this point, a recess is taken; at the
10 conclusion of which the case continues in the absence of the
11 jury as follow:
12 JURY OUT
13          THE COURT:  Ready for our jury?
14          MR. ZEBRAK:  Your Honor, one administrative issue.
15          THE COURT:  Yes, sir.
16          MR. ZEBRAK:  I'm sorry I have to raise with the
17 Court.  But Cox won't give us an updated copy of the slide
18 deck.  And when we do our cross-examination, we need to be able
19 to display it.  I can't, on the ELMO, use slides with different
20 numbers, and it -- this makes no sense to me.
21          We've offered a thumb drive for them just to hand it
22 over.  They refuse to do so.  We would like a copy.
23          MR. BUCHANAN:  So they have the original slides.  And
24 we told them, we're taking out the ones that the Court said
25 either take them out completely or take out that portion that's

**2765**

1  objectionable.
2           So the last two are out, and then 13, 21 -- those
3  other numbers are out.  I've given them the numbers.
4           So they have a set, and they just need to turn the
5  pages, and what will be displayed will just be the ones that
6  the Court said were permissible.
7           THE COURT:  Okay.  Is that -- can you use those that
8  you -- you already have a set of the old ones that you can pull
9  up, or you don't?
10          MR. ZEBRAK:  Yes, sir.  However, they'll have
11 different slide numbers on them.  It's not going to be exactly
12 the one they use.
13          This should have taken 30 seconds, and we're just
14 hoping to alleviate any confusion.  I don't see the reason why
15 they won't give us a slide.
16          THE COURT:  Can you do -- can you give them a copy of
17 the new ones?  I mean, how hard is that?
18          MR. BUCHANAN:  Well, we don't have it.  We didn't
19 print them out.  We didn't make the -- but what's going to be
20 displayed is what's --
21          THE COURT:  I understand, I understand.  The same
22 thing.  Page numbers different --
23          MR. BUCHANAN:  I don't know --
24          MR. ZEBRAK:  And we're not looking for a printed
25 copy, Your Honor.  We're just asking them to digitally move the

**2766**

1  file into a thumb drive.
2           MR. BUCHANAN:  All right, we'll give it --
3           THE COURT:  Let's give it to them if you could.
4           MR. BUCHANAN:  That was not something they ever
5  agreed to do with us.  But, okay, we'll do that.
6           THE COURT:  Thank you.
7           MR. ZEBRAK:  Thank you, Your Honor.
8           THE COURT:  All right.  Joe, let's get our jury,
9  please.
10          NOTE:  At this point the jury returns to the
11 courtroom; whereupon the case continues as follows:
12 JURY IN
13          THE COURT:  All right.  Please have a seat.
14          MR. BUCHANAN:  Your Honor, we'd call Dr. Christian
15 Tregillis to the stand.
16          THE COURT:  All right.  Please come forward, sir.
17          NOTE:  The witness is sworn.
18          THE COURT:  All right.  Good morning, sir.
19          Please, Mr. Buchanan, proceed.
20          CHRISTIAN D. TREGILLIS, called by counsel for the
21 defendants, first being duly sworn, testifies and states:
22    DIRECT EXAMINATION
23 BY MR. BUCHANAN:
24 Q.  Sir, could you state your full name for the record, and
25 spell your last name, please.

**2767**

1  A.   Sure. Christian Dale Tregillis. My last name is spelled
2  T-r-e-g-i-l-l-i-s.
3  Q.   And what is your occupation, sir?
4  A.   Thank you. I am what is referred to as a forensic
5  financial analyst. Which means that I perform accounting,
6  financial, and economic investigations. The word "forensic"
7  means in the context of a pending or potential legal dispute.
8       So a lot of my work is in the context of legal
9  disputes, but not all of it.
10 Q.   Okay. What is your educational background?
11 A.   I graduated with an undergrad degree in economics from
12 Occidental College in 1989. I worked for a couple years from
13 1989 to 1991. And then I went to graduate school and got a
14 Master's in business administration from the University of
15 Chicago in finance and accounting.
16      I also have continuing education obligations for
17 professional licenses that I have, but those are the only ones
18 in school since college.
19 Q.   Could you summarize your professional career for the jury
20 and the Court, please.
21 A.   Sure. So after graduating in 1993, like I said, from
22 graduate school, I began working in the same field in which I
23 work today, which is, like I said, performing those accounting,
24 financial, and economic investigations.
25      I started off at what used to be called the Big Six

**2768**

1  accounting firms. I worked at one called Coopers & Lybrand,
2  and then another one called Ernst & Young, and then another
3  one, Deloitte & Touche. Which is -- well, now it's gone from
4  down to six, down to four.
5       But -- so like I said, I was a partner at Deloitte &
6  Touche, and then in 2004 I left there. There were some new
7  legislation in Congress that changed the scope of what the big
8  accounting firms could do. And so, I left, and a lot of people
9  in my industry left and moved on to other places. And I have
10 continued to work, like I said, in the same capacity.
11      I've been at my current firm, which is called Hemming
12 Morse, since 2016. But like I said, doing the same work all
13 the way through since graduate school.
14 Q.   Is there any particular area that you focused on in terms
15 of evaluating assets or doing forensic accounting?
16 A.   Yes. Over the course of my career, I've focused pretty
17 significantly on intellectual property, but also generally in
18 the area of quantification of economic harm.
19      And so, in the course of my work, sometimes I work on
20 the plaintiff's side, sometimes on the defendant's side. It's
21 about evenly mixed, a little bit more on the plaintiff's than
22 defendant's.
23      So in the case of intellectual property cases,
24 sometime they're, like I said, in the context of disputes,
25 sometimes not. But if I'm working for a plaintiff that has

**2769**

1  intellectual property rights, like I said, a little bit more of
2  those than the defendant's side.
3       But then I'm quantifying economic harm a lot of
4  times. Sometimes I work in a neutral role, so between two
5  sides that have a dispute. Like I recently worked on a matter
6  in which there was a dispute about copyright values. And so, I
7  helped the two sides work out a settlement in that case.
8       But like I said, a fair amount of intellectual
9  property work.
10 Q.   Okay. About how many matters have you calculated the
11 amount of economic harm in a manner that you are retained?
12 A.   Hundreds. I've testified about 120-something times. The
13 vast majority of those pertain to economic harm. Those include
14 depositions, not all of them get to trials or arbitrations. I
15 think about 50 have gotten to trials. But like I said, the
16 vast majority is the quantification of economic harm.
17 Q.   Okay. And have you been retained by Winston & Strawn
18 before, my law firm?
19 A.   Yes. I have been retained by Winston & Strawn folks. I
20 have also worked against Winston & Strawn folks. So been both
21 for and against.
22 Q.   Do you hold any certifications with regard to your
23 profession?
24 A.   Yes. I am a CPA and -- a certified public accountant.
25 And I'm also what is called certified in financial forensics.

**2770**

1  We have a professional organization nationally called the
2  American Institute of CPAs, and I do work for the American
3  Institute of Certified Public Accountants. And we created a
4  certification in financial forensics, which is a specialty for
5  people that do forensic accounting investigations like I do.
6  So we launched that about ten years ago, and I have one of
7  those.
8       I'm also accredited in business valuation, which is a
9  certification for CPAs who value businesses or intellectual
10 property rights like copyrights, and trademarks, patents, and
11 trade secrets.
12 Q.   Do you work --
13 A.   And there's one other one called certified licensing
14 professional, which is for people that work in licensing of
15 intellectual property.
16 Q.   Okay. Do you work for any other entities besides your
17 firm, Hemming Morse?
18 A.   Yes. I think I mentioned a moment ago, I do work for the
19 American Institute of Certified Public Accountants, and also
20 the California Society of CPAs. That work relates to helping
21 people in my profession who do these kinds of investigations
22 understand how to do them.
23      So that means writing practice aids, or creating
24 standards, or helping educate people in how we do this kind of
25 work.

**2771**

1  So, for example, last -- well, earlier this year, it
2  was the culmination of a couple years to get it together, but I
3  was the co-author of a practice aid that was used as a
4  reference guide for what we call lost profits calculations. So
5  teaching people in my profession how you quantify the amount of
6  profits that an injured party has suffered in the context of a
7  legal dispute.
8       Because that's a lot of what we do. I don't get
9  involved in the decision of whether somebody is liable or not
10 liable. I get involved in the quantification part of it,
11 quantifying the harm.
12      And so, there are a lot of people in my profession,
13 and we try to help -- for the IACPA, we help them understand
14 the best ways of doing that. And so, I've helped in writing
15 and speaking throughout my career on those kinds of issues.
16 Q.  So you've used the term "intellectual property." Would
17 that include copyrights?
18 A.  Yes, that's one of the four forms of intellectual
19 property: Patents, trademarks, trade secrets, and copyrights.
20 Q.  And you've worked on matters assessing the value of
21 copyrights and trademarks and patents?
22 A.  Yes, all of the above. Like I said, it's sometimes
23 valuing outside the context of a dispute. For example, there
24 might be a license, somebody wants to negotiate the right
25 license rate, the royalty rate. Or purchasing, we can see

**2772**

1  purchase transactions. There can be reasons for financial
2  reporting. Sometimes companies want to tell you about the
3  value of the assets that they have in their financial
4  statements.
5       So there are a variety of contexts, including in
6  legal disputes.
7  Q.  Mr. Tregillis, could you look at your binder at DX 259.
8       Is that your curriculum vitae or resumé.
9  A.  Yes.
10 Q.  Okay.
11 A.  This is from my April 10 report. And this is my
12 curriculum vitae, right. It's a summary of my professional
13 experience.
14      MR. BUCHANAN: Okay. I'd move that into evidence,
15 Your Honor.
16      THE COURT: Any objection?
17      MR. ZEBRAK: No objection, Your Honor.
18      THE COURT: Received.
19 BY MR. BUCHANAN: (Continuing)
20 Q.  Mr. Tregillis, you're being paid as an expert in this
21 case?
22 A.  I'm not, not directly. My firm, Hemming Morse, is paid
23 for my work in this matter, that's right.
24 Q.  Yeah. And what is your hourly rate?
25 A.  $490 an hour is what the firm is paid.

**2773**

1  Q.  Okay.
2  A.  I don't get all of that, but they do.
3  Q.  And how many hours have you put into your work on this
4  case?
5  A.  Probably close to 200.
6  Q.  Okay. And that would involve writing expert reports?
7  A.  Yes. Performing analysis. There was a lot of analysis
8  that was required here. There are 10,000 copyrights in suit,
9  those all needed to be investigated. So it takes a lot of
10 analysis.
11      And then, like I said, writing reports. And there
12 has been some back and forth.
13      I also looked at the analyses of Dr. Lehr and Dr.
14 McCabe. And we looked at some of the same kinds of issues.
15 Dr. McCabe and I performed pretty similar analyses. So over
16 time we were able to figure out where there were differences,
17 or at least I was, and find some common ground.
18      But like I said, those reports reflect my analyses of
19 my opinions, including considering the opinions of Dr. Lehr and
20 Dr. McCabe.
21 Q.  And then you were deposed by the plaintiffs in this case
22 as well?
23 A.  Yes, that's right, I think in June or July.
24 Q.  Okay. And then you prepared for your testimony here
25 today?

**2774**

1  A.  Correct.
2  Q.  Okay. And the amount that you're being paid is not
3  affecting your views in this case or the outcome, how you look
4  at things?
5  A.  No. Like I said, I testify on both sides of cases. I am
6  not somebody who could survive in my profession if I was to
7  take a position that would be advantageous to one or the other
8  side. It needs to be supported.
9       As a CPA, my professional standards require that my
10 opinions be supported by sufficient relevant data and evidence.
11 And that my work, if -- like I said, if I was to be constantly
12 on one side, expressing opinions that would help one or the
13 other side, that information would be brought back up to me on
14 future work.
15      MR. BUCHANAN: Okay. We'd proffer Mr. Tregillis as
16 an expert on the calculations of economic harm, Your Honor.
17      THE COURT: All right. Any objection?
18 Quantification of economic harm, is that --
19      MR. BUCHANAN: Yeah, on the calculations of economic
20 harm. Sorry.
21      THE COURT: Okay.
22      MR. ZEBRAK: May we approach, Your Honor?
23      THE COURT: Yes, sir.
24      NOTE: A sidebar discussion is had between the Court
25 and counsel out of the hearing of the jury as follows:

### 2775

1  AT SIDEBAR
2           THE COURT:  Yes, sir.
3           MR. ZEBRAK:  So we have no objection to him being
4  admitted as an expert on financial calculations, all that kind
5  of stuff.
6           But the way that that has been phrased is really to
7  tell the jury that his quantification of economic harm, that
8  he's the expert quantifying the harm.  And I just think it's
9  framed in too argumentative of a manner.
10          THE COURT:  Okay.  Your exception is noted.  I'm
11 going to allow him to be qualified with that understanding.
12 That's what he has repeated several times on the stand already.
13          MR. ZEBRAK:  Thank you, Your Honor.
14          NOTE:  The sidebar discussion is concluded; whereupon
15 the case continues before the jury as follows:
16 BEFORE THE JURY
17          THE COURT:  All right.  He'll be admitted as an
18 expert in the calculation and quantification of economic harm.
19          Go ahead, Mr. Buchanan.
20          MR. BUCHANAN:  Thank you, Your Honor.
21 BY MR. BUCHANAN: (Continuing)
22 Q.   What was your assignment in this matter, Mr. Tregillis?
23 A.   It was to analyze the amount of economic harm to the
24 plaintiffs in the context of this legal dispute.
25          And, additionally, to consider the opinions of Dr.

### 2776

1  Lehr and Dr. McCabe; and to the extent that I had thoughts on
2  their opinions, to express those.
3  Q.   So you reached some opinions in this case with regard to
4  those issues?
5  A.   Yes.  If I could just comment, Mr. Gould, I think one of
6  the jurors and I are looking, and you're obfuscating the
7  connection of my line of sight with the jurors.
8           THE COURT:  Well, just testify.
9           THE WITNESS:  Okay.
10          THE COURT:  We can't move your witness box and
11 counsel are allowed to sit in the front row there, so --
12          THE WITNESS:  Okay.  Very good.
13          I am sorry, could you ask the question again?
14 BY MR. BUCHANAN: (Continuing)
15 Q.   Could you -- I asked you, you said you had formed certain
16 opinions.  Did you develop some demonstratives or slides to
17 reflect those opinions?
18 A.   Yes, I did.
19 Q.   Okay.  Can we pull up the first slide, please.
20          And is this a summary of your opinions in this matter
21 that you formed based on the information you reviewed?
22 A.   Yes, it is.
23 Q.   Okay.  Could you go through them one by one.  The first
24 one says:  Dr. Lehr has offered unsupported opinions not tied
25 to the accused wrongful acts of Cox.

### 2777

1           Why don't you just go through and summarize them.
2  A.   Okay.  So I think you read it accurately, and that is what
3  I intend to -- intended to depict here.  I put these slides
4  together in an attempt to explain my opinions.
5           And so, this one relates to the idea that Dr. Lehr
6  has offered opinions that in some instances, like I said, I
7  find to be not supported, not supported by facts, and in some
8  situations are not tied to the accused wrongful acts of Cox.
9           I think I'll explain that in more detail when we get
10 into it.  But he talks about things that are more general harms
11 about piracy generally, but not related to what I understand to
12 be at issue in this lawsuit.  That's what that first one
13 relates to.
14 Q.   Okay.  And the second one?
15 A.   The second is using the infringement notices sent by the
16 RIAA, and assuming that each notice represents a displaced
17 legitimate digital download of each track with a copyright in
18 suit, I've calculated what I've referred to as displaced
19 downloads of $692,000.
20          So for all of the notices, each one, if that was to
21 have a $1 price tag associated with it, that adds up to
22 $692,000, if you pick up each of the tracks that has a
23 copyright in suit in those notices.
24 Q.   And your third opinion?
25 A.   The third is that many users and tracks had few notices.

### 2778

1  Dr. McCabe testified about the fact that there was one, at
2  least, notice that implicated each of the copyrights in suit.
3  And I thought I would go deeper and say, is it more than one or
4  how many?  I thought I would investigate that further.
5  Q.   Now, you testified a moment ago that you have additional
6  slides or information with regard to each of these opinions.
7  So could we start with the first of your opinions.
8           Did you prepare some slides to summarize or help with
9  your testimony in that regard?
10 A.   Yes.  So the first area is, like I said, is my opinion
11 relating to the opinions of Dr. Lehr.
12          And so, what I have done here is put up a slide that
13 was one of his slides in which he talks about, as it says in
14 the title:  Piracy harms copyright holders.
15          So like I was saying a minute ago, this is an opinion
16 about piracy, generally.  This is not an opinion about the
17 accused wrongful acts of Cox.
18          Cox is accused of engaging in its business in a way
19 that is alleged to be wrongful.  Again, I'm not taking on
20 whether it's wrongful or not.  That's not my opinion.  My
21 opinion though is that any time you're talking about
22 quantifying economic harm, it should be the harm relating to
23 the accused wrongful behavior, not piracy generally.
24          So Dr. Lehr, when he talks about the effects of
25 piracy generally, well, piracy has been something that has been

**2779**

1  in existence for roughly 20 years. It relates to people
2  engaging in piracy and wrongfully downloading content of all
3  types all across the world on many ISPs relating to works that
4  are not part of this lawsuit.
5      This lawsuit, as I understand it, pertains to, again,
6  the work -- the actions of Cox, whether Cox should have
7  implemented a different policy and procedures and acted
8  differently. So that's what I think is relevant.
9      What I see here is Dr. Lehr opining about piracy that
10 is not part of this case. So just as a general matter, that's
11 my -- one of the big concerns there.
12 Q.  Do you have a slide that, you know, summarizes your
13 distinction that you just made between his views and your
14 views?
15 A.  Yes. And somebody just forwarded it -- or moved forward
16 to that slide. So, thank you.
17     So what I have done here is put up a comparison of
18 what I view to be Dr. Lehr's analysis, as I understand it, and
19 his testimony, which I read, in this case.
20     So Dr. Lehr is talking about the beginning of piracy
21 from the 1990s through today. I understand this case is about
22 behavior between February 1, 2013, and November 26, 2014.
23     Dr. Lehr is talking about all internet users around
24 the world. I understand this case is about Cox's subscribers,
25 all of which are in the United States.

**2780**

1      I understand Dr. Lehr is talking about all content,
2  movies, pornography, games, and music. I understand this case
3  is only about music.
4      Dr. Lehr is talking about all music. I understand
5  this case is about only the music owned by the plaintiffs and
6  which is covered by the copyrighted works in suit.
7      So it is just a fundamentally different analysis.
8  And so, when he talks about piracy has these effects, I think
9  that, as I see it, I think it's valuable to put information in
10 front of the jury to provide them with information about what's
11 at issue in this lawsuit, quantifying that.
12 Q.  Okay. So do you have any observations about the sort of
13 global nature of piracy that Dr. Lehr testified about?
14 A.  Yes.
15 Q.  Do you have a slide?
16 A.  Well, if you could move forward to the next slide. Now
17 you are sort of above my pay grade on slide creation, so I had
18 some other people create a slightly more complex graph.
19     But, yes, I -- there was a graph that was put
20 together for me that depicts a peer-to-peer network, in this
21 case looking at an example of a transfer of a single file.
22     So imagine there is somebody in Canada who says that
23 they want to get a copy of a track by Van Halen. And they say,
24 okay, I would like to get a copy of that. And they choose to
25 go to a peer-to-peer network.

**2781**

1      So we see in the center of this a computer that says,
2  okay, let's go find where out there in the world is there a
3  copy of this Van Halen song that I would like to go get.
4      Then the BitTorrent, or other peer-to-peer network,
5  would go search and see who is out there and who has that. And
6  you can see that in this instance there are seven different
7  subscribers from around the world that all have a copy of this
8  file, one of which is the Cox subscriber, it's the fifth one.
9      And so, the user is then able to go get the pieces of
10 that file. And the way I understand that the peer-to-peer
11 network works is the file can be an individual file in its
12 totality or in pieces.
13     So that's a key part of this, is the going and
14 obtaining those packets of information that are then assembled
15 at the computer of that example of that person I used in Canada
16 that would want to go get a copy of that file.
17 Q.  So how many subscribers are we talking about in this case
18 with regard to Cox that are implicated with the works in suit?
19 A.  How many subscribers are implicated with the works in
20 suit? There are, as I understand it, 57,600 users that have
21 been identified as having a work in suit on their device as
22 part of MarkMonitor's process of investigating. And that's
23 people that have one or two or three or more.
24     So you start out with 57,600. I think 31,700 or so
25 had three notices. But there were, I think, a total of 57,000

**2782**

1  or so if you consider all of the users that had been detected
2  as having a work in suit.
3  Q.  How many subscribers, broadband subscribers, did Cox have
4  at this time frame, 2013 to 2014?
5  A.  About 4.5 million, I understand.
6  Q.  All right. So you have gone through this slide. Do you
7  have another slide on this same issue?
8  A.  Yes. So for purposes of my analysis, what I understand is
9  that if you talk about what's at dispute in this case, it is
10 that the Cox subscriber would potentially not be on the network
11 if Cox had acted differently.
12     Now, I understand one interpretation is all of those
13 57,600 people would have never had any of those notices. If
14 that be the case, then that fifth source of this file to get
15 those packets of information that are assembled on the computer
16 by that user in Canada, that source would not have been
17 available. And then the Canada user would have to go get that
18 packet of information, or packets that came from the Cox user,
19 would have to be obtained from the other sources that have the
20 same file out on the peer-to-peer network.
21     So in this example, that packet is obtained from a
22 Verizon subscriber. That's the effect, like I said, if you
23 wipe out all of those 57,000 users and all of their having ever
24 made those files available on the peer-to-peer network.
25 Q.  So going back to Dr. Lehr's slide on piracy generally, do

2783

1 you have specific areas of disagreement?
2 A.  Yes.  Well, again, what happens here is if you go to the
3 next slide, you'll see one scenario here is that if you have
4 that Cox subscriber that got terminated, then they would
5 presumably go get internet access somewhere else.
6         MR. ZEBRAK:  Objection, Your Honor, foundation.
7         THE COURT:  Overruled.
8 A.  So to the extent that a subscriber goes and gets that
9 service from somewhere else, here you have Time Warner Cable as
10 the subscriber, then that subscriber would be back on the
11 internet, back on the peer-to-peer network and, again, having
12 their file available to have pieces of it that could be
13 downloaded and assembled at that user's computer in Canada.
14         So, ultimately, whether the person would be wiped out
15 completely like in the last slide and you have to go get the
16 packet from a Verizon subscriber, or whether the person just
17 moves to another ISP and then you get it from now what would be
18 a Time Warner subscriber, that's really what we're talking
19 about.
20         And that's just fundamentally not what Dr. Lehr was
21 talking about.
22 BY MR. BUCHANAN:  (Continuing)
23 Q.  So why don't we go back to Dr. Lehr's slide on piracy
24 generally.  And do you have specific areas of disagreement with
25 regard to his other points?

2784

1 A.  Yes.  Well, we really at the title, just about the
2 difference between piracy generally and what's at issue in this
3 case, and that's a theme throughout these points, but if you go
4 here through the four points that are on this slide, one of his
5 points, the first is:  Infringing downloads and uploads
6 displace legitimate sales.
7         And I have done an analysis to reflect that.  I think
8 that's my second opinion.  So we will probably get to that in a
9 minute.
10 Q.  What about your opinions with regard to some of those
11 other points?
12 A.  Okay.  On the second one, the point is:  Piracy
13 negatively impacts pricing.
14         So again, does piracy generally -- over the last
15 20 years, has that had a negative effect on the price of
16 downloads?  Does that mean when you go to iTunes and you buy a
17 song for $1.29, if the world had been different for the last
18 20 years, would the price be higher than $1.29 per track?  Is
19 the price of CDs potentially going to be more than the price
20 that it has been?  Maybe.
21         That's not an investigation that Dr. Lehr performed.
22 Dr. Lehr testified and said that -- he said that there is a
23 double effect, that there is both a price and a quantity
24 effect.
25         Well, the way that it works in the field of economics

2785

1 is when we make an investigation, it's possible that if there
2 is a decrease in demand for something, that could be seen in
3 lower prices, it could be seen in fewer sales, but that's
4 something you have to investigate.
5         We go find facts.  We look at the pricing history.
6 We say, okay, is there evidence that the price would have been
7 lower or higher?  And so, is the $1.29 a deflated price?
8         That's not an investigation that Dr. Lehr performed.
9 He hasn't quantified it.  He has talked about the concept.
10         So there's no evidence of there being a double effect
11 or that there's any piracy, just from music -- or there has
12 been no price erosion as a result of the piracy generally.
13         And then there's certainly no analysis by Dr. Lehr of
14 a price erosion effect related to the wrongful acts accused
15 here.  So if you say Cox would've implemented prices
16 differently with its subscribers, and the prices would have
17 been -- or, sorry, the policies would have been different in
18 2013 and 2014, does that mean that the plaintiffs would have
19 charged more for their music if Cox had behaved differently for
20 its 5 percent of the United States internet that is a part --
21 that's less than 1 percent of the world internet?
22         That's not an analysis that Dr. Lehr performed, and
23 there's no evidence of that.
24 Q.  Now, what about his third point:  Copyright holders incur
25 substantial enforcement costs?  Do you have an opinion with

2786

1 regard to his testimony on that issue?
2 A.  Yes.  And it's just very similar to what I was talking
3 about before.  If Cox had behaved differently and implemented
4 different policies -- let's say they would have terminated
5 subscribers earlier, or sent more e-mails, or more aggressive
6 e-mails, or changed its policy, which, again, that's what I
7 understand this lawsuit to be about, would that have caused the
8 copyright holders to have incurred --
9         MR. ZEBRAK:  Objection, Your Honor.  Can we have a
10 sidebar, please?
11         THE COURT:  Yes, sir.
12         NOTE:  A sidebar discussion is had between the Court
13 and counsel out of the hearing of the jury as follows:
14 AT SIDEBAR
15         MR. ZEBRAK:  I believe he's testifying outside his
16 reports now and really presenting closing argument that
17 Mr. Elkin is intending to give.
18         Mr. Tregillis did two analyses, and Your Honor has
19 seen his reports.  He did a works in suit analysis, and he did
20 an analysis where he quantified actual damages looking at the
21 iTunes downloads.  He didn't measure overall incentives.
22         And this is a preview of closing argument.  And I
23 just -- and it's being directly elicited, Your Honor.  I
24 just --
25         THE COURT:  He's responding to statements that Lehr

**2787**

1  made, and he's saying there has been no analysis done by Lehr,
2  no --
3         MR. ZEBRAK:  I understand that.
4         THE COURT:  -- in this area.
5         MR. ZEBRAK:  I apologize, Your Honor.
6         THE COURT:  No, it's fine.
7         MR. BUCHANAN:  And it --
8         MR. ZEBRAK:  Well, let me finish.
9         MR. BUCHANAN:  Sorry.
10        MR. ZEBRAK:  So, yes, Your Honor, but he was
11 responding to Lehr in his original reports.  He didn't analyze
12 Cox's incentives.  He didn't say, if Cox had terminated this
13 earlier, that would have happened.
14        This is Mr. Elkin's closing argument via Mr. --
15        THE COURT:  Okay.  I don't need the preview of the
16 closing argument.  I want to know what your objection is to him
17 testifying about these matters.  It's outside of his reports?
18 He's never -- he wasn't asked this in his deposition?
19        MR. ZEBRAK:  Yes, Your Honor.
20        THE COURT:  He doesn't under -- he doesn't know what
21 Cox's incentives, economic incentives are?
22        MR. ZEBRAK:  All of the above.
23        THE COURT:  How is this admissible?
24        MR. BUCHANAN:  His reply report replies to Dr. Lehr
25 and Dr. McCabe, and he talks all about this, about piracy and

**2788**

1  how generic he is, and he doesn't confine it to the facts of
2  this case.  It's all in the reply report.
3         And he's responding to the slides that Dr. Lehr put
4  up, it's directly -- and he is a rebuttal witness.  It's
5  covered in his reply report.  And it's directly rebutting Dr.
6  Lehr's testimony, both in his reports and --
7         THE COURT:  I didn't read anything about Cox's
8  economic incentives regarding infringement, or lack of economic
9  incentive, or whether it's relevant or not.  That's where I
10 don't know --
11        MR. BUCHANAN:  I didn't -- I'm not sure that he's
12 going in that direction and if he made any reference to that.
13 Obviously, Dr. Lehr spoke at length about that, and Mr.
14 Bakewell responded to that.
15        But we'll keep him, you know, within his reply report
16 and responding to Dr. Lehr's testimony.
17        THE COURT:  Okay.
18        MR. ZEBRAK:  Your Honor, the notion that he can get
19 on the stand and say anything he wants about piracy and do an
20 analysis from the stand that he never did in his reports, we
21 object to that.
22        And counsel is saying that we'll keep him in his
23 reply report.  What he's just gone through, he never said if
24 Cox had done this after these number of steps, that would
25 happened.  He made the very thin observation that --

**2789**

1         THE COURT:  He hasn't said that now.
2         MR. ZEBRAK:  Well, he has been -- Your Honor,
3  respectfully, I think he has been on the stand saying, had Cox
4  terminated earlier, done this and that.
5         In his report, he object -- he made the very thin
6  observation that Dr. Lehr's analysis isn't an actual damages
7  analysis, he's talking about piracy generally.  And this is
8  just well outside his report.
9         And on top of that, they're eliciting testimony about
10 Cox's policy, not about the harm we've suffered.  It's, again,
11 not in his report.
12        MR. BUCHANAN:  Well, he was making just some
13 assumptions about dealing with Dr. Lehr.  Dr. Lehr says, piracy
14 is terrible, it lasted all these years, it had all these
15 impacts.  And he never tried to quantify them.
16        He's just pointing that out, let's look at this case,
17 here are the claims, here's the claim period, here are the
18 works in suit.  He has looked at those.  He has given a price.
19 And he's analyzed about what happens here with the Cox
20 subscriber if he left.  I mean, it -- you know, and what -- and
21 that's tied to the dollar --
22        THE COURT:  Okay.  Let's move into his analysis that
23 was done in his reply brief where he's talking about specific
24 -- the specific numbers and how he calculates what he believes
25 his royalty rate to be, yeah.

**2790**

1         MR. OPPENHEIM:  Sorry.  Just one other issue, Your
2  Honor.
3         Twice now, Mr. Tregillis has said, this case is about
4  whether or not Cox's policy was appropriate.  That's not what
5  this case is about.
6         THE COURT:  Yeah.
7         MR. OPPENHEIM:  This case is about copyright
8  infringement.  Whether or not Cox's policy was appropriate is
9  not the claim.  He shouldn't be testifying as to what this case
10 is about, and that needs to be cleaned up.
11        THE COURT:  Yeah.  Okay.
12        MR. OPPENHEIM:  And if I may, one second issue,
13 because I don't want to have to deal with another jury
14 instruction conference on this issue.
15        He's being asked questions about copying into Canada,
16 and the implication being, well, it's not in the U.S., so
17 there's no infringement.
18        Under the line of cases of <u>Subafilms</u>, any portion of
19 an activity that is infringing in the United States is
20 infringement here and can be rectified here.
21        We -- this shouldn't be inserted into the case so
22 that we have to put an instruction in to the jury about that.
23        THE COURT:  I don't know where the Canada stuff was
24 going from either.  What's that?
25        MR. BUCHANAN:  That had nothing to do with -- that

**2791**

1  was just --
2  THE COURT:  Why is he testifying about it?
3  MR. BUCHANAN:  He's testifying -- he was testifying
4  about the -- in his reply report, he responds to a lot of these
5  points that Dr. Tregillis talks about, enforcement costs, and
6  the piracy generating the harm.  And he's saying -- he's just
7  giving an example that if you had a subscriber and he left the
8  Cox network, you know, then someone could replace him.
9  The Canada thing, it's just someone coming in and
10 downloading a song.  He's not saying it's legal there.  It was
11 just part of an example.
12 We're going to get to the whole issue of the piracy.
13 But he has a right, because he did his reply, to respond to Dr.
14 Lehr's points on that chart.
15 THE COURT:  To the extent he replied in his rebuttal
16 report, he can testify to that information.  Canada wasn't in
17 that report.  Using other ISPs wasn't in that report.  These
18 are all -- he's just thinking outside the box.  And that's not
19 permitted.
20 So let's focus him on what's in the reports.
21 MR. BUCHANAN:  Okay.  Well, I -- so what you -- when
22 you say, he's thinking outside the box, he was responding to
23 what Dr. Lehr, and he has --
24 THE COURT:  He had Lehr's reports.
25 MR. BUCHANAN:  And he commented, he said they were

**2792**

1  way too generic.
2  THE COURT:  Well, you can't just they're way too
3  generic.  You've got to have -- it has got to be in your
4  reports.
5  MR. BUCHANAN:  Well, he did.  He talked about how he
6  doesn't tie piracy to harm and into this case, and he talks
7  about that in his reports.
8  So I can narrow it.
9  THE COURT:  Let's move him into his --
10 MR. OPPENHEIM:  Can we get --
11 THE COURT:  Okay.  Hold on.
12 MR. OPPENHEIM:  -- a clarification for the jury that
13 what this case is about is what you'll instruct them it's
14 about?
15 I'm not asking you to correct him, but at least tell
16 the jury -- because he's now said it twice.  He's obviously --
17 it has been in his talking points or whatever has been created.
18 Let's clarify that it's what you say it is.  It's not about the
19 policy.
20 MR. BUCHANAN:  Well, Judge, I would object to that.
21 I mean, you can do that with the instructions to the jury.  You
22 say, you know, I meant -- to call him out and say he's outside
23 of it -- Dr. Lehr, I don't think he answered a single question
24 that I asked him.  He was all over the lot.
25 And so, I just don't think it's fair because this

**2793**

1  witness may be -- in the Court's view, said something that
2  wasn't tied directly to his reports.  There shouldn't be an
3  instruction to the jury about that.
4  MR. ZEBRAK:  Your Honor --
5  THE COURT:  Yeah.
6  MR. ZEBRAK:  I was just going to add that we've now
7  seen this with witness after witness, from Dr. Feamster and
8  others, where they're speaking about areas that the Court told
9  them not to speak to.
10 THE COURT:  Well, I didn't tell him it's --
11 MR. ZEBRAK:  Well, but Mr. Buchanan has --
12 understands that he needs to speak to --
13 THE COURT:  What do you want me to say?  Do you want
14 me to say that his testimony about what Cox's policy is is
15 not --
16 MR. OPPENHEIM:  To the extent that Mr. Tregillis has
17 indicated what this case is about, and that it's about Cox's
18 policy, the jury should disregard that.  You will instruct the
19 jury what the case is about --
20 THE COURT:  Well, it's his understanding of what the
21 case is about and why he prepared this testimony the way he
22 did, right?
23 MR. OPPENHEIM:  That's not what he said.  He
24 didn't -- there was no qualification to what he said.  Twice,
25 unequivocally, he said this is a case about whether or not

**2794**

1  Cox's policies were reasonable.  It's not a negligence case,
2  and it's not about the policies.
3  THE COURT:  Okay.
4  MR. ELKIN:  Thank you, Your Honor.  I think he's --
5  Mr. Oppenheim is extending what he said.  What he said, I heard
6  it a couple times now, because he did say it, that his
7  understanding of the case is not about X, it's not about Y.
8  I think how this case gets characterized -- I think
9  Mr. Buchanan can certainly rein him in to not elicit any of
10 that sort of going forward.  But the notion that somehow there
11 should be some instruction to the jury about what the case is
12 about and what the case is not about, I think it is not
13 necessary at this point.
14 THE COURT:  I'm not going to give them an instruction
15 at this stage.  Your exception is noted.
16 MR. ZEBRAK:  Your Honor, one final --
17 THE COURT:  But let's rein in him.
18 MR. ZEBRAK:  One final thing.
19 THE COURT:  No, come on.  We've had six roundabouts.
20 MR. ZEBRAK:  Yes, Your Honor.
21 NOTE:  The sidebar discussion is concluded; whereupon
22 the case continues before the jury as follows:
23 BEFORE THE JURY
24 THE COURT:  All right.  Mr. Buchanan, please
25 continue.

## 2795

1  BY MR. BUCHANAN: (Continuing)
2  Q.  Okay. So back to with regard to the third bullet:
3  Copyright holders incur substantial enforcement costs.
4       So are you aware of some of the costs that were
5  discussed by Dr. Lehr that are involved in this case in terms
6  of enforcement?
7  A.  Yes.
8  Q.  Okay. And for example?
9  A.  These would include costs like hiring MarkMonitor to
10 investigate and sweep the internet. And hiring Audible Magic.
11 It would include litigation costs. Those kinds of expenses
12 that the copyright holders have incurred relating to enforcing
13 their cases.
14 Q.  Payments to the RIAA, would they be included?
15      MR. ZEBRAK: Leading, Your Honor.
16      THE COURT: Overruled.
17 A.  Yes.
18 BY MR. BUCHANAN: (Continuing)
19 Q.  Okay. And in -- what about internal costs, for example,
20 if the music companies had an individual --
21      THE COURT: You can ask him whether he understands
22 internal costs, but don't lead him beyond that, please.
23      MR. BUCHANAN: Okay.
24 BY MR. BUCHANAN: (Continuing)
25 Q.  What about internal costs, say of the music companies,

## 2796

1  with regard to enforcing piracy?
2  A.  Yes, I understand there are internal people who work on
3  this at the music companies as well.
4  Q.  Okay. Are those costs that you believe could have been
5  calculated?
6  A.  Yes. That's a concern that I have with Dr. Lehr's
7  opinion, is that this is a blanket six words on a slide rather
8  than reflective of an investigation that he performed. He
9  didn't interview, didn't look at those records, didn't make any
10 analysis of the quantum here that I believe would be something
11 he could have investigated.
12 Q.  And do you believe whether he even attempted to do that?
13 A.  I'm aware -- I'm not aware of him having attempted to do
14 that. There was no testimony about attempting to do that.
15 Q.  Okay. So the fourth bullet here: Piracy deters future
16 investments and reduces incentives to create. This is from
17 Dr. Lehr's slides.
18      Do you recall any testimony from him in his efforts
19 to try to quantify this or measure it in any way?
20 A.  No. Again, this is just a generalized description of
21 piracy generally and talking about deterring future investments
22 and incentives to create.
23      I would think -- I haven't seen any evidence that
24 there are fewer songwriters writing songs or writing fewer
25 songs because of Cox's actions.

## 2797

1       And the investments, I'm not aware of any evidence of
2  any investments that the music companies would have made that
3  they didn't make because of Cox's investments -- or Cox's
4  behavior in --
5       THE COURT: So you don't know one way or the other,
6  right? You didn't do any discovery on that yourself; is that
7  right?
8       THE WITNESS: That's right. I'm not aware of any.
9       THE COURT: All right. I will strike your last
10 answer.
11      Let's proceed, please.
12 BY MR. BUCHANAN: (Continuing)
13 Q.  Okay. Now, Dr. Lehr, you recall, he also testified about
14 alleged benefits to Cox. Do you recall that?
15 A.  Yes.
16 Q.  Okay. And do you have a slide on that?
17 A.  Yes.
18 Q.  Okay. So why don't you, you know, tell the jury and the
19 Court what your opinions are with regard to Dr. Lehr's attempt
20 to show the benefits to Cox.
21 A.  Again, what I see here is a description of Cox's benefit
22 from the infringement of its network. If you go to the second
23 line on there -- I think the first line has been testified to
24 by others. But the second line: The repeat infringers paid
25 Cox more for internet service on average and likely purchased

## 2798

1  more expensive internet plans.
2       Dr. Lehr did look at data on that one. And he
3  concluded, I think, there was about an 8 percent higher fee
4  paid by those subscribers that were the subject of 20 or more
5  notices, the residential subscribers with 20 or more notices,
6  compared to those with one or two notices.
7       My problem with that calculation is he has grabbed
8  two extremes. By looking at those that have 20 or more
9  notices, that is a very small number of subscribers in that
10 category. And to say, I'm going to compare those with the very
11 smallest group and say there is an 8 percent difference, that's
12 a very small amount of difference for grabbing the two
13 extremes.
14      He made no analysis of the everybody-in-between
15 group, the threes and fours and fives, and didn't say that
16 those were found to have had any significantly different amount
17 of data usage or fees compared to anybody else.
18      So it's sort of cherry-picking to grab only the very,
19 very highest and say that you're going to compare those to the
20 very lowest.
21 Q.  When you referred to notices, did you mean tickets?
22 A.  Yes.
23 Q.  Okay. So also, did you hear Dr. Lehr's testimony with
24 regard to whether he considered the pricing for packages for
25 internet services geographically and if he calculated that into

## Page 2799

1. his equation?
2. **A.** He didn't. I understand that Cox has -- charges different
3. rates to different people based on things like geography. For
4. example, I think there is a different rate in Connecticut
5. compared to other states. That's not something that Dr. Lehr
6. considered or accounted for when he did his analysis comparing
7. the two far ends to see if there was any difference in rates.
8. So there can be rate fluctuations for other reasons.
9. **Q.** And what about the issue of a notice or a ticket equalling
10. a download, did he analyze that at all?
11. **A.** When you say -- the idea of a notice or a ticket not
12. equalling a download, what do you mean by that?
13. **Q.** So do you recall whether he attempted to equate each
14. notice with additional data because it related to another
15. download?
16. **A.** Oh. No. The identification of a ticket is just that
17. there was somebody who had a file available at a given time,
18. and that that showed up in the CATS system --
19. MR. ZEBRAK: Objection, Your Honor. He's not a
20. technical expert.
21. THE COURT: Sustained.
22. MR. ZEBRAK: I move to strike.
23. THE COURT: Strike the last answer.
24. Ask your next question.
25. BY MR. BUCHANAN: (Continuing)

## Page 2800

1. **Q.** So did --
2. THE COURT: Mr. Tregillis, you're here to testify as
3. a forensic economist and quantify it. This testimony about
4. matters that you weren't asked to testify about and which you
5. have demonstrated you don't have independent knowledge about,
6. you're just assuming, is not proper.
7. So let's testify about what you're here to testify
8. about, and not these other beliefs that you may have which are
9. outside of your reports and your deposition. Okay?
10. Do we understand each other?
11. THE WITNESS: Thank you very much, Your Honor. Yes.
12. THE COURT: All right, thank you.
13. Let's go.
14. BY MR. BUCHANAN: (Continuing)
15. **Q.** So in your reply report you discussed this testimony by
16. Dr. Lehr about the -- comparing the people with one to two
17. notices versus those with over 20 notices, correct?
18. **A.** Yes.
19. **Q.** Okay. Were you able -- and he calculated -- if you
20. recall, he calculated in his report how much data might be used
21. by the people that had 20 or more, there would be more data.
22. Do you recall that?
23. **A.** Yes.
24. **Q.** Did you happen to calculate what it would take for, say
25. the subscribers, the 57,000 subscribers of Cox, if they wanted

## Page 2801

1. to download all the data and -- or the music that he indicated
2. in his reply report or his report?
3. MR. ZEBRAK: Objection, Your Honor. It's outside the
4. scope.
5. THE COURT: Well, overruled. I'm going to let him
6. answer the question.
7. Do you understand the question? And is it part of
8. your analysis, sir?
9. THE WITNESS: It is. It's in my reply report, and
10. I'm aware of what he's asking about.
11. THE COURT: All right. Please go ahead, then.
12. **A.** I did perform that analysis. And what I calculated was
13. that there are in this dispute a number of notices that have
14. been identified. And if you look at all of files that are in
15. those notices for all of the time period from 2012 through the
16. end of the notice period, the end of the claim period in 2014,
17. if you take all of those files and you were to have the 57,600
18. subscribers, and all of them were to be at the bottom tier of
19. Cox's programs, it would take 1 percent of one month to
20. download all of the files that were -- and all of the notices,
21. all of the occurrences that are at issue in this case, even
22. those beyond this case, going back to 2012.
23. BY MR. BUCHANAN: (Continuing)
24. **Q.** Okay. Under any particular package?
25. **A.** Under the bottom package, I think it's called the Standard

## Page 2802

1. Package.
2. MR. ZEBRAK: Your Honor, may we have a brief sidebar?
3. THE COURT: Yes, sir.
4. NOTE: A sidebar discussion is had between the Court
5. and counsel out of the hearing of the jury as follows:
6. AT SIDEBAR
7. MR. ZEBRAK: Sorry, Your Honor, I was confused. I
8. thought it wasn't in his report. I lost it. I apologize. He
9. is -- close enough.
10. THE COURT: Okay. All right, thank you.
11. NOTE: The sidebar discussion is concluded; whereupon
12. the case continues before the jury as follows:
13. BEFORE THE JURY
14. BY MR. BUCHANAN: (Continuing)
15. **Q.** So let's go to bullet number 3: Cox saved costs by not
16. addressing copyright infringement.
17. So on bullet 3, that relates to Dr. Lehr's testimony
18. about the costs saved by Cox by not addressing copyright
19. infringement. Do you have an opinion about that?
20. **A.** Yes. It's similar to what I expressed earlier about
21. whether Cox saved moneys. It's not an instance in which Dr.
22. Lehr performed a calculation, didn't investigate that.
23. **Q.** Okay. All right. Let's go to your second opinion: Using
24. the infringement notices sent by the RIAA, assuming each notice
25. represents a displaced legitimate digital download of each

**2803**

1  track with a copyright in suit, I calculate displaced downloads
2  of $692,000.
3      Now, you briefly described that before. Can you now
4  go into more detail for the Court and the jury on that issue.
5  A.  Sure. I think if you move forward in the slides, you'll
6  start to see the slides that I created to try to explain this.
7  Q.  Okay. This says: Works in suit claimed by plaintiffs.
8  And you've got some calculations here.
9      What's purpose of this slide.
10 A.  Well, it explains how my whole analysis started. Like I
11 said, it's similar, it seems to me, to what Dr. McCabe did,
12 which is probably why we ended up with pretty similar outcomes.
13     And so, as Dr. McCabe testified, there are a
14 combination of sound recordings and musical compositions. And
15 if you add those up, that gets you to works in suit, which are
16 alleged by the plaintiffs to be 10,017.
17     So a sound recording, as I tried to put into the
18 picture here, I understand for purposes of my analysis relates
19 to a recording of a track.
20     And the musical composition, I think of it more like
21 sheet music. It's not specific to who would have performed
22 that -- performed that song.
23     So that's where it starts, is with what are -- these
24 lists of the sound recordings and the musical compositions.
25 Q.  Okay. Could you walk us through the process on this

**2804**

1  particular opinion.
2  A.  Yes. I think if you go to the next slide, what I did here
3  was I copied in the first ten lines of this sound recordings
4  list, which is PX 1 on the left, and the musical compositions
5  list on the right, PX 2.
6      And like I said, this is just the first ten lines.
7  There are 6,734 lines to the sound recordings. And 3,283 lines
8  to the musical compositions.
9      So, for example, you can see Alabama, Alan Jackson,
10 Alicia Keys, and then it lists the tracks. So for the sound
11 recordings, you have who performed it, and the track, and the
12 title of that song.
13     And then it has the registration number and the
14 plaintiff, as you can see on PX 1 on the left.
15     And then on the right, you don't have the performer
16 because it's just the music. It doesn't -- if you have
17 different artists that are performing the same track, it would
18 still implicate the same copyright. It doesn't matter who is
19 singing it.
20     So that's how we get to -- that's where my analysis
21 starts, is looking at PX 1 and PX 2.
22 Q.  Okay. So there has been some testimony about how this
23 information was gathered and notices were sent with regard to
24 like MarkMonitor and Audible Magic.
25     You did not investigate their work, did you?

**2805**

1  A.  No. For purposes of my analysis, I understand there is
2  some issues of dispute about whether the Audible Magic and
3  MarkMonitor --
4      MR. ZEBRAK: Objection, Your Honor. He doesn't need
5  to proffer --
6  Q.  Did you --
7      THE COURT: I'm sorry. I'm sorry, there's an
8  objection. Sustained.
9  BY MR. BUCHANAN: (Continuing)
10 Q.  Did you --
11     THE COURT: Ask your next question.
12 Q.  Did you consider Audible Magic or MarkMonitor, did you
13 look into anything they did?
14 A.  No, I didn't. I accept that at face value.
15 Q.  Okay. Thank you. So -- okay. You've identified this.
16 Can you give us -- I think you gave us the detail here. So
17 what did you do with this information?
18 A.  Well, if you go to the next slide, then, again, it's going
19 back to the start. And go forward one more.
20     What happens in my investigation is I'm trying to
21 understand how a download works, as I've tried to show that
22 graphically. And I understand that there is a MarkMonitor
23 investigation that found -- in this case user A has a -- I put
24 a little yellow symbol there to show that there is a track that
25 was identified as part of a file on a user's computer. And

**2806**

1  they got that from the users on the right.
2      So when I see that there is a MarkMonitor notice or
3  an RIAA-sent notice that MarkMonitor put together, then you
4  know that somebody had gotten that file. And for purposes of
5  my analysis, I'm assuming they got it from a peer-to-peer
6  network wrongfully.
7  Q.  Okay. So how did you use these infringement notices in
8  your analysis?
9  A.  The infringement notice, we have three examples here, and
10 then I'll show you the process that I undertook in making my
11 investigation.
12     So you start off, I have the three notices here.
13 This is for a track by Nicki Minaj called "Marilyn Monroe." As
14 it says in the title at the top, there is no sound recording,
15 but there is a musical composition, and it has two different
16 numbers for it. And you can see it was detected three times.
17 It was in 2013, in August and October and December.
18     And you can see the title and the artist and then
19 what is called the hash text. And a hash text is the number
20 that is unique to this electronic file. That's the Audible
21 Magic hash text. And then you can see the file name and where
22 it was found.
23     MR. ZEBRAK: Objection, Your Honor. He's -- again, I
24 think he's testifying as to the underlying technology.
25     THE COURT: No. I'll allow him to testify.

**2807**

1  THE WITNESS:  Okay.
2  THE COURT:  Just at this level.  You're not
3  testifying about the technology and how it all works.
4  THE WITNESS:  Exactly.  Understood.
5  THE COURT:  All right.  Go ahead.
6  BY MR. BUCHANAN:  (Continuing)
7  Q.  Okay, proceed.
8  A.  So for purposes of my analysis, I took the hash text from
9  the notices, and then I went to the Audible Magic dataset, and
10 that's what's shown in the second part there that starts with:
11 Torrent ID.
12     And from the Audible Magic dataset, I could see the
13 same what's called info hash or hash text.  And then the
14 Audible Magic dataset tells me what is in that file, because
15 you could have a file that has one song or a lot of songs, some
16 are an album, for example.  And so, Audible Magic tells me
17 that.
18     And here what this tells us in Audible Magic is that
19 this hash file, this electronic file that is sitting on
20 someone's computer, has Nicki Minaj's "Marilyn Monroe."  That's
21 the only file or the only track that is part of this file.
22     So then I take it in the green box and say, now let's
23 go see if I can find Nicki Minaj's "Marilyn Monroe" in PX 1 and
24 PX 2.
25     So I trace it through.  And sure enough, you can see

**2808**

1  "Marilyn Monroe" is part of the PX 2, which is the list of the
2  musical compositions.  So there's -- it's not in the sound
3  recordings.  There's nothing by Nicki Minaj in the sound
4  recordings.  But Nicki Minaj does have tracks that are in PX 2
5  in the musical compositions.
6      So this is line 3,220, and shows us where it is in
7  PX 2.  And it tells us there who owns it and it lists the
8  copyright registration numbers.
9      So as you can see, I summarize at the bottom, you
10 have three notices, they're all in 2013.  There's one hash ID.
11 And it's a musical composition, but not a sound recording.
12     So I employed a similar analysis for all of the
13 tracks and all of the files and all of the copyrights.  I have
14 another example that goes the other way in the next slide.
15 Q.  Okay.  So what does this slide indicate to you, it's Katy
16 Perry, "Hot and Cold"?
17 A.  Yes, so now it's flipped.  Now this is a sound
18 recording -- you can see at the top, I showed the small piece
19 from PX 1.  And you can see in PX 1, it's Katy Perry's "Hot and
20 Cold."  You can see the sound recording number.
21     And then if you go look in the notice dataset, you
22 can see during the claim period, there were 46 times that "Hot
23 and Cold" was in there.
24     And again, there's a sound recording, but no musical
25 composition.  And if you follow that through, you can see in

**2809**

1  2013, there were 31 of them.  And in 2014, there were 15 of
2  them.
3      And then over on the right, I observed that sometimes
4  you would see the same hash ID at the same location in multiple
5  -- and there -- on multiple days.  So there's a new notice each
6  time that the MarkMonitor people found that same file at the
7  computer, the same computer on another day, it shows up in a
8  unique notice.
9  Q.  So in looking at all this notice data, did you reach any
10 conclusions?
11 A.  Yes.  I think if you go to the next slide, you can see by
12 going through that whole process for all of the notices, there
13 are 162,000 notices for the claim period.  162,502 from
14 February 1 to November 26.  I was able to make that
15 investigation and I observed what I described here.  Which is,
16 like I said, each notice allegedly states that a file was
17 available for download on that day.
18     So if you have it observed available on other days,
19 that's going to show up in another notice.  The notice can be
20 for a hash ID with one track or many.  I described that
21 earlier, how it could be an album for a particular hash ID or
22 it could be just one song, like in the case of "Marilyn Monroe"
23 by Nicki Minaj.
24     And then also, many of those hash IDs that were found
25 in the claim period don't relate to the works in suit.  There

**2810**

1  was about 49,000 and change that didn't have a work in suit,
2  but 113,000 I found that did.
3      And then also, like I said earlier, there are a lot
4  more of these in 2013 than 2014.
5  Q.  Okay.  So what did you do next with this data?
6  A.  If you go to the next slide, I think that -- well, here we
7  go back to that next slide.  And continue one further.  There
8  you go.
9      So what you found -- or what I found is, I was
10 able -- Dr. McCabe said he found all of the 10,017 claimed
11 works in suit.  I was able to find 9,801 of them.  So that's
12 98 percent agreement.
13     There are some examples where I disagreed with him.
14 It really is situations in which he has found what he thinks is
15 the musical composition.  It looked to me like it wasn't the
16 same musical composition.  It might be a different song with
17 the same title, and I thought that he had made an improper
18 connection.
19     But for purposes of my analysis, I'm just giving him
20 the benefit of the doubt.  It's only 2 percent, so I'm just
21 going to assume all of them, even if I disagree.  I'm going to
22 give him those anyway for purposes of my analysis.
23 Q.  Okay.  So let's go to the -- you looked at the notices and
24 tracks.  Let's go to the next slide, and this is:  Displaced
25 download and revenue share to plaintiffs.

**2811**

1    So what does this depict and how does this relate to
2    your conclusions and analysis.
3    A.   Well, like I was saying earlier, I calculated displaced
4    downloads of $692,000. So I tried to put together a graph to
5    explain what that means. What that means is, we have examples
6    where this user on the left has gotten files from those three
7    people that are each through BitTorrent making files available
8    and pieces of files that could be assembled on that user on the
9    left's computer.
10       What I'm saying is, if that didn't happen and it
11   didn't go through path 2 and it went through path 1, then what
12   does that turn into?
13       And you can see if that had been a legitimate
14   download, it would have been a purchase for between $0.79 and
15   $1.29 through iTunes. And there's a part of that, a revenue
16   share that goes to the plaintiffs.
17       So for those that, like I said, it's a range of $0.79
18   up to $1.29, I looked at the information that the plaintiffs
19   produced about how much their revenue share is, and I rounded
20   it up. And it looks at about $0.90 for sound recordings and
21   $0.10 for musical compositions.
22       And so, I used that in my calculation of the money
23   that the plaintiffs would have gotten if these downloads, that
24   group of downloads had gone through channel 1, had all been
25   iTunes types of purchases, instead of getting them from

**2812**

1    BitTorrent or another peer-to-peer network.
2    Q.   Okay. So did you do any analysis or make any assumptions
3    with regard to whether if someone downloaded a song, whether
4    that same person would have purchased that same song from
5    iTunes if they were unable to download it?
6    A.   Yes. I think Dr. Lehr testified about that. There was a
7    question for many of these people who are going the route of
8    BitTorrent, would these people, if they weren't able to do that
9    and go through BitTorrent or a peer-to-peer network, would they
10   have purchased something from the plaintiffs?
11       Dr. Lehr said that it might not be all of them. And
12   I agree, it might not be all of them. But for purposes of my
13   analysis, I assumed every one of them, even if it's somebody
14   that maybe wouldn't have, I'm assuming they all would have
15   bought a download through iTunes or a similar source.
16   Q.   Okay. So you talked about looking at the tracks and the
17   notices. And so, what did you find or conclude after looking
18   at them and comparing them?
19   A.   I think if you go to the next slide, you can see here the
20   results of what I found.
21       And that is, there are 677 total, what I call, track
22   notices. So I described earlier how there is that dataset of
23   the notices of about 162,000, about 113,000 of which contain
24   the works in suit. But this shows that there are about six
25   tracks per notice, because there are a lot of albums.

**2813**

1    And so, if you say that each one -- let's say there's
2    an album of ten tracks, that's going to turn into $10 that
3    would go to the plaintiffs for purposes of my analysis, because
4    it depends on how many tracks are in each notice.
5    And so, all of the tracks in all of the notices gets
6    you to 677,000 of the ones that I was able to trace. And that
7    is for a total of 7,421 tracks that are covered by those 9,801
8    works in suit that I found.
9    So it's a little higher if you give the benefit of
10   the doubt to Dr. McCabe and the plaintiffs. Instead of 9,801
11   works in suit, then it goes all the way up to the 10,017. And
12   7,421 becomes 7,608.
13   Q.   You used the term "a conservative approach or analysis"
14   several times. What do you mean by that?
15   A.   There were multiple times in my analysis where I used what
16   I thought were conservative inputs. Like, for example,
17   assuming all of these would have turned into legitimate
18   downloads that the plaintiffs would have gotten paid for.
19   That's an example.
20       But I think in the next slide, perhaps -- there you
21   go.
22       So you can see in the next slide that there is the
23   benefit of the doubt on that 2 percent. So although there are
24   some with which I think Dr. McCabe, I think, got it wrong, I'm
25   saying, put those in there anyway.

**2814**

1    Also, I'm giving the plaintiffs a dollar per track no
2    matter how -- what copyright they hold. Because as we
3    described earlier, like the Nicki Minaj track where they just
4    have a musical composition, if all they have is the musical
5    composition, they would only get the $0.10 musical composition
6    royalty for their revenue share.
7        If they have just a sound recording, like with Katy
8    Perry, they just would get $0.90.
9        I have assumed that for all of the 7,421 tracks, they
10   have all -- well, actually 7,608, I'm assuming -- because I'm
11   giving them the benefit of the doubt, I'm going -- I'm adding
12   that 2 percent in there.
13       So for all 7,608, they get credit for having a sound
14   recording and a musical composition, even if they only have
15   one, which is frequently. Normally they have only one. I gave
16   them the benefit of having both, gave them a dollar, not just
17   $0.90 or $0.10.
18   Q.   And you used the word "track." What do you mean by
19   tracks?
20   A.   Well, like I said, a track is a song. And so, you have
21   copyrights, there are 10,017 copyrights, but only 7,608 tracks.
22   And that's because some of the tracks have both a copyright
23   and -- a copyright and a musical composition and a sound
24   recording. So you're going to have fewer. There's a piece
25   that have just one, there's a piece that have just the other,

**2815**

1  and then there's a piece that has both.
2      So as a result, because there is overlap, then that
3  ends up being a smaller number.
4      MR. OPPENHEIM: Your Honor, I think we discussed this
5  earlier, I would object and move to strike. This was, I
6  believe, a product of a very lengthy earlier discussion.
7      THE COURT: Yeah, sustained. I'll strike the last
8  answer.
9  BY MR. BUCHANAN: (Continuing)
10 Q.  So, Mr. Tregillis, you are aware that the plaintiffs claim
11 that your assessment of a dollar per track is -- doesn't
12 measure the true amount of harm.
13     Do you understand that?
14 A.  Yes.
15 Q.  Okay. And what is your response to that?
16 A.  Mr. Zebrak, in his deposition of me, asked me questions
17 about the dollar and my justification for that. And I think
18 that my dollar rate is an appropriate rate. I think that as I
19 identify here, there are some conservative elements of it. For
20 example, the use of a dollar even if the plaintiffs only have
21 one form of copyright. I think that that's conservative.
22     If it -- if they only have a musical composition at
23 $0.10 and I'm giving them a dollar, I think that's
24 conservative.
25 Q.  So your third point then: Each notice included, even has

**2816**

1  the same hash ID.
2      Can you explain that?
3  A.  Yes. So what I've done here is if you have a download of
4  a track on a -- identified on a user's computer, and it shows
5  up three days in a row, I'm saying that I'm going to triple
6  count that and say that although it seems to be the same file
7  on the same computer multiple days, I'm going to have the -- a
8  dollar for each of those tracks each of those days.
9      I think that's conservative.
10 Q.  Okay. And what about with regard to your fourth
11 conservative assumption with regard to Dr. McCabe?
12 A.  I'm including all notices, not the standard that
13 Dr. McCabe had used. Dr. McCabe had said that he was looking
14 at all of the notices, had shown all of the copyrights at issue
15 if the user had been the subject of two prior notices.
16     So I'm not using that standard. I'm using all of the
17 notices.
18 Q.  Okay. Now, I'd like to move to your third opinion: Many
19 users and tracks had few notices.
20     And James will take us there when he gets a chance.
21 Thank you, James.
22     Could you explain this.
23 A.  Yes, I can. I wanted to look deeper at the users and
24 tracks that are at issue here. Dr. McCabe said he found each
25 of them one time, at least one time. And I wanted to know how

**2817**

1  many times are we finding these.
2      So I put together some examples to show this, and I
3  have total numbers as well.
4  Q.  Okay. James, could you --
5      So -- okay. What does this slide depict?
6  A.  So this is all notices in the claim period by -- for
7  tracks covered by -- or tracks by the artist Jamiroquai. And
8  you can see, there is one song called "Virtual Insanity." And
9  all of these, there were, it looks like, eight notices. And
10 there are eight notices, they all happened in a one-month
11 period. They all happened in October of 2014.
12     And then I summarized that at the bottom. And you
13 can Jamiroquai, you can see there is just an SR, a sound
14 recording. There's no musical composition. It's all on one
15 hash ID. And it appeared eight times in October of 2014.
16 Q.  Okay. And why did you pick this particular artist and
17 this information?
18 A.  This is just an example that I found. I grabbed a few --
19 I think four of them that I'm showing here.
20 Q.  All right. And I think you have one on Van Halen; is that
21 right?
22 A.  Van Halen, this is all notices in the claim period for
23 Van Halen.
24     So for all of Van Halen's songs, these all come from
25 one album of Van Halen's, from -- it's called "1984," which is

**2818**

1  Van --
2      MR. ZEBRAK: Objection, Your Honor.
3      THE COURT: I'm sorry?
4      MR. ZEBRAK: Objection, Your Honor, foundation. I
5  could explain on a sidebar, but he's now testifying about --
6      THE COURT: All right. Approach the bench, please.
7      NOTE: A sidebar discussion is had between the Court
8  and counsel out of the hearing of the jury as follows:
9  AT SIDEBAR
10     THE COURT: Yes, sir.
11     MR. ZEBRAK: So, Your Honor, from recollection, I do
12 believe he talked about Van Halen in his report. But in his
13 answer he's now talking about appearance of these tracks on
14 albums. And I want to be very careful that he's not going to
15 do what Your Honor just struck from his slides and now talk
16 about interrelationship between tracks and albums. It has
17 nothing to do with his damages analysis or how he determined
18 the works in suit.
19     MR. BUCHANAN: He is not going to do that.
20     THE COURT: Okay.
21     MR. ZEBRAK: Well, he just mentioned an album, Your
22 Honor. This keeps happening.
23     THE COURT: All right. Let's just focus --
24     MR. BUCHANAN: Well, there is a calculation between,
25 you know, sound recording and musical composition, which he

**2819**

1  testified about. So each one of these things is in his report.
2  He is just testifying about that he has looked at them, and it
3  shows the frequency of those artists. So he has picked three
4  very popular artists. It shows the frequency of how many times
5  they got tickets, people got tickets or notices related to
6  works. And that's the information, all that information is in
7  the report. He laid it all out. They had a right to depose
8  him on that, and now they are just trying to box him in.
9      MR. ZEBRAK: Your Honor, I have no objection to him
10 discussing how he did his damages analysis. He doesn't need to
11 discuss albums. Which is the issue -- the interrelationship
12 between tracks and albums. He didn't do an analysis of all
13 that. It does not involve his damages calculation.
14     He is now straying into the area that should be off
15 limits.
16     MR. OPPENHEIM: And I believe the demonstrative shows
17 that there are three SRs for those tracks. So there is no
18 foundation. I mean, he can't look at it and say, well, it is
19 one SR or it's one album. You can't determine that unless you
20 go outside of the record. And I don't know whether its true or
21 not.
22     MR. BUCHANAN: Look, he got this information, it's in
23 his report. Whether it's a sound recording or musical
24 composition, it's in PX 1 and PX 2, he looked at that. He
25 looked at the notice data, the ticket data. And all this

**2820**

1  information is in his report.
2      So he did determine whether it is a sound recording
3  or musical composition, whether it's an album or a single, all
4  that.
5      THE COURT: I understand that. All right. Let's
6  stay away from albums and move forward. Thank you.
7      MR. ZEBRAK: Thank you, Your Honor.
8      NOTE: The sidebar discussion is concluded; whereupon
9  the case continues before the jury as follows:
10 BEFORE THE JURY
11 BY MR. BUCHANAN: (Continuing)
12 Q.  So were you finished explaining on the Van Halen notices
13 in the claim period?
14 A.  No, I was not. What I observed here with Van Halen was,
15 like I said, it is nine tracks that are all from the Van Halen
16 album "1984" --
17     MR. ZEBRAK: Objection, Your Honor.
18     THE COURT: Yeah.
19 BY MR. BUCHANAN: (Continuing)
20 Q.  Just refer to tracks.
21 A.  Okay. Very good. I observed nine tracks here. And they
22 were all part of -- you can see on the far right, there is a
23 hash ID on the far right that shows up as 1, and one of them is
24 2.
25     So there is a hash ID that covers this whole set of

**2821**

1  tracks. And then there is an additional hash ID that just
2  covers the top track. And then you can see how many notices.
3      So for the hash ID that covers all of the tracks,
4  there were five of those in the claim period. And then there
5  is another hash ID, like I said, for just the top track,
6  "1984," and there were two extra ones of those.
7      The five that occurred for the whole album were in
8  2013. And then there was one -- the other one, like I said,
9  the two instances in 2014 relating to the single.
10 Q.  Okay. Now, I think you also did a same sort of chart and
11 analysis for Celine Dion; is that correct?
12 A.  Yes. I thought I would try a different kind of music
13 here. So now we're looking at Celine Dion for all the notices
14 in the claim period for Celine Dion. And you can see a range
15 of outcomes. Her "My Heart Will Go On" track from "Titanic" is
16 the biggest at 214 notices. And then the number goes down to
17 as few as five notices.
18     And it depends on the number of hash IDs because each
19 hash ID shows up some number of times. And if you add those
20 all up, that's what you see here for Celine Dion. And there
21 were far more "My Heart Will Go On" notices than there were the
22 ones that had the tracks at the bottom with as few as five.
23     So it's a range. In this case, again, I'm showing
24 the sound recordings and the musical compositions. All of
25 these have sound recordings. Six of them have musical

**2822**

1  compositions. Again, there were more in 2013 than 2014.
2  Q.  So did you do any analysis of the tickets and notices
3  during the claims period for the -- regarding the music in this
4  suit?
5  A.  I don't understand your question.
6  Q.  Okay. Go to the next slide.
7      Okay. We have one more, Annie Lennox.
8  A.  Yes.
9  Q.  And did you do a similar analysis with regard to Annie
10 Lennox as you did the other artists?
11 A.  Yes, I did. So here we have one hash ID that covers all
12 of these -- well, I didn't mean to touch the screen. Sorry
13 about that. Ten tracks. And there are 17 notices. They are
14 covered by a combination of sound recordings and musical
15 compositions, as you can see in the -- now that I know I can
16 touch the screen and make a dot on it -- they are covered in
17 those two columns SR and MC.
18     So you have a combination, like I said.
19 Q.  Does "SR" stand for sound recording and "MC" stands for
20 musical composition?
21 A.  That's right. And like I said, there's a total of 17
22 notices for all of Annie Lennox's music for the claim period.
23 Q.  So did you attempt to analyze how many users had had how
24 many notices in the claims period?
25 A.  Yes, I did.

2823

1  Q.  Okay. And did you prepare a graphic or a demo for that?
2  A.  Yes, I did.
3  Q.  Okay. And so, we're looking at this. And so, what does
4  this depict?
5  A.  Well, I guess my green dots from touching the screen are
6  still there, so sorry about that.
7       But what I see here is this pie reflects the -- well,
8  this is the pie that I put together. And it reflects how many
9  notices are we talking about for users. And during the claim
10 period, you can see out of the 57,000, 31,000 had one or two
11 notices during the claim period.
12      And then you can see the distribution for notices in
13 the claim period to 51 or more, there are 14 of them in that
14 category.
15      So about 70 percent of them were in the one or two
16 notices in the claim period.
17 Q.  Okay. How does this compare to Dr. McCabe's analysis?
18 A.  Well, there is a difference, which is Dr. McCabe was
19 looking at notices for a longer period of time. I was saying
20 for just the claim period.
21      So he had, I think, a little bit under half in the
22 one to two category. If you look as just the claim period, the
23 one to two category gets a lot bigger.
24 Q.  Okay. Do you have a slide that shows different -- the two
25 and the five and above as well?

2824

1  A.  Yes. I -- like I said earlier, I wanted to investigate
2  this idea of that if you have all notices included, then you
3  have notices per track.
4       And you can see the blue section of the pie is the
5  number of notices -- or number of tracks that have 1 to 50.
6  And then copper or orange, I guess, is 51 to 100. And then 101
7  to 500. And 501 to 1,000. And 1,001 plus.
8       You can see if you consider all of the notices,
9  instead of disqualifying the first and the second the way that
10 Dr. McCabe did, then more conservatively you can see what the
11 pie distribution is.
12      I attempted to use a method more similar to what Dr.
13 McCabe did by looking at above the first two. After the first
14 two, if you look at just those, then you can see, as you would
15 you expect, that you have fewer notices per track. And so, the
16 blue part of the pie gets bigger.
17      And then if I adjusted that to another standard, what
18 if you were to look after the first five notices per user, then
19 you see a much smaller number here of notices per track.
20      And the number of tracks also falls because some of
21 these would fall away if you start eliminating notices. But
22 you can see that the lion's share of these have very few
23 notices. It's over half, even if you're including all of the
24 notices in the 1 to 50 category. And it just gets to be more
25 and more of them that fall into that category if you're willing

2825

1  to take out the initial two or initial five notices.
2  Q.  Mr. Tregillis, could you summarize your opinions in this
3  case one last time.
4  A.  Well, I think I identified three of those --
5  Q.  Can we pull that -- go ahead.
6  A.  The three areas -- it's fine, I can describe them. I had
7  areas in which I disagree with Dr. Lehr because I thought his
8  opinions were disconnected or not supported by facts and
9  investigation.
10      The second is I calculated that 692,000 using what I
11 think is a conservative methodology. And the third is, I found
12 that there were many tracks and users that had very few
13 notices. Generally what I observed is, like I said, there was
14 a trend here that was a downturn, a decrease, from 2013 to 2014
15 in the quantity of the notices at issue.
16      MR. BUCHANAN: No further questions.
17      THE COURT: Thank you.
18      MR. BUCHANAN: Pass the witness, Your Honor.
19      MR. ZEBRAK: Thank you, Your Honor.
20      THE COURT: Cross-examination. Go ahead.
21    CROSS EXAMINATION
22 BY MR. ZEBRAK:
23 Q.  Good afternoon, Dr. Tregillis -- excuse me -- Mr.
24 Tregillis.
25 A.  Mr. Tregillis, yes.

2826

1       THE COURT: Let's go for about ten minutes and then
2  it is a good time to break.
3       MR. ZEBRAK: Yes, Your Honor.
4  BY MR. ZEBRAK: (Continuing)
5  Q.  Your parents would be proud, I just made you a doctor.
6       Mr. Tregillis, you are by no means serving as a
7  neutral here, are you?
8  A.  Correct.
9  Q.  Right. So when you talked about acting as a neutral at
10 times, that has nothing to do with your work here, right?
11 A.  No, it's similar. I perform accounting, financial, and
12 economic investigations, sometimes I'm on one or the other
13 side. Sometimes I'm in a neutral role. It's a similar
14 process.
15 Q.  Sure. Well, let's follow up. You talk about being on a
16 side. Here -- well, first of all, it's Winston & Strawn that
17 hired you. Yes or no, sir?
18 A.  Correct.
19 Q.  And you are on Winston & Strawn's side, correct?
20 A.  I believe they are the ones who have called me to testify
21 here today.
22 Q.  And you're obligated to serve their interests, are you
23 not, sir?
24 A.  No. I am obligated to serve my own interest. I was hired
25 to perform an investigation, and I do that of my own volition,