# Exhibit 19

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| |
|---|
| SONY MUSIC ENTERTAINMENT, *et al.*, <br> *Plaintiffs*, <br><br> v. <br><br> COX COMMUNICATIONS, INC, *et al.*, <br><br> *Defendants*. |

Civil No. 1:18-cv-950 (LO / JFA)

**COX'S MEMORANDUM OF LAW IN SUPPORT OF ITS RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL UNDER FEDERAL RULES OF CIVIL PROCEDURE 50(B) AND 59(A)**

Case No. 1:19-cv-00874-RBJ-MEH   Document 199-18   filed 07/13/20   USDC Colorado   pg 3
of 40
Case 1:18-cv-00950-LO-JFA   Document 682   Filed 01/31/20   Page 2 of 39 PageID# 29089

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................iii

STANDARD ....................................................................................................................... 1

ARGUMENT ...................................................................................................................... 1

I.      Cox is entitled to JMOL of no vicarious liability. ........................................... 1

      A.     Plaintiffs presented no evidence sufficient to prove that Cox derives a direct financial benefit from alleged infringements by Cox's subscribers. ............... 2

            1.     Plaintiffs offered no evidence sufficient to show that the availability of Plaintiffs' works was a "draw" for Cox's subscribers. .................... 2

      B.     Plaintiffs have no evidence that Cox derived a direct financial benefit from alleged infringement by Cox Business subscribers' end users. ............................. 6

      C.     There is no evidence that Cox had the ability to supervise the alleged infringements by Cox Business subscribers' end users. ............................................. 7

II.     Cox is entitled to JMOL limiting certain of Plaintiffs' statutory damages claims to one award per work........................................................................................ 9

      A.     Plaintiffs are entitled to only a single statutory damages award for a sound recording and the music composition from which it derives............................... 10

            1.     Under Section 504(c), a music composition and a sound recording derived from it are one "work," entitled to one award of statutory damages.................................................................................................... 10

            2.     There is no dispute that 2,556 of Plaintiffs' asserted sound recordings are derivative of music compositions that are also in suit................. 11

            3.     Cox is entitled to JMOL that Plaintiffs cannot recover statutory damages for both a recording and its related music composition............. 12

      B.     A large majority of the sound recordings were registered as parts of "compilations," and are eligible for only one damages award per compilation............ 14

            1.     For recordings registered as parts of albums or "works for hire," Plaintiffs can recover only one award per registration. ........................... 15

Case No. 1:19-cv-00874-RBJ-MEH   Document 199-18   filed 07/13/20   USDC Colorado   pg 4
of 40
Case 1:18-cv-00950-LO-JFA   Document 682   Filed 01/31/20   Page 3 of 39 PageID# 29090

2.      There is no dispute that the vast majority of Plaintiffs' sound re-
cordings were registered as albums or works made for hire.................... 16

3.      The independent economic value rule does not override the plain
meaning of Section 504(c)(1), and Plaintiffs lacked sufficient evi-
dence of independent value to defeat JMOL. .......................................... 17

III.    Cox is entitled to JMOL of no infringement by Cox Business subscribers..................... 20

A.      Evidence that infringement has occurred at a Cox Business IP address is
insufficient to support liability for infringement by that business........................ 20

B.      Cox cannot be held contributorily liable for the infringing conduct of un-
specified individuals using the networks of its business subscribers. ................. 22

IV.     Cox is entitled to JMOL of no direct infringement........................................................... 24

A.      Cox is entitled to JMOL of no direct infringement of the reproduction
right. ....................................................................................................................... 24

B.      Cox is entitled to JMOL of no direct infringement of the distribution right. ....... 25

V.      Cox is entitled to JMOL of no contributory liability. ....................................................... 29

CONCLUSION................................................................................................................... 30

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ALPS Prop. & Cas. Ins. Co. v. Farthing*,
    No. 2:17cv391, 2018 U.S. Dist. LEXIS 175390 (E.D. Va. Sep. 25, 2018) ...............................8

*Arista Records, Inc. v. Flea World, Inc.*,
    2006 WL 842883 (D.N.J. March 31, 2006) .............................................................................3

*Atlantic Recording Corp. v. Howell*,
    554 F. Supp. 2d 976 (D. Ariz. 2008) ....................................................................................27

*BMG Rights Mgmnt (US) v. Cox Commn'cns, Inc.*,
    149 F. Supp. 3d 634 (E.D. Va. 2015) .......................................................................... *passim*

*BMG Rights Mgmnt (US) v. Cox Commn'cns, Inc.*,
    199 F. Supp. 3d 958 (E.D. Va. 2016) ............................................................................19, 26

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
    881 F.3d 293 (4th Cir. 2018) ...............................................................................................22

*Bryant v. Media Rights Prods. Inc.*,
    603 F.3d 135 (2d Cir. 2010)...............................................................................15, 17, 18

*Capitol Records, Inc. v. MP3Tunes, LLC*,
    28 F. Supp. 3d 190 (S.D.N.Y. 2014).....................................................................................11

*Capitol Records, Inc. v. MP3Tunes, LLC*,
    48 F. Supp. 3d 703 (S.D.N.Y. 2014).....................................................................................18

*Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp.*,
    51 F.3d 1229 (4th Cir. 1995) .................................................................................................1

*Cobbler Nevada, LLC v. Gonzales*,
    901 F.3d 1142 (9th Cir. 2018) ..................................................................................... *passim*

*Columbia Pictures Indus., Inc. v. Fung*,
    710 F.3d 1020 (9th Cir. 2013) .............................................................................................24

*Ellison v. Robertson*,
    357 F.3d 1072 (9th Cir. 2005) ............................................................................................3, 4

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
    844 F.3d 79 (2d Cir. 2016)..............................................................................................11, 13

Case No. 1:19-cv-00874-RBJ-MEH   Document 199-18   filed 07/13/20   USDC Colorado   pg 6
of 40
Case 1:18-cv-00950-LO-JFA   Document 682   Filed 01/31/20   Page 5 of 39 PageID# 29092

*Gamma Audio & Video v. Ean-Chea*,
    11 F.3d 1106 (1st Cir. 1993) ...................................................................................18

*Hotaling v. Church of Jesus Christ of Latter-Day Saints*,
    118 F.3d 199 (4th Cir. 1997) ..................................................................................28

*King v. McMillan*,
    594 F.3d 301 (4th Cir. 2010) ...............................................................................1, 6

*Klein & Heuchan, Inc. v. Costar Realty Information, Inc.*,
    707 F. Supp. 2d 1287 (M.D. Fla. 2010) ...................................................................3

*Leonard v. Stemtech Int'l Inc*,
    834 F.3d 376 (3d Cir. 2016) ....................................................................................3

*In re Napster, Inc. Copyright Litig.*,
    191 F. Supp. 2d 1087 (N.D. Cal. 2002) .................................................................16

*Perfect 10, Inc. v. Amazon.com*,
    508 F.3d 1146 (9th Cir. 2007) ..........................................................................29, 30

*Perfect 10, Inc. v. Giganews, Inc.*,
    847 F.3d 657 (9th Cir. 2017) ...................................................................................3

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,
    494 F.3d 788 (9th Cir. 2007) .................................................................................29

*Rams v. Def Jam Recordings, Inc.*,
    202 F. Supp. 3d 376 (S.D.N.Y. 2016) ....................................................................3

*Ray v. Allergan, Inc.*,
    2012 WL 2120018 (E.D. Va. June 1, 2012) ...........................................................1

*Rowland v. California Men's Colony, Unit II Men's Advisory Council*,
    506 U.S. 194 (1993) ...............................................................................................13

*Sullivan v. Flora, Inc.*,
    936 F.3d 562 (7th Cir. 2019) .................................................................................18

*Teevee Toons, Inc. v. MP3.com, Inc.*,
    134 F. Supp. 2d 546 (S.D.N.Y. 2001) ..................................................................13

*Tomelleri v. Zazzle, Inc.*,
    2015 WL 8375083 (D. Kan. Dec. 9, 2015) .............................................................3

*Towler v. Sayles*,
    76 F.3d 579 (4th Cir. 1996) ...................................................................................24

Case No. 1:19-cv-00874-RBJ-MEH   Document 199-18   filed 07/13/20   USDC Colorado   pg 7
of 40
Case 1:18-cv-00950-LO-JFA   Document 682   Filed 01/31/20   Page 6 of 39 PageID# 29093

*TufAmerica, Inc. v. Codigo Music LLC*,
    162 F. Supp. 3d 295 (S.D.N.Y. 2016)......................................................10

*U.S. Equal Employment Opportunity Comm'n v. Consol Energy, Inc.*,
    860 F.3d 131 (4th Cir. 2018) ...................................................................1

*UMG Recordings, Inc. v. Grande Commnc'ns. Networks, LLC*,
    2018 U.S. Dist. LEXIS 160492 (W.D. Tex. Sep. 20, 2018)......................3

*UMG Recordings, Inc. v. Hummer Winblad Venture Partners (In re Napster,
Inc.)*, 377 F. Supp. 2d 796 (N.D. Cal. 2005)...........................................27

*Varghese v. Honeywell Int'l, Inc.*,
    424 F.3d 411 (4th Cir. 2005) ...................................................................9

*VHT Inc. v. Zillow, Inc.*,
    918 F.3d 723 (9th Cir. 2019) ................................................................9, 17

*Xoom, Inc. v. Imageline, Inc.*,
    323 F.3d 279 (4th Cir. 2003) ..............................................................17, 18

*Yellow Pages Photos, Inc. v. Ziplocal, LP*,
    795 F.3d 1255 (11th Cir. 2015) ..............................................................17

*Zagorsky-Beaudoin v. Rhino Entertainment Company*,
    2019 WL 4259788 (D. Ariz. Sept. 9, 2019).............................................3

**Statutes**

1 U.S.C. § 1 ....................................................................................................13

17 U.S.C. § 101 .................................................................................10, 15, 16, 17

17 U.S.C. §504(c) ............................................................................... *passim*

**Other Authorities**

Black's Law Dictionary (10th ed. 2014)..........................................................8

Webster's Third New International Dictionary (2002).....................................8

Fed. R. Civ. P. 50(a) .........................................................................................1

H.R. Rep. No. 94-1476 (1976)...........................................................11, 13, 15, 17

S. Rep. 105-190 (1990)...................................................................................3, 4

S. Rep. No. 94-473 (1975) ..............................................................................11, 13

Case No. 1:19-cv-00874-RBJ-MEH   Document 199-18   filed 07/13/20   USDC Colorado   pg 8
of 40
Case 1:18-cv-00950-LO-JFA   Document 682   Filed 01/31/20   Page 7 of 39 PageID# 29094

Defendants Cox Communications, Inc. and CoxCom, LLC ("Cox") respectfully renew their motion for judgment as a matter of law ("JMOL") and, in the alternative, a new trial, pursuant to Federal Rules of Civil Procedure 50(b) and 59(a).

## STANDARD

Judgment as a matter of law is appropriate "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). In addition to seeking JMOL on sufficiency grounds, "a party may appropriately move for judgment as a matter of law on discrete legal issues." *Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp.*, 51 F.3d 1229, 1236 (4th Cir. 1995). A renewed JMOL motion "is properly granted if the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof." *Ray v. Allergan, Inc.*, 2012 WL 2120018, at *1 (E.D. Va. June 1, 2012).

Even if the verdict is supported by substantial evidence, the Court may grant a new trial if it determines that the verdict was against the "clear weight" of the evidence or "will result in a miscarriage of justice." *U.S. Equal Employment Opportunity Comm'n v. Consol Energy, Inc.*, 860 F.3d 131, 145 (4th Cir. 2018). Although the decision to grant a new trial "is within the sound discretion of the district court," if the Court "finds [that] the verdict is against the clear weight of the evidence" or "will result in a miscarriage of justice, he *must* set aside the verdict … and grant a new trial." *King v. McMillan*, 594 F.3d 301, 314-315 (4th Cir. 2010) (emphasis added).

## ARGUMENT

### I.      Cox is entitled to JMOL of no vicarious liability.

Vicarious liability is "[a] variant on *respondeat superior*," by which a defendant may be held "accountable for third-party infringement if he (1) possessed the right and ability to supervise the infringing activity; and (2) possessed an obvious and direct financial interest in the exploited

copyrighted materials." *BMG Rights Mgmnt (US) v. Cox Commn'cns, Inc.*, 149 F. Supp. 3d 634,

673-674 (E.D. Va. 2015) (quotation omitted) ("*BMG I*"). Cox is entitled to JMOL on Plaintiffs'

vicarious liability claims because Plaintiffs failed to provide evidence that Cox had a "direct fi-

nancial interest" in the alleged infringement or that Cox had the ability to supervise infringement

by Cox Business subscribers.

### A.   Plaintiffs presented no evidence sufficient to prove that Cox derives a direct financial benefit from alleged infringements by Cox's subscribers.

The necessary "direct financial interest" requires proof of a "causal relationship" between

"the infringing activities *at issue in th[e] case* and a direct financial benefit to the defendant."

*BMG I* at 675-676 (emphasis and alteration in original) (quotation omitted). Where the defendant's

only source of revenue is a monthly subscription fee unrelated to the infringement, a "direct finan-

cial interest" requires a determination that infringement constitutes a "draw" for the infringing

subscribers. *Id.* at 676. Here—unlike in *BMG*—Plaintiffs made no attempt to prove that the op-

portunity to infringe their copyrights acted as a "draw" to Cox's subscribers. Their claim of vicar-

ious infringement therefore fails as a matter of law.

### 1.   Plaintiffs offered no evidence sufficient to show that the availability of Plaintiffs' works was a "draw" for Cox's subscribers.

Plaintiffs failed to offer evidence from a which a reasonable jury could have found that the

ability to infringe their copyrighted works was a "draw" to any Cox subscriber. It is undisputed

that the only revenue Cox received from its subscribers was a monthly subscription fee. *See* DX-

337 and Tr. 1904:1-1906:7 (Negretti direct).[1] While Cox offered different levels of service to meet

---

[1] Referenced trial exhibits and proposed trial exhibits are attached hereto as Exhibit A. Referenced trial testimony is attached hereto as Exhibit B.

the needs of its subscribers, and charged different flat rates for the different levels, it is also undisputed that Cox's revenues from these flat-rate subscriptions did not depend on the manner or purpose for which its subscribers used the service. *Id.*

Both Congress and the courts have made it clear that a flat fee-for-subscription revenue model like Cox's is not sufficient to establish the necessary causal relationship with infringement by subscribers, unless the alleged infringement acts as a "draw" to infringers, in the sense that "the value of the service lies in providing access to infringing material." S. Rep. 105-190, at 44 (1990) (quoted in *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2005)).[2] And "the value of [a] service" does not "lie[] in providing access to infringing material" where such access is "just an added benefit" of the service.  *Ellison*, 357 F.3d 1079.  As this Court explained in *BMG*:

> [Because] Cox provides a content-neutral commercial service that makes a wide selection of services and activities available to its subscribers … [and] charges the same flat monthly fees to its users whether they use Cox's service for infringing or non-infringing purposes … the relevant inquiry … is whether the infringing activity constitutes *a draw for [Cox's] subscribers*, not just an added benefit.

*BMG I* at 676 (emphasis added). Without evidence that "some portion of [Cox's] fees are generated from subscribers that are drawn to Cox's service at least in part *because* of the infringing activity alleged *in this case* … the requisite causal connection between the benefit and the infringing activity is not established." *Id.* (emphasis added); *see also, e.g.*, *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 673-674 (9th Cir. 2017); *UMG Recordings, Inc. v. Grande Commnc'ns. Networks, LLC*, 2018 U.S. Dist. LEXIS 160492, at *9 (W.D. Tex. Sep. 20, 2018).

---

[2]  The "draw" standard originated in the Ninth Circuit but has been adopted broadly throughout the federal courts. *See, e.g., Leonard v. Stemtech Int'l Inc*, 834 F.3d 376, 388-389 (3d Cir. 2016); *Zagorsky-Beaudoin v. Rhino Entertainment Company*, 2019 WL 4259788, at *9 (D. Ariz. Sept. 9, 2019); *Tomelleri v. Zazzle, Inc.*, 2015 WL 8375083, at *15 (D. Kan. Dec. 9, 2015); *Rams v. Def Jam Recordings, Inc.*, 202 F. Supp. 3d 376, 385 (S.D.N.Y. 2016); *Klein & Heuchan, Inc. v. Costar Realty Information, Inc.*, 707 F. Supp. 2d 1287, 1299 (M.D. Fla. 2010); *Arista Records, Inc. v. Flea World, Inc.*, 2006 WL 842883, at *12-13 (D.N.J. March 31, 2006).

Plaintiffs knew what they had to prove to prevail on vicarious liability: their Amended Complaint repeatedly alleges that "the ability to download and distribute Plaintiffs' works through Cox's service has served as a draw for Cox to attract, retain, and charge higher fees to subscribers." Am. Compl., ¶ 9; *see also id.*, ¶¶ 83, 97, 111. And they knew what kind of evidence might suffice: the *BMG* plaintiffs survived summary judgment by producing a customer survey purporting to show that for some fraction of Cox subscribers, the ability to obtain free music from certain web-sites was one reason (among many) they subscribed to Cox's service. *BMG I* at 676.

But Plaintiffs made no attempt to produce that kind of evidence in this case. In opposing summary judgment, they argued only that infringement *must* be a draw because of the "sheer vol-ume of [infringement] notices" and the fact that "specific subscribers infringed repeatedly." ECF No. 392 at 36.[3] But the cases have consistently distinguished between evidence that an ISP's sub-scribers might have *benefited* from the opportunity to infringe—which does not suffice to establish vicarious liability—and evidence that those subscribers were *drawn* to the ISP's service by that opportunity, or where "the value of" the service "lies in providing access to infringing material." *Ellison*, 357 F.3d at 1079 (quoting S. Rep. 105-190, at 44). This is particularly true where, as here, the service in question consists of internet access, which is used pervasively for an almost infinite array of purposes—work, education, reading, newsgathering, email, gaming, shopping, legitimate streaming, VoIP calling, and too many others to name. *See BMG I* at 676. To find that infringement was a "draw" on this evidence would eviscerate the causation requirement for vicarious liability.

---

[3] Plaintiffs also urged the Court to ignore settled law concerning the "direct financial benefit" prong, arguing that Cox's flat-fee revenue from allegedly-infringing subscribers somehow *did* con-stitute a direct financial benefit derived from their infringing activities, despite all authority to the contrary. ECF No. 392 at 32. Plaintiffs' attempt to rewrite this basic rule of vicarious liability would have resulted in a breathtaking expansion of its boundaries.

Case No. 1:19-cv-00874-RBJ-MEH   Document 199-18   filed 07/13/20   USDC Colorado   pg 12
of 40
Case 1:18-cv-00950-LO-JFA   Document 682   Filed 01/31/20   Page 11 of 39 PageID# 29098

Plaintiffs' trial evidence offered no more evidence of "draw" than their summary judgment opposition. Their only theory of direct financial benefit, as conveyed to the jury in both opening and closing argument, was that Cox benefited financially by declining to terminate known repeat infringers. *See, e.g.*, Tr. 2952:12-22 (citing Zabek and arguing for direct financial interest because "Cox kept the infringing customer[s] on its network so that it could keep the money coming"). But it is well settled that the mere fact that Cox earned flat-fee revenue by keeping infringing subscribers on its network does not constitute a sufficiently direct financial benefit from the infringing activity to support vicarious liability. Nor is it evidence that infringement was a "draw" to the subscribers, or that the value of Cox's service to them lay in infringement.

Plaintiffs may also point to evidence showing that bandwidth and download speeds are draws for subscribers, that a certain percentage of online bandwidth is generally understood to consist of peer-to-peer activity, and that subscribers who received large numbers of infringement notices on average consumed more bandwidth.[4] This evidence, too, falls well short of the established standard for direct financial benefit. At most, it shows that infringers benefit from high-speed internet access—a benefit they can obtain from any number of other ISPs. There is no evidence that anything about *Cox's* service, as opposed to any other, specifically drew customers who wanted to infringe Plaintiffs' works. To the contrary, the evidence showed that Cox's AUP document prohibited copyright infringement; that Cox responded to breaches of that prohibition by actively discouraging infringement through warnings, suspensions, and—occasionally—terminations; and that, virtually alone among major ISPs, Cox *did* terminate repeat infringers. *See* Tr.

---

[4] *See, e.g.*, Tr. 1897:17-1898:3, 1901:5-22, 1930:20-1931:8, 1934:21-1935:15 (Negretti); Tr. 1704:17-1705:15, 1706:5-1707:2, 1708:1-16, 1708:21-24 (Fuenzalida); Tr. 1788:10-1789:5, 1790:1-1791:4, 1791:5-1793:23, 1794:21-1795:3 (Lehr).

1020:20-1021:11 (Trickey cross); Tr. 332:3-8 (Marks direct) ("[t]ermination was not required un-
der CAS"); Tr. 1606:22-24; 1053:5-20 (Carothers cross). This is the exact opposite of a "draw."

In the absence of any evidence sufficient to support the conclusion that Cox received a
"direct financial benefit" from the infringements at issue, in the sense that the opportunity to in-
fringe acted a "draw" to its subscribers or constituted the value of its service, a reasonable jury
could not have found Cox vicariously liable for its subscribers' infringement. The Court should
grant JMOL on Plaintiffs' vicarious liability claim. Plaintiffs lack any comparable evidence—or
indeed any evidence at all—to support their essentially identical claim, vicarious liability is not a
"close question." *See BMG I* at 676. No reasonable jury would hold otherwise. Even if the Court
were to conclude that there was sufficient evidence to support the judgment of vicarious liability,
it remains the case that the great weight of the evidence requires a different result, necessitating a
new trial. *King*, 594 F.3d at 314 (emphasis added).

Finally, if the Court grants either JMOL or a new trial on vicarious liability, it should also
order a new trial on damages. Given Plaintiffs' heavy emphasis at trial on Cox's purported finan-
cial benefit from the infringement, it is highly unlikely that a jury finding liability only on contrib-
utory infringement—which requires no showing of financial benefit—would have rendered the
unprecedented $1 billion award. The correct course of action is to re-try the damages issue without
the use of Plaintiffs' pervasive but inadequate evidence of "direct financial benefit."

**B.      Plaintiffs have no evidence that Cox derived a direct financial benefit from
alleged infringement by Cox Business subscribers' end users.**

The infirmities discussed above are fatal to Plaintiffs' vicarious liability claims, including
those based on Cox's relationships with both residential and Cox Business subscribers. But Plain-
tiffs' claims with respect to the Cox Business subscribers have multiple additional infirmities.

Case No. 1:19-cv-00874-RBJ-MEH   Document 199-18   filed 07/13/20   USDC Colorado   pg 14
of 40
Case 1:18-cv-00950-LO-JFA   Document 682   Filed 01/31/20   Page 13 of 39 PageID# 29100

*First*, Plaintiffs offered no evidence to show that there is any difference in Cox's revenues from Cox Business subscribers accused of infringement, and those not so accused. *Second*, there is no evidence that any Cox Business subscribers are themselves *direct* infringers, or that any Cox Business subscriber met the criteria for contributory infringement *or* vicarious liability, either. *Compare Cobbler Nevada, LLC v. Gonzales*, 901 F.3d 1142 (9th Cir. 2018). And *third*, there is no dispute that the individual "end users" who actually did the alleged infringing on Cox business subscribers' networks did not pay Cox for their use of the Cox Business customer's system. Plaintiffs therefore cannot show the essential "causal relationship" of Cox's revenues from Cox Business subscribers to "the infringing activities at issue in th[e] case." *BMG I* at 675-676.

A JMOL order based on the failure of Plaintiffs' evidence with respect to Cox business subscribers requires a new trial on damages. More than 25% of the notices in this case related to infringements occurring at Cox business subscribers, Tr. 1543:12-17 (Beck direct), and virtually all the subscribers with large numbers of notices fell into this category. Tr. 1979:9-24 (Weber direct). Many of Plaintiffs' arguments concerning the culpability of Cox's conduct consisted of evidence regarding these high volume infringers and necessarily had an impact on the jury's damages award. Further, no evidence currently exists that would allow the Court to determine which of the works at issue were infringed by residential subscribers.

### C.    There is no evidence that Cox had the ability to supervise the alleged infringements by Cox Business subscribers' end users.

Plaintiffs' vicarious liability claims against Cox Business subscribers also fail because Cox lacked the "right and ability" to supervise the alleged infringement. Here, Plaintiffs lacked sufficient evidence to prove that Cox had either the "right" or the "ability" to *supervise* the conduct of the individuals who actually infringed Plaintiffs' copyrights; namely, its business subscribers' end users. Plaintiffs' only evidence on this issue related to Cox's general right to terminate subscribers

Case No. 1:19-cv-00874-RBJ-MEH   Document 199-18   filed 07/13/20   USDC Colorado   pg 15
of 40
Case 1:18-cv-00950-LO-JFA   Document 682   Filed 01/31/20   Page 14 of 39 PageID# 29101

who violated its AUP—but the right and ability to *terminate* an account is not the right and ability to *supervise* the account's users, with whom Cox has no direct relationship.

To "supervise" means to "coordinate, direct, and inspect continuously and at first hand the accomplishment of" and "oversee with the powers of direction and decision the implementation of one's own or another's intentions." Webster's Third New International Dictionary (2002) (cited in *ALPS Prop. & Cas. Ins. Co. v. Farthing*, No. 2:17cv391, 2018 U.S. Dist. LEXIS 175390, at \*22 (E.D. Va. Sep. 25, 2018)); *see also* Black's Law Dictionary (10th ed. 2014) (defining "SUPERVI-SION" as "[t]he series of acts involved in managing, directing, or overseeing persons or projects"); Cambridge English Dictionary (defining "supervise" as "to be responsible for the good perfor-mance of an activity or job, or for the correct behavior or safety of a person").[5]

Under *any* conceivable definition of "supervise," Cox had neither the legal right nor the ability to supervise the actions of Cox Business end-users whose identities Cox did not even know. *See, e.g.*, Tr. 1024:19-1025:11 (Trickey cross); Tr. 1336:8-17 (Zabek); Tr. 1531:16-1532:6 (Beck cross); Tr. 2246:19-2248:5 (Feamster direct); Tr. 2503:23-2504:18 (Jarchow direct); *see also id.* at 2513:22-2514:8 (same). The right to terminate, on which Plaintiffs relied for their evidence of supervision, does not relate to the infringing end-users at all, but to an intervening entity between Cox and the infringer: the Cox Business subscriber. Tr. 791:13-17, 793:7-14 (McCabe direct). Even if the Cox Business subscriber's right to terminate its end users' accounts was sufficient to constitute "supervision" (and it is not), Cox's right to terminate the Business subscriber's account for the actions of indirect users of whose existence and identity Cox lacks any knowledge is twice removed from that "supervision." To describe Cox's relationship with unknown end users as "su-pervisory" is to stretch the meaning of that term beyond all recognition.

---

[5] Available at https://dictionary.cambridge.org/us/dictionary/english/supervise.

Case No. 1:19-cv-00874-RBJ-MEH   Document 199-18   filed 07/13/20   USDC Colorado   pg 16
of 40
Case 1:18-cv-00950-LO-JFA   Document 682   Filed 01/31/20   Page 15 of 39 PageID# 29102

Under Plaintiffs' theory of vicarious liability, an ISP receiving notice of infringement by an unidentified end-user of (say) a public university's internet account could avoid vicarious liability for subsequent infringements by that user only if it terminated the entire university's internet access. Indeed, under Plaintiffs' theory, the ISP could be vicariously liable for the *first* such infringement, even though it had no conceivable means to prevent it.

The highly attenuated connection between Cox and the infringements of its subscribers' end users simply does not involve the kind of "supervision" that vicarious liability requires. Because Cox lacked any right or ability to directly "stop or limit the direct infringing conduct" of those end users, it is entitled to JMOL of no vicarious liability for that conduct or, at a minimum, a new trial. *VHT Inc. v. Zillow, Inc.*, 918 F.3d 723, 746 (9th Cir. 2019).

## II.   Cox is entitled to JMOL limiting certain of Plaintiffs' statutory damages claims to one award per work.

Cox moved for summary judgment that Plaintiffs were entitled to recover only one award of damages per work under 17 U.S.C. §504(c), which provides for "an award of statutory damages for all infringements involved in the action, with respect to *any one work*[.]" 17 U.S.C. § 504(c)(1) (emphasis added). For purposes of statutory damages, "*all the parts* of a compilation or derivative work constitute one work." *Id.* (emphasis added). Cox explained that Section 504(c) applied to Plaintiffs' suit precluding Plaintiffs from recovering (1) for both a sound recording and its underlying composition, and (2) for more than one work registered as part of a compilation, such as an album. ECF No. 329 at 36-40. The Plaintiffs did not dispute the factual premises for Cox's motion, instead opposing it entirely on legal grounds. ECF No. 392 at 37-40.

In this Circuit, the proper mechanism for preserving a denial of summary judgment on "discrete legal issues" is a motion for JMOL. *Varghese v. Honeywell Int'l, Inc.*, 424 F.3d 411, 423 (4th Cir. 2005).  Because, even after trial, there remains no genuine dispute of material fact on

these issues, the Court should grant Cox JMOL reducing the number of statutory damages awards

to one award per derivative work and one award per compilation.

> ### A. Plaintiffs are entitled to only a single statutory damages award for a sound recording and the music composition from which it derives.

Under the plain language of the Copyright Act, a musical composition and a sound record-

ing embodying that composition are a single "work," and so entitled to a single award of statutory

damages. Here, there is no dispute that 2,556 of Plaintiffs' asserted music compositions are em-

bodied in sound recordings that are also in suit.[6]   Indeed, Plaintiffs themselves calculated this

number.  *See* PX-38.  Plaintiffs are thus entitled to only one award of statutory damages for each

sound recording and the composition from which it derives.

> ### 1. Under Section 504(c), a music composition and a sound recording derived from it are one "work," entitled to one award of statutory damages.

It is a basic tenet of copyright law that a sound recording is a "derivative work" of a musical

composition. *See* 17 U.S.C. § 101 ("a sound recording" is an example of a "derivative work …

based upon one or more preexisting works"); *see also, e.g.*, *TufAmerica, Inc. v. Codigo Music

LLC*, 162 F. Supp. 3d 295, 303 n.5 (S.D.N.Y. 2016) ("Generally, '[a] sound recording is a deriva-

tive work in relation to the musical work recorded therein, just as a motion picture is a derivative

---

[6] The 2,556 number was undisputed at the time of the summary judgment proceedings, and was based on a summary exhibit prepared by Plaintiffs.  PX-38.  Plaintiffs subsequently reduced the total number of works in suit for trial, which presumably reduced the number of overlapping works.  *Compare* Proposed PX-1 and PX-2 *with* Admitted PX-1 and PX-2. As of December 16, Cox's expert Christian Tregillis calculated the new number to be 2,412, but was prevented by Plaintiffs' objection from introducing that number into evidence. If Plaintiffs object to using the 2,556 number that they calculated and which was undisputed for summary judgment purposes, calculating the precise number of overlapping works that remained in the 10,017 works considered at trial is a ministerial act of comparing PX-1 and PX-2 and should not prevent JMOL.

Case No. 1:19-cv-00874-RBJ-MEH   Document 199-18   filed 07/13/20   USDC Colorado   pg 18
of 40
Case 1:18-cv-00950-LO-JFA   Document 682   Filed 01/31/20   Page 17 of 39 PageID# 29104

work in relation to the novel or screenplay upon which it is based.'") (quoting 1 Nimmer on Copyright § 2.10[A] n.8 (2015)). Because a recording is derivative of the underlying composition, the recording and the composition together are eligible for a single award of damages under Section 504(c)(1), which provides that "all the parts of a … derivative work constitute one work." *Id.*

Accordingly, courts routinely hold that a sound recording and the music composition it embodies are a *single work* for purposes of calculating statutory damages. *See, e.g.*, *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 94 (2d Cir. 2016); *Capitol Records, Inc. v. MP3Tunes, LLC*, 28 F. Supp. 3d 190, 191–92 (S.D.N.Y. 2014). In *Capitol Records*, the court held that when the defendants "infringed the copyright covering a sound recording and music composition for the same song, they infringed only one work because the infringement was directed at the sound recording and the music composition was not exploited separately." *Capitol Records, Inc.*, 28 F. Supp. 3d at 192. As the Second Circuit has explained, "[a] plain reading of the Copyright Act's text supports" a finding "that the plaintiffs could recover only one statutory damages award for a musical composition and its corresponding sound recording, even where the composition and the recording were owned by separate plaintiffs." *EMI Christian Music Grp.*, 844 F.3d at 94-95. Congress expressly contemplated and approved this result.[7]

> ### 2.   There is no dispute that 2,556 of Plaintiffs' asserted sound recordings are derivative of music compositions that are also in suit.

Plaintiffs themselves have affirmed that the great majority of the Publisher Plaintiffs' musical compositions—at the time of summary judgment, 2,556 out of 3,402 of them—are embodied

---

[7] *See* H.R. Rep. No. 94-1476, at 162 (1976); S. Rep. No. 94-473, at 144 (1975) ("[A]lthough the minimum and maximum amounts are to be multiplied where multiple 'works' are involved in the suit, the same is not true with respect to multiple copyrights, multiple owners, multiple exclusive rights, or multiple registrations. This point is especially important since, under a scheme of divisible copyright, it is possible to have the rights of a number of owners of separate 'copyrights' in a single 'work' infringed by one act of a defendant.").

Case No. 1:19-cv-00874-RBJ-MEH   Document 199-18   filed 07/13/20   USDC Colorado   pg 19
of 40
Case 1:18-cv-00950-LO-JFA   Document 682   Filed 01/31/20   Page 18 of 39 PageID# 29105

in sound recordings that are also at issue. Indeed, prior to trial, they produced a proposed trial

exhibit (PX-38) describing the overlap of sound recordings and compositions:

### Sound Recordings and Musical Compositions

| Works in Suit | |
|---|---|
| Sound Recordings | 7,031 |
| Musical Compositions | 3,402 |
| Total Works | 10,433 |
| | |
| Intersection of Works in Suit | |
| Works Claimed Only As Sound Recordings | 4,475 |
| Works Claimed Only As Musical Compositions | 882 |
| Works Claimed with Corresponding Sound Recordings and Musical Compositions | 2,556 |

*See* PX-38. Cox submitted this document to the Court in support of Cox's motion for summary

judgment on this issue, and Plaintiffs did not dispute its provenance or its accuracy. *Compare* ECF

No. 329 at 40 *with* ECF No. 392 at 38-40.[8]  Instead, they raised only legal arguments. *See* ECF

No. 392 at 38-40; *see also* Oct. 24, 2019 Hr'g Tr. ("SJ Tr.") at 119:17-123:11 (Plaintiffs' counsel

opposing summary judgment on purely legal grounds) (attached hereto as Exhibit C).[9]

### 3.   Cox is entitled to JMOL that Plaintiffs cannot recover statutory damages for both a recording and its related music composition.

Plaintiffs' only grounds for opposing Cox's motion for summary judgment were legal ar-

guments that lacked support in either the statute or applicable precedent. *First*, Plaintiffs argued

for a novel reading of Section 504(c)(1), asserting that the statute's use of the singular "copyright

---

[8] Plaintiffs' initial list of exhibits described PX-38 as a "Summary of Exhibits A and B"—that is, a summary of the lists of musical compositions and sound recordings attached to the Complaint. *See* ECF No. 280-1 at 2.  Plaintiffs removed PX-38 from their exhibit list shortly before trial. Compare *id*. *with* ECF No. 612-1 at 2.

[9] Cox also made a proffer on this issue at trial, providing the Court with an exemplar of an over-lapping sound recording and composition that were in evidence. *See* Tr. 2858:3-2959:1.

owner" means that "Section 504 assumes that the same person owns multiple copyrights impli-cated by the same infringement, and necessarily limits its application to such cases." ECF No. 392 at 38. As Cox explained in its reply, however, Plaintiffs' "creative" reading of Section 504(c) to limit "copyright owner" to single owners is directly contrary to 1 U.S.C. § 1, which provides that "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise[,] words importing the singular include and apply to several persons, parties, or things[.]" 1 U.S.C. § 1. By statute, that is, the phrase "copyright owner" includes the plural "copyright owners." Plain-tiffs made no attempt to explain how "the context indicates" exclusively singular reading of "cop-yright owner" in Section 504(c), and could not do so: when Congress drafted Section 504(c)(1), it was well aware that "it is possible to have the rights of a number of owners of separate 'copyrights' in a single 'work' infringed by one act of a defendant," and it created the single-recovery rule with that knowledge. H.R. Rep. No. 94-1476, at 162 (1976); S. Rep. No. 94-473, at 144 (1975).

Plaintiffs also argued that it would be "absurd" if "suing separately allowed rights holders to each recover their own statutory damages award, but if suing in the same action they are limited to a single award." ECF No. 392 at 40 (citing *Teevee Toons, Inc. v. MP3.com, Inc.*, 134 F. Supp. 2d 546, 548 (S.D.N.Y. 2001)). But as Plaintiffs acknowledged, their only authority for that prop-osition was expressly considered and rejected by the Second Circuit just three years ago. *See EMI Christian Music Grp.,* 844 F.3d at 94-95. *Teevee Tunes* was also dismissed as "clearly erroneous" by a leading copyright scholar. *See* 6 Patry on Copyright §22.186.

Even if policy arguments could suffice to overturn a result expressly required by statute—and they cannot—Plaintiffs' argument is not persuasive here. At the summary judgment hearing, Plaintiffs' counsel claimed that its "absurd results" argument was "not a policy argument," but was "an argument for why the context indicates otherwise" for purposes of 1 U.S.C. § 1. SJ Tr. at

Case No. 1:19-cv-00874-RBJ-MEH   Document 199-18   filed 07/13/20   USDC Colorado   pg 21
of 40
Case 1:18-cv-00950-LO-JFA   Document 682   Filed 01/31/20   Page 20 of 39 PageID# 29107

121:14-17. But the relevant "context" for purposes of 1 U.S.C. §1 is "the text of the Act of Congress surrounding the word at issue, or the texts of other related Congressional Acts." *Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 199 (1993). Plaintiffs' opinion that applying the plain meaning of Section 504(c) is economically unfair is not a valid basis for concluding that the "context" of the statute requires Plaintiffs' twisted interpretation.

Even if Plaintiffs were correct that the two groups of Plaintiffs could have sought separate awards if they had elected to sue separately, it would not matter. They chose to sue together—presumably to marshal resources and conserve expenses. Plaintiffs also ignore that because the two groups sued together, the jury was able to consider their separate harms, if any, when determining the amount of statutory damages it awarded per work. It cannot be "absurd" to hold Plaintiffs to a single award of statutory damages when that result is due to Plaintiffs' own pleading decisions—and more importantly, dictated by the plain language of the Copyright Act.

Because it is undisputed that 2,556 of the sound recordings in suit (less any works removed from the case before trial) are derivative of musical compositions in suit, Cox is entitled to JMOL that Plaintiffs cannot recover a separate award of statutory damages for those works.

**B.    A large majority of the sound recordings were registered as parts of "compilations," and are eligible for only one damages award per compilation.**

Statutory damages are available only for infringed "works," and by statute, "*all the parts* of a compilation … constitute one work."  17 U.S.C. § 504(c)(1) (emphasis added). There is no dispute that a large majority of the works in suit are "parts of a compilation," either because they were registered as parts of albums or because they were registered as parts of "works made for hire" that covered multiple songs. Each compilation is a single "work" for purposes of statutory damages. Accordingly, Cox moved for summary judgment limiting Plaintiffs' statutory damages claim to a single aware for each compilation. ECF No. 329 at 36-39. As with the derivative-works

Case No. 1:19-cv-00874-RBJ-MEH   Document 199-18   filed 07/13/20   USDC Colorado   pg 22
of 40
Case 1:18-cv-00950-LO-JFA   Document 682   Filed 01/31/20   Page 21 of 39 PageID# 29108

issue, Plaintiffs did not dispute the factual basis for Cox's motion. Because there remains no dispute that Plaintiffs' sound recordings were registered as compilations, Cox is entitled to JMOL limiting Plaintiffs to a single award per compilation.

### 1. For recordings registered as parts of albums or "works for hire," Plaintiffs can recover only one award per registration.

"An album falls within the Act's expansive definition of compilation … [and] [b]ased on a plain reading of the statute, therefore, infringement of an album should result in only one statutory damage award." *Bryant v. Media Rights Prods. Inc*., 603 F.3d 135, 140-41 (2d Cir. 2010). In enacting Section 504(c), Congress specifically intended that the one-recovery rule for compilations should apply "*regardless of whether … the individual items in the material have been or ever could have been subject to copyright.*" *Id*. at 141 (quoting H.R. Rep. No. 1476, 94th Cong., 2d Sess. 162, *reprinted in* 1976 U.S.C.C.A.N. 5659). Accordingly, the court held that because it was "the copyright holders" who "chose to issue Albums," the "plain language of the Copyright Act limits the copyright holders' statutory damages award to one for each Album" infringed. *Id*. The court so held even though the accused infringers sold "the album's songs individually." *Id*. at 142.

Similarly, Plaintiffs are entitled to only one award for recordings that were registered as "works made for hire"—a designation that, by statute, is only available when *all* of the sound recordings covered by the *single* registration are parts of a *single* "compilation."[10] 17 U.S.C. § 101. A "work made for hire" is—

> (1) a work prepared by an employee within the scope of his or her employment; or
>
> (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation,

---

[10] There were 1,113 albums registered as "works for hire" as of the summary judgment proceedings. The Plaintiffs subsequently removed a few of those works from the suit.

> as a supplementary work, as a compilation, as an instructional text, as a test, as
> answer material for a test, or as an atlas[.]

17 U.S.C. § 101. Plaintiffs have never claimed that any of the recording artists were their employ-

ees. Nor can they show that any sound recordings registered collectively as a work made for hire

were "specially ordered or commissioned" as a part of an audiovisual work, nor as a translation,

supplementary work, instructional text, test, answer material for a test, or atlas. That leaves only a

"contribution to a collective work" or "compilation." Because "[t]he term 'compilation' includes

collective works[,]" 17 U.S.C. § 101, Plaintiffs' election of work-for-hire registrations for these

sound recordings means that, by operation of law, they *cannot be anything but* compilations.[11] As

such, the works can be the basis for only one award of damages per work-for-hire registration.

### 2.      There is no dispute that the vast majority of Plaintiffs' sound record-ings were registered as albums or works made for hire.

Cox's motion for summary judgment explained that of the 7,057 sound recordings then at

issue, 6,777 were registered as "works made for hire," as albums, or both. ECF No. 329 at 36, 38.

Plaintiffs did not dispute those figures: their opposition brief raised exclusively legal arguments.

*See* ECF No. 392 at 37-38; SJ Tr. at 117:5-123:11. The paragraphs of Plaintiffs' Statement of

Additional Material Facts purporting to respond to Cox's statement on this issue do not dispute

the relevant facts set forth in Cox's Statement of Undisputed Facts. *Compare* ECF No. 329 at 4, ¶

9 *with* ECF No. 392 at vii and 4, ¶¶ 2, 3.[12]

---

[11] This form of registration provides Plaintiffs with a significant commercial advantage by estab-
lishing a corporate registrant as the work's "author" for purposes of copyright law, and precluding
the work's human creators from asserting any rights in the future. *See In re Napster, Inc. Copyright
Litig.*, 191 F. Supp. 2d 1087, 1096–97 (N.D. Cal. 2002).

[12] Cox also made a proffer on this issue, providing the Court with an exemplar compilation show-
ing nine Green Day sound recordings registered on a single registration for the album "Dookie."
Tr. 2857:4-23.

There was thus no dispute that the vast majority of the recordings in suit were registered as compilations, or that when the total number of sound recordings in suit was 7,057, the number that qualified as compilations was 6,777. Nor did any evidence at trial create such a dispute.

### 3. The independent economic value rule does not override the plain meaning of Section 504(c)(1), and Plaintiffs lacked sufficient evidence of independent value to defeat JMOL.

Rather than disputing the factual premises of Cox's motion, Plaintiffs argued in response that because "the sound recordings in suit were [also] published, distributed, and licensed by the Record Company Plaintiffs as individual works," they had independent economic value and were therefore eligible for statutory damages on a per-work basis. ECF No. 392 at 38. The Court denied Cox's motion without specifically addressing it. But because Plaintiffs' reliance on the independent economic value theory was misplaced, and because in any event they offered no evidence at trial sufficient to support a finding that their works had independent economic value, the Court should grant Cox JMOL that Plaintiffs can claim statutory damages for only the compilations.

First, Plaintiffs' reliance on the independent economic value theory was misplaced. The Copyright Act "specifically states that all parts of the compilation must be treated as one work for the purpose of calculating statutory damages … [it] provides no exception for a part of a compilation that has independent economic value[.]" *Bryant*, 603 F.3d at 142; *see also Zillow, Inc*., 918 F.3d at 747; *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1281 (11th Cir. 2015). Indeed, the Copyright Act's definition of "collective work"—"a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole"—*presupposes* that each individual work in the collection has independent value. *Id*. (quoting 17 U.S.C. § 101). Allowing Plaintiffs to evade the statutory damages limitation by claiming independent economic value therefore makes no sense

Case No. 1:19-cv-00874-RBJ-MEH   Document 199-18   filed 07/13/20   USDC Colorado   pg 25
of 40
Case 1:18-cv-00950-LO-JFA   Document 682   Filed 01/31/20   Page 24 of 39 PageID# 29111

within the statutory scheme. As the Fourth Circuit has explained, "[a]lthough parts of a compila-

tion or derivative work may be 'regarded as independent works for other purposes[,]' for purposes

of statutory damages, they constitute one work." *Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 285

(4th Cir. 2003), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154

(2010) (quoting H.R. Rep. No. 94-1476, at 162 (1976)); *see also Sullivan v. Flora, Inc.*, 936 F.3d

562, 568-569 (7th Cir. 2019).[13] Although the Seventh Circuit in *Sullivan* suggested that the Fourth

Circuit in *Xoom* sent "mixed signals, following the Second Circuit's approach in *Bryant* but sug-

gesting different facts may fit with a different construction of Section 504(c)(1)," the fact remains

that *Xoom* did follow *Bryant*, and the Fourth Circuit has not revisited the issue. *Bryant* represents

the correct understanding of Section 504(c) as Congress wrote it, and the independent economic

value theory has no application here.

Even if the independent value theory applied here to vitiate the one-award-per-compilation

rule, which it does not, Plaintiffs failed to offer sufficient evidence from which a reasonable jury

could find for them on this issue. Plaintiffs "had the burden of proving whether on the date of

infringement, each individual sound recording at issue in this case was available for purchase as a

single." *EMI Capitol Records, Inc. v. MP3tunes, LLC*, 48 F. Supp. 3d 703, 721 (S.D.N.Y.), *aff'd

in part, rev'd in part and remanded sub nom. EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,

840 F.3d 69 (2d Cir. 2016), *withdrawn from bound volume*, and *aff'd in part, rev'd in part and

remanded sub nom. EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79 (2d Cir.

2016).  To avoid the result required on the face of the statute, Plaintiffs had to present evidence

---

[13] As the Seventh Circuit explains in *Sullivan*, there is an apparent circuit split on this issue, with
several other Circuits interpreting Section 504(c)(1) to require, or at least permit, application of
the independent value test to determine if each work in suit has "copyright value unto itself and
[is] therefore an independent work … for purposes of awarding statutory damages."  *Sullivan*, 936
F.3d at 570 (citing *Gamma Audio & Video v. Ean-Chea*, 11 F.3d 1106, 1118 (1st Cir. 1993)).

Case No. 1:19-cv-00874-RBJ-MEH   Document 199-18   filed 07/13/20   USDC Colorado   pg 26
of 40
Case 1:18-cv-00950-LO-JFA   Document 682   Filed 01/31/20   Page 25 of 39 PageID# 29112

sufficient to support a finding that each of the sound recordings at issue were available as "singles" during the Claim Period and so had "independent economic value." They failed to do so.

Plaintiffs survived summary judgment on this issue by presenting declarations by record label witnesses from Sony, Universal, and Warner, each of whom stated that "during the Claim Period," his company "distributed" or "exploited" all "or virtually all" of its "claimed copyrighted sound recordings as individual tracks available online." ECF No. 392-6 (McMullen Declaration ¶ 6); ECF No. 392-5 (Leak Declaration ¶ 6); ECF No. 392-3 (Glass Declaration ¶ 6). At trial, however, Plaintiffs did not offer comparable evidence. They produced no documents demonstrating how any of the works in suit were issued or when. Only three witnesses testified for the record label plaintiffs, and two of them said nothing about how their works were available. *See* Tr. 218:5-267:10 (McMullan); Tr. 1188:3-1234:22 (Flott). The only information even touching on this issue came from Sony's Kooker, who offered a single sentence stating that sound recording downloads "typically would be available as individual tracks or also as albums." Tr. 112:16-17. This was not sufficient. In the face of undisputed evidence that the vast majority of the recordings in suit were registered as compilations, a statement by a Sony executive that sound recordings in general were "typically" available as singles "*or*" (not "and") as albums since "roughly, [the] early 2000s" could not provide the basis for a reasonable juror to conclude that Sony's works in suit—never mind the other Plaintiffs'—were available and had separate economic value as individual tracks.

*BMG* is readily distinguishable. It involved only compositions, and the plaintiffs' evidence of independent economic value was significantly stronger: a representative of the only plaintiff testified specifically that "every one of these compositions [in suit] is, in fact, available for purchase or downloading individually." *BMG Rights Mgmnt (US) v. Cox Commn'cns, Inc*., 199 F. Supp. 3d 958, 983 (E.D. Va. 2016) ("*BMG II*"). Plaintiffs here offered no such specific testimony

Case No. 1:19-cv-00874-RBJ-MEH   Document 199-18   filed 07/13/20   USDC Colorado   pg 27
of 40
Case 1:18-cv-00950-LO-JFA   Document 682   Filed 01/31/20   Page 26 of 39 PageID# 29113

regarding the recordings in suit. Cox is thus entitled to judgment that Plaintiffs can claim statutory damages for only 1,453 works. Alternatively, the Court should order a new trial on the grounds that the jury award based on 10,017 works was against the great weight of the evidence.

## III.  Cox is entitled to JMOL of no infringement by Cox Business subscribers.

Certain of Plaintiffs' claims relate to alleged infringement by users of networks supported by Cox's "Cox Business" broadband services. Cox Business subscribers include organizations whose networks may be used by dozens, hundreds, or thousands of end users. But Plaintiffs' evidence only identifies alleged infringers by the IP address of the Cox Business subscriber, which is shared by every end user on the business' network. As such, identification of a Cox Business IP address where infringement is allegedly occurring is not sufficient to identify the actual infringer. That failure of evidence dooms these claims.

In the only decision to have considered the issue, the Ninth Circuit held that a plaintiff cannot make a claim of direct or contributory copyright infringement against a broadband subscriber merely by identifying the IP address of a business where some unidentified person has engaged in infringing activity. *Cobbler,* 901 F.3d at 1147. *A fortiori*, if a business cannot be held liable for copyright infringement merely because some unidentified person is infringing on its network, then an ISP cannot be held liable for copyright infringement merely because it provides the Internet access for that network.

### A.  Evidence that infringement has occurred at a Cox Business IP address is insufficient to support liability for infringement by that business.

Proving the predicate act of direct infringement necessarily requires proof that a particular person did the infringing. *See, e.g.*, *Cobbler,* 901 F.3d at 1147 (to prove direct infringement, a plaintiff "must show that … the defendant himself violated" the copyright statute). With respect to alleged infringement by Cox Business subscribers, Plaintiffs have no such proof.

Case No. 1:19-cv-00874-RBJ-MEH   Document 199-18   filed 07/13/20   USDC Colorado   pg 28
of 40
Case 1:18-cv-00950-LO-JFA   Document 682   Filed 01/31/20   Page 27 of 39 PageID# 29114

The only evidence of any Cox Business subscriber's direct infringement consists of "Evidence Packages" purporting to show that acts of infringement occurred at an IP address registered to a Cox Business subscriber. But Cox Business subscribers are (unsurprisingly) businesses. They operate networks which, in turn, provide internet access to multiple end users. Tr. at 1473:21-1474:19 (Beck cross). All of a Cox Business subscriber's end users access the internet using the same IP address—the one assigned to the business subscriber. *See* Tr. at 1472:12-1473:3 (Beck cross). If the subscriber is (for example) a public university, then that single IP address would be associated with thousands of individual students, faculty, visitors, and employees. *Id*.

Plaintiffs' inability to prove *which* user of a particular Cox Business subscriber's IP address purportedly infringed a particular copyright is fatal to their direct infringement claims. In *Cobbler* the copyright owner traced apparent infringement to a particular IP address assigned to defendant Gonzales, whose account provided Internet service for residents of and visitors to the adult foster care home he operated. 901 F.3d at 1144-1145. The plaintiff sought to hold Gonzales liable for direct infringement "by copying and distributing copyrighted works himself," or in the alternative, for contributory infringement because he had failed to secure his internet connection. *Id.*

The district court dismissed the direct infringement claim and the Ninth Circuit affirmed, explaining that "[t]o establish a claim of copyright infringement," a plaintiff "must show that … *the defendant himself* violated one or more of the plaintiff's exclusive rights." *Id*. at 1147 (emphasis added). Plaintiff could not make that showing because the defendant's IP address "did not permit identification of a specific party that is likely to be the infringer." *Id*. The Ninth Circuit held that an "allegation that a defendant is the registered subscriber" of an IP address "associated with infringing activity" is insufficient to state a claim for direct *or* contributory infringement against

Case No. 1:19-cv-00874-RBJ-MEH   Document 199-18   filed 07/13/20   USDC Colorado   pg 29
of 40
Case 1:18-cv-00950-LO-JFA   Document 682   Filed 01/31/20   Page 28 of 39 PageID# 29115

the subscriber, because "a bare allegation that Gonzales failed to police his internet service … does not sufficiently link Gonzales to the alleged infringement." *Id.*

The defects that were fatal to the infringement claims in *Cobbler* are equally fatal here. Cox Business customers, like the defendant in *Cobbler*, provide internet service to their employees, customers, guests, and visitors. Tr. at 1474:1-1474:19 (Beck cross); 964:25-965:4, 990:11-20 (Trickey direct). Here, as in *Cobbler*, no evidence connects any act of infringement and the Cox Business subscriber, or any act of infringement to any particular end user. As in *Cobbler*, mere evidence that a Cox Business subscriber's IP address has been used by someone to infringe is insufficient to show that either any end-user or the business subscriber itself is an infringer.

### B.   Cox cannot be held contributorily liable for the infringing conduct of unspecified individuals using the networks of its business subscribers.

Of necessity, if the Cox Business subscribers cannot be held liable for direct infringement occurring on the networks that they administer, Cox cannot be held liable for that behavior merely because it connects the networks of Cox Business subscribers to the internet. In *BMG*, the Fourth Circuit specifically precluded expansion of the contributory infringement doctrine to Cox in its role as an internet service provider merely because it had "generalized knowledge … that infringement was occurring somewhere on its network." *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 311 (4th Cir. 2018). Such knowledge "is exactly what falls short" of the kind necessary to prove contributory infringement. *Id.*

The Court rejected this argument on summary judgment. It found *Cobbler* distinguishable, in part, because "the fundamental conundrum in *Cobbler* was finding and naming the right defendant; here, there is no dispute or hesitation in naming Cox as the intended defendant." ECF No. 610 at 23-24. Respectfully, that distinction is not accurate. Both cases involve unidentifiable end users and a lawsuit against a secondary defendant who provided internet access to that end user. Both

cases specifically present the question of whether the internet provider can be held liable for infringement by his unidentified end user. The primary difference is that Cox is a full degree of separation farther removed from the infringing user than Gonzales was. As the Court correctly noted, Gonzales was analogous to a Cox Business subscriber. If an intermediary like Gonzales cannot be held liable for infringement by his unknown user, it is difficult to understand how the intermediary's ISP could be held liable for infringement by the intermediary's user.[14]

In concluding otherwise, the Court found that "[t]he natural analogy is that Cox has the information to identify its subscribers in this case, just as Comcast had the information to identify Mr. Gonzales in *Cobbler*." ECF No. 610 at 25. That Cox had the information to identify its business subscribers is undisputed, but irrelevant: the trial evidence unequivocally showed that Cox did *not* have the information to identify the infringing end-users on its business subscribers' networks—just as Gonzales did not have that information about his infringing users. *See, e.g.*, Tr. 1024:19-1025:11 (Trickey direct); Tr. 1336:8-17 (Zabek); Tr. 1531:16-1532:6 (Beck direct); Tr. 2246:19-2248:5 (Feamster direct); Tr. 2503:23-2504:18 (Jarchow direct); *see also id.* at 2513:22-2514:8 (Jarchow direct). At most, what Cox had was "generalized knowledge" that there was infringement on its Business subscribers' networks. The Court's summary judgment decision suggests that given such information, the only way for Cox to avoid infringement liability was to immediately terminate the account of the Cox Business user, no matter how many innocent end-users lost their internet access as a result. Nothing in the Fourth Circuit's *BMG* opinion requires, or even suggests, that drastic result. Accordingly, we respectfully urge the Court to grant Cox JMOL or a new trial on this issue.

---

[14] The court also suggested that *Gonzales* is distinguishable because of Cox's status as an ISP. ECF No. 610 at 24.  We submit that this, too was mistaken: the DMCA reserves for ISPs the same infringement defenses available to any other party.

Case No. 1:19-cv-00874-RBJ-MEH   Document 199-18   filed 07/13/20   USDC Colorado   pg 31
of 40
Case 1:18-cv-00950-LO-JFA   Document 682   Filed 01/31/20   Page 30 of 39 PageID# 29117

## IV.     Cox is entitled to JMOL of no direct infringement.

To prove contributory and vicarious infringement by Cox, Plaintiffs were required first to prove that the 10,017 works in suit were directly infringed by Cox's subscribers, either by distributing the works in suit or by reproducing them. Plaintiffs failed to prove either. With respect to reproduction, Plaintiffs offered no evidence sufficient to prove that the copies of the works-in-suit identified on subscribers' computers were copied unlawfully. As for distribution, Plaintiffs' trial evidence established (at most) only that Cox's subscribers made the works-in-suit available for download by others—and as this Court held in *BMG*, merely making works available does not violate the Plaintiffs' distribution right. Because Plaintiffs presented no evidence of direct infringement sufficient support a jury verdict, Cox is entitled to JMOL of no infringement.

### A.     Cox is entitled to JMOL of no direct infringement of the reproduction right.

To hold Cox indirectly liable for a subscriber's direct infringement of the reproduction right, the burden is on Plaintiffs to prove that the subscriber actually made an infringing copy of a work at issue using Cox's network. *Towler v. Sayles*, 76 F.3d 579, 581 (4th Cir. 1996); *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1034 (9th Cir. 2013).

Plaintiffs have presented no evidence sufficient to prove that any Cox subscriber made unauthorized copies because there is no evidence showing *how* any Cox subscribers obtained Plaintiffs' works. The MarkMonitor system cannot determine whether copies of Plaintiffs' works detected on devices associated with Cox subscribers' IP addresses were initially purchased from iTunes, legally uploaded from a purchased CD, obtained from another legal source, or copied on some network other than Cox's—i.e., at a McDonalds, at the subscribers' workplace, at a hotel, or the like. Asked specifically whether, "[w]hen MarkMonitor identifies a peer, a Cox subscriber on a network with a file, can it tell if the peer obtained it [(the file)] from another peer on the network

Case No. 1:19-cv-00874-RBJ-MEH   Document 199-18   filed 07/13/20   USDC Colorado   pg 32
of 40
Case 1:18-cv-00950-LO-JFA   Document 682   Filed 01/31/20   Page 31 of 39 PageID# 29118

as opposed to a legitimate source like iTunes or Amazon or something like that," Plaintiffs' expert

Barbara Frederiksen-Cross gave the following response:

> Well, in the evidence I examined, it was often the case that the -- I mean, in approxi-
> mately, I think, 15 percent of the records, the peer was still collecting the evidence. So
> they only had part of the file, you know, 90 percent but not 100 percent. So that certainly
> tells me that in those instances, that peer was not getting it off of Amazon.

Tr. 484:16-25. At most, this could lead a reasonable jury to conclude that "approximately" 15%

of the works in suit were copied from some unauthorized source. Fredericksen-Cross's testimony

amounts to an admission that Plaintiffs have no proof of unlawful copying for 8,962 of the 10,017

works in suit. Indeed, because the 15% figure does not identify *which* copyrighted files were cop-

ied, it is insufficient to prove that any particular copyrights were infringed. Nor is this an academic

issue: because the copyrights in this case are owned by 53 different plaintiffs, a judgment of in-

fringement based on the 15% figure would raise an unresolvable question as to which plaintiffs

had prevailed in the case, and which had not.[15] Cox must therefore be granted JMOL of no in-

fringement or, in the alternative, a new trial.

### B.   Cox is entitled to JMOL of no direct infringement of the distribution right.

"[T]o establish a direct infringement of a rights holder's distribution right" under Section

106(3), the Plaintiffs were required to "show an actual dissemination of a copyrighted work." *BMG*

---

[15] Frederiksen-Cross also testified that:

> [T]he implication that all of these peers might have gotten something legally and then gone
> out there and created torrents for it presumably -- because if they got it legally, they
> wouldn't have a torrent – it's kind of like saying you walk into a bar and there's a guy there
> with a beer in his hand. Where did he get it? Well, he probably bought it in the bar. Is it
> possible that one of those guys or two of those guys were the ones who first created a
> torrent? As a hypothetical, that could be possible, but it's improbable.

Tr. 485:1-10.  But this gets the burden of proof backwards.  If Plaintiffs want to claim that some
of them are drinking unlawfully obtained beer, it is Plaintiffs' burden to prove which of them did.

*I* at 670 (discussing cases). Here, Plaintiffs have not proven "actual dissemination" of any work, making it impossible for a reasonable jury to find a violation of Plaintiffs' distribution rights.

The easy and obvious way to prove that a Cox subscriber "actually disseminated" a particular recording would have been to use a file-sharing protocol to actually download that recording directly from the subscriber's computer. *See BMG I* at 972 ("Courts have consistently relied upon evidence of downloads by a plaintiff's investigator to establish both unauthorized copying and distribution of a plaintiff's work.").

It is undisputed that—at least with respect to 9,973 of the 10,017 works in suit—neither Plaintiffs themselves, the RIAA, or MarkMonitor ever did this.[16] Indeed, the MarkMonitor system was intentionally configured *not* to download allegedly infringing files. *See, e.g.*, Tr. 469:10-470:6, 475:22-25, 581:4-582:18 (Fredericksen-Cross). The MarkMonitor system can be configured to download a copy of every allegedly infringing file but Plaintiffs chose to purchase a cheaper option that relies entirely on metadata. The only actual download of any file occurred when the system downloaded a "reference file," from which metadata was extracted that was later used as a point of comparison for metadata obtained from Cox subscribers. There is no evidence that any of those reference file downloads were obtained from a Cox subscriber.

Plaintiffs' failure to actually download any of the allegedly infringing files makes this case readily distinguishable from *BMG*, in which the record label's agent "downloaded approximately 100,000 full copies of BMG's works using Cox's service." *BMG I* at 663, 670; *see also BMG II* at

---

[16] For just 143 of the 175,968 "Evidence Packages" that constitute Plaintiffs' evidence of infringement, the value of the "downloaded" variable is non-zero, but still shows that *less* than the entire file may have been downloaded. Plaintiffs cannot prove that any such fragmentary portion would have included *any* pieces from *any* of the works-in-suit. Accordingly, Plaintiffs' claim for infringement of their distribution right also fails with respect to these 143 Evidence Packages—which, in any event, pertain to only 44 of the works-in-suit. *See* Tr. 580:9-581:3 (Fredericksen-Cross cross).

Case No. 1:19-cv-00874-RBJ-MEH   Document 199-18   filed 07/13/20   USDC Colorado   pg 34
of 40
Case 1:18-cv-00950-LO-JFA   Document 682   Filed 01/31/20   Page 33 of 39 PageID# 29120

972 (holding that "the evidence that Cox IP addresses uploaded 100,00 copies of BMG's works to Rightscorp can form the basis of a distribution claim."). Without evidence of actual downloads of the allegedly infringing files, Plaintiffs have no direct evidence of "actual dissemination" sufficient to carry their burden of proof.

Nor is there circumstantial evidence sufficient to support a finding of actual dissemination. At most, Plaintiffs' evidence demonstrated that a particular Cox subscriber was making available a particular work for sharing. Responding specifically to a question asking why she disagreed that Plaintiffs lacked evidence of infringement, Plaintiffs' expert Fredericksen-Cross explained that she had "examined about 175,000 evidence cases[,]" and that "[e]very one of those cases included hash information for the file that the peer itself had reported that it was *making available to distribute*." Tr. 481:17-482:3. She further explained that the evidence cases represented "actual activity that the peer running the client software is responding to a request for a file *with information about the file it has to share*." Tr. 482:4-7. That is, the evidence cases do not establish that a file was actually shared; they establish only that a computer connected to Cox's network through a subscriber's account provided information to about a file it *could* share. Indeed, asked whether it was possible to "uncover the number of times that [a] Cox user distributed files," Fredericksen-Cross replied, "[n]ot in any practical way, no." Tr. 453:15-18. She then explained that (absent the download that Plaintiffs chose not to pay for) there is no way for anyone to determine whether a Cox subscriber actually distributed a file without conducting a forensic examination of his computer—and even then, "you would not have evidence of all of their activity." Tr. 453:15-454:5.

As a matter of law, that evidence is insufficient to prove the "actual dissemination" required to establish infringement of the distribution right. At most, it proves that Cox subscribers were

Case No. 1:19-cv-00874-RBJ-MEH   Document 199-18   filed 07/13/20   USDC Colorado   pg 35
of 40
Case 1:18-cv-00950-LO-JFA   Document 682   Filed 01/31/20   Page 34 of 39 PageID# 29121

making available works for potential downloading by others. But "evidence of Cox account hold-ers making copyrighted works available for download is insufficient to show distribution." *BMG I* at 664. Other courts reach the same conclusion. *See, e.g.*, *Atlantic Recording Corp. v. Howell*, 554 F. Supp. 2d 976, 983 (D. Ariz. 2008); *UMG Recordings, Inc. v. Hummer Winblad Venture Partners (In re Napster, Inc.)*, 377 F. Supp. 2d 796, 802 (N.D. Cal. 2005).

Responding to this argument in opposing summary judgment, Plaintiffs had little to say. They referred to the Fourth Circuit's decision in *Hotaling v. Church of Jesus Christ of Latter-Day Saints,* 118 F.3d 199 (4th Cir. 1997), but this Court already considered that decision at length in *BMG* and rejected its application. *See BMG I* at 665-667. They also pointed to the supposedly "tit-for-tat way that BitTorrent works," suggesting that because "[i]n the BitTorrent protocol, any par-ticipating peer will generally be downloading or retrieving pieces of the file as well as providing" pieces of the same file, it must be true that "when MarkMonitor detected the Cox subscribers online, running the P2P software, and 'sharing' an unauthorized copy of Plaintiffs' works, there can be no reasonable question that the subscriber distributed the file." ECF No. 392 at 19-20. The logical flaws in that argument are obvious. First, at the most it is applicable to the 15% of files that Frederiksen-Cross allegedly observed downloading. For the 85% of peers that were not observed downloading a file, there is no basis to assume they were doing anything other than making an upload available. Second, the argument equates the presence of BitTorrent software on a computer and the reported availability of a file for sharing with actual distribution. But that is exactly what the cases preclude. Third, Plaintiffs make this argument only with respect to the BitTorrent proto-col, but there were three other protocols used by the accused infringers in this case.

Case No. 1:19-cv-00874-RBJ-MEH   Document 199-18   filed 07/13/20   USDC Colorado   pg 36
of 40
Case 1:18-cv-00950-LO-JFA   Document 682   Filed 01/31/20   Page 35 of 39 PageID# 29122

Plaintiffs' trial evidence is deficient for the same reasons. Asked to explain why she be-lieved that Plaintiffs had sufficient evidence that Cox subscribers distributed infringing files, Fred-ericksen-Cross referred to the "tit-for-tat way that BitTorrent works," explaining that because Bit-Torrent "prioritize[s] exchanges with peers that are … downloading to you," evidence that a par-ticular peer was downloading files necessarily means the peer was simultaneously uploading files. Tr. 486:14-488:14. But as explained, Plaintiffs have no evidence that any particular Cox subscrib-ers were downloading any particular files. And absent such evidence, the "tit-for-tat" argument is simply another way of saying that files were available for distribution. Cox is therefore entitled to JMOL of no infringement of the distribution right or, in the alternative, a new trial.

## V.      Cox is entitled to JMOL of no contributory liability.

To prove that Cox is liable for contributory infringement by its subscribers, Plaintiffs had to establish that Cox induced, caused, or materially contributed to specific acts of direct infringers. Plaintiffs made no attempt to prove that Cox either induced or caused any infringement. Material contribution is found when the defendant "engages in personal conduct that encourages or assists the infringement." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007). Plaintiffs presented no evidence sufficient to meet that standard.

The only evidence Plaintiffs offered to prove "material contribution" was evidence that: (1) Cox provided internet access to subscribers who used that access to infringe, (2) Cox did not terminate those subscribers after receiving a certain number of infringement notices, and (3) Cox "provided anonymity" to infringing subscribers.[17] That evidence is insufficient to permit the jury to conclude that Cox "encouraged or assisted" the direct infringement. Indeed, the evidence shows that Cox had an active and effective policy of *dis*couraging infringement, notifying its subscribers

---

[17] *See* Tr. 2951:2-23 (Plaintiffs' closing argument).

Case No. 1:19-cv-00874-RBJ-MEH   Document 199-18   filed 07/13/20   USDC Colorado   pg 37
of 40
Case 1:18-cv-00950-LO-JFA   Document 682   Filed 01/31/20   Page 36 of 39 PageID# 29123

of infringement allegations, graduating to soft and then hard suspensions, and ultimately—in some cases—terminating the subscriber. On this evidence, a reasonable jury could not conclude that Cox was "encouraging or assisting" that infringement.

Cox's active efforts to discourage infringement are what distinguishes this case from (for example) the Ninth Circuit's decision in *Perfect 10, Inc. v. Amazon.com*, 508 F.3d 1146, 1172 (9th Cir. 2007), in which it held that "Google could be held contributorily liable if it had knowledge that infringing Perfect 10 images were available using its search engine, could take simple measures to prevent further damage to Perfect 10's copyrighted works, and failed to take such steps." *Id.* Here, Cox *did* take "simple measures to prevent" further infringements by its subscribers, and the evidence showed that those measures were largely successful. *See* Tr. at 1962:1-1963:10 (Weber direct); *id.* at 1591:14-1592:3; PX-325. That those measures did not always include the most drastic available measure—termination—does not somehow convert Cox's efforts to *dis*courage infringement into an effort to *en*courage it. This is particularly true here, because the graduated response system that Cox used to discourage infringement was all but identical to—but more rigorous than—the CAS system that Plaintiffs expressly endorsed.

We are aware of no precedent in which a defendant took active and largely successful measures to discourage infringement and was nonetheless found to have "materially contributed" to that infringement. In light of the evidence presented at trial, a reasonable jury could not find that Cox materially contributed to any direct infringements. Cox is entitled to JMOL of no contributory liability or, in the alternative, a new trial.

## CONCLUSION

For all these reasons, Cox requests that Court grant Cox judgment as a matter of law or, in the alternative, a new trial.

Case No. 1:19-cv-00874-RBJ-MEH   Document 199-18   filed 07/13/20   USDC Colorado   pg 38
of 40
Case 1:18-cv-00950-LO-JFA   Document 682   Filed 01/31/20   Page 37 of 39 PageID# 29124

Dated: January 31, 2020

Respectfully submitted,

*/s/ Thomas M. Buchanan*
Thomas M. Buchanan (VSB No. 21530)
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc.
and CoxCom, LLC*

*Of Counsel for Defendants*

Michael S. Elkin (*pro hac vice*)
Thomas Patrick Lane (*pro hac vice*)
Sean R. Anderson (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
Email: melkin@winston.com
Email: tlane@winston.com

Jennifer A. Golinveaux (*pro hac vice*)
Thomas J. Kearney (*pro hac vice*)
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA 94111-5840
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
Email: jgolinveaux@winston.com
Email: tkearney@winston.com

Michael L. Brody (*pro hac vice*)
WINSTON & STRAWN LLP
35 W. Wacker Dr.
Chicago, IL 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
Email: mbrody@winston.com

Diana Hughes Leiden (*pro hac vice*)
WINSTON & STRAWN LLP
333 S. Grand Avenue, Suite 3800
Los Angeles, CA 90071
Telephone: (213) 615-1700
Facsimile: (213) 615-1750
Email: dhleiden@winston.com

Geoffrey P. Eaton
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5705
Fax: (202) 282-5100
Email: geaton@winston.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 31, 2020, the foregoing was filed and served electronically

by the Court's CM/ECF system upon all registered users.


*/s/ Thomas M. Buchanan*
Thomas M. Buchanan (VSB No. 21530)
1700 K Street, NW
Washington, DC 20006-3817
Tel: (202) 282-5787
Fax: (202) 282-5100
Email: tbuchana@winston.com

*Attorney for Cox Communications, Inc.*
*and CoxCom, LLC*