# Exhibit 24



North America   Europe   Asia

101 California Street
34th Floor
San Francisco, CA 94111
T +1 415 591 1000
F +1 415 591 1400

**JENNIFER A. GOLINVEAUX**
jgolinveaux@winston.com

June 23, 2020

**VIA EMAIL**

Special Master Regina Rodriguez
Regina.rodriguez@wilmerhale.com

Re: *Warner Records, Inc., et al. v. Charter Communications, Inc.*, 19-cv-00874-RBJ-MEH (D. Colo.) – Charter's Response to Plaintiffs' June 16 Request for Reconsideration of the May 29, 2020 Order ("May 29 Order")

Dear Ms. Rodriguez:

Plaintiffs seek reconsideration of two aspects of the Special Master's May 29 Order based upon a recent post-trial decision in *Sony Music Entm't v. Cox Commc'ns, Inc.*, No. 1:18-CV-950-LO-JFA (E.D. Va.) ("*Sony*"), ECF No. 707 (the "*Sony* Post-Trial Order"). Plaintiffs' motion should be denied, as it does not demonstrate "manifest error of law or fact or present[] newly discovered evidence." *See Nat'l Bus. Brokers, Ltd. v. Jim Williamson Prods.*, Inc., 115 F. Supp. 2d 1250, 1256 (D. Colo. 2000); *see also Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000) ("[A] motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law. It is not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing."). Plaintiffs fail to meet their burden with respect to either issue.

I. **Plaintiffs Fail to Meet Their Burden to Reverse the May 29 Order Regarding Plaintiffs' Overbroad RFP 43 Regarding BitTorrent**

RFP 43 sought all "Documents discussing the impact of Subscribers' use of BitTorrent and/or peer-to-peer networks on your current or future profits." The May 29 Order directed Plaintiffs to narrow the scope of the overbroad request "to specifically target infringing activity" because of clear, and uncontested, evidence presented by Charter that BitTorrent "is used for many legitimate purposes." May 29 Order at 38. Rather than narrow the request as directed, Plaintiffs argue that the May 29 Order should be reversed or withdrawn based upon evidence cited in the *Sony* Post-Trial Order.[1]

In doing so, Plaintiffs misconstrue the scope and findings of the *Sony* Post-Trial Order, which concerned Cox's post-trial challenge to the *Sony* Plaintiffs' evidence of the underlying direct infringement of their works on peer-to-peer networks. *See Sony*, ECF No. 682 at 24-25, 28-29 (Cox's Mem. of Law in Support of its Renewed Motion for Judgment as a Matter of Law, or in the Alternative, a New Trial Under Federal Rules of Civil Procedure 50(b) and 59(a)). Cox challenged the *Sony* Plaintiffs' claim that evidence that a work was merely available on a peer-to-peer network was sufficient to prove that the work was unlawfully obtained. The Court concluded, based on the evidence, that a reasonable juror could have credited the studies the *Sony* Plaintiffs' experts presented concerning the prevalence of illegal content on

---

[1] To the extent Plaintiffs suggest that the record below was incomplete, that does not justify reconsideration as they had an opportunity to cite the reports with their initial briefing; they are not "newly discovered evidence."



June 23, 2020<br>Page 2

BitTorrent. But it is an axiom of first-year civil procedure that finding that a reasonable juror could conclude that an alleged fact is true, is not the same thing as finding that a reasonable juror necessarily found that the fact is true, particularly where, as here, the jury entered a general verdict on liability. And even if the *Sony* court had made such a finding, it would not be binding on all non-parties in all other cases for all time. Indeed, Charter intends to present contrary evidence in this case.

Second, the studies submitted by Plaintiffs simply do not support Plaintiffs' claim that 99% of all BitTorrent traffic is infringing. Plaintiffs' Ex. 1 (Price, Sizing the Piracy Universe ("Price")) actually finds that only 69.7% of BitTorrent content is infringing, which necessarily means that 30.3% of BitTorrent traffic is not. *See* Plaintiffs' Ex. 1 at 85, Table 8.1.2; *see also, id*. at 30, Table 3.5.1 (All BitTorrent traffic represented 12.4% of North American bandwidth in 2010, but infringing BitTorrent traffic represented only 8.7% of North American bandwidth). Indeed, specifically with reference to what is at issue here—BitTorrent *music* files—Price reports only 7.6% of BitTorrent files fall into this category, *id.* at 29, Chart 3.5.1, and he further reports that only 78.1% of BitTorrent music files found on a BitTorrent site typically characterized as a "hotbed" of infringement were in fact infringing; this implies that 21.9% of BitTorrent music files were not. *Id.* at 13. Moreover, it is important to emphasize that Price reached the conclusion that 30% of BitTorrent traffic is not infringing not by analyzing BitTorrent traffic as a whole, but by analyzing "over six hundred web sites which form the basis of the visitor measurement analytics used in some of the different sections of this report."[2]  Those web sites, however, were selected because they were "verified … as being focused on providing infringing content.  "Focused" means that the infringing material comprises more than half of all links or files posted on the site." *Id.* at 13. In other words, Price finds that piracy is rampant based on his analysis of websites "focused on providing infringing content." *Id.* Even relying on this selectively skewed sample, his finding is that 30% of the content and 20% of the music files are non-infringing. One can only wonder what the numbers would have been if he had analyzed a data universe the was not biased toward infringing behavior.

As for Plaintiffs' Exhibit 2, (Mateus, Quantifying Global Transfers of Copyrighted Content Using BitTorrent ("Mateus")), it is not much more helpful. Mateus calculates the percentage of "transferred copies" that fall into different categories of content, finding that 34.9% of the transferred files are "songs" or "music albums," and that 26.6% are "software," "documents," or "adult content."[3] Mateus nonetheless concludes that 99.45% of all transfers are noninfringing because the number of transfers indexed on sites dedicated to identifying lawful BitTorrent content represent only 0.55% of the total. *See* Plaintiffs' Ex. 2, Section 3.3. But the fact that these sites manage to index only a handful of transferred files does not mean that they purport to be comprehensive arbiters of issues of copyright law on the internet. And the findings of the Price study, Plaintiffs' own source, are flatly to the contrary.

Finally, it is relevant to this issue to recognize that the peer-to-peer networks of the early 2010's (i.e., the period at issue in this case) were to a large degree "choked" by fake "copies" of supposedly copyrighted content. *See* Ex. 1 (Santos et al., *Funnel: Choking Polluters in BitTorrent File Sharing*

---

[2] These analytics are used in the section dealing with BitTorrent. *See* Plaintiffs' Ex. 1, Section 3.
[3] Software and document distribution were among the most widely recognized legitimate forms of peer-to-peer file sharing. *See* Ex. 4, "BitTorrent and the Legitimate Use of P2P," *available at* http://www.joestewart.org/p2p.html (discussing legitimate uses of BitTorrent including sharing free software upgrades, disseminating current news, and sharing legitimately obtained and distributed music). The legality of files containing adult content was notoriously difficult to determine and was typically not included in analyses of internet piracy. *See* Price, at 80.



*Communities*, IEEE Transactions on Network and Service Management, Dec. 2011, pp. 1); *see also* Ex. 3 (Liang et al., *Pollution in P2P File Sharing Systems*, 24th IEEE International Conference on Computer Communications (INFOCOM 2005), pp. 1174-1185). One article estimated that, for the "top-250 movies" in 2010, the number of shared files labelled "FAKE" or "BAD" by users was almost 2.4 times the number labelled "VERIFIED" or "GOOD"; that is, more than two-thirds of the files that were evaluated were not what they purported to be. See Ex. 1 at 2; *see also* Ex. 3, at 9 (Showing "pollution" rates of 20%-75% for popular songs). These studies and others from the period report that the principal sources of such fake files were internet trolls seeking to propagate Trojan horses and similar malware or "antipiracy agencies" seeking to pollute peer-to-peer networks. *See* Ex. 2 (Cuevas, et al., *Is Content Publishing in BitTorrent Altruistic of Profit-Driven* at 2-4). But if (as Price found) only 70% of BitTorrent traffic appeared to contain infringing content in 2010, and if two-thirds of facially infringing content was fake, then only about 42% of peer-to-peer content was actually made up of infringing files during the relevant time period. The majority of the content—58%—was either non-infringing files or fakes.

Plaintiffs fail to present newly discovered evidence or a manifest error of fact to justify their motion for reversal or withdrawal of the May 29 Order on RFP 43. They are free to seek more tailored discovery in accordance with the May 29 Order. Their motion should be denied.

II. **There is No Basis to Reverse the May 29 Order Requiring a Response to MPP Interrogatories 13 and 14, or to Delay Plaintiffs' Response for Months Based on *Sony***

In *Sony*, Judge O'Grady held that Plaintiffs cannot double recover statutory damages for sound recordings in suit that overlap with music compositions in suit. *Sony* Post-Trial Order at 52. This issue had been raised by Cox at summary judgment, but the *Sony* court declined to rule on it at that stage, taking it up for the first time in response to post-trial briefing. *Id.* at 22, 52. Plaintiffs now argue that the *Sony* court put the burden on Cox to identify the overlap, and so, the Special Master incorrectly required the MPPs to respond to interrogatories seeking this same information. Plaintiffs are wrong for multiple reasons.

The *Sony* court did not reverse the burden on this issue, as Plaintiffs suggest. After ruling for Cox on this issue, it simply determined that the most practical post-trial procedure for determining the overlap on a closed record was to have Cox first brief the specific number of works that should be dropped from the case, and then Plaintiffs could respond. *Sony* Post-Trial Order at 51-52. The procedural posture of that order is a far cry from the Special Master's ruling on a discovery motion that the MPPs, who indisputably have this information, should respond to Charter's interrogatories and provide it at this stage. No one, presumably including the *Sony* court, would dispute that developing this issue in discovery so that it can be resolved based upon undisputed facts at summary judgment *before trial* is preferable to addressing it post-trial, particularly where, as here, it is likely to knock thousands of works and hundreds of millions of dollars in potential exposure out of the case. Plaintiffs also fail to justify delaying providing this information for months out of vague concerns that the "facts" provided by responding to these interrogatories will somehow pervert the record in *Cox*. Plaintiffs have failed to meet their burden on either issue and their motion should be denied.

    a.    **The May 29 Order requiring Plaintiffs to perform this analysis should stand**

The law governing this issue is clear, and made even clearer by the recent *Sony* decision. In a copyright infringement case where plaintiffs assert both a music composition and a corresponding sound



recording, as here, the plaintiffs are entitled to only a single award of statutory damages for the overlapping works, should they establish liability. *See* 17 U.S.C. 504(c); *see also EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 94 (2d Cir. 2016); *Sony* Post-Trial Order at 36-49. This is because the sound recording is "derivative" of the music composition. *Id.*; *see also* 17 U.S.C. § 101. In this case, while Plaintiffs assert 11,027 separate works (6,963 sound recordings and 4,064 music compositions), should they establish liability, Plaintiffs are entitled to statutory damages on only a fraction of that total. By Charter's count, approximately 3,000 sound recordings are derivative of music compositions, reducing Charter's potential exposure by hundreds of millions of dollars.

Based on the clear law and significance of the calculation for purposes of statutory damages, Charter served an interrogatory for this basic factual information. The Special Master ordered Plaintiffs to provide it because "Charter has demonstrated that the Plaintiffs' burden of producing the requested information is less than Charter's." May 29 Order at 25 (citing FRCP 33(d)). Nothing from the *Sony* Post-Trial Order changes that. For the reasons set forth in Charter's May 8, 2020 motion to compel, the parties' May 15, 2020 hearing, Charter's May 20, 2020 supplemental brief, and herein, there is no basis to reverse the May 29 Order and deny Charter's motion to compel Plaintiffs to identify the music compositions and sound recordings that overlap in this case.

And of course, the information Charter requests with MPP Interrogatories 13 and 14 is already in Plaintiffs' possession. This is because the 42 Music Publisher Plaintiffs did not send any notices to Charter and, separately, none of their 4,064 compositions in suit are identified by name in any of the notices of alleged infringement sent by the Record Company Plaintiffs. Instead, the Record Company Plaintiffs' notices identify a single sound recording (e.g., a music file, such as a mp3 of an album or album track). Thus, before they filed suit on behalf of the Music Publisher Plaintiffs, Plaintiffs necessarily determined which music compositions were recorded on the music files. In other words, Plaintiffs determined the sound recording/music composition overlap, which is the subject of Charter's interrogatories. Plaintiffs do not dispute this. Because the burden on Plaintiffs is necessarily less than it is on Charter, this information should be provided through an interrogatory, as ordered. *See* May 29 Order at 25.

In their request for reconsideration, Plaintiffs neither challenge the legal relevance of this information nor articulate any burden with providing it. Instead, Plaintiffs' requested reversal of the May 29 Order was spurred by the *Sony* Post-Trial Order.[4] Plaintiffs argue that because the *Sony* court ordered Cox to initially correlate the evidence from a closed record post-trial, the same should be true here for purposes of <u>discovery</u>. But the procedural postures of the two cases could not be more different.

In *Sony*, Cox moved for summary judgment on the derivative works issue, which the *Sony* court did not address, thus deferring the issue for trial.[5] At trial, the *Sony* court declined to instruct the jury (as Cox had requested) to make only one statutory damages award for the overlapping works. Following trial, however, the *Sony* court granted in part Cox's post-trial motion and ruled that the *Sony* plaintiffs are **not** entitled to separate awards for overlapping compositions and recordings. Cox argued in its post-trial motion that the trial evidence was sufficient to demonstrate the overlap. Thus, given this procedural posture, the

---

[4] Plaintiffs did not meet and confer with Charter about their intention to seek a reversal of the Special Master's order. *See* Charter's Response to Plaintiffs' Local Rule 7.1 Certification.

[5] After summary judgment was decided, Plaintiffs withdrew from their trial exhibit list a proposed exhibit that identified the number of overlapping sound recordings and music compositions. *See* Ex. 5 (PX-38).



*Sony* court ordered Cox to perform this analysis based on the trial record. In response to Cox's post-trial submission, the *Sony* plaintiffs will no doubt argue that the trial record is insufficient to support the overlaps Cox has identified. In other words, despite Cox having identified **accurate overlaps**, Plaintiffs will argue that the *Sony* court should disregard them due to insufficient trial record support. For obvious reasons, Charter endeavors to avoid this protracted procedure.

Charter intends to move for summary judgment on this issue. Plaintiffs' verified interrogatory response identifying the overlap will provide a clean factual record and there should be no factual dispute precluding summary judgment, allowing for an efficient resolution of this important yet basic issue. Charter endeavors to avoid the protracted disputes over this basic information that ensued in *Sony*. As is contemplated by the Federal Rules, and the May 29 Order, this is the most efficient means to resolve this issue. While Charter could attempt to perform this analysis itself, based on a review of the titles of the works, the underlying U.S. Copyright Office registration certificates, and additional documentation, Charter expects Plaintiffs to object to such a methodology, as they undoubtedly will do in *Sony*. Thus, Charter would be required to depose each Plaintiff Group and question the witness on the information it seeks through this interrogatory regarding the thousands of music compositions in suit. This is obviously an inefficient means to conduct discovery and, further, demonstrates that the burden in responding to these interrogatories is far less for Plaintiffs (who have already done this analysis) than Charter.

      **b.**      **There is no justification for delaying Plaintiffs' response for months**

Plaintiffs also ask that they not be required to respond to the interrogatory until after Cox files its post-trial submission in *Sony*. There is no good reason to delay this production. Plaintiffs elected to sue Charter while having a pending case proceeding against Cox. Cox will respond to the *Sony* court's order and identify the overlap at issue and point to record evidence in support.

While Plaintiffs attempt to mask the fact that they are seeking refuge from having to disclose what should be consistent facts, they claim their request seeks to preserve the integrity of the *Sony* trial record. In reality, what Plaintiffs are seeking to preserve is their own credibility with the Courts. If Plaintiffs are providing accurate facts, there should be no concern, and there is certainly no valid reason to delay production just because Plaintiffs have multiple cases pending. Whether a sound recording is derivative of a music composition is a fact not subject to dispute. The delay would also prejudice Charter, who intends to begin serving Rule 30(b)(6) deposition notices on Plaintiff groups in the next week. It should not be required to put off depositions while awaiting basic discovery for months based upon Plaintiffs' vague and misguided concerns about the facts coming out in the Charter case while the *Sony* case is being briefed. Plaintiffs should not be permitted to further delay their response to Charter's interrogatories, which were served over four months ago. The Special Master should deny Plaintiffs' request to delay their submission.

Sincerely,

*s/ Jennifer A. Golinveaux*



June 23, 2020<br>Page 6

**CHARTER'S RESPONSE TO PLAINTIFFS' LOCAL RULE 7.1(A) CERTIFICATION**

Plaintiffs' June 8, 2020 email did not state as a basis for reconsideration of the Special Master's May 29, 2020 Order that Plaintiffs were considering seeking a reversal of the order with respect to MPP Interrogatories 13 and 14. Similarly, during the parties' June 9, 2020 telephonic conferral, Plaintiffs' counsel did not indicate that Plaintiffs sought the reversal of the order, only that Plaintiffs would seek an order permitting them to answer the interrogatories sometime after Cox made its post-trial submission in *Sony Music Entm't v. Cox Commc'ns, Inc.*, No. 1:18-CV-950-LO-JFA (E.D. Va.).

During the parties' June 12, 2020 telephonic conference with the Special Master, Plaintiffs did not indicate that they intended to seek a complete reversal of the order. Rather, Plaintiffs again indicated that their concern was one related to timing.

Respectfully submitted,
*s/ Jennifer A. Golinveaux*