# Exhibit 2

**Statement of Pending Discovery Disputes (June 26, 2020)**
Submitted by: Defendant Charter Communications, Inc. ("Charter")

I.   **Audible Magic Reference Files and Fingerprints**

| Request at Issue (verbatim) | Response to Request (verbatim) | Explanation of Position | Opposing Party Response |
|---|---|---|---|
| **RFP 90**: For the Copyrighted Works, copies of the digital files You used (or provided to a third party to use) to create a digital fingerprint through the Audible Magic System that were used by Audible Magic and/or MarkMonitor in connection with the creation of the infringement notices sent to Charter.<br><br>**RFP 91**: For the works for which you created digital fingerprints, as described in Request No. 92,[1] | **Objs. to RFP 90**: Plaintiffs object to the request as overly broad, unduly burdensome, irrelevant, and not proportional to the needs of the case, including because Plaintiffs have already produced, or will be producing digital copies of the works in suit and infringing copies of the works in suit. No other copies are necessary to establish direct infringement and therefore are not relevant or proportional to the needs of the case. Therefore, the burden and/or | In response to Charter RFP 2,[3] Plaintiffs produced or are producing digital copies of their sound recordings in suit.<br><br>At issue here is RFP 90, seeking the Reference Files,[4] and RFP 91, seeking documents sufficient to show the "fingerprints"[5] made from those Reference Files. Before moving to compel a response to RFP 90, Charter asked Plaintiffs to confirm whether the digital files produced in response to RFP 2 are copies of | • RFP 90 asks for "*copies* of the digital files . . . used . . . to create a digital fingerprint[.]"  As explained in previous letters, Plaintiffs already confirmed that the vast majority of copies they produced in response to RFP 2 are in fact the "copies" called for in RFP 90.  Plaintiffs are in the process of confirming the remaining minority of works, and will produce further copies to the extent necessary.  This satisfies Charter's demand in RFP 90. |

---

[1] RFP 92: Documents and communications sufficient to show the process used to create the digital fingerprints for the Copyrighted Works used by Audible Magic and/or MarkMonitor to match alleged infringements.

[3] RFP: 2 Full digital copies of all Copyright Works, including any and all versions of each Copyright Work You claim has been infringed, and any version submitted to the United States Copyright Office of the Library of Congress.

[4] "Reference Files" are copies of the digital files used to create fingerprints used to verify the alleged direct infringements at issue.

[5] A "fingerprint" is a unique identifier for a sound recording, which can be used to determine whether another file contains an identical sound recording. Plaintiffs claim they used fingerprints to determine whether an infringing file contained a copy of a work in suit.

| | | | |
|---|---|---|---|
| documents sufficient to show those digital fingerprints. | expense of the proposed discovery outweighs any likely benefit.<br><br>**Resp. to RFP 90**: Pursuant to the foregoing objection, Plaintiffs have or will produce digital copies of the recordings in suit and infringing copies of the works in suit.<br><br>**Objs. to RFP 91**: Plaintiffs object to the request as overly broad, unduly burdensome, irrelevant, and not proportional to the needs of the case, including because Plaintiffs have already produced, or will be producing digital copies of the works in suit and infringing copies of the works in suit. No other copies are necessary to establish direct infringement and therefore are not relevant or | the Reference Files.[6] Plaintiffs refused and the Special Master ordered them to do so.<br><br>On June 1, Plaintiffs responded but did not comply with the order, as they refused to confirm whether the produced files are copies of the Reference Files, instead arguing that the question was irrelevant and that the "ISRCs" for a subset of the digital files match, though refusing to say what reference material they used to make that determination.<br><br>Charter asked that Plaintiffs comply, answer the question, and provide the source used to match the ISRCs. Plaintiffs refused. That issue is currently before the Special Master.[7] Charter now seeks an order compelling | • Charter's argument that Plaintiffs "did not comply" with the Special Master's April 28 order is wrong. Plaintiffs confirmed that the produced files are the same as the Reference Files. As Plaintiffs explained in their June 1 and June 15 submissions, the way to determine that *is* by reference to "ISRCs." An ISRC is a unique and permanent identifier that can never represent more than one unique sound recording. Because of this, a digital file associated with a given ISRC in 2015 will have the same audio content as a digital file associated with that ISRC today.<br><br>• RFP 91 seeks irrelevant, burdensome, and cumulative information. Charter does not |

[6] The Special Master previously denied Charter's motion to compel without prejudice as premature, pending Plaintiffs' June 1, 2020 response. *See* May 29, 2020 Order at 25-26.

[7] Plaintiffs refuse to produce the information they used to match the ISRC codes claiming it is not called for by RFP 90 or 91. This is disingenuous, as Plaintiffs are then relying on information they claim is not responsive to Charter's requests to attempt to satisfy Charter's request. Charter is entitled to this information to determine whether Plaintiffs' representations are accurate. In any event, this information is responsive to Charter's RFP 92, which Plaintiffs have agreed to answer. *See supra*, n.1; Resp. to RFP 92 ("Subject to the foregoing objections, Plaintiffs will produce non-privileged, non-work product documents responsive to this request to the extent such documents exist and can be found in Plaintiffs' possession, custody, or control after a reasonable and diligent search.").

| | | | |
|---|---|---|---|
| | proportional to the needs of the case. Therefore, the burden and/or expense of the proposed discovery outweighs any likely benefit.<br><br>**<u>Resp. to RFP 91</u>**: Pursuant to the foregoing objection, Plaintiffs have or will produce digital copies of the recordings in suit and infringing copies of the works in suit.[2] | Plaintiffs to respond to RFPs 90 and 91.<br><br>RFP 90 seeks the Reference Files. As discussed, if what Plaintiffs have produced are copies of the files used to create the Reference Files, then this request is satisfied. If not, the Reference Files should be produced. If Plaintiffs do not have the Reference Files, Charter is entitled to that information, as it bears on Plaintiffs' ability to prove direct infringement in this case (and to what extent the fact-finder assigns any weight to the direct infringement "evidence"), a necessary prerequisite to the secondary claims against Charter. The Reference Files are fundamental because Plaintiffs did not download the allegedly infringing files from Charter subscribers because MarkMonitor charged more money to do so, and instead relied solely upon a metadata matching process that | need the fingerprint used by Audible Magic—in some cases from *eight years ago*—to determine if the works are infringing. Charter has both the infringing recordings and the legitimate recordings. Charter can conduct this comparison using those materials alone.<br><br>• Further, Charter's RFP 92 does not call for the production of any digital fingerprint. As such, Plaintiffs' willingness to search for and produce documents sufficient to demonstrate the *process* of creating fingerprints, as requested and to the extent they exist, does not encompass the fingerprints themselves.<br><br>Similarly, Charter has not served any request calling for production of "the information . . . used to match the ISRC codes." The plain text of the three RFPs Charter cites in its improper |

---

[2] Charter does not intend to misstate Plaintiffs' response and, accordingly, has copied Plaintiffs' served responses to these requests in the column, as ordered. That said, there has been correspondence between the parties regarding these request subsequent to Plaintiffs' responses, in which Plaintiffs have explained their position. To the extent Charter believes Plaintiffs' position is necessary to explain Charter's request, Charter has incorporated that into the "Explanation of Position" column. Charter expects Plaintiffs to supplement their position in the "Opposing Party Response" column.

| | | relied on the Reference Files to match alleged infringements. The Reference Files provide a key link in Plaintiffs' ability to prove direct infringement.<br><br>RFP 91 seeks "documents sufficient to show [the] digital fingerprints." Again, Plaintiffs refuse to produce responsive documents on the basis that they are producing digital copies of the works in suit. But those files are not responsive to a request seeking fingerprints. Charter seeks this information so that it can analyze *what* Audible Magic was matching alleged infringements against. Plaintiffs created these fingerprints (at least for some works), provided them to Audible Magic, MarkMonitor, and/or the RIAA,[8] and they were then used by Audible Magic and MarkMonitor to purportedly verify the alleged infringements at issue.[9] As with RFP 90, whether | footnote makes this abundantly clear: RFP 90 seeks "copies of digital files"; RFP 91 seeks documents sufficient to show the Audible Magic fingerprints; RFP 92 seeks documents "sufficient to show the process used to create the digital fingerprints." |
|---|---|---|---|

---

[8] Documents produced by Audible Magic to date demonstrate that, in at least some instances, Plaintiffs created their own fingerprints using Audible Magic's technology in-house.

[9] *See Sony* Trial Tr. 465:25-466:5) (*Sony* plaintiffs' expert testified: "Audible Magic gets recordings from the content providers, that is to say, from the record companies, and it uses its patented software to create fingerprints that are present in each song recording, and it

| | | | |
|---|---|---|---|
| | | Plaintiffs maintained these fingerprints, and whether they match works in suit, is fundamental to Plaintiffs' direct infringement case.<br><br>It is also unclear how Plaintiffs can refuse to produce documents in response to RFP 91 while, at the same time, agreeing to produce documents in response to RFP 92, seeking "[d]ocuments and communications sufficient to show the process used to create the digital fingerprints for the Copyrighted Works used by Audible Magic and/or MarkMonitor to match alleged infringements." Such documents should include the fingerprints and Reference Files.<br><br>Plaintiffs failed to articulate any burden, and refused to even say during meet and confer whether they have the requested documents. | |

---

puts those in a database along with information like the song's artist and title, and that's what I'm going to call a reference database."); *see also id.* 502:22-25 (MarkMonitor's infringement verification process "works by matching this digital fingerprint of a song to a database of digital fingerprints. It's not matching a file to a file. It's, it's the digital fingerprint stored in the database.").

II.   **Plaintiffs' Withheld "Hash" Analysis from the MarkMonitor Hard Drive**

| Request at Issue (verbatim) | Response to Request (verbatim) | Explanation of Position | Opposing Party Response |
|---|---|---|---|
| **May 4, 2020 Special Master Letter**, requiring Plaintiffs to produce the MarkMonitor hard drive with intact metadata and to include the "single privileged file to be included on Plaintiffs' privilege log."[10, 11] | Plaintiffs represented that they have produced all files from the MarkMonitor hard drive save for one allegedly privileged file called Hash_Report_02292016.xlsx (the "Hash Report Excel Spreadsheet"), which they claim on their privilege log is protected from disclosure as "work product" and describe the file as "Report prepared at the request of counsel in anticipation of litigation, containing analysis of infringement evidence collected in anticipation of litigation." | The Hash Report Excel Spreadsheet is dated February 29, 2016. Plaintiffs claim it is protected work product. Charter disagrees.\n\nThe Special Master ordered Plaintiffs to produce litigation consulting agreements with MarkMonitor.  May 29 Order at 7-8.  Plaintiffs did not produce any agreement between them (or their outside counsel) and MarkMonitor that pre-dates November 1, 2018.  Instead, Plaintiffs produced an agreement between the RIAA and MarkMonitor dated January 2016 (the "2016 RIAA/MM Agreement").[12] | This issue is not ripe, and should not be addressed by the Special Master at this time.  The parties are engaged in ongoing discussions concerning entries on their respective privilege logs. Among other things, Charter has yet to provide a compliant privilege log that would allow Plaintiffs to challenge the substance of Charter's privilege designations, as explained in Plaintiffs' concurrent submission to the Special Master. Accordingly, Plaintiffs have repeatedly proposed to Charter that the parties designate a time, following the exchange of satisfactory logs, to mutually raise substantive objections to entries |

---

[10] Special Master May 4, 2020 Ltr. at 3.

[11] This document is responsive to, at the very least, Charter's 5 (*see supra*), 62 (All documents concerning the RIAA and either this lawsuit, Charter, CAS, MarkMonitor, and/or the Copyright Works), 63 (All documents pertaining to the relationship, agreement, and/or communications between You and/or any other Plaintiff and the RIAA and/or MarkMonitor regarding this lawsuit, the Copyright Works, and/or Charter.).

[12] Ex. 1 (PL_CH_0083049).

| | | | |
|---|---|---|---|
| | | Even assuming that MarkMonitor served as a "litigation consultant" to Plaintiffs prior to 2018, Plaintiffs cannot use that to shield directly relevant facts. Such relationship would not render all material MarkMonitor documented in connection with verifying infringements by P2P users "work product." Indeed, Plaintiffs have selectively produced extensive data created by MarkMonitor that Plaintiffs do not claim as work product, as long as they view it as helpful to their case. This is, in fact, Plaintiffs' only evidence of direct infringement. During meet and confer, Plaintiffs said the withheld Hash Report Excel Spreadsheet differs because it is *analysis* done at Plaintiffs' request.<br><br>But based upon the 2016 RIAA/MarkMonitor Agreement produced this week, the Hash Report Excel Spreadsheet appears merely to summarize *which* allegedly infringing files | on each other's logs, in the same way that the parties have been working on search term issues. This will allow the parties' privilege objections to be addressed in an organized and consistent manner. |

| | | MarkMonitor was able to locate.[13] Plaintiffs should not be able to shield as work product this fundamental factual evidence. Plaintiffs improperly appear to draw the line between producing evidence they believe supports their case, while withholding as "work product" MarkMonitor data that could undermine it.<br><br>Charter is entitled to this data, which is relevant to key issues, including whether MarkMonitor was able to locate alleged infringements for any of the works in suit (for each of which Plaintiffs seek up to $150,000 in statutory damages), and whether the Hash Report Excel Spreadsheet impacts the accuracy of notices sent to Charter. If MarkMonitor sent notices for files that it was later unable to locate or capture, Charter is entitled to know that and argue it to the jury. | |
|---|---|---|---|

---

[13] The agreement says that the "RIAA will "provide a list of up to 7200 hashes. MarkMonitor to search for an attempt to download the files associated with those hashes." Ex. 1 at 3. It further states that "[h]ashes that could not be obtained … will be considered unavailable." *Id.* It further states that "MarkMonitor will provide **a report in Excel format to show a list of successfully downloaded files** with those hashes with the individual audio tracks extracted to show the full volume of audio track." Ex. 1 at 4 (emphasis added).

| | | Plaintiffs cannot use baseless assertions of work product as a sword and a shield. They should be compelled to produce the Hash Report Excel Spreadsheet. At the very least, they should provide it to the Special Master for *in camera* review. | |
|---|---|---|---|

### III.   Plaintiffs' Communications with MarkMonitor

| Request at Issue (verbatim) | Response to Request (verbatim) | Explanation of Position | Opposing Party Response |
|---|---|---|---|
| **RFP 55**: All communications with MarkMonitor regarding the Copyright Works and/or copyright infringement notices considered, prepared, or sent to Charter or its account holders, subscribers, or customers.[14] | **Objs. to RFP 55**: Plaintiffs object to this request as overly broad, unduly burdensome, and not proportional to the needs of the case, including in that it seeks "all communications" concerning broad subject matter. Moreover, as drafted, the request appears to seek information concerning communications with nonparties irrespective of Charter, the copyrighted works in suit, or the relevant time period. The request | Plaintiffs say they have largely completed their production in response to requests to which they originally agreed to produce documents, which largely includes RFP 55.<br><br>Plaintiffs have produced a total of approximately 550 emails, most non-substantive. They have produced **only 9** documents total with MarkMonitor, the vendor that identified all the alleged | • The size of Plaintiffs' production for this category is not remarkable given the type of documents that the request seeks. There is no reason to expect that MarkMonitor would have been communicating about the Copyrighted Works, nor would one expect the Plaintiffs themselves to have had communications with MarkMonitor about notices sent to Charter. As Charter knows, |

---

[14] In Charter's RFPs, "Plaintiff(s)" is defined as the plaintiff entity and "and/or any of its or their representatives, all past and present predecessors, successors, subsidiaries, affiliates, and parent companies, and all past and present directors, officers, partners, employees, agents, representatives, or persons acting on behalf of the foregoing entities."

| | | |
|---|---|---|
| | thus seeks information not relevant or important to resolving the issues in the action, and the burden and/or expense of the proposed discovery thus far outweighs any likely benefit. Plaintiffs also object to this request insofar as it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, or the joint defense or common interest privilege, as trial preparation materials, or under other privilege or immunity recognized by law.<br><br>__Am. Resp. to RFP 55__: Subject to the foregoing objections, the parties' correspondence and discussions during the meet-and-confer process, this Court's discovery orders and rulings, and the Protective Order, Plaintiffs will produce, for the period from January 1, 2010 to December 31, 2016, responsive, non-privileged communications with MarkMonitor concerning infringement notices MarkMonitor sent to Charter in connection with the RIAA notice program at issue in this case that | infringements at issue, none of which deal with the notice program and all of which are largely non-substantive and from a single custodian. Plaintiffs' privilege log notably includes only one entry involving MarkMonitor (the Hash Report Excel Spreadsheet discussed above), and that only in response to the Special Master's order that it be logged.<br><br>The near nil set of communications between Plaintiffs and MarkMonitor can be explained simply by the fact that it was not Plaintiffs *but Plaintiffs' outside counsel* who communicated with MarkMonitor. Because it was Plaintiffs' counsel who coordinated with MarkMonitor—and was thus the keeper of the facts and communications Charter is seeking to investigate—with respect to RFP 55, Plaintiffs discovery responses should include (or log as privileged) communications between their outside counsel Oppenheim & Zebrak and MarkMonitor through 2016, the time period ordered by | MarkMonitor was engaged by RIAA—the record companies' trade association—to detect infringements and generate notices to send to Charter. Recognizing this, Charter has separately subpoenaed RIAA seeking RIAA's communications with MarkMonitor.<br><br>• Plaintiffs *have* produced the actual results of the notice program to Charter: nearly 700,000 notices themselves, and associated evidence packages.<br><br>• The Special Master already considered and rejected Charter's demand for communications between outside litigation counsel and MarkMonitor.  *See* May 29 Order at 7–8.  The instant request is an improper attempt to seek reconsideration of the Order denying Charter's request that Plaintiffs be ordered to search the custodial files of outside litigation counsel at Oppenheim + Zebrak. The Special Master ordered Plaintiffs to produce any litigation agreements between MarkMonitor and Plaintiffs, and |

| | are in Plaintiffs' possession, custody, or control, to the extent located following a reasonable and diligent search. | the Special Master. This is distinct from the issue previously brought to the Special Master, in which Charter requested Plaintiffs add their outside counsel as a custodian across Charter's requests. This is the only means to obtain non-privileged, non-work-product communications and, relatedly, challenge the scope of any claimed privilege.[15] | nothing more. *Id.* Plaintiffs have done so. <br><br> It is unclear how Charter can thus contend its current request is somehow "distinct" from that previously decided by the Special Master. Put simply, Charter is demanding that Plaintiffs be required to search the files of *outside litigation counsel* to identify, produce, and/or log MarkMonitor communications. But as previously explained—and the Special Master acknowledged—it is extraordinarily burdensome, and highly unprecedented to require outside litigation counsel to collect, search, and log documents about the litigation. Charter has not identified any valid basis for such a dramatic departure from established practice (nor has it agreed to search the files of its own litigation counsel, Winston & Strawn). |
|---|---|---|---|

---

[15] In light of the newly produced 2016 Agreement and near absence of responsive communications, Charter reserves its rights to seek responsive documents after 2016.

## IV.    Charter's RFPs 59 and 23 Relating to P2P Networks and Antipiracy

| Request at Issue (verbatim) | Response to Request (verbatim) | Explanation of Position | Opposing Party Response |
|---|---|---|---|
| **RFP 59**: Documents sufficient to demonstrate the specific actions You undertook in the last ten (10) years that were intended to reduce the infringement of Your Copyright Works and/or any of Your other copyrighted works, including any amount of money you expended on these actions.<br><br>**Charter's Narrowed RFP 59**: "Charter agrees to narrow its request to documents sufficient to demonstrate the actions Plaintiffs took as related to the following anti-piracy measures, in addition to the cost for such measures, including but not limited to those involving the RIAA, the IFPI, the NMPA, and/or any other such organizations that assisted in these measures: P2P notice programs, P2P spoofing campaigns, Digital Rights Management (DRM) or other types of digital content-protection | **Resp. to RFP 59**: Subject to the foregoing objections, upon entry of an appropriate protective order, Plaintiffs will produce notices of infringement in their possession, custody, or control that are related to the copyrighted works in suit and were sent to Charter by or on behalf of Plaintiffs, to the extent located following a reasonable and diligent search.<br><br>**Objs. To RFP 59**: Plaintiffs object to this request as vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case. The request for documents sufficient to demonstrate "the specific actions" that Plaintiffs undertook over a ten-year period to reduce the infringement of *any* of their copyrighted works encompasses vast amounts of irrelevant information relating to potentially thousands of litigations, as well as | The information requested by Charter's narrowed RFP 59 is relevant to myriad issues: (1) deterrence as a factor to be considered by the jury when deciding statutory damages; (2) Plaintiffs' credibility; (3) mitigation as an affirmative defense; (4) mitigation as a factor to be considered by the jury when deciding the level statutory damages; and (5) context for the jury.<br><br>With respect to mitigation as an affirmative defense, as the Special Master stated, "the merits of the affirmative defense are not before [the Special Master] at this time." May 29, 2020 Order at 20. Charter submits that in a case such as this, it is a valid defense in this jurisdiction;[16] the cases relied upon by Plaintiffs are distinguishable. Charter intends | Charter's kitchen-sink arguments all lack merit and should be denied.<br><br>• This case concerns Charter's actions and omissions with regard to the rampant copyright infringement occurring over its networks. Charter seeks to deflect from its own conduct by arguing that Plaintiffs can and should have done more to protect their copyrights through other anti-piracy measures. But the case law is clear that a copyright owner has no obligation to police infringements of its works in order to assert a claim for infringement. Thieves—and those who aid and abet them—do not get to argue that their culpability is diminished because their victim should have better defended itself. |

[16] Charter made this position clear in its submission to Judge Jackson. ECF 160 at 9-11.

| | | | |
|---|---|---|---|
| measures Plaintiffs implemented or, considered but elected not to implement, and threatened or actual litigation as related to alleged P2P infringement against individual users of P2P networks or entities developing or hosting P2P networks, such as BitTorrent, Ares, Gnutella, and eDonkey. Documents sufficient to demonstrate these measures could include internal or external presentations, reports, white papers, summaries, notes, correspondence, or other comprehensive documents regarding potential antipiracy measures, ongoing antipiracy measures, and the efficacy of antipiracy measures implemented." | non-litigation enforcement efforts and/or technical measures, which are unrelated to Charter, peer-to-peer networks, the works in suit, or to resolving any issues in this case. It would be virtually impossible for Plaintiffs to produce documents "sufficient to demonstrate . . . any amount of money" Plaintiffs expended on all of their antipiracy and enforcement efforts since 2009. Plaintiffs therefore also object on the basis that the request appears intended to harass and/or unduly burden Plaintiffs.<br><br>Plaintiffs object to this request insofar as it seeks information protected by the attorney client privilege, work-product doctrine, joint-defense or common-interest privilege, or under other privilege or immunity recognized by law. | to seek discovery in support of this active affirmative defense.<br><br>But even if it were not a complete affirmative defense, there is ample case law in this district (and others) holding that Plaintiffs' actual harm is a factor relevant to the jury's determination of the amount statutory damages.[17] Thus, where a jury is deciding between a huge range of $200 up to $150,000 per work, when deciding which amount is fair, this evidence can be weighed as a non-exhaustive factor in that determination. Plaintiffs' failure to mitigate this harm bears directly on this factor, and can be used by a jury in reducing a per-work award.<br><br>Plaintiffs have also put their alleged harm directly at issue in | • Moreover, as the Special Master recognized in denying Charter's previous request as to RFP 59, "failure to mitigate is not a proper defense in the face of a request for statutory damages." May 29 Order at 20. Accordingly, Plaintiffs' "mitigation" efforts are simply not a valid subject of discovery. The purported "ample case law in this district" that Charter cites is not to the contrary. Those cases plainly deal with "revenue lost by the copyright holder" and "dilution of the value of Plaintiffs' copyrights." They do not show that a copyright owner's mitigation efforts are in any way relevant to setting the appropriate statutory damages amount in this jurisdiction. |

---

[17] *See Harrington v. Aerogelic Ballooning, LLC*, No. 18-CV-02023-MSK-NYW, 2019 WL 2613334, at *3 (D. Colo. Apr. 25, 2019), *report and recommendation adopted in part*, No. 18-CV-02023-MSK-NYW, 2019 WL 5095683 (D. Colo. Aug. 8, 2019) (statutory damages "factors include … 'the revenue lost by the copyright holder.'") (citing *Bryant v. Media Right Prod. Inc.*, 603 F.3d 135, 144 (2d Cir. 2010)); *see also Grady v. Swisher*, No. 11-CV-02880-WYD-KLM, 2014 WL 3562794, at *16 (D. Colo. July 18, 2014) (court may consider "revenues lost by the copyright holder and the "dilution of the value of Plaintiffs' copyrights"); *Grady v. Nelson*, No. 12-CV-03004-RM-KMT, 2014 WL 7143852, at *9 (D. Colo. Dec. 15, 2014) (same); *see also e.g.*, *EIG, Inc. v. Kayne Anderson Capital Advisors, L.P.*, 948 F.3d 261, 275 (5th Cir. 2020).

Plaintiffs further object to this request as unreasonably cumulative and duplicative, for example of Request No. 46, among others.

**Resp. to Narrowed RFP 59**:

"[E]ven as narrowed, this still calls for a wide array of irrelevant material that has no bearing on Charter or the infringements at issue in this case. In any event, as noted above, the Special Master denied Charter's motion to compel on RFP 59, rejecting Charter's persistent argument that Plaintiffs' mitigation efforts are a valid basis for discovery, and finding that Charter failed to establish 'any other relevant purpose for the requested information.' Dkt. 181 at 18-19. There is simply no basis for Charter to continue to press for this discovery. These issues have been briefed extensively, multiple times, and have been the subject to a lengthy hearing before and decision from the Special Master."

this case. Plaintiffs allege that online P2P infringement "undercuts the legitimate music market, depriving Plaintiffs and those recording artists and songwriters whose works they sell and license the compensation to which they are entitled." First Am. Compl., ¶ 102. Plaintiffs further allege that "[w]ithout such compensation, Plaintiffs, and their recording artists and songwriters, have fewer resources available to invest in the further creation and distribution of high-quality music." *Id.* Charter is entitled to demonstrate the extent to which Plaintiffs could have avoided, and thus have failed to mitigate, those harms.

Plaintiffs have also put at issue their own antipiracy efforts. Plaintiffs devote an entire section of the First Amended Complaint to "Plaintiffs' Enforcement Activities," in which they allege "[o]ver the past two decades as P2P piracy became widespread, music and other copyright owners have employed litigation and other means to attempt to curtail massive theft of their copyrighted

• Plaintiffs have by no means put a wide array of their anti-piracy efforts "directly at issue" by merely referencing in their complaint certain prior efforts to address P2P piracy, including through subpoenas to Charter to identify infringing subscribers— efforts which Charter thwarted by protecting its infringing subscribers and refusing to identify them even in response to subpoenas. *See* First Am. Compl. at 19–22. Those references provide background context for Plaintiffs' decision to bring secondary-liability claims against Charter; they do not open the door to years' worth of discovery into Plaintiffs' varied activities to protect their rights.

• Charter's deterrence rationale does not support its position. Plaintiffs have already agreed to produce documents concerning "the diminished or diminishing use of BitTorrent or other peer-to-peer file sharing networks," as Charter acknowledges. Accordingly, Charter is already receiving evidence that bears on "how much *P2P infringement*

| | | | |
|---|---|---|---|
| | | works." First Am. Compl., ¶ 92. That Charter cannot now investigate and challenge these assertions would be fundamentally unfair.<br><br>Further, Plaintiffs' antipiracy efforts, including Digital Rights Management ("DRM"),[18] are relevant to the level of P2P infringement, a topic about which Plaintiffs have already agreed to produce documents. *See, e.g.*, RFP 22-24.[19] To the extent Plaintiffs lessened their enforcement of their copyrights on P2P networks and switched their focus to other areas, such as, for example, stream ripping (i.e., stealing streams from Spotify or YouTube), that bears directly on this issue of how much *P2P infringement* there was, and whether Plaintiffs continued to view it as an issue. | there was," "whether Plaintiffs continued to view it as an issue," and Charter's arguments about "whether a large award of statutory damages is needed to deter Charter and other ISPs from infringement," as it claims here. Charter has not articulated, and cannot articulate, why that is insufficient, other than to speculate that the categories of documents that Plaintiffs have agreed to produce "allow[] too much subjectivity." Charter's speculation that it will not receive what it asked for in response to another request is not a basis to warrant wide-ranging discovery into other anti-piracy efforts by the Plaintiff entities—especially where so much of Plaintiffs' anti-piracy activities are conducted by or at the direction of counsel and involve substantial sensitivities and privileges. |

---

[18] DRM is a technology that controls access to content on digital devices.

[19] Plaintiffs have agreed to produce documents concerning "the financial effect of copyright infringement via BitTorrent and other peer-to-peer file sharing networks on Plaintiffs' revenue and/or profits," (Am. Resp. to RFP 22), "the diminished or diminishing use of BitTorrent or other peer-to-peer file sharing networks," (Am. Resp. to RFP 23), and "documents assessing the benefit or harm to Plaintiffs from copyright infringement via BitTorrent or other peer-to-peer file sharing networks," (Am. Resp. to RFP 24).

| | | | In addition, Plaintiffs' anti-piracy efforts directed at P2P infringement are relevant to the question of *deterrence*, a factor the jury may consider when awarding statutory damages. Again, to the extent Plaintiffs' focus during the Claim Period and after shifted from P2P infringement to other, more prevalent methods of infringement, the question of whether a large award of statutory damages is needed to deter Charter and other ISPs from infringement will be informed by this evidence.<br><br>This information is also probative of Plaintiffs' credibility. Plaintiffs allege (and will no doubt argue at trial) that they protect their artists' works, and it is entirely the fault of other parties, here Charter, that they have been harmed to such a great degree. Plaintiffs will point to this extreme harm and argue that ISPs like Charter should alone make them whole. Documents produced in *Sony* demonstrate that as P2P infringement was peaking (a few years before | • Charter's credibility argument again amounts to a blame-the-victim argument that has no legal support. Plaintiffs' ability to seek relief from Charter for its turning a blind eye to blatant and repeated infringement by its subscribers is not dependent on what other steps Plaintiffs took to defend themselves.<br><br>• Finally, and importantly, Charter's reliance on highly confidential documents produced under the Protective Order in the *Sony* case to argue its position here is highly improper. Not only is Charter incorrect in its description of those documents, but, more importantly, the *Sony* Protective Order expressly prohibits use of such confidential information for any purpose outside the *Sony* litigation. This is precisely the concern Plaintiffs raised in their request for reconsideration of the Special Master's May 29 Order concerning discovery into the relationship between sound recordings and musical compositions. This is not the only |

| | | | |
|---|---|---|---|
| | | Plaintiffs began to generate tremendous revenue from legitimate streaming), Plaintiffs cut their antipiracy budgets or otherwise narrowed their enforcement efforts. To the extent Plaintiffs put their efforts at issue, the jury should know this. This is especially true because Plaintiffs are seeking huge windfall damages here, which are far more beneficial to them than had they actually solved the issue with their own efforts. The fairness factor that a jury will be confronted with in deciding statutory damages must weigh a massive windfall recovery Plaintiffs are seeking from the relatively modest amounts they could have expended to tackle these infringements at the outset. Plaintiffs should not be rewarded from shirking their own responsibilities to cooperate in curbing alleged infringements because the statutory damages scheme of the Copyright Act has a better pay out.<br><br>Finally, Plaintiffs' agreement to produce documents concerning "diminished or diminishing uses" | instance of such improper reliance. |

|  |  | of P2P infringement and their "harm or benefit" from P2P infringement, (*e.g.*, RFP 23-24, *see supra* n.17), allows too much subjectivity. It is unclear how Plaintiffs will draw the line between a document relating to Plaintiffs' antipiracy efforts and whether ongoing enforcement is needed in light of the levels of P2P infringement. For example, if the document relates to P2P enforcement efforts and the efficacy, does that relate to "diminished or diminishing uses" of P2P or Plaintiffs' "harm" from P2P? If so, it would be responsive, per Plaintiffs' proposal. Or, does the document relate to Plaintiffs' "antipiracy" efforts? If so, then it would be non-responsive per Plaintiffs' proposal. Indeed, how could any document relating to P2P _**not**_ relate to Plaintiffs' harm, about which Plaintiffs agree to produce documents? Plaintiffs' unilateral determination as to where such documents fall on the responsiveness line exemplifies the problem with the way in which they have attempted to splice Charter's requests. |  |

|  |  |  |  |
|---|---|---|---|
|  |  |  |  |

| Request at Issue (verbatim) | Response to Request (verbatim) | Explanation of Position | Opposing Party Response |
|---|---|---|---|
| **RFP 23**: All documents that reference BitTorrent or other types of peer-to-peer file sharing technologies as they relate to diminished or diminishing use of such technologies, copyright infringement, sampling musical works, or permitted authorized uses, whether actual, perceived, or potential, of the Copyright Works. | **Obj. to RFP 23**: Plaintiffs object to this request because it is overly broad, unduly burdensome, and not proportional to the needs of the case, including in that it seeks "[a]ll documents that reference" broad subject matter, particularly without any reference to the relevant time period. Plaintiffs also object because the request is vague and ambiguous. The effect of actual or potential infringement via BitTorrent or other types of peer-to-peer file sharing sites has been felt far and wide in the music industry in numerous ways since the late 1990s. It has impacted all employees and all areas of the music business and been the subject of many litigations. The vast burden and/or expense of the proposed | Plaintiffs agreed to produce documents concerning the "diminished or diminishing use of BitTorrent or other peer-to-peer file sharing networks," though not "documents that reference BitTorrent or other types of peer-to-peer file sharing technologies as they relate to" either "copyright infringement, sampling musical works, or permitted authorized uses."

For all of the reasons stated for RFP 59, as narrowed by Charter, documents concerning the other topics referenced in RFP 23 should be produced. The parties are engaged in meaningful discussions regarding custodians and search terms, so any burden argument from Plaintiffs is premature. | This request is overbroad as written. Plaintiffs have repeatedly told Charter (i) they are not aware of any documents concerning "authorized uses" of BitTorrent or other P2P sites, and (ii) they are not aware of any reasonable means to search for and locate any "needle in the haystack" responsive documents at each of the Plaintiff companies (for example, because Plaintiffs are not aware of any such authorized uses, they would not even know where to begin in terms of identifying custodians to search for these hypothetical documents).

Plaintiffs therefore have asked Charter to identify any non-speculative "authorized uses" about which it might be aware— akin to Charter's earlier request |

<table>
<tr><td></td><td>

discovery as drafted thus outweighs any likely benefit.

Plaintiffs also object that, as drafted, the request does not appear to seek information relevant or important to resolving the issues in the action. In addition, Plaintiffs object to this request insofar as it seeks the disclosure of publicly available information or information equally available to Charter from documents or other sources within its own possession, custody, or control. Plaintiffs also object to this request to the extent it seeks information protected by the attorney-client privilege, attorney work-product doctrine, or joint defense or common-interest privilege, as trial preparation materials, or other privilege or immunity recognized by law.

**<u>Am. Resp. to RFP 23</u>:** Subject to the foregoing objections, the parties' correspondence and discussions during the meet-and-confer process, this Court's discovery orders and rulings, and the Protective Order, Plaintiffs will produce non-privileged

</td><td></td><td>

for documents concerning "BitTorrent Bundles," for which Plaintiffs agreed to search and produce documents—and Charter has identified none. Likewise, Charter has not identified any non-speculative basis for why Plaintiffs would have documents concerning BitTorrent or P2P as they relate to "sampling musical works."

Notwithstanding the overbreadth of Charter's request, in an effort to reach compromise, Plaintiffs are willing to produce documents concerning BitTorrent or other types of peer-to-peer file sharing technologies as they relate to (1) diminished or diminishing use of such technologies, or (2) copyright infringement. Plaintiffs will propose appropriate search terms and custodians for this search to Charter as part of the parties' ongoing search term conferrals.

</td></tr>
</table>

| | | | |
|---|---|---|---|
| | documents concerning the diminished or diminishing use of BitTorrent or other peer-to-peer file sharing networks, to the extent such documents exist and can be found in Plaintiffs' possession, custody, or control after a reasonable search. | | |

### V. Charter's Interrogatory No. 13 to the Record Company Plaintiffs Regarding Compilations

| Request at Issue (verbatim) | Response to Request (verbatim) | Explanation of Position | Opposing Party Response |
|---|---|---|---|
| **RCP Interrogatory 13**:<br><br>Identify which sound recordings listed on Exhibit A (including any amendments to same) to Plaintiffs' Complaint were first issued or released together on or as albums or compilations, including for each the name of the corresponding album or compilation. | **Objs. to RCP Interrogatory 13**:<br><br>1. Record Company Plaintiffs object to the terms "issued" and "released" as vague and ambiguous. Charter's use of these terms implies distinct definitions for each—definitions which Charter has not provided.<br><br>2. Record Company Plaintiffs object to the term "compilations" as vague and ambiguous, including that it is unclear whether Charter is requesting, for example, that Record Company Plaintiffs identify any sound recording on Exhibit A that was | The parties met and conferred on this request several times, to try to resolve Plaintiffs' objections. The remaining issues are Plaintiffs' claim that the information is not legally relevant and, whether Charter can obtain this information from the public domain.<br><br>This information is relevant and could reduce Charter's exposure by hundreds of millions of dollars. A copyright plaintiff is entitled to only one award of statutory damages for all works that are a part of a compilation. | Charter's request is make-work. Charter seeks the requested information in order to try to prevent each recording in this case from obtaining its own statutory damage award. But the case law establishes that whether the sound recordings at issue were released on an album is irrelevant to the number of works for which Charter owes damages. *See, e.g., Sony Music Entm't v. Cox Commc'ns, Inc.*, No. 1:18-cv-950, 2020 WL 3121306, at *18 (E.D. Va. June 2, 2020) (affirming separate statutory damages awards for individual songs that were available individually, even |

| | | |
|---|---|---|
| | released together with another sound recording on Exhibit A as part of a playlist, a marketing promotion, on a streaming service, a third party product (such as a movie soundtrack), or something else. Charter's use of the terms "albums" and "compilations" implies distinct definitions for each—definitions which Charter has not provided.<br><br>3. Record Company Plaintiffs object to the interrogatory because whether sound recordings were "first issued or released together on or as albums or compilations" is not relevant to any claim or defense in suit. Each sound recording listed on Exhibit A has been exploited as a standalone work through multiple platforms, including online services such as iTunes or Spotify. Each is a distinct copyright work, and the manner | 17 U.S.C. § 504(c)[20]; *see also* U.S. Copyright Office, Circular 14, Copyright in Derivative Works and Compilations.[21] An album is a type of compilation. Charter will argue on summary judgment that the number of works for purposes of statutory damages should be limited to the number of compilations (i.e., albums), as opposed to individual tracks (i.e., each of the 10 works in suit that may be on a particular album). Many of Plaintiffs' works in suit were contained on albums, thus the resolution of this issue in Charter's favor would massively reduce the number of "works" to be considered by the jury when awarding statutory damages, should liability be established.<br><br>In addition to the determination as to what tracks are part of what albums, Charter also asks whether | if those songs were also made available on albums); *MacAlmon Music, LLC v. Maurice Sklar Ministries, Inc.*, No. 13-cv-02471-PAB-CBS, 2015 WL 794328, at *5 (D. Colo. Feb. 4, 2015) (finding that a certain track in an album was a distinct work for statutory damages), *adopted by* No. 13-cv-02471-PAB-CBS, 2015 WL 782722 (D. Colo. Feb. 24, 2015); *see also EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 101 (2d Cir. 2016) (affirming lower court decision to allow separate statutory damages awards for songs issued as singles that were made available on albums because when material is "issue[d] on an independent basis, the law permits a statutory damages award for each individual work." (internal quotations omitted)); *Walt Disney Co. v. Powell*, 897 F.2d 565, 569– |

---

[20] 17 U.S.C. 504(c)(1) ("For the purposes of this subsection, all the parts of a compilation or derivative work constitute one work."

[21] *Available* at https://www.copyright.gov/circs/circ14.pdf. To the extent the Court engages in an analysis beyond the registration, whether Plaintiffs first released the works on compilations (e.g., albums) may be relevant to the determination of whether to count the compilation as a single "work" for purposes of statutory damages or each component track as separate works.

| | | |
|---|---|---|
| | in which it was first issued or released does not bear on any claim or defense in suit.<br><br>4. Record Company Plaintiffs object to the interrogatory insofar as it seeks information equally and readily available to Charter, including through publicly available sources (*e.g.*, the copyright registration certificates state the date on which a recording was first published).<br><br>5. Record Company Plaintiffs object to the interrogatory as unduly burdensome, and not proportional to the needs of the case. A sound recording can be packaged with other sound recordings in numerous different ways (*e.g.*, as part of an album, a marketing promotion, a playlist, a soundtrack to a movie or dramatic work, or on a streaming service), and it would require an unduly burdensome investigation to identify and group together all sound recordings on Exhibit A that were released together in any manner. | tracks were *first* issued as parts of albums.  In other words, did the particular track first issue as a single and was it then later included on an album? Or not? During meet and confer Charter's counsel suggested that a review of Plaintiffs' track release dates, notes, or data could yield this information.<br><br>As with other issues bearing on the works in suit, Charter can try to piece together information from the public domain. However, Plaintiffs will no doubt object to any findings based on this analysis, requiring Charter to confirm everything through depositions.  This process can be greatly shortcut by written discovery, which is precisely what Charter's interrogatory is intended to do.<br><br>Moreover, the burden is necessarily less for Plaintiffs than Charter.  At the very least, the burden is proportional to the needs of the case, given the impact this information will have on the amount of potential statutory damages. | 70 (D.C. Cir. 1990) (finding that works are distinct and qualify for a separate statutory damages award if they have separate economic value).  Here, every sound recording at issue was issued and sold or made available to consumers individually. Because each of those sound recordings stands on its own, each is entitled to its own separate statutory award, regardless of whether it may have been commercially released at some point with other sound recordings. Thus, the information that Charter seeks is not relevant.<br><br>In any event, as Charter acknowledges, the requested information is publicly available and equally accessible to Charter. |

| | 6. Record Company Plaintiffs object to the interrogatory because it contains at least three distinct topics that should be separately numbered interrogatories: (1) Which sound recordings in Exhibit A were first issued on "albums" or "compilations"; (2) the names of the "albums" and compilations"; and (3) what other sound recordings in Exhibit A, if any, were included on the "albums" or "compilations." | | |
|---|---|---|---|

## VI.   Charter's RFP 61 Seeking Deposition Transcripts and Declarations from *Grande*

| Request at Issue (verbatim) | Response to Request (verbatim) | Explanation of Position | Opposing Party Response |
|---|---|---|---|
| **RFP 61**: All documents that reference the litigations styled as *UMG Recordings, et al. v. Grande Commc'ns et al.* (W.D. Tex.), and/or *Sony Music Entm't, et al. v. Cox Commc'ns, Inc., et al.* (E.D. Va.), including but not limited to pleadings and/or discovery, as well as any documents reflecting sworn testimony by Your employees and/or representatives in those litigations. | **Obj. to RFP 61:** Plaintiffs object to this request as overly broad, unduly burdensome, and not proportional to the needs of the case, including in that it seeks information not relevant or important to resolving issues in the action. Plaintiffs also object to this request insofar as it seeks information protected by the attorney-client privilege, the attorney work-product doctrine, or the joint defense or common interest | The *Grande* case is another suit brought by the music industry against an ISP.  It is set for trial later this year.  Many of the same Plaintiffs are at issue here and in *Grande*.  Accordingly, many of Plaintiffs' representatives who were deposed in *Grande* were deposed in *Cox* and will likely be deposed in *Charter* (and *BHN*).  Charter seeks the *Grande* | Charter's request here seeks an end-run around the Special Master's decision precluding discovery into Rightscorp. Specifically, the Special Master "agree[d] with Plaintiffs" that, because none of their notices were sent by Rightscorp, Plaintiffs' communications with Rightscorp are not relevant. May 29 Order at 17–18. |

| | | | |
|---|---|---|---|
| **Narrowed RFP 61**:[22] Charter is willing to narrow this request to all deposition transcripts and sworn declarations from *UMG Recordings, et al. v. Grande Commc'ns et al.* (W.D. Tex.) and *Sony Music Entm't, et al. v. Cox Commc'ns, Inc., et al.* (E.D. Va.) of Plaintiffs' employees and/or representatives.[23] | privilege, as trial preparation materials, or under other privilege or immunity recognized by law. Many of the Plaintiffs in this case are also plaintiffs in *UMG Recordings, et al. v. Grande Commc'ns et al.* and/or *Sony Music Entm't, et al. v. Cox Commc'ns, Inc., et al.* The vast majority of non-public documents that could be responsive to this request fall under the attorney-client privilege or the protection afforded to trial preparation materials under the Federal Rules of Civil Procedure. Plaintiffs therefore further object on the basis that the request appears intended to harass and/or unduly burden Plaintiffs. As such, this request imposes no obligation on Plaintiffs to produce a log of responsive documents withheld on the basis of privilege or other protection or immunity. Additionally, Plaintiffs object to this | transcripts, as is routine where there is significant overlap between cases.[24] <br><br> Plaintiffs' "compromise position" proposes relevance redactions, specifically to redact any discussion of Rightscorp. The Special Master has already ordered Plaintiffs to unredact extensive relevance redactions in this case. Plaintiffs effort to impose their own unilateral relevance redactions here is also improper. <br><br> Testimony from *Grande* of Plaintiffs' witnesses or representatives relating to Grande and Rightscorp is relevant, as it bears on Plaintiffs' understanding of ISPs' responses to infringement notices, Plaintiffs' anti-piracy | In *Grande*—unlike this case—Rightscorp collected the infringement evidence and sent notices to the ISP. By requesting the *Grande* transcripts, and specifically arguing that Plaintiffs' testimony regarding Rightscorp is "relevant," Charter unequivocally is seeking the very discovery that was recently rejected by the Special Master. <br><br> To the extent that Charter is seeking something else in those transcripts, Plaintiffs have offered to provide that information by way of compromise: specifically, Plaintiffs have agreed to produce (despite there being only 300 overlapping works between the two cases) declarations and transcripts |

---

[22] Following meet and confer efforts, Plaintiffs have agreed to produce deposition transcripts from *Sony*.

[23] Charter's April 22, 2020 Ltr. to Pls. at 5.

[24] *See Waters v. Earthlink, Inc.*, No. CIV.A. 01-11887-REK, 2004 WL 6000237, at *3 (D. Mass. Dec. 1, 2004) (ordering deposition testimony from "a case involving similar claims and facts to the case at bar"); *Lillibridge v. Nautilus Ins. Co.*, No. CIV. 10-4105-KES, 2013 WL 1896825, at *8 (D. S.D. May 3, 2013) (granting order "compelling defendant to produce copies of prior deposition transcripts for certain of its employees… Because this testimony is relevant to this case and could lead to admissible evidence, the motion to compel is granted"). Further, in *Sony*, Plaintiffs sought Cox's employee's deposition transcripts from the prior *BMG* case, which Cox produced. *See Sony*, ECF 61 at 2.

| | | |
|---|---|---|
| | request because it seeks information that is publicly available or equally available and/or accessible to Charter.<br><br>**Resp. to RFP 61**: Pursuant to the foregoing objections, Plaintiffs respond that they will not produce documents responsive only to this request.<br><br>**Resp. to Narrowed RFP 61**: Plaintiffs' "compromised position" is as follows: to produce declarations and testimony from Plaintiffs' witnesses and corporate representatives, except with respect to any portions relating to Rightscorp or to Grande specifically. | efforts, and, potentially, Plaintiffs' harm.<br><br>Plaintiffs claimed in meet and confer that Charter's unwillingness to accept their compromise position was a backdoor effort to obtain Rightscorp discovery, lacks basis. The Special Master denied Charter's request for Plaintiffs to comprehensively search for Rightscorp documents, relying largely on Plaintiffs' purported burden. There was no ruling that Rightscorp was irrelevant, nor would Plaintiffs seriously make such a suggestion, having sought and obtained evidence of millions of Rightscorp notices in this case that Plaintiffs intend to present to the jury. If Plaintiffs wish to stipulate that Rightscorp evidence is irrelevant and precluded from trial, that is one thing, but Plaintiffs should not get the benefit of using their chosen Rightscorp evidence while improperly shielding facts that may undermine their reliance on such evidence. | from *Grande*, except those portions the provision of which would be inconsistent with the orders in this case. That compromise provides Charter with any testimony generally relating to antipiracy or ownership issues that potentially overlap with issues in this case, without opening a backdoor to discovery that's already been sought and rejected. |

|  |  | The unredacted transcripts are necessary for Charter to test Plaintiffs' credibility, which is always relevant. Plaintiffs should not be allowed to cherry pick helpful testimony from that case while shielding the rest. If Plaintiffs are taking contradictory or inconsistent positions between cases, on any issues, Charter is entitled to explore that, whether it goes to issues directly at issue or to impeach Plaintiffs. Issues as to the relevance of particular issues can be resolved prior to trial. The *Grande* transcripts should be produced unredacted. |  |