# Exhibit A



North America Europe Asia

333 S. Grand Avenue, 38th Floor
Los Angeles, CA 90071
T +1 213 615 1700
F +1 213 615 1750

**ERIN R. RANAHAN**
Partner
213-615-1835
ERanahan@winston.com

January 16, 2020

**VIA EMAIL**

Magistrate Judge Michael E. Hegarty
Alfred A. Arraj United States Courthouse
Courtroom A-501, 5th Floor
901 19th Street
Denver, CO 80294
Email: hegarty_chambers@cod.uscourts.gov

**Re:** ***Warner Records Inc., et al. v. Charter Communications, Inc.***
**D. Colo. Case No. 19-cv-00874-RBJ-MEH**

Dear Judge Hegarty:

Defendant Charter Communications, Inc. ("Charter") hereby responds to the letters Plaintiffs sent via email to Chambers on January 10, 2020 and January 14, 2020.

I. The Court Should Order Plaintiffs to Produce the Umbrella Agreements Here

The "umbrella agreements" Charter seeks from Plaintiffs go to the very heart of Charter's investigation into damages. They will assist with assessing the *value* of the claimed works-at-issue, including how Plaintiffs organize the works and valued them for purposes of streaming and downloading (conduct alleged here) during the relevant period. *See N.A.S. Imp. Corp. v. Inc.*, 968 F.2d 250, 252-53 (2d Cir. 1992) (finding that the *actual value* of the copyright is relevant to the jury's determination of statutory damages). Further, courts have found that statutory damages awarded should encompass consideration and bear some relation to any actual damages, or lack thereof. *Van Der Zee v. Greenidge*, No. 03 Civ. 8659 (RLE), 2006 WL 44020, at *2 (S.D.N.Y. 2006) (statutory damages must bear some relation to actual damages). That must be considered here.

The umbrella agreements cover entire catalogs of Plaintiffs' works at once (as opposed to being work-by-work) and would involve streaming or downloading of the works-in-suit through the third party's platform in exchange for certain licensing fees or royalties. Some of these agreements would be expected to operate under a tiered pricing structure, which sets forth different payments per stream or download based on the value that Plaintiffs and the third parties have ascribed to the works. This information is therefore highly relevant to the valuation of the works-in-suit, which is critical to any expert analysis about damages that will be presented to the jury so that they can decide any appropriate "just" amount of damages on a per work basis, as statutory damages are intended.



In attempting to suggest some disproportionate burden, Plaintiffs identify 275 agreements for the 23 separate record company Plaintiffs, and 131 for the 42 separate music publisher Plaintiffs.[1] Apparently Plaintiffs already have largely identified and isolated the agreements, and thus turning over these agreements would presumably involve very little additional effort (besides providing notice as may be required, as is often incumbent in any production of an agreement).

In any event, being required to produce about 400 agreements is hardly the type of burden that would be considered disproportionate to the needs of this case. Any so-called "burden" must be measured against the fact that Plaintiffs seek well over a billion and a half dollars in statutory damages in this case, which is being prosecuted through 65 separate Plaintiffs, who have asserted 11,000 alleged works-in-suit, for each of which they claim a separate statutory damages award of up to $150,000. Plaintiffs have within the last two weeks expanded this action to add over a dozen Plaintiffs. And Plaintiffs have recently obtained a verdict for a billion dollars in the *Cox* case, and are now seeking to continue their windfall recoveries while denying basic due process for Defendants to defend themselves. Having some unspecified number of employees "diverted" from "their normal business duties" is what happens in every litigation and does not render any search and production disproportionate, especially in a case where Plaintiffs are seeking the type of damages they seek here.

Plaintiffs propose that rather than simply produce the 400 or so agreements, they should be free to cherry pick some percentage of these agreements, which they claim to be their "core agreements" that cover most of their revenue. That makes no sense. Being denied the full scope of these highly relevant agreements would defeat the purpose of a full evaluation into the value of the works as assessed through streaming and downloading agreements. Regardless of what percentage of revenue these agreements represent, Charter's experts should still be entitled to analyze how those agreements are structured and how the works are valued during the claim period, *especially* those that show a lower value and may therefore represent only a small percentage of Plaintiffs' revenue. Plaintiffs are free to make whatever arguments they later want to make about the weight of any analysis or import into the use of this information (subject to rulings by the Court) but Plaintiffs should not be permitted to seek over a billion dollars and avoid the corresponding burdens with seeking damages of this astronomical magnitude. [See attached, *Universal Music Group Recordings, Inc. v. Bright House Networks, LLC* (8:19-cv-710-MSS-TGW) ("*UMG v. BHN*") 1/8/20 Hr'g 92:19-21 ("It's a billion dollars. The proportionality test sort of goes by the wayside…"); 95:1-22.]

Any "sensitivity issues" in producing these agreements can be dealt with through protective orders and highly confidential designations, as the *UMG v. BHN* court recently found over Plaintiffs' vehement objection. [1/8/20 Hr'g: 116:2-121:15.]

For the reasons set forth herein, at the 12/17/19 hearing (pp. 123-133), and in Charter's 12/16/19 Statement of the Issues (pp.12-13), the full scale of umbrella agreements should be ordered to be produced.

---

[1] Plaintiffs have apparently excluded from these calculations at least two agreements they deem to be irrelevant because they "primarily" involve "audio-visual" streaming deals through Vimeo and Vevo. Charter disagrees with this characterization. These agreements would still speak to the value of the works, and the fact that videos are also involved in the streaming does not change that.


II. The Related Financial Production in *UMG v. BHN* Should Be Usable in Discovery Here

Plaintiffs also cannot, and do not, deny that there is no burden whatsoever in deeming what Plaintiffs produce in the pending parallel action *UMG v. BHN* about works-in-suit in this case usable in discovery for this case. Plaintiffs have been ordered to gather and produce umbrella agreements and other related economic information about the works-in-suit in *UMG v. BHN* to the same counsel and for what is currently for all practical current purposes, the same party (as Charter now owns Bright House), for the same relevant time period. The Court in *UMG v. BHN* agreed that BHN should be provided information to defend against Plaintiffs' extraordinary claims of damages. 1/8/20 Hr'g at 113:13-115:13 (Court to Plaintiffs' Counsel: "They are entitled to defend against your huge claim of damages…They want to see this kind of information because it would show that the actual damages…aren't anywhere near what you think they are. …This isn't your final argument to the jury. They want to help defend against your extraordinary claim, which apparently isn't that extraordinary, so, and what they're asking for are distribution or licensing agreements showing numbers."). It would be fundamentally unfair if Charter's expert here may have additional agreements to use in his assessments in *UMG v. BHN*, but must ignore such agreements for purposes of Charter.

The fact that Plaintiffs may seek to challenge the ruling in *UMG v. BHN* does not relieve Plaintiffs' obligations to comply with the Order.[2]

The Court should deem any information produced in *UMG v. BHN,* including the umbrella agreements and information relating to the value of the works in suit at issue here, usable for discovery in this case.

III. Charter Responded Fully to The Court's 12/17/19 Order

Contrary to Plaintiffs' suggestion, Charter fully complied with the Court's 12/17/19 Order (Dkt. 100).

With respect to both issues in which the Court included questions to be answered by January 10, Charter agreed to produce the responsive information it has located by January 31, 2020. This includes month-by-month internet subscriber number for the 38-month claim period, and information that reflects internet revenues for the 38-month claim period.

[2] The so-called "burden" declarations Plaintiffs say should have been given more weight by the Court in *UMG v. BHN* are meaningless. They provide the same, cut-and-pasted generalized burden argument for all declarants that do not even mention how many agreements they estimate it would involve; how many works each declarant is claiming in the case; why the specific documents would be burdensome to locate and produce; and provides no actual cost estimates for locating such information. *See Bonanno v. Quizno's Franchise Co.*, LLC, 255 F.R.D. 550, 552–53 (D. Colo. 2009) (the party resisting the discovery has the burden of showing the requests are irrelevant, over-broad, or unduly burdensome, including providing a detailed explanation, exhibits, and/or affidavits to support the claim). In fact, while the declarations attempt to use the burden they claim to have experienced in being ordered to produce financial information in *Cox,* Plaintiffs do not specify how much time was needed or burden was endured in *Cox*, which if provided, could have been used to extrapolate an actual estimate about what would need to be done there.



With respect to the "terminations for non-pay," this Court began the December 17, 2019 hearing by noting that it would provide views with hopes that the parties would work out the issues from there and obviate the need for the Court's assistance. 12/17/19 Hr'g Tr. 2:21-24. The initial example of an issue in which the Court mentioned was in seeking specific numbers with respect to terminations for non-pay, when Charter could simply stipulate that it terminates users for non-payment. ("So a lot of these things can be dealt with factual stipulations because no one in their right mind would say, we can't terminate somebody because they're violating the law. You wouldn't say that. So you can agree with that so you don't need that discovery because they can stipulate to that fact."). 12/17/19 Hr'g Tr. 3:25-4:1-5. And even towards the end of the discussion, the Court again noted, "Right, **but we are talking about something that is, alone, irrelevant and that is people who are terminated for failure to pay, which has nothing to do with infringement, nothing at all**, but you want to use it to show abilities, I understand that. And so we'll do that, but, **in and of itself, it's irrelevant**." 12/17/19 Hr'g Tr. 18:16-21.

The Court's December 17 Order did not mention the issue at all. In any event, as Plaintiffs note, the discussion during the hearing was about investigating and reporting "any" undue "burden" in obtaining monthly as opposed to annual information for non-payment during the claim period. After conducting additional internal investigation, Charter is not seeking to rely on any undue burden argument in this request, but does, however, maintain its relevance objection.

Indeed, the *UMG v. BHN* court recently found this information was *not relevant*, and denied Plaintiffs' motion to compel this information. [*UMG v. BHN* 1/9/20 Order (Dkt. 93); 1/8/19 Hr'g Tr. 24:8-9, 25:23-26:17.] As noted by the *UMG v. BHN* Court, Plaintiffs' argument for the relevance of BHN's data regarding terminations for non-payment "doesn't compute" and the Court agreed with BHN that comparing terminations for copyright infringement with non-payment terminations is an attempt to compare "apples and oranges." *Id.*

Indeed, terminating for non-payment is an entirely distinct inquiry—Charter indisputably does not provide free internet services—but charges its customers for its services. Charter is merely charging a flat fee for providing a pipe to access the internet, and would deny access to those who have not paid the price of admission. The standard for terminations that Plaintiffs are attempting to invoke against Charter through this lawsuit is far more complicated, suggesting that Charter should have terminated internet access for paying customers for allegations of infringement before they were proven, even where such alleged infringement was by users that were not the subscribers, such as where an account that services a library, an airport, a military base or even a family. Charter does not control what its customers do on the internet. Charter is not in any position to view or disable access to the alleged infringing conduct, and even if technically feasible (which it is not), Charter is not in the business of spying on its customers. Terminating for non-payment would not require the judgment calls and invasion of privacy that terminations based on alleged copyright violations involve. The Court should deny Plaintiffs' request for non-payment information.

Charter likewise complied with the Court's order on the remaining requests. With respect to internet accounting, Charter understood those inquiries to be aimed at ascertaining whether some internet only revenues could be gleaned from Charter's accounting records given the bundled nature of the services Charter offers. Charter has determined that it can provide such information, and has agreed to do so. There was no indication from the 12/17/19 hearing that the Court believed phone and cable revenue to be relevant.

Indeed, Plaintiffs already have Charter's extensive public financials about overall revenues, which it can use to draw inferences about the internet percentage of the business. The only revenue remotely relevant would be internet, which Charter has agreed to provide.

Similarly, to the extent Plaintiffs are able to identify subscribers about which Plaintiffs' alleged infringement notices were sent, Charter can reasonably isolate the subscribers' revenue during the claim period and will provide it within the next 60 days. For other subscribers for whom Charter has yet to be able to identify from Plaintiffs' notices, Charter cannot yet identify this information, though Charter is still investigating whether alternative means of locating and providing this information are achievable.

Charter continues to diligently, and in good faith, prepare its productions for this case, and will continue to make additional productions to Plaintiffs shortly.[3]

Regards,

Erin R. Ranahan

cc: Neema T. Sahni nsahni@cov.com
Matthew J. Oppenheim matt@oandzlaw.com
Scott A. Zebrak scott@oandzlaw.com
Jeffrey M. Gould jeff@oandzlaw.com

[3] Plaintiffs also represented at the December 17, 2019 hearing that they "expected to make this week," a production of revenue information (Hr'g Trans. 125:7-9; 127:22-23-128:1), but then indicated after that conference that they would be delaying that production, which has yet to be made.