# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

WARNER RECORDS INC., *et al.*,

      Plaintiffs,

v.

CHARTER COMMUNICATIONS, INC.,

      Defendant.

Case No. 1:19-cv-00874-RBJ-MEH

## OPPOSITION TO PLAINTIFFS' AMENDED MOTION TO DISMISS CHARTER'S COUNTERCLAIMS THREE AND FOUR

### I.      INTRODUCTION AND FACTUAL BACKGROUND

Plaintiffs seek more than $1.7 *billion* in statutory damages from Charter, claiming that their "hundreds of thousands of statutory [copyright] infringement notices" demonstrated that Charter's subscribers infringed 11,482 sound recordings and music compositions that Plaintiffs allegedly "own and/or control." Yet after Charter sought to test Plaintiffs' ownership claims, Plaintiffs withdrew their claims for 455 works (the "Dropped Works")—approximately 4%, or nearly *one out of every twenty-five* claims. Information about *which* of Plaintiffs' notices correspond to the Dropped Works is exclusively within Plaintiffs' control, and Plaintiffs have gone to great lengths to avoid providing this information in discovery. But it is plain that what Plaintiffs characterize as an "unremarkable" decision to abandon claims for these hundreds of works—for which they sought *$68.25 million* in statutory damages—is, instead, a calculated attempt to avoid being held accountable for knowing, material misrepresentations. As alleged in Charter's counterclaims, sending false notices, which materially misrepresented both Plaintiffs' ownership of works and that those works had been infringed, caused harm to Charter and the public, and violated both Section 512(f) of the DMCA and the Colorado Consumer Protection Act ("CCPA").

1

Each of Plaintiffs' notices sent to Charter during the March 24, 2013 – May 17, 2016 claim period asserted, under penalty of perjury, that the sender was authorized to send it. FAC ¶¶ 2, 95; ECF 165 (First Amd. Answer & Counterclaims) ("CC") ¶ 63, 69. Each of Plaintiffs' notices also asserted that the sender had a "good faith belief" that the allegedly infringing activity had not been authorized "by the copyright owner, its agent, or the law." CC ¶ 69. But because, as Charter alleges, Plaintiffs did not actually *own* the Dropped Works, they could not possibly have authorized their agent, the RIAA, to send the notices. And because the RIAA lacked knowledge of who the true owner was, it could not have formed a good faith belief—or *any* belief—that the use was not authorized by the work's owner. Charter, unaware of Plaintiffs' misrepresentations, promptly acted on the notices by processing them and forwarding them to its customers with instructions to take immediate action to stop exchanging any infringing material. CC ¶¶ 36, 159, 169-170.

Tellingly, Plaintiffs do not argue that they actually *did* own the Dropped Works.[1] Instead, they attempt to attack Charter's counterclaims on technical grounds, urging the Court to adopt unsupported interpretations of key legal terms and ignore established legal standards, and arguing that certain of Charter's allegations made on information and belief (which are, however, well supported by the known facts) are insufficient as a matter of law. As discussed below, Plaintiffs' urged legal interpretations are simply incorrect. And Charter's allegations on information and belief have ample factual and evidentiary support, and are plainly sufficient to state these claims at the pleading stage. Because information concerning Plaintiffs' putative ownership of the Dropped Works, and information about which notices corresponded to those works, is within

---

[1] Remarkably, even though certain of the same Plaintiffs here were awarded nearly $100,000 each for certain of the Dropped Works asserted in a prior copyright infringement case against Cox Communications—for alleged copyright infringement during the very same time period—Plaintiffs' counsel was unable to confirm in response to pointed questioning from Magistrate Hegarty that those Plaintiffs actually *owned* those Dropped Works. CC ¶ 76-78. *See* Ex. A (transcript).

Plaintiffs' control—but will likely have evidentiary support after a reasonable opportunity for discovery—Charter's pleading of those facts on information and belief is proper.

## II.     CHARTER HAS ADEQUATELY PLED ITS § 512(f) COUNTERCLAIM

### A.     Charter adequately alleges the harm element of § 512(f)

Section 512(f) requires Charter to plead it was injured as a result of Plaintiffs' false notices "in removing or disabling access to the material or activity." Charter alleged such injury, including that it "bears the costs of processing" the false notices and must "engage with its subscribers" about them, from which it suffers "harm to its reputation and loses the goodwill of its subscribers." CC ¶113. These injuries resulted directly from the false notices Plaintiffs sent seeking removal of the allegedly infringing content, and thus are cognizable under § 512(f).

Plaintiffs argue that § 512(f) requires a service provider to have actually removed or disabled the content. This extreme interpretation is wrong: it lacks support in the statute, would categorically exclude all § 512(a) "conduit" service providers from *any* remedy under § 512(f), and flies in the face of Congress's clearly expressed "inten[t] to deter knowingly false allegations to service providers in recognition that such misrepresentations are detrimental to rights holders, service providers, and Internet users." H.R. Rep. 105-51 pt. 2 at 59 (1998). *See Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 608 (1979) ("our task is to interpret the words of the[] statute[] in light of the purposes Congress sought to serve"). Rather, the interpretation that aligns with the text and purpose of the statute is that a § 512(a) "conduit" ISP may invoke § 512(f) when it has been injured by taking action to "remov[e] or disabl[e] access" to the content in reliance on false notices. Charter sufficiently alleges that it took such steps. *See, e.g.*, CC ¶ 36 ("Charter … forwarded those notices to accused subscribers … emphasizing that they should take immediate action to stop the exchange of any infringing material."). Nothing in § 512(f) requires acting through specific means or with a specific outcome; imposing such requirements on ISPs like

Charter is incompatible with Congress's purpose of deterring knowingly false notices.[2]

Both out-of-circuit cases Plaintiffs rely on lack relevance. *Amaretto Ranch Breedables, LLC v. Ozimals, Inc.* concerned notices defendant had sent to a third party service provider that stored plaintiff's material online. 790 F. Supp. 2d 1024, 1027 (N.D. Cal. 2011). But because the court had previously issued a TRO, the service provider had not taken any actions to remove or disable the online material. *Id.* The situation here is starkly different, since Charter (which is an ISP, not a storage provider) *took* action on Plaintiffs' notices. CC ¶¶ 1, 5, 10, 36, 124, 170). *Arista Records, Inc. v. Mp3Board, Inc.*, in which the notices at issue were simply too vague to constitute misrepresentations, is entirely irrelevant. 2002 WL 1997918, at *14 (S.D.N.Y. Aug. 29, 2002).

Accepting Charter's allegations as true for purposes of this Motion, Charter adequately alleges an injury in connection with "removing or disabling access to" the disputed material.

## B.    Charter's § 512(f) counterclaim adequately alleges knowledge

Plaintiffs argue (Mot. 6) that Charter must plead Plaintiffs had "actual knowledge" that their infringement notices were inaccurate. Not so. Section 512(f) imposes liability on "any person who knowingly materially misrepresents under this section that material or activity is infringing[.]" 17 U.S.C. § 512(f)(1). Numerous courts, recognizing that this "statutory language is sufficiently clear on its face and does not require importation of standards from other legal contexts," have given the term 'knowingly' its ordinary legal meaning: "that a party actually knew, should have known if it acted with reasonable care or diligence, or would have had no substantial doubt had it been acting in good faith, that it was making misrepresentations." *Online Policy Group v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1204 (N.D. Cal. 2004) (citing Black's Law Dictionary definitions of 'knowledge,' including 'actual' and 'constructive' knowledge); *Ground Zero Museum Workshop*

---

[2] In particular, Plaintiffs' view that an ISP must *itself* remove or disable access to material, Mot. 6-7, is mistaken.

4

*v. Wilson*, 813 F. Supp. 2d 678, 704 (D. Md. 2011) (same, citing *Diebold*); *Johnson v. New Destiny Christian Ctr. Church, Inc.*, 2017 WL 3682357, at *3 (M.D. Fla. Aug. 25, 2017) (declining to dismiss § 512(f) counterclaim under *Diebold* standard where, among other things, plaintiff allegedly "did not hold a valid copyright registration … at the time of the misrepresentations"); *Automattic Inc. v. Steiner*, 82 F. Supp. 3d 1011, 1026-27 (N.D. Cal. 2014) (finding knowing misrepresentation "because Defendant could not have reasonably believed that the [material] … was protected under copyright"). This is consistent with how the term is defined elsewhere in federal law.[3]

Plaintiffs' argument (Mot. 7) that "knowing" misrepresentation requires showing "*actual knowledge* of misrepresentation on the part of the copyright owner" is based on a misapplication of *dictum* from a Ninth Circuit case, *Rossi v. MPAA, Inc.*, that does not even concern a § 512(f) claim. 391 F.3d 1000, 1004 (9th Cir. 2004). In *Rossi*, the defendants had sent copyright infringement notices to the plaintiff's web hosting service, pursuant to § 512(c), after inspecting the plaintiff's website; although no actual infringement had occurred, plaintiff had to move his website to another host. *Id.* at 1002. The plaintiff brought claims for economic interference, defamation, and infliction of emotional distress. *Id.* The issue before the court was whether the defendants' inspection had been sufficient to give them a "good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law," as required by § 512(c)(3)(A)(v). The Ninth Circuit held that § 512(c)(3)(A)(v) required only a *subjective* good faith belief that the copyright owner had not authorized the use. *Id.* at 1004. In *dictum*, the Ninth Circuit stated (without further analysis) that "the overall structure of § 512," including the term

---

[3] *See, e.g.*, 22 U.S.C. § 8511(6) ("'knowingly'… means that a person has actual knowledge, or should have known, of the conduct, the circumstance, or the result"); 15 U.S.C. § 1264(c)(5) ("'knowingly' means (A) having actual knowledge, or (B) the presumed having of knowledge deemed to be possessed by a reasonable person who acts in the circumstances, including knowledge obtainable upon the exercise of due care to ascertain the truth of representations.").

"knowingly" in § 512(f), supported its holding. *Id.* This Court's *Dudnikov* decision also fails to support Plaintiffs' arguments. Mot. 7, 8 (citing *Dudnikov v. MGA Ent., Inc.*, 410 F. Supp. 2d 1010 (D. Colo. 2005)). In that case, the Court dismissed a perjury claim (which it treated as if it had been a § 512(f) claim) after "conclud[ing] that [the defendant] acted within its rights" in issuing an infringement notice. Unlike here—where Plaintiffs did not "act[] within [their] rights"—the notices in both *Dudnikov* and *Rossi* were sent on behalf of the true copyright owners; both cases are thus inapposite.

A case Plaintiffs themselves rely on, *Johnson v. New Destiny Christian Ctr. Church, Inc.*, is informative as to how courts treat § 512(f) claims when the underlying misrepresentation concerns a lack of copyright ownership, versus mistaken (but "good faith") infringement allegations. In a decision Plaintiffs ignore, the court applied *Diebold*'s "knowingly" standard and declined to dismiss a § 512(f) claim that was based in part on allegations that the plaintiff "did not hold a valid copyright registration … at the time of the misrepresentations." 2017 WL 3682357, at *3 (M.D. Fla. Aug. 25, 2017) ("*Johnson I*"). Instead, Plaintiffs cite a *subsequent* decision in which the Court—having found the purported lack of registration was not an issue—dismissed the § 512(f) claim due to the plaintiff's subjective, good faith belief that "the use in question was 'not authorized.'" 2019 WL 1014245, at *4 (M.D. Fla. Mar. 4, 2019) ("*Johnson II*"). Here, as in *Johnson I*, the underlying issue is whether the sender had rights to the works at issue—not, as in *Johnson II*, whether the plaintiff had authorized certain uses of works that it actually owned. Accordingly, the *Johnson I / Diebold* ordinary legal interpretation of the term "knowingly" should apply.

Finally, even if the Court were to import a "subjective" "good faith" standard into § 512(f) (which it should not), Plaintiffs' conduct falls far short of good faith. "A subjective belief based on a reckless inquiry cannot be considered a 'good faith' belief, and ignorance does not negate

6

recklessness where a reasonable investigation would have revealed the truth." *U.S. Commodity Futures Trading Comm'n v. Complete Devs., LLC*, 2014 WL 794181, at *16 (N.D. Ohio Feb. 26, 2014) (internal quotation marks omitted); *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 193 (3d Cir. 2000) ("it clearly can be argued that a subjective belief based only upon an inquiry that is reckless can never properly be considered a 'good faith' belief"). Plaintiffs boast of their "enormous investments of money, time, and exceptional creative efforts," FAC ¶ 1, yet failed to adequately investigate whether they even owned works for which they sent some of their millions of notices, CC ¶ 81. At a minimum, Plaintiffs' failure "evinces a lack of a good-faith belief that the statements in their notices were accurate." CC ¶ 156. Charter's allegations are, at the very least, plausible.

### III.   CHARTER HAS ADEQUATELY PLED ITS CCPA CLAIM

#### A.   Charter's CCPA claim is not preempted by the Copyright Act

Having argued (incorrectly) that Charter, as a conduit service provider, categorically lacks a remedy under § 512(f), Plaintiffs proceed to argue that Charter lacks *any* remedy because "Congress intended for federal law to *exclusively* govern the DMCA notice process," preempting any other possible counterclaims. Mot. 12 (emphasis in original). Nonsense. Not only does the plain language of the Copyright Act itself conclusively rebut Plaintiffs' preemption argument, but all available evidence shows that Congress intended precisely the opposite of what Plaintiffs argue. Moreover, *field* preemption (which Plaintiffs argue here) does not apply to the Copyright Act, and *conflict* preemption (which Plaintiffs do not argue in any event) is plainly inapplicable.

The Copyright Act's express preemption provision—which Plaintiffs ignore—provides:

> **Nothing in this title** annuls or limits any rights or remedies under the common law or statutes of any State with respect to … activities violating legal or equitable rights that are **not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106.**

17 U.S.C. § 301(b)(3) (emphases added). Plaintiffs' misconduct violated "legal or equitable rights"

that are plainly "not equivalent" to any of the § 106 exclusive rights. And there is no merit to Plaintiffs' speculation about Congress's intent in passing the DMCA, especially since those speculations are flatly contradicted by Congress's *express* intent in passing the Copyright Act itself: that "the general laws of … fraud[] **would remain unaffected** [by the Copyright Act] as long as the causes of action contain elements… that are different in kind from copyright infringement." H.R. Rep. No. 94-1478, p.132 (emphasis added). Both the plain language of the Copyright Act and its clear legislative history thus obviate Plaintiffs' preemption argument.

Nor is preemption warranted on any other basis. Contrary to Plaintiffs' argument that Congress intended to "occupy the field" of copyright law, Mot. 10, "field preemption generally does not pertain to the copyright arena, given that Congress has left ample room to the states to act within the ambit of copyright protection." 1 Nimmer on Copyright § 1.18. Moreover, as courts have repeatedly recognized, the DMCA's procedures are optional. 17 U.S.C. § 512(l) ("The failure … to qualify for limitation of liability under [§ 512] shall not bear adversely upon the consideration of a defense [to infringement] by the service provider."); *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 552 (4th Cir. 2004) ("despite a failure to meet the safe-harbor conditions … an ISP is still entitled to all other arguments under the law[.]"). This is not the stuff of field preemption.

Unsurprisingly, the handful of preemption cases Plaintiffs rely on lack relevance and are unpersuasive. *Diebold* relied on *conflict* preemption—which Plaintiffs do not argue[4]—to find, "on the facts of th[e] case," that there was "an irreconcilable conflict" between the copyright claims and a state interference with contract claim, because following the DMCA's takedown procedures could interfere with a contract. 337 F. Supp. 2d at 1205. No similar Catch-22 situation exists here,

---

[4] Conflict preemption occurs when compliance with both federal and state law "is a physical impossibility," or "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Diebold*, 337 F. Supp. 2d at 1205. Neither holds here.

where Charter's CCPA claim seeks to vindicate non-contract-based rights, including the public's rights, against Plaintiffs' improper assertion of works *in which they had no ownership interest*. Plaintiffs' unpublished, out-of-circuit district court decisions are inapposite for the same reasons, and because they also ignore the strictures of § 301 and Congress's express intent vis-à-vis preemption. *See Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, 2011 WL 2690437, at *3–5 (N.D. Cal. July 8, 2011) (preemption of contract interference claim and unspecified "other state law claims"); *Lenz v. Universal Music Corp.*, 2008 WL 962102, at *3 (N.D. Cal. Apr. 8, 2008) (same, for tortious interference with contract); *Stevens v. Vodka & Milk, LLC*, U.S. Dist. LEXIS 43666, at *6-7 (S.D.N.Y. Mar. 12, 2018) (same, for tortious interference with contract). An un-published (and unreported) decision in *Quill Ink Books, Ltd. v. Soto*, No. 1:19-CV-476 (E.D. Va. Am. Order filed Aug. 15, 2019), is inapposite for the same reasons, since it dismissed state law claims for tortious interference, as well as for defamation and statutory conspiracy, each of which concerned harm to the defendant, not the public. By contrast, courts have held state law unfair competition counterclaims like those here are not preempted, deciding them on the merits instead. *See, e.g., Capitol Records, Inc. v. MP3tunes, LLC*, 611 F. Supp. 2d 342, 347–48 (S.D.N.Y. 2009) (deciding state statutory and common law unfair competition counterclaims on their merits).[5]

## B.    Charter's CCPA claim is pled with sufficient particularity

As a preliminary matter, Plaintiffs misrepresent both the CCPA—which requires allegations of knowledge, not "intent"—and Federal Rule 9(b), which courts universally relax where, as here, information is exclusively within Plaintiffs' knowledge.

Under the CCPA, "[a] person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation," the person "knowingly" makes a false

---

[5] The *Capitol Records* court declined to grant plaintiffs' motion to dismiss on preemption grounds. *See id.*, 2008 WL 5596084 (S.D.N.Y. Dec. 15, 2008).

representation. Colo. Rev. Stat. Ann. § 6-1-105(1)(e). Plaintiffs piece together unrelated phrases from the Colorado Supreme Court's 2003 *Rhino Linings* decision to argue—incorrectly—that the CCPA requires "an intent to mislead and deceive the plaintiff." *See* Mot. 12 (selectively quoting *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 147 (Colo. 2003)).[6] But—as the *Rhino Linings* court repeatedly emphasized—"a plaintiff may satisfy the deceptive trade practices requirement of [CCPA] section 6-1-105(1)(e) by establishing ***either*** a misrepresentation ***or*** that the false representation had the capacity or tendency to deceive, even if it did not." *Id.* at 148 (emphases added); *Crowe v. Tull*, 126 P.3d 196, 204 (Colo. 2006) (*en banc*) ("Liability [under the CCPA] … is dependent upon knowledge ***or*** intent existing at the time of the … conduct"); *and see, e.g., Peterson v. USAA Life Ins. Co.*, 353 F. Supp. 3d 1099, 1108 (D. Colo. 2018), *aff'd*, 2020 WL 2609831 (10th Cir. May 22, 2020) (noting, in context of CCPA claim against insurance company, that "an insured does not need to intend to deceive the insurer."); *State ex rel. Suthers v. Mandatory Poster Agency, Inc.*, 260 P.3d 9, 14 (Colo. App. 2009) ("[L]iability under the CCPA may be implicated only by intentional conduct—i.e., the defendant knowingly engaged in a deceptive trade practice.") (quoting, with approval, trial court statement).[7]

Also contrary to Plaintiffs' arguments, Rule 9(b) does not require detailed pleading of facts exclusively in the opposing party's possession and control. Rather, "[a]llegations of fraud may be based on information and belief when the facts in question are peculiarly within the opposing

---

[6] Plaintiffs' penchant for misleading patchwork "quotations" is also on display at Mot. p.13, which incorrectly implies that *Avalon Condo. Ass'n, Inc. v. Secura Ins.*, 2014 WL 6464562, at *3 (D. Colo. Nov. 18, 2014) has something to do with "intent" under the CCPA. It does not.

[7] Plaintiffs have misinterpreted the *Rhino Linings* court's citation to *Parks v. Bucy*, 72 Colo. 414, 419 (1922), a contract case that long predated the CCPA. *Parks* merely stands for the proposition that, in general, a misrepresentation may be actionable if it is *either* a statement made "with knowledge of its untruth," *or* one made "recklessly and willfully … without regard to its consequences, and with an intent to mislead and deceive the plaintiff." *Rhino Linings* at 147.

party's knowledge and the complaint sets forth the factual basis for the plaintiff's belief." *Scheidt v. Klein*, 956 F.2d 963, 967 (10th Cir.1992); *Schlenker v. City of Arvada, Colo.*, 2009 WL 4730725, at *3 (D. Colo. Dec. 9, 2009) ("Pleading on information and belief is a desirable and essential expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff[,]" quoting 5 Wright & Miller, Fed. Prac. & Pro. § 1224 (3d ed.)). Plaintiffs insist that Charter's CCPA claim must meet an exorbitant pleading standard that the Federal Rules do not require, and which lacks support in case law. Mot. 12. But as the Tenth Circuit recognizes, "[t]he primary purpose of Rule 9(b) is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based[.]" *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 987 (10th Cir. 1992); *Duran v. Clover Club Foods Co.*, 616 F. Supp. 790, 793 (D. Colo. 1985) (sustaining CCPA claim where plaintiffs "alleged … sufficient facts to apprise defendants of the nature of the alleged deceptive trade practices") (citation and quotation marks omitted). Charter's counterclaims easily meet the relevant standard. *Schwartz v. Celestial Seasonings, Inc.*, in which the Tenth Circuit reversed a district court's dismissal of securities fraud claims under Rule 9(b), is instructive. 124 F.3d 1246 (10th Cir. 1997). The *Schwartz* court reasoned that a complaint satisfies the requirements of Rule 9 when it adequately identifies: (1) the time, place, and contents of the fraudulent misrepresentations or omissions; (2) the identity of the party alleged to have made the misrepresentations or omissions; and (3) the consequences of those misrepresentations or omissions. *Id.* at 1252–54. Charter has adequately alleged these elements on information and belief, an approach necessitated by Plaintiffs' "hide the ball" approach to litigation:

(1) Time, place and contents. Charter alleges that Plaintiffs' false notices were sent between of March 24, 2013 and May 17, 2016. Information about which notices corresponded to

which Dropped Works is peculiarly within Plaintiffs' control, to be revealed in discovery.[8] Each

such notice misrepresented, at a readily ascertainable time (which only Plaintiffs know), that the

RIAA was authorized to send the notices (it was not), *and* that it had formed a good faith belief

(which was an impossibility) that the true copyright owner had not authorized use of the work.

(2) Identity of the party alleged to have made the misrepresentations. Plaintiffs' pretext that

notice is insufficient under Rule 9(b) is risible, since their Complaint identified each Plaintiff that

purported to own each of the Dropped Works.[9]

(3) Consequences of misrepresentations. Charter adequately alleges harm to the public

from Plaintiffs' false notices. CC ¶¶ 109-113.

As discussed above, Plaintiffs' argument that Charter must allege an "intent to deceive" is

mistaken, and Charter has adequately alleged knowledge, which is all that the CCPA (and Rule

9(b)) requires.[10] CC ¶¶ 79-80, 154-156, 167.

### C.    Charter's CCPA claim adequately alleges an impact on the public

As an initial matter, Rule 8—not Rule 9—governs the public impact element of this claim.

*D.R. Horton, Inc.-Denver v. The Travelers Indem. Co. of Am.*, 2012 WL 527204, at *4 (D. Colo.

Feb. 16, 2012). Plaintiffs argue that Charter fails to adequately allege an impact on members of

the public as actual *or potential* consumers of Plaintiffs' music. Not so. *See* CC¶¶ 173-174. Plain-

tiffs' argument is impossible to square with their claim that they own or control "some of the

---

[8] The Special Master ordered Plaintiffs to provide this information in discovery, including with
respect to the Dropped Works. ECF 181 at 24-25 (granting Charter's motion for "an order com-
pelling a response to [interrogatories] which … seek the identification of each notice that corre-
sponds to each of Plaintiffs' works in suit."); ECF 190 at 9-11 ("declin[ing] to make any revisions"
to the order). Plaintiffs have resisted this discovery by every means at their disposal. *Id.*

[9] To the extent Plaintiffs argue that identification is insufficient for failure to identify the owners
of *sound recordings* corresponding to the Music Publisher Plaintiffs' Dropped Works, that infor-
mation is in Plaintiffs' possession, custody or control, to be disclosed in discovery.

[10] Plaintiffs apparent position that Charter must plead intent with particularity also ignores Rule
9(b)'s instruction that "intent[] [and] knowledge… may be alleged generally." FRCP 9(b).

world's most famous and popular music … [and] sound recordings," as well as "large catalogs of iconic musical compositions and modern hit songs" that have "shaped the musical landscape as we know it, both in the United States and around the world." FAC ¶ 1.

Plaintiffs mischaracterize Charter's allegations concerning harm to *other* ISPs that are "like Charter," *and* those ISP's customers, as alleging "a purely private harm." Mot. 18. But to the extent Plaintiffs' false infringement notices were submitted to *other* ISPs, concerning *their* customers, those customers (and the ISPs themselves) were also impacted members of the public. Plaintiffs' false allegations would have become part of the accused customers' records, to be counted along with legitimate notices, potentially subjecting the accused individuals to legal exposure, or suspension or termination of Internet access, as putative "repeat infringers." And other ISPs would have been harmed by Plaintiffs' false notices in the same ways Charter was harmed.

Plaintiffs fault Charter for not alleging "the number or proportion of consumers affected by the challenged business practices," Mot. 14, but the case law does not require such specificity when the practice is widespread or directed at the market generally. *See Peterson v. USAA Life Ins. Co.*, 2018 WL 1427206, at *4 (D. Colo. Mar. 22, 2018). Here, Plaintiffs' conduct is widespread—they have sent millions of notices and initiated over 30,000 lawsuits against individuals and ISPs. Further, Plaintiffs' argument is disingenuous in light of their failure to provide the information that would allow Charter to determine how many false notices Plaintiffs sent, concerning how many Charter subscribers. Equally disingenuous, and for the same reason, is their argument that Charter has failed to plead that Plaintiffs' conduct "has previously impacted consumers or has the significant potential to do so in the future." *Id.* Plaintiffs do not dispute that members of the public were harmed by receiving Plaintiffs' false and misleading notices, and could not plausibly do so: courts have recognized the pernicious impact on members of the public when

record companies like Plaintiffs leverage "a huge imbalance" between their "large law firms with substantial resources" and "individuals who don't have lawyers and don't have access to lawyers and who don't understand their legal rights." CC ¶ 110 (citation omitted). Plaintiffs' Motion simply ignores Charter's allegations concerning the obvious, undisputed *in terrorem* effect on the public of Plaintiffs' false notices, which Charter passed on to members of the public in good faith, but which were a part of Plaintiffs' and the RIAA's "decades-long campaign against consumers, threatening expensive, time-consuming litigation, and wielding the prospect of outsized and disproportionate statutory damages." *See* CC ¶ 109, ¶¶ 110-111. Finally, Plaintiffs' failure to address the second factor going to public impact—the relative sophistication and bargaining power of the affected consumers, as opposed to Plaintiffs—effectively concedes that factor.

At a minimum, because public impact is a question of fact and not law, *see One Creative Place, LLC v. Jet Ctr. Partners*, LLC, 259 P.3d 1287, 1288 (Colo. App. 2011),[11] Charter is entitled to discovery before Plaintiffs move to dismiss or strike this counterclaim. For example, Charter is entitled to discovery on the extent to which Charter customers contacted Plaintiffs or the RIAA after receiving Plaintiffs' false notices. *See, e.g.*, *Brodeur v. Am. Home Assur. Co.*, 169 P.3d 139, 155 (Colo. 2007) (remanding CCPA claim against insurance company, where "the trial court did not permit adequate discovery of Respondents' internal claim processing practices that may have allowed Petitioner to show an impact on the public."). Charter is also entitled to know whether Plaintiffs sent similar notices to *other* ISPs based on the Dropped Works: both those ISPs and their customers are members of the public, and to the extent other ISPs imposed consequences on *their*

---

[11]  Courts may consider relevant factors, including—without limitation—"the number of consumers directly affected by the challenged practice, the relative sophistication and bargaining power of the [affected] consumers … and evidence that the challenged practice has previously impacted other consumers or has significant potential to do so in the future." *Id.* at 1289-90.

subscribers based on Plaintiffs' notices (including based on the volume of notices customers received), that would also constitute an effect on the public.

## IV.    CONCLUSION

The Court should not dismiss Charter's third and fourth counterclaims. At a minimum, in light of ongoing discovery, dismissal would be premature. In the event the Court finds Charter's allegations insufficient, because Charter's investigation is ongoing, dismissal should be without prejudice, giving Charter the opportunity to plead additional facts to support its allegations.

Respectfully submitted,

Charles K. Verhoeven
David Eiseman
QUINN EMANUEL URQUHART & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600 (telephone)
E-mail: charlesverhoeven@quinnemanuel.com
E-mail: davideiseman@quinnemanuel.com

Andrew H. Schapiro
QUINN EMANUEL URQUHART & SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400 (telephone)
andrewschapiro@quinnemanuel.com

Craig D. Joyce
John M. Tanner
FAIRFIELD AND WOODS, P.C.
1801 California Street, Suite 2600
Denver, Colorado 80202
(303) 830-2400 (telephone)
E-mail: cjoyce@fwlaw.com

Dated: July 27, 2020

*/s/ Jennifer A. Golinveaux*
Jennifer A. Golinveaux
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA  94111-5840
(415) 591-1506 (telephone)
E-mail: jgolinveaux@winston.com

Michael S. Elkin
Thomas Patrick Lane
Seth E. Spitzer
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
(212) 294-6700 (telephone)
E-mail: melkin@winston.com
E-mail: sspitzer@winston.com

Erin R. Ranahan
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071
(213) 615-1933 (telephone)
E-mail: eranahan@winston.com
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 27, 2020, I caused the foregoing document and all supporting materials thereto to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record registered with CM/ECF.

 */s/ Jennifer A. Golinveaux*
Jennifer A. Golinveaux