IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

WARNER RECORDS INC., *et al.*,

    Plaintiffs,

v.

CHARTER COMMUNICATIONS, INC.,

    Defendant.

Case No. 1:19-cv-00874-RBJ-MEH

**DEFENDANT CHARTER COMMUNICATIONS, INC.'S OPPOSITION TO
PLAINTIFFS' MOTION TO DENY WAYNE COLEMAN'S DESIGNATION AS A
<u>QUALIFIED PERSON UNDER THE PROTECTIVE ORDER</u>**

## **INTRODUCTION**

Plaintiffs' objections to Wayne Coleman's designation as a "Qualified Person" have no basis in fact or law. Plaintiffs improperly presume that Mr. Coleman has no regard for the Protective Order in this case or his professional, contractual, and ethical obligations, and the grounds set forth in Plaintiffs' motion are based on manufactured risks that simply do not exist.

Mr. Coleman is one of the most experienced royalty auditors in the country, having conducted thousands of royalty audits over nearly 50 years on behalf of music companies and artists alike to assess the extent to which artists have been underpaid pursuant to their agreements. Plaintiffs speculate that should Mr. Coleman be provided access to confidential agreements in this case, he may disregard the Protective Order and his professional obligations in his various engagements for an unknown benefit to "recruit" potential class members in another case, though he has never served as a "recruiter" for class actions, and no such risk exists here. Plaintiffs further suggest that Mr. Coleman would use information gained in this case to enhance his audits and as an attempt to drum up new royalty audit clients. Not only is that again baseless speculation, but viewing agreements themselves will reveal nothing about whether payments were properly paid to artists in accordance with those agreements—which is what royalty audits are based upon.

Even if Plaintiffs had any legitimate concerns about Mr. Coleman's engagement, Plaintiffs fail to satisfy their burden of demonstrating that his access to materials here would cause Plaintiffs the "risk of serious harm." Plaintiffs attempt to stretch the standards for qualifying experts and any threat of "serious harm" beyond all reason and recognition in seeking to preclude Charter from engaging a qualified expert, and thereby seeking to block Charter from meaningfully defending itself from Plaintiffs' astronomical claims.

Plaintiffs' objections are entirely unfounded and their Motion should be denied.

## FACTUAL BACKGROUND

During the relevant time period, Charter was an internet service provider ("ISP") that provided a high speed internet service through which its subscribers had the freedom to access the internet as they chose. Plaintiffs are multi-billion-dollar music conglomerates that represent over 60 of the largest record companies and music publishers in the world.[1] In this case, Plaintiffs allege Charter's subscribers have infringed 11,027 of their copyrighted works by sharing them on peer-to-peer ("P2P") networks, like BitTorrent. Plaintiffs seek windfall damages against Charter—seeking maximum statutory damages in the amount of $150,000 per work, which amounts here to potential damages in excess of $1.6 billion.

Plaintiffs did not elect to sue Charter's subscribers on the accounts through which the allegedly infringing activity occurred, nor did Plaintiffs sue those who build and host the P2P networks on which Plaintiffs claim all the allegedly infringing activity occurred. Plaintiffs have instead sued Charter, an ISP.

Should Plaintiffs establish liability, the jury may be instructed to consider a host of factors, including, as relevant here, Plaintiffs' actual damages from the alleged infringement and the relative value of the copyrights in suit, which are relevant even to claims of statutory damages. In order to aid the jury's consideration of these and related issues, Charter sought Plaintiffs' artist revenues, artist agreements, and agreements with third-party platforms like Spotify and Apple, the latter of which the court in *UMG Recordings, Inc. et al. v. Bright House Networks, LLC*, Case No.

---

[1] Indeed, it was recently reported that the "big three" labels (Plaintiffs here) made approximately $22.9 million every 24 hours from streaming in 2019, "roughly $953,000 every hour, until the fourth fiscal quarter when profits soared even higher, with Universal cracking over $1 billion, and the combined "big three" labels making $1.03 million an hour." *See* Michael Broerman, *Report: Major Labels Make $1 Million An Hour From Streaming*, Live for Live Music (Feb. 27, 2020), *available at* https://liveforlivemusic.com/news/major-labels-streaming/

8:19-cv-00710-MSS-TGW (M.D. Fla.) ("*Bright House*") ordered Plaintiffs to produce.[2] Plaintiffs have begun to produce these documents, which they have uniformly designated as Highly Confidential—Attorneys' Eyes Only ("HC-AEO"), pursuant to the Protective Order.

In order to aid Charter's review of these documents, Charter retained Mr. Coleman. Mr. Coleman has nearly 50 years of experience performing royalty audits on behalf of both music companies and artists. *See* Affidavit of Wayne Coleman ("Coleman Aff."), ¶¶ 2-7. Mr. Coleman has also testified numerous times. *Id*., ¶ 7. He has never been accused or found to have violated any protective order, a non-disclosure agreement, or any other contractual, professional or ethical obligations in connection with his decades of work. *Id*., ¶ 8.

On June 26, 2020, pursuant to Section 5(a)(iii) of the Protective Order, Charter notified Plaintiffs that Mr. Coleman is an "actual or potential independent expert[] or consultant[]" who had signed the Protective Order and, therefore, a "Qualified Person" to whom Charter intended to provide documents Plaintiffs designated HC-AEO. *See* Declaration of Erin Ranahan ("Ranahan Decl."), Ex. 1 at 5. On June 30, 2020, Plaintiffs requested that Charter disclose "the subjects on which Mr. Coleman would consult or opine, and the categories of materials to which he would need access for that purpose." *Id.* at 4. Charter responded that its disclosure of Mr. Coleman related only to the provision of documents designated HC-AEO to Mr. Coleman, which is distinct from the scope of his proposed expert testimony. *Id*. at 3. On July 2, 2020, Plaintiffs formally objected to Charter's disclosure of Mr. Coleman as a "Qualified Person." *Id.* at 1.

On July 20, 2020, Charter proposed a compromise to Plaintiffs, which Charter believed would resolve Plaintiffs' objections. Ranahan Decl., Ex. 2 at 4. Specifically, and in direct response

---

[2] The documents were ordered to be produced in *Bright House* over Plaintiffs' strenuous objections. *See* Ranahan Decl., Ex. 3 (*Bright House* Jan. 8, 2020 Hr'g Tr.) at 105:13-123:9. These documents are deemed produced in this case as well.

4

to the objections Plaintiffs assert in their Motion, Charter proposed that (1) Mr. Coleman would explicitly agree not to "recruit" potential class members for the class actions Plaintiffs reference in their Motion, and (2) Charter would agree to allow Plaintiffs to redact identifying information from agreements for any artists in which Mr. Coleman is currently engaged in audits, to the extent Mr. Coleman was not otherwise provided copies of those agreements, through the conclusion of such audits. *Id.*

On July 21, 2020, the parties discussed Charter's proposal. Ranahan Decl., ¶ 8. Plaintiffs stated that they would consider Charter's proposal that Mr. Coleman agree not to "recruit" potential class members and not provide any information he learns in this case to the class plaintiffs' counsel. *Id.* However, Plaintiffs stated that Charter's proposal did not address their other concern, which is that Mr. Coleman would use information gained in this case to recruit new clients for other royalty audits adverse to Plaintiffs. *Id.* Charter's counsel responded that Plaintiffs' concern was unclear and unfounded, and was not meaningfully addressed in Plaintiffs' Motion. *Id.* Following the meet and confer, Plaintiffs' counsel responded in writing, reiterating their positions with respect to Charter's proposal. *Id.*; *see also id.* Ex. 2 at 3.

On July 23, 2020, Plaintiffs made a counterproposal. *See id.*, Ex. 2 at 1-2. Charter responded on July 27, 2020, stating that Plaintiffs' counterproposal went far beyond what the parties had discussed. Charter reiterated that Mr. Coleman "would sign an addendum to agree not to solicit class members or solicit new audit customers based on his engagement, and would abide by the Protective Order." *Id.* at 1. Charter further stated that Plaintiffs' proposal "appears to limit the scope of [Mr. Coleman's] testimony and prevent him from testifying from his knowledge and experience, which is inappropriate." *Id.* Charter's counsel offered to set up a further meet and confer call with Plaintiffs. *Id.* As of the date of this filing, Plaintiffs have not responded. *Id.*, ¶ 9.

5

## **LEGAL STANDARD**

The Protective Order provides that a party may, in good faith, object to the designation of "an actual or potential independent expert or consultant as a Qualified Person" and bears the "burden of demonstrating that disclosure to the disputed expert or consultant would expose the objecting party to risk of serious harm." ECF 63 (Protective Order), § 14(b).

The Protective Order does not define "risk of serious harm," though courts generally find such a risk exists where the producing and receiving parties are direct competitors, the information in question is competitively sensitive, and the proposed expert has an ongoing consulting relationship with the receiving party. *See, e.g.*, *Applied Films GmbH & Co. KG v. Galileo Vacuum Sys., Inc.*, No. 1:05-CV-2056-RWS, 2006 WL 8432703, at *2 (N.D. Ga. June 26, 2006) (denying objection because proposed experts did not "maintain ongoing consulting relationships with Plaintiff or Defendants' other competitors"); *Amoco Corp. v. Exxon Chem. Corp.*, No. CIV. A. C87-242A, 1987 WL 60204, at *5 (N.D. Ga. Sept. 17, 1987) (denying objection even where proposed expert was "a consultant and technical director, as well as the immediate past president and general manager, for … an actual or potential competitor of plaintiff"); *U.S. Gypsum v. Lafarge N. Am., Inc.,* No. 03C6027, 2004 WL 816770, at *1 (N.D. Ill. Mar. 2, 2004) (objecting party bears the burden to show risk of suffering an unfair competitive disadvantage). A "party cannot rely solely upon conclusory statements, but must present evidence of specific damage likely to result …." *BASF Corp. v. United States*, 321 F. Supp. 2d 1373, 1378 (2004) (addressing the risk of serious harm in the context of trade secrets) (citation omitted); *see also Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 250 F.R.D. 426, 430 (D. Neb. 2008).

## ARGUMENT

### I. Plaintiffs' Objections Are Unfounded

Plaintiffs' objections to Mr. Coleman's designation as a "Qualified Person" lack any merit. Plaintiffs' objections are all premised on the theory that in order to drum up business, Mr. Coleman would willfully violate the Protective Order, his non-disclosure agreements, and all professional and ethical considerations. Plaintiffs provide nothing specific to justify this baseless theory, despite the Protective Order's requirement that all objections be made in "good faith." For the reasons set forth below, Plaintiffs' Motion should be denied.

#### a. Mr. Coleman poses no competitive threat to Plaintiffs.

Unlike the proposed experts in the cases upon which Plaintiffs rely, Mr. Coleman poses no competitive threat to Plaintiffs. The cases Plaintiffs cite, (Mot. at 6), confirm that the true "risk of serious harm" is where the disclosure of such information may reasonably make its way into the hands of a competitor. *See, e.g.*, *Digital Equip. Corp. v. Micro Tech., Inc.*, 142 F.R.D. 488, 492 (D. Colo. 1992) (expert "has an ongoing relationship with [defendant] separate and apart from his consulting work in connection with this case … The fact that he has a *continuing nexus to an important aspect of [defendant's] business* precludes him from being categorized as an 'independent expert' within the meaning of the protective order or under the caselaw.") (emphasis added); *F.T.C. v. Exxon Corp.*, 636 F.2d 1336, 1349-50 (D.C. Cir. 1980) (barring of Exxon's in-house counsel from confidential, competitively sensitive information belonging to an Exxon competitor.); *Symantec Corp. v. Acronis Corp.*, No. 11-5310 EMC JSC, 2012 WL 3582974, at *3 (N.D. Cal. Aug. 20, 2012) (barring a non-testifying consultant who actively consults with proponent's competitors); *BASF Corp. v. United States*, 321 F. Supp. 2d at 1378 (precluding provision of sensitive material where the parties' manufacturing processes overlapped, and there

7

was the possibility that disclosure to the expert might "improve [direct competitor] Huntsman's competitive position in the marketplace").

But Mr. Coleman is not a competitor of Plaintiffs nor does he have ongoing consulting relationships with Plaintiffs' competitors. As such, Plaintiffs cannot satisfy the standard of establishing that they face a genuine risk of serious harm through Mr. Coleman's engagement as a Qualified Person in this case.

Indeed, Plaintiffs are themselves competitors in the marketplace: Warner Music Group, Sony Music Entertainment, and Universal Music Group are the "big three" music companies and constantly vie for the same artists and dominant market share. Notably, Plaintiffs do not state that any of the purportedly sensitive information Charter intends to provide Mr. Coleman would somehow get, for example, from Sony Music Entertainment to Warner Music Group or Universal Music Group. It would not, of course, as the Protective Order precludes these materials from being reviewed by anyone but outside counsel and independent experts and consultants.

The paradigmatic scenario present in the cases upon which Plaintiffs rely is simply not at play here. Charter and Plaintiffs are not competitors. None of Plaintiffs' information is of any use to Charter other than to defend against this case, and the disclosure of it to Charter would not affect Plaintiffs' competitive standing. *See Exxon Corp.*, 636 F.2d at 1349; *BASF Corp.*, 321 F. Supp. 2d at 1380–81.

Further, Mr. Coleman has neither worked for nor does he have an ongoing consulting relationship with Charter or any other ISP. Thus, there is no risk that information produced by Plaintiffs will harm Plaintiffs' competitive standing. *See Digital Equip. Corp.*, 142 F.R.D. at 492; *Symantec Corp.*, No. 11-5310 EMC JSC, 2012 WL 3582974, at *3. Plaintiffs' authorities are inapposite.

### b. Plaintiffs have no basis to presume Mr. Coleman will "recruit" for class actions.

To date, Mr. Coleman has served in a limited and informal role in connection with putative class actions.[3] Coleman Aff., ¶ 11. Mr. Coleman participated in a conference call between class plaintiffs' counsel and defendants' counsel during which the parties discussed information management issues, given Mr. Coleman's familiarity with how the record labels and music publishers store information. *Id.* Mr. Coleman was not hired to "recruit" class members, has never performed that role, and has no intention of doing so going forward. *Id.*, ¶ 12. In order to alleviate Plaintiffs' concerns, Mr. Coleman has offered to explicitly agree not to "recruit" potential class members or otherwise provide any information gained in this case to the class plaintiffs' counsel.

While Charter's proposal obviates Plaintiffs' objection, the Court should overrule Plaintiffs' objection in the first instance because it is precisely the type of speculation courts routinely reject. *BASF*, 321 F. Supp. 2d at 1378 ("[P]arty cannot rely solely upon conclusory statements, but must present evidence of specific damage likely to result …."). Indeed, Plaintiffs do not even attempt to articulate how or why they believe Mr. Coleman will serve in this role.

Further, Plaintiffs' articulated "risk" is that more artists will join class actions that attempt to remedy what those artists view as systematic underpayment by the major record companies and music publishers. Plaintiffs can rest assured that this risk exists independent of this case or Mr. Coleman's retention—as it stems from the scale of Plaintiffs' alleged mistreatment of artists. Mr. Coleman intends to abide by the Protective Order, and whatever other covenants may be deemed appropriate. Plaintiffs' attempt to use their own alleged wrongdoing against a class of plaintiffs to block Charter from asserting a fulsome defense in this case is improper and unprecedented, and should not be permitted.

---

[3] Notably, Plaintiffs do not even identify these putative class actions in their Motion.

9

    c. **Plaintiffs have no basis to presume Mr. Coleman will utilize information obtained in this case in connection with audits.**

Although not expressly stated in their Motion, Plaintiffs suggested during the parties' meet-and-confer that Mr. Coleman will utilize information obtained in this case to "recruit" new clients for royalty audits. For the same reasons discussed above, Plaintiffs have no basis to assume Mr. Coleman will violate the Protective Order. Plaintiffs' conclusory objection should be rejected on this basis alone. *BASF*, 321 F. Supp. 2d at 1378.

Moreover, Plaintiffs have no basis to assume that Mr. Coleman simply looking at or analyzing agreements will somehow reveal new potential audit clients—which would deal with the actual output and payments under the agreements, not the structure of the agreements themselves. Plaintiffs do not explain how the provision of any agreement in this case would spur Mr. Coleman to recruit new clients. Mr. Coleman has represented thousands of artists over his nearly 50-year career. He knows who his clients have been. The agreement does not tell Mr. Coleman the extent to which Plaintiffs have underpaid the artist. Only Plaintiffs' specific payment records to artists would show that. And if Mr. Coleman wanted new clients and to determine whether underpayment had occurred, all he would need to do is go to Plaintiffs' websites and peruse their artists' lists—which are publicly available information. Coleman Aff., ¶¶ 13-14. Therefore, the provision of artist agreements alone discloses nothing to Mr. Coleman that would pose a serious risk of harm to Plaintiffs.

Plaintiffs also argue that the provision of their agreements with third-party platforms like Apple and Spotify, which they claim Mr. Coleman does not routinely receive in connection with royalty audits, could somehow pose them competitive harm. Plaintiffs do not explain how. They simply state that these agreements are not something he receives in the normal course of royalty audits. Mot. at 5. Not only do Plaintiffs again provide no basis for their belief that Mr. Coleman

10

would violate the Protective Order, Plaintiffs provide no explanation as to how information contained in these third-party agreements would somehow harm them competitively.

Any competitive risk would come from Sony Music Entertainment learning the details of Warner Music Group's agreement with Spotify or from Universal Music Group learning the terms of Sony Music Entertainment's agreement with Apple. Providing these agreements to Mr. Coleman does not impact that risk at all.

Plaintiffs also do not explain how Mr. Coleman could use these agreements in his auditing work (again, assuming he willfully violated the Protective Order and did not already receive these agreements in connection with his auditing work). The agreements spell out the terms of how much the digital platforms pay Plaintiffs. The amount Plaintiffs in turn pay the artists is governed by separate artist agreements, which Mr. Coleman would already be provided in connection with an audit.

Plaintiffs appear to be most concerned that the details of their financial relationships with Apple, Spotify, and other third-party platforms would be disclosed to their artists—artists who Plaintiffs are alleged to have systematically underpaid. Perhaps these agreements would cast light on the fact that Plaintiffs retain much more of the proceeds from digital streaming than they in turn pay to their artists. The class actions that Plaintiffs face, in addition to numerous other disputes, demonstrate that the prospect of artist backlash is real. But that risk exists independently from this case; it is based on Plaintiffs' alleged wrongdoing against their artists. Charter should be permitted to provide these agreements to Mr. Coleman pursuant to the Protective Order so that Mr. Coleman can help Charter prepare its defense to Plaintiffs' massive claims here.

### d. Plaintiffs have no basis to presume Mr. Coleman will violate the non-disclosure agreements or his professional obligations.

Plaintiffs also argue that because "Mr. Coleman routinely executes non-disclosure agreements with Plaintiffs[,] [i]t is difficult to imagine how Mr. Coleman could consult with BHN on issues relating to Plaintiffs' artist and songwriter agreements, royalty calculations, or royalty practices without necessarily violating those non-disclosure agreements." Mot. at 5. It is true that Mr. Coleman regularly executes non-disclosure agreements and Mr. Coleman intends to honor those agreements. Coleman Aff., ¶ 8. But this Motion is about whether the provision of documents Plaintiffs have designated HC-AEO to Mr. Coleman would "pose the risk of serious harm." Plaintiffs' objection has nothing to do with the provision of any such documents, let alone a risk associated with it. The objection should be rejected outright.

It is also for this reason that Plaintiffs' attempt to limit Mr. Coleman's potential consulting and testimony on behalf of Charter, through an objection procedure set up regarding the provision of HC-AEO documents in this case, is improper. Plaintiffs have requested that Mr. Coleman sign an agreement that limits his ability to use "non-public" information he has learned from his prior audit engagements in this case. Mr. Coleman's theoretical use of "non-public" information would be governed by non-disclosure agreements that may have covered his receipt of that information in the first instance. If there was no such agreement, it has lapsed, or is otherwise non-enforceable, then there is no bar to Mr. Coleman utilizing information he has learned over his nearly 50-year career in this case, whether as a consultant or a testifying expert. Further, and critically for purposes of Plaintiffs' Motion, the Protective Order at issue has nothing to do with Mr. Coleman's use of information he has learned from other engagements. Plaintiffs' attempt to fabricate protections under the guise of an objection pursuant to the Protective Order should be rejected.

In addition, since Plaintiffs bear the burden to demonstrate the "risk of serious harm," their claim that they find it "difficult to imagine" how Mr. Coleman could play a role in this case without violating a non-disclosure agreement rings hollow. Indeed, Plaintiffs provide no basis for their objection that Mr. Coleman may willfully violate these agreements. Putting aside the fact that this objection has nothing to do with the Protective Order at issue, there are myriad ways in which Mr. Coleman can use his experience to assist Charter in reviewing materials produced in this case, understanding the issues that music labels and publishers face, understanding the issues that artists face, and understanding how the industry operates. Mr. Coleman need not violate the specific terms of a non-disclosure agreement in which he entered with Plaintiffs by disclosing the details of a particular audit in order to assist Charter with its defense. Plaintiffs' conclusory claim to the contrary should be rejected.

## II.     Charter's Proposal Obviates Plaintiffs' Objections

Charter respectfully submits that Plaintiffs' Motion should be denied in its entirety, as each objection is baseless. Plaintiffs' interests are adequately protected by Mr. Coleman's agreement to be bound by the Protective Order, Mr. Coleman's independent professional and ethical obligations, and the additional proposals Charter offered on July 20, 2020 in an attempt to resolve this dispute. Charter and Mr. Coleman are prepared to immediately undertake these assurances so as to put Plaintiffs' objections to rest.[4]

## CONCLUSION

Based on the foregoing, Plaintiffs' Motion should be denied in its entirety.

---

[4] Any attempt by Plaintiffs to supplement their Motion (as they indicated they may do) should be rejected, as Plaintiffs should have asserted all of their arguments in opposition to Mr. Coleman's designation in their Motion.

13

Dated: July 30, 2020

Charles K. Verhoeven
David Eiseman
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600 (telephone)
(415) 875-6700 (facsimile)
E-mail: charlesverhoeven@quinnemanuel.com
E-mail: davideiseman@quinnemanuel.com

Andrew H. Schapiro
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400 (telephone)
(312) 705-7401 (facsimile)
andrewschapiro@quinnemanuel.com

Craig D. Joyce
FAIRFIELD AND WOODS, P.C.
1801 California Street, Suite 2600
Denver, Colorado 80202
(303) 830-2400 (telephone)
(303) 830-1033 (facsimile)
E-mail: cjoyce@fwlaw.com

Respectfully submitted,

*s/ Erin R. Ranahan*
Erin R. Ranahan
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071
(213) 615-1933 (telephone)
(213) 615-1750 (facsimile)
E-mail: eranahan@winston.com

Michael S. Elkin
Thomas Patrick Lane
Seth E. Spitzer
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
(212) 294-6700 (telephone)
(212) 294-4700 (facsimile)
E-mail: melkin@winston.com
E-mail: tlane@winston.com
E-mail: sspitzer@winston.com

Jennifer A. Golinveaux
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA 94111-5840
(415) 591-1506 (telephone)
(415) 591-1400 (facsimile)
E-mail: jgolinveaux@winston.com

*Counsel for Defendant*
*Charter Communications, Inc.*

**CERTIFICATE OF SERVICE**

I certify that on July 30, 2020, I caused a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court via CM/ECF, which will send a notice of electronic filing to all counsel of record.

*s/ Erin R. Ranahan*
Erin R. Ranahan