# Exhibit 3

UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

-   -   -

HONORABLE CHARLENE EDWARDS HONEYWELL
UNITED STATES DISTRICT JUDGE PRESIDING

UMG RECORDINGS, INC., et al.,          )
                                       )
                 PLAINTIFFS,           )
                                       )
        VS:                            )8:19-CV-710-T-35TGW
                                       )
BRIGHT HOUSE NETWORKS,LLC,             )
                                       )
                 DEFENDANTS.           )
_____)

MOTION HEARING
DIGITAL TRANSCRIPTION  OF PROCEEDINGS
JANUARY 8, 2020

SHARON A. MILLER, CSR, RPR, CRR,FCRR
IL CSR 084-2617
FEDERAL OFFICIAL COURT REPORTER
801 N. FLORIDA AVENUE, SUITE 13A
TAMPA, FLORIDA 33602

Proceedings recorded by digital recording,
transcript produced by computer-aided transcription

UNITED STATES DISTRICT COURT

```
 1   APPEARANCES OF COUNSEL:

 2   ON BEHALF OF PLAINTIFFS:

 3           OPPENHEIM & ZEBRAK,LLP
             BY:  MR. MATTHEW J. OPPENHEIM
 4               MR. JEFFREY GOULD
             4530 Wisconsin Avenue NW 5th Floor
 5           Washington, DC  20818
             (202) 480-3958
 6           matt@oandzlaw.com
             jeff@oandzlaw.com
 7

 8           COVINGTON & BURLING, LLP
             BY:  MS. MEGAN M. O'NEILL
 9               MS. NEEMA T. SAHNI
             1999 Avenue of the Stars, Suite 3500
10           Los Angeles, CA  90067
             (424) 332-4800
11           mmoneill@cov.com
             nsahni@cov.com
12

13   ON BEHALF OF DEFENDANTS:

14

15           WINSTON & STRAWN, LLP
             BY:  MS. ERIN R. RANAHAN
16               MS. JENNIFER GOLINVEAUX
             101 California Streeet, 35th floor
17           Las Angeles, CA 94111
             (415-591-1506
18           eranahan@winston.com
             jgolinveaux@winston.com
19

20           GUNSTER, YOAKLEY & STEWART, PA
             BY:  MR. JOHN A SCHIFINO
21           401 E. Jackson Street, Suite 2500
             Tampa, FL  33602
22           (813)228-9080
             jschifino@gunster.com
23

24

25

                     UNITED STATES DISTRICT COURT
```

1          THE COURT:  Well, it's being granted.  It's

2   being granted for the 10 years.

3          MR. GOULD:  Thank you, Your Honor.

4          THE COURT:  The 10 years starts now.

5          MR. GOULD:  Excuse me.

6          THE COURT:  The 10 years starts now, so it's

7   not as if it's 10 years from the end of the discovery

8   period.

9          MR. GOULD:  Ten years from today looking back.

10          THE COURT:  Yeah, right.  Yeah, as opposed to

11   10 years from 2016 back.

12          MR. GOULD:  Understood, Your Honor.

13          THE COURT:  Okay.  What do the Defendants say

14   about No. 8?

15          MS. RANAHAN:  Thank you, Your Honor.  So

16   request 8, this again goes to the statutory damages

17   analysis and a jury is entitled to look and an expert

18   is entitled to look at how much the Plaintiffs value

19   their works even in a statutory damages case, also

20   entitled to consider what the actual damages are.

21   They don't have to award the actual damages number but

22   they can, and appellate courts have found actual

23   damages should bear some resemblance to a statutory

24   damages award.

25          So in this request we are seeking, first,

UNITED STATES DISTRICT COURT

1    there's umbrella agreements that Plaintiffs enter with

2    companies like YouTube or companies -- I've listed

3    some of them that I'm aware of here, Your Honor, where

4    a Plaintiff set a price in those agreements to how

5    much they would charge for a stream, how much they'd

6    charge for a download and some of them actually break

7    apart works by different tiers, and so they actually

8    value their own works at different levels.

9          Now, we could use that and give it to an

10   expert and present to the jury, look, here's their big

11   money makers up here.  These are the works that have

12   hardly brought in anything, and to be able to do that

13   they need to see how Plaintiffs internally value these

14   works so the umbrella agreements apply across the

15   catalog.  It's not like work by work by work.  They'll

16   have an agreement with YouTube.  Every time one of our

17   works are streamed, we'll pay this very miniscule

18   amount, and these ones are worth more, so those basic

19   agreements about how they value streaming.

20         In addition to that, there are basic license

21   agreements that they enter for these works, and all of

22   this, again, even though it's now seeking statutory,

23   and they've made that clear, actual damages can come

24   in, at least our assessment of them.  They can refute

25   it.  They can explain to the jury this is not

UNITED STATES DISTRICT COURT

1    accurate, but we are allowed to at least get the

2    discovery presented to our expert, try to make a case

3    to the jury to go below a billion dollars which is

4    what they just got for each work.  It's a huge range,

5    $200 minimum, 150,000 maximum, so we should be able to

6    say this is really what Plaintiffs would have gotten

7    here.  They can say they should get more for whatever

8    reasons they want to say but we're entitled to

9    investigate this.

10         THE COURT:  Okay.  And then at trial is your

11    expert going to go through each one of these things

12    and say, okay, for anytime somebody uses one of the

13    iTunes, here's 15 cents or something?  Do they do

14    that?

15         MS. RANAHAN:  Our expert would try to distill

16    it into a report and come up with here's what we're

17    going to present.  I don't know what our expert is

18    going to do yet.  I'm thinking of ways we could use

19    this information.  To present it in here's a bucket,

20    here's another bucket.

21         What happened in the Cox trial, Your Honor,

22    was a backwards -- they basically took a billion

23    dollars, there was a slide, you know, about a billion

24    dollars.  They took the billion dollars and went

25    backwards, divided it by the number of works.  We

UNITED STATES DISTRICT COURT

1    would want to present to the jury, look, you need to

2    look at these things from the front.  We need to look

3    at how these things are actually valued and how much

4    they --

5          THE COURT:  They did what to get their billion

6    dollars?  Here's what all these compositions are

7    worth?

8          MR. GOULD:  No.  We did nothing like that in

9    the Cox case.  She was not Counsel in the Cox case.

10   Ms. Golinveaux was and there was no such slide as to

11   asking for a billion dollars.

12         MS. RANAHAN:  That's incorrect.

13         MR. OPPENHEIM:  We let the jury decide what

14   amount within the statutory range.  We didn't ask for

15   a billion, Your Honor.  We simply said it should be at

16   the higher end of the range, we leave it to you, Your

17   Honor, to you, the jury, so this statement is just

18   inaccurate.  But I think it's -- we need not dwell on

19   it because it's not particularly relevant.  I think

20   the discovery dispute here, I'm happy to speak more to

21   it if you want, Your Honor.

22         THE COURT:  No, because it's not your turn.

23   What do you have to say about this one?

24         MR. GOULD:  I'm a little confused by what

25   Ms. Ranahan said.  So I'd like to clarify the record

UNITED STATES DISTRICT COURT

1    if I could and then address what I think is again an

2    overbroad request for irrelevant information.  But in

3    the Cox case, as we would do here, we presented a case

4    with a certain number of works and said to the jury,

5    you are to decide how many works were infringed and

6    you are to decide how much damage per work, and we put

7    forward the verdict form.

8         THE COURT:  Well, yeah, I know, but -- and how

9    did you come up with some suggestion to the jury this

10   is what it ought to be?

11        MR. GOULD:  We put on a compelling case

12   showing that Cox was contributorily and vicariously

13   liable on a willful basis for over 10,000 works and

14   the jury agreed and the jury in its wisdom based on

15   the factors that the judge instructed under the

16   statutory damages scheme decided the amount.  We said

17   we think that this conduct is egregious and a damage

18   award at the higher end is appropriate.  That's all.

19   They came back with the number.  We were thrilled.  We

20   were surprised.

21        THE COURT:  But, okay, that's all you said?

22   Is that oh, hey, you guys just come up with some

23   number?  You must have -- didn't you have an expert?

24        MR. GOULD:  Your Honor, we had a financial

25   expert and they had a financial expert.  What our

UNITED STATES DISTRICT COURT

 1      expert did is talked about how in the peer-to-peer

 2      infringement context it is impossible to understand

 3      the scope of infringement occurring on those networks

 4      because of the viral manner in which peer-to-peer

 5      music is distributed.  If I -- if I upload and

 6      distribute a song to you, Your Honor, and you

 7      distribute it to someone else, this then goes to 10

 8      people, then a hundred, then a thousand, then a

 9      million.  The concept is each of those is detrimental

10      to the Plaintiffs, and through this viral network the

11      scope of the infringement and the scope of the harm

12      grows virally and then --

13          THE COURT:  I understand, "oh, my God, this is

14      horrible," but then how did you suggest to them they

15      come up with a number?

16          MR. GOULD:  We did not, Your Honor.  Our

17      financial expert looked at the nature of BitTorrent.

18          THE COURT:  He must have come up with

19      something.  He didn't say, hey, you guys go.

20          MR. GOULD:  I'm trying to explain, Your Honor.

21      He said you can't know the scope of infringement, and

22      without knowing the scope of infringement you can't

23      understand the displaced legitimate sells and

24      therefore you cannot, you cannot determine the amount

25      of economic harm caused by the infringement.  That was

UNITED STATES DISTRICT COURT

1    his opinion.  You can't determine the amount of

2    economic harm.  And we then argued about all of the

3    various statutory damages factors that the jury is

4    entitled to consider.

5         What he did do is he showed in various other

6    ways the amount of revenue and what we would

7    essentially call ill-gotten gain that the Defendants

8    in those cases earned as a result of their infringing

9    behavior.

10        THE COURT:  How did he go about doing that?

11   What was his underlying data?

12        MR. GOULD:  He looked at several things which

13   we addressed on Plaintiffs' motion which includes the

14   revenue that the Defendant generated from the

15   infringing subscriber, profit and loss statements on a

16   product basis or that the expert could determine the

17   lifetime value that the ISP considers when it decides

18   whether to keep or terminate infringing subscriber.

19   He talked about the financial size and scope of the

20   Defendant, and critically he talked about what the

21   Defendants' economic incentive is, the economic

22   incentive to tolerate infringement on its network.

23        THE COURT:  Did he not give any numbers?

24        MR. GOULD:  Well, I just wanted to say that he

25   looked at the amount of revenue.

UNITED STATES DISTRICT COURT

1              THE COURT:  Where does he get that

2     information?

3              MR. GOULD:  Defendants produced it and he just

4     ordered it earlier, and you just ordered it.

5              THE COURT:  Okay.

6              MR. GOULD:  So one of the motions that my

7     colleague argued was revenue from the infringing

8     subscribers and Your Honor understood and granted

9     that.  We will look at the revenue that Bright House

10    generated from the infringing subscribers to the

11    extent they have it and it's available, and we're

12    still working through this.  Each case is different.

13    We'll likely have an expert who will testify -- look

14    at it and testify this is how much money Bright House

15    made by tolerating infringement on its network.

16             THE COURT:  They have a right to counter

17    whatever you're claiming.

18             MR. GOULD:  The problem --

19             THE COURT:  That's what No. 5 goes to.

20             MR. GOULD:  Understood, Your Honor.  So if I

21    could address this is the notion that Ms. Ranahan

22    described, that statutory damages should resemble or

23    correlate to actual damages, and that's not -- that's

24    not an accurate statement of the law.  The Supreme

25    Court --

UNITED STATES DISTRICT COURT

1          THE COURT:  It's good enough; right?  Isn't it

2     true that --

3          MR. GOULD:  I don't know if the Supreme --

4          THE COURT:  It's a factor you can look at.  I

5     mean if it's totally irrelevant, then fine.

6          MR. GOULD:  I --

7          THE COURT:  But it isn't apparently.

8          MR. GOULD:  So what the courts have said, what

9     the Supreme Court has said and the Eleventh Circuit

10    has said and this Court has said, that even where

11    there's no showing of actual damage and that would

12    include cases where actual damages --

13         THE COURT:  Understand.  Don't tell me no

14    actual damages because you're not claiming actual

15    damages, but it's my understanding that for some

16    reason actual damages can have a bearing on the

17    statutory damages.

18         MR. GOULD:  It's something that the jury

19    consider among the statutory damage factors.

20         THE COURT:  Okay.  Well, then -- then they

21    have a right to challenge how low the actual damages

22    are.

23         MR. GOULD:  The problem with the request, Your

24    Honor, is that it's untethered to any ability to do

25    any rational exercise on that.  And let me just

1     explain to you why.  In order --

2            THE COURT:  Then you can object to the expert

3     as being a bogus expert.

4            MR. GOULD:  We may -- we may.  We may be

5     heading down that road, but if you think about an

6     actual damage or economic harm theory in this case,

7     you need to know two things, Your Honor.  You need to

8     know how much infringement is out there and use that

9     as theoretically.

10           THE COURT:  We're not talking about that.

11    We're not proving your case.  We're talking about

12    their defense to your huge claim of damages.  They are

13    entitled to defend against your huge claim of damages,

14    and this is something they want to defend against that

15    and so why -- I don't know here why you think you're

16    entitled to stuff.  They want to see this kind of

17    information because it would show that the actual

18    damages on any -- aren't anywhere near what you think

19    they are.

20           MR. GOULD:  That's the problem.  The

21    information they're seeking doesn't allow even a

22    seasoned expert to do that analysis, and if I could,

23    Your Honor --

24           THE COURT:  Why not?

25           MR. GOULD:  Two things.  One is they're

UNITED STATES DISTRICT COURT

115

1   seeking all these license agreements because they

2   want -- because they want the multiplier of like --

3   imagine you lost a single sale from infringement.

4   What they want to do is say how much money did you

5   lose by that single infringement.  Is it a dollar,

6   because you would have earned that on an iTunes

7   download?  Is it 15 cents?

8         THE COURT:  No.  This isn't your final

9   argument to the jury.  This is they want to help

10   defend against your extraordinary claim, which

11   apparently isn't that extraordinary, so, and what

12   they're asking for are distribution or licensing

13   agreements showing numbers.  Isn't that what you want?

14         MS. RANAHAN:  Yes, Your Honor.  Numbers and

15   tiers.  It's RPF 8, Your Honor, on Page 11.

16         THE COURT:  I'm looking at it.  Now, what's

17   the problem with giving them numbers?

18         MR. GOULD:  We've offered to give them

19   numbers.  We've offered to give them a proffer of our

20   download revenue received per lawful download.  We can

21   explore --

22         THE COURT:  What's the problem with giving

23   them their narrowed request?

24         MR. GOULD:  Well, it doesn't seem so narrow to

25   me, Your Honor.  There's several parts to this.

UNITED STATES DISTRICT COURT

1    There's at least three overbroad parts.  One is

2    they're seeking -- and I recognize this may not be

3    appealing to you as an objection, but they're seeking

4    among our most sensitive agreements.  I won't labor

5    that issue.

6            THE COURT:  I don't mind that issue.

7            MR. GOULD:  All right.  Then let's talk about

8    that then.  These catalog-wide distribution agreements

9    with our digital service providers iTunes, Spotify,

10   YouTube and the like, those are among the company's

11   most sensitive competitor agreements that define the

12   parameters by terms in which they generate their

13   revenue for their revenue from legitimate sales.  What

14   we did in the prior case and we've offered to do here

15   is make a proffer to them of the financial -- key

16   financial terms that are embedded in those agreements,

17   and what they did -- and the last case used that

18   information as a proxy for what we would have earned

19   for each sale we lost caused by infringement.  We can

20   do that again.

21           THE COURT:  So what are you prepared to give

22   them?

23           MR. GOULD:  A proffer of the revenue generated

24   per digital download for works in the representative

25   time frame in the claim period.

UNITED STATES DISTRICT COURT

1          THE COURT:  And where do you get that -- where

2     do you get that number?

3          MR. GOULD:  We pull it from our very sensitive

4     agreements, or averages based on what they're saying

5     are these tiered notions --

6          MS. RANAHAN:  Your Honor.

7          MR. GOULD:  -- of hot songs and low songs.

8          MS. RANAHAN:  With all respect, we would like

9     to have the opportunity to do that analysis and have

10    our expert look at the agreements.  Their average

11    numbers aren't providing us the tiered information.

12    They're not providing us how much each stream or

13    download can go for in these tiers.  What their

14    umbrella agreements applying with these Plaintiffs

15    groups across the board to all songs, there's no

16    burden at all, there's no burden described.

17         THE COURT:  I'm buying this sensitive

18    argument.

19         MS. RANAHAN:  Well, we have highly

20    confidential protective order, Your Honor.  We can do

21    Attorneys Eyes Only.  We can do Outside Counsel Only.

22    We can do whatever it takes, but to be denied relevant

23    discovery is not going to help defend against a

24    billion dollars because it's sensitive, not to

25    mention, Your Honor, they're dated.  I'm pretty sure

UNITED STATES DISTRICT COURT

 1   they entered revised agreements by now.  This period

 2   is like 2012 to 2016, so it's not even current, and

 3   most likely they've entered new ones since.  So this

 4   very dated information that we will swear to only use

 5   with attorneys unless we need to get to the jury

 6   through the expert, there's ways to protect against

 7   that, Your Honor.  It's not argument against relevant

 8   discovery to say, you know, we might have some

 9   economic harm.  That's what a protective order is for,

10   so whatever we need to do with the order we're willing

11   to abide by it, but to be denied the ability to defend

12   against a billion dollars with averages that Counsel

13   has created based on we don't know what, we don't know

14   what license agreements they're using, we don't know

15   if it's such a burden how they're even able to look at

16   them to create these average amounts.  Its average

17   amount doesn't give our expert anything to work with.

18   We don't have the tiers.  We don't have the amounts a

19   stream or download goes for.

20          THE COURT:  Okay.  So I'm moving past the

21   sensitivity item.

22          MR. GOULD:  These are sensitive not just to

23   the Plaintiffs but to the third parties.

24          THE COURT:  I understand that, but, you know,

25   we can do protective orders and so on.

UNITED STATES DISTRICT COURT

1           MR. GOULD:  Sensitive as well to the third

2      parties who all compete against each other, even the

3      Plaintiffs themselves.  Ms. Ranahan talks about 60

4      some Plaintiffs.  This is six groups.  There's three

5      record company groups and three publisher groups, but

6      sensitive across the companies even within the

7      Plaintiff's group.

8           THE COURT:  That's up to you guys.

9           MS. RANAHAN:  They've sued together so we're

10     now -- because they don't show each other.

11          THE COURT:  You don't have to show them the

12     other clients' records.  You have to show it to the

13     Defendant.

14          MR. GOULD:  Understood.  I was just trying to

15     give a little bit of color to the sensitivity, Your

16     Honor.

17          THE COURT:  Okay.

18          MR. GOULD:  But, you know, I think there are

19     less -- there are ways to get at this information that

20     are less burdensome, less onerous, less --

21          THE COURT:  Okay.  Well, I'm going to grant 8.

22     I'm persuaded that under the circumstances that the

23     Defendants are entitled to that information.

24          MR. GOULD:  Your Honor, there are multiple

25     other parts of 8 that go deeply and vastly beyond

1    that.

2         THE COURT:  That what?

3         MR. GOULD:  That go vastly and beyond those

4    umbrella agreements.  They've asked for every license

5    for every of the 7500 works in suit, for any

6    agreement -- let's see.  Excuse me, Your Honor.  It

7    says all distribution agreements and/or all license

8    agreements entered during the claim period or

9    governing during the claim period.  Again, that's the

10   umbrella agreements are one thing, so I understand

11   your ruling on that and respectfully disagree with it.

12        The other piece is every single license --

13   take a copyrighted composition.  That copyrighted

14   composition could be licensed in a hundred different

15   ways over a hundred different years.  It could be

16   licensed --

17        THE COURT:  We're not talking about a hundred

18   different years.  We're talking about the claim

19   period.

20        MS. RANAHAN:  Claim period.

21        MR. GOULD:  Operative during the claim period.

22   Operative during the claim period could implicate

23   contracts that were created at any point in time, but

24   a copyrighted composition or sound recording could be

25   licensed to be used in a movie, a video game, a

UNITED STATES DISTRICT COURT

1     greeting card, a compilation.  It could be licensed in

2     any number of ways.

3          MS. RANAHAN:  Your Honor, it all goes to the

4     value of the work.  It goes to the value of the work

5     during the claim period, and that's what we're asked

6     to defend against and the jury is allowed to consider

7     it.

8          THE COURT:  Okay.  I'm going to grant No. 8.

9          MR. GOULD:  Your Honor, you still have another

10    category in there.

11         THE COURT:  I'm granting No. 8.  I have reread

12    it.  You know, it's during the claim period, so this

13    sort of goes to the heart of their defense and you're

14    asking for a billion dollars.  I have trouble getting

15    past that.

16         MR. GOULD:  I see that.  Can I ask a question,

17    Your Honor?

18         THE COURT:  So since it isn't so hypothetical

19    that it might otherwise seem.

20         MR. GOULD:  I have another question.  It's an

21    honest question.  I don't mean to sound dismissive.

22    Should our companies not pursue these rights?

23         THE COURT:  Pardon?

24         MR. GOULD:  Should our companies not pursue

25    the protection of these rights just because there's

1   potential value at the end?

2          THE COURT:  That's up to them the answer is,

3   but if they're asking for a billion dollars, they're

4   going to have to do a whole lot of work to get it.

5          MR. OPPENHEIM:  Your Honor, I feel as though I

6   need to, just for record purposes, we've never asked

7   for a particular number, so it's been said a hundred

8   times during this hearing by opposing counsel that

9   we've asked for a billion dollars and you've said it.

10  We've never --

11         THE COURT:  You're the one that said it first.

12         MR. GOULD:  No, Your Honor.

13         THE COURT:  Yeah, you did.  You just said you

14  tried a case and got a billion dollars.

15         MR. OPPENHEIM:  Your Honor, I relayed to you

16  the result of what happened in another case.  In this

17  case, just so we're clear, we've asked for statutory

18  damages.  We've not specified how much nor do we

19  expect we'll ask the jury for a specific dollar

20  amount.

21         THE COURT:  Well, how much does the maximum

22  statutory damages add up to?

23         MR. OPPENHEIM:  Of course --

24         MS. RANAHAN:  Over a million dollars, over a

25  billion, over a billion.

UNITED STATES DISTRICT COURT

1          MR. OPPENHEIM:  I thought I was speaking, Your

2     Honor.  I'll let Ms. Ranahan go.

3          THE COURT:  Now it is a billion dollar case.

4     And guess what?  It's not your turn either.  It's his

5     turn.

6          MR. OPPENHEIM:  I understand that, Your Honor.

7          THE COURT:  All right.  So I'm granting 8.

8     Now, this is more so I'm having trouble thinking you

9     need 8 and 9.

10          MS. RANAHAN:  So, Your Honor, for 9 it was

11     compiled for about 80 percent of the works in the Cox

12     case already, so all that would be remaining would be

13     18 percent up to the time frame.  Just so that we --

14     if we were allowed to use what was produced in the Cox

15     case on that front, so there's --

16          THE COURT:  Well, but if you get 9, why do you

17     need 8?

18          MS. RANAHAN:  Well, you're right, Your Honor.

19     We'll just take 8.  We don't need 9.  8 we need to

20     test 9 anyway, and 8 was what was produced in Cox so

21     we don't need 9.  If we can just stick with 8.  Thank

22     you.

23          THE COURT:  Then 9 will be denied as

24     withdrawn.

25          MR. GOULD:  Your Honor, at the risk of harming

                    UNITED STATES DISTRICT COURT

1    UNITED STATES DISTRICT COURT   )

2                                   )

3    MIDDLE DISTRICT OF FLORIDA     )

4

5              I, SHARON A. MILLER, Official Court Reporter

6       for the United States District Court, Middle District

7       of Florida, do hereby certify that pursuant to Section

8       753, Title 28, United States Code that the foregoing

9       is a true and correct transcript of the stenographic

10      notes taken by computer-aided transcription taken in

11      the above-entitled cause by the undersigned and that

12      the transcript format is in conformance with the

13      regulations of the Judicial conference of the United

14      States.

15   /S/Sharon A. Miller, CSR, RPR, CRR, FCRR

16   Official Court Reporter

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT