IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:19-cv-00874-RBJ-MEH

**WARNER RECORDS INC.,** *et al.***,**

       Plaintiffs,

v.

**CHARTER COMMUNICATIONS, INC.,**

       Defendant.

---

**PLAINTIFFS' PARTIAL OBJECTION TO SPECIAL MASTER'S AUGUST 12, 2020
ORDER RESOLVING DISCOVERY DISPUTES**

---

Plaintiffs object to the portions of the Special Master's August 12, 2020 Order (Dkt. 230, "Order") (1) permitting Charter to excise millions of entries from ticket data (RFP No. 2) and related communications (RFP No. 3); (2) sustaining Charter's privilege claims based on its deficient privilege log; and (3) compelling production of irrelevant discovery of Audible Magic "reference files" and related documents used by counsel to respond to discovery requests.

Under the Order Appointing Special Master, "any order, report, or recommendation of the Master on non-dispositive motions (unless it involves a finding of fact or conclusion of law) will be deemed a ruling on a procedural matter," reviewable for abuse of discretion.  Dkt. 143 at ¶ 6.  A Special Master abuses her discretion when she "fails to articulate a reason for [her] decision . . . or articulates a reason which has no basis in fact[,] or the reason articulated is contrary to law."  *Lee v. State Farm Mut. Auto. Ins. Co.*, 249 F.R.D. 662, 671 (D. Colo. 2008). The "subordinate role of the master means that the trial court's review for abuse of discretion may be more searching than the review that an appellate court makes of a trial court."  Fed. R. Civ. P. 53, Advisory Committee Notes, Note to Subdivision (g).

## OBJECTION TO RULING ON PLAINTIFFS' RFPs 2-3, CONCERNING PRODUCTION OF CHARTER'S TICKET DATA

At its core, this case is about what Charter did or didn't do in response to notices that alerted Charter to specific instances of copyright infringement by its subscribers.  Fundamental to that inquiry are Charter's internal records logging each infringement notice that it received, the subscriber account to which it related, and the steps Charter took in response—so-called "ticket data."  This evidence is critical to Plaintiffs' case in at least three ways.

*First*, it shows the extent of Charter's knowledge of specific repeat infringers on its network and how Charter responded.  This goes directly to Charter's liability for contributory

infringement.  *Second*, the data is critical to a "repeat-infringer analysis," *i.e.*, an assessment of how many notices Charter received regarding particular subscribers, and as to whom Charter took no action.  This translates into extraordinarily powerful evidence before a jury:  that Charter had subscribers who were each the subject of many hundreds of notices, for example, and yet Charter took no action to terminate such repeat infringers.  *Third*, the evidence is critical to defeating Charter's "safe harbor" defense under the DMCA, under which Charter must show that it "adopted *and reasonably implemented*" a repeat-infringer policy that resulted in the termination of repeat infringers under appropriate circumstances.  17 U.S.C. § 512(i)(1)(A).  Perhaps the most efficient, direct, and compelling way to determine whether Charter "reasonably implemented" a policy to terminate repeat infringers is by reference to its ticket data.

Because this evidence is so fundamental, it has been deemed relevant and has featured prominently in *every* similar ISP case that has been litigated to date.  Providing this data is not difficult because ISPs, like Charter, maintain systems that organize and track precisely this data.

Here, Plaintiffs object to the Special Master's ruling limiting Plaintiffs' access to this core discovery and Charter's related communications with its subscribers.  In response to Plaintiffs' request for comprehensive ticket data for all subscribers who received three or more notices (and related communications), the Special Master permitted Charter to withhold from production over 13 million data entries pertaining to notices sent by a third-party, Rightscorp.  Order at 15.  The Order allows Charter to cherry-pick the data it will provide, leaving Plaintiffs with an incomplete and misleading picture of how Charter responded to infringement notices— and leaving them unable to conduct a comprehensive repeat-infringer analysis.

Moreover, because Rightscorp sent notices on behalf of many music rights-holders, the

notices that have been excluded from discovery almost certainly concern many of the same

Charter subscribers who were the subject of Plaintiffs' notices—and thus would show that those

subscribers were the subject of many more notices than otherwise could be shown.[1]  By

precluding Plaintiffs' discovery into these notices, the Order will cause the dataset to be

irretrievably skewed for the balance of the case, and not on the basis of any neutral sampling

criteria.  Whatever arguments Charter wishes to make about the *weight* to be accorded this

evidence at trial, Plaintiffs are clearly entitled to discovery of the complete scope of Charter's

response to infringement notices, and its implementation of its purported policies.

## I.      Background

### A.      The Court orders Charter to produce ticket data and associated communications for all "RIAA-Accused Subscribers."

In June 2019, Plaintiffs served RFP 2, seeking "ticket data" for *all* infringement notices

Charter received, and RFP 3, seeking responses from *all* subscribers who received those notices.

*See* Sahni Decl. Ex. 1.[2]  Plaintiffs subsequently offered to narrow these requests to cover (i) all of

*Plaintiffs'* notices and (ii) all notices sent by any other rights-holders concerning the RIAA-

Accused Subscribers, *i.e.*, the subscribers who also were the subject of Plaintiffs' notices.

At the December 17, 2019 hearing, Judge Hegarty endorsed this approach, ordering

Charter to produce data and communications responsive to RFPs 2-3 as to all notices sent by *any*

other rights-holders concerning the RIAA-Accused Subscribers.  Dec. 17, 2019 Hrg. Tr. at

---

[1] *See, e.g., BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 300-05 (4th Cir. 2018) (discussing jury verdict in favor of music companies based on Rightscorp notices and upholding district court's finding that ISP was ineligible for safe harbor because it failed to implement a repeat-infringer policy with respect to Rightscorp notices).

[2] All references to exhibits are to the Declaration of Neema T. Sahni, unless stated otherwise.

78:11-13, 79:2-24; Dkt. 100 at 3.  Thus, Charter was required to produce ticket data for *all* of Plaintiffs' notices and *all* notices sent by *any* other rights-holder concerning the same subscribers.

> **B.     Charter fails to produce the ticket data for all accused subscribers.**

For the next two months, Charter failed to produce any ticket data, forcing Plaintiffs to again move the Court for relief.  At the February 19, 2020 hearing, Charter disclosed for the first time that, under an alleged document retention policy, Charter retained ticket data for only 38,000 notices sent by Plaintiffs, concerning approximately 11,000 subscribers, though Plaintiffs sent Charter over 700,000 notices during the Claim Period.  Feb. 19, 2020 Hrg. Tr. 120:4-126:6.

Because Charter claims that it retained ticket data for only a small fraction of Plaintiffs' notices, it did not comply with either prong of what it was required to produce under the Court's Order:  (i) it could not produce ticket data for *all* (or anywhere near all) of Plaintiffs' notices; and (ii) because it lacked the ticket data that would identify the subscribers associated with well over 90% of Plaintiffs' notices, it could not identify the ticket data relating to notices sent by other rights-holders concerning those subscribers.  Charter could have compensated for its inability to identify the relevant subset of its data, and complied with the Court's Order, by simply producing *all* ticket data for the period.  It did not do so.  Instead, Charter eventually produced the ticket data associated with only ***6%*** (roughly) of Plaintiffs' notices, and nothing more.[3]

---

[3] Charter later identified another 11,000 subscribers who were the subject of Plaintiffs' notices, after it was ordered to respond to Plaintiffs' RFP seeking Dynamic Host Configuration Protocol ("DHCP") logs that can be used to match IP addresses to subscriber accounts.  *See* Dkt. 164 at 2-4.  Charter has yet to produce the ticket data associated with these additional subscribers.

**C.      Charter asserts a safe-harbor defense, putting at issue its treatment of all repeat infringers, whether or not they were accused by Plaintiffs.**

A month later, Charter asserted as an affirmative defense that the DMCA's "safe harbor" shields it from liability.  Dkt. 147 at ¶ 21.  To be eligible for that affirmative defense, Charter must demonstrate that it "adopted and *reasonably implemented* … a policy that provides for the termination in appropriate circumstances of subscribers and account holders of [its] network who are repeat infringers."  17 U.S.C. § 512(i)(1)(A) (emphasis added).

Charter's defense puts squarely at issue its treatment of and communication with *all* repeat infringers—not just the RIAA-Accused Subscribers.  That is because "Section 512(i)(1)(A) requires an assessment of the service provider's 'policy,' not how the service provider treated a particular copyright holder."  *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007).  Thus, Charter's "response to adequate non-party notifications [*i.e.*, notifications on behalf of rights-holders other than Plaintiffs] is relevant in determining whether [it] reasonably implemented [its] policy against repeat infringers."  *Id*.

The Special Master has repeatedly recognized that Charter's safe harbor defense requires discovery into its handling of *all repeat infringers* and thus rejected Charter's attempts to restrict discovery requests to Plaintiffs or their notices.[4]  *E.g.,* Dkt. 181 at 26-27 (ordering Charter to state how many infringement notices it received for every month of the Discovery Period, and to state how many actions, by type of action, it took with respect to them).

---

[4] *E.g.*, Dkt. 181 at 26-27 ("Charter's invocation of the DMCA Safe Harbor puts at issue its overall policies and procedures for addressing infringement. . . . Plaintiffs are entitled to probe how Charter's infringement policies were actually implemented."); May 18, 2020 Hrg. Tr. (Ex. 2) at 27:24-28:2 ("I don't think it is appropriate to simply limit [Charter's discovery] to the plaintiffs in this case but, rather, the inquiry is Charter's actions and how Charter, in general, handled these notices.").

This included RFPs 2-3.  At the July 2 hearing, the Special Master agreed with Plaintiffs that those requests should no longer be limited to notices regarding the RIAA-Accused Subscribers.  Ex. 3 at 40:15-58:18.  *First*, because Charter did not retain the information that would allow it to identify which subscribers were the subject of more than 90% of Plaintiffs' notices, the only way for Charter to comply with the Court's December Order would be to provide ticket data and associated communications for *all* notices received during the Claim Period.  *Id*.  *Second*, because Charter's assertion of a safe-harbor defense put at issue its treatment of *all* repeat infringers, its production of ticket data and related communications could not be limited to only the RIAA-Accused Subscribers.  *Id.* at 47:1-6.  The Special Master ordered the parties to confer on a reasonable set of additional ticket data and associated communications for Charter to produce.  *Id*. at 57:6-58:18.

### D.     The Special Master's Order

Plaintiffs proposed that Charter produce ticket data and communications responsive to RFPs 2-3 for all subscribers who received three or more notices during the Claim Period (*i.e.*, repeat infringers).  Charter's counterproposal was to provide the requested ticket data and documents for all subscribers who received three or more notices during the Claim Period *from rights-holders other than Rightscorp*.  Ex. 4.  Charter made that proposal because, *according to Charter*, "Rightscorp has suffered from all sorts of issues.  They would send 1,000 [notices] on the first day of the same work. They're not as reliable[.]"  Ex. 5 at 14:19-24.  Charter also submitted a declaration contending that it would be *less* burdensome to winnow Rightscorp notices from its database before producing the data to Plaintiffs.  *Id.* at 21:3-8; Ex. 6.  That declaration was not credible on its face; Plaintiffs submitted a declaration from an expert familiar

with the computer system that Charter used to store its ticket data during the Claim Period, who

explained that Charter's position was at odds with the basic principle that extracting a broader

dataset is less burdensome than formulating limiters to produce a more restricted subset.  Ex. 7.

Nevertheless, the Special Master adopted Charter's proposal, without relying on

Charter's views of the reliability of Rightscorp notices.  The Order focuses on the volume

differential between the two proposals—Charter claims that Plaintiffs' proposal would result in

the production of ticket data and communications associated with 18 million notices, versus 5

million for its proposal—and erroneously states that the additional 13 million notices would be

duplicative, and thus, their probative value cannot outweigh the added burden.  Order at 15.

## II.     The Special Master's order on RFPs 2-3 should be overturned.

In adopting Charter's counterproposal, the Special Master conducted a flawed

proportionality test that has no basis in fact, deprives Plaintiffs of evidence that is the basic

building block of any mass infringement case, and runs contrary to established legal principles.

The Order relies upon the following errors, each of which constitutes an abuse of discretion.

*First*, the Order ignores that Charter's proposal deprives Plaintiffs of their ability to

conduct a "repeat-infringer analysis."  The ticket data—and only the ticket data—provide the

IP address and account number for each notice received.  That information is critical to

Plaintiffs' ability to perform a "repeat-infringer analysis" showing, for example, that a subscriber

associated with a given account number and IP address was the subject of 50 notices each month

for the entire Claim Period.  Charter's failure to terminate such subscribers could hardly be more

relevant to its safe harbor defense.  *E.g.*, *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,

149 F. Supp. 3d 634, 654 (E.D. Va. 2015) ("appropriate circumstances [requiring termination to

qualify for safe harbor] clearly cover account holders who repeatedly or flagrantly infringe copyright"). Likewise, the repeat-infringer analysis will allow Plaintiffs to show the jury that X-thousand subscribers received 10 or more notices in a given month, and Y-thousand subscribers received 100 or more notices in that same period, with no responsive action from Charter.

Obtaining the dataset necessary to perform this repeat-infringer analysis was *the* central reason for seeking additional ticket data beyond the RIAA-Accused Subscribers. By excising notices from Rightscorp, Charter's counterproposal skews the data and resulting analysis. At trial, Charter is of course free to argue to the jury that notices from Rightscorp, or anyone else, are not reliable. But it should not be permitted to exclude that entire category of notices from the evidence that Plaintiffs can even *discover*, and thereby distort the record of what Charter did.

Critically, the Order *makes no mention* of the probative value of the repeat-infringer analysis, despite Plaintiffs having made clear, in several hearings and written submissions, that this is why they needed an unadulterated dataset. *See* Ex. 3 at 54:18-55:11; Ex. 5 at 22:2-7; Ex. 7 at 2. Instead, the Special Master assumed that the incremental probative value of the ticket data would diminish with the more tickets Plaintiffs received and reviewed. Order at 12-13, 15. But that has it literally backwards. The greater the number of notices that Charter ignored concerning a given subscriber, the more powerful the evidence at trial.

**Second, the Special Master's finding that Plaintiffs' proposal would result in the production of "duplicative" discovery has no basis in fact.** The Special Master's proportionality test also rests on the erroneous premise that the ticket data and documents sought by Plaintiffs' proposal would be duplicative of other discovery. *See* Order at 13, 15, 17. This is simply wrong. In support, the Order cites "work log notes"—records of calls between Charter's

employees and subscribers concerning infringement notices—that Plaintiffs have received in response to another RFP.  *See* Order at 14; Dkt. 181 at 28-30.  This is not duplicative of the discovery sought by Plaintiffs' proposal for RFPs 2-3.  Plaintiffs have received *no* ticket data and *no* work log notes for *any* subscribers who were not identified in their notices.  Ex. 3 at 32:16-21. The ticket data at issue here will consist entirely of data and documents relating to *other* subscribers, because Charter has already produced all of the data that it retained for the RIAA-Accused Subscribers.  *All of the data and documents that Plaintiffs will receive pursuant to their proposal for RFPs 2-3 will be new*.[5]  The Special Master's assumption otherwise was a further factual error.

      ***Third*, the Order bases its burden finding on the volume of notices alone, though there is no evidence that the extra volume would create material additional burden.**  The parties submitted competing declarations regarding the incremental burden, if any, associated with Plaintiffs' proposal for RFPs 2-3. As Plaintiffs' expert (who has extensive experience analyzing data systems, including databases similar to what Charter used to track infringement notices during the Claim Period) explained, writing code to implement Charter's proposal to excise Rightscorp data, and thus exclude certain data from the larger set, would be *more onerous* than Plaintiffs' alternative.  Ex. 7.  The Special Master did not address this conclusion at all.

      Further, once the code is written, the extraction is a matter of computer processing time

---

[5] In response to Interrogatories 13 and 14, Plaintiffs received the raw total number of notices Charter received, and the raw total number of actions, by type of action, that Charter took in response.  *See* Ex. 8.  It is two pages' worth of charts setting forth 123 raw numbers.  This data says nothing about the number of notices each subscriber received—and in fact does not even identify any IP addresses or subscribers at all—and thus does not allow Plaintiffs to conduct a repeat-infringer analysis of the type described herein.

and thus does not entail real burden.  *Id*. at ¶ 9.  Indeed, Charter's declaration made no arguments that the processing time alone would create significant additional burdens to Charter.  *See* Ex. 6. And yet, this additional volume is what the Special Master rested her decision on:  "[w]hile there is dispute between the parties on the burden of producing some 13 million notices, *the sheer volume connotes some significant level of burden*."  Order at 15.  Additional computer processing time—especially where there is no support for the notion that the additional time entails a real burden—is not a reason to deprive Plaintiffs of *the core* discovery needed to test Charter's claim that it reasonably implemented a policy to terminate repeat infringers.

## OBJECTION TO RULING ON CHARTER'S PRIVILEGE ASSERTIONS

Fifteen months into discovery, Charter has yet to produce *any* substantive internal communications regarding copyright infringement from the relevant time period.  It has not produced a single email discussing (i) its internal policy for terminating repeat infringers, (ii) how Charter developed its purported copyright infringement policy, (iii) how it communicated with customers who were the subject of infringement notices, or (iv) how it responded to known repeat infringers.  It is inconceivable that such documents do not exist—Charter had an entire team of employees devoted to addressing these issues.  Indeed, it appears Charter has identified at least a handful of internal documents on these topics, but it has refused to produce them on the grounds of privilege—though such documents appear operational and non-privileged in nature.

Plaintiffs, therefore, must have the opportunity to examine an adequate privilege log to determine whether Charter has properly asserted its privilege claims.  Charter's log makes that impossible.  Rather than including an email's "subject" line, or a document's filename or title, Charter's log includes vague and generic variations of the same description for nearly every

entry, which has the effect of masking the specific topic of each document for which it asserts a privilege.  This is in stark contrast to Plaintiffs' log, which includes email subject lines and titles or filenames, such that Charter can understand the nature of Plaintiffs' privilege claims.  Compounding the problem, Charter recently served a second privilege log listing more than 800 additional documents (or document families) pertaining to its email spoliation that Charter is withholding.  As here, nearly every entry on that log uses the same few generic descriptions.[6]

Plaintiffs challenged Charter's assertion of privilege for a handful of items.  For all but one of those challenges, the Special Master simply rubber-stamped Charter's generic descriptions as sufficient as a matter of law, refusing even to look at the documents *in camera*.  Charter's privilege log is plainly insufficient, and the Order sustaining those claims has no basis in fact and is contrary to law.  Charter should be required to supplement its log.

## I.      Background

Charter submitted its initial privilege log on May 25, 2020.  In June, Plaintiffs requested multiple times that Charter supplement its log to comply with this District's practices; Charter refused.  Following a July 2, 2020 hearing with the Special Master, the parties agreed to exchange amended privilege logs.  Charter's log was still inadequate, and Plaintiffs again requested additional non-privileged information to allow them to meaningfully assess Charter's privilege claims.  Again, Charter refused to provide more.  *See* Ex. 9.

---

[6] On March 4, 2020, Charter disclosed that it deleted emails from active litigation holds for the majority of relevant custodians.  Dkt. 167 at 1, 5-6.  On May 4, 2020, Plaintiffs served Charter with spoliation-related discovery.  *Id*. at 4.  After months of conferrals and briefing before the Special Master, Charter produced 621 spoliation-related documents, while withholding 820 based on assertions of privilege or work product.  Plaintiffs anticipate additional motions practice concerning that log; resolution of the instant Objection is critical to the path ahead on those privilege claims.

On July 13, Plaintiffs submitted to the Special Master a chart challenging certain of Charter's privilege log entries.  Ex. 10.  These included entries for emails forwarding a presentation that was sent to *unidentified persons* on multiple listservs, emails between non-attorney personnel seemingly discussing operational matters, and other emails for which the description was too vague to even ascertain their general nature.  Relevant to this objection, the Special Master's subsequent order sustained Charter's assertion of privilege for nine of Charter's privilege log items: Entries 4, 29-35, 27.  Order at 31-33.

## II.      The Special Master abused her discretion in approving conclusory log entries.

The Special Master erred in determining that Charter's privilege log entries adequately "describe the nature" of the documents or communications withheld.  In Colorado, "[g]enerally, a privilege log is adequate if it identifies with particularity the documents withheld, including their date of creation, author, *title or caption*, addressee and each recipient, *and general nature or purpose for creation*."  *Zander v. Craig Hosp.*, 743 F. Supp. 2d 1225, 1232 (D. Colo. 2010). "The information provided in the privilege log must be sufficient to enable the court to determine whether each element of the asserted privilege is satisfied."  *Horton v. United States*, 204 F.R.D. 670, 673 (D. Colo. 2002).  Though courts have not required the title or caption of documents in all cases, it is necessary where the descriptions of withheld documents are insufficient, as here. The log items that the Special Master found adequate fall far short, and the Special Master's reasoning in deeming Charter's vague privilege log adequate was itself inconsistent.

To take just one example, the Special Master found that Charter's description of an email and attached presentation in Entry 28 was "sufficiently detailed"—but in the very next sentence, also noted that the "number of individuals listed, including the inclusion of two unidentified

listservs, *without further description*, calls into question the confidentiality of the alleged privileged document." Order at 30. The Order thus found Charter's entry "adequate," while simultaneously acknowledging that the entry did not identify all recipients of the document.[7] *Id.*

At issue, eight of the nine challenged items contain similarly vague descriptions:

- Item 4: Email chain seeking legal advice from in-house counsel and providing attachments to in-house counsel to obtain legal advice regarding internal presentation on customer communications.

- Items 29-35: Email chain providing information and attachments providing information to obtain legal advice from in-house counsel regarding copyright notices.

*See* Ex. 9. The Special Master endorsed Item 4 because "[t]he email here was sent from a Charter employee to Charter's in-house counsel," and "Charter has represented that the attachment was sent to counsel for the purpose of obtaining legal advice." Order at 31. And she similarly endorsed Items 29-35 because Charter "represented that the attachments were provided to Charter's in-house counsel to obtain legal advice regarding copyright notices." *Id.* at 33.

But a representation that a document was sent to counsel to obtain legal advice does not adequately "describe the nature" of the document, nor does the generic description that it concerns "customer communications" or "copyright notices." The items do not provide, and Charter refuses to provide, even the titles or captions of the email chains or the attachments (as Plaintiffs did). Charter insists that such information is privileged, and that providing subject

---

[7] The Special Master ordered "Plaintiffs" to submit a letter brief identifying the titles of the recipients of the communication, when of course only Charter could do so. Order at 30. It should also be noted that merely identifying the titles of the recipients is insufficient in this District, as parties are required to provide the specific names of the recipients and other identifying information. *See June v. Union Carbide Corp.*, No. CIV.A. 04-CV-00123MS, 2006 WL 2583579, at *1 (D. Colo. Sept. 7, 2006); *Pandeosingh v. Am. Med. Response, Inc.*, No. 14-CV-01792-PAB-KMT, 2014 WL 5488415, at *2 (D. Colo. Oct. 30, 2014).

lines or filenames would divulge privileged information, but "[t]he basis for asserting a privilege is not itself privileged[.]" *Zander*, 743 F. Supp. at 1232-33 (instruction not to answer regarding basis for privilege was improper; "the plaintiff is entitled to know which quality management function was alleged to be involved in the creation of each allegedly privileged document").

The remaining item, an email between two non-attorneys, is described as:

- Item 17: Email obtaining information and document attachment summarizing information to seek legal advice from Kelly Starkweather* regarding copyright program.

This entry should be examined with particular scrutiny given that it was exchanged between non-attorney personnel. No attorney sent or received the email or attachment or forwarded information from counsel to client. There is thus no basis to sustain Charter's attorney-client communication claim. Yet the Special Master incorrectly characterized Charter's description as "one containing questions for in-house counsel about handling notices." Order at 33. Nothing in Charter's description supports this; rather, it says that it "obtain[s] information" and attaches a document "summarizing information." *See Lee*, 249 F.R.D. at 671 (finding abuse of discretion where ruling has "no basis in fact"). During conferrals, Charter's counsel claimed the attached document summarizes internal questions on handling infringement notices. Ex. 10 at 6. But even if true, information on how Charter handles notices is not privileged; it is operational—a description of how these employees do their jobs. *RCHFU, LLC v. Marriott Vacations Worldwide Corp.*, 2018 WL 3055774, at *4 (D. Colo. May 23, 2018) (document prepared primarily for purpose of developing operational strategy was not privileged).

This dispute must be considered in the context of Charter's larger failure to produce any substantive documents on key issues. To date, Charter has produced almost no documentation

demonstrating how it handles copyright notices.  To the extent that Charter is seeking to shield such documents from production by claiming they are privileged (as with these items), that is improper; documents describing Charter's operational functions in response to notices are not legal advice, even if they incorporate comments or business advice from an attorney.  At the very minimum, the Special Master should have ordered *in camera* review of these documents to determine whether their contents were in fact privileged in full.

## OBJECTION TO RULING ON FINGERPRINTS AND RELATED DOCUMENTS

To prevail on their secondary liability claims against Charter for copyright infringement, Plaintiffs must prove that Charter's subscribers *directly infringed* their copyrighted works. Plaintiffs intend to meet this burden by showing that every "infringing file" that Plaintiffs' antipiracy vendor, MarkMonitor, detected Charter's subscribers downloading or distributing is unmistakably a work that Plaintiffs own or control.  This entails a simple A to B comparison between an infringing file and an authorized one.  Plaintiffs have already produced both: authentic digital copies of over 7,000 works in suit *and* copies of the "infringing files" detected by MarkMonitor.  This is all that Charter or Plaintiffs need to determine if the files distributed on Charter's networks are, in fact, infringing.

Despite these productions, Charter seeks additional discovery about which specific sound recording files, or "reference files," were used by Plaintiffs' vendors in the 2012 to 2015 time period to confirm the infringements, as well as documents related to counsel's investigation of that issue.  Charter claims this discovery is necessary to determine whether the infringement notices that Plaintiffs sent to Charter were accurate.  But that simply rephrases the very question that is answered by the evidence that Plaintiffs *already* have produced:  if the files already

produced demonstrate infringement, then the notices claiming infringement were accurate.  The information Charter seeks is therefore irrelevant.  As detailed below, the burden of this irrelevant discovery is also disproportionate to the needs of the case and seeks protected attorney work-product.  In compelling this discovery without addressing Plaintiffs' valid relevance, proportionality, and privilege objections, the Special Master abused her discretion.

## I.    Background

From 2012-2015, Plaintiffs sent Charter over 700,000 notices of infringement, detailing specific, repeat infringements of Plaintiffs' copyrighted works by specific Charter subscribers.  Those notices were generated by Plaintiffs' antipiracy vendor, MarkMonitor, which in that time period, searched peer-to-peer file-sharing networks to identify potentially infringing copies of Plaintiffs' works.  Upon detecting a potentially infringing file for the first time, MarkMonitor downloaded the infringing file and verified what it contained.  MarkMonitor performed that verification using the audio "fingerprinting" technology of another vendor, Audible Magic.  Specifically, Audible Magic used its specialized audio matching software to compare the acoustical fingerprint of a suspected infringing file to its database of audio "fingerprints"[8] of Plaintiffs' legitimate sound recordings.  When the software verified a match between an infringing file and a legitimate file, MarkMonitor generated and sent a notice to Charter.  This is precisely the same system and process that was used in *Sony Music Entm't v. Cox Commc'ns, Inc.*, No. 1:18-CV-950-LO-JFA, (E.D. Va.), to establish liability.

---

[8] A "fingerprint" is a unique, condensed digital summary of an audio file that can be used to identify that file or quickly locate similar files based on similar acoustic characteristics.  Audible Magic uses proprietary software to compare fingerprints, similar to the more commonly known consumer application, Shazam.

Charter now claims these notices of infringement are insufficient "proof" of infringement.  It thus demanded last fall that Plaintiffs produce legitimate digital copies of *every one* of the roughly 7,000 recordings in suit.  Charter argued that it needed to be able to compare those files to the infringing files that Plaintiffs had also produced to determine for itself whether the latter were in fact infringing.  ***Plaintiffs agreed, and over the next several months, produced to Charter over 7,000 digital copies, at substantial effort and expense***.

Having received the very materials it requested, Charter then demanded that Plaintiffs produce what it called the "reference files"—*i.e.*, the exact files that Plaintiffs sent to Audible Magic for its use in detecting infringements in the 2012-2015 time period.  Plaintiffs explained to Charter and the Special Master that such discovery was plainly irrelevant:  because Plaintiffs had already produced both the infringing and legitimate files at issue, Charter already possessed all the discovery it needed to test Plaintiffs' claims of direct infringement by doing its own comparison (*e.g.*, by use of a similar software tool or by listening to them).  Simply put, Charter does not need the exact files that Audible Magic used to perform such a comparison *in the past* in order for Charter to conduct that comparison itself *today*.

Nonetheless, in her April 28 Order, the Special Master instructed Plaintiffs *to investigate* "whether the digital files that Plaintiffs have produced . . . are the same files that were used by or provided to Audible Magic" to confirm and detect infringements on P2P networks.  Dkt. 164 at 9.  After a further time-intensive and burdensome investigation, Plaintiffs confirmed that the vast majority (approximately 80%) of digital copies they had produced were copies of the same sound recordings provided to Audible Magic for use in detecting infringements in the 2012-2015 time period.  To confirm this, Plaintiffs referred to the International Standard Recording Codes, or

"ISRCs," associated with each digital recording.  An ISRC is a unique and permanent identifier that can never represent more than one unique recording, and so by comparing the ISRCs already produced to those provided to Audible Magic, Plaintiffs were able to determine that they had in fact produced most of what Charter was after.  Ex. 11.

In response, Charter demanded—not by formal discovery request, but by letter—that Plaintiffs produce "the information upon which Plaintiffs relied in order to represent that the digital files Plaintiffs have produced to date have the same ISRCs as the files from which Audible Magic Reference Files were created."  Ex. 12 at 9.  In plain English, this was a demand to know how counsel went about identifying documents and information produced in discovery. Granting this request, the Special Master ordered Plaintiffs to produce (1) "documents sufficient to show which files were fingerprinted"; (2) "the information upon which Plaintiffs relied in order to represent that the digital files . . . produced to date have the same ISRCs as the files from which the Audible Magic Reference Files were created"; and "(3) "the reference files" to the extent they exist.  Order at 26.

## II.     The ruling on fingerprints and related documents should be overturned.

The Special Master abused her discretion by compelling this discovery without articulating any reason for rejecting Plaintiffs' relevance, proportionality, and work-product objections, and by granting discovery unmoored to any document request.

*First*, the Order grants Charter's motion to compel without addressing Plaintiffs' relevance and proportionality objections.  As an initial matter, the Order fails even to acknowledge, much less refute, Plaintiffs' consistent arguments that the requested discovery is irrelevant and not proportional.  *See, e.g.*, Ex. 13 at 10–11; Ex. 14 at 1-4; Ex. 15 at 8-9.  Instead,

18

the Order merely asserts—in conclusory fashion, without explanation or even an articulation of Charter's purported theory of relevance—that "Charter has established that these files are relevant." Order at 24-25. The Order does not attempt to "articulate a reason for [this] decision," which is in and of itself an abuse of discretion. *Lee*, 249 F.R.D. at 671. And the reason the Order does not do so is *because there is no relevance argument*; the materials already produced by Plaintiffs are sufficient to establish whether the infringing files infringe Plaintiffs' works at issue, and therefore also whether Plaintiffs' notices were accurate.

Even if Charter had articulated some relevance for this information (which it did not), the Special Master correctly noted that Plaintiffs can resist discovery if it "is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad discovery." Order at 26. The Special Master failed, however, to apply this test, simply asserting instead that "Plaintiffs ha[d] failed to meet this burden[.]" *Id*. But Plaintiffs had previously alerted the Special Master that they had invested "great expense of time and effort" to investigate the questions posed. Ex. 11 at 2. Engaging in further investigation to comply with the Special Master's recent Order would compound this burden by requiring Plaintiffs to collate information from multiple databases and identify and produce even more digital music files. This burden is simply not warranted given the irrelevance of the requested discovery and the fact that Charter *already has at least one copy of essentially every recording in suit*, which it can use to test Plaintiffs' claims of direct infringement.

*Second*, the Order disregards Plaintiffs' valid work-product objections. Charter demanded, and the Special Master has now ordered, production of information that Plaintiffs consulted to investigate whether the digital files they had produced in discovery had the same

ISRCs as the files provided to Audible Magic for use in detecting and confirming infringements in 2012–2015.  This is work-product, consisting of documents, analyses, and spreadsheets exchanged between Plaintiffs and their counsel, in connection with litigation, and based on analyses of Plaintiffs' internal databases.  Ex. 15 at 8 n.8.  The Special Master did not even address Plaintiffs' work-product objection, much less make a reasoned finding that it was not well-founded, or should be overcome by a substantial need for the discovery (because there is none).  That, too, constitutes an abuse of discretion.  *Lee*, 249 F.R.D. at 671.

> ***Third***, **the Order grants Charter's motion to compel discovery without reference to any document request calling for that discovery**.  The Order references only RFP 90 (seeking "copies" of digital files used to make fingerprints) and RFP 91 (seeking the fingerprints themselves), neither of which calls for the production of "the information upon which Plaintiffs relied" to verify the ISRCs of the produced files.  Order at 25.  It is improper to compel discovery that is not called for by a document request.  *See, e.g.*, *James v. Wash Depot Holdings, Inc.*, 240 F.R.D. 693, 695 (S.D. Fla. 2006) ("Rule 37 does not authorize a court to compel documents . . . based on an informal discovery request").  Among other reasons, it effectively denies Plaintiffs the ability to interpose valid objections, including for work-product, as discussed above.  In any event, the Special Master did not articulate any reason why Plaintiffs should be required to produce discovery that Charter has not properly requested.

> For these reasons, the Special Master's Order requiring production of "documents sufficient to show which files were fingerprinted," and "reference files" should be overturned.[9]

---

[9] Plaintiffs have also sought reconsideration of another part of the Order and reserve their right to object to that additional issue.

Dated: August 19, 2020

Janette L. Ferguson, Esq.
Benjamin M. Leoni, Esq.
LEWIS BESS WILLIAMS &
WEESE, P.C.
1801 California Street, Suite 3400
Denver, CO 80202
Telephone: (303) 861-2828
jferguson@lewisbess.com
bleoni@lewisbess.com

Matthew J. Oppenheim
Scott A. Zebrak
Jeffrey M. Gould
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave. NW, 5th Floor
Washington, DC 20016
Telephone: (202) 621-9027
matt@oandzlaw.com
scott@oandzlaw.com
jeff@oandzlaw.com

*/s/ Jonathan M. Sperling*
Jonathan M. Sperling
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
jsperling@cov.com

Mitchell A. Kamin
Neema T. Sahni
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
mkamin@cov.com
nsahni@cov.com

*Attorneys for Plaintiffs*

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 19, 2020, I caused the foregoing document and all supporting materials thereto to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record registered with CM/ECF.

*/s/ Jonathan M. Sperling*
Jonathan M. Sperling