# Exhibit 2

Page 1

```
             IN THE UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00874-RBJ-MEH
_____

WARNER BROS. RECORDS INC., et al.,

         Plaintiffs,

vs.

CHARTER COMMUNICATIONS, INC.,

         Defendant.
_____

                    TELEPHONIC HEARING

                     May 18, 2020
_____

         This telephonic hearing was taken before
Special Master Regina Rodriguez on May 18, 2020, at
1:32 p.m. Mountain Standard Time before K. Michelle
Dittmer, Registered Professional Reporter and Notary
Public within the state of Colorado.

(The reporter, K. Michelle Dittmer, appearing remotely
via telephone)
```

Page 2

```
                    A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF WARNER BROS. RECORDS INC.:

        MATTHEW J. OPPENHEIM, ESQ.
        JEFFREY M. GOULD, ESQ.
        Oppenheim & Zebrak LLP
        4530 Wisconsin Avenue N.W.
        5th Floor
        Washington, DC 20016
        Phone: 202-480-2999
        Email: matt@oandzlaw.com
        Email: jeff@oandzlaw.com
        (appeared telephonically)

        JONATHAN MICHAEL SPERLING, ESQ.
        Covington & Burling LLP
        620 Eighth Avenue
        The New York Times Building
        New York, New York 10018-1405
        Phone: 212-841-1153
        Email: jsperling@cov.com
        (appeared telephonically)

        NEEMA T. SAHNI, ESQ.
        Covington & Burling LLP
        1999 Avenue of the Stars
        Suite 3500
        Los Angeles, California 90066-4643
        Phone: 424-332-4757
        Email: nsahni@cov.com
        (appeared telephonically)
```

Page 3

```
ON BEHALF OF THE DEFENDANT:

        MICHAEL STUART ELKIN, ESQ.
        SEAN R. ANDERSON, ESQ.
        CESIE C. ALVAREZ, ESQ.
        Winston & Strawn, LLP
        200 Park Avenue
        New York, New York 10166-4193
        Phone: 212-294-6729
        Phone: 212-294-5388
        Email: melkin@winston.com
        Email: sranderson@winston.com
        Email: calvarez@winston.com
        (appeared telephonically)

        JENNIFER ANN GOLINVEAUX, ESQ.
        Winston & Strawn, LLP
        101 California Street
        Suite 3400
        San Francisco, California 94111-5802
        Phone: 415-591-1506
        Email: jgolinveaux@winston.com
        (appeared telephonically)

        ERIN R. RANAHAN, ESQ.
        Winston & Strawn, LLP
        333 South Grand Avenue
        Los Angeles, California 90071
        Phone: 213-615-1835
        Email: eranahan@winston.com
        (appeared telephonically)

        JOHN (JACK) TANNER, ESQ.
        Fairfield & Woods, P.C.
        1801 California Street
        Suite 2600
        Denver, Colorado 80202-2645
        Phone: 303-830-2400
        Email: jtanner@fwlaw.com
        (appeared telephonically)
```

Page 4

```
                    P R O C E E D I N G S

         REPORTED REMOTELY FROM ARVADA, COLORADO

              SPECIAL MASTER RODRIGUEZ:  Okay.  Why
don't we get started.  We're here today for hearing in
Warner Records versus Charter Communications,
19-cv-00874.  Last Friday, we took up defendant's motion
to compel and promised we're here this afternoon to take
up the plaintiffs' motion to compel.
              Could we have entry of appearances,
starting with plaintiffs, please.
              MR. OPPENHEIM:  Good afternoon,
Ms. Rodriguez.  This is Matt Oppenheim, and I believe my
colleague, Jeff Gould, from Oppenheim & Zebrak is on, as
well as cocounsel, Neema Sahni and Jonathan Sperling,
from Covington & Burling.
              SPECIAL MASTER RODRIGUEZ:  Thank you.
              For the defendants?
              MS. GOLINVEAUX:  Good morning -- good
afternoon, Ms. Rodriguez.  It's Jennifer Golinveaux at
Winston & Strawn.  And I believe with me on the line are
my partners, Michael Elkin and Erin Ranahan, at Winston &
Strawn, as well as Sean Anderson and Cesie Alvarez.
              MR. TANNER:  Your Honor, it's Jack Tanner
with Fairfield & Woods here in Denver.  I'm also on the
line.  Craig Joyce, who was at the hearing on Friday,
```

 1  documents are properly being provided.  The question of
 2  whether or not it's burdensome is a little bit different
 3  than what we're dealing with here at this moment.  But I
 4  understand your point.
 5              MS. GOLINVEAUX:  And Ms. Rodriguez, just
 6  to close the loop, we would -- if you -- if you -- upon
 7  further reflection on the transcript, we think you will
 8  agree with us in terms of what you ordered on Friday, but
 9  if you come to the determination that Oppenheim & Zebrak
10  does not have to provide their correspondence with
11  MarkMonitor or their litigation agreement with
12  MarkMonitor, we would ask that you allow us, as
13  Mr. Oppenheim suggested, to do further briefing on that
14  specific issue as to why it would be appropriate here.
15              SPECIAL MASTER RODRIGUEZ:  Okay.  All
16  right.  I will look at it.
17              MS. GOLINVEAUX:  Thank you.
18              SPECIAL MASTER RODRIGUEZ:  Any remaining
19  matters from Friday?
20              MS. RANAHAN:  No, I don't believe so.
21  Thank you.  This is Erin again.
22              SPECIAL MASTER RODRIGUEZ:  All right.
23              All right.  Let's turn to the plaintiffs'
24  motion to compel.  In the first instance, plaintiffs have
25  asked that Charter be ordered to state how many

 1  infringement notices it received from 2012 to 2016 and
 2  what actions it took in response to them that encompasses
 3  Interrogatories 13 and 14.
 4              The first thing I would note is that the
 5  motion to compel seeks documents from the time period
 6  2012 to 2016, but the request itself sought information
 7  from 2010 to 2016.
 8              Am I correct in understanding that you are
 9  limiting your time period to 2012 to 2016?
10              MR. OPPENHEIM:  Ms. Rodriguez, this is
11  Matt Oppenheim.
12              Yes, we agreed, as part of the meet and
13  confer, to limit our request.
14              SPECIAL MASTER RODRIGUEZ:  Okay.
15              MS. GOLINVEAUX:  Ms. Rodriguez, it's
16  Jennifer Golinveaux.
17              In fact, their motion is limited to May of
18  2016, so I just wanted to make that clear.
19              SPECIAL MASTER RODRIGUEZ:  Through May of
20  2016.  All right.
21              MS. GOLINVEAUX:  Yes.
22              SPECIAL MASTER RODRIGUEZ:  It appears, as
23  I review this, that this information is directly relevant
24  to the defense of the safe harbor that was raised by
25  Charter.  And I think we had this discussion a little bit

 1  on Friday, but it looks like, under this defense, the
 2  focus is on Charter's conduct and implementation of its
 3  policy.  So it would not necessarily be limited just to
 4  the plaintiffs in this case.
 5              What -- my understanding is, is that what
 6  plaintiffs are asking for is the number by month of all
 7  notices received.  They have not asked for each notice.
 8  I did not see anything in the record indicating that
 9  providing total number of notices would be unduly
10  burdensome.
11              Similarly, they've asked -- plaintiffs
12  have asked for all actions by type of action that Charter
13  took.  Again, this appears to be an appropriate and
14  reasonable request specifically targeted to the
15  information which plaintiffs need as relevant to its
16  response to Charter's affirmative defense.
17              Defendant has stated that it has responded
18  to the RF -- request for interrogatory.  I would note
19  that Exhibit 1 that was attached was actually the -- the
20  supplemental responses by Charter to the second set of
21  RFPs that starts with RFP 25, rather than the request
22  related to the interrogatories.  But the interrogatories
23  were -- were included with the plaintiffs' submission.
24              So again, I don't think that it is
25  appropriate to simply limit it to the plaintiffs in this

 1  case but, rather, the inquiry is Charter's actions and
 2  how Charter, in general, handled these notices.  I agree,
 3  and it is my -- as I said in the prior hearing, that
 4  requests for every communication regarding every notice
 5  was so broad.
 6              But it appears to me that in this
 7  interrogatory, plaintiffs have narrowed it, as they
 8  should, to the numbers by month for the limited time
 9  period of 2012 through May of 2016.
10              My question of -- to defense counsel is,
11  why would this information not be relevant to Charter's
12  actions and how it implemented its own policies related
13  to infringers?
14              MS. GOLINVEAUX:  It's Jennifer Golinveaux
15  from Winston.  Thank you, Ms. Rodriguez.  I can address
16  that.
17              First, to be clear, we responded to these
18  interrogatories, not only with respect to plaintiffs'
19  notices, but as to all third-party notices as well that
20  were sent to what's been defined by the parties as the
21  accused subscribers, and those are the subscribers that
22  got -- that ever received an RIAA notice on behalf of
23  plaintiffs.  So we've already provided them the
24  underlying data for this for both plaintiffs' notices and
25  all third-party notices directed at those subscribers.

1  Their -- their only argument of relevance
2  for getting the total number ever sent by anyone to any
3  Charter subscriber is that it's somehow relevant to
4  whether Charter implemented a repeat infringer
5  termination policy under the DMCA, as you note.
6        But here, Charter has offered a
7  stipulation and plaintiffs assert an admission request
8  and Charter has acknowledged that it didn't terminate
9  anyone in response to the copyright notices.
10       So the sheer number of third-party notices
11 that came in completely unrelated to plaintiffs' notices
12 has no relevance to that issue.  It is not probative on
13 that issue.
14       Moreover, I would note, you've footnoted
15 our discussion of the Rightscorp request that we talked
16 about on Friday.  This -- this -- providing this
17 information would directly implicate Rightscorp.  And
18 that's because even with respect to the accused
19 subscribers who got the RIAA notice -- notices, more than
20 90 percent of the third-party notices sent to them were
21 from Rightscorp.
22       So to the extent you're prepared to order
23 this -- this information with respect to all third-party
24 notices, we think that this absolutely makes plaintiffs'
25 own communications about Rightscorp squarely at issue in

1  this case because plaintiffs had meetings with
2  Rightscorp.  They rejected Rightscorp's services, and
3  their discussions of why they would not use Rightscorp
4  would be a relevant party admission to counter evidence
5  that they're going to come forth with about total numbers
6  of notices not at issue in this case.
7        SPECIAL MASTER RODRIGUEZ:  Okay.
8        Plaintiffs' counsel, do you want to
9  respond?
10       MR. OPPENHEIM:  Yes.  Thank you,
11 Ms. Rodriguez.  Yes.  Let me back up a little.
12       So it -- this information is -- is
13 relevant to the safe harbor, as you indicated, because
14 the safe harbor is not just about what Charter did with
15 respect to plaintiffs' notices.  It's about how Charter
16 adopted and implemented the repeat infringer policy
17 generally.  And -- and so you're starting point was
18 right.
19       But it's also relevant to other purposes
20 as well.  It's not just the repeat infringer policy, of
21 course, right?  So it goes directly to plaintiffs'
22 affirmative claims, right?
23       The plaintiffs are asserting a claim that
24 Charter received notice that it had infringing
25 subscribers and failed to adequately address that

Page 31                                                                               Page 32

1  infringement.  And how Charter responded to notices is
2  squarely part of plaintiffs' affirmative claims, not only
3  in terms of the actions it took, the notice it was on,
4  whether it knew the infringement was going on in this
5  case, but it also goes directly to Charter's culpability.
6        And I think it's very telling,
7  Ms. Rodriguez, if you look at Exhibit 2 to plaintiffs'
8  letter and you look at the charts that were used in the
9  Cox case -- and in particular, I point you, if you have
10 it, to page 2 of that exhibit, because this really shows
11 what we're getting at here, and it speaks to many of the
12 issues that -- that Ms. Golinveaux was just trying to
13 refute.
14       And I don't know if you've looked at this
15 chart or if you have it in front of you, but if you
16 could, it's very helpful.  It shows -- and, of course,
17 this is Cox, but we would like to create the exact same
18 chart, whatever the numbers are, for Charter, right?
19       So for a period of time, month-by-month,
20 what's the total number of notices that -- infringement
21 notices that Charter received?  How many of those notices
22 did they actually accept?  We don't know the answer to
23 that.  How many of those notices did they delete and
24 never accept?  We don't know the answer to that.  How
25 many warnings did they send?  We don't know the answer to

1  that.  How many suspensions and how many terminations?
2        And you can see as, Ms. Rodriguez, you
3  tried cases for many years.  You can imagine that this
4  kind of chart in front of a jury is a very useful way of
5  not only describing the safe harbor and that -- which
6  obviously is not a jury issue, a judge issue -- but for
7  purposes of a jury to understand the culpability of the
8  ISP.  You know, how did they respond to these notices?
9        And so you look at this chart and you say,
10 "This is useful information."  And I think you already
11 said that.  You -- you started by saying you thought it
12 was relevant.
13       Now, Ms. Golinveaux starts with something
14 a little misleading when she says -- maybe not
15 intentionally, so I'm not trying to attribute that -- but
16 she says:  Well, we provided third-party notices for the
17 accused subscribers.  But accused subscribers are just
18 the subscribers that were the subject of plaintiffs'
19 notices.
20       She's not representing to you that they've
21 provided all the third-party notices and they haven't.
22 So that's number one.  And they need to.  They have to.
23 It's critical for purposes of understanding
24 comprehensively what Charter did and did not do with
25 respect to its -- its policy.