Exhibit 3

Telephonic Hearing
July 2, 2020

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00874-RBJ-MEH

───────────────────────────────────────────

WARNER BROS. RECORDS INC., et al.,

Plaintiffs,

vs.

CHARTER COMMUNICATIONS, INC.,

Defendant.

───────────────────────────────────────────

TELEPHONIC HEARING

July 2, 2020

───────────────────────────────────────────

        This telephonic hearing was taken before
Special Master Regina Rodriguez on July 2, 2020, at
10:01 a.m. Mountain Standard Time before K. Michelle
Dittmer, Registered Professional Reporter and Notary
Public within the state of Colorado.


(The reporter, K. Michelle Dittmer, appearing remotely
via telephone)

Telephonic Hearing
July 2, 2020

Page 2

```
 1    A P P E A R A N C E S
 2    ON BEHALF OF THE PLAINTIFF WARNER BROS. RECORDS INC.:
 3              MATTHEW J. OPPENHEIM, ESQ.
              JEFFREY M. GOULD, ESQ.
 4              ANDREW GUERRA, ESQ.
              Oppenheim & Zebrak LLP
 5              4530 Wisconsin Avenue N.W.
              5th Floor
 6              Washington, DC 20016
              Phone: 202-480-2999
 7              Email: matt@oandzlaw.com
              Email: jeff@oandzlaw.com
 8              Email: andrew@oandzlaw.com
              (appeared telephonically)
 9
              JONATHAN MICHAEL SPERLING, ESQ.
10              PHILLIP HILL, ESQ.
              LOWRY YANKWICH, ESQ.
11              Covington & Burling LLP
              620 Eighth Avenue
12              The New York Times Building
              New York, New York 10018-1405
13              Phone: 212-841-1153
              Email: jsperling@cov.com
14              Email: pahill@cov.com
              (appeared telephonically)
15
16              NEEMA T. SAHNI, ESQ.
              J. HARDY EHLERS, ESQ.
17              Covington & Burling LLP
              1999 Avenue of the Stars
18              Suite 3500
              Los Angeles, California 90066-4643
19              Phone: 424-332-4757
              Email: nsahni@cov.com
20              Email: jehlers@cov.com
              (appeared telephonically)
21
22
23
24
25
```

Wilson & Associates, LLC
scheduling@wilsonandassociatesllc.com

Telephonic Hearing
July 2, 2020

Page 3

```
 1    ON BEHALF OF THE DEFENDANT:
 2              SEAN R. ANDERSON, ESQ.
                CESIE C. ALVAREZ, ESQ.
 3              Winston & Strawn, LLP
                200 Park Avenue
 4              New York, New York 10166-4193
                Phone: 212-294-6729
 5              Phone: 212-294-5388
                Email: sranderson@winston.com
 6              Email: calvarez@winston.com
                (appeared telephonically)
 7
                JENNIFER ANN GOLINVEAUX, ESQ.
 8              Winston & Strawn, LLP
                101 California Street
 9              Suite 3400
                San Francisco, California 94111-5802
10              Phone: 415-591-1506
                Email: jgolinveaux@winston.com
11              (appeared telephonically)
12              ERIN R. RANAHAN, ESQ.
                Winston & Strawn, LLP
13              333 South Grand Avenue
                Los Angeles, California 90071
14              Phone: 213-615-1835
                Email: eranahan@winston.com
15              (appeared telephonically)
16              CRAIG D. JOYCE, ESQ.
                Fairfield & Woods, P.C.
17              1801 California Street
                Suite 2600
18              Denver, Colorado 80202-2645
                Phone: 303-830-2400
19              Email: cjoyce@fwlaw.com
                (appeared telephonically)
20
21
22
23
24
25
```

Telephonic Hearing
July 2, 2020

```
 1    can just identify them at the time.
 2                    SPECIAL MASTER RODRIGUEZ:  Okay.  Well, so
 3    that I would have time to look at it, let's have it due
 4    by 5:00 p.m. Mountain Time on the 13th.  I could do a
 5    hearing -- discussion with you-all on Wednesday, the
 6    15th, at probably -- I could do 1:00 Mountain Time.
 7                    MR. SPERLING:  That works for the
 8    plaintiffs.  Thank you very much.  We appreciate you
 9    making the time for us so quickly.
10                    SPECIAL MASTER RODRIGUEZ:  All right.  And
11    if the parties really run into an issue where they have
12    not been able to get everything together, you-all could
13    jointly give me a call, like on Friday, tell me where you
14    are.  We could talk about if we need to make changes.
15                    But for now, let's set it that we'll have
16    the submissions by 5:00 on the 13th and we'll have a
17    hearing and discussion at 1:00 on the 15th.  Okay?
18                    MR. SPERLING:  Yes.  Thank you.
19                    MS. RANAHAN:  Yeah.  Thank you.
20                    SPECIAL MASTER RODRIGUEZ:  All right.
21    Then I think that -- let's turn to plaintiffs' Issue
22    Number 1.  Look at my . . .
23                    All right.  It looks like what we're
24    talking about here is with regard to the production of
25    call logs for subscribers identified in plaintiffs'
```

Telephonic Hearing
July 2, 2020

 1   notice.

 2                     I also ordered Charter to produce call

 3   logs for certain repeat infringers who were not the

 4   subject of plaintiffs' notices.  And this, again, is

 5   consistent with the overall principle that I shared with

 6   you-all earlier in this call, and the parties were to

 7   discuss what would warrant or what would constitute a

 8   repeat infringer.

 9                     It looks like what plaintiffs have

10   proposed is three notices, and Charter has proposed five

11   notices.  The question also was raised by plaintiffs

12   about whether this included a few subscribers or all

13   subscribers.

14                     MR. GOULD:  Ms. Rodriguez, this is Jeff

15   Gould -- oh, I'm sorry.  I didn't mean to interrupt.

16                     SPECIAL MASTER RODRIGUEZ:  Well, hold on

17   just a minute.  Let me just make sure --

18                     MR. GOULD:  Sure.

19                     SPECIAL MASTER RODRIGUEZ:  -- I'm -- we're

20   all tracking on the same thing.

21                     Charter has produced the 38,000-plus work

22   logs for plaintiffs' notices, right?

23                     MS. GOLINVEAUX:  Correct.  Jennifer

24   Golinveaux.

25                     SPECIAL MASTER RODRIGUEZ:  And then --

Telephonic Hearing
July 2, 2020

1              MS. GOLINVEAUX:  That's correct.

2              SPECIAL MASTER RODRIGUEZ:  And then call

3    logs associated with third-party notices received by any

4    accused subscribers.  You're proposing that that should

5    be five or more notices, correct?

6              MS. GOLINVEAUX:  That's correct.

7              SPECIAL MASTER RODRIGUEZ:  And,

8    Plaintiffs, tell me how your proposal, other than the

9    number, differs from this very specific proposal by

10   Charter:  Call logs associated with third-party notices

11   received by any accused subscribers who received five or

12   more notices.

13             MR. GOULD:  Thank you, Ms. Rodriguez.

14   This is Jeff Gould for the plaintiffs.

15             So I think we need to back up a little bit

16   because the framework that the defendants have put

17   forward, which is the entire denominator being these

18   so-called accused subscribers, is not the actual

19   denominator.  That was not the denominator in the

20   document request.  And as we read your very clear

21   language of your May 29 order, those two categories you

22   set up also were not limited to that denominator of

23   accused subscribers.

24             So the request itself sought work log

25   notes for all infringement notices.  And as we talked

Telephonic Hearing
July 2, 2020

```
 1    about it, and as you ruled very clearly in the language
 2    of your order, the first was:  Charter shall produce the
 3    requested work logs for infringing subscribers identified
 4    in plaintiffs' notices.  It doesn't say for the 5 percent
 5    of plaintiffs' notices that Charter retained.  It says
 6    the "infringing subscribers identified" --
 7                    SPECIAL MASTER RODRIGUEZ:  Okay.
 8                    MR. GOULD:  -- "in plaintiffs' notices."
 9    And that would reach to the entirety of the ticket data
10    that they have produced.
11                    So -- so for the first category, instead
12    of producing the work logs for all of the ticket data for
13    those subscribers, they want to limit it to just the
14    5 percent.  That's not what the order says.
15                    And on the second --
16                    SPECIAL MASTER RODRIGUEZ:  Can I stop you
17    right there?
18                    MR. GOULD:  Yes.
19                    SPECIAL MASTER RODRIGUEZ:  Hold that
20    thought for a moment.
21                    Ms. Golinveaux, is that accurate, that
22    you're wanting to limit that?  Because I do think my
23    order was that it was the full spectrum.
24                    MS. GOLINVEAUX:  Ms. Rodriguez, I think
25    we're on the same page as you.  But to be clear, I
```

Telephonic Hearing
July 2, 2020

Page 24

1   understood from the hearing and from your order that
2   Charter was to go ahead and produce the roughly -- I
3   represented at the hearing it was about 38,000 -- it
4   was -- work log notes associated with RIAA notices, which
5   we have done.
6             And we've proposed now broadening that out
7   to then third-party notices that those accused
8   subscribers got, which was -- require a review of a
9   corpus of about -- I think it was about 2 1/2 million
10  additional tickets, which we thought was a reasonable
11  compromise to get them what you indicated in the hearing
12  you thought they were entitled to, which is a broader set
13  than just limited to the RIAA notices.
14            SPECIAL MASTER RODRIGUEZ:  Right.
15            MR. GOULD:  So, Ms. Rodriguez, I believe
16  Ms. Golinveaux is simply rearguing the position she
17  stated in May, and which was resolved by your order.  And
18  the first piece of your order couldn't be clearer, that
19  this first piece applies to the infringing subscribers
20  identified in plaintiffs' notices, not the 5 percent of
21  notices that Charter didn't -- that Charter retained.
22            MS. GOLINVEAUX:  Ms. -- I'm not sure what
23  he's referring to with the 5 percent limitation.  We
24  produced --
25            SPECIAL MASTER RODRIGUEZ:  Well, that is

Telephonic Hearing
July 2, 2020

1    where I'm confused.

2                  MS. GOLINVEAUX:  Yeah.  Okay.

3                  MR. GOULD:  Okay.  I apologize.

4                  So plaintiffs sent Charter about 700,000

5    notices, and Charter has only found 38,000 of them.

6    That's roughly 5 percent, it's closer to 6 percent.  So

7    what Charter wants to do here is produce the work log

8    notes for the 38,000 notices that it retained.  That's

9    5 percent of our notices.

10                 SPECIAL MASTER RODRIGUEZ:  No, that's not

11   what my order said.

12                 Is that what you're saying,

13   Ms. Golinveaux?

14                 MS. GOLINVEAUX:  No.  We have produced all

15   38,000 work logs associated with the RIAA notices, and I

16   think that the hearing was very clear on that point, and

17   I think your order is clear that that's what we were

18   instructed to do and we have done that.

19                 SPECIAL MASTER RODRIGUEZ:  Okay.

20                 MR. GOULD:  That's certainly not what the

21   order says.

22                 SPECIAL MASTER RODRIGUEZ:  Well, let me

23   pull out the order.

24                 MR. GOULD:  Yeah.  It's on page --

25                 SPECIAL MASTER RODRIGUEZ:  It's a long

Telephonic Hearing
July 2, 2020

```
 1   order.
 2                 MR. GOULD:  We quoted the language in our
 3   chart, if that's of any help.
 4                 SPECIAL MASTER RODRIGUEZ:  Yeah.
 5                 MR. GOULD:  But certainly --
 6                 SPECIAL MASTER RODRIGUEZ:  What page are
 7   you -- you indicated you have the page number, Mr. Gould?
 8                 MR. GOULD:  Yes.  On page 29 of your
 9   May 29 order, in bold.
10                 SPECIAL MASTER RODRIGUEZ:  All right.  So
11   I guess --
12                 MR. GOULD:  On the front -- I'm sorry.
13                 SPECIAL MASTER RODRIGUEZ:  I'm still
14   struggling with understanding what is unclear about
15   the -- the order.
16                 MR. GOULD:  There's nothing unclear about
17   it.
18                 SPECIAL MASTER RODRIGUEZ:  Okay.  So
19   I'm -- you're being very specific, Ms. Golinveaux, in
20   your representation with regard to the RIAA data.  I
21   don't -- and you'll refresh my recollection here if I'm
22   wrong, but I don't see that this was limited to RIAA
23   data.
24                 What we are -- what we -- what I've
25   ordered here is that Charter will produce the call logs
```

Telephonic Hearing
July 2, 2020

```
 1   for certain repeat infringers who are not identified in
 2   plaintiffs' notices.  So not the 38,000 for which there
 3   were notices, but the --
 4                 MS. GOLINVEAUX:  Right.
 5                 SPECIAL MASTER RODRIGUEZ:  -- ones for
 6   whom there were no notices.  And then the parties were to
 7   meet and confer on what constitutes a repeat infringer
 8   and whether that number would be 1, 2, 3, 4, 5, and I
 9   think I suggested a range of between 3 and 4.
10                 As I understand it, plaintiffs have
11   proposed three and defendants have proposed five.
12                 Have I said anything that's
13   inconsistent --
14                 MS. GOLINVEAUX:  Yeah.
15                 SPECIAL MASTER RODRIGUEZ:  -- with your
16   understanding?
17                 MS. GOLINVEAUX:  So I think that the
18   disagreement here, Ms. Rodriguez, is that at the
19   hearing -- and we quoted the language in the chart --
20   that we were quite clearly discussing, and I quoted, that
21   I said I think there are 38,000 ticket data entries for
22   plaintiffs' notices, so they have to be gone through
23   individually.
24                 And then you said, that should provide
25   plaintiffs with sufficient data to understand and
```

Telephonic Hearing
July 2, 2020

1    determine whether there's certain patterns and issues, et

2    cetera.  And so that was where you were inclined to go.

3                 And then Mr. Sperling said:  Well, wait a

4    minute.  We'd also like some more outside of plaintiffs'

5    notices.  And so that's what we were ordered to meet and

6    confer about.

7                 So what -- to be -- to be crystal-clear,

8    we have produced all 38,444 work logs associated with

9    plaintiffs' notices.  What we are proposing is to go

10   beyond that and look at the corpus for all the

11   third-party notices that came in to the accused

12   subscribers who got the RIAA notices.

13                 SPECIAL MASTER RODRIGUEZ:  Uh-huh.

14                 MS. GOLINVEAUX:  And to provide the call

15   logs for any who got five or more.  I think what --

16                 SPECIAL MASTER RODRIGUEZ:  Okay.

17                 MS. GOLINVEAUX:  -- Mr. Gould is arguing

18   is that we should go outside that corpus and look at any

19   subscriber that Charter ever got a notice from,

20   irrespective of whether anything came in from the RIAA.

21                 And as we indicated in the briefing,

22   you're talking about 18 million-plus tickets when you

23   look at that.  And that, in our mind, is what guided our

24   proposal, is overbroad and too burdensome and goes

25   outside of what you said your goal was, which is to limit

Telephonic Hearing
July 2, 2020

```
 1   it in a reasonable way.
 2                SPECIAL MASTER RODRIGUEZ:  Yeah.  All
 3   right.  Thank you.
 4                MR. GOULD:  If I could respond,
 5   Ms. Rodriguez.
 6                SPECIAL MASTER RODRIGUEZ:  Thank you for
 7   that clarification.  I've got it now.
 8                MR. GOULD:  Could I -- Ms. Rodriguez,
 9   there's just a -- if I might.  So --
10                SPECIAL MASTER RODRIGUEZ:  Hold on just a
11   minute.  Let's just hold on a minute.
12                MR. GOULD:  Okay.
13                SPECIAL MASTER RODRIGUEZ:  You guys have
14   answered my questions and I'm looking at the order.
15                All right.  When we say, "Charter shall
16   produce call logs for certain repeat infringers who are
17   not identified in plaintiffs' notices," it is correct
18   that the context in which we were discussing this was
19   with regard to accused subscribers.  So the question
20   there was whether or not there were accused subscribers
21   who were repeat infringers.
22                So the category here was the category of
23   accused infringers, and I'm going to indicate that I
24   believe that three notices is the appropriate number to
25   use to identify what a repeat infringer would be.  So,
```

Telephonic Hearing
July 2, 2020

Page 30

```
 1    again, the world is of accused subscribers who received
 2    three or more notices.
 3                    Is that clear to everyone?
 4                    MS. GOLINVEAUX:  It is clear.  Thank you.
 5                    MR. GOULD:  Ms. Rodriguez, it's clear.
 6                    SPECIAL MASTER RODRIGUEZ:  Okay.
 7                    MR. GOULD:  Could I add a point for your
 8    consideration?
 9                    First, your position is clear.  I
10    understand it.  It's different than the order and I
11    respect that.  Charter certainly didn't move to
12    reconsider, but we are where we are today, so I accept
13    it.
14                    Can I give you a couple of pieces of
15    important context about these notes that I hope may
16    result in a different outcome?
17                    So we've now received the work log notes
18    for the 38,000 that Ms. Golinveaux referred to.  Many of
19    them are -- wrote:  Warning sense, ticket close.  And in
20    that regard, they're by no means a substitute for more
21    richer ticket data or emails.
22                    But they're really critical, and
23    they're -- previously, Charter told you they would be
24    redundant of the ticket data, and that's not at all the
25    case.
```

Telephonic Hearing
July 2, 2020

Page 31

1                   And let me just give you a couple of
2       examples.  One of those ticket logs, work logs says the
3       following:  Customer owns a computer repair shop.  He
4       provided a service where a customer could bring him a
5       damaged copy of an original CD and he would download the
6       songs and put them on a new CD.  Advised that using
7       torrent clients for this purpose is still copyright
8       infringement.
9                   So what we have in this work log note is
10      an admission of infringement by a customer and admission
11      by Charter that they know this conduct is illegal.
12                  So these notes directly rebut Charter's
13      claim, first of all, that plaintiffs' protection system
14      is unreliable, and it shows that Charter knew this
15      conduct was illegal and what Charter was saying to
16      infringing subscribers.  We don't have a lot of sources
17      about what Charter was saying to its customers.
18                  The other thing that's --
19                  SPECIAL MASTER RODRIGUEZ:  I understand
20      that, Mr. Gould, and that is why -- well, let's hold on a
21      minute.  I don't think we need to reargue this whole
22      issue.  I understood your point from the prior
23      discussions, Mr. Gould, that these work log notes are
24      important and may reveal information that is not
25      disclosed elsewhere, which is why I ordered the

Telephonic Hearing
July 2, 2020

Page 32

1   production.

2                   However, it can't be unlimited, right,

3   unless there's a good reason for that.  Now, you may have

4   adduced certain information that may be able to be put

5   forth at a later point in time to expand the world.  But

6   right now, you don't even have the world that we can get

7   you right now.

8                   What we've tried to do is parcel this down

9   into pieces so that we can make determination about

10  relevance and burden and proportionality here, although,

11  again, given the nature of the case, the parameters are

12  similar to the case: large.

13                  But --

14                  MR. GOULD:  That's what we're talking

15  about.

16                  SPECIAL MASTER RODRIGUEZ:  -- I hear what

17  you're saying, you're developing that information.  And

18  right now, what you have before you, what I've ordered.

19  And to the extent it wasn't clear, I'm clarifying it:

20  The world relates to accused subscribers, anybody who

21  received three or more notices.

22                  MR. GOULD:  Understand, Ms. Rodriguez.

23  And I understand we're under a time constraint, so --

24                  MS. GOLINVEAUX:  Ms. Rodriguez --

25                  MR. GOULD:  -- number one --

Telephonic Hearing
July 2, 2020

Page 33

```
 1              MS. GOLINVEAUX:  -- I'm sorry to -- I'm
 2   sorry to cut in.
 3              MR. GOULD:  Can I --
 4              MS. GOLINVEAUX:  But if this is -- well,
 5   no.  You just spoke, Mr. Gould, and I didn't get a chance
 6   to respond.  You just recited a note where Charter is
 7   specifically telling a subscriber not to do something,
 8   and you tried to spin that as Charter, you know,
 9   cooperating with infringement somehow.  And I haven't had
10   a chance to respond.
11              Ms. Rodriguez, I object to this effort
12   over and over, every time you order anything, plaintiffs
13   reargue and then reargue again.  And then if you stick to
14   your order, then they file a motion for reconsideration.
15   It's why these hearings go on for multiple hours.
16              I would like to reach our issues today as
17   well, and I think it's inappropriate for this constant
18   reconsideration and reargument after you -- after you
19   have orders.
20              SPECIAL MASTER RODRIGUEZ:  I will say I
21   don't think that it's helpful here, Mr. Gould.  I
22   understand the point, and I understand there will be more
23   information in these documents.  And you can then bring
24   what you find, and there may be a basis for expanding the
25   order.  But the order is the order right now.
```

Telephonic Hearing
July 2, 2020

Page 34

```
 1                    MR. GOULD:  Very well.  We understand
 2   your -- your order and that we have the right to return
 3   if -- if needed down the road.  Thank you.
 4                    SPECIAL MASTER RODRIGUEZ:  All right.
 5   With regard to Plaintiffs' Issue 3, this relates to
 6   multiple RFPs regarding Charter's objection that
 7   subscribers not identified in the plaintiffs' notices are
 8   not relevant.
 9                    Again, this information is not, per se,
10   irrelevant, I think which has been Charter's position.
11                    MR. OPPENHEIM:  I'm sorry,
12   Ms. Rodriguez --
13                    SPECIAL MASTER RODRIGUEZ:  I've given --
14                    MR. OPPENHEIM:  -- this is Matt Oppenheim.
15                    I'm a little lost.  What issue are we on?
16   I thought we were on Issue 2, the rog -- Interrogatory
17   Number 16.  Sorry, I'm just lost.
18                    SPECIAL MASTER RODRIGUEZ:  All right.
19                    MS. RANAHAN:  I think the ones you just
20   mentioned, Ms. Rodriguez, may have been switched to the
21   search terms.
22                    SPECIAL MASTER RODRIGUEZ:  Okay.  Hold on
23   a minute.
24                    All right.  Well, with respect -- let's
25   look at RFP 38 and 39.
```

Telephonic Hearing
July 2, 2020

Page 39

```
 1    but I didn't want us to walk away from --
 2                    SPECIAL MASTER RODRIGUEZ:  Okay.
 3                    MR. SPERLING:  -- potentially getting
 4    understanding --
 5                    SPECIAL MASTER RODRIGUEZ:  Yeah.
 6                    MR. SPERLING:  -- to Charter about the
 7    need to address those.
 8                    SPECIAL MASTER RODRIGUEZ:  Thank you.
 9    Does Charter disagree that 16 would fall in the same
10    category?
11                    MS. RANAHAN:  This is Erin Ranahan.  We
12    agree that 16 also falls in the same category.
13                    SPECIAL MASTER RODRIGUEZ:  Okay.  And,
14    Mr. Sperling, I'm sorry, the other RFPs suggest it falls
15    in the same category?
16                    MR. SPERLING:  I think it was 27, so the
17    very next one in the chart.
18                    SPECIAL MASTER RODRIGUEZ:  Yeah.
19    Ms. Ranahan or Ms. Golinveaux, do you agree 27 falls in
20    the same category?
21                    MS. RANAHAN:  Yes.
22                    SPECIAL MASTER RODRIGUEZ:  Okay.  29, 30.
23    All right.  I think we've covered most of the universe
24    with that.
25                    My notes indicate the next issue was with
```

Telephonic Hearing
July 2, 2020

Page 40

1   regard to RFP 3.  And I guess, on this one, I want to
2   understand clearly what -- what it is -- what more it is
3   that plaintiffs are seeking here.  I guess it would be --
4   no -- yeah, on 3, RFP 3.  And --
5                MR. OPPENHEIM:  Jonathan, are you there?
6                MR. SPERLING:  I'm sorry.  I -- it was --
7   yeah, this is Mr. Sperling.  I was speaking, but I was on
8   mute, so --
9                SPECIAL MASTER RODRIGUEZ:  RFP 2 and 3,
10  Mr. Sperling.
11               MR. SPERLING:  Right.  So you'll recall,
12  these were the subject of our letter about two weeks ago
13  on June 15, so just as a background.
14               SPECIAL MASTER RODRIGUEZ:  Yes.
15               MR. SPERLING:  So the parties previously
16  agreed, and Judge Hegarty ordered, that Charter would
17  produce all the ticket data for subscribers who were the
18  subject of plaintiffs' notices.
19               There's no dispute that that -- I don't
20  think there's a dispute that that's not limited to ticket
21  data relating to our notices.  It covers all notices from
22  any rights holder concerning subscribers that also were
23  the subject of our notices.
24               So you look at any subscriber that
25  received one of our notices and you produce all the

Telephonic Hearing
July 2, 2020

Page 41

```
 1    ticket data for notices from anybody that that subscriber
 2    has used.
 3                    SPECIAL MASTER RODRIGUEZ:  Okay.
 4                    MR. SPERLING:  And what Charter --
 5                    SPECIAL MASTER RODRIGUEZ:  Let me just
 6    ask -- hold on just a moment.
 7                    MR. SPERLING:  Yeah.
 8                    SPECIAL MASTER RODRIGUEZ:  Is there any
 9    dispute that that was what was ordered to be produced and
10    has been produced, Ms. Golinveaux?
11                    MS. GOLINVEAUX:  We are in full agreement
12    that that is what we have produced, Ms. Rodriguez.
13                    SPECIAL MASTER RODRIGUEZ:  Okay.  Okay.
14    All right.  I'm sorry to interrupt.
15                    MR. SPERLING:  Yeah, no, that's fine.
16    It's productive.
17                    So that was what was ordered to be
18    produced.  Ms. Golinveaux has just said that that is what
19    was produced, but it really hasn't been and here's why.
20                    What Charter knew at the time -- they
21    didn't tell us and they didn't tell the Court at the
22    time -- is that, as Mr. Gould was referring to earlier,
23    Charter actually only had ticket data for 38,000 of the
24    roughly 700,000 notices that we sent.  So 5, 6 percent.
25                    What that means is, in the overwhelming
```

Telephonic Hearing
July 2, 2020

Page 42

```
 1   majority of cases, Charter can't identify which
 2   subscribers were the subject of our notices, because what
 3   they've done -- there's a little tweak on this at the
 4   end -- but up until last week, what they had done is they
 5   went and they looked at the ticket data to correlate the
 6   notices, which we reproduced to them in this case, with
 7   the ticket data and thereby identify the subscribers.
 8                But since they only had ticket data for
 9   38,000 notices, they could only identify the subscribers
10   that were at issue for 38,000 of the notices.  That means
11   for --
12                SPECIAL MASTER RODRIGUEZ:  Okay.  Hold
13   on --
14                MR. SPERLING:  -- 670,000-plus --
15                SPECIAL MASTER RODRIGUEZ:  -- just a
16   minute.
17                MR. SPERLING:  Yeah.
18                SPECIAL MASTER RODRIGUEZ:  Hold on just a
19   minute.
20                So -- just so I'm tracking you, what
21   you're saying is, is that because they only kept data for
22   38,000 of the subscribers, they could not cross-reference
23   and tell you about all of the subscribers with regard to
24   the notices that you sent, and there were vastly more
25   notices than that?
```

Telephonic Hearing
July 2, 2020

1          MR. SPERLING:  Correct.  And they have

2  last week -- so they identified about 11,000 subscribers

3  that were associated with those 38,000 notices.  There's

4  a delta, right, because you have the number of

5  subscribers that received many notices that Charter

6  didn't act on.

7          Last week, they came forward and they

8  said -- in connection with providing us with the DHCP

9  logs, which is something that you required them to do --

10  they had identified an additional roughly 11,000

11  subscribers.

12          But it remained the case that they have

13  not identified, for the great majority of notices that we

14  sent, who the subscribers were that received those

15  notices.

16          And since they can't identify which

17  subscribers were the subject of our notices, they, by

18  definition, have not done what they were ordered to do.

19  They were ordered to produce all tickets associated with

20  any subscriber that was the subject of one of our

21  notices -- excuse me, our notices and tickets that were

22  the subject of any notice -- let me start that sentence

23  over and try and make it clear.

24          As Ms. Golinveaux agreed with a moment

25  ago, they were required to produce ticket data for all

Telephonic Hearing
July 2, 2020

```
 1   subscribers who had been the subject of one of our
 2   notices.  But, in fact, what they have done is they've
 3   produced that ticket data for the very small sliver of
 4   subscribers that they know received our notices.
 5             And as to the majority of subscribers that
 6   were the subject of our notices, they haven't produced
 7   the ticket data because they can't identify them.  They
 8   didn't tell us that when this was agreed to.  They didn't
 9   tell the Court that.  But, by definition, it means they
10   haven't done what the Court ordered them to do.
11             There's one way they could do what the
12   Court ordered them to do.  The way they can make sure
13   that they are producing the ticket data for all
14   subscribers who are the subject of any plaintiffs'
15   notices is to produce the ticket data for the full claim
16   period, and that way, they will capture all subscribers
17   and, therefore, all subscribers who are the subject of
18   our notices.
19             But their position right now is that they
20   shouldn't actually have to do what they were ordered to
21   do.  And I don't think there's any dispute that they have
22   not, in fact, produced the ticket data for all
23   subscribers that were the subject of our notices; and
24   instead, they have only produced the ticket data for the
25   small subset of subscribers that they were able to
```

Telephonic Hearing
July 2, 2020

1  identify as having received our notices.

2          Bottom line, we just want to enforce

3  Judge Hegarty's order, and they're essentially seeking

4  endorsement of their failure to comply with that.

5          SPECIAL MASTER RODRIGUEZ:  Okay.  Well,

6  let me just make sure I'm tracking with you on some of

7  these things and . . .

8          So what you're saying is that Charter only

9  produced the ticket data that it retained where it was

10  able to match the ticket data with a subscriber for whom

11  a notice was produced by plaintiff or issued by

12  plaintiff; is that right?

13          MR. SPERLING:  I'd say it slightly

14  differently, and since we do want to try -- try to say it

15  differently.

16          SPECIAL MASTER RODRIGUEZ:  Yeah.

17          MR. SPERLING:  They retained ticket data

18  for only about 5 percent of the notices that we sent.

19  They looked to the ticket data to identify subscribers

20  because their ticket data essentially matches the notice

21  to a subscriber.  And, therefore, with respect to the

22  670,000-odd notices that we sent for which they don't

23  have tickets, they could not identify the subscribers.

24          SPECIAL MASTER RODRIGUEZ:  Okay.

25          MR. SPERLING:  Again last week, they did

Telephonic Hearing
July 2, 2020

Page 46

```
 1   identify some additional number of subscribers based on
 2   their related review of the DHCP logs, but it remains the
 3   case that as to -- our understanding is, as to the great
 4   majority of our notices, they have not identified the
 5   subscribers who were the subject of those notices.
 6                SPECIAL MASTER RODRIGUEZ:  Okay.  And so I
 7   guess the question that I have for you, Mr. Sperling, is,
 8   I understand you-all have issues with the document
 9   retention policy and whether it was appropriate, et
10   cetera.  But if they don't have the ticket data, how are
11   they to produce the information that they do not have?
12                MR. SPERLING:  Oh.  So no one's asking to
13   produce information that they don't have.  Our position
14   is simply, having agreed to produce something, they're
15   now put in the position where they can either fail to
16   comply or they can comply by being overinclusive, because
17   if they produce --
18                SPECIAL MASTER RODRIGUEZ:  And by being
19   "overinclusive," you mean by producing all tickets during
20   a particular period of time?
21                MR. SPERLING:  Correct.
22                SPECIAL MASTER RODRIGUEZ:  The claim
23   period?
24                MR. SPERLING:  Correct.
25                SPECIAL MASTER RODRIGUEZ:  Okay.
```

Telephonic Hearing
July 2, 2020

```
 1                    MR. SPERLING:  And then, of course, that
 2   also implicates their assertion of the safe harbor
 3   defense, which puts at issue how they responded
 4   generally, how they implemented generally their policy
 5   with respect to notices and repeat infringers during the
 6   time period.
 7                    So at the time we agreed to them --
 8                    SPECIAL MASTER RODRIGUEZ:  I understand
 9   that.
10                    MR. SPERLING:  Okay.
11                    SPECIAL MASTER RODRIGUEZ:  All right.
12   Ms. Golinveaux, I -- I'd like you to respond specifically
13   to this issue the plaintiffs have raised.
14                    And as -- as I start this conversation, I
15   did receive a letter with regard to where this -- well, I
16   did receive your request for guidance on where this issue
17   should be raised, whether it's here or with
18   Judge Hegarty.
19                    I think that given that it is tied to so
20   many different issues that we are addressing, it makes
21   sense for it to be addressed here, and so we are having
22   that conversation now.
23                    But, Ms. Golinveaux, I would like you to
24   address for me -- I do understand that you do not retain
25   the ticket data past a certain time period and so you
```

Telephonic Hearing
July 2, 2020

Page 48

```
 1   don't have it.  But why should you not now produce all of
 2   the ticket data then for the claim period that is
 3   retained?
 4             Obviously, you can't produce what you
 5   don't have, but if it has been retained, why wouldn't you
 6   produce all of the ticket data for the claim period?
 7             MS. GOLINVEAUX:  Certainly, I'll address
 8   that.
 9             First of all, I take issue with
10   Mr. Sperling's characterizations on a number of levels,
11   but -- but particularly with regard to his argument that
12   Charter is not in compliance with Judge Hegarty's order.
13             At the hearing -- and I wasn't there, so I
14   don't know if Mr. Sperling was there or not -- but
15   Judge Hegarty was fully aware that there were retention
16   policies in place and that -- and Ms. Ranahan informed
17   him that Charter would not likely have ticket data going
18   back for the full period the plaintiffs were looking.
19             He was aware of that, and he said
20   something along the lines of, "Well, you can only produce
21   what you have."  That's -- that's all taken into
22   consideration at that hearing.
23             Now, plaintiffs keep trying to create
24   some -- some vague, you know -- it's like an accusation
25   of wrongdoing as to Charter as to only having 5 percent,
```

Telephonic Hearing
July 2, 2020

 1    but the timeline here -- and I think I've addressed this

 2    at other hearings -- but the timeline is critical.

 3                    They sued for a snapshot in time, from

 4    May -- from March 2013 to May 2016.  That was their

 5    prerogative.  They sued on that back snapshot of time

 6    because they thought it was most advantageous.  And --

 7    but they didn't provide Charter with notice of their

 8    claim, much less file the lawsuit -- they didn't file the

 9    lawsuit until 2019 -- but they didn't even provide

10    Charter with notice of their claims until Mr. Oppenheim

11    sent a letter in March of 2016.

12                    For various reasons, Charter had issued a

13    hold in December of 2015 and so had a little over a year

14    of ticket data going back from that December of 2015

15    date, which we're working from here.

16                    But to suggest that that had to do with

17    some wrongdoing on Charter's behalf is really beyond the

18    pale and they -- and they make that argument at every

19    hearing so I feel like I have to go through that

20    timeline.

21                    So what Charter has --

22                    SPECIAL MASTER RODRIGUEZ:  And --

23                    MS. GOLINVEAUX:  Yeah.

24                    SPECIAL MASTER RODRIGUEZ:  -- just so you

25    know, Ms. Golinveaux, I understand that and I am not

Telephonic Hearing
July 2, 2020

1   assuming wrongdoing.  And as one party casts aspersions

2   on another doesn't necessarily mean that I -- I buy it,

3   right?

4                But what I'm trying to get to are the

5   heart of the issues here.  Charter did have -- whether

6   it's for nefarious or purely business reasons -- and that

7   will have to be something that I think will get sorted

8   out by the finders of fact here -- the fact remains that

9   Charter has a limited set of these tickets that have been

10  retained.  And I agree with Judge Hegarty: you can only

11  produce what you have.

12               So nonetheless, certainly the information

13  related to how Charter handled these claims and the

14  ticket data, were it to exist or the information there,

15  would be relevant to the claims here.  And so if there is

16  another way to attain it, it does make sense that we

17  explore that.

18               So that's why I'm asking the question

19  about, why wouldn't all the ticket data for the claim

20  period be something that you could produce?

21               MS. GOLINVEAUX:  I appreciate that and

22  I'll address that.

23               I left off one important detail in the

24  timeline also, which is plaintiffs did not send any

25  notices to Charter for -- for about the last year of the

Telephonic Hearing
July 2, 2020

1    claims period.  So that was their choice.  Who knows why

2    they decided not to, but they didn't.  And that's part of

3    the reason that there's more limited ticket data.

4                    But to address your point, Ms. Rodriguez,

5    what we have produced, we've already -- we've already

6    accounted for that more limited data in what has been

7    produced, and here's what I mean by that.

8                    In addition to producing all the ticket

9    data in connection with RIAA notices -- and that's for

10   the 11,000 folks Mr. Sperling just mentioned -- that's

11   also, as you'll recall, you ordered Charter to go back to

12   its DHCP logs and see if it could identify additional

13   folks who got those notices based on extracting IP

14   addresses from their notices.

15                    We have since done that, and we have told

16   plaintiff we will also agree to supplement our ticket

17   production with any ticket data related to those -- that

18   additional set of subscribers.

19                    In addition, they've gotten, not just the

20   ticket data for the RIAA notices, but for any third-party

21   notice that came in to this set of accused subscribers.

22   And that's a broader set to account for their need and

23   their reasonable need in the case to go beyond just what

24   happened with their notices, which we -- we, Charter,

25   considers to be the proper inquiry.

Telephonic Hearing
July 2, 2020

1           And that is millions of rows of data

2    associated with those third-party notices that came in to

3    the accused subscribers.

4           So to take all of that -- and then also

5    the work logs that you just ordered, which is also beyond

6    just the RIAA notices, but all the -- associated with the

7    accused subscribers who got repeat notices.

8           So to go beyond that universe to any

9    notice, any copyright notice that Charter ever received

10   for the three-year period and to produce all the ticket

11   data would be very burdensome, and it's far beyond what's

12   called for in this case in light of the data that they

13   have received.

14          SPECIAL MASTER RODRIGUEZ:  Do you have a

15   way to, without necessarily producing it, to identify all

16   of the notices that would have generated ticket data?

17   Have you developed an estimate of how many notices we're

18   talking about here?

19          MS. GOLINVEAUX:  We --

20          SPECIAL MASTER RODRIGUEZ:  I mean,

21   right --

22          MS. GOLINVEAUX:  I don't have a number.

23          SPECIAL MASTER RODRIGUEZ:  -- how many

24   tickets, yeah.

25          MS. GOLINVEAUX:  How many total -- total

Telephonic Hearing
July 2, 2020

1    tickets?

2                    SPECIAL MASTER RODRIGUEZ:  Yeah.

3                    MS. GOLINVEAUX:  For the claims period?

4                    SPECIAL MASTER RODRIGUEZ:  Yeah.

5                    MS. GOLINVEAUX:  Millions and millions and

6    millions.  I don't have a precise number.  It's -- it's

7    well over 18 million.  It's a lot.

8                    SPECIAL MASTER RODRIGUEZ:  Okay.  All

9    right.

10                   MS. GOLINVEAUX:  And, Ms. Rodriguez, to be

11   clear, that's -- that's -- primarily, that's heavily due

12   to Rightscorp, because they were sending hundreds or even

13   thousands of notices on the very same file.  So they

14   would just keep generating them, sometimes within minutes

15   or seconds of each other, sometimes sending 10 or 15 or

16   100 a day.

17                   So the vast majority of those are for

18   Rightscorp.  So I just want to put that in perspective.

19                   SPECIAL MASTER RODRIGUEZ:  I understand.

20   I do recall the discussion about Rightscorp.

21                   MS. GOLINVEAUX:  Yeah.

22                   SPECIAL MASTER RODRIGUEZ:  All right.

23   Well, Mr. Sperling, I guess -- I mean, it is a bit of a

24   quandary here in terms of how much can be produced.  I do

25   understand that there are probably many, many notices

Telephonic Hearing
July 2, 2020

1   that are duplicative, and simply requiring ticket data

2   for every notice is not going to provide substantially

3   more substantive information than what you have already.

4               I do understand the drive to obtain more

5   information, and it seems that that has been happening

6   with both the logs, with the additional information that

7   we have been working to obtain here as part of this

8   process.

9               So short of all ticket data, what -- do

10  you have a proposal of what you would think would provide

11  you with the information, but not have redundant or

12  nonadditive additional information?  Because we do

13  need -- I understand there's a lot, but there has to be

14  a rational basis to engage in that level of work where

15  we're talking about millions of additional tickets.

16              MR. SPERLING:  Right.  So it's

17  Mr. Sperling.  I mean, a couple of thoughts on that.

18              Number one is, we don't agree that this

19  would be redundant and not additive because among the

20  things that we would want to show are the number of

21  instances of subscribers who were the subject of an

22  extraordinarily large number of notices after whom

23  Charter took no action.

24              And so if I'm understanding you correctly,

25  Ms. Rodriguez, you're suggesting, "Well, it's sort of

Telephonic Hearing
July 2, 2020

```
 1   cumulative and additive if somebody received many notices
 2   and that doesn't really add to the picture," and we come
 3   at it from exactly the opposite direction, which is that
 4   the fact that there were so many notices and so many
 5   separate acts of infringement by the same subscriber is
 6   very powerful evidence of Charter's knowledge of the
 7   infringement, Charter's internal contribution of the
 8   infringement by failing to take action vis-a-vis that
 9   subscriber, Charter's profiting from the infringement.
10   It goes to liability, it goes to damages, and so those
11   kinds of numbers are really important.
12               Second of all, we know that we have
13   different views about the culpability or lack of
14   culpability, the lack of ticket data from these notices
15   we sent.  I don't think I made a single accusatory
16   comment with respect to what they have or don't have in
17   this hearing.  Simply pointing out the fact.
18               The fact is that they have very little,
19   and the fact is that, at the time that they were ordered
20   to produce this, there was no limitation on the universe.
21               Of course they can only produce what they
22   have.  You can't produce what you don't have.  But they
23   didn't let on to anybody what they knew, which is they
24   only had the tickets for 5 percent of the notices.
25               And there is a bait-and-switch quality to
```

Telephonic Hearing
July 2, 2020

1   that.  There's no question about it.  And had they put

2   that on the table and they said, "This is our proposal,

3   and we want you to know we're only going to be able to

4   identify the subscribers associated with 5 percent of the

5   tickets," then we wouldn't have agreed to that.  We would

6   have come up with something else.

7               Now, we -- the last, most significant

8   point, I think, is, when you talk about the volume of

9   information that they're generating, it's just an extract

10  from the database, right?  And so not disputing that it

11  takes computer time and that sort of thing, but it's a

12  data dump.  Nobody is searching for and collecting

13  documents.  Nobody is reviewing documents for

14  responsiveness.  It's a purely automated process.

15              And so it's hard -- going back to your

16  comment about, you know, burden arguments don't get very

17  far in a case of this magnitude, when we're talking about

18  a burden which is purely, sort of, computer-processing-

19  time burden, it's hard to see why it's not appropriate

20  for them to have to produce all of this.  Then the burden

21  will be on us to make sense of it, to try to use it.

22              But the burden of producing is really not

23  significant, and we are substantially disabled,

24  substantially, by not getting that.  Because it's not

25  just that we're not getting the data for everybody; we,

Telephonic Hearing
July 2, 2020

```
 1   therefore, also won't be getting the data with respect to
 2   the overwhelming majority of subscribers that were
 3   actually the subject of our notices.
 4              So, you know, I could go through other
 5   reasons why --
 6              SPECIAL MASTER RODRIGUEZ:  Well, you say
 7   that -- yeah.  So you said that had you known the exact
 8   lay of the land at the hearing with Judge Hegarty, you
 9   wouldn't have made the agreement that you made.  Well,
10   now that you know the exact lay of the land, what
11   agreement would you be willing to make with regard to
12   this data?  Is there a compromise between:  We want all
13   ticket data for the claim period?
14              MR. SPERLING:  So I imagine that we could
15   potentially limit it to some number of sort of the
16   overall top ticket recipients, so maybe we take several
17   hundred, and Charter then has the burden to review the
18   data.  It seems to me that's more burdensome for them,
19   but they can sort the data, identify the subscribers that
20   were the subject of the greatest number of participants.
21              But I think probably what makes the most
22   sense is, if you're telling us, "Please come up with a
23   compromise proposal," we can go back, we can do that.  We
24   can be prepared to discuss that with Charter next week.
25   We can put it together with the search term discussion,
```

Telephonic Hearing
July 2, 2020

Page 58

```
 1    and then we can be prepared to address that with you when
 2    we reconvene --
 3                 SPECIAL MASTER RODRIGUEZ:  Okay.
 4                 MR. SPERLING:  -- on the 15th.
 5                 SPECIAL MASTER RODRIGUEZ:  I think that
 6    makes sense.  And I've got to tell you, I have -- feel
 7    that the answer lies somewhere between, you know, what
 8    you have now and everything that you've asked for.
 9                 And so I do think it makes sense for you
10    to come up with something reasonable here.  Not all of it
11    is going to be important and relevant to what you're
12    needing or at that level, which would require that level
13    of production.  Unless, you know, you cannot find an
14    agreement, and then I will make one.
15                 But my request is that each party make a
16    proposal, not just balk at the others, but the -- what is
17    your affirmative proposal?
18                 MR. SPERLING:  Yes, we will do that.
19                 SPECIAL MASTER RODRIGUEZ:  Okay.  All
20    right.  Plaintiffs' Issue -- I think it's Number 6 with
21    regard to the custodians.
22                 MR. SPERLING:  So with respect to
23    Plaintiffs' Issue 6, Ms. Rodriguez, we were going to have
24    Mr. Ehlers lead the discussion on that, and then we
25    realized that he's not yet been admitted in this case.
```

Telephonic Hearing
July 2, 2020

Page 59

1          Obviously, subject to your agreement, we
2    thought that might be all right for him to lead it, given
3    that we're having the informal discussion with Special
4    Master, it's not a formal appearance.  And, of course,
5    we're happy to have him file his admission papers next
6    week.
7              Is that okay with the Special Master?
8              SPECIAL MASTER RODRIGUEZ:  Ms. Golinveaux,
9    do you-all have any objection?
10             MS. GOLINVEAUX:  Charter doesn't object.
11             SPECIAL MASTER RODRIGUEZ:  Okay.  Yeah.
12    That's -- that's fine.  Just please enter your appearance
13    as soon as possible.
14             MR. SPERLING:  We will make sure that he
15    does, and I'll turn it over to Mr. Ehlers.
16             SPECIAL MASTER RODRIGUEZ:  All right.
17             MR. SPERLING:  Thank you.
18             SPECIAL MASTER RODRIGUEZ:  Okay.
19             MR. EHLERS:  Thank you, Ms. Rodriguez, and
20    thank you, Jennifer, for understanding.
21             So for Issue 6, some important context for
22    this request that Charter add a couple of additional
23    custodians is that plaintiffs have still gotten almost no
24    custodial emails from Charter.  Charter's produced no
25    internal custodial emails for the claim period that

Telephonic Hearing
July 2, 2020

Page 60

```
 1   discuss the DMCA or copyright infringement.
 2              Charter appears to have produced just
 3   seven or eight documents with internal emails sent from
 4   it custodians, et al., and they cover just a couple of
 5   unique email chains.
 6              Part of the reason for that is that
 7   Charter employed some unduly restrictive search terms,
 8   and for that reason, we moved for the exchange of search
 9   terms that we've been discussing, and that was ordered in
10   April.
11              And another reason for that is that
12   Charter hasn't been searching custodians that are likely
13   to have responsive documents.  And for that reason, at
14   the last conference, you ordered Charter to add certain
15   custodians that were identified in its initial
16   disclosures and that it was refusing to search, and you
17   also ordered the parties to meet and confer about
18   custodians that plaintiffs had identified in the few
19   documents that Charter had produced.
20              And the three custodians at issue in this
21   chart are among that set.  We've been trying to meet and
22   confer about this since almost the day or two days after
23   that last hearing.
24              These three employees appear hundreds of
25   times in the limited documents that Charter has produced.
```