# Exhibit 7

# COVINGTON

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Jonathan M. Sperling

Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
T  +1 212 841 1153
jsperling@cov.com

**Via Email**                                                July 21, 2020

Special Master Regina Rodriquez
regina.rodriquez@wilmerhale.com

Re:  *Warner Records v. Charter Commc'ns*, No. 19-cv-00874

Dear Ms. Rodriquez:

Please find attached a declaration from Plaintiffs' expert, Barbara Frederiksen-Cross. Ms. Frederiksen-Cross has extensive experience analyzing data systems, including the CATS database.  As she explains, the July 17 Declaration of Colton Mabb substantially overstates the incremental burdens associated with Plaintiffs' proposal for RFPs 2-3, which in fact are minimal.  In particular, writing code to implement Charter's proposal to excise Rightscorp data, and thus exclude certain data from the larger set, would be *more onerous* than the alternative.

Charter's July 17 "cover letter" also goes well beyond the burden declaration that you authorized and attempts to re-argue the incremental benefits of Plaintiffs' proposal.  Should you consider the cover letter, please note that it relies completely on the following three misrepresentations.

*First*, Charter states that it "previously provided Plaintiffs *all* ticket data" related to RIAA notices "plus *all* ticket data" relating to notices sent to RIAA-accused subscribers.  That is not true.  As discussed at the July 2 hearing, Charter has produced ticket data for only approximately 11,000 subscribers, who were the subject of roughly 38,000, or 6%, of the 700,000 infringement notices that Plaintiffs sent to Charter during the Claim Period.  Charter has not produced *any* ticket data relating to the other subscribers implicated by the remaining 94% of the notices Plaintiffs sent, including any ticket data associated with approximately 11,000 additional subscribers that Charter recently identified through its production of DHCP logs.[1]  Charter's inability to comply with Judge Hegarty's order by producing "all ticket data" for

---

[1] It bears emphasizing that Charter resisted production of the DHCP logs on the same grounds that it invokes here, claiming that Plaintiffs had what they needed from the ticket data already produced, and that any additional discovery would be duplicative.  *See* 4/17/2020 Hrg. Tr. at 53:4-16 ("[A]sking Charter to produce the DHCP logs from December 2014 to March 2015, which is what plaintiffs are requesting, would give them no useful information, and it would be redundant of the information they've already received from the ticket data that Charter has produced").  In fact, however, production of the DHCP logs—which you ordered in April, over Charter's objection—resulted in *doubling* the number of identified subscribers who were the subject of Plaintiffs' notices.  (Although, again, Charter has not produced any ticket data associated with those additional subscribers.)  Charter's argument about the sufficiency of the selected ticket data that *it* wants to Plaintiffs to receive is no truer now than it was then.

**COVINGTON**

Special Master Regina Rodriquez
July 21, 2020
Page 2

Plaintiffs' notices and the RIAA-accused subscribers is among the reasons the Special Master ordered the expansion of RFPs 2 and 3 in the first place.  7/2/20 Hrg. Tr. at 40:15-58:18.

*Second*, Charter states that it is "unclear what more Plaintiffs need from additional ticket data" in light of Charter's responses to Interrogatories 13 and 14.  Not so.  Most crucially, Charter's responses to Interrogatories 13 and 14 say nothing about *the number of notices each subscriber received*.  They state the raw total number of notices Charter received, and the raw total number of actions, by type of action, that Charter took in response.  The ticket data, by contrast, identifies the IP address and account number for each notice received.  That will permit Plaintiffs to perform what is called a "repeat infringer analysis"—for example, showing that a subscriber associated with a given account number and IP address received 1,000 notices a month for the entire Claim Period.  Charter's failure to terminate such subscribers could hardly be more relevant to its safe harbor defense.  Likewise, the repeat infringer analysis will allow Plaintiffs to show the jury that X-thousand subscribers received 10 or more notices in a given month, and Y-thousand subscribers received 100 or more notices in that same period.  The raw totals Charter provided in response to Interrogatories 13 and 14 would not allow Plaintiffs to conduct that analysis or present that compelling evidence to the jury.  To perform that analysis, Plaintiffs need the ticket data (and that is precisely why Charter does not want to produce it).

*Third*, Charter states that "Plaintiffs already have ticket data for millions of Rightscorp notices" to argue it should be entitled to exclude ticket data for Rightscorp.  But Plaintiffs are not after Rightscorp data *per se*.  What Plaintiffs want, and what they properly are entitled to, is an *unadulterated* data set for the Charter subscribers who received three or more notices.  There is no question Rightscorp-related tickets are part of that data set.  Charter's counterproposal would skew the outcome of any analyses of that dataset by removing a whole category of notices, all based on Charter's purported notions of reliability.  That manipulation of the data to be provided in discovery is not proper.  Charter is free to argue to the jury that certain notices, whether from Rightscorp or others, are not reliable.  But it cannot properly limit discovery of those notices now.

Respectfully submitted,

*/s/ Jonathan M. Sperling*

Jonathan M. Sperling

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:19-cv-00874-RBJ-MEH

**WARNER RECORDS INC., *et al.*,**

      Plaintiffs,

v.

**CHARTER COMMUNICATIONS, INC.,**

      Defendant.

---

## DECLARATION OF BARBARA FREDERIKSEN-CROSS

---

I, Barbara Frederiksen-Cross, hereby declare pursuant to 28 U.S.C. § 1746 that the following statements are true and correct to the best of my personal knowledge and belief:

### Introduction

1.      I am the Director of Litigation Services at JurisLogic LLC ("JurisLogic"). JurisLogic provides consulting services to computer hardware and software manufacturers and specializes in performing assessments of computer software and software development projects for the legal profession in the United States, Canada, Japan, Singapore, and Europe.

2.      I have been asked by Plaintiffs in this case to review the Declaration of Colton Mabb to Articulate the Burden Required to Comply With Plaintiffs' Proposals for Request for Production Nos. 2 and 3, dated July 17, 2020, and provide my professional opinion of the articulated burden therein.

## **Qualifications**

3.      I have over forty-five years of personal experience as a software developer and consultant.  My experience includes software design, programming, project management, capacity planning, performance tuning, problem diagnosis, and administration of hardware, operating systems, application software, and database management systems.  I have experience working with software platforms and systems used by banks, insurance companies, hospitals, and telecommunication providers.

4.      My experience includes the configuration, management, and use of tools used to search, extract, and copy data from a variety of computing systems, databases, and platforms.  I am experienced with techniques used to locate and extract data from databases, file systems, and archival and backup systems.  I also have extensive experience with technologies used on a variety of platforms to support storage administration, records retention automation, and data archival and recovery.  I served as the head of storage administration for companies such as Nike, Inc., Pacific Telecom, and Americold.  I also provided storage administration services, including administration of data extract, transfer, and archival systems, for numerous other clients to whom I have provided consulting services.

5.      Throughout my career I have developed software programs that ran against very large sets of data and/or large databases.  Examples include programs that processed telephone switch and billing data, and programs that processed financial data for customer checking and debit and Visa card transactions.  Both the financial and communication data I worked with exceeded millions of transactions per day.  In the context of systems administration work, I have also written software to analyze complex data from very large computing systems for the

purpose of generating reports to aid in diagnosing problems, measuring system capacity usage, and developing mathematical models that analyze past computer resource requirements to develop workload profiles that can be used to model and predict future resource requirements. This data typically included selection and analysis of many millions of records that spanned multiple months or years of detailed resource utilization data.

6.      In the course of work in forensic analysis for litigation matters, my team and I routinely develop complex queries to extract data from very large collections of data.  This includes both databases and other forms of computer readable data such as unformatted text-based files and/or structured data stored in "flat" (i.e. non-database) file structures.  My team and I also have direct experience in running queries and/or searches across very large data collections.  In the normal course of my forensic work, it is not uncommon to perform searches, counts, and data extractions against data collections that contain many millions of records.  In some instances, this analysis has required processes that included searches, matches, analysis, and extractions of data from data collections that exceeded a thousand terabytes.

7.      Directly relevant to this case, I served as an expert witness in the *Sony v. Cox* and *BMG v. Cox* cases.  As part of my investigation in those cases, I studied materials about the CATS system that Charter has licensed for use in processing abuse complaints.  In doing so, I reviewed computer source code to understand how CATS functioned and what it was capable of doing.

### General Observation

8.      The Mabb Declaration discusses the work that would be involved in drafting code to extract data from a data system.  In evaluating the Mabb Declaration, it is important to

understand that, in general, the more restrictions or limitations involved in the extraction, the more complicated and time-consuming the development process generally is.  Conversely, developing code to extract data with fewer restrictions or limitations is generally simpler and faster.  For example, limiting a system query for data related only to those customers whose last names begin with the letters A, B, or C will be more complicated than querying that system for the same data for all customers.

9.      Another important background consideration is that the computer processing time required to extract data from a data system once the computer code is written is generally not burdensome, as this task is performed by the computer and does not require human effort.  In my experience, searching databases and extracting even several terabytes of data can be accomplished in less than 24 hours.

10.     As detailed below, the time and effort described in the Mabb Declaration seem significantly out of proportion to what I would expect.

## **RFP 2**

11.     I find Mr. Mabb's estimation for the amount of time that it would take to extract the data related to RFP 2 not credible for several reasons.  First, Mr. Mabb has failed to articulate any particular technical barrier to prevent the extraction of the data or explain the length of his estimate.  Second, it is my understanding that ticket data for some Accused Subscribers[1] has already been produced.  Because of this, many of the tools required for the data extraction

---

[1] It is my understanding that the term "Accused Subscribers" has been used in this case to refer to the Charter subscribers who were identified in one or more of the notices sent by the RIAA on behalf of the record label plaintiffs.

contemplated by this request must already exist.  Finally, Mr. Mabb's articulated burden is contrary to the general rule that extracting data with the least number of limiters is easiest. Therefore, extracting date for all tickets would be simplest.  Extracting data for all tickets for subscribers with three or more notices would be slightly more complex.  Extracting data for tickets for subscribers with three or more notices, while also excluding tickets generated by Rightscorp notices, would be the *most* complex of these options and would require *more* work than simply extracting all ticket data for subscribers who were the subject of three or more notices.  Because of this, Mr. Mabb's time estimates for these tasks seem highly unlikely to me based on my over four decades of experience in the field.

12.     In paragraph 6 of his declaration, Mr. Mabb asserts that Plaintiffs' demands require extensive development effort to fulfill.  He further elaborates on his estimate of the effort in paragraph 7, where he states:

> In order to pull documents responsive to this request, I first have to develop and write code for a specialized query. I then have to run and test the code.  After I am confident that it will work as planned, I have to run the query, extract the data, and process it into a manageable and useable format for production in the litigation. After the data is translated into a usable format, I quality check the data for any errors that need to be addressed.  Running the query to extract the volumes of data at issue in Plaintiffs' proposal requires substantial computer processing resources and time.  I estimated that it would take weeks of processing time to extract the data at issue in Plaintiffs' proposal.

13.     In providing this opinion, Mr. Mabb does not identify any specific underlying technical issues that would prevent the successful extraction of all of the requested data.  Instead, he identifies a general process as unduly burdensome.  Mr. Mabb fails to identify, however, any specific characteristics of the data, except the volume of records, that would cause undue burden.

Volume of data alone would not account for his high estimates, since the program must perform the same processing steps regardless of the size of the data.

14.    Further, it appears that much of the allegedly burdensome work Mr. Mabb identified has already been performed, albeit with a narrower scope of application.  It is my understanding that Charter has already produced the ticket data for approximately 11,000 Accused Subscribers who received Plaintiffs' notices, including millions of records related to *third party notices* (including Rightscorp notices) sent to those Accused Subscribers.  The only difference between what Plaintiff's seek for RFP 2, and what has already been produced, is that Plaintiffs seek production of ticket data for all subscribers (or all subscribers who received three of more notices), instead of for only those 11,000 Accused Subscribers.

15.    The very nature of manipulating large data sets and extracting data from them means that, since Charter has already produced a subset of the currently requested ticket records, Charter must necessarily have undertaken the development of tools to successfully identify, extract, and format the requested data.  The processes Charter has *already* developed for its production merely includes the *added* capability (as compared to the capability necessary to extract the data Plaintiffs now seek) of selecting only those records that correspond to Accused Subscribers.

16.    Based on my experience, it is generally a simpler task to extract all records than to select a subset of records.  It is also my experience that the transformation of search and selection logic, to remove or alter selection criteria for an already working process, is a simple and straightforward task that requires minimal programming and testing time for a competent developer.

6

17.     Thus, as a practical matter, and based on my decades of experience in the field, I am aware of no reason why the tools already used to produce this narrower subset of the data could not be easily modified to provide the data requested by Plaintiffs.  It is clear that Charter is already familiar with the composition of the ticket data, based on both the production they have already made and also on their ability to quantify and characterize the number of total additional tickets at issue, the number of tickets generated specifically by Rightscorp, and the number of tickets added when their existing production of ticket data related to 11,000 Accused Subscribers was expanded to include all tickets from any source.

18.     The additional logic required to limit the extraction to only subscribers with three or more notices is also trivial.  Both my staff and I have experience in writing such queries.  Although it is simpler logic to extract all records, the task of filtering to limit an extraction to only those subscribers who have three or more tickets is simple programming.  It can be employed during extraction of the data via query commands to *count* occurrences based on subscriber ID, and then during extraction, to test this count value and select only those subscribers whose ticket count is greater than two.

19.     Alternatively, the selection for subscribers who have three or more tickets could also be run as a separate process after all subscriber records have been extracted and formatted, since the subscriber ID number is part of the formatted extraction data.

20.     In either approach, counting the number of tickets based on subscriber ID to find those subscribers with three or more tickets is programmatically a simple matter.

21.     Even were simple modifications to the existing process and tools unsuitable for some reason, I believe Mr. Mabb's estimate of the time required to accomplish a broader

extraction for RFP 2 is exaggerated.  In my experience, once one has an understanding of the data structures involved, such queries can typically be written and tested in a matter of hours or, at most, days.  Here, Charter is working with its own data, and has already developed a similar extraction process to select and format records for the notices sent to Accused Subscribers. Armed with this experience, it seems highly unlikely to me that it would take a Charter programmer familiar with the data and the existing extraction process months to create a system for extracting a set of records for all subscribers, or for all subscribers who received more than three notices (with or without the Rightscorp notices).

22.     I also note that Mr. Mabb estimates that it would take a month *less* to develop processing that *adds* an additional exclusion criterion (i.e., the exclusion of Rightscorp tickets) than it would take develop processing to extract tickets for subscribers with three or more notices.  As I indicated above, it is generally a simpler task to extract all records than to select a subset of records.  Thus, without further explanation, the difference in Mr. Mabb's estimates is at odds with how data extraction actually works.

23.     In my opinion Mr. Mabb's estimate that running the extraction process for RFP 2 would take weeks of computer processing time is also likely overstated.  Mr. Mabb has provided no insight into how he formulated this estimate, or what (if any) special circumstance would cause the extraction to require such exceedingly long processing times.  In my experience, even complex queries and searches that are run against over a thousand terabytes of data seldom exceed 12 hours of processing time if the data is stored in a database or other indexed format.

**RFP 3**

24.     I find Mr. Mabb's estimation of burden with respect to the data requested under RFP 3 to also be unsupported and overstated.  First, documents previously produced by Charter demonstrate that they have the tools to perform the requested data extraction.  Second, as mentioned above, identifying records related to subscribers who received three or more notices is programmatically simple.  Finally, Mr. Mabb fails to articulate what analysis he undertakes with respect to the requested information, how long this analysis would take, or the basis for the amount of time he estimates it would take to search for the records, extract the records, and perform such analysis.

25.     In paragraph 11 of his declaration, Mr. Mabb concedes that Charter has already produced subscriber responses as requested for RFP 3 for approximately 11,000 subscribers that received RIAA notices during the claim period.

26.     In my opinion, this shows that Charter has already developed the processing techniques necessary to match subscriber IDs or ticket numbers to subscriber responses that concern infringement notice data; and Charter has further developed selection criteria needed to limit production to those responses from Accused Subscribers.

27.     In order to adapt this existing process to produce records for all subscribers who received infringement notices, it is likely one need only *remove* the selection criteria for Accused Subscribers.  If the production were to be further limited to only those subscribers who received three or more infringement notices, the process is still very straightforward, since the change in program logic would require only filtering for the easily derived list of subscribers who have received three (or more) notices.  Moreover, in order to have obtained the communication

records already produced, Charter must have already developed selection criteria based on ticket or subscriber ID.

28.    Mr. Mabb also conceded in paragraph 12 that he has already developed processes to extract the subscriber communications for Rightscorp and other third-party notices that relate to the Accused Subscribers.

29.    As previously noted, the identification of those subscribers who received three or more notices is a programmatically simple counting process.  Once the list of subscribers with three or more notices identified, it is also a trivial matter to select only the notices that correspond to those selected subscribers.  So, regardless of whether Charter's selection of communications is based on the notice ID, or on the customer ID, there is no reason that extracting the requested communication records should take months.

30.    In paragraph 12, Mr. Mabb says that the burden associated with producing the RFP 3 communications is more burdensome than producing ticket data because he would need to "search for, extract and analyze individual .txt files for each of the millions upon millions of notices where such communications are available."  In characterizing this burden, Mr. Mabb does not identify any specific technical hurdle to identifying, searching for, or extracting the communication records.

31.    In my opinion, the burden associated with searching for and extracting the communication is overstated.  The processing Charter used for the subset of communication records that have already been produced must necessarily have been capable of searching for, selecting, and extracting communications that relate to notices sent for RIAA, as well as notices sent by Rightscorp, and others.  Thus, any problems with searching for, selecting, and extracting

10

the communication records have already been solved by Charter and addressed in the existing process.  The search, selection, and extraction tasks for these records should therefore require at most a very simple adaption of the process Charter already used for the subset communication records it has already produced.

32.     I also note that counsel has informed me that the data Charter produced in the context of RFP 3 contain ticket ID numbers.  Hence, identification criteria for the communication records sought in RFP 3 are easily obtained.

33.     Mr. Mabb does not identify or quantify the time associated with what he "analyzed" in the .txt communications, other than to imply that such analysis is performed separately from the work Charter's attorneys undertake in the removal of subscriber identifying information.

34.     Given the factors noted above, and my own experience searching large collections of textual data, I can see no reason why it should take a month to extract the communication records.  This is true whether all communication records are produced or whether the additional burden of filtering out the communications related to Rightscorp notices is added to the selection process.  At most I would expect that the record selection and extraction would require only a few days to accomplish.

Executed in Hubbard, Oregon this 21st day of July, 2020

_____

Barbara Frederiksen-Cross

11