**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

WARNER RECORDS INC., *et al*.,

      Plaintiffs,

v.

CHARTER COMMUNICATIONS, INC.,

      Defendant.

Case No. 1:19-cv-00874-RBJ-MEH

**CHARTER COMMUNICATIONS, INC.'S ("CHARTER") RESPONSE TO
PLAINTIFFS' PARTIAL OBJECTION TO SPECIAL MASTER'S AUGUST 12, 2020
ORDER RESOLVING DISCOVERY DISPUTES**

## TABLE OF CONTENTS

Page

INTRODUCTION...................................................................................................... 1

LEGAL STANDARD ................................................................................................. 2

ARGUMENT .............................................................................................................. 2

I.    IT WAS NOT AN ABUSE OF DISCRETION FOR THE SPECIAL MASTER TO
      LIMIT PLAINTIFFS' RFPS 2 AND 3.............................................................. 2

      A.    This Court's Prior Related Rulings........................................................ 2

      B.    The Special Master Reasonably Accepted Charter's Proposal............ 4

      C.    There Is No Basis to Overturn the Special Master's Order ................. 6

II.   FINDING CHARTER'S PRIVILEGE LOG ADEQUATE WAS NOT ABUSE OF
      DISCRETION ................................................................................................. 8

III.  THE SPECIAL MASTER'S RULINGS REGARDING FINGERPRINTS AND
      RELATED DOCUMENTS SHOULD STAND............................................... 9

      A.    "Reference Files" and "fingerprints" are Central to Plaintiffs' Infringement
            Claims ................................................................................................ 10

      B.    The Special Master Considered Extensive Briefing and Argument .... 10

      C.    The Special Master Properly Considered Plaintiffs' Relevance and Proportionality
            Arguments........................................................................................... 16

      D.    Plaintiffs "Work-Product" Argument is Baseless............................... 18

      E.    The Ordered Discovery Is Called for by Charter's RFPs, Which the Special
            Master Properly Considered .............................................................. 19

      CONCLUSION ............................................................................................ 20

Charter hereby responds to Plaintiffs' Partial Objection to Special Master's August 12, 2020 Order Resolving Discovery Disputes. ECF 233 ("Objection").

## **INTRODUCTION**

Plaintiffs' secondary copyright infringement claims are premised on the contention that Charter should have known of its subscribers' alleged infringement due to notices Plaintiffs' agents sent Charter. This is despite the fact that none of the music publishers actually sent any notices, the record label Plaintiffs sent their last notice to Charter in March of 2015, and the notices specified only a fraction of the works-in-suit. Moreover, the artificial Claim Period that Plaintiffs have selected for this case conveniently predates Plaintiffs' own exploitation of the internet, which in recent years has brought Plaintiffs record profits, driven by streaming revenues made possible by ISPs like Charter. Nevertheless, through this and their other lawsuits, Plaintiffs seek astronomical, "windfall" damages in excess of $1.6 billion against ISPs like Charter. Against this backdrop, Plaintiffs now seek to bolster their over-reaching claims by overturning certain rulings carefully made by the Special Master after extensive briefing, hearing, and consideration.

First, Plaintiffs challenge the Special Master's Order regarding RFPs 2 and 3 which reasonably limited the scope of Plaintiffs' incredibly burdensome demand for *all* ticket data and correspondence related to *all* Charter subscribers implicated in *any* notice Charter received. Second, Plaintiffs challenge the Special Master's fair determination that Charter's privilege log entries are reasonable and adequate. Third, Plaintiffs seek to avoid discovery that is *critical* and *fundamental* to the case by challenging the Special Master's decision to compel Plaintiffs to produce information showing whether their purported evidence of direct infringement was properly verified (which will likely reveal it was not). For the reasons set forth in the Special Master's Order and discussed here, the Court should not overturn the Special Master's well-reasoned rulings. Plaintiffs' requested relief should be denied.

## LEGAL STANDARD

The order appointing the Special Master states that "[a]ny order, report, or recommendation of the Master on nondispositive motions (unless it involves a finding of fact or conclusion of law) will be deemed a ruling on a procedural matter" which can "only" be set aside if "it constitutes an abuse of discretion." ECF 143, ¶ 6. The discovery rulings to which Plaintiffs object are "procedural matters." *See, e.g.*, *Ramos v. Banner Health*, No. 15-cv-2556-WJM-MJW, 2018 WL 4700707, at *2 n.2 (D. Colo. Aug. 8, 2018) ("the scope of discovery is a procedural matter."); *see also Univ. of Texas at Austin v. Vratil*, 96 F.3d 1337, 1340 n.3 (10th Cir. 1996). To satisfy the "abuse of discretion" standard, the Special Master's Orders must be deemed to be based on "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *See Baldwin v. U.S.*, No. 11-cv-02033-MSK-KLM, 2012 WL 7051296, at *3 (D. Colo. Sept. 17, 2012) (declining to overrule discovery ruling as it did not constitute abuse of discretion).

## ARGUMENT

### I.    IT WAS NOT AN ABUSE OF DISCRETION FOR THE SPECIAL MASTER TO LIMIT PLAINTIFFS' RFPs 2 and 3

Plaintiffs seek to overturn the Special Master's order on RFPs 2 and 3, which reasonably limited the scope of the ticket data and related subscriber correspondence Plaintiffs are demanding from Charter. This ruling does not constitute an abuse of discretion and should not be overturned.

#### A.    This Court's Prior Related Rulings

At the December 17, 2019 discovery hearing, Magistrate Hegarty ordered Charter to produce ticket data corresponding to Plaintiffs' notices and the notices sent by other complainants that implicated the subscribers identified in Plaintiffs' notices (the "Accused Subscribers"), noting that his order was subject to proportionality. *See* ECF 108 (Dec. 17, 2019 Hr'g Tr. at 79:22-24). Charter agreed to produce this data, but informed the Court that because Plaintiffs sent their last

notice in March 2015 (despite the Claim Period running to May 2016) and did not notify Charter of their claims until March 23, 2016, there was some ticket data that Charter no longer had, pursuant to its retention policies.[1] Before Charter received notice of Plaintiffs' claims, ticket data was managed pursuant to Charter's reasonable retention policies, which Charter has produced to Plaintiffs.[2] Had Plaintiffs notified Charter of their claims after they sent their final notice in March 2015 instead of waiting a full year, additional ticket data for the Accused Subscribers would be available. The obligation to preserve evidence "arises when the party in possession of the evidence knows that litigation by **the party seeking the evidence** is pending or probable." *Point Blank Sols., Inc. v. Toyobo Am., Inc.*, 2011 WL 1456029, at *24 (S.D. Fla. April 5, 2011) (emphasis in original).

Charter complied with the Court's order from the December 17 hearing and produced the ticket data for Plaintiffs' notices, *plus* millions of additional records comprising *all* available ticket data related to third party notices sent to the Accused Subscribers, as well as communications with the Accused Subscribers. ECF 100. The Accused Subscriber ticket data alone spans 11 spreadsheets and contains information pertaining to 2,578,642 notices and over 11,000 subscribers. Further, through analyzing additional DHCP logs and undertaking efforts to identify even more subscriber data, Charter was able to locate data for 11,000 additional Accused Subscribers for which it has agreed to produce the corresponding ticket data and correspondence.

---

[1] Plaintiffs wrongly claim that they did not know that not all ticket data was retained until late February. But Charter informed the Court at the December 17, 2019 hearing that it did not retain ticket data past a certain period in light of Plaintiffs' late notice of the claims. ECF 108 (Hr'g Tr. at 78:6-10) ("We also don't have a lot of data for 2012 so we're providing what we have, still. But unfortunately because of the way these ticket log data were captured, it just--by the time we got notice of the lawsuit in 2016, we weren't maintaining 2012 records on this [stuff].").

[2] Declaration of Jennifer A. Golinveaux ("Golinveaux Decl.") ¶20. References to exhibits preceded by a letter are to the Golinveaux Decl., the exhibits to which are described more fully therein.

### B.      The Special Master Reasonably Accepted Charter's Proposal

Plaintiffs then moved to compel more data and correspondence pertaining to all copyright notices Charter received during the Discovery Period. After Plaintiffs could not articulate why they required all of this additional ticket data, the Special Master reasonably denied the request as overbroad and encouraged the parties to reach a reasonable compromise.[3] *See* Ex. A (July 2, 2020 Hr'g Tr. at 58:6-14) ("I have – feel[ing] that the answer lies somewhere between, you know, what you have now and everything that you've asked for. And so I do think it makes sense for you to come up with something reasonable here. Not all of it is going to be important and relevant to what you're needing or at that level, which would require that level of production.").

In response, Plaintiffs proposed that Charter provide ticket data for all the subscribers who received three or more notices, which would have included data for over 18 million additional notices, including approximately 13 million notices from an unrelated entity RightsCorp. RightsCorp would send multiple notices to Charter implicating the same subscriber for the very same file, in short succession, resulting in a disproportionate and misleading number of subscribers receiving three or more notices.[4] The addition of these notices would have increased the burden by approximately 13 million notices, with no appreciable benefit. In response, Charter argued that

---

[3] Plaintiffs' first suggestion was to limit the data to just "several hundred" subscribers who received the most notices. *See* Ex. A (July 2, 2020 Hr'g. Tr. at 57:14-20) ("So I imagine that we could potentially limit it to some number of sort of the overall top ticket recipients, so maybe we take several hundred…[i]t seems to me that's more burdensome for them, but they can sort the data, identify the subscribers that were the subject of the greatest number of participants.").

[4] As was litigated in previous cases involving it, RightsCorp would spam an ISP's system with hundreds of notices often for the very same file and same subscriber, and same observation of allegedly infringing activity. *See e.g.* Ex. B (*Sony v. Cox* Trial Tr. at 1502:9-1503:2). This is evident in millions of entries of the ticket data Charter has already produced. *Id.*, Ex. C (Excerpt from CHA_00001277 showing twenty-five notices sent to the same IP address by RightsCorp within 3 seconds); *Id.*, Ex. D at ¶ 5 (July 17, 2020 Declaration of Charter employee Colton Mabb indicating that Rightscorp "employed a practice of sending numerous notices, sometimes in very short succession, regarding the same subscriber and the same allegedly infringing file"). Thus, the RightsCorp notices create a misleading appearance of repeat infringement.

the incremental burden of producing data for approximately 13 million RightsCorp notices was not proportional to the needs of the case, especially considering that Plaintiffs (a) already have ticket data for millions of RightsCorp notices (all those sent to Accused Subscribers) and (b) have the benefit of other substantial discovery related to Charter's response to copyright notices, including Charter's substantive responses to Interrogatories 13 and 14, identifying the total number of notices Charter received and actions taken in response to those notices, by month.

As explained in Charter's burden declaration submitted by Mr. Colton Mabb, Plaintiffs do not have a correct understanding as to the complicated process and substantial effort required to produce the expansive data they seek. In fact, Charter is not able to automatically pull all ticket data and selectively remove notice-senders, like RightsCorp. Instead, Charter must write specialized code to retrieve the ticket data associated with specific complainants, specific subscribers, or specific notices.[5] If the Special Master's order were reversed and the additional 13 million RightsCorp notices had to be produced, it would take Charter *at least* two months to extract and produce the supplemental data. *Id.* at ¶8. The time, cost, and overall burden involved with producing an additional 13 million records significantly outweighs the probative value of the data—particularly where, as here, Plaintiffs have been unable to articulate why the additional ticket data is necessary.

After careful consideration, and after noting that Plaintiffs had failed to identify a compelling reason for the additional data, the Special Master reasonably accepted Charter's proposal to exclude the RightsCorp notices, but otherwise ordered Charter to produce all ticket

---

[5] *See* Ex. D (C. Mabb Decl. at ¶ 7) ("In order to pull documents responsive to this request, I first have to develop and write code for a specialized query. I then have to run and test the code. After I am confident that it will work as planned, I have to run the query, extract the data, and process it into a manageable and useable format for production in the litigation.").

data for the subscribers identified in three or more copyright notices. *See* 8/12 Order ("Plaintiffs have not articulated what additional information they would actually glean from the production of millions of additional" ticket data entries;[6] *see also* Ex. A (July 2, 2020 Hr'g. Tr. at 58:6-14).

### C. There Is No Basis to Overturn the Special Master's Order

Importantly, Plaintiffs have not cited any authority for the proposition that they are entitled to the entirety of Charter's ticket data irrespective of burden. While the DMCA requires evidence that the ISP "has adopted and reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of subscribers and account holders . . . who are repeat infringers," this does not mean that any discovery tied to the defense is limitless. 17 U.S. Code § 512 (i)(1)(a) (articulating the conditions necessary to be eligible for the safe harbor defense). The safe harbor defense does not entitle Plaintiffs to burdensome information regarding how Charter responded to every single notice it received from every complainant for all subscribers, particularly in light of RightsCorp's practices. Indeed, discovery "may be constrained where the court determines that the desired discovery is unreasonable or unduly burdensome given the needs of the case, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." *See Simpson v. Univ. of Colorado*, 220 F.R.D. 354, 356 (D. Colo. 2004) citing Fed. R. Civ. P. 26(b)(2).[7]

Moreover, the ticket data Plaintiffs already have (including some RightsCorp notices) and additional discovery related to Charter's DMCA defense, is more than sufficient to understand Charter's policies and practices for responding to copyright notices, and precisely how Charter

---

[6] The Special Master's 8/12 Order refers to "work logs" but, as she has since clarified during the August 25, 2020 status conference, the Order refers to the "ticket data" sought by RFP 2.

[7] This Court has noted that where discovery is particularly burdensome, it is sufficient to rely on a statistically significant portion of the evidence from which to extrapolate and interpret information. *See* ECF 80 (Oct. 29, 2019 Hr'g. Tr. at 20:12-21:20, 36:5-37:6, 40:11-16); *see also* ECF 138 (Feb. 19, 2020 Hr'g. Tr. at 49:10-51:23).

responded to millions of notices. Further, Charter has responded to RFAs and interrogatories on the subject, and has also produced subscriber correspondence, which Plaintiffs can use to determine Charter's response to copyright notices and its treatment of subscribers who received multiple notices. *See e.g.,* Ex. E (Charter's Amended Responses to Plaintiffs' First Requests for Admission); Ex. F (Charter's Responses to Plaintiffs' Second Requests for Admission); Ex. G (Charter's Third Supplemental Responses to Plaintiffs Second Set of Interrogatories, Responses to Interrogatories 13 and 14). Additionally, Charter has produced the work log notes it maintained for each of Plaintiffs' notices, a subset of work log notes for third party notices, a breakdown of the total number of notices Charter received per month, and the actions it took in response to every notice it received.[8] Charter has also produced its internal and external copyright infringement policies and is producing discovery evidencing its policy for repeat notices.[9] Further, after months of negotiations, Charter has search terms it will soon apply to its ESI, which will likely lead to additional correspondence with subscribers about notices and Charter's policies. In sum, Plaintiffs already have more than enough information from which they can conduct their investigation into Charter's repeat-infringer policy.

Given what Charter has already produced, and given that Plaintiffs have failed to show a compelling reason for the additional discovery sought, there is no basis to overturn the Special Master's 8/12/20 Order. *See* Ex. D (C. Mabb Decl. at ¶¶ 8, 10, 12). Plaintiffs' demand that Charter produce *all* ticket data for every subscriber who received any copyright notice, as well as related correspondence, was appropriately recognized by the Special Master as overbroad and

---

[8] *See e.g.,* CHA_00025040 - CHA_00063483 and CHA_00063581 - CHA_00077368 (work log notes); Ex. G (Charter's Third Supplemental Responses to Plaintiffs Second Set of Interrogatories, Responses to Interrogatories 13 and 14).

[9] *See e.g.,* CHA_00001273 - CHA_00001359; Ex. H (Charter's Responses to Plaintiffs Fourth Set of Requests for Production, 80-82).

disproportional to any legitimate need in the case, both in her Order and at the hearings. *See* ECF 230 (8/12 Order at 13) ("Thus, while Plaintiffs have established that the additional information is relevant, they have not persuasively argued that this additional evidence will be of sufficient probative value to outweigh the burden of producing the volume of information requested . . . ."). Her decision was not "arbitrary, capricious, whimsical" or "manifestly unreasonable." *See Baldwin*, 2012 WL 7051296, at *3. The order should stand.

## II.   FINDING CHARTER'S PRIVILEGE LOG ADEQUATE WAS NOT ABUSE OF DISCRETION

Charter's privilege log was properly prepared, consistent with the law in this Court and the rulings by the Special Master.[10] It provides sufficient information from which Plaintiffs can understand: the identity of the participants, the general substance of the discussion, the type of document attached, and the claimed privilege. Contrary to Plaintiffs' assertion, it is not obligatory in this district to include title and subject lines for privilege log entries. *See Thane v. GEICO Cas. Co.,* No. 16-CV-02940-CMA-MEH, 2017 WL 3157966, at *6 (D. Colo. July 25, 2017) (Hegarty, M.J.).

In *Thane,* this Court held that the plaintiff's privilege log "provided sufficient detail because it included the date of each document, the particular privilege asserted, and the description of each document, in which Plaintiff typically states or implies the author and recipient(s) and the general nature of the document . . . ." *Id*. The privilege log format approved in *Thane* is the same format Charter has used. And the descriptions in Charter's privilege log are even more descriptive

---

[10] Charter has already twice amended its log to provide more detail concerning the subject matter for the attachments and document types. Plaintiffs included Charter's first amended log but failed to include Charter's second amended log. It is provided for the Court here as Exhibit I.

than Plaintiffs'.[11] For example, from Charter's Item 4, Plaintiffs can understand that there was an email chain which sought legal advice from attorney Christopher Avery regarding an internal presentation on customer communications.

The descriptions Charter has provided are consistent with the practice in this District and more than adequate to allow Plaintiffs to assess Charter's privilege claims. There is no reason to reconstruct Charter's privilege log to add email titles where a description is enough. There is nothing more for Charter to provide to Plaintiffs concerning Item 4, or any of the other entries Plaintiffs have again challenged, that would not invade Charter's privilege. As the Special Master noted in her 8/17 Order, a party asserting privilege must provide a log that "describe[s] the nature" of the documents or communications withheld. *See* 8/12 Order at 31 (citing Fed. R. Civ. P. 26(b)(5)(A)(ii)). Charter has met its threshold of sufficiently describing the documents and why they are privileged. Because the Special Master's determination was fully consistent with the practice in this district, and was not "arbitrary, capricious, whimsical, or manifestly unreasonable," there is no basis to overturn the Special Master's Order. *Baldwin.*, 2012 WL 7051296, at *3.

## III.   THE SPECIAL MASTER'S RULINGS REGARDING FINGERPRINTS AND RELATED DOCUMENTS SHOULD STAND

Last, Plaintiffs object to the Special Master's order requiring Plaintiffs to produce: (1) "documents sufficient to show which files were fingerprinted"; (2) "the information upon which Plaintiffs relied in order to represent that the digital files … produced to date have the same ISRCs as the files from which the Audible Magic Reference Files were created" and (3) any "Reference Files" (to the extent they exist). Plaintiffs' objections appear to be directed to item two only, which

---

[11] *Compare* Ex. I (Charter's Amended Privilege Log) (Item 4: "Email chain seeking legal advice from in-house counsel and providing attachments to in-house counsel to obtain legal advice regarding internal presentation on customer communications") to Ex. J (Plaintiffs' Privilege Log) (Item 14: "Email with attachment requesting legal advice regarding global digital strategy").

Plaintiffs now claim requires the disclosure of attorney-work product and is not called for by any of Charter's discovery requests. Plaintiffs' objections are not well-founded and should be overruled.

### A.    "Reference Files" and "fingerprints" are Central to Plaintiffs' Infringement Claims

As was explained fully in the briefing before the Special Master, and as is recognized in her opinion, "Reference Files" and "fingerprints" play a central role in Plaintiffs' direct infringement case. During the relevant period, Plaintiffs retained a third party service provider, MarkMonitor, to locate internet users who were believed to be sharing copies of copyrighted works. The way MarkMonitor determined whether a computer file was a copy of a protected recording was to take a digital "fingerprint" of the file. MarkMonitor then asked another vendor, Audible Magic, to determine whether that fingerprint matched the fingerprint of a "reference" copy within the library of copyrighted works Audible Magic maintained (the "Reference File(s)"). Thus, the allegation that a file found on the computer of a Charter subscriber was a "copy" of a protected work is, in each instance, based on Audible Magic's purported matching of a fingerprint of that file to the fingerprint of a Reference File. Accordingly, in order to test Plaintiffs' evidence of direct infringement, which Charter must be permitted to do in order to defend itself, it is necessary for Charter to know whether the purportedly "matched" fingerprint is actually a copy of one of the works-in-suit. To do so, Charter must be able to review the Reference File that the fingerprint purportedly matched. Without that information, Charter's ability to investigate and challenge Plaintiffs' infringement claims is completely obstructed.

### B.    The Special Master Considered Extensive Briefing and Argument

On April 10, 2020, Charter moved to compel Plaintiffs to provide information explaining whether the digital copies of the works-in-suit that Plaintiffs have produced (the "Digital Copies")

were the same files used by MarkMonitor and Audible Magic to confirm the alleged infringements prior to MarkMonitor's transmission of notices to Charter (i.e., the Reference Files). Ex. K. Charter was forced to file its motion because Plaintiffs refused to provide this basic information, even though Charter had several discovery requests specifically calling for it.

During an April 17, 2020 hearing, the Special Master heard extensive argument regarding the relevance of the Reference Files and fingerprints. Ex. L (April 17, 2020 Hr'g Tr. at 139:18-154:9). Charter explained that it needed to understand what files Plaintiffs used to purportedly verify infringement *before* MarkMonitor sent notices on those files. *Id.* at 148-149. It further explained that when Plaintiffs' vendor, MarkMonitor, sent notices, it did not download a copy of the file being shared by the subscriber (or even a piece of the file) to confirm whether it matched one of Plaintiffs' works, even though MarkMonitor was capable of performing that service and offered to provide it. Plaintiffs instead chose to use a cheaper version of MarkMonitor's system, which relied only on matching metadata, which can be an unreliable process. Specifically, MarkMonitor only checked whether the "hash id" (a computer generated identifier) of the torrent file being shared by a subscriber was the same as the hash id of a torrent file that it had previously determined contained Plaintiffs' works. If the hash ids matched, MarkMonitor sent a notice. *Id.* at 150:13-151:11. MarkMonitor created this list of previously identified torrent files by utilizing Audible Magic to compare copies of Plaintiffs' works to suspected infringing files. The copies of Plaintiffs' copyrighted works used by Audible Magic are the Reference Files, and thus an essential aspect of Plaintiffs' direct infringement proof. If the two files matched, MarkMonitor would send notices to users sharing that torrent file.

The allegedly "infringing" files provided on Plaintiffs' hard drive, which were downloaded from P2P networks years *after* the notices at issue were sent, are not an adequate substitute for the

11

evidence that Charter is requesting, as those files are not actually copies of what Plaintiffs used to verify infringement and are not what Charter's subscribers allegedly shared. Indeed, the only way to test the accuracy of Plaintiffs' notices of infringement is to determine whether MarkMonitor's initial matching accurately matched a shared file to a copyrighted work, which requires examining the Reference Files and corresponding fingerprints.

In the proceedings before the Special Master, Plaintiffs argued that they had already produced the Digital Copies, so no further production was necessary. In response, the Special Master observed that the additional discovery Charter had requested was "critical," *id.* at 151:9, and ordered Plaintiffs to investigate whether the Digital Copies were the same as the Reference Files—the actual files used to verify infringement before notices were sent. ECF 164 at 9.

On June 1, 2020, Plaintiffs sent a letter to the Special Master, which asserted that they were able to determine that the Digital Files are the same as the Reference Files by looking at the ISRCs of the Digital Files.[12] Plaintiffs did not produce a listing of the ISRCs in question, nor did they explain how the (undisclosed) codes for the Digital Files had been compared to the codes for the works-in-suit (none of which has been produced). Rather, Plaintiffs simply offered the bare assertion that approximately 83% of the files they produced are "the same as" the Reference Files and that they would endeavor to re-produce accurate copies of the remaining 17%. *See* Ex. M.

Charter responded by explaining that the identity of the Reference Files is key to Plaintiffs' proof of direct infringement (or lack thereof), and that Charter is entitled to access the evidence that would allow it to test the accuracy of Plaintiffs' notices, which form the basis of Plaintiffs'

---

[12] ISRC stands for International Sound Recording Code, which is "the international identification system for sound recordings and music video recordings. Each ISRC is a unique and permanent identifier for a specific recording, independent of the format on which it appears (CD, audio file, etc.) or the rights holders involved. Only one ISRC should be issued to a track, and an ISRC can never represent more than one unique recording." *See* https://www.usisrc.org/about/index.html.

secondary liability claims against Charter. *Id.* This evidence is precisely what the Special Master ordered to be produced, but what Plaintiffs have never produced, and what they seek to shut down by this objection.

Charter also rebutted Plaintiffs' argument that one could simply compare the Digital Files to the "infringing" files Plaintiffs had produced on a hard drive in order to test the accuracy of the notices. Charter explained that this was not possible, because the files on the hard drive were not located and downloaded until 2016, years *after* Plaintiffs sent notices. And even then, the files were not downloaded from Charter subscribers. The only way to perform the comparison proposed by Plaintiffs would be to compare the files that MarkMonitor found on the subscribers' computers (which no longer exist), to the files that MarkMonitor downloaded from the internet for Audible Magic fingerprinting (which no longer exist), and to compare both of those to the Reference Files, which are the subject of this motion. It is simply not acceptable to "sidestep" the problem, as Plaintiffs suggest, by substituting the Digital Files for the Reference Files, while depriving Charter of access to the Reference Files. And it is equally unacceptable for Plaintiffs to demand that Charter accept on faith that the files saved ex post facto on the hard drive produced by Plaintiffs (years after the notices were sent) are in fact the exact same as the files found on the internet and on subscribers' computers.

In the same letter, Charter requested that Plaintiffs, at a minimum, produce the information that formed the basis for Plaintiffs' representation that approximately 83% of the Digital Files are the same as the Reference Files, as nothing produced in discovery would allow Charter to perform that analysis. Plaintiffs refused to provide this information. This was the subject of two additional letters to the Special Master. *See* Ex. N & Ex. O.

During a May 15, 2020 discovery conference, the parties discussed Charter's motion to compel Plaintiffs' response to RFPs 90 and 91, which seek production of the Reference Files and fingerprints, respectively. In providing an update as to whether the Digital Files were the same as the Reference Files, Plaintiffs' counsel represented that they needed to "go[] back to historical records from many years that were not limited to the notice program at issue here and try[] to match up what was provided back then to what we have produced today." Ex. P (May 15, 2020 Hr'g Tr. at 74:6-9). Plaintiffs did not represent that of any of these historical records were privileged or otherwise work-product.

On July 1, 2020, pursuant to the Special Master's pre-motion identification procedure, Charter listed the Reference Files and corresponding fingerprints as discovery it intended to seek through a motion to compel. Ex. Q. During the subsequent conference regarding this issue, Plaintiffs acknowledged for the first time that they *no longer have* the Reference Files. Instead, they indicated that, at most, they were able to represent that 80% of the Digital Files have the same ISRCs as the files used to create Audible Magic fingerprints. Plaintiffs did not produce any documentation showing what the ISRCs of the Digital Files were, or what the ISRCs of the Reference Files had been. Plaintiffs further acknowledged, again for the first time, that neither Sony Music Entertainment nor Warner Music Group retained the fingerprints—because they did not think they were important—and that Universal Music Group never possessed them in the first place. Ex. A at 138:23-139:9, 142:10-18, 149:12-151:18. The Special Master noted the critical significance of this discovery but that she could not order Plaintiffs to produce what they had failed to retain. *Id.*, at 138:23-139:9, 142:10-18, 149:12-151:18.

On July 16, 2020, Charter formally moved to compel Plaintiffs to produce "documents sufficient to demonstrate which files were fingerprinted, including the information upon which

Plaintiffs relied in order to represent that the [Digital Files] have the same ISRCs as the files from which Audible Magic Reference Files were created." Ex. R. Charter argued that this production was even more critical in light of Plaintiffs' recent disclosure that they did not retain either the Reference Files or fingerprints called for by RFPs 90 and 91. Charter explained that, because Plaintiffs were relying on non-produced information in order to satisfy Charter's request for the Reference Files (RFP 90), Charter was entitled to the information upon which Plaintiffs relied so that Charter could independently confirm Plaintiffs' representations. *Id.* Charter explained that its existing discovery encompassed this information, namely its requests seeking documents sufficient to show the process used to create the fingerprints (RFP 92) and all communications with MarkMonitor and Audible Magic related to the matching of the alleged infringing files of the works-in-suit (RFP 93).

Plaintiffs opposed Charter's motion, claiming that the requested information was not called for by any request. Ex. S. In doing so, Plaintiffs ignored Charter's argument that the discovery was warranted because Plaintiffs had relied on this non-produced information in order to represent to the Special Master that the Digital Files were "the same as" the requested Reference Files. Plaintiffs also did not respond to Charter's argument that the discovery was warranted in light of Plaintiffs' admitted failure to retain this foundational evidence. Instead, Plaintiffs argued that there is no basis to require the production of documents used by counsel to identify the ISRCs of files used to recreate the Reference Files, and that the requested information is irrelevant because Charter could instead compare the legitimate versions of the works-in-suit to the infringing torrents, both of which Plaintiffs have produced. However, as detailed above, the infringing torrents are not the files Charter subscribers allegedly shared—they are files that were downloaded from P2P networks *years after* notices were sent to Charter. *See supra* III.B. Further, because

MarkMonitor's system relied on metadata matching to the Reference Files, as opposed to actual comparisons of the files, Charter is entitled to the information actually utilized by MarkMonitor and Audible Magic to make the matches. Plaintiffs' opposition to Charter's motion to compel did not address either of those issues. Finally, Plaintiffs made no arguments as to burden or proportionality in opposing Charter's motion to compel.

On August 12, 2020, the Special Master granted Charter's motion to compel, holding that the Reference Files were relevant, as previously determined on the record. ECF 230 at 25. She further held that Plaintiffs had failed to adequately show that the purported burden in producing the requested information outweighed its relevance. Because Charter sought the Reference Files, and Plaintiffs had not produced them, the Special Master determined that Plaintiffs had failed to demonstrate why their representation that matching ISRCs is sufficient, particularly because the Reference Files are relevant and directly requested by RFP 90. ECF 230 at 25.

The Special Master's discovery rulings on the fingerprints and related documents are the product of months of detailed briefing and hearings. She ordered the production of the discovery at issue because it is central to Charter's ability to test Plaintiffs' claim of direct infringement, which is a necessary predicate to establishing secondary liability. The Special Master did not abuse her discretion in ordering this essential discovery, and Plaintiffs' objections should be overruled.

### C. The Special Master Properly Considered Plaintiffs' Relevance and Proportionality Arguments

In arguing that the Special Master's decision constitutes an "abuse of discretion," Plaintiffs cite only one case—*Lee v. State Farm Mut. Auto. Ins. Co.*, 249 F.R.D. 662, 671 (D. Colo. 2008)— and grossly misrepresent its holding. Specifically, Plaintiffs claim that *Lee* stands for the proposition that it is an abuse of discretion for a special master not to articulate a basis for relevance in a discovery ruling. However, the actual holding of *Lee* is that an abuse of discretion occurs only

when a special master fails "to articulate a reason for [the] decision ***and no such reason is readily apparent from the record***," or where the special master articulates a reason which has no basis in fact or is contrary to law. *Id.* (emphasis added). So long as the reason is articulated, and the appropriate factual and legal criteria are satisfied, the rationale need not be one that is agreeable to the losing party of reviewing court. *Id.* Here, the Special Master articulated a reason for her decision and her reasoning is readily apparent from the record. It is supported by the facts and the law. Thus, Plaintiffs' argument that the Special Master abused her discretion should be rejected.

Indeed, the record is clear that the Special Master specifically considered, and rejected, Plaintiffs' relevancy arguments. Instead, she adopted Charter's position, which is that the Reference Files are relevant, as they are the files upon which all subsequent infringement notices were based. She also credited Charter's argument that the information sought by Charter is relevant to testing Plaintiffs' assertions and representation regarding the Reference Files, which Plaintiffs inexplicably failed to retain.

In addition, although Plaintiffs contend that the Special Master "abused her discretion" by failing to consider Plaintiffs' burden and proportionality arguments, it is important to note that Plaintiffs ***never made these arguments*** when opposing Charter's motion to compel.[13] Because Plaintiffs did not make any burden or proportionality arguments, the Special Master could not have abused her discretion in finding that the relevance of the discovery outweighed any burden. Moreover, even if this Court could entertain Plaintiffs' belated burden and proportionality arguments, there would be no basis to make such a finding. Plaintiffs have not filed any declarations from party representatives on burden, or provide any detail about the claimed burden

---

[13] Plaintiffs point to their June 1, 2020 letter, but this was in response to Charter's question about whether the files they had produced were the same as the Reference Files—discovery that was previously ordered and is not subject to the objections currently before the Court. *See* Obj. at 19.

other than the bare assertion that Plaintiffs would be required "to collate information from multiple databases and identify and produce even more digital music files." *Id.* Putting aside Plaintiffs' failure to explain or quantify this burden, as the Special Master has recognized on numerous occasions, in this and other contexts, the fact that Plaintiffs are seeking up to $150,000 per work justifies the burden in producing information, particularly where, as here, it is foundational to Plaintiffs' ability to maintain their suit against Charter.

### D.    Plaintiffs "Work-Product" Argument is Baseless

Plaintiffs also argue that the Special Master abused her discretion in disregarding their purported "work-product objections." Obj. at 19-20. But Plaintiffs did not meaningfully assert any work-product objections in the underlying proceedings with the Special Master. Instead, they relegated their purported work-product objection to a single footnote in their opposition to Charter's motion to compel. And, even then, the footnote set forth only a hypothetical restatement of black-letter discovery law as opposed to an actual explanation as to how the information constitutes work product.[14]

Indeed, there is no credible argument that the requested information is work product. Plaintiffs already admitted in their opposition to Charter's motion to compel that the Reference Files and corresponding fingerprints were not created in anticipation of litigation. According to Plaintiffs, that is why they had no duty to preserve them. Ex. S at 9, n.9. If the fingerprints and the Reference Files were not created in anticipation of litigation, that admission alone is dispositive of Plaintiffs' work product objection. Plaintiffs also have mentioned that they relied upon "historical records" that "were not limited to the notice program at issue here" as part of their effort "to match

---

[14] The footnote stated: "[t]o the extent Charter seeks communications between Plaintiffs and their counsel regarding the investigation into which ISRCs were sent to Audible Magic, those attorney-client communications are core work product and not discoverable." Ex. S at 8, n.8.

up what was provided back then to what we have produced today." *See supra* at 14. Again, since these historical records were not created in anticipation of litigation, there is no basis to assert that they were created by or at the direction of counsel. These records simply note which versions of Plaintiffs' works were used to create fingerprints, as Plaintiffs separately admit. Ex. S at 9, n.9 ("[T]he Record Company Plaintiffs have master catalogs containing digital files of their sound recordings, including those at issue here; and (2) they used those master digital files to make Audible Magic fingerprints using an Audible Magic tool (in the case of Sony Music and Warner Music), or to send copies to Audible Magic to do the same (in the case of Universal Music)."). Accordingly, those documents are also not work product.

Plaintiffs' "work-product objection" should be rejected. Not only did Plaintiffs fail to articulate one to the Special Master, but there is no independent basis to deem the underlying information work product.

### E.   The Ordered Discovery Is Called for by Charter's RFPs, Which the Special Master Properly Considered

Finally, there is no merit to Plaintiffs' objection that the Special Master impermissibly ordered the production of materials falling outside of the scope of Charter's discovery requests. The Special Master's order directly pertains to all of the following requests made by Charter: (1) copies of the Reference Files (RFP 90); (2) copies of the fingerprints (RFP 91); (3) documents sufficient to show the process for making the fingerprints for each work in suit (RFP 92); and (4) all communications with MarkMonitor and/or Audible Magic regarding the creation of the fingerprints (RFP 93). All of these request necessarily encompass production of the Reference Files used to make the Audible Magic fingerprints.[15]

---

[15] The Special Master also ordered Plaintiffs to produce any fingerprints in their possession, to the extent they were retained. It is unclear whether this portion of the Special Master's order is also subject to

The Special Master also properly ordered Plaintiffs to produce any information upon which Plaintiffs have based their representations about the Reference Files. This order was necessitated by Plaintiffs' misrepresentation that they still possessed the Reference Files, responsive to RFP 90, and belated admission that the evidence no longer exists. The Special Master held that Plaintiffs had failed to establish that their representation alone was sufficient to meet their obligation to RFP 91, which now requires to Plaintiffs provide the underlying factual information they are relying upon. This determination was fully supported by evidentiary record and not arbitrary, capricious, whimsical, or unreasonable. As such, there is no basis to characterize it as an abuse of discretion.

## **CONCLUSION**

For the foregoing reasons, the Court should overrule Plaintiffs' Objections and uphold the Special Master's rulings on Plaintiffs' RFPs 2 and 3, Charter's privilege log, and the fingerprint discovery.

Dated: August 26, 2020                                    Respectfully submitted,

<table>
<tr>
<td>

Charles K. Verhoeven
David Eiseman
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600 (telephone)
(415) 875-6700 (facsimile)
E-mail: charlesverhoeven@quinnemanuel.com
E-mail: davideiseman@quinnemanuel.com

Andrew H. Schapiro
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400 (telephone)
(312) 705-7401 (facsimile)
andrewschapiro@quinnemanuel.com
</td>
<td>

*s/ Jennifer A. Golinveaux*
Jennifer A. Golinveaux
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA 94111-5840
(415) 591-1506 (telephone)
(415) 591-1400 (facsimile)
E-mail: jgolinveaux@winston.com

Michael S. Elkin
Thomas Patrick Lane
Seth E. Spitzer
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
(212) 294-6700 (telephone)
(212) 294-4700 (facsimile)
E-mail: melkin@winston.com
E-mail: tlane@winston.com
</td>
</tr>
</table>

Plaintiffs' objections. To the extent it is, the objection should be overruled for the same reasons set forth above. This discovery is clearly sought by RFP 90, which seeks the Reference Files.

E-mail: sspitzer@winston.com

Craig D. Joyce
Fairfield and Woods, P.C.
1801 California Street, Suite 2600
Denver, CO 80202
(303) 830-2400 (telephone)
(303) 830-1033 (facsimile)
E-mail: cjoyce@fwlaw.com

Erin R. Ranahan
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071
(213) 615-1933 (telephone)
(213) 615-1750 (facsimile)
E-mail: eranahan@winston.com

*Counsel for Defendant*
*Charter Communications, Inc.*

## CERTIFICATE OF SERVICE

I certify that on August 26, 2020, I caused a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court via CM/ECF, which will send a notice of electronic filing to all counsel of record.

| | |
|---|---|
| Matthew J. Oppenheim<br>Scott A. Zebrak<br>Jeffrey M. Gould<br>OPPENHEIM + ZEBRAK, LLP<br>4530 Wisconsin Ave. NW, 5th Floor<br>Washington, DC 20016<br>Tel: (202) 851-4526<br>E-mail: matt@oandzlaw.com<br>E-mail: scott@oandzlaw.com<br>E-mail: jeff@oandzlaw.com<br>*Attorneys for Plaintiffs* | Mitchell A. Kamin<br>Neema T. Sahni<br>Mark Y. Chen<br>COVINGTON & BURLING LLP<br>1999 Avenue of the Stars, Suite 3500<br>Los Angeles, CA 90067-4643<br>Tel: (424) 332-4800<br>E-mail: mkamin@cov.com<br>E-mail: nsahni@cov.com<br>E-mail: mychen@cov.com<br>*Attorneys for Plaintiffs* |
| Janette L. Ferguson<br>LEWIS BESS WILLIAMS & WEESE, P.C.<br>1801 California Street, Suite 3400<br>Denver, CO 80202<br>Tel: (303) 861-2828<br>E-mail: jferguson@lewisbess.com<br>E-mail: bleoni@lewisbess.com<br>*Attorneys for Plaintiffs* | Jonathan M. Sperling<br>William E. O'Neil<br>COVINGTON & BURLING LLP<br>620 Eighth Avenue<br>New York, NY 10018-1405<br>Tel: (212) 841-1000<br>E-mail: jsperling@cov.com<br>E-mail: woneil@cov.com<br>*Attorneys for Plaintiffs* |
| | Megan M. O'Neill<br>COVINGTON & BURLING LLP<br>850 Tenth Street, NW<br>Washington, DC 20001-4956<br>Tel: (202) 662-5416<br>E-mail: moneill@cov.com<br>*Attorneys for Plaintiffs* |

*s/ Jennifer A. Golinveaux*
Jennifer A. Golinveaux