# Exhibit K



333 S. Grand Avenue, 38th Floor
Los Angeles, CA 90071
T +1 213 615 1700
F +1 213 615 1750

**ERIN R. RANAHAN**
eranahan@winston.com

April 10, 2020

**VIA EMAIL**

Special Master Regina Rodriguez
Regina.rodriguez@wilmerhale.com

Re:   *Warner Records, Inc., et al. v. Charter Communications, Inc.*, **Case No. 19-cv-00874-RBJ-MEH – Charter Communications, Inc.'s April 10, 2020 Moving Letter Brief**

Dear Special Master Rodriguez:

We write on behalf of Defendant Charter Communications, Inc. ("Charter"), seeking an order compelling Plaintiffs to respond to discovery relating to the five issues identified in our April 8, 2020 email.

Charter served its first document requests ("RFP") in June 2019.[1] After nearly ten months, Plaintiffs have failed to provide meaningful discovery. Although they repeatedly tout having produced "millions" of documents, the overwhelming majority consists of 600,000-plus notices of alleged infringement and corresponding "evidence packages." These are machine-generated files created by third parties the Recording Industry Association of America ("RIAA") and MarkMonitor. Beyond these third-party documents that Plaintiffs have produced, most of the discovery Charter seeks from Plaintiffs remains outstanding. The principal exceptions are ownership documents for just 1% of the works-in-suit (produced only after Judge Hegarty ordered it) and digital copies of a portion of the works-in-suit.[2] Discovery is not about cherry picking documents for production that help your case, while dodging and delaying production of documents properly sought by the other side. Plaintiffs should be ordered to comply with their basic discovery obligations to provide information essential to the claims and defenses in this case.

**I.   Issue No. 1 – Plaintiffs' Complete Failure to Produce Responsive Email Communications**

Despite having had Charter's RFPs since June 2019, Plaintiffs have yet to produce *a single* email. Instead they claim to still be at the beginning stages of any email review and flatly refuse to provide any date certain to complete their production. This has prejudiced Charter in its ability to develop its defenses and take depositions. Charter, therefore, requests an order setting a date certain by which Plaintiffs will produce emails responsive to Charter's RFPs and to identify the custodians from whom they are searching for potentially responsive documents.[3] Charter requests that the date certain be no later than May 1, 2020.

---

[1] Plaintiffs' Objections and Responses to Charter's RFPs are attached hereto as **Exhibit 1**.

[2] In contrast, Charter has provided millions of individual records with respect to the accused subscribers, all available records regarding its receipt and handling of tens of thousands of notices, many years of extensive financial information, responsive emails located by expansive searches of millions of emails from 14 custodians, and detailed interrogatory responses that contain monthly subscriber and billing data from 2012-2016.

[3] Charter also proposed to Plaintiffs last summer that the parties exchange and negotiate custodians and search terms, but Plaintiffs declined. Since then, Charter has identified its 14 email custodians, collected ***over three million emails***, applied appropriate search terms, spent substantial resources reviewing, and has produced those that are responsive.



April 10, 2020<br>Page 2

As Plaintiffs acknowledge, many of Charter's RFPs squarely seek emails, including RFP 22-25, 27-28, 48, 50, 53, 55, 62-65, 81, 84. Yet in recent calls, Plaintiffs stated that they do not expect to have many emails to produce concerning the years of transactions and communications which bear on these claims. Plaintiffs make this assertion based on pure speculation, since they appear to have yet to begin reviewing emails for production.[4] Given Plaintiffs' ongoing delay, Charter seeks an order requiring Plaintiffs to complete production of responsive emails, and a privilege log for any withheld documents, so that it can assess the adequacy of the production and determine whether additional, responsive documents are outstanding. Plaintiffs should also be required to identify the custodians from whom they are searching so that Charter can assess whether Plaintiffs have included custodians likely to possess responsive information. Each of these mandates is necessary given the time that has lapsed without any progress by Plaintiffs on email productions.

Charter's RFPs are very likely to yield responsive emails. For example, Charter seeks communications between Plaintiffs and the RIAA regarding the notice program the RIAA ran for Plaintiffs and the use of MarkMonitor, the vendor that generated Plaintiffs' infringement notices. RFP 55 and 81. Charter also seeks communications regarding Audible Magic, a vendor which provided a critical piece of technology that purportedly verified that the allegedly infringing files were in fact copies of Plaintiffs' works. RFP 84. Plaintiffs should possess non-privileged email communications responsive to these requests, as at least some of these types of documents were produced in *Sony Music Entertainment, Inc. et al. v. Cox Communications, Inc. et al.*, Case No. 1:18-cv-00950-LG-JFA (E.D. Va.) ("*Sony*").

Charter also seeks internal or inter-Plaintiff emails, including communications regarding studies, reports, or analyses concerning the effect of copyright infringement on Plaintiffs, or the use of P2P networks, like BitTorrent, which has legitimate uses that Plaintiffs exploited, including through so-called promotional "BitTorrent Bundles." RFP 25. Plaintiffs should possess many such documents, as each Plaintiff Group employs people devoted to addressing these issues. Charter also seeks communications regarding its own subscribers, which would include any emails that Charter's subscribers sent to Plaintiffs or the RIAA after receiving notices of alleged infringement. RFP 27.

Plaintiffs should be required to take their obligations to produce emails seriously. Charter seeks an order requiring Plaintiffs to produce emails responsive to its RFPs, including but not limited to RFP 22-25, 27-28, 48, 50, 53, 55, 62-65, 81, 84, along with a complete privilege log, and for each Plaintiff to disclose their custodians by May 1, 2020.[5]

## II.     Plaintiffs' Revenue and Profit Information

Charter seeks an order compelling Plaintiffs to produce information sufficient to demonstrate their

---

[4] Plaintiffs were also ordered by Judge Hegarty to produce a documents regarding disputes over ownership of 1% of the works-in-suit in January 2020. Plaintiffs did not produce any emails responsive to this 1% sample. Plaintiffs admitted during a recent call that they did not search email to locate such obviously responsive documents.

[5] These requests have been the subject of the parties' discussions—both written and verbal—for months. Plaintiffs have made representations regarding their document search and collection efforts in reference to these requests. Any argument by Plaintiffs that they have not agreed to produce responsive documents or that Charter's demand is otherwise unripe should be rejected. Plaintiffs should be compelled to produce documents responsive to these relevant requests. The parties' correspondence regarding these and other requests are attached hereto as **Exhibit 2**.



April 10, 2020
Page 3

total annual[6] revenue and profits—from physical sales, digital sales, and streaming—for the last ten years.[7]

Plaintiffs cite studies in their First Amended Complaint from as far back as 2011 to suggest that P2P piracy destroyed the music business. At the *Sony* trial, these same Plaintiffs showed publicly-available data tracing these effects of P2P piracy back from 1999 (the onset of Napster) through 2014 (the end of the claim period there). Plaintiffs' Claim Period here (March 2013 through May 2016) does not capture the reality of what has occurred in the last ten years since the music industry first resisted—but now benefits *tremendously* from—the proliferation of music on the Internet. After 2014, and increasingly by 2016, the music industry experienced astronomical growth fueled by *legal streaming through the Internet,* reliant-upon services provided *by ISPs like Charter*.

Further, publicly-available information shows that file sharing diminished dramatically as a percentage of Internet traffic both during the Claim Period and in the years following it. Financial information from the period of this decline is also relevant to the issue of statutory damages, for which deterrence is a factor. *See, e.g.*, *Zuffa, LLC v. Gonzalez*, No. 17-CV-01805-CMA-NYW, 2017 WL 6016403, at *3 (D. Colo. Nov. 14, 2017) ("In this district, courts have considered factors such as the … deterrence of future similar behavior…."); *Girlsongs v. 609 Indus., Inc.*, 625 F. Supp. 2d 1127, 1130-1132 (D. Colo. 2008). The requested revenue and profit information will undercut Plaintiffs' inevitable argument that a high level of statutory damages is required to deter Charter from permitting P2P infringement on its network because the supposed need for deterrence is overstated by the reality that P2P infringement is no longer an impediment for Plaintiffs, and Plaintiffs now greatly benefit from ISPs like Charter. The jury is entitled to understand that.

Plaintiffs refuse to provide this information, insisting that a sufficient amount of it is available in the public domain. But only the Universal Music Group and Warner Music Group Plaintiffs have some of this information publicly-available in annual reports, while Sony Music Entertainment and the Sony/ATV and EMI Plaintiff Groups do not. Plaintiffs should provide this data. Charter is also entitled to figures Plaintiffs consider accurate and reliable so that it can ask about it during depositions and present it to the jury. Plaintiffs should be compelled to provide financials sufficient to show revenue and profit from physical sales, digital downloads, and streaming for the last 10 years through annual reports, consolidated financials, accounting data, or whatever document is sufficient to demonstrate the requested information.

### III. <u>Unaltered Hard Drive of Allegedly Infringing Files</u>

Charter seeks an order requiring Plaintiffs to produce an unaltered copy of a hard-drive Plaintiffs' counsel received from MarkMonitor containing evidence of the alleged direct infringements at issue in this case. Instead, Plaintiffs seem to have provided self-serving extracts therefrom. MarkMonitor is the vendor the RIAA hired to generate the infringement notices at issue. As part of its services, MarkMonitor collected digital copies of audio files downloaded by MarkMonitor from P2P networks as evidence for this litigation. Charter sought copies of these digital audio files from MarkMonitor by subpoena. MarkMonitor initially agreed to produce a hard drive containing the files to Charter but reversed course after apparent coordination with Plaintiffs, insisting, instead, that because it provided the files to Plaintiffs, it would be burdensome to also provide a copy of the hard drive to Charter.

---

[6] In contrast, Plaintiffs insisted on *monthly* financial data from Charter.
[7] The information is responsive to Charter's RFP 16 and 17.



April 10, 2020<br>Page 4

Charter repeatedly asked Plaintiffs' counsel to make available an unaltered copy of the hard drive as received from MarkMonitor. Plaintiffs refused to produce the hard drive for months, offering the explanation that the files on the drive needed to be "processed."[8] Charter pointed out that Plaintiffs should not be "processing" responsive data before producing it. Nonetheless, once Plaintiffs finally produced the hard drive on April 1, 2020, it was evident that they had copied over files from the original drive for production, which altered the metadata for the files. That metadata is particularly crucial here because it provides evidence as to when the files were created and last manipulated, evidence that is relevant as to whether these files are in fact copies of files downloaded by Charter subscribers and at issue in this case, or something copied or created after those infringements allegedly happened. Moreover, to the extent that metadata has been preserved, it appears the files Plaintiffs have produced were mostly (85%) created over a two-hour period in March 2016, and that the rest were created thereafter. But the investigations in this case took place during the March 2013 to May 2016 Claim Period. Thus, whatever the files are that Plaintiffs produced, they are not the files that were downloaded in connection with these investigations. When Charter again insisted on an unaltered copy of the hard drive containing this key evidence received from MarkMonitor, Plaintiffs' counsel admitted that they did not provide an unaltered version of the evidence and, incredibly, claimed that they had no obligation to do so because Charter should have specifically requested that they refrain from altering the evidence.[9]

Charter is entitled to inspect the copy of the hard drive Plaintiffs received from MarkMonitor containing foundational evidence for this case, not merely copies of files (with altered metadata) from that hard drive selected by Plaintiffs. At a minimum, this will show whether the pre-2016 files were missing from MarkMonitor's records or whether they were omitted by Plaintiffs' "processing" of this data. Charter seeks an order requiring Plaintiffs to produce an unaltered copy of the hard drive Plaintiffs' counsel received from MarkMonitor, including all related correspondence, so that Charter can perform appropriate technical and forensic analyses.

### IV.    References Copies of the Works-in-Suit

Plaintiffs are in the process of producing digital copies of the copyrighted sound recordings at issue. These recordings were supposedly used by a third party, Audible Magic, as "reference" copies to verify that the recordings found online were indeed copies of the works covered by the copyrights in suit. Charter has asked Plaintiffs whether the files that are being produced are, in fact, the reference copies used by Audible Magic to verify the notices of alleged infringement in this case. Plaintiffs claim that they do not know, and refuse to investigate arguing implausibly that confirmation of whether the allegedly infringing online files were in fact copies of the protected works is "unlikely to yield relevant information." To explain in a little more detail, as part of the process of identifying alleged instances of infringement and generating the infringement notices at issue in this case, Plaintiffs used Audible Magic technology to verify whether files available on P2P networks contained copies of Plaintiffs' works. Audible Magic compares a legitimate version of the copyrighted work (the "reference" file) to a suspected file on a P2P network to confirm that the online copy does in fact contain the copyrighted work, as opposed to another work with a similar title, an amateur cover, a corrupted or "dud" file, a different version by the same artist, or something else. Plaintiffs claim that all of the notices at issue here are accurate, meaning that when they state that a certain file downloaded from a P2P networks contains one of their works, it contains that work. Charter is entitled

---

[8] The hard drive with the allegedly infringing files was produced in response to Charter's RFP 30, 32-33, and 35.

[9] The parties' correspondence regarding this issue is attached hereto as **Exhibit 3**.



to examine the reference files Audible Magic used to match alleged infringements. The only way to do this is with these references files. Plaintiffs should be required to investigate this basic question and provide an answer. Charter should also know whether the files are in fact the reference copies so that it can determine whether a further motion to compel the reference copies is necessary.

## V.      **Redactions**

Plaintiffs should be ordered to undo "relevance" based redactions to otherwise relevant documents. Plaintiffs have produced over 250 agreements to support their chain of title to a one-percent sample of the works-in-suit. Within virtually all of these documents, Plaintiffs have redacted information they unilaterally deem irrelevant.[10] For example, in recording agreements, Plaintiffs have redacted what appears to be the amount of an artist's advances, royalty rates, and other financial information. Plaintiffs claim this is appropriate because the information is "not relevant" and is "sensitive." Of course, the protective order in this case addresses any concerns about sensitivity. The information is not privileged, and there is no other legitimate basis to redact it. *McCall v. Skyland Grain, LLC*, No. 08-CV-01128-PAB-BNB, 2009 WL 1203304, at *6 (D. Colo. Apr. 29, 2009) (granted motion to compel documents improperly redacted as "non-relevant"); *Kovacs v. Hershey Co.*, 2006 WL 1980291, at *17; *McNabb v. City of Overland Park*, No. 12-CV-2331 CM/TJJ, 2014 WL 1152958, at *2-*4 (D. Kan. Mar. 21, 2014) ("In the few cases in this district where the court has addressed the propriety of unilateral redactions of either irrelevant, non-responsive, or confidential information, unilateral redactions have been found to be inappropriate").[11]

In any event, the information Plaintiffs have unilaterally deemed irrelevant is highly relevant. For example, information relating to the amount Plaintiffs paid their artists is probative of the value of Plaintiffs' works-in-suit, which is relevant to statutory damages.[12] Information regarding the value of Plaintiffs' works-in-suit is important context for this case in which Plaintiffs assert 11,027 distinct works with varying levels of popularity and worth. Plaintiffs seek up to $150,000 for each of these works for a total statutory damages award of up to **$1,654,050,000**. These Plaintiffs were awarded nearly $100,000 on over 10,000 works-in-suit in *Sony*. Information like that Plaintiffs have redacted is critical to distinguish the relative value of each work-in-suit so that the jury can appropriately assess individual statutory damages awards, should Plaintiffs prevail on liability.

---

[10] A selection of five agreements in which such redactions were made is attached hereto as **Exhibit 4**.

[11] Cases from other districts are in accord. *Cyris Jewels v. Casner*, No. 12CV1895KAMSLT, 2016 WL 2962203, *4 (E.D.N.Y. May 20, 2016) ("The City has cited no authority—and the court has found none—upholding a party's right to redact from admittedly responsive and relevant documents information based on that party's unilateral determinations of relevancy."); *Orion Power Midwest, L.P. v. Am. Coal Sales Co.*, No. 2:05-CV-555, 2008 WL 4462301, at *1-2 (W.D. Pa. Sept. 30, 2008) (rejecting "redaction campaign" where "[b]ased on an extensive review of the relevant caselaw … the Special Master reasoned that redaction of documents is disfavored").

[12] *See Stampin' Up!, Inc. v. Hurst, No.* 2:16-CV-00886, 2018 WL 2018066, at *6 (D. Utah May 1, 2018) (listing "the value of the [copyright]" as a relevant factor to "[be] consider[ed] in determining the statutory damages"); *New Atlas Dot Com, Inc. v. Pizza Inn I-40 W., Inc.*, No. CIV-11-149-D, 2013 WL 425038, at *3 (W.D. Okla. Feb. 4, 2013)( "the value of the copyright" may guide the discretion of determining statutory damages); *Harrington v. Aerogelic Ballooning, LLC*, No. 18-CV-02023-MSK-NYW, 2019 WL 2613334, at *8-9 (D. Colo. Apr. 25, 2019), report and recommendation adopted in part, No. 18-CV-02023-MSK-NYW, 2019 WL 5095683 (D. Colo. Aug. 8, 2019) (value considered when assessing expert analysis).

**WINSTON & STRAWN LLP**

April 10, 2020
Page 6

Very truly yours,

Erin R. Ranahan