# Exhibit L

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00874-RBJ-MEH
_____

WARNER BROS. RECORDS INC., et al.,

Plaintiffs,

vs.

CHARTER COMMUNICATIONS, INC.,

Defendant.
_____

TELEPHONIC HEARING

April 17, 2020
_____

      This telephonic hearing was taken before Special Master Regina Rodriguez on April 17, 2020, at 10:04 a.m. Mountain Standard Time before K. Michelle Dittmer, Registered Professional Reporter and Notary Public within the state of Colorado.

(The reporter, K. Michelle Dittmer, appearing remotely via telephone)

```
 1   I'd like for you to do is do the printout of the index of
 2   the files, the folders on that hard drive, and indicate
 3   for me what you say is relevant to this case and have
 4   produced and what is not relevant to this case, and I'll
 5   look at it in camera.
 6                 MR. GOULD:  Understood.
 7                 THE COURT REPORTER:  Is that Mr. Gould?
 8                 MR. GOULD:  Yes, that was Mr. Gould.
 9   Understood.
10                 THE COURT REPORTER:  Thank you.
11                 SPECIAL MASTER RODRIGUEZ:  Okay.  Next
12   issue.  The reference copies of the works in suit.
13                 MR. ANDERSON:  Hi, this is Sean Anderson
14   from Winston & Strawn.  I can address this issue when
15   you're ready.
16                 SPECIAL MASTER RODRIGUEZ:  Yeah.  Go
17   ahead, please.
18                 MR. ANDERSON:  Okay.  So with this issue,
19   Charter has posed a straightforward question that seeks
20   an answer concerning some pretty foundational evidence in
21   this case.  In response to Charter's request seeking
22   digital copies of the works in suit, plaintiffs have
23   represented that they have produced music files that are
24   copies of the works in suit.  That's responsive to
25   Charter's Request for Production Number 2.
```

```
 1                 But Charter is also asking the plaintiffs
 2    to state whether these files they have produced are the
 3    same as those plaintiffs or their agents used through
 4    Audible Magic to create unique digital fingerprints.  The
 5    background Audible Magic has a proprietary service due,
 6    which is able to analyze the work they attract from a new
 7    Warner records album and create a unique fingerprint of
 8    that track.
 9                 There's a reference database of these
10    fingerprints akin to the FBI's fingerprint database.
11    These digital fingerprints are integral to verifying
12    whether plaintiffs' infringement notices that it sent to
13    Charter and are the basis of their claims here are
14    accurate.
15                 That's because MarkMonitor, which we were
16    just talking about, the vendor clients used to send these
17    notices, compares torrent files on peer-to-peer networks
18    that might contain copies of plaintiffs' works, which
19    Audible Magic has also analyzed, to these digital
20    fingerprints.
21                 If the fingerprints match, then
22    MarkMonitor concludes that the torrent files on the
23    network includes one of plaintiffs' works, and it sends
24    the notice to the ISP stating as much.
25                 THE COURT REPORTER:  I'm sorry, I'm sorry.
```

```
 1   Excuse me.  This is the reporter.
 2                MR. ANDERSON:  Yeah.  Sorry.
 3                THE COURT REPORTER:  I missed a word.  You
 4   said "sends the notice to the ISP" . . .
 5                MR. ANDERSON:  Stating as much, stating as
 6   much.
 7                THE COURT REPORTER:  Okay.  Thank you.
 8                MR. ANDERSON:  Sometimes they do not match
 9   because what is in the torrent file is not a copy of
10   plaintiffs' works.  Even though it might be labeled as
11   such, it could be a dud, a corrupted file, an amateur
12   cover, or a live version of the same song by the same
13   artist, but not the same copyrighted work that is being
14   sued on in this case.
15                So what Charter would like to know is
16   whether these files are the so-called reference files,
17   the ones used to make the fingerprints.
18                You know, the reason we're asking about
19   this now is because we intend to have our expert test the
20   veracity of plaintiffs' infringement notices.  And one
21   way to do this is to have the expert compare plaintiffs'
22   notices to the torrent files they claim Charter
23   subscribers have downloaded to the reference copy --
24   reference copies.
25                So plaintiffs are producing the digital
```

1    copies of the works in suit now, which is why we're
2    asking about these files now.
3                In their papers, plaintiffs respond to
4    Charter's motion noting two things primarily:  First,
5    that Charter has not served any discovery requests
6    calling for this information, but we have.  There's an
7    outstanding RFP that squarely seeks these reference
8    files, RFP Number 90.
9                That request is not subject to this
10   month's hearing, but I'll note that plaintiffs object to
11   that request, refuse to produce responsive documents and
12   state instead that they have produced the digital files
13   we're talking about today.
14               So what we're trying to do is cut through
15   all of this, and as we've discussed in connection with
16   other issues and requests today, that let's not take form
17   over substance and have a good-faith and candid
18   discussion about what they have produced so far so we can
19   determine what we need to still work through.
20               And we'd like to put our expert to work on
21   this now, which is why we're asking about the files that
22   have currently been produced.
23               SPECIAL MASTER RODRIGUEZ:  Okay.  Yeah, I
24   don't have requests for -- Request Number 90 in the ones
25   that I have.  Mine only go up to 84, so I have not seen

1   that one.
2               MR. ANDERSON:  Right.  So the issue teed
3   up for today's discussion was simply to compel, and I
4   recognize that this isn't only a motion to compel, but to
5   compel plaintiffs to respond to the simple question we
6   have posed so we can determine whether or not to tee up a
7   motion or a request for a motion based on RFP 90.
8               I'm happy to read it, you know, into the
9   record if it's helpful.  But essentially it asks for --
10  I'll read it:  For the copyrighted works which has been
11  defined as the works in suit, copies of the digital files
12  you used or provided to a third party to use to create a
13  digital fingerprint through the Audible Magic system that
14  were used by Audible Magic and/or MarkMonitor in
15  connection with the creation of the infringement notices
16  sent to Charter.
17              SPECIAL MASTER RODRIGUEZ:  Okay.
18              MR. ANDERSON:  And I'll repeat that
19  plaintiffs' objection to that request is that they've
20  produced the copies we're talking about today.
21              So we're essentially in a situation where
22  we're asking --
23              SPECIAL MASTER RODRIGUEZ:  Yeah.
24              MR. ANDERSON:  -- "What have you produced"
25  and then -- okay.  I'll stop there.

```
 1                SPECIAL MASTER RODRIGUEZ:  So counsel for
 2    plaintiffs, it does seem to me that this would be
 3    relevant.  I agree with you that the RFP 2 did not make
 4    the request, but as I have said earlier, we can elevate
 5    form over substance of trying to get to the issues here,
 6    and it does sound like this request has been made to you.
 7                What is your response?  Is this a
 8    reference file or what is this that has been produced?
 9                MR. SPERLING:  So, Ms. Rodriguez, it's
10    Jonathan Sperling.  And the response is twofold.
11                And number one, I mean, we have told them,
12    we have responded to them and explained to them that we
13    don't know as of right now.  And more importantly --
14    equally importantly, it doesn't really matter if,
15    Ms. Rodriguez, you were able to follow the description by
16    Charter's counsel, the purpose for which they want to use
17    it, at the end of the day, they want to establish whether
18    the infringing file actually was infringement, right?
19                And so you do that by taking the
20    infringing file; often you can just listen to it, in
21    fact, can you recognize the song?  But if it's a song
22    you're not familiar with, you take the infringing file
23    and you compare it to the digital copies that we're
24    producing.  Those are the digital copies of the works in
25    suit, the works that we're suing on.
```

1                   So you compare the infringing file to the
2      actual sound recording, and either it's infringing or
3      it's not.
4                   So all this talk about the Audible Magic
5      notice and what was a master of that, at the end of the
6      day, it's all focused on a single question which is:  Was
7      the -- was the file that we allege is infringing actually
8      infringing on the sound recording that we own?  And
9      that's when we're entitled to damages, when they infringe
10     our copyrighted works.
11                  And we're producing material that allows
12     them to make exactly that comparison.  That's the only
13     question that needs to be answered.
14                  MR. ELKIN:  If I could --
15                  MR. SPERLING:  Beyond that, their
16     question -- with respect to their question that they have
17     put to us not in a discovery request, in correspondence,
18     you know, we've told them, based on the investigation
19     we've done so far, we don't know the answer.  There's
20     certainly nothing more to say about it, Ms. Rodriguez.
21                  SPECIAL MASTER RODRIGUEZ:  All right.
22                  MR. ELKIN:  This is Mr. Elkin here.  I
23     just want to be very -- I'll be quick, I promise, if I
24     can.
25                  SPECIAL MASTER RODRIGUEZ:  Go ahead.

1             MR. ELKIN:  Thank you.
2             A lot of what Mr. Sperling just said just
3    is -- isn't -- accurately depict the background here.
4    This MarkMonitor has a system for sending out notices.
5    It claims that it only sends out notices once it has
6    verified the recordings against the Audible Magic
7    database.
8             And what we're looking for here are the
9    files that Audible Magic had matched to the RI double --
10   to the major record label's sound recordings.  That
11   foundational evidence isn't established at that time.
12            There's an issue about whether what's
13   contained associated with that cryptographic hash is what
14   it purports to be.  It's like having a set of FBI
15   fingerprints that, you know, you could say this
16   fingerprint matches that fingerprint, but you don't know
17   ultimately what the fingerprints were based on.
18            And without that information, we are --
19   we're without foundational evidence to be able to test a
20   very important part of the MarkMonitor notification
21   system.
22            SPECIAL MASTER RODRIGUEZ:  Okay.  Counsel
23   for plaintiffs, you're saying that you don't know whether
24   or not what you have produced satisfies that element,
25   being able to show that it is the same or not the same?

```
 1                MR. SPERLING:  So in terms of being able
 2   to demonstrate whether it's the same -- sorry,
 3   Mr. Sperling speaking.  To be able to demonstrate whether
 4   it's the same or not the same as the infringing file is
 5   exactly what they need to determine that.  It's the sound
 6   recording.  We're giving them the actual sound recording.
 7                So let's take a concrete example.  We send
 8   them an infringement notice.  It says:  Billy Joel's Born
 9   to Run.  We sue them.  We say:  You are liable for your
10   subscriber downloading an infringing copy of Bruce
11   Springsteen's Born to Run.
12                To the extent they don't know what Born to
13   Run sounds like, we're producing a digital copy, Born to
14   Run.  And they put them side-by-side, you can listen to
15   them side-by-side and do a digital analysis to compare
16   them, a so-called proximity analysis, which is so sound
17   technological people don't have to listen to it --
18   however they want.
19                They can do that comparison.  We're giving
20   them, in answer to your question, Ms. Rodriguez, exactly,
21   exactly what they need and the only thing that they need
22   to determine whether it's actually an infringing file or
23   not.
24                MR. ELKIN:  We disagree.  This is
25   Mr. Elkin.  Completely disagree.
```

 1                MR. ANDERSON:  And just to -- just to add
 2    to Mr. Elkin's point, what we're asking for is the file
 3    that MarkMonitor used to verify whether the infringement
 4    notices that it was sending were accurate at the time or
 5    the time before they sent them.
 6                So the question is, "What are those
 7    files," not, "What are the files that are being sued on
 8    alone in this case."  It's a -- it's as used in the
 9    system, not just a --
10                SPECIAL MASTER RODRIGUEZ:  Right.
11                MR. ANDERSON:  -- a legitimate copy of the
12    work in suit.
13                THE COURT REPORTER:  And that was -- I'm
14    sorry, was that Mr. Anderson?
15                MR. ANDERSON:  I apologize, Mr. Anderson.
16                THE COURT REPORTER:  Okay.  Thank you.
17                MR. ANDERSON:  Just said that last.
18                THE COURT REPORTER:  Okay.  Thank you.
19    Sorry.
20                SPECIAL MASTER RODRIGUEZ:  Mr. Anderson,
21    if at the end of the day they are indeed the same files,
22    isn't plaintiffs' counsel correct that it doesn't matter?
23                So in other words, if they're able to
24    verify that the files they used to notify of an
25    infringement is the same file that they're producing to

1  you now and that they're using as the basis for the
2  allegation that it's infringement, why does it matter?
3              MR. ANDERSON:  That's what our question
4  for today's hearing asks is, whether the files that they
5  have produced, which they've represented are just digital
6  copies of the works in suit are the same.
7              SPECIAL MASTER RODRIGUEZ:  Right.  Then my
8  question for defense counsel is, as I understand what
9  you're telling me is, at this moment, you don't know the
10 answer to that question; is that correct?
11             MR. ELKIN:  So Mr. Anderson, if I could
12 just jump in, this is Mr. Elkin here.
13             The issue is that the -- the copies, the
14 recordings that MarkMonitor identifies under its system
15 is with respect to hashes that it claims it verifies
16 against the Audible Magic database.
17             The problem is that what they're
18 purporting to rely on is what is within the Audible Magic
19 database originally.  They -- what happens is that
20 Audible Magic, unlike what -- how the system is supposed
21 to work, doesn't at that -- doesn't in, let's say, 2013
22 verify what the Audible Magic database -- the Audible
23 Magic database very well could have had a recording that
24 it was given to by Universal Music Group in 2009, and we
25 don't know ultimately what the -- what they're comparing

```
 1    it to.
 2                   We don't have, from the -- we don't have
 3    the recordings that were lodged within Audible Magic
 4    originally to even determine what's cross-referenced.
 5    It's -- I don't know whether this is a burdensome issue,
 6    but it's a foundational issue for us.
 7                   SPECIAL MASTER RODRIGUEZ:  Well, if the --
 8                   MR. SPERLING:  This is Jonathan Sperling.
 9    Sorry, I didn't hear the answer to the question.
10                   SPECIAL MASTER RODRIGUEZ:  -- the
11    plaintiffs were able to either confirm or deny that they
12    are the same, wouldn't that answer the question for you?
13                   MS. GOLINVEAUX:  Ms. Rodriguez, this is
14    Jennifer Golinveaux.  The problem is that plaintiffs are
15    not going to rely on copies of the actual infringing
16    files taken from the subscribers' computers because
17    although MarkMonitor offered that service, it was more
18    expensive so they didn't make those copies.  Instead,
19    they are going to rely on metadata matches from Audible
20    Magic's reference library.
21                   We -- without knowing whether the files
22    were -- that they're producing are, in fact, the ones
23    that Audible Magic used to create the reference library,
24    we don't know how reliable that metadata is.  That's the
25    issue here.
```

```
 1                   And all we're asking them -- they're
 2   producing thousands of files.  We're saying:  Look, guys,
 3   we want to make this, you know, efficient.  Are those the
 4   reference files?  If not, we've got a problem.
 5                   SPECIAL MASTER RODRIGUEZ:  Right.  Okay.
 6   With that explanation, I mean, counsel for plaintiffs,
 7   can you confirm or -- I understand that, right now, you
 8   don't know the answer.  But it does not seem unduly
 9   burdensome, in light of the critical nature of this
10   evidence, for you to confirm or deny whether it is
11   referenced data.
12                   MR. SPERLING:  Yeah.  So Jonathan
13   Sperling.
14                   Ms. Rodriguez, a moment ago, you asked
15   what I think is the right question:  What difference does
16   it make?  And the response to tell you that it makes a
17   difference was to -- and I'm assuming it was an error --
18   but to misdescribe the technology and to tell you that
19   the MarkMonitor hash is dependent on what was given to
20   Audible Magic, and that's not correct.
21                   MarkMonitor identified the infringing
22   file, and that file had a hash, and that's the identifier
23   for you for the file.
24                   And so all you need to know is what the
25   infringing file is, and then you can compare that
```

1  infringing file, the thing that we're suing on, to the
2  actual file that we're producing.
3              MarkMonitor's generation of the hash to
4  identify the infringing file doesn't turn on what's in
5  Audible Magic's database.
6              SPECIAL MASTER RODRIGUEZ:  So it seems to
7  me that, at this point in time, that it makes sense that
8  you're going to have to do depositions of the MarkMonitor
9  folks to understand what it is they use, how they keep
10 it, and what these files are that you have.
11             At a minimum, I do think plaintiffs should
12 identify whether or not it is the same or different,
13 whether it is the same reference file or different.  At
14 this point, I'm not going to order the production, but I
15 am going to order that you answer the question whether
16 it's the same or different.
17             Then you can get from the discovery
18 depositions how it's used, how it was created, and what
19 was, in fact, used to determine whether or not there was
20 an infringing file or not.
21             MR. OPPENHEIM:  This is Matt Oppenheim.
22 Can I ask for a clarification on that, because --
23             SPECIAL MASTER RODRIGUEZ:  Go ahead.
24             MR. OPPENHEIM:  You used the term "file,"
25 Ms. Rodriguez, was it the same file?  That's a different

```
 1   question of was it the same exact sound recording, right,
 2   which is a -- right?
 3                  So -- and let me -- just so that we all
 4   talk a little bit in lay terms, right?  Bruce Springsteen
 5   Born to Run from the original album Born to Run, there
 6   could be a million different files of the exact same
 7   sound recording of that -- of that recording, right?  And
 8   when you're asking, "Is it the file," boy, I don't think
 9   we'd ever be able to answer that question.
10                  But if you're asking, is it the same sound
11   recording, I think we can try to investigate and answer
12   that question.
13                  SPECIAL MASTER RODRIGUEZ:  All right.
14                  MR. OPPENHEIM:  If that --
15                  SPECIAL MASTER RODRIGUEZ:  So if they
16   answer that question, will that satisfy what you need?
17                  MS. GOLINVEAUX:  No.  Mr. Oppenheim, with
18   all due respect, is deliberately confusing the issue.
19   All we want to know is whether the digital files they're
20   producing are the same ones their clients used or
21   provided to Audible Magic to make the initial
22   fingerprints for the library.  That is a different
23   question.
24                  And it's the plaintiffs who provided those
25   files or through -- through their agent, RIAA, to Audible
```

```
 1   Magic.  We want to know if that's what we're getting or
 2   not.
 3                  SPECIAL MASTER RODRIGUEZ:  So I'm going to
 4   order that plaintiffs answer that precise question.  I'm
 5   not ordering any productions at this time, but I am
 6   ordering that you answer the question yes or no.
 7                  All right.
 8                  MR. OPPENHEIM:  We undertake to find out,
 9   if we can.  I'm not sure if we can.  But we'll find out.
10                  SPECIAL MASTER RODRIGUEZ:  Okay.  If you
11   can't, you'll come back and we'll talk about that.
12                  Redactions.  Plaintiffs have produced
13   documents in response to RFP 4 and 5 that contain
14   redactions.
15                  I'll tell everybody, I am not a fan of
16   unilateral redactions unless an objection has been
17   properly preserved.  I do not see an objection that was
18   preserved.  I see that the documents were produced with
19   redactions.
20                  So, I mean, the plaintiffs, you could
21   explain to me the basis for standing on the objection --
22   or, strike that -- standing on providing redacted copies.
23   I understand that just the fact that you have a
24   protective order in the case is not dispositive of the
25   issue.
```