# Exhibit R



North America   Europe   Asia

101 California Street
34th Floor
San Francisco, CA 94111
T +1 415 591 1000
F +1 415 591 1400

**JENNIFER A. GOLINVEAUX**
jgolinveaux@winston.com

July 16, 2020

**VIA EMAIL**

Special Master Regina Rodriguez
Regina.rodriguez@wilmerhale.com

Re:   *Warner Records, Inc., et al. v. Charter Communications, Inc.*, **Case No. 19-cv-00874-RBJ-MEH – Charter Communications, Inc.'s July 16, 2020 Motion to Compel**

Dear Ms. Rodriguez:

Charter seeks an order requiring Plaintiffs to:

1) Respond to Record Company Interrogatory No. 13, which asks Plaintiffs to identify which sound recordings in suit were first released as a part of an album, critical to the determination of how many separate statutory damages awards are available in this case (assuming infringement is established);

2) Produce documents in response to RFP 59 regarding Plaintiffs' anti-piracy efforts, which are relevant to various aspects of mitigation—a live defense in this case that is also relevant to inform the appropriate level of any statutory damages—as well as deterrence and context;

3) Produce deposition transcripts and declarations Plaintiffs have agreed to provide from the closely-analogous case *UMG Recordings, Inc., et al., v. Grande Communications Networks, LLC et al.*, Case No. A-17-CA-365-LY (W.D. Tex.) ("*Grande*"), but without Plaintiffs applying unilateral "relevance" redactions to hide information they prefer to keep out of the case;

4) Produce documents responsive to RFPs 90-93 that are critical to Plaintiffs' ability to prove direct infringement, sufficient to show which works were fingerprinted, which is necessary in light of Plaintiffs' recent revelation that they opted not to retain either the Reference Files or the fingerprints at issue because they did not consider them relevant; and

5) Produce documents revealed in the recently-produced (in response to the Special Master's order) consulting agreement between the RIAA and MarkMonitor.

**I.   INTERROGATORY NO. 13 REGARDING THE NUMBER OF COMPILATIONS FOR PURPOSES OF STATUTORY DAMAGES**

With Interrogatory No. 13, Charter requests the Record Company Plaintiffs ("RCP") identify whether their respective works in suit were first released or issued on albums or compilations, including for each the name of the corresponding album or compilations. The Copyright Act is clear: "For the purposes of [statutory damages], all the parts of a compilation or derivative work constitute one work." 17



July 16, 2020
Page 2

U.S.C. § 504(c). The U.S. Copyright Office's guidance confirms the Act's plan language. *See* U.S. Copyright Office, Circular 34 at 3 ("[A]n album that contains multiple sound recordings … is considered a collective work for purposes of registration" and "[a] collective work is considered a single work for purposes of calculating statutory damages.").

Multiple courts are in agreement, holding that albums are "compilations." *See, e.g.*, *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 140-141 (2d Cir. 2010) ("An album falls within the Act's expansive definition of compilation[,]" so "[b]ased on the plain reading of the statute, therefore, infringement of an album should result in only one statutory award."); *see also UMG Recordings, Inc. v. MP3.COM, Inc.*, 109 F. Supp. 2d 223, 225 (S.D.N.Y. 2000); *see also Sullivan v. Flora, Inc.*, 936 F.3d 562, 571-72 (7th Cir. 2019); *Sony Music Entm't v. Cox Commc'ns, Inc.*, 2020 WL 3121306, at *12 (E.D. Va. June 2, 2020).

Accordingly, the U.S. Copyright Office has taken pains to explicitly warn rights holders of the monetary consequences of registering works as compilations.[1] Other courts have held that this determination depends on the manner in which the individual parts of a compilation were released, marketed, licensed, or sold, among other related factors. *See, e.g.*, *Walt Disney Co. v. Powell*, 897 F.2d 565, 569 (D.C. Cir. 1990) (considering whether individual copyrights are "distinct, viable works with separate economic value and copyright lives of their own"); *Sony Music Entm't*, 2020 WL 3121306, at *12 (observing that "analyzing independent economic value requires that the record include factual information about the copyrights as they operate in the market").

Despite the Copyright Act's clear language, guidance from the U.S. Copyright Office, and case law, courts have disagreed as to whether a plaintiff who asserts the alleged infringement of parts of a compilation is entitled to separate awards of statutory damages for each part. But regardless of the test applied, courts are universally in agreement that the number of "compilation[s] for purposes of statutory damages pursuant to Section 504(c)(1) of the Copyright Act is a mixed question of law and fact." *See Bryant*, 603 F.3d at 140 (internal citation omitted); *see also VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 747 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 122, 205 L. Ed. 2d 41 (2019); *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1277 (11th Cir. 2015). While the legal question is not before the Special Master at this time—Charter intends to raise this issue on summary judgment, and if necessary, present it to the jury. It must be provided a meaningful opportunity to gather the basic facts to support its legal argument that Plaintiffs should be entitled to only a single award per compilation—not individual awards per part of a compilation.

---

[1] *See* U.S. Copyright Office, Circular 34 at 3 ("A collective work is considered a single work for purposes of calculating statutory damages; ***therefore, registering a collective work together with the individual works contained in it may have important consequences in an infringement action***. Section 504(c)(1) of the Copyright Act states that a copyright owner may be entitled to recover 'an award of statutory damages for all infringements involved in the [infringement] action, with respect to any one work,' and "[f]or the purposes of this subsection, all the parts of a compilation . . . constitute one work." The statute also states that a collective work is, by definition, a compilation. ***Thus, when you register a number of individual works as part of a collective work, you may be entitled to seek one award of statutory damages for the collective work as a whole rather than a separate award for each individual work, even if the defendant infringed all of those works***.") (emphasis added).



July 16, 2020<br>Page 3

The resolution of this issue in either party's favor would dictate the total number of works at issue, and thus the amount of damages that can be awarded in this case.[2] Plaintiffs have registered many of their works as albums. No matter how Judge Jackson decides this issue, the information Charter requests is indisputably relevant to the compilation question. Courts routinely consider exactly the type of information Charter seeks. *See, e.g., Tomelleri v. Zazzle, Inc.*, 2015 WL 8375083, at *16 (D. Kan. Dec. 9, 2015) (declining to rule at summary judgment but noting multiple factual issues, "including the number" of works at issue and "whether Plaintiff issued the illustrations individually or as part of his books"); *Energy Intelligence Grp., Inc. v. CHS McPherson Refinery, Inc.*, 300 F. Supp. 3d 1356, 1371 (D. Kan. 2018) (considering both how the plaintiff placed its publications together for group registration and how it "sold these monthly collections to customers"); *Grady v. Nelson*, 2014 WL 7143852, at *8 (D. Colo. Dec. 15, 2014) (considering group registration in contrast with individual availability in the marketplace); *MacAlmon Music, LLC v. Maurice Sklar Ministries, Inc.*, 2015 WL 794328, at *5 (D. Colo. Feb. 4, 2015), *report and recommendation adopted*, 2015 WL 782722 (D. Colo. Feb. 24, 2015) (considering when the work was published and registered, who it was licensed to, and how it was distributed to the public).

There is no case in which a court held that the sheer fact that tracks of an album were made available individually on services like iTunes entitles the plaintiff to separate awards of statutory damages as a matter of law. Plaintiffs previously cited *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, in which the Second Circuit merely affirmed the district court's decision to uphold a jury verdict for per-track statutory damages as opposed to per-album statutory damages. 844 F.3d 79, 101-102 (2d Cir. 2016). In so doing, the Second Circuit noted that the district court did not err because "all the songs in question were made available as singles on the date of infringement," while the defendant did not put forward any rebuttal evidence. *Id.*

Charter does intend to present evidence to rebut any such claims of "independent value" here, even assuming Plaintiffs demonstrate that each work in suit was made available individually on iTunes during the Claim Period. Indeed, Charter will point to the fact that some tracks did not sell as standalone tracks during the Claim Period (i.e., where Plaintiffs' per-track revenue figures are zero for the track in question), and that Plaintiffs intended the tracks to be released, promoted, and sold as part of an album. Thus, just because a user could technically download an individual track from iTunes for $1.29 does not mean that that individual track would have been downloaded without the album. It is the existence and promotion of the **album** that drew the user to iTunes, Charter will argue, not the individual track. This evidence will rebut the notion that simply because a part of a compilation is available on iTunes it can stand apart from the compilation on which it was originally released for purposes of statutory damages. In order to make these, and related arguments, Charter needs the information requested with RCP Interrogatory No. 13, which seeks the identity of the sound recordings in suit first released or issued as parts of albums and, conversely, which were first released or issued as singles.

Plaintiffs must have the information readily available, as all that is needed is release dates, schedules, or plans for the works in suit. While Charter could attempt to research each of the thousands of sound recording in suit to attempt to determine whether any were first released as parts of albums or as singles, Plaintiffs would no doubt oppose Charter's reliance on this information as unsubstantiated,

---

[2] Plaintiffs have already elected statutory damages in this case. The statutory damages range per work is between $750 and $30,000, and even for willful infringement, from $750 to $150,000. 17 U.S.C. § 504(c)(1).



unverified, inaccurate, or otherwise improper.[3] Thus, Charter would be forced to conduct Rule 30(b)(6) depositions of each RCP about its findings. This, in turn, would require each RCP to designate a representative who could provide the very information Charter presently seeks with RCP Interrogatory 13. This process would be an enormous waste of time and resources. Charter's targeted interrogatory is the most efficient means to obtain this information.

## II.    RFP NO. 59 REGARDING PLAINTIFFS' ANTI-PIRACY EFFORTS

RFP 59 seeks documents sufficient to demonstrate the actions Plaintiffs took regarding certain enumerated anti-piracy measures, and the costs for such measures.[4] Charter offered to meet and confer with Plaintiffs regarding a reasonable set of custodians, document types, and other parameters for this request, but Plaintiffs refused. Any burden argument from Plaintiffs should therefore be rejected. Plaintiffs have objected that any information regarding their antipiracy efforts is irrelevant. The information RFP 59 seeks is relevant to at least four issues, including: (1) mitigation as an affirmative defense; (2) mitigation as a factor to be considered by the jury when deciding the just level statutory damages; (3) general deterrence as a factor to be considered by the jury when deciding statutory damages; and (4) context for the jury.

### i.    The information is relevant to the issue of mitigation.

Judge Jackson specifically permitted Charter to maintain its mitigation affirmative defense. ECF 162. While it remains an open question in the Tenth Circuit whether mitigation is a viable affirmative defense to defeat *liability* in a copyright infringement suit in which the plaintiff elects statutory damages, mitigation is still an important factor in calculating any fair amount of statutory damages. ECF 160 at 10; *see also* Charter's May 20, 2020 Supp. Ltr. Br. at 2 (citing cases).

The district courts in this Circuit that have rejected mitigation as a bar to liability all cite to a Tenth Circuit opinion that deals with penalties under ERISA, *Moothart v. Bell*, 21 F.3d 1499, 1506-1507 (10th Cir. 1994). Other courts have expressly rejected that approach in the copyright context. *See Malibu Media, LLC v. Julien*, 2013 WL 5274262, at *2 (S.D. Ind. Sept. 17, 2013) (rejecting *Moothart* because reasons for reliance on an ERISA statutory damages penalty provision is distinct from copyright cases where "the purpose of statutory damages is to serve a dual purpose of compensating the plaintiff for any actual damages that are not easily ascertainable and to deter future copyright infringement."). Thus, Charter respectfully submits that these district court cases were wrongly decided and *Moothart* is not binding

---

[3] Indeed, this research would largely consist of searching Wikipedia, Discogs.com, and other third-party websites, which Plaintiffs would surely refuse to authenticate.

[4] Charter's (narrowed) RFP 59 is as follows: "Documents sufficient to demonstrate the actions Plaintiffs took as related to the following anti-piracy measures, in addition to the cost for such measures, including but not limited to those involving the RIAA, the IFPI, the NMPA, and/or any other such organizations that assisted in these measures: P2P notice programs, P2P spoofing campaigns, Digital Rights Management (DRM) or other types of digital content-protection measures Plaintiffs implemented or, considered but elected not to implement, and threatened or actual litigation as related to alleged P2P infringement against individual users of P2P networks or entities developing or hosting P2P networks, such as BitTorrent, Ares, Gnutella, and eDonkey. Documents sufficient to demonstrate these measures could include internal or external presentations, reports, white papers, summaries, notes, correspondence, or other comprehensive documents regarding potential antipiracy measures, ongoing antipiracy measures, and the efficacy of antipiracy measures implemented."

precedent.[5] Charter intends to advance this position with Judge Jackson. Given that mitigation remains a defense here, Charter should not be foreclosed from gathering discovery to best present this argument.

Independent of the question of whether mitigation is a cognizable defense to avoid liability, mitigation is also relevant to a jury's determination of a "just" amount of statutory damages—which includes non-exhaustive factors about what is fair to award under the circumstances. These factors include but are not limited to "the degree of willfulness or inadvertence by the infringer; the deterrent purposes of the Copyright Act; the typical license fees charged for the use of the work; the expenses saved, and profits earned, by the infringer; and the revenue lost by the copyright holder." *Harrington v. Aerogelic Ballooning, LLC*, 2019 WL 2613334, at *9 (D. Colo. Apr. 25, 2019); *see also Bryant*, 603 F.3d at 144; *Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 313, 317 (S.D.N.Y. 2011)); *see also Grady v. Swisher*, 2014 WL 3562794, at *16 (D. Colo. July 18, 2014) (court may consider "revenues lost by the copyright holder and the "dilution of the value of Plaintiffs' copyrights"); *Grady v. Nelson*, 2014 WL 7143852, at *9 (same); *see also e.g.*, *Energy Intelligence Grp., Inc. v. Kayne Anderson Capital Advisors, L.P.*, 948 F.3d 261, 275 (5th Cir. 2020) (mitigation is relevant to the determination of the appropriate level of statutory damages, even if not as an defense).

Many courts also instruct the jury that it may consider the plaintiff's failure to mitigate, particularly as it relates to the plaintiff's actual harm, which is always a factor to be considered. *See Energy Intelligence Grp., Inc.*, 948 F.3d at 275 ("Hence, the district court appropriately instructed the jury to consider EIG's lost revenues and mitigation in determining the amount of statutory damages."); *UMG Recordings, Inc. v. Escape Media Grp., Inc.*, 2015 WL 1873098, at *8 (S.D.N.Y. Apr. 23, 2015) ("[T]he jury has broad discretion in determining how to award statutory damages and may consider actual damages as a factor in making that determination, a failure to mitigate damages may remain relevant, particularly because one purpose of statutory damages is to approximate actual damages that are difficult to prove."); *Julien*, 2013 WL 5274262, at *2 ("While the plaintiff may opt for statutory damages, the court may consider plaintiff's actual damages in making its determination… In determining Plaintiff's actual damages, it is reasonable for the court to consider the actions Plaintiff took to mitigate such damages."); *Malibu Media, LLC v. Tashiro,* 2014 WL 5488810, at *2 (S.D. Ind. Oct. 29, 2014) (same, collecting cases). This makes sense, as the amount that could have been spent should be weighed against Plaintiffs' request for windfall damages. Plaintiffs should not be incentivized to reduce their efforts to cooperate with ISPs to reduce infringement because seeking windfall statutory damages under the Copyright Act is far more lucrative.

Because courts consider the harm to plaintiffs from the alleged infringement, the issue of what Plaintiffs did here to mitigate that harm is squarely relevant. Plaintiffs allege that online P2P infringement "undercuts the legitimate music market, depriving Plaintiffs and those recording artists and songwriters whose works they sell and license the compensation to which they are entitled." First Am. Compl., ¶ 102. Charter is entitled to demonstrate the extent to which Plaintiffs could have avoided, and thus have failed to mitigate, those alleged harms.

---

[5] These cases also largely deal with copyright owners asserting the alleged infringement of pornography against individual defendants who typically do not assert robust defenses. Thus, they were largely decided on undeveloped factual records. None of them involve facts analogous to the present case, namely the music industry's effort to shift all responsibility to ISPs for online piracy, an issue that consumed many industries across the globe for decades.



July 16, 2020<br>Page 6

Plaintiffs will also no doubt put on evidence at trial here, as they did in *Sony Music Entertainment et al. v. Cox Communications, Inc. et al.*, No. 1:18-cv-950 (E.D. Va.) ("*Sony*"), that online piracy has decimated Plaintiffs' respective businesses since the onset of Napster in 1999 and suggest that Plaintiffs have undertaken reasonable measures to stop it. During opening statements, the *Sony* plaintiffs' counsel argued that "piracy is not a victimless crime" and "[a]rtists, composers, and everyone else connected to the music economy were losing money hand over fist from the piracy … ." *Sony* Trial Tr. 29:19-23 (Ex. 1). He explained the "devastating" effect of this piracy as follows:

> [P]eer-to-peer piracy had a devastating effect on the music industry. Between … 2004 and 2014, the use and enjoyment of music went through the roof … and so you would have expected that's great for the music industry. No, it wasn't. … [B]etween 2004 and 2014, because of peer-to peer piracy, annual revenues went down year after year and were cut in half, cut in half. So in 2008, the record industry began sending infringement notices to Cox. These infringement notices informed Cox about specific Cox subscribers who were infringing on music copyrights. These were the people running the digital music record stores.

*Id.* 38:20-39:19.

During trial, the *Sony* plaintiffs put on evidence from their expert Dr. Lehr, an MIT economist, who opined that "copyright infringement causes significant harm to rights holders," *id.* 1739:15-17, and "[c]opyright holders incur significant enforcement costs." *Id.* 1742:19-20. He explained that copyright holders' enforcement efforts are "a big disruption effect on their business models" and "their ability to pursue different ways to build out their business models has been adversely affected." *Id.* 1743:9-18. During closing statements, the *Sony* plaintiffs doubled-down on this theme, arguing that online piracy "was not a slow-down; [it] was a slaughter. Lost jobs, lost labels, lost revenue." *Id.* 2972:16-17. And in urging the jury to award the maximum amount of statutory damages ($1.5 billion), counsel argued that their harm justified that amount. *See id.* 2975:14-2976:6.

Charter intends to put Plaintiffs' arguments into context regarding Plaintiffs' alleged harm from online piracy. Specifically, Charter seeks to gather evidence from RFP 59 to support its position that Plaintiffs could have spent far less to help curb alleged infringement than Plaintiffs are seeking as damages though this lawsuit. This will provide a more complete history of online piracy, the effect it had on Plaintiffs' respective businesses, what could have been done to reduce it, and the resources Plaintiffs devoted to these efforts, particularly as compared to other expenses, such as salaries and bonuses. This will help the jury to decide (if it first finds liability) to what degree Charter should be held responsible for Plaintiffs' alleged harm as compared to allocating some level of responsibility to Plaintiffs themselves or even non-parties, such as the direct infringers themselves or the creators and maintainers of the P2P networks. Indeed, the DMCA safe harbor at issue in this case was created to ensure that innovation was not stifled with threats of astronomical liability for copyright infringement against service providers, and to encourage content owners to cooperate and work together with ISPs to combat infringement. Plaintiffs should not be able to avoid any assessment of the burdens they themselves declined to shoulder to do their part. This is especially true when Plaintiffs now seek to hold Charter liable for well over a billion dollars for alleged infringing activity by Charter's third party subscribers. *See UMG Recordings, Inc., et al., v. Bright House Networks, LLC,* 2020 WL 3957675, at *1 (M.D. Fla. July 8, 2020) (considering context of



Plaintiffs' decisions on who to sue when dismissing with prejudice vicarious liability claim, noting that Plaintiffs "do not seek relief against the creators of BitTorrent or any Bright House subscribers"), attached hereto as Exhibit 2.

### ii. The information is relevant to the issue of deterrence.

RFP 59 is also relevant to the issue of general deterrence, which is another factor a jury may consider when awarding statutory damages. *Bryant*, 603 F.3d at 144 ("When determining the amount of statutory damages to award for copyright infringement, courts consider… the deterrent effect on the infringer and third parties."); *Sony BMG Music Entm't v. Tenenbaum*, 660 F.3d 487, 503 (1st Cir. 2011) (approving the lower court's list of non-exhaustive factors for the jury to consider in issuing a statutory damages award, i.e. "… and the need to deter this defendant and other potential infringers."). Plaintiffs' Claim Period (March 2013 to May 2016) is a tolling agreement-created snap shot in the history of music industry piracy. It happens to cover a handful of years during which P2P piracy was spiking but, critically, before legitimate online streaming services like Spotify and Pandora exploded in popularity. It was only in the years following the Claim Period that P2P piracy precipitously dropped and Plaintiffs began to make astronomical amounts of money from streaming—made possible by ISPs like Charter. Indeed, it was recently reported that the "big three" labels made roughly $22.9 million every 24 hours from streaming in 2019, "roughly $953,000 every hour, until the fourth fiscal quarter when profits soared even higher, with Universal cracking over $1 billion, and the combined "big three" labels making $1.03 million an hour."[6]

Charter expects to show that Plaintiffs' antipiracy efforts were reduced from combatting P2P piracy to take advantage of what the internet had to offer and the revenues internet service could facilitate (such as through stream-ripping from Spotify or YouTube). If liability is found, such information has the potential to assist the jury in deciding whether a large statutory damages award is necessary to deter Charter and other ISPs from allegedly harboring this form of infringement when it no longer poses such a significant threat, as the benefits Plaintiffs enjoy from the internet vastly outweigh any harm.

### iii. The information is relevant as important context and background.

This information is also relevant as important context and background. Plaintiffs are the largest record companies and music publishers in the world—multi-billion-dollar music conglomerates that already make hundreds of millions of dollars each year through legal streaming by internet users— including through Charter's ISP systems. Their antipiracy efforts are coordinated by the powerful trade organizations the International Federal of the Phonographic Industry ("IFPI"), the Recording Industry Association of America ("RIAA"), and the National Music Publishers Association ("NMPA"), among others. Plaintiffs and their representatives are a force in everything that they do, from sourcing talent, producing, releasing, and promoting music, exploiting music through myriad channels, and, importantly, protecting it. Plaintiffs' documents are undoubtedly a rich source of information as to how P2P piracy can be stopped, what Plaintiffs did or did not do to stop it, and what else, if anything, anyone, including Plaintiffs, Charter, or non-parties, could have done to reduce any impact or harm.

### III.    RFP NO. 61 REGARDING THE *GRANDE* TRANSCRIPTS AND DECLARATIONS

---

[6] *See* Michael Broerman, *Report: Major Labels Make $1 Million An Hour From Streaming*, Live for Live Music (Feb. 27, 2020), *available at* https://liveforlivemusic.com/news/major-labels-streaming/



July 16, 2020
Page 8

RPF 61 seeks deposition transcripts and under seal declarations of Plaintiffs' representatives from *Grande*. Plaintiffs have agreed to produce these transcripts, but seek to unilaterally redact testimony about either Rightscorp or the defendant in that case, Grande Communications (even though they do not represent the defendant Grande—they sued Grande) on relevance grounds. There is of course a reason Plaintiffs want to go to the trouble of redacting testimony about Rightscorp: it would deprive Charter of key information to rebut the reliability of Rightscorp's notices, which Plaintiffs intend to rely heavily on in this case.[7]

*Grande* is another copyright case brought by a group of record companies against an ISP—many of which are the same Plaintiffs in this case. In both cases, the plaintiff record companies assert infringement of thousands of works, and they share at least the following additional commonalties: (i) the record companies' purported ownership of those works are at issue, including the practice of registering, protecting, and exploiting those works; (ii) the record companies assert that they have been harmed by rampant P2P infringement, particularly as a result of actions (or inaction) of ISPs; (iii) the record companies' purported harm is at issue, including both their general harm dating back to the onset of Naptser in 1999 and specific harm from the alleged instances of infringement at issue in each case; (iv) the record companies' antipiracy efforts are at issue; and (v) the level of infringement the record companies observed during the overlapping claims periods, what the record companies did in response to that infringement, and the results are at issue. Accordingly, many of the same representatives deposed in *Grande* will likely be deposed here (as was the case in *Sony*).

Not only are there many relevant overlapping topics, Charter should be entitled to view this information—unredacted—for potential impeachment material. Charter can of course ask Plaintiffs many of the same questions their representatives were asked in *Grande*. Charter also seeks these transcripts in order to confirm Plaintiffs' positions on issues germane to this case, to investigate whether Plaintiffs' positions have changed over the last several years, to exploit prior inconsistent statements, test credibility, and ensure that Charter has the most complete set of information for purposes of defending against Plaintiffs' astronomical claims. It is axiomatic that this type of impeachment evidence is relevant and that such discovery is routinely permitted. *Lillibridge v. Nautilus Ins. Co.*, , 2013 WL 1896825, at *8 (D.S.D. May 3, 2013); *Abel v. Mylan, Inc.*, 2010 WL 3910141, at *4 (N.D. Okla. Oct. 4, 2010).[8]

Further, Plaintiffs' unworkable proposal to redact material relating to the defendant "Grande" could conceivably extend to substantial amounts of information, as nearly everything in that case will relate in some sense to Grande. Moreover, regardless of whether all of Plaintiffs' communications about Rightscorp have been ordered produced in this case, Plaintiffs have sought and obtained data from Charter regarding **millions and millions of Rightscorp notices** that they plan to present at trial, as they did in *Sony*. Charter must be permitted to inquire into Plaintiffs' sworn testimony about such notices to test them against any statements about Rightscorp notices that they make in this case. To the extent Plaintiffs do have relevance objections as to certain information in the *Grande* transcripts, those objections should be resolved by Judge Jackson at an appropriate stage prior to or at trial.  Plaintiffs, therefore, should be compelled to produce these transcripts, unredacted, and reserve their relevance arguments for trial, if necessary.

---

[7] The Special Master has already held in this case that unilateral relevance redactions are inappropriate when they are redacting potentially relevant material. ECF 164 at 10.

[8] It should be noted that in *Sony*, Plaintiffs requested Cox's deposition transcripts from a prior mass P2P infringement lawsuit in which Cox was a defendant (*BMG Rights Mgm't (US) LLC v. Cox Communications, Inc. et al.*, Case No. 1:14-cv-1611 (E.D. Va.)), which Cox provided and Plaintiffs used extensively in *Sony*.



### IV. DOCUMENTS SUFFICIENT TO DEMONSTRATE WHICH FILES WERE FINGERPRINTED

During the July 2, 2020 conference, Charter sought an order requiring Plaintiffs to respond to RFPs 90 and 91, which seek the Audible Magic Reference Files and fingerprints, respectively. In response, Plaintiffs had interposed only relevance and burden objections. At that hearing, however, nearly four months after initially responding to these requests, many rounds of briefs and hearings, and many meet and confers, Plaintiffs for the first time said that they could not identify the actual files used to create the Reference Files and that Plaintiffs did not retain the fingerprints because they did not consider them relevant. July 2 Hr'g Tr. 138:23-139:9, 142:10-18, 149:12-151:18 (Ex. 3). The Special Master noted the critical significance of this evidence, *id.* 153:21-154:2, 155:21-156:6, but acknowledged that she could not order Plaintiffs to produce what they had failed to retain. *Id.* 138:23-139:9, 142:10-18, 149:12-151:18.

In light of this revelation, following the hearing, Charter's counsel asked Plaintiffs to produce documents sufficient to demonstrate *which files* were fingerprinted. Charter pointed out that Plaintiffs' failure to retain this information, and refusal to disclose how they compared the ISRCs of the files produced to what was used to create the Reference Files, necessitated the production of this information. Charter also pointed to existing RFPs that encompassed this information. The parties met and conferred on this issue twice. Plaintiffs refused to produce the requested documentation, claiming that it is not requested by Charter's RFPs and is work product. They also refused to log the documentation.

What Charter seeks is simple. This information is necessitated by Plaintiffs' admitted failure to retain indisputably critical information. It is squarely encompassed by several outstanding requests, to which Plaintiffs agreed to respond.[9] Accordingly, Plaintiffs should be ordered to produce documents sufficient to show which files were fingerprinted, including the information upon which Plaintiffs relied in order to represent that the digital files Plaintiffs have produced to date have the same ISRCs as the files from which Audible Magic Reference Files were created.

### V. OTHER DOCUMENTS IDENTIFIED IN THE RIAA'S 2016 AGREEMENT WITH MARKMONITOR

On May 29, 2020, the Special Master ordered Plaintiffs to produce their litigation consulting agreements with MarkMonitor. ECF 181 at 7-8. As a result, Plaintiffs produced a January 29, 2016 agreement entered into between the RIAA and MarkMonitor. *See* Ex. 4 (PL_CH_0083049) (the "2016 RIAA/MM Agreement"). In connection with Charter's briefing on privilege log-related issues, Charter requested Plaintiffs produce the Excel spreadsheet that is referenced in this agreement (the "Hash Report), which they had logged on their privilege log and are withholding as work product. The 2016 RIAA/MM

---

[9] RFP 92: Documents and communications sufficient to show the process used to create the digital fingerprints for the Copyrighted Works used by Audible Magic and/or MarkMonitor to match alleged infringements; RFP 93: All Communications between You and MarkMonitor or Audible Magic exchanged for the purpose of matching of alleged infringing files of the Copyright Works by Charter subscribers with digital copies of the Copyright Works, including but not limited to regarding copies of all files, or portions, or derivatives thereof (including any hashes, digital fingerprints, or checksums of files or portions of files) used as a reference for the purposes of fingerprinting, identifying, or verifying that files are copies of the Copyright Works.



July 16, 2020<br>Page 10

Agreement also identifies several other categories of documents Plaintiffs have not produced—or even logged on their privilege log—which are directly responsive to Charter's outstanding requests.[10]

The 2016 RIAA/MM Agreement states that the RIAA was to provide MarkMonitor (1) "with a list of up to 7200 hashes" which MarkMonitor was supposed to try to download from the Internet. This process was to continue for one month and "[h]ashes that could not be obtained by the end of the one-month period [would] be considered unavailable." For the files successfully located, (2) "those files [were to] be processed against Audible Magic fingerprinting for identification and verification," (3) "MarkMonitor will record packet capture logs to track when and where the files associated with these hashes are downloaded," and (4) "MarkMonitor will deliver a copy of the files downloaded and associated logs/back-up material to RIAA." The 2016 RIAA/MM Agreement also states that (5) "MarkMonitor will provide a report in Excel format to show a list of all successfully downloaded files associated with those hashes with the individual audio tracks extracted to show the full volume of audio tracks"—the Hash Report.[11] Plaintiffs have now (after first resisting and then being ordered to do so by the Special Master) produced items (3) and (4) listed above. At issue is Plaintiffs' refusal to produce the remaining three categories of information generated by MarkMonitor under the 2016 RIAA/MM Agreement or to even log them on their privilege log. During meet and confer they said they would not do so because it was not called for by Charter's requests or was work product.

Beyond these documents specified in the 2016 RIAA/MM Agreement, Plaintiffs have still not produced *any* communications with MarkMonitor relating to the 2016 RIAA/MM Agreement or the work done pursuant to it. Nor have they produced any documents showing why RIAA elected to commission the project governed by the 2016 RIAA/MM Agreement or any evaluation of MarkMonitor's findings, any requested follow-up, or, indeed, anything regarding the project except for the information that was produced on the Hard Drive that was the subject of much litigation before the Special Master; namely, the downloaded recordings and the packet capture files. Plaintiffs have also refused to log any of this material on their privilege log. All of these documents are squarely responsive to Charter's outstanding requests. Plaintiffs should be compelled to produce the referenced documents, and any others responsive to Charter's requests, as previously ordered. *See* ECF 181.

Very truly yours,

*s/ Jennifer A. Golinveaux*

---

[10] RFP 55: All communications with MarkMonitor regarding the Copyright Works and/or copyright infringement notices considered, prepared, or sent to Charter or its account holders, subscribers, or customers; RFP 62: All documents concerning the RIAA and either this lawsuit, Charter, CAS, MarkMonitor, and/or the Copyright Works; RFP 63: All documents pertaining to the relationship, agreement, and/or communications between You and/or any other Plaintiff and the RIAA and/or MarkMonitor regarding this lawsuit, the Copyright Works, and/or Charter; RFP 84: All documents concerning the company Audible Magic and/or its technology, including without limitation, the use of Audible Magic's technology to identify the alleged infringements at issue in this litigation; *see also* RFPs 92-93 (*supra*, n.9).

[11] A "hash" that identifies a shared file may refer to a file that consists of a single song or track; but, more frequently, the shared file consists of multiple tracks. Multiple tracks would be shared as part of a single file in the case where the file being shared is a copy of an album, or a copy of a user's collection of the works by an artist.