# Exhibit 5

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00874-RBJ-MEH

_____

WARNER BROS. RECORDS INC., et al.,

Plaintiffs,

vs.

CHARTER COMMUNICATIONS, INC.,

Defendant.

_____

TELEPHONIC HEARING

May 15, 2020

_____

        This telephonic hearing was taken before
Special Master Regina Rodriguez on May 15, 2020, at
10:02 a.m. Mountain Standard Time before K. Michelle
Dittmer, Registered Professional Reporter and Notary
Public within the state of Colorado.

(The reporter, K. Michelle Dittmer, appearing remotely
via telephone)

Telephonic Hearing
May 15, 2020

Page 2

```
 1    A P P E A R A N C E S
 2    ON BEHALF OF THE PLAINTIFF WARNER BROS. RECORDS INC.:
 3            MATTHEW J. OPPENHEIM, ESQ.
              JEFFREY M. GOULD, ESQ.
 4            Oppenheim & Zebrak LLP
              4530 Wisconsin Avenue N.W.
 5            5th Floor
              Washington, DC 20016
 6            Phone: 202-480-2999
              Email: matt@oandzlaw.com
 7            Email: jeff@oandzlaw.com
              (appeared telephonically)
 8
 9            JONATHAN MICHAEL SPERLING, ESQ.
              Covington & Burling LLP
10            620 Eighth Avenue
              The New York Times Building
11            New York, New York 10018-1405
              Phone: 212-841-1153
12            Email: jsperling@cov.com
              (appeared telephonically)
13
14            NEEMA T. SAHNI, ESQ.
              Covington & Burling LLP
15            1999 Avenue of the Stars
              Suite 3500
16            Los Angeles, California 90066-4643
              Phone: 424-332-4757
17            Email: nsahni@cov.com
              (appeared telephonically)
18
19
20
21
22
23
24
25
```

Telephonic Hearing
May 15, 2020

Page 3

```
 1    ON BEHALF OF THE DEFENDANT:
 2              MICHAEL STUART ELKIN, ESQ.
                SEAN R. ANDERSON, ESQ.
 3              CESIE C. ALVAREZ, ESQ.
                Winston & Strawn, LLP
 4              200 Park Avenue
                New York, New York 10166-4193
 5              Phone: 212-294-6729
                Phone: 212-294-5388
 6              Email: melkin@winston.com
                Email: sranderson@winston.com
 7              Email: calvarez@winston.com
                (appeared telephonically)
 8
                JENNIFER ANN GOLINVEAUX, ESQ.
 9              Winston & Strawn, LLP
                101 California Street
10              Suite 3400
                San Francisco, California 94111-5802
11              Phone: 415-591-1506
                Email: jgolinveaux@winston.com
12              (appeared telephonically)
13              ERIN R. RANAHAN, ESQ.
                Winston & Strawn, LLP
14              333 South Grand Avenue
                Los Angeles, California 90071
15              Phone: 213-615-1835
                Email: eranahan@winston.com
16              (appeared telephonically)
17              CRAIG D. JOYCE, ESQ.
                Fairfield & Woods, P.C.
18              1801 California Street
                Suite 2600
19              Denver, Colorado 80202-2645
                Phone: 303-830-2400
20              Email: cjoyce@fwlaw.com
                (appeared telephonically)
21
22
23
24
25
```

Telephonic Hearing
May 15, 2020

```
 1              P R O C E E D I N G S
 2        REPORTED REMOTELY FROM ARVADA, COLORADO
 3              SPECIAL MASTER RODRIGUEZ:  Thank you.  And
 4   let's go ahead and -- sounds like we have everybody,
 5   right?  Well, I guess we'll see when we do the entries of
 6   appearance.  We should have this down by now.  Seems like
 7   we just did this a couple days ago.
 8              All right.  Well, I trust everyone's still
 9   at home.
10              AUTOMATED VOICE ON CONFERENCE CALL:  Erin
11   Ranahan has left the meeting.
12              SPECIAL MASTER RODRIGUEZ:  We lost
13   Ms. Ranahan, it sounds like, for a moment.
14              (Discussion off the record.)
15              SPECIAL MASTER RODRIGUEZ:  Well, let's go
16   ahead and get started.
17              We're here on Warner Records versus
18   Charter Communications, Case Number 19-cv-00874.
19              Will the parties please enter their
20   appearances, starting with plaintiffs.
21              MR. OPPENHEIM:  Good morning,
22   Ms. Rodriguez.  This is Matt Oppenheim, and I believe my
23   colleague from Oppenheim & Zebrak, Jeff Gould, is on the
24   line, as well as Jonathan Sperling and Neema Sahni from
25   Covington.
```

Telephonic Hearing
May 15, 2020

```
 1                    SPECIAL MASTER RODRIGUEZ:  Okay.

 2                    MS. GOLINVEAUX:  And good morning,

 3        Ms. Rodriguez.  It's Jennifer Golinveaux at Winston &

 4        Strawn.  And with me are my colleagues, Michael Elkin,

 5        Erin Ranahan, and I believe Sean Anderson and Cesie

 6        Alvarez.

 7                    SPECIAL MASTER RODRIGUEZ:  Okay.

 8                    MR. JOYCE:  And this is Craig Joyce, local

 9        counsel for Charter.

10                    SPECIAL MASTER RODRIGUEZ:  All right.

11        Good morning, Mr. Joyce.

12                    All right.  So we've got -- this is part

13        of our regularly scheduled hearings for once a month, and

14        I have both the plaintiffs', as well as the defendant's,

15        motions to compel.

16                    I guess my first question is, have any of

17        these issues been resolved and do we need to address

18        everything, or are there some issues that we no longer

19        need to address today?

20                    MR. OPPENHEIM:  So, Ms. Rodriguez, this is

21        Matt Oppenheim on behalf of plaintiffs.

22                    In terms of our issues, I think those

23        issues are still live and need to be addressed.  I

24        believe --

25                    SPECIAL MASTER RODRIGUEZ:  Okay.
```

Telephonic Hearing
May 15, 2020

```
 1                    MR. OPPENHEIM:  -- on the defendant's
 2   side -- and obviously they'll speak for themselves -- I
 3   believe that one of their requests for production we --
 4   based on the new information that was provided in their
 5   filing with respect to RFP 25, we're now going back and
 6   identifying some additional custodians.
 7                    But we only got that information for the
 8   first time in what they filed with you, so we're in that
 9   process.
10                    I will note -- and, obviously, hope the
11   defendants can speak for what -- if they think some of
12   the issues have been resolved -- there are an enormous
13   number of issues before us today and --
14                    SPECIAL MASTER RODRIGUEZ:  Yeah.
15                    MR. OPPENHEIM:  -- cognizant of how
16   lengthy our hearing went -- not on Wednesday, though that
17   one went long as well -- but a month ago on a shorter
18   list of issues.
19                    We recognize -- and I'm not trying to put
20   the thumb on the scale either way in terms of whose
21   issues get addressed -- it may be appropriate that some
22   of these issues we put over to another conference
23   scheduled very soon thereafter because, obviously, at
24   some point fatigue sets in with all of us on the phone
25   here.
```

Telephonic Hearing
May 15, 2020

1          So I just offer that up as an observation

2    that the plaintiffs were discussing earlier.

3          SPECIAL MASTER RODRIGUEZ:  Well, it seems

4    that we're on the same wavelength because if this hearing

5    goes as the last one did, I just don't see that there's

6    any way we'll finish all of this today.

7          So I do think we should talk about

8    breaking this up.  Happy to hear from the defendants, as

9    well, as to whether or not there are any issues -- any

10   issues that have been resolved and their thoughts about

11   breaking this up.

12         MS. GOLINVEAUX:  Thank you.  It's Jennifer

13   Golinveaux for Winston.

14         I believe that all the issues we raised in

15   our motion are -- are still live, but I'm going to defer

16   to Ms. Ranahan to confirm that, as she's handling that

17   part of the argument today.

18         MS. RANAHAN:  Yes.  So I would say there's

19   one issue that's partially resolved, and that is that

20   we -- it's the last issue we raised, in that plaintiffs

21   have now produced plaintiff-specific hit reports, so that

22   issue is -- it's the very last issue on our -- on our

23   letter.

24         There is an issue about whether they'll

25   agree to do that in the future, but we can raise that if

Telephonic Hearing
May 15, 2020

```
 1    they -- if, you know, that comes to be an issue again.
 2              SPECIAL MASTER RODRIGUEZ:  Okay.  All
 3    right.  Well, that's one issue.  We'll take what we can
 4    get on this.  That's fine.
 5              I guess, in my mind, I thought that
 6    probably it would make sense to address the issues by
 7    party, and my initial thought was that we would this time
 8    start with defendant's motions to compel -- motion to
 9    compel and their issues, followed by the plaintiffs.
10              It may be that we move that to Monday, but
11    if there is something urgent or there is some reason to
12    reverse that order, I'm perfectly happy to do that, if
13    somebody has a concern about that.
14              So I'll let you guys comment on that one.
15              MR. OPPENHEIM:  You know, as the
16    plaintiffs, we'd obviously like to get our issues
17    resolved.  And given that our list, I believe, is shorter
18    than the defendant's list, would have preferred that our
19    issues go first, obviously.  That's probably not
20    surprising.
21              And -- and I don't know what scheduling
22    issues we're going to face in -- in trying to
23    reschedule -- schedule another -- a follow-on.  Maybe we
24    could alternate one issue plaintiffs, one issue
25    defendants, and we're back -- or, sorry, one issue
```

Telephonic Hearing
May 15, 2020

```
 1   defendants, one issue plaintiffs, one issue defendants,
 2   one issue plaintiffs.  That way, we're not putting a
 3   thumb on the scale either way.
 4              SPECIAL MASTER RODRIGUEZ:  I think, in
 5   theory, that might be an approach.  The problem I have
 6   is, is that many of these issues are not separate and
 7   distinct issues, so I fear that by splitting things up,
 8   we may lose some efficiency there, to the extent we have
 9   any.
10              But please, defense counsel, feel free to
11   weigh in.
12              MS. GOLINVEAUX:  It's Jennifer Golinveaux.
13              I think -- I think we agree with you,
14   Ms. Rodriguez, that some of the issues are related on the
15   respective motions, so it's probably more efficient to go
16   party-by-party.  And we're happy to go with our motion
17   first this time just in the interest of, I think we
18   started with the plaintiffs' motion last time, so we can
19   continue to go back and forth in these hearings to the
20   extent we continue to have them.
21              SPECIAL MASTER RODRIGUEZ:  I mean, that
22   seems like a fair approach, that we can shift back and
23   forth.  I will say, candidly, there were some of the
24   issues that were raised by defendants that I feel like I
25   need to go back and look at in more detail, so I may not
```

Telephonic Hearing
May 15, 2020

```
 1    be able to reach a conclusion today, but we can certainly
 2    get started and get these underway.
 3                    It looks like -- yes, that was on my list
 4    of things that we should be able to resolve quickly, is
 5    Charter's request for plaintiffs' specific hit reports.
 6    So it sounds like that has been resolved and plaintiffs
 7    have represented that they either have provided that
 8    information or will provide -- I'm sorry if I missed
 9    that.  Which is it, Counsel?  Is it have provided or --
10                    MR. OPPENHEIM:  Yes.
11                    SPECIAL MASTER RODRIGUEZ:  -- will
12    provide?
13                    MR. OPPENHEIM:  Yes, Ms. Rodriguez.  It's
14    Matt Oppenheim.
15                    Yes, we have provided it.
16                    SPECIAL MASTER RODRIGUEZ:  Okay.
17                    MR. OPPENHEIM:  Before we launch into the
18    substance, just to make sure that -- that the plaintiffs
19    are on a schedule, can we schedule the hearing, the
20    next -- the continuation now, so we don't end up at the
21    end of this realizing that it's going to take us two
22    weeks or a week to get -- to reconvene?
23                    SPECIAL MASTER RODRIGUEZ:  Sure.
24                    MR. OPPENHEIM:  Would that be acceptable?
25                    SPECIAL MASTER RODRIGUEZ:  Yes, that seems
```

Telephonic Hearing
May 15, 2020

Page 11

```
 1    fair.
 2                    Depending on how much time we're going to
 3    take, I can make time available on Monday afternoon,
 4    commencing approximately 1:00 -- commencing at 1:30
 5    Mountain Time.
 6                    MR. OPPENHEIM:  I believe that works for
 7    all of the plaintiffs' counsel, Ms. Rodriguez.
 8                    SPECIAL MASTER RODRIGUEZ:  Okay.
 9                    MS. GOLINVEAUX:  And it's Jennifer
10    Golinveaux at Winston.
11                    That works for me, and I'll ask Mr. Elkin
12    and Ms. Ranahan if that works for them as well.
13                    MS. RANAHAN:  That works --
14                    MR. ELKIN:  Mr. Elkin --
15                    MS. RANAHAN:  -- for me.
16                    MR. ELKIN:  -- here.  Fine.
17                    SPECIAL MASTER RODRIGUEZ:  Okay.  So
18    Monday at 1:30 Mountain.
19                    MS. RANAHAN:  Thank you.
20                    SPECIAL MASTER RODRIGUEZ:  Is that -- is
21    that soon enough?
22                    MR. OPPENHEIM:  Yeah.
23                    SPECIAL MASTER RODRIGUEZ:  I hope that's
24    soon enough, that that satisfies the plaintiffs'
25    concerns.
```

Telephonic Hearing
May 15, 2020

Page 12

```
 1                   MR. OPPENHEIM:  Yes, Ms. Rodriguez, it
 2   does, unless you want to go on Saturday.
 3                   SPECIAL MASTER RODRIGUEZ:  You know what?
 4   There's only one benefit to being the Special Master, and
 5   I get to say no to that one on this occasion.
 6                   All right.  So we will plan to take that
 7   up -- this up and start with plaintiffs' motion to compel
 8   on Monday.  To the extent we're not able to complete
 9   anything today on defendants, we can do that.
10                   If by some --
11                   AUTOMATED VOICE ON CONFERENCE CALL:
12   (Unintelligible) has left the meeting.
13                   SPECIAL MASTER RODRIGUEZ:  -- you know --
14   uh-oh.
15                   If by some magic we're able to get through
16   defendant's motion more quickly today, we can certainly
17   start on plaintiffs'.
18                   All right.
19                   MR. OPPENHEIM:  So one last preliminary --
20   I apologize, Ms. Rodriguez.
21                   SPECIAL MASTER RODRIGUEZ:  Uh-huh.
22                   MR. OPPENHEIM:  It's Matt Oppenheim again.
23                   You had asked us on Wednesday about the --
24   a question about whether we had any thoughts on changing
25   the overall process, and I don't -- didn't know whether
```

Telephonic Hearing
May 15, 2020

Page 13

```
 1   you wanted to address that up-front --
 2                   AUTOMATED VOICE ON CONFERENCE CALL:
 3   (Unintelligible) has joined the meeting.
 4                   MR. OPPENHEIM:  -- or at the end.
 5                   SPECIAL MASTER RODRIGUEZ:  Let's do the
 6   hard stuff first and see what our --
 7                   MR. OPPENHEIM:  Okay.
 8                   SPECIAL MASTER RODRIGUEZ:  -- capacity is
 9   once we get through the defendant's motion.  If we have
10   time today --
11                   MR. OPPENHEIM:  Very well.
12                   SPECIAL MASTER RODRIGUEZ:  -- we can
13   address it.
14                   MR. OPPENHEIM:  Absolutely.
15                   SPECIAL MASTER RODRIGUEZ:  And I guess,
16   you know, you all can decide as to whether or not you
17   want to have a court reporter for that discussion.  Seems
18   to me that that would be more of an informal discussion
19   to see what's working and what's not; but to the extent
20   you want a reporter, you're certainly welcome to have
21   that.  But that might be something that you don't want to
22   go to the expense for.
23                   All right.  But thanks for reminding us of
24   that.
25                   The other issue, just so you all know, I
```

Telephonic Hearing
May 15, 2020

```
 1   haven't forgotten about the order that needs to go to the
 2   court.  I wanted to check in with Judge Hegarty to see if
 3   he wants -- what the form is that he wants that.
 4               Normally, I think I would just send that
 5   to him by email, but he may want more context here.  So I
 6   just wanted to check in with him first, but I do know
 7   that we need to do that because it triggers timing for
 8   other things, so it hasn't fallen off the radar.  I will
 9   get that done.
10               MS. GOLINVEAUX:  It's Jennifer Golinveaux.
11               Thank you, Ms. Rodriguez, and I ginned up
12   the PII stipulation that you're -- stipulated order.
13               SPECIAL MASTER RODRIGUEZ:  Yeah.
14               MS. GOLINVEAUX:  And our concern there, to
15   be clear, is that if subscribers do object to the
16   disclosure, since they'll likely be filing that with the
17   court, we wanted to be sure that Judge Jackson and
18   Judge Hegarty were aware of the stipulated order that you
19   are entering.
20               SPECIAL MASTER RODRIGUEZ:  Exactly.  Well,
21   and I think the order needs to come from them, not from
22   me.
23               MS. GOLINVEAUX:  Right.
24               SPECIAL MASTER RODRIGUEZ:  I think the
25   court should enter that order, not me.
```

Telephonic Hearing
May 15, 2020

Page 15

```
 1                    MS. GOLINVEAUX:  Yeah, yeah.
 2                    SPECIAL MASTER RODRIGUEZ:  So I just
 3   wanted to check in with Judge Hegarty as to exactly how
 4   he wants that done.  Like -- I agree with you, they need
 5   to know about it.
 6                    MS. GOLINVEAUX:  Okay.  Thank you.
 7                    SPECIAL MASTER RODRIGUEZ:  All right.  Is
 8   that it for the preliminaries?
 9                    MR. OPPENHEIM:  Yes.  Thank you,
10   Ms. Rodriguez.
11                    SPECIAL MASTER RODRIGUEZ:  Okay.  All
12   right.  So let me see here, look at my notes on this.
13                    All right.  So with regard -- let's just
14   start with Charter's request for documents that mention,
15   refer to, or relate to Charter and the above-captioned
16   litigation that were created, received, or sent from 2013
17   to the present.
18                    And this really relates to Request
19   Number 27 specifically, but also Requests 55, 56, 62,
20   looks like 64.  In here, the defendant has requested
21   documents through 2019, but the plaintiff points out that
22   the claim period is through 2016.
23                    I must say, I'm not exactly clear as to
24   the rationale for documents and information up to the
25   present.  So I'd appreciate it if defense counsel would
```

Telephonic Hearing
May 15, 2020

```
 1   address that particular issue.
 2                MS. RANAHAN:   Sure.   Thank you,
 3   Ms. Rodriguez.   This is Erin Ranahan.
 4                And we have -- we actually did propose
 5   that claim period for most of the requests.   For these,
 6   these involve communications involving and relating to
 7   the third parties that were involved with the factual
 8   basis underlying the infringement, the alleged
 9   infringements in this case.
10                So this would involve communications, you
11   know, with and regarding MarkMonitor, Audible Magic, the
12   RIAA.   So -- and these instances, these requests would
13   involve communications that would have been, you know,
14   talking about the evidence, gathering the evidence.   And
15   one example, for instance, is, you know, discussions
16   about the MarkMonitor hard drive, which I know you heard
17   a lot about.
18                But so these requests are, in particular,
19   things that we believe would have been discussing things
20   that happened during the claim period after the claim
21   period.   So that's our rationale for these particular
22   requests.
23                SPECIAL MASTER RODRIGUEZ:   Okay.   But as I
24   understand it -- and I could have this wrong -- but the
25   plaintiffs are saying that a -- in the first instance,
```

Telephonic Hearing
May 15, 2020

1   they don't believe that that information exists where

2   that was done.

3                    I guess I'd like to hear from plaintiffs

4   on that issue.

5                    MR. OPPENHEIM:  Mr. Sperling, do you want

6   to start on the issue of the time period, and I can pick

7   up on the issue of the custodians?

8                    MR. SPERLING:  Sure.  Sure.

9                    Good afternoon -- or good morning,

10  Ms. Rodriguez.  Jonathan Sperling.

11                   I think we view this the same way as you

12  do, Ms. Rodriguez.  I'm not clear at all why the

13  post-period documents are relevant.  Anything having to

14  do with the factual investigation that was performed

15  would -- would have been done by counsel.

16                   And so almost by definition, you know,

17  insofar as that's what they're asking for, then they're

18  asking for privileged documents.

19                   I would point out also that the request is

20  not -- is not limited in that way, but know that

21  documents having to do with the factual investigation, it

22  might have been after the claim period about the claim

23  period, so it's work product and it's going to be

24  privileged.

25                   It's also just unworkable as a practical

Telephonic Hearing
May 15, 2020

Page 18

```
 1   matter, so there's no real way for us, you know, to
 2   conduct a search -- even if it otherwise, you know, made
 3   sense, to construct a search of documents dated after
 4   2016 that's limited to documents that concern things that
 5   happened before 2016.
 6               SPECIAL MASTER RODRIGUEZ:  Okay.
 7               MR. SPERLING:  So given -- given all that,
 8   we're just having difficulty sort of seeing -- you know,
 9   it's a relevance issue, how it's not just going to sweep
10   in exclusively privileged materials and how, as a
11   practical matter, you could even construct this search.
12               SPECIAL MASTER RODRIGUEZ:  Okay.
13               MS. GOLINVEAUX:  Ms. Rodriguez, if I could
14   respond to that point.  It's Jennifer Golinveaux.
15               SPECIAL MASTER RODRIGUEZ:  Yes,
16   Ms. Golinveaux.
17               MS. GOLINVEAUX:  Thank you.
18               So Mr. Sperling raised the privilege
19   issue.  I didn't hear him say that the documents didn't
20   exist, but he thought they would likely be privileged
21   because they would have likely been investigations
22   conducted by counsel.
23               But to be clear, these requests are
24   focused on documents and correspondence with third
25   parties, the third parties who created and generated the
```

Telephonic Hearing
May 15, 2020

1    foundational evidence of the alleged infringements in

2    this case.   Plaintiffs have never, to our knowledge,

3    taken the position that the correspondence between

4    plaintiffs' agents and their lawyers and these third

5    parties are privileged.

6                    So if they are taking that position now,

7    we certainly think they're relevant, those investigations

8    into those -- into that evidence; and if they're taking

9    that position, we're entitled to see a formal privilege

10   log and have the opportunity to challenge that.

11                   I'll further point out that with respect

12   to evidence like the hard drive you were told about from

13   MarkMonitor and other evidence, it appears -- but we

14   don't know because we haven't received it all yet -- that

15   a lot of the evidence was gathered long after plaintiffs

16   stopped sending notices to Charter in an effort to kind

17   of bolster the evidence of infringement.

18                   So, for example, the alleged infringing

19   files that MarkMonitor purportedly copied from the

20   peer-to-peer network, those were not done before or in

21   proximity with the notices; those were done well after

22   that, sometime in 2016 and some even later.

23                   So these are very important documents.

24   We're entitled to see the same evidence that the

25   plaintiffs see with respect to these alleged direct

Telephonic Hearing
May 15, 2020

```
 1   infringements and to test that evidence.
 2                  SPECIAL MASTER RODRIGUEZ:  Okay.
 3                  MR. SPERLING:  Ms. Rodriguez, Jonathan
 4   Sperling again.  Just quickly.
 5                  Talking about communications with
 6   MarkMonitor.  I mean, they're -- they're our litigation
 7   consultant, right?  We work with them for purposes of
 8   crafting program and strategizing for the litigation, and
 9   so the fact that they are a third party doesn't bear on
10   the privilege status of -- of the information or the
11   documents at all.
12                  And I'm also a little bit confused, I
13   confess, because Request Number 27 is not at all limited
14   to communications with third parties.  And the proposal
15   by defendant is that we should have to produce everything
16   responsive to that request as drafted.  It says:  All
17   documents that mention, refer to, or relate to Charter
18   and/or the above-captioned litigation, and then it's got,
19   you know, 2013 to the present.
20                  So the request is not limited to
21   communications with third parties.  Communications with
22   third parties, in fact, they're talking about are
23   privileged documents, and so we're still left, I think,
24   scratching our head on this a bit.
25                  SPECIAL MASTER RODRIGUEZ:  Okay --
```

Telephonic Hearing
May 15, 2020

```
 1                    MS. GOLINVEAUX:  And --
 2                    SPECIAL MASTER RODRIGUEZ:  -- what --
 3                    MS. GOLINVEAUX:  -- Ms. Rodriguez.
 4                    SPECIAL MASTER RODRIGUEZ:  Go ahead.
 5                    MS. GOLINVEAUX:  Just to put a final point
 6     upon it.  It's clear -- I think it's clear to you by now
 7     that plaintiffs are channeling certain evidence that
 8     MarkMonitor gathered, they're having it sent to them and
 9     then trying to produce it to us.
10                    We are entitled to understand what
11     plaintiffs have received from MarkMonitor.  And if
12     plaintiffs are, in fact, claiming privilege into those --
13     which they never formally have -- we're entitled to a
14     formal privilege log so we can test that privilege, that
15     privilege claim, that work product claim.
16                    SPECIAL MASTER RODRIGUEZ:  Okay.  All
17     right.
18                    MS. RANAHAN:  Ms. Rodriguez --
19                    SPECIAL MASTER RODRIGUEZ:  And here's
20     the -- yes?
21                    MS. RANAHAN:  Oh, sorry.  Sorry.
22                    What I was going to say is, there was a --
23     we have also requested a litigation --
24                    SPECIAL MASTER RODRIGUEZ:  Can you --
25                    MS. RANAHAN:  -- consultant --
```

Telephonic Hearing
May 15, 2020

Page 22

```
 1                    SPECIAL MASTER RODRIGUEZ:  -- please
 2     identify who this is that's speaking?
 3                    MS. RANAHAN:  Sorry.  This is Erin
 4     Ranahan.
 5                    SPECIAL MASTER RODRIGUEZ:  Okay.
 6                    MS. RANAHAN:  I just have one --
 7                    SPECIAL MASTER RODRIGUEZ:  I'm sorry --
 8                    MS. RANAHAN:  -- more point on the --
 9                    SPECIAL MASTER RODRIGUEZ:  -- I didn't --
10                    MS. RANAHAN:  Okay.
11                    SPECIAL MASTER RODRIGUEZ:  -- recognize
12     you instantly.  Go ahead.
13                    MS. RANAHAN:  I'm sorry, I'm sorry.
14                    So we have actually requested a litigation
15     consultant during this and haven't received it, so we are
16     still -- the privilege has not been -- all been
17     established, and we want to investigate that as well and
18     see these communications on a privilege log so we can
19     understand the nature of these claims and whether to
20     challenge any of them.  There hasn't been anything
21     established that this is a proper privilege relationship
22     yet, so --
23                    SPECIAL MASTER RODRIGUEZ:  Okay.
24                    MS. RANAHAN:  -- we just want to be able
25     to challenge that.
```

Telephonic Hearing
May 15, 2020

Page 23

```
 1                    And as far as the search term issue about
 2      whether it's practical, I mean, it would just be the same
 3      search terms up to the present; and I don't see how
 4      that's not feasible, with the search terms already being
 5      used.
 6                    SPECIAL MASTER RODRIGUEZ:  Okay.  All
 7      right.  Well, here's the -- here's the thing.  Clearly, I
 8      think, the requests that have been made with regard to
 9      the time period of 2013 to 2016 are relevant and should
10      be produced.
11                    And as I understand it, the plaintiffs
12      have agreed to produce information from that time period.
13      And it actually may be January 1 of 2010, so if I should
14      be corrected on my time period, please let me know.  Is
15      it January 1 of 2010 or 2013?
16                    MS. SAHNI:  Ms. Rodriguez, this is Neema
17      Sahni for plaintiffs.
18                    It's January 1, 2010, for Request
19      Number 55, which is one where they had asked for
20      additional years, and so we went back three additional
21      years.
22                    SPECIAL MASTER RODRIGUEZ:  Okay.
23                    MS. SAHNI:  The other request you
24      referenced was either 2012 or 2013 to 2016.
25                    SPECIAL MASTER RODRIGUEZ:  Okay.  All
```

Telephonic Hearing
May 15, 2020

Page 24

```
 1   right.  So I do think it is reasonable and that the
 2   plaintiffs should produce for the time periods as
 3   indicated.  However, I -- I do struggle to see the
 4   relevance proportional to the needs of the case and the
 5   issues in the matter of that number -- that search past
 6   the claim period of May of 2016.
 7               We have not yet seen the MarkMonitor
 8   information, and that is yet to be completely produced.
 9   If defendants are able to establish a basis based upon
10   that, we can revisit that issue.
11               But at this point, I don't see that that
12   information is sufficiently relevant to require search
13   for those years and is not proportional to the needs in
14   this case.
15               All right.
16               MS. GOLINVEAUX:  Ms. Rodriguez, it's
17   Jennifer Golinveaux.  Just one point of clarification.
18               SPECIAL MASTER RODRIGUEZ:  Uh-huh, yes.
19               MS. GOLINVEAUX:  With respect -- thank
20   you.
21               With respect to the correspondence between
22   plaintiffs' counsel and MarkMonitor through the end of
23   the claims period, can we make that -- well, two points.
24   Can we make that through 2016, since they were clearly
25   getting evidence from MarkMonitor in 2016; and as well,
```

Telephonic Hearing
May 15, 2020

Page 25

```
 1    they need to log any of that that was with counsel on a
 2    privilege log?
 3                  SPECIAL MASTER RODRIGUEZ:  Yes.
 4                  MS. GOLINVEAUX:  Thank you.
 5                  MS. SAHNI:  Ms. Rodriguez, this is Neema
 6    Sahni.
 7                  Just to make sure I understand that, so
 8    that's RFP Number 55, which is the communications with
 9    MarkMonitor, that will go through the end of 2016; is
10    that correct?
11                  SPECIAL MASTER RODRIGUEZ:  Yes.
12                  MS. SAHNI:  Okay.
13                  SPECIAL MASTER RODRIGUEZ:  All right.
14                  MR. OPPENHEIM:  I guess I -- I'm sorry, I
15    apologize, Ms. Rodriguez.  I -- because of the manner in
16    which we're going through these, I'm a little confused.
17    On Request Number 55 --
18                  SPECIAL MASTER RODRIGUEZ:  Who is this
19    that's speaking, please?
20                  MR. OPPENHEIM:  I apologize.  It's Matt
21    Oppenheim --
22                  SPECIAL MASTER RODRIGUEZ:  Okay.
23                  MR. OPPENHEIM:  -- counsel for plaintiff.
24                  SPECIAL MASTER RODRIGUEZ:  Mr. Oppenheim,
25    yes.
```

Telephonic Hearing
May 15, 2020

Page 26

```
 1                    MR. OPPENHEIM:  Ms. Golinveaux just raised
 2   the question about production of documents from
 3   plaintiffs' counsel.  That's not subsumed within their
 4   first issue, but in later issues.
 5                    I -- obviously, I don't understand that
 6   you've now ordered -- just want to make sure -- that
 7   plaintiffs' counsel has to start doing searches of the
 8   Oppenheim & Zebrak law firm, for example, in the same way
 9   that Winston & Strawn doesn't have to start searching all
10   of their correspondence, right?
11                    SPECIAL MASTER RODRIGUEZ:  No, that's not
12   what my understanding of this is, is that --
13                    MR. OPPENHEIM:  Okay.
14                    SPECIAL MASTER RODRIGUEZ:  -- there was a
15   request for correspondence with regard to infringement
16   notices that MarkMonitor sent to Charter, so presumably
17   that would be in your database and that you are going to
18   search for those documents from January 1 --
19                    MR. OPPENHEIM:  Absolutely.
20                    SPECIAL MASTER RODRIGUEZ:  -- 2010 until
21   December 31, 2016.  And to the extent there is a
22   privilege that's being claimed for any of those
23   communications, those would need to be put on a privilege
24   log so that appropriate determinations of privilege can
25   be made.
```

Telephonic Hearing
May 15, 2020

1              MR. OPPENHEIM:  Very well.  Thank you.

2              SPECIAL MASTER RODRIGUEZ:  Uh-huh.  Yes.

3              All right.  Let's talk about the request

4     for certain -- dates certain for completion of the

5     ownership production.  As I understand it, this is

6     supposed to be forthcoming on June 1; is that right?

7              MS. SAHNI:  Ms. Rodriguez, this is Neema

8     Sahni again for the plaintiffs.

9              This -- the June 1 deadline that was set

10    at the last conference was for our email production.

11    That said --

12             SPECIAL MASTER RODRIGUEZ:  Okay.

13             MS. SAHNI:  -- I think June 1 is probably

14    feasible.  We've already produced over 95 percent of the

15    ownership documentation.  We're just tracking down some

16    final remaining documents, as you can imagine for over

17    11,000 works, this is a massive undertaking.  And so

18    there's still some documents we're working to collect and

19    review and produce.

20             I suspect it will be in June.  I can't

21    guarantee that it will be the next two weeks because

22    it's, you know, a small number, but it's things we're

23    still tracking down.  But we've told defendant's counsel

24    several times that it will be in June.  And at this

25    point, you know, it's -- I think only about 3 percent of

Telephonic Hearing
May 15, 2020

```
 1    the works still remain.
 2                    SPECIAL MASTER RODRIGUEZ:  Okay.  So
 3    defense counsel, can you tell me what -- what the problem
 4    with this proposed production is?
 5                    MS. RANAHAN:  Sure.  Sure.  Thank you.
 6    This is Erin Ranahan.
 7                    So right now, we don't -- they have not
 8    agreed to commit to a date to complete it.  And as
 9    ownership documents, we've asked them to tell us what's
10    outstanding because we can't even begin to start
11    reviewing unless we know that, for instance, you know,
12    everything relating to one composition or one work has
13    been produced or whether the 5 percent outstanding, you
14    know, relates to an isolated number of works.
15                    So we've asked plaintiffs what is
16    outstanding so that we can start reviewing the
17    95 percent.
18                    SPECIAL MASTER RODRIGUEZ:  Okay.  So --
19                    MS. RANAHAN:  In other words, if there's a
20    whole chain of title of one work and one piece is
21    missing, then it's going to be a wasted effort to even
22    start it.  And what we've --
23                    SPECIAL MASTER RODRIGUEZ:  Okay.
24                    MS. RANAHAN:  -- said is, you know, Give
25    us a date to complete it or give us a list of what's
```

Telephonic Hearing
May 15, 2020

1   outstanding, and they have not done that.

2             SPECIAL MASTER RODRIGUEZ:  Okay.  So

3   that's the question.

4             Plaintiffs, are you able to do that?

5             MS. SAHNI:  Ms. Rodriguez, this is Neema

6   Sahni again.

7             I don't understand exactly what the issue

8   is.  There are a large number of registrations that

9   you'll get that have been produced, as well as chain of

10  title documents.  Defendant's counsel is entirely free to

11  begin reviewing those and matching them to the works in

12  suit and seeing what remains and what exists.

13            What I'm saying is, there is less than --

14  about 3 percent of work for which we're still completing

15  our production.  I don't see a reason for why we have to

16  identify to them the works that that applies to.

17            They can absolutely begin their review.

18  There is nothing stopping them from starting to go

19  through the 97 percent we've produced and identifying the

20  registration certificates that link up with certain works

21  in suit and begin that process.

22            There is zero -- I mean, having done this

23  review on our end to produce these materials, it happens

24  in a -- in a process where you can start reviewing these

25  materials iteratively, and there's no reason whatsoever

Telephonic Hearing
May 15, 2020

1  that they have to wait for the 100 percent to begin that

2  review.

3           SPECIAL MASTER RODRIGUEZ:  Okay.  But I

4  guess my question is, are you able to identify the works

5  that haven't been produced yet in a relatively easy

6  manner?  Like, is that a heavy list for you to do, or is

7  that something that you could easily provide?

8           MS. SAHNI:  Ms. Rodriguez, I don't think

9  we can sort of identify a list to them that we think is

10  complete or not, and they're going to have different

11  views --

12           SPECIAL MASTER RODRIGUEZ:  Okay.

13           MS. SAHNI:  -- of what they think would be

14  complete.  So --

15           SPECIAL MASTER RODRIGUEZ:  Okay.

16           MS. SAHNI:  -- we obviously believe --

17           SPECIAL MASTER RODRIGUEZ:  That answers my

18  question.

19           MS. SAHNI:  Yeah.

20           MS. GOLINVEAUX:  Ms. Rodriguez, if I could

21  just say --

22           SPECIAL MASTER RODRIGUEZ:  So can you give

23  us a date certain by when this last 3 percent will be

24  done?  I understand that you don't want to commit to

25  June 1, but can you commit to June 10?

Telephonic Hearing
May 15, 2020

```
 1                         MS. SAHNI:  I think we could probably
 2   commit to -- to June 15 at the very latest, but I
 3   think -- I expect it will be before then, but if you
 4   would like us to commit to a date certain, I would say
 5   June 15 --
 6                         SPECIAL MASTER RODRIGUEZ:  Okay.
 7                         MS. SAHNI:  -- if that works for you,
 8   Ms. Rodriguez.
 9                         SPECIAL MASTER RODRIGUEZ:  Defense --
10   defense counsel, would that work, if they have --
11                         MS. RANAHAN:  This is Erin Ranahan --
12                         SPECIAL MASTER RODRIGUEZ:  -- a date
13   certain that all of it will be produced to you by
14   June 15?
15                         MS. RANAHAN:  Erin Ranahan again.
16                         So that -- June 15 would be fine to
17   receive the remainder, but we would still reiterate that
18   we would like to know what is outstanding so that we can
19   make way with what we have so far.
20                         And again my point being, like, we start
21   one work or chain of title and we think we've now
22   identified errors, like, we need to know if what's coming
23   in, if they relate to that or if it's works that haven't
24   been produced for anything yet.  Otherwise, we are held
25   up with what we have so far if we don't know what's
```

Telephonic Hearing
May 15, 2020

1    missing.

2                      But as far as timing on the remainder --

3                      SPECIAL MASTER RODRIGUEZ:  I understand --

4                      MS. RANAHAN:  -- that's fine.

5                      SPECIAL MASTER RODRIGUEZ:  Well, I

6    understand that you'd like to have the 100 percent in

7    order to start your process.  You're not going to have

8    100 percent immediately.  So what I'm trying --

9                      MS. RANAHAN:  Okay.

10                     SPECIAL MASTER RODRIGUEZ:  -- to provide

11   to you is the date certain that you requested, and the

12   date certain plaintiffs have represented that they can do

13   is on or before June 15.  Is there any reason --

14                     MS. RANAHAN:  That date -- that date is

15   fine.

16                     SPECIAL MASTER RODRIGUEZ:  -- why that

17   date does not work?  Okay.  Great.

18                     MS. RANAHAN:  Yeah.  No, we were -- we

19   can't get to -- understand what the missing things are.

20   All we're asking is if we can know what's missing, but it

21   sounds like plaintiffs don't want to provide that to us.

22                     SPECIAL MASTER RODRIGUEZ:  Okay.  So that

23   deals with RFPs 3 and 5, I believe.

24                     MS. RANAHAN:  There's one more aspect of

25   it, Ms. Rodriguez, and that is --

Telephonic Hearing
May 15, 2020

Page 33

1              SPECIAL MASTER RODRIGUEZ:  Of RFP 5?

2              MS. RANAHAN:  -- where the plaintiffs have

3    ordered -- yes, for the -- for this ownership

4    perspective.  The plaintiffs were ordered --

5              SPECIAL MASTER RODRIGUEZ:  Okay.  Yeah.

6              MS. RANAHAN:  -- to produce the ownership

7    samples, the 1 percent.  They were ordered to produce

8    documents relating to dispute.

9              And initially, they told us they had

10   produced one; they have now identified it by Bates

11   Number -- or two of them by Bates Number.  But in the

12   context of now talking about search terms and email

13   searches, we've asked if they conducted an email search

14   to find those, and they said they had not, that they had

15   consulted central repositories to do that.

16             And so we've asked them to add search

17   terms to try to make sure that was a complete -- and

18   custodians to make sure that was a complete search.  And

19   I just would like to point out that Sony, they actually

20   took the position that they did not have central

21   repositories for the date information, that's why they

22   couldn't produce it.

23             And I can provide examples of where they

24   said that to you, it's something that came up in 5.  But

25   they basically stated:  As a practical matter, none of

Telephonic Hearing
May 15, 2020

Page 34

```
 1   the plaintiffs maintain centralized files cataloging
 2   ownerships of the literary disputes that may have been
 3   raised concerning the thousands of works at issue, and
 4   they produced six declarations from all the answers
 5   stating that they did not maintain centralized files
 6   cataloging ownership for validity disputes.
 7              Then they tell us here that the way in
 8   which they went about doing a search for the validity
 9   ownership disputes that they were ordered to produce for
10   the first time, they went to these centralized files.
11              The two documents they produced to us were
12   emails, so I believe it would be appropriate for them to
13   apply and to take that obligation of the court order
14   seriously to do a reasonable search for emails for these
15   disputed documents for the 1 percent ownership.
16              SPECIAL MASTER RODRIGUEZ:  Okay.  I don't
17   know who's going to speak for plaintiffs on this issue,
18   but could you address Ms. Golinveaux's point?
19              MS. SAHNI:  Yes.  Ms. Rodriguez, this is
20   Neema Sahni again.  Thank you.
21              So first, I'd like to clarify that we said
22   that we consulted centralized repositories and email
23   folders where such dispute-related documents would
24   reside.
25              To be clear, we don't -- our clients don't
```

Telephonic Hearing
May 15, 2020

1  maintain a central folder that says:  Here's all the

2  cease and desist letters we've received over time.  This

3  is not -- and that that is absolutely true from the

4  declarations in Sony and it's absolutely true today.

5           Our clients do not have a centralized

6  folder database that says:  Here's everything we have on

7  disputes.

8           The reality is that these are incredibly,

9  incredibly rare.  And I just want to take a minute to

10 talk about what they're looking for.  They're asking us

11 to search for documents that relate to when a music

12 publisher or record company is out there distributing a

13 works, selling it for streaming rights on Spotify; it's

14 out there on iTunes.

15          And reporting royalties to an artist or a

16 songwriter and somehow the artist or songwriter shows up

17 and says, "You don't have rights."

18          That doesn't happen.  You know, Beyonce

19 doesn't show up to Sony Music and say, "You don't have

20 rights to sell my music on Spotify."  This is not

21 something that exists.

22          And we've told them this several times,

23 that there's not a sort of universe of disputes that

24 occur over music that is being exploited commercially.

25 And when we investigated with our clients, this was

Telephonic Hearing
May 15, 2020

```
 1   confirmed.  These are incredibly rare.
 2               What we did -- because there was a 110
 3   sample list and to -- to just provide a little context,
 4   we have already agreed to provide chain of title record
 5   and registration information for all 11,000 works in
 6   suit; and Charter demanded, "We need more, we need more."
 7               Judge Hegarty set up a reasonable process
 8   in which there would be a 1 percent sample of works for
 9   which we would provide additional documentation requested
10   by Charter, and Charter had added this request for
11   dispute-related documents.
12               There were 110 works cherry-picked by
13   Charter, by design; that was the point of the sample,
14   they can give us a list of works.  And we went to our
15   clients.  We said, "Here's 110 works."  In some cases, it
16   was only 5 for some plaintiff groups; for some plaintiff
17   groups, it was 30.
18               And we said, "What is the best way to
19   search for this?"  And because it was a small number of
20   works, each plaintiff group had their own process by
21   which they could do this.  In some cases, they went to
22   their copyright department and their litigation
23   department and said, "Here's the list of works.  Have we
24   had any disputes about them?"
25               In other cases, there were 16 different
```

Telephonic Hearing
May 15, 2020

```
 1    people that have to be asked, and they searched their
 2    email files.  It varied group by group, but it was a
 3    process that was conducted based on the limited number of
 4    works at issue.
 5              And so the -- the proportionality of doing
 6    an email search for such a small number of works didn't
 7    make sense when, instead, these disputes are quite rare
 8    and all the plaintiffs needed to do was to find their --
 9    the records of people and/or repositories where this
10    information might exist, and they searched those.
11              And we came back, we found one work for
12    which there was a purported dispute, however you want to
13    characterize that, and we produced it.  And that process
14    involved investigation, discussions with our client.  I'm
15    not entirely sure what else is required beyond that.
16              We then had a whole set of briefings and a
17    conference in February with Judge Hegarty in which
18    Ms. Ranahan, not once but three times, raised the
19    disputes issue.  And Judge Hegarty, throughout that
20    conference, declined to order any more ownership
21    discovery than what was already being produced.
22              So the fact that this is being raised
23    again is just another bite at the apple on the same
24    issue, but I have yet to hear a proportional, reasonable
25    way for us to do this, applying search terms for "own" or
```

Telephonic Hearing
May 15, 2020

Page 38

```
 1    "cease and desist" across broad custodian files?
 2                I mean, the entire business of our
 3    plaintiffs is managing an exploiting right.  To search
 4    the word "own" in that is just absurd.
 5                SPECIAL MASTER RODRIGUEZ:  All right.  So
 6    I want to be clear about what defendants are requesting
 7    here.  Are you asking for this search across the
 8    1 percent sample, or are you asking this across the
 9    11,000 works?
10                MS. RANAHAN:  Right.  Thank you.  This is
11    Erin Ranahan.
12                We are not asking the process of the order
13    be revisited.  We're looking, for the 1 percent sample,
14    for them to complete the search as they should have done
15    in a diligent manner.  And I would just -- those
16    1 percent works.
17                We didn't learn that they had not searched
18    any emails for this request until -- for this order,
19    actually, until recent meet-and-confer discussions when
20    they say they didn't think they had to do it because
21    consulting with their clients was a sufficient exercise.
22                All we -- if there's -- if they don't
23    exist, then it shouldn't be too burdensome to search for
24    them.  All we're asking is whether they will apply some
25    search terms to the basic custodians.  We'll negotiate
```

Telephonic Hearing
May 15, 2020

Page 39

```
 1   with them about that, like we're doing with other search
 2   terms.  All we're asking to do is, will they search
 3   emails, and they just outright refuse to even consider
 4   it.
 5              And I'm not suggesting that -- it's not
 6   usually sufficient to just go to the client and say, "Do
 7   these emails exist," and take their word for it.  I'm not
 8   suggesting they're hiding anything, but why would they
 9   remember every last type of ownership dispute that
10   happened five, ten years ago, or however long it may be?
11              This is something that should just be
12   subject to a basic search because they were ordered to
13   search for them for 1 percent.  The substance of the
14   matter has been decided.  We're just talking about making
15   sure that it's complied with in a reasonable and a
16   diligent way.
17              SPECIAL MASTER RODRIGUEZ:  Okay.
18              AUTOMATED VOICE ON CONFERENCE CALL:  Matt
19   Oppenheim has left the meeting.
20              SPECIAL MASTER RODRIGUEZ:  Ms. Sahni, do
21   you have emails that have been collected from this
22   1 percent or -- I mean, I -- well, let's just limit it to
23   the 1 percent right now.
24              Presumably, you have emails that have been
25   collected from those owners?
```

Telephonic Hearing
May 15, 2020

1           MS. SAHNI:  Ms. Rodriguez, not in the

2   context of these requests.  For this 1 percent sample

3   issue, we asked our clients, they consulted with either

4   centralized repositories or individuals who may have been

5   involved in the exploitation of these works or --

6           AUTOMATED VOICE ON CONFERENCE CALL:

7   (Unintelligible) has joined the meeting.

8           MS. SAHNI:  -- or anything around these

9   works, and they checked their files.  It's not that

10  they -- you know, we asked them if you recall any

11  disputes, as Ms. Ranahan characterized it.

12          They went and they checked their files.

13  They looked to see -- in one instance, they looked to

14  see, for example, if there was any holds on the royalties

15  for -- for any of these artists, because that would be

16  reflected.

17          So they conducted due diligence on their

18  end.  We did not collect emails for these individuals

19  because there's no centralized group of custodians that

20  deal with disputes.  That could be reflected, depending

21  upon the plaintiff group, in any different number of

22  ways, and they -- they tailored their search based on how

23  this would be reflected in their system and then

24  identified, based on those limited works, that was the

25  way that they were going to go forward.

Telephonic Hearing
May 15, 2020

Page 41

```
 1                  I will note that there was discussion, you
 2   know, about certain more-tailored searches, and
 3   defendants have never agreed to that.  They've always
 4   said that they want us to run these broad searches across
 5   all custodians.  And we told them, there's not somebody
 6   at our plaintiff group that handles all disputes for all
 7   ownership issues because, again, these are very, very
 8   rare.
 9                  SPECIAL MASTER RODRIGUEZ:  Uh-huh.  Well,
10   I agree that, you know, running the search term "owner"
11   or "own" would be -- I mean, it would probably yield a
12   lot that has nothing to do with this case and would be
13   pretty onerous in this matter.
14                  But I'm wondering if there is a targeted
15   search that could be done to address this issue.  I've
16   reviewed Judge Hegarty's order, and it did appear that
17   Judge Hegarty was not inclined to order additional
18   discovery on this issue.  However, the defendants have
19   raised a really targeted question as it relates to this
20   1 percent sample.
21                  So this is an issue that I think I need to
22   go back and look at Judge Hegarty's order again and to
23   delve into this a little bit more before I can come to a
24   conclusion on this.  But it does seem to me that if the
25   parties were to agree to some search terms, for example,
```

Telephonic Hearing
May 15, 2020

1    "own" and "dispute" or something very targeted that could

2    be run, that might make some sense.

3                    And again, we're only talking about the

4    1 percent, not 11,000 different works.

5                    MS. RANAHAN:  Correct.

6                    SPECIAL MASTER RODRIGUEZ:  So let me look

7    at this a little bit in more detail and come back either

8    on Monday or shortly thereafter.

9                    MS. RANAHAN:  Thank you, Ms. Rodriguez.

10                    SPECIAL MASTER RODRIGUEZ:  Yes.

11                    MS. RANAHAN:  This is Erin Ranahan again.

12    If I could just -- a couple more points.

13                    So we are exchanging hit reports in many

14    other contexts, and I think that we could try some of

15    these things and see what comes out.  If they can

16    identify some custodians, that might be appropriate.

17                    But what we had suggested is something

18    like "own" and "cease and desist," something like that.

19    But we're happy to look at the hit reports, and we're not

20    trying to be overly onerous at all.  We're just trying to

21    make sure that we've had a fair chance to look at this,

22    because the point of the 1 percent was to see what we

23    could find to see if it would justify a broader search.

24                    So if we haven't even gotten to an

25    adequate look at the original 1 percent, then we haven't

Telephonic Hearing
May 15, 2020

Page 43

1    been given the opportunity to prove why more should be
2    ordered.
3                    And I would just request if we could
4    submit maybe one page to just provide you the language
5    that they submitted from these declarations about not
6    having centralized file for this exact discovery.  It was
7    exactly the way that they avoided having to search for
8    it, was on the burden of having no centralized files.
9                    So, you know, our concern is that to rely
10   on these now, what they claim to be centralized files,
11   isn't adequate.
12                   So I would request that we could just
13   submit maybe one page to just show you these cites and
14   provide you the context for that, how it contradicts what
15   they're --
16                   SPECIAL MASTER RODRIGUEZ:  Well --
17                   MS. RANAHAN:  -- saying now.
18                   SPECIAL MASTER RODRIGUEZ:  -- I understand
19   your point, but I'm not understanding that what Ms. Sahni
20   is saying is that it was a centralized file; but, rather,
21   they went to each client to make this determination and
22   to search the records there.  So I'm not sure that an
23   additional one page on that would assist.
24                   What would assist me is to understand what
25   Judge Hegarty ordered, what he intended, and what he

Telephonic Hearing
May 15, 2020

Page 44

```
 1    intended with regard to additional discovery on this
 2    particular issue.
 3              The other thing that would help me is if
 4    the parties could perhaps propose specific search terms
 5    that could be run over this 1 percent sample and hit
 6    reports on that.
 7              I mean, it may very well be that there are
 8    no such documents, but if you already have the -- if you
 9    already have the database and you run a search over that
10    database without actually having to pull and -- and
11    review those documents, it does not seem to me that that
12    is terribly onerous at all.  It's a matter of, you know,
13    having your folks with Relativity, or whatever you're
14    using, do that search and give you a hit report.  And
15    then we can make further determinations based on that hit
16    report.
17              MS. SAHNI:  And, Ms. Rodriguez, that --
18              MR. SPERLING:  Ms. --
19              MS. SAHNI:  Sorry, go ahead, Jonathan.
20              MR. SPERLING:  No, no.  You go ahead
21    first.
22              MS. SAHNI:  Just so I understand the
23    proposal, you're asking, Ms. Rodriguez, for the
24    custodians we have in our current database, what would we
25    consider as proposed search terms; is that correct?
```

Telephonic Hearing
May 15, 2020

Page 45

```
 1                  SPECIAL MASTER RODRIGUEZ:  Yes.
 2                  THE COURT REPORTER:  Was that Rahmi?
 3                  MR. SPERLING:  No.  That was Ms. Sahni.
 4                  MS. SAHNI:  No, sorry.  Ms. Sahni.
 5                  THE COURT REPORTER:  Sorry.  Okay.  Thank
 6      you.
 7                  MR. SPERLING:  And, Ms. Rodriguez, it's
 8      Jonathan Sperling, also for plaintiffs.
 9                  Just -- just for context -- and there's
10      nothing that we're asking for further on this right
11      now -- but because you've talked about trying to work out
12      what you describe as targeted searches like for "dispute"
13      and "C&D."
14                  So I think it's important to understand
15      the business, as always.  So disputes come up in the
16      business all the time.  Not disputes over what they're
17      talking about, but people have disputes.  We have
18      disputes with distributors, we can have disputes with
19      artists over royalties, we can have disputes with artists
20      over, you know, what we're supposed to do with respect to
21      a certain kind of marketing.
22                  Cease and desist letters are a feature of
23      the business with respect to whether, you know,
24      somebody's got the rights to an artist, whether somebody
25      is making an unauthorized exploitation of our works.
```

Telephonic Hearing
May 15, 2020

Page 46

```
 1   Just like we sent notices to Charter, we send notices to
 2   other people, and sometimes those take the form of cease
 3   and desist.
 4             And so the kinds of terms that we're
 5   talking about, "cease and desist" and "dispute" are in no
 6   way -- it's not just that they're in no way limited to
 7   disputes over ownership, but the overwhelming majority,
 8   I'm not exaggerating when I say over 99 percent of
 9   documents with those words in them will not have to do
10   with disputes over ownership of the rights to exploit.
11             I just --
12             SPECIAL MASTER RODRIGUEZ:  Well, that is
13   why we're talking about --
14             MR. SPERLING:  -- wanted to provide that
15   context because we're going to go -- yeah.  Sorry.
16             SPECIAL MASTER RODRIGUEZ:  I understand,
17   and that's why we're talking about, let's see what it
18   shows.  If you've got -- if you use the words "cease and
19   desist" and you've got a million hits, that's going to
20   tell us that that's not very targeted and it's not really
21   pulling what we're looking at.
22             And it may be there isn't a reasonable
23   search that can be done.  But if you pull ten documents,
24   I don't think it's unreasonable to look at those ten
25   documents and do a sampling to say:  Yeah, none of these
```

Telephonic Hearing
May 15, 2020

Page 47

 1    ten documents relate to ownership.

 2              That's all we're asking here.  And we're

 3    looking to see how onerous this really is and whether a

 4    targeted search can be done.

 5              But as I said, I want to look back at the

 6    order, I want to see what Judge Hegarty was intending to

 7    order, what he did order, how he limited the request, and

 8    what additional discovery he contemplated on this issue.

 9              MS. SAHNI:  Thank you, Ms. Rodriguez.

10              MR. SPERLING:  Got it.  Yeah.  Thank you.

11              SPECIAL MASTER RODRIGUEZ:  All right.

12              MS. RANAHAN:  One final thing, if I could

13    just say, this is Erin -- oh, sorry.  This is Erin

14    Ranahan.  Just one more thing.

15              I just want to note this is about, you

16    know, 110 works and there's 65 plaintiffs here.  So if

17    you do it by title or artist, I think that would also

18    narrow it, but I think that should be something to at

19    least look into.

20              But if you would like more briefing, let

21    us know, if that would be helpful to you or if you would

22    rather just search for it.  But if you want more briefing

23    for us to identify the prior hearings and what has been

24    done more specifically, we're happy to do that, too.

25              SPECIAL MASTER RODRIGUEZ:  I mean, I think

Telephonic Hearing
May 15, 2020

Page 48

```
 1    I can look at Judge Hegarty's orders without requiring
 2    you all to brief more.
 3              What would be helpful is if you all would
 4    confer about whether there are search terms that could be
 5    run and if you can even run some sample searches to give
 6    me a sense of how many hits you're getting, that would be
 7    helpful and you could submit something on that.
 8              MS. SAHNI:  We'll do that, Ms. Rodriguez.
 9    This is Neema Sahni.
10              SPECIAL MASTER RODRIGUEZ:  Thank you.
11              Okay.  I think that completes our
12    discussions with respect to RFPs 3 and 5.
13              Next, Charter asks for a motion to -- for
14    a motion to compel with regards to Interrogatory 13 and
15    14.
16              I guess, as I look at this issue, it looks
17    like this is a -- maybe "technology" is not the right
18    word here -- but this is a task that could be
19    accomplished with searching with the Excel spreadsheets,
20    combining them and seeing where you have duplicates.
21              What -- maybe somebody could explain to me
22    exactly what the issue is here.  It seems that if you
23    have both lists and they both use the same name, can't
24    you just search with those -- put those together and
25    search for duplicates to see where you have overlap?
```

Telephonic Hearing
May 15, 2020

Page 49

 1              MR. OPPENHEIM:  So Ms. Rodriguez, this
 2    is Matt Oppenheim.
 3              I think you've hit it on the nose.  This
 4    is -- the defendant has all the documents that it needs
 5    to do whatever analysis it wants to do, and we produced
 6    them, they know how to do that analysis.
 7              So while you may be new to this process,
 8    neither Winston & Strawn nor O & Z, Oppenheim & Zebrak,
 9    are.  We've gone through this before.  And Winston &
10    Strawn knows well that what they're asking for is work
11    product, and what they're asking for is information that
12    will be produced by experts, if at all.
13              And, you know, we don't -- it's not as
14    though the plaintiffs have in their files a document that
15    is responsive to what they've asked.  We've produced the
16    lists of works at issue, and they're free to do whatever
17    comparison they want.
18              Now, there's a critical presumption
19    underlying Charter's request to your -- that -- that
20    can't go unaddressed.  And that is, that the legal basis
21    for their request is that they say:  Well, plaintiffs
22    cannot recover for a composition contained within a sound
23    recording -- recover statutory damage for the same
24    composition that's contained within a sound recording in
25    the same case.  That is an issue they litigated in the

Telephonic Hearing
May 15, 2020

```
 1   Cox case and they lost.

 2              So I don't think we need to get to the

 3   pure legal issue, and if we have to, I suppose that's

 4   something we should probably brief to Judge Hegarty.  But

 5   because what they're asking for is not something we have

 6   and it's not an appropriate discovery request, it's an

 7   analysis that they're capable of doing, and we've

 8   equipped them with all the information they need to do

 9   that analysis.

10              SPECIAL MASTER RODRIGUEZ:  Okay.  Thank

11   you.

12              Who is going to address this issue on the

13   defendant's side?

14              MR. ELKIN:  It's Michael Elkin.  I'd like

15   to start, if I could.  And I think Ms. Ranahan can -- or

16   Ms. Golinveaux can pick up with some of the record points

17   before you, Ms. Rodriguez.

18              First, as it relates to Sony, I think

19   Mr. Oppenheim stretched a little, in stating that this

20   was addressed and we lost.  It was far more nuanced than

21   that and it's the subject of --

22              SPECIAL MASTER RODRIGUEZ:  It always is.

23              MR. ELKIN:  -- a trial motion -- yeah,

24   it's far -- and --

25              SPECIAL MASTER RODRIGUEZ:  Yeah.
```

Telephonic Hearing
May 15, 2020

Page 51

1              MR. ELKIN:  -- I don't want to burden you,
2  Ms. Rodriguez.  It's subject to posttrial motion
3  practice, and there's a long history there, and I'm happy
4  to go into at least Cox's version of it.
5              But here's the point.  They have
6  propounded notices -- that is to say, MarkMonitor has
7  propounded notices to Charter related to certain
8  infringements allegedly committed by Charter subscribers.
9              In those MarkMonitor notices, they have
10 specified -- there is specified certain works, certain
11 sound recordings.  And there is an indication there
12 that -- it's referred to as some cryptographic hash or
13 SHA1 hash -- that they are now claiming in this case, and
14 they certainly claimed in Sony as well, that the -- what
15 is represented is not simply the sound recording, at
16 least for purposes of the contributory liability claim,
17 but unspecified music compositions that they believe
18 lurks beyond this hash, and they haven't identified what
19 that is.  So that's one issue.
20             The second issue is that they very much
21 will take issue, we suspect -- as they did in the other
22 case -- as to what is a derivative work and what is a
23 compilation and the extent to which any one or more sound
24 recordings were released as a compilation within the
25 meaning of Section 504(c) 1 of the copyright statute.

Telephonic Hearing
May 15, 2020

1              This is information that they clearly

2       have.  They represent 85 percent of the music industry,

3       Sony, Warner, and Universal.  They have the highest, the

4       biggest music publishing entities and sound recording

5       entities.  They have this information.  They want to hold

6       onto this for as long as they can.

7              There are many substantive, relevant

8       considerations here, and the notion that somehow they

9       won't respond to basic information that goes to the heart

10      of this case when they're suing for more than a billion

11      dollars, I don't think is fair.

12              SPECIAL MASTER RODRIGUEZ:  Okay.  But --

13              MR. ELKIN:  So, Ms. -- I apologize.  Go

14      ahead.

15              SPECIAL MASTER RODRIGUEZ:  If I look at

16      this, it looks like that what's being said here is that

17      this information has been produced.  It may not be

18      produced in a -- in the way and with the analysis that

19      you're looking for, but at least you have the information

20      and the data upon which you and/or your experts could run

21      these analyses.

22              Is that true or not true?

23              MR. ELKIN:  First of all, they -- I'm

24      going to defer to one of my other colleagues who will be

25      able to respond to the record evidence.

Telephonic Hearing
May 15, 2020

1               But they did make a reference in their

2       submissions that our expert last time ran through the

3       analysis.  They moved to preclude and they were

4       successful at getting the expert not to testify with

5       regard to that.

6               So I think that that position that they

7       have espoused is rich, but I would ask one of my

8       colleagues to address your question, Ms. Rodriguez.

9               MR. OPPENHEIM:  So before I get

10      tag-teamed, Ms. Rodriguez, if I could just respond to

11      those points.  This is Matt Oppenheim.  So --

12              SPECIAL MASTER RODRIGUEZ:  Well, I just

13      really --

14              MR. OPPENHEIM:  -- the reason this --

15              SPECIAL MASTER RODRIGUEZ:  -- can I

16      please -- hold on a minute, Mr. Oppenheim.  I'm --

17              MR. OPPENHEIM:  Yes.

18              SPECIAL MASTER RODRIGUEZ:  -- trying to

19      get an answer to at least what I think is a pretty

20      straightforward question.

21              Do you agree or disagree that the

22      information that the defendants need in order to develop

23      this spreadsheet or get the information that they want,

24      do they already have it?  I understand it may not already

25      be in the format they would like.  But do they have the

Telephonic Hearing
May 15, 2020

Page 54

```
 1    data that they or their expert would need in order to run
 2    the analysis that they're talking about?  I hope that --
 3                    MR. OPPENHEIM:  Yes, Ms. Rodriguez.
 4                    SPECIAL MASTER RODRIGUEZ:  -- this is a
 5    yes or no -- yes.  Okay.
 6                    THE COURT REPORTER:  I'm sorry, who was
 7    that?
 8                    SPECIAL MASTER RODRIGUEZ:  To the
 9    extent -- I want to know the answer to that question from
10    both the defendant's perspective and the plaintiffs'.  I
11    believe the plaintiffs have told me that, yes, they have
12    provided that information to the defendants and the
13    defendants have it and it can be used to run the analysis
14    that defendants are wanting to do, either with their
15    experts or on their own.
16                    Is that correct, Mr. Oppenheim?
17                    MR. OPPENHEIM:  So yes, and I -- I'll
18    break it down because there are two requests here and
19    they're -- I'm sorry.  If you don't want any context,
20    that's fine.  I'll just say yes.  And I'm happy to --
21                    SPECIAL MASTER RODRIGUEZ:  Yes.  I just
22    want --
23                    MR. OPPENHEIM:  -- explain some more if
24    you'd like.
25                    SPECIAL MASTER RODRIGUEZ:  -- I just want
```

Telephonic Hearing
May 15, 2020

```
 1   to know --
 2                   MR. OPPENHEIM:  Okay.
 3                   SPECIAL MASTER RODRIGUEZ:  -- yes.
 4                   MR. OPPENHEIM:  Yes, they have it.  Yes,
 5   they have it.
 6                   SPECIAL MASTER RODRIGUEZ:  All right.  And
 7   defense counsel, is that accurate or not?  And if not,
 8   why not?
 9                   MS. RANAHAN:  So we do not -- what we have
10   is the work that they claim --
11                   SPECIAL MASTER RODRIGUEZ:  And --
12                   MS. RANAHAN:  -- but we do not --
13                   SPECIAL MASTER RODRIGUEZ:  -- is this
14   Ms. Golinveaux?
15                   MS. RANAHAN:  Oh, I'm sorry.  This is Erin
16   Ranahan.
17                   SPECIAL MASTER RODRIGUEZ:  I'm sorry.  Why
18   do you sound --
19                   MS. RANAHAN:  Erin Ranahan.
20                   SPECIAL MASTER RODRIGUEZ:  -- like
21   everybody, Ms. Ranahan?
22                   MS. RANAHAN:  I know.  Me and Jennifer go
23   back a long time --
24                   SPECIAL MASTER RODRIGUEZ:  I apologize.
25                   MS. RANAHAN:  -- right, Jennifer?
```

Telephonic Hearing
May 15, 2020

Page 56

```
 1                 SPECIAL MASTER RODRIGUEZ:  I'm going to
 2   catch that.
 3                 MS. GOLINVEAUX:  All the time.
 4                 MS. RANAHAN:  Everyone confuses us all the
 5   time on the calls, but -- okay.  Erin Ranahan.
 6                 So what we have is the work that they've
 7   alleged.  What we do not have in our possession anywhere
 8   from what they've given us is what works they are linking
 9   up between the compositions and the sound recordings and
10   how they're tying that to the notices.
11                 And that's -- so yes, they have given us
12   the titles, but sometimes there's titles of the songs
13   that repeat, there's multiple titles.  So all we're
14   asking them is to link, between their compositions and
15   sound recordings, which are derivative of each other.
16                 So it's not something that we have in our
17   possession.  It would require us to start doing a lot of
18   digging and trying to guess which notices they're
19   claiming apply to these.
20                 And a lot of times, these notices don't
21   even mention any of the -- like 75 percent of the work --
22   the last case, they didn't even ever have a notice for.
23   That's a separate issue.  They have no notices for
24   composition.
25                 So how do we know which they're claiming
```

Telephonic Hearing
May 15, 2020

 1   between composition and sound recordings?  Just because

 2   they've named them, that's not accurate.  We need to know

 3   how they are lining this up and how they are constructing

 4   their composition versus sound recordings.

 5                MR. OPPENHEIM:  Ms. Rodriguez, would you

 6   like me to respond?  It's Matt Oppenheim.

 7                SPECIAL MASTER RODRIGUEZ:  Oh, I'm sorry.

 8   I muted myself.

 9                Yes, Mr. Oppenheim, please respond.

10                MR. OPPENHEIM:  Certainly.

11                First off, I must respond to two things

12   that Mr. Elkin said.  First off -- and this has been

13   repeated on many, many phone calls and I just -- let's --

14   I think it's fundamental.  They keep saying we're -- you

15   know, we're seeking more than a billion dollars.

16                We have not put any demand on -- we've

17   indicated we're going to seek statutory damages.  There's

18   a range in what those damages are and -- and we have not

19   said that we're seeking more than a billion dollars.  We

20   have not indicated what our request is.  And to keep

21   saying that we're seeking more than a billion dollars is

22   overstating it, so that's point one.

23                Point two, the reason that Winston &

24   Strawn's expert was precluded from providing the evidence

25   that Mr. Elkin referred to is because the expert had

Telephonic Hearing
May 15, 2020

1    never offered an opinion on it previously.  So it was an

2    evidentiary exclusion, not because -- not for any other

3    reason.

4               Now let me respond to Ms. Ranahan.  There

5    are two different issues here.  One is RFP 13 -- excuse

6    me, Rog 13, which is seeking to know which compositions

7    are contained within which sound recordings.  This is an

8    exercise of just looking and understanding which

9    composition is in which recording.

10              So if, for example, you see that Aretha

11   Franklin's sound recording of Respect is on the sound

12   recording list and you see Otis Redding's composition of

13   Respect is on the composition, there you go, you've got

14   it.  You do the comparison.  So this is -- that is a

15   comparative analysis.  And they know that.  That's number

16   one.

17              Our -- Rog 14 is asking something

18   different.  Rog 14 is saying:  Which notices correspond

19   to which works?  This is an expert analysis, not -- they

20   have all the documents they need to do it.

21              So the notices that go to Charter are

22   notices that say:  This subscriber on your network is

23   engaged in infringement using this particular protocol of

24   this particular file.  Here's the hash and here's a

25   representative sample of a work that's infringed.  And

Telephonic Hearing
May 15, 2020

1    that representative sample may be Aretha Franklin's

2    Respect.  But that file may contain 50 sound recordings

3    and, concurrently, 50 compositions.

4              The documentation that has been provided

5    both by Mark -- from documents from MarkMonitor and

6    Audible Magic describe each and every recording contained

7    within the files that are the subject of notices.  Our --

8    we will have an expert who will do the analysis of

9    expanding all of that and then describing it for purposes

10   of the jury.  This is exactly what happened in Cox.

11             And what the defense is trying to do here

12   with respect to this latter issue is to require us to

13   disclose an expert analysis before we've even done it.

14   So they know that what they're doing is pushing the

15   expert issues.

16             Now, they are fully capable of doing this

17   themselves.  They have every one of those documents

18   themselves.  They've seen how our expert did it in Cox

19   with the exact same MarkMonitor and Audible Magic type

20   spreadsheets.

21             SPECIAL MASTER RODRIGUEZ:  Okay.

22             MS. RANAHAN:  If I could respond that,

23   Ms. Rodriguez.  This is -- if I -- this is Erin Ranahan

24   again.  If I could just respond to a couple of points

25   that he raised.

Telephonic Hearing
May 15, 2020

```
 1                   This is not expert analysis.  This is
 2      basic factual investigation that plaintiffs had to do to
 3      bring their Complaint.  What they have is a situation
 4      where the people claiming composition, or the companies,
 5      did not have any notices that they sent.  So they looked
 6      to see the notices that they were going to claim here and
 7      decided which compositions they had from that.  So this
 8      is not work product.
 9                   SPECIAL MASTER RODRIGUEZ:  Hold on a
10      minute.
11                   MS. RANAHAN:  This is factual --
12                   SPECIAL MASTER RODRIGUEZ:  Hold on.  I'm
13      sorry, hold on, Ms. Ranahan.  Say that one more time.
14      Can you start that sentence over --
15                   MS. RANAHAN:  Sure.  I apologize.
16                   SPECIAL MASTER RODRIGUEZ:  -- say it one
17      more time.
18                   MS. RANAHAN:  I'm sorry.
19                   SPECIAL MASTER RODRIGUEZ:  A little more
20      slowly.
21                   MS. RANAHAN:  Sure.  I'm sorry.
22                   So when plaintiffs went to investigate
23      their claims in this case, they had only sent notices on
24      certain limited number of the sound recordings.  No
25      compositions.
```

Telephonic Hearing
May 15, 2020

1                So for them to then team up with the

2    publishers and say, "We're bringing this together," they

3    gave the publishers:  Here's the songs or here's the

4    sound recordings they're claiming from the works here.

5    So they had to have done this.

6                For the publishers to have alleged that

7    there's all these notices, they've done this analysis.

8    It's basic factual research.  It does not require

9    experts.

10               But there are subsets of these for which

11   we have -- there's duplicate songs, there's no notices.

12   There's all sorts of issues that if we don't have their

13   representation, we're left with nothing that's going to

14   be able to hold up in court.

15               Because we can try to guess, we can try to

16   match, but plaintiffs -- this is plaintiffs' claims,

17   these are plaintiffs' copyrights.  They know which ones

18   they're claiming.  And to hide that from us when they are

19   seeking over $2 billion in this case, if you look at the

20   maximum statutory damages, if plaintiffs want to

21   stipulate to some minimum statutory damage.

22               But we can't deny the scope of the

23   proportional issue when they've already, you know,

24   received an award that is being challenged for a billion

25   and they're now here bringing enough works that if they

Telephonic Hearing
May 15, 2020

Page 62

1   got their way and treated every one of these

2   individually, which they want to do, it could be over

3   $2 billion, so we are allowed to --

4              SPECIAL MASTER RODRIGUEZ:  Okay.

5              MS. RANAHAN:  -- understand.  This is a

6   major issue that didn't get fully fleshed out yet.

7              SPECIAL MASTER RODRIGUEZ:  Okay.

8              MS. GOLINVEAUX:  And Ms. Rodriguez, it's

9   Jennifer Golinveaux.

10             One thing Mr. Oppenheim said is simply not

11  accurate.  To be clear, they're suing on more than 10,000

12  individual works in this case.  If you look at the

13  notices that they provided to us which they are relying

14  on to establish an element of contributory liability,

15  they only name a small sub -- a fraction of those works.

16  If you look through those notices, you'll only find, you

17  know, less than half of those works in the notices.

18             In order to bring suit, they had to know

19  which notices they are claiming now should cover the

20  works that are not named in the notices.  That simple

21  factual investigation we're asking them to respond to in

22  the interrogatory.  We can't do that ourselves.  They've

23  already done it.

24             SPECIAL MASTER RODRIGUEZ:  Okay.  Well, it

25  definitely seems that the plaintiffs are going to have to

Telephonic Hearing
May 15, 2020

Page 63

```
 1    be able to tie up and establish both their ownership, as
 2    well as that notice was provided to the defendants of
 3    infringement.  And at some point, they're going to have
 4    to tie all these things up.
 5                 I'm not convinced that the point is now.
 6    It does seem that the plaintiffs have produced what was
 7    requested and required of them, which is the composition
 8    name and the sound recording name, and that this
 9    information is available and can be used by both
10    plaintiffs and defendants to probe their claim.
11                 I don't know if this is going to be the
12    subject of deposition testimony.  I strongly suspect it
13    will be.  And certainly you all have indicated it will be
14    the subject of expert testimony.
15                 But at this point, I'm not inclined to
16    require the production of anything further, given the
17    representations that what has been produced is sufficient
18    in order for defendants to compare and determine whether
19    or not a work is on -- is the same or both -- on both
20    documents.
21                 So it seems to me that they have produced
22    that.  A spreadsheet could be run and the search for
23    duplicates could be -- could be made.
24                 MS. GOLINVEAUX:  Ms. Rodriguez, is it -- I
25    just want to make sure the point is clear that for most
```

Telephonic Hearing
May 15, 2020

Page 64

1    of the works in suit, they do not -- their titles do not
2    show up in the notices at all.  So we cannot -- we do
3    not -- we absolutely do not have the information to -- to
4    do that matching.
5                    SPECIAL MASTER RODRIGUEZ:  Is that --
6                    MR. OPPENHEIM:  Ms. Rodriguez --
7                    SPECIAL MASTER RODRIGUEZ:  -- accurate,
8    Mr. Oppenheim?
9                    MR. OPPENHEIM:  Ms. Rodriguez, that --
10   that's not -- it's accurate by half measures and
11   misleading, and let me explain why.
12                    So the notices contain multiple things.
13   One of the things it contains is a file name of the file
14   that the Charter subscriber is infringing.  That file
15   could say something like, "Motown's Greatest Hits."  And
16   then it would list an example of a particular sound
17   recording in the file, which could be "Aretha Franklin,
18   Respect."
19                    And what Ms. Golinveaux is saying is,
20   "See, it only lists Aretha Franklin, Respect."  The law
21   doesn't require the plaintiffs to list every work in a
22   notice.  That's clear.  And they won't tell you -- if
23   the -- if Charter tells you otherwise, force them to
24   brief it because that's not what the law requires.
25                    So -- so what they do have, though, for

Telephonic Hearing
May 15, 2020

1   each of the files listed in the notice, they have the

2   documents from MarkMonitor and Audible Magic which

3   described every sound recording contained within that

4   file.  For example, "Motown's Greatest Hits," it may list

5   50 sound recordings that includes everything from Marvin

6   Gaye to, you name it, right?  And -- and it lists all of

7   them.  And they can see all of the sound recordings

8   contained within that file.  So they have those

9   documents.

10              SPECIAL MASTER RODRIGUEZ:  Okay.

11              MS. GOLINVEAUX:  Ms. Rodriguez --

12              SPECIAL MASTER RODRIGUEZ:  All right.

13   Let's --

14              MS. GOLINVEAUX:  -- what he just described

15   is --

16              SPECIAL MASTER RODRIGUEZ:  I've heard

17   enough on --

18              MS. GOLINVEAUX:  -- is --

19              SPECIAL MASTER RODRIGUEZ:  I've heard

20   enough.

21              MS. GOLINVEAUX:  It's simply not accurate,

22   it's simply not accurate.  They -- the notices only

23   identify perhaps 25 percent of the works, at best, and

24   what Mr. Oppenheim is saying was a complete red herring.

25   He's saying they didn't have to notify works in order to

Telephonic Hearing
May 15, 2020

Page 66

```
 1    be proper notices.
 2                   But our point is different.  Our point is,
 3    we have no way of figuring out -- for that 75 percent of
 4    works in suit that they're claiming they were provided
 5    notices for, that's fine, they can claim that.  But we
 6    need to know which work corresponds to which notice and
 7    they -- in order to be able to test that because they are
 8    not identified in the notice.
 9                   SPECIAL MASTER RODRIGUEZ:  And how does
10    this issue relate to the database that we discussed at
11    the prior hearing, if at all?
12                   MS. GOLINVEAUX:  It's really a different
13    issue because this has to do with the notices that were
14    sent, and they do not -- and they only, as Mr. Oppenheim
15    just acknowledged, would reference perhaps one work in
16    suit.  But now plaintiffs are taking the position that
17    that provided notice for maybe 50 or 70 works that are
18    not mentioned in that notice.
19                   SPECIAL MASTER RODRIGUEZ:  All right.
20    Here's what I will do on this one, because I do agree
21    that this is a significant issue.  If you all would each
22    submit to me a very brief, no more than two-page,
23    supplemental briefing on this particular issue.
24                   I can't decide this issue until I get that
25    briefing, so the quicker we can do the briefing, the
```

Telephonic Hearing
May 15, 2020

```
 1   better.  We'll have the next hearing on Monday.  Can we
 2   get the briefing by Tuesday?
 3                  MR. OPPENHEIM:  Ms. Rodriguez, this is
 4   Matt Oppenheim.
 5                  I -- first of all, I thought you had
 6   resolved it, so I don't understand what Ms. Golinveaux
 7   has said which has changed your mind because what she
 8   said is just inaccurate.  It's -- and what I -- the idea
 9   that we're now going to go back -- the notices specify
10   the file name, and she can't dispute that.  Nor can she
11   dispute that they have the documents that show what files
12   are contained within what file name.  They have all that.
13                  And -- and what they know is that our
14   expert report, when it is due, will provide a detailed
15   analysis of this.
16                  So what they're trying to do is force us
17   to complete an expert analysis and produce information
18   prior to the expert deadline, and that's not proper.
19   So -- I mean, I'm happy to submit another brief, but it's
20   just kind of -- the issues just go on and on and on, but
21   this one is simple.
22                  MR. ELKIN:  This is Mr. Elkin here.
23                  I -- this is completely wrong.  What
24   Mr. Oppenheim is not telling you is that what is
25   contained in these notices in terms of a hash, be
```

Telephonic Hearing
May 15, 2020

Page 68

```
 1    impossible for Charter to figure out.  You'd have to --
 2    Charter would have to sort of download one of these four
 3    peer-to-peer protocols, jump through a number of hoops.
 4              It took their own expert in Sony 30 pages
 5    to describe the convoluted way in which Charter would be
 6    able to divine what it is they're talking about.
 7              They're the ones that have Rule 11
 8    obligations to be able to assert that they have conducted
 9    due diligence with respect to those music composition
10    claims.
11              What you just heard is completely
12    fallacious.
13              SPECIAL MASTER RODRIGUEZ:  All right.
14              MR. OPPENHEIM:  Ms. Rodriguez, that --
15              SPECIAL MASTER RODRIGUEZ:  Here's the
16    problem I have, is that I need to look at this in more
17    detail because it's not that one person is saying the
18    light was red and another is saying that it's green here.
19    What you're both saying is there wasn't a light and, you
20    know, it was a street light and it -- this is too much.
21              So I need to see this in writing, what it
22    is that you're claiming the notices say and don't say and
23    what the obligation is there.  And I will tell you my
24    inclination is that it appears to me that you already
25    have the information that you need.
```

Telephonic Hearing
May 15, 2020

Page 69

```
 1              So I need to be convinced that this is not
 2   the case, that you don't already have this information.
 3   And I'm going to give you that opportunity to do it in
 4   writing because I feel like we've got two ships passing
 5   in the night here, and I need to get some clarity on
 6   this.
 7              So you may choose to provide supplemental
 8   briefing on this or not.  I have asked for the defendants
 9   to give me something that establishes what it is they are
10   saying here.  And plaintiffs may feel free to punch this
11   up, but I want to see it in writing.
12              MS. GOLINVEAUX:  Thank you, Ms. Rodriguez.
13   This is Jennifer --
14              (Simultaneous crosstalk.)
15              SPECIAL MASTER RODRIGUEZ REPORTER:  I
16   don't know who's speaking, except everybody.
17              SPECIAL MASTER RODRIGUEZ:  Let's do one at
18   a time.  Ms. Ranahan?
19              MS. GOLINVEAUX:  It's Ms. Golinveaux.  Go
20   ahead.  I'm sorry.
21              SPECIAL MASTER RODRIGUEZ:  Oh, sorry.  All
22   right.
23              MR. OPPENHEIM:  So this is Mr. Oppenheim.
24   I just --
25              SPECIAL MASTER RODRIGUEZ:  I'm going to
```

Telephonic Hearing
May 15, 2020

1   hear one more time from each of you.  Ms. Golinveaux was

2   about to say something.  I'll hear from Ms. Golinveaux,

3   then Mr. Oppenheim, and then we're going to move forward.

4               MS. GOLINVEAUX:  I was just saying thank

5   you.  We will provide that briefing.

6               SPECIAL MASTER RODRIGUEZ:  Okay.  Got it.

7   Thank you.

8               Mr. Oppenheim?

9               MR. OPPENHEIM:  That's fine.  We'll

10   have -- we'll submit something.

11               If I may, could we put it to Wednesday

12   since we're going to have a hearing on Monday?  Is that

13   all right?

14               SPECIAL MASTER RODRIGUEZ:  That's fine.

15               All right.  It looks like the next thing

16   that we have relates to the Audible Magic files, RFP

17   responses 90 and 91.  Defendants are seeking the

18   reference files used by Audible Magic.

19               As I understand it, these are the files

20   that we've asked the plaintiffs to confirm by June 1

21   whether or not they are, in fact, the reference files.

22               MR. ANDERSON:  Yes, Ms. Rodriguez --

23               SPECIAL MASTER RODRIGUEZ:  What is it that

24   we need to take up now?

25               MR. ANDERSON:  Ms. Rodriguez, this is Sean

Telephonic Hearing
May 15, 2020

1    Anderson on behalf of defendant.

2              So Charter's two requests, 90 and 91,

3    which were not subject to last month's hearing, are a bit

4    broader than the question that is currently pending.  90

5    seeks all of the reference files.  91 seeks the

6    corresponding database of fingerprints.

7              As we discussed last month, these --

8    these -- these styles and this information is critical to

9    plaintiffs' alleged direct infringement case.

10             To the extent that the files plaintiffs

11   have produced to date for the sound recordings in suit

12   are exactly the same as that are used by Audible Magic to

13   create the reference files, then RFP 90 is partially

14   satisfied.

15             However, there is -- there are works in

16   suit, music compositions in suit for which there's no

17   corresponding sound recording in suit.  Thus, what

18   plaintiffs have produced to date would not cover those

19   music compositions in suit to the extent they -- they can

20   determine that the files are the same.

21             Further, RFP 91 has not yet been satisfied

22   or responded to at all, which is the primary reason that

23   we're moving for this now.

24             Further, though plaintiffs allude to the

25   fact that this information may need or be derived from

Telephonic Hearing
May 15, 2020

```
 1   third parties, it is our understanding that plaintiffs
 2   should have or do maintain these files and create the
 3   reference copies themselves.
 4              So that is why we're seeking it directly
 5   from plaintiffs now.  If plaintiffs cannot produce these
 6   documents or are not in possession of these documents,
 7   that's their answer.  And that raises potential
 8   preservation issues, you know, issues relating to
 9   plaintiffs' ability to establish direct infringement and
10   obviously informs where else and how else we seek this
11   discovery.
12              So, again, to the extent that what
13   plaintiffs have produced to date is exactly the same as
14   the files used to create the Audible Magic reference
15   files partially satisfies, but there is still the balance
16   of work for which there is no corresponding sound
17   recording in suit.
18              And then RFP 91, which seeks the
19   fingerprint database itself, was not subject to last
20   month's discussion.
21              SPECIAL MASTER RODRIGUEZ:  All right.  So
22   you don't disagree that we're waiting for the plaintiffs
23   to answer the question for us as to whether or not the
24   digital copies they have produced are the same reference
25   files provided to the Audible -- to Audible Magic during
```

Telephonic Hearing
May 15, 2020

1    the claim period, right?  That's what we're waiting on.

2                   MR. ANDERSON:  For the sound recordings in

3    suit, which is a subset of RFP 90, which seeks --

4                   MS. GOLINVEAUX:  And --

5                   MR. ANDERSON:  -- the reference that --

6                   MS. GOLINVEAUX:  And -- it's -- it's

7    Jennifer Golinveaux.

8                   Ms. Rodriguez, to be clear, for RFP 90,

9    plaintiffs have objected to producing the reference

10   files.  So I think what would be useful here is -- you

11   know, it's great, we'll get an answer on June 1, but

12   there's -- there's no valid objections to producing the

13   reference files.  Either they've already done it or they

14   should do it.

15                   SPECIAL MASTER RODRIGUEZ:  Okay.

16                   (Simultaneous crosstalk.)

17                   SPECIAL MASTER RODRIGUEZ:  For plaintiffs?

18                   MS. SAHNI:  Yes.  Ms. Rodriguez, this is

19   Neema Sahni for the plaintiffs.

20                   SPECIAL MASTER RODRIGUEZ:  Okay.

21                   MS. SAHNI:  I'm happy to respond.

22                   First, I think your instinct is exactly

23   right.  We are still investigating the issue that was

24   raised last month.  That is precisely encompassed in

25   these requests.

Telephonic Hearing
May 15, 2020

1          They have asked the question of whether
2    what we've produced is the same as the reference files
3    provided to Audible Magic.  We are deep in the midst of
4    that investigation.  It's complicated, it's time
5    intensive, we've had a number of calls with our clients.
6          This is going back to historical records
7    from many years that were not limited to the notice
8    program at issue here and trying to match up what was
9    provided back then to what we have produced today.   In
10   some cases, the historical records go by UPC Code, which
11   is an album code as opposed to an individual track code.
12         This is a complicated exercise, and we are
13   deep in the process of it, investing enormous amounts of
14   resources in getting the answer that you asked us to
15   provide.
16         We are working to do that on the timeline
17   that you ordered, and you expressly said in your order
18   that we would not be required to produce the reference
19   files pending that answer.
20         So we were, frankly, quite surprised to
21   see that Charter moved on this, given that this is
22   something that was addressed last month and that we are
23   actively moving forward on.
24         To the issue of whether this is -- you
25   know, why we've objected to the reference files period,

Telephonic Hearing
May 15, 2020

1   as we explained last month -- and I'm happy to explain

2   again, although I think this is, frankly, resolved by the

3   fact that this is entirely premature and unripe -- it is

4   not, in fact, integral to proving direct infringement, as

5   they claim in their brief.

6            As we discussed last month, to determine

7   whether a file is, in fact, an infringing file of a work

8   that we are claiming in the suit and that we own or

9   control, all Charter needs to do is open up the

10  infringing file and listen to the works.

11           If it is indeed -- you know, you open the

12  file that says -- purports to be an infringing file of

13  Lady Gaga's Poker Face, you can listen to that file and

14  determine, is it in fact Lady Gaga's Poker Face?

15           You can then also run a match against the

16  digital copies we've been producing, and if it's a

17  copy -- it's matched to a copy of a work that we own or

18  control, then there is direct infringement, period, done.

19  There is nothing that is required for the historical

20  reference file.

21           Notwithstanding that, we are engaging in

22  this exercise per your order to find that information

23  out.

24           As to the question of the musical works,

25  that's a complete red herring.  A musical work doesn't

Telephonic Hearing
May 15, 2020

1    have a fingerprint.  It is an arrangement of lyrical
2    notes and musical notes that correspond to any number of
3    sound recordings.  And so the question of whether or not
4    we could provide a fingerprint or a reference file for
5    musical works, I'm not even sure what that means,
6    frankly.  It's totally not a fit for something that is
7    not a sound recording.
8                    So we have produced digital copies of the
9    sound recording where there is actually a musical style
10   associated with the SR.
11                   I'm happy to answer any further questions
12   about the musical style piece or the digital copy piece
13   or the reference file piece; but like I said, I think
14   this can be resolved by simply saying that this is not
15   ripe right now.  We are working on the question you asked
16   us to provide.
17                   MR. ANDERSON:  Ms. Rodriguez --
18                   SPECIAL MASTER RODRIGUEZ:  And have --
19                   MR. ANDERSON:  -- if I could respond to
20   that --
21                   SPECIAL MASTER RODRIGUEZ:  -- the
22   parties -- hold on a minute, please.
23                   Have you all met and conferred as it
24   relates specifically to RFP 91?
25                   MR. ANDERSON:  Yes.

Telephonic Hearing
May 15, 2020

Page 77

```
 1                   SPECIAL MASTER RODRIGUEZ:  Okay.
 2                   THE COURT REPORTER:  Who was that, please?
 3                   MR. ANDERSON:  Sorry.  Mr. Anderson
 4       from -- Sean Anderson from Winston & Strawn.
 5                   THE COURT REPORTER:  Thank you.
 6                   SPECIAL MASTER RODRIGUEZ:  All right.
 7       Mr. Anderson, you may briefly respond to Ms. Sahni's
 8       statement --
 9                   MR. ANDERSON:  So -- so Ms. Sahni made --
10                   SPECIAL MASTER RODRIGUEZ:  -- but I will
11       tell you I am inclined -- that this is premature at this
12       point.  I think we're going to know more once we get the
13       answer to the question that was posed to plaintiffs at
14       the last hearing.
15                   MR. ANDERSON:  I'll address Ms. Sahni's
16       various points, but also your note regarding prematurity.
17                   First, with respect to the ability to
18       verify plaintiffs' alleged infringement notices with this
19       data.  As we discussed at length last month, it's not
20       possible.  What Ms. Sahni left out was the fact --
21                   SPECIAL MASTER RODRIGUEZ:  Okay.  I'm
22       sorry, I'm sorry, I'm sorry, Mr. Anderson.  Can you slow
23       down for a moment?
24                   MR. ANDERSON:  Yes.  Sorry.
25                   SPECIAL MASTER RODRIGUEZ:  Start over.
```

Telephonic Hearing
May 15, 2020

1    I'm just not listening as fast as you're talking, and I

2    want to make sure I understand what you're saying.

3                   MR. ANDERSON:  My apologies.

4                   With respect to the ability for Charter to

5    verify the alleged infringement notices at issue in this

6    case, we discussed this at length last month.

7                   What Ms. Sahni left out from her

8    description is that the quote/unquote infringing styles

9    they have produced are not the actual files that

10   Charter's subscribers are alleged to have downloaded.

11                  They are stand-alone files that were

12   created after the claim period, as you're well aware, in

13   connection with the MarkMonitor hard drive briefing that

14   purportedly matched files that Charter subscribers may or

15   may not have possessed at some period of time years

16   prior.

17                  So we can't simply open up the file and

18   listen to it to ensure that the notice that was directed

19   at the Charter subscriber is the same.

20                  Turning specifically to --

21                  SPECIAL MASTER RODRIGUEZ:  Excuse me,

22   excuse me.  I apologize for interrupting you, but isn't

23   that what we're waiting to find out, is if they're the

24   same or not?

25                  MR. ANDERSON:  So what I was referring to

Telephonic Hearing
May 15, 2020

1    was the quote/unquote infringing files, which were the

2    files that were downloaded from peer-to-peer networks by

3    plaintiffs or plaintiffs' agent, MarkMonitor, that

4    Ms. Sahni -- and, you know, she'll correct me if I'm

5    misrepresenting what she stated, but I don't believe that

6    I am -- that Ms. Sahni said we could simply open up and

7    listen to and say, "Oh, this is a Lady Gaga song.  That

8    must have meant that this Charter subscriber three years

9    prior downloaded this Lady Gaga song."

10            But, of course, the file that we're

11    listening to is not the file that the Charter subscriber

12    downloaded.  It's a file that MarkMonitor downloaded in

13    2016, put in a hard drive that we've been discussing, the

14    metadata related to, that we only received, you know,

15    several weeks ago.

16            The reference files are different.  The

17    reference files are the legitimate copies of plaintiffs'

18    works that MarkMonitor purportedly used to compare to the

19    infringing files that I was just discussing a moment ago.

20    The reason that this request is not premature is for

21    several reasons.

22            First, as Ms. Golinveaux noted, plaintiffs

23    have objected to producing the reference files to a -- to

24    a request for production that squarely seeks these files,

25    RFP 90.  So we are moving to compel them to produce those

Telephonic Hearing
May 15, 2020

1    reference files.

2                    To the extent that what they have produced

3    to date are the same, then they have -- they have

4    satisfied, likely, a good majority of RFP 90.  However,

5    turning to Ms. Sahni's other point that there's no such

6    thing as a digital file for a music composition, that's

7    not true based on the way that plaintiffs have

8    constructed this case.

9                    As we just discussed a moment ago with

10   respect to the notices, say, for example, plaintiffs --

11   and we put this example in our -- in our brief in a

12   footnote in relation to a Rolling Stones song.

13                   But say plaintiffs are suing for a

14   composition for which there is no corresponding sound

15   recording in suit.  Now, plaintiffs are going to claim

16   that Charter's subscriber infringed this composition by

17   virtue of downloading a sound recording that -- that has

18   that composition embedded within it.

19                   Now, that sound recording might not be at

20   issue in this case because it's owned by an independent

21   label, it's owned by, you know, not one of plaintiffs'

22   entities.

23                   But Audible Magic did verify that the

24   sound recording that embodies plaintiffs' composition is

25   an accurate copy of that song.  So we are entitled to

Telephonic Hearing
May 15, 2020

 1    that file as well because RFP 90 is not all copies of

 2    the work -- digital copies of the works in suit; it's all

 3    copies of the files that Audible Magic or plaintiffs used

 4    to verify the infringements in this case.

 5                    And then the last point Ms. Sahni made

 6    was -- or there was a reference to these files being

 7    provided to MarkMonitor.  It's our understanding that

 8    plaintiffs, as part of their own content protection

 9    efforts, as a normal course of business, created these

10    reference files themselves.  They admitted a CD was

11    pressed -- or a work was completed, they created the

12    reference files and maintained a fingerprint database.

13                    So this -- it's not necessarily the case

14    that these files may be in the possession of MarkMonitor

15    and they need to figure out what they sent to

16    MarkMonitor.  It's also likely the case that these are

17    documents that should be in plaintiffs' possession.  If

18    they're not, as I noted, then, you know, there's

19    potential preservation issues.

20                    SPECIAL MASTER RODRIGUEZ:  Okay.

21    Ms. Sahni, do you have a response to all of that?

22                    MS. SAHNI:  Sure, Ms. Rodriguez.  I'm

23    happy to address any or all of it.

24                    But, I mean, I think you understand our

25    point that this is -- this is entirely premature.  As to

Telephonic Hearing
May 15, 2020

Page 82

```
 1   the issue of whether or not we'll produce the reference
 2   files, I think it's not ripe yet.  We haven't
 3   investigated, but we haven't completed the investigation
 4   you asked us to complete.
 5              As to the musical works, I, frankly, don't
 6   even understand Mr. Anderson's point that somehow we're
 7   supposed to produce an SR for an independent label.  I
 8   mean, it doesn't really make sense, but -- but I, you
 9   know, go back to what I said, that I think it represents
10   a fundamental misunderstanding of what a musical work is.
11   There is no fingerprint of a musical work.
12              If there are any specific questions you
13   have, I'm happy to address it, but I also am cognizant of
14   making sure we don't go for several hours.  And if
15   there -- if there's other things you would like me to
16   address, I'm happy to.
17              MR. ANDERSON:  If I could just clarify
18   that last point about the fingerprint for a musical work.
19   We're not asking for the fingerprints of a --
20              SPECIAL MASTER RODRIGUEZ:  Is this
21   Mr. Anderson?
22              MR. ANDERSON:  Sorry.  This is
23   Mr. Anderson.
24              We're not asking for a fingerprint of a
25   musical work.  We're asking for a fingerprint of the work
```

Telephonic Hearing
May 15, 2020

1   plaintiffs claim constitutes the infringement of a

2   musical composition by virtue of a Charter subscriber

3   downloading that work by a peer-to-peer network.

4              This case is about what plaintiffs claim

5   Charter's subscribers downloaded constituting

6   infringement in this case.  If there's a sound recording

7   that was downloaded that infringes plaintiffs' music

8   composition only, there is, therefore, a file.  And we

9   want the reference copy for that file as well.

10             MS. SAHNI:  And, Ms. Rodriguez, my point

11  is simply that Mr. Anderson himself said that we may not

12  have owned that SR itself.  I mean, the whole point is,

13  these are SRs that are not -- sound recordings that are

14  not in the case.

15             And so the notion that we would have to go

16  out and find a sound recording that we may or may not

17  control for a musical composition for which we do

18  control, I mean, they can go and find it themselves if

19  that's the case.

20             I -- I'm sort of -- sort of shocked at

21  that request, frankly.  It seems pretty preposterous to

22  ask us to go out and find a sound recording for -- that

23  we are not claiming in this case.

24             So again, I'm happy to address any of your

25  questions.  I do think that Mr. Anderson's representation

Telephonic Hearing
May 15, 2020

Page 84

```
 1    of how infringement can be proven in this case is
 2    inaccurate and it's misleading as to what it is that
 3    we've provided and how we can link the works together.
 4                But I also think that this one is pretty
 5    easily resolved without getting deep into those technical
 6    issues since we're in the midst of our investigation on
 7    the question posed.
 8                SPECIAL MASTER RODRIGUEZ:  All right.
 9    Well, I have to admit I'm a bit confounded with this
10    issue and explanation of a topic that I thought I had
11    previously understood and -- but at the bottom line, what
12    I would say is that I do believe that this is premature
13    as it relates to the motion to compel with regard to RFPs
14    90 and 91, so I would deny that at this point with leave
15    to refile once we have the answers with regard to whether
16    or not the digital copies that have been produced are the
17    same reference files provided to Audible Magic during the
18    claim period.
19                I would also say, I guess I'm a bit
20    confused -- and maybe it's simply that I don't understand
21    here something, and I'm sure you guys will point that out
22    and -- and tell me what I don't understand.
23                But it seems to me that if it is
24    information that Audible Magic would have, Audible Magic
25    has been subpoenaed, and that information is accessible
```

Telephonic Hearing
May 15, 2020

Page 85

1    from Audible Magic, or should be.

2              Perhaps your argument is, is that

3    plaintiffs have control over Audible Magic and their

4    copies and files.  But at least at this moment, I would

5    say that this is premature.

6              Again, once we get the answer to the

7    question, we can take this up again if the defendants

8    feel that the information is still lacking.

9              MS. GOLINVEAUX:  Ms. Rodriguez, this is

10   Jennifer Golinveaux.  If I could just respond to your

11   last question, I think I can provide a short, clear

12   answer to that.

13             The fingerprints that were used -- and

14   these are fingerprints, these are data files that are

15   created from the plaintiffs' songs and Audible -- we

16   can't get all those from Audible Magic because plaintiffs

17   apparently used the Audible Magic software to make the

18   fingerprints themselves and to provide them.

19             So there's information that's in the

20   possession of the plaintiffs that we need to get from the

21   plaintiffs.  This is how the MarkMonitor system matched

22   the alleged infringements, by using these -- these

23   metadata fingerprints to match up against the files they

24   found online.

25             SPECIAL MASTER RODRIGUEZ:  Okay.  All

Telephonic Hearing
May 15, 2020

Page 86

```
 1    right.  Let's take a -- what do we still have?
 2                MS. RANAHAN:  Ms. Rodriguez, can we just
 3    get clarity.  On the first batch that we've talked
 4    about -- this is Erin Ranahan, sorry.
 5                The first batch we talked about, where
 6    you said they could go through to 2016, that's, like,
 7    all of those requests, right, not just the one -- I think
 8    Ms. Sahni asked does this just apply to 55, and I just
 9    want to make sure that --
10                SPECIAL MASTER RODRIGUEZ:  No.
11                MS. RANAHAN:  -- this is through 2016.
12                SPECIAL MASTER RODRIGUEZ:  All of them.
13                MS. RANAHAN:  That's for all of them.
14    Okay.  Thank you.
15                MS. SAHNI:  Ms. Rodriguez, let me clarify
16    that because we -- you expressed -- made an order as to
17    our communications with MarkMonitor because that was the
18    request, was that they wanted to be able to know about
19    any communications we had with MarkMonitor.  That is only
20    RFP Number 55, which is the only one that asked for
21    communications with MarkMonitor.  So that's the one where
22    we are agreeing to go till the end -- for -- we asked if
23    we could go until the end of 2015.
24                So I'm now a little confused because that
25    was --
```

Telephonic Hearing
May 15, 2020

```
 1                    SPECIAL MASTER RODRIGUEZ:  Yes.
 2                    MS. SAHNI:  -- what their request focused
 3      on.
 4                    SPECIAL MASTER RODRIGUEZ:  All right.
 5      Yes.
 6                    MR. OPPENHEIM:  And, Ms. Rodriguez, if I
 7      can --
 8                    SPECIAL MASTER RODRIGUEZ:  I stand
 9      corrected.  Let me see if I can clarify this before
10      everybody starts jumping in here.
11                    With regard to the communications with
12      MarkMonitor, I did order through the end of 2016.  With
13      regard to the other interrogatory requests -- or, sorry,
14      request for production --
15                    MS. RANAHAN:  This is communications with
16      other third parties, like RIAA.  This is just other --
17                    THE COURT REPORTER:  I'm sorry, I can't --
18      I'm sorry.  I didn't hear that.
19                    SPECIAL MASTER RODRIGUEZ:  Hold on.
20                    THE COURT REPORTER:  And was that
21      Ms. Ranahan?
22                    MS. RANAHAN:  Yeah, sorry.
23                    THE COURT REPORTER:  I'm sorry, it was a
24      little muffled.
25                    MS. RANAHAN:  I was just going to say, the
```

Telephonic Hearing
May 15, 2020

Page 88

```
 1   other -- right, the other request here relates to the
 2   other third-party communications, like the RIAA and
 3   Audible Magic.  So we would request that the same through
 4   2016 apply to all of these.
 5               MR. OPPENHEIM:  This is Matt Oppenheim.  I
 6   guess I'm confused.  I thought that there was an
 7   agreement that had already been reached with
 8   Judge Hegarty on what the, quote/unquote, discovery
 9   period was.
10               Are we now trying to redo all of that and
11   we have to go back and redo all of these -- all of the
12   searching and the requests?  I mean, this is not as
13   simple as just saying, "Oh, let's extend it," as far as I
14   can tell.  But others can jump in.
15               (Simultaneous crosstalk.)
16               SPECIAL MASTER RODRIGUEZ:  We don't need
17   to replow that ground.  Let's go through it so that it is
18   clear.
19               With request to -- with respect to Request
20   Number 27, I order that the plaintiffs to produce through
21   May of 2016.
22               With regard to Request Number 55, all
23   communications with MarkMonitor regarding the copyright
24   works and the copyright infringement notices considered,
25   prepared, or sent to Charter or its account holders,
```

Telephonic Hearing
May 15, 2020

Page 89

1   subscribers, or customers, that that request will go
2   through the end of 2016.
3                    With regard to Request Number 56, that
4   request will go through May 17, 2016.
5                    With regard to Request Number 62, that
6   request goes through May 17, 2016.
7                    With regard to Request Number 63, that
8   request would go through May 17, 2016.
9                    With request -- with regard to Request
10  Number 64, that request will go through May 17, 2016.
11                   Same would be for the Request Number 65.
12                   The same would be true for Request
13  Number 66.
14                   The same will be true for Request
15  Number 84.
16                   MS. SAHNI:   Thank you, Ms. Rodriguez.
17  This is Neema Sahni.
18                   I had one question.   On RFP 56, I think we
19  have a disagreement as to what -- whether -- we have not
20  agreed to produce documents specific to that request,
21  although we do believe that documents responsive to 65
22  and 66 basically cover it, so I just wanted to understand
23  the order as to that one.
24                   I'm happy to talk further about -- about
25  the request if that would be helpful.

Telephonic Hearing
May 15, 2020

1           SPECIAL MASTER RODRIGUEZ:  So is this
2    request not covered by other requests?  Is this not
3    duplicate -- duplicative of others?
4           MS. SAHNI:  That is our understanding,
5    Ms. Rodriguez, is that between -- we're not understanding
6    what the delta is.  To the extent they want the computer
7    code software itself, that -- that they would get through
8    MarkMonitor, but we've already agreed to produce, under
9    65 and 66, MarkMonitor's analyses of the computer code
10   used to send notices to Charter, as well as documents
11   concerning the reliability of the MarkMonitor system, and
12   we'll be reviewing and producing only one of those search
13   terms as to those.
14           So I believe we're set on that, but I -- I
15   wanted to make sure there was no other order as to that
16   one, which we haven't specifically agreed to produce
17   beyond those two, which we think make it duplicative.
18           SPECIAL MASTER RODRIGUEZ:  All right.
19   Yes.  Thank you for raising that one.
20           That was -- defendants, is there something
21   beyond what's already been agreed to that you're
22   requesting?
23           MR. ANDERSON:  So I'll just note that
24   RFP 56, as we flagged in our initial appendix and then
25   again in our reply yesterday, plaintiffs had previously

Telephonic Hearing
May 15, 2020

1    represented that they would produce documents in

2    response -- sorry, this is Sean Anderson from Winston &

3    Strawn -- had represented that they would produce

4    documents responsive to this request subject to their

5    objection.

6                    There is likely some overlap between the

7    other requests that they highlight in their column RFP 65

8    and 66, and I'll just note that RFP 56 does not speak to

9    computer code itself, contrary to plaintiffs'

10   representation.  It's documents concerning that.  Whereas

11   65 and 66 are more focused on analyses -- or 65 is

12   regarding analyses.

13                    So these would be documents concerning the

14   systems used to send notices to Charter or that

15   plaintiffs otherwise are relying on in this case that

16   aren't limited to analyses in that respect.

17                    MS. GOLINVEAUX:  And, Ms. Rodriguez --

18                    SPECIAL MASTER RODRIGUEZ:  Okay.  Well,

19   why don't you all --

20                    MS. GOLINVEAUX:  It's Jennifer --

21                    SPECIAL MASTER RODRIGUEZ:  -- sit down

22   and -- why don't you all sit down and look at what is

23   produced and then make a decision about what needs to be

24   produced that's beyond what has already been produced by

25   plaintiff when they make this production and then confer

Telephonic Hearing
May 15, 2020

1   with them about what more you're seeking that they have

2   not provided and see if you can come to some resolution.

3                   If not, then certainly we can address

4   that.

5                   MS. SAHNI:  Thank you, Ms. Rodriguez.

6                   MR. ANDERSON:  Understood.

7                   SPECIAL MASTER RODRIGUEZ:  Okay.  Now I

8   have lost track of where we are.

9                   THE COURT REPORTER:  Can we have a break

10  soon?  This is the reporter.

11                  SPECIAL MASTER RODRIGUEZ:  Yeah, I was

12  just going to say, let's take a break, even more so that

13  our reporter is asking.  You have earned it.  So how long

14  of a break would you like?

15                  THE COURT REPORTER:  10 or 15 minutes for

16  me.

17                  SPECIAL MASTER RODRIGUEZ:  That's a

18  question for our reporter.

19                  Okay.  Why don't we take a 15-minute

20  break.  It's 11:55 and we'll break until 12:10.  I'm

21  going to leave the line open and mute it, but just so

22  you'll know, it will still be open so that you can get

23  back on.

24                  THE COURT REPORTER:  Thank you.

25                  SPECIAL MASTER RODRIGUEZ:  Okay?  All

Telephonic Hearing
May 15, 2020

Page 93

```
 1   right.  Thanks.
 2                   (Recess taken from 11:55 a.m. until
 3   12:12 p.m.)
 4                   SPECIAL MASTER RODRIGUEZ:  All right.  We
 5   probably should do entries again, just so we make sure we
 6   have everybody.
 7                   Plaintiffs, you want to do your entries?
 8                   MR. OPPENHEIM:  Sure.  This is Matt
 9   Oppenheim, and I believe that we still have the same
10   group on board, which is Jonathan Sperling, Neema Sahni,
11   and Jeff Gould on behalf of plaintiffs.
12                   MS. GOLINVEAUX:  And this is Jennifer
13   Golinveaux at Winston & Strawn, and we also have Michael
14   Elkin, Erin Ranahan, Sean Anderson, and Cesie Alvarez.
15                   SPECIAL MASTER RODRIGUEZ:  Okay.  All
16   right.  Thanks everybody.  I think we're closing in on
17   the finish here.
18                   So it looks like now what we have to turn
19   to is the financial documents, Requests Number 22, 23,
20   24, and 25, although these look different enough that we
21   probably should address them separately unless,
22   Defendants, you disagree.  These are your requests.
23                   MS. RANAHAN:  No.  I think that makes
24   sense.  This is Erin Ranahan.  I think that makes sense.
25                   SPECIAL MASTER RODRIGUEZ:  Okay.
```

Telephonic Hearing
May 15, 2020

1          MS. SAHNI:  Ms. Rodriguez, this is Neema

2    Sahni for the plaintiffs, if I may -- and I'm hesitant to

3    take us backwards -- but I do want to clarify one issue.

4    We went through RFPs 27, 55, 56, 62 to 66, and 84.

5          And I know you clarified the time period,

6    but Charter's proposed order as to those is, in many

7    cases, to respond to the request as written, and

8    obviously we have responded subject to various objections

9    and provided responses that we believe are relevant and

10   proportionate to the needs of the case.

11         To the extent that you are ordering any --

12   or you're inclined to order any as written, I would, you

13   know, obviously want the opportunity to be heard on why

14   our response is adequate.  But I wanted to make sure the

15   record was clear as to that issue.

16         SPECIAL MASTER RODRIGUEZ:  Yes.  It is

17   clear.  And it's, for example, my understanding -- and

18   y'all can correct me if I'm wrong on this -- but to the

19   extent we have not addressed, that the issue was with

20   regard to the time period.

21         MS. SAHNI:  Okay.  That's -- that's my

22   understanding as well, Ms. Rodriguez, is that we will

23   continue to apportion as our response but subject to the

24   time periods that you have identified, including

25   extending out the claim period for RFP 55.  Thank you

Telephonic Hearing
May 15, 2020

1   very much for that clarification.

2                    SPECIAL MASTER RODRIGUEZ:  Yeah.

3                    MS. GOLINVEAUX:  And Ms. Rodriguez, this

4   is Jennifer Golinveaux.

5                    If that's the case, there are a few issues

6   that I believe Ms. Ranahan needs to go through.  Because

7   if you look at plaintiffs' responses to some of these

8   requests, including Request 55, they carefully parsed

9   what types of communications, what types of relevant

10  communications of MarkMonitor they would deem responsive.

11                   And so we would ask you to enter that

12  request and a couple of others as drafted, as opposed to

13  their kind of carefully crafted carve-out.

14                   SPECIAL MASTER RODRIGUEZ:  So, for

15  example, with respect to Request Number 55, it appears to

16  me that the response of plaintiffs agreeing to produce

17  for the period from January 1, 2010 to December 31, 2016,

18  responsive nonprivileged communications with MarkMonitor

19  concerning infringement notices MarkMonitor sent to

20  Charter in connection with the RIAA notice program at

21  issue in this case that are in plaintiffs' possession,

22  custody, or control, to the extent located following a

23  reasonable and diligent search, that seems appropriate to

24  the request as crafted.

25                   Plaintiffs' search term disclosure also

Telephonic Hearing
May 15, 2020

Page 96

1  shows that their search of email communications with
2  MarkMonitor has not been limited by subject matter and
3  must capture all email communication sent to, from, or
4  cc'ing MarkMonitor to May.
5            Again, that seems appropriate, and I'm not
6  ordering anything additional at this time.
7            MS. GOLINVEAUX:  Ms. Rodriguez, this is
8  Jennifer Golinveaux again.
9            The one thing, important thing that they
10 carved out is communications about the copyrighted works,
11 and Charter does have counterclaims in the case regarding
12 sending them notices for works that plaintiffs did not
13 own.
14            So I think what you've stated we would
15 agree with in terms of its reasonableness, with the
16 addition of the communications regarding the works in
17 suit.
18            MS. SAHNI:  Ms. Rodriguez --
19            SPECIAL MASTER RODRIGUEZ:  I'm sorry --
20            MS. SAHNI:  -- I'm happy to --
21            SPECIAL MASTER RODRIGUEZ:  -- the last
22 thing you said -- hold on, hold on just a second.
23            MS. GOLINVEAUX:  Sure.
24            SPECIAL MASTER RODRIGUEZ:  I missed the
25 last part of what you said, Ms. Golinveaux.  They agree

Telephonic Hearing
May 15, 2020

```
 1   with regard to the . . .
 2                   MS. GOLINVEAUX:  The works, the
 3   copyrighted works at issue.
 4                   SPECIAL MASTER RODRIGUEZ:  Yes.  Okay.
 5   Got it.
 6                   MS. SAHNI:  Ms. Rodriguez, if I -- if I
 7   may, I'm happy to address that issue, if it would be
 8   helpful.
 9                   SPECIAL MASTER RODRIGUEZ:  Briefly,
10   please.
11                   MS. SAHNI:  Sure.
12                   So what matters is the RIAA notice program
13   at issue in this case.  If we had communications with
14   MarkMonitor concerning infringement notices, that is part
15   of that notice program that would be -- be included here.
16                   So to the extent that there are
17   copyrighted works that were included in those notices and
18   we were having communication with MarkMonitor about the
19   notices, we would produce that.
20                   To the extent that this is related to what
21   Ms. Golinveaux characterized as her counterclaims, which
22   we have now -- it's clear that we are intending to move
23   to dismiss and has not -- and that -- that is moving
24   forward, I'm not entirely clear why they would need
25   something about the copyrighted works that don't relate
```

Telephonic Hearing
May 15, 2020

Page 98

1     to the RIAA notice program and notices in this case.

2                    So I'm sort of -- again, it's not clear to

3     me what they're moving for.  If they want to know about

4     our communications with copyrighted works that have no

5     nexus to the notice program and notices sent in this

6     case, that's not proper and it's not proportionate to the

7     needs of this.

8                    MS. GOLINVEAUX:  It's Jennifer Golinveaux.

9                    I can help try to clarify that.  If there

10    were --

11                   SPECIAL MASTER RODRIGUEZ:  Well, hold on

12    just a second.

13                   MS. GOLINVEAUX:  Yeah.

14                   SPECIAL MASTER RODRIGUEZ:  Hold on just a

15    second.

16                   As I understand it, they're asking for

17    those that are in the case and those that are going to be

18    dismissed because that's the subject of their

19    counterclaim; is that right?

20                   MS. GOLINVEAUX:  That's right,

21    Ms. Rodriguez.

22                   SPECIAL MASTER RODRIGUEZ:  And so my

23    question is, why -- well, somebody needs to put something

24    on mute.  Okay.  Thank you.

25                   So my question is, why would the -- I

Telephonic Hearing
May 15, 2020

Page 99

```
 1    understand that those matters are no longer in the case,
 2    but they would be the subject of the defendant's
 3    counterclaim.  Why should that not be encompassed in the
 4    production?
 5              MS. SAHNI:  I'm sorry, Ms. Rodriguez.  If
 6    I understand the question, the copyrighted works are the
 7    works that are in the case and are in the Exhibits A and
 8    B that we filed, the amended Exhibits A and B.
 9              To the extent that there are notices that
10    relate to those works and concern and impact
11    communications about notices from MarkMonitor for the
12    RIAA notice program, those would be included.
13              The defined copyrighted works is the works
14    in suit.  So to the extent that there are works in suit
15    for which they sent -- we sent notices and those notices
16    were part of this RIAA notice program, that would be
17    encompassed by what we've agreed to produce.
18              So I'm --
19              SPECIAL MASTER RODRIGUEZ:  All right.  And
20    that would include -- would that include the ones that
21    plaintiffs have now said that they're going to dismiss?
22              MS. SAHNI:  Well, the request calls for --
23    the copyrighted works is the works in suit.  I guess I'm
24    not entirely clear.  Are they asking for something that's
25    not in suit?
```

Telephonic Hearing
May 15, 2020

Page 100

```
 1                    THE COURT REPORTER:  Was that Ms. Sahni?
 2                    MS. SAHNI:  Yes.  I'm sorry.
 3                    THE COURT REPORTER:  Okay.  Thank you.
 4                    MS. SAHNI:  It was.  Thanks for stopping
 5   me.
 6                    MS. GOLINVEAUX:  Ms. Rodriguez, it's
 7   Jennifer Golinveaux.
 8                    What we're asking, they only agreed to
 9   give documents about the notices themselves, but if
10   plaintiffs were corresponding with MarkMonitor about the
11   works in suit and whether they, you know -- whether, for
12   example, they -- they owned those works or how
13   MarkMonitor was matching those works, that, of course,
14   would be relevant, too.
15                    So that's the only point I'm trying to
16   make with respect to our request as drafted versus what
17   they've -- what they've said they'd give.
18                    SPECIAL MASTER RODRIGUEZ:  Okay.  Well,
19   I -- I believe that what the plaintiffs have represented
20   that they are providing would encompass that, and so I
21   will accept the response of the plaintiffs, that they
22   would provide this data from January 1 of 2010 to
23   December 31, 2016.
24                    MS. RANAHAN:  And this is Ms. Ranahan.
25   Just to clarify -- or Erin Ranahan, sorry.
```

Telephonic Hearing
May 15, 2020

1           That would include correspondence over

2   works that have been dropped because they relate to

3   defendant's counterclaims even if plaintiffs no longer

4   consider them works in suit; is that correct?

5           MS. SAHNI:  Ms. Rodriguez, respectfully,

6   the request calls for copyright works, which is the works

7   in suit.  And so to the extent that we've got notices

8   about the works that are in the case, they -- we will

9   produce documents about those notices and those works in

10  suit.  But there's -- I'm sort of failing to see why

11  their request calls for anything else.

12          SPECIAL MASTER RODRIGUEZ:  All right.

13          MS. GOLINVEAUX:  This is Jennifer --

14          SPECIAL MASTER RODRIGUEZ:  As I look at

15  the request, it does refer to copyright works, which is

16  defined as works in suit.  Is there another request that

17  requests this information for works that have or will be

18  dismissed that are the subject of defendant's

19  counterclaim?

20          MS. GOLINVEAUX:  If they're taking the

21  position -- it's Jennifer Golinveaux.  If they're taking

22  the position that they're not going to give it for works

23  that they've subsequently -- that they've dropped now, we

24  can certainly serve a new one.

25          SPECIAL MASTER RODRIGUEZ:  I mean --

Telephonic Hearing
May 15, 2020

Page 102

```
 1                    MS. GOLINVEAUX:  If that's necessary.
 2                    SPECIAL MASTER RODRIGUEZ:  If that's
 3    your -- yeah, if -- plaintiffs, if that is your position,
 4    I guess you can take that position, but to quote Judge
 5    Jackson, the goose and gander rule is alive and well.
 6                    MR. OPPENHEIM:  Ms. Rodriguez --
 7                    MS. RANAHAN:  This is Erin Ranahan --
 8                    MR. OPPENHEIM:  -- this is Matt Oppenheim.
 9    Can I answer your question -- I'm sorry.  I --
10                    SPECIAL MASTER RODRIGUEZ:  Please, let's
11    have one person at a time.
12                    MR. OPPENHEIM:  I'm sorry.
13    Ms. Rodriguez --
14                    MS. RANAHAN:  This is Erin --
15                    MR. OPPENHEIM:  -- can I ask a question?
16    I guess I'm a little confused.  This is Matt Oppenheim.
17                    There's been correspondence with the court
18    about plaintiffs' motion to dismiss this counterclaim.
19    Is it your position as the Special Master that --
20    notwithstanding that there's -- that that counterclaim
21    has not been answered, is still subject to motion to
22    dismiss, that discovery should be going forward on it?
23    Is that where we are?
24                    SPECIAL MASTER RODRIGUEZ:  My question
25    was, is that plaintiffs' position, that because this has
```

Telephonic Hearing
May 15, 2020

1  not been specifically requested here -- I agree with

2  them -- so I guess what I would tell you all is that you

3  need to confer on that particular issue.

4          I'm ordering that it be produced for the

5  works in suit as the plaintiffs have responded to Request

6  Number 55.  The plaintiffs --

7          UNIDENTIFIED SPEAKER:  Ms. Rodriguez --

8          SPECIAL MASTER RODRIGUEZ:  The plaintiffs

9  can make -- the defendants can make the request as it

10 relates to works that are anticipated to be dismissed but

11 that are subject of the counterclaim.

12         MS. GOLINVEAUX:  It's Jennifer Golinveaux.

13 Thank you, Ms. Rodriguez.

14         We will serve a new request.  To be clear,

15 the works that they dropped were works in suit when we

16 draft the request.  But now that they've --

17         SPECIAL MASTER RODRIGUEZ:  Understood.

18         MS. GOLINVEAUX:  -- dropped them, if

19 they're taking the position they won't get discovery, we

20 can serve a new request, if that's -- if that's how they

21 want to go.

22         SPECIAL MASTER RODRIGUEZ:  Thank you.

23         MS. GOLINVEAUX:  Yeah.

24         SPECIAL MASTER RODRIGUEZ:  Anything else?

25         MS. GOLINVEAUX:  Thank you, Ms. Rodriguez.

Telephonic Hearing
May 15, 2020

Page 104

```
 1              MS. RANAHAN:  Ms. Rodriguez, yes.  There
 2  still -- this is Erin Ranahan.  There still are a few
 3  from that first batch that have skills issues that were
 4  not just time related and, unfortunately, I think we're
 5  going to have to go through one by one, such as 62, 63,
 6  and 64.
 7              SPECIAL MASTER RODRIGUEZ:  All right.
 8  Let's go through them.
 9              MS. RANAHAN:  Okay.  So for 62, we're also
10  asking that they produce RIAA documents about this
11  lawsuit, Charter, MarkMonitor, and the works in suit, and
12  they've limited their response to be much more narrow.
13              MS. SAHNI:  Ms. Rodriguez, in response to
14  that, I think our response is completely adequate and
15  quite clear.  We say that we will produce documents
16  concerning the RIAA, Charter, and copyright infringement.
17              I can't imagine how anything else can be
18  related to this lawsuit.  The plaintiffs view a number of
19  activities and tasks in coordination with their trade
20  organizations, the RIAA, and if it concerns copyright and
21  Charter, they'll get it.  But this is not a window into
22  every dealing that our plaintiffs have with the RIAA, and
23  it should not be construed as such.
24              MS. GOLINVEAUX:  It's Jennifer Golinveaux.
25  I believe Ms. Sahni just said they agreed to produce
```

Telephonic Hearing
May 15, 2020

Page 105

```
 1    documents also about this lawsuit, but they did
 2    specifically carve that out of their response, just to be
 3    clear.
 4                  SPECIAL MASTER RODRIGUEZ:  Yeah.  I
 5    was going to say I'm looking at -- I wasn't clear what
 6    plaintiffs were trying to carve out here.  My
 7    understanding was that they were going to produce the
 8    documents that were being requested by defendants, but
 9    only through May of 2016, and would not produce documents
10    postdating 2016.
11                  Is that not accurate?
12                  MS. SAHNI:  That -- that's -- I'm not
13    entirely clear on what they mean by "the lawsuit."  If it
14    deals with Charter and copyright infringement, we'll
15    produce it through May 2016.  So there was no litigation
16    at that point in time.
17                  I'm not entirely sure what the delta is
18    there, Charter and copyright infringement.  To the extent
19    that they're looking for documents about the Copyright
20    Alert System, which we noted in our brief, that's totally
21    improper and completely misaligned with the prior rulings
22    of the court.  But to the extent that it deals with the
23    RIAA, Charter, and copyright infringement through
24    May 2016, as we stated in our response and as our search
25    terms reflect, we will review and produce as appropriate.
```

Telephonic Hearing
May 15, 2020

Page 106

```
 1                    MS. GOLINVEAUX:  So if Ms. Sahni is saying
 2      that they will produce all the documents concerning the
 3      RIAA and Charter, I think that's probably fine -- I think
 4      that's what she just said -- in addition to what they
 5      have agreed to produce.
 6                    MS. SAHNI:  Ms. Golinveaux, I want to make
 7      clear, as I -- my response has been -- I'm literally
 8      reading a document:  RIAA, Charter, and copyright
 9      infringement.  If those -- if it -- if the document
10      concerns those three topics, we will produce it through
11      this date range.
12                    SPECIAL MASTER RODRIGUEZ:  All right.
13      Does that address the question --
14                    MS. GOLINVEAUX:  Well, she left out --
15                    SPECIAL MASTER RODRIGUEZ:  -- the issue?
16                    MS. GOLINVEAUX:  -- MarkMonitor, she left
17      out MarkMonitor, but otherwise it does.
18                    SPECIAL MASTER RODRIGUEZ:  Are you --
19                    MS. SAHNI:  I expect --
20                    SPECIAL MASTER RODRIGUEZ:  -- with respect
21      to MarkMonitor?
22                    MS. SAHNI:  Yeah.  I -- that's why I'm
23      really quite puzzled.  We said we would produce
24      nonprivileged documents concerning MarkMonitor and -- and
25      then there is a list of topics, one of which is the RIAA.
```

Telephonic Hearing
May 15, 2020

1           So, again, I think some of these scope
2      restrictions, I'm not understanding what their concern
3      is, and maybe would have benefited from more
4      meet-and-confers on this if they were confused.  But I
5      think we -- you know, we've addressed everything, and I
6      understood this to be a time period issue, which you have
7      now resolved, Ms. Rodriguez, so thank you for that.
8           SPECIAL MASTER RODRIGUEZ:  All right.
9           MS. GOLINVEAUX:  The concern is how
10     they've parsed their response so carefully.  So if
11     they're agreeing now to give documents concerning RIAA,
12     Charter, MarkMonitor, and the copyrighted works, that's
13     fine.  If they're trying to carve something out, then --
14          SPECIAL MASTER RODRIGUEZ:  Okay.  Let's
15     stop there, let's stop there.
16          MS. GOLINVEAUX:  Yeah, yeah.
17          SPECIAL MASTER RODRIGUEZ:  Are you
18     agreeing to produce those documents as just stated?
19          MS. SAHNI:  If it relates to Charter,
20     MarkMonitor, RIAA, and copyright infringement, there will
21     be -- that we will produce those works.  To be clear, we
22     will not produce documents related to the Copyright Alert
23     System, if that's what they're trying to back door in
24     this request, and I think we've made that very clear.
25          MS. GOLINVEAUX:  We are not.

Telephonic Hearing
May 15, 2020

Page 108

```
 1               SPECIAL MASTER RODRIGUEZ:  Okay.
 2               MS. GOLINVEAUX:  No, no, we are not --
 3               SPECIAL MASTER RODRIGUEZ:  Does anybody
 4    think we're -- I don't think we have a disagreement at
 5    this point.  Let's please not argue over things we don't
 6    need to.  Let me make it clear, there is not going to be
 7    production related to the CAS.
 8               MS. GOLINVEAUX:  Correct.  And we're not
 9    trying to do that, Ms. Rodriguez, but she left out --
10               SPECIAL MASTER RODRIGUEZ:  Okay.
11               MS. GOLINVEAUX:  -- the term "copyright
12    works."  That's -- that was the concern, not -- we're
13    not -- this is not a back-door way to try to get CAS
14    documents.
15               SPECIAL MASTER RODRIGUEZ:  Are we clear on
16    this one?
17               MS. GOLINVEAUX:  It does include the
18    copyright works, the works in suit?
19               MS. SAHNI:  If it relates to Charter,
20    copyright infringement, and MarkMonitor, we will produce
21    it.  I'm still sort of unclear on what the -- the delta
22    is.  I --
23               MS. GOLINVEAUX:  The works in suit.
24    That's the delta.
25               MS. SAHNI:  To the extent that it
```

Telephonic Hearing
May 15, 2020

Page 109

```
 1   includes -- it covers -- it deals with Charter and

 2   copyright infringement, Ms. Golinveaux, you will be

 3   getting those documents.  So I'm --

 4                MS. GOLINVEAUX:  Okay.  That's -- that's

 5   the delta.  We're concerned with the works in suit

 6   because if it's talking about ownership and whether

 7   plaintiffs actually own them, because we think that they

 8   didn't for hundreds, that's the delta and we're entitled

 9   to those documents.

10                MS. SAHNI:  Then if it concerns Charter,

11   copyright infringement, MarkMonitor, and RIAA, those

12   works will be -- those documents will be produced.  And

13   so to the extent that there are works in suit that are

14   encompassed in those documents, we are not going to carve

15   them out, if that is the question.

16                I'm happy to continue to have this

17   dialogue, Ms. Rodriguez, if it would be helpful, but I'm

18   not sure that we're moving the needle forward, moving the

19   ball forward.

20                SPECIAL MASTER RODRIGUEZ:  No.  I mean it

21   appears to me that this is clear.  I guess my question to

22   Ms. Golinveaux is:  What is unclear in terms of what

23   Ms. Sahni has represented will be produced pursuant to

24   this request?

25                MS. GOLINVEAUX:  Sure.  The documents
```

Telephonic Hearing
May 15, 2020

Page 110

```
 1   concerning the RIAA and the copyrighted works in suit.  I
 2   think maybe she's saying they will produce that.  I just
 3   can't tell from how she's wording it.
 4                  MS. SAHNI:  If it relates to --
 5                  SPECIAL MASTER RODRIGUEZ:  From my --
 6                  MS. SAHNI:  Sorry.  Go ahead.
 7                  SPECIAL MASTER RODRIGUEZ:  Let's cut
 8   through this.  From my perspective, it does.
 9                  MS. GOLINVEAUX:  Okay.
10                  SPECIAL MASTER RODRIGUEZ:  So if those are
11   not produced, then we'll come back and talk about it
12   again.  But it sounds to me like -- and I would
13   instruct -- that they are going to produce those
14   documents for works in suit.
15                  MS. GOLINVEAUX:  Thank you.
16                  SPECIAL MASTER RODRIGUEZ:  Okay?
17                  MS. GOLINVEAUX:  Yeah.
18                  SPECIAL MASTER RODRIGUEZ:  All right.
19   What else?
20                  MS. RANAHAN:  Number 64, plaintiffs have
21   not agreed to produce.
22                  SPECIAL MASTER RODRIGUEZ:  Again, my
23   understanding was the dispute here was the timeline.  If
24   that is not the extent of the dispute, can you please
25   identify specifically for me what it is the plaintiffs
```

Telephonic Hearing
May 15, 2020

1   have not agreed to produce that you believe they should

2   produce.

3                  MS. RANAHAN:   Sure.  So for this one --

4   this is Erin Ranahan again.   This one, they have not

5   produced -- agreed to produce anything.  So we have

6   sought documents concerning the relationship, agreement

7   and communications between the RIAA and any person as it

8   relates to this suit, the works for Charter, and

9   plaintiffs have not agreed to produce anything.

10                  SPECIAL MASTER RODRIGUEZ:   But is this one

11   not already subsumed within what plaintiffs are producing

12   in RFP 62 and 63 -- or let me ask the question a

13   different way:

14                  What is it you're seeking here that you're

15   not already going to get in terms of what's been agreed

16   to in RFP 62 and 63?

17                  MS. RANAHAN:   So this is seeking -- this

18   is Erin Ranahan again.   This one is seeking the agreement

19   with the RIAA that they have about the copyrighted works.

20                  SPECIAL MASTER RODRIGUEZ:   All right.

21   Ms. Sahni, what is your responses on that?

22                  MS. SAHNI:   Ms. Rodriguez, I had the same

23   reaction as you did to this one, which is that there's a

24   document that concerns RIAA, Charter, and copyright

25   infringement that will be produced.  So I'm not entirely

Telephonic Hearing
May 15, 2020

Page 112

```
 1   sure what agreements they're referring to.
 2                 Our clients, like I said, do a lot of work
 3   with the RIAA on a broad array of issues.  To the extent
 4   that there's a document that concerns the topics that are
 5   at issue in this case, which is Charter and copyright
 6   infringement, we have agreed to produce it.
 7                 So I'm -- I'm sort of, again, just puzzled
 8   at what the -- what the dispute is.
 9                 SPECIAL MASTER RODRIGUEZ:  All right.  It
10   does appear to me that the documents that are requested
11   as part of -- or in RFP 64 would be subsumed within what
12   is agreed to and being produced pursuant to RFP 62 and 63
13   and, therefore, no further order is required.  Again, the
14   time period here is through May of 2016.
15                 MS. SAHNI:  Thank you, Ms. Rodriguez.
16                 SPECIAL MASTER RODRIGUEZ:  Any others on
17   which we need to take up something more than the timeline
18   for production?
19                 MS. RANAHAN:  No.  I think just one more
20   point is that their answer does say -- and this may be
21   being paranoid -- this is Erin Ranahan again, I'm sorry.
22   But it does say that it has to hit all those things as
23   opposed to or.  So I just want to make sure that what the
24   agreement is, is that plaintiffs are going to produce
25   things that touch on any of those things, you know, the
```

Telephonic Hearing
May 15, 2020

Page 113

1    RIAA and MarkMonitor; it doesn't have to hit all four of

2    them.  Because it's just the way it's phrased is "and"

3    instead of "or."  And then --

4                  SPECIAL MASTER RODRIGUEZ:  Does it say --

5                  MS. SAHNI:  I'm not entirely sure I

6    understand Ms. Ranahan's point.  We've -- we've written a

7    response that makes clear what we're agreeing to produce.

8    If it's RIAA, Charter, and copyright infringement, we'll

9    be producing it.

10                 I don't think there's any proportionate

11   basis to require production of any document that concerns

12   copyright infringement and RIAA.  There's a claim at

13   issue in this case against Charter, and we've agreed to

14   produce documents related to Charter and copyright

15   infringement and the RIAA.

16                 MS. RANAHAN:  Right.  So -- again, Erin

17   Ranahan again.  Our concern is that that means that what

18   they're agreeing to would require the document to hit all

19   three of those things in one, as opposed to searching for

20   these things independently.

21                 SPECIAL MASTER RODRIGUEZ:  Well, why would

22   they be searching for just the word "copyright"?

23                 MS. GOLINVEAUX:  That's still part of --

24                 SPECIAL MASTER RODRIGUEZ:  It has to be --

25                 MS. GOLINVEAUX:  -- the request.

Telephonic Hearing
May 15, 2020

Page 114

```
 1                    SPECIAL MASTER RODRIGUEZ:  -- pointing to
 2      something -- or why would they -- I fail to see how that
 3      advances the ball here.  They could have a number of
 4      documents that reference -- that are hit on the search
 5      term "RIAA."
 6                    MS. RANAHAN:  Right.
 7                    SPECIAL MASTER RODRIGUEZ:  But the ones
 8      that would potentially be relevant here would be the ones
 9      that would be tied to the copyright works and Charter.
10                    MS. SAHNI:  There's a number of activities
11      that have nothing to do with this case that we might have
12      communications regarding the RIAA and copyright
13      infringement.  There's absolutely no proportionate basis
14      that would require discovery of those documents.
15                    If it relates to Charter or this lawsuit
16      somehow because, you know, it concerns Charter, it will
17      be produced.
18                    MS. GOLINVEAUX:  Ms. Rodriguez, it's
19      Jennifer Golinveaux.
20                    I think we're fine with what you said, so
21      long as it's -- if it relates to Charter or the
22      copyrighted works, we're fine with that.  We're fine with
23      that.
24                    SPECIAL MASTER RODRIGUEZ:  Okay.  I do
25      think that that's fair.  If it's RIAA related to Charter
```

Telephonic Hearing
May 15, 2020

Page 115

```
1    or the copyrighted works, that would be fair game for
2    this production.  Do we have any dispute about that?
3                     Okay.  Terrific.
4                     Any others?
5                     MR. OPPENHEIM:  I'm sorry.  This is Matt
6    Oppenheim.  I just -- I'm just thinking through what you
7    just articulated.
8                     So if the RIAA, who hit -- who was
9    involved in hundreds of antipiracy efforts that have
10   absolutely nothing to do with Charter or peer-to-peer or
11   even the Internet, has a case that they're overseeing
12   that involves, say, a pirate bazaar in Russia that
13   they're involved with and it has some of the same works,
14   we have to produce those documents?  That doesn't make
15   any sense to me.  I don't -- but maybe I'm mishearing
16   you.
17                    SPECIAL MASTER RODRIGUEZ:  So it has to
18   have relevance to this matter.
19                    MS. SAHNI:  Okay.
20                    MR. OPPENHEIM:  Very well.
21                    MS. SAHNI:  Thank you, Ms. Rodriguez.
22                    MR. OPPENHEIM:  Apologies if you had said
23   that and I misheard you.  Sorry about that.
24                    SPECIAL MASTER RODRIGUEZ:  All right.
25   Let's turn to the financial -- the request for financial
```

Telephonic Hearing
May 15, 2020

1   records.  I think the first one there is RFP 22:  All
2   documents concerning the effect from copyright
3   infringement using peer-to-peer file-sharing technologies
4   on your projected and actual total revenue and/or profits
5   generated during plaintiffs' claim period.
6                  I must admit I find the relevance of this
7   fairly attenuated, but let me ask this question:  We had
8   this conversation earlier and what plaintiffs agreed to
9   produce was the top-level financial data through the
10  present.
11                 What -- why is Charter needing this
12  additional information and documents?
13                 MS. RANAHAN:  So this is Erin Ranahan.
14                 So this is not financial information
15  relating to plaintiffs.  This would be the impact of
16  these file-sharing technologies which they claim were the
17  vehicles for the --
18                 SPECIAL MASTER RODRIGUEZ:  I see.
19                 MS. RANAHAN:  -- infringement in this
20  case.  So it's --
21                 SPECIAL MASTER RODRIGUEZ:  Okay.
22                 MS. RANAHAN:  -- fairly nuanced.  So
23  that's what the peer-to-peer file-sharing technologies
24  are.  And so that's -- that's what plaintiffs seek.
25                 SPECIAL MASTER RODRIGUEZ:  Okay.

Telephonic Hearing
May 15, 2020

1          MR. SPERLING:  Ms. Rodriguez --

2          SPECIAL MASTER RODRIGUEZ:  And --

3          MR. SPERLING:  -- this is Jonathan

4   Sperling.  I'm sorry.

5          SPECIAL MASTER RODRIGUEZ:  Yes, please.

6          MR. SPERLING:  I was just going to say,

7   very briefly, Ms. Rodriguez, Jonathan Sperling for the

8   plaintiffs.

9          I didn't understand what Ms. Ranahan just

10  said because the request is asking about the impact of

11  those things on our total revenue and profit, so it

12  absolutely goes to the financial effect.

13          When we met on this a month ago, exactly

14  as you said, we met to have you resolve the issue that

15  defendant had raised in their papers, which is that they

16  needed the top-level financial information that you just

17  referred to, Ms. Rodriguez, in order to show that the

18  effective peer-to-peer file-sharing technologies, in

19  their view, had diminished and that the financial impact

20  of peer-to-peer had left.

21          And that's exactly what they wrote in

22  their letter to you of April 10.  They said the requested

23  revenue and profit information will undercut the

24  plaintiffs' inevitable argument.  At a high level

25  statutory damages is required to get Charter for

Telephonic Hearing
May 15, 2020

Page 118

```
 1   permitting P2P, peer-to-peer, infringement on its
 2   network.  Because the supposed need for insurance is
 3   overstated, P2P infringement is no longer an impediment
 4   for plaintiffs.
 5               So you gave them all this post-claim
 6   financial information up to the present in order to
 7   address this exact issue and, therefore, we're not clear
 8   why now that they've gotten that information, they have
 9   gotten it for this purpose, that now we need to go and
10   try to find narrative documents in which anybody talks
11   about this same topic.
12               MS. RANAHAN:  If I could, this is Erin
13   Ranahan again.
14               SPECIAL MASTER RODRIGUEZ:  Yeah.
15   Ms. Ranahan, if you could address for me, because I
16   candidly thought we had addressed and resolved this
17   issue --
18               MS. RANAHAN:  Yes.
19               SPECIAL MASTER RODRIGUEZ:  -- to provide
20   you with the information that you needed in a reasonable
21   and proportionate manner.  It does seem to me that this
22   is requesting quite a bit, so I'd like to understand what
23   it is exactly you're trying to get above and beyond what
24   you're already being provided --
25               MS. RANAHAN:  Yes.
```

Telephonic Hearing
May 15, 2020

1              SPECIAL MASTER RODRIGUEZ:  -- and how
2      that's proportional to the needs in the case at this
3      time.
4              MS. RANAHAN:  Okay.  So this -- this is
5      Erin Ranahan again.
6                   This one is purely a time frame issue, and
7      it is not seeking financials.  This is seeking studies
8      and reports and analyses that plaintiffs have internally
9      conducted about the impact of peer-to-peer on their
10     bottom line.  It's not going to be reflected in a
11     financial report or, you know, the top-level financials.
12     And these are documents that plaintiffs agreed to produce
13     through 2016.
14                   Our concern is that if there was a study,
15     for instance, that plaintiff had sent around that says:
16     Oh, here's the -- here's what's happened with
17     peer-to-peer lately.  Here's what's happened since 2018,
18     it's not really impacting our bottom line as much.
19     There's new legal ways to consume music.  It's not we,
20     you know, declined on this.  This relates to our
21     mitigation and our deterrence factor, statutory damages,
22     which goes all the way through the present.
23                   So the only dispute here is not of
24     substance, because they have agreed to do it for 2016.
25     The dispute is whether studies which happened after 2016

Telephonic Hearing
May 15, 2020

Page 120

```
 1   about this and which may even refer to the claim period,
 2   but even up to the present would be relevant.
 3                 So it's really seeking to extend just the
 4   time frame for these, not financials, but internal
 5   studies or reports or analyses about how these
 6   peer-to-peer technologies are impacting their -- what we
 7   had done before was about how streaming was increasing
 8   their bottom-line financials.
 9                 This is something different.  This is
10   about what they think internally or do report has
11   negatively impacted them, or not, through peer-to-peer
12   technologies, which is the source of the alleged
13   infringement in this case.
14                 So it's much more narrow and specific, and
15   they have agreed to do it --
16                 SPECIAL MASTER RODRIGUEZ:  Okay.
17                 MS. RANAHAN:  -- through 2016, so it's
18   just a time frame issue.
19                 SPECIAL MASTER RODRIGUEZ:  I see.  Okay.
20   Well, here's what --
21                 MR. OPPENHEIM:  Ms. Rodriguez, really
22   briefly --
23                 SPECIAL MASTER RODRIGUEZ:  -- the way I
24   see this -- I've heard enough on this.
25                 MR. OPPENHEIM:  Okay.
```

Telephonic Hearing
May 15, 2020

1           SPECIAL MASTER RODRIGUEZ:  With the

2    information that the plaintiffs have been -- or, sorry,

3    that the defendant has been provided, which includes the

4    top-level financial data through the present, in addition

5    to the documents that plaintiffs have agreed to produce

6    for the period March 1, 2012 to May 17, 2016, that seems

7    to be appropriate and proportional to the request that

8    defendant has made and its need.

9               From this information, it seems that

10   plaintiffs -- or, sorry, the defendant can glean the

11   information that it needs with regard to the request.

12   There is perhaps speculative relevance to documents

13   beyond that time period, but I say that that is

14   speculative and that that concern is, at least in large

15   part, remedied by the fact that defendant is being

16   provided with the top-level documents that should provide

17   the financial information.

18               All right.  Let's go to Request Number 23.

19   This is a request for documents that reference bit

20   torrent or other types of peer-to-peer file-sharing

21   technologies as they relate to diminished or diminishing

22   use of such technologies, copyright infringement,

23   sampling musical works, or committed authorized uses,

24   whether actual, perceived or potential of the copyright

25   works.

Telephonic Hearing
May 15, 2020

1              Plaintiffs have agreed to -- plaintiffs

2     have agreed to produce the nonprivileged analyses and

3     internal documents on this topic for the time period

4     March 1, 2012, through May 17, 2016.  This time period

5     seems to be appropriate.

6              Counsel for defendant, what is your

7     concern with regard to this particular request and

8     response that plaintiffs have made?

9              MR. ANDERSON:  This is Sean Anderson.

10             So this is another time period request

11    and, you know, many of the same arguments that

12    Ms. Ranahan just made would apply here as well.  But

13    essentially would concern reports and studies created

14    in -- in years after the claim period that may reflect

15    directly on the claim period, which, of course, you would

16    need the experience of the years that comprise the claim

17    period to understand what happened.

18             That's one prong of it, so this would be

19    documents in 2017 and 2018 that -- that concerns the

20    claim period directly.

21             But in addition to that or separately from

22    that, it is documents themselves that concern the period

23    post-claim period.  So I just want to make it clear that

24    there are two components to what Charter is seeking here

25    or potentially two ways of -- in drafting the request and

Telephonic Hearing
May 15, 2020

Page 123

1    what Charter is seeking.

2                    And -- and that goes directly, as

3    Ms. Ranahan articulated a few moments ago, to issues

4    bearing on statutory damages and -- and other affirmative

5    defenses we might -- or we are asserting in this case.

6                    SPECIAL MASTER RODRIGUEZ:  Okay.  Well, as

7    with Request Number 22, it appears that the documents

8    you're seeking would be speculative.  There's no

9    indication that they do exist and that relevance after

10   the time period is also questionable at this point.

11                   Defendant has been granted top-line

12   financial information, which should provide the

13   information that they are seeking and allow them to

14   address the issues with regard to damages.

15                   So I'm going to order that the plaintiffs

16   produce nonprivileged analyses and internal documents

17   concerning the diminished or diminishing use of bit

18   torrent or other peer-to-peer file-sharing networks to

19   the extent such analyses and internal documents exist and

20   can be found in plaintiffs' possession, custody, or

21   control after reasonable search for the time period

22   March 1, 2012 through May 17, 2016.

23                   MS. RANAHAN:  This is Erin Ranahan.

24                   Could I just ask, for 22 and 23, could we

25   have it apply to things that were dated after the claim

Telephonic Hearing
May 15, 2020

Page 124

```
 1    period but were about the claim period?
 2                MR. SPERLING:  Ms. Rodriguez, this is
 3    Jonathan --
 4                SPECIAL MASTER RODRIGUEZ:  I'm not sure
 5    how --
 6                MR. SPERLING:  Sorry.
 7                SPECIAL MASTER RODRIGUEZ:  I'm not sure
 8    how that could be identified without having to go to the,
 9    what seems disproportionate effort at this point, to
10    review all of the analyses subsequent to the claim
11    period.
12                I think that that effort is proportional
13    and required during the claim period, but given the
14    speculative nature, with regard to that after the claim
15    period, I don't know that it is warranted in this matter.
16                MS. RANAHAN:  Okay.  And just to be clear,
17    if there's a 2017 study about 2016 -- and I wouldn't
18    think this would be necessarily emails, but something
19    more targeted is what we would be seeking, but I
20    understand your --
21                SPECIAL MASTER RODRIGUEZ:  I'm sorry, you
22    said that you are aware of a 2017 report --
23                MS. RANAHAN:  No, no.
24                SPECIAL MASTER RODRIGUEZ:  -- about 2016?
25                MS. RANAHAN:  I was just using an example.
```

Telephonic Hearing
May 15, 2020

Page 125

```
 1              SPECIAL MASTER RODRIGUEZ:  Oh.
 2              MS. RANAHAN:  Right now I'm just --
 3              SPECIAL MASTER RODRIGUEZ:  Yeah.
 4              MS. RANAHAN:  We are not aware because we
 5   don't have the access.  But I'm suggesting if there was,
 6   you know, a 2017 study about what had happened last two
 7   years, last year, because it's dealing with the analysis
 8   of the claim period, which I understand you do
 9   consider -- plaintiffs have agreed are relevant.
10              And we've agreed to similar things for
11   plaintiff, where we are looking at things during the
12   claim period that's just -- perhaps were completed the
13   next day or, you know, the following January, 2017, or
14   whatever it is, but it was about the claim period.
15              SPECIAL MASTER RODRIGUEZ:  Certainly I
16   understand.  And if there were evidence deduced from
17   other discovery depositions, interrogatories, et cetera,
18   that clearly indicated that such analyses did exist for
19   the relevant claim period, I would say, at that point, it
20   would make sense to search for those.  However, at this
21   point in time, it's very much speculative.
22              MS. RANAHAN:  All right.
23              SPECIAL MASTER RODRIGUEZ:  Anything else
24   on this request?  22 and 23?
25              All right.  24.  Request for 24:
```

Telephonic Hearing
May 15, 2020

Page 126

```
 1    Documents concerning the effect of the use of
 2    peer-to-peer technologies.  We -- sorry.  Anything else
 3    with regard to Request Number 24?
 4                   MS. RANAHAN:  I think this is about
 5    time -- 24 and 25 are time objections.  We wanted the
 6    2019, but we think we hear your position on that, and we
 7    can revisit this if we find anything in depositions or
 8    otherwise.
 9                   THE COURT REPORTER:  Was that Ms. Ranahan?
10                   SPECIAL MASTER RODRIGUEZ:  Okay.  Yes.
11                   MS. RANAHAN:  Yes, I'm sorry.  This is
12    Ms. Ranahan.
13                   THE COURT REPORTER:  Thank you.
14                   SPECIAL MASTER RODRIGUEZ:  All right.  And
15    then Request Number 54:  All communications with
16    Rightscorp regarding the copyright works and/or copyright
17    infringement notices considered, prepared, or sent to
18    Charter or its account holders, subscribers, or
19    customers.
20                   Plaintiffs have objected to this request.
21                   I guess what I need is some understanding
22    here of whether or not plaintiffs are going to have
23    testimony about Rightscorp or Rightscorp's communications
24    here.
25                   How is this relevant in the case?
```

Telephonic Hearing
May 15, 2020

```
 1                    MS. RANAHAN:  This is Erin Ranahan.  I
 2    could speak to what we understand because they -- we've
 3    produced a lot of this to plaintiffs and they've asked
 4    for it specifically.
 5                    With the Rightscorp notices, plaintiff
 6    used RIAA for their notices, but there's another
 7    organization or company called Rightscorp -- there was --
 8    and they're widely known as just flooding inboxes, you
 9    know, sending millions and millions and -- and doing all
10    sorts of things that actually, I believe, put them out of
11    business.  And they have sort of a bad reputation in this
12    arena.
13                    So what we've done is produced millions of
14    third-party notices that happened to be Rightscorp
15    notices, and we expect plaintiffs to be propping those up
16    as examples of what they claim to be alleged
17    infringements to suggest that, you know, Charter should
18    have acted more stridently in responding to those or
19    terminating things.
20                    So plaintiffs want to use those notices to
21    their advantage by suggesting that it's more evidence
22    that Charter should have been -- you know, knowing these
23    infringements were occurring.
24                    So what we want to do is understand
25    plaintiffs, what they know about Rightscorp, which we
```

Telephonic Hearing
May 15, 2020

```
 1   understand that they know that they're not as -- they're
 2   not reliable sources of notice, and they have a lot of
 3   issues.
 4               So that's the context.
 5               SPECIAL MASTER RODRIGUEZ:  Okay.
 6               MR. ELKIN:  Ms. Rodriguez, this is
 7   Mr. Elkin.  I just -- if I could just amplify that --
 8               MR. OPPENHEIM:  Can I get a word in
 9   edgewise?  This is Matt Oppenheim.
10               (Simultaneous crosstalk.)
11               SPECIAL MASTER RODRIGUEZ:  Okay.  All
12   right.  Let's -- let's hold on a minute.  Let's hold on a
13   minute.  This is not going to be constructive.  So let's
14   take one at a time.
15               Ms. Ranahan just provided us with some
16   information.  I'd like to hear plaintiffs' response to my
17   question, which is:  How does Rightscorp factor into this
18   case, and are you going to produce testimony about
19   Rightscorp as part of your case?
20               After that, Mr. Elkin, I will give you an
21   opportunity to be heard.
22               MR. OPPENHEIM:  Thank you, Ms. Rodriguez.
23   This is Matt Oppenheim.
24               So Ms. Ranahan said several things that
25   are just factually incorrect, or her perceptions, which
```

Telephonic Hearing
May 15, 2020

Page 129

```
 1    are wholly irrelevant.  As I understand it, though, don't
 2    have any contact or relationship with them, Rightscorp is
 3    very much in business.  And they were the vendor, I
 4    guess, that was the source of notices in another case
 5    that was successfully pursued at one point against Cox
 6    and then -- and then settled.
 7                    So let's put out of this the issue of
 8    what -- whether they've got a good or bad reputation or
 9    what anybody's personal view of them is.  With respect to
10    this case, the plaintiffs -- neither the plaintiffs nor
11    RIAA hired Rightscorp to send notices to Charter.  And so
12    it's not plaintiffs' intent to call as a witness any
13    Rightscorp witness whatsoever.
14                    Now, Charter received notices from many,
15    many, many different rights holders.  It's mostly just
16    the music industry.  Charter received notices from the
17    video game industry, the textbook industry, the movie
18    industry, I could go on and on and on.  And lots of
19    different companies use lots of different vendors.  We
20    understand that among the different vendors that sent
21    notices to Charter for non-plaintiffs, one was
22    Rightscorp.
23                    Apparently now what Charter is seeking to
24    do is to ask plaintiffs what plaintiffs' opinion or what
25    plaintiffs' internal documents on Rightscorp indicate,
```

Telephonic Hearing
May 15, 2020

Page 130

```
 1    even though plaintiffs didn't use Rightscorp.  It's just
 2    not a relevant topic.
 3              Now, the Rightscorp notices themselves
 4    are, in fact, important because Charter, like every other
 5    ISP, receives notices from lots of different vendors.
 6    And they don't -- they don't investigate the validity of
 7    a notice before acting on it, and certainly Charter
 8    hasn't produced a single document to suggest that they
 9    did -- that they did any such investigation.
10              And if they did, it would be -- I would be
11    highly skeptical on it because no ISP does.  They receive
12    notices.  It puts them on notice that particular
13    subscribers are engaged in infringement.
14              So the fact that they received these
15    notices, yes, that will come into evidence.  Whether or
16    not Rightscorp was working -- who they were working on
17    behalf, what they were doing, not relevant in the case at
18    all, and plaintiffs don't intend to put that forward.
19              SPECIAL MASTER RODRIGUEZ:  Okay.
20              MR. ELKIN:  Ms. Rodriguez?
21              SPECIAL MASTER RODRIGUEZ:  Yes.
22              MR. ELKIN:  Mr. Elkin here.
23              SPECIAL MASTER RODRIGUEZ:  Yes.
24              MR. ELKIN:  Thank you for giving me the
25    opportunity to respond.
```

Telephonic Hearing
May 15, 2020

1              There's so many things that Mr. Oppenheim

2    just said that I think are all over the lot laced with

3    some personal testimony.  Let me just try to set the

4    context, if I could.

5              We know, based on the other case, the name

6    of which I don't have to mention, that the strategy and

7    what happened at trial was that the Rightscorp notices

8    were used in a very meaningful way by the plaintiffs to

9    demonstrate all of the notices that the other ISPs should

10   have drafted didn't address regardless of the specifics

11   related to it without even providing any information or

12   testimony in terms of the reliability of that particular

13   service.

14             There's no question, given the sheer

15   volume, regardless of whether Rightscorp is a good actor,

16   a bad actor, a side actor, there's no question that they

17   just pummel out tens of thousands, hundreds of thousands,

18   and millions upon millions of notices indiscriminately,

19   and they're going to be using that.

20             We know, based on other information that

21   we have, that the RIAA and the constituent record labels

22   that have a significant voice made a conscious decision

23   not to use Rightscorp.  They were pitched by Rightscorp,

24   they had conversations with Rightscorp, and they decided

25   they didn't want to do it because reputational issues.

Telephonic Hearing
May 15, 2020

Page 132

```
 1                  They want to now shield those
 2    communications from discovery in this case while using
 3    the very specific notices that were sent out by a service
 4    that they determined themselves to not be a sufficient
 5    reliable, trustworthy partner.  And that's just palpably
 6    wrong.
 7                  SPECIAL MASTER RODRIGUEZ:  Okay.  Well --
 8                  MR. OPPENHEIM:  Ms. Rodriguez, I'm happy
 9    to respond to that, if you'd like, because that's not
10    accurate.
11                  SPECIAL MASTER RODRIGUEZ:  Okay.  Well, I
12    have a couple of questions, and you'll tell me if I'm
13    on -- off-base, I'm sure.
14                  It seems to me that RIAA's decision to use
15    or not to use Rightscorp, that inquiry is more
16    appropriately directed to RIAA.  I understand that
17    plaintiffs may use the notices to Charter as some
18    evidence in this case, but that defendants would then
19    have the opportunity to challenge the validity of those
20    notices and the reputation of Rightscorp.  But it seems
21    to me that that comes from discovery vis-a-vis
22    Rightscorp, and clearly defendants already have some of
23    that information.
24                  So the question here is the extent to
25    which plaintiffs should be put to producing information
```

Telephonic Hearing
May 15, 2020

Page 133

```
 1    related to Rightscorp.  And while I think, ultimately,
 2    the issue of Rightscorp and its reputation and its
 3    notices and all of those things may be potentially
 4    relevant and potentially admissible in the case, I'm not
 5    clear at this moment that it should come from the
 6    plaintiff.  So perhaps you can address that specific
 7    issue --
 8                    MR. OPPENHEIM:  Sure, Ms. Rodriguez.
 9    I'm --
10                    SPECIAL MASTER RODRIGUEZ:  -- why does
11    this come from plaintiffs?  Mr. Oppenheim --
12                    MR. ELKIN:  This is Mr. Elkin.
13                    SPECIAL MASTER RODRIGUEZ:  -- or Mr.
14    Elkin --
15                    MR. ELKIN:  Oh, I'm sorry.
16                    SPECIAL MASTER RODRIGUEZ:  Yes.
17    Mr. Elkin, I think it's fair that you respond to that.
18                    MR. ELKIN:  Thank you, Ms. Rodriguez.
19    Mr. Elkin here.
20                    We know that the specific record label
21    executives had meetings with Rightscorp, and they were
22    specifically pitched and they have specific
23    communications.  They may have their own reactions to it,
24    and there weren't uniform reactions to it, to be sure.
25                    This as we -- obviously we've been
```

Telephonic Hearing
May 15, 2020

1    referring to RIAA as if somehow it's a monolith, but the

2    reality is that each of these major record companies have

3    their own business executives, they have their own policy

4    representatives, and they have their own meetings.

5                    And there's no question that these

6    plaintiffs have repositories of communications that are

7    directly relevant to the extent to which they believe

8    from a credibility point of view this was a company

9    reputable that they should partner with to try to serve

10   notices of infringement to Charter and other ISPs.

11                   So it's not simply --

12                   SPECIAL MASTER RODRIGUEZ:  Well --

13                   MR. ELKIN:  -- a question of the RIAA.

14                   SPECIAL MASTER RODRIGUEZ:  I understand

15   that, but I guess the question I'm still left with is, is

16   isn't the issue Charter's knowledge and Charter's actions

17   in response to various notices?  So it would be what

18   Charter knew about Rightscorp, as opposed to what the

19   plaintiffs knew?

20                   MR. ELKIN:  Mr. Elkin here, Ms. Rodriguez.

21                   That seems to be true from the perspective

22   of what the plaintiffs are going to show, but I think it

23   is not fair for them to be able to demonstrate that

24   Charter receives all of these notices about Charter

25   subscribers from Rightscorp while shielding them and

Telephonic Hearing
May 15, 2020

Page 135

```
 1   their executives from communications in which they
 2   participated about whether or not those notices from that
 3   organization were effective or reliable.
 4                  It goes directly to the issue of
 5   credibility relative to their insinuations and statements
 6   as to whether they're valid and reliable.
 7                  SPECIAL MASTER RODRIGUEZ:  But I guess I'm
 8   not clear that if that is necessarily the position of the
 9   plaintiffs, it's simply that Charter received these
10   notices and then it is up to Charter to do what it will
11   with them.  And it is the knowledge of Charter that would
12   be at issue, it seems to me, as opposed to the knowledge
13   of the plaintiffs here.
14                  So I -- I still fail to see the relevance
15   of Charter's communications with Rightscorp or their
16   knowledge or discussions about Rightscorp.  I suppose you
17   could ask that in depositions about what executive
18   knowledge of Rightscorp is and why they made the decision
19   not to use them.
20                  But to do searching discovery on this and
21   interrogatories, I -- I still have a hard time
22   understanding how that is specifically relevant to the
23   issues in this case.
24                  MR. ELKIN:  So Ms. Rodriguez, this is
25   Mr. Elkin.  I'm going to try one more time, and I
```

Telephonic Hearing
May 15, 2020

1   understand what your take is.  I respect it.

2             The frustration here is knowing that the

3   sheer -- the arguments about notices which plaintiffs

4   will maintain are effectively true, notice equals

5   knowledge, when they know full well, we would argue,

6   based on their own assessments, that it is anything but

7   that.  And it's -- it's just an unfair position that we

8   feel that we're in.

9             I don't want to beat a dead horse here,

10  and I respect your time, but that's the frustration.  And

11  we believe in those circumstances, if it's relevant for

12  us, which we think it is, to inquire of the record label

13  executives why they decided not to do this and what their

14  views were, we would think as a corollary getting

15  communications directly with Rightscorp would also be

16  probative.

17            That's my argument.

18            MS. GOLINVEAUX:  If I could just

19  briefly --

20            (Simultaneous crosstalk.)

21            SPECIAL MASTER RODRIGUEZ:  Hold on, hold

22  on, hold on, hold on, hold on.  Let's do one at a time.

23  I know everybody has strong feelings on this issue, so I

24  will hear from everyone.  But let's take it one at a

25  time.

Telephonic Hearing
May 15, 2020

1          Mr. Oppenheim, you may respond to

2   Mr. Elkin's comments briefly.

3          MR. OPPENHEIM:  Yes.  Thank you.

4          So, look, under Mr. Elkin's rubric, they

5   could ask us about every technology company that ever

6   sent a notice to Charter and to opine on the validity or

7   the reliability of that company.

8          The irony here is that Charter, I don't

9   believe -- and I'm happy to be corrected -- I don't

10  believe they produced a single document to say that they

11  doubted the credibility of Rightscorp or any other

12  vendor.  I don't think we have any documents whatsoever

13  about any vendors.

14          So I think that, again, this is -- you're

15  right in saying this is an issue of Charter's knowledge,

16  not our knowledge.

17          MS. GOLINVEAUX:  Ms. Rodriguez, I was just

18  going to give you one point on the evidence we've

19  produced with respect to Rightscorp if -- if I could.

20  This is Jennifer Golinveaux.

21          SPECIAL MASTER RODRIGUEZ:  Yes.  Thank

22  you.

23          MS. GOLINVEAUX:  Yeah.

24          So as you know, the plaintiffs requested

25  from Charter the ticket data, the data about the notices

Telephonic Hearing
May 15, 2020

1   that came in, both for their notices and then any

2   third-party notices that those same accused subscribers

3   received and --

4                   SPECIAL MASTER RODRIGUEZ:  Yes.

5                   MS. GOLINVEAUX:  -- we produced -- we

6   produced that, and it reflected more than 2 million

7   notices, something in the order of 2 1/2 million notices.

8                   Of those, just to show you how important

9   this issue is, more than 90 percent are from Rightscorp.

10  Many times, they spammed hundreds, if not thousands, of

11  notices for the same file on the same user's computer in

12  an extremely short period of time, day or less than a

13  week.

14                  So to the extent the plaintiffs -- we know

15  plaintiffs are going to argue that all those notices that

16  Charter got showed there was a bad actor; they did the

17  same thing in the Cox case.

18                  And so if they -- if they -- if there's

19  correspondence that the plaintiffs had understanding and

20  recognizing these practices that Rightscorp undertook and

21  they're relying on the 90 percent plus of the notices

22  that came from Rightscorp, it's highly probative of

23  whether those notices should have given -- put Charter on

24  notice or Charter should have been cutting people's

25  Internet off because of those Rightscorp notices.

Telephonic Hearing
May 15, 2020

1              SPECIAL MASTER RODRIGUEZ:  Okay.  Well,
2    this does dovetail into the issues that plaintiffs have
3    raised in their motion to compel seeking information
4    related to third parties' notices.  But I -- I remain
5    puzzled about the relevance of this information related
6    to the plaintiffs' knowledge.
7              So as of right now, I'm not going to order
8    that plaintiffs respond to this RFP.  I will reserve
9    ruling on this one until we hear about these issues and
10   we flesh out the issues in response to plaintiffs'
11   request for production, because I -- it does encompass
12   third-party notices, and so this may become an issue as
13   part of that.
14             So I'll reserve that, but I will tell you
15   my inclination would be, I think that the relevance here
16   is attenuated as to what the plaintiffs may have or have
17   thought with regard to Rightscorp and their reputation.
18             All right.  Anything further on that one?
19             Antipiracy spending.  Again, the relevance
20   here seems very tenuous.  So perhaps, defendants, you
21   could help me understand what the relevance here is.
22   Plaintiffs, I'd like to hear from you about what kind of
23   burden there would be in providing this information
24   because it does seem like it would be pretty
25   straightforward to be able to provide.

Telephonic Hearing
May 15, 2020

Page 140

1             If I could hear from defendants about the

2    relevance, please.

3             MR. SPERLING:  Hi, Ms. Rodriguez.  It's

4    Jonathan Sperling for the plaintiffs.

5             So there's a sort of threshold --

6             SPECIAL MASTER RODRIGUEZ:  No, hold on

7    just a second.  Hold on just a second.

8             Can I hear from defendants first on the --

9             MR. SPERLING:  I misheard you,

10   Ms. Rodriguez.  I apologize.

11            MS. RANAHAN:  Hi, this is Erin Ranahan.

12            And this relates, to us, to mitigation and

13   the ways in which plaintiffs devoted resources to these

14   issues and how it tracks over time.  So we are seeking to

15   investigate how plaintiffs' efforts -- and again, so like

16   the mitigation and statutory damages.

17            And under a statutory damages analysis,

18   mitigations -- mitigation can also be considered, so it's

19   a separate potential affirmative defense and then also an

20   aspect of statutory damages.

21            So -- and I know we talked about the way

22   that the revenues have gone to the plaintiffs over time

23   and over 2016 and afterwards.  But also, the amount that

24   they've been willing to spend on piracy, we -- may have

25   fluctuated, and we should be able to investigate that and

Telephonic Hearing
May 15, 2020

Page 141

```
 1   know where they, you know, stopped doing so and -- with
 2   devoting resources.
 3                    SPECIAL MASTER RODRIGUEZ:  So I understand
 4   that it goes to the mitigation, which is an element of
 5   the defense.
 6                    So plaintiffs' counsel, Mr. Sperling, you
 7   were about to address.  What I would like to understand
 8   is why this doesn't go to mitigation and what is the
 9   burden of producing this information?
10                    MR. SPERLING:  Thanks, Ms. Rodriguez and
11   apologize.  I was convinced that -- notwithstanding the
12   fact that this is a defendant's issue, I thought you
13   would ask the plaintiff's position first.  I just jumped
14   in otherwise.
15                    So there are a couple of issues here,
16   Ms. Rodriguez.  First, there's sort of this fundamental
17   barrier, and I know you asked about burden.
18                    So the plaintiffs pay annual dues to the
19   RIAA.  They don't sort of make a payment for antipiracy
20   and a payment for a different activity.  And so there is
21   no sort of documentation evidence that sort of concerns
22   the, you know, antipiracy spending by the plaintiffs in
23   terms of what they provide to the RIAA.
24                    So that -- that's, in terms of the burden,
25   a fundamental issue.  There's not separate spending that
```

Telephonic Hearing
May 15, 2020

Page 142

```
 1   you can break out.  There's just dues.
 2               SPECIAL MASTER RODRIGUEZ:  So you're
 3   saying that the information that the defendants are
 4   seeking doesn't actually exist?
 5               MR. SPERLING:  If that -- to my knowledge,
 6   it does not exist.  That's a much better --
 7               SPECIAL MASTER RODRIGUEZ:  Okay.
 8               MR. SPERLING:  -- way to put it.
 9               Second of all --
10               SPECIAL MASTER RODRIGUEZ:  Well, I don't
11   think I can ask you to produce information that doesn't
12   exist.
13               MR. SPERLING:  Yeah.
14               SPECIAL MASTER RODRIGUEZ:  So maybe we
15   could stop there.
16               MR. SPERLING:  Yeah, and I guess -- I
17   mean, I should say, look, like any organization, my
18   understanding is that the RIAA has a budget, but there is
19   no segregable information about payments that are made,
20   right?  Like any organization, there's going to be a
21   budget, what they plan to spend on certain things.
22               But a dues payment is a dues payment, and
23   there's no amount of money that's paid to the RIAA that's
24   specific to this.  So, in fact, as you said, I don't
25   think the thing exists such that we could provide it to
```

Telephonic Hearing
May 15, 2020

Page 143

1   them.

2                   SPECIAL MASTER RODRIGUEZ:  Okay.  Well, I

3   cannot order that you produce something that does not

4   exist, and your representation is that it does not exist.

5   If that representation should change, that would be

6   important to know.

7                   Do you need time to determine whether or

8   not for sure and that you can make that representation

9   here?  Because we will hold you to that --

10                  MR. SPERLING:  Yes, and this --

11                  SPECIAL MASTER RODRIGUEZ:  -- if this does

12  not exist.

13                  MR. SPERLING:  Right.  That's totally

14  fair, Ms. Rodriguez.

15                  Let me try and get to the second issue

16  because I think it forestalls that.  Defendants talk

17  about mitigation and you said, right, there's mitigation.

18  And this may present a pure issue of law, and so maybe

19  it's got to get briefed to Judge Hegarty, or to you if he

20  decides to refer that to you.  I think under the existing

21  order, it doesn't.

22                  But there is no mitigation issue with

23  respect to copyright damages.  So as we said in our

24  papers and how we sort of analogized it to theft more

25  sort of a sidestepping litigation issue, they cannot take

Telephonic Hearing
May 15, 2020

1   the position -- certainly with respect to statutory

2   damages, they cannot take the position, say:  Don't hold

3   us responsible because the plaintiff should have done a

4   better job of locking the barn door.

5            To hold us responsible for what was

6   stolen, to hold us responsible for what were stolen, they

7   should have had a better lock, they should have had a

8   better security system.

9            There is no mitigation component or

10  analysis or element of the damages and, therefore, even

11  if I were to learn that I was mistaken -- I believe that

12  everything I told you was correct or I wouldn't have told

13  it to you -- but even if I was mistaken, it still

14  wouldn't be relevant.

15            SPECIAL MASTER RODRIGUEZ:  Understood.

16            MS. RANAHAN:  Ms. Rodriguez, if I could

17  respond to that.  This is Erin Ranahan.

18            Our request doesn't ask for a breakdown by

19  piracy.  It asks for what was paid to the RIAA, and then

20  we could investigate how much they allocated for piracy

21  or other -- or note whatever else they might have paid

22  them for.

23            But to -- mitigation, it is an affirmative

24  defense.  It has not been adjudicated, and there is case

25  law out there that mitigation can be considered.  Even in

Telephonic Hearing
May 15, 2020

Page 145

1    amounts of statutory damages, it's not a full defense.

2    It can be used to consider the amount of damages.

3                So there is a recent case, actually, that

4    found exactly that.  I'm happy to present it to the

5    court -- or to -- to you, Ms. Rodriguez.  But it --

6    mitigation is an affirmative defense we've alleged, and

7    it has also been found in case law could go towards the

8    level of statutory damages.  So I would take issue with

9    that.

10               And also we know that there have been RIAA

11   payments, which is what this seeks, so that's what --

12   that's what's being sought.  It's not a breakdown

13   separately.

14               SPECIAL MASTER RODRIGUEZ:  All right.

15   Well, as it relates to simply the payment to RIAA between

16   2010 and 2016, it seems to me that that would be a very

17   readily identifiable amount with very little burden to

18   provide.  It could go to both the issue of mitigation,

19   but as well to demonstrating the relationship between

20   RIAA and the plaintiffs.

21               So I would order that the plaintiffs

22   provide simply the amount paid to RIAA for the years 2010

23   through 2016.

24               MR. SPERLING:  Ms. Rodriguez, this is

25   Ms. Sperling.  Let me push back a little bit on that.

Telephonic Hearing
May 15, 2020

Page 146

```
 1                    I mean, it's a trade organization.   It
 2      does the full range of actives that trade organizations
 3      undertake.   There's lobbying, there's international trade
 4      stuff.   I think they run the program for certifying gold
 5      records, so if someone's cut a gold record, a gold album,
 6      or a platinum album, they do that.
 7                    And so it is not obvious to me what the
 8      relevance is of the total amount that we pay to the trade
 9      association.   What is the total amount that we paid to
10      the RIAA for the full range of activities that the RIAA
11      undertakes with the recording industry, whether it's
12      marketing, whether it's Grammy's related, whether it's
13      gold records related, whether it's lobbying, what does
14      that have to do with this case and this dispute?
15                    SPECIAL MASTER RODRIGUEZ:   Well, as
16      plaintiffs said, and you've also indicated that there is
17      a relationship between RIAA and the plaintiffs, and RIAA
18      was the agent that you hired to obtain these and to
19      prepare these notices.   So I do think it is probative of
20      some issues in the case, and the burden to produce that
21      is very limited.
22                    The information is protected by the
23      confidentiality provisions, and you can certainly mark it
24      as sensitive, or however you want, and I'm sure that the
25      defendants would be willing to maintain that confident --
```

Telephonic Hearing
May 15, 2020

1  whatever level the confidentiality you're needing on

2  that.

3                    MR. SPERLING:  So --

4                    MR. OPPENHEIM:  Ms. Rodriguez, this is

5  Matt Oppenheim --

6                    MR. SPERLING:  -- and, again, this is

7  Mr. Sperling.

8                    So there's no misunderstanding, it is

9  not -- we didn't hire them.  They're not -- there's

10  certainly a relationship.  It's a trade association for

11  the recording industry, and the record company plaintiffs

12  in the case are members of the RIAA.

13                    It's not that we hired them.  It's not

14  that they're a trade association and we're trying to deny

15  any relationship with them.  We're certainly not doing

16  that.  It's not that they're a trade association and we

17  hired them for a service.

18                    They're a trade association of the

19  recording industry.  Plaintiffs here include the three

20  major record companies, and so they are significant

21  members of the trade association, and that's what I'm

22  talking about.

23                    I -- my point here at this point is not to

24  argue with you about other issues, but what you just said

25  sounded like it was based on a misunderstanding, which

Telephonic Hearing
May 15, 2020

1   we'll take the blame for, in terms of what the

2   relationship is between the plaintiffs and the RIAA.

3                   They're members of the trade association,

4   and they pay annual dues to the trade association.  The

5   annual dues fund, you know, a whole universe of

6   activities.

7                   And it sounds -- and I could be

8   misunderstanding -- but it sounds like we're saying now

9   that insofar as one of those activities is antipiracy

10  work and this case involves an antipiracy notice program

11  where they send notices, that, therefore, the full amount

12  of money that we pay to the RIAA in membership dues is

13  discoverable.

14                  If that's your determination on those

15  facts, I see you're not going to argue it anymore, but I

16  wanted to make sure that we're talking about the same set

17  of facts.

18                  SPECIAL MASTER RODRIGUEZ:  Yeah.  That

19  is --

20                  MR. OPPENHEIM:  If I may --

21                  SPECIAL MASTER RODRIGUEZ:  I appreciate

22  the clarification, but I think it's within the bounds of

23  relevance that you produce simply the membership amount.

24  You've indicated that you cannot identify what the

25  specific antipiracy portion is of that, but that the RIAA

Telephonic Hearing
May 15, 2020

1    does provide some sort of antipiracy services to you.

2    You can certainly argue the ultimate admissibility about

3    these amounts, but I do think it's relevant and should be

4    produced.

5                    MR. OPPENHEIM:  Ms. Rodriguez, if I may,

6    it's Matt Oppenheim, and I apologize for tag-teaming.

7                    But Mr. Sperling was not counsel in the

8    Cox case, and I -- I was lead counsel, and I know exactly

9    how I think this is going to get used, and I want to make

10   sure you appreciate that and speak to legal issue here.

11                   During the Cox case, the Winston lawyers

12   attacked the RIAA for their lobbying activities, which

13   obviously is nothing to do with -- with the case, this

14   case, or that case.  And by providing this information,

15   it will -- it will just further expose that issue, which

16   is irrelevant, prejudicial, and improper.

17                   And it's all founded, as I understand it,

18   on this claim of mitigation.  And if possible, what I'd

19   like to do, since we've -- we've said to you that

20   unequivocally mitigation is not a defense in this case

21   because we sought statutory damages, which is damages at

22   law.

23                   Mitigation is an equitable principle of

24   law, and so the law here is very clear.  Supreme Court

25   has spoken to it, the Fifth Circuit has spoken to it, the

Telephonic Hearing
May 15, 2020

Page 150

```
 1   Ninth Circuit has spoken to it.  We would like an
 2   opportunity to brief that to you, because if we can
 3   convince you that mitigation is not a defense here, then
 4   we don't have to get to the prejudice and relevance
 5   issue.
 6                So if we could have till Wednesday to
 7   submit a letter to you on that, it would be much
 8   appreciated.
 9                SPECIAL MASTER RODRIGUEZ:  Okay.
10                MR. ELKIN:  Ms. Rodriguez, Mr. Elkin here.
11   If I could very briefly --
12                SPECIAL MASTER RODRIGUEZ:  Yeah.  I'm
13   going to allow a briefing on this issue, but please
14   proceed, Mr. Elkin.
15                MR. ELKIN:  Thank you.  So Mr. Elkin here.
16                So first of all, with regard to the --
17   what happened in the Cox case, as it keeps getting
18   brought up, the issues regarding the RIAA in terms of
19   what was central was the extent to which their piracy
20   spend went down because of the extent to which they went
21   after individual file sharers.  The fact that there is
22   some issue raised concerning lobbying and describing who
23   the RIAA is, it's really being overplayed and it's --
24   it's inaccurate.
25                The bottom line here -- and we're happy to
```

Telephonic Hearing
May 15, 2020

Page 151

```
 1   have the issue briefed -- mitigation has -- is founded in
 2   two specific parts of this copyright case, and we can
 3   disagree about the extent to which one circuit views it
 4   this way and another circuit views it that way.
 5                The -- whether or not, A, there's a
 6   mitigation as an affirmative defense, as -- as was
 7   originally allowed, at least to go through trial in the
 8   Cox case, and other circuits have permitted that as well.
 9                But regardless of that, and even in the
10   Cox case, the district court judge, you know, permitted
11   evidence to be used with respect to the extent to which
12   from a statutory damages point of view where on the
13   continuum statutory damages a jury can award it.
14                So we're happy to brief it, but I just
15   want to go on record saying that we do not concur with
16   Mr. Oppenheim's views on the issue of mitigation.
17                SPECIAL MASTER RODRIGUEZ:  Sure.  I
18   understand that you all don't concur on that.
19                And I guess what I would say on that is,
20   the issue here is -- is more limited.  I'm not going to
21   ultimately make a decision as to whether or not
22   mitigation is an appropriate affirmative defense in this
23   case.  That is, in fact, the question, I believe, of law
24   that would have to be decided by the judge.  But that is
25   different as to whether or not it could be relevant to
```

Telephonic Hearing
May 15, 2020

1    some other issue.

2             And so you can certainly convince me that

3    this is an issue of law and, I don't know, does that mean

4    I get to delegate back?  That would -- you know, if I can

5    delegate, that's lovely.  But the real issue is, What is

6    relevant and what is proportional here?

7             And while it may -- the evidence may not

8    ultimately come in as it relates to an affirmative

9    defense of mitigation, it may be relevant for other

10   purposes, which would allow it to be discoverable.  And

11   that really is the question in my mind.

12            MS. RANAHAN:  Ms. Rodriguez, this is Erin

13   Ranahan.  I --

14            MR. OPPENHEIM:  If I may --

15            MS. RANAHAN:  -- would say that it's also

16   relevant to his motivation.  Sorry.

17            MR. OPPENHEIM:  If I may, I'll just quote

18   Judge Hegarty to you in the case of Purzel Video v.

19   Smoak, where it says -- Judge Hegarty said a copyright

20   plaintiffs' exclusive pursuit of statutory damages

21   invalidates a failure to mitigate defense, and then

22   citing other cases, okay?  So --

23            SPECIAL MASTER RODRIGUEZ:  Okay.

24            MR. OPPENHEIM:  So while I -- the

25   defendant may be able to point to other cases, that's our

Telephonic Hearing
May 15, 2020

Page 153

```
 1   judge in this case.

 2                  SPECIAL MASTER RODRIGUEZ:  Okay.

 3                  MR. OPPENHEIM:  The --

 4                  SPECIAL MASTER RODRIGUEZ:  That's helpful.

 5   I did not have all of that in front of me, so please let

 6   me have that.  I'll be interested to read through that.

 7                  MR. OPPENHEIM:  Very well.

 8                  MS. RANAHAN:  And, Ms. Rodriguez, if I

 9   could --

10                  MR. OPPENHEIM:  If I may -- sorry.  Let me

11   just finish.

12                  The other point that was just made by

13   Mr. Elkin is -- is he wants to speak to -- he wants this

14   information because somehow it relates to the RIAA, not

15   suing Charter, but years before these notices were sent

16   having sued individuals for engaging in peer-to-peer

17   infringement.

18                  I have no idea what the relevance of that

19   could possibly be, other than the Charter subscriber who

20   was -- who was found liable for that in multiple trials.

21   But -- but it just seems to me that this is a fishing

22   expedition.

23                  The RIAA budget covers so many different

24   things that has nothing to do with this, and it is highly

25   confidential.  And allowing counsel who represents lots
```

Telephonic Hearing
May 15, 2020

Page 154

1   of different ISPs to get ahold of the RIAA budget, even
2   subject to the protective order, is something that the
3   RIAA will find extremely difficult to swallow because it
4   has nothing to do with this case.
5              MR. ELKIN:  Mr. Elkin --
6              SPECIAL MASTER RODRIGUEZ:  All right.
7   Well --
8              MR. ELKIN:  -- here, Ms. Rodriguez.  Very
9   briefly.
10             First of all, Mr. Oppenheim
11  mischaracterized what I did.  I was trying to -- he was
12  talking a moment ago about how we would intend to use it
13  in this particular case.  All I did in my prior comment
14  is to correct him with respect to how some of that
15  information was used in the Cox case, as opposed to
16  talking about some lobbying expenses.
17             With regard to the issues here in terms of
18  the briefing, just so that we're clear, did you want the
19  briefing, Ms. Rodriguez, specifically directed to the
20  issue of mitigation in terms of whether it's a defense or
21  whether this particular -- or how this evidence that
22  we're seeking will be tethered to the issues in the case?
23  We just -- I'd like to have, if I could, some clarity
24  about the subject matter so that we don't miss the mark
25  for you.

Telephonic Hearing
May 15, 2020

```
 1              SPECIAL MASTER RODRIGUEZ:  Yeah.   Thank

 2    you.

 3              So when I asked the question of what the

 4    relevance of this information is, defendants indicated

 5    that it goes to mitigation, which clearly raised this

 6    issue.

 7              So to the extent that it goes to

 8    mitigation and that's defendant's position, whether or

 9    not mitigation can be used as an affirmative defense in a

10    statutory damages case would be important and

11    particularly Judge Hegarty and Judge Jackson's ruling on

12    those issues or the Tenth Circuit.

13              However, if you've said that it can be

14    used for purposes other than relevant to mitigation, I

15    would be interested in that as well if the defendant has

16    a different theory about the relevance and that it is

17    significant enough to overcome the confidentiality and

18    privacy issues that plaintiffs have raised.

19              Did that answer your question, Mr. Elkin?

20              MR. ELKIN:  Ms. Rodriguez, it does, as far

21    as that's concerned.  Thank you very much.

22              SPECIAL MASTER RODRIGUEZ:  Okay.

23              MS. RANAHAN:  Ms. Rodriguez, this is Erin

24    Ranahan.  I just have a couple comments, very briefly.

25              First of all, plaintiffs threatened
```

Telephonic Hearing
May 15, 2020

1   already to have that -- to bring a motion on that

2   specific affirmative defense, and Judge Jackson at docket

3   160 -- this is our response at docket 160 -- asked for

4   briefing on the affirmative defenses, and we presented

5   that.  And Judge Jackson allowed that affirmative defense

6   to stand.  So that's in the record, docket 160, page 9.

7               And separately, I would just like to add a

8   separate ground, and that is motive, obviously.  So if

9   the RIAA is testifying, you know, we should be allowed to

10  understand the payments that have been going back and

11  forth to know the motive.

12              MR. OPPENHEIM:  Ms. Rodriguez, we'll --

13              SPECIAL MASTER RODRIGUEZ:  Okay.

14              MR. OPPENHEIM:  -- happily respond to what

15  Judge Jackson did.  There was no briefing by plaintiff on

16  the issue whatsoever.

17              SPECIAL MASTER RODRIGUEZ:  Okay.

18              MR. OPPENHEIM:  And Judge Jackson has not

19  ruled on the issue, so we'll address that in our filing.

20              SPECIAL MASTER RODRIGUEZ:  All right.

21  I -- I fear asking this question, but I do want to have

22  the question of, why would this not be more properly

23  addressed to the RIAA?  They have an interest in

24  protecting the information, and we're already subpoenaing

25  them, and presumably they'll be deposed in this case.

Telephonic Hearing
May 15, 2020

Page 157

```
 1                    MS. RANAHAN:  Thank you, Ms. Rodriguez.
 2                    The same counsel represents them both, so
 3        it's going to be the same -- I mean, it's the same.
 4        It's -- Oppenheim & Zebrak represent the RIAA through the
 5        subpoena so --
 6                    SPECIAL MASTER RODRIGUEZ:  Okay.
 7                    MS. RANAHAN:  -- it's the exact same.
 8                    SPECIAL MASTER RODRIGUEZ:  Okay.  That
 9        answers my question.
10                    All right.  So custodian.
11                    MS. RANAHAN:  And Ms. Rodriguez, this is
12        Erin Ranahan again.  If you want to push this until
13        Monday, given how late this has gone, I'm happy to do
14        that.  Whatever you would prefer.
15                    SPECIAL MASTER RODRIGUEZ:  Yeah.  Well,
16        plaintiffs have also raised the issue with -- regarding
17        custodians.  I take it that you all have exhausted your
18        ability to meet and confer on this issue, and there's not
19        going to be any further progress on that front?
20                    I will tell you that a reference to how
21        many one side has identified versus the other without
22        tying it specifically rings rather hollow, but --
23                    MS. RANAHAN:  There's --
24                    SPECIAL MASTER RODRIGUEZ:  I'd like --
25                    MS. RANAHAN:  Sorry, this is Erin again,
```

Telephonic Hearing
May 15, 2020

Page 158

 1    Erin Ranahan.

 2                   SPECIAL MASTER RODRIGUEZ:  Okay.

 3                   MS. RANAHAN:  There's apparently a few

 4    that plaintiffs are now agreeing to put up under this

 5    section, which we don't know who those are.  We just

 6    heard for the first time.

 7                   SPECIAL MASTER RODRIGUEZ:  Okay.

 8                   MS. RANAHAN:  So there may be.  I don't

 9    know if counsel wants to let us know who those are over

10    the weekend, I can get a better understanding for Monday,

11    if you want to set this aside.

12                   SPECIAL MASTER RODRIGUEZ:  Okay.  Well,

13    why don't we do that.  Why don't you all confer on

14    whether or not there are any that you're now agreeing to,

15    and then we will take up the ones that are not agreed to

16    on Monday at our hearing.

17                   All right.  Anything further with regard

18    to defendant's motion to compel?

19                   All right.  We had mentioned that we would

20    consider discussing process and procedure for these

21    parities and what may or may not work.  You all want to

22    do that today, or should we save that for Monday as well?

23                   MR. OPPENHEIM:  It's entirely -- from

24    plaintiffs' perspective, Ms. Rodriguez, entirely up to

25    you and your stamina here.  We're happy to address it

Telephonic Hearing
May 15, 2020

1    now, we're happy to address it Monday, whichever you

2    prefer.

3                MS. GOLINVEAUX:  Ms. Rodriguez, it's

4    Jennifer Golinveaux.

5                If plaintiffs have something in mind, it

6    may be useful for them to mention it now so we can have

7    time to consider it over the weekend and we might have a

8    more useful brief or conversation on Monday, if that

9    makes sense.

10               SPECIAL MASTER RODRIGUEZ:  Thank you.

11   You're channeling my thoughts.  I think maybe it would be

12   useful to have a conversation if -- with both sides

13   about -- then it gives us some time to think about it and

14   come back with counterproposals or further discussion.

15               So I don't know who wants to go first, but

16   I am interested in any thoughts that you have, ways that

17   we can make this better, ways that we can make this work

18   better for you.

19               MR. OPPENHEIM:  This is Matt Oppenheim.

20   I'm happy to be first to jump off the ice ledge into the

21   water.

22               SPECIAL MASTER RODRIGUEZ:  Okay.

23               MR. OPPENHEIM:  From plaintiffs'

24   perspective, we believe that this special master process

25   should more closely mirror the legal process in court.

Telephonic Hearing
May 15, 2020

1    And by that, we believe that the communications with you

2    should be limited to the equivalent of motions and

3    oppositions, and any communications beyond motions and

4    oppositions should occur only after permission is sought

5    and only in extraordinary circumstances.

6                    And I think what we're trying to get at

7    here is, we don't need to have a constant dribble of

8    letters and emails to you and receiving a reply brief the

9    night before we're having a hearing.  That's -- that's

10   not, we believe, the way the process should work.  It --

11   it's overwhelming to you and it's -- it's not necessarily

12   appropriate.  We should exercise more discretion.

13                   We also think that the briefing process

14   itself probably needs to be adjusted slightly in terms of

15   length and timing.  I think that the idea of short --

16   shorter, you know, five letter briefs -- and that may

17   have been suggested by plaintiffs -- that now we see

18   that -- what that is doing, in fact, is forcing us to --

19   to address issues in such a short-handed way that

20   sometimes I think we leave you, as the Special Master,

21   with less background and legal basis than probably you

22   should get.

23                   So we'd like to recommend extending the

24   submissions to either eight or ten pages and then adding

25   on, as you suggested, a one-page meet-and-cover

Telephonic Hearing
May 15, 2020

 1   certification under the local rules.

 2               We'd also like to suggest that the process

 3   be somewhat less time constrained.  We're finding it

 4   difficult to confer with our clients adequately, and then

 5   it's not really working as we think it should.

 6               We still think expedition is useful, so we

 7   would suggest that a motion be filed two weeks prior to a

 8   scheduled hearing, the opposition filed one week before

 9   the hearing; in other words, one week later.  And we

10   would eliminate the process of giving notice in advance

11   of submitting the brief because, under the certification

12   process, that we should be going -- excuse me, the

13   meet-and-confer process, that we're going to certify,

14   there should be -- already everybody should know well in

15   advance what the issues are that are going to be teed up

16   in a motion because we've been meeting and conferring on

17   those issues ad nauseam, hopefully.

18               And so we think that while it will

19   elongate the process somewhat, it would probably lead to

20   hearings, we believe, probably once every six weeks, as

21   opposed to once every four weeks.  We think that this

22   will facilitate a better process, and so we would -- we

23   would recommend that.

24               SPECIAL MASTER RODRIGUEZ:  Okay.  Fewer

25   hearing, that makes sense.  I think that if the parties

Telephonic Hearing
May 15, 2020

1  agree that we can stretch these out more, that would be

2  fine.

3          As you know, we set the original cadence

4  at once a month so that the parties would be able to get

5  expeditious responses and have certainty around it.  But

6  I'd be interested in defendant's position, and you may or

7  may not have one right now; may want to think about it

8  over the weekend.

9          But if parties would agree on that, I

10  certainly don't have a problem with it.

11          MR. ELKIN:  Ms. Rodriguez, Ms. Elkin here.

12          I appreciate the comments of

13  Mr. Oppenheim.  We have not had a chance to entertain

14  them since we heard them for the first time today, so I

15  would suggest that now that we know them, we can discuss

16  it internally, and then we're heard to you on Monday if

17  we can.

18          SPECIAL MASTER RODRIGUEZ:  Okay.  That's

19  fine.

20          The one thing I would like us to all think

21  about is the notice of the issues.  I don't know how much

22  work that is to prepare, but I agree that that seems to

23  be something that we thought might be helpful to get the

24  parties to meet and confer and have further conferrals

25  before briefs had to be filed on Friday.  But if the

Telephonic Hearing
May 15, 2020

Page 163

1    parties are finding that it's just an extra step, I'm not

2    interesting in creating extra steps unnecessarily.

3                    So I would think about that to see if it

4    is of value to you all.  It is of some value to me just

5    to know what's coming, but, you know, we can work around

6    that.  So I would ask that everybody think about all of

7    this, but that in particular.

8                    MR. SPERLING:  And, Ms. Rodriguez, it's

9    Jonathan Sperling for the plaintiffs.  I appreciate you

10   raising it, because I think from our side also, you know,

11   subject to hearing and being persuaded otherwise by

12   Charter's counsel when we've had a chance to hear back

13   from them, I think we're -- we're finding that it's

14   not -- not particularly helpful.

15                   And I think overall, you know our issue

16   with the process because we -- we very much appreciate

17   the fact that you made yourself to available to conduct

18   these on a monthly basis so that we could expedite

19   things.  But the schedule, from our perspective, ends up

20   being so compressed that, number one, almost as soon as

21   the first conference before you or hearing before you is

22   done, parties are teeing up issues for the next one.  And

23   that, in turn, frankly, I think, is disincentivizing

24   compromise.

25                   It goes also to what Mr. Oppenheim said

Telephonic Hearing
May 15, 2020

Page 164

1    about communication with you and trying to make it a

2    little bit more like a court process.  I think that,

3    unintentionally -- you know, not your responsibility

4    exactly as Matt said, as Mr. Oppenheim said -- probably

5    we were -- we were the authors on side of this, in part,

6    so just learning the consequences of our own bad

7    suggestion.

8                But I think we've created a process

9    potentially where if somebody is going to be in front of

10   you every few weeks, that it could be viewed as

11   advantageous to have issues to bring in front of you to

12   appear to characterize the other side as maybe being

13   unreasonable, as opposed to having a process in which

14   some judgment has to be exercised as to whether something

15   rises to the level to bring to you sooner than the next

16   hearing.

17               And I think it's that process, you know,

18   if we think about how we all conduct things in court in

19   front of a magistrate judge or district judge, you know,

20   we weigh whether this is a matter that's worth taking the

21   initiative to bring to the court or whether the court is

22   going to be annoyed that it had to be bothered.

23               And that thought process encourages

24   compromise, and I think if we have a structure in which

25   essentially every few weeks we're in front of you no

Telephonic Hearing
May 15, 2020

1    matter what and nobody suffers the consequences of having

2    been viewed as -- having to have caused the

3    decision-maker, you, to pay attention to a discovery

4    issue, that the judgment gets skewed, and the ordinary

5    judgment says maybe, I should compromise rather than

6    asking to be heard.  I'm being heard anyway, so I'm not

7    going to compromise.

8                   And I think we want to create -- and

9    there's no attribution of blame here.  You know, this

10   could be going on on both sides, but I think we feel like

11   that's happening a little bit.

12                  And so for purposes of everybody's

13   consideration over the weekend and for the discussion on

14   Monday, one of the reasons why we think we should go to

15   this six-week schedule is we think it can help actually

16   facilitate more compromise and fewer issues, hopefully,

17   having to come before you.

18                  SPECIAL MASTER RODRIGUEZ:  All right.

19   Well, I mean, Mr. Sperling, I would say that I certainly

20   hope that no one would refuse to compromise or feel that

21   it was advantageous in some ways to bring up issues that

22   don't really need to be brought up.  That only increases

23   the cost, the time, and the effort.  And as I recall from

24   the very beginning the parties, particularly the

25   plaintiffs, were concerned about costs.  So that, I

Telephonic Hearing
May 15, 2020

```
 1    certainly hope is not the case for anyone.

 2              But I am happy to set this up so that it

 3    works for all the parties because that is the point and

 4    the intention here.  We need to balance being available,

 5    getting things done quickly, with allowing parties to

 6    fully deal with issues and to bring the best argument

 7    forward as possible.

 8              So, yes, let's please all think about

 9    this, come back with suggestions, and we'll address this

10    and take it up again on Monday.

11              Thank you, Ms. Dittmer, our court

12    reporter.  I know this is challenging, and we appreciate

13    you hanging in there with us.

14              THE COURT REPORTER:  Thank you.

15              MR. OPPENHEIM:  Here, here.  Plaintiffs

16    agree.  Thank you, Ms. Rodriguez.

17              SPECIAL MASTER RODRIGUEZ:  Is there

18    anything else that we need to address today?

19              MR. OPPENHEIM:  Not from plaintiffs'

20    perspective.

21              SPECIAL MASTER RODRIGUEZ:  Or have we worn

22    everybody out?

23              UNIDENTIFIED SPEAKER:  Mr. Alvarez, from

24    defendants, nothing here.  Thank you very much to you and

25    the court reporter and counsel.
```

Telephonic Hearing
May 15, 2020

Page 167

1              SPECIAL MASTER RODRIGUEZ:  Thank you,

2     everyone.  Have a good weekend and we will talk to you on

3     Monday.

4              MULTIPLE SPEAKERS:  Thank you.  Okay.

5     Thanks.

6              (WHEREUPON, the within proceedings were

7     concluded at 1:53 p.m. on the 15th day of May, 2020.)

8                    *      *      *      *      *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Telephonic Hearing
May 15, 2020

Page 168

```
 1                    REPORTER'S CERTIFICATE

 2

 3        I, K. MICHELLE DITTMER, Registered Professional

 4   Reporter and Notary Public, State of Colorado, do hereby

 5   certify that the said hearing was taken in machine

 6   shorthand by me at the time and place aforesaid and was

 7   thereafter reduced to typewritten form; that the

 8   foregoing is a true transcript of the proceedings had.  I

 9   further certify that I am not employed by, related to,

10   nor counsel for any of the parties herein, nor otherwise

11   interested in the outcome of this litigation.

12            IN WITNESS WHEREOF, I have affixed my signature

13   this 22nd day of May, 2020.

14            My commission expires April 15, 2024.

15

16   _____
                  K. MICHELLE DITTMER
              Registered Professional Reporter
17                Wilson & Associates, LLC

18

19

20

21

22

23

24

25
```