# Exhibit D

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
        Case No. 19-cv-874-RBJ-MEH
 3    _____

 4    WARNER RECORDS, INC., et al.,

 5         Plaintiffs,

 6    vs.

 7    CHARTER COMMUNICATIONS, INC.,

 8         Defendant.
      _____
 9

10             Proceedings before MICHAEL E. HEGARTY, United

11    States Magistrate Judge, United States District Court for the

12    District of Colorado, commencing at 10:52 a.m., September 9,

13    2020, in the United States Courthouse, Denver, Colorado.

14    _____

15    WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE HEREIN

16    TYPOGRAPHICALLY TRANSCRIBED. . .

17    _____

18                        APPEARANCES

19             JONATHAN M. SPERLING, MATTHEW J. OPPENHEIMER, NEEMA

20    SAHNI and JEFF GOULD, Attorneys at Law, appearing for the

21    Plaintiffs.

22    _____

23

24                  ORAL ARGUMENT/IN COURT HEARING

25
```

2

1                    APPEARANCES (continued)

2              ANDREW H. SCHAPIRO, ERIN R. RANAHAN, JACK M.

3    TANNER, ALLISON H. HUEBERT, JENNIFER A. GOLINVEAUX and

4    MICHAEL L. BRODY, Attorneys at Law, appearing for the

5    Defendant.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

145

```
1    essentially the interrogatory we have served.  We've said
2    show us -- you say you notified us about Tom Petty, "The
3    Waiting is the Hardest Part," we've looked at the -- you
4    know, at the list here and we don't see that there.  Where is
5    it?  They say, Well, go find it yourself.  And that was the
6    argument in front of the Special Master, but it's -- you
7    know, this is not a --
8                THE COURT:  Can you find it yourself?
9                MR. SCHAPIRO:  Pardon me?
10               THE COURT:  Can you find it yourself?
11               MR. SCHAPIRO:  I think the answer to that is two
12   steps.  We can go through a process that I think would allow
13   us to put those pieces together.
14               THE COURT:  The same process they would go through?
15               MR. SCHAPIRO:  The process that we know they have
16   already gone through for at least some of them.  I understand
17   what Mr. Oppenheim was saying, I think is a legitimate -- a
18   legitimately held belief that before they brought suit they
19   would have connected notices on the case saying you failed to
20   honor these notices about our works in suit, they would have
21   matched them.  If they say that they didn't --
22               THE COURT:  I think Rule 11 would require nothing
23   less than that.
24               MR. SCHAPIRO:  That's what we think and that's what
25   the Special Master thought.  He's saying they didn't do that
```

1   and they think they can prove their case in some other way,

2   but --

3          THE COURT:  Well, he did it -- he said they did it

4   for some.

5          MR. SCHAPIRO:  They did it for some, and so you

6   were asking is there something we can do, is something that

7   they for at least some have already done and they know how to

8   do it.  For how many they've done it, I don't know, but the

9   interrogatory asks them to link up the works in suit with the

10  notices, which is a pretty basic request.  They've given us a

11  spreadsheet, but this wasn't a -- a spreadsheet which is one

12  piece in that puzzle, which has about seven steps, but this

13  isn't a request for production, it's an interrogatory.

14         Now, the plaintiffs argued that this requires

15  expert testimony and that we're asking for an early -- early

16  disclosure of expert testimony of some sort, that the Special

17  Master correctly rejected that.

18         THE COURT:  Well, even Mr. Oppenheim just admitted,

19  could a layperson do this?  Yes, he said that, but is it more

20  appropriate for an expert to do and he said, yes, it would

21  be.

22         MR. SCHAPIRO:  I think there we're getting into

23  semantics a little bit.  You might need someone who is smart

24  and technically capable, but this is not a piece of

25  information or a set of information that should wait until

1   expert disclosures, because we're seeking in discovery, in

2   the early phases of discovery here now to understand their

3   case and to attack the weaknesses in their case.  And the

4   mere fact that something requires a person who is smart and

5   technical to do doesn't mean that it has to wait until expert

6   disclosures or the expert report of some sort.

7           THE COURT:  But didn't you tell me you do have the

8   means do this as well as they have?

9           MR. SCHAPIRO:  I think we can't deny that, right?

10          MS. RANAHAN:  I think we could ultimately do it,

11  but again, consistent with Rule 11, we expected that they

12  would have -- to able to put them in the case, they would

13  have found, well, this noticed covered it at some point, and

14  that's what the Special Master understood too.

15          And I just want to make a technical distinction,

16  because we hosted -- we didn't host any of this content.

17  This was -- of course, we're giving internet access to

18  people, so if we get a notice and it says, you know, "Born to

19  Run," our favorite example, is being infringed, so we're

20  taking that literally.  We're not going to see what that user

21  is doing on the internet and starting to spy on the

22  customers, that's not -- we don't even have the access to

23  their full, you know, internet or what they're doing.

24          So this is -- it's different than if you're hosting

25  the material where you get a notice, which is I think the

148

1   process they're describing.  You get a notice of a

2   representative sample of something that you're hosting as a

3   host for content and then you can go to that person and say,

4   let me look, let's see what that person is doing and you have

5   more control.

6           Here this is again, like we are providing internet.

7   So it's like, you know, going to your Comcast, and if Comcast

8   gets a note and then all the sudden they start going,

9   hovering into what you're doing, it's a different level, so

10  just to keep that technical distinction clear.

11          THE COURT:  Understood.

12          MR. SCHAPIRO:  It's the notices, of course, that

13  form the basis of our alleged knowledge and it's that alleged

14  knowledge that forms the basis of their contributory

15  liability claim.

16          So this is work that the Special Master found would

17  be burdensome.  She -- in this particular dispute, there was

18  one round of briefing, then there was a follow-up round of

19  briefing, supplemental briefing, in which the plaintiffs

20  explained how one can tie notices to torrent files and they

21  claimed that we could do the same thing, but they didn't tell

22  us how they tied the contents of the torrent files to

23  specific works, which is what we've asked them to tell us in

24  this interrogatory.

25          THE COURT:  Read the interrogatory out loud.

149

1          MR. SCHAPIRO:  Does somebody have the interrogatory

2     handy?  I apologize.  Okay, it is Number 14 -- 15 and 14.

3     Hang on, I think I have it in here.

4          MR. OPPENHEIM:  I can do it if you don't mind my

5     interrupting.  I'm happy to read it.

6          MR. SCHAPIRO:  I don't mind.  I'm pulling it up,

7     please, thank you.

8          MR. OPPENHEIM:  So there are two interrogatories at

9     issue, Your Honor.  One is Interrogatory Number 14, which was

10    listed -- sent to the record company plaintiffs, which said:

11    For each sound recording listed on Exhibit A, including any

12    amendments to the same to plaintiffs' complaint, identify

13    each RIAA notice that references the allegedly infringed file

14    corresponding to that sound recording.

15          And then they issued a similar Interrogatory Number

16    15 to the music publisher plaintiffs that says:  For each

17    music composition listed on Exhibit B, including any

18    amendments to the same to plaintiffs' complaint, identify

19    each RIAA notice that references the allegedly infringed file

20    corresponding to that music composition.

21          THE COURT:  That's pretty basic.  Go ahead.

22          MR. SCHAPIRO:  Your Honor, that's about it.  That's

23    pretty basic and that's our presentation.

24          THE COURT:  Well, I know, but I'm still trying to

25    understand, as a general matter in my experience as a lawyer

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

150

1    and as a judge, it's one thing to ask a party for something

2    they have.  It's a very different thing to ask a party to

3    (inaudible) up work and give it to you.  Those are -- rarely

4    if ever have I seen the latter successful.

5            MR. SCHAPIRO:  Well, and here is why this is a

6    little bit different.  I think this is in its own way a

7    little more in the nature of a contention interrogatory,

8    because they are saying -- their case is we put you on notice

9    about each and everyone of these and therefore you are

10   liable.  And so we are saying, You did?  Please show us

11   where.  And they say, Well, it's in this stack of stuff, you

12   finds it yourself.

13           So it's not illegitimate for us to say, and this is

14   very different from us saying, do our work for us.  We're

15   saying you've made a claim as a stack you have stuff, this is

16   as basic as you said almost a Rule 11 level claim, we're

17   going to burn one of our interrogatories by saying -- two of

18   our interrogatories by saying, Where does this song show up

19   in a notice because it seems like 75 percent of them aren't

20   there at all?

21           THE COURT:  Right, which they don't dispute, I

22   suspect.

23           MR. OPPENHEIM:  Yeah, Your Honor, there is a

24   fundamental misunderstanding of what our case is here, and I

25   would like to --

1          THE COURT:  Well, I know, but I want to make sure

2     you don't dispute that, that in fact the name of an actual

3     work of all that your suits -- all the works in suit, only 25

4     percent were specifically identified in a notice.

5          MR. OPPENHEIM:  So I don't know the specific math,

6     but the concept that there is only a representative sample

7     listed on the work -- on the notice is absolutely correct.

8          THE COURT:  Okay.

9          MR. OPPENHEIM:  As to the exact numbers, I haven't

10    done the calculation.

11         THE COURT:  The facts are what they are.  That's

12    not a subject to dispute, I wouldn't think.

13         MR. OPPENHEIM:  Yeah, right, but the concept is

14    good.  The notice, however, is putting Charter on notice that

15    it has an infringing subscriber.  So Ms. Ranahan indicated,

16    look, we're not hosting websites that have content and that's

17    right.  What they're doing is they're providing service to

18    infringers.  And what the notices do is provide notice to

19    Charter that they are providing service to known repeat

20    infringers and that they're not doing anything about it.

21         It's not plaintiffs' obligation to identify each

22    and every work in order to bring a suit.  There is absolutely

23    no law that says that.  That would be a novel theory in a

24    case like this.

25         THE COURT:  Well, you wouldn't have time -- again,

1   you wouldn't have time to do it.  I just want to make sure

2   that you all agree that in fact the name of a work only

3   represented 25 percent of the total.

4          MR. SCHAPIRO:  Apparently we do.  Mr. Oppenheim

5   isn't talking about a specific number.

6          THE COURT:  I think for the purposes of this

7   argument he --

8          MR. SCHAPIRO:  For purposes of this argument that's

9   true.  And I think it's an interesting legal theory that we

10  heard a moment ago, because, you know, the idea in a

11  copyright case is that you have to prove up, including in a

12  case of contributory liability, which is what's at issue

13  here, you have to prove up your case.  Of course, this will

14  be done in some fashion that doesn't entail sitting down

15  through thousands and thousands of them, but you have to

16  prove that in each instance the contributory infringer knew

17  about -- knew or was on whatever the requisite type of notice

18  that they were going to try and prove at trial was of this

19  specific infringement, not just that you had an infringer

20  somewhere.  At least that's going to be our -- our position.

21         THE COURT:  Let me ask this:  I have down that

22  there were 700,000 notices, each notice contained an IP date

23  and time.  Are we good so far?

24         MR. SCHAPIRO:  Yes.

25         THE COURT:  And each notice contained a hash file.

153

1   Are we good so far?

2            MR. SCHAPIRO:  That's what I'm told, yes.

3            THE COURT:  You haven't seen them?

4            MR. SCHAPIRO:  I'm told by our team, so I believe

5   that, yes.

6            THE COURT:  And that each notice listed at least

7   one representative work within that hash?

8            MR. SCHAPIRO:  I have no reason to doubt that.

9            THE COURT:  Okay.  So maybe this is more of a

10  question for the plaintiff, but would Charter at that moment

11  have been able to turn to some source and find out all the

12  works within that hash?

13           MR. OPPENHEIM:  Could they have?

14           THE COURT:  Yes.

15           MR. OPPENHEIM:  Yes, but that's not the relevant

16  inquiry here.

17           THE COURT:  I just want to know, how could they

18  have done that?

19           MR. OPPENHEIM:  They could have -- they could have

20  easily just looked on BitTorrent and seen it, absolutely.

21           THE COURT:  So they could have gone into the

22  BitTorrent program, put in a hash, and it would have

23  identified all the works that are in that hash?

24           MR. OPPENHEIM:  They could have done that.  Also --

25  sorry, Your Honor.

154

1          THE COURT:  I just want to make sure, is that true

2     what I just said?

3          MR. OPPENHEIM:  Yeah, they could have -- they could

4     have searched for the hash and found details on the hash,

5     including --

6          THE COURT:  So if the hash contained ten works --

7          MR. OPPENHEIM:  It would list it.

8          THE COURT:  -- they could have received that

9     notice, somebody knew what they were doing could have seen

10    all ten works that were within that hash?

11         MR. OPPENHEIM:  They could have gotten a listing of

12    every work in the hash, they could have listened to the works

13    in the hash, they -- but also, by the way, in addition to the

14    hash, it also had the file name.  So the example that's in

15    the -- what was sent to Your Honor, I believe, as part of the

16    exhibits, the one notice, I believe it's Exhibit 7, it's

17    Whitney Houston, "I Will Always Love You," it has the IP

18    address, the file size, the IP port, the network, the

19    protocol.

20         THE COURT:  I don't have exhibits here, so could

21    you please hand that to me.

22         MR. OPPENHEIM:  Yes.  I don't have extra copies,

23    but I'm happy to hand it up.  It also lists, Your Honor, the

24    file name.  So in this particular case, it lists the file

25    name Whitney Houston, "The Ultimate Collection 2007."

1          THE COURT:  That's an album, I guess?

2          MR. SCHAPIRO:  And while that's being handed up,

3    can I just make the point -- I was trying not to interrupt

4    here, but, of course, if we go online and we see in response

5    to that notice -- we're getting thousands -- so we go online

6    and we find that and we say, okay, here is Whitney Houston,

7    which they say is theirs and it's infringing, and then we

8    also see that Bruce Springsteen or "Happy Birthday" or

9    someone's high school saxophone recital is in there, we have

10   no idea what is authorized or infringing.

11         THE COURT:  That I understand.

12         MR. SCHAPIRO:  They have not made a claim until

13   now.

14         THE COURT:  Sure, but you can see what's in there?

15         MR. SCHAPIRO:  Yes, and then they sue us and say,

16   Well, the high school saxophone recital is also infringing.

17         THE COURT:  All right.  But, again, I guess my

18   fundamental -- somebody -- do you disbelieve -- do you accept

19   their representation that they haven't done this except for

20   some works, which provided the basis for them to file a

21   complaint in the first place?

22         MR. SCHAPIRO:  I have to -- I have to accept their

23   representation.  I will say the Special Master -- they didn't

24   make any burden argument to the Special Master and she found

25   there is a burden to us.

156

1            THE COURT:  Why?

2            MR. SCHAPIRO:  Because we walked through what it

3     would take to take thousands of works in suit and go through

4     essentially a cryptographic hash matching compared to the

5     spreadsheets, manually listen to thousands of infringing

6     files on torrent where the legitimacy of the torrent might be

7     in dispute, resolving problems about the overlap of sound

8     recordings and music compositions.  That's an exercise that

9     they've gone through with at least, if we take their word for

10    it, on at least some of these.

11            THE COURT:  Well, so here is what I would

12    understand about both of you.  You have equal access to

13    resources.  Often in lawsuits we have a plaintiff who is a

14    person, there is no money and an attorney on a contingent fee

15    and a defendant that's a Fortune 50 company, okay.  That's

16    disparate.  I don't see disparency here, okay.  I see an

17    equal ability to find resources to do this kind of work, and

18    you're asking me just to say who has to do it.  Why would I

19    make them do that if they haven't done it yet?

20            Now, the fact that they haven't done it yet may be

21    good for you, okay.  It may be that you can point out at

22    trial to the jury they're proceeding basically on speculation

23    based on a few representative samples, but what makes you

24    think that if this is done, it won't inure to their benefit

25    more than your benefit because it will -- it will give them

157

1   even more evidence and more concrete and verifiable evidence

2   of the violations?

3        MR. SCHAPIRO:  I was about to speak, but I see my

4   colleague leaning towards the microphone.

5        MS. RANAHAN:  I have one -- just a point to make to

6   that exact issue.  The problem is that they've asked us,

7   Well, you can go on to wiki pages and you can try to piece it

8   together with unverifiable sources.  We will then have what

9   we've compiled and they will dispute it and say, This isn't

10  verified, that's not authenticated, that's not the notices we

11  relied on.  So we're not in a position to use that for

12  summary judgment.  We're not in a position to say, you know,

13  here is what the notices were.  We're then trying to

14  speculate and they will surely find evidentiary problems with

15  it.  So it's a --

16       THE COURT:  So you don't know how they did even

17  this first group?

18       MS. RANAHAN:  Right, and of course, the original --

19  what they had pulled is no longer available, right.  I mean,

20  the original files that they had -- you know, we know that

21  those original infringements aren't available.  So we are now

22  trying to decipher, which again if we get a notice about one

23  work and we are an ISP, we aren't on notice that every single

24  thing that that person may have is infringing, we don't know

25  that anything is infringing, except for what they've told us.

1            So they expected us at the time -- this is their

2    theory of the case -- that we get this notice and we treat

3    everything that person did as an infringement.  And how?  How

4    would we know?  And so we're asking them to tell us for the

5    75 percent that we can't see in a notice, which notice do you

6    think covered that?  And they must know.  As you said, it's a

7    Rule 11 thing.  How could they file a suit --

8            THE COURT:  Right.  Are you saying it's a mystery

9    to you at this moment and to any expert you employ how they

10   might have done that in the first place?

11           MS. RANAHAN:  Well, I'm sure they had an efficient

12   way to go about it.  We would do our best.

13           THE COURT:  You just don't know what that was?

14           MS. RANAHAN:  We don't know what that was.

15           THE COURT:  Okay.  And so why shouldn't I at least

16   require you to identify the process you used to inform

17   yourselves that -- that this notice applied to these works

18   and then let them take the manner of your -- I'm not going to

19   call it work product, but methodology to allow them to -- to

20   do the rest of the job they think you should have done but

21   you didn't do?

22           MS. RANAHAN:  So the concern is that we verify --

23           MR. OPPENHEIM:  Can I answer the question?

24           THE COURT:  Yeah, go ahead.

25           MR. OPPENHEIM:  Thank you.  So first off, in our

1   submissions to Ms. Rodriguez, we provided a detail analysis

2   of how you would go about that analysis, a flow chart, how

3   you would go about doing the analysis they've asked for, and

4   we've laid it out.

5           THE COURT:  No, how you did go about it.

6           MR. OPPENHEIM:  Well, how we did, right?

7           THE COURT:  Or how one would.  There is a

8   difference.

9           MR. OPPENHEIM:  What counsel did is clearly work

10  product, but there is a fundamental -- they are misleading

11  you on the law here --

12          MR. SCHAPIRO:  Objection.

13          MR. OPPENHEIM:  -- and what our claim is.  Okay, so

14  I want to step back.  Charter doesn't care what was infringed

15  or how much was infringed.

16          THE COURT:  It's hard for you --

17          MR. OPPENHEIM:  Hold on, let me --

18          THE COURT:  It's a little bit sketchy to ascribe,

19  you know, motive.

20          MR. OPPENHEIM:  No, no, no, no.  They -- not

21  motive.  I'm talking about process.  They have not produced a

22  single document, nor do I think they ever could, instead that

23  they looked at what was infringed.  Charter had some process.

24  When a notice came in, they would deal with the notice.  What

25  they looked at was who was the alleged infringer.  That's

160

1   what they cared about.  They didn't look at whether it was

2   one work or 10,000 works.  That wasn't relevant in their

3   analysis, it was an automated process.

4           So this notion that underlies their entire

5   assertion here is that we had to have given notice of a

6   particular work in order to bring a suit.  That's not true.

7   What we had to do was make them aware that they had repeat

8   infringers that they were continuing to provide service to

9   and that they weren't doing anything about it, and we did

10  that over and over and over again.  Once we've established

11  that knowledge, that knowledge is sufficient for a

12  contributory infringement claim.

13          Now, we do have to prove the underlying

14  infringement, and we'll do that, and the way we'll do that is

15  we have -- we have the infringing hash files.  Ms. Ranaham

16  keeps saying we don't, we do, and we've produced them.  They

17  have them, everyone of them, and we've produced the

18  legitimate files.  We don't need to visit that again because

19  we spent a lot of time on that.  They can match it.

20          THE COURT:  So what you're saying is that they can

21  take any given one of these 700,000 notices right now today

22  if they wanted to and find out for that notice how many works

23  were in fact infringed?

24          MR. OPPENHEIM:  So I'm going to -- I'm pausing

25  because you used the word "infringed."  What they can figure

1   out is what the hash is and the file in that notice.  They

2   can then look at another spreadsheet and say, What does

3   Audible Magic say the actual tracks are that in there.  Those

4   tracks -- it may be that there are -- let's say that there

5   are 100 tracks.  It may be that 60 of them are infringing on

6   plaintiffs' works and 40 of them infringed somebody else's

7   works.  I'm just making up numbers here, right.

8          So obviously we wouldn't be proceeding on the 40 or

9   making allegations on the 40, and even on the 60 we may not

10  be proceeding, because if -- for lots of reasons.

11         THE COURT:  But you're not doing to get down to

12  this minute detail at trial.

13         MR. OPPENHEIM:  No, no, and nor are they, nor are

14  they.  They're not going to go through -- just think about

15  this, 770,000 notices, let's just assume there is an average

16  of 15 to 20 tracks for each of those hashes.  Start doing the

17  multiplication, and you see that the data set they're looking

18  for is going to be multiple millions of lines of data that

19  they want us to calculate for them.  No jury is going to look

20  at that, right.

21         THE COURT:  Well, they're going to look at a

22  synopsis or accumulation of that data, I hope.

23         MR. OPPENHEIM:  Well --

24         MR. SCHAPIRO:  And I think this sums up some of the

25  unfairness to us, because Your Honor asked a moment ago,

162

1   Well, why them and not us?  And it's exactly for this reason.

2   I mean, we are here trying to defend ourselves against

3   something that is going to come in --

4            THE COURT:  Well, no, they just told you they're

5   not going to go into that kind of detail.

6            MR. SCHAPIRO:  Right, but it's very hard for us to

7   defend ourselves because what's going to happen is a stack of

8   documents is going to be put in front of the jury and an

9   expert is going to say we have linked all these things.  And

10  at a minimum we are saying, you have brought this case and

11  you said you infringed all of these works that we own and you

12  were on notice.  And we're saying, Where are the notices?

13  And they say, Well, go find it yourself.

14           THE COURT:  No.  You'll say, There is no proof of

15  that, ladies and gentlemen of the jury, they haven't

16  submitted any proof of that.  And they'll say, Well, here is

17  what we submitted.  And so -- you have a good argument

18  already.  I just don't understand -- I mean, I understand why

19  if we were --

20           MR. SCHAPIRO:  We think we can --

21           THE COURT:  No trial can possibly deal with this

22  much detail on a song-by-song or work-by-work basis, you

23  can't.  So necessarily all this information is going to be

24  aggregated and presented in lump -- in lumps, right?

25           MR. SCHAPIRO:  Which is exactly why we have to be

163

1    able to test it and understand what they are alleging.

2           THE COURT:  But you can -- you can without them

3    already.  You have what they have.  Again, I want everybody

4    to have the same base information and to do with it whatever

5    they think they can.  That's the way it should go.  Don't you

6    agree?

7           MR. SCHAPIRO:  I believe instead that the -- the

8    party that has the burden and intends to show, to link these

9    things up, should be the one, in response to a legitimate

10   interrogatory -- we've given them an interrogatory -- to

11   respond to the interrogatory.

12          THE COURT:  Well, what I think is fair, and I'll

13   hear them on that one before I make any kind of final

14   decision, is that they produce to you what they've already

15   done.

16          MR. OPPENHEIM:  On that front, Your Honor --

17          THE COURT:  Because then you would have an

18   argument, members of the jury, if they're suing on 770,000

19   alleged protected -- well, notices with up to multiple

20   violative works within each notice, so millions and millions

21   of alleged violations, right, that's what they're suing on,

22   and yet, they brought this suit having only ten examples of

23   these things.  That I think is relevant.

24          MR. OPPENHEIM:  Two things.  One, I want to hand up

25   what I referenced to you earlier, which is a May 20, 2020

164

1    letter that I sent to Ms. Rodriguez, and opposing counsel is

2    copied on it, and it lays out the process to go through the

3    documents to review for purposes of doing the analysis that

4    they're asking for.

5            So we've laid that out already, Your Honor, and we

6    will have an expert who will -- who will conduct an analysis

7    and issue a report connecting the works in suit to the

8    notices, but they will not do what the defendants have asked

9    and it will be a subject of expert testimony.  They will have

10   every opportunity to examine that, to examine the expert.

11   They will have all the underlying data.  I have no doubt,

12   just like in Cox, Winston & Strawn who represented them

13   there, will have a counter expert who will say, I looked at

14   this as well and I either or disagree agree or don't agree.

15   In the Cox case their expert agreed with, I think, 94 or 98

16   percent of the calculation of the experts.  They were

17   exceedingly close on millions of lines of data.

18           So this isn't -- what they're asking for is going

19   to happen through expert testimony, and that's the way it

20   should happen, because it is a massive data exercise and how

21   we choose to do that data exercise and present it to the jury

22   will be what we construct and put in the --

23           THE COURT:  But I would like -- I'll just call this

24   connect the dots all the way, okay, what he's asking you to

25   do.  For how many notices do you believe your side has

165

1    connected the dots all the way?

2         MR. OPPENHEIM:  I guess I'm unclear on the

3    question.  I apologize.

4         THE COURT:  Okay.  So somebody presumably had the

5    notice that was sent to Charter.  It listed hash value and

6    everything you've shown me, okay, and then has -- for any of

7    those notices, has anybody on the plaintiffs' side, either

8    pre-suit or post-suit, identified that in this notice, in

9    fact in this hash value, there were eight different works

10   that were protected that were downloaded, and even though we

11   listed only one representative sample, there were in fact

12   eight that we know of?  Has anybody done that for any notice?

13        MR. OPPENHEIM:  We've done it the other way, Your

14   Honor, but the analysis is not complete yet, and let me

15   explain.

16        So what we've done is we've looked at the --

17   everyone of the works in suit, right, was included in at

18   least three or more notices, not necessarily as Mr. Schapiro

19   would like it to be, but by virtue of hash or file.  So

20   everyone -- so we do it the other way.

21        But, Your Honor, here is why what we were

22   discussing this morning is so important.  When we get

23   additional files on the accused subscribers, we will learn

24   that, oh, this person who was only the subject of one notice

25   from the plaintiffs was subject to potentially 50 notices

166

1   from the movie studios and 25 notices from game companies and

2   30 notices from other music companies.  And so now this

3   person who we thought their works were not necessarily

4   included, their infringements were not included in our

5   analysis, now will get included because it was a three or

6   more, that person was subject to three or more notices.

7          So we will -- we have not completed our analysis,

8   nor exactly how we're going to do with the expert, but we

9   will do it once we have all the data, and that will be

10  presented in an expert report of what we're going to tell to

11  the jury.

12         THE COURT:  But it sounds like -- so what you're

13  saying you haven't done it sounds like you might have done.

14  In other words, you took all 770,000 notices and have

15  identified all the infringed works within those notices,

16  which you said you did by even coming up with your list of

17  alleged infringing works.  I mean, how many alleged

18  infringing works are there?

19         MS. RANAHAN:  11,000 or something.

20         THE COURT:  11,000.  So the only way you would know

21  that is if you matched the works that your clients own with a

22  notice and a hash value and found out that these are the

23  total number of works that were encompassed within those

24  770,000 notices.  Does that sound fair?

25         MR. OPPENHEIM:  Well, they have this -- they have

167

1   the spreadsheet -- they have that spreadsheet, which goes

2   from hash to all works, and then they have the works in suit.

3              THE COURT:  The hash -- and the hash came from one

4   of the 770,000 notices?

5              MR. OPPENHEIM:  Right.  I don't know off the top of

6   my head how many hashes.

7              THE COURT:  But you have a spreadsheet that shows

8   all 770,000 hash -- hash values?

9              MR. OPPENHEIM:  Right, they do too, yeah, same

10  spreadsheet.

11             THE COURT:  You have that too?

12             MR. SCHAPIRO:  Yes.

13             THE COURT:  And then those hash values, you have a

14  spreadsheet that shows what works were within each of those

15  hash values?

16             MR. OPPENHEIM:  And they do too.

17             THE COURT:  And you have that too?

18             MR. SCHAPIRO:  Yes.

19             THE COURT:  I guess I just don't see it.  I don't

20  see what you can't do with that.

21             MR. SCHAPIRO:  So I think you may have hit on a

22  compromise a moment ago when you said -- we said we thought

23  they would have done -- had done all of the work actually

24  linking (inaudible).  We can't from that spreadsheet, without

25  taking many more steps, say this notice that we received is

168

1  tied to Tom Petty, "The Waiting is the Hardest Part," but if

2  they've done it for some, which apparently they have, or some

3  they're tying specifically the notice to the work, they

4  should provide that, because it's not extra work.

5          MS. RANAHAN:  And we can't figure out from the file

6  which ones are their works by just looking at the files.  We

7  need them to tell us which ones are included that are their

8  works.

9          THE COURT:  But wait a second.  So they said you

10 have a document that shows all the works within a hash value.

11         MS. RANAHAN:  But that -- it doesn't show which

12 works they're claiming.  It just shows --

13         THE COURT:  No, no, no.  It shows you all the works

14 within a hash value, and are those works listed by title or

15 are they listed by the fingerprint?

16         MR. OPPENHEIM:  They're listed by title and all you

17 have to do is compare it to Exhibit A of the complaint, which

18 has a list of works in suit.  And what Mr. Schapiro just said

19 is just simply not true.  They absolutely have the ability to

20 look at the hash and then go to the other spreadsheet and

21 look at the works that are listed in that hash --

22         THE COURT:  It just sounds like a lot of --

23         MR. OPPENHEIM:  -- and just compare it to Exhibit

24 A.

25         THE COURT:  No, I agree.  It sounds like a lot of

1    work, but it is something that is available to people who

2    will do it.

3              MR. SCHAPIRO:  I think that's what the Special

4    Master said, it's a lot of work, it's available to people to

5    do it.  She thought they had already done it for everything.

6    They've only apparently done it for some, but because it's a

7    lot of work and because it is the basis of their theory and

8    because it's an interrogatory that at least on its face is

9    legitimate, they should at least be ordered to provide us the

10   subset that they did.

11             MS. RANAHAN:  And the titles.

12             THE COURT:  Does that mean the conclusion that they

13   reached?  Because you might not have the process by which

14   they reached it in some kind of readily producible form, but

15   you might have the conclusion.

16             MR. SCHAPIRO:  Well, that we will need to see or

17   hear from them.  We're trying to figure out on our own how

18   they did or how we can do it.

19             THE COURT:  You understand what we're saying --

20             MR. OPPENHEIM:  Yeah, I understand --

21             THE COURT:  -- or trying to say?

22             MR. OPPENHEIM:  -- they're looking for attorney

23   work product, what we did and what we did with our consulting

24   experts.  That is not discoverable.

25             MS. RANAHAN:  This is the basic facts underlying

1  their claims.  So if we have a hash spreadsheet that shows a

2  title, that's -- again, we're getting back to the same issue

3  with the versions and the eight different versions of "Born

4  to Run," and so we're trying to figure out, well, for this --

5  which notice are you claiming is that version of the song

6  that was included and we can't efficiently do that.  They

7  clearly have more access to which works they're claiming for

8  which notice.  They have done it for somewhere between some

9  and maybe all, but it is something that is not just equally

10  accessible burden.

11         This is their works, they know the decisions they

12  made about which they included.  They've made a decision that

13  the work has to be three different times infringed, so they

14  must have known which works have been, you know, subject to

15  which notices.  We don't know that without them giving it to

16  us in a way that's verified and not us trying to piece it

17  together from public sources that we're trying to figure out.

18         MR. OPPENHEIM:  Just -- Your Honor, it just doesn't

19  make any sense.  I just said that -- and I showed you a

20  letter.

21         THE COURT:  It makes sense.  It may not be fair,

22  but it makes sense.

23         MR. OPPENHEIM:  No, they have the spreadsheets,

24  they have the files.

25         THE COURT:  And it makes sense that they would want

171

1    you to do the work.

2            MR. OPPENHEIM:  Oh, yes, okay, I get it, they would

3    like us to do work that we have no intent to do, right.  And

4    so they should -- if they want to do this analysis, as my

5    grandmother would say, you know, go with God and do it.  You

6    know, have at it, they can do it.

7            THE COURT:  By the way, can we have some levity at

8    all?  Is that okay with you guys.

9            MR. SCHAPIRO:  Please.

10           THE COURT:  So there is a thread going on back in

11   Chambers -- turn the record off for a second.

12           (Record turned off.)

13           THE COURT:  It makes sense, but to the extent the

14   Special Master, Ms. Rodriguez, based her ruling on the fact

15   that this information already exists and I accept plaintiffs'

16   counsel representation that it doesn't, then I find that

17   that's reversible, okay.

18           What's the next -- oh --

19           MS. RANAHAN:  But what about to the extent that she

20   said it does?

21           THE COURT:  Yeah, but that's a different issue, but

22   I don't know what that looks like as far as I don't want

23   either of you -- I mean, if you want -- if you're going to

24   push on that door, you may potentially erode a base you might

25   have for getting into your work product, so if you want to

236

1   conclusion at 4:13 p.m.)

2

3

4                    TRANSCRIBER'S CERTIFICATION

5   I certify that the foregoing is a correct transcript to the

6   best of my ability to hear and understand the audio recording

7   and based on the quality of the audio recording from the

8   above-entitled matter.

9

10  /s/ Dyann Labo                  September 18, 2020

11  Signature of Transcriber               Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25