# Exhibit 7

**COVINGTON**

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Mitchell A. Kamin

Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
T  +1 424 332 4759
mkamin@cov.com

**By Electronic Mail**                                                      April 8, 2020

John J. Rosenthal, Esq.
Winston & Strawn LLP
1700 K Street, NW
Washington, DC  20006
T: (202) 282-5000
*jrosenthal@winston.com*

>    Re:   ***Warner Bros. Records Inc., et al. v. Charter Comm's, Inc.***, **Case No.: 1:19-cv-00874-RBJ-MEH**

Dear John:

We write to follow up on yesterday's phone call, which we scheduled to discuss your letters of March 4 and March 23 regarding Charter's destruction of emails for 9 of the 14 custodians it identified as having relevant and responsive information in this matter.  When you agreed to have a call with us to discuss outstanding issues, we expected it to be consistent with your promise of an "open and transparent dialogue" to "ensure that Plaintiffs fully understand [the] facts surrounding the e-mail loss."  We are disappointed that neither you nor your colleagues were willing to answer (or even hear) our questions yesterday and would not entertain them unless submitted in writing.

We nonetheless accept your offer to answer written questions within two days, and ask for those responses in writing.  Please provide complete written responses to the following questions no later than April 10.  These questions are numbered consecutively with our prior questions and therefore begin with number 17.

17. Your March 23 letter indicates that the 9 custodians whose data was lost were put on hold in December 2015 and/or January 2016 connection with a notice from a third party.

    a. Who is the unrelated third-party that notified Charter of a possible claim for copyright infringement on December 16, 2015?

    b. Was that claim resolved, and if so, when?

18. Did Charter institute a legal hold specific to Plaintiffs' notice in March 2016, separate and apart from the legal hold instituted for other copyright owners?

19. Your response to various questions in your March 23 letter, including your response to Question 2, refers to the "operative legal hold."  Please state whether the

**COVINGTON**

John J. Rosenthal, Esq.
April 8, 2020
Page 2

"operative legal hold" refers to the hold implemented in connection with the third-party notice Charter received in December 2015.  If not, please identify the hold to which the phrase "operative legal hold" refers.

20. Your March 23 response to Question 8 says that the transfer of legal holds from Salesforce.com to Legal Hold Pro was a manual transfer.

    a. Who performed the manual transfer?

    b. To whom did that person report?

    c. Did any of the other individuals listed in your response to Question 1 perform a role in the transfer of legal holds?  If so, please identify those persons and the role that each played.

    d. Were the 9 custodians identified in response to Question 10 the only 9 Charter custodians whose data was lost as a result of the failure to transfer an active legal hold from SalesForce.com to Legal Hold Pro?  If not, please identify the number of additional Charter custodians whose data was lost as the result of a failure to transfer a legal hold from SalesForce.com to Legal Hold Pro.

    e. Were holds for any other matters or claims omitted when transferring from Salesforce.com to Legal Hold Pro?

21. Did Charter continue to preserve data, through journaling or otherwise, for the 9 custodians after the January 2018 transfer?

22. In response to Question 8, you say that, as of January 2018, "messages for the 9 custodians were journaled and preserved in ProofPoint until *at least that point*."  Please state whether messages for those 9 custodians were journaled and preserved after that point.

23. The last sentence of your response to Question 8 distinguishes between being "subject to another legal hold" and being "on another active legal hold."  Please explain the difference in meaning between those two expressions.

24. Was the "months-long process of comparing lists of active legal hold custodians in Legal Hold Pro against those custodians on hold in ProofPoint, and releasing any ProofPoint custodians no longer subject to an active hold in Legal Hold Pro" a manual or automatic process?

    a. If manual, who performed it?  To whom did that person report?

    b. Did any of the other individuals listed in your response to Question 1 play a role in comparing legal hold lists and releasing custodians no longer subject to an the transfer of legal holds?  If so, please identify those persons and the role that each played.

**COVINGTON**

John J. Rosenthal, Esq.
April 8, 2020
Page 3

25. Your response to Question 10 identifies data other than the 90-day snapshots that was preserved when Charter instituted the legal holds in December 2015 and January 2016.  What kinds of data were preserved aside from the 90-day snapshots?  How were they preserved?

26. When were the 90-day snapshots taken for each of the 14 custodians identified in your response to Question 5?

27. On March 4, you wrote that "[b]y virtue of the number of employees on hold in its ProofPoint archive as it relates to other matters, Charter has identified a substantial volume of messages (over 3 million) sent or received by the 14 custodians during the period March 2012 to May 2016."  Your response to Question 14 in your March 23 letter states that 1,264,704 of these were sent to or from the 9 custodians whose data was deleted.

    a. Please identify the "employees on hold in [Charter's] ProofPoint archive as it relates to other matters" from whom Charter obtained this data.

    b. How many of the 1,264,704 emails were sent to or from persons not on your initial disclosures and not placed on legal hold in connection with this matter?

    c. Have you produced any of those 1,264,704 emails?  Do you plan to produce any of them in response to any of our document requests served to date?

28. You have indicated that your responses to Questions 11 and 12 were incomplete due to the Epiq outage, which has since been rectified.  Please update those responses accordingly.

29. When was the first time that anyone at Charter became aware that the data from the 9 custodians had been deleted?  When was the first time that anyone at Charter became aware that the data from the 9 custodians was not recoverable from other sources?

30. Your March 4 letter refers to a "long-standing IT policy" limiting email retention to 90 days.  Where is that policy memorialized?  Did it apply only to email inboxes, or all of a custodian's email?  Did it apply to all Charter employees?  If not, who was exempted from this policy?

31. You have indicated that Charter had a 6-month data retention policy for ticket data and 18-month retention policy for ticket table data.  When were those policies implemented?  Have those policies ever been in writing?  Please list all Charter employees who were involved in developing, adopting and implementing those policies.

32. Are there any other retention policies applicable to materials potentially relevant to this lawsuit not disclosed to us to date?

**COVINGTON**

John J. Rosenthal, Esq.
April 8, 2020
Page 4

      Please let us know if you have any questions.  Plaintiffs reserve all rights regarding Charter's destruction of data in this case.

Sincerely,

*/s/ Mitchell A. Kamin*
Mitchell A. Kamin
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
mkamin@cov.com

*Attorneys for Plaintiffs*