# Exhibit 8



1700 K Street, NW
Washington, DC 20006
T +1 202 282 5000
F +1 202 282 5100

**JOHN ROSENTHAL**
(202) 282-5875
jrosenthal@winston.com

April 14, 2020

Mitchell Kamin
Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643

**Re:**   *Warner Bros. Records, Inc., et al v. Charter Communications* Discovery

Dear Mitch:

I write in response to your letter of April 8, 2020, concerning Charter's inadvertent loss of email ESI. We appreciate the opportunity to respond to your questions in writing.

It is unfortunate that you have chosen to mischaracterize our conversation on April 7 ("We are disappointed that neither you nor your colleagues were willing to answer (or even hear) our questions yesterday and would not entertain them unless submitted in writing."). You will recall that I expressly asked you to recite your questions during the call, one after another, stating that once I had heard the complete list I would answer those that I could without reference to my notes or files, but that you and your colleagues refused to proceed on that basis. I assure you that it remains Charter's intent to continue a transparent dialogue concerning these issues. But "transparent" does not mean only "as Plaintiffs demand," and we also will continue to ensure that Charter's interests are protected through a thorough and accurate record of that dialogue.

For your ease of reference, we have included here those Responses to your questions which we previously provided on March 16 and 23. Our responses specifically to your April 8 Questions begin on Page 8.

Please let me know if you would like to schedule a call to discuss Charter's responses.

## I.   Charter's March Responses

1. Question: *Identify all persons with knowledge regarding the "loss of e-mails as a result of the migration of [Charter's] legal hold management system in 2017 and 2018." (See 3/4/2020 Ltr. from M. Elkin to M. Kamin Regarding Warner Bros. Records, Inc. et al v. Charter Communications Discovery). If the person is a current Charter employee, please provide their job title. If the person is a former Charter employee, please provide their former job title and current address, email address, phone number, and employer.*

    Response: The following individuals have knowledge of events related to the email loss:

...



April 14, 2020
Page 2

| Name | Title | Current Employee | Other Details |
|---|---|---|---|
| Kirill Abramov | Vice President, Associate General Counsel - Intellectual Property Law | Y | |
| Dan Vasey | Sr. Director, Records Management & eDiscovery | Y | |
| Christine Flores | Manager, Legal Services – Litigation | Y | |
| Kimberly Love | Records Analyst | Y | |
| Joshua Paske | Sr. Manager, eDiscovery | N | Current employer unknown; address unknown; email unknown; phone number unknown |

We have been unable to locate current contact or employer information for Mr. Paske. Since he was a member of Charter Communications' Legal Department, we request that you not contact him directly should you locate contact information. If we are able to locate contact information and should you wish to talk to Mr. Paske, we can discuss a process that will ensure the protection of Charter's privileges.

2. Question: *Please describe how and when Charter first discovered that it deleted "emails as a result of the migration of its legal hold management system in 2017 and 2018," including how and when Charter first discovered that data belonging to "9 of the 14 Charter custodians relevant to this litigation" was deleted. Please include the specific date(s) on which these discoveries were made.*

Response: Charter first became aware that certain custodians subject to the relevant legal hold did not appear to be on active hold in its ProofPoint archive in April 2019. After extensive investigation by Winston & Strawn, including thorough inquiry into the cause of the preservation failure and careful investigation of the availability of sources from which the data might be restored or replaced, Charter became aware of the full scope of the loss, the specific relevant custodians impacted, the causes of the loss, and the unavailability of alternative sources, in late 2019. Charter continued to investigate whether any ticket data was impacted through February 2020, confirming that it was not impacted.

3. Question: *Explain why Charter first notified Plaintiffs on March 4, 2020, as opposed to earlier, that data "belonging to 9 of the 14 Charter custodians relevant to this litigation" were deleted.*

Response: Investigation into the loss, including the nature and causes of the loss and whether any of the lost data might be restored or replaced from alternative sources, took substantial time, analysis and effort. Furthermore, discovery in this matter has been fluid, and at various points since April 2019 it has been unclear from the parties' negotiations and positions whether



April 14, 2020
Page 3

substantial custodian-based discovery would be sought. Only after all of the facts were known to Winston & Strawn and Charter, did we proceed to notify Plaintiffs.

4. Question: *Please confirm that the email loss described in your March 4, 2020 letter on behalf of Bright House Networks, LLC is separate, distinct, and unrelated to Charter's "loss of e-mails as a result of the migration of its legal hold management system in 2017 and 2018." If the two events are related in any way, please explain how.*

   Response: We confirm that the loss described in our March 4, 2020, letter concerning Charter Communications is distinct from and unrelated to the loss described in our correspondence concerning Bright House Networks. As we made clear in both letters, the losses occurred at different times, involved different data sources, and had different precipitating causes.

5. Question: *Please identify the "14 relevant custodians [that Charter has] identified for this matter."*

   Response: The following custodians have been identified as custodians relevant to Plaintiffs' claims:

   a. Avery, Christopher
   b. Brockel, Timothy
   c. Deloach, Tammy
   d. Haynes, Mary
   e. Jones, Philip
   f. Mabb, Colton
   g. Matthews, Kelly
   h. McMeley, Christin
   i. Nelson, Matthew
   j. Neuverth, Todd
   k. Noce, Elfin
   l. Rowlett, Laurie
   m. Stewart, Tammy
   n. Wood, Laurie

6. Question: *Please identify the "9 . . . Charter custodians relevant to this litigation" who became "inadvertently subject to the December 2018 clean-up" of Charter's archives. If the person is a current Charter employee, please provide their job title. If the person is a former Charter employee, please provide their former job title and current address, email address, phone number, and employer.*

   Response: Emails for the following employees were deleted from ProofPoint while the employee was on legal hold. We do not have current contact or employer information for all of the former employees, but we will endeavor to provide this information to you:



April 14, 2020
Page 4

| Name | Title | Current Employee | Other Details |
|---|---|---|---|
| Avery, Christopher | Director, Senior Counsel | N | TBD |
| Brockel, Timothy | Security Specialist II | N | TBD |
| Haynes, Mary | Vice President, Network Operations Security | Y | |
| Jones, Philip | Security Specialist II | Y | |
| Matthews, Kelly | Security Specialist I | N | TBD |
| McMeley, Christin | **Vice President, Government Affairs/Chief Privacy Officer** | N | TBD |
| Neuverth, Todd | Senior Project Manager | Y | |
| Noce, Elfin | Senior Manager, Counsel | N | TBD |
| Stewart, Tammy | Manager, Compliance & Ethics | Y | |

7. Question: *Please provide the specific dates when Charter "initiated preservation for employees who may be relevant to this matter," including when it issued any legal hold(s).*

    Response: Charter was not notified of Plaintiffs' claims until March 2016. However, on December 16, 2015, Charter was notified of a possible claim for copyright infringement by an unrelated third-party. In response, Charter issued a legal hold on December 17, 2015 that was subsequently used across all secondary copyright infringement matters, even though they lacked specific notice of Plaintiffs' claims at the time. Charter initiated preservation on December 18, 2015. Consistent with its standard practices, messages already within the ZL Technologies archive that could be associated with new custodians were set aside and preserved on December 22, 2015. Certain additional custodians were added to the hold on January 21, 2016. Messages already within the ZL Technologies archive that could be associated with these custodians were set aside and preserved on January 29, 2016. Please see Response 10 for details for the impacted custodians.

8. Question: *Please specify how exactly the "9 . . . Charter custodians relevant to this litigation" became "inadvertently subject to the December 2018 clean-up" of Charter's archives. a. Were they omitted from the "lists of active legal hold custodians in Legal Hold Pro"? b. Were they ever on those lists? c. If so, at what point did they fall off?*

    Response: The operative legal hold was activated in SalesForce.com on December 17, 2015. The transfer of active hold data between SalesForce.com and Legal Hold Pro began in April 2017 and finished January 2018; messages for the 9 custodians were journaled and preserved in ProofPoint until at least that point. The transfer was not automated, and each active legal hold was transferred manually. The operative legal hold inadvertently was omitted from this process. We cannot verify whether any of the 9 custodians may have been subject to another legal hold at that time, but they were not on another active legal hold at the time of the clean-up, causing their preserved messages to be discarded.



April 14, 2020<br>Page 5

9. Question: *Identify all persons involved with "the December 2018 clean-up" of Charter's archives, including but not limited to any persons at Winston & Strawn and any persons in Charter's in-house legal department (past or present).*

Response: Individuals with knowledge of the December 2018 ProofPoint data clean-up have been identified in response to Question 1, above. No one from Winston & Strawn, any other outside firm, or ProofPoint had knowledge of the events leading up to or comprising the clean-up action.

10. Question: *How much data—in terms of documents and bytes—was deleted in the "December 2018 clean-up," as to each of the "9 . . . Charter custodians relevant to this litigation"?*

Response: ProofPoint cannot provide logs or records that indicate what was deleted at the message or custodian level. The data deleted from ProofPoint consisted of the entire corpus of data transferred from the ZL Technologies archive as part of a migration in March 2017. Any messages not otherwise preserved because they remained associated with another active hold custodian at the time of the clean-up were discarded. Messages that were associated with another legal hold custodian at the time of the deletion were retained.

We are aware that the ZL Technologies archive contained the following volumes of messages for each of the 9 custodians (covering all dates prior and up to) at the time they were added to the operative legal hold:

| Name | ZL Archive Volume as of December 2015/January 2016 | Date Added to Legal Hold |
|---|---|---|
| Avery, Christopher | 94,521 | Dec. 22, 2015 |
| Brockel, Timothy | 50,320 | Jan. 29, 2016 |
| Haynes, Mary | 123,856 | Dec. 22, 2015 |
| Jones, Philip | 14,324 | Jan. 29, 2016 |
| Matthews, Kelly | 15,032 | Dec. 22, 2015 |
| McMeley, Christin | 29,145 | Dec. 22, 2015 |
| Neuverth, Todd | 70,541 | Dec. 22, 2015 |
| Noce, Elfin | 25,926 | Jan. 29, 2016 |
| Stewart, Tammy | 82,716 | Dec. 22, 2015 |

These represent the minimum volume, per custodian, that was deleted (but note that these totals extend to the period before the Discovery Time Period).[1] We are unable to quantify, however, the volume of messages that may have been journaled for each custodian between January 2016 and the close of the Discovery Time Period on May 17, 2016. Accordingly, we do not know the original volume associated with each custodian in the ZL Technologies archive corpus, and we therefore cannot calculate the volume of unique data that is no longer available.

---

[1] These totals do not include messages drawn from the 90-day inbox capture conducted at the time of the hold, which were preserved outside the ZL Technologies archive.



April 14, 2020
Page 6

11. Question: *How much data—in terms of documents and bytes—remains available after the "December 2018 clean-up," as to each of the "9 . . . Charter custodians relevant to this litigation"?*

Response: In early March 2020, Charter's eDiscovery vendor was the target of a cyber attack that has taken its Relativity hosting capability offline. We are unable to provide details that precisely satisfy your request at this time. We are able to respond, however, that Charter possesses the following messages and loose documents for each of the 9 custodians for the period March 1, 2012 to May 31, 2016 (corresponding roughly with the Discovery Time Period):

| Name | Total Documents Mar. 1, 2012 – May 31, 2016 |
|---|---|
| Avery, Christopher | 90,791 |
| Brockel, Timothy | 119,658 |
| Haynes, Mary | 294,770 |
| Jones, Philip | 46,096 |
| Matthews, Kelly | 14,891 |
| McMeley, Christin | 91,682 |
| Neuverth, Todd | 230,140 |
| Noce, Elfin | 87,588 |
| Stewart, Tammy | 289,088 |

➢ **April 14, 2020 Update**: For each custodian, Charter possesses the below number and volume of documents (all dates and sources):

| Name | Total Volume (GB) | Total Documents |
|---|---|---|
| Avery, Christopher | 19.41 | 176,018 |
| Brockel, Timothy | 83.48 | 522,755 |
| Haynes, Mary | 457.39 | 1,703,664 |
| Jones, Philip | 69.17 | 454,323 |
| Matthews, Kelly | 6.43 | 14,952 |
| McMeley, Christin | 24.50 | 198,490 |
| Neuverth, Todd | 144.13 | 797,248 |
| Noce, Elfin | 86.53 | 369,783 |
| Stewart, Tammy | 169.06 | 981,800 |

12. Question: *Does Charter possess emails for any of the "14 Charter custodians relevant to this litigation" sent or received more than 90 days before that custodian received a legal hold? If so, for which custodians, and how many emails for each custodian?*

Response: Yes, Charter possesses numerous documents sent or received by each impacted custodian more than 90 days prior to the start of their legal hold. Due to the status of Charter's



April 14, 2020
Page 7

eDiscovery vendor, we cannot provide precisely the metrics requested at this time. We are able to respond, however, that Charter possesses the following volumes of messages corresponding to the periods March 1, 2012 to February 28, 2013, and March 1, 2013 to December 31, 2015:

| Name | Total Documents Mar. 1, 2012 – Feb. 28, 2013 | Total Documents Mar. 1, 2013 – Dec. 31, 2015 |
|---|---|---|
| Avery, Christopher | 60,433 | 30,350 |
| Brockel, Timothy | 7,256 | 80,353 |
| Haynes, Mary | 133 | 230,140 |
| Jones, Philip | 11 | 23,115 |
| Matthews, Kelly | 0 | 14,891 |
| McMeley, Christin | 76,370 | 15,311 |
| Neuverth, Todd | 31,704 | 153,282 |
| Noce, Elfin | 416 | 69,043 |
| Stewart, Tammy | 48,261 | 199,431 |

➢ **April 14, 2020 Update**: For each custodian, Charter possesses the below number of documents dated on or before the date shown (90 days prior to the date each custodian went on hold):

| Name | Dated on or Before | Total Documents |
|---|---|---|
| Avery, Christopher | Sept. 22, 2015 | 173,589 |
| Brockel, Timothy | Oct. 30, 2015 | 80,005 |
| Haynes, Mary | Sept. 22, 2015 | 204,500 |
| Jones, Philip | Oct. 30, 2015 | 16,270 |
| Matthews, Kelly | Sept. 22, 2015 | 14,951 |
| McMeley, Christin | Sept. 22, 2015 | 198,395 |
| Neuverth, Todd | Sept. 22, 2015 | 157,028 |
| Noce, Elfin | Oct. 30, 2015 | 60,280 |
| Stewart, Tammy | Sept. 22, 2015 | 263,192 |

13. Question: *What is the date range of the "over 3 million emails" remaining after the email deletion and within which Charter is "searching for relevant and responsive information"?*

Response: The 3 million emails referenced in our March 4 letter are associated with the 14 relevant custodians and cover the time period March 2012 to May 2016 [and a broader time period with respect to certain requests, including RFP 1]. This is an average of 214,286 messages per custodian, or 4,286 messages per month per custodian.

14. Question: *Of the "over 3 million emails," how many were sent to or from the "9 . . . custodians . . . subject to the December 2018 clean-up"?*

Response: 1,264,704



April 14, 2020
Page 8

15. Question: *Describe the investigations Charter has undertaken to determine "whether any of the lost archive data might be recovered, restored, or replaced," and identify all individuals (both internally at Charter and externally) involved in those investigations.*

    Response: As discussed in Response 10, the lost data was drawn from the ZL Technologies archive that was transferred into ProofPoint in March 2017. To determine whether the lost data could be restored or replaced, Winston & Strawn (John Rosenthal and Jason Moore):

    a. Confirmed that the administrators of the ZL Technologies archive (then Renew Data, now KLDiscovery), which was decommissioned in August 2017, do not possess: (1) back-up or archive copies of the archive or (2) back-up or archive copies of the media used to transfer the archive to ProofPoint. (Andrew Neipert, KLDiscovery)

    b. Confirmed that Charter eDiscovery did not receive a collateral copy of the archive and did not receive or relay the transfer media en route from KLDiscovery to ProofPoint. (Dan Vasey, Charter Communications)

    c. Confirmed that ProofPoint: (1) cannot restore the data that was deleted in December 2018, (2) did not retain the hard drives used to transfer the ZL Technologies archive to ProofPoint, (3) do not possess temporary or periodic backups of the overall ProofPoint archive from which the deleted data could be restored, and (4) did not create a temporary staging copy of the ZL Technologies archive that may still be accessible or itself restorable. (Thomas Mahoney and Jason Colvin, ProofPoint, Inc.)

16. Question: *Did Charter undertake to interview the 9 custodians about Plaintiffs' claims and the lost emails? If so, when were those interviews undertaken?*

    Response: Of the nine referenced custodians, we have conducted interviews concerning issues related to Plaintiffs' claims and their relevant ESI with: Christopher Avery (Oct. 2. 2019), Mary Haynes (Aug. 7, 2019), Christin McMeley (Oct. 2, 2019), Todd Neuverth (July 23, 2019), and Tammy Stewart (July 22, 2019). Timothy Brockel, Kelly Matthews, and Elfin Noce are former employees we have been unable to interview to date, and Philip Jones reports up to Tammy Stewart, Todd Neuverth, and Laurie Rowlett.

II. **Charter's Responses to Follow-up Questions Submitted April 8, 2020**

17. Question: *Your March 23 letter indicates that the 9 custodians whose data was lost were put on hold in December 2015 and/or January 2016 connection with a notice from a third party.*
    a. *Who is the unrelated third-party that notified Charter of a possible claim for copyright infringement on December 16, 2015?*
    b. *Was that claim resolved, and if so, when?*

    Response:
    a. Mingus Music Werkshop.



    b.  Mingus Music Werkshop never filed suit.

18. <u>Question</u>: *Did Charter institute a legal hold specific to Plaintiffs' notice in March 2016, separate and apart from the legal hold instituted for other copyright owners?*

<u>Response</u>: The existing December 2015 hold encompassed the scope of the record potentially relevant to Plaintiffs' notice in March of 2016, so another hold was not issued. Charter elected to manage legal holds for all music copyright infringement claims under a single legal hold.

19. <u>Question</u>: *Your response to various questions in your March 23 letter, including your response to Question 2, refers to the "operative legal hold." Please state whether the "operative legal hold" refers to the hold implemented in connection with the third-party notice Charter received in December 2015. If not, please identify the hold to which the phrase "operative legal hold" refers.*

<u>Response</u>: It refers to the December 2015 hold.

20. <u>Question</u>: *Your March 23 response to Question 8 says that the transfer of legal holds from Salesforce.com to Legal Hold Pro was a manual transfer.*

    a. *Who performed the manual transfer?*
    b. *To whom did that person report?*
    c. *Did any of the other individuals listed in your response to Question 1 perform a role in the transfer of legal holds? If so, please identify those persons and the role that each played.*
    d. *Were the 9 custodians identified in response to Question 10 the only 9 Charter custodians whose data was lost as a result of the failure to transfer an active legal hold from SalesForce.com to Legal Hold Pro? If not, please identify the number of additional Charter custodians whose data was lost as the result of a failure to transfer a legal hold from SalesForce.com to Legal Hold Pro.*
    e. *Were holds for any other matters or claims omitted when transferring from Salesforce.com to Legal Hold Pro?*

  <u>Response</u>:
    a. Kimberly Love and Christy Flores.

    b. Dan Vasey.

    c. Kirill Abramov played a consultative role.

    d. The 9 custodians relevant to this matter were not the only legal hold custodians impacted by the loss. We do not have a precise tally of impacted custodians who are not relevant to this matter.



    e. Yes.

21. Question: *Did Charter continue to preserve data, through journaling or otherwise, for the 9 custodians after the January 2018 transfer?*

    Response: Most of the discovery for this matter runs through May 17, 2016. It is not relevant whether new messages or data were journaled or preserved for these custodians after January 2018. Notwithstanding the foregoing, messages journaled through January 2018 into the ZL Technologies archive were preserved in ProofPoint until the December 2018 clean up event. The 9 custodians remained on journaling until approximately September 2018.

22. Question: *In response to Question 8, you say that, as of January 2018, "messages for the 9 custodians were journaled and preserved in ProofPoint until at least that point." Please state whether messages for those 9 custodians were journaled and preserved after that point.*

    Response: Please see Response to Question 21, above.

23. Question: *The last sentence of your response to Question 8 distinguishes between being "subject to another legal hold" and being "on another active legal hold." Please explain the difference in meaning between those two expressions.*

    Response: The Response to Question 8, above, contains a typo and should read: "We cannot verify whether any of the 9 custodians may have been subject to another legal hold ***during*** that time, but they were not on another active legal hold at the time of the clean-up, causing their preserved messages to be discarded." As to your Question, the 9 custodians were not listed on any other legal hold that was active as of December 26, 2018 ("another active legal hold"), which is why their data was removed from ProofPoint.

24. Question: *Was the "months-long process of comparing lists of active legal hold custodians in Legal Hold Pro against those custodians on hold in ProofPoint, and releasing any ProofPoint custodians no longer subject to an active hold in Legal Hold Pro" a manual or automatic process?*
    a. *If manual, who performed it? To whom did that person report?*
    b. *Did any of the other individuals listed in your response to Question 1 play a role in comparing legal hold lists and releasing custodians no longer subject to an the transfer of legal holds? If so, please identify those persons and the role that each played.*

    Response:
    a. This was a manual process. Kimberly Love. She reported to Dan Vasey.

    b. Kirill Abramov played a consultative role.



25. <u>Question</u>: *Your response to Question 10 identifies data other than the 90-day snapshots that was preserved when Charter instituted the legal holds in December 2015 and January 2016. What kinds of data were preserved aside from the 90-day snapshots? How were they preserved?*

<u>Response</u>: Question 10 does not contain a reference to data other than 90-day snapshots and journaled messages.

26. <u>Question</u>: *When were the 90-day snapshots taken for each of the 14 custodians identified in your response to Question 5?*

| Name | Date of Snapshot | No Snapshot Reason |
|---|---|---|
| Avery, Christopher | N/A | Separated at time of Hold, mailbox previously deleted |
| Brockel, Timothy | February 1, 2016 | |
| DeLoach, Tammy | N/A | Was not determined to be potentially relevant until a later date |
| Haynes, Mary | N/A | Already on another legal hold at time of Hold (snapshot would capture data already journaled) |
| Jones, Philip | February 1, 2016 | |
| Mabb, Colton | December 22, 2015 | |
| Matthews, Kelly | N/A | Separated at time of Hold, mailbox previously deleted |
| McMeley, Christin | N/A | Separated at time of Hold, mailbox previously deleted |
| Nelson, Matthew | N/A | Was not determined to be potentially relevant until a later date |
| Neuverth, Todd | December 22, 2015 | |
| Noce, Elfin | January 16, 2015 | Already on another legal hold at time of Mingus Music Werkshop Hold, so a new snapshot was not taken at that time |
| Rowlett, Laurie | N/A | Already on another legal hold at time of Hold (snapshot would capture data already journaled); Ms. Rowlett has been on legal hold since 2003 |
| Stewart, Tammy | December 22, 2015 | |
| Wood, Laurie | N/A | Already on another legal hold at time of Hold (snapshot would capture data already journaled) |

27. <u>Question</u>: *On March 4, you wrote that "[b]y virtue of the number of employees on hold in its ProofPoint archive as it relates to other matters, Charter has identified a substantial volume of*



messages (over 3 million) sent or received by the 14 custodians during the period March 2012 to May 2016." Your response to Question 14 in your March 23 letter states that 1,264,704 of these were sent to or from the 9 custodians whose data was deleted.

    a. Please identify the "employees on hold in [Charter's] ProofPoint archive as it relates to other matters" from whom Charter obtained this data.

    b. How many of the 1,264,704 emails were sent to or from persons not on your initial disclosures and not placed on legal hold in connection with this matter?

    c. Have you produced any of those 1,264,704 emails? Do you plan to produce any of them in response to any of our document requests served to date?

Response:

    a. The corpus includes more than 1 million messages drawn from a pool of Charter employees on hold in the ProofPoint archive. Charter does not believe the identity of these employees is relevant to the issues at hand.

    b. This Question appears to assume that all of these 1,264,704 messages may be relevant to this action. This is not the case, nor the implication of our prior correspondence. The duties of the 9 custodians cover(ed) a broader set of substantive areas and facts than are implicated by Plaintiffs' Requests for Production. Nevertheless, we can state that 1,194,754 of the indicated 1,264,704 messages are from sources other than the custodians' 90-day snapshots.

    c. Yes, Charter has searched and produced responsive emails from this corpus of email data in response to Plaintiffs' Requests for Production.

28. Question: You have indicated that your responses to Questions 11 and 12 were incomplete due to the Epiq outage, which has since been rectified. Please update those responses accordingly.

Response: Please see updated Responses, above.

29. Question: When was the first time that anyone at Charter became aware that the data from the 9 custodians had been deleted? When was the first time that anyone at Charter became aware that the data from the 9 custodians was not recoverable from other sources?

Response: Please review our Response to Question 2, above, which contains the dates requested.

30. Question: Your March 4 letter refers to a "long-standing IT policy" limiting email retention to 90 days. Where is that policy memorialized? Did it apply only to email inboxes, or all of a custodian's email? Did it apply to all Charter employees? If not, who was exempted from this policy?

Response: The policy is Charter Communications Records and Information Management Policy (Oct. 1, 2004). This policy applies to the user's "emails" that are not otherwise



April 14, 2020
Page 13

designated as important company Records. The policy to applies to all employees and data sources.

31. <u>Question</u>: *You have indicated that Charter had a 6-month data retention policy for ticket data and 18-month retention policy for ticket table data. When were those policies implemented? Have those policies ever been in writing? Please list all Charter employees who were involved in developing, adopting and implementing those policies.*

    <u>Response</u>: Once again, the ticket data and ticket table data were not subject to any of the inadvertent ESI loss, and thus should not be conflated with the ESI issues raised herein. Accordingly, these Questions would be more appropriate for a document request, which would allow the opportunity for objections and further investigation, as well as potentially explored through deposition topics.

32. <u>Question</u>: *Are there any other retention policies applicable to materials potentially relevant to this lawsuit not disclosed to us to date?*

    <u>Response</u>: The retention policy discussed in our Response to Question 30, above, is the only policy applicable to the ESI that is the subject of this correspondence. This Question would be more appropriate as a document request, which would all the opportunity for objections and further investigations.

Sincerely,

*John Rosenthal*

John Rosenthal

CC: Michael S. Elkin
    Jennifer Golinveaux
    Erin Ranahan
    Jason Moore