# Exhibit 4

**COVINGTON**

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Jonathan M. Sperling

Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
T  +1 212 841 1153
jsperling@cov.com

**Via Email**                                                                                                      September 2, 2020

Special Master Regina Rodriquez
1225 17th Street, Suite 2600
Denver, CO 80202
regina.rodriguez@wilmerhale.com

      Re:  *Warner Records v. Charter Commc'ns*, No. 19-cv-00874

Dear Ms. Rodriguez:

      Plaintiffs move for an order compelling Charter to provide discovery on 5 different issues, as set forth below.

      **1. Charter should be ordered to produce a key for the dataset it created in response to the Special Master's Order, reflecting its responses to Acceptable Use Policy violations other than copyright infringement.**

      In May, the Special Master ordered Charter to produce data from its CATS ticket database showing what actions it took in response to violations of its Acceptable Use Policy ("AUP") *other than* copyright infringement.  *See* Dkt. 181 at 30–31.  Charter produced to Plaintiffs an Excel spreadsheet, based on its CATS ticket data, purporting to reflect that information.  But much of the spreadsheet that Charter produced is inscrutable because it contains acronyms and jargon unique to Charter ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.[1]  Charter has refused Plaintiffs' request to produce a key that would allow Plaintiffs to decipher the spreadsheet.

      Charter's refusal to produce a key is improper for two reasons:  *First*, Charter created the spreadsheet at issue in response to the Special Master's order.  *See* Dkt. 181 at 31 n.3 (Charter advised the Special Master it would be "creating a report that summarizes the non-copyright AUP violations by type and by total number of actions taken").  Charter has failed to abide by that order if the spreadsheet is incomprehensible.  It is pure obstruction for Charter to create and produce an undecipherable dataset, and then refuse to provide information that would allow Plaintiffs to understand it.  *Second*, Plaintiffs served an RFP seeking documents sufficient to show the meaning of each field included in ticket data produced by Charter in this case, *and Charter agreed to produce documents responsive to that RFP*.  Plaintiffs therefore request that the Special Master order Charter to produce document(s) that show the meaning of the fields included in the spreadsheet Bates numbered CHA_00063488.

---

[1] Plaintiffs note that this document was designated by Charter as Highly Confidential – Attorneys' Eyes Only.

**COVINGTON**

Special Master Regina Rodriquez
September 2, 2020
Page 2

      A. *Background.*

In May, Plaintiffs moved for an order compelling Charter to produce documents responsive to RFP 61, which seeks:

> All documents or communications distinguishing, differentiating, or otherwise comparing Charter's responses to violations of its Acceptable Use Policies for reasons other than copyright infringement (including for hacking or spamming) to its responses to violations of those policies on the basis of copyright infringement.

Following extensive briefing and a hearing, the Special Master deemed this information relevant, recognizing that Plaintiffs are entitled to an answer regarding: "What did Charter do, why, when . . . and did Charter follow its own policies and procedures?" Ex. 1 (May 18, 2020 Hrg. Tr. 77:19–78:2). Based on this relevance, and Charter's representation that it could "creat[e] a report that summarizes the non-copyright AUP violations by type and by total number of actions taken in response to each category of AUP violation from available CATS data for the Claims Period," the Special Master ordered Charter to "produce CATS data providing information regarding Charter's actions taken in response to different categories of abuse." Dkt. 181 at 30–31, 31 n.3.

Charter then produced a spreadsheet purportedly containing the information ordered by the Special Master. *See* Ex. 17 (CHA_00063488). For each year from 2014 to 2016, that spreadsheet lists categories of AUP violations, the types of actions Charter took in response to the violations, and the numbers of each type of action taken. However, the AUP violation and action categories include acronyms and jargon that Plaintiffs are unable to decipher. In addition to the AUP violation categories listed above, there are other categories that make little sense as violations—for example, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇ There are also acronyms included in the action categories that appear to be unique to Charter's internal security team. These include, for example, ▇▇▇▇▇▇▇▇

Plaintiffs therefore asked that Charter produce a key to the dataset, noting that they had previously served RFP 67 asking for "[d]ocuments sufficient to show the meaning of each action, code, field, or definition used in the 'ticket log' data produced . . . in this action," in response to which Charter agreed to produce responsive documents. *See* Ex. 4 (H. Ehlers June 29, 2020 email); Ex. 13 at RFP 67. Nevertheless, Charter refused, contending, without explanation, that Plaintiffs' request somehow "goes beyond" RFP 67 and that "Charter has no obligation to create such a document for Plaintiffs." *See* Ex. 7 (C. Alvarez July 28, 2020 email).

      B. *Charter's refusal is improper, because Charter is obligated to produce documents showing the meaning of the fields in its ticket data, and Charter created the dataset knowing that it would be undecipherable to Plaintiffs.*

Charter's refusal is highly improper.

COVINGTON

Special Master Regina Rodriquez
September 2, 2020
Page 3

*First*, Charter's refusal to provide a key effectively seeks to circumvent the Special Master's order by producing the required information in a way that is incomprehensible. If Charter does not want to produce a key for its jargon and acronyms, it should be ordered to provide a new spreadsheet without them that explains what actions Charter took in response to various types of abuse.

*Second*, Charter has agreed to produce documents "sufficient to show the meaning of each action, code, field, or definition used in the 'ticket log' data" it produces in this case. *See* Ex. 13 at RFP 67. Having been ordered by the Special Master to produce CATS data related to non-infringement AUP violations, Charter cannot now refuse its corresponding obligation to produce document(s) "sufficient to show the meaning of" the fields in that dataset. Charter's contention that Plaintiffs' request for a key "goes beyond" RFP 67 is baseless. The spreadsheet it produced, on its face, ███████████ related to non-infringement AUP violations, contained in its CATS ticket database. *See* Ex. 17 (CHA_00063488). The requested key thus falls squarely within the scope of RFP 67. And tellingly, Charter has not contended that it has no responsive documents explaining what these fields mean, nor that it would be overly burdensome to create a key to the extent one does not exist, just as Charter created the spreadsheet.

**2. Charter should be ordered to produce documents concerning its efforts to determine whether any of its subscribers were "adjudicated to be a repeat infringer," regardless of whether those documents concern subscribers identified in Plaintiffs' notices.**

Charter has purported to reconcile (i) its assertion of the safe-harbor defense with (ii) the fact that Charter did not terminate a single subscriber during the Claim Period, by asserting that it had a policy to terminate repeat infringers only if they had been adjudicated as such by a court. *See* Dkt. 160 at 13–14. But Charter has refused to produce documents showing how it implemented its purported policy, *unless the document concerns a subscriber identified in Plaintiffs' notices*. That limitation is unjustifiable. Plaintiffs' request concerns the alleged policy on which Charter is relying to assert its safe-harbor defense, and—as the Special Master has repeatedly made clear—that defense demands evaluation of Charter's treatment of *all* repeat infringers, not just those identified in Plaintiffs' notices. The Special Master has further made clear that, in light of Charter's assertion of a safe-harbor defense, it may not restrict discovery to documents concerning Plaintiffs' notices. Notwithstanding that clear guidance, Charter continues to do so.

A. *Background.*

Charter has asserted a DMCA safe-harbor defense in this case, contending that it implemented a reasonable policy for termination of repeat infringers. Dkt. 160 at 13–14. Charter admits that it, in fact, never terminated a single subscriber for copyright infringement. Ex. 15 at RFA 4. Nonetheless, Charter takes the position that it reasonably implemented a termination policy because it claims it *would have* terminated a subscriber who was "first adjudicated to be a repeat infringer." Dkt. 160 at 13–14.

COVINGTON

Special Master Regina Rodriquez
September 2, 2020
Page 4

Plaintiffs, in turn, have sought discovery on Charter's purported "adjudicated repeat infringer" policy to see if this is what Charter's policy was and how it was implemented, or if it is simply a post-hoc rationale. As relevant here, Plaintiffs served RFP 81, which seeks:

> Documents reflecting any efforts or action taken by Charter to determine whether any of its Subscribers had been "adjudicated to be a repeat infringer," (see Charter's Submission Regarding its Affirmative Defenses at 13, ECF No. 160), including all documents concerning Charter's (i) criteria for determining whether a Subscriber had been "adjudicated to be a repeat infringer," (ii) protocols for identifying any Subscriber that had been "adjudicated to be a repeat infringer," (iii) notations in CATS or any other internal tracking system evidencing that any Subscriber had been "adjudicated to be a repeat infringer," (iv) internal communications concerning whether any Subscriber had been "adjudicated to be a repeat infringer," and (v) communications with Subscribers suspected of having been, or deemed to have been, "adjudicated to be a repeat infringer."

*See* Ex. 14 at RFP 81.

Charter agreed to produce documents responsive to RFP 81 only if those documents concern "subscribers identified in Plaintiffs' copyright notices." *Id.* It maintained a relevance objection to all other responsive documents. Ex. 10 (H. Ehlers Aug. 24, 2020 email).

> B. *Charter's limitation is untenable in light of its assertion of a safe-harbor defense, and is a blatant attempt to avoid producing documents.*

RFP 81 seeks documents showing how Charter implemented the purported "adjudicated repeat infringer" policy on which it is relying to assert a safe-harbor defense. That defense requires that Charter show that it "adopted and reasonably implemented, and inform[ed] [its] subscribers and account holders of . . . a policy that provides for the termination in appropriate circumstances of subscribers and account holders of [its] network who are repeat infringers." 17 U.S.C. § 512(i). Therefore, Charter's assertion of the safe-harbor defense puts squarely at issue its treatment of *all* repeat infringers, and Plaintiffs are entitled to *all* documents showing how Charter implemented its "adjudicated repeat infringer" policy. Indeed, the Special Master has repeatedly made clear that, in light of Charter's safe-harbor defense, it may not restrict discovery to Plaintiffs' notices, as it attempts to do here. *See, e.g.*, Special Master Aug. 31, 2020 Ltr. at 3 ("At a minimum, Charter's assertion of the safe-harbor defense puts at issue its conduct with respect to repeat infringers and not just the accused subscribers or works in suit in this matter."); July 15, 2020 Hrg. Tr. 40:19-24 (Ex. 2; "If you are limiting your response to communications only with accused subscribers, you must identify specifically why you believe that limitation is valid in the face of my prior instruction that discovery should not be limited simply to accused subscribers."); May 18, 2020 Hrg. Tr. 27:24-28:2 (Ex. 1; "I don't think it is appropriate to simply limit [Charter's discovery] to the plaintiffs in this case but, rather, the inquiry is Charter's actions and how Charter, in general, handled these notices."); Dkt. 181 at 26--27 ("Charter's invocation of the DMCA Safe Harbor puts at issue its overall policies and

COVINGTON

Special Master Regina Rodriquez
September 2, 2020
Page 5

procedures for addressing infringement.  Information relating to the total number of notices received and Charter's reaction to those notices is therefore relevant.  Plaintiffs are entitled to probe how Charter's infringement policies were actually implemented.").

Furthermore, Charter's limitation is obviously an attempt to avoid producing *any* documents in response to RFP 81.  For one thing, Plaintiffs' request encompasses generally applicable documents that are unlikely to mention *any* specific subscribers, let alone a subscriber identified in Plaintiffs' notices.  For example, Plaintiffs' request seeks documents concerning Charter's "criteria" and "protocols" for determining whether a subscriber has been adjudicated to be a repeat infringer, and the process for monitoring such infringers.  There is no reason to think such documents would refer to specific subscribers.  Charter's proposal to produce only documents referring to specific subscribers would shield such relevant documents from production.

In addition, Charter has already stated that it "believes that the facts will show that none of Charter's subscribers who were accused by Plaintiffs were . . . adjudicated" to be repeat infringers.  Dkt 160 at 13.  If this is true, then it is particularly unlikely that any subscribers identified in Plaintiffs' notices would be referenced in documents related to Charter's implementation of its "adjudicated repeat infringer" policy.

This is especially so because Charter has taken the position that, due to its deletion of ticket data, it is not able to identify the subscribers that were the subject of the overwhelming majority of Plaintiffs' notices.  Thus, Charter *cannot even identify* documents referring to the overwhelming majority of subscribers identified in Plaintiffs' notices.

Having asserted that it had an "adjudicated repeat infringer" policy, Charter cannot avoid producing documents that would allow Plaintiffs to investigate whether such a policy, in fact, existed, and how it was implemented and communicated in practice.

### 3. Charter should be ordered to produce the documents it relied on to answer Plaintiffs' Interrogatories 13 and 14.

For over two months, Plaintiffs have asked Charter to identify and produce the documents on which it relied to answer Plaintiffs' Interrogatories 13 and 14.  Those Interrogatories seek information at the heart of this case—how many infringement notices Charter received (No. 13), and the number of actions, by type of action, it took in response (No. 14)—and Plaintiffs have sought to understand how Charter included information in its responses that dates from years earlier than the ticket data it has produced.  Last Friday, Charter finally revealed the document underlying *one* of the Interrogatories: for Interrogatory 13, Charter relied on a CATS data file with summary statistics related to copyright infringement notices that it received.  This confirmed that Charter is withholding a relevant and responsive file describing notices that Charter received during 2.5-plus years of the Discovery Period for which Charter *has not produced any ticket data*.  Furthermore, Charter still has not even identified what file(s) it relied on to respond to Plaintiffs' Interrogatory 14, let alone agreed to produce it.   The documents underlying both Interrogatories 13 and 14 go to the heart of the claims and defenses in this case, are responsive to multiple RFPs served by Plaintiffs, and impose no burden to produce.  Charter should have produced them months ago, and must do so now.

**COVINGTON**

Special Master Regina Rodriquez
September 2, 2020
Page 6

　　　　A.　*Background.*

　　　　The Special Master's May 29 order required that Charter respond to Plaintiffs' Interrogatories 13 and 14. Dkt. 181 at 26–27. These interrogatories sought (i) the total number of infringement notices Charter received from any source from 2012 to 2016, and (ii) the types and number of actions Charter took in response to those notices. *See id.* On June 25, Charter served it supplemental responses to Interrogatories 13 and 14, which included responsive information from November 2012 to May 2016, and March 2013 to May 2016, respectively. Ex. 16.

　　　　On June 29, Plaintiffs asked that Charter identify the sources of the information included in its responses, noting that the information went back further than the ticket and ticket-table data produced in this case, which date only to November 2014. Ex. 4 (H. Ehlers June 29, 2020 email). Charter did not respond to Plaintiffs' email, nor to their follow-up email sent on July 6. *See* Ex. 7.

　　　　On July 13, Plaintiffs included this issue in their chart for the July 15 hearing before the Special Master. Ex. 5 at 8. In response, Charter contended that it "was actively discussing the issue[] internally," Ex. 6 (E. Ranahan July 14, 2020 Ltr.), and the Special Master instructed the parties to continue to confer, Ex. 2 (July 15, 2020 Hrg Tr. 11:4–9).

　　　　Following the hearing, Plaintiffs reiterated their request for the documents underlying Interrogatories 13 and 14 *three more times. See* Ex. 7. After Plaintiffs threatened to ask the Special Master to intervene, Charter finally responded on July 28 that it had already provided "[t]he information requested in Plaintiffs' interrogatories" 13 and 14 and "has no obligation to produce additional documents." *See id.* Charter reiterated its refusal on a July 29 telephonic meet and confer.

　　　　Plaintiffs raised Charter's failure to produce these underlying documents—*or even identify them*—during the August 25 status conference. Ex. 9 (H. Ehlers Aug. 24, 2020 email). The Special Master ordered Charter to provide its position on whether it would produce the documents from which it derived the responses to Interrogatories 13 and 14. Ex. 3 (Aug. 25, 2020 Rough Hrg. Tr. 65).

　　　　On August 28, Charter finally revealed the source of its response to Interrogatory 13: "a file that Charter maintains with certain summary statistics concerning CATS" ("CATS Summary Statistics File"). Ex. 11 (J. Golinveaux Aug. 28, 2020 email). It wrote that, in addition to including data related to copyright complaints, the file also "tracks information on a variety of complaints beyond copyright notices." *Id.* In its August 28 email, Charter did not state whether or not it would produce the file, in violation of the Special Master's order.

　　　　In addition, Charter's email did not state whether this file was also the source of its response to Interrogatory 14, even though Plaintiffs' repeated requests have been for the data sources underlying both Interrogatories. *See, e.g.,* Ex. 4 at 1, Ex. 5 at 8, Ex. 7 at 1, Ex. 9 at 2.

　　　　On August 30, Plaintiffs responded that, based on Charter's email, it is clear that the CATS Summary Statistics File is responsive to multiple RFPs that Plaintiffs have served. Ex. 11

COVINGTON

Special Master Regina Rodriquez
September 2, 2020
Page 7


(H. Ehlers Aug. 30, 2020 email).  Plaintiffs asked that Charter confirm by August 31 that it will produce the file.  *Id.*  Plaintiffs wrote that absent such confirmation, they would move for an order compelling production in their September 2 motion.  *Id.*

Two days later, Charter wrote that it disagreed that the CATS Summary Statistics File is responsive to any of Plaintiffs' RFPs, *id.* (J. Golinveaux Sep. 1, 2020 email), forcing Plaintiffs to bring this issue to the Special Master again, nearly two months after they first did so.

Notably, Charter also stated in its email that the CATS Summary Statistics File "does not track what actions were taken against subscribers in response to the various types of notices during the Discovery Period."  *Id.*  Therefore, it cannot be the file on which Charter relied on to provide the data from before November 2014 in responding to Interrogatory 14.  Thus, over two months after Plaintiffs first requested the information, Charter *still* has not identified the file(s) on which it relied to answer Interrogatory 14.

> B. *The documents underlying Interrogatories 13 and 14 are responsive to multiple RFPs served by Plaintiffs, are unquestionably relevant to the issues in this case, and will be a minimal burden for Charter to produce.*

The documents underlying Interrogatories 13 and 14 are responsive to several of Plaintiffs' RFPs.  The CATS Summary Statistics File is unquestionably responsive to Plaintiffs' RFP 24, which requests "[a]ll documents on which [Charter] relies in responding to Plaintiffs' Interrogatories."  *See* Ex. 12 at RFP 24.[2]  Since Charter has expressly stated that it relied on the file to respond to Plaintiffs' Interrogatory 13, it must produce it.  The CATS Summary Statistics File is also responsive to RFP 26, which seeks "[a]ll documents relating to CATS, including . . . documents reflecting your actual use of the CATS system to track abuses of any copyright infringement-related policy by your users."  Ex. 13 at RFP 26.  Though Charter placed a narrow limitation on the documents it would produce in response to that RFP, *see id.*, that limitation is clearly unjustified as applied to this highly relevant document.

Though Charter has continued to stonewall regarding the documents underlying Interrogatory 14, those documents—which allowed Charter to describe the types and number of actions Charter took in response to infringement notices—are necessarily responsive to RFPs 24 and 26 as well.  Further, to the extent these source documents concern Charter's actions in response to infringement *and other types of AUP violations*, the documents also must be produced pursuant to the Special Master's Order regarding RFP 61.  As discussed above in Section 1, that Order states:  "Charter is hereby ordered to produce CATS data providing information regarding Charter's actions taken in response to different categories of abuse."  Dkt. 181 at 30-31.  The document that Charter provided in response to RFP 61 contains data

---

[2] Charter contends that it never agreed to produce documents underlying its narrative interrogatory responses and merely agreed to produce documents in response to interrogatories where it relied on Rule 33(d).  Ex. 11 (J. Golinveaux Sep. 1, 2020 email).  To the extent this non-response is an objection to the RFP as served, it should be overruled—especially on the facts presented for Interrogatories 13 and 14.

COVINGTON

Special Master Regina Rodriquez
September 2, 2020
Page 8

beginning only in 2014.  *See infra* at 1.A.  Charter's response to Interrogatory 14 includes information *before* 2014, and if the source documents concern actions taken in response to abuses other than infringement, they fall squarely within the Special Master's Order (and also demonstrate the insufficiency of Charter's response to RFP 61).

It is unsurprising that these documents are responsive to multiple RFPs served by Plaintiffs, as *they contain core information about the claims and defenses at issue* that Plaintiffs have been seeking for many months.  For the same reason the Interrogatories are relevant and were compelled, the underlying documents from which those summary statistics are likewise relevant.  Plaintiffs are entitled to examine these documents maintained in the ordinary course, from during the Claim Period, without any gloss provided on that data by Charter's litigation counsel in an interrogatory response.  Moreover, the fact that Charter created and maintained these statistics and files is probative evidence in and of itself:  Charter's awareness of and response to these statistics will demonstrate whether it reasonably implemented a repeat infringer policy, as required for its safe-harbor defense.

This data is *especially critical* due to the minimal ticket data that Charter has retained and produced in this case.  Charter has produced ticket data concerning only 6% of Plaintiffs' notices from the Claim Period, and concerning only 8% of all infringement notices from the Claim Period.  That data goes back only to November 2014, while the Claim Period for this case begins in March 2013, and the Discovery Period begins in March 2012.  Charter cannot be allowed to withhold files that contains CATS or CATS-related data for *two years of the Discovery Period* for which it has not produced any ticket data.  And it is no answer for Charter to argue that the summary file extends beyond the subscribers identified in Plaintiffs' notices—the Special Master has already rejected that argument (multiple times).

Charter's only response to the relevance of these documents appears to be that *portions* of the CATS Summary Statistics File are not relevant because they contain "information on a variety of complaints beyond copyright notices."  Ex. 11 (J. Golinveaux Aug. 28, 2020 email).  But Charter cannot withhold an otherwise responsive and relevant document relating to Charter's receipt and handling of copyright notices—the central issue in this case—because that file also contains information that Charter believes is not relevant to the case.  The law in the Tenth Circuit is clear that not only can a party not *withhold* a document because a portion is non-responsive, it cannot even *redact* that information absent a compelling reason.  *See, e.g., Brunet v. Quizno's Franchise Co.*, No. 07-cv-01717-PAB-KMT, 2009 WL 902434, at *3 (D. Colo. Apr. 1, 2009); *McNabb v. City of Overland Park*, No. 12-cv-2331-CMTJJ, 2014 WL 1152958, at *5 (D. Kan. Mar. 21, 2014); *HR Tech., Inc. v. Imura Int'l U.S.A., Inc.*, No. 08-2220-JWL, 2010 WL 4792388, at *5-6 (D. Kan. Nov. 17, 2010).

In any event, that information *is* relevant and the Special Master therefore ordered it produced in response to RFP 61.  *See* Dkt. 181 at 30-31 (ordering Charter to produce "information regarding Charter's actions taken in response to *different categories of abuse*") (emphasis added)).  During the hearing on Plaintiffs' motion regarding RFP 61, the Special Master explained that—with respect to complaints *other than copyright infringement*—Plaintiffs were entitled to know, "What did Charter do, why, when . . . and did Charter follow its own policies and procedures?" Ex. 1 (May 18, 2020 Hrg. Tr. 77:19–21).  The portions of the file

**COVINGTON**

Special Master Regina Rodriquez
September 2, 2020
Page 9

with statistics on non-infringement violations are just as relevant to this case, as the Special Master has recognized.

Finally, Plaintiffs note that Charter has not suggested that there would be *any* burden in producing these files, let alone an *undue* burden that would justify non-production. Indeed, Charter has already identified, reviewed, and produced information from these files, so it is hard to imagine what burden would be associated with producing them now to Plaintiffs.

> **4. Charter should be ordered to produce documents concerning the use of virtual private networks ("VPNs") on its network to avoid detection for copyright infringement, regardless of whether those documents concern subscribers identified in Plaintiffs' notices.**

As with RFP 81, Charter has improperly limited the documents it will produce in response to Plaintiffs' RFP 83, which seeks "[d]ocuments concerning the use of virtual private networks ("VPNs") by Charter's Subscribers or Users to avoid detection of copyright infringement." Charter agreed to produce responsive documents only if they "concern[] those subscribers associated with accounts identified with IP addresses set forth in Plaintiffs' notices," and it asserted a relevance objection to all other responsive documents. Ex. 14 at RFP 83; Ex. 10.

"VPNs mask your internet protocol (IP) address so your online actions are virtually untraceable."[3] It is well known that copyright infringers frequently use VPNs to avoid detection, particularly after receiving an initial notice accusing them of infringement. Indeed, a quick Google search reveals that this is a common practice. *See* Sam Cook, *Is Using a VPN Legal or Illegal? Is a VPN Safe to Use? Here's What You Need to Know*, Comparitech (Apr. 13, 2017), https://www.comparitech.com/blog/vpn-privacy/vpn-safe-legal-or-illegal/ (noting that a "VPN service will hide copyright infringement activities"); *DMCA Notices: How Hollywood's Lawyers Find You*, TurnOnVPN (Apr. 26, 2017), https://www.turnonvpn.org/blog/avoid-dmca-notices/ ("If you're serious about protecting your privacy online and enjoy torrenting content, then a VPN is essential to avoid receiving DMCA notices."). Given the pervasiveness of this practice, it is quite likely that Charter has highly probative documents and communications related to its subscribers' use of VPNs for improper purposes, especially since at least one website highlights that "*Charter is VPN- friendly.*" *See Best VPNs for Charter*, BestReviews (last visited Aug. 30, 2020), https://vpn-services.bestreviews.net/isps/charter/ (emphasis in original).

Plaintiffs served this request to ascertain the extent to which Charter was aware of its subscribers' use of VPNs to avoid detection, and whether it took any steps to investigate repeat infringers that accounted for these obfuscating tactics. But once again, Charter's limitation of its response to the RIAA-accused subscribers is an improper restriction on safe-harbor discovery. Charter's awareness of, and response to, its subscribers' use of VPNs to avoid detection for copyright infringement goes directly to whether Charter "reasonably implemented" a repeat infringer policy. Plaintiffs are therefore entitled to responsive documents that concern any of

---

[3] Steve Symanovich, *What Is a VPN?*, Norton (last visited Aug. 30, 2020), https://us.norton.com/internetsecurity-privacy-what-is-a-vpn.html.

Charter's subscribers, or no specific subscribers at all.  If, for example, Charter created a report describing generally how its subscriber use VPNs to avoid detection for infringement, but it nevertheless did not try to curb improper use of VPNs, that would be highly probative evidence related to whether Charter reasonably implemented a repeat infringer policy.  Moreover, as noted above, Charter's limitation is especially improper in light of the fact that it can identify only a fraction of the subscribers included in Plaintiffs' infringement notices, and the Special Master's repeated guidance that safe harbor discovery should not be so limited.

> **5. Charter should be ordered to produce documents sufficient to show what it communicated to subscribers concerning the disclosure of their personal identifying information in this case.**

Charter has improperly refused to produce a narrow category of its communications *about this case* with subscribers accused of infringement.  As modified through meet-and-confer discussions, Plaintiffs' RFP 84 seeks only the form outgoing letter that Charter sent to 787 subscribers notifying them of Charter's intent to disclose their personal identifying information ("PII") pursuant to the PII Order (Dkt. 182), along with any modifications to the letter made for specific subscribers, if applicable.  This narrow request seeks documents that are clearly relevant, non-privileged, and impose a minimal burden to produce.

### A. Background.

RFP 84 seeks "[c]ommunications between Charter and any current or former Charter Subscriber regarding 'Charter's intent to disclose their name and contact information pursuant to [the] Order' Regarding Personal Identifying Information in this case (ECF 182)," including communications sent or received by Charter's outside or in-house counsel.  Ex. 14 at RFP 84.  Charter refused to produce any documents responsive to this request, claiming that it "seeks information that is not relevant," "fails to describe with reasonable particularity the items or categories of items to be produced," and "improperly seeks information protected by the attorney-client privilege."  *Id.*

During meet-and-confer discussions, Plaintiffs offered a narrow compromise, agreeing to accept documents sufficient to show the text of the responsive communications.  For example, if Charter used one single form letter to send the notification of its intent to disclose PII pursuant to the PII Order to all 787 subscribers subject to that Order, Plaintiffs would accept that form letter in satisfaction of RFP 84.  Ex. 8 at 3 (H. Ehlers Aug. 19, 2020 Ltr.).  If Charter modified that form letter for some subscribers, Plaintiffs would accept documents sufficient to show the form letter and each modification.  *Id.*  Charter rejected this reasonable and limited compromise.  Ex. 10 (H. Ehlers Aug. 24, 2020 email).

### B. *Charter's letter to accused infringers about this case is relevant, non-privileged, and a negligible burden for Charter to produce.*

What Charter has told its subscribers who were the subject of infringement notices about this case is unquestionably relevant.  In order to succeed on their claims, Plaintiffs must prove, among other things, that there was underlying direct infringement by Charter's subscribers. Plaintiffs initially asked for Charter to identify all of the subscribers who were the subject of

**COVINGTON**

Special Master Regina Rodriquez
September 2, 2020
Page 11

Plaintiffs' notices, so that Plaintiffs could understand who was engaging in the underlying direct infringement, and gather evidence to support that element of their claims.  Plaintiffs ultimately agreed to a limited sample.  Further, while it was not necessary for Charter to give notice to subscribers before identifying them in response to a court order, Plaintiffs did not contest this.  But rather than share with Plaintiffs the nature of the notice and guidance that Charter was giving to these alleged infringers, Charter now seeks to hide those communications, but there is no basis for withholding them.

Plaintiffs are entitled to know how Charter has characterized the claims and defenses to the very subscribers whose infringement is at issue—and who may end up being witnesses.  Furthermore, Plaintiffs are entitled to see these communications to understand the context for the PII objections raised by these subscribers.  Plaintiffs are entitled know, for instance, whether Charter encouraged subscribers to challenge disclosure, incentivized them in any way to do so, or suggested arguments for them to raise.

Charter's other objections are similarly baseless.  Plaintiffs' request does not "fail[] to describe" the documents sought.  It asks for a narrow category of communications, with a defined set of subscribers, related to a specific Order in this case.  Nor, presumably, are there any attorney-client relationships between Charter's lawyers and the subscribers subject to the PII Order, or any confidential legal advice conveyed in the communications Charter was ordered to make to third parties.  Indeed, the request does not ask for draft communications, but rather the *actual* communications sent to or from subscribers.  There is nothing privileged about those third-party communications.  Charter should be required to produce the narrowed set of documents Plaintiffs proposed in the parties' meet-and-confer.

Respectfully submitted,

*/s/ Jonathan M. Sperling*

Jonathan M. Sperling