# Exhibit 5



101 California Street
34th Floor
San Francisco, CA 94111
T +1 415 591 1000
F +1 415 591 1400

North America   Europe   Asia

September 10, 2020

**VIA EMAIL**

Special Master Regina Rodriguez
Regina.rodriguez@wilmerhale.com

Re:   *Warner Records, Inc., et al. v. Charter Communications, Inc.*, Case No. 19-cv-00874-RBJ-MEH–Charter's Opposition to Plaintiffs' September 2, 2020 Moving Letter Brief ("Motion")

Dear Ms. Rodriguez:

Defendant Charter opposes Plaintiffs' September 2, 2020 motion to compel ("Motion") as follows. Plaintiffs move on five issues. Charter addresses each in turn.

**I.   Plaintiffs Improperly Seek to Compel Charter to Create a New Document "Key" in Response to a Document Request**

Plaintiffs improperly seek to compel Charter to create a key to assist with Plaintiffs' review of a report Charter generated from its CATS system, which Charter was directed to produce in response to RFP 61. Plaintiffs' request should be denied for two reasons. *First*, the report Charter produced in response to RFP 61 is not the same as the "ticket log" data requested by RFP 67. *See* Ex. A (Plaintiffs' Third Set of Requests for Production) (RFP 67 seeks "Documents sufficient to show the meaning of each action, code, field, or definition used in the "ticket log" data produced or to be produced by you in this action."). *Second*, even if the CATS report is responsive to Plaintiffs' RFP 67, Charter does not maintain the data key Plaintiffs are requesting. Charter's counsel should not be compelled to create work product for Plaintiffs in connection with a document request. Plaintiffs are free to ask any questions they have about the report in deposition.

**A.   Background**

Plaintiffs previously moved on RFP 2, which sought "Logs of all Infringement Notices" for the copyright notices Charter received. *See* Ex. B (Plaintiffs' First Set of Requests for Production, RFP 2). The parties and the Court referred to the data responsive to RFP 2 as "ticket log" data. *See* Ex. C (Plaintiffs' Dec. 16, 2019 Discovery Conference Letter) ("Charter should produce, for the time period of January 1, 2010 through May 17, 2016: (i) logs of all Infringement Notices (or **'ticket log' data**) pertaining to all of Charter's subscribers who have been identified in Plaintiffs' Infringement Notices") (emphasis added); *see also* Ex. D (Dec. 17, 2020 Hr'g. Tr. at 68:23-69:1) ("We're [Plaintiffs] seeking for all the users identified in those infringement notices, the – you know, the logs of those notices, or **what they called ticket log data**, pertaining to all those subscribers without limitation as to complainant.") (emphasis added); *see also id.* at 75:18-21 ("THE COURT: What is a ticket log? MS. SAHNI: This is a log, Your Honor, that of all the subscribers and linking them up to the number of notices and then what actions were taken as to each notice."). The data corresponding to the copyright notices Charter received and responsive to RFP 2 has consistently been referred to as "ticket log" data throughout the case because Charter's



September 10, 2020
Page 2

CATS program created tickets for each of the copyright notices it received and stored the data in its own repository in CATS. A screenshot showing the fields of data Charter produced in response to RFP 2 is depicted here:

CATS "TICKETS" table Data

(Screenshot of ticket log data from the spreadsheet produced in response to RFP 2).

In connection with Plaintiffs' motion to compel additional data responsive to RFP 2, the Court ordered Charter to produce the ticket log data for all notices received by those subscribers identified in Plaintiffs' notices, referred to as the Accused Subscribers. Charter complied with this order and provided the available data. However, before receiving the production, Plaintiffs served RFP 67, which sought documents sufficient to show the meaning of each field of the "'ticket log' data" expected to be produced. In response to RFP 67, Charter agreed to produce non-privileged documents to the extent they existed. During subsequent meet and confers, Plaintiffs explained that they were looking for a key that defined each of the fields in the ticket data. Charter investigated and informed Plaintiffs that it did not maintain such a key in the ordinary course of business and therefore did not have responsive documents. Since Plaintiffs indicated that they intend to take a Rule 30(b)(6) deposition about the ticket data, Charter suggested that the deposition would be an appropriate time to ask questions about the different fields in the ticket data.

Separately, Plaintiffs served RFP 61, which sought documents regarding Charter's responses to non-copyright violations of its Acceptable Use Policies. Before Charter was ordered to produce information responsive to RFP 61, Charter was asked to explain how the information was maintained. *See* Ex. E (May 18, 2020 Hr'g. Tr. at 64:10-69:14) Charter informed the Special Master that it "maintains information on non-copyright violations of its Acceptable Use Policy ('AUP') in the Charter Abuse Tracking System ('CATS')" and Charter would have to generate a report with the responsive information from CATS. *See* Ex. F (May 27, 2020 Email from J. Golinveaux to the Special Master). Charter prepared and produced the report by extracting the requested data from CATS. *See* Screenshot below. Though both are processed and stored in CATS, the information on non-copyright abuses Charter maintains is not the same as the ticket log data Charter produced in response to RFP 2. Charter also provided Plaintiffs with the name of the Charter employee most knowledgeable about all of the data maintained in CATS. *See* Plaintiffs' Ex. 13 (Charter's Supplemental Response to Plaintiffs' Second Interrogatories).

| ACTION_YEAR | ABUSE_TYPE | ACTION | ACTION_COUNT | DISTINCT_TICKET_COUNT |
|---|---|---|---|---|



September 10, 2020
Page 3

Charter has informed Plaintiffs (both in email correspondence and telephonic meet and confers) that their demand for a key corresponding to the non-copyright abuse report is beyond the scope of RFP 67 and, regardless, Charter does not maintain such a key. *See* Plaintiffs' Ex. 7 (July 28, 2020 C. Alvarez email).

### B. Plaintiffs' Requested Relief Exceeds the Scope of its Document Request

Plaintiffs' RFP 67 requests a key for ticket log data. The CATs report Charter created pursuant to RFP 61 is not ticket log data. Throughout the course of discovery in this case, "ticket log" data has referred to data corresponding to the tickets Charter created in response to receiving copyright infringement notices. Plaintiffs' new interpretation of "ticket log" data, which encompasses *any* data that Charter maintains in CATS, is not consistent with Charter's business practices, entirely overbroad, and should be rejected on that basis. "Ticket log" data should continue to reasonably refer to the tickets Charter created to process copyright notices. Plaintiffs' attempt to expand the scope of RFP 67 to any data originating from CATS is improper.

### C. Charter Does Not Maintain a Document Responsive to RFP 67

More fundamentally, as detailed in Section I.A. above, Charter has fully complied with its obligation to produce data responsive to RFP 61 by producing the CATs report. The fact that it produced the CATs report, however, does not mean it is now required to create work product in order to facilitate Plaintiffs' review of that document. *See Georgacarakos v. Wiley*, 2009 WL 924434, at *2 (D. Colo. Apr. 3, 2009) ("if a requested document is not in the possession of a party or non-party, such person need not create the non-existent document"); *see also Raytheon Aircraft Co. v. United States*, 2007 WL 4300221, at *9 (D. Kan. Dec. 8, 2007) (noting that if documents requested do not already exist, the party is not required to generate the requested information for discovery). Under the Federal Rules, Plaintiffs' request that Charter manufacture and produce work product to aid in Plaintiffs' review of the CATs report is improper.

## II. Plaintiffs' Motion Seeks to Circumvent Prior Orders Regarding the Scope of Charter's Responses Concerning its Repeat Infringer Policy

Plaintiffs next seek to compel Charter to produce documents in response to RFP 81 concerning actions taken by Charter to determine whether any of its subscribers were adjudicated to be repeat infringers *beyond* the subscribers Plaintiffs identified in their notices. This request should be denied as overbroad and duplicative. In fact, Plaintiffs' RFP 81 seeks a broad range of discovery that is duplicative of several requests previously narrowed by the Special Master.[1]

---

[1] Plaintiffs' RFP 81 seeks:
> Documents reflecting any efforts or action taken by Charter to determine whether any of its Subscribers had been "adjudicated to be a repeat infringer," (see Charter's Submission Regarding its Affirmative Defenses at 13, ECF No. 160), including all documents concerning Charter's (i) criteria for determining whether a Subscriber had been "adjudicated to be a repeat infringer," (ii) protocols for identifying any Subscriber that had been "adjudicated to be a repeat infringer," (iii) notations in CATS or any other internal tracking system evidencing that any Subscriber had been "adjudicated to be a repeat infringer," (iv) internal



September 10, 2020
Page 4

Charter's assertion of DMCA safe harbor does not entitle Plaintiffs to unlimited discovery of information disconnected from the claims in the case, particularly where responding would be overly burdensome and in conflict with past orders. Charter has agreed to provide Plaintiffs with discovery sufficient for Plaintiffs to understand Charter's copyright policies. Plaintiffs' request, without a subscriber limitation, far exceeds the scope of permissible discovery and should be denied.

### A. Plaintiffs' Request Exceeds the Scope of the DMCA, is Duplicative, and Contradicts the Special Master's Prior Orders

Charter has asserted DMCA safe harbor – which requires Charter to terminate repeat infringers in appropriate circumstances. In order to trigger termination, Charter's policy required more than a mere unsubstantiated accusation of infringement from a copyright claimant. *See* ECF 160 at 13 (Charter's Submission Regarding its Affirmative Defenses). Charter has produced (or is in the process of producing, pursuant to email review in connection with search term negotiations with Plaintiffs) both its policies and related documents concerning the implementation of its policies. It has also provided Plaintiffs with information concerning its response to the copyright notices it received.[2] *See* Ex. D (Dec. 17, 2019 Hr'g. Tr. at 63:10-13); *see also* ECF 230 at 13 (Aug. 12, 2020 Special Master's Order) (ordering Charter to produce ticket log data and correspondence for subscribers beyond the Accused Subscribers). Additionally, Charter is in the midst of reviewing and producing correspondence regarding subscribers beyond the Accused Subscribers and not limited to Plaintiffs' notices. *See* Ex. G (Special Master's Aug. 31, 2020 Letter Order) (ordering Charter to expand the scope of some negotiated search terms to go beyond Plaintiffs' notices and the Accused Subscribers).

In response to RFP 80, Charter has also agreed to produce documents evidencing its repeat infringer policy, without any limitation by subscriber.[3] Similarly, Charter will produce documents sufficient to show its criteria for determining whether a subscriber was an adjudicated repeat infringer and its related protocols, responsive to subsets (i) and (ii) of RFP 81. *See* Plaintiffs' Ex. 14 (Charter's Objections and Responses to Plaintiffs Fourth Requests for Production). However, Charter is reasonably limiting its response to subsets (iii), (iv), and (v) of Plaintiffs' RFP 81 to the Accused Subscriber because, if the scope of Plaintiffs' RFP 81 were to be broadened to include every subscriber, it would directly contradict the Special Master's prior order. Specifically, subset (iii) of Plaintiffs' RFP 81 which seeks "notations in CATS or any other internal tracking system" would circumvent the Special Master's order limiting the production of work log notes to those

---

communications concerning whether any Subscriber had been "adjudicated to be a repeat infringer," and (v) communications with Subscribers suspected of having been, or deemed to have been, "adjudicated to be a repeat infringer."

[2] Charter has produced over 25 external policies and internal processing guidelines, work log notes detailing the manner in which Charter's employees processed copyright notices identifying the Accused Subscribers, and all correspondence with the Accused Subscribers.

[3] RFP 80 seeks "Charter's alleged policy to only terminate a Subscriber in connection with copyright infringement if the Subscriber had been 'adjudicated to be a repeat infringer.'" Charter has agreed to produce responsive documents sufficient to show Charter's policy.



that correspond with Plaintiffs' notices and a subset of third party notices identifying the Accused Subscribers. *See* Ex. H (July 2, 2020 Hr'g. Tr. at 29:15-30:2) ("When we say, 'Charter shall produce call logs for certain repeat infringers who are not identified in plaintiffs' notices,' it is correct that the context in which we were discussing this was with regard to accused subscribers.").

The expansive discovery Plaintiffs are already receiving, related to Charter's DMCA safe harbor defense, is more than sufficient to understand Charter's policies and practices for responding to copyright notices. Charter has responded to Requests for Admission and Interrogatories concerning Charter's implementation of its policies, and has also produced subscriber correspondence, which Plaintiffs can use to determine Charter's response to copyright notices and its treatment of subscribers who received multiple notices. *See e.g.,* Ex. I (Charter's Amended Responses to Plaintiffs' First Requests for Admission); Plaintiffs' Ex. 15 (Charter's Responses to Plaintiffs' Second Requests for Admission); Ex. J (Charter's Third Supplemental Responses to Plaintiffs Second Set of Interrogatories, Responses to Interrogatories 13 and 14). Additionally, Charter has produced the work log notes it maintained for each of Plaintiffs' notices, a subset of work log notes for third party notices, a breakdown of the total number of notices Charter received per month, and the actions it took in response to every notice it received. *See e.g.,* CHA_00025040 - CHA_00063483 and CHA_00063581 - CHA_00077368 (work log notes); Ex. J (Charter's Third Supplemental Responses to Plaintiffs Second Set of Interrogatories, Responses to Interrogatories 13 and 14); *see also* Ex. E (May 18, 2020 Hr'g. Tr. at 66) (the Special Master stated that the work log notes ordered "should provide the plaintiffs with sufficient data to understand and determine whether there are patterns, issues, information with regard to Charter's responses to notices without going into the many millions of potential notices that may exist"). Charter has also produced its internal and external copyright infringement policies and is producing documents evidencing its policy for repeat notices. *See* CHA_00001273 - CHA_00001359; Plaintiffs' Ex. 14 (Charter's Responses to Plaintiffs Fourth Set of Requests for Production, 80-82). Recently, Charter was also ordered to produce additional ticket log data and related correspondence beyond the Accused Subscribers. In addition, after lengthy negotiations, Charter is applying the negotiated search terms to its upcoming ESI production, which will likely lead to the production of additional correspondence about notices and Charter's policies. In sum, Plaintiffs already have, or will soon receive, more than enough information from which they can assess Charter's repeat-infringer policy.

Charter's DMCA defense does not entitle Plaintiffs to unlimited discovery tangentially related to its policies, particularly where responding would be overly burdensome because it would require Charter to review records it maintained for all of its subscribers including *all* work log notes, ticket data, and correspondence, and in conflict with past orders on the scope of permissible discovery. Charter has agreed to provide Plaintiffs with discovery sufficient for Plaintiffs to understand Charter's repeat infringer policy, pursuant to the statute. *See* 17 U.S. Code § 512 (i)(1)(a) (articulating the conditions necessary to be eligible for the safe harbor defense). The safe harbor defense does not entitle Plaintiffs to broad and burdensome discovery tangentially related to its repeat infringer policy. Indeed, discovery "may be constrained where the court determines that the desired discovery is unreasonable or unduly burdensome given the needs of the case, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in



September 10, 2020
Page 6

resolving the issues." *See Simpson v. Univ. of Colorado*, 220 F.R.D. 354, 356 (D. Colo. 2004) citing Fed. R. Civ. P. 26(b)(2). Discovery should be appropriately constrained here.

Importantly, Plaintiffs have failed to articulate what additional information they would receive from this invasive and burdensome discovery that they have not already or will soon receive. Moreover, Plaintiffs have not argued that the additional evidence is of sufficient probative value to outweigh the burden of reviewing and producing the volume of information requested – particularly where RFP 81 is duplicative of discovery Charter has and will be producing concerning its policies and the implementation of those policies.

Plaintiffs' demand for production of all documents, not limited to Accused Subscribers, responsive to subsets (iii), (iv), and (v) of RFP 81, far exceeds the scope of permissible discovery. Their Motion should be denied.[4]

### III. Plaintiffs' Motion to Compel Documents Used to Respond to Interrogatories 13 and 14 Exceeds the Scope of Plaintiffs' Document Requests

Plaintiffs also move to compel the production of the "source" document Charter relied on to respond to Interrogatories 13 and 14, which ask for the total number of copyright notices received per month (for the entire Discovery Period) and an identification of the customer facing actions Charter took in response to each notice, asserting that it is responsive to Plaintiffs' RFPs 24, 26, and 62. However, the source material Charter relied upon in preparing its interrogatory responses is not responsive to any of Plaintiffs' cited document requests and contains commercially sensitive information not relevant to any claim or defense in the case and for periods outside the Discovery Period at issue in this case.

#### A. Background

Charter responded to Plaintiffs' Interrogatories 13 and 14 in accordance with the Special Master's Order on June 25, 2020. *See* Ex. L (Charter's Responses to Plaintiffs' Second Set of Interrogatories). On June 29, 20202, Plaintiffs sent Charter a series of follow-up questions by email demanding to know why data for the month of August 2015 (out of four years of monthly information) was missing from Charter's response to Interrogatory 13. *See* Plaintiffs' Ex. 4. Plaintiffs also demanded that Charter identify the "source" of Charter's responses to Interrogatories 13 and 14, incorrectly assuming Charter was withholding additional ticket log data. *See id*.

While Charter was diligently investigating Plaintiffs' questions, Plaintiffs again demanded an immediate response, prematurely raised the issue with the Special Master, and twice more threatened Court intervention. *See* Plaintiffs' Ex. 7. On July 29, 2020, Charter agreed to supplement its response to Interrogatory 13 and explained to Plaintiffs that the data used to respond

---

[4] Charter has served a similar request to Plaintiffs seeking "[a]ll documents concerning Your decision not to pursue litigation against Charter's subscribers, account holders, and/or customers who have allegedly infringed the Copyright Works." *See* Ex. K (Plaintiffs' Objections and Responses to Charter's First Set of Requests for Production). Plaintiffs have refused to produce responsive documents, stating that the request "seeks information not relevant to resolving issues in the action" and objecting based on burden. *Id*.



to Interrogatories 13 and 14 was not ticket log data stored in CATS. *See* Plaintiffs' Ex. 7 (July 28, 2020 C. Alvarez email).

Despite being informed that the source was not ticket log data stored in CATS (and not responsive to Plaintiffs' document requests), Plaintiffs prematurely raised the issue during the August 25, 2020 status conference with the Special Master, demanding that they were entitled to a production of the source data.[5] *See* Ex. M (Aug. 25, 2020 Hr'g. Tr. at 60:25-61:20). The Special Master ordered Charter to indicate on August 28 whether it would agree to informally identify, without a new interrogatory or motion practice, the source of the data used to supplement Interrogatory 13. *See* Ex. M (Aug. 25, 2020 Hr'g. Tr. at 63:8-13 and 64:12-23). The order did not extend to Interrogatory 14, nor did it require Charter to state whether it would produce the source, despite Plaintiffs' claims to the contrary.[6] *Id.*

Although Charter fully complied with the Special Master's Order by providing the requested information on August 28, and although the Special Master's Order did not authorize further communications on the subject, Plaintiffs sent another email on August 30 email again demanding immediate production of the "source data." *See* Plaintiffs' Ex. 11 (J. Ehlers Aug. 30, 2020 email). Charter responded on September 1 again explaining that the source data was not responsive to Plaintiffs' existing document requests. *See* Plaintiffs' Exhibit 11 (J. Golinveaux Sep. 1, 2020 email).

### B. The Source of Charter's Responses is Not Responsive to Plaintiffs' Requests

Contrary to Plaintiffs' argument, the documentation used to prepare Charter's responses to Interrogatories 13 and 14 is not responsive to RFPs 24, 26, and 62. The source documentation is a report containing summary statistics regarding all types of complaints processed in CATS, which contains a vast array of information that far exceeds the scope of the case, for example summary statistics concerning threat and harassment tickets, virus tickets, spam tickets, Ddos attack tickets, and all the other types of abuses an ISP must deal with, in addition to copyright tickets.  In its responses to Interrogatories 13 and 14, Charter provided all the relevant and responsive information requested by the interrogatories and contained within the report.  It was entirely appropriate for Charter to respond to the interrogatories in this manner, rather than relying on Fed. R. Civ. P. 33(d).[7]

Plaintiffs' RFP 24 seeks the documents on which Charter relies in responding to Plaintiffs'

---

[5] Plaintiffs have repeatedly argued and tried to create the misimpression that Charter somehow "purposely" deleted relevant CATS data. This self-serving narrative has no basis in fact.  As Charter has repeatedly informed Plaintiffs and as they know from documents that have been produced, Charter retained its CATS data in accordance with its retention policies and schedules. Although the Claims Period runs to May 2016, Plaintiffs stopped sending Charter notices related to the claims at issue in this case in March 2015.  It was Plaintiffs' decision to wait until March 23, 2016 to first put Charter on notice of their claims and have only themselves to blame for earlier CATS data not being available.

[6] Even though Charter was not ordered to provide the information for Interrogatory 14, Charter can confirm that the same document was used to respond to both Interrogatories 13 and 14.

[7]  Rule 33(d) allows parties to produce documents *in lieu of* providing a narrative response to an interrogatory in appropriate circumstances.



September 10, 2020
Page 8

Interrogatories. Plaintiffs, however, simply dismiss the fact that Charter objected to the scope of this request and agreed to produce only the documents relied upon pursuant to Rule 33(d), <u>as did Plaintiffs</u> in response to a near identical request.[8] *See* Plaintiffs' Ex. 12. Here, Charter provided a complete narrative response to both Interrogatories 13 and 14 and, as noted above, did not rely on Rule 33(d) in any way.

Similarly, contrary to Plaintiffs' argument, the source documentation at issue is not responsive to Plaintiffs' facially overbroad RFP 26, which seeks all documents relating to CATS, its technical abilities, and communications with Cox regarding CATS.[9] Charter appropriately objected to RFP 26 as overbroad and agreed to produce its CATS manuals and source code. *See* Plaintiffs' Ex. 13 (Charter's Supplemental Responses to Plaintiffs' Second Set of RFPs).

The document is also not responsive to RFP 61. As discussed in Section I, in connection with ordering Charter to comply with RFP 61, the Special Master asked Charter to explain how the information concerning actions taken in response to non-copyright actions is stored at Charter. *See* Plaintiffs' Ex. 1 at 77:25-78:18 (ordering Charter to state how it tracked the actions taken in response to non-copyright violations of its Acceptable Use Policies in connection to Plaintiffs' RFP 61). As Charter informed the Special Master and Plaintiffs, the information that tracks the actions Charter took in response to non-copyright abuses is stored in CATS. *See* Ex. F (May 27, 2020 J. Golinveaux Email). The CATs report Charter subsequently produced in response to RFP 61 contains a wide range of actions and information, including subscriber suspensions. This same information is not maintained in the source document underlying Charter's responses to Interrogatories 13 and 14. Thus, even though the document underlying Charter's responses to Interrogatories 13 and 14 tracks certain summary statistics related to non-copyright Acceptable Use Policy violations, the data responsive to RFP 61 was maintained in and retrieved from CATS and has already been produced to Plaintiffs.

As noted above, in addition to not being responsive to Plaintiffs' requests, the source document relied on to respond to Interrogatory 13 and 14 contains statistical data about all types of abuses that is far beyond the scope of relevant discovery in this case both in subject matter and time-period, as well as non-responsive statistics maintained for other entities. Charter has provided all of the responsive information within the document in its responses to Interrogatories 13 and 14. Any other information contained in the document is either irrelevant or non-responsive and commercially sensitive as it contains statistics regarding the vast array of abuses with which Charter deals as an ISP tracks. Even if the Special Master was inclined to order production of the

---

[8] Charter's response is entirely consistent with the position Plaintiffs' took in response to Charter's parallel RFP. *See* Ex. K (Plaintiffs' Response to Charter's First Set of Requests for Production, Request 83).

[9] In full, RFP 26 seeks:
> All documents relating to CATS, including documents describing the technical abilities of the CATS system to track abuses of any copyright infringement-related policy by its users, or otherwise track or process notices of infringement, the source code implementing CATS, all versions of the CATS Abuse Automation System Implementation Plan, all communications between You and Cox regarding CATS, and documents



September 10, 2020
Page 9

document, which Plaintiffs entirely fail to justify, Charter should be entitled to redact the non-relevant information. For all of these reasons, Plaintiffs' Motion seeking the document Charter relied upon to respond to Interrogatories 13 and 14 should be denied.

### IV. Plaintiffs' Motion for Information Concerning Virtual Private Networks should be Denied as Irrelevant

Plaintiffs' RFP 83 broadly seeks all documents concerning Charter's subscribers' use of virtual private networks (VPNs), irrespective of whether the subscriber was the subject of *any* copyright notice. Thus, it is a grossly overbroad request that would require Charter to review all of the documents associated with every subscriber, despite the lack of any showing that the documents are relevant to Plaintiffs' claims or Charter's counterclaims or defenses. Further, Plaintiffs' demand for such information circumvents the Special Master's prior order limiting the discovery of work log notes to the Accused Subscribers. *See* Ex. E (May 18, 2020 Hr'g. Tr. at 66) (the Special Master stated that the work log notes ordered "should provide the plaintiffs with sufficient data to understand and determine whether there are patterns, issues, information with regard to Charter's responses to notices without going into the many millions of potential notices that may exist").

Any mention of "VPN" would exist in the work log notes Charter has already produced. The work log notes contain Charter's annotations of any issues that arose when processing notices and/or receiving calls from subscribers. Additionally, Charter will be producing its internal correspondence concerning any copyright notices Charter received as well as additional communications with subscribers, beyond those identified in Plaintiffs' notices. This documentation will necessarily include any discussion of VPNs, to the extent any such communications exist. *See* Ex. G (Special Master's Aug. 31, 2020 Letter Order) (expanding the scope beyond Plaintiffs' notices for several search terms related to internal and external communications); *see also* ECF 230 at 17 (Aug. 12, 2020 Special Master's Order) (ordering Charter to produce the correspondence with any subscribers who received three or more notices, excluding RightsCorp notices). From this discovery, Plaintiffs will be able to assess whether Charter knew that its subscribers were using VPNs and how such knowledge affected Charter's response to copyright notices.

Plaintiffs' argument that this discovery is somehow related to Charter's repeat infringer policy and its DMCA defense is completely disconnected from the facts and claims in the case.[10] The DMCA requires evidence that the ISP "has adopted and reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of subscribers and account holders . . . who are repeat infringers." 17 U.S. Code § 512 (i)(1)(a). A subscriber's use of a VPN, however, is not evidence of how Charter implemented its policies. Charter's policies, internal processing guides, and internal work log notes do not refer to VPN usage. Indeed, despite Plaintiffs' misleading reliance on articles *post-dating the claims*, there is nothing to suggest that Charter's subscribers were using VPNs during the claims period, or that Charter was aware that its

---

[10] If VPN usage is at all relevant in this case, it seems to weigh against the notice process and accuracy of notices more than clarifying Charter's repeat infringer policy.



September 10, 2020
Page 10

subscribers were using VPNs, or that Charter had a way to monitor VPN usage. Regardless, the use of VPN by Charter's subscribers is completely unrelated to Plaintiffs' claims.

Plaintiffs' request should be denied as cumulative, duplicative and overly burdensome.

## V.   Recent Communications Charter had with its Subscribers due to its Legal Obligations Regarding PII Are Completely Irrelevant

Plaintiffs also move to compel Charter to respond to RFP 84, which seeks the communications Charter had with its subscribers prior to producing their personally identifying information ("PII") in response to the Special Master's prior order. *See* ECF 182 (Order Regarding Personal Identifying Information ("PII Order")). This is a classic fishing expedition with no bearing on any claims or defenses in this case. Importantly, the communications occurred in 2020, which was long after the claims period (which ended in May 2016). This request is nothing more than an attempt to make an end run around the PII disclosure procedure established by the Court.

Under the Cable Privacy Act, Charter is obligated to notify its subscribers of an impending disclosure of their PII and to allow the subscribers an opportunity to object. *See* 47 U.S. Code § 551. The Special Master issued an Order Regarding Personal Identifying Information on June 5, 2020, which governs the notice and objection procedure. ECF 182 (PII Order). The PII Order requires Charter to provide notice to a subset of its subscribers that their name, address, email address, and subscriber account number has been requested by Plaintiffs in this action. The notified subscribers have a set time in which to object or seek relief from Court, after which Charter is to provide the Subscriber PII of non-objecting subscribers to Plaintiffs, under a HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY designation. Charter provided the required notices to the subscribers on June 25, 2020.

Charter appropriately objected to RFP 84 (which seeks Charter's 2020 communications with its subscribers) on relevancy grounds. *See* Plaintiffs' Ex. 14 (Charter's Objections and Responses to Plaintiffs' 4th RFPs). Plaintiffs' motion does not come close to addressing Charter's relevancy objection. Instead, Plaintiffs complain that Charter's characterization of the case could have encouraged its subscribers to object to the disclosure of their PII. But, this is both irrelevant and unfounded. Charter has no stake in whether or not its subscribers object. Rather, Charter has made the communications, as instructed, and consistent with its obligations under the Cable Privacy Act.[11]

Because Charter's 2020 communications with subscribers regarding its PII obligations bear no relevance to any claim or defense in this case, and because it would be overly burdensome for Charter to have to provide this correspondence, Plaintiffs' Motion concerning RFP 84 should be

---

[11] During the August 21 meet and confer, Charter offered to produce (as a compromise) a copy of the form letter Charter used to prepare the notifications. Plaintiffs' rejected Charter's proposal as insufficient and demanded all of Charter's correspondence with its subscribers. While Charter is still willing to enter into this compromise in the event the Special Master finds it warranted, Charter respectfully requests that the Special Master order only the production of the form letter, and preclude Plaintiffs from burdening Charter with serial, follow-on requests for additional correspondence.



September 10, 2020<br>Page 11

denied.

        Respectfully,

        */s/Jennifer A. Golinveaux*
        Jennifer A. Golinveaux