# Exhibit 9

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00874-RBJ-MEH
_____

WARNER BROS. RECORDS INC., et al.,

   Plaintiffs,

vs.

CHARTER COMMUNICATIONS, INC.,

   Defendant.
_____

TELEPHONIC HEARING

May 18, 2020
_____

        This telephonic hearing was taken before Special Master Regina Rodriguez on May 18, 2020, at 1:32 p.m. Mountain Standard Time before K. Michelle Dittmer, Registered Professional Reporter and Notary Public within the state of Colorado.

(The reporter, K. Michelle Dittmer, appearing remotely via telephone)

WILSON & ASSOCIATES, LLC
scheduling@wilsonandassociatesllc.com

Page 2

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF WARNER BROS. RECORDS INC.:

    MATTHEW J. OPPENHEIM, ESQ.
    JEFFREY M. GOULD, ESQ.
    Oppenheim & Zebrak LLP
    4530 Wisconsin Avenue N.W.
    5th Floor
    Washington, DC 20016
    Phone: 202-480-2999
    Email: matt@oandzlaw.com
    Email: jeff@oandzlaw.com
    (appeared telephonically)

    JONATHAN MICHAEL SPERLING, ESQ.
    Covington & Burling LLP
    620 Eighth Avenue
    The New York Times Building
    New York, New York 10018-1405
    Phone: 212-841-1153
    Email: jsperling@cov.com
    (appeared telephonically)

    NEEMA T. SAHNI, ESQ.
    Covington & Burling LLP
    1999 Avenue of the Stars
    Suite 3500
    Los Angeles, California 90066-4643
    Phone: 424-332-4757
    Email: nsahni@cov.com
    (appeared telephonically)

WILSON & ASSOCIATES, LLC
scheduling@wilsonandassociatesllc.com

Page 3

ON BEHALF OF THE DEFENDANT:

    MICHAEL STUART ELKIN, ESQ.
    SEAN R. ANDERSON, ESQ.
    CESIE C. ALVAREZ, ESQ.
    Winston & Strawn, LLP
    200 Park Avenue
    New York, New York 10166-4193
    Phone: 212-294-6729
    Phone: 212-294-5388
    Email: melkin@winston.com
    Email: sranderson@winston.com
    Email: calvarez@winston.com
    (appeared telephonically)

    JENNIFER ANN GOLINVEAUX, ESQ.
    Winston & Strawn, LLP
    101 California Street
    Suite 3400
    San Francisco, California 94111-5802
    Phone: 415-591-1506
    Email: jgolinveaux@winston.com
    (appeared telephonically)

    ERIN R. RANAHAN, ESQ.
    Winston & Strawn, LLP
    333 South Grand Avenue
    Los Angeles, California 90071
    Phone: 213-615-1835
    Email: eranahan@winston.com
    (appeared telephonically)

    JOHN (JACK) TANNER, ESQ.
    Fairfield & Woods, P.C.
    1801 California Street
    Suite 2600
    Denver, Colorado 80202-2645
    Phone: 303-830-2400
    Email: jtanner@fwlaw.com
    (appeared telephonically)

WILSON & ASSOCIATES, LLC
scheduling@wilsonandassociatesllc.com

Page 4

P R O C E E D I N G S

    REPORTED REMOTELY FROM ARVADA, COLORADO

        SPECIAL MASTER RODRIGUEZ: Okay. Why don't we get started. We're here today for hearing in Warner Records versus Charter Communications, 19-cv-00874. Last Friday, we took up defendant's motion to compel and promised we're here this afternoon to take up the plaintiffs' motion to compel.

        Could we have entry of appearances, starting with plaintiffs, please.

        MR. OPPENHEIM: Good afternoon, Ms. Rodriguez. This is Matt Oppenheim, and I believe my colleague, Jeff Gould, from Oppenheim & Zebrak is on, as well as cocounsel, Neema Sahni and Jonathan Sperling, from Covington & Burling.

        SPECIAL MASTER RODRIGUEZ: Thank you.

        For the defendants?

        MS. GOLINVEAUX: Good morning -- good afternoon, Ms. Rodriguez. It's Jennifer Golinveaux at Winston & Strawn. And I believe with me on the line are my partners, Michael Elkin and Erin Ranahan, at Winston & Strawn, as well as Sean Anderson and Cesie Alvarez.

        MR. TANNER: Your Honor, it's Jack Tanner with Fairfield & Woods here in Denver. I'm also on the line. Craig Joyce, who was at the hearing on Friday,

WILSON & ASSOCIATES, LLC
scheduling@wilsonandassociatesllc.com

1          SPECIAL MASTER RODRIGUEZ:  I'm sorry.  I'm
2    sorry to interrupt you.
3          But you want to give an answer to my
4    question, which was:  Charter had its own policy, as I
5    understand it.
6          MS. GOLINVEAUX:  Right.
7          SPECIAL MASTER RODRIGUEZ:  And under that
8    policy, it indicated that a subscriber could be
9    terminated for infringement if they received X number of
10   notices.
11         My recollection was that it was one, but
12   I'm asking you, Ms. Golinveaux, to help refresh my
13   recollection.  What is the number?  Or am I recalling
14   this policy incorrectly?
15         MS. GOLINVEAUX:  Yeah.  The policy
16   absolutely does say that Charter reserves the right to
17   terminate repeat infringers.  But what I was trying to
18   articulate, not very artfully, is that it did not
19   terminate subscribers based purely on receiving notices,
20   that there would have to be something else that kicked in
21   in a claims period to -- to justify termination.  So it
22   wouldn't be --
23         SPECIAL MASTER RODRIGUEZ:  All right.
24         MS. GOLINVEAUX:  -- relevant to the ticket
25   data.

WILSON & ASSOCIATES, LLC
scheduling@wilsonandassociatesllc.com

Page 70

1          SPECIAL MASTER RODRIGUEZ:  All right.
2          (Simultaneous crosstalk.)
3          SPECIAL MASTER RODRIGUEZ:  I think I've
4    got it.
5          MS. GOLINVEAUX:  If I could just say, what
6    Mr. Sperling is proposing now was nowhere in their
7    briefs, so we have never even inquired with our clients
8    with respect to the burden on what he's now asking for,
9    which could implicate an unknown number of notices.
10         So if they're now switching course and
11   asking for some different relief that they didn't brief,
12   I think we should be entitled to present some burden
13   arguments on that in a declaration, if you're inclined
14   to --
15         SPECIAL MASTER RODRIGUEZ:  Well, they
16   have.  They have made the request for logs, for all
17   infringe -- infringing notices -- sorry, for all notices
18   of infringement.
19         I'm not necessarily inclined to provide
20   that or to require you to provide that, but I do think
21   that some subset is appropriate.  Certainly those with
22   regard to the plaintiffs is appropriate, and certainly
23   some number with regard to repeat infringers is
24   appropriate.
25         So do you have a counterproposal or

WILSON & ASSOCIATES, LLC
scheduling@wilsonandassociatesllc.com

Page 71

1    thoughts on that particular issue?
2          MS. GOLINVEAUX:  Well, their motion was
3    specific to, quote/unquote, infringing subscribers, which
4    they defined in their own request for production as
5    subscribers who received notices.  So -- so that would
6    mean records with respect to any third-party notice that
7    came in to folks who got RIAA notices.
8          So if you're going -- if he's going -- so
9    that's probably defined it in -- in their own request.
10   So if he's going to propose something with respect to
11   folks who got more than one, it should certainly be
12   limited to that set of, quote/unquote, infringing
13   subscribers who got the RIAA notices.
14         SPECIAL MASTER RODRIGUEZ:  All right.  So
15   what I'm going to order now is that the plaintiffs --
16   sorry, that Charter needs to provide responses with
17   regard to the call logs, the worker call logs for the
18   infringing subscribers identified in plaintiffs' notices.
19   That would be all notices for the plaintiffs.
20         The parties are instructed to meet and
21   confer with regard to what would be an appropriate
22   number, whether it's three or four -- whatever the number
23   is the parties can agree to -- in terms of repeat
24   infringers that defendant would also search for and would
25   provide the logs.

WILSON & ASSOCIATES, LLC
scheduling@wilsonandassociatesllc.com

Page 72

1          MR. SPERLING:  Thanks, Ms. Rodriguez.
2    It's Jonathan Sperling for the plaintiffs.
3          I just wanted to make sure you got an
4    answer to your question because it wasn't a complicated
5    question, and a simple question ought to get a simple
6    answer.  So it's in Exhibit 4 to our motion on the first
7    page, what their policy was, and I'm reading to you
8    directly from it.
9          If Charter receives more than one notice
10   alleging copyright infringement on the customer's part,
11   customer may be deemed a, open quote, repeat copyright
12   infringer, closed quote.
13         So the answer to your question,
14   Ms. Rodriguez, was more than one.
15         SPECIAL MASTER RODRIGUEZ:  All right.
16         With regard to RFP 61, seeking documents
17   distinguishing Charter's treatment of copyright
18   infringement notices from its treatment of other
19   acceptable use policy violations.
20         Charter, do you want to address this one
21   in the first instances?
22         MS. GOLINVEAUX:  Thank you, Ms. Rodriguez.
23   It's Jennifer Golinveaux.
24         So as we note in our opposition, we
25   already produced a detailed document called Abuse and

WILSON & ASSOCIATES, LLC
scheduling@wilsonandassociatesllc.com

```
 1  Vulnerability Process Playbook, which details how Charter
 2  responds to various AUP violations, including whether
 3  they be fishing or DDos attacks or copyright infringement
 4  or spam.  So they already have that.
 5              To companion that, what they've already
 6  got, with this extremely broad request for production
 7  that seeks all documents or communications in any way
 8  comparing how Charter responded to copyright with other
 9  violations, is overbroad, overly burdensome, and not
10  proportional.
11              SPECIAL MASTER RODRIGUEZ:  Is it
12  Mr. Sperling that's going to respond?
13              MR. SPERLING:  It is.  You guessed well,
14  Ms. Rodriguez.
15              So, look, it's clearly relevant, right?
16  The point is to conduct a comparison.  And in the same
17  way that it's important to see what they were saying
18  internally about how they would respond to notice of
19  repeat infringer by their subscribers, it's important to
20  be able to compare that to what they said about how they
21  would respond to other kinds of violations of their
22  acceptable use policy; and to be able, when we tell the
23  story to the jury, to show the jury:  Look, this is what
24  they did when they were confronted with violations of the
25  acceptable use policy that impacted their pocketbook.
```

```
 1  They were very rigid, they were very strict, they
 2  enforced that policy as written.  Unlike what they did
 3  when it came to violations with the acceptable use policy
 4  that impacted plaintiffs' pocketbook because their
 5  subscribers were stealing from plaintiffs by infringing
 6  their copyrights.  Even though Charter knew it, there, by
 7  contrast, Charter chose to take a light touch and not to
 8  enforce acceptable use policy as written.
 9              We're entitled to tell that story.  I'm
10  sure Charter has many things that they plan to tell the
11  jury to refute or rebut that story, but we're entitled to
12  the discovery that allows us to tell that story and to
13  show that Charter chose to treat violations of copyright
14  infringement of the copyright laws differently than they
15  treated other violations with the acceptable use policy.
16              And it goes to Charter's wilfulness, it
17  goes to its internal contribution to subscribers'
18  infringing activity, it goes to its right and ability to
19  control its subscribers' infringing activity when they --
20  when you can see that they were prepared to cut off
21  subscribers for other kinds of violations, but chose not
22  to cut off subscribers for these kinds of violations, et
23  cetera.
24              In short, it's clearly relevant for the
25  same reason that the other documents that you've already
```

```
 1  ordered to be produced are relevant.
 2              SPECIAL MASTER RODRIGUEZ:  Would a similar
 3  process to what you've proposed in RFP 37 suffice to meet
 4  your needs?  That is, rather than seeking every document
 5  related to this issue, to provide numbers of actions and
 6  what actions were taken with regard to the particular
 7  type of policy violations?
 8              MR. SPERLING:  So that's certainly part of
 9  the story, Ms. Rodriguez.  But it's incomplete because it
10  doesn't provide the color and texture of narrative
11  emails.  So we certainly want the information that you're
12  describing, but respectfully think we're also entitled to
13  the narrative documents, where they're actually
14  discussing in their own words how they're treating one
15  kind of violation differently than another kind of
16  violation.
17              SPECIAL MASTER RODRIGUEZ:  And do we have
18  evidence to indicate that there were actually actions
19  taken for these different types of policy violations?
20  That is, are we talking about potentially another null
21  set here, or do we know that actions were taken?
22              MR. SPERLING:  We don't know what actions
23  were taken, other than we certainly know that they
24  terminated subscribers for nonpayment.  But in terms of
25  violations of DP's playbook, we don't know what actions
```

```
 1  that they took, and so we need this discovery in order to
 2  find that out.
 3              MS. GOLINVEAUX:  No, that's not accurate.
 4  The Abuse and Vulnerability Process Playbook walks
 5  through each of these violations of the AUP one at a time
 6  and provides some detailed information about them.
 7              And I have to say, Mr. Sperling's
 8  characterization of other violations like fishing and
 9  DDos attacks and spam as ones that would just hit
10  Charter's pocketbook and that's why they would be
11  interested in dealing with them, that is -- that is --
12  I'm a little bit at a loss of words for that.
13              Those are issues, very serious issues that
14  affect each and every one of us as subscribers to an ISP
15  that are taken seriously, and they have exactly what they
16  need from the playbook.  It's a very detailed playbook.
17              We were -- we produced it in the interest
18  of being very -- you know, to providing them that
19  information even though they hadn't served a specific
20  request on these other violations that they're not
21  relevant.
22              And for now to do some kind of, you know,
23  broad email search for every time anyone discussed any
24  comparison is really above and beyond what's appropriate
25  and proportional here.
```

```
 1              MR. SPERLING:  So just --
 2              SPECIAL MASTER RODRIGUEZ:  Well --
 3              MR. SPERLING:  -- really briefly,
 4    Ms. Rodriguez.
 5              In the Cox case, in which we didn't
 6    participate -- and you and I have that among other things
 7    in common -- but we do know that these kinds of actions
 8    were produced in Cox, and there were huge variations.
 9    And telling us that they have some sort of playbook or
10    policy book doesn't tell us what they actually did in
11    practice and doesn't tell us what they were saying about
12    it.
13              MS. GOLINVEAUX:  I don't think he's
14    accurate about that.
15              SPECIAL MASTER RODRIGUEZ:  Okay.  Well,
16    here's what -- the production of the playbook, I agree,
17    doesn't necessarily tell us whether or not Charter played
18    by the playbook and followed its own policy, which seems
19    to me to be at the heart of this case:  What did Charter
20    do, why, when, et cetera, and did Charter follow its own
21    policies and procedures?
22              Nonetheless, I -- I do recognize that it
23    is quite voluminous to produce every single
24    communication.
25              So what I would order here is that Charter
```

```
 1    should produce documents showing its action, so the
 2    actual action for a finding of abuse.
 3              Charter, how does this -- how is this
 4    information maintained?
 5              MS. GOLINVEAUX:  You mean actions taken
 6    going beyond the playbook, specific actions by category
 7    with respect to different abuse violations?
 8              SPECIAL MASTER RODRIGUEZ:  Right.  Do you
 9    keep spread -- are there spreadsheets that relate to
10    this?  How is the information maintained in the normal
11    course of business?  There has to be some sort of
12    record --
13              MS. GOLINVEAUX:  Yeah.
14              SPECIAL MASTER RODRIGUEZ:  -- that is --
15    an abuse, for example, hacking was reported.  There would
16    have to be somewhere it indicates that the hacking was
17    reported, notice went to the alleged violator, and then
18    whatever action Charter took.
19              Is that also in the logs that we discussed
20    or is that someplace else?
21              MS. GOLINVEAUX:  Well, responsive to
22    particular notices on abuses would be within -- I assume
23    within the CATS ticket data.  But I would have to -- I
24    can go back and -- and query the client.  I, frankly,
25    don't know what documents beyond the playbook might
```

```
 1    detail the actions specific to different categories of
 2    abuse.  I could look into that.
 3              SPECIAL MASTER RODRIGUEZ:  Yeah.  And I
 4    understand that the playbook specifies what actions would
 5    be taken under Charter's policies.  However, what I'm
 6    asking is, where would information related to what action
 7    actually was taken be stored, whether that's in CATS or
 8    elsewhere?  Is it the logs?  Is it something else?
 9              MS. GOLINVEAUX:  Right.  I, frankly, would
10    have to go to the client about that.  It's not a -- it's
11    not something we have ever needed to look into in either
12    this case or the Cox case, so I'm just not sure.
13              SPECIAL MASTER RODRIGUEZ:  Okay.  Well,
14    fair enough.  If you could let us know.  If you would
15    send a response to me next week by Wednesday as to how
16    that data is kept so that we can --
17              MS. GOLINVEAUX:  Certainly.
18              SPECIAL MASTER RODRIGUEZ:  -- make a
19    judgment on where that is.  Because it does appear to me
20    to be relevant, of how Charter managed its own policies
21    and whether or not it took action on these different
22    types of policy violations.
23              MS. GOLINVEAUX:  Certainly we'll look into
24    that.
25              MR. SPERLING:  And, Ms. Rodriguez, it's --
```

```
 1              SPECIAL MASTER RODRIGUEZ:  All right.
 2              MR. SPERLING:   -- Mr. Sperling --
 3              SPECIAL MASTER RODRIGUEZ:  We've been
 4    going about an hour and a half.  It probably makes sense
 5    that we take a break to give the reporter some relief
 6    here.
 7              Mr. Sperling, if you have a quick comment,
 8    quickly, before we break.
 9              MR. SPERLING:  Quickly and hopefully
10    helpfully, too, Ms. Rodriguez.
11              I just wanted to suggest -- as we're sort
12    of thinking about this and waiting for Charter to respond
13    to the directive that you just gave -- you know, in terms
14    of testing the burden, because you talked about the idea
15    that, you know, requiring the search for all the emails
16    might be too burdensome.
17              It seems to me that that burden
18    proposition can be tested the same way that we're testing
19    it with respect to all the other requests, which is to
20    come up with a set of proposed terms and have them run a
21    search and see what their report shows, because that
22    might show that it's far less burdensome than some of us
23    believe it could be right now.
24              SPECIAL MASTER RODRIGUEZ:  Okay.  Well,
25    that may be the next step.  I guess the question really
```

1  is, Where is this information kept and how?  How is it
2  kept, even if it is kept?  Because at a first glance, it
3  may be that that will answer some of these issues.
4          All right.  Let's take a break.  It's 2:11
5  now.  Let's reconvene -- sorry.  3:11 now.  Let's
6  reconvene at 3:30.
7          MR. OPPENHEIM:  Very well.  Thank you.
8          MS. GOLINVEAUX:  Thank you.
9          MS. RANAHAN:  Thank you.
10         (Recess taken from 3:11 p.m. until
11  3:30 p.m.)
12         SPECIAL MASTER RODRIGUEZ:  All right.  I
13  think the next thing that we had to take up was the issue
14  with regard to custodians.
15         I think I understand the issues as you all
16  have set them forward, but if you'd like to make brief
17  argument on this issue with regard to the custodians, I
18  would start with defendants on that issue.
19         MS. GOLINVEAUX:  It's Jennifer Golinveaux.
20  Thank you, Ms. Rodriguez.
21         I think we broke it down kind of by
22  custodian groupings as we saw relevant and as the
23  plaintiffs raised that --
24         AUTOMATED VOICE ON CONFERENCE CALL:
25  (Unintelligible) has joined the meeting.

1          MS. GOLINVEAUX:  -- and -- and walked
2  through on these why we didn't think it was appropriate
3  to add them to the pool of 17 custodians Charter is
4  already searching.
5          We had additionally identified 14 and
6  during the course of the parties' meet-and-confers, we
7  added an additional 3 that the plaintiffs requested.
8          But with respect to the ones that were
9  briefed to you, we really don't think that they are
10  tailored to provide relevant information in a way that
11  would justify the burden.
12         And I could kind of walk it through by
13  category, but I think our brief kind of sets forth our
14  positions on why, you know, we drew the line there and
15  why we didn't think they were relevant.
16         SPECIAL MASTER RODRIGUEZ:  Okay.  So with
17  regard to Mr. Erhardt and Mr. Taylor, these folks were
18  both included in the Rule 26(a)(1) disclosures; is that
19  correct?
20         MS. GOLINVEAUX:  That -- that is correct.
21  As we point out, we served those obviously early on in
22  the case as you're required to do, and we really erred on
23  the side of being over-inclusive.
24         And when we drilled down on these issues
25  later in the case, it turns out, as you saw from our

1  briefs, that Mr. Erhardt didn't even start at Charter
2  until September of 2016, which is a little after the
3  claims period and almost a year and a half after
4  plaintiffs sent their last notice.
5          And similarly, Mr. Taylor started, I think
6  it was a day before they sent their last notice.
7          So we -- what we ended up doing was
8  including as custodians people who we thought would have
9  had more interaction with plaintiffs' notices.
10         SPECIAL MASTER RODRIGUEZ:  Okay.  Hold on
11  just a moment.  Let me -- Mr. Taylor was hired on what
12  date?
13         MS. GOLINVEAUX:  His hire date was
14  March 30, 2015, and plaintiffs sent their last copyright
15  notice to Charter in March of 2015.  Even though their --
16  their claims period, for some reason, extends further,
17  their last notice came in in March of 2015.
18         SPECIAL MASTER RODRIGUEZ:  All right.
19  Well, the claims period that we have been using is the
20  period that we have been using through -- so through May
21  of 2016.  Under that basis, Mr. Taylor should be included
22  since his hire date was March 30, 2015.
23         Mr. Erhardt, E-r-h-a-r-d-t, didn't start
24  until September 2016 after the claim period, and he
25  should not be included.

1          MS. GOLINVEAUX:  Okay.
2          MR. OPPENHEIM:  Ms. Rodriguez, this is
3  Matt Oppenheim.  If I may be just heard briefly on
4  Mr. Erhardt.
5          So he wasn't just included in the Rule 26
6  Disclosures.  In February, Charter amended their RFP
7  responses to certain interrogatory responses, and they
8  listed Mr. Erhardt in that -- in those interrogatory
9  responses as having responsibility for designing,
10  developing, and implementing Charter's policies and
11  protocols for addressing infringement.
12         One of the things that we would typically
13  expect somebody who worked in the network securities
14  operations team to have is to have conducted an analysis
15  of how the system, the graduated response system -- that
16  is, the way in which Charter was responding to notices --
17  how it was functioning.  Was it accomplishing its goals?
18         And to do that, typically you would be
19  looking at data, what had happened in the past, had the
20  number of notices been increasing?  Had the amount of
21  infringement potentially been decreasing?  Did they see
22  that subscribers who had been sent notices from Charter
23  were being responsive?
24         So in that respect, even though
25  Mr. Erhardt might have come after the period, because he

```
 1   evening.
 2              UNIDENTIFIED SPEAKER:  Thank you.
 3              UNIDENTIFIED SPEAKER:  Thank you.
 4              THE COURT REPORTER:  Thanks.
 5              (WHEREUPON, the within proceedings were
 6   concluded at 6:08 p.m. on the 18th day of May, 2020.)
 7                  *    *    *    *    *
```

```
 1                    REPORTER'S CERTIFICATE
 2
 3         I, K. MICHELLE DITTMER, Registered Professional
 4   Reporter and Notary Public, State of Colorado, do hereby
 5   certify that the said hearing was taken in machine
 6   shorthand by me at the time and place aforesaid and was
 7   thereafter reduced to typewritten form; that the
 8   foregoing is a true transcript of the proceedings had.  I
 9   further certify that I am not employed by, related to,
10   nor counsel for any of the parties herein, nor otherwise
11   interested in the outcome of this litigation.
12         IN WITNESS WHEREOF, I have affixed my signature
13   this 29th day of May, 2020.
14         My commission expires April 15, 2024.
15                     _____
16                          K. MICHELLE DITTMER
                        Registered Professional Reporter
17                          Wilson & Associates, LLC
```

WILSON & ASSOCIATES, LLC
scheduling@wilsonandassociatesllc.com

WILSON & ASSOCIATES, LLC
scheduling@wilsonandassociatesllc.com