**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

WARNER RECORDS INC. (f/k/a/
Warner Bros. Records, Inc.), *et al.*,

              *Plaintiffs*,

      v.

CHARTER COMMUNICATIONS,
INC.,

              *Defendant*.

Case No. 19-cv-00874-RBJ-MEH

**CHARTER COMMUNICATIONS, INC.'S MOTION TO COMPEL**
**<u>PRODUCTION OF DOCUMENTS</u>**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................2

LEGAL STANDARD............................................................................................................7

ARGUMENT .........................................................................................................................8

I.      PLAINTIFFS HAVE WAIVED ANY WORK-PRODUCT PROTECTION
        REGARDING THE HASH REPORT ................................................................10

II.     THE HASH REPORT IS SUBJECT TO PRODUCTION EVEN IF THERE
        WERE NO WAIVER .........................................................................................11

        A.      Charter Has A Substantial Need For The Hash Report .........................11

        B.      Charter Cannot Obtain The Hash Report Data By Other Means...........13

        C.      The Hash Report Is Factual Work Product ...........................................15

CONCLUSION....................................................................................................................16

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Austin v. City & Cty. of Denver ex*,
  2006 WL 1409543 (D. Colo. May 19, 2006).......................................................... 10

*Bishelli v. State Farm Mut. Auto. Ins. Co.*,
  2008 WL 280850 (D. Colo. Jan. 31, 2008).......................................................... 13

*Chevron Corp. v. Stratus Consulting, Inc.*,
  2010 WL 3923092 (D. Colo. Oct. 1, 2010) ..................................................... 7, 10

*Frontier Refining, Inc. v. Gorman-Rupp Co., Inc.*,
  136 F.3d 695 (10th Cir. 1998) ............................................................................ 7

*Hansen Constr., Inc. v. Everest Nat'l Ins. Co.*,
  2017 WL 7726711 (D. Colo. July 28, 2017) ......................................................... 8

*Henderlong v. Allstate Ins. Co.*,
  2009 WL 82493 (D. Colo. Jan. 13, 2009)............................................................ 13

*Martensen v. Koch*,
  301 F.R.D. 562 (D. Colo. 2014) ......................................................................... 10

*Martin v. Monfort, Inc.*,
  150 F.R.D. 172 (D. Colo. 1993) ........................................................................... 8

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Intrawest ULC*,
  2015 WL 5047635 (D. Colo. Aug. 27, 2015) ........................................................ 8

*Sony v. Cox*,
  No. 18-cv-950 (E.D. Va.).......................................................................... 3, 4, 12, 13

*Thane v. GEICO Cas. Co.*,
  2017 WL 3157966 (D. Colo. July 25, 2017) ..................................................... 8, 15

*United States v. J-M Manufacturing Co.*,
  2013 WL 424782 (D. Colo. Feb. 4, 2013) ........................................................... 15

*Walker v. Cty. of Contra Costa*,
  227 F.R.D. 529 (N.D. Cal. 2005).......................................................................... 10

## **Statutory Authorities**

17 U.S.C. § 512(f)................................................................................................................. 13

Charter Communications, Inc. ("Charter") respectfully seeks an order from the Court compelling Plaintiffs to produce: (1) a "Hash Report" that Plaintiffs claim to be protected attorney work product; and (2) any documents and underlying data related to this Hash Report.

## CERTIFICATION PURSUANT TO D. COLO. L. CIV. R. 7.1(a)

Counsel for Charter certifies that, pursuant to D. Colo. L. Civ. R. 7.1, they have conferred with counsel for Plaintiffs by telephone as described more fully in the text below, and Plaintiffs declined to consent to the requested relief.

## INTRODUCTION

For more than five years, Plaintiffs and their affiliates have brought multiple lawsuits around the country against internet service providers ("ISPs") such as Charter for alleged copyright infringement of musical various musical works.  These suits are similar: Plaintiffs seek awards of billions of dollars in damages premised on the ISP's subscribers' supposed online sharing of files containing digital versions of Plaintiffs' works.  Because a claim of secondary infringement against an ISP requires that Plaintiffs first prove the direct infringement by each subscriber for which the ISP is to be held liable, Plaintiffs must produce evidence of what each subscriber *actually* shared, giving rise to the secondary liability claim.

The Hash Report is an excel database documenting Plaintiffs' 2016 efforts to recreate evidence fundamental to Plaintiffs' claims of infringement by Charter subscribers from 2012 through 2015—it is Plaintiffs' internal record of evidence they claim shows that Charter subscribers directly infringed their works.  Moreover, Plaintiffs have represented that the Hash Report is the *only* source of this key information.  Charter now seeks production of the Hash Report

and associated documents to support its challenges to the reliability of Plaintiffs' evidence of direct copyright infringement by Charter subscribers.

## **BACKGROUND**

Almost a decade ago, Plaintiffs retained MarkMonitor, LLC ("MarkMonitor")—an "antipiracy vendor"—to detect when subscribers of ISPs (such as Charter) downloaded or distributed music that Plaintiffs claimed to own or control. From 2012 through 2015, MarkMonitor generated and sent hundreds of thousands of infringement notices to Charter on behalf of Plaintiffs, alleging that Charter subscribers had infringed Plaintiffs' copyrights by unlawfully sharing music on the internet. Ex. 1 (Plfs' Jul. 15 Ltr.) at 1. Plaintiffs now claim that Charter should be secondarily liable for its subscribers' alleged direct copyright infringement, and seek over a billion dollars in damages on that basis.

To detect potential infringement during this time period, MarkMonitor used "keyword" searches to identify "torrents"—that is, collections of files shared on peer-to-peer networks on the internet. MarkMonitor would search for torrents that, based on their title, appeared to include songs owned by Plaintiffs. When a potentially infringing torrent was identified, MarkMonitor would take a snapshot, or "fingerprint," of the songs comprising it.

MarkMonitor relied on another company, Audible Magic Corporation ("Audible Magic"), to analyze and compare MarkMonitor's "fingerprints" of files within a torrent to a separate database of "fingerprints" supposedly created from authentic copies of works owned by Plaintiffs. If Audible Magic determined that a torrent contained any files that matched "authentic" copies of works owned by the Plaintiffs (that is, if the two sets of "fingerprints" matched), MarkMonitor

would record the torrent's "hash value," which is a string of 40 alphanumeric characters appearing in the torrent's metadata that could theoretically act as an identifier for the downloaded torrent.

Once the torrent's constituent files were fingerprinted and its hash recorded, MarkMonitor discarded the content of the torrent and its constituent files.  As a consequence, none of the recordings downloaded by MarkMonitor for fingerprinting during the period in question currently exist.  When MarkMonitor subsequently encountered a torrent on the internet or on a Charter subscriber's computer with the same hash as one that MarkMonitor had downloaded, fingerprinted, and discarded, MarkMonitor did not download or analyze that file, but simply assumed that, because it had the same hash, the newly encountered torrent was the same as the previously encountered one.[1]

From this process, MarkMonitor retained only its record of: (1) the hash value for each torrent it identified as containing potentially infringing content; (2) some (but not all) of the information sent back by Audible Magic after the matching process; and (3) the notices sent to Charter.  *See* Ex. 2 (Sept. 9, 2020 Hr'g. Tr.) at  71:20-72:3, 73:8-12; *see also* Ex. 3 (*Sony v. Cox*

---

[1]  The "hash value," title, or index of a torrent is not sufficient to identify its actual content.  These are fields that can be manipulated by the file's creator.  It is common for torrents to have title names or "hash values" indicating that they contain an album or copyrighted work, even if they do not.  There are many reasons these "fake" torrents exist—for example, if an individual was successful in getting others to download the files they were sharing (due to those files "pretending" to be in-demand music) they received extra downloading privileges through torrent sites, and the music industry itself spread "fake" torrents containing corrupt files and viruses to discourage people from sharing music.  Studies have found that over two-thirds of the files "shared" on peer-to-peer networks that were able to be classified had false labels of this nature.  *See* Ex. 13, Flávio Roberto Santos, et al., Choking Polluters in BitTorrent File Sharing Communities, 8 IEEE Transactions on Network Service Management 310 (Dec. 2011).

Trial. Tr.) at 580:9-581:9.   Consequently, it is impossible to determine today what a Charter subscriber was allegedly *actually* sharing in 2012-2015, the claim period at issue in this case.

In or around 2016, Plaintiffs apparently realized that MarkMonitor had not actually downloaded or saved the files that Plaintiffs needed to prove that a Charter subscriber was unlawfully sharing music during the relevant time period.  Plaintiffs (via their agent the Recording Industry Association of America ("RIAA")), rehired MarkMonitor to try and find files on the internet (shared by other people, years later) that *appeared* to match the files that MarkMonitor initially detected and sent notices regarding. ████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

███████████████████████████████████

████████ Indeed, as a result of this effort, Plaintiffs have now produced a hard drive (the "MarkMonitor Hard Drive") that they created in 2016 and that they claim includes copies of the same files that were shared by Charter subscribers years prior and intend to rely on these files.

Despite Plaintiffs' affirmative reliance on the supposed outcome of MarkMonitor's 2016 activities, Plaintiffs have withheld and logged as attorney work product the aforementioned "Hash Report." The Hash Report is the primary source of information concerning the reliability—or unreliability—of the evidence on which Plaintiffs are now relying to prove their case. Ex. 5 (Plfs' Priv. Log), Item 82. The Hash Report is "a list of all successfully downloaded files associated with those hashes with the individual audio tracks extracted to show the full volume of audio tracks." Aug. 12 Order at 27. The Hash Report also contains a list of the 7,200 hashes corresponding to the torrents that MarkMonitor was supposed to try to download in order to "recreate" what it had allegedly detected Charter's subscribers sharing years prior. Ex. 6 (Sept. 1 Certification). It was compiled, at least in part, from the notices of copyright infringement that MarkMonitor sent to various ISPs. *Id.* Plaintiffs have represented that the Hash Report is the only source for this information. Ex. 7 (Def's Sept. 24 Ltr.) at 3. Plaintiffs acknowledge that the Hash Report also contains "Audible Magic information," namely: (1) what files were and were not verified by Audible Magic as including Plaintiffs' alleged copyrighted material; and (2) data about which songs were supposedly included in the files that it matched.[2]  *Id.*  The Hash Report is

---

[2]  Charter has tried to obtain relevant information through third parties, including both MarkMonitor and Audible Magic, but both entities failed to retain key data from both the 2012-2015 notice period, as well as information related to the "reconstruction" work they conducted for Plaintiffs from 2016 onward.  As noted above, MarkMonitor failed to retain the torrents it

critically important to Charter: it is the ***only*** source of this data which potentially undermines the reliability of the system and the identity of the recordings that Plaintiffs intend to rely on.

Charter asked the Special Master to compel production of communications related to and information generated pursuant to the 2016 SOW, including the Hash Report that Plaintiffs argued was protected by the work product doctrine. *See* Aug. 12 Order at 26-28, 34-36. After ordering the production of some of the documents related to the 2016 SOW (*id.* at 28), the Special Master declined to order production of the Hash Report "at [that] time" on the ground that the other "documents may provide Charter with the data that it seeks" (*id.* at 36). That is, the Special Master reasoned that this other discovery might moot Charter's need for the Hash Report, because it would allow "Charter to determine 'the extent to which MarkMonitor was unable in 2016 to locate and authenticate'" the files it alleged Charter's subscribers were sharing years earlier. Consistent with this rationale, she left open the possibility of obtaining the Hash Report if this exercise failed. *Id.*; *see also* Ex. 11 (Sept. 28 Ltr. from Special Master) at 3.

On September 1, 2020 Plaintiffs attested that "the documents referenced in the 2016 RIAA/Mark Monitor Agreement have all been produced or logged" and therefore they had nothing

---

downloaded and the fingerprints it created from those files, and it failed to retain most of the data it received back from Audible Magic allegedly confirming whether a MarkMonitor fingerprint matched with a copyrighted work and, if so, what work it matched. *See* Ex. 8 at 16-17 (MarkMonitor's Amended Objections and Responses to Charter's Document Subpoena, Response to RFP 12). Audible Magic failed to retain the database of fingerprints created from Plaintiffs' master song files which were used to match the fingerprints received from MarkMonitor. *See* Ex. 9 (May 20, 2020 Email from Audible Magic to Charter); Ex. 10 (Aug. 8, 2020 Email from Charter to Audible Magic). Audible Magic retained no data whatsoever regarding any verification inquiries taking place after MarkMonitor was rehired in 2016. *Id.* Plaintiffs themselves have produced post-2016 Audible Magic data for only 171 songs out of the over 40,000 recordings on the MarkMonitor Hard Drive. *Id.*

more to produce in response to the August 12 Order.  Ex. 6 (Sept. 1 Certification).  After raising concerns with Plaintiffs' Certification in an email to the Special Master, the parties met-and-conferred by telephone on September 15.  Ex. 7 (Def's Sept. 24 Ltr.) at 3.  During that meet and confer, Plaintiffs' counsel confirmed that the list of 7,200 hashes exists only in the Hash Report, and possibly in earlier drafts or "iterations" of that spreadsheet, but again refused to produce it. *Id.*  Plaintiffs also represented, incorrectly, that the Audible Magic data had been produced.

When Charter raised these issues again to the Special Master after discovery and asked her to order Plaintiffs to produce the Hash Report, she instructed Charter to raise its concerns directly to this Court, due to the Court's recent order that it would consider directly any disputes related to potentially-privileged material.  Ex. 11 (Sept. 28 Ltr. from Special Master) at 3.

## LEGAL STANDARD

A "litigant cannot use the work product doctrine as both a sword and a shield by selectively using the privileged documents to prove a point but then invoking the privilege to prevent an opponent from challenging the assertion."  *Chevron Corp. v. Stratus Consulting, Inc.*, 2010 WL 3923092, at *10 (D. Colo. Oct. 1, 2010) (Hegarty, M.J.) (quoting *Frontier Refining, Inc. v. Gorman-Rupp Co., Inc.*, 136 F.3d 695, 704 (10th Cir. 1998)).  "[I]n the same vein of thought, waiver of the attorney client or work product privileges can occur when the privilege holder asserts a claim or affirmative defense which puts the privileged matter directly at issue."  *Id.* (quotations omitted).  "The primary inquiry is whether the party claiming privilege will assert the allegedly protected material in aid or in furtherance of its claims or defenses."  *Id.*

If waiver is not found, the privilege nonetheless is not absolute:

Rule 26(b)(3) … contemplates a sequential step approach to resolving work product issues.  First, the party seeking discovery must show that the subject documents or

tangible things are relevant to the subject matter involved in the pending litigation and are not privileged.  Once such a showing has been made, the burden shifts to the party seeking protection to show that the requested materials were prepared in anticipation of litigation or for trial by or for the party or the party's attorney, consultant, surety, indemnitor, insurer or agent …. If the Court concludes that the items were prepared in anticipation of litigation, the burden shifts back to the requesting party to show: (a) a substantial need for the materials in the preparation of the party's case; and (b) the inability without undue hardship of obtaining the substantial equivalent of the materials by other means.  Finally, even if substantial need and unavailability are demonstrated, the Court must distinguish between factual work product, and mental impressions, opinions, and conclusions, for the latter are rarely, if ever, subject to discovery.

*Thane v. GEICO Cas. Co.*, 2017 WL 3157966, at \*3 (D. Colo. July 25, 2017) (Hegarty, M.J.) (quoting *Martin v. Monfort, Inc.*, 150 F.R.D. 172, 172-73 (D. Colo. 1993)).  "The more crucial the information is to the requesting party, the more likely the documents will not be subject to the privilege."  *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Intrawest ULC*,  2015 WL 5047635, at \*3 (D. Colo. Aug. 27, 2015).  "'Because the work product doctrine is intended only to guard against divulging the attorney's strategies and legal impressions, it does not protect facts concerning the creation of work product or facts contained within work product.'"  *Hansen Constr., Inc. v. Everest Nat'l Ins. Co.*, 2017 WL 7726711, at \*1 (D. Colo. July 28, 2017) (citation omitted).

## **ARGUMENT**

Charter seeks to compel production of the Hash Report[3] because, as Plaintiffs' counsel has admitted, it is the only source of the list of 7,200 hashes corresponding to the torrents that MarkMonitor was asked to attempt to download from the Internet in 2016, and because the 2016 Audible Magic evaluation of the files downloaded from those hashes also exists nowhere else.  By

---

[3]  Throughout this Motion, Charter's request for production of the "Hash Report" also includes its request for documents and information underlying the Hash Report, including the Audible Magic fingerprints.  For this reason, Charter uses the term "Hash Report" to refer to all of these materials.

extension, the Hash Report is the only evidence of: (1) the identities of the files associated with hashes that MarkMonitor could *not* find; and (2) the identities of the files that MarkMonitor found but which Audible Magic could not verify or which otherwise turned out *not* to be the recordings being sought.  This data showing both what went right and what went wrong in the 2016 recreation of the 2012-2015 downloads is purely factual work product, and Plaintiffs have already waived privilege over it by producing the part of the results of MarkMonitor's 2016 work that helps them—that is, the MarkMonitor Hard Drive containing torrent files containing slightly over 3,700 recordings that Plaintiffs contend are identical to the ones allegedly shared by Charter subscribers in 2012-2015 and were the subject of Plaintiffs' original notices, and the associated hash values for those files.  The significance of this evidence to the litigation is plain: it would enable Charter to show that the process by which Plaintiffs initially identified alleged infringement on the internet by Charter subscribers, and subsequently accused those subscribers of copyright infringement via notices, was unreliable.  This in turn is critical to Charter's defense, because all of Plaintiffs' secondary infringement claims against Charter first require proof that Charter's subscribers directly infringed Plaintiffs' works.  Plaintiffs' primary evidence of that direct infringement is the notices they sent to Charter in 2012-2015.  Plaintiffs intend to prove their case by comparing the music found on the torrent files they purport to be the files referenced in the notices—downloaded by MarkMonitor years later from different people—to recordings of Plaintiffs' songs.  Dkt. 233 ("Plfs' Partial Objection to Special Master's Aug. 12 Order") at 15.  This evidence will help Charter show that those infringement notices were wrong and that this process is fatally flawed.

I.    **PLAINTIFFS HAVE WAIVED ANY WORK-PRODUCT PROTECTION REGARDING THE HASH REPORT**

This Court should order that the Hash Report and related documents and data be produced because Plaintiffs have waived any possible privilege over it by producing the favorable results of MarkMonitor's 2016 work, while withholding the unfavorable ones.  Courts routinely order the production of work product evidence where parties selectively use privileged documents to further their arguments.  *See, e.g.*, *Chevron Corp.*, 2010 WL 3923092, at *10 ("fundamental fairness precludes Plaintiffs from using communications concerning Stratus and Mr. Cabrera as a shield from production after wielding the conclusions from disclosure of these communications as a multi-billion dollar damages sword"); *Austin v. City & Cty. of Denver ex rel. Bd. of Water Comm'rs*, 2006 WL 1409543, at *8 (D. Colo. May 19, 2006) ("As long as Defendants persist in asserting a *Faragher/Ellerth* defense, Plaintiff should be permitted to explore the *bona fides* of that affirmative defense.  Any other result would permit Defendants to use the attorney-client privilege as both a sword and a shield.").  In particular, courts do not allow parties to conduct factual investigations to further their legal positions but produce only the helpful subsets of that investigation while withholding the remainder.  *See Martensen v. Koch*, 301 F.R.D. 562, 581 (D. Colo. 2014) ("To allow Mr. Koch to rely upon the Grant Thornton reports to plan for and justify the Bear Ranch confrontation and then withhold those same materials from Plaintiff would, in my opinion, effectively subvert the fact-finding process."); *Walker v. Cty. of Contra Costa*, 227 F.R.D. 529, 533 (N.D. Cal. 2005) (party loses work product and attorney-client privileges when relying on an investigation to prove a claim or defense) (collecting cases).

Here, Plaintiffs attempt to use the facts generated by MarkMonitor in 2016 that help them, while concealing the facts that hurt them.  Part of the results of MarkMonitor's 2016 work has

already been produced in the form of the collection of the recordings on the MarkMonitor Hard Drive (Ex. 1 (Plfs' Jul. 15, 2020 Ltr.) at 2), and these files are going to be central to Plaintiffs' direct infringement case.  Plaintiffs have put MarkMonitor's work at issue by relying on it to prove their secondary liability claims.  *See* Dkt. 233 ("Plfs' Partial Objection to Special Master's Aug. 12 Order") at 15 ("Plaintiffs intend to meet this burden by showing that every 'infringing file' that Plaintiffs' antipiracy vendor, MarkMonitor, detected Charter's subscribers downloading or distributing is unmistakably a work that Plaintiffs own or control.").  However, Plaintiffs refuse to provide the entirety of the factual material underlying this claim, shielding the information that would show the extent to which Plaintiffs' notices purported to identify files that Plaintiff cannot prove to have existed or to match any of Plaintiffs' works-in-suit.  Plaintiffs cannot rely on the results of their investigation that support Plaintiffs' case, while simultaneously preventing discovery into the reliability of those findings.  The law does not allow such a result.

## II.  THE HASH REPORT IS SUBJECT TO PRODUCTION EVEN IF THERE WERE NO WAIVER

### A.  <u>Charter Has A Substantial Need For The Hash Report</u>

Charter has a substantial need for the Hash Report because it is the only source of the list of 7,200 hashes and the related Audible Magic data pertaining to the torrents that were the subject of notices to Charter, and which MarkMonitor was tasked to download from the internet in 2016 when Plaintiffs realized that they did not have the underlying files associated with their notices. This material represents the unproduced portion of the scope of the work Plaintiffs requested from MarkMonitor in association with the 2016 SOW.  Additionally, the Hash Report is the only source of information that would allow Charter to determine the files that MarkMonitor could not find, the files that Audible Magic could not verify, and the files that turned out ***not*** to contain Plaintiffs'

works in suit.  Plaintiffs have confirmed the connection between this data and the notices sent to

Charter, admitting that the Hash Report was compiled exclusively from the data Plaintiffs relied

on when initially sending notices of copyright infringement to ISPs.  Ex. 6 (Sept. 1 Certification).

Plaintiffs represented that they "have produced downloaded files containing hashes for

every work in suit," so Charter supposedly "knows which hashes were downloaded in 2016 and

which were not" because "any files MarkMonitor did not download are not works in suit."  Ex. 1

(Plfs' Jul. 15, 2020 Ltr.) at 2.  Plaintiffs believe that this selective disclosure of the material most

helpful to them is all that is needed, but the Hash Report would also show which of the files that

were the subject of the notices MarkMonitor was not able to find and what files Audible Magic

could not verify.  Further, Charter has no reliable way of determining whether the files downloaded

in 2016 are the same as the files Plaintiffs contend its subscribers were sharing in 2012-2015, and

thus needs this underlying data to demonstrate the unreliability of Plaintiffs' process.

In other words, the Hash Report is effectively an audit of the reliability of the infringement

notices that were sent to Charter.  Without this information, Charter cannot determine the extent

to which MarkMonitor could not locate and authenticate (with Audible Magic) the torrents it did

not retain, but which it alleged (via notices) that Charter's subscribers were sharing during the

Claim Period.  The reliability of those notices impacts virtually every liability issue in this case,

including Charter's ability to challenge the adequacy of the notices and the sufficiency of

Plaintiffs' direct infringement evidence.[4]  The reliability of the notices is also relevant to Charter's

---

[4]   The ability to undermine the reliability of these notices is also important because, in *Sony v.
Cox*, No. 18-cv-950 (E.D. Va.), Plaintiffs' counsel made representations to the jury about the
import of all infringement notices received by the defendant, not just those that related to the
works-in-suit.  Specifically, Plaintiffs relied on the broader set of notices in *Cox* to argue that

counterclaim for violation of 17 U.S.C. § 512(f) for knowingly sending materially inaccurate notices of alleged infringement.  The Special Master already acknowledged Charter's significant need for this information, stating that Charter must be given documentation that will allow it to "determine 'the extent to which MarkMonitor was unable in 2016 to locate and authenticate' the hashes for which the RIAA sent notices."  Aug. 12 Order at 36; *see also* Dkt. 261 ("Oct. 8 Order") at 10-11 ("These notices form the basis of Plaintiffs' infringement claims. The content of these notices, including information about how the information therein was gathered and verified, is therefore relevant and highly probative.  …  Given the importance of the notices and the information therein, the probative value of the information sought is high.").

Thus, Charter has established a substantial need for the information requested.

### B.        Charter Cannot Obtain The Hash Report Data By Other Means

The Hash Report is the sole source from which Charter can obtain the list of 7,200 hashes, the Audible Magic fingerprinting results, and the associated data.  This Court has found the element of undue hardship satisfied when information sought is not available elsewhere.  *See, e.g.*, *Henderlong v. Allstate Ins. Co.*, 2009 WL 82493, at *2 (D. Colo. Jan. 13, 2009) ("Here, the undue hardship element is met, as it is quite apparent that the sought-after information is not available elsewhere.") (Hegarty, M.J.); *Bishelli v. State Farm Mut. Auto. Ins. Co.*, 2008 WL 280850, at *1 (D. Colo. Jan. 31, 2008) (Hegarty, M.J.) (same).

---

infringement of the works-in-suit were just a few examples of the so-called "massive" infringement which counsel claimed was devastating the recording industry. Ex. 12 (*Sony v. Cox* Trial. Tr.) at 41:16-43:12.  The fact that the process by which MarkMonitor attempted to detect infringement was faulty will help Charter demonstrate that Plaintiffs' claimed level of infringement on its networks was vastly overstated.

*First*, the Hash Report is the only way that Charter can get the list of 7,200 hashes that MarkMonitor tried to download from the Internet in 2016.  Plaintiffs' counsel recently disclosed that the list of 7,200 hashes exists in no format other than the Hash Report, or in earlier drafts or "iterations" of that spreadsheet.  Ex. 7 (Def's Sept. 24 Ltr.) at 3.  The September 1 Certification and the ensuing meet and confer make clear that, contrary to the possibility contemplated by the Special Master that that the ordered production "might provide Charter with the raw evidence that was used to create the Hash Report," the underlying information Charter seeks is not being produced and, indeed, does not exist outside of the Hash Report.

*Second,* the fact that the 7,200 hashes first described in the 2016 SOW exist only in the Hash Report means that it is also the only source from which Charter could glean the identities of the hashes that MarkMonitor *could not* find on the Internet.

*Third*, the Hash Report is the only way that Charter can get the information about what files associated with the 7,200 hashes *were not verified* by Audible Magic, or what information Audible Magic found about the files that were verified and whether that information showed the files to be copies of something other than the works at issue.  The Hash Report is the only way to access this information because Audible Magic had produced no results for any verification inquiries after July 2015 and because Plaintiffs have only produced post-2015 results for only 171 songs.  *See supra* at 5 n.2.

Because this information is not available elsewhere, Charter has satisfied the hardship element such to justify production of this material.

### C.   <u>The Hash Report Is Factual Work Product</u>

The data contained in the Hash Report represents "factual work product" that is typically discoverable, and not "mental impressions, opinions, and conclusions," which are not.  *Thane*, 2017 WL 3157966, at *3.

*First*, as the August 12 Order explained, the "factual nature" of this alleged work product cannot be disputed.  What 7,200 hashes are listed in the report and whether MarkMonitor successfully downloaded them are matters of fact.  The data generated by Audible Magic is also factual.  Further, this data—showing what was and was not downloaded, and what was or was not verified—was generated in response to the requests submitted by MarkMonitor (to Audible Magic and to peer-to-peer networks), not by counsel.  Together, these facts constitute "evidence [that] might be used by Charter to determine 'the extent to which MarkMonitor was unable in 2016 to locate and authenticate' the hashes for which the RIAA sent notices."  Aug. 12 Order at 36. Documents showing ***why*** counsel included or omitted hashes from that list theoretically might reflect counsel's mental impressions, but that is not what is being sought in this motion.

The sole case Plaintiffs relied upon before the Special Master supports a finding that the Hash Report should be produced.  In *United States v. J-M Manufacturing Co.*, 2013 WL 424782, at *4 (D. Colo. Feb. 4, 2013), the court held that "[t]he selection of a particular test methodology or testing sample or set of samples to test could" lead to "inferences" that, "in turn, could reveal attorney opinions, theories, or strategies."  But that scenario is not relevant here.  The information sought does not reveal any significant inferences about counsel's thought process, in just the same way that whether or not MarkMonitor could download or Audible Magic could identify any particular file does not give rise to inferences about counsel's strategy.  In *J-M Manufacturing*,

15

counsel chose among a number of relevant methodologies, and that may have revealed something about counsel's thinking.  Here, by contrast, no concerns arise from disclosure of the end result of third party work, particularly since Plaintiffs intend to rely these results.  *See supra* § I.

*Second*, Plaintiffs have tacitly admitted that a list of hashes is not protectable "work product" because they have disclosed a subset of these hashes while withholding the remainder. Plaintiffs produced the MarkMonitor Hard Drive containing the later-downloaded files and the associated hash values for these files.  Ex. 1 (Plfs' Jul. 15, 2020 Ltr.) at 2.  There is no basis for Plaintiffs to claim that information about the hashes they have not produced are work product, but that the hashes of the files they have chosen to produce are not.  *See also supra* § I.

## CONCLUSION

Based on the foregoing, Charter requests that the Court order Plaintiffs to produce the Hash Report and all associated data .

16

Dated: October 17, 2020

Jennifer A. Golinveaux
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA 94111-5840
(415) 591-1506 (telephone)
(415) 591-1400 (facsimile)
E-mail: jgolinveaux@winston.com

Michael S. Elkin
Thomas Patrick Lane
Seth E. Spitzer
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
(212) 294-6700 (telephone)
(212) 294-4700 (facsimile)
E-mail: melkin@winston.com
E-mail: tlane@winston.com
E-mail: sspitzer@winston.com

Erin R. Ranahan
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071
(213) 615-1933 (telephone)
(213) 615-1750 (facsimile)
E-mail: eranahan@winston.com

Respectfully submitted,

*/s/  Andrew Schapiro*
Andrew H. Schapiro
Allison Huebert
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400 (telephone)
(312) 705-7401 (facsimile)
E-mail: andrewschapiro@quinnemanuel.com
E-mail: allisonhuebert@quinnemanuel.com

Charles K. Verhoeven
David Eiseman
Linda Brewer
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600 (telephone)
(415) 875-6700 (facsimile)
E-mail: charlesverhoeven@quinnemanuel.com
E-mail: davideiseman@quinnemanuel.com
E-mail: lindabrewer@quinnemanuel.com

Todd Anten
Jessica Rose
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Ave, 22nd floor
New York, NY 10010
(212) 849-7000 (telephone)
(212) 849-7100 (facsimile)
E-mail: toddanten@quinnemanuel.com
E-mail: jessicarose@quinnemanuel.com

Craig D. Joyce
Fairfield and Woods, P.C.
1801 California Street, Suite 2600
Denver, Colorado 80202
(303) 830-2400 (telephone)
(303) 830-1033 (facsimile)
E-mail: cjoyce@fwlaw.com

*Counsel for Defendant*
*Charter Communications, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 17, 2020, I caused the foregoing document and all supporting materials thereto to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record registered with CM/ECF.

*/s/ Andrew Schapiro*

Andrew Schapiro
