# Exhibit 7



North America  Europe  Asia

101 California Street
34th Floor
San Francisco, CA 94111
T +1 415 591 1000
F +1 415 591 1400

**JENNIFER A. GOLINVEAUX**
jgolinveaux@winston.com

September 24, 2020

**VIA EMAIL**

Special Master Regina Rodriguez
Regina.rodriguez@wilmerhale.com

Re:   *Warner Records, Inc., et al. v. Charter Communications, Inc.*, 19-cv-00874-RBJ-MEH –
Plaintiffs' Compliance with the August 12, 2020 Order Regarding the Agreement Between
the RIAA and MarkMonitor

Dear Ms. Rodriguez:

  I write on behalf of Defendant Charter Communications, Inc. ("Charter") in response to Plaintiffs' September 1, 2020 certification (the "September 1 Certification") regarding whether Plaintiffs either produced or logged the categories of documents identified in the Statement of Work – Anti-Piracy Services between the RIAA and MarkMonitor, dated January 29, 2016 (the "RIAA/MM Agreement"), as ordered by you. ECF 230 ("August 12 Order"). There are two issues that we wish to call to your attention.

  First, as I indicated in my September 4, 2020 email, the September 1 Certification does not address all of the categories of documents identified in the August 12 Order. Specifically, you ordered Plaintiffs to produce or log "communications with Mark Monitor relating to the RIAA/Mark Monitor Agreement or the work done pursuant to it" so long as they are in Plaintiffs' (as opposed to their counsel's) custody or control, and regardless of the fact that the communications were primarily between the RIAA, MarkMonitor, and outside counsel at Oppenheim + Zebrak LLP ("O+Z"). August 12 Order at 28. The September 1 Certification, however, does not mention communications regarding the RIAA/MM Agreement. During a meet and confer with Plaintiffs following my September 4 email, we were informed that these documents were still being reviewed by Plaintiffs, and that we will be receiving an additional production and/or an updated log. Once we have that supplementation, we will raise any issues that may arise from it.

  Second, as also indicated in my September 4 email, the September 1 Certification implied that certain elements of "raw evidence" generated by MarkMonitor and Audible Magic in 2016, which were to be produced pursuant to your August 12 Order, are included within the Hash Report (defined below) that you deemed protectable work product. Subsequently, during the parties' same meet and confer, Charter was informed that the missing "raw evidence" has not been produced because Plaintiffs consider it work product. (During the meet and confer Plaintiffs' counsel could not confirm whether such evidence exists apart from the logged version of the Hash Report and said it was "complicated" because there are various "iterations" of the Hash Report, none of which have been produced or logged, but all of which they consider work product despite your August 12 Order.) Charter had understood your Order regarding the Hash Report to be premised on the fact that Charter had no need for the Hash Report to access the data on which it was based because that evidence was to be produced. Since that turns out not to be the case, Charter has renewed its request to Plaintiffs that they produce the Hash Report. After meeting and conferring on this issue,



September 24, 2020
Page 2

Plaintiffs have refused to do so.[1] Charter, therefore, respectfully requests that the Special Master order Plaintiffs to produce the Hash Report by a date certain.

## I.     The August 12 Order

As summarized in the August 12 Order, the RIAA/MM Agreement states the following:

> [T]he RIAA was to provide MarkMonitor (1) "with a list of up to 7200 hashes" which MarkMonitor was supposed to try to download from the Internet. For the files successfully located, (2) those files [were to] be processed against Audible Magic fingerprinting for identification and verification," (3) "MarkMonitor [was to] record packet capture logs to track when and where the files associated with these hashes were downloaded," and (4) "MarkMonitor [was to] deliver a copy of the files downloaded and associated logs/back up material to the RIAA.

August 12 Order at 26-27 (quoting Def. Letter Br. July 16, 2020 at 10). You ordered Plaintiffs to certify whether the above-referenced documents have been produced and or logged, *id.* at 28, and explained that the import of this ruling meant that "I have ordered production of the … items identified in the 2016 Agreement," other than the "Hash Report," *id.* at 36, defined and discussed below. Since, as the August 12 Order notes, Charter had acknowledged receipt of items (3) and (4), the import of this ruling was to require the production of items (1) (the "list of up to 7200 hashes") and (2) (the results of the "Audible Magic fingerprinting for identification and verification").

The RIAA/MM Agreement also states that (5) "MarkMonitor [was to] provide a report in Excel format to show a list of successfully downloaded files associated with those hashes with the individual audio tracks extracted to show the full volume of audio tracks" (i.e., the "Hash Report"). *Id.* at 27 (quoting Def. Letter Br. July 16, 2020 at 10). Plaintiffs withheld and logged the Hash Report, asserting that it was protected by the work product doctrine. Charter moved for production of the Hash Report, arguing that the Hash Report was not work product and that, even if it were, it should be produced because Charter is entitled to the underlying data it contained and there is no other way to obtain that evidence. The Special Master ruled that because Plaintiffs were separately ordered to produce the "raw evidence" contained in the Hash Report, Charter could not meet its burden to establish an "undue hardship" warranting the Hash Report's production. *Id.* at 35-36.

## II.    Plaintiffs' Production and Certification

To date, Plaintiffs have produced a hard drive (the "MarkMonitor Hard Drive") that has been characterized as containing the files MarkMonitor downloaded from P2P networks pursuant to the RIAA/MM Agreement and the associated packet capture ("PCAP") files. This appears to satisfy only categories (3) and (4) (as listed in the August 12 Order) of the producible 2016 materials. However, Plaintiffs have neither produced nor logged any list of the 7,200 hashes the RIAA requested MarkMonitor to search for or the results of Audible Magic's testing of any downloaded files, which are categories (1) and (2) of the producible 2016 materials. Accordingly, since these categories of "documents listed in the

---

[1] Charter describes the parties' meet and confer efforts both as necessary background and pursuant to Local Civil Rule 7.1.



September 24, 2020
Page 3

2016 RIAA/MM Agreement have [neither] been logged [n]or produced, Plaintiffs [have been] ordered to produce them." August 12 Order at 28.

The above notwithstanding, on September 1, 2020, Plaintiffs certified that they were in full compliance with the August 12 Order, stating that "[t]he downloaded files and PCAP files have been produced and the other documents have been logged." September 1 Certification. Plaintiffs did not specifically reference the status of either the list of 7,200 hashes or the Audible Magic verification results. As noted above, no such documents have been produced, nor are they discernibly identified on Plaintiffs' log.

Plaintiffs did, however, re-state their basis for asserting the work product privilege over the Hash Report and appeared to assert for the first time that the list of 7,200 hashes and the Audible Magic results were covered by the same work product immunity because they are incorporated in that document. That is, Plaintiffs explained that "the Hash Report is a spreadsheet initially prepared by outside counsel, containing a list of the 7,200 hashes selected by counsel based on their analysis of the underlying notice data … ." September 1 Certification. Plaintiffs represented that this work was performed "for the purposes of deciding which works to include in this and other lawsuits against ISPs." *Id.* Plaintiffs also represented that, "[a]t counsel's direction, MarkMonitor supplemented the spreadsheet to provide additional information, including the Audible Magic results, for the purpose of informing counsel's litigation strategy." *Id.* Plaintiffs claimed that the Hash Report is not "strictly factual" but "[r]ather, it reflects counsel's analysis and metal impressions, regarding inquiries that counsel undertook and wanted undertaken, for the express purpose of informing litigation decisions." *Id.* Plaintiffs claimed that this is "core work product." *Id.* (citing *United States v. J-M Mfg. Co.*, 2013 WL 424782, at *4 (D. Colo. Feb. 4, 2013), *aff'd sub nom. Nevada v. J-M Mfg. Co.*, 555 F. App'x 782 (10th Cir. 2014)).

I identified Charter's concerns about Plaintiffs' September 1 Certification in my September 4 email, specifically noting that, if the list of 7,200 hashes and the Audible Magic results are contained in the Hash Report, any work product protection for that document has been waived.

As noted above, the parties met and conferred by telephone on September 15. During that meet and confer, counsel for Plaintiffs disclosed that the list of 7,200 hashes exists in no format other than the Hash Report, except possibly for earlier drafts or "iterations" of that spreadsheet. As for the Audible Magic results, Plaintiffs asserted that these had been produced separately by Audible Magic, but Charter explained that, in fact, Audible Magic had produced *no* results for any verification inquiries after July 2015. Nor have Plaintiffs separately produced this material. The only Audible Magic results Plaintiffs have produced are found in a spreadsheet bearing Bates number PL_CH_0003189. But that document contains Audible Magic results for only 171 songs for the month of February 2016, which is when all of the work under the RIAA/MM Agreement was performed. This is obviously nowhere near the entirety of the Audible Magic data for the 61,000-plus recordings on the MarkMonitor Hard Drive,[2] let alone the unknown number of

---

[2] The reason why there are tens of thousands of files on the MarkMonitor Hard Drive when only 7,200 hashes were being sought, is that the "hashes" in question identify a "torrent," which is a collection of files being shared on a peer to peer network. A torrent may, and often does, contain multiple songs; for example, where the torrent contains an entire album or a peer's personal collection of all of the recordings of an artist.



files that MarkMonitor found when searching for the 7,200 hashes but which Audible Magic could not verify or which otherwise turned out not to be the recordings being sought.

### III. Plaintiffs Should Be Compelled to Produce the Hash Report and All Corresponding Information

Plaintiffs' September 1 Certification and the subsequent meet and confer discussions establish that the Hash Report should be produced. Federal Rule of Civil Procedure 26(b)(3)(A) specifically recognizes that consultant work product should be produced if the party seeking its discovery "has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A). As the August 12 Order recognized, the following showing is required to meet this standard:

> First, the party seeking discovery must show that the subject documents or tangible things are relevant to the subject matter involved in the pending litigation and are not privileged. Once such a showing has been made, the burden shifts to the party seeking protection to show that the requested materials were prepared in anticipation of litigation or for trial by or for the party or the party's attorney, consultant, surety, indemnitor, insurer or agent… If the Court concludes that the items were prepared in anticipation of litigation, the burden shifts back to the requesting party to show: (a) a substantial need for the materials in the preparation of the party's case; and (b) the inability without undue hardship of obtaining the substantial equivalent of the materials by other means. Finally, even if substantial need and unavailability are demonstrated, the Court must distinguish between factual work product, and mental impressions, opinions, and conclusions, for the latter are rarely, if ever, subject to discovery.

August 12 Order at 35-36 (quoting *Colorado Mills, LLC v. Philadelphia Indem. Ins. Co.*, 2013 WL 1340649, at *3 (D. Colo. Apr. 2, 2013) (M.J. Hegarty)).

Charter has a "substantial need" for the 2016 materials. As the August 12 Order explained, the 2016 materials "may provide Charter with the data that it seeks," so that it can "determine 'the extent to which MarkMonitor was unable in 2016 to locate and authenticate' the hashes for which the RIAA sent notices." August 12 Order at 36. Plaintiffs effectively confirmed the importance of this information in the September 1 Certification, where they explained that the list of the 7,200 hashes was compiled from the "underlying notice data." Thus, information in the Hash Report showing which hashes were and were not found, and which of the found hashes were and were not verified by Audible Magic, serves as a de facto "audit" of the reliability of these aspects of Plaintiffs' notices and MarkMonitor's infringement investigations.

Plaintiffs' work product claim, therefore, must stand or fall with the question of whether Charter can, without undue hardship, obtain from other sources the substantial equivalent of the list of 7,200 hashes and the Audible Magic data compiled in 2016 and apparently contained in the Hash Report. The August 12 Order conditionally found that Charter could not make its undue hardship showing as to the Hash Report because other portions of the Order assured that the underlying data would be produced. *See* August 12 Order at 36 ("Given that I have ordered the production of the remaining items identified in the 2016



September 24, 2020
Page 5

Agreement, and that these documents may provide Charter with the data that it seeks, I find that Charter has failed to meet its burden **at this time**.") (emphasis added). The September 1 Certification and the ensuing meet and confer make clear that the underlying information Charter seeks is not being produced and, indeed, does not exist outside of the Hash Report. Thus, Charter cannot secure this data from any alternative source without bearing an "undue burden." Indeed, this burden is not just undue, it is insuperable because there simply is no source for the data other than the Hash Report.[3]

While Plaintiffs claim that the 7,200 hashes were "selected by counsel based on their analysis of the underlying notice data," the results of this purported "analysis" are evident, in part, from the information Plaintiffs have already disclosed on the Hard Drive containing the successfully located and (allegedly) verified files that has already been produced in this case. Moreover, if Plaintiffs are relying on a particular torrent in support of their infringement claims, the hash associated with that torrent necessarily is one of the 7,200 the RIAA asked MarkMonitor to download and the contents of that list have, to that extent, further been disclosed. What Charter seeks is information relating to the hashes for the torrents for which Plaintiffs sent notices but which are *not* contained on the MarkMonitor Hard Drive because MarkMonitor was unable to locate or verify them when tasked with doing so years after the Claim Period.

Nor can Plaintiffs show that the list of hashes and the Audible Magic data are "mental impressions, opinions, and conclusions" of counsel, as opposed to "factual work product."

First, as the August 12 Order explained, this should not be disputed, since "**Plaintiffs** have represented that the categories of documents are 'raw evidence.'" August 12 Order at 36. Moreover, that concession is not hard to understand. The Audible Magic data was generated by Audible Magic in response to the requests submitted by MarkMonitor. Counsel had nothing to do with it. As for the 7,200 hashes, **what** is on that list is simply a matter of fact, and it is the predicate to understanding what happened in 2016. The relevance of that list is manifest. It is, as the August 12 Order put it, the "evidence that might be used by Charter to determine 'the extent to which MarkMonitor was unable in 2016 to locate and authenticate' the hashes for which the RIAA sent notices." *Id.* Documents showing **why** counsel included or omitted hashes from that list may or may not reflect counsel's mental impressions, but that is not what is being sought.

Indeed, this is a classic "sword and shield situation." Half of the results of MarkMonitor's work have already been produced in the form of the downloaded files and the PCAP files saved on the MarkMonitor Hard Drive and, as discussed above, the August 12 Order required the production of the rest of it. Plaintiffs want to rely on the MarkMonitor Hard Drive to show which of the notices referred to files that they were able to successfully find and verify. But they refuse to provide the universe of files sought that would necessarily show where their 2016 efforts were unsuccessful and, as a result, their 2012-2015 notices were unsupported. Since all of the 7,200 files sought were among the files for which notices were sent, *see* September 1 Certification, concealment of that list necessarily obscures the extent to which the

---

[3] In separate correspondence sent today, we noted that MarkMonitor's recent production of a spreadsheet with Bates number MM000096 appears to confirm that it is not an alternative source of this data. In the event that MarkMonitor did actually retain the missing Audible Magic data, an alternative source for that information would thereby exist. Regardless, Charter would still dispute the applicability of the work product immunity to this aspect of the Hash Report on the ground that the Audible Magic data is not work product but discoverable "raw evidence."



2016 work undermines the credibility of the earlier notices. Plaintiffs cannot use the work product doctrine to have it both ways. That is why courts routinely order the production of work product evidence under analogous circumstances. *See, e.g.*, *In re: Urethane Antitrust Litig.*, No. 04-MD-1616-JWL, 2011 WL 13074299, at *5 (D. Kan. Feb. 14, 2011) (crediting the "defendants' concerns that plaintiffs may, unfairly, only be disclosing facts proffered that are favorable to plaintiffs' case (and withholding facts proffered that are favorable to defendants)" and ordering discovery); *Ryall v. Appleton Elec. Co.*, 153 F.R.D. 660, 664 (D. Colo. 1994) (holding that it would be "manifestly unfair" to allow the defendant "to use its claims that it conducted a good faith investigation … while denying [the p]laintiff the opportunity to inquire into the details of this investigation."); *U.S. ex rel. Baker v. Cmty. Health Sys., Inc.*, No. CIV. 05-279 WJ/ACT, 2012 WL 12294414, at *2 (D.N.M. Sept. 26, 2012) (ordering the production of documents underlying the statements in a declaration where the plaintiff relied on that declaration in support of a claim).

Moreover, the sole case upon which Plaintiffs rely also demonstrates that the requested information should be produced. In *United States v. J-M Mfg. Co.*, 2013 WL 424782, at *4 (D. Colo. Feb. 4, 2013), the court held that "[t]he selection of a particular test methodology or testing sample or set of samples to test could, in circumstances where the available choices are sufficiently numerous and distinct, permit one to draw inferences as to the reasons why one option was selected over another; those inferences, in turn, could reveal attorney opinions, theories, or strategies." To the extent Plaintiffs claim the *J-M Manufacturing* scenario is relevant here, Plaintiffs are wrong. *J-M Manufacturing* involved the choice of one methodology for testing regarding PVC pipes over several others that could have been used. Here, the only "analysis" Plaintiffs are likely to have performed in the selection of the 7,200 hashes involved reviewing (non-privileged) notice data, identifying the works for which notices were sent during the Claim Period (non-privileged), identifying the works Plaintiffs owned or controlled (non-privileged), and providing that list to MarkMonitor to determine whether the torrents associated with those notices could still be downloaded from P2P networks and, in turn, whether Audible Magic could confirm that they did indeed contain copies of Plaintiffs' copyrighted works (the results of which were produced in part). In *J-M Manufacturing*, counsel chose among a number of relevant methodologies, and that may have revealed something about counsel's thinking. Here, by contrast, no concerns arise for disclosure of the end result; particularly since Plaintiffs intend to rely on the affirmative results of their selection, but seek to conceal the negative ones.

\* \* \*

Based on the foregoing, Charter requests that the Special Master order Plaintiffs to produce the Hash Report by a date certain. The Hash Report it is not work product and is otherwise discoverable as Charter has established a "substantial need." Charter additionally requests that the Special Master order Plaintiffs to certify whether (1) they have searched for any "communications with Mark Monitor relating to the RIAA/Mark Monitor Agreement or the work done pursuant to it"; (2) the volume of such communications; and (3) order Plaintiffs to produce and/or log these communications by October 2, 2020. Charter requests that Plaintiffs be ordered to provide certifications as to items (1) and (2) by September 30, 2020.

Respectfully submitted,
*s/ Jennifer A. Golinveaux*