# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

WARNER RECORDS, INC., et al,

    Plaintiffs,

v.

CHARTER COMMUNICATIONS, INC.,

    Defendants.

**Case No. 19-cv-00874 RBJ**

**THIRD PARTY AUDIBLE MAGIC CORPORATION'S OPPOSITION TO CHARTER COMMUNICATIONS, INC.'S MOTION TO COMPEL**

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ................................................................................................................ 1

II. BACKGROUND .................................................................................................................. 3

    A. Audible Magic's Source Code is Fundamental to Its Business and Closely Guarded ..................................................................................................................... 3

    B. The *Warner* Litigation and the Special Master Discovery Order .......................... 4

    C. Audible Magic's Conferrals Regarding the Source Code's Safe and Secure Production ................................................................................................................. 4

III. LEGAL STANDARD .......................................................................................................... 6

IV. ARGUMENT ........................................................................................................................ 8

    A. Audible Magic Has Already Agreed to Produce the Source Code on a Date Certain and Charter Refused the Proposal ............................................................... 8

    B. The Business Risks to a Non-Party and the Health Risks to All Parties of Source Code Inspection Strongly Counsel Against Immediate Disclosure ........... 9

        1. The *Warner* Protective Order ....................................................................... 9

        2. The Risks Attending Immediate Inspection are Substantial .................... 10

        3. The Risks Attending Remote Inspection are Substantial for Audible Magic, Regardless of COVID-19 ............................................... 11

    C. The Additional Discovery Sought is Either Not Relevant, Privileged, or Both ......................................................................................................................... 13

        1. The Special Master Has Determined Documents After the Claims Period are Not Relevant .............................................................................. 13

        2. Audible Magic Lacks Authority to Produce the Remaining Discovery ..................................................................................................... 15

V. CONCLUSION ................................................................................................................... 15

## TABLE OF AUTHORITIES

Page

**Cases**

*Adobe Sys., Inc. v. Macromedia, Inc.*,
  No. 00 Civ. 743, 2001 WL 1414843 (D. Del. Nov. 5, 2001) ....................................................9

*Collardey v. All. for Sustainable Energy, LLC*,
  406 F. Supp. 3d 977 (D. Colo. 2019) ......................................................................................8

*Copart, Inc. v. Admin. Review Bd., U.S. Dep't of Labor*,
  495 F.3d 1197 (10th Cir. 2007) ..............................................................................................14

*Definitive Holdings, LLC v. Powerteq LLC*,
  No. 18 Civ. 844, 2019 WL 6682395 (D. Utah Dec. 6, 2019) ...................................................9

*Generac Power Sys., Inc. v. Kohler Co.*,
  No. 11 Civ. 1120, 2012 WL 2049945 (E.D. Wis. June 6, 2012) ..............................................7

*Impulse Tech. Ltd. v. Nintendo of Am., Inc.*,
  No. 11 Civ. 2519, 2012 WL 13026729 (N.D. Ohio Sept. 19, 2012) ......................................10

*Lee v. State Farm Auto. Ins. Co.*,
  249 F.R.D. 662 (D. Colo. 2008) ............................................................................................15

*Opternative, Inc. v. Jand, Inc.*,
  No. 17 Civ. 6936, 2019 WL 3050891 (S.D.N.Y. July 12, 2019) .............................................9

*Profita v. Puckett*,
  No. 15 Civ. 1237, 2017 WL 1491003 (D. Colo. Apr. 25, 2017) ..............................................7

*Rimbert v. Eli Lilly & Co.*,
  647 F.3d 1247 (10th Cir. 2011) ..............................................................................................14

*Sony Music Entm't v. Cox Commc'ns, Inc.*,
  No. 18 Civ. 950 (E.D. Va 2019) ..............................................................................................9

*W. Convenience Stores, Inc. v. Suncor Energy (U.S.A.) Inc.*,
  970 F. Supp. 2d 1162 (D. Colo. 2013)................................................................................7, 13

*W. Convenience Stores, Inc. v. Suncor Energy (U.S.A.) Inc.*,
  No. 11 Civ. 1611, 2014 WL 1257762 (D. Colo. Mar. 27, 2014) ..............................................7

*Warner Records Inc., et al. v. Charter Commc'ns, Inc.*,
  19 Civ. 874 (D. Colo. 2019) ECF No. 146 ..................................................................... *passim*

## TABLE OF AUTHORITIES
(continued)

Page

**Statutes**

18 U.S.C. §§ 1831-39 (Defend Trade Secrets Act) ...................................................................... 13

code ("Source Code") .................................................................................................................... 1

Colo. Rev.Stat § 7-74 (Colorado Uniform Trade Secrets Act) ..................................................... 13

Source Code ............................................................................................................................ *passim*

**Other Authorities**

Fed. R. Civ. P. 26 ........................................................................................................................... 7

Fed. R. Civ. P. 26(b)(1) .................................................................................................................. 7

Rule 26(b)(3) .................................................................................................................................. 7

Fed. R. Civ. P. 45 ........................................................................................................................... 7

Fed. R. Civ. P. 45(d)(1) .................................................................................................................. 7

## I. INTRODUCTION

Respondent Audible Magic Corporation's ("Audible Magic") business is content recognition: analyzing audio media to create a unique identifier and then determining if that identifier exists in its audio database. The backbone of its publicly lauded content solution is its highly confidential and proprietary source code ("Source Code"), which it has developed over the past 20 years. Audible Magic has taken significant steps to protect the Source Code from public disclosure by implementing protocols and technical measures restricting access to the underlying code. Its Source Code is its bloodline: without it, there would be no Audible Magic.

Movant Charter Communications, Inc. ("Charter") knows this. Audible Magic has consistently and firmly stated over months of correspondence that the Source Code must remain secure from any risk of disclosure. Nonetheless, Charter demands Audible Magic produce its source code under conditions that raise a substantial risk of harm to Audible Magic, and under conditions that it does not demand of its opposing party. Charter demands the Source Code's *immediate* inspection notwithstanding the safety concerns associated with the novel coronavirus ("COVID-19"). Moreover, rather than coordinate a safe and secure in-person inspection that complies with local shelter-in-place protocols, Charter requests the Source Code's *remote* inspection. Charter makes this request despite the fact that any remote inspection outside of a secure room and secure computer significantly increases the risk of public disclosure.

Audible Magic has been actively searching for a way to comply with the non-party subpoena, protect its proprietary source code, and preserve the health of everyone involved in the inspection and wider community. Just a few days ago, based on new guidance from city officials and a better sense about how to overcome COVID-related logistical challenges, Audible Magic came to believe that it can set a date for an in-person inspection with confidence. To this end, Audible Magic proposed on October 20, 2020, to Charter that the Source Code inspection occur in its outside counsel's office on November 30, 2020. The parties then made progress towards

1

finding a date for the inspection. Audible Magic even proposed that the inspection start on November 18. However, just yesterday -- at the last minute -- Charter made the entire agreement contingent on an unreasonable and brand-new demand that it be granted at least ten business days to review the Source Code. This highly premature request catapulted otherwise productive conversations. Motion practice therefore continues.

The Federal Rules of Civil Procedure do not compel a non-party to place its business in jeopardy just so a party can pursue discovery. Indeed, the Federal Rules protect non-parties from subpoena compliance when the risks attending disclosure are this great. Accordingly, Audible Magic respectfully asks that the request for immediate Source Code production be denied. Ultimately, however, to protect Audible Magic from the substantial – and, indeed, existential – risk of Source Code disclosure to the public, the company respectfully urges the Special Master to tailor any order issued so that the Source Code inspection may only occur in Audible Magic's outside counsel's San Francisco office, and only after sufficient time for the parties to confer about safety procedures. It is crucial that Audible Magic have a chance to confer in good faith about the conditions for a safe Source Code inspection without being blindsided.

Charter also requests an order directing Audible Magic to produce, log, or disclaim the existence of two categories of discovery. First, Charter requests documents created after May 2016. However, as Audible Magic has repeatedly asserted, the Special Master expressly found this specific category of documents not relevant to the matter, and denied Charter from discovery into the Plaintiffs' communications with Audible Magic after this date. Not satisfied with the Order, Charter is attempting to relitigate that issue in the context of a non-party subpoena. Nevertheless, the law of the case should stand, Audible Magic's reliance on this Order should not be challenged, and Charter's request should be denied.

Second, Charter requests documents that are protected by the work-product doctrine held by a party in the underlying litigation. Audible Magic does not hold or otherwise control that

2

privilege and therefore is unable to produce those documents. Charter must request that information from the privilege holder, not Audible Magic.

## II. BACKGROUND

### A. Audible Magic's Source Code is Fundamental to Its Business and Closely Guarded

The core of Audible Magic's business is audio recognition technology that classifies sound based on its perceptual characteristics. Ikezoye Decl. ¶ 2. Since 2000, Audible Magic has expended significant time and resources to research and develop its technology. *Id*. The technology produces a set of numeric values called a "digital fingerprint," which, in essence, identifies a unique recording just as a human fingerprint identifies a person. *Id*. ¶ 3. Audible Magic also possesses a "reference database" of fingerprints from millions of sound recordings. *Id*. ¶ 4. It provides customers access to a matching software that converts unknown audio into fingerprints, and then compares the newly-created fingerprint to the reference database. *Id*. ¶ 6.

Audible Magic provides a "black box" service, which means that the company has no knowledge about where or how customers obtain audio files and no knowledge about what customers do after the matching process takes place. *Id*. ¶ 7. The service is an automated way to identify and match files and Audible Magic has no insight into a customer's use of the Audible Magic information or reasons for obtaining the information. *Id*.

The Source Code is the foundation of Audible Magic's audio recognition technology. *Id*. ¶ 9. A vast portion of Audible Magic's revenue relies on the audio recognition technology, either through customers seeking to match unknown audio files to digital fingerprints in the reference database, or for other purposes. *Id*. ¶ 8. Accordingly, any disclosure of the Source Code would be catastrophic for the company. *Id*. ¶ 10.

Given this, Audible Magic takes significant steps to preserve the confidentiality of its Source Code. For example, Audible Magic monitors all access to the Source Code at all times.

3

*Id.* ¶ 11.  Audible Magic also prohibits anyone from accessing the Source Code unless they are an Audible Magic engineer with a specific business purpose for doing so.  *Id.*  Moreover, customers are always prohibited through normal business activities from viewing the Source Code, and any person outside of Audible Magic who is allowed to view the Source Code (for auditing purposes, for example) must sign a non-disclosure agreement.  *Id*.

### B. The *Warner* Litigation and the Special Master Discovery Order

Audible Magic is not a party to the present litigation.  Plaintiffs, record labels Universal Music Group, Sony Music Entertainment and Warner Music, sued Charter for vicarious copyright infringement, alleging Charter incurred a direct financial benefit from its subscribers' infringement of the record labels' sound recording and musical composition copyrights.  Expert discovery does not end in this action until June 2021.  *See Warner Records Inc., et al. v. Charter Commc'ns, Inc.*, 19 Civ. 874 (D. Colo. 2019) ECF No. 146.

On March 11, 2020, Judge Hegarty issued the Special Master appointment.  *Warner Records Inc., et al.*, ECF No. 143.  On May 29, 2020, the Special Master entered discovery Order ("Order") concerning motions to compel filed by both parties.  *Id*. ECF No. 181.  The Order identified the scope of discovery as limited to the claim period of "March 2013 – May 2016," and prohibited discovery outside of this period.  *Id*. ECF No. 181 at 4-5.  Specific to the present dispute, the Order expressly denied Charter's request for "documents concerning the company Audible Magic and/or its technology" from after the claim period's conclusion.  *Id*. ECF No. 181 at 13-14.  The Order held that the requested discovery of Audible Magic's documents is irrelevant to the matter and unduly burdensome to produce.  *Id*. ECF No. 181 at 4.

### C. Audible Magic's Conferrals Regarding the Source Code's Safe and Secure Production

Charter served the third-party subpoenas on Audible Magic on December 20, 2019, nearly nine months into the litigation.  Ghaffari Decl. Ex. 1 (Subpoena Duces Tecum, Dec. 20,

2019). The subpoenas included document requests and a request to inspect the Source Code. Audible Magic served its responses and objections in January and February 2020 and shortly thereafter produced substantial documents responsive to the requests. *Id.* ¶ 3. Included in Audible Magic's document production are transaction logs, which identify fingerprint requests and results within the relevant claim period. *Id.* Audible Magic also agreed it would produce the Source Code for an in-person inspection at Audible Magic's outside counsel's office. *Id.*

Charter fell silent thereafter. Rather than diligently pursue an inspection, Charter waited until June 2020 to make the request, nearly six months after it first served its subpoenas and well over a year after the start of litigation. *Id.* Ex. 3 (June 13 Email). Audible Magic agreed to an inspection, but only in a way that both protects against public disclosure and takes necessary health and safety precautions to mitigate the spread of COVID-19. For example, on June 30, 2020, Audible Magic told Charter that "Audible Magic will make its extremely confidential and trade secret code available," as long as it's done "on a computer that is physically located at the offices of Audible Magic's counsel and under counsel's direct control." *Id.* Ex. 4 (June 30 Email). Audible Magic stressed this protection is necessary because the Source Code "is Audible Magic's most sensitive and valuable intellectual property. Audible Magic will not and cannot put the business value of essentially the entire company at risk in any way." *Id.*

To this end, Audible Magic has firmly insisted that the risk of Source Code disclosure through inspection can be no greater than what the company normally permits. This is inevitably complicated by the COVID-related exigencies, which Audible Magic has tried to explain to Charter. *See Id.* Exs. 4 (June 30 Email), 5 (June 22 Email), 6 (June 25 Email), 7 (July 27 Email), 8 (Aug. 3 Email). But the unpredictable public health conditions do not change the fact that any Source Code disclosure must be under the securest procedures, and "a remote inspection does not adequately protect the security of Audible Magic's underlying source code, which is without dispute Audible Magic's most sensitive and valuable technology." *Id.* Ex. 8. On August 3,

5

2020, Audible Magic again tried to explain to Charter that "[w]e simply do not have any ability to control the circumstances of a remote inspection to the same degree as an in[-]person inspection in our [counsel's] San Francisco office" and "[g]iven the value of the source code to Audible Magic's business, we cannot take any chances with it." *Id.*

Audible Magic has engaged in good faith efforts to schedule a source code inspection that protects this highly confidential proprietary technology, the people involved in the inspection, and the wider community. Earlier this year, Audible Magic was not prepared to schedule a date certain for an inspection in light of the challenges. Given this, Charter notified Audible Magic in August of its intention to file a motion to compel. *Id.* ¶ 4. It ultimately filed this motion in mid-September, when Audible Magic still was not prepared to schedule an inspection. Warner Records, Inc, et al, ECF Nos. 254, 258.

In light of changing city protocols and a better understanding about how to overcome COVID-related logistical challenges, Audible Magic is now prepared to schedule an in-person inspection. To this end, on October 20, 2020, Audible Magic informed Charter that the inspection could take place at its outside counsel's office on November 30, 2020, as long as sufficient safety precautions were in place. *Id.* Ex. 2. The parties productively negotiated for two days, and held a telephonic conferral on the morning of October 22, 2020. *Id.* ¶ 5. Audible Magic agreed through these discussions to begin the inspection on November 18, 2020. *Id.*

However, at this very last minute, Charter made the entire agreement contingent on an unreasonable and brand-new demand that it be granted at least ten business days to review the Source Code. *Id.* This highly premature request catapulted otherwise productive conversations. Audible Magic had not agreed to any such condition, and cannot agree before understanding how much time the inspection reasonably requires. *Id.*

### III. LEGAL STANDARD

"It is generally recognized that a non-party involuntarily embroiled in civil litigation

6

should not be subjected to undue burden or significant expense by virtue of having received a subpoena." *W. Convenience Stores, Inc. v. Suncor Energy (U.S.A.) Inc.*, No. 11 Civ. 1611, 2014 WL 1257762, at *21 (D. Colo. Mar. 27, 2014); see also *W. Convenience Stores, Inc. v. Suncor Energy (U.S.A.) Inc.*, 970 F. Supp. 2d 1162, 1192 (D. Colo. 2013) ("[A] non-party . . . should not be forced to expose data that could conceivably compromise its competitive position"). To protect non-parties, both Rule 45 and Rule 26 direct the Court to consider factors that pay special attention to the non-party's interests in limiting or prohibiting the production.

Rule 45 requires the subpoenaing party to "take reasonable steps to avoid imposing an undue burden." Fed. R. Civ. P. 45(d)(1). To determine compliance with Rule 45(d)(1), "courts consider a number of factors, including the person's status as a non-party, the relevancy of the discovery sought, the subpoenaing party's need for the documents, the breadth of the request, and the burden imposed on the subpoenaed party." *Profita v. Puckett*, No. 15 Civ. 1237, 2017 WL 1491003, at *29 (D. Colo. Apr. 25, 2017), report and recommendation adopted, No. 115 Civ. 1237, 2017 WL 4225451 (D. Colo. June 6, 2017) (internal quotation omitted).

Rule 26 protects non-parties by only permitting discovery on matters relevant and "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The risk of disclosing sensitive information weighs in favor of limiting discovery. See *Generac Power Sys., Inc. v. Kohler Co.*, No. 11 Civ. 1120, 2012 WL 2049945, at *2 (E.D. Wis. June 6, 2012) (denying a motion to compel source code and stating that "[s]ource code for programs is often one of the most valuable assets a company possesses. If the Court were to order the full disclosure of the source code . . . there is no guarantee that [the other party] would not, perhaps unintentionally, use that source code to better its business position.").

In addition, Rule 26 only permits discovery of non-privileged matter. Fed. R. Civ. P. 26(b)(1); see also Fed. R. Civ. P. 26(b)(3) (work product doctrine prevents disclosure of items "prepared in anticipation of litigation or trial by or for another party or its representative");

7

*Collardey v. All. for Sustainable Energy, LLC*, 406 F. Supp. 3d 977, 981 (D. Colo. 2019).

IV.     **ARGUMENT**

       A.     **Audible Magic Has Already Agreed to Produce the Source Code on a Date Certain and Charter Refused the Proposal**

It is beyond dispute that COVID-19 poses substantial – and at times life threatening – health risks. Accordingly, state and local governments have imposed shelter-in-place ordinances that are designed to protect the health of the community and stymie COVID-19's rampant spread. These ordinances are often revised in response to health officials' changing understanding on how to control the spread and minimize the risk of infection or whether a particular community is seeing an increase in COVID-19 cases. For example, while the city of San Francisco was assigned to the second most-restrictive "red tier" under the State's reopening framework in late August 2020, the city is now in mid-October assigned to the second least-restrictive "orange tier."[1]  These changes in guidance are accompanied by a growing understanding about how to stop the spread. For example, it is now commonly accepted within the scientific community that wearing a face mask decreases the likelihood of transmission.

Audible Magic has been closely watching the changing guidelines. It has also been developing practices to ensure that the return to indoor activities is done safely. For example, the law firm for Audible Magic's outside counsel, Crowell & Moring LLP, now has health procedures that all persons must follow to enter the San Francisco office. Ghaffari Decl. ¶ 7.

Now that new guidelines are in place, and due to its preparation, Audible Magic is positioned to comply with the subpoena request while protecting the Source Code and the health of all parties involved. Audible Magic has therefore done what it has promised to do this whole time: provided a date certain for the in-person inspection on November 30, 2020. See Ghaffari Decl. Ex. 2. After negotiations, it even agreed to hold the inspection on November 18. *Id.*

---

[1] *See* Stay Safe at Home Health Officer Order Frequently Asked Questions, Updated October 14, 2020, at https://www.sfdph.org/dph/alerts/files/Stay-Safe-at-Home-COVID-19-FAQs.pdf.

8

Charter however, insisted that an unrelated term about the number of inspection days be decided before agreeing to the date for the inspection to begin. *Id.* It is highly premature to make this decision because neither Audible Magic nor Charter has any idea yet whether ten days is reasonably required to complete the review. Such a determination requires a separate discussion about the scope of the review, the needs of the experts, and the complexity of the code. It bears noting that in a similar case, *Sony Music Entm't v. Cox Commc'ns, Inc.*, No. 18 Civ. 950 (E.D. Va 2019), Audible Magic's code only required a single day of review each by the parties. *Id.* ¶ 5. These topics have not been on the table at all, and should not have been introduced during a conferral about the date for the inspection to begin.

### B. The Business Risks to a Non-Party and the Health Risks to All Parties of Source Code Inspection Strongly Counsel Against Immediate Disclosure

"Courts have consistently acknowledged the importance of source code and the fact that it is often one of the most valuable assets a company possesses." *Opternative, Inc. v. Jand, Inc.*, No. 17 Civ. 6936, 2019 WL 3050891, at *1 (S.D.N.Y. July 12, 2019) (internal quote omitted); *see also Definitive Holdings, LLC v. Powerteq LLC*, No. 18 Civ. 844, 2019 WL 6682395, at *2 (D. Utah Dec. 6, 2019) (internal citation omitted) ("Courts dress technical information with a heavy cloak of judicial protection because of the threat of serious economic injury to the discloser of scientific information"); *Adobe Sys., Inc. v. Macromedia, Inc.*, No. 00 Civ. 743, 2001 WL 1414843, at *1 (D. Del. Nov. 5, 2001) ("[T]he source codes of a software company . . . are of critical importance to its business and must be provided the highest form of protection a court can provide in the context of a particular case."). Despite this, Charter asks that Audible Magic produce the Source Code under conditions that raise a substantial risk of disclosure. Due to the significant burden of production, both Federal Rules 45 and 26 militate against this request.

#### 1. The *Warner* Protective Order

The most pressing reason why Audible Magic should not be required to produce its

9

highly sensitive source code without the appropriate precautions in place is because neither party to this litigation would accept such an outcome. Indeed, Charter and Plaintiffs in Warner have agreed to a stipulated protective order ("Protective Order") that is directly on point to the source code inspection request at issue on this motion. Warner Records Inc., et al., ECF No. 63.

The Protective Order expressly prohibits a source code inspection under the conditions that Charter now demands Audible Magic follow. Specifically, Paragraph 6(b) of the Protective Order states, in relevant part, that "SOURCE CODE produced in discovery shall be made available for inspection, in a format allowing it to be reasonably reviewed and searched, during normal business hours or at other agreeable times, at an office of the designating party's counsel or another mutually agreeable location." See Warner Records, Inc, et al, ECF No 63 at 6 (emphasis added). In short, Charter and Plaintiff recognize the fundamental importance of only permitting source code inspection to occur in a location that both parties confidently agree is secure. Yet Charter's motion suggests that this protection should not apply to Audible Magic.

It would be highly irregular and deeply prejudicial for a non-party to be subject to fewer discovery protections than the parties. This is the very sort of risk that Courts take special care to protect non-parties from when they are involuntarily pulled into litigation. On this basis alone, the Special Master should deny Charter's request for a departure from the Protective Order. See *Impulse Tech. Ltd. v. Nintendo of Am., Inc*., No. 11 Civ. 2519, 2012 WL 13026729, at *1 (N.D. Ohio Sept. 19, 2012) (recognizing the "weighty concerns regarding the security of [a party's] source code" and only permitting the production because "this Court is confident that the terms of the governing confidentiality agreement will be abided by the parties.").

### 2. The Risks Attending Immediate Inspection are Substantial

COVID-19 has presented unique risks attendant to any immediate inspection. The changes to normal life that COVID-19 has caused are difficult to follow and grow more complex as more people are involved. Just a few examples of the "new normal" include protocols

directing building owners to restrict certain in-person gatherings, requiring visitors to affirm to having taken health precautions, and refusing entry if a person has been in close contact with another who has the virus. For guests (i.e., non-tenants), some building owners require a 14-day quarantine if that individual is traveling from outside the city or county. While these precautions may complicate business dealings, they are designed to minimize the risk of transmission.

Any Source Code inspection in the near future must account with this reality. It is for this reason that an "immediate" inspection should be denied as that would prevent the parties from adequately complying with safety protocols. This not only would pose a health risk to anyone reviewing the Source Code, but could increase the risk of disclosure of the Source Code, whether inadvertent or not. Source code inspections are done under strict protocols. The computer is not connected to the Internet and any computer ports (e.g., USB) are closed to prevent the inspector from plugging in a device that could compromise the source code computer or exfiltrate confidential information. In addition, all the parties are typically located in the same conference room during the inspection to prevent any individual from capturing images of the source code without authorization. These necessary security measures require time and coordination to implement sufficient safety precautions. This process should not be rushed.

   **3.  The Risks Attending Remote Inspection are Substantial for Audible Magic, Regardless of COVID-19**

Charter has suggested two alternatives to an in-person inspection at Audible Magic's outside counsel's office: (1) a Source Code inspection at an unknown third-party site or (2) a remote inspection over the Internet. See Charter Commc'ns Inc, ECF No. 15 at 18; Ghaffari Decl. Ex. 9. Neither are appropriate for any source code inspection, regardless of COVID-19.

First, Charter has failed to show that an inspection at a third-party vendor's site is any safer or more "immediate" than Audible Magic's outside counsel's office. In fact, the opposite is more likely. For example, the parties would need to review and comply with the local

11

government's shelter-in-place protocols. The parties would then need to reach out to the vendor and simply trust that they are following the protocols as well. As the parties have no visibility over the vendor's safety protocols and no control over the number of visitors that enter the building, this is likely all that we would get. Another (of the numerous) potential challenges is that the parties would have no information about the building's ventilation system or whether there are conference rooms that are sufficient in size to accommodate social distancing for several individuals. These unknowns not only risk the health of all involved, but could jeopardize Audible Magic's efforts to ensure a secure inspection that keeps the Source Code safe. For example, the vendor may not, under present conditions, have a conference room sufficient in size to ensure that an Audible Magic representative can be present for the inspection and prevent the inspector from capturing the Source Code on another device.

Second, Charter argues that a remote inspection is possible. However, Charter ignores a fundamental principle underlying source code inspection: that the inspection device is disconnected from the Internet and a printer. It is common practice to disconnect inspection devices from the Internet to prevent the source code from being transmitted on an unsecure Internet line. There is also a risk that malicious code could be transmitted to the inspection device and surreptitiously exfiltrate the highly proprietary source code.[2] Similarly, an inspection device is rarely, if ever, connected to the printer due to the risk of printing pages of the confidential source code. Moreover, a remote inspection peels away other safety measures such as having an Audible Magic representative in the room to prevent the inspector from capturing images of the Source Code or ensuring that the inspection device will be safely returned to Audible Magic at the conclusion of the inspection. While a remote inspection reduces risks

---

[2] For example, given the more intensive remote work environment in 2020, cybercriminals have increased the use of ransomware to target remote computing facilities. *See* Ransomware During COVID-19, at https://www.govtech.com/blogs/lohrmann-on-cybersecurity/ransomware-during-covid-19.html. Audible Magic must be able to directly control this category of risk.

associated with COVID-19, it tips the scale strongly against the security of Audible Magic's most prized possession. Charter has not offered any legal support for requiring a remote inspection in these circumstances, especially given the severe and actual risk of disclosure.

It is no vice for a company to diligently protect the secrecy of its private technology. As described above, Audible Magic already takes substantial steps to do this through its normal course of its business. Ikezoye Decl. ¶ 11. As a non-party to this litigation, Audible Magic should not be required to expose its Source Code to potential disclosure. See W. Convenience Stores, Inc., 970 F. Supp. 2d at 1192 ("[A] non-party . . . should not be forced to expose data that could conceivably compromise its competitive position"). Indeed, the law encourages companies like Audible Magic to take such protective measures. See e.g., 18 U.S.C. §§ 1831-39 (Defend Trade Secrets Act); Colo. Rev.Stat § 7-74 (Colorado Uniform Trade Secrets Act).

Charter has not articulated any basis to demand an immediate inspection, let alone a remote inspection. This is particularly true because Charter is requesting to inspect Audible Magic's most important technology, where any disclosure could significantly harm its business.

### C. The Additional Discovery Sought is Either Not Relevant, Privileged, or Both

Charter's motion states that it seeks "an order directing Audible Magic to produce, log, or disclaim the existence of certain material sought by Requests for Production ("RFPs") 1-3, 8, 11, 15, 19-21 of the subpoena." Ghaffari Decl. Ex. 1. The "certain materials sought" fall into two categories: (1) documents created after May 2016 and (2) privileged documents.

#### 1. The Special Master Has Determined Documents After the Claims Period are Not Relevant

Any discovery post-dating May 2016 falls squarely within the May 29, 2020, Special Master Order. *See Warner Records, Inc, et al*, ECF No. 181. Audible Magic has relied on the Order, which denied Charter's request for "documents concerning the company Audible Magic and/or its technology" from after May 2016 because "Charter has not established that the

13

requested documents post-dating the claim period are relevant to this matter, and the burden of producing such documents therefore outweighs their probative value." *Id.*, ECF No. 181 at 5, 13-14. Charter's request here directly seeks to evade the Order. It therefore should be denied.

The law of the case doctrine requires deference to the Order. "The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1251 (10th Cir. 2011) (internal quote omitted); *Copart, Inc. v. Admin. Review Bd., U.S. Dep't of Labor*, 495 F.3d 1197, 1201 (10th Cir. 2007) ("[T]he doctrine of law of the case applies to issues previously decided either explicitly or by necessary implication") (internal quote omitted). The Special Master appointment expressly states that the Special Master has authority to "issue orders resolving" discovery disputes and that the Special Master "shall have the sole discretion to determine procedures for resolution of all assigned matters" and "shall have authority to take all appropriate measures to perform the assigned duties." *Warner Records, Inc, et al*, ECF No. 143. Moreover, the appointment states that the Court will set aside a Special Master decision based on a highly deferential abuse of discretion standard. *Id*. Accordingly, Audible Magic is entitled to treat the Order as binding on subsequent stages of the litigation.

In addition, Charter is correct that, to the extent the documents it requests in the subpoena both exist and are privileged, it is entitled to a privilege log. But that request is misdirected at Audible Magic. First, any documents post-dating May 2016 are irrelevant and not proper discovery.[3] This includes any privilege log to the extent there were privileged communications. Further, requiring a non-party to sift through four years of irrelevant material to construct a privilege log would impose an undue burden and significant financial expense to Audible Magic.

---

[3] For the Plaintiffs' Claim Period, Audible Magic has not withheld any documents on the basis of privilege aside from the transaction log from approximately February 2016. This disclosure, alone, should satisfy Charter's demand that Audible Magic produce, log, or disclaim any potentially withheld documents on the basis of privilege.

14

Second, the February 2016 transactions logs are the subject of a privilege claim by another party. Thus, Charter should request a privilege log from the privilege holder, not a third party.

### 2. Audible Magic Lacks Authority to Produce the Remaining Discovery

Charter requests discovery into privileged materials of another party. Plaintiffs in this matter have asserted work product over certain documents falling within the claims period. Ghaffari Decl. Ex. 12 ("Plaintiffs have asserted work product protection over the look-ups that MarkMonitor conducted with Audible Magic in January and February 2016"); *Lee v. State Farm Auto. Ins. Co.*, 249 F.R.D. 662, 685 (D. Colo. 2008) (the work product doctrine "applies to documents and tangible things prepared by a party in anticipation of litigation"). When the work product doctrine attaches to documents, they are privileged from discovery in almost all circumstances. *Id*. In light of Plaintiffs' assertion, Audible Magic is unable to produce the documents without intentionally waiving Plaintiffs' privilege. Charter has not offered any support for its request of these documents from Audible Magic. Instead, the proper method, at this juncture, would be for Charter to request these documents from Plaintiffs, which Audible Magic understands has been requested and is currently subject to a separate motion.

### V. CONCLUSION

Based on the foregoing, Audible Magic respectfully requests the Special Master deny Charter's motion to compel in its entirety. If the Special Master grants Charter's request for an immediate Source Code inspection, then Audible Magic respectfully requests the order requires the Source Code be produced in Audible Magic's outside counsel's San Francisco office.

Respectfully submitted,

Dated: October 23, 2020

    */s/ Kayvan M. Ghaffari*
Gabriel Ramsey
Kayvan M. Ghaffari

Attorneys for Non-Party Audible Magic

15

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 23, 2020, I caused the foregoing do document and all supporting materials thereto to be filed electronically with the Clerk of the Court using the CM/ECF system.

                                                          */s./ Kayvan M. Ghaffari*
                                                          Kayvan M. Ghaffari