# Exhibit 1

**O+Z | Oppenheim + Zebrak, LLP**

Jeffrey M. Gould
4530 Wisconsin Avenue NW, 5th Floor
Washington, DC 20016
jeff@oandzlaw.com

*Via Electronic Mail*                                                           July 21, 2020
Special Master Regina Rodriguez
regina.rodriguez@wilmerhale.com

      Re:    <u>*Warner Records et al. v. Charter Communications*, Case No. 19-cv-00874</u>

Dear Special Master Rodriguez:

For the reasons below, Charter's motion should be denied in its entirety.

**I.  Plaintiffs should not be required to conduct an irrelevant analysis regarding sound recordings issued as albums or compilations for Interrogatory 13.**

Charter wants Plaintiffs to undertake a burdensome analysis that has no legal relevance, and without Charter even trying to perform the analysis itself based on the materials it has at hand. The analysis sought is not one that Plaintiffs would ever undertake, and they should not be required to perform it for Charter here.

Each of the sound recordings in suit is a distinct work, registered for copyright protection. Each has been released and monetized as a standalone work through multiple platforms, including digital service providers such as iTunes or Spotify. McMullan Decl. ¶¶ 5-7; Leak Decl. ¶¶ 5-7; Glass Decl. ¶¶ 5-7. Notwithstanding, in Interrogatory No. 13, Charter asks the Record Company Plaintiffs to identify which of roughly 7,000 sound recordings in suit "were first issued or released together on or as albums or compilations, including for each the name of the corresponding album or compilation." Charter seeks this information to argue that the number of works eligible for statutory damages awards should be limited to the number of albums or compilations, as opposed to the number of individual tracks.

But, as the case law makes clear, this information is irrelevant: "Nothing in the Copyright Act bars a plaintiff from recovering a statutory damage award for a sound recording issued as an individual track, simply because that plaintiff, at some point in time, also included that sound recording as part of an album or other compilation." *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 199 F. Supp. 3d 958, 984 (E.D. Va. 2016), *aff'd in part, rev'd in part*, 881 F.3d 293 (4th Cir. 2018) (quoting *Arista Records, LLC v. Lime Grp. LLC*, No. 06-cv-5936, 2011 WL 1311771, at *2–3 (S.D.N.Y. Apr. 4, 2011)); *see also EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 101 (2d Cir. 2016) (awarding "separate statutory damages awards for songs that the plaintiffs issued as singles, even if those songs were also made available on albums"), *cert. denied sub nom. Robertson v. EMI Christian Music Grp., Inc.*, 137 S. Ct. 2269 (2017).

Critically, Charter has not cited *a single case* in which a sound recording that was issued individually for sale was deemed ineligible for a separate statutory damage award because it was initially released as part of an album. Rather, courts that have limited statutory damage awards to the number of albums or compilations have done so because the works at issue there were *only* issued as albums or compilations. *See Bryant v. Media Rights Prods., Inc.*, 603 F.3d 135, 140 (2d Cir. 2010) (holding plaintiffs could recover one statutory damage award per album because plaintiffs had issued their sound recordings *only* in album form); *UMG Recordings, Inc. v. MP3.COM, Inc.*, 109 F. Supp. 2d 223, 225 (S.D.N.Y. 2000) (awarding statutory damages per album where copyright holders *only* distributed physical copies of CDs).

By contrast, numerous courts have affirmed per-track statutory damages awards for individually-released recordings that also were part of an album. *See EMI Christian Music Grp.*, 844 F.3d at 101; *Arista Records,* 2011 WL 1311771, at *2–3; *Walt Disney Co. v. Powell*, 897 F.2d 565, 569–70 (D.C. Cir. 1990) (finding that works are distinct and qualify for a separate statutory damages award). Most recently, in *Sony Music Entertainment v. Cox Communications, Inc.*, the Eastern District of Virginia held that a per-track award was proper where, as here, "the plaintiff[s] made all relevant songs available as singles on the date of infringement[.]" No. 18-cv-950, 2020 WL 3121306, at *18 (E.D. Va. June 2, 2020) ("*Cox*"). The *Cox* court found that a per-track award for sound recordings issued individually was consistent with *Bryant* and *UMG*, among other cases, because in those cases the works were *only* issued as albums. Thus, consistent with the Copyright Act and cases interpreting it, both the jury and court in *Cox* "properly allowed separate statutory damages awards for songs that the plaintiffs issued as singles, even if those songs were also made available on albums." *Id.* (internal quotation omitted).

Charter states that it also needs the requested information to rebut Plaintiffs' claims of "independent economic value" for each song. But Plaintiffs have already produced historic *per-work* revenue from which Charter can argue this point, and Judge Jackson rejected Charter's demand for more, explaining that "[i]t is inconceivable that a jury could examine that number of works individually and calculate damages separately on a work by work basis. That might be defendant's litigation position, but it is unrealistic from a practical standpoint." ECF No. 159 (internal citation omitted). Regardless, the pertinent question in determining whether per-song statutory damages are available is whether Plaintiffs issued their works individually, not how much revenue each generated. *Cox*, 2020 WL 3121306, at *15 ("The format of sale will generally delineate each work for purposes of statutory damages."). Plaintiffs plainly issued the works individually here. McMullan Decl. ¶¶ 5-7; Leak Decl. ¶¶ 5-7; Glass Decl. ¶¶ 5-7.

Ultimately, Charter's request is not only irrelevant, but unnecessary and an improper burden shift. Charter (by its own admission) can determine for itself whether the sound recordings in suit were first released on albums. Mot. at 3. Charter has requested and obtained copyright registration information for each of the works, which includes the date the works covered by the registrations were first published, and Charter itself identifies other available sources of information. Charter apparently has made no effort to undertake the analysis itself in the first instance, and would rather shift the burden to Plaintiffs—though its counsel clearly knows how to conduct that analysis, as it put forward precisely this analysis in *Cox*. Plaintiffs should not be required to conduct an analysis that Charter has the means and ability to do itself.

July 21, 2020<br>Page 3 of 10

*See Bayview Loan Servicing, LLC v. Boland*, 259 F.R.D. 516, 518–19 (D. Colo. 2009) ("[A] party cannot ordinarily be forced to prepare its opponent's case.").

## II.   RFP 59 seeks overbroad discovery into irrelevant and privileged matters.

Charter's RFP 59, even as supposedly narrowed, is objectionable on multiple levels.  The request is vastly overbroad in seeking a scattershot of irrelevant and privileged documents in support of legal arguments the Special Master has largely considered and rejected.  Charter's continued attempt to blame the victim and impose a duty on copyright holders to police infringement of their works is contrary to law and cannot support the requested discovery.

### A.   Charter's RFP 59 is overbroad and seeks irrelevant information.

In its supposedly "narrowed" RFP 59, Charter requests virtually every document about Plaintiffs' anti-piracy efforts for the last decade.  Charter seeks documents concerning all worldwide anti-piracy efforts, by the entire music industry, whether actually undertaken or merely considered, and the costs for such measures.  Mot. at n.4.  By referencing IFPI, the request has worldwide reach.[1]  By referencing NMPA and RIAA, the request goes beyond just Plaintiffs, to the entire U.S. record and music publishing industries.  Separate and apart from any anti-piracy or enforcement efforts aimed at *Charter's* misdeeds—documents on which Plaintiffs have produced or are producing—Charter seeks documents concerning any threatened or actual litigation against unnamed individuals or entities that have used, developed or hosted open source peer-to-peer ("P2P") software protocols, as well as Plaintiffs' digital rights management efforts, P2P notice campaigns, and "spoofing" efforts.

This case concerns *Charter's* actions and omissions with respect to the copyright infringement occurring over its networks, not all of Plaintiffs' anti-piracy efforts generally—but Charter's requests are in no way limited to this matter.  Charter's request is thus vastly overbroad and amounts to a fishing expedition.  *See McGee v. Hayes*, 45 F. App'x 214, 217 (10th Cir. 2002) (courts are "not required to permit [a party] to engage in a 'fishing expedition' in the hope of supporting" its claims); *Johnson v. Barnes*, No. 17-cv-02346-MSK-MEH, 2020 WL 2059928, at *3–4 (D. Colo. Apr. 29, 2020) (denying motion to compel where document requests were not "proportional to the needs of the case" because they were "grossly overbroad and largely irrelevant to the claims in this case").

The request for documents concerning unrelated litigations also deliberately seeks privileged information, and the volume of such privileged material would be substantial.  The music industry's legal campaigns against P2P networks and P2P infringers have been extensive—the vast majority of which have nothing to do with Charter, and virtually all of which involve a substantial amount of legal advice at every stage and are privileged.  Similarly, the music industry has been involved in using and considering digital rights management and "spoofing" for many different formats, channels and content, but none of that relates to Charter.

---

[1] IFPI (International Federation of the Phonographic Industry) is the trade organization that represents the interests of the recording industry *worldwide*.  RIAA (Recording Industry Association of America) and NMPA (National Music Publishers Associations) are the domestic trade associations that represent the major record companies' and music publishers' interests, respectively, in the United States.

As for notices, the music industry has been sending notices for P2P infringement to universities, businesses and ISPs for years but, as Judge Jackson already indicated, "[i]t is difficult for me to see how what plaintiffs were willing to accept from those providers in that context is relevant to *Charter's* legal obligations in this case." ECF No. 159 (emphasis added). So, too, here. And these are just some of the anti-piracy efforts that have been public. Identifying any other effort or approach that was merely *considered*, as RFP 59 demands, would be a disproportionately burdensome exercise aimed at irrelevant information.

As for the document types, Charter seeks "internal or external presentations, reports, white papers, summaries, notes, correspondence, or other comprehensive documents," including those that analyze the efficacy of Plaintiffs' anti-piracy measures—virtually all of which are by, for, or at the direction of attorneys, and thus protected from disclosure. By any measure, the request is preposterously broad and, importantly, has nothing to do with any claims or defenses in this case.

### B. Mitigation of damages is not a valid affirmative defense in this District.

As the Special Master has already observed, "case law on this issue in this district is clear . . . that failure to mitigate is not a proper defense in the face of a request for statutory damages." ECF No. 181 at 20 (May 29, 2020 Special Master Order); *see also Purzel Video GmbH v. Smoak*, 11 F. Supp. 3d 1020, 1031 (D. Colo. 2014) (accepting M.J. Hegarty recommendation to strike failure-to-mitigate defense because plaintiff elected statutory damages); *Purzel Video GmbH v. St. Pierre*, 10 F. Supp. 3d 1158, 1169–70 (D. Colo. 2014) (same).[2] The Special Master should decline Charter's invitation to apply inapposite, out-of-circuit case law to directly contravene this district's clear law and the Special Master's prior ruling, which Charter never appealed.[3]

### C. Mitigation is irrelevant to the calculation of a statutory damages award.

Charter next repeats another argument that was specifically rejected in the Special Master's May 29 Order—that Plaintiffs' anti-piracy efforts are relevant "to inform the appropriate level of any statutory damages." Ex. 1 (May 20, 2020 E. Ranahan Ltr. to R. Rodriguez). The Special Master addressed this and concluded that, beyond mitigation as an affirmative defense, Charter "ha[s] not established any other relevant purpose for the requested information." ECF 181 at 20. Charter did not appeal that ruling and presents nothing new here.

---

[2] *See also Nunes v. Rushton*, 299 F. Supp. 3d 1216, 1243 (D. Utah 2018) ("Failure to mitigate is not a valid defense to statutory damages.").

[3] Contrary to Charter's repeated suggestions, Judge Jackson has never endorsed Charter's mitigation defense. Rather, Judge Jackson admonished Charter to "eliminate any 'affirmative defense' that is not a true affirmative defense' and instructed Charter to provide "a short (one or two simple paragraphs) summary of the grounds you presently have to support the [remaining] defense[s]." ECF No. 154. Charter then dropped all but eight defenses, including mitigation, in support of which Charter cited only out-of-circuit case law and ignored Judge Hegarty's multiple decisions on the issue. Subsequently, without any individual analysis, and specifically noting that "[t]his is not a comment on the merits of any affirmative defense," Judge Jackson allowed Charter to maintain the eight defenses. ECF No. 162.

Charter wants this discovery to argue that Plaintiffs, who are the victims of massive copyright infringement on Charter's network, are responsible for having taken insufficient steps to prevent infringement. But the law does not impose on copyright holders any obligation or duty to police their copyrights. *See, e.g.*, *William A. Graham Co. v. Haughey*, 568 F.3d 425, 438–39 (3d Cir. 2009) (rejecting "the proposition that a copyright owner has a duty to investigate infringement 'in the offing'" and stating that a copyright owner "does not have a duty to ferret out potential acts of infringement before they occur"); *PK Music Performance, Inc. v. Timberlake*, 2018 WL 4759737, at *8 (S.D.N.Y. Sept. 30, 2018) ("[C]opyright owners do not have a general duty to police their copyrights."); *Design Basics, LLC v. Chelsea Lumber Co.*, 977 F. Supp. 2d 714, 725 (E.D. Mich. 2013) ("The Court . . . rejects [d]efendants' argument that [p]laintiff was under a continuous duty to police its copyright . . . .").[4]

Charter's argument that Plaintiffs are to blame for the infringement that Charter facilitated and from which Charter profited is classic victim blaming and cannot justify the discovery Charter seeks. *Cf. Harrington v. Aerogelic Ballooning, LLC*, No. 18-cv-02023, 2018 WL 8646682, at *2 (D. Colo. Nov. 29, 2018) (noting that "the elements of copyright infringement do not contain an element that inquires into the state of mind of the copyright holder" and rejecting defendant's argument to the contrary as "an odious form of victim-blaming by the perpetrator").

Relying only on case law from outside this Circuit, Charter also argues that a copyright owner's failure to mitigate is relevant to the calculation of a statutory damages award. In doing so, Charter ignores cases in this Circuit that have explicitly held that "**a plaintiff's failure to mitigate damages is not relevant to a statutory damages award calculation**." *Energy Intelligence Grp., Inc. v. CHS McPherson Refinery, Inc.*, 300 F. Supp. 3d 1356, 1373 (D. Kan. 2018) (emphasis added); *see also Spanski Enterprises, Inc. v. Telewizja Polska S.A.*, No.12-cv-957, 2017 WL 598465, at 2 (D.D.C. Feb. 14, 2017) (rejecting argument that copyright holder "has any obligation to 'mitigate' statutory damages"). The cases that Charter cites ignore that copyright owners need not show actual harm to recover statutory damages, and Charter's arguments are at odds with the Supreme Court's decision in *F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228 (1952). In *Woolworth*, the Supreme Court made clear that a copyright owner can recover statutory damages even when there is no actual harm. 344 U.S. at 225 ("Even for uninjurious and unprofitable invasions of copyright the court may, if it deems it just, impose a liability within statutory limits to sanction and vindicate the statutory policy."). Because there is no obligation for copyright owners to show actual harm to recover statutory damages, requiring Plaintiffs to reduce such harm and provide discovery on such efforts would nullify *Woolworth*. *Cf. Sony BMG Music Entm't v. Tenenbaum*, 660 F.3d 487, 502 (1st Cir. 2011) (rejecting argument that statutory damages award requires copyright owner to demonstrate actual harm).

---

[4] *See also Wilson v. Dynatone Publ'g Co.*, 892 F.3d 112, 119 (2d Cir. 2018) ("An author is not under a duty to constantly monitor filings in the Copyright Office on pain of losing her copyright."); *Ranieri v. Adirondack Dev. Grp., LLC*, 164 F. Supp. 3d 305, 345 (N.D.N.Y. 2016) (holding that copyright owner has no duty to police public records or activities); *H. M. Kolbe Co. v. Armgus Textile Co.*, 315 F.2d 70, 74 (2d Cir. 1963) (holding that copyright owner has no affirmative duty to police subsequent distributions of his own product).

In fact, during the recent *Cox* trial, Charter's counsel (Winston) argued at length that the jury should be instructed to consider mitigation of damages in deciding an appropriate amount of statutory damages. *See* Ex. 2, *Cox* Trial Tr. 2319:24–2320:19, 2895:17–2899:13, 2906:24–2908:9. Judge O'Grady declined to give that instruction. *See* Ex. 3 at (*Cox* final jury instructions on statutory damages).

Charter's reliance on *Energy Intelligence Group, Inc. v. Kayne Anderson Capital Advisors, L.P.*, 948 F.3d 261 (5th Cir. 2020), is also misplaced. In *Kayne Anderson*, the plaintiff newsletter publisher could have stopped the direct infringement at issue, but waited some period of time before providing notice to the defendant or pursuing a claim. 948 F.3d at 266–67. Thus, the mitigation at issue—and the evidence relevant to the analysis there—was what the publisher did (or did not do) with respect to curbing the defendant's direct infringement at issue and reducing harm that had already occurred. Here, by contrast, Plaintiffs sent Charter more than 700,000 notices contemporaneous to the infringement in an effort to stop any new infringements from occurring. But Charter is not seeking discovery regarding actions taken by Plaintiffs vis-a-vis *Charter*; Plaintiffs are already producing that. Instead, Charter is seeking information about Plaintiffs' anti-piracy efforts *unrelated* to Charter. Even if failure to mitigate damages was relevant to a statutory damages award calculation, which it is not, Plaintiffs' anti-piracy efforts *not involving Charter* are plainly irrelevant and not a proper subject of discovery.

Charter also appears to suggest that Plaintiffs should have pursued claims against direct infringers instead of pursuing a claim against Charter—yet another argument that has been squarely foreclosed by Supreme Court precedent. In *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, the Supreme Court made clear that copyright owners are under no obligation to sue direct infringers and may instead pursue a claim for secondary liability. 545 U.S. 913, 930 (2005) ("When a widely shared service or product is used to commit infringement, it may be impossible to enforce rights in the protected work effectively against all direct infringers, the only practical alternative being to go against the distributor of the copying device for secondary liability on a theory of contributory or vicarious infringement."). Charter has cited no case—nor are Plaintiffs aware of any—where a copyright owner's decision not to sue a direct infringer was deemed relevant to a statutory damages analysis or a basis for reducing a statutory damage award; doing so would completely eviscerate the Supreme Court's ruling in *Grokster*. As the owners of the copyrights at issue here, Plaintiffs are singularly entitled to determine what claims they pursue and against whom, and Charter cannot contend otherwise here to support its far-reaching request.

### D.  Charter's remaining justifications for RFP 59 all lack merit.

Charter's remaining arguments regarding deterrence and context all lack merit and, frankly, are hard to comprehend. On deterrence, Charter presents no rational argument why the need to award a sufficiently high damage award to deter Charter from future infringement could somehow render Plaintiffs' separate anti-piracy efforts relevant. And to the extent Plaintiffs included allegations in their complaint or offered argument at trial in a different case concerning other anti-piracy efforts or harm, that merely provides background context for Plaintiffs'

decision to bring secondary liability claims against Charter.[5] They do not open the door to unlimited discovery into Plaintiffs' varied efforts to protect their rights.

Finally, Charter purports to characterize Plaintiffs' size and profits to argue the discovery is warranted because "Plaintiffs' documents are undoubtedly a rich source of information" on anti-piracy and "what else, if anything, anyone, including Plaintiffs, Charter, or non-parties, could have done to reduce impact or harm." Mot. at 7. Charter's counsel's speculation (and hope) about the richness of Plaintiffs' document is not a basis to authorize a fishing expedition.[6]

### III. Charter's request for testimony concerning Rightscorp seeks irrelevant information in contravention of the Special Master's prior ruling.

Charter seeks to compel production of deposition transcripts and sealed declarations of Plaintiffs' representatives from the *Grande* case. Charter has essentially admitted that this request is targeted at obtaining discovery regarding Rightscorp that the Special Master has already denied, from a case that has no demonstrated relevance to the core issue in this case: *Charter's* handling and response to infringement notices during the Claim Period.

*Grande* is a mass infringement case against a *different ISP* about notices sent by a *different vendor*, Rightscorp, about mostly *different works*.[7] Charter's request for all of Plaintiffs' testimony from that case, regardless of the content, is another fishing expedition. On this basis, Charter's request for transcripts from *Grande* are entirely objectionable. Nonetheless, Plaintiffs have offered as a compromise to produce the requested *Grande* testimony and declarations, except for those portions that specifically concern that different ISP defendant, Grande Communications, and that different technology vendor, Rightscorp. This reasonable compromise proposal would provide Charter everything it needs to investigate any purported "commonalities" between the two cases (*i.e.*, the record companies' ownership, registration practices, harms of P2P infringement, anti-piracy efforts, and level of infringement observed during the overlapping claim periods and the companies' response). It also provides Charter with testimony on any purportedly overlapping topics on which Charter might be entitled to investigate inconsistent statements for impeachment purposes.

Charter's outright rejection of this reasonable proposal fully reveals its true motivation for compelling production of the *Grande* materials—to circumvent the Special Master's prior order and guidance denying discovery into *Plaintiffs'* documents about Rightscorp, based on the finding that "it is the knowledge of Charter that would be at issue . . . as opposed to the knowledge of the plaintiffs here." May 15 Hr'g Tr. 135:11–13; *see also* July 2 Hr'g Tr. 216:12–15 ("what's at issue here is what Charter knew and then what Charter did based on that

---

[5] The *Sony* plaintiffs did not, as Charter contends, seek "the maximum amount of statutory damages." They appealed to the jury's judgment in light of the statutory scheme and the court's instructions. *See* Ex. 2 at 2975:14–16 ("On the damages question, we leave it to you, the jury, to determine the appropriate damages award. We believe it should be at the high end of the range.").

[6] While Charter does not explain how or why Plaintiffs' size is relevant, it is worth noting as context that Charter's annual revenue—$45.8 billion in 2019—dwarfs the annual revenue of all Plaintiffs combined. https://corporate.charter.com/investors/Charter%20Announces%20Fourth%20Quarter%202019%20Results (last accessed July 20, 2020).

[7] Of the over 11,000 works at issue in this case, only 300 are at issue in *Grande*.

knowledge, how Charter interacted and dealt with these notices of infringement."); May 29 Order at 17–18 (rejecting discovery into Rightscorp because "none of [Plaintiffs'] notices were sent by Rightscorp."). Charter has admitted as much, making clear that what it really seeks is a vehicle to obtain Rightscorp discovery that it is not otherwise able to obtain. *See* Def.'s Statement of Pending Disc. Disputes 25–27, June 26, 2020.

### IV. Charter's request for documents sufficient to demonstrate which files were fingerprinted is not called for by any RFP and seeks irrelevant information.

Charter seeks documents sufficient to show which music files were used to generate Audible Magic fingerprints, "including the information upon which Plaintiffs relied in order to represent that the digital files Plaintiffs have produced to date have the same ISRCs" as files used in Audible Magic's identification of the infringing works at issue in this case.

There is no basis to compel such production, because none of the RFPs Charter cites call for this information. RFP 90 seeks "*copies of the digital files*" Plaintiffs used to create digital fingerprints that were used by Audible Magic in connection with the infringement notices sent to Charter; RFP 91 seeks "documents sufficient to show those *digital fingerprints*"; RFP 92 seeks "documents sufficient to show the *process* used to create the digital fingerprints" used by Audible Magic to match alleged infringements; and RFP 93 seeks "*communications*" between Plaintiffs and Audible Magic exchanged for the purpose of matching alleged infringing files with digital copies. Not a single one of these requests asks for documents *used by litigation counsel* to identify the ISRCs of the files used to create Audible Magic fingerprints.[8]

Although Charter's failure to identify an applicable document request is dispositive, Charter also has not demonstrated that the requested information is relevant to any issue in the case. Charter has repeatedly claimed it needs so-called "Reference Files" and fingerprints to rebut Plaintiffs' claims of direct infringement, but that is plainly not true. The relevant question in determining infringement is whether "the accused work is sufficiently similar that an ordinary observer would conclude that the defendant unlawfully appropriated the plaintiff's protectable expression[.]" *See, e.g.*, *Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1288 (10th Cir. 1996) (reversing district court because "a finding of substantial similarity does not require that an infringing work be a 'virtual copy' of a protected one"). Here, Plaintiffs have produced copies of the *actual* protected works—the *actual* copyrighted sound recordings that Plaintiffs claim were infringed—and copies of the infringing files. As in any other infringement case, comparison of those two things is all that is necessary to prove (or disprove) infringement.

Charter has never responded to this point or explained why it needs *proxies* for the copyrighted works—or any information related to the generation of those proxies—when Plaintiffs are providing the copyrighted works themselves. Notwithstanding this lack of relevance, Plaintiffs have agreed to produce email correspondence with Audible Magic regarding the provision of fingerprints or digital copies, and the parties have agreed on broad search terms intended to capture any copies of fingerprints (or copies of digital files) that may have been

---

[8] To the extent Charter seeks communications between Plaintiffs and their counsel regarding the investigation into which ISRCs were sent to Audible Magic, those attorney-client communications are core work product and not discoverable.

transmitted by email (however unlikely).  July 2 Hr'g Tr. 153:4–8.  Plaintiffs have also agreed to search for email communications regarding the "process for creating the fingerprints," (RFP 92) despite Charter's limited request for "documents and communications *sufficient to show*" that process.[9]  No more is required or warranted.

### V. Charter's request regarding the 2016 RIAA/MarkMonitor Agreement should be denied.

Charter seeks an order compelling (1) documents referenced in the 2016 agreement between RIAA and MarkMonitor ("2016 RIAA/MM Agreement" or "Agreement"), and (2) communications related to the Agreement.  The motion should be denied.

*First*, the documents referenced in the Agreement have either been produced already or included in Plaintiffs' privilege log.  To the extent that this request is simply another way to get at the information in the Hash Report, Plaintiffs have properly withheld and logged that report as work product.  As explained in Plaintiffs' July 15 letter, the 2016 RIAA/MM Agreement was entered expressly in anticipation of litigation, at the request of counsel, for the purpose of deciding whether to sue certain ISPs and, if so, over which copyrighted works.  Ex. 4 (Jul. 15, 2020 J. Gould Ltr. to R. Rodriguez).  As also previously explained, the Hash Report itself is a spreadsheet initially prepared by outside counsel, containing the list of torrent hashes selected by counsel based on their analysis of the underlying notice data, along with other information resulting from inquiries undertaken based on counsel's analysis.  There can be no question that it is core protected work product.  *See United States v. J-M Mfg. Co.*, No. 11-cv-1691, 2013 WL 424782, at *4 (D. Colo. Feb. 4, 2013) (forensic test report, including results, constituted work product where "[t]he selection of a particular test methodology or testing sample or set of samples to test … could reveal attorney opinions, theories, or strategies"), *aff'd sub nom. Nevada v. J-M Mfg. Co.*, 555 F. App'x 782 (10th Cir. 2014).

---

[9] To support its unjustified request, Charter levies unfounded accusations about "indisputably critical information" that Plaintiffs purportedly failed to retain.  This is a red herring, for the reasons described above.  In any case, as to copies of the files used to generate fingerprints, (1) the Record Company Plaintiffs have master catalogs containing digital files of their sound recordings, including those at issue here; and (2) they used those master digital files to make Audible Magic fingerprints using an Audible Magic tool (in the case of Sony Music and Warner Music), or to send copies to Audible Magic to do the same (in the case of Universal Music).  Plaintiffs have their master catalogs containing those digital files, and produced copies of those files, which they confirmed in the very same hearing transcript that Charter cites in its motion.  July 2 Hr'g Tr. 151:7–18.

As to the fingerprints, the Sony Music and Warner Music Plaintiffs no longer possess the Audible Magic fingerprint files they created, and thus have no responsive documents to RFP 91, which seeks production of those files.  Universal Music never created fingerprints in-house, and thus likewise has no responsive documents.  Contrary to Charter's assertion that Plaintiffs had some obligation to preserve the fingerprints, the fingerprints were decidedly *not* generated in contemplation of litigation.  To the contrary, RIAA sent notices to Charter as part of a *notice program* (not a litigation program) in the hopes that Charter would take action to curb infringement in response.  Only after that program ended—and thus, by definition, long after the fingerprints at issue here were sent to Audible Magic—did Plaintiffs realize that litigation was necessary to stop Charter from continued infringement.  Plaintiffs thus had no obligation to retain fingerprints during the period at issue, nor any practical reason to do so, since the fingerprint files are only usable within the Audible Magic software and database.

July 21, 2020<br>
Page 10 of 10

*Second*, communications related to the Agreement were primarily between RIAA, MarkMonitor and outside litigation counsel at Oppenheim + Zebrak ("O+Z"). Charter's effort to compel those communications concerning the genesis and evaluations of the project from Plaintiffs seeks an end-run around the Special Master's prior rulings, the third-party protections of Rule 45, and the parties' own agreements. Charter has already served subpoenas on MarkMonitor and RIAA, including a request to RIAA for *all documents* concerning the Agreement. The Special Master has already twice rejected Charter's demand that Plaintiffs search the custodial files of O+Z (on May 29 and July 2), and nothing in Charter's motion turns on new information learned since then. MarkMonitor produced the 2016 RIAA/MM Agreement to Charter on March 17 and attached it to their second subpoena to RIAA on April 17—the date of the very first Special Master hearing. And Charter itself long ago proposed, and Plaintiffs agreed, that the parties "need not log any documents authored by outside counsel." Ex. 5 at 2 (Nov. 27, 2019 S. Coorg Ltr. to N. Sahni); Ex. 6 at 3-4 (Dec. 4, 2019 N. Sahni Ltr. to S. Coorg). In sum, Charter's suggestion that Plaintiffs are refusing to produce or log responsive documents ignores this important history and should be rejected.

Sincerely,

*Jeffrey M. Gould*