# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

WARNER RECORDS INC., *et al.*,

     Plaintiffs,

v.

CHARTER COMMUNICATIONS, INC.,

     Defendant

Case No. 19-cv-00874-RBJ-MEH

### PLAINTIFFS' OPPOSITION TO CHARTER COMMUNICATION, INC.'S <u>MOTION TO COMPEL PRODUCTION OF DOCUMENTS</u>

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................1

BACKGROUND ........................................................................................................................3

I.  Plaintiffs' counsel created the Hash Report in anticipation of litigation............................3

II.  Only limited portions of the Hash Report are at issue here...................................................6

III.  Charter's motion mischaracterizes the Hash Report in fundamental ways. .......................6

   A.  The Hash Report is not an "audit" of the reliability of MarkMonitor. ............................6

   B.  The Hash Report is not the "only source" of evidence showing that Charter subscribers directly infringed Plaintiffs' works. .................................................................7

   C.  The Hash Report is not the "primary source of information concerning the reliability" of Plaintiffs' infringement evidence. ..........................................................................7

   D.  The Hash Report is not a "recreation" of evidence. .......................................................8

ARGUMENT ...........................................................................................................................8

I.  Plaintiffs have not waived work-product protection over the Hash Report because they have not put the Hash Report at issue, have not selectively disclosed protected information, and the subject-matter waiver rule does not apply to opinion work product..8

II.  The Hash Report is core work product and Charter cannot satisfy its burden to overcome that protection. ...................................................................................................................11

   A.  Charter does not have a substantial need for the hashes counsel selected to investigate but did not download in 2016. ....................................................................................12

   B.  Charter does not have a substantial need for the 2016 Audible Magic look-ups, and Charter can readily obtain their substantial equivalent...................................................15

   C.  The Hash Report is opinion work product that is protected absolutely. ........................16

III.  Charter's catchall demand for unspecified documents and data related to the Hash Report should be denied. ..................................................................................................................17

CONCLUSION ........................................................................................................................18

## INTRODUCTION

Charter seeks to pierce Plaintiffs' work-product protection but fails to show—because it cannot—the required "substantial need" or any other justification to support Charter's desire to see the analysis and opinions of Plaintiffs' litigation counsel in preparing Plaintiffs' claims in this and other lawsuits.

From 2012–2015, Plaintiffs sent millions of infringement notices to internet service providers—including more than 700,000 notices to Charter—identifying specific instances of infringement by specific subscribers. Each notice contained, among other things, a cryptographic "hash value" identifying the infringing file.[1]

Thereafter, ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

---

[1] A "hash" or "hash value" is a unique identifier generated by a cryptographic algorithm for a specific file that serves as a file's "digital fingerprint." Files with the same hash value are identical.

[2] Audible Magic uses proprietary software to compare digital "fingerprints" of audio files, similar to the more commonly known consumer application, Shazam.

MarkMonitor performed this work pursuant to a January 2016 contract entered into expressly "in anticipation of litigation." Mot. Ex. 4 at 1. The Hash Report reflects counsel's mental impressions, analysis, and opinions in selecting the samples to search for and test and in memorializing the results. As such, it is entitled to absolute protection as opinion work product. *Nevada v. J-M Mfg. Co.*, 555 F. App'x 782, 284-85 (10th Cir. 2014) (affirming conclusion that because selection and results of a testing set "may reveal attorney selective processes about which pipes to test or which tests to perform, the court concluded that the test results qualified as opinion work product, which our precedent suggests is absolutely privileged.").

Seeking insight into counsel's analysis of Plaintiffs' claims, Charter seeks to compel production of the Hash Report. Specifically, Charter seeks two things from the Hash Report: (1) the hashes counsel sought to investigate but did not download in 2016, and (2) the results of Audible Magic identifications for the downloaded files that Plaintiffs produced to Charter in discovery and which Charter can analyze itself. Neither is necessary for Charter's defense. And Charter cannot state a basis to overcome Plaintiffs' work-product protection under Rule 26's exacting "substantial need" and "undue hardship" standard in order to obtain either.

As to the first item Charter purports to seek, Plaintiffs already have produced in discovery *all* the files downloaded in the 2016 project, including infringing copies of every recording in suit. By definition, therefore, Charter knows which hashes were downloaded in 2016. If Charter seeks to determine which hashes were in notices but not downloaded, Charter can determine this itself by simply looking at the notices. What Charter does not need to know, and should not get here, is which hashes Plaintiffs' counsel was interested in seeing. That is entirely counsel's thinking process, also known as work product. As to the second, Charter has no need for the 2016 Audible Magic results commissioned as part of Plaintiffs' counsel's

investigation because it has *actual copies* of the 2016 downloads and can conduct its own independent analysis on those files—including analyzing them through Audible Magic or listening and comparing them to the authentic recordings of Plaintiffs' works.

Nor have Plaintiffs waived work-product protection over the Hash Report. Plaintiffs have withheld the Hash Report in full, and thus there is no truth to Charter's claim that Plaintiffs have selectively disclosed favorable portions while withholding others. Plaintiffs also have not sought to affirmatively use the Hash Report to support their case, and do not plan to do so. And, to be sure, none of Plaintiffs' claims implicate or rely on the Hash Report itself in any way.

Charter cannot articulate a reason that it needs to see what Plaintiffs' lawyers were considering, and what information counsel considered important, when preparing Plaintiffs' claims in this and other lawsuits, other than to get at counsel's analysis and legal strategy. Plaintiffs and third parties have produced an enormous amount of data and documents related to Plaintiffs' notices and the evidence of infringement by Charter subscribers—including the actual files downloaded in 2016 and authentic copies of the same. Charter has everything it needs to analyze the reliability of that evidence, and it does not need the Hash Report to do so. Charter's motion should be denied.[3]

## **BACKGROUND**

### I.   **Plaintiffs' counsel created the Hash Report in anticipation of litigation.**

From 2012-2015, the Recording Industry Association of America ("RIAA") engaged MarkMonitor, on behalf of the record company Plaintiffs, to monitor and detect infringement of

---

[3] Charter's motion should also be denied because it fails to comply with Local Rule 37.1, which requires that "[a] motion under Fed. R. Civ. P. 26 or 37 directed to an interrogatory, request, or response under Fed. R. Civ. P. 33, 34, or 36 shall set forth either in the text of the motion or in an exhibit to the motion the specific interrogatory, request, or response to which the motion is directed." Nowhere does Charter say which to which request its motion is directed.

Plaintiffs' copyrighted music on peer-to-peer (P2P) networks and send infringement notices to certain ISPs, including Charter (the "RIAA Notice Program").  Declaration of Matthew J. Oppenheim ¶ 3 ("Oppenheim Decl.").  The purpose of the RIAA Notice Program was to provide notice to Charter of specific instances of infringement by IP addresses on Charter's network so that Charter could take appropriate action, since only Charter knows which subscribers are associated with which IP addresses.  MarkMonitor only sent notices after confirming that a Charter subscriber was actively infringing Plaintiffs' works.  Pursuant to this program, RIAA sent millions of notices of infringement to ISPs, including more than 700,000 to Charter.  *Id.* The notices contained, *inter alia*, an identification of the Charter subscriber by their IP address, the specific date and time of the infringing act, the name of the file containing the infringing recordings, a cryptographic hash value uniquely identifying that file, a representative sample of what was infringed, and the peer-to-peer network used (*e.g.*, BitTorrent).  *Id.* ¶ 4.

Nothing in the agreements governing the RIAA Notice Program contemplated or anticipated litigation, and had Charter acted on the infringement notices to stop the infringing behavior, no litigation would have been necessary.  The prospect of litigation arose in early 2016 when Plaintiffs analyzed the data generated by the RIAA Notice Program and determined that Charter did *nothing* in response to its receipt of more than 700,000 notices.  (That conclusion has only been borne out in this litigation, as Charter has admitted in response to interrogatories that during the period at issue it neither terminated nor suspended a single subscriber for copyright infringement, including subscribers who were the subject of thousands of infringement notices.)

Thereafter, in January 2016, RIAA and MarkMonitor entered into an agreement at the direction of counsel to conduct further investigation expressly "in anticipation of litigation."  *Id.* ¶ 5; Mot. Ex. 4 at 1.  █████████████████████████████████████████████

████████████████████████████████████ Oppenheim Decl. ¶¶ 6-7.  As noted above, a "hash" or "hash value" is a unique identifier generated by a cryptographic algorithm for a specific file that serves as a file's "digital fingerprint."  Files with the same hash value contain identical content, and each RIAA notice references an infringing file by hash.  *Id.* ¶ 4.

Plaintiffs' outside litigation counsel selected the hashes to investigate ██████████

████████████████████████████████████████████████

███████████████████████████████ Counsel selected the hashes to include based on counsel's analysis of data generated from the notice program that ended in 2015.  *Id.* ¶ 6.  This process was undertaken for purposes of informing counsel's litigation strategy for this and other lawsuits against ISPs.  *Id.* ¶ 5.  At counsel's direction, MarkMonitor then supplemented the spreadsheet to provide additional information to further inform Plaintiffs' litigation strategy, including the results of Audible Magic look-ups on the downloaded files.  *Id.* ¶ 7.  Charter mischaracterizes this document—the "Hash Report"—as an "excel database," Mot. at 1, when, in fact, it is simply a spreadsheet created by and at the direction of counsel, with an ordinary ".xlsx" file extension.  Oppenheim Decl. ¶ 8.

In discovery, Plaintiffs have produced or agreed to produce the following:

- A digital copy of the authentic work for every sound recording in suit.

- A hard drive containing all of the hash files downloaded pursuant to the 2016 SOW, which included, for each recording in suit, copies of the infringing files that were the subject of Plaintiffs' infringement notices.

- PCAP files (or packet capture logs) showing when and where the files associated with the hashes in the 2016 SOW were downloaded.

- Four indexes for the hard drive of folders and infringing files, named and organized by hash value, such that Charter can easily identify the included hashes.

- The 2016 SOW demonstrating that MarkMonitor was engaged for this project "in anticipation of litigation."  Mot. Ex. 4 at 1.

Oppenheim Decl. ¶¶ 9-10.

## II.     Only limited portions of the Hash Report are at issue here.

Because Plaintiffs have already made significant productions related to the works in suit,

Charter can identify only two items from the Hash Report that it purports to need.  *First*, Charter

claims it needs ███████████████████████████████████████████████

███  Mot. at 8.  But because Plaintiffs have already produced the files downloaded in 2016,

including an index of those files organized by hash value, the only hashes Charter does not have

are the hashes for files that were *not* downloaded.  The hashes at issue in Charter's motion,

therefore, are the hashes that counsel investigated but that were not downloaded in a one-month

period in 2016.

*Second*, Charter says it needs "the Audible Magic evaluation of the files downloaded

from those hashes."  *Id.*  As part of the 2016 SOW, ████████████████████████



## III.     Charter's motion mischaracterizes the Hash Report in fundamental ways.

### A.  The Hash Report is not an "audit" of the reliability of MarkMonitor.

There is no validity to Charter's claim that the Hash Report is an "audit" of the reliability

of MarkMonitor.  Mot. at 12.  Charter's contrary suggestion that the Hash Report was designed

or intended to audit MarkMonitor's reliability, or that it could even be used as such, is made up

and lacks factual support.  The SOW makes clear that MarkMonitor's work is being undertaken

for "investigative purposes" and "in anticipation of litigation."  Mot. Ex. 4 at 1.  The SOW says

nothing about an audit or any other objective related to examining MarkMonitor's reliability, and the Hash Report neither draws nor permits any conclusions regarding MarkMonitor's reliability. Nor did the Hash Report attempt a systematic evaluation of the MarkMonitor system.

### B.   The Hash Report is not the "only source" of evidence showing that Charter subscribers directly infringed Plaintiffs' works.

Charter has also made up the claim that "the Hash Report is the only source" of "evidence [Plaintiffs] claim shows that Charter subscribers directly infringed their works."  Mot. at 1.  Plaintiffs have never represented any such thing.  The infringement notices themselves, the evidence packages recording MarkMonitor's infringement detection, the infringing and authentic copies of works in suit, and the multitude of other evidence Plaintiffs have produced, *see supra*, establish that Charter subscribers directly infringed the works in suit.  The Hash Report adds nothing to that body of evidence and Plaintiffs do not rely on it.

### C.   The Hash Report is not the "primary source of information concerning the reliability" of Plaintiffs' infringement evidence.

Charter has also made up the claim that "[t]he Hash Report is the primary source of information concerning the reliability—or unreliability—of the evidence on which Plaintiffs are now relying to prove their case."  Mot. at 5.  Again, this is simply inaccurate.  *First*, the Hash Report says nothing about the reliability of Plaintiffs' infringement evidence.  *Second*, Charter has all of the *actual* evidence establishing infringement, which it can analyze independently to try to show that the evidence is not reliable.  *Third*, Plaintiffs, RIAA, MarkMonitor, and Audible Magic have all produced substantial documents regarding the operation of the RIAA Notice Program and the MarkMonitor and Audible Magic technologies on which the evidence is based.

Besides documentation, Charter's experts will review the proprietary source code—*i.e.*, the written computer software programs—for the MarkMonitor and Audible Magic systems used

here.  To be clear, Charter's technical experts will be able to review and inspect the written computer code that is the literal source of how the MarkMonitor and Audible Magic systems used here operate.  Charter has also served deposition notices on MarkMonitor and Audible Magic, which include numerous topics aimed at assessing their reliability.

### D.  The Hash Report is not a "recreation" of evidence.

Charter also claims that the Hash Report attempts to "recreate" evidence of Charter's subscribers' infringement.  Mot. at 4.  This perversion of the evidence ignores the reality of Plaintiffs' notices and the investigation under the 2016 SOW.  Plaintiffs' notices reported evidence of infringement by Charter's subscribers with the objective of getting Charter to take action against that widespread infringement.  ████████████████████████ ████████████████████████████████████████████████████ ██████████████████████  Oppenheim Decl. ¶ 5.  Regardless, even accepting Charter's incorrect "recreation" theory, Plaintiffs have produced the files allegedly "recreated."

### ARGUMENT

I.  **Plaintiffs have not waived work-product protection over the Hash Report because they have not put the Hash Report at issue, have not selectively disclosed protected information, and the subject-matter waiver rule does not apply to opinion work product.**

Plaintiffs have not waived work-product protection over the Hash Report because they are not affirmatively asserting the Hash Report as evidence to support their claims, have not selectively disclosed protected information, and the subject-matter waiver rule does not apply to opinion work product.

*First*, as this Court has previously observed, in determining waiver "[t]he primary inquiry is whether the party claiming privilege will assert the allegedly protected material *in aid or in furtherance of its claims or defenses*."  *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-CV-

00047-MSK-MEH, 2010 WL 3923092, at *10 (D. Colo. Oct. 1, 2010) (Hegarty, M.J.) (emphasis added).  That is not the case here: Plaintiffs are not relying on the protected material in the Hash Report at all.  *See Frontier Ref., Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 704 (10th Cir. 1998) (no waiver where plaintiff "did not rely on the work product in any manner to justify its right to recovery or to respond to [the defendant's] defense").  To the extent Plaintiffs will rely on anything from the 2016 SOW, it is the downloaded files and Plaintiffs have produced them.  The downloaded files are evidence; the Hash Report is an *analysis*, conducted at the direction of counsel in anticipation of litigation, and Plaintiffs do not rely on it here.  Charter's theory of waiver requires finding that Plaintiffs ████████████████████████████ ████████████████████████████████████, but that is not the case here.

  Charter's argument that "Plaintiffs have put MarkMonitor's work at issue by relying on it to prove their secondary liability claims," Mot. at 11, also errs, because it confuses MarkMonitor's work generally with the specific project that generated the Hash Report.  Plaintiffs' reliance on MarkMonitor's work to prove infringement of the works in suit does not put the Hash Report at issue.  To establish waiver, Charter must show Plaintiffs rely *specifically* on the Hash Report to support their claims or litigation arguments, and this Charter cannot do.

  *Second*, Plaintiffs have not waived work-product protection over the Hash Report by producing the files that were downloaded in 2016, while withholding the Hash Report.  The downloaded copies of the infringing files themselves—which Charter has and can independently test itself—are distinct from the specific selection of hashes Plaintiffs' counsel directed MarkMonitor to investigate based on counsel's analysis.  *See* Oppenheim Decl. ¶¶ 5-7.  The underlying files and indices happen to identify some of the hashes counsel selected to investigate, while the Hash Report itself is an attorney-directed analysis reflecting counsel's

opinion regarding litigation strategy.  It says nothing of whether MarkMonitor accurately detected infringements by Charter subscribers in 2012-2015, as Charter maintains.

Charter mischaracterizes the facts in claiming that Plaintiffs are "shielding the information that would show the extent to which Plaintiffs' notices purported to identify files that Plaintiff cannot prove to have existed or to match any of Plaintiffs' works-in-suit."  Mot. at 11.  Plaintiffs' notices resulted from a reliable detection process that Charter did not question until this litigation commenced; the notices *themselves* establish that the files referenced therein existed.  Further, that a file was not downloaded during the 2016 period does *not* establish that the earlier infringement notice for that file was inaccurate or the file doesn't exist; it merely indicates that a file unlawfully distributed through Charter's network at the time of the notice was not located as being unlawfully distributed during a one-month period in 2016.

It is also false that Charter needs the Hash Report to match infringement notices to works in suit.  Mot. at 11.  The Court already found that Plaintiffs have produced everything Charter needs to match notices to works in suit and also ordered Plaintiffs to do so.  ECF No. 284.  Charter's alleged need for the Hash Report to do precisely that is therefore nonexistent.

*Third*, even if there were a selective disclosure of *some* protected information (and there was not), "the subject matter waiver rule does not extend to opinion work product."  *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, No. 01-CV-01451-REB-CBS, 2005 WL 7987529, at *3 (D. Colo. Aug. 15, 2005).  As explained below, the Hash Report is opinion work product that is protected absolutely.

The cases Charter cites where courts found waiver are all inapposite, because all of those cases found that the party asserting the privilege had put the waived material at issue by relying on the privileged material in the litigation in some manner.  Mot. at 10.  *Martensen v. Koch* held

that a defendant waived work-product protection over a consultant's report by admitting under oath that the report was the only basis for his affirmative defenses of unclean hands and fraud. 301 F.R.D. 562, 580 (D. Colo. 2014).  In *Walker v. Cty. of Contra Costa*, the defendant in an employment discrimination case relied on an internal pre-litigation investigation for its affirmative defense; the court held that "any protection that may have applied [was] waived by Defendants' stated intent to rely on the investigation as a defense in this action."  227 F.R.D. 529, 536 (N.D. Cal. 2005); *see also Austin v. City & Cty. of Denver ex rel. Bd. of Water Comm'rs*, No. CIVA05CV01313PSFCBS, 2006 WL 1409543, at *8 (D. Colo. May 19, 2006) (holding that defendant waived privilege over its investigation into plaintiff's allegations by asserting affirmative defense that it "exercised reasonable care to prevent and promptly correct any unlawful behavior by its employees of which it was made aware.").

Unlike those cases, Charter can point to nothing to show that Plaintiffs are relying on the fact of having conducted a pre-litigation investigation, or that investigation's results, ██████████ ██████████████████████████████████████ Because, of course, they are not. Nor, by relying on the infringement evidence Plaintiffs have produced, are Plaintiffs relying on the fact that some of that evidence was collected as part of their pre-litigation investigation. There is therefore no waiver here.[4]

## II.     The Hash Report is core work product and Charter cannot satisfy its burden to overcome that protection.

There can be no dispute that the Hash Report is protected work product.  Charter does not contend otherwise.  As explained above, the 2016 SOW was entered into expressly in

---

[4] This also is entirely unlike Charter's waiving privilege and work-product protection over documents related to its spoliation of evidence by advancing a self-serving narrative based on counsel's investigation while withholding the documents on which that narrative relies.  ECF No. 262.

anticipation of litigation.  Mot. Ex. 4 at 1; Oppenheim Decl. ¶ 5.  Pursuant to that SOW, counsel initially created the Hash Report based on its analysis, and it was then supplemented with additional information and analysis at counsel's direction for the purpose of informing litigation strategy.  Oppenheim Decl. ¶¶ 5-7.

To overcome Plaintiffs' work-product claim, Charter has the burden of  "show[ing] that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."  Fed. R. Civ. P. 26(b)(3)(A)(ii).  "A substantial need exists where the information sought is *essential* to the party's defense, is *crucial* to the determination of whether the defendant could be held liable for the acts alleged, or carries *great probative value* on contested issues."  *Nevada v. J-M Mfg. Co.*, 555 F. App'x 782, 785 (10th Cir. 2014) (internal quotation marks omitted).  "Nor does a showing of potential relevance mean that [the movant] has demonstrated a substantial need."  *Id.* (internal quotation marks omitted); *see also Cont'l Circuits LLC v. Intel Corp.*, 435 F. Supp. 3d 1014, 1023 (D. Ariz. 2020) ("Th[e] showing [to overcome work-product protection] requires more than mere relevancy."). And, "even if substantial need and unavailability are demonstrated, the Court must distinguish between factual work product, and mental impressions, opinions, and conclusions, for the latter are rarely, if ever, subject to discovery."  *Thane v. GEICO Cas. Co.*, 2017 WL 3157966, at *3 (D. Colo. July 25, 2017).

Charter cannot carry its burden of showing substantial need and inability to obtain substantially equivalent information elsewhere.  But even if it could, the Hash Report reflects opinion work product that should be protected absolutely.

**A.  Charter does not have a substantial need for the hashes counsel selected to investigate but did not download in 2016.**

Charter has no substantial need for the list of hashes counsel selected to investigate in 2016 but did not find, because it is neither "essential" nor "crucial to the determination" of any issues.  Charter contends it needs this information to challenge the reliability and accuracy of Plaintiffs' notices and to challenge the sufficiency of Plaintiffs' direct infringement evidence.[5] Mot. at 11-13.  Neither contention demonstrates the requisite "substantial need."

The Tenth Circuit's decision in *Nevada v. J-M Mfg. Co.* is instructive.  555 F. App'x 782 (10th Cir. 2014).  There, the United States hired a lab to conduct tests on pipes manufactured by the defendant as part of deciding whether to formally intervene, which it ultimately did not.  *Id.* at 783.  The Tenth Circuit held that the defendant could not compel production of the lab's test results because the investigation—including the selection of which pipes to test and the results of those tests—was protected work product.  *Id.* at 785**.**  The court rejected the defendant's argument of substantial need where the defendant "could conduct its own independent testing . . . ."—just as Charter can do its own testing on the 2016 downloads  *Id.*  In so ruling, the Tenth Circuit affirmed the district court's conclusion that that "[b]ecause the test results may reveal attorney selective processes about which pipes to test or which tests to perform, . . . the test results qualified as opinion work product, which our precedent suggests is absolutely privileged." *Id.* at 784-85.  Finally, the Tenth Circuit observed that:

> Potential attacks on the credibility of independent testing done in preparation for litigation are not sufficient to show a substantial need for an opposing party's test results.  If we were to hold otherwise, this justification could conceivably apply to all tests conducted by parties in anticipation of litigation and would discourage parties from engaging in independent testing.

*Id.*

---

[5] Charter also claims it needs the Hash Report to support Charter's counterclaim "for violation of 17 U.S.C. § 512(f) for knowingly sending materially inaccurate notices of alleged infringement." Mot. at 12-13.  As Charter's § 512(f) counterclaim has been dismissed, ECF No. 284, Charter has no substantial need for discovery to support that claim.

All the same applies equally here.  *First*, Charter has no substantial need for the list of hashes counsel selected to investigate but did not download in 2016, in order to test the reliability or adequacy of Plaintiffs' notices.[6]  The reliability and accuracy of Plaintiffs' notices stands on the infringement evidence available when Plaintiffs sent the notices in 2012-2015. That a particular hash was not downloaded in 2016 shows only that a copy of that infringing file was not downloaded during a one-month period in 2016; it shows nothing about whether MarkMonitor correctly identified a Charter subscriber copying or distributing an infringing file years earlier.  Charter is well aware that a specific file could be copied and distributed among some of its subscribers at one point in time and not at other times, and Plaintiffs have never claimed that any work ever infringed once was always continuously infringed thereafter.  The truth is, no one can measure the full extent of infringement that occurs and a snapshot of infringement in time is inherently underinclusive.

*Second*, identifying hashes counsel selected to investigate but that were not downloaded in 2016 is neither essential to nor determinative of Charter's defense to Plaintiffs' direct infringement evidence.  Plaintiffs will prove direct infringement of the works in suit by, among other things, demonstrating that (1) the 2016 downloads contain infringing copies of Plaintiffs' authentic works, and (2) Charter subscribers identified in Plaintiffs' 2012-2015 infringement notices downloaded and distributed files whose hash values match precisely the hash values of infringing files downloaded under the 2016 SOW.  Charter has the notices and underlying data with the referenced hashes, the infringing files with associated hash values, and authentic copies of every recording in suit.  Charter thus has everything it needs to challenge Plaintiffs' evidence

---

[6] It is unclear what Charter means when it refers to the "adequacy" of Plaintiffs' notices.  Charter never questioned the adequacy of those notices at the time they were sent from 2012-2015.

of direct infringement.  It can compare the authentic and infringing copies to see if they match.

It can run the infringing copies through Audible Magic or another content identification service.

It can calculate the hash values itself on the infringing files and determine if they match the

hashes in Plaintiffs' notices.  And it can challenge the reliability of cryptographic hash functions

that NSA and others routinely rely on for secure messaging and to know a file's contents.

**B. Charter does not have a substantial need for the 2016 Audible Magic look-ups, and Charter can readily obtain their substantial equivalent.**

Charter also has no substantial need for the 2016 Audible Magic look-ups because they

are not "essential" to Charter's defense or "crucial to the determination" of any issues, and

Charter has numerous ways to obtain substantially equivalent information of whether the

infringing files are copies of Plaintiffs' authentic works.  Charter contends that the 2016 Audible

Magic results are essential to know which files Audible Magic could not verify and which files

did not contain Plaintiffs' works in suit.  Mot. at 11-12.  But "want" and "need" are not the same.

Charter has no need for the 2016 Audible Magic look-ups because it already has copies

of the *actual files* used to conduct those look-ups and can conduct its own independent analysis

on those files—including running them through Audible Magic's service or even listening to the

files themselves to see if they are the same or different than Plaintiffs' authentic works.  To the

extent Charter argues that performing new Audible Magic look-ups *today* will not allow it to

assess the reliability of look-ups performed during the 2012-2015 notice program, the same is

necessarily true of the *2016* look-ups it demands here, which likewise date from after the notice

program.  What Charter seeks here is not a recreation of look-ups performed at the time of the

notice program, but rather to learn what Plaintiffs' attorneys may have discovered in undertaking

an investigation in preparing this case.  *See J-M Mfg.*, 555 F. App'x at 784-85 (finding no

substantial need for results of tests selected by counsel and performed at counsel's direction).[7]

### C.  The Hash Report is opinion work product that is protected absolutely.

Even if Charter could show substantial need for the Hash Report and undue hardship in

obtaining substantially equivalent information (and it cannot), the Hash Report reflects opinion

work product and therefore is non-discoverable.  "Courts recognize a distinction between

'opinion work product,' which may be entitled to complete protection, and 'non-opinion' or 'fact

work product,' that may be discoverable under the Rule 26(b)(3) exception."  *United States v. J-*

*M Mfg. Co.*, No. 11-CV-01691-MSK-MJW, 2013 WL 424782, at *3 (D. Colo. Feb. 4, 2013),

*aff'd sub nom. Nevada v. J-M Mfg. Co.*, 555 F. App'x 782 (10th Cir. 2014).  "Opinion work

product reveals the mental impressions, conclusions, opinions, or legal theories of a party's

attorney or other representative concerning the litigation."  *J-M Mfg. Co.*, 555 F. App'x at 785

n.12 (internal quotation marks omitted).  "Opinion work product is absolutely privileged."  *Id.*

(citing *In re Qwest Commc'ns Int'l Inc.*, 450 F.3d 1179, 1186 (10th Cir. 2006)).

Plaintiffs' litigation counsel initially prepared the Hash Report, and the Hash Report

reflects counsel's mental impressions and analysis undertaken in anticipation of litigation.  The

choices of which hashes to include in the report, which data to search for with regard to those

---

[7] Nor is the Hash Report the "only source" of the 2016 Audible Magic data, as Charter contends. Mot. at 11.  The information also exists in Audible Magic's files, though, as here, Plaintiffs object to its production on work-product grounds.  Charter has moved to compel that information from Audible Magic and Plaintiffs have objected.  ECF No. 258; 280.  In their opposition, Plaintiffs requested that the motion be transferred to Judge Hegarty for resolution consistent with the instant motion.  ECF No. 280.  For the reasons explained in both oppositions, production of the 2016 Audible Magic looks-up should not be compelled at all because Charter cannot show the required "substantial need."  If the Court concludes otherwise, however, production of data from Audible Magic's files would be a lesser intrusion into Plaintiffs' work product than requiring production of the attorney-created and directed Hash Report that also contains other information.

hashes, and what analysis to conduct on the data collected all reflect counsel's mental impressions and opinions and are influenced by counsel's legal theories.  *See J-M Mfg. Co.*, 2013 WL 424782, at *4 (forensic test report, including results, constituted opinion work product where "[t]he selection of a particular test methodology or testing sample or set of samples to test . . . could reveal attorney opinions, theories, or strategies"); *J-M Mfg. Co.*, 555 F. App'x at 784-85 (affirming district court's conclusion that because selection of testing sample set "may reveal attorney selective processes about which pipes to test or which tests to perform, the court concluded that the test results qualified as opinion work product, which our precedent suggests is absolutely privileged.").  Indeed, Charter admits that "[d]ocuments showing why counsel included or omitted hashes from that list theoretically might reflect counsel's mental impressions . . . ."  Mot. at 15.  That is precisely what the Hash Report includes, and, if revealed, could shed light on counsel's *reason* for selecting the hashes it did.

Charter's argument that the Hash Report is purely factual ignores that, by virtue of counsel's analysis of which data and data fields to include, it reflects counsel's strategic judgment.  It reflects counsel's analysis and mental impressions, regarding inquiries that counsel undertook and wanted undertaken, for the express purpose of informing litigation decisions.  *See Vardon Golf Co. v. BBMG Golf Ltd.*, 156 F.R.D. 641, 648 (N.D. Ill. 1994)  (upholding assertion of attorney work product over attorney-initiated tests where "[t]he selection of the tests and test data would surely reflect the attorney's strategy . . . .").

### III.   Charter's catchall demand for unspecified documents and data related to the Hash Report should be denied.

Charter's motion includes a vague catchall request for, not just the Hash Report itself, but also "any documents and underlying data related to this Hash Report."  Mot. at 1, 8 n.3, 16.  With the exception of Audible Magic fingerprints, *see* Mot. at 8 n.3, which Charter could

generate itself from the 2016 downloads and therefore plainly has no need, Charter's motion never identifies these theoretical related documents or underlying data.  And although Charter attempts to define "Hash Report" broadly to include "documents and information underlying the Hash Report," *id.*, Charter directs all of its arguments toward the Hash Report spreadsheet itself. Charter's motion never even attempts to show how it has a substantial need for some other undefined set of documents; nor could it.  Even if the Hash Report itself were discoverable (and it is not), any related documents and communications remain protected.  Accordingly, Charter's request for any documents and underlying data related to the Hash Report must be denied.

## **CONCLUSION**

For the reasons stated above, Plaintiffs respectfully request that the Court deny Charter's Motion to Compel Production of Documents in its entirety.

Dated: November 9, 2020

Respectfully submitted,

*/s/  Matthew J. Oppenheim*

Jonathan M. Sperling
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
jsperling@cov.com

Matthew J. Oppenheim
Jeffrey M. Gould
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave. NW, 5th Fl.
Washington, DC 20016
Telephone: (202) 621-9027
matt@oandzlaw.com
jeff@oandzlaw.com

Neema T. Sahni
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Ste. 3500
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
mkamin@cov.com
nsahni@cov.com

Janette L. Ferguson, Esq.
Benjamin M. Leoni, Esq.
LEWIS BESS WILLIAMS &
WEESE, P.C.
1801 California Street, Suite 3400
Denver, CO 80202
Telephone: (303) 861-2828
jferguson@lewisbess.com
bleoni@lewisbess.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 9, 2020 I caused the foregoing document and all supporting materials thereto to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record registered with CM/ECF.

*/s/ Matthew J. Oppenheim*