**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543 | TEL (213) 443-3000 FAX (213) 443-3100

WRITER'S EMAIL ADDRESS
andrewschapiro@quinnemanuel.com

November 16, 2020

Special Master Regina Rodriguez
Regina.rodriguez@wilmerhale.com

Re:   *Warner Records Inc. v. Charter Communications, Inc.*, Case No. 19-cv-00874-RBJ—
      Charter's Reply In Support of its Motion to Compel Audible Magic

Dear Ms. Rodriguez:

Charter writes in support of its Motion to Compel Compliance With *Subpoena Duces Tecum* directed at Audible Magic (Dkt. 258). The Special Master should compel Audible Magic to (1) immediately make its source code available for review without an artificial limitation on the review's length, and (2) produce or log documents related to its verification of works downloaded by MarkMonitor in 2016, including its transaction logs and communications relating thereto. Audible Magic's source code, and its transaction logs from the 2016 MarkMonitor project, sit at the very core of Plaintiffs' infringement case, and Charter must be granted meaningful access to this evidence so that it may test Plaintiffs' claims.

   I.    **Audible Magic Source Code Review**

There is no dispute that the Audible Magic source code is relevant and responsive to Charter's subpoena. Plaintiffs' vendor MarkMonitor used Audible Magic to identify allegedly infringing works contemporaneously with the transmission of MarkMonitor's notices to Charter from 2012 to 2015, and again in 2016 to (purportedly) verify that the works-in-suit matched fingerprints allegedly created from reference files for the works-in-suit provided to Audible Magic by Plaintiffs. Audible Magic's source code thus sits at the heart of Plaintiffs' direct infringement case. Yet, despite the passage of over ten months since Charter served its subpoena, Audible Magic has yet to make its source code available for inspection.

quinn emanuel urquhart & sullivan, llp

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE | BOSTON | SALT LAKE CITY
LONDON | TOKYO | MANNHEIM | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH | SHANGHAI | PERTH | STUTTGART

As it currently stands, Audible Magic has agreed to only a two-day inspection in San Francisco, which the parties had agreed would commence on November 18, 2020.[1]  On the afternoon of November 16, 2020, however, Audible Magic's counsel informed Charter that Audible Magic would not make its code available on November 18 without a court order, due to new COVID-related restrictions in San Francisco.  Audible Magic nonetheless continues to insist upon an in-person review.

Moreover, while Audible Magic will only agree to make its code available for two days, Audible Magic has not identified any information about the total size or organization of its codebase—such as total lines of code, number of modules/submodules, and how it is commented—that would help Charter estimate an appropriate duration for an initial review.  Since even Audible Magic agrees that "the scope of the review, the needs of the experts, and the complexity of the code" are relevant to determining an appropriate review length, Audible Magic Resp. at 9, Audible Magic's refusal to provide any information to Charter about its code in advance of the review underscores the unreasonableness of its arbitrary 2-day limitation.

Moreover, there is no legal basis to support Audible Magic's refusal to make its source code available for more than 2 days.  Audible Magic has not moved to amend the operative Protective Order, which affords the inspecting party with unlimited access to source code as long as the other notice and security provisions are met.  Nor is there a single model protective order, adopted by any jurisdiction in this country, that imposes a specific limit on the number of days that a party is permitted to inspect source code.  And courts regularly uphold the reasonableness of inspections that take months to complete.  *See, e.g., Big Baboon Corp. v. Dell, Inc.*, 723 F.Supp.2d 1224, 1229-30 (C.D. Cal. 2010) (providing 46 additional days for review after a 4 month review period); *Activision Blizzard Inc. v. Acceleration Bay LLC*, 2016 WL 4548985, *2 (N.D. Cal. Sept. 1, 2016) (parties conducted "over two dozen days of source code review"); *High 5 Games, LLC v. Marks*, 2019 WL 1399552, *3 (D.N.J. Mar. 28, 2019) (compelling additional source code review, even after the party had already had "28 prior days of review"); *Eagle View Technologies, Inc. v. Xactware Solutions, Inc*., 2017 WL 5886004, at *7 (D.N.J. Nov. 29, 2017) (party conducted, in all, 33 days of source code review); *see also See, e.g.*, T. Foster et al., *A Lawyer's Guide to Source Code Discovery*, The Federal Lawyer, Feb. 2011 at 45, available at: https://www.fedbar.org/wp-content/uploads/2011/02/feature3-feb2011-pdf-1.pdf ("Lawyers and judges who do not appreciate the difficulties [of source code review] often believe that a couple of days should suffice, but that is almost never the case.").  This is because the law is clear:  "**There is, however, no source code exception to the production requirements of Fed.R.Civ.P. 34.**"  *Apple Inc. v. Samsung Elecs*. Co., 2012 WL 1595784, at *1 (N.D. Cal. May 4, 2012) (emphasis added).

While Charter can certainly start with a two-day review period, it is unlikely to complete its review in that period and certainly cannot commit to such a circumscribed inspection without having seen the code in the first place.  Audible Magic cannot deny Charter an opportunity for meaningful review based on amorphous concerns about the security of its code.  A party wishing

---

[1]  The parties are continuing to work out other logistical details regarding the source code review.  Charter is committed to completing the review as quickly and efficiently as possible.  To the extent Charter is able to complete its review in the 2 days Audible Magic has agreed to allocate, Charter will promptly inform the Special Master and will withdraw this portion of the motion to compel.

to restrict access to its relevant, responsive source code, bears the burden of demonstrating that the restrictions it demands are reasonably necessary to assuage "a legitimate concern based on the risk of competitive harm that could result from disclosure of the source code." *MVS Studio Inc. v. Bingo Bean, LLC*, 2011 WL 10538669, at *2 (C.D. Cal. June 24, 2011). The protections demanded by a producing party must be weighed against "the risk that . . . [the restrictions] will impair" the receiving party's ability to litigate its claims and defenses. *Id.* (citing *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992)). Here, Audible Magic has not identified any particular security concern that can only be addressed by shortening review far beyond what any model protective order or case law has ever supported.

All of the security and safety concerns that Audible Magic has articulated are addressed by the existing Protective Order and the parties' agreed upon inspection protocol. Charter is sensitive to the importance of conducting the code review safely and securely, in a way that minimizes risk to all participants. Charter has agreed to an in-person review at Audible Magic's outside counsel's San Francisco office—which is precisely what Audible Magic requested to secure its code. Audible Magic points to the pandemic as a reason to deny Charter's motion to compel an immediate inspection, but never explains why the pandemic is a limiting factor on the length of a review in its outside counsel's office. And to the extent Audible Magic is concerned about conducting an in-person review during the pandemic, Charter has repeatedly offered to conduct a remote review, a step numerous courts with technology-heavy dockets have embraced. *See* Mot. at 12-13 and Exs. 28 and 29 (indicating that the International Trade Commission and Eastern District of Texas have implemented rules and procedures to facilitate remote code review due to COVID-19). Audible Magic has rejected Charter's proposals. In short, Audible Magic should not be permitted to prevent Charter from conducting a meaningful in-person review due to the pandemic, while at the same time refusing a remote review that would obviate any risks to participants.

Audible Magic's other arguments are equally unwarranted. First, Audible Magic indicates that the source code review in the *Cox* case (litigated on the E.D. Va's "rocket docket") took just one day—but that says nothing of the amount of time necessary to assess Audible Magic's source code. Audible Magic offers no evidence that Cox considered its review sufficient or complete, rather than simply the product of Audible Magic's discovery recalcitrance and the procedural schedule in place in that litigation. There is no reason that Charter—a different company, with different experts, pursuing a different litigation strategy—should be constrained by Cox's strategic decisions. Second, Audible Magic provides no support for its position that a code review lasting longer than two days is excessively burdensome. Charter has no incentive to drag out code review—and thus continue to pay its attorneys and experts to attend—longer than is strictly necessary to effectively defend this litigation. Third, Audible Magic insists that there is no immediate need to conduct a source code review—but that is demonstrably untrue. Charter served its subpoena over ten months ago, and there is less than three months left in fact discovery. As Charter explained, a comprehensive review of Audible Magic's source code is a gating event for other crucial discovery that is yet to take place, including Charter's 30(b)(6) depositions of Audible Magic and MarkMonitor, and further follow-on documentary discovery that may be required from Plaintiffs and its vendors. Charter's need for an immediate and meaningful review of Audible Magic's source code could not be more acute.

Accordingly, Charter requests an order compelling Audible Magic to immediately make its source code available for review and preventing Audible Magic from limiting Charter's review to two days, a duration not provided for by the operative Protective Order, which Audible Magic never challenged. Alternatively, Charter requests an order requiring Audible Magic to make its code available remotely. Audible Magic should not be permitted to insist that the pandemic precludes an in-person inspection of a reasonable length, while at the same time rejecting a remote review. Audible Magic may not immunize core evidence of direct infringement in this case from scrutiny.

## II.  Audible Magic Should Be Compelled To Produce Its Non-Privileged Documents Relating to the 2016 Project, Including Its 2016 Transaction Logs, And Log Any Privileged, Responsive Evidence

### a. The 2016 Audible Magic Transaction Logs Are Highly Relevant and Provide Information That is Not Otherwise Available

Audible Magic refuses to produce a complete set of its transaction logs relating to the works-in-suit, and related documents and communications, which are responsive to at least Request Nos. 2, 3, 15, and 19. As set forth in greater detail in Charter's Motion to Compel Production of the Hash Report, Dkt. 266, Plaintiffs' vendor MarkMonitor generated and sent notices of alleged infringement to Charter from 2012-2015, which are the predicate for Plaintiffs' claims in this case. Dkt. 266 at 3-4. However, at the time the notices were sent, MarkMonitor never actually downloaded the allegedly infringing files from any Charter user. *Id*.[2] Lacking substantiation of the alleged infringement, Plaintiffs later asked MarkMonitor to download and Audible Magic to verify copies of the infringing files in February 2016, 10 months after the last notice at issue was sent. *Id*. at 4-5. Specifically, Plaintiffs (through the RIAA) directed MarkMonitor to download 7,200 torrent files with Info Hashes that matched the files identified in the notice letters sent to Charter, and send them to Audible Magic to determine whether the files matched sound recordings in Audible Magic's database. Mot. Ex. 18. It is these files, downloaded by MarkMonitor in 2016, that were supposedly verified by Audible Magic during the 2016 Project, that Plaintiffs intend to present to the jury in this case as evidence of infringement and the alleged accuracy of the notices sent to Charter from 2012 to 2015. *See* Pls. Resp. to Mot. to Compel Hash Report, Dkt. 287 at 14 ("Plaintiffs will prove direct infringement of the works in suit by, among other things, demonstrating that … the 2016 downloads contain infringing copies of Plaintiffs' authentic works.").

Plaintiffs have directed Audible Magic to withhold its records of the 2016 file matching, thus seeking to use the fruits of the 2016 Project as their central evidence in this litigation, while at the same time contending that the transaction logs generated by Audible Magic (which identify matches or lack thereof as well as show the specific sound recording that Audible Magic's system associates with particular Info Hashes) are irrelevant or work product. Denying Charter discovery of the transaction logs generated as part of the 2016 Project would effectively require the parties

---

[2]  Instead, MarkMonitor identified and downloaded a torrent once (not from a Charter subscriber) and sent that file to Audible Magic to match in its reference database. MarkMonitor did not save the files it sent to Audible Magic for verification either.

and the Court to accept Plaintiffs' *ipse dixit* that the files downloaded by MarkMonitor in 2016 matched the works in suit and the works identified on the notices sent to Charter. This is particularly troubling since it appears that Audible Magic was asked to match approximately 7,200 hashes provided by MarkMonitor and was only able to do so for about half of them (3,700).[3] Charter is entitled to analyze the methodology and results of the 2016 Project to determine whether they are consistent with Plaintiffs' evidence of alleged infringement—and neither Plaintiffs nor Audible Magic can meaningfully dispute that the requested documents are key to doing so.[4]

### b. Plaintiffs Waived Their Right to Object to the Audible Magic Subpoena

Plaintiffs' November 2, 2020 submission to the Special Master should be given no weight in the Special Master's determination of Charter's motion to compel because Plaintiffs waived their right to object. Plaintiffs delayed raising these objections for almost a year—staying silent after receiving the notice of subpoena and being copied on numerous communications with Audible Magic. It was not until September 2020, when ***Plaintiffs*** argued that they should not be required to produce their Hash Report at least in part because some of the underlying fact evidence could be obtained from Audible Magic, that Charter definitively learned of the existence of the withheld 2016 transaction logs. *See* Golinveaux Dec. ¶ 42; *see also* Pls. Opp. Br., Dkt. 280 at 4 & n.4. Plaintiffs cannot, on one hand, argue that Charter should be foreclosed from obtaining the Hash Report because the underlying evidence can be sought from Audible Magic and on the other vehemently object to Charter's access to the Audible Magic evidence.

Federal Rule of Civil Procedure 45(d)(2)(B) requires objections to a subpoena to be served "before the earlier of the time specified for compliance or 14 days after the subpoena is served." Charter served its subpoena on Audible Magic on December 20, 2019, requesting that responsive documents be produced by January 15, 2020. It is not the case, as Plaintiffs maintain, that the strict time constraints of Rule 45(d)(2)(b) do not apply to them because they are not the "person commanded to produce documents" under the subpoena--the law unequivocally requires a party to move to quash a subpoena ***before*** the third party's deadline for compliance. *Wiley v. Covad Commc'ns Co.*, 2010 WL 1225035, at *1 (D. Colo. Mar. 29, 2010) (Hegarty, M.J.) (denying Plaintiff's renewed motion to quash as untimely, since it was filed ten days after the [nonparty] subpoena's date of compliance).

---

[3] For example, only 3,700 audio files have been produced to Charter on a Hard Drive that Plaintiffs represent reflect verified works-in-suit.

[4] The 2016 SOW between the RIAA (on behalf of Plaintiffs) and MarkMonitor called for this Audible Magic matching to be concluded during the 30 days following the SOW's January 29, 2016 effective date. Thus, the transaction logs at issue are primarily from January and February 2016, which is within the claims period. However, to the extent there are any additional transaction logs or other documents or communications related to the 2016 Project that fall outside the claim period, they should be produced. For the reasons outlined herein, these documents represent precisely the kind of discrete and limited post-claim period documents that the Special Master has previously ordered produced. *See* Dkt. 181 at 5 ("In certain instances, however, Charter has demonstrated that certain limited post-claim documents are relevant and should be produced.").

Indeed, in the principal case Plaintiffs rely on, *Chevron Corp. v. Stratus Consulting, Inc.*, 2010 WL 2135217, at *4 (D. Colo. May 25, 2010), Magistrate Judge Hegarty explained that "unjustified delay, inexcusable conduct, or bad faith" can justify a waiver of the right to object to a subpoena on privilege grounds—and found that an unexplained delay of under two months constituted an "unjustified delay." Plaintiffs likewise offer no explanation for their ten-month delay, instead pointing to generic objections to *different* discovery requests directed at Plaintiffs that Plaintiffs say should have put Charter on notice of their objection to the subpoena. But that is not the way discovery works. A party is required to raise specific objections on a request-by-request basis—neither blanket nor general objections are recognized as effective under current law. *See, e.g. E.E.O.C. v. Outback Steakhouse of FL, Inc.*, 251 F.R.D. 603, 608 (D. Colo. 2008) (the "burden of showing that the requested discovery is objectionable . . . cannot be satisfied by merely asserting a boilerplate objection to discovery without providing concrete substantiation.") (internal citation omitted). Moreover, the two "objections" to which Plaintiffs point were served on March 26, 2020 (to Charter's Second Set of Requests for Production) and April 29, 2020 (Objection To Production of Hash Report)—three months after service of the Audible Magic subpoena. Even if objections to one set of discovery requests could be deemed effective as to an entirely different set of discovery requests—a proposition for which Plaintiffs have offered no supporting authority—the months of delay would make the March and April objections untimely anyway.

Plaintiffs' reliance on their April 29 objection to producing the Hash Report further exemplifies their "inexcusable conduct" and "bad faith" in objecting to the Audible Magic subpoena. Plaintiffs maintain that "[t]o suggest that Plaintiffs objected to production of the hash report, but not the information contained within the hash report, is nonsensical." Dkt. 280 at 3. But, as noted above, the position they now deride as "nonsensical" was their *exact position* for the first nine months after the Audible Magic subpoena issued. Plaintiffs, from December 2019 to September 2020, (1) knew about the Audible Magic subpoena; (2) lodged no objection to the Audible Magic subpoena; (3) assumed that the transaction logs had been produced to Charter; and (4) opposed production of the 2016 Hash Report on the very ground that the data it contained was available from Audible Magic. The Special Master should not reward Plaintiffs' evident gamesmanship by permitting them to now object to the production of documents they assumed had been produced for months, without objection. Plaintiffs' response brief should not be considered.

### c. The Special Master Should Deny Plaintiffs' Request to Transfer This Motion to Magistrate Judge Hegarty and Should Compel Audible Magic to Produce the 2016 Data and a Privilege Log

#### 1. Plaintiffs Have No Colorable Basis to Assert Work Product Protection For the 2016 Transaction Logs

The transaction logs were generated as part of Audible Magic's ordinary course of business. Whether or not a particular Info Hash matches a work in Audible Magic's database is a factual determination, neither informed nor determined by counsel. It is axiomatic that neither the attorney-client privilege nor the attorney-work product doctrine shields discovery into underlying facts. *See, e.g., Marcin Eng'g, LLC v. Founders at Grizzly Ranch, LLC*, 219 F.R.D. 516, 525 (D. Colo. 2003) (noting that the work product "doctrine applies to documents and tangible things

6

prepared by a party in anticipation of litigation. . . . It does not apply to facts underlying or contained in such documents.").

Nonetheless, seeking to avoid production of this core unprivileged evidence, Plaintiffs belatedly assert work product protection, and, on that basis, request that this motion be referred to Magistrate Judge Hegarty. However, while Plaintiffs broadly characterize the 2016 Audible Magic transaction logs as "work product," they fail to establish the *prima facie* basis for attorney client privilege or attorney work product protection. *See Cline v. Adv. Med. Optics, Inc.*, 2009 WL 585507, at *2-3 (E.D. Tex. Mar. 6, 2009). At most, Plaintiffs say that the logs were information the "Plaintiffs' lawyers were considering when assembling" their claims, and accordingly assert that Charter has no valid reason to compel their production. But the mere fact "lawyers were considering" certain information when thinking about filing a case does not by any stretch transform that information into work product. *See Resolution Tr. Corp. v. Dabney*, 73 F.3d 262, 266 (10th Cir. 1995) ("Because the work product doctrine is intended only to guard against divulging the attorney's strategies and legal impressions, it does not protect facts concerning the creation of work product or facts contained within work product."). Additionally, even if Plaintiffs had established *prima facie* evidence that the logs are work product (which they cannot), any work product protection has been waived because Plaintiffs rely on the files MarkMonitor downloaded and Audible Magic allegedly verified to prove their direct infringement case. *See, e.g.*, *Chevron Corp. v. Stratus Consulting, Inc.*, 2010 WL 3923092, at *10 (D. Colo. Oct. 1, 2010) (Hegarty, M.J.) ("fundamental fairness precludes Plaintiffs from using [communications] as a shield from production after wielding the conclusions from disclosure of these communications as a multi-billion dollar damages sword").

Plaintiffs assertion that Charter has access to the underlying information provided by the 2016 transaction logs is both false and irrelevant. Since Plaintiffs have not (and cannot) establish the foundational facts to support assertion of attorney-client privilege or attorney work product, whether they believe there are alternative sources for this evidence is immaterial. Plaintiffs' assertion is also factually inaccurate. That Plaintiffs have produced the actual files successfully downloaded by MarkMonitor in 2016 is no substitute for the Audible Magic transaction logs. First, and most fundamentally, access to the evidence that Plaintiffs have produced, which allegedly corroborates their claims, is no substitute for access to the evidence that they have selectively withheld, which would undermine them. And Plaintiffs' intimation that Charter could use the files produced to simply recreate the transaction logs by hiring Audible Magic—***Plaintiffs' purported litigation consultant***—is absurd. By definition, any reports that Charter commissioned now to verify the Plaintiffs' digital files using the Audible Magic database would ***not*** be the same evidence that Plaintiffs relied on four years ago to identify allegedly infringed works. Moreover, while Charter may be able to commission Audible Magic to identify the digital files that Plaintiffs have chosen to produce, that is not evidence regarding the files that Plaintiffs could ***not*** verify and chose ***not*** to produce. Charter is entitled to production of the evidence that is directly probative of the bases for the *en masse* infringement notices Plaintiffs' agents sent to Charter and the reliability (or unreliability) of the automated system Plaintiffs relied upon to generate those notices.

### 2. Transferring This Motion to Judge Hegarty Would Be Premature, as the Hash Report Motion Does Not Control Discoverability of the Transaction Logs

While Charter does not dispute that Magistrate Judge Hegarty—pursuant to his oral order retaining jurisdiction over privilege issues—will ultimately decide Plaintiffs' (belated and specious) assertion of work product protection over the transaction logs and other documents related to the 2016 Project, Plaintiffs' request to transfer this motion to Magistrate Judge Hegarty is premature. First, this motion presents issues that are not before Judge Hegarty and are not coextensive with the relief requested in Charter's pending motion to compel production of the Hash Report. Unlike the Hash Report, which Plaintiffs insist was "initially prepared by outside counsel," the Audible Magic transaction logs were generated by Audible Magic (not counsel) for the purpose of verifying a list of works downloaded by MarkMonitor in 2016. Dkt. 280 at 2. In their brief in opposition to the motion to compel the Hash Report, Plaintiffs concede that "production of data from Audible Magic's files would be a lesser intrusion into Plaintiffs' work product than requiring production of the attorney-created and directed Hash Report that also contains other information." Dkt. 287 at 16 n.7. Indeed, whether or not the Court finds the Hash Report to be protected from disclosure by the attorney work product doctrine, which it is not for the reasons set forth in Dkt. 266, that decision is not determinative of whether Audible Magic should be compelled to produce the transaction logs (and at least log communications relating thereto). Unlike the Hash Report, the Audible Magic transaction logs were created in the ordinary course of business from a database that—by Plaintiffs' own characterization—was available to anyone who wanted to pay for the service. Audible Magic's matching process was not created by lawyers or for litigation. And the merits aside, as explained above, there is a substantial likelihood that Plaintiffs waived any work product protection attendant to the transaction logs due to their untimely objection, but did not necessarily do so with respect to the Hash Report.

Accordingly, the pendency of Charter's motion to compel production of the Hash Report is no reason to transfer this motion to Magistrate Judge Hegarty. The Hash Report and the 2016 transaction logs are separate sets of documents subject to different arguments, and so Magistrate Judge Hegarty's resolution of the motion to compel production of the Hash Report will not resolve the parties' dispute over the transaction logs. As explained below, Charter should be afforded the opportunity to challenge Plaintiffs' newfound assertion of work product protection over the 2016 transaction logs and related documents with the benefit of a privilege log and a fulsome understanding of the documents being withheld.

### 3. Audible Magic Should Be Compelled to Produce a Privilege Log

At a minimum, transferring this motion to Magistrate Judge Hegarty at this juncture would be premature, because neither Audible Magic nor Plaintiffs have provided a privilege log of withheld, responsive documents in Audible Magic's possession beyond identifying the transaction logs. While Magistrate Judge Hegarty has the authority to determine whether work product protection attaches to the requested documents, the Special Master can and should order Audible Magic to log the documents they are withholding. Federal Rule of Civil Procedure 45(e)(2)(A)(ii) provides that "[a] person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must … describe the nature of the withheld

documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim." Courts have repeatedly required third parties to produce privilege logs under Rule 45(e). *See, e.g., Cty. Of Jacksonville v. Shoppes of Lakeside, Inc.*, 2016 WL 7227566, at *1 (M.D. Fla. Jan. 7, 2016) (noting that nonparty's failure to attach a privilege log to its motion seeking to quash a subpoena for requesting privileged documents "make[s] it difficult for the Court to analyze whether and what relief, if any, should be granted."); *Bennie v. Munn*, 2013 WL 4761383, at *1 (D. Neb. Sept. 4, 2013) (explaining that Magistrate Judge had previously ordered nonparty to provide a privilege log and submit documents thought to be privileged *in camera*).

Contrary to Audible Magic's assertion—unsupported by any legal authority—that it need not produce a log, nothing in the text of Rule 45 enables Audible Magic to evade its obligation to produce a privilege log to the extent it withholds responsive documents. Indeed, the Special Master required third party MarkMonitor to produce a privilege log detailing documents over which Plaintiffs assert privilege. Dkt. 253 at 9 ("MarkMonitor should amend its responses to identify requests for which documents are being withheld and to identify such documents on a privilege log, including but not limited to, communications with Plaintiffs' counsel in this matter."). In doing so, the Special Master expressly rejected the precise argument Audible Magic now makes. Dkt. 253 at 12 ("[S]ince MarkMonitor acknowledges that it withheld certain documents as privileged or based upon a common interest protection, MarkMonitor must know which documents are being withheld pursuant to a claim of protection, even if the privilege or other protection is the Plaintiffs'. Thus, it is not unreasonable that MarkMonitor should log and identify the basis for the withholding of such documents.").

Regardless, in no event is it appropriate for the Special Master to transfer this motion to Magistrate Judge Hegarty at this juncture. As Charter indicated in its opening brief, at the time Charter filed this motion to compel, Audible Magic had not identified *any* meaningful reason why it was withholding documents related to the 2016 Project—and in fact denied that any such documents existed. Now that Audible Magic has acknowledged the existence of the 2016 transaction logs, and identified the work product doctrine as the basis for its decision to withhold them (and potentially additional documents), it should have to produce a privilege log identifying and describing the withheld documents. Ordering it to do so (1) is within the Special Master's power; (2) will present Magistrate Judge Hegarty with the clearest record of what specific documents are in dispute; and (3) will enable Charter to file a specific and targeted motion to compel.

A privilege log is especially important to clarify the universe of withheld documents. It is difficult to believe Audible Magic's representation that the transaction logs are the only documents it is withholding on the basis of privilege or work product protection related to the 2016 Project.[5]

---

[5] Additionally, according to a spreadsheet produced by Audible Magic listing its invoices to RIAA, Plaintiffs initiated a "Music Compliance ID Service" project with Audible Magic beginning in January 2018 and running through May 2018. Similarly, in November 2018, shortly before this case was filed, Audible Magic invoiced RIAA for "transactions totaling 111,978." If either project, like the 2016 project, related to this litigation the relevant materials would obviously need to be logged.

9

It is highly unlikely that transaction logs represent the only correspondence between Audible Magic and MarkMonitor and/or the RIAA or its counsel, or that Audible Magic generated no other documents related to the 2016 Project. Yet Audible Magic has neither produced nor logged any additional documents related to the 2016 Project. The Special Master should compel Plaintiffs to log (or produce) all documents in its possession related to the 2016 Project, so that Charter has notice of the specific privilege claims, and so that Magistrate Judge Hegarty has a clear record to the extent further motion practice is necessary to address Plaintiffs' assertion of work product protection.

### III.   Conclusion

For the foregoing reasons, the Special Master should compel Audible Magic to proceed with an immediate source code review that is not limited to two days. The Special Master should further compel Audible Magic to produce or log the transaction logs from the 2016 Project and any related documents or communications.

Respectfully submitted,

*/s/Andrew Schapiro*

Andrew Schapiro