UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

WARNER RECORDS INC. (f/k/a/ Warner Bros. Records, Inc.), *et al.*,

*Plaintiffs*,

v.

CHARTER COMMUNICATIONS, INC.,

*Defendant*.

Case No. 19-cv-00874-RBJ-MEH

**CHARTER COMMUNICATIONS, INC.'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

In 2016, Plaintiffs engaged in an exercise (the "2016 Project") to create the purported evidence of direct infringement that they failed to obtain during the 2012 to 2015 claims period in this case, when they sent hundreds of thousands of infringement notices to Charter. Plaintiffs now seek to selectively use the results of that exercise in support of their claims, while at the same time asserting work product protection over the data associated with the Hash Report that Plaintiffs feel will harm their case. The law recognizes that a party who selectively produces favorable information to assert an infringement claim but withholds less favorable information on the grounds of privilege improperly uses privilege as a sword and a shield. In the circumstances here, the law requires production of the Hash Report and related data. Nothing in Plaintiffs' response brief alters that fundamental conclusion.[1]

---

[1] In a footnote, Plaintiffs argue that Charter's Motion failed to comply with Local Rule 37.1 because Charter does not say "to which request its motion is directed." However, Plaintiffs ignore that Charter was directed to file this Motion by the Special Master to address a privilege

### I. Charter Properly Characterizes the Hash Report

Plaintiffs open their brief by asserting that Charter mischaracterized the Hash Report in a variety of ways. Charter did no such thing—its characterizations of the Hash Report are accurate.

***First***, the Hash Report ***is*** effectively an audit of MarkMonitor's reliability, as it reflects (1) the extent to which MarkMonitor was able to find and download the files on which the 660,000 infringement notices were based, and (2) to the extent those files actually existed, whether Audible Magic was able to verify that their contents infringed Plaintiffs' works. That the 2016 Statement of Work indicates that the 2016 Project was undertaken for "investigative purposes" and "in anticipation of litigation" in no meaningful sense changes the nature of the Hash Report as a document that tests the reliability of MarkMonitor's system for generating notices.

***Second***, it is Plaintiffs who mischaracterize Charter's argument with respect to the availability of the evidence in the Hash Report. Contrary to Plaintiffs' mischaracterization of Charter's argument, Charter never contended that the Hash Report is Plaintiffs' only evidence of direct infringement. Charter instead posited—accurately—that the Hash Report is the only available source of ***the results of the 2016 Project***. Plaintiffs do not dispute—and in fact have affirmatively represented—that there is no source other than the Hash Report from which Charter can obtain the full list of 7,200 hashes that MarkMonitor searched for in 2016 or the results of that inquiry. *See* Mot. Ex. 7 at 3. And, as explained in section IV, *infra*, this evidence is necessary to

---

issue. *See* Sept. 28, 2020 Ltr. From Special Master to All Counsel (Ex. 14). Charter attached both Plaintiffs' privilege log (Mot. Ex. 5) and Plaintiffs' letter to the Special Master explaining the basis of their objection (Mot. Ex. 1) to enable the Court to understand the parties' dispute.

assess the reliability of what Plaintiffs acknowledge is their key evidence of direct infringement—the notices sent to Charter from 2012-2015, and the works downloaded by MarkMonitor in 2016.

***Third***, Plaintiffs' contention that the Hash Report is not a "recreation" of evidence is wrong. MarkMonitor did not download a single file actually shared by a Charter user from 2012-2015, when it sent hundreds of thousands of notices to Charter. And, to the extent that MarkMonitor did download files from other sources for Audible Magic matching during the 2012-2015 period, it did not retain any of them. In an after-the-fact effort to generate the evidence that they failed to collect, Plaintiffs re-retained MarkMonitor to download files associated with 7,200 info hashes in *2016*. Plaintiffs now seek to use this re-created evidence as their core evidence of direct infringement.

In short, the Hash Report and its underlying data was effectively an audit of the reliability of the MarkMonitor system that Plaintiffs used to generate the infringement notices from 2012-2015 and the audio files that *were* re-collected in 2016 that now form the foundation of Plaintiffs' case. Plaintiffs seek to use part of the evidence generated from that audit—the works successfully downloaded in 2016—as key evidence of direct infringement, while at the same time refusing to produce those parts of their audit that would cast doubt on their claims. It is through this lens that the Court must assess Plaintiffs' assertion of work product protection over the Hash Report.

## II.     The Hash Report is Factual Work Product

As a preliminary matter, the Court should reject Plaintiffs' argument that the data included in the Hash Report is "opinion" work product simply because the hashes included in the 2016 Project and the Audible Magic verifications contained therein may enable Charter to speculate about decisions made by counsel to identify those hashes and request those analyses. If Plaintiffs'

3

view were adopted, even documents that constitute paradigmatic factual work product—for instance, factual statements made by a witness during an interview—would be "opinion" work product, because of the possibility they might reveal something about an attorney's thought process (for example, what the attorney decided to ask the witness). But this is not the law. *See, e.g., United States v. Graham*, 2003 WL 23198792, at *6 (D. Colo. Dec. 2, 2003) ("Thus, if the statement was recorded to preserve it as representing what the witness said as opposed to what the attorney thought about what the witness said, then it is 'fact,' not 'opinion' work-product."). Here, Plaintiffs seek to use the files downloaded in 2016 and their associated data (including hashes) as factual evidence against Charter, while at the same time insisting that the other hashes MarkMonitor searched for in 2016 are somehow not facts, but instead opinions. This position is both illogical and inconsistent with the law, which limits "opinion" work product to "pure mental impressions severable from the underlying data." *Graham*, 2003 WL 23198792, at *6. By producing and relying upon the works downloaded in 2016 and their attendant hashes, Plaintiffs concede that the hashes MarkMonitor searched for in 2016 have "evidentiary value for either substantive … or impeachment" purposes, and are thus factual work product. *Id.* (noting that opinion work product "has no intrinsic evidentiary value, but instead, represents expressions of attorney ratiocination or of legal theory").

Moreover, Plaintiffs' position is inconsistent with the many cases where courts have required production of entire investigations that the party seeking to avoid production placed at issue. *See, e.g., Martensen v. Koch*, 301 F.R.D. 562, 579-81 (D. Colo. 2014) (directing production of an investigation that "was commissioned … at the direction of Oxbow's then-general counsel" and characterizing the investigation as factual work product); *Austin v. City & Cnty. of Denver ex*

4

*rel. Bd. of Water Comm'rs*, 2006 WL 1409543, at *8 (D. Colo. May 19, 2006) (ordering production of an investigative report over party's objection that it would "reveal the substance and nature of the attorney-client communications that resulted in changes to the preliminary and final reports given to the complainants"). Attorney judgment goes into every attorney-directed investigation, but the fruits of those investigations still must be produced if a party has a substantial need for them, as Charter does here, or where the party asserting work product protection has used the investigation affirmatively, as Plaintiffs have done here. *See* Secs. III and IV, *infra*.

Moreover, as Charter explained in its opening brief, Plaintiffs' reliance on *United States v. J-M Manufacturing Co.*, 2013 WL 424782, at *4 (D. Colo. Feb. 4, 2013) is misplaced. While the *J-M Manufacturing* court noted that counsel's selection of a particular testing methodology "could reveal attorney opinions, theories, or strategies,"[2] the information sought here does not reveal any significant inferences about counsel's thought process. Plaintiffs do not explain how a list of hashes—half of which they have already selectively produced, *see* Mot. Ex. 1—could meaningfully reveal counsel's strategy. The same is true of the 2016 Audible Magic results. Plaintiffs have already revealed that the Hash Report contains the Audible Magic results—nothing more about Plaintiffs' counsel's strategy is revealed by producing the results. The Hash Report and underlying data is thus factual work product subject to production.

---

[2] Plaintiffs represent that the Tenth Circuit affirmed the district court's conclusion that the testing methodology at issue constituted opinion work product, Resp. at 17, but this is false. The Tenth Circuit expressly declined to affirm the district court on this ground. *See Nevada v. J-M Mfg. Co.*, 555 F. App'x 782, 786 n.3 (10th Cir. 2014) ("Although the district court also held that the test results qualify as opinion work product, we need not reach that issue[.]").

### III.     Plaintiffs Waived Work Product Protection Over The Hash Report

Plaintiffs waived any work product protection over the Hash Report by producing portions of the 2016 Project that they deem favorable to their position—the list of successfully downloaded works—while at the same time refusing to produce the portions of the Project that they deem unfavorable.  Plaintiffs' insistence that work product protection over the Hash Report has not been waived because they do not intend to rely on the Hash Report *itself* in supporting their claims is flawed.  That is not the law, and none of the cases upon which Plaintiffs rely support that proposition.  Indeed, in *Chevron Corp. v. Stratus Consulting, Inc.*, 2010 WL 3923092, at *10 (D. Colo. Oct. 1, 2010), the issue was not whether a party was using a single document as a sword and a shield.  Instead, the Court explained that "fundamental fairness precludes Plaintiffs from using communications … as a shield from production after ***wielding the conclusions from disclosure of these communications*** as a multi-billion dollar damages sword." *Id*. (emphasis added).  The Court then specifically ordered production of the full set of communications related to those conclusions, noting that "justice does not permit one side to inform and facilitate a damages assessment, purposed for the reliance of the court, without permitting its opponent access to the materials and process underlying the assessment." *Id*. at *11.  And that is exactly what Plaintiffs are doing here: they admit that they are using the fruits of the 2016 Project as key evidence of direct infringement, while at the same time seeking to deny Charter access to the portions of the 2016 Project that would cast doubt on the reliability of that evidence.

Nor does *Frontier Refining, Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 704 (10th Cir. 1998), support Plaintiffs' position.  In *Frontier*, unlike here, the party asserting work product protection "did not use ***any*** work product as a sword," and thus did not waive protection over the wide

universe of documents the defendants demanded. *Id.* As *Frontier* recognizes, the question is whether Plaintiffs are "selectively using the privileged documents to prove a point but then invoking the privilege to prevent an opponent from challenging the assertion." *Id.* Here, Plaintiffs rely on the results of the 2016 Project to support their infringement claims—they affirmatively contend that the files MarkMonitor was able to successfully download in 2016 are identical to those that MarkMonitor allegedly detected Charter's subscribers sharing in 2013-2015[3]—but shield from discovery the unhelpful facts that demonstrate the holes in this system.

Indeed, the files downloaded in 2016—which Plaintiffs have produced and intend to rely on—are subject to every single argument that Plaintiffs make in attempting to shield the Hash Report from production. According to Plaintiffs, their counsel identified the specific hashes that MarkMonitor was to search for in 2016. The works that MarkMonitor was able to find are just as much reflective of "the specific selection of hashes Plaintiffs' counsel directed MarkMonitor to investigate based on counsel's analysis" as the list of hashes that MarkMonitor was unable to find. Resp. at 9. Plaintiffs have produced the former, believing it to be helpful to them, while at the same time shielding the latter from production. Regardless of what you call it, Plaintiffs may not produce the half of their "evidence" or "analysis" they think will benefit them, while withholding the half they think will not.

For these reasons, Plaintiffs' efforts to distinguish the cases cited in Charter's opening brief are futile. Each of these cases concerned the exact circumstance at issue here: a party sought to rely on portions of an investigation while at the same time withholding documents related to those

---

[3] *See, e.g.*, Resp. at 9 ("To the extent Plaintiffs will rely on anything from the 2016 SOW, it is the downloaded files").

7

investigations. *See Martensen*, 301 F.R.D. at 581 ("To allow Mr. Koch to rely upon the Grant Thornton reports to plan for and justify the Bear Ranch confrontation and then withhold those same materials from Plaintiff would, in my opinion, effectively subvert the fact-finding process."); *Austin*, 2006 WL 1409543, at \*8 ("As long as Defendants persist in asserting a *Faragher/Ellerth* defense, Plaintiff should be permitted to explore the *bona fides* of that affirmative defense. Any other result would permit Defendants to use the attorney-client privilege as both a sword and a shield.") *Walker v. Cnty. of Contra Costa*, 227 F.R.D. 529, 533 (N.D. Cal. 2005) (party loses work product and attorney-client privileges when relying on an investigation to prove a claim or defense). Ultimately, Plaintiffs' only argument to distinguish this on-point law is that the Court should gerrymander the 2016 Project into separate categories: the downloaded hashes, which they have produced, and the "non-downloaded hashes" and "2016 Audible Magic results," which they have not. Plaintiffs point to no authority that allows them to artificially divide an investigation into constituent parts and selectively produce only certain parts in support of their claim. No such authority exists.

Finally, Plaintiffs also insist that they have not waived work product protection over the Hash Report because they do not believe the Hash Report is relevant. But Plaintiffs' assessment of relevance is immaterial to whether they have waived work product protection. Moreover, Plaintiffs' assertions of irrelevance are wrong. Of course it is highly relevant to the reliability of the MarkMonitor system if MarkMonitor's investigations in 2016 reveal that it erroneously sent hundreds of thousands of notices to Charter in 2012-2015. And of course it is relevant if Audible Magic was unable in 2016 to verify that files that served as the basis of hundreds of thousands of

8

notices in 2012-2015 were actually infringing. Plaintiffs may wish that the jury did not hear this information, but that does not make it any less material to Plaintiffs' claims.

The Court should thus compel Plaintiffs to produce the Hash Report as Plaintiffs have waived any work product protection they may have asserted.[4]

### IV. Charter Has a Substantial Need for the Hash Report

As Charter indicated in its opening brief, the Hash Report constitutes fundamental evidence that is unavailable from any other source. As Plaintiffs readily admit, in 2016, they instructed MarkMonitor to download files associated with 7,200 hashes, but MarkMonitor was only able to locate and download "some but not all of the files" associated with those hashes. Resp. at 1. Plaintiffs have, however, refused to provide the Hash Report, which contains the hashes that MarkMonitor was unable to locate. And Plaintiffs admit that the Hash Report is the only source of this information. Mot. Ex. 7 at 3. Instead of addressing this point, Plaintiffs argue that Charter does not have a substantial need for the portion of the 2016 Project they selectively declined to produce because "[t]he reliability and accuracy of Plaintiffs' notices stands on the infringement evidence available when Plaintiffs sent the notices in 2012-2015." Resp. at 14. But the whole reason that Plaintiffs undertook the 2016 Project is because they failed to collect any evidence in 2012-2015 and needed to recreate this material to prove direct infringement. At the time MarkMonitor generated the notices they sent to Charter, MarkMonitor did not download or verify infringement of a single file actually shared by a Charter subscriber. When MarkMonitor went

---

[4] For the same reasons, Plaintiffs have also waived work product protection over any documents related to the Hash Report. Plaintiffs may not conceal related communications and data underlying the Hash Report while affirmatively relying on the results of this project.

9

back in 2016 to try to find copies of the files identified on notices sent to Charter, it was unable to locate potentially thousands of them. This failure is reflected in the Hash Report and, according to Plaintiffs, there is no other source of this information.

The information Charter seeks in its Motion to Compel is critical to its defense of this case. Plaintiffs concede that their direct infringement case is predicated upon their claim that the 2012-2015 notices actually identified acts of infringement, Resp. at 14, but seek to conceal the fact that they were unable to actually locate potentially thousands of files that formed the basis of their notices. Further, Plaintiffs contend that the files identified through the 2016 Project are identical to the torrents MarkMonitor detected in 2012-2015, but through their work product assertions they seek to prevent Charter from evaluating that claim or the accuracy of the MarkMonitor process. That Plaintiffs' notice program may have resulted in the generation of thousands (or tens or potentially hundreds of thousands) of inaccurate notices is crucial evidence in this case, and it is unavailable from any source other than the Hash Report. While Plaintiffs assert that MarkMonitor's inability to locate or verify thousands of files is meaningless, it is, in reality, powerful evidence that MarkMonitor's system for generating notices from 2012 to 2015 was unreliable. This is especially so because Plaintiffs intend to rely on the total corpus of notices they sent to Charter in proving their case, as they did in the *Sony v. Cox* litigation. Plaintiffs should not be permitted to simultaneously weaponize the hundreds of thousands of notices they sent as evidence against Charter, while at the same time depriving Charter of key evidence that those notices are inaccurate.

With respect to the 2016 Audible Magic results—which are also contained in the Hash Report—Plaintiffs do not dispute that the results constitute core evidence related to direct

10

infringement in this case. Instead, Plaintiffs' only response is that Charter can obtain the same evidence from different sources. Not so. First, Plaintiffs' suggestion that Charter can simply hire Audible Magic—*Plaintiffs' purported litigation consultant*—and run the works through its system today is absurd. Charter should not have to retain Plaintiffs' consultant—who undoubtedly would reject any retention due to the obvious conflict—to obtain information Plaintiffs claim they already have about whether or not the hashes Plaintiffs' contend are identical to those identified in the original notices actually contain works owned by the Plaintiffs. Second, even if Charter could run the downloaded files through Audible Magic, it would not replace the 2016 Audible Magic results. Both Plaintiffs and Audible Magic have represented that Audible Magic's system dynamically changes over time, and so the system today is not the same system that existed in 2016.[5] Third, the fact that Plaintiffs have produced and intend to use at trial the works downloaded in 2016 does not obviate Charter's need for the Audible Magic results. If Plaintiffs possess evidence that the torrents they intend to use at trial do not actually contain Plaintiffs' works, Charter has a substantial need for that information.

Plaintiffs cite a single unpublished Tenth Circuit case, *Nevada v. J-M Mfg. Co.*, 555 F. App'x 782 (10th Cir. 2014), in support of the proposition that they can selectively withhold

---

[5] Plaintiffs' position with respect to the 2016 Audible Magic results is contradictory. They maintain that the results are available from Audible Magic's transaction logs, while at the same time insisting that those transaction logs are also protected by the work product doctrine. Regardless, because neither Plaintiffs nor Audible Magic has produced, or even logged as privileged, the transaction logs, it is not clear that they are an adequate replacement for the hash report—*i.e.*, whether they identify the works that Audible Magic was not able to verify. Regardless, as explained in this motion and the separate motion to compel production of the transaction logs currently before the Special Master, Plaintiffs have waived any work product protection over both the transaction logs and the Hash Report.

11

documents related to the 2016 Project. *Nevada* stands for no such thing. In *Nevada*, the defendant sought to obtain a test conducted by a consultant hired by the federal government when it was deciding whether to intervene in the suit. The Tenth Circuit ruled that the requested test had only limited relevance to the plaintiffs' legal theory, and that even if the testing showed results favorable to the defendant, those results would be "fully consistent with the plaintiffs' theory." *Id*. at 785-86. In addition, the court found that the defendant could conduct its own testing that was substantially identical to the government's test, rejecting the defendant's argument that its tests would be subject to credibility attacks. *Id*. Unlike the evidence at issue in *Nevada*, the evidence Charter seeks here is both crucial to its defense of this case and unavailable from other sources. As explained above, the hashes that MarkMonitor was unable to locate are both fundamental to assessing the reliability of the MarkMonitor system on which Plaintiffs' entire case rests, and, by Plaintiffs' admission, cannot be recreated and are unavailable from any other source. And the 2016 Audible Magic results, including any results showing that Audible Magic was unable to verify the works downloaded in 2016, are core evidence related to Plaintiffs' direct infringement case and the reliability of the Audible Magic system.

## V. CONCLUSION

For the foregoing reasons, the Court should grant Charter's motion to compel production of the Hash Report.

| | |
|---|---|
| Dated: November 23, 2020 | Respectfully submitted, |

Jennifer A. Golinveaux
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA 94111-5840
(415) 591-1506 (telephone)
(415) 591-1400 (facsimile)
E-mail: jgolinveaux@winston.com

Michael S. Elkin
Thomas Patrick Lane
Seth E. Spitzer
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
(212) 294-6700 (telephone)
(212) 294-4700 (facsimile)
E-mail: melkin@winston.com
E-mail: tlane@winston.com
E-mail: sspitzer@winston.com

Erin R. Ranahan
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071
(213) 615-1933 (telephone)
(213) 615-1750 (facsimile)
E-mail: eranahan@winston.com

*/s/ Andrew Schapiro*
Andrew H. Schapiro
Allison Huebert
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400 (telephone)
(312) 705-7401 (facsimile)
E-mail: andrewschapiro@quinnemanuel.com
E-mail: allisonhuebert@quinnemanuel.com

Charles K. Verhoeven
David Eiseman
Linda Brewer
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600 (telephone)
(415) 875-6700 (facsimile)
E-mail: charlesverhoeven@quinnemanuel.com
E-mail: davideiseman@quinnemanuel.com
E-mail: lindabrewer@quinnemanuel.com

Todd Anten
Jessica Rose
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Ave, 22nd floor
New York, NY 10010
(212) 849-7000 (telephone)
(212) 849-7100 (facsimile)
E-mail: toddanten@quinnemanuel.com
E-mail: jessicarose@quinnemanuel.com

Craig D. Joyce
Fairfield and Woods, P.C.
1801 California Street, Suite 2600
Denver, Colorado 80202
(303) 830-2400 (telephone)
(303) 830-1033 (facsimile)
E-mail: cjoyce@fwlaw.com

*Counsel for Defendant*
*Charter Communications, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 23, 2020, I caused the foregoing document and all supporting materials thereto to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record registered with CM/ECF.

                                                          */s/ Andrew Schapiro*
                                                          Andrew Schapiro