## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

WARNER RECORDS INC., *et al.*,

      Plaintiffs,

v.

CHARTER COMMUNICATIONS, INC.,

      Defendant

Case No. 19-cv-00874-MSK-MEH

## PLAINTIFFS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS TO DEFENDANT'S SECOND AMENDED COUNTERCLAIMS I AND II

### ANSWER

Plaintiffs Warner Records Inc., Atlantic Recording Corporation, Bad Boy Records LLC, Elektra Entertainment Group Inc., Fueled By Ramen LLC, Lava Records LLC, Maverick Recording Company, Nonesuch Records Inc., The All Blacks U.S.A., Inc., Warner Music Inc., Warner Records/SIRE Ventures LLC, WEA International Inc., Warner Chappell Music, Inc., Warner-Tamerlane Publishing Corp., W Chappell Music Corp. d/b/a WC Music Corp., W.C.M. Music Corp., Unichappell Music Inc., Rightsong Music Inc., Cotillion Music, Inc., Intersong U.S.A., Inc., and Chappell & Co. Inc. (collectively, the "Warner Plaintiffs"); and Plaintiffs Sony Music Entertainment, Arista Music, Arista Records LLC, LaFace Records LLC, Provident Label Group, LLC, Sony Music Entertainment US Latin, The Century Family, Inc., Volcano Entertainment III, LLC, and Zomba Recordings LLC (collectively, the "Sony Music Plaintiffs"); and Plaintiffs Sony/ATV Music Publishing LLC, EMI Al Gallico Music Corp., EMI Algee

Music Corp., EMI April Music Inc., EMI Blackwood Music Inc., Colgems-EMI Music Inc., EMI

Consortium Music Publishing Inc. d/b/a EMI Full Keel Music, EMI Consortium Songs, Inc.,

individually and d/b/a EMI Longitude Music, EMI Entertainment World Inc. d/b/a EMI Foray

Music, EMI Jemaxal Music Inc., EMI Feist Catalog Inc., EMI Miller Catalog Inc., EMI Mills

Music, Inc., EMI Unart Catalog Inc., EMI U Catalog Inc., Famous Music LLC, Jobete Music Co.

Inc., Stone Agate Music, Screen Gems-EMI Music Inc., and Stone Diamond Music Corp.

(collectively, the "Sony/ATV and EMI Plaintiffs"); and UMG Recordings, Inc., Capitol Records,

LLC, Universal Music Corp., Universal Music – MGB NA LLC, Universal Music Publishing

Inc., Universal Music Publishing AB, Universal Music Publishing Limited, Universal Music

Publishing MGB Limited, Universal Music – Z Tunes LLC, Universal/Island Music Limited,

Universal/MCA Music Limited, Universal/MCA Music Publishing Pty. Limited, Music

Corporation of America, Inc., Musik Edition Discoton GmbH, PolyGram Publishing, Inc., and

Songs of Universal, Inc. (collectively, the "Universal Plaintiffs," and with the Warner Plaintiffs,

Sony Music Plaintiffs, and Sony/ATV and EMI Plaintiffs, the "Plaintiffs"), respectfully submit

the following Answer and Affirmative Defenses to Counterclaims I and II asserted by Defendant

Charter Communications, Inc. ("Charter" or "Defendant"):

<u>**ANSWER TO COUNTERCLAIMS**</u>

I. <u>**Introduction**</u>[1]

  1. Charter is an Internet service provider ("ISP") that provides its customers

access to the Internet.  During the Claim Period, as part of its ISP services, Charter did not

store its subscribers' content on its servers. Charter did not host websites that index

---

[1] For the Court's convenience, Plaintiffs have reproduced Defendant's headings from its Second
Amended Counterclaims for purposes of Plaintiffs' Answers thereto.  Plaintiffs do not thereby
concede, affirm, or otherwise adopt any of those headings.

infringing files. Charter did not create or distribute peer-to-peer file-sharing software or other file-sharing software. Nevertheless, Plaintiffs seek to impose secondary liability on Charter for alleged copyright infringement by its subscribers occurring during the Claim Period, in an effort to create a substantial new set of liabilities and burdens for ISPs.

**Answer**: Plaintiffs admit that Charter is an Internet service provider and that Plaintiffs have asserted claims against Charter for secondary liability for copyright infringement by its subscribers.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 1 of Charter's First Amended Counterclaims (hereinafter "Counterclaims"), and on that basis deny those allegations.

2.     This Court has subject matter jurisdiction over Charter's counterclaims pursuant to 28 U.S.C. §§ 1331, 1367, and 1338(a).

**Answer**: Plaintiffs admit that this Court has subject matter jurisdiction over Charter's declaratory judgment counterclaims.  Plaintiffs have moved to dismiss the remaining claim.  Pursuant to the Federal Rules of Civil Procedure, they are not yet required to respond to this allegation as to those claims and reserve their rights accordingly.

## II.   Factual Allegations

### A.  Charter's Business

3.     Charter is one of the largest communications companies in the country, offering a variety of services, including cable, telephone, and Internet access services.

**Answer**: Plaintiffs admit the allegations contained in Paragraph 3 of Charter's Counterclaims.

4.      Charter provides Internet service to both residential subscribers and businesses. Its high-speed Internet service provides some 29 million U.S. customers with Internet connections across 41 states.

**Answer**: Plaintiffs admit that Charter provides Internet service to residential subscribers and businesses.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 4 of Charter's Counterclaims, and on that basis deny those allegations.

5.      As an ISP, Charter provides its customers with a gateway to the Internet, which has become virtually indispensable to functioning in the modern world.

**Answer**: Plaintiffs admit that Charter provides Internet service to its customers, among other services.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 5 of Charter's Counterclaims, and on that basis deny those allegations.

6.      The Internet provides access to a host of services, some of them critical. Individuals rely on Internet access to obtain services in the areas of healthcare, employment, education, banking, commerce, social interaction, news and entertainment, and many others.

**Answer**: Plaintiffs admit that individuals use the Internet for a variety of services. Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 6 of Charter's Counterclaims, and on that basis deny those allegations.

7.      As the Supreme Court recently emphasized in the case of *Packingham v. North Carolina*, for many people the Internet provides "the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public

square, and otherwise exploring the vast realms of human thought and knowledge." 137 S. Ct. 1730, 1737 (2017).

      **Answer**: Plaintiffs admit that the quoted text appears as cited in the Supreme Court opinion in *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017).  The remaining allegations contained in Paragraph 7 state legal conclusions or opinions to which Plaintiffs are not required to respond.

      8.    The critical importance of the Internet has been highlighted in the current COVID-19 global pandemic. With much of the country currently under some form of shelter in place directive or order, hundreds of thousands of people across the country are working or attending classes from home and relying on high speed internet access to make that possible. To ease the strain in this challenging time, Charter is offering free Spectrum broadband internet and Wi-Fi access for 60 days to households with K-12 and/or college students who do not already have a Spectrum broadband subscription. Charter is also opening its Wi-Fi hotspots across its footprint for public use.

      **Answer**: Plaintiffs admit that many areas of the United States are taking varying measures to minimize the spread of the virus commonly referred to as COVID-19.  Plaintiffs further admit that some people in the United States are working or attending classes from home, and may use Internet services to do so.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 8 of Charter's Counterclaims, and on that basis deny those allegations.

      9.    A subscriber losing Internet access can have devastating consequences.

      **Answer**: Plaintiffs lack knowledge or information sufficient to admit or deny the allegations in Paragraph 9 of Charter's Counterclaims, and on that basis deny those allegations.

10.     As an ISP, Charter provides connections and enables connected computers to access the Internet.

**Answer**: Plaintiffs admit that Charter is an ISP and that Internet service is required to access the Internet.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 10 of Charter's Counterclaims, and on that basis deny those allegations.

11.     Charter provides Internet access service to its residential subscribers for a flat monthly fee.

**Answer**: Plaintiffs admit that Charter provides Internet service, among other services, to its residential subscribers.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 11 of Charter's Counterclaims, and on that basis deny those allegations.

12.     During the Claim Period, Charter could not remove third-party material from the Internet unless that material is stored on Charter's own servers. Charter could not control what its customers store on their own or others' computers.

**Answer**: Plaintiffs lack knowledge or information sufficient to admit or deny the allegations in Paragraph 12 of Charter's Counterclaims, and on that basis deny those allegations.

13.     During the Claim Period, Charter had no ability to remove or take down infringing content from its customers' computers. Charter could not restrict, or even detect, the specific content that its customers access or share.

**Answer**: Plaintiffs deny that Charter cannot know about the content that its customers are uploading or downloading.  Otherwise, Plaintiffs lack knowledge or information

sufficient to admit or deny the allegations in Paragraph 13 of Charter's Counterclaims, and on that basis deny those allegations.

14.     During the Claim Period, Charter could not supervise the online activities of its customers. Nor could Charter control its customers' conduct online. While Charter could disable its customers' ability to access its ISP system, or terminate customers' accounts, that did not give Charter control over its customers' conduct online. For example, a Charter subscriber could access the Internet through other accounts or public networks.

**Answer**: Plaintiffs deny that Charter cannot supervise and/or control the online activity of its customers, including their infringing activities.  Plaintiffs admit that Charter could disable its customers' ability to access its ISP system or terminate its customers' accounts. Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 14 of Charter's Counterclaims, and on that basis deny those allegations.

15.     During the Claim Period, Charter also could not determine whether one of its subscribers was using the network, as opposed to someone else using the subscriber's account, with or without the subscriber's permission to do so.

**Answer**: Plaintiffs lack knowledge or information sufficient to admit or deny the allegations in Paragraph 15 of Charter's Counterclaims, and on that basis deny that allegation. Plaintiffs also aver that, pursuant to Charter's Acceptable Use Policies and Terms of Service, a Charter subscriber is responsible for online activity that occurs through that account's network connection, and that Charter knows who its subscribers are.

16.     Charter does not control the Internet.

**Answer**:  Plaintiffs are unable to admit or deny this allegation because it is incomprehensibly vague and ambiguous.  To the extent an answer is required, Plaintiffs lack

knowledge or information sufficient to admit or deny the allegation in Paragraph 16 of Charter's Counterclaims, and on that basis deny that allegation.

17.     The privacy of its customers is of paramount concern to Charter. Internet users frequently transmit private and sensitive information, and trust their ISP to safeguard their privacy and security.

**Answer**: Plaintiffs admit that some Internet users may transmit private and sensitive information using Internet service.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 17 of Charter's Counterclaims, and on that basis deny those allegations.

18.     Charter does not spy on its customers or monitor their Internet traffic. Even if it could do so—and it cannot—it would not. Engaging in surveillance in such a fashion would violate Charter's policies, ethics, and corporate culture.

**Answer**: Plaintiffs deny that Charter does not monitor its customers' Internet traffic or that it cannot monitor its' customers online traffic.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 18 of Charter's Counterclaims, and on that basis deny those allegations.

19.     Operating an ISP service—and safeguarding customers and other Internet users—entails responding to a number of potential abuses such as security threats, invasion of privacy, identity theft, denial of service attacks, botnets or other malware (such as viruses, spyware, and worms), spam, fraud, phishing scams, copyright infringement, and a host of others.

**Answer**: Plaintiffs admit that Charter receives complaints about Internet abuses, including, among other things, copyright infringement, but avers that Charter does not

adequately respond to copyright infringement complaints in order to safeguard Plaintiffs' rights and interests.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 19 of Charter's Counterclaims, and on that basis deny those allegations.

20.     Charter's Subscriber Security Services Team manages issues like these that threaten Charter's network or customers, as well as other abuses of Charter's system. This team is tasked with protecting Charter's customer-facing networks and services by assessing and responding to security threats and attacks, and coordinating threat-mitigation activities with the appropriate organizations and external agencies to ensure a safe and secure communications infrastructure.

**Answer**: Plaintiffs lack knowledge or information sufficient to admit or deny the allegations in Paragraph 20 of Charter's Counterclaims, and on that basis deny those allegations.

21.     Among other things, the Subscriber Security Services Team assists law enforcement and cooperates with other ISPs to combat security and privacy threats, addresses internal security issues, assists customers, and processes copyright infringement notices that Charter receives from copyright owners and their agents.

**Answer**: Plaintiffs lack knowledge or information sufficient to admit or deny the allegations in Paragraph 21 of Charter's Counterclaims, and on that basis deny those allegations.

**B.  Charter's Receipt of Copyright Infringement Notices During the Claim Period**

22.     When Charter receives a copyright infringement notice alleging copyright infringement from a third party, it reviews the notice to ensure that it complies with Charter's policies. Among other things, Charter requires the sender of a copyright infringement notice to identify the copyrighted work claimed to have been infringed and to

identify the material that is claimed to be infringing. Copyright infringement notices must also comply with Charter's other policies, including Charter's privacy policy.

**Answer**: Plaintiffs lack knowledge or information sufficient to admit or deny the allegations in Paragraph 22 of Charter's Counterclaims, and on that basis deny those allegations.

23.     Charter reserves the right to terminate subscribers and account holders who repeatedly infringe copyrights, and Charter's policy is to terminate repeat infringers when Charter deems it appropriate to do so. Charter informs its subscribers and account holders of this policy.

**Answer**: Plaintiffs admit that Charter has the right and ability to terminate subscribers and account holders who repeatedly infringe others' copyrights, but aver that Charter has admitted in this lawsuit that it has a policy against doing so.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 23 of Charter's Counterclaims, and on that basis deny those allegations.

24.     Charter cannot verify infringement notices that it receives. In particular, Charter cannot verify whether the information in a notice is accurate.

**Answer**: Plaintiffs deny the allegations in Paragraph 24 of Charter's Counterclaims.

25.     Charter cannot itself detect infringement, and cannot determine whether infringing content is crossing its network. Charter cannot control or examine material that is on its subscribers' computers. Even if it could, doing so would violate Charter's policies and violate its users' privacy.

**Answer**: Plaintiffs deny that Charter does not have the ability to determine whether infringing content is crossing its network.  Plaintiffs lack knowledge or information

sufficient to admit or deny the remaining allegations in Paragraph 25 of Charter's Counterclaims, and on that basis deny those allegations.

26.     Copyright infringement notices that Charter receives for its ISP service always refer to acts of alleged infringement that occurred in the past. Charter cannot examine the content a customer allegedly made available in the past, detect what the customer did with that content, or know whether a subscriber was authorized to possess, reproduce, or distribute that content.

**Answer**: Plaintiffs admit that copyright owners send copyright infringement notices with respect to acts of infringements that have already occurred and may be ongoing, which provides Charter with information to prevent future acts of infringement by those same subscribers.  Plaintiffs deny the remaining allegations in Paragraph 26 of Charter's Counterclaims.

27.     Charter cannot confirm whether the sender of a notice actually owns the copyright for an allegedly infringed work, nor whether the sender is authorized to send notices on behalf of the true owner. Charter cannot determine the true owner of the copyright for an allegedly infringed work.

**Answer**: Plaintiffs deny the allegations in Paragraph 27 of Charter's Counterclaims.

28.     Charter cannot control alleged infringement on the Internet. Charter cannot supervise or control what its customers store on their computers, and cannot look at, locate, or remove any content that its customers may be uploading, downloading, or accessing through its ISP service.

**Answer**: Plaintiffs deny that Charter cannot control infringement occurring on the Internet through the Charter network.  Plaintiffs lack knowledge or information sufficient to admit or deny the allegations in Paragraph 28 of Charter's Counterclaims, and on that basis deny those allegations.

29.     With respect to business customers, terminating an account would sever access to multiple potentially innocent end-users. This is particularly the case with business customers that may be regional or local ISPs, through which hundreds, thousands, or even tens or hundreds of thousands of potentially innocent end-users' internet access could be severed due to the alleged acts of a single end-user.

**Answer**: Plaintiffs deny that terminating an account would necessarily sever access to multiple potentially innocent end-users.  Plaintiffs lack knowledge or information sufficient to admit or deny the allegations in Paragraph 29 of Charter's Counterclaims, and on that basis deny those allegations.

### C.  Charter's Abuse Tracking System

30.     As noted above, in this case, Plaintiffs seek relief for claims of infringement that accrued from March 24, 2013 through May 17, 2016.

**Answer**: Plaintiffs admit the allegations contained in Paragraph 30 of Charter's Counterclaims as to Plaintiffs' First Amended Complaint.  Plaintiffs also admit that through their counterclaims to Charter's declaratory judgment counterclaims, Plaintiffs also seek relief for claims of infringement that accrued from May 18, 2016 through April 30, 2020.

31.     During the Claim Period, Charter received different types of notifications concerning its ISP system. This included security notices, notices about system issues, copyright infringement notices, and others.

**Answer**: Plaintiffs admit that during the Claim Period, Plaintiffs sent copyright infringement notices to Charter.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 31 of Charter's Counterclaims, and on that basis deny those allegations.

32.     Prior to and throughout the Claim Period, Charter utilized a system called "CATS"—Charter Abuse Tracking System—to partially automate the handling of abuse notifications that Charter receives. Among other things, Charter's Subscriber Security Services Team used CATS as a tool for processing and addressing copyright infringement notices. This allowed Charter to process, respond to, and to address such notices more efficiently.

**Answer**: Plaintiffs lack knowledge or information sufficient to admit or deny the allegations in Paragraph 32 of Charter's Counterclaims, and on that basis deny those allegations.

33.     Automation is important, because manual processing of incoming abuse complaints is infeasible for all but the smallest ISP networks in light of the automated techniques used by spammers that generate a high volume of abuse complaints. Automation also decreases the risk that complaints from copyright owners could get lost in the flood of other abuse complaints.

**Answer**: Plaintiffs lack knowledge or information sufficient to admit or deny the allegations in Paragraph 33 of Charter's Counterclaims, and on that basis deny those allegations.

34.     CATS converted copyright infringement notices that meet Charter's basic requirements into "tickets." CATS also stored a copy of the copyright notices received (if any) per subscriber.

**Answer**: Plaintiffs deny that Charter stored copies of copyright notices, and aver that  Charter has admitted in this lawsuit to having systematically destroyed such documents. Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 34 of Charter's Counterclaims, and on that basis deny those allegations.

35.    Accepting and processing notices is both time-consuming and costly, requiring multiple systems and numerous personnel to work in coordination. Charter incurs costs in connection with undertaking these actions, as well.

**Answer**: Plaintiffs lack knowledge or information sufficient to admit or deny the allegations in Paragraph 35 of Charter's Counterclaims, and on that basis deny those allegations, except Plaintiffs aver that, pursuant to its legal obligations, an ISP must dedicate resources to take appropriate action upon receiving copyright infringement notices.

36.    During the Claim Period, Charter processed notices received from Plaintiffs, in accordance with its policies and CATS and forwarded those notices to accused subscribers reminding them that infringing copyright violates Charter's Acceptable Use Policy and emphasizing that they should take immediate action to stop the exchange of any infringing material.

**Answer**: Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 36 of Charter's Counterclaims, and on that basis deny those allegations.

37.    In July 2011, all of the major record companies and movie studios, along with their industry representatives, the RIAA and the Motion Picture Association of America ("MPAA"), and five of the largest ISPs in the United States collectively entered

into the Copyright Alert System Memorandum of Understanding ("CAS MOU") to establish a "Copyright Alert System" (the "CAS").

**Answer**: Plaintiffs admit that certain content owners, trade groups, and ISPs were parties to the CAS MOU and that the CAS MOU speaks for itself.

38.     Under the CAS, signatory content owners or their representatives, which included the RIAA and MPAA, could send notices of alleged copyright infringement ("ISP Notices") to ISPs. The ISPs would accept and process the ISP Notices.

**Answer**: Plaintiffs admit that certain content owners, trade groups, and ISPs were parties to the CAS MOU and that the CAS MOU speaks for itself.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 37 of Charter's Counterclaims, and on that basis deny those allegations.

39.     If an ISP received an ISP Notice that could be associated with the account of a particular ISP subscriber, then the ISP would send a notification—called a Copyright Alert—to the subscriber.

**Answer**: Plaintiffs admit that certain content owners, trade groups, and ISPs were parties to the CAS MOU and that the CAS MOU speaks for itself.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 39 of Charter's Counterclaims, and on that basis deny those allegations.

40.     Under the CAS MOU, participating ISPs were required to accept and process only a limited volume of ISP Notices. The CAS MOU also provided that a participating ISP could temporarily cease processing ISP Notices if it received more than its business processes and systems could reasonably address.

**Answer**: Plaintiffs admit that certain content owners, trade groups, and ISPs were parties to the CAS MOU and that the CAS MOU speaks for itself. Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 40 of Charter's Counterclaims, and on that basis deny those allegations.

41. After an ISP had forwarded six Copyright Alerts to a single subscriber, the ISP was not required to forward any subsequent Copyright Alerts, regardless of the fact that the subscriber might be the subject of multiple, subsequent infringement notices.

**Answer**: Plaintiffs admit that certain content owners, trade groups, and ISPs were parties to the CAS MOU and that the MOU speaks for itself. Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 41 of Charter's Counterclaims, and on that basis deny those allegations.

42. Further, an ISP was not required to forward more than one Copyright Alert to a single subscriber within a seven-day grace period, to give an affected subscriber time to review each Copyright Alert pertaining to such subscriber's account and to take appropriate steps to avoid receipt of further Copyright Alerts.

**Answer**: Plaintiffs admit that certain content owners, trade groups, and ISPs were parties to the CAS MOU and that the MOU speaks for itself. Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 42 of Charter's Counterclaims, and on that basis deny those allegations.

43. The participating ISPs were required to track the number of notices their subscribers received so that the information could be provided to the content owners (or their representatives), so that the content owners could institute infringement actions directly against the subscribers—not the ISPs.

**Answer**: Plaintiffs admit that certain content owners, trade groups, and ISPs were parties to the CAS MOU and that the MOU speaks for itself.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 43 of Charter's Counterclaims, and on that basis deny those allegations.

44.     The CAS did not require ISPs to terminate subscribers who were repeatedly accused of infringement.

**Answer**: Plaintiffs admit that certain content owners, trade groups and ISPs were parties to the CAS MOU and that the MOU speaks for itself.  Plaintiffs deny that ISPs were not required to terminate subscribers who repeatedly infringed.

45.     At least some of Plaintiffs are, and during the Claim Period were, well aware of the provisions of the CAS MOU.

**Answer**: Plaintiffs admit that some of the Plaintiffs were parties to the CAS MOU.

46.     On information and belief, all of the Warner Plaintiffs are, or during the Relevant Time Period were, affiliates, subsidiaries, or successors of signatories to the CAS MOU.

**Answer**: Plaintiffs admit that Warner Music Group was a party to the CAS MOU.

47.     On information and belief, all of the Sony Music Plaintiffs are, or during the Relevant Time Period were, affiliates, subsidiaries, or successors of signatories to the CAS MOU.

**Answer**: Plaintiffs admit that Sony Music Entertainment was a party to the CAS MOU.

48.     On information and belief, all of the Sony/ATV and EMI Plaintiffs are, or during the Relevant Time Period were, affiliates, subsidiaries, or successors of signatories to the CAS MOU.

**Answer**: Plaintiffs deny that the Sony/ATV and EMI Plaintiffs were parties to the CAS MOU but admit that they are affiliates of Sony Music Entertainment.

49.     On information and belief, all of the Universal Plaintiffs are, or during the Relevant Time Period were, affiliates, subsidiaries, or successors of signatories to the CAS MOU.

**Answer**: Plaintiffs admit that UMG Recordings, Inc. was a party to the CAS MOU.

50.     The RIAA was a signatory to the CAS MOU.

**Answer**: Plaintiffs admit the allegations contained in Paragraph 50 of Charter's Counterclaims.

51.     On information and belief, all of the Record Company Plaintiffs were members of the RIAA during the Relevant Time Period or were affiliates, subsidiaries, or partners of RIAA members.

**Answer**: Plaintiffs admit the allegations contained in Paragraph 51 of Charter's Counterclaims.

52.     Charter was also aware of the CAS MOU during the Relevant Time Period; however, Charter was not a signatory to the CAS MOU.

**Answer**: Plaintiffs admit that Charter was not a signatory to the CAS MOU. Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 52 of Charter's Counterclaims, and on that basis deny those allegations.

53.     On information and belief, one goal of the CAS MOU was to establish industry standard practices for entertainment industry copyright owners to submit copyright infringement notices to ISPs, and for ISPs to process such notices and inform their subscribers of infringement allegations against them.

**Answer**: Plaintiffs deny the allegations contained in Paragraph 53 of Charter's Counterclaims.

54.     Content owners participating in the CAS MOU (including some of Plaintiffs here) and participating ISPs (including SBC Internet Services, Verizon Online, Comcast Cable Communications Management, CSC Holdings, and Time Warner Cable) established the Center for Copyright Information (the "CCI").

**Answer**: Plaintiffs admit that certain content owners, trade groups, and ISPs were parties to the CAS MOU and that the CAS MOU speaks for itself.

55.     An express goal of the CCI was "facilitating the involvement of non-participating ISPs in … the Copyright Alert program."

**Answer**: Plaintiffs admit that certain content owners, trade groups, and ISPs were parties to the CAS MOU and that the MOU speaks for itself.

56.     In May 2014, RIAA Chairman and CEO Cary Sherman described the CCI as "a model for success." Mr. Sherman lauded "the Alert program and all its accomplishments." He stated that the CAS was "moving the needle," and acknowledged that as the CAS program progressed, "there were fewer and fewer Alerts sent at each level."

**Answer**: Plaintiffs admit that the quoted text appears at various points in an article published on the RIAA website in May 2014.  Plaintiffs lack knowledge or information

sufficient to admit or deny the remaining allegations in Paragraph 56 of Charter's Counterclaims, and on that basis deny those allegations.

57.     Further, upon information and belief, early reports note that merely sending notices had a meaningful impact on reducing infringement, as evidenced by the fact that fewer subscribers continued to receive subsequent alerts. Further, the CCI believed that the program would be effective against the vast majority of subscribers engaged in on-line infringement and that "very few subscribers, after repeated alerts, will persist (or allow others to persist) in the content theft."

**Answer**: Plaintiffs deny CAS had a meaningful impact on reducing infringement or that it was effective.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 57 of Charter's Counterclaims, and on that basis deny those allegations.

58.     Importantly, the CAS MOU required that the ISPs provide data to the content owners and/or their representatives, so that the participants could assess the effectiveness of the program.

**Answer**: Plaintiffs admit that certain content owners, trade groups and ISPs were parties to the CAS MOU and that the MOU speaks for itself.

### E.  Plaintiffs Withdrawal of Works for Which They Sent Copyright Infringement Notices to Charter

59.     Upon information and belief, the Record Company Plaintiffs claim to own or control the vast majority of music sold in the United States.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.  To the extent the allegations in Paragraph 59 relate to Charter's

declaratory judgment claims and an answer is therefore required, Plaintiffs deny the allegations contained in Paragraph 59 of Charter's Counterclaims.

      60.     On information and belief, the Record Company Plaintiffs, through their agent the RIAA, engaged the services of rights-enforcement company MarkMonitor to monitor and detect infringing activity and send notices alleging copyright infringement to Charter. MarkMonitor markets itself as an "antipiracy solution."

      **Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.  To the extent the allegations in Paragraph 60 relate to Charter's declaratory judgment claims and an answer is therefore required, Plaintiffs admit that the RIAA and MarkMonitor entered into an agreement to monitor and detect infringing activity and send notices of copyright infringement to Charter.  Plaintiffs deny the remaining allegations of Paragraph 60 of Charter's Counterclaims.

      61.     On March 22, 2019, Plaintiffs sued Charter for contributory infringement and vicarious liability, alleging that Charter's subscribers had infringed at least 11,482 sound recordings and music compositions (the "works in suit"). The works in suit are listed on Exhibits A and B to Plaintiffs' Original Complaint.

      **Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.  To the extent the allegations in Paragraph 61 relate to Charter's declaratory judgment claims and an answer is therefore required, Plaintiffs admit that the allegations in Plaintiffs' complaint speak for themselves.  Plaintiffs deny the remaining allegations of Paragraph 61 of Charter's Counterclaims.

62.     In connection with these allegations, Plaintiffs claimed that they "own and/or control in whole or in part the copyrights and/or exclusive rights" in the works in suit.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.  To the extent the allegations in Paragraph 62 relate to Charter's declaratory judgment claims and an answer is therefore required, Plaintiffs admit that the allegations in Plaintiffs' complaint speak for themselves.  Plaintiffs deny the remaining allegations of Paragraph 62 of Charter's Counterclaims.

63.     In connection with these allegations, Plaintiffs claimed that between March 24, 2013 and May 17, 2016, their "representatives … sent hundreds of thousands of statutory infringement notices to Charter, under penalty of perjury," claiming that Charter's subscribers infringed the works in suit. The Music Publisher Plaintiffs did not send any notices, however, as the notices were sent only on behalf of the Record Company Plaintiffs' representative, the RIAA.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.  To the extent the allegations in Paragraph 63 relate to Charter's declaratory judgment claims and an answer is therefore required, Plaintiffs admit that the allegations in Plaintiffs' complaint speak for themselves. Plaintiffs further admit that Plaintiffs' notices to Charter were sent by the RIAA, identifying infringed sound recordings, and that those sounds recordings embody underlying musical compositions, many of which are owned by the

Music Publisher Plaintiffs. Plaintiffs deny the remaining allegations contained in Paragraph 63 of Charter's Counterclaims.

64.     On January 15, 2020, Plaintiffs amended the list of works in suit, removing over 450 works from this case (the "Dropped Works").

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.

65.     The Record Company Plaintiffs dropped 272 sound recordings and the Music Publisher Plaintiffs dropped 183 music compositions.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.

66.     Upon information and belief, Plaintiffs dropped at least some of these works because, contrary to their allegations, they do not "own and/or control in whole or in part the copyrights and/or exclusive rights" to the works.

**Answer**:  This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.

67.     For many of the Dropped Works, the claimant listed on the U.S. Copyright Office registration certificate is an entity other than the formerly asserting Plaintiff. Based on review of other publicly available information, these claimant-entities appear independent from the formerly asserting Plaintiff. On information and belief, Plaintiffs sent infringement notices for these Dropped Works despite lacking the right to do so.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.

68. Indeed, Plaintiffs only dropped these works after they were ordered in this case to produce further documentation relating to their purported ownership or ability to assert the works in suit in this case.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.

69. Despite later dropping these works, the Record Company Plaintiffs, or their agent acting on their behalf, nevertheless sent notices to Charter in connection with the Dropped Works, each claiming to "have identified a user … reproducing or distributing an unauthorized copy of a copyrighted sound recording," and stating that the recipient of the notice "may be liable for infringing activity occurring" on Charter's network. The Record Company Plaintiffs further claimed in their notices that the targeted user's "Internet account was used to illegally copy and/or distribute copyrighted music over the Internet" and that the notice contained "the details of the illegal file-sharing, including the time, date, and a sampling of the music shared." The Record Company Plaintiffs' notices "assert that the information in the notice is accurate" and that the sender had "a good faith belief that this activity is not authorized by the copyright owner, its agent, or the law." The notices further stated "[u]nder penalty of perjury" that "the RIAA is authorized to act on behalf of its member companies in manners involving the infringement of their sound recordings, including enforcing their copyrights and common law rights on the Internet."

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.

70.    While the Music Publisher Plaintiffs did not send any notices for the music compositions in suit to Charter, the Music Publisher Plaintiffs' infringement claims in this case purportedly rely on notices sent by the Record Company Plaintiffs to Charter, including those for the Dropped Works.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.

71.    Upon information and belief, at least in connection with the Dropped Works, the Record Company Plaintiffs sent notices to Charter with inaccurate information, including but not limited to the misrepresentation that the RIAA was authorized on behalf of Plaintiffs to send a notice relating to these allegedly infringed works, that the Record Company Plaintiff on whose behalf the notice was sent owned or controlled the work, and that the actions alleged to have been taken by Charter's subscribers constituted infringement of the Record Company Plaintiffs' rights.

**Answer**:   This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.

72.    Upon information and belief, the Record Company Plaintiffs did not own the Dropped Works when they sent notices for them.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.

73.     Upon information and belief, the Record Company Plaintiffs did not have the right to send notices to Charter for the Dropped Works.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.

74.     Upon information and belief, Plaintiffs, as a matter of practice, do not confirm whether they "own and/or control in whole or in part the copyrights and/or exclusive rights" to works before notices are sent to ISPs, like Charter.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.

75.     After Plaintiffs identified the works in suit, including the Dropped Works, Charter investigated Plaintiffs' purported ownership or control of the Dropped Works, or whether the Record Company Plaintiffs otherwise had the right to send notices to Charter for them.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.

76.     Many of the same record companies and music publishers that are Plaintiffs in this case pursued damages in *Sony Music Entertainment et al. v. Cox*

*Communications, Inc. et al.*, Case No. 1:18-cv-950 (LO/JFA) (E.D. Va.) ("Sony") for certain of the Dropped Works. The jury in the Sony case returned a verdict for certain of the Dropped Works in an amount of nearly $100,000 per work.

**Answer**:   This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.

77.   Yet for many other Dropped Works that were also originally asserted in *Sony*, Plaintiffs dropped those works in *Sony* before trial, further demonstrating their belief that they did not possess the right to send notices for these Dropped Works.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.

78.   In this case, Plaintiffs' counsel could not confirm to the Court either that each of the Sony record companies and music publishers owned or controlled each of the works at issue in that case or was the correct legal entity to obtain an award of statutory for each of those works.

**Answer**:   This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.

79.   Upon information and belief, Plaintiffs devote substantial resources to protecting and exploiting the copyrights they claim to own or control.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and

therefore no answer is required.  To the extent the allegations in Paragraph 79 relate to Charter's

declaratory judgment claims and an answer is therefore required, Plaintiffs admit that they

devote resources to protecting and exploiting their copyrights.

80.    Upon information and belief, at all times, Plaintiffs had or should have had

knowledge of the status of their purported ownership or control of copyrights when they

sent infringement notices regarding those copyrights, including those at issue in this case.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f)

claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and

therefore no answer is required.

81.    Plaintiffs sent millions of notices to ISPs during the Claim Period,

including hundreds of thousands of notices to Charter.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f)

claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and

therefore no answer is required.  To the extent the allegations in Paragraph 81 relate to Charter's

declaratory judgment claims and an answer is therefore required, Plaintiffs admit that they sent

many notices to Charter and other ISPs during the Claim Period.

82.    Charter could not have discovered that Plaintiffs' notices for the Dropped

Works were inaccurate until January 15, 2020, after Plaintiffs dropped the works from this

case and Charter analyzed Plaintiffs' notice data.

**Answer**:   This allegation pertains to Charter's dismissed DMCA Section 512(f)

claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and

therefore no answer is required.

**F.  The Unreliability of Plaintiffs' Copyright Infringement Notices**

83.     Notices of alleged copyright infringement, such as those Plaintiffs' agents submitted to Charter, can be unreliable.

**Answer**: Plaintiffs deny the allegations contained in Paragraph 83 of Charter's Counterclaims as to Plaintiffs' notices.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 83 of Charter's Counterclaims, and on that basis deny those allegations.

84.     Academic studies have demonstrated that copyright infringement notices sent by third parties to online service providers can be unreliable and are prone to error.

**Answer**: Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 84 of Charter's Counterclaims, and on that basis deny those allegations.

85.     For example, a 2016 study examined a sample of 288,675 copyright infringement notices that were sent to online service providers between May 1, 2013 and October 31, 2013 (the "Study Period"). Jennifer Urban, et al., Notice and Takedown in Everyday Practice (2016) ("Urban Study").

**Answer**: Plaintiffs admit that the cited Urban Study speaks for itself.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 85 of Charter's Counterclaims, including whether the information or analysis in the Urban Study is accurate, and on that basis deny those allegations.

86.     The Urban Study found that 4.2% of the infringement claims examined "were fundamentally flawed because they targeted content that clearly did not match the identified infringed work." Id. at 88. In addition, 28.4% of notices that the Urban Study

examined "had characteristics that raised clear questions about their validity," including notices with "multiple potential issues." *Id.*

> **Answer**: Plaintiffs admit that the cited Urban Study speaks for itself.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 86 of Charter's Counterclaims, including whether the information or analysis in the Urban Study is accurate, and on that basis deny those allegations.

87.    Because some notices in the sample set for the Urban Study contained multiple requests, these notices together represented over 100 million claims of infringement. *Id.*

> **Answer**: Plaintiffs admit that the cited Urban Study speaks for itself.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 87 of Charter's Counterclaims, including whether the information or analysis in the Urban Study is accurate, and on that basis deny those allegations.

88.    The RIAA sent notices that were included in the sample that the Urban Study analyzed.

> **Answer**: Plaintiffs admit that the cited Urban Study speaks for itself.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 88 of Charter's Counterclaims, including whether the information or analysis in the Urban Study is accurate, and on that basis deny those allegations.

89.    MarkMonitor sent notices that were included in the sample that the Urban Study analyzed.

> **Answer**: Plaintiffs admit that the cited Urban Study speaks for itself.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph

89 of Charter's Counterclaims, including whether the information or analysis in the Urban Study is accurate, and on that basis deny those allegations.

90.     The Urban Study also discussed specific instances in which notices sent by MarkMonitor were "clear mismatches" between the allegedly infringed work and the online content that was allegedly infringing. *Id*. at 92.

**Answer**: Plaintiffs admit that the cited Urban Study speaks for itself.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 90 of Charter's Counterclaims, including whether the information or analysis in the Urban Study is accurate, and on that basis deny those allegations.

91.     The Urban Study also identified MarkMonitor as having sent tens of thousands of notices during the Study Period alleging infringement by file-sharing websites that had been "dead more than 18 months." *Id*. at 89-90.

**Answer**: Plaintiffs admit that the cited Urban Study speaks for itself.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 91 of Charter's Counterclaims, including whether the information or analysis in the Urban Study is accurate, and on that basis deny those allegations.

92.     Multiple news stories, including stories from the time period covered by Plaintiffs' copyright infringement allegations, reported errors in notices sent by MarkMonitor to online service providers. For example, in February and March 2013, multiple news stories highlighted instances in which MarkMonitor (under the name Dtecnet, a division of MarkMonitor) had sent erroneous copyright infringement notices to online service providers.

**Answer**: Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 92 of Charter's Counterclaims, and on that basis deny those allegations.

93.     A February 3, 2013 news story reported that Dtecnet, a division of MarkMonitor, had sent copyright infringement notices to Google, alleging that HBO's own website contained infringing copies of HBO's copyrighted content. See Ernesto Van der Sar, "HBO Wants Google to censor HBO.com," TorrentFreak (February 3, 2013).

**Answer**: Plaintiffs admit that the cited article speaks for itself.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 93 of Charter's Counterclaims, including whether the information or analysis in the news story is accurate, and on that basis deny those allegations.

94.     A March 1, 2013 news story reported that Dtecnet, a division of MarkMonitor, had misidentified a modified version of an online game as a television show, resulting in issuance of multiple inaccurate copyright infringement notices. See Masnick, Mike, "System Used By New Six Strikes CAS, Falsely Identifies Game Mods As NBC TV Shows," TechDirt.com (Mar. 1, 2013).

**Answer**: Plaintiffs admit that the cited article speaks for itself.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 94 of Charter's Counterclaims, including whether the information or analysis in the news story is accurate, and on that basis deny those allegations.

95.     MarkMonitor was also the rights-enforcement organization that the CCI employed to detect instances of alleged infringement and send ISP Notices in connection with the CAS.

**Answer**: Plaintiffs deny the allegations contained in Paragraph 95 of Charter's Counterclaims.

96.     In 2012, the CCI hired the firm Stroz Friedberg to perform an assessment of MarkMonitor's technology in connection with the CAS.

**Answer**: Plaintiffs admit that in 2012, the CCI hired Stroz Friedberg, LLC to perform an assessment of the MarkMonitor system used in CAS, as contemplated by the CAS MOU.

97.     Stroz Friedberg had been retained by the RIAA as a lobbying firm from 2004 through 2009.

**Answer**: Plaintiffs admit that RIAA has worked with Stroz Friedberg on certain lobbying activity.

98.     The Stroz Friedberg assessment contained six recommendations that "focused on improving the accuracy and reliability" of MarkMonitor's processes.

**Answer**: Plaintiffs admit that Stroz Friedberg performed an assessment of the MarkMonitor system used in CAS, as contemplated by the CAS MOU, and concluded that the system it reviewed was accurate and reliable.  Plaintiffs further admit that Stroz Friedberg's findings speak for themselves.

99.     Among the six recommendations, Stroz Friedberg advised that MarkMonitor should augment the file identification trail. Specifically, Stroz Friedberg stated that the current manual verification process employed by MarkMonitor to review the first instance of an infringed file is key to all subsequent steps in its process. Thus, if a file were to be improperly verified as infringing as a result of improper or incomplete review, it would generate a ripple effect through the entire AntiPiracy workflow, resulting in the

collection and generation of notices for non-protected works. MarkMonitor advised that the potential exposure of risk at this juncture warranted supplemental mitigating measures.

**Answer**: Plaintiffs admit that Stroz Friedberg performed an assessment of the MarkMonitor system used in CAS, as contemplated by the CAS MOU, and concluded that the system it reviewed was accurate and reliable.  Plaintiffs further admit that Stroz Friedberg's findings speak for themselves.

100.   Stroz Friedberg further explained that MarkMonitor generates notices for allegedly infringing files before it has verified those files as authentic. MarkMonitor stated that this process results in the collection of thousands of files that are later determined to be not infringing. MarkMonitor also stated that this process increases the chances that notices will be generated for non-infringing files.

**Answer**:  Plaintiffs admit that Stroz Friedberg performed an assessment of the MarkMonitor system used in CAS, as contemplated by the CAS MOU, and concluded that the system it reviewed was accurate and reliable.  Plaintiffs further admit that Stroz Friedberg's findings speak for themselves.

101.   After it was reported that Stroz Friedberg had been a lobbyist for the RIAA between 2004 and 2009, the CCI hired a second consulting firm, Harbor Labs, to conduct another review of MarkMonitor's system.

**Answer**: Plaintiffs admit that it was reported that Stroz Friedberg had done some lobbying work for RIAA.  Plaintiffs also admit CCI hired Harbor Labs to perform certain services in connection with the analysis of the MarkMonitor system used in CAS, as contemplated by the CAS MOU.

102.   Harbor Labs did not analyze MarkMonitor's system directly but relied on test results conducted previously by Stroz Friedberg as part of its assessment in 2012.

**Answer**: Plaintiffs admit that Harbor Labs was provided with a copy of a 2012 report by Stroz Friedberg. Plaintiffs deny the remaining allegations contained in Paragraph 102 of Charter's Counterclaims.

103.   On December 5, 2012, Harbor Labs released its evaluation, in which it stated that MarkMonitor should undergo consistent and regular end-to-end testing, improve its verification approaches, and improve its controls over employee access to sensitive data.

**Answer**: Plaintiffs admit that Harbor Labs produced a report and that the report speaks for itself.  Plaintiffs deny the remaining allegations contained in Paragraph 103 of Charter's Counterclaims.

104.   Specifically, Harbor Labs noted that MarkMonitor does not maintain any precision-relevant metrics on its live system. In other words, except for in the event a recipient of a notice complains that the notice is inaccurate, MarkMonitor does not maintain any data confirming its notices are accurate.

**Answer**: Plaintiffs admit that Harbor Labs produced a report and that the report speaks for itself.  Plaintiffs deny the remaining allegations contained in Paragraph 104 of Charter's Counterclaims.

105.   On information and belief, Plaintiffs have not directly sued providers of P2P software, and/or companies or individuals who host, index, or link to infringing copies of the works in suit.

**Answer**: Plaintiffs deny the allegations contained in Paragraph 105 of Charter's Counterclaims.

106.   On information and belief, Plaintiffs have not sued any individual direct infringers for the infringements they allege here.

**Answer**: Plaintiffs lack knowledge or information sufficient to admit or deny the allegations in Paragraph 106 of Charter's Counterclaims, because, among other reasons, Charter cannot identify all of the infringers identified in Plaintiffs' infringement notices, and on that basis deny those allegations.

107.   Charter brings Claims I and II for declaratory relief based upon explicit threats and actual litigation by Plaintiffs against Charter. An actual case or controversy exists within the meaning of 28 U.S.C. § 2201 as to whether Charter bears liability pursuant to the claims threatened by Plaintiffs in and out of court. A judicial determination is necessary and appropriate at this time so that the parties may ascertain their respective rights and obligations, if any.

**Answer**: Plaintiffs admit that Charter brings Counterclaims against Plaintiffs for declaratory relief.  The remaining allegations contained in Paragraph 107 state legal conclusions to which Plaintiffs are not required to respond.

**G.  Plaintiffs' Rampant and Deceptive Enforcement Conduct**

108.   Upon information and belief, the Record Company Plaintiffs, through their agent the RIAA, send notices of alleged copyright infringement for works they do not own or otherwise have the right to enforce.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.

109.   The Record Company Plaintiffs, along with the RIAA, have engaged in a decades-long campaign against consumers, threatening expensive, time-consuming litigation, and wielding the prospect of outsized and disproportionate statutory damages.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.

110.   For example, between approximately 2004 and 2009, the record industry initiated over 30,000 lawsuits against individuals who were alleged to have downloaded music on peer-to-peer networks. Many of these individuals were forced to settle their suits, out of fear, as one court observed:

> There is a huge imbalance in these cases. The record companies are represented by large law firms with substantial resources. The law is also overwhelmingly on their side. They bring cases against individuals, individuals who don't have lawyers and don't have access to lawyers and who don't understand their legal rights.
>
> Some category of individuals are defaulted because they read the summons, and they haven't the foggiest idea what it means and don't know where to go, so they're defaulted, and they owe money anywhere from $3,000 to $10,000 as a result of these defaults.[2]

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.

111.   The Record Company Plaintiffs, through the RIAA, exploit and leverage this imbalance of knowledge and resources in order to extract settlements from the consuming public. Upon information and belief, in order to do so, the Record Company Plaintiffs and/or the RIAA exploit sound recordings beyond their legal entitlement.

---

[2] *Capitol Records, Inc. et al. v. Noor Alaujan, et al.,* Case No. 03-11661-NG (D. Mass.), June 7, 2008 Mot. Hr'g Tr. at 8:14-25.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.

112. The Record Company Plaintiffs' practices also target ISPs, like Charter, whose subscribers are consumers of Plaintiffs' goods.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.

113. As an ISP, Charter receives Plaintiffs' notices and, in turn, passes them onto its subscribers. In certain circumstances, the subscribers question the veracity of the notices. As a result, Charter bears the cost and burden of processing Plaintiffs' notices and engaging with its subscribers to address these and other issues as a result of Plaintiffs' actions. To the extent the notices that Charter forwards to its subscribers contain inaccurate allegations of copyright infringement, Charter suffers harm to its reputation and loses the goodwill of its subscribers.

**Answer**:  This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.

**H. The Works in Suit Constitute a Small Percentage of Each Plaintiff's Catalogue**

114. Plaintiffs allege to collectively own or control the vast majority of music exploited in the United States, if not the world.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and

therefore no answer is required.  To the extent the allegations in Paragraph 114 relate to Charter's declaratory judgment claims and an answer in therefore required, Plaintiffs admit that they own or control copyrights in certain sound recordings and musical compositions.  Plaintiffs deny the remaining allegations of Paragraph 114 of Charter's Counterclaims as incomprehensibly vague and ambiguous.

115.   Upon information and belief, Plaintiffs collectively own or control many millions of works. Yet in this case, they collectively only assert the alleged infringement of 11,027 works.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.  To the extent the allegations in Paragraph 115 relate to Charter's declaratory judgment claims and an answer in therefore required, Plaintiffs admit that the allegations in Plaintiffs' complaint speak for themselves, including the number of works and which works they allege Charter secondarily infringed.  Plaintiffs also admit that they have not asserted claims against Charter for all works that each Plaintiff owns or controls.  Plaintiffs deny the remaining allegations of Paragraph 115 of Charter's Counterclaims as incomprehensibly vague and ambiguous.

116.   For example, of the 66 individual Plaintiffs, approximately 45 assert fewer than 100 works each. Many of these Plaintiffs assert only a handful of works and, in some cases, all from the same album(s) and/or recording artist(s).

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.  To the extent the allegations in Paragraph 116 relate to

Charter's declaratory judgment claims and an answer in therefore required, Plaintiffs admit that the allegations in Plaintiffs' complaint speak for themselves, including the number of works and which works they allege Charter secondarily infringed.   Plaintiffs deny the remaining allegations of Paragraph 116 of Charter's Counterclaims as incomprehensibly vague and ambiguous.

117.   Even the Plaintiffs that assert the highest numbers of works in suit—i.e., Sony Music Entertainment, Inc. (approx. 2,283), UMG Recordings, Inc. (approx. 1,903), and WB Music Corp. (approx. 822)—assert infringement of only a very small percentage of the total number of works that each of those Plaintiffs owns or controls.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.  To the extent the allegations in Paragraph 117 relate to Charter's declaratory judgment claims and an answer in therefore required, Plaintiffs admit that the allegations in Plaintiffs' complaint speak for themselves, including the number of works and which works they allege Charter secondarily infringed.  Plaintiffs also admit that they have not asserted claims against Charter for all works that each Plaintiff owns or controls.  Plaintiffs deny the remaining allegations of Paragraph 117 of Charter's Counterclaims as incomprehensibly vague and ambiguous.

118.   Based on the foregoing, it is clear that Plaintiffs are suing on only a small percentage of the total number of works that each owns or controls.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.  To the extent the allegations in Paragraph 118 relate to Charter's declaratory judgment claims and an answer in therefore required, Plaintiffs admit that

the allegations in Plaintiffs' complaint speak for themselves, including the number of works and which works they allege Charter secondarily infringed.  Plaintiffs also admit that they have not asserted claims against Charter for all works that each Plaintiff owns or controls.  Plaintiffs deny the remaining allegations of Paragraph 118 of Charter's Counterclaims as incomprehensibly vague and ambiguous.

119.   Of this small percentage of works owned or controlled by each Plaintiff asserted in this case, upon information and belief, Plaintiffs have not elected to only sue for infringement of their most popular works.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.  To the extent the allegations in Paragraph 119 relate to Charter's declaratory judgment claims and an answer in therefore required, Plaintiffs admit that the allegations in Plaintiffs' complaint speak for themselves, including the number of works and which works they allege Charter secondarily infringed.  Plaintiffs also admit that they have not asserted claims against Charter for all works that each Plaintiff owns or controls.  Plaintiffs deny the remaining allegations of Paragraph 119 of Charter's Counterclaims as incomprehensibly vague and ambiguous.

120.   Of this small percentage of works owned or controlled by each Plaintiff asserted in this case, upon information and belief, Plaintiffs have not elected to only sue for infringement of their most profitable works.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.  To the extent the allegations in Paragraph 120 relate to

Charter's declaratory judgment claims and an answer in therefore required, Plaintiffs admit that the allegations in Plaintiffs' complaint speak for themselves, including the number of works and which works they allege Charter secondarily infringed.  Plaintiffs also admit that they have not asserted claims against Charter for all works that each Plaintiff owns or controls.  Plaintiffs deny the remaining allegations of Paragraph 120 of Charter's Counterclaims as incomprehensibly vague and ambiguous.

121.   Of this small percentage of works owned or controlled by each Plaintiff asserted in this case, upon information and belief, Plaintiffs have not elected to only sue for infringement of their works that were allegedly infringed most frequently during the Claim Period.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.  To the extent the allegations in Paragraph 121 relate to Charter's declaratory judgment claims and an answer in therefore required, Plaintiffs admit that the allegations in Plaintiffs' complaint speak for themselves, including the number of works and which works they allege Charter secondarily infringed.  Plaintiffs also admit that they have not asserted claims against Charter for all works that each Plaintiff owns or controls.  Plaintiffs deny the remaining allegations of Paragraph 121 of Charter's Counterclaims as incomprehensibly vague and ambiguous.

122.   Plaintiffs instead elected to sue for infringement of those works for which they claim a Charter subscriber infringed after that subscriber was the subject of "multiple" prior infringement notices received by Charter, as they allege. See, e.g., First Amended Complaint, ¶¶ 5, 9, 101, 109, 115, 118.

**Answer**: This allegation pertains to Charter's dismissed DMCA Section 512(f) claim and/or dismissed Charter's Colorado Consumer Protection Act ("CCPA") claim, and therefore no answer is required.  To the extent the allegations in Paragraph 122 relate to Charter's declaratory judgment claims and an answer is therefore required, Plaintiffs admit that the allegations in Plaintiffs' complaint speak for themselves.

## CLAIM ONE

### FOR A DECLARATORY JUDGMENT THAT CHARTER IS NOT LIABLE FOR CONTRIBUTORY INFRINGEMENT OF PLAINTIFFS' WORKS AT ISSUE DURING THE CLAIM PERIOD

123.   Charter repeats the allegations in Paragraphs 1 through 122 and incorporates them here.

**Answer**: Plaintiffs incorporate the Answers to all preceding paragraphs as if fully set forth herein.

124.   During the Claim Period, Charter provided high-speed Internet service that enabled its subscribers to access the Internet and the myriad of services that Internet access enables and provides. Charter itself did not store its subscribers' content on its servers in connection with its ISP service, did not host websites that index infringing files, did not promote the ability to infringe on its network, and did not create or distribute peer-to-peer file-sharing software or other file-sharing software.

**Answer**: Paragraph 124 contains legal conclusions to which no response is required.  To the extent a response is required, Plaintiffs admit that Charter provides high-speed Internet service and that Internet service is required to access the Internet.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations contained in Paragraph 124 of Charter's Counterclaims, and on that basis deny those allegations.

125.   During the Claim Period, Charter's ISP system was capable of substantial non-infringing uses.

**Answer**: Paragraph 125 contains legal conclusions to which no response is required.  To the extent a response is required, Plaintiffs admit that Charter is an ISP and the Internet can be used for many things.  Plaintiffs otherwise lack knowledge or information sufficient to admit or deny the allegations contained in Paragraph 125 of Charter's Counterclaims, and on that basis deny those allegations.

126.   During the Claim Period, Charter could not itself detect infringement occurring on its system or the Internet.

**Answer**: Paragraph 126 contains legal conclusions to which no response is required.  Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations contained in Paragraph 126 of Charter's Counterclaims, and on that basis deny those allegations.

127.   During the Claim Period, Charter lacked the ability to verify Plaintiffs' allegations of infringement.

**Answer**: Plaintiffs deny the allegations contained in Paragraph 127 of Charter's Counterclaims.

128.   The systems Plaintiffs used during the Claim Period to detect infringement and send copyright infringement notices were unreliable and were known to be unreliable.

**Answer**: Plaintiffs deny the allegations contained in Paragraph 128 of Charter's Counterclaims.

129.   During the Claim Period, Charter lacked knowledge of any acts of copyright infringement by others particularly claimed by Plaintiffs in their First Amended Complaint.

**Answer**: Paragraph 129 contains legal conclusions to which no response is required.  To the extent a response is required, Plaintiffs deny the allegations contained in Paragraph 129 of Charter's Counterclaims.

130.   Charter lacked knowledge of any acts of copyright infringement by others generally claimed by Plaintiffs in this action.

**Answer**: Paragraph 130 contains legal conclusions to which no response is required.  To the extent a response is required, Plaintiffs deny the allegations contained in Paragraph 130 of Charter's Counterclaims.

131.   During the Claim Period, and for the works Plaintiffs assert in their First Amended Complaint, Charter did not materially contribute to any third party's violation of Plaintiffs' exclusive right to reproduce works in copies under 17 U.S.C. § 106(1).

**Answer**: Paragraph 131 contains legal conclusions to which no response is required.  To the extent a response is required, Plaintiffs deny the allegations contained in Paragraph 131 of Charter's Counterclaims.

132.   During the Claim Period, and for the works Plaintiffs assert in their First Amended Complaint, Charter did not materially contribute to any third party's violation of Plaintiffs' exclusive right to prepare derivative works based upon Plaintiffs' copyrighted works under 17 U.S.C. § 106(2).

**Answer**: Paragraph 132 contains legal conclusions to which no response is required.  To the extent a response is required, Plaintiffs lack knowledge or information

sufficient to admit or deny the allegations contained in Paragraph 132 of Charter's Counterclaims.

133.   During the Claim Period, and for the works Plaintiffs assert in their First Amended Complaint, Charter did not materially contribute to any third party's violation of Plaintiffs' exclusive right to distribute copies of Plaintiffs' copyrighted works to the public by sale or other transfer of ownership, or by rental, lease, or lending under 17 U.S.C. § 106(3).

**Answer**: Paragraph 133 contains legal conclusions to which no response is required.  To the extent a response is required, Plaintiffs deny the allegations contained in Paragraph 133 of Charter's Counterclaims.

134.   During the Claim Period, and for the works Plaintiffs assert in their First Amended Complaint, Charter did not materially contribute to any third party's violation of Plaintiffs' exclusive right to perform Plaintiffs' copyrighted works publicly in copies under 17 U.S.C. § 106(4).

**Answer**: Paragraph 134 contains legal conclusions to which no response is required.  To the extent a response is required, Plaintiffs deny the allegations contained in Paragraph 134 of Charter's Counterclaims.

135.   During the Claim Period, and for the works Plaintiffs assert in their First Amended Complaint, Charter did not materially contribute to any third party's violation of Plaintiffs' exclusive right to display Plaintiffs' copyrighted works publicly in copies under 17 U.S.C. § 106(5).

**Answer**: Paragraph 135 contains legal conclusions to which no response is required.  To the extent a response is required, Plaintiffs lack knowledge or information

sufficient to admit or deny the allegations contained in Paragraph 135 of Charter's Counterclaims.

136.   During the Claim Period, and for the works Plaintiffs assert in their First Amended Complaint, Charter did not materially contribute to any third party's violation of Plaintiffs' exclusive right to perform Plaintiffs' copyrighted sound recordings publicly by means of a digital audio transmission under 17 U.S.C. § 106(6).

**Answer**: Paragraph 136 contains legal conclusions to which no response is required.  To the extent a response is required, Plaintiffs deny the allegations contained in Paragraph 136 of Charter's Counterclaims.

137.   Charter is entitled to a declaration that it is not liable to Plaintiffs for the infringement of the works Plaintiffs assert in their First Amended Complaint or otherwise for the infringement of Plaintiffs' works during the Claim Period, or any of them, on account of copyright infringement by others.

**Answer**: Paragraph 137 contains legal conclusions to which no response is required.  To the extent a response is required, Plaintiffs deny the allegations contained in Paragraph 137 of Charter's Counterclaims.

## <u>CLAIM TWO</u>

### FOR A DECLARATORY JUDGMENT THAT CHARTER IS NOT LIABLE FOR VICARIOUS INFRINGEMENT OF PLAINTIFFS' WORKS AT ISSUE DURING THE CLAIM PERIOD

138.   Charter repeats the allegations in Paragraphs 1 through 137 and incorporates them here.

**Answer**: Plaintiffs incorporate the Answers to all preceding paragraphs as if fully set forth herein.

139.   During the Claim Period, Charter lacked the ability, including the practical ability, to supervise its subscribers.

**Answer**: Paragraph 139 contains legal conclusions to which no response is required.  To the extent a response is required, Plaintiffs deny the allegations contained in Paragraph 139 of Charter's Counterclaims.

140.   During the Claim Period, Charter lacked the ability, including the practical ability, to control its subscribers.

**Answer**: Paragraph 140 contains legal conclusions to which no response is required.  To the extent a response is required, Plaintiffs deny the allegations contained in Paragraph 140 of Charter's Counterclaims.

141.   During the Claim Period, the sole means of control Charter had over a subscriber's use of the Internet was Charter's ability to disable Internet service or terminate the subscriber's account, thereby removing the customer's ability to access the Internet for any purpose.

**Answer**: Paragraph 141 contains legal conclusions to which no response is required.  To the extent a response is required, Plaintiffs admit that Charter had the ability to disable a subscriber's Internet service or terminate the subscriber's account, thereby removing the subscriber's ability to infringe Plaintiffs' copyrights through Charter's network. Plaintiffs deny the remaining allegations contained in Paragraph 141 of Charter's Counterclaims.

142.   During the Claim Period, Charter did not have a direct financial interest in infringement of Plaintiffs' works, if any, that occurred on Charter's system or network.

**Answer**: Paragraph 142 contains legal conclusions to which no response is required.  To the extent a response is required, Plaintiffs deny the allegations contained in Paragraph 142 of Charter's Counterclaims.

143.   During the Claim Period, Charter did not receive a direct financial benefit as a result of any copyright infringement that may occur over its network.

**Answer**: Paragraph 143 contains legal conclusions to which no response is required.  To the extent a response is required, Plaintiffs deny the allegations contained in Paragraph 143 of Charter's Counterclaims.

144.   Copyright infringement occurring over Charter's ISP system can slow traffic and adversely impact the transmission of data for all users of the system. These effects harm both Charter and its users.

**Answer**: Paragraph 144 contains legal conclusions to which no response is required.  To the extent a response is required, Plaintiffs admit that copyright infringement occurring over Charter's ISP system harms Plaintiffs.  Plaintiffs lack knowledge or information sufficient to admit or deny the allegations contained in Paragraph 144 of Charter's Counterclaims, and on that basis deny those allegations.

145.   During the Claim Period, Charter provided Internet access service to its residential subscribers for a flat monthly fee. Charter's fees are not based on the particular uses customers make of its ISP system, including whether that customer is alleged to have infringed.

**Answer**: Plaintiffs lack knowledge or information sufficient to admit or deny the allegations contained in Paragraph 145 of Charter's Counterclaims, and on that basis deny those allegations.

146. During the Claim Period, to the extent any of Plaintiffs' works were available to infringe on P2P networks, including the works in suit, they were accessible generally on the Internet, not just by Charter's subscribers.

**Answer**: Plaintiffs admit that certain P2P networks are accessible through the Internet. Plaintiffs lack knowledge or information sufficient to admit or deny the remaining allegations contained in Paragraph 146 of Charter's Counterclaims, and on that basis deny those allegations.

147. Because of this fact, Plaintiffs allege that P2P infringement of their works (not limited to their works in suit) has greatly affected their respective businesses. But Plaintiffs do not (and could not) allege that all of this alleged infringement occurred using Charter's service.

**Answer**: Plaintiffs admit that infringement of their copyrighted works harms their businesses and that infringement occurs through Charter's network, among other avenues. Plaintiffs also admit that the allegations in Plaintiffs' complaint speak for themselves. To the extent Paragraph 147 incorporates by reference the allegations in Paragraph 146, Plaintiffs incorporate their response to Paragraph 146. Plaintiffs deny the remaining allegations contained in Paragraph 147 of Charter's Counterclaims.

148. Further, Plaintiffs only assert that Charter is secondarily liable for the infringement of a small percentage of the total number of works that each Plaintiff owns or controls.

**Answer**: Plaintiffs admit that the allegations in Plaintiffs' complaint speak for themselves, including the number of works and which works they allege Charter secondarily infringed. Plaintiffs also admit that they have not asserted claims against Charter for all works

that each Plaintiff owns or controls.  Plaintiffs deny the remaining allegations contained in Paragraph 148 of Charter's Counterclaims.

149.   Of this small percentage of works owned or controlled by each Plaintiff asserted in this case, upon information and belief, Plaintiffs have not elected to only sue for infringement of either their most popular works, their most profitable works, their works that were allegedly infringed the most by Charter's subscribers during the Claim Period, or their works that were allegedly infringed the most across all networks. Instead, Plaintiffs have sued only on those works that were allegedly infringed by Charter's subscribers after that subscriber was the subject of multiple prior infringement notices.

**Answer**: Plaintiffs admit that the allegations in Plaintiffs' complaint speak for themselves, including the number of works and which works they allege Charter secondarily infringed.  Plaintiffs also admit that they have not asserted claims against Charter for all works that each Plaintiff owns or controls.  Plaintiffs deny the remaining allegations contained in Paragraph 149 of Charter's Counterclaims.

150.   Each Plaintiff cannot demonstrate that infringement of their respective works in suit served as a draw to subscribe to Charter's ISP service, as required to establish vicarious liability. See, e.g., *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 674 (9th Cir. 2017); *UMG Recordings, Inc. v. Grande Communs. Networks, LLC*, 2018 U.S. Dist. LEXIS 160492, at *9 (W.D. Tex. Sep. 20, 2018).

**Answer**: Paragraph 150 contains legal conclusions to which no response is required.  To the extent a response is required, Plaintiffs deny the allegations contained in Paragraph 150 of Charter's Counterclaims.

151.   Charter is entitled to a declaration that it is not vicariously liable to Plaintiffs, or any of them, on account of copyright infringement by others for the works in suit during the Claim Period.

**Answer**: Paragraph 151 contains legal conclusions to which no response is required.  To the extent a response is required, Plaintiffs deny the allegations contained in Paragraph 151 of Charter's Counterclaims.

## CLAIM THREE

### VIOLATION OF DMCA SECTION 512(f) FOR KNOWINGLY SENDING MATERIALLY INACCURATE NOTICES OF ALLEGED INFRINGEMENT

152.   Charter repeats the allegations in Paragraphs 1 through 151 and incorporates them here.

**Answer**:  The allegations in Paragraphs 152-165 pertain to Charter's dismissed DMCA Section 512(f) claim, and therefore no answer is required.  Charter agrees in footnote 13 that no answer is required.  To the extent a response is required to Paragraph 152, Plaintiffs incorporate their Answers to all preceding paragraphs as if fully set forth herein.[3]

153.   Upon information and belief, during the Claim Period, the Record Company Plaintiffs sent notices to Charter that contained inaccurate information, including but not limited to the misrepresentation that the RIAA was authorized on behalf of the

---

[3] Charter's footnote 13 states as follows: "On November 5, 2020, the Court granted Plaintiffs' Amended Motion to Dismiss Charter's Counterclaims Three and Four. ECF 284 at 3-4 (dismissing without prejudice). The Court, however, granted Charter's Motion for Leave to Amend, id. at 5-6, and Charter's proposed amended pleading included those counterclaims, see ECF 192-1. Thus, out of an abundance of caution—i.e., to fully comply with the Court's November 5 Order by not modifying its pleading other than as Charter represented, and to preserve its appellate rights—Charter has not deleted Counterclaims Three and Four herein or associated requested relief, but acknowledges that these counterclaims have been dismissed without prejudice by the Court and do not require a response."

Record Company Plaintiffs to send a notice relating to these allegedly infringed works, that the Record Company Plaintiff on whose behalf the notice was sent owned or controlled the work, and that the actions alleged to have been taken by Charter's subscribers constituted infringement of the Record Company Plaintiff's rights.

**Answer**: The allegations in Paragraphs 152-165 pertain to Charter's dismissed DMCA Section 512(f) claim, and therefore no answer is required.

154.   Upon information and belief, the Record Company Plaintiffs knew or should have known that the notices contained inaccurate information before they were sent. For example, the Record Company Plaintiffs knew, or should have known, that they did not own or control certain of the works identified in notices sent to Charter before they were sent.

**Answer**: The allegations in Paragraphs 152-165 pertain to Charter's dismissed DMCA Section 512(f) claim, and therefore no answer is required.

155.   Upon information and belief, the Record Company Plaintiffs became aware of the fact that they did not own or control certain works or, alternatively, they did not have the permission to send infringement notices relating to certain works. Upon information and belief, Plaintiffs nevertheless sent, or authorized the sending of, notices to Charter, despite this knowledge.

**Answer**: The allegations in Paragraphs 152-165 pertain to Charter's dismissed DMCA Section 512(f) claim, and therefore no answer is required.

156.   Upon information and belief, the fact that the Record Company Plaintiffs authorized the sending of numerous infringement notices for works that they did not own or

control evinces a lack of a good-faith belief that the statements in their notices were accurate.

**Answer**: The allegations in Paragraphs 152-165 pertain to Charter's dismissed DMCA Section 512(f) claim, and therefore no answer is required.

157.   During the Claim Period, Charter received notices from the Record Company Plaintiffs that it could not verify. Specifically, Charter could not verify whether any of the Plaintiffs owned or controlled the work identified in the notice. Charter also could not verify whether the sender of the notice was authorized to send it. Charter also could not verify whether the activity that was alleged in the notice constitute copyright infringement.

**Answer**:  The allegations in Paragraphs 152-165 pertain to Charter's dismissed DMCA Section 512(f) claim, and therefore no answer is required.

158.   During the Claim Period, Charter relied on the Record Company Plaintiffs' statement that "the information in the notice is accurate" and that Plaintiffs "have a good faith belief that this activity is not authorized by the copyright owner, its agent, or the law."

**Answer**: The allegations in Paragraphs 152-165 pertain to Charter's dismissed DMCA Section 512(f) claim, and therefore no answer is required.

159.   In reliance on these representations, Charter accepted the notices and processed them accordingly. This includes, but is not limited to, accepting each notice into its CATS, processing it, forwarding it to the referenced subscriber, and taking any further necessary action.

**Answer**:  The allegations in Paragraphs 152-165 pertain to Charter's dismissed DMCA Section 512(f) claim, and therefore no answer is required.

160.   The steps Charter took in response to receiving Plaintiffs' inaccurate notices can result in the "removal or blocking" of the noticed material.

**Answer**:  The allegations in Paragraphs 152-165 pertain to Charter's dismissed DMCA Section 512(f) claim, and therefore no answer is required.

161.   Charter also incurs costs in implementing its CATS, including when processing Plaintiffs' inaccurate notices.

**Answer**:  The allegations in Paragraphs 152-165 pertain to Charter's dismissed DMCA Section 512(f) claim, and therefore no answer is required.

162.   Charter is also injured when it processes inaccurate notices, causing it to forward false accusations to its subscribers, to the extent this creates tension with the impacted subscribers, negatively affects goodwill, and causes reputational harm to Charter.

**Answer**:  The allegations in Paragraphs 152-165 pertain to Charter's dismissed DMCA Section 512(f) claim, and therefore no answer is required.

163.   Charter was additionally injured through its investigation of the veracity of the notices for the Dropped Works, including whether Plaintiffs owned or controlled the works when the Record Company Plaintiffs sent notices for them, including to the extent they relate to the Music Publisher Plaintiffs' Dropped Works, or whether the Record Company Plaintiffs had the right to send notices to Charter for the Dropped Works.

**Answer**:  The allegations in Paragraphs 152-165 pertain to Charter's dismissed DMCA Section 512(f) claim, and therefore no answer is required.

164.   Charter was further injured through its defense of the allegations concerning fallacious notices, including determining whether Plaintiffs own or control the works when the Record Company Plaintiffs sent the notices or whether the Record

Company Plaintiffs had the right to send notices to Charter for the Dropped Works, including to the extent they relate to the Music Publisher Plaintiffs' Dropped Works.

**Answer**:   The allegations in Paragraphs 152-165 pertain to Charter's dismissed DMCA Section 512(f) claim, and therefore no answer is required.

165.   Charter could not have discovered that Plaintiffs' notices for the Dropped Works were inaccurate until January 15, 2020, after Plaintiffs dropped the works from this case and Charter subsequently analyzed Plaintiffs' notice data.

**Answer**:   The allegations in Paragraphs 152-165 pertain to Charter's dismissed DMCA Section 512(f) claim, and therefore no answer is required.

## CLAIM FOUR

### VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT, COLO. REV. STAT. 6-1-101 et seq. ("CCPA")

166.   Charter repeats the allegations in Paragraphs 1 through 165 and incorporates them here.

**Answer**:  The allegations in Paragraphs 166-178 pertain to Charter's dismissed CCPA claim, and therefore no answer is required.  Charter agrees in footnote 13 of its Counterclaims that no answer is required.  To the extent a response is required to Paragraph 166, Plaintiffs incorporate their Answers to all preceding paragraphs as if fully set forth herein.

167.   The Record Company Plaintiffs engaged in an unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice in the course of their business, by knowingly or recklessly sending, and causing to be sent, copyright infringement notices concerning works for which they did not own the rights and for which they lacked authorization to send such notices.

**Answer**:  The allegations in Paragraphs 166-178 pertain to Charter's dismissed CCPA claim, and therefore no answer is required.

168.   In the course of their business, the Record Company Plaintiffs caused their agent, the RIAA, to engage in unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent trade practices, as described above.

**Answer**:  The allegations in Paragraphs 166-178 pertain to Charter's dismissed CCPA claim, and therefore no answer is required.

169.   In the course of Charter's business, it has been injured by the Record Company Plaintiffs' deceptive trade practice described above, including because Charter has incurred costs in implementing its CATS system and its customer service operations in receiving, processing, and forwarding the Record Company Plaintiffs' inaccurate notices.

**Answer**:  The allegations in Paragraphs 166-178 pertain to Charter's dismissed CCPA claim, and therefore no answer is required.

170.   Charter was also injured in the course of its business when it processed those inaccurate notices and thereby forwarded false accusations to its subscribers, including to the extent this created tension with the impacted subscribers, negatively affected Charter's goodwill, and caused reputational harm to Charter.

**Answer**: The allegations in Paragraphs 166-178 pertain to Charter's dismissed CCPA claim, and therefore no answer is required.

171.   Charter was also injured in the course of its business by the cost and burden of investigating the veracity of those inaccurate notices for the Dropped Works, including: investigating whether Plaintiffs owned or controlled the works at the time(s) the Record Company Plaintiffs sent notices for them; investigating the extent to which those

works related to the Music Publisher Plaintiffs' Dropped Works; and investigating whether the Record Company Plaintiffs otherwise had the right or were authorized to send notices to Charter for the Dropped Works.

**Answer**:  The allegations in Paragraphs 166-178 pertain to Charter's dismissed CCPA claim, and therefore no answer is required.

172.   Charter was also injured in the course of its business by being required to defend itself against Plaintiffs' allegations concerning the Dropped Works and the inaccurate notices, including: determining whether Plaintiffs owned or controlled the works at the relevant times, or whether the Record Company Plaintiffs had the right to send notices to Charter for the Dropped Works; and determining the extent to which the sound recordings at issue in the notices related to the Music Publisher Plaintiffs' Dropped Works.

**Answer**:    The allegations in Paragraphs 166-178 pertain to Charter's dismissed CCPA claim, and therefore no answer is required.

173.   On information and belief, the Record Company Plaintiffs own or control a significant share of the recorded music distributed, sold, and publicly performed in the United States. Thus, their conduct in sending inaccurate notices to Charter impacted actual and/or potential consumers of the Record Company Plaintiffs' goods, services, and property.

**Answer**: The allegations in Paragraphs 166-178 pertain to Charter's dismissed CCPA claim, and therefore no answer is required.

174.   The Record Company Plaintiffs' actions in sending and causing to be sent inaccurate notices to ISPs like Charter—which notices are in turn forwarded to members of the public—significantly impacts these members of the public, who are falsely led to believe that they have violated the law, and who are instructed to take actions based on inaccurate

notices and otherwise coerced to comply with baseless threats based on the inaccurate notices.

> **Answer**: The allegations in Paragraphs 166-178 pertain to Charter's dismissed CCPA claim, and therefore no answer is required.

175.    The Record Company Plaintiffs' conduct caused injury to Charter, and Charter has been and continues to be irreparably harmed by those actions and has no adequate remedy at law.

> **Answer**:  The allegations in Paragraphs 166-178 pertain to Charter's dismissed CCPA claim, and therefore no answer is required.

176.    Upon information and belief, the Record Company Plaintiffs engaged in the conduct described above in bad faith, and their conduct was fraudulent, reckless, willful, knowing, and/or intentional.

> **Answer**: The allegations in Paragraphs 166-178 pertain to Charter's dismissed CCPA claim, and therefore no answer is required.

177.    The Record Company Plaintiffs' conduct described above constitutes deceptive trade practices in violation of the Colorado Consumer Protection Act, including at least violations of Colo. Rev. Stat. § 6-1-105(1)(e) and (kkk), and § 6-1-105(3).

> **Answer**:  The allegations in Paragraphs 166-178 pertain to Charter's dismissed CCPA claim, and therefore no answer is required.

178.    Charter could not have discovered that Plaintiffs' notices for the Dropped Works were inaccurate until January 15, 2020, after Plaintiffs dropped the works from this case and Charter subsequently analyzed Plaintiffs' notice data.

**Answer**: The allegations in Paragraphs 166-178 pertain to Charter's dismissed CCPA claim, and therefore no answer is required.

## DEMAND FOR JURY TRIAL

Plaintiffs request a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

Charter's Prayer for Relief contains legal conclusions to which no response is required. To the extent a response is required, Plaintiffs deny any allegations associated with Charter's Prayer for Relief and deny that Charter is entitled to any relief.

## AFFIRMATIVE DEFENSES

Plaintiffs identify the following affirmative defenses to Charter's Second Amended Counterclaims One and Two seeking declaratory judgments of non-infringement, and reserve the right to raise additional defenses as discovery proceeds.  Plaintiffs do not assume the burden of proof on any issue, however characterized, on which they do not bear that burden.  Plaintiffs reserve all affirmative defenses not stated herein under Rule 8(c) of the Federal Rules of Civil Procedure and any other defense at law or in equity that may now exist or in the future be available based upon discovery and further investigation in this case.

1.   The statute of limitations bars Charter's declaratory judgment counterclaims to the extent Charter seeks a declaration outside the applicable limitations period.

2.   Charter's declaratory judgement counterclaims are barred to the extent they fail to present a justiciable controversy between the parties

3.   Charter's declaratory judgement counterclaims are barred to the extent they are redundant of Plaintiffs' underlying claims.

4.   The doctrines of waiver, estoppel and/or laches bar Charter's declaratory judgment counterclaims.

## COUNTERCLAIMS TO DEFENDANT'S COUNTERCLAIMS I AND II

Counterclaim Plaintiffs ("Plaintiffs"), by and through their counsel, hereby allege, on personal knowledge as to matters relating to themselves and on information and belief as to all other matters, counterclaims to Counts I and II of Defendant's Second Amended Counterclaims as set forth below.[4]

### INTRODUCTION

1.   Through these counterclaims, Plaintiffs allege secondary copyright infringement claims against Charter for claims that accrued from May 18, 2016 through April 30, 2020 (the "Counterclaim Period"), *after* Plaintiffs formally notified Charter of their legal claims based on Charter's persistent failure to address repeated infringing activity by its subscribers.

2.   In the underlying action, Plaintiffs allege that Charter is contributorily and vicariously liable for infringement of more than 11,000 of Plaintiffs' copyrights.  Specifically, Plaintiffs allege that Charter knowingly contributed to, and reaped substantial profits from, rampant copyright infringement committed by thousands of its subscribers, causing great harm to Plaintiffs, their recording artists and songwriters, and others whose livelihoods depend upon the lawful acquisition of music.  The claims in the underlying action are limited to those that accrued between March 24, 2013 and May 17, 2016 (the "Original Claim Period").

3.   In response to the underlying action, Charter filed its First Amended Answer, Affirmative Defenses, and Counterclaims on April 29, 2020.  ECF No. 165.  Charter's First

---

[4] The Counterclaim Plaintiffs are listed in Exhibits I and II to these Counterclaims.

Amended Counterclaims included claims for (i) a declaratory judgment that Charter is not liable to Plaintiffs for contributory copyright infringement; and (ii) a declaratory judgment that Charter is not liable to Plaintiffs for vicarious copyright infringement (the "Declaratory Judgment Counterclaims").  Charter explained that its "counterclaim for non-infringement is *not* limited to Plaintiffs' [Original] Claim Period."  ECF No. 158 (emphasis added).

4.      Based on Charter having put the Counterclaim Period at issue, Plaintiffs investigated Charter's liability for the Counterclaim Period.  Plaintiffs determined that Charter continued to contributorily and vicariously infringe Plaintiffs' copyrights for years after the Original Claim Period and throughout the Counterclaim Period, and asserted counterclaims-in-reply on June 15, 2020.

5.      Charter later amended its declaratory judgment counterclaims to limit them to Plaintiffs' Original Claim Period in its November 18, 2020 First Amended Answer, Affirmative Defenses, and Second Amended Counterclaims, ECF No. 295, but only after Plaintiffs were forced to investigate the Counterclaim Period and identified and asserted additional infringement claims in light of Charter's counterclaims.

6.      Plaintiffs now bring these counterclaims that accrued during the Counterclaim Period.  Plaintiffs' claims that accrued during the Counterclaim Period demonstrate that, not only did Charter facilitate infringement of Plaintiffs' copyrighted works by its subscribers during the Original Claim Period, but Charter's complete failure to comply with its legal obligations continues unabated to this day—and certainly continued after Plaintiffs indisputably provided Charter with notice of their claims.

7.      In March and April 2016, Plaintiffs sent Charter formal notice of their claims in the underlying action.  Through those notices, Plaintiffs informed Charter that they had sent

Charter a massive number of infringement notices identifying specific Charter subscribers (by Internet Protocol or "IP" address), who were infringing specific files.  Plaintiffs explained that, despite having receiving those infringement notices and Charter's knowledge of repeat offenders, Charter nevertheless failed to address the widespread infringement occurring on its networks.  Plaintiffs informed Charter that "[n]ot only must Charter act within the law going forward, but Charter must remedy the infringement to date."

8.      Plaintiffs believed—or at least hoped—that in response to this notice Charter would alter its conduct and take meaningful steps to address ongoing infringement by its subscribers.  Unfortunately, that did not happen.  Instead, Charter persisted in contributing to and profiting from its subscribers' infringement of Plaintiffs' copyrights through Charter's network, even *after* receiving Plaintiffs' March and April 2016 notices of claims, and remarkably, *even after* Plaintiffs initiated the underlying lawsuit in March 2019.

9.      During the Counterclaim Period, the Universal Plaintiffs continued to monitor and detect infringement occurring through Charter's network and sent more than 47,000 *additional* notices to Charter identifying specific Charter subscribers infringing Plaintiffs' copyrighted works.  Those notices advised Charter of its subscribers' blatant and systematic use of Charter's internet service to illegally download, copy, and distribute Plaintiffs' copyrighted music through BitTorrent and other online file-sharing services.  Infringement of Plaintiffs' works in suit from the underlying action continued during the Counterclaim Period, and infringement of additional copyrighted works also occurred.  Just as in the Original Claim Period, Charter did nothing to address the infringement, continuing to prioritize its own profits over its legal obligations during the Counterclaim Period.

10.      Plaintiffs therefore now assert these counterclaims to seek relief for secondary

liability claims against Charter that accrued during the Counterclaim Period.  These counterclaims involve many of the same parties (and no new parties), concern the same underlying technologies, processes and systems, and will require substantially overlapping document discovery, depositions, and expert analyses as Plaintiffs' earlier claims.

11.    As it did during Original Claim Period, Charter continued to deliberately turn a blind eye to its subscribers' infringement during the Counterclaim Period.  And it maintained its policy of refusing to terminate or otherwise take meaningful action against the accounts of repeat infringers of which it was aware.  Astonishingly, Charter maintained its policy and practice of inaction even after Plaintiffs notified Charter that they would assert legal claims for this very same conduct.  Even the threat of litigation did not make Charter take its legal responsibilities to copyright owners more seriously.  Instead, Charter doubled down on its do-nothing policy, sitting idly by as it received *even more* notices of ongoing, repeat infringements by its subscribers.

12.    Charter also continued to derive a direct financial benefit from its customers' infringement.  The unlimited ability to download and distribute Plaintiffs' works through Charter's service continued to serve as a draw for Charter to attract, retain, and charge higher fees to subscribers.  Indeed, Charter continued to draw subscribers to its network—including subscribers who wished to download and distribute music illegally through online file-sharing programs, like BitTorrent—by touting features of its service that are attractive to copyright infringers, including Charter's "blazing-fast . . . speeds" that allow users to "[d]ownload music" and other "large files in seconds."  By touting these features and continuing its policy of refusing to terminate the accounts of specific recidivist infringers known to Charter, Charter obtained a direct financial benefit from its subscribers' continuing infringing activity.  That financial benefit

included improper revenue that it would not have received had it appropriately shut down those accounts.  Charter decided not to terminate infringers because it wanted to maintain the revenue that is generated from their accounts.

13.    The infringing activity of Charter's subscribers that is the subject of these counterclaims, and for which Charter is secondarily liable, occurred *after* Charter received multiple notices of each subscriber's infringing activity, and *after* Plaintiffs formally notified Charter of their legal claims.  Specifically, Plaintiffs seek relief for claims that accrued from May 18, 2016 through April 30, 2020 for infringement of works by Charter subscribers *after* those particular subscribers were identified to Charter in multiple infringement notices.  Plaintiffs are entitled to relief for Charter's callous disregard for their copyright interests, even in the face of legal action, and for Charter's persistent failure—spanning nearly a decade—to take meaningful action to address widespread repeat infringement by its subscribers.

**NATURE OF ACTION**

14.    Plaintiffs repeat and re-allege each and every allegation contained in their Amended Complaint as if fully set forth herein.

15.    This is a civil action in which Plaintiffs seek damages for copyright infringement under the Copyright Act, 17 U.S.C. § 101, *et seq.*

16.    This Court has subject matter jurisdiction over Plaintiffs' counterclaims pursuant to 28 U.S.C. §§ 1331, 1367 and 1338(a).

**PLAINTIFFS**

17.    As in the underlying action, Plaintiffs are record companies that produce, manufacture, distribute, sell, and license commercial sound recordings, and music publishers that acquire, license, and otherwise exploit musical compositions, both in the United States and

internationally.  Plaintiffs own in whole or in part the copyrights and/or control exclusive rights in innumerable popular sound recordings and musical compositions, including the sound recordings listed on Exhibit I and musical compositions listed on Exhibit II, both of which are illustrative and non-exhaustive.  All of the sound recordings and musical compositions listed on Exhibits I and II have been registered with the U.S. Copyright Office.[5]

18.    The Counterclaim Record Company Plaintiffs (listed in Exhibit I to these Counterclaims) are some of the largest record companies in the world, engaged in the business of producing, manufacturing, distributing, selling, licensing, and otherwise exploiting sound recordings in the United States through various media.  They invest substantial money, time, effort, and talent in creating, advertising, promoting, selling, and licensing unique and valuable sound recordings embodying the performances of their exclusive recording artists.

19.    The Counterclaim Music Publisher Plaintiffs (listed in Exhibit II to these Counterclaims) are leading music publishers engaged in the business of acquiring, owning, publishing, licensing, and otherwise exploiting copyrighted musical compositions.  Each invests substantial money, time, effort, and talent to acquire, administer, publish, license, and otherwise exploit such copyrights, on its own behalf and on behalf of songwriters and others who have assigned exclusive copyright interests to the Counterclaim Music Publisher Plaintiffs.

<u>**CHARTER AND ITS ACTIVITIES**</u>

20.    Charter is one of the largest internet service providers ("ISPs") in the country.  Charter markets and sells high-speed internet services to consumers nationwide.  In 2015, Charter had more than 5 million subscribers and today has more than 29 million subscribers.

---

[5] Exhibits I and II attached hereto are identical to the exhibits attached to Plaintiffs' June 15, 2020 counterclaims-in-reply, except that they omit 14 duplicates from prior Exhibit I and one duplicate from prior Exhibit II that had been inadvertently included.

Through the provision of those services, Charter has knowingly contributed to, and reaped substantial profits from, massive copyright infringement committed by thousands of its subscribers, causing great harm to Plaintiffs, their recording artists and songwriters, and others whose livelihoods depend upon the lawful acquisition of music. Charter's contribution to and profit from its subscribers' infringement is both willful and extensive, and renders Charter equally liable.

21.    At all pertinent times, Charter's customers, including those in Colorado, have paid substantial subscription fees for access to its high-speed internet network, with Charter offering a tiered pricing structure whereby a subscriber can have even higher downloading speeds for a higher monthly fee. Many of Charter's customers are motivated to subscribe to Charter's service because it allows them to download music and other copyrighted content— including unauthorized content—as efficiently as possible. Accordingly, in its consumer marketing material, including material directed to Colorado customers, Charter has touted features of its service that are attractive to infringers, including its "blazing-fast Internet speeds" that allow users to "download just about anything instantly," including up to "8 songs in 3 seconds." Users, in turn, have utilized these speeds to pirate Plaintiffs' works on a staggering scale.

22.    Between 2016 and the present, for example, the Universal Plaintiffs sent Charter more than 47,000 copyright infringement notices, provided under penalty of perjury, detailing specific instances of its subscribers using P2P protocols on its network to distribute and copy Plaintiffs' copyrighted content unlawfully. Based on the sheer volume of copyright infringement that occurs over Charter's internet network, there can be little doubt that downloading Plaintiffs'

music illegally is something that many Charter users seek to do through Charter's internet service.

23.    At the same time, Charter has consistently and actively engaged in network management practices to suit its own purposes.  This includes monitoring for, and taking action against, spam and other unwanted activity that might otherwise interfere with its provision of internet service to its subscribers.  But Charter has gone out of its way *not* to take action against subscribers engaging in repeated copyright infringement, for its own financial benefit and at the expense of the underlying owners and controllers of copyright interests, including Plaintiffs, ultimately forcing Plaintiffs to bring this litigation.

24.    At all pertinent times, Charter knew that its subscribers routinely used its networks for illegally downloading and uploading copyrighted works, especially music.  Charter condoned the illegal activity because it was popular with subscribers and acted as a draw to attract and retain new and existing subscribers.  Charter's customers, in turn, purchased more bandwidth and continued using Charter's services to infringe Plaintiffs' copyrights.  Charter undoubtedly recognized that if it terminated or otherwise prevented repeat infringer subscribers from using its service to infringe, or made it less attractive for such use, Charter would enroll fewer new subscribers, lose existing subscribers, and ultimately lose revenue.  For those account holders and subscribers who wanted to download files illegally at faster speeds, Charter obliged them in exchange for higher fees.  In other words, the greater the bandwidth its subscribers required for pirating content, the more money Charter made.

## PLAINTIFFS' ENFORCEMENT ACTIVITIES AND CHARTER'S PERSISTENT INACTION

25.    During the Counterclaim Period, the Universal Plaintiffs sent notices to Charter identifying specific instances of its subscribers' infringement through BitTorrent and other P2P

services.  From 2016 through the present, Charter received more than 47,000 notices, provided under penalty of perjury, detailing specific instances of its subscribers using P2P protocols on its network to distribute and copy copyrighted content unlawfully both within, and beyond, the Charter network.

26.    The infringement notices sent to Charter identify the unique IP address assigned to each user of Charter's network, and the date and time the infringing activity was detected. Only Charter, as the provider of the technology and system used to infringe, had the information required to match the IP address to a particular subscriber, and to contact that subscriber or terminate that subscriber's service.

27.    Those infringement notices notified Charter of clear and unambiguous infringing activity by Charter subscribers—that is, unauthorized downloading and distribution of copyrighted music.

28.    The infringement notices sent to Charter also pointed to specific subscribers who were flagrant and serial infringers.  The infringement notices identified thousands of Charter subscribers engaged in blatant and repeated infringement of Plaintiffs' copyrighted works. Rather than terminating repeat infringers—and losing subscription revenues—Charter simply looked the other way.

29.    During the Counterclaim Period, Charter had the full legal right, obligation, and technical ability to prevent or limit the infringements occurring on its network.  Under Charter's "Terms of Service/Policies," Charter was empowered to exercise its right and ability to suspend or terminate a customer's internet access for, among other reasons, a subscriber's copyright infringement activity.  Charter's copyright policy expressly provides that "[i]f Charter receives more than *one* Notice of Copyright Infringement on the customer's part, the customer may be

deemed a 'repeat copyright infringer . . . [and Charter] reserves the right to terminate the accounts of 'repeat copyright infringers.'" (emphasis added).

30.    Despite these alleged policies, and despite receiving more than 47,000 infringement notices from the Universal Plaintiffs during the Counterclaim Period, as well as thousands of similar notices from other copyright owners, Charter knowingly permitted specifically identified repeat infringers to continue using its network to infringe.  Rather than disconnect the internet access of blatant repeat infringers to curtail their infringement, Charter knowingly continued to provide these subscribers with the internet access that enabled them to continue to illegally download or distribute Plaintiffs' copyrighted works unabated.  Charter's provision of high-speed internet service to known infringers materially contributed to these direct infringements.

31.    Charter failed to take real action against repeat infringers despite the fact that Plaintiffs formally notified Charter of its liability for such conduct as far back as March 2016.  In March and April 2016, Plaintiffs sent Charter formal notice of their claims in the underlying action.  Plaintiffs explained that Charter was liable for copyright infringement based on its failure to respond adequately to hundreds of thousands of infringement notices and its failure to stop repeat infringement occurring on its networks.  Plaintiffs informed Charter that "[n]ot only must Charter act within the law going forward, but Charter must remedy the infringement to date."  Unfortunately, Charter failed to heed this warning.  Instead, even after receiving formal notice of Plaintiffs' claims, Charter continued to look the other way—ignoring at least 47,000 *additional* notices of infringement from Plaintiffs and countless more from other copyright holders.

32.     Charter's motivation for refusing to terminate or suspend the accounts of blatant infringing subscribers was simple: it valued corporate profits over its legal responsibilities. Retaining infringing subscribers provided a direct financial benefit to Charter, as it allowed Charter to continue to collect revenue from accounts that should have been terminated.  Further, by not taking action against its infringing subscribers, Charter avoided the risk that account terminations would make its service less attractive to other existing or prospective users. Moreover, Charter did not devote sufficient resources to tracking repeat infringers, responding to infringement notices, and terminating accounts in appropriate circumstances.  Instead, Charter deleted internal records evidencing the infringement notices it received, making it impossible to even determine whether or the extent to which its subscribers had repeatedly infringed.

33.     Charter's facilitation of and profit from infringement of Plaintiffs' works through Charter's network undercuts the legitimate music market, depriving Plaintiffs and those recording artists and songwriters whose works they sell and license of the compensation to which they are entitled.

## CLAIMS FOR RELIEF

## Count I – Contributory Copyright Infringement

34.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 33 as if fully set forth herein.

35.     Charter and its subscribers do not have any authorization, permission, license, or consent to exploit the copyrighted sound recordings or musical compositions at issue.

36.     Charter's subscribers, using internet access and services provided by Charter, have unlawfully reproduced and distributed via BitTorrent, or other P2P networks, thousands of sound recordings and musical compositions for which Plaintiffs are the legal or beneficial

copyright owners or exclusive licensees.  The copyrighted works infringed by Charter's subscribers, which have been registered with the U.S. Copyright Office, include those listed on Exhibits I and II, and many others.  The foregoing activity constitutes direct infringement in violation of 17 U.S.C. §§ 106 and 501, *et seq.*

37.    Charter is liable as a contributory copyright infringer for the direct infringements described above. Through Plaintiffs' infringement notices and other means, Charter had knowledge that its network was being used for infringement of Plaintiffs' copyrighted works on a massive scale, and also knew of specific subscribers engaged in such repeated and flagrant infringement. Nevertheless, Charter facilitated, encouraged, and materially contributed to such infringement by continuing to provide its network and the facilities necessary for its subscribers to commit repeated infringements. Charter had the means to withhold that assistance upon learning of specific infringing activity by specific users but failed to do so.

38.    By purposefully ignoring and turning a blind eye to its subscribers' flagrant and repeated infringements, Charter knowingly caused and materially contributed to the unlawful reproduction and distribution of Plaintiffs' copyrighted works, including but not limited to those listed on Exhibits I and II hereto, in violation of Plaintiffs' exclusive rights under the copyright laws of the United States.

39.    Each infringement of Plaintiffs' copyrighted sound recordings and musical compositions constitutes a separate and distinct act of infringement. Plaintiffs' claims of infringement against Charter are timely pursuant to tolling agreements.

40.    The foregoing acts of infringement by Charter have been willful, intentional, and purposeful, in blatant disregard of Plaintiffs' rights.  Indeed, the sound recordings on Exhibit

I and the musical compositions on Exhibit II represent works infringed by Charter's subscribers after those particular subscribers were identified to Charter in multiple infringement notices.

41.   As a direct and proximate result of Charter's willful infringement of Plaintiffs' copyrights, Plaintiffs are entitled to statutory damages pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 with respect to each work infringed, or such other amount as may be proper under 17 U.S.C. § 504(c).  Alternatively, at Plaintiffs' election, they shall be entitled to their actual damages pursuant to 17 U.S.C. § 504(b), including Charter's profits from the infringements, as will be proven at trial.

42.   Plaintiffs also are entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

## Count II – Vicarious Copyright Infringement

43.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 42 as if fully set forth herein.

44.   Charter and its subscribers have no authorization, license, or other consent to exploit the copyrighted sound recordings or musical compositions at issue.

45.   Charter's subscribers, using internet access and services provided by Charter, have unlawfully reproduced and distributed via BitTorrent or other P2P services thousands of sound recordings and musical compositions of which Plaintiffs are the legal or beneficial copyright owners or exclusive licensees. The copyrighted works infringed by Charter's subscribers, which have been registered with the U.S. Copyright Office, include those listed on Exhibits I and II, and many others. The foregoing activity constitutes direct infringement in violation of 17 U.S.C. §§ 106 and 501, et seq.

46.     Charter is liable as a vicarious copyright infringer for the direct infringements described above. Charter has the legal and practical right and ability to supervise and control the infringing activities that occur through the use of its network, and at all relevant times has had a financial interest in, and derived direct financial benefit from, the infringing use of its network. Charter has derived an obvious and direct financial benefit from its customers' infringement. The ability to use Charter's high-speed internet facilities to illegally download Plaintiffs' copyrighted works has served to draw, maintain, and generate higher fees from paying subscribers to Charter's service.  Among other financial benefits, by failing to terminate the accounts of specific repeat infringers known to Charter, Charter has profited from illicit revenue through user subscription fees that it would not have otherwise received from repeat infringers, as well as new subscribers drawn to Charter's services for the purpose of illegally downloading copyrighted works.  The specific infringing subscribers identified in Plaintiffs' notices, including the egregious infringers identified therein, knew Charter would not terminate their accounts despite receiving multiple notices identifying them as infringers, and they remained Charter subscribers to continue illegally downloading copyrighted works.

47.     Charter is vicariously liable for the unlawful reproduction and distribution of Plaintiffs' copyrighted works, including but not limited to those listed on Exhibits I and II hereto, in violation of Plaintiffs' exclusive rights under the copyright laws of the United States.

48.     Each infringement of Plaintiffs' copyrighted sound recordings and musical compositions constitutes a separate and distinct act of infringement. Plaintiffs' claims of infringement against Charter are timely pursuant to tolling agreements.

49.     The foregoing acts of infringement by Charter have been willful, intentional, and purposeful, in blatant disregard of Plaintiffs' rights. Indeed, the sound recordings on Exhibit

I and the musical compositions on Exhibit II are works infringed by Charter's subscribers after those particular subscribers were identified to Charter in multiple prior infringement notices.

50.    As a direct and proximate result of Charter's willful infringement of Plaintiffs' copyrights, Plaintiffs are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 with respect to each work infringed, or such other amount as may be proper under 17 U.S.C. § 504(c).  Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b), they shall be entitled to their actual damages, including Charter's profits from the infringements, as will be proven at trial.

51.    Plaintiffs are further entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment from this Court against Charter as follows:

a.    For a declaration that Charter willfully infringed Plaintiffs' copyrights;

b.    For statutory damages pursuant to 17 U.S.C. § 504(c), in an amount up to the maximum provided by law, arising from Charter's willful violations of Plaintiffs' rights under the Copyright Act; or, in the alternative, at Plaintiffs' election, their actual damages pursuant to 17 U.S.C. § 504(b), including Charter's profits from infringement, in an amount to be proven at trial;

c.    For an award of Plaintiffs' costs in this action, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505;

d.    For pre-judgment and post-judgment interest at the applicable rate on any monetary award made part of the judgment against Charter; and

e.    For such other and further relief as the Court deems proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury

of all issues that are so triable.

Dated November 24, 2020

Respectfully submitted,

/s/ *Matthew J. Oppenheim*
Matthew J. Oppenheim
Scott A. Zebrak
Jeffrey M. Gould
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20015
Tel:  202-480-2999
scott@oandzlaw.com
matt@oandzlaw.com
jeff@oandzlaw.com

Jonathan M. Sperling
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Tel: (212) 841-1000
jsperling@cov.com

Mitchell A. Kamin
Neema T. Sahni
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643
Tel: (424) 332-4800
mkamin@cov.com
nsahni@cov.com

Janette L. Ferguson, Esq.
LEWIS BESS WILLIAMS & WEESE, P.C.
1801 California Street, Suite 3400
Denver, CO 80202
Tel: (303) 861-2828
jferguson@lewisbess.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of November 2020, a true and correct copy of the foregoing was filed with the Clerk of Court via the CM/ECF system, which will send notification of such filing to all counsel of record.

_____ /s/ Matthew J. Oppenheim_