1

```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
 2
    Case No. 19-cv-874-RBJ-MEH
 3   _____

 4   WARNER RECORDS, INC., et al.,

 5        Plaintiffs,

 6   vs.

 7   CHARTER COMMUNICATIONS, INC.,

 8        Defendant.
     _____
 9

10            Proceedings before MICHAEL E. HEGARTY, United

11   States Magistrate Judge, United States District Court for the

12   District of Colorado, commencing at 10:01 a.m., December 18,

13   2020, in the United States Courthouse, Denver, Colorado.

14   _____

15   WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE HEREIN

16   TYPOGRAPHICALLY TRANSCRIBED. . .

17   _____

18                      APPEARANCES

19            JONATHAN M. SPERLING, MATTHEW J. OPPENHEIMER, NEEMA

20   SAHNI and JEFF GOULD, Attorneys at Law, appearing for the

21   Plaintiffs.

22
     _____
23

24                    MOTION HEARING

25
```

1                  APPEARANCES (continued)

2           ANDREW H. SCHAPIRO, CRAIG JOYCE, NATHAN HAMSTRA and

3     LINDA BREWER, Attorneys at Law, appearing for the Defendant.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

3

```
 1                 P R O C E E D I N G S
 2              (Whereupon, the within electronically recorded
 3    proceedings are herein transcribed, pursuant to order of
 4    counsel.)
 5              THE COURT:  Good morning, everyone.  Case Number
 6    19-cv-874, Warner Records, Inc. vs. Charter Communications.
 7    I'm not sure how to go about introductions, but I guess --
 8    who's going to take the lead for plaintiff today?
 9              MR. GOULD:  Good morning, Judge Hegarty.  This is
10    Jeff Gould from Oppenheim & Zebrak on behalf of the
11    plaintiffs.  We are all --
12              THE COURT:  Are you video or --
13              MR. GOULD:  -- having --
14              THE COURT:  Hold on, hold on.
15              MR. GOULD:  I am trying -- I am trying on multiple
16    different browsers all at the same time and none of them are
17    working.  We are having this problem on each of our ends.
18              THE COURT:  I'm trying to get -- can I not see it
19    -- are there only three people on video, or are there more?
20              UNIDENTIFIED SPEAKER:  Three including you, Your
21    Honor.  Well, actually, four, including you.
22              THE COURT:  That's all you see?  Is that all we
23    have on video?
24              COURTROOM DEPUTY:  One, two, three, four, five,
25    six, seven -- seven.  They may just not have their cameras
```

1   turned on.

2          THE COURT:  Why doesn't everybody turn their

3   cameras on for me if you are on video.

4          MR. GOULD:  Your Honor, can you hear me?

5          THE COURT:  Yes.  Who is that?

6          MR. GOULD:  This is Jeff Gould for the plaintiffs.

7   We are having trouble getting on the video.  We are on Macs

8   here following the instructions to use Safari.  We have tried

9   Google Chrome and Firefox and still no dice.

10          THE COURT:  Well, we will wait unless anybody is in

11   a hurry.  I'm not.

12          MR. GOULD:  No, we're here for you and your

13   schedule, so we will keep trying.  Maybe I will shut down my

14   computer and that sometimes does the trick.

15          THE COURT:  Well, I just want to see everybody, you

16   know.  I'm sick and tired of voices only and it's a little

17   bit more difficult anyway, so . . .

18          MR. GOULD:  Strongly disagree -- I'm sorry, I

19   strongly agree.

20          MR. OPPENHEIM:  Judge Hegarty, this is Matt

21   Oppenheim.  Is there supposed to be a meeting ID or pass

22   code?

23          THE COURT:  No.

24          COURTROOM DEPUTY:  Just the link off the

25   instructions go straight to the --

5

1          THE COURT:  Yeah.  Are you just trying to link -- I

2     mean, every -- you guys who are on the video, Craig, you guys

3     just dialed in, didn't you?  No Code or anything, right?

4          MR. JOYCE:  Yeah, I just clicked the link, jumped

5     right on.

6          UNIDENTIFIED SPEAKER:  And, Your Honor, I had

7     difficulty the first time, but then I just tried it again and

8     it went right in.

9          THE COURT:  Okay.

10          MR. GOULD:  Is anybody else on a Mac that was

11     successful?

12          UNIDENTIFIED SPEAKER:  I am on a Mac.

13          MR. GOULD:  You are?

14          UNIDENTIFIED SPEAKER:  Yeah, I am.

15          MR. GOULD:  So you're using Safari?

16          UNIDENTIFIED SPEAKER:  Chrome.

17          MR. GOULD:  Chrome.

18          THE COURT:  Yes, I don't think you should do

19     Explorer under any circumstances, for example.  So how many

20     people do we have?  Like 10, 12?  Let's do a statistical

21     sampling.  Who has gotten COVID?  No one?  All right, that's

22     good.

23          (Pause)

24          UNIDENTIFIED SPEAKER:  What how about you, Your

25     Honor?  Have you managed to avoid it?

6

1          THE COURT:  So I have -- I mean, I read something

2   this week where one out of 40 Coloradans are contagious.

3   First of all, it's like what Mark Twain said about

4   statistics:  There's lies and damned lies and then there is

5   statistics, so I usually don't believe anything like that.

6   But I have 11 children, 12 grandchildren, five

7   daughters-in-law.

8          UNIDENTIFIED SPEAKER:  Oh, my.

9          THE COURT:  So there's 30 of us total --

10          UNIDENTIFIED SPEAKER:  Wow.

11          THE COURT:  -- and zero cases.  And we all are

12   probably on the aggressive side of being out and about in

13   society.

14          UNIDENTIFIED SPEAKER:  Nicely done.

15          THE COURT:  Would I be able to see everybody once

16   they are?  I mean, are there unlimited screens for me, do you

17   know?

18          COURTROOM DEPUTY:  (Inaudible).

19          THE COURT:  Well, I have seen more than four in

20   criminal duty and this is the same camera system we use for

21   that, isn't it?  It's just funny how, you know, some people

22   are able to do this and some people aren't.  I don't

23   understand.

24          Why do you suppose -- Andrew, why do you suppose

25   you were able to once and not -- not the time before?

1          MR. SCHAPIRO:  The first time I came through, it

2     asked me for some type of pass code, and so I just closed the

3     tab, opened a new tab and pasted the exact same browser

4     address in and then it worked.  So I don't know.  I would

5     like to say that I had some deep insight, but I don't.

6          THE COURT:  I will be the first to say --

7          MS. BREWER:  That insight was me.

8          THE COURT:  We are not on the cutting edge in our

9     direct in technology, unfortunately.  I -- we are not -- we

10    are probably in the middle somewhere as far as all the courts

11    go in the country, but we have limitations on this.

12         MR. GOULD:  Aha, success.  I see --

13         THE COURT:  They are dribbling in.  Jonathan, we

14    see you.  You all hear us?

15         MR. SPERLING:  Yes.  Good morning, Your Honor.

16         THE COURT:  Good morning, good to see you.

17         MR. SPERLING:  Likewise, Your Honor.  Your Honor,

18    everyone in my household has antibodies so we won't be

19    getting anybody infected.

20         THE COURT:  Your what?  Your house what?

21         MR. SPERLING:  Everyone in our household has

22    antibodies at this point, COVID antibodies, so we won't be

23    getting anybody infected on this video.

24         THE COURT:  Well, it means -- it means that you

25    technically had it, but you didn't feel it?

8

1        MR. SPERLING:  Oh, some of us felt it, Your Honor.

2        MS. SAHNI:  Good morning, Your Honor.  Neema Sahni

3   for the plaintiffs.  Good to see you.

4        THE COURT:  You, too.

5        MR. SCHAPIRO:  Same for my daughter, Your Honor.

6   She picked it up at college and had a mild course and now she

7   feels like she has got the get-out-of-jail-free card.

8        THE COURT:  Yeah, but that's only a six-month

9   probation from what I understand.

10       MR. SCHAPIRO:  Right.

11       THE COURT:  Shall we wait for Matt, probably?

12   Matt, are you still listening?

13       MR. OPPENHEIM:  I am on, Your Honor, and I'm -- I

14   have rebooted my whole computer.  The (inaudible) came back

15   up, and I'm trying again.  Hopefully, this will work.  My

16   colleague, Jeff Gould, is going to present the argument

17   today.  I know he is struggling as well.

18       THE COURT:  Yeah, I would call this more of an

19   interactive process than an argument, so it's -- it's going

20   to be good, though, I promise.  It's a matter of just getting

21   together and sitting down and reasoning through these things,

22   okay.

23       MR. OPPENHEIM:  Yeah, it keeps asking me for a pass

24   code.

25       THE COURT:  Gosh, I'm just sorry about that.

1    That's our bad, I'm sure.

2              COURTROOM DEPUTY:  No.

3              THE COURT:  No.  Yeah, but.

4              COURTROOM DEPUTY:  Just if you clear your cache

5    maybe, but all you have to do is copy and paste the link into

6    -- like if you have Chrome, it always works in Chrome.

7              THE COURT:  Are you copying and pasting, or are you

8    clicking the link?

9              MR. OPPENHEIM:  We are copying and pasting.

10             THE COURT:  Into Chrome?

11             MR. OPPENHEIM:  I am, and I am to Chrome.

12             THE COURT:  This is not an judicial endorsement.

13             MR. OPPENHEIM:  And I have rebooted my whole

14   computer.

15             MR. GOULD:  Yes, I have done all the same.  I even

16   just downloaded the Cisco Meeting app.

17             THE COURT:  Well, I have my own little Zoom back in

18   my office and I would do that, but the Court -- they tell us

19   that it's not secure, but who cares about something like

20   this.  I mean, it's a public proceeding, for goodness sake.

21   Who cares if it's not secure.

22             MR. SPERLING:  Your Honor, for the plaintiffs, we

23   would be happy to do that.  Mr. Gould is presented to have

24   the interactive conversation with the Court today and I do

25   think it would be valuable for him to be on video, together

10

1    with everyone else.

2            THE COURT:  But do you want to send -- see, the

3    problem is, I don't have a camera on the bench.  I have a

4    camera back in --

5            COURTROOM DEPUTY:  It wouldn't be recorded.

6            THE COURT:  So the recording system doesn't pick up

7    noise?

8            COURTROOM DEPUTY:  I mean, I guess in if you put

9    like a microphone next to a computer speaker, but it won't

10   (inaudible) the court's --

11           THE COURT:  Yeah, that's lousy.

12           MR. GOULD:  It keeps telling me:  Meeting Not

13   Found.

14           COURTROOM DEPUTY:  Everyone is using the same

15   thing, so.

16           THE COURT:  Yeah.  I wish I had a better answer.  I

17   mean, we can do this back in my Chambers, it's just not going

18   to be on the record, that's -- which is neither here nor

19   there for me.

20           MR. GOULD:  Your Honor, I do think that -- I have

21   not used it, but I do think that Zoom has a record function

22   and we could turn it on and then provide that recorded video

23   to a court reporter if that were acceptable.

24           THE COURT:  That's your call.  We're not -- we

25   don't have the funds to pay for anything like that, but if

1   you want to do that, I'm -- I'm not a stickler for certain

2   procedures, at least.  I am for some, I guess, but.

3          MR. SCHAPIRO:  Your Honor, for the defendants, we

4   are not sticklers either, but we would want to make sure that

5   there's, you know, a record in some form that (inaudible).

6          THE COURT:  Okay, but I think somebody has two --

7   two devices on.

8          MR. GOULD:  That was me, but now I have appeared in

9   the video so I could turn off the phone.  Matt, try that link

10  that Jonathan just sent.  I see you all.

11         THE COURT:  Yes, we see you.  Well, I mean, if we

12  had the major players right now -- is there anybody we are

13  missing from either side that really thinks it's critical?

14         MR. SPERLING:  Your Honor, for the plaintiffs,

15  while we certainly would like Mr. Oppenheim to be able to

16  join by video also, I think we can proceed --

17         THE COURT:  Okay.

18         MR. SPERLING:  -- with Mr. Gould here and Mr.

19  Oppenheim on the phone.

20         THE COURT:  Well, Jonathan, will you introduce

21  everybody for you, please.

22         MR. SPERLING:  Sure.  Good morning, Your Honor.

23  Jonathan Sperling, Neema Sahni of Covington & Burling, and

24  Jeff Gould, and Matt Oppenheim by telephone of Oppenheim &

25  Zebrak also the plaintiffs.  As we just discussed, Mr. Gould

1   will be largely making the presentation for the plaintiffs

2   this morning.

3           MR. SCHAPIRO:  And Your Honor, for Charter, I'm

4   Andrew Schapiro from the firm Quinn Emanuel.  With me is my

5   colleague Nate Hamstra and Craig Joyce, my local counsel whom

6   I think you know, and then we have various people on the

7   telephone.

8           THE COURT:  Very good.

9           MR. SPERLING:  And, Your Honor, it looks like we

10  now have Mr. Oppenheim by video as well, so we are all set on

11  the plaintiffs' side.

12          THE COURT:  Very good.  Okay.  So like I said, it's

13  not oral argument, per se, although I had to call it

14  something, so let me just give you some thought processes.

15  So both sides are seeking one another's privileged documents.

16  You basically on the offensive cite the same cases for your

17  respective motions and on the defensive cite the same cases.

18          I predict, although not for certainty, that the

19  result of these two motions to compel would not be one side

20  winning everything and the other side losing everything.

21  Even though they do seek different kinds of documents for

22  different reasons with different analyses, I just predict

23  that one side is not going to win the whole argument on

24  privilege and the other side is going to lose the whole

25  argument on privilege on both motions, because you all cite

13

1    the same law.  And you all rely on the same principle, one of

2    which is the most sacred of all, are attorney opinion work

3    product, but you both rely on that as a shield for your

4    documents, right?

5            But I could open up the plaintiffs' and read very

6    strong statements that you just can't get to opinion work

7    product, but then both sides are claiming that's what the

8    other side is seeking.

9            Do you see the dilemma, or am I the only one?

10            MR. SCHAPIRO:  Your Honor, I may be the only one

11    who is in a weird position because I thought that we are here

12    only to argue on what we call the hash report motion, hash

13    report issue.  Is there a second motion at issue?

14            THE COURT:  We are talking about all three that are

15    pending in front of me.  Yeah, I listed that one, but they

16    are all interrelated, aren't they?  I mean, they really are.

17    At least the two motions to compel have similar theories of

18    why a document should be produced and the 502 motion is a

19    derivative of plaintiffs' motion to compel, right?

20            So I don't see how you --

21            MR. SCHAPIRO:  Well, with --

22            THE COURT:  What?

23            MR. SCHAPIRO:  Well, with regard to the 502 motion,

24    we are willing to produce --

25            THE COURT:  No, no, no.  Andrew, I know -- I know

14

1  what you are doing.  I know, I know.  And I'm granting it

2  today.

3          MR. SCHAPIRO:  Okay.

4          THE COURT:  I'm granting that motion today, okay?

5  That will be by written order, but I want you to produce to

6  me, then, in some manageable format the remainder of the

7  200-plus privileged documents, okay.

8          MR. SCHAPIRO:  Sure, for review.

9          THE COURT:  For review to me, to Chambers.

10          MR. SCHAPIRO:  Absolutely, absolutely, Judge.

11          THE COURT:  So for that reason, then, I'm going to

12  deny plaintiffs' motion to compel without prejudice.  You

13  will -- they will have three-quarters of the documents, I

14  will have the remaining one-quarter of the documents from the

15  privileged list and will make a review of those while the

16  plaintiffs make a review of what is being produced.

17          Can you do that by close of business today, by the

18  way, because the order will hit the airwaves probably

19  immediately after I walk off the bench.  So would you be able

20  to have those in plaintiffs' hands today?

21          MR. SCHAPIRO:  I think I would need to ask one of

22  my colleagues on the phone about that.  We will certainly do

23  our best.  I invite whoever would be overseeing production of

24  those documents can help make that happen.

25          THE COURT:  Okay.  Now, Jeff, is it you that is

1    speaking for the plaintiffs?

2              MR. GOULD:  Yes, sir.

3              THE COURT:  So what I would then imagine your side

4    doing is, with all deliberate speed, looking at those

5    documents.  In the event that the argument doesn't change at

6    all or maybe you even gain new argument as to why the

7    remainder should be produced, then you have leave to file

8    what I would call a supplemental motion to compel

9    incorporating all of the arguments you have already made, but

10   in that supplemental motion only focusing on any new grounds

11   to go after the 200-odd documents that aren't being produced.

12   But I want you to be educated at least by the 600-plus that

13   are being produced so that we can really focus in.  All

14   right?

15             MR. GOULD:  Understood, Your Honor.  May I ask a

16   question about that?

17             THE COURT:  Yes.

18             MR. GOULD:  Time can be your friend but also a

19   challenge at times.  So I would ask, would there be

20   opportunity in the event we felt we need to file, that we

21   produce on an expedited schedule at some point that would

22   provide some alacrity for resolving that?

23             THE COURT:  Yes, of course.  I mean, I'm doing --

24   I'm trying to do what I can for you guys given your express

25   concern about the close of discovery.  I also am privy a

16

 1   little bit to maybe some comments Judge Jackson made to you

 2   about whether, in fact, that's a real deadline.  I think that

 3   issue came up with him, didn't it?

 4           MR. SCHAPIRO:  Yes, Your Honor.  Judge Jackson

 5   admonished us that we need to stick to the date for

 6   dispositive motions and trial, and that if we can work out

 7   among ourselves a modification of the discovery schedule that

 8   doesn't push those other deadlines, that's fine with him.

 9   And so we are talking now about that, but because dispositive

10   motions are due June 1, we are still -- even if we push some

11   of these deadlines a bit, we are still on a very tight

12   schedule.

13           THE COURT:  Understood.

14           MR. SPERLING:  So, Your Honor, it's --

15           THE COURT:  Go ahead.

16           MR. SPERLING:  -- it's Mr. Sperling.  I think we

17   have quite a different understanding than Mr. Schapiro only

18   with respect to dispositive motions deadline that Judge

19   Jackson that that date also for whether (inaudible) which

20   (inaudible) transcript.  I think it is somewhat ambiguous.

21   To the extent that you have some insight, Your Honor, it

22   might be helpful.

23           THE COURT:  Yes, Jonathan, you are not coming --

24   you are not coming across real clearly.  I don't know what --

25   but you guys agree that he's kind of fading in and out?

17

1        MR. SCHAPIRO:  Yes, and I can (inaudible) we are

2   happy to talk off line about that.  He may be right, whatever

3   the transcript says, we will work out something with you

4   first so we can come up with a proposal on discovery.

5        MR. SPERLING:  Okay, terrific.  So, Your Honor, I

6   think that disposes of that issue.

7        THE COURT:  Yes.  Well, theoretically, you can have

8   whatever discovery period you want as long as you keep the

9   dispositive motion deadline.  Parties in the past have taken

10  discovery deadline right up to the dispositive motion

11  deadline.  It's not ideal, but, you know, if there's some

12  discovery that occurs there around that time that may be --

13  could be relevant to the trial but not relevant necessarily,

14  not material to the motion to summary judgment, then, you

15  know -- I think the whole point for Judge Jackson is that he

16  is not going to just let things slide indefinitely.  He is

17  going to put your feet to the fire and he is -- I have seen

18  him conduct a trial 45 days after the initial scheduling

19  conference.  So among all of the judges we have, he -- he is

20  willing to stick to his guns for sure.

21       MR. SPERLING:  And, Your Honor, this is Mr.

22  Sperling again.  It might be helpful (inaudible) our side

23  (inaudible) to the extent that I realize this is (inaudible)

24  to (inaudible) question for the Court.  To the extent you

25  have some experience, if we are talking about dispositive

18

1    motions, (inaudible) first potentially (inaudible) trial date

2    mid-October of 2000 --

3            MR. SCHAPIRO:  Can't really hear you, John.  Sorry.

4            THE COURT:  Yes.  Maybe everybody -- would you mute

5    while Jonathan is talking, please, except I don't think we

6    can mute, so.

7            MR. SPERLING:  Is that any better, Your Honor, do

8    you hear me now?

9            THE COURT:  Much, much better.

10           MR. SPERLING:  So, Your Honor, a somewhat unusual

11   question, but you have given the benefit of your experience

12   with Judge Jackson and guidance.  So currently the

13   dispositive motion deadline is June 1.  I think at most we

14   would be talking about moving it, to the extent the parties

15   could agree, by a short period, maybe a few weeks.

16           Is it realistic for us to expect if we do that,

17   just based on the Court's own experience with Judge Jackson,

18   that we would get a ruling on those dispositive motions, you

19   know, reasonably advance of a mid-October trial?  I'm not

20   asking you for promises, obviously, but to the extent the

21   Court has experience with Judge Jackson's practice in that

22   regard, I think it would be really valuable insight to help

23   guide the parties.

24           THE COURT:  Sure.  So as long as you don't extend

25   the briefing out, like ask for extensions of time either on

1    the response or the reply, you are going to have it, at best,

2    let's say you do push that June date back even just by weeks,

3    you are going to -- if you follow the rules on briefing, you

4    are going to be briefed in August, right?

5              MR. SPERLING:  Yes, Your Honor.

6              THE COURT:  So relatively few judges can afford to

7    clear the decks and focus on one case.  I imagine the motions

8    will be complex.  A very, very quick turnaround would be two

9    months.  One month would be incredible.  So I would say the

10   best you could hope for is 30 days.  That would put you

11   probably into the first or second week of September with a

12   trial date of when?

13             MR. SCHAPIRO:  October, Your Honor.

14             THE COURT:  October what?

15             MR. SCHAPIRO:  Mid-October.

16             THE COURT:  Mid-October.  Nothing is ideal.

17             MS. BREWER:  Your Honor.

18             THE COURT:  Yes, go ahead.

19             MS. BREWER:  This is Linda Brewer from Quinn

20   Emanuel on behalf of Charter.  We had one additional

21   clarification question related to dispositive motions which

22   is that Judge Jackson's Practice Standards indicate that

23   there is typically a date set for letter briefing ahead of

24   the dispositive motion deadline, and that wasn't in our

25   scheduling order and so we wanted to clarify whether the

20

 1   letter briefing requirement applies to this case or does not.

 2          THE COURT:  You know --

 3          MR. SCHAPIRO:  Or, in other words, whether that

 4   June 1 deadline is meant for the letter or for the full on

 5   brief.  It was a little unclear to us.

 6          MS. BREWER:  Right.

 7          THE COURT:  By the way, I'm -- one thing people

 8   cannot do is call a district judge's chambers and ask those

 9   kind of questions, but you can call me and I will ask those

10   kind of questions.  That's something I have always done in my

11   career, so I'm happy to do that here.

12          Yeah, and so I didn't practice in front of Judge

13   Jackson, I'm not that familiar with the letter briefing.

14   What is that?

15          MR. SCHAPIRO:  It's essentially a premotion letter

16   which I think ordinarily would require essentially permission

17   before you go ahead and file your motion.  I think in this

18   case everyone knows that dispositive motions are going to be

19   filed, but we just wanted clarity and certainly wouldn't want

20   to miss a deadline or violate procedures.

21          THE COURT:  I'll try and see what I can do, if he

22   wouldn't mind eliminating that requirement.  That sounds like

23   the underlying theme that you are hoping for, right, that you

24   just file motions instead of any premotion letter?

25          MR. SCHAPIRO:  Yes, Your Honor.

1          THE COURT:  Okay, I'll deal with that.

2          MR. GOULD:  I think the plaintiffs would agree,

3    Your Honor, also, of course, subject to Judge Jackson's view,

4    premotion letters probably don't make as much since here as

5    they would in most situations that these rules are geared to.

6          THE COURT:  Okay.  So as long as we are talking

7    about making sense, are you both contemplating full summary

8    judgment or partial summary judgment?

9          MR. SCHAPIRO:  I think it's a little early for us

10   to say, but I expect full motions from the defendants based

11   on what we have seen and we haven't even had a deposition

12   yet, but I would expect that our motion would be one that, if

13   granted, would not (inaudible) the entire case.

14         THE COURT:  Well, a couple of things.  Are there

15   going to be fundamentally different arguments than were made

16   in any other case that has occurred before?

17         MR. SCHAPIRO:  I haven't surveyed all the cases

18   that occurred before, Your Honor.

19         THE COURT:  No, this case --

20         MR. SCHAPIRO:  There will be some (inaudible).

21         THE COURT:  That Virginia case, you know, is large

22   as life in everybody's mind, so that case is what I'm talking

23   about.  Are the arguments going to be fundamentally different

24   here than they would have been there -- they were there?

25         MR. SCHAPIRO:  I think they will.  And certainly,

1    the evidence is different here.  As you may recall, our firm

2    Quinn Emanuel, unlike our co-counsel, was not and our

3    adversaries were not involved in the Cox case, but the

4    evidence and some of the arguments which I would (inaudible)

5    if I'm able not preview just yet for the plaintiffs, will

6    differ from those in Cox.  Not to say that there won't be

7    some overlap for sure.

8            THE COURT:  Well, and so my second point is this:

9    Nobody tries more cases than Brooke Jackson.  There is a

10   corollary to that.  Just statistically that means he is on

11   the lower side of granting summary judgment.  If he tries the

12   most cases, he probably grants the fewest summary judgment

13   motions.  I don't know that for sure, I'm just supposing

14   that.  So not that it's going to stop anything you guys are

15   going to do, but at the same time, I think you ought to just

16   have certain expectations.

17           So what else on scheduling?  I don't know how we

18   got down that path.

19           MR. OPPENHEIM:  Your Honor.

20           THE COURT:  Go ahead.

21           MR. OPPENHEIM:  This is Matt Oppenheim, and I

22   appreciate your indulgence on that path for one more moment.

23   I respectfully will I think disagree with Mr. Schapiro.  I

24   think the case is actually going to be very similar to the

25   Cox case, but obviously will get there in time.

23

1             The question I had for you is whether you have any

2   sense of whether Judge Jackson would entertain a partial

3   summary judgment motions at different times.  For example, as

4   you know, Your Honor, apart from the question of liability

5   under the two different copyright theories here, there's the

6   issue of the safe harbor.  And do you believe that Judge

7   Jackson would entertain perhaps an earlier motion for summary

8   judgment if we chose to on the safe harbor since that really

9   probably shouldn't be an issue since the Charter never

10  terminated a single subscriber during the claim period?

11            THE COURT:  How soon can you file it?

12            MR. OPPENHEIM:  I think we want to take some

13  depositions first, Your Honor.  We haven't begun.  But if we

14  -- if we teed it up, for instance, a couple months before the

15  normal summary judgment deadline, is that something that you

16  think he might entertain?

17            THE COURT:  Well, so if it doesn't actually shorten

18  the case at all, if it doesn't shorten discovery, because

19  what you are saying is you are going to file it at a time

20  when, by the time the briefing is finished, the other motions

21  for summary judgment are going to be filed anyway and

22  discovery's going to be finish.  So if it doesn't add any

23  efficiencies to the case, if I were he, I would say no, but I

24  will check with him.  I mean, if you were going to do that in

25  the next month or two, that's a different story, but if it

24

1   doesn't actually help at all, his schedule or his

2   administration of the trial, maybe it shortens the trial or

3   something like that, I don't -- I don't see that he would --

4   I doubt that he would want you to file serial motions for

5   summary judgments.  Does that make sense?

6          MR. OPPENHEIM:  Yes, understood.  In both the two

7   different Cox cases that preceded and the Grande case down in

8   Texas, all of them the Courts found no safe harbor on summary

9   judgments, so it was helpful in narrowing the scope of the

10  trial somewhat for all of those cases.

11         THE COURT:  Well, true.

12         MR. SPERLING:  And, Your Honor, I would only add

13  here -- I'm sorry, Your Honor, I didn't mean to speak over

14  you.  But in response to your question, I think -- and

15  hopefully others can mute so I don't have the same microphone

16  issues -- it might help Judge Jackson in two respects, even

17  if it doesn't cut off discovery.  Number one, it will avoid

18  him receiving summary judgment briefing on all of the issues

19  at once and later, number one.

20         Number two, as the Court may have heard, Judge

21  Jackson was not shy about telling the parties that he thought

22  that this case should be settled, and an earlier disposition,

23  a safe harbor issue would probably be a nudge in one

24  direction or other on that as well.

25         So to the extent that Judge Jackson would like us

1    to make serious endeavors in that direction, which of course

2    we are happy to do, as the Court appreciates, you know, our

3    respective clients are -- their settlement positions are

4    formed by their sense of exposure or potential recovery, and

5    getting resolution of some of these issues early on would, I

6    think, help get the parties closer to together

7            THE COURT:  Yeah.  You know, Jonathan, I trust you,

8    I just don't -- settlement is one thing I do have quite a bit

9    of experience in, 1300 times.  I don't see this as leading

10   toward any kind of resolution short of trial because no

11   matter what kind of decision Judge Jackson issues on summary

12   judgment, I don't think anybody's going to convince any of

13   you that you are wrong and so you are always going to believe

14   that you are going to have the ability to appeal and win.  So

15   with that kind of a belief in the rightness of your cause,

16   it's just real hard to talk settlement, because I -- I -- it

17   would be surprising to me even in ex parte settlement

18   communications, which is what we do, that you would admit

19   even to me privately any risk of losing.

20           But if I'm wrong, hallelujah, you know, I would

21   love to see that happen and I have been wrong before.  But I

22   appreciate --

23           MR. SCHAPIRO:  Your Honor --

24           THE COURT:  Go ahead.

25           MR. SCHAPIRO:  I'm sorry.  On timing, I just have

26

 1  one other point that I was -- I inquired by text of some of

 2  my colleagues about the timing for getting those 502

 3  documents produced because they are all processed by a

 4  vendor.  And if we have Monday or to respect people's time a

 5  little, even Tuesday morning to get those to the other side

 6  and to you in-camera, that would be greatly appreciated.

 7  Today I know would be tricky, based on what I was told.

 8          THE COURT:  Okay, that's fine, Andrew.  I just

 9  would have expected that when you ask for that kind of

10  relief, you are prepared to provide the documents on a very

11  short notice, so this shouldn't be the first time you thought

12  about, hey, this might actually happen.  But that's --

13          MR. SCHAPIRO:  That's a fair point, Your Honor.

14  Your point is well taken.

15          THE COURT:  Okay.  Just do it as soon as you can,

16  practically can, okay?

17          MR. SCHAPIRO:  Will do.

18          THE COURT:  All right.  So far I'm going to talk to

19  Judge Jackson about pre-briefing letters, about early summary

20  judgment.  I guess that was just for Matt and that's just on

21  the issue of safe harbor.  Was there anybody else thinking

22  about an early summary judgment, wanting two bites at the

23  apple?  Okay.  So I will talk about that with him as well.

24  Probably e-mail, maybe just one counsel per side.  Who would

25  that be on the plaintiff?

1          MR. GOULD:  Your Honor, it can be Mr. Oppenheim or

2    me, whatever is easier -- whoever's name is easier for the

3    Court to spell.

4          THE COURT:  They are both probably German names and

5    I studied in Germany for years, so they are both equally

6    easy.

7          And then on the defense side?

8          MR. SCHAPIRO:  On our side, I think that would be

9    me.  And that's Schapiro, spelled actually the German way and

10   not the usual way, S-C-H.

11         THE COURT:  Sure, which I appreciate.  That mean

12   your folks didn't get a new name at Ellis Island on the way

13   over, I guess.

14         MR. SCHAPIRO:  Or maybe there was a clerk that

15   decided it's Tuesday and so you are going to be S-C-H instead

16   of S-H, we don't know.

17         THE COURT:  Okay.  So getting -- are we done with

18   schedule?

19         MR. GOULD:  Your Honor --

20         THE COURT:  Yes.

21         MR. GOULD:  -- I had one additional point.  This is

22   Jeff Gould.  If folks are having a hard time hearing me

23   please mute, I'd appreciate it.  Just turning back to the

24   (inaudible) a renewed waiver motion that plaintiffs sounds

25   like may -- well, have a right to file with you, could we set

28

1    a schedule for expedited briefing now, something like a week

2    for opposition, and let, you know, a short period for reply?

3            THE COURT:  On which issue?

4            MR. GOULD:  You gave us a reservation to refile a

5    supplement --

6            THE COURT:  Yes, we are getting back to that.  Yes,

7    we are getting back to that.  You are jumping the gun here a

8    second.  I want to make sure there's nothing else on

9    dispositive motions or the scheduling of discovery and then

10   we will get back to these issues of privilege, okay?

11           MR. GOULD:  All right, thank you.

12           THE COURT:  Anything else on either of those two

13   matters?

14           MR. SPERLING:  Not from plaintiffs.  Thank you,

15   Your Honor.

16           THE COURT:  Okay, all right.  All right, do you

17   guys mind if I call you by first name because I think most

18   people like their first name.  I like my first name, so.

19           MR. SPERLING:  That's fine with us, Your Honor.

20           MR. SCHAPIRO:  (Inaudible).

21           THE COURT:  So, Jeff, so you understand that what I

22   need is for you to focus solely on the documents you don't

23   have, on any supplemental.  When you would file that, if you

24   do, and I'm begging you not to, but I know you will do

25   whatever is in your client's best interest, you will just

29

 1   incorporate by reference all of the arguments that were made

 2   in the prior motion and in the new briefing only give me

 3   something new.  I don't need the repetitive arguments about

 4   all of the standards and I don't need Nina's decision to be

 5   cited to me again, or anything like that, okay?

 6           MR. GOULD:  Understood.

 7           THE COURT:  All right.  And you said expedited

 8   briefing.  Yeah, I think you are all are aware of the issues.

 9   You all have plenty of stock briefs that you have and so I

10   would propose five business days for a response, two business

11   days for a reply.  Okay?

12           MR. GOULD:  Thank you, Your Honor.

13           THE COURT:  All right.  So I just -- somebody just

14   sent me 2 gigabytes of privileged materials which was quite a

15   task to open up.  How am I going to receive these 200

16   documents?  I mean, I assume it's only -- it's just text sort

17   of things and, therefore, it should be megabytes and not

18   gigabytes; is that right, Andrew?

19           MR. SCHAPIRO:  That's my understanding, Your Honor,

20   and we are happy to provide it to the Court in whatever way

21   -- in whatever way you prefer.

22           THE COURT:  And my understanding is, based on your

23   reply brief that you filed yesterday or two days ago, maybe,

24   that it's only in your opinion -- opinion work product that

25   you've withheld?  That's all?

1           MR. SCHAPIRO:  Correct.  Opinion work product, yes.

2           THE COURT:  All right.  Anything else on that

3    before we turn to Charter's motion to compel?  Okay.

4           So the main reason I wanted to talk today is the

5    diametrically opposed fact assertions that the hash file in

6    the defendant's view was used offensively, or will be used

7    offensively at trial, but the dark side will not and will be

8    shielded, and then the plaintiffs' very plain statement that

9    this hash file is not going to be used whatsoever at trial,

10   these are just -- they are inconsistent, they can't both be

11   true.  So that's what -- that's -- at least one of the root

12   issues I need to understand is that.

13          So I'm going to let Mr. -- is it -- Jeff, are you

14   going first -- Andrew, I mean, are you going for the defense?

15          MR. SCHAPIRO:  I'm trying to think (inaudible).

16   sorry, I was muted there.

17          THE COURT:  Okay.  Articulate again in as briefly

18   and clearly as you can, your argument that, in fact, they are

19   using that hash file for their -- a part of it at least, part

20   of the results, for their affirmative case at trying to

21   shield the hash report (inaudible), but trying to shield

22   those parts that actually show that their investigation had

23   flaws and is not credible, so put that on the record.

24          MR. SCHAPIRO:  Absolutely, Your Honor.  And you

25   used the word "results" a moment ago which is the keyword.

31

1    So, you know, in this case, as you know, the plaintiffs went

2    back in 2016 and asked Mark Monitor and Audible Magic to, in

3    our words, recreate -- they dispute that, but we think it's

4    accurate -- the evidence that would allow them to show what

5    files were shared by our subscribers during the relevant

6    period of 2012 to 2015.  And they have -- in this case, they

7    are seeking to use the files that were downloaded through

8    that process in 2016, including their hashes, as evidence

9    against Charter.  They say that the other evidence they

10   searched for in 2016 somehow is not relevant or are opinions,

11   they are not facts.

12           THE COURT:  But your position is that both of those

13   are part of one effort and one result, correct?  Is that what

14   you are arguing?

15           MR. SCHAPIRO:  That's correct, that they are trying

16   to wield the conclusions from these documents as a sword.

17   And one of the cases we cite in our briefing is Chevron Corp

18   vs. Status Consulting, which is 2010 Westlaw 392- -- 3092, we

19   think addresses a very similar situation.  In that case, the

20   Court -- it's a District of Colorado case, 2010 -- said that

21   justice does not permit one side to inform and facilitate a

22   damages assessment purposed for the reliance of the Court

23   without permitting it to (inaudible) access to the materials

24   and process underlying the assessment.

25           So this actual report is a list of 7200 hashes that

1    they sent out and said, Go find these if you can on the

2    internet to Mark Monitor and Audible Magic.  And in this

3    case, they are going to be producing, they keep pointing to a

4    hard drive -- and I'm sure we'll hear about the hard drive

5    from Mr. Gould -- on which they have some of these files and

6    hashes, which were derived from this process of going out and

7    searching and re-creating in 2016, but they're mindful enough

8    to look back at that process, how Audible Magic and Mark

9    Monitor got there.

10          Now, I want to be clear, we are not asking for

11   anyone's opinions or guidance.  We are not asking for papers

12   in which the lawyer says why you should look for this file or

13   that file.  We just want to know what files were sought and

14   which ones were found, or more significantly for our

15   purposes, which ones were not found either because they

16   weren't out there or because when Audible Magic compared with

17   them to the works in suit, they turned out not to be works in

18   suit.

19          THE COURT:  Okay, a couple of --

20          MR. SCHAPIRO:  It's actually pretty straightforward

21   in our view.

22          THE COURT:  Okay, a couple of questions.  And I

23   know Jeff is going to be dying to jump in, but just wait your

24   turn so you can be fully informed about what we are talking

25   about.

1          7200, was that the original complete set of what

2     was searched for in 2016, or was that just a subset of what

3     was searched?

4          MR. SCHAPIRO:  I don't think we know, which is one

5     of the reasons we would like to get the report.  I can tell

6     you that they are alleging 10,000 -- someone on my side can

7     correct if I'm wrong -- something like 10,000 hashes in just

8     against Charter.  So it's a subset of something, but --

9          THE COURT:  Okay.

10         MR. SCHAPIRO:  -- we don't know, which is what we

11    want to see.

12         THE COURT:  And I understand from your arguments

13    that you believe that if it is a subset, it's a subset of the

14    unsuccessful, that the search was unsuccessful as to those

15    7200, right?  That's what you believe?

16         MR. SCHAPIRO:  Right.

17         THE COURT:  Okay.

18         MR. SCHAPIRO:  Not as to all of them.  I think even

19    on the first page of the plaintiffs' brief they say that Mark

20    Monitor was able to find some but not all of the 7200.

21         THE COURT:  Okay.

22         MR. SCHAPIRO:  So our expectation (inaudible) is

23    they found some and they didn't find some.

24         THE COURT:  All right, that's your understanding,

25    then, that of the 7200, there were some successes in the

34

1    sense that they did re-create customers sharing and some they

2    didn't?

3            MR. SCHAPIRO:  Correct.

4            THE COURT:  Okay.  And then is it your argument and

5    view that plaintiff is claiming the compilation is the

6    attorney opinion, but there's no other opinions that would

7    exist in any of the documents you are seeking?  In other

8    words, it's selection --

9            MR. SCHAPIRO:  I mean, my understanding of what

10   they are saying -- I mean, that they may articulate it

11   differently -- is that we might somehow be able to divine

12   from the list of, you know, which ones they chose to send out

13   for search and which they didn't, something about their

14   thought process that would somehow be relevant to us, but we

15   are not interested in that and I don't see how you'd be able

16   to derive that from just seeing, here's a list and here are

17   the results of it.  And if somehow there's some scintilla of

18   that in there, it's by far outweighed by the actual purpose

19   for which it's sought, which is to show just what was sought

20   and what came back, the pure fact.

21           THE COURT:  Okay, but you believe you are not

22   asking for anything any attorney actually wrote.  The only

23   thing that would be revealing would be the -- if someone were

24   to look at the totality of the documents we are talking

25   about, that would potentially reveal just an attorney's

35

1    thought processes as to what they should have Mark Monitor

2    do?

3              MR. SCHAPIRO:  Exactly.  I want to be a hundred

4    percent clear about that.  You are exactly right, Your Honor.

5    We are not asking here for any communications that they may

6    have had or meetings or documents that ultimately led them to

7    choose these files versus other files, anything like that.

8    We just want the list.

9              THE COURT:  Okay.  Now --

10             MR. SCHAPIRO:  And I think that, you know, from

11   that, we could reverse engineer something about their thought

12   processes.

13             THE COURT:  Okay.  And I'm going to suggest

14   something a little bit unusual, but it's something I would do

15   probably if everybody were in here, live in court.

16   Obviously, I don't want the plaintiff to have to, on the

17   record in the hearing of defense counsel, articulate the

18   opinion work product that they are trying to protect and they

19   say they are trying to protect it, but I don't have a clear

20   understanding of what that would be other than what we are

21   all talking about right now.  And if that's it, that it's

22   just their -- so Jeff, this question is to you.

23             If it's just that producing these documents would

24   reveal attorney thought processes as to what to submit to

25   Mark Monitor, then I don't think I need any further

1   explanation, but if it's more complex than that, more subtle,

2   then what I would do is I would call you up to the bench and

3   engage in a little in-camera sort of discussion.

4          And I would -- I'm prepared to do that right now,

5   by having all defense sign off on this call and then call

6   back in, as much as that risks us kind of having trouble

7   getting back all together, but that's -- I just need to know

8   how much I need to understand about the argument on the

9   plaintiffs' side.  And if there is more, I need to

10  understand, then I'm happy to entertain that in camera.

11         Okay, so you have the microphone.

12         MR. GOULD:  Thank you, Your Honor.  I want to

13  address a couple of things Mr. Schapiro said, but I first

14  want to answer your question.

15         There is more information that would be disclosed

16  that reflects counsel's analysis, mental impressions and

17  thought processes that is included in that spreadsheet and

18  the disclosure of it would provide too much of it to the

19  defendants.  So I think that your suggestion is probably a

20  good idea if -- unless you are inclined to deny the motion, I

21  happily --

22         THE COURT:  No, I think we are going to have to do

23  that.  Would you like to make your argument right now before

24  we do that or after?

25         MR. GOULD:  I'm happy to make it, whatever you

1    think would be most helpful to you, Your Honor.

2              THE COURT:  Okay, I think I would be more effective

3    as an adjudicator if I had more information.  So is our

4    public telephone line on?

5              COURTROOM DEPUTY:  (Inaudible).

6              THE COURT:  Is there?  Okay.  So I'm going to have

7    to turn off the public telephone line.  So to the extent

8    anybody's on the telephone and you want to listen in on the

9    plaintiffs' side, you might want to call one of the counsel

10   whose --

11             COURTROOM DEPUTY:  (Inaudible).

12             THE COURT:  Okay, all right.  So give me ten

13   minutes.  It's 10:51.  So I would like all of the

14   representatives of the defense to sign back in in

15   approximately ten minutes, okay?

16             MR. GOULD:  Your Honor, could I make one other

17   comment before we break --

18             THE COURT:  Go ahead.

19             MR. GOULD:  -- picking up on what Mr. Schapiro

20   said.  Their papers kind of have a little bit of (inaudible)

21   a catch-all ending to it where they are asking for some vague

22   and undefined set of all documents related to this program

23   and this whole 2016.  Mr. Schapiro's questionnaire made it

24   quite clear to me, at least, that this motion is strictly and

25   only about the hash report

1        THE COURT:  Yeah, I wasn't that focused on that

2   part of what you wrote to me in the reply.  So, yeah, I --

3   Mr. Schapiro, you can speak for yourself, but I think that's

4   how I saw it.

5        MR. SCHAPIRO:  I think that's right, although not

6   having seen the hash report, our understanding is that part

7   of that, or at least what we are speaking of when we are

8   talking about the hash report, is there's a list of the

9   Audible Magic results.  So, remember, Mark Monitor is out

10  there searching the web, Audible Magic is theoretically

11  matching what's found there against works in suit.  So there

12  was a list of results from Audible Magic and we think that is

13  encompassed in this and that certainly is not anyone's work

14  product either.  It's just the result of the search.

15       I don't know if that's technically part of this

16  actual spreadsheet or whether it's an attachment or something

17  like that.  But I agree, we are not looking for

18  communications or guiding the investigation, et cetera.  And

19  to the extent that there is any lack of clarity on that, I

20  will stand on what I'm saying here

21       THE COURT:  Okay.  So again, let's sign back in at

22  about five after 11:00, Denver time.

23       Do we have the ability to turn the record off?

24       COURTROOM DEPUTY:  Yes.

25       THE COURT:  Okay.  So we are going to turn the

39

1    record off and have only plaintiffs' counsel or

2    representatives, I guess, on the line, okay.

3              MR. SCHAPIRO:  So we should come back at five past

4    the hour?

5              THE COURT:  Five past the hour.

6              MR. SCHAPIRO:  Thank you.

7              MR. SPERLING:  And, Your Honor, it's Mr. Sperling.

8    Just out of an abundance of caution, I think the information

9    we received had two different phone numbers.  There was a

10   public number that I see is listen only.

11             THE COURT:  Yeah, we are turning that off.

12             MR. SPERLING:  -- and then a counsel number.

13             THE COURT:  Right.

14             MR. SPERLING:  Okay.

15             THE COURT:  We are turning the public off because

16   this is not a public proceeding anymore.

17             MR. SPERLING:  Right.  And then the counsel --

18             (Audio recording turned off from 10:53 to 11:08.)

19             THE COURT:  So we have Linda Efron (ph), Andrew

20   Schapiro, Jen Golinveaux, Huebert Allison -- or Allison

21   Huebert, I guess.  Yep.

22             MS. BREWER:  This is Linda Brewer.  Just for the

23   benefit of the court reporter and the Court, I might show up

24   as Linda Efron through my phone line.  That's my married

25   name.  My maiden name is Brewer, which is what is affiliated

1   with my appearance.

2            THE COURT:  That's fine.  And I wish we had a court

3   reporter, but we don't.  It's just the recorder.

4            MS. BREWER:  Oh, okay.  I will go on mute.

5            THE COURT:  Do we have all of the necessary players

6   as far as everybody can see?

7            So my question to you, Jeff, and one that we have

8   talked about before the in-camera proceeding, is sort of our

9   lack of -- well, is it your contention -- and if so, explain

10  factually -- that none of the effort in 2016 has been a basis

11  for a complaint for the evidence you are going to produce at

12  trial?

13           Because one good point, Mr. Schapiro does make is

14  that you can't hardly use an effort, an analysis, a report as

15  a basis for your case and then not allow at least a

16  credibility inquiry into that.  Because, as you know, at

17  trial, credibility, truthfulness is always an inherent issue

18  and maybe the most critical issue is the credibility evidence

19  people submit.  And so that resonates a little bit with the

20  judge when there's an allegation that someone is trying to

21  use evidence that was collected, but yet not permitting any

22  inquiry into the manner in which it was collected.  So please

23  address that.

24           MR. GOULD:  Thank you, Your Honor.  So when we

25  (inaudible).  Can you all hear me?

41

1          THE COURT:  Hear?  Yes.  See?  I think you have one

2  of those cloaking devices on.  There you go.

3          MR. GOULD:  Is that better?

4          THE COURT:  Yep.

5          MR. GOULD:  So we have produced the files from

6  (inaudible) the evidence from the 2016 program that we would

7  rely on and they have it.  They can ask questions if they

8  want about it, of the Monitor witness, the witnesses of the

9  plaintiffs.  They can ask how it was collected.  We have also

10  produced, I think, somewhere in the range of 60,000 files

11  that are essentially log files that show exactly where and

12  when and from whom they were downloaded.  (Inaudible)

13  understand the collection process for those files.

14          The argument that Charter made in it briefs -- can

15  you folks still hear me?  I'm spotty over here.  Okay.

16          The argument that Charter made in it briefs on

17  selected disclosures is -- I don't say this in a nefarious

18  way -- is a little misleading.  It is not at all the case,

19  Your Honor, that the plaintiffs are relying on the fact that

20  they did an investigation and telling you, Hey, here's what

21  that investigation shows, trust us.  We found evidence that

22  substantiates our allegations and we produced it.  We say

23  those files with the hashes that are shown on those files are

24  infringing.  Charter is welcome to dispute that.  They can

25  seek discovery on other facts to dispute that.  They know

42

1    what those files are.  What they want to know is what we, as

2    counsel, found when we were looking into those.

3              THE COURT:  Well, hold on a second, let me ask a

4    few pointed questions.  And I'm trying -- I'll try to

5    segregate what I heard on camera versus what I know to be

6    from the public filings and the arguments we have made today.

7              You sent notices from 2012 to 2015?

8              MR. GOULD:  I'm sorry, you went out for one minute.

9    Can you repeat that?

10             THE COURT:  Yes.  You sent notices to Charter in

11   the time period 2012 to 2015?

12             MR. GOULD:  Correct.

13             THE COURT:  And from what I read in the briefs,

14   some of that information that might have been able to be

15   captured during that time wasn't captured; is that correct?

16   Captured and preserved?

17             MR. GOULD:  It's a hard question.  There's always

18   -- there's no limit to what you can capture, right?  I think

19   what you are asking is:  Did Mark Monitor download files from

20   the Charter subscribers?

21             THE COURT:  Well, sure, let's start with that.

22             MR. GOULD:  No, it didn't have to because it had

23   verified verification that the files with those Monitor

24   hashes were infringing.

25             THE COURT:  Okay.  But so you do have preserved

43

1    evidence from 2012 to 2015 concerning the notices that you

2    sent, that you identified in each one of those notices -- you

3    said millions, I think, but I don't know how many went to

4    Charter -- but, anyway, those notices identified IS -- IPs

5    for the infringers, correct?

6              MR. GOULD:  The notices -- you broke off for a

7    second.  The notices identified IP addresses --

8              THE COURT:  For the infringer?

9              MR. GOULD:  -- a date and time of the

10   infringement --

11             THE COURT:  Okay.

12             MR. GOULD:  -- the name of the infringing file --

13             THE COURT:  Yes.

14             MR. GOULD:  -- and the unique (inaudible) hash for

15   that file containing the infringing orders.

16             THE COURT:  And that's all evidence that you have

17   turned over?

18             MR. GOULD:  Yes, sir.  In addition, the notice

19   lists an exemplary work.

20             THE COURT:  Okay.

21             MR. GOULD:  We have produced everything that exists

22   and that we have.

23             THE COURT:  Okay.  So that's the evidence -- at

24   least some of that is going to be what you introduce at trial

25   in support of your affirmative claim, correct?

44

1          MR. GOULD:  Yes.

2          THE COURT:  Is what Mark Monitor did in 2016 also

3  going to be part of what you introduce at trial?

4          MR. GOULD:  The files that are downloaded in 2016

5  will be.  We would -- which we have produced.

6          THE COURT:  So the files they downloaded -- every

7  file that they downloaded, you have produced?

8          MR. GOULD:  Yes, sir.

9          THE COURT:  And that's all you are going to use at

10  trial from that effort, are the files downloaded by Mark

11  Monitor?

12          MR. GOULD:  Yes.

13          THE COURT:  And, Andrew, do you disagree?

14          MR. SCHAPIRO:  I just reserve that if something in

15  the course of the case changes, we would need to re- -- that

16  would cause us to revisit that, but where we sit today, yes,

17  only the downloads from 2016.

18          THE COURT:  Okay.  So, Andrew, let's say in a -- in

19  a different kind of lawsuit, pre-suit plaintiffs' attorney

20  goes out, does an investigation of liability, gathers

21  evidence and then, you know, for a year goes out and uses his

22  own wits and thought processes to determine what to

23  investigate and how to find out facts that would support a

24  claim in court, and then the case is filed because they feel

25  they have a good faith basis for doing so, and then they turn

45

1    over all evidence that they are going to use at trial, but

2    they don't disclose every phone call they made, every car

3    trip they took, every website they looked at, because to do

4    that would be to re-create, you know, an attorney opinion

5    work product that shows how they do their business, that's

6    the merchandise of a lawyer.  So how is this different than

7    that?

8         MR. SCHAPIRO:  Yes, I think -- I think it's

9    entirely different, Your Honor.  You said yourself and I'm

10   going to go on (inaudible) maybe as Mr. Gould, they are going

11   to use the evidence collected in the 2016 project in an

12   attempt to try and support their allegations and prove that

13   there was direct infringement by the subscribers here.  The

14   2016 project was the effort by Mark Monitor to go back and

15   find out what these files were for which the notices were

16   sent.

17        And it's a key part of our defense in this

18   billion-dollar case to show that the Mark Monitor process and

19   Audible Magic's supporting role in that are not reliable and

20   they are withholding a document that shows not an attorney

21   going -- as far as I know, I mean, I don't know what was

22   discussed in camera and I obviously can't rebut it.  But as

23   far as we know and the part that we are seeking, the document

24   -- it is more as if you said, I'm going to send a -- you

25   know, a detective out to go and watch, you know, to see

1    whether -- what person goes in and out of this building and

2    what's an important part of the case in some way or another.

3    And we have a right to get a report that the detective

4    provides the lawyer saying, Well, you know, on such and such

5    a day, it was really rainy and I really couldn't tell if

6    anybody was going in and out.  On another day, I saw someone

7    wearing a wet hat, might have been that person.  Seems like

8    it turned out that it wasn't.

9         They can't just selectively say, Ah, you know, we

10   have this detective, isn't that great, and it's the gold

11   standard which that they are going to be saying if it's

12   anything like the Cox case.  And, by the way, you know, on

13   Thursday the 16th, the man in the brown hat entered.  We have

14   a right to test that and we are just seeking the facts

15   produced by that report.

16        THE COURT:  So I don't see that, that's the

17   problem.  You are going to have to convince me of that.  For

18   example, using your analogy, let's say a dozen times he

19   doesn't see the person he wants.  He thinks it might be them,

20   but it wasn't them.  But one time he saw them and he has them

21   on video and everybody in the courtroom, including the

22   defense, says, Yeah, that's our guy in that video.

23        The fact that there were a dozen other times that

24   that investigator didn't see the person go in and out of the

25   building, what difference does it make?  It's not material to

47

1    the case.

2              MR. SCHAPIRO:  Well, maybe my analogy is imperfect

3    in that way because in this case the detective is saying and

4    the plaintiffs' lawyers are saying, Well, we know -- we are

5    not just relying on the fact that you saw this person come in

6    once or twice.  They are saying that that they sent all of

7    these notices to us and that these notices put us on notice

8    of actual infringement --

9              THE COURT:  Stop there, stop there.

10             MR. SCHAPIRO:  -- among the --

11             THE COURT:  Did you say that -- did your client

12   retain notices that were sent?

13             MR. SCHAPIRO:  Did our client retain notices that

14   were sent?

15             THE COURT:  Yes.

16             MR. SCHAPIRO:  I don't think we have them for the

17   entire period, but they have been produced to us by the other

18   side in this case.

19             THE COURT:  No, I know, but these were -- I know I

20   have discussed this before, but it's been a lot of water

21   under the bridge.  Were these electronic notices?

22             MR. SCHAPIRO:  Yes.

23             THE COURT:  And did your client retain any of those

24   from the period 2012 to 2015?

25             MR. SCHAPIRO:  I think I would have to ask one of

1   my colleagues to weigh in on that because I'm actually not

2   sure.

3           THE COURT:  Is this part of a spoliation evidence,

4   by the way?

5           MR. SCHAPIRO:  They call it spoliation, yes.  We

6   call it the ESI issue, so I'm not sure which -- what

7   percentage or which we have.

8           THE COURT:  Well, it's a loss of data in any event,

9   right?  We all agree on that.

10          MR. SCHAPIRO:  Yes.

11          MR. GOULD:  If that's helpful, Your Honor -- if

12  it's helpful, Your Honor, I have a fair familiarity with the

13  numbers.

14          THE COURT:  Go ahead.

15          MR. GOULD:  So of the roughly 700,000 notices we

16  sent to Charter, they were able to identify somewhere in the

17  ballpark of 11 percent.

18          THE COURT:  You mean that they -- that they had

19  already, that they maintained?

20          MR. GOULD:  Well, what we know from the litigation

21  and the discovery is that we have received records from them,

22  from Charter, demonstrating that they saved data from

23  approximately 11 percent of our notices.

24          THE COURT:  Okay.  Andrew, I have got to -- do you

25  expect to challenge the authenticity or accuracy of

49

1    plaintiffs' representation on the 700,000 notices?  Or do you

2    expect to be able to, in good faith, argue that that, in

3    fact, did not happen; that there were not 700,000 notices is

4    during that time period?

5           MR. SCHAPIRO:  I don't think we will contest that

6    there were -- I can't tell you the exact number, but that

7    notices they say they sent were sent.  We are not going to

8    contest the fact that notices were sent.

9           THE COURT:  Okay.  So I want to see -- I mean, if

10   you can do so without revealing your thought processes, which

11   is what this whole dang thing is about.  Being a trial

12   attorney myself and a trial judge, I want you to walk me

13   through how -- if there's not going to be a fact dispute on

14   the 700,000 notices being sent, although you may dispute that

15   those notices had -- were accurate in the sense that what

16   they say happened actually happened -- I suspect that's where

17   the challenge -- some challenge may be; is that correct?

18          MR. SCHAPIRO:  Precisely.

19          THE COURT:  Okay.  So in all of these notices that

20   they sent, there's information in each notice, but what you

21   will be contesting at trial is that, Members of the Jury, for

22   many of these notices, they were simply wrong.  There was no

23   illegal download, there was no sharing.  They just -- where

24   they got this information, we are not sure, but they are

25   wrong.  Is that -- am I getting that correct?

50

```
 1            MR. SCHAPIRO:  Ladies and Gentlemen of the Jury,

 2    they are wrong and the reason we know that is because you saw

 3    in this hash report when they went out and said, Go chase

 4    down these 7200 hashes, it turned out that some substantial

 5    portion of them couldn't be found and that another portion of

 6    them, although they were found, when Audible Magic tried to

 7    match it and say that it was work they claim it was, it

 8    wasn't actually.

 9            THE COURT:  Respond, please, Jeff.

10            MR. GOULD:  Thank you, Your Honor.  Mr. Schapiro

11    focuses on two -- the hashes that were not downloaded in 2016

12    and the 2016 Audible Magic results.  Nothing in the hash

13    report informs the first, beyond what Mr. Schapiro already

14    knows.  There's a body of notices that include a finite

15    number of infringing files identified by hash.  Mr. Schapiro

16    and Charter know which files were downloaded and produced and

17    they know which ones were not downloaded and produced.  They

18    can make whatever arguments they want to the jury about what

19    that means.  They could say, You should not believe

20    plaintiff, Ladies and Gentlemen, that these files that they

21    claim exist actually do exist.  That's their argument; that

22    these files don't actually exist.  They can make that

23    argument without the hash report.

24            As to the 2016 Audible Magic results, what they

25    want to do is see if Audible Magic said something different
```

1   at different times about files with the same hash.  And they

2   kind of -- let me cap their own argument there as well,

3   because they argued in these papers and to you on September 9

4   that because the Audible Magic referenced database is dynamic

5   and changes over time, looking at it later in time does not

6   tell you anything meaningful or may not tell you anything

7   meaningful about what Audible Magic found and said about the

8   same file at some different period of time.

9          And by the way, they have the downloaded file and

10  so I don't know why it's so critical that they find out what

11  Audible Magic said about them.  They can listen to them.

12  They can run them through any tool they want.  So they have

13  no need for the non-downloaded hashes because they know what

14  those are and they can do any analysis they want to

15  demonstrate to the jury that the files that we say are

16  infringing actually are not.

17         THE COURT:  Let me ask you a question.  So whatever

18  Mark Monitor did in 2016 was a historical review, correct?

19         MR. GOULD:  I'm sorry, can you repeat that, please.

20         THE COURT:  Okay.  Whatever Mark Monitor did in

21  2016 had to deal with what happened from 2012 to 2015?

22         MR. GOULD:  What Mark Monitor did in 2016 was spend

23  a single month looking on several peer-to-peer networks for a

24  bunch of files.

25         THE COURT:  Okay, but can that be done today?

1          MR. GOULD:  That could be done today.  And if a

2    file with a hash that appears in our notice in 2012 is still

3    circulating on the peer-to-peer network, it's the same

4    infringing content that was the subject of our notice a

5    number of years back.

6          THE COURT:  But it's likely there would be less of

7    that today than there was in 2016?

8          MR. GOULD:  Well, if you are asking whether the

9    scope of peer-to-peer infringement has changed, I would say

10   no, there's a proliferation of the use of the internet, and

11   though there are trends here and there and (inaudible),

12   peer-to-peer infringement is still a problem.  If you are

13   asking whether those same files circulating in 2012 or 2014

14   are still circulating today, that's a harder question.  It

15   will depend on the social mores and the holiday seasons and

16   the hot new releases and what's popular.  But as to a given

17   file, maybe and maybe not.

18         THE COURT:  Mr. -- well, Jeff, do you believe that

19   Andrew already has the information he says he needs in a

20   different form?

21         MR. GOULD:  I think he has the information he needs

22   to make the argument that he presented to you --

23         THE COURT:  Where did he get that?

24         MR. GOULD:  -- which is that --

25         THE COURT:  Tell me how did he got that.

53

1          MR. GOULD:  He can look at the whole body of hashes

2     listed in our notices and subtract the hashes from the

3     downloads we produced and tell the jury that every other hash

4     we noticed either doesn't exist or Mark Monitor never

5     downloaded it or, you know, plaintiffs are trying to pull the

6     wool over your eyes.

7          MR. SCHAPIRO:  So if I may, Your Honor.

8          THE COURT:  Go ahead.

9          MR. SCHAPIRO:  Mr. Gould may want to prescribe or

10     limit the way we would argue this important point, but we

11     have a right to argue it in the way that we think is

12     strongest.  And so for us just to say, all right, well, there

13     are X number of notices, but now they are able to show you,

14     Jury, only a certain number of files, we can infer that we

15     actually weren't able to find those or that Audible Magic

16     didn't match them, I would bet -- you know, I would bet my

17     home on the fact that the plaintiffs will stand up and

18     contest that.  They are going to say, no, it doesn't show

19     that.

20          We would like to be able to show and we have a

21     right to show, based on the (inaudible) saying, you know, and

22     we're not just making this up because here, in fact, when

23     they sent out 7200 hashes to try and re-create this evidence

24     of what happened in 2012 and 2015, part of this 2016 project,

25     which is the project that produced every single file that

54

1    they are pointing to as their evidence in this case, look

2    what actually happened.  It came back tremendously

3    unreliable.  I shouldn't have to just say, Oh, well, subtract

4    and then you can guess that it might have been, unless they

5    want to disavow an (inaudible).  If they will stipulate that

6    that's true, sure, that's fine, but I would be surprised if

7    they would do that.

8           THE COURT:  Well, so I need some education here.

9    Could you engage in a similar effort that Mark Monitor did by

10   retaining your own expert and have them sort of do the same

11   thing today?  Could you do that?

12          MR. SCHAPIRO:  The expert that we have -- so there

13   is Mark Monitor and there's Audible Magic.  So they propose

14   -- the plaintiffs, rather, in their brief proposed that we

15   should hire Audible Magic to try and go out and do this,

16   which is completely unrealistic for two reasons.  The first

17   reason is that Audible Magic is their litigation consultant,

18   their supporter, and we are trying to test the reliability of

19   the Audible Magic product.

20          But, secondly as Mr. Gould noted, and we have said

21   in other context, the database is what is called a dynamic

22   database.  So the closer in time report that they produced in

23   2016 and on which they are relying for this case is far more

24   useful for us than anything we would try to re-create now,

25   and I would also say that's a tremendous burden and expense.

55

1        So if they have this report that they are declaring

2    is privileged that they could just provide to us that is not,

3    we would say, work product, we shouldn't have to go hire and

4    got find some consultant other than Audible Magic to try and

5    be, you know, try and duplicate what Audible Magic did.

6    That's -- that's not efficient or fair.

7        THE COURT:  Well, except the last time I agreed

8    with that argument, I was reversed by Judge Jackson, okay.  I

9    relied on that same analysis in requiring the plaintiffs to

10   produce, I think regarding the plaintiffs to produce

11   something, and Judge Jackson overruled that.  So I'm not so

12   sure that that's an argument that is -- that he agrees with.

13       MR. SCHAPIRO:  Respectfully, I think the context is

14   quite different here.  Here, there is an assertion of

15   privilege over a single document or a single set of

16   documents.  They are already accruing and existing, and I

17   think, you know, the threshold question is:  Is it even

18   cognizable as work product before we go any further?  And

19   just the basic data which we are seeking and some work

20   product that became apparent -- or some opinion that became

21   apparent that is not overcome or not laid in the course of

22   the in-camera discussion, there could be a redaction -- if

23   there is something there that says, there could be a

24   redaction, but there is this document that is there.  We are

25   not asking them to create any new document and the burden

1    regardless is something that needs to be taken into account.

2            THE COURT:  How long is this hash report?  Like,

3    what is the size of it?

4            MR. GOULD:  I'll assume that question is for me.

5    It's a spreadsheet that has roughly the 7200 lines.

6            THE COURT:  But it's just data.  So as far as

7    computer memory space, it wouldn't be that large?

8            MR. GOULD:  Correct.  That was a partial

9    (inaudible) quite a bit more, and then we have been talking

10   about all of the different ins and outs, I don't want to

11   disclose too much about it.  It's a spreadsheet that's

12   manageable, a whole bunch of megabytes.  It's not, you know,

13   photos or (inaudible) ones that requires a super computer.

14           THE COURT:  All right.  Well, I mean, I guess I've

15   have got to treat everybody fairly.  So I -- as much as I'm,

16   you know, trying to envision what we are talking about, I

17   think I need to see it.  So would you please submit that in

18   camera, too?

19           MR. GOULD:  Yes, Your Honor.

20           THE COURT:  Okay.  I think I have exhausted the

21   argument then on that unless somebody wants to add anything.

22           Hearing nothing, what else can we talk about?  Go

23   ahead.

24           MR. GOULD:  Your Honor --

25           THE COURT:  Go ahead.

57

1        MR. GOULD:  -- I'll just close on two thoughts.

2   One is the substantial need burden is quite high, there's

3   been no real dispute that this is work product, and the

4   substantial need burden is not relevant and it's not

5   speculation about what I might be able to do with the

6   document.  It's real, it requires essential or crucial

7   evidence demonstrated by Charter in this case.  And I don't

8   think they have come close because they don't need it, it's

9   not critical, and particularly as to the Audible Magic piece

10  of the hash report, there are numerous ways for them to find

11  substantially equivalent information.  It may not be a

12  hundred percent exactly the same, but the standard is

13  substantial equivalence.  They can do their own listening

14  analysis, they can do their own visually forensic -- visual

15  forensic comparison, and they haven't come close.

16       MR. SCHAPIRO:  Mr. Gould began by saying that there

17  is no dispute that there is work product.  Just for the

18  record, we do dispute that it's work product for the reasons

19  outlined in our briefs and discussed today.  And I will leave

20  it at that, unless people want to keep talking about it.

21       THE COURT:  I don't.

22       MR. SCHAPIRO:  Your Honor, we do have another issue

23  if we're finished with this, just housekeeping type of

24  issues.

25       THE COURT:  Go ahead.

58

1          MR. SCHAPIRO:  So we would like to get your

2   guidance, if we could, about how to efficiently resolve an

3   impasse between the parties about how to interpret two of

4   your rulings from the September 9 hearing, because we both

5   read the transcript but we have very different

6   interpretations and we're at an impasse and we each believe

7   our interpretation is correct, so we probably -- I probably

8   would go to the source.

9          So without getting into it, but the substantive

10   argument, the first issue is fairly simple.  It just concerns

11   the date by which plaintiffs are required to supplement their

12   interrogatory responses to Interrogatories Number 13 and 14,

13   and at that the hearing on September 9, this is on page 193

14   of the transcript, Your Honor ordered the plaintiffs to

15   supplement their interrogatory responses two months prior to

16   the close of discovery.

17          And the reason (inaudible), there was an argument

18   then about whether this information would somehow bleed over

19   into the Virginia case and so the plaintiffs didn't want to

20   provide it while they thought it might still have some impact

21   on the Virginia case.  And so you said, Well, it can be

22   provided later, we will make it two months prior to the close

23   of discovery.  And that's on lines 23 and 24 of that page of

24   the transcript.

25          So we assumed that was November 30 because the

1   close of fact discovery was at the end of January.  And the

2   plaintiff did not provide that information on November 30 and

3   they say that your ruling meant the close of expert

4   discovery, which is April 1, which is when the initial expert

5   reports are served.  So we thought it would be helpful if we

6   could ask Your Honor which deadline was intended.

7           MR. OPPENHEIM:  Your Honor, this is Matt Oppenheim.

8   I remember when we argued this, what Your Honor said is that

9   you did not want to do anything that would in any way

10  potentially impact the judge's -- the analysis of Virginia.

11          To update you, that issue is still outstanding.

12  Judge O'Grady has not ruled on it yet, but we all are

13  certain, hope for a ruling soon.  We do not yet have a

14  ruling.  And as I think, I recall, you stated, Well, this is

15  the kind of information that they don't need until trial so

16  there's no harm in waiting.

17          So from our perspective, since there's been no

18  ruling, we certainly think that continuing to wait makes

19  sense.  We are not trying to avoid producing it, just avoid

20  producing it in a way that it could be used to disrupt the

21  Virginia proceeding.

22          There's also an overlay with the ongoing

23  discussions we have been having about the likelihood of

24  extending the fact discovery by some period of time in the

25  90-day range, give or take, and, Mr. Schapiro, we are

60

1   certainly happy to work with you on a deadline.

2           MR. SCHAPIRO:  Sure, sure.  Sure, sure, but, you

3   know, as Mr. Oppenheim said, the issue was fully briefed

4   before Judge O'Grady so that's done, it's in.  They said, you

5   know, we had contested whether it was relevant at all and

6   whether those -- you know, the assumptions underlying their

7   desire to withhold evidence that's relevant in this case

8   because they are afraid of what it might do to another case,

9   but is now fully briefed.  So we arguably (inaudible)

10  depositions in the rest of discovery and we can't just get

11  something out on the eve of trial and have it be useful as

12  any trial lawyer knows, so I feel like it was --

13          THE COURT:  Well, so -- Mr. Schapiro, what's your

14  belief is the typical timeframe in which the judge out there

15  issues his rulings?

16          MR. SCHAPIRO:  I have no involvement in the Cox

17  case.  I don't know, Your Honor.

18          MR. OPPENHEIM:  Your Honor, I would --

19          MR. SCHAPIRO:  It is the rocket docket as you know,

20  so they're supposed to be quick.

21          MR. OPPENHEIM:  Yes, but like the Colorado court,

22  Your Honor, I believe they are down at least one judge and

23  are working, as you are and Judge Jackson in COVID times, so

24  we will give Judge O'Grady a break, though I think we are all

25  hopeful that something will be forthcoming shortly.

61

1           Look, the one thing I do know about the Cox case is

2    the fact that something is fully briefed doesn't necessarily

3    means it's always fully briefed.  There's been no reticent on

4    the part of the parties to submit additional briefs when they

5    believe that they have something to say.

6           So, you know, I would ask that we continue to stay

7    the course that Your Honor had set previously.  We have no

8    issue whatsoever in producing it once there is a decision by

9    Judge O'Grady.

10          MR. SCHAPIRO:  I actually agree with Mr. Oppenheim

11   about one thing.  Having watched bits of the Cox proceedings

12   from afar, and that is that, yes, it seems like nothing is

13   over there, but in fact cuts the other way, because we

14   thought originally that they were concerned about -- they

15   were concerned about some of this evidence somehow making its

16   way into briefs, which, again, we said, Why does it matter if

17   something is true makes its way into a brief, but, okay,

18   fine.  Now it's briefed and they are afraid that maybe there

19   would be, you know, a supplemental filing of some kind.

20          MR. OPPENHEIM:  I'm the sure that after Judge

21   O'Grady rules, there will be additional proceedings, a motion

22   for reconsideration, a rehearing, appeal.  At some point it's

23   going to be the day before trial here.

24          THE COURT:  No, I agree.  So -- what did Judge

25   Jackson say specifically as far as -- your current discovery

62

1   deadline is in January; is that right?

2            MR. OPPENHEIM:   January 31.

3            THE COURT:  And what did he say --

4            MR. SCHAPIRO:  For a fact, it's true, Your Honor,

5   and Judge Jackson specifically acknowledged that the parties

6   are free to extend the fact discovery deadline.  And Mr.

7   Schapiro during that hearing indicated that he agreed that

8   the fact discovery deadline would need to be pushed out and

9   he contemplated that something in the range of 90 days.  And

10  Judge Jackson left it to us to have that discussion and I

11  think that we have started to have that discussion, we are

12  working on it.

13           THE COURT:  All right.  Why don't we do this.

14  Let's meet, if you can, on January 29.  The 31st itself is a

15  Sunday.  I mean, I want to -- did Judge Jackson leave it to

16  me to supervise an extension of discovery?  Was he

17  contemplating making that decision himself?

18           MR. SCHAPIRO:  I don't think he indicated, no, I

19  think he -- I think opposing counsel will agree with me,

20  essentially, you know, kicked it over to us and said, you

21  guys are grownups so you can work something out.  And I

22  imagine he would not mind us bringing it back before you so

23  that -- so that he doesn't have to delve into that once we

24  come up with something, but I'm happy to do whatever

25  everybody else wants to do.

63

1          THE COURT:  Okay, so let's meet, if you can,

2   January 29.  At that time we will set a discovery deadline.

3   We will also address this issue with the hard deadline.  It

4   can't be indefinite, it can't wait specifically only on what

5   the Virginia court does, because that's just not fair to the

6   parties so I will set a hard deadline at that point.  But you

7   can certainly count on discovery being done at least 60 days

8   beyond January 31, if not more.

9          We will do whatever makes sense for the case as

10  long as you guys did demonstrate that you are being diligent

11  in litigating the case and I have seen no evidence otherwise.

12  So I wouldn't expect any surprises then either, okay?

13          MR. SCHAPIRO:  Your Honor, for all purposes and I

14  think I might be -- Jonathan is probably thinking the same

15  thing I am.  We might, among ourselves, I hope, work out some

16  agreed proposal for discovery deadlines sooner than -- I

17  think we hope to relatively soon come up with a proposed

18  schedule so that we can all plan around it and continue on

19  with discovery.  So if we work out a proposal that is

20  mutually agreeable prior to that time, could we simply submit

21  it to Your Honor for either your blessing or your desire to

22  have us in and talk it through?

23          THE COURT:  No, I won't need to talk it through as

24  long as you can agree on it.  You can count on me entering it

25  as the deadline as long as, in my view, it doesn't interfere

64

1    with what Judge Jackson is doing.  I just want you to wait

2    until January 29, but if you are agreeing on it, I promise

3    you that's what the schedule is going to be, okay.  I just

4    think we need to -- even if you thought right now that you

5    could do something and it would be nice and firm, things just

6    change too much, and so I think it behooves us to wait until

7    the last second to then actually, you know, put something in

8    writing so that we don't have to keep doing this.

9                MR. SCHAPIRO:  That makes sense, thank you, Judge.

10               THE COURT:  Not only that because, for example,

11   just two days ago we again vacated our January trials so we

12   are doing that on a month-by-month basis, so we will have

13   more information in mid to late January about what February

14   looks like and maybe even on into the later months.

15               So I think the more information we can all have

16   about the likelihood that you will, in fact, go to trial on

17   October, which, if Judge Jackson says you will, you will, but

18   he's not the ultimate decision maker on whether any trial

19   occurs in this courthouse.  The chief judge is.  And the

20   chief judge has vacated all bench and jury trials through

21   January and we are doing that on a month-by-month

22   consideration.  So at least that will give us a little more

23   information about the landscape and we can see how this

24   vaccine is doing and all kinds of things.  So anyway, plan on

25   it -- plan on your schedule being adopted for sure.  I just

65

 1   don't want to do it before then, okay?

 2           MR. SCHAPIRO:  Understand what you are saying.

 3           MR. SPERLING:  Your Honor -- Andy, before we go to

 4   other issues, let me take the stand for a moment, if that's

 5   okay.

 6           MR. SCHAPIRO:  Sure.

 7           MR. SPERLING:  Okay, thanks.  Judge Hegarty, I

 8   mean, to guide us a little bit, I mean, we will work with Mr.

 9   Schapiro on the schedule.  I expect that we should get a

10   proposal out to him this weekend.  As we try and plan for

11   things, recognizing the trial date for the time being is

12   viable as Judge Jackson indicated, is there flexibility, and

13   does Your Honor have the ability to make modifications to

14   things such as the date of the pretrial conference where you

15   might what to propose an adjustment to something like that?

16   I think right now it's set quite early.  Sometime in -- and

17   maybe in the first half of August for a trial in mid-October.

18   We want to be sensible and not be proposing things or

19   thinking about things that are not workable because we are

20   being presumptuous in moving things that we don't have the

21   right to move.

22           THE COURT:  Well, so there is typically two

23   pretrial matters that we have.  One is a final pretrial

24   conference where we enter a final pretrial order that will

25   govern the remainder of the proceedings, but the next one is

66

1   a trial preparation conference where you actually get

2   together with the trial judge and go over all of specifics of

3   how he is going to try the case.  You are talking about the

4   final pretrial conference?

5           MS. SAHNI:  No, Your Honor, it's the trial prep

6   conference.  I think there was a pretrial conference

7   scheduled for August 2 and when the order that -- that the

8   trial date was set, Judge Jackson changed that to the trial

9   prep conference.  And that's one we would like to push closer

10  to trial, which is the trial prep conference.

11          THE COURT:  Well, since Judge Jackson so rarely

12  uses magistrate judges, there are some judges who combine the

13  final pretrial and trial prep into one super conference.  I

14  don't know if he does that.  Are you saying that you believe

15  he does that?

16          MS. SAHNI:  We are not sure, Your Honor.  All we

17  know is that he took the placeholder that was put for the

18  pretrial conference and put instead the trial prep

19  conference.  So I'm not sure if he is envisioning that both

20  would be joined together or if he is imagining the pretrial

21  conference would be earlier.  But currently the trial prep

22  conference is set for August 2, while the trial itself is

23  October 18, which is a good 2 1/2 months earlier.

24          THE COURT:  All right.  So by order dated March 17,

25  I set a final pretrial conference which I envisioned to be in

67

1    front of me, because I don't set matters that are in front

2    Judge Jackson, and that contains all of the current

3    deadlines.  Do we agree on that?

4             MS. SAHNI:  That's correct, Your Honor, for the

5    pretrial -- the pretrial dates, but my understanding is he

6    then vacated that pretrial date and changed it to a trial

7    prep conference.

8             THE COURT:  Okay.

9             MS. SAHNI:  If it's helpful, Your Honor, I believe

10   that's ECF 161 for that minute order.

11            THE COURT:  I'm reading it right now.

12            MS. SAHNI:  Okay.

13            THE COURT:  Well, I agree -- he did not at that

14   time set a trial date, correct?

15            MS. SAHNI:  I think he later then set the October

16   18 date after the parties conferred over e-mail with

17   chambers.

18            THE COURT:  I agree that it's not customary to have

19   a trial preparation conference so far in advance of trial.

20   We usually do it two to three weeks in advance of trial.  So

21   that's another matter I will cover with him.

22            MR. SPERLING:  Thank you, Your Honor.  And then

23   just before we pivot -- again, it's Mr. Sterling.  Just

24   before we pivot to whatever Mr. Schapiro's next issue was,

25   assuming that it works for opposing counsel, is it possible

68

1   for the Court to have us appear on January 28 instead of

2   January 29?

3            THE COURT:  Yes.

4            MR. SPERLING:  Thank you, Your Honor.

5            THE COURT:  Let's call at, if you can, 1:00 Denver

6   time.  I guess I have all day.  I have a trial that day, but

7   we just said all trials vacated.  So I can -- I can see you

8   any time that day.

9            MR. SPERLING:  I'm sure 1:00 is fine here.

10           THE COURT:  1:00 then on January 28.  And we

11  certainly will deal with scheduling the remainder of the case

12  within the confines of Judge Jackson's current settings.  We

13  will also then use that as an opportunity to talk about any

14  pending issues, and possibly if ripe, then the undesired

15  supplemental motion to compel.  Okay?

16           MR. SCHAPIRO:  Your Honor, I have one other matter

17  and maybe it makes the most sense just to ask for a briefing

18  schedule on this, but I thought I would bring up another

19  issue on which we have some disagreements unless it can be

20  readily resolved, but we are just seeking some guidance here.

21           This concerns our Request for Production Numbers 90

22  and 91.  Those are the ones that ask for the production of

23  the Audible Magic referenced files and fingerprints.  And as

24  you may recall, the Special Master had ordered the plaintiffs

25  to comply with those requests and the plaintiffs said that

1    the actual fingerprints no longer existed and so the Special

2    Master instructed them to produce documents sufficient to

3    show which files were fingerprinted.

4            They objected and brought the matter to you in one

5    of our prior hearings.  This was the September 9 hearing, and

6    it's essentially on pages 127 through 130 of that hearing,

7    and they had objected and Your Honor overruled their

8    objections on September 9, but we now have an impasse.

9            The plaintiffs are taking the position that they

10   need only provide the same copies of the works that they

11   provided prior to the parties' disputes and that they don't

12   need to provide anything to connect those files to the

13   Audible Magic fingerprints.  And we think that's not a

14   correct interpretation of your order because that would

15   essentially mean that the Special Master's original ruling

16   was meaningless and didn't do anything.  So we are happy to

17   either talk that out now or if we could get a short, you

18   know, expedited briefing schedule just to brief it, whichever

19   --

20           THE COURT:  What page?

21           MR. SCHAPIRO:  Page 127, line 24.  It goes to the

22   next page 128, line 9, and then it takes up again a little

23   further down on 129 through the top of 130.

24           THE COURT:  Well, I mean, is it Jonathan who said:

25   Given the fact that Your Honor is not ruling our way in

70

1   connection with this issue -- right?

2           MR. SPERLING:  Correct.

3           THE COURT:  So all I can say is I certainly did not

4   have in my mind that whatever is going to be produced is

5   already in the hands of the defense.  It's something new, if

6   that's the question.

7           MR. SCHAPIRO:  That is the question.

8           MR. SPERLING:  So, Your Honor, we had a long

9   discussion here, I think it spans something like pages 60

10  something to 130 of the transcript.  And I will preface this

11  by saying to the extent that Mr. Schapiro proposes whether we

12  break this narrow issue in a short briefing of just a few

13  pages, we are happy to do that.

14          But the issue was that, number one, did we need to

15  produce these files?  And that's the issue on which you have

16  ruled against us and I acknowledge that.  And then there was

17  the second issue as to whether we needed to produce

18  information showing how we, as counsel, concluded that these

19  are the right files to produce.  And you said something to

20  the effect -- and we're producing, I should say, Your Honor,

21  everything that you directed in terms of the underlying files

22  and that's a huge undertaking.  It's a very large universe,

23  broader than what is really relevant.  We are doing all of

24  that.

25          THE COURT:  Let me stop you there.  Are you

1   producing material that has not previously been produced to

2   the defense?

3           MR. SPERLING:  Yes, we are, Your Honor.

4           THE COURT:  Okay.

5           MR. SPERLING:  We are producing material that's not

6   previously produced.

7           THE COURT:  So I know where you are going.  You are

8   going on your sentence that at some point there's reliance on

9   counsel to discharge their obligation professionally, which

10  means if I order all e-mails on a certain topic to be

11  produced, I count on attorneys just to follow my order and I

12  don't go to their office and ask them to re-create how they

13  did that.  I do expect them to follow the instruction to the

14  letter because obviously it's contempt of court not to and a

15  violation of your professional obligation which can have

16  consequences that are career-ending.

17          So yes, that is a principle that we, as judges,

18  have to apply all of time, that as long as you produce the

19  information we (inaudible) you produce, you don't generally

20  have to also -- unless there's a good faith basis to

21  challenge the production and say there's far more than this,

22  Your Honor, and here's an example of something that although

23  they should have produced and they didn't, so obviously,

24  their process was flawed.  That, then, causes me to go into

25  discovery on discovery, which, of course, all judges love to

1   do.  That's our number one goal, is to have discovery on

2   discovery.

3          But sometimes it happens, so go ahead.

4          MR. HAMSTRA:  Your Honor, if I may, this is Nathan

5   Hamstra.  On this issue, one point of clarification.  I

6   believe when plaintiff said that they produced more files

7   after this order, my understanding is, you know, they

8   produced sort of the underlying recordings for sending 85

9   percent of the files in the case and they were still looking

10  for that remaining 15 percent.  They had already agreed to

11  produce those prior to this hearing, this order.  They were

12  just still looking for those.  And then after the order, they

13  continued to produce those is my understanding.

14         As a result, you know, they did continue to produce

15  files, but it's sort of the same class of files that they had

16  already agreed to produce prior to this hearing.  So in other

17  words, for the -- you know, their interpretations that

18  ultimately the hearing did not change the state of play

19  regarding on what they had produced.

20         MR. SPERLING:  So, Your Honor, it's Mr. Sperling.

21  So that's not accurate.  We previously were producing one

22  copy of each of the sound recordings in suit.  And pursuant

23  to your order, we are doing something substantially

24  different, which is providing all copies and there are

25  multiple copies of the same sound recording, but all copies

73

1    that were delivered to Audible Magic during the relevant

2    period for Audible Magic to use.  That's a big undertaking.

3    It's a difficult process, it's very data intensive.  We have

4    been working very hard on it.  We are certainly happy to

5    discuss with opposing counsel the timing for all of that.

6            Then there's a separate issue, which is -- and that

7    goes to Your Honor's point about discovery on discovery,

8    which is, do we also have to disclose to them the materials

9    that we relied on to determine that these are the right files

10   to produce?  And Your Honor told us, no, we don't have to put

11   the puzzle pieces together for them.  And that, I think, is

12   the point of disagreement here, because if the only question

13   whether we are producing the files that were provided Audible

14   Magic, which was the expanded relief that Your Honor ordered,

15   we're in the process of doing that.

16            THE COURT:  Well, somebody started this

17   conversation by saying that whatever I did, I affirmed Ms.

18   Rodriguez, correct?

19            MR. SCHAPIRO:  Correct.

20            THE COURT:  So if I'm affirming Ms. Rodriguez,

21   interpretation of what she ordered should come from her.

22   Does that make sense?

23            MR. SCHAPIRO:  That would be fine with us, Your

24   Honor, yes.

25            MR. SPERLING:  So, Your Honor, the reason why it

1   would be less fine with plaintiffs is we discussed this with

2   you, this exact issue.  And while you generally did affirm

3   Ms. Rodriguez's order on this issue, you acknowledged the

4   issue then, as you have acknowledged it now, and told us that

5   we don't need to put the puzzle pieces together.  And it

6   would be remarkable for us if in this instance counsel needed

7   to produce the material that they relied on to determine that

8   their document production was correct, in the absence of any

9   showing of the type that Your Honor identified, in the

10  absence of any showing that we somehow failed to do what we

11  were supposed to do.  And I don't understand Mr. Schapiro's

12  clause to be contending that we have failed to do that or are

13  not discharging our obligations there.

14          THE COURT:  Well, can I --

15          MR. SCHAPIRO:  So, Your Honor --

16          THE COURT:  Can I look at the language of Ms.

17  Rodriguez?  Is that in the record somewhere or was that oral?

18          MR. HAMSTRA:  I suspect that is in the record

19  somewhere, but I don't have a docket cite for you.

20          MR. SCHAPIRO:  I'm sure our team is scrambling to

21  find it, Your Honor.

22          THE COURT:  Good.

23          MR. SPERLING:  We're looking for it, Your Honor.

24          THE COURT:  You have associates for that purpose.

25  Go ahead.

75

1          MR. SPERLING:  Your Honor, we believe it was the

2    Special Master's order of August 12, but we are looking to

3    confirm.

4          MR. HAMSTRA:  Yes, that looks right to me as well.

5    There's a discussion beginning on page 25 of Docket 230.

6          THE COURT:  The reference files used by Audible

7    Magic to detect alleged infringements have been discussed at

8    length in numerous hearings and orders during the parties'

9    April 12 -- April 17, 2020 hearing.  I ordered plaintiffs to

10   answer by June 1, 2020 whether the digital copies they have

11   already produced are the same referenced files provided to

12   Audible Magic during the claim period.  On June 1, plaintiffs

13   sent a letter to Charter stating that they had matched the

14   International Standard Recording Code, ISRCs, of

15   approximately 83 percent of the digital files produced.

16   Plaintiff argues that this establishes the files produced are

17   the same as those that were used and provided to Audible

18   Magic.

19          She says:  The RFPs 90-91 seek Audible Magic

20   reference files and fingerprints respectively.  Counsel

21   stated for the first time that plaintiffs did not retain the

22   fingerprints and that those files therefore could not be

23   produced.  To the extent this is the accurate, plaintiff

24   shall supplement their response to so state.  Charter says:

25   This revelation requires production of referenced files used

76

1   to create fingerprints.  Plaintiffs argue by matching ISRCs

2   for the files they produce with the reference files, they

3   have shown that the recordings therein are the same.

4          All right, the order is:  Plaintiffs are ordered to

5   produce documents sufficient to show which files were

6   fingerprinted.  Stop there.  Is there a dispute over that?

7   Is that where the dispute lies?

8          MR. SPERLING:  There is -- I see Mr. Schapiro

9   nodding, Your Honor, but we don't believe there is a dispute

10  there.  We intend to produce the information of documents

11  sufficient to show which files were fingerprinted.  The issue

12  from our perspective is the next clause.

13         THE COURT:  Including the information upon which

14  plaintiffs relied in order to represent that the digital

15  files plaintiffs have proved to date have the same ISRCs as

16  the files from which Audible Magic reference files were

17  created.

18         MR. SCHAPIRO:  So that is why we are here and, you

19  know, you will recall, Your Honor, we argued for probably an

20  hour on that in front of Your Honor September 9 and you

21  affirmed the Special Master.  So that's the clause that we

22  think self-evidently applies here, and, of course, if there's

23  something that is a privileged, an order never anyone

24  requires anyone to turn over something that is privileged,

25  and we can always fight that out separately if that's the

1    case.  But that is the operative clause.

2          MR. HAMSTRA:  So, Your Honor, this is Nathan

3    Hamstra.  If I may add, you know, presumably these Audible

4    Magic signatures have ISRCs associated with them and

5    presumably plaintiffs went and they probably have some

6    database where they correlate ISRCs to these recordings and

7    then they use these ISRCs to find these recordings.

8    Obviously, plaintiff can correct me if I'm way off here.  And

9    these are the recordings that they produced, but we don't

10   know which of those recordings are associated with which ISRC

11   and it's not actually a trivial task because different

12   versions of the same song will have different ISRCs, so it's

13   not kind of self-evident.

14         THE COURT:  What about the last sentence:  To the

15   extent that the reference files themselves exist, those files

16   shall be produced pursuant to this order?  Is that at issue?

17         MR. HAMSTRA:  They are claiming that that they are

18   producing those.  It's really that second clause we just

19   mentioned.

20         THE COURT:  Okay.

21         MR. SPERLING:  Your Honor, we agree, that is not at

22   issue.  The only issue is the notion that in addition to

23   producing the underlying materials, we have to also produce

24   information showing how we concluded that these are the right

25   materials to produce.

78

1        THE COURT:  Which means describe it, in my

2    interpretation.  Would you disagree?

3        MR. SPERLING:  I'm not sure what Ms. Rodriguez

4    meant by her order, Your Honor, but I am quite confident that

5    Charter is not looking for something as simple as a short

6    narrative description provided by counsel.

7        THE COURT:  Well, it says --

8        MR. HAMSTRA:  One thing that I think would, so Your

9    Honor --

10       THE COURT:  Go ahead.

11       MR. HAMSTRA:  -- if they did, in fact -- if the

12   order seeks the information relied upon to -- for how they

13   made this determination that these are the right files to

14   produce, and so to the extent that they did that because

15   those files they produced have ISRCs are associated with

16   them, we want those ISRCs associated with the files they

17   produced.  We think that's the way they did it, from the

18   argument on this motion.  If they did it some other way,

19   there's some other material, but they looked at something

20   when they decided, hey, these were the right files to produce

21   and that information should be discoverable.  That's not work

22   product, and that's what we want.

23       MR. SPERLING:  The big concern, Your Honor, and to

24   the extent that we need to get more deeply into this, you

25   know, Ms. Sahni can address it.  But I do have some concern

79

1    Your Honor, about this opening the door to lots of discovery

2    on discovery, as Your Honor said, in trying to understand how

3    it is that opposing counsel came to the conclusion that a

4    certain set of documents were the correct responsive

5    documents to produce and why other documents were not the

6    correct responsive documents to produce.

7            THE COURT:  Well, here's -- I mean, I'm looking at

8    it this way:  You assert, I think, factually, accurately,

9    that data has been lost by the defense, correct?

10           MR. SPERLING:  Yes, Your Honor, most certainly.

11           THE COURT:  And you are trying to get information,

12   including what Charter calls privileged information, to go

13   back and understand how could you have done this, correct?

14           MR. SPERLING:  Yes, Your Honor.

15           THE COURT:  What Ms. Rodriguez said is that the

16   plaintiffs did not retain fingerprints.  So to the extent

17   something wasn't retained, that means it's also lost

18   information, correct?

19           MR. SPERLING:  Correct, Your Honor.  What she is

20   referring to is information that wasn't retained many years

21   ago before anybody was contemplating this litigation.

22           THE COURT:  Yeah, I'm not saying it's spoliation.

23   I'm saying it's just information that you had once and you

24   don't have now, right?

25           MR. SPERLING:  There are -- yes, Your Honor, there

1    are some things that we do not possess today that we

2    possessed at one time.

3          THE COURT:  And all that Charter is asking to do is

4    same thing you are asking them:  Show us why, how this wasn't

5    retained.  And if you are trying to re-create the process for

6    producing information that you didn't keep in the first

7    place, even though there wasn't litigation pending, we want

8    to know how you are doing that.

9          You guys are asking the same thing of one another

10   and it's logical that you are.

11         MR. HAMSTRA:  Your Honor, if I may clarify, I don't

12   think we are asking for information as to how the data was

13   lost.  We are asking for discoverable information that

14   plaintiffs used to sort of, you know, attempt to re-create

15   what was lost.

16         THE COURT:  That's what I just said.

17         MR. HAMSTRA:  So I --

18         THE COURT:  You are trying to figure out how they

19   re-created something that they say once existed.

20         MR. SPERLING:  Your Honor, there's a way to

21   shortcut this, in fact, based on what Mr. Hamstra indicated.

22   I mean, if they want to know that the files we are producing

23   have the same ISRCs, Your Honor, an ISRC is an industry code,

24   a unique identifier associated with a particular sound

25   recording file, when we produce the files, the meta data will

1   include the ISRC so they will be able to see the ISRCs right

2   there in what we produce.

3           Our understanding is that that will be true in each

4   and every case.  If it turns out that there are some

5   instances in which the ISRC is not in the meta data, then by

6   all means, opposing counsel should come back to us and let us

7   know that there's some where it's not there.

8           THE COURT:  Okay.  Well, I want that --

9           MR. SPERLING:  I think that resolves the issue that

10  Mr. Hamstra identified.

11          THE COURT:  I want that process to be played out,

12  but I'm going to permit them to raise it again to the extent

13  that they are not satisfied and that they believe that they

14  don't have what they need in order to prepare for trial with

15  regard to those fingerprints.  Okay?

16          MR. SPERLING:  That sounds reasonable to us, Your

17  Honor, thank you.

18          THE COURT:  What else?

19          MR. SCHAPIRO:  Nothing from us, Your Honor.

20          MR. GOULD:  Your Honor, we had -- this is Jeff

21  Gould.  We one more housekeeping item.  There's -- I wanted

22  to just remind you that there was another motion on your

23  docket, which we understand the Court's busy, just looking

24  for some guidance from you, might have an opportunity to get

25  to it, it's ECF 264.  It's a partial objection to Ms.

82

1    Rodriguez's October 8 order and it pertains to just one

2    issue.

3            THE COURT:  Yeah, well, I'm glad you brought that

4    up because within our own internal recordkeeping processes,

5    it is not marked as any obligation that I have.  So honestly,

6    I hate to burst anybody's bubble, but I do not scour the

7    docket of this case on a regular basis so that's news to me.

8            Summarize the issue, please, Mr. Oppenheim -- or

9    Jeff, why don't you just summarize the issue.

10           MR. GOULD:  Actually, I think I'll pass the baton

11   on this one.  Is that Jonathan or Matt?

12           MR. SPERLING:  Your Honor, the issue is that -- and

13   I'm only getting to this right at a high level, actually,

14   probably we can play musical chairs, Ms. Sahni can speak to

15   this in a little bit more detail, so I will sit.

16           MS. SAHNI:  Thank you, Your Honor.  So this is an

17   issue about some source data for which there are two

18   interrogatories that Charter was required to answer:

19   Interrogatories 13 and 14, I believe.  And they later

20   disclosed that they got certain -- that information from

21   certain source data that was different from what we thought

22   they had and apart from what they represented they have in

23   terms of remaining ticket data.  And so we had an issue where

24   they then produced the source data, but they did so in a

25   heavily redacted form, so much so that very little of the

1   document is actually visible.  And we disagree with the

2   notion more generally of being able to redact what they claim

3   to be nonresponsive information in an otherwise responsive

4   document.

5          And secondarily, we don't believe the other

6   information is itself nonresponsive.  So we teed that issue

7   up to Ms. Rodriguez and she had allowed them to produce the

8   source data document in redacted form.  They did so.  We

9   provided a copy to your Chambers.  And as you will see when

10  you look into this issue, it's heavily redacted.  We

11  challenge those redactions on the grounds I just noted.

12          And to be clear, Your Honor, the redactions are not

13  privileged redactions.  These are what they admit are

14  responsiveness redactions in their view.

15          THE COURT:  Well, I mean, I will acknowledge that

16  it is quite -- it is not my custom, nor any other judges I

17  know, that would permit parties to redact nonresponsive

18  information out of a responsive document.  They can redact

19  privileged information, confidential information such as

20  health information protected by HIPAA, but you generally

21  don't get to produce documents and then redact nonresponsive

22  information.  The nonresponsive information just won't become

23  part of the trial, but in every document production, in every

24  exchange of information of documents, at least, there's bound

25  to be portions that are not responsive.  They might be

1    talking about what they are going to have for lunch in an

2    e-mail stream, in addition to talking about facts material to

3    the case.  We don't require, even allow, that to be redacted.

4              So what's the basis -- I mean, what's the logical

5    basis for the --

6              MR. SCHAPIRO:  So, Your Honor --

7              THE COURT:  Go ahead.

8              MR. SCHAPIRO:  The reason the Special Master in

9    this case allowed us to redact is that the very document

10   itself is not responsive to a request for information.  This

11   is a document -- we were ordered to show -- to produce

12   something that showed what we relied on in preparing an

13   interrogatory response.  So, you know, it's essentially, you

14   know, information sufficient to show.

15             And so we said, Well, in order to could come up

16   with what we relied on, I guess we went back and we looked at

17   this big spreadsheet to provide our interrogatory response,

18   but this spreadsheet has a whole bunch of other stuff on it.

19   And she said, In those circumstances, just produce the parts

20   that you relied on.  And that seems like a perfectly

21   reasonable and fair thing and that's why we are here.

22             MR. OPPENHEIM:  So, Your Honor, I'm sorry --

23             THE COURT:  Matt, Matt, hold on a second before you

24   respond.

25             MR. OPPENHEIM:  (Inaudible) for production and not

1    an interrogatory.

2          THE COURT:  Whoever is going to respond for

3    plaintiff, let me throw this out.  Again, just like

4    information that I talked about with Jonathan, where I have

5    to rely on the good faith of an attorney to follow my orders,

6    if the Special Master said produce responsive information but

7    you don't have to produce nonresponsive, then as a general

8    matter we are going to not question that.  We are not going

9    to have to go into the process by which counsel chose what is

10   responsive and what is not responsive.

11         I mean, you guys are -- you are fighting against

12   one another over the same thing, accusing each other and

13   wanting the same material from each other again and again and

14   again.

15         I mean, people who live in a glass house shouldn't

16   throw stones, so I have got to treat you all equal.

17         MR. OPPENHEIM:  Respectfully, Your Honor, that's

18   not -- that's not -- and this is Matt Oppenheim.  That's not

19   at all the situation here.  And this goes back to the fact

20   that Charter has virtually no ticket data.

21         And just to put it in context, in the Cox case, we

22   had all of the ticket data related not only to the notices

23   that the plaintiffs themselves had sent, but that other

24   rights holders had sent for the claim period.  Here, we have

25   less than 11 percent of the ticket data related to our

86

1   notices and virtually nothing else.

2           So what we would ask for -- we asked for was

3   summary statistics about notices they received and what they

4   did in response to those notices.  Also when they received

5   other abuse-type violations because ISPs view copyright

6   infringement as one of many different types of abuse.  Other

7   types of abuse are spamming and DUS attack -- DNS attack, so

8   on and so forth.  So they have all of these different types

9   of abuse and they usually generate tickets for them and they

10  take actions for them.

11          So we said, if you can't give us the ticket data,

12  give us summaries, whatever summaries you have of that abuse

13  information, and they gave us very little at first.

14          Then later they were ordered to produce additional

15  information and they suddenly came up with these (inaudible)

16  numbers that we had not seen in the summary spreadsheets.

17  And we said, Wait a minute, what you are telling us in an

18  interrogatory response is inconsistent with the documents you

19  have produced, so obviously you have data that you are not

20  producing.  So where did that data come from?  And they said,

21  Well, we have a masters -- they finally disclosed that that

22  they had a spreadsheet and then they chose to -- so they were

23  ordered to -- they were asked to produce that by virtue of

24  two different requests.

25          One is we had a request for summary statistics

87

1   because they didn't have ticket data.  We also had a request

2   that said, To the extent that you have answered an

3   interrogatory based on documents, give us the underlying

4   documents.  So there were two different requests.

5          What Ms. Rodriguez did, contrary to what I have

6   ever had in any court, she said, It's okay for them to redact

7   out nonresponsive information in a document that has nothing

8   to do with PII, HIPAA or privilege.  And we said, Wait a

9   minute, but that goes to the other abuse claim.  She said,

10  Well, that's not in the interrogatory response.

11         Your Honor, they should produce this on either of

12  the two interrogatories -- the requests for production bases

13  incomplete without any redactions.  And the idea that Ms.

14  Rodriguez could order that they wouldn't be allowed to redact

15  the relevance, I frankly think is contrary to the law.

16         It's not, as you suggest, Your Honor, picking and

17  choosing how you get to certain information.  They have a

18  spreadsheet, they have given us part of it, and especially in

19  the context of a spreadsheet where you can't understand the

20  entirety of it unless you see the entirety of it

21         MR. SCHAPIRO:  Your Honor, I don't, first of all,

22  understand what the prejudice is to opposing counsel, if it's

23  nonrelevant data that is redacted, but the Special Master had

24  a good reason for making this decision and certainly did not

25  abuse her discretion in making that decision.  This is

88

1  sensitive business data from a massive spreadsheet related to

2  years.

3          THE COURT:  Oh, my gosh, hold on.  I still see

4  them.

5          (Court lost connection.)

6          THE COURT:  We are back on.

7          MR. SCHAPIRO:  I'm not sure why I lost you, but I

8  was saying that the Special Master, her decision had a

9  rational basis.  It certainly was not an abuse of discretion.

10  The material that she permitted us to redact contains -- in a

11  massive spreadsheet, contains post-2016 data.

12          THE COURT:  Okay, so --

13          MR. SCHAPIRO:  Post-2016 information that we would

14  like --

15          THE COURT:  Yeah, hold on a second.  How long is

16  this report?

17          MR. SCHAPIRO:  Someone else may need to tell me.  I

18  don't know.

19          MS. SAHNI:  Your Honor, it was e-mailed to your

20  Chambers on November 3.  There was an e-mail sent from

21  someone, a member of our team, John Hardy Ellers (ph).

22          THE COURT:  Yeah.

23          MR. OPPENHEIM:  That was the redacted version,

24  right?

25          MS. SAHNI:  It was the redacted version.

1        THE COURT:  I'm still going to stay with my

2   question.

3        MS. SAHNI:  It had a whole number of lines so you

4   could see --

5        THE COURT:  Right.

6        MS. SAHNI:  -- how large.  It's just a spreadsheet.

7   The time-stamp, I believe, would be 241 Mountain.  Helpful?

8        THE COURT:  I can't access -- it's difficult

9   accessing my e-mail from the bench is the problem.  So how

10  long is it?

11       MS. SAHNI:  I will open it up and let you know how

12  many lines I see that's redacted.

13       MR. SCHAPIRO:  And sheets.

14       MS. BREWER:  This is Linda Brewer.  I don't know

15  that -- if the question is what is the volume of data in the

16  spreadsheet, it is, I believe, characterized in our briefing

17  which I'm trying to pull up, but I think it's fair to say

18  it's tens of thousands of fields of data, but the reason for

19  that is because this is essentially a database hold, so this

20  is a -- or, you know, what is sometimes referred to as a

21  database dump.  And the portions that are redacted are the

22  post-2016 time period, because as you could see from what is

23  unredacted, there is a field for each month of the year and

24  that continues on past the 2016 time period.

25       MS. SAHNI:  Your Honor, if I may, I have pulled up

1   the document now.  It is about 300 lines of data on the first

2   tab and then there's about seven or eight tabs that follow.

3   And if you look at the redactions and you are able look at it

4   in chambers, as it may be, you will see that the redactions

5   are not limited to post-2016 information.

6           I'm looking at a column right now that talks about,

7   for example, November 2012, and all but, I believe, five

8   lines -- or six lines were redacted and that is squarely

9   within the discovery period.

10          So that is not the sole basis for the redactions

11   and they have never taken that position.  They claim it is

12   nonresponsive and confidential.  We have a protective order

13   in this case with a highly confidential Attorneys' Eyes Only

14   designation, so that's (inaudible) upon which the parties

15   have been permitted to redact in this case.

16          THE COURT:  Give me the page you are relying on

17   again.

18          MS. SAHNI:  Your Honor, the document itself was

19   sent to you via e-mail.

20          THE COURT:  No, I have it on the screen, so I --

21          MS. SAHNI:  So if you look at the very first tab,

22   it's called Charter Rom Metrix and that is the only tab they

23   have provided in any unredacted form and that still only has

24   1, 2, 3, 4, 5, 6 lines of data that are unredacted.  The

25   remaining tabs have been redacted in full.

91

1          If you look at the bottom, it just says:  Redacted

2     1, 2, 3, 4, 5, 6, 7 and 8.  So they have only provided one

3     tab of this document, and within that one tab, they have

4     provided 6 lines of data.  And if you look at the top, they

5     have --

6          THE COURT:  Hold on.  I want to make sure I'm

7     seeing what you are.  So all DMCA Tickets Received, is that

8     one line of data you are saying?

9          MS. SAHNI:  Correct.

10         THE COURT:  Legacy DMCA Tickets Auto Closed e-mail,

11    Legacy DMCA Tickets Manually Closed e-mails, and then three

12    lines, one beginning with 418756 -- wait, wait, hold a

13    second.  Okay, then DMCA Postcard Warnings Mailed; is that

14    correct?

15         MS. SAHNI:  Yes, other than the 6 lines of data.

16         THE COURT:  Okay.

17         MS. SAHNI:  If you see the remainder, it's all

18    blacked out.  Those are the redactions that they have

19    applied.

20         THE COURT:  And I'm looking at a total of 363

21    entries; is that correct?

22         MS. SAHNI:  On that first tab, I do see 300 and --

23    yes -- 63, is where the redactions seem to go.

24         THE COURT:  So tab A, correct?

25         MS. SAHNI:  Correct.

92

1          THE COURT:  And then there's a tab --

2          MS. SAHNI:  And the other --

3          THE COURT:  Tab B.  Then N, O, P, Q, R, S is what I

4    see.

5          MS. SAHNI:  So as I see tabbed, the next few sheets

6    are all redacted and they are called Redacted 1, 2, 3, 4, 5,

7    6, 7, 8.

8          THE COURT:  Well, I have 2, 3, 4, 5, 6, 7.  Yeah,

9    it's difficult for me to understand what this is, not having

10   seen it.

11         MR. SCHAPIRO:  Your Honor, we do have a brief filed

12   on this, so our brief is filed as well if the Court wants to

13   consider them.  People who are a little closer to it than I

14   am had the main input on this.

15         THE COURT:  All right, yeah.  So what I want to do

16   here is -- again, it's unusual to be able to redact

17   nonresponsive.  This is a little bit out of the ordinary

18   where you are not just blacking out certain lines of a memo

19   or an e-mail, it's a little different.  So the normal

20   analysis wouldn't necessarily apply, but what I do want you

21   to do, Mr. Schapiro, is use Attorneys' Eyes Only some small

22   sampling of redacted material to one lawyer for the plaintiff

23   just for purpose of this process.  So you plaintiffs choose a

24   lawyer.

25         MS. SAHNI:  You can send that to me, Neema Sahni.

93

1          THE COURT:  You are not to share with anybody else.

2   Understand?

3          MS. SAHNI:  Understood.

4          THE COURT:  I just want you to be able to see what

5   is not redacted, copy me on that.  Then if you believe

6   there's some further argument to be made, it better be a good

7   argument, okay?  You better, in that -- in any -- I mean, I

8   don't know what to say -- produce 2, 3, 4, 5, 6 and 7.  It's

9   hard to show you what I'm looking at.  I can't even share

10  screen, I don't think.

11          Do we even have a share screen function on this?

12  We don't think we do.

13          MS. SAHNI:  Your Honor, if there's a way to come up

14  with a more random sample, the concern would be that they

15  would pick lines that they believe are the most defensively

16  nonresponsive.

17          THE COURT:  I'm picking the lines right now.  So

18  just tell me what you would -- tell me a very small portion

19  and I will see if that's okay.

20          MS. SAHNI:  I think it would be helpful to maybe

21  get every -- maybe even fifth line of the first tab.

22          THE COURT:  Okay.  Every fifth line of the first

23  tab for your eyes only and then if we need --

24          MS. SAHNI:  And --

25          THE COURT:  If you have something to raise with me,

94

1    then I will go back on a record with one -- with you and with

2    one defense counsel in probably a closed proceeding or a

3    restricted proceeding with a restricted transcript that would

4    be available at the moment just to the Court.

5              So what restriction level is that?

6              MS. SAHNI:  Sorry, Your Honor, if I may, I just

7    want to clarify.  So I meant every fifth line of data, but we

8    would like to make sure we can see the titles of the tabs and

9    of the rows and columns.  Otherwise, it's hard to assess

10   what's actually being redacted.

11             THE COURT:  Mr. Schapiro, do you understand what

12   she is asking for?

13             MR. SCHAPIRO:  I do, I think.  I hope other people

14   on the call do.  Every fifth line including -- and the title

15   on the (inaudible).

16             MS. SAHNI:  Correct.  So all of titles of the rows

17   and the columns and the tabs as well as every fifth line of

18   data.

19             MR. SCHAPIRO:  Okay.

20             UNIDENTIFIED SPEAKER:  I'm sorry, was it every tab

21   or the first tab?  I wrote down the first tab.

22             MR. SCHAPIRO:  The first tab.

23             MS. SAHNI:  The title of the remaining tabs,

24   because you have redacted the titles, even the titles of the

25   remaining tabs, so we don't even know what data is in tabs 1

95

1    through 8.  So I would ask that the titles of the remaining

2    tabs, not the row and column information therein, but at

3    least the titles of the tabs included.

4            MR. SCHAPIRO:  Your Honor, and I thought your

5    original proposal was adequate.

6            THE COURT:  Yes.  Well, I mean, it's also not very

7    informed.  So I mean, we are talking about nonresponsive, so

8    I think in order to quench her interest in this thing, then

9    that would be a better way of proceeding.  So who would be

10   the defense counsel in any further discussion on this issue?

11           MR. SCHAPIRO:  I'm going to say on our side it

12   should be Linda Brewer or Allison Huebert.  Maybe one of them

13   can speak up or raise a hand or something or send me a text

14   so it's definitely not me.

15           THE COURT:  I'm going -- not going to -- you can

16   choose at the relevant time.  The plaintiffs have already

17   chosen.

18           MR. SCHAPIRO:  All right.

19           THE COURT:  But again, I mean, I can see why in

20   this context the Special Master, you know, if she had a

21   vision of what this spreadsheet was, might have made that

22   order.  I just also -- you know, because it is a little bit

23   unusual to withhold nonresponsive information as opposed to

24   other sorts of information that we traditionally permit to be

25   redacted, I just want them to understand that you made the

96

1    right call.  And so it's Attorney's Eye Only, one lawyer for

2    the plaintiff, and then if there's a matter to be raised,

3    please e-mail chambers or call chambers and request another

4    conference in which we will go on a restricted record.  Okay?

5          MR. SCHAPIRO:  Okay.

6          MS. SAHNI:  Thank you, Your Honor.

7          THE COURT:  What else?

8          MR. SPERLING:  Nothing for the plaintiffs, Your

9    Honor.  We appreciate the extensive amount of time you have

10   given us today.

11         THE COURT:  Okay.  You said that last time, nothing

12   else.  You mean it this time?

13         MR. SPERLING:  Nothing for the next five minutes,

14   Your Honor.

15         THE COURT:  Okay.

16         MR. SCHAPIRO:  I think that's it for us as well,

17   Your Honor.

18         THE COURT:  I'm going to go over with you what I'm

19   going to confer with Judge Jackson on and I will e-mail, I

20   guess, Mr. Gould -- or Mr. Sperling and Mr. Schapiro.

21         That is a relief from any pre-briefing letter

22   requirement; inquiry into whether Judge Jackson would

23   entertain a preliminary summary judgment motion on the safe

24   harbor issue.  No one raised any other issue with me on that.

25   And then a suggestion that the trial preparation date in

97

1    August be vacated and be set at a time that's more

2    appropriately closer to the actual trial in the matter.

3             Was there anything else that you needed to get some

4    intel on with Judge Jackson?

5             MR. SPERLING:  I think, Your Honor, the question of

6    whether it was within the parties' power to agree to a small

7    adjustment of the dispositive motion deadline, recognizing,

8    of course, the point that you made about things take time to

9    be briefed and time to be decided.

10            THE COURT:  Right.  You also want to know as part

11   of that inquiry what he would anticipate from it, from a

12   resources's standpoint, a decision date in the event, let's

13   say, that it's fully briefed by the first week of August.  Is

14   that fair?

15            MR. SPERLING:  That is fair, Your Honor.  We

16   recognize that Nina's chambers are human and we just want to

17   plan around what's feasible and what's not.

18            THE COURT:  And that is a relevant question because

19   there are judges historically on this bench who, when

20   confronted with motion for summary judgment so close to

21   trial, just issues an order saying, I'm just going to hear

22   everything at trial.  So I think it's a valid question to

23   ask.

24            Was that it on the Judge Jackson quest for

25   information?

98

1            MR. SPERLING:  From the plaintiffs' understanding,

2      yes, Your Honor.

3            THE COURT:  Okay.  So reiterating today, then,

4      Docket 266 remains under consideration.  I'm going to issue

5      an order on the motion for a 502(d) ruling.  262, motion to

6      compel, is denied without prejudice for submission of a

7      supplemental motion addressing the 200-plus documents that

8      are not being produced.  The documents that are being

9      produced will be hopefully, at the latest, Monday or Tuesday

10     of next week.  Merry Christmas on that one, or late Happy

11     Hanukkah.  That, and then what we are going to determine from

12     Judge Jackson, which I will e-mail you on; and also the

13     matters we have just addressed, which is potential

14     reconsideration of this spreadsheet and its redactions for

15     nonresponsive information and then potential further -- was

16     that it?  That was it.

17           MR. SCHAPIRO:  I hate to do this because this is

18     truly a housekeeping question.  When we send you the in

19     camera -- the material for review in camera, do we just do

20     that to the ordinary chambers e-mail?  Is there --

21           THE COURT:  Yes.  No, Hegarty_chambers is the

22     secured e-mail for our chambers, so no one else gets that at

23     all.

24           MR. SCHAPIRO:  All right.  Thank you, Judge.

25           THE COURT:  So what you are going to send is the

1   Attorney's Eye Only that you are going to send to the

2   plaintiff, correct?

3           MR. SCHAPIRO:  I was thinking -- we would be happy

4   to do that.  I was thinking about from much earlier, the

5   502(d), the 200 or so documents.

6           THE COURT:  That's fine, that's fine.  I guess I

7   probably -- all right, I don't want to have the other

8   nonresponsive information unless it does end in a request by

9   the plaintiff to take this back up for consideration.

10          MR. SCHAPIRO:  All right, sure.

11          THE COURT:  Okay.  Well, thank you all, appreciate

12   the short notice.  I am just trying to do whatever I can to

13   help you get what you need to litigate the case.  We will be

14   in recess, take care.

15          (Whereupon, the within hearing was then in

16   conclusion at 12:48 p.m.)

17

18

19

20

21

22

23

24

25

100

```
 1              TRANSCRIBER'S CERTIFICATION

 2    I certify that the foregoing is a correct transcript to the

 3    best of my ability to hear and understand the audio recording

 4    and based on the quality of the audio recording from the

 5    above-entitled matter.

 6

 7    /s/ Dyann Labo                    December 30, 2020

 8    Signature of Transcriber                    Date

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```