1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
    Case No. 19-cv-874-RBJ-MEH
 3  _____

 4  WARNER RECORDS, INC., et al.,

 5       Plaintiffs,

 6  vs.

 7  CHARTER COMMUNICATIONS, INC.,

 8       Defendant.
    _____
 9

10          Proceedings before MICHAEL E. HEGARTY, United

11  States Magistrate Judge, United States District Court for the

12  District of Colorado, commencing at 1:00 p.m., January 28,

13  2021, in the United States Courthouse, Denver, Colorado.

14  _____

15  WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE HEREIN

16  TYPOGRAPHICALLY TRANSCRIBED. . .

17  _____

18                     APPEARANCES

19          JONATHAN M. SPERLING, NEEMA SAHNI, MATTHEW J.

20  OPPENHEIMER and JEFF GOULD, Attorneys at Law, appearing for

21  the Plaintiffs.

22  _____

23

24                  STATUS CONFERENCE

25
```

1                    APPEARANCES (continued)

2              ANDREW H. SCHAPIRO, LINDA BREWER, Attorneys at Law,

3      appearing for the Defendant.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1                    P R O C E E D I N G S
 2              (Whereupon, the within electronically recorded
 3     proceedings are herein transcribed, pursuant to order of
 4     counsel.)
 5              THE COURT:  19-cv-00874, Warner Records, Inc., et
 6     al. vs. Charter Communications.  I think we had all the
 7     plaintiffs, so why don't go through the litany for them,
 8     whoever wants to take the lead.
 9              MR. SPERLING:  Good morning, Your Honor.  It's
10     Jonathan Sperling and Neema Sahni from Covington & Burling
11     and Matt Oppenheim from Oppenheim & Zebrak.
12              THE COURT:  Hi.  It's just not morning anywhere in
13     the Continental United States, but where do you happen to be?
14     Are you in Hawaii or something?
15              MR. SPERLING:  No, just out of sorts, Your Honor.
16              THE COURT:  It's the haircut.  You're like --
17              MR. SPERLING:  It's the beard.
18              THE COURT:  Like Samson, you lost your hair, man,
19     and so now you lost your -- all right, cool.
20              And go ahead and make appearances for those who are
21     at least here for the defense and then we'll add Mr. Schapiro
22     when he comes on.
23              MS. BREWER:  Certainly.  Good afternoon.  This is
24     Linda Brewer on behalf Charter with Quinn Emanuel.  And as I
25     mentioned, my colleague Mr. Schapiro should be joining
```

1    shortly.  If he cannot get in by video, he will dial in by

2    phone momentarily, and I'll let my colleagues from Winston &

3    Strawn introduce themselves as well.

4              THE COURT:  Okay.

5              MS. ALVAREZ:  Hi.  This is (inaudible) Alvarez on

6    behalf of defendants from Winston & Strawn and joining the

7    phone will be (inaudible) who is trying to also dial in.

8              THE COURT:  Okay, you've got to work on that audio

9    Ms. Alvarez Winston.  It's really kind of shaky there, okay.

10             MR. JOYCE:  Good afternoon, Your Honor.  Craig

11   Joyce here on audio only because I haven't grown a beard yet.

12             THE COURT:  Well, when you get old enough to shave,

13   let us know.

14             MR. SCHAPIRO:  This is Andy Schapiro joining by

15   phone.  I think most people on our end have been trying to

16   use the Cisco system and we keep getting that page that asks

17   us for a password.  I think last time the other side ran into

18   this and we've tried a number of times, so I thought I would

19   just dial in.

20             THE COURT:  Yeah, I'm sure it's our fault.  I

21   apologize, for some reason courts can't catch up with

22   technology, but --

23             COURTROOM DEPUTY:  And also if you're -- the video

24   system works best using Chrome.  This is Chris Thompson,

25   courtroom deputy.  And this feedback we've heard from other

1    attorneys, you always have make sure to clear cache and

2    delete your cookies, so I apologize for that.

3              MR. SCHAPIRO:  Yeah, I tried both of those, but,

4    thanks.  I tried a new window, I tried an incognito window.

5    I'm only using Chrome.  It worked last time, I don't know.

6    I'll keep trying.

7              THE COURT:  Well, we'll plod our way through.  So,

8    again, we only have now 25 minutes until the video goes dark

9    on us, so who wants to start, and be efficient, please.

10             (Poor audio for Mr. Sperling, resulting in

11   inaudibles.)

12             MR. SPERLING:  Good morning, Your Honor.  Jonathan

13   Sperling again for the plaintiffs.

14             A couple of issues coming from the last hearing on

15   this temporary (inaudible) which he put this on the calendar

16   (inaudible).  One of those is scheduled, a revision discovery

17   schedule, which is largely worked out with one issue

18   (inaudible), but there is another real significant issue that

19   really just arose from the last eight hours (inaudible).  So

20   (inaudible) was that -- it was our challenge to Charter's

21   redaction of document on (inaudible).  I'm hearing feedback

22   and I can (inaudible).

23             THE COURT:  Yeah, I can't go mute, but everybody

24   else should, please.  So, go ahead.

25             MR. SPERLING:  Thank you, Your Honor.

6

1           MR. SCHAPIRO:  Your Honor, if you may turn your

2    volume down a little, it might help.

3           MR. SPERLING:  So, Your Honor, at the December 18

4    conference you set up a process for our (inaudible) Charter's

5    redaction of a document that (inaudible) answering

6    interrogatories.  They redacted for nonresponsiveness, they

7    redacted all the six rows.  Less than 48 hours ago, more than

8    five weeks after you set this process up, Charter agreed to

9    produce a version of this document without redactions, which

10   is great.  They also told us for the first time, less than 48

11   hours ago, that there are actually 34 prior versions of that

12   spreadsheet that they had not previously produced

13   (inaudible).

14          So, you know, on the one hand, Your Honor, we're

15   really happy that this redaction issue was resolved, but it

16   gives rise to a much larger, more significant and very, very

17   urgent issue that needs to be addressed.

18          I'm going to walk through the document with the

19   Court.  You know, Your Honor, in (inaudible) the exact same

20   reaction when we saw this document.  Of course, nobody else

21   from plaintiffs' side has seen this document pursuant to the

22   process that you set up.  It's been limited to the three of

23   us.

24          And our reaction is, this document is the single

25   most important document we've seen in the case, and it was

1    clearly redacted precisely because of that substantive

2    report.  And while it's great that we're getting it now, we

3    can see that what they are deeming not relevant and not

4    responsive (inaudible) is clearly responsive.  They continue

5    to take the position -- Your Honor, while they've agreed to

6    get us these documents, they've expressly taken the position

7    that the information is still not relevant and not responsive

8    to any of our requests.  So, for example, they won't even

9    agree to produce the e-mail transmitting or discussing these

10   documents or the information.

11        And so what's so urgent, Your Honor, is we need a

12   determination from the Court as to the responsiveness of this

13   information; that this information can't be redacted from

14   other documents on the basis of (inaudible).  And, Your

15   Honor, because of the grave concerns that we have by virtue

16   of this, of how they're going about making responsiveness

17   determinations, we have a proposal we would like to discuss

18   that will make more sense if you indulge me to walk through

19   the document.

20        But the urgency of this is driven by the fact, Your

21   Honor, we have now the schedule that the parties have largely

22   worked out would contemplate discovery closing on April 2.

23   That's two months from now.  We don't have time to spend a

24   few more weeks meeting and conferring on this and then coming

25   you or first going to the Special Master.  We need to start

8

1   depositions (inaudible) within a couple of weeks and we need

2   to get this issue resolved.

3          We've had concerns for some time we've raised with

4   them about in response to this call, but if the Court will

5   indulge me, I would like to take, I'm cognizant of the time,

6   three or four minutes to walk you through this document so

7   that you can see what we're talking about and why we have the

8   concerns.

9          THE COURT:  Go ahead.

10          MR. SPERLING:  We e-mailed the document to Chambers

11   this morning and so I hope that the Court has it.  This

12   document is one of the 34 spreadsheets.  It's the only one

13   that we've received.  And, you know, look, I'll be guided

14   obviously by the Court here.  Charter has taken the position

15   they'll produce these, so I don't believe that there is any

16   reason why this discussion now needs to be limited on the

17   plaintiffs' side to the three attorneys who were given access

18   to this previously, so I would like to proceed.  If there are

19   any objections or we think that there is anybody that somehow

20   get off the line who is on the line, the Court should let us

21   know.  Otherwise, I'm just going to proceed in light of

22   Charter's agreement that it should be produced.

23          THE COURT:  Mr. Schapiro.

24          MS. BREWER:  Mr. Schapiro, I believe, is only by

25   phone, and so I am viewing the participants and it looks like

9

1    there are other participants.  I'm seeing Mr. Gould's name,

2    Ms. Gregsby's (ph) name, her name in terms of people that are

3    participating in the call that weren't part of the

4    agreement --

5              THE COURT:  Okay.

6              MS. BREWER:  -- as the three that should view the

7    spreadsheet or hear the information about it.

8              THE COURT:  There is your answer, Mr. --

9              MR. SPERLING:  So I think, Your Honor, the question

10   is, since Charter has agreed to produce the document, is

11   there a reason why nobody else can have access to this

12   hearing now?

13             THE COURT:  Yes, I understood your question.  So

14   what's the response to that?  He's saying let's change the

15   game.

16             MS. BREWER:  Okay, I'm -- I'm not sure if

17   Mr. Schapiro is on -- on mute or not able to respond.  I

18   would defer to him on that issue.  This is --

19             THE COURT:  Andrew, are you there?

20             MS. BREWER:  -- the first that we've heard of this

21   request.

22             THE COURT:  Andrew?

23             MS. BREWER:  He's, I think, indicating that he

24   might be on auto mute.  I really apologize for this, Your

25   Honor.

1          THE COURT:  Yeah, we haven't done anything to mute

2     anybody.

3          MS. BREWER:  I -- in the interest of time and out

4     of respect for the fact that we didn't have notice --

5          THE COURT:  Hold on a second.  Andrew, call

6     (303)335-2146.

7          MR. SPERLING:  Your Honor, if it's faster to drop

8     people because I'm mindful of the time, we'll drop them, but,

9     you know, there is no allegation here of any privileged

10    information, there is no allegation (inaudible), and so I

11    just don't understand what reason there would be for any

12    attorney in the case not to have access to a document that

13    they've agreed to produce.  I mean, everyone will see

14    tomorrow what they can't see today, but really, my interest

15    is in light of the Court's schedule moving on, so whatever

16    the Court thinks is best, I would like to just (inaudible) if

17    we can.

18         THE COURT:  Yeah, hold on a second.  Yeah, can

19    you -- Andrew, do you mind participating this way?

20         MR. SCHAPIRO:  Whatever way works.  I'm sorry, I

21    had my phone completely unmuted and I tried muting it on and

22    off (inaudible).  Can you hear me now?

23         THE COURT:  Yeah, this is working now.  Can you

24    address Jonathan's proposal, please.

25         MR. SCHAPIRO:  I'm sorry, I didn't hear the

11

1  proposal, though.  What did he propose?  I think I was off

2  trying to dial in.

3          THE COURT:  Well, no, see, he's saying that you've

4  produced a document in whole.  He sees no reason right now to

5  have an Attorney's Eye Only provision.  He would like to

6  discuss the document.  He doesn't want everybody to have to

7  get off, so that's his proposal.

8          MR. SCHAPIRO:  That's okay, yeah.  I'm fine with

9  that.  And, Your Honor, I just want to say that because I

10  don't have the video, although I know the document he is

11  talking about, I'm not able necessarily to see if he's

12  pointing to a row or not, but I think I might be able to

13  shorten this because whatever point Mr. Sperling may be

14  making about the need for speed, we have moved quickly here,

15  but this issue is a million miles from ripe right now.  I

16  mean, he pointedly said, oh, well, five weeks after this was

17  first ordered.  I will tell you what happened during those

18  five weeks, and Ms. Sahni can confirm this, I am sure.  We

19  spoke with -- I spoke with Ms. Sahni --

20          THE COURT:  Andrew, Andrew, Andrew, I don't need to

21  hear that.  I'm fine with your five weeks.  What he is saying

22  is, he wants to start depositions in earnest and it's the

23  next two weeks he's more worried about than the previous five

24  weeks.

25          MR. SCHAPIRO:  Understood.

1           THE COURT:  So what he -- I mean, what does it look

2    like -- I'm -- I'm inferring that he wants all 34 versions

3    which he says exists.  Where are you guys on that?

4           MR. SCHAPIRO:  I think we told them we're going to

5    give them all 35 versions --

6           THE COURT:  Okay.

7           MR. SCHAPIRO:  -- and -- and the e-mails.  He

8    stated a moment ago that we weren't agreeing to produce

9    e-mails.  We have agreed to produce e-mails and meet and

10   confer.

11          THE COURT:  I'm all good with that.  Just do it as

12   soon as you can.  I trust you, okay.

13          MR. SCHAPIRO:  Thank you.

14          MR. SPERLING:  So, Your Honor, here is the issue

15   and glad that we got that clarification on the e-mails.

16   They're continuing to take the position, and that's what they

17   told us in writing, that the information here is

18   nonresponsive, nonrelevant.  And so let me show you the

19   document, Your Honor, this is really important.

20          THE COURT:  Wait a second, wait a second.  Why do

21   you care -- I'm not going to force them not to retreat -- I'm

22   not going force them to retreat from the position that it's

23   nonresponsive and nonrelevant if they're agreeing to produce

24   it.  That's something that will happen at trial.  Why are we

25   arguing about that?

13

1          MR. SPERLING:  I'll tell you why we're arguing

2     about it, Your Honor.  Because we've had grave concerns about

3     the (inaudible) of documents from certain custodians and not

4     just, you know, privileged determinations versus

5     nonprivileged determinations, but the overall universe,

6     including what's been logged, and concerns about what they

7     are deeming to be responsive and what they're deeming to be

8     nonresponsive such that it doesn't even need to be logged or

9     produced.

10          And when you see this, Your Honor, I think you will

11     understand why we have a concern that transcends this

12     document and we need a determination not only about

13     relevance, but the process which we would like to lay out for

14     the Court to go and address what we view as a real problem

15     with how they're proceeding with this.

16          If I could show you the document, Your Honor, I

17     think you'll really understand what I'm talking about.

18          THE COURT:  I'm only going to look at a document if

19     there is a real problem to solve.  So I -- I, like any other

20     judge, has a very responsive view of relevance.  I mean, it's

21     just -- you know, it's very low threshold, that's number one.

22     Number two, so responsiveness, generally if a plaintiff can

23     articulate a reason why it's responsive, probably most judges

24     are going to say, okay, that's responsive, so -- but I'm not

25     sure there is a dispute here.  Andrew, do you think there's a

14

1    dispute?

2              MR. SCHAPIRO:  No, there is no dispute.   There

3    are --

4              MR. SPERLING:  There is.

5              THE COURT:  Hold on, Jonathan.  Go ahead.

6              MR. SCHAPIRO:  There are some particular requests

7    for production or interrogatories that I believe they will

8    say or have said to us this material might have been

9    responsive to or might be relevant in regard to.  We've taken

10   the position, and would be happy to explain to them because

11   we will have to go row by row on it, why they are mistaken

12   about that, but that's not something to do here on the fly

13   having just heard about it right before this call.  We're

14   happy to do it fast if he thinks there is two weeks, but we

15   can explain why it's not responsive and if he cares for

16   whatever reason.  I don't know, we're giving it to him.

17             THE COURT:  Yeah.  I mean, this is not the time to

18   have a drawn-out argument on that issue.  If we have to do

19   it, I can do it, you know, many other times.  Next week for

20   sure.  You know, I've got wide open spans of two or three

21   hours.

22             So I would like you to at least -- I mean, I think

23   somebody -- we're all hearing some things for the first time.

24   I've said things on the record just now.  You know, I'm going

25   to have a broad view of the requirement to produce on both

15

1    sides.  So why don't we just try to work that out, and if you

2    really end up disagreeing on something being responsive -- by

3    the way, I mean, have you burned all your discovery --

4    written discovery requests?  Because if somebody says

5    something is not responsive, then all you have to do is say,

6    Well, please explain to me how I can draft it so it is

7    responsive, and then --

8            MR. SPERLING:  That's a great question, Your Honor.

9    In fact, the key -- and I'm so happy that you went there.

10   The issue that remains disputed with respect to the discovery

11   schedule is that while we've agreed to push out the end of

12   fact discovery April 2, Charter took the position after

13   December 31 had passed, that because the prior end of fact

14   discovery had been January 31, that therefore the time to

15   serve written discovery requests had passed as of December

16   31, and their position is we can't serve any more written

17   discovery requests.

18           And again, Your Honor, if you'll indulge me, I see

19   the clock is 1:19.  If you'll give me three or four minutes

20   to walk you through this document, even if we're going to

21   reserve on decision and discussion about this, I think it

22   will be really, really eyeopening to the Court to see what

23   happened here.

24           THE COURT:  Okay.  Well, you would be maybe

25   surprised at what I consider eyeopening or not, but Andrew,

16

1    with regard to written discovery, my policy generally is that

2    whatever discovery deadline is, the written discovery

3    deadline is 33 days before that because you have to have time

4    to respond to all written discovery requests within the close

5    of fact discovery.  That's always been my policy absent an

6    agreement by the parties to some other sort of process.  So

7    any disagreement with that?

8                MR. SCHAPIRO:  No, but --

9                MS. BREWER:  No, we certainly respect if that's

10   your -- oh, sorry.

11               MR. SCHAPIRO:  (Inaudible).

12               THE COURT:  She is.  Yeah, hold on.  Go ahead.

13               MS. BREWER:  No, if that's Your Honor's

14   perspective, we certainly understand.  It was not an

15   ultimatum given to the plaintiffs.  It was part of the

16   correspondence and the meet-and-confer process we had with

17   them.  We served all of our written discovery on our end on

18   December 30, so it wasn't intended to be a gotcha.  It was a

19   good faith belief that the parties were operating with that

20   understanding.

21               THE COURT:  Okay.

22               MS. BREWER:  And again, it wasn't take it or leave

23   it.  If that's Your Honor's perspective, then we'll live with

24   that.

25               THE COURT:  No, no, that wasn't my perspective, at

1    all, but that will be the order of the Court.  Written

2    discovery is due sufficiently in time for it to be responded

3    to within the fact discovery deadline.

4            Now, show me your dog and pony, please, Jonathan,

5    just be as quick as you can.

6            MR. SPERLING:  I will, Your Honor, and thank you.

7            So, Your Honor, look, as the Court is aware, the

8    central issues in this case are whether Charter had knowledge

9    of the infringement activity (inaudible) and what it did, and

10   what it did with DMC notices and the tickets they created to

11   deal with them.

12           So if you just pop open the spreadsheet, you'll

13   see --

14           THE COURT:  What's it called?

15           MR. SPERLING:  Pardon me?

16           THE COURT:  What's it titled?

17           MR. SPERLING:  The title -- the document title is a

18   long string of letters and numbers beginning with 25BE37F.

19           MR. SCHAPIRO:  Your Honor, if it helps, we could

20   bring it up on a screen share for you.

21           THE COURT:  That would be better.

22           MR. SCHAPIRO:  Okay.  Linda, do you have it handy,

23   do you want to do that?

24           THE COURT:  What I have is (inaudible).  That's

25   what I have as far as Excel spreadsheets that I can see.

1          MR. SPERLING:  Your Honor, you should have --

2          MS. BREWER:  This is the e-mail I sent this

3    morning, but I can -- I can pull it up.  I recognize you

4    probably haven't had a chance to take a look.

5          THE COURT:  Okay.

6          MS. BREWER:  Except I'm not sure if this video --

7    I'm not having an option to present from this video platform,

8    so that may not --

9          MR. SCHAPIRO:  It's the double square on the

10   bottom.  It's the second button.

11         MS. BREWER:  Hold on, let me see if I can.

12         MR. SPERLING:  I tried to go ahead and share it.

13   Does everyone see it on their screen?

14         THE COURT:  Yes.

15         MR. SPERLING:  Okay.  So, Your Honor, if you look

16   through here, beginning with row 2, you'll see that this is a

17   spreadsheet that has row after row after row of information

18   about DMCA tickets, opened, closed, how they were dealt with,

19   what was batched.  And we can describe what that is, what was

20   auto closed.  And it goes on for 31 rows of information about

21   DMCA tickets.  Charter produced originally the redacted

22   spreadsheet showing (inaudible) other.  What the document

23   also does, it compares what you see with respect to DMCA

24   tickets, and by contrast, what happened with non-DMCA

25   tickets.  So it sets side by side and compares what was done

19

1    for DMCA, what was done for non-DMCA.

2              In addition, the document has other tabs with lots

3    of analysis like you see here of how they handled DMCA

4    tickets, and it has another tab which has additional

5    analysis, including key information regarding the number of

6    times that subscribers who received notices from Charter,

7    which notices directed drivers to log in to a website called

8    notices.charter.com if they wanted to find out what this was

9    all about.  They tracked how many successful logins they had.

10   So you can see here, for example, in this period they had

11   1.61 -- excuse me, 1,161,786 tickets.  That's in row 3.  They

12   sent out many, many postcards, and that they had only in row

13   9 a very small handful of people that actually acted on this.

14             So there are a lots of metrics here that

15   (inaudible) metrics over here, there's lots of analysis os

16   what was going on with the DMCA.

17             Charter represented to the Court that the

18   information they redacted, all of that information was not

19   relevant and not responsive.

20             We had a document request, Your Honor, which

21   specifically asked for metrics reports.  We had a document

22   request (inaudible), which specifically asked for documents

23   comparing how Charter responded to DMCA tickets and how they

24   responded to other kinds of abuse violations, and they

25   represented to the Special Master, and this is contained --

20

 1    this Special Master's written order, they represented to the

 2    Special Master that there was no spreadsheet that contained

 3    that information.  That's in her order, Docket 181 at page

 4    31-03.  They said it's not maintained in any readily

 5    available spreadsheet or report.

 6              And we had to fight like hell, Your Honor, to get

 7    these unredacted.  And as recently as December 18 they

 8    represented to you that the information here is a data dump,

 9    that it's not relevant.  And is there is some information in

10    this spreadsheet that's not relevant in this case?  Of

11    course, as with just about any document, Your Honor, but what

12    they redacted, what they characterized as a data dump, what

13    they characterized as not relevant was the stuff that's

14    hugely relevant and directly responsive to our request.

15              And even after you told them that they had to

16    unredact the row headers, so that leaving aside the actual

17    information (inaudible), the type of information contained in

18    the documents, you'll recall Ms. Sahni had to get back to you

19    because they were refusing to unredact all the row headers

20    and the reason was clearly because they didn't want us to see

21    the kind of information contained here.  They didn't want us

22    to know that this document exists.

23              So let me pivot in the time we have remaining, Your

24    Honor.  I want to talk about --

25              THE COURT:  Okay, so if you guys get cut off on

1   video, you can all call into audio.  Right, what's the number

2   we always give out for our teleconference?

3          COURTROOM DEPUTY:  The phone number for the

4   teleconference line is (888)278-0296.  Again, that's

5   (888)-278-0296, and the access code is 8212991.

6          THE COURT:  Okay, please proceed.

7          MR. SPERLING:  Thanks, Your Honor.  So, you know,

8   we've only now learned as a result of this process, as a

9   result of having to go back to you, not only what was in

10  this, but in fact, that there are 34 prior iterations of this

11  spreadsheet.  And one of the things that they represented to

12  you on December 18 was that the redacted information comes

13  from after the claim period, but that's simply not true.

14  There is a ton of information about DMCA tickets and how

15  responded to them from within the claim period.  That's true

16  even for the one document that we knew existed and decide the

17  34 others from within the claim.

18          So what the document does, it compares side by side

19  the response to DMCA infringements.  It gives us a wealth of

20  information we didn't have before, analysis of what they call

21  (inaudible) performance indicators.  So why is all this

22  relevant?  They are agreeing to give us the documents anyway.

23  It's relevant because, as I said at the outset, we have great

24  concerns about their responsive determinations.  They're

25  continuing to take the position, given the information that

1    I've showed you, and I've done it in a real shorthand manner,

2    Your Honor, because of the time constraints you indicated,

3    they're taking the position that's not responsive to our

4    (inaudible) report, that's not responsive to our request for

5    documents (inaudible) how they responded to DMCA tickets and

6    how they responded to other kinds of abuse violations.

7            There is a custodian at Charter.  His name is Keril

8    Abermoff (ph).  He's a lawyer.  We had a big fight over there

9    need to even search for his documents.  Ultimately

10   (inaudible) compel them and add him as a custodian.  The

11   Special Master ordered them to do so.  And they, in

12   connection with all of that, ran searches and gave us hit

13   counts, Your Honor, and those searches were really narrowly

14   focused on the issues in this case.  Looking for terms like

15   DMCA, infringement, copyright, bittorent.

16           They came back to us and they said there are 27,458

17   unique documents from his files (inaudible) search terms,

18   okay.  What we got from them in production was 35 documents

19   and he appears on 170 documents in their log.  So somehow out

20   of these 27 1/2 thousand hits on search terms that are super

21   tightly geared to this case we got a response rate of less

22   than 1 percent.

23           And we know now, Your Honor, that they take the

24   view that a lot of stuff about DMCA (inaudible) about

25   metrics, about responding to (inaudible).

23

1              (Audio stopped.)

2              (Discussion to reconnect.)

3              THE COURT:  Jonathan, are you there?

4              MR. SPERLING:  I am, thank you, Your Honor.

5              THE COURT:  And Andrew, are you on yet?  We'll

6    wait.  Andrew?  Not yet.

7              MR. SCHAPIRO:  I'm on, Your Honor.

8              THE COURT:  Okay, go ahead, Jonathan.

9              MR. SPERLING:  Thanks, Your Honor.  So we have

10   these incredibly low hit counts with respect to Mr. Abermoff

11   notwithstanding that these searches terms are really narrowly

12   tailored to the issues in the case.  And out of, you know, 27

13   1/2 thousand unique hits on the search terms, they produced

14   35 documents and logged onto some others, and so you're

15   talking about less than 1 percent.

16             And we have grave concern about what they're

17   deeming not responsive (inaudible).  Given that now they're

18   calling this document nonresponsive, and as recently as

19   December, after having told the Special Master that all the

20   redacted information of documents is irrelevant or

21   nonresponsive, they told you that it's a wide array of

22   information having nothing to do with this case.  That's what

23   they said in response to our objection at the hearing.  They

24   told you again that it's a data dump and that the portion

25   that they redacted is post-2016.

1          Given that we're seeing this, given what they tried

2     to hide and given the representations that they made to the

3     Court, which were not accurate representations, we would like

4     to undertake the sampling process with respect to their

5     documents and three custodians.

6          And the sampling process would be for them to

7     essentially provide all -- they must have all their documents

8     up in a review system, there will be an identifying number,

9     the documents won't have actual Bates stamps on them, but

10    they'll be a unique identifier and their document (inaudible)

11    for each document.  We would like them to produce, or log if

12    they're asserting privilege over it, every tenth document for

13    us to review.  That will be a sampling process and we can

14    come back to the Court, but we believe that we need to

15    undertake this process so that we can have some insight into

16    what they're deeming responsive and what they're deeming not

17    responsive.

18          We're undertaking -- undertaking the burden to

19    review those documents.  There is no prejudice to them from

20    doing this.  Again, if they want to log documents that they

21    think are privileged, then they can.  If they're going to be

22    concerned that they don't have the time for that, we know

23    that they've been big proponents of Rule 502(d) and got you

24    to enter a Rule 502(d) order.  They can produce these

25    documents pursuant to Rule 502(d) order.  That's the real

25

1   original purpose of Rule 502(d), that you don't have to

2   undertake an extensive preproduction privilege review and

3   then they can always cull back documents afterwards if they

4   conclude that they're privileged or want to assert a

5   privilege.

6           But we really need a process to be able to see some

7   of the documents that are hit that they deemed nonresponsive

8   given that they are characterizing even this document as

9   nonresponsive.  The spreadsheet which has the same metrics,

10  and they didn't produce a response request from (inaudible)

11  report.  It compares side by side how they responded to DMC

12  notices and other kinds of abuse violations and they told the

13  Special Master no such spreadsheet exists and they told you

14  the document is not responsive to that request.

15          So that's our proposal, Your Honor, that we be able

16  to review, receive from them promptly from three custodians,

17  Mr. Abermoff, Laurie Ralett (ph) and Culton Mave (ph), all of

18  them are key custodians, every tenth document that they

19  deemed nonresponsive so that we can assess what's really

20  going on here.

21          THE COURT:  Okay.  Andrew.

22          MR. SCHAPIRO:  Sure, I'll start and then I may ask

23  Ms. Alvarez from Winston & Strawn, who has dealt with a lot

24  of the document review and meet and confers, to get into the

25  weeds here to the extent that we are in the weeds.

1          As an initial matter, this proposal and this

2     complaint we are hearing for the very first time on this

3     call, and I want to reiterate that the appropriate and

4     efficient way to deal with this is for them to give us, or

5     you, it doesn't matter, split them out in writing their

6     position -- we're happy to put it on a short schedule -- and

7     allow us to respond so that I don't have to on the fly

8     respond to arguments that we're hiding the ball or answer why

9     Mr. Abermoff, in-house counsel, who wasn't on many of the

10    sheets, doesn't show up in the hit counts, because I'm not

11    really prepared to do that.  Jennifer Golinveaux from Winston

12    & Strawn who is most familiar with this isn't attending

13    today, she had hearing, because we thought this was a

14    conference primarily about the schedule.

15         So to the extent that our adversary had some view

16    that this document is a blockbuster of some kind, and it's

17    not for reasons that we can explain, then they should have

18    given us a heads up about it and we could be ready to

19    absolutely, you know, provide something useful for the Court.

20         But beyond that, this proposal makes to me, if I

21    understand it, zero sense.  They want to start sampling the

22    documents of in-house litigation counsel.  That's something

23    that we certainly will not agree to without a vigorous fight.

24    I think what they're really saying is they believe that there

25    is material on this that is responsive to a particular RFP

27

1    Number 61.  We think that it's not and we're happy to hash

2    that out with them.  As I said, I think that's something

3    where we need to go row by row, but the initial rows that

4    Mr. Sperling was pointing to, row 8, row 16, are the rows

5    that we actually produced, those are what we produced.

6           Now, beyond that, it's going to get beyond my pay

7    grade and so I would ask Ms. Alvarez to respond to the

8    specifics of this, but I think this is completely

9    inappropriate and, you know, frankly, unfair for us on the

10   fly to respond to some request that you order a sampling of

11   in-house lawyers documents and that we're accused of trying

12   to hide the ball anyway.

13          THE COURT:  Well, let me ask you a question.  I

14   guess you're saying in-house counsel's document.  I mean, an

15   attorney can still be the custodian of business records,

16   right, and it doesn't make them anything special.  So they

17   just happen to be a lawyer, but if they're the custodian of

18   documents then I can't help that.

19          What I thought I heard Jonathan saying is that

20   somebody ran a search, there were, I thought, I don't know,

21   35,000 or 3500 hits and 35 documents were produced, or some

22   very small order of magnitude off of some search hits.

23   Right?  Is that what you said, Jonathan?

24          MR. SPERLING:  Yes.  Yes, Your Honor, and the exact

25   numbers are -- let me page up and I can get them for you.  It

1   was 27,548 unique hits.  That's what they told us.  That

2   number of (inaudible) documents hitting the search terms.

3   They produced 35 (inaudible) the custodian and he appears on

4   170 in the log.  So that comes out to at most -- when it's on

5   the log, we never know whether they took it from his files or

6   from somebody else's, but at most it would be 205 documents

7   out of 27,548 hits.

8              THE COURT:  Right.  So that's going to -- that's

9   going to peak anybody's curiosity, Andrew, you know that.  So

10  all they're saying, I guess, is some sampling.  He's

11  proposing one out of ten.  I don't care what the number is,

12  as long as it statistically is likely to produce information

13  enough for us to make intelligent decisions.  (Inaudible)

14  sampling is a good process generally in many contexts.  I'm

15  not opposed to it.  I don't have a problem with you not being

16  able to agree right at the moment for the reasons you stated.

17  So we can table this just briefly, talk about it again

18  Monday, allow you to talk with counsel and your client.

19             You know, we do have to just keep pushing things

20  hard because I don't think that the case is anywhere near

21  ready to be tried and that's my job to get it ready to be

22  tried.

23             So that's what I would like to encourage.  Would

24  you be able to get back to us by Monday with an intelligent

25  response?

1          MR. SCHAPIRO:  Yes.  In writing you mean?  Yes,

2   sure.

3          THE COURT:  So can you look at your calendars,

4   please.

5          MR. SCHAPIRO:  Oh, I'm sorry, you say to reassemble

6   on Monday?

7          THE COURT:  Correct.  I guess sort of reassemble.

8   You know, move your finger a few inches and press some

9   buttons and then start talking, but, yes.  I'm available in

10  the morning -- in the morning and -- yeah, morning would be

11  fine, starting maybe at 9:30 our time.  I can give you a

12  solid 45 minutes, then I've got a little bitty thing and then

13  I can give you the rest of the morning.  So we could have --

14  I don't want to take hours, but I mean, we can have time in

15  the morning.

16         MR. SCHAPIRO:  We can make ourselves available

17  whenever works best for you.

18         THE COURT:  Okay, let's shoot for that, 9:30 Monday

19  morning.  The issue on the table then is the sampling issue

20  and a proposal as to the number of samples we're going to

21  take.

22         All right, and -- well, all right, so Jonathan,

23  just sort of implicit in what you're saying and how you're

24  saying it, is you're really mad, you think they've done

25  something wrong, you use the term hiding the ball.  I mean,

1   you know, I'm not going to sanction anybody just because of

2   oral argument and things I hear during that, so anything

3   you're looking for other than me ordering a new course of

4   business would have to be in writing, okay?

5           MR. SPERLING:  Yeah, understood, Your Honor.  And

6   let me be clear on a few things.  You know, we take serious,

7   and I think (inaudible) in your ruling on their 502(d) motion

8   with respect to spoliation discovery and we took that to

9   heart.  And I don't say things like hiding the ball likely.

10  This is -- this is really serious, but from what I understand

11  the Court, (inaudible) urgency of the schedule and how long

12  this has taken, we would have gone about this a different

13  way, but there is just no time to engage in a long, drawn-out

14  meet and confer and so we appreciate the Court's ruling that

15  (inaudible) --

16          THE COURT:  Well, yeah, we can't --

17          MR. SPERLING:  -- on Monday.

18          THE COURT:  I mean, Andrew was saying there is no

19  even short, you know, expedited conferral on this one, but in

20  any event, the order of business from now on is going to be

21  this:  I'll hear matters at a moment's notice, but if you

22  haven't gone through that conferral process, it's going to

23  result in what I just did, allowing the other side to think

24  about things and get back to us.

25          So if you do want something decided on the spot by

1   me, then you'll have to at least give a little bit of time.

2   And, you know, I'm -- I'm expecting people to, you know, do

3   turnarounds very quickly.  We are getting toward the end of

4   discovery, it's a very important case by any standard, so

5   everybody's attention sort of needs to be focused on this for

6   the next couple months just by necessity.

7          MR. SPERLING:  Understood, Your Honor.

8          THE COURT:  So what else do we need to talk about

9   today?  What?

10         MR. SPERLING:  Your Honor, it's Jonathan again.  We

11  have more two items.  You've been so generous with your time,

12  especially (inaudible) and we appreciate the -- you know,

13  ability of the e-mail correspondence.  I think there are two

14  items that are sitting on the Court's plate.  One is

15  (inaudible) 502(d) order with respect to spoliation

16  discovery, there were still 130-some documents (inaudible)

17  withheld on the grounds of (inaudible) work product and I

18  think you were going to review those in camera.  You also

19  gave us the opportunity to come back on the basis of

20  documents that we did receive and make a supplemental motion

21  if we wanted to.  We're not going to do that right now, so

22  once the Court is be able to get through the in-camera

23  review, which I know can be burdensome, we'll be in a

24  position to proceed with that -- with that deposition.  So I

25  just wanted to (inaudible) reminder on the Court's plate.

1          And then the other item that's pending is an

2    objection by Charter with respect to item 28 from their

3    privilege log.  The Special Master ordered them to produce

4    that four months ago.  They went back, they asked her again

5    (inaudible), again they came to you, so it's certainly not

6    the Court's fault in any way, but we've been waiting on the

7    document for a long time, and to the extent the Court is able

8    to get (inaudible) resolution of that objection into the --

9    you know, the schedule, the various things the Court has to

10   decide, that will also help us move forward.

11         We want to get started, as the Court knows, with

12   our depositions (inaudible) to get a resolution on this, we

13   need to get that document on the --

14         THE COURT:  Hold on, Jonathan, what -- that's

15   objection is docket --

16         MR. SPERLING:  I'm going to pull that up for you.

17   Where objection was filed December 29.  (Inaudible) docket

18   number for you.

19         THE COURT:  That's Docket 329 and then response is

20   331.  And, you know, I've looked it over in detail.  It's

21   sitting on my desk.  I don't really want to write a written

22   order and so I'm going to affirm the Special Master for the

23   reasons stated in the plaintiffs' brief.  Okay?

24         MR. SPERLING:  Terrific.  Thank you, Your Honor.

25         THE COURT:  What else?

1          MR. SPERLING:  I believe that's it for the

2     plaintiffs, Your Honor.

3          THE COURT:  Okay.  Andrew or anybody else, please.

4          MR. SCHAPIRO:  Yes, as long as we're here, just one

5     thing I thought I would raise.

6          In Your Honor's order about the hash report, you'll

7     recall from a few weeks ago, I just wanted to make sure we

8     understand something.  You recall that was a document that

9     the plaintiffs wanted to shield as work product and you

10    granted the order, but you added a caveat, and the caveat was

11    based in part on what I think might have been representations

12    that were made when you'll recall that there was an in

13    camera -- a virtual in-camera discussion or a virtual sidebar

14    when -- when our side was off camera.

15         So the order says, you know, (inaudible),

16    plaintiffs cannot -- I'm quoting now, quote:  Plaintiffs

17    cannot make affirmative use of a portion of the results of

18    the hash report and shield the remainder as work product.

19    Plaintiffs' counsel represented that the fruit of every

20    aspect of Mark Monitor's 2016 effort, (Mark Monitor also

21    having spawned the hash report) they intend to use at trial

22    has been produced to defendant, the end of my quotation here.

23         And then at the end your rule says that if it turns

24    out they violated that representation, you would recommend

25    that Judge Jackson strike any such evidence and enter further

34

1    orders.

2           And we wanted to be clear so that we can make sure

3    that that order -- that this order is abided by.  What is

4    meant by plaintiffs' counsel has represented that the fruit

5    of every aspect of Mark Monitor's 2016 effort has been

6    produced, because as you'll recall, our point was, yes, they

7    want to use the pieces of the report -- the fruit -- sorry,

8    the fruit of Mark Monitor's efforts, they want to use the

9    efforts where they found items that were infringing, but what

10   they were trying to not turn over is the hash report which

11   will allow us to show when they went down and looked and

12   didn't find what they (inaudible) to find.  So has all of

13   that been produced?

14          THE COURT:  Can I read my message?  That was an

15   e-mail, wasn't it?

16          MR. SCHAPIRO:  I believe it was -- it was an

17   attachment to an e-mail.

18          THE COURT:  And what was the date of the e-mail?

19          MR. SCHAPIRO:  I'm reading from a document that I

20   cut and pasted.  Just a moment, I'll find it.  I invite my

21   colleagues to take over as well.

22          THE COURT:  I can't find it, but if you can.

23          MR. SCHAPIRO:  Just one more moment I think I'll be

24   able to find it.  Docket 332 apparently.  Docket 332, Your

25   Honor, I'm told.

1          THE COURT:  Okay, all right, let's see.  And which

2    line are you focusing on?

3          MR. SCHAPIRO:  I'm focusing on the line that says:

4    Plaintiffs' counsel recommended that the fruit of every

5    aspect of Mark Monitor's (inaudible) efforts (inaudible) that

6    they intend to use at trial has been produced to -- to

7    defendant.

8          Now, what we're looking for here, of course, is not

9    only -- so that's the sword, but we're also looking for the

10   shield.  So what we're looking for is the fruit of Mark

11   Monitor's efforts that they don't intend to use at trial, but

12   which will undermine the ones that they do choose to use at

13   trial.  So we weren't sure whether that encompassed within

14   what you're saying they need to have produced to us.

15         THE COURT:  Well --

16         MR. OPPENHEIM:  This is Matt Oppenheim.  I did not

17   understand the question that is being asked.  I apologize.

18   Could I ask it to be restated?

19         THE COURT:  Well, I mean, as a general matter, he's

20   saying there seems to be some body of data that was used --

21   well, that plaintiff -- that this Mark Monitor produced and

22   his -- his general point is you can't pick and choose out of

23   that body of data stuff that's good and you intend to use and

24   produce it, but then have other portions of that same body of

25   data that maybe, you know, don't shine such a good light on

1   your case or maybe help the other side that you can't -- that

2   you won't produce and also won't use.  Andrew, did I get that

3   right?

4          MR. SCHAPIRO:  That's exactly right.

5          THE COURT:  And you can't argue with that general

6   proposition, so I agree.  What are we going to do about that,

7   Matt?

8          MR. GOULD:  Magistrate Judge Hegarty, this is Jeff

9   Gould on behave plaintiffs, also from Oppenheim.  If you

10  remember --

11         THE COURT:  Very good.

12         MR. GOULD:  -- I spoke with you about this issue

13  last time.  So I'm a little confused, first of all, about

14  where we are here.  I mean, your ruling was I think about

15  three weeks ago and the time has run to reconsider or appeal

16  this, so I don't quite know what the posture is, but setting

17  that aside for the moment, this issue was briefed and argued

18  at length on both -- in a public session and in a private

19  session, and at length we discussed the contours of exactly

20  what Mr. Schapiro has raised today.  I don't really

21  understand what the confusion is about.  We made clear then

22  and you understood, as I see it from your opinion here, that

23  the fruits of Mark Monitor's efforts that they intend to rely

24  on have been produced, and there is nothing in the hash

25  report that was the subject of this work product issue that

1    we intend to rely on, and so there is no sword and shield.

2            The waiver argument has been, you know, pursued and

3    discussed at length.  So I -- maybe I'm missing

4    Mr. Schapiro's point, but I don't really see -- you know, I

5    don't see anything new here.  He's trying to -- it feels like

6    an effort to reargue this out of time.

7            THE COURT:  No, I -- I know how it may feel like

8    that.  What is appropriate at any moment in the case is

9    confusion over a judge's order and the interpretation of that

10   order.  So that's -- if there is true misunderstanding about

11   that, that's always an appropriate thing to discuss.

12   Reconsideration is not.  So it's just that, you know, you

13   guys live this case every day, I live it only as often as you

14   bring it to me, and so it's not something that's maintained

15   fresh in my mind.  And, you know, when I wrote that, I

16   believed in what I wrote; I think I understand what I wrote.

17   But I think the good point you make is exactly what, Andrew,

18   might be there that you believe would -- would cause issues

19   or violation of this order?

20           MR. SCHAPIRO:  Yes, Your Honor.  Well, the hash

21   report has seven -- a list of 7,000 items that they sent Mark

22   Monitor out to look for and some of them they came back empty

23   handed.  And so if they're not intending to rely on anything

24   that came back from Mark Monitor, which I recall you said the

25   sword, then, fine, but they are intending to rely on what

38

1    they got back from Mark Monitor, they have represented to

2    you, as I understand it I guess in that private session,

3    because at the end of the order you say if I find plaintiffs

4    in violation of their representation to me, they represented

5    to you that they're not going to use anything from Mark

6    Monitor as to which they haven't given over both the good and

7    the bad, the sword and the shield.

8            If what they're saying instead today is, Well,

9    we've given you everything we're going to use, that's fine,

10   but that's just the sword, that's not the shield.  So the

11   reason I'm asking is you have invited us I think quite

12   appropriately to hold them to their word and to raise this

13   again down the road if they are not keeping with that

14   representation, but I'm looking at this order.  We want to

15   make sure there is a clear record so that they can't say,

16   Well, sure, we told you we're going to give you everything

17   we're going to use and that's good enough.

18           THE COURT:  Understood.  Well, I did -- I mean, I

19   think we're going to have to see it in action, because what I

20   did give you the ability to do is reassert a motion to compel

21   or a request to compel, at least, if you see what you

22   perceive to be inappropriate application of this order,

23   right?

24           MR. SCHAPIRO:  Okay, yes, you know, you did say at

25   this time, I follow that, but I -- well, I guess -- I guess

1    we'll end up going back to this transcript and maybe that's

2    the -- the best we can do at this point.  But our point is

3    simply that if they're going to rely on material from the

4    Mark Monitor investigation that's helpful for them, then that

5    has to be consistent with this apparent representation they

6    made to you that they've sent over the material that might

7    not be helpful from Mark Monitor.

8          THE COURT:  Right, and I think that the way for

9    that to be effectively policed is for me to just, you know,

10   remain apprised and engaged in this whole process, even

11   possibly through trial.  So --

12         MR. GOULD:  Your Honor, may I respond briefly?

13         THE COURT:  Yes.

14         MR. GOULD:  This is Jeff Gould again.  So

15   Mr. Schapiro has just reargued his motion, make no mistake

16   about it.  Review his papers, review the transcript.

17   Mr. Schapiro argued at length that producing some downloaded

18   files while withholding a hash report that he claims

19   references other files was a sword and shield and a waiver on

20   that basis.  It was briefed, it was argued and there is a

21   clear record and ruling on it.  He's rearguing it.

22         What's important to understand here too is

23   plaintiffs are not relying on privileged material.  In order

24   for sword and shield to apply, we would need to be relying on

25   privileged material while withholding other privileged

40

1  material.  That's not what's happened here at all.  Nothing

2  new to see here.

3       You know, respectfully, I think that this feels

4  improper.

5       THE COURT:  Right.  Well, I don't -- listen, what I

6  did was a little bit unique in allowing an in-camera proffer.

7  It's -- it's what I would do in open court if someone says,

8  Your Honor, there is a privilege involved here.  If I say any

9  more about it, I'm going to, you know, violate the privilege,

10  and I would say, Will you please approach and explain it.  So

11  it's something that sometimes you have to hear in camera, but

12  what I don't recall is did we -- did we keep the recording on

13  during that proffer or did we turn it off when -- we

14  talked -- how did we talk, Mr. Gould?

15       MR. GOULD:  I don't know whether the recording was

16  on on your end.  I can tell you that on the transcript -- the

17  written transcript there is a break, the written transcript.

18       THE COURT:  So sometimes I designate a portion of a

19  transcript restricted to the Court only.  I don't know if we

20  just turned it off or I had a Court restriction only.  I

21  mean, in retrospect, in hindsight, I should have had it be a

22  Restricted Level 1 Court Only access, or whatever level that

23  is, but if I didn't, I didn't; but I somewhat recall the

24  conversation so I'm just going to just have to try to keep

25  that fresh in my mind.

41

1          But, again, I think it's going to come down to -- I

2     think it's what Justice Douglas said about obscenity:  I'll

3     know when it I see it.  So I'll just have to keep a close

4     watch on the case, I suppose.

5          But the point is taken, you know, and I think we

6     should move on.  What's next?

7          MR. SCHAPIRO:  I think just the schedule, but maybe

8     that's closed.  I don't know if anyone else has anything on

9     that.

10          MR. SPERLING:  I think the schedule -- Jonathan

11     Sperling -- maybe the best thing, now that we've got that

12     issue resolved, is we can submit it to you in writing, Your

13     Honor, and then you can enter an order based on those dates,

14     so we're happy to do that.

15          THE COURT:  That's fine.  Do you guys have a trial

16     date still set or was that vacated?

17          MR. SPERLING:  For the time being, Judge Jackson

18     has been quite adamant that he's not moving it and so that's

19     what gives rise to a lot of the issues here and we need to

20     get all this done very quickly.

21          THE COURT:  Right.  Well, I mean, it's not beyond

22     me to go to a district judge and say, You really need to

23     change your trial date.  So if we reach that point, just let

24     me know.  Okay?

25          MR. SCHAPIRO:  We're not there yet, I think.  I

42

1   think with the schedule that we have, we may be able to do

2   it.

3          MR. SPERLING:  Two more minor things, Your Honor.

4   Again, Jonathan Sperling.  One, in light of your ruling,

5   (inaudible) Charter's objection to the Special Master's

6   ruling requiring them to produce that privilege log entry

7   number 28, can we just set a date by which they need to

8   produce it?  I propose tomorrow, just a single document, or

9   if they need until Monday, I guess that's fine, but we would

10  like to have it promptly.

11         THE COURT:  Well --

12         MR. SCHAPIRO:  Yeah, we have to decide whether

13  we're going to take that up.

14         THE COURT:  Yeah, that's fine.  I mean, he's --

15  he's got a right to appeal it further.  So three business

16  days, Friday -- so that's typically what I do.  So Tuesday at

17  midafternoon, okay.

18         MR. SPERLING:  Thanks, Your Honor.  And then I

19  think this (inaudible) resolved, but I would just like to be

20  clear so that we can plan for a continuation of the hearing

21  on Monday.  At this point, with respect to the one unredacted

22  spreadsheet metrics report that's been provided to us at this

23  point, are we free to share that among the full plaintiffs'

24  counsel team and not have it be restricted to Ms. Sahni, Mr.

25  Oppenheim and me?

43

1          THE COURT:  Andrew?

2          MR. SCHAPIRO:  Yeah, we have no objection to that.

3          THE COURT:  Okay, so ordered.

4          MR. SPERLING:  Thanks so much for your time, Your

5     Honor.  Nothing further from the plaintiffs.

6          THE COURT:  Okay.  Defense?

7          MR. SCHAPIRO:  Nothing further.

8          THE COURT:  Okay, talk to you guys Monday.

9          (Whereupon, the within hearing was then in

10     conclusion at 2:03 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

44

```
 1                    TRANSCRIBER'S CERTIFICATION

 2    I certify that the foregoing is a correct transcript to the

 3    best of my ability to hear and understand the audio recording

 4    and based on the quality of the audio recording from the

 5    above-entitled matter.

 6

 7    /s/ Dyann Labo                    January 30, 2021

 8    Signature of Transcriber               Date

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com