1

1            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO
2
   Case No. 19-cv-874-RBJ-MEH
3   _____

4   WARNER RECORDS, INC., et al.,

5        Plaintiffs,

6   vs.

7   CHARTER COMMUNICATIONS, INC.,

8        Defendant.
   _____

9

10           Proceedings before MICHAEL E. HEGARTY, United

11   States Magistrate Judge, United States District Court for the

12   District of Colorado, commencing at 9:33 a.m., February 1,

13   2021, in the United States Courthouse, Denver, Colorado.

14   _____

15   WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE HEREIN

16   TYPOGRAPHICALLY TRANSCRIBED. . .

17   _____

18                    APPEARANCES

19           MATTHEW J. OPPENHEIM and JONATHAN SPERLING,

20   Attorneys at Law, appearing for the Plaintiffs.

21   _____

22                 STATUS CONFERENCE

23

24

25

2

```
 1                    APPEARANCES (continued)

 2              ANDREW H. SHAPIRO, ERIN R. RANAHAN,

 3    ALLISON H. HUEBERT, CESIE ALVAREZ and CRAIG JOYCE, Attorneys

 4    at Law, appearing for the Defendant.

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                   P R O C E E D I N G S

2              (Whereupon, the within electronically recorded

3    proceedings are herein transcribed, pursuant to order of

4    counsel.)

5              THE COURT:  Case Number 19-cv-00874, Warner

6    Records, Inc. vs. Charter Communications.  Andrew, I can see

7    why you didn't go on video.  You need a haircut, man.  Make

8    your appearance.

9              MR. SCHAPIRO:  (Inaudible).

10             THE COURT:  So, okay, go ahead and make your

11   appearances for the plaintiff, please.

12             MR. OPPENHEIM:  Good morning, Your Honor.  This is

13   Matt Oppenheim on behalf of the plaintiffs.  I believe my

14   colleague, Jonathan Sperling from Covington & Burling, is

15   also on the line, though he has dialed in by phone and in

16   transit, so I will be addressing the Court this morning.

17             THE COURT:  Very good.  I guess for the defense.

18   Is anybody else for the plaintiff?

19             Okay, go ahead for the defense, please.

20             MR. SHAPIRO:  Sure.  For the defense you've got

21   Andrew Shapiro, and I'll let my colleagues introduce

22   themselves.

23             THE COURT:  Okay.

24             MS. HUEBERT:  Allison Huebert.

25             THE COURT:  Thank you.

4

1          MS. RANAHAN:  Erin Ranahan.  And Cesie Alvarez is

2    with us too from Winston & Strawn.

3          MR. JOYCE:  And Craig Joyce, local counsel.

4          THE COURT:  Thank you.  All by yourself in a big

5    room.

6          MR. JOYCE:  Yes.

7          THE COURT:  So the thought occurred to me, you

8    know, I know there is a lot at stake here, right, but that's

9    for both sides.  Have you guys ever in any one of these cases

10   gave a serious run at resolving it short of a trial?

11         MR. OPPENHEIM:  So, Your Honor, from plaintiffs'

12   perspective, we have been inviting settlement dialogue since

13   2016 with Charter, and they have never wanted to sit down and

14   discuss a resolution.

15         MR. SHAPIRO:  And, Your Honor, I will say that -- I

16   will tell you what I also told Mr. Oppenheim, which is that

17   we are always open to proposals.  I believe that at this

18   point, because of the dollar signs in the plaintiffs' eyes

19   after their large award in Cox, we are (inaudible) for

20   anything to be useful, but we're always, of course, open to

21   listening and to talking.  I think we just have a certain

22   view at this stage about the realism of that.

23         THE COURT:  Well, that's why Hollywood types hire

24   smart lawyers so they can advise them that not everything

25   that glitters is gold, right?  So I've seen a lot of eight-

1   or nine-figure or ten-figure judgments that never occur, and,

2   you know, don't know what's going to happen to the one out

3   there.

4           I agree with you, Andrew, in the sense that if --

5   if that's the benchmark, there will probably be little to

6   talk about, but if we can just start anew and analyze this

7   thing as we would any case, not forgetting that there is

8   something going out in Virginia, but at the same time just

9   come at it from cost benefit analysis, I don't see why this

10  case has to be different than -- than most other cases, you

11  know, 99 percent of all the other cases in the country that

12  don't get tried.

13          So --

14          MR. OPPENHEIM:  Your Honor, I -- so our -- let me

15  draw you a little more detail.  We saw it where we are well

16  beyond the.

17          MR. SHAPIRO:  Matt -- Matt -- Matthew, can I just

18  interrupt for a second, because just want to be clear this is

19  a public -- I believe we're on the record here and this is a

20  public --

21          THE COURT:  We're on the record.  We don't have to

22  be necessarily if things would -- I mean, we don't -- I doubt

23  that he's going to say anything that's shockingly unpublic,

24  but go ahead with that in mind.

25          MR. OPPENHEIM:  I appreciate the -- the caution

1   warning, but I think we're okay.  Well before Cox was even

2   close to trial, we sought to mediate the case with Charter

3   and actually had some extensive discussions about doing a

4   mediation, and then ultimately Charter decided it didn't want

5   to mediate and so we didn't go down that road.  They've --

6   we've told them repeatedly we're open to discussing

7   settlement, we said that well before the Cox verdict.

8          I think it's presumptuous of Charter to assume that

9   because of the Cox verdict that we're too far apart because

10   we've never had a discussion, and it's also presumptuous for

11   Cox to believe that the -- excuse me, for Charter to believe

12   that the Cox verdict isn't telling in some measure, but you

13   can't find out if you're going to settle a case if you don't

14   talk about it.

15          So all of this is to say, the plaintiffs remain

16   open with settlement.  Charter obviously does not.  And from

17   plaintiffs' perspective, that's fine, we'll go forward and

18   we'll try this case.  The evidence -- if we ultimately get

19   everything we should get here, I think it's looking like it's

20   going to line up very similarly to Cox.  There is no saying

21   that the jury will come back the same way, but it's not

22   entirely dissimilar.

23          THE COURT:  Sure --

24          MR. SHAPIRO:  And --

25          THE COURT:  Andrew, I can say this:  I mean, I'm

7

```
 1    just throwing it out there.  Settlement negotiations in my

 2    experience are inherently ex parte, so if you would want to

 3    have any kind of a conversation along those lines, I'm fairly

 4    certain that Judge Jackson would approve.  So if you want to

 5    talk about that offline with me and whoever else you want on

 6    the line, we could do that.

 7         MR. SHAPIRO:  Your Honor, I appreciate that and we

 8    will certainly bring it back to our -- our client.  I

 9    respectfully disagree with the way Mr. Oppenheim, of course,

10    has characterized this, and indeed after reading the letter

11    that they put in, if they believe that this document, which

12    we have agreed to provide to them is the most important

13    document in the case, then I feel really good about the case,

14    if that's -- if that's the --

15         THE COURT:  I mean, there you go.  I mean, there is

16    something to talk about all the time, isn't there?  So,

17    anyway, why don't you -- well, I mean, I don't even know what

18    you've got to talk to your client about.  If you've got to

19    talk to your client about discussing potential resolution

20    with a magistrate judge, then it sounds like Matt might be

21    right, that you don't have any permission and that they're

22    not interested whatsoever.  I mean, if you can't sit here and

23    the say, Yeah, we'll give you a call, you know, without

24    having to go check with anybody, then I'm wondering what's

25    going on in your camp.
```

8

1            MR. SHAPIRO:  I may have not been as clear as I

2       meant to be.  The position that I expressed at the beginning

3       of this discussion, which is we felt we were just likely to

4       be so far away that it would -- the game wouldn't be worth

5       the (inaudible), but we'll have a discussion with the client,

6       and what Mr. Oppenheim said here today, which is that they

7       don't necessarily view Cox as the be all and end all, which

8       has been our impression, and my guess is that, of course,

9       we're happy to have some discussions of some sort.

10           THE COURT:  Well, if anything has --

11           MS. RANAHAN:  Can I just say something, because

12      there was one -- there were discussions that happened in the

13      context of the Brighthouse case, which was to try to settle

14      both -- you know, to hopefully ideally settle both.  It was

15      just a timing question.  It was never -- I know Mr. Elkin had

16      a conversation with not Mr. Oppenheim, but someone else from

17      plaintiffs' firm, and the idea was timing issue, that we

18      would wait to have some clarity on Cox and some other issues

19      here.  So it wasn't that we were unwilling.  I just -- that

20      misrepresentation is just not the tone that was taken.  It

21      was just a timing issue.

22           MR. OPPENHEIM:  There is nobody else from the

23      plaintiffs' side who has had any settlement discussions.  It

24      would have been me and it hasn't happened.

25           THE COURT:  Okay.  Well, I don't -- that is all

9

1   water under the bridge.  If anything -- if anything that the

2   last year has proven to us is that things we thought would

3   never happen can happen, right?  So why not continue to ride

4   the wave of the unexpected and -- and give it a shot.  I

5   mean, it's -- I don't know.  It -- I think I -- well, Andrew,

6   I would invite a phone call from you, that's all I'm going to

7   say.  Okay?

8            MR. SHAPIRO:  Absolutely, we really appreciate that

9   and we will -- we will follow up.

10            THE COURT:  Okay.

11            MR. SHAPIRO:  Definitely.

12            THE COURT:  So who wants to pick up where we left

13   off, I guess.

14            MR. SHAPIRO:  I would like to, Your Honor, if

15   that's all right.

16            THE COURT:  Yes.

17            MR. SHAPIRO:  Since we're here to respond to I

18   think what was presented on Thursday and we've had a little

19   time to think about it.  As I -- as I believe you know, the

20   plaintiffs late last night, at least for me since I'm in the

21   Central Time zone, put in a submission.  We had a PowerPoint

22   that we were planning to use today to respond to the way

23   things had been left Thursday, as far as I know.  I think

24   that addresses most, if not all of what is in their letter,

25   but if it's all right with you, I would like to do a little

10

1   screen share and use that PowerPoint, or we've also sent it,

2   if you want to just call it up on --

3          THE COURT:  No, I think the screen share worked

4   well last time, so let's try that again.

5          MR. SHAPIRO:  Let me see if I can successfully do

6   it.  Do you see now their PowerPoint?

7          MR. OPPENHEIM:  No.

8          THE COURT:  No.

9          MR. SHAPIRO:  All right, hold on.

10         THE COURT:  Jonathan was able to do that on

11  Thursday pretty easily.

12         MR. SHAPIRO:  I've got it here, I think.  Hold on,

13  now you're all seeing yourselves.  How is this?

14         THE COURT:  Still your beetles looking self.

15         MR. SHAPIRO:  All right, hold on.  I have

16  (inaudible) and by your screen, I'll share a Chrome tab.

17  Microsoft PowerPoint share.  I got an X, could not share

18  screen.  I don't know why that is.

19         THE COURT:  Was this submitted to me in some kind

20  of an electronic form?

21         MR. SHAPIRO:  It was sent into the Hegarty chamber

22  e-mail.

23         THE COURT:  Okay.

24         MR. SHAPIRO:  Let me just try one more --

25         THE COURT:  All right.

1        MR. SHAPIRO:  -- and see if I can do it this way.

2   Otherwise -- yeah, I keep getting error message that says

3   could not share screen, so I think I'm doing it right.  So is

4   it okay if I just --

5        THE COURT:  Let me find that.

6        MR. SHAPIRO:  Sure.  It would have been sent to you

7   this morning at about 7:30 your time.

8        THE COURT:  Okay, I'm ready to play it.

9        MR. SHAPIRO:  All right.  So, Your Honor, I think

10  there are two questions that are really at issue here in this

11  case today, and the first is whether there was anything

12  improper about the way Charter treated the document that

13  brought us all here, and then the second is, based on that,

14  is there any further action that is warranted.  And these

15  first two slides are just an introduction, but as I think we

16  will demonstrate, there was absolutely nothing improper about

17  redacting the document as directed by the Special Master

18  here.

19        She herself determined that this document was not

20  called for by plaintiffs' RFP -- is not by RFP 61, which is

21  the one involving comparisons of how Charter treated

22  different types of abuse, because this document doesn't show

23  what are called customer-facing actions.  And instead we were

24  ordered to produce an entirely separate report from the CATS

25  database from that that includes all of this and has been

12

 1    provided.  I'll get into more detail about that in a moment.

 2           Secondly, it's not called for -- wasn't called for

 3    by their RFP Number 70, which called for metrics, because

 4    there was an objection pending, and then after a meet and

 5    confer, Charter agreed back in November to produce the

 6    metrics reports from the discovery period that the plaintiffs

 7    now are saying we've dragged our -- we've failed to produce.

 8           And this document came into play -- I should give a

 9    little bit of a background -- after the plaintiffs sought to

10    find out what we had based our answers to certain

11    interrogatories on, Number 13 and Number 14.  I'll get into

12    that in a moment, but the Special Master said, Well, you need

13    to provide to them the document you relied on -- the material

14    you relied on to answer those interrogatories.  That's what

15    we did, that's why we were allowed to redact most of the

16    document because most of it didn't answer that question.

17           Now, all of this was hashed out in front of the

18    Special Master, and if the plaintiffs truly believe that

19    there was a misrepresentation in front of the Special Master,

20    as they say, then they should raise that with her because she

21    is in a position to determine whether there has been a

22    misrepresentation or not.

23           And, Your Honor, I think, you know, I've been

24    before you a few times now, and I think hope you know it's

25    not my style and I know it's not yours to engage in a lot of

13

1 finger pointing, but honestly, after preparing for this

2 hearing this morning, I feel that the plaintiffs have made

3 what can only be described as gross misrepresentations about

4 the record and about how we got here.  So I want to just talk

5 through that, but I believe by the end of this, you will

6 certainly agree that there is no justification for the

7 plaintiffs' supposed remedy here, there is no basis to start

8 rummaging through documents that were not produced.

9    And in particular, this idea of comparing hit

10 counts to documents is entirely unenlightening.  Kirill

11 Abramov oversees litigation for Charter, and search terms

12 like the words "copyright," which the plaintiff describes as

13 narrowly focused, and, of course, are going to return high

14 hit count.  Indeed, I think -- Ms. Alvarez can correct me --

15 we were even turning up documents like an e-mail from, you

16 know, High Hotels saying, you know, copyright 2020, et

17 cetera.

18    And by the way, the plaintiffs' own hit count and

19 production numbers are in many instances similar to this.

20 It's -- it's revealing of nothing that you have large hit

21 counts for broad search terms and only certain documents are

22 turned over.

23    All right, so I'm going to talk for a moment about

24 how we got here.  There were two interrogatories, Number 13

25 and Number 14, regarding the number of DMCA notices we

14

1    received and the customer-facing actions we took in response

2    to DMCA (inaudible).  And we answered those interrogatories

3    and the plaintiffs, understandably, I suppose, moved to be

4    provided with the source of our interrogatory responses.

5    Where did you come up with those answers about the numbers of

6    notices and customer-facing actions?  So there was briefing

7    and argument in front of the Special Master, and she

8    determined that we should produce the information we had

9    relied upon to answer those interrogatories.

10            We had relied on this spreadsheet from August 2017,

11   which is -- excuse me, April 2017, which is well beyond the

12   claims period.  And this -- these spreadsheets are

13   essentially different exports or iterations of statistical

14   data that was used by Charter security team to assess

15   staffing needs and utilization.

16            THE COURT:  Are you on 5?

17            MR. SHAPIRO:  Pardon me?

18            THE COURT:  You're on Slide 5?

19            MR. SHAPIRO:  I'm still on Slide 4, but I'm riffing

20   a little bit, so just to give you a little more background of

21   that one.

22            So the -- this April 2017 spreadsheet included, it

23   allowed us to go back and answer those interrogatories, but

24   it was something that had a cumulative of numbers over the

25   years and the Special Master, after being told what this was,

1   said, Well, produce the information you used to answer those

2   interrogatories and we did that.  That was the original

3   redacted spreadsheet.

4          There is another interrogatory -- excuse me,

5   another RFP, Number 61 --

6          THE COURT:  Well, did you have that as a live

7   discussion in front of her, what to -- to produce that

8   document?

9          MR. SHAPIRO:  Yes, I believe (inaudible), one of my

10  Winston Strawn colleagues, I believe was on that discussion,

11  but, yes, absolutely.

12         THE COURT:  Well, was --

13         MS. RANAHAN:  It was not only a live discussion

14  originally, it was then extensive briefing and rebriefing and

15  hearing again.  So there was a lot of specifics before her

16  about all the requests that at the time were being put forth

17  as justification for having us go beyond just the

18  interrogatory that was at issue.

19         THE COURT:  Including the -- including the issue of

20  what you can redact?

21         MS. RANAHAN:  Exactly.  It was exactly what was

22  before her is what we should probably redact.  They raised we

23  think this is responsive to request for production.  Her

24  initial reaction was these are interrogatories, so there is

25  no document production requirement, and the request for

16

1  production that you're bringing before me, I believe they're

2  not responsive to or they've already provided the information

3  that's being sought, because a lot of this was cumulative and

4  that we had provided extensive ticket data, millions of

5  items, we had responded to all these interrogatories.  So she

6  had found that the requests themselves didn't call for them

7  at the 2017 version.  It was a version that was late after

8  the discovery period, so it was not within the discovery

9  period, and so she found it was proper for us to redact

10  anything beyond the interrogatory responses.

11          MR. OPPENHEIM:  Your Honor, the December 18 status

12  conference, and there is a transcript -- the relevant page is

13  page 89, and what Charter said is that the -- it is what is

14  sometimes referred to as a data dump.  I'm quoting now from

15  the transcript.  And the portions that are redacted are the

16  post-2016-time.

17          MR. SHAPIRO:  Let me be clear about that because

18  that's raised in the plaintiffs' letter, so that was a

19  statement I think by one of my colleagues in passing, but if

20  you read the entire context and certainly what was discussed

21  with the Special Master, it was never our position that the

22  only things that were redacted were post-2017 material.

23  There was post-2017 material redacted, which is one reason

24  why this document wasn't called for, but that was just one

25  among many reasons that items were redacted.

1          Now, the Special Master also inquired as to whether

2    this might be this source document, as she called it, it

3    might be responsive to the plaintiffs' Request for Production

4    Number 61, which regards actions taken in response to

5    noncopyright abuses.  And she ordered us, rather than to

6    produce this, to create and produce a separate report

7    directly from the CATS system, the system that tracks abuse,

8    showing the actions taken in response to noncopyright abuses.

9    That included data that was not even reflected in the April

10   2017 spreadsheet.  And I think you'll see here on Slide

11   Number 4, she says:  In response -- I'm quoting her e-mail to

12   us of October 14.  In response to RFP 61, Charter was ordered

13   to provide a report summarizing the AUP violations by type

14   and total number of actions taken.

15          Now, in the meantime, back in October, the

16   plaintiffs objected to her order allowing our redactions,

17   thus the process that has led to us getting here, and Your

18   Honor ordered that certain information be unredacted in an

19   attempt to resolve the dispute.

20          This, by the way, is what we produce -- I'm now on

21   Slide Number 5 -- what we produced in response to RFP 61,

22   this report summarizing AUP violations by type, total number

23   of actions, as ordered, with 436 fields.  You can see the

24   actions taken in that middle column there:  Left message,

25   requested suspension, restored customer, sent warning, et

18

1   cetera, et cetera.  Directly responsive to RFP 61.

2          Now, at the same time, the plaintiffs have a

3   request for production, which features now in their letter,

4   Request for Production Number 70.  That one was issued back

5   in April of last year and we objected to that and they said

6   nothing more about it until November, okay.  We objected in

7   April saying that the burden of pulling metrics reports

8   wasn't proportionate to the case.  They sat on it, and then

9   in November, six months later, they raise it again and say,

10  Well, wait, what about this?  We engaged in good faith

11  meetings with them, and on November 23 -- I mean, this is the

12  point that was completely kept from you on Thursday, Your

13  Honor.  On November 23 we agreed -- before we went in front

14  of you, we agreed to produce all of the metrics reports from

15  the discovery period and the related correspondence.  This is

16  an excerpt from an e-mail.  I'm on Slide Number 6.

17          To the extent this information has not already

18  produced, we will agree to produce any responsive and

19  nonprivileged metrics reports, PowerPoints, DMCA escalations,

20  trackers, et cetera, et cetera.

21          Now, there was a little followup between, I

22  believe, Ms. Huebert from our side and Mr. Ehlers from the

23  other side, about exactly how -- what would be included in

24  that, and they reached resolution on December 10.  I can

25  provide the e-mail if the Court wishes.  But this request for

1    metrics report, which is what these things are, these are

2    metrics reports, didn't become -- didn't even become live or

3    an issue until after they responded to our objection, and we

4    said, Okay, we'll produce them.  That was in December.

5           These reports contain all of the discovery period

6    data that's in this April 2017 post-discovery report, because

7    it turns out -- and this is something we had not known until

8    in November they raised the issue again and we went back and

9    started digging into these metrics reports, it turns out that

10   there are iterations of these document.

11          So the problem that we had initially about this

12   April 2017 report could be obviated by reaching an agreement,

13   which we did with them, to just produce the ones that cover

14   the discovery period.  We confirmed that they include the

15   same data as the April 2017 report, but for the discovery

16   period, and they agreed that they would take it, so we

17   thought we're done.

18          But meanwhile, in a separate track, this objection

19   was already underway, they had objected to the Special

20   Master's ruling from October or when it was, and so we would

21   continue to argue about these -- those redactions.

22          In retrospect, we perhaps could have made more

23   clear to them, if they didn't -- I'm going to assume good

24   faith and assume that maybe they misunderstood when we told

25   them in November that, fine, we're going to produce the

20

1    preexisting metrics sheet, maybe we should have made more

2    clear to them that this is all the data that is also in this

3    2017 sheet that we're all fighting about.  And ultimately,

4    one of the reasons we didn't come back and keep burdening you

5    after the compromise worked out with Ms. Sahni about

6    unredacting some, which we thought, look, fine, we can

7    unredact it all, even though this is identical to the

8    material we're going to be providing from the discovery

9    period because it's not worth fighting about.

10           And so now on Slide Number 7.  On our hearing on

11   Thursday, plaintiffs' counsel declared that we won't even

12   agree to produce the e-mail transmitting or discussing these

13   documents or the information.  We had reiterated the day

14   before what we had also said in November that we're going to

15   produce the 34 spreadsheets, the associated families and --

16   that we would produce any transmittal e-mails and associated

17   material.  We assumed that had resolved everything.

18           We were also told on Thursday that -- I mean, I

19   think I explained a moment ago why comparing hit count to

20   documents produced is unenlightening, but plaintiffs told the

21   Court on Thursday that we had produced only 35 documents from

22   Mr. Abramov.  We produced at least 212 e-mails and documents

23   from Mr. Abramov and now I'm on to Slide 9.

24           These numbers are in no way a red flag that justify

25   rummaging through unproduced documents or e-mails.  You know,

1    as I point out on this slide, in their October 2, 2020

2    production, the plaintiff produced less than 1 percent of

3    documents as measured against the hit count of documents for

4    communications between plaintiffs and Mark Monitor, one of

5    the most important issues in this case.

6           Similarly, we negotiated search terms about

7    peer-to-peer documents, extremely important issue in this

8    case -- it's all about peer-to-peer sharing -- and they

9    produced fewer than 3 percent if you look at the hit counts.

10   Meanwhile, they told the Special Master that they searched

11   through 150,000 attorney e-mails, and yet we've gotten a

12   privilege log that -- with only 300 items.

13          So if we're going to go down that road, and maybe

14   we will, I don't know, then it has to work both ways and we

15   would be more than happy if -- you know, we would rather that

16   we don't go down this road, but if we go down this road, we

17   would be more than happy to present the Court with examples

18   of situations in which we have questions, if we're just

19   looking at the numbers, about whether we're getting what

20   we're supposed to be getting from the plaintiffs.

21          MR. OPPENHEIM:  I think we've lost Mr. Shapiro, at

22   least I have.

23          THE COURT:  Yeah, we'll have to wait.

24          (Pause in the proceedings.)

25          MR. SHAPIRO:  It would be highly inappropriate

1    to -- for plaintiffs to obtain some trove of e-mails --

2              THE COURT:  Andrew, wait a second.  Andrew, Andrew.

3    Do you know that you were not on our screen for the last two

4    minutes?

5              MR. SHAPIRO:  No.  What are you seeing?

6              THE COURT:  You've been talking for the last two

7    minutes.  We haven't heard a thing you said because you were

8    gone.

9              MR. SHAPIRO:  Wow, can you hear me now?

10             THE COURT:  Yes.

11             MR. SHAPIRO:  I was fantastic for two minutes.  I

12   was great, I was doing so well.

13             THE COURT:  You last left off with 150,000 attorney

14   e-mails on Slide 9.

15             MR. SHAPIRO:  9, all right.  I apologize.  I didn't

16   know what that was.  I thought -- thought I was on a roll.

17   Can everyone hear me now?

18             THE COURT:  Yeah, we're fine.

19             MR. SHAPIRO:  Okay, great.  So as noted in Slide 9,

20   we were told that 150,000 attorney e-mails were served and

21   we've seen only 300 items on a privilege log.

22             So now to my final slide, Number 10.  Well, there

23   is one more comment about that Number 9, which is we can go

24   down this road and we can all raise concerns or suspicions we

25   have based on numbers and hit counts, and if we do, we

1    will -- we will be prepared to provide, you know, a full

2    slate of our concerns in that regard.

3           We have been doing what I think is the better

4    course in this instance, which is raising those issues in

5    meet and confers that are ongoing with the plaintiffs, but if

6    they need to be brought to Your Honor or to the Special

7    Master, they will, but there is nothing about the handling --

8    and now I'm on my tenth and final slide.

9           There is nothing about the way this document, this

10   metrics report was handled that in any way would justify

11   casting doubt on Charter's e-mail searches.  We have taken

12   our obligations as officers of the court seriously.  We are

13   well aware of the way Your Honor approaches discovery, Judge

14   Jackson, the Special Master.  We've been proceeding in good

15   faith, but we've been doing this the way you do in a normal

16   case, which is running specific targeted searches, having

17   discussions with the other side about specific RFPs.  If

18   there is an objection to an RFP, seeing how that objection

19   gets resolved, hashing it out and then producing documents in

20   accordance with whatever orders are issued.

21          But the effort here to gain access to the e-mails

22   of these three custodians, including the in-house lawyer who

23   oversees this very litigation, is not just a -- is not a

24   business person, he is the person who is overseeing

25   litigation based on this (inaudible) conjecture is entirely

1    inappropriate.

2           And if the Court is inclined to go that way, having

3    gotten that letter at 11 p.m. Central last night, we would

4    want to put in full briefing so that we can have a record on

5    this in response to all their specific allegations.

6           Thank you.

7           THE COURT:  Well, I have a general view about

8    people seeking privileged documents, and that is, you're all

9    living in a glass house.  I've already shielded what I viewed

10   as some privileged documents that the plaintiff did not want

11   to produce, but if we start going down that road, it's going

12   to be -- the pain is going to be equally felt by both sides,

13   but I'm not -- I don't think Matt is going to agree that he's

14   seeking privileged documents.  I suspect that's what he's

15   going to say.

16          Anyway, do you need a response, Mr. Oppenheim, or

17   should we just kind of see where that leaves us?

18          MR. OPPENHEIM:  If I could give you a response, I

19   would like to, Your Honor, because I am -- I've tried to bite

20   my tongue while Mr. Shapiro (inaudible), but it was

21   difficult, because what he's just done simply rewrites

22   history and attempts to whitewash serious misrepresentations

23   and discovery improprieties, and I don't say that lightly,

24   Your Honor.

25          The idea that this document was not encompassed by

1    our requests or that they shouldn't have produced it in full

2    is -- is frankly absurd.  The hiding of this document calls

3    into question the premise of the discovery process and the

4    foundation of our litigation system, which relies on counsel

5    to -- to act appropriately.

6          So here they -- they've asked two questions, and I

7    would like to -- I would like to address those two questions.

8    The first is, was there any problem -- anything problematic

9    about Charter's treatment of the document?  The answer is

10   yes, yes, yes and yes, unquestionably.

11         But what's interesting is, if you look at their --

12   the second slide of their presentation, they refer to it as

13   "the document."  Let's just start there.  They don't want a

14   to call it what the document is called, because what the

15   document is called and what counsel for Charter has referred

16   to the document as is the CATS metrics report, and the reason

17   that's important is because RFP 70, which wasn't promulgated

18   in April, as Mr. Shapiro says, it was promulgated in

19   February, that RFP specifically asks for metrics reports.  It

20   uses that exact term.

21         And what Charter did in response was to come back

22   and object and say, Oh, this is not relevant.  Metrics

23   reports are not relevant, one; and two, it would be

24   burdensome.  Well, in February -- when we got their

25   objections, maybe we didn't understand what was going on, but

26

 1   we do now.  We now know that they routinely every month

 2   distributed internally at Charter a metrics report, and they

 3   had 34 of them for the period.  They didn't tell us that, of

 4   course.  So they had 34 copies of a spreadsheet that they

 5   distributed.  They objected on burden.  I'm pretty sure that

 6   producing 34 copies of a document -- excuse me, copies of 34

 7   documents is not burdensome.

 8           That's the relevance, Your Honor.  You went through

 9   the document on Thursday and you saw what was in that

10   document.  That document -- and we've laid it out at length

11   in our -- in our letter submission.  But there is no question

12   that row after row after row of what's in that document is

13   relevant.

14           So it goes to the core issues of the case.  And, in

15   fact, the Winston counsel knows that because they know from

16   the Cox trial that one of the exhibits that played a pivotal

17   role in the case was a chart that showed what Cox was and was

18   not doing in response to notices, and that's what this

19   document does, make no mistake, and they didn't want us to be

20   able to present that to the jury with any level of detail.

21           So they gave us -- they gave us an interrogatory

22   response and then they told the Special Master that there was

23   no real document to support.  It was more like a data dump

24   and most of it was not relevant.  And then they ultimately --

25   and I can go through every one of the other RFPs by the way.

1    There are five of them that we identify in that letter, spot

2    on, this document is responsive to.  And I can walk through

3    each and every one, but --

4              THE COURT:  Well, hold on, let me ask you a

5    question, let me ask you a question.  What you're getting is

6    not necessarily with what you're going to get out of this

7    RFP, because we now think, or hopefully you think you're

8    going to get what you need, but what you're saying is how

9    many others have they taken what you view as an inappropriate

10   interpretation and applied it and then you don't have

11   responsive information relating to numerous other document

12   requests.  That's where you are, right, I think, right?

13             MR. OPPENHEIM:  Yes.  I mean, that's right, Your

14   Honor, but they've made these misrepresentations all along

15   the way, right.  So they mis- -- they told the Special Master

16   that what they were redacting involved third-party

17   information and was outside of the timeframe and was not

18   relevant.

19             And we can now see that the overwhelming majority

20   of the document is directly responsive, and it's not a data

21   dump.  It has metrics analysis done in it.  It has exactly

22   the type of information we were seeking.  They misrepresented

23   to the Special Master what it was so they wouldn't have to

24   produce it.  And by the way, they only indicated that there

25   was one.  It was only as of a week ago that we learned that

1    there are 34 of these within the discovery period.

2         And -- and -- so we had to object to the Special

3    Master's ruling on this.  The Special Master's ruling, of

4    course, was premised on the misrepresentations made to her.

5    And we came to you, Your Honor, and you immediately said,

6    Well, redacting for relevance is not the norm, and you

7    created a meet-and-confer process.  And you can look at the

8    transcript.  It was very clear that what we asked for was to

9    unredact all of the column and row headings, and then you

10   said every -- the data and everything (inaudible), but they

11   didn't do that, and the reason they didn't do that is they

12   knew once we saw the row headings that the game would be up.

13        And what they refused to -- and Ms. Sahni, who, by

14   the way, is not here anymore because she has delivered her

15   baby, by the way, good news, but they refused to do so

16   because they knew the game would be up when we saw what was

17   on it.  And she came to you, and you said (inaudible).  She

18   said, Oh, my.  And we had a back and forth exchange with

19   (inaudible) counsel over unredacting the document.

20        They finally agreed to unredact the document, but

21   they continued to assert that the document was not relevant,

22   which raises serious questions about their understanding of

23   what's relevant in this case and what's not and where they

24   draw the line.  But they then committed to, as is set forth

25   in their slide -- their Slide Number 6, they -- they said

1   that they were going to produce the 34 unredacted reports to

2   us by the end of the week and the related correspondence.

3   And we asked them, we asked them whether that included all of

4   the e-mails, because we didn't know whether they were pulling

5   the spreadsheets from a database or from e-mails.  And they

6   refused to answer.

7          And so while they've said they've produced it by

8   the end of last week, as soon as they knew that there was

9   going to be a hearing today, they pulled the plug on

10  producing anything.  And we haven't received it, Your Honor,

11  so we still don't have the 34 spreadsheets, we don't have the

12  e-mail transmittals.  And what's astounding, is as we look

13  through our production and search for it, we can't find a

14  single e-mail about these reports back and forth between

15  Charter personnel.  That you don't produce these reports

16  (inaudible) and not use them.  You produce these reports

17  because they get used.  That's why you've got KPI analysis in

18  them.  And they haven't produced a single one of those

19  e-mails.

20         So to answer their first question, was there

21  anything problematic with their treatment of document, the

22  answer is yes in at least ten different ways.  Then the

23  question -- then the question they ask is, Well, is there any

24  other further action warranted?  Well, and they throw out a

25  bunch of (inaudible), and they complain, Well, you know,

1    look, Mr. Abramov is the in-house litigation lawyer.

2            Your Honor, you know what was absent from

3    Mr. Shapiro's presentation to you?  One is that Mr. Abramov

4    was listed on their Rule 26 disclosures as the individual

5    with information about their program, their DMCA program and

6    its operation.

7            And then on top of that, in their rog responses to

8    us, they all disclose Mr. Abramov as the individual

9    knowledgeable about this -- the matters in this case.  So

10   they didn't pick Mr. Abramov because he's in-house litigation

11   counsel.  They identified him as the appropriate witness,

12   right.  And then they complain, well, the search terms, of

13   course, terms like copyright, we're going to have lots of

14   hits.  What they didn't tell you, Your Honor, is that there

15   were 25 different search terms that used copyright, but every

16   one of them had other limitations and requirements.  There

17   was not a requirement to search for just the term

18   "copyright."  I mean, it's these kinds -- these kinds of sly

19   statements that just mislead.

20           So the Abramov -- then they say in their

21   presentation, Oh, we've misrepresented the number of Abramov

22   documents.  We said it was 35 documents and they say it's

23   212.  Yes, if you add in the documents from the

24   spoliation-related discovery, which has nothing to do with

25   the hit counsel on the 27,000 hits, then, yes, it's 212, but

1   we weren't including spoliation documents or documents

2   related to spoliation.  We were including documents that went

3   to the merits of the case, and that number is 35.  But I

4   don't really care whether you take 212 or you take 35.  35

5   out of 27,000 or 212 out of 35,000, whatever the number is,

6   it's still going to be less than 1 percent.

7          And so their ability to identify and produce

8   responsive documents is very clearly -- is very clearly

9   wanting, and we have to find a way to deal with that in this

10  case.  So what is their response, and it's the response you

11  have to go to when you have nothing else, and that is

12  goose/gander.  Well, goose/gander doesn't apply here.  Well,

13  and I'll tell you why, because they haven't identified a

14  situation here where we're not producing documents that

15  should be produced.

16         Now, if they do and they come back and they

17  demonstrate that and they put forward then an appropriate

18  sampling process, we'll have a discussion about it, but they

19  haven't done that.  All they've done is say, Look, we have

20  several instances where their production numbers are very

21  low, but remember, the plaintiffs and the defendant here are

22  very differently situated.

23         When Charter is having an internal discussion about

24  peer to peer, that is directly related to this case, because

25  peer-to-peer infringement goes to directly to issues of safe

1    harbor, copyright infringement and plaintiffs knows this.

2            When the plaintiffs talk about peer to peer, it

3    could have to do with anything over the last 25 years of

4    fighting peer-to-peer piracy or around the globe that has

5    nothing to do with Charter, absolutely nothing to do with

6    Charter.  And the Special Master in her rulings did not

7    require us to produce everything related to peer to peer,

8    obviously, right.

9            Similarly, if you asked us to produce

10   communications about Mark Monitor, the music industry has

11   been using Mark Monitor, my guess is, for over 15 years, and

12   on many different things having nothing to do with the

13   notices to Charter.  And so the idea that the hit count is

14   low there is fine.

15           Now, we made an affirmative choice in our

16   back-and-forth meet and confers on discovery to accept larger

17   search strings in order to get them to, and we were willing

18   to do that knowing that when we did a responsiveness review

19   many of it would just not be related to this case.

20           So goose/gander doesn't apply, but if they can come

21   forward and demonstrate as we have that we have not produced

22   documents that should have been produced or we've made

23   relevance determinations that are improper, then we'll have

24   that discussion and we'll go through that process.

25           So the last point, but not least, you know, they

1    said they were going to produce the documents by Friday.

2    They didn't.  They still have not committed to producing all

3    of the documents related to the metrics reports and the

4    information contained within the metrics reports.  So that

5    remains outstanding, but that's minor compared to the larger

6    issue that this uncovers for us.

7            Thank you, Your Honor.

8            THE COURT:  Hold on, I need to take a brief matter

9    by phone, okay.  So you guys just mute yourselves, if you

10   don't mind.

11           (Recess was taken.)

12           MR. OPPENHEIM:  Your Honor, if I may make two final

13   points.  It's Matt Oppenheim again.  One is, the plaintiffs

14   have included as custodian numerous in-house counsel and

15   searched their files as requested by Charter, so I don't

16   want -- I don't want there to be any question about that.

17           Secondly, if I can leave you with one thing on the

18   merits of this.  Charter marked all 35 -- 34 versions of this

19   report and all the correspondence about it as nonresponsive.

20   That alone is all you need to know here to approve the

21   sampling request.  When you compound the misrepresentations

22   on top of that, there really can't be any question that we

23   need to solve this problem.

24           Thank you.

25           THE COURT:  Well, remind me what again we're --

1    again --

2              MR. SHAPIRO:  So, Your Honor --

3              THE COURT:  -- you guys live this case every day, I

4    don't.  What are we sampling?  We talked about it, I know,

5    Thursday.

6              MR. OPPENHEIM:  Yes, Your Honor, is that with

7    respect to three custodians, including Kirill Abramov --

8    sorry, Kirill Abramov, Culton Mave (ph) and -- I'm blanking

9    on the third one we proposed -- Laurie Ralett (ph), that

10   those custodians, that there have already been searches done

11   based upon agreed-upon search terms.  The documents that have

12   been collected based on those search terms have been uploaded

13   by Charter into their document system for review.  We have

14   proposed that they should produce every tenth document that

15   wasn't already produced that -- that is in those documents.

16   Because the documents have control numbers in their document

17   system, they should be able to produce every tenth document,

18   and we'll review them; that they should do -- obviously time

19   is of the essence.  They should do so within one week.

20              If they want to do a privilege review, that's fine.

21   If not, this is exactly where a 502 order would be

22   appropriate to avoid privilege problems down the road.  But

23   obviously time here is a problem.  We're supposed to be

24   starting depositions in the next two weeks, and, you know,

25   the trial we've been told is unmovable, and fact discovery

35

1    is -- is up in, I believe, in April.

2              MR. SHAPIRO:  Your Honor --

3              THE COURT:  Yeah, Andrew, can I ask you just a

4    couple questions, please.

5              MR. SHAPIRO:  Yes.

6              THE COURT:  So what Matt said was they had a

7    document request that specifically used the term "metrics

8    reports."  Is that true?

9              MR. SHAPIRO:  Yes, and may I elaborate on that?

10             THE COURT:  You may -- you may -- when I'm done

11   with my cross-examination, you can elaborate, okay.

12             MR. SHAPIRO:  Yeah.

13             THE COURT:  Is this report we're fighting about

14   called "the task metrics report"?

15             MR. SCHAPIRO:  This is a metrics report.  This is

16   one from April 2017.  There are others from the discovery

17   period.

18             THE COURT:  Right, but Matt said you guys call it

19   internally -- not you guys, your client -- call it internally

20   the task metrics report.  Is that true or not?

21             MR. SHAPIRO:  Yes, although that is something we

22   learned in November when the plaintiffs raised -- responded

23   to our objection on metrics reports, yes.

24             THE COURT:  Okay.  So would you agree with me that,

25   I guess maybe from podunk, Denver, Colorado, when somebody

1   asks for a metrics report and you got a report called a

2   metrics report, it sounds responsive.  Will you agree with

3   that?

4           MR. SHAPIRO:  Yes.

5           THE COURT:  Okay, so go ahead and explain.

6           MR. SHAPIRO:  All right.  So what I wanted goes say

7   goes (inaudible).  Mr. Oppenheim in his presentation conjured

8   this idea that we were struggling to hide the metrics

9   report -- whoever is typing -- we are struggling to hide

10  these metrics reports, because we knew that, quote, the game

11  would be up if we handed them over.  His whole theory is

12  based on that and it falls apart when we look at the facts

13  and the chronology.

14          Here is what happened:  Mr. Oppenheim was right.

15  In February they issue an RFP Number 70, asking for a metrics

16  report.  We -- as is the case with both sides' discovery

17  reports, we provide our responses and objections.  We object

18  saying that it would be burdensome to produce and that we

19  don't see the relevance of metrics reports to the case.  This

20  happens all the time in our discovery and their discovery,

21  and then we meet and confer and we work out some sort of

22  compromise.  They did nothing about it.  We objected.  We

23  assumed they were okay with our objection, which is also the

24  case, they may raise objections to us and sometimes we follow

25  up or sometimes we don't, because we say, all right, this one

1    isn't worth really pursuing.

2            In November, in November they come back to us and

3    say, Hey, what about these metrics reports, what about this

4    objection?  We then very promptly go back and start looking

5    more about okay, well, what do we have as metrics reports

6    because they're not taking our objection.  We determine that

7    this document that we had used to -- to answer

8    Interrogatories 13 and 14 is called a metrics report, and in

9    fact, there are multiple versions of them.  If we had known

10   that, we would have relied initially on the -- on the metrics

11   reports from the discovery period and never gotten into this

12   business about a report from 2017, but the problem with this,

13   in our view, has always been primarily the fact that it's

14   outside the discovery period.

15           We then agreed in November, before any of this came

16   to you, Judge Hegarty, that we would turn over the metrics

17   reports.  A mere matter of weeks after they said, Hey, what

18   about these metrics reports, we said, All right, we'll turn

19   them over to you, November 23, but only from the discovery

20   period, all right.

21           There was some follow-up hashing out with Mr.

22   Ehlers, though it wasn't (inaudible) in December in which

23   there were decisions made about what are called families of

24   up documents and e-mails, but it's entirely correct for Mr.

25   Oppenheim to say that it was only within a few days ago that

1    they learned that there were multiple versions of this.

2    There was an e-mail exchange between our side and Mr. Ehlers

3    in December, which made that clear.

4         So if you remove from this story the idea that we

5    were struggling to hide metrics reports, we told them in

6    December -- excuse me, in November, you can have these.  The

7    fight was only about this one from October of 2017, and that

8    the idea that this was all some scheme because we were

9    worried the game would be up would make us really the dumbest

10   conspirators in the world if we thought we could -- we could

11   hide the metrics reports by turning over all the metrics

12   reports that they asked for.

13        So if you take that out of the equation, everything

14   else that flows from it, the idea that there is something

15   suspicious about how we're -- we're reviewing documents goes

16   out the window.

17        And then this idea that they (inaudible) looking

18   Mr. Abramov's documents, yes, he's a custodian, and we've

19   provided the documents that are responsive.  His documents

20   have nothing to do with anything on this spreadsheet or

21   metrics reports, so I don't know how we got here other than

22   an effort by them to try and dig around in the files of a

23   lawyer.  So we think it would be entirely improper, there is

24   zero basis for that.

25        THE COURT:  Okay, let me ask a few more questions.

1    Number one, Matt, you were -- you were involved in the

2    Virginia litigation?

3              MR. OPPENHEIM:  Yes, I was, Your Honor.

4              THE COURT:  Okay.  Were metrics reports produced

5    and were they relied on in that lawsuit?

6              MR. OPPENHEIM:  I can't say that they were called

7    metrics reports.  I can't recall what they were called, but,

8    yes, in the Cox case we got a complete download of data,

9    including every ticket for the relevant period for the case.

10             THE COURT:  Okay, the equivalent of what you're

11   calling metrics -- I mean, if you didn't get metrics reports

12   out of that lawsuit, where did you even get the name metrics

13   reports -- how did you even know to put that into a discovery

14   request here?

15             MR. OPPENHEIM:  Yeah, I just don't remember what

16   the title of the document.

17             THE COURT:  Okay.  Well, but then, if you knew how

18   relevant they were, why did you wait from February until

19   November to raise the issue?

20             MR. OPPENHEIM:  Well, so we had many discovery

21   requests, Your Honor, some of which would have been, shall we

22   say, not overlapping, but would have hit it in other ways.

23   So and let me -- by the way, critical something to

24   Mr. Shapiro said, he said they issued their objection to our

25   request -- he agrees now, it wasn't April, it was February.

1   And he says they objected for burdensome and relevance, and

2   they said then after we came back in -- in the fall, said

3   then they went and searched.  That's -- see, this is -- this

4   is why they're having discovery issues.  You don't issue

5   objections until you search.  You can't say it's burdensome

6   or not relevant --

7          THE COURT:  I know.  I have a follow-up question to

8   that too.  I just want to know just purely why you waited

9   from February to November, and I think what you said is you

10  had a lot of other balls in the air, right?

11         MR. OPPENHEIM:  Right.  So, for example, excuse me,

12  Your Honor, RFP 61, which is a key -- a key discovery request

13  for purposes of this issue, we also served in February, it

14  sought all documents or communications, quote,

15  distinguishing, differentiating or otherwise comparing

16  Charter's responses to violations of its acceptable use

17  policies for reasons other than copyright infringement,

18  including for hacking or spamming to its responses to

19  violations of those policies on the basis of copyright

20  infringement.

21         We actually met and conferred repeatedly, and then

22  in May of 2021 -- excuse me, 2020, we moved to compel.  And

23  what Charter said to the Special Master that they do not

24  maintain -- quote, this information is not maintained in a

25  readily available spreadsheet or report.  That's a quote from

1  what they told the Special Master, and you can see it, Docket

2  181, on pages 30 to 31.

3        Let -- I mean, now look at this.  I mean, this

4  document is exactly what RFP 61 called for, absolutely, and

5  they represented to the Special Master that they didn't have

6  a readily available spreadsheet or report like this.  They

7  had 34 of them.  And when they agreed -- Mr. Shapiro said,

8  Well, in November we agreed to produce these.  Well, in

9  November they produced one.  They never disclosed they had 34

10 of them.  And the one they produced, the overwhelming

11 majority, probably 95 percent of it was redacted.  So to

12 suggest that they agreed to produce it in November is to

13 ignore that they were redacting everything from it, and then

14 they justified that redaction based on more

15 misrepresentations about it being out of the time period,

16 sensitive third-party information.

17        And it wasn't until the second time you told them

18 to produce the titles of the columns and the rows then it was

19 finally realized that they had exactly what RFP 70 and 61

20 called for, as well as RFP 34, 16, 69.  I could go on and on,

21 Your Honor.

22        THE COURT:  Okay, yeah, I have a few more

23 questions.  Andrew, I think I heard during your presentation

24 you said that this metrics report is what your side used to

25 answer Interrogatories 13 and 14.  Is that what you said?

1          MR. SHAPIRO:  Correct, several lines of it were

2     used to answer that question.

3          THE COURT:  Now, things may have changed since I

4     litigated, but when I was a litigator, I always included a

5     catchall request to produce all documents used in responding

6     to interrogatories.  Did the plaintiffs not do that here?

7          MR. SHAPIRO:  That I do not know.  Maybe one of my

8     colleagues could -- could tell me, but the Special Master

9     directed us to produce the lines of this sheet that were used

10    to answer an interrogatory and we did.

11         THE COURT:  Okay.  So another question I have is --

12    I probably said this before, but most judges keep -- keep a

13    little shaker on their bench with huge grains of salt, okay,

14    so I'm swallowing that salt right now in what you guys are

15    arguing, but what I am worried about, I guess at some level,

16    is that you maybe have so many people working on this that

17    communications are being lost, and that's what I'm worried

18    about.  I'm not worried about you personally because I think

19    I'm a decent judge of character, but I'm worried about the

20    people you necessarily have to rely on to give you

21    information both from your client and maybe within the

22    structure of the law firms that are handling this case.

23         So explain to me why that's not a legitimate

24    concern.

25         MR. SHAPIRO:  Your Honor, I think it's -- hello?

1          THE COURT:  We're here.

2          MR. SHAPIRO:  Can you still hear us?

3          THE COURT:  Yes.

4          MR. SHAPIRO:  Yeah, your screen has turned blank,

5  but as long as -- now you're back.

6          THE COURT:  Yep.

7          MR. SHAPIRO:  Your Honor, I think it is fair to

8  say, I would never stand up here and deny that in big

9  litigation sometimes there are communication issues and in

10  small litigations there are as well.  I think an important

11  communication -- an important miscommunication that seems to

12  have occurred on the other side in this case is they -- Mr.

13  Oppenheim still seems not to understand that on November 23

14  we agreed to give them all of the metrics reports from the

15  discovery period.

16          The document that has been fought about, it turns

17  out pointlessly and that's ultimately why we said let's just

18  unredact all this stuff, honestly, it's just another version

19  of that exact thing, but from outside the discovery period.

20  So I think there has been a miscommunication on their side.

21  We do our best to search and respond to discovery requests,

22  and I believe we have fulfilled all of our duties in that

23  regard.

24          I don't think there is anything surprising or odd

25  about the fact that it was only in November when they said to

1   us, Hey, we want to talk more about metrics reports, that we

2   did more digging and determined that there were metrics

3   reports from the discovery period.  We had objected early --

4   I don't think it's correct for Mr. Oppenheim to say, You need

5   to go and search for -- to find out how many total specific

6   documents there are in a certain category before you can

7   object and say, This seems like it would be disproportionate,

8   because in many instances, that would be self-defeating.  A

9   part of the work is going to all the different people and

10  finding out if these things exist.

11          And our point was, what do you need metrics

12  reports -- maybe there is another miscommunication here.

13  These documents are not -- the Special Master specifically

14  and correctly said this.  These source reports are not

15  detailing what are called customer-facing action, which is

16  what RFP 61 calls for.  Mr. Oppenheim may stretch to find one

17  item or two items out of the, you know, hundreds of fields in

18  here that he might say are customer-facing action.

19          These metrics reports are internally used by the

20  security team to make sure people have enough work or not too

21  much work.  It's just watching the staff and saying how many

22  items are they dealing with in abuse.  These -- I guarantee

23  you, if we had produced this in response to RFP 61, we would

24  be here with them objecting.  This is nonresponsive because

25  it doesn't show customer-facing actions.  They need to give

1   us customer-facing actions, which is what the Special Master

2   ordered us to do.  We had to go and create, it's on one of

3   our sides, an entire report in response to RFP 61 from the

4   CATS system itself showing what we did to customers.

5           So the argument that this is responsive to RFP 61

6   is incorrect and was correctly rejected by the Special

7   Master.

8           THE COURT:  Right.  Well, I'm never going to get

9   you all to agree and you would be here, well, indefinitely.

10  So, you know, you keep saying being produced in November.

11  What Matt is saying is, yeah, but 95 percent redacted with no

12  headings.  You know, I understand that, but I guess --

13          MR. SHAPIRO:  Well, we're to give them everything

14  unredacted now --

15          THE COURT:  No, I know you are now.  When will that

16  happen, by the way?

17          MR. SHAPIRO:  I think it happened today, this

18  morning, Ms. Alvarez, or it's happening today.  We need over

19  the weekend to do a quality check.

20          THE COURT:  Well, if there is someone --

21          MR. OPPENHEIM:  We did get it (inaudible) during

22  the hearing, Your Honor, so obviously we couldn't have viewed

23  the documents before the hearing.

24          THE COURT:  Okay, but are you saying you got them?

25          MR. OPPENHEIM:  I have no idea, Your Honor, but one

1    of the -- in fact, what's interesting, and now revealed by

2    Mr. Shapiro's PowerPoint presentation, is the RFP -- the

3    interrogatory that they provided us was apparently based off

4    of a metrics report from 2017, and we did, by the way, have a

5    document request for the documents underlying the

6    interrogatory, so we had that request.  They didn't produce

7    it in response to that.

8           They're now saying that they're going to produce

9    the metrics reports, but they're not actually going to

10   produce the metrics report that was underlying the data that

11   they provided us, because they're claiming that the one that

12   they used -- so -- so Mr. Shapiro is saying we agreed to

13   produce it.  They didn't agree to produce it.  They redacted

14   it.  We had to come to you, we had to go through this lengthy

15   process.  It was only after they lost and lost and lost and

16   were forced to -- yes, now they're claiming they're going to

17   produce it, but they're not producing the one that actually

18   underlies the interrogatory response, nor have they agreed to

19   produce all the documents related to the metrics reports, for

20   which we have -- I think we found one document that

21   references metrics reports.

22           MR. SHAPIRO:  Right, maybe --

23           THE COURT:  Well, you blanked out -- you blanked

24   out when you explained the reason why they weren't producing

25   the one that they used to rely on answering Interrogatories

1   13 and 14.  What do you think their explanation is?

2          MR. OPPENHEIM:  Well, their explanation is it's

3   outside the discovery period, but that's the one they used.

4   They chose to use that one, as I understand it.

5          MR. SHAPIRO:  Your Honor, maybe I'm not being clear

6   enough, but that's completely incorrect.  The Special Master

7   correctly said, Produce the document, but just produce the

8   lines that you relied on, and that's what we did.  We

9   produced the five lines that -- that actually supported the

10  interrogatories, the lines we relied on.

11         And then there was this whole fight about, oh,

12  well, should it be produced, what about for other reasons

13  separate and apart from what you relied on for the

14  interrogatory, and that's when we turned into the fight that

15  has brought us here about this 2017 document that we relied

16  on.  But we said, Fine, we'll give you all the other metrics

17  reports from the discovery period, what they want.

18         THE COURT:  Well --

19         MR. OPPENHEIM:  Your Honor, the reason the Special

20  Master limited the production to that is because they

21  represented to the Special Master that the report had

22  information outside the time period and sensitive third-party

23  information.  It was based on those representations, all of

24  which were not true we now learn.

25         THE COURT:  Okay, but I've still got to go back to

48

1    the issue of where does that leave us.

2            MR. SHAPIRO:  I think --

3            MR. OPPENHEIM:  -- there is one issue, Your Honor,

4    that Mr. Shapiro raised, and that is that this document does

5    not respond to the request about customer-facing actions.

6    Again, this is simply not true.  This document describes how

7    many postcards did they send to customers; how many of them

8    were returned; how many of them were resent; how many phone

9    calls were made outbounds regarding DMCA notices; how many

10   were inbound phone calls came because of them; how many times

11   did customers log on to the website to see the DMCA notices.

12   All of this is customer-facing action.  It's not every line

13   of the document, but it is substantially in the document, and

14   those lines were redacted among many, many others.

15           MR. SHAPIRO:  Your Honor, it's about four lines of

16   the document, all of which were encompassed in the much

17   broader and more detailed report from CATS that the Special

18   Master ordered us to produce.

19           You asked a moment ago, Judge, where does this end.

20   And I don't wanted to be presumptuous, but I will because it

21   where I think this leaves us -- leaves us or should leave us.

22   It leaves us with, I suppose, a reminder to both sides to

23   make sure we -- we are expansive in the way we respond to

24   discovery requests, a reminder to both sides to be clear in

25   our meet and confers or after our meet and confers what we've

1   actually agreed to and what we're not agreeing to so we don't

2   get into this situation on whether we standing on objection,

3   acquiescing to the other side's objection or have open

4   issues.

5           And it leaves us with -- if the plaintiffs actually

6   believe that we misrepresented a thing to the Special Master,

7   it leaves us in a position where they should go back to her,

8   and, you know, she can sanction us if we've done that.  I

9   would welcome the opportunity to hash it out in front of her

10  because we've misrepresented nothing to her.

11          THE COURT:  Okay.  Well, what I think I -- I need a

12  metrics report myself is what I need, and this is what I

13  need.  I -- I need to know -- I need to have a cumulative

14  position from both sides of discovery requests that either of

15  you believe have not been properly responded to.  I want to

16  know the universe of disputes that exist out there.  Now, is

17  that doable from the plaintiffs' side?

18          MR. OPPENHEIM:  Can I ask a question to understand

19  what you're looking for a little better?  When you say

20  request that had not been properly responded to, are you

21  referring to the production of documents or are you referring

22  to the responses and objections that lawyers send?  I assume

23  it's the former, not the latter.

24          THE COURT:  Well, I don't -- I think those are so

25  intertwined you can't separate them from one another because,

50

1  like you said, they gave you objections in whenever, response

2  to the February RFP and, you know, those objections are tied

3  intimately to what exists, what their knowledge is.  I mean,

4  they're all in, you know, just horses of different colors.

5       I guess I'm asking this:  Let me get an idea of how

6  many written discovery requests have been propounded.  From

7  the plaintiffs' standpoint, how many RFPs, how many

8  interrogatories have you issued?

9       MR. OPPENHEIM:  Give me one moment, Your Honor, I'm

10  asking my team members who will hopefully have that

11  information.  I think we've issued somewhere in the 90 range

12  in terms of requests for production, and I'm not sure about

13  interrogatories.  Give me one moment.  I think we've issued

14  around 20 or so interrogatories, maybe slightly more.

15       THE COURT:  By the way, I'm going to ask the same

16  question for the defense, so . . .

17       MR. SCHAPIRO:  Yeah, we figured, we're looking.

18  And I can answer for us, if you want, while Mr. Oppenheim

19  looks.

20       MR. OPPENHEIM:  I thought I was done.  Did I not

21  answer entirely?  Sorry.  It's slightly less than 100

22  requests for production and in the 20s the number of

23  interrogatories.  So 97 RFPs and 25 -- no, sorry, 20 or so

24  rogs and I think -- but go ahead, 21 rogs, sorry.

25       THE COURT:  What's your limit?

1          MR. SHAPIRO:  25 and 100, I believe.

2          THE COURT:  All right.  How many, Andrew, on your

3   side?

4          MR. SHAPIRO:  So, Your Honor, we've issued our

5   numbers with up to the limits, 25 interrogatories, 25

6   requests for admissions, 100 requests for production.

7          THE COURT:  All right.  So I need to know what's

8   still in dispute out of each of those camps.

9          MR. OPPENHEIM:  So, Your Honor, we can certainly

10  create a chart about what's in dispute of the -- those

11  requests.  It's difficult to know what they've failed to

12  produce other than by observing, you know, an absence of the

13  documents within their production.  That's why the sampling

14  process on a limited number of custodians we thought was the

15  appropriate way to get at this.

16         THE COURT:  Right.  Well, here is what I -- here is

17  what I think.  I think you need to identify deficiencies,

18  they do.  You trade.  You see if you're missing something

19  when they tell you, Oh, you don't remember this, but in

20  response to Request for Production Number 22 we gave you this

21  and you said okay.

22         All right, I need to know true disputes after a

23  conferral process, and then, you know, I -- I recognize the

24  time pressures you guys have, but I've got to take

25  responsibility for my jurisdiction, and so I need those

```
 1    resolved right in the next couple weeks also to make orders

 2    to clean everything up so that I can hand off a case to Judge

 3    Jackson where you guys at least feel that you've done your

 4    job for your client in preparing and gathering information

 5    for trial.

 6              And at the end of that process, you know, it's the

 7    first time since March, but I'm just going to have to have

 8    you here.  Send whoever you want, but we're going to set

 9    aside a day, roll up our sleeves.  I may not even be among

10    the bench, I may be down among the common people and just

11    getting these done, because I don't want these things to

12    fester and to go on indefinitely.

13              So give me an idea how long -- you guys have been

14    dealing with one another now for quite awhile.  How long will

15    the process take that I've just requested that you identify

16    deficiencies?  And please be as narrow as possible.  I mean,

17    this is not Christmas.  Christmas has already past.  Or

18    Hanukkah or whatever.  It is -- it's lean times in January or

19    February.

20              So be judicious, bring me true disputes, and I'm

21    just going to resolve all of them and somebody will take

22    notes during that session and provide a summary of what I'm

23    ordering.

24              So how long will that process take to gather what

25    you think is efficient, share it with one another, cross off
```

1    a few things and then bring me a list of true disputes?

2           MR. SHAPIRO:  Your Honor, I think -- I haven't

3    consulted with my colleagues, although I'm trying to do so in

4    the chat, but I would guess maybe three weeks, if we want to

5    be comprehensive.  Matt, what do you think?  I mean, I'm open

6    to your thoughts as well.

7           MR. OPPENHEIM:  I think that we should be able

8    within a week to exchange a list and then -- and then meet

9    and confer on those lists maybe a week later.  So -- so I

10   don't think the three weeks is -- is wrong.  That may be

11   right.  I -- I'm not sure, though, Your Honor, two things.

12   One is, it does nothing to address the main issue we've

13   identified throughout these two hearings, which is Charter's

14   failure to produce responsive documents, because we'll sit

15   down with them and they'll say exactly what Mr. Shapiro just

16   said, which is, We've done a review and we've identified

17   responsive information, we've produced it, and we now know

18   through this process, but that's not true.  They don't --

19   they don't know what's responsive and they object before they

20   actually even look.

21          So the process that you're setting forth, Your

22   Honor, won't get it all to really the mainstay of the

23   problem.  Though I -- though I welcome the invitation to

24   resolve the outstanding objections, it doesn't get to the

25   production issue.

54

1         Secondly, I'm not sure what it means for purposes

2    of scheduling depositions.  Should we wait on scheduling any

3    further depositions until this process is completed?  And I

4    invite Your Honor's thoughts on that.

5         THE COURT:  No.  Again, you guys have got to run

6    your own case as far as what you need in discovery.  I only

7    handle disputes.  So you have to decide yourself whether you

8    can proceed intelligently with depositions or not.  That's

9    your call, okay.

10        But I think this does get to exactly the problem.

11   I mean, ultimately you guys have been around enough to know

12   that you're probably never going to be satisfied that you

13   have everything.  Can you accept that?

14        MR. OPPENHEIM:  That is a certainty, Your Honor.

15        THE COURT:  Okay.  Well, I think neither of you

16   will ever be satisfied that the other side has turned over

17   everything they're supposed to.  All I can do is take the

18   information I'm presented and make the orders that I feel

19   necessary, but ultimately I'll never persuade both of you

20   that -- that the other side has been completely transparent,

21   efficient, comprehensive in what they've done.

22        So we all know that therein lies the inherent

23   problem with the justice system and discovery is, to a very

24   large stint, it relies on a huge element of good faith and

25   abiding by the oath that you all took when you got your

1    license.  You know, I'm not in a position where I can take

2    one of Matt's associates and just force Winston & Strawn to

3    hire that person and have them be inside and watch everything

4    that's going on.  I mean, that's not the way it's done,

5    right?  We've got to trust each other at some level.

6            So I'll deal with this as well as any judge really

7    can.  You know, what I -- what I want to do is either on the

8    22nd or 23rd you guys pick the day to set aside the whole

9    day.  I would like to have some people present.  Some people

10   could appear as needed even all day by video because, you

11   know, we have the ability to do that, and I need people who

12   know what's going on to be able to respond to questions and

13   we'll go through each of the remaining issues that you have

14   and I will issue orders appropriate.

15           MR. OPPENHEIM:  So, Your Honor, I (inaudible) --

16           MR. SHAPIRO:  And --

17           MR. OPPENHEIM:  -- the production issue, because,

18   you know, I -- I was lead counsel in the Cox case and I

19   know -- I've litigated ISP cases, and I know what we should

20   be expecting to see in a production of documents.  And the

21   lawyers figured out that what happened in Cox they don't want

22   to repeat again, so we don't have the internal discussions

23   that we should be getting.  And this process you've set up,

24   while very usefully and I appreciate it, will not get that at

25   all.  And so Your Honor last week, based on the presentation

56

1    we made, was inclined to say a sampling process was

2    appropriate to see whether or not Cox had, in fact, produced

3    responsive documents.

4          THE COURT:  Why do you think what I just said --

5    Matt, why do you think what I just said is exclusive of that?

6    I mean, you know, or actually inclusive of that?  I'll make

7    an order on that today, but I can't let other disputes just

8    be out there and take these piecemeal or you guys will never

9    be ready for trial.

10          So I'll deal with that one today.  All I'm saying

11   is, I don't know what I don't know, but I know it's coming

12   down the tracks some day at me, and I just want to have it

13   all out early -- as early as possible.

14          MR. OPPENHEIM:  Your Honor, I apologize if I

15   misunderstood that you were going to issue an order on a

16   sampling process.

17          THE COURT:  Yes.

18          MR. OPPENHEIM:  So, yes --

19          THE COURT:  That's what we're here for today,

20   right, but I just see this coming again and again and again,

21   and, you know, at the moment I'm not bad for time.  I've been

22   fully staffed, all my law clerks and I have come in every

23   single day since this thing started and we are as caught up

24   as anybody in America on our motions list, and so I have some

25   time right now that I'm willing to give you guys because this

1    merits some attention, so that's all I'm saying.

2         MR. SHAPIRO:  Judge, the 22nd works better for us,

3    I think, or at least for me.  I haven't consulted with

4    others.  I'm not sure who will be participating, but Monday

5    is a little bit better than the Tuesday, on this end.

6         THE COURT:  Well, that's probably better Monday

7    because it might be Monday and Tuesday.  All right, so just

8    getting back to the issue de jure, so I guess were we going

9    to be hearing from you right now, Andrew, on the proposed one

10   out of ten?

11        MR. SHAPIRO:  Well, if by that you mean that you're

12   inclined to order some sampling, I, first of all, hope that

13   we've persuaded you that sampling is not called for and

14   inappropriate here of any kind, and so I guess I need to know

15   that first.  If we're talking about numbers, where --

16        THE COURT:  Well, I want (inaudible) we're

17   sampling.  I know there is three document custodians that

18   Matt talked about.  I don't know what they are in custody of,

19   so that's a little bit vague to me.  So please explain what

20   exactly you're proposing, Mr. Oppenheim.

21        MR. OPPENHEIM:  Certainly, Your Honor.  So

22   Mr. Abramov we have -- all three, I believe, Your Honor, of

23   the individuals I believe are nonspoliated custodians.  Many

24   of the individuals who we've been told could have responsive

25   documents, those documents, the preservation was spoliated.

1    So we selected three where we understand they were not

2    spoliated.  Mr. Abramov was -- all three, I believe, were

3    identified by defendants as individuals who had information

4    relevant to the issues in this case.  Because of that,

5    Mr. Abramov in particular, because while he was identified as

6    having information, the scant number of documents we

7    received, it just on its own raises serious, serious

8    questions.

9            THE COURT:  Let me -- hold on, let me ask you a

10   question.  We don't normally discover against a person, okay.

11   We don't say you're a custodian of documents, give us 10

12   percent of everything you have.  You have to identify

13   categories of documents that are relevant to the case.

14           So I'm not -- I'm not understanding, are you

15   actually wanting to just get all the documents this guy has

16   of any kind?

17           MR. OPPENHEIM:  No, I'm sorry.

18           THE COURT:  Explain yourself.

19           MR. OPPENHEIM:  Yeah, let me back up, I'm sorry, I

20   shorthanded it.  Let me -- let me back up.

21           The parties have negotiated based on the search --

22   based on the discovery request, negotiated search terms, and

23   those terms are actually not just terms, they're fairly

24   complex search strings.  We managed, I think, to negotiate

25   most of them cooperatively.  There were several that we had

59

1    disagreements about and we -- we litigated what the search

2    string should be before the Special Master.  And based on

3    those search strings, the parties were obligated to go search

4    certain custodians that were agreed upon.

5            Now, initially Charter refused to include

6    Mr. Abramov, and we had to litigate the issue ever whether

7    Mr. Abramov should be included, and we litigated that to the

8    Special Master.  And she agreed, yes, he should be included

9    absolutely.  They made the same arguments Mr. Shapiro made

10   here, oh, he's in-house litigation counseling, he oversees

11   the case, but she recognized, as I've described earlier

12   today, he's listed in their Rule 26 disclosures, he had --

13   and in their interrogatory responses and he was responsible

14   for overseeing this program during the relevant time period.

15   And so we had agreed upon search strings.

16           And they said, Well, these -- the searches of

17   Mr. Abramov's files will be way too burdensome.  And she

18   said, Well, tell me how many hit counts there are for that

19   individual based on the agreed-upon search terms.  And they

20   came back and they described that it was roughly 27,000

21   documents.  And she said, Well, that's not too burdensome for

22   you to review, so you should review those and produce any

23   responsive documents.  And they said, Well, many of them may

24   be privileged.  And she said, Well, you should log anything

25   that's privileged.

1            In response what we got was what we have described

2    to Your Honor, which -- which was a paltry production of I

3    believe it was 35 documents and 100 -- 100 some on their

4    privilege log out of 27,000, less than 1 percent.

5            So one of the key people they described as

6    responsible for overseeing the program based on narrow search

7    terms, they've been negotiated and agreed upon by the

8    parties.

9            So just looking at that has raised concerns and

10   we've gone back and we've tried to talk and they -- you know,

11   their response is, We've reviewed them.  So serious questions

12   about responsiveness there.  And those -- by the way, those

13   search terms are limited to the agreed-upon discovery period.

14           THE COURT:  Okay, so --

15           MR. OPPENHEIM:  So it's not getting --

16           THE COURT:  -- all you want is a sampling of an

17   already segregated identified batch of documents for which

18   some have been produced, but very little, some have been

19   identified as privileged, very little, and so they would take

20   every -- they would take some percentage of those, some

21   whatever if I ordered it, whatever I would order, they would

22   again review those for privilege, but absent privilege and

23   putting the sampled documents that are privileged on a

24   privileged list and providing that to you, they produce

25   everything else.  That's what the point is, right?

1          MR. OPPENHEIM:  That's correct, Your Honor.  Every

2    one of the documents has already been uploaded into their

3    discovery system and should already have a control number,

4    and so we know it's within the discovery period, we know it's

5    responsive to an agreed-upon search string.  It's already in

6    their search system -- their discovery system, and so we

7    simply ask that they be required to produce a sample of those

8    documents for those three custodians.

9          We didn't ask for all custodians; we limited it to

10   three.  And we'll see what we get back.  And based on what we

11   get back, if there are responsive documents in there, then

12   there will be appropriate to have a further discussion about

13   how do we solve this problem.

14         But if Mr. Shapiro is right and their production is

15   proper and they've been producing the responsive documents,

16   then the issue will be -- be over.

17         MS. RANAHAN:  Your Honor, if I could just speak to

18   the history of Kirill Abramov in particular, because again

19   he's in-house litigation counsel and we had a lot of

20   discussion before this Special Master on him.

21         So originally we did include him on Rule 26, but

22   then said because we expect nearly every one of his

23   responsive documents to be privileged, that we didn't know

24   that the burden would be worth it.  We went before the

25   Special Master multiple times, she had three hearings on

1   this.  She originally ordered us to meet and confer and

2   figure out if we could find a way to isolate the

3   nonprivileged documents to make it less burdensome.

4          We then ran hit counts and ultimately he submitted

5   a declaration that he did not expect -- this is Kirill

6   Abramov in-house counsel for litigation at Charter, all

7   litigation at Charter.  He submitted a declaration and said,

8   You know, I do not expect to have nonprivileged responsive

9   documents in this case.  Special Master knew that.  She said,

10  Well, let's at least go through them -- even though we're

11  applying these broad terms, let's at least go through them.

12  He submitted a declaration that he said he didn't expect it.

13  Let's just log the ones that are responsive.

14         So there was never an expectation that Kirill

15  Abramov, in-house counsel for all Charter's IP litigation

16  matters, would yield such a huge number of nonprivileged

17  responsive documents.  And plaintiffs knew that, the Special

18  Master knew that.  She thought it would be logged.

19         And when we ultimately did produce the 200, this is

20  now, sounds like, just his e-mails have zero to do with this

21  spreadsheet issue.  They were not sent to Kirill Abramov who

22  is not located there, but it feels like this is a backdoor

23  way to now get access to our in-house counsel litigation

24  privileged e-mails, which I know at the last hearing the

25  suggestion was just claw it back if it turns out to be

```
 1    privileged, which is just -- we have not breached this.  This

 2    was just raised for the first time on Thursday.  Our in-house

 3    counsel has the most sensitive information of all to Charter,

 4    all those e-mails, and we're just going to be handing over

 5    potentially privileged documents.

 6              THE COURT:  No, nobody said that.  Nobody is saying

 7    that, number one; but number two, did you list him as a

 8    document custodian?

 9              MS. RANAHAN:  Not as a document custodian.  We

10    listed him as an individual with information that's relevant

11    to this case.  And we do know that because he does the

12    policies, he does, but having a bunch of privileged e-mails

13    doesn't eviscerate the fact that he has some relevant

14    knowledge, and this is exactly what we went -- again, we had

15    like three different discussions with the Special Master on

16    this exact issue --

17              THE COURT:  Right.

18              MS. RANAHAN:  -- because protecting his privilege

19    communication was very important to Charter.

20              THE COURT:  But the capacity in which you

21    designated him as a person with knowledge is a fact witness,

22    correct?

23              MS. RANAHAN:  And we ultimately agreed to search

24    all his e-mails for this reason before the Special Master

25    ordered it, by the way, she said meet and confer.  We met and
```

1  conferred and we agreed that we would -- because we needed to

2  make sure we saw them all before we turned any over.  Because

3  of how sensitive they were, we agreed that it was worth the

4  company's time to review all of those e-mails.  Even though

5  things like copyright is going to yield, because he's

6  overseeing dozens and dozens and dozens of litigation matters

7  for Charter, is going to have (inaudible) hits on these broad

8  terms.  They were not tailored terms, they were very broad.

9         THE COURT:  Right, but no one.

10         MS. RANAHAN:  So something like copyright.

11         THE COURT:  But no one is talking about you

12  wholesale producing privileged documents.  We've already

13  discussed that you put privileged documents on a privilege

14  list.  I mean, you don't think -- unfortunately, there are a

15  lot of documents at issue here, but that doesn't immunize you

16  from having a privilege list, does it?

17         MS. RANAHAN:  Well, I think that was the

18  suggestion, which was that we just produce one out of ten,

19  regardless of privilege, and we claw it back later, which is

20  obviously a huge concern.

21         THE COURT:  Well, that's not what I'm going to --

22  that's not what I'm going to order.  So it --

23         MS. RANAHAN:  And also, Your Honor, I would just

24  say that your proposal makes perfect sense, that we do this

25  within the context of request and not just a backdoor way to

65

1    just get one out of ten.  I think it would make more sense

2    for you to consider what would be an appropriate solution

3    after we do this meet and confer.  We have never meet and

4    conferred -- met and conferred on any of this.  This was

5    raised for the first time Thursday before you.

6            We had a huge deposition Friday in this case and

7    now here we are, and I just think it makes more sense for us

8    to have a discussion.  We've never even met and conferred on

9    this.  We skipped right through Special Master.  So I think

10   before any sampling is ordered, it should be in the context

11   of requests and where that makes sense within the request, if

12   it makes sense.

13           THE COURT:  Whose deposition did you have on

14   Friday?

15           MS. RANAHAN:  So Friday we had -- and this

16   dovetails into another issue, Your Honor, which may make

17   sense to raise now.  We had a 30(b)(6) for UMPG.  Mr. Shapiro

18   took that deposition.  I was also participating on the phone

19   so I heard the whole thing, but that was all day.  That was a

20   30(b)(6), the very first deposition in this case.  We were

21   there all day Friday.

22           We've yet, since Thursday, had the chance to

23   consult with our client who now potentially has e-mails and

24   other, you know, sampling searches.  So I just think it would

25   be premature to order something like this when we haven't

1    briefed it, we haven't had a chance to meaningfully consult

2    clients.  And it's basically seeking a sanction for us

3    agreeing to something in November that they raised in

4    November.

5           I mean, they're essentially asking for a wholesale

6    search because of a request that we agreed to the same month

7    that they raised it with us, and without meeting and

8    conferring and without going through the Special Master,

9    we're now here with a -- it's essentially a sanction request.

10   It's saying we should be punished because in November we

11   agreed to produce something when they raised it, and

12   therefore, all of our -- the integrity of our entire e-mail

13   search and collection is now under some scrutiny, which is

14   just not appropriate.  It's not connected to this --

15          THE COURT:  Well, the concept of -- I mean,

16   punishment can only come from a judge in a context like this,

17   right?

18          MS. RANAHAN:  Right, but something like a sampling

19   of us -- we have undertaken great expense and resources to

20   review these documents.  We've spent, you know, enormous

21   resources to make sure we're getting all the responsive

22   documents.  We've reviewed hundreds of thousands of

23   documents, and to now just hand them over one out of ten to

24   the plaintiffs for this, for this issue that was so, so

25   heavily litigated on the spreadsheet before, before Special

1    Master, that we voluntarily agreed to -- if we were trying to

2    hide the ball, wouldn't we have at least taken up request 70

3    up to the mat and tried to fight it.  We agreed before they

4    even brought a motion to compel on request for 70 to your

5    attention.

6            It was completely -- it was agreed to in November.

7    Within the context that they raised it, we agreed to it, it

8    has now been produced.  And so now here we are, without even

9    meeting and conferring, suggesting that the entire production

10   needs to be undone.

11           So I would just request that your proposal, which

12   is a very good one, that the parties go through each of the

13   requests, identify specific concerns by request, and we

14   confer on those and figure out what makes sense.  But to

15   just, based on this story, based on this spreadsheet that we

16   agreed as soon as they raised it in the context of metrics,

17   to have that our agreement before any litigation somehow

18   result in this unearthing of one out of ten our documents

19   custodians is just way over the line.  It's not connected or

20   proportional to the issue, and I think at least a meet and

21   confer is warranted.

22           THE COURT:  Well, it's one out of ten of apparently

23   the results of a search, correct?

24           MS. RANAHAN:  Right, but those searches have

25   nothing to do with the spreadsheet about which they brought

1    it to you, nothing.

2            THE COURT:  No, I know that, I know that, they're

3    different issues, I understand, but they're still an issue.

4    So --

5            MS. RANAHAN:  I don't know that there is an issue.

6    I think this was a very -- this issue was very narrowly

7    litigated.  We had several hearings in a different context.

8    The post-2017, different request at issue, and now here we

9    are with 70 that never got litigated because we worked it

10   out.  So I don't think there is an issue.

11           I think that once we go through these numbers,

12   you'll realize that the hit rates are very similar, that

13   there is a lot of broad terms that turn up a lot of

14   nonresponsive information, and I don't know that this -- this

15   is some red flag.  I think we have to do the work first, meet

16   and confer, compare the spreadsheets and see where that gets

17   us.

18           But to suggest that this spreadsheet issue that was

19   so, so heavily litigated, we did everything we could before

20   the Special Master, she considered this very closely, we then

21   met and conferred with them in good faith, agreed to produce

22   it, that that would somehow now lead to questions about the

23   whole production, I just don't see how that follows.

24           MR. OPPENHEIM:  Your Honor, the fact that counsel

25   continues to tell you that they agreed in November to produce

1    these metrics reports is very telling, because even that is a

2    whitewash, and you know that.  They -- they produced one and

3    they redacted 99 percent of it.  They didn't agree to produce

4    it, and they still don't produce it after the hearing last

5    week.  I still haven't seen them, right.

6            This idea that they've produced the documents, and

7    they keep telling you this, this is exactly why we've got a

8    problem.

9            MR. SHAPIRO:  Your Honor, if this turns on whether

10   we agreed in November to produce the documents, we will

11   happily within six hours give you fully documented proof of

12   that and then we can be done with this.

13           THE COURT:  Well, no, I -- I'm done with it now.

14   So what I would like you to do is -- do you have these

15   search -- results of the search, 27,000 documents, is it in

16   some kind of electronic format?

17           MS. RANAHAN:  So, again, that's Kirill Abramov's

18   e-mails only.  That's our in-house counsel's e-mails that

19   were --

20           THE COURT:  Fine.

21           MS. RANAHAN:  So that is --

22           THE COURT:  Is it segregated, accumulated and

23   sitting in some kind of electronic file?

24           MR. OPPENHEIM:  Yes, they will have it in their

25   discovery system, I'm sure.

1          THE COURT:  No, I'm asking them.

2          MR. OPPENHEIM:  I'm sorry.  Well, I'm sorry.  Well,

3     I know how we do it.  We're doing it the same way, we've

4     talked about it, so I know they have it.

5          MS. RANAHAN:  We have millions of documents that we

6     have collected that are sitting -- what they're talking about

7     was the original hits on our in-house counsel that again, we

8     didn't --

9          THE COURT:  I know what you're talking about.  Do

10    you have those segregated and in some finite, electronically

11    stored form?

12         MR. SHAPIRO:  I don't know, Your Honor.  I can find

13    out quickly.

14         THE COURT:  Okay.  Well, bring it on the 22nd,

15    okay?  That will be --

16         MS. RANAHAN:  (Inaudible).

17         THE COURT:  Pardon?

18         MR. SHAPIRO:  Okay.

19         MR. OPPENHEIM:  Could you repeat that, Your Honor?

20         THE COURT:  Yeah, I want you to bring it with you

21    on the 22nd so I can sit there and look at it with you.

22         MR. SHAPIRO:  And it is the 27,000 documents which

23    we can do electronically or the answer to how we have it

24    stored?  We're happy to do whatever, either.

25         THE COURT:  No, bring it on a -- bring it on a disk

1   that you can run off some kind of software on a computer that

2   you bring with you.

3          MR. SHAPIRO:  Okay.

4          THE COURT:  Keep it all internal to yourself.  I'll

5   sit next to you or somebody and look at it, appropriately

6   masked up, I guess, if I need to be, and then -- and then

7   take a look for myself.  Okay?

8          MS. RANAHAN:  And you're talking about only

9   Mr. Abramov's or the whole? because that was count for

10  Mr. Abramov, I believe.

11         THE COURT:  The three custodians that Mr. Oppenheim

12  is referring to.  Okay.

13         MS. RANAHAN:  There is one more issue, Your Honor,

14  if we could raise, and this is something you had denied

15  without prejudice on earlier -- at an earlier time.  At our

16  first very first initial teleconference with you, we raised

17  that we needed to have -- as you know, plaintiffs are raising

18  statutory damages of billions of dollars between this and the

19  Florida case.  They have brought a certain number of works,

20  11,000-plus works, and what you previously ordered as far as

21  financial track by track was that we could get whatever was

22  produced in the Cox case.

23         The Cox case doesn't include 3- to 4,000 of the

24  works that are only here in this case, and also, only covers

25  a portion of the claim period at issue in this case.  So it

1    doesn't have anything from either 2015 or 2016.

2           So we have a portion of the track level

3    financial -- when I say track level, it means the works

4    specifically for which plaintiffs are seeking 150,000 per

5    work.  We have only a portion and only a truncated time

6    period.  So we -- in the 30(b)(6), for instance, that we had

7    on Friday, the witness was presented with this Cox data and

8    was confused by why, you know, it wasn't for the full claim

9    period and seemed to have not the works at issue.  And I

10   have -- at least there are several reasons why it's

11   appropriate now for us to try to come back to you and try to

12   figure out how to revisit this.

13          So first of all, I think you're -- one of your

14   initial concerns was, we're not going to be presenting for

15   11,000 works individual financial information to the injury,

16   because it's not a realistic thing, which is -- I agree with

17   that.

18          But what we could do -- and I had a trial in March

19   of 2020 against many of the publishers at issue in this case,

20   where we had track level financials for every work for the

21   whole claim period.  We were able to find certain examples

22   that were the lowest or that didn't yield any financials, and

23   I think specifically cross witnesses about those.

24          THE COURT:  Are we losing the video?

25          MS. RANAHAN:  So right now we don't have -- we

73

1   don't have full claim period financials for anyone, for any

2   single work, and we also don't have the full scope of the

3   works at issue.  There is, again, several thousand missing.

4           So -- and also, of course, we would love our expert

5   to be able to do a comprehensive synthesis of all the works

6   at issue for the time period at issue.  And at present we

7   can't have our expert do that either because he's, again,

8   only given the work at issue in Cox.

9           Plaintiffs have not agreed to do that because they

10  say there is some burden involved, though, again, we haven't

11  had any specific burden.  They were able to isolate this

12  information to produce in Cox.  To suggest that they don't

13  track on a song-by-song basis is just not realistic.  We've

14  had -- we've had track by track produced in this case I'm

15  referring to in March that us against the publishers.  They

16  keep this information.  They keep -- it's like saying a food

17  manufacturer is not going to track which product is making

18  which money.  Of course, they track this data and it's very

19  basic.  I know you've reiterated how important it is to have

20  broad relevance and to be able to give us a chance to defend

21  ourselves from billions of dollars of liability.

22          And in the case in March where we were able to find

23  some of those examples, the jury -- I know we've heard a lot

24  about the billion dollar verdict, but in this case, the jury

25  actually found the lowest, 750 per work in this case, and we

1    were able to use that financial data to cross some of them on

2    it.

3           So I -- I don't know if this is an appropriate

4    venue to raise this.  I'm doing it because I think we need to

5    do it sooner than later so that our expert can get it so that

6    we can start having meaningful information in these

7    depositions to ask about.  And you had made it very clear

8    several times that it was without prejudice to see what we

9    could do with the sampling information and then come back if

10   we needed more.

11          MR. OPPENHEIM:  Your Honor, I believe -- first of

12   all, this reference to this other lawsuit in March, it wasn't

13   an ISP case.  It was in no relation to this at all.  It was

14   against a small individual website, individual owner, not a

15   multibillion dollar company like Charter engaged in egregious

16   conduct as they have here.  Put that aside, that case is not

17   relevant.

18          This issue was resolved I believe by you and then

19   appealed to Judge Jackson, and I believe that Judge Jackson

20   said it's inconceivable that a jury would examine the number

21   of works individually and calculate damages separately on a

22   work-by-work basis.  That might be defendant's litigation

23   position, but it is unrealistic from a practical standpoint.

24   And he went on.  That Judge Jackson rejected this, as I

25   recall, and, you know, there is a significant burden to

75

1    pulling all of the individual data as to each of the tracks

2    in this case.  So the idea was that they would -- they would

3    get what had already been pulled and they got that.

4              So I'm happy -- if they want to seek to reargue it

5    and they want to rebrief it, we'll go back through all the

6    briefing and what Judge Jackson said before and what the

7    ruling was, but on the fly, that's my recollection.

8              THE COURT:  No, but I don't think she's talking

9    about --

10             MS. RANAHAN:  (Inaudible).

11             THE COURT:  Hold on, hold on, my turn.  I don't

12   think she's talking about getting down into the weeds and

13   going on a work-by-work basis.  She's talking about getting

14   data that her expert can accumulate so they can present to

15   the jury a cumulative argument as to what damages might be in

16   the event the jury finds liability.  That's how I interpret

17   it, I guess.

18             MR. OPPENHEIM:  So she --

19             MS. RANAHAN:  (Inaudible).

20             MR. OPPENHEIM:  So, remember, we produced

21   cumulative data on the record industry.  What I understand

22   her asking for is saying, we only have track-by-track revenue

23   data on 3- to 4,000 works.  We want track-by-track revenue

24   data on the rest, on the other 6,000 works.  So she wants

25   what she doesn't have already, which is, you know, one and

1    half times the work that was already done for the Cox case,

2    which by the way, was not used in the Cox case by any expert

3    or anybody.

4              MR. SHAPIRO:  And, Your Honor, I will say as the

5    person who took the deposition on Friday of their 30(b)(6)

6    witness, when I showed him what we were permitted to use,

7    which is just the list of works and the revenue related to

8    those works from Cox, he was reasonably enough a little bit

9    confused.  He was saying, Well, yes, some of these are the

10   works in this case, but what is this list from, because I was

11   asking questions about the damages they face.  And we were

12   able to muddle through with a list from Cox, but given that

13   they're seeking a lot of money from us, it shouldn't be that

14   hard for them to give us the list of revenue from natural

15   works in suit in this case.

16             MS. RANAHAN:  And I will say, as far as Judge

17   Jackson's ruling, he actually said -- he noted in his ruling

18   that you had given us permission to come back after if we

19   felt like we needed more information and that that was

20   significant to his ruling.

21             And as far as Cox, I disagree that we didn't use it

22   at all.  I wasn't part of the Cox team, but I understand that

23   we did.  But you also had noted in February, it would be

24   insane of us to take the exact same damages approach that we

25   took in Cox again here.  Of course, that didn't go as well,

```
 1    which is why I'm citing that example to what happened in

 2    March, which as plaintiffs' counsel noted, you know, it is

 3    not relevant.  Of course it's relevant.  It's a situation

 4    where the jury is asked to decide what's fair, and we were

 5    able to come up with the best example we could find of, for

 6    instance, a work that had zero revenue for the whole period.

 7    And for us to be able to find those examples and distinguish

 8    high-value works from low-value works, we should have the

 9    right do that, as opposed to what happened in Cox, which is

10    where --

11              THE COURT:  Go ahead.

12              MS. RANAHAN:  -- which is where the jury picked a

13    number and they picked the billion and worked backwards from

14    the billion.  We would rather have the jury look at these

15    things as different values, which they're entitled to do and

16    we're allowed to present, some of them worth with very

17    little.  And if we can do -- if we can get data -- I mean,

18    this is basic.  The litigating copyright cases for 16 years

19    have never had a case where we can't get basic financial

20    information about the works alleged throughout the claim

21    period.  I mean, this is so incredibly basic and that we're

22    trying to now be able to -- whether we spend all of our trial

23    presenting every one to them or do some aggregate, this is

24    absolutely critical for us to be able to defend against,

25    again, a $2 billion case, where in the other case I'm
```

78

1    mentioning, the total damages for 200 works was 160,000.  So

2    it can make a difference (inaudible) for to us get this

3    financial data.

4            MR. OPPENHEIM:  Your Honor, so two things.  One is,

5    I understand the reason Mr. Cokakis (ph) in his deposition

6    was confused is because nobody explained to him what the

7    document was; that it was the revenue -- the track-by-track

8    revenue data from the Cox case.  So that's why he was

9    confused.  Mr. Shapiro didn't explain it to him, and so be

10   it, that's what happens.

11           MR. SHAPIRO:  Not correct.

12           MR. OPPENHEIM:  Let me offer a suggestion.  Judge

13   Jackson did leave open the possibility that if the defendants

14   made a showing that it was needed down the road based --

15   after a 30(b)(6) deposition, that they could make that

16   showing in writing.  So why don't they brief it up and let's

17   deal with it on the 22nd.  They submit a short letter brief,

18   we're happy to respond and deal with it then.

19           THE COURT:  Okay.  Well, I do think -- I agree

20   sooner than later is important, and I think there is going to

21   be probably some additional work to do on this particular

22   endeavor with regard to damages, because damages are

23   everything.

24           What I'm doing right now -- this is probably

25   unique, but I think it's appropriate -- I am communicating

 1   with --

 2            MR. OPPENHEIM:  I'm sorry -- sorry.

 3            THE COURT:  That's okay.

 4            MR. OPPENHEIM:  I was -- go ahead.

 5            THE COURT:  You go ahead.

 6            MR. OPPENHEIM:  I had responded to what had been

 7   said, but then realized I had been muted, and so if I could

 8   just -- Judge Jackson, Your Honor, did say --

 9            THE COURT:  We heard you.  No, we heard you.  You

10   weren't muted.

11            MR. OPPENHEIM:  Oh, you did?  Okay, okay, thank

12   you.

13            THE COURT:  That's okay.

14            MR. OPPENHEIM:  Apology.

15            THE COURT:  Nobody was saying anything.  There was

16   just quiet going on because I'm multitasking.  I'm -- I'm

17   conferring with the Special Master.  I mean, I've never done

18   this.  I've only used a Special Master once or twice in my

19   life.  She's going to -- she's going to be with us all day on

20   Monday and we're going to do this together, okay.  So you

21   bring your lawyers and I'm going to bring my lawyer and have

22   it out.

23            And we -- here is the thing.  I mean, I'm bringing

24   her in because I don't -- I'm not trying to bypass her, but I

25   do recognize that this could be creating some inefficiencies

1    given the time -- the proclivities which you guys appealed

2    what she's doing or what I'm doing.  So, you know, I guess

3    desperate times call for desperate measures.

4            So she and I and probably her associate will be

5    here as the neutrals.  Anything -- we'll try to create a

6    comprehensive list of what we discussed.  Anything not

7    discussed is waived after that day.  So be prepared, I guess.

8            Does anybody have any questions about that?  And

9    we'll address this issue as well with regard to further

10   production of financial information regarding the works at

11   issue.

12           MR. SHAPIRO:  The only question I have, Your Honor,

13   and maybe we can always -- we can always follow up with an

14   e-mail would be, we're all going to be tempted to put in

15   (inaudible) in advance of this, because we're lawyers and

16   that's what we want to do, and so we're happy do that, but

17   maybe you could give some guidance as to what you're seeking

18   in that regard because, of course, you know, we're all going

19   to be -- they'll send you something and we'll send you

20   something and they'll send you something and we'll all be

21   trying to get the last word, et cetera.  So I'm just

22   wondering what you're looking for in that regard, if

23   anything.

24           THE COURT:  Right.  So you're going to have an army

25   of people go through all the discovery you've issued, look at

1   all the responses, see where you are.  You're going to be

2   very clear, I want you to identify every single document

3   request that you've issued, 1 through 97 for the plaintiffs,

4   1 through 100 for the defense.  And you're going to say:  RFP

5   1, no issue; RFP 2, no issue; RFP 3, don't feel like you've

6   responded to this appropriately in this way; RFP 4, no issue.

7   So I want you to list every single one.  You're going to

8   provide that to the other side, probably you said a week, so

9   by February 8 would be very good.

10          Then within another week to February 15, each of

11  you will get the other side's response back saying, Well, you

12  know, you didn't recognize this that we produced and this and

13  this.  I suspect then during the week of February 15 you'll

14  have a little bit of conferring going on, and then I want by

15  Friday close of business the 19th, to get something that you

16  expect us to read over the weekend, summarizing from your

17  standpoint the deficiencies that remain with regard to what

18  you're expecting from the other side.  Okay?

19          So -- and to the extent possible, what the

20  conferral process has has -- has accomplished, what it hasn't

21  accomplished.  I mean, I do want to know for each one of

22  these that you -- you asked and they wouldn't do it, okay.

23          And as you all know, when the Court grants a motion

24  to compel, these are mandatory.  You do know that, right?

25  Okay.  So everything you bring to me that I agree with, I

1    will likely consider a motion to compel, and if granted, I

2    have to award fees.  And it may just be a tally at the end of

3    the day so that you all's fees cancel each other out, I don't

4    know; I doubt that.  But I think that's an appropriate way to

5    proceed.  I'm going to view this as in the nature of moving

6    to compel after meet and confer and there is still no

7    agreement on proceeding.  All right?

8              Does that answer the question posed?

9              MR. OPPENHEIM:  Yes, that's very helpful, Your

10   Honor, in terms of setting forth a process.  I believe there

11   is one set -- short set of requests that we issued that are

12   not technically due until the 26th of this month.  If -- if

13   we could get -- obviously we don't want to just leave those

14   on the side.  If we could accelerate the responses to those

15   and join any issues up by then --

16             THE COURT:  Well, how many did you issue?

17             MR. OPPENHEIM:  I think it was four requests for

18   productions.

19             THE COURT:  Well, I'm going to consider all pending

20   issues, so, you know, it would probably be best -- you must

21   have just issued those in the last week, then, I guess?

22             MR. OPPENHEIM:  Yeah, I believe it was followup to

23   earlier discovery.  And to be clear, sorry, Your Honor, it

24   was four requests for production, one interrogatory and 20

25   requests for admissions.

1          THE COURT:  Okay.  Well, again, I'll keep in mind,

2    you know, the abbreviated time that the defense has had to

3    respond.  I mean, I agree -- I just handed out a bunch of

4    work, so I'm not inclined to -- to make them respond in

5    writing necessarily, but, again, I am going to tackle all the

6    issues I can possibly tackle.  So that's going to be on the

7    table.  Okay?

8          MR. OPPENHEIM:  Very well.

9          THE COURT:  Try to make it.

10          MR. SHAPIRO:  Your Honor --

11          THE COURT:  I just ask you to try to make this user

12    friendly as possible, please, whatever you submit.  That's

13    all.  All right, go ahead, Andrew.

14          MR. SHAPIRO:  I had one semi-housekeeping matter.

15    I assume we're finished with this?

16          THE COURT:  It sounds like it.

17          MR. SHAPIRO:  Sure.  So as you'll recall, you ruled

18    from the bench on Thursday against us on the presentation

19    from the in-house lawyers privilege log Number 28 with

20    "attorney-client privilege" written on the front page of some

21    lawyers' notes in the note section of the field, and I think

22    your order was that we need to -- I mentioned that we needed

23    to consult with our client about whether the client was

24    inclined to appeal that and -- or object to that.  And so you

25    said, we would need to otherwise produce it on Tuesday.

1        I believe, and we'll have confirmation just by the

2   end of the day, that we are going to take that up, and so I

3   would ask for a stay or clarity that we don't have to produce

4   this document on Tuesday, because our contention is that it's

5   privileged, and so once we produce it, then they're yours.

6        THE COURT:  Yeah.  I mean, I think that's generally

7   the -- the way the rules envision that is that an appeal

8   stays the actual production.

9        MR. SHAPIRO:  Thank you, Judge.

10        THE COURT:  Okay.  What else?

11        MR. OPPENHEIM:  So, Your Honor, just we all have

12   clarity for purposes of this hearing:  Will the defendants be

13   submitting -- would you like the defendants to submit a

14   written submission on the track-by-track revenue issue that

15   they raised, and do you have a timeline in mind for that and

16   an opposition?

17        THE COURT:  Well, no.  I mean, that's -- that's a

18   document request they've had, right?

19        MR. OPPENHEIM:  Well, I believe that Judge

20   Jackson's ruling said they could reraise it in writing to the

21   Court.  So to the extent that the plaintiffs are going to

22   respond to a claim that the 30(b)(6) deposition that they

23   took demonstrates a need for additional track-by-track

24   revenue, we would like to see that articulated so we could

25   respond to it directly, though, understandably short.

           1          THE COURT:  Sure.  Well, I want you to include that

           2   in the process that you're going to engage in over the next

           3   couple weeks, and then -- so why don't on Friday, the 19th,

           4   submit your respective positions on the record as restricted

           5   documents and just title it -- just title it -- I don't know

           6   what you want to -- plaintiffs' position on pending discovery

           7   issues as requested by the Magistrate Judge and make it a

           8   restricted document and that will cover the written part of

           9   whatever requirement there was to raise it in writing.  Okay?

          10          MR. OPPENHEIM:  Your Honor, with respect to all the

          11   other discovery issues, the process you've laid out makes

          12   sense to me.  With respect to this one, plaintiffs can't

          13   respond to Charter's position until we see Charter's

          14   position, so we need to them to -- to submit something that

          15   we can respond to.

          16          THE COURT:  Wait, are you saying -- but, Matt, are

          17   you saying it's less than clear what they want?

          18          MR. OPPENHEIM:  It's less than clear what is

          19   different now than what -- when they litigated it before and

          20   lost.  It's very clear that they want what they wanted

          21   before, I got that.  What I don't understand is -- so Judge

          22   Jackson said, if after they take a 30(b)(6), they can

          23   demonstrate a need for it, then they can submit it in writing

          24   a request for the Court.

          25          MS. RANAHAN:  Did I just go through the procedural

 1    history, because it was the (inaudible) requirement was

 2    never --

 3             THE COURT:  Hold on a second, hold on a second,

 4    we're --

 5             MS. RANAHAN:  I'm sorry, sorry.

 6             THE COURT:  This is why I want to do this live so

 7    we're going to be dealing with this part of the communication

 8    gap.

 9             Here is what I would say about that, I suppose.  I

10    don't know what Judge Jackson was thinking.  I think if he

11    was in his mind believing that they want that information so

12    that they could possibly present, you know, a work-by-work

13    damage model to the jury, then he knew that was not going to

14    happen, he was not going to allow that.

15             If they want it so -- I mean, it's all -- the devil

16    is in the details, right, it all depends on the burden.  I

17    mean, if you guys had this information at the snap of a

18    finger, then why wouldn't you -- why wouldn't the judge

19    require you to produce it because then the expert can spend

20    all the money they want to spend, do all the math and

21    statistical analysis and come up with a model of damages

22    that's based on, you know, the cumulative effect that they

23    say it had on the plaintiffs.

24             So even if there is 11,000, I mean, you have the

25    expert do all the work and then come in and say, you know,

1    Based on the work that I did, this is the average damage that

2    you can reasonably argue, and that makes sense to me.  So,

3    you know --

4            MS. RANAHAN:  Procedurally, Your Honor, just to

5    clarify, I'm not sure where the writing requirement came

6    from, but it started with a telephonic prefiling motion with

7    you back in October 2019 where we hadn't submitted anything

8    in writing and you said your preliminary thoughts are why

9    don't you start with the Cox data and then come back to me

10   without prejudice and raise it again.

11           We never submitted anything in writing because that

12   was your ruling on the initial call, and then we objected to

13   that because we wanted to get the data, you know, sooner than

14   later to Judge Jackson.  He didn't say anything about we had

15   to raise it in writing.  He just said, given that your

16   instruction was you could come back, he found that

17   significant and so here we're coming back.

18           THE COURT:  No, I understand that.

19           MS. RANAHAN:  I don't know where this --

20           THE COURT:  But what I'm saying is, I guess, I'm

21   going to view your respective filings on disputes as the

22   equivalent of a motion to compel, because the way we do it in

23   our district, we kind of short circuit that process by

24   attempting to have these informal conferences, but, you know,

25   whatever you file and tell me there is still a dispute and

1   the other side is refusing to produce, that's the

2   equivalent -- legal equivalent of a motion to compel.

3          And just, I guess, Matt thinks he needs more

4   information, so by the end of this week, as a specific task,

5   explain what you need and why you need it in this particular

6   regard and that is the damages for -- what I didn't get was

7   whether there is only -- of the 11,000 here, only 3- or 4,000

8   can came from the Cox case --

9          MS. RANAHAN:  3- or 4,000 that we don't yet have.

10  The overlap is about 8,000.  So it's most -- most of the

11  work, but not for all the claim period.  So we would want an

12  update for the full claim period of all, so the extra year

13  and a half that we don't have yet, so that we can actually

14  point to things and say here is the revenue for the claim

15  period for the works in suit.

16          And then on top of that, there is some for which we

17  have zero information.  And those would be the works for

18  which they have now added in that were not part of the Cox

19  case.  And by our calculation that's about 3,000 to 4,000.

20  So for those we have nothing, literally nothing.

21          THE COURT:  Okay.  And can everybody still hear me?

22          MS. RANAHAN:  Yes.

23          THE COURT:  Okay.  So just going into this process,

24  there is going to be a little bit of a presumption of

25  production, but I'm going to keep an open mind.  Anything

1   else from the plaintiffs?

2          MR. OPPENHEIM:  No.  One last issue, Your Honor.  I

3   know at the last hearing defendants raised an issue regarding

4   the hash report.  I'm not seeking to discuss that today, but

5   just to put it on your radar, we will be submitting something

6   to the Court regarding that discussion.

7          THE COURT:  So as part of this process we're

8   talking about or independent?

9          MR. OPPENHEIM:  Independently, Your Honor.

10          THE COURT:  I mean, what are you going to be

11   submitting so I can see it coming?

12          MR. OPPENHEIM:  We're going to submit a letter,

13   Your Honor, that will review what was previously litigated

14   and what your ruling was compared to what Mr. Shapiro said at

15   the hearing on Thursday.  So the litigate -- when we

16   litigated this issue previously at some length, and you spent

17   quite a bit of time on it, we were very carefully litigating

18   question about whether a particular document was privileged,

19   and if so, whether it was so needed that -- so needed that it

20   should be produced nonetheless.

21          And Mr. Shapiro didn't differentiate between that

22   document and the total of what Mark Monitor did in 2016.  So

23   we want to set that forth and clarify the discussion, because

24   the discussion we had Thursday just ignored the distinctions

25   that we were very careful about in the process of our prior

1  litigation of this issue.

2          Mr. Shapiro reargued exactly what he had argued

3  previously to you that you had rejected, but by bringing it

4  up on the fly and without the benefit of any briefing or

5  context, I think, elicited responses from the Court that

6  would certainly create confusion down the road and could --

7  and Mr. Shapiro knows -- for the effort of precluding the

8  mass of plaintiffs' affirmative evidence in the case.  So we

9  want to set that forth.  We have a very short letter and

10  think we can clarify if.

11          THE COURT:  Okay, but I --

12          MR. SHAPIRO:  Your Honor, we welcome that -- we

13  welcome that, because I think Mr. Oppenheim is concerned

14  probably about the same thing I'm concerned about, which is

15  we have a record with some transcript and an order, and given

16  your, I think entirely appropriate invitation to us to raise

17  this issue at trial, if they try to use this sword -- I'm

18  sorry, hide behind the sword/shield distinction, I think it

19  will be useful if we get -- if we're all 100 percent clear on

20  this so later we're not fighting it out.

21          THE COURT:  I don't disagree.  The only issue I

22  have is the more little letters and e-mails you have floating

23  out to this Court, I promise you the less efficient this

24  process is going to be, because we don't have a bunch of IT

25  people and associates tracking all of our stuff, and you're

1    one of 3- or 400 cases that we have to deal with.  And the

2    more people in various places you burden the Court with, the

3    less responsive you're going to find us, just not because I'm

4    punishing you, but because I can't keep track of everything,

5    but if you want to submit a letter, that's fine, okay.

6              MR. OPPENHEIM:  Thank you, Your Honor.

7              THE COURT:  All right.  What else from the

8    plaintiff?

9              MR. OPPENHEIM:  Nothing from plaintiff.

10             THE COURT:  Okay.

11             MR. OPPENHEIM:  Nothing further from plaintiff.

12             THE COURT:  And from the defense.

13             MR. SHAPIRO:  Your Honor, I think barbershops are

14   going to be allowed to reopen in Chicago this week, so

15   hopefully I'll be a little more clean-cut next time I see

16   you.

17             THE COURT:  Well, if you want to come a day before,

18   my wife cut my hair this morning and she's very good at that.

19             MR. SHAPIRO:  My wife volunteered to cut mine, but

20   I think I would quicker have my kids do it and I'm not going

21   to do that.

22             MR. OPPENHEIM:  I've had my daughter to do it and

23   she's been great at it.

24             THE COURT:  So one other thing.  I would like a

25   roster of the people who will come from each side also on

92

```
 1   Friday, the 19th, and you should confer with the courtroom
 2   deputy about the use of technology.  We'll probably be doing
 3   this -- will the technology be better on 2?  Even in a
 4   ceremonial courtroom, it's all the same?
 5           COURTROOM DEPUTY:  (Inaudible).
 6           THE COURT:  Right, but I would like to spread out.
 7   Reserve 2, okay.  So we have this big ceremonial courtroom
 8   that we'll reserve for that day.  I mean, one thing that's
 9   not at a premium is courtrooms.  They're a dime a dozen
10   nowadays because no one is coming in to occupy them.  So
11   we're going to be having a very, very, very large ceremonial
12   courtroom where we'll all spread out and accommodate as many
13   people as you would want to bring.
14           But I really do need people with answers and
15   clients available, because I don't want a response to be,
16   We'll have to check with our client.  That's why you need a
17   vetting process, conferral process going into this so you
18   have answers for me, because we are going to try and resolve
19   everything at least up through the date of that conference on
20   that day.  What?
21           So I can probably start at -- I guess it was 9:30
22   this morning.  So I can start whenever you guys want, 9:00 or
23   9:30.  I don't want to do any earlier than that.  Yeah, it's
24   not a big deal.  So any preference?
25           MR. SHAPIRO:  9:15.
```

93

1           MR. OPPENHEIM:  It's entirely up to you.

2           THE COURT:  9:15.

3           MR. SHAPIRO:  9:15.

4           THE COURT:  See, you're capable of compromise, look

5  at that.  It's a nice baby step you just took.  Capitalize on

6  that, build on it and work out something.

7           So, I guess, I have heard everything that both

8  sides have had to say, especially Matt, commenting on how he

9  views the good faith of the defendant's efforts.  I would

10  like -- and I understand and it's necessary to raise those,

11  and you've got a transcript.  We're not going to have a

12  transcript of that day, okay, probably not.  I don't know,

13  we'll see.  Only if we go on the record.  I'll keep that one

14  in reserve, but this is truly going to be getting the

15  disputes resolved rather than focusing on the reason for the

16  dispute, okay.

17           All right, we'll be in recess.  Thank you all, take

18  care

19           (Whereupon, the within hearing was then in

20  conclusion at 11:55 a.m.)

21

22

23

24

25

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

```
 1                    TRANSCRIBER'S CERTIFICATION

 2     I certify that the foregoing is a correct transcript to the

 3     best of my ability to hear and understand the audio recording

 4     and based on the quality of the audio recording from the

 5     above-entitled matter.

 6

 7     /s/ Dyann Labo                    February 3, 2021

 8     Signature of Transcriber               Date

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```