# Exhibit 1

1

```
 1             IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
     Case No. 19-cv-874-RBJ-MEH
 3   _____

 4   WARNER RECORDS, INC., et al.,

 5        Plaintiffs,

 6   vs.

 7   CHARTER COMMUNICATIONS, INC.,

 8        Defendant.
     _____
 9

10           Proceedings before MICHAEL E. HEGARTY, United

11   States Magistrate Judge, United States District Court for the

12   District of Colorado, commencing at 10:01 a.m., December 18,

13   2020, in the United States Courthouse, Denver, Colorado.

14   _____

15   WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE HEREIN

16   TYPOGRAPHICALLY TRANSCRIBED. . .

17   _____

18                       APPEARANCES

19           JONATHAN M. SPERLING, MATTHEW J. OPPENHEIMER, NEEMA

20   SAHNI and JEFF GOULD, Attorneys at Law, appearing for the

21   Plaintiffs.

22
     _____
23

24                      MOTION HEARING

25
```

2

```
 1                    APPEARANCES (continued)

 2             ANDREW H. SCHAPIRO, CRAIG JOYCE, NATHAN HAMSTRA and

 3    LINDA BREWER, Attorneys at Law, appearing for the Defendant.

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

30

1          MR. SCHAPIRO:  Correct.  Opinion work product, yes.

2          THE COURT:  All right.  Anything else on that

3   before we turn to Charter's motion to compel?  Okay.

4          So the main reason I wanted to talk today is the

5   diametrically opposed fact assertions that the hash file in

6   the defendant's view was used offensively, or will be used

7   offensively at trial, but the dark side will not and will be

8   shielded, and then the plaintiffs' very plain statement that

9   this hash file is not going to be used whatsoever at trial,

10   these are just -- they are inconsistent, they can't both be

11   true.  So that's what -- that's -- at least one of the root

12   issues I need to understand is that.

13          So I'm going to let Mr. -- is it -- Jeff, are you

14   going first -- Andrew, I mean, are you going for the defense?

15          MR. SCHAPIRO:  I'm trying to think (inaudible).

16   sorry, I was muted there.

17          THE COURT:  Okay.  Articulate again in as briefly

18   and clearly as you can, your argument that, in fact, they are

19   using that hash file for their -- a part of it at least, part

20   of the results, for their affirmative case at trying to

21   shield the hash report (inaudible), but trying to shield

22   those parts that actually show that their investigation had

23   flaws and is not credible, so put that on the record.

24          MR. SCHAPIRO:  Absolutely, Your Honor.  And you

25   used the word "results" a moment ago which is the keyword.

1    So, you know, in this case, as you know, the plaintiffs went

2    back in 2016 and asked Mark Monitor and Audible Magic to, in

3    our words, recreate -- they dispute that, but we think it's

4    accurate -- the evidence that would allow them to show what

5    files were shared by our subscribers during the relevant

6    period of 2012 to 2015.  And they have -- in this case, they

7    are seeking to use the files that were downloaded through

8    that process in 2016, including their hashes, as evidence

9    against Charter.  They say that the other evidence they

10   searched for in 2016 somehow is not relevant or are opinions,

11   they are not facts.

12           THE COURT:  But your position is that both of those

13   are part of one effort and one result, correct?  Is that what

14   you are arguing?

15           MR. SCHAPIRO:  That's correct, that they are trying

16   to wield the conclusions from these documents as a sword.

17   And one of the cases we cite in our briefing is Chevron Corp

18   vs. Status Consulting, which is 2010 Westlaw 392- -- 3092, we

19   think addresses a very similar situation.  In that case, the

20   Court -- it's a District of Colorado case, 2010 -- said that

21   justice does not permit one side to inform and facilitate a

22   damages assessment purposed for the reliance of the Court

23   without permitting it to (inaudible) access to the materials

24   and process underlying the assessment.

25           So this actual report is a list of 7200 hashes that

1    they sent out and said, Go find these if you can on the

2    internet to Mark Monitor and Audible Magic.  And in this

3    case, they are going to be producing, they keep pointing to a

4    hard drive -- and I'm sure we'll hear about the hard drive

5    from Mr. Gould -- on which they have some of these files and

6    hashes, which were derived from this process of going out and

7    searching and re-creating in 2016, but they're mindful enough

8    to look back at that process, how Audible Magic and Mark

9    Monitor got there.

10           Now, I want to be clear, we are not asking for

11   anyone's opinions or guidance.  We are not asking for papers

12   in which the lawyer says why you should look for this file or

13   that file.  We just want to know what files were sought and

14   which ones were found, or more significantly for our

15   purposes, which ones were not found either because they

16   weren't out there or because when Audible Magic compared with

17   them to the works in suit, they turned out not to be works in

18   suit.

19           THE COURT:  Okay, a couple of --

20           MR. SCHAPIRO:  It's actually pretty straightforward

21   in our view.

22           THE COURT:  Okay, a couple of questions.  And I

23   know Jeff is going to be dying to jump in, but just wait your

24   turn so you can be fully informed about what we are talking

25   about.

33

1          7200, was that the original complete set of what

2     was searched for in 2016, or was that just a subset of what

3     was searched?

4          MR. SCHAPIRO:  I don't think we know, which is one

5     of the reasons we would like to get the report.  I can tell

6     you that they are alleging 10,000 -- someone on my side can

7     correct if I'm wrong -- something like 10,000 hashes in just

8     against Charter.  So it's a subset of something, but --

9          THE COURT:  Okay.

10          MR. SCHAPIRO:  -- we don't know, which is what we

11     want to see.

12          THE COURT:  And I understand from your arguments

13     that you believe that if it is a subset, it's a subset of the

14     unsuccessful, that the search was unsuccessful as to those

15     7200, right?  That's what you believe?

16          MR. SCHAPIRO:  Right.

17          THE COURT:  Okay.

18          MR. SCHAPIRO:  Not as to all of them.  I think even

19     on the first page of the plaintiffs' brief they say that Mark

20     Monitor was able to find some but not all of the 7200.

21          THE COURT:  Okay.

22          MR. SCHAPIRO:  So our expectation (inaudible) is

23     they found some and they didn't find some.

24          THE COURT:  All right, that's your understanding,

25     then, that of the 7200, there were some successes in the

34

1    sense that they did re-create customers sharing and some they

2    didn't?

3              MR. SCHAPIRO:  Correct.

4              THE COURT:  Okay.  And then is it your argument and

5    view that plaintiff is claiming the compilation is the

6    attorney opinion, but there's no other opinions that would

7    exist in any of the documents you are seeking?  In other

8    words, it's selection --

9              MR. SCHAPIRO:  I mean, my understanding of what

10   they are saying -- I mean, that they may articulate it

11   differently -- is that we might somehow be able to divine

12   from the list of, you know, which ones they chose to send out

13   for search and which they didn't, something about their

14   thought process that would somehow be relevant to us, but we

15   are not interested in that and I don't see how you'd be able

16   to derive that from just seeing, here's a list and here are

17   the results of it.  And if somehow there's some scintilla of

18   that in there, it's by far outweighed by the actual purpose

19   for which it's sought, which is to show just what was sought

20   and what came back, the pure fact.

21             THE COURT:  Okay, but you believe you are not

22   asking for anything any attorney actually wrote.  The only

23   thing that would be revealing would be the -- if someone were

24   to look at the totality of the documents we are talking

25   about, that would potentially reveal just an attorney's

1    thought processes as to what they should have Mark Monitor

2    do?

3            MR. SCHAPIRO:  Exactly.  I want to be a hundred

4    percent clear about that.  You are exactly right, Your Honor.

5    We are not asking here for any communications that they may

6    have had or meetings or documents that ultimately led them to

7    choose these files versus other files, anything like that.

8    We just want the list.

9            THE COURT:  Okay.  Now --

10           MR. SCHAPIRO:  And I think that, you know, from

11   that, we could reverse engineer something about their thought

12   processes.

13           THE COURT:  Okay.  And I'm going to suggest

14   something a little bit unusual, but it's something I would do

15   probably if everybody were in here, live in court.

16   Obviously, I don't want the plaintiff to have to, on the

17   record in the hearing of defense counsel, articulate the

18   opinion work product that they are trying to protect and they

19   say they are trying to protect it, but I don't have a clear

20   understanding of what that would be other than what we are

21   all talking about right now.  And if that's it, that it's

22   just their -- so Jeff, this question is to you.

23           If it's just that producing these documents would

24   reveal attorney thought processes as to what to submit to

25   Mark Monitor, then I don't think I need any further

1    explanation, but if it's more complex than that, more subtle,

2    then what I would do is I would call you up to the bench and

3    engage in a little in-camera sort of discussion.

4            And I would -- I'm prepared to do that right now,

5    by having all defense sign off on this call and then call

6    back in, as much as that risks us kind of having trouble

7    getting back all together, but that's -- I just need to know

8    how much I need to understand about the argument on the

9    plaintiffs' side.  And if there is more, I need to

10   understand, then I'm happy to entertain that in camera.

11           Okay, so you have the microphone.

12           MR. GOULD:  Thank you, Your Honor.  I want to

13   address a couple of things Mr. Schapiro said, but I first

14   want to answer your question.

15           There is more information that would be disclosed

16   that reflects counsel's analysis, mental impressions and

17   thought processes that is included in that spreadsheet and

18   the disclosure of it would provide too much of it to the

19   defendants.  So I think that your suggestion is probably a

20   good idea if -- unless you are inclined to deny the motion, I

21   happily --

22           THE COURT:  No, I think we are going to have to do

23   that.  Would you like to make your argument right now before

24   we do that or after?

25           MR. GOULD:  I'm happy to make it, whatever you

37

1    think would be most helpful to you, Your Honor.

2              THE COURT:  Okay, I think I would be more effective

3    as an adjudicator if I had more information.  So is our

4    public telephone line on?

5              COURTROOM DEPUTY:  (Inaudible).

6              THE COURT:  Is there?  Okay.  So I'm going to have

7    to turn off the public telephone line.  So to the extent

8    anybody's on the telephone and you want to listen in on the

9    plaintiffs' side, you might want to call one of the counsel

10   whose --

11             COURTROOM DEPUTY:  (Inaudible).

12             THE COURT:  Okay, all right.  So give me ten

13   minutes.  It's 10:51.  So I would like all of the

14   representatives of the defense to sign back in in

15   approximately ten minutes, okay?

16             MR. GOULD:  Your Honor, could I make one other

17   comment before we break --

18             THE COURT:  Go ahead.

19             MR. GOULD:  -- picking up on what Mr. Schapiro

20   said.  Their papers kind of have a little bit of (inaudible)

21   a catch-all ending to it where they are asking for some vague

22   and undefined set of all documents related to this program

23   and this whole 2016.  Mr. Schapiro's questionnaire made it

24   quite clear to me, at least, that this motion is strictly and

25   only about the hash report

38

1          THE COURT:  Yeah, I wasn't that focused on that

2     part of what you wrote to me in the reply.  So, yeah, I --

3     Mr. Schapiro, you can speak for yourself, but I think that's

4     how I saw it.

5          MR. SCHAPIRO:  I think that's right, although not

6     having seen the hash report, our understanding is that part

7     of that, or at least what we are speaking of when we are

8     talking about the hash report, is there's a list of the

9     Audible Magic results.  So, remember, Mark Monitor is out

10    there searching the web, Audible Magic is theoretically

11    matching what's found there against works in suit.  So there

12    was a list of results from Audible Magic and we think that is

13    encompassed in this and that certainly is not anyone's work

14    product either.  It's just the result of the search.

15          I don't know if that's technically part of this

16    actual spreadsheet or whether it's an attachment or something

17    like that.  But I agree, we are not looking for

18    communications or guiding the investigation, et cetera.  And

19    to the extent that there is any lack of clarity on that, I

20    will stand on what I'm saying here

21          THE COURT:  Okay.  So again, let's sign back in at

22    about five after 11:00, Denver time.

23          Do we have the ability to turn the record off?

24          COURTROOM DEPUTY:  Yes.

25          THE COURT:  Okay.  So we are going to turn the

1   record off and have only plaintiffs' counsel or

2   representatives, I guess, on the line, okay.

3           MR. SCHAPIRO:  So we should come back at five past

4   the hour?

5           THE COURT:  Five past the hour.

6           MR. SCHAPIRO:  Thank you.

7           MR. SPERLING:  And, Your Honor, it's Mr. Sperling.

8   Just out of an abundance of caution, I think the information

9   we received had two different phone numbers.  There was a

10  public number that I see is listen only.

11          THE COURT:  Yeah, we are turning that off.

12          MR. SPERLING:  -- and then a counsel number.

13          THE COURT:  Right.

14          MR. SPERLING:  Okay.

15          THE COURT:  We are turning the public off because

16  this is not a public proceeding anymore.

17          MR. SPERLING:  Right.  And then the counsel --

18          (Audio recording turned off from 10:53 to 11:08.)

19          THE COURT:  So we have Linda Efron (ph), Andrew

20  Schapiro, Jen Golinveaux, Huebert Allison -- or Allison

21  Huebert, I guess.  Yep.

22          MS. BREWER:  This is Linda Brewer.  Just for the

23  benefit of the court reporter and the Court, I might show up

24  as Linda Efron through my phone line.  That's my married

25  name.  My maiden name is Brewer, which is what is affiliated

1   with my appearance.

2            THE COURT:  That's fine.  And I wish we had a court

3   reporter, but we don't.  It's just the recorder.

4            MS. BREWER:  Oh, okay.  I will go on mute.

5            THE COURT:  Do we have all of the necessary players

6   as far as everybody can see?

7            So my question to you, Jeff, and one that we have

8   talked about before the in-camera proceeding, is sort of our

9   lack of -- well, is it your contention -- and if so, explain

10  factually -- that none of the effort in 2016 has been a basis

11  for a complaint for the evidence you are going to produce at

12  trial?

13           Because one good point, Mr. Schapiro does make is

14  that you can't hardly use an effort, an analysis, a report as

15  a basis for your case and then not allow at least a

16  credibility inquiry into that.  Because, as you know, at

17  trial, credibility, truthfulness is always an inherent issue

18  and maybe the most critical issue is the credibility evidence

19  people submit.  And so that resonates a little bit with the

20  judge when there's an allegation that someone is trying to

21  use evidence that was collected, but yet not permitting any

22  inquiry into the manner in which it was collected.  So please

23  address that.

24           MR. GOULD:  Thank you, Your Honor.  So when we

25  (inaudible).  Can you all hear me?

1           THE COURT:  Hear?  Yes.  See?  I think you have one

2    of those cloaking devices on.  There you go.

3           MR. GOULD:  Is that better?

4           THE COURT:  Yep.

5           MR. GOULD:  So we have produced the files from

6    (inaudible) the evidence from the 2016 program that we would

7    rely on and they have it.  They can ask questions if they

8    want about it, of the Monitor witness, the witnesses of the

9    plaintiffs.  They can ask how it was collected.  We have also

10   produced, I think, somewhere in the range of 60,000 files

11   that are essentially log files that show exactly where and

12   when and from whom they were downloaded.  (Inaudible)

13   understand the collection process for those files.

14           The argument that Charter made in it briefs -- can

15   you folks still hear me?  I'm spotty over here.  Okay.

16           The argument that Charter made in it briefs on

17   selected disclosures is -- I don't say this in a nefarious

18   way -- is a little misleading.  It is not at all the case,

19   Your Honor, that the plaintiffs are relying on the fact that

20   they did an investigation and telling you, Hey, here's what

21   that investigation shows, trust us.  We found evidence that

22   substantiates our allegations and we produced it.  We say

23   those files with the hashes that are shown on those files are

24   infringing.  Charter is welcome to dispute that.  They can

25   seek discovery on other facts to dispute that.  They know

42

1    what those files are.  What they want to know is what we, as

2    counsel, found when we were looking into those.

3             THE COURT:  Well, hold on a second, let me ask a

4    few pointed questions.  And I'm trying -- I'll try to

5    segregate what I heard on camera versus what I know to be

6    from the public filings and the arguments we have made today.

7             You sent notices from 2012 to 2015?

8             MR. GOULD:  I'm sorry, you went out for one minute.

9    Can you repeat that?

10            THE COURT:  Yes.  You sent notices to Charter in

11   the time period 2012 to 2015?

12            MR. GOULD:  Correct.

13            THE COURT:  And from what I read in the briefs,

14   some of that information that might have been able to be

15   captured during that time wasn't captured; is that correct?

16   Captured and preserved?

17            MR. GOULD:  It's a hard question.  There's always

18   -- there's no limit to what you can capture, right?  I think

19   what you are asking is:  Did Mark Monitor download files from

20   the Charter subscribers?

21            THE COURT:  Well, sure, let's start with that.

22            MR. GOULD:  No, it didn't have to because it had

23   verified verification that the files with those Monitor

24   hashes were infringing.

25            THE COURT:  Okay.  But so you do have preserved

43

 1   evidence from 2012 to 2015 concerning the notices that you

 2   sent, that you identified in each one of those notices -- you

 3   said millions, I think, but I don't know how many went to

 4   Charter -- but, anyway, those notices identified IS -- IPs

 5   for the infringers, correct?

 6            MR. GOULD:  The notices -- you broke off for a

 7   second.  The notices identified IP addresses --

 8            THE COURT:  For the infringer?

 9            MR. GOULD:  -- a date and time of the

10   infringement --

11            THE COURT:  Okay.

12            MR. GOULD:  -- the name of the infringing file --

13            THE COURT:  Yes.

14            MR. GOULD:  -- and the unique (inaudible) hash for

15   that file containing the infringing orders.

16            THE COURT:  And that's all evidence that you have

17   turned over?

18            MR. GOULD:  Yes, sir.  In addition, the notice

19   lists an exemplary work.

20            THE COURT:  Okay.

21            MR. GOULD:  We have produced everything that exists

22   and that we have.

23            THE COURT:  Okay.  So that's the evidence -- at

24   least some of that is going to be what you introduce at trial

25   in support of your affirmative claim, correct?

44

1          MR. GOULD:  Yes.

2          THE COURT:  Is what Mark Monitor did in 2016 also

3  going to be part of what you introduce at trial?

4          MR. GOULD:  The files that are downloaded in 2016

5  will be.  We would -- which we have produced.

6          THE COURT:  So the files they downloaded -- every

7  file that they downloaded, you have produced?

8          MR. GOULD:  Yes, sir.

9          THE COURT:  And that's all you are going to use at

10  trial from that effort, are the files downloaded by Mark

11  Monitor?

12          MR. GOULD:  Yes.

13          THE COURT:  And, Andrew, do you disagree?

14          MR. SCHAPIRO:  I just reserve that if something in

15  the course of the case changes, we would need to re- -- that

16  would cause us to revisit that, but where we sit today, yes,

17  only the downloads from 2016.

18          THE COURT:  Okay.  So, Andrew, let's say in a -- in

19  a different kind of lawsuit, pre-suit plaintiffs' attorney

20  goes out, does an investigation of liability, gathers

21  evidence and then, you know, for a year goes out and uses his

22  own wits and thought processes to determine what to

23  investigate and how to find out facts that would support a

24  claim in court, and then the case is filed because they feel

25  they have a good faith basis for doing so, and then they turn

45

1   over all evidence that they are going to use at trial, but

2   they don't disclose every phone call they made, every car

3   trip they took, every website they looked at, because to do

4   that would be to re-create, you know, an attorney opinion

5   work product that shows how they do their business, that's

6   the merchandise of a lawyer.  So how is this different than

7   that?

8          MR. SCHAPIRO:  Yes, I think -- I think it's

9   entirely different, Your Honor.  You said yourself and I'm

10  going to go on (inaudible) maybe as Mr. Gould, they are going

11  to use the evidence collected in the 2016 project in an

12  attempt to try and support their allegations and prove that

13  there was direct infringement by the subscribers here.  The

14  2016 project was the effort by Mark Monitor to go back and

15  find out what these files were for which the notices were

16  sent.

17         And it's a key part of our defense in this

18  billion-dollar case to show that the Mark Monitor process and

19  Audible Magic's supporting role in that are not reliable and

20  they are withholding a document that shows not an attorney

21  going -- as far as I know, I mean, I don't know what was

22  discussed in camera and I obviously can't rebut it.  But as

23  far as we know and the part that we are seeking, the document

24  -- it is more as if you said, I'm going to send a -- you

25  know, a detective out to go and watch, you know, to see

1   whether -- what person goes in and out of this building and

2   what's an important part of the case in some way or another.

3   And we have a right to get a report that the detective

4   provides the lawyer saying, Well, you know, on such and such

5   a day, it was really rainy and I really couldn't tell if

6   anybody was going in and out.  On another day, I saw someone

7   wearing a wet hat, might have been that person.  Seems like

8   it turned out that it wasn't.

9           They can't just selectively say, Ah, you know, we

10  have this detective, isn't that great, and it's the gold

11  standard which that they are going to be saying if it's

12  anything like the Cox case.  And, by the way, you know, on

13  Thursday the 16th, the man in the brown hat entered.  We have

14  a right to test that and we are just seeking the facts

15  produced by that report.

16          THE COURT:  So I don't see that, that's the

17  problem.  You are going to have to convince me of that.  For

18  example, using your analogy, let's say a dozen times he

19  doesn't see the person he wants.  He thinks it might be them,

20  but it wasn't them.  But one time he saw them and he has them

21  on video and everybody in the courtroom, including the

22  defense, says, Yeah, that's our guy in that video.

23          The fact that there were a dozen other times that

24  that investigator didn't see the person go in and out of the

25  building, what difference does it make?  It's not material to

47

1    the case.

2          MR. SCHAPIRO:  Well, maybe my analogy is imperfect

3    in that way because in this case the detective is saying and

4    the plaintiffs' lawyers are saying, Well, we know -- we are

5    not just relying on the fact that you saw this person come in

6    once or twice.  They are saying that that they sent all of

7    these notices to us and that these notices put us on notice

8    of actual infringement --

9          THE COURT:  Stop there, stop there.

10         MR. SCHAPIRO:  -- among the --

11         THE COURT:  Did you say that -- did your client

12   retain notices that were sent?

13         MR. SCHAPIRO:  Did our client retain notices that

14   were sent?

15         THE COURT:  Yes.

16         MR. SCHAPIRO:  I don't think we have them for the

17   entire period, but they have been produced to us by the other

18   side in this case.

19         THE COURT:  No, I know, but these were -- I know I

20   have discussed this before, but it's been a lot of water

21   under the bridge.  Were these electronic notices?

22         MR. SCHAPIRO:  Yes.

23         THE COURT:  And did your client retain any of those

24   from the period 2012 to 2015?

25         MR. SCHAPIRO:  I think I would have to ask one of

48

1  my colleagues to weigh in on that because I'm actually not

2  sure.

3          THE COURT:  Is this part of a spoliation evidence,

4  by the way?

5          MR. SCHAPIRO:  They call it spoliation, yes.  We

6  call it the ESI issue, so I'm not sure which -- what

7  percentage or which we have.

8          THE COURT:  Well, it's a loss of data in any event,

9  right?  We all agree on that.

10          MR. SCHAPIRO:  Yes.

11          MR. GOULD:  If that's helpful, Your Honor -- if

12  it's helpful, Your Honor, I have a fair familiarity with the

13  numbers.

14          THE COURT:  Go ahead.

15          MR. GOULD:  So of the roughly 700,000 notices we

16  sent to Charter, they were able to identify somewhere in the

17  ballpark of 11 percent.

18          THE COURT:  You mean that they -- that they had

19  already, that they maintained?

20          MR. GOULD:  Well, what we know from the litigation

21  and the discovery is that we have received records from them,

22  from Charter, demonstrating that they saved data from

23  approximately 11 percent of our notices.

24          THE COURT:  Okay.  Andrew, I have got to -- do you

25  expect to challenge the authenticity or accuracy of

1    plaintiffs' representation on the 700,000 notices?  Or do you

2    expect to be able to, in good faith, argue that that, in

3    fact, did not happen; that there were not 700,000 notices is

4    during that time period?

5             MR. SCHAPIRO:  I don't think we will contest that

6    there were -- I can't tell you the exact number, but that

7    notices they say they sent were sent.  We are not going to

8    contest the fact that notices were sent.

9             THE COURT:  Okay.  So I want to see -- I mean, if

10   you can do so without revealing your thought processes, which

11   is what this whole dang thing is about.  Being a trial

12   attorney myself and a trial judge, I want you to walk me

13   through how -- if there's not going to be a fact dispute on

14   the 700,000 notices being sent, although you may dispute that

15   those notices had -- were accurate in the sense that what

16   they say happened actually happened -- I suspect that's where

17   the challenge -- some challenge may be; is that correct?

18            MR. SCHAPIRO:  Precisely.

19            THE COURT:  Okay.  So in all of these notices that

20   they sent, there's information in each notice, but what you

21   will be contesting at trial is that, Members of the Jury, for

22   many of these notices, they were simply wrong.  There was no

23   illegal download, there was no sharing.  They just -- where

24   they got this information, we are not sure, but they are

25   wrong.  Is that -- am I getting that correct?

50

1          MR. SCHAPIRO:  Ladies and Gentlemen of the Jury,

2   they are wrong and the reason we know that is because you saw

3   in this hash report when they went out and said, Go chase

4   down these 7200 hashes, it turned out that some substantial

5   portion of them couldn't be found and that another portion of

6   them, although they were found, when Audible Magic tried to

7   match it and say that it was work they claim it was, it

8   wasn't actually.

9          THE COURT:  Respond, please, Jeff.

10         MR. GOULD:  Thank you, Your Honor.  Mr. Schapiro

11  focuses on two -- the hashes that were not downloaded in 2016

12  and the 2016 Audible Magic results.  Nothing in the hash

13  report informs the first, beyond what Mr. Schapiro already

14  knows.  There's a body of notices that include a finite

15  number of infringing files identified by hash.  Mr. Schapiro

16  and Charter know which files were downloaded and produced and

17  they know which ones were not downloaded and produced.  They

18  can make whatever arguments they want to the jury about what

19  that means.  They could say, You should not believe

20  plaintiff, Ladies and Gentlemen, that these files that they

21  claim exist actually do exist.  That's their argument; that

22  these files don't actually exist.  They can make that

23  argument without the hash report.

24         As to the 2016 Audible Magic results, what they

25  want to do is see if Audible Magic said something different

51

1   at different times about files with the same hash.  And they

2   kind of -- let me cap their own argument there as well,

3   because they argued in these papers and to you on September 9

4   that because the Audible Magic referenced database is dynamic

5   and changes over time, looking at it later in time does not

6   tell you anything meaningful or may not tell you anything

7   meaningful about what Audible Magic found and said about the

8   same file at some different period of time.

9           And by the way, they have the downloaded file and

10   so I don't know why it's so critical that they find out what

11   Audible Magic said about them.  They can listen to them.

12   They can run them through any tool they want.  So they have

13   no need for the non-downloaded hashes because they know what

14   those are and they can do any analysis they want to

15   demonstrate to the jury that the files that we say are

16   infringing actually are not.

17           THE COURT:  Let me ask you a question.  So whatever

18   Mark Monitor did in 2016 was a historical review, correct?

19           MR. GOULD:  I'm sorry, can you repeat that, please.

20           THE COURT:  Okay.  Whatever Mark Monitor did in

21   2016 had to deal with what happened from 2012 to 2015?

22           MR. GOULD:  What Mark Monitor did in 2016 was spend

23   a single month looking on several peer-to-peer networks for a

24   bunch of files.

25           THE COURT:  Okay, but can that be done today?

1          MR. GOULD:  That could be done today.  And if a

2     file with a hash that appears in our notice in 2012 is still

3     circulating on the peer-to-peer network, it's the same

4     infringing content that was the subject of our notice a

5     number of years back.

6          THE COURT:  But it's likely there would be less of

7     that today than there was in 2016?

8          MR. GOULD:  Well, if you are asking whether the

9     scope of peer-to-peer infringement has changed, I would say

10    no, there's a proliferation of the use of the internet, and

11    though there are trends here and there and (inaudible),

12    peer-to-peer infringement is still a problem.  If you are

13    asking whether those same files circulating in 2012 or 2014

14    are still circulating today, that's a harder question.  It

15    will depend on the social mores and the holiday seasons and

16    the hot new releases and what's popular.  But as to a given

17    file, maybe and maybe not.

18         THE COURT:  Mr. -- well, Jeff, do you believe that

19    Andrew already has the information he says he needs in a

20    different form?

21         MR. GOULD:  I think he has the information he needs

22    to make the argument that he presented to you --

23         THE COURT:  Where did he get that?

24         MR. GOULD:  -- which is that --

25         THE COURT:  Tell me how did he got that.

1          MR. GOULD:  He can look at the whole body of hashes

2     listed in our notices and subtract the hashes from the

3     downloads we produced and tell the jury that every other hash

4     we noticed either doesn't exist or Mark Monitor never

5     downloaded it or, you know, plaintiffs are trying to pull the

6     wool over your eyes.

7          MR. SCHAPIRO:  So if I may, Your Honor.

8          THE COURT:  Go ahead.

9          MR. SCHAPIRO:  Mr. Gould may want to prescribe or

10    limit the way we would argue this important point, but we

11    have a right to argue it in the way that we think is

12    strongest.  And so for us just to say, all right, well, there

13    are X number of notices, but now they are able to show you,

14    Jury, only a certain number of files, we can infer that we

15    actually weren't able to find those or that Audible Magic

16    didn't match them, I would bet -- you know, I would bet my

17    home on the fact that the plaintiffs will stand up and

18    contest that.  They are going to say, no, it doesn't show

19    that.

20          We would like to be able to show and we have a

21    right to show, based on the (inaudible) saying, you know, and

22    we're not just making this up because here, in fact, when

23    they sent out 7200 hashes to try and re-create this evidence

24    of what happened in 2012 and 2015, part of this 2016 project,

25    which is the project that produced every single file that

54

 1    they are pointing to as their evidence in this case, look

 2    what actually happened.  It came back tremendously

 3    unreliable.  I shouldn't have to just say, Oh, well, subtract

 4    and then you can guess that it might have been, unless they

 5    want to disavow an (inaudible).  If they will stipulate that

 6    that's true, sure, that's fine, but I would be surprised if

 7    they would do that.

 8             THE COURT:  Well, so I need some education here.

 9    Could you engage in a similar effort that Mark Monitor did by

10    retaining your own expert and have them sort of do the same

11    thing today?  Could you do that?

12             MR. SCHAPIRO:  The expert that we have -- so there

13    is Mark Monitor and there's Audible Magic.  So they propose

14    -- the plaintiffs, rather, in their brief proposed that we

15    should hire Audible Magic to try and go out and do this,

16    which is completely unrealistic for two reasons.  The first

17    reason is that Audible Magic is their litigation consultant,

18    their supporter, and we are trying to test the reliability of

19    the Audible Magic product.

20             But, secondly as Mr. Gould noted, and we have said

21    in other context, the database is what is called a dynamic

22    database.  So the closer in time report that they produced in

23    2016 and on which they are relying for this case is far more

24    useful for us than anything we would try to re-create now,

25    and I would also say that's a tremendous burden and expense.

55

1        So if they have this report that they are declaring

2   is privileged that they could just provide to us that is not,

3   we would say, work product, we shouldn't have to go hire and

4   got find some consultant other than Audible Magic to try and

5   be, you know, try and duplicate what Audible Magic did.

6   That's -- that's not efficient or fair.

7        THE COURT:  Well, except the last time I agreed

8   with that argument, I was reversed by Judge Jackson, okay.  I

9   relied on that same analysis in requiring the plaintiffs to

10  produce, I think regarding the plaintiffs to produce

11  something, and Judge Jackson overruled that.  So I'm not so

12  sure that that's an argument that is -- that he agrees with.

13       MR. SCHAPIRO:  Respectfully, I think the context is

14  quite different here.  Here, there is an assertion of

15  privilege over a single document or a single set of

16  documents.  They are already accruing and existing, and I

17  think, you know, the threshold question is:  Is it even

18  cognizable as work product before we go any further?  And

19  just the basic data which we are seeking and some work

20  product that became apparent -- or some opinion that became

21  apparent that is not overcome or not laid in the course of

22  the in-camera discussion, there could be a redaction -- if

23  there is something there that says, there could be a

24  redaction, but there is this document that is there.  We are

25  not asking them to create any new document and the burden

56

1    regardless is something that needs to be taken into account.

2              THE COURT:  How long is this hash report?  Like,

3    what is the size of it?

4              MR. GOULD:  I'll assume that question is for me.

5    It's a spreadsheet that has roughly the 7200 lines.

6              THE COURT:  But it's just data.  So as far as

7    computer memory space, it wouldn't be that large?

8              MR. GOULD:  Correct.  That was a partial

9    (inaudible) quite a bit more, and then we have been talking

10   about all of the different ins and outs, I don't want to

11   disclose too much about it.  It's a spreadsheet that's

12   manageable, a whole bunch of megabytes.  It's not, you know,

13   photos or (inaudible) ones that requires a super computer.

14             THE COURT:  All right.  Well, I mean, I guess I've

15   have got to treat everybody fairly.  So I -- as much as I'm,

16   you know, trying to envision what we are talking about, I

17   think I need to see it.  So would you please submit that in

18   camera, too?

19             MR. GOULD:  Yes, Your Honor.

20             THE COURT:  Okay.  I think I have exhausted the

21   argument then on that unless somebody wants to add anything.

22             Hearing nothing, what else can we talk about?  Go

23   ahead.

24             MR. GOULD:  Your Honor --

25             THE COURT:  Go ahead.

1          MR. GOULD:  -- I'll just close on two thoughts.

2    One is the substantial need burden is quite high, there's

3    been no real dispute that this is work product, and the

4    substantial need burden is not relevant and it's not

5    speculation about what I might be able to do with the

6    document.  It's real, it requires essential or crucial

7    evidence demonstrated by Charter in this case.  And I don't

8    think they have come close because they don't need it, it's

9    not critical, and particularly as to the Audible Magic piece

10   of the hash report, there are numerous ways for them to find

11   substantially equivalent information.  It may not be a

12   hundred percent exactly the same, but the standard is

13   substantial equivalence.  They can do their own listening

14   analysis, they can do their own visually forensic -- visual

15   forensic comparison, and they haven't come close.

16          MR. SCHAPIRO:  Mr. Gould began by saying that there

17   is no dispute that there is work product.  Just for the

18   record, we do dispute that it's work product for the reasons

19   outlined in our briefs and discussed today.  And I will leave

20   it at that, unless people want to keep talking about it.

21          THE COURT:  I don't.

22          MR. SCHAPIRO:  Your Honor, we do have another issue

23   if we're finished with this, just housekeeping type of

24   issues.

25          THE COURT:  Go ahead.

100

```
 1                    TRANSCRIBER'S CERTIFICATION

 2    I certify that the foregoing is a correct transcript to the

 3    best of my ability to hear and understand the audio recording

 4    and based on the quality of the audio recording from the

 5    above-entitled matter.

 6

 7    /s/ Dyann Labo                     December 30, 2020

 8    Signature of Transcriber                    Date

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```