1

```
 1            THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
 2
    Case No. 19-cv-874-RBJ-MEH
 3  _____

 4  WARNER RECORDS, INC., et al.,

 5       Plaintiffs,

 6  vs.

 7  CHARTER COMMUNICATIONS, INC.,

 8       Defendant.
    _____
 9

10          Proceedings before MICHAEL E. HEGARTY, United

11  States Magistrate Judge, United States District Court for the

12  District of Colorado, commencing at 12:59 p.m., February 18,

13  2021, in the United States Courthouse, Denver, Colorado.

14  _____

15  WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE HEREIN

16  TYPOGRAPHICALLY TRANSCRIBED. . .

17  _____

18                    APPEARANCES

19          JONATHAN M. SPERLING and MATTHEW J. OPPENHEIM,

20   Attorneys at Law, appearing for the Plaintiffs.

21          JOHN ROSENTHAL, JASON MOORE, and LINDA BREWER,

22  Attorneys at Law, appearing for the Defendant.

23  _____

24                 DISCOVERY CONFERENCE

25
```

2

```
 1                    P R O C E E D I N G S

 2              (Whereupon, the within electronically recorded

 3    proceedings are herein transcribed, pursuant to order of

 4    counsel.)

 5              THE COURT:  So Warner vs. Charter.  I don't even

 6    have a case caption, so 19-cv-874, but no one is going to

 7    wonder what case it is.

 8              Okay.  So let's start with, I think, the Winston &

 9    Strawn, January 2, 2020.  Okay, are you guys ready to

10    function on that one?  Who is going to be talking for the

11    defense?

12              MR. ROSENTHAL:  Your Honor, John Rosenthal.

13              THE COURT:  Okay.  So -- so for the plaintiff's

14    information, I'm going to be vague as I need to be to

15    describe the questions that I have, okay, because it's the

16    redactions that I'm asking about.  All right?  All on the

17    same page?

18              MR. OPPENHEIM:  Understood, Your Honor.

19              THE COURT:  Okay, so turn to page 3.

20              MR. ROSENTHAL:  Yes, Your Honor.

21              THE COURT:  Third paragraph in the bullet point.

22              MR. ROSENTHAL:  Yes, Your Honor.

23              THE COURT:  Is that privileged?

24              MR. ROSENTHAL:  Yes, I believe that shows opinion

25    work product.
```

1          THE COURT:  Okay.  If -- if that were a

2    deposition -- if that were an interrogatory question,

3    wouldn't that be discoverable?

4          MR. ROSENTHAL:  Yeah, I think the range of

5    custodians would, not ones that we feel, in our opinion, have

6    identified maybe more relevant or less relevant or why.

7          THE COURT:  Okay.  So it's -- it's the third word

8    in that paragraph that you're concerned about?  I mean, that

9    makes it --

10         MR. ROSENTHAL:  Yes, Your Honor.

11         THE COURT:  All right.

12         MR. ROSENTHAL:  Your Honor, in fairness to

13   plaintiffs, I'm not sure they -- we have not delivered the

14   privileged -- the updated privilege log yet, so I'm not sure

15   they understand what document we're talking about.

16         MR. SPERLING:  I can confirm, Your Honor, that we

17   do not.

18         THE COURT:  Okay.  So this is a -- I'm going to

19   just identify the proposed parts as unredacted.  John, you're

20   okay with that, right?

21         MR. ROSENTHAL:  Yes, Your Honor.

22         THE COURT:  Okay.  This is a January 22, 2020 memo

23   from Winston & Strawn to Charter Communications, and the

24   topic is Charter Communications.  Don't you want to delete

25   four words in that first in re: line?

4

1          MR. ROSENTHAL:  Yes, Your Honor.

2          THE COURT:  So was that an oversight?

3          MR. ROSENTHAL:  Yes, Your Honor.

4          THE COURT:  Okay.  So Charter Communications data

5   loss analysis, okay?

6          MR. ROSENTHAL:  Right.

7          THE COURT:  Are you good on the plaintiff's side

8   for understanding what we're doing?

9          MR. OPPENHEIM:  I think as well as we can, Your

10  Honor.

11         THE COURT:  Yeah, I agree with that.  Page 5, first

12  sentence -- in fact, what's wrong with the whole -- in the

13  third bullet point, what's wrong with that paragraph?

14         MR. ROSENTHAL:  Which bullet point, Your Honor?

15  I'm sorry, I was moving to the page.

16         THE COURT:  Page 5, third bullet point.

17         MR. ROSENTHAL:  Yeah, we can make that available,

18  although this was the focus with e-mail loss, not text.

19         THE COURT:  Understood.  Well, yeah, I think it

20  falls within the zone of relevance.

21         What about parts of the next longer bullet point?

22  Maybe not the first sentence, maybe not the second, but what

23  about the third sentence?  And the fourth?  That would be the

24  last two sentences, without the footnote.

25         MR. ROSENTHAL:  Yeah, the third one I don't have a

1   problem with this.  The fourth one, it's more opinion work

2   product.

3           THE COURT:  Okay, let's unredact the second-to-last

4   sentence, then.

5           Yeah.  For the plaintiff's benefit, starting on

6   page 6, there is virtually nothing redacted; page 7, nothing;

7   page 8, nothing; page 9, nothing; page 10, nothing; page 11

8   starts redactions again.  So the pages that are unredacted

9   are the substantive conclusions regarding the issue we're

10  discussing.

11          So the memo was not intended just to recount the

12  facts, but also interspersed with -- with conclusions reached

13  as far as the data loss is legal advice and research.

14          Turning to page 15, is that also something less,

15  starting -- I don't know what you would call that, but the

16  table, does that -- I know it probably contains mixed

17  information, correct?

18          MR. ROSENTHAL:  Yes, Your Honor.

19          THE COURT:  But does it also -- is it a selected

20  group or the total universe?

21          MR. ROSENTHAL:  It is a selected group.

22          THE COURT:  Okay, turning to 18.  What's wrong with

23  that first paragraph?

24          MR. ROSENTHAL:  Well, first, I didn't think CATS

25  was in the scope here.  Second of all, this is kind of a

6

1  compilation of our analysis based upon a variety of sources.

2  So it's not like just a recitation of a particular document

3  or piece of fact.  It's really --

4          THE COURT:  Well, I don't see any analysis --

5          MR. ROSENTHAL:  -- what's our interpretation --

6          THE COURT:  I don't see any analysis in there.  I

7  see factual conclusions.  I mean, I think, from your

8  perspective, all that paragraph is -- is true; is that

9  correct?  Or is it -- is it just somebody's position?

10          MR. ROSENTHAL:  So it would -- those were the facts

11  that we had analyzed at that point in time.  There was

12  additional work done around that issue, so I don't know

13  whether it reflects the current state of today.

14          THE COURT:  Well, I think that paragraph would be

15  helpful.  I think it's -- if anybody was asked a question

16  like a question incorporating the words in the Number 4 that

17  leads off that paragraph and -- I mean, would there be an

18  objection if somebody testified to all that information?

19          MR. ROSENTHAL:  No, again, if they testified, but

20  this is an attorney trying to analyze all that stuff and put

21  it together in a narrative.

22          THE COURT:  But that's -- that's --

23          MR. ROSENTHAL:  Your Honor, I don't have a problem

24  this.  Ms. Golinveaux is not on the phone and I would just

25  want to have the opportunity to confer with her, and if we

7

1    have a problem, we can come back.  I don't think it will be a

2    problem.

3              THE COURT:  Yeah, that's fine.  I mean, I'm

4    inclined to view that paragraph as the equivalent of what's

5    being not redacted.  I mean, if there are specific -- I just

6    don't see anything in there that I would call work product.

7    I understand all the rest that you've said, but let's think

8    about that paragraph and get back to me.  And the first

9    sentence of the next paragraph, okay?

10             MR. ROSENTHAL:  Yes, Your Honor.

11             THE COURT:  All right.  Then that's it.

12             MR. ROSENTHAL:  All right.

13             THE COURT:  Now, there is others, though, correct?

14             MR. ROSENTHAL:  Yeah, there was a -- there is the

15   original document that you asked about and then there was an

16   attachment to this document, a timeline.

17             THE COURT:  Was that -- could you direct me to --

18   do you have the folder?  And show me the number of bytes so I

19   can identify the document.

20             MR. ROSENTHAL:  Mr. Moore.

21             MR. MOORE:  Yes, Your Honor.  So for -- the

22   timeline is, I show it as 275 kilobytes.  It begins 1/2/20

23   memo, Attached A.

24             THE COURT:  Okay.  Yeah, I show something different

25   than that, but -- okay, there is just a very -- the

8

 1   non-highlighted red, is that additions that you're proposing?

 2            MR. MOORE:  I apologize, Your Honor, I don't

 3   understand.

 4            THE COURT:  Okay, you have red.

 5            MR. MOORE:  You mean the red text?

 6            THE COURT:  Red text and highlighted red text or

 7   highlighted text.  So is the red text a proposed addition

 8   that wasn't in the original?

 9            MR. ROSENTHAL:  So this original was -- this is an

10   attachment to the 1/20 memo.

11            THE COURT:  Right.

12            MR. ROSENTHAL:  So -- so this is a new document.

13            THE COURT:  What do you mean?

14            MR. MOORE:  The red text, Your Honor, was -- was in

15   the original document.  If you look at the legend, it

16   signifies comments or sources that were considered

17   attorney-client privilege at the time.

18            THE COURT:  Right.  Well, okay, so under Date Issue

19   Event, and then the fourth field is in red.  Are you

20   proposing to produce that field, the title of that field?

21            MR. MOORE:  If -- yes, Your Honor.  If it's not

22   highlighted in red, we're proposing to produce it.

23            THE COURT:  All right.  So I'll just tell the

24   plaintiffs that there is very little that is redacted out of

25   this.  Maybe 1 percent.  And I'm -- I'm okay with the

9

1    redactions on that.

2              What else do I need to look at?

3              MR. ROSENTHAL:  The redactions for the 8/19 memo.

4              THE COURT:  And I don't know if I have an 8/19

5    memo.

6              MR. MOORE:  It's titled CH Priv Log 00586, Proposed

7    Redactions.

8              THE COURT:  Okay, hold on.  Oh, 586?

9              MR. MOORE:  Yes, Your Honor.

10             THE COURT:  All right.  That one is a little more

11   difficult, but the gray scale is kind of hard to read.  So

12   what you're proposing to produce is -- or not produce, I

13   guess, is the gray scale?

14             MR. ROSENTHAL:  Yes, what's boxed out in the gray

15   scales.

16             THE COURT:  All right.  And interspersed with some

17   of the text?

18             MR. ROSENTHAL:  Yes, Your Honor.

19             THE COURT:  All right.  For the plaintiff's, this

20   is an August 22 -- August 20, 2019 memo again from Steven

21   Sherman and others at Charter to Winston & Strawn.

22             MR. ROSENTHAL:  Your Honor, sorry to correct you.

23   It's from Winston & Strawn.

24             THE COURT:  Oh.

25             MR. ROSENTHAL:  So what this is --

10

1          THE COURT:  All right.

2          MR. ROSENTHAL:  -- this is the -- this is the

3    earlier memo.

4          THE COURT:  Right.

5          MR. ROSENTHAL:  And the one we just reviewed was an

6    update to this memo.

7          THE COURT:  Okay.

8          MR. ROSENTHAL:  So even though the other one is

9    dated January -- January 20, 2019, that was a typo.  It was

10   actually January 20, 2020.  So that was a later update to

11   this -- this memo.

12         THE COURT:  Okay.  So same comments, I think some

13   of the same -- at least one I'm seeing, same paragraph that I

14   thought should be produced is in this one, right?  On page 8?

15         MR. ROSENTHAL:  I'm going there, Your Honor.

16         THE COURT:  Right after the table.

17         MR. ROSENTHAL:  Yes, Your Honor.

18         THE COURT:  Okay.  And then --

19         MR. ROSENTHAL:  And the same (inaudible) on the

20   next paragraph, Your Honor.

21         THE COURT:  Okay.  Would you say that this is in --

22   in total a subset of the later one with regard to total --

23         MR. ROSENTHAL:  Yes.

24         THE COURT:  Okay, all right.  Then same comments

25   would apply.  What else do I need to look at?  Mr. Moore,

1    what about you, anything else?

2            MR. MOORE:  We had no further proposed redactions,

3    Your Honor.

4            THE COURT:  Okay.  All right.

5            MR. ROSENTHAL:  Jason, and maybe I'm -- Your Honor,

6    just one thing.  Your Honor, maybe I'm looking at the wrong

7    version, Jason, but the Appendix A does seem to blocked out

8    on this.  We would be proposing to redact the entire Appendix

9    A, correct?

10           THE COURT:  Is that part of the --

11           MR. MOORE:  I --

12           THE COURT:  Is that part of that same PDF or is it

13   a different one?

14           MR. ROSENTHAL:  No, same PDF.

15           MR. MOORE:  It does appear to be redacted in the

16   version that we submitted.  Appendix B is not.

17           MR. ROSENTHAL:  Okay.  For some reason the version

18   I have it doesn't look like it's been redacted.

19           THE COURT:  Appendix B or Attachment B?

20           MR. MOORE:  Attachment, Your Honor.

21           THE COURT:  All right.

22           MR. MOORE:  Apologies.

23           THE COURT:  Okay.  All right, why don't you please

24   consider what we've talked about, and if you're okay with

25   that, produce it, and if not -- what I don't want you to be

12

1    in a position to do is produce something now, then have me

2    require you to take -- to unredact some material, because

3    then that shows where we had disagreements, right?  So maybe

4    it will anyway, I don't know, but if you can live with what

5    I've just suggested, then go ahead and produce it, okay, but

6    after you consult with whoever you need to internally, but I

7    think --

8              MR. ROSENTHAL:  Yes, Your Honor.

9              THE COURT:  I think that (inaudible) that what I

10   just suggested is the right way to go.  All right?

11             MR. ROSENTHAL:  All right.

12             THE COURT:  Okay.  So while we're together,

13   anything else to make Monday the most efficient as possible?

14   Are we still doing Monday?  Did I -- I don't think I got a

15   response from anybody.  We still don't have a video feed?  We

16   do.  Okay, okay.

17             MR. OPPENHEIM:  My take on that issue, on that

18   point, Your Honor, we may have reached some consensus between

19   us and the best way to proceed on that, but before we get to

20   that, if we could just speak (inaudible) with this redacted

21   memo for a moment --

22             THE COURT:  Okay.

23             MR. OPPENHEIM:  -- or memos.

24             THE COURT:  Please.

25             MR. OPPENHEIM:  Jonathan, would you like to go --

13

1           MR. SPERLING:  Matt, go ahead.

2           MR. OPPENHEIM:  So I guess among the many things

3    that are on the agenda for Monday and potentially Tuesday of

4    next week is the issue of spoliation, and, you know, we don't

5    yet have this timeline, we don't yet have the documents.  I

6    don't know when we're going to get it.  I know that we had a

7    hearing a week ago or so, the idea was for us to get it

8    within the next day or so.

9           Is it possible that you could -- I mean, we're

10   about two business days out from the hearing.  Could we at a

11   minimum get this memo tonight?  I mean, I'm not certain we'll

12   be able to fully absorb it on Monday, but at least give us

13   some chance to.

14          THE COURT:  I mean --

15          MR. ROSENTHAL:  Well, I -- go ahead, Your Honor, I

16   didn't mean to cut you off.

17          THE COURT:  You'll be able to fully absorb it, I

18   promise you.  I mean, none of this is going to be a mystery.

19   In fact, probably 90 percent of it you've seen in some form

20   before so yeah, I mean, if -- I would like to do it by

21   tonight, yes, but I don't -- I'm not worried about your

22   ability to react and then -- the reason I wanted it produced

23   now with some time to reflect is so we can address the issue

24   of whether a 30(b)(6) is necessary, and if I thought it

25   wasn't, that you can make an educated record on why you think

14

1    it is.  Okay?

2          MR. OPPENHEIM:  Certainly.  And, you know, that

3    there are going to be -- there are some other

4    spoliation-related issues that have been tabled from the

5    hearing we had with the Special Master, that are going to

6    come up at all, kind of comes together, so the sooner we can

7    get it the better, that's all --

8          THE COURT:  Understood.

9          MR. OPPENHEIM:  -- Your Honor.

10         THE COURT:  Yep.

11         MR. OPPENHEIM:  Okay.

12         THE COURT:  So I would like it tonight.  I think I

13   just got it yesterday, so -- but I'm not -- this is tricky

14   stuff, it's important stuff to the defendant, and so, you

15   know, I just don't want to rush and make mistakes.  So I'm

16   okay with everything that has happened so far.

17         Anything else from the plaintiff?

18         MR. SPERLING:  So --

19         MR. OPPENHEIM:  Yeah, go ahead, please.

20         MR. SPERLING:  Yeah, apologies for the tag team,

21   Your Honor.  Just on that with the timing, obviously we

22   haven't seen the documents yet, but we're trying to get keep

23   up with the back and forth between the Court and Charter's

24   counsel, and it sounded like there was one paragraph that

25   we're suggesting should not be redacted, but Mr. Rosenthal

15

1    said he would like to confer with Ms. Golinveaux of his firm,

2    and so -- and come back to the Court.

3           And so with respect to that one, I just wanted to

4    make sure we had the same understanding with respect to

5    timing.  Is that going to get resolved by tonight so that the

6    Court can make a decision (inaudible) -- you know, if that's

7    going to be produced, that we get that by tonight as well?

8           THE COURT:  Yeah.  Well, based on the record that

9    John and I just made, I think he probably didn't feel

10   informed enough to give a final position, but as far as what

11   I heard from him and what I see myself, I still think it

12   ought to be produced.  So unless something -- unless some

13   better argument comes up, I want it included in what's

14   produced.  Okay?

15          MR. SPERLING:  Okay, thank you.

16          THE COURT:  Anything else from the -- by the way,

17   who -- is anybody coming from plaintiff's side?

18          MR. SPERLING:  Your Honor, from plaintiff's side

19   you'll have more participants than you want remotely, and I

20   will be there in person together with an associate from my

21   firm --

22          THE COURT:  Very good.

23          MR. SPERLING:  -- who I don't think the Court has

24   been able to meet with yet.

25          THE COURT:  We have electricity in every part of

16

1    the Metro area so there shouldn't be any inconvenience.

2              MR. SPERLING:  That's a step up.  So with --

3              MR. OPPENHEIM:  Yeah, go ahead, please, Jonathan.

4              MR. SPERLING:  Go ahead, Matt.

5              MR. OPPENHEIM:  So just wanted to speak to the

6    logistics for the Monday hearing.  We have been conferring

7    with counsel for Charter and making some good progress on the

8    best way to present things.  And one of the things I think

9    we're set up to do is to bring in a system whereby there's

10   better access to be than maybe the Court's existing video --

11             THE COURT:  Listen, you know, you could get a

12   better system from play school than what we have.  So I have

13   no doubt that what you're going to bring is going to be more

14   efficient.  We -- this cannot happen again.  I mean, I don't

15   care what IT has to do.  Is somebody on their way up?

16             MR. OPPENHEIM:  So --

17             THE COURT:  Hold on a second, I'm going to kick

18   some tires.

19             (Discussion with IT.)

20             MR. OPPENHEIM:  Linda, we can't hear you.

21             MS. BREWER:  Thank you.  Hopefully I'm off mute

22   now.  I was just going update the Court.  Your Honor, we have

23   on our end secured an IT vendor who has been working

24   cooperatively with your IT staff and we've been transparent

25   with plaintiffs about that, and, you know, have discussed

17

1   with them jointly retaining the vendor.  The vendor is

2   prepared to come in tomorrow and is going to provide

3   hotspots, so there will be two secure Wifi hotspots, so each

4   side will have their own secure Wifi.  And we'll have the

5   vendor on hand all of Monday to assist and troubleshoot

6   with -- with the technology.  So that's what we've made in

7   preparation for Monday.

8         THE COURT:  Well, great, maybe he can pop down to

9   our IT department and actually help us out a little bit too.

10        MS. BREWER:  He will be here tomorrow, so I think

11   we are willing to do that.

12        THE COURT:  Yeah, we'll take all the help we can

13   get.  We're not proud.  Okay, okay.

14        MR. OPPENHEIM:  And -- and with your permission,

15   Your Honor, we would like to use Zoom, which we'll provide,

16   that we've been discussing, which we think will allow the

17   participants who are participating remotely more reliable

18   access.

19        THE COURT:  Well, based on the needs of the Court,

20   I'm releasing us from being bound to our system because our

21   system is not working and we have to have a proceeding.  So I

22   don't have a problem with that.  Okay?

23        MS. BREWER:  Okay.

24        MR. OPPENHEIM:  Excellent.  We've also got -- oh,

25   I'm sorry, go ahead, Linda.

1        MS. BREWER:  So, Matt, in light of that, I think we

2   were trying to get that (inaudible) yesterday.  So I'll pass

3   Magistrate Judge Hegarty's guidance back to our IT to see if

4   that is possible for tomorrow.  I think that is going to

5   likely require some additional (inaudible), but we hopefully

6   have time to do that.  Okay.

7        MR. OPPENHEIM:  Also, Your Honor, we -- we had a

8   discussion about the best way to potentially review the three

9   custodians' documents that we discussed at the last several

10  hearings; that you had instructed Charter to bring a CD-ROM

11  with those three custodians nonproduced documents that had

12  been the subject of hits based upon agreed-upon results.

13       And while we appreciate the concept of bringing a

14  CD-ROM, we think what will be more efficient, and I think we

15  can agree with Charter on this, we all use the same

16  Relativity discovery platform, and we're going to provide, or

17  I guess Charter will provide, access to Relativity where

18  documents are already stored.  They'll have conducted

19  research with these documents which they'll have right there,

20  and it will be much easier to then pull documents up and look

21  at them than looking at a CD-ROM.

22       THE COURT:  Now, you have a license to do whatever

23  you need to do and whatever is most efficient.  I expressed

24  25-year-old technology, and I -- you know, I haven't

25  practiced law for 15 years, so, yeah, please bring

1    cutting-edge stuff.

2         MR. OPPENHEIM:  Great.  And just so you don't feel

3    like you're that out of it, Your Honor, both Mr. Sperling and

4    I had to get a lesson on this in order to -- to figure out

5    that this works better, so we're with you.

6         The last issue, though, which we suggested would

7    make this process much easier, there is roughly, you know,

8    over 30 documents as between these custodians, and we had

9    originally contemplated a process where there would be a

10   sampling of every tenth document, so the plaintiffs obviously

11   were doing something different.  And the question was we're

12   not going to go through 30,000 documents, we're not even

13   going to go through 3,000 documents.

14        What we thought from the plaintiff's perspective

15   would be the most sense is each of those custodians, as their

16   documents -- the search is loaded into Relativity, each of

17   those custodians generates basically an index of what their

18   documents are in an Excel spreadsheet, and we think that

19   if -- if Charter could provide a list of what those documents

20   are just with the meta data from them in advance of the

21   hearing, that all of us would be much more -- it would be

22   much easier for us to just flip through that, identify

23   documents that we think we want to look at and just pull it

24   up on the system.

25        We did propose this to Charter and they were

20

1   considering it.  They had not, I think, had a chance to

2   respond to, but since time is short we wanted to raise it

3   today for your consideration and to hear what Charter's

4   response was.

5          THE COURT:  Sure.  Well, certainly --

6          MS. BREWER:  We --

7          THE COURT:  Yeah, go ahead.  We can't -- I mean,

8   we're not going to be spending all day, either one or two

9   days, just look at documents we've got to really, you know --

10         MR. OPPENHEIM:  Of course.

11         THE COURT:  -- discuss big picture things and only

12   look at the individual trees when we absolutely have to.  So

13   go ahead, Ms. Brewer.

14         MS. BREWER:  Certainly, yes.  So we did have a

15   conversation with Mr. Oppenheim and Mr. Sperling yesterday.

16   We did agree that we would bring our -- you know, what will

17   likely be a laptop with the Relativity software on it.  It

18   will have saved searches on.

19         Where we're not in agreement with them is that the

20   process that was contemplated or ordered was that we would be

21   providing an index with meta data of our nonproduced

22   custodial documents.  Your Honor may recall one of the

23   custodians is Kirill Abramov, who is in-house counsel to

24   Charter.  These are sensitive documents.  They would be

25   privileged.  We are fully cooperative in whatever the Court

1    wants to do with regard to an in-camera review of the

2    documents.  We will stand prepared to do that in a realtime.

3         We do not believe it is reasonable or within the

4    scope of what was ordered us to provide Excel report or meta

5    data, a printout that would be an index of every document

6    that would be within those saved searches.

7         So we do object to that and we communicated that

8    yesterday.

9         THE COURT:  Okay.

10        MR. OPPENHEIM:  So, Your Honor -- I'm sorry.

11        THE COURT:  No, well, so a couple things.  Number

12   one, although my intention and desire to resolve all issues

13   up to this point on Monday or Tuesday, I'm not naive enough

14   to think there won't be something left to do.  So you don't

15   have to -- I mean, don't feel that you -- that this would be

16   the end of any particular request that you're seeking.  You

17   know, if -- I would like it to be the end, but we may also on

18   Monday or Tuesday set people off on a course toward the end,

19   so -- it's like what Churchill said, this is not end, or the

20   beginning of the end, but it is the end of the beginning, so.

21        Also, I don't -- the only order I have for Monday,

22   direct order, is that you guys don't tell me, As you may

23   recall.  Assume I don't recall a damn thing, okay.  Just

24   ready to educate me at all times, because I have Charter

25   documents on my desk like snow, like snow down in Dallas.

1    So, you know, I'm not going to able to retain all the

2    different discussions that we've had.  So you'll -- you'll

3    frequently bring me up to date about where we are on a

4    particular issue, okay.

5            MR. OPPENHEIM:  Yes, Your Honor.  And in that vein,

6    since you may not recall, at the hearing that we had where

7    you required Charter to turn over the metrics reports and we

8    discussed that the fact that Charter had taken the position

9    that the vast majority of those reports were nonresponsive,

10   we identified that -- that that actually was an indicator of

11   a substantial problem, and that was that we did not get

12   document production on significant issues, and especially

13   with respect to certain custodians.

14            We identified that Mr. Abramov, who was the

15   subject -- who was listed by Charter as one of the

16   individual -- on the Rule 26 disclosure as an individual who

17   had information about their policies and procedures, and

18   we've now learned actually that he was the -- he was

19   responsible for overseeing the DMCA program at some level.

20   And notwithstanding that, he was listed on the Rule 26

21   disclosures they originally didn't want to include him as a

22   custodian, they thought they were required by the Special

23   Master to do so.  There was a very intense discussion,

24   negotiation over what the search terms would be for his

25   documents.  Those narrow search terms resulted in over 27,000

23

1    hits and less than -- I believe it was less than a total of

2    250 documents were either produced or logged out of 27,000

3    very targeted searches.

4            So you had indicated -- we had asked for the

5    opportunity to sample his documents to see whether Charter's

6    failure to understand what is responsive and relevant in the

7    case was the problem in their production of Abramov

8    documents.  You've suggested that Charter should bring the

9    documents to this hearing, which is fine, and we're happy to

10   handle the process that way, and we appreciate that Charter

11   has agreed to bring the documents loaded in Relativity.  We

12   think that makes a lot of sense.

13           Without some kind of index, the negotiating through

14   30,000 some documents doesn't make any sense.  We won't have

15   time.  It would take us hours to even get through a tiny

16   number of documents.  If we had an index of the meta data in

17   advance -- and, again, these are things that already hit on

18   the agreed-upon search terms.  At least if we had that index,

19   we could have a fairly targeted and strategic and maybe

20   time-sensitive discussion.

21           And, you know, to the extent that -- that the issue

22   here is that somehow Charter believes that Mr. Abramov's --

23   the meta data associated with Mr. Abramov's e-mails, that is

24   the re: line, is potentially privileged, well, this is what

25   502(d) is really for and we could quickly enter a 502(d)

1  order on that meta data, we all know re: lines don't disclose

2  privileged issues in any kind of significant way, but to the

3  extent they're concerned about that, a 502(d) order would

4  quickly address that, and that way we would be set up to have

5  a very kind of well thought through hopefully strategic

6  discussion.

7  THE COURT:  What about a re: line that says we're

8  really in trouble on this one?  That might be privileged, do

9  you think?

10  Okay, Ms. Brewer.

11  MS. BREWER:  Your Honor --

12  THE COURT:  Go ahead.

13  MS. BREWER:  Mr. Oppenheim has now just reargued

14  what we extensively organized on the record on February 1.

15  Your Honor heard all of those arguments.  You heard our

16  response to that.  Before this hearing today I pulled up that

17  transcript and I reviewed it very carefully to see what your

18  final decision was after hearing that argument.  I have it up

19  in front of me.

20  The hearing concluded with you saying, Bring it --

21  referring to the documents:  Bring it on a disk that you can

22  run off of some kind of software on a computer that you can

23  bring with you.  Mr. Schapiro acknowledged, Okay.  You said:

24  Keep it all internal to yourself.  I'll sit next to you or

25  somebody and look at it, appropriately masked up if need to

1    be, and then I'll look at it for myself.

2            The process that we discussed at the conclusion of

3    the February 1 hearing was absolutely that our documents,

4    including Mr. Abramov's documents, would remain in

5    (inaudible) to your review in camera (inaudible) with us.

6            And we're prepared to do that, but we absolutely

7    object to providing the index that was never discussed, not

8    ordered of us, and was just raised with us for the first time

9    yesterday.  It wasn't even in the discovery charts that Your

10   Honor ordered us to exchange that we've just spent extensive

11   time dealing with in order to narrow issues.

12           This is a completely new ask.  It's invasive.  We

13   do not have time to enter into a 502(d) and we absolutely

14   object to this.

15           THE COURT:  Wait, hold on a second.  So I didn't

16   address the issue of an index, though?

17           MS. BREWER:  No, it was not asked in that hearing.

18   The sampling was asked, it was extensively argued, which

19   Oppenheim just did with the same arguments made today, and at

20   the conclusion of that you decided that the appropriate way

21   to respond was for us to bring all of the documents on our

22   device, which we are fully prepared to do.  We are fully

23   prepared to have the (inaudible).  We are -- we have retained

24   the trial (inaudible).  The trial (inaudible) be there to

25   troubleshoot.  All of this can proceed.

1          But Your Honor did not agree with them that this

2    sampling was appropriate.  Your Honor outlined a very

3    controlled, very smart process for this to -- for us to

4    disclose all of our issues on the 8th, for us to respond on

5    the 15th, for us to spend this meeting and conferring.  We've

6    done that, and we're prepared to proceed (inaudible) make

7    this, you know, on these searches, respond to questions in

8    realtime, but it was absolutely not contemplated that our

9    opposing counsel would sit down and participate in this

10   process or have a cheat sheet of what our documents are.

11          In fact, Your Honor earlier in the hearing, you

12   know, responded to that saying this is -- you know, this

13   is -- this process not Christmas, it's not -- you know,

14   it's -- we need to be realistic here.  This is a not a

15   process -- this Court does not contemplate a process where

16   I'm going to let opposing counsel pick an associate and come

17   over to Winston & Strawn and Quinn Emanuel and look over your

18   shoulder at what you're doing.  At some point you need to

19   have some trust in each other.  At some point you need to

20   focus on the issues that matter and you need to be

21   professional about this.

22          THE COURT:  Okay, hold on a second, let me ask you

23   a question.  Was this -- is this an historical index or one

24   that was produced during litigation?

25          MS. BREWER:  Produced during litigation.

1          THE COURT:  So it was created for the purpose of

2     identifying documents that had hits on them?

3          MS. BREWER:  No.  The index -- to clarify, Your

4     Honor, the index that they're asking for is for us to create

5     one today for their use.  That would be an index of saved

6     searches.  So the database of documents that were searched,

7     but deemed nonresponsive and not produced.  And what they're

8     asking is that we generate through our vendor a cheat sheet

9     or index of them that would show them every single document

10     contained within that search, including our in-house counsel,

11     who is the manager of this litigation's privileged e-mails.

12          MR. OPPENHEIM:  So, can I clarify, because that's

13     not -- I want to make sure that what we're proposing is

14     clearly stated.  I don't -- what we've proposed, and Charter

15     has already agreed to, is that all of these search -- all of

16     the documents that were responsive to the agreed-upon search

17     terms would be put into search files on this computer.

18     Relativity already has the index.  It's how Relativity's

19     software maintains the file.  So all we're asking for is that

20     index that Relativity already has that simply lists what the

21     documents are.

22          Now, there is absolutely no reason why the Court

23     should have to decide whether something is responsive or

24     relevant without input from the plaintiffs if the document is

25     not privileged.

1              So to the extent that there is a document that

2    Charter says this is not privileged, there is no reason that

3    the plaintiff shouldn't participate in discussion of whether

4    it's responsive or relevant because obviously the Court is

5    not familiar with all of the discovery requests in the case

6    and all of the issues.

7              So in terms of process, whether or not we have this

8    index, we presume we're going to be part of it.  And there is

9    a reason that you said that this process should happen, Your

10   Honor, and that's because there was serious, let's at least

11   just say, maybe breakdown in communication within the Charter

12   team as to what was responsive and relevant in the case, and

13   that's why we're here, so we can (inaudible) trust, but that

14   trust is why we're going through this process.

15             You didn't, Your Honor, reject the sampling

16   process.  You simply said, Bring the documents, so all --

17   you're right, the index was not discussed at the last

18   hearing, but we didn't discuss in any detail what the process

19   was, so we're trying to put forward what we think would be

20   most efficient because obviously we're not going to have time

21   to go through hundreds of documents.

22             THE COURT:  Well, so -- Ms. Brewer, what -- do you

23   have the same understand that Mr. Oppenheim just said about

24   the -- the platform on which these documents were -- were

25   generated creates its own index?  Is that your understanding

1    as well.

2            MS. BREWER:  No, it's not consistent with my

3    understanding, and as expressed, we have serious reservations

4    about this ask and we object to it.  It is highly invasive,

5    it is contemplating something that was not ordered, it is of

6    great concern, because it implicates our in-house counsel's

7    (inaudible) manager of this litigation.  And this was

8    something -- this was reargument on something that was

9    already heard and decided by Your Honor and I pulled up the

10   transcript.  I'll read it verbatim because --

11           THE COURT:  Well, no, I don't see it -- hold on, I

12   don't see it that way necessarily.  You guys have reargued

13   things in the past, I agree, but if we didn't discuss some

14   means by which one side could quickly assess at least some

15   substance of what the other side has and -- and it's not

16   privileged, then there is just no -- and it can be generated

17   with a couple of strokes on --

18           MR. ROSENTHAL:  Your Honor --

19           THE COURT:  -- on a computer, then there is just no

20   reason not to --

21           MR. ROSENTHAL:  Your Honor.

22           THE COURT:  Go ahead.

23           MR. ROSENTHAL:  Well, Your Honor, so this has been

24   the history of this litigation:  Constant overreach, constant

25   overreach, constant raising everything, multiplying the costs

1   of this litigation here.  And there is a way discovery works.

2   Under Rule 34, they serve a request and, you know, the

3   Federal Rules and Sedona Principle 6 recognize the producing

4   parties in the best situation to determine a search

5   methodology and determine the relevance.

6         Now, we have an adversarial system in the federal

7   system and it doesn't give the other side the right to sit

8   down and look at our document to determine relevance here.

9         Now, the Federal Rules were amended in 2015 and

10  those amendments carved out expressly the discovery of the

11  relevant information because what the rules committee has

12  identified was a constant overreach, and what they wanted to

13  do was eliminate what will likely lead to discovery of

14  admissible evidence and make it clear that what's in scope is

15  relevant evidence here.

16        Now, at the 11th hour they cherrypicked three key

17  custodians, including the person that is managing this

18  litigation, the in-house line attorney managing this

19  litigation, and now they want to sample his documents, and

20  they've raised an issue of what was I reviewed.  The quality

21  of the review, not the search terms, the quality of the

22  review, good enough.

23        So if Your Honor wants to review the documents to

24  make that determination in camera, we don't have a problem

25  with that, but they don't get to sit there and look at

1    documents we've determined are not relevant and make that

2    judgment themselves.  If they want to do that, then we want

3    the goose/gander rule.  We want their three key custodians.

4              THE COURT:  I understand.

5              MR. ROSENTHAL:  We want their work product as to

6    their index.

7              THE COURT:  I get your point, I get your point, let

8    me ask a question.

9              So Mr. Oppenheim, as far as you know, could such an

10   index be generated on the spot when we're here on Monday?

11             MR. OPPENHEIM:  Absolutely -- sorry, go ahead,

12   Jonathan, please.

13             MR. SPERLING:  Yeah, even though my name is not Mr.

14   Oppenheim.  Judge Hegarty, the index can be created

15   instantaneously at any time.  As Mr. Oppenheim said before,

16   neither he nor or I were familiar with the document review

17   platform before yesterday.  It's probably been 15 years since

18   either he or I engaged in a serious document review of our

19   own, too, but we've seen the system, we've inspected and we

20   know for a fact that it can be generated.  If it's not the

21   touch of one button, it's a few mouse hits, you know, but

22   it's literally that.  It's under 60 seconds to do this, and

23   we know that and we've seen it.

24             The difficulty, of course, of having it generated

25   on the spot there is then how will we get it in a usable

1   form.  And the only thing I would say in response to

2   Mr. Rosenthal's comments, because obviously he was not part

3   of the last hearing on this and we -- you ordered this

4   because you had concerns about the responsiveness calls that

5   they were making and so these abstractions discussions about

6   these rules I don't think are really helping the situation.

7          What we want is to facilitate the most efficient

8   review possible, exactly what Mr. Oppenheim said,

9   realistically, as you said, you can't remember everything in

10  order for the Court to make informed decisions about whether

11  the document is responsive or not.  The Court needs some

12  input from plaintiffs.

13         We're certainly not trying to pry into their

14  privileged documents, but the index is easy to create.  If we

15  get it beforehand, then we can have a really efficient

16  process.  If we wait until the day of the hearing and they

17  start trying to generate then, and there is going to be a

18  very, very large Excel spreadsheet, it will be very

19  difficult, because we'll be looking at it for the very first

20  time then and that will take a lot of time, as opposed to

21  having a chance to review it in advance and being able to

22  tell you that these are some of the documents that we think

23  merit your review.  And as to the extent you, after an

24  initial review, conclude that they're not privileged, merit

25  our review as well in light of the concerns that you had

1    about their responsiveness calls.

2              THE COURT:  Okay.  Well, if it's as easy to

3    generate --

4              MR. ROSENTHAL:  Your Honor, just --

5              THE COURT:  Hold on.  If it's as easy to generate

6    rate as you say, we'll do it first thing Monday morning, and

7    if I think it would help the process, we'll provide it then

8    and that will be one of the latter issues that we'll do and

9    you can have an army of associates looking things over and

10   selecting what you should be requesting.  Okay?

11             What else from the plaintiff?

12             MR. ROSENTHAL:  Your Honor, can we ask the same

13   courtesy from their side?  Can we select three custodians

14   randomly and ask them to bring the documents and have them

15   available on Relativity, because this is what's going to go

16   on.  Reviewers in a large complex case involving millions of

17   documents review documents and reviewers make decisions, and

18   I'm sure I can cherrypick documents on both sides where

19   somebody may have made an error and that's what they're going

20   to do here.  We want the ability to do the same thing on

21   their documents.  We want to select three key custodians of

22   theirs.  It's not easy -- it's just as easy for their vendor

23   to get it loaded on Relativity and have those materials there

24   so we can show through the goose/gander rule, Your Honor, the

25   same thing is going on.

1        THE COURT:  Well, I'm not going to preclude you

2   from that.  I just -- you know, I don't understand at the

3   moment or appreciate any argument you might have that there

4   were deficiencies.  We just don't have a record to build on

5   yet.  We may build on a record and we can maybe create that

6   record next -- early next week and this may have to be sort

7   of a monthly meeting that we have.

8        You're not going to be precluded from the kind of

9   request that you're making right now.  It just doesn't seem

10   like it's going to be efficient for us to do that this coming

11   Monday.

12        MS. BREWER:  Your Honor, if I may.  We did make a

13   record of that, because we carefully followed the process,

14   the exact process that Your Honor outlined for the hearing on

15   the 22nd, which was on the 8th, we sent them our chart going

16   through all of the written discovery requests that we served,

17   including document requests, and we identified deficiencies.

18        So we have communicated that to them and we have

19   not -- and we have worked very hard over the past two weeks

20   to try to winnow the issues down and to meet and confer with

21   them, but we have identified significant deficiencies in the

22   document production and they're well aware of that.

23        And so what Mr. Rosenthal has communicated as

24   appropriate in the goose/gander context is absolutely part of

25   record and is going to be part of the process on the 22nd,

1   and it's -- it is because we participated in the process that

2   you outlined.

3          So, absolutely, if this is the ask that they're

4   making of us, then they should stand prepared for the three

5   custodians that we can identify within a few hours of this

6   hearing to run the Relativity searches, and be prepared, like

7   we are, on Monday to -- to run the index with you and the

8   Special Master and we can decide from there.

9          THE COURT:  Jonathan.

10         MR. OPPENHEIM:  Your Honor, if I may --

11         THE COURT:  No, I'm going to ask Jonathan a

12  question.  He seems to know how easy this is.  Do you

13  understand what they're asking?

14         MR. SPERLING:  I understand what you're asking --

15  what they're asking, Your Honor.  And the difference, of

16  course, is we made a showing to you -- we didn't write a

17  letter to them.  We made showing to you the documents that

18  you concluded, you concluded, were directly responsive have

19  been designated as nonresponsive and withheld and even

20  redacted when they were first ordered to produce them.  They

21  haven't made any such showing to you.  Parties engage in

22  discovery disputes all the time where they follow up on

23  requests.  We, of course, have a bunch of issues that we

24  followed up with them about in our letter that we wrote to

25  them on the 8th, just as we've written to us.

1          Those disputes between the parties we agree don't

2     warrant this kind of inspection.  The issue here is that you

3     saw documents, you concluded they were directly responsive to

4     requests.  They should have been produced months and months

5     ago.  We told you, because it's true, they're the most

6     important documents we've seen in the case.

7          And in light of that, and in light of the

8     statistics that you saw in their responsiveness

9     determinations, you concluded that there was concern about

10    the responsiveness determinations that they made.  They've

11    made no such showing to you, and it's not appropriate for

12    them to turn around and say, well, but they've written

13    (inaudible) request to us on various things and, therefore,

14    we should be subject to the same procedure.

15         You had valid and serious concerns about

16    responsiveness determinations they were making.  It was based

17    on a showing.  They've not made that showing and we're not a

18    position now to start undertaking this new process because

19    they've decided --

20              THE COURT:  Okay, yeah, I'm going to stop you

21    there.

22              MR. SPERLING:  (Inaudible).

23              THE COURT:  We're going to lose our video.  Hold

24    on.

25              MR. SPERLING:  (Inaudible) not appropriate.

37

1          THE COURT:  Hold on.  We're going to lose our video

2     feed in two minutes because there is other judges that need

3     it.  So I wasn't prepared to go this broadly.  I'm not saying

4     no to anything specifically as far as a final decision.

5     We're just going to have to table this one until Monday,

6     okay?

7          Anything else from the plaintiffs, only about

8     making Monday more efficient?  You can't open any new can of

9     worms because I just don't have time.

10          MR. OPPENHEIM:  Nothing further, Your Honor.

11          THE COURT:  How about from the defense?

12          MS. BREWER:  No, Your Honor.

13          THE COURT:  Okay.  See you guys on Monday, take

14     care.

15          (Whereupon, the within hearing was then in

16     conclusion at 1:57 p.m.)

17

18

19

20

21

22

23

24

25

```
1                    TRANSCRIBER'S CERTIFICATION

2    I certify that the foregoing is a correct transcript to the

3    best of my ability to hear and understand the audio recording

4    and based on the quality of the audio recording from the

5    above-entitled matter.

6

7    /s/ Dyann Labo                    February 19, 2021

8    Signature of Transcriber               Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```