1

```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
2
   Case No. 19-cv-874-RBJ-MEH
3  _____

4  WARNER RECORDS, INC., et al.,

5       Plaintiffs,

6  vs.

7  CHARTER COMMUNICATIONS, INC.,

8       Defendant.
   _____
9

10        Proceedings before MICHAEL E. HEGARTY, United

11 States Magistrate Judge, United States District Court for the

12 District of Colorado, and REGINA M. RODRIGUEZ,

13 Court-Appointed Special Master, commencing at 9:22 a.m.,

14 February 22, 2021, in the United States Courthouse, Denver,

15 Colorado.

16 _____

17 WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE HEREIN
   TYPOGRAPHICALLY TRANSCRIBED. . .
18 _____

19                    APPEARANCES

20        JONATHAN M. SPERLING, SHIRA POLIAK, MATTHEW J.

21 OPPENHEIM, ALEX KAPLAN, STACEY GRIGSBY, ANDERS LIDEROT, J.

22 HARDER EHLERS, Attorneys at Law, appearing for the

23 Plaintiffs.

24 _____

25        IN COURT HEARING: UNRESOLVED DISCOVERY DISPUTES
```

2

1                    APPEARANCES (continued)

2              ANDREW H. SCHAPIRO, LINDA J. BREWER, GRACIE CHANG,

3      JOHN ROSENTHAL, ERIN R. RANAHAN, JACK M. TANNER, ALLISON H.

4      HUEBERT, JENNIFER A. GOLINVEAUX, SEAN ANDERSON, CECIE

5      ALVAREZ, Attorneys at Law, appearing for the Defendant.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              (Whereupon, the within electronically recorded

3    proceedings are herein transcribed, pursuant to order of

4    counsel.)

5              MR. ROSENTHAL:  For this, we realize it's a

6    significant chunk, two days out of your schedules, and we

7    appreciate your extensive efforts to try and move this along

8    and get the parties through their outstanding discovery

9    disputes.

10             As I mentioned before, we have some remote

11   participants, folks who are not able to travel for -- due to

12   the pandemic.

13             THE COURT:  Hold on just a second.  Chris, this

14   keyboard is not working with this computer.

15             (Court and courtroom deputy confer.)

16             THE COURT:  All right, go ahead and get started.  I

17   want to be able to make an internal record of what I'm doing,

18   but this computer system is not working.  We're having

19   somebody come up, they'll fix it on the fly, okay.

20             Jonathan, go ahead.

21             MR. ROSENTHAL:  Your Honor --

22             THE COURT:  Okay, John.

23             MR. ROSENTHAL:   -- John Rosenthal.  Before we

24   begin, just a little process.

25             As we understood it, the process that you laid out

4

1    starting at the end of January was the parties to prepare

2    charts, meet and confer, try and reduce the disputed --

3              THE COURT:  Well, you were supposed to -- you were

4    supposed to identify those issues you believe outstanding,

5    number one, on your side, all of them.  Send them to the

6    other side, get their response.  So it's going like this,

7    right?  And then do a 7.1()a), try to narrow it as much as

8    possible and at the end of that process, give to me an

9    identification of all the unresolved issues, which I told you

10   I would probably treat in the nature of a motion to compel.

11   So if granted, there is going to be fees.  That's what I

12   said.

13             So what's your question?

14             MR. ROSENTHAL:  Your Honor, so the parties spent a

15   great deal of time and effort and money to do that over the

16   last several weeks, and as it -- as it relates to plaintiffs'

17   issues, when we look at what we've done and the meet and

18   confers over the next several weeks, we're down to one RFA,

19   one interrogatory and two RFPs.

20             THE COURT:  Okay.

21             MR. ROSENTHAL:  And then Saturday night --

22             THE COURT:  That's good news, I assume.

23             MR. ROSENTHAL:  That is good news, except Saturday

24   night we had this dumped in our lap, right --

25             THE COURT:  Okay.

1          MR. ROSENTHAL:  -- which is a global motion about a

2     whole variety of stuff never raised --

3          THE COURT:  A global motion?

4          MR. ROSENTHAL:  Well, it's a series of -- I'm not

5     sure what you call this.  All I can tell you is that it's a

6     series of new things that weren't the subject of our meet and

7     confer, which I believe is going to be the subject of this

8     presentation.

9          THE COURT:  All right.

10         MR. ROSENTHAL:  So what I ask is we first focus on

11    those issues on the charts that the client --

12         THE COURT:  Okay.

13         MR. ROSENTHAL:  -- that the parties --

14         THE COURT:  Well, tell us what you did Saturday

15    night.

16         MR. SPERLING:  Okay.  What we did Saturday night,

17    Your Honor, is we submitted a brief where we identified --

18    let me dial back if I can for a second, Your Honor.

19         THE COURT:  Make it very brief.  If we -- if I let

20    you guys go on like you want to go on, we will not get a

21    single thing done, but we're going to get things done, so be

22    brief.

23         MR. SPERLING:  I will be brief, Your Honor.

24         This was a productive process and we're grateful to

25    you for setting it up.  Charter agreed to a number of

6

 1   requests that were outstanding that they previously did not

 2   agree to; that's great.  We'll talk about the time and

 3   consequences of that later on.

 4            We have outstanding RFPs, RFA interrogatory that we

 5   identified to them.  We have other outstanding issues that we

 6   identified to them and that we discussed with Your Honor and

 7   that we discussed with the Special Master that would be

 8   discussed, in turn, today.

 9            Those include issues related to spoliation

10   discovery; those include challenges to their privilege log.

11   All of that was discussed repeatedly with Charter, it was

12   discussed with you, it was discussed with Ms. Rodriguez as

13   things that we would be bringing forward.

14            I'm not aware of anything new that's in our papers.

15   If we get to such a thing and they say this is the first

16   they're hearing of -- the first they heard of it was Saturday

17   night, my suggestion is that we address that then.

18            THE COURT:  So in your view, whatever you did

19   Saturday night is just a summary --

20            MR. SPERLING:  That's --

21            THE COURT:  -- of everything that was done up to

22   that point.  Nothing new?

23            MR. SPERLING:  Nothing new, Your Honor, except

24   insofar -- you ordered them, for example, on Thursday to

25   produce to us redacted versions of certain documents related

1    to spoliation that they had until that point withheld as

2    opinion work product and you said it was important that we

3    would be able to get that so that we could address it today.

4              We got it Thursday night --

5              THE COURT:  Like I said.

6              MR. SPERLING:  -- like you said, Your Honor.  And

7    we spent Friday writing a submission and then the deadline

8    was pushed to Saturday night, which we appreciate, more time

9    for the papers to get better.

10             THE COURT:  So part of what --

11             MR. SPERLING:  And so that's included -- if

12   Mr. Rosenthal --

13             THE COURT:  And so that's included.  Okay, your

14   sort of weird position on whether that Winston & Strawn

15   material resolves the issue is what's included -- something

16   that's included in your notebook?

17             MR. SPERLING:  That's correct, Your Honor.

18             So if Mr. Rosenthal's complaint is that we didn't

19   come back to him between Thursday night and the original

20   Friday filing deadline to discuss how the materials he

21   produced impacted what we were going to want to say today,

22   he's right; I don't believe that was contemplated.

23             THE COURT:  Okay.

24             MR. SPERLING:  So a lot has come off the table.

25             We're happy to proceed with respect to the first

8

 1    issue, Your Honor.

 2            THE COURT:  Okay, hold on.  I just want to type, I

 3    just want to type, so help me type.

 4            (Court and courtroom deputy confer.)

 5            THE COURT:  All right, go ahead.

 6            MR. SPERLING:  Thanks, Your Honor.  So a couple

 7    of --

 8            SPECIAL MASTER:  Wait, hold on, Mr. Schapiro --

 9            MR. SPERLING:  Oh, yeah, we're waiting for Andy.

10            (Court and Special Master confer.)

11            THE COURT:  Please proceed.  Oh, we've got John --

12    we've got Andrew back?  No, not yet.

13            (Pause.)

14            THE COURT:  All right, please proceed.

15            MR. SPERLING:  So --

16            MR. ROSENTHAL:  Your Honor, Your Honor --

17            MR. SPERLING:  -- (inaudible), Your Honor.

18            THE COURT:  Hold on, hold on.  This is not going to

19    (inaudible) but go ahead.

20            MR. ROSENTHAL:  We still haven't resolved this.  We

21    worked out a process for over a month to go through these

22    charts.  We did that.  They dropped a 23-page --

23            THE COURT:  Who says I have to regard it?  Who said

24    I have to regard it at all?  I'll just ignore it.  Will that

25    settle the issue?

9

1          MR. ROSENTHAL:  That will settle the issue.

2          THE COURT:  Okay.  Please proceed.

3          MR. SPERLING:  Thank you, Your Honor.

4          So Mr. Rosenthal's interruption is actually tried

5     to what I wanted to begin with, with one prefatory comment

6     before that.

7          I just wanted the Court to know you had raised, a

8     couple weeks ago, essentially request parties having a

9     settlement dialogue in kind.  Judge Jackson made similar

10    comments to us in December.

11         THE COURT:  Andy and I spoke at length on Thursday

12    night.

13         MR. SPERLING:  Pardon me?  I didn't hear you.

14         THE COURT:  Mr. Schapiro and I spoke at length on

15    Thursday night about settlement.

16         MR. SPERLING:  Thank you, Your Honor.

17         THE COURT:  And I can talk to somebody from your

18    side any time you're willing to.

19         MR. SPERLING:  We're willing to do that today when

20    there is a break in the action, Your Honor.

21         THE COURT:  We'll do it today because that's what I

22    do best.

23         MR. SPERLING:  Okay, terrific.  Thanks, Your Honor.

24         THE COURT:  Yep.

25         MR. SPERLING:  So this was a good process, it was a

10

1    good process because --

2              THE COURT:  By the way --

3              MR. SPERLING:  Yes.

4              THE COURT:  -- it's a lot easier to settle with

5    someone that you're at least mildly tolerable of and don't

6    detest, so the better we get along today, the more likely

7    that process is.

8              MR. SPERLING:  Of course, Your Honor.  We don't

9    detest anybody.

10             THE COURT:  I know, I know.  It's a strong word.

11             MR. SPERLING:  But what was valuable about the

12   process is that we raised a great number of pending discovery

13   issues that they agreed to go back and acquiesce our request

14   on, and that's great.  But we're cutting out something

15   significant if we say, okay, let's just talk about the

16   handful that are left.  Because a big open question is:  When

17   are we going to get all of that material?  So that's

18   something we're willing to address.

19             And then we're very happy that they agreed to give

20   us that material.  There are a couple of significant things

21   outstanding.  They're not limited to the things that Mr.

22   Rosenthal said, because there is also significant issue

23   related to custodians.

24             Before we talk about that, when we spoke on

25   Thursday, we had the hearing in front of you, we discussed

11

1    the idea that at the beginning of today's conference, Charter

2    would provide us with the indexes, just the indexes for the

3    search term hits that were deemed nonresponsive for those

4    three custodians:  Mr. Abramov --

5              THE COURT:  They didn't agree to that.  I mean --

6              MR. SPERLING:  No, no.  You just said we should

7    address it first thing, Your Honor.

8              THE COURT:  All right.

9              MR. SPERLING:  And another thing you said was --

10             THE COURT:  That was stupid of me.

11             MR. SPERLING:  -- you said, Don't assume that I

12   remember anything.  And those --

13             THE COURT:  Yeah, they did a big, massive search,

14   they got 35,000 hits.  You think there is this huge index

15   that they could do a couple keystrokes and print out.  They

16   don't want to do that.

17             Is that the issue?

18             MR. SPERLING:  Well, I think that skips the

19   background, Your Honor, which you may recall.  I don't think

20   Ms. Rodriguez has heard it.

21             But the reason that we got there, the way that

22   they -- we got -- we got there and I would like to put

23   something on the screen, if I can.

24             The way that we got there had to do with the

25   metrics reports.  So -- so these are the metrics reports.

12

1   These are reports that Charter had on a monthly basis with

2   lots and lots of data, row after row, about how they were

3   handling DMCA tickets.

4           MR. ROSENTHAL:  Your Honor, I think --

5           MR. SPERLING:  There is also --

6           THE COURT:  Hold on, hold on, hold on.  Why are you

7   objecting?

8           MR. ROSENTHAL:  This is exactly what we're doing.

9           THE COURT:  What?

10          MR. ROSENTHAL:  We spent a month going over these

11  charts and now we're on to their presentation.  This is

12  their brief.

13          MR. SPERLING:  No, Your Honor.  No, Your Honor.

14  You said that we're going to address this today.

15          THE COURT:  I didn't want to hear it last week.

16  We're going to hear it right now, so.

17          MR. ROSENTHAL:  Well, Your Honor, can we go through

18  the charts first?  That's what we --

19          THE COURT:  What charts?  That these things that

20  you've created?

21          MR. ROSENTHAL:  Yes, Your Honor.

22          THE COURT:  Well, I mean --

23          MR. SPERLING:  Your Honor, you ordered something on

24  February 1 and they weren't happy about it.  They reargued it

25  on Thursday.  And here is Mr. Rosenthal interrupting me time

13

1    and time again because he wants to prevent us from addressing

2    something that you said on February 1 we were going to take

3    up.

4           THE COURT:  Well, tell me something I don't know

5    about this.  Don't reiterate anything you've said.  Just

6    don't tell me something I don't know, and I may or may not

7    decide at this point.  We may move on.

8           MR. SPERLING:  Terrific, Your Honor.

9           So your conclusion, after seeing what happened

10   here, was that you had concerns.  And here is your -- your

11   language up on the screen from the February 1 conference.

12          You had concerns about -- without any suggestion of

13   bad faith on anybody's part, the response to these

14   determinations that Charter was making, and your concern

15   arose from the fact that there was a request for metrics

16   reports and documents called Metrics Reports and they

17   redacted them and said that they weren't responsive and had

18   nothing to do with the issues in this case.  And it was only

19   once you forced them to unredact a little bit, that we found

20   out they had everything to do with this case and they agreed

21   to produce them all.

22          Now, there is more that we learned right after

23   that -- and this is new.  Because in addition to the reports

24   themselves, each one was accompanied by something called a

25   "dashboard," a monthly PowerPoint that had narrative reports

1    talking about steps that they were taking with respect to

2    handling DMCA tickets, right, infringement notices and how

3    they were logging them in their system.

4          We didn't know that when we were in front of you on

5    February 1.  These documents hit on our search terms, so it

6    means that somebody reviewed them and designated them

7    nonresponsive.

8          So before we even knew about this, you had a

9    concern, and then we talked about the yield on the search

10   term hits for one of their custodians Kirill Abramov, okay.

11         As we move on through the slide deck, you know, I

12   just want you to see some of the very specific references to

13   DMCA tickets and handling them that are in these dashboards

14   that come in the metrics reports that have been withheld as

15   nonresponsive.

16         So these heightened the concern.  And there is

17   material stuff here, like the fact that they were working

18   with Cox about how to handle infringement tickets.

19         So the issue with Mr. Abramov -- and this is more

20   detail than we had last time -- is as follows:  Mr. Abramov

21   had 27,458 unique hit on the search terms.  The search

22   terms --

23         THE COURT:  Where are the search terms?  Could I

24   have a list of the search terms, please.

25         MR. SPERLING:  Well, I've got some of them up on

1    the screen.  We're happy to give you a list of all of them --

2                THE COURT:  Okay.

3                MR. SPERLING:  -- but I could walk through four to

4    give you a sense.

5                THE COURT:  That's fine.  That's --

6                MR. SPERLING:  So let's go with the first one here.

7    We've got the text of the request on the left.  That's the

8    plain English version.

9                We've lost the screen for a moment.

10               THE COURT:  Yeah, as much as we like Mr. Oppenheim,

11   we don't want to be looking at him right now, so.

12               MR. SPERLING:  Yeah.  I see our documents are

13   shrunk down to the right.

14               THE COURT:  I do, too.  It's just too small to

15   read.

16               MR. SPERLING:  Yeah, of course.

17               FEMALE SPEAKER:  Your Honor, (inaudible).  Can we

18   get clarification from plaintiffs' counsel (inaudible)

19   production, which discussion relates to.

20               THE COURT:  5.

21               SPECIAL MASTER:  And can I just get a little bit of

22   clarification, Jonathan?

23               MR. SPERLING:  Yes, of course.

24               SPECIAL MASTER:  It was my understanding you're

25   talking about right now RFP 5?

16

1          MR. SPERLING:  What we're talking about it relates

2   to 5, 13, I'll go to the next slide, but there was a

3   discussion with Judge Hegarty on February 1 about doing a

4   review of documents that hit on the search terms for

5   Mr. Abramov, Ms. Rowlett and Mr. Mabb, three Charter

6   custodians, but that were designated nonresponsive.

7          And we discussed on February 1 that we would

8   address that today.  And Charter was actually instructed to

9   bring the documents, although we worked out that they would

10  have them accessible electronically.  So it is distinct from

11  the charts.

12         But to forestall the next interruption, I don't

13  really understand, we had a discussion on the 1st about doing

14  this today.

15         THE COURT:  Right.  But so what I think they're

16  referring to is:  Charter appreciates plaintiffs'

17  representation on February 18 meet and confer that plaintiffs

18  do not intend to raise any further issues regarding this

19  request, Request Number 5, at the 2/22 hearing.

20         Apparently, that was a misstatement.

21         MR. SPERLING:  So we don't have a dispute over the

22  scope of what they are searching for in Number 5.  We have an

23  issue with their responsiveness determinations and it's not

24  limited to any specific request.  We can't know what it's

25  limited to.

1              Here are four examples.  This was a request, they

2    were supposed to look for documents in Mr. Abramov's files

3    concerning these various peer-to-peer-file-sharing networks,

4    and the search terms required there to be -- in order for the

5    document to hit, there had to be a reference to one of those

6    peer-to-peer protocols.  And it had to be in conjunction with

7    something like studies or review or investing or things like

8    bandwidth or peer-to-peer.  And Mr. Abramov had 13,224 hits

9    on this search term.  That's a lot.

10             We'll get in a moment to how few documents were

11   produced, but you'll recall, Your Honor, it's fewer than a

12   hundred and fewer than 200 that were logged.  And that's not

13   as specific to this search; that's as to all of them.

14             The next search I wanted to focus on, Number 13, is

15   asking any technological means or mechanisms that they

16   considered or implemented to prevent violations of their

17   acceptable use policy.

18             And again, it's a pretty specific search.  There

19   are 8,750 hits.  So we expected there to be a reasonable

20   number of responsive documents here.

21             I'll show the Court two more.  If you could go to

22   the next line, please.  Request 29 was all communications

23   between Charter, on the one hand, and any subscribers or

24   users, on the other, discussing or considering any

25   infringement notice.  That's the scope of what they had to

18

1    produce.

2          Here is the search.  Notice, ticket, et cetera,

3    within 50 of DMCA copyright, and it's limited to e-mails

4    where there is a non-Charter domain, an outsider on the

5    communication.  Over 4,000 such hits.

6          And the last one I'll show you was documents

7    concerning our copyright interests, the plaintiffs.  And the

8    search terms required that there be a reference to either the

9    IRAA, which is the Music Label's Trade Association, or the

10   plaintiffs themselves or MarkMonitor, who was the agent for

11   sending the notices, in conjunction with the terms.  That

12   refers to us.  And there were 2,772 hits on those.

13         But here is what was deemed responsive, and these

14   numbers are excluding their spoliation production.  There

15   were other documents there, because we're talking about the

16   determinations they made with these searches, these merit

17   searches, so I'm talking about the number of documents that

18   they deemed responsive to those searches.

19         It's 55 produced as of February 1; 61 as of today.

20   Those numbers are roughly 30 higher than what we represented

21   to you three weeks ago.  The difference is, there is some,

22   what are called, dummy documents, they just sort of say

23   "Charter" or nothing else, there is no content.  We didn't

24   count them, but we realize that you probably should since

25   they're part of the search term hit collection.

1          THE COURT:  But some of the Rule 502, 600 documents

2    would fall into this category, although not produced as part

3    of that process?

4          MR. SPERLING:  No, Your Honor.  They may have

5    produced other documents from Mr. Abramov as part of the

6    502(d) production, but none of those would have been part of

7    this 27,458 that hit on the agreed-ordered search terms.

8          THE COURT:  Okay.

9          MR. SPERLING:  So 61 produced as of today, 168

10   logged.  Out of 27,000, 458.

11         THE COURT:  Right.  But do you have any argument,

12   besides a statistical analysis, that it just can't be because

13   they're so few?  Do you have any other argument?

14         MR. SPERLING:  The argument is that when you look

15   at the terms, Your Honor, you look at the search terms and

16   you see how focused they are, okay, that gives rise to a

17   great concern as to how they could have designated so many

18   documents that hit on those terms nonresponsive.

19         THE COURT:  Right, that's what I mean.  That's a

20   statistical argument.

21         Do you have any -- do you have any -- a single

22   document that you got in some other manner that would have

23   been responsive but wasn't produced as part of this

24   production on these requests for production to show me that,

25   Aha, you know, this certainly was responsive and it was

1   within those 27,000 that wasn't produced?  Is there anything

2   like that?

3         MR. SPERLING:  We have two kind of things, Your

4   Honor.

5         We have, not specific to Mr. Abramov, the metrics

6   reports and the dashboards that we just spoke about.  We also

7   see, from their privilege log and from their redacted

8   documents that they produced, the partially logged --

9   partially redacted documents, that he was the individual who

10   was responsible for setting policy.  So he is somebody who,

11   by his nature, should have relevant documents.  These are

12   Charter's initial disclosures.

13         THE COURT:  No, I understand everything you're

14   saying.

15         Who is the point person for having made the

16   decision on what is responsive and what is not out of those

17   27,000 documents?  I want to speak to that person right now.

18         Do you have an example of a responsive document I

19   could look at?

20         MR. ROSENTHAL:  So, Your Honor --

21         THE COURT:  Yes, go ahead.

22         MR. ROSENTHAL:  -- as you might imagine, this was a

23   pretty complex process involving lots of people.  So a

24   third-party vendor, same vendor that they use, was hired to

25   do first-level review, and then the second-level review was

1    done by Winston.

2              THE COURT:  So if this -- if this vendor, who's

3    a -- are they lawyers?

4              MR. ROSENTHAL:  Yes, they're contract lawyers.

5              THE COURT:  Okay.  So this vendor, if they said

6    something is not responsive, was there any quality check on

7    that vendor?

8              MR. ROSENTHAL:  Yes, there was a QC process.  It

9    doesn't involve every single document, but it involves --

10             THE COURT:  Okay.  So the documents that the vendor

11   would have said are not responsive, and that was, at least

12   some documents were not reviewed further by anyone within the

13   counsel's team for the defendant?

14             MR. ROSENTHAL:  Yes, Your Honor --

15             THE COURT:  That's true?

16             MR. ROSENTHAL:  -- which would be -- that's the

17   normal process in discovery --

18             THE COURT:  Okay.

19             MR. ROSENTHAL:  -- on both sides.

20             THE COURT:  But did this vendor have an

21   attorney-client relationship with Charter?

22             MR. ROSENTHAL:  Yes.  It's -- it's -- in the

23   e-discovery industry in these large cases, it's typical that,

24   because of the cost of review, that a third-party review

25   service that has JD-qualified --

22

1          THE COURT:  No, I know that.  In your view, did

2    they have an attorney-client -- did that vendor have an

3    attorney-client --

4          MR. ROSENTHAL:  Yes, Your Honor.

5          THE COURT:  -- relationship with Charter, not a

6    contractual relationship with Winston & Strawn?

7          MR. ROSENTHAL:  Yes, Your Honor.

8          THE COURT:  Okay.  So in your view, that's just

9    another set of attorneys, even though they're not Winston &

10   Strawn, or whatever firm Andrew works for, even though

11   they're not the two outside law firms that are doing this,

12   they're still part of the team that is reviewing documents

13   and would be within the attorney-client relationship?

14         MR. ROSENTHAL:  Yes, Your Honor.

15         THE COURT:  Okay.

16         MR. SPERLING:  So, Your Honor, the issue is, we

17   know, not just at the first-line level of review, but at

18   higher levels of review there was -- there was a breakdown in

19   the process.  And that was what was so meaningful about the

20   metrics reports and the dashboards.  It's not just somebody

21   designated them nonresponsive, although that happened.

22   They're arguing that they were nonresponsive right up to the

23   day that they agreed to produce them.

24         THE COURT:  Okay, but wait a second.  I would like

25   to -- John, go ahead and tell me the nature of the

1    nonresponsive -- examples of nonresponsive documents and

2    responsive documents.

3             What's the difference?  I need to understand that.

4             MR. ROSENTHAL:  So, yeah.  I'm not sure how to

5    answer that, Your Honor.

6             This is Kirill Abramov.  He is the line litigation

7    counsel responsible --

8             THE COURT:  I know, his name has been thrown around

9    more than I care -- far more than he cares, I'm sure.

10            MR. ROSENTHAL:  So there are going to be lots of

11   things related to trademark cases, unrelated claims of DMCA

12   violations not brought by their clients.

13            THE COURT:  Okay.  So this is the way judges do

14   this.  We trust the attorneys to tell us the truth, because

15   if they don't, they can be sanctioned and held in contempt.

16   Judges cannot go and do this themselves, go look at these

17   27,000 documents, nor can we just allow someone from your

18   side to walk in and look at them.  We just have to trust you

19   and them for this decision on nonresponsiveness.

20            So if you have nothing other than it's remarkable,

21   outrageous that they only produced 1/10th of 1 percent of the

22   documents or 100th of 1 percent, I agree it sounds funny, but

23   not enough for me to say you get to poke around in all these

24   documents.

25            MR. SPERLING:  So on February 1, Your Honor, we

24

1    said that we did, and what we talked about was a sampling

2    process.  Again, because -- if you look at what's on the

3    screen --

4              THE COURT:  Well, did we do that?  What did we do

5    in that regard?

6              MR. ROSENTHAL:  Well, first of all, Your Honor --

7              MR. SPERLING:  Your Honor, this won't work with the

8    interruptions.  Mr. Rosenthal will have his chance to speak.

9              THE COURT:  I understand.  I'm asking you, What did

10   we do?

11             MR. SPERLING:  Well, here is what we did.  We

12   raised the issue of the sampling.  You started going down

13   that road and then what you decided was, you told them, Bring

14   the documents.

15             THE COURT:  All right, all right.  I'm refreshed on

16   that issue.

17             MR. ROSENTHAL:  Yes, but several times during that

18   hearing they suggested you ordered it.  Then on papers they

19   submitted, they suggest you ordered it.  That's not what

20   happened here.

21             THE COURT:  Okay.  But do you have -- you have

22   nonresponsive documents in some form today that I can walk

23   down and look at, right now?

24             MR. ROSENTHAL:  Yes, Your Honor.

25             THE COURT:  All right, show me.

25

1              (Pause.)

2              MR. SPERLING:  And, Your Honor, just so that we

3    know, I actually couldn't hear what they're being asked to

4    show you.

5              THE COURT:  Examples of the 27,000 nonresponsive

6    documents.

7              (Pause.)

8              (Court and Special Master confer.)

9              MR. SPERLING:  So, Your Honor, Ms. Rodriguez, we

10   really propose two processes, either one works.

11             THE COURT:  You aren't going to let me talk?  I

12   just went through a process on behalf of all you guys and you

13   don't want me to say anything about it?

14             MR. SPERLING:  Of course I do, Your Honor.

15             THE COURT:  Okay.  All right.  So neither of us see

16   anything suspicious so far, although it's an extremely

17   limited sampling.

18             MR. SPERLING:  So that's what we were driving at,

19   Your Honor.  We proposed either of two things:  Sampling or

20   they can give us an index and we can pick.  There is -- there

21   is a case where --

22             THE COURT:  How many --

23             MR. SPERLING:  -- this was done.

24             THE COURT:  How many DMCA notice-related documents

25   have they produced?

26

1           MR. SPERLING:  We have in the neighborhood 7,000

2   e-mails, I believe, custodian lost total.

3           THE COURT:  What do you think you're going to find?

4           MR. SPERLING:  Oh, I think we're going to find a

5   lot, Your Honor.  Let me be clear.

6           THE COURT:  I want to know what you think.

7           Do you believe they're hiding the ball on specific

8   documents so effectively that among the 7,000 they've

9   produced, they were so skilled at what they decided to

10  produce, that they were able to avoid this one, little gold

11  vein of stuff that would win your case?  Is that what you

12  think?

13          MR. SPERLING:  Here is what I think, Your Honor.  I

14  think two things.  This is going to answer your question, I

15  hope.

16          First of all, if we hadn't pushed and fought and

17  pushed and fought on the metrics reports, we still wouldn't

18  have them and we still wouldn't have the dashboards today.

19  Okay?

20          I didn't know specifically what was there.  I

21  didn't know in advance specifically what's going to be in the

22  dashboards, but there is really important stuff in there,

23  okay.  And they insisted to you and to Ms. Rodriguez over and

24  over that it had nothing to do with the case.

25          Now, they've produced essentially, almost no

1    documents with respect to Mr. Abramov; but we can see from

2    the documents that there are, including documents from other

3    custodians, that he was routinely interacting with their

4    network security operations team, including advising them

5    about how to deal with certain notices, how to respond to

6    subscribers, okay.  We don't know what color there is in

7    terms of their discussion of their policy.

8           And to your question, Your Honor and to Ms.

9    Rodriguez, this goes to a larger issue.  It really is the

10   unifying theme of most of the outstanding issues; and that

11   is, we see in many instances what happened.

12          What we don't see is any of their internal

13   discussion about it, including at the most senior levels.

14          And a bit later, I will try to bring some coherence

15   to the other issues that we have to talk about by showing how

16   they all revolve around that.

17          But here, Mr. Abramov, we see from the documents,

18   was routinely consulting on nonprivileged issues.  There is a

19   case that, in very similar circumstances, just a couple of

20   years ago endorsed and granted the kind of relief we're

21   asking for here, which is a sampling process.

22          So they don't want to give us an index, they're

23   concerned about privilege, let's have a sampling process,

24   let's get every 10th, every 50th document.  They can screen

25   for privilege first.  We're not trying to get behind that.

28

1    We might have challenges.  But let them screen them, rule out

2    what they contend is privileged, and let us look at some

3    random sample of the non- -- of the hits that they deem

4    nonresponsive.

5            SPECIAL MASTER:  So a couple of things,

6    Mr. Sperling, let me just make sure I'm clear.  I wasn't

7    involved in the prior hearing.

8            So you have concern about what was produced, based

9    on, (a), what you claim to be the derth of documents,

10   correct?

11           MR. SPERLING:  In part.  It's the disparity between

12   the hits on pretty tight search terms and what was actually

13   deemed responsive.

14           SPECIAL MASTER:  Right.

15           MR. SPERLING:  So it's not just the derth; it's

16   tied to the search term hit numbers and what the terms were.

17           SPECIAL MASTER:  All right.  And then, secondly,

18   that you -- from experience in this case trying to get

19   documents, you also are suspicious that there are documents

20   that are responsive and relevant that have not been produced

21   to you?

22           MR. SPERLING:  Again, it's more specific than that,

23   Ms. Rodriguez.  It is --

24           SPECIAL MASTER:  I'm trying to really understand --

25           MR. SPERLING:  We have --

29

1          SPECIAL MASTER:  -- the big picture of what this

2    was because I wasn't here at the last hearing.

3          MR. SPERLING:  Yeah.  So -- so let me go on for a

4    second.  If we can put this slide deck back up.  I'll fill

5    you in while we put the slide deck up.

6          We had an issue in front of you in the summer.

7    They responded to an interrogatory asking about the types of

8    customer-facing actions they took for the entirety of the

9    claim period.  And they gave us numbers for the entirety of

10   the claim period.

11         Now, that was surprising to us because, as you

12   know, they don't have the CATS data for the entirety of the

13   claim period.  So we said, Well, where did that come from?

14         SPECIAL MASTER:  Well, I remember this

15   discussion --

16         MR. SPERLING:  Okay.

17         SPECIAL MASTER:  -- and we worked a lot with that

18   issue, as well as the search terms.

19         MR. SPERLING:  Right.  So on this issue, they said

20   to you, well, the document that they relied upon -- so here

21   is what much of that spreadsheet looks like, which is on the

22   screen now, but that's what they gave us.  Now, that's just

23   for that tab.

24         There are other tabs that look like that, where

25   they're talking about volume of DMCA tickets.  They're

1    talking about their process for closing them and having moved

2    to a system for automation and batching, the goal of which

3    was to send fewer notices, actually, to subscribers, and they

4    charted how they were doing it.  These are all separate tabs

5    of the -- of the spreadsheet.

6              And what they said to you about all of this was

7    that, with the exception of these six lines or five lines

8    that you see on the screen, any other information contained

9    in the document is either irrelevant or nonresponsive.  That

10   was their letter brief to you.  And then they kept at it,

11   they kept saying that it's not responsive.  They said --

12             SPECIAL MASTER:  Okay, I got it.

13             MR. SPERLING:  Okay.

14             SPECIAL MASTER:  But now, you've gotten the full

15   metrics report, correct?

16             MR. SPERLING:  We have the metrics reports

17   themselves.

18             SPECIAL MASTER:  So let's go back to that.

19             MR. SPERLING:  We don't have documents talking

20   about them, but we have the reports themselves.

21             SPECIAL MASTER:  Can we go back to that?

22             MR. SPERLING:  Can we go back to?

23             MR. ROSENTHAL:  That's not correct, Your Honor.

24             SPECIAL MASTER:  What is correct?

25             MS. GOLVINEAUX:  It's Jennifer Golvineaux from

1   Winston.

2           THE COURT:  You've got to be near a microphone if

3   you want to be on the record.

4           MS. GOLVINEAUX:  So -- so plaintiffs' counsel is

5   conflating two things, as Ms. Rodriguez is very familiar

6   because we spent so much time with that large spreadsheet, so

7   much of her time.  So there are two issues.

8           Charter relied on a post-claims period spreadsheet

9   from 2017 to respond to certain interrogatories.

10  Ms. Rodriguez, we explained that there was a whole bunch of

11  metrics in there from after the discovery period that did not

12  relate to copyright, and based on our discussion, we redacted

13  that, in part.

14          After that, in April, the plaintiffs served a

15  request for metrics reports.  We didn't even know about the

16  metrics reports at that point.  We initially objected, met

17  and conferred about them.  And then on November 23, 2020

18  after the meet and confer process, agreed to produce all the

19  claims period metrics reports.

20          So the implication and the outright claim that

21  Charter looked at these discovery period metrics reports and

22  decided they were not responsive is inaccurate.

23          MR. SPERLING:  Ms. Rodriguez, here is the e-mail

24  that -- Ms. Golvineaux just told you November, I think 23rd,

25  and yet, here is the e-mail from Charter's counsel two months

1   later, January 26, in which they say, We're reiterating that

2   we continue to disagree with plaintiffs, that the additional

3   information is relevant or called for by prior orders or

4   discovery requests and reserving the right to object to use

5   or admission of any portion of the CATS metrics reports.

6        So it's true, I agree with Ms. Golvineaux 100

7   percent, they agreed to produce them; but two months later,

8   they were arguing they weren't responsive.  And even after

9   they agreed to produce something called metrics reports,

10  Judge Hegarty, you'll remember, we were on the phone with you

11  in December and we said, Why don't they unredact the row

12  headers?  And they fought it and they to come back a second

13  time.

14       Remember, Ms. Sahni came back because they wouldn't

15  unredact all the row headers, and we said, Unredact all the

16  row headers.

17       And so now they're telling you, Oh, we were always

18  willing to reveal what it was; it's just that this one

19  document had some information from after the claim period.

20  But that's not consistent with what they said to you, it's

21  not consistent what they said to Ms. Rodriguez, it's not

22  consistent to us.

23       THE COURT:  Well, hold on a second.  You said you

24  didn't know about metrics reports.  That's what you just

25  said.

1          MS. GOLVINEAUX:  The client provided us that 2017

2    spreadsheet to respond to interrogatories so that we have to

3    go with the most fulsome dataset that they had.  At that

4    point we had not identified these -- they hadn't -- they

5    served a request specific to the metrics reports in late

6    April 2020.

7          THE COURT:  No, no, but the client clearly knew

8    about metrics reports.  It's their report, right?  You, as

9    counsel, didn't know about them, is that what you're saying?

10          MS. GOLVINEAUX:  That's correct.  We had the big

11    spreadsheet from 2017.

12          THE COURT:  This didn't come up in the Cox case?

13    These metrics reports didn't come up in discovery in the Cox

14    case?

15          MS. GOLVINEAUX:  No, Your Honor.

16          THE COURT:  And so -- all right.

17          Does it worry you, even if you don't consider them

18    particularly responsive, metrics reports, at least from what

19    I can tell, sound like they're an important document to the

20    client, right?  They -- they track important information,

21    would you agree?

22          MS. GOLVINEAUX:  Your Honor, that's why we agreed

23    to produce them in November.

24          THE COURT:  Let's take this a step at a time.  They

25    seem to track important information, right?

1          MS. GOLVINEAUX:  Your Honor, I agree.  And the

2    reservation that Mr. Sperling read was because that they're

3    full of information about abuses of other than copyright, so

4    we were reserving our rights, even though we produced them,

5    to object to that down the road as not responsive because --

6          THE COURT:  Okay.

7          MR. ROSENTHAL:  -- we disagree with the plaintiffs.

8          THE COURT:  I've got to understand this.  You say

9    they are so relevant; they continue to say they are not

10   responsive and not relevant?  You continue to say that,

11   right?

12         MS. GOLVINEAUX:  No, they are, Your Honor.

13         THE COURT:  Oh.

14         MS. GOLVINEAUX:  We think they're responsive.  And

15   in our e-mail on November 23 said, to the extent this

16   information has not already been produced, we'll agree to

17   produce any responsive, nonprivileged final, quote/unquote,

18   metrics reports and related PowerPoints, DMCA escalations,

19   associated DMCA escalation tackers, max exempt lists, subject

20   to our objections and responses.  So they are conflating

21   these two issues.

22         (Court and Special Master confer.)

23         THE COURT:  So the gist of what you're saying is,

24   they have a clearly different world view on what is

25   responsive and what is not.

1          What they are saying is not responsive or not

2    relevant, you know is relevant, in your mind, and yet, they

3    continue to say it's not.  So that's part of your analysis as

4    to why there has got to be responsive or relevant material in

5    these 27,000 because they're just not looking at the case the

6    way you are; is that what you're saying?

7          MR. SPERLING:  Over and over again.  Yes, Your

8    Honor, over and over again.  They have these for every single

9    month.  And we would ask for them because there was a

10   reference to them in one of their documents.  And then they

11   sat there and redacted out of it tons of information about

12   DMCA tickets in this case.  And if they had their way, we

13   never would have known about it.

14         It's only after you ordered the unredacted, the row

15   headers, that all of a sudden, then we got them.

16         THE COURT:  Produce one out of 100.  Every 100th

17   that's not privileged, produce it, okay.

18         MR. SPERLING:  Okay.  Thank you, Your Honor.

19         THE COURT:  We're done with that issue.

20         MR. SPERLING:  I'm not arguing the issue, Your

21   Honor.  And thank you for the relief.  I don't want us to

22   have a dispute down the line.

23         Is that what we proposed before, whatever number it

24   is, it's one out of 100, they should have doc IDs for each

25   document in the system --

36

```
1              THE COURT:  Isn't there a way that you guys have

2   done this uniformly?  Just follow the way you would do this.

3              MR. ROSENTHAL:  Your Honor --

4              THE COURT:  I mean, this is not rocket science.

5              MR. SPERLING:  I just want to make sure that it's

6   not one in 100 cherrypicked, so I just want it to be every

7   100 based on the doc IDs.

8              THE COURT:  Randomly every 100.

9              MR. SPERLING:  Randomly every 100.  Thank you.

10              MR. ROSENTHAL:  So, Your Honor, we've taken one

11   document, a single document, right, and we've now said, based

12   upon that, we're going to redo discovery based upon --

13              THE COURT:  You're not going to redo anything.

14   You're mischaracterizing what I said.

15              Number one, Ms. Rodriguez and I didn't find

16   anything that we think you've done wrong, okay?  But --

17              MR. ROSENTHAL:  But that's not how discovery works.

18              THE COURT:  Well, let's show him, that's my point.

19   I just want --

20              MR. ROSENTHAL:  We don't have to show him.  That's

21   not how discovery works.  We have problems with what they

22   did, we have serious problems with what they did.

23              THE COURT:  Well --

24              MR. ROSENTHAL:  We're actually believe they are

25   hiding documents.
```

1          THE COURT:  We'll get to your problems, we're not

2     there yet.

3          MR. ROSENTHAL:  But the federal rules don't say,

4     okay, based upon conjecture.  You asked him three times what

5     he had other than his gut.  He pointed to the metrics report.

6     That's it.  So -- and then not --

7          THE COURT:  No.

8          MR. ROSENTHAL:  -- in the context of any specific

9     report.

10          THE COURT:  It is -- there is some --

11          MR. ROSENTHAL:  You have now ordered us to produce

12     irrelevant documents not tied to any specific request so you

13     could satisfy his curiosity and his fishing expedition.

14          THE COURT:  There is tied -- number one --

15          MR. ROSENTHAL:  That's not the way the federal

16     rules work.

17          THE COURT:  -- it is tied to a specific request.

18          Number two, there is some objectively valuable

19     merit to a search that produces so many hits and yet, so few

20     actual responsive documents.  I'm not disagreeing that that

21     can be possible.  Maybe even true.  But it is, at least,

22     enough to produce 200 documents.  That's all we're talking

23     about.  And mark them "Confidential," mark them whatever you

24     need to and if -- and then return them and destroy them.  You

25     don't get to keep copies of them.  You've got to return

38

1      everything they give you, okay?

2              But if you come up with some that you can prove

3      that are responsive, then we're going to have a problem,

4      that's all.  But if you are right, you don't have anything to

5      worry about, okay?  And it's not much of a burden.  And

6      everything I do can be appealed to Judge Jackson, okay.

7              MR. SPERLING:  Thank you, Your Honor.

8              MR. ROSENTHAL:  So, Your Honor, what we would --

9      Your Honor, that would be acceptable.  We would also note

10     that we would want to log some of these because, again --

11             THE COURT:  Log?

12             MR. ROSENTHAL:  -- all of these -- the -- the

13     documents you are looking at --

14             THE COURT:  I'm not going to tell you -- I'm not

15     telling you to produce privileged documents.  If any of those

16     are privileged -- but one thing I'm worried about is you guys

17     are hiding behind privilege, both sides, because you know

18     that that's a shield that will keep your documents out from

19     the other side.  And I think privilege is being viewed by you

20     guys more broadly than I've seen it viewed in other cases.

21             Anyway, mark it -- create a privilege log and

22     don't -- you know -- well, I want you to produce to us every

23     hundredth document --

24             MR. ROSENTHAL:  I will.

25             THE COURT:  -- privileged or not, but mark it

1   "Privileged" if it's privileged.

2           MR. ROSENTHAL:  Yes, Your Honor.

3           THE COURT:  Okay, all right.

4           MR. SPERLING:  So, Your Honor, my only concern with

5   that modification is, it's an adversary system.  We're

6   probably better situated than any judicial officer is to

7   argue relevance.

8           THE COURT:  Yeah, but she's not a judicial officer.

9   She practices law still in a very big law firm, and she knows

10  she's capable of getting into your mind and knowing what you

11  would need.

12          MR. SPERLING:  It's not an expression of lack of

13  confidence in Ms. Rodriguez.  She's not an advocate.  And we

14  need an adversary system that works on the basis of advocacy.

15          Once they've screened out privileged documents,

16  what's the harm to them in us seeing the nonprivileged search

17  term hits?

18          THE COURT:  Your caution is noted.

19          MR. SPERLING:  Thank you, Your Honor.

20          THE COURT:  All right.

21          MR. SPERLING:  Okay.  If we could move on, Your

22  Honor.

23          THE COURT:  Please.

24          MR. SPERLING:  We would like to address the issues

25  that we raised.

1              THE COURT:  All right.

2              MR. SPERLING:  They include --

3              MR. ROSENTHAL:  Objection, Your Honor.  Could we go

4     back to the charts?  Again, we're to a 23-page single --

5              THE COURT:  I thought we were about to go back to

6     the charts.

7              MR. SPERLING:  I thought so too, Your Honor.

8              THE COURT:  He is going to the charts.

9              MR. ROSENTHAL:  Well, what request are we on?

10             MR. SPERLING:  We're on the issue that we raised --

11             MR. ROSENTHAL:  What request was that?

12             MR. SPERLING:  -- which was failure to designate

13    custodians.

14             MR. ROSENTHAL:  No.  What request are we on?

15             THE COURT:  Let's do this.

16             MR. ROSENTHAL:  You've raised now -- there are two

17    document requests --

18             THE COURT:  I gave you some -- John, John, John,

19    John, John.

20             MR. SPERLING:  It's hard for me to hear the Court

21    when Mr. Rosenthal is speaking.

22             THE COURT:  I gave you some leeway to raise an

23    issue not on these things at the beginning.

24             MR. SPERLING:  Yeah.

25             THE COURT:  We've dealt with it.  Now we'll go to

41

1   this and then we'll wrap up with these off-index items, okay.

2          MR. SPERLING:  So I want to proceed whatever way

3   works best for you -- for you and Ms. Rodriguez.

4          THE COURT:  You have these big, old, very

5   expensively produced charts up here.  Let's go -- I think

6   that's what you guys want to do, right?  Go off the charts?

7   Let's do that.

8          MR. SPERLING:  So, I, of course, am going to follow

9   instructions.  But I think you will digest this better --

10  I'll make my proposal, you tell me what you think -- if I

11  could --

12         SPECIAL MASTER:  Mr. Sperling, if I could please

13  just make a suggestion here.

14         MR. SPERLING:  Yes, of course, Ms. Rodriguez.

15         SPECIAL MASTER:  I suggest that you stick to your

16  charts so that we can follow along, which is why I was trying

17  to clarify this with you.

18         By my review of this, it looks like that -- the

19  first RFP that is up for discussion is RFP Number 22.

20         MR. SPERLING:  It is, Ms. Rodriguez.  My colleague,

21  Ms. Grigsby, is going to argue that one.

22         SPECIAL MASTER:  Okay.  Let's start there then,

23  please.

24         MR. SPERLING:  Thank you.

25         (Ms. Grigsby's mic is not picking up her voice

42

1   clearly, resulting in inaudibles.)

2           MS. GRIGSBY:  Good morning, Your Honor, and Ms.

3   Rodriguez.

4           SPECIAL MASTER:  Can we have that a little bit

5   louder, please.  And we don't have anything on the screen if

6   you think we're looking at something.

7           MS. GRIGSBY:  Good morning, Your Honor, and

8   Ms. Rodriguez.

9           SPECIAL MASTER:  Yep.

10          MS. GRIGSBY:  So, actually, I wanted to go back --

11          SPECIAL MASTER:  Please don't go back.

12          MS. GRIGSBY:  -- to RFP 8.  There is still a

13   dispute with our -- (inaudible) background noise.  I don't

14   know if it's on your end, if you're hearing that.

15          SPECIAL MASTER:  No, we don't.  We just hear you.

16          MS. GRIGSBY:  Okay.  So I'm looking at RFP 8.  And

17   there it deals with policies and procedures.  The parties

18   have made substantial progress on RFP 8; however, there is

19   still one remaining piece that is unclear, based on Charter's

20   response to the meet-and-confer process.  Namely, Charter's

21   response when it said it would search for policy,

22   specifically made final external policies concerning

23   copyright infringement, and it said nothing about internal

24   policies or processes.

25          SPECIAL MASTER:  Okay.  Is that the only dispute

1   there, is what -- what exactly the policies are that Charter

2   is going to produce?

3           MS. GRIGSBY:  Right, it's the scope question.

4           SPECIAL MASTER:  Okay.  Mr. Schapiro, or somebody

5   from the Charter team, would you like to address that,

6   please.

7           MS. GOLVINEAUX:  Thank you, Ms. Rodriguez, I'll

8   address that.  And I -- and the good news is I don't think we

9   have a dispute here, so I think we can move on pretty

10  quickly.

11          So RFP 8 sought copyright or infringement policies

12  applicable to subscribers and users and listed as examples

13  Charter's DMCA policy, repeat infringer policy and acceptable

14  use policy.

15          I will be clear, Charter is not limiting that to

16  external policies.  Charter already produced its internal

17  acceptable use policy applicable to employees from 2017.

18          What we said during meet and confer is that we will

19  go back and look for any public-facing policies from the

20  post-discovery time period, even those would have been

21  publicly available to go and check their prior versions, and

22  we will produce those as well.

23          SPECIAL MASTER:  Okay.  Does that resolve the

24  issue, Ms. Grigsby?

25          MS. GRIGSBY:  So we just wanted to get additional

44

1    clarification, based on the fact that Charter has said that,

2    for example, the batching process is separate from what they

3    are producing.  And when we say "batching process," that is

4    something that Charter internally used to decide to group

5    notices and send them to subscribers.

6           In the meet-and-confer process, Charter took the

7    position that because the batching process was not something

8    that was external to users and subscribers, that it was not

9    within RFP Number 8.

10          It sounds like Charter's counsel has said that it

11   acknowledges that something, like an internal process, even

12   if it is not communicated to users and subscribers, is within

13   RFP.  Again, we just want clarification that it will not just

14   be the batching process, which is something that we pointed

15   out to Charter, but any other type of internal policy dealing

16   with copyright infringement.

17          SPECIAL MASTER:  It sounds like Ms. Golvineaux

18   has already addressed that, but, Ms. Golvineaux, if

19   there is something there -- I don't understand this

20   batching/nonbatching, but if you understand what Ms. Grigsby

21   is talking about, if you could please address that and clear

22   up the miscommunication if there is any.

23          MS. GOLVINEAUX:  Certainly, Ms. Rodriguez.

24          So during meet and confer, plaintiffs raised this

25   concern that they wanted to see more documents about the

45

1   batching of notices and the process by which Charter did

2   that.

3          We explained to them that we didn't consider that

4   to be responsive to RFP 8 because it's not a policy

5   applicable to subscribers and users; but in the interest of

6   moving on, we said we would go ahead and look for any

7   procedures related to batching from the discovery period and

8   go ahead and produce those.

9          SPECIAL MASTER:  Okay.  All right, thank you.

10  What's next?

11         MS. GRIGSBY:  Ms. Rodriguez, and Your Honor, I just

12  want to be clear that there is this other procedure, even if

13  it is not subscriber (inaudible), that that should be within

14  the scope of the RFP.  And separately, Charter's response

15  talks about external policy from 2017 to 2019.  We would want

16  any internal and external policies from that period, as well.

17         MS. GOLVINEAUX:  So I think I've clarified that we

18  will produce both internal and external policies.  I believe

19  what counsel is doing is reading into RFP 8 words that don't

20  exist in RFP 8.  She's talking now about some very broad

21  discussion of procedures and practices.

22         Those words, she keeps saying them, but they don't

23  appear in 8.  8 is copyright in- -- or infringement policies

24  applicable to subscribers and users:  For example, the DMCA

25  policy, the repeat infringer policy and the acceptable use

1   policy.  So that may be where the dispute is.

2            In the interest of trying to move things forward,

3   when they raised this idea that they're really interested in

4   the batching processes, we agreed to go ahead and look for

5   those, as well, during the discovery period.

6            SPECIAL MASTER:  All right.  I think that that's an

7   acceptable compromise.  I understand what the parties have

8   said and what Ms. Golvineaux has proposed as compromise here,

9   and that appears to me to be reasonable and acceptable and

10  consistent with the agreements here with regard to RFP 8.

11           All right, Ms. Grigsby, what's next?

12           THE COURT:  By the way, just so we're clear what

13  we're doing, we're one voice today, so nothing she says is

14  going to be appealable to me.  Whatever she says is my

15  decision as well, okay.

16           MS. GRIGSBY:  Yes.

17           So now, I'm going to move on to RFP 22.  So RFP 22

18  calls for communication with and from any employee, officer,

19  director of Cox Communication or of Bright House Networks

20  regarding alleged copyright infringement.  And here, both

21  parties agree that we are at an impasse.

22           So one thing that is important to note is that,

23  based on some of the documents that we already have, we're

24  aware that Charter and Cox were in communication.  So, for

25  example, what is on our slide 41 -- and here, actually, we

1    have some of it to share with you.

2            SPECIAL MASTER:  One moment.  Well, why don't you

3    go ahead and explain it to us, Ms. Grigsby, while we're

4    getting the slide up.

5            MS. GRIGSBY:  Sure, I can explain it.

6            So when Charter documents, one said that Charter is

7    working with Cox Communication and their process with DMCA

8    correlated complaint.  That's from August 2014.  Then we have

9    a later communication where a Charter employee states that he

10   is going to continue efforts to reaching out to Cox

11   Communications to enhance DMCA autoclosed script.

12           We have a number of these communications.  And one

13   person who also shows up is Jason Dayback (ph) from Cox.  And

14   based on this communication, it's our understanding that Cox

15   is Jason Dayback and Laurie Rowlett and Colton Mabb from

16   Charter set a time to discuss how they would handle a

17   particular right holder.

18           So the two companies were in communication

19   specifically about how they would handle infringement

20   notices.

21           So based on that, we have asked and we have probed

22   whether Charter has finished (inaudible) these documents.  It

23   was our understanding that Charter had agreed already to

24   produce these documents based on the correspondence in 2019.

25   So in particular, there was correspondence where plaintiffs

48

1    requested, on RFP 22, that defendants reconsider their

2    proposed scope of limitation, based on their responses and

3    objections.

4           Then plaintiffs received a response from Charter

5    where Charter said, To the extent the responsive information

6    sought by Requests 9, 16, 17 and 22 are not already covered

7    by other requests, defendants are willing to search for and

8    produce responsive documents during the discovery period.

9           So as of December 2019, plaintiffs were under the

10   impression that this material would actually be produced.  So

11   then we have learned more recently that Charter wants to

12   limit these communications.

13          And so at this point, what we are asking for is to

14   find the communications -- for Charter to search the

15   communication and to produce them.

16          SPECIAL MASTER:  Okay.

17          MS. HUEBERT:  Thank you.  This is Allison Huebert

18   for Charter.

19          So in response, I just wanted to note what Charter

20   did agree to produce.  Charter did agree to produce any

21   communications with Cox that concerned plaintiffs or their

22   notices, and we confirmed that in our May 28, 2020 discovery,

23   supplemental responses where we said, Charter will produce

24   responsive nonprivileged documents concerning plaintiffs'

25   works-in-suit or notices sent on plaintiffs' behalf during

1    the discovery period to the extent we find them through a

2    reasonable and diligent search.

3              This is what we've done.  We've also produced --

4    we've also produced documents -- if -- if Charter was

5    expressing its policies on DMCA to somebody at Cox, that

6    would have been roped into other requests.

7              This is very similar to a request that was recently

8    heard in front of Special Master Rodriguez relating to

9    communications about the Cox and BMG lawsuits.

10             On December 21, 2020, Special Master Rodriguez

11   recognized that the relevance, if any, of those searches with

12   regard to Cox is marginal.  Still, we investigated

13   internally.  We ran some searches to see what would come up.

14             And what happens is Charter is on the same types of

15   ISP general mailing lists that Cox and Bright House was, so

16   we would get mass mailers pertinent to the ISP industry.  So

17   there is a lot of hits that are between Charter and Cox,

18   e-mail addresses, we can't delineate those out.

19             Given that the marginal relevance, the fact that

20   we've already agreed to produce, you know, documents

21   responsible, 100 different requests that would rope into, you

22   know, similar discussions, if they were relevant to those

23   other requests, if they were talking about Charter's DMCA

24   policies, if they were talking about changes that Charter

25   implemented in respect to their policies, those would have

50

 1    been produced.

 2           What plaintiffs want is us to go on a fishing

 3    expeditious to see if anybody at Charter ever talked to

 4    anybody at Cox, you know, about copyright infringement; but

 5    if it wasn't reflected ultimately in Charter's policies and

 6    practices, it's not relevant to this.

 7           What some employee may have said to another

 8    employee, if it doesn't touch on what Charter was actually

 9    doing in respect to plaintiffs' notices or doing in the time

10    period of this case, it's just not relevant.  So we decided

11    to limit it appropriately.

12           We offered during the meet-and-confer process to

13    run specific targeted searches for certain types of

14    documents; but they wanted the full scope of the request,

15    which would be unduly burdensome and disproportionate, given

16    the fact that they -- plaintiffs have not been able to

17    articulate how these communications are relevant to their

18    claims in this case and how they would go to showing

19    something is more likely than not in respect to their claims,

20    if they weren't talking about what Charter was actually doing

21    or they weren't talking about plaintiffs.

22           And so we think that our limitations are reasonable

23    and so we stand on it.  We think that -- again, they're

24    trying to go after material that happened outside of the

25    claims period in this case that -- communications that may

1   have been exchanged close to the end of the discovery period

2   that had nothing do with plaintiffs' notices.  And if you can

3   recall, the last plaintiffs' notice Charter received at issue

4   in this case is from March 2015.

5          So this was all -- any -- any --I think all of the

6   remaining handful of discovery requests that are at issue

7   today are all plaintiffs trying to get after that discovery

8   which has been foreclosed again and again and again.

9          So we stand on our position.  We're happy to answer

10  any questions; but we believe that our offer to search for

11  and produce information relating to plaintiffs, the

12  works-in-suit, our policies, you know, they cover all of the

13  actual relevant -- the actual relevant information called for

14  in this case.

15         MS. GRIGSBY:  Your Honor, Ms. Rodriguez, if I could

16  just respond briefly.

17         So, basically, the limitation that Charter proposes

18  would create a null fact.  We are not asking for the

19  particular notices.  What we're asking for is information on

20  a graduated response program, or the CATS system, so we know

21  from the document that Charter licensed CATS from Cox, and we

22  also know that they then spoke to Cox about how to implement

23  the copyright infringement detection program.

24         So here, we're not just asking for a blind fishing

25  expedition.  We know, based on the facts, that there was this

1    communication between Cox and Charter with respect to the

2    copyright infringement program that they had set up and that

3    they had stayed in touch with Cox -- "they," meaning Charter,

4    had stayed in touch with Cox in order to implement their

5    program.

6              We have seen only one document with a Cox e-mail

7    address, despite the express references in the Charter

8    e-mails to talking to Cox about the CATS system and their

9    program.

10             We are not trying to tap on to the Cox litigation,

11   nor are we trying to go on a fishing expedition; but it is

12   relevant that Cox is an adjudicated infringer.  And so if

13   Charter is taking cues from Cox in how to run its program,

14   then that is highly relevant.

15             THE COURT:  Well, I'm sorry, what -- first of all,

16   have you tried third-party discovery against Cox, as well?

17             MS. GRIGSBY:  With respect to this RFP, we have

18   not.

19             THE COURT:  Why not?

20             MS. GRIGSBY:  Well, our opposing counsel also

21   represented Cox, we think we would get the same objection.

22             Your Honor, sorry, were you about to say something?

23             THE COURT:  No, that's okay.  So specifically,

24   what's your name again, sorry?

25             MS. HUEBERT:  Allison Huebert.

53

1           THE COURT:  Huebert?

2           MS. HUEBERT:  Uh-huh.

3           THE COURT:  Okay, Ms. Huebert.  Are you agreeing or

4    disagreeing that communications between Cox and Charter about

5    CATS or about infringers is relevant or not relevant?

6           MS. HUEBERT:  I think it's -- I mean, there is

7    obviously a spectrum of relevance and that has to be informed

8    by proportionality.  So, you know, I think that -- I don't

9    see how it could be relevant if they're talking about how

10   does your script processing work?  Oh, we do this and you do

11   that.

12          THE COURT:  Why would you be asking another company

13   how their process works, unless you were trying to inform

14   yourself and either change or improve your own process?

15          MS. HUEBERT:  But we produced all the

16   information --

17          THE COURT:  No, no.  Could you answer that

18   question?

19          MS. HUEBERT:  To inform yourself?  Absolutely.

20   Does that make it more --

21          THE COURT:  All right.  Inform yourself for the

22   purpose of maybe changing the way you do business, correct?

23   Or else you wouldn't be contacting anybody; you're perfectly

24   fine with the way you're doing business.  But if you contact

25   a competitor, Hey, how are you doing this, it's for the

54

 1   purpose of maybe adopting a better practice.  Would you agree

 2   with that?

 3          MS. HUEBERT:  There could be high-level

 4   discussions, there could be discussions on the fact that we

 5   use a software tool that's similar to their software tool --

 6          THE COURT:  Okay.  But the --

 7          MS. HUEBERT:  -- that process a million notices,

 8   and we produced --

 9          THE COURT:  -- advocacy number one is answer a

10   judge's question.

11          MS. HUEBERT:  Sure, thank you.

12          THE COURT:  Okay?  So what do you say about that?

13          MS. HUEBERT:  It depends on what the claims are.

14   In this case, does it make it more --

15          THE COURT:  No, no, no.  The question is very

16   simple.

17          MS. HUEBERT:  Sure.

18          THE COURT:  Is there any other purpose

19   communicating with a competitor about how they're doing

20   things, other than to potentially look at how you're doing

21   things and change?

22          MS. HUEBERT:  Well, you're informing yourself, so

23   that could be one purpose, yes.

24          THE COURT:  Give me another.

25          MS. HUEBERT:  To inform yourself as to how your

1    competitor operates.

2            THE COURT:  Why?

3            MS. HUEBERT:  So you understand what the industry

4    standards might be.

5            THE COURT:  What difference does it make if you

6    understand how they operate if you potentially intend to

7    change the way you operate and get a better competitive

8    advantage?

9            MS. HUEBERT:  That would probably be the result

10   of -- of those types of communications --

11           THE COURT:  I agree.

12           MS. HUEBERT:  -- you're asking how to -- but we did

13   produce all of the information as to how our system actually

14   operated.  We considered --

15           THE COURT:  I'm hearing them wanting communications

16   with Cox which can't possibly be privileged.  Can we get an

17   amen to that one, okay?

18           MS. HUEBERT:  Yes.

19           THE COURT:  Okay.  They're not privileged, so we

20   don't have to worry about that, all right.

21           So you're talking to a competitor about how to

22   address issues of -- first of all, if you're talking to the

23   competitor about how to address issues of violations of the

24   copyright, that's relevant, period.  Produce those, if you

25   have it, okay?

1          MS. HUEBERT:  Sure.

2          THE COURT:  Because the only reason you're doing

3    that is to try and better inform your own system and maybe

4    improve or not improve.

5          MS. HUEBERT:  And I have a potential compromise

6    that might address the plaintiffs' concerns in that

7    respect --

8          THE COURT:  Go ahead.

9          MS. HUEBERT:  -- that would also address ours.

10         We have no problem producing this information,

11   these communications with Cox up through the -- the final

12   time plaintiff sent us a notice in this case, which is, I

13   believe, the end of March 2015.

14         THE COURT:  Well, but my relevant time period is

15   the time period for which they believe you should have been

16   controlling your customers and work.  And what is that time

17   period?

18         MS. HUEBERT:  That is -- that is the last notice

19   that plaintiffs sent to -- to Charter regarding the issues in

20   this case was in March --

21         THE COURT:  No, no, no.  But is that the relevant

22   time period for recovery of damages in this case?

23         MR. SPERLING:  No, it's not, Your Honor.  The claim

24   period runs for another year.  And so the obvious question

25   is, What are they trying to exclude by cutting off those

57

1    communications?  It's particularly important because, as

2    you'll hear in connection with some of the other issues in

3    our chart, there was a big push at Charter, beginning late

4    2015 into early 2016, following the summary judgment verdict

5    in the Cox case and then the jury verdict -- summary judgment

6    decision, excuse me, and then the jury verdict to adopt for

7    the first time a so-called graduated response system.

8            So before that, Charter had no disciplinary policy

9    of any kind with respect to subscribers who are the subject

10   of copyright infringement notices.  And they actively began

11   discussing adopting a system of graduated disciplinary steps

12   that could result in termination.  And that ran from, like,

13   beginning of December 2015 through March 2016 and beyond

14   March 2016.  And one would expect that they were talking to

15   Cox about that because Cox had a graduated response system.

16           And Ms. Huebert's compromise sounds like it's

17   specifically trying to exclude any communications with Cox

18   about that in that period.

19           Ms. Rodriguez has rightly slapped us down once or

20   twice -- I don't mean the slap, it just wasn't noted, that's

21   why I said "rightly."  I mean, you don't ask for documents

22   outside of the discovery period.

23           The claim period is the claim period.  But by the

24   same token, the claim period is the claim period, they should

25   have to produce their documents for the duration of the claim

58

1   period and not cut it off early.

2           MS. HUEBERT:  And to respond to a clear point that

3   was made here, and has been made time and time again, is that

4   those changes did not impact anything during the claim

5   period.  Discussions regarding potential changes at the end

6   of the claim period that were not implemented during the

7   claim period, discovery into those issues have been

8   foreclosed again and again and again.

9           So that's why we have proposed the time cutoff.

10  It's precisely to take that out of the equation because they

11  wouldn't be admissible anyway.  It's burdensome for us to

12  look and it's going to be used for an improper purpose.  And

13  the discovery into those issues has been foreclosed by

14  numerous orders in this case when plaintiffs have tried to go

15  outside the claims period.

16          MR. SPERLING:  We certainly don't agree that this

17  is not admissible, Your Honor.  I don't know where that comes

18  from.

19          THE COURT:  Well, we're not going outside the

20  claims period; we're functioning within a the claims period.

21  So, apparently, your compromise was not accepted.  They

22  respectfully declined to acquiesce.

23          Okay, what's the next issue?

24          MR. SPERLING:  Do we have a ruling on that issue?

25          THE COURT:  I said to produce communications with

59

1    Cox regarding enforcement of notices or -- I don't know how

2    you want to phrase it, but you know what I mean -- through

3    the claims period.

4          MR. SPERLING:  Thank you, Your Honor.  We have the

5    scope of the request.

6          And maybe to avoid confusion, would that,

7    therefore, include, for example, the communications on the

8    subject you have right on the screen in front of you in these

9    two documents, CHA130966 --

10          THE COURT:  Well, certainly 966.

11          MR. SPERLING:  -- and 84755?

12          THE COURT:  What's the autoclose script?

13          MR. SPERLING:  So the autoclose script is a way by

14    which they close notices.  So let's say subscriber is the

15    subject of 100 notices, and they get around to -- Charter

16    gets around to notifying the subscriber of one of those

17    notices while they're proceeding to send distinct separate --

18          THE COURT:  Wait.  Notices that you send?

19          MR. SPERLING:  Any right's owners.  So there could

20    be a variety of right's owners --

21          THE COURT:  Maybe some of your clients sent these?

22          MR. SPERLING:  It could be our clients, it could be

23    any of the right's owners.  It definitely could be our

24    clients.  So let's say somebody is the subject of 100 notices

25    from our clients.

60

1            THE COURT:  Okay.  And Charter is copied on all of

2    those?

3            MR. SPERLING:  Sure.  Charter is the recipient of

4    all of those.

5            THE COURT:  Recipient of all of those.

6            MR. SPERLING:  And then Charter potentially needs

7    to notify the subscriber of the fact that there was a

8    separate notice.

9            THE COURT:  So you think they have a numerosity

10   requirement before they reach out to the subscriber?

11           MR. SPERLING:  So, no.  What they did, Your Honor,

12   was, rather than send 100 notices to the subscriber

13   corresponding to the 100 notices that came in from right's

14   owners like us, they would send one notice to the subscriber

15   and automatically close all other open tickets.  That's the

16   autoclose.

17           THE COURT:  With one -- with one actual notice to

18   the subscriber closed 100 that they received from whoever?

19           MR. SPERLING:  Correct.  Not told them in the

20   communication that there were 100; just closed the remaining

21   99.

22           THE COURT:  So what you're saying, their system

23   until they did something a notice is open; and once they do

24   something about it, it's closed?  Is that what you're saying?

25           MR. SPERLING:  I think so, Your Honor, but to make

1   sure we're not miscommunicating, they get an infringement

2   notice.

3          THE COURT:  Right.

4          MR. SPERLING:  They, Charter, get an infringement

5   notice.  They have a system set up to then communicate to the

6   subscriber that the subscriber was the subject of an

7   infringement at that time.

8          THE COURT:  So it's an open ticket at that time?

9          MR. SPERLING:  They open a ticket in CATS.

10         THE COURT:  Right.

11         MR. SPERLING:  Right.  Just like when you call

12  because your air conditioner is broken or whatever and they

13  say, We'll get a ticket into the system.

14         THE COURT:  And then I call, too, because I can't

15  get into my computer, they open a ticket.  Yeah, I agree.

16         MR. SPERLING:  Bingo.

17         THE COURT:  And then when they say they have it

18  done, which they don't, they send me a closed ticket notice.

19         MR. SPERLING:  Right.  So what Charter would do,

20  perhaps similarly, is they would notify the subscriber of one

21  of those 100 and automatically close the other 99.  So it

22  goes directly to --

23         THE COURT:  Are you saying the notice didn't

24  include the other 99?

25         MR. SPERLING:  Correct, Your Honor.

62

 1          THE COURT:  So what's included?  The notice to the

 2    subscriber included one alleged example of download, but not

 3    the other 99?

 4          MR. SPERLING:  The -- the form changed over time.

 5    I believe in some circumstances it didn't tell the subscriber

 6    anything about the number.  So, for example, if they didn't

 7    have an e-mail address for the subscriber, which apparently

 8    happened more often than you would think, they would send

 9    them a postcard.

10          And to the best of our understanding, the postcard

11    would just say this important action -- there is an important

12    notice related to your account, go to this website,

13    notices.charter.com, to find out more.  And they would send

14    one, and they would close all the others.

15          So this speaks directly to how they processed

16    infringement notices and what they did or didn't do to notify

17    subscribers about the full scope and range of the notices.

18          THE COURT:  Response?

19          MS. HUEBERT:  We've already offered to make

20    searches for these documents.

21          THE COURT:  Okay, that's good.  It's so ordered.

22          MS. HUEBERT:  So we're happy to do it.

23          MR. SPERLING:  I couldn't hear what Ms. Huebert

24    said.

25          MS. HUEBERT:  I said, we already offered to do

63

1    target searches related to the specific items we're talking

2    about.

3              THE COURT:  Both 966 and 755, okay?

4              MR. SPERLING:  Sure.  But you made a subject matter

5    ruling before, Judge Hegarty, so I just wanted to make sure

6    these are within the scope of the subject matter ruling

7    because I don't want to have fights later.

8              MS. HUEBERT:  Because we already agreed to do that

9    stuff.

10             MR. SPERLING:  Okay, great.

11             THE COURT:  Great.

12             MR. SPERLING:  Thank you, Your Honor.  Thank you,

13   Ms. Rodriguez.

14             I think the next issue in the chart, actually it

15   is, the custodians.  So in the chart it is on page 60 through

16   62, and there are three kinds of custodians at issue.

17             SPECIAL MASTER:  I'm sorry, I'm not following you.

18   I have RFP 44.

19             MR. SPERLING:  Let me catch up to you for a moment,

20   Ms. Rodriguez.

21             SPECIAL MASTER:  We're done with all the RFPs?

22             MS. HUEBERT:  Uh-huh.

23             SPECIAL MASTER:  Okay, great.  Sorry, I didn't mean

24   to insert something in there that we didn't need to address.

25   We've got plenty on our plate without that.

1          MR. SPERLING:  No.  But I appreciate making sure

2     that we were not overlooking something, so.

3          So on page 60 is the custodians.  And there's three

4     to talk about here, three types.  Let me group the first two

5     together.  It's Scott Weber and Charlotte Field.

6          THE COURT:  Page 60 of what?

7          MR. SPERLING:  Page 60 of -- our chart is Exhibit 1

8     to our -- our submission, so it should have a cover that says

9     "Exhibit 1" on it.  And at the top it says, Charter's Amended

10    Response to Plaintiffs' February 8, 2021 Letter of Discovery

11    Disputes.  February 19, 2021.

12          THE COURT:  Do you see it?

13          SPECIAL MASTER:  Oh.  All right, it says it's page

14    97.

15          (Court and Special Master confer.)

16          THE COURT:  Okay, we don't know what you're talking

17    about.

18          MR. SPERLING:  Would it help if I approach the

19    Bench to try and (inaudible - away from microphone) I'm

20    sorry, I don't have it in front of you because Ms. Rodriguez

21    showed it to me earlier.

22          THE COURT:  Yeah, come on up.

23          MR. SPERLING:  Thank you.

24          (Inaudible discussion.)

25          THE COURT:  Plaintiffs' exhibits, is that what

65

1    you're talking about for today?

2              MR. SPERLING:  Yes.

3              THE COURT:  No.  Oh, what exhibit?

4              MR. SPERLING:  Exhibit 1.

5              THE COURT:  Go ahead.

6              MR. SPERLING:  Just trying to get the slide up on

7    the screen, Your Honor.

8              (Inaudible discussion.)

9              MR. SPERLING:  Okay.

10             THE COURT:  Go ahead.

11             MR. SPERLING:  Thanks, Your Honor.  Thanks,

12   Ms. Rodriguez.

13             So the first two custodians that plaintiffs seek

14   for Charter to add are Scott Weber and Charlotte Field.

15             Now, in order to understand who they were and what

16   role they played, I want to come back to what we were talking

17   about a few minutes ago, which is the move by Charter after

18   the verdict and summary judgment decision in Cox to adopt a

19   graduated response system.

20             So this is a document dated March 10, 2016, so it's

21   within the claim period, and it's a deck talking about a

22   graduated response system.

23             It starts -- here, this is the first page that you

24   have in front of now, it's a page ahead and you see it says

25   under the main heading:  Charter will enforce a six-strike

66

```
1    process for any copyright infringement claim.
2              And you get to the third bullet point, two more
3    notifications of one's services will be terminated.  And then
4    on the next page you see services will be terminated if
5    customer does not successfully complete settlement or appeal
6    process.
7              So this reflects Charter discussing thinking about
8    whether they needed to make changes to their system, whether
9    their system was okay or not, in light of what they saw
10   happened in Cox.  Because before this, they had no process or
11   procedure to ever terminate subscribers for copyright
12   infringement.
13             THE COURT:  Could I -- is that true or not true?
14             MS. HUEBERT:  What?
15             THE COURT:  That prior to this, Charter didn't have
16   a process for terminating somebody based on their
17   infringement notices?
18             MS. HUEBERT:  Well, we had the process, but we did
19   not, as a general rule terminate, because of many reasons,
20   including the fact that notices are based on inactive data
21   and other stuff.
22             THE COURT:  Thank you.
23             MS. HUEBERT:  We don't contest that, so this is why
24   these issues related to changes in our system that do not
25   impact this case whatsoever in those early discussions of
```

67

1    those changes that happened over a year past when plaintiffs

2    sent the last notice --

3              THE COURT:  You'll get a chance to argue.  All I

4    wanted to know was whether he was right about that one point.

5              Go ahead.

6              MR. SPERLING:  And just to clarify, Your Honor,

7    when Ms. Huebert says they "didn't terminate as a general

8    matter," we have an interrogatory response from them saying

9    that the number of terminations during the claim period for

10   copyright infringement was zero.

11             THE COURT:  Right.

12             MR. SPERLING:  So that's the general -- general

13   rule.

14             THE COURT:  So that is again -- yeah, talking

15   about -- talking to a judge, words mean things.  So "as a

16   general matter" is far different than "never."

17             MS. HUEBERT:  Well, again, we have our

18   interrogatory response --

19             THE COURT:  No, no, no, no.  Listen, listen,

20   listen, listen.

21             "As a general matter" allows for exceptions.

22   "Never" doesn't.  So was it never?  Or as a general matter?

23   It's one of those two.  Just tell me which one.

24             MS. HUEBERT:  We don't know.  We haven't come

25   across any --

68

1          THE COURT:  You don't know whether Charter -- you,

2     sitting here today, you guys don't know whether

3     Charter issued --

4          SPECIAL MASTER:  Well, hold on a minute.  Hold on a

5     minute.

6          THE COURT:  -- terminated a single client?

7          MS. HUEBERT:  It is our understanding from

8     everything we know, that that did not happen --

9          SPECIAL MASTER:  Hasn't Charter stipulated that

10    they did not terminate any users for infringement?

11         MS. HUEBERT:  During the claims period.

12         THE COURT:  Up to March 2016.

13         SPECIAL MASTER:  Then I don't understand what the

14    dispute is here.

15         MS. HUEBERT:  Okay.  I might be just -- we were

16    still going through discovery searches in the processing --

17         THE COURT:  I will tell you that -- let me just

18    give you guys some advice.

19         That kind of response makes me suspicious and will

20    lead to onerous burdens on your client, okay.

21         Answer the question directly and honestly.  I will

22    demand that.  All right?  And if it's, No, we never did, it's

23    not "as a general matter" of up to March 2016.  It's we did

24    it.

25         MS. HUEBERT:  That's my understanding.

1          THE COURT:  Go ahead.

2          MR. SPERLING:  So then they started thinking about

3     whether they should change that, which, of course,

4     potentially evidences their belief they had a problem with

5     that policy; that that policy was no good.

6          So this is dated March 10, this slide deck.  And

7     here is a communication from Colton Mabb, prominent employee

8     in this all of this, you've heard his name before.  It's

9     addressed to his supervisor, a woman named Mary Haynes.  She

10    may have been two levels up, not his direct supervisor.  And

11    it's dated March 8.

12         And you see from the conclusion of the e-mail --

13    March 8 was a Tuesday, March 8 of 2016.  So he says, Anywho,

14    safe travels and hope the Thursday meetings go well.

15         So Thursday, two days later is March the 10th.  So

16    there is a meeting related to that deck we just looked at a

17    moment ago, which is dated March the 10th.

18         Now, there is something else that happens on March

19    the 8th.  There is another meeting, and this meeting involves

20    two senior people:  Scott Weber and Charlotte Field.  Those

21    are the two custodians we're talking about.

22         Scott Weber, at the time, was executive vice

23    president for network operations.  Charlotte Field, we just

24    learned from the dashboards that accompany the metrics

25    reports, was the senior vice president, so a step below

70

1    Weber, but above Mary Haynes.

2           And they are participating in the meeting on the

3    8th, where they're also discussing, as you can see from the

4    titles of the attachments, and I'll show you in a moment,

5    DMCA dashboard, DMCA tickets received, 2015 year-end metrics.

6           So Mr. Weber and Ms. Field are invited to a meeting

7    to discuss these documents.  And here's what, some of what

8    you see in these documents.

9           The documents include detailed information on DMCA

10   activity, number of notices received, how they were handled

11   by Charter.

12          In the left-hand column, very interestingly, and,

13   Ms. Rodriguez, you've seen or heard about this before, this

14   is the list of customers A through Y where they are reporting

15   to Mr. Weber and Ms. Field that they had subscribers in 2015,

16   a subscriber who was the subject of 59,665 notices a year.

17          Now, we probably all subscribe to the Internet.

18   I'm willing to guess that probably no one in this room has

19   ever gotten a DMCA infringement notice; but they had

20   subscribers, many subscribers with tens of thousands of

21   notices in a year.  And they're reporting this at a meeting

22   to Mr. Weber and Ms. Field.  So this is the meeting on the

23   8th.

24          Now, when we look at their privilege log entries,

25   we see -- remember, we looked at a deck that was dated the

71

1    10th, Mary Haynes.  And there is an entry here dated March

2    10, DMCA impacts.  And remember, that deck talked

3    about another -- hold on, go back for a second.

4           The very last bullet, which is highlighted:

5    Impacts.  They're looking at what's the effect going to be on

6    any number of subscribers we have?  How many subscribers are

7    we going to lose, all right, by virtue of terminating them?

8    And they're talking about the impact of adopting a

9    termination regime that impacts approximately 200,000

10   customers per year, based on 2015.

11          So now, if we jump back ahead, we see from the

12   privilege log that that deck is being discussed on March 10

13   with Scott Weber and Charlotte Field.

14          Now, here is the problem:  Mary Haynes --

15          SPECIAL MASTER:  Can you go back one slide, one

16   more -- yeah, just for a moment?  Okay, go ahead.

17          MR. SPERLING:  I should add also that immediately

18   beneath the entry I focused you on, there is also a March 10

19   meeting.  The March 10 meeting also got to DMCA, and that

20   invitation comes from Rick Dykhouse or Dyckhouse, I believe

21   it's Dykhouse, general counsel of Charter, addressed to

22   Kirill Abramov.

23          So here is the issue with Mary Haynes, who was the

24   custodian of that deck.  When I say "custodian," I mean, she

25   was the one who was soliciting comments from Colton Mabb and

1   she was going to that meeting on the 10th because Colton Mabb

2   sent her good luck.

3          Charter deleted -- let's talk another time about

4   how accidental it was or wasn't.  Not for now.

5          Charter lost, by deletion, a terrific number of

6   e-mails from Mary Haynes.  And as a result, we only have

7   documents involving Mr. Weber and Mr. [sic] Field and

8   communications between them and Mary Haynes if they were

9   passed down the chain.

10         So here is what we see about Charlotte Field I

11  mentioned that we learned only in the dashboards.  This is

12  from one of the dashboards produced three weeks ago today:

13  That Charlotte Field became senior vice president, so above

14  Mary Haynes.

15         Now, here is a document partially redacted where we

16  see an e-mail from Charlotte Field to Mary Haynes talking

17  about the Cox verdict.  The only reason we have that

18  communication with Mary Haynes, since most of her documents

19  were lost, is because Mary Haynes proceeds to forward it to

20  other people, including Laurie Rowlett and Kirill Abramov,

21  who are custodians.

22         So we see what happens down the chain from Mary

23  Haynes; but because Mary Haynes' e-mails were lost and

24  because Weber and Field are not custodians, we have no idea

25  what gets communicated back up the chain.  We can't see the

1    discussion at senior levels of management about this.

2            Here is another example.  Scott Weber, same

3    individual we're talking about, e-mailed Charlotte Field,

4    same individual we're talking about.  This is December 8,

5    again on the heels of Cox.

6            Charlotte, there is some questions being generated

7    regarding our DMCA process.  Apparently, he is not a lawyer,

8    he doesn't quite get what happened to Cox.  Apparently, Cox

9    was called up by the Government on some aspect of their

10   policy/process.  Can you forward info as to what our process

11   is and how we are doing following our processes?

12           So Scott Weber is interested.  He wants to know

13   what is the company doing with respect to DMCA policy and

14   process.

15           Now, this e-mail, too, we only have it because it

16   gets forwarded on to Laurie Rowlett and others.  If it hadn't

17   been forwarded on, we wouldn't see it, just like we won't see

18   all the other e-mails between Scott and Charlotte --

19           SPECIAL MASTER:  We get your point.

20           MR. SPERLING:  Yeah.

21           SPECIAL MASTER:  What are you asking for?

22           MR. SPERLING:  Well, we want them to be added as

23   custodians.  It's as simple as that.

24           SPECIAL MASTER:  For the entire time period?

25           MR. SPERLING:  That's what we're asking for because

74

1    we see -- let me see if I have the document here for you.

2         Actually, yeah, if you look on your screen, Your

3    Honor, Ms. Rodriguez.  Scott Weber is involved in these

4    decisions at the senior management level going back years.

5    This is an e-mail from October 2012.

6         THE COURT:  I have a question here.

7         MR. SPERLING:  Yeah.

8         THE COURT:  I'm not used to -- Lord knows, I've

9    handled thousands of cases.  I'm not used to

10    compartmentalizing discovery by custodians.

11         When one party asked another party for all memos

12    relating to this, are you saying that they've excluded some

13    people from these searches, just because they're not calling

14    them "custodians"?  Is that what you're saying?

15         MR. SPERLING:  That is what I'm saying.  And to be

16    sure, there are searches for which we've agreed will search

17    certain custodians and not others because it's burdensome and

18    not likely to produce relevant stuff.  But here --

19         THE COURT:  Wait, wait.

20         So on your servers, or whatever system it is that

21    houses your e-mails, these people are all on different

22    servers, so that one search on one server wouldn't catch all

23    the people who use that server?

24         MR. SPERLING:  Well, but there is terrific volume,

25    and so the way that you can narrow the search is by custodian

75

1    of documents.

2            THE COURT:  I'm sorry.  What -- in what way was

3    Mr. Weber a custodian of any documents?  Didn't he just write

4    memos and receive memos?  And how was he a custodian?

5            MR. SPERLING:  The way it's preserved on the system

6    is that if the e-mail hit your inbox or was sent from your

7    inbox, you're a custodian of e-mails that came to you or were

8    sent from your box.  It's like searching his box.

9            Now, there will be other people who are on the

10   other side of those e-mails, but that's why we were pointing

11   out --

12           THE COURT:  So if he -- if he and Charlotte sent

13   e-mails back and forth --

14           MR. SPERLING:  Charlotte?

15           THE COURT:  Charlotte Field.  -- and neither of

16   them are custodians, in somebody's view, and these memos only

17   went between the two of them, those wouldn't be captured by

18   any searches?

19           MR. SPERLING:  Not until they're added as

20   custodians and zeroed in is exactly on the issue, Your Honor.

21           With respect to your question about timeframe, this

22   is from October 2012.  It's about throttling torrents,

23   torrents, BitTorrents, it's the peer-to-peer traffic that

24   we're always talking about in front of the two of you.  Just

25   received confirmation from Scott Weber and Carl Lushner (ph)

1    that we have no plans to throttle.

2            So that means that Scott Weber is the guy making,

3    or the senior level communicating down to the network

4    security team those decisions.  He's involved in all these

5    decisions, and Charlotte Field is, once she joins.

6            And with respect to your question about time

7    period, Charlotte Field, we saw from that dashboard that we

8    put on the screen, only joined in -- I'm going to get it

9    up -- February 2015.  So it's a relatively short timeframe to

10   search for her, anyway.  They should be added as custodians.

11           MS. HUEBERT:  So to put plaintiffs' request in the

12   proper context and to ((inaudible)).

13           SPECIAL MASTER:  Let's just skip to the chase on

14   this.

15           MS. HUEBERT:  Sure.

16           SPECIAL MASTER:  Why would we not add them as

17   custodians?  I understand that at the time --

18           MS. HUEBERT:  Uh-huh.

19           SPECIAL MASTER:  -- that the custodians were

20   negotiated --

21           MS. HUEBERT:  Yes.

22           SPECIAL MASTER:  -- it wasn't apparent, the

23   relevance, or why we would include them.  But given what

24   Mr. Sperling has just provided --

25           MS. HUEBERT:  Uh-huh.

77

1          SPECIAL MASTER:  -- and the information that he's

2    gleaned from the information that he does have available to

3    him, it looks at least like this is squarely within the realm

4    of relevant information.

5          So please explain why they should not be added.

6    We'll deal with the burden or otherwise.

7          But do you have any argument as to why they aren't

8    directly relevant?

9          MS. HUEBERT:  Yes, absolutely.

10          Well, I mean, it's not just relevance; it's

11    duplication.  So as you saw the e-mail here about Carl

12    Lushner, plaintiffs just recently, just now that we are

13    getting close to the end of the discovery period, within the

14    last couple months -- asked us to add Michael Hannerhan (ph),

15    Carl Lushner and Scott Weber.

16          We investigated.  We decided that we would add

17    Michael Hannerhan and Scott Lushner because they're the ones

18    who would be the more likely person to have nonduplicative

19    data, if any.

20          You know, we agreed to search another 100,000

21    documents.

22          SPECIAL MASTER:  That answers the question about

23    why.

24          MS. HUEBERT:  So for that, Scott Weber, and we said

25    no Scott Weber, because --

1            SPECIAL MASTER:  And you might listen to my

2    question first.

3            MS. HUEBERT:  -- because Scott Weber is the COO of

4    Charter --

5            SPECIAL MASTER:  Ms. Huebert.

6            MS. HUEBERT:  -- at the time -- I'm sorry, I'm

7    sorry.  I didn't hear your question.

8            SPECIAL MASTER:  So you might just listen to my

9    question here.

10           MS. HUEBERT:  Sure.

11           MR. ROSENTHAL:  So I understand why you've added

12   the others, I appreciate that, and I know that you've been

13   working to reach agreements with the other side.

14           What is the rationale for declining to add

15   Mr. Weber and Ms. Field?

16           MS. HUEBERT:  Sure.

17           SPECIAL MASTER:  Specifically, those two?

18           MS. HUEBERT:  For Mr. Weber, we looked at the

19   information that plaintiffs provided us, which was a meeting

20   invite, that it wasn't clear whether or not he even attended

21   the meeting.  It was an e-mail chain where he wasn't a

22   participant.  And I believe that's it.  That's the --

23           SPECIAL MASTER:  Well, we just saw --

24           MS. HUEBERT:  Sure.

25           SPECIAL MASTER:  Listen carefully to my question,

1   please.

2          We just saw this information that, at least to us,

3   makes it looks like Mr. Weber was involved in some of these

4   issues.  If you will look on your screen right now --

5          MS. HUEBERT:  Uh-huh.

6          SPECIAL MASTER:  -- his name is there, and it

7   indicates they received confirmation from Scott Weber.

8          So my question to you is, Why would he not be

9   relevant?

10          MS. HUEBERT:  We're not saying that he might not

11   have relevant documents.  That specific e-mail was to confirm

12   that something that was reported in the media was not true,

13   and he didn't participate in that chain.  And that's the only

14   thing that they could point to, out of the hundreds of

15   thousands of documents, the privilege logs, everything.

16          They could make this same kind of presentation to

17   probably 300 other people.

18          THE COURT:  Go back to that slide, the previous

19   one.

20          MR. SPERLING:  Sorry.

21          THE COURT:  The immediate previous one.

22          MR. SPERLING:  There we go.

23          THE COURT:  No.  There.  So he's not just

24   participating, he is the decision-maker.  It says:  We have

25   received confirmation from Scott Weber and Carl Lushner that

1  we have no plans.

2          So Weber and Lushner are deciding the plans for

3  their client, according to that e-mail.  So it's not just a

4  participant; it's a shot-caller.

5          MS. HUEBERT:  Either that or they understand what

6  the policies are and are reporting on that.  And we did add

7  Carl Lushner.

8          This is -- at the end of the day, we can go ahead

9  and add Scott Weber, we can add Charlotte Field.  Charlotte

10  Field wasn't raised to us until February 8 in the plaintiffs'

11  letter, even though she was on the privilege log a year --

12  you know, last year.  They also said:  Charlotte Field and

13  unnamed other people and all contractors.

14          So her -- this request was new and it was baked

15  into a much broader, much more difficult request.  But

16  (inaudible), you know, we thought it wouldn't be relevant

17  because she wasn't hired until February 2015.

18          She's not overseeing the SSST team, like they're

19  saying, where she is directly involved in operations.  I've

20  researched this.  And she was hired as a senior vice

21  president of application platform operations.  She's

22  responsible for all service delivery applications and the

23  operation side of Charter's video platforms.  She appears

24  on --

25          SPECIAL MASTER:  Well, she has very little

1    relevance or the documents are limited.  I would assume that

2    the search terms that have been previously agreed upon with

3    plaintiffs would sort that out.

4            MS. HUEBERT:  And that's --

5            SPECIAL MASTER:  So the real question here is

6    whether or not you agree that Charlotte and Scott can be

7    added to the list.

8            MS. HUEBERT:  We can agree to that.  But their

9    request wasn't limited to Charlotte and Scott, but we can

10   agree to that.

11           SPECIAL MASTER:  So --

12           MR. SCHAPIRO:  Andy Schapiro.  Can I just say --

13   clarify one thing --

14           SPECIAL MASTER:  Yes.

15           MR. SCHAPIRO:  -- to make sure that -- just based

16   on what Judge Hegarty said earlier, I wanted to make clear

17   that there -- that no one believes there is anything

18   nefarious about designating custodians.  Both sides have

19   equally done that.  It's something that's negotiated

20   because --

21           THE COURT:  Oh, no, no, I just didn't understand

22   the process.

23           MR. SPERLING:  I should point out -- sorry, Your

24   Honor.

25           MS. HUEBERT:  And we have 36 of those.

82

1          THE COURT:  Basically, what he said he is doing the

2   same thing:  They're limiting your searches, you're limiting

3   your searches.  If you're self-limiting your searches, that's

4   fine with me.  I mean --

5          MR. SCHAPIRO:  It's not self-limiting.  It's

6   through negotiating with the other side.  We say, these are

7   our custodians, these are your custodians.

8          THE COURT:  I understand.  But you're engaging in

9   negotiated limits on custodians.  That's fine with me and so

10  now I understand.

11         I'm not saying that you guys had done it sneakily.

12  You decided who your custodians would be based on

13  negotiations; they decided who theirs would be.  You had

14  these agreements.  But now they just want to add a couple,

15  you might want to add something too.

16         It's just a process that discovery is supposed to

17  do and that's inform us better of our case.  And they just

18  took maybe a little different path that gives us -- I mean,

19  why do we have discovery, unless we want to find out things

20  we don't know already?

21         So, yeah, I'm fine with everything.

22         Thank you, Andrew.

23         MR. SPERLING:  I actually thought Andrew was going

24  to stand up to thank me for going out of my way to say:  And,

25  of course, we did the same thing too.  Okay.

 1           SPECIAL MASTER:  No.  I mean --

 2           THE COURT:  Let's close the door on this issue.

 3           MR. SPERLING:  I thought they just agreed to add

 4  these two custodians.

 5           THE COURT:  They did.  Is that all you're asking

 6  for?  I don't want to hear it again because today is it.

 7  There might be new issues that arise after today, but it

 8  ain't going to be about custodians, unless you have something

 9  that you can show me that we didn't know at the time, your

10  Honor, this person had anything to do with anything.  So I

11  want to understand --

12           MR. SPERLING:  Yep, sorry.

13           THE COURT:  -- so you understand the nature of

14  today, right?

15           MR. SPERLING:  I sure do, Your Honor.

16           THE COURT:  Okay.

17           MR. SPERLING:  The last one on the list is

18  contractors.

19           So when they produced the dashboards three weeks

20  ago today, one of the things that we saw was, in month after

21  month, every single monthly dashboard for the entirety of the

22  claim period were identified as a "challenge mitigation,"

23  mitigating the challenge they faced in handling DMCA

24  infringement notices for all of the infringement that was

25  going on on their network.  Contractors continued to support

84

1    the DMCA efforts, which allows ESG -- that was then the name

2    of the security team -- to meet its SLA, service level of

3    performance.

4            Now, we know before that they had subcontractors

5    who worked; but this was the first time, three weeks ago,

6    that we learned that this was a month in/month out issue that

7    they were retaining a bunch of contractors.

8            And as part of their 502(d) production on

9    spoliation, which we got --

10           UNIDENTIFIED FEMALE SPEAKER:  The end of December.

11           MR. SPERLING:  -- the end of December, we got a

12   complete list, which is great, of all the contractors.

13   (Inaudible) current contractors, it goes on to list the

14   noncurrent ones as well.

15           These contractors -- to be clear, these were people

16   that were actually working the notices we know from some of

17   the contractors that we knew about; that contractors would,

18   like regular employees, interact directly with subscribers in

19   connection with notices, participate in chats.  We've gotten

20   some chats among members of the network security team where

21   they're talking about what subscribers said, that subscribers

22   acknowledged infringement, that sort of thing.

23           We posed, I believe in our first very

24   interrogatory, Interrogatory Number 1 was for them to

25   identify everybody that was involved in working on the

85

1   network security team.  And in their response, they limited

2   it to employees.  At the time we didn't know to make anything

3   of it because we didn't know that there was this long list of

4   contractors, which we found out about at the end of December.

5   And we didn't know that there was this major effort month

6   in/month out, because we didn't have the dashboards until

7   three weeks ago today, that they were hiring a bunch of

8   contractors to work on the network security team for DMCA

9   tickets.  So it's the same custodian issue, right?

10         We just want them to add all the contractors as

11  custodians; otherwise, there are line people, L-I-N-E, line

12  people on the network security team who are simply excluded.

13  We got some of them, but we don't have others.

14         SPECIAL MASTER:  Okay.  So let me ask two, just

15  procedural questions.

16         Given that these contractors are just now being

17  raised, (a), would they have e-mail -- e-mailboxes on the

18  Charter system that would have been preserved as part of this

19  process?  I mean, is this even available?

20         MS. HUEBERT:  We're trying to investigate that.

21  It's very -- so the people that they put on the screen, those

22  people, I believe, all became permanent employees at some

23  point.  And we offered to update our interrogatory responses

24  to list those to the extent they weren't already included.  I

25  think we had 18 people of the network security on the rog

1   responses.

2           What they're asking for is us to go back to 2008

3   and figure out who our temp employees were that handled the

4   millions of notices and did processing.  All of that data,

5   those chats, those call logs, that was stored in CATS.  We

6   produced that to them.

7           So this is not -- it would be extremely unlikely

8   that a low-level, temp employee that was hired basically to

9   handle overflow of notice processing would have relevant

10  nonduplicative e-mail communications related to this case

11  that weren't wrapped up into the actual network security team

12  which, again, we had 18 people -- we searched, I think, 18 or

13  19 of all of their files for the specific subscriber

14  communications at issue.  We produced the CATS data.

15          We just expanded our production beyond what was

16  ordered and beyond our responses to this meet-and-confer

17  process, as far as CATS data, beyond even plaintiffs'

18  notices.

19          So they have this information.  What they want to

20  do is -- we've gone back to our HR people and they can't --

21  they have a hard time, even figuring out who these people

22  were.  And there would be no reason for us to have to go

23  through that extremely burdensome process to try to identify

24  these people, to see what was saved and wasn't saved, to try

25  to restore hard drives if they're available, to search for

87

 1   temp employee communications about notice processing, that

 2   would have been wrapped up in the actual employees at Charter

 3   who did the work, who were responsible for supervising that.

 4            MR. SPERLING:  So, Ms. Rodriguez, what you have on

 5   the screen now is the list of who all those people were.

 6   We're not asking them to go find out who they were.

 7            We're very grateful that we finally got a document

 8   that lists them all, but it's not true that they have to go

 9   find out who they are.  It's the people in this document.

10            SPECIAL MASTER:  So this document, is this a

11   document that was produced to you or is this a document you

12   have created?

13            MR. SPERLING:  This is a document that they

14   produced to us.  It's part of their spoliation production at

15   the end of December, pursuant to Judge Hegarty's 502(d)

16   order.

17            MS. HUEBERT:  And we have no problem updating our

18   interrogatory to reflect this information.

19            SPECIAL MASTER:  Okay.  But the question remains

20   whether or not these people would have been included in the

21   preservation and whether or not they can be identified if

22   their mailboxes still exist.

23            Do we know whether or not their e-mailboxes

24   existed?  I understand that now they've been -- some of these

25   have been transferred into permanent employees, but

88

1   preexisting their time as a permanent employee, do you know

2   whether or not you have these mailboxes available?

3            MR. ROSENTHAL:  So we're looking at this now.  We

4   know that -- that there are six that were added to this that

5   we were just told.  But the other ones, we're trying to

6   determine that now.  We only got this request this month.

7            SPECIAL MASTER:  Right, I understand.  So here is

8   what I am concerned about and then I'll let Judge Hegarty

9   jump in on that.

10           But, procedurally, what I'm concerned about is we

11  already have a lot of issues about preservation and time

12  periods, et cetera.  I do not want to run down another rabbit

13  hole about when and whether these employees -- people who

14  became employees, but were previously contractors, when and

15  whether, et cetera, their documents were preserved.

16           So what I would be cautious and cognizant of here

17  is, even if they were ordered to be produced if they do

18  exist, I personally would not be inclined to entertain any

19  arguments about lack of preservation if they were not an

20  actual Charter employee.

21           MR. SPERLING:  Message received.

22           THE COURT:  Not just that, they're not going to

23  be -- they're not going to be decision-makers for Charter.

24           SPECIAL MASTER:  Exactly.

25           THE COURT:  And so I think we both hear you on

1   decision-makers, not so much on minions.  Does that make

2   sense?

3            MR. SPERLING:  What I thought I heard Ms. Rodriguez

4   saying, I may have had it wrong, was that it made sense to

5   add them as custodians; but she sure doesn't want to hear us

6   come back later and say, Oh, you see, they didn't preserve

7   them.  And like I said, to the extent I understood that

8   message correctly, message received.

9            SPECIAL MASTER:  Well, I don't think I went that

10  far yet.

11           MR. SPERLING:  Okay.

12           SPECIAL MASTER:  That was just laying a baseline.

13           I'm not going to -- and I'll urge Judge Hegarty, as

14  well, we're not going to run down that rabbit hole.  We've

15  got enough rabbit holes we're stuck in.

16           MR. SPERLING:  I got it, Ms. Rodriguez.  Totally

17  understood.

18           SPECIAL MASTER:  All right.  So then the question

19  becomes whether or not they should be added as custodians.

20           For the time period in which they were actually

21  employees of Charter, I'm understanding Charter to say that

22  you're willing to add them to the list.

23           Am I correct or incorrect?  Thumbs up or thumbs

24  down?

25           MS. HUEBERT:  To the extent we can identify them.

90

1    There is a lot of these people --

2              SPECIAL MASTER:  I just need to understand.

3              MR. ROSENTHAL:  As to the ones on the list, Your

4    Honor, yes.

5              SPECIAL MASTER:  Thank you, Ms. Huebert.  You get

6    those.  You've been through this with me a few times.  I just

7    want a clear answer.  All right.

8              So to the extent they were employees -- at the time

9    they -- let's just be really clear.

10             If they did, in fact, become a regular employee of

11   Charter from whatever point in time they became an employee

12   of Charter, through the time they were no longer an employee

13   of Charter, Charter is willing to include them as a

14   custodian?

15             MS. HUEBERT:  Yes.  I believe, for the most part,

16   we already have if they were employees at any point.

17             SPECIAL MASTER:  Just yes or no?

18             MS. HUEBERT:  Yes, absolutely.

19             SPECIAL MASTER:  All right.  To the extent you've

20   already done it, all the better to you --

21             MS. HUEBERT:  For the discovery period.

22             SPECIAL MASTER:  -- less additional work you have

23   to do.  Yes.

24             MR. ROSENTHAL:  To get clarification, you said

25   until they were no longer employees, (inaudible) to that

91

1   claims period?

2          SPECIAL MASTER:  Yes, absolutely, claims period.

3          Now, what remains is the in between, is the period

4   of time in which they were contractors, not employees of

5   Charter, but they were contract employees, would they have

6   had a Charter e-mail account?

7          MR. ROSENTHAL:  We are -- we are looking into that.

8          SPECIAL MASTER:  Okay.  How long will it take you

9   to figure that out?

10         MR. ROSENTHAL:  We should be able to get the answer

11  by (inaudible).

12         SPECIAL MASTER:  Any chance we could get it by the

13  end of the day?

14         MR. ROSENTHAL:  On a break, I will make some calls.

15         SPECIAL MASTER:  All right.

16         So let's -- we've cabined this particular time

17  period that we're talking about, this issue, just down to

18  whether or not Charter is going to be asked to produce

19  documents for contractors that are on this chart in front of

20  us now.  And Charter is going to tell us, as soon as they

21  can, whether or not those people even would have had a

22  mailbox account at Charter prior to the time they became

23  employees.

24         MS. HUEBERT:  And that's the document, Exhibit 11,

25  00116450, that's on the screen?

92

1          SPECIAL MASTER:  Yes, thank you.

2          MS. HUEBERT:  And that's Charles Cherry (ph),

3   Anthony Easterwood (ph), Jeffrey Earhart (ph), Andre Main

4   (ph), Bernard Ramos (ph) and Ian Stephen (ph).

5          MR. SPERLING:  That -- that --

6          SPECIAL MASTER:  Okay.  So once we hear about

7   that --

8          MR. SPERLING:  That -- that wasn't the right list.

9          SPECIAL MASTER:  -- we will deal with the decision

10  about whether or not those should be added, okay.  So then

11  you can give us your argument about why they should or should

12  not be included as custodians.

13         MS. HUEBERT:  Thank you.

14         SPECIAL MASTER:  And again, all of this, the

15  overarching bubble, if you will, of all of this conversation

16  with regard to this particular request for the contractors

17  being added as custodians, would be only for the claims

18  period, okay.

19         Are we communicating?

20         MR. SPERLING:  I'm not sure.  Well, from the claims

21  period, of course, Ms. Rodriguez.  You know, she -- she read

22  off -- hear me out, Ms. Rodriguez.  I don't think you're

23  going to be as upset with me as you look like you're going to

24  be.

25         Ms. Huebert read off a list of names, but it was

93

1    the -- it was the then-current employees.  Please scroll back

2    up.  She read off that list.

3          There's a list of names of former contractors, and

4    we, of course, want to include them, too, to the extent their

5    e-mails were preserved.  Of course, if they weren't

6    preserved, we hear you loud and clear, you won't hear us

7    coming back making any spoliation arguments.

8          We do have strong indications that temporary

9    workers in the network security team have Charter e-mail

10    addresses, because we did have documents from one such person

11    who did become an employee, Jeffrey Earhart or Aerhart.  And

12    we have e-mails from him when he was a temp before he became

13    an employee.

14          THE COURT:  So this list here you're talking about,

15    though, these people who were former contractors were never

16    employees?

17          MR. SPERLING:  I don't know.  All I know is that as

18    of December 23, 2015, they were former contractors who were

19    no longer working for Charter.

20          So Ms. Huebert seemed to be carrying them off and

21    not including them.  And our request was to include them, and

22    I thought Mr. (inaudible) was including them, but maybe I had

23    it wrong.

24          SPECIAL MASTER:  Can you scroll that so we can see

25    the whole list?

94

1          THE COURT:  Isn't it logical that they're former

2    contractors no longer working for Charter; they're not

3    referred to as former employees, they were never employees?

4          MR. SPERLING:  They were never employees, but they

5    worked -- they worked just as employees.

6          THE COURT:  No, I know they did.  I know they

7    worked on maybe relevant issues, but they were never

8    employees.

9          MS. HUEBERT:  My understanding of Ms. Rodriguez's

10   order was if they became an employee at any point, we would

11   want to give that information.

12         THE COURT:  That was.

13         MS. HUEBERT:  That's why we referenced (inaudible)

14   issue versus the expansion here.

15         MR. SPERLING:  Okay.  So, Ms. Rodriguez, are you

16   excluding contractors who did not become employees?

17         SPECIAL MASTER:  Yes.

18         MR. SPERLING:  Sorry for the misunderstanding.

19   It's 11:30.  Could I ask the Bench's indulgence for a very

20   short break?

21         THE COURT:  Are you going to order lunch in?

22   You're welcome to eat lunch right there at the table.

23         MR. SPERLING:  Is there a cafeteria in the

24   courthouse?  A vending machine in the courthouse?

25         THE COURT:  Yes.

95

1          SPECIAL MASTER:  There is?

2          THE COURT:  Yes.  In the jury assembly room in the

3    ground floor.  I don't know if it's stocked anymore.

4          MR. SPERLING:  Like to get a soda kind of anything.

5          THE COURT:  Yeah, I think there is.

6          MR. SPERLING:  Okay.  Thank you.

7          MS. GOLINVEAUX:  We do have lunch coming in on our

8    side and it's not coming in until 12:30.  (Inaudible)

9          THE COURT:  I think he wants just five minutes

10   right now.  Yeah, go ahead.

11         MS. GOLINVEAUX:  Yeah, that's good.  That's not an

12   issue.  I second the motion.

13         MR. SPERLING:  Okay.  Thanks, everyone.

14         (Break was taken.)

15         THE COURT:  Okay, let me tell you what I have so

16   far and you tell me if you'll want to make additional record.

17         Number one, DMCA notices and how they're treated by

18   Charter.  Let's see, we're ordering every hundredth document

19   and that's going to be produced to us in-camera.  And can we

20   do that by Friday?  It's only like 270 documents.

21         MR. ROSENTHAL:  I'll have to check, Your Honor.  It

22   should be, but I'll have to check.

23         THE COURT:  Friday, unless otherwise requested with

24   good cause.

25         Request for Production 8, I think we resolved that

1     issue.  That involved batching process, internal and external

2     policies.  I don't think there was any orders by the Court;

3     it was agreed to among the parties.

4             Request for Production Number 22, produce

5     communications with Cox regarding notices, policies and

6     practices, DMCA complaints, and autoclosed script through

7     March 2016.

8             And again, I mean, John, give me your estimate

9     about when you can do that, or Ms. Huebert.

10            MS. HUEBERT:  I would -- well, we haven't run the

11    search terms, you know, to work on this.  So we will do it as

12    soon as we can with everything else that comes out today.

13            THE COURT:  Okay, yeah.  We're going to have to put

14    a deadline by the end of today, so be thinking about that.

15            Number four, we're adding Scott Weber and Charlotte

16    Field as custodians.

17            Number five, contractors:  For the moment, we're

18    just adding people who actually became employees of Charter,

19    and then only for the period through the claims.  And we're

20    going to reserve -- defendant is going to find out if others

21    had an e-mail address, simply contractors.

22            Did we deny that or reserve that?  Do you guys

23    think -- with regard to other contractors who didn't actually

24    become employees and, therefore, had Charter domain e-mails,

25    did we reserve that for Charter getting back to us on

1    whether -- if they were custodians, they even had a Charter

2    e-mail domain?

3         MR. ROSENTHAL:  Yes, Your Honor.  We are trying to

4    get that information.

5         THE COURT:  Okay.  Very good.  So that's been

6    reserved.  And we're now on the next issue, I think.

7         MR. SPERLING:  So, Your Honor, the next issue, and

8    Ms. Rodriguez, the next issue in our chart are privilege log

9    challenges, which appears on page 64 of the chart.  And Mr.

10   Oppenheim will be arguing that.

11        THE COURT:  By the way, did you guys order lunch,

12   Jonathan?

13        MR. SPERLING:  No, we're okay.  We can just grab a

14   drink, whenever is the next break.

15        THE COURT:  Did you find out whether there is a

16   soda machine downstairs?

17        MR. SPERLING:  I actually didn't.  I took the

18   Court's word for it, as I always do.

19        THE COURT:  Well, there was.  I mean, I'm not

20   saying there is still because we don't have anybody working

21   in the courthouse, so why would Coke stop you.

22             (Mr. Oppenheim's mic is not picking up his voice

23   clearly, resulting in inaudibles.)

24        MR. OPPENHEIM:  Good afternoon, Your Honor, and

25   Ms. Rodriguez.

98

1          Just by way of clarification on the last list, did

2    we include the custodians of Field and Weber in that list?

3          THE COURT:  I did.

4          MR. OPPENHEIM:  Okay.  I think the next issue up

5    for us to cover is -- are plaintiffs' objections to privilege

6    assertions made by Charter.

7          And this, Your Honor, is covered within our

8    submission of February 20 to you.  And it starts on page 10,

9    and we've included specifics and pieces of their privileged

10   chart within that.

11         THE COURT:  Okay.  So, hold on a second.  Is this

12   what I said I was going to ignore?  Okay.  But have they --

13   did they not raise -- they didn't raise in the process I

14   designed privilege log issues with you at all?

15         MR. OPPENHEIM:  We have, Your Honor.

16         THE COURT:  I know.  I appreciate that, Matt, but

17   I'm asking these guys first.

18         MR. ROSENTHAL:  No, they added this as a separate

19   part of the chart.

20         (Inaudible discussion.)

21         THE COURT:  No, no, but did you -- do you have

22   notice that they were going to raise this as an issue prior

23   to Saturday?

24         MR. ROSENTHAL:  We did.  But again, the purpose of

25   the whole exercise was to tie this to specific requests.

99

1              THE COURT:  No, I agree with that.  But -- well --

2              MR. ROSENTHAL:  (Inaudible).

3              THE COURT:  We had to do the whole set of issues.

4    Now, if they involved requests, agreed, but I intended to

5    address all outstanding issues when I said that and,

6    therefore, this should have been in their first communication

7    to you.  It didn't have to be tied to a specific request.

8              I mean, these are tied to all requests because they

9    disagree with how you're calling privileged documents, so.

10             Okay.  Go ahead.  Please proceed, Matt -- Matthew.

11             MR. OPPENHEIM:  Thank you, Your Honor.  So as, you

12   know, we previously discussed, the plaintiffs believe there

13   are some holes and limitations in Charter's document

14   production.  And I'll be making many reasons for that.  We

15   would -- one of the reasons is the use of privilege.  And

16   we've already seen that with respect to item 28.  That has

17   already been before Ms. Rodriguez and she reviewed in-camera

18   and cited not privileged.  You affirmed that over objection,

19   Judge Hegarty, and I believe that matter is fully briefed and

20   pending before Judge Jackson now.  That copy still has not

21   been produced.

22             For purposes of today, we have -- I -- I split off

23   our challenges into seven categories to make it a little more

24   digestible.

25             The first five categories are substantive

1    categories that seek production of entire documents and their

2    own 26 documents in those first line of categories.

3            Categories 6 and 7 seem to have nonprivileged

4    attachments produced and unredacted re: lines in the

5    Charter's privilege log that we believe preclude us from

6    being able to assess whether or not a privilege is fairly

7    asserted.

8            THE COURT:  Well, wait a second.  Are you saying

9    that issues -- you said you had seven issues, but you're

10   saying Issues 1 through 5 comprise a total of 27 documents?

11           MR. OPPENHEIM:  26, Your Honor.

12           THE COURT:  26 documents?  Why can't we just look

13   at the documents?  You guys have the documents where we can

14   just scroll through?  It would probably take us less time to

15   just look at the documents and make a call as to hear you

16   guys argue about it.

17           MR. OPPENHEIM:  I can give a very brief overview

18   for each section and then you can look at them, if you like.

19           THE COURT:  Well, hold on.  Yeah.

20           MR. SCHAPIRO:  I do think that's where we're ending

21   up.  I mean, I guess I'm the associate that's been designated

22   to deal with these.  I have a list of 57 objections they made

23   and I just see this is going to end up with in-camera review

24   for most of them --

25           THE COURT:  Right.

1          MR. SCHAPIRO:  -- or with us trying to justify the

2     designations, but maybe not in the presence of the other

3     side.  So it might make more sense to cut to the chase.

4          THE COURT:  That's what I'm trying to do.  So can I

5     look -- can we look at the documents?  Do you have them just

6     hard copy or just electronic?  Is it something --

7          MR. SCHAPIRO:  We may actually have them as hard

8     copies.  We thought they were just electronic.

9          THE COURT:  I would love them in hard copies.

10         MR. SCHAPIRO:  If you will give us 90 seconds to

11    confer, I think we may have them.

12         THE COURT:  I have a nice stopwatch.

13         MR. OPPENHEIM:  But, Your Honor, it may make it

14    easier for you to understand the documents if you give me 30

15    seconds --

16         THE COURT:  That's okay.  You've got 90, go ahead.

17         MR. OPPENHEIM:  So the first category of what you

18    are going to see are documents related to what Mr. Sperling

19    previously walked you through, which is what was happening

20    within Charter in March of 2016 when they were trying to

21    assess whether or not their DMCA policies were working.  And

22    all three of those documents are not attorney communications.

23    They involved no attorneys.

24         The second category are also all nonlawyer

25    communications, and these are communications that relate to

102

1    DMCA policies and procedures.

2           And I'm happy to walk through specifically some of

3    the details regarding these documents and how they connected

4    to other documents that we've seen, as you go through them,

5    Your Honor.  But I'll just keep walking through the

6    categories so that you have a sense of what they are.

7           Category 3 includes five documents that are

8    operational in nature.  So if you're looking at these

9    documents and the re: lines, and what we can see about them,

10   these documents appear to relate to DMCA reporting.  So they

11   have subject lines, like DMCA dashboards, which we've been

12   discussing in the context of metrics reports; DMCA breakdowns

13   and metrics.

14          So these are documents that we don't believe --

15   even though they do have some lawyers listed on the

16   documents, we don't believe that they're necessarily

17   privileged, because, of course, if the lawyers are involved

18   in operational discussions, that doesn't automatically make

19   the documents privileged.

20          Category 4 includes four documents.  And these are

21   internal operations -- operational communications concerning

22   third-party issues.  For example, when Rightscorp, in 2013,

23   had heard that the Charter call center was telling

24   subscribers that the Rightscorp notices were fraudulent,

25   there is a discussion about what Charter apparently was

1    doing.  That is not a privileged discussion.  That is an

2    operational communication relating to an issue raised by a

3    third-party infringement notice.

4            The last category includes only one document.  This

5    is a document that was not on the privilege log but was

6    redacted, and we believe also the redactions were improper.

7            The document lists monthly project assignments sent

8    by a nonlawyer to his manager.  And we don't believe that

9    there should be a privilege attached to that, based on our

10   review.

11           And again, I'm happy to walk through each category

12   with you in more detail if you like.

13           THE COURT:  All right, Mr. Oppenheim, first

14   document, please.

15           MR. OPPENHEIM:  So the first document is Log ID 144

16   and the subject matter of this document is:  DMCA Impasse.

17   You'll notice that the date of this document is March 10,

18   2016.

19           THE COURT:  Hold on.

20           MR. OPPENHEIM:  This is exact --

21           THE COURT:  Hold on.

22           MR. OPPENHEIM:  I'm sorry.

23           THE COURT:  March 10?

24           MR. OPPENHEIM:  2016.

25           THE COURT:  Okay, and so it's a -- who is it from?

1           MR. OPPENHEIM:  Mary Haynes --

2           THE COURT:  To?

3           MR. OPPENHEIM:  -- who is not a lawyer, to Scott

4    Weber.

5           THE COURT:  Okay, we have the document.

6           MR. OPPENHEIM:  Okay.

7           THE COURT:  Okay.

8           MR. OPPENHEIM:  None of these individuals are

9    lawyers.  And this is March 10, 2016, the day at the meetings

10   at Charter were occurring where they were analyzing and

11   deciding whether or not their DMCA policies were working.

12   And this is an internal discussion not involving lawyers that

13   we don't believe should be privileged.

14          Critically, these are executives discussing the

15   DMCA impact.

16          THE COURT:  So are there no lawyers -- there are no

17   lawyers on this -- let me ask the defense.  Are there any

18   lawyers on this e-mail?

19          MR. SCHAPIRO:  No, Your Honor.  And as a general

20   matter, because we haven't met and conferred about these, but

21   they just said (inaudible).

22          THE COURT:  You can stand at the podium, too, if

23   you want.

24          MR. SCHAPIRO:  As a general matter, because we

25   haven't met and conferred on these, my guess is on some of

1   these, we will agree to --

2          THE COURT:  Yeah.  Well, you're going to have to

3   make that tough decision --

4          MR. SCHAPIRO:  -- I just need to --

5          THE COURT:  Sure.

6          MR. SCHAPIRO:  And I want to be careful about what

7   we discuss in open court, of course.

8          THE COURT:  Yeah, look at this one and tell me

9   whether you're going to continue in your objection or not.

10  Can you tell me -- I'm going to ask about one word in here.

11         What's a strike?

12         MR. SHAPIRO:  Yes.  A strike is a claim against a

13  person.

14         THE COURT:  By whom?

15         MR. SCHAPIRO:  Internally, this would be

16  internally:  What do we consider a strike against someone for

17  violating policies?

18         THE COURT:  Meaning something they did wrong?

19         MR. SCHAPIRO:  Correct.

20         THE COURT:  Some subscriber did wrong?

21         MR. SCHAPIRO:  Correct.

22         THE COURT:  Okay.  Does this relate to the six- or

23  seven-strike rule that you had?

24         MR. SCHAPIRO:  I don't think there was a six- or

25  seven-strike rule in this case, Your Honor.

1          THE COURT:  Oh, sorry.  We saw a document flash up

2    that said there is -- that somebody implemented a six-strike

3    rule.

4          MR. SCHAPIRO:  I think that's in a --

5          MR. SPERLING:  I think that they were considering

6    it.

7          THE COURT:  Discussing a six-strike rule.

8          MR. SPERLING:  Correct, Your Honor.  Graduated

9    response would be six strikes.

10          THE COURT:  Was that a Charter document?

11          MR. SPERLING:  That was a Charter document.

12          THE COURT:  Okay.

13          MR. SPERLING:  And that document is dated the same

14    date, March 10, as I believe the one you're looking at.

15          THE COURT:  All right, fine.

16          MR. SCHAPIRO:  And just again, I want to be careful

17    about what we read from the document, but I believe one

18    version of the attachment to this document has already been

19    produced and plaintiffs have requested production of similar

20    documents, so we are -- I think we can reassess the privilege

21    status of this.

22          Let me just consult internally and see if I'm --

23          THE COURT:  That's fine.

24          MR. SCHAPIRO:  -- missing anything.

25          THE COURT:  You can caucus anywhere you want to.  I

1    really want to do this efficiently, but definitively.

2          MR. OPPENHEIM:  The motions to caucus as to all

3    three of these categories simultaneously because they're all

4    very similar in kind?

5          THE COURT:  Well, I suspect if they make some kind

6    of principal decision, they'll be able to respond quickly to

7    the others as they come up on the screen, or they come up by

8    us.

9          (Pause.)

10         MR. SCHAPIRO:  Do you have a -- so the assertion in

11   this first document, Your Honor, is based on the request here

12   for specific guidance.

13         I concede that there are not lawyers on this, but

14   it is people who are nonlawyers saying, We need to get

15   guidance, which I think is plainly legal guidance on this

16   question.  That's why we withheld it and we would be inclined

17   to stand on that.

18         THE COURT:  Well, but wait a second.  How to deal

19   with strikes is, at the very least, a mixed legal/business

20   determination, right?  It's not purely legal?

21         MR. SCHAPIRO:  It's not purely legal.  I would

22   argue that it is predominantly legal, because it's not

23   something that really has to do with how the -- how the

24   business functions.  It's more a question of what might

25   render us liable or compliant to this -- under this law.

1          THE COURT:  But that is not evident from this memo,

2    number one.

3          Number two, this memo references no pending claim

4    or litigation against Charter.  If somebody didn't know

5    anything about any lawsuit, if one had never occurred and

6    somebody was reading this, they would think we're just

7    figuring out how to do our business.  Don't you agree?

8          MR. SCHAPIRO:  Yeah.  And I'm going to read the

9    (inaudible), and I think unless my colleagues tell me

10   otherwise, I think I'm going to -- oh, I'm sorry.

11         There is something that I was unaware of and that I

12   wonder what is the right way to explain this to the Court

13   without explaining it to the other side.

14         THE COURT:  Be vague as you need to be and if we

15   need to have you approach, you can.

16         MR. SCHAPIRO:  Okay.  In the final sentence --

17         MR. SPERLING:  Andy, I'm sorry to interrupt.  Can

18   you talk into the mic?

19         MR. SCHAPIRO:  Yeah, I think we need to approach.

20         THE COURT:  Okay.  This is a --

21         UNIDENTIFIED FEMALE SPEAKER:  (Inaudible).

22         THE COURT:  Yeah.

23         MR. SCHAPIRO:  Well, no.  I think I can do this in

24   a vague way, as long as the response is --

25         THE COURT:  We won't -- I will not include --

1       MR. SCHAPIRO:  In the end here, you see a reference

2  and you see some initials and a reference to a geographic

3  location in the final -- the second-to-last sentence.

4       THE COURT:  The one, two, three, four, five --

5  sixth to the last word?

6       MR. SCHAPIRO:  Yes.

7       THE COURT:  Okay.

8       MR. SCHAPIRO:  So that has to do with something

9  that was going on with a government -- a legal matter that

10  was going on with a government at the time.  So I think that

11  makes it more clear that this is someone saying, We need

12  legal guidance on this.

13       THE COURT:  Okay.  Well, approach on that one,

14  please.

15       (Inaudible discussion.)

16       (White noise 12:10:39 p.m. to 12:13:23 p.m.)

17       THE COURT:  Okay.  I'm back on an unrestricted

18  record and a redacted version of this document is agreed to

19  be produced.

20       MR. OPPENHEIM:  Will that include the attachment,

21  Your Honor?

22       THE COURT:  I thought they said they already

23  produced the attachment in some other place.

24       MR. SCHAPIRO:  Yeah, I think we did.  And if I

25  confirm that, then we certainly have no issue on the

1    attachment.

2         SPECIAL MASTER:  Do we have a Bates number for

3    these for the record?

4         MR. OPPENHEIM:  I'm sorry.

5         THE COURT:  Well, I'm using the designation that

6    Matthew gave me, which was Tab -- it's 144, which is a

7    description, so -- and it's the memo you talked about.  So

8    it's 144 without any decimal point, right?

9         MR. SPERLING:  Right, Log ID 144.

10        THE COURT:  Right.  And 144.001 is what Andrew says

11   has been produced in some other place.  And, Andrew, would

12   you confirm that with people who would know?

13        MR. SCHAPIRO:  Yes.

14        MR. OPPENHEIM:  And think about how to correlate

15   whatever was produced to the relevant facts of this e-mail,

16   if possible.

17        MR. SCHAPIRO:  Yes, or if a copy -- or we can

18   produce a copy with it if it's identical.

19        THE COURT:  Okay.  It's going to be -- you either

20   have got it or you're going to get it.  All right?

21        MR. OPPENHEIM:  Great.

22        THE COURT:  Go ahead.

23        MR. OPPENHEIM:  The next item, Your Honor, is Log

24   ID Number -- I'm actually going to reverse the order here --

25   407.  It's an e-mail the very next day involving Mary Haynes

1   and Gary Barton.  So Gary Barton -- so Mary Haynes was the

2   senior director at network security operations, not a lawyer,

3   (inaudible) vice president network security operation.  She

4   was listed in the initial disclosures.

5           Gary Barton was the senior product manager for

6   wireless products, as we understand it.  And it's a follow-on

7   the next day (inaudible).  Another e-mail about senior

8   personnel not involving lawyers regarding DMCA notices.

9           And what has been produced is a partially redacted

10  change -- redacted portions, not to us, appear to involve any

11  attorney communications (inaudible) to the issues.

12          THE COURT:  We need to hear from Andrew on why it's

13  privileged.

14          (White noise 12:16:43 p.m. to 12:20:34 p.m.)

15          THE COURT:  Okay.  We're going to direct the

16  production of that document with redactions as stated on the

17  record.

18          MR. OPPENHEIM:  Your Honor, the next document,

19  Document Log ID 148, this document, Your Honor, is

20  particularly important.  This is a document dated March 23,

21  2016, so this is several weeks or a week or so after they

22  started this conversation about whether to change the policy.

23  And this is an e-mail chain between Mary Haynes, Pete Hall

24  and Laurie Rowlett.  None of them are lawyers.

25          And if you would, Your Honor, it is important if

1   you would look at the attachment requested be produced, which

2   is CHA00082411.  And I will take a moment so that you can

3   appreciate the critical nature of this.

4           This document --

5           MR. SPERLING:  Well, hold on a second.

6           Your Honor, do you have the document in front of

7   you, if not?  We'll hand it up and we'll get a copy.

8           THE COURT:  We have Tab 54 in front of us.  What

9   else is he referring to?

10          MR. SPERLING:  The document --

11          THE COURT:  Pardon?

12          MR. SPERLING:  He's referring to the document

13  82411.  We're going to hand it to the Bench and opposing

14  counsel in just a moment.

15          (Court and Special Master confer.)

16          SPECIAL MASTER:  Is this the deck titled --

17          MR. SPERLING:  I believe it's the Impact.

18          SPECIAL MASTER:  -- DMCA copyright?

19          MR. OPPENHEIM:  Correct, DMCA copyright altering

20  system enhancements.

21          THE COURT:  That's the same thing -- Andrew, that's

22  the same thing -- document we just talked about with 144.001.

23          MR. SCHAPIRO:  Yeah.  They said they have it.

24          THE COURT:  Yeah, you already have the deck or

25  whatever.

 1           SPECIAL MASTER:  Dated March 10, 2016.

 2           MR. SCHAPIRO:  Yeah.  No, the deck we have, I

 3   think, right?

 4           THE COURT:  Okay.

 5           MR. OPPENHEIM:  The deck we have.  This is a

 6   further discussion, Your Honor, related to this deck.  This

 7   is the deck, Your Honor, where on --

 8           THE COURT:  Are you only referring to the memo

 9   dated 3/23?

10           MR. OPPENHEIM:  Yes, Your Honor.

11           THE COURT:  Okay.

12           MR. OPPENHEIM:  And if we understand it, that this

13   is a conversation on March 23rd concerning the DMCA impact

14   deck.  And that DMCA impact deck specifically contemplates

15   that services will be terminated if a customer does not

16   successfully complete settlement or appeal process that is

17   with respect to a copyright notice.  And they've done an

18   analysis that said this would impact approximately 200,000

19   customers per year based on 2015.

20           And then goes on to describe in great detail many

21   of the things that we have to do if they undertook this

22   policy.  So there was internal nonattorney senior-level

23   discussion about this proposal, which has been marked as

24   "Privileged," even though there are no lawyers on it.

25           And that's Log ID 148.

1           THE COURT:  Right.  Do you need to approach Andrew

2  or can you argue from there?

3           MR. SHAPIRO:  I think I might be able to concede

4  from here --

5           THE COURT:  Okay.

6           MR. SCHAPIRO:  -- even better.  I think that this

7  was -- was logged, because, as you see right on the top, it

8  says:  Attorney-client privileged.

9           THE COURT:  Agreed.

10           MR. SCHAPIRO:  But unless I'm missing something, I

11  don't think I have a basis that would convince you that this

12  should have been withheld.  So my guess is someone reviewing

13  this document, a contractor or someone else, attorney-client

14  privilege, and probably didn't take the next step up.

15           THE COURT:  Okay.  So what I don't really want

16  to --

17           MR. SCHAPIRO:  Let me make sure I haven't given

18  away the farm.  May I confer.

19           THE COURT:  Yeah, confer.

20           One thing I don't want the plaintiffs to do is say,

21  Aha, oh, they're turning over something they've called an

22  attorney-client privilege, now we get to even broader -- more

23  broadly expand what we want to look at.

24           Don't do that, please.

25           MR. SPERLING:  We will not do that.

1           THE COURT:  Okay.

2           MR. SCHAPIRO:  My assumption is the person who

3    wrote this back in 2016 quoted attorney-client privilege

4    because it was, at some point, related to conversations that

5    had happened with lawyers, but --

6           THE COURT:  You don't have to explain that.

7           MR. SCHAPIRO:  Okay.

8           THE COURT:  Yeah.  No need.

9           MR. SCHAPIRO:  Let me just confirm.

10          (Pause.)

11          MR. SCHAPIRO:  Okay, so we will -- we'll withdraw

12   the designation.

13          THE COURT:  Next document, please.

14          MR. OPPENHEIM:  Okay.  We're going to the next

15   category.  These are also all communications involving

16   nonlawyer related to DMCA policies and procedures.

17          So the next two entries are Log ID 245 and 247.

18   Your Honor, these -- I'm going to take them together because

19   I believe that one is a draft and one is a final version of

20   the same document, though I'm not certain of that.  These are

21   documents that I believe came from the file that somebody by

22   the name of Kate Dement, who -- we're not certain who she is

23   based on our Googling research, which is always a little

24   dangerous, but it appears that she was a marketing executive.

25          And this is a document from 2012, which was

1   originally in the privileged log entitled -- excuse me -- it

2   was originally titled, DMCA at Charter, and a revised version

3   of the log that changed the title to SRT DMCA to (inaudible).

4   It appears to be a PowerPoint presentation about DMCA at

5   Charter in 2012 involving a nonlawyer.

6           We have no idea to whom this was distributed or

7   shown, but I have no basis to believe that this is a

8   privilege, based off of the log.

9           THE COURT:  All right.  So, you know, what's your

10  general position if -- if a nonlawyer receives legal advice

11  but then relates that legal advice to another nonlawyer in a

12  communication that doesn't involve any lawyers, is that

13  privileged, Mr. Oppenheim?

14          MR. OPPENHEIM:  It depends on whether it's

15  operational or not.  It depends on how -- I can -- I can -- I

16  can imagine that if the document that the lawyer said, This

17  is their guidance on this issue and this is our exposure,

18  then I would agree that that would be privileged.

19          If they're making operational decisions based off

20  of legal guidance and then implementing them, I don't believe

21  it's privileged anymore, because at some level you could

22  argue that everything related to an infringement (inaudible)

23  that involves --

24          THE COURT:  No, no, no, I know that.  But I don't

25  think you have to actually use magic words "the lawyer said."

1   They just have to establish that the lawyer did, in fact, say

2   that, through some other means of proving it to us.  But if a

3   person went to get legal advice to avoid violations of a law

4   and then -- and that's an operational person -- and they want

5   to help their team avoid violations of the law, so they tell

6   everyone else what the lawyer said without using the words

7   "the lawyers said," it sounds like you would agree that

8   that's privileged?

9           MR. OPPENHEIM:  It depends on when you say -- I was

10  with you all the way up until the distribution -- if it's

11  broadly distributed to a group of operational people within

12  Charter, I believe it loses its privilege.

13          THE COURT:  Why?  What's the argument?

14          MR. OPPENHEIM:  Because now it has become an

15  operational document and it's no longer legal guidance to --

16  that's directing what the company is doing.  And what -- we

17  can't tell from this (inaudible).

18          THE COURT:  Well, wait a second, let me ask you

19  this.  So the U.S. Supreme Court, per Justice Gorsuch, now

20  says that discrimination on the basis of sex is equal sexual

21  orientation, okay?  We all know that happened.  And some

22  company is worried about that and asks their lawyers and

23  their lawyers tell them, Hey, you know, we've got to change

24  the way we're doing business or else we're going to get sued

25  on that basis from now on and here is what you need to do.

118

1   And then they go back and have a team meeting among

2   entry-level people up to the vice president and they say,

3   Here is what our lawyers -- not even that.  Here is what the

4   law is about discrimination on the basis of sexual

5   orientation, we've got to change the way, you know, we view

6   this, blah, blah, blah.  Privilege or not?

7         MR. OPPENHEIM:  When they're directing a change in

8   their policy, that's not privileged, because, otherwise, how

9   would we ever learn that they directed a change in their

10  policy?

11        MR. SCHAPIRO:  Well, I would respectfully -- I

12  would disagree with that.  The change in the policy isn't

13  privilege, but the meeting or the communication certainly is.

14  Whether it's speaking to one person in the business or a

15  bunch of people in the business, the business is the client.

16        You know, if you have -- let's, you know, think of

17  the case as more, you know, straight out of law school, if

18  I'm wondering whether I can be made to testify against myself

19  and I go -- I go and ask a lawyer that and -- well, let's say

20  there are two of us, okay, we committed a crime.  And I go

21  and ask our lawyer, Can we be forced to testify against

22  ourselves?  And then I go back to my -- my co-conspirator and

23  I say, We can't forced to testify against ourselves, that's

24  communicating with the lawyer.

25        THE COURT:  Well, as a matter of a proffer, who

1    created this?

2              MR. SCHAPIRO:  Who created the PowerPoint?

3              THE COURT:  Yes.

4              MR. SCHAPIRO:  It was Mr. Abramov and Ms.

5    Starkweather.

6              THE COURT:  Mr. Abramov created it?

7              MR. SCHAPIRO:  At least it went out from him.  He

8    may have had some underlings who helped with it.

9              THE COURT:  Okay.

10             MR. SCHAPIRO:  And can I just --

11             THE COURT:  Is it reflected in this?

12             MR. SCHAPIRO:  Absolutely.  And just to make it

13   easier, the Special Master already -- I didn't want to

14   interrupt -- but these presentations are substantively

15   identical to Log Entry 19 on our first privilege log.  And

16   the Special Master sustained our privilege assertion on

17   that -- on that matter.

18             The main difference is that Log Entry 19, the later

19   one where the presentation has been updated, we -- on that

20   one, we had added in the -- in the column of the Privilege

21   Log that it was from Mr. Abramov and Ms. Starkweather, who

22   were the presenters of this.  The substance is unchanged

23   unless maybe one side might have been updated.

24             MR. OPPENHEIM:  I appreciate that because we were

25   not aware of that.

120

1          THE COURT:  Hold on, Matt.  Who got this

2    presentation?

3          MR. SCHAPIRO:  It was only internal people at

4    Charter, but I can't -- I can't necessarily come up with a

5    list of who they would have been.

6          THE COURT:  Would have been broadly widely

7    distributed?

8          MR. SCHAPIRO:  I don't believe broadly widely, but

9    that's in the eye of the beholder.  More than four people and

10   less than 100.

11         THE COURT:  More than supervisors?

12         MR. SCHAPIRO:  More than supervisors?  I don't

13   know.

14         THE COURT:  Colorado law makes a distinction

15   between supervisory and nonsupervisory personnel with regard

16   to privileged.

17         MR. SCHAPIRO:  I wouldn't want to misrepresent --

18         THE COURT:  Okay.

19         MR. SCHAPIRO:  -- and if I tried to answer -- I'm

20   going to see if I can get an answer here for a moment.  By

21   the way and, you know, of course, the first page of each

22   presentation is labeled "Privilege," and it does say, "Legal

23   Affairs" on the cover page.

24         MR. OPPENHEIM:  I thought that this was distributed

25   to the individuals who were responsible for taking notices

1    and addressing them.  If there was a privilege, that

2    privilege is lost.

3              THE COURT:  Do you -- how can we know who would

4    have received this?

5              MR. SCHAPIRO:  I'm not sure.  I think what you will

6    see from the presentation, without me giving away too much,

7    is that it is obviously a guide for a presentation that

8    people in legal affairs were making because it is primarily

9    topics or questions.  And so determining to, you know, who

10   may have been in the room or the audience when the

11   presentation was given back in 2016 might be -- strike

12   "might" -- would be difficult.

13             I can say that it was gone -- that it was delivered

14   to the, as I understand it, people who were overseeing the

15   monitoring process relating to DMCA, but I can't answer your

16   question here about whether they were people whose title

17   would be supervisor or might have had a different title.

18   I -- I don't know and I'm not sure it's easily determinable.

19             MR. OPPENHEIM:  The burden rests on them to

20   substantiate the privilege nature of the document.  If they

21   can't say with certainty that the document was not

22   distributed broadly to people who were handling notices on a

23   day-to-day basis, I don't believe that they can maintain the

24   privilege.

25             MR. ROSENTHAL:  Well, the standard under Colorado

 1    law clearly is that -- the privilege in the state is not

 2    limited to a control group; it's limited to those employees

 3    that need -- that need the information and need the advice.

 4            So if the legal department is providing advice to

 5    people processing DMCA matters, that's exactly the purpose of

 6    the privilege here.  Widespread -- and the case law around

 7    widespread is when you send an e-mail out to a corporation,

 8    to 22,000 employees, and the people don't have a need to

 9    know.

10            SPECIAL MASTER:  So the question here that we

11    can't -- we still don't have an answer to is whether it's

12    widespread, control group, or the standard, as we've just

13    articulated it in Colorado.  We still don't know the answer.

14            THE COURT:  You don't know whether it was limited

15    to the people you just said it can go to?

16            MR. ROSENTHAL:  Your Honor, we can try, either over

17    lunch or over the next two days, to talk to the people in the

18    legal department to figure out who this was presented to.

19            THE COURT:  Okay.

20            MR. SCHAPIRO:  And let me just add that, yes, it is

21    our burden, of course; but as a practical matter or a

22    reasonable matter, without an e-mail or a presentation

23    conveying legal advice and you need to prove a negative at

24    some point, that the reason, at some point, that gets sent

25    out to the large audience four years -- you know, four years

1   ago, at some point it seems fair to rest on inferences.

2   And --

3          SPECIAL MASTER:  It does, but here is the thing.

4          What you presented us with is this PowerPoint.  It

5   looks like this PowerPoint, to use your word, "based on

6   inferences," looks like it was designed to provide

7   information to certain people.  And the question mark that

8   lives right now is:  Who are those certain people?  Is this

9   all staff training?  Or is this limited to just those people

10  who are processing something?  Is this more broadly

11  disseminated within the organization?

12         And so, yes, on its face it appears that it may be

13  privileged.  It indicates confidential.  It indicates,

14  Subject to:  Attorney-client privilege.  You've asserted

15  that.  Plaintiffs have now challenged saying, Hold on a

16  minute, this looks like, we think it went more broadly.

17         In the context of other documents that we've seen,

18  it appears there are questions here.

19         And so we're now asking you the question:  Who got

20  this?

21         THE COURT:  Sometimes PowerPoints are made to a

22  live audience and that's the only time anybody ever sees it.

23  Sometimes it's made to a live audience, but some people miss

24  it so it's e-mailed all around.  Then if that e-mail

25  duplicates itself to a lot of other people, that makes a

124

1    difference.

2              So I think what we both believe is, at the moment,

3    as long as it's -- it's not waived by being broadly

4    disseminated, it's privileged, but we need to get an accurate

5    answer of who received it.

6              MR. SCHAPIRO:  So let's see what we can find out

7    over the lunch hour.

8              THE COURT:  Okay.

9              SPECIAL MASTER:  That would be helpful.  Thank you.

10             THE COURT:  It is the lunch hour right now, by the

11   way.

12             MR. OPPENHEIM:  So, Your Honor, it sounds as though

13   it's up to Charter to substantiate that it wasn't properly

14   distributed.  If they can, then privilege will retain, retain

15   the privilege.

16             THE COURT:  Yes.  You'll also go after 247, you

17   said?

18             MR. OPPENHEIM:  It looks to us, from the log, as

19   though one is two different versions of the same thing.

20   Obviously, we haven't seen the document, so we can't tell.

21   So I've been trying to deal with them as one.  If they're

22   different, then --

23             THE COURT:  I'm sorry, 240 -- we're looking at 245

24   and 247, correct?

25             MR. OPPENHEIM:  Correct.

1          THE COURT:  It looks like -- it's the same thing.

2          MR. OPPENHEIM:  Very well.  So we'll just apply the

3     same rationale.

4          THE COURT:  Yes.

5          MR. OPPENHEIM:  The next item will be Log ID 28.

6     This document is produced with substantial redactions.  It is

7     an internal e-mail, again nonlawyer.  The subject line

8     obviously piqued our interest since it says "RIAA," which is

9     Recording Industry Association.  EMC and HEOA is the higher

10    education act.

11         This document, apart from the redactions, we can

12    see that the nonlawyers want to have a discussion about RIAA

13    takedown notices, including the (inaudible) -- the group

14    notices directly from Charter appears p-to-p blocking

15    measures and effectiveness and the ability to capture logs

16    for DACP requests.  That is the ability to identify who the

17    underlying infringers are.  And then there is a back and

18    forth about a specific Charter subscriber -- sounds like a

19    corporate subscriber, of sorts -- who is getting

20    notifications at an old e-mail and wants to get notifications

21    directly.

22         And the reason this is important is because, as you

23    heard earlier about batching and you heard earlier about

24    scripts autoclose, where Charter was diminishing the number

25    of notices that were being sent to customers, here there is a

126

1    discussion about a customer who wants to get the notices.

2    And all of these communications about this are redacted, even

3    though there are no lawyers involved.

4            They've not asserted they were product

5    organizations, just attorney-client privilege.

6            THE COURT:  You've got to explain this one, Andrew,

7    we're not seeing some things here.

8            MR. SCHAPIRO:  All right, one moment, Judge.

9            THE COURT:  By the way, you all feel free to

10   distribute food, or if you want to take a one-minute break,

11   we can do that, two-minute break.

12           (Pause.)

13           THE COURT:  Okay.  We were informed that the

14   parties have an understanding amongst one another that you're

15   allowed to redact or not produce personal identifying

16   information.  Is that true?

17           MR. OPPENHEIM:  I don't think it's quite that

18   simple.  I think --

19           THE COURT:  It never is.

20           MR. OPPENHEIM:  -- with respect to Trivers, right,

21   we've agreed that there would be some notice given?  But with

22   respect to complainants, copyright owners and the like, we

23   have not agreed to -- in fact, there is no reason to agree to

24   that.

25           THE COURT:  Okay.  So most of what's redacted is

1     just personal and identifying information.  We've directed

2     that everything else be unredacted, okay?

3             MR. OPPENHEIM:  The entire first page is redacted.

4     Is that just one (inaudible) over the course of the whole

5     page?

6             THE COURT:  It's one big -- no big deal.

7             MR. OPPENHEIM:  Okay.

8             MR. SCHAPIRO:  Would we -- would we be able, just

9     because I think our sandwiches have arrived, to take a break

10    for a minute to organize?

11            THE COURT:  Yes, please, go ahead, because we've

12    just gotten through Document 28.  Yeah, grab your stuff,

13    okay.  We're off the record.

14            (Break was taken.)

15            THE COURT:  Okay, everybody ready to proceed?  We

16    just finished document -- Document 28.

17            Mr. Oppenheim.

18            MR. OPPENHEIM:  Yes, Your Honor.  So the next log

19    item we're turning to is log item 368.  This is a document

20    that was produced with a small redaction.  Normally, it

21    doesn't warrant a lot of attention, but given the substance

22    of the communication, it did.

23            So this is a communication between nonlawyers in

24    December of 2015.  And in this document, if you look at the

25    bottom of the chain, Scott Weber, who I believe was earlier

1    described as the chief operating officer, (inaudible)

2    e-mailed Charter (inaudible) for information as to what

3    Charter's DMCA's process is and how they're doing following

4    our processes.

5             And he asks that in light of some questions

6    generated regarding our DMCA process (inaudible).  That's --

7    the response comes back from Ms. Stewart -- excuse me, Ms.

8    Field.  She says she's out.  Tammy Stewart can assist.  And

9    she says, We process all DMCA messages for all DMCAs we

10   receive including those (inaudible) companies (inaudible).

11   We have all our processes documented and have a lot of

12   recording around the (inaudible).

13            Then Stewart goes to respond to the question that

14   has been asked by Scott Weber and that response is redacted.

15   Of course, what Scott Weber asked was entirely for

16   operational information.  And so the question is:  Why is the

17   response to a question about something that is purely

18   operational being redacted as between nonlawyers?

19            MR. SCHAPIRO:  And I'm not sure I need to come up

20   with this.  I'm happy to come up, but I think this would be

21   an easy call.  I would just mention that the person Elfin

22   noted there is Elfin Noche or Elfin Noche, who is a lawyer.

23   I'm happy to walk through this, but I'm hoping that might not

24   be necessary.

25            MR. OPPENHEIM:  Your Honor, just to correct the

1   record, I think I misspoke.  I think I said Weber was the

2   chief operating officer.  Apparently, he is the EVP of

3   network operations.  I wanted to -- apologies.

4           (Pause.)

5           THE COURT:  We believe it's privileged.

6           MR. OPPENHEIM:  Your Honor, the next items -- I'm

7   going to handle a few together because I believe they're

8   either the same or so closely related as to be -- to be dealt

9   with collectively, and those are items 307 and 308, which

10  were partially redacted.  What this is, Your Honor, you've

11  heard the name Colton Mabb many times.  Colton Mabb sends a

12  monthly report in May of 2014 to Laurie Rowlett, who I guess

13  was his supervisor.  The majority of the report is there.

14  They've redacted two lines out of what is his monthly update

15  of tasks and accomplishments.

16          Mr. Mabb is not a lawyer, nor is Ms. Rowlett, and

17  this is just his monthly report.  I'm not sure why, in either

18  of these documents where it's the same type of redactions,

19  they've taken out certain items that do not appear to -- from

20  the face of it to warrant attorney-client protection.

21          MR. SCHAPIRO:  These two also I think are

22  self-evidently privileged, but I'm happy to approach the

23  attorney question.

24          THE COURT:  Go ahead.  We find this privileged,

25  both.

1          MR. OPPENHEIM:  Next item, Your Honor, is item 21.

2   We don't have a document -- plaintiffs do not have a document

3   to look at today.  This was in March of 2013.  It was an

4   e-mail, again all nonlawyers from Laurie Rowlett and Kathy

5   Nelson and Laurie Wood, and this is an e-mail where the

6   subject matter is Round Hill Music DMCA ticket analysis

7   request.  I assume -- it says REQ, I assume that's requested.

8   Round Hill is a music publishing company and was in one of

9   the plaintiffs in one of the early Cox cases.  Presumably,

10   this has to do with repeat infringement claims, and this is a

11   discussion of an infringement in an operational perspective

12   related to a music company.  Without seeing more, it seems

13   entirely operational.

14          MR. SCHAPIRO:  On this one, I -- I probably need to

15   provide the document, unless we can directly N submit a tab

16   in the -- the tab should be Tab Number 5 in the binder, and

17   you'll see why this was withheld.

18          THE COURT:  Well, yeah, we're looking at it.

19          MR. SCHAPIRO:  Okay.

20          MR. OPPENHEIM:  I don't believe, Your Honor, that

21   this is simply an analysis of repeat infringement from an

22   operational perspective that that would be privileged.

23          THE COURT:  Make a record, Andrew.  Do you have to

24   approach?

25          MR. SCHAPIRO:  No.  This -- well, I'm not sure how

131

1    to make a record without talking about the document which

2    they don't have.  So this is a -- this is a -- this reflects

3    actions taken in response to a -- this reflects an inquiry

4    from lawyers.

5              THE COURT:  Right, yes.

6              MR. SCHAPIRO:  Yes.  That's why -- that's what I

7    have, Your Honor.

8              THE COURT:  It is an inquiry --

9              MR. SCHAPIRO:  Well, let me give you an example

10   about (inaudible).  My lawyer asked me to check and see if I

11   had filed -- I needed to go and see if I filed something,

12   such a form, with my income tax that -- that is my lawyer and

13   I are in an iterative process of determining whether I was in

14   compliance answering a legal question.

15             MR. OPPENHEIM:  If Your Honor --

16             MR. SCHAPIRO:  (Inaudible) analysis --

17             THE COURT:  Hold on, Matt.  Matt, hold on.  Go

18   ahead.

19             MR. OPPENHEIM:  I'm sorry.

20             MR. SCHAPIRO:  This is somewhat more general.  But

21   it's essentially here is what our lawyers want us to look at,

22   which to me should be privileged.

23             THE COURT:  All right.  That's plenty of

24   information, Matt.  What do you say to that?

25             MR. OPPENHEIM:  Yeah.  Look, I am sure Charter

1    could say every time they got a request from a copyright

2    owner about potential repeat infringers, that what they were

3    looking at was in order to inform lawyers, and incredibly

4    every single analysis they did in response to a copyright or

5    a complaint would be privileged, and that can't be the case.

6           What they're doing is going back and looking at

7    their tickets, which by the way, we don't have, so which

8    creates a substantial (inaudible) question, right.  We don't

9    have these tickets back to this period of 2013.  We couldn't

10   re-create this ourselves.

11          And so they're doing an operational analysis of

12   what had happened.  If, in fact, they knew in 2013 that they

13   had a repeat infringer problem, that's clearly relevant.

14          MR. ROSENTHAL:  Your Honor --

15          THE COURT:  You can only hurt your case, but you

16   can go ahead and say whatever you want.

17          MR. ROSENTHAL:  It's really -- an attorney is --

18   part of the attorney-client privilege is you can seek out

19   information from the client in order to facilitate the need

20   for legal advice.

21          THE COURT:  Yeah, we know.  It's privileged.

22          MR. ROSENTHAL:  Okay.  Sorry, I didn't hear you.

23          THE COURT:  Go ahead, Matt.

24          MR. ROSENTHAL:  I should have sat down.

25          THE COURT:  I warned you.  Don't say I didn't warn

133

1    you.

2              MR. ROSENTHAL:  I didn't hear the warning.  Quit

3    while you're ahead.

4              MR. OPPENHEIM:  Your Honor, we're now moving

5    into -- Your Honor, can I ask whether or not that document on

6    21 was ultimately forwarded to Round Hill Music?  Because if

7    it was, then, obviously, it would lose its protection because

8    we don't --

9              THE COURT:  The question has been posed.

10             MR. SCHAPIRO:  I don't have it anymore.

11             MR. OPPENHEIM:  On the face of it, we cannot tell.

12             THE COURT:  It's not self-evident, is it?

13             SPECIAL MASTER:  No.

14             MR. OPPENHEIM:  (Inaudible).

15             THE COURT:  I would need to have additional

16   information, but --

17             MR. SCHAPIRO:  No, there is certainly nothing on

18   there that suggests it was forwarded to anyone, and there is

19   no reason, since you've seen the content of that, that that

20   would have been forwarded.

21             THE COURT:  There is no indication internally,

22   Matt, that it was intended to be forwarded to anybody.

23             MR. OPPENHEIM:  Yeah.  And, unfortunately, because

24   of the lack of e-mails, we can't tell --

25             MR. SCHAPIRO:  Your Honor, can I say, there are --

134

1   I'm trying to be (inaudible), but they have 57 privileges

2   that they're challenging, some of them just on, well, this

3   seems kind of interesting, which is the same thing.  We're

4   going to be here all day if it then turns into, Well, but

5   what if that (inaudible) that document wasn't somewhere --

6          THE COURT:  Yeah, but that's the first time he has

7   said that.  Every other time he has accepted without further

8   comment, so I'm going to allow a little grace.

9          MR. SCHAPIRO:  All right.

10          THE COURT:  Go ahead.

11          MR. OPPENHEIM:  Your Honor, the next items are log

12   items 359 and 361.  I think we can handle that collectively.

13   This is a new category.

14          There are five documents in this category, and all

15   of these appear to be operational communications.  And so the

16   359 and 361, these are documents where the subject matter is:

17   DMCA Dashboard Year to Date.  Of course, that dashboard is

18   the document that was widely distributed to Charter that we

19   recently learned they were distributed, along with the

20   matrix -- metrics reports that came from Colton Mabb, who is

21   not a lawyer.

22          The fact that there are lawyers on the

23   communication, lawyers who are overseeing the DMCA notice

24   program, does not suddenly imbue it necessarily with a

25   privilege.

1            And it appears that this may be exactly what we

2    were discussing when we were discussing the metrics reports

3    where we said we don't have any documents or virtually no

4    documents where they're discussing what's in the metrics

5    reports.  So they -- they ultimately agreed to turn over

6    metrics reports.  They ultimately turned over the dashboards.

7    They turned over e-mails communicating it, but we have no

8    discussion of them.

9            THE COURT:  Well, I don't think you're going to be

10   terribly informed by -- even if you did receive this

11   document, I don't think you'd be further informed on that

12   issue, but we both believe it's privileged.

13           MR. OPPENHEIM:  Your Honor, the next item is item

14   107.  This is another document that, while it contains an

15   attorney on the document, it comes from Colton Mabb again and

16   it's now an updated copy of the DMCA dashboard, and it

17   appears, again, to be a discussion of those dashboards.

18           MR. SCHAPIRO:  And this is really just a

19   continuation of our, you know (inaudible).

20           THE COURT:  Yeah, more difficult to determine other

21   than the -- the recipients -- internally more difficult to

22   determine that.

23           MR. SCHAPIRO:  Yes.

24           THE COURT:  Is this 107 we're talking about at the

25   moment?

136

1          MR. OPPENHEIM:  Yes, Your Honor.  It would be an

2     e-mail dated December 16, 2015 with an attachment.

3          THE COURT:  With an attachment?

4          MR. OPPENHEIM:  So we don't have -- so -- and

5     that's true for 359 and 361 too, we don't have the

6     attachments or the e-mails.

7          THE COURT:  Do they have the attachment, which is

8     107.001?

9          MR. SCHAPIRO:  I believe they will now because I

10    think these are encompassed within the dashboard documents

11    that we agreed to give them --

12         THE COURT:  Yep.

13         MR. SCHAPIRO:  No, apparently not, Your Honor.

14         MR. OPPENHEIM:  Okay.  So let me -- let me just --

15         THE COURT:  Let him -- let him finish answering.

16         MR. OPPENHEIM:  I'm sorry.

17         MR. SCHAPIRO:  I'm sorry, it is not clear on the

18    face of this, because I believe, as you understand from the

19    prior e-mails we saw, this may have been a subset or a

20    narrowed-down version of the materials that is being produced

21    to them as (inaudible) for the reasons that are evident from

22    the -- from the prior (inaudible).

23         SPECIAL MASTER:  Do you have any objection to the

24    production of the attachment?

25         MR. OPPENHEIM:  I guess I don't -- blindly, I'll

1   ask a question whether the attachment was created by

2   Mr. Mabb, because if it was, he's not the lawyer and he was

3   involved in the creation of the metrics report.  I'm not sure

4   why --

5           SPECIAL MASTER:  We understand that.

6           THE COURT:  Yeah, we've got that.

7           MR. SCHAPIRO:  We do, because this was produced

8   specifically for reasons I can discuss at sidebar now that I

9   have the attachment in the course of the conversations we've

10  seen in those two prior e-mails.

11          SPECIAL MASTER:  So, I'm sorry, I'm not sure I

12  understood your response.

13          MR. SCHAPIRO:  That the -- although the

14  attachment -- the attachment itself was prepared in response

15  to the specific inquiry by the lawyer and the same reasons

16  that the inquiry by the lawyer here is relevant and shows the

17  legal thinking (inaudible) of the in-house (inaudible) --

18          SPECIAL MASTER:  Okay.

19          MR. SCHAPIRO:  -- at Charter.  This is a very short

20  attachment.

21          THE COURT:  Approach, please.

22          (White noise 1:34:27 to 1:35:06 p.m.)

23          MR. SCHAPIRO:  -- subset of data that has already

24  been produced or is part of what was discussed earlier today,

25  as being produced to the plaintiffs.  This, on the other

138

1   hand, is specific subset that was requested by in-house

2   counsel as part of some legal analysis and, therefore, it's

3   both work product and attorney-client privilege.

4           SPECIAL MASTER:  All right.  With that

5   representation, we will find that the logging of this

6   document on the privilege log and withholding as privileged

7   is appropriate.

8           MR. OPPENHEIM:  So if I can -- I missed the very

9   beginning of what Mr. Schapiro said, just the microphone was

10  turned off.  Apologies if I'm stepping over something he

11  said.

12          But for each of the documents in this category,

13  there are attachments.  Those attachments appear to be

14  related to the types of documents, such as the metrics

15  report.  Arguably, the metrics -- for all we know, metrics

16  reports were requested by -- by counsel.  If it's operational

17  tracking what's appropriate we're doing in the context where

18  we don't even have all the CATS data, it's difficult to

19  discern the privilege, but maybe we have to go through them

20  one by one.

21          On the last one, we look at the Attachment 359 and

22  361, the DMCA Dashboard Year to Date, was that done

23  specifically at the direction of counsel, as well?

24          SPECIAL MASTER:  I don't -- I'm sorry, Mr.

25  Oppenheim, I have lost you here.  You asked us about --

139

1          THE COURT:  The last two items we saw.

2          MR. SCHAPIRO:  Yeah, I'm sorry, Ms. Rodriguez.  359

3    and 361.

4          MALE SPEAKER:  May I be heard for one moment?

5          SPECIAL MASTER:  Yes.

6          MALE SPEAKER:  I think there is a presumption that

7    when we put together a privilege log, that our entries are

8    accurate and we have operated in good faith.  That's the one

9    I've been showing you when you looked this up and you

10   determined that these items are privileged.  We don't -- I

11   don't think it's appropriate for them to continue

12   cross-examination to try and understand (inaudible) because

13   privilege is privilege and --

14         THE COURT:  Well, 359 and 361 are of the same

15   nature.  One wasn't a memo with an attachment.  They're both

16   memos which we find privileged.  This one is a communication

17   with an attachment, but, again, for different reasons, we

18   find them both privileged.

19         MR. OPPENHEIM:  Just so that there is no

20   misunderstanding, I'm not accusing anybody of bad faith here.

21   I'm going through and appropriately challenging certain

22   items, some of which the Court has held up the challenge and

23   some not.

24         The next item is 112.  It was again a nonlawyer

25   communication in December of 2015 with an attachment called

140

1   DMCA Breakdown, where it appears as though Mr. Mabb is doing

2   an analysis of what was happening with DMCA notices, which

3   appears to be purely operational in nature.

4           SPECIAL MASTER:  This document appears to be a

5   communication with Elfin Noche -- is that how his name is a

6   pronounced?  As I understand it, Elfin is a lawyer.

7           MR. SCHAPIRO:  He is, Your Honor, Ms. Rodriguez.

8           SPECIAL MASTER:  So Mr. Mabb is communicating with

9   the lawyer without revealing further information about the

10  document.  As we review it, it appears to be clearly

11  privileged.

12          What's next?

13          MR. OPPENHEIM:  The attachment as well, Your

14  Honor -- Ms. Rodriguez.

15          THE COURT:  Isn't that the same attachment we just

16  looked at?

17          MR. SCHAPIRO:  It is.

18          SPECIAL MASTER:  Same reason, it's privileged.

19          MR. SCHAPIRO:  It is the same and then a virtually

20  similar one, yes.

21          MR. OPPENHEIM:  Very well.  The next item is 118.

22          THE COURT:  Item what?

23          MR. OPPENHEIM:  I'm sorry, Log ID 1-1-8.

24          THE COURT:  Go ahead.

25          MR. OPPENHEIM:  And this is the subject DMCA

141

1    Metrics.  We obviously spent a lot of time discussing DMCA

2    metrics.  It appears to be an internal discussion about the

3    metrics, which is exactly what we've been trying to

4    understand.  It is, of course, between counsel, we recognize

5    that; but the fact that it's between counsel doesn't mean it

6    isn't operational.

7            SPECIAL MASTER:  All right.  Mr. Oppenheim, what is

8    the basis for challenging this?

9            MR. OPPENHEIM:  Well, the topic itself directly

10   relates to the documents that were just recently produced --

11   been withheld and were produced.  We don't have any internal

12   discussion about those metrics reports.  We're hoping this is

13   finally some internal discussion about metrics reports.  And

14   if so, those metrics (inaudible) operation.

15           SPECIAL MASTER:  Mr. Schapiro, this is filed in the

16   same category as the ones we discussed prior, that this is a

17   subset of --

18           THE COURT:  The attachments.

19           SPECIAL MASTER:  -- information, attachments, yeah,

20   there is three to those.  This is some subset of information

21   that has otherwise being provided?

22           MR. SCHAPIRO:  That is my understanding, based on

23   the people who are on the e-mail and the date.

24           SPECIAL MASTER:  All right.

25           THE COURT:  By the way, there is a lot of lawyers

1    on this side.  When he says something like, This is my

2    understanding based on blah, blah, blah, and you know that

3    not to be true necessarily, you've got to tell him right way,

4    because I'm assuming you all are agreeing to everything he's

5    saying, okay.

6              MR. OPPENHEIM:  The next --

7              SPECIAL MASTER:  I was --

8              MR. ROSENTHAL:  There has to be a good faith basis

9    to believe the documents aren't privileged.  You're

10   listening; and he's guessing, he's speculating.  This is not

11   the way discovery is done.  He doesn't get to sit there and

12   guess and speculate.  He's got an obligation under the rules.

13   He also has an obligation to accept your rulings when you

14   make them.

15             Every time single time in this case he reargues

16   everything and it's not by accident.  Every single time.

17   He's multiplying the cost of this litigation.  This is

18   fundamentally unfair.

19             He's got an obligation under the federal rules to

20   come forward with a good faith basis, not his conjecture and

21   speculation.  This is not appropriate.  They can sign an

22   affidavit saying that he's got a good faith basis and put

23   into a pleading what he believes his good faith basis is.

24             That's his obligation under the rules.  He's got a

25   26(g) certification requirement.

143

1          MR. OPPENHEIM:  Your Honor, we've gone through a

2    very extensive privilege log, and we've limited our

3    challenges to a very limited number of items, based on very

4    clear criteria that we've laid out.  And we can state in

5    several of our challenges, and as Your Honor observed at the

6    beginning of this proceeding, the assertion of privilege in

7    this case has been used somewhat broadly, the way you

8    characterized it.

9          I'm prepared to move on whenever you are, Your

10   Honor.

11         THE COURT:  You both made a record on your --

12   Mr. -- well, John on his process argument and your response.

13   Yeah, so I understand what you're saying, but he's

14   challenging only 26 documents, I think, out of a tab of 125.

15         MR. ROSENTHAL:  57, Your Honor, of which he

16   basically announced this on Saturday evening.

17         THE COURT:  I know, but I thought we were talking

18   about -- you told me 26.

19         MR. OPPENHEIM:  I thought it was 26, Your Honor.

20   If it's 27, I apologize.

21         THE COURT:  He said 57.

22         MR. ROSENTHAL:  With the attachments.

23         THE COURT:  Oh, with the attachments?  All right.

24         So anyway, I mean, I'm -- I get both sides.  Just

25   keep going, please.

144

1          MR. OPPENHEIM:  Very well, Your Honor.

2          MR. ROSENTHAL:  Well, Your Honor, can we ask him

3     when he raises objections, to state specifically what the

4     basis is so there is a record here, because I believe their

5     operational is not a basis --

6          THE COURT:  No.  What he has said is from the title

7     of the document, it sounds exactly what we're looking for and

8     it involves more lawyers.  That has been a particular brand

9     of argument he has made.  That, on its face says, No, maybe

10    let's take a look at it.  I don't see anything nefarious in

11    that when it involves (inaudible).  So then maybe poking

12    around, well, maybe there is no poking that should be done.

13         But I can't tell until I see each document, so I'm

14    just going to assume they're good faith, and if I hear

15    something that I think is outside the envelope of propriety,

16    we'll call it down.

17         MR. ROSENTHAL:  Well, let's look at the next

18    document, Your Honor.

19         THE COURT:  Okay.

20         MR. ROSENTHAL:  On its face, it has three different

21    attorneys.

22         THE COURT:  What document?  I didn't get the

23    number.

24         MR. ROSENTHAL:  We're on 118 now.

25         THE COURT:  No.  We just did 118 now.

145

1           MR. ROSENTHAL:  All right, 184.

2           MR. OPPENHEIM:  Your Honor, let me --

3           SPECIAL MASTER:  We could take 118 as an example.

4           And I think your suggestion is duly noted, as Judge

5    Hegarty has just indicated.  I think the point here is, is

6    that this is it, right?  We're going through this exercise,

7    we're trying to resolve these to be the best of our ability.

8    But today is the day, so we're not going to do this again, as

9    I understand this, right?

10          THE COURT:  Well, no, I hope not.

11          MR. ROSENTHAL:  That would -- hope springs eternal,

12   but that is not the pattern in this case, because they take

13   it to the Special Master and then they take it to Your Honor

14   and then they raise it again.

15          THE COURT:  Well, today -- whatever -- what I've

16   said is, it's forever waived, up and to including today, any

17   issues that reasonably should have been waived -- or raised

18   by today.

19          I mean, obviously, there is going to be some issues

20   that arise in the future, but it's not going to be within the

21   scope of what we're doing today.  It has to be some new

22   disagreement.

23          Go ahead.

24          MR. SPERLING:  I just wanted to maybe offer an

25   observation, Your Honor.

146

1           MR. OPPENHEIM:  Your Honor --

2           MR. SPERLING:  Matt, just a moment.

3           Just to sort of move things along, I'm not

4    suggesting for a second Charter can't raise whatever

5    objections they want to raise.  This repeated assertion that

6    we raised this for the first time Saturday night should stop.

7    The documents are identified in the chart.  There was a meet

8    and confer on this --

9           THE COURT:  I don't think -- did you Saturday --

10   Saturday night in your most recent words, comments?  I know

11   he said that at the beginning.  Did he say it again just now?

12          MR. SPERLING:  That's what I heard, Your Honor.

13          THE COURT:  All right.  Well --

14          MR. SPERLING:  And we -- and we had a successful

15   challenge to their privilege log item 28, which they took to

16   Ms. Rodriguez yet a second time and then to you, and they

17   still don't have.  So this business that people exhaust their

18   rights, it happens on both sides.  And the suggestion that

19   there is something wrong in us taking advantage of the

20   opportunity to be before you and have these things heard is

21   not well placed.

22          MR. OPPENHEIM:  And just so we have a proper

23   record, there are 407 different entries on their logs out of

24   150, so anyway.

25          THE COURT:  All right, please, let's go.

1         MR. OPPENHEIM:  Let me -- let me skip to the

2    (inaudible) of 185.  So this is an interesting item.  You'll

3    recall earlier Mr. Sperling described to you that one of the

4    things that we don't have in the document production are any

5    communications among the most senior personnel, or we have, I

6    should say, very, very few.

7         185 is that type of communication.  And this

8    eventually, because this is an e-mail dated March 8, 2016, a

9    date that we've already discussed where there was a meeting

10   (inaudible) senior personnel.  Originally the log that was

11   provided on November 2, the re: line was Executive Summary

12   DMCA.

13        On Friday night they produced a new log and

14   Charter's new log redacted out the term "DMCA" from the log

15   as though the inclusion of the term "DMCA" in the log is

16   privileged.

17        Now, I can't imagine a world where the use of the

18   term "DMCA" in a log is privileged, especially when it

19   appears throughout other places in their log.  So this is

20   exactly the type of senior discussion where decisions are

21   likely made, or at least discussed, and we have no insight

22   into.

23        THE COURT:  What about -- Andrew, what about

24   redacting the last half of the second line?

25        MR. SCHAPIRO:  Are we on 185?

148

1          THE COURT:  I think so.  It's Tab 81 for us.

2          MR. SCHAPIRO:  Yes.  Are you asking if we would be

3    comfortable redacting only the second half or only the first

4    half?

5          THE COURT:  Only the -- only the second half --

6    well, the last two-thirds of the second line, redacting.

7          MR. SCHAPIRO:  Sorry, I'm just trying to determine

8    because I -- whether something that I had in front of me is

9    redacted or not, so let me just take one moment with your

10   indulgence.

11         THE COURT:  Yep.

12         MR. SCHAPIRO:  Your Honor, I believe that this

13   entire document is -- is redacted, and I think it should be

14   clear why --

15         THE COURT:  Well --

16         MR. SCHAPIRO:  -- on its face, but it doesn't

17   look -- it's not shaded on the copy I have so that's why I'm

18   confused.

19         THE COURT:  Oh, the only thing that's shaded is the

20   attachments on our copy.

21         MR. SCHAPIRO:  Right.  And the reason I pause is my

22   understanding and my strong hope is that the --

23         THE COURT:  Matt, what do you have on this one?  Do

24   you have any -- was this produced in any form to you?

25         MR. OPPENHEIM:  No, I do not believe it was

1   produced in any form.  I personally don't know what the

2   attachment is, so I can't speak to that.

3           MR. SCHAPIRO:  Right.  So the -- so we're not

4   just -- so the difference here, Your Honor, is not just about

5   the subject line.  It's about a document which, in my view,

6   is about as privileged as they come.  So that's why -- that's

7   why we're here.

8           THE COURT:  Understood.  Yeah, it's privileged.  I

9   didn't know -- I didn't read the text of it because I only

10  read the highlighted part.

11          MR. SCHAPIRO:  I apologize.

12          THE COURT:  Hold on a second.  And who is

13  Mr. Dykehouse?

14          MR. SCHAPIRO:  He's the general counsel of the

15  (inaudible).

16          THE COURT:  Okay.  Yeah, it's privileged.

17          MR. OPPENHEIM:  And in the privilege log the use of

18  the term "DMCA," is that privileged?

19          MR. SCHAPIRO:  What's the next item?

20          THE COURT:  Wait a minute.  Are you saying that

21  they produced the title description, unredacted ones with the

22  word "DMCA" and they produced a new one with it gone?  Is

23  that what you said?

24          MR. OPPENHEIM:  Yeah, yes.

25          THE COURT:  Can you explain that, anybody?

1          MR. SCHAPIRO:  Sorry, I didn't follow what Mr.

2     Oppenheim said.

3          THE COURT:  He said you produced one log with this,

4     the letters "DMCA" in it, and then another one where you

5     actually took it out so they are able to see that you took it

6     out, which makes them wonder why you did that.

7          MR. SCHAPIRO:  I think that was a mistake by

8     whoever was redacting the document.  I don't -- I don't have

9     a strong feeling about whether that -- those two words can be

10    in or be out.

11         THE COURT:  Yeah.  I don't think "DMCA" is

12    privileged, so it should stay in the title.

13         MR. OPPENHEIM:  I am going to skip the challenges

14    to 184, 141 and 143, but I would ask, because there is

15    partial redactions of the re: lines that look like they're

16    the same, if Charter would please revisit that and if it all

17    (inaudible) DMCA, to unredact that, produce a new log.

18         Excuse me, and 197 as well.

19         THE COURT:  Okay.

20         MR. OPPENHEIM:  The next one I will skip to, Your

21    Honor, is item 334.  This is an e-mail from Elfin Noche to

22    Mr. Abramov in January of 2015, and it is from lawyer to

23    lawyer.  It is described as a:  Meeting agenda reflecting a

24    request for legal advice from in-house counsel regarding

25    policies.  And the topic of discussion is Rightscorp issues,

1    obviously, a relevant topic.

2         And the reason that I include this is because on

3    the pcc: line, they listed a list serve.  And it's difficult

4    to understand how it could be that privilege if they are

5    attributing the meeting agenda, you know, discussion to a

6    list serve.

7         MR. SCHAPIRO:  I think I can clarify that.  I have

8    been told that this, as best we can tell, this SVC Missouri

9    list serve are the people who reserve a conference room,

10   because this is, you know, a reservation for a calendar

11   invite.  So you have to cc: the people to see if -- I don't

12   know what has been revealed here or not, so I won't be able

13   to see under Location, that item there.  That's why that's

14   there, to make sure that someone is not in the same

15   conference room as you.

16        THE COURT:  Yeah, I'm not suspicious at all, so it

17   looks like what they say it is.

18        What's the next one?

19        MR. OPPENHEIM:  Let's turn to another category.

20   And this is Category 4 on page 15 of a letter, and it's item

21   278.

22        THE COURT:  Yeah, I think -- I think if we agree

23   with the first one, we'll agree with every one of them, so

24   we'll probably just do one of these.

25        Item 278?

1          MR. OPPENHEIM:  We have four of them, Your Honor,

2    and hopefully we can deal with them, yes, collectively, I

3    hope.

4          So the first one, Your Honor, we do have a partial

5    redacted e-mail.  And in this e-mail on November 12, 2013

6    Robert Steele, and he is an executive with Rightscorp,

7    e-mails Avery stating that Rightscorp has learned that the

8    Charter call center informs subscribers that Charter does not

9    forward Rightscorp notices and that the notices are

10   fraudulent.  Avery responds by taking Charter's position,

11   that Charter refused to forward notices.  And then we've got

12   a back and forth which is redacted.

13         What's redacted is Rowlett forwarding the e-mail to

14   Haynes.  And what is strange about this is that Avery's

15   exchange with Rightscorp is unredacted and clearly asking

16   operational questions about the forwarding of notices and

17   whether the call center is communicating to customers that

18   notices are fraudulent.

19         THE COURT:  I'm sorry.  Is there a lawyer involved

20   in these?

21         MR. SCHAPIRO:  Yes, sir.  Chris Avery is in-house

22   lawyer.

23         MR. OPPENHEIM:  And he's not in the (inaudible)

24   of --

25         THE COURT:  Right.  So he's not involved in the top

153

1    half of this, correct?

2              MR. SCHAPIRO:  Well, if you see what's redacted --

3              THE COURT:  Yeah, I will.

4              MR. SCHAPIRO:  -- you'll see why Chris -- you'll

5    see a reference to Chris Avery there.

6              THE COURT:  Who is Robert Steele?

7              MR. OPPENHEIM:  Robert Steele works for Rightscorp,

8    Your Honor.

9              THE COURT:  Okay, we believe it's privileged.

10             MR. OPPENHEIM:  Your Honor, I'll -- I'll skip the

11   next two and go to the last one in this category, which is

12   April 24, 2014, item 299.

13             THE COURT:  109?  Okay.

14             MR. OPPENHEIM:  So this is an e-mail from April 24,

15   2014 titled, Moving Forward.  And -- and what you see in

16   this -- and this is -- this is critical.

17             If you start at the back, what you see, on April 10

18   Robert Steele -- again, the Rightscorp executive -- sends to

19   Chris Avery an e-mail and he says, Just following up.  Has

20   there been anything in your policies or notice system on our

21   end, the Rightscorp end?  It looks like less notices are

22   getting through.  Also, we welcome an opportunity to discuss

23   transmitting data in a more scalable way than e-mail.

24             And then Mr. Steele provides all kinds of data

25   relating to the notices that they've been sending to Charter.

154

1   There's been a back-and-forth response between internal

2   people at Charter.

3        Now, I will tell you, Your Honor, if you look at

4   the response on page -- the Bates page that ends 379 from

5   Laurie Rowlett to Chris Avery, it says, Hi, Chris.  And then

6   it proceeds and it's all redacted.

7        We actually know what that part of the response

8   says, even though it's redacted, because Charter produced a

9   different e-mail chain than this one, but it had this piece

10  in it and they didn't redact it there.  And that document

11  clearly shows that what was redacted should not be redacted.

12        MR. SCHAPIRO:  (Inaudible).

13        THE COURT:  Matt, tell us what you think it says.

14        MR. OPPENHEIM:  It just contains a numerical

15  analysis of ticket data, compared to what's (inaudible).  So

16  Charter was trying to figure out whether their numbers --

17  whether the numbers that Rightscorp had said were right.  And

18  so they redacted it in one place and they didn't redact it in

19  another and then they redact the rest.

20        I don't believe that there is a basis -- for the

21  one piece that we know that they didn't redact, in another

22  place, no, it shouldn't be privileged, but it causes us to

23  doubt the rest of the redactions of this event.

24        THE COURT:  I'm still -- I still want to make sure

25  you think you have -- you have what you think you have.

1        What do you think it says after, Hi, Chris?

2        MR. OPPENHEIM:  So you'll see that there is --

3   there is some text and then underneath it, there is kind of a

4   long vertical bar on the next page.

5        THE COURT:  Yes.

6        MR. OPPENHEIM:  And that long vertical bar, as I

7   understand it, is all data.  It's just a -- it's basically

8   notice data or ticket data analysis.

9        (Court and Special Master confer.)

10       THE COURT:  We've been having boiler problems.

11  Okay, Matt, go ahead, I'm listening to you.

12       MR. OPPENHEIM:  If I have that wrong, Your Honor, I

13  have it wrong, but based on the e-mails that we see, it

14  appears that there is operationally -- that is operational

15  data coming directly out of the tax system in response to

16  Field's query, and then there is a discussion of it.  Based

17  on that, we wouldn't believe the rest is privileged.

18       And again, a lot of this discussion involves

19  nonlawyers.

20       THE COURT:  Okay, Matt --

21       SPECIAL MASTER:  So I guess the question is, if it

22  has been produced to you in unredacted form, we're not going

23  to rule it to be privileged in one place and not in another.

24  So if you already have it, I'm not sure --

25       MR. OPPENHEIM:  Right.

1          SPECIAL MASTER:  -- one, why we need to rule on it

2     again.  And two, I'm not sure what has been already produced

3     and what hasn't.  So maybe somebody could clear that up.

4          MR. OPPENHEIM:  Yeah, let me clarify.

5          So we do have the one piece in another -- in

6     another e-mail.  You know, the e-mail took -- there were

7     multiple responses.  What we don't have is the other

8     exchanges in this e-mail chain.

9          THE COURT:  Well, can't you show us what --

10         MR. OPPENHEIM:  We only have --

11         THE COURT:  Wait, Matt.  Can't you show us what you

12    do have?

13         MR. OPPENHEIM:  I can tell you what the document

14    is.  It's 84483.

15         SPECIAL MASTER:  That doesn't help me.

16         MR. OPPENHEIM:  (Inaudible).

17         MR. SPERLING:  We'll get it on the screen in a

18    moment.

19         MR. OPPENHEIM:  Okay.  Get it on the screen, thank

20    you.

21         SPECIAL MASTER:  All right.  Well, why don't we

22    move on while we're looking for that.

23         MR. SPERLING:  It's on the screen now,

24    Ms. Rodriguez.

25         SPECIAL MASTER:  Sorry?

157

1          MR. SPERLING:  It's on the screen.

2          SPECIAL MASTER:  Oh, it is?  Thank you.

3          So this is what you do have?

4          MR. OPPENHEIM:  What we do have.  And this, at

5     least, appears to be, if we scroll down a little bit, from

6     Mabb/Rowlett here, the same thing, Moving Forward.  I'm not

7     sure it's working remotely -- oh, there we go.

8          THE COURT:  Okay, that's end of what we have here.

9          MR. OPPENHEIM:  Right.  So this -- I'm sorry.

10          SPECIAL MASTER:  What you're showing us as

11     unredacted is what we see --

12          THE COURT:  Stop, stop, stop, stop.

13          MR. SPERLING:  Ms. Rodriguez, we'll scroll when you

14     want us to scroll.  So we've paused at the top of the bottom

15     e-mail of the chain.

16          THE COURT:  I'm not seeing -- we're seeing

17     something, but everything we're seeing is already not

18     redacted in the document we have.  You're saying you --

19          MR. OPPENHEIM:  The document -- yes.  The document

20     up on the screen has been produced and we have this one.

21          What we do have is what is Log ID 299, which is a

22     different one than what's up on the screen, where there is

23     further discussion of this as between nonlawyers.

24          So if you look at ID -- Log ID 299, the top entry

25     is from Colton Mabb to Laurie Rowlett, neither are lawy- --

1   excuse me, lawyers -- it's hard to say that, right.  And

2   so -- and then below, that there seems to be further

3   discussion of this CATS data.

4           Again, it's relevant because Rightscorp was -- was

5   concerned about whether or not Charter was actually

6   forwarding the notices.

7           THE COURT:  Okay.  We don't see any material

8   difference between this content and what we've called

9   privileged already, so we believe it's privileged.

10          MR. OPPENHEIM:  The last item -- the last item is

11  not on the log because it was never logged.  It's a partially

12  redacted document and it's CHA129662.

13          THE COURT:  Okay.  Where are we going to find that?

14          MR. SCHAPIRO:  Where am I going to find this also?

15  Where is this?

16          MR. OPPENHEIM:  Maybe we can just put that up on

17  the screen.

18          FEMALE SPEAKER:  Excuse me --

19          MR. OPPENHEIM:  Bates number CHA00129662.

20          SPECIAL MASTER:  Mr. Oppenheim, where would we find

21  this document?

22          MR. OPPENHEIM:  I'm sorry, Ms. Rodriguez, I thought

23  it was getting pulled up right now on the screen.

24          SPECIAL MASTER:  Oh, okay.  I just didn't hear that

25  part.

1          MR. OPPENHEIM:  (Inaudible).

2              (Inaudible discussion.)

3          MR. OPPENHEIM:  By way of introduction, this

4    document appears to be a monthly report that was created by

5    Timothy Brockel, who is not a lawyer, somebody who was

6    involved in the operations of Charter's abuse group.  This is

7    his monthly report as of January 28, 2016, and they have

8    redacted just certain lines randomly.  I shouldn't say

9    "randomly," but certain lines --

10         SPECIAL MASTER:  Okay.

11         MR. OPPENHEIM:  -- including (inaudible).

12         MR. SPERLING:  So, Ms. Rodriguez, we'll scroll

13   through it at the speed that you want.  So just tell us when

14   you're ready to move on and we'll move down another half

15   page.

16         SPECIAL MASTER:  Okay.  Go ahead and scroll.

17         THE COURT:  This is a document you have?  Okay.

18         MR. OPPENHEIM:  It is.  And you'll see that after

19   we get down past SRT Support, there is a critical section

20   where this individual DMCA procedure review.

21         THE COURT:  Sorry, it doesn't appear on the log

22   anywhere?

23         MR. OPPENHEIM:  No, this was not logged.

24         THE COURT:  Can I have an explanation for that?

25         MR. SCHAPIRO:  I think Ms. Alvarez can explain it

160

1    better than I can, so invite her to do so, although she's not

2    near a microphone.

3              THE COURT:  Can she go to the podium?

4              MS. ALVAREZ:  So the way we decided to log e-mails

5    on this case, it was a mutually agreed-upon procedure, was to

6    log the cover e-mails, even if the attachment was being held

7    on privilege grounds.  So you'll see that the cover e-mail

8    actually appears on the log with entries in it.  406, so that

9    does appear on the log.  And we produced that document, as

10   well as the attachment.

11             THE COURT:  406 is not in this book.

12             MS. ALVAREZ:  This was just -- I can show you a

13   copy, but the privilege log, you guys have a copy of.

14             THE COURT:  So 406 identifies an attachment that's

15   not being produced?

16             SPECIAL MASTER:  So the document that you have up

17   on the screen, Mr. Sperling, the CHA129662 --

18             MR. SPERLING:  Yes.

19             SPECIAL MASTER:  -- the attachment to the e-mail,

20   that is on Charter's privilege log at Log ID 46 [sic]; is

21   that correct?

22             MR. SPERLING:  I actually -- go ahead, Matt.

23             MR. OPPENHEIM:  Yeah.  So, Ms. Rodriguez, I don't

24   know -- I don't know that.  I'm not disputing it.  We -- item

25   406 on the log didn't exist until Friday night, so the prior

1    log --

2              SPECIAL MASTER:  Well, it sounds like everybody is

3    complaining about when they got things and I have some

4    complaints too, but let's move on from that.

5              MR. OPPENHEIM:  (Inaudible)

6              SPECIAL MASTER:  Let's -- answer my question,

7    please, somebody.  Is this attachment that Mr. Oppenheim is

8    talk about the attachment to item 406 on Charter's privilege

9    log?

10             MR. SCHAPIRO:  I think the answer is yes, and I

11   just want to make sure no one at the table speaks up and

12   tells me that I'm mistaken, but --

13             MS. ALVAREZ:  We are just checking the log to

14   confirm it.

15             MR. SCHAPIRO:  -- we want to make sure.

16             SPECIAL MASTER:  I appreciate that, thanks.  We

17   want to be clear.

18             MR. SCHAPIRO:  In my text chain, I'm told yes, but

19   let's confirm.

20             SPECIAL MASTER:  All right.  Well, let's just be

21   clear about that.

22             And then if the answer to the question is yes, that

23   this is, in fact, the attachment, my understanding is the

24   basis for the privilege claim here is that what is contained

25   in the attachment and what has been redacted -- because

1    again, the attachment that we're looking at is not withheld.

2    There is a section that is redacted.

3            My understanding is, is that that relates to advice

4    that was provided by an attorney.

5            MR. SCHAPIRO:  Yes, it does.

6            SPECIAL MASTER:  Okay.  And, in fact, on the

7    privilege log, it indicates that it is an e-mail chain with

8    partially privileged attachment containing the confidential

9    mental impressions and legal advice of in-house counsel,

10   Kirill Abramov, regarding the copyright program, correct?

11   And that is the basis for the privilege.

12           And, Mr. Oppenheim, I'm sorry, you're going to have

13   to help me.  What is the basis for your challenge for this

14   privilege claim?

15           MR. OPPENHEIM:  Ms. Rodriguez, this appears, from

16   now I'm understanding what it's attached to, this was a

17   monthly report from a security specialist, not any -- not any

18   senior personnel and not anybody who had any management

19   responsibility who sent a monthly report to another nonlawyer

20   within Charter about what he was doing in his day -- you

21   know, over the course of a month with respect to the abuse

22   group.

23           SPECIAL MASTER:  Okay.

24           MR. OPPENHEIM:  So I can't see that -- that on the

25   face of that, a normal report like this would not, in my

1    mind, be privileged.

2            SPECIAL MASTER:  Well, I understand in your mind it

3    would not be privileged, but I don't have any reason to call

4    Charter's counsel a liar on this.  That is the representation

5    that's made here.  They're an officer of the court.  I've now

6    looked at the document and I don't disagree with the

7    privilege call, so this is privileged.

8            Next.

9            MR. OPPENHEIM:  Please understand, I'm not calling

10   anybody a liar, Ms. Rodriguez.  I'm simply reviewing what I'm

11   looking at.

12           And to be fair, did you have an opportunity to see

13   an unredacted version, Ms. Rodriguez?

14           THE COURT:  Yeah.  We've read the redacted parts

15   and they're privileged.

16           MR. OPPENHEIM:  Very well, thank you, Your Honor.

17           We have two items left and they can be handled en

18   masse.

19           THE COURT:  En masse, two documents en masse.

20           MR. OPPENHEIM:  Item 6.  There are documents on the

21   privilege log which include communications by -- from third

22   parties, which either are attached or forwarded which have

23   not been produced.  And we have four examples of them:  Log

24   IDs 8, 200, 203 and 216.

25           And we believe that all of the e-mail

1   communications about those communications may be privileged.

2   A communication from a third party, such as Rightscorp to

3   Charter, should be produced, that there can't be a privilege

4   over that.

5          THE COURT:  So, first of all, please identify

6   whether the attachments have been produced in some other

7   form, some other way to the plaintiffs.

8          MR. SCHAPIRO:  I apologize.  I'm still trying to

9   find out where we are here.  We're on --

10         MR. OPPENHEIM:  Andrew, we're on page 16 of our

11  letter, and it's Log IDs 8, 200, 203 and 216.

12         MR. SCHAPIRO:  Okay.  And I don't think have those.

13   Tab Number 4?  Okay.  So the first one is Tab Number 4?  I

14  see that, okay.

15         THE COURT:  Then 97.

16         MR. SCHAPIRO:  Okay.  So all of these -- I don't

17  want to be the person complaining about things being raised

18  on Saturday, but the reason I'm not going to have answers

19  about a lot of these is these were raised for the first time

20  on Saturday.  And we are looking into this and we can produce

21  them if we locate them with the original attachments.

22         I don't think they've been produced yet.  We can do

23  this.  And it's one that they raised, we need to just do the

24  work to look into it, but we don't think it's privileged.  We

25  just need to find it, I think.

1           THE COURT:  Okay, 4.

2           MR. SCHAPIRO:  Hold on, Jennifer is saying --

3           THE COURT:  Matt, 4, 200, what?

4           MR. OPPENHEIM:  No.  8, Your Honor.

5           THE COURT:  Oh, 8.

6           MR. OPPENHEIM:  200.

7           THE COURT:  Yes.

8           MR. OPPENHEIM:  203, 216.

9           THE COURT:  203, 216.

10          MR. SCHAPIRO:  Well, at least on some of these --

11   sorry, I'm flying pretty fast here -- but, yeah, I see one

12   here where it's plainly referring to -- the attachment is

13   plainly input from a lawyer.  And I can show you why, but

14   again --

15          THE COURT:  You mean, it's from an in-house lawyer?

16          MS. ALVAREZ:  No.  Outside counsel.

17          THE COURT:  Well, but outside counsel, but not

18   some -- that's not a third party, so not a third party.

19          MR. SCHAPIRO:  Outside counsel in litigation.

20          MS. ALVAREZ:  For Charter.

21          MR. SCHAPIRO:  Yeah, for Charter.

22          But having 24 hours to go back on these, I'm not

23   necessarily in a position --

24          THE COURT:  Okay.  If they're all the same, then

25   it's privileged.  If they're not, tell us, okay.  Otherwise,

1   we're going to move forward believing that they're all the

2   same quality, okay?

3          MR. SCHAPIRO:  So we -- we can, during whatever the

4   remainder of the afternoon, double-check and see if they fall

5   into that category.  There are only two categories.

6          One is we haven't found them and that's fine, we're

7   going to produce them.  There are probably a handful.

8   Jennifer, thank goodness, she showed me where there is an

9   attachment from outside counsel marking something up and

10  that's one where we would stand on privilege.

11         One other thing that I should add, because we were

12  successful just now in reaching Mr. Abramov about that

13  presentation earlier that you had asked us to look into.

14         THE COURT:  Go ahead.

15         MR. SCHAPIRO:  And so we've been informed by

16  Mr. Abramov that the presentation was displayed during

17  meetings between Charter in-house lawyers and the people who

18  worked on the operations security team.  The operations

19  security team is the one that manages Charter's DMCA notice

20  response process.

21         So it was, we think, the lawyer displaying it to

22  the limited universe of people who actually deal with the

23  notice response process.

24         MR. OPPENHEIM:  But that -- so in my mind, you

25  know, that -- that's the group that includes all of those

1   contractors who are not even Charter employees who are

2   dealing on a day-to-day basis with infringement notices.

3   Those are not anybody with any kind of supervisory

4   responsibility.  In fact, as contractors, not even clear that

5   they cleared the hurdle of being a Charter employee.

6          MR. ROSENTHAL:  Well, at some point you have to

7   argue what the law is and that's not the law in Colorado.

8   That's not the law in Colorado.  It's not limited to

9   supervisory personnel.

10          You still need to have the information and the

11   legal advice.  And under Colorado law, clearly a contractor

12   can extend -- and to other kinds of third parties,

13   particularly those during the employee equivalent function,

14   are entitled to have attorney-client communications.

15          So it's a work product objection.

16          MR. SCHAPIRO:  And the information --

17          MR. OPPENHEIM:  This wasn't --

18          MR. SCHAPIRO:  The information that I --

19          SPECIAL MASTER:  Counsel --

20          THE COURT:  Hold on a second.

21          SPECIAL MASTER:  -- can everybody just pause for a

22   moment.

23          THE COURT:  Yeah, we're conferring.

24          (Pause.)

25          THE COURT:  How would you characterize the purpose

168

1  of what that -- the purpose of that PowerPoint?

2          MR. SCHAPIRO:  The purpose was to describe the

3  legal framework and legal obligations and, to some extent,

4  they facilitate a back and forth so that the people who were

5  doing this work would understand why and what lines -- what

6  the lines were.  I am told that, normally, this would be a

7  group of 10 to 20 people, so not 100.

8          THE COURT:  So would it be -- would the purpose of

9  delivering it be to tell people the way things are going to

10  be in this company?

11          MR. SCHAPIRO:  I think it was more to answer

12  questions they might have so that they would understand why

13  things are the way they are.

14          THE COURT:  Right.  But was it stating company

15  practices or policies?

16          MR. SCHAPIRO:  I think it was stating the company's

17  understanding of what the legal bounds for range were.  So it

18  wasn't necessarily, You must always do A.  It was these are

19  things that are covered or are not covered.

20          THE COURT:  Right.  But implicit in that is, this

21  is the way we're going to approach it?

22          MR. SCHAPIRO:  Well, I think a lawyer -- certainly,

23  yes.  When a lawyer gives legal advice, unless the client

24  wants to disregard it, the lawyer is saying --

25          THE COURT:  No.  A lawyer can say, Listen, here

1   is -- here is what the outcome probably is if you do this

2   course.  If we do a different course, it may be a different

3   outcome altogether.

4           That's giving legal advice on what different

5   outcomes would be, depending on what the conduct is.

6   However, if a lawyer says, Here is the way we are going to be

7   doing this, and it's not giving them options or consequences,

8   it's just saying what Charter is doing and we expect you to

9   get in line, that might be slightly different.

10          MR. ROSENTHAL:  But, Your Honor -- and I'm sorry,

11  we're doing this over text message, but I'm advised by the

12  person who gave the presentation that the presentation was

13  put together to respond to questions raised by -- by those

14  people asking for legal advice on particularized questions.

15          MR. OPPENHEIM:  So, Your Honor, the operations

16  security team are the people who take in notices or respond

17  to phone calls and decide what to do with (inaudible).

18  They're not eliciting, with all due respect, legal advice

19  about what Charter needs to do.

20          That -- that seems like a far reach.  What they

21  want to know is what they should and shouldn't do.  And this

22  sounds to me like a presentation, much like somebody would

23  have where gather people up at a factory and say, Look, we're

24  not going to have indecent photos in lockers because it makes

25  people --

170

 1          SPECIAL MASTER:  All right, all right.  Mr.
 2    Oppenheim, I understand your arguments, we understand your
 3    arguments.
 4          But counsel has made a very specific representation
 5    as to what this was and has gone to the extent of actually
 6    talking to the person who prepared this, so we don't have any
 7    basis to overrule that or to undermine that representation.
 8          I assume you'll have the opportunity to ask about
 9    these types of presentations in depositions; but at this
10    point, it has been represented that this was done for the
11    purposes of answering questions and providing legal advice to
12    a limited number of employees whose job it was to deal with
13    the DMCA notices.
14          So for that reason, we're not going to disturb the
15    privilege claim here.
16          THE COURT:  What's next on the agenda?
17          MR. OPPENHEIM:  The last item, Your Honor -- and
18    maybe this is easily resolved based on what Mr. Schapiro said
19    earlier -- and that is, redacted re: lines.  There are 28
20    different entries where Charter has redacted the entirety of
21    the re: line in the privilege log.
22          As Your Honor will remember, you previously advised
23    us that the parties could be judicious in the use of
24    redaction and be able to articulate for each redaction why
25    we've decided that the actual language would have revealed an

1   attorney-client communication.

2           Earlier, we had a situation where they redacted the

3   term "DMCA" and Mr. Schapiro acknowledged that was probably

4   overzealous.  So for these 28 items, maybe it falls under the

5   same category.  It's hard to imagine that the very short re:

6   lines in these are redacted, but we're not in a position to

7   evaluate the assertion of privilege when the entirety of the

8   re: line is redacted.

9           MR. ROSENTHAL:  Again, I would ask counsel to state

10  his basis other than his conjecture for that, because what I

11  heard was absolute conjecture.

12          THE COURT:  So -- I mean, I wouldn't say that

13  redacting a re: line is the most typical thing I see in a

14  privilege fight, so there is some question there.  Can I just

15  look at one, please, or the group.

16          MR. SCHAPIRO:  Sure, I'll come up.

17          And this is why it is only in 28 -- 28 items,

18  because I recall that hearing, it was the first one that I

19  came to out here in Colorado.  And in the transcript on page

20  211, you said:  I just want you to be judicious in your use

21  of redactions and be able to articulate why -- for each

22  redaction why you decided it.  And then you said:  With

23  regard to the re: lines, I would say that again,

24  hypothetically, internal discussions about how to avoid legal

25  liability for something we have done sounds privileged to me

1    because people are doing it in order to shield themselves

2    from legal liability and that's a fundamental point of an

3    attorney-client communication is, How can my lawyer prevent

4    me from stepping on a land mine?

5              So with that, I'll approach.

6              THE COURT:  Restricted record.

7              (White noise 2:28:06 to 2:34:11.)

8              SPECIAL MASTER:  All right.  We reviewed the

9    particular re: lines that are at issue in this matter and

10   have looked at the documents.

11             While it is an arguably close call, I do believe

12   that it does fall within the realm of privilege and we don't

13   have a basis to overturn that at this point.  Defendants have

14   sustained that burden.

15             MR. OPPENHEIM:  Very well.  We've gone over the

16   plaintiffs' privileged challenges, and I appreciate the

17   Court's patience.

18             SPECIAL MASTER:  Thank you.

19             MR. OPPENHEIM:  Would the Court like a five-minute

20   break?  Or do you want us to push forward, Your Honor?  Your

21   Honor is --

22             SPECIAL MASTER:  Maybe we -- let's talk about what

23   we have left and what you have planned for us for our

24   afternoon.  So -- so in looking at Charter -- or at

25   plaintiffs' submissions, it looks like you still have the

173

1    conversation about spoliation of e-mail and additional

2    discovery that you're requesting, right?

3              MR. SPERLING:  That's correct, Ms. Rodriguez.

4              SPECIAL MASTER:  And about how long do you think

5    that's going to take?

6              MR. SPERLING:  Mr. Oppenheim is going to argue it.

7    Hard to say.  It really depends, I think, on -- on the Bench.

8    It's not super short; but, of course, but, of course, we

9    don't want to make it very long.

10             THE COURT:  Okay, I'll give him two minutes to do

11   an opening.

12             MR. SPERLING:  Okay.

13             MR. OPPENHEIM:  Your Honor, if I could.  At the

14   hearing two weeks ago, February 9 --

15             SPECIAL MASTER:  Before we launch into this, maybe

16   -- we're just trying to table set for a moment.  Let us just

17   table set for a moment so we can have an appreciation of

18   what's coming down the pike.  So that's that.

19             Then you also have some objections to the orders

20   that I issued -- I've lost track of time.

21             MR. SPERLING:  I think it was just last week.

22             SPECIAL MASTER:  Weeks ago, it seems like.

23             MR. SPERLING:  Yeah, and it was more weeks than

24   that.  We're going to withdraw those, Ms. Rodriguez, with

25   respect to the 30(b)(6) topics.

1          SPECIAL MASTER:  All right.  That's good.  We're

2    making progress there.  Then --

3          FEMALE SPEAKER:  Can we have clarification of that?

4    You're withdrawing your objection to (inaudible) on the

5    financial data redaction to the (inaudible)?

6          MR. SPERLING:  No, no, no.  Topics 21 and 46 from

7    our 30(b)(6) notice, that's on page 21 of our brief, so we're

8    going to withdraw those.  70 is not really challenged to.

9          Remember, Ms. Rodriguez, you put 70 over to today

10   because it's spoliation related.  So that will get wrapped up

11   with the spoliation topic.

12         SPECIAL MASTER:  With the spoliation, okay.

13         MR. SPERLING:  Then I think that there are really

14   only two issues left.  I don't know that they require any --

15   any argument.  One might, but not right away.

16         One is, we do have two pending brief objections

17   (inaudible), to Judge Hegarty, because we felt, you know, we

18   had to exhaust our process.  I don't know if you and Judge

19   Hegarty want to address those today or not, but they're

20   outstanding issues.

21         Judge Hegarty convened a call sometime in the past

22   two weeks to ask what's before him or going to be before him.

23   Those are -- those are ripe for a decision.

24         SPECIAL MASTER:  Okay.

25         MR. SPERLING:  And then the last thing, and maybe

1    it makes sense to wait on this until after we've gone through

2    the defendant's issues, is it sounds like there is a lot more

3    discovery that needs to be produced and we need to figure out

4    a timeline for that.  We need a date certain and we need to

5    think about how that impacts the calendar, because there's

6    like no time left.

7            THE COURT:  Right.  Well, I told them, you know, I

8    need them to be telling you when they can do this and then --

9    you guys don't have a trial date, correct?  He vacated that?

10           MR. SPERLING:  He didn't.

11           THE COURT:  He didn't?

12           MR. SPERLING:  You raised the possibility of going

13   to talk to him about it.  We just need a -- look, we're the

14   plaintiffs, we don't want to defer trial unnecessarily.  But

15   we also, of course, want to able to complete discovery on the

16   basis of the rulings that you and Ms. Rodriguez have given

17   here.  And we need a reasonable amount of time, once they've

18   completed their production, to actually absorb and digest all

19   that information.

20           THE COURT:  Right.

21           MR. SPERLING:  And we want to take all the depos

22   that are outstanding.  I mean, we haven't taken a single depo

23   yet.

24           THE COURT:  Yeah, that is a wrap-up issue.

25           MR. SPERLING:  Okay.

1        SPECIAL MASTER:  And then for Charter, we have --

2   we've received your materials.  Are there any -- is there

3   anything else?  Yours is pretty succinct and to the point.

4        MS. ALVAREZ:  Both parties had filed, per

5   Magistrate Judge Hegarty's instructions, briefing asking for

6   clarification on the order on the Hash report.  So we have

7   that pending as well.

8        THE COURT:  I think anything on the briefs, I'll

9   just handle probably by an order if it's a matter of --

10       MR. ROSENTHAL:  There are some additional issues on

11  that.

12       THE COURT:  Okay.

13       MR. SPERLING:  Does that mean issues raised for the

14  first time?

15       SPECIAL MASTER:  Well, I guess we'll find out when

16  we get to that.  All right.

17       MS. ALVAREZ:  Pardon.  So just to clarify in

18  response to Judge Hegarty's question about the trial date, we

19  have had a conference with Judge Jackson on December 15 of

20  2020.  And the parties have asked for guidance in the context

21  of the proposed counterclaims that plaintiffs had wanted to

22  assert.  And Judge Jackson told us, in no uncertain terms,

23  that the October 2021 trial date was firm and that he was not

24  inclined to move it.  So that is -- that is the guidance that

25  we received from Judge Jackson.

177

1        THE COURT:  Okay.

2        SPECIAL MASTER:  All right.  So let's take a

3   ten-minute break and we'll come back.  And I guess I'll throw

4   this out to Charter first.

5        Given we've been most of the time this morning

6   occupied with plaintiffs' issues, do you want to take up your

7   issues after we come back on the break?  And then we'll -- I

8   don't know that we will get to the spoliation issues that

9   plaintiffs have raised.  I don't know how your team has

10  separated this out to who is going to argue what, but it

11  looks like we'll have to come back tomorrow to address at

12  least some of those.

13       So maybe you all want to confer if you need your

14  whole -- who is going to draw the short straw or long straw,

15  depending on your perspective of who is going to hold over

16  until tomorrow to help deal with some of these other issues.

17       MS. ALVAREZ:  Certainly.

18       MR. ROSENTHAL:  We'll confer.

19       SPECIAL MASTER:  All right.  So you'll advise us

20  when we come back from the break as to what issues we're

21  going to take up then and then we'll go back to and

22  complete -- we'll make sure we'll get to all of your issues,

23  Mr. Sperling.

24       MR. SPERLING:  Thanks, Ms. Rodriguez, got it.

25       (Break was taken.)

178

1          MR. SCHAPIRO:  I think we're waiting for

2   Ms. Brewer, but I think where we are -- while she is getting

3   back, I can represent from our side in terms of how best to

4   proceed.

5          I think we would be -- I think our preference would

6   be to go ahead and finish with the plaintiffs' issues now, so

7   that the issue that is -- the data loss issue is next, right?

8   And then we wrap up the plaintiffs' issues.  And we

9   understand that it is, obviously, going to roll into

10  tomorrow.

11         THE COURT:  Yep.

12         MR. SPERLING:  Matt, can we let somebody go on

13  spoliation, based on what Ms. Rodriguez and Judge Hegarty

14  said?  Or can we do that now?

15         FEMALE SPEAKER:  What did you say?

16         MR. SPERLING:  I was speaking to Mr. Oppenheim.  I

17  just wanted to know if we let somebody go who we would have

18  needed for spoliation?

19         THE COURT:  Oh, a person is missing maybe?

20         MR. SPERLING:  Yeah, based on being told they would

21  be tomorrow morning.  Matt, do you even hear us?

22         MR. OPPENHEIM:  Yes, sorry.  I lost you there for a

23  minute.  Yeah, I just told him to go home.  I don't know

24  if --

25         MR. ROSENTHAL:  Why?  I don't know why you told him

1    to go home.  We were --

2            THE COURT:  We got it, we got it.

3            MR. ROSENTHAL:  We decided we can wait to hear

4    back).

5            THE COURT:  One time I had a -- I had a case in

6    front of a U.S. district judge in this district and it was

7    about 11:30 in the morning, had a telephone conference.  My

8    opposing counsel was out in Los Angeles, actually on a

9    highway on his cellphone during an oral argument with a

10   district judge, kind of an oral argument, kind of a

11   discussion, I think, about discovery or something, but this

12   judge really didn't like what this guy had to say, ticked

13   this judge off.

14           Remember, this guy -- it's Friday.  This guy is in

15   Los Angeles on the highway on a cellphone at 11:30 in the

16   morning.  And he says, You will be in my courtroom at 4

17   o'clock this afternoon or you will be in prison.  The

18   district judge says that to a dude.  The dude was in the

19   courtroom at 4 o'clock.

20           It was incredible.

21           MR. OPPENHEIM:  Okay, Your Honor, I think we are

22   ready to proceed because I don't want to be in that position.

23           THE COURT:  Where are you right now?

24           MR. OPPENHEIM:  Not in prison.

25           MR. SPERLING:  Yeah, I think we need to mute it

1   because we're transferring the PowerPoint to Ms. Poliak

2   here --

3            THE COURT:  All right.

4            MR. SPERLING:  -- who will be able to use it, but

5   we'll let you know as soon as we're fired up and ready to go.

6            MR. OPPENHEIM:  I can -- I can -- while they're

7   pulling that up, let me introduce the issue and what we're

8   going to do to set a stage, because I think it's useful.  And

9   in particular, because I know Ms. Rodriguez has not been a

10  part of the last several hearings.

11           So on February 9, the Court, Your Honor, ordered

12  Charter to produce redacted versions of the Winston & Strawn

13  investigation notes.  And the Court instructed at that time

14  that, if after analyzing the memos, we thought that

15  additional discovery was necessary, plaintiffs should come

16  back and explain why at the hearing on the 22nd.

17           So we did receive the redacted memos on Thursday

18  night last week.  We reviewed them.  And in the process of

19  analyzing the memos and considering the issues in them, we

20  were cognizant of two presumptions that we would have to

21  overcome in order to get any additional discoveries.

22           One, the Court's initial reaction to reading the

23  investigation memo that the facts were not in dispute.

24           And, two, that if we did ask for additional

25  discovery, Mr. Rosenthal would, no doubt, get up and say that

1    this is the same thing all over again and that the issues

2    were all resolved.

3            So we wanted to make sure that if we put this

4    forward, we were very clear about what we didn't have.  And

5    it was clear that we didn't have it and that it was clear

6    that we needed it.

7            And based on our review of the memos, we can assure

8    you that there are serious and important outstanding fact

9    questions.  We're prepared to go over some of them today.

10   Some of them we might want to do in-camera, and then we'll

11   explain the targeted discovery that we think is needed to

12   resolve those fact -- those specific fact issues.

13           THE COURT:  Pretend that I'm only going to let you

14   make one point, give me your best shot first.

15           MR. OPPENHEIM:  Can you give me two slides, is my

16   first point?

17           THE COURT:  Whatever your best shot is on one

18   point, take it.

19           MR. ROSENTHAL:  I'm going to bet it's not one --

20   two slides, it's not one point.

21           THE COURT:  Okay.  How much?

22           MR. ROSENTHAL:  Whatever Your Honor would like.

23           THE COURT:  Well, what I would like ten zeros

24   behind it.  Okay, go ahead.  Not after a decimal point

25   either.

1        MR. OPPENHEIM:  If I gave you one more point, do we

2   get all the discovery we want, Your Honor?  (Inaudible).

3        THE COURT:  Yeah, I think I'm going too far down

4   that road.

5        Go ahead, show us your slides.

6        MR. OPPENHEIM:  Okay.  So if we could turn to slide

7   1, please.  So -- so --there are certain things we do agree

8   about, and it's important to understand what we do agree

9   about, right?  So undisputed facts.

10        In March of 2016, when Charter received a legal

11   hold from the plaintiffs, it did not put a place -- in place

12   any legal hold.

13        THE COURT:  Well, wait.  Hold on, hold on.

14        Before you go on spending ten minutes on this, can

15   you guys quickly read that and make sure there are no points

16   in which you disagree because that's what's he's saying, this

17   misrepresents a consensus.

18        MR. ROSENTHAL:  Did not.

19        THE COURT:  For which first point?

20        MR. ROSENTHAL:  (Inaudible).

21        MR. OPPENHEIM:  I can't hear Mr. Rosenthal.

22        THE COURT:  He says your second one he doesn't

23   agree with.

24        MR. OPPENHEIM:  Would it be possible for him to

25   move closer to a microphone?

183

1          THE COURT:  Yeah, yeah.  It's actually not just

2     possible; it's mandatory.

3          MR. ROSENTHAL:  Yes, Your Honor.  We don't agree

4     with that.  The second point, for example, is not accurate.

5          MR. OPPENHEIM:  Well, I guess that just -- maybe I

6     should just rest that there are disputed facts right there.

7          MR. ROSENTHAL:  There aren't disputed facts about

8     the e-mail loss.

9          MR. OPPENHEIM:  Well, there are --

10         THE COURT:  Hold on.

11         MR. ROSENTHAL:  Wait a second.

12         THE COURT:  Go ahead, we'll let John say something.

13    Go ahead.

14         MR. ROSENTHAL:  I certainly hope, Counsel, you are

15    going to be honest, truthful and straightforward with the

16    Court, particularly about the facts --

17         MR. OPPENHEIM:  You know what, I'm not --

18         MR. ROSENTHAL:  -- that we disclosed to you

19    yesterday in our letter response to your February 11.

20         MR. OPPENHEIM:  (Inaudible).

21         THE COURT:  All right.  Well, this is a terrible

22    record.  Hold on, hold on.  Yeah, I mean, those are fighting

23    words.  Let's not have fighting words, John.

24         MR. ROSENTHAL:  Well, Your Honor, we sent him a

25    letter yesterday --

1          MR. OPPENHEIM:  I --

2          THE COURT:  Matt, I got you, okay.  I'm taking

3   control.  Let's let him speak.  You'll get your turn.

4          MR. ROSENTHAL:  We sent him a letter yesterday

5   outlining the facts related to the CATS, right.

6          THE COURT:  Okay.

7          MR. ROSENTHAL:  And now you're going to hear a

8   different story.

9          THE COURT:  Well, you showed me --

10          MR. ROSENTHAL:  He knows what the facts are.  He

11   misconstrued them in his brief.  We tried to clarify them and

12   now he's going to continue with the same rendition of his

13   facts.

14          THE COURT:  Okay.  Well, but I can't get into that

15   many weeds, so don't assume this is -- go ahead, Mr.

16   Oppenheim, but don't assume that this is all undisputed, I

17   guess.

18          MR. OPPENHEIM:  Okay, understood.  Well, I'm going

19   to lay it out for you, Your Honor.

20          So first fact, when they got our claim letter, they

21   didn't put a hold in place.  Second fact, they did have a

22   document that confirmed the legal hold for CATS data in place

23   in 2012.  That existed as of 2015 and they have been very

24   clear that that -- they have no documentation indicating that

25   that was lifted.

1           Third fact, Charter had a legal hold from

2     (inaudible) as late -- as of late 2015.

3           Fourth, Charter intended to preserve those e-mails

4     and CATS ticket data under the Mingus hold.

5           Fifth, Charter admits it destroyed several hundred

6     thousand potentially relevant e-mails that were supposed to

7     be preserved by the Mingus hold.

8           And last, Charter has no significant past ticket

9     data from before November 2014.

10          So now let's turn to what the key unresolved

11    questions are on the next line, please.  So unresolved.  What

12    did Charter do when it received plaintiffs' demand letter in

13    2016?  What is the Mingus hold?  A master hold.  Why was the

14    Mingus hold not migrated in 2017?  When did Charter have a

15    hold in place to preserve CATS ticket data and how long does

16    Charter retain ticket data in the normal course?

17          Now, the outside counsel members that were produced

18    made claims on all of these issues, as well as the letter we

19    received last night from Mr. Rosenthal that was somewhat

20    different than other representations that have been made to

21    the Court, and those documents, the outside counsel memos and

22    Mr. Rosenthal's letter, are either unsupported or

23    inconsistent with the documents that have been produced, and

24    that's what we're going to demonstrate.

25          And so I'm going to walk through each of these, and

186

1    I'll do it quickly, but I was told I needed to make a

2    showing, so we're going to make a showing.

3            THE COURT:  Well, hold on.

4            MR. OPPENHEIM:  We're going to --

5            THE COURT:  Just hold on a second.  Ms. Rodriguez

6    and I are going to talk for a second.

7            (Court and Special Master confer.)

8            THE COURT:  All right.  So I already know what

9    you're going to say so I really don't need to hear that.

10   It -- the materials didn't placate your request for

11   information, I understand that, so we believe that you have

12   made a strong enough showing for a 30(b)(6), okay?

13           MR. OPPENHEIM:  Your Honor, may I -- a couple other

14   very specific things would be helpful to zero in on, and if I

15   may.

16           One is, in the Winston Strawn memos, there is a

17   reference to legal -- Charter's legal hold policies, and

18   we -- we are not aware of that having been produced and it's

19   obviously very important and we would ask that that -- that

20   that or those, I don't know if there is more than one, be

21   produced.

22           SPECIAL MASTER:  During what time period?

23           MR. OPPENHEIM:  I'm sorry?

24           SPECIAL MASTER:  During what time period?

25           MR. OPPENHEIM:  For the relevant period,

1   Ms. Rodriguez, so that would be 2012 -- during the discovery

2   period.

3            SPECIAL MASTER:  Okay.

4            MR. OPPENHEIM:  Secondly, that to the extent that

5   the Winston & Strawn memos are referring to documents that

6   were not produced, those be produced, as well, because we

7   don't want later have an affidavit put forward in response to

8   our spoliation motion with documents that weren't produced.

9            THE COURT:  A response, if any?

10           MR. OPPENHEIM:  I'm sorry, I didn't -- I apologize,

11   I didn't hear you.

12           THE COURT:  Response -- a response, if any, from

13   the defense.

14           MR. ROSENTHAL:  Well, I would like to be heard on

15   the overall issue.  It was kind of a one-sided issue.  You

16   ruled before you had a chance to hear from us.

17           THE COURT:  No, I know, but I'm letting you make

18   your record now.

19           MR. OPPENHEIM:  So --

20           MR. ROSENTHAL:  Well, I guess the first would be a

21   clarification about the 30(b)(6).  Are we talking about a

22   30(b)(6) on the e-mail losses or the 30(b)(6) on the CATS

23   issues?  And if it's the CATS issues, which issues are you --

24           THE COURT:  I thought we were just on spoliation of

25   data loss.

188

1          MR. ROSENTHAL:  Well, it's not that simple, Your

2     Honor.  They originally ran in in May, after we disclosed the

3     e-mail loss, and they said they needed this -- all this

4     discovery.  And the Special Master -- most of which we had

5     agreed to give them to them, right.  And the Special Master

6     said, no, no, no, go take a 30(b)(6).  And for weeks we tried

7     to negotiate a 502(d) agreement, which would give them the

8     underlying documents.  They said, no, no, no, we want

9     everything and we litigated that in front of you.  And we

10    turned over the 600 documents on the e-mail loss, and we had

11    a hearing in which probably the single most document that is

12    clearly privileged, Your Honor said, Well, can't we show them

13    the facts because once you show them the facts, there is no

14    there then.  And we showed them the facts, right.

15          It was a subsequent version of that memo, more

16    detailed, because between when we did the initial memo in

17    June -- in June to when we finalized the memo in January --

18    or August and January, we had done more analysis, we had

19    looked at more documents and we set forth the facts.  And the

20    facts are fairly undisputed as to what happened there, right,

21    but the request for a 30(b)(6) on the expedited basis was

22    related to the e-mail loss issues, not the CATS issues.

23          THE COURT:  Okay.

24          MR. ROSENTHAL:  All right.  So we believe --

25          MR. OPPENHEIM:  Your Honor --

```
1           MR. ROSENTHAL:  -- the objected --

2           MR. OPPENHEIM:  -- on the CATS issue --

3           THE COURT:  No.  So you'll get your turn, go ahead.

4           MR. ROSENTHAL:  We believe the objected facts

5   related that have been produced.  We produced a memo and we

6   produced all of the exhibits cited in the memo with the

7   exception of the two which we claim are work product

8   privilege, the two attachments and the one timeline related

9   to BHM.

10          So we have provided all those documents, including

11  legal hold policies under the 502(d).  We believe the facts

12  are completely out there.  I'm not sure why they need a

13  30(b)(6) at this point.  They haven't articulated as to why.

14  They said in their letter because Charter changed its story.

15  We didn't change our story.  The facts revealed when we were

16  looking at this in August, that the process was an automated

17  process and that the Mingus and 64 other holds were left off.

18          When we actually looked at additional e-mails,

19  which are produced and which have been provided among the

20  600, it became clear that it became a manual process and that

21  some -- somehow in the manual process when people were

22  identifying the (inaudible), that 64 holds didn't make it

23  over.

24          THE COURT:  Okay.

25          MR. ROSENTHAL:  So that's separate and apart from
```

1    the CATS issue.  It's not all related.  In the CATS issue

2    they've tried multiple times to get certain documents and the

3    Special Master said, Outside the confines of an expedited

4    discovery process, because it's a loss of documents in a

5    record retention situation, not a legal hold, go take your

6    discovery.  They haven't taken that discovery, right.

7           So now do they want it in the form of an expedited

8    30(b)(6) or do they want it in the form of the normal

9    discovery process?

10           In addition, we're trying to confuse apples and

11   oranges here.  In 2000 -- the end of 2015 when the Mingus

12   litigation came in -- and the idea that they don't know the

13   scope of the Mingus hold is preposterous.  They have the

14   document.  It says clearly on its face, it was an umbrella

15   hold and the scope of the documents preserved.  And they keep

16   saying, Well, we don't know what your client did in response

17   to our March notice.  As we said before, the client did

18   nothing because it was already covered by the Mingus hold,

19   right.

20           Now, in the Mingus hold, in there, included CATS

21   data at that point in time.  That was put on hold.

22           Now, CATS data is only kept under the record

23   retention schedule for a period of 12 months.  We produced

24   the records retention schedule, and they know that -- with

25   respect to the Mingus hold, that CATS material was preserved

191

1    from the time of CATS -- from the Mingus hold and whatever we

2    had in terms of its closed ticket data for the preceding 12

3    months.  They know that exists.

4            What they're trying to say is, is 2012 hold, the

5    2012 hold, you should have saved the world relating to CATS

6    and, therefore, because you didn't save the world relating to

7    an unrelated legal hold, somehow you've spoliated materials

8    in this case.  Well, that's not the law.

9            In 2012, Digital Rights, who is not their client,

10   wrote a letter, right, relating to four publishers to which

11   they don't represent, right, and a hold was put in place, an

12   unlimited amount of ticket data, 7,000 tickets were put on

13   hold.

14           Now, that hold, at least the legal department

15   believed, had gone away, and that information was not

16   otherwise preserved.  It was tabled, with the exception of

17   the 7,000 ticket data, right.  The 7,000 ticket data for the

18   Digital Rights hold in 2012, that was preserved.

19           What was not preserved was the Mingus hold because

20   that didn't arise until 2015.  We're mixing apples and

21   oranges here.

22           So what they're trying to do is create a case that

23   somehow in their case we spoliated evidence because there was

24   a preexisting unrelated hold years before.

25           THE COURT:  Okay.

192

1           MR. ROSENTHAL:  And the two don't meet up.

2           THE COURT:  I'm just referring to the -- the 2015,

3   not the 2012 CATS at the moment.

4           MR. ROSENTHAL:  Well, they're not.  They're --

5   they're not.  Read their papers --

6           THE COURT:  Was it 2012 --

7           MR. OPPENHEIM:  Yes, Your Honor.

8           THE COURT:  Hold on, hold on.  Was a 2012 CATS hold

9   a subject of that Winston & Strawn memo?

10          MR. ROSENTHAL:  No.

11          THE COURT:  It wasn't addressed at all?

12          MR. ROSENTHAL:  No.

13          THE COURT:  Okay, so I'm still not talking about

14  that.  Even if they are, I'm not.

15          MR. ROSENTHAL:  Okay.  Well, I'm trying to clarify

16  what we're --

17          THE COURT:  How much clearer do you want me to be?

18          MR. ROSENTHAL:  Well, Your Honor --

19          MR. OPPENHEIM:  Your Honor --

20          MR. ROSENTHAL:  -- the facts have been disclosed

21  here.  I'm not sure at this point what additionally they

22  need, and they really haven't articulated other than --

23          THE COURT:  Well, what I'm saying is Winston and

24  Strawn did this investigation, they have the results of that.

25  They believe that even after that, there are questions

193

 1    remaining they need answers to.  That's not surprising,

 2    because -- I mean, the memo wasn't -- doesn't purport to be,

 3    you know, a comprehensive history, it's just what happened,

 4    and they want to explore the parameters of -- of that and

 5    test it.

 6            And, you know, it's not every case that you have

 7    data loss.

 8            You agree with that, right?

 9            MR. ROSENTHAL:  Yes.

10            THE COURT:  In fact, I mean, this is not -- I think

11    this is the unusual case where, I guess during the migration

12    of some accounts or whatever, significant e-mails were lost.

13    That's just an unusual circumstance that I can't help.  The

14    facts are what they are, and so they get just -- they should

15    get to explore that, that's all I'm saying.  I'm not saying

16    anything more than that.

17            And I was going to rely mainly on them in

18    determining whether -- I know that was probably naive of me

19    to think that they could placate their desire to take

20    discovery just by reading that memo, but I tried.  It didn't

21    work.  They just put on a list of questions that they have;

22    I'll take that on good faith.  And Ms. Rodriguez and I both

23    agree that what we originally contemplated for the 30(b)(6),

24    which was interrupted by me because I hoped there was a

25    shortcut, now we've decided there was not a shortcut;

1    therefore, we need to go back to Plan A.

2              Does that make sense?

3              MR. ROSENTHAL:  Yes, Your Honor.

4              THE COURT:  Okay.  Do you have anything else to

5    say?

6              MR. ROSENTHAL:  To use your own words, I do not

7    think it represents a, quote/unquote, heck of a showing that

8    you stated last week.

9              THE COURT:  Understood, yeah.  Appreciate that.

10             MR. OPPENHEIM:  Your Honor, I -- so -- so thank

11   you.  I think it's resolved as to the e-mail loss.  I want to

12   make sure it's also resolved as to the CATS data.  And I --

13   and to be clear, there were three things about the CATS data

14   that Mr. Rosenthal just put forward as fact, which I can

15   demonstrate are, if not absolutely untrue, certainly not

16   clear.

17             And let me start with the 2012 hold, because Your

18   Honor is saying this isn't covered by it, so I would ask to

19   pull up slide 23 so I can just show it to you, because Mr. --

20   please share it, if you would.

21             Mr. Rosenthal said that -- that the 2012 hold only

22   covered 7,000 tickets, that's what he just said, which is the

23   first time I've heard that, I believe.  But here is the 2012

24   legal hold.

25             I'm only seeing a blue screen.  I don't know if you

195

1   guys are actually seeing the slide.  Are you guys seeing

2   slide 23?

3           SPECIAL MASTER:  Not yet.

4           COURTROOM DEPUTY:  It has not been brought up yet.

5           MR. OPPENHEIM:  Oh, okay.  Bring up slide 23.

6           So this is a Charter internal document from their

7   own CATS system.  It's -- there it is.  I don't know if it

8   has come up, if you guys are seeing it.  Oh, there we go,

9   excellent.  Can everybody else see it well?

10          THE COURT:  Yeah.

11          MR. OPPENHEIM:  So this is a document from

12  Charter's abuse automation system implementation plan, their

13  CATS bible, I think they call it.  And note the date on the

14  upper right, October 30 (inaudible).  Ms. Rodriguez, I know

15  you've seen this.

16          So this document says as of March 30, 2012, Charter

17  is in a prelitigation dispute and is legally obligated to

18  preserve responsible information defined below.  Charter must

19  preserve all information that's responsive --

20          THE COURT:  Why did you take it off?

21          MR. OPPENHEIM:  -- from all (inaudible) from the

22  date of the first DMCA notice related continuing forward.

23  And then it goes on, it says, All retention periods are

24  suspended concerning information until further use.

25          THE COURT:  Are you guys seeing it, still?  We're

1   only seeing that, so we can, Chris.

2         MR. SPERLING:  We see it on our screen too.

3         THE COURT:  Yeah, I know you are, but we're not.

4   Is it on this big guy here?

5         MR. ROSENTHAL:  Yes.

6         THE COURT:  Turn it around, please.  It's minimized

7   in our screen.

8         SPECIAL MASTER:  Now, we've got Matt again, only

9   bigger.

10         MR. OPPENHEIM:  It got worse, not better.

11         THE COURT:  All right, go ahead.

12         SPECIAL MASTER:  Yeah, there we go.

13         MR. OPPENHEIM:  So what you see in this document is

14   Charter in 2012 acknowledging that it had an obligation to

15   preserve responsive information and that it was preserving

16   all information responsive from this date to the present and

17   continuing forward.  And it says the following table should

18   not be dropped from the CATS and DHCP database is in order to

19   comply with this legal hold.

20         Now, when we first raised this with Ms. Rodriguez,

21   right -- let me back up.  So as -- according to this

22   document, as of October 2015 ticket data from 3/30/2012

23   forward should have been preserved.

24         THE COURT:  Well, hold on.  Can I ask you a

25   question why you have standing to raise this issue?

1        MR. OPPENHEIM:  Because if they had a legal hold in

2  place, then they should have had all this data.

3        THE COURT:  No, no, I agree with that, but why do

4  you have standing to assert that?

5        MR. OPPENHEIM:  Because -- well, the question is

6  what happened to it and when.  It appears that sometime after

7  October 13, 2005, which would have been during the discovery

8  period, right, during the claim period, that this was

9  destroyed.  I don't know -- and I don't -- I don't know that

10  because they haven't answered any questions about that.

11        THE COURT:  Right, but they weren't holding this

12  because of anything your clients did.

13        Am I right about that?

14        MR. OPPENHEIM:  That is correct.

15        THE COURT:  Okay.  So somebody else may have a big

16  beef with Charter for not preserving their documents.  And

17  even if these documents might have been responsive to

18  something you needed, your right to have them held didn't

19  accrue until you asserted a claim; is that correct?

20        MR. OPPENHEIM:  No.  The question, I think, Your

21  Honor --

22        THE COURT:  No, no, no.  I'm asking you if that's

23  correct.  Your legal right to have them hold documents and

24  preserve documents did not accrue until they had notice that

25  they might have a legal matter with your clients; is that

198

1    right?

2            MR. OPPENHEIM:  I disagree with you and I will

3    explain.

4            THE COURT:  Why?  Okay.

5            MR. OPPENHEIM:  Because if after they had notice or

6    were aware of our potential claim, they engaged in some

7    conduct that resulted in spoliation of data that they

8    understood would go to our claim, then they spoliated --

9            THE COURT:  That's what I just said.  I said after

10   they had notice of your claim.

11           MR. OPPENHEIM:  Or have reason, right.  And we

12   don't know when this was lost.

13           And if I can, and again, this is -- you've asked me

14   to do this without going through this piece by piece.  This

15   is the second piece.

16           The first piece is the 2015 Mingus hold of data,

17   which I'm going to go to next; but we don't know, Your Honor,

18   when this -- this 2012 forward data was potentially

19   spoliated.  They've refused to answer questions about it.

20   And when they were asked about this by Ms. Rodriguez at a

21   hearing, they said, Well, we don't know that this hold was

22   actually in place.  There may have been a remnant in the

23   document.

24           And so Ms. Rodriguez appropriately said to them,

25   Well, then you should figure that out.  And they came back

1   and they said, We have no written documentation indicating

2   that this legal hold was ever lifted.

3          MR. ROSENTHAL:  Your Honor --

4          MR. OPPENHEIM:  Now, they may think that something

5   happened that wasn't written and they haven't produced, but

6   they haven't spoken to it, they haven't told us.  As far as

7   we know, this is what the documentation shows.

8          THE COURT:  Well, wait.  Hold on.  Wouldn't that

9   only matter if they were relying on the 2012 hold as part of

10  the preservation of documents for your clients?

11         MR. OPPENHEIM:  Yeah, so let me connect this up to

12  the next one, which is the Mingus hold that came about in

13  roughly the same time period, in late 2015.

14         And so -- and what Mr. Rosenthal said about that is

15  he said, of course, the Mingus hold included CATS data.  So I

16  would ask you now to turn to slide 16.  Because while

17  Mr. Rosenthal is saying that now and said that a couple days

18  or two weeks ago, that's not what they had said before.

19         What they had told us in May and in February, but

20  (inaudible) in May, was right there in what they filed to the

21  Court.  They said relevant CATS data was maintained in

22  accordance with the CATS detention schedule.  They did not

23  say it was subject to the Mingus hold.

24         And then they said -- you can see right here,

25  Ms. Ranahan in a hearing, we go back to that time period.  By

1    the time we got notice of a lawsuit, it was only (inaudible)

2    six-months' worth of data and others 18, not the one

3    Mr. Rosenthal just said.

4            Go to the next slide, please.  So what we were then

5    told in February (inaudible), but by Ms. Ranahan, at the time

6    that the demand letter for this lawsuit was sent to in March

7    2016, Charter had a six-month retention policy for ticket

8    data (inaudible) itself and an 18-month retention policy for

9    ticket data.  Again, Mr. Rosenthal just said it was a year,

10   right, but again, in April Ms. Ranahan again told us in

11   writing, six months, 18 months, right there, April 1, 2020.

12           So here is what we've got on this.  Plaintiffs

13   don't know if the CATS data was preserved as of late 2012

14   going forward all the way to 2015, and then the Mingus hold

15   would have taken up and continued to preserve it, right.  And

16   then how long it would have preserved it for and how long

17   (inaudible).

18           All of these are totally -- these issue are totally

19   misunderstood.  Is it six months?  Is it one year as Mr. --

20   as we were just told?  Or is it 18 months?  Because

21   repeatedly we've been told different thing after different

22   thing after different thing.

23           So respectfully, Your Honor -- and I'm trying to

24   cut this short because I know the patience is running thin.

25   We need a discovery into the CATS retention and spoliation

1    issue, and that should both include -- some of it will be a

2    fact deposition of a witness who we're already going to take,

3    which will be Mr. Mabb, who we've heard so much about, or

4    it's a question of how much time we take for his deposition.

5            THE COURT:  Well, hold on.  When did the plaintiffs

6    notify Charter of their claim in this case?

7            MR. ROSENTHAL:  March 2016.

8            THE COURT:  March 2016.  So I'm going to ask you a

9    very clear question, Mr. Oppenheim, I want a very succinct

10   answer.

11           When did Charter's obligation to preserve documents

12   related to your clients arise?

13           MR. OPPENHEIM:  As of -- well --

14           THE COURT:  I knew you couldn't do it.

15           MR. OPPENHEIM:  As of -- well --

16           THE COURT:  I knew you couldn't do it.

17           MR. OPPENHEIM:  No, I am going to do it.

18           THE COURT:  Okay.

19           MR. OPPENHEIM:  It was certainly by no later than

20   the claim letter, but arguably at the time of the BMG vs. Cox

21   decision when they were on notice of a protective

22   (inaudible).

23           THE COURT:  All right.  So if they only had an

24   obligation to preserve information for your clients as of

25   March 2016, what basis do you have to raise -- anything that

1    was lost before March of 2016 wouldn't be spoliation.  As to

2    this case, it may be crappy document-handling procedures, it

3    may be gross negligence, it may be fraud, but it's not

4    spoliation, because they have the legal obligation to

5    preserve documents until the law says they do as to your

6    clients.

7         You may have all kinds of other arguments and maybe

8    even discoverable information to be had, but it's not called

9    spoliation as far as I understand that concept.

10        Does that make sense?

11        MR. OPPENHEIM:  No, because, Your Honor, they --

12        THE COURT:  It doesn't make sense?

13        MR. ROSENTHAL:  It makes --

14        THE COURT:  It makes sense.  You may disagree with

15   it, but it didn't make sense?

16        MR. OPPENHEIM:  No, no.  And if you will let me

17   explain --

18        THE COURT:  All right.

19        MR. OPPENHEIM:  -- I think what I have to say will

20   make sense.  They didn't put a hold in place at the time that

21   they received our letter, because they -- they didn't do

22   anything.  There is no discussion of them doing anything.

23   They -- they now claim -- there is no documentation for it --

24   that there was a hold in place already by virtue of the

25   Mingus claim.

1        So that -- according to that, our -- the data that

2   we're relying on should be from the Mingus date backwards.

3   Now, we don't now whether that's the Mingus date backward

4   finding.  Six months, a year, 18 months, and even some of

5   their policies suggest two or three years, we don't know.

6        THE COURT:  Okay, well, wait a second.  I

7   understand what you're saying, but if the obligation arose as

8   of March 2016, as to this case for which any spoliation

9   argument can be based, and they tell you at that point we had

10  a hold already for six months or 18 months, but they're

11  wrong, still their obligation arose as of March of 2016 no

12  matter how you slice it, that's when the obligation arose.

13       Now, if they mistakenly told you that they had been

14  holding them already and they hadn't, all I'm concerned about

15  for spoliation is what conduct they engaged in as of March

16  2016 and forward as to documents they should have preserved

17  for you.  Anything else -- like I said, if they had already

18  lost information, if those statements weren't correct, that

19  there hadn't been a six-month retention or that everybody had

20  let the 2012 CATS data hold lapse, all that is interesting

21  and it may mean something.  It just doesn't mean spoliation

22  for which you get spoliation, you know, remedies.  I don't --

23  I don't believe that.

24       I mean, I don't know how you can have a legal claim

25  arise when they have a legal obligation.  At least spoliation

1    requires a duty to you; not a duty to the world, not a duty

2    to somebody named Mingus, but a duty to you.

3            MR. OPPENHEIM:  So you would agree, Your Honor,

4    that when they get notice of our claim, they don't normally

5    have an obligation to preserve what happens from that point

6    forward, they have an obligation to preserve everything in

7    their system that they have in their system at that time,

8    right?  I don't mean to cross-examine you, but I want to walk

9    you through it.

10           THE COURT:  No.  They have an obligation to

11   preserve whatever the law would require them to preserve

12   based on their reasonable interpretation of the claims that

13   can be made against them.  This is pedestrian stuff that

14   happens in every case.  We've got a hold on all the documents

15   that might be relevant to the issues raised by the

16   plaintiffs.

17           MR. OPPENHEIM:  Right.  And if they had -- if they

18   had data already preserved as of March 2016 and they had a

19   legal obligation under other holds within their system to

20   maintain that data and then they get a legal claim from us,

21   they can't suddenly say, Oh, we're going to destroy the stuff

22   that is more than a year old because we only have a one-year

23   retention requirement.  That would clearly be spoliation,

24   right?

25           THE COURT:  Well, as you phrase it in the very

1    narrow way that you phrase it, I think it's -- that could be

2    fall in the zone of spoliation, if they intentionally

3    destroyed documents pursuant to any policy.

4          MR. OPPENHEIM:  Well, based on the (inaudible).  If

5    they -- if they had documents -- if they have documents on

6    their system related to our claim at the time they went to

7    our letter, whether those documents go back six months, a

8    year or ten years, they have an obligation to act reasonably

9    to preserve it.

10          THE COURT:  As you phrase it, I agree.  As you

11    phrase that, I agree.

12          MR. OPPENHEIM:  Right.  So if they had documents on

13    their system as of March of 2016 dating back, either from the

14    Mingus hold or from the 2012 hold, it doesn't matter which,

15    they have an obligation to act reasonably to preserve that.

16          THE COURT:  Right, you just said that.

17          MR. OPPENHEIM:  So, right, but I was trying to put

18    it in the context of these specific holds.  So that's why the

19    Mingus hold and that's why the 2012 hold, right, that's why

20    they're important here.  Now --

21          THE COURT:  No, I disagree, I still don't see it.

22    I still don't see it.  Whatever documents existed as of March

23    2016, no matter why they existed, if they existed and there

24    was a way to determine that, they had an obligation to

25    preserve that.

1           MR. OPPENHEIM:  Right.

2           THE COURT:  Okay, so -- so if you could take a

3    snapshot -- if you could take a snapshot of every ounce of

4    information they had as of March of 2016, that's the universe

5    that they needed to think about in preserving information.

6    And then --

7           MR. OPPENHEIM:  I want to --

8           THE COURT:  -- let's move forward from there,

9    whatever they did or accidently, mistakenly, intentionally

10   from that point forward, that lost information relevant to

11   this case is the subject of debate and discussion and

12   discovery.

13          MR. OPPENHEIM:  So let me make two points to that.

14   I don't think we're that far apart and I think you're going

15   to agree with me.

16          One is, I want to put a pin in whether the trigger

17   date is the date of our letter or the date that they're on

18   notice of potential claims by virtue of the BMG decision.

19   There is law, Your Honor, that says that industry

20   participants can have a duty to preserve when they're put on

21   notice of potential claims.  So put a pin in that, whether

22   the trigger date is the date of our letter or the date of the

23   BMG vs. Cox decision.

24          But putting that aside, we have no idea factually

25   whether or not the documents were preserved from -- whether

1    it be March 2016 or the BMG decision made forward, because --

2    because Charter has refused to respond to any questions about

3    this, right.

4            So they keep saying, you know, that it was -- first

5    they said it was preserved under the normal course, then they

6    said it was preserved under Mingus, right.  We don't know why

7    they don't have data.

8            We are missing over 90 percent of the data and they

9    haven't explained why.  We simply want to ask the question.

10   We don't know where it went and what happened.

11           THE COURT:  Yeah, so I'm not disagreeing with --

12   Ms. Rodriguez and I both agree that you can take discovery

13   into what they did starting at least in March of 2016 to

14   preserve data.

15           MR. OPPENHEIM:  Thank you.  We would like to be

16   able -- we don't want to have to come back to Your Honor when

17   they object to questions that go back to the date of the BMG

18   decision.

19           SPECIAL MASTER:  We already ruled on that.

20           THE COURT:  What did you rule?

21           SPECIAL MASTER:  That a ruling in the industry

22   cannot be held to be putting a party on notice that they have

23   to institute a legal hold for documents.

24           THE COURT:  Yeah, so you can talk to the judge

25   about that one.

1        All right.  So where do you think that you're going

2    to get crosswise with them, based on what I just said and

3    what Ms. Rodriguez just said?

4        MR. ROSENTHAL:  You're asking me?

5        MR. OPPENHEIM:  Oh, you're asking --

6        THE COURT:  I'm looking at you, but talking to him.

7    I don't know where to look.

8        MR. SPERLING:  The question was for Matt, but I

9    think at least one concern, Your Honor, would simply be, and

10   hear you loud and clear, but as far as their position, and I

11   think this is what we heard from Mr. Rosenthal, that in

12   connection with the March of 2006 letter put on notice of the

13   claims in this case, they relied on a hold placed in December

14   in 2015; that we should be able to explore at least what

15   happened with that hold in December 2015.

16       THE COURT:  Of course.

17       MR. SPERLING:  Okay.

18       THE COURT:  I'm telling you whatever conduct they

19   engaged in on the representations they made to you as to, no

20   worries, it's all taken care of, we are going to do this

21   according to some other hold; that is, conduct that occurred

22   on or after your notice and so that's what can be explored.

23       And I'm telling you that they -- they got to cover

24   this -- there is already somebody that they had a hold going

25   on for is fine, but it's just what they actually did after

209

1    March of 2016 that's going to matter on any motion.

2            I mean, I just don't think any judge I know is

3    going to sanction them for something they did in 2012 when

4    you gave them a notice in 2016.  It would be -- it would be

5    irreversible error.

6            MR. OPPENHEIM:  So, Your Honor, I think that makes

7    sense and let me see if I can bring this to a --

8            MR. ROSENTHAL:  Wait, wait, we don't need to bring

9    -- here we go again.  Now we are going to try and unwind the

10   whole thing.

11           THE COURT:  Well, you have got one minute to

12   summarize what you --

13           MR. ROSENTHAL:  No, no, I object.

14           THE COURT:  Why would you object?

15           MR. ROSENTHAL:  We heard extensive, extensive

16   argument well beyond what was reasonable.  The Court has

17   ruled here, and this is what they do every time, every single

18   time.  Back here, I'm just going to clarify my understanding.

19   Let me ask this.  This has been this case over and over

20   again.

21           They won't accept the Court's ruling.  It has

22   multiplied this litigation and raised costs tremendously.

23           THE COURT:  But --

24           MR. ROSENTHAL:  Sometime the Court has to say,

25   That's it, I ruled.

1          THE COURT:  You'd be interested in the decision

2     that I wrote.  Just go to Westlaw and research Hegarty in 16F

3     and you may find some interesting things that could give you

4     some ammunition if you think that's been going on, because I

5     sanctioned the EOC $50,000 for engaging in conduct I thought

6     that multiplied proceedings and put too much cost on the --

7     on the defendant.  And, so I reapportioned things, because I

8     agreed.  Okay?

9          Go ahead.

10          MR. OPPENHEIM:  So -- so Your Honor, you -- you

11     indicated we should take a 30(b)(6) deposition previously.  I

12     think we have resolved topics as to the e-mail loss.

13     Obviously we are going to need to add topics for purposes of

14     -- of the CATS discovery.  I assume that that's acceptable.

15     I don't have an issue --

16          MR. ROSENTHAL:  It's not, Your Honor.

17          THE COURT:  Well, the 30(b)(6) is for e-mail loss.

18          MR. ROSENTHAL:  In the context of their overall

19     30(b)(6), they issued notices on topics on CATS and they

20     should take that there, not in the context of the e-mail loss

21     deposition.

22          THE COURT:  Sorry, I didn't understand what you

23     just said.

24          MR. ROSENTHAL:  In the -- in the -- in the -- when

25     they ran in here for an expedited deposition in May of last

1    year, that was on e-mail loss.  They got shut down on CATS.

2    They were told, Go through the normal discovery process and

3    take a deposition on CATS.  So --

4              THE COURT:  Okay.

5              MR. ROSENTHAL:  -- there is --

6              THE COURT:  That I originally said, Ms. Rodriguez

7    and I both agree, okay.

8              MR. ROSENTHAL:  There is a normal 30(b)(6) that

9    they are going to take.  They have noticed CATS as one of

10   those issues, and that deposition testimony should taken

11   there.  It shouldn't be taken in the context of the e-mail

12   loss.

13             That's what I'm trying to say.

14             SPECIAL MASTER:  Okay, just so -- just so I'm

15   clear, because the issue with regard to spoliation -- and I

16   -- I hear what you are saying -- there's two ways that the

17   plaintiffs have been referring to spoliation, or two

18   categories of documents.  One is e-mail, one is CATS.

19             The request that we addressed with regard to the

20   30(b)(6) deposition of Charter's witness, was that related to

21   CATS or was it related to e-mail?  Because I did say it

22   should be dealt with in the spoliation context, but I'm not

23   sure I distinguished it between the two buckets in the way

24   that you have and the way that Judge Hegarty just articulated

25   it.

1          MR. ROSENTHAL:  Yeah, I believe you did, Your

2     Honor.

3          MR. OPPENHEIM:  (Inaudible).

4          SPECIAL MASTER:  I just want to make sure so that

5     we don't have --

6          MR. ROSENTHAL:  I would just like to put a place

7     holder, spoliation is a --

8          MR. OPPENHEIM:  If I may --

9          MR. ROSENTHAL:  -- specific -- a specific of

10    finding of intent.

11         SPECIAL MASTER:  I understand.  That's why I want

12    to make sure we're sorting it out here.

13         MR. ROSENTHAL:  They haven't made any finding of

14    intent here and now the e-mail loss issue (inaudible).

15         SPECIAL MASTER:  Fair enough.

16         MR. OPPENHEIM:  So -- so the 30(b)(6) deposition

17    that you previously permitted, Ms. Rodriguez, was as -- only

18    as to e-mail loss.  And your reason for that was because what

19    Charter told you -- and I'm going to quote their brief.

20         SPECIAL MASTER:  No, no, no, no.  Mr. Oppenheim, I

21    understand that.  I just want to make sure that we don't have

22    any debate here and that there is no inconsistency with the

23    ruling that I gave last week.

24         So to the extent that there may be any

25    inconsistency, I want to make it really clear here that what

1    we talked about with regard to the 30(b)(6) on the loss of

2    e-mail issue is with regard -- the 30(b)(6) with regard to

3    the loss of e-mail issue.

4              With regard to CATS, that's normal discovery and we

5    did not make a different ruling on that one.

6              Does that clear things up?

7              MR. OPPENHEIM:  That's correct.  That's 100 percent

8    correct.

9              SPECIAL MASTER:  All right.

10             MR. ROSENTHAL:  Thank you.

11             MR. OPPENHEIM:  And the reason you came to that

12   conclusion --

13             SPECIAL MASTER:  Wait, wait, I don't need to know.

14   I remember.  I just want to make sure it's clear.  So we're

15   are good.

16             MR. OPPENHEIM:  Okay.  So we are now at --

17             MR. ROSENTHAL:  Wait, wait, wait.

18             MR. OPPENHEIM:  -- (inaudible) --

19             MR. ROSENTHAL:  Is there a reason for him to

20   clarify the Court's rulings, because I don't believe there

21   is, Your Honor.  This is -- this is an example --

22             MR. OPPENHEIM:  (Inaudible).

23             MR. ROSENTHAL:  I'm trying to stop (inaudible)

24   right now.

25             THE COURT:  Hold on.

1          (Court and Special Master confer.)

2          MR. OPPENHEIM:  What Charter told the Court in

3    order to avoid having any 30(b)(6) on CATS data loss was,

4    quote, relevant CATS data was maintained in accordance with

5    the CATS (inaudible).

6          What Mr. Rosenthal has now told us is that's not

7    true; it was preserved by virtue of the Mingus hold.  And the

8    difference there amounts to millions of notices that

9    plaintiff -- and tickets that plaintiffs don't have.

10          MR. ROSENTHAL:  Your Honor, may I --

11          MR. OPPENHEIM:  And so we would (inaudible) to

12    that.

13          MR. ROSENTHAL:  May I approach?

14          MR. OPPENHEIM:  Can I asked what is handed up?

15          MR. ROSENTHAL:  A letter you got yesterday.

16          MR. OPPENHEIM:  Right, which has yet a different

17    story from all of the representations over the last year that

18    we have been litigating this case under.

19          SPECIAL MASTER:  Okay.

20          MR. OPPENHEIM:  Mr. Rosenthal has --

21          SPECIAL MASTER:  Mr. Oppenheim, can I make a

22    suggestion here real quick?  Can you pause and let us read

23    this for a second.

24          (Court and Special Master confer.)

25          SPECIAL MASTER:  All right.  Go ahead, Mr.

1  Oppenheim.

2          MR. OPPENHEIM:  So can I call your attention in

3  that letter, Your Honors, to the very last paragraph.  The

4  third sentence I believe it is.

5          It starts:  In earlier correspondence.  It says:

6  In earlier correspondence, we referred to an 18-month

7  detention policy for ticket data.  Charter subsequently

8  produced its records and information management policy and

9  corresponding records retention schedule in effect at the

10  time of the Mingus hold.  The schedule unambiguously

11  classifies as ticket data under Rule (inaudible) 80 of the

12  retention schedule, which provides for a retention period of

13  CL plus one, one year after the close of retention.

14  Accordingly, Charter preserved CATS ticket data from one year

15  after closing the initial (inaudible).  So --

16          SPECIAL MASTER:  Okay.  Mr. Oppenheim, we -- we

17  read that, but --

18          MR. OPPENHEIM:  So --

19          SPECIAL MASTER:  -- it does not change our opinion

20  on this, unless Judge Hegarty disagrees.  I think we dealt

21  with this on a number of different occasions.  And, in fact,

22  as I go back to when I previously addressed this with regard

23  to RFP 79, ECF 230, my order entered August 12, I expressly

24  discussed this.  The existence of a legal hold in

25  October 2015 is not necessarily relevant, where, as here,

1   plaintiff did not file suit until 2019 and did not provide

2   Charter with notice of their claims until March of 2016.

3          That was from the hearing transcript July 2, 2020.

4   I understand that you don't agree with me, but --

5          MR. OPPENHEIM:  Your --

6          SPECIAL MASTER:  -- that does not mean that we are

7   going to continue to debate this issue.  That was the ruling

8   then.  You have now raised it again.

9          We have really considered it.  We understand what

10  you are saying.  We have now reviewed this letter where

11  Winston & Strawn has clarified, dated February 21, 2021.  We

12  have also reviewed the briefing that you have submitted that

13  was extensive on this issue.

14         Again, the ruling hasn't changed.  Again, I

15  understand that you don't agree, and you certainly have every

16  right to raise this as an appeal with Judge Jackson.

17         MR. OPPENHEIM:  So, Ms. Rodriguez, you came to a

18  decision based off of everything, on an entirely different

19  story than what is in the February 21st letter.

20         MR. ROSENTHAL:  That's not correct, and I object to

21  this.  When does this stop?  When does he stop?  At some

22  point the Court has to say, Enough is enough, with him.  You

23  know, he's constantly rearguing everything.  This is

24  censurable conduct.  I'm sorry, it is.

25         MR. OPPENHEIM:  For the last year and a half --

217

1          MR. ROSENTHAL:  No.  Again, I'd ask for a ruling

2    from the Court; the Court already ruled.  I don't understand

3    why we are sitting here engaging in additional argument.

4          MR. OPPENHEIM:  (Inaudible).

5          SPECIAL MASTER:  Mr. Rosenthal, I'm not sure you

6    are helping your cause here.

7          THE COURT:  You thinks he knows -- you know what

8    he's going to say.  I don't know what he is going to say.

9          MR. ROSENTHAL:  Well, he's shifting sands, Your

10   Honor, because this is what goes on, every time --

11         THE COURT:  But so do you think we are just sitting

12   here, a couple of knuckleheads, who are going to get

13   bamboozled by the -- you know, the personality of Mr.

14   Oppenheim?

15         MR. ROSENTHAL:  No, sir.

16         THE COURT:  It's not true.  I don't think it's

17   true.

18         MR. SPERLING:  I don't think it's true, either,

19   Your Honor.

20         SPECIAL MASTER:  Is there anything further on that

21   issue that we have not already addressed?

22         MR. OPPENHEIM:  So, Your Honor, here's the last

23   point with respect to spoliation.  Ultimately, Judge Hegarty,

24   you asked the question at the very beginning of the last

25   hearing:  Where was this going?  And that's actually the

1   perfect question.  (Inaudible) spoliation, right, both with

2   respect to the e-mail loss and the CATS ticket data loss.

3          And, no doubt, the defendants will put forward

4   affiants, or declarants, in response to our motion on both

5   points.  We want to make sure we have an opportunity to

6   cross-examine, or examine, if you will, those affiants before

7   those declarations are put forward.

8          So we just want to make sure we have a fair process

9   here.

10          Thank you, Your Honor.

11          THE COURT:  Just remember, I have already said, I

12   think pigs get fed and hogs get slaughtered, okay?

13          MR. OPPENHEIM:  I understand, Your Honor.

14          THE COURT:  And I know they're detestable to the

15   jury's face, so I'm sorry for that analogy.

16          MR. ROSENTHAL:  I hear it all the time.

17          MR. SPERLING:  I have a question that has nothing

18   to do with scope, nothing to do with scope, just that I'm

19   clear.  My apologies, there's a lot of back and forth.

20          So I believe the request you're referring from our

21   30(b)(6) notice, or the topic, was Topic 70, Ms. Rodriguez.

22   And you are saying Topic 70 will now, in fact, be part of the

23   regular 30(b)(6) and not the spoliation 30(b)(6)?  Do I have

24   that right?  Whatever the scope of it is, per your ruling --

25          SPECIAL MASTER:  Yes.

1        MR. SPERLING:  -- on the bench?  I just wanted the

2    allocation of which deposition.

3        SPECIAL MASTER:  Yes.  With regard to the CATS

4    data, that is a regular deposition topic.

5        MR. SPERLING:  Thank you.

6        THE COURT:  By the way, I've got to walk out of

7    here at 10 after 4:00.  We are about 18 minutes out.

8        MR. OPPENHEIM:  Correct.  I think the only question

9    is to resolve the last -- the issue we have been going back

10   and forth on to Your Honors, which is, should plaintiff have

11   an opportunity to examine whoever they intend to put forward

12   on the CATS ticket data loss before they put forward a

13   declaration in opposition to our motion?

14       If it's only going to be people who we're otherwise

15   deposing and they are otherwise putting forward, then it's

16   not an issue.  But I don't want to be in a position that they

17   put forward a declaration through somebody who they don't

18   otherwise provide to us for examination.

19       THE COURT:  Well, why don't you just wait until the

20   dispositive motion deadline to move for your sanctions under

21   spoliation?  Why do you have to do it any sooner than that?

22       MR. OPPENHEIM:  Because I don't know that that

23   resolves the issue Your Honor, unless I'm misunderstanding.

24       THE COURT:  No, I'll allow you to complete

25   discovery, and so you don't have to worry about them putting

1  forward an affiant on your motion that you haven't had

2  discovery.

3          MR. OPPENHEIM:  They could still put forward an

4  affiant that they didn't put forward in a response to a

5  30(b)(6) notice, right?

6          SPECIAL MASTER:  I mean, we can't divine what might

7  happen in the future.  If they put forward an affiant to

8  assert certain facts, we have to presume you will have a fair

9  opportunity to question that person about that.  I can't -- I

10  don't know --

11          THE COURT:  You can also move to strike.  You can

12  say Hey, we did a 30(b)(6) notice on this exact topic and

13  they are putting forward somebody that they didn't even

14  designate to respond to that.  So move to strike their

15  affidavit.

16          MR. OPPENHEIM:  Very well, Your Honor.

17          SPECIAL MASTER:  All right.  Were there any other

18  issues that -- it seems to me, as I recall, there was some

19  issue hanging out with regard to -- we are going to check to

20  see -- we've narrowed it down to a certain world, but if we

21  have an answer today.

22          MR. ROSENTHAL:  The contractors.

23          SPECIAL MASTER:  Yes, the contractors.

24          MR. ROSENTHAL:  So we did check -- we did check and

25  this is the former contractors.

1          SPECIAL MASTER:  Yes.

2          MR. ROSENTHAL:  Correct.  The former contractors

3    were all -- and they are verifying this.  There were a number

4    of people there.

5          SPECIAL MASTER:  Okay.

6          MR. ROSENTHAL:  What I was told is based upon what

7    their preliminarily looked at, is that former contractors

8    were all terminated prior to the Mingus hold.  And they

9    wouldn't have -- while they had e-mail accounts, those e-mail

10   accounts wouldn't have been saved.  Contractor accounts, once

11   the contractor's terminated, unless they are on hold for some

12   reason, their e-mails are not preserved.

13         SPECIAL MASTER:  So even though the date we are

14   using is a later one, which is March of 2016 when you were

15   notified of the claims, you have gone back to look, even from

16   the date of the Mingus hold, which is in 2015, a year

17   earlier.  What you are saying is that none of those

18   contractors that were identified on the list that were

19   terminated had accounts that were held after March of 2015?

20         MR. ROSENTHAL:  That's what they preliminarily have

21   told me, yes.

22         SPECIAL MASTER:  Okay.  And so overnight, could you

23   all just confirm that just so we are sure and we are not back

24   here debating about some later discovered information or

25   whatever?  We would like to bring this to a close.

222

 1            MR. ROSENTHAL:  Yes.

 2            SPECIAL MASTER:  Thank you.

 3            MR. SPERLING:  So again, Ms. Rodriguez, to share

 4     with you, the remaining thing the plaintiffs have has to do

 5     with the deadlines for completion of plaintiffs very

 6     substantial production.  I don't want to do it now, if the

 7     Bench agree, it makes sense to do it at the end, but they

 8     have agreed to produce a lot of stuff.  And so that's why we

 9     want to walk through the overall volume of everything that

10     needs to be produced by both sides after we have gotten all

11     of your rulings tomorrow so we can work from there.  But we

12     will reserve that until after we go through all of their

13     issues.

14            THE COURT:  Do you have anything quick you could do

15     with us?

16            FEMALE SPEAKER:  We think we do, but --

17            MR. SCHAPIRO:  Yeah, we have one that will be three

18     or four minutes, I think.

19            MR. ANDERSON:  Good afternoon, Your Honor, and Ms.

20     Rodriguez.

21            Yes, this should be very quick because it's mostly

22     seeking clarification.  I'm sorry.  Sean Anderson on behalf

23     of the defendants.

24            THE COURT:  New guy.

25            MR. ANDERSON:  This should be quick --

1

2          THE COURT:  You started on a fresh slate, by the

3  way, so --

4          MR. ANDERSON:  See how this goes.  I've had a whole

5  day worth of lessons, though.

6          Like I said, this should be very quick because

7  (inaudible -- background noise).  I'll turn, Your Honor and

8  Ms. Rodriguez, to actually RFP 90 because it's concerning RFP

9  2 and 90, but both are kind of encompassed by plaintiff's

10  response in our chart 290.  And that's on pages 13 and 14 of

11  our submission.

12          And as Ms. Rodriguez is aware, and perhaps, Judge

13  Hegarty is, as well, the parties have been engaged in some

14  discussions over the last six months or so regarding the --

15  the nature of the digital files of the works-in-suit that

16  have been produced in this case.  And there is essentially

17  two sets of works -- or sorry, two sets of files that have

18  been produced.

19          One is the digital files of the works-in-suit, and

20  then the other, per plaintiff's description in the third

21  column from the left, towards the bottom of page 14 is, all

22  copies that were delivered to Audible Magic during the

23  relevant period for Audible Magic to use.

24          And so all we are seeking in terms of confirmation

25  here is to understand whether, because plaintiffs used the

1   word "exemplary files" in their response to us, which caused

2   us some, at least, confusion, if what they mean to be saying

3   is that they are going to produce a copy of -- a digital copy

4   of each work-in-suit in one bucket, and then separately, a

5   copy of each work delivered to Audible Magic during the

6   relevant time period for Audible Magic to use as they

7   represent.  And -- and if -- if so, what is the significance

8   or the operation of the word "exemplary" in their response?

9           MR. SPERLING:  I'm not actually sure why we are

10  going back and forth over this.  We -- we have told them

11  repeatedly, and we actually sent them an e-mail yesterday

12  saying, what is the daylight between what you are asking for

13  and we'd agreed to give you?  And we didn't get a response.

14          So we originally were producing one copy of each

15  work-in-suit.  We received an order from the Bench that we

16  needed to produce all timely delivered copies to Audible

17  Magic.  I mean, essentially copies that were delivered to

18  Audible Magic when the finger -- fingerprinting matching

19  process joined right before the claim period.

20          I don't remember the exact parameters, joined

21  before; but whatever the order was, that's what it was and

22  that's what we have been doing.

23          So a timely delivered copy could also be an

24  exemplary copy.  We totally produced --

25          THE COURT:  Define "exemplary."

1          MR. SPERLING:  Yeah.  So here's the easiest way to

2     think about it.  You can have multiple, like, product codes,

3     you call them the ISRC.  And the ISRC is a unique identifier

4     for a given product.  So any ISRC can only be associated with

5     one sound recording.  But a single sound recording could have

6     many ISRCs, because maybe you have the one that was included

7     in the original studio album release, and then you have a

8     separate ISRC for the single release, and you have a separate

9     ISRC for the greatest hits album; in other words, all the

10    exact same sound recording.

11          If you have a book, and you have a first printing

12    and a second printing and then you have got paperback and

13    then you have got the UK release and the Canadian release,

14    it's all the same book.

15          THE COURT:  So exemplary means producing just one

16    out of maybe four or five?

17          MR. SPERLING:  So we additionally produced one and

18    it may have been timely delivered to Audible Magic; it may

19    have been a later ISRC.  And so they have asked us to

20    identify by Bates number which ones are the timely delivered

21    ones and which ones are the other ones.  And we said, Fine,

22    we'll give you the Bates numbers for them.

23          I think that resolves the issue.  If there's

24    something more that they are asking for, we still don't know

25    what it is, and we would ask that they state it more clearly

1    because we keep asking for what it is and we haven't been

2    told what it is.

3          MR. ANDERSON:  Thank you.  So I think that makes

4    sense with respect to the files sent to Audible Magic, but is

5    the -- is your description saying -- I'll direct the question

6    to the Court.

7          I guess our question is --

8          THE COURT:  No, you can talk to him.

9          MR. ANDERSON:  Is your description of exemplary the

10   same with respect to the copy of the digital -- digital copy

11   of the work-in-suits?

12         MR. SPERLING:  It generally just means an example.

13   I -- I don't mean to be obtuse.  We produced a copy

14   originally.  It could have been a timely delivered copy.  It

15   could have not been a timely delivered copy.  If it was not a

16   timely delivered copy, we would have also produced other

17   timely delivered copies.  If it was a timely delivered copy,

18   to the extent there were -- yet other (inaudible), we

19   produced those too.

20         I -- I believe that you guys have -- and this is

21   where we are going back and forth on.  You guys have created

22   something of an artificial distinction between them, okay.

23         The only difference in universe is that some copies

24   we have produced may not have been timely delivered.  They

25   may be ISRCs, the date from after that.

1          We are happy, and will, provide the Bates numbers

2    to identify those that were not timely delivered ones, versus

3    those that were timely delivered ones.

4          Again, if that's not addressing what you want, I'm

5    totally at a loss.

6          MR. ANDERSON:  I think it does for purposes of this

7    request and what we -- what we wanted to apply for this --

8    for this process.

9          But just with all due respect, I mean, the

10   confusion, if any, was caused by some of the responses from

11   plaintiffs, which is essentially an admission that about

12   17 percent of the files that they had produced earlier in

13   discovery and represented were the same, were not actually

14   the same.

15         So that's -- that's where the disconnect is.

16         MR. SPERLING:  Whoa, whoa, whoa, whoa, whoa.  Not

17   the same as what?

18         MR. ANDERSON:  We have requested digital copies of

19   the works-in-suit, and then separately, copies of the works

20   sent to Audible Magic.  Counsel for plaintiffs had

21   represented that all but 17 percent of those two files were

22   identical.

23         So that's -- that's where the disconnect derived

24   from, if anything, which was a representation by counsel.

25         MR. SPERLING:  I apologize, I still don't

1   understand the disconnect.

2           There can be many, many ISRCs, okay, for single

3   sound recording.  Again, you take the book analogy.  You can

4   have the hard copy, the paperback, the large-print edition,

5   the UK release, the Canadian release, the Australian release,

6   all right, they are all the same thing, okay.

7           We are identifying for you, by Bates number, okay,

8   those copies that we have produced that were so-called timely

9   delivered and those that we produced that were not timely

10  delivered so that whatever analysis you want to do with

11  respect to the timely delivered ones, you know which ones

12  were timely delivered and which ones weren't.

13          We haven't said anything misleading.  We haven't

14  said anything wrong.  We are confused by your questions.  And

15  since we have agreed to give you what you are asking for, I

16  am not sure what we are continuing to talk about other than

17  you taking a pot shot.

18          THE COURT:  Do you understand or not?

19          MR. ANDERSON:  I understand that.  The response he

20  gave previously about clarifying the request we teed up for

21  discussion today, I understand that and that is what we

22  sought.  I was merely trying to correct the record with

23  respect to his assertion that there was a false construct

24  when this, quote/unquote --

25          THE COURT:  The bottom line for me is, do you have

229

1    what you need?

2          MR. ANDERSON:  I do, Your Honor.  Thank you.

3          THE COURT:  Okay.

4          MR. SPERLING:  Great.

5          SPECIAL MASTER:  Anything else we can do for the

6    good of the order in the next one minute.

7          MS. ALVAREZ:  One thing we wanted -- I'm sorry, and

8    then I'll let Mr. Rosenthal speak, because I think he had one

9    clarification issue.

10         But we had wanted to mention that when we had the

11    conference with Your Honor on February 1, we had discussed

12    with Your Honor the fact that the parties were in dispute

13    with respect to the production of track-level financials.

14    And you had invited us to make our request in writing to

15    plaintiff, which we did.

16         There -- we did not get -- we did not find a middle

17    ground there.  And so, per Your Honor's instructions, we

18    submitted briefing on that.  I know you stated earlier

19    briefing might be bold on --

20         THE COURT:  Well --

21         MS. ALVAREZ:  -- on the papers, but --

22         THE COURT:  -- what I meant was any formally filed

23    motion would be ruled on paper.  If I can possibly rule on a

24    brief issue that is not on CM/ECF, I would like to.  So this

25    one was just informal briefs?

230

 1           MS. ALVAREZ:  It was, Your Honor.  It was letter

 2  briefing that was submitted this weekend.  And --

 3           THE COURT:  This weekend?

 4           MS. ALVAREZ:  Yes.  Unfortunately, this weekend.

 5  But it was part of the process that Your Honor had -- it was

 6  the timing that Your Honor had -- had requested.

 7           The reason why we bring it up today is because, you

 8  know, we have been discussing depositions today and the case

 9  schedule.  And it was said earlier that no depositions have

10  started.

11           In fact, we have been taking depositions on our

12  end.  We would like to continue a pace with that, pursuant to

13  Judge Jackson's guidance that we need to stay on schedule to

14  meet his trial date.

15           This data is a gating item for some of the

16  depositions that we need to take.  So that's -- that's the

17  timing sensitivity of that.

18           MR. OPPENHEIM:  Your Honor, do you want to hear

19  argument on this issue this evening, or do you want to put

20  this over until in the morning?

21           THE COURT:  Well, is this the issue that -- that

22  Ms. Rodriguez ruled on, I disagreed with it, and Jackson

23  disagreed with me?  No.

24           MS. ALVAREZ:  No.  I --

25           MR. OPPENHEIM:  Judge Jackson -- I'm sorry.  Go

1    ahead, please.

2              MS. ALVAREZ:  Different issue.  It's not one that

3    was, as I understand it, addressed with Ms. Rodriguez.  It

4    was brought up with you because of the way that Judge Jackson

5    ruled on the issue earlier in the case was with leave for us

6    to revisit it if we had grounds to do so, based on

7    developments in the case.

8              So we presented to you why we believe we need that

9    information for depositions and for expert analysis and in

10   light of the 30(b)(6) deposition that we had already taken of

11   one of representatives of Universal, the publisher group.

12             THE COURT:  And the hash value was what was used in

13   the violation notices?  No?

14             MS. ALVAREZ:  So we also have an issue with the

15   hash report.  So, apologies, there are a lot of issues.

16             THE COURT:  Okay.

17             MS. ALVAREZ:  This one has to do with the financial

18   data and the sufficiency of the financial data that's been

19   produced by plaintiff.

20             THE COURT:  The per-work data?

21             MS. ALVAREZ:  The financial data.

22             MR. OPPENHEIM:  Correct, Your Honor.

23             THE COURT:  Per work.

24             MS. ALVAREZ:  Pardon?

25             THE COURT:  Per work at issue?

 1          MR. SPERLING:  Correct.

 2          MR. OPPENHEIM:  Correct.  And Judge Jackson, when

 3   he ruled on it, he really said two things.  He said -- and

 4   perhaps this might trigger your memory.

 5          He says:  It's inconceivable that a jury could

 6   examine that number of works, the 11,000 works, individually

 7   calculate damages separately on a work-by-work basis.  And so

 8   he then went on said that the provision of the information

 9   that we gave them from the Cox case he believed was a

10   sufficient sample from which reasonable inferences could be

11   drawn.

12          And, respectfully, I don't believe that you can

13   read Judge Jackson's order to say that he allowed Charter to

14   come back and relitigate this issue.

15          What Judge Jackson said was that if there were

16   other types of discovery that would speak to the issue of

17   damages, that that door was always open.  And -- and --

18          MR. ANDERSON:  Your Honor --

19          THE COURT:  Well, I'm certainly not going to review

20   anything Judge Jackson did.  Did you -- did you give us a

21   transcript of where he said all of this?  Was it a written

22   order?

23          MR. SPERLING:  It's a written order.  It's a

24   written orders, Your Honor.  I see you looking at your

25   watches, I wonder if we should just put this over until

233

1    tomorrow --

2            MS. ALVAREZ:  We're happy -- we're happy --

3            MR. SPERLING:  -- (inaudible) the timing issues, as

4    well.

5            MS. ALVAREZ:  We are happy to put it over until

6    tomorrow.  We just wanted to -- to make sure it was clear

7    that was yet -- it was another brief issue that was

8    submitted.

9            SPECIAL MASTER:  What docket number is the briefing

10   that you are referring to?

11           MR. ANDERSON:  I have it right here.

12           SPECIAL MASTER:  Yeah, sorry. What is the --

13           MR. ANDERSON:  Plaintiffs was last night.  It's

14   Docket 383 and ours was 378.

15           SPECIAL MASTER:  378 is the one that we saw.

16           MR. SPERLING:  What time are we convening tomorrow?

17           SPECIAL MASTER:  We have from Charter 378 and 379.

18           THE COURT:  I don't think we have 383.

19           MR. ANDERSON:  378 is Charter's submission, which

20   was filed on Saturday, along with the chart.  And plaintiffs

21   was filed last night at 383.

22           MR. SPERLING:  We can make a hard copy of 383

23   tomorrow.  It's four pages.

24           SPECIAL MASTER:  I don't have that one.

25           MR. SPERLING:  Yeah, we'll bring it to you.  It's

1    -- it's really short.

2            SPECIAL MASTER:  Okay.

3            MR. SPERLING:  Three pages, three and a half.

4            SPEAKER:  (Inaudible).

5            SPECIAL MASTER:  Okay, thanks.

6            MR. SPERLING:  What time will we all see each other

7    tomorrow morning?

8            SPEAKER:  I think Jackson's -- Judge Jackson's was

9    159, not 8.

10           MR. OPPENHEIM:  All right.  I stand corrected, I

11   apologize.

12           THE COURT:  9:15?

13           MR. SPERLING:  That's good for plaintiffs.

14           THE COURT:  Okay.  Based on what we have done

15   today, and you believing that you are going to use one-tenth

16   of the words that they used, what -- how long do you think it

17   will last?

18           MR. SCHAPIRO:  I -- it's a vague assumption.  But,

19   yeah, I think we can be done by early afternoon.  Probably a

20   few hours, to be safe.

21           THE COURT:  Okay.  Well, a few hours, even giving

22   you three, would take us to noon.  So maybe 12:30, 1:00?

23           MR. SCHAPIRO:  Yeah.  It's going to be -- you know,

24   if everything goes well, maybe it's a little before noon,

25   everything goes badly it's at 2:00, I just don't want to

235

1    predict that, but I'm booking -- I'm changing my flight to

2    something around 4:00 in the afternoon, in hopes that we will

3    be done by then.

4              THE COURT:  Okay.  All right.  Great, thank you,

5    guys.

6              SPECIAL MASTER:  Thank you so much.

7              THE COURT:  We are in recess.

8              (Whereupon, the within hearing was then in

9    conclusion at 4:12 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

236

```
1                    TRANSCRIBER'S CERTIFICATION

2     I certify that the foregoing is a correct transcript to the

3     best of my ability to hear and understand the audio recording

4     and based on the quality of the audio recording from the

5     above-entitled matter.

6

7     /s/ Dyann Labo                    February 26, 2021

8     Signature of Transcriber                   Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```