1

```
1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
2
      Case No. 19-cv-874-RBJ-MEH
3     _____

4     WARNER RECORDS, INC., et al.,

5          Plaintiffs,

6     vs.

7     CHARTER COMMUNICATIONS, INC.,

8          Defendant.
      _____
9

10            Proceedings before MICHAEL E. HEGARTY, United

11    States Magistrate Judge, United States District Court for the

12    District of Colorado, and REGINA M. RODRIGUEZ,

13    Court-Appointed Special Master, commencing at 9:18 a.m.,

14    February 23, 2021, in the United States Courthouse, Denver,

15    Colorado.

16    _____

17    WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE HEREIN
      TYPOGRAPHICALLY TRANSCRIBED. . .
18    _____

19                         APPEARANCES

20            JONATHAN M. SPERLING, JEFFREY M. GOULD, SHIRA

21    POLIAK, MATTHEW J.  OPPENHEIM, ALEX KAPLAN, STACEY GRIGSBY,

22    ANDERS LIDEROT, J. HARDER EHLERS, Attorneys at Law, appearing

23    for the Plaintiffs.

24    _____

25            IN COURT HEARING: UNRESOLVED DISCOVERY DISPUTES
```

2

```
 1                    APPEARANCES (continued)

 2             ANDREW H. SCHAPIRO, LINDA J. BREWER, GRACIE CHANG,

 3    JOHN ROSENTHAL, ERIN R. RANAHAN, JACK M. TANNER, ALLISON H.

 4    HUEBERT, JENNIFER A. GOLINVEAUX, SEAN ANDERSON, CECIE

 5    ALVAREZ, Attorneys at Law, appearing for the Defendant.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                    P R O C E E D I N G S

2              (Whereupon, the within electronically recorded

3    proceedings are herein transcribed, pursuant to order of

4    counsel.)

5              (Audio was poor at times, resulting in inaudibles.)

6              THE COURT:  All right, same cast of characters, a

7    little bit different seated situation.  Please begin.

8              MR. SCHAPIRO:  Your Honor, I think we'll begin with

9    some of the items on our chart, but we have a few topics as

10   to which we've either reached compromise or decided, even if

11   we win, it's not necessarily worth the battle.  So I think

12   Mr. Anderson will take the lead on that.

13             THE COURT:  Well, good, because I think the high

14   ground is unoccupied at the moment, so it looks like you're

15   taking the high ground.

16             MR. ANDERSON:  Okay, certainly.  So as a

17   preliminary matter, we did raise a few interrogatories to

18   which -- in our chart, and those are at pages 24 and forward,

19   starting with interrogatory 20.  And it's not that we're

20   fully withdrawing these interrogatories for the moment, but

21   we do want to see if we can reach a compromise with

22   plaintiffs, which is, essentially, plaintiffs have objected

23   to these interrogatories because we request information on a

24   work-by work basis.

25             In other words, Interrogatory 20 is for each

4

1   copyright work on a work-by-work basis:  State the legal and

2   factual basis for your contention that Charter knew of

3   specific instances of infringement by a Charter subscriber or

4   was willfully blind to such instances.  That's alleged in

5   their complaint.

6           While we're not conceding that interposing

7   objection -- proposing objection -- interrogatory, such as

8   this on a work-by-work basis for this type of information is

9   improper in an effort to reach a compromise, we would request

10  that plaintiffs, if not on a work-by-work basis, generally

11  provide the information requested by the interrogatory to the

12  extent that it can be generally applied to the works-in-suit.

13          And that would be the same with respect to 21,

14  which is a bit of a modification on 20.  And I have a

15  separate proposed compromise with respect to 22, but I can

16  stop there.

17          MR. SPERLING:  I think that  if I understand the

18  proposal correctly, that they want a generic response,

19  recognizing that it sort of has a factual predicate that's

20  disputed between the parties as to what's the relevant

21  question:  Whether they're on notice of works or notice of

22  infringing subscribers, that's fine as to those two.  We can

23  provide a generic answer as to all.

24          THE COURT:  Is that what you wanted to hear?

25          MR. ANDERSON:  More or less.  I mean, with respect

5

1    to the dispute over the -- the notice question, I mean, we

2    would ask for our interrogatory to be answered as posed.  You

3    can interpose further objections, legal or otherwise, if you

4    likes but --

5              MR. SPERLING:  Like I said, we'll give an answer.

6    We're not just going to proceed to object and not provide an

7    answer, we'll provide a generic answer as to all.

8              THE COURT:  What's a generic answer?

9              MR. SPERLING:  An answer that -- an answer that is

10   sufficiently general that it applies to all, which is what I

11   understand --

12             THE COURT:  Okay.

13             FEMALE SPEAKER:  -- him to be asking for.

14             THE COURT:  Yeah, when I was propounding

15   interrogatories as a lawyer and the other side said, I'll

16   give you a generic answer to that one, I don't think I would

17   have liked that too much.

18             MR. SPERLING:  I understand that only to be what he

19   is asking for, is -- was the alternative that we object to,

20   which is work-by-work for 11,000 works.

21             MR. ANDERSON:  Not to get mired in semantics, but

22   what I did say was "generally applicable" and I think

23   Mr. Sperling said that, but he also intermixed that with

24   "generic," so I appreciate --

25             THE COURT:  I like "generally applicable" better

6

1    than "generic."

2              MR. ANDERSON:  Yes, I do --

3              THE COURT:  So I'll accept your term.

4              MR. ANDERSON:  All right, thank you, Your Honor.

5              All right, turning to Interrogatory Number 22, this

6    is another work-by-work interrogatory.  And again, we don't

7    concede that interposing such interrogatory is improper under

8    the law.

9              However, again, we compromise -- you know, we

10   understand that plaintiffs to be saying, through their

11   objections, that essentially -- well, I'll give a preview as

12   to what the interrogatory seeks.

13             It's a determination or a calculation of the kind

14   of actual damages, or actual economic harm on a work-by-work

15   basis.  We understand that the objections that plaintiffs

16   seem to be interposing are that they are not seeking actual

17   damages, they haven't done that type of analysis, and they

18   don't need to do that type of analysis.

19             If the crux of it is, essentially, they don't have

20   that information, we would request that plaintiffs simply

21   state in the interrogatories that they have not calculated

22   this information on a work-by-work basis.

23             MR. GOULD:  Good morning, Ms. Rodriguez and Judge

24   Hegarty.  This is Jeff Gould --

25             THE COURT:  Yeah, good to see you.

1          MR. GOULD:  -- from D.C.  So this interrogatory is

2    problematic in a number of ways.

3          I -- if I'm understanding Mr. Anderson's proposed

4    compromise is they're now looking for an admission that

5    plaintiffs have not calculated the actual damages for work.

6          Am I understanding that correctly?

7          THE COURT:  I think so.

8          MR. ANDERSON:  Or a response that notes that this

9    information is not in the plaintiffs' possession because it

10   is not something that plaintiffs perform or possess.

11         THE COURT:  Right.  That's a longer way of saying

12   you haven't done it, so.

13         MR. GOULD:  Yeah.  I think, consistent with the

14   interrogatories we just discussed, we can provide a narrative

15   answer that acknowledges that, consistent with what our

16   expert will say, is the actual damages are -- cannot be known

17   with certainty and we haven't calculated it.

18         THE COURT:  Okay.  That's the last part you wanted;

19   they haven't calculated it?

20         MR. ANDERSON:  Yes, thank you, Your Honor.

21         THE COURT:  That's what I said.

22         MR. ANDERSON:  I heard that.

23         THE COURT:  Okay.

24         MR. ANDERSON:  Okay.  So those are the three

25   interrogatories that we did not think there should be a big

8

1   dispute on, based on our proposed compromises, so we

2   appreciate the plaintiffs' willingness there?

3          THE COURT:  Can I ask a question?

4          So if you don't put on evidence of actual damages

5   and the statutory damages are somewhere between 1,000 and a

6   100,000 a work; is that right?

7          MR. ANDERSON:  750 and 150.

8          THE COURT:  750 dollars --

9          MR. ANDERSON:  Dollars, and 150,000.

10         THE COURT:  -- 150,000?  All right.  What -- and

11  you don't have any proof as to actual damages, what is the

12  proof that goes into allowing -- assisting in a jury to pick

13  a number between $750 and $150,000 per work?

14         MR. SCHAPIRO:  Your Honor has probably, at times,

15  been involved in criminal sentencings where there is a range

16  and then there is a bunch of factors and --

17         THE COURT:  Yeah, but many are based on the conduct

18  of the defendant.  Is that true here?  The conduct of the

19  defendant will largely determine where that falls between

20  those two numbers?

21         MR. SCHAPIRO:  Yes.  The fight -- but also the harm

22  to -- suffered by the plaintiff, as well.  The jury is

23  entitled to look at -- if -- it as very broad standard that

24  allows the jury to look at almost anything that you want to

25  present.  And I will tell you, if this goes to trial, the --

9

1    you know, as I think you know, there was a trial a year or

2    two ago, the BMG case, where the jury chose the very bottom

3    level, $750.  There was the Cox trial where they chose

4    $100,000, and the battle between the sides is they're going

5    to be saying, We're terrible and look at all the notices that

6    they got, and not just the notices in this case, but all of

7    these other notices about which you're going to hear

8    something in a moment. And they're going to say, you know,

9    They profited and they're terrible.

10           And we're going to say, assuming there is liability

11   and, hopefully, there wouldn't be liability, we're going to

12   say, Absolutely not, we did -- if there was some more that we

13   could have done in this case, that's the most that they've

14   proved, then you should give $750 here because they were

15   barely damaged.  In fact, they were probably helped by the

16   sharing and the virility of getting some of their songs out

17   in this case.

18           THE COURT:  What is the evidence of that?  I mean,

19   obviously, you can't just make argument; argument is not

20   evidence.

21           MR. SCHAPIRO:  Yeah, there will be evidence of

22   that.

23           THE COURT:  What will that look like?

24           MR. SCHAPIRO:  That will be expert testimony --

25           THE COURT:  Okay.

1        MR. SCHAPIRO:  -- talking about how marketers --

2   marketers and artists try to get their songs out by various

3   means and that getting a song out and shared and becoming

4   viral actually benefits an artist, a song, a recording.

5   We've all seen that --

6        THE COURT:  You go on YouTube and you watch it and

7   somebody advertises for you to watch it.  And you watch that

8   advertisement and money is generated by people?

9        MR. SCHAPIRO:  There you go.  And you're going to

10  the concerts, which is actually how artists make most of

11  their money these days.  I mean, I'm not telling the

12  plaintiffs anything that they don't already know.

13       So there are going to be some fights from -- among

14  experts about that.  And we're also going to be saying, Look,

15  they're making so much money from actually using the

16  Internet, the pipe that we provide, that -- you know, this is

17  fake.  This is -- this is -- their business model for a

18  period in the middle of -- of the -- of the last decade was,

19  Well, we haven't quite figured out how to make money in the

20  new digital world.  I know how we can make money, let's sue

21  the Internet providers.

22       THE COURT:  Well, that's another question I have

23  right there.

24       So you know there is a business model out there in

25  some industries, like the ADA tester cases.  And I had all

1     the Malibu media cases, they were all assigned to me in this

2     district.  And that was -- they weren't, just by their own

3     admission, if I can recall, because I had settlement

4     conferences with the owner of Malibu media, the founder, they

5     weren't just suing people because they were outraged somebody

6     was doing this; this was actually a way they were going to

7     improve their bottom line.

8              MR. SCHAPIRO:  Of course.  That's what's happening

9     here.

10             THE COURT:  And so it was a business thing.

11             Now, if a lawyer -- if you go to a lawyer and say,

12    Hey, can we sue people and make money that way too because

13    we're kind of hurting in these other sectors?  And the lawyer

14    says, Yeah, I think you can, let me look into it.  And the

15    lawyer says, Yeah, here is how you do it.  Is that a lawyer

16    acting as a lawyer or a lawyer acting as a business person?

17             MR. SCHAPIRO:  Sounds like business person to me.

18             THE COURT:  Well, I know you'll say that.

19             But that's a question here for me because I -- I

20    haven't had any evidence of this, but if was there an intent,

21    through litigation -- like when people sue -- when people

22    just stockpile patents, right, and then they sue for the

23    purpose of equity partners wanting to make some money and so

24    they find people to sue and get a bunch of people to invest

25    in that lawsuit, it's just an investment.

1           It is such a blend of business and law, it's

2    incredible, but --

3           MR. SCHAPIRO:  It's very similar to what patent

4    trolls do.  And, you know, these folks are maybe a little bit

5    more sophisticated than the clumsier ones, like Rightscorp,

6    although this will all go to why -- how we perceived the

7    notices that we received, and it will all go to why the

8    reliability of the notices is a very important piece of our

9    defense, that this is, essentially, a stickup.

10          And you'll recall Rightscorp is the one that goes

11    out, sends a thousand in a day about one song and then sends

12    a note to the -- to the subscriber, or the alleged infringer,

13    saying, You violated federal law, but if you pay us $25,

14    we'll go away.  And that was their model.

15          And so there will be evidence about that, Your

16    Honor.

17          THE COURT:  Okay.  So, Jonathan, or whoever is

18    going to speak for the plaintiffs, if a company decides we're

19    going to make money this way, in addition to the other ways

20    we make money, and it analyzes how do that and it involves

21    lawyers in an analysis, but it really is a way that they're

22    going to try to make money, that's kind of a blend of legal

23    advice and a lawyer serving as part of the business model of

24    the company, don't you think?

25          MR. SPERLING:  It's an inapplicable hypothetical,

13

1    Your Honor.  It's just not what happened here.

2            I mean, I'm going to let Mr. Oppenheim speak to

3    sort of a fuller response to what Mr. Shapiro said.  But the

4    premise that that's what's going on here, it's a little bit

5    silly.  And I will limit my remarks to this and pass it to

6    Mr. Oppenheim.

7            You know, a patent troll doesn't do anything.  The

8    analogy is kind of silly.  We develop, promote, go-to-market

9    music.  It's a commercial enterprise and it's a commercial

10   enterprise that benefits us and benefits our artists and

11   benefits our composers, right.  And if people buy the music,

12   everybody is happy.  People love the music, right.  The

13   creators get rewarded, right.  And we're rewarded for the

14   significant role that we play in bringing that to market.

15           Then there's the subscribers who chose to steal our

16   stuff.  So patent trolls are, people get a patent, don't do

17   anything with it.

18           THE COURT:  Well, how many subscribers has the

19   company sued -- have you -- has the recording artist sued?

20           MR. SPERLING:  Pardon me?

21           THE COURT:  How many subscribers have the recording

22   artists sued?

23           MR. SPERLING:  So I don't know the specific

24   numbers.  I'm going to pass to Mr. Oppenheim, but the

25   suggestion that --

14

1          THE COURT:  No, no.  Have they sued individual

2   people?

3          MR. SPERLING:  There -- yes, there have been such

4   instances, absolutely.

5          THE COURT:  Okay.

6          MR. OPPENHEIM:  So, Your Honor, so let me back up

7   if I may, Your Honor.  There are two issues that have been

8   raised here.

9          One is what is -- what's the statutory construction

10  to getting damages?  And the other is, what are plaintiffs

11  doing here?

12         Let me start with the latter --

13         THE COURT:  No, I don't want to make it into a big,

14  long discussion.

15         MR. OPPENHEIM:  I'm not.  I'll keep it short, Your

16  Honor.

17         THE COURT:  I don't need a medora going on here.

18         MR. OPPENHEIM:  The suggestion --

19         THE COURT:  What?

20         MR. OPPENHEIM:  Your Honor, the suggestion that

21  this is a situation where the plaintiffs are acting like

22  patent trolls is, frankly, a little offensive.  There has

23  been a mass of ongoing infringement on the Charter network

24  where Charter's aware of certain customers of theirs who have

25  been the subject of tens of thousands of notices, and Charter

15

1   has done nothing about it.

2            And these are not people who are sitting out there

3   doing nothing.  What they're doing is, they're taking music

4   that is owned by the owner license, by the plaintiff, and are

5   being monetized by the plaintiff.  And these Charter

6   subscribers are distributing it to anybody on the Internet

7   who wants it for free.

8            And the reason damages can't be calculated here is

9   because this type of technology does not warrant or allow you

10  to observe the quantum of distribution that occurs.

11           So we don't know whether any particular

12  subscribe- -- Charter subscriber distributed a particular

13  song a hundred times or a million times.  And so you can't

14  calculate the cost of damages.  And even if you could, since

15  they're distributing a file that is then redistributed, it

16  makes the calculation even more difficult.  And -- and so it

17  can't be calculated.

18           That doesn't mean that there is a massive, massive

19  harm, and here is how we know that there is massive, massive

20  harm, and this is testimony that came out of Cox -- in the

21  Cox case.

22           There is a direct correlation between what happened

23  to the music industry's revenues when peer-to-peer piracy

24  took off, and the correlation is very clear.  And the record

25  companies profits -- excuse me, revenues dropped like -- it

16

1    plummeted like a bolder over a cliff, while Internet

2    companies, like Charter, chose to profit massively off of

3    these individuals using the network to distribute the music.

4          The suggestion that while the companies -- while

5    the record companies are getting slaughtered by this

6    infringement, that they're now acting as a troll for

7    protecting their rights to compensate their artists, which,

8    by the way, we're not just talking about the Bruce

9    Springsteens of the world.  We're talking about the backup

10   union musician.  We're talking about the producers.  We're

11   talking about lots and lots of people in the music ecosystem

12   who are compensated by this.  Lots and lots of people who

13   lost their jobs because of this piracy.

14         So how does this fit within the damage's framework.

15   The Supreme Court has said, in the long-standing and

16   unrefuted case of -- the Woolworth case, that a plaintiff

17   copyright holder need not show any actual damages in pursuing

18   the statutory damages.

19         And the reason for that is because statutory

20   damages were enabled -- enacted by Congress because, in some

21   instances like this, it's impossible to determine --

22   determine the actual damages.

23         And so there is a series of factors that the jury

24   gets to consider when determining what the damages are, what

25   statutory damages should be.  That includes:  What are

17

1    plaintiffs' losses?  What are the defendant's gains?  What is

2    the need for deterrence?  What is the defendant's

3    culpability?  And what is the need to punish?

4           And the jury gets to consider all of those a

5    factors and, as Mr. Shapiro said, they're given broad

6    discretion within those factors.

7           But I really doubt to push back the idea that when

8    a plaintiff is protecting their rights and seeking to recoup

9    massive losses from those who have gained as a result of that

10   activity, that they're acting improperly in any way.

11          THE COURT:  What's your next issue?

12          MR. ANDERSON:  Okay.  So this is essentially a

13   helpful segue to an issue we briefly discussed at the end of

14   the day yesterday, which is Charter's request for the balance

15   of the, for lack of a better term, pro work revenue, or

16   track-level revenue.

17          As Your Honor will recall, what was produced in

18   this case to date is the information that plaintiffs compiled

19   in the Sony case.  So that is information between 2011 and

20   2014, whereas the claim period here is 2013 to 2016.  And

21   it's only for the works that were at issue in Sony where

22   there is only about an 80 percent overlap of the

23   works-at-issue here.

24          So what we're missing in this case is two full

25   years of claim period, two years which are unique in the

1    sense that those are the years during which streaming kind of

2    took off, and also information pertaining to 20 percent of

3    the works for the entire claim period.

4         Now Your Honor, when he set this procedure up on

5    February 1 and also requested that the parties submit

6    supplemental briefing on this by the weekend -- this past

7    weekend -- noted that there would be a presumption of

8    production of this information and it should happen sooner

9    than later.

10        And that makes sense because back when we last

11   discussed this, Your Honor has held that his order with

12   respect to producing the information from Sony in this case

13   was without prejudice.

14        Now, Charter does not disagree with plaintiffs in

15   their submission where they say that Judge Jackson and Your

16   Honor left open the ability for us to seek other information

17   pertaining to actual damages in this case.  That -- that

18   remains open and we intend to do so, including through the

19   interrogatory we just discussed in upcoming depositions.

20        But nothing changes the fact that Your Honor

21   allowed to us revisit this, should we be able to show (1),

22   that -- continue to show that it's relevant, which this

23   morning's discussion solidifies.  And also that we can show

24   that it's needed by our experts, which we can discuss in

25   moment.  And further, we can also show that we know that

1    plaintiffs -- and they don't dispute this -- plaintiffs have

2    this information.  It's readily accessible in their systems.

3    Of course, it is.  Of course, they know how much each of

4    their tracks generate in revenue.

5              And if there's issues as to how to be compiled and

6    how to mitigate some of those -- some of those concerns, we

7    can discuss this.  But as it stands right now, our experts,

8    who were engaging with and as we're preparing for

9    depositions, don't have any data pertaining to 20 percent of

10   the work-in-suit.  That's worth hundreds of millions of

11   potential statutory damages.

12             And just to address one other point that was

13   brought up at the end of the day yesterday, which Judge

14   Jackson also flagged in his order, the notion that we're

15   somehow going to sit down with a jury and walk the jury

16   through each and every one of these works, that's not --

17   that's not --

18             THE COURT:  I -- I understand.  You're going to --

19             MR. ANDERSON:  We're going to synthesize it.

20             THE COURT:  You're going to accumulate the

21   information.

22             MR. ANDERSON:  Yeah.  And we're going to pull out

23   the exemplary -- the exemplary works, but we need to be able

24   to tell the jury that we looked at everything.  That is the

25   only way that this is convincing.

20

 1            These are very talented lawyers, obviously, and

 2    they're going to exploit any vulnerability that there is.

 3    And the burden here is certainly, certainly outweighed by the

 4    importance of this work.

 5            And as Your Honor also asked this morning, you

 6    know, and as Mr. Shapiro walked through, and also Mr.

 7    Oppenheim, there is a range of factors at issue here with

 8    respect to statutory damages.

 9            The focus from the plaintiffs' point of view is

10    going to be on Charter's culpability.  They're going to

11    hammer that point.  We need to ground that narrative with

12    facts.  And the fact that we have to ground it to shift the

13    narrative to -- to what is the relative value of the

14    works-in-suit; how certain works-in-suit made no money over

15    the claim period; how, despite there being zero infringement

16    notices for a particular work and very little revenue, that

17    means that that work is differently valued than others.  All

18    of these factors are things that should be considered by the

19    jury and -- and our expert needs to consider at this point in

20    time.

21            MR. SCHAPIRO:  Can I just add one thing.  We had

22    the deposition -- we had the deposition of the 30(b)(6)

23    witness from the UMPG music publishers a couple weeks ago,

24    and we showed him what we have been permitted to use here,

25    which is the list of pro work revenue from the Cox case,

21

1   which Mr. Anderson refers to as the "Sony case," just as, you

2   know, plaintiff and defendant.

3         And we showed him that and he was, understandably

4   enough, puzzled because he -- we represented what it was.

5   And we said, Well, we've been permitted to use this one,

6   which had some overlap, and we walked him through it.  But he

7   said, Well, if I were going to talk to you about our works, I

8   guess I would need to see the list that corresponds to our

9   works.

10        So we're just asking that we be allowed to show

11  them the works that are at issue here, that was done in Cox.

12        MR. OPPENHEIM:  So, Your Honor, this is Matt

13  Oppenheim and I'll address that.

14        The presentation right now on Charter ignores

15  what -- exactly what Judge Jackson said, ignores what you

16  said and ignores the arguments as to why this doesn't make

17  any sense, even if you -- even if you put aside Judge

18  Jackson's ruling and what your ruling says.

19        What Judge Jackson said when he ruled was, they had

20  enough based off of the sample that you had ordered for them

21  in order to -- for them to create reasonable inferences, and

22  he did not permit them to come back and reargue this.  And

23  that's exactly what they're doing.

24        What he did, was he said they can seek other types

25  of damage information if they like, which is not an

1   invitation to reargue over what they already lost, which was

2   this issue.

3           MR. ANDERSON:  Your Honor, if I may interrupt

4   there --

5           MR. OPPENHEIM:  And, technically -- if I may -- if

6   I can just finish be, please -- what you said, both in the

7   ruling that went up to Judge Jackson -- and this is

8   important -- is you ordered the provision of this Cox data.

9   And then you said, because you thought that that sample would

10  be enough, in light of the massive burden here -- and I need

11  to talk to that burden in a second.

12          But you then said that they are -- they could take

13  a 30(b)(6) on this issue.  And if you can show me that, in

14  fact, the plaintiffs' counsel was incorrect, that we have a

15  way of doing this differently than what we had explained --

16  and this goes to the burden issue -- then they could come

17  back.  Because the burden here is massive.

18          The plaintiffs do not track this information in a

19  computerized way that it can be done easily.  And we provided

20  burden affidavits in the original briefing, which described

21  that, in the Cox case, it took multiple people full-time

22  eight weeks to pull even that limited data and that limited

23  data is not even everything that they're asking for here on

24  the Cox works.

25          So not only are they adding new works, and they're

1   adding a new timeframe, but they're actually asking for

2   revenue streams that weren't gathered in Cox.

3          And so if you think that in the Cox case, it took

4   eight weeks for a tiny fraction of what they're asking for

5   now, right, now, go back to what you said at the hearing --

6   your hearing.  You said if they took a 30(b)(6) and

7   established that we actually could provide this information,

8   that you would revisit it.  They haven't done that.

9          What Mr. Schapiro has said, is that Mr. Kokakis was

10  confused by what he was presented with.  By the way, they

11  haven't submitted any deposition testimony.  And there is a

12  reason for that, because the record from that deposition was

13  very unclear.  They didn't explain to Mr. Kokakis what they

14  were showing him, he was confused.

15         That happens from time to time in deposition, but

16  they certainly didn't create the record that you invited them

17  to create.

18         THE COURT:  Well, wait, wait.  Who was defending

19  the deposition?

20         MR. OPPENHEIM:  Alex Kaplan, who is on the phone.

21         THE COURT:  I just can't believe an attorney --

22         MR. ANDERSON:  Your Honor --

23         THE COURT:  I can't believe an attorney on your

24  side would allow your witness to give confused testimony

25  without somehow stopping and correcting it.  That's

1   unbelievable to me.  I don't think that happened.

2          MR. ANDERSON:  Your Honor, if I could address this

3   last point.

4          THE COURT:  Hold on, let him finish.

5          MR. ANDERSON:  Oh, I thought he was finished.  I'm

6   sorry.

7          MR. KAPLAN:  Your Honor, this is Alex Kaplan.  I

8   was there.

9          I did eventually step in to point out that the --

10   that the witness was not understanding what counsel was

11   testifying.  Frankly, I didn't want to interrupt

12   Mr. Schapiro's deposition.

13          THE COURT:  Well, I mean, yeah, interrupting a

14   deposition is one thing; but allowing your client, your

15   witness to give false testimony or garbled testimony or

16   incorrect testimony is just something we all have to fix

17   right on the spot, you know, so.

18          MR. KAPLAN:  Absolutely, Your Honor.  But he did

19   not give false or garbled testimony.  Mr. Schapiro put the

20   track-by-track revenue spreadsheet from the Cox case in front

21   of the witness, which had a different number of tracks than

22   the witness understood that UMPG had at issue in this case.

23   And the witness pointed that out and said he was confused.

24   He didn't give false or incorrect testimony.

25          THE COURT:  Okay.

1          MR. SCHAPIRO:  And that's why we need the -- and

2   that's why we need the actual tracks in this case so we don't

3   have to show them tracks from a different case.

4          THE COURT:  Well, so what I don't -- I mean, Mr.

5   Oppenheim is proffering a burdensome argument that, sitting

6   here, I can't test and we can't know that.

7          MR. ANDERSON:  Your Honor, I have a -- I have a

8   little bit more I would like to --

9          THE COURT:  Go ahead.

10          MR. ANDERSON:  -- to add on the -- on the burden

11   point.

12          So, you know, the burden declarations that were

13   submitted in connection with the original briefing on this,

14   we requested a vast array of financial data, including profit

15   and loss statements on a work-by-work basis.  And plaintiffs

16   said that that was not possible, and that makes sense -- some

17   sense if they haven't calculated their expense on a

18   work-by-work basis.

19          When it comes to generating some type of report

20   that will show what they've earned on a work-by-work basis,

21   they, still today, maintain that there is such a burden.

22          However, in the Sony case -- and this goes to Mr.

23   Oppenheim's point and Your Honor's instruction as to bringing

24   forward some evidence that -- that maybe plaintiffs were

25   mistaken in how they were articulating their burden.

1          In the Sony case, Mr. Abbotwall (ph), for example,

2    who is in-house litigation counsel for Sony/ATV EMI, the Sony

3    Music Publishing group here, one/sixth of the case, he put a

4    forward declaration in this case that said, as Mr. Oppenheim

5    essentially just described it, this is a very burdensome

6    process.

7          However, in Sony vs. Cox, the person who actually

8    created the document at question here, Mr. Tom Foley, he was

9    deposed.  And the question was:  How was this document

10   created, this per-work revenue?  Sony's royalty

11   administration system has a series of reports that we can

12   run.  And one of them --

13          MR. GOULD:  Excuse me -- excuse me.  This is a

14   confidential transcript --

15          MR. ANDERSON:  Mr. Gould, this was produced in this

16   case.

17          MR. GOULD:  Oh, I apologize.

18          MR. ANDERSON:  Sorry, I should have said at the

19   outset.  I know that there are some sensitivities there,

20   okay.

21          He said, Sony's royalty administration system has a

22   series of reports that we can run and one of them is by Sony.

23   So the report allows us to generate a historical income on a

24   song-by-song basis.  There were a limited number of songs

25   here, so I queried the songs that were specific to this list

27

 1   and provided historical earnings from calendar years 2011 to

 2   2014.  So every song is in this catalog?  Yes.

 3          Similarly, he said -- I asked:  You described a few

 4   moments ago that this system you were able to query in order

 5   to generate the information in this document, it's called

 6   tempo, and it has -- the source of this information is the

 7   sum of royalty earnings that the songs have earned from a

 8   variety of sources over the course of this time.  And as we

 9   have discussed before, this list of types of sources of

10   income.  Sorry, this is jumbled here.

11          We have similar testimony from the Warner Music

12   Group, similar testimony from the Universal Music group.

13          THE COURT:  So here's is a couple of questions.

14          Number one, it would be shocking to me that you

15   guys haven't found an ex-music industry person who has come

16   over to your side and given you all the inside scoop on all

17   of this.  If you haven't done that, I'm just shocked, because

18   that usually happens in this kind of case.

19          But, number two:  Are these people entitled to

20   royalties and aren't those royalties supposed to be

21   calculated to the cent?  I mean, don't the people who

22   actually create this music expect to be paid royalties,

23   Mr. -- I'm going to ask Jonathan that.

24          MR. OPPENHEIM:  Can I answer that because I --

25          THE COURT:  No, no, I'm not looking at you right

28

1    now.

2            Go ahead, answer me that.

3            MR. SPERLING:  Yes, Your Honor.  But the way it

4    works is that it's exploitation by exploitation.  And in

5    fact, these contracts typically provide for different kinds

6    of royalty rates, for different kinds of exploitations.

7            Let me set aside publishing for a second, which is

8    what Mr. Anderson was speaking about, the music publishers,

9    I'll come back to that because it's an important distinction.

10   If you know about record companies -- and, you know, many --

11   certainly, if you go back a couple of decades.

12           So there will be one type of royalty rate for sales

13   of an album, another type of royalty rate for a single, and

14   another type of royalty rate for a license to use in a movie

15   sound track, and another kind of royalty rate for digital

16   download.

17           THE COURT:  And you add them all up and that's the

18   royalty?

19           MR. ANDERSON:  Yeah.  And if I could just --

20           THE COURT:  Right?  You add those all up and that's

21   how much royalty they have?

22           MR. ANDERSON:  Sorry.

23           MR. SPERLING:  So the way the system works is

24   that -- each exploitation is made, and there's is a

25   calculation of a royalty, but there is no calculation of

1    revenue on a track-by-track basis.

2          Now, here is where I want to differentiate between

3    labels and publishers.  I understand the testimony that Mr.

4    Anderson just -- just read, and my understanding is that the

5    publishers, while not super easy, can do it without a

6    tremendous amount of burden.  But the systems are different

7    because the nature of the exploitations are different.

8          The publishers don't have the variety of

9    exploitations that the labels have.  They book this, and they

10   distribute the revenues by a different system.  And it would

11   be extraordinarily burdensome for the labels to do it.

12          I wasn't prepared to argue this, so I don't have

13   the details at my fingertips, but I believe they're in the

14   declarations that we submitted previously on this.  It would

15   take months, months to do this for the labels.

16          THE COURT:  Well, if there is going to be in

17   Virgina a billion and a half or two billion would be split

18   up, people are going to want to have their pro rata share;

19   isn't that true?

20          MR. SPERLING:  Oh, so a great question, Your Honor.

21          So our clients distribute proceeds like that to the

22   artist, but that's not a royalty.

23          THE COURT:  No, I know it's not a royalty, but

24   you've got to decide how to divide it up.  This artist gets

25   this much, this artist gets this much.  How do you reach that

1   calculation?

2           MR. SPERLING:  So every client is going to do that

3   a little bit differently and they'll come up with a system

4   that they think is fair as between all the various artists

5   and participants, but it has got nothing to do with booking

6   track-by-track revenue.

7           THE COURT:  What's it based under?

8           MR. SPERLING:  Your Honor, since they haven't

9   received that billion-dollar award in Virginia yet --

10          THE COURT:  But they're counting on it already, I

11  promise you that.

12          MR. SPERLING:  Well, actually, I'm pretty

13  confident, Your Honor, that while they may have had

14  discussions I'm not privy to, nobody has settled on a

15  distribution mechanism.

16          THE COURT:  Oh, good reason to settle the cases --

17          MR. SPERLING:  -- for that.

18          THE COURT:  -- then because they're not already

19  counting on that money, right?

20          MR. SPERLING:  Your Honor, jokes aside.

21          THE COURT:  No.  That's serious, actually.  If

22  they're not even counting on that, yeah, I think we can get

23  this case settled.

24          MR. SPERLING:  The fact of the matter is that this

25  track (inaudible) is not a true statement to say, for the

31

1     labels, that they have this sitting in a database and they

2     can produce it.  It's just not true.  And we submitted

3     declarations on that so that we don't have to have a fight

4     between Mr. Anderson's representations, and my

5     representations, or Mr. Oppenheim's representations.  And for

6     the labels to do this would be incredibly difficult.

7                THE COURT:  But it was done in Cox?

8                MR. SPERLING:  It was done in Cox over a long

9     period of time.

10               MR. OPPENHEIM:  Not -- not --

11               MR. SPERLING:  Go ahead, Matt.

12               MR. OPPENHEIM:  Your Honor, if I may.  I know you

13    would much prefer to speak to Mr. Sperling, but he wasn't

14    involved.  And so if you want the actual answers, I'm sorry,

15    you're going to have to deal with me.

16               THE COURT:  Make it short.

17               MR. OPPENHEIM:  I apologize for that.  I know you

18    do not want to --

19               THE COURT:  Make it short.

20               MR. OPPENHEIM:  Well, so what was provided in Cox

21    over -- over great objection, was a very limited subset of

22    what they are asking for here in Charter.  So let me give you

23    an example.

24               If an artist -- if an artist records a track and

25    released that track, that track could be released as a

1    single, it could be released on an album, then on a greatest

2    hits album, then on a compilation album of hits of 2019

3    and --

4            THE COURT:  I've heard this about a dozen times.  I

5    know -- I know this stuff.  Yes, I know.

6            MR. ANDERSON:  Your Honor --

7            MR. OPPENHEIM:  But what all that they got in the

8    Cox case, and this took eight weeks to do, was that the

9    revenues for the distribution of the single.

10           Here, they're asking for the revenues for

11   everything.  Everything, every album, every license,

12   everything.  And so -- again, the burden here -- even in Cox,

13   it took eight weeks for that limited number of tracks, for

14   that limited period of time, for that limited revenue stream.

15   Here, they're asking for much broader.

16           And, by the way, Judge Jackson already ruled on

17   this.  And he did not leave the door open for just

18   relitigation of the issue a year later, and they never came

19   back to you when you told them they would have to come back

20   to.

21           They have no -- they have not put forward an

22   evidentiary record to demonstrate why the plaintiffs' burden

23   affidavits are not correct.

24           MR. ANDERSON:  Your Honor, if I could just -- one

25   point of clarification and one point of rebuttal.

33

1            The point of clarification is that our -- our chart

2    and our submission is limited to the type of information that

3    plaintiffs produced in Sony vs. Cox, so I'm not quite sure

4    what Mr. Oppenheim is referring to when he says what we're

5    seeking here is somehow in excess of that.

6            And I also opened this issue by noting that --

7            THE COURT:  Sony vs. Cox is the Cox decision we're

8    all talking about?

9            MR. ANDERSON:  Yeah, sorry, the Virginia case.

10            THE COURT:  Okay.  So you aren't seeking more than

11    that?

12            MR. ANDERSON:  No, no.  And if it needs to be --

13    and I will put this, you know, softly forward at first.

14    If -- given this discussion we're having about the various

15    systems, if there's a way that's less burdensome to provide

16    this information than what was provided in Sony, we would be

17    willing to consider that as well.

18            But then the one point of rebuttal is to

19    Mr. Sperling, who distinguished the testimony I read from

20    Mr. Foley at Sony/ATV EMI, we also have testimony from

21    Matthew Flaught (ph), the CFO of Warner Music Group, and

22    Jason Gallion, the CFO of Universal Music, in which both of

23    them also said that they have systems through which they can

24    query by ISRC, which is a song code, and generate reports of

25    revenue.

1          THE COURT:  Anything else?

2          MR. ROSENTHAL:  I would just add, Your Honor, you

3     know, I don't understand the burden argument at all here.  A

4     billion dollars, eight weeks of work, that's quite a return

5     on investment here.  They chose to bring these lawsuits.

6          They may not describe this as similar as to what's

7     going on with the trolls, but they are in the business here,

8     this is a business.  They are in a litigation business, and

9     since 2012, they've constructed a business here to generate

10    revenue.

11         MR. OPPENHEIM:  There is no basis for this

12    assertion and it is --

13         MR. ROSENTHAL:  This is an absolute -- you hired

14    MarkMonitor in 2012 to start this business and that's --

15         MR. OPPENHEIM:  -- it is improper.

16         MR. ROSENTHAL:  -- this is exactly what they're

17    doing.

18         THE COURT:  Wait a second, wait a second, wait a

19    second.

20         Matt, you were speaking earlier today.  Somebody

21    tried to interrupt you and you got angry at that and you

22    said, Let me finish.  You know what, you can't live in a

23    glass house if you're going to do that, all right?

24         MR. OPPENHEIM:  I understand.

25         THE COURT:  I'm not very happy about that.  I mean,

1   at least what you all ought to do is accord one another the

2   same deference that you demand for yourself, okay?  And if

3   you don't believe that, then you're in the wrong profession,

4   because it is a profession, okay?

5           So let's keep it on a professional level and apply

6   the Golden rule.

7           Hold on a second, we need to talk.

8           (Court and Special Master confer.)

9           THE COURT:  So is there a ballpark estimate on --

10  on what this costs to do, this eight weeks' worth of work?

11          MR. SPERLING:  I will defer to Mr. Oppenheim and

12  Mr. Gould, who lived through it in the Cox case.

13          THE COURT:  Matt, you're on mute.

14          (Speaker confusion.  Transcriber transcribed as Mr.

15  Gould.)

16          MR. GOULD:  Sorry, I was muted, apologies.

17          The answer is, we don't know, we can get it.  It

18  would certainly be less on the publisher's side than it would

19  be on the recorded music side; but if the Court would like us

20  to get that figure, we can -- we can endeavor to do that.

21          THE COURT:  Right.  Well, it's not going to go into

22  the calculation in the decision.  It's going to go, maybe, to

23  the calculation on apportionment, but we both agree this

24  information needs to be produced.

25          MR. ANDERSON:  Thank you, Your Honor.

1          And I would just clarify for the record in terms of
2    the expense -- you know, the historical expense of what
3    plaintiffs went through in Sony.  I mean, it's -- it's going
4    to be -- the operative question would be:  What would they
5    need to do to supplement the production here?  I just want to
6    clarify that for the record.
7          THE COURT:  Well, my view is I've relied on what
8    they did in -- in Sony and made them produce what was
9    relevant to this case; freshen it up and produce the same
10   quality information per work.  Whatever was done in that
11   case --
12         MR. ANDERSON:  Understood, Your Honor.
13         THE COURT:  -- I would like done in this case.
14         MR. GOULD:  Your Honor, previously when a similar
15   issue came up on the other side with respect to Charter
16   needing to investigate DHCP logs, you shifted the costs to
17   plaintiffs.  Is this an area where you'll shift the cost to
18   the defendant?
19         THE COURT:  That's what I meant by "apportionment."
20         MR. GOULD:  So --
21         MR. SCHAPIRO:  Does "apportionment" mean sharing
22   or --
23         THE COURT:  Apportionment means we'll make a
24   decision as to who bears the burden, but we would need to
25   know what the burden is, not to decide the issue, but to

37

1    decide --

2              MR. SCHAPIRO:  I see.

3              THE COURT:  -- how it's shared, if at all.

4              MR. GOULD:  When would you like us to provide the

5    estimates cost, Your Honor?

6              THE COURT:  Well, actually, it's not going to be an

7    estimate.  You can just wait until it's all done and then you

8    can give us the bill, the actual bill.

9              MR. GOULD:  Very well.

10             THE COURT:  Okay.  Now, I'm counting on you guys,

11   you respectively have things you're going to expect from one

12   another.  You're going to have to summarize that at the end

13   of this meeting as to each element because we're not going to

14   do that, and then you're going to have to ask for deadlines,

15   and that's what we'll discuss at the end, okay?

16             MR. ANDERSON:  Got it, Your Honor.

17             THE COURT:  Next issue for the defense.

18             MR. ROSENTHAL:  Good morning, Your Honor.

19             THE COURT:  Go ahead.

20             MR. ROSENTHAL:  Good morning, Your Honor.

21             THE COURT:  Good morning.

22             MR. ROSENTHAL:  Mr. Schapiro and I are going to

23   tag-team this morning, so he may be jumping up to help me out

24   along the way.

25             So I know Your Honor has heard a lot about the Hash

1    Report, but we're back here again, if we can put the first

2    slide up.

3            So, Your Honor, we've talked about damages here,

4    right.  And at the bottom -- at the end of the day, we're

5    trying to get the information that would allow us to, both

6    analyze damages and prove that their damage case isn't what

7    they say it is.  And we've spent a lot of time and money to

8    get here and we're still not here.

9            And the relevant players here are MarkMonitor,

10   Audible Magic, and Oppenheim & Zebrak.  And as we sit here,

11   after spending lots of money and lots of hearings and going

12   to different places and taking depositions, we still don't

13   have the information.

14           THE COURT:  MarkMonitor, Audible Magic, and what

15   else?

16           MR. ROSENTHAL:  Oppenheim & Zebrak.

17           THE COURT:  Okay.

18           MR. GOULD:  What is the issue that we're discussing

19   at present?

20           MR. ROSENTHAL:  Well, we'll -- I'll ask you not to

21   interrupt me and you will hear about the issue, all right.

22           So, you know, plaintiffs argue this is the largest

23   copyright infringement case in the history.

24           THE COURT:  Is that microphone on?  Tap it.  It's

25   not on.

1              MR. SPERLING:  And since we took a moment, I think

2     we just want to know which item on the chart we're

3     addressing, which seems like a fair request.

4              THE COURT:  I don't think I've ever, like,

5     religiously adhered to a chart, so.

6              (White noise momentarily.)

7              MR. SPERLING:  Yes, Your Honor.

8              THE COURT:  We appreciated a little bit of advance

9     notice, but there has been little bit off script here.

10             MR. ROSENTHAL:  Is that better, Your Honor?

11             THE COURT:  I can hear you, yeah.

12             MR. ROSENTHAL:  So plaintiffs, being able to walk

13    in the room and attempt to -- to hold Charter secondarily

14    liable here, they must be able to prove direct infringement.

15    They have to prove that subscribers actually shared

16    works-in-suit and that they have the evidence to prove that.

17    So we've been trying to get this evidence.

18             So the origin of the evidence, what is it?  So in

19    2012, MarkMonitor was originally hired to compile this

20    evidence, right.  And they compiled the evidence between 2012

21    and 2016, right, but they lost that evidence.  They didn't

22    keep that evidence, right.

23             So what happened here is -- next slide, please.

24    Okay.

25             In 2016 MarkMonitor entered into a consulting

1   agreement, right.  And the consulting agreement was signed

2   January 29, 2016, and it put certain services -- and these

3   services, as you'll see -- if I can approach, Your Honor.

4             THE COURT:  Thank you.

5             MR. ROSENTHAL:  These services were to be done in

6   anticipation of litigation, right -- anticipation of this

7   litigation.

8             THE COURT:  And this is a -- this is when I went on

9   a sidebar ex parte with them --

10            MR. ROSENTHAL:  Yes, Your Honor.

11            THE COURT:  -- at one of my hearings.

12            MR. ROSENTHAL:  So over nine months after the last

13  notice was sent and the fact they didn't have this, they go

14  and they hire MarkMonitor to compile this evidence.

15            And if you turn to the bottom, it talks about data

16  collection if you go to the next slide, what were the tasks

17  they were supposed to do?  They were supposed to search for

18  7,000 hashes, because MarkMonitor was only able to locate

19  7200 torrents.  And they were able to download that

20  information and provide it to Audible Magic.  And, in turn,

21  what they were also supposed to do is create this Hash

22  Report.

23            THE COURT:  And these -- again, these hashes are

24  identifiers for works that are out there in the Internet

25  being shared?

1            MR. ROSENTHAL:  Collection of works, but

2    Mr. Schapiro can clarify that.  That's where --

3            THE COURT:  The same -- but an artist -- they refer

4    to artists who might have a greatest hits collection, a

5    single, an album, but the same work by the same person

6    recorded at the same time, does that all get the same hash

7    mark?

8            MR. SCHAPIRO:  No, it doesn't, not necessarily.

9            THE COURT:  Okay.

10           MR. SCHAPIRO:  What gets a hash mark -- and there

11   are two different kinds of hash marks.  But what gets a hash

12   mark, for these purposes, is a file or a torrent being shared

13   by someone out there in the wild.  And the torrent could be

14   something that the person -- a collection of songs or records

15   that the person assembled on his or her own and is put out

16   there.  It could be one song --

17           THE COURT:  Okay.  So the hash is created, not

18   necessarily for a particular work, but for a particular

19   sharing endeavor at the moment?

20           MR. SCHAPIRO:  Correct.

21           THE COURT:  Okay.  And so the same work could be

22   shared a dozen types, it has a dozen different hashes?

23           MR. SCHAPIRO:  It could.

24           THE COURT:  Okay.

25           MR. SPERLING:  Your Honor, I have to interrupt

1    procedurally only.

2            You specifically said at the end of yesterday's

3    session this would be dealt with on the papers and it

4    wouldn't be argued.  So I understand now Mr. Rosenthal didn't

5    want to identify the issue, but at the end of yesterday's

6    session, right --

7            THE COURT:  I said matters that were briefed as

8    motions on CM/ECF --

9            MR. SPERLING:  Yes.

10           THE COURT:  -- could be dealt with with written

11   records.

12           MR. SPERLING:  Then I must have misheard or

13   misunderstood, Your Honor.

14           THE COURT:  Yeah.  So if this is the subject of a

15   fully briefed motion on CM/ECF, then I'll issue a written

16   order on that.  Is it --

17           MR. ROSENTHAL:  There are additional facts here,

18   Your Honor, which --

19           THE COURT:  I don't mind necessarily receiving a

20   little bit of argument, but is this the -- is this an issue

21   that's fully briefed?

22           MR. ROSENTHAL:  It is, but there are additional

23   facts that have come to light since the briefing.

24           THE COURT:  All right.  And what in the brief --

25           MR. OPPENHEIM:  But the brief was filed Saturday

43

1   night.

2           THE COURT:  What are the CM/ECF numbers on the --

3   ECF numbers on the briefs?

4           MS. ALVAREZ:  I'll pull them up in a moment, Your

5   Honor.  But I also wanted to clarify, plaintiffs asked for

6   your permission, Your Honor, to file a motion for

7   clarification of the Hash order.  Both sides have asked to

8   discuss this issue with Your Honor today.

9           THE COURT:  Why are you telling me that?  I'm about

10  to discuss that.

11          MS. ALVAREZ:  All right.

12          THE COURT:  So are you trying to reinforce what I'm

13  about to do?

14          MS. ALVAREZ:  I will get the docket numbers.

15          THE COURT:  All right.

16          MR. ROSENTHAL:  Can I proceed while she's getting

17  the docket numbers?

18          THE COURT:  I suppose, sure.

19          MR. ROSENTHAL:  Okay.  So -- so just to -- to reset

20  this.

21          From 2012 to 2016, they compiled this evidence,

22  they lost the evidence.  They hired MarkMonitor to go back

23  and figure out how to re-create this evidence yet, again off

24  the information they have, the 7,000 torrents.

25          So what does Charter need to understand for its

44

 1    case?  It needs to understand what torrents MarkMonitor was

 2    able to locate, what torrents they were able to locate, but

 3    Audible Magic was unable to verify and whether there are any

 4    torrents that MarkMonitor and Audible Magic were unable to

 5    verify for which the plaintiffs are suing here, right.

 6             THE COURT:  But the torrents can stay out there for

 7    years; is that correct?

 8             MR. ROSENTHAL:  That is my understanding.

 9             THE COURT:  Otherwise, why would you -- how could

10    you possibly re-create something through looking at the web

11    if it couldn't -- if it wasn't being preserved.

12             MR. SCHAPIRO:  So for today's purposes, that's

13    entirely right.  There are, I will concede around the edges,

14    some questions about whether torrents actually are always --

15    whether their hashes for torrents are always the same or not,

16    and there probably will be some expert testimony about fake

17    or altered hashes out there; but for today's purposes, I

18    think that's not particularly important.  We can -- we're

19    willing to accept that.

20             THE COURT:  All right, go ahead.

21             MR. ROSENTHAL:  So we went to the Special Master

22    and we asked to get this information.  And when we asked

23    plaintiffs for this data, what they represented, it was

24    inextricably intertwined with the Hash Report and the

25    underlying data is not otherwise available.

45

1          So we were told -- and the plaintiffs also

2    represented that we should be getting the information from

3    Audible Magic, all right.  So that's what we did.  We turned

4    to Audible Magic.

5          Now, if we could go to the next slide.

6          May I approach again, Your Honor?

7          MS. BREWER:  While he's doing that, I'll just

8    clarify for the record it's Docket Entry 363, which is

9    plaintiffs' motion for clarification of the order on the Hash

10   Report, and then our responses, Docket Number 374.

11         MR. ROSENTHAL:  So we moved to compel this data and

12   the Special Master ordered the data, either be produced or

13   logged, right.  So what do we get?

14         We get a February 3 e-mail from Audible Magic's

15   attorney.  And at the bottom you can read:  Additionally,

16   regarding the privilege log, the restored database does not

17   contain the data you are requesting.  Audible Magic engineers

18   have completed additional search and are unable to find the

19   data you seek elsewhere.  Thus, no privilege log will be

20   forthcoming.

21         In other words, Audible Magic doesn't have the

22   data, right.  So the only place the data exists is the Hash

23   Report.

24         Now, let's go back to MarkMonitor, right.  So what

25   do we get from MarkMonitor on Friday, right?  So for the

1   first time -- if I can approach again, Your Honor.  The first

2   document we handed to you, Your Honor, is the actual

3   privilege log produced by MarkMonitor.

4           The second document is the same document

5   reformatted with headings and we put in, obviously, lines so

6   that it can be easier to follow.

7           So what does this say, okay?  So what is

8   illuminating?  Several things about this log.

9           The first thing is that if you look at the second,

10  the third, the fourth entry, right, Audible Magic apparently

11  put a legal hold in place at the request of Oppenheim &

12  Zebrak in July of 2018, two years after they were first

13  retained to do this work -- two years after they were

14  retained to do this work -- right.

15          THE COURT:  Well --

16          MR. ROSENTHAL:  And what else do we know, Your

17  Honor --

18          THE COURT:  Well, they're talking about it two

19  years later, but are you saying that's only when the hold

20  arose?

21          MR. ROSENTHAL:  That's -- we just got this

22  privilege log on Friday.

23          THE COURT:  Well, I know, but just because they're

24  talking about it doesn't mean the hold hasn't been there for

25  a while, right?

47

1          MR. ROSENTHAL:  Well, Your Honor, there is no other

2   hold on this log.

3          THE COURT:  Okay.

4          MR. ROSENTHAL:  They haven't disclosed another

5   hold.  If there is another hold, we would like to know about

6   it.

7          THE COURT:  All right.

8          MR. ROSENTHAL:  All right.  But what do we know

9   about it, right?  This is the first time we heard about this,

10  and two years later, right.

11         And second, MarkMonitor has produced zero e-mails

12  to or from MarkMonitor from the period of time that

13  MarkMonitor was hired in anticipation of litigation to the

14  date of the litigation hold.  It has produced some e-mails

15  afterwards, but none during the relevant time period.

16         What else do we know?  That plaintiffs -- that

17  there are no entries on this log relating to any of the

18  information sent or received from Audible Magic, except for

19  the Hash Report, right.

20         So we're now at a point where this has been a --

21  let me finish -- this has been a chase, right.  Not only a

22  chase involving us and our expenses and time, but the

23  Court's.

24         MR. SCHAPIRO:  Can I just --

25         MR. ROSENTHAL:  Oppenheim & Zebrak knew exactly

48

1    where this information is, they knew what didn't exist and

2    what existed, and they forced a chase around.  The only place

3    this information exists is in the Hash Report.  It's directly

4    relevant to this case.  It's not privileged, and it should be

5    produced.

6              Now, Mr. Schapiro is going to add a little more to

7    that.

8              THE COURT:  Okay.

9              MR. SCHAPIRO:  I didn't mean to cut off my

10   colleague.  I was just going to make one other point that

11   troubles us about the log that we just received that seems to

12   indicate that, even though this was supposedly all done in

13   preparation for litigation, there was no hold.  And that's

14   probably why there are no documents.

15             But the thing that is troubling is, we received

16   that document in an unusual format, given the way parties

17   have been exchanging documents in this case; and that is, it

18   was locked so that you could not, in its native format, sort

19   it in chronological order, but we don't do that when we

20   present documents.

21             So the way we were able to put this together and

22   see, okay, 2016, there is this first entry and then later on

23   in 2018, you'll see the numbers don't match.  They're not in

24   order, just the numbers on the side.  We had to have

25   word-processing go through, reenter it all manually so that

49

1    we could sort it.  And we were troubled by the fact it wasn't

2    provided to us in a way that it would have been obvious on

3    the face of this that there was this long gap.  We had to

4    discover that by digging around.

5            MR. ROSENTHAL:  I just add, in terms of our

6    request, we obviously want the information.  We want the Hash

7    Report.  We would also ask that a privilege log be created by

8    Oppenheim & Zebrak as to all their communications as between

9    MarkMonitor and Audible Magic.  At this time, we're not

10   moving to pierce those, but we do have serious concerns as to

11   whether or not a privilege exists.  We don't believe a

12   privilege exists.

13           Let me explain that for a second, Your Honor.  In

14   the Cox case, look, they have to present evidence at trial,

15   right, of the alleged infringement.

16           So what do they do in the Cox case?  They went out

17   and they hired Audible Magic as a consultant to generate

18   this -- this information.  And then they called a person from

19   Audible Magic as a fact witness, right, from MarkMonitor as a

20   fact witness, to present this evidence and authenticate the

21   witness, right.

22           So here we have a situation where now they're

23   claiming all that is attorney work product, right.  Somehow

24   it's attorney work product, right.  They're manufacturing

25   evidence to use at trial and then calling a litigation

50

1    consultant, who is not a litigation consultant; it's a

2    testifying expert, right, to testify at trial.  They're going

3    to have to present that same evidence here, right.  They're

4    going to try and shoestring this person as a fact person.

5              THE COURT:  Well, did you try --

6              MR. ROSENTHAL:  If they're a fact --

7              THE COURT:  Did you try to inquire -- did you try

8    to -- did you argue to the judge in Virginia that this person

9    is not a fact witness; it should be -- they should be

10   designated as an expert, they should produce a report, they

11   should comply with Rule 26?

12             FEMALE SPEAKER:  Your Honor, the plaintiffs did not

13   produce the 2016 consulting agreement in Cox, even though

14   such agreements were ordered by the magistrate.  So we were

15   not aware of the project in Cox, so it was a very different

16   setup.

17             THE COURT:  No, no.  But he said Mark -- somebody

18   from MarkMonitor testified in the case, but the person wasn't

19   involved in the claims period with anything.  They were

20   completely post-claims period, kind of forensic review of

21   these hashes and yet, he was allowed to testify as a fact

22   witness and not an expert?

23             FEMALE SPEAKER:  He testified as to the system and

24   how reliable the system was and the files that they got as

25   part of that 2016 project, which are the files that they

51

1    relied on as the evidence of direct infringement in Cox and
2    that they plan to rely on as the evidence of direct
3    infringement in this case.
4             MR. ROSENTHAL:  So, Your Honor, if I could just
5    finish.
6             They're going to have to call that and they're
7    going to have to call a fact -- a witness here to testify to
8    all this.  Otherwise, they're not going to have any evidence
9    of direct infringement.
10            If the person is a fact witness, which we don't
11   believe they are, then they don't have an attorney-client
12   privilege, not with Oppenheim & Zebrak, right.  They're a
13   fact witness here.  They don't get to do work product as a
14   fact witness.
15            If they're a testifying expert, they don't get to
16   shield under the federal rules their communications with
17   their attorneys that form the basis of their opinions or
18   could be used to attack those.  They can't have it both ways.
19            You know, I reviewed all these pleadings and
20   everybody is talking about substantial need here, but
21   everybody has simply missed the underlying fact here.
22            There is no underlying privilege.  It can't exist.
23   It's not a question of work product and substantial need.
24   They can't have an underlying attorney-client privilege here.
25   It doesn't work that way.  And it's -- they could argue it

52

1    hasn't come to head because they haven't designated

2    MarkMonitor yet as a witness, which is why we want all these

3    communications logged, because that's coming, and they can't

4    have it both ways.

5             THE COURT:  So there is no Rule 26(a)(1) disclosure

6    or supplemental disclosure that identifies any MarkMonitor

7    employee?

8             MR. GOULD:  MarkMonitor is listed on the initial

9    disclosure in June of 2020.

10            THE COURT:  Okay.  Well, obviously, you've got to

11   be listed on a -- on a disclosure in order for a person to

12   testify as a witness at trial.

13            MR. ROSENTHAL:  So, Your Honor, at this point in

14   time, look, it's clear this is the damage evidence in the

15   case.  We are entitled to probe it, to show why it's not what

16   they say it is, it's not what they said it is in Cox.

17            THE COURT:  Well, it's a causation.  It's the

18   causation evidence, not the damages evidence.  We already

19   gave you the damages evidence, right?

20            MR. SCHAPIRO:  I guess in the end, Your Honor -- if

21   I may.

22            THE COURT:  Am I right, is it the causation?

23            MR. SCHAPIRO:  I think it's both.

24            So they have to, just for liability, they have to

25   prove that there was actual direct infringement, right,

53

1    because we're just the ones who are secondarily liable.

2              So number one, that's a part of their case and

3    they're going to use this to try and say there was direct

4    infringement, so we want to attack that.

5              Secondarily, if we can show that a large number of

6    the works to which they point actually shouldn't be swept up

7    here, that goes to damages.  And maybe I can just do 60

8    seconds of wrap-up, because I'm sure heads are exploding in

9    New York and Washington and they -- they want to talk,

10   whoever is going to take the other side.

11             THE COURT:  And they've been very nice about being

12   quiet.  Can we all -- can we all agree on that?

13             MR. ROSENTHAL:  Okay.  Yes, Your Honor.

14             MR. SCHAPIRO:  We've all taken your guidance to

15   heart --

16             THE COURT:  All right.

17             MR. SCHAPIRO:  -- on that, Your Honor.  But, you

18   know, this originally -- so I echo and endorse everything

19   Mr. Rosenthal said about whether there is even any underlying

20   privilege.  But on the Hash Report itself, as you and

21   Ms. Rodriguez will recall, this initially came up when we

22   sought it in front of the Special Master.  And she said,

23   reasonably enough, see first if you can get it from some

24   other -- I'm not going to order it now, go see if you can get

25   it elsewhere.  It has now become clear we can't get it

54

1    elsewhere.

2          By their own description, the Hash Report is a list

3    of 7000, 7200 hashes that they wanted their consultants or

4    agents to go out there and search for.

5          It's very hard to see, especially in light of the,

6    I think fairly reasonable approach you took on the ESI memo

7    where you said, Hey, just because something might have a

8    discussion with a lawyer in it, but it's full of facts, you

9    can't withhold the whole document.

10         By the same token here, whatever marginal insight

11   we might get into their thinking if we see which hashes they

12   chose to send out to be searched for in the wild is far

13   outweighed by -- by our need for this.  So if there is a work

14   product privilege, it's easily overcome.

15         MR. ROSENTHAL:  And I would surmise there -- there

16   can't be.  They can't have it both ways.

17         If the person is a fact -- if MarkMonitor is a fact

18   witness here, they don't have an attorney-client privilege

19   with them.

20         And if they're an expert, they can't shield -- try

21   and shield their communications when those communications

22   form the basis of their ultimate opinion here.

23         THE COURT:  Is there something wrong with having an

24   attorney-client relationship with a witness, even though

25   they're not a party?

1              MR. ROSENTHAL:  Not when -- not when the person is

2      a testifying expert and a material witness in a case.

3              THE COURT:  Well, but -- you proffered them as a

4      fact witness, not an expert.  So I've seen many cases where

5      somebody comes in and they, in fact, have an attorney-client

6      relationship with counsel for one of the parties, but they're

7      not a party; they're just a fact witness.

8              MR. ROSENTHAL:  Right.  But if they're a fact

9      witness here, then their communication -- what they're trying

10     do is to generate evidence to support their claim for damages

11     here.  They went out and they hired these people, right.

12             If they hired these fact witnesses, why is there a

13     privilege relating to that?

14             THE COURT:  I don't know.  We'll see.  It's a good

15     question.  It's a good question.

16             MR. ROSENTHAL:  All right.  And at this point,

17     we're not asking to pierce that.  What we want is the log.

18     We'll be back here to ask to pierce that, but -- but right

19     now, we want the log.

20             And you know what, we have been dragged around the

21     mud here.  They knew from day one what was in those reports,

22     what was not in the reports, what existed, and did not exist.

23     There is a real question as to what their candor with this

24     Court has been.

25             THE COURT:  Okay.  Who is going to do this?  Are

56

1    you guys going to tag-team or what?

2           MR. GOULD:  Thank you, Your Honor.  Jeff Gould here

3    from Washington.

4           So, first, there is a lot to unpack here.  I think

5    it's vital to correct many of the statements that were just

6    presented to you that are not correct.  But I want to begin

7    first and foremost with, I don't quite know what this is -- I

8    don't quite know what this is.

9           There was voluminous motions practice over the Hash

10   Report before, both Ms. Rodriguez and yourself.  There was

11   voluminous motion practice under RFP 55 --

12          THE COURT:  Well, Mr. Gould, I'm going to stop you

13   there.  Do you agree that a judge, at least, should avoid

14   clear error?

15          MR. GOULD:  Yes, I do.

16          THE COURT:  And if clear error has been committed

17   in the past by a judge, they have an obligation to correct

18   it?

19          MR. GOULD:  I think that -- I would not disagree

20   with that, clearly, Your Honor.

21          THE COURT:  That's number one.

22          Number two, Mr. Rosenthal, 26 -- Rule 26(4)(C) --

23   Rule 26(b)(3)(A) and (B), protect communications between the

24   party's attorney and any witness required to provide a report

25   under Rule 26(a)(2)(B), regardless of the form of

1   communications, except to a certain extent.

2           There is a privilege that can arise, you agree?

3           MR. ROSENTHAL:  Yes.

4           THE COURT:  Because that rule institutes one,

5   right.

6           MR. ROSENTHAL:  Yes.  But it's not --

7           THE COURT:  You -- the argument you were making

8   made it seemed like you believe there can be no such

9   privilege.

10          MR. ROSENTHAL:  Are we talking between expert or

11  fact witness here?

12          THE COURT:  Well, you keep -- I want you to tell me

13  whether you think these guys are experts or fact witnesses.

14          MR. ROSENTHAL:  We believe they're experts.

15  They're trying to play this game that they're fact witnesses.

16          THE COURT:  Okay, so --

17          MR. ROSENTHAL:  You can't go out and hire a

18  consulting firm and say, Please develop this evidence that we

19  know in anticipation of litigation.

20          If you hire him as a nonconsulting expert, that's

21  one thing; you have absolute protection.  But once you decide

22  to use them as testifying experts here, they move into a

23  different realm here.

24          Now, the Federal Rules of Evidence were amended

25  to -- and the Rules of Procedure to protect certain kinds of

58

1   communications between an expert and outside counsel, but not

2   when those communications and that information goes to the

3   very underlying opinion.

4           THE COURT:  Okay.  So I want to preface -- again,

5   lay some foundation for Mr. Gould.

6           That same rule says that these communications are

7   not protected.  Communications that identify facts or data

8   that the party's attorney provides and that the expert

9   considers in forming opinions.  That's not privileged.  You

10  agree with that, right?

11          MR. GOULD:  I'm sorry, was that directed to me?

12          THE COURT:  That was directed to you, Mr. Gould.

13          MR. GOULD:  I think the rule says what it says.

14          THE COURT:  Okay.

15          MR. GOULD:  And, yeah, I --

16          THE COURT:  And then also assumptions that the

17  party's attorney gives to the expert and the expert uses

18  those assumptions in coming to opinions, those communications

19  are not privileged also?

20          MR. GOULD:  These are unobjectionable statements of

21  the law under Rule 26, but they don't apply here because

22  MarkMonitor is not an expert.

23          THE COURT:  Okay.

24          MR. GOULD:  MarkMonitor was deposed --

25          THE COURT:  No, that's the answer -- I mean, that's

59

1      the answer from your perspective.  I understand.

2               MR. GOULD:  Yeah.

3               SPECIAL MASTER:  And just so the record is clear,

4      help me out here, Mr. Gould.

5               You reference that MarkMonitor has been identified

6      as a witness in the Rule 16 disclosure -- sorry, in the Rule

7      26 disclosures.

8               MR. GOULD:  On June 6, 2019.

9               THE COURT:  And how did you describe the relevance

10     of who they are?

11              MR. GOULD:  MarkMonitor or -- it was under the

12     category of Individuals Likely to Have Discoverable

13     Information.

14              THE COURT:  But you didn't provide further

15     disclosure?

16              MR. GOULD:  That the disclosing party may use to

17     support or defendant's claims.  And we listed it as the

18     following:  MarkMonitor's observation of infringements by --

19     it looks like a typo -- Cox subscribers.  It meant Charter's

20     subscribers.  So it would be MarkMonitor's observation of

21     infringements by Charter subscribers, infringement of

22     plaintiffs' copyright works by Charter's subscribers, notices

23     of copyright infringement sent to Charter.

24              THE COURT:  Okay.

25              MR. GOULD:  There is a critical distinction here

60

1   that is getting blended and confused that is critical to

2   understand.

3           And that is, on the one hand, Your Honors, between

4   the 2012 to 2015 notice program -- 2012 to 2015 notice

5   program, on the one hand, and the 2016 efforts undertaken in

6   anticipation of litigation, the two projects are both

7   involved in this case, but they were separate projects with a

8   distinct delineation between them.  And it's important Your

9   Honors under that distinction.

10          And so if you'll listen, I would like to explain

11  how this narrative unfolds.

12          From 2012 to 2015 the IRAA, through MarkMonitor,

13  detected infringement on peer-to-peer networks and sent

14  infringement notices to Charter and other ISPs.  The

15  purpose -- this is really important.  The purpose of the

16  notice program was to provide notice, to provide notice to

17  Charter of specific instances of infringement by subscribers

18  on its network.  Because only Charter knows who those

19  subscribers are and only Charter could do something about it

20  by informing them and working with them to stop further

21  infringements.  The 2012 to 2015, a notice program.

22          They did this -- this was not a litigation program.

23  They did this.  But with MarkMonitor, there were two

24  fundamental important parts of the monitoring and detection

25  system.  Two pieces.

61

1          One is to verify that it follows infringing and one

2    is to verify that a subscriber is distributing and infringing

3    files.  What Mr. Rosenthal, and the five other attorneys who

4    are tag-team in this issue, are focused on is the piece about

5    the file verification.

6          It's important and critical to understand what

7    happened when and what didn't happen when.  So when

8    MarkMonitor first identifies a file -- can you hear me?

9          THE COURT:  Yes.

10         MR. GOULD:  Okay.  When MarkMonitor first

11   identifies a file, it downloads that file in full.  It then

12   generates a fingerprint and runs it against Audible Magic's

13   database to confirm the contents of that file and whether

14   that file is infringing.  That's one piece -- the file

15   infringing.

16         Those files are associated with a cryptographic

17   hash value that is unique to a file and any file at any time

18   in the history of the world that you see with the same

19   cryptographic hash file is the same file with the same

20   contents.  Once you know what is in a file represented by a

21   specific cryptographic hash, you don't have any need to save

22   that one, or ten versions or 100 versions of it, because each

23   one and every one is the same.

24         MR. SPERLING:  Jeff, if you could pause for one

25   second and I apologize.

62

1          Judge Hegarty, you made a reference before, and I

2     don't want to key in on your terminology, but to what

3     Mr. Gould just said, I wanted to make sure you understand

4     what gives rise to the cryptographic hash, because I think he

5     made reference something to like the hash being assigned.

6          It's a function of the bits.  If the two files are

7     one bit apart, right, if it's a 01, right, if they're one bit

8     apart, then the hash will be different.  And any variety of

9     programs can look at a file and just generate the hash.

10          All right.  So that's the only thing I wanted to be

11    clear in the understanding why Mr. Gould is saying what he

12    is.

13          And, Jeff, I apologize for the interruption.

14          MR. GOULD:  No, thank you for the clarification.

15          A hash is not a sign.  It's generated by algorithm

16    that identifies the hash of a particular file.

17          The screen is frozen.  Can you all hear me?

18          MR. SPERLING:  We hear you fine.

19          MR. GOULD:  Once MarkMonitor knows the hash, it

20    goes out and looks for other instances of subscribers

21    distributing a file with the same hash.  So you have, one,

22    file verification; and, two, verification that a subscriber

23    is distributing, okay.

24          For three years MarkMonitor did that with confirmed

25    verified infringement files and sent 700,000 notices to

63

1    Charter, okay.  That process ended sometime in 2015, okay.

2              At the conclusion of that notice program -- again,

3    not a litigation program, but a notice program in which

4    MarkMonitor was serving as an antipiracy vendor, an agent --

5    at the end of that program, the attorneys, some of them in

6    the (inaudible) case --

7              THE COURT:  Hold on, Mr. Gould, let me ask you a

8    question.

9              So MarkMonitor was retained by the recording

10   industry to do this?

11             MR. GOULD:  Correct.

12             THE COURT:  Prior to them doing this, was somebody

13   else doing this for the recording industry?

14             MR. GOULD:  MarkMonitor had been doing it for

15   earlier in time.  The relative -- relevant period and

16   contracts at issue in this case pertain to 2012 to 2015.

17   MarkMonitor was operating under a different name of Detect

18   Net for some years prior, but it's the same method.

19             THE COURT:  So, but even prior to 2012, were those

20   kinds of violations notices sent out?

21             MR. GOULD:  Yes.

22             THE COURT:  Maybe on a different scale?

23             MR. GOULD:  I mean, it's sort of like one program

24   leads to the next.  So in the 2012 time frame, it was -- I

25   don't want to say it was a reset button, but it was more of a

64

1   continuation of what had been done previously, but with a

2   little more kind of boundary on the front and back end.

3            THE COURT:  Okay.

4            MR. GOULD:  Between 2012 and 2015 MarkMonitor had a

5   contract with RIAA; sends notice based on the detection of

6   infringing files and infringements by Charter subscribers.

7            No litigation yet.  End of 2015, the BMG trial is

8   hot.  A verdict in that case was December 2015.

9            Unsurprisingly, the record companies and publishers

10  represented in this case began to think carefully about

11  what -- what they might be able to do to enforce their rights

12  and detect -- deter piracy in a same vein and in January of

13  2016, started looking at the body of evidence generated over

14  those prior years, okay.

15           Okay, (inaudible) me about some chapters.  Chapter

16  1 is the 2012 to 2015 notice program.  That ends.  BMG case

17  goes to trial.  Summary judgment (inaudible) and a verdict

18  for BMG.

19           January 2016, the group, many of whom are

20  represented in this case, start thinking about what they can

21  do for litigation and look at the body of evidence and

22  detections of infringement from the Chapter 1 period.  And

23  based on that analysis, which was conducted by counsel and at

24  the direction of counsel, determined that there may be good

25  claims.  Those claims have arisen in the Cox case and in this

65

1   case and in the Bright House case.

2           THE COURT:  So all those notices listed from 2012

3   and 2015 weren't done with the idea that we're going to sue

4   somebody just in the general sense and foreseeing your rights

5   and telling people to stop?

6           MR. GOULD:  That's exactly right, Your Honor.

7   That's exactly right.

8           The nature of the notice program is that we are

9   giving you notice that you can do something about it, and had

10  you done something about it, Charter, there would have been

11  no need for litigation that.

12          That very issue, Your Honor, was teed up expressly

13  by the Court in Virginia, because the Winston attorneys, who

14  are arguing today, made arguments that MarkMonitor and

15  plaintiffs had spoliated evidence from 2012 to 2015.  And the

16  magistrate in that court, Your Honor -- and I can share the

17  opinion with you -- found that there was no work product and,

18  therefore, no requirement to retain documents in anticipation

19  of litigation during the 2012-2015 period.

20          So you don't need to take just my word for it.  You

21  can take the guidance from the Magistrate in Virginia who

22  heard all of these arguments.  Big chess meeting, a

23  spoliation from 2012 to 2015 and gave it the back of the

24  hand, because there was nothing -- there was no "there"

25  there, okay.

66

1          That brings us to 2016, Chapter 2.  Look at the

2     body of evidence that generated over these prior years and

3     determine, Wow, they really did nothing.  Charter did

4     nothing.  Their recidivism was off the charts.  We're going

5     to go forward with litigation.

6          In that very month, January of 2016, at direction

7     of counsel, RIAA and MarkMonitor entered the Statement of

8     Work that Mr. Rosenthal presented today.  A short (inaudible)

9     that has -- asks MarkMonitor to go look for and download

10    files associated with infringing hashes.  That contract, Your

11    Honor, on its face says, "anticipation of litigation."

12         Chapter 1, notice program, no litigation.  Chapter

13    2, hash download program, litigation.  So the notion out of

14    the gate that there is anything untoward or spoliation or

15    failure to obtain something from the notice program is simply

16    a nonstarter.  It has no -- it has no merit, it's a

17    distraction, and it's contrary to the facts and prior

18    findings of other courts.

19         THE COURT:  Well, okay, but you are suing for the

20    period 20-, what, '13 to '16?

21         MR. GOULD:  The claim period, yes, March 2013 to

22    mid-2016.

23         THE COURT:  So it is true that whatever MarkMonitor

24    was doing between 2012 and 2015 involved information that's

25    relevant to this case, correct?

67

1          MR. GOULD:  Absolutely.  And the evidence generated

2     has been produced.  We haven't claimed privilege or work

3     product over communications with MarkMonitor from those

4     times.  The RIAA has produced lots of documents which RIAA

5     was communicating with MarkMonitor during the 2012 to 2015

6     timeframe.

7          Those communications were not claimed as privileged

8     nor work product.  They've been logged on -- RIAA logged --

9     I'm sorry.  They have not been logged on the RIAA log because

10    they were not privileged.

11         THE COURT:  Okay.  So you withheld no information

12    that you have prior to January 2016 concerning what

13    MarkMonitor has done, any communication with MarkMonitor, et

14    cetera?

15         MR. GOULD:  I'm not aware, Your Honor, that we have

16    withheld either -- that either the plaintiffs or the RIAA

17    have withheld relevant and responsive communications with

18    MarkMonitor during the notice period.

19         THE COURT:  All right.

20         MR. GOULD:  That brings us to 2016.

21         2016 MarkMonitor engages under this 2016 hash

22    download work in a one-month process of looking to download

23    files associated with the verified infringing hashes.

24         We talked about this, Your Honor.  There is a

25    difference between what kind information you might retain and

68

1    save as part of a preliminary investigation and what kind of

2    information you would save and either bring forward as

3    admissible evidence in this a lawsuit.   In fact, brought this

4    on December 18.

5            We gave the example of an investigator looking at a

6    website who identified the landscape and later with the

7    intent to sue, going back and collecting forensic evidence.

8    Mr. Schapiro gave you an example where he disagreed and said

9    an investigator watching on an eyewitness basis, that the

10   perks walking in and out of the door wouldn't necessarily be

11   required to identify for the other side every one, even those

12   who had no relevance.   And you wisely disagreed with that

13   analogy and said, No, you have to identify the ones that

14   matter, that you will present at trial, okay.

15           So 2016, MarkMonitor goes and tries to download

16   files.   Downloads some.   We've produced them.   Doesn't

17   download, because it didn't find others.   Didn't produce

18   them.   Produced what was found and what we have.   And we

19   didn't produce what we didn't find and don't have.

20           This notion that we're cherrypicking what to

21   produce is -- is not correct.   We produced everything -- the

22   good, bad and ugly.

23           THE COURT:   Wait.   I mean, so you just said you

24   produced searches that resulted in a positive findings, but

25   it is relevant, searches that resulted in failures.   That's

69

1   relevant to the defendants from, what I understand,

2   because --

3           MR. GOULD:  Well, I understand -- I'm sorry, go

4   ahead.

5           THE COURT:  But you did produce the searches that

6   resulted in failures?

7           MR. GOULD:  We didn't produce files that we didn't

8   find; that's correct.  We talked about this at length on the

9   18th.

10          THE COURT:  Right, right.

11          MR. GOULD:  The notion -- the argument was, you

12  have to produce a Hash Report because you've produced the

13  downloaded files.  That waiver argument is misguided because

14  it is an argument that we are relying on the Hash Report,

15  while using it as a sword and shield, and that is not --

16  that's not the case.  We are relying on downloaded files with

17  hash values that correspond to the notices-in-suit.

18          We are not relying on the Hash Report.  The Hash

19  Report was an attorney-driven project, based on opinions

20  counsel -- counsel's opinion, based on its analysis of

21  infringement data as to what kinds of additional evidence

22  they might want -- might want to collect and pursue.

23          Some are met, some are much of which have no

24  bearing on any notice ever sent to Charter.  So this was done

25  on a (inaudible).

70

1          MR. SCHAPIRO:  So, Your Honor --

2          THE COURT:  Hold on.  Are you finished, Mr. Gould?

3          MR. GOULD:  Not quite, Your Honor.  There is a lot

4    to address and I appreciate your patience.

5          I want to focus, Your Honors, on what is most

6    helpful and constructive, but it's imperative that I correct

7    the record on a lot of the jumbled information that you heard

8    from three to four or five attorneys who preceded me.  And if

9    you will indulge me, I would appreciate it.

10          Number one, the log entries that Mr. Rosenthal is

11    showing that was a MarkMonitor log, not a (inaudible) log.

12    The one that identified entries, happy to look at them.

13          Number two, this notion of like litigation

14    gamesmanship per scrambled log, number one, is simply not the

15    case.  It was the dates on that log MarkMonitor produced are

16    ready and apparent, and the log is something like 30 entries

17    log.  So it's kind of -- kind of a silly argument, further

18    compounded by the fact that Charter produced 400-entry log

19    with its dates scrambled.

20          THE COURT:  Hold on.  I don't think he was

21    complaining about dates being scrambled.  He was complaining

22    about the form that you produced them, being able to

23    unscramble on their own without having to actually having to

24    physically transfer all the data and do that.

25          MR. SPERLING:  So, sorry to step in.

1          MR. GOULD:  First of all, Your Honor --

2          MR. SPERLING:  We didn't produce it, Your Honor.

3     Okay, sorry.

4          THE COURT:  Okay.

5          MR. GOULD:  But, first of all, Your Honors, that

6     was in a MarkMonitor privilege log, (inaudible) privilege

7     log.  It was 30-or-so entries long.  So this notion of

8     unscrambling is -- I'm not sure.

9          But in any event --

10          THE COURT:  Well, wait a second.  I want to make

11     sure we're talking about the same thing.  No one -- no one

12     who is listening to me now assisted MarkMonitor in producing

13     that log?

14          MR. GOULD:  Correct.  I had some discussions with

15     MarkMonitor about the nature of the information but some of

16     those are on plaintiffs' privileged.  I did not produce a

17     log.

18          THE COURT:  And they didn't give it to you to look

19     at first before they produced it?

20          MR. GOULD:  I looked -- I looked at pieces of it,

21     yes.

22          THE COURT:  Okay.

23          MR. GOULD:  Third, there is a lot talk about

24     Audible Magic as a trial witness.  Audible Magic did not

25     testify (inaudible - voice drops).  And, Your Honor, the

1   reason all of this is important is because that fact alone

2   doesn't bear on this dispute; but it bears, Your Honor, on

3   the reliability of the information that you're receiving from

4   a team of lawyers from two separate firms who are not

5   coordinating and seem not to know the information

6   (inaudible).  I don't say that as an attack.  It is

7   consistent with guidance we've got from this Court before.

8   So respectfully, I need to correct the record.

9           This notion that the plaintiffs in the Cox case

10  didn't produce the 2016 contract wholly ignores that

11  MarkMonitor produced it.  They had it and they had every

12  opportunity to explore it.  There was no allegation of Cox

13  that those plaintiffs didn't produce what they needed to

14  produce.

15          Next, Mr. Rosenthal is very interested --

16  Mr. Rosenthal has great interest in Mr. Oppenheim, it's

17  clear.  We can't get enough of Mr. Oppenheim.  And now what

18  he wants is to look at Mr. Oppenheim's e-mails.

19          So, Ms. Rodriguez, you will certainly appreciate

20  that there have been three or four attempts to get at Mr.

21  Oppenheim's e-mails.  And each instance you issued carefully

22  tailored orders that account for the issues presented and the

23  facts as they are.

24          RFP 55 was last ruled on, I think in May of 2020.

25  That ruling was not appealed.  Charter took another shot at

73

```
1    Oppenheim's (inaudible) e-mails on its second, third, fourth,
2    fifth, sixth shot at the Hash Report.  And in each instance
3    the ruling was the same.  Plaintiffs need not search
4    custodial files of Oppenheim's (inaudible), okay.
5              So this is long water under the bridge, number one,
6    and procedurally improper and long since expired.
7              I think that there is a lot, probably more, but I
8    will pause there.  Your Honors, your reflections, I'm happy
9    to address them.
10             THE COURT:  No questions.
11             MR. SCHAPIRO:  So, Your Honor, I'll speak briefly
12   and I think Mr. Rosenthal wants to address the -- and should,
13   the larger picture.
14             So when we were having one of our battles about
15   that metrics sheet that consumed a lot of our time over the
16   last few weeks, you may recall that at one point a lawyer for
17   the other side said, Well, this is the most important
18   document in the case to us.  And I joked that if that's their
19   best document, we feel really good about our case.
20             And what you're hearing here is Mr. Gould and
21   others are saying, Oh, the Hash Report isn't going to provide
22   anything useful to the defendants because who cares what we
23   weren't able to find, et cetera, et cetera.  But that's not
24   their decision to make.
25             The Hash Report, in our view, is certainly -- and
```

74

1    the underlying documents is certainly one of the -- not the

2    most important -- documents for us, for our defense in that

3    case.  Because we know, from the Cox case, that they are not

4    going to just talk about the notices we received relating to

5    the works-in-suit; they're going to talk about what Mr.

6    Oppenheim yesterday called millions of notices and what

7    Mr. Gould today said were 700,000 notices.

8            I invite them to stipulate and we may back down

9    then.  And if they stipulated they will not make any argument

10   based on the number of notices that we got other than the

11   ones for the works-in-suit or make what in Cox was the

12   tip-of-the-iceberg argument, maybe we would view this

13   differently.

14           THE COURT:  Okay, hold on.

15           So you've just been given an offer of some kind of

16   a deal.  Because if you do say 700,000, but there is really

17   only a fraction of those where you can actually provide

18   evidence to a jury that there was infringement and the

19   plaintiffs, or defense wants to find the 600-and-some

20   thousand where you couldn't find anything to demonstrate to

21   the jury that, No big deal here, are you going to rely on

22   that -- all those notices in your case?

23           MR. GOULD:  Your Honor, I apologize.  Could someone

24   restate succinctly what this offer was?

25           THE COURT:  Go ahead and state it again.

1          MR. SCHAPIRO:  Sure.

2          Are you going to refer to any notices or number of

3   notices other than the ones that were received by us about

4   the works-in-suit in this case?  And are you going to make

5   any type-of-the-iceberg argument?

6          MR. GOULD:  I'm thinking how to begin to answer the

7   question.

8          What we know from the evidence in this case is that

9   Charter received -- excuse me.  What we know from the

10  evidence in this case is that Charter saved notice of 18

11  million notices during the claim period alone.  700,000 of

12  those came from the plaintiffs.

13         The plaintiffs will rely on all of those as

14  evidence of an astronomical amount of infringement that was

15  occurring on Charter's network and that (inaudible).

16         MR. SCHAPIRO:  So the answer is yes?

17         THE COURT:  Okay.  So hold on, hold on.  Stop right

18  there.  So you just said plaintiff will rely on those

19  concerning the astronomical number of violations.  But should

20  they then be able to test the fact that maybe some

21  percentage, maybe even a large percentage, of those notices

22  did not involve actual infringement?  Should they be able to

23  say that in response to your saying, There were 18 million

24  and of those 700,000 were ours?  And what if they -- they

25  believe that, you know, 300,000 of those didn't involve

1   infringement at all, shouldn't they be able to do discovery

2   under that theory of theirs?

3          MR. GOULD:  They can.

4          THE COURT:  Okay.

5          MR. SPERLING:  They can give it their best shot.

6   They have everything they need to do.

7          So at the risk of repeating myself because we

8   talked about this exact issue on December 18 and you

9   overruled their objection and found no substantial need to

10  overcome the infringement because they could obtain

11  substantially equivalent information elsewhere, the standard

12  to overcome work product.

13         What Charter has is downloaded copies of the files

14  for the works-in-suit, and they know every single notice that

15  pertains to a file that was downloaded in 2016.  So they can

16  take the files that they have and do whatever they want with

17  them.  They can listen to them, they could run through any

18  content identification service, like Audible, Shazam,

19  Echoprint, whatever you can come up with.  They can hire

20  someone to listen to them and say they're not what they are.

21         And what they can do -- and we talked about this

22  exact issue, Your Honor -- is for all of those notices that

23  list hashes for which there has not been a produced download,

24  Charter can beat the drum hard to the jury that they should

25  not believe for a second that those files exist or that they

1    are what we claim they are in the notices.

2             We will have testimony and evidence that they were

3    verified through a reliable content identification service.

4    Audible Magic and Charter has inspected for four days the

5    source code that implements that program.  They've received

6    documents from Audible Magic.  They've taken Audible Magic's

7    deposition.  They have a wealth of information to test the

8    reliability of every single notice.  That's notices for which

9    we produced to download and notices for which we have not.

10   And you understood this, it seems to me quite well, when we

11   spoke on December 18 and in your subsequent order because you

12   ruled expressly on these exact same facts and these exact

13   same arguments, that Charter failed to show a substantial

14   need to overcome the work product which you found existed,

15   given that their -- their failure to establish inability to

16   obtain substantial equivalence; not the exact same --

17   substantial equivalence.

18            And then just to circle back briefly to where

19   Mr. Schapiro started, he said, We really, really want this,

20   okay.  But relevance and strong desire do not equate with

21   substantial need sufficient to overcome work product.  It's a

22   high burden.

23            MR. SCHAPIRO:  So, Your Honor --

24            THE COURT:  Okay.  Thank you.

25            MR. SCHAPIRO:  -- a couple of things.  So first of

78

1   all, the answer to your question was:  Yes, they do intend to

2   rely on all the notices.

3            THE COURT:  Okay.

4            MR. SCHAPIRO:  And here is how it's going to go.

5   They're going to say, Look at all these notices we've got.

6   And we can say, Sure, we can do this reverse engineering,

7   subtract the number that we received and somehow hire, which

8   is an insane idea, Audible Magic, their consultant, or listen

9   to songs and try to back it out.  And they will say -- and we

10  will say, Hey, a lot of these notices weren't reliable.

11           And they'll say, Oh, yes, they were, you have no

12  reason to believe that.  You just have speculation from the

13  defendants.

14           But if we can say, as I think we will be able to

15  say, in -- not all of -- these are not reliable because, in

16  fact, when you went to find them in 2016, you couldn't find

17  them.

18           THE COURT:  You already had that, though?

19           MR. SCHAPIRO:  No.  We can't say why --

20           THE COURT:  Why don't you have that argument right

21  now.

22           MR. SCHAPIRO:  -- why they haven't given us those

23  hashes.  In fact, they've said to us at times, There are lots

24  of reasons why we might have included a work in this case.

25  Maybe there was a sensitivity or the owner didn't want to or

1    something like that.

2          But there is a second piece:  Either MarkMonitor

3    couldn't find it or, equally important, Audible Magic, which

4    is the second half here, found it -- that MarkMonitor found

5    it and they didn't make a match with Audible Magic.  It was

6    actually the wrong song.

7          That is way more powerful to the jury sitting in

8    that box than just saying, Well, you know what, there might

9    have been.  And that was not ruled on by any magistrate in

10   Cox.  That didn't come up because of the way the information

11   came in in that case.

12         This is -- this is on a blank slate and it is

13   certainly not something you decided back in December, because

14   the whole reason you're here is your order, I think

15   reasonably enough, but in a way that you conceded it's

16   somewhat ambiguous, said that they should be precluded from

17   introducing evidence if it turns out they have not provided

18   to us -- and then here was the sentence that we all sought

19   clarification on -- the fruits of the investigation on which

20   they intend to rely.

21         And so the question was:  Does "on which they

22   intend to rely" refer to the investigation or to fruits?

23         So they sought clarification and we're back here.

24   So I don't think this has been decided for at all.  And I

25   think we would have a decent argument that -- that it would

80

1    be error to tie our hands behind our back in this regard.

2           The dynamic going on here is they want to replay

3    Cox in every way, and we don't.  They also expected us to

4    terminate on the basis of notices.  They're going to say, You

5    are reliable because you got a gazillion notices and you

6    didn't terminate.  And if we can show when you went out to

7    look, it turns out, they were hit or miss, that's a helpful

8    fact for us.  And we get to choose how we raise that defense.

9    They can say you can do it a different way.

10          THE COURT:  Well, wait a second.  So you may be

11   able to say now they were hit or miss, but isn't it relevant

12   back in 2012 to 2015 what you thought?  Isn't that going to

13   be the standard that the jury has to weigh:  Did you even

14   care whether they were accurate or not at the time?  And did

15   you do an investigation about whether they were accurate?

16   And as a result of that investigation, did you come to any

17   conclusions?

18          Because if you just ignored it altogether, then the

19   fact that five years later you determined, Hey, some of those

20   weren't valid anyway seems to be not very relevant.

21          MR. SCHAPIRO:  Well, I think you're totally right,

22   Your Honor, and so this is just a piece of our defense.  It's

23   not stand-alone.

24          But as you saw yesterday, even in some of the

25   documents, there were questions internally at that time about

1    the reliability of notices.  And are people who are taking

2    calls from customers who get notices are getting calls from

3    people at those times saying I'm on 80-year-old woman, I

4    don't listen to a lot of hip hop, I don't understand what

5    this is?

6            So, yes, it will be on us to provide the other

7    piece of the argument, that's true.  But -- but we need both

8    of them.

9            THE COURT:  Okay.  Let me, so let me -- tell me if

10   you can't answer this question.

11           You don't dispute that all these notices were sent

12   out 2012 to 2015, right?

13           MR. SCHAPIRO:  No, we don't dispute that.

14           THE COURT:  Okay.  And is there any document -- are

15   there any documents that have been produced in this case that

16   demonstrated in that 2012 to 2015 time period, Charter

17   actually investigated the accuracy of any of these notices?

18           MR. SCHAPIRO:  I believe so.  Of the notices for

19   the works-in-suit, I'm not sure; but about notices that --

20           THE COURT:  The other 18 million, you might have

21   investigated some --

22           MR. SCHAPIRO:  Yes.

23           THE COURT:  -- but of the 700,000 we're talking

24   about --

25           MR. SCHAPIRO:  Yes, I can't speak specifically

82

1   about the works-in-suit.

2           THE COURT:  Okay.  So you don't -- now, we'll have

3   a document concerning the 700,000 where Charter actually

4   endeavored to determine whether that -- there was really

5   infringement going on?

6           MR. SCHAPIRO:  Yeah, I don't know one way or

7   another.  But I want to be clear, to investigate, it's a

8   little bit tricky other than sending a notice to a

9   subscriber, having a conversation with a subscriber, right.

10  We can't go into someone's system and --

11          THE COURT:  No, no, no, you can't, but you know who

12  was sending the notices, right?

13          MR. SCHAPIRO:  Yes.

14          THE COURT:  And you could make a phone call or have

15  a meeting with the people sending notices and say, You know

16  what, we're getting a lot of these notices, will you tell us

17  what the basis is for how you determined that there is

18  infringement going on so we can practice down ourselves?

19  That didn't happen, right?

20          MR. SCHAPIRO:  Well, I want to be accurate.

21          I think there were some discussions in a variety of

22  context with Rightscorp that, arguably, dealt with that

23  subject matter.  But it's -- it would be a longer answer.

24          So the answer, to some extent, that did happen, or

25  we will be able to argue to the jury that that happened -- we

1   will be able to point to things and argue to the jury that

2   there was some of that happening.

3          THE COURT:  And what you're seeking right now is

4   just this thing called the Hash Report?  That's all we're

5   talking about at the moment?

6          MR. SCHAPIRO:  Yeah.  My colleague will make the

7   larger ask.

8          But the first step is the Hash Report, which as I

9   understand it, it's -- it's a list of works that they -- or

10  hashes that they wanted to be searched and some explanation

11  of, either what was found or wasn't found, which is purely

12  factual, as far as I know.  If there is something in there

13  that says why specifically a lawyer wants you to look at this

14  one, there would be a perfectly good argument, I'm sure, that

15  that should be redacted.

16          But if their argument is instead that, somehow if I

17  know that they sent out a request for Superstition by Steven

18  Wonder and Ain't Too Proud To Beg by the Temptations, and

19  Superstition comes back as a positive and Ain't Too Proud to

20  Beg doesn't, that somehow we'll be able to figure out

21  something amazing or revealing about the lawyer's thought

22  process in including Ain't Too Proud To Beg.  That is

23  marginal, at best.

24          MR. ROSENTHAL:  Well, so a couple things.

25          First of all, counsel raised the issue about the

84

1    2012 to 2015 notices.  We're not alleging that those notices

2    were spoliated.

3              THE COURT:  I need to get down to this privilege

4    issue.  So as I've read to you, Rule 26 deals with whether

5    communications were privileged.  But the plaintiffs are

6    saying, Hey, this is not an expert, this is a fact witness.

7              And I think that may, in fact, be a determination

8    that we have to make, as to whether the person is, in fact, a

9    fact witness or an expert, as the rules have designed.

10             So because -- would you agree -- I don't know who

11   is going to -- Mr. Gould, if you're still on -- on this

12   pointy end of the spear here, let me know.

13             Would you agree that if this is an expert, then the

14   communications you have in directing their work are not

15   privileged under Rule 26?

16             MR. GOULD:  I would agree that Rule 26 would apply

17   and we would have to look at each communication and determine

18   whether they were within or outside of the specific items

19   listed, facts and data, assumptions they relied on, whatever

20   the rule says.  I agree the rule would apply.

21             THE COURT:  So a few questions.

22             First all, there is no dispute that the information

23   we're arguing about is relevant to the case?

24             MR. GOULD:  By and large, I wouldn't dispute that.

25   There may be some isolated line-items that may not apply.

1          THE COURT:  Yeah.

2          MR. GOULD:  But, by and large, I would agree.

3          THE COURT:  And what are you relying on in

4   protecting that information from discovery?

5          MR. GOULD:  What is the basis for withholding it?

6          THE COURT:  Correct.

7          MR. GOULD:  Work product.

8          THE COURT:  Work product.  So.

9          MR. GOULD:  Your Honor, I can explain that a bit

10   further.  We talked about this substantially on December 8,

11   including ex parte.

12          The information that MarkMonitor sought to

13   investigate was identified based on litigation of counsel's

14   assessment.

15          THE COURT:  No, no, I remember that.  No doubt.

16          So when you are asserting work product, you're

17   working for a client necessarily.  It's not -- it doesn't

18   belong to the attorney, right?  I mean, you're doing work for

19   a client, right?

20          MR. GOULD:  That's correct.

21          THE COURT:  Who was the client?

22          MR. GOULD:  The plaintiffs in these variety of ISP

23   cases.

24          THE COURT:  So not the RIA --

25          MR. GOULD:  It's --

86

1          THE COURT:  Not the RIAA itself?  As an entity,

2     that is an organized corporate entity, the RIAA?

3          MR. SPERLING:  It's a trade association, Your

4     Honor.

5          MR. GOULD:  Yes.

6          THE COURT:  Trade association.

7          MR. GOULD:  It's a little bit of a hard question.

8     The labels and RIAA work hand-in-hand tremendously and

9     closely.  RIAA was the contractor with -- with MarkMonitor.

10    The work was done at the direction of plaintiffs' counsel.

11    RIAA serves as counsel to the labels in a variety of

12    instances.

13         SPECIAL MASTER:  Mr. Gould, just to help clarify a

14    little bit here.

15         So you are not relying on attorney-client privilege

16    for protecting the hash tag, you're relying on work product?

17         THE COURT:  Hash Report.

18         SPECIAL MASTER:  Hash Report?

19         MR. GOULD:  That's correct.

20         SPECIAL MASTER:  Okay.  So we've heard about

21    attorney-client privilege here, we've heard about different

22    issues.  You're relying on work product privilege -- or work

23    product doctrine?

24         MR. GOULD:  That's correct.  That's consistent with

25    the law, that's consistent with the prior arguments, and

87

1     that's consistent with Judge Hegarty's finding.  And --

2             SPECIAL MASTER:  I just need a yes or no.  I'm just

3     trying to make sure I'm clear.

4             And so where do we have evidence of the

5     attorney-client privilege or that there was an

6     attorney-client relationship with RIAA?

7             MR. GOULD:  I'm not -- I guess I'm not quite

8     following.

9             The RIAA is authorized by the label to conduct a

10    variety of anti-piracy efforts.  On that basis, the RIAA ran

11    the notice program during the 2012 to 2015 timeframe.  And

12    having run that program, as plaintiffs began working with

13    litigation counsel, in conjunction with the RIAA, to analyze

14    the data that was available and decide whether and against

15    who valid claims might lie, the plaintiffs and the RIAA and

16    outside litigation counsel, worked together on a work-product

17    basis.

18            SPECIAL MASTER:  And that outside litigation

19    counsel was Oppenheim & Zebrak?

20            MR. GOULD:  Correct.  RIAA has a litigation

21    department that regularly represents the labels directly and

22    other times liaises with outside litigation counsel.

23            SPECIAL MASTER:  All right.  And so you're saying

24    one separate move, though; but that this was report directed

25    and controlled by Oppenheim & Zebrak as counsel for RIAA?

1           MR. GOULD:  I'm saying that there is a contract

2    signed between RIAA and MarkMonitor entered in anticipation

3    of litigation at the direction of counsel, counsel for --

4    excuse me, counsel for RIAA, counsel for the plaintiffs, the

5    outside litigation.  And attorneys asked the plaintiffs -- I

6    mean, I'm not trying to obfuscate.

7           I think the challenge is that the labels, the RIAA

8    and Oppenheim & Zebrak were working together to figure out

9    whether there are valid claims.  And if so, what those would

10   look like and against whom.

11          SPECIAL MASTER:  All right.  Well, the thing that

12   at least I am struggling with here is that this is not our

13   first round with this conversation.

14          MR. GOULD:  Sure.

15          SPECIAL MASTER:  And it does seem to be a bit of a

16   moving target, because when we talked about this before with

17   the Hash Report, I specifically did not order that the report

18   be produced, and I ordered -- or, at least, I suggested

19   strongly that Charter seek to obtain the information from the

20   third parties, so MarkMonitor or Audible Magic, et cetera.

21          As I understand what they have represented, is they

22   have attempted to do that and they have not been able to get

23   satisfactory answers.  And I -- having heard this, I don't

24   know this as well as you all, you live this day in and day

25   out, but based on the times that I have dealt with this

89

1   issue, I feel like it is a bit of pointing, go here, go

2   there, and yet at the end of the day, the answers are still

3   somewhat illusive.

4           So I think that we have to point to and be really

5   specific here because this is an important issue for all of

6   the parties.  And I need to clearly understand the basis for

7   the work-product privilege and whose privilege -- sorry, the

8   work-product protection, whose protection it is, who's

9   claiming it, and what is the extent of the claim.

10          So that would be, at least in my mind, step one.

11          THE COURT:  So and I have -- I want to again, you

12  know, the fact that I heard this in December doesn't mean

13  that I've retained everything that I understood at that time.

14          We -- there are 11,000 works-at-issue here and you

15  had MarkMonitor look for 7200.  Is that -- is that grossly

16  correct?

17          MR. GOULD:  I think the numbers are correct, but

18  it's not quite -- it's not quite the way I will phrase it,

19  Your Honor.

20          In this lawsuit there are roughly 7500 sound

21  recordings and roughly 4,000 compositions.  So what we're

22  talking about here today with the Hash Reports is recordings,

23  primarily.  So there are roughly 75-, 7600 sound recordings

24  in this suit.

25          The Hash Report project that -- excuse me.  The

1   hash downloading project was not unique to Charter.  It was a

2   process undertaken for potentially a variety of litigation,

3   and so that's why I hesitated briefly.

4           THE COURT:  Wait, so --

5           MR. GOULD:  They were --

6           THE COURT:  So you say there is how many recordings

7   at issue in this lawsuit?

8           MR. GOULD:  Roughly 7600.

9           THE COURT:  And MarkMonitor dealt only with

10  recordings?

11          MR. GOULD:  Each recording embodies a composition.

12  The project was undertaken in the first instance and

13  primarily as to recording.

14          THE COURT:  Okay.  So there is not much of a

15  selection going on if you choose 90 percent of all the

16  universe.  That doesn't sound like much --

17          MR. GOULD:  That's not --

18          THE COURT:  -- of a work product.

19          MR. GOULD:  That's not -- excuse me.

20          That's not quite right, Your Honor, because a hash

21  corresponds to a file.  And a file, as they're distributed on

22  BitTorrent and these peer-to-peer networks, is routinely an

23  album, a discography, a full collection.  So a single hash --

24  and this is -- and Charter knows this because there is other

25  data that is very, very clear about it.  A hash may, in some

1   instances, correspond to one work, but in others may

2   correspond to ten or 100 or 200.

3            And so those works-in-suit elected from within

4   those hash files is not -- it's not accurate -- it's not an

5   accurate understanding to think of works to hashes as

6   one-to-one.

7            THE COURT:  Okay.  Well, what is the ratio then?

8            MR. GOULD:  Well, it depends.  Like I said, it

9   could be a single song and it could be a discography of Bob

10  Dylan's collective works.

11           THE COURT:  No.  What's your best estimate on

12  aggregation of what you did?  Are you covering --

13           MR. GOULD:  I couldn't estimate because it varies

14  hash-to-hash and case-to-case.

15           THE COURT:  It still doesn't sound like much

16  selectivity, much thought went into it?

17           MR. GOULD:  I don't know if that's right.  I don't

18  know if that's right, Your Honor.  There is other documents

19  that correspond to all of the hashes for the works-in-suit

20  and it identifies somewhere between 40- to 50,000 individual

21  tracks.

22           THE COURT:  Well, did you -- did you have algorithm

23  liaise to decide what to ask MarkMonitor to do?  Did somebody

24  just do it manually and point out these numbers?

25           I mean, without getting into that part of your work

1    product, was there -- is there anything you can tell me about

2    how you went about to actually identify files?  And if you

3    can't answer that, you can't.

4           MR. GOULD:  I can give you some broad strokes and

5    this is the kind of stuff that we talked about exactly, Your

6    Honor, in the ex parte proceeding on December 18.

7           Attorneys and folks at the law firm did a data

8    analysis, based on a body of data and evidence generated over

9    three years as to lots of -- lots of ISPs and lots of

10   notices.  And, you know, equalized based on certain factors

11   that were of interest to -- based on the attorney's views of

12   the relative importance of factors that I can't go into

13   publicly, and that information was a part of how that list

14   was generated.

15          THE COURT:  Have I seen the Hash Report?

16          MR. GOULD:  Yes, you have.

17          SPECIAL MASTER:  So just another follow-up on a

18   slightly different question.

19          So if I understood what you said, Mr. Gould, is

20   that all of the underlying data, if you will, related to the

21   hashes in the Hash Report have been produced to Charter; is

22   that correct?

23          MR. GOULD:  Could you repeat it one more time.

24          SPECIAL MASTER:  Yeah.

25          MR. GOULD:  I want to make sure I understand.

1           SPECIAL MASTER:  I'm just trying to understand.  I

2    thought I understood you to say that all of the data that's

3    contained within the Hash Report has been produced to the

4    defendants in, perhaps, another format, but they have all

5    that underlying data elsewhere?  Is that accurate?  Did I

6    understand that correctly?

7           MR. GOULD:  Close, but -- but I have to say no.

8           SPECIAL MASTER:  Okay.

9           MR. GOULD:  And so, I mean, if they had everything,

10   well, we would withhold it, right.

11          So what is in the Hash Report that we have not

12   disclosed is the list of hashes that litigation counsel asked

13   MarkMonitor to download in 2016 and did not find.

14          SPECIAL MASTER:  But those exist someplace else and

15   those have been produced to the defendants?

16          MR. GOULD:  What do you mean when you say "those"?

17          THE COURT:  No.  So you determined what to do from

18   a big body of data; they have that big body of data also?

19          MR. GOULD:  No, because it pertains to many other

20   ISPs and cases.

21          SPECIAL MASTER:  Well, even those that pertain to

22   this case, do we know that they have all of the ones that

23   pertain to this case?

24          MR. GOULD:  Absolutely.

25          SPECIAL MASTER:  And tell me how we know that

94

1    absolutely.

2            MR. GOULD:  Because we produced it in multiple

3    forms.  We produced a spreadsheet that summarizes on a

4    line-by-line basis each of the 704,000 notices, including the

5    hash identified in that notice.  We've also produced every

6    actual notice, like the text file e-mail, for each of those

7    that we had identified.

8            SPECIAL MASTER:  Okay.

9            MR. GOULD:  We also produced for each of the ones

10   we could find and identify, the so-called, using air quotes

11   here, evidence packages that compile a group of, like,

12   computer-generated log files that demonstrate where the

13   information was obtained, hand-shaken process.  And they also

14   have the Audible Magic verification data that was produced

15   for each infringing hash that's at issue in this case.

16           THE COURT:  Well, that's -- that's what I am

17   asking.

18           So there is a universe of information that you say

19   you chose as attorney work product to give to MarkMonitor to

20   have them search, correct?

21           MR. GOULD:  One more time, Your Honor, please.

22           THE COURT:  There is this universe of data out

23   there --

24           MR. GOULD:  Yes.

25           THE COURT:  -- and you took that universe and --

95

1   and made certain decisions and then that's what you had

2   MarkMonitor do?

3           MR. GOULD:  Our request in 2016 January to download

4   a set of files associated with the verifying infringing

5   hashes was based on attorney analysis of a large body of

6   data.

7           THE COURT:  Right.  But I mean, my question is,

8   if -- if the defense had the same mind-set that Oppenheim &

9   Zebrak had back in 2016, they could re-create this because

10  they had the same information for which you created it?

11          MR. GOULD:  They could do the same thing as to the

12  Charter data.

13          SPECIAL MASTER:  Let me ask the question this way.

14          We've all agreed that the raw data that underlies

15  the Hash Report is relevant, right?  You equivocated a little

16  bit there, Mr. Gould.

17          But as a general matter, we agree that that

18  underlying raw data is relevant, because that's the actual

19  evidence of infringement, right?

20          MR. GOULD:  But not as to other ISPs.  That's the

21  distinction.  I mean, this notice -- all of these notice

22  programs there were -- I don't know the number off the top of

23  my head, but say there were eight or 12 ISPs, okay.  The

24  analysis of the data that led to the hash download project

25  was the global data.

96

1          SPECIAL MASTER:  The global data?  All right.

2          MR. GOULD:  That's -- that's why I said there may

3   be -- there may be instances in the Hash Report where there

4   are hashes that have nothing at all do with Charter.

5          SPECIAL MASTER:  Right.  But the ones at least that

6   have do with Charter, let's just take that subset, right?

7          MR. GOULD:  Yeah.

8          SPECIAL MASTER:  Let's just talk about Charter.

9   That is the actual evidence of infringement, right?

10          MR. GOULD:  It's a hard question to answer and I'm

11   not trying to be -- I'm not trying to dodge.

12          The evidence of infringement takes a variety of

13   pieces and form.

14          SPECIAL MASTER:  Okay.  So it would be at least one

15   piece of evidence --

16          MR. GOULD:  Let me clarify a little bit.  One

17   point -- I want to clarify that and it may be helpful.

18          SPECIAL MASTER:  Okay.

19          MR. GOULD:  I'm still focused on what hashes they

20   don't have files for.  There is a simple construct here.

21          We've produced notices that have, let's make the

22   math simple, 100 -- say there are 100 notices -- I'm sorry,

23   and 100 hashes in our notices, okay, 100 hashes notices.  And

24   so we produced files for 80 percent of those hashes.  You

25   know what Charter knows as a result of that?  It knows the 20

1   percent of notice -- it knows the 20 percent of hashes that

2   were not (inaudible).  It knows the information --

3            MR. SPERLING:  I just want to dwell on Mr. Gould's

4   last point to make sure --

5            SPECIAL MASTER:  Hold on just a second.  I want to

6   be clear here.

7            Nobody is disputing that the underlying evidence is

8   relevant under the Hash Reports and the claim here as a work

9   product one.  So what is the standard?  Is that it can't be

10  obtained, but it's obtainable from someplace else?  So

11  where --

12           MR. GOULD:  Substantial --

13           SPECIAL MASTER:  Yeah.

14           MR. GOULD:  Substantial --

15           SPECIAL MASTER:  Tell me where this evidence is

16  that you're --

17           MR. GOULD:  Substantial need --

18           SPECIAL MASTER:  -- seeking to obtain from

19  someplace else.  I think substantial need has been

20  demonstrated here.

21           Where -- just tell me where it is, where do they

22  go.  Because what I'm hearing from the defendants is, We

23  don't have it.  So there has got to be a -- they either have

24  or they don't.

25           MR. GOULD:  Okay.

1          SPECIAL MASTER:  So I'm just looking for somebody

2    to tell me, where is it?

3          MR. GOULD:  The information is in the notices that

4    they already have.  They have -- they know which hashes were

5    not downloaded in 2016.  The delta -- it's the delta between

6    the hashes in the notices and the hashes that have been

7    produced from downloaded files.

8          It sounds like Mr. Sperling has something to add.

9          MR. SPERLING:  And, Ms. Rodriguez, Mr. --

10         THE COURT:  Hold on.

11         (Court and Special Master confer.)

12         SPECIAL MASTER:  So you're saying they have to

13   extrapolate backwards to get it, is, in essence, is what I'm

14   hearing?

15         MR. GOULD:  I'm saying they have to do their simple

16   math, yes.

17         MR. SCHAPIRO:  And here is why that doesn't give us

18   all that we need, because, as I was trying -- hoping to --

19   trying to explain earlier, that will tell us that they're not

20   suing on a work in this notice; but it will not tell us

21   whether it's because MarkMonitor couldn't find it, whether it

22   was because Audible Magic didn't match it, or whether it was

23   just because Beyonce said, I don't want to be involved in

24   this lawsuit.  Or something like that.  And they will --

25         SPECIAL MASTER:  And this is why, when we dealt

99

1    with this issue before, I suggested that to avoid these

2    issues with privilege, et cetera, that we should get that

3    information, to the extent possible, from Audible Magic or

4    MarkMonitor.

5              MR. SCHAPIRO:  Yes, very reasonably.

6              SPECIAL MASTER:  I understand your representation

7    today that you have attempted to get that information from

8    other sources and have not been able to get it?

9              MR. SCHAPIRO:  That is correct.

10             SPECIAL MASTER:  Okay.  Mr. Sperling, you wanted to

11   say something.

12             MR. SPERLING:  I was going to make sure that one

13   point that Mr. Gould, who is a very capable advocate, made

14   was clear.  But it sounds like you understood it, so I'm

15   going to leave things in his capable hands.

16             MR. ROSENTHAL:  And, Your Honor, just one point of

17   clarification because I was trying to take notes.

18             Did I understand to say they don't have an

19   attorney-client privilege with MarkMonitor and they're

20   relying on work product?  I thought that's what counsel.

21             SPECIAL MASTER:  That's what I understood.

22             MR. ROSENTHAL:  All right.  Then -- then it would

23   be fair to say that on this log all these representations

24   here about attorney-client privilege are actually -- should

25   be stricken, because an attorney-client relationship, by

100

1    their own admission, doesn't exist.

2         So we're now down to work product with respect to

3    this log of stuff after -- after 2018 -- after 2016.

4         THE COURT:  Right.  But none of those entries rely

5    on attorney-client alone.  Every single one contains --

6         MR. ROSENTHAL:  I understand --

7         THE COURT:  Okay.

8         MR. ROSENTHAL:  -- yes, Your Honor.

9         THE COURT:  Yeah.

10        MR. ROSENTHAL:  But one is an absolute privilege,

11   absent fraud on the Court, all right.  And the other one

12   is -- well, first of all, there is a predicate to whether the

13   privilege did exist.

14        If the privilege exists, it's absolutely, absent

15   fraud upon the Court.  We will get there.

16        The second one, work product, substantial need has

17   been shown here.  So I just want to be clear that this log is

18   inaccurate.

19        MR. GOULD:  And we will take Mr. Rosenthal's --

20        SPECIAL MASTER:  Well, I think we'll address that

21   issue after this.  We can raise that, keep it.  But let's

22   actually -- this is a thorny enough issue, in and of

23   itself --

24        MR. ROSENTHAL:  Understood.

25        SPECIAL MASTER:  -- let's deal with it.

1           THE COURT:  We're going to take a break.

2           MR. GOULD:  Can I just -- can I just respond

3    briefly to that point, recognizing you don't really want to

4    hear it, but I need to protect my record here.

5           I need to think, again, about whether there was an

6    attorney-client privilege.  I forget the name of the Second

7    Circuit case with the accountants.

8           MR. SPERLING:  I think it's the Kovel doctrine

9    case, K-O-V-E-L.

10          MR. GOULD:  Kovel, thank you, Mr. Sperling.

11          Under the Kovel doctrine, agents certainly can

12   establish attorney-client privilege, so --

13          SPECIAL MASTER:  All right.  But I just want to be

14   clear before Judge Hegarty and I caucus to discuss this issue

15   further, is that you are not standing on attorney-client

16   privilege to protect the Hash Report.  What you are relying

17   upon is the work-product doctrine and the standard that we

18   just went through?

19          MR. GOULD:  Yes.

20          SPECIAL MASTER:  If it's anything other than a yes,

21   we just wasted about 20 minutes.

22          MR. GOULD:  I think that's right.  This was

23   decided, take a look respectfully at Judge Hegarty's prior

24   order where he found work product existed and they held

25   substantial need.  That applies here, as well.

1           Last thing -- last thing is we produced all the

2    downloaded works, whether they are for works-in-suit or not.

3    The notion that we won't produce their works-in-suit is not

4    quite right.

5           THE COURT:  Well, here's my main -- here's the

6    final answer for me, the major fact dispute.

7           Typically, as I view it, if the defense could

8    reconstruct something that you did, then there is not

9    substantial need; but they have to have the same source data

10   to do it.  So they have to have access to everything you had

11   access to in order to reconstruct.

12          And I still don't think we have a clear answer

13   whether they had -- they do now, right now, using whatever

14   resources they can drum up, have access to the same

15   information that you used to create the Hash Report for which

16   you're now claiming attorney work product?

17          MR. SCHAPIRO:  The clear answer is, we don't.  We

18   don't.

19          MR. ROSENTHAL:  As Audible Magic's attorney, you

20   have the document.  They said they don't have the data.

21          THE COURT:  Right.  So I want to ask Mr. Gould that

22   because you seem like a very reasonable person.

23          MR. GOULD:  I appreciate that.

24          What's the question?

25          THE COURT:  All right.  So, typically, if one party

1    wants something from another party, then -- all right, if the

2    defense wants something from the plaintiff and the plaintiff

3    has it because they used their ingenuity to come up with a

4    conclusion -- a report, data, whatever -- but the defense

5    could run their own analysis and come up with an answer

6    themselves, I'm not going to require production, go do it

7    yourself.

8              Judge Jackson may disagree with that, because I

9    think I relied on that once and he said, Produce it anyway.

10   Or maybe something about that.

11             But anyway, so I'm asking you, do they have the

12   source information from which they could -- if they had the

13   wherewithal, re-create the efforts that MarkMonitor engaged

14   in for you in 2016?

15             MR. GOULD:  For every single thing that pertains to

16   Charter and the Charter case and the Charter notices, yes.

17             THE COURT:  And what else would be relevant,

18   besides what pertains to Charter?  I mean --

19             MR. GOULD:  Absolutely nothing.  That's the

20   carve-out as to other ISPs and notices to other ISPs that

21   might have had hashes that never went to Charter.

22             MR. SCHAPIRO:  And so I --

23             MR. GOULD:  The only thing that -- hashes that went

24   to Charter.  Hashes that went to Charter.  Hashes that went

25   to Charter.  Charter knows what hashes went to Charter.

1   Charter knows what hashes we downloaded and produced.  And

2   Charter knows what hashes went to Charter and we didn't

3   download and produce.

4           MR. ROSENTHAL:  What we don't know is which of

5   those hashes are reliable.  They're hiding this evidence.

6   That is what is on the Hash Report.  And, Your Honor --

7           THE COURT:  But how did they found out --

8           MR. ROSENTHAL:  Your Honor --

9           THE COURT:  -- Mr. Rosenthal, how did they find out

10  which of those hashes are reliable?

11          MR. ROSENTHAL:  Well, they --

12          THE COURT:  That's what you want from them.

13          MR. ROSENTHAL:  Because Audible Magic didn't keep

14  the data that they conveyed to Oppenheim & Zebrak who put it

15  on the Hash Report.  That's the only place it exists.

16          THE COURT:  The data from 2012 and 2015?

17          MR. ROSENTHAL:  No.

18          THE COURT:  No, what?

19          MR. ROSENTHAL:  No, they didn't.

20          THE COURT:  But that's what we're referring to --

21          MR. ROSENTHAL:  I'm sorry.

22          THE COURT:  -- the data --

23          FEMALE SPEAKER:  Your Honor, it's the data from

24  2012, when they went up -- when MarkMonitor went up and tried

25  to find those files, they either found them or didn't.

1          THE COURT:  Right.

2          FEMALE SPEAKER:  If they found them, they sent them

3  over to Audible Magic to check, and both those datasets got

4  put on the Hash Report.

5          THE COURT:  And if they didn't find them, they

6  disregard -- they disregard- -- they just threw out that

7  information?

8          FEMALE SPEAKER:  We don't know because we haven't

9  seen the Hash Report.

10         THE COURT:  Okay.

11         MR. SCHAPIRO:  And I think there's nar- -- I think

12  we're actually in agreement on the foundation here, I think,

13  from hearing what Mr. Gould said.  And maybe Mr. Gould can

14  agree, yes, it is possible -- we would contend legally it is

15  not our obligation, given how much of a burden it would be.

16  It is possible for us to back out and at least determine

17  which items on the notices that we received are not in the

18  case now.  And we can assume that those ones also were in the

19  Hash Report.

20         But that's not the thing that we're particularly

21  interested in about the Hash Report.  What we're interested

22  in is, when you sent these out, what did MarkMonitor and

23  Audible Magic find?  I believe they will tell us, We have no

24  basis, without the Hash Report, of determining what

25  MarkMonitor or Audible Magic found.

1          MR. ROSENTHAL:  I would just add, Your Honor, with

2     all due respect and as Judge Shinless (ph) used to say, When

3     you say that, you're disagreeing with me --

4          SPECIAL MASTER:  That's right.

5          MR. ROSENTHAL:  -- but the burden here is on them.

6     They have the burden to demonstrate a damaging causation

7     case.  It is not our job to re-create.  It's their job to put

8     forward the evidence that they're going to rely on at trial

9     here.

10         They're hiding the ball.  This has been a shell

11    game, and they're continuing to hide the ball.  And what is

12    in their --

13         THE COURT:  You've got to explain that, though.

14    How are they hiding the ball?

15         MR. ROSENTHAL:  What is in there is fact.  It's not

16    legal analysis.  It's facts.  You've --

17         THE COURT:  Well, what they're hiding, your view,

18    is their failures?

19         MR. ROSENTHAL:  Correct.

20         THE COURT:  They're not disclosing their failures

21    to you, and you get to look at both their failures and

22    successes.  Is that it, in a nutshell?

23         MR. ROSENTHAL:  Correct.  And we get to show the

24    jury that this is a house of cards; they've put up a massive

25    damage case they can't support.  We're being accused of

1   secondary infringement here.  It's their obligation to

2   demonstrate that.  We should be able to show to the jury,

3   Well, that's not exactly the case.

4           MR. GOULD:  But, Your Honor, Mr. Rosenthal has put

5   the burden (inaudible).  We've established privilege and it's

6   their burden to overcome it.  They have not do so --

7           THE COURT:  Well, in the first instance --

8           SPECIAL MASTER:  It's a protection, not a

9   privilege.

10          THE COURT:  Yeah.

11          SPECIAL MASTER:  We're not talking about privilege.

12          MR. GOULD:  We've established --

13          SPECIAL MASTER:  We're talking about work product.

14          MR. GOULD:  We've established --

15          THE COURT:  Work product is not as strong as

16   attorney-client.  Can we all agree on that?

17          MR. SCHAPIRO:  Yes, and it doesn't cover facts.

18          THE COURT:  Right.  Well, yeah.  Okay.

19          MR. GOULD:  We've established the work product and

20   it's their burden to overcome.

21          THE COURT:  We'll take about a ten-minute.

22          MR. ROSENTHAL:  Your Honor --

23          THE COURT:  Go ahead.  What?

24          MR. ROSENTHAL:  -- we will be challenging the fact

25   that there is no underlying privilege there.  But where we

1   are today is, there is an attorney -- they claim a

2   work-product privilege, we believe we demonstrate substantial

3   need, but we don't believe that there is an underlying --

4   they have the ability to claim that.

5          Because at the end of the day, they're going to put

6   MarkMonitor up here as a testifying, something; we believe

7   it's a testifying expert because that's the basis of their

8   damage case.  They went out, they hired a consultant to

9   generate a damage case they're going to rely on.

10          Under the rules, they can't shield the basis of the

11   opinions and conclusions that form the basis, both those that

12   support, as well as refute that.  That's the whole basis.

13          THE COURT:  Okay.

14          MR. ROSENTHAL:  Thank you, Your Honor.

15          THE COURT:  Take a break.

16          (Recess taken.)

17          THE COURT:  Okay, so we've reached a firm

18   conclusion, at least in our minds, and I'll state the basis

19   for it just very succinctly.  I hope it deals with at least

20   one of these motions incidentally, which would be Docket 363,

21   plaintiffs' motion for clarification, and then Docket 374, I

22   guess a response.

23          And you guys tell me if it does.

24          MR. GOULD:  Your Honor --

25          THE COURT:  What?

1          MR. GOULD:  -- Your Honor, I think Mr. Oppenheim

2    needs one minute to get back to (inaudible).  If you'll

3    indulge me, can I please check with him.

4          THE COURT:  Well, I see him.

5          MR. GOULD:  Oh, then I'm mistaken.  Never mind.

6          THE COURT:  Yeah.

7          MR. OPPENHEIM:  I'm here.  I was being unusually

8    quiet.

9          THE COURT:  All right, that's about to change.  All

10   right.

11         So our determination -- and I know you'll believe

12   you have a bigger basis to appeal, and I'm positive there

13   will be one, which is fine, because judges get appealed all

14   the time and reversed and affirmed -- and that is, we're

15   suspect of the work product claim, we're concerned about the

16   loss of data.  By plaintiffs' own admission, the defense

17   doesn't have the same body of information from which they

18   could re-create the effort and we believe that the Hash

19   Report should be produced.

20         Okay, what's the next issue?

21         MR. GOULD:  Your Honor, may I ask, notwithstanding

22   Mr. Rosenthal's discontent, a clarifying question?  When you

23   say that concerned about loss of data, could you clarify what

24   you have in mind, because we're not aware of any.

25         THE COURT:  Well, it was our understanding that

1   MarkMonitor did not keep some of the results of the work that

2   they did in 2016.

3          MR. GOULD:  That's not correct.

4          THE COURT:  Is that your understanding?

5          MR. ROSENTHAL:  Audible Magic.

6          THE COURT:  Audible Magic.  Somebody didn't.

7          MR. ROSENTHAL:  And then -- and then --

8          THE COURT:  What about Audible Magic?

9          SPECIAL MASTER:  Can I --

10          MR. GOULD:  Audible Magic disclosed recently that

11   they could not find the lookups that pertain to this project,

12   that's correct.

13          MR. ROSENTHAL:  So we have a couple of things.

14   One, we have of the Audible Magic data.  Two, we have a legal

15   hold that did not go into place until 2018, even though they

16   were -- MarkMonitor was retained in 2016.  They have not

17   logged a single e-mail in that time period.  So we believe

18   that information has either been lost or hasn't been logged.

19   We would like it all logged so we can make an evaluation as

20   to whether or not it was lost or not.

21          SPECIAL MASTER:  Okay.  Let us just deal with the

22   first issue, which is the request for the Hash Report, the

23   full Hash Report.  Our order is that the Hash Report should

24   be produced.

25          Number one, we do believe that the claim of work

1    product is somewhat dubious here.  It is not entirely clear

2    whose work product protection this is, who's claiming it, et

3    cetera.  But even assuming that work product protection would

4    cover the Hash Report, there is a substantial need for this

5    evidence, as set forth by the defendants; and that this

6    information is not available from another source,

7    particularly given that Audible Magic no longer has the

8    underlying data and defendants have attempted to obtain the

9    underlying data from third-party sources, in particular

10   MarkMonitor and Audible Magic.

11          Therefore, it is our opinion that the substantial

12   need test, if a work product protection even did exist in

13   this situation, that showing has been met.  Therefore, we

14   determined that the document in question, that is, the hash

15   tag report, should be produced.

16          THE COURT:  And at the end of today, again, we're a

17   going to talk about timing.  Timing would include a stay of

18   any particular order to permit you to appeal, but it's going

19   to be a tight timeline because, as Mr. Sperling said, you

20   know, I think you guys want a trial sooner than later.  And

21   so in light of that, you'll have tight timelines for you to

22   appeal anything tighter than the rules, the Local Rules,

23   okay.

24          MR. SCHAPIRO:  All right.  So next -- I think we

25   can just go back to our chart, if that's acceptable to --

1          MR. ROSENTHAL:  One other thing.  Your Honor, that

2   does resolve the Hash Report.  We would like a log generated.

3   We have serious questions about whether or not there are

4   e-mails between 2016 and 2018.

5          THE COURT:  What have you been told?  Have you

6   asked that question?

7          MR. ROSENTHAL:  Well, we did serve a subpoena and

8   we got a privilege log that doesn't reflect any.

9          THE COURT:  No, but have you asked that question in

10  discovery to the plaintiffs?

11         MR. ROSENTHAL:  Well, the question would have to be

12  directed to Oppenheim & Zebrak, because MarkMonitor did not

13  produce that information and did not log that information.

14         THE COURT:  Did you ask the plaintiffs for

15  communications between plaintiffs' counsel and MarkMonitor

16  for the time period 2016 to 2018?

17         MR. ROSENTHAL:  We didn't.

18         THE COURT:  Why not?

19         MR. ROSENTHAL:  Go ahead.

20         MR. SCHAPIRO:  There has been motion practice.  We

21  did serve requests for discovery post-claim period.  I'll let

22  Ms. Golinveaux speak to that.

23         MS. GOLINVEAUX:  Well, we did serve that discovery,

24  Your Honor, and this came up at a hearing with Ms. Rodriguez

25  last summer.  And it became clear that it wasn't the

1    plaintiffs themselves who had the correspondence with

2    MarkMonitor; it was Oppenheim & Zebrak and the RIAA.  And at

3    that time --

4           THE COURT:  But here they're -- Mr. Gould has put

5    on the record that everybody is the same:  RIAA, the

6    plaintiffs, Oppenheim & Zebrak, they're all the same.  It was

7    all one big effort.  So if you direct that to the plaintiffs,

8    based on what Mr. Gould said, you should be able to get that

9    information because they're treating themselves as the same.

10          MR. ROSENTHAL:  Well, they're treating themselves

11   the same as Rightscorp, right, but MarkMonitor is an

12   independent company which they just admitted they don't have

13   an attorney-client relationship with.

14          THE COURT:  But if you're asking for something from

15   MarkMonitor, we can't give it to you because MarkMonitor is

16   not here.  If you're asking for something from the

17   plaintiffs --

18          MR. ROSENTHAL:  MarkMonitor says they don't have --

19          MS. GOLVINEAUX:  Your Honor, in light of your

20   guidance, we can go back to the plaintiffs and explain that

21   that's the position, coming out of today, and try and work

22   that out with them.

23          THE COURT:  Yeah, I think you should.

24          MR. SCHAPIRO:  So the next item on our chart, I

25   believe, is RFP 4 --

1          MR. GOULD:  Mr. Schapiro, if I can just clarify

2     that.  I apologize, there is a couple things to clarify about

3     that.

4          I -- the notion that there is no attorney-client

5     privilege with MarkMonitor from 2016 I don't think is

6     resolved.  Under Kovel, I made clear that I need to rethink

7     that.  If we made that conclusion in our log, I would stand

8     by it, so check to further review and opportunity to think

9     about it.

10          Number two, multiple motions already, or

11     communications between MarkMonitor and Oppenheim & Zebrak or

12     multiple motions, multiple, multiple orders.  To the extent

13     that this is like RIAA and plaintiffs and Oppenheim & Zebrak

14     and MarkMonitor, we're altogether, think about very broad

15     subpoenas to RIAA, including more documents and

16     communications with MarkMonitor and plaintiffs in 2016.

17     Those documents have been produced or logged.  There is no --

18     they can try to get it from a fifth try, but it will be the

19     same.

20          MR. ROSENTHAL:  Well, we'll pursue it through

21     plaintiffs.  But what's clear here is they're using their law

22     firm as a business agent to conduct these communications.  So

23     before, the Special Master was resistent about us serving

24     discovery on litigation counsel.  I think it's becoming

25     obvious that they're not just litigation counsel; they're

1    business counsel here.  They're a part of this enterprise to

2    make money here.  And we'll first talk to them --

3              THE COURT:  Yeah, I don't think we're discussing

4    anything --

5              MR. ROSENTHAL:  -- but it's pretty clear that we're

6    going to need discovery from them.

7              THE COURT:  Mr. Gould, I'm not going to find that

8    you've waived attorney-client just because of what you said

9    today.  I mean, I know you're working on the fly -- hold on a

10   second.

11             So, yeah, I mean, if there is a case out there, I

12   don't believe that you've engaged in any kind of waiver of

13   attorney-client by not -- by backing off of it.  You can

14   reassert it, okay.

15             MR. GOULD:  One last thing is this notion that

16   Mr. Rosenthal is dreaming up that we're a part of this

17   enterprise, I don't know where it comes from.  He likes to

18   remind everyone that there is good faith obligations and need

19   to have factual basis for their statement.  So again, glass

20   houses.  Oppenheim & Zebrak is litigation counsel for the

21   plaintiffs.

22             THE COURT:  Okay.  Anything else on that issue?

23             Please, next issue.

24             MR. SCHAPIRO:  I think Mr. Anderson is handling the

25   next issue, which is RFP Number 4.  I think that should be

116

1    the next one on the chart.

2          MR. ROSENTHAL:  That's correct.

3          And so this pertains to plaintiffs' work-for-hire

4    agreements.  And what we're focused on here is the record

5    company plaintiffs' work-for-hire agreements.  And here, as

6    Your Honor may recall, what has been deemed produced in this

7    case are all of the work-for-hire agreements that were

8    produced in Bright House to the extent that they relate to

9    the works-in-suit here.  And there is about an 80 percent

10   overlap.

11         And then we -- we also obtained an order that

12   plaintiffs were to produce the work-for-hire agreements for a

13   110 work sample of the works solely at issue in this case,

14   which was approximately 1 percent, I believe.

15         And so plaintiffs can't dispute that when they

16   fallaciously represent that a work that they registered with

17   the U.S. Copyright Office is one made for hire, that they are

18   taking rights away from -- from their artists.  By

19   recommending on a copyright application that the work is made

20   for hire, you preclude the original author from ever being

21   able to retain his or her rights in that work under the

22   Copyright Act.  This is currently being disputed by many

23   artists against the labels and the publishers.  So plaintiffs

24   cannot dispute that that is a fact.

25         So what Charter is seeking to do with these

1   work-for-hire agreements is two things:  One, it is to make

2   that point, which is that when plaintiffs do this, they are

3   taking something away from their artist, which is their

4   rights to ever revert rights under the -- under the Copyright

5   Act.

6          So, for example, if you create a song, an album,

7   and you assign it to a record company, as long as that work

8   is not registered as one made for hire, after a statutorily

9   mandated period of time, you can retain that -- you can

10  revert back those rights; you can take back those rights from

11  the record company.

12          And this is to essentially protect the next great

13  American novelist or songwriter from signing away his or her

14  rights at a very young age and not being able to -- to retain

15  those.  So plaintiffs can't dispute that.

16          What plaintiffs are disputing is that this is

17  otherwise not relevant to the question of copyright validity

18  and ownership, but that's just one of the prongs for which

19  we're seeking this information.

20          So the first one is that this is relevant to rebut

21  plaintiffs' claims that they act in the best interest of

22  their artists and it's something that we're seeking to show

23  that plaintiffs actually, in some instances, do knowingly

24  take rights away from their artist without -- without

25  permission.

Case No. 1:19-cv-00874-RBJ-MEH   Document 400   filed 03/07/21   USDC Colorado   pg 118 of 256

1          THE COURT:  What -- what claim or defense does that

2     go to?

3          MR. SCHAPIRO:  Well, it goes to the defense that

4     plaintiffs are entitled to, for example, a high award of

5     statutory damages because, as you heard from Mr. Oppenheim

6     earlier today, this is about the -- the engineer, the back-up

7     artist, this is about supporting, not the Bruce Springsteens,

8     but the less -- the less popular artist.

9          This is to rebut the narrative that plaintiffs here

10    are essentially coming with clean hands, and it's relevant

11    to -- to rebut that -- that trial narrative.

12          But what's relevant to liability and statutory

13    damages is whether we can seek to invalidate those

14    registrations based on fallacious or, you know, erroneous

15    representations in copyright.

16          THE COURT:  And how does one go about invalidating

17    those?

18          MR. SCHAPIRO:  So that's -- that's a -- there is a

19    process set up under the Copyright Act which requires or --

20    requires the -- the movant, the party seeking to invalidate

21    the claim -- I think the Court is bound by this requirement

22    as well -- to submit the question to the Register of

23    Copyrights.

24          THE COURT:  For each work?  You can't go -- I doubt

25    that you could go to the United States Government and dump on

1   them 100,000 works or 10,000 works.  You would have to do it

2   work-by-work, right?

3           MR. SCHAPIRO:  Correct.

4           THE COURT:  Is there any intention to do that?

5           MR. SCHAPIRO:  Well, so the issue is we need to

6   have the agreements and related deposition testimony to

7   establish that, as a systematic matter, as a matter of

8   practice and policy, the record company's registered works as

9   works made for hire without always having a valid agreement

10  in place before doing so.

11          I'm not saying that, as a matter of fact, that is

12  the case here, and I know Mr. Oppenheim will probably address

13  this.  But what I'm saying is that the discovery we're

14  seeking, this discovery proceeding right now, goes to that

15  question.  And --

16          THE COURT:  But do you have even one verified

17  example that you can show us where that happened?

18          MR. SCHAPIRO:  We have examples where we've looked

19  to see whether, based on the documents produced by

20  plaintiffs, there is a work-for-hire agreement in place

21  before the work was registered.  And we have found instances

22  in which that's not the case.

23          We have found instances in other places where there

24  is an agreement that post-dates the creation of the work,

25  that has a work-for-hire provision.  And that is an open

1   question of law as to whether it needs to predate or

2   post-date, but in all cases, there needs to be an agreement,

3   but --

4          THE COURT:  But we're not going to do -- as Brooke

5   Jackson said, you're not going to be permitted to do that on

6   a work-by-work basis.  So are you just going to try and come

7   up with a sampling and then extrapolate it out to a larger

8   set and argue in front of the jury that, in fact, there is 7

9   percent of the works that they're bringing?  Well, there is

10  no rights that they are representing in this court.

11         MR. SCHAPIRO:  So two -- two responses to that,

12  Your Honor.

13         First is, while we're not -- while we would be

14  doing this on a work-by-work basis in some sense, it's really

15  on an artist-by-artist basis because an artist is the

16  operative party here.  And if there is an agreement with an

17  artist and that artist has 15 or 30 or 50 works-in-suit, that

18  single question will resolve -- the single issue will resolve

19  the question.

20         THE COURT:  Well, how many artists are there in

21  this case?

22         MR. SCHAPIRO:  Several hundred, but not more.

23         THE COURT:  Just several hundred?

24         MR. SCHAPIRO:  Well, per -- per plaintiff group.  I

25  actually don't have that number, but I'm assuming, based on

121

1    the number of works-in-suit and dividing by albums, it's

2    hundreds.

3            But the question is, this is a question that will

4    be resolved at -- at least with respect to copyright

5    validity, but would be resolved at summary judgment.  If we

6    can establish that plaintiffs don't have valid copyright

7    registrations, they can't pursue claims and seek statutory

8    damages for those works, only actual damages, which

9    plaintiffs have already irrevocably sought statutory damages.

10           In terms of your other question about how we would

11   present this information to the jury, when it doesn't pertain

12   to copyright validity and copyright -- their ability to

13   maintain claims in this case and to seek statutory damages,

14   which would be resolved on summary judgment, we would argue

15   in -- with examples and as to industry practice that

16   plaintiffs are doing this, and that would go more towards

17   rebutting plaintiffs' claim, that they're acting in the best

18   interest of the artist.  But that does not necessarily have

19   to do with liability.

20           Now, plaintiffs are going to say that the law is

21   unclear, or they might go further and say that there is no

22   law to support the proposition that an erroneous

23   representation as to the work-for-hire status on an

24   application can serve to invalidate a registration.

25           And there is a law that says, essentially, like an

1   innocent mistake doesn't -- doesn't invalidate a

2   registration, and so long as the plaintiffs can otherwise

3   show that they have the right or ability to assert this work

4   in this case, that's not enough.

5          But I don't think that they can point to a case --

6   and maybe they will today -- that shows that a record company

7   has done this in gross en masse as a part of pattern and

8   practice for years.

9          THE COURT:  And so how did this issue play out in

10  Cox?

11         MR. SCHAPIRO:  So this issue specifically was not

12  addressed in Cox for two reasons:  One, we didn't get the

13  work-for-hire agreement so we couldn't make a specific

14  argument.

15         THE COURT:  You tried, but didn't get them?

16         MR. SCHAPIRO:  We tried in discovery to get the

17  work-for-hire agreements and we didn't get them.  We got them

18  in Bright House, which is the case that's kind of preceding

19  in pace with this one in Florida, which is the -- which are

20  the agreements that we used to do some preliminary analysis

21  here.  But we did not get the agreements in -- in Cox.

22         The argument, and it's often misconstrued in

23  plaintiffs' papers and in argument that we did make in Cox is

24  different, which is that, essentially, if a work is -- and

25  this is a very kind of nutty -- or knotty statutory argument.

1    But if the work is registered as one made for hire, it can

2    only be considered under a compilation under the law.  And

3    it's if considered a compilation under the law, you're only

4    entitled to one award of statutory damages.

5            That's the argument we made in Cox, and that's what

6    plaintiffs sometimes say -- you know, we raised this in Cox

7    and it was denied and this same should happen here, that's

8    not entirely accurate.

9            THE COURT:  But what's being withheld here?

10           MR. SCHAPIRO:  So what's being withheld here is not

11   very much, not very much, and the nature of the documents is

12   really straightforward.

13           What's being withheld here are agreements for

14   about, I think, 20 percent of the works for which -- that are

15   not at issue in Bright House.  And the nature of the

16   agreements are -- are simply the recording agreements or

17   equivalent that predate or otherwise relate to the works at

18   issue.  So these are already the types of agreements

19   plaintiffs have produced to meet their -- their burden to

20   establish standing.

21           You know, they've produced thousands and thousands

22   of what we colloquially refer to as chain of title documents.

23   These are documents saying we own this work because so-and-so

24   transferred it to this person and this person and this

25   person.  These are in the same bucket.  They just --

1        THE COURT:  So 80 percent of the works here are at

2   issue in Bright House?

3        MR. SCHAPIRO:  That's my understanding.

4        THE COURT:  And you have the documents you want for

5   those 80 percent?

6        MR. SCHAPIRO:  Based on plaintiffs' representation,

7   and we want probe this during deposition.

8        THE COURT:  Understand.  But you think if they're

9   telling you the truth, you have them?

10        MR. SCHAPIRO:  Correct.

11        THE COURT:  Okay.  So what I don't understand, I

12   guess, is:  Why isn't 80 percent enough to demonstrate what a

13   100 percent means?

14        MR. SCHAPIRO:  Well, Your Honor, with respect to

15   the more, for lack of a better term, rebuttal trial argument

16   that we want to make and that we would want to pursue with

17   depositions that plaintiffs are acting not always in the best

18   interest of their artists by doing this, I would agree that,

19   with the number of agreements that we have produced from

20   Bright House, we can probably make that argument with

21   deposition testimony in this case and be able to show that

22   they've done this without (inaudible).

23        However, when it comes to the copyright validity

24   argument, that goes squarely to the number of works-in-suit

25   for which we can be held liable.  And, you know, if we knock

1    out 50 or 100 based on the damages that were awarded in Cox,

2    that's a significant amount.

3              THE COURT:  And how many have you knocked out in

4    Bright House?

5              MR. SCHAPIRO:  We haven't -- we haven't done this

6    process.

7              THE COURT:  How many will you knock out in Bright

8    House?

9              MR. SCHAPIRO:  I don't have that analysis with me

10   right now.  But I'll tell you -- I'll tell you this, that I

11   think the percentage is -- is -- based on our analysis back

12   when we discussed this last year and our preliminary analysis

13   leading up to this hearing, I would say about 10 percent have

14   questions, right.

15             Now, we need to probe those questions with -- with

16   plaintiffs during a deposition.  And some of them might be

17   resolved, they might have some other documents that --

18             THE COURT:  So 90 percent of the claims -- of the

19   works-at-issue in Bright House have no suspicion of

20   invalidity or ownership?  That's what you just said.

21             MR. SCHAPIRO:  I would not say that -- so I want to

22   cabin this discussion to this work-for-hire question.

23             We have a separate work stream, and this will be an

24   issue for summary judgment on pure ownership issues, right.

25   There might be issues that plaintiffs just simply can't show

1   that they have ownership of a work-in-suit, irrespective of

2   this work-for-hire issue.

3           So -- but to get to your -- to address your point,

4   based on the analysis that we did last year and again leading

5   up to this hearing, we have questions, questions we would

6   like to pose to plaintiffs at depositions regarding about 10

7   percent.

8           And I'll add again, you know, even if the number

9   that we knock out is fewer than 10 percent, plaintiffs are

10  seeking maximum statutory damages here in a willful case.

11  That's $150,000 per.

12          THE COURT:  So the agreements that you're looking

13  for for 20 percent of the works not at issue in Bright House,

14  what are those agreements called?

15          MR. SCHAPIRO:  Plaintiffs can probably give more

16  detail with respect to this, but they're -- they're the

17  recording agreements.  They're the agreements that recording

18  artists sign with their labels when they begin a contractual

19  relationship with their labels.

20          And to be clear, these are -- you know, there is

21  probably some confidentiality sensitivity issues that we have

22  addressed through protective orders, but plaintiffs have

23  produced thousands of these already.

24          All we're looking for is for them to do a targeted

25  search for the ones that predate the creation of the work or

1    otherwise address this work-for-hire question.

2             THE COURT:  And did they oppose it in Bright House?

3             MR. SCHAPIRO:  Yes.  But the Magistrate Judge

4    ordered it over that objection.

5             THE COURT:  Go ahead.  Are you done?

6             MR. SCHAPIRO:  Yes, Your Honor.

7             THE COURT:  All right.  Plaintiffs.

8             MR. KAPLAN:  Yes, Your Honor, this is Alex Kaplan

9    remotely.  Can you hear me okay?

10            THE COURT:  Sure.

11            MR. KAPLAN:  Okay.  Thank you, Your Honor.

12            I'm going to briefly address everything that was --

13   that was just discussed, including explaining why, even if

14   they were to get these remaining work-for-hire agreements,

15   it's not going to help them invalidate any copyrights.

16            I do want to start with, though, why it's coming up

17   now and the burden here.  As Your Honor is well aware, over a

18   year ago Charter came to the Court for production of

19   work-for-hire agreements pursuant to this RFP.  Your Honor

20   ordered the 110-work sample.  We produced that.

21            They then asked for all of the work-for-hire

22   agreements that were produced in the Bright House case, as we

23   just discussed.  We produced that.  That was back in May,

24   with a few more produced in July and August, I think.  So

25   that's -- what, six, eight months ago.

128

1        We haven't heard a word since then for any more

2  agreements and, all of a sudden, this comes up with this

3  proceeding.

4        So, first of all, we think it's too late now in the

5  process for them to ask for this as it was all dormant,

6  again, since we produced these last summer.

7        Nothing has come up in discovery new that makes

8  them come today.  They're really just raising it because they

9  can through this process.  As indicated, we've produced

10 thousands of documents related to the -- they now want more.

11       On this -- and I should say, Your Honor, I mean,

12 there was a hearing, I know, over a year ago where you

13 specifically said, We're not going to look to invalidate

14 registrations for 11,000 works, that's just not going to

15 happen.  Those were your words.

16       Let me turn to the substance.  The need for

17 producing all of the remaining work-for-hire agreements --

18 and just by our rough calculations, this seems to cover over

19 2000 sound recordings in this case.  It's heavily outweighed

20 by the burden that it would place on us to go -- look for

21 those and produce them, especially at this point with the

22 time left.

23       THE COURT:  So Charter is (inaudible) on a

24 burdensome argument then.

25       MR. KAPLAN:  Well, it's both burdensome and there

1   is actually no relevance --

2              THE COURT:  Okay.

3              MR. KAPLAN:  -- here to -- to the reasons why they

4   argue they need these.  And I will talk about that now.

5              They articulated two purposes for needing these

6   work-for-hire agreements.  The first is to rebut the

7   presumption of the validity of the copyrights and the

8   registrations.  And then to rebut plaintiffs' purported

9   arguments, they say, that it's our argument that the record

10  labels act in the best interest of their artists.

11             Now, let me take those in reverse, Your Honor,

12  because our argument in this case is not that we act in the

13  best interest of our artists.  We don't dispute that we do.

14             Our argument in this case is that this lawsuit, if

15  we win it, will benefit our artists.  And whether there are

16  work-for-hire agreements in place or not is irrelevant

17  whether this lawsuit and winning this lawsuit will benefit

18  our artist.

19             Their second justification is that having the

20  work-for-hire agreements for these remaining roughly 2500

21  sound recordings to -- in order to invalidate them, having

22  those will do nothing to -- to invalidate the -- those

23  work-for-hire -- I'm sorry, those work -- those copyright

24  registrations.  And let me explain why under the law.

25             And if I could ask my colleagues here in the

1   courtroom to put up the statute that we're talking about here

2   and that I was (inaudible) earlier.

3          This is section 411(b)(1) of the Copyright Act,

4   which goes to the certificates of registration.  And you can

5   see what it says:  A certificate of registration satisfies

6   requirements of this section, meaning that they can bring a

7   lawsuit, regardless of whether the certificate contains any

8   inaccurate information unless-- and then there is (A) and

9   there is (B).

10         So there is two things that they would have to

11  establish in order to invalidate the registrations.  The

12  first under (A) says that the inaccurate information was

13  included on the application for registration with knowledge

14  that it was inaccurate.

15         And the second is that the inaccuracy of the

16  information, if known, would have caused the Register of

17  Copyrights to refuse registration.

18         They have to produce -- they have to prove both of

19  those.  And you can see here is a quote actually from the Cox

20  case where the judge there noted they would have to establish

21  both of the materiality and the (inaudible).

22         Having the work-for-hire agreements, either the

23  ones they already have or the ones they're seeking, are not

24  going to answer those questions.  And that's because if -- if

25  they were right, that we were not permitted to call these

1    works-for-hire -- and we definitely do not agree with that.

2    But even if they're right, if the -- if the Register of

3    Copyrights knew that these couldn't be works-for-hire, they

4    wouldn't have refused the registration because the recorded

5    agreements always have an alternative assignment provision.

6            So they say, for example, the artist agrees that

7    the sound recordings were made as a work-for-hire.  And, if

8    for whatever reason, that turns out to be incorrect, in the

9    alternative, we assign all rights to the record holder.

10           So whether it's as a work-for-hire or as an

11   assignment, the record label is assigned copyrights and,

12   therefore, has the right to get (inaudible - voice dropped.)

13   So the Copyright Office would not have refused to issue these

14   registrations, even if it was incorrect to call them

15   works-for-hire.  And as I said before, we do not agree that

16   it was incorrect to call them works-for-hire.

17           So we don't even have to get to trying to prove --

18   I see Your Honors are conferring.  I'll pause for a moment.

19           (Pause.)

20           THE COURT:  All right, you can keep arguing.

21           MR. KAPLAN:  I should proceed?

22           THE COURT:  Yes.

23           MR. KAPLAN:  Okay.  So because they can't even

24   establish 411(b)(1)(B) as we see, it's not even necessary to

25   talk about 411(b)(1)(A), that the record companies included

parable

1   on the certificate that these were works-for-hire knowing

2   that that wasn't inaccurate; but the case law that we've

3   cited before talks about why it's reasonable to deem works --

4   works-for-hire that is complicated.  And we're not aware of

5   any decision invalidating that registration for a sound

6   recording to be invalidated because it was a work-for-hire.

7          These are -- these are close legal calls.

8          I don't think we really need to debate that today,

9   because, as I said, they can't even establish 411 --

10          THE COURT:  Hold on a second, let me stop you there

11   for a second.

12          I think we're probably going to end up disagreeing

13   with you on relevance, at least for purposes of

14   discoverability.  So why don't you focus on the

15   burdensomeness.

16          MR. KAPLAN:  Sure.  Just to be clear, though, on

17   what I'm hearing, there is nothing in the work-for-hire

18   agreement that allows them to reach either of these

19   conclusions that we're looking at on the screen.  That's why

20   I'm saying producing the work-for-hire agreements is not

21   relevant to them actually trying to invalidate them.

22          With respect to -- to the burden, we're talking

23   about agreements for 2500 works here.  I don't know how many

24   work-for-hire agreements that -- that results in.  As we

25   talked about before, there are hundreds of artists, I think

133

1    probably at least 400 artists for sound recordings here.

2          It's hard to know exactly how many agreements that

3    we would have to go out and look for; but suffice it to say,

4    these are not just located in one place.  These agreements

5    are in many different places, including in some cases only in

6    physical copies, as I understand it, or in offices that are

7    not even open today.

8          And so the burden that we're talking about here is

9    trying to have someone at each of the record labels to go out

10   and try to find each of the contracts or the amendments that

11   are related to this unknown number, pull them altogether and

12   then review them and try to produce them here.  And as I've

13   said, in the situation where the offices are closed and so

14   forth, it's even more difficult.

15          THE COURT:  Well, I know, but it's not a mystery.

16   This is not a new endeavor.  It's an endeavor that's already

17   been engaged in so you ought to have some kind of concrete

18   estimate for me as to what the actual burden -- because I

19   mean, the burden ultimately is in dollars because you can

20   hire people to do things as much as you want.  You can bring

21   in contractors, paralegals, whatever you need to do, I don't

22   care.  There is people out there that need work.  So what

23   would it cost?

24          MR. KAPLAN:  You know, we talked about cost before

25   and that's something that we would need to -- to go look for.

1          But what I can tell Your Honor is that it took us

2    over three months to collect and review the agreements that

3    we produced in Bright House for these work-for-hire

4    agreements and that was without the follow-up issues.  So it

5    is significantly time-consuming.

6          I think Mr. Sperling may want to say something, so

7    I would like to just turn it to him for a moment.

8          MR. SPERLING:  So just to elaborate, to answer your

9    question, Judge Hegarty, we had this conversation before --

10          THE COURT:  Right.

11          MR. SPERLING:  -- like a year and a half ago.  And

12    you are consistent, among many other virtues, and you raised

13    the question, and this was the 110 sample.  Does the Court

14    recall the 110 sample?

15          THE COURT:  Right.  And I -- and there was actually

16    results from that sampling that you gave me where I think

17    they questioned -- ended up questioning why?

18          MR. SPERLING:  There were results from the

19    sampling.

20          THE COURT:  Right.

21          MR. SPERLING:  And you got briefing from both

22    sides --

23          THE COURT:  Right.

24          MR. SPERLING:  -- and we came back in front of you

25    and you said, I don't see much here, but here is my ruling.

1    The compromise is what you have to do in Bright House, you do

2    it anyway.  Produce in this case what you produce in the

3    Bright House case anyway.  And that's what we did.

4            And they're not coming up with anything new, you

5    know.  It's the same arguments that they made before.

6    They're just trying to see if they can get you to do

7    something different this time around a year later.

8            THE COURT:  No, but did I say -- did I say that's

9    the end of the issue?

10           MR. SPERLING:  No, Your Honor.

11           THE COURT:  That's the question.  I mean, I know --

12   I think I remember saying that.  But did I say:  That's the

13   final ruling?  That's the issue.

14           MR. SPERLING:  I -- it was certainly your final

15   ruling on the matter.  I don't have the transcript in front

16   of me.  I certainly don't recall you saying:  And I never

17   want to hear about this again.

18           THE COURT:  I don't think I've ever said that,

19   anyway.

20           MR. SPERLING:  But to the burden point, Your Honor,

21   I know you want to hear from them on that.

22           To the burden point, that was what motivated the

23   sample.  We could go back and try and reconstruct if that was

24   burdensome, even for the 110.  But you already had a solution

25   to that and it was based on those results of that exercise to

1   address the same burden question that you have now.

2          Maybe -- you ultimately ruled that we didn't have

3   to do it beyond what we're doing for Bright House.

4          THE COURT:  Right.  I mean, in some of these cases

5   that I've dealt with, a healthy statistical sample

6   extrapolated out to the whole is sufficient to produce the

7   result you want to argue in Court.

8          That's why I'm asking the defense to articulate a

9   reason why that's not true here.  Now, if it's a good enough

10  reason, I think, you know, we know what the result will be.

11  But if it's not a good enough reason, then it's not worth the

12  effort.

13         So it's a constant scale, sliding scale of effort

14  versus result, versus need, versus cost.  And you put those

15  into a blender and out comes a concoction.  And so I'm trying

16  to determine what the ingredients are here.

17         MR. SCHAPIRO:  So, Your Honor, on the burden point,

18  I mean, saying that -- excuse me, saying that an effort took

19  three months doesn't necessarily communicate how much time

20  went into that and certainly there would be some -- some

21  learned processes from that endeavor that could be applied

22  here.

23         And then in terms of the number of works for which

24  this pertains to, again this analysis is done on artist --

25  essentially, an artist-by artist basis.  And there are, as we

1   discussed in the context of torrents, sometimes there is 40,

2   50, 60 works-in-suit by the same artist because there was a

3   torrent with a discography, right, so it's fewer agreements

4   than works-in-suit.

5            And you know, if the burden is becoming a critical

6   issue here, I mean, we are undergoing this analysis and we

7   would be willing to work with the Court or plaintiffs

8   in terms of identifying the overlap, if that was part of the

9   calculus.

10           I didn't hear that from plaintiffs as being a

11  concern, but, you know, certainly we're going towards the

12  same goal here, which is to fill in the gaps.  And so we can

13  help identify --

14           THE COURT:  No, but would you be willing to pay for

15  it?

16           MR. SCHAPIRO:  Well, you know, I'll defer that --

17  the way that -- the way that this process was set up was to

18  essentially minimize discovery disputes by coming to some

19  resolution.  And you know, plaintiffs are seeking $150,000

20  per work in this case.  And we are putting plaintiffs to --

21  to task, essentially, to -- to meet the burdens that they

22  need to meet to be entitled to that potential award.  And one

23  of those is showing that they have valid registrations.

24           Again, you know, we're not hearing numbers and

25  hours.  We heard months.  The discovery pace back then was

1    much slower than it is now, so I don't know how long things

2    would take today with the kind of urgency that everyone is

3    operating under.  But I would say that we would be -- we

4    would be willing to engage in that discussion further with

5    the Court and plaintiffs, obviously, in a view of getting the

6    information.

7         MR. KAPLAN:  Well, Your Honor, I mean, it's an

8    unknown number of works, but if there is something more than

9    400 recording artists, at least in this case, and 80 percent

10   have been turned over, that could be, let's say, 20 percent

11   of the artist, I mean, you're talking about, perhaps, up to

12   100 different recordings agreements to go out and find any

13   amendments to -- it's not just, you're sending people out

14   there to find them, as I said before.  These could be located

15   in many different places depending on where they are

16   (inaudible) and depending on where the client's offices are.

17        Again, it's not simply just thinking about hours or

18   costs, the distractions of business.  The folks -- we have

19   to consider now what Your Honor ordered earlier with respect

20   to the production of that financial information, which as

21   we've said before, is a tremendous amount of work to put

22   together.

23        Again, I just want to emphasize, I mean, this

24   discussion goes back a year and we produced the large

25   majority of the Bright House work-for-hire agreements back in

1  May and we haven't heard a word since that.

2         And now, we're in late February with just a few

3  weeks left in the discovery period.  And, you know, it would

4  have been one thing to talk about this burden when there was

5  a year left in the discovery period or nine months, but with

6  a few weeks and with everything else to do, it's extreme.

7         THE COURT:  Well, a few weeks, I'm not sure -- I

8  would say you've got three or four months left, number one.

9         Number two, I mean, the way I view a party's

10  ability to come to the Court and move to compel -- let's say

11  you have this case -- when did discovery start in this case?

12         MR. ROSENTHAL:  November or December of 2019 --

13         THE COURT:  2019.

14         MR. ROSENTHAL:  '19.

15         THE COURT:  All right, 2019.  So we've had

16  basically six -- 15 months of discovery.  So if something

17  occurs in month three and there is a disagreement and the

18  defendant doesn't get what they want at that moment and they

19  don't revisit it until month ten, I don't think there is a

20  waiver there.

21         I think, as you're nearing the end of the discovery

22  period, everybody has an obligation to tee up whatever

23  disputes remain, get them resolved among themselves.  If not,

24  go to the Court.  That's just what we do.  We resolve

25  discovery disputes.

```
 1              Now, if you don't bring it to us until a month or
 2    two after discovery is finished, then it might be a problem.
 3    But if you're actually bringing this as a dispute within the
 4    discovery period still, I just don't see that as an issue
 5    that precludes the defense or the plaintiff from raising it,
 6    you know.  It's just not an effective argument to say you
 7    should have raised it back then because we're still deep in
 8    discovery at the moment.  So that, I'm not buying.
 9              You know, you're not raising privilege.  You are
10    raising burdensome; but at the same time, among all the
11    things we've talked about, some of the things were virgin
12    soil that you're going to plow.  This is not.  This is a
13    ground that's plowed already.  We've already plowed 140 acres
14    of the 160.  They're just asking you to plow the remaining
15    20, so --and do it the same way you've already done it.
16              So you have a process for which you've engaged in
17    that other case for a lot of works at issue.
18              The question, I guess, for us is:  In the overall
19    scheme of things, based on their arguments of relevance and
20    your arguments on burdensomeness, is it worth producing the
21    remaining 20 percent?  And that's the issue we have to
22    decide.
23              Anything I said that was way off base?
24              MR. KAPLAN:  Well, Your Honor, I mean, I think --
25    here's the thing.
```

1        So the 110 sample was produced back in February,

2   hundreds more were produced in May.  They haven't gone to the

3   Copyright Office for any of these.  And they have to, right.

4        If you would turn to the second slide, the process

5   that Mr. Anderson talked about before is that they would need

6   to go to the Copyright Office through the Court and ask for

7   the Copyright Office to advise the Court whether that

8   inaccurate information -- and we don't consider it

9   inaccurate -- if known, would have caused the Register to

10  refuse registration.

11        THE COURT:  Right.  Are you familiar with that

12  process?  Have you seen that process occur?

13        MR. KAPLAN:  I actually have been involved in a

14  case, Your Honor -- it's the case that I've cited there in

15  the bullet.  It concerned one registration.  They're talking

16  about --

17        THE COURT:  I never had it.  How long did it take

18  the Copyright Office to actually do this?

19        MR. KAPLAN:  It took a few months for -- I mean,

20  first we litigated the issue with the district court who then

21  said, Okay, I hear everything.  I now need to refer the

22  question to the Copyright Office.  So the district court did

23  that.  The Copyright Office took, I believe, a few months.

24  Came back.

25        What the Copyright Office said was actually

142

1    inconclusive.  And then the district court had to consider

2    what the Copyright Office said or didn't say in order for the

3    district court to then decide, Well, you know what, we're not

4    going to invalidate this.

5              THE COURT:  Okay.  To the extent -- my belief is to

6    the extent this requires actually initiative by the Court to

7    reach out to the Registrar of Copyrights, Brooke Jackson is

8    not going to do that.  So I think that's not the purpose.

9              I'm looking at this information as being relevant

10   toward actually going and validating copyrights.  I -- I

11   thought the defendants said that's not necessarily what

12   they're going to do; they're going to use it in the lawsuit

13   for some other purpose.

14             Am I wrong about that?

15             MR. ANDERSON:  There were two prongs, Your Honor.

16   One was seeking to invalidate registrations for purposes of

17   plaintiffs being able to pursue their claims here.

18             THE COURT:  Well, would Brooke Jackson -- would

19   Judge Jackson have to reach out, as this slide says:  The

20   Court shall request?  Would he have to do that?

21             MR. ANDERSON:  The party requesting, I think, is

22   typically the one that does the leg work here.

23             THE COURT:  So the Court doesn't authorize the

24   request?  You can do it independent of any -- any involvement

25   of the district court?

143

1          MR. ANDERSON:  The way I've seen it in case law

2     and, obviously, Mr. Schapiro has -- sorry, Mr. Kaplan has

3     some experience, as well, is that when seeking to invalidate

4     registrations, it's, for lack of a better term, error if the

5     Court invalidates a registration without first having this

6     process be undertaken, i.e., the copyright -- the Register of

7     Copyrights weighing in.

8          However, what the Copyright -- Register of

9     Copyrights says is merely persuasive to the Court as to

10    whether or not the Court will invalidate the registrations.

11    But there does need to be that step first.

12         Judge Jackson does not need to be the one who

13    submits something, I don't believe.  I think we would.

14         MR. KAPLAN:  I don't -- I don't think that's right.

15         I mean, first of all, if you just look at the

16    language of the statute that's on the screen, it says:  The

17    Court shall request the Register of Copyrights.  So I believe

18    it is the Court that has to ask for this as part of the

19    lawsuit.  And then the Register takes this referral,

20    considers it, and then issues a written sort of almost

21    advisory opinion, which may not (inaudible) as happened in

22    the RG case.

23         THE COURT:  So when did you get the 80 percent that

24    you already have?

25         MR. ANDERSON:  If I could just -- we would write

144

1    the submission, obviously.  We wouldn't require the judge --

2            THE COURT:  When did you get the 80 percent you

3    already have?

4            MR. ANDERSON:  In May, June, I believe.

5            THE COURT:  And you haven't sought to do this yet,

6    with regard to 80 percent; is that correct?

7            MR. ANDERSON:  Correct.  And I'm glad Mr. Kaplan

8    brought this slide up again, or at least the one before that

9    had the two steps for invalidating the registration.  And he

10   said that the work-for-hire agreements themselves wouldn't

11   give us what we need to do.  So, exactly.

12           That's why we're here, one, trying to get the

13   work-for-hire agreements.  And then, two, we need to depose

14   plaintiffs on those agreements, the lack thereof, whether

15   there were any other agreements, and whether they knew that

16   when registering this work as one made for hire that, in

17   fact, the agreement that they had on file did not have such

18   provision.

19           That goes to the knowledge or the intent purpose.

20   So that's why --

21           THE COURT:  I'm not going to view this law or the

22   actual invalidation as a basis for ordering anything here,

23   because you haven't done it in the Bright House case, you

24   haven't done it in this case.  You've had the information for

25   nine months to do it, and I just don't believe you're going

1    to.

2             So if there is another foundation for how this

3    might be used in our case, give it to me now, because I don't

4    believe that you can possibly engage in that process in time

5    enough for it to matter here.  And I don't think Judge

6    Jackson would participate to the extent any court involvement

7    is required, because he has already made express statements

8    about this is not going to be tried on a work-by-work basis.

9             MR. ANDERSON:  Certainly, Your Honor.  So we need

10   deposition testimony with the agreements in order to

11   establish what is required to meet the statutory requirements

12   here.

13            THE COURT:  But you already have a lot of

14   agreements.  Have you sought that deposition testimony

15   already?

16            MR. ANDERSON:  We have.  And plaintiffs are

17   objecting to it, which is not teed up for today, and we've

18   had a process with the Special Master to address 30(b)(6)

19   topics.  But we haven't taken yet a plaintiff's deposition

20   yet on this issue, and we had a four-hour, three-hour meet

21   and confer last week on this.  That is happening presently.

22            And to your second point, with respect -- with

23   respect to the timing of this, the invalidation of

24   registrations could be resolved prior to trial.  All this is

25   relevant to in terms of trial preparation is how many

146

1    works-in-suit there are, how many awards of statutory damages

2    would plaintiffs be able to obtain if they established

3    liability.

4            And third, with respect to Judge Jackson's notion

5    of not -- not wanting to try this on a work-by-work basis,

6    the jury would never catch wind of this invalidation process

7    because it would be resolved prior to trial.

8            But to your other -- your first point, which is the

9    two bases for relevance, one is this:  The invalidation

10   process.  The other the jury would hear about.  And that is

11   related to essentially plaintiffs' acts of generally

12   registering works as works made for hire without -- without a

13   valid basis to do so, but that -- that is --

14           THE COURT:  So what you're saying is -- let's say

15   we require the additional 20 percent to be produced, you get

16   your deposition.  You are representing to the Court that you

17   are going to engage in an effort under that statute to

18   invalidate it?  You are going to do that in the next three or

19   four months, because that's all the time you have.

20           If you go into trial in October, I mean, that's --

21   that's only seven months away right now.  And discovery ends

22   way before you go into trial and dispositive motions need to

23   be briefed to give the month -- Court several months to

24   decide, because no district judge decides a motion for

25   summary judgment with only weeks before trial.  They just

1  deny them out of hand and say, We're just going to try the

2  case, I'm not going to put in the work.

3          So there is some time you have to build in here.

4          Are you going to do that?  Plainly answer that

5  question.

6          MR. ANDERSON:  If we find evidence, if we're

7  provided the agreements and we get deposition testimony to

8  support the statutory requirements here, that is our

9  intention.

10          THE COURT:  And you're going to do it on a

11  work-by-work basis because that sounds like what you have to

12  do.

13          MR. ANDERSON:  Well, it's on a

14  registration-by-registration basis.

15          THE COURT:  All right.

16          MR. ANDERSON:  And there are multiple works

17  registered on single registrations.

18          THE COURT:  Okay.

19          MR. ANDERSON:  And the issues that we identify are

20  on an artist basis.  So we could have flagged, say, 100

21  potential issues, take depositions, and whittle it down to 20

22  or 30.

23          THE COURT:  How many registrations are there at

24  issue in this case?

25          MR. ANDERSON:  I think about 1500 on the sound

1   recording side, if I recall correctly.  But the point being

2   is that there could be anywhere from 5 to 20 -- so, for

3   example, a record company will register an entire album on a

4   registration, so it's going to be 12 or 15, or however many

5   tracks are on that album.  So if we invalidate that, that's

6   12 works.

7          So I mean, I completely understand Your Honor's

8   reticence with respect to timing and process here, but I do

9   not think that should -- if we found there to be issues

10  worthy of raising in this process, that it would be a

11  voluminous effort.  It would be, I would think, in the

12  potentially dozens.

13         And I'm sure that there is a way to frame it for

14  the Copyright Office, as well, to address -- address, you

15  know, joint questions.

16         MR. KAPLAN:  So, Your Honor, first of all, based on

17  what was just said, why isn't the 80 percent plus, that they

18  already have sufficient to do that?

19         THE COURT:  I think they said they don't have any

20  deposition testimony.  They actually need that, plus

21  deposition testimony, in order to do this process in their --

22  in their mind.

23         MR. KAPLAN:  So on the deposition testimony, Your

24  Honor, this also came up during the February 19, 2020 hearing

25  when Charter, at the time, expressed to you that they

1   intended to have a 30(b)(6) witness testify to works-for-hire

2   provisions for every single work in the case and you

3   expressed great skepticism that that could happen, that the

4   plaintiffs could prepare their witnesses to answer that on a

5   work-by-work basis.

6           So, I mean, it all goes to the same place that Your

7   Honor was before, which is the idea of doing this for, even

8   just some or many of the registrations in this case at the

9   point in time with what's called for in the statute that

10  we're looking at here, it's just -- it's just impossible.

11          And this could have been done, if they really were

12  going to (inaudible) I realize they're talking about taking

13  depositions now, but they could have asked to take deposition

14  on this particular point a long time and yet, they haven't.

15          MR. ANDERSON:  Your Honor, I mean, in terms of the

16  timing, we -- the parties have, essentially, negotiated a

17  one-time sitting for all of the party witnesses.  So that's

18  what we're working towards and this is one of the issues.

19          And if our positions back in February and

20  throughout discovery were broader, that was to protect our

21  rights, you know, in order to get everything we need to do

22  this investigation.

23          But like, as I represented to the Court, you know,

24  if we have a valid -- valid basis for pursuing this with the

25  Copyright -- Register of Copyrights, we will do so, but I do

1    not anticipate that it will be very voluminous.

2              And if it is, and if we have a good faith basis and

3    we tell it to plaintiffs, I mean, it should -- perhaps

4    they'll remove the works from the case.

5              THE COURT:  But if it's not going to be very

6    voluminous, is it proportional to the needs of the case?

7              MR. ANDERSON:  Well --

8              THE COURT:  So if you're probably going to knock

9    out 1 percent, I mean, 1 percent of a billion dollars is --

10             MR. ANDERSON:  Correct.

11             THE COURT:  -- 10 million, $10 million?

12             MR. ANDERSON:  Let me put it -- let me put it in

13   this perspective.  If we can invalidate one registration,

14   that's a $1 million of statutory damages.

15             MR. KAPLAN:  That's at -- that's at every work on

16   that registration, is that --

17             MR. ANDERSON:  Well, we would be entitled to --

18             THE COURT:  Hold on.

19             MR. ANDERSON:  Sorry.

20             THE COURT:  Go ahead, Mr. Kaplan.

21             MR. KAPLAN:  Sure.

22             I mean, Mr. Anderson is talking as if they're going

23   to bring in, you know, ten registrations and those ten

24   registrations are each going to cover ten works and they're

25   going to then get 100 works that are in the suit.  And that's

1    not what's going on here.

2           And I will say, I'm not aware of a single time

3    where the Register has invalidated a sound recording because

4    there was an application made that checking off the

5    work-for-hire box was fraudulent and inaccurate and it

6    wouldn't have led to a registration if they knew what they

7    were doing.

8           So I just -- the whole thing is fantasy.  And

9    again, if they really needed to do this, they can do it with

10   what they have.

11          THE COURT:  All right, hold on.

12          (Pause.)

13          What was the results of the sampling, of the 110

14   that we already did?  Can somebody make a representation of

15   that?

16          MR. ANDERSON:  I believe we flagged issues with

17   respect to eight works in the sample that pertained to

18   somewhere around 40 works if you applied those issues to

19   outside the sample.

20          THE COURT:  And, Mr. Sperling, do you want to give

21   a response?  You think that's correct?

22          MR. SPERLING:  I don't think it is, Your Honor, but

23   I don't -- I just don't have it on my fingertips. My

24   recollection is single digits, I think.

25          What they raised was in the single digits, and I

152

1    think we debunked all of it in our paper, but I -- I wouldn't

2    want to make that absolute representation to the Court,

3    because I don't have it on my fingertips and I don't have a

4    recollection.

5              Whatever it was was not enough to make you believe

6    that there was a "there" there that needed to be pursued.

7    And the reason we came on to the BHM thing was not because he

8    said, Well, I think you should produce some further sample.

9    They made the point, which was a fair point, they said, Well,

10   if they're doing it anyways to a bunch of works in another

11   case, like, why can't we just have that?  And you said, Well,

12   that makes sense.

13             But this, I do have a firm recollection of.  It was

14   not that you were motivated by any belief that they made a

15   showing of some kind.

16             THE COURT:  But wasn't -- the 110 they got to

17   choose?  It wasn't a random sampling; is that correct?

18             MR. SPERLING:  Correct.  It was cherrypicked on

19   their part, and they still didn't make a showing that

20   satisfied you.

21             MR. ANDERSON:  And if I could just add one thing

22   for the record, I mean, in terms of the debunking that

23   occurred, it wasn't a debunking on the argument that we were

24   making; it was merely a recitation of the fact that under

25   their interpretation of law, it doesn't matter.

153

1              MR. KAPLAN:  Can I --

2              THE COURT:  That request is denied.

3              MR. SCHAPIRO:  So would this be a good time to take

4      five minutes and grab our sandwiches?  Or we're also happy

5      to --

6              THE COURT:  You can, yeah.  Go ahead.

7              MR. SCHAPIRO:  -- go forward, unless there is --

8              THE COURT:  I don't think we have sandwiches.

9              SPECIAL MASTER:  We do.

10             THE COURT:  Oh, all right.  Okay, grab your stuff.

11             MR. SCHAPIRO:  Thank you, Judge.

12             (Audio begins at 1:40 p.m.)

13             MR. ROSENTHAL:  -- here.  I don't think there

14     should be sampling on either side here, but -- but if that's

15     going be the standard here, it's got to be the standard for

16     everybody.

17             THE COURT:  Well, with a proper foundation.

18             MR. ROSENTHAL:  With the proper foundation.

19             THE COURT:  Okay.  Well, I think honestly, it's --

20     I think Ms. Rodriguez agrees, but there is a foundation

21     clearly that has been laid that the first go-around was not

22     perfect.  That foundation has been laid.

23             And the second go-around, we're taking your word

24     that it's perfect, but actually you gave that word implicitly

25     with the first round, because that's what you do when you

1  say, Here are the responsive documents, you are representing

2  that you have engaged in a good faith search and these are

3  the hits, the proper hits.

4        So that's enough of a basis for me.  Yeah, every

5  hundredth document, please, randomly -- I mean, not randomly,

6  but numerically.

7        What's the next issue?

8        MR. SCHAPIRO:  I think Ms. Brewer has --

9        THE COURT:  By the way -- by the way, okay.  I want

10  you guys to report back to me on both of these every

11  hundredth documents.  I want a specific report once those are

12  produced.

13        MR. GOULD:  With regard to ours, they're being

14  produced to you --

15        THE COURT:  That's true, that's true.

16        MR. GOULD:  -- because they're (inaudible) in-house

17  counsel.

18        THE COURT:  And I'll need a report back from you on

19  theirs.

20        MR. GOULD:  Sure.

21        THE COURT:  Because that's going to matter -- I

22  mean, you know, when a federal law enforcement agent comes to

23  me and wants a warrant because they think something is there,

24  I tell them, You come back to tell me what you found.

25  Because sometimes there is an overly aggressive in describing

1   the matter to a judge and there was nothing there.  They just

2   were hoping something was there.  That matters to me.

3           So I want you to file a report as soon as you get

4   these and I want you to tell me what you found, okay.

5           MR. SCHAPIRO:  Will do.

6           MR. GOULD:  Your Honor, with all due respect, if

7   we're in a goose/gander world, then our documents should go

8   to you as well.  We've got about a dozen, you know, eight to

9   ten of our custodians are attorneys.  If a concern to theirs

10  is producing nonresponsive documents that capture privilege,

11  then the same apply in great measure to ours.

12          THE COURT:  Well, I asked you specifically, I

13  thought, whether you're relying on privilege and you're not;

14  you're relying on responsive.

15          MR. GOULD:  I'm making a different point, Your

16  Honor, maybe not clearly.  Many of our document custodians

17  are attorneys, including in-house litigators.  I can't turn

18  over a set of nonresponsive documents willy-nilly without

19  doing a careful privilege review.  If you would like to see

20  them in-camera, as far as sampling consistent with the

21  approach you've taken for Charter custodians, we don't like

22  it, but we'll live with that.  And I suppose you'll get to

23  revisit your second request today by looking through these

24  documents.

25          THE COURT:  Yeah, but I'm not sure I'm educated

1   enough about what's relevant in these documents, as opposed

2   to the ones that you're giving me.  I don't know if I can do

3   that.

4           MR. SCHAPIRO:  We have no objection to logging.  If

5   they're privileged, we don't want to see privilege documents.

6           THE COURT:  Well, also, I mean, they would clawback

7   anything that -- I mean, you have to return anything that's

8   privileged, although, you know, obviously that's a problem.

9   I know it is, in your mind.  But Mr. Sperling is just like

10  steaming.

11          Go ahead and say what's on your mind.

12          MR. SPERLING:  I'll try and keep the steam in, Your

13  Honor.

14          Respectfully, there is no basis that we can see for

15  differentiating.  We talked yesterday about them doing a

16  privilege review and we'd only get the ones that they agreed

17  weren't privileged.  And they made a loud argument about how

18  we shouldn't be able to see, even nonprivileged documents

19  that are not responsive.  And that is what led to your

20  conclusion --

21          THE COURT:  No, no.  I only want -- I care -- I

22  don't care if you guys see nonprivileged documents that

23  aren't responsive.  That's -- that does happen; but that's

24  not a harm, in my view, like it is to see a privileged

25  document.

1        MR. SPERLING:  So all that we're looking for is

2    equivalent treatment.  If the parties are going to do a

3    privilege review, log those that they believe are privileged

4    and submit those to you for review, right, and produce

5    directly to the other side those they don't think are

6    privileged, we'll do that.

7        THE COURT:  Well, so --

8        MR. SPERLING:  If we're going to do it in-camera,

9    we'll do it in-camera, but --

10       THE COURT:  So you're going to be producing 300

11   documents, they're going to be producing -- somebody --

12   they're going to be producing 270.

13       MR. ROSENTHAL:  But wait a second --

14       THE COURT:  Wait, wait, no, no, let me finish.  You

15   just don't want to interrupt a judge.

16       And so what's the burden of you all doing your own

17   privilege review?  I don't want to look at privileged

18   documents, I don't want do that review for you guys.  I want

19   you to produce this random sample, but I don't want to make

20   privilege calls.  So withhold out of the 270 or 300, whatever

21   you think is privileged.

22       MR. SPERLING:  And log for the other side, I take

23   it?

24       MR. ROSENTHAL:  But wait a second --

25       THE COURT:  Log?  Oh, yeah, log.  Of course, sure.

1          MR. ROSENTHAL:  But, Your Honor, this is

2    fundamentally different.  They have not tied the Kirill

3    Abramov documents to a particular request.  They want to say,

4    Generally, we want to you look at his documents, not tying it

5    to a specific request.  You go through --

6          UNIDENTIFIED SPEAKER:  You want to make sure there

7    is a distinction because (inaudible).

8          MR. ROSENTHAL:  No.  The distinction is we've tied

9    this to a particular request.

10         THE COURT:  All I'm saying is-

11         MR. ROSENTHAL:  They're tying it -- we have a

12   general feeling that you -- because of the one document, the

13   one document, which wasn't related to custodial issues, we

14   have a general feeling you haven't complied with your

15   discovery obligation, so one out of every 100th produced of

16   Kirill Abramov, not the tied to a specific request.

17         MR. GOULD:  So, I'm sorry.

18         THE COURT:  They're trying to calm him down --

19   they're trying to calm him down themselves, so why don't you

20   ahold for a second.

21         MR. ROSENTHAL:  All right.  So I'm told that I'm

22   being corrected.  All right, I'm being told to be quiet.

23         MS. GOLVINEAUX:  I just -- I wanted to clarify --

24   I'm sorry for butting in.

25         The only -- we just want to make sure there is not

1   a confusing record, because we are not intending to do a

2   privilege review on the 270 documents from our in-house

3   litigation counsel.  We're going to give them all to you for

4   in-camera review because we expect most of them are

5   privileged.  And so that's the process we --

6           THE COURT:  I thought only some were going to be

7   potentially privileged, not the vast --

8           MS. GOLVINEAUX:  Yes, there may be some that

9   aren't --

10          THE COURT:  (Inaudible) some that are.

11          MS. GOLVINEAUX:  -- but we're not planning to

12  withhold anything from you.  We're giving it all to you.  And

13  so we're talking about their documents that are possibly

14  nonresponsive, but not privileged.  We're not asking to do

15  anything other than if they come across them in that 200 to

16  300 documents that they have to do, if they come across a

17  privileged one, don't give it to us.  Just put it on your --

18          THE COURT:  No, I'm misunderstanding what I ordered

19  yesterday then.  I thought that there were so many hits --

20  this was with the hits, right, which were the greatest hits

21  of all time?

22          MS. GOLVINEAUX:  Yes, yes.

23          THE COURT:  So this was hits.  And how can you only

24  produce 50 when you have 27,000 hits?

25          MS. GOLVINEAUX:  Well, the (inaudible) is they were

1    logged --

2            THE COURT:  And then I thought you guys told me

3    some of these might be privileged.  And that's when I said

4    produce them in camera, but nobody suggested then, yesterday,

5    that you just withhold the privilege ones and put them on a

6    log and let the other side see a log.

7            So produce all the documents that aren't

8    privileged, log the ones that are and produce the log with a

9    good description.  I don't see what the problem is with that.

10           MS. GOLVINEAUX:  I don't either.

11           THE COURT:  Well, I assume you want to do both

12   sides?

13           MR. SPERLING:  Right.

14           MR. SCHAPIRO:  Well, Your Honor, a couple --

15           THE COURT:  So I don't have to do anything.

16           MS. GOLVINEAUX:  Judge, I tried to reach out to a

17   previous order and we just wanted to make the record clear

18   about that.

19           THE COURT:  Okay, yeah.  I'm amending the previous

20   order.  You all produce the documents to one another; but if

21   you're withholding anything, out of those purely every 100th,

22   and you've got to do every 100th.  You know, if you get to

23   100 and, Oh, man, this is a document, let's do 99 or 101,

24   that would be sanctionable contempt.

25           MS. GOLVINEAUX:  But that's -- that's going to be a

1    very -- that's the problem that we talked about yesterday.

2    We are talking about our in-house litigation counsel's

3    documents.  That's why they all have to go to you.

4            There are not documents in -- I mean, we can

5    through those.  And if there are documents that are not

6    relevant and not privileged, you know, those -- those are not

7    going to -- yesterday we talked about our in-house counsel,

8    litigation counsel's documents.  They're all going to you for

9    in-camera review.  And if you find issues with them, that's

10   going to lead to something else.

11           THE COURT:  So was the issue yesterday, that's

12   privilege or responsiveness?

13           MS. GOLVINEAUX:  It was privilege.  It was

14   absolutely --

15           MR. SCHAPIRO:  But one of the reasons, that --

16           MS. GOLVINEAUX:  Sorry.

17           MR. SCHAPIRO:  -- that we'll be making more work

18   for you and everyone if we -- if we first -- if the idea is

19   to pull out the ones that we think are privileged from

20   Mr. Abramov and turn over to them, is we're going to have to

21   be making calls on that that we think are right about what's

22   litigation and what's business, what's privilege.

23           An in-house counsel for whom I'm going -- I can

24   represent that a majority of his -- he's constantly talking

25   with outside counsel about cases.  So what will happen if we

162

1    turn it over to them, is we're going to give them a log with

2    this many items.  And then we're going to give them one, and

3    we're going to come back and be fighting about the log.  So

4    we thought we would short-circuit that step by giving the 270

5    to Your Honor.  And I think that just saves everyone time.

6              So what happened with the documents they give us,

7    we'll take it either way:  They do to you, they go to us with

8    the privilege ones logged.  We don't care.

9              SPECIAL MASTER:  All right.  So let's just table

10   set for a second so we're all operating on the same page.

11             My recollection from yesterday is that the

12   challenge with respect to the Kirill Abramov's documents was

13   that plaintiffs were challenging whether documents that were

14   being withheld as privileged were actually operational and,

15   therefore, the privilege did not apply, or for some other

16   reason that those documents should not actually be considered

17   privileged; is that correct?

18             MR. SPERLING:  No, that's not correct, Ms.

19   Rodriguez.

20             SPECIAL MASTER:  State it in three sentences or

21   less what is actually correct, in your opinion.

22             MR. SPERLING:  What is correct -- the concerns over

23   the responsiveness determinations that they made with the

24   result that there was an order that, with respect to those

25   documents of -- three custodians, Mr. Abramov, Ms. Rowlett

1    and Mr. Mabb, for those documents that were search hits,

2    search term hits, they would -- but redeemed nonresponsive,

3    they would take every hundredth such document, search term

4    hit, deemed nonresponsive and produce them.  The ultimate

5    determination was -- I think this is my third sentence -- the

6    ultimate determination was --

7            THE COURT:  Wrap that sentence.

8            MR. SPERLING:  -- that they would go to Chambers

9    for review in Chambers.  That's the three-sentence answer.

10           The one sentence request is:  We just want like

11   treatment.

12           MR. ROSENTHAL:  But wait a second.  First of all,

13   yesterday was related to Kirill Abramov, now we've expanded

14   this.  And again, they're not tying there to a particular

15   deficiency in a particular request.

16           MR. SCHAPIRO:  Here is what we would like to do.

17           All documents from Kirill -- the hundred -- the

18   number that we're going to sample from Kirill Abramov to Your

19   Honors without us doing -- trying to guess on privilege

20   because that might just end up disputed.  Their documents,

21   their one out of a hundred, I really don't care whether they

22   come to us or they do to you first.

23           If it's important that they go to you first, fine.

24   I think it might be easier for the reasons that Judge Hegarty

25   said and maybe save us steps if they just pull out the

1   privileged ones and give us the (inaudible) ones.  I don't

2   think it's worth fighting much about.

3           What is worth fighting about is yesterday we spoke

4   only about Kirill Abramov and we think we're far down this

5   road.  We're not -- we're not agreeing to any other -- to

6   these other two -- two people whose e-mails -- whose

7   materials you didn't even look at.

8           THE COURT:  Well, here is what I've -- I've --

9   happened yesterday.  We were given a device, we looked up

10  documents on that device for responsiveness.  We actually

11  didn't find any that we found particularly responsive.  We

12  weren't looking for privilege; we were looking for

13  responsiveness.

14          I thought you guys said, Yeah, but when we produce

15  every hundredth, some potentially are privileged.  And that's

16  why then I said, Okay, well, then I understand, submit it all

17  in-camera.  But I didn't think about the possibility of just

18  marking those on a privilege log not producing them.

19          What's wrong with that, again?

20          MR. SCHAPIRO:  The problem is -- what I said a

21  little earlier, that with a custodian, such as Mr. Abramov we

22  are likely to be logging the overwhelming majority of them as

23  privileged and then the other side is, I believe, going to be

24  challenging those calls.  So --

25          THE COURT:  But we've had indicated as far as what

1    we think is privileged because we've gone over with you

2    things we didn't think were privileged and things we did

3    think were privileged, so at least you know what's in our

4    head, right?  And so you can use that knowledge when you make

5    this -- this privilege call.

6            But then what you're saying is, we're going to have

7    to make a privilege decision primarily and not a

8    responsiveness decision?

9            MR. SCHAPIRO:  I think what would happen is you

10    would see these documents and you would say, Boy, it's not

11    actually that strange to us that so few of Mr. Abramov's

12    e-mails were produced, because even these ones that are

13    nonresponsive and, therefore, weren't logged in this case are

14    plainly privileged, so there is no "there" then.

15            THE COURT:  Okay.  So, well, produce -- to me the

16    privileged -- to us the privileged ones, produce to them the

17    nonprivileged ones, okay.

18            MR. ROSENTHAL:  Your Honor, I -- sorry.

19            THE COURT:  I'm still going to make you make your

20    privilege call in the first instance.  I'm not going to make

21    your original privilege call.  You make it, log it.  Don't

22    produce the log yet.  Produce the documents to us, all 270,

23    but designate the ones you're saying are privileged.  Produce

24    to them the nonprivileged of those 270, so they've got a

25    smaller subset similar to what I have.  Okay?

166

```
 1            MR. SPERLING:  And I take it maybe this --

 2            (Inaudible discussion.)

 3            MR. SCHAPIRO:  (Inaudible) the remaining

 4   ones (inaudible - overtalk).

 5            SPECIAL MASTER:  I just want to clarify.  You

 6   identified two other custodians, was it --

 7            MR. SCHAPIRO:  Yes.

 8            SPECIAL MASTER:  -- or whomever it was.  My

 9   recollection from yesterday it was a Mr. Weber and a Ms. --

10            THE COURT:  We added those as custodians, yeah.

11            SPECIAL MASTER:  Those were added as custodians --

12            THE COURT:  Field.

13            SPECIAL MASTER:  -- but these were not going to be

14   documents that came to us.

15            MR. SPERLING:  So -- so when we presented this all

16   to Judge Hegarty three weeks ago, we talked about the three.

17   And he said bring the documents for the three, and we -- and

18   that was what was presented in our papers.  And so we

19   understood the ruling yesterday to be as to those three

20   custodians.

21            THE COURT:  What we understood, at least what was

22   going on yesterday, is we agreed you're going to add Scott

23   Weber and Charlotte Field as custodians and the Abramov

24   documents were the 27,000-plus hits.

25            MR. OPPENHEIM:  Your Honor, this is Matt Oppenheim.
```

1          We're mixing different issues that we covered

2    yesterday.

3          THE COURT:  I agree.

4          MR. OPPENHEIM:  One that we did cover was the issue

5    of the custodians and whether Weber and Field should be

6    added.  That was a different issue.

7          On the issue of the review, as a result of the

8    issues that arose from the metrics report, we identified

9    three witness -- three custodians whose documents we believe

10   needed to be reviewed whose files had not been spoliated.

11         It was in our original papers to you, it was in the

12   presentation yesterday, it was on the slides.  And the three

13   custodians, Abramov -- excuse me, Mabb -- and I'm sorry, I'm

14   blanking -- Laurie -- Laurie Rowlett, and we identified all

15   three yesterday.

16         It is, I believe, the case at the end, you referred

17   only to Abramov, which may be why there is a little

18   confusion, but we had put all three up and have for the last

19   month.  And it was only at the end, that you just referenced

20   Abramov that Charter is now saying, Well, this is only about

21   Abramov.  But we were -- we did do a presentation yesterday

22   as to all three.  And I believe -- I, at least, believe that

23   your ruling applied to all three.

24         THE COURT:  Okay.  But the question I have is the

25   number 27,000, is that all three, or is that just Abramov?

1           MR. SCHAPIRO:  Just Mr. Abramov.

2           MR. OPPENHEIM:  No.  The 27,000 was Abramov and

3    there was roughly another 10,000, I believe, that's

4    between -- total as between the other two.

5           THE COURT:  Okay.  Well --

6           MR. OPPENHEIM:  And so -- and we did presented

7    that, both in the hearings several weeks ago and yesterday in

8    the slides and in the discussion.

9           THE COURT:  Keep the extra ten as a card up your

10   sleeve in the event that Abramov documents show that they did

11   a lousy job, okay.

12          MR. SPERLING:  Understood.

13          MR. OPPENHEIM:  With one note, and that is that the

14   other two are not counsel and so unlikely to have the same

15   privilege issues.  So maybe we keep one of the two cards up

16   the sleeve, but not both.

17          THE COURT:  So, regardless --

18          MR. ROSENTHAL:  So let's get back to --

19          THE COURT:  -- the word "Abramov" was tossed around

20   100 times for -- every one time for somebody else's name.  So

21   it was my clear impression that you were really (inaudible -

22   background noise) after the Abramov documents, and so that's

23   what I permitted.

24          MR. SPERLING:  It's fine, Your Honor.  We

25   understood differently.  We can come back on the other two,

1  based on the Abramov review.  I think we all want to move on.

2  I want to make sure that we -- we are clear on the guidance

3  because there was a lot of talking.

4         My understanding is that as to both sides, we will

5  produce all of the documents --

6         THE COURT:  Privilege to nonresponsive --

7  privileged documents every hundredth -- nonprivileged

8  documents every hundredth.

9         MR. SPERLING:  Nonprivileged documents every

10 hundred.  Well, let me try again because I think I might

11 better state what you said before.

12        THE COURT:  Go ahead, please.

13        MR. SPERLING:  Every hundredth document will be

14 either produced to the other side or logged.  And as to the

15 entirety of them, right, whether logged as privileged or not

16 logged, they will go to Chambers; is that correct?

17        THE COURT:  Well, I intended that you give each

18 other the nonprivileged ones.

19        MR. SPERLING:  Right.

20        THE COURT:  But we probably need the whole set.

21        MR. SPERLING:  So we'll give the whole set to you?

22        THE COURT:  With some kind of identifier for those

23 that you claim were privileged.

24        MR. SPERLING:  Got it.  Thank you very much for the

25 clarification.

170

1          MS. BREWER:  May I proceed going back to the chart,

2     hopefully a breath of fresh air.  Ms. Brewer for Charter.

3          I'm going to cover -- I'm going to, for the sake of

4     efficiency, group together three RFPs:  87, 96 and 97.  87

5     starts on the chart that you've been provided at page 10.

6          These at a high level -- the dispute between the

7     parties pertaining to these requests for production relate to

8     the dispute concerning dropped works.

9          I'm hoping I can make short of this argument

10    because the Special Master entertained arguments from both

11    sides in the context of the universal 30(b)(6) deposition

12    topics and provided her guidance to the parties on this issue

13    at that time.

14          Would you like me to pause?  I heard a phone

15    ringing.  May I proceed?  Okay.

16          And so as I said, on January 19 in the context of

17    the 30(b)(6) deposition we discussed whether or not Charter

18    could continue to pursue discovery concerning the dropped

19    works.  We also discussed that in the context of today's

20    hearing.  Following that guidance, I believe it is -- it is

21    the thinking of the Special Master, as well as Your Honor,

22    that we may pursue this discovery.

23          We understand that the argument that the plaintiffs

24    are making is that we had counterclaims that were related to

25    the dropped works.  We understand that Judge Jackson has

1   issued his ruling on those counterclaims.  However, it has

2   always been our position in this case that the dropped works

3   are, nevertheless, relevant to the case outside of our

4   counterclaims.

5           If I can go to the exact words of the Special

6   Master on the January 19 hearing.  The Special Master stated:

7   I do agree that Charter is entitled to probe the basis for

8   the notices.  Given that plaintiffs are going to argue that

9   just the shear volume of notices put them on notice, they

10  certainly are able to challenge the validity of those

11  notices.

12          Now, we understand in the context of the 30(b)(6)

13  deposition, that it was the Special Master's guidance, based

14  on the circumstances related to that deposition, that we

15  couldn't pursue that discovery in that deposition, but we

16  still feel that we are not foreclosed from the request for

17  production that we've issued.

18          MR. GOULD:  I'm going to handle this one as well,

19  Your Honors.

20          Ms. Rodriguez, you ruled on this on 96 and 97 and

21  said, Produce the documents unless Judge Jackson dismisses

22  the counterclaims.  That's the end -- short and the end of

23  it.  I could go on if you would like more.  If you're

24  convinced, I will stop there.

25          SPECIAL MASTER:  Stop there for a moment.

1          What about the issue with regard to the

2    counterclaims?  Because as I recall -- and again, I -- we've

3    run down a lot of different roads a lot of different times,

4    but what was the argument with regard to the counterclaims?

5    Once the counterclaims are no longer in, right --

6          MS. BREWER:  Right.

7          SPECIAL MASTER:  -- or the counter --

8    counterclaims.

9          MS. BREWER:  Let's not go there.

10         SPECIAL MASTER:  Right.  So I understand the need

11   to challenge the notices, but haven't we talked about a

12   number of different avenues to challenge those notices,

13   including the Hash Report that you're now getting?

14         MS. BREWER:  So, yes, you are correct, that that is

15   the -- that we were discussing another way to challenge the

16   notices, so this is one of them; but we are -- we believe we

17   are entitled to, for the same reasons that were put forward

18   earlier today with respect to the Hash Report, we -- the

19   Bench -- you know, the Special Master and the Magistrate

20   Judge today put a very pointed question to plaintiffs'

21   counsel:  Are you going to stand up in front of the jury and

22   point to 700,000 notices being sent to Charter as part of the

23   evidence in your case?  And they said yes.  They equivocated,

24   but they are absolutely going to go there.

25         SPECIAL MASTER:  Well, certainly, we understand

1   that.  But you also, as it relates to the dismissed works --

2   how many were there?

3            MS. BREWER:  I believe it's 455.

4            SPECIAL MASTER:  Okay.  So you have the evidence

5   that those works were dismissed.

6            MS. BREWER:  We know -- we have the fact that they

7   were dismissed.  What we believe we're entitled to is the

8   discovery of whether there were ownership issues with respect

9   to those dropped works.

10           It's -- it's similar to what we were arguing with

11  respect to the Hash Report because those are other potential

12  defects with the notices; but one potential defect is that

13  they didn't own the works in the first place.  And these are

14  works that at one point in time they asserted against us in

15  this litigation.

16           SPECIAL MASTER:  Well -- yeah, I'll let you go

17  ahead, Judge.

18           THE COURT:  Maybe you go ahead.

19           SPECIAL MASTER:  The only thing I would say there

20  is the distinction is that the plaintiffs were relying on a

21  work product privilege as it relates to the hash tag report,

22  and to me and to Judge Hegarty that appeared dubious, at

23  best, and even if there were, it seemed that you had met the

24  standard for obtaining that information, despite the work

25  product protection.

1          This is a different issue because you're talking

2    about works that were dismissed clearly within the

3    litigation, and those decisions were clearly made by counsel.

4          So it appears to me that you're attempting to get

5    to exactly the kind of work product and potentially

6    privileged matters that would be protected.  Further, that

7    that need is lessened in this case because you have the fact

8    that those were withdrawn, and you can make whatever hay you

9    would like and whatever hay Judge Jackson will allow you to

10   make before the jury about those having been withdrawn or

11   dismissed.

12          MS. BREWER:  Can I -- can I clarify --

13          SPECIAL MASTER:  Yes.

14          MS. BREWER:  -- and address that?

15          So absolutely -- absolutely, the concern that you

16   just identified is valid, but that's not what we're seeking

17   here.  So we're not seeking privileged communications, or

18   what decisions were made by counsel with respect to dropping

19   those works.  We don't intend to make that argument.

20          What we're looking for are the factual underlying

21   chain of title ownership documents related to those works,

22   because we believe that they likely have some works that were

23   dropped because there were ownership issues or they didn't

24   own the works in the first place.  And that's what we're

25   looking for.

1           Absolutely not counsel's decisions.  If a work was

2      dropped that they owned, we get the ownership documentation,

3      we see that they owned it and it was dropped, nobody at this

4      table or within these teams is going to stand up at trial and

5      say, Well, Counsel made some decision about that.  That's not

6      the argument.

7           What we're looking for is just the underlying

8      factual information, the documentation related to the

9      ownership of the works.

10          THE COURT:  But if I was the trial judge in this

11     case, I would not let you have a trial about

12     works-not-at-issue.  I mean, I kind of under- -- I mean, I

13     know why you want it, but it's not a good reason relating to

14     what's actually going to be tried in this case.

15          You have other grounds for -- we've given you

16     foundation for going after works-at-issue and whether it is

17     proper title to those and whether there is standing even to

18     assert the claims.  But now you're going to say, Members of

19     the Jury, they originally sued on this many, but then they

20     dismissed some.

21          I mean, most judges I know are not going to let you

22     talk about claims that are dismissed because it's under -- at

23     least under 403 where their relevance is vastly outweighed by

24     the prejudicial effect of planting in the jury's mind that

25     somebody didn't do a very good job and you oversued and now

1    you cut back a little bit.

2            I mean, we're encouraging parties all the time

3    under Rule 1 to only try those matters that are absolutely

4    necessary and be looking at all types to pare down your case

5    and not overplead.

6            And I'm going to penalize somebody for, in fact,

7    taking my advice?  That's kind of counterproductive in my

8    mind.

9            MS. BREWER:  I fully embrace what you're saying,

10   Your Honor, especially as a former law clerk in federal

11   court.  If a party narrows the case, that should be embraced.

12           The issue here is that they don't plan to go there.

13   They, instead, plan to stand up and say, A notice sent to

14   Charter is evidence of infringement, and Charter received

15   700,000 notices.  That's the issue.  If they were just going

16   to talk to the jury about the notices associated purely with

17   the works-in-suit, excluding the dropped works or any other

18   works, that, we would embrace; but we're, unfortunately, not

19   in that position going into this trial.

20           They conceded today they fully plan to go there.

21   We know that for a fact because they did that in Cox.  And I

22   know that because we were just served with a request for

23   admission in late January asking us to admit that Charter

24   received 700,000 notices.

25           We're a group of pretty experienced trial lawyers

1   and when you see an RFA like that served on your client, you

2   know the purpose of that is it's going on an opening slide.

3   It's going in opening; it's going in closing.  That jury is

4   going to hear over and over again that Charter received

5   700,000 notices.  That's the issue.

6          MS. GOLVINEAUX:  Your Honors, the only thing I

7   would add to Ms. Brewer's presentation is that these two

8   requests are very narrowly tailored.  These are documents

9   sufficient to show that you actually owned the work when you

10  sent a notice on it.  And these works can relate to

11  potentially tens of thousands of notices that they're going

12  to argue in this case.  So they're very tailored.

13         SPECIAL MASTER:  Well, I hear that as different

14  than what I thought we were talking about.  You were talking

15  about just the works that were dropped.  Now you're talking

16  about whether or not you owned it when the notice was sent.

17         And we have provided you with the opportunity to

18  get the evidence as to whether or not the plaintiff owned

19  the -- owned the work at the time that the notice was sent.

20  That was, one, the intention behind providing the Hash

21  Report; two, it seems to me that we've talked about this

22  several times before and requiring plaintiffs to produce

23  evidence related to their ownership.

24         Am I wrong about that?

25         MS. BREWER:  I don't ever want to say you're wrong.

1          SPECIAL MASTER:  Well, sometimes I am, so.

2          MS. BREWER:  I will say -- I will say my

3    understanding, and I invite my colleagues to correct me if

4    I'm wrong, but I don't think that the Hash Report, which

5    again, we have not seen, but that's -- that is going to

6    potentially show other defects related to the notice, the

7    inability, for example, for MarkMonitor to validate the

8    process that it purportedly engaged in during the claim

9    period, which again, we don't have.

10          This goes to whether or not the work wasn't owned

11   at the time that the notice was sent.  It's a different

12   defect.  And again, if somebody could represent today in

13   Court that they're not going to talk about 700,000 notices --

14          THE COURT:  Well, I think if I could get a

15   stipulation with the plaintiffs that, even if you do talk

16   about 700,000, you will enter a fact stipulation that can be

17   presented to the jury that you are:  Number one, not suing on

18   all those 700,000 before this jury.  And number two, that

19   there may have even been works among the 700,000 which could

20   inform the basis of a lawsuit, or something to that effect.

21          Would you guys be willing to enter into that kind

22   of fact stipulation?

23          MR. GOULD:  It's, number one, that there are

24   notices for works that are not in suit.  And number two was

25   what?

 1          THE COURT:  That, in fact, of the 700,000, not only

 2   are you not suing on all of them before this jury, but you

 3   also -- but you also recognize that it is factually correct

 4   that not all 700,000 could have been -- could have -- or

 5   somehow have been a judicial claim because there were

 6   defects.

 7          MR. SCHAPIRO:  Or how about that they didn't --

 8   some of them were for works that they didn't actually own?

 9          THE COURT:  Better still.  But if that's the point,

10   I would be -- I think I would be happy with the fact

11   stipulation and that's enough.

12          MR. GOULD:  Your Honor, there is -- there is an RFA

13   that we've already answered:  Admit that you didn't own the

14   dropped works.  We denied it.  It's like -- you know, we've

15   ruled on these issues.

16          THE COURT:  Admit that you are -- articulate that

17   again.

18          MR. GOULD:  Admit that you didn't own the dropped

19   works, and we denied it.  You ruled on this issue.  Your

20   ruling was right the first time.  The skepticism here is

21   warranted.  It's a goose chase, based on speculation.

22          The Bright House court denied this exact same --

23          THE COURT:  Yeah, but we're not going to --

24          MR. GOULD:  -- (inaudible) even when --

25          THE COURT:  We're not going to --

1           MR. GOULD:  Even when --

2           THE COURT:  Let me ask you a question, though.

3           You denied that you didn't own -- that you denied

4    that you didn't own the dropped works.

5           MR. GOULD:  Yes.

6           THE COURT:  On the flip side of that coin, are you

7    affirmatively representing to us that of all 400 dropped

8    works, it's your good faith belief, after a reasonable

9    investigation, that your clients did own those?

10          MR. GOULD:  Yes.

11          THE COURT:  Okay.

12          MS. BREWER:  Okay.  I think I'm on deck for the

13   next one as well, so I'll just take a moment to turn the

14   page.

15          SPECIAL MASTER:  And just to clarify, Ms. Brewer,

16   you were right, that I was incorrect about that, so I had

17   conflated those two.

18          So I do stand corrected on that.  So thank you.

19          MS. BREWER:  Thank you, I appreciate that.

20          Okay.  The next two are RFPs 99 and 100, and I

21   apologize I don't have the page, though.  I do.  It's page 20

22   of our chart.

23          I would hope that these two requests don't warrant

24   much discussion at all and I view these as noncontroversial.

25          We issued two requests that were asking for the

1    plaintiffs to produce documents from the Cox and the Grande

2    cases.  There is no argument that what we've requested is not

3    relevant; that it's prejudice -- or that it's privileged, or

4    that there is any prejudice or burden associated with

5    producing this information.

6           We did engage in a meet and confer in good faith

7    with respect to the breadth arguments and we narrowed our

8    ask.  And so what we're asking for is simply deposition

9    transcripts, declarations and any exhibits thereto of the

10   fact witnesses and expert witnesses from those two cases.

11          I'm pleased to report my understanding -- and this

12   is, you know, evolving, I think, as this hearing is going

13   on -- that we were able to reach agreement with MarkMonitor

14   and Audible Magic that they would provide the deposition

15   transcripts and exhibits, so at least we can check them off

16   of the list.  But there are still fact witnesses that we

17   don't have this information for and there are also -- there

18   is no agreement from plaintiffs currently with respect to

19   providing us with the expert depositions or declarations and

20   exhibits thereto.

21          MR. GOULD:  I think there is a lot of history here,

22   but I'm going to start with the counter to the punch, okay.

23          What Ms. Brewer is really after is the deposition

24   transcripts of its competitor ISPs at Cox and Grande, sworn

25   statements by its competitor ISPs in (inaudible) in separate

1    litigations (inaudible) and, number two, expert reports and

2    declarations -- excuse me, expert reports and depositions

3    submitted in these other cases so that it can piggyback on

4    the expert work in other cases.

5              In the Sony vs. Cox case, the same -- let me pause

6    there.

7              THE COURT:  We're not shocked.

8              MR. GOULD:  Okay.

9              THE COURT:  I'm not.

10             MR. GOULD:  If you're going to order plaintiffs to

11   produce the sworn testimony of Cox -- Charter's competitors,

12   we think that's the wrong path, that should be pursued and

13   sought directly from those competitors ISPs so that they can

14   be afforded the procedural (inaudible) under the rules of

15   whatever competitive concerns they may have.

16             THE COURT:  Stop there for a second.

17             Are you under any legal obligation from some other

18   Court or jurisdiction to not produce those?

19             MR. GOULD:  They're subject to the protective order

20   in the Cox and Grande.

21             THE COURT:  And I assume the protective order has

22   an escape clause for any lawful process entered by another

23   Court?

24             MR. GOULD:  I think that's a safe assumption.

25             THE COURT:  Okay.  Go ahead.

1          MR. GOULD:  Secondly, as to the -- you know, there

2    has been a lot of discovery requests about what other ISPs

3    were doing and what Charter has never been willing to do is

4    serve a subpoena on another ISP.  I don't quite understand

5    why, but if they want to find out what Cox -- oh, if they

6    want to fine out what Cox was saying and doing about

7    copyright handling, they certainly are free to go directly to

8    them.

9          And it's also directly at odds with the position

10   they took yesterday in trying to deflect and not produce

11   their own documents about (inaudible) with those.

12         As for the experts, Winston Strawn, and the same

13   lawyers you see here, oppose these same requests in the Sony

14   vs. Cox case.  When the Sony plaintiffs asked for the expert

15   reports and depositions from the preceding BMG case, Winston

16   stood up and said, You can't get that, you've got to do your

17   own work.  And the magistrate judge in the Eastern District

18   of Virginia -- I'll never forget this -- he said, What is it,

19   Mr. Oppenheim, are you going to -- don't you need to plow

20   your own road?  He said, Plow your own road.  And we had to

21   live with that.  In Cox it was fine, it worked out.

22         The other piece of it is those were the -- in that

23   case, those were requests 1 through 5 at the first day of

24   discovery.  It's not a coincidence here that these are

25   requests 99 and 100 out of 100.  It's not a situation where

1   Charter has come in and said, There's been a lot of water

2   under the bridge before, let's see what's out there and then

3   we can narrowly tailor what we need on top of it.

4           They've engaged in intense and diligent litigation

5   and discovery from (inaudible) and they have sought

6   everything they could possibly need or ever want.

7           And as a part of the housekeeping at the end of the

8   day, they said, What have we missed?  And they tacked this

9   one on.

10          And the first request was for everything under the

11  sun from those cases.  They wanted all documents produced,

12  all pleadings, all discovery responses.  And, wisely, they

13  tailored what they've asked you to compel here, but the

14  outcome should be no different.

15          Now, we've given them the fact depositions and

16  testimony from the plaintiffs' witnesses.  If they want that

17  from other parties, they should go directly to those parties.

18  And there is no basis to give them a free ride on the expert

19  work of other cases when they have their own experts here,

20  who are conducting source code inspections, preparing reports

21  and more than capable of carrying Charter's water.

22          MS. BREWER:  May I respond?  May I respond?

23          THE COURT:  Yes.

24          MS. BREWER:  I don't -- I don't -- something is

25  going on with the audio.

1          (Echo.)

2          THE COURT:  I think somebody on the system has two

3     devices going, or something.

4          MS. BREWER:  Can people -- okay, I think I'm safe.

5          What Mr. Gould articulated, as passionate as it

6     was, is not the standard for discovery.  You did not once

7     hear him argue that the discovery is not relevant.  You did

8     not hear him argue that it's burdensome.  You did not hear

9     him argue that it's privileged.  Why did you not hear him

10    argue that?  Because he can't.

11         We have -- and he puts the word piggy --

12    "piggyback" out there, I'm assuming hoping it's going to make

13    me blush and feel ashamed for serving this request for

14    production.  I absolutely do not.  Because the other word for

15    it is "judicial economy."  Another word for it is "fairness."

16         These are the same expert witnesses, these are the

17    same fact witnesses, they've made sworn statements under oath

18    relevant to the same works, the same parties, and we're

19    entitled to that information.

20         And why it's important -- I can pause.

21         MR. GOULD:  We've produced our witness's testimony.

22         MS. BREWER:  Excuse me.

23         THE COURT:  Hold on a second, hold on a second,

24    we're going to speak for a second.

25             (Court and Special Master confer.)

186

1               (Pause.)

2               THE COURT:  Yes, so we don't -- we don't see a

3       principled reason not to produce the material, so.

4               MS. BREWER:  Thank you.

5               THE COURT:  We see a reason, just not a principled

6       one.

7               MS. BREWER:  Thank you.  And that applies to 99 and

8       100?

9               THE COURT:  Well, I don't know.

10              MS. BREWER:  Thank you.

11              THE COURT:  I don't know, I said.

12              MS. BREWER:  99 and 100.  And, you know, we had

13      articulated in our chart what our -- how we had narrowed the

14      request, so we'll assume the order is that that request is

15      granted.

16              THE COURT:  But by the same token, anything that

17      plaintiffs would want from you guys also, although you may

18      not have anything, I suppose, because you weren't party to

19      that other case --

20              MS. BREWER:  Correct.

21              THE COURT:  This would be definitely -- this ruling

22      would apply to anything of this nature either party wants,

23      okay?

24              MS. BREWER:  Understood.  I will defer to my

25      colleagues as to the next issue.

1          MR. GOULD:  Clarify on that.  We lost, I believe.

2     And if not, I'll certainly get the (inaudible) request out

3     for all prior sworn testimony from Charter's witness's

4     experts and third parties related to Charter's copyright

5     handling and practices.

6          MS. BREWER:  Oh, okay.  We're going to move on.

7          MR. ANDERSON:  Okay, I will be brief.

8          We have two interrogatories that we put on our

9     chart.  This is on pages 32 forward.  The first one is

10    interrogatory 23.  And this really is just trying to help

11    with organizing the data in this case that plaintiffs have

12    produced and that plaintiffs have exclusive possession of in

13    some respects.  And it's asking them to identify by ISRC,

14    which is the International Standard Recording Code, the

15    digital copies of the works-in-suit that they've produced;

16    the copies of the, quote/unquote, reference files they've

17    produced; and then the copies of the, quote/unquote,

18    infringing files.  It's really just an organizational

19    interrogatory that -- that -- that associates each of those

20    types of files with one another by -- by ISRC.

21          And, you know, this will aid in expert discovery,

22    this will aid in narrowing further discovery disputes, and it

23    seems like a very straightforward request.  Perhaps, there is

24    some ambiguity on plaintiffs' side, but we haven't

25    necessarily heard it yet.

1            MR. SPERLING:  So there is really, as Mr. Anderson

2      just said, three components.  The ISRC for each recording

3      we've produced, as you heard yesterday, we had an exchange,

4      Mr. Anderson and I, which encouraged to be direct towards the

5      end of the day, where you want us to identify the Bates

6      numbers for all the copies of the sound recordings that we've

7      already produced, identify which ones are the so-called

8      timely delivered to Audible Magic copies and which of the

9      other companies.  So they have all those sound files.

10            Almost all of them have the ISRC right in the meta

11      data.  We've told them that.  There was one plaintiff group

12      for which that wasn't true, they each encode them

13      differently.  And we gave them a digital overlay for the

14      document production so that they would have the ISRCs.

15            So -- so with respect to our copies, this is make

16      work.  They have the information at hand, they have the

17      documents with the ISRC, or they have an overlay, they have

18      meta data which corresponds to ISRC to each produced file.

19      And now they want us to go ahead and also put them in an

20      interrogatory response.

21            To the extent they want somebody to make a chart

22      for the documents that they already have from us, they should

23      do their own work.  That's with respect to those two.

24            And then I'll pause there before we get to the

25      third component, which is the ISRCs for the infringing files,

1    right.  Those are the torrent files that others were

2    exchanging that were pirated.

3              MR. ANDERSON:  So I guess my only --

4              THE COURT:  You agree with the proposition that if

5    you could equally do some endeavor; you can't ask them to do

6    it for you?

7              MR. ANDERSON:  Yes, Your Honor, under rule -- under

8    the interrogatory rules in rule 33(d), I understand that as

9    well --

10             THE COURT:  Okay.

11             MR. ANDERSON:  -- that they point to existing

12   materials.

13             I would proffer that if they have this information

14   already compiled in the process of having, you know, provided

15   these -- this information, that it would -- they should just

16   produce it in the form of an interrogatory response, as the

17   burden would be less for them than it would be for us.

18             MR. SPERLING:  We have not so compiled it.

19             THE COURT:  We don't see a basis for it.

20             MR. SPERLING:  Thank you.

21             Then the last component, which were equally

22   inexplicable, ISRCs for the infringing files.  So these are

23   torrent files, pirated files exchanged by people.

24             To the extent that somebody -- that the torrent

25   file contains a copy of a legitimate file that did have the

1    ISRC and the meta data.  They have the torrent file, they can

2    see the ISRC there, just like we can.

3         If it doesn't, for whatever reason, we don't know

4    what the ISRC is going to be.  And again, I'll take you back

5    to our discussion from yesterday.

6         So an ISRC is like a product code, right.  So maybe

7    one day the two of you will write a book about how you

8    presided over this massive lawsuit.  I'm sure it will be a

9    best seller; it will be a page turner.  So there will be a

10   first edition and a second edition and a third edition.

11        Like I said yesterday, there'll be the Canadian

12   release and the UK release and it will be the large print

13   format.  Maybe later on, based on some appellate decision,

14   you'll -- you'll drop the last chapter of the book because it

15   doesn't really apply anymore.  Somebody copies the book; they

16   copy the book.  So if somebody goes and were to type into a

17   computer program, type into Microsoft Word, just reading and

18   type the whole thing, it's like coming back and asking, Well,

19   which version did they copy from?  Like, why are you asking

20   the publisher?  The sound recording is the sound recording.

21        We don't know what ISRC is represented in the

22   infringing file, unless you can see it in the meta data of

23   the infringing file.  And they have the infringing file.

24        So as to that one, either -- to the extent it's

25   knowable, they have the same capability to know it.  The

191

1    alternative is it's not knowable, so we don't understand what

2    they want from us.

3              THE COURT:  I've just got to bring this up.

4              Does anybody know about the S&Es, or the SEs?  Does

5    anybody know what that is?

6              MR. SPERLING:  It's some (inaudible) historical

7    knowledge, but I would be happy for the Court to fill us in.

8              THE COURT:  You really don't know what that is?

9    You need to study your own faith.

10             MR. SCHAPIRO:  A religious group or something?

11             THE COURT:  Yes.  They -- they were in charge of

12   copying the Torah for centuries and that's where the Dead Sea

13   scrolls came from, seas of the S&Es.  And even uncovered

14   versions dating back to 4- or 500 B.C. that are identical to

15   what's in the Torah today.  So all copied by hand, as you

16   know.  I mean, each of these Torahs has been copied.

17             It's cool that you can reproduce information, not

18   just verbatim, but down to the (inaudible - voice dropped).

19   I think that's neat.  Just as an aside about copying, but

20   there is no claim of authorship there.  I mean, there is

21   nobody -- that person --

22             MR. SPERLING:  I'm pretty sure there is no valid

23   copyright in the Bible today.

24             THE COURT:  (Inaudible) copy the work as much as

25   you can.

1        MR. ANDERSON:  More importantly, there is no

2   statutory damages at issue.  I think -- I think I can resolve

3   this.  I mean, with a lot of these requests and the way the

4   plaintiffs have responded to them, it's been a, you know, a

5   litany of objections without -- you know, if they don't have

6   the information, that would have been the proper response.

7        If they can't compile the information or they

8   wanted to say that you have the information we have and you

9   can work with it in that way, that would have been the

10  proper response.

11       THE COURT:  Well, if they did it because of this

12  litigation and you can go ahead and do it yourself, that's a

13  good response.

14       MR. ANDERSON:  Right.  But, you know, just to

15  briefly, very briefly address.  I mean, the issue here is

16  that plaintiffs own copyrights to specific recording, as both

17  of you are well aware, given all the technical issues we've

18  been discussing today, plaintiffs own copyrights to specific

19  works, the works that may have been traded on BitTorrent

20  might have been different versions of that, and yet again,

21  the works produced in this case could be yet another version.

22       And so that's why there's this focus on tying the

23  three bodies of evidence together, but based on the

24  representations today, we can work with the data we have for

25  the time being.

1          SPECIAL MASTER:  That makes sense.

2          MR. ANDERSON:  Okay.  The final two issues we

3    have -- sorry, there is one more interrogatory, Interrogatory

4    24, which is asking for plaintiffs to identify the

5    works-in-suit that MarkMonitor was monitoring on their behalf

6    during the claim period; in other words, when they were and

7    were not monitoring for these works.

8          The Special Master may recall that we had moved to

9    compel plaintiffs respond to another interrogatory and

10   articulated our basis for relevance for this as being that we

11   need to understand when plaintiffs were monitoring their

12   works and when they were not.  And the Special Master ordered

13   that the information seemed relevant, though the request, as

14   propounded, didn't really get at it, and so we propounded a

15   new request.  And that is this Interrogatory 24.

16         And the reason that it's important is because if we

17   want to show that a certain subscriber received notices on

18   Monday, Wednesday and Friday for a particular work and then

19   she stopped receiving notices, if we want to make the

20   argument that she stopped receiving notices because she

21   stopped infringing or that she stopped sharing that work, we

22   need to know whether plaintiffs were actually still

23   monitoring it.

24         Because in the Cox case when this argument was made

25   during trial, the response from plaintiffs was like, Well,

194

1   you don't know whether MarkMonitor just simply stopped

2   monitoring for that; you don't know whether she stopped

3   infringing.

4           And so it goes towards contributory infringement in

5   the sense that we can show whether or not our response to

6   plaintiffs' notices reduced recidivism, to use the word that

7   came up today, or just generally helped extend the

8   infringement.  And that is the basis for our request.

9           SPECIAL MASTER:  Mr. Gould.

10          MR. GOULD:  Thank you, Ms. Rodriguez.

11          So first of all, the interrogatory, as drafted, is

12  objectionable.  It amounts to thousands of individual

13  subparts.

14          They asked for each copyrighted work on a

15  work-by-work basis.  State whether you were monitoring for

16  the entire claim period.  That's part one times 11,000 and

17  then part two times 11,000 is:  If the answer is anything

18  other than a qualified yes, identify the period.

19          We object, first out of the gate, on it's a

20  problematic interrogatory that vastly exceeds 25

21  interrogatories permitted under the federal rules.  I suspect

22  that's why they withdrew their position on rogues 20 through

23  22 and asked for a generalized answer because they saw this

24  (inaudible) was probably not well served.

25          Second --

1          SPECIAL MASTER:  I thought your -- go ahead, yeah.

2          Assume that we don't sustain that particular

3   objection, what is your substantive basis for challenging

4   this discovery request?

5          MR. GOULD:  It's irrelevant, unhelpful to serve the

6   purposes that it does.  You need to understand how

7   peer-to-peer works and what information is and isn't

8   available.  And even without this, the arguments that they

9   presented are available to them.

10         It's a fundamental fact that no party could ever

11  observe and detect every instance of infringement because

12  peer-to-peer transfers are visible only to those involved in

13  the exchange.  If Ms. Rodriguez and Judge Hegarty were

14  sharing information on peer-to-peer, I could not see it.  The

15  notion -- what that means is that we could never see the full

16  scope and amount of infringements.

17         Plaintiffs' notices capture a limited snapshot in

18  time of the peer-to-peer infringement that they detected, and

19  Charter has the arguments and facts it needs to rebut and

20  fulfilling (inaudible).  Got a third one (inaudible).

21         SPECIAL MASTER:  So the current version -- and this

22  is Interrogatory Number 24, correct?

23         MR. ANDERSON:  That's correct.

24         SPECIAL MASTER:  The current version of this

25  interrogatory request is:  For each copyright work on a

1    work-by-work basis:  State whether you were monitoring and

2    sending notices of alleged infringement regarding the

3    copyright work for a potential infringement for the entire

4    claims period.  If the answer is anything other than a

5    nonqualified yes for any copyright work, identify the

6    specific time periods during which you were monitoring and

7    sending, et cetera, et cetera, on this one.

8            Can you work with a generalized response similar to

9    what was done previously or you need it on a per-work basis?

10           MR. ANDERSON:  To rebut the argument that

11   plaintiffs made in response to the arguments made at the Cox

12   trial about when infringement notices stopped, whether that

13   actually meant someone stopped receiving -- could have

14   stopped infringing, we would need it on a work-by-work basis.

15           I will note, though, that the way that this is

16   drafted is to assume, based on some knowledge that we have in

17   this case, that for a great period of time all the works

18   probably were being monitored for the entire period, but that

19   there might have been different phases.  So I'm not

20   envisioning a labyrinthine type of a response here.  It could

21   be by six-month periods, I'm not sure, but --

22           MR. GOULD:  So the argument that Mr. Anderson wants

23   to make is that if you have two infringements or notices

24   about a single work within the claim period, it's relevant

25   that there weren't works on the days before, between or after

1   those, and he has everything he needs to make that argument.

2   What he's asking you doesn't advance that.

3          And the third point I wanted to make is as to the

4   proportionality.  This information is not readily available.

5   It's not residing in a central place where we can go and

6   figure it out.  This would require an effort to pull together

7   some history from records that may or may not be available.

8          The best we can do, as I understand it, is to

9   search through some e-mails and cherrypick what was included

10  and when and try the best we could to draw some timeline from

11  that, which I agree with counsel would not be complete.

12          MR. ANDERSON:  Well, I will say two things in

13  response to that, if I could.

14          One is that we would only be making this argument

15  if faced with the argument plaintiffs specifically made at

16  Cox, which is to say, almost with glee during trial when

17  cross-examining an expert, You can't prove that because you

18  don't have this data.  So that's why we served this

19  interrogatory.

20          If plaintiffs are representing that they don't have

21  this data in a reliable fashion, then perhaps that converts

22  to some type of preclusion issue when it comes to -- to

23  arguments at trial, but we're just trying to get to the

24  bottom of an interrogatory at the moment.

25          THE COURT:  What -- I need to understand why it

1    matters whether for any particular work they were monitoring

2    it for the whole time period or just part of a time period.

3    Why does that matter?

4           MR. ANDERSON:  I can give a very -- very brief

5    description.

6           So if every day for a month-long period MarkMonitor

7    is pinging for a Bruce Springsteen song, for example, and

8    Subscriber A gets notices on Monday, Tuesday, Wednesday,

9    Thursday, and we know that MarkMonitor is continuing to

10   monitor for that, the next three weeks of that month, which

11   she doesn't get any further notices, we can make an argument

12   for the jury that because Charter reached out to this

13   subscriber or because Charter forwarded the notices, that

14   that subscriber stopped infringing.

15          THE COURT:  But that's a surmise.

16          MR. ANDERSON:  It is.

17          THE COURT:  That's not a provable fact.

18          MR. ANDERSON:  It is.  But it is how ISPs and

19   rights' holders monitor the effectiveness or the efficacy of

20   monitoring programs.  People look at how many subsequent

21   notices a particular subscriber gets.  And if we say, This

22   subscriber didn't receive any further notices, their answer

23   is going to be, Because we just stopped sending notices.

24          But if we can prove that that's not true, that

25   actually the subscriber took some action to reduce her

199

1    action -- activity on peer-to-peer networks, that is relevant

2    to contributory infringement.

3            THE COURT:  Okay, I know I've probably been told

4    this a hundred times.  These notices were sent to sub- --

5            MR. ANDERSON:  The ISP, and the ISP forwarded them

6    on to subscribers.

7            THE COURT:  You did?

8            MR. ANDERSON:  Uh-huh.

9            THE COURT:  All 700,000 you forwarded them on to

10   subscribers?

11           MR. ANDERSON:  Yes.

12           MR. GOULD:  That's not accurate.

13           MR. SPERLING:  We know that's not accurate from

14   many, many documents.  I mean, I don't think Mr. Anderson

15   means to mislead you or misrepresent --

16           THE COURT:  Oh, this is where like they might have

17   sent a message out, something is in your inbox, you might

18   want to go there and check it out.

19           MR. SPERLING:  The auto closing and the batching.

20   Again, I don't want an argument.  I don't think Mr. Anderson

21   really means to say that they forwarded all 700,000 notices

22   to the subscribers.

23           MR. ANDERSON:  I was trying to lay out the process

24   by which infringement from the monitoring companies makes its

25   way to subscribers as a general nature.

1          THE COURT:  No, no, no.  Yeah.  My question was,

2    did you forward 700,000 notices to your subscribers?

3          MR. ANDERSON:  That I don't have specific

4    information on; others may.  But I think there was some -- as

5    we were discussing yesterday, some kind of batching processes

6    by which, if a certain amount were received within a period

7    of time, there was a single communication, given the volume.

8          THE COURT:  Right, but the single communication

9    wouldn't have identified how many different violation notices

10   were sent; is that right?

11         MR. ANDERSON:  I don't know the answer to that.

12         THE COURT:  Not necessarily?

13         MR. ANDERSON:  I don't know the answer to that.

14         THE COURT:  500 were sent about this one

15   subscriber, you may send a message to that subscriber saying,

16   Look at your inbox, there is an important information from

17   your provider.  And if they looked there, there would have

18   been a notice that somebody says you're illegally downloading

19   something?

20         MR. ANDERSON:  That's consistent with what I heard

21   being discussed yesterday.

22         But one thing that I can speak to, which is

23   specific to the issues -- the notices at issue in this case

24   is that MarkMonitor only sent a single notice per work per

25   day to a subscriber, so there is a bit more of a direct

1    correlation there.  In other words, there weren't multiple

2    notices being sent within the same day to the same work to

3    the same person.  It was --

4            THE COURT:  But anyway, you're trying to put the

5    negative in there in the end.

6            MR. ANDERSON:  Well, yes, because --

7            THE COURT:  By not sending one to this person on

8    this day, there were no violations.  That's -- that's --

9    you're trying to --

10            MR. ANDERSON:  Or that there is a reasonable

11   inference that that subscriber stopped sharing the work on a

12   peer-to-peer network as a result of actions taken by Turner.

13            THE COURT:  Right.  But so has anybody actually

14   done discovery into your actual customers, talked to a single

15   one of them who said, I was doing this and I stopped because

16   I got a notice from Charter?  Has that been done by anybody?

17            MR. ANDERSON:  Well, there is plenty of -- plenty

18   of public commentary in -- you know, as to the -- you know,

19   how --

20            THE COURT:  Well, let's say, for example, when

21   there is a trademark complaint, you know, somebody is

22   infringing on someone's trademark and you -- you actually

23   deliver specific customers who said, I was confused, I mean,

24   they actually bring in real people who say, I bought this

25   because I thought it was this, but it wasn't this, it was

1    something else.  That's always the case.

2              Is there that kind of evidence here at all?

3              MR. GOULD:  I'll say yes, if I understand your

4    question correctly.  We have lots of correspondence from our

5    subscribers after we send them the notice saying, I'm sorry,

6    I didn't realize it, it was my son.  I've spoken to him

7    and --

8              THE COURT:  Okay.

9              MR. GOULD:  -- and we're going to stop.

10             THE COURT:  Okay.  Real person saying, Yes, this

11   happened, we're stopping?

12             MR. GOULD:  Yes.

13             THE COURT:  Okay.

14             MR. GOULD:  And this fits into the larger picture

15   that we need to show that, far from encouraging or trying to

16   facilitate infringement, we were actually trying to stop

17   infringement.  And it may be they feel like we should have

18   done more.

19             THE COURT:  Well, clearly they do.

20             MR. GOULD:  Or could have done more.  But that's

21   not our legal obligation.  Our legal obligation is to not

22   encourage or not facilitate it.

23             And we're going to say that the vast majority of

24   times, I believe this was shown -- has been shown in some of

25   these other cases -- that you sent a couple of notices.  The

1   person never sees one again.  And it's a fair inference to

2   ask the jury to believe, in combination with the

3   correspondence that we'll be showing them, that that's

4   because what we were doing was perfectly fine.  And, yes,

5   they focused on a small sliver where there was some

6   wrongdoers, okay.

7           MR. ANDERSON:  So, Ms. Rodriguez, I just remind

8   you, we had that discussion of Customers A through Y, those

9   top 25 infringers -- you saw them briefly on the screen

10  yesterday -- we talked to the PII.  And you said no, and

11  that's fine, but, of course, they can't have it both ways,

12  right, which is those are subscribers who continue to do it

13  again and again and again and again.  The top one was, I

14  think, 54 or 59,000 notices in a single year.

15          So, again, they just can't have it both ways for

16  resisting that and then trying to prove by inference the

17  opposite.

18          THE COURT:  We're going to -- so in my book this

19  is -- this chapter on this hearing is going to be called "The

20  Both Ways Hearing," because I've heard that word "both ways"

21  at least two dozen times.

22          MR. ANDERSON:  This is only going to be one

23  chapter?

24          SPECIAL MASTER:  Don't want to relive this again.

25          THE COURT:  Do you want to talk about this?

1             SPECIAL MASTER:  Yeah.

2             (Court and Special Master confer.)

3             THE COURT:  Anybody have a coin?  Nobody has --

4    nobody carries coins anymore, I guess.

5             MR. SPERLING:  They have the burden.  So they have

6    the burden, so the tie goes to us.

7             THE COURT:  I was just kidding, okay.  We're not

8    flipping coins here.

9             (Court and Special Master confer.)

10            THE COURT:  Could -- we need a little more

11   definition here.

12            So either Jeff or Jonathan, when these were being

13   monitored for violations, would they be monitored for a

14   continuous period?  Or it could be Monday, Wednesday, Friday?

15   Would it be a straight through time period, an inclusive time

16   period?  Or would it be spotty?

17            MR. GOULD:  It would be -- I'm trying to think how

18   to answer your question directly.  I.

19             think it's that there was a period of time for

20   which works were monitored and MarkMonitor identified

21   instances of infringement within that period.  It wasn't that

22   they searched for these works on Monday through Wednesday and

23   then different works on Thursday through Sunday.

24            THE COURT:  Okay.  Were there works that you know

25   of and you can represent to us today that were monitored for

1    the entire two-year period continuously?

2            MR. GOULD:  I strongly believe that that is the

3    case.  But the way this searching is, is you have people on a

4    system like MarkMonitor and go out and look for -- look for

5    something.  So, you know, it's not the case that each a work

6    is continuously and systematically monitored electronically

7    by a churning system for every minute of every day.

8            THE COURT:  Okay.  If it's not that, what is it?

9            MR. GOULD:  It's --

10           THE COURT:  Would a human -- would it be a human

11   that had to decide we're turning on the monitoring for this

12   thing right now and then turn it off?

13           MR. GOULD:  Your Honor, I've got to walk back from

14   what I said because I'm not sure -- I'm not sure it's wrong.

15   I'm just -- I'm not sure.

16           MR. OPPENHEIM:  I think I can clarify a little,

17   Your Honor.

18           So there are really -- there are two issues.  One

19   is what marks is MarkMonitor monitoring for when?  And then

20   the other issue -- in terms of what they've been told from

21   RIAA and from the plaintiffs.  And then the other issue is

22   how does that monitoring happen, right?

23           So MarkMonitor may have a list of works and that

24   list of works may be -- some of them went through the entire

25   period of monitoring at Charter and others did not.  And

1    there was no log file maintained by the RIAA of this, so it

2    would have been typically by e-mail communication.

3           So in order to look up whether works were taken out

4    or put on the MarkMonitor works, would be searching e-mails

5    for artist names and track names to see if we could find

6    them.

7           But then once it's at MarkMonitor, my understanding

8    is -- and MarkMonitor obviously can speak to this more

9    accurately -- is that they have some control -- it's, if you

10   will, a volume control to decide how many they're going to be

11   searching for and when based on what they're seeing in terms

12   of network activity.  And so they can push certain works on

13   the list, search for them more or less.  And that's all

14   within MarkMonitor.

15          They don't keep records of it.  It's kind of

16   something -- as I understand, they do it kind of just based

17   on what their theme on the guitar network is at the time.

18          THE COURT:  So an ISRC -- somebody would have

19   provided MarkMonitor with an ISRC -- am I getting that term

20   right?

21          MR. OPPENHEIM:  Yeah.  Actually, I think you're

22   getting the term right, but, actually, they didn't provide

23   the information by ISRC.  They would have provided the

24   information, I suspect, by an artist and title.

25          THE COURT:  Okay.

1          MR. OPPENHEIM:  And that artist and title could be

2   like multiple ISRCs, as Mr. Sperling has explained.

3          THE COURT:  So who knows -- if they're -- I am so

4   not into music, you guys, so I can't even give you an

5   example.

6          But if a particular artist and work was provided in

7   MarkMonitor, was it just the name of the artist and the name

8   of the work?  Or was it also an ISRC?

9          MR. OPPENHEIM:  I believe, for the time at issue,

10  it was -- typically would have been artist and name and not

11  ISRC.  I do believe that that, at a later time not within

12  this case, may have changed.

13         THE COURT:  Okay.  So do the defendants know about

14  every notice to MarkMonitor to look for an artist and work?

15         MR. ANDERSON:  Is that question directed at

16  defendants?

17         THE COURT:  Yes.

18         MR. ANDERSON:  So we don't know -- I think that's,

19  essentially, what this interrogatory is getting at, is we

20  don't know what the RIAA on plaintiffs' behalf directed

21  MarkMonitor to monitor at any given time, no.

22         THE COURT:  And is there a record of that?

23         MR. ANDERSON:  Well, I'll note that the contracts

24  which we've been speaking about over the last two days

25  between the RIAA and MarkMonitor that gave rise to this

1    notice program has some language in it that says, We'll

2    search a certain number of songs a week, we'll send you a

3    weekly update.

4             And I think that's the correspondence that

5    Mr. Gould and Mr. Oppenheim are referring to, is that it

6    potentially seems like it was somewhat of an iterative

7    process, and I think that's what was contemplated in the

8    agreement.

9             We don't have that information.

10            THE COURT:  Now, were you provided the name -- who

11   provided to MarkMonitor what to look for?  Or did they think

12   of it on their own?

13            MR. ANDERSON:  I'm not going to answer that on

14   behalf of the plaintiffs.  My understanding --

15            THE COURT:  Okay.  Asking the plaintiffs' counsel.

16            MR. OPPENHEIM:  So the RIAA would have provided an

17   initial list of artist tracks and then that list would have

18   changed over time as new works, right.  Because, obviously,

19   over the course of a three-year period, there were lots of

20   new works that came out and they would be searching for some

21   of those new works.  And they might have dropped other works

22   off the list, so that would change.

23            And there wasn't a process where they kept logs of

24   this; that wasn't ever contemplated.  If there were, this

25   would be easy for to us provide, but there weren't.

1            And add to the initial list, because I think that

2     may be your next question, it may actually have -- have begun

3     well before.  And I don't know this for certain, but I do

4     believe this is likely true, well before 2012, because the --

5     the monitoring by the company that was then called Detect

6     Net, later became MarkMonitor, had been going on for some

7     time.  So I believe the initial list was provided sometime

8     far back and it just kept evolving.

9            THE COURT:  By e-mail?

10           MR. OPPENHEIM:  It would have been by e-mail

11    typically, I believe.  It could have -- I don't know.  It

12    could have been potentially also been by phone calls.  I

13    don't know.

14           THE COURT:  Okay.  But if it was -- each time then

15    something that RIAA wanted something new searched or

16    something old dropped, it would have been communicated by

17    e-mail or a phone call?

18           MR. OPPENHEIM:  That's my understanding.

19           THE COURT:  And there was no comprehensive log for

20    those e-mails or phone calls?

21           MR. OPPENHEIM:  That's correct.

22           And one has got to believe in this day and age that

23    would be different, but, remember, this began before 2012 and

24    it was just a different process back then.

25           SPECIAL MASTER:  So I believe Mr. Anderson had

1   asked a question earlier as to whether or not there was a

2   stipulation that could be provided as to whether or not

3   plaintiffs -- what plaintiffs' representation on this topic

4   would be.

5           Is it that you cannot provide that information

6   right now?  We can neither confirm nor deny?  I mean, short

7   of having you go through this exercise --

8           THE COURT:  Our question is this:  So would there

9   be a way to determine, for any of the works-at-issue, that

10  for these six months it was searched, then for these 18

11  months it was not?

12          MR. OPPENHEIM:  I think it would be exceptionally

13  difficult to do that, Your Honor.  And -- but let me connect

14  that to the point Mr. Anderson was making.

15          Even if we could do that, it wouldn't show what

16  they're saying it would show, because, look -- and Mr. Gould

17  was trying to explain this -- is that when you go on

18  BitTorrent as MarkMonitor, you only get a very small glimpse

19  of what's happening on BitTorrent.  So you can't say that

20  just because you didn't send a notice on something, whether a

21  particular infringer was or was not infringing.  MarkMonitor

22  may not have seen them.  MarkMonitor could only see a very

23  limited amount of what was happening on it.

24          So all of this effort that we would be going

25  through to create, essentially, a log from e-mails, right,

1    would be an effort to do something that, as a technical

2    matter, wouldn't show anything one way or the other.

3              MR. SPERLING:  And just the reason for that --

4              SPECIAL MASTER:  But I think --

5              MR. OPPENHEIM:  (Inaudible) only see what you're

6    engaged in, not what other people.

7              SPECIAL MASTER:  Understood.  But I think the point

8    there is, then you can't say, one way or the other, which is

9    happening.  Either if it's Gina Rodriguez's alleged

10   infringement, MarkMonitor, because you just told us all the

11   ways which you cannot identify when the monitoring was going

12   on, you can't say, one way or another, from the fact that

13   there are no more notices to me, whether it's because I

14   stopped infringing or because MarkMonitor stopped monitoring,

15   or some other reason?

16             MR. SPERLING:  That's correct.

17             SPECIAL MASTER:  Okay.  So then --

18             MR. OPPENHEIM:  That's correct.

19             SPECIAL MASTER:  -- after we hear at trial from you

20   that -- that Gina Rodriguez was continuing to infringe, you

21   can't say one way or the other?  Does that --

22             MR. OPPENHEIM:  Right.

23             SPECIAL MASTER:  -- address your issue, Mr.

24   Anderson?

25             MR. ANDERSON:  Yes, Your Honor.  That's what I

212

1    was -- or Ms. Rodriguez, that's what I was referring to when

2    I was talking about trial and evidentiary issues, preclusion

3    issues.

4           SPECIAL MASTER:  All right.  So with that

5    understanding, I think -- I mean, I don't know that there's

6    much more we can do.  I don't see that it's going to be

7    helpful to dig into this in the way that has been discussed

8    and that plaintiffs have listed a host of reasons why they

9    cannot answer this question, one way or the other.  And,

10   therefore, I would assume, given they can't answer that

11   question one way or the other as we sit here in this

12   courtroom, they're not going to be able to answer it, one way

13   or the other, as you sit upstairs in Judge Jackson's

14   courtroom.

15          Similarly, I don't know that you're going to have a

16   definitive answer either, but I think both sides are at the

17   same advantage or disadvantage with regard to this evidence.

18          MR. ANDERSON:  I appreciate the opportunity to make

19   that record.  Thank you.

20          THE COURT:  Thank you.

21          MR. ANDERSON:  And our final issue is really one

22   where we need to request leave from the Court to finish our

23   meet and confers with plaintiffs and potentially raise any

24   issues that may remain.  And it relates to our privilege log

25   issues.

1          Plaintiffs, over the weekend, produced 32 documents

2    that they had previously logged on their privilege log.  And

3    then last night at 10:30 p.m. produced another 29, either in

4    whole or partially redacted and -- or sorry, they didn't

5    produce them.  They said they were going to produce them.

6    They're not going to produce them until Wednesday -- until

7    Friday with a log on Wednesday.  So we have not had

8    opportunity to assess the -- our issues with respect to those

9    documents that they're continuing to withhold on privilege

10   that they've redacted, in part, and would intend to -- to try

11   to resolve all issues, in light of your guidance yesterday;

12   and if any remain, raise them in a discrete and targeted

13   manner with the Court.

14          THE COURT:  Okay.  Are we ready for the issue of

15   timing and going forward?

16          MR. SPERLING:  We have one other, I guess,

17   substantive issue -- well (inaudible), Your Honor, with

18   respect to when you first raised this on February 1.  And one

19   of the things that we identified for you was that we had some

20   outstanding requests for production that we just served the

21   week before as to which their responses are due in just a few

22   days.  And we actually asked for you to accelerate the

23   response date.  And you said, No, I'm not going do that, but

24   we should address them at the hearing.

25          So there was nothing for us to put in our -- in our

1    brief because we served the request and their responses

2    weren't due, but we're happy to put them on the screen and

3    walk through them.

4            There is only four of them, but you said we should

5    address it, so we would like to address it.

6            And then for some housekeeping, I'll identify the

7    other issues that we have.  We can go through them as you

8    like.

9            THE COURT:  Well, I reserve the right to take it

10   back, but go ahead.

11           MR. SPERLING:  Of course you do, Your Honor.  And

12   then we'll just be back here again, right.

13           THE COURT:  Maybe not.

14           MR. SPERLING:  We have a couple of, we think,

15   corrections or clarifications from the minute order that you

16   entered yesterday.

17           THE COURT:  I entered a minute order yesterday?

18           MR. SPERLING:  Somebody on behalf of your Chambers

19   did, Your Honor.

20           THE COURT:  Minutes of today or what, Chris?

21           MR. SPERLING:  Like a summary -- summary order just

22   identifying issues that were resolved and some instances --

23           THE COURT:  Yeah, I didn't look at that, so if

24   there is a correction, raise it now.

25           MR. SPERLING:  Okay.  I'll identify the iteration

215

1   and go through every one.

2          Finally, with respect to deadlines and schedules --

3          THE COURT:  Well, let's start with that one.  Go

4   through the minutes from yesterday.

5          MR. SPERLING:  Give me just a moment, Your Honor,

6   and I will pull it up.

7          MR. ROSENTHAL:  Your Honor, can we take a break and

8   let the parties confer and see where the disagreements are

9   rather than --

10          THE COURT:  Oh, so you haven't raised a position on

11   that?

12          MR. SPERLING:  I don't have any disagreements.  I'm

13   happy to confer with them for a moment.  I don't think it's

14   disagreements.

15          THE COURT:  Well, I have my notes here so -- Chris

16   sometimes asks me, What did you do here?  What did you do

17   here?  I'll tell him, but it's not impossible to lose things

18   in translation.  So if it's real easy, let's just go ahead.

19          If it's -- you've seen what you think is easy and

20   no greater and not disputed but it wasn't, in fact, the case,

21   so I'm going to rely on you to apply the knowledge, skill,

22   understanding, training and experience you have from the last

23   couple days and really bluntly tell me whether you think --

24   whether you believe it's not.

25          MR. SPERLING:  Why don't I run through them.  And

1   if it's one where they say, no, no, that's not right.

2            THE COURT:  Okay, that's fine.

3            MR. SPERLING:  We'll table that one and we'll go

4   confer with them, rather than have an argument with them.

5            THE COURT:  Run through it, because some people

6   want to get out of here by 4:00 to catch a plane.

7            MR. SPERLING:  Yeah.  With respect to, there was an

8   order of reproduction of two documents identify by Bates

9   number that related to RFP 22.  We had already identified

10   those two Bates numbers.

11           Our understanding was that it was an order to

12   produce documents responsive to request, which were exchanged

13   with Cox.  It has nothing to do with those two documents.  We

14   already have those.

15           THE COURT:  No.  My order on 22 -- or our order

16   was, I think:  Produce communications with Cox regarding

17   notice, policies and procedures, DMCA complaints, and

18   autoclosed script.

19           MR. SPERLING:  Okay, perfect.  We can move on.

20           THE COURT:  That was my order.

21           MR. SPERLING:  The next one is, there was an order

22   from you and Ms. Rodriguez about contractors, and them adding

23   as custodians any contractors that became employees.

24   Mr. Rosenthal stood up and sort of gave a progress report,

25   but they were supposed to have verification.  If that's

1  simply not captured by the order, if we don't have to worry

2  about that, that's fine.  But it's --

3          THE COURT:  Well, he stood up and said the

4  contractors that are on that list never became employees and

5  were gone by the end of 2015.  That's what I heard.

6          MR. SPERLING:  I think he said:  That's their best

7  understanding, they were still conferring.  And I think

8  Ms. Rodriguez asked them to be able to confirm today if they

9  could.

10         THE COURT:  Okay.

11         MR. ROSENTHAL:  They continue to look into the

12  issue.  The information is not changed.  They are continuing

13  to do that.  If there is going to be a change in that status,

14  we'll report back to both plaintiffs --

15         THE COURT:  Okay, don't let that drop in the

16  cracks.  I know you won't.

17         MR. SPERLING:  There was -- looking -- the notes

18  that I see say:  There was nothing in the order about our

19  challenge to their privilege log entries 8, 200, 203 and 216.

20  And I think the issue is that Mr. Schapiro, at first, said

21  they would go back and look to see if there were any

22  nonprivileged attachments that were not produced; but,

23  frankly, the record wasn't clear to us.  And so we just think

24  it's beneficial to have --

25         THE COURT:  We have "privileged."

1          MR. SPERLING:  Okay.  But with respect to the

2   attachments, the question I think was whether he was going to

3   look to see whether there were nonprivileged attachments or

4   not.

5          THE COURT:  I still have the attachments as a

6   question mark in my notes too.

7          MR. SPERLING:  Okay.  So is that our understanding

8   that Charter is going to --

9          FEMALE SPEAKER:  Your Honor, which item are we

10  talking about?

11         THE COURT:  That's series 8, 200, 203 and 216.  The

12  issue is "attachments" and that was an open question.  Is

13  that it?

14         MR. SPERLING:  Nope, I was ready for that.

15         THE COURT:  I like the word "Nope."  Did you say

16  nope, N-O-P-E?

17         MR. SPERLING:  I did only because of the atmosphere

18  of informality that you've encouraged, Your Honor.

19         THE COURT:  No.  I like that word.

20         FEMALE SPEAKER:  I'm sorry, this is (inaudible).

21  Can you clarify what document you're reading from?

22         MR. SPERLING:  I'm not reading from a document.

23  I'm reading from my team's notes.  So I think we had

24  challenges to your privilege log entries --

25         MR. ROSENTHAL:  So, again, Your Honor --

1              THE COURT:  He's trying to clarify the minutes.

2      After every day in Court, you entered minutes is what

3      happened and that's my courtroom deputy.

4              MR. ROSENTHAL:  But he's not readings from the

5      minutes.

6              THE COURT:  What?

7              MR. ROSENTHAL:  He's readings from his team's

8      notes.

9              THE COURT:  Oh.

10             MR. ROSENTHAL:  What we would like to do is get

11     together with his team, with our notes, and his team --

12             THE COURT:  Okay.  Are you trying to get

13     clarification from the -- from the minutes from yesterday or

14     from what you think happened?

15             MR. SPERLING:  I think it's like a yes or no, Your

16     Honor, which is:  Are they going to look for nonprivileged

17     attachment to those documents or not?

18             MR. ROSENTHAL:  Well --

19             MR. SPERLING:  You -- you -- hold on,

20     Mr. Rosenthal, you'll have a chance, I promise.

21             You ruled that they were privileged.  You denied

22     our privilege on challenge.  We're not rearguing that.  It's

23     just a question about what happened on the record and trying

24     to get clarity.

25             THE COURT:  Okay, go ahead.

220

1        MR. ROSENTHAL:  He's reading from his team's notes.

2        THE COURT:  That's fine.

3        MR. ROSENTHAL:  But we don't have access to what

4   he's reading to.  We prepared a set of notes, too, what we

5   thought happened yesterday.

6        THE COURT:  Well, do you have a question about this

7   one?

8        MR. ROSENTHAL:  We could confer with them and see

9   whether we have the same thing or we have a disagreement.

10        THE COURT:  Well, but then you've got to come back

11   to me.  If we can just have it out here, that's fine.  He

12   said if you wait a second, we're not sure about that one

13   then, then go back there and talk --

14        MR. ROSENTHAL:  But that's not the way this has

15   worked in this case.  Everything is -- it's --

16        SPECIAL MASTER:  This is not advancing the process

17   right now, Mr. Rosenthal.  Let's keep moving.

18        MR. ROSENTHAL:  I agree.  There is a set of

19   official Court minutes that were produced.  We could operate

20   from that or we could look, or he could provide us a copy of

21   what he's looking at.

22        THE COURT:  I just don't want you to file a motion

23   for reconsideration later, so.

24        FEMALE SPEAKER:  But could we just -- perhaps --

25   and maybe this is a question for the Court trial, or IT

221

1   clerk.  But it's our understanding what the -- with the

2   exception of in-camera discussions, these two hearings,

3   yesterday and today, are on the record and that there should

4   be a transcript.

5           THE COURT:  There will be, yeah.  But I think --

6   but again, you're already asking for clarification from

7   something I said on the record for which there is a

8   transcript.  If you can clarify before you leave today, it

9   saves me time and saves you guys motions practice.

10          FEMALE SPEAKER:  Well, Your Honor, we don't have

11  the transcript yet.

12          THE COURT:  But you have your recollections.  I'm

13  fine with your recollections for the moment.  Go ahead.

14          FEMALE SPEAKER:  But, Your Honor, could we break

15  for ten minutes so that we could get on the same page with a

16  long list of items he's going through.

17          THE COURT:  He's on the fourth or fifth.

18          MR. SPERLING:  Actually, I have only have one item

19  after this, so it's not a long list.

20          THE COURT:  Just one more, please.

21          MR. SPERLING:  Yeah, I'm happy for them to come

22  back before the end of the day and give us the answer on

23  that.  It's just whether they're going to do it or not.

24          THE COURT:  I told them to, so they are.

25          MR. SPERLING:  Okay, great.

1          THE COURT:  Okay.

2          MR. SPERLING:  It's actually two more -- my

3    mistake.

4          There is nothing in the minute order about the

5    30(b)(6).  If you don't think that we need it there, that's

6    fine, right.  You sort of gave us back the 30(b)(6).

7          THE COURT:  I did.

8          MR. SPERLING:  Spoliation only as to e-mails.

9          THE COURT:  Right.

10          MR. SPERLING:  Right.  Finally, there is nothing in

11    the minute order about our request for Production 8

12    concerning policies.  Our understanding is that Charter

13    clarified that they would produce both consumer-facing and

14    internal policies from the claim period in 2017 to 2019.  If

15    that's their understanding, great; if not, I agree we should

16    huddle with them.

17          THE COURT:  Request for Production 8, in what order

18    did you do that?  All right, RFP 8, defendant says no

19    dispute.  Charter is not limiting their response to internal

20    policies.  They will look for public-facing policies.

21    Batching process not within RFP 8, according to Charter.  Now

22    Charter agrees that they will not rely solely on batching

23    process.

24          If you can understand my notes --

25          MR. SPERLING:  Yeah, so it's that thing that you

223

1    read --

2             THE COURT:  If there is another process, even if

3    not subscriber-facing, it will be included in the search.

4    Want internal and external policies during relevant time

5    period; issue resolved.

6             MR. SPERLING:  So -- so the gap that I think is

7    still unclear, in listening to Your Honor, is whether they're

8    looking for and producing internal policies that are not

9    consumer-facing on these issues.  It's a yes or no.

10            THE COURT:  So --

11            MR. SPERLING:  Our understanding is that they said

12   that they would and that's what your order was supposed to

13   encompass.

14            THE COURT:  If there is another process, even if

15   not subscriber-facing, it will be included in their search.

16            MR. SPERLING:  Yeah, I think that's what we were

17   relying on, "policy" instead of "process."

18            THE COURT:  Process, whatever.

19            FEMALE SPEAKER:  So, Your Honor, the process

20   discussion was specific to batching.  And we said we would --

21   even though that's not process of what he was asking for, we

22   would look for that.  But in response to this conferring,

23   what I said was that we had already produced the internal

24   policies from the post-discovery period and that we would go

25   back, even though they were public, and produce any

224

1    public-facing as well.

2               THE COURT:  Okay, there you go.

3               MR. SPERLING:  So that's -- that's it on that list,

4    unless my --

5               FEMALE SPEAKER:  (Inaudible).

6               MR. SPERLING:  Hold on a second.

7               THE COURT:  Unless what?  You're the list

8    deliverer.

9               MR. SPERLING:  Yeah.  I think -- I believe we may

10   need to clarify some more (inaudible) in meet and confer with

11   Ms. Golinveaux (inaudible) on that and we may need to come

12   back to you because we may have understood something.  We can

13   do that in a moment.

14              THE COURT:  Okay.

15              MR. SPERLING:  Those are the issues with respect to

16   the minute order.  Thank you.

17              THE COURT:  Thank you.

18              MR. SPERLING:  So there is pending RFPs if you want

19   to hear it or you want us to come back.

20              SPECIAL MASTER:  Hold on.  Let's do the minute

21   order first, let's complete that.

22              MR. SPERLING:  Sorry, I didn't realize it was

23   complete.

24              MS. BREWER:  Thank you.

25              If we are going to clarify the minute order to add

1   in a line-item with respect to the 30(b)(6) deposition, it

2   should refer to it as "ESI data loss."  The Court did not

3   embrace or accept plaintiffs' characterization of it as a

4   "spoliation deposition."  In fact, the Court expressed the

5   opposite view.

6            THE COURT:  It's the e-mail loss issue.

7            MS. BREWER:  Yes.

8            THE COURT:  Whatever you want to call that in any

9   other terms, it's still those.  Okay, so it's the e-mail loss

10  issue.  CATS issue would will be subject to normal discovery

11  is what we said.

12           MR. SPERLING:  Right, that was my -- that was our

13  understanding.

14           MS. BREWER:  With respect to the discovery that was

15  served on January 27, Your Honor absolutely did not order us

16  to respond to that on an accelerated schedule.  And in the

17  chart process, it was included.

18           We had a discussion with them in terms of

19  exchanging positions on the chart and we acknowledged that we

20  would respond on the normal timetable and did not hear

21  anything back from them.  It was absolutely not discussed

22  with us that we would have to respond to those requests in

23  realtime today.  And we object to being put on the spot.

24           THE COURT:  Well, again, I think they were probably

25  trying to head off problems at the pass.  But I think we need

226

1    to deal with -- I want to make sure we're done at 4:00, so I

2    want to deal right now with -- with what we do from here on

3    with what we've already decided.  And then maybe I'll let you

4    make just a tiny, brief record -- not a record, but see if

5    there is anything I want -- we want to discuss regarding the

6    discovery you've issued but for which a response is not yet

7    due.

8             MR. SPERLING:  Sure, obviously, Your Honor.  I

9    think I was pretty clear in stating upfront that you did not

10   order them to respond on an accelerated basis.

11            THE COURT:  Right, you did, yep.

12            MR. SPERLING:  What you said, and this was the

13   February 1 transcript, you said:  So I'm not inclined to make

14   them respond in writing necessarily, but again, I am going to

15   tackle all the issues I can possibly tackle, so that's going

16   to be on the table.  That's what you said.  They were there,

17   we were there, we received it on that basis.

18            If you tell us now, I'm not going to do it, then

19   you're not going to do it.

20            MS. BREWER:  Okay.

21            THE COURT:  Yeah, that's right.  Well said.

22            MR. SPERLING:  With respect to their challenge to

23   your respective rulings, you and Ms. Rodriguez's rulings

24   to -- let me phrase this in a way that will be clear.

25            We challenged one of their privilege log entries

227

1    previously on 28.  That was in August.  Ms. Rodriguez, in

2    early October, ordered them to produce it and found it wasn't

3    privileged.  They came back a few weeks later, said, Please

4    look again.  She did.  She ordered them to produce it again.

5    They objected to you.  You said, Produce it, not privileged.

6    They objected to Judge Jackson.  It's fully briefed.  It's

7    February, we moved on it in August.  The Court has been very

8    helpful sometimes in interceding with Judge Jackson to

9    unlodge things, given his heavy docket, like you have a heavy

10   docket.  To the extent we can get a ruling on privilege log

11   item 28 sooner rather than later --

12           THE COURT:  What's the ECF?

13           MR. SPERLING:  -- that would help deal with timing

14   issues.  And I will give you the ECF number as soon as it

15   comes through on my screen.

16           MS. BREWER:  Your Honor, if I can clarify, because

17   there was a misstatement made.  It is not fully briefed.  Our

18   reply brief is due tonight --

19           THE COURT:  Okay.

20           MS. BREWER:  -- and we plan to file one.

21           THE COURT:  Well, (inaudible) --

22           MS. BREWER:  Other than that, we have no issue with

23   acceleration of the timing; but it is not a true statement

24   that it's fully briefed because we were given an opportunity

25   to file a reply and we intend to do so.

228

1          MR. SPERLING:  I misspoke, I apologize.

2          THE COURT:  Okay.

3          MR. SPERLING:  I had in mind that by the time of

4     the hearing, be fully briefed, which is what I remember, and

5     they're right, it's due today.  And -- because you told us

6     however long we took to put in our opposition, that's how

7     long they got for the reply.

8          So I apologize for the misstatement.  That's

9     privilege item 28.

10         With respect to --

11         THE COURT:  You were going to give me an ECF

12    number.

13         MR. SPERLING:  Yes, I was.  And I'm not sure why I

14    don't have it yet.

15         THE COURT:  Somebody's in trouble.

16         MR. SPERLING:  Heads will roll, but I will give it

17    to you as soon as it shows up on my screen.

18         MS. BREWER:  I can pull that up.

19         THE COURT:  No.  Just keep going.  Tell me when you

20    do, just call out a number.

21         MR. SPERLING:  Yeah, I will get it for -- I will

22    get it for Your Honor.

23         With respect to deadlines and scheduling, there is,

24    I think, two types of things to discuss.

25         One is simply deadlines for production of all these

229

1    various things; but we have a short, I would say it's 10, 15

2    minutes, showing to describe, because it's a really critical

3    issue, which is -- and this actually began with yesterday.

4             THE COURT:  As long as it's not a reconsideration.

5             MR. SPERLING:  It's not a reconsideration, Your

6    Honor, thank goodness.

7             It is a really helpful process, but one thing I

8    don't think you've had the chance to hear is last Thursday,

9    as part of this process, Charter yielded on a bunch of

10   issues, like a lot.  Now, we're really happy that they did.

11            THE COURT:  Well, since they did, why don't you say

12   thank you?

13            MR. SPERLING:  I do say thank you.

14            THE COURT:  To them.

15            MR. SPERLING:  Thank you, all of you.

16            THE COURT:  Okay.

17            MR. SPERLING:  But as we would like to walk through

18   with you, the consequences of that are significant.  And I

19   will walk through with you and Ms. Rodriguez how those tie to

20   our existing 30(b)(6) topics.

21            MR. SHAPIRO:  But we've learned (inaudible) --

22            MR. SPERLING:  Hold on, hold on a second.

23            MR. SHAPIRO:  -- and we won't do it again.

24            SPECIAL MASTER:  What did he say?

25            THE COURT:  He's just joking.  A little levity.  Go

230

1    ahead.

2           MR. SPERLING:  The time and consequences are

3    significant.  And it can't be the case that you just sort of

4    hear me say that and then say, No, it's not.  I need to be

5    able to walk you and Ms. Rodriguez through it, because

6    otherwise, here is what's going to happen.

7           I already heard Ms. Brewer yesterday say, We don't

8    need to move the discovery deadline.  I would love for cases

9    to work like that, I guess, where I could dump a bunch of

10   discovery on two people two, three weeks before the end of

11   discovery before they've ever taken any depositions and run

12   out the clock.

13          MS. BREWER:  I don't see --

14          MR. SPERLING:  I'm not done with my presentation,

15   but I am pausing just because I see you're conferring.

16          THE COURT:  Would it matter to you if, in the

17   normal course, what I usually do in a situation where I

18   believe that my orders and things that happen in front of me

19   necessitate a district judge relaxing deadlines, that I -- I

20   go to the district judge and suggest, based on my experience,

21   the time it will take to finish the processes that I see

22   going on and suggest maybe a new schedule?

23          MR. SPERLING:  Of course, Your Honor, but here is

24   what we're ultimately trying to work towards.

25          We already know what their position is.  Their

1    position is, Don't budge.  To the extent that you think that

2    doesn't make sense -- and I think I can persuade you that

3    doesn't make any sense.

4              THE COURT:  What I'm reconsidering --

5              MR. SPERLING:  I would rather work it out.

6              THE COURT:  I've been litigating since 1988 so I

7    know how long things -- actually, I law-clerked two years

8    before that for a U.S. district judge, so I know these

9    things.

10             MR. SPERLING:  Yeah.

11             THE COURT:  I can handle this one.

12             MR. SPERLING:  Okay.  I just -- given the imminence

13   of the current deadline, we've sort of got to know, is it

14   going to change, as we think it obviously has to?  Or is it

15   not, in which case --

16             THE COURT:  Well, I can't tell you today.

17             MR. SPERLING:  Right.  I'm not suggesting that the

18   Court could because I understand that the Court needs to

19   confer with Judge Jackson.

20             THE COURT:  Right.

21             MR. SPERLING:  But, for example, if the Court was

22   inclined to say, I'm going to go to Judge Jackson and tell

23   him I think it's going to take X amount of time, then it

24   probably makes sense for the parties to confer on a schedule,

25   unless they're going to really go to the mat on keeping the

1   schedule.  So I'm just trying to drive towards --

2          THE COURT:  All right.  Well, thinking out loud, as

3   I see it, I think you have four or five months left to

4   discovery.  You would file dispositive motions, typically, 30

5   days after the end of discovery, okay.  So if you had four

6   months even from right now, that would take you to roughly

7   July 1.  Summary judgment briefing would be until late

8   August, if you don't ask for extensions of time on briefs,

9   which would be shocking --

10          MR. SPERLING:  I'm sorry to interrupt, Your Honor.

11          Right now we have an April 2 fact discovery close,

12   April 2.  It's --

13          THE COURT:  I'm telling you what I think I see:

14   Four or five more months of discovery based on everything

15   we're talking about.

16          MR. SPERLING:  Okay, fine, Your Honor.

17          THE COURT:  That's what I'm saying.

18          MR. SPERLING:  Yeah, misunderstood.

19          THE COURT:  If summary judgment briefing was about

20   the middle to end of August, you know, that barely leaves him

21   enough time to really get around to making a decision, trial

22   looming.  We're only now starting to have trials.

23          How many days do you guys think your trial would

24   be?

25          MR. SPERLING:  We think about three weeks, Your

1    Honor.

2           THE COURT:  If COVID is still around, you will not

3    have a three-week trial this year.  You won't.  Because --

4    not because of Judge Jackson, because Chief Judge Brimmer

5    won't let you, okay.  He's only permitting trials right now

6    within three to four days.  He is not having any multi-week

7    trials.  They won't even qualify for what we call our "pilot

8    program" on trials.

9           So unless a miracle happens regarding COVID, we're

10   not going to see three- or four-week trials this year.

11   And -- that's not Judge Jackson's fault or his prerogative.

12   It's the chief judge's prerogative.

13          So I just don't think it's realistic in the first

14   place.  So hurry up and wait is not a good process.  I'm just

15   telling you the brutal truth about trials in courts today.

16          Many districts are not even having trials again.

17   We're starting up again in March, but -- but there is about

18   50 trials waiting to be tried right now, so.

19          MR. SPERLING:  So here is what I propose to Your

20   Honor, to Ms. Rodriguez.

21          Let us confer with opposing counsel for ten minutes

22   on the one issue that we disagreed about the minute order and

23   to see if we can come to any agreements with respect to

24   deadlines for production.  And then I propose that leaves us

25   30 minutes --

1          THE COURT:  Okay.

2          MR. SPERLING:  -- on the schedule.  And to the

3    extent we don't have agreement, then you can set deadlines

4    for production and we can walk through with you how we're

5    affected with respect to the 30(b)(6).  And then we can

6    easily finish by 4 o'clock.

7          THE COURT:  Make it so, number two.

8          MR. SPERLING:  Great.  And I will now give you the

9    ECF numbers that the Court asked for.  Their objection to

10   your ruling is ECF 362.

11         THE COURT:  Okay.

12         MR. SPERLING:  I assume that's one that matters.

13   Our opposition was 371.

14         SPECIAL MASTER:  Did you have something,

15   Ms. Brewer?

16         MS. BREWER:  Yes, thank you, Ms. Rodriguez.

17         I'm just providing this piece of information for

18   the Court.  I'm not advocating -- I just wanted the Court to

19   be aware because I know sometimes judges appreciate having

20   this information so they can look out for one another.

21         As the Court is aware, there is a parallel action

22   against Bright House proceeding in Florida.  We just met and

23   conferred with the other side and negotiated an extension of

24   the schedule in the Bright House case.  But what the judge

25   elected to do and what the judge issued as part of her order

1   is that the Bright House case will be stayed in -- as of

2   October 1, in light of the Charter trial.

3          So if that's information that would benefit Judge

4   Jackson to put in his calculus of what he wants to do, we

5   just wanted to -- to make this Court aware of that.

6          And I can provide the Bright House docket number,

7   if that would be helpful.

8          THE COURT:  No, no, it's not necessary.  But you do

9   realize Florida is way more open than we are.

10         MS. BREWER:  I have family in Florida and I fully

11  appreciate that, yes.

12         THE COURT:  Okay.  And I'll be there in three days

13  too.

14         MR. SPERLING:  Okay.  Are we taking a ten-minute

15  break?

16         THE COURT:  Yeah, yeah, ten minutes.

17         MR. SPERLING:  Okay, great, thank you.

18         (Break was taken.)

19         MR. SPERLING:  I think we're ready, Your Honor.

20         THE COURT:  Go ahead.

21         MR. SPERLING:  So I think with respect to the

22  minute order, it sounds like Charter hasn't had a chance to

23  review it.  They may have -- they don't know whether they

24  have issues or not.  And so to the extent there is something

25  that somebody thinks requires further clarification, we won't

1    take the position of, that because it wasn't addressed here

2    and now it has been waived.  Is that a fair characterization?

3              MR. ROSENTHAL:  No, I don't think it is.  At the

4    end of yesterday the Court amply summarized the findings for

5    the day.  We think the end-of-the-day summary transcript is

6    the accurate representation of what happened.

7              What we would like to do is have a similar summary

8    today, and we don't believe the minute order, looking at our

9    notes, it would take awhile to do side-by-side comparison,

10   but we believe there are discrepancies between what the Court

11   summarized yesterday --

12             THE COURT:  Well, I'll include today, then, okay.

13   So -- did we start today with defendant's issues?  We did.

14             So RFP 90, seek clarification of the word

15   "exemplary," "timely" versus "untimely," produced IRS --

16   IR -- "ISRCs" to "Audible Magic."  I just have "resolved,"

17   that there was some agreement on the record about that.

18             Two, track level of pro work revenue; two years of

19   claim period missing; 20 percent of works for entire claim

20   period.  Ordered to produce what was produced in Cox.

21             Interrogatories 20 and 21, Charter looking for a

22   compromise.  Plaintiffs will supply a generally applicable

23   answer.

24             Work-by-work damages, Interrogatory 22.  Plaintiffs

25   agree they haven't calculated it; resolved.  I guess I think

1    we ordered nothing.

2              Hash Reports, you know the answer to that.  Ordered

3    that the hash tag report must be produced.

4              Recording agreements, 80 percent of the works at

5    issue produced in Bright House, blah, blah, blah; denied.

6              RFP 23, every hundredth.  That's stated on the

7    record.

8              RF 87, 400 dropped works; issue denied.

9              99 and 100, produce.

10             Interrogatory Number 23, denied.

11             Interrogatory 24, denied.

12             And then finally, you have to have a meet and

13   confer regarding plaintiffs' privilege log issues.  You'll

14   raise at a later date after digesting the info just produced

15   last night.

16             That's what I have for today.

17             MR. SPERLING:  Unless some of my team tells me

18   otherwise, I think that's a good summary.

19             MS. BREWER:  I think I'm in the same position

20   Mr. Sperling is in.

21             THE COURT:  Go ahead.

22             MS. BREWER:  I think that was pretty close to --

23             THE COURT:  That's fine.

24             MS. BREWER:  -- if not dead-on accurate, but we

25   were, you know, scrolling through --

1          THE COURT:  That's fine, yep.  I'm not going to say

2   you waived anything.

3          MS. BREWER:  Okay.

4          THE COURT:  That's just my summary.

5          MS. BREWER:  I will say I think what wasn't

6   mentioned is with respect to the Hash Report, that Your Honor

7   did additionally state that if plaintiffs intended to object

8   to Judge Jackson on that ruling, that that would also be

9   given an accelerated briefing schedule --

10          THE COURT:  Right.  Go ahead and brief that issue

11   yet.  I said we would include that with timing and where to

12   go from here at the end.

13          MS. BREWER:  Perfect.  Thank you.

14          MR. SPERLING:  So in that case, Your Honor, when we

15   talk about timing, I want to show you two slides, and only

16   two slides, to help just inform that discussion, if that's

17   okay with you and Ms. Rodriguez.

18          Let's go to the slide -- slide 3 and 4, please.

19   Slide 3.  You can't put up more than one at a time.

20          So just to get a sense of the scope of what they

21   agreed to do before we began this two-day process.  We had

22   requests about programs that they consider for addressing

23   copyright infringement --

24          THE COURT:  Well, wait a second.  Agreed to do

25   outside of our involvement?

239

```
1              MR. SPERLING:  As part of the process you set up --

2              THE COURT:  Right.

3              MR. SPERLING:  -- but outside of your involvement.

4              THE COURT:  But you didn't come to a conclusion

5    with them about when they would do that?

6              MR. SPERLING:  Correct.

7              THE COURT:  Okay.

8              MR. SPERLING:  Correct.

9              THE COURT:  I wish you would have.

10             MR. SPERLING:  So there is no need -- there is no

11   need to short-circuit it, because this is what we want to

12   describe to the Court and they can respond.

13             THE COURT:  Maybe they have an answer for you.

14             MR. ROSENTHAL:  Well, we can respond now --

15             MS. BREWER:  Hold on, you guys, can I -- can I

16   speak?

17             MR. ROSENTHAL:  -- a slide that he --

18             MS. BREWER:  Can I speak?

19             MR. ROSENTHAL:  -- had he -- had he --

20             MS. BREWER:  Can I speak?

21             MR. ROSENTHAL:  -- known he had the slides --

22             THE COURT:  She's asking you --

23             SPECIAL MASTER:  Ms. Brewer, yes, please speak.

24             MS. BREWER:  Thank you.

25             We obviously don't have slides because our issues
```

1    were just heard today.  What we discussed in the meet and

2    confer is that we would be willing to begin producing

3    documents, both the documents that were part of this process

4    ordered yesterday or to the extent anything was discussed

5    today on a rolling basis.  We believe that the timing that we

6    can meet for producing that -- the additional documentation

7    is March 15.  But when I asked Mr. Sperling, Can you do the

8    same, I didn't get an acknowledgment.  Instead I got, No, in

9    our instance, our production is going to take much more work,

10   much longer.  That's going to take us months.

11           THE COURT:  Well, let's talk about you first.  So

12   are you saying everything you're obliged to do, both what you

13   agreed to in this process before you got here and what I've

14   ordered you to do, is going to be done by March 15?  Is that

15   what you're saying?

16           MS. BREWER:  Yes, that's what I'm saying.  That's

17   what we communicated to opposing counsel.  And, you know, in

18   good faith, we're going to start producing what are

19   available, what we're able to produce, as soon as we can.

20   We're not going to sit on it until March 15.  And certainly

21   if it looks like when we're getting close to March 15 if

22   there is anything that looks like it might be a one-off that

23   isn't going to meet that date, we would communicate that in

24   advance, but we don't currently anticipate that being a

25   problem.

1        THE COURT:  Okay, just to reiterate.  You hope and

2   anticipate, barring some unforeseen difficulty, to produce

3   everything that you've voluntarily agreed to and that I've

4   ordered by March 15.

5        MS. BREWER:  Correct, but I would hope that I'm

6   communicating that in good faith with the understanding

7   that -- I forget the exact phrase that Your Honor used for

8   this two-day process, but I think it was:  It goes both ways.

9        THE COURT:  It's a both ways, Chapter.

10        MS. BREWER:  I can't be a good lawyer for my client

11   if I'm saying that to you in good faith and then I find out

12   they're not going to do any of that.

13        THE COURT:  No, no, but what they do is up to me.

14        MS. BREWER:  Okay.

15        THE COURT:  So the faster you want to go, the more

16   I buy in to your desire truly to go to trial quickly.

17        MS. BREWER:  Yes.

18        THE COURT:  But the longer you stretch that out,

19   the more I think you do want it both ways.  You want to take

20   a long time, but you also want a quick trial.  So, yes, if I

21   see you proceeding at all deliberate speed, then that's going

22   to be impressive.  Okay?

23        MR. SPERLING:  Okay.  So I guess it's the nature of

24   this lawsuit that like nobody can resist.  I came back to

25   you, as opposed to saying they've committed to March 15,

1    because they didn't commit to March 15.  I heard --

2              THE COURT:  Well, they did say to me, good effort.

3              MR. SPERLING:  What we would love, Your Honor, is

4    a -- is a date certain.  And we recognize there are always,

5    you know, extraordinary things that happen.

6              THE COURT:  Why?  What's wrong with March 15?  You

7    realize March 15 is less than three weeks away?

8              MR. SPERLING:  It would be great if they complete

9    it by then, Your Honor.  It's just the reservations concern

10   me.  I leave it at that.

11             THE COURT:  The order is March 15, unless permitted

12   otherwise through an informal phone call informing me that

13   any particular effort is impossible for this reason, okay.

14             MR. SPERLING:  That's excellent, thank you, Your

15   Honor.  Couldn't ask for more than that.

16             THE COURT:  All right.  Now, I've got to put your

17   date on, so.

18             MR. SPERLING:  So I'm trying to get sort of a

19   comprehensive look at what we have to do.  The one that

20   concerns us most is the track level revenue that you ordered.

21   So that takes forever.  And that's exactly what I told to

22   Ms. Brewer.  I didn't --

23             THE COURT:  Is that the eight-week deal?

24             MR. SPERLING:  So in Cox for fewer works and only

25   pulling track revenue for the tracks of singles, so not the

1  track record associated with selling as part of an album, to

2  my understanding, took eight weeks.  Here it's more works,

3  longer time and to be more comprehensive.

4        So my understanding is that the publishers can do

5  it more quickly than that and, of course, we would do it more

6  quickly than that; I think two to three weeks.  But with --

7  with respect to the labels, it's an incredibly time-intensive

8  process, just like I told you a couple hours ago.  You've

9  told us to do it, we're going to it, but we can't do it

10 faster than we can do it.

11       To say, do it by March 15 is to tell us, you'll

12 just be held in contempt.  It's not possible to be done that

13 quickly.

14       THE COURT:  I didn't say March 15.  I'm asking you,

15 I'm trying to talk with you about it.

16       MR. SPERLING:  Yeah.  I wasn't suggesting that you

17 were, Your Honor.

18       THE COURT:  Okay.

19       MR. SPERLING:  So sorry for the misunderstanding.

20       What I would love to be able to do is talk to my

21 clients because, for example, one thing we might be able to

22 offer, haven't had a chance to offer yet, and maybe it will

23 be something that's appealing to the other side, is we might

24 be able to make it go substantially quicker if we limit, for

25 example, to revenue for the top three distributors, you know

1   which I assume would be today, Spotify, Apple.  Not sure who

2   the third would be.

3          If that's something that they're willing to

4   consider, I need to talk to my client and figure out how much

5   that cuts off it.  If they say, No, that's not a nonstarter,

6   we wanted everything and that's the order that we got, then

7   that's a different conversation with my clients.  But I don't

8   think I can tell the Court today how long that will take,

9   other than it's awhile.  And if the Court says, Let us know

10   by Friday, we'll let you know by Friday.  Thursday, take

11   Thursday.  Wednesday, probably too soon.  I don't think we

12   can --

13          THE COURT:  Well, let's just shoot for March 31.

14          MR. SPERLING:  I can only convey what my clients

15   tell me, Your Honor.

16          THE COURT:  Understood.

17          MR. SPERLING:  I do believe that that's impossible

18   with respect to the labels.  With respect to the publishers,

19   I think it can be done.  With respect to the labels, I don't

20   think it's humanly possible.

21          THE COURT:  Okay.

22          MR. SPERLING:  But we'll come back and tell the

23   Court --

24          MR. OPPENHEIM:  Your Honor --

25          MR. SPERLING:  -- this week.

1        MR. OPPENHEIM:  Sorry.  Based on the Cox

2   experience, I mean, we were -- that's the rocket docket and

3   we were encouraged to move heaven and earth, which we did.

4   And it was on the record company side, even for just the

5   singles revenue for a single ISRC, which is what you -- I

6   think you ordered us to do here, the same thing we did in

7   Cox.  It took eight weeks.

8        Here, to refresh the existing really is to just do

9   it again.  It's not getting leftovers; it's, you know, doing

10   the whole thing again and then adding to it all the

11   additional works.

12        So again, publishers, as Mr. Sperling said, we can

13   do much faster, but the record company side, I would be

14   surprised if -- if we did it in eight weeks, that would be

15   shocking, but we can go back and find out.  If we pull from

16   less than all sources, hopefully, we could do it faster.

17        MS. BREWER:  Respectfully, that was a lot -- that

18   was a lot of words, and within those words I did not once

19   hear a month or a date for any of their production

20   commitments.

21        MR. SPERLING:  I think we're trying to resolve the

22   track level one first, and then, of course, we're going to

23   talk about the other commitments, because we're not going to

24   leave the room without you giving us a date by which we have

25   to produce those.

246

1          THE COURT:  So, you know I have to -- I have to

2     have this case ready for Judge Jackson.  I have to presume at

3     the moment that you are going to trial in -- what was the

4     date?

5          MR. SPERLING:  October 18.

6          THE COURT:  October 18.  So I have to make you move

7     heaven and earth because I don't have any choice at the

8     moment.  So at the moment, barring the -- with Judge Jackson

9     coming to some kind of educated decision on when this can be

10    tried, I have seen him order trial 45 days after the

11    scheduling conference.  So you're showing up for the first

12    time in court and you have trial 45 days later.  It's his

13    prerogative and it's not going to be reversible error, no

14    matter what.  If he puts you to trial in -- in August or

15    July, it would be reversed, but he can do that.  So I just

16    have to check with him.

17         Based on that you need to do your best by -- well,

18    eight weeks would be April 20, okay, that is what eight weeks

19    from today is.  I think you ought to just give me -- I'll

20    give you a date of April 1.  And again, like I told them, if

21    sometime, hopefully, week prior to that you know that it

22    can't be done, then you come back and show me what you've

23    done, prove to me that you've been, you know, engaging in the

24    process that we've ordered you to.

25         Here is the problem again.  You all have a right to

1    appeal.  So here is what I'm saying, you know, if you appeal

2    this, deadlines are out the window.  So, you know, that would

3    be a good faith appeal, though.  That's all I have to say.

4    Because I'm going to go up and tell him, you know, we've got

5    this deadline we're working off for trial and I just ordered

6    a whole bunch of stuff to be produced and they might appeal.

7    So I bet his intent will go up for your appeals, but -- and

8    that's his call again.

9            But I'm going to tell April 1 for you, just like I

10   said March 15 for them.

11           MR. SPERLING:  Obviously, that's your order, Your

12   Honor.  I -- I feel confident --

13           THE COURT:  I know in advance you're going to come

14   back and tell me something, that's fine.

15           MR. SPERLING:  (Inaudible).  I mean, I hope -- I'm

16   reasonably optimistic for the publishers we can do it within

17   that deadline.

18           MS. BREWER:  Can I make a question?  As the Special

19   Master is aware, because she's been helping the parties with

20   deposition objections and resolving objections to topics so

21   that we can get depositions scheduled, if we're not getting

22   that financial data until April 1 and the fact discovery

23   closes currently April 2, that prevents us -- or at least it

24   gives them an argument, I'm assuming, because they've already

25   made it, we can't -- you know, they're not going to put up

1   the witnesses, or they are.  But those witnesses aren't

2   coming back, right, like you get that one bite at the apple,

3   and I think that a reasonable path forward is we carve out at

4   least those topics --

5           THE COURT:  Well, discovery is not going to close

6   April 2, okay.  That's -- did I set that deadline?

7           MS. BREWER:  The Court set the deadline.

8           THE COURT:  Well, did I set that deadline?

9           MR. SPERLING:  No.  It was a negotiated deadline

10   between the parties after Judge Jackson said he's not moving

11   the trial date --

12           THE COURT:  Okay.

13           MR. SPERLING:  -- but before we went through this

14   process with all the disagreements in order --

15           THE COURT:  So you submitted some kind of a

16   stipulation and he -- he endorsed it?

17           MR. SPERLING:  Correct.

18           THE COURT:  I just don't see how you can -- do you

19   see how you can complete discovery by April 2?  All

20   discovery?

21           MS. BREWER:  We were prepared to do so.

22           THE COURT:  No.  Do you -- based on everything

23   you've heard today -- you were a law clerk and you called

24   yourself a very experienced litigator.  Knowing what you know

25   about what you guys are both about to do and the discovery

1    you need to take and depositions you need to take -- I assume

2    you need to take depositions.

3              MS. BREWER:  Yes, we --

4              THE COURT:  And I assume you guys have scheduled

5    depositions during COVID and it's not the easiest thing to

6    do.  So knowing everything you know, do you believe discovery

7    can be completed in five weeks, the end of five weeks?

8              MS. BREWER:  We acknowledge that it's challenging,

9    and to clarify, I wasn't trying to boast myself.  I was

10   speaking --

11             THE COURT:  No, I know.  And I was trying to

12   encourage you that you know what you're doing and I'll trust

13   you.

14             MS. BREWER:  Yes.

15             THE COURT:  Do you think you can complete

16   everything we've just discussed to do in five weeks?

17             MS. BREWER:  I think based on what is the scope of

18   the two days, it would be challenging, I acknowledge that.  I

19   just -- I want to be clear -- I'm respect the Court -- I

20   can't set the discovery deadline.  So it's April 2 right now.

21   I just have to try and meet that.

22             THE COURT:  No.  But if I go up and talk to Brooke

23   Jackson and he says, Michael, sorry, I mean, I really like

24   you, but I've got to try this case in October, then you're

25   going to hear some new deadlines on me.  And it ain't my

 1  fault, okay.  So I don't care about moving heaven and earth,

 2  I'm going to order you to produce it and it's sufficient;

 3  that it's useful to complete discovery by April 2.  I don't

 4  have any choice.

 5          MR. SPERLING:  I just --

 6          THE COURT:  So be prepared for that, strap it on.

 7  That's all I can say.

 8          MR. SPERLING:  But if we get their documents March

 9  16 -- and I hear you, maybe this --

10          THE COURT:  Well, no, no, their deadline won't be

11  March 16 either.  Everything is going to be accelerated.  It

12  might be next week, it might be Monday.  I don't know.  I

13  have to go confer with him.  But if he is going to -- and by

14  the way, whatever he does, I totally respect, because I

15  really respect Brooke Jackson.  I will do -- I will enter the

16  orders I have to to comply with his desires for this case.

17          MR. SPERLING:  Of course, Your Honor.  Just so you

18  know when we're talking about for two custodians that they

19  agreed to add, not counting the two that you ordered them to

20  add yesterday, they told us that they already ran the

21  searches.  We don't have the documents yet.

22          They said they had 100,000 hits.  So we could be

23  talking about a lot of -- a lot of volume.  And then, of

24  course, we need time to actually digest the material before

25  we move forward with depositions that we've got to complete

1    by April 2.

2            And -- and this is the last thing.  They won't even

3    give us -- we've asked them four times to tell us who your

4    designees are for our 30(b)(6) deposition of you.  And I have

5    to raise this now --

6            THE COURT:  When did you issue the topics?

7            MR. SPERLING:  I'm going to tell you what we did,

8    Your Honor.  We both simultaneously served notices with

9    respect (inaudible) for the publishers and we, for them, on

10   December 30.  We both simultaneously served responses and

11   objections on January 29.

12           A few days later, on February 4, we gave them the

13   designees for Sony ATV, the Sony publishing entity, and they

14   went ahead and they took the deposition of the first

15   designee.  And there was one scheduled for Thursday, although

16   it looks like they want to put that off, and they can

17   proceed, because they have the meaningful documents they need

18   and we've told them who are designees are, so they're moving

19   forward.

20           So as to us, we served the notice the same day,

21   right.  We got the responses the same day.  We asked them a

22   second time for designees on February 10.  They didn't

23   answer.  We asked them again on the 17th.  They didn't

24   answer.  We asked them again on the 20th.  They didn't

25   answer.  They won't tell us who the designees are.  I don't

1    like walking into court and bothering the two of you with,

2    Can you make them tell us who their designees are?

3              THE COURT:  But you will, anyway.

4              MR. SPERLING:  But I'll put the e-mails on the

5    screen.  They won't answer the question.  And then they say,

6    Oh, sure, we can make April 2, no problem because --

7              THE COURT:  No, she didn't say that.  She said "it

8    would be very problematic," I think were your words.  But can

9    you provide designees by close of business Friday?

10             MS. BREWER:  Yes.

11             THE COURT:  All right, do it.  What else?

12             MR. SPERLING:  Your Honor, I think that's it,

13   subject to what you come back to us with.

14             THE COURT:  Right.

15             MR. SPERLING:  Once we hear back from the Court,

16   obviously, we may have something we want to say to you about

17   the deadlines for production because we do feel like we are

18   being put in an impossible position.

19             I'll end where I began this subject yesterday:

20   We're plaintiffs, we want to go to trial, but we need a

21   reasonable time to digest the information that we get.  And

22   then we need a reasonable time to actually take the 20

23   depositions that are allocated to our side -- they get 22 --

24   before the close of discovery.

25             THE COURT:  You know that you're preaching to the

1    choir, but I'm not the right choir.

2            MR. SPERLING:  I got it, Your Honor.

3            THE COURT:  So any appeal of what we've done -- how

4    soon do you guys -- in your experience, how soon do you have

5    a transcript?

6            MR. ROSENTHAL:  They're pretty quick.

7            MS. BREWER:  They are pretty quick.  I think we've

8    gotten them within a day or two.

9            THE COURT:  Okay.

10           MR. SPERLING:  I think two days.

11           MS. BREWER:  I don't know -- I don't know for a

12   hearing as long as a full day one, though.

13           THE COURT:  Right, two days actually.  So I want

14   any appeal filed by Wednesday, a week from tomorrow.

15           MR. SPERLING:  A week from tomorrow, Your Honor?

16           THE COURT:  That's your deadline for appealing

17   anything to Judge Jackson.  And since you're not going to

18   produce discovery anyway, it's an effective stay, because you

19   weren't going to probably produce anything by then anyway,

20   so, okay.

21           MR. SPERLING:  Understood, Your Honor.

22           MS. BREWER:  Could we get -- I'm sorry, Your Honor,

23   I know I should quit -- quit while you're ahead, but could we

24   get clarification from plaintiffs if they're able to

25   communicate it if they intend to object to your ruling on the

254

1   Hash Report?

2           Because we're to be willing to be upfront with them

3   about Privilege Log Number 28, and they -- you know, they

4   pressed us to make that clarification to them so that we

5   could be put on that accelerated briefing schedule for that.

6           THE COURT:  Well, how does it benefit you knowing

7   by tomorrow or Thursday versus next Wednesday whether they're

8   going to appeal that?

9           MS. BREWER:  That's a fair point.  I think if they

10   aren't appealing it, the point is we don't think that there

11   is reason for that to take long.  That should be something

12   they could produce within a day or so.

13           THE COURT:  I'm just not going to make them tell

14   you because this is a decision that they're going to have to

15   vet from the inside.

16           MS. BREWER:  Understood.

17           THE COURT:  But by noon on Wednesday, that's when

18   your appeals are due.

19           MR. SPERLING:  Noon on Wednesday of next week, Your

20   Honor?

21           THE COURT:  Correct.

22           MR. SPERLING:  Okay.  I don't think we have

23   anything else other than to again thank you both for two long

24   days.  We appreciate it.

25           FEMALE SPEAKER:  I'm sorry, Your Honor.  You said

1    April 1 for the discovery they said would be both burdensome,

2    the financial trackable to discovery.  What about the other

3    items.

4            THE COURT:  No, I said April 1 for everything.

5            FEMALE SPEAKER:  For both parties?

6            THE COURT:  No.  March 15 for you, because you told

7    me March 15.  I said April 1 for them.  And for both of you,

8    if three or four, five business days before that, you know

9    you're not going to meet those deadlines, I want you to call

10   an informal conference and tell me why you're not going to,

11   what you've been doing to meet the deadline, why you can't.

12   And then we'll talk about extended time.  And by the way, by

13   that time I will have talked to Judge Jackson and it may all

14   be a moot point anyway.

15           FEMALE SPEAKER:  Thank you, Your Honor.

16           MS. BREWER:  Yes, thank you.

17           THE COURT:  And I mean, I just -- I took you up on

18   it, so -- the date.  They didn't give me a date.  I forced it

19   on them, so -- so you said, Nothing else.  What about you?

20           UNIDENTIFIED SPEAKER:  Who won the basketball game?

21           (Discussion off the record.)

22           (Whereupon, the within hearing was then in

23   conclusion at 4:00 p.m.)

24

25

1                    TRANSCRIBER'S CERTIFICATION

2    I certify that the foregoing is a correct transcript to the

3    best of my ability to hear and understand the audio recording

4    and based on the quality of the audio recording from the

5    above-entitled matter.

6

7    /s/ Dyann Labo                    March 1, 2021

8    Signature of Transcriber               Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25