1

```
1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2
     Case No. 19-cv-874-RBJ-MEH
3    _____

4    WARNER RECORDS, INC., et al.,

5         Plaintiffs,

6    vs.

7    CHARTER COMMUNICATIONS, INC.,

8         Defendant.
     _____
9

10            Proceedings before MICHAEL E. HEGARTY, United

11   States Magistrate Judge, United States District Court for the

12   District of Colorado, commencing at 10:06 a.m., March 9,

13   2021, in the United States Courthouse, Denver, Colorado.

14   _____

15   WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE HEREIN
     TYPOGRAPHICALLY TRANSCRIBED. . .
16   _____

17                        APPEARANCES

18            JONATHAN M. SPERLING, HARRY EHLERS, MATTHEW J.

19   OPPENHEIM, and co-counsel, Attorneys at Law, appearing for

20   the Plaintiffs.

21            ANDREW H. SCHAPIRO, LINDA J. BREWER, ERIN R.

22   RANAHAN, and co-counsel, Attorneys at Law, appearing for the

23   Defendant.

24   _____

25                       ORAL ARGUMENTS
```

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

2

```
 1              P R O C E E D I N G S

 2              (Whereupon, the within electronically recorded

 3  proceedings are herein transcribed, pursuant to order of

 4  counsel.)

 5              THE COURT:  Good morning, everybody.  Case Number

 6  19-cv-874, Warner vs. Charter.  Why don't we have entries of

 7  appearance, starting with the plaintiff.

 8              MR. EHLERS:  Good morning, Your Honor.  Hardy

 9  Ehlers from Covington on behalf of the plaintiffs and also

10  joined by Matt Oppenheim and Jonathan Sperling and some

11  others on the phone.

12              THE COURT:  Thank you.

13              MS. BREWER:  Good morning, Your Honor.  Linda

14  Brewer from Quinn Emanuel on behalf of Charter, and with me

15  is Mr. Schapiro and Mr. Fortenbery from Quinn.  We also have

16  Erin Ranahan and (inaudible) from Winston as well as

17  (inaudible) local counsel.

18              THE COURT:  Okay.  Yeah, you're kind of fading in

19  and out there.  Does she -- does she sound well to everybody

20  else?

21              MALE SPEAKER:  I think everyone just needs to mute

22  while --

23              THE COURT:  No?

24              MR. OPPENHEIM:  Someone needs to mute.

25              THE COURT:  Yeah.  Okay.
```

1            MS. BREWER:  Is that better?

2            THE COURT:  Yeah, that's better.

3            MS. BREWER:  Okay.

4            THE COURT:  Okay, good.  So, you know, I --

5    actually, this is the easier way for me to do business and

6    probably not that difficult of a way for you guys to do

7    business because of the video appearance issue.

8            So here's what I'm thinking, okay, on the objection

9    to the decision of these -- on this discovery.  So forget

10   discovery limits, forget Special Master's ruling.  Let's just

11   start from a principle that everybody gets discovery into one

12   another's defenses and claims, right, we're all there.

13   That's an unassailable proposition.

14           So to the extent that the defense is raising the --

15   will raise the principle or the belief or the assertion that

16   today peer-to-peer problem is no longer here, then that's a

17   defense and the other side gets discovery into it.  Anything

18   wrong with what I've said so far from anybody?

19           MS. BREWER:  I -- yes, on our end there is -- we --

20   we take issue with that, but for reasons that I can explain,

21   but I'll -- I'll -- I'll accept the -- the basic premise, but

22   I would like to explain the context of --

23           THE COURT:  I'm dying to hear what you have to say.

24           MS. BREWER:  Yes.

25           THE COURT:  Go ahead.

1          MS. BREWER:  Okay.  So what has been presented to

2   Your Honor in -- in the papers is, in our view, misleading.

3   What was represented by the plaintiffs is that this discovery

4   is necessary to rebut a deterrence defense and the manner in

5   which that was presented -- that argument was presented to

6   Your Honor makes it sound as if that was an argument that was

7   stated for the first time at a September 9 hearing before

8   Your Honor.  In fact, this has been an argument that has been

9   in the case going back to -- at least to April 2020.

10          In April 2020, what was first before the Special

11   Master was a request that Charter made with respect to some

12   -- a production of documents related to annual financials

13   from 2017, 2018, 2019.  That was when the parties first

14   started discussing this issue.

15          In the context of that hearing on that request by

16   Charter, the plaintiffs agreed to provide that discovery,

17   because what we were seeking was essentially just annual

18   information, and for some of the plaintiffs, it was -- it

19   could just be readily obtained from the -- for example, from

20   the 10-Ks or the like, and so they said, No burden, we agree

21   to provide it to you.

22          Next, in May, what was before the -- the Special

23   Master was Plaintiffs' Request Number 33.  Why Number 33 is

24   significant is -- I think can be best illustrated by a slide

25   that I'm hoping Mr. Fortenbery can pull up, and that is the

1   -- the slide that lists Requests for Production 19, 33, and

2   101.

3          So if Your Honor can see this slide, Request for

4   Production Number 19 was served by plaintiffs back in January

5   of 2020 -- I'm sorry, this was actually served in June of

6   2019, but was still being argued as of 2020.  So requests for

7   number -- Request Number 19 is asking Charter to produce

8   revenue and profit information and that request was limited

9   to the claims period.  So there was no dispute in the context

10  of that request that it was from -- it was for the 2013 to

11  2016 time period.

12         What happened is plaintiffs then served a Request

13  Number 33.  Number 33 was a repeat of Request Number 19, but

14  it was expanded from the time period of May 2016 through the

15  present.  This request was heard by the Special Master, it

16  was extensively argued, and in the briefing before the

17  Special Master, it was argued that this information, you

18  know, could -- should be relevant and that plaintiffs were

19  entitled to this information.  It was all in the context with

20  the full understanding that defendants were making this

21  argument about deterrence.  The Special Master ruled against

22  the plaintiffs on Request Number 33.

23         Plaintiffs then objected to Your Honor on Request

24  Number 33 and that was what was heard at the September 9

25  hearing.  At the September 9 hearing, plaintiff said, Well,

6

1    wait a minute, we think the Special Master was wrong.  And

2    this argument went on for at least 34 to 40 pages of the

3    transcript.

4            So Your Honor heard extensive argument about

5    Request Number 3, and within that argument, plaintiff said,

6    Well, wait a minute, we have a goose/gander issue to present

7    you with, and you said, Okay, well, I'm interested in that.

8    Tell me what you think the goose/gander issue is here.  And

9    they said, Well, Request Number 3 -- 33, we should -- you

10   know, we want to -- we want to bring Your Honor's attention

11   to the fact that they've made this damages deterrence

12   argument, and you heard about that, you heard extensive

13   argument about that.

14           After you heard that argument, you decided the

15   issue against the plaintiffs.  So you said, The Special

16   Master foreclosed this discovery.  I understood all of the

17   arguments you made as to why you think it should be tied to

18   this deterrence defense or otherwise, but in this -- in this

19   context on this record, Request Number 33 is not going to be

20   permitted.  It's -- it -- for the various reasons that were

21   set forth by the Special Master on the underlying

22   proceedings.

23           Then look at what happened.  A month later, on

24   November 9, Charter was served with Request Number 101.

25   Request Number 101 is Request Number 33.  It absolutely is.

1   How do we know that?  Because when plaintiff said, Hey, we

2   need to -- we need to serve discovery on our counterclaims,

3   we waited a little bit too late for this, we understand that,

4   but we're going to do it in a hurry and we think that we

5   should just do it by e-mail.  You should just agree that all

6   of our prior requests should be extended through April 2020.

7   So why don't you just agree to do that and, you know, expand

8   all of your discovery.  And we said, Well, hold on.  That's

9   not -- that's not proper under the federal rules and we had

10  an entire month with a back and forth as to how to proceed

11  with respect to this counter counterclaims discovery.

12          We had a hearing before the Special Master and she

13  said, As of right now, we don't know if those counter claims

14  are coming in -- the plaintiffs' counter counterclaims.

15  That's up for Judge Jackson to decide.  In the event that he

16  decides that that discovery is permitted, then, in that

17  instance, this discovery will be allowed to proceed, but in

18  the meantime, we don't know one way or the other.  So why

19  don't you -- you, plaintiffs and Charter, work it out amongst

20  yourselves, figure out something that is, you know, mutually

21  applied to both sides if you want to go over the discovery

22  caps.

23          And -- and she said, Why don't you go back,

24  plaintiffs, and look at your prior requests that were served,

25  figure out which ones you think didn't cover the 2016 to 2020

1    time period, reserve those requests, but make very clear in

2    those requests what they relate to out of the original

3    requests, because we're -- that's -- that's how we're going

4    to do this.  And so when they served Request 101, they tied

5    it to Request Number 19, which again is the pre-2016 request,

6    and omitted Request Number 33, because that was the exact

7    copy of 101.

8            So the issue we have, Your Honor, is this is

9    another instance where plaintiffs have taken a ruling that

10   they don't like, okay, which was the ruling on Request Number

11   33.  They didn't object on Your Honor's ruling to that to

12   Judge Jackson; they accepted it.  But what they did is they

13   waited a month and then they reserved us with the identical

14   request, but this time they attempted to justify it with the

15   counter counterclaims discovery.

16           Now, what happened in December is when we were

17   faced with the deadline to respond to this discovery, we

18   said, It's not looking like Judge Jackson agrees with you

19   that these counter counterclaims are going to come into the

20   case.  Why don't we defer this discovery until we can get

21   clarity from Judge Jackson who's about to rule on the

22   parties' motions related to the counter counterclaims.

23           They said, No, you go ahead and respond to this

24   discovery.  We had a meet and confer with them where they

25   said, We are 100 percent confident -- 100 percent confident

9

1    that Judge Jackson is letting these counterclaims into the

2    case and there is nothing that you can do about it, Charter.

3    So respond to that discovery.

4         Six days after we responded to the discovery with

5    objections, we had the conference before Judge Jackson.  That

6    was on the counter counterclaims.  Judge Jackson reviewed all

7    of the papers that the -- the parties had submitted and he

8    heard argument from us in that discovery conference, and he

9    unequivocally, very conclusively ruled that the counter

10   counterclaims and the expanded time period were not permitted

11   to be in the case.

12        He said, I quote:  The Court is not going to permit

13   the plaintiff to add the new claims.  I have no hesitancy in

14   saying that.  Mr. Oppenheim -- Oppenheim's letter told the

15   Court that I better do it or else.  I'll select or else.  If

16   the plaintiffs want to file a new case, let them file.

17   Folks, this case was filed on March 22 of 2019.  It's an old

18   case.  You've consumed a great deal of time of Magistrate

19   Judge Hegarty, and perhaps an even greater amount of time

20   from Special Master Rodriguez, and you've had plenty of time

21   to do discovery.

22        You've not been the slightest bit shy about filing

23   your motions.  You have a trial date.  That date is October

24   18, 2021.  That date was set on May 5 of 2020 and this case,

25   unless it settles, will go to trial on October 18, 2021.

1              The Special Master agreed with us when we were

2    before her on January 22 that Judge Jackson could not have

3    been clearer about the scope of the case.  He said -- and

4    this is on page 10 of the transcript from the December 15

5    hearing:  The new claims, they're not going to proceed in

6    this case.  This case is 11,027 works between March 24, 2013

7    and May 17, 2016.

8              The discovery that is before you on this objection

9    is the counter counterclaims discovery --

10             THE COURT:  Ms. Brewer -- Ms. Brewer, attaching

11   labels --

12             MS. BREWER:  Yes.

13             THE COURT:  -- doesn't advance the ball.  I don't

14   care about labels and I don't care that much about history.

15   I care about parties, both your -- both your sides' right to

16   discovery on relevant issues in the case.

17             So my -- my fundamental question is:  Number one,

18   does Charter intend to assert that there's no more issue with

19   peer-to-peer infringement?  So if they intend to assert that,

20   I just want to know.  What -- what they quote you as saying

21   is that today, the peer-to-peer problem, is no longer here.

22             So will that be a part of this case?

23             MS. BREWER:  That may be an argument that is made

24   at trial.  I can't -- I can't say it isn't going to.  We've

25   consistently been upfront with the Court about that for the

1    entirety of 2020 and I'd -- I'd like to say that this was

2    also an argument that we made.  This deterrence argument, we

3    made in support of discovery that we wanted to take of

4    plaintiffs, and a very good example of that is something that

5    the plaintiffs cited to the Special Master.

6           So when they were arguing this before the Special

7    Master, they pointed the Special Master to a July 2020 motion

8    to compel where we made that exact argument.  However, that

9    argument, Your Honor, was made in the context of Charter's

10   Request for Production Number 59.  We made the argument:  We

11   need this discovery, Request for 59, because this would help

12   us to make that argument at trial.

13          And the Special Master heard us -- heard -- read

14   the briefs, heard the argument on -- on that and said, I'm

15   sorry, Charter, no, you're not -- 59 is too broad.  I

16   understand you're trying to tie it to that argument, but I --

17   we look at the request, we look at the scope of the case and

18   -- and we don't stray from the scope of the case, unless it's

19   a narrowly tailored -- tailored request and there's a

20   particularized need.

21          We had the same conversation with her yesterday

22   when the plaintiffs were before the Special Master in

23   connection with the RIAA arguing, No, no, no, Charter is not

24   entitled to discovery past 2016.  That's outrageous, Your

25   Honor, they said.

12

1             Mr. Oppenheim said, This is a fishing expedition.

2    This is on the eve of the close of discovery.  This should

3    not be allowed to stand, Your Honor.  The parties have been

4    having these same arguments over and over, and the Special

5    Master repeated to us yesterday -- we've been very careful --

6    the Special Master and -- and you, Your Honor, have been very

7    careful to look at each of the requests -- discovery requests

8    and not stray from the defined claims period or discovery

9    period that Judge Jackson has said is the scope of the case,

10   unless they are narrow topics and a particularized need is

11   shown.

12             Now, in the context of the requests that are before

13   Your Honor, we believe that not a single one of these

14   requests is narrow.  If -- if you want to pull up, Mr.

15   Fortenbery, the list of the counter-claims discovery, this is

16   the broadest discovery that has been at issue in the case.

17             THE COURT:  Well, but Ms. Brewer --

18             MS. BREWER:  Requests for --

19             THE COURT:  Okay, okay.  You're --

20             MS. BREWER:  Yes.

21             THE COURT:  Again, you're laser focused on things

22   like transcripts and the wording of discovery requests.  I

23   want to start with principles.  I want to just talk about

24   principles and then determine where we go from there, and if

25   you are reserving the ability to argue that peer-to-peer

13

1    infringement is no longer a problem, that's a post-2016

2    argument.  You're inserting it.  If you want to reserve that

3    right to do so at trial, you are bringing that into the case

4    as far as a time period which is after the claims period.

5             All right, that's that.  And if you're going to do

6    that, they get to test the credibility of that statement.

7    And so what discovery do they have on whether peer-to-peer

8    infringement is still a problem?  Just explain that to me.

9             MS. BREWER:  So, Your Honor, this is -- I -- what

10   discovery do they have?  They have whatever discovery they

11   have served to date that has been argued -- that we've either

12   agreed to, or if we didn't agree to it, it went to a hearing

13   and in the context of that request, Your Honor or the Special

14   Master looked at the request and in each instance decided

15   whether or not the parties could go beyond 2016 or not.

16            THE COURT:  Okay.

17            MS. BREWER:  And -- and again, I -- I bring you to

18   the fact that this argument -- this was not a new argument.

19   We are --

20            MR. SCHAPIRO:  And Your Honor, I think -- I think

21   Ms. Ranahan has some background on that.  She just wanted to

22   add one point.  Sorry.

23            THE COURT:  Well --

24            MS. RANAHAN:  This is my quote.  So it's been taken

25   out of context, so I just would like to just respond about

1   what was intended when I said, It's no longer a problem.

2   What that meant was we're talking revenues for streaming.  So

3   in the context of that quote of me saying, It's no longer a

4   problem for plaintiffs, the point is because they're making a

5   ton -- a killing -- so much money off of streaming today.  So

6   the p-to-p is no longer their problem, because they're

7   focused -- they make so much money on streaming.

8        I wasn't saying that it doesn't exist anymore.  The

9   context of my quote was:  The streaming revenue has displaced

10  this from being a real problem, which is why they've selected

11  the claim period that they did.  They did it when there was a

12  proliferation of streaming.  There is now -- or a

13  proliferation of p-to-ps.  There is now all of these legal

14  ways to get music.  It's a much different climate for

15  youngsters out there or anyone trying to get music, there's

16  now all these legal channels where they're making money off

17  streaming.

18       So I wasn't saying that there's no p-to-p anymore.

19  What I was saying is the problem has gone down significantly,

20  because -- and -- and that's from their proof -- from their

21  perspective, because of the money they've made on streaming.

22       So the first time we raised that argument, which

23  was in April when we asked for the top level financials, it

24  was about streaming revenue.  It was about we want to know

25  how much money they're making off of streaming, and that was

1    the only context that, reciprocally, we've gotten that

2    argument to have any traction.  Every other -- like Ms.

3    Brewer mentioned, every other instance, the Special Master

4    denied it and thought it was too broad, getting into

5    communications too broad.  So it was in the narrow context of

6    financial streaming information.

7              THE COURT:  Okay.  Well, that's --

8              MS. RANAHAN:  And, again, this is my quote, so I'm

9    -- I don't want to be taken out of context.  It was to the

10   point of saying, this is not a problem for plaintiffs.  Not

11   that it doesn't exist, it's just that the -- the way the

12   music industry shifted and the legal streaming that's come

13   about since 2016, it's exploded.  So that was the context of

14   my statement.

15             THE COURT:  Sure.

16             MS. RANAHAN:  I just wanted to make --

17             THE COURT:  Sure.

18             MS. RANAHAN:  -- that clear.  It's not that I'm

19   saying it disappeared.

20             THE COURT:  You know, they're entitled -- everybody

21   in this country, at least right now, is entitled to make as

22   much money as they possibly can, agreed?  And even if they're

23   making --

24             MS. RANAHAN:  Of course.

25             THE COURT:  -- a beaucoup bunch of money on legal

1    streaming --

2           MS. RANAHAN:  Of course.

3           THE COURT:  -- they -- implicit in that argument is

4    that it overshadows any losses they're having by

5    peer-to-peer.  That's implicit in your statement.

6           So if you argue that at trial, they may want to

7    say:  Listen, she's right in the sense that we made $5.7

8    billion on streaming, but we believe we also lost 4 billion

9    dollars because of this peer-to-peer problem.  Now, you know,

10   are we doing fine on one end?  Yes.  Members of the Jury,

11   this is illegal conduct and we're being harmed by it.

12          They're entitled to say that if you're going to say

13   your part.  You know --

14          MS. RANAHAN:  Right, but that would be their -- oh,

15   sorry, Your Honor.  That would be their documents.  That

16   would be their -- showing their damage, what you -- what you

17   just described.  So it wouldn't have anything to do with our

18   communications or it would be what -- how they were harmed --

19          THE COURT:  Right, but how they were harmed is how

20   much peer-to-peer infringement is going on and that's

21   happening on -- on people -- on companies like Cox or Charter

22   or Comcast or whoever -- you have to have the internet to do

23   that and so you have to have an internet provider in order to

24   do that and that's their argument.  Do I agree with that?  I

25   have no idea, I don't care.  I don't even care about, you

1    know, how this turns out.  I care about getting you guys to a

2    trial where you can both present your respective positions

3    and let a jury decide.

4            So my question is -- my point is:  If you're going

5    to make those arguments -- and by the way, your streaming

6    argument is post-2016.  So, you know, you're saying now those

7    things are available, now they're making a whole bunch of

8    money, now this other thing's not that big of a problem.  I

9    don't -- I can't disagree with the logic of that, but it

10   still inserts into the case matters that occurred after 2016.

11           So that artificial barrier is gone.  It may be the

12   limit for which --

13           MS. RANAHAN:  I understand that, Your Honor.

14           THE COURT:  -- they can recover damages, but it's

15   not the limit for which they can have discovery because of

16   what might be argued at trial.  And so I've got to decide

17   what discovery they're entitled to to rebut any argument that

18   Charter makes about either this peer-to-peer infringement is

19   less today, because the lawful and cheap ways of doing this

20   are abundant, or there really isn't much going on, or we've

21   stopped it, whatever the basis for saying that it's not an

22   issue anymore, they get to test, because credibility of

23   someone's position is always an issue in a case.

24           So I don't care if I have to give them Requests for

25   Productions Number 104 and 105 or 10 -- 109 and 110, you're

18

1   entitled to discovery.  This is about the truth and I care a

2   lot about the truth, regardless of technicalities like this

3   was argued in September and this was in the transcript in

4   April.  I mean, honestly, you guys have armies of lawyers on

5   either side.  We have a couple of judicial officers and a

6   Special Master who have extremely busy lives and this is one

7   of 300 cases.

8        So keeping track of everything that has happened in

9   the case is impossible, at least for me.  All I can do is do

10  the best I can with the information I have, and the

11  information I have right now, unless you want to say that you

12  won't make this argument, is that Charter will say -- or

13  reserves the right to argue that either infringement --

14  peer-to-peer infringement is far less or doesn't exist or is

15  not a problem or that their income from lawful streaming is

16  so overwhelming that it really -- no problem here anymore.

17  Those are the kind of arguments that they get to test with

18  information.

19        Okay?  So what else --

20        MS. RANAHAN:  If I could just make one more point

21  about that?  Just about what they have already and then I'm

22  done, but they -- what they -- they are the ones that detect

23  their infringement.  So they detect how much p-to-p

24  infringement is happening and send notices.  The notices

25  we've seen -- the very last -- most recent notices are from

19

1   early 2015.  So the -- the plaintiffs are the ones that do

2   the detecting of the -- on alleged infringements, and you

3   heard a lot about that at the discovery summit, so what we --

4   we don't have a mechanism to detect plaintiffs' p-to-p --

5   plaintiffs' p-to-p works after 2016.  That would be

6   plaintiffs identifying their works and sending them to us.

7           So just as a matter -- and I -- I completely

8   understand what you're saying, Your Honor.  What I'm saying

9   is we don't have that within our possession.  This -- what

10  you're talking about is what plaintiffs have when they are in

11  the process of identifying infringements on our networks.  We

12  don't monitor -- like we don't follow and try to figure out

13  who every user of an internet -- an internet account, what

14  they're doing until we're told.

15          So they have it within their possession.  This

16  exact information that you're -- you're interested in them

17  having, they --

18          THE COURT:  Finally, you're hitting on a point I

19  can deal with.  You say they have the information they need

20  to rebut that argument.  Is that what you're saying?

21          MS. RANAHAN:  Yes, exactly.  They -- they --

22          THE COURT:  Okay.

23          MS. RANAHAN:  It is in their possession and their

24  ability to figure out what their infringements are on our

25  site after 2016.  There's nothing preventing them from doing

1    that and that's the only way, in this case, we've known about

2    any of their infringements is their notices, which Your Honor

3    cut off at March, 2016.  So we wouldn't have this in our

4    possession.

5          We don't track -- unless they tell us it's their

6    works, we're not tracking -- oh, this is -- you know, this

7    plaintiff or that plaintiff or we don't know.  We have

8    internet users.  They are the ones that have monitoring

9    systems and go out and find the infringements, and

10   unfortunately for the ones in this case, they lost those

11   infringements, so they had to recreate the infringements.

12         So that's on plaintiffs' burden of proof is to try

13   to figure out what was happening on the internet and how it

14   connects to Charter.  We don't do that.  So we're not out

15   picking -- you know, what plaintiffs' infringements.  So

16   that's -- and I -- and I completely agree with what you're

17   saying, Your Honor.  I'm just telling you that that's not

18   anything that Charter has.

19         THE COURT:  No, I know you don't -- okay, I know.

20   I know you could have, obviously, because if they're

21   obtaining it in a lawful way, you could obtain it in a lawful

22   way, too.  So, you -- but you just don't do that.  I

23   understand, that's not part of your business.

24         MS. RANAHAN:  So we don't -- we wouldn't be able to

25   -- we would have to have their -- all their hash and their

1    files and figure out what was theirs.  We would never be able

2    to do that -- they would have to tell us and they -- there's

3    just not -- we would have no way of doing that.  It would be

4    --

5              THE COURT:  Okay.  All right, so --

6              MS. BREWER:  Correct.

7              THE COURT:  -- the issue I have -- the issue I want

8    to talk about is:  As I saw this -- this problem, plaintiffs

9    say, We need this, it's relevant, and then the defense is --

10   not that it's not needed and not that it's not relevant, it's

11   just that it doesn't meet the standard of abuse of

12   discretion.  So I didn't see once, I don't think, in

13   Charter's response to the objection to the January 22, '21

14   order that this information's not relevant.  It's just they

15   relied on the defense that it -- that it should be sustained,

16   the -- the objection should be overruled, because it doesn't

17   meet the standard for overruling the Special Master.

18             So let me hear from -- so I got your point that

19   they have all the information they would need to prove that

20   peer-to-peer infringement is still going on.  That's your

21   point, right, Ms. Ranahan?

22             MS. BREWER:  Right, that's her point.  I would -- I

23   would say we -- just to clarify for the record, we do object

24   on the grounds of relevance.  The fact that they said that in

25   their reply does -- does not make it true.  We did argue that

1   this is not relevant, that this is burdensome and that this

2   is prejudicial; but I know you've heard a lot from me, so I'm

3   -- I'm going to pause, because I -- I want to respect Your

4   Honor's wish to --

5            THE COURT:  Well, I know --

6            MS. BREWER:  -- hear from the other side.

7            THE COURT:  -- but I -- you know, I'm going to test

8   you.  Point me to the section of your objection dated

9   February 10, 2021 where you argued that what they want is not

10  relevant.

11           By the way, I mean, I could have almost written

12  their response -- as I was reading your response, I could

13  have written their reply for them.  Of course they're not

14  going to go after information regarding counterclaims that

15  don't exist.  Why would they?  They're spending millions of

16  dollars in attorneys' fees anyway.  They -- they know that

17  those are not going to come back in the case.  Why would that

18  be the purpose of the discovery, I was thinking as -- as you

19  were making this argument in your objection.

20           I -- that would be monumentally irresponsible to --

21  to spend money on claims that aren't in the case.  So I'm

22  thinking, Okay.  And then I didn't see a section on

23  relevance.  Yes, I saw a section on prejudice.  Show me where

24  your relevance objection is.

25           MS. BREWER:  So the relevance objection was made in

23

1   the underlying proceeding, but that's the point that we're --

2   we're making when we're saying this isn't rationally related.

3   So to the extent that they're arguing that it's -- that the

4   relevancy is the deterrence argument.  The discovery that

5   they're asking Your Honor to compel production of is not

6   (inaudible) related to that defense and that's the point that

7   Ms. Ranahan was making that I -- I think Your Honor was

8   receptive to.

9         What we have to do is we have to look at what is

10   the discovery that they're -- that they're moving on and

11   that's the Requests 89, 98, 101, 110, 112, 128 for request

12   for production.  When you look at those requests, those are

13   so far afield from what they're saying the relevancy of the

14   discovery is.  These are requests that were served at the

15   beginning of the case related to plaintiffs' notices of

16   infringement.

17         Now what we're being asked to do is to provide this

18   expansive discovery related to our ticket data, but in this

19   instance it will not be tethered to any notices that were

20   served in the 2016 to 2020 time period, and the reason why

21   it's now not tethered to any notices is because the counter

22   counterclaims that they tried to assert that would have been

23   premised on thousands of new works and new notices, Judge

24   Jackson said, No, those are out of the case.

25         So if you look at, for example, request for --

24

1    Request for Production 89, if you could pull that up -- Seth,

2    if you would -- and you could just pull up the list of

3    counterclaims discovery.  They're asking for logs of all

4    infringement notices sent to you by any person or entity from

5    May 18, 2016 to April 30, 2020.  Well, this is the corollary

6    of Requests for Production Number 2 that was served at the

7    very beginning of the case.

8           Now, when we got that request, we said this request

9    is burdensome.  And then, as you see, because there's

10   references to docket numbers and to hearing transcripts,

11   we're still fighting about that request as late as September

12   9 and, in fact, we're still fighting about it the week before

13   the discovery summit.

14          So this request, which has been kicking around

15   since 2019, was very hard fought and that was in the context

16   of infringement notices that were actually sent to us

17   associated with works where plaintiffs bear the burden of

18   proof and plaintiffs bore a burden of providing the corollary

19   information to us.

20          So now what we're being faced with is discovery

21   that's not tethered to anything, where plaintiffs have now no

22   burden to produce the equivalent information to us.  In fact,

23   we can't ask for it, because we've already completed our

24   discovery requests.  We did that at the end of December.  And

25   it's -- and it goes on from there.  They're asking 98.  You

1    see:  All of your internal and external communications

2    regarding copyright infringement by Charter subscribers for

3    the entire time period of May, 2016 to 2020.  And then you

4    look at 110:  Internal communications regarding copyright and

5    policies for all of 2016 and 2020.

6           But again none of this -- none of it is actually

7    tethered to notices that are produced in the case or that we

8    have any information about, which were in fact not sent by

9    all of -- by plaintiffs in concession, don't even involve the

10   entire plaintiffs group.  It was only the Universal

11   plaintiffs that continued to send notices in the 2016 to 2020

12   time period.

13          This is why it was very important, Your Honor, to

14   both sides to go to Judge Jackson.  I mean, the -- the

15   Special master heard these same arguments about what are we

16   going to do about these counterclaims and, you know, we were

17   all scratching our heads at that point in time, because we

18   needed guidance from Judge Jackson.  So is this going to be

19   -- is this within the bounds of the case?  If we make an

20   argument that goes after, you know, 2016 time period, does

21   that mean all of this discovery comes in?

22          And so we, you know, politely asked Judge Jackson:

23   Can we have a status conference, because we need your

24   guidance?  And he -- in the -- in the midst of the pandemic

25   and in the midst of what I'm sure is a very congested court

1    docket, got on a Zoom -- or a -- a video conference with the

2    parties and -- and gave his clear -- very clear guidance.

3              THE COURT:  Okay.  Mr. Ehlers --

4              MS. BREWER:  They fundamentally --

5              THE COURT:  Hold on.  I've -- it's been 40 -- 30

6    minutes and I haven't heard a thing from the plaintiff.

7              So Mr. Ehlers?

8              MR. EHLERS:  Sure, and thank you, Your Honor.

9              THE COURT:  Hold on -- hold on.  I want my

10   questions answered.  I don't want you to give me some

11   prepackaged argument.  My job is to determine what the claims

12   and defenses are in the case and to allow discovery.  Now,

13   regardless of whether a particular discovery request phrases

14   it correctly or is overbroad or includes more information

15   that is necessary, I've been known to rewrite them myself and

16   say, This is one I'll approve.  All right?

17             I need to know succinctly what you believe

18   Charter's going to argue as a defense, what you need in order

19   to counter that defense and -- whether you already have it,

20   and if you don't have it, what you need, but it's not going

21   to be a -- it's not going to be what you've already asked

22   for.  It's going to be what I determine that you need.

23             So give me your best shot.

24             MR. EHLERS:  Thank you.  What -- what Charter's

25   reserving its right to argue at trial, and we haven't heard

1    otherwise today, is that peer-to-peer infringement ceased --

2    is -- is not a problem today.  Not in 2016, not in 2015.  And

3    so there's no Charter behavior to deter here, and because

4    deterrence is a primary determinant of statutory damages,

5    Charter's theory's going to go:  Plaintiff's damages should

6    be reduced.

7           We have gotten no discovery on that.  The claim

8    that plaintiffs are in possession of the information already

9    to rebut that claim, that claim being that there's no Charter

10   behavior to deter here is not true.  The fact that plaintiffs

11   may have sent some notices after 2016 does not get you there.

12   They are saying there is no Charter behavior to deter.  It's

13   a deterrence argument.

14          The six RFPs and the three interrogatories that are

15   at issue here, they all go right to that defense.  Between

16   them, they show that Charter continues to receive

17   infringement notices, specifying peer-to-peer infringement

18   (inaudible) i.e., not a dinosaur.  It's an ongoing problem

19   today.  They will show the actions that Charter took or more

20   likely did not take when confronted with that ongoing, repeat

21   peer-to-peer infringement problem on its network; i.e., there

22   is behavior to deter here.

23          So we've got -- all of those requests are relevant

24   to defense.  Your Honor started with the principle that we

25   should get discovery into Charter's defenses.  We understood

28

1    that you'd like to spend time discussing what that would look

2    like and we're very happy to do that, including by going

3    request by request and explaining why it's relevant to the

4    defense.

5              THE COURT:  Okay, well, hold on.  What you do have

6    -- are you saying that your -- your plaintiff group sent no

7    notices to Charter after '20 -- after March of 2016?

8              MR. EHLERS:  No, we're not -- we're not saying

9    that.  What we are saying is that the fact that plaintiffs

10   sent Charter notices after 2016 does not get you -- that's

11   not the discovery that you need to rebut this defense, but

12   they will assert, that they're reserving their right to

13   assert that, Members of the Jury, you may -- Charter may have

14   -- you may have just found Charter liable for knowingly

15   contributing to all of this mass infringement on its network,

16   but that being the case, well, it's not a problem today.  You

17   know -- you know, that same behavior doesn't exist anymore,

18   either because peer-to-peer has just gone away completely, or

19   we're -- we're handling it differently, whatever it is.  The

20   fact that plaintiffs may have sent notices to Charter after

21   2016 doesn't -- doesn't rebut that.  Plaintiffs aren't the

22   only white soldier out there sending notices as -- as Charter

23   knows and Your Honor has seen.

24             And so to get to the full scope of the problem,

25   which the deterrence defense looks at, it's not specific to

1    plaintiffs, we should get to find out, Well, how many notices

2    did you receive in 2019, what did you do in response to them?

3    In other words, is there -- is that same behavior that is at

4    issue in this case, is there any need to continue to deter it

5    and that's -- that's what the -- the jury's going to look at

6    in part in deciding statutory damages and that's exactly what

7    this argument is -- is getting to, that they're reserving the

8    right to make.

9              THE COURT:  Okay, so stop there.  Who's -- who's

10   going to answer my questions for the defense?

11             MS. BREWER:  I will.

12             THE COURT:  Do -- do the plaintiffs have discovery

13   on how many notices that you've received in that time period

14   of 2016 to 2020 and what you did about it?

15             MS. BREWER:  They do not have that information;

16   however, they are the ones in possession of the notices that

17   they sent to Charter.  And again it was just, by their own

18   concession, just a subset of the plaintiffs to continue to

19   send notices after 2016 -- after May 2016.

20             THE COURT:  Okay.

21             MS. BREWER:  Okay?  But they are --

22             THE COURT:  I know -- I know they have --

23             MS. BREWER:  -- the ones --

24             THE COURT:  -- what they sent, but I think the

25   evidence has been in this case that what the plaintiff group

30

1   has sent to Charter since whenever, 2012, is a -- is a subset

2   or some fraction, even healthy fraction, of all the

3   infringement notices that Charter receives.  Is that correct?

4            MS. BREWER:  That is correct, yes.

5            THE COURT:  Okay.  So, do you have an argument that

6   based on your likely defense, the deterrent defense, it is

7   not relevant how many notices Charter received and it is not

8   relevant what they did about those notices after the claims

9   period?  Are you saying that that's not relevant?

10           MS. BREWER:  We are saying that is not relevant,

11  and the reason why is because we're talking about not

12  necessarily an affirmative defense, but an argument that

13  would be made in the context of a statutory damage claim.  So

14  they're asking for statutory damages at the top end of the

15  scale and we are entitled to our arguments as to why the top

16  end isn't appropriate.  That's -- that's the context for this

17  --

18           THE COURT:  Okay.  And it's --

19           MS. BREWER:  It would be --

20           THE COURT:  Is that information relevant to that

21  analysis?

22           MS. BREWER:  Is the information of how many notices

23  we received after 2016 relevant?  We would argue it is not,

24  Your Honor.

25           THE COURT:  Why?

1          MS. BREWER:  We would argue we made -- because the

2    notices that we're being held responsible for in terms of

3    liability in this case, we don't bear the burden of proof on

4    those.  The plaintiffs bear the burden of proof --

5    fundamentally, on liability, before you can ever get to a

6    damages analysis --

7          THE COURT:  Ms. Brewer, Ms. Brewer, Ms. Brewer --

8          MR. SCHAPIRO:  Can I just jump in because I -- I

9    think we might be talking past each other slightly here.  So

10   if we open up the universe to all notices from anyone, from

11   2016 until now, as a potential argument on damages, that

12   would create multiple trials within a trial and that would

13   (inaudible) --

14         THE COURT:  Andrew, I'm -- Andrew, Andrew, I'm fine

15   if you don't mention at trial -- if you agree that you will

16   not address post-March 2016 conduct or occurrences of any

17   kind.  Are you going to agree to that?

18         MR. SCHAPIRO:  I think -- I think we could agree.

19   I -- we would probably need to consult and just double check

20   with a member of our team who is not on this call right now,

21   but I think we could agree to say that we will not talk about

22   behavior by us after 2016.

23         The -- the point -- the whole reason this came up,

24   as Ms. Ranahan said, was her -- her discussions about how the

25   music industry and its revenue streams have -- have changed.

1    But this notion that we will get up and argue and say, Okay,

2    well, we're -- we're fine now.  We're -- I don't anticipate

3    us making that argument.  I'm a little bit reluctant to give

4    it up on the fly.  I should just doublecheck with someone.

5         THE COURT:  I understand, I understand, and that's

6    fine, I don't mind you checking with your client, but you

7    also can't say or argue that the legal streaming overwhelms

8    any current peer-to-peer infringement, because then that

9    relies on empirical evidence about current peer-to-peer

10   infringement.

11        So do you see, I think you could argue that

12   streaming is -- you know, has changed since 2016 and lots of

13   people do streaming and they make money off of that, but you

14   can't either imply or state that that dwarfs the peer-to-peer

15   infringement.

16        Do you see what I'm saying, Andrew?

17        MR. SCHAPIRO:  Well, I -- I see what you're saying,

18   but I think that the reason that this discovery would not

19   actually allow anyone to get any closer to the truth on that

20   actual question is that the fact that we've received some, a

21   few, or a lot of notices during this period does not shed any

22   meaningful light on whether peer-to-peer sharing remains a

23   large problem and here's why:

24        Number one, as you know and we've -- you know, had

25   a lot of hearings on -- on issues related to this, our

1  position is and -- and the truth is, many, many notices from

2  other rights holders, which is what Mr. Ehlers invoked, are

3  unreliable and invalid.  So if they want to point to and say,

4  Oh, well, you received 100 notices from Rightscorp or some

5  other company during this period, then we're down the rabbit

6  hole of us saying, Right, but those are the notices from the

7  spammers who were asking $20 from people for settlement.

8  Those will much more directly determine whether peer-to-peer

9  sharing remains a problem, and that's across the industry,

10  which is what we'd be pointing to.  Not just with regard to

11  Charter, because our point would be, Look, what is happening

12  in the industry and that's through expert testimony and both

13  sides have experts retained on those topics.

14          THE COURT:  Well, but -- okay.  How does -- how

15  does their expert get the information about Charter's conduct

16  from 2016 to 2020 in order to state an opinion?

17          MR. SCHAPIRO:  I -- well, I -- I have said that we

18  would, I believe, not make arguments about our conduct.  The

19  question is what has happened to the business model or the

20  market here --

21          THE COURT:  Okay.

22          MR. SCHAPIRO:  -- much broader than anything with

23  Charter's conduct.

24          THE COURT:  As long as you're not going to make

25  either a direct or implied argument -- see, I mean, you guys

1    understand this whole deterrence defense better than I do,

2    but to the extent that behavior is part of an analysis on

3    damages, what I'm saying is you can't rely, in arguing

4    damages, that you're a good citizen now.  You can't do that,

5    because they get to -- to ask whether that's true and put on

6    evidence it's not true.  Agreed?

7            MR. SCHAPIRO:  Yeah, I -- I think that -- I think

8    that's right.

9            THE COURT:  Okay.

10           MS. BREWER:  We agree.

11           THE COURT:  Okay.  So Mr. Ehlers, if you're not

12   that -- your whole -- the whole premise of your objection was

13   their claim, as you state on page 2 of your objection that

14   peer-to-peer problem is no longer here, if they -- if they

15   waive that argument, then we're fine, aren't we?

16           MR. EHLERS:  Yeah.  I mean, if they agree that

17   they're not (inaudible - audio cuts out) not our problem

18   anymore (inaudible) deterrence (inaudible) that's what we

19   want this discovery for.  The discussion -- preceding

20   discussion was a little bit, I think --

21           MR. SPERLING:  Hardy, I'm sorry -- let me

22   interrupt.  Hardy, you faded out.  It was a spotty

23   connection, so we couldn't hear your argument.  You have to

24   dial it back to the beginning.

25           THE COURT:  Well, you -- so yeah, you're breaking

1  up.  Your pixels are all over the place and -- and we can't

2  hear your voice.  It's kind of scrambled.

3             MR. SPERLING:  Okay, now he's frozen.  Your Honor,

4  I might step in.  It's Jonathan Sperling --

5             THE COURT:  Please do.

6             MR. SPERLING:  -- and good morning to you.  Hardy,

7  I was about to take it away from you.  I'll pass it back if

8  your connection is good now.

9             MR. EHLERS:  I hope it is and I apologize for that.

10            So I was saying that if -- if they're agreeing that

11 peer-to-peer -- not to argue that peer-to-peer infringement

12 is no longer a problem and they're not going to argue that

13 the jury shouldn't consider that if there's no need for a

14 deterrence when they consider the amount of statutory damages

15 to award, then sure.  That -- I mean, that's what we want

16 this discovery for.

17            The discussion that preceded this, I think, was

18 kind of talking past the point and removing it from the

19 necessary context that this is going to come up in the

20 context of a deterrence argument after a finding of liability

21 based on Charter's receipt and inaction in the face of

22 infringement notices, and so for -- for Charter to argue that

23 infringement notices would -- you know, it would open up a

24 separate litigation, it's just missing the point.  It's going

25 to come up at trial after Charter's found liable for not

1   doing -- for ignoring the mass repeat infringement on its

2   network that it was put on notice of by these infringement

3   notices.

4          And so for it to get up at that point and say, No

5   behavior to deter, plaintiffs should get the minimum amount

6   of statutory damages, we should be able to say, Members of

7   the Jury, all of those infringement notices that we talked

8   about in the -- for the claim period, well, (inaudible) how

9   many Charter received in 2019.

10         THE COURT:  Yeah, but --

11         MR. EHLERS:  Charter (inaudible) infringement

12   notices in the claim period that we talked about earlier,

13   look what Charter did in response to 2019.  Of course there's

14   behavior to deter.

15         THE COURT:  Okay.  No, I -- I understand the

16   argument.  We're -- you're just kind of summarizing the

17   points that we -- got us here, I guess.  So, Andrew, when --

18   when do you want to identify whether you're willing to -- in

19   sort of an in limine fashion, not -- not have that argument

20   -- not make that argument?

21         MR. SCHAPIRO:  Yeah, today is Tuesday.  Can we have

22   until the end of -- can we have until Friday?

23         THE COURT:  Yes.

24         MR. SCHAPIRO:  Yeah.  And I just want to be clear,

25   but I think it's probably best to, just, you know -- we can

1    put this in whatever we submit -- to be clear, the argument

2    that I don't anticipate us making, because I agree with you,

3    it -- it would be fair in that case to -- to open the door

4    wide to all kinds of -- you know, to -- doubling the size of

5    the trial, I think.  The argument that I don't anticipate us

6    making is that we are a good citizen now, so you don't --

7    there's nothing -- so you don't need to do anything.

8           Their -- the arguments that I think we will still

9    make, but these requests are not targeted towards and I --

10   and I think -- I think we're in agreement with the -- with

11   the -- with the plaintiffs, that we still might make is,

12   well, the industry -- the landscape of the industry has

13   changed.  It doesn't have anything to do with Charter, what

14   -- what we're doing or what we're not dealing with, but we

15   will not make a good citizens argument.

16          THE COURT:  Right.  I think I can live with that

17   analytically.  Whether the plaintiffs can or not, I guess

18   they'll have to take up with Judge Jackson if they -- if they

19   feel it's necessary, but what I believe that that would make

20   a relevant discovery is if you solely focus on the lawful

21   means by which the recording industry makes their profits has

22   changed significantly, then I don't think that necessarily

23   implies that the unlawful revenue they've -- that the loss of

24   revenue for unlawful activities is not -- you just can't

25   imply that or you can't make that argument subtly or

1    directly.  Agreed?

2              MR. SCHAPIRO:  Yes.

3              THE COURT:  Okay.  On the plaintiffs' side --

4              MR. SPERLING:  Your Honor, I think from plaintiffs'

5    perspective -- I'm sorry, Your Honor, I didn't mean to step

6    on your toes.

7              THE COURT:  I just don't want you to be afraid of

8    grasping -- seizing the day, okay?  So -- but it's your call.

9              MR. SPERLING:  And Your Honor -- yeah, I think,

10   Your Honor, from plaintiffs' perspective, the issue is that

11   if they're making any deterrence argument and I -- I

12   appreciate the line that Your Honor tried to just draw about

13   them talking about the industry, but insofar as it is a

14   deterrence-based argument, that they're arguing that there is

15   nothing today to deter --

16             THE COURT:  But they won't make that argument.

17             MR. SPERLING:  -- (inaudible) --

18             THE COURT:  They can't make that argument.  They

19   can't, or I'm going to allow the discovery that I feel is

20   necessary, okay?

21             MR. SPERLING:  Yes, Your Honor.

22             THE COURT:  Like -- like Andrew said, I think,

23   they're perfectly willing to be tried on their conduct that

24   occurred during the -- the claims period and that's where the

25   trial should be and Andrew doesn't want to open this up into

1  double the size of the case by trying the time period between

2  2016 and 2020 and I agree with that.  Okay?

3          So I'm going to -- first of all, I'm going to

4  overrule the objection, but if I feel justice requires, I

5  will craft appropriate discovery unless we hear what we

6  expect to hear from Andrew by Friday, and that is that they

7  won't raise their good citizenship since 2016 and, if

8  anything, they will simply talk about the nature of the

9  lawful industry and how it's evolved and what happens today

10 as plaintiff entities can make income in new and innovative

11 ways.  Okay?

12         All right, so what -- I guess, e-mail -- Andrew, is

13 that what you're expecting on Friday?

14         MR. SCHAPIRO:  Yeah.  If it's acceptable to you and

15 acceptable to everyone else, we've -- I think we've found

16 that the e-mailing works right and we'll huddle and see where

17 we come out on this.

18         THE COURT:  But be very careful --

19         MR. EHLERS:  Your Honor --

20         THE COURT:  -- how you word that e-mail, okay?

21         MR. SCHAPIRO:  We're going to be very careful about

22 it.  That's why I wanted until Friday rather than tomorrow,

23 because I know that at some point, we're going to make some

24 argument -- argument in the closing argument and there's

25 going to be a fight about it.

40

1           THE COURT:  All right.

2           MR. OPPENHEIM:  Your Honor -- Your Honor, this is

3    Matt Oppenheim.  Good afternoon.

4           THE COURT:  Hi.

5           MR. OPPENHEIM:  Obviously, as this issue -- issue

6    proceeds to trial and Judge Jackson has to wade through this

7    transcript and what's happened in making decisions on

8    preclusion, we're going to need a -- a clear record -- I'm

9    not sure how that e-mail is going to be part of a record that

10   Judge Jackson can look at.  Can we -- can we maybe get it

11   filed as a precipe or something that's on ECF so that there's

12   a record we can point to assuming that -- that there --

13          THE COURT:  Yeah, no.  I think it's a -- I think a

14   stipulation is fine, but I think it's fair to have Andrew

15   send it out as an e-mail and test the waters first before it

16   gets made into some kind of a stipulation, because in the

17   event that I'm convinced he drew -- you know, somebody drew

18   too cute of a line, then there might be further discussion

19   and I -- I don't want to force him into something that you

20   can't retreat from unfairly.

21          Okay?

22          MR. OPPENHEIM:  Understood.  Appreciate -- it makes

23   sense.  Appreciate the conversation today.  I do think

24   reducing all of this down to a stipulation would be great at

25   the end.

1          THE COURT:  Okay.  And this is -- I mean, this is

2    the best way I have ever -- I usually operate in order to

3    reach decisions is to have a discussion, because there's

4    often questions that I don't find answered in the papers and

5    there's just no effective way, short of weeks worth of

6    briefing, for me to get answers other than sitting here

7    today.

8          So I hate to put people on the spot, but it is the

9    most efficient way to run business in a case that's hurdling

10   toward a collision with an October 18 trial date.  Okay?

11         Thank you all.  Yes?

12         MS. BREWER:  One housekeeping issue just related to

13   briefing schedule for our currently pending objection.  So

14   Your Honor had indicated a preference for an expedited

15   briefing on any objections arising out of the discovery --

16   out of February 22 and 23 discovery conference.  Plaintiffs

17   did file an objection.

18         We interpreted your guidance as requiring us to

19   file our response to that objection within seven days.  I

20   hope -- I hope that's consistent with what Your Honor

21   intended, and so we're prepared to meet that by filing

22   tomorrow, but it is -- it's an open question as to how much

23   time the plaintiff should get in reply.  So we just wanted

24   that clarified since we didn't get that, you know, tied --

25   tied up with a bow on the 23rd.

1          THE COURT:  So when --

2          MS. BREWER:  We would ask --

3          THE COURT:  -- was your -- when will your response

4   be filed?

5          MS. BREWER:  Tomorrow.

6          THE COURT:  Okay.

7          MS. BREWER:  Is -- is today Tuesday?  Yeah,

8   tomorrow.

9          THE COURT:  So the -- the 10th?  Can we -- can the

10  plaintiffs get a reply in by Friday -- or by Monday?

11         MR. EHLERS:  We can do Monday, Your Honor.

12         THE COURT:  Okay.  Thank you.  Anything else from

13  either side?

14         MS. BREWER:  No.  We'd ask that -- there was a

15  sampling that was to be submitted and there wasn't a deadline

16  for plaintiffs to provide that to Your Honor, so we wanted

17  some clarification as to what Your Honor had intended for the

18  timing of that.

19         THE COURT:  John?

20         MR. SPERLING:  So, Your Honor, we're -- we're

21  working on that.  We actually had started down the road of

22  doing it the way we thought it was supposed to be done, which

23  is different than the way that Charter did it, and you

24  indicated that -- that Charter did it the right way, and so

25  we had to just start over from scratch.  I can't tell the

43

1   Court, sitting here on the line, exactly when it will be

2   done, but I am happy to confer with the folks that are

3   working on that and (inaudible) an e-mail today giving them

4   an anticipated date.

5          THE COURT:  Okay.  Well, I mean, you can't even

6   give me an outside date?  I -- I don't care about an early

7   date, but you have to put some burden on yourself.

8          MR. SPERLING:  I would just be making it up, Your

9   Honor.  What I propose is let us go back to Charter this

10  afternoon and if they think that that position is

11  unreasonable, obviously they can come back to you and we can

12  do that informally with you.  I'm not -- Judge, you know me.

13  I'm not trying to put you off.  I just -- if I gave you a

14  date, I'd be making it up.

15         THE COURT:  All right, that's fine.  I trust you.

16         Okay.  Thank you, guys.

17         (Whereupon, the within hearing was then in

18  conclusion at 11:06 a.m.)

19

20

21

22

23

24

25

44

1                    TRANSCRIBER'S CERTIFICATION

2    I certify that the foregoing is a correct transcript to the

3    best of my ability to hear and understand the audio recording

4    and based on the quality of the audio recording from the

5    above-entitled matter.

6

7    /s/ Dyann Labo                    March 11, 2021

8    Signature of Transcriber               Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25