# EXHIBIT 3

WebEx/Telephonic Hearing
March 16, 2021

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00874-RBJ-MEH
_____

WARNER BROS. RECORDS INC., et al.,

      Plaintiffs,

vs.

CHARTER COMMUNICATIONS, INC.,

      Defendant.

_____

WEBEX/TELEPHONIC HEARING

March 16, 2021
_____

      This WebEx/telephonic hearing was taken before Special Master Regina Rodriguez on March 16, 2021, at 12:01 p.m. Mountain Standard Time before K. Michelle Dittmer, Registered Professional Reporter and Notary Public within the state of Colorado.

(The reporter, K. Michelle Dittmer, appearing remotely via telephone)

1    for (audio interruption)
2                    SPECIAL MASTER RODRIGUEZ:  You're cutting
3    in and out again, Mr. Schapiro.  Sorry.
4                    MR. SCHAPIRO:  Okay.  Sorry.  Can I be
5    heard now?
6                    SPECIAL MASTER RODRIGUEZ:  Yes.
7                    MR. SCHAPIRO:  Can you hear me better?
8    Okay.
9                    The plaintiffs' theory in this case about
10   vicarious liability is what's known as the "draw theory,"
11   and they managed to defeat a motion to dismiss on that
12   theory by arguing, among other things, that Charter
13   advertised that it had super-fast speeds for downloads
14   and that Charter had certain features that -- and -- that
15   made it a draw to people who wanted to infringe.
16                   And additionally, they argued that
17   Charter's policies with regard to notices and infringers
18   is something that was a draw and, therefore, supports
19   vicarious liability.
20                   We think we will be able to show that
21   Charter's policies were not a draw in any way because
22   there was nothing different about what Charter was doing
23   from what any Internet company would do.
24                   And so if your electric -- Charter was
25   essentially the same as, you know, some -- any other

1    utility provider; and if somebody used that utility to
2    infringe, there was nothing about providing that service
3    or that utility that was a draw.  And for that reason, we
4    should be able to inquire into this topic.
5                SPECIAL MASTER RODRIGUEZ:  All right.  I
6    do believe that we've heard arguments in this case so far
7    about what other ISPs were doing and whether or not
8    certain actions were feasible by Charter in order to stem
9    this arguable tide of infringement.
10               This does seem to me to be relevant, and
11   it does seem to me that there would be someone at Charter
12   with little to no preparation here that would be aware of
13   what the industry standards were.
14               MR. SCHAPIRO:  Okay.  You just said
15   someone at --
16               SPECIAL MASTER RODRIGUEZ:  In other
17   words --
18               MR. SCHAPIRO:  You just said someone at
19   Charter.  Did you mean someone at Charter?
20               SPECIAL MASTER RODRIGUEZ:  I'm sorry.
21   Someone at plaintiffs that would have an understanding of
22   what other ISPs were doing; in other words, what the
23   industry standard may have been.
24               So it seems to me that this is quite
25   relevant, and there should be somebody with the

1    plaintiffs that have this knowledge.  The topic is
2    probative to Charter's claims in substance.
3                So I'll let plaintiffs, whoever it is on
4    your behalf that can respond, respond to that.  But that
5    is my thinking on this one.
6                MR. KAPLAN:  That would be me,
7    Ms. Rodriguez.
8                SPECIAL MASTER RODRIGUEZ:  Okay.
9    Mr. Kaplan?
10               MR. KAPLAN:  Thank you.
11               So let me start with why it's not relevant
12   and address Mr. Schapiro's argument.  He is talking
13   about, with respect to draw, what Charter's policies
14   were, what Charter's advertising was.
15               We're not talking about what Charter's
16   policies were or advertising was in comparison to any
17   other ISPs.  That wasn't our argument.
18               And we're not intending, at any point in
19   this trial, to compare what Charter's policies were on
20   repeat infringers or termination to anyone else.  It's
21   just what the --
22               SPECIAL MASTER RODRIGUEZ:  Well --
23               MR. KAPLAN:  -- what the policies were.
24               SPECIAL MASTER RODRIGUEZ:  Okay.  Let me
25   just stop you there and ask you a question.  I understand

1    that maybe you're not going to directly compare, but a
2    draw would have to indicate preferring one over another.
3                    And so while you may not necessarily make
4    a direct comparison, obviously, you, by implication, are
5    making the argument that a subscriber would choose
6    Charter's system over somebody else's system or services
7    because Charter makes it easier for me, if I'm the
8    subscriber, to carry on my illegal activities.
9                    So I'm not sure I wholly understand that
10   your argument is that there's no comparison there or that
11   that comparison isn't there.  By implication, isn't there
12   one?
13                   MR. KAPLAN:  I'm not sure that -- that
14   there is there.  But it's -- it's -- that's not our only
15   issue with this -- with this topic.  What the topic --
16                   SPECIAL MASTER RODRIGUEZ:  Okay.
17                   MR. KAPLAN:  -- says is, it's asking about
18   the plaintiffs' understanding of other ISP responses.
19                   SPECIAL MASTER RODRIGUEZ:  Okay.
20                   MR. KAPLAN:  This is -- you know, so first
21   of all, that's subjective, to begin with.  I think that
22   if what Charter is really getting at here is they want to
23   be able to compare what their policies were to others in
24   the industry, they can get that discovery.
25                   They can go to these competitors and say,

1  "What were your policies?  Give us discovery on your
2  policies."  They would get the direct evidence that way
3  instead of the plaintiffs' understanding or impression of
4  what these policies are.
5              And you may recall, at the February 23
6  hearing, we were ordered to produce the discovery from
7  the Cox litigation and from the Grande litigation, so
8  they'll get the document productions and testimony from
9  the Cox witnesses or the Grande witnesses.
10             And if they want to look at that and try
11 to use that evidence directly of what those ISPs'
12 policies were, they can do that.  I mean, nothing has
13 stopped them in this case from issuing subpoenas to any
14 other ISPs and gotten the policies from -- from the ISPs
15 directly.
16             To come to -- to the plaintiffs and say,
17 "Well, what were your impressions of the other ISPs out
18 there that you may have looked into as far as their
19 policies," I mean, there's tons of evidentiary issues
20 there, but I don't think they've met, you know, what
21 their obligation is to collect this evidence.
22             Let me -- if I could just make two other
23 quick points here.
24             One is that they started asking some of
25 these questions in the one deposition that we've had.

```
 1    This was for the publishers.  And, I mean, the questions
 2    were about -- were about, literally, this witness's
 3    impressions of what the other ISPs were doing.
 4                And one of them, the question went like
 5    this:  How about RCN, are you familiar with a provider
 6    RCN?
 7                The answer:  I know of the provider RCN.
 8                And then here's the question:  They're not
 9    so bad, are they?
10                I mean, that's the type of questions and
11    inquiry that we're talking about.  And, I mean, if our
12    witnesses were ever to get up on the stand and say,
13    "Well, you know, Charter honestly is the worst of the
14    worst.  I mean, they didn't terminate anyone," they're
15    going to jump up and down.  That's not going to be
16    admissible here according to the -- to the plaintiffs --
17    I'm sorry, to the defendants, I would imagine.
18                So, I mean, whether or not the evidence is
19    relevant here, there are the right ways to go about
20    trying to get it and they haven't done that.
21                MR. SCHAPIRO:  So --
22                SPECIAL MASTER RODRIGUEZ:  Okay.
23                MR. SCHAPIRO:  -- if I may.
24                SPECIAL MASTER RODRIGUEZ:  Yes.
25                MR. SCHAPIRO:  Unless we're about to win.
```

```
 1   If we're about to win, I'll stop.  But otherwise, if you
 2   want to hear a little more.
 3                I mean, this is from -- I'm looking at,
 4   this is from the second page of the plaintiffs'
 5   opposition to the motion to dismiss in this case on
 6   vicarious liability, which, as you know, I think in
 7   Bright House, the motion to dismiss was granted on.  But
 8   I guess, I mean, this is a close case, and so we also
 9   need to be able to make the legal record.
10                But they wrote:  Charter has sought to
11   draw subscribers to its Internet service by touting
12   specific features of that service that are attractive to
13   copyright infringers, including its blazing fast speeds
14   that allow users to download up to eight songs in three
15   seconds.
16                The Complaint further explains -- this --
17   I'm still quoting plaintiffs:  That hundreds of thousands
18   of users in turn have utilized these features to
19   distribute plaintiffs' works illegally, committing the
20   reasonable inference that at least some of these users
21   were attracted to Charter by the ability to illegally
22   download and distribute plaintiffs' works.
23                Elsewhere, they've said -- now I'm not
24   quoting anymore -- that our policies as to notices
25   encouraged people to stay on and keep infringing.
```

```
 1              So we should be allowed to ask these
 2   relatively simple questions.  That question that he
 3   was -- was quoted from the RCN deposition, not a good
 4   question, I agree, or whatever that deposition was.  We
 5   have better questions lined up for these.  And we should
 6   be entitled to ask them.
 7              SPECIAL MASTER RODRIGUEZ:  All right.
 8   Well, it seems to me that what Charter is probing here is
 9   exactly this question of the relative benefit of using
10   Charter versus others and the draw to using Charter, and
11   so it seems to me that that is relevant, directly
12   relevant to the defendant's claims and defenses in this
13   case.
14              If -- it should be relatively
15   straightforward to put up a witness on what plaintiffs'
16   knowledge is in this arena.  If they don't have an
17   understanding of other ISPs' responses, they simply
18   don't, but if they do, Charter is entitled to probe that
19   question.  So I would allow Topic 57 to go forward.
20              All right.  Topic 71:  Communications by
21   you or on your behalf with Charter and/or Charter's
22   subscribers whom you allege infringed the sound
23   recordings you assert --
24              MR. OPPENHEIM:  I'm sorry, Ms. Rodriguez.
25   I apologize, I was trying to get something in and I was
```

```
 1                    REPORTER'S CERTIFICATE

 2

 3        I, K. MICHELLE DITTMER, Registered Professional

 4   Reporter and Notary Public, State of Colorado, do hereby

 5   certify that the said hearing was taken in machine

 6   shorthand by me at the time and place aforesaid and was

 7   thereafter reduced to typewritten form; that the

 8   foregoing is a true transcript of the proceedings had.  I

 9   further certify that I am not employed by, related to,

10   nor counsel for any of the parties herein, nor otherwise

11   interested in the outcome of this litigation.

12              IN WITNESS WHEREOF, I have affixed my signature

13   this 21st day of March, 2021.

14              My commission expires April 15, 2024.

15

16              _____
                          K. MICHELLE DITTMER
17                   Registered Professional Reporter
                          Wilson & Associates, LLC
18

19

20

21

22

23

24

25
```