# Exhibit 1

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
      Case No. 19-cv-874-RBJ-MEH
 3    _____

 4    WARNER RECORDS, INC., et al.,

 5         Plaintiffs,

 6    vs.

 7    CHARTER COMMUNICATIONS, INC.,

 8         Defendant.
      _____
 9
10              Proceedings before MICHAEL E. HEGARTY, United

11    States Magistrate Judge, United States District Court for the

12    District of Colorado, commencing at 1:02 p.m., March 18,

13    2021, in the United States Courthouse, Denver, Colorado.

14    _____

15    WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE HEREIN
      TYPOGRAPHICALLY TRANSCRIBED. . .
16    _____

17                         APPEARANCES

18              JONATHAN M. SPERLING and co-counsel, attorneys at

19    Law, appearing for the Plaintiffs.

20              ANDREW H. SCHAPIRO and co-counsel, Attorneys at

21    Law, appearing for the Defendant.

22    _____

23                        ORAL ARGUMENTS

24

25
```

90

1    crisp.

2              THE COURT:  All right.

3              MR. SPERLING:  We'll be on time.

4              THE COURT:  Okay.  Was that it, then?

5              MS. RANAHAN:  We do have one --

6              THE COURT:  Go ahead.

7              MS. RANAHAN:  We do have one more issue that we've

8    raised.  This is Erin Ranahan.

9              We've raised, in a letter to you last night about a

10   couple of deposition topics on a 30(b)(6).  We've -- we've

11   provided a two-page letter, it's probably yesterday afternoon

12   your time, and thought it might make sense to have just a

13   discussion with you so that we could explain some of the

14   issues.

15             It's pretty simple -- two topics we wanted to --

16             THE COURT:  Was that the Sean Anderson e-mail?

17             MS. RANAHAN:  Yes, exactly.  Sean Anderson sent the

18   e-mail with a quick cover letter and then there's an attached

19   letter from myself.  It's a two- or three-page letter.

20             THE COURT:  No, I read it.  I read it.  The

21   work-for-hire issue and the dropped works?

22             MS. RANAHAN:  Correct.

23             THE COURT:  Okay.  So I have -- I have their

24   position.  Did you want to -- who wants to address that from

25   the plaintiff?

1          MR. KAPLAN:  Your Honor, this is Alex Kaplan.  Can

2     you hear me?

3          THE COURT:  Yes.

4          MR. KAPLAN:  I'll address it.  I'm not sure -- I

5     mean, I'm happy to get into the substance, but the letter

6     asked the Court to provide -- and these are their words --

7     preliminary guidance on this preview of intended objections

8     to a ruling that the Special Master made where we don't even

9     have a transcript yet.

10          THE COURT:  Okay.  And that's all we need to know.

11     If that's true, then I'm not going to touch it for the

12     moment.

13          MS. RANAHAN:  Well, obviously, we're all being --

14     you know, whatever you tell us could actually resolve it.

15     These are two very limited topics.

16          So -- and one of the things I wanted to clarify was

17     something about this whole procedure with the Copyright

18     Office, which came up during the -- I don't know if you

19     recall this, Your Honor, but it came up during the two-day

20     hearing.

21          It came up a year ago when I brought up the fact

22     that these work-for-hires, what we'd need is we'd need a

23     couple of (inaudible) testimony.  And then after we had that,

24     we could bring something to the Copyright Office if it was

25     referred to by the Court.

1           When we brought it up a year ago, Mr. Oppenheim

2   said he'd never heard of such a procedure.  20 years, he's

3   never heard of it.

4           I happen to have a case against Mr. Kaplan where he

5   mentioned it during the summit that that's something that had

6   happened in a case he was in.  We were opposing counsel in

7   that case.  And I just wanted to let you know how that worked

8   so that you understand why the deposition testimony's

9   actually critical to that process, because your concern

10  during the hearing was, How are you going to have time to do

11  this?  When are you going to do this?

12          And so I just wanted to give you a little bit more

13  information about how we did that in that other case, which

14  is it came up -- Mr. Kaplan raised an argument about our

15  registrations during summary judgment.  The Court, in its

16  summary ruling, picked out five -- five registrations that

17  had this issue that he raised.  We then submitted that to the

18  Copyright Office.

19          Within three months, we had a ruling back -- it was

20  two to three months.  And it wasn't that the whole case was

21  slowed down, it wasn't that we didn't have time, it was that

22  we do have to have the Court look at it and then refer it.

23          So what we need on the work-for-hire is we have

24  this 80 percent agreement -- we have 80 percent from Bright

25  House.  We just want to be able to ask the witnesses some

1   basic questions about these work-for-hire agreements that

2   were produced from Bright House, and we've since run an

3   analysis of the Bright House documents.

4          That was the other concern you had during February

5   23, is:  What have you done with the 80 percent that you've

6   gotten in Bright House so that I know you're actually doing

7   something and this isn't just busy work?

8          Well, we've since done the analysis and there's 15

9   percent of the work-for-hire problem that affects the 80

10  percent that are overlapping with this case.  So that's a

11  significant amount.  That's double what was represented

12  during the hearing on the 23rd.

13         So what we want to do -- and we will give them a

14  very narrow list of the exact agreement -- artists that we

15  have an issue with.  It's only about 10 or so, per plaintiff.

16  And we can -- you know, this isn't a prolonged, extended

17  hearing.  It's not anything that we want documents right now

18  on.

19         All we want to do is be able to use that 80 percent

20  that we got from Bright house, which was always the intent.

21  And we have -- we've had this discussion before, which is

22  that, you know, if you did it in Bright House, see what you

23  can do with the Bright House and I'll decide if it's worth

24  the other 20 percent.

25         So all we want to do is make that 80 percent able

94

1    to ask questions about those documents to the plaintiff

2    30(b)(6) representative on the work-for-hire.

3           And then once we have the testimony, which we see

4    as two-prong, we would provide the artist's name to them in

5    advance, provide them the agreement we see, either where it's

6    missing or not, and say:  Is there anything else here?  And

7    do you stand by your work-for-hire designation?  And if they

8    do, then that's what we need to go to the Copyright Office

9    and potentially make a showing.

10          We need to have some intent, that it was, you know,

11   done intentionally or knowingly and that it was -- so all we

12   need is -- and so what we're willing to do is provide this --

13   the artist, it's just sort of -- be able to ask about it.

14          What happened was that the Special Master was

15   relying on what we had said on the 23rd without the benefit

16   of knowing the recent developments and also understanding the

17   difference between us wanting them to produce everything for

18   the other 20 percent and us just being able to ask about what

19   we do have already.

20          So I think that the deposition is a lot less

21   burdensome.  So that's the work-for-hire issue.

22          MR. KAPLAN:  Your Honor, I thought we were not

23   going to argue this issue that they previewed.

24          THE COURT:  Okay.

25          MS. RANAHAN:  I mean, obviously, Your Honor, if we

95

1    can get an early ruling, we'll take it; but we'll take

2    (inaudible) we want -- we know that you like to operate in a

3    live context.  I wanted to just --

4              THE COURT:  No, I do, I do.  I'll just say that

5    it's awful dangerous at times to instruct a witness not to

6    answer, except for privilege.  That's all I'm going to say

7    about that, okay?

8              All right.  I have a question for, I think, first,

9    the defense and it involves something I heard earlier today.

10   And, again, this is not an area of law in which I practice,

11   nor would ever want to, I guess.  Unless I could probably get

12   a 30 percent contingency fee on a billion dollars, then I

13   might put some work in on the case.

14             Is it --

15             MR. SPERLING:  Your Honor, we wish we could get

16   that too.

17             THE COURT:  Is it -- I was just being hypothetical.

18             Is it true, Andrew, or whoever, that actual harm to

19   the plaintiffs is not an issue at trial?

20             MS. RANAHAN:  That's not true.  Andy, did you -- do

21   you want Andy to answer that?

22             THE COURT:  Anybody.

23             MS. RANAHAN:  I mean, that's -- actual harm is

24   absolutely a factor and that --

25             MR. SCHAPIRO:  Yes.  Whether you mean as a legal

96

1  matter or in -- in this trial?  Either way, the answer -- the

2  answer is it's necessary.

3          THE COURT:  Okay.  And does the plaintiffs -- do

4  the plaintiffs agree on that?  Because I thought I heard them

5  say, We're not going to rely on harm to our clients.  We're

6  going to rely on conduct by Charter.

7          MR. SCHAPIRO:  Well, I think they're going to be

8  asking for statutory damages, and so their argument will be

9  that, you know, they get statutory damages, but one of the

10  factors that leads into that is actual harm.

11          MR. OPPENHEIM:  Right.  So I agree with what Andrew

12  said there.  A critical point here is the Supreme Court in --

13  I'm going to get the year wrong -- but a very, very long time

14  ago made clear that in the statutory damages context, the

15  copyright owner plaintiff need not show any harm in order to

16  obtain statutory damages.  And, in fact, that's -- that

17  that's because that statutory damages were created for the

18  situation where a plaintiff may not be able to demonstrate

19  harm.  And in this case, and I'm not saying anything that's,

20  I think, in any way surprising to anybody, that in the

21  context of peer-to-peer infringement, measuring the quantum

22  of harm is impossible.

23          The activity that occurs can only be seen by the

24  people engaged in it.  You know that the infringement is

25  viral on a peer-to-peer network, but you can't -- you can't

1    see the full extent of it.

2          So for those -- to put it into graphic terms, if

3    you remember there used to be an old commercial for shampoo,

4    I think it was Breck Shampoo, and it said:  And then you tell

5    two friends, and then you tell two friends and then you two

6    -- tell two friends and it all magnified out and lots and

7    lots of people appeared on your screen.  That's kind of the

8    nature of peer-to-peer infringement and you can't measure it.

9          So there will certainly be, I'm sure, testimony on

10   both sides about the level of peer-to-peer activity on the

11   network and what was seen.  Actually, quantifying in a kind

12   of contract damages type way, the extent of that harm is

13   something that typically is not done.

14         THE COURT:  Okay.  So just to be clear, at that --

15   as it stands right now, the plaintiffs wouldn't intend to put

16   on evidence of any particular monetary damage to their

17   clients?

18         MR. OPPENHEIM:  Well, we would certainly put on

19   evidence of what happened to the industry as a result of

20   peer-to-peer infringement overall.  That's the graph that you

21   saw earlier.

22         The dotted line is a -- is not a line of what

23   happened to the industry; that's a line of music consumption.

24   But the actual revenues you can see and then you can compare

25   that to what was happening with peer-to-peer activity during

1    that same time period and a jury gets to consider that big

2    picture.

3              THE COURT:  So you'll put on evidence of revenue

4    changes from year-to-year in the industry as a whole?

5              MR. OPPENHEIM:  Likely, Your Honor.

6              THE COURT:  And where does that come from?  That

7    information?

8              MR. OPPENHEIM:  From the company -- I mean, the

9    revenue data is industry-collected information from the

10   plaintiffs.

11             THE COURT:  From some kind of trade organization?

12             MR. OPPENHEIM:  Yeah.  It's aggregate data of the

13   -- I believe -- and I don't have it right in front of me -- I

14   believe it's the aggregate financial data of the plaintiffs

15   in the case -- of the record company plaintiffs in the case,

16   I believe.  Not the -- I don't believe it includes the music

17   publishers.

18             THE COURT:  Okay, fine.

19             MR. OPPENHEIM:  But it -- it'll be put in, Your

20   Honor, through -- I believe, both through the fact witnesses

21   who will explain it and experts who will explain it.

22             THE COURT:  Okay.  All right.  Anything else today

23   from the plaintiffs?

24             MR. GOULD:  I don't believe so, Your Honor.  We

25   appreciate --

99

1          THE COURT:  All right, thank you.

2          MR. GOULD:  -- the time today.

3          THE COURT:  Thank you.  From the defense?

4          MR. SCHAPIRO:  Nothing further, Your Honor.

5          THE COURT:  All right, I still would encourage you

6   --

7          MS. RANAHAN:  Oh, so just for those objections, you

8   just want us to submit them formally, because what we need

9   is -- what we're trying to get is someone to be designated.

10  I appreciate your comment that they shouldn't instruct their

11  witnesses not to answer, unless it's privilege.  But what if

12  the question is whether they're going to have someone

13  prepared to talk about, like the limited artists

14  work-for-hire situation and --

15         THE COURT:  I'm sorry, so they objected formally to

16  that topic as a whole?

17         MS. RANAHAN:  Yes, and -- yes.

18         MR. GOULD:  And the Special -- and the Special

19  Master ruled on it in -- in our favor and apparently Charter

20  wants to object, and that's fine.  It's just that there's a

21  procedure for doing that, which is based off of receipt of

22  the -- of the transcript.

23         I mean, again, I'm -- I'm prepared to argue it

24  today, Your Honor, but it doesn't follow the procedure in the

25  order that -- point to the Special Master and set out the,

100

1   you know, the whole way of doing this.

2           THE COURT:  Sometimes drastic times require drastic

3   measures, right?

4           MR. GOULD:  Well, if you want to -- I mean, if

5   you're going to entertain this now, we'd like the option to

6   speak on it, please.

7           MR. SCHAPIRO:  Well, it --

8           THE COURT:  Well, hold on just a second.  I want to

9   read quietly first for a minute.

10          So there is document discovery on this.  You want

11  it to also be a 30(b)(6) topic?

12          MS. RANAHAN:  Correct.  So we have the 80 percent

13  overlap from the Bright House case and we had -- during the

14  document -- you know, the February 23rd, 22nd hearing, we had

15  attempted to get the remaining 20 percent.  And during that

16  you entertained very lengthy argument on that and at the end

17  said, Well, you have the -- you know, the 80 percent, so why

18  don't you see what you can do with that.

19          You noticed that we hadn't done anything yet with

20  Bright House.  And we have since.  And it's a 15 percent

21  concern rate where there's 15 percent of the agreements did

22  not have a work-for-hire.  So there is something there --

23  more than double what the sample was, or about double what

24  the sample was.  And I think that plaintiffs' counsel

25  repeatedly said it was a single digit error rate and it --

1    it's no longer that when we're looking at the actual 80

2    percent overlap.

3           So all what we want to do is be able to give them a

4    list of the artists we want to ask about.  Again, it's no

5    more than about 10 per plaintiff group and just so that we

6    can ask about their arrangement.  And if that's the only

7    agreement that would have had the provision and if they have

8    anything else.  And if not, do they stand by their

9    work-for-hire designation on the Copyright Office?

10          And we think that testimony will give us enough to

11   potentially go to the Copyright Office on this.  And I will

12   just say, Your Honor, I know you started this thing asking

13   for settlement.  Are we, you know, moving towards settlement?

14          I would say, something like this:  We believe

15   there's, like, a widespread problem with this and that

16   exposing something like this, even if it doesn't make it to

17   the Copyright Office, could, you know, actually -- you know

18   --

19          MR. GOULD:  Your Honor, what the -- we have no --

20   we have no concerns about that, honestly.  But what -- what

21   we're talking about here is an objection to the Special

22   Master's ruling.  This is an abuse-of-discretion standard.

23   We don't have the transcript yet, we don't have the basis of

24   her decision.  You've got a letter from Charter that was sent

25   less than 24 hours before the hearing that we haven't had a

102

1   chance to respond to.

2          At the very least, we should be able to put in a --

3   a response brief.  But, really, we should follow the process.

4   So I really don't want to get into argument -- I mean, I

5   disagree with so much of what was just -- what was just said.

6   But there really needs to be a process that we follow here

7   and where we, at least, have the ability to put in a

8   responsive paper and be able to see what the Special Master

9   ruled.

10          THE COURT:  Unless, in fact, you --

11          MS. RANAHAN:  We are --

12          THE COURT:  No.  Hold on, hold on, hold on.  Hold

13   on.

14          So, yeah, unless, in fact, you win right now and

15   then you're not worried about process, I assume?

16          MR. GOULD:  Yes, if you --

17          MS. RANAHAN:  I mean, if you -- what we want to

18   avoid, because this -- these are coming up, we want to get

19   attention on to these and try to get, you know, them decided.

20   We don't want the objections to be sitting past -- I know

21   that plaintiffs' counsel expressed concern about if we don't

22   get rulings now, it's just as good as not -- of losing them,

23   because we have a coming-up deposition.

24          So we do want to get these decided.  I want -- I

25   know that it helps to explain things to Your Honor so that

103

1    you can hear, you know, some of the recent things.  So I

2    thought it would be worth at least getting your take.

3              A lot of the things we've been doing lately are way

4    outside of any procedure that anyone agreed to, I think a lot

5    of these hearings, and we thought it would be worth raising

6    these before you.

7              THE COURT:  Okay.  So direct question, Ms. Ranahan:

8    Do you believe that your letter sufficiently frames the issue

9    so that if I wanted to rule on it right now, you've been

10   heard?

11             MS. RANAHAN:  Yes.

12             THE COURT:  Okay.  Then the objection is overruled.

13             Anything further?

14             MR. GOULD:  Not from plaintiffs, Your Honor.

15             THE COURT:  Okay.  See you guys tomorrow, but in

16   the meantime, Andrew, et al., or, Jonathan and Matt, et al.,

17   feel free to call me.  I think I -- I think we ought to talk

18   about settlement.

19             Okay?

20             MS. RANAHAN:  So I -- just to ask, so we are -- we

21   are allowed to ask, but they don't have to prepare a witness

22   about these -- so you're saying they don't have to prepare a

23   witness on either of the two topics, because we didn't hear

24   -- we didn't argue the second one at all.

25             So I know that I'm saying my written response is

104

1    enough, but I didn't mean to speak for the whole group,

2    because I wanted to get a preliminary -- I get your point

3    that I want to get only to my benefit, as everybody does in

4    this litigation, but I don't want to waive the second issue,

5    which now hasn't been heard at all.  And I didn't even

6    understand what the ruling was.

7              So should we just now to go Judge Jackson --

8              THE COURT:  Well --

9              MS. RANAHAN:  -- or should we not?

10             THE COURT:  My question to you was:  Do you believe

11   your letter and what you just stated, you've been

12   sufficiently heard on your objection to the Special Master's

13   rulings?  And I thought you said yes.

14             MS. RANAHAN:  Right, I understand that, Your Honor.

15   But I -- but we haven't discussed the second issue at all.  I

16   thought we laid -- I thought you meant, did we lay out the

17   position and lay out everything that was before you and would

18   we need to submit another objection.  I didn't know you

19   meant, you know, you can rule on it on the fly and then we

20   would waive our formal written objection, so --

21             THE COURT:  All right.  Well, it's not on the fly

22   --

23             MS. RANAHAN:  I thought you meant --

24             THE COURT:  No, no, hold on.  It's not on the fly.

25   It's after having read what you submitted and heard what you

105

1   said.

2           MS. RANAHAN:  Okay.  So if you've -- if you've

3   considered it and you're -- then we'll just go straight to

4   Judge Jackson on this and not -- I just want to make sure

5   we're not violating going through the interim ruling, because

6   plaintiffs' counsel said --

7           THE COURT:  No, you would not be violating --

8           MS. RANAHAN:  -- they wanted to make --

9           THE COURT:  Yeah, you wouldn't be violating

10  anything by going to Judge Jackson, except unless you argue

11  that I didn't give you a chance to be heard.  That's why I

12  asked you the question:  Have you had your chance to be

13  heard?

14          MS. RANAHAN:  On the first issue, we've -- if

15  you've read the whole thing and you've decided that they

16  shouldn't prepare a deposition witness on those issues, then

17  I suppose we've been heard.  I didn't know that we talked to

18  the second issue at all.

19          THE COURT:  Well, you --

20          MS. RANAHAN:  So for the -- for the first issue.

21          THE COURT:  You explained it in your letter and

22  which I read?

23          MS. RANAHAN:  Yeah.

24          THE COURT:  Did you want to add anything to that?

25          MS. RANAHAN:  Well, you said -- yes.  So I would

106

1   like to be -- I mean, I've made my record on the first issue.

2   We haven't talked about the second one at all.

3          So I realize, you know, we've been doing a lot of

4   things out of order here and all we wanted to do was see if

5   we could get this resolved early or get some guidance to see

6   if making objections would be, you know, worth it.  But I

7   don't want to waive everybody's --

8          THE COURT:  No.  I understand what you're doing and

9   you're the one who brought the topic up.  So I'm asking you:

10  Do you want to be -- I think you've just acknowledged that

11  you've been heard sufficiently as to any objection on the

12  first issue.

13         Do you want to add any oral argument on the second?

14         MS. RANAHAN:  Yes.  Sure, Your Honor.

15         So if -- so if I understand that what -- your

16  ruling on the first is just they should not need -- we don't

17  -- we (inaudible) a list of the artists and then ask about on

18  the work-for-hire, that's not something that you would

19  entertain?

20         THE COURT:  What I'm saying is I'm overruling an

21  objection.  Do you believe that there are matters that Ms.

22  Rodriguez didn't even address that I would have to address?

23         MS. RANAHAN:  Well, Ms. Rodriguez was relying on

24  your statement from the February 22nd and 23rd about document

25  discovery so she was deferring to those rulings.  And these

1   are just asking, you know, 10, 20 minutes of questions at a

2   deposition testimony.

3            So we wanted to get your guidance to see if,

4   perhaps, with the new revelations that we just described to

5   you, which are the -- what we have done with the Bright

6   House, which has doubled the concern rate, and also the fact

7   that the -- that what had happened in the context of what

8   went -- how we went about getting those to the Copyright

9   Office last time, which was through summary judgment, and

10  then a very quick ruling.  We just thought it would be worth

11  alerting you to those updates.

12           THE COURT:  Are you saying Ms. Rodriguez engaged in

13  no analysis whatsoever, besides, Well, this was stated at the

14  February 22nd and 23rd oral argument and, therefore, no?

15  That's all she said?

16           MS. RANAHAN:  That's not all she said, but that was

17  the gist of her saying -- I think this was decided -- I think

18  these issues were largely decided.  And we can wait for the

19  transcript to confirm that, but that -- and Ms. -- if anyone

20  else wants to speak up, but that was -- the gist of it was

21  that she thinks this had been decided on both of these two

22  issues that we've put in this letter, including the dropped

23  works, and given that there was updates, I just wanted you to

24  have these updates before -- because we could try to do a

25  reconsideration, based on the new updates; but I think you

1  have indicated that you are not -- the single digits seem to

2  be significant to you as far as the document discovery.

3          This is us trying to just ask some questions about

4  documents that were produced in Bright House that you had

5  indicated before we could use for discovery in this case.

6  You had indicated we could do that.  And you said we have 80

7  percent, so what's wrong with being 20 percent more?  It

8  might be too burdensome.

9          So I'm just -- I was expecting that you would be

10 open, because you've been very pro-discovery on these issues,

11 that you would allow us to ask some questions here.

12         So, yes, I am taken aback by your overruling that

13 initial objection, now knowing the new facts that we've

14 brought before you.  On the dropped works -- go ahead.

15         THE COURT:  Now, are you amending your response

16 that you'd like to be heard further?  That's the question.

17         MS. RANAHAN:  Yeah.  I mean, if this -- if you're

18 going to -- yes.  If you don't -- if you're not impressed by

19 those two new things I've brought to your attention, I would

20 love the opportunity to do a formal objection, let plaintiffs

21 respond and we can get the transcript, which is what they've

22 been asking for.

23         THE COURT:  Okay, that's fine.  That's what Mr. --

24         MS. RANAHAN:  But I -- you know, I --

25         THE COURT:  -- what Mr. Kaplan asked for, so that's

109

1    what you have.  Okay?

2            MS. RANAHAN:  Okay.  And then we'll defer the

3    second issue, which is the dropped works.  I know you started

4    by saying, you know, attorney representation is not evidence

5    --

6            THE COURT:  No, we're not deferring --

7            MS. RANAHAN:  -- and we're trying to --

8            THE COURT:  We're not deferring anything.  If you

9    wanted to object, go ahead and object when you get your

10   transcript.  Okay?

11           MS. RANAHAN:  Okay.  So we'll -- thank you.

12           THE COURT:  All right.  Anything else?

13           MR. SPERLING:  Definitely not, Your Honor.

14           THE COURT:  You're wise beyond your years, Mr.

15   Sperling.  Okay, we'll be in recess.

16           (Whereupon, the within hearing was then in

17   conclusion at 4:36 p.m.)

18

19

20

21

22

23

24

25

110

1                        TRANSCRIBER'S CERTIFICATION

2      I certify that the foregoing is a correct transcript to the

3      best of my ability to hear and understand the audio recording

4      and based on the quality of the audio recording from the

5      above-entitled matter.

6

7      /s/ Dyann Labo                    March 22, 2021

8      Signature of Transcriber              Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25