1

1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO
2
   Case No. 19-cv-874-RBJ-MEH
3  _____

4  WARNER RECORDS, INC., et al.,

5       Plaintiffs,

6  vs.

7  CHARTER COMMUNICATIONS, INC.,

8       Defendant.
   _____
9

10          Proceedings before MICHAEL E. HEGARTY, United

11 States Magistrate Judge, United States District Court for the

12 District of Colorado, commencing at 1:02 p.m., March 18,

13 2021, in the United States Courthouse, Denver, Colorado.

14 _____

15 WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE HEREIN
   TYPOGRAPHICALLY TRANSCRIBED. . .
16 _____

17                    APPEARANCES

18          JONATHAN M. SPERLING and co-counsel, attorneys at

19 Law, appearing for the Plaintiffs.

20          ANDREW H. SCHAPIRO and co-counsel, Attorneys at

21 Law, appearing for the Defendant.

22 _____

23                   ORAL ARGUMENTS

24

25

2

1                    P R O C E E D I N G S

2            (Whereupon, the within electronically recorded

3    proceedings are herein transcribed, pursuant to order of

4    counsel.)

5            THE COURT:  Case Number 19-cv-874.  Go ahead and

6    make your appearances, please.

7            MR. SPERLING:  Good afternoon, Your Honor.  For the

8    plaintiffs from Covington & Burling, Jonathan Sperling,

9    Stacey Grigsby, and Hardy Ehlers; and from our colleagues at

10   Oppenheim & Zebrak, Matt Oppenheim, Jeff Gould, and Alex

11   Kaplan.

12           THE COURT:  Thank you.

13           MR. SCHAPIRO:  And for Charter, Andrew Schapiro

14   from Quinn Emanuel.  My colleague, Linda Brewer, is on the

15   video.  Our friends from Winston & Strawn, Sean Anderson, and

16   Erin Ranahan are on.

17           I believe some others, possibly including local

18   counsel, are on --

19           MR. JOYCE:  Yes.  This is Craig Joyce and I am -- I

20   am on by telephone.

21           MR. HUEBERT:  And this is Allison Huebert, I'm also

22   on by telephone.

23           THE COURT:  Okay.  So I don't know who's going to

24   take the lead for the plaintiff.  I think you probably both

25   have things you need to talk about, so we'll just start with

1    the plaintiff.

2            MR. SPERLING:  Good afternoon, Your Honor.  It's

3    Jonathan Sperling.

4            With respect to the issue of Charter's attempt to

5    simultaneously make arguments as to why there's no need for

6    deterrence today, but resist discovery into the scope of

7    peer-to-peer infringement on their network today, I think you

8    -- you largely nailed it, Your Honor, in your e-mail.

9            They can't make arguments about industry-wide

10   trends, purport to hitch themselves to that, as if those

11   trends are true of them, too, without us being able to

12   examine whether they are or are not.  And there are really

13   two kinds of -- of points they seem to want to make.

14           One is industry-wide trends in terms of plaintiffs'

15   revenues.  As you immediately grasped last week, that says

16   nothing about the amount of money that plaintiffs continue to

17   lose to infringement.  And if they want to raise that subject

18   with, as you grasped, the clear, intended implication that a

19   jury should infer that piracy is not the scourge today that

20   it once was or somehow doesn't impact plaintiffs' revenues

21   today in a way that it once did, then they open themselves up

22   to discovery on that very subject.

23           With respect to industry-wide trends and

24   peer-to-peer piracy, you know, you captured it, Your Honor,

25   in an e-mail of Monday.  As I said, they can't try and

 1   exploit those trends to their advantage as if it's true to

 2   them without us being able to examine whether it is or isn't

 3   true of them.  And their proposal, therefore, which offers

 4   nothing other than that they will claim credit for any

 5   industry-wide declines in piracy, to the extent that they can

 6   show that there is such a thing, that leaves open the door

 7   for them to try to have it both ways.

 8           To imply to the jury, at a minimum, that there is

 9   nothing to deter today, that either Charter is not

10   meaningfully impacting plaintiffs' revenues today or that

11   Charter is not engaging in conduct today that needs to be

12   deterred, while simultaneously resisting the discovery that

13   would test both of those issues.

14           It -- it seems pretty simple, at the end of the

15   day, Your Honor, so I don't want to belabor it.  And we're

16   happy, frankly, to turn to the discovery request that we

17   identified and that we -- we appreciate that you were

18   offering your preliminary thoughts on, and we're happy to

19   walk through a discussion of those.

20           THE COURT:  Yeah, let's wait on that.

21           So, Andrew, I think the point here is this:  What

22   -- what I believe I said and what I intended was, you can --

23   I will -- the discovery is not relevant enough, or at least

24   proportional, whatever considerations that I need to put in

25   there, if all you're going to say is that people are doing

1   things in a new way.  Right now, they're -- they're using

2   streaming, you know.  They're telling Alexa to play their

3   songs.  They're telling whoever to play their songs and

4   that's -- and that is a way that people -- sort of a new-ish

5   way people are making money.

6          But you can't -- you can't then, at the same time,

7   talk about the decline of -- of piracy without the plaintiffs

8   being able to -- I mean, if you -- if you just wanted to say

9   -- I mean, I don't even know -- in order to even say that,

10  you'd have to have somebody educated on the stand.  I mean,

11  obviously statements by counsel are not evidence.

12         So in order for that to be evidence, you'd have to

13  have a witness or an exhibit that would say, like you said in

14  your e-mail, there's a decline of p-to-p privacy -- piracy

15  generally.  You'd have to introduce some kind of evidence of

16  that and -- and then that would be subject to

17  cross-examination.

18         So that's the -- that's the concern that I had.

19  And what do you say about that?

20         MR. SCHAPIRO:  So I have a couple of answers, but

21  one of which I -- I think will put it to rest, which is it's

22  unlikely the inclusion of the phrase about the "decline of

23  peer-to-peer piracy" generally is what caused Mr. Sperling to

24  raise his objections and is plainly what causes you to

25  believe that this is somehow going beyond what we had

1    discussed on March 9.

2            I think, based in part on some of the concerns that

3    you just raised about how we -- that some of the -- the

4    issues of proof and how that, in itself, could turn into a

5    trial within a trial, I think we're willing to strike that

6    language and then have the relatively straightforward

7    stipulation that I think we all contemplated on March 9, but

8    I'd like to give a little bit of background for a moment.

9            You know, this -- this has been a -- sort of a

10   moving target for us, the plaintiffs' efforts to get at

11   notices and tickets from the post-2016 period.  You know,

12   first they said, Well, they need it -- their deterrence, by

13   the way, has been in the case, you know, that's -- that's an

14   issue that was raised, you know, a year ago.

15           But at first, they said they need this information

16   for the counter-counterclaims.  And when they logged on the

17   counter-counterclaims, they said -- as I understood them to

18   be saying, they needed it to counter an anticipated good

19   citizen argument from us.  And now they're saying they need

20   it to counter the peer-to-peer piracy is declining argument.

21           So we're going to ask them, I think, and we'll take

22   that one off the table, too, but I think when that one's off

23   the table, the proportionality -- the disproportionality is

24   (inaudible).  I have a whole little presentation here just

25   even in my head that I won't bother you with.  But if -- if

```
1    -- if you're disinclined to go with us, even after we strike

2    that language, I can explain why it would be very

3    disproportionate, problematic, to try and get into

4    understanding what notices and tickets from the post-2016

5    period meant, or mean.

6              THE COURT:  What is your evidence going to be of --

7    are -- are you going to put on a witness, or exhibits, or

8    both -- I guess you'd have to -- on the developments in the

9    music industry, including business model and sources of

10   revenue?  You -- you'll have witnesses who are going to

11   testify to that?

12             MR. SCHAPIRO:  I think so.  And, in part, this

13   depends on what the plaintiffs are going to do; but if they

14   do -- do what we -- you know, what they did in Cox --

15   someone, by the way, has a -- a message dinger going off and

16   it's --

17             THE COURT:  Yeah.

18             MR. SCHAPIRO:  -- it's very -- it's loud to people

19   who aren't muted, other than the Judge not on mute.

20             THE COURT:  Right.

21             MR. SCHAPIRO:  So -- so in Cox, you know, they

22   basically said:  Piracy is killing music.  We've all seen

23   those ads, right?  And artists -- you know, artists are

24   getting creamed.  And we want to, at least, reserve the right

25   in -- in entering into this stipulation, we want to reserve
```

8

1    the -- we don't want to tie our hand behind our back and not

2    be able to answer if they get up and say, you know, you need

3    to return a huge award, because, you know, the -- the music

4    industry can barely survive now and all these poor artists

5    are being creamed -- we want to say, Well, actually, the

6    music industry's doing quite well and artists aren't

7    necessarily getting creamed.

8              THE COURT:  But you can --

9              MR. SCHAPIRO:  You know, they can come back and say

10   --

11             THE COURT:  Statements by --

12             MR. SCHAPIRO:  -- we --

13             THE COURT:  Statements by lawyers are not evidence,

14   so you'll have to put on evidence of that, right?

15             MR. SCHAPIRO:  Yeah.  Yeah, yeah.  So I -- we will

16   have experts who will say that.  And they can say or argue --

17   and I think it's a legitimate argument -- and they'll say,

18   you know, Hey, it doesn't -- it doesn't matter if we're doing

19   well in some ways, you know, piracy still harms us, et

20   cetera.

21             THE COURT:  Sure.

22             MR. SCHAPIRO:  I assume they'll say that.

23             THE COURT:  But again, they have to have evidence.

24   They can't just say that, too.  I mean --

25             MR. SCHAPIRO:  Yeah --

9

1          THE COURT:  -- at least, if I were the trial judge,

2    I wouldn't let anybody say those sort -- kind of things

3    without proving it up.  And then if they said it, for

4    example, in an opening statement and there was never any

5    proof and they closed their case, you know, and the defense

6    asks for an instruction that they're to disregard that

7    statement by counsel, because of that -- what did not come

8    into evidence, then that's what I would do at least, but I

9    don't know what Judge Jackson does about those kinds of

10   things.

11         MR. SCHAPIRO:  Yeah.  I mean, this is what happened

12   in Cox.  And so we just -- we want to be prepared and in

13   making this stipulation that we think, you know, gives away a

14   lot, we just want -- we want to reserve the right to counter

15   arguments such as that.

16         THE COURT:  Jonathan, what -- you know, again,

17   whenever I ask anybody questions, if it gets too much into

18   trial strategy or work product, just tell me, because, you

19   know, you have to -- you have to guard that yourself.  I'm

20   not your guardian on that one.

21         But are you going to put on evidence of some kind

22   that piracy is still a problem?

23         MR. SPERLING:  Your Honor, we would talk about the

24   impact that the piracy that Charter engaged in had.

25         THE COURT:  Through the claims period?

10

1            MR. SPERLING:  What?

2            THE COURT:  Through the --

3            MR. SPERLING:  Through the claims period and --

4    right?

5            THE COURT:  Right.

6            MR. SPERLING:  And, Your Honor, insofar as we were

7    also required to provide financials for years following the

8    claim period, we would certainly speak to those to the same

9    extent that Charter would speak to those.

10           The problem here is the following:  That when Mr.

11   Schapiro says that he wants to talk about the growth of

12   streaming or how the industry is doing and how that impacts

13   our financials, that's relevant only if it's intended to

14   imply something about the impact of Charter's conduct, about

15   the impact of piracy, and whether we're affected by that

16   today or not.

17           It can only go to either the impact of Charter's

18   conduct on our revenues today or the scale of peer-to-peer

19   piracy today.  And that's the stumbling block.

20           If they want to make that implication, they want to

21   imply to the jury -- and that's the only purpose for

22   mentioning this, is to imply to the jury that we're not

23   impacted by piracy today -- and, of course, the defendant's

24   Charter and damages arguments are relevant if Charter is

25   found liable.  So we're contemplating a world in which a jury

11

1  has found that Charter did contribute to piracy and is liable

2  for secondary copyright infringement, they want to argue that

3  Charter doesn't need to be deterred today, because we're

4  doing just fine.  Then, by definition, as you recognized,

5  they opened themselves up to discovery by what's going on

6  there.

7         THE COURT:  But that's not what he said.

8         MR. SCHAPIRO:  Your Honor, this isn't --

9         THE COURT:  Hold on, hold on.  That's not what he

10 said --

11        MR. SCHAPIRO:  Okay.

12        THE COURT:  -- and I want to give you an example of

13 where I think they're going.  And if it's true, then I just

14 don't think this discovery, I'm going to permit.

15        So I rarely ate out for lunch until there's

16 something called Chipotle was invented, and then I started

17 eating out a lot.  That availability of something that was --

18 I viewed as healthy and tasty created demand that didn't

19 exist before, okay?

20        If all they're going to argue is that these new

21 ways of playing music has simply created demand for people

22 like me, too -- I mean, I'm not -- I've never been involved

23 in piracy, but I play a lot more music now because I can just

24 ask Alexa to play my favorite songs.  So that has actually

25 created demand, which I assume has created revenue, okay.  So

12

 1    more people listening to music through streaming services,

 2    the more money the plaintiffs make.  That does not -- there

 3    is no underlying implied argument that piracy is -- actually,

 4    there's no underlying argument about piracy whatsoever.

 5              Now, if you wanted to say, Ah-ha, but we still

 6    think piracy goes on, that's up to you.  But I don't see that

 7    as a -- as an implied argument in their putting on evidence

 8    that these new and innovative ways that the industry is

 9    moving has created demand and, therefore, revenue.

10              Does that make sense?

11              MR. SPERLING:  Your Honor, we have trouble fully

12    understanding that.  It certainly makes sense as far as it

13    goes, but the relevance of that to the case, if not -- is not

14    obvious at all.

15              The only relevance would be if it's tied to

16    deterrents or the impact of piracy to our revenues, as you

17    recognized when we were together last week.

18              You know, if our -- if our revenue from legitimate

19    sources has doubled or tripled or increased a hundred-fold,

20    for that matter, but the amount of piracy -- the amount of

21    money that we're losing to piracy has also doubled or tripled

22    or increased a hundred-fold, then it's of no relevance that

23    to -- to Charter's damages, the damages for which they should

24    be held liable, that we're making more money from legitimate

25    exploitations.

13

1          What matters is how much is Charter taking out of

2     its pocket, because it endorses and condones and facilitates

3     and contributes and financially benefits from piracy on its

4     network.

5          And so it's untenable and unconscionable that they

6     can say the very thing, I think, that Your Honor articulated,

7     which is, Hey, look, the music industry, they're doing great.

8     They're making money from all these other ways and there's

9     demand that wasn't there before, without being able to show

10    the flip side of the story, the reverse side of the coin.

11    Because, again, it's only relevant when it's intending to

12    imply something about the extent to which we are or are not

13    being damaged today by what they're doing.

14          The bottom line is, Look, if they don't want to

15    talk about the post-claim period, that's one thing, but they

16    can't simultaneously talk about what's going on today for

17    damages purposes while not enabling us to take discovery of

18    what is, in fact, going on today.

19          THE COURT:  But you're going to open that door at

20    trial, right?  You go first.

21          MR. SPERLING:  Pardon me, Your Honor?

22          THE COURT:  Your case will go first, you will be

23    the side of the "v" that addresses post-claim period conduct

24    in your case-in-chief, correct?

25          MR. SPERLING:  If we choose to go there, Your

14

 1    Honor.  But if we choose to simply say, Look at what they

 2    did, they need to be deterred, then we've not opened the door

 3    to any discussion about what had happened after the claim

 4    period.

 5            THE COURT:  Right, right.

 6            MR. SPERLING:  But the very thing that you

 7    suggested they would say does open the door to that.

 8            THE COURT:  But, so you might not argue, then, at

 9    all that peer-to-peer piracy is an ongoing problem, that's

10    what you're saying?

11            MR. SPERLING:  Well, we may not talk about it at

12    all, Your Honor.

13            THE COURT:  Okay.  So the case that's brought

14    involves all the notices that you sent to Charter, your

15    argument they did nothing about it, although they may have

16    terminated people when they weren't paying their bill or for

17    some other reason, but they certainly didn't do it because of

18    piracy, right?  That's your fundamental premise.

19            They need to be punished for that, right?  So far

20    correct?

21            MR. SPERLING:  They certainly need to compensate us

22    and be deterred, Your Honor, correct.

23            THE COURT:  All right.  So then is it -- is it

24    necessary to either -- to any claim or defense that -- or to

25    any argument on damages, is it a necessary fact issue under

15

1    the law what is going on now?

2              Is that necessary in order to address damages, as

3    the law permits them, either through wanting to reduce -- you

4    know, limit the amount of damages in the event liabilities

5    found, or to increase the amount of damages in the event

6    liability is found?

7              Is that -- is the law written in a way that

8    necessarily makes a conduct up to the date of trial open, a

9    game or necessary?

10             MR. SPERLING:  So it -- you threw a few things in

11   there, Your Honor.  Are open, game, necessary.  I don't have

12   a lot at my fingertips, but to the very best of my

13   understanding, Your Honor.  Necessary?  No.  But game

14   permissible?  Yes.  One can talk about it, one needn't talk

15   about it.

16             It sounds like they want to talk about it.

17             THE COURT:  What is the --

18             MR. SPERLING:  If they want to talk about it --

19             THE COURT:  Can you explain to me the language in

20   the -- is it just a practical argument on deterrence or is

21   that a concept that's actually in the statute?

22             MR. SCHAPIRO:  No, Your Honor.  The statute does

23   not specifically list deterrents, but the statute and the

24   case law that interpret are pretty clear that it's fairly

25   broad in terms of what a plaintiff can argue.

16

1   It's -- in a way, it's very similar to the types of

2 things that come in in punitive damages cases.  I don't think

3 the plaintiffs will disagree with me on this.  There's a

4 fairly broad range of factors.

5   It's not enumerated anywhere, but I think Mr.

6 Sperling has really, just, in a way, made the case for us

7 here.  And it -- the fact is, there are a broad set of

8 factors that one can consider.  It's unclear exactly what --

9 what arguments they're going to make.

10   But I think two data points are important here and

11 that show the disproportionality.  And the first is, back in

12 May of 2020 -- and this is reflected on Docket -- in Docket

13 81 at pages 14 and 15, we, Charter, sought an order from the

14 Special Master requiring the plaintiffs to provide

15 post-claims information in response to some RFPs about the

16 financial effect of peer-to-peer infringement on plaintiffs.

17 And we argued, at the time, that documents like that would be

18 necessary to paint a complete picture for the jury, which is

19 relevant to deterrence -- a deterrence factor for statutory

20 damages and we lost.

21   The statute -- the Special Master denied our

22 request and said she had already allowed some limited

23 discovery to allow us to bolster such arguments and said that

24 the tenuous relevance that documents from as late as 2019

25 would have -- sorry, she -- and she stated that there was

17

1  tenuous relevance that the documents from as late as 2019

2  would have to the claims at issue in this case.

3          Then, in July of 2020 -- and this is reflected --

4          THE COURT:  Andrew, I want to know if that was --

5  if that was in response to an argument that the plaintiffs

6  made that it's not relevant.

7          Is that what they were arguing?  And if so, what

8  did they say?

9          MR. SCHAPIRO:  I don't have that at my -- at my

10 fingertips, Your Honor, but I assume they did.  Maybe someone

11 else on the call can tell me.  I assume that they resisted

12 producing those for exactly that reason.

13         MR. SPERLING:  Your Honor, we resisted production

14 of those materials, because we'd been repeatedly told and

15 been subject to orders that discovery is limited to the claim

16 period.

17         I don't think there's another instance -- I could

18 be wrong, but I don't think there's another instance in which

19 post-claim period discovery's been permitted other than,

20 somewhat bizarrely in our view, Charter's ability to get

21 financials from us for years following the claim period.

22         So -- and Mr. Schapiro describes not being able to

23 get certain information.  I don't recall the particular

24 requests or the particular conference.  It may be that the

25 Special Master did not give them everything they asked for.

18

1          But you would be misled if you took from Mr.

2     Schapiro's statement that they were denied discovery of us

3     regarding years following the claim period.  In fact, we were

4     required to produce financials for years following the claim

5     period.

6          They'll cross our witnesses with those documents.

7     We just had a conference with the Special Master discussing

8     30(b)(6) topics, there's to us, and it's clear they're going

9     to use those financial documents that we had to produce to

10    take testimony from our witnesses about our performance and

11    what was going on with us following the claim period.

12         So it's a little bit ironic that Mr. Schapiro's

13    suggesting that somehow the door was shut on them.  The door

14    was opened for them.  And yet, we're being told that if they

15    have their way, we won't be able to get reciprocal discovery

16    about what they were doing on their network.

17         And I'm going to -- I think we need to sort this

18    out before we turn to Mr. Schapiro's arguments about --

19         THE COURT:  No, I'm going to ask you --

20         MR. SPERLING:  -- burden of --

21         THE COURT:  Let me ask you two questions, first.

22    Jonathan, let me ask you two questions:

23         Number one --

24         MR. SPERLING:  Yeah.

25         THE COURT:  -- has Judge Jackson said anything on

19

 1    the record about his view of post-claim discovery?

 2            MR. SCHAPIRO:  Yes, he has, Your Honor.

 3            THE COURT:  What did he say?

 4            MR. SCHAPIRO:  He was very clear, in our view that

 5    he wasn't interested in seeing a bunch of post-claim

 6    discovery.  He wanted to move this ahead.  I think Ms. Brewer

 7    can speak to that.

 8            MR. SPERLING:  So, Your Honor, I think that's --

 9    that's not a fair response to your question.

10            What Judge Jackson said, and we all know it, is

11    that he said:  This case is going to be about the notices

12    that were served between 2012 and 2015.  And he wasn't going

13    to let in the claims that we wanted to assert for years

14    following the claim period.

15            We all accept that, we all know that.  You had it

16    100 percent right last week when you said, in response to

17    Charter, like, there are suggestions that we're trying to

18    backdoor that discovery here.  He's made it clear, we agree,

19    those claims are not in the case.

20            That's very different than him having stated a

21    position as to the applicability, the relevance of evidence

22    following the claim period.

23            If that's all that Mr. Schapiro's referring to,

24    then we don't believe that that's a fair understanding or

25    interpretation or presentation of what he said.

20

1          THE COURT:  Okay.

2          MR. SCHAPIRO:  To my knowledge -- and I couldn't

3   promise you, Your Honor, but to my knowledge, sitting here, I

4   don't believe that Judge Jackson has said anything about the

5   issue one way or the other.  It's just not been presented to

6   him.  We've had only a handful, maybe two or three written

7   rulings from him, and we've appeared in front of him exactly

8   once.

9          THE COURT:  Okay.  Then the next question is:

10  Would you expect to move in limine about post-claims period

11  evidence?

12         MR. SPERLING:  If they are able to make these

13  arguments and we're not able to get that discovery -- if

14  we're not able to get discovery from them at all with respect

15  to years following the claim period, then I expect we will

16  seek to move in limine to exclude that.

17         THE COURT:  No, no.  Let's say you can have

18  whatever discovery -- let's say I just suddenly announce

19  everybody gets whatever they want to, I'm not going to listen

20  to any objections, would you --

21         MR. SPERLING:  I'm sorry, could you repeat that,

22  Your Honor?

23         THE COURT:  Yeah.  Let's say that I -- I announced

24  that from now on you can have whatever discovery you want to

25  without objection, all right?  Let's say I announced that.

1            Would you -- would you anticipate --

2            MR. SPERLING:  Yeah.

3            THE COURT:  -- even if you had all the post-claim

4  discovery that you wanted, would you anticipate still trying

5  to limit the case to the claims period?  Or would you, on

6  your own initiative as the affirmative case, without

7  anticipation of what the defendant will do, would you put on

8  evidence of any kind that post-dates the claim period?

9            MR. SPERLING:  If left to our druthers, we would,

10 Your Honor.

11           THE COURT:  Okay.  And that would be --

12           MR. SPERLING:  So we would absolutely talk about

13 the scourge that p-to-p remains today, but we can't have a

14 universe in which they can do it and we can't.

15           THE COURT:  I understand, okay.

16           MR. SCHAPIRO:  Can I respond on the reciprocity --

17           THE COURT:  Go ahead.

18           MR. SCHAPIRO:  -- Your Honor?

19           So I think that, first of all, in terms of the

20 financials, we're even.  They have our financials, post-claim

21 period; we have their financials.

22           But the quote from Judge Jackson, the first

23 sentence of it, I think, is worthy of note.  I don't have the

24 exact language in front of me, but it was:  This case is

25 going to be -- this case is about the notices from 2013 to

1    2016.  And they're here fighting us to try and get the

2    notices after 2016.

3            I have another data point on this.  You know, back

4    in July of 2020 -- and this is reflected in Docket Entry

5    230 -- the plaintiffs were seeking -- excuse me.  We were

6    seeking documents showing plaintiffs' decrease in anti-piracy

7    measures post-claims period as information relevant to

8    deterrence.

9            With that I could -- show that you guys, after the

10   claims period, reduced your anti-piracy efforts.  We lost on

11   that too.  The Special Master said that that data had

12   questionable probative value.  And she said maybe you can ask

13   about it at a deposition, but she's not going to order them

14   to provide any documents on that.

15           And I think that does lead us into proportionality,

16   because we're slicing the bologna very thin here trying to

17   come up with some theory or some universe in which notices

18   and tickets and associated data from 2016 to 2019 is somehow

19   relevant.

20           I think it's not.  And I think, you know,

21   especially if we -- if we are agreeing that we're not going

22   to argue that peer-to-peer sharing or piracy has decreased,

23   really what -- whatever slight relevance there was, you know,

24   is, you know, down to nearly zero.  But if you put on the

25   other side of the scale what this would entail, it becomes

1   obvious that their request should be denied.

2          I mean, first of all, we know that the number of

3   notices is not probative of anything, especially since these

4   are notices that aren't coming from the -- most of these

5   notices aren't coming from the plaintiffs themselves.  But

6   moreover, as we've mentioned a couple times -- we would have

7   every right to show why, of course.

8          But, you know, if 2016 is an important date,

9   because in 2016 Time Warner -- there was a merger and

10  acquisition of Time-Warner and Charter.  So we would need to

11  contextualize for the jury, first of all, the fact that

12  Time-Warner, at that time, was part of the CATS program that

13  you've heard much about while Charter wasn't.  The fact that

14  Charter then had a new system for processing notices

15  post-2016, the fact that the RIAA stopped sending notices for

16  the plaintiffs' works-in-suit -- or most of the plaintiffs,

17  but not all in 2016, but then Universal starting sending its

18  own notices for different works-in-suit after 2016.

19         We wouldn't be able to challenge the reliability of

20  these Universal notices the same way we're challenging the

21  RIAA notices, because we have no discovery about the system

22  that Universal used.

23         So, you know, if this were to be done in any fair

24  way, we would have every right to say, Okay, well, now we

25  have to explain to you what these notice and ticket numbers

1   mean, which is an entire trial within a trial that, based on

2   the marginal relevance, doesn't justify.

3            So, Your Honor --

4            THE COURT:  Jonathan -- wait.  Do you agree with

5   Andrew's statement that you both have post-claim financial

6   information about one another?

7            MR. SPERLING:  Charter's a public company, Your

8   Honor.  So insofar as they have publically filed financials

9   from later years, we certainly have that.

10           I'm going to look to my team, but I believe, to the

11  best of my knowledge, they've not been required to produce

12  any internal financial documents, anything that's not

13  publically available to the world on the web for (inaudible)

14  claim period.

15           And to be clear, Your Honor, we sought that

16  information and it was denied to us and Mr. Schapiro referred

17  to a different kind of discovery.  And he said, Oh, they were

18  denied the discovery with respect to our anti-piracy work

19  after the claim period, Your Honor.  They were denied that

20  discovery for the claim period too.

21           What Ms. Rodriguez concluded is, based on clear

22  Tenth Circuit law that she felt properly that she was bound

23  by, there is no mitigation obligation or relevance when it

24  comes to copyright infringement.  And, therefore, their

25  attempts to take discovery about what we might have done to

25

1    mitigate piracy is irrelevant, as a matter of law.  It didn't

2    have to do with the claim period.

3          So coming back to your question, Your Honor, no.

4    Other than what they have publicly filed as 10Ks and 10Qs, we

5    were denied financial information from them.  They've got our

6    internal stuff, but we don't have theirs.

7          And with respect to Mr. Schapiro's arguments about

8    burden, they really weren't about burden.  They were about

9    admissibility, they were about late, they were about trial

10   management; but they weren't about burden of discoverability,

11   because what we're talking about are the metric supports.

12   We're all very familiar with those now.  They're easily

13   identifiable, easy to produce.

14         We're talking about CATS ticket data, easy to

15   export.  We heard a bunch of representations about systems

16   changing and that if that's what they're going to say, then

17   we're entitled to take discovery about it to see if it's

18   true.

19         We don't know that the things that Mr. Schapiro

20   said are true.  I'm not saying -- I'm not accusing Mr.

21   Schapiro of saying anything false.  But as he said, you know,

22   lawyers make argument, evidence establishes facts.  And Mr.

23   Schapiro's statements aren't evidence.  We're entitled to the

24   evidence.

25         THE COURT:  So Andrew --I have a question for you,

26

1   Andrew:

2           What Jonathan just said, I believe, was that their

3   conduct is not relevant.  Therefore -- well, number one, do

4   you agree with that?  Their conduct during the claim period

5   is not relevant?

6           MR. SCHAPIRO:  Their conduct during the claim

7   period?

8           THE COURT:  Correct.

9           MR. SCHAPIRO:  No.  I think there are many ways in

10  which I think both of us would agree -- both sides would

11  agree that their conduct during the claims period is

12  relevant.

13          On that one particular issue, we thought we could

14  show that their reduction of anti-piracy efforts was

15  probative of a reduction in piracy and we lost on that.  The

16  Magistrate Judge said, Ah, you know, that's not very strong

17  evidence.

18          So there we are.  And --

19          THE COURT:  No, but I thought I just --

20          MR. SCHAPIRO:  And I want to just --

21          THE COURT:  I thought I just heard Jonathan say

22  that Ms. Rodriguez found, pursuant to Tenth Circuit case law,

23  that the plaintiffs' efforts during the claims period to

24  reduce piracy is not a relevant issue at trial.

25          Is that true?

27

1          MR. SPERLING:  Your Honor, insofar as it's directed

2     at me and -- and, obviously, Mr. Schapiro should answer as

3     well -- the issue on the table was:  The extent to which we

4     engaged in other anti-piracy efforts, was that true or not?

5     And it was clear that Charter wanted discovery of that to try

6     to argue that we had failed to mitigate our damages.

7          They wanted to establish that insofar as we

8     potentially reduced some sort of anti-piracy effort, that

9     that bore on the damages we could recover.

10          And our position, our recollection -- Mr. Schapiro

11     will let you know if he agrees -- is that the Special Master,

12     on that issue, said Tenth Circuit law is clear.  A copyright

13     infringement plaintiff has no duty to mitigate and,

14     therefore, they can't take discovery about what our

15     anti-piracy efforts were or weren't and how they changed over

16     time as a way to somehow try to establish that, you know, we

17     wouldn't have been robbed if only we'd bought a better lock

18     for the door.

19          THE COURT:  But then you can't argue at trial that

20     you did all you could during the claim period to stop piracy.

21     You can't make that argument, correct?

22          MR. SPERLING:  I -- that's probably right, Your

23     Honor.  And that -- I mean, that's a ruling that she made and

24     I assume Judge Jackson will deal with those issues.  We're --

25     I don't contemplate that we're going to make that argument,

1   to be clear.  I'm not trying to have it both ways.

2          I don't think we've thought through every word

3   we're going to say at trial, but that sounds right to me,

4   Your Honor.  And that's why we resisted it.

5          We don't intend to talk about:  Well, you know,

6   there was nothing else we could possibly do.  That's not the

7   issue.  The issue in the case is not whether we did

8   everything one could possibly do to lock the door.

9          Did we double-lock it, triple-lock it, buy the best

10  alarm system, put in lasers?  The issue is:  Did Charter know

11  that their subscribers were stealing our stuff?  Answer, yes.

12  Did Charter knowingly contribute to that?  Yes.  Did Charter

13  profit from that?  Yes.

14         You know, we just received from them documents this

15  week, as a result of the hearing we had in front of you a

16  couple of weeks ago, now showing, as we expected would be the

17  case, that Charter was paying close attention to the amount

18  of its network traffic that was consumed by peer-to-peer

19  piracy and documents showing that they knew that peer-to-peer

20  piracy was in the neighborhood of 40 percent of all upload

21  traffic on the network, okay?

22         So that's what this case is about.  This case is

23  about them knowing what was going on and profiting from it.

24  It's not about what steps we took beyond letting them know

25  about the infringements that we detected and that we notified

1    them about and their failure to do anything about it.

2            THE COURT:  You agree that is, then, Ms. Rodriguez

3    never barred discovery into notices you sent -- your clients

4    sent, or someone on behalf of your clients sent, to Charter.

5    That is relevant and will be tried.

6            MR. SPERLING:  They've gotten those notices and

7    they've taken lots of discovery around the process by which

8    those notices were generated and issued.  Lots.

9            THE COURT:  No, but you will --

10           MR. SCHAPIRO:  And the answer is yes, Your Honor.

11           THE COURT:  -- you will put on display -- you will

12   put on evidence in your case-in-chief of the notices you sent

13   Charter.  That's what I'm asking.

14           MR. SPERLING:  Oh, sure, Your Honor, because we're

15   going to say, Look, well, we put them on notice on specific

16   infringing subscribers.  Of course, there's no disagreement

17   about that.

18           THE COURT:  Okay.  So that is -- I mean, that is

19   mitigation, as well, in a sense, correct?  But that's the

20   only area of mitigation that discovery was permitted into; is

21   that right?

22           MR. SPERLING:  No -- no, Your Honor.  I have to say

23   no to that.

24           That's got nothing to do with mitigation.  That's

25   about establishing the affirmative case.  That's -- that they

30

1    were put on notice that they had subscribers who were repeat

2    infringers.  It's got nothing to do with mitigation --

3    mitigation.

4            THE COURT:  All right.

5            MR. SPERLING:  It's about establishing their

6    knowledge that they were on notice.

7            THE COURT:  So if you -- if the evidence were --

8    and it's probably not.  But if the evidence were that you

9    sent only one-tenth of the notices you could have sent and

10   that you actually knew about, but you just didn't do it, for

11   whatever reason, that's not an issue?

12           MR. SPERLING:  I'm sorry, could you say that again,

13   please, Your Honor?

14           THE COURT:  That wouldn't be relevant that you --

15   you sent out 700,000 notices, but, in fact, you were aware of

16   7,000,000 potential violations?

17           MR. SPERLING:  Absolutely, Your Honor, it wouldn't

18   be relevant.  What matters is:  Were they put on notice of

19   repeat infringers?  They were.  What did they do about it?

20           THE COURT:  Okay.  Jonathan -- Andrew, anything you

21   disagree about what he just said?

22           MR. SCHAPIRO:  Well, only a couple of things.  And

23   to the extent that I -- that I followed the thread here, I

24   certainly agree that we're going to be fighting about the --

25   what was meant and what we were supposed to have learned from

1   the notices that we were sent.

2          I think they will -- I don't want to be seen to be

3   conceding that -- I assume they are still going to be

4   arguing, not only about the notices that they sent us, but

5   they're trying and we've had lots of fights about this to

6   say, Well, you know, we received a whole lot of other notices

7   and they keep telling us they're going to point to those, as

8   well.

9          But I don't think that's exactly germane to what

10  you're asking.  My understanding is this point of mitigation

11  is an open question in the circuits.  But anyway, I don't --

12  I don't think I disagree with anything, really, that Mr.

13  Sperling said.

14          The only thing I disagree with, which came from the

15  last set of questions, was about the financials.  Because I

16  continue to -- you know, I think it is clear that we are

17  similarly situated.  The only difference is we're a public

18  company and so we each have relatively thin top-line

19  information about the other.  And we have each sought, I

20  think, unsuccessfully, to get orders to get more granular

21  financial data from the others, but --

22          THE COURT:  Okay, but you --

23          MR. SCHAPIRO:  -- otherwise, I have no (inaudible)

24  on that.

25          THE COURT:  You agree with his statement that you

1   have produced no discovery on your financial condition

2   post-claim period other than what's in the public record?

3        MR. SCHAPIRO:  I believe that's true.  But I invite

4   others on the team to text me or speak up if I've lost track

5   of some of the discovery, which is -- I think that is -- I'm

6   pretty sure that's correct.

7        THE COURT:  Okay.  So getting back to the issue at

8   hand:  There is a potential relevance of that information,

9   but I mean, at the moment, if you're willing to drop any

10  argument of -- about the state of p-to-p piracy after the

11  claim period, I understand, Jonathan, your -- your position.

12  But either we're going to do full-blown discovery post-claim

13  period or we're not going to do any, in my view, because

14  fine-line drawing is just not the specialty of federal

15  courts.

16       We tend to bring a meat cleaver to issues like

17  this, because it's just -- it weighs the courts down too much

18  to get into the weeds so deep that we don't have time to

19  spend on any other case, because we have to be constantly

20  drawing those lines.

21       So I can't -- you know, and, plus, honestly,

22  whatever -- unless you spend the kind of time that I'm

23  spending with you guys, you know, I'm not sure a judicial

24  officer can fully appreciate the subtleties of all of the

25  different directions that any one piece of evidence can take

1      you during trial.

2              But what is, to me, fundamentally a necessary point

3      is that you can't resist discovery into anything and then

4      expect to address that issue at trial yourself.

5              That I think -- does everyone agree with that

6      principle, that you can't resist discovery and then on a --

7      on a given topic or theory arguing that it's irrelevant or

8      not sufficiently relevant, and then put on evidence yourself

9      of that?

10             Agreed, Jonathan?

11             MR. SPERLING:  Absolutely, Your Honor.  And to be

12     clear, if Mr. Schapiro would withdraw not just the

13     reservation of the right to argue about the state of

14     peer-to-peer piracy after the claim period, but also withdraw

15     his ability to argue about how we fared in trends in the

16     music consumption industry after the claim period, we would

17     not seek this discovery.

18             THE COURT:  But I --

19             MR. SCHAPIRO:  So, Your Honor, and --

20             THE COURT:  No, wait, let me -- let me ask you,

21     based on case law, of your understanding, or maybe even jury

22     instructions that courts have permitted or arguments that

23     you've seen or heard about at trials of this nature, explain

24     to me again, the best you can, how this information about

25     streaming and different ways that they make their income, how

34

1    will you present that at trial?

2             MR. SCHAPIRO:  So, Your Honor, it is in many ways

3    going to be responsive and we are reserving the right to

4    respond.  But if you read the opening from the Cox vs. Sony

5    case, the main theme of that opening, or a main theme was

6    this kind of piracy is killing the industry.  These poor

7    artists, who you love, the soundtrack of your life, is being

8    violated by these evil cable companies.

9             THE COURT:  Present tense?

10            MR. SCHAPIRO:  And we want to -- we'd like to say,

11   you know what, the internet actually is a friend -- can be a

12   friend to -- to the music industry in response to that.

13            It depends how they put it, but if they -- and for

14   us to -- to be able to say the industry is actually doing

15   well and benefiting from many things that the -- that

16   Internet subscribers do.  And this -- you know, the law on

17   statutory damages does allow a broad set of factors, but we

18   may not even make these arguments.  It depends -- it depends

19   how they frame it.

20            We don't want to have a hand tied behind our back.

21            THE COURT:  Okay.  So I want to --

22            MR. SPERLING:  I want to make clear on --

23            THE COURT:  Hold on a second, Jonathan.  I'm going

24   to ask you both one simple question, and based on your

25   responses, I may be able to get a final answer to this whole

1    issue.

2         Would -- can you agree to try this case on the

3    historical damage that you believe Charter has caused to your

4    clients?

5         MR. SPERLING:  I don't want to give a misleading

6    answer to that, Your Honor.  So I'm going to give you

7    something other than a yes or no and, certainly, I hope that

8    it will be helpful.

9         We absolutely will argue on the basis of the

10   evidence introduced at trial concerning the claim period,

11   that Charter's conduct demonstrates that Charter needs to be

12   deterred.  We don't need to talk about what's happened after

13   the claim period.  We can base that discussion on what

14   Charter did during the claim period.

15        But, we don't need to be able to have a discussion

16   about what they did after that, so long as they are not

17   talking about what they did after that, and we can't get

18   discovery on that topic.

19        THE COURT:  But the argument that Charter needs to

20   be deterred is a present tense argument.

21        MR. SPERLING:  Well, Your Honor, it's a present

22   tense argument, but we're happy to have that argument based

23   on the conduct that they engaged in.

24        And if what you are suggesting, Your Honor, is,

25   Hey, that doesn't really work, deterrence turns on what

36

1   they're doing today, I'm not sure that the case needs to go

2   in that direction.  But if that's your conclusion, then the

3   necessary consequence to that conclusion, Your Honor, is that

4   we've got to know what's going on today.  But we believe that

5   on the basis of the conduct that we show Charter engaged in

6   during the claim period, we can make the case to the jury

7   they've shown themselves to be a party that needs to -- a

8   wrongdoer that needs to be deterred.

9           I'd like to have an opportunity, also, Your Honor,

10  to be able to confer offline with my co-counsel, because

11  you're asking important questions about big-picture issues on

12  the scope of the trial.  And so I'm going to let Mr. Schapiro

13  respond to your question and if I have something else to add,

14  I'll -- with your permission, I'll come back after that.

15          THE COURT:  I think after Andrew responds, all

16  three of us are going to go confer with somebody.  Okay?

17          So go ahead then, Andrew.

18          MR. SCHAPIRO:  Yeah.  So it's a little difficult to

19  know how to respond, given what it sounds like Mr. Sperling

20  is reserving.

21          Now, a factor that is often used when juries are

22  instructed about statutory damages is the need for a general

23  deterrence.  You need to send a message out there to others

24  who should be told that if you contribute to infringement,

25  you're going to be held -- you're going to be held liable;

1   and that the statutory damages can take, as one of their

2   bases, all of the damage and harm that was done and that

3   might be done if people aren't deterred from this.

4        And so I don't hear him to be saying he's going to

5   give up those arguments.  I certainly don't hear him to be

6   saying they're going to give up the type of opening argument

7   that they had in Cox.

8        So -- so I'm not exactly sure what to respond other

9   than that we want to be able to respond to the arguments they

10  make about the need for a damages here.

11       THE COURT:  Okay, but just to be clear:  If their

12  opening statement and closing argument and their evidence

13  goes no farther than to say when a company like Charter has

14  these kinds of notices and they don't do anything about it,

15  they need to learn that they need to do something and only a

16  large damages award will let them know that they need to do

17  something.

18       If it goes no farther than that, then I think maybe

19  we can skip everything post-claim period.

20       And let me hear from you, Andrew, on that.

21       MR. SCHAPIRO:  If all they say is when -- see, and

22  the problem that I have is that the jury is being asked to

23  decide what is a fair and appropriate amount to deter and

24  punish today.  So I don't think we can give up the right to

25  talk about what the landscape or the business looks like

38

1  today or might look like in in five years.  I think that's

2  where we were on March 9 and I thought we were all in

3  agreement.

4          MR. OPPENHEIM:  Your Honor, if I may, I would to

5  put forward one thought on deterrence in how it was handled

6  in the Cox case.

7          And -- unlike Mr. Schapiro and Mr. Sperling, I was

8  there.  And, by the way, Mr. Schapiro, the word "evil" is not

9  used once in the opening statement to describe Cox.  And I

10 would appreciate you not attributing those kind of statements

11 to me.

12         Having said that, Your Honor, one can easily argue,

13 right, that the type of conduct that somebody engaged in at a

14 point in time is unacceptable and that the jury should return

15 an award that deters that type of conduct, whether or not the

16 party is currently engaged in that same conduct now, right?

17         So we could easily argue, right, that what Charter

18 has -- did between 2012 and 2016 is outrageous and a message

19 should be sent, not just to Charter but to others, that this

20 kind of conduct is unacceptable, right?

21         We could argue for that kind of deterrence.  That's

22 what we did in Cox, right, without getting into the -- into

23 the present.

24         Now having said that, right, the only question,

25 really, that I heard when you began this discussion is, if

39

1    there -- if we're getting into present tense deterrence, the

2    burden associated with it.  I do think it is worth spending a

3    moment on it and I know Mr. Sperling earlier tried to raise

4    it.

5            I do not believe that there is a significant burden

6    on the limited discovery that we -- that we provided in our

7    e-mail to you and that would put everybody on an equal

8    playing field in terms of information about what was

9    happening with Charter in terms of p-to-p up to the present.

10           And so you don't have to open the door to redoing

11   all discovery to the present.  It's a very limited set of

12   data that would speak to these issues.

13           THE COURT:  Right, but context is everything.  So

14   if I were defending this case, and you made an argument and

15   put on evidence about Charter's conduct to date relative to

16   notices, then I would certainly want to put on evidence that

17   since 2016, for example, if I had -- if I had the evidence to

18   put on:  In 2016 when this was going on, the industry was

19   making $3,000,000,000 a year and piracy was costing them

20   $1,000,000,000 and now the industry is making $20,000,000,000

21   a year and piracy is costing them half a billion.

22           I would definitely want to put that argument on to

23   provide the jury some context, because implied in what you

24   want to do is that it's -- you know, you want to make your

25   clients appear like they're being robbed and, you know, when

40

1  --

2           MR. OPPENHEIM:  Your Honor --

3           THE COURT:  -- when a -- when a billionaire is

4  robbed of $1,000 versus a homeless person being robbed of $5,

5  there's a significant difference in that morally.  So that's

6  what I'm saying.

7           MR. OPPENHEIM:  Your Honor, let me test that for a

8  moment.

9           The fact that the -- in your example, that the

10  record companies may have found other ways to -- to make

11  revenue, shouldn't in any way, and I don't believe any case

12  law supports this, the idea that that should come in to be

13  permitted to be argued for a reduced statutory damage award,

14  right?

15          When you look at -- and there's a lot of case law

16  on what the statutory damage factors are, but none of that

17  case law says, You get -- that the defendant gets to argue

18  that the plaintiff's making money in other ways, which is

19  what you're saying.  So it's okay to steal from the

20  plaintiff, so long as they're -- they're making money

21  somewhere else.  That's not an argument that I -- that I've

22  ever seen.  It seems to be what you're suggesting.

23          It may -- it may speak to the moral culpability in

24  the theft situation you described, but not in a copyright

25  infringement.

1        THE COURT:  No, but the question I had, Matt, is

2   this:  So if you just put on raw data about the amount of

3   money that slipped through their fingers because of p-to-p

4   piracy, but you don't ever imply or state that this has left

5   any particular plaintiff in a bad condition, then I may agree

6   with you.  But they -- nobody could get on the stand and give

7   any kind of evidence about this -- this put us in the -- in

8   the straights.  This -- this made us go out and do this.

9        I mean, you can't do that.  You agree with that,

10   right?

11        MR. OPPENHEIM:  I'm not sure whether I agree with

12   it or not, but just for (inaudible) right, nobody within the

13   music industry is going to or has gotten up and said:  This

14   is the quantum of damage caused by peer-to-peer piracy and --

15   and this is the number, right.  Because the nature of

16   peer-to-peer piracy is you can't quantify the extent of the

17   harm that it does, right?

18        So the evidence that will be put on is the quantum

19   of infringement that we're aware of, right, and what that

20   likely led to in terms of other infringement.  So the way

21   that the proof will come forward is not in terms of what you

22   just described, which is a -- we lost a half-a-billion

23   dollars or some monetary figure, right?  What will be put on

24   is the quantum of infringement.

25        And so let's take Charter, for example.  Let's say

42

1   Charter was receiving, each year, 15,000,000 infringement

2   notices.  And Mr. Schapiro keeps saying, Yeah, notices don't

3   mean anything.  That's not true.  Notices mean something,

4   right?

5            So they get 15,000,000 notices a year.  Now, if

6   that constituted 40 percent of their traffic, right, in Year

7   1 and then in Year 5 they're still getting 15,000,000 a year,

8   but it's constituting, say, now 10 percent of their traffic,

9   because there's a lot more other traffic, that's not

10   relevant, because the quantum of piracy has remained the

11   same.  They've done nothing to slow it down and deter it.

12   It's just that they've grown their other business larger,

13   right?

14            So they wouldn't get to say, you know, Hey, you --

15   it's a much smaller portion -- part of our revenue now,

16   right, in the same way.

17            THE COURT:  Okay, I know what I need to do.  Any

18   other final points before we go off the record briefly?

19            MR. SCHAPIRO:  The only other thing I will say is

20   that, although I wasn't at the Cox trial, the opening slide

21   or slide during opening, Slide Number 19, it was in the

22   opening there, was entitled, "P-to-P Piracy, Devastating

23   Effects on the Music Industry."  And it was a graph showing a

24   trend pointing up, you know, beyond the end of the slide.

25            The other thing I would say is that I think Mr.

43

1   Oppenheim had it exactly right when he used the phrase a

2   moment ago "moral culpability," because -- he said:  Okay

3   well, maybe if this were the case of the robbery, it would be

4   relevant to moral culpability.

5            But when you get to statutory damages, the case law

6   -- and I can even cite the jury instructions in Cox in this

7   regard -- are fairly broad, akin to punitive damages or

8   criminal sentencing and something which I'm sure you're

9   familiar with.

10            So one of the factors was the need to punish the

11   defendant.  Another was the need to -- for deterrence.  It

12   didn't specify whether it was general, specific, or whatever

13   it was.  And it will be -- it would be a logical argument to

14   come in and say, Hey, we're not just pointing to money that

15   they're making randomly from something that these plaintiffs

16   are getting.  They're saying they've lost all of this money,

17   because of what the Internet is doing.

18            We're talking about now -- when we're talking about

19   streaming -- by the way, evidence of streaming revenue was

20   allowed in in Cox.  We're talking about money that they're

21   making because of the Internet, because of us.  The Internet

22   is free.  This free Internet that's being provided, you know

23   -- you know, these folks are culpable, they need to be

24   punished.

25            And so there's a -- there's a -- we will have broad

44

1    -- at least we will argue -- and they can argue to Judge

2    Jackson it should be otherwise.

3              And I will just close by saying, I do think Judge

4    Jackson had it right, though, and when he said:  Ultimately,

5    this case is about the notices from 2013 to 2016.

6              MR. SPERLING:  And Your Honor, I'd close with this,

7    too -- trying to conceptualize something for you, which is I

8    think we're now talking about two things and it's

9    understandable.

10             One is whether the stuff that Charter wants to say

11   is relevant at all.  And I think Mr. Oppenheim explained why

12   it's not.

13             But the other is that insofar as you think that it

14   might be, that's what got us here in the first place; that if

15   they're going to make those arguments, then it can't be the

16   case that we can't establish what's going on on their network

17   today and their culpability today.

18             We don't have to go there.  But if they want to

19   talk about what the world looks like today, we, of course,

20   have to get discovery about what's going on today.

21             THE COURT:  I know that, but if you also want to

22   make an argument about your clients being devastated, that is

23   exactly the point I was bringing up.  That is a relative,

24   comparative term.

25             MR. SPERLING:  And so, Your Honor, we can talk

45

1    about our clients being devastated during the claim period by

2    what Charter did during the claim period.  I don't have to

3    talk about what's going on after the claim period.

4           Listen, Your Honor, it's -- our view is, okay, they

5    did plenty during the claim period.  We're not worried about

6    our ability to show that Charter behaved unconscionably

7    during the claim period; that they damaged us during the

8    claim period; and that they need to be slapped hard

9    financially as a result in order to deter them from

10   continuing to do what they did during the claim period.

11          THE COURT:  Well, all I'm saying is there's a

12   difference between word "devastated from 2012 to 2016," and

13   "is being devastated."  That's -- that's a huge difference,

14   do you agree?

15          MR. SPERLING:  I do agree, Your Honor.

16          THE COURT:  Okay.  All right.  So can you guys -- I

17   hate to do this to you, I have another matter right now and I

18   do want to make a phone call.  And can you sign back in at

19   2:30 Denver time?

20          MR. SPERLING:  We can, Your Honor.  Thank you,

21   we'll see you then.

22          THE COURT:  All right, thank you.

23          (Proceedings were in recess from 2:05 p.m. until

24   3:12 p.m.)

25          THE COURT:  So here's -- just as a preliminary

46

1   matter, you know, I think we ought to continue settlement

2   negotiations if we can.  So either of you, feel free to call

3   me at your convenience, okay?

4           Second, I believe that Judge Jackson will do

5   everything he can to cabin this case stopping in March of

6   2016 and that goes for both sides.  So I think if the

7   plaintiffs start straying into some kind of current

8   deterrence argument, they're going to be slapped down in

9   front of the jury and the same thing for the defense, okay?

10          MR. SCHAPIRO:  Okay.  So I take it that means

11  you're not overruling the Special Master on this?

12          THE COURT:  That means that I'm fairly confident in

13  not permitting any more discovery that involves anything

14  after 2016.

15          MR. SCHAPIRO:  Thank you, Your Honor.

16          MR. SPERLING:  And I take it -- okay.  Well, that's

17  May 2016, Your Honor?  That's the end of the --

18          THE COURT:  Whatever it was, May or -- I thought it

19  was March, but May -- May 2016.

20          MR. SPERLING:  So, Your Honor, maybe -- you've been

21  so generous, is there anything that's practical guidance --

22  we don't want to clog up the system.  We also want to make

23  sure we're not procedurally faulted.

24          We hear what you said loud and clear, and I'm not

25  quibbling with it for a second.  I don't want to confront the

47

1    situation at trial or immediately before trial where,

2    theoretically, Charter tries to make an argument, We say we

3    were denied discovery on that issue, (inaudible) to be

4    precluded, and we're told, Well, you didn't pursue your

5    objection all the way through the appeal process to Judge

6    Jackson.

7         So I'm really not interested in filing an

8    additional piece of paper to go to Judge Jackson to get the

9    exact same result, but I want to make sure that we are doing

10   what we need to do to protect our client's interest so that

11   we're not told:  You procedurally erred and can't make the

12   preclusion argument that would otherwise be available to you.

13        THE COURT:  Right.  So I'm going to make it clear

14   -- ask a clear question to both of you, get your assent on

15   the record and, hopefully, that will do it for you.

16        The defendant agrees that, even regarding

17   deterrence, they will address conduct up to and including the

18   end of the claims period only and not conduct by either side

19   post-dating May of 2016.  Is that the defendant's agreement?

20        MR. SCHAPIRO:  I guess it depends what one means by

21   "deterrence."  We will do what we -- what we said in the

22   proposed stipulation, and we will strike the words about the

23   "decline of peer-to-peer sharing."  That's what we will do.

24        And let me just be clear, I don't think that's a

25   deterrence argument.  So I -- you know, unless they make a

48

1    deterrence argument that we have to respond to, it's not a

2    deterrence argument.  It's a -- you know, if they -- you're

3    saying that the -- that the industry has been devastated and

4    -- and we're going to tell you it wasn't.

5            So I think we can agree to that, if that -- if

6    that's the understanding.  But, you know, someone's going to

7    come back and point to this transcript, I guess.  So the same

8    concern that Mr. Sperling had, I have.

9            THE COURT:  Well, I think what you just said is

10   only if the plaintiffs open the door to that.

11           MR. SCHAPIRO:  Yeah, I think that's right.  I'm

12   sure we'll have debates about what opens or doesn't open the

13   door.  Yeah.

14           THE COURT:  And that's going to be Judge Jackson's

15   call.  But you agree with me, except to the extent that you

16   can argue the plaintiffs opened the door to some post-2016

17   occurrence, right?

18           MR. SCHAPIRO:  Well, if they argue that from 2000

19   -- so -- so you know, the slide that I referred to in Cox,

20   went back in 1999 and through 2014 and then it had an arrow

21   sort of pointing up, if they argue in this case that the

22   industry was devastated through 2016 and then they just stop

23   and don't say then, Oh, but then what happened is the

24   industry was not devastated anymore, that opens the door and

25   argue -- but talking about devastation to the industry opens

49

1    the door.

2           THE COURT:  Do you have that -- do you have that

3    exhibit you could screen-share?

4           MR. SCHAPIRO:  Yeah, someone on our team does.

5    Sean or Seth, could you please share that.

6           MR. OPPENHEIM:  It was -- it was a slide in

7    opening.  I'm not sure it was an -- an exhibit, Your Honor,

8    but that's fine.  Yeah, absolutely we should pull it up.  If

9    -- if they don't have it, we do.

10          MR. ANDERSON:  One moment, I think I can do this.

11          THE COURT:  Is it -- is it -- Matt, was it -- did

12    the Judge require you guys to share opening slides with one

13    another before opening?

14          MR. OPPENHEIM:  Yes, right beforehand.

15          THE COURT:  Right beforehand?

16          MR. OPPENHEIM:  And -- and then --

17          THE COURT:  In the courtroom?

18          MR. OPPENHEIM:  Yeah, right beforehand and then we

19    -- we resolved objections --

20          THE COURT:  Okay.

21          MR. OPPENHEIM:  -- at sidebar prior to the

22    openings.

23          MR. ANDERSON:  Can you see that all right?  You

24    don't have to see my --

25          THE COURT:  I do.

1          MR. ANDERSON:  -- e-mails --

2          THE COURT:  So if that arrow was a

3   quarter-of-an-inch shorter -- if that line was a

4   quarter-of-an-inch shorter and had a vertical mark, instead

5   of a triangle at the end, Mr. Schapiro, you wouldn't -- you

6   would agree that -- I guess, that didn't necessarily point to

7   anything post-2014?

8          MR. SCHAPIRO:  I -- no, Your Honor.  I bet I would

9   make that argument.  It says "Music consumption trend" and

10  even if you just have the dots, any reasonable person looking

11  at this and the reason they're showing it is to say and music

12  consumption's going -- shooting up to the ceiling and our

13  revenues are going down, down, down.

14         And the fact is if you take a look -- the reason

15  they cut off the date, you know, when they did in our case,

16  is if you look at the very next, you know, year and the year

17  after that and the year after that, it entirely reverses

18  itself.

19         So they're quite happy to get up and say, Oh, we

20  were totally devastated and you -- and, you know, you need to

21  do something about it.

22         MR. SPERLING:  Whoa, whoa.  We -- we didn't cut off

23  a date, Your Honor.  They're the ones that are opposing

24  discovery after 2016.

25         MR. SCHAPIRO:  No, no, no.  This case was filed to

1   cover 2013 to 2016.  This is the -- these are the notices at

2   issue in this case.

3           THE COURT:  Well, I just think you all ought to be

4   share with -- careful with what kind of demonstratives that

5   you come with to court that morning, because you may get them

6   stricken.

7           MR. SPERLING:  I hear you, Your Honor.  This is --

8   Your Honor, this is encapsulating the problem, okay?  They

9   want to have it both ways.

10          They want to say the same thing that Mr. Schapiro

11  just said, and we've heard repeatedly from Charter's counsel,

12  that this was a cherrypicked period, that the world changed

13  later and, yet, we can't take discovery on that issue.

14          So if what you are proposing Your Honor is that

15  both sides stipulate that nobody will make arguments with

16  respect to deterrents or damages based on events following

17  May 2016 -- not just the parties' conduct, events following

18  May 2016 -- we can stipulate to that if they'll stipulate to

19  that.

20          If they're going to go back now -- I think I heard

21  Mr. Joyce just say, No, I'm going to stand on the thing that

22  was in my e-mail to the Court and to plaintiffs last Friday,

23  then, respectfully, I don't think we're going to engage in a

24  productive use of time here.

25          And while I've read it, I'd just as soon, at that

52

1    point, Judge Hegarty, that you deny our objection, we take it

2    to Judge Jackson.  And we just get finality that way, because

3    there is -- you're sensibly trying to get us to a

4    stipulation, but we're not getting there.

5          THE COURT:  All right.  Jonathan, from your

6    standpoint, do you believe -- let's theorize that I permit --

7    that I believe Andrew is trying to reserve the ability to

8    argue that the streaming services have vastly changed the

9    industry and that includes today, Members of the Jury, up --

10   you know, it certainly includes post-2016.

11         All right.  Let's say that he's -- I believe he's

12   reserving that and he -- because that's what he seems to be

13   saying.  And I also agree then that you should be entitled to

14   some limited discovery into the continuation of peer-to-peer

15   piracy.

16         Do you believe that that would be the only

17   post-2016 conduct I would be dealing with for the rest of

18   this case?

19         MR. SPERLING:  The discovery that we would need in

20   connection with addressing that argument is, I believe, the

21   only post-2016 -- excuse me, the only post-2016 discovery

22   that would be implicated by their argument, number one.

23         Number two, I'm not aware of any other post-2016

24   discovery that we are currently seeking.  I believe the only

25   context in which we are seeking that is in connection with

53

1    this argument that they want to make.

2              So I realize that was a lot of words, I'm just --

3    want to be as clear as I can with you --

4              THE COURT:  I understand you.  I understand.

5              MR. SPERLING:  -- Your Honor.  And I -- I believe

6    the answer is:  That's the only post-2016 discovery.

7              THE COURT:  And do you agree, Andrew?

8              MR. SCHAPIRO:  I don't know what I'd be agreeing

9    to.  I don't agree they should -- they should -- no.  I don't

10   agree that they are entitled to that at all and these --

11             THE COURT:  No, no, no, no.

12             MR. SCHAPIRO:  These are --

13             THE COURT:  No, no, no.

14             Do you agree that -- that this is the only issue in

15   the case right now concerning discovery that would involve

16   some kind of information that would postdate 2016?

17             MR. SCHAPIRO:  Is this the only live -- just live

18   issue now about post-2016 discovery?

19             THE COURT:  Right.

20             MR. SCHAPIRO:  I think there is another issue

21   relating to post-2016 discovery that is still live, either

22   before the Special Magistrate or before you.  And I'm trying

23   to remember what it is and maybe someone can remind me on the

24   -- on the Chat, or someone can speak up.

25             MS. BREWER:  Oh, I'll speak up.  It's Ms. Brewer.

54

1          So as Your Honor's aware, the dispute that concerns

2     the Hash Report and the -- you know, what we view to be our

3     concerns about privilege calls and work product protections

4     claims, that all concerns the post-2016 time period.

5          MR. SCHAPIRO:  Right, right.  The agreement -- the

6     investigation that was done to re-create or to -- well,

7     that's -- that's what we call it, re-create the evidence.

8          THE COURT:  Okay.  But that's a -- that's an issue

9     before Judge Jackson, not me, right?

10         I resolved my --

11         MR. SCHAPIRO:  Yes.

12         THE COURT:  Okay.

13         MR. SCHAPIRO:  Yes.

14         THE COURT:  Yeah, all right.  Yeah, not historical

15    rulings by me that may still be in play before Judge Jackson,

16    but the -- but current or prospective issues that I might

17    address?

18         MS. BREWER:  Prospective issues would be, Your

19    Honor, that the continued privilege and work product claims

20    over communications related to the Hash Report.  And that was

21    one of the issues that was raised in the e-mail that was sent

22    last night, which understandably, we don't need to get into

23    the substance of, because I -- I know you've heard a lot

24    today.  But we just want to be clear in answering your

25    question that, Yes, there are still live issues that,

1    unfortunately, if the parties cannot resolve through the

2    meet-and-confer process, we'll have to come back and see you.

3             Unless you wish for the Special Master to address

4    it, which we did ask her, because she wanted to respect the

5    (inaudible).

6             THE COURT:  Okay.  Well, I mean, let me hear from

7    you one last time, Andrew --

8             MR. SCHAPIRO:  Sure.

9             THE COURT:  -- confirming that you intend to raise

10   -- that you intend to introduce evidence that the plaintiffs,

11   since 2016 -- May of 2016, have benefited from -- financially

12   benefited from new means of income for their works through

13   streaming and other platforms.

14            MR. SCHAPIRO:  We reserve the right -- while I

15   can't say we intend to do that, we do reserve the right to

16   make that argument.

17            It is going to depend on what arguments they make

18   -- the devastation argument, et cetera.  But yes, we reserve

19   the right and we reserve the right to decide based on the

20   arguments they make.

21            And I just want to make the point that I don't

22   think there is parody here.  The response to an argument --

23   if they say the industry was devastated and we say:

24   Industry's doing fine now, the response to that is for them

25   to come back, if they want, and say, Either it doesn't

56

1    matter.  Or, No, the industry isn't doing fine.

2             The response is not to say:  We want to look at

3    your ticket data, your notices, get into all of that with

4    regard to Charter.  It's -- these two things are essentially

5    ships passing in the night.

6             THE COURT:  Well, why isn't -- why isn't the

7    argument that, No, we're not doing fine, include, at least,

8    some argument that we could be doing 30 percent better if it

9    wasn't for piracy still?  Why isn't that, at least, within

10   the zone of relevance -- discovery on that issue?

11            MR. SCHAPIRO:  Yes, yes, yes.  To the extent that

12   either side is arguing about what is happening generally --

13   and in this regard, I think we're back to where we were March

14   9 or even in front of the Special Master -- they can argue

15   generally and we can argue generally.

16            But I think, you know, as I said a little earlier

17   in the hearing, they started out saying -- so they're --

18   they're not saying -- they don't actually think they need

19   this to respond to -- and according to our notices and

20   tickets, to respond to an argument about how the industry is

21   doing now, okay?

22            That not actually what they are thinking.  They

23   want this, because they think it's a juicy, interesting way

24   to try and expand the number of notices and work up the jury.

25   They started originally by saying they need it for the

57

1    counter-counterclaims.  They dropped that when they lost

2    that.

3              Then, on March 9, they said they needed it to

4    respond to a potential good citizen argument by us.  You

5    seemed to -- that you were not willing to buy that.  So then

6    they said, Okay, well it's about p-to-p is declining, we need

7    to respond to that.  We said, Fine, we will take that off the

8    table.  Now they're saying, Okay, but we need this to respond

9    to an argument that, in general, the industry is doing well.

10             There are many, many ways to respond to an argument

11   that the industry is doing well.  This is not a rational one.

12             MR. SPERLING:  Your Honor, the case is not about

13   whether the industry is doing well.  I mean, you have it

14   right, Your Honor.  I don't want to belabor the point.

15             The case is about -- and the damages issue is about

16   deterring Charter from continuing to do the very bad thing

17   that took money from us.  And if they want to talk about the

18   state of the industry, it's relevant only insofar as it goes

19   to that thing, right?  The extent to which they need to be

20   deterred.  And that's the issue.  The case ain't about the

21   state of the industry.

22             But, Your Honor, look we've put on the table, I

23   believe, the stipulation you were after from our side.  So

24   long as they would be bound by the same, we would agree not

25   to argue anything about facts, events, developments,

58

1    occurrences beyond May of 2016.

2            Mr. Schapiro is not agreeing to that.

3    Respectfully, I think the options before the Court now are to

4    grant us some discovery and we can talk about what that looks

5    like or for us to just go to Judge Jackson.

6            THE COURT:  Understood.  So, Andy, I'm going to

7    give you one last chance to talk internally with all your

8    people.  All you have to do is tell me this:  I stand by what

9    I said on Thursday.  Or, I agree with the proposition that

10   you laid out.

11           So I -- and I mean, it's -- asking you to commit to

12   a course of action on the spot is somewhat unfair.  So I'll

13   give you that chance and then based on your response, I'll

14   make a ruling.  Okay?

15           MR. SCHAPIRO:  Okay.  How would you like to do this

16   logistically?

17           THE COURT:  Just send an e-mail around saying I

18   stand by what I stated at the oral argument or --

19           MR. SCHAPIRO:  Okay.

20           THE COURT:  -- or that we will not -- as long as

21   the plaintiff doesn't open the door, we will not argue about

22   all the ways plaintiffs have benefited from streaming

23   services since 2016, okay?

24           MR. SCHAPIRO:  Okay.  So I'm writing that down?

25   Okay.

59

1          MR. SPERLING:  And Your Honor, I take it as part of

2     that, like, they're not going to otherwise argue that there

3     are developments (inaudible) going to 2016 --

4          THE COURT:  I didn't -- I didn't mean just

5     streaming, I meant developments.  But streaming is a

6     shorthand for "new ways to earn money," okay?

7          And let me ask another question --

8          MR. OPPENHEIM:  Your Honor, I'm --

9          THE COURT:  Go ahead.

10          MR. OPPENHEIM:  Sure.  I was just going to ask

11     about the timing here, because, as we all know, there's a

12     very limited clock to close discovery --

13          THE COURT:  Close of business tomorrow --

14          MR. OPPENHEIM:  If Mr. Schapiro --

15          THE COURT:  -- so 5:00 Denver time tomorrow.

16          MR. OPPENHEIM:  Okay.  And if the discovery's going

17     to proceed --

18          THE COURT:  It would be expedited --

19          MR. OPPENHEIM:  -- we want to make sure --

20          THE COURT:  It'll be expedited.

21          MR. OPPENHEIM:  And not stayed if they decide to

22     appeal your ruling, Your Honor, because --

23          THE COURT:  Well --

24          MR. OPPENHEIM:  -- if it stayed pending your

25     ruling, then they're going to get what they want de facto if

60

1  not de jure.

2        THE COURT:  Well, when -- when does discovery

3  close?

4        MS. BREWER:  May 31.

5        THE COURT:  All right.

6        MR. OPPENHEIM:  But we haven't taken -- we have to

7  take depositions, Your Honor.  And if we don't have this for

8  purposes of taking the depositions, they're going to say,

9  appropriately, they don't want to put witnesses up twice,

10  right, when the new stuff is produced.  So they're going to

11  say, We have to wait or forgo depositions on all the new

12  material.  And that's obviously not an option and a lot of

13  depositions take lots of calendars to coordinate with so many

14  lawyers.

15        I just want to -- I'm just trying to be practical

16  for a moment.  They produce -- just let me finish, if I may,

17  and I'll give you -- I'm sure the Judge will give you time to

18  respond.

19        No matter how quickly we hope that things will be

20  produced in this case and commitments to do it on a rolling

21  basis, it always takes longer than we expect and it always

22  comes in at midnight the day that it's due.  So if there's a

23  stay, that could create real issues.

24        THE COURT:  I'll address it.

25        MS. BREWER:  May I?

1            THE COURT:  You can, but -- go ahead, but I'll

2    address that in whatever I issue.  Okay?

3            MS. BREWER:  Yeah, apologies, Your Honor, and

4    apologies to Mr. Oppenheim, I did not mean to interrupt.

5            But we are in the absolute same position on

6    Charter's end with respect to discovery that we sought and

7    that you granted at the discovery conference with -- with

8    respect to, both the Hash Report and the track level

9    financial data.  That is stayed.  We do not get that

10   discovery unless and until Judge Jackson rules and rules in

11   our favor and we respected that process.

12           THE COURT:  Okay.  So --

13           MS. BREWER:  So we do not understand --

14           THE COURT:  I agree -- I agree.  Hold on.

15           So Matt, you'll agree no stays on anything or

16   you'll stipulate to a stay on everything of my rulings?

17           MR. OPPENHEIM:  Respectfully, there's a -- these

18   are totally dissimilar and let me explain why.

19           The first is, on the Hash Report -- and I'm happy

20   to address this, Your Honor.  We think fundamentally that

21   there is a serious work product issue and it actually is now

22   exposed by virtue of their effort to seek all of the

23   Oppenheim & Zebrak e-mail communications relating to the

24   preparation of this case.

25           They believe you opened the door to all of that by

62

1    saying that the Hash Report is not subject to work product.

2    Respectfully, I think you got that wrong.

3            I'm happy to explain why.  I think, in the course

4    of a two-day, very long, mega hearing, somehow the facts were

5    lost.  And I'm happy to go through it again, but I hope that

6    if not, Judge Jackson will resolve it.

7            Producing that now would have significant

8    prejudicial effect.  It's attorney work product.  There's no

9    doubt in my mind.  That's number one.

10           Two, with respect to the track-level revenue, you

11   could order us to produce it tomorrow.  As we indicated at

12   the last hearing, it's not possible.  This is going to take

13   months for our companies to collect.  That was the issue with

14   the track-level revenue.

15           So the -- and what we have asked for, for purposes

16   of going forward, if we have to go forward on the post-2016

17   issues, which remember, we're happy to not have it happen.

18   It's the defendants that are pushing this issue, right?

19           It -- all we're asking for are the metrics reports,

20   right, the CATS data, which is a data download, right.  And

21   -- and a -- and I've now lost track of the third category of

22   documents.  But it is not -- we intentionally narrowed it in

23   order to make sure it wasn't a heavy lift.

24           MR. SCHAPIRO:  And we will, of course, want -- we

25   will back then, because we will want time to serve both the

63

1    third-party discovery and the party discovery that we will

2    need to put the notices in context from 2016, because those

3    are notices, not from the parties, although if the parties

4    sent some, they need to provide them to us.  So the party and

5    non-party discovery, to counteract the argument that they are

6    going to try to make from the simple number of notices and

7    the metrics.  And we'll be back for that and we will ask that

8    that be expedited.

9              MR. OPPENHEIM:  Well, wait, hold on a minute.

10   There are --

11             MR. SCHAPIRO:  I'm done.

12             MR. OPPENHEIM:  There are roughly -- fair enough.

13             There are roughly, you know, somewhere in the range

14   of a million notices a month that go to Charter, many of

15   which come from many, many, many different parties.  As far

16   as I know, there has not been a single subpoena from Charter

17   to the copyright holders who sent those notices here.

18             So the suggestion Mr. Schapiro's now making that,

19   Well, we didn't do it for the notices during the claim

20   period, but we're going to do it for the notices post-claim

21   period, it's a little hard to buy that.

22             THE COURT:  Okay, I've heard you enough.

23             What else do we need to talk about today?

24             MR. SPERLING:  Your Honor, we e-mailed you

25   yesterday and I think you saw it and you asked for a response

64

1    from Charter with respect to this document that they've

2    asserted privilege over.

3            So, you know, we'd just like to have them submit

4    that to you if they haven't already so it can be reviewed by

5    you in-camera and resolved.  I'm happy to speak to the issue,

6    but I expect you'll look at the document and you'll reach

7    your own conclusion.

8            MR. SCHAPIRO:  And the only thing I'll say on that

9    is that the person who is most able to address it, if the

10   Court has questions, was not able to be on this call because

11   of a conflict.  We got the -- you know, the inquiry from Mr.

12   Sperling, or the e-mail went into the -- a day or so ago.

13           So we would ask that if -- if there are specific

14   questions about the document and the assertion of privilege,

15   that we get a time on the calendar to discuss it so Ms.

16   Halwass, H-A-L-W-A-S-S for the court reporter, can join us

17   for that.

18           THE COURT:  And this --

19           MS. BREWER:  And I just wanted to confirm for the

20   sake of answering the specific question that plaintiffs'

21   counsel asked:  Yes, we did submit that in-camera to

22   Magistrate Judge Hegarty yesterday, just as we committed to

23   do and communicated that we were doing.

24           So we have submitted that.  We stand ready to

25   address the Court's questions about that.  We have similarly

1    asked that the document that was just identified for the

2    first time on Monday by Oppenheim & Zebrak's firm also be

3    submitted to the Court for in-camera inspection.  So we ask

4    that we get the same confirmation.

5         THE COURT:  Give me the -- give me the e-mail date

6    and time again, Jonathan, for --

7         MR. SPERLING:  Yeah, I will.  Give me just a

8    moment, Your Honor.  I'll pull it up for you.  And while I

9    pull up the date, just so that you are clear, Your Honor, in

10   terms of the scope of the issue, we had seen five lines in a

11   document they produced to us, out of an abundance of caution,

12   we went to them and said, Let us know if you're asserting

13   privilege over those five lines.

14        We don't have a problem with their assertion of

15   privilege over those five lines.  We never expected that we'd

16   be rewarded for bringing that to their attention by having

17   them assert privilege over the entirety of the spreadsheet

18   and the entirety of the e-mail that it's attached to and

19   that's -- that's the issue.

20        So I'm checking the e-mails.  We submitted that to

21   you, Your Honor, yesterday at -- I might get the time-stamps

22   wrong.  I think it was 11:36 a.m. your time, Your Honor, and

23   that e-mail came from Hardy Ehlers, E-H-L-E-R-S, from our

24   team.

25        You responded at -- again, the time-stamps might be

66

1    wrong, because different folks are in different time zones,

2    but I believe it was 11:58.  And you asked if Charter's

3    counsel could briefly respond, that would be helpful.  And

4    they did.

5         MS. BREWER:  And that communication is when we also

6    identified the document that we would like plaintiffs to

7    submit in-camera to the Court for inspection.  So -- and I

8    don't think that I've heard yet whether they abided by that

9    request.

10        MR. OPPENHEIM:  Your Honor, I'm happy to address it

11   now if you'd like.  This is -- this is what I was speaking

12   about.

13        This is a continuation of Charter's just

14   unrelenting effort to uncover the internal e-mails of

15   Oppenheim & Zebrak in preparing this case for litigation.

16   This has been addressed repeatedly in front of the Special

17   Master, who has time and again rejected it, but here we are

18   again.

19        And the document that they seek to have us submit,

20   there's just no basis for doing so.  I'm happy, actually, to

21   do it, because I think if Your Honor saw it, you would

22   readily agree that this is exactly what privileged materials

23   are.  But, frankly, we need to put an end to this constant

24   attack on our law firm, as though we are anything but a law

25   firm, providing counsel to our clients.

1          And, you know, I stood quietly by as Oppenheim &

2   Zebrak was attacked by Charter's counsel at the two-day

3   summit hearing as not being a law firm, but I'm respectfully

4   done with that.

5          So the person who sent this e-mail was my

6   paralegal.  The paralegal sent it at my direction.  It was an

7   analysis done by people within my firm and then sent to a

8   number of people that included counsel at the RIAA, who is a

9   lawyer who has represented the record companies for many

10  years.

11         After she had left, I believe it was Hogan &

12  Hartson, as a partner there, right, it was also sent to

13  MarkMonitor because MarkMonitor was in the process of being

14  retained as a consultant for purposes of putting together the

15  litigation.  And the law on this is very clear.  It -- the

16  Kovel doctrine makes clear that counsel are permitted to

17  retain third parties as consultants.

18         So this is work product.  It is privileged.  The --

19  we can go through it in great detail.  If Your Honor wants to

20  review it, I don't have an objection other than this idea

21  that they can simply start asking for outside counsel's

22  e-mails to be reviewed by the Court whimsically because of

23  the decision on the Hash Report, to me, is without legal

24  basis.

25         The Hash Report was the product of a decision made

68

1    internally at Oppenheim & Zebrak looking at certain data to

2    do a certain analysis based on our thinking and that is

3    quintessential work product.

4              The fact that it was provided to the RIAA, who has

5    a legal department that represents, and exclusively

6    represents, the labels on anti-piracy matters, does not

7    somehow spoliate or disrupt that work product.  And the fact

8    that it was sent to MarkMonitor and MarkMonitor provided

9    information in response when they were being retained as a

10   litigation consultant does not in any way disrupt that work

11   product.

12             Now I understand that the Hash Report issue is

13   currently before Jackson.  But this idea that because the

14   Special Master made a comment at the two-day discovery

15   hearing questioning the work product assertion on the Hash

16   Report, that suddenly all of the Oppenheim & Zebrak internal

17   e-mails on behalf of our clients are opened up is beyond the

18   pale.

19             If --

20             MS. BREWER:  May I --

21             MR. OPPENHEIM:  That is open, I would like,

22   similarly, to get a review of all of the Winston & Strawn

23   e-mails related to their retention -- Charter's retention of

24   documents, which, as we all know, didn't happen.  Winston &

25   Strawn was onboard in 2016.  What did they say to Charter?

69

1          We could go down this road, but, frankly, we

2   haven't, because we assumed that there's a privilege there

3   and that there's a work product, but they are not observing

4   the same courtesy.

5          MS. BREWER:  May I respond, Your Honor?

6          THE COURT:  Briefly, please.

7          MS. BREWER:  So I take from the tone of Mr.

8   Oppenheim's comments that he feels attacked, and I wanted to

9   clarify for the record that no personal attack was intended.

10          We brought the document to Your Honor's attention

11   because it was first surfaced to us on Monday in context with

12   active briefing.  It is at odds with prior briefing and a

13   declaration submitted by Mr. Oppenheim that causes us to have

14   serious questions about shifting facts and whether or not the

15   facts we were previously provided were accurate.

16          With respect to the privilege, we have

17   communicated, certainly, to their firm that we believe -- and

18   this was discussed at the February 23 conference -- that the

19   Oppenheim & Zebrak communications should be locked.

20          I want that to be distinguished from what I heard

21   Mr. Oppenheim saying, which is that we were demanding the

22   production of them.

23          Locking is different.  Locking -- it respects the

24   privilege claim.  It allows Your Honor to evaluate privilege.

25          With respect to the contention about whether a firm

70

 1    should be outraged with respect to Your Honor's inquiry into

 2    the basis for privilege or work product, I would like to

 3    remind Mr. Oppenheim and the Court that we did, in fact,

 4    provide to the Court Winston Strawn (inaudible) with respect

 5    to the data logs.  And we were not outraged by the

 6    (inaudible).  We provided that and we even (inaudible)

 7    questions about it, and when the Court told us that the

 8    Court's guidance was that the factual information retained

 9    within outside counsel's (inaudible) should be (inaudible)

10    produced to the other side in unredacted form we respected

11    the Court's guidance and we (inaudible).

12            MR. OPPENHEIM:  May I respond to just a couple of

13    those quicks -- points quickly, Your Honor?

14            THE COURT:  Well, just -- are you -- are you

15    rejecting the proposition that it has to be on a privilege

16    log?

17            MR. OPPENHEIM:  Yes, Your Honor.

18            Unless -- unless all of the firms here are going to

19    log all of their communications from here -- relating to the

20    case, why should Oppenheim & Zebrak do it, but not the other

21    firms?

22            THE COURT:  I thought this predated the --

23            MR. OPPENHEIM:  Why should --

24            THE COURT:  Did they say it predated -- well, are

25    you guys not putting any time limit on that?  I agree,

1   generally, that after a lawsuit is filed, certainly you don't

2   need a log -- privileged documents concerning your

3   representation in a lawsuit.

4           But what was the date of the communication we're

5   talking about?

6           MR. OPPENHEIM:  Yeah.  So, Your Honor, this -- at

7   least twice, they requested to the Special Master that

8   Oppenheim and Zebrak should have to log their communications.

9   Twice, the Special Master has rejected that explicitly and

10  they have never objected to or appealed those determinations.

11          So if that's the current request, right, that's not

12  timely.

13          THE COURT:  So you're saying none of your --

14  nothing Oppenheim & Zebrak -- no communication they were

15  involved in has been included on any kind of privilege log?

16          MR. OPPENHEIM:  No, I can't say that.  Obviously,

17  to the extent that there are -- if there were certain

18  communications from our plaintiffs, they could potentially be

19  on a privilege log.  I don't know whether there are or not.

20          But the communications that Oppenheim & Zebrak has,

21  right, in putting together the claim and evaluating the

22  possible claim, right, obviously predate the assertion of the

23  claim, right.  But it's never been the case, right, that

24  clients -- that firms start to log their pre-litigation

25  efforts.

1          And to the extent that Ms. Brewer is suggesting

2     that Winston and Strawn has logged their communications with

3     Charter, that's certainly not true.

4          They produce investigatory memos.  They have not

5     logged their communications of -- back in 2016, when they did

6     receive the claim -- the claim from the plaintiffs.  And

7     those, certainly -- and we haven't asked for them to be

8     logged.

9          But this is not an issue about logging.  What this

10    is about is their effort to invade fundamentally privileged

11    materials.

12         Of course, counsel is allowed to communicate with

13    other counsel and consultants in evaluating a potential claim

14    without those being exposed, right, to a challenge.

15         MR. SPERLING:  Judge Hegarty --

16         THE COURT:  Well, no.  I mean, with that broad of a

17    -- of a proposition, I disagree.  I mean, sometimes, even if

18    Oppenheim & Zebrak eventually represented them in a lawsuit,

19    they could be operating in a different capacity, you know, as

20    lawyers advising them how to do a business model.  That --

21    that's just too broad, Mr. Oppenheim.

22         MR. OPPENHEIM:  Your Honor --

23         THE COURT:  Yeah?

24         MR. OPPENHEIM:  Your Honor, Oppenheim & Zebrak only

25    represents the plaintiffs in a litigation capacity and every

73

1    one of these is in direct consideration of potential ISP

2    claims.  That's exactly -- that's exactly what they're trying

3    to get at.

4              THE COURT:  So you don't consider yourselves

5    general outside counsel for the plaintiffs?

6              MR. OPPENHEIM:  Oh, no, my goodness.  These are --

7    these are record companies that have many firms and have

8    large legal departments themselves.  And, in fact, they are

9    going to take the depositions of many of the in-house

10   lawyers.

11             THE COURT:  Well, I mean, just -- I'm not

12   disagreeing with any proposition of law you're stating.  But

13   I will tell you that in my experience, the local practice is

14   that once a lawsuit is filed, certainly nothing has to be put

15   on a privileged log, but lawyers in this district often put

16   on privileged logs pre-lawsuit communications.

17             So -- but --

18             MS. BREWER:  And, in fact --

19             THE COURT:  Go ahead.

20             MR. OPPENHEIM:  Well, that, Your Honor --

21             MS. BREWER:  And to clarify, Your Honor, those

22   communications have been logged.  This concern arises

23   precisely because of that, which is that there are

24   communications and -- and attorney-client privilege

25   assertions and work product assertions that have been made

74

1   and those have been logged.

2          But it's come to our attention there are serious

3   concerns about the consistency with respect to the logs that

4   we're receiving from the RIAA, MarkMonitor, and from the

5   plaintiffs.

6          That's what this January 7, 2016 e-mail was brought

7   to your attention.  It was brought to your attention for that

8   reason.

9          But again, this is at issue because the plaintiffs

10  are relying on the evidence that was generated in 2016 to

11  support the direct infringement case at trial.

12         That's why we're in this difficult position.  If it

13  were not premised on that, we would not be having this

14  discussion.

15         THE COURT:  Well, the whole problem with choosing

16  -- the whole problem with not choosing a bright line date is

17  that then one side gets to choose what it thinks doesn't have

18  to be logged and what does have to be logged and it gets to

19  make that call.  And no one can ever test it, because the

20  documents simply don't exist on any kind of record submitted

21  to the other side.

22         So I do have a technical -- I mean, philosophical

23  issue with an -- even outside litigation counsel producing or

24  identifying some of its communications pre-lawsuit on a

25  privilege log, but not others, and getting to decide what the

75

1   difference is.

2           That seems troublesome to me.

3           MR. OPPENHEIM:  Your Honor, what happened to --

4   let's -- I think the facts are as clear as mud here.  Let me

5   see if I can -- I can clear it up.

6           The RIAA agreed to produce a privilege log.  So to

7   the extent that O&Z communicated with folks at the RIAA, they

8   have a privilege log that shows those communications.

9           MarkMonitor agreed and provided a privilege log.

10  And again, to the extent that there are O&Z communications

11  with MarkMonitor, they can see those.

12          But there was an agreement among counsel and it was

13  litigated before Rodriguez to not log outside litigation

14  counsels' e-mail communications.

15          That's not the issue currently before you.  The

16  issue before you -- though, they would like that.  But the

17  issue before you is whether or not plaintiff should have to

18  submit a document which, on its face, is obviously

19  privileged.  It is a document that was sent by my paralegal,

20  Mike Candour (ph), to counsel at the RIAA and to MarkMonitor.

21  It was in anticipation of retaining MarkMonitor for the Hash

22  download project.

23          It is -- and to the extent that they say there's

24  inconsistencies, it's because it was before -- it was getting

25  a quote on the work -- scope of work that we were asking them

1    for, but it is clearly privileged and work product.

2    MarkMonitor was acting in an advisory capacity to plaintiffs'

3    counsel.

4              THE COURT:  But did MarkMonitor or the RIAA put

5    that document on their privilege logs?

6              MR. OPPENHEIM:  Yes, and that's how they've seen

7    it.

8              MS. BREWER:  No, they did not.

9              MR. OPPENHEIM:  Oh, I'm sorry.

10             MS. BREWER:  They did not, Mr. Oppenheim.  And you

11   know that.  They did not.

12             MR. OPPENHEIM:  I apologize.  It was -- this one

13   was -- this particular document was discovered recently and

14   the privilege log was recently amended, or is being amended

15   to add it, and that's why this is arising.

16             THE COURT:  Whose privilege log?

17             MS. BREWER:  It is still not on the -- it is still

18   not on the log.  Part of the problem we have, Your Honor,

19   which again came up during the discovery summit is that we

20   did receive, finally, a privilege log from MarkMonitor.  That

21   privilege log only logs the Hash Report from 2016.  And it

22   indicates -- and there's nothing else from 2016.  There's

23   nothing on the log from 2017.

24             The next entry is 2018 and that reflects that

25   that's been the litigation (inaudible).  That is -- that is,

77

1    in itself (inaudible).

2         Now we have this event, which is the RIAA,

3    identifying for the first time the document that has been on

4    no one's log.  Nobody knew about it and the concern rises

5    because the entire time we were briefing and arguing before

6    Your Honor about the Hash Report, the facts that were

7    presented to the Court, and to Your Honor specifically, is

8    that the Hash Report project referred to February, 2016.

9         This document that we just found out about on

10   Monday dated January 7, 2016, and we have no other contents

11   for it.  And all we ask, Your Honor, is that it be submitted

12   to you in-camera.  We did not demand its production to us.

13   We did not challenge the privilege claim there.

14        We said, Please submit this to Your Honor -- to

15   Magistrate Judge Hegarty and they said they had.  I thought I

16   heard today that they said they would have no problem doing

17   that, but they have not done it.

18        THE COURT:  Well, how did you find out about it on

19   Monday?

20        MS. BREWER:  We found out about it, Your Honor,

21   because the plaintiffs were preparing to file their reply

22   brief to Judge Jackson on the Hash Report dispute and,

23   apparently, they wanted to make the argument that the Hash

24   Report came from Oppenheim & Zebrak.  And so this document

25   surfaced for the first time and was provided to us within a

78

1  few hours of the reply brief being filed.

2          In the e-mail, they identified it and said it would

3  be coming on a forthcoming log.  We, in fact, have not

4  received that log yet.  Even worse, the reply brief was then

5  filed a few hours later.  And this represented that this

6  document had been previously identified to us and on the log.

7          We had to reach out to plaintiffs' counsel and say

8  we had serious concerns about that misrepresentation in the

9  reply brief.  They retracted the statement and filed a

10  corrected reply brief.

11          THE COURT:  Okay, but I still don't -- I still

12  don't --

13          MR. OPPENHEIM:  Your Honor --

14          THE COURT:  Hold on, hold on, Matt.  I still don't

15  get the chain of events.

16          Number one, what was the first step in you finding

17  out about this document?  Go through one step at a time.

18          MS. BREWER:  The first that we heard of the

19  document was an e-mail from Mr. Gould on the afternoon of

20  Monday.

21          THE COURT:  And what did he say?

22          MS. BREWER:  He indicated -- he indicated that a

23  supplemental privilege log would be forthcoming with an

24  entry.  And the entry that we were provided was -- I

25  excerpted it; I put it into the e-mail that they sent to Your

79

1    Honor.

2            THE COURT:  Right.  So that's all it said was --

3            MS. BREWER:  That's all --

4            THE COURT:  -- this is a document we should have

5    included on our -- on the plaintiffs' privilege log and we

6    didn't and now here's the entry?

7            MS. BREWER:  To clarify, the communication was that

8    this was a document that would be on the RIAA's privilege

9    log.  There was no communication about whether it would be on

10   plaintiffs' privilege log at all.

11           THE COURT:  Okay.  Then what -- what next happened

12   after you got that e-mail?

13           MS. BREWER:  After we got that e-mail, a reply

14   brief was filed before Judge Jackson that indicated that this

15   document was already on the RIAA's privilege log and we were

16   aware of it.  We asked them to retract that statement because

17   it was false.

18           THE COURT:  But what was the context in which they

19   made that statement in the brief?

20           MS. BREWER:  The context that they made the

21   statement in the brief was to refute a point that we made,

22   which was on all of the privilege logs that we had as of the

23   date that we filed our brief before Judge Jackson, that all

24   of the privilege logs that had identified anything having to

25   do with the Hash Report had identified the Hash Report as

1    authored by MarkMonitor.

2             We made the point that there, in fact, were no

3    privilege logs that showed that Oppenheim & Zebrak, as a law

4    firm, had ever sent an e-mail with an attachment to

5    MarkMonitor prior to the existence of the Hash Report.

6             THE COURT:  Okay.  So then that argument

7    precipitated the plaintiff saying, Ah-ha, there is one and

8    we're now logging it on RIAA's log?

9             MS. BREWER:  You have that correct, except for I

10   believe what Mr. Gould was communicating was that the RIAA

11   was putting it on its privilege log.  We have not had a

12   communication from the plaintiffs, despite also asking the

13   same questions, as to whether or not they would be willing to

14   log Oppenheim & Zebrak's communications prior to the filing

15   of the (inaudible).

16            THE COURT:  Okay.  So they let you peek under the

17   skirt, in your view, for the reason of countering your

18   substantive argument that there had been no involvement of

19   Oppenheim & Zebrak?

20            MS. BREWER:  I would agree with that, except for I

21   don't think I got to peek under the skirt, so to speak.  I

22   only received an e-mail with a description provided by

23   counsel for RIAA of the documents that itself is inconsistent

24   with the declaration that was previously submitted to the

25   Court, as well as the prior briefing.  And you don't need to

81

1    take my word for that.  (Inaudible) of the briefing, the

2    paragraphs in the declaration that was previously submitted

3    to the (inaudible) --

4            THE COURT:  And so is Mr. Gould on the line?

5            MR. OPPENHEIM:  Yeah.  And let --

6            MR. GOULD:  Yes, and I --

7            THE COURT:  So Mr. --

8            MR. GOULD:  And I need to speak, Your Honor.

9            THE COURT:  And, Jeff, hold on a second.

10           You -- you wanted -- you want Judge Jackson to rely

11   on this information without the opportunity to look at the

12   document?

13           MR. GOULD:  No.  Your Honor, some of what Mrs.

14   Brewer said is correct, but the gloss on it is misleading and

15   -- and that's not an attack, but there's a long history here

16   with this document.

17           Oppenheim & Zebrak, we have said -- plaintiffs have

18   said, since the dawn of time, that Oppenheim & Zebrak created

19   the Hash Report in the first instance and sent it to

20   MarkMonitor.  That has long since been part of the record,

21   that is old news.

22           Ms. Brewer is correct, there was not a privilege

23   log entry showing that transmission until recently, but that

24   -- the notion that that is new information is not -- is not

25   correct.

1          THE COURT:  I didn't get that notion from her, by

2     the way, but go ahead.

3          MR. GOULD:  We have been through many discussions

4     about the Hash Report.  Mr. Oppenheim's declaration that Ms.

5     Brewer referred to talks about directing a one-month project

6     in February, 2016, okay.

7          The contract for that project was signed on January

8     29, 2016.  Ms. Brewer's suggestion that troubling --

9     troubling irregularities and misrepresentation is that the

10    fact that we were coordinating before the signing of the

11    contract for the one-month program in February.

12          Certainly, the project didn't emerge out of thin

13    air on February 1.  There was discussions about it in

14    January.  A contract was signed on January 29 and the project

15    occurred in the month of February, which is 100 percent

16    consistent with every prior representation.

17          Now, a critical piece, Your Honor, is that last

18    week, Ms. Rodriguez entertained a hearing between the parties

19    on the scope of a topic for the RIAA's 30(b)(6) deposition.

20    This is a little bit of a turn, so bear with me.

21          Last week, Ms. Rodriguez entertained a disputed

22    topic on RIAA 36 about how far out in time RIAA would need to

23    testify on communications regarding the hash download

24    project.  And we obviously disagree with it, but she ruled

25    that we need -- that RIAA needs to prepare a witness to

83

1   testify in those communications to the filing of the

2   complaint in 2019.

3          I explained to Ms. Rodriguez, in order to prepare a

4   witness on that, I would need to have RIAA search for

5   documents it had not previously agreed or been ordered to

6   produce, okay?

7          In response to Ms. Rodriguez's ruling a week ago,

8   RIAA had to look for documents it had not previously agreed

9   to or been ordered to produce.  And in doing so, expanded

10  that search and identified this and other documents that will

11  be logged on a supplemental log that we promptly disclosed to

12  Charter would be forthcoming.

13         And because this issue over the initial genesis and

14  transmission of the Hash Report was a live dispute on active

15  briefing, as Ms. Brewer said, we promptly disclosed that

16  entry, even before the remainder of the supplemental log was

17  ready.

18         There's no (inaudible), there's no hiding.  We

19  learned of new information, documentary information, that was

20  consistent with every representation we've made, and we

21  promptly disclosed on the RIAA's behalf, a single privilege

22  log.  There's no ah-ha, no gotcha.  It's full disclosure as

23  we learn the information.

24         So, respectfully, the gloss provided here that

25  there's some games is simply not the case.  Now --

84

1          THE COURT:  Okay, yeah.  No, Jeff, I gotcha, and

2     that was very clear.  Thank you.

3          Ms. Brewer, you want me to look at it in-camera.

4     What do you think I might find in-camera that would cause you

5     to make any kind of argument that it should be produced?

6          MS. BREWER:  The concern we have, which is why we

7     would like Your Honor to take a look at it, is with respect

8     to the accuracy of the description, which forms the basis for

9     the -- the privilege and the (inaudible).

10         And to address a point Mr. Gould just made, because

11    I do think it's important to clarify the record, the e-mail

12    and attachment that we're talking about is from January,

13    2016.  That is within the existing claims period.

14         If Mr. Gould had identified for us a document from

15    2019, everything that he just said would be compelling and we

16    wouldn't have an issue.  We would say, Okay, we understand

17    that you got this ruling from Special Master Rodriguez and

18    you expanded the scope of your search beyond May, 2016.

19         But the document that was just identified for the

20    first time on Monday is one that fell within the existing

21    scope of what was required to have been produced and/or

22    logged by January 15 of 2021, per order of the Special Master

23    that was in December.

24         THE COURT:  No.  So --

25         MS. BREWER:  It was absolutely --

85

```
 1              THE COURT:  -- I actually don't -- I think the

 2   printed-off e-mail from you that provides the log entry, the

 3   proposed log entry, only has:  Date, privilege or protection,

 4   authored to, and cc.  Five fields.  There is no description

 5   of the document.

 6              Is there something else that's supposed to be

 7   there?

 8              MR. OPPENHEIM:  Your Honor --

 9              MS. BREWER:  In the e-mail -- in the e-mail that

10   may have gotten cut off in the way that an e-mail prints out

11   in a hard copy --

12              THE COURT:  Right.  So what is the description?

13   Read the description.

14              MR. GOULD:  I -- I can read it --

15              MS. BREWER:  And so the description that was

16   provided to us --

17              MR. GOULD:  I can read it to you.  I'm sorry --

18              MS. BREWER:  I'm talking and he asked me a

19   question.

20              THE COURT:  Well, but actually, Linda, I can't hear

21   you very well.  So I'm going to let Jeff do it.

22              Go ahead.

23              MR. GOULD:  Thank you, Your Honor.

24              The description is:  Privileged e-mail chain with

25   privileged attachment regarding anti-piracy services to be
```

1    undertaken in anticipation of litigation against ISPs, and

2    sending MarkMonitor initial version of Hash Report, reflected

3    analysis, and mental impressions of outside litigation

4    counsel.

5            THE COURT:  Okay.  So it mentions that it

6    transmitted the Hash Report, it mentions that it involves

7    anti-piracy services.  Those are the two substantive

8    descriptions, correct?

9            MR. GOULD:  And then there's a subject line entry.

10   The subject line of the e-mail is:  Follow-up Evidence

11   Collection.

12           THE COURT:  Okay.  Again, Linda, what would you

13   think I might find?  What are you suspicious of?

14           MS. BREWER:  Well, and certainly I -- "suspicious"

15   is a strong word, Your Honor.  And so I -- I do want to --

16   what I'm saying is there is a serious concern about why this

17   document wasn't identified earlier.  And there is a concern

18   about the description that it's attaching the initial version

19   of the Hash Report when that information itself is

20   inconsistent with all of the prior briefing.  And that's

21   referenced in my e-mail by docket number in the declaration

22   that says the Hash Report was created in February of 2016,

23   after the --

24           THE COURT:  Well, wait a second, wait a second.

25   It's not inconsistent with a final Hash Report being produced

87

1    in February of 2016.  There's always drafts of anything when

2    you're careful, right?

3            MS. BREWER:  But that is not -- if you look at --

4    if you look at the docket numbers that were provided and we

5    also provided within the e-mail the quote from those, that is

6    not the information that was provided previously.

7            THE COURT:  Are you talking about the statement

8    that --

9            MS. BREWER:  The information that was provided --

10           THE COURT:  Hold on.

11           -- in February, 2016, plaintiffs' counsel directed

12   a one-month project?  Is that what you're relying on?

13           MS. BREWER:  Yes.

14           THE COURT:  So that implies to you, at least, or

15   even states directly, that that's when it began.  And you're

16   now saying this e-mail shows it began earlier and that's

17   inconsistent with the representations they've made.

18           Is that what you're saying?

19           MS. BREWER:  Yes.

20           THE COURT:  All right.  Explain that one, Jeff.

21           MR. GOULD:  I think I did, Your Honor.

22           The contract was signed on January 29, the project

23   occurred in February.  It's hardly surprising and -- nor is

24   it inconsistent that the parties involved would have been

25   planning for it in January.  And in order to download hashes

88

1    in February, those hashes were identified in January.

2              THE COURT:  Okay.  So I'm --

3              MR. SCHAPIRO:  And, Your Honor --

4              THE COURT:  I've got enough on that.

5              MS. BREWER:  It's shifting sands --

6              THE COURT:  I no, I'm not going to require any

7    further action with regard to that one.

8              Do we need to address the defendant's alleged

9    privilege document?  The five lines, I guess?  Do we need to

10   address that?

11             MR. SCHAPIRO:  Your Honor as to which I would want

12   Ms. Halwass to be --

13             THE COURT:  Oh, sorry, okay.

14             MR. SCHAPIRO:  -- available

15             THE COURT:  That's fine.  I'm available tomorrow,

16   by the way.  Right?

17             MR. SPERLING:  That's fine for us, Your Honor.

18             And again, the five lines is not the issue.  We

19   don't have a problem with the assertion of privilege over the

20   five lines.  It's the sort of, you know, expansive assertion

21   of a cloak over the entirety of a spreadsheet.  Just reams

22   and reams of just data, raw, factual information, and an

23   e-mail chain that they didn't think was privileged at the

24   time that they produced or even when we asked them to provide

25   the spreadsheet, it was attached to it.

89

```
 1              THE COURT:  I understand.

 2              MR. SPERLING:  So --

 3              THE COURT:  I understand.

 4              MR. SPERLING:  -- yeah.

 5              THE COURT:  What time tomorrow do you guys want to

 6    do this?  Do we have -- do you have the video capability?

 7    All right?  What time do you want to do it?

 8              MR. OPPENHEIM:  I think we have a hearing, Your

 9    Honor, with Ms. Rodriguez at, I believe, it's 12:30 Mountain

10    Time.  So we'd have --

11              MR. SPERLING:  Any time.

12              MR. OPPENHEIM:  -- any time before or after that,

13    I'm sure we --

14              THE COURT:  Yeah, I'm fine with before or after.

15              MR. SCHAPIRO:  It would need to be after, I think,

16    for time zones with regard for Ms. Halwass if possible.

17              THE COURT:  Okay.  So will 1:30 work?

18              MR. SCHAPIRO:  As far as I know, yes.

19              MR. OPPENHEIM:  And -- and --

20              MR. GOULD:  If not, we will have someone else

21    available to --

22              THE COURT:  But so if you're still on with Ms.

23    Rodriguez, we'll just be here waiting for you to be finished

24    and come on with us.  Okay?

25              MR. SPERLING:  We're going to try and be really
```

90

1    crisp.

2            THE COURT:  All right.

3            MR. SPERLING:  We'll be on time.

4            THE COURT:  Okay.  Was that it, then?

5            MS. RANAHAN:  We do have one --

6            THE COURT:  Go ahead.

7            MS. RANAHAN:  We do have one more issue that we've

8    raised.  This is Erin Ranahan.

9            We've raised, in a letter to you last night about a

10   couple of deposition topics on a 30(b)(6).  We've -- we've

11   provided a two-page letter, it's probably yesterday afternoon

12   your time, and thought it might make sense to have just a

13   discussion with you so that we could explain some of the

14   issues.

15           It's pretty simple -- two topics we wanted to --

16           THE COURT:  Was that the Sean Anderson e-mail?

17           MS. RANAHAN:  Yes, exactly.  Sean Anderson sent the

18   e-mail with a quick cover letter and then there's an attached

19   letter from myself.  It's a two- or three-page letter.

20           THE COURT:  No, I read it.  I read it.  The

21   work-for-hire issue and the dropped works?

22           MS. RANAHAN:  Correct.

23           THE COURT:  Okay.  So I have -- I have their

24   position.  Did you want to -- who wants to address that from

25   the plaintiff?

1           MR. KAPLAN:  Your Honor, this is Alex Kaplan.  Can

2    you hear me?

3           THE COURT:  Yes.

4           MR. KAPLAN:  I'll address it.  I'm not sure -- I

5    mean, I'm happy to get into the substance, but the letter

6    asked the Court to provide -- and these are their words --

7    preliminary guidance on this preview of intended objections

8    to a ruling that the Special Master made where we don't even

9    have a transcript yet.

10          THE COURT:  Okay.  And that's all we need to know.

11   If that's true, then I'm not going to touch it for the

12   moment.

13          MS. RANAHAN:  Well, obviously, we're all being --

14   you know, whatever you tell us could actually resolve it.

15   These are two very limited topics.

16          So -- and one of the things I wanted to clarify was

17   something about this whole procedure with the Copyright

18   Office, which came up during the -- I don't know if you

19   recall this, Your Honor, but it came up during the two-day

20   hearing.

21          It came up a year ago when I brought up the fact

22   that these work-for-hires, what we'd need is we'd need a

23   couple of (inaudible) testimony.  And then after we had that,

24   we could bring something to the Copyright Office if it was

25   referred to by the Court.

92

1   When we brought it up a year ago, Mr. Oppenheim

2 said he'd never heard of such a procedure.  20 years, he's

3 never heard of it.

4   I happen to have a case against Mr. Kaplan where he

5 mentioned it during the summit that that's something that had

6 happened in a case he was in.  We were opposing counsel in

7 that case.  And I just wanted to let you know how that worked

8 so that you understand why the deposition testimony's

9 actually critical to that process, because your concern

10 during the hearing was, How are you going to have time to do

11 this?  When are you going to do this?

12   And so I just wanted to give you a little bit more

13 information about how we did that in that other case, which

14 is it came up -- Mr. Kaplan raised an argument about our

15 registrations during summary judgment.  The Court, in its

16 summary ruling, picked out five -- five registrations that

17 had this issue that he raised.  We then submitted that to the

18 Copyright Office.

19   Within three months, we had a ruling back -- it was

20 two to three months.  And it wasn't that the whole case was

21 slowed down, it wasn't that we didn't have time, it was that

22 we do have to have the Court look at it and then refer it.

23   So what we need on the work-for-hire is we have

24 this 80 percent agreement -- we have 80 percent from Bright

25 House.  We just want to be able to ask the witnesses some

93

1    basic questions about these work-for-hire agreements that

2    were produced from Bright House, and we've since run an

3    analysis of the Bright House documents.

4            That was the other concern you had during February

5    23, is:  What have you done with the 80 percent that you've

6    gotten in Bright House so that I know you're actually doing

7    something and this isn't just busy work?

8            Well, we've since done the analysis and there's 15

9    percent of the work-for-hire problem that affects the 80

10   percent that are overlapping with this case.  So that's a

11   significant amount.  That's double what was represented

12   during the hearing on the 23rd.

13           So what we want to do -- and we will give them a

14   very narrow list of the exact agreement -- artists that we

15   have an issue with.  It's only about 10 or so, per plaintiff.

16   And we can -- you know, this isn't a prolonged, extended

17   hearing.  It's not anything that we want documents right now

18   on.

19           All we want to do is be able to use that 80 percent

20   that we got from Bright house, which was always the intent.

21   And we have -- we've had this discussion before, which is

22   that, you know, if you did it in Bright House, see what you

23   can do with the Bright House and I'll decide if it's worth

24   the other 20 percent.

25           So all we want to do is make that 80 percent able

94

1    to ask questions about those documents to the plaintiff

2    30(b)(6) representative on the work-for-hire.

3           And then once we have the testimony, which we see

4    as two-prong, we would provide the artist's name to them in

5    advance, provide them the agreement we see, either where it's

6    missing or not, and say:  Is there anything else here?  And

7    do you stand by your work-for-hire designation?  And if they

8    do, then that's what we need to go to the Copyright Office

9    and potentially make a showing.

10          We need to have some intent, that it was, you know,

11   done intentionally or knowingly and that it was -- so all we

12   need is -- and so what we're willing to do is provide this --

13   the artist, it's just sort of -- be able to ask about it.

14          What happened was that the Special Master was

15   relying on what we had said on the 23rd without the benefit

16   of knowing the recent developments and also understanding the

17   difference between us wanting them to produce everything for

18   the other 20 percent and us just being able to ask about what

19   we do have already.

20          So I think that the deposition is a lot less

21   burdensome.  So that's the work-for-hire issue.

22          MR. KAPLAN:  Your Honor, I thought we were not

23   going to argue this issue that they previewed.

24          THE COURT:  Okay.

25          MS. RANAHAN:  I mean, obviously, Your Honor, if we

1    can get an early ruling, we'll take it; but we'll take

2    (inaudible) we want -- we know that you like to operate in a

3    live context.  I wanted to just --

4             THE COURT:  No, I do, I do.  I'll just say that

5    it's awful dangerous at times to instruct a witness not to

6    answer, except for privilege.  That's all I'm going to say

7    about that, okay?

8             All right.  I have a question for, I think, first,

9    the defense and it involves something I heard earlier today.

10   And, again, this is not an area of law in which I practice,

11   nor would ever want to, I guess.  Unless I could probably get

12   a 30 percent contingency fee on a billion dollars, then I

13   might put some work in on the case.

14            Is it --

15            MR. SPERLING:  Your Honor, we wish we could get

16   that too.

17            THE COURT:  Is it -- I was just being hypothetical.

18            Is it true, Andrew, or whoever, that actual harm to

19   the plaintiffs is not an issue at trial?

20            MS. RANAHAN:  That's not true.  Andy, did you -- do

21   you want Andy to answer that?

22            THE COURT:  Anybody.

23            MS. RANAHAN:  I mean, that's -- actual harm is

24   absolutely a factor and that --

25            MR. SCHAPIRO:  Yes.  Whether you mean as a legal

1   matter or in -- in this trial?  Either way, the answer -- the

2   answer is it's necessary.

3           THE COURT:  Okay.  And does the plaintiffs -- do

4   the plaintiffs agree on that?  Because I thought I heard them

5   say, We're not going to rely on harm to our clients.  We're

6   going to rely on conduct by Charter.

7           MR. SCHAPIRO:  Well, I think they're going to be

8   asking for statutory damages, and so their argument will be

9   that, you know, they get statutory damages, but one of the

10  factors that leads into that is actual harm.

11          MR. OPPENHEIM:  Right.  So I agree with what Andrew

12  said there.  A critical point here is the Supreme Court in --

13  I'm going to get the year wrong -- but a very, very long time

14  ago made clear that in the statutory damages context, the

15  copyright owner plaintiff need not show any harm in order to

16  obtain statutory damages.  And, in fact, that's -- that

17  that's because that statutory damages were created for the

18  situation where a plaintiff may not be able to demonstrate

19  harm.  And in this case, and I'm not saying anything that's,

20  I think, in any way surprising to anybody, that in the

21  context of peer-to-peer infringement, measuring the quantum

22  of harm is impossible.

23          The activity that occurs can only be seen by the

24  people engaged in it.  You know that the infringement is

25  viral on a peer-to-peer network, but you can't -- you can't

1    see the full extent of it.

2            So for those -- to put it into graphic terms, if

3    you remember there used to be an old commercial for shampoo,

4    I think it was Breck Shampoo, and it said:  And then you tell

5    two friends, and then you tell two friends and then you two

6    -- tell two friends and it all magnified out and lots and

7    lots of people appeared on your screen.  That's kind of the

8    nature of peer-to-peer infringement and you can't measure it.

9            So there will certainly be, I'm sure, testimony on

10   both sides about the level of peer-to-peer activity on the

11   network and what was seen.  Actually, quantifying in a kind

12   of contract damages type way, the extent of that harm is

13   something that typically is not done.

14           THE COURT:  Okay.  So just to be clear, at that --

15   as it stands right now, the plaintiffs wouldn't intend to put

16   on evidence of any particular monetary damage to their

17   clients?

18           MR. OPPENHEIM:  Well, we would certainly put on

19   evidence of what happened to the industry as a result of

20   peer-to-peer infringement overall.  That's the graph that you

21   saw earlier.

22           The dotted line is a -- is not a line of what

23   happened to the industry; that's a line of music consumption.

24   But the actual revenues you can see and then you can compare

25   that to what was happening with peer-to-peer activity during

98

1    that same time period and a jury gets to consider that big

2    picture.

3            THE COURT:  So you'll put on evidence of revenue

4    changes from year-to-year in the industry as a whole?

5            MR. OPPENHEIM:  Likely, Your Honor.

6            THE COURT:  And where does that come from?  That

7    information?

8            MR. OPPENHEIM:  From the company -- I mean, the

9    revenue data is industry-collected information from the

10   plaintiffs.

11           THE COURT:  From some kind of trade organization?

12           MR. OPPENHEIM:  Yeah.  It's aggregate data of the

13   -- I believe -- and I don't have it right in front of me -- I

14   believe it's the aggregate financial data of the plaintiffs

15   in the case -- of the record company plaintiffs in the case,

16   I believe.  Not the -- I don't believe it includes the music

17   publishers.

18           THE COURT:  Okay, fine.

19           MR. OPPENHEIM:  But it -- it'll be put in, Your

20   Honor, through -- I believe, both through the fact witnesses

21   who will explain it and experts who will explain it.

22           THE COURT:  Okay.  All right.  Anything else today

23   from the plaintiffs?

24           MR. GOULD:  I don't believe so, Your Honor.  We

25   appreciate --

1           THE COURT:  All right, thank you.

2           MR. GOULD:  -- the time today.

3           THE COURT:  Thank you.  From the defense?

4           MR. SCHAPIRO:  Nothing further, Your Honor.

5           THE COURT:  All right, I still would encourage you

6    --

7           MS. RANAHAN:  Oh, so just for those objections, you

8    just want us to submit them formally, because what we need

9    is -- what we're trying to get is someone to be designated.

10   I appreciate your comment that they shouldn't instruct their

11   witnesses not to answer, unless it's privilege.  But what if

12   the question is whether they're going to have someone

13   prepared to talk about, like the limited artists

14   work-for-hire situation and --

15          THE COURT:  I'm sorry, so they objected formally to

16   that topic as a whole?

17          MS. RANAHAN:  Yes, and -- yes.

18          MR. GOULD:  And the Special -- and the Special

19   Master ruled on it in -- in our favor and apparently Charter

20   wants to object, and that's fine.  It's just that there's a

21   procedure for doing that, which is based off of receipt of

22   the -- of the transcript.

23          I mean, again, I'm -- I'm prepared to argue it

24   today, Your Honor, but it doesn't follow the procedure in the

25   order that -- point to the Special Master and set out the,

1   you know, the whole way of doing this.

2            THE COURT:  Sometimes drastic times require drastic

3   measures, right?

4            MR. GOULD:  Well, if you want to -- I mean, if

5   you're going to entertain this now, we'd like the option to

6   speak on it, please.

7            MR. SCHAPIRO:  Well, it --

8            THE COURT:  Well, hold on just a second.  I want to

9   read quietly first for a minute.

10           So there is document discovery on this.  You want

11   it to also be a 30(b)(6) topic?

12           MS. RANAHAN:  Correct.  So we have the 80 percent

13   overlap from the Bright House case and we had -- during the

14   document -- you know, the February 23rd, 22nd hearing, we had

15   attempted to get the remaining 20 percent.  And during that

16   you entertained very lengthy argument on that and at the end

17   said, Well, you have the -- you know, the 80 percent, so why

18   don't you see what you can do with that.

19           You noticed that we hadn't done anything yet with

20   Bright House.  And we have since.  And it's a 15 percent

21   concern rate where there's 15 percent of the agreements did

22   not have a work-for-hire.  So there is something there --

23   more than double what the sample was, or about double what

24   the sample was.  And I think that plaintiffs' counsel

25   repeatedly said it was a single digit error rate and it --

1   it's no longer that when we're looking at the actual 80

2   percent overlap.

3           So all what we want to do is be able to give them a

4   list of the artists we want to ask about.  Again, it's no

5   more than about 10 per plaintiff group and just so that we

6   can ask about their arrangement.  And if that's the only

7   agreement that would have had the provision and if they have

8   anything else.  And if not, do they stand by their

9   work-for-hire designation on the Copyright Office?

10          And we think that testimony will give us enough to

11  potentially go to the Copyright Office on this.  And I will

12  just say, Your Honor, I know you started this thing asking

13  for settlement.  Are we, you know, moving towards settlement?

14          I would say, something like this:  We believe

15  there's, like, a widespread problem with this and that

16  exposing something like this, even if it doesn't make it to

17  the Copyright Office, could, you know, actually -- you know

18  --

19          MR. GOULD:  Your Honor, what the -- we have no --

20  we have no concerns about that, honestly.  But what -- what

21  we're talking about here is an objection to the Special

22  Master's ruling.  This is an abuse-of-discretion standard.

23  We don't have the transcript yet, we don't have the basis of

24  her decision.  You've got a letter from Charter that was sent

25  less than 24 hours before the hearing that we haven't had a

1   chance to respond to.

2          At the very least, we should be able to put in a --

3   a response brief.  But, really, we should follow the process.

4   So I really don't want to get into argument -- I mean, I

5   disagree with so much of what was just -- what was just said.

6   But there really needs to be a process that we follow here

7   and where we, at least, have the ability to put in a

8   responsive paper and be able to see what the Special Master

9   ruled.

10          THE COURT:  Unless, in fact, you --

11          MS. RANAHAN:  We are --

12          THE COURT:  No.  Hold on, hold on, hold on.  Hold

13   on.

14          So, yeah, unless, in fact, you win right now and

15   then you're not worried about process, I assume?

16          MR. GOULD:  Yes, if you --

17          MS. RANAHAN:  I mean, if you -- what we want to

18   avoid, because this -- these are coming up, we want to get

19   attention on to these and try to get, you know, them decided.

20   We don't want the objections to be sitting past -- I know

21   that plaintiffs' counsel expressed concern about if we don't

22   get rulings now, it's just as good as not -- of losing them,

23   because we have a coming-up deposition.

24          So we do want to get these decided.  I want -- I

25   know that it helps to explain things to Your Honor so that

1   you can hear, you know, some of the recent things.  So I

2   thought it would be worth at least getting your take.

3           A lot of the things we've been doing lately are way

4   outside of any procedure that anyone agreed to, I think a lot

5   of these hearings, and we thought it would be worth raising

6   these before you.

7           THE COURT:  Okay.  So direct question, Ms. Ranahan:

8   Do you believe that your letter sufficiently frames the issue

9   so that if I wanted to rule on it right now, you've been

10  heard?

11          MS. RANAHAN:  Yes.

12          THE COURT:  Okay.  Then the objection is overruled.

13          Anything further?

14          MR. GOULD:  Not from plaintiffs, Your Honor.

15          THE COURT:  Okay.  See you guys tomorrow, but in

16  the meantime, Andrew, et al., or, Jonathan and Matt, et al.,

17  feel free to call me.  I think I -- I think we ought to talk

18  about settlement.

19          Okay?

20          MS. RANAHAN:  So I -- just to ask, so we are -- we

21  are allowed to ask, but they don't have to prepare a witness

22  about these -- so you're saying they don't have to prepare a

23  witness on either of the two topics, because we didn't hear

24  -- we didn't argue the second one at all.

25          So I know that I'm saying my written response is

104

1    enough, but I didn't mean to speak for the whole group,

2    because I wanted to get a preliminary -- I get your point

3    that I want to get only to my benefit, as everybody does in

4    this litigation, but I don't want to waive the second issue,

5    which now hasn't been heard at all.  And I didn't even

6    understand what the ruling was.

7              So should we just now to go Judge Jackson --

8              THE COURT:  Well --

9              MS. RANAHAN:  -- or should we not?

10             THE COURT:  My question to you was:  Do you believe

11   your letter and what you just stated, you've been

12   sufficiently heard on your objection to the Special Master's

13   rulings?  And I thought you said yes.

14             MS. RANAHAN:  Right, I understand that, Your Honor.

15   But I -- but we haven't discussed the second issue at all.  I

16   thought we laid -- I thought you meant, did we lay out the

17   position and lay out everything that was before you and would

18   we need to submit another objection.  I didn't know you

19   meant, you know, you can rule on it on the fly and then we

20   would waive our formal written objection, so --

21             THE COURT:  All right.  Well, it's not on the fly

22   --

23             MS. RANAHAN:  I thought you meant --

24             THE COURT:  No, no, hold on.  It's not on the fly.

25   It's after having read what you submitted and heard what you

1   said.

2          MS. RANAHAN:  Okay.  So if you've -- if you've

3   considered it and you're -- then we'll just go straight to

4   Judge Jackson on this and not -- I just want to make sure

5   we're not violating going through the interim ruling, because

6   plaintiffs' counsel said --

7          THE COURT:  No, you would not be violating --

8          MS. RANAHAN:  -- they wanted to make --

9          THE COURT:  Yeah, you wouldn't be violating

10  anything by going to Judge Jackson, except unless you argue

11  that I didn't give you a chance to be heard.  That's why I

12  asked you the question:  Have you had your chance to be

13  heard?

14         MS. RANAHAN:  On the first issue, we've -- if

15  you've read the whole thing and you've decided that they

16  shouldn't prepare a deposition witness on those issues, then

17  I suppose we've been heard.  I didn't know that we talked to

18  the second issue at all.

19         THE COURT:  Well, you --

20         MS. RANAHAN:  So for the -- for the first issue.

21         THE COURT:  You explained it in your letter and

22  which I read?

23         MS. RANAHAN:  Yeah.

24         THE COURT:  Did you want to add anything to that?

25         MS. RANAHAN:  Well, you said -- yes.  So I would

1    like to be -- I mean, I've made my record on the first issue.

2    We haven't talked about the second one at all.

3            So I realize, you know, we've been doing a lot of

4    things out of order here and all we wanted to do was see if

5    we could get this resolved early or get some guidance to see

6    if making objections would be, you know, worth it.  But I

7    don't want to waive everybody's --

8            THE COURT:  No.  I understand what you're doing and

9    you're the one who brought the topic up.  So I'm asking you:

10   Do you want to be -- I think you've just acknowledged that

11   you've been heard sufficiently as to any objection on the

12   first issue.

13           Do you want to add any oral argument on the second?

14           MS. RANAHAN:  Yes.  Sure, Your Honor.

15           So if -- so if I understand that what -- your

16   ruling on the first is just they should not need -- we don't

17   -- we (inaudible) a list of the artists and then ask about on

18   the work-for-hire, that's not something that you would

19   entertain?

20           THE COURT:  What I'm saying is I'm overruling an

21   objection.  Do you believe that there are matters that Ms.

22   Rodriguez didn't even address that I would have to address?

23           MS. RANAHAN:  Well, Ms. Rodriguez was relying on

24   your statement from the February 22nd and 23rd about document

25   discovery so she was deferring to those rulings.  And these

1   are just asking, you know, 10, 20 minutes of questions at a

2   deposition testimony.

3          So we wanted to get your guidance to see if,

4   perhaps, with the new revelations that we just described to

5   you, which are the -- what we have done with the Bright

6   House, which has doubled the concern rate, and also the fact

7   that the -- that what had happened in the context of what

8   went -- how we went about getting those to the Copyright

9   Office last time, which was through summary judgment, and

10  then a very quick ruling.  We just thought it would be worth

11  alerting you to those updates.

12         THE COURT:  Are you saying Ms. Rodriguez engaged in

13  no analysis whatsoever, besides, Well, this was stated at the

14  February 22nd and 23rd oral argument and, therefore, no?

15  That's all she said?

16         MS. RANAHAN:  That's not all she said, but that was

17  the gist of her saying -- I think this was decided -- I think

18  these issues were largely decided.  And we can wait for the

19  transcript to confirm that, but that -- and Ms. -- if anyone

20  else wants to speak up, but that was -- the gist of it was

21  that she thinks this had been decided on both of these two

22  issues that we've put in this letter, including the dropped

23  works, and given that there was updates, I just wanted you to

24  have these updates before -- because we could try to do a

25  reconsideration, based on the new updates; but I think you

 1   have indicated that you are not -- the single digits seem to

 2   be significant to you as far as the document discovery.

 3            This is us trying to just ask some questions about

 4   documents that were produced in Bright House that you had

 5   indicated before we could use for discovery in this case.

 6   You had indicated we could do that.  And you said we have 80

 7   percent, so what's wrong with being 20 percent more?  It

 8   might be too burdensome.

 9            So I'm just -- I was expecting that you would be

10   open, because you've been very pro-discovery on these issues,

11   that you would allow us to ask some questions here.

12            So, yes, I am taken aback by your overruling that

13   initial objection, now knowing the new facts that we've

14   brought before you.  On the dropped works -- go ahead.

15            THE COURT:  Now, are you amending your response

16   that you'd like to be heard further?  That's the question.

17            MS. RANAHAN:  Yeah.  I mean, if this -- if you're

18   going to -- yes.  If you don't -- if you're not impressed by

19   those two new things I've brought to your attention, I would

20   love the opportunity to do a formal objection, let plaintiffs

21   respond and we can get the transcript, which is what they've

22   been asking for.

23            THE COURT:  Okay, that's fine.  That's what Mr. --

24            MS. RANAHAN:  But I -- you know, I --

25            THE COURT:  -- what Mr. Kaplan asked for, so that's

1    what you have.  Okay?

2              MS. RANAHAN:  Okay.  And then we'll defer the

3    second issue, which is the dropped works.  I know you started

4    by saying, you know, attorney representation is not evidence

5    --

6              THE COURT:  No, we're not deferring --

7              MS. RANAHAN:  -- and we're trying to --

8              THE COURT:  We're not deferring anything.  If you

9    wanted to object, go ahead and object when you get your

10   transcript.  Okay?

11             MS. RANAHAN:  Okay.  So we'll -- thank you.

12             THE COURT:  All right.  Anything else?

13             MR. SPERLING:  Definitely not, Your Honor.

14             THE COURT:  You're wise beyond your years, Mr.

15   Sperling.  Okay, we'll be in recess.

16             (Whereupon, the within hearing was then in

17   conclusion at 4:36 p.m.)

18

19

20

21

22

23

24

25

110

```
 1                    TRANSCRIBER'S CERTIFICATION

 2   I certify that the foregoing is a correct transcript to the

 3   best of my ability to hear and understand the audio recording

 4   and based on the quality of the audio recording from the

 5   above-entitled matter.

 6

 7   /s/ Dyann Labo                    March 22, 2021

 8   Signature of Transcriber               Date

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```