THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cv-874-RBJ-MEH

---

WARNER RECORDS, INC., et al.,

Plaintiffs,

vs.

CHARTER COMMUNICATIONS, INC.,

Defendant.

---

Proceedings before MICHAEL E. HEGARTY, United States Magistrate Judge, United States District Court for the District of Colorado, commencing at 1:30 p.m., March 19, 2021, in the United States Courthouse, Denver, Colorado.

---

WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

---

APPEARANCES

HARDY EHLERS, Attorney at Law, appearing for the Plaintiffs.

ANDREW H. SCHAPIRO, Attorney at Law, appearing for the Defendant.

---

DISCOVERY CONFERENCE

P R O C E E D I N G S

(Whereupon, the within electronically recorded proceedings are herein transcribed, pursuant to order of counsel.)

THE COURT: Okay, Case Number 19-cv-874.

Make your appearances, please

MR. EHLERS: Hi, for the plaintiffs you have Hardy Ehlers from Covington & Burling, Jonathan Sperling also from Covington, Matt Oppenheim from Oppenheim & Zebrak and I believe some others on the phone.

THE COURT: Thank you.

MR. SCHAPIRO: And, Your Honor, for Charter you have Andrew Schapiro from Quinn Emanuel. With me are Ella Hallwass and Allison Huebert. We also have others on the phone, including some of our friends from Winston & Strawn.

THE COURT: Are they all friends?

MR. SCHAPIRO: Yes, they are.

THE COURT: Cool. Okay.

MR. SCHAPIRO: Even Jonathan and Matt, I would say.

THE COURT: That's the way it ought to be. It's a profession, right?

ZOOM OPERATOR: Your access code was not recognized here.

THE COURT: Hold on a second, I guess we are supposed to let the public listen.

ZOOM OPERATOR: To join the conference as the host, please enter the secure code followed by -- there are three participants on the call, including you. You are joining your conference as the host. For many of the available commands, press star.

THE COURT: All right, now that we have got that out of the way. We will be here solely on the issue of the five lines -- well, the whole document, but the five lines that were redacted.

MR. SCHAPIRO: Yes, Your Honor, I'm sorry that we weren't able to deal with this yesterday, but I, at least, needed to consult with Ms. Hallwass on this and so I think we are just here on this privilege issue, so I'm hoping it can be -- can be a quick one.

THE COURT: So I want to call up that docket.

MR. SCHAPIRO: And so just to be clear, I think there are two documents. There's an e-mail and the attachment.

I'm not sure where the feedback is coming from.

THE COURT: We've created a whole separate folder just for this case on our drive.

MR. SCHAPIRO: Your Honor, I apologize, I'm having a lot of audio feedback.

THE COURT: I agree. I'm getting it too.

MR. SCHAPIRO: People are not muted, maybe. I'm

seeing (audio cut out.)

THE COURT: All right. So I am looking at Highly Confidential Entry 412, correct? By the way, what does it take to make it to the Highly Confidential rating, versus just confidential?

MR. SCHAPIRO: That's above my pay grade, Your Honor.

THE COURT: Okay, so -- and I have the Excel spreadsheet. All right. So the document was originally inadvertently produced in total? Or with some lines redacted?

MR. SCHAPIRO: In total, Your Honor.

THE COURT: Where does the five lines come in? Tell me that. What is that about?

MR. SCHAPIRO: So the five lines are on the spreadsheet and Ms. -- let me just see if I can pull this up. And I want to be somewhat careful because I gather -- you said there's some members of the public listening to, but I just want to make sure no one thinks we are waiving privilege. I'm perfectly happy to talk about all of this.

THE COURT: Well, I don't know if there's members of the public. I mean, we don't ask, but there are two people on the phone line, so whoever they are, they are.

MR. SCHAPIRO: Yes, okay. So I guess we are in open court, I guess is my point.

THE COURT: We are in open court.

MR. SCHAPIRO: If Your Honor looks at the spreadsheet, along the bottom you will see there are multiple tabs and one of them is called "Background Info."

THE COURT: I'm there right now. So there are two lines, three lines, and five lines.

MR. SCHAPIRO: Correct. And -- and the plaintiffs commendably came back to us and said, Oh, you know, we see this part here, they are aware that Chris Avery is an attorney. You see at the top it says, Chris Avery's Request Number 18, and they said, Did you mean to produce this? And we did not mean to produce it, nor did we mean to produce the spreadsheet or the e-mail. And I think I can just, in two sentences, explain why.

I mean, this segment here that you are looking at explains that this is a request from Chris Avery, in-house counsel, who is trying to assess issues about the notices, many of which appear to attribute multiple infringements to a single work and repeat notices that are not based on actually sharing. So he gives an assignment to his team.

I could show you, if you wanted, through some other documents that we could show you in-camera where this quote comes from, but it has its genesis in a conversation with some outside counsel.

And he then says to his time, We need to validate

this, can you do -- do this assignment, crunch the numbers? And so this -- all of this spreadsheet, other than the very first tab -- the first tab (inaudible) is the raw number. The rest of it is the number crunching in response to the request from this in-house lawyer Chris Avery.

So we are willing -- we informed the plaintiff about this just a little bit before the call. We are willing -- I don't think we have a good claim on the very first tab, which is the raw information. So we are willing to produce that to them.

But the rest of the spreadsheet is just the worker bees carrying out Chris Avery's request that they analyze some numbers that he can use in his legal analysis. And the cover e-mail should make that clear, too

THE COURT: First, that's a lot more than two sentences, so be careful what you say.

Second, I don't see fundamental principal difference between this with a Charter attorney trying to direct things to be done internally concerning the claims that are being made against it and the plaintiffs' lawyers, in 2016 doing the same thing: Trying to do an internal effort to bring the case. What is the principal difference between those two things?

MR. SCHAPIRO: Well, one of the main differences is that the plaintiffs' lawyers are talking to someone who is

not the client. They are sending out to some third party saying, Here's an assignment we want you to do. So if Chris Avery had sent this out to some accounting firm or something, and said, I want you to go and do this analysis, you would have a very different analysis here, because then there's some third party.

This is the client internally. This would be -- this would be like Sony Entertainment internally saying, All right, let's -- you know, let's take a look at, you know, whether these notices support our legal theory, whatever it might be.

THE COURT: So your position is that if Charter, no matter who's involved, lawyers or not, if Charter included in any communication an outside party, that it's not privileged?

MR. SCHAPIRO: Not automatically, but that we would have much more of an uphill battle, and I think that's why we prevailed on the Hash Report. There's another point about the Hash Report, of course, which is we are not even getting the data. The Hash Report, most of which as I understand, I have never seen it. It's just data. We have -- as I, you know, was explaining, we are prepared to produce the actual underlying data that was not used for the analysis, but just not the analysis.

Now, if we then turn around and say, We are going to sue you based on this analysis and this is going to form

the basis of our claims that you were doing X, Y and Z, they would have a stronger case, too. That's the Hash Report

But I think we are on solid ground. Whatever one might think about the -- the differences between this and the Hash Report, I think we are on solid ground that this is privileged for the reasons I've said.

THE COURT: Well, so when was -- when was this written -- this little box of sentences?

MR. SCHAPIRO: It was contemporaneous with the project, but I would have to leave it to Ms. Hallwass, would it be in 2013 at some point? Probably in March of 2013.

MS. HALLWASS: Yes, pretty much, 2013.

THE COURT: Okay. All right, who is going to talk for plaintiff?

MR. EHLERS: Good afternoon, Your Honor, Hardy Ehlers. So we -- we saw Charter's e-mail come in 20 minutes before the hearing. We haven't fully -- a chance to fully digest Charter's new position on what it's proposing to produce. And while we appreciate Charter's new position on what it's going to produce, we don't think that the privilege applies to any of the other material in the spreadsheet.

Charter's position seems to be that requests for information or number crunching in response to an attorney's request, if there was one, means all of the data is privileged, too, but that's not true for several reasons.

First, as we have seen in this case already, Charter's lawyers, in-house lawyers, can wear more than one hat. And so if the request was made for predominantly business purposes, then not even those five lines should be redacted.

Setting that aside, the privilege applies to communications. There is one communication here, it's those five lines in the spreadsheet. The rest of it is a compilation of facts. Multi-communication to or from an attorney with those facts might be privileged. It does not apply to the facts themself. Upjohn made that clear a really, really long time ago. These are numbers from a preexisting database. They didn't go and create a new database at the -- at the request of the attorney. This was just -- I'm sorry -- Charter's existing past database.

We can see, based on the subject line of the privileged log they provided for this document, that it concerns a termination demand. So we're talking about repeat infringement here. And so this is Charter's contemporaneous repeat infringer data that's always going to be more complete than the set they produced to us that existed before they attorney ever requested information. So they are trying to use the fact that there was a request to hide the underlying facts. And the law is clear that you just can't do that.

There's no -- if they were to redact just the five

lines that we notified them about and (inaudible) with the spreadsheet and look at the spreadsheet, (inaudible) of a single communication.

THE COURT: Why -- isn't the Hash Report just facts, the report itself?

MR. OPPENHEIM: I --

THE COURT: No, Matt. No, no, you weren't doing this, he was, let him fly solo. Isn't the information in the Hash Report facts?

MR. EHLERS: I understand that information in the Hash Report is much more along the lines of attorney impressions, that the data was created as -- as a -- you know, a case workup, right? It's not preexisting data that had already been --

THE COURT: That's an explanation, I understand. But is the information in the Hash Report facts?

MR. EHLERS: Your Honor, I have never seen the Hash Report, so I'm a little uncomfortable answering that question.

THE COURT: Okay.

MR. OPPENHEIM: I'm happy to jump in if you would like, Your Honor.

THE COURT: I'll bet you are. You are never hesitance to jump in. Okay, so people keep saying "five lines." Maybe the way it's on my version, but are we talking

about all of text?

MR. SCHAPIRO: I think plaintiffs' position was that it (inaudible) -- I have to call this up on my screen again. The first few lines of the text are not -- would not be privileged. I think they just think the final paragraph starting, We need to validate.

THE COURT: Okay. I don't see the fundamental difference between that last paragraph and the first line, at least. I mean, it's all talking about the same thing, so -- I don't know. Go ahead.

MR. EHLERS: Your Honor, I can explain, I want to be a little bit careful. I know that the protective order bars us from characterizing information that's been clawed back, and since as of, at least, 30 minutes ago they've clawed back the entire thing, I don't want to say too much. But the reason we pointed to the five lines was that the prior portion seemed to be reproducing a communication that was sent to outside Charter, which would necessarily not be privileged.

MR. SCHAPIRO: So --

THE COURT: Wait a second. Does Matt agree with that? That something sent outside the company is necessarily not privileged? Is that what you want him to say, Matt? You are shaking your head no.

MR. EHLERS: Sorry, let me put a finer point on it,

Your Honor. Sent to an adverse party.

THE COURT: Oh, my goodness. Okay. So anybody else want to say anything?

MR. SCHAPIRO: I can respond to that last one, if it matters, but, you know, that will engender another back and forth. We -- we have a narrative about that.

THE COURT: Well, I'm not sure I have heard about the need for this thing either. I mean, somebody describe the relevance, how it might be used at trial. If you could do that for me, please, because, you know, it has to be something that's needed.

MR. EHLERS: Sure, Your Honor, this is -- and, again, I am going to have to speak at a high-level, but it's data that was compiled in response to a termination request sent by another right's holder saying, You need to terminate these subscribers because they are the subject of lots and lots of infringement notices. So that's obviously what this whole case is about.

And the need here is this is -- this is a contemporaneous document with that information. Charter's produced some of that to us, years later, but as you have heard on multiple occasions, the data that we have received is limited because of Charter's retention policy and (inaudible) that retention policy.

So we have gotten a fraction of the data -- the

sorts of data that is reflected in this spreadsheet produced to us years later. Right, this is the 11 percent of the subscribers that were identified in plaintiffs' notices show up in the ticket data that we can then do a repeat infringer analysis on. This is a contemporaneous repeat infringer analysis based on a whole raw set of data that was available to Charter at the time. And so it's something we don't have. It's something that also shows that Charter was performing this kind of analysis, right, that it was tracking repeat infringement at the time. And so the very fact that it exists is -- is alone significant.

And, you know, there's obviously no -- we have no -- we have no ability to get the same thing through -- through any other source

THE COURT: Right, but if you --

MR. SCHAPIRO: What we're willing to do --

THE COURT: Hold on, Andrew. If they agree that you can have at least the first tab, then you have established its existence and, therefore, for whatever that's worth, you can use that at trial that this exists, right?

MR. EHLERS: Well, no. Every single one of these tabs is raw data with no communication. So I mean, it's responsive to discovery we served. It's talking about repeat infringement on Charter's network. It's a core issue in the case. There's no attorney-client privilege -- there is no

attorney-client communication here at all.

THE COURT: You didn't hear what I said. Maybe you didn't -- hold on, maybe you didn't hear what I said. So if they -- if they don't -- if we only -- if I only order the production of the first tab, you have met your need to establish this exists. At trial, you could hand this to a defense witness and you can say, What is this? And they will say, This is what it is. And, When was it created? Why was it created? Et cetera. So there you go. You have what you need.

I haven't seen or heard you say anything else that would --

MR. EHLERS: So --

THE COURT: -- would require it to be produced. Go ahead.

MR. EHLERS: We do need -- the fact that it exists is one reason why it's significant, but the data itself is also information that we absolutely want and need. And I'm a little bit -- my hands are tied a little bit in responding to what's in the other tabs because, Your Honor, I don't -- they've made this proffer to disclose a tab that is literally entitled "Raw Data," probably because that was kind of a hard position for them to take.

I don't -- I don't -- we haven't done an analysis on the other -- on the other tabs. I can't tell you how -- I

can't look at the document right now and tell you, We need -- we need these numbers that are in tab 4, these numbers that are in tab 6 because I'm not allowed to look at it, right? They clawed it back.

But we know that all of it is talking about repeat infringement on Charter's network and that's obviously what this case is all about. And so we can't say now in March, seven months before trial, that we don't want the data in those other tabs. Of course, we could -- we could use that and analyze it to assess of the problem

MR. SCHAPIRO: So I think Your Honor put your finger on it when you said that they the have data. I can represent -- and somebody on my team should shout if I'm misrepresenting -- that the rest of the other tabs are all based on that data. It is running different analyses from that data, which the plaintiff or their experts will be perfectly capable of doing, too. If they want to take all of the raw data about the notifications that were at issue in this spreadsheet and mix and match them and slice and dice them, they can.

But the spreadsheet -- the amendments compiled for and at the request of counsel behind those other tabs is the part that we are seeking to claw back.

THE COURT: So are you representing, based on knowledge, that everything in the remainder of the document

is some kind of subset of what's in the raw data -- or the raw logs tab?

MR. SCHAPIRO: Let me invite the person with knowledge and with the great New Zealand accent on our team to weigh in with that because I don't actually -- my knowledge is secondhand, it comes from her.

MS. HALLWASS: Yes, that's my understanding.

THE COURT: That's -- I don't like that term, that's my understanding. I just like, Yes, that's true; or No, we don't have enough information to answer that question. So it's either yes or it could be based on information and belief, I suppose. But if you can say yes, say yes.

MS. HALLWASS: I haven't verified it all, so I can't say yes in that context, but it's my understanding that the data reflected in the other tabs is encompassed in the raw logs tabs.

THE COURT: Okay. Well, Andrew, I'm going to expect an answer to that question, even if you can't do it today. I will probably --

MR. SCHAPIRO: Yes.

THE COURT: -- make a ruling based on your current representation, but you have got to confirm that representation with -- with certainty, okay?

MR. SCHAPIRO: We can confirm it within a business day or two. I don't want to promise over the weekend because

I think some -- yes, for sure, we'll -- we will confirm that, and if we are wrong, obviously, we are wrong at our peril. We'll confirm and let you know one way or another.

THE COURT: Anything else from the plaintiff?

MR. EHLERS: Yes, Your Honor, just one point, which the way this (inaudible), it's sort of assumed that there has been a work product claim over these other tabs. There's been no work product claim over these tabs. It was logged as privileged. There is -- the attorney-client privilege protects communications. It doesn't protect facts. The spreadsheet contains zero communications from an attorney, apart from the (inaudible) looked at, five of which are even arguably privileged.

And so to engage in this process of, Well, are the other tabs duplicative of the first tab and maybe they reflect number crunching as opposed to raw numbers is -- is beside the point, frankly. It's all facts. None of it's communications. And these are facts that, again, go to the core issue of the case, which is repeat infringement on Charter's network.

THE COURT: Well, what is the first tab, to your understanding?

MR. EHLERS: I -- Your Honor, I can't -- I can't look at it and tell you that. I'm not allowed to access the document.

THE COURT: Well, you can -- you can look at it because I'm ordering it that produced, accepting defendant's proffer. So I don't know if you have it available to you. Has anybody in the plaintiffs' side seen the first tab or did they -- how did you -- how did you just skip to the background information, which is the second tab, without actually seeing the first tab? By the way, who is the human being that actually saw this and had the wherewithal to say, Hey, this might be privileged? Who is that person?

MR. EHLERS: Your Honor, it was me.

THE COURT: You said -- wait. So are you saying -- remember, officer of the Court, everything that goes with that, are you saying you did not look at anything on that first tab called digital rights raw logs?

MR. EHLERS: No. I'm saying I had the spreadsheet up. We were looking at the data. I clicked on the background information tab at some point. And in looking at this -- this particular document, saw the reproduced e-mail, and then pursuant to our ethical duties in Colorado, we notified opposing counsel.

THE COURT: Okay. So when you were -- when you were looking at that raw data, what did you think it was? What went through your mind?

MR. EHLERS: That it was an analysis of repeat infringement on Charter's network of -- of subscribers that

were the subject of notices.

THE COURT: Okay, so it lists a ticket ID because I'm -- I can talk about this, because it's going to be produced. It lists a ticket ID that presumably is -- is that an internal Charter? Or is that an ID provided by the people who are alleging infringement?

MR. SCHAPIRO: That would be internal Charter, Your Honor.

THE COURT: Okay, then an account number is what, Andrew?

MR. SCHAPIRO: Sorry, I was muted. It should be the subscriber account.

THE COURT: Subscriber account. Okay, so that's all of those first numerous are one person?

MR. SCHAPIRO: Yes, because this was about how to respond to -- to some claims of repeat infringement.

THE COURT: Okay.

MR. SCHAPIRO: As to which --

THE COURT: Digital Rights Corp is the entity that asserts the plaintiffs' rights?

MR. SCHAPIRO: Correct.

THE COURT: The IP address is associated with the account number?

MR. SCHAPIRO: Right.

THE COURT: The abuse date is when the download

allegedly occurred?

MR. SCHAPIRO: Correct.

THE COURT: The complaint date is when the ticket was received?

MR. SCHAPIRO: Approximately.

THE COURT: Notice ID is what?

MR. SCHAPIRO: That, I think -- that I actually don't know, but I believe it's -- someone from our team can tell me. I believe it's when the notice came in that was -- you know, a notice sent from Digital Rights Corp would have some number on it saying, this is -- you know, to identify it.

THE COURT: Okay.

MR. SCHAPIRO: In correspondence, please reference number, blah, blah, blah.

THE COURT: Okay. Then title song and file name are self-explanatory, obviously, right?

MR. SCHAPIRO: Yes.

THE COURT: Yes, and there are how many entries? 1400-and-some-odd, does that sound right.

MR. SCHAPIRO: Yes. That's what it looks like, yes.

THE COURT: 1496.

Okay, what else can I do for you guys?

MR. SCHAPIRO: Nothing for us, Your Honor

THE COURT: Okay. From the plaintiff?

MR. EHLERS: Nothing -- nothing from us, Your Honor.

THE COURT: Okay. So can somebody -- I still have -- I ask this every time, or practically every time, but I just am desperate to get this stack of paper off my desk. So I have the dispute on 346, correct? That's the plaintiffs' objection to Special Master that -- have you -- Andrew, have you decided what you guys are going to say?

MR. SCHAPIRO: No, but we will meet your 5 p.m. Mountain deadline, so we will -- I think people are discussing this now elsewhere and I will have it -- our e-mail to you by 5:00 p.m.

THE COURT: Okay, so I have before me 346. I'm going to have before me what we talked about yesterday with Ms. Ranahan, probably, an appeal. What else? Anybody know? I have the one out of every hundred that we need to review that plaintiff produced. Is that right?

MR. SCHAPIRO: Yes, on the BitTorrent.

THE COURT: Right. Matt, anything else you could think of.

MR. SPERLING: Your Honor, it's Jonathan. Not pending before you, I think there's one that's pending before Judge Jackson.

THE COURT: Right.

MR. SPERLING: Which is Charter's objection on your ruling directing them to produce items on the privilege log.

THE COURT: Right, got that.

MR. SPERLING: And then I apologize, Your Honor, I -- I may have (inaudible) for a moment, but I didn't hear the resolution of the first issue that we (inaudible).

THE COURT: So I'm going to order produced obviously the first tab and permit the remainder to be redacted. Well, there was one good point that we haven't run down to the ground yet and that's Mr. Ehler's allegation that no work product doctrine was asserted. Is that true?

MR. EHLERS: That's (inaudible) only asserts the attorney-client privilege over the document.

MR. SCHAPIRO: Yeah. And the reason is, Your Honor that attorney-client privilege covers not only what the attorney says to the client but what the client says to the attorney. And this may be a spreadsheet rather than a -- than a, you know, a narrative note, but this is a client preparing an analysis at the direction of the attorney and giving it to the attorney. So if my attorney says, Hey, I need you to go back and look through your checkbook and show me these -- these submissions you made because we are -- you know, we are under the spotlight with the IRS and I need to figure out what our exposure is, and I go back and I assemble all of this stuff and say, Okay, here's what I have got

pursuant to your direction (inaudible), I think that more accurately -- it's privileged for sure, but I think it more accurately falls within the heading of attorney-client than work product.

THE COURT: Right, but so you -- is that an explicit or at least a tacit admission that it wasn't created in contemplation of litigation?

MR. SCHAPIRO: No, because it was contemplated on the basis of a threat from Digital Rights Corp saying, We think you're liable for these violations. And us saying, Okay, we aren't, what is this?

THE COURT: So -- all right. I know you think -- you guys do -- if you do nothing else, you do overkill. What I don't understand is what -- if this was done in anticipation of litigation at the direction of an attorney, why is it not work product?

MR. SCHAPIRO: Well, it may be, too, because it -- I guess it is both, because in this case the person doing that analysis, the work, is the client. So what -- you know, I go back to my analogy about my lawyer says, Go dig out your tax payments and give them to me in a spreadsheet and I will figure out whether you owe or whether this threat from the IRS actually -- whether we should fight it or not.

THE COURT: Right, but you didn't assert --

MR. SCHAPIRO: It's from the client, so I think

attorney-client privilege is a more potent privilege.

THE COURT: Okay. Well, I guess, sometimes you don't believe in the belt and suspender's approach, right? So sometimes just the belt is enough.

All right. So that's what my ruling is on that, that it's attorney-client.

Anything else?

MR. EHLERS: So --

THE COURT: Go ahead.

MR. EHLERS: -- Your Honor, I just -- just to respond to one point that Mr. Schapiro made, which was that this is -- this is privileged because it's a communication back to an attorney with facts, but it's not that, right? Presumably they either logged that or withheld it some other way. This is a -- this is a spreadsheet that was attached in an e-mail chain between zero lawyers. There's not a single communication in this entire parent body combination of documents other than the one cell we have been looking at.

THE COURT: Wait, so are you saying --

MR. EHLERS: We all know (inaudible). That's really the only (inaudible) is protected here. I don't -- if there is no work product assertion, then there's no reason to distinguish tab 1 from the other tabs.

THE COURT: You are saying that the attorney wasn't included -- although he asked for certain things to be done,

he wasn't included in the results of what he asked? Is that what you are saying?

MR. EHLERS: I'm -- that may or may not have happened, but they sure -- that is sure not the document we are looking at now. And if there is a document out there where they say, Mr. Attorney, here's the results of our investigation for you, that's privileged. That's a privileged communication. This is a -- this is just a bunch of facts.

THE COURT: Andrew, address that. I don't -- I'm looking at the e-mail itself.

MR. SCHAPIRO: Sure. So just cognizant of the fact that we are on an -- on an open line, if -- start at the -- at the bottom, so the first in time e-mail is from Mr. Avery --

THE COURT: Right.

MR. SCHAPIRO: -- a lawyer. It's a bounce-back what you see -- what the subject -- the subject line is here. So the nonattorney says -- is talking about his request. She is saying, he's out of the office, that this -- can we provide . . ., I'm not going to speak it out loud. That may be enough to satisfy his request.

Then if you go up to next one in time, this one says: Does Chris only want . . .? Which would like? There's a very big difference. And further up -- basically

this entire thread -- and we have highlighted some of them -- is the team saying, Are we satisfying the request from the lawyer here? Is this what he wants from us? Are we preparing the thing he wants us to communicate to him, this spreadsheet? Every time Chris is mentioned, Chris is the -- Chris is the in-house lawyer. I don't think there should be any dispute about the e-mail.

THE COURT: I'm sorry. Is this whole e-mail chain just the back and forth for people trying to figure out what the lawyer wanted?

MR. SCHAPIRO: Yes.

THE COURT: So it doesn't transmit the results, the fruits of the effort?

MR. SCHAPIRO: To -- to him? Not this one, that's correct. It's the same analysis as the spreadsheet itself. It is the -- the analysis -- the number crunching and analysis requested by the attorney. Me saying to my wife, I guess, We need to pull out our estimated tax returns for the past five years, what is this? Where is it? The attorney want this. It's specifically saying, this should be enough to meet his request, or is he asking for this or for that.

Look at the one dated March 7, 2013 at 2:54 p.m. It's all back and forth about what does our attorney want and is this it?

THE COURT: March 7, 2013 at what time? 2:54?

MR. SCHAPIRO: Yes, sir.

THE COURT: Don't need to call me sir.

MR. SCHAPIRO: (Inaudible).

THE COURT: Only military --

MR. SCHAPIRO: Your Honor.

THE COURT: -- can call me sir. And you do not look military, so --

MR. SCHAPIRO: I'll send you a picture of when I had a crew cut, but that's when it was kind of funk.

THE COURT: Okay.

MR. EHLERS: So, Your Honor, what the whole colloquy made clear is that, indeed, the spreadsheet was -- what we are looking at is our communication to a lawyer. It's a spreadsheet, it's facts. it's the tax return in Mr. Schapiro's hypothetical.

THE COURT: I'm sorry, what is your point? That -- say that again.

MR. EHLERS: We started talking about the exchange in the e-mail chain, and what was clear is that this -- there has been no transmittal as what Mr. Schapiro just acknowledged, and so when we're looking at the spreadsheet, we are looking at facts, not a communication.

THE COURT: Right. So, again, I want to make sure what you are saying. If there are -- if there are documents in -- in the plaintiffs' possession where some plaintiffs'

lawyer asks operational people do something, and then those operational people talk with one another, How do we meet this lawyer's request? Do we do this? Do we do that? You are saying those communications are not privileged? Is that what you are saying?

MR. EHLERS: No. I'm saying that insofar as the data that the lawyer requested was preexisting in a database like this; that if they exchanged among themselves, here's a spreadsheet of song prices, that spreadsheet is not privileged.

THE COURT: I'm -- I'm ordering the data produced, not -- just not -- the efforts to please the lawyer. I'm ordering the raw data produced and then what they did in order to meet the lawyer's needs at his specific request. That's what I'm not ordering produced, so.

Okay, that will be ruling of the Court. What else?

MR. SCHAPIRO: That's all we have, Your Honor.

THE COURT: Okay.

MR. EHLERS: I just wanted to clarify, Your Honor, are you ordering the production of the entire spreadsheet apart from the one cell or --

THE COURT: No, just tab 1.

MR. EHLERS: Okay. I mean, the -- and is the basis for the ruling on the other tabs that it's protected by -- by work product? Because if that's true, they haven't made

assertion, and if it's privileged, then -- then there is just no communication.

THE COURT: So would you say that a party waives work product by not raising it?

MR. EHLERS: I think -- I think, in most -- in most cases, yes, but I also haven't heard them make a -- make a fulsome work product argument today. And even if they did, it would be -- it would be subject to (inaudible) work product, right, and we haven't discussed whether there would be substantial need. I referred to some of the reasons why there would be earlier; namely, that this is repeat infringer data that we don't have and can't get elsewhere.

THE COURT: All right. So to be clear, I just want to make sure I know you are arguing. If a lawyer asks a client to do something and the client does it and sends it to the lawyer -- well, if the client does the work, that work itself is not covered by the attorney-client private. That's what you are saying?

MR. EHLERS: I'm saying that the underlying facts are not. I mean, this is -- this is Upjohn, right? Like the underlying -- the attorney-client private protects communications between an in-house counsel and other employees of the company, and so the in-house counsel can (inaudible) information. That's not a controversial proposition, but equally uncontroversial is that same

privilege cannot serve to shield the underlying facts. And what we are looking at in this spreadsheet is underlying facts in every single tab.

THE COURT: I mean, I'm -- I'm trying to nail this point down. So I wanted Mr. Ehlers to answer this.

As a general proposition within the attorney-client privilege, an attorney asks the client to do something internally, for whatever reason, administrative -- compliance with administrative regulations or maybe, you know, SEC filing requirements, lawyer knows what needs to be done. He tells his client to do that in order to meet their legal obligations. And the client does that. Communications to and from attorney and client would be privileged, but the work that the client does is not privileged? Is that what you are saying?

MR. EHLERS: I'm saying that -- yes, if the -- if the communications were undertaken for a legal purpose and not a business purpose, they would be privileged. And if the client -- I think there might be a -- but, yeah, the work done by the client with the facts is not privileged

THE COURT: Okay. Andrew?

MR. SCHAPIRO: So imagine I'm consulting with my attorney and he says to me, Okay, I want you to -- I understand your business partner was just found dead in the office. I need you to write up for me exactly what happened.

Give me the chronology of it, all the data here. Write it up for me. Eventually, in some form I -- you know, I do that, I'm making sure I'm getting it exactly right. Ultimately, it does go to him and Ms. Hallwass can explain how the spreadsheet, after they hashed out -- after they worked out exactly, you know, what it should include goes to the attorney. By Mr. Ehler's principles, that -- that confession that I write out about exactly how my business partner ends up dead on the floor in my office, I'm preparing for my lawyer and my first draft of it and then I give it to my lawyer isn't privileged. And, you know, what would that do to the attorney-client relationship?

MR. EHLERS: No, that wasn't exactly a fair recitation of our position. If the client is going to collect information at an attorney's request and the attorney's request is made for a legal purpose, then the information the client goes and collects is -- to the extent it's raw facts, those facts can't be withheld by the privilege. That's been the law for a very, very long time. There might be some circumstances in which the facts are -- you can't -- you cannot segregate them from the attorney-client privilege. Maybe -- they had never been gathered before or they are put together in such a fashion that you can't disclose the fact without disclosing the communication, those would be some limited circumstances.

That's not true here. If they were to redact that one cell of data with an attorney-client communication and you just looked at that spreadsheet, it wouldn't disclose any substance of any attorney-client communication, and that's all that is protected by the privilege.

MR. SCHAPIRO: So two things, Your Honor. This was, and various people are pinging me on the chat. It was ultimately in another thread sent to the attorney, and we can, in a -- if we can reduce the number of people on this Zoom or on this conference or find some other way, we can show you or explain that.

Number two, they have the data. We are giving them the data and this is all subject to the representation that -- that we'll -- that we will confirm that everything in this spreadsheet behind it is derivative of the data. So they are getting the data.

MR. EHLERS: And, Your Honor, that communication that Mr. Schapiro just described is what is protected by privilege, right? It's client saying, Attorney, for legal purpose, he asked me to do this, here's what I'm providing, that's the kind of thing that does get protected. What doesn't are raw facts.

Again, this is a spreadsheet with a bunch of tabs. In one of the tabs is a communication. We asked them to, you know, redact that and we know about that. Every other cell

of every other tab in this spreadsheet is data from a preexisting database. This isn't something that was created in response. It was pulled from a preexisting database already on their system. Facts that they were maintaining in the normal course of business --

THE COURT: Right, so --

MR. EHLERS: -- that we don't have.

THE COURT: So if the facts were that Mr. Avery asked for certain information and in a ten-hour phone call somebody told him that information over the phone, instead of putting it in a document, you are still saying that the communication back from the client would not be privileged?

MR. EHLERS: Well, we wouldn't have the records -- I mean, that would be an attorney-client communication, right, but in your hypothetical, we could depose that person and they would have to recite the same --

THE COURT: Let's say the phone call's recorded -- the phone call's recorded and it can be transcribed.

MR. EHLERS: Well, then your phone call is the second e-mail that Mr. Schapiro was talking about. That's not what we are talking about right now. This is a -- this is not that. There is no communication here.

THE COURT: No, I'm saying the attorney asked for certain information. Three days later the client calls back and says, I got what you need. Here it is. You got a pen

and a lot of, lot of paper, maybe some graph paper. All right. And gives him all of the information contained in this spreadsheet, all in a phone call, all to the attorney.

Is any part of that privileged?

MR. EHLERS: I think that recording is privileged. But that is not what we are dealing with here.

THE COURT: Okay. Then I guess based on that response, I disagree.

Okay. What else can we do?

MR. SCHAPIRO: Nothing here, Your Honor

THE COURT: All right. So I would -- again, I'm encouraging a phone call sometime soon. I still think there is lots of value in trying to resolve case. I know it's kind of dicey for me to be sitting here almost daily deciding disputes and also talking to you ex parte about settlement, but you know, I think I can do that safely without diving into too much to the merits. And besides that, I'll have nothing to do with the trial of this case. So everybody have a great weekend.

MR. SCHAPIRO: We appreciate that, Your Honor thanks.

THE COURT: Thank you, Your Honor.

(Whereupon, the within hearing was then in conclusion at 2:18 p.m.)

TRANSCRIBER'S CERTIFICATION

I certify that the foregoing is a correct transcript to the best of my ability to hear and understand the audio recording and based on the quality of the audio recording from the above-entitled matter.

/s/ Dyann Labo March 25, 2021

Signature of Transcriber Date