1            THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO

2

Case No. 19-cv-874-MEH

3 _____

4 WARNER RECORDS, INC., et al.,

5     Plaintiffs,

6 vs.

7 CHARTER COMMUNICATIONS, INC.,

8     Defendant.

  _____

9

10       Proceedings before MICHAEL E. HEGARTY, United

11 States Magistrate Judge, United States District Court for the

12 District of Colorado, commencing at 3:12 p.m., April 1, 2021,

13 in the United States Courthouse, Denver, Colorado.

14 _____

15 WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE HEREIN

16 TYPOGRAPHICALLY TRANSCRIBED. . .

17 _____

18                APPEARANCES

19       ALEX KAPLAN, JONATHAN M. SPERLING, MATTHEW J.

20 OPPENHEIM, STACY GRIGSBY and HARDY EHLERS,

21 Attorneys at Law, appearing for the Plaintiffs.

22 _____

23

24              ORAL ARGUMENT

25

2

1                    APPEARANCES (continued)

2              ANDREW H. SCHAPIRO, LINDA BREWER, ERIN RANAHAN,

3    SEAN ANDERSON, and CRAIG JOYCE, Attorneys at Law, appearing

4    for the Defendant.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1                     P R O C E E D I N G S
 2              (Whereupon, the within electronically recorded
 3     proceedings are herein transcribed, pursuant to order of
 4     counsel.)
 5              THE COURT:  Okay, guys, good afternoon.  Here again
 6     on 19-cv-874, Warner vs. Charter.  Go ahead and make your
 7     appearances.
 8              This happens virtually every single time.
 9              MR. KAPLAN:  Right, that -- that actually wasn't a
10     mute -- a mute issue, but I realized my sound wasn't getting
11     through.  My apologies, Your Honor.  This is Alex Kaplan of
12     Oppenheim & Zebrak for the plaintiffs.  With me on the screen
13     here, Matt Oppenheim and Jeff Gould and I will let Mr.
14     Sperling make introductions on the Covington side.
15              THE COURT:  Okay.
16              MR. SPERLING:  Good afternoon, Your Honor.
17     Jonathan Sperling for Covington.  I think we also have on the
18     phone Stacy Grigsby and Hardy Ehlers for Covington.
19              THE COURT:  Thank you.
20              MR. SCHAPIRO:  Good afternoon, Your Honor.  For
21     Charter, Andrew Schapiro from Quinn Emanuel with my
22     colleague, Linda Brewer.  There might be some others on the
23     phone and I will let the Winston & Strawn lawyers introduce
24     themselves.
25              MS. RANAHAN:  Good afternoon, Your Honor.  It's
```

4

1    Erin Ranahan for Charter and also we have Sean Anderson here.

2              THE COURT:  Thank you.

3              MR. JOYCE:  And Craig Joyce by phone.

4              THE COURT:  Thank you.  So we're here on the two

5    30(b)(6) topics, right?

6              MR. SCHAPIRO:  Correct, Your Honor, yes.

7              THE COURT:  Okay.  So let me -- again, my way of

8    thinking is going to reduce this thing to its elemental level

9    and we're talking first about the -- the 8020, is that okay?

10   Right?  That's one of the topics?  The 8020?

11             MR. SCHAPIRO:  Yes.  I and Mr. Anderson are going

12   to be handling that.

13             THE COURT:  Okay.  So we've got an order that I

14   gave early in the case that required production of that

15   material from the -- what case was it?  The --

16             MR. ANDERSON:  Bright House case --

17             THE COURT:  Bright House case?

18             MR. ANDERSON:  -- in Florida.

19             THE COURT:  Right, which involved more works --

20   different works than here, but there was 80 percent overlap.

21   That was my understanding.  Right, Mr. Anderson?

22             MR. ANDERSON:  That's correct, Your Honor.  That's

23   correct.

24             THE COURT:  All right, 80 percent overlap.  Since

25   those records have already been assembled, I ordered

1   production.  I think I probably said something along the

2   lines of, you know, listen, you're never going to try -- no

3   district judge is going to let you try every single work of

4   11,000 works.  You wouldn't have enough time ever to do that,

5   so the trial is necessarily going to be based on statistics,

6   cumulative evidence and I felt that 80 percent was a very

7   large sampling at least of material.

8            So that was that order.  And now what's sought is

9   at least the ability to ask a 30(b)(6) witness about the

10  other 20 percent.  Am I good so far?

11           MR. ANDERSON:  No -- no, Your Honor.  The only

12  clarification is that we are not seeking to obtain the

13  document discovery on the remaining 20 percent.  That was

14  discussed on the 23rd in person.  What we're simply seeking

15  to do is obtain deposition testimony regarding the 80 percent

16  that were also -- that were already produced and deemed --

17           THE COURT:  Okay, sorry.

18           MR. ANDERSON:  -- available in this case.

19           THE COURT:  So documents -- so 30(b)(6) testimony

20  on the 80 percent --

21           MR. ANDERSON:  Correct.

22           THE COURT:  -- that was already produced?  Okay.

23           MR. ANDERSON:  Correct, and was -- was somewhat of

24  the premise of -- at least it's Charter's position, not

25  ordering the balance of the 20 percent at the hearing --

1          THE COURT:  Understood.

2          MR. ANDERSON:  -- because --

3          THE COURT:  Right.  There's an argument that that's

4    what I implied you're entitled to do.  In lieu of getting the

5    documents of the 20 percent is just ask testimony about the

6    80 percent.  Is that fair?

7          MR. ANDERSON:  Well, I won't -- I won't say that

8    you implied something, but it is our -- our understanding

9    that a basis for your order not requiring the production of

10   the 20 was that we -- this was an open question as to being

11   able to inquire about the 80 percent and also a basis of why

12   we think that the Special Master's order may have taken the

13   document discovery ruling too strongly in that respect.

14         THE COURT:  Okay.  And please just put on the

15   record the sort of questions that you would ask about that 80

16   percent.

17         MR. ANDERSON:  Certainly.  So the discovery

18   requests that -- that generated the documents in the Bright

19   House case that are being produced in this case was

20   essentially, your work-for-hire agreements for the sound

21   recording for the works-in-suit, which is predominantly the

22   sound recordings in the suit.  And so what we received are,

23   you know, hundreds of -- of documents.  We've related those

24   or essentially tied those to specific works.  For a good

25   number of them, we don't see any agreement, and then for

1    another decent portion of them, we see an agreement, but it

2    doesn't have a work-for-hire provision within it and it's

3    pretty standard language.  There's a lot of case law that

4    says you essentially need to have that boilerplate language.

5    This is a work, you know, made for hire.

6          So what we would do, the first question, as we put

7    in our papers, would be to ask whether there are any other

8    agreements that the -- that the plaintiff is aware of that

9    would -- that would govern this relationship for this

10    particular work, which is a very straightforward question,

11    because it -- it would -- we would identify the work and the

12    artist in advance.

13          And then the follow-up question is:  When your --

14    when plaintiffs went about registering this work and they

15    were registered as a work-for-hire, do they stand by that

16    designation?  Is that -- is that a (inaudible) act?  Was that

17    done with intention or are they somehow now saying today, Oh,

18    you know, that was an accident; we looked, we haven't -- we

19    have records here that -- that that shouldn't have been done?

20          And we think the answer for most of these is going

21    to be, you know, with respect to the -- to the first

22    question, the answer's going to be, Yes, we did a reasonable

23    search for all agreements that were responsive to this

24    request and whatever we produce is what we have.  And I'm

25    pretty certain the question -- the answer to the second

8

1    question is going to be, Yes, we stand by that designation as

2    well, but it's our -- it's Charter's position that we need

3    that testimony -- well, not that we necessarily need it, but

4    that it would be very probative of the issue of whether or

5    not these registrations are valid.

6         THE COURT:  But you're not going to be asking

7    questions on a work-by-work basis; just sort of, as a group?

8         MR. ANDERSON:  Well, it's a mix of the two.  It's

9    -- it would be -- so the same question would apply to a dozen

10   or two dozen works.  So, for example, 27 works registered by,

11   I'll just use Elton John, all registered as

12   work-made-for-hire.  No work-for-hire agreement was produced

13   in Bright House that we can see or, for example, that were --

14   the agreement that was produced doesn't contain a

15   work-for-hire provision.  We would ask those two questions

16   with respect to that issue and it would apply to all of those

17   works.

18        So what we had discussed on the -- on the -- a week

19   or two ago when we discussed this kind of on a more informal

20   basis was that it would be a dozen or two artist issues.  So

21   essentially a dozen or two sets of those two questions per

22   plaintiff group, which we would pre-identify for the

23   plaintiffs.

24        And I'll also note that getting to your -- your

25   first point, Your Honor -- or your preamble point about the

1   ruling from last year:  Of course this case, at trial, isn't

2   going to be tried on a work-by-work basis.  However,

3   plaintiffs will, at summary judgment, submit very voluminous

4   declarations in which they attest to their ownership of every

5   single individual work.  All 11,027 works.

6           Now, some of those attestations will apply to

7   hundreds or two hundred -- you know, multiple hundreds of

8   works, but in a lot of cases, it's individual paragraphs in a

9   declaration attesting to their ownership of individual works.

10   That's their -- that's their burden and that's usually

11   fleshed out on summary judgment and this is also when we

12   would be making these arguments on summary judgment.  It's

13   not something that necessarily would be put before -- before

14   the jury, at least not with respect to validity.

15           THE COURT:  So envisioning, if you had permission

16   to do this, how that testimony would go, how long do you

17   think this inquiry would last?

18           MR. ANDERSON:  Well, if we kept it to the dozen or

19   two-dozen artists -- the terminology I think we put in our

20   papers is artist issues, because it's essentially an issue

21   that's artist specific and it could apply to multiple numbers

22   of works, I can't see it taking longer than an hour for all

23   of those issues, and it would -- it would become somewhat

24   rote in the sense that I imagine that plaintiffs' position

25   with respect to the second question, whether they stand by

10

 1    that designation, would be the same for every single one, and

 2    I'm sure we could get some kind of representation on the

 3    record that would imply as much.

 4            But, you know, the question with respect to, is

 5    this the governing agreement, are there any other agreements,

 6    I think we would want to take, you know, a few moments, at

 7    least, with respect to each artist issue to make sure we've

 8    made a record of that.

 9            What we're afraid of happening is that we're going

10    to make this showing on summary judgment and we -- and you

11    know, I know plaintiff will probably come back and make some

12    legal arguments about why this is not relevant, but that's

13    not really what we're discussing today; this is burden.

14            But what we're afraid of is that we're going to

15    make this presentation on the record as it exists today and

16    then, you know, there's going to be something on -- on

17    summary judgment opposition that says, Oh, well, here's an

18    agreement that creates a question of fact as to that or

19    essentially disproves what we're asserting and that's what

20    we're trying to foreclose with this discovery.

21            THE COURT: So I view a 30(b)(6) as a tool for

22    discovery that can't easily be addressed through written

23    discovery.  Why couldn't these questions have been more

24    easily addressed through some kind of either request for

25    admission or interrogatory?

1        MR. ANDERSON:  I think we need the freedom to be

2    able to explore a bit of the -- so we have other questioning

3    that we're permitted to pursue with respect to plaintiffs'

4    general practices for registering works as made for hire and

5    we think asking those questions in conjunction with specific

6    targeted questions with respect to the artist works -- for

7    artist issues -- artist issues that we would pre-identify

8    would be the most compelling kind of evidence for potentially

9    invalidating these registrations.

10        So this -- this would be a two -- potentially a

11    two-step process in the sense that we would be making this

12    argument on summary judgment to Judge Jackson and we think

13    having testimony would be more compelling than just kind of

14    sterile admissions on this front, and then if Judge Jackson

15    deemed it sufficient, we would be making a supplementary

16    showing to the copyright office.  And so it's to make the

17    most fulsome record we can.

18        If the burden was a huge issue in the sense that we

19    were intending to, you know, do a full day deposition with

20    each plaintiff just on this issue, I think -- I think, you

21    know, finding a document discovery method would be more

22    appropriate, but here, I mean, we're sitting -- these are

23    seven-hour depositions per plaintiff group where we're

24    covering a -- you know, a wide number of topics and this

25    would just be a small portion of it.

12

1          And I should note, plaintiffs are already preparing

2     to put up witnesses on very detailed issues with respect to

3     their ownership of the works-in-suit.  You know, probing the

4     ins and outs of their assignment agreements and their

5     corporate structure.

6          So this isn't, you know, an out of -- out of the

7     ordinary for this case to have these types of questions, and

8     this is a very limited -- a limited inquiry, given the number

9     of works that we would be identifying.

10          THE COURT:  So do you believe the Special Master's

11    decision covers your ability to ask about policies and

12    practices in addition to individual works or just individual

13    works?

14          MR. ANDERSON:  So we moved before the Special

15    Master on two separate topics.  One she ruled in our favor

16    and essentially permitted us to pursue questions as to

17    general policies and practices.  The one that she did not

18    rule in our favor on is the one before Your Honor today,

19    which is on the specific works.

20          THE COURT:  Okay.  So you're -- you're agreeing

21    that what you -- what you just answered in response to why

22    this wouldn't be susceptible to written discovery is that

23    while you'll be getting testimony at a 30(b)(6) about the

24    policies and practices, you want to be able to, in a sort of

25    more dynamic way, ask the witness about the application of

13

1   those policies and practices to individual works which you

2   say are a couple dozen, potentially?

3           MR. ANDERSON:  Yeah.  Well, not number of works,

4   but a couple dozen --

5           THE COURT:  Agreements?

6           MR. ANDERSON:  -- artist issues, which, you know --

7   which could apply to more works, which would make this effort

8   worth the -- you know, the game would be worth the candle for

9   Charter's liability purposes.  And I'll note that plaintiffs

10  have already done a lot of this work or should have done a

11  lot of this work in connection with producing these

12  agreements in the Bright House matter.  They were under an

13  order to produce all work-for-hire agreements.

14          So the answer to the first question as to whether

15  this applies, these are all the agreements, I mean, you know,

16  one could take the position that that's answered by

17  implication, but we want deposition testimony.  And, you

18  know, the second question is very much informed by the first

19  one, which is:  If there's no other agreements, what's the

20  basis for their designation?  If there is an agreement, but

21  it doesn't have a work-for-hire provision, same question.

22          But again, I -- you know, I'm trying to be very

23  practical and realistic here, but I can't see this taking

24  longer than an hour.  And I don't think, you know, the

25  parties -- Charter, you know, needs to expend much more than

14

1    that time, given the number of other issues that we need to

2    inquire about at these depositions.

3          THE COURT:  Okay.  So again, I'll -- go ahead,

4    who's doing this for the plaintiffs?

5          MR. KAPLAN:  That would be, Your Honor, Mr. Kaplan.

6          THE COURT:  Yep, go ahead.

7          MR. KAPLAN:  Thank you.  I think the right starting

8    place and what I don't think has come up yet -- definitely

9    did not come up in Charter's brief, is what's the legal

10   standard here and it's abuse of discretion.  They have not

11   argued anywhere in their brief -- the words "abuse of

12   discretion" don't come up, but that is -- that is the

13   standard.

14         And they may be disappointed with the ruling or

15   think it's unfair, but they have not articulated any basis as

16   to how the Special Master abused her discretion here and

17   that's because she didn't.  She heard their argument, she got

18   their written submission, she listened and she then applied

19   not just the ruling from the February 23 hearing, but made

20   specific reference to having been there and having heard the

21   entire discussion, all the positions that the parties put

22   forth on February 23, and she made her decision based on

23   that.  And so it was well reasoned, based on law that Your

24   Honor had issued at the February 23 hearing and by no means

25   did she abuse her discretion in rejecting the motion to

15

1    compel the testimony here with respect to works-for-hire.

2            That really should end the analysis, Your Honor,

3    that there's just no abuse of discretion and they can't even

4    make out why there is.

5            If we're going to go on from there, then we're

6    looking at relevance and burden, and the decision at the

7    February 23 hearing really was based on relevance.  I'm

8    hearing Charter say that it was all about burden, but as we

9    pointed out in our brief, the decision at the time -- and

10   this was page 144 to 145 of the February 23 transcript, was

11   that you were not going to view the invalidation procedure.

12   And that's really what we're talking about, right, the

13   argument to invalidate these registrations under a specific

14   statute in the Copyright Act that requires going to the

15   Copyright Office, you were not going to view that basis as

16   relevant to why they should get the documents and you denied

17   it on that basis.

18           Now, we also talked about burden and why it would

19   be so burdensome to produce the remaining documents.  We have

20   a burdensome argument here with respect to the testimony,

21   which I'll get to in a moment, but the decision at the 23rd

22   hearing was on relevance and that's what we're talking about

23   today.

24           Now, I didn't hear Mr. Anderson talking about going

25   to the Copyright Office today, but that's what they have to

16

1    do.  I mean, that's what this invalidation procedure in

2    Section 411 of the Copyright Office talks about and then

3    there's a standard for that, right, that there has to be

4    material errors and there has to be fraudulent intent.

5    That's what we talked about at length of February 23.  That's

6    what they would have to do here and that's what you found

7    wouldn't -- they weren't going to do, it's not justified and

8    the decision was made on relevance there.

9            I mean, the other point I just want to make quickly

10   on this is, you know, we see in their -- in their brief the

11   attack on our clients, on the record industry, this argument

12   that it's theft with respect to registering work-for-hire.  I

13   mean, I -- that's why they want to get into this.  They want

14   to be able to, you know, make us look bad in front of the

15   jury, and I think their brief made that obvious; but it

16   doesn't -- you know, again, I didn't hear it today about

17   going to the Copyright Office.  That's what they would have

18   to do here to invalidate the registrations.

19           We've also made the point in our -- in our brief,

20   Your Honor, that they're not going to be able to do that.

21   There are no cases that show that a copyright registration

22   should be invalidated because the work-for-hire box was

23   erroneously checked off when the claimant did own the work or

24   have the right to register it and, again, that's what we're

25   talking about here.

17

1          They're not arguing that there's an ownership issue

2   or that the plaintiffs didn't have the right to actually get

3   registrations here.  They're arguing over this work-for-hire

4   issue.  And we cited a few cases in our brief, Your Honor,

5   that said clearly that you don't invalidate a registration

6   because the work-for-hire box was checked off when it is

7   clear that the copyright was transferred and that there was

8   the right to register and obtain a registration.

9          I won't dwell on that, Judge, but that is -- that's

10  in our brief.  We quoted from three different cases on that.

11         With respect to the -- to the burden, we're still

12  not clear how much work that they are talking about in terms

13  of artists or agreements.  We've heard a dozen -- we've heard

14  dozens.  Their brief says it's several dozen artist

15  agreements -- several dozen artists where they say that there

16  was no agreement produced that shows a work-for-hire clause.

17  Then they say that there were additional artists where there

18  was no agreement at all.  So, I mean, by my count, several

19  dozens is minimally 36, plus these other artists.  I think

20  we're talking about 40, 50 artist or maybe more.

21         And then what we're really talking about is looking

22  into the ownership, the transfer provisions in those

23  agreements, and that's for each of these artists, and then we

24  get down to the specific works, and so that is a lot to -- to

25  prepare on, that we have to go and look at, especially if

18

1    they're saying that these agreements don't exist.  I mean,

2    that's digging in for each one of these to figure out what is

3    -- what is the issue here.

4         So the burden is very significant, and I think Your

5    Honor alluded to written discovery that could have been

6    proposed here that they -- that they didn't do.  It sounds

7    like it would have gotten them answers.

8         And so I think, again, they haven't even argued --

9    attempted to argue that they meet the abuse of discretion

10   standard.  There was no abuse of discretion, the documents

11   aren't relevant for the reasons that you articulated at the

12   February 23 hearing and the burden is still very significant,

13   especially in proportion to the actual merits on this

14   discovery.

15        MR. ANDERSON:  So Your Honor, if I could just

16   address a few of Mr. Kaplan's points?

17        THE COURT:  Yeah, hold on --

18        MR. ANDERSON:  I mean, with respect --

19        THE COURT:  Let me --

20        MR. ANDERSON:  Yeah.

21        THE COURT:  Let me ask a question first.  Point me

22   to the language used by the Special Master, please, in

23   addressing this issue.

24        MR. KAPLAN:  At the -- at the March 16 hearing,

25   Your Honor?

1            THE COURT:  Yes.

2            MR. KAPLAN:  Okay.  So it was the March 16

3    transcript on page 11.  To begin with, line 1 was, she said:

4    It would seem that Topic 11, which is asking for information

5    on the designation of a witness to testify about specific

6    sound recordings you assert in the litigation have been

7    deemed or designated as a work-for-hire as that is defined in

8    17 U.S.C. Section 101 is a bridge too far and inconsistent

9    with the discussion that we had and Judge Hegarty ruled on at

10   the hearing on February 23.

11           And then on page 15 to 16 of the transcript, Ms.

12   Rodriguez added:  With regard to Topic 11, we would decline

13   it on that one, at this time, for the reasons set forth in

14   the February 23 hearing as well as our discussion today.

15           That discussion today was referring to Charter's

16   argument.

17           THE COURT:  Okay.  So I have the transcript

18   attached to the objections, but it skips from page 11 to page

19   19.  You just cited page 15 and 16.  Why don't I have that?

20           MR. KAPLAN:  We submitted that, Your Honor, with --

21   with our brief.  I'm not sure whether you're looking at the

22   exhibits to our brief or to Charter's.

23           THE COURT:  Oh, I was looking at Charter's.  So

24   what exhibit on yours?

25           MR. KAPLAN:  It is Exhibit 2.

20

1          THE COURT:  All right.  All right, then let's see,

2   15 -- you said 15 to 16?

3          MR. KAPLAN:  Yes.  At the end of page 15, I think

4   it was line 23, you'll see there --

5          THE COURT:  And was Ms. Rodriguez provided the kind

6   of scope information that Mr. Anderson just said in terms of

7   this being limited to low, single digit work -- artists?  Was

8   that -- was that part of the discussion that day?

9          MR. KAPLAN:  It was part of Charter's argument,

10  yes.

11         THE COURT:  Can you point that to me?

12         MR. ANDERSON:  I mean, I can represent, Your Honor,

13  that before the Special Master, we did similar to what we did

14  on the 23rd before Your Honor and Ms. Rodriguez is say that

15  while this issue applies to many -- potentially applies to

16  many works, we would only be inquiring about a limited

17  number, and I think we used the same kind of ballpark-type

18  figures, you know, dozens or two dozens depending on the

19  issue.

20         You know, I think today, you know, in light of --

21  if burden were being a consideration that was carrying weight

22  here, you know, we would -- we would identify, you know, a

23  reasonable number -- well, we'd always be identifying these

24  reasonable -- identify a reasonable number so we could, you

25  know, pursue this type of testimony to see how burdensome it

1  actually is, at least with respect to, you know, like in the

2  plaintiff group.

3          There are three -- three plaintiff groups comprised

4  of, I think, over 20, you know, labels.

5          THE COURT:  Well, hold on.  What I'm seeing -- I

6  don't know whether this is the same issue, because some of

7  these issues are so close to one another -- I know you guys

8  see bright lines, but I don't.

9          So on page 14, I see a reference by Mr. Schapiro to

10  the 80 percent documents, 15 percent of those are

11  problematic.  Was that the relative number of potential works

12  that was presented to Ms. Rodriguez?  Because 15 percent of

13  8500 documents is, you know, 1500, 1800 documents, so.

14          MR. ANDERSON:  So, yeah, I can -- I can provide a

15  little clarity on the -- on how the numbers are interrelating

16  here.

17          So Charter identified in its papers to Ms.

18  Rodriguez that the potential issues applied to upwards of 15

19  percent of the works-in-suit, which is approximately a

20  thousand works.  However, the number of, you know, artist

21  issues, again, for the lack of a better term, is far fewer

22  than that.  In other words, you ask the two questions I -- I

23  articulated earlier and it could apply to 30, 40, 50, 60

24  works.  So that number, you know, comes down pretty

25  dramatically.  But even beyond that, we're not going to ask

22

1    about every single artist issue for all 1000 works.  We would

2    identify a reasonable number and, again, in advance, for

3    plaintiffs to be able to adequately prepare.  You know, we

4    would pick the ones that apply to the most works, the ones

5    that have -- you know, the kind of -- the clearest issues

6    that we think we can explore in order to make this record for

7    summary judgment.

8              THE COURT:  But again, I want -- I want the

9    plaintiff, Mr. Kaplan, for you to show me in the record where

10   it's clear Ms. Rodriguez was presented with the scope of this

11   in terms of several dozen -- I don't know if -- I think you

12   said artists, Mr. Anderson, right?  Is that what you used?

13   You used the word "artists?"

14             MR. ANDERSON:  Yes, yes.

15             THE COURT:  Several dozen artists at issue instead

16   of 15 percent of 80 percent or whatever.  So can you tell me,

17   Mr. Kaplan, where in the record it's clear that she had that

18   information and was ruling on accurate information?

19             MR. KAPLAN:  Yes, Your Honor.  If you go to page 10

20   of the transcript, you will see as part of Mr. Anderson's

21   argument there, starting on line 7, he says:  So by our

22   internal account, it's about between 10 and 20 per plaintiff

23   group.  So essentially 10 to 20 discrete artist inquiries per

24   plaintiff group.

25             THE COURT:  How many plaintiff groups were there?

1          MR. KAPLAN:  Three plaintiff groups for each record

2     label, three for each publishing group.

3          THE COURT:  Well, how many is that?  So how many

4     total plaintiffs are there?

5          MR. KAPLAN:  Well, there's six -- Your Honor,

6     there's six total plaintiff groups, but there are three

7     plaintiff groups for the record labels.  So they did argue,

8     certainly, before Ms. Rodriguez that it was a smaller and

9     more limited universe and they may have put that in their

10    letter.  We submit these two-page letters to Ms. Rodriguez

11    that outline our issues that we want to argue.  They

12    certainly called it, you know, their narrowed inquiry into

13    Topic 11.

14         So I think it was clear before Ms. Rodriguez the

15    scope here, but you know, I do want to point out one other

16    thing that we're still -- we still don't know how many

17    artists we're talking about or agreements.  They made the

18    argument to Ms. Rodriguez on the 16th.  They gave this range,

19    but no specifics.  They wrote you a letter on March 17 when

20    -- they argued it on March 18 when you initially denied this.

21    They talked about dozens of artists.  They didn't give a

22    specific number.  They submitted this objection to you, they

23    talked about several dozen artists.  They didn't give you a

24    specific number.  And now sitting here today, we don't have a

25    specific number.

24

1          So while they're arguing that it's low numbers,

2    maybe a dozen, maybe dozens, they've had four or five

3    opportunities to tell us exactly how much it is to really

4    understand what we're talking about and they haven't done it.

5    And so while, as I said before, several dozen is at least 36,

6    plus some others they'd talked about, we don't know what it

7    is, but even that number is a lot when it comes to preparing

8    witnesses and going through all of the agreements with each

9    -- with each witness regarding each artist.

10          MR. ANDERSON: So, Your Honor, in terms of what was

11   presented to the Special Master, you know, what -- as we

12   submitted in our -- in our objections to you, is that what

13   carried the day on that ruling was essentially a perceived

14   kind of anything further on this issue is not relevant, based

15   on these document discovery rulings from February 23, and

16   that's what we submit was error in connection with that,

17   because, you know, Charter submits that the Special Master

18   gave too much weight to essentially those specific discovery

19   rulings and not enough weight to the fact that those -- in

20   our -- in Charter's view, those document discovery rulings

21   were premised on the ability to pursue some of this new

22   deposition testimony and further, you know, specifying those

23   in advance.

24          And to Mr. Kaplan's point about the identification

25   of the artists, I mean, we're not trying to hide the ball

1    here.  We have the analysis done, I'm representing to the

2    Court.  I'm looking at a document right now that outlines

3    some of the, you know, statistics in terms of how many issues

4    there are per artist.  We're just not going to put that in a

5    submission for plaintiffs to try to, you know, and I mean, no

6    disrespect by this, but cause -- cause confusion on the

7    record to make it seem like there's an issue where there's no

8    issue or to try to resolve issues.  You know, this is

9    something we may -- we may pursue to the best of our

10   abilities if we don't get this deposition testimony on

11   summary judgment and right now it's work product.  And

12   frankly, plaintiffs can figure it out themselves, but to

13   resolve any discrepancies between the dozens or the two

14   dozens, I can represent that what we're interested in doing

15   is exploring this with a meaningful number of artists.

16          So I can represent that there are 21 artists for

17   the Sony Music Group for which there is no work-for-hire

18   agreement produced and -- I'm sorry, 43 artists for no

19   agreement produced and 21 where there was an agreement

20   produced, but it has no work-for-hire provision.  Now that's

21   64 on its own.

22          We would not intend to ask about all 64.  We would

23   identify the ones that apply to the most works, that seem

24   like they have the most potential and we would -- we would

25   give that to plaintiffs well in advance of the deposition so

1     that they can prepare.

2           And in terms of the burden, again, I mean, the

3     parties are already preparing to go through these exact types

4     of issues, but just for other purposes in terms of the

5     (inaudible) of terms within an agreement and whether there's

6     a chain of title.  And this is -- this is really just another

7     branch of the same -- the same tree, it's the same type of

8     questioning, with the added benefit of us pre-identifying the

9     issues and the questions.

10          THE COURT:  Would you -- would you mind repeating

11    just for a second what you begin with in terms of the two

12    categories that you were going to inquire and how many are in

13    each category?

14          MR. ANDERSON:  Sure.  So the two questions we were

15    going ask was -- so, I'll put it this way:  There are certain

16    artists whose works were registered as made-for-hire for

17    which we don't see any agreement produced.  Then there are

18    certain artists for which their works were registered as

19    made-for-hire, but the agreement produced does not contain a

20    relevant provision.  So there's groups -- there's numbers of

21    artists in each group.

22          For Sony, no work-for-hire provision.  Our

23    preliminary analysis as of right now, 21 artists.  No

24    agreement, 43 artists.  For Universal, no work-for-hire

25    provision, 20 artists.  No agreement, 7 artists.  For the

27

1   Warner Music Group, no work-for-hire provision, 7 artists.

2   No agreement, 21 artists.

3        Now, that's -- that's more than a couple of dozen

4   artists, I recognize.  We would -- we would be identifying

5   for plaintiffs well in advance of the deposition those

6   specific artists, you know, with -- we'd want to inquire,

7   which would be a reasonable number.

8        And the two questions we would ask are:  If there

9   are no agreements produced, we would confirm through, you

10  know, one or two, three questions, did you produce all the

11  agreements that you believe apply to this (inaudible) that

12  would otherwise contain a work-for-hire provision?

13       We would get an answer there.  It should be, Yes,

14  because they were under discovery obligation to do so

15  already.

16       And then we would ask one or two follow-up

17  questions about whether they stand by their representation

18  that despite not having an agreement in place, they

19  nevertheless represented to the US Copyright Office that this

20  work is made for hire, and that -- that would apply to those

21  -- whatever -- Your Honor, if you were inclined to rule in

22  our favor, you know, 12, 24 artist issues.  And that's why

23  I'm comfortable saying it wouldn't take longer than an hour.

24       And I recognize there's some burden involved, but a

25  lot of this work has already been done by plaintiffs in

1 connection with their discovery obligations.

2     THE COURT:  Okay.  Anything on the --

3     MR. KAPLAN:  Your Honor --

4     THE COURT:  Go ahead.

5     MR. KAPLAN:  I'm sorry.  I just want to put -- I

6 mean, I was trying to add up the numbers there for the three

7 plaintiff groups.  There was somewhere between -- somewhere

8 in the 90s, maybe 99 different artists.  That's a lot higher

9 than the several dozen or a few or a dozen.

10     I think that -- what would -- every time we talk

11 about this, it changes, Your Honor, but now we see what the

12 -- you know, why they didn't want to get specific in terms of

13 the numbers.  That's a lot.  That's a lot to look into.

14     There clearly was no error by Ms. Rodriguez in

15 looking at this and deciding that they shouldn't get the

16 testimony here.  And I just want to say one other thing:

17 We're talking about one topic.  There were 81 different

18 topics in their -- in their notice.  There's no way that this

19 is taking one hour.

20     I mean, they can use their time as they want, but

21 this is -- this is very significant and we need to prep for

22 all of them.  So we're talking about one topic right now

23 where -- with 100 artists and who knows how many agreements.

24 There is real burden here, Your Honor.

25     MR. ANDERSON:  Your Honor, if I could just respond.

29

1   I specifically said that while that adds up to more than the

2   one or two dozen, that we would only be identifying so many

3   is because that would be what is reasonable and that would be

4   what we would want to pursue, because it would affect the

5   most number of works and that's exactly what Charter

6   represented.  It was Mr. Schapiro who argued before the

7   Special Master, we would be identifying 10 or 20 artists for

8   a plaintiff group.

9          So I mean, while I recognize that Mr. Kaplan added

10  those up correctly, I mean, the implication that we're

11  somehow changing the number is completely false.  The total

12  number that I just read to Your Honor into the record has

13  never been previously disclosed except to the extent that we

14  said this potential issue impacts upwards of that many, but

15  that we would only be questioning regarding a subset of that,

16  again, which we would pre-identify.

17         And again, in terms of the burden, I just -- you

18  know, we would -- we would be identifying the artists and

19  agreements in advance and this work has already been done.

20  The fact that there are 81 topics is a reality of this case.

21  There's just as many on the other side and the parties are

22  putting up witnesses for multiple topics today.  This is

23  pretty standard.

24         THE COURT:  Okay.  So listen carefully, because I

25  know at least one of you will have questions possibly, I

1    guess.

2              So I am going to overrule the objection.  I'm going

3    -- but I do -- based on the language Ms. Rodriguez used that

4    the plaintiff is not required to prepare the witness about

5    specific sound recordings -- that's what the word she used --

6    I would view the scope of what she did approve as permitting

7    you to ask the question of isn't it true that and you can

8    present your information about the 21 artists no provision or

9    no agreement -- 7 artists no agreement.  You can confront the

10   witness with that information.  If they don't testify the way

11   you believe they have to based on your view of the documents,

12   then you can confront them on specific inconsistencies.

13             So you're not going to be permitted to go through

14   all the specific sound recordings, but you can ask them to

15   acknowledge those general -- the general information you just

16   presented about no agreement or no provision and address it

17   that way, because I believe that's within the scope of what

18   she did permit.  Is that -- did I articulate that clearly

19   enough for you, Mr. Anderson?

20             MR. ANDERSON:  Yes, Your Honor, that's understood

21   and appreciated.

22             MR. KAPLAN:  Your Honor, can I just make one point

23   here --

24             THE COURT:  Yes.

25             MR. KAPLAN:  -- or ask a question?

1           THE COURT:  Right.

2           MR. KAPLAN:  What -- you made a reference to what

3  Ms. Rodriguez permitted?

4           THE COURT:  Yes.

5           MR. KAPLAN:  What she permitted was testimony on a

6  different topic and that was Topic Number 12, and Topic

7  Number 12 went to -- I don't have the exact words in front of

8  me, but it went to the basis for the way each plaintiff makes

9  a determination as to whether a sound recording is a

10  work-for-hire or registers it as a work-for-hire.

11          She allowed testimony there, but she didn't allow

12  testimony about everything that we argued over today.  So I

13  just wanted to make that clear, because it sounded like you

14  were maybe under a different understanding.

15          THE COURT:  Well, I was just because I asked that

16  question at the beginning and you didn't -- you didn't

17  contradict what Mr. Anderson said.

18          So as I'm reading her order, what she says is:

19  However, it would seem that Topic 11, which is asking for

20  information and the designation of a witness to testify about

21  specific sound recordings you assert in the litigation had

22  been made -- had been deemed or designated as a

23  work-made-for-hire as that is defined in 17 U.S.C. Section

24  101 is a bridge too far.  So that's what I'm reading that she

25  said, which is what you pointed me to.

1      And then I -- but you're right, I had understood

2  that the policies -- the practices about how plaintiffs'

3  registered works-for-hire -- made-for-hire and, you know, I

4  -- are you saying that there's no topic that's designated in

5  the 30(b)(6) that's going forward regarding whether there's

6  an agreement -- whether each work-made-for-hire had an

7  agreement or I'm not sure what -- again, remind me what -- I

8  think you distinguished, Mr. Anderson, between an agreement

9  or a provision?

10     MR. ANDERSON:  Yeah.  Well, so in some cases,

11  there's a -- there's no agreement, so we just don't know

12  whether there is one or not, and that would be the question

13  that we would ask; but in other instances, there's an

14  agreement, but it doesn't have a provision, so we would want

15  to confirm.

16     And, you know, just for the record, I mean, at the

17  beginning, I thought I had said, Your Honor, that there were

18  two topics that we -- that we moved on before the Special

19  Master.  One was ruled in our favor and the other was not and

20  the one that's not is before Your Honor today on an

21  objection.

22     The way that the parties have essentially litigated

23  these, for lack of a better term, is one relates to policies

24  and procedures and one is specific to the works that would

25  apply to as you kind of articulated.  And so I mean, the --

33

 1    it seems like a natural extension:  How do you go about

 2    registering works as works-made-for-hire, what do you look

 3    for, what steps do you take?  That's what we're permitted to

 4    ask.

 5              So you would -- so you would agree that in this

 6    case, where there's no agreement, that, you know, you didn't

 7    -- it just seems like it -- what Your Honor's permitting

 8    today very much, in my mind, is a natural extension of the

 9    testimony that were --

10              THE COURT:  Well, certainly so what -- what you can

11    say is -- what you could ask -- when you get into those

12    policies and procedures, you could ask, but those weren't --

13    I know that's your policy and procedure and that's how you

14    think you do business, but in fact there are many instances

15    in which that's not followed.  If they deny that, then you

16    can confront them with examples of what you're referring to.

17              Does that make sense?

18              MR. ANDERSON:  Yes, that makes sense.

19              THE COURT:  And to me that's --

20              MR. ANDERSON:  That's how we drafted the topics and

21    how we --

22              THE COURT:  That's just preparing for

23    cross-examination.  So that's -- that would be covered within

24    the scope of any topic that you ever ask a witness about is

25    confronting them with -- with examples that contradict what

1    they just said their practices and policies were.

2          Okay?

3          MR. KAPLAN:  And Your Honor, what's our preparation

4    of obligation litigation here?  Because that's really what

5    the issue is.  I mean, they -- you know, the way that they

6    had their Topic 11 was that we were going to have to be

7    prepared on all sorts of specific artists or agreements and

8    be able to answer a question or be stuck with the -- with the

9    -- you know, the gotcha that where are the witnesses, I don't

10   know, and they were supposed to be prepared on this.

11         THE COURT:  Well, I'm confirming -- I'm affirming

12   the Special Master on Topic 11, so you don't have to be

13   prepared on that.  But I'm just under the impression that the

14   kind of witnesses you will be producing could be confronted,

15   maybe if appropriate and within the scope of a given topic,

16   with a document and they would know what that document is and

17   they would see -- be able to, right on the record, look at

18   that document, read it, and say, Yeah, I don't see that in

19   that document.

20         That's not -- I can -- you know, that's permitted,

21   but I'm not requiring them to speculate about what the

22   specific hundred or so documents or what -- however many it

23   is Mr. Anderson referred to, works-for-hire agreements.  They

24   just don't need to go through those line items to prepare for

25   a -- for the deposition.  And in the event that you believe,

1   reasonably, they aren't prepared and the witness testifies, I

2   don't have knowledge on that, because I wasn't asked to do

3   that, then I guess you'll just have to raise that with me

4   after the deposition if you think that was improper for the

5   witness.

6           Okay?

7           MR. KAPLAN:  Okay.

8           THE COURT:  Yeah, you know, I mean, this stuff is

9   easy to talk about in theory.  In application, it gets a lot

10  more difficult, I understand that, and that's why we've had

11  so many of these conferences.

12          So the next topic, please?

13          MS. RANAHAN:  Thank you.  So the next one we have

14  is the dropped works, which is similar in that it was

15  something -- well, let's go back a little bit, because the

16  Special Master originally was inclined to give us this for

17  the record labels and not for the publishers.

18          So this is the dropped works discovery.  You recall

19  there's 242 that were dropped and this comes out about 63,

20  you know, different artists and such and we want to be able

21  to --

22          THE COURT:  272, right?

23          MS. RANAHAN:  And plaintiffs are still relying on

24  the -- that was the total number, but once you go down to the

25  works --

36

1           THE COURT:  Oh.

2           MS. RANAHAN:  -- it's like 63 something.  So it's a

3    subset.  Again, it's another issue where you get down to a

4    subset that implies a lot more works.

5           So what had happened in this case was plaintiffs

6    originally went before the Special Master on the 30(b)(6) for

7    the publishers.  Now, the publishers in this case did not

8    send any notices.  So we went before the Special Master to

9    get this topic for the publishers and she questioned

10   plaintiffs very succinctly about are you relying on these

11   notices still, the dropped works notices, because we know

12   you've taken the works out of the case, but the notices

13   themselves, are you still going to rely on those, and the

14   plaintiffs' counsel said, Yes, they still want to rely on

15   those.  They were very specific about not withdrawing those

16   works.

17          So she said, Well, it seems like Charter should be

18   able to ask about those.  And she almost -- she tentatively,

19   actually, granted it, and as often happens in this case, you

20   know, plaintiffs argued again, Wait a minute, wait a minute,

21   these are not notices that were sent on behalf of the

22   publishers.  These are notices that were sent on behalf of

23   the labels.  The labels is what we're here on now.

24          So then what happened in the interim -- so then she

25   ultimately decided, Okay, well, it doesn't make sense for the

1    publishers to have to answer to this since no notices were

2    ever sent on their behalf.  They were instead sent on the

3    labels' behalf.

4            So then we had the hearing before you, the

5    discovery summit, and the document issue was ruled upon,

6    which is whether they had to go and produce documents for

7    every single underlying dropped work or they have to produce

8    the chain of title documents.  And there was a very lengthy

9    argument.  I think it was, you know, you were -- it was a

10   close call for you and I think ultimately what happened was

11   plaintiffs' counsel made a representation that they owned

12   everything -- that they could make a representation that they

13   owned it all.

14           We've uncovered, you know, issues that we think we

15   would like to call into question, and again, it's a small --

16   it's a very small subset and we're even willing to do

17   something like -- it's about 20 per plaintiff group right

18   now.  And to put it in context, the plaintiff groups are 17

19   total plaintiffs.  They have grouped themselves into three --

20   three labels.  And now we're back on the label question, and

21   by the time we got to the Special Master on the labels, she

22   then deferred to your judgment at the discovery summit on the

23   23rd and thought that you had decided on the document issue.

24   So that's what happened.

25           And her initial inclination was that this would be

1   appropriate for the labels, which we're here on now, because

2   that's who the notices were sent for.

3           So what we want to do is ask for the small subset.

4   I mean, we're willing to make it very narrow and ask, you

5   know, this is, again, three groups, something like there's 20

6   for each, we could narrow it down to maybe five for each

7   plaintiff and provide that in advance.  Something very small

8   just so that we can inquire.

9           What we have now is a representation by plaintiffs'

10  counsel at the hearing before you on the 23rd that he said

11  they owned them all, but that's -- I think you made the point

12  a couple of weeks ago, Your Honor, you said, you know,

13  attorney representations is not evidence.  And then we also

14  have an RFA response that is a little more nuanced, because

15  it's:  Do we have the rights to do it?

16          Now, we've found specific examples where we would

17  like to ask about it because they appear to be registered to

18  a different person, not the plaintiffs, and plaintiffs have

19  very large conglomerate companies where they have arms in

20  other parties that they may rely on saying, you know, they

21  were the owner, but that doesn't mean that it's correct at

22  the time.

23          So because plaintiffs are still relying on these

24  notices, we think that it's fair game for us to at least

25  inquire about that there were errors in some of these notices

39

1    as far as whether they owned them at the time.

2           And keep in mind there is -- there is so many other

3    notices that we will not even have the third parties here to

4    attest to whether they are accurate or not.  This is a small

5    subset that we can test that so that plaintiffs, when they

6    wave around Charter received, you know, 10,000 notices on

7    this day, or whatever it is, we can say, Well, look, those

8    are not always reliable.  Even plaintiffs' own notices are

9    not always reliable and here's -- or here's some examples of

10   that.

11          THE COURT:  So a couple of questions.  First of

12   all, again, this seems very susceptible to written discovery.

13   When you're going -- when you're actually asking about the

14   status of specific works, why didn't you pursue that avenue?

15          MS. RANAHAN:  Well, we did ask an RFA.  Your Honor,

16   we said, Do you own all of the dropped works, to which they

17   said, Yes.  But the RFA obviously is helpful to them and not

18   to us from a discovery perspective and we have -- we want to

19   investigate that.  So we're -- we have doubts about that

20   response.

21          And also -- I would just like to point out also,

22   Your Honor, one year ago, when we were before you in February

23   2020, you asked Mr. Oppenheim the same question that you

24   asked I think it was Mr. Gould at the most recent hearing, Do

25   you own all the works, and Mr. Oppenheim would not answer

1    that question.

2           So there's some -- at the time he was not

3    comfortable answering that and you respected that, because

4    they had received some awards in the prior litigation -- the

5    Cox case that they had withdrawn from this case.  And so

6    we're trying to get -- you know, if they could withdraw them

7    and still got judgment there, then they are willing to get

8    judgments on works that they may not have had the rights to

9    and we want to investigate some specifics about what the

10   concerns were and why they would drop the works.

11          So we did ask an RFA.  The RFA was:  Do you own,

12   you know, the dropped works?  And it was, We either have a

13   right or we own it.  It was a nuanced answer.  So when they

14   say that, they could mean that they have some oral agreement

15   with someone.  There's very -- there's specific formalities

16   in corporate law that require you to have a written

17   assignment.  To bring a lawsuit, you need to have standing.

18          So in their view, they could think, Look, no one's

19   going to sue us.  We have, you know, this big family of

20   companies, so we're comfortable with it, but we want to still

21   ask about these questions to show, Look, even the plaintiffs

22   don't have their records straight.  And I've actually taken a

23   deposition -- or actually cross-examined a publisher in a

24   prior case that admitted that they don't even do chain of

25   title searches until they start lawsuits, until they actually

1    sue.

2            So it's -- we just want to investigate this and try

3    to show that there was some real concerns with some of the

4    notices they sent.  It's their -- again, we could limit it to

5    five -- we could give an advance five per plaintiff group,

6    which is 17 plaintiffs.  That would be -- it's only 63 total

7    that we have issues with and we could give them in advance,

8    like five for each, just so that we could inquire and test

9    the assertion that Mr. Gould made, which was a factual

10   assertion, and test the discovery answer, which we did submit

11   a written discovery answer, and we just want to test that.

12           THE COURT:  So is it your understanding that all of

13   the dropped works we're talking about, that the notices for

14   those went to Charter?

15           MS. RANAHAN:  Yes.

16           THE COURT:  And how many notices total -- during

17   what time period, by the way?  During the claim period?

18           MS. RANAHAN:  Yeah.  Well, actually it's

19   interesting, because the notices are from 2012 through the

20   beginning of 2015.  So only about half the claim period and

21   that goes back from a year before discovery.

22           So they stopped sending them in early 2015 and the

23   claim period goes through mid-2016 or early 2016.

24           THE COURT:  May of 2016.  Okay, so --

25           MS. RANAHAN:  There's like a year of none, but

42

 1    there -- you know, other than that, yes.

 2              THE COURT:  How many total notices went to Charter?

 3              MS. RANAHAN:  How many just -- do you mean --

 4    because some of these notices, there's a lot of -- they'll

 5    send one that they say represents more than just one work,

 6    but do you mean just how many total notices from anybody or

 7    from plaintiffs or --

 8              THE COURT:  From plaintiffs.

 9              MS. RANAHAN:  I don't know if anyone -- if

10    plaintiffs know the exact answer to that question or if

11    anyone has a better estimate.  I think it was 100 --

12    something like 300,000 or something and I may be -- that's

13    just a -- if anyone wants to correct.  I think it was

14    something like 300,000.

15              THE COURT:  All right.  Who's arguing -- who's

16    arguing for the plaintiff?

17              MR. KAPLAN:  I'm arguing this one again, Your

18    Honor.

19              THE COURT:  Okay.  So Mr. Kaplan, do you agree that

20    there's approximately 300,000 notices that went from your

21    plaintiffs to Charter?

22              MR. KAPLAN:  Your Honor, I believe it's more than

23    700,000, and if I'm wrong on that, I'm sure Mr. Sperling and

24    Mr. Oppenheim will step in.  So I --

25              MR. OPPENHEIM:  You're correct.

1        MR. KAPLAN:  So yeah, I believe -- the plaintiffs

2   sent more than 700,000 notices to Charter.  Of course, there

3   were many other millions of notices that went from others to

4   Charter, but I don't know that any of that actually matters

5   with respect to what we're talking about today.

6        THE COURT:  Well, here's what matters to me:  Why

7   do you insist on relying on 272 when you have 700,000 that

8   you already have?

9        MR. KAPLAN:  I don't think it's --

10        THE COURT:  Or 242 or whatever the number is.

11   Several hundred out of 700,000.  That's one out of a

12   thousand.  One out of, actually, 2000 or 3000.  So miniscule

13   percent.  Why does -- why do those matter?

14        MR. KAPLAN:  Well, they matter for a number of

15   reasons, but Your Honor, each notice could cover more than

16   one work in the case.  In other words, the notice could

17   address a number of different sound recordings or musical

18   compositions that are in a stream, in a torrent, and so it

19   may -- a notice may address more than the one work that we're

20   talking about here with respect to whether it's dropped or

21   not.

22        There are technical reasons as well.  You know,

23   we've got 700,000 notices or so.  We're talking about, I

24   guess, in this case, notices that cover 272 in different

25   places in terms of pulling them out, if that's really what

44

1    we're -- what we're talking about.

2            But I would like to get back to what's the real

3    issue here, which is:  Did the Special Master abuse her

4    decision -- her discretion in denying the -- you know, we're

5    talking about testimony with respect to the ownership or

6    having an exclusive right in these dropped works.

7            THE COURT:  Right, but --

8            MR. KAPLAN:  And --

9            THE COURT:  -- whether she abused her discretion

10   depends on the law and the facts, right?  The application of

11   law to fact, correct?

12           MR. KAPLAN:  Well, sure, Your Honor, but she didn't

13   make it -- she didn't make an error in any way on either

14   side, law or fact.  What she did was, she said, Look, we've

15   talked about the dropped works, we talked about them

16   extensively at the February 23 hearing.  We said the dropped

17   works are not in the case.

18           Now, Charter, you've argued, Yes, we agree they're

19   not in the case anymore, but there's this issue of how they

20   related to notices and inaccuracy.  And what she said was,

21   Well, look, you issued an RFA here that asked for an

22   admission that the record -- that the plaintiffs -- the

23   record company plaintiffs didn't own or have an exclusive

24   right in any of those works.  And the answer was, We denied

25   it.  We said, We do own or have an exclusive right in all of

45

1    those dropped works.  And what the Special Master said was,

2    Okay, well, that was -- Charter, that was your RFA.  You may

3    not be happy with the way you phrased it today, but that was

4    your RFA.  They answered it and (inaudible) answer an RFA --

5    an RFA, generally that's the end of it and we don't allow

6    additional discovery --

7              THE COURT:  Well, wait a second, wait a second.

8              MR. KAPLAN:  -- on that.  That's the --

9              THE COURT:  Wait a second.  Are you saying that

10   once you say something in response to an RFA, that's the end

11   of the matter?  It's in -- it's unimpeachable?

12             MR. KAPLAN:  No, it's not -- it's not that it's

13   unimpeachable, but that it ends -- for the purposes of what

14   we're talking about here, that it ends -- it ends the

15   inquiry.  That what they're -- that what they're looking to

16   do now is to reopen all of that, get back into works that are

17   out of the case when it's clear that the -- we have told --

18   what they want to be able to say is, Look, you didn't own or

19   have the rights to some of these works that you issued

20   notices on.

21             We've issued an RFA answer that said, We own or

22   have exclusive rights in all of them.  And that was

23   satisfactory to you, Your Honor, when you denied the

24   discovery on February 23 and that was satisfactory to the

25   Special Master when they argued this on --

1        THE COURT:  Well, what do you mean?  What was

2   satisfactory and what was it satisfactory to what question?

3   I mean, it's pretty vague just to say, That's satisfactory.

4   Do I understand what you said in response to the request for

5   admission?  Yes.  Do I believe that a party is entitled to

6   test one another's responses to requests for admissions,

7   impeach them, demonstrate that it wasn't true and then

8   possibly even get more discovery once they demonstrate that

9   it wasn't true?  I -- you know, I don't agree that I said

10  that.

11        MR. KAPLAN:  So let me put it succinctly, Judge

12  Hegarty.  On February 23, you denied the document discovery

13  on this, at least in part based on the RFAs.  Charter didn't

14  appeal that --

15        THE COURT:  What are you reading?

16        MR. KAPLAN:  -- but the Special Master --

17        THE COURT:  Mr. Kaplan, what are you reading?  What

18  are you reading, please?

19        MR. KAPLAN:  Excuse me?

20        THE COURT:  What is the source material for what

21  you just said?

22        MR. KAPLAN:  My outline.

23        THE COURT:  Okay.  Can you point me to something

24  that your outline is based on, like the page in the

25  transcript or something like that?

1          MR. KAPLAN:  I'm sorry, for which?  For your ruling

2  --

3          THE COURT:  Yes.

4          MR. KAPLAN:  -- or for Ms. Rodriguez's ruling?

5          THE COURT:  Yeah, from the summit.

6          MR. KAPLAN:  If you'd bear with me, Your Honor.

7          THE COURT:  Was it on the 22nd or the 23rd?

8          MR. KAPLAN:  It was the 23rd.  It was in the range

9  of pages 175 to 180, roughly.

10          THE COURT:  There you go.  You had a good associate

11  with you on that.  170 -- sorry, to what?

12          MR. KAPLAN:  Sorry.  174, 175 through about 180.

13          THE COURT:  All right.  Hold on.

14          Okay.  So I'm seeing that -- who was speaking? --

15  Ms. Brewer said we're looking for underlying chain of title

16  ownership documents relating to the dropped works, because we

17  believe they likely have some works that were dropped because

18  there were ownership issues or they didn't own the works in

19  the first place and that's what we're looking for.  And that

20  came up in the context of whether they were seeking privilege

21  documents or not.

22          And then I stated logically that you can't try --

23  you can't try the lawsuit over matters that aren't at issue,

24  which is not surprising.

25          MR. SPERLING:  Your Honor, if I can interject just

48

1    to help?  It's Jonathan Sperling.  I think if you focus on

2    pages 179 to 180 of the transcript.

3              THE COURT:  Okay, yeah, that's better.

4              MR. SPERLING:  What you'll see is that ultimately,

5    Mr. Gould referred to the RFA response.  You asked him to

6    confirm or make a representation to you about the accuracy of

7    the RFA response.  He did.  And after you had sort of started

8    and stopped a few times at the bottom of 179 saying, We're

9    not going to, we're not going to, then on 180 after Mr. Gould

10   made that representation, you said, Okay, and we just moved

11   on to the next issues, because you decided that they were not

12   going to get that discovery.

13             The transcripts are never perfect, but that's the

14   exchange and that's where you ruled against them with respect

15   to their request to get document discovery about the dropped

16   works.

17             And I think the point that Mr. Kaplan is trying to

18   make is we have your ruling saying we don't have to produce

19   the documents.  Ms. Rodriguez said, Right.  They don't get

20   deposition testimony on something that they weren't entitled

21   to get documents on and it wouldn't make sense to require us

22   to produce a deponent and prepare them with the documents

23   when you already ruled that we don't have to produce the

24   documents because the issue is closed.

25             THE COURT:  Well, okay.  All I asked was:  Are you

49

 1    affirmatively representing that all 400 dropped works -- I

 2    don't know where I got 400, maybe your numbers have changed

 3    -- it's your good faith belief after reasonable investigation

 4    your clients did own those?  The response by Mr. Gould was:

 5    Yes.  I said:  Okay.

 6              And what are you relying on?  Jonathan, you can

 7    speak or whoever, but what are you relying on that I ruled

 8    just by saying "okay"?

 9              MR. SPERLING:  Your Honor, I'm going to pass it

10    back to Mr. Kaplan in a moment, but I will say, I see the

11    transcript is a little bit vague.  I don't think that there's

12    any dispute.  I would be very surprised if Charter disputes

13    that your ruling was that they don't get document discovery

14    on that issue.

15              We have not provided that document discovery and

16    they've never taken a position on any day since that hearing

17    that we are required to produce that discovery, because it

18    was clear to everyone, and there may be something you said

19    that was not perfectly captured by the court reporter, but

20    you moved on, you denied their request on that issue.  And

21    again, I don't think there's any dispute about that at all.

22              THE COURT:  Okay.  So -- so if I was only

23    addressing document discovery, then I wasn't addressing

24    deposition testimony.  Is that correct?

25              MS. BREWER:  That's correct.

1          MR. KAPLAN:  That's right, Your Honor.  The

2    deposition testimony wasn't at issue there, but I think the

3    -- the point is that we weren't obligated to go produce

4    documents with respect to ownership on these dropped works

5    now, and the answers to these -- to this deposition testimony

6    is based on those documents.

7          So we -- so again, when we're talking about what

8    the Special Master did and whether it's an abuse of

9    discretion, she looked at the ruling and said, Well, they're

10   not ordered to produce documents on these issues.  So,

11   therefore, they're not going to be looking at documents to

12   prepare witnesses on this testimony.  It makes sense to me

13   that the testimony is foreclosed by that ruling.

14         THE COURT:  Well, but I don't see the logic of

15   those two that you just said.  Yes, I can understand why I

16   didn't want to do discovery about dropped works in a sort of

17   stand-alone context, but if you're saying that I was

18   presented with the issue that the plaintiffs are still trying

19   to seek a benefit in the litigation of the dropped works,

20   then I -- if I considered that, I'd like you to show me

21   where.

22         MR. KAPLAN:  Well, the argument, Your Honor, and

23   I'll look for it if I have in the -- in these pages of the

24   transcript, but the argument that Charter presented for the

25   relevance of that document discovery was the same argument

1   that they're preventing today; that they were arguing that it

2   went to the accuracy of the notices and you heard that and

3   you denied the discovery.

4           And you can -- it's a little muddled in here, but

5   you can see it on page -- where is it? -- 176, Ms. Brewer is

6   talking about notices sent -- if they were just going to talk

7   to the jury about the notices associated purely with the

8   works-in-suit, excluding the dropped works or any other

9   works, that we would embrace; but we're, unfortunately, not

10  in that position going into the trial.

11          And then she goes on to talk about, you know, this

12  very issue of having notices in the case that in whole or in

13  part relate to the dropped works.

14          So it was the basis of their argument for relevance

15  for the document discovery on the 23rd, and as we just

16  looked -- as we got to page 178, 179, the denial of the

17  document discovery followed that argument.

18          THE COURT:  Well, what the Special Master said on

19  the record is:  We have provided you with -- to Ms. Brewer, I

20  think -- we have provided you with the opportunity to get the

21  evidence as to whether or not the plaintiff owned the work at

22  the time the notice was sent.

23          So clearly she had in her mind that was in bounds.

24  Correct?

25          MR. KAPLAN:  I'm sorry, Your Honor.  Where are you

1    looking?

2              THE COURT:  The middle of page 177, line 17.

3              MR. KAPLAN:  That's where there was some colloquy

4    about whether the Special Master had been looking at the

5    right thing and some discussion with -- from Ms. Brewer about

6    mixing issues, Your Honor.

7              THE COURT:  Right.  So what's the -- what's the

8    upshot of what you just said?  I mean, was the record

9    corrected?  Because what -- it's clear from that paragraph

10   that Ms. Rodriguez believed it was proper for the defendant

11   to get evidence on whether the plaintiff owned a work at the

12   time a notice was sent, right?

13             MR. KAPLAN:  I don't think so, Your Honor.  I think

14   what happened was that there was some confusion about whether

15   Ms. Rodriguez was talking about one issue, and she said

16   something like, you know, Correct me if I'm wrong.  And Ms.

17   Brewer said, Well, I don't like to tell the Court when

18   they're wrong, and then it turned out that Ms. Rodriguez was

19   talking about something else and everybody very politely sort

20   of dealt with that and then the ruling was made.

21             MS. RANAHAN:  So the ruling -- the hearing did end,

22   Your Honor, on you asking that admission from counsel.  That

23   was how it did close out, and we did understand that to be

24   denying the document and discovering only based on

25   plaintiffs' representation that we'd still want the

53

1    opportunity to test.  And we have found public records that

2    we believe make those representations suspicious and we want

3    the opportunity -- and that's why we're representing we'll

4    just do it for a very small number, five for each.

5           Plaintiffs are not only using the ones from this

6    case, but also want to rely on millions of notices sent by

7    third parties, and so I -- we need to have a way to show that

8    these are not always reliable and that there are errors sent

9    in these notices, which we believe we can show with

10   (inaudible), but that was the -- and the Special Master

11   originally did find this to be appropriate for the labels,

12   because the labels are the ones who sent the notices, and

13   then it was because of the document discovery issues that

14   happened that -- but we are just trying to find the truth.

15          We're just trying to test the statement that was

16   enough for you to go -- it was a very long argument, which I

17   know your guys are looking at the transcript now.  It went on

18   for awhile and it ended with that statement by counsel.  It

19   was Mr. Gould's statement at counsel that was enough for you

20   to say the document discovery is not worth it.

21          That had nothing to do with us asking questions and

22   for them to make that representation, Your Honor, they had to

23   look at something.  Maybe they skimmed through it in a

24   computer and they'll have to gather them up and produce them,

25   but you can't make a representation that you owned everything

54

1   to either file this case, do an RFA response and then

2   represent before you in court unless you've looked at

3   something.

4           So whatever they looked at to be able to prepare

5   themselves to make that statement before the Court, they

6   should be able to prepare the witness on the same

7   information.  This isn't, you know, hugely burdensome.  If we

8   went five for each three plaintiffs' groups, that's 15 works

9   and we would give them the names before and just test some of

10  these so that we can see what we can find, and if they're

11  telling the truth, they're telling the truth, but we have the

12  right to try to investigate that.

13          MR. KAPLAN:  Your Honor, it sounds like that

14  they're now offering to make this about five dropped works

15  for each of the three plaintiffs.  Obviously the burden there

16  is a lot different than almost a hundred per plaintiff.  So I

17  think I can certainly understand that offer with respect to

18  preparing.  Obviously, if they identified them in advance and

19  we could -- you know, we could testify to each of the three.

20          The one other thing I want to say is, you know,

21  they're referring to public information that they found that

22  they think casts doubt on the representations in court or in

23  the RFA answer.

24          We looked -- they had raised at the Special Master

25  hearing this issue of an independent label called Conquered

1    and that Conquered might own the rights and therefore

2    Universal doesn't and there's something nefarious going on.

3            So, you know, we just took a quick internet search

4    ourselves and, of course, Conquered has a distribution deal

5    with Universal and distribution is a copyright right.  That's

6    an exclusive right if you have it and so that's the right

7    there.  There's nothing incorrect about what counsel said or

8    about what the RFA said.

9            I do want to state for the record, it's in our

10   brief and that's why we think this is really, at the end of

11   the day, a whole lot of nothing and irrelevant.

12           THE COURT:  Well, but did I hear an olive branch in

13   the first part of what you just said?

14           MR. KAPLAN:  You did, Your Honor.

15           THE COURT:  I'll take it.

16           MR. KAPLAN:  So our olive branch is if they're

17   willing to identify five works for each of the three

18   plaintiffs and tell us what those are ahead of time, then we

19   will be able to answer questions about whether each of the --

20   whether the plaintiffs owned or had an exclusive right in

21   those works at the time the notices were sent.

22           MS. RANAHAN:  All right.  What I meant was the

23   artists.  I think I mentioned this earlier, but artists,

24   because that applies a lot more works.  So five artists per

25   plaintiff.  Five artists per plaintiff.

1          MR. KAPLAN:  But then how many --

2          MS. RANAHAN:  Or we could do -- we could do, you

3    know, five different -- one representative work by each

4    artist would be the same -- I would think it would be the

5    same inquiry.  So I don't know how -- if that's a different

6    burden for you.

7          If we did, you know, five works that applied to

8    some artists, it would be the same question.  If you own the

9    rights for the artist, I don't see how the burden is

10   different from us saying -- I just want to make sure this is

11   fair so that we -- if we mention it by artists as opposed to

12   --

13         MR. KAPLAN:  Well, I think what was clear was that

14   the offer was five works and that was the olive branch that

15   we were accepting, Your Honor, and there are different

16   agreements that cover different periods of time with

17   different artists, and so it's not to say that it's just, you

18   know, one artist and that's it.  That really may not be the

19   answer.

20         So our olive branch --

21         MS. RANAHAN:  So if we did five works for five

22   different artists, that would be still the same, right?  And

23   that's fine.  I mean, that's --

24         MR. KAPLAN:  No.  Our offer that we are accepting

25   is on five works per plaintiff group.

57

1          MS. RANAHAN:  Okay, that's great, but they could be

2     five different artists, those works?

3          THE COURT:  It's five works.  Ms. Ranahan, you're

4     running -- you're kind of --

5          MS. RANAHAN:  Okay, sorry, sorry.  I just want to

6     make sure --

7          THE COURT:  You're not --

8          MS. RANAHAN:  -- I don't have to come back to you.

9          THE COURT:  Lawyers got to learn to quit while

10    they're ahead, because you're going to talk yourself out of

11    this if you don't watch out.

12         MS. RANAHAN:  Okay.

13         THE COURT:  All right?

14         MS. RANAHAN:  Got it.  Thank you.

15         THE COURT:  All right.  Mr. Kaplan, you're a

16    gentleman.  Thank you.

17         What else can I do for you guys today?

18         MR. SPERLING:  Thank you, Your Honor.  It's

19    Jonathan Sperling again.  I regret having to raise this with

20    you, truth be told.  You know as well as anybody, we're under

21    a very tight schedule in this case.  We have (inaudible)

22    first fact discovery deadline.  But you know that it's

23    compressed.  We're grateful for the two-day summit that we

24    had in Denver.  We're grateful for the document production

25    deadline that you gave them, which was March 15.  They

1    produced documents.  There are gaps, there are missing things

2    we're following up with them.

3             It's going to be a struggle to get all the

4    depositions done and we're committed to doing it, but the

5    problem that we're running into is we have probably 15 to 16

6    fact depositions to schedule and we've been e-mailing the

7    other side to schedule them and what they are doing is

8    insisting they are not available for weeks on end.  And so

9    they're putting us in the position -- and I'll give you some

10   specifics in a moment -- putting us in a position where

11   they're essentially going to try to force us to go from

12   taking, call it 16 depositions in two months, which is a

13   challenge in itself, to 16 depositions in five weeks.

14            So let me give you two examples.  On March 19, we

15   reached out to them to ask whether their witness for the

16   document deletion 30(b)(6), the spoliation 30(b)(6), would be

17   available on April 5.  So that was 17-days' notice.  And

18   look, we understand maybe they're not available April 5.

19   Maybe we've got to push it off a day or two.

20            We got a response from them a week later that said,

21   Most of that week will not work.  That's a direct quote.  And

22   then proceeded to offer us April 20, 21, 22 or 23.  So the

23   first date they were offering was 32 days after we inquired.

24            Since they said most of the week of the 5th won't

25   work, we said, Well, we're happy to take any part of that

59

1   week that does work.  All right?  And again, they said, No,

2   no, no, we're not offering you anything before April 20.  So

3   their position was the earliest date they'd offer is 32 days

4   later.

5           THE COURT:  I don't need to hear anything else, Mr.

6   Sperling.  My job -- I'm tasked by a United States District

7   Judge to get this case ready for trial.  If any of that is

8   true, it's not good enough.  I'm sorry, there can't be

9   anything more important on anybody's plate than avoiding a

10  billion dollar judgment.  Okay?

11          So you guys have got to do better.  I'm not going

12  to accept people who are unavailable for lengthy periods of

13  time.  They're just going to have to interrupt their plans.

14  I'm sorry.

15          MS. BREWER:  May I respond, Your Honor?

16          THE COURT:  Yes.

17          MS. BREWER:  Because I -- I do want to clarify.  I

18  mean, it is -- this is -- and I regret that -- that this is

19  brought to your attention.  I mean, this is -- this is

20  something both sides are dealing with.  We both have

21  depositions that we're trying to schedule.

22          You know, nothing could be clearer than the fact

23  that both sides are in this difficult position than the fact

24  that we're in an argument today over topics from a notice

25  that was served on plaintiffs at the end of December.

 1            THE COURT:  Ms. Brewer, Ms. Brewer, that kind of

 2   argument doesn't move me one bit.  I need to address not

 3   what's happened in the past, not anybody else's bad conduct.

 4   I need to get depositions going.  You guys could spend all

 5   day talking about faults of one another.  I want you to

 6   address what I just said and that is that we have to do

 7   depositions quickly.

 8            MS. BREWER:  Yes, and I -- so I accept that, Your

 9   Honor, and I apologize if I -- if I indicated something

10   different than complete deference to that.  We are taking it

11   seriously, we are working with our client, we are getting

12   back to them with dates and we're giving them dates in April,

13   and we are committed to continuing to do so and we've

14   communicated that as such to them.  And we've also brought it

15   up with the Special Master and we've said, We recognize that

16   there is going to be a dance that happens with respect to

17   everybody wanting specific dates and it not always being

18   possible.  And we had, a week ago, asked her for her help if

19   the parties needed, which she said she would offer up.

20            So we are fully committed to a cooperative process

21   where we discuss dates and, in some instances, that

22   particular date or week they propose may not work for that

23   particular witness, but we are trying to get back to them and

24   work with them cooperatively about that.  And in the two

25   instances that are brought up, we've offered dates in April

1    for those witnesses.

2              THE COURT:  Well, Mr. Sperling was talking

3    specifics.  You're talking a high level of generality.  So if

4    I need to go over specific examples by name, I'll do that.  I

5    think it's -- if, for example, the plaintiff says, I want

6    this deposition in the next 20 days, three weeks or whatever,

7    that person, absent an extremely good reason, and it needs to

8    be specific as to why not -- I'm in Europe, I got COVID,

9    something of that effect -- I'm just not going to accept at

10   face value.  And I'll entertain somebody coming back to me,

11   because I'm probably going to have to supervise this, someone

12   not being available for three straight weeks.  It's not going

13   to work.

14             Okay?

15             MS. BREWER:  Yes.

16             MR. SPERLING:  Thank you, Your Honor.  So let me

17   try and just bring it down to specifics so that we don't have

18   to burden you more.

19             With respect to the example that I gave you, Your

20   Honor, where we inquired on March 19 about April 5 or that

21   week, we understand from Charter that the witness will be on

22   vacation the following week and so we would ask that they be

23   made available sometime next week, the week of the 5th.  It

24   can be the latter part of the week, that's fine.  We're not

25   trying to jam them up.  At this point, it's Thursday, so

1   we're not, you know, looking to get Monday, that sort of

2   thing, but we'd like them to be made available next week and

3   then there's another I'll raise after that.

4           MS. BREWER:  My understanding is that the -- there

5   is not availability.  I apologize for the fact that wasn't

6   clear from the e-mail.  The witness was on a previously

7   scheduled vacation and we're doing the best we can to give

8   you the availability that we have, which we did.

9           MR. SPERLING:  Not the week of the 5th.  That

10  wasn't the representation.  The representation was that the

11  witness is on vacation the following week, not the week of

12  the 5th.

13          THE COURT:  Who is it, Mr. Sperling?  Just give me

14  a name.

15          MR. SPERLING:  I'm going to give you the name

16  momentarily, Your Honor.  I have to pull it back up.  It's

17  Dan Vacey (ph), Your Honor.  And the e-mail, which I'll read

18  to you, says:  Unfortunately, April 5 and most of that week

19  will not work because of conflicts.  The witness that will be

20  testifying on behalf of the company is out on a previously

21  scheduled family vacation the week of April 12, and then it

22  goes on to offer dates the following week.

23          MR. SCHAPIRO:  So Judge, that witness, Dan Vacey,

24  is being prepared by -- an e-mail was sent by Mr. Rosenthal,

25  who, as you know, is dealing with these data loss issues.  We

1    can check with him and we will try and get this scheduled as

2    soon as we can and discovery doesn't end until May.

3           I'm not sure what the e-mail meant when it said,

4    "most of that week."  If there's any way to get it done

5    sooner, we will and if it's your preference, we'll come to

6    you every time there's a dispute about whether a deposition's

7    happening fast enough.  Heaven knows we have enough of those

8    on both sides, but I can commit to you that we will get this

9    one done quickly and immediately.

10          THE COURT:  Yeah, you know, Andrew, I don't want to

11   hear every one.  I know you were being facetious, but I don't

12   think I have dealt with this specific topic about the speed

13   at which depositions necessarily need to occur.

14          So, you know, I hate to put this burden on you.  I

15   will honor any particular person's sabbath, Jewish people on

16   the Saturday and Christian people on the Sunday, but if we

17   have to go into weekends, I'll do that.  Okay?

18          I'm sorry, but this case is too important.  Judge

19   Jackson has made it clear he's going to try it when he's

20   going to try it and I'm not going to let him down.  All

21   right?

22          MR. SCHAPIRO:  Judge, I think we welcome that,

23   because we're just as eager to get this moving --

24          THE COURT:  Oh, I know.

25          MR. SCHAPIRO:  -- and that's fine.

64

1           THE COURT:  I know.  All right, so if you have a

2    specific issue -- but I think you know the language to use

3    with one another from now on.  You need to actually identify

4    not just unavailable, not just other obligations.  You

5    actually need to tell each other what the person is doing to

6    the extent it doesn't invade someone's privacy.

7           So you can use some level of generality, but I want

8    you to be as specific as possible.  So I'm also -- anything

9    else before I do one more thing?

10          MR. SPERLING:  Not from the plaintiffs, Your Honor.

11   We had another specific one where there was a long delay, but

12   I think your guidance is clear and so I think we'll plan to

13   just address that directly with Charter.

14          THE COURT:  All right.  Anything else from the

15   defense?

16          MR. SCHAPIRO:  Nope.

17          THE COURT:  Okay.  We have reviewed the sampling of

18   documents provided by the plaintiff, both Ms. Rodriguez and

19   I, and as we determined with the sampling of documents

20   provided by the defense, we don't perceive anything

21   nefarious.  We believe this is consistent with what all the

22   studies have shown, that sometimes there's some human error

23   as far as producing responsive documents, and therefore, we

24   don't need -- perceive the need for any further orders.

25          Okay?

1           MR. KAPLAN:  Your Honor, thank you for your time.

2           MR. ANDERSON:  Thank you, Your Honor.

3           THE COURT:  All right, thank you guys.  You know

4    where I am if you need me.  Take care.  Good to see you all

5    again.

6           (Whereupon, the within hearing was then in

7    conclusion at 4:42 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

66

```
 1                    TRANSCRIBER'S CERTIFICATION

 2    I certify that the foregoing is a correct transcript to the

 3    best of my ability to hear and understand the audio recording

 4    and based on the quality of the audio recording from the

 5    above-entitled matter.

 6

 7    /s/ Dyann Labo                    April 6, 2021

 8    Signature of Transcriber               Date

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```