1

1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2
   Case No. 19-cv-874-RBJ-MEH
3  _____

4  WARNER RECORDS, INC., et al.,

5       Plaintiffs,

6  vs.

7  CHARTER COMMUNICATIONS, INC.,

8       Defendant.
   _____
9

10          Proceedings before MICHAEL E. HEGARTY, United

11  States Magistrate Judge, United States District Court for the

12  District of Colorado, commencing at 3:28 p.m., April 7, 2021,

13  in the United States Courthouse, Denver, Colorado.

14  _____

15  WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE HEREIN
    TYPOGRAPHICALLY TRANSCRIBED. . .
16  _____

17                      APPEARANCES

18          JONATHAN M. SPERLING, JEFF GOULD, MATTHEW J.

19  OPPENHEIM, ALEX KAPLAN and CRAIG JOYCE, Attorneys at Law,

20  appearing for the Plaintiffs.

21  _____

22                      ORAL ARGUMENT

23

24

25

2

```
1                    APPEARANCES (continued)

2              ANDREW H. SCHAPIRO, LINDA J. BREWER, JOHN

3    ROSENTHAL, JASON MOORE, Attorneys at Law, appearing for the

4    Defendant.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                P R O C E E D I N G S

 2              (Whereupon, the within electronically recorded

 3    proceedings are herein transcribed, pursuant to order of

 4    counsel.)

 5              THE COURT:  Case Number 19-cv-874, Warner Records

 6    vs. Charter Communications, Inc.  Be careful how you make

 7    your appearances, I am in an incarcerating mood.

 8              MR. OPPENHEIM:  Good afternoon, Your Honor.  It's

 9    Matt Oppenheim and Jeff Gould and Alex Kaplan from Oppenheim

10    & Zebrak and we also have Jonathan Sperling from Covington &

11    Burling on behalf of the plaintiffs.

12              THE COURT:  All right, we've already set Mr.

13    Gould's arraignment.  So he's aware of that already.

14              For the defense, please?

15              MR. SCHAPIRO:  Hello, Your Honor.  Andrew Schapiro

16    from Quinn Emanuel.  Linda Brewer is here with me.  John

17    Rosenthal and Jason Moore are going to be joining and

18    addressing an issue by telephone.  I think there are others

19    on telephone, including our local counsel, I believe.

20              THE COURT:  Look at you all --

21              MR. JOYCE:  Yes, this is inmate Craig Joyce

22    appearing locally.

23              THE COURT:  Thank you, Mr. Joyce.  Nice haircut,

24    Andrew.

25              MR. SCHAPIRO:  I'm vaccinated so the world is my
```

1   oyster.

2          THE COURT:  All right.  Well, pretend I don't know

3   much about the issue and it's plaintiffs' objection.  So you

4   may proceed and I may be eating some yogurt while you're

5   doing it, because I didn't get lunch.  Okay?

6          MR. SCHAPIRO:  Your Honor, if I may, because

7   there's one potentially time-sensitive issue.  Mr. Rosenthal,

8   who has joined by phone, wanted to address an issue that's

9   relevant for the deposition that is supposed to take place

10  tomorrow and he's currently preparing the witness right now

11  in St. Louis.  And would it be possible for him to address

12  that issue first so that he can then go back to preparing the

13  witness so we can figure out what happens next?

14         THE COURT:  Yes.

15         MR. SCHAPIRO:  Thanks.

16         MR. ROSENTHAL:  Good afternoon, Your Honor.  John

17  Rosenthal.

18         So Your Honor, as you are aware, you entered a

19  502(d) order covering the production of certain documents in

20  the case and that the production of those documents in and of

21  themselves would not constitute a waiver of the

22  attorney-client or work product privileges.  So we are now --

23  the 30(b)(6) deposition on the e-mail loss issues is

24  scheduled to go on tomorrow.  And in the original order that

25  Your Honor entered did not -- and that was Docket 321 -- only

1    addressed the production of the documents at issue.  It did

2    not address testimony around those documents or those issues.

3          So the parties have been meeting and conferring in

4    an attempt to agree on an order.  If we could submit to Your

5    Honor extending that order to cover the deposition testimony.

6    So, for example, if the Charter witness testified about the

7    documents or facts and issues around the documents, that

8    testimony also would not constitute a waiver of the

9    attorney-client privilege.

10         Not surprisingly, the parties cannot reach an

11   agreement.  We had originally -- and we submitted a -- our

12   motion this morning to Your Honor that outlined our

13   positions.  It also included the language that the plaintiffs

14   would ask for in the order versus our language.

15         The main issue here, you know, and I don't think

16   anyone has a dispute that the order should be extended to

17   cover oral testimony with respect to testimony around the

18   documents that were produced.  I don't think there's also an

19   issue that the parties are not about opinion work product.

20   They both recognize that Charter is standing on its opinion

21   work product and doesn't intend to offer any testimony and

22   will object to any testimony that attempts to pierce opinion

23   work product.

24         The suit appears to be around attorney-client

25   privilege.  We had asked for an order to make it clear that

1   we are still preserving our right to object to certain

2   attorney-client testimony that they may try and elicit at

3   their deposition.  On their hand, they wanted their order

4   extended so that all of the topics noticed in the very broad

5   30(b)(6) notice would be covered by the 502(b) order, and

6   also that by the language they have suggested, Charter would

7   not have the ability to make any attorney-client privilege

8   objections.

9           We don't think that's appropriate.  As we've

10  represented to Your Honor at the 502(b) oral argument -- I

11  mean, the papers that we were willing to enter into a 502(d)

12  that would produce documents relating to six categories of

13  attorney-client privileged documents and non-opinion work

14  product.  We're willing to extend that -- the order and think

15  the order should be extended to cover those areas, but there

16  are areas noticed in the topics that are well beyond the six

17  areas as well as there are areas, for example, that we did

18  not agree or indicate that we were willing to waive the

19  attorney-client privilege.

20          Let me give you an example.  In the deposition

21  notice, they -- it's noticed, for example, issues around

22  worker's retention policy and we don't intend to waive any

23  attorney-client or work product privileges as it relates to

24  records retention policies.

25          Another example is the investigation that was

1    conducted by outside counsel as it relates to the e-mail

2    loss.  While Your Honor has ordered us to produce the facts

3    related to that as related in the two privileged memos that

4    were subject to prior hearings, we are not waiving our

5    attorney-client privilege with respect to all communications

6    with outside counsel.

7              So that is the central focus of this.  Whether the

8    scope of -- or extension a 502(d) order should have, we think

9    it is the testimony around the documents produced and we

10   think it's attorney-client privileges around the six

11   categories that we agreed to allow inquiry.  We don't think

12   it should cover opinion work product and we do not believe it

13   should result in a blanket waiver of attorney-client

14   privilege.

15             THE COURT:  Okay.  For the plaintiff?

16             MR. OPPENHEIM:  Apologies.  I was muted, Your

17   Honor.  Matt Oppenheim.

18             Your Honor, we don't disagree with Charter's

19   request to amend the existing order, and I actually don't

20   think that this should be particularly difficult, because I

21   believe that this issue is one that the Court previously

22   grappled with.  So the question is whether Charter gets to

23   pick and choose within the topics related to spoliation on

24   what testimony it's going to give and which testimony it's

25   going to not give under the protection of privilege, and

8

1  previously, the Court, in dealing with this, recognized that

2  that was a fair point, that Charter should not be allowed to

3  selectively decide what it will disclose and what it won't

4  disclose within this issue, right?  And you encouraged

5  Charter to take a very broad look at what it was agreeing to

6  produce and what it was withholding and what you told -- what

7  you advised Charter was that they should produce everything

8  related to spoliation except those matters constituting

9  opinion work product and we think that that's the right line

10 here.

11         So we agree that they should be permitted to assert

12 privilege related to opinion work product, but otherwise,

13 with respect to the 30(b)(6) topics that we noticed a very

14 long time ago and for which the defendants have not sought

15 any kind of protective order, the -- they should not be

16 allowed to selectively decide what they testify to and what

17 they don't and that's what their proposed language would

18 allow them to do.

19         It allows them to, based on their decision --

20 exclusively their decision, assert privilege when they want

21 to and not when they want to and that can't be the way it

22 works.  There's got to be a line that is a fair and sensible

23 line and we think that with respect to the spoliation topics,

24 that that line is opinion work product.

25         So we've proposed in language which we asked

9

1    Charter to include, and they did include in their filing,

2    which is ECF -- sorry, I lost the number -- ECF-432, Your

3    Honor.  In paragraph 13, we proposed the language that we

4    recommend using, and the underlying language is the amendment

5    we propose.

6            Their proposal, which is contained in paragraph 11,

7    would allow them to just decide to assert privilege whenever

8    they wanted, to hide whatever they wanted, which -- you know,

9    my point isn't to suggest any ill motive on their part, but

10   we need some kind of objective criteria here.

11           THE COURT:  So in defendant's proposed paragraph,

12   it says Charter shall retain the right to object, but are you

13   also seeking to retain the right to instruct not to answer?

14   There's a difference between those two.  So what's the

15   response to that?

16           MR. ROSENTHAL:  Yes, Your Honor.  So -- yes, and I

17   think we have to go back to the six categories that we

18   disclosed previously in the hearing that we'd be amenable to

19   providing testimony.  Those were communications related to

20   the creation and management of the hold covering this

21   litigation, records relating to the custodians and data

22   sources preserved under that hold, records related to

23   Charter's legal hold management migration in the related

24   cleanup of the legal hold, communications reflecting

25   decisions relating to the hold status and specific custodian,

10

1    communications relating to the purge of the held e-mail data

2    in December of 2018 and communications other than with

3    outside counsel relating to Charter's identification and

4    investigation of the e-mail loss, and we intend to, within

5    the extent of the order, allow testimony into each of those

6    topics.

7           What we don't intend to allow testimony, which

8    counsel has repeatedly tried to get to, is what outside

9    counsel did in its investigation regarding this and

10   communications it had with the client related to this

11   investigation, and also their 30(b)(6) notice is extremely

12   broad and touches on issues having nothing to do with the

13   e-mail loss issues and we don't intend to waive our

14   attorney-client privilege, for example, on questions related

15   to our records retention schedule.

16          THE COURT:  Okay.  Well, here's what I think.  This

17   is too intricate a topic for me to fully rule on, but what I

18   am going to say is this:  I'm going to adopt Charter's

19   language, but if plaintiff establishes to me that improper

20   instructions were given to the deponent, then they will get

21   their fees for that motion and they will get their fees for

22   any subsequent supplemental deposition that's required as a

23   result of any ruling that I make that finds the instruction

24   was not appropriate.

25          Okay?

1          MR. ROSENTHALL:  Yes, Your Honor.  Can we -- we

2    would like to have that projection before the hearing.  Can

3    we deem it entered orally or could we get the order entered

4    today so that we can -- we don't want somebody later to

5    attack the deposition and attempt to pierce arguing that the

6    order wasn't in place at the time the testimony took place.

7          THE COURT:  All right.  I mean, it's more

8    appropriate to have a written order, so if you can provide a

9    form of order.  If you haven't already done that, then that's

10   fine.

11         MR. ROSENTHAL:  The formal order was submitted with

12   the motion, Your Honor.

13         THE COURT:  Okay, thank you.

14         MR. ROSENTHAL:  And then just one other point of

15   clarification and it may not be an issue at all and I

16   apologize, I've been doing some kind of a (inaudible) trying

17   to move quickly.  Counsel indicated that they were having

18   four attorneys attend the deposition, which is not a problem.

19   I assume only one attorney is attempting to take -- or to

20   actually depose the witness?

21         THE COURT:  Well, what has your practice been on

22   both sides?  Is that -- is that the rule you've both

23   followed?

24         MR. ROSENTHAL:  Well, not many depositions have

25   occurred.  I believe we've only had one person take

1    depositions.  All this is in a related topic.  I could see if

2    you had a 30(b)(6) that was kind of spread out and totally --

3    over separate days and different topics, that we might have

4    multiple people making inquiries, but there's -- (inaudible)

5    Case law suggesting it's not appropriate on a bunch of

6    related topics to have multiple people attempt to take

7    depositions, because that's fundamentally unfair to the

8    witness, and we are obviously going to have people asking the

9    same question in different ways and being repetitive and

10   using different terms and different language and nomenclature

11   and that's why the case law suggests that we should only have

12   one person being -- taking a deposition.

13            THE COURT:  Mr. Oppenheim?

14            MR. OPPENHEIM:  Yeah, I don't see an issue here,

15   Your Honor.

16            THE COURT:  Thank you.

17            MR. ROSENTHAL:  Thank you, Your Honor.

18            THE COURT:  Thank you, take care.

19            Okay.  Now, are we ready for the objection?

20            MR. GOULD:  Thank you, Your Honor.  Jeff Gould on

21   behalf of the plaintiffs.

22            I take it from your start that would you like me to

23   start at the beginning and so I will, unless you have a

24   different preference.  Topic 57 in Charter's notice to the

25   record company plaintiffs seeks testimony on plaintiffs'

13

1    understanding of other ISPs' responses to receiving notices

2    of alleged copyright infringement, including whether those

3    other ISPs terminated subscribers who received a certain

4    number of notices, and if so, at what number of notices.

5            So to summarize:  Plaintiffs' understanding of how

6    other ISPs handle infringement notices, including with

7    respect to termination.

8            THE COURT:  All right.  So what's the relevance of

9    the topic, please?

10           MR. GOULD:  So certainly, we think there is none.

11           THE COURT:  Okay.  I need to understand the

12   relevance before we go forward.

13           MR. SCHAPIRO:  So is that an invitation to me, Your

14   Honor?

15           THE COURT:  Yes.

16           MR. SCHAPIRO:  Sure.  So as the Special Master

17   found and as we argued below, this is relevant in a couple of

18   ways.  First of all, as you know, there is the vicarious

19   liability theory that the -- that is still in the case that

20   the plaintiffs are pressing and the -- one of the core

21   arguments there is that we did things that drew subscribers

22   to Charter.  They say that we advertised or that we had,

23   quote, blazing fast speeds that allowed users to download up

24   to eight songs in three seconds and that our supposed failure

25   to take action against repeat infringers is what motivated

14

1    people to subscribe to Charter.

2            So on those grounds, as a first point, we have a

3    right to say, Well, wait a minute, you guys -- first of all,

4    as someone who's very well positioned to know what -- you

5    know, what these other ISPs are doing, you're saying that

6    we're liable because we were doing something that drew people

7    to us.  In fact, you -- as you knew, all these other ISPs

8    were -- had the exact same blazing speeds or similar blazing

9    speeds or -- and/or with your acquiescence, other ISPs were

10   not terminating people.  So your draw theory is faulty.

11           Secondly, we want to argue that this is relevant to

12   our defenses against contributory liability, because if they

13   knew of and, as I think we'll be able to show, acquiesced in

14   through certain agreements that they had other ISPs'

15   decisions not to terminate, it will be harder for them to

16   argue that we engaged in purposeful, culpable expression and

17   conduct that is required to show contributory property

18   infringement.

19           There is a threshold issue.  So I don't think -- I

20   certainly don't think the Special Master abused her

21   discretion in saying we're allowed to inquire into that.

22   There's a threshold issue there, however, though and

23   ordinarily I wouldn't be too concerned about this, because it

24   -- you know, I don't want to be engaging in, you know,

25   lawyerly, you know, complaints about footfaults and technical

15

1   fouls, but this objection is untimely.

2          So, and if it's a close call at all, you know, that

3   should decide it.  It was due -- so the Special Master

4   rendered her decision on the 16th of March by the agreement

5   among the parties that everyone has abided to thus far and

6   that governs this case.  Their objection was due on March 23,

7   which is when we filed our objection to any decisions from

8   that March 16 hearing.

9          We didn't get this objection until March 29.  Now,

10  one could say -- and if this were two months ago, I might

11  say, Okay, you know, that it doesn't -- you know, big deal,

12  you know, if it's -- they were, you know, the 29th -- inside

13  the 23rd, but you've made clear to us and I think we all

14  understand, we're up against an end of May discovery

15  deadline.  We're fighting about topics here, there's going to

16  be a -- you know, there will be additional fights and we want

17  to get these depositions going.

18          So that's, I think, the simple way to dispose of

19  this in addition to the failure by the plaintiff to show any

20  abuse of discretion on the merits.

21          THE COURT:  Okay, so I know you guys are good at

22  this.  I'm about to ask you, but are there examples

23  previously I've engaged in where I ignored a deadline such as

24  what Mr. Schapiro just stated?  Because I don't want to be a

25  hypocrite.  Have I ever ignored such a deadline before?

1          MR. SCHAPIRO:  I don't think anyone has missed one

2     before.  So the answer is no.

3          THE COURT:  Okay, because you're all awful good at

4     bringing up past conduct on our part.

5          Okay.  So that's not a bad reason, given the

6     urgency of completing matters.  Does anybody want to take a

7     stab at responding to that?

8          MR. GOULD:  Thank you, Your Honor.  So I'll just

9     briefly address the timeliness argument.  It's incorrect.

10    There is an order of this Court, by yourself, not an

11    agreement of the parties, but an order in ECF-143 at page 5,

12    which states, and I'm quoting:  Parties may file objections,

13    quote, no later than five business days from the time that

14    order reports or recommendation is served.  Served, Your

15    Honor.  Served.

16         The order was served on the parties via transcript

17    -- via certified transcript of the reporter on March 22 and

18    the objection was filed five business days thereafter.  Mr.

19    Schapiro's smiling.  He's quibbling over my interpretation of

20    the word "served."  You know, I think served is pretty clear.

21    Ms. Rodriguez ruled on the record.  We timely objected after

22    service of her written order.

23         We discussed this very issue about the need for a

24    transcript for you, Your Honor, to review her rulings for

25    abuse of discretion.  On March 18, there was a question

1   raised by Charter when Charter sought -- referring to when

2   they sought preliminary guidance on topics that she had

3   denied, and your language on March 18, at page 109, was,

4   quote, if you wanted to object, go ahead and object when you

5   get your transcript.

6          How can you, sir, (inaudible) for abuse of

7   discretion without her ruling before you?  As to the prior

8   practice of the parties, I can tell you from everything we've

9   seen and looked at, the timely objections have all been

10  within five days of service of an order and the service of

11  the order has come in multiple different ways.

12         Ms. Rodriguez has filed orders on the docket, the

13  parties have received written transcripts of orders sometimes

14  day of and sometimes later.  The example that Charter cites

15  in footnote 3 that they claim is inconsistent with our prior

16  practices -- with our practice here is actually not correct,

17  and that example, we filed our objection five days -- five

18  business days from receipt of the rough transcript.

19         I think this is all pretty ticky-tacky, frankly,

20  and then the -- and in any event, there's certainly no

21  prejudice because the topics that we're talking about would

22  be testified by witnesses who are scheduled -- tentatively

23  scheduled as of this date to testify the last week of April

24  or later in May.

25         I think that should be the end of it.  I'm happy to

18

1   address the merits unless you want to talk further about the

2   issue.

3           THE COURT:  No.  I'm going to guess -- here's the

4   thing:  I mean, if I'm going to deny anything based on a

5   filing deadline, the deadline has to be clear, probably more

6   clearer than this, and I don't know whether it's a fault of

7   the language I chose in the original order or whatever.  I

8   think you'll probably -- neither of you are going to agree

9   that you're following practices or standards you've set up

10  for yourself.  So I can't ever make you agree on what's the

11  deadline for things, but I'm not going to say no harm, no

12  foul.  I'm going to say that based on the lack of clarity of

13  when something is actually due, I'm reticent to rely on that

14  as the sole basis for denying any request for relief.

15          So let's move on to the merits.

16          MR. GOULD:  Thank you, Your Honor.

17          MR. SCHAPIRO:  Thank you, Your Honor.  And just one

18  other thing.  Just so that we're all abiding by the same

19  standards going forward, I'm happy to have the understanding

20  be that the clock starts when we get the transcript or the

21  clock starts when there's an order, the clock starts

22  whenever, as long as we all know, but maybe here's an

23  opportunity for clarification so that we all know what we're

24  supposed to do going forward.

25          THE COURT:  Right.  Well, let me say this:  If I

1   ever hear of a plaintiff making the similar argument against

2   you, you haven't seen me angry yet.  So that won't happen,

3   okay?

4          MR. SCHAPIRO:  All right.  I'll take that to mean

5   -- from now on, we're going to assume that if there's nothing

6   else issued on the docket, and I'm just looking at Jeff and

7   Matt and Alex here as well, the transcript is what starts the

8   clock ticking.  Maybe we'll have a side e-mail about this so

9   that we all -- so that we're not all left scratching our

10  heads.

11         THE COURT:  That sounds like a good --

12         MR. GOULD:  That seems workable.  I think we can

13  work together on that.

14         THE COURT:  Okay.

15         MR. SCHAPIRO:  Okay.

16         MR. GOULD:  Thank you.  So Your Honor, I'll turn to

17  the merits.  First, let's level set here.  Plaintiffs are the

18  music industry, they are not ISPs.  They and their artists

19  write, record, perform, distribute music.  That's their

20  business.  That's what they know, that's what they

21  understand.

22         Topic 57 seeks plaintiffs' understanding of a

23  different business based on secondhand information.  Namely,

24  their understanding of other ISPs' responses to notices,

25  whether they terminate and when.

1          Now, there's a threshold dispute -- threshold legal

2     dispute of whether comparing to other ISPs is relevant at

3     all, okay?  Charter hasn't cited a single case to support its

4     contention that a comparison is relevant on this draw issue

5     in vicarious, and that's not surprising.  We're not aware of

6     any such case, but I don't think we need to dig in on that

7     issue, because we can resolve this on a far simpler basis.

8          Charter isn't asking what ISPs do.  Charter is

9     asking what plaintiffs' understanding is of what other ISPs

10    do.  So even accepting at face value that a comparison is

11    relevant, which we don't, but accepting it for argument:

12    Charter offers no arguments and Charter offers no law for why

13    plaintiffs' understanding of that is relevant.

14          In their brief, they present two arguments:  One on

15    vicarious and one on contributory.  Mr. Schapiro touched on

16    both of them and I'll address both of them.

17          First, vicarious.  So one element in a vicarious

18    claim is that we need to prove that Charter received a

19    financial benefit from the infringement.  One of the ways to

20    show that is by showing draw and that means where we could

21    show Charter's subscribers are drawn to Charter by the

22    ability to infringe and plaintiffs allege that infringers

23    were drawn to Charter by the ability to infringe.

24          That's based on what Charter is doing and what

25    Charter is not doing, not anybody else, and plaintiffs have

1   no intention of making comparison in that regard to other

2   ISPs.

3            THE COURT:  Well, wait a second.  Inherent in your

4   argument that people are drawn from one thing to another

5   thing, from one to two -- thing one to thing two, is that

6   thing two is doing something different than thing one.

7   That's inherent in your argument, isn't it?

8            MR. GOULD:  I don't think so.  I don't think so.

9   That's how Ms. Rodriguez saw it, and if that's your view, I

10  think -- we may be out of luck, but I don't think that's

11  right.

12           The question and all of the case law and history on

13  this is:  Was there a draw to the secondary infringer?  It's

14  not a comparison.  It's did Charter have the right and the

15  ability to control the infringers and did they receive a

16  direct financial benefit?  Direct financial benefit can be

17  shown in any number of ways, one of which is draw.

18           So -- but in any event, the fatal leap here is not

19  that they're asking what other ISPs do, that makes sense.

20  They're not asking us what other ISPs do.  They're asking --

21  if they wanted that, they'd go to the other ISPs.  They're

22  asking what the record companies understand other ISPs do,

23  right?

24           THE COURT:  Yeah, but Mr. Gould --

25           MR. GOULD:  So let me --

1          THE COURT:  Wait, hold on.  If you don't have

2    anybody in the plaintiffs' group that paid any attention to

3    that, then your response to that 30(b)(6) topic is:  There's

4    nobody responsive to that 30(b)(6) topic.  So isn't that the

5    easy answer?

6          MR. GOULD:  It may be, but it's a little more

7    layered than that, because to the extent plaintiffs have

8    knowledge of it, it's through their enforcement efforts that

9    are done by and at the direction of counsel.  And so it's no

10   secret that plaintiffs have brought several of these cases

11   and do enforcement and notice sending as to other ISPs, but

12   anything they would have learned is in the context of those

13   enforcement efforts.  So there's a heavy privilege overlay,

14   number one.

15         But number two, like, how could it possibly be

16   relevant?  And let me give you an analogy.  I've been

17   thinking about this.  So my son loves ice cream.  He loves

18   ice cream from the shop near our house in Maryland called

19   Moorenko's, okay?  And I would argue that my son is drawn to

20   Moorenko's because the lines move fast, they give fairly

21   unlimited samples and they always have his favorite flavor,

22   salted caramel, right.  And keeping with the analogy, Charter

23   is asking you -- Judge Hegarty, you, in Colorado, sitting on

24   the bench, what you understand, Judge Hegarty, about the

25   lines and samples and flavors at all other ice cream parlors,

23

1    regardless of their location.  Ice cream parlors in Maryland,

2    California, Florida, Massachusetts, Texas, right?

3              With all due respect, Judge Hegarty, what you

4    understand about the lines, samples and flavors of ice cream

5    shops that you don't work at is completely irrelevant to why

6    my eight-year-old son likes to go to Moorenko's in Maryland.

7              THE COURT:  But wouldn't I be out there studying --

8              MR. GOULD:  And that's --

9              THE COURT:  Wouldn't I be out there studying the

10   length of line and effect it has on people's willingness to

11   go to that shop or drive five minutes to go to another shop?

12   Wouldn't I be studying the popularity in the industry of

13   caramel -- you said caramel what?

14             MR. GOULD:  He likes salted caramel.

15             THE COURT:  Salted caramel.  Wouldn't I be studying

16   the popularity of salted caramel?  And, you know, if it's

17   only one eight year old that likes it, we're probably not

18   going to continue that flavor anymore?  Wouldn't I be

19   studying all of those trends?

20             MR. GOULD:  So if you wanted to conduct a consumer

21   survey and have an expert skilled in consumer behavior and

22   marketing raise those kind of issues, you know, you might

23   have some admissible evidence, but that's not what we're

24   talking about.  We're not talking about a consumer study

25   that's empirical that gets to those issues and that accounts

1    for geographic availability.  We're talking about a record

2    company that doesn't run ISPs, talking about their

3    understanding of something based on some activity or

4    enforcement they have -- they may have done or learned about

5    in some other litigation.  It's totally irrelevant.

6              THE COURT:  Right, I think you --

7              MR. GOULD:  The question is why does a subscriber

8    --

9              THE COURT:  All right, hold on.  Your argument did

10   imply that you did such scientific studies in other cases.

11   Now, it might be privileged, but it sounds like you've done

12   those -- that work in other cases.  No?

13             MR. GOULD:  No.

14             THE COURT:  Okay.

15             MR. GOULD:  So look, I -- we can talk about -- you

16   know, if there's nothing to talk about, then the prep and

17   testimony is easy, but I think there's a threshold issue of

18   relevance and it's -- you know, the exact same -- so there's

19   the relevance and then there's the foundation, right?  So

20   this exact same issue came up in the first Cox trial.  There

21   was one before -- the same plaintiffs were involved.  BMG

22   sued Cox and there was a first trial, and in that trial, a

23   Cox witness tried to take the stand and talk about what other

24   ISPs did.

25             So you can imagine what the district court judge

25

 1   presiding over that trial said.  They said, No way.  A Cox

 2   employee can't get on the stand and talk about what other

 3   ISPs did.  He said impressions of other ISPs' practices based

 4   on that proffered witness's conversation's, that personal

 5   knowledge.  He said they should have taken the third-party

 6   discovery of the ISPs if they wanted it.

 7          What that accounts to here, on a discoverability

 8   dispute, is that this is unlikely to -- this is not

 9   reasonably likely to lead to admissible evidence.  And you

10   can be sure that if plaintiffs stand up at trial and say:

11   Charter's the worst.  Others suspend and others terminate,

12   but Charter does nothing, you can be certain Mr. Schapiro

13   will be jumping out of his chair.  Hearsay, relevance,

14   personal knowledge, right?  And that's even more so given

15   that virtually any understanding we would have is based on

16   largely privileged activity.

17          MR. SCHAPIRO:  So Mr. Gould is on to something

18   there, I think, and that is that this is a topic that is

19   likely to be fought out and appropriately fought out at the

20   in limine phase.  We're talking about discovery here,

21   however, and I want to address a few things that he said.

22          You know, with -- I think an analogy that might be

23   a little bit more apt than the ice cream analogy is if

24   someone is accusing me of being a getaway driver and saying

25   we know you're a getaway driver because people were choosing

1    you of the blazing fast speeds of your car that goes 30 miles

2    an hour.  I would have a right to say, Well, now wait a

3    minute, 30 miles an hour, that's actually not blazing fast

4    and not only to point -- yes, fine, one way I might want to

5    get those facts in is by putting on an expert to talk about

6    what other cars do, but it's also very effective.  I can't,

7    you know, count how many times that Mr. Oppenheim has stood

8    up during our hearings and said, Well, we want to tell the

9    jury, because it's effective to do it this way.  It would be

10   very effective for us to say, Well, in fact, your own people

11   knew that other ISPs were even more blazing fast.  So how can

12   you be arguing that this was a draw?

13           I mean, similarly with the ice cream, you know,

14   analogy I was thinking, this is kind of like -- I think you

15   were on to this, Magistrate Judge Hegarty, that they are like

16   the ice cream manufacturer.  They have a reason to be paying

17   attention to which stores move their product well or in which

18   stores their product is stolen or not.

19           We are -- I want to be clear:  We are not planning

20   to actually introduce evidence about their thought processes

21   or their understanding.  We're trying to get at the facts

22   from multiple angles.  They are people who we believe have

23   collected and understand a lot about the facts.  If it turns

24   out we're wrong, we'll come up empty handed at the 30(b)(6)

25   and too bad for us.  If it turns out we're right and they

1    have that information, then we might have a fight in front of

2    Judge Jackson about whether we can introduce it or not or

3    whether it's a step removed, but we certainly don't want to

4    be in a position where Judge Jackson is saying, You should

5    have asked and gotten discovery on that.  Why didn't you get

6    discovery on that before.

7           THE COURT:  So, Andrew, what you just said was if

8    it turns out we're right, blah, blah, blah, if it turns out

9    we're wrong, blah, blah, blah.  Are you saying that you have

10   no idea -- there's nothing in the record, there's nothing

11   you've ever seen about whether they have any such

12   understanding at all or is this -- is there some basis for

13   you --

14          MR. SCHAPIRO:  No, no.  It will turn out that we're

15   right.  I just didn't want to be presumptuous.  They have

16   agreements with other ISPs, with industry groups.  They've

17   paid a lot of attention to what different ISPs do.  At least

18   that -- on information and belief, Your Honor.

19          MR. GOULD:  So, Your Honor, if I could respond to a

20   couple of points.  The speed issue -- so look back at the

21   topic.  The topic has nothing to do with speed, nothing to do

22   with draw generically.  The topic is:  Plaintiffs'

23   understanding of other ISPs' responses to handling

24   infringement notices and whether they terminate.

25          Speed has nothing to do with this topic, okay?

1    It's convenient, it's helpful for Mr. Schapiro to talk about

2    it, because it's an element of draw, perhaps, in the

3    complaint filed a year and a half ago, but that's not what

4    this topic seeks or that certainly can't be the basis to

5    affirm that this topic is appropriate.

6          Secondly, let me give you a sense, Your Honor,

7    because there was one deposition where, you know, we --

8    before we (inaudible) here a little bit, we actually put up a

9    witness on this and, let me give you an example of how this

10   went and why this is so utterly irrelevant and the plaintiff

11   shouldn't be put to the burden of having to prepare on it.

12         Mr. Schapiro took a 30(b)(6) of a UMPG witness and

13   he asked him to compare how Cox and Charter are and the

14   witness testified to information that's public from the Cox

15   trial, and he said, Cox is bad, but Charter is worse.  At

16   least Cox terminated a few.  And then Mr. Schapiro asked him,

17   How about RCN?  Do you -- are you familiar with the provider

18   RCN?

19         The witness said, I know of the provider RCN.  And

20   the answer -- what Mr. Schapiro's response was, They're not

21   so bad, are they.  So that's what we're talking about.

22         I mean, Mr. Schapiro will tell you that's not his

23   finest question and he'll do better next time and I certainly

24   believe him, but that's what we're talking about here.

25   They're looking for impressions and innuendo from a

1    third-hand things that are never going to be admissible in a

2    million years and --

3           THE COURT:  Well, so I've got to --

4           MR. GOULD:  -- that were --

5           THE COURT:  I've got to make sure that this isn't

6    going to happen, then.  You're not -- nobody at the trial on

7    the plaintiffs' side is going to state or even imply that

8    Charter's behavior is any worse or any better than any other

9    ISP, correct?

10          MR. GOULD:  That is not -- we have no intention of

11    that at this point, and certainly my partners will speak up

12    if I'm mistaken.

13          THE COURT:  So you have no intention of mentioning

14    anybody else or even Charter's place in the industry with

15    regard to their propensity to terminate or their response to

16    infringement notices?

17          MR. GOULD:  So where I sit today, Your Honor, as an

18    affirmative case that is not the intention.  I cannot

19    preclude -- I cannot account for Charter opening the door to

20    that and us needing to rebut, but the intention is not to

21    come at them with a comparative, you know, attack.

22          MR. SCHAPIRO:  And I think there's a high

23    likelihood that Mr. Gould will be arguing that we have opened

24    the door, because we do believe -- we -- I think we do expect

25    that we will be trying to show that what we were doing could

1   not possibly -- our position about terminating could not

2   possibly have been a draw, it's pulling people who want to

3   infringe to our service, when what we were doing was no

4   different than any other service.  And so we do plan to put

5   that in affirmatively, and so we have a right to get

6   information from whatever source we think might be a decent

7   source.  This won't be our only source, but, you know, under

8   the approach to broad discovery, I certainly don't think it

9   was an abuse of discretion to allow us to ask this.

10         Yeah, my question wasn't so great at that first

11   deposition.  I think that -- it was a subtopic, but it also,

12   I think, illustrates why this isn't much of a burden to

13   prepare a witness for.  So --

14         THE COURT:  So, Andrew, is it your belief that the

15   plaintiffs or their agents have actually done research into

16   the practices of other ISPs?  I mean, I -- they obviously

17   have -- they sent infringement notices, probably, to many

18   ISPs, right?  We all agree on that.  The plaintiffs' group

19   did, correct?

20         MR. OPPENHEIM:  No dispute, Your Honor.

21         MR. GOULD:  No dispute, Your Honor.

22         THE COURT:  What?

23         MR. GOULD:  No dispute, Your Honor.

24         THE COURT:  Okay.

25         MR. SCHAPIRO:  Correct.

1              THE COURT:  So you -- if you found -- if you

2    believed or had notice or had information that some ISP was

3    not stopping this sort of behavior, somebody probably sent a

4    notice.  How many ISPs are there out there?  Hundreds,

5    dozens, practically tens, practically a -- single digits?

6    What are we talking about?

7              MR. GOULD:  So, Your Honor, I think my answer is it

8    depends on how you define what an ISP is, but arguably there

9    are hundreds, if not thousands.

10             MR. SCHAPIRO:  There are -- but there are -- the

11   major ISPs in the country, there are, you know, maybe a

12   dozen.

13             THE COURT:  Okay.  A dozen maybe control 80 percent

14   or 90 percent of the traffic?

15             MR. SCHAPIRO:  I'm speaking impressionistically,

16   Your Honor, that wouldn't surprise me, but that seems about

17   right.

18             MR. GOULD:  So impressionistically is the type of

19   deposition testimony Mr. Schapiro's looking for.  It's not

20   (inaudible) constructive, Your Honor, and it goes to the

21   heart here.  There's been no law cited for you to demonstrate

22   the legal relevance of a comparison in this regime.  None.

23             It's convenient to say drawn from one or the other,

24   but that's not what the law is.

25             THE COURT:  Sure.

1          MR. GOULD:  The law is draws to Charter.

2          MR. SCHAPIRO:  Yes, but it's not what the law is --

3    it's not only what the law is, it's what logic is.  I mean, I

4    think, you know as the Special Master saw and I think as you

5    saw intuitively, Judge Hegarty, if you're saying you were

6    drawn to me be -- you were drawn to me where?  From where?

7    You're choosing what internet service to use or to stay on.

8          So, you know, you are not drawn in a vacuum here.

9    You're not just living in a cell like the one that was -- you

10   know, that we -- that -- the attorney holding room that we

11   were looking at when we came onto this call and you have --

12   only have one choice.  That's the whole point.

13         MR. GOULD:  So, Your Honor, if I could make another

14   point.  So there's another issue here.  You know, Mr.

15   Schapiro's talking about comparison.  If you read the briefs

16   closely, you'll see that both sides agree that Charter's

17   liability is not to be judged based on the practices,

18   conduct, customs, (inaudible) of others in the industry.

19   Charter itself cites a whole thick footnote of cases for

20   exactly that point.

21         It's something we, at long last, agree on.

22   Charter's liability is not to be judged on the conduct of

23   others and that applies as well to this issue of draw, and

24   the reason no one's cited any law to him on that is because

25   there is none.

1          So, you know, the last point I'd make on this, for

2    the moment, is that there's a geographic competitive aspect

3    to this.  If you accept -- and I think you should not.  If

4    you accept the notion that draw from ISP 1 to ISP 2 is

5    relevant and that you accept that plaintiffs' understanding

6    as opposed to actual facts are relevant, which I discourage

7    you from doing so, then and only then will the relevant

8    factor be Charter's competitor ISPs and the geographic

9    markets in which it operated during the claim period, because

10   certainly you can't draw from one to the other if they don't

11   compete.

12          THE COURT:  Okay, thank you.

13          Yeah, so as tempting as it would be to overrule a

14   district judge, which Ms. Rodriguez will be in about six

15   weeks or eight weeks and that -- magistrate judges don't ever

16   get to do that, I think it comes down to a matter of

17   discoverability versus admissibility.  I don't see this as

18   central to anybody's case, but I think as I perceive it, you

19   guys are spending tens or hundreds of thousands of dollars

20   potentially on every single question that's asked of a

21   witness at trial and so this is -- you're covering all your

22   bases, you're trying to not have that situation that Andrew

23   spoke about when you're wanting to address a topic at trial,

24   but you're prevented from discovery.

25          If Jeff is correct, this is going to be a very

34

1   short portion of any deposition and especially if there's

2   privilege involved.  So I don't find a basis for overruling

3   the Special Master's ruling.

4          What else can we talk about today?

5          MR. SCHAPIRO:  I think there's nothing from us,

6   Your Honor.

7          THE COURT:  And are you guys --

8          MR. GOULD:  Your Honor, may I ask --

9          THE COURT:  Yes, go ahead.

10         MR. GOULD:  May I ask one?  Sorry, may I ask one

11  clarification?  My last point:  If you accept the proposition

12  that a draw from 1 to 2 is somehow appropriate, shouldn't

13  this topic be limited in scope to geographically competitive

14  ISPs during the claim period?

15         THE COURT:  Geographically competitive?  Well,

16  what's the geographic area you're talking about?

17         MR. GOULD:  That's a question that only Charter can

18  answer.  So I would ask that if we're stuck having to prep

19  and answer this topic that Charter provide us with a list of

20  ISPs who they considered competitors during the claim period.

21         THE COURT:  Okay.  Well, since Andrew offered up

22  his impression that it was no more than a dozen, then I'll --

23  I think that's not a bad request.  So, Andrew, you provide no

24  more than a dozen comparators, okay?

25         MR. GOULD:  Comparative -- comparators that may --

1          MR. SCHAPIRO:  I -- if I can take a run at it, my

2     run at it will be -- that also seems like an appropriate in

3     limine argument.  I think we -- they -- the more efficient

4     way for us to do this is to ask about the witnesses's

5     understandings, and then if they want to say later on, Well,

6     wait a minute, this one's in California and Charter doesn't

7     cover that part of California, okay, let them do that then.

8          THE COURT:  I'm not understanding exactly -- Jeff,

9     so hold on a second.  You -- Andrew, you want to ask about

10    just the plaintiffs' understanding of the general propensity

11    of ISPs as a conglomerate, and if it's limited to that, then

12    I think, you know --

13         MR. SCHAPIRO:  No, no.

14         THE COURT:  Okay.

15         MR. SCHAPIRO:  Specific and general.  My point is

16    the most efficient way, rather than us trying to slice and

17    dice at this stage, this -- you know, one county in Missouri

18    and a different in California, is for us to find out what

19    they know, and then if they feel that they have an argument

20    that, Oh, well, wait a minute, this isn't relevant in

21    comparing thing 1 to thing 2, be our -- it would be unduly

22    prejudicial, because part of this county isn't covered or

23    something, that's an argument for them to make to Judge

24    Jackson at the in limine phase.

25         THE COURT:  Now, I just don't understand exactly

1   yet how you think this questioning is going to go down.  So,

2   you know, not that I want you to reveal all your mental

3   processes, but imagine I'm your 30(b)(6) witness.  What --

4   give me a question.

5           MR. SCHAPIRO:  Sure.  You're familiar with your

6   company's efforts to control infringement, correct?

7           THE COURT:  Sure.

8           MR. SCHAPIRO:  Correct.  You've sent notices out to

9   ISPs when you thought that you were -- that works that you

10  owned were being infringed, correct?

11          THE COURT:  Millions.  Millions.

12          MR. SCHAPIRO:  Okay.  And that's important to you

13  to understand what the ISPs do after they get those notices,

14  right?

15          THE COURT:  Well, it's important that they stop the

16  people from infringing, if that's what you mean.

17          MR. SCHAPIRO:  And one of the reasons that you're

18  suing Charter is you're saying that Charter's actions were

19  attractive to people who wanted to infringe, because you

20  think Charter didn't do enough; is that correct?

21          THE COURT:  Their inactions were attractive to

22  people, because yes, they didn't do anything.

23          MR. SCHAPIRO:  And you're familiar with the --

24  another ISP called RCN; is that correct?

25          THE COURT:  Yes.

1          MR. SCHAPIRO:  And you sent a lot of notices to

2     RCN, right?

3          THE COURT:  We sent --

4          MR. GOULD:  Objection; form.

5          THE COURT:  I think there's an objective number of

6     notices that we sent and I don't know that number.

7          MR. SCHAPIRO:  And you're aware of -- I'll ask you

8     an open-ended question.  Are you aware of whether RCN

9     terminated anyone?

10          THE COURT:  I'm not aware of whether they

11     terminated anyone.

12          MR. SCHAPIRO:  And did -- did you file a lawsuit

13     against RCN?

14          THE COURT:  Well, you can do a nationwide search

15     and you can find that, no, we did not file a lawsuit.

16          MR. SCHAPIRO:  And, in fact, you had agreements

17     through some trade associations with some ISPs that made

18     clear that it was okay if they didn't terminate infringers,

19     as long as they sent notices and filed certain other

20     practices, correct?

21          THE COURT:  Well, if you had those agreements,

22     Andrew, why do you need to ask a question about it?

23          MR. SCHAPIRO:  Well, because I want to get my

24     foundation -- I assume we're out of character now.  I want to

25     authenticate, I want to get my foundation and I want to

1    understand why.

2              THE COURT:  Okay.  So --

3              MR. SCHAPIRO:  Because you knew, actually, that

4    this was a drop in the bucket.  It didn't make any difference

5    in terms of infringement.  And you knew that sending -- just

6    passing notices along to subscribers 98 percent of the time

7    is going to do the trick and, in fact, even at the time, you

8    weren't concerned about terminating the thing that you're now

9    saying is the be all and end all of protecting your

10   properties?

11             THE COURT:  Well, yeah, but those questions --

12             MR. GOULD:  Your Honor --

13             THE COURT:  -- those questions go beyond their

14   understanding of their practices of ISPs.  You're digging

15   into -- that's -- some of those questions weren't on this

16   topic.  They might be on a topic you've addressed, but they

17   weren't on this topic.  Go ahead

18             MR. SCHAPIRO:  I'm doing my best on the fly here.

19             THE COURT:  All right.  Go ahead, Jeff.

20             MR. GOULD:  Your Honor, thank you.  So look, I

21   think we finally got to the kernel of the nugget here, an

22   hour in.  Mr. Schapiro wants to ask the witnesses questions

23   about CAS, the Copyright Alert System, which was a private

24   agreement between a number of content owners and the record

25   and movie industry with several other ISPs not including

1    Charter.  It's called CAS.  You've probably seen it and heard

2    it in the papers and probably remember it.

3          THE COURT:  Well, you're not surprised about that,

4    though, are you?  This is not a surprise to you --

5          MR. GOULD:  No, but --

6          THE COURT:  -- or a revelation?

7          MR. GOULD:  Well, the reason I'm a little surprised

8    is because there are a number of deposition topics expressly

9    on CAS, which the witness -- which the plaintiffs have agreed

10    to put up witnesses on, and Charter and Mr. Schapiro are free

11    to explore the contours of those agreements, what was

12    required and what was not.

13          Now, what Mr. Schapiro continues to argue, and this

14    is in their papers, is that what's relevant and good for

15    contributory is not just plaintiffs' understanding, which is

16    what the topic seeks, plaintiffs' understanding, but if you

17    read the brief carefully and particularly look at page 10, I

18    think it is, on four or five different occasions they talk

19    about wanting to know what plaintiffs understood and

20    endorsed.  Plaintiffs understood and endorsed and that's what

21    Mr. Schapiro's driving at.  That is not even called for by

22    this topic.  This topic only seeks what plaintiffs

23    understood.

24          And by the way, to the -- like, just to set the

25    record straight, the notion that plaintiffs endorsed any ISPs

40

1    not terminating is a false (inaudible) and incorrect.  The

2    copyright laws exist and have, you know, legal effect with or

3    without a regard to a private agreement between parties.  And

4    when Mr. -- when Judge Jackson considered the relevance of

5    CAS and what others were doing and what others were

6    terminating long, long, long ago in ECF-159, you know what he

7    said?  He said, It's hard for me to see the relevance of what

8    other parties agreed to in a private agreement that has

9    nothing to do with Charter.  I'm paraphrasing.

10             THE COURT:  Sure.

11             MR. GOULD:  He got it right then and --

12             THE COURT:  Well, that bodes well for you at trial,

13   but you do raise another question.  What are you guys going

14   to do if you're on one topic and the defending party believes

15   that a question is not within that topic?  What's your

16   practice or what's your anticipation?

17             MR. GOULD:  I think it depends, Your Honor, on how

18   it's going.  I mean, certainly the parties would be within

19   their rights to object that the question is outside the scope

20   of the topic for which the witness is required to be

21   prepared, and then if the attorney wants to continue and ask

22   and see if the witness has personal knowledge, I suppose

23   they're free to do so.

24             THE COURT:  Okay.

25             MR. SCHAPIRO:  If I -- yes, okay.

1          THE COURT:  Well, I guess what -- Andrew, you did

2    delve into a specific ISP.  You just -- if there are truly

3    hundreds, I just think it's fair that the deponent have some

4    notice.

5          MR. SCHAPIRO:  So let's do this, Your Honor.

6          THE COURT:  What?

7          MR. SCHAPIRO:  Yes, I have a compromise.  How about

8    we will -- and we can send them a list.  We will only ask

9    them about the ISPs to which they sent notices, which is

10   either, you know, a dozen -- two dozen max.  It's probably

11   somewhere between 10 and 20, roughly and then the witness can

12   be prepared.

13         THE COURT:  All right, that's fine.  That's a good

14   compromise.

15         MR. SCHAPIRO:  Thank you.

16         THE COURT:  Go ahead.

17         MR. GOULD:  And, Your Honor, that's without regard

18   to whether those ISPs compete in geographic markets with

19   Charter such that they could be drawn from 1 to 2, which was

20   Mr. Schapiro's only argument for all of this.

21         THE COURT:  What is Charter's geographic market?

22         MR. SCHAPIRO:  I -- honestly, I don't know as I sit

23   here today.  It's one of the largest in the country.  It

24   doesn't cover my part of town, it doesn't cover Chicago, but

25   -- and by the way, draw isn't our only argument.  We also

1   were arguing that it's relevant to contributory liability,

2   because we want to say they knew of -- and we do want to try

3   and make the endorsement argument about whether we engage in

4   purposeful conduct.

5          So I don't know, and I think it would be

6   inefficient to be trying -- it literally does vary from, you

7   know, county to county.  Sometimes, who your internet

8   provider is, I think trying to slice and dice that at this

9   phase would be inefficient.

10         They know who they sent notices to.  If it ends up

11  being something that comes in at trial or if they want to

12  have their witness or their expert say, Well, you can't make

13  a draw argument about this, because it's not head to head and

14  we say we can make a draw argument, because it's a good

15  comparison, it's thing 1 to thing 2 and we -- and then we'll

16  fight that out.

17         THE COURT:  Yeah, it's too many weeds for me to be

18  talking about geographic markets, so I'm not inclined to do

19  that.  Okay?

20         What else?

21         MR. SCHAPIRO:  Actually, we probably do have one

22  other just little housekeeping matter, Your Honor.  As we're

23  getting closer to the close of discovery, I think each side,

24  but certainly I know we are, in the next few days, going to

25  be filing some additional motions about discovery issues, and

1    the current briefing schedule -- there are instances in

2    which, because we're going to, I think, be having a lot of

3    depositions, you'll be happy to hear, in April and May in

4    which we might need an expedited briefing schedule on some of

5    these.

6              Is the best way to deal with that just to send you

7    an e-mail or make a formal motion and say rather than the

8    usual -- I apologize, I'm forgetting as I sit here, but one

9    of my colleagues can tell me the amount of time we each have

10   to answer and then reply -- can we, just through an e-mail or

11   some other way, seek an expedited briefing schedule from you?

12             I don't mean turn things around in one day, but

13   just quicker than normal?

14             THE COURT:  Are you satisfied with my practice to

15   date in which I receive a motion and I set a hearing date and

16   you guys all try to get briefs in by that date?  Is that a

17   problem?

18             MR. SCHAPIRO:  I think that's been working very

19   well.  You know, the -- yes, I think that works, especially

20   because we know we can e-mail you and we'll get a response

21   fast.

22             MR. OPPENHEIM:  So, Your Honor -- and this is Matt

23   again.  I think it's going to depend on the nature of the

24   motion that's filed.  Some of the motions, for example, the

25   issue earlier with respect to the 502(d) order, sure, we

44

1    didn't even need to file an opposition.  Happy to be heard on

2    it in an expedited fashion quickly and we didn't object to

3    not having time to file an opposition.  But, you know, we

4    know, for example, they've been working for several weeks on

5    a motion seeking to pierce the privilege with respect to a

6    bunch of different entities.

7         We know they've been working on this for awhile.

8    They're going to drop it on us, I suspect, in the next day or

9    so and they're going to want us to turn around a response in

10   a very expedited fashion as we're taking depositions.  For a

11   motion like that it probably won't work.

12        So I think it's going to depend on the nature of

13   the motion, Your Honor.

14        THE COURT:  Sure, and you know, Matt, you're going

15   to probably -- it's likely you'll be seeking -- you'll be

16   filing some kind of motion in the future and, you know, of

17   the nature where it might require full briefing and not too

18   compressed.  So it's going to go both ways.

19        I agree with you in the sense that it does depend

20   on the nature of the relief.  If I got an issue concerning

21   privilege, I'm not going to set a hearing right away, because

22   that requires more deliberation than just talking things

23   through on the bench.

24        So you're right, it depends.  With the things I've

25   been seeing, I think these are things we can hash out both in

1   an expedited briefing schedule and on the bench, but there

2   are some things that just won't fit in that.

3           I will say this:  If you can -- if you submit your

4   motion -- when you submit a motion, I would like you to

5   include, if you can, a stipulated expedited briefing

6   schedule, or if you're unable to reach that, to explain in

7   your Rule 7.1(a) that -- let's say it's Charter filing a

8   motion, the plaintiffs indicated they can't file a response

9   in less than 20 days and, therefore, their position is that's

10  -- that they want to stick to their local rules as far as

11  briefing.

12          So if you just would flag that for me, we'll be

13  attuned to that and be looking for your 7.1(a) statement as

14  to the briefing schedule.

15          Okay?

16          MR. OPPENHEIM:  Very well, Your Honor.

17          THE COURT:  All right.  Thank you all.

18          MR. OPPENHEIM:  Thank you.

19          THE COURT:  All right.

20          (Whereupon, the within hearing was then in

21  conclusion at 4:27 p.m.)

22

23

24

25

1                    TRANSCRIBER'S CERTIFICATION

2     I certify that the foregoing is a correct transcript to the

3     best of my ability to hear and understand the audio recording

4     and based on the quality of the audio recording from the

5     above-entitled matter.

6

7     /s/ Dyann Labo                    April 12, 2021

8     Signature of Transcriber               Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25