1

```
1              THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
2
    Case No. 19-cv-874-RBJ-MEH
3   _____

4   WARNER RECORDS, INC., et al.,

5       Plaintiffs,

6   vs.

7   CHARTER COMMUNICATIONS, INC.,

8       Defendant.
    _____
9

10          Proceedings before MICHAEL E. HEGARTY, United

11  States Magistrate Judge, United States District Court for the

12  District of Colorado, commencing at 3:21 p.m., April 26,

13  2021, in the United States Courthouse, Denver, Colorado.

14  _____

15  WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE HEREIN

16  TYPOGRAPHICALLY TRANSCRIBED. . .

17  _____

18                    APPEARANCES

19          JONATHAN M. SPERLING, MATTHEW J. OPPENHEIM, COREY

20  MILLER, MICHAEL FIELDS and SHIRA POLIAK, Attorneys at Law,

21  appearing for the Plaintiffs.

22  _____

23

24                 DISCOVERY CONFERENCE

25
```

2

```
1                    APPEARANCES (continued)

2              ANDREW H. SCHAPIRO, JOHN ROSENTHAL, JASON MOORE,

3    ELLA HALLWASS and CRAIG JOYCE, Attorneys at Law, appearing

4    for the Defendant.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                      P R O C E E D I N G S

2              (Whereupon, the within electronically recorded

3       proceedings are herein transcribed, pursuant to order of

4       counsel.)

5              THE COURT:  Okay.  Case Number 19-cv-874, Warner

6       Records, Inc. vs. Charter Communications, Inc.  I suppose I

7       have to go through appearances.  Let's just have one lead

8       attorney for both sides introduce whoever is going to be

9       potentially participating from that side.

10             MR. SPERLING:  Good afternoon, Your Honor.

11      Jonathan Sperling of Covington Burling for the plaintiffs

12      together with Hardy Ehlers of Covington and Matt Oppenheim

13      and Jeff Gould of Oppenheim & Zebrak.

14             THE COURT:  Okay.

15             MR. SCHAPIRO:  Hello, Your Honor.  Andrew Schapiro

16      from Quinn Emmanuel for Charter.  With me are two colleagues

17      who I'm not sure you've met on camera yet, but have been

18      doing the lion's share of the work:  Jessica Rose and Ella

19      Hallwass.  We also have some other folks on the phone.

20             THE COURT:  Okay.  So Mr. Ehlers, I didn't mean to

21      put you on the spot, but when you describe to a judge all of

22      the ways that this thing is not privileged, but you know if

23      Mr. Schapiro is correct that there is a legend on the

24      document that says "attorney-client privilege" and you don't

25      say that in your e-mail, that seems to me a little bit of

4

1    sandbagging.

2             Do you understand me?

3             MR. EHLERS:  I understand you, Your Honor, and our

4    intent wasn't to mislead the Court or admit anything.  That

5    wouldn't have served our request very well.  We understood

6    from the protective order that we're not allowed to disclose

7    the content of the information in making a challenge and so

8    what we did was raise to the Court what our request was,

9    which was for in-camera review and, of course, in requesting

10   in-camera review, we're taking the position that the document

11   is not privileged and so that's what we said in our e-mail.

12            THE COURT:  Okay.  No, what you said in your e-mail

13   -- hold on.  You said that it's a one page e-mail, copying no

14   lawyers, and containing only purely operational information.

15   So you told me something about it and then you said Charter

16   has asserted that belated and meritless claim are privileged.

17            I mean, at least in that small list of things about

18   the document, it would not have violated any protective order

19   to say although it has an attorney-client stamp on it, we

20   believe that is meaningless.  That's all I would want to hear

21   in that kind of a context.  Okay?  So let's just bury that.

22   It's not a big deal.

23            Mr. Schapiro, do you think you get an indefinite

24   amount of time for clawback?  Do you think that that is

25   available forever, even at trial?

5

```
 1            MR. SCHAPIRO:  I don't know if I would go as far as
 2    to say even at trial.  Of course there's -- I'm getting a lot
 3    of feedback, I don't know if somebody else -- I would ask --
 4            THE COURT:  Yeah, I don't know what that is.
 5            MR. SCHAPIRO:  -- non-participants to mute, please.
 6    But there is, of course, an obligation on both sides.  If we
 7    get a document or if the other side gets a document that said
 8    privilege on it, ordinarily we flag it for each other.  What
 9    happened with this one was in the course of preparing our
10    revised privilege log, we looked at this and some related
11    documents that actually put this in context and we realized
12    that this had been produced, and the reason the
13    attorney-client privilege notation was not originally picked
14    up by some machine learning that is supposed to do that is
15    because it's in an image rather than in text, but I believe
16    we had --
17            THE COURT:  And it's tiny, too.  It's very tiny.
18    We can all stipulate to that.
19            MR. SCHAPIRO:  It's quite tiny.  I can't dispute
20    that, Your Honor.
21            THE COURT:  Well, here's the thing:  To me -- is it
22    true that you produced it in October?
23            MR. SCHAPIRO:  That we produced this document in
24    October?  Yes.
25            THE COURT:  Okay.  I -- maybe I misunderstand the
```

6

1   process, but it would seem to me that with what I view as an

2   army of attorneys, you would be checking at some point

3   through your entire production, as big as it is, that nothing

4   was inadvertently produced that's privileged.  When will you

5   stop doing that or ever will you stop doing that?

6           I mean, when can we have a definitive time for

7   saying you have done all the checking that you need to do

8   over your own documents?

9           MR. SCHAPIRO:  That's a totally valid concern, Your

10  Honor, and I don't know if I can propose a specific date, but

11  what I would say is there has been no material prejudice at

12  this point to the other side, and if a document is

13  privileged, if the fault is ours and we had produced

14  something that we should have caught -- and believe me, there

15  are layers of quality control here and we catch a lot of

16  things, but sometimes some small percentage get through, but

17  you know, if we produced something that was privileged,

18  (inaudible) when we see that, we have to aggressively protect

19  the privilege --

20          THE COURT:  Well, but the --

21          MR. SCHAPIRO:  -- and I expect the other --

22          THE COURT:  This seems to me to be -- I mean, the

23  plaintiffs know what it looks like, right?  I mean, they've

24  seen it.

25          MR. SCHAPIRO:  Yeah.

7

1          THE COURT:  This seems to me to be at the heart, at

2     the very heart of this case, what you are doing about your

3     customers.  It goes to the essence of the litigation.  This

4     should have been sticking out like the biggest sore thumb in

5     the history of sore thumbs.  I don't -- is there no -- are

6     there no cases that say, at some point, you've waived this

7     right to clawback?  Are there cases that say that?

8          MR. SCHAPIRO:  As I stand here, I don't know.  I

9     would not be surprised if there are cases that say that --

10     I'm sure there are ways to waive attorney-client privilege,

11     there's a way to waive just about any right, but I want to

12     clarify one thing here:  This is a document that was prepared

13     -- the flowchart or the chart there was prepared in the

14     spring of 2016 after the notice letter was sent from the

15     plaintiffs or precursors to the plaintiffs suggesting that

16     they're likely to sue us about these matters, and so this is

17     at the very end of the claims period and the attorneys start

18     saying, Okay, what changes should we, could we make to

19     protect ourselves, because it looks like these folks are

20     getting ready to sue us here?  And they start a discussion of

21     that.

22          We could show you and I could have a declaration,

23     I'm sure, within 24 hours, Your Honor, that the genesis of

24     this chart -- this table itself is not only -- the in-house

25     people at Kirill Abramov, but it reflects comments and input

8

1   from Winston & Strawn lawyers, including Winston & Strawn

2   lawyers who are on this case, Jennifer Golinveaux and Michael

3   Elkin, just the virgin -- before this, before it gets sent to

4   the other folks in the organization saying, Okay, this is

5   what we're proposing.  Give us your feedback.

6            So that's the -- you know, whether that's at the

7   heart or not, it's -- we would say privileged.

8            THE COURT:  But truly, if you're already under

9   threat of litigation at this point -- you just said that,

10   right?

11           MR. SCHAPIRO:  Correct.

12           THE COURT:  -- why wouldn't they copy this -- why

13   wouldn't they copy this to a lawyer if they're vetting ways

14   to either avoid getting sued, ameliorate any damages in an

15   already coming down the tracks lawsuit?  Why wouldn't a

16   lawyer be included in the analysis on the e-mail?

17           MR. SCHAPIRO:  Right.  Well, that gets -- yes, that

18   gets us right back to your question about when or how did we

19   -- you know, why are we raising this now.  There are prior --

20   there's a series of prior e-mails and documents leading up to

21   this -- leading up to the actual creation of this exact

22   chart, which is it's full of all the lawyers, including even

23   outside counsel.

24           One of those lawyers sends it to Mr. -- the first

25   person on -- Sam James and then Sam James asks some other

9

```
1    people within Charter -- sends it to them here to look at it,

2    but there are -- this exact chart is e-mails from, you know,

3    several days before this.  That's -- it has more lawyers than

4    are on this Zoom.

5              THE COURT:  I know, but so if a lawyer says, Figure

6    out a way to handle this whole thing better and then -- and

7    tells that to operational people, and they do it or they

8    engage in an effort do it, I mean, it seems to me they would

9    want to show the lawyer, Okay, we're doing what you asked.

10             I don't -- I mean, you almost have to intentionally

11   not send it to a lawyer, as many lawyers as you say are on

12   previous e-mails.  You have to deliberately decide this isn't

13   going to a lawyer in order to not send it to a lawyer.  Does

14   that sound logical?

15             MR. SCHAPIRO:  Well, here -- and I'm purely

16   speculating, but just based on my own experience, at some

17   point, when the e-mail thread is (inaudible) a lot of people

18   who's time you don't necessarily want to take while you are

19   checking on one thing.  So Mr. James is checking with other

20   people saying, This is what's proposed, this is what's coming

21   from the lawyers, speak now or forever hold your peace.  Is

22   this feasible?  Give us your feedback.  You know, you'll see

23   under two of these areas in the chart number, I think it's 4

24   and 6 or 3 and 5, you know, there's talk about potential

25   other legal consequences.
```

10

1        My guess is at some point, the person was acting as

2    the point person, Mr. -- this Sam James.  And I think Ella

3    Hallwass can correct me if I'm wrong, but I think we have

4    other e-mails that would lead at least to that inference that

5    Sam James is being the point person on this to then get back

6    to the lawyers.

7            THE COURT:  So everything you say makes sense.  I

8    understand.  This doesn't seem like -- if the timing is

9    correct and they're receiving -- when was -- when was the

10   notice received about the fact that they're contemplating --

11   the plaintiffs were contemplating a lawsuit?

12           MR. SCHAPIRO:  March 26, 2016.  That's when we got

13   the demand letter.

14           THE COURT:  It all fits in a timeline that's

15   logical, I agree.

16           So I guess -- who's going to address this for the

17   plaintiff?

18           MR. SPERLING:  I will, Your Honor.

19           THE COURT:  Okay.

20           MR. SPERLING:  Jonathan Sperling.

21           THE COURT:  So Jonathan.  I mean, I can easily find

22   -- in fact, probably reasonably find -- that they wouldn't be

23   doing this absent a lawyer's involvement.  Okay?  That this

24   just wasn't an idea that -- to make their business better.

25           I mean, according to you and what you're going to

11

```
1    try and prove at trial, this wasn't on their radar screen.

2    They just ignored this for years, but now completely contrary

3    to what you're going to -- evidence you're going to put on

4    for 2012, '13, '14 '15, they're really thinking about it now

5    and the reason they're thinking about it is because your

6    clients threatened to sue them and they are now being told by

7    lawyers, Hey, figure out a way to actually deal with these

8    allegations we're getting from these recording companies on

9    us doing something wrong.  What can we do to at least

10   partially address their allegations?  That all makes sense.

11   So assume that I'm finding that.  Why is it not privileged?

12          MR. SPERLING:  So, Your Honor, two things:  First

13   of all, you shouldn't find that, because it's a truncated

14   view of the world based on incomplete information.  So in

15   fact, beginning in December of 2015, Charter began

16   considering a graduated response policy, well before we wrote

17   out a letter threatening them with claims.  In fact, when we

18   were in front of you in person in Denver on February 22 and

19   23, although I certainly don't expect the Court to remember

20   the document, I showed you and the Special Master documents

21   from earlier in March, March 9, again before our letter, in

22   which they were describing and contemplating a six-step

23   graduated response program.

24          Your Honor, I obviously don't have the clawback

25   document in front of me so I can't see it.  I do have some
```

12

1   recollection of it.  As Your Honor said, it's a pretty

2   significant document.  Can I speak about the contents of the

3   document to the extent that we recall it?

4           THE COURT:  Yes, but then -- and let me ask this

5   question first:  As small as it is, the words

6   "attorney-client privilege" are the same size as everything

7   in a box -- a lined box at the bottom of this chart, and so

8   if anybody would have read that, they would have read the

9   attorney-client privilege.

10          What is your obligation in this context that if you

11  see something called attorney-client privilege, do you have

12  any obligation to raise it with Charter?

13          MR. SPERLING:  So Your Honor, we have, on a number

14  of occasions, gone back to Charter and said, Hey, we have a

15  document from you.  It looks like you may want to assert

16  privilege over it.

17          In doing that, we think that we've gone beyond what

18  the Colorado Ethical Rule requires, which is that on the face

19  of the document, you believe that it is privileged and we

20  should have erred on the side of, even when we don't think

21  it's privileged, when we can see that they likely would want

22  to assert a privilege, we've gone back to them.

23          With respect to this document -- again, I don't

24  have it in front of me, Your Honor -- I can tell you and

25  absolutely represent to you I never saw that.  I don't know

13

1    where it is on the document.  You tell me it's there and Mr.

2    Schapiro tells me it's there, so I'm sure it's there.  I

3    looked at this document closely.  I marked it up extensively.

4    I didn't see that.

5            So shame on me perhaps, but if we'd seen that, we

6    would have done exactly what we've done with other documents

7    where we've gone back to them, even when they didn't say

8    attorney-client privileged on them.  Your Honor, I want to be

9    clear, there are instances where we see somebody's name on a

10   document -- let's say we see a lawyer's name, and although

11   it's not designated privileged, we've gone back.

12           So in response to your narrow question, what's your

13   obligation, we've genuinely tried to construe our approach,

14   even if we're not obliged to, to go back to them properly and

15   flag this stuff and act in the best of faith.  Here, we

16   didn't see it.

17           Maybe shame on us again, but I'm representing to

18   Your Honor I looked at that document closely.  The copy that

19   I had and that I no longer have was heavily marked up and I

20   didn't see that.

21           THE COURT:  So it is offset, it's by itself.  The

22   document actually is -- it's sort of presented in a parallel

23   way all across it except the word "Charter Communications" is

24   in the upper right hand corner and "attorney-client

25   privilege" is in the lower right-hand corner and they are

14

1   actually just sitting there by themselves.

2          So I don't dispute what -- because I believe you, I

3   believe you're an honest person, but it would be hard to

4   miss.

5          MR. SPERLING:  And that said, Your Honor, it

6   wouldn't really make a difference, potentially.  Again, I'm

7   not suggesting for a second if we had seen it we wouldn't

8   have taken a different approach, but in a document that has

9   no lawyers on it - I mean, we all know that the

10  attorney-client privilege designation can be overused.  I'd

11  be surprised if there aren't -- you know, there isn't some

12  document from our side where some business person put that on

13  a document and it wasn't under a proper analysis privileged,

14  and so its mere presence, I don't think, tells us anything.

15  Certainly, again, had we seen it we would have come forward.

16         But I want to pivot back to sort of the substantive

17  analysis, because we all know -- the Court knows, Charter

18  knows that if you have a document that's not privileged, you

19  don't bestow it with privilege and cloak it just by virtue of

20  putting the stamp on it.  So the underlying question is

21  whether it's privileged and the fact that that stamp is there

22  doesn't answer that question.

23         So going back to the timeline that you asked about,

24  Your Honor, this discussion of a six-step graduated response

25  policy is decidedly not, not a response to our demand letter

15

1    and we can provide the Court with the documents that show

2    that Charter was considering that six-step process before

3    they ever received our demand letter.

4            THE COURT:  Can you show it to me on the -- I need

5    to see that.  Can you show it to me right now?

6            MR. SPERLING:  Yeah.  I'm going to ask Mr. Ehlers,

7    if he could, to pull that up and when he's ready he'll let us

8    know.

9            MR. SCHAPIRO:  (Inaudible).

10           MR. SPERLING:  And we can wait or we can go on,

11   Your Honor.  Whatever you want to --

12           MR. SCHAPIRO:  Maybe I can provide one bit of

13   context that might shorten this, because I didn't want to get

14   too into the weeds earlier when Your Honor asked me about the

15   timeframe, but in December 2015, we received a similar demand

16   letter from an outfit called Mingus.  Maybe you've heard of

17   it, because this Mingus hold has become relevant with regards

18   to some of the document issues.

19           So December 2015, as I understand it, after getting

20   this first demand letter, is when some of these inquiries

21   started and then it heats up in the spring of 2016.

22           THE COURT:  No, listen.  I -- in my view, the

23   plaintiffs can't have it both ways.  They can't say that

24   Charter did nothing and then spontaneously, without any

25   incentive provided by a potential lawsuit, suddenly did

1    something.  I don't believe that happened.

2            If the plaintiffs are right about Charter's --

3    ignoring their obligations, then suddenly December we start

4    seeing a flurry of activity that carries through the claim

5    period, I think logically that's attributable to -- and even

6    in the plaintiffs' view -- or especially in the plaintiffs'

7    view to the threat of litigation, but do you have the

8    document you can show me?

9            MR. SPERLING:  Your Honor, we -- yeah, we don't

10   doubt for a second -- I think the documents show that they

11   began to reconsider their policy after the verdict in the BMG

12   vs. Cox case.  That's the first Cox action, not the one that

13   was brought by Mr. Oppenheim's firm.  And so obviously there

14   was concern about liability there.  Of course, there was a

15   catalyst for their reconsideration of their policy.

16           But that gets to the second key issue Your Honor,

17   which is, businesses make changes to their policies and their

18   procedures and they implement new procedures and they adopt

19   new procedures all the time.  There are few such decisions

20   that aren't informed, at least in part, by legal advice and

21   the communications of the legal advice can be privileged, but

22   procedures and proposed procedures are not privileged just

23   because they were informed by legal advice.

24           Charter was discussing potential changes to its

25   procedures throughout the discovery period, including before

1    the BMG vs. Cox verdict, and documents reflecting those

2    proposals, some of which were implemented, some of which are

3    not, are absolutely discoverable and have been produced and

4    Charter has not sought to claw those back, of course, even if

5    their proposals were informed in some way by legal advice.

6            So here, the relevant question is whether a

7    document with no lawyers on it and that isn't forwarding some

8    underlying communication from a lawyer is privileged, and

9    what it is, is it's a more detailed presentation, a more

10   thought out presentation of a potential new procedure, a

11   six-step graduated response program, but there's no

12   communication of legal advice.  It might be informed by the

13   lawyers, it'd be shocking if it wasn't.  That doesn't render

14   privilege.  Then everything that they did on this subject

15   ever would be privileged because of course lawyers are having

16   input into the procedures that they choose to adopt.

17           And Your Honor, if you want to see the document,

18   we're ready to put it on the screen.

19           THE COURT:  I do.  Okay.  That's -- okay, DMCA deck

20   means what?

21           MR. SCHAPIRO:  It means a PowerPoint.  A PowerPoint

22   presentation.

23           THE COURT:  Oh, okay.  Go ahead.

24           MR. OPPENHEIM:  It looks like Mr. Sperling has

25   temporarily dropped.

18

1            And so, Your Honor, this is Matt Oppenheim.  While

2    we're waiting for Jonathan to rejoin us, what you see in this

3    document --

4            THE COURT:  Wait, go back up.

5            MR. OPPENHEIM:  -- is --

6            THE COURT:  I need you to go back up a little bit.

7    What does it mean to say, Customers that settle will be reset

8    to zero strikes?  What does that mean?

9            MR. OPPENHEIM:  So Rightscorp, which you've heard a

10   lot about -- oh, Jonathan, you're back.  Okay.  Do you want

11   to pick it up here and answer that question?

12           MR. SPERLING:  I think the question was about zero

13   strikes, so --

14           MR. OPPENHEIM:  No, no, no.  Let me -- no, it was a

15   question about settlement.  So Your Honor, Rightscorp -- and

16   then I'll hand it back to Jonathan in a second.

17           Rightscorp was sending notices, which included a

18   link for the subscriber -- for the underlying Charter

19   customer to settle the infringement claim.  The plaintiffs

20   were not doing that, but Rightscorp was, and there may have

21   been some -- a couple of other vendors that were doing that,

22   all of course with the consent of their client, who would be

23   the copyright holder, and so this was addressing -- that

24   particular provision was addressing, largely, Rightscorp

25   notices, but I'll hand it back to Jonathan now since he's

19

1    back on.

2              THE COURT:  All right, so keep going down --

3    scrolling down.

4              MR. SPERLING:  Your Honor, so I don't know -- you

5    know, what you covered, I see that -- up to that point in the

6    document.  You can see here, this is our proposal.  It's

7    after the BMG vs. Cox verdict back in December.  It's several

8    months later in March.

9              Obviously, the lawyers have been thinking and

10   providing input.  It contemplates a six-strike process, just

11   like you see on the other document, with graduated responses

12   being educational, moving to acknowledgment notifications,

13   meaning that the subscriber has to do something in order to

14   be able then wade out onto the worldwide web.  They have to

15   acknowledge the notice.

16             You see in the second-to-last bullet, after the one

17   that Mr. Oppenheim was just discussing with you, that if the

18   subscriber doesn't either successfully complete settlement --

19   that's referring to the Rightscorp process that Matt

20   described -- or appeal -- that's the appeal process I think

21   maybe they indicated on the clawed-back document where the

22   subscriber had the opportunity to challenge the veracity of

23   the infringement notices -- then after six strikes, services

24   would be terminated.

25             The last bullet point appears to be talking about

1   the financial impact to Charter.  Impacts approximately

2   200,000 customers per year would mean that they would have

3   200,000 customers per year that would have to be suspended or

4   terminated by virtue of that six-strike process.  Of course,

5   they'd lose the subscriber revenue for those.

6           This slide proceeds to talk about how they would go

7   about, at a more technical level, implementing these changes.

8   It talks about the anticipated additional call volume among

9   the fourth hash there.  The fifth hash mark tells you what

10  that translates into, which is more about cost -- the more

11  full-time employees.

12          So again, the big picture here is this is another

13  document setting forth proposals, just an earlier in time

14  version of the same kind of proposal for a six-step graduated

15  response policy, no assertion of privilege, right up until

16  today.  It's not that Charter was unaware that they produced

17  this one, because I put this document on the screen in your

18  presence, in Mr. Schapiro's presence, in Denver back on

19  February 22.  And so you compared that document to the

20  document that they're trying to claw back now, it's simply a

21  later in time, more refined version of a proposal of the same

22  new set of procedures; a six-step graduated response policy.

23          It may be informed by legal advice, just like the

24  earlier one was, but where's the communication of legal

25  advice?  Where is the communication of the lawyers' mental

1   impressions?  It's a circulation of a procedural proposal

2   among business people for them to discuss.

3          THE COURT:  Okay, I've got it.  Andrew, do you want

4   to wrap up?

5          MR. SCHAPIRO:  I do.  So I think this document

6   proves our point.  I mean, look, the facts about this

7   document is that the reason that we produced this document is

8   we could not readily connect this one to the lawyers.  It

9   doesn't have the same footprints that the other, shorter

10  document, which has, by the way, far less what I would call

11  operational material does.  So as I said at the top, the

12  document that we're fighting over today is one where we can

13  show through a series of e-mails -- we'd be happy to produce

14  a declaration or an in-camera, exactly what -- where that

15  document appears to have come from.

16          It may well be that this deck too, if we had the

17  goods, we'd be asserting privilege over this one too, but we

18  don't have the goods and so we have to, in good faith,

19  produce it.  But I also think this obvious -- whatever

20  complaints the other side might have about prejudice,

21  whatever questions they want to ask about the procedures you

22  were contemplating or, you know, how much it would have cost

23  or how many strikes you were going to have, they can have

24  this document and others just like to ask it.

25          We're just trying to protect the privilege of our

1    outside counsel and our in-house counsel and not allow

2    documents to be out there.

3              THE COURT:  I understand.

4              MR. SPERLING:  And Your Honor, I understand that

5    last point.  I mean, this document is so significant --

6              THE COURT:  You're going to talk me out of it if

7    you keep talking.

8              MR. SPERLING:  I'm done, Your Honor.

9              THE COURT:  I was looking for even one iota of

10   input from a lawyer differentiating this document from what I

11   just saw on the screen that's not privileged.  I mean, I

12   wanted to find it.  I'm looking for it.  I can't find a

13   single element about any of this allegedly privileged

14   document that would have been input from a lawyer if I accept

15   that this other document I was shown on the screen is not

16   privileged.  There's no difference.  No material difference

17   --

18             MR. SCHAPIRO:  So --

19             THE COURT:  -- number one.  Number two -- go ahead.

20             MR. SCHAPIRO:  So let me just -- okay.  Let me see

21   if I have some, although I haven't looked at the one that was

22   on the screen recently, but the fourth offense -- under the

23   -- on the one that's being fought about today, under fourth

24   offense, it proposes stronger legal language.  Under fifth

25   offense, it says pending review and approval.

1      So I think -- I don't know if those are in the

2  original one that's there, but those are two that leap out at

3  me.

4      THE COURT:  Right, I understand, and I don't know

5  what law -- legal language means.  I mean, what does that

6  mean?  So it's pretty vague.  But, Andrew, in the end, I

7  mean, at some point we've got to say, you've had your shot at

8  looking at documents that you think are privileged that you

9  inadvertently produced.  That's got to end sometime,

10  especially with us hurdling towards the discovery deadline.

11      And, you know, I've been there.  I've been in the

12  massive big firm.  I've seen 15 or 20 associates look through

13  300 boxes of documents in three days.  I've been part of

14  that.  That's what has to happen.  And if it happened here,

15  then I think that you've waived, and I hate to say that,

16  because it's -- even if -- if this was privileged, I'd hate

17  to rely on waiver, because that's regrettable; but in the

18  end, I don't think it's privileged, but if it is, it's

19  waived.

20      Okay.  What else can I do for you guys?

21      MR. SPERLING:  Thank you, Your Honor.  We've tried

22  to resolve -- as you may have seen from my later e-mail, the

23  question of the deposition date.  Charter offered another

24  date, so we've worked that out.  We don't need to bother you

25  with that further.

24

1          THE COURT:  Okay.  Am I seeing you guys later this

2    week?  29th?

3          MR. SPERLING:  Yes, Your Honor.

4          MR. SCHAPIRO:  You are.

5          THE COURT:  Okay.  I think there's at least a

6    decent chance that you've lost Ms. Rodriguez.  Her hearing is

7    tomorrow, which is why she's unavailable this week.  There's

8    just nothing that's going to derail that.  Think that over,

9    because in the event that, you know, you think you have

10   significant needs for somebody, I don't think I can meet

11   those needs or -- between now and the end of discovery period

12   and there's kind of a subject matter expert attorney in town

13   who would be willing to step in.  If you want to vet him, his

14   name is Greg Whitehair and he has served as a special master

15   for me in other contexts.

16          I actually took his place as an Assistant U.S.

17   Attorney at the Department of Justice back in 1992.  I've

18   known him since then.  Anyway, that's a name.  I don't know

19   what firm he's with right now, but it's a -- kind of a unique

20   name:  J. Gregory Whitehair, just like it sounds.

21          So consider that in case we've lost Ms. Rodriguez

22   for good.  Okay?

23          MR. SCHAPIRO:  And one last thing?

24          THE COURT:  Okay.

25          MR. SCHAPIRO:  Just to clarify, because, you know,

25

1    a large part of the reason we went to the exercise of seeking

2    to claw this back, despite the fact that very similar

3    documents are out there already, is to make sure that we are

4    not found to have waived the privilege in any broad fashion.

5    And so I just want to clarify that you are finding here that

6    if they -- even if the document is privileged, privilege is

7    waived, applies only to this document and is not a finding of

8    some broad --

9               THE COURT:  Absolutely.

10              MR. SCHAPIRO:  -- waiver of (inaudible)?

11              THE COURT:  So if you -- if there was another

12   document that you find you've produced and you want to claw

13   back and the circumstances are different, this is not res

14   judicata.  Okay?

15              MR. SPERLING:  Your Honor, very last thing:  Can we

16   just get confirmation that the document will be reproduced

17   today?  I mean, they obviously have it and we've got depos,

18   you know, as soon as tomorrow.

19              THE COURT:  Yeah.  And besides I think Judge

20   Jackson is out for the whole week.  So -- you know, I mean, I

21   know you've appealed a lot of things and you should, because

22   he's reversed several things and that's his prerogative, but

23   anyway he's not available.  And to the extent --

24              MR. SCHAPIRO:  Your Honor, we're not -- I think

25   even without consulting, I don't think we're going to appeal

26

1    this --

2              THE COURT:  And --

3              MR. SCHAPIRO:  -- as long as it's not, you know,

4    some broad waiver --

5              THE COURT:  No, it's not.

6              MR. SCHAPIRO:  -- of the privilege behind --

7              THE COURT:  I find that it's not.  And good luck

8    with your depositions, okay?

9              MR. SCHAPIRO:  Okay.

10             MR. SPERLING:  Thank you, Your Honor.

11             THE COURT:  Bye-bye.

12             MR. OPPENHEIM:  Thank you, Your Honor.

13             (Whereupon, the within hearing was then in

14   conclusion at 3:53 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
1                    TRANSCRIBER'S CERTIFICATION

2    I certify that the foregoing is a correct transcript to the

3    best of my ability to hear and understand the audio recording

4    and based on the quality of the audio recording from the

5    above-entitled matter.

6

7    /s/ Dyann Labo                    April 29, 2021

8    Signature of Transcriber            Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```