1

```
1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2
     Case No. 19-cv-874-RBJ-MEH
3    _____

4    WARNER RECORDS, INC., et al.,

5         Plaintiffs,

6    vs.

7    CHARTER COMMUNICATION, INC.,

8         Defendant.
     _____
9              Proceedings before MICHAEL E. HEGARTY, United

10   States Magistrate Judge, United States District Court for

11   the District of Colorado, commencing 9:35 a.m., on April 29,

12   2021, at in the United States Courthouse, Denver, Colorado.

13   _____

14              WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

15   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

16   _____

17                        APPEARANCES

18              JEFFREY GOULD, MATT OPPENHEIM and JONATHAN

19   SPERLING, Attorneys at Law, appearing for the

20   Plaintiffs.

21              ANDREW SCHAPIRO, LINDA BREWER, TODD ANTON and

22   CRAIG JOYCE, Attorneys at Law, appearing for

23   the Defendant.

24   _____

25                        MOTION HEARING
```

```
 1                  P R O C E E D I N G S

 2            (Whereupon, the within electronically recorded

 3   proceedings are herein transcribed, pursuant to order of

 4   counsel.)

 5            THE COURT:  Good morning, everyone.  Case Number

 6   19-cv-874.  Why don't we make our appearances.  One counsel

 7   for each side introduce your side, please.

 8            MR. GOULD:  Thank you, Your Honor.

 9            This is Jeff Gould from Oppenheim & Zebrak on the

10   behalf of the plaintiffs.  And with me is Matt Oppenheim and

11   Jonathan Sperling from the Covington firm.

12            THE COURT:  Thank you.

13            MR. GOULD:  Also, Oppenheim and (inaudible), as

14   well.

15            THE COURT:  Okay.

16            MR. SCHAPIRO:  Good morning, Your Honor.

17            Andrew Schapiro from Quinn Emmanuel for Charter.

18   We have Linda Brewer, Todd Anton from our firm, and several

19   people on the phone, including local counsel, Craig Joyce.

20            THE COURT:  Did you gain another name, Ms. Brewer?

21   Did I hear him just say Ms. Brewer-Anton, or something?

22            MR. SCHAPIRO:  Oh, no.  Sorry, Your Honor.  I

23   said, Ms. Brewer and my other colleague, Todd Anton, who

24   should be one of the Hollywood Squares you're seeing.

25            And I apologize, the audio sounds a little weird
```

1    to me, but I don't know if that's on my end.  I'm calling

2    from the office today, rather than home.

3             Is the audio okay for other people?

4             THE COURT:  It's a little different today.

5             MR. SCHAPIRO:  As long as you can hear me.

6             THE COURT:  So I guess you guys are proceeding

7    with the premise that I can go ahead and decide the

8    privilege issue without actually eyeballing a single

9    document, right?

10            MR. SCHAPIRO:  Well, actually, Your Honor, I --

11   you might be a step ahead of us there, or getting the same

12   place that we are, because I think where we've ended up, as

13   we were discussing this yesterday internally and preparing

14   for this, is that it's pretty clear, after Judge Jackson's

15   ruling, what the -- what the rule is.  And this is really

16   just about how it applies.

17            The rule should be the effects, but not mental

18   impressions.  That's the line that Judge Jackson drew.  It's

19   consistent with the law, of course.  And it almost doesn't

20   matter, these fights about, you know, which side of Kovel

21   this district is on.

22            And they're -- with regard to the first part of

23   our motion, which is seeking the RIAA's communications with

24   MarkMonitor about the 2016 project, there are only 37

25   documents, as far as I know, at issue.  And so our position

4

1    is we're not asking for anybody's mental impressions.

2          We're asking for what you might call the when,

3    how, what of making -- of undertaking this project, and we

4    should be able to see what was said about that.

5          So we'd be more than happy if Your Honor wants to

6    take a look and we'll live with your ruling with that being

7    the principle, no mental impressions, but yes to facts.

8          THE COURT:  Jeff, are you speaking for the

9    plaintiffs?

10          MR. GOULD:  Yes.  Thank you, Your Honor.

11          As a threshold, we don't agree with Mr. Schapiro's

12    distillation of the question for you, Your Honor.  He --

13    certainly, Judge Jackson made a ruling, limited only to the

14    work product, over a single document.  There was no

15    discussion over communications, nor do I think is it a

16    one-size-fits-all-application of Judge Jackson's ruling to

17    the broad range of communications they have now challenged,

18    which are covered by, both work product and attorney-client

19    privilege assertions.

20          So I think we need to back up quite a bit before

21    trying to stamp the dispute here with a simple application

22    of Judge Jackson's ruling.

23          We certainly do agree with Mr. Schapiro, that

24    Judge Jackson made clear that not all of this is subject to

25    discovery, even based on his understanding that, you know,

5

1    MarkMonitor will testify.

2            If I -- Your Honor -- Judge -- Your Honor, I'm

3    happy to follow your lead here, but I kind of wanted to go a

4    little higher level for a moment out of the gate, if you'll

5    indulge me.

6            THE COURT:  Go ahead.

7            MR. GOULD:  So I think in order to understand this

8    issue, we need to understand it in the context of what's

9    happened so far.

10           So today, they -- Charter wants to compel

11   privileged communications regarding this 2016 download

12   project.  And as you know well, we've been fighting these

13   issues for a long time -- fighting, specifically, over the

14   hash report.  And over the last year, Charter has moved, you

15   know, something like four or five or six times to compel

16   that, and the first we heard of it was April 2020.  They

17   wanted everything on a hard drive from MarkMonitor.

18           They then moved to compel it in July of 2020 and

19   didn't get what they wanted.  They then asked the Special

20   Master again in September of 2020 and didn't get the hash

21   report then.

22           At that point, they invited you to the party, Your

23   Honor, and in November filed a formal motion to review that

24   was briefed and argued at length in December.  And you'll

25   recall that we had an ex parte session of that.

1           You ruled, in writing, in (inaudible) of 2021.

2   And Charter didn't like that answer and sought to reargue it

3   informally at a January 28th hearing, which led to more

4   briefing and clarification over the hash report.  And then,

5   ultimately, full-blown rearguments from scratch at the

6   February 23rd summit and more briefs to Judge Jackson.

7           So, literally, a full year of briefings, motions,

8   about a half a dozen tries, they finally got it.  And yet,

9   in all those tries, Your Honor, what Charter did not seek

10  privileged communications regarding the project.  And that

11  was even after RIAA --

12          Your Honor, you're frozen on my screen.  Can you

13  hear me?

14          THE COURT:  Yes.

15          MR. GOULD:  -- was after RIAA served its initial

16  privilege log in November of 2020, with the majority of the

17  documents that it's now seeking.

18          Admittedly, there's a few additional ones.  But

19  the majority of the documents were on their plate at the

20  privilege log as of November 2020.

21          And at the December 18th hearing, there was some

22  question about the scope of what Charter was seeking.  And

23  we asked Mr. Schapiro if it was just the hash report or

24  more.  And I'm quoting here from the December 18th

25  hearing:  Mr. Schapiro said:  I agree, we are not looking

1  for communications or guiding the investigation, et cetera,

2  and to the extent that there's any lack of clarity on that,

3  I will stand on what I'm saying here.

4         It was all about the hash report.  They said they

5  had a need for it; it was the crux of their case.  They

6  needed to know which downloads were found and which weren't,

7  what Audible said about them.

8         And they justified that request by saying, This is

9  a narrow request and even if it's an intrusion into work

10 product, it's a narrow one.  The final report.  Not some

11 broad demand.  Not communications.  The results of the

12 (inaudible) to test the direct and (inaudible) of elements.

13 Well, now, they have that, and they're still not satisfied

14 and they're wielding that ruling with a hammer.

15        Your Honor, there's weeks left in discovery.  And

16 this is part of the problem that has compounded this

17 litigation for over a year.  And one thing I have learned

18 over my years is I don't get to file successive motions for

19 each additional document.

20        Judicial efficiency requires that I be organized

21 and efficiently present my requests.  Well, they've done

22 exactly the opposite.

23        They should have moved on this last year and,

24 certainly, by the term of the February summit where you made

25 clear that all issues not moved and presented are waived.

8

1    So --

2            MR. SCHAPIRO:  So, Your -- Your Honor, this --

3            MR. GOULD:  -- enough is enough and the parties

4    need to live with their strategic decisions.

5            Your Honor, last week you recognized this when

6    they tried to claw back a document that had been produced

7    six months earlier.  And the same logic applies here.

8            If you grant this, Your Honor, what's next?  Next

9    week, is it piercing privileged communications between O&Z

10   and plaintiffs?  Is it more documents from after the filing

11   of the complaint?

12           It would be well within your discretion, Your

13   Honor, to find this is a day late and a dollar short.

14           They've waived, when they didn't move on this and

15   the five or so other times. and there's no reason we should

16   be battling this.  We should be focused on the path ahead.

17   So --

18           MR. SCHAPIRO:  So, Your Honor, Mr. Gould's

19   recounting of the history and his reading of the process is

20   wrong for reasons I'll explain in a moment.

21           But I think it's always a sign that your adversary

22   doesn't really have much to say on the merits when the

23   primary argument is a process argument --

24           THE COURT:  Well, hold on.

25           MR. SCHAPIRO:  Now, the fact is --

9

```
 1              THE COURT:  Hold on.  Hold on just a second.

 2          So I respect what Jeff said.  I mean -- and I need

 3     to respond to it, only because it -- he deserves it.

 4          So, Jeff, I would -- as I looked at the landscape,

 5     you know, implicit in what you said was a little bit of

 6     frustration with, maybe, the Bench shifting or changing its

 7     mind or allowing successive attempts at -- I agree, that

 8     seems wrong.  I actually had to, at least myself, become

 9     more educated about the case.

10          There are -- you guys live this stuff.  You know?

11     And it is second nature to you, but it's not to me.  And I

12     don't know if it is to Judge Jackson or Ms. Rodriguez.  But,

13     you know, it's complex.  And I think I've become more

14     educated as the case has gone along about, not just the

15     nature of the claims and defenses, but also the history and

16     things that happened back in 2015 and then 2016.

17          So that's, at least, part of my explanation to

18     you, why I think maybe it evolved a little bit with regard

19     to the hash report.

20          I think that the argument with regard to raise it

21     now or forever hold your peace, as far as February goes, the

22     ruling on the hash report then might have opened up a new

23     opportunity, I guess, in the defense's view.  And so I think

24     they would probably argue that, you know, it wasn't ripe.

25          But what resonates a little bit more and what
```

1    Andrew needs to address right now is whether Jeff's quote

2    from December is on point.  Because we do need to -- there

3    is -- there is some power to the proposition that we need to

4    keep our word and that we are entitled to rely on one

5    another's word, as far as intentions.

6            And so, Andrew, he seemed to quote pretty directly

7    something that seems on point, but I know you're about to

8    tell me why it's not.

9            But anyway, address that, please:  Why you

10   shouldn't be held to the commitment that you made when you

11   said you weren't after communications, if those are the

12   communications that are the subject of our debate right now.

13           MR. SCHAPIRO:  Yeah.

14           So I think what we're saying is consistent,

15   although I don't have the prior transcript in front of me,

16   so I would need to look at the whole context.

17           But as I said at the outset here:  We're not

18   seeking mental impressions here; we are seeking only facts.

19   And Mr. Gould started off by saying, Well, we kept coming

20   back on the hash report and what about the -- and then we

21   came back and, you know, finally we were successful.

22           Well, it turned out we were right on the hash

23   report.  I think, as we're all learning more about what the

24   case is about, and you and Special Master Rodriguez came to

25   see that, and so did Judge Jackson.

1           And now, in the light of Judge Jackson's ruling, I

2    think what we're asking for is entirely reasonable.  But

3    there's a very important chronological fact I need to state

4    here, which is we did not even have RIAA's privilege log

5    with these communications at the February hearing.  We

6    didn't have any communications.

7           We -- we were -- they were supposed to give us an

8    amended log in January.  They missed the deadline by a

9    couple of months.  When they amended the log, it was when we

10   saw these communications.  I'm talking about RIAA, who was a

11   party from whom we're seeking documents in this first part

12   of our motion.

13          So I think we're being consistent, and it

14   certainly was not my intention at our prior hearing to say

15   we shouldn't get facts.  That wasn't the context, if I

16   remember correctly, about people raising issues of privilege

17   asking if we wanted to go behind the privilege.

18          MR. GOULD:  So, Your Honor, if I could respond to

19   a couple things.

20          First, I -- if my remarks were taken as

21   frustration with you, that was, by no means, my intent.

22          THE COURT:  No, no, no, no.  No --

23          MR. GOULD:  It's quite the opposite.

24          THE COURT:  -- I wasn't angry at you.  I think you

25   were accurate.  You were accurate in the sense that things

1    -- rulings may have changed or just evolved.  And I think

2    you do have a right to expect a consistent judiciary.  There

3    is this thing called law of the case, and certainty is

4    important in this litigation.  And so I wasn't criticizing

5    you.  I was addressing a valid point that you raised.

6            MR. GOULD:  Thank you, Your Honor.

7            To Mr. Schapiro's point, I mean, he didn't really

8    answer the question, Your Honor.

9            There's a black-and-white quote in the December 18

10   transcript that -- where Mr. Schapiro unequivocally --

11           THE COURT:  No, that's -- I want to stop you,

12   though, Jeff.  I don't want to pass that by.  I mean, that

13   can be lost.

14           So Andrew, I -- if you need to look at it, I want

15   you to take the time right now to look at it.  It is the

16   December 18 proceeding.  And you can start on Page 34.  And

17   I mean, I'm getting -- I'm not -- I haven't had this time to

18   study it like probably Jeff did or whoever he probably

19   assigned to do that.

20           But if we're talking about the report, then I want

21   you to look at what you said and address it and we'll take

22   as much time as much time as we need.

23           (Pause).

24           MR. SCHAPIRO:  (Inaudible).

25           THE COURT:  And the quote is:  We are not asking

1    here for any communications that they may have had or

2    meetings or documents that ultimately led to choose these

3    files versus other files, anything like that.  We just want

4    the list.

5            MR. SCHAPIRO:  And, yeah, I'm taking a look, Your

6    Honor.

7            THE COURT:  Yeah.  I mean, you prefaced that by

8    using the words:  I want to be a hundred percent clear about

9    that.

10           So address that, and then let's see what that

11   exactly meant.

12           MR. SCHAPIRO:  Right, sorry.  Which page, Your

13   Honor?  Because I have -- someone sent me the excerpt, but

14   I'm just going through the transcript --

15           THE COURT:  We're on 34 to 35.

16           MR. GOULD:  And the quote that I read, Your Honor,

17   is, I think, on page -- let me just find it.  It's on 38.

18           THE COURT:  Yeah.  But was that -- was my quote in

19   apposite, or was it also relating on that point?

20           MR. GOULD:  No.  He said -- he said it twice and

21   then on 38, put the nail in the coffin, so to speak.

22           MR. SCHAPIRO:  All right.

23           So, Your Honor, this may go -- now that I read the

24   context, it's -- it comes back to me.

25           So this may be an argument that the plaintiffs can

1    raise about our request of O&Z log privilege matters.  But

2    what Your Honor says on page 34 at line 21 is:  "But you

3    believe" -- addressing me -- "you are not asking for

4    anything any attorney actually wrote.  The only thing that

5    would be revealing would be the -- if someone were to look

6    at the totality of the documents."  And here, we're talking

7    about O&Z.  ". . . if someone were to look at the totality

8    of documents we're talking about, that would potentially

9    reveal just an attorney's thought processes as to what they

10   should have MarkMonitor do."

11           And that's what I'm answering.  I'm saying:  "I'm

12   not looking for an attorney's mental impressions," which is

13   I think what I said at the start of this hearing now and

14   which is consistent with what Judge Jackson said.

15           Now, again, you know, I don't think that in any

16   way, in an argument about why we should get the hash report

17   in saying:  I don't want the attorneys' mental impressions,

18   why would you get the hash report from the plaintiffs,

19   means that we don't get communications between RIAA and Mark

20   Monitor concerning the project.

21           MR. GOULD:  So if we could keep reading, Your

22   Honor, on 38 at -- it still goes, and there's nothing in

23   here about the attorney point that Mr. Schapiro just said.

24           MR. SCHAPIRO:  I -- honestly, I think it's

25   directly here.  The Court says -- again, line 21:  ". . .

1    you believe you're not" -- and this is a question I was

2    answering.  ". . . you are not asking for anything any

3    attorney actually wrote.  The only thing that would be

4    revealing if someone were to look at the totality of the

5    documents, that would potentially reveal just an attorney's

6    thought processes."

7               THE COURT:  No, but you go broader, though,

8    Andrew, and on Page 38, you said:  ". . . we are not looking

9    for communications or guiding the investigation, et cetera.

10   And to the extent that there is any lack of clarity on that,

11   I will stand on what I'm saying here."

12              So I mean, at the time it appeared to me that you

13   were foregoing anything about the report, except their

14   report, and that's what -- seems to be what you were saying

15   at the time.

16              MR. SCHAPIRO:  So this, again, was in the context

17   of seeking the hash report from the plaintiffs:  What do we

18   want in connection with the hash report from the plaintiffs?

19              And if I was unclear, or if I was mistaken in what

20   I said, I apologize.  But to the extent that, as Your Honor

21   has said many times, the ultimate guiding principle here,

22   our North Star, is seeking the truth.

23              The truth here is included in the communications,

24   at least the 37 documents that we're seeking now that are on

25   a privilege log that we didn't have, even at the February

16

1    hearing --

2              THE COURT:  But, Andrew, what kind of truth --

3              MR. SCHAPIRO:  I always want to be true to my

4    word.  And I -- if I -- you know, I don't believe I would

5    have said:  We will never ask for anything additional, based

6    on what we learn later or based on rulings from Judge

7    Jackson about the hash report.

8              That would have been irresponsible; but if I did,

9    I would ask that I be excused for it and that the higher

10   principle prevail.

11             THE COURT:  Well, you were -- you were clearly

12   walking away from something.  Can we agree on that?

13             MR. SCHAPIRO:  Yes.

14             THE COURT:  And what were you walking away from?

15             MR. SCHAPIRO:  The communications -- the internal

16   communications of the lawyers who were in the room there,

17   the O&Z lawyers, about the hash report.

18             MR. GOULD:  Your Honor, the reason this came up is

19   there was a catch-all sentence or two in their briefs that

20   led that to that hearing where they said:  And we want

21   everything else related to the hash download project.

22             And at that hearing, it was unequivocally clear

23   that Mr. Schapiro was arguing singularly about the hash

24   report.  And to avoid any confusion, ambiguity or doubt

25   about that, I made sure that the record was clear on that.

1          I said:  Your Honor, it's -- there's a little bit

2    of ambiguity in the papers, but what you've heard from Mr.

3    Schapiro makes it abundantly clear this is about and only

4    about the hash report.  You do agree, Mr. Schapiro?

5          Yes, I agree.  No communications.

6          THE COURT:  Well, he -- he --

7          MR. GOULD:  Well, I also want to respond -- I also

8    want to respond briefly to this notion that --

9          MR. SCHAPIRO:  Hold on.  That's exactly right,

10   what -- what -- I agree with Mr. Gould on that.

11         We were -- we're trying to get, at that point,

12   clarity on what we were asking you to order there and we

13   were -- you know, we originally asked for, and would have

14   liked to have gotten, more from that.  And instead, we ended

15   up saying:  Fine, we'll take the hash report.  You don't

16   have to order something beyond that -- or order that they

17   produce the hash report, not the communications.

18         I believe -- and we didn't prevail, even in -- at

19   that time.  We come back in February.  We argue.  We

20   prevail.  We explain more what this is about.

21         And now we have Judge Jackson saying that the

22   plaintiffs are going to rely on -- let me pull -- find my

23   book -- that they can't have it both ways to have

24   MarkMonitor present its work and work product at trial

25   without exposing all of MarkMonitor's work on this case to

1  scrutiny.

2       So it's true, in December, I'm trying to do the

3  best I could in saying:  What I'm asking you to order now,

4  as I stand here, Your Honor, is the -- I'm not asking you to

5  order the communications.  I'm asking you to order the hash

6  report.  We lost that, okay?

7       But I don't think I was saying:  And I will never

8  try to make an argument again about why we should get the

9  communications.

10       MR. GOULD:  So a couple of things, Your Honor.

11       First, after your ruling following that December

12  hearing, Mr. Schapiro had a different tune, which was:  We

13  won that.  There was some ambiguity between the parties

14  about what your order meant and Mr. Schapiro was quite clear

15  that his interpretation was they won that issue.

16       Now, he's telling you they didn't win that issue.

17       Number two, he said a couple of times that they

18  couldn't have moved on RIAA privilege documents in February,

19  because RIAA supplemented its log in March.

20       It's true that RIAA supplemented its log in March,

21  but it produced its log in November, with the majority of

22  documents here.

23       And the motion that you are being asked to decide

24  is one based on principle.  And the principle is no

25  different -- or entries that appeared on the November log

19

1    and the handful or so -- of the -- you know, the dozen that

2    were added after.

3            THE COURT:  So let me just talk generally -- well,

4    I think, you know, one of the things Andrew said was:  We're

5    not looking for communications or guiding the investigation.

6            Well, the only way to guide the investigation

7    would be to look at documents that were actually between

8    MarkMonitor and somebody else, because "guiding the

9    investigation" means instructions given to Mark Monitor.  So

10   I think the documents we're talking about seems to fall

11   squarely within that.

12           Now, what the legal effect is, Andrew, I don't

13   know.  That's a different story, you know.  Can you have

14   bound yourself back then?  And does that mean that you can't

15   ever change your position?  That's a different story.

16           But I think, at least, it's a fair point that Jeff

17   said it appeared, back in December, that you told the Court

18   these were not what you were looking for.

19           But it -- you know, once you get the report and

20   you have now decided, yeah, you do need those, that's maybe

21   -- that's an argument.  But I don't -- I do like this to be

22   an intellectually honest process.

23           So, I mean, I try to be as open and, you know,

24   vulnerable as I need to be, because I -- it always bugged me

25   arguing before a judge when I knew they had done something

20

1    wrong and they're disingenuously trying to rewrite their own

2    history.  And that's frustrating and I'm not going to do

3    that.

4            I'm going to, you know, honestly acknowledge

5    things I've said before.  And if I change them, I'm going to

6    try and give and give, at least, a rational reason why I've

7    changed.

8            All right.  So --

9            MR. SCHAPIRO:  So I -- I --

10           THE COURT:  Go ahead.

11           MR. SCHAPIRO:  I appreciate that, Your Honor.  And

12    you know, might have appreciated a heads-up so I could have

13    actually gone back and looked at the -- before -- in the

14    briefs, so that I could have gone back and looked at the

15    transcript and made sure that what I said is (inaudible)

16    accurate -- is accurate, honest and persuasive.

17           So here we are.  I was -- I was doing my best

18    there.  And I think -- you know, one thing I will say, based

19    on the history, is that the second -- amended log had a

20    second -- which we received February or March -- whenever

21    that was, March -- had a second version of the hash report

22    for the first time.  That wasn't disclosed until March.

23           And then here we are, and I appreciate what you

24    are saying.  We will try to be as candid with the Court,

25    always, as we can.

1            THE COURT:  Very good.

2            So big picture:  If the status is now that that

3    report -- you have -- you do have the report, right?  On the

4    defense side?

5            MR. SCHAPIRO:  We do.  There is one issue about it

6    that we had sought, I think, after some direction from the

7    Special Master to reraise with Judge Jackson.  He's out.

8    Maybe this is something we will end up raising with you, as

9    well.

10            And that is, that the -- we have the report of the

11    column headings and the row headings are redacted.  I might

12    be describing the terms wrong.  But there are redactions

13    that we believe -- that appear to us to be improper.  And we

14    acknowledge that they are allowed to -- under the ruling, to

15    redact anything that shows, I guess, the thinking of "the

16    why" in these certain selections, but I think we're going to

17    be back before you on that, or Judge Jackson.

18            We're not sure who -- where we're supposed to

19    go --

20            THE COURT:  Well, that was Judge Jackson --

21            MR. SCHAPIRO:  -- (inaudible).

22            THE COURT:  I think I told you that in an e-mail,

23    maybe.  But I talked to him --

24            MR. SCHAPIRO:  Yeah.

25            THE COURT:  -- and he said he's more than happy to

1   interpret his own orders and apply them.  So that's

2   something to -- that he knows you're going to raise with

3   him.

4           But getting back to the fundamental question:  So

5   the MarkMonitor report is going -- is produced, maybe will

6   be an exhibit at trial in some fashion; MarkMonitor will

7   testify in some fashion.

8           So the credibility of a witness and the extent,

9   credibility, breadth, accuracy of what MarkMonitor did will

10  be a relevant issue at trial, as it would be with any piece

11  of evidence that anybody ever generates during the facts and

12  occurrences of a lawsuit.

13          So that -- to the extent there are documents out

14  there that describe the scope, that define the effort, that

15  information is relevant and important when it comes time

16  during the trial to discuss what Mark Monitor did, both

17  during the claims period and then reconstructing what it did

18  in 2016.

19          So there is some power behind Andrew's opening

20  comments -- although Jeff thought we were way too far ahead

21  of ourselves -- in going after the actual facts of the

22  investigation.  But not, let's say, an attorney who says

23  something like:  Oh, my gosh, I just think -- don't think we

24  can re-create everything we did back in 2015 or '13 or '14.

25  And what's that going to mean for us if we sue these guys,

1    you know, and all that.

2         That, I think, what Andrew is saying is fair game

3    for protection; but maybe communications by Mark Monitor

4    expressing some -- something particular about its efforts

5    and how it's going and where it's failing or where it's

6    succeeding, that seems to be squarely within information

7    that's necessary for trial.  And without that, there might

8    be this huge gap that is going to hinder the fact-finding

9    process.

10        So I'm sympathetic to that.  I mean, it kind of

11   jumps to the end of the analysis for work product to a

12   substantial need sort of thing.  But, you know, in the end,

13   I just don't know how I decide any of this without actually

14   looking at documents because in a very contested privileged

15   question, it seems to me that a judge has to see what it is

16   the parties are arguing about, unless someone disagrees.

17        And I can -- and this can be decided simply based

18   on your opposing views on the categorization of the

19   documents, either as work product and attorney-client or

20   not, as fact-based or opinion-based or not.  If you think I

21   can decide it just on those arguments, and that I should,

22   then I guess I would try; but if you think I actually need

23   to look at some documents, then I would be willing to do

24   that too.

25        MR. SCHAPIRO:  Your Honor, we think the best

1   course here is to look at the documents and we'll -- I'm

2   pledging here, I'm waiting to see the transcript come back

3   in four months.  But, you know, we certainly expect that

4   your ruling will be one that we can live with.

5          You know, the principle, as we said it, I think is

6   clear, that they're -- that the -- the what, when and how as

7   opposed to the why, we should get it.

8          If it's the why, or if it's the attorney saying,

9   Uh-oh, this is going to be a problem for our case or we need

10  that, then we shouldn't get it.  If it's attorney or, in

11  particular, if it's MarkMonitor going back to RIAA saying,

12  You know, we're running into a problem, we can't find these

13  files because there are so many out there that look like

14  them, or whatever it might be, I don't know, obviously

15  that's (inaudible).

16         THE COURT:  Well, Jeff --

17         MR. GOULD:  So, Your Honor --

18         THE COURT:  Yeah, let me ask you this, Jeff.

19         So without me deciding the issue and without you

20  waiving any arguments and everything's already preserved --

21  and I'll even let you put more oral argument if you want,

22  but you've done a great job on paper -- would you be willing

23  to take a stab at scrubbing these things that may be

24  gray-scaling everything that you believe would fit within

25  the exclusion that the defense says is appropriate, because

1    I don't want to do that?  I am -- I don't want to do your

2    guys' work for you.  I think I would do a poor job.

3            So would you, at least, be willing to accept that

4    effort, without waiving the potential argument that it's all

5    privileged?

6            MR. GOULD:  I'm a little unclear what you're

7    asking, Your Honor.  We've been painting a little bit loose,

8    I think, with -- given that there are, both work product and

9    attorney-client privilege assertions, and the analysis is

10   different for each.  And as I understand the law, Mr.

11   Schapiro and Charter need to overcome both of those.

12           So I'm not sure I quite understand what you're

13   asking us to do.  I'm open to constructive ideas that

14   minimize the burden on the Court and get us to where we need

15   to be.  It -- I -- but I don't know quite what you mean by

16   "categorizing or gray-scaling."

17           THE COURT:  All right.  So --

18           MR. GOULD:  And then like the -- and then the

19   headline is, I'm -- I feel strongly about the privileges.

20           THE COURT:  I know --

21           MR. GOULD:  So --

22           THE COURT:  I know, and they're not --

23           MR. GOULD:  -- the first question, to rule without

24   looking, I think you can deny the motion without looking.

25           THE COURT:  Yeah.  Well -- and I don't feel

26

1    comfortable doing that, but if both parties thought it was

2    necessary or appropriate without -- to decide a privilege

3    issue without looking at a document, then I guess I could.

4           But what I would propose is this:  You heard

5    Andrew say he's not looking for mental impressions, right?

6    He's looking for facts.

7           MR. GOULD:  Okay, I heard.

8           THE COURT:  So you decide, in the first

9    instance -- even though you don't agree that that analysis

10   is appropriate, you decide in the first instance what might

11   be reasonably, in the event that the Court went his way,

12   construed as essential facts that might be discoverable

13   versus mental impressions or attorney-client advice that

14   would not be discoverable, and you don't black out or

15   redact, but you gray-scale the material that you believe is

16   unquestionably privileged.

17          Does that make sense?

18          MR. GOULD:  So the issue that I come back to, Your

19   Honor, is, like, I -- we can look through the documents and

20   make determinations about what we think is fact and what we

21   think is opinion and mental impression.  It doesn't address

22   the attorney-client privilege question, because that only

23   considers the work product analysis.  And under the

24   attorney-client privilege, it's the communication that's

25   privileged.

1            THE COURT:  Right.  But don't I actually have to

2    see a document in order to believe -- in order to find that

3    it's clear that the attorney was communicating for the

4    purpose of giving legal advice?

5            MR. GOULD:  Do you have to?  I think on these

6    facts and the record before you, no.  I mean, I would

7    understand if you felt you needed to, but I don't think you

8    need to.

9            I mean, the record is clear and we've tried to

10   clarify.  You know, there had been a lot of confusion

11   earlier in the case about the dynamics and relationships,

12   and we've tried to make it as clear as we could for you,

13   Your Honor, with an RIAA and an Oppenheim & Zebrak

14   declaration setting forth who is the attorney; who is the

15   counsel; what is the nature of the communication conducted,

16   pursuant to a short contract that was expressly entered for

17   a litigation program.  And a litigation program entered by

18   counsel is done for the purpose of providing legal advice

19   for our clients.  You know, what claims should we bring?

20   Against whom?  Which works should we sue on?

21            That's legal advice.

22            THE COURT:  Right.  So --

23            MR. GOULD:  Well, so I don't actually --

24            THE COURT:  What I would propose to do, because

25   you guys are, hopefully, getting to the endgame, is to have

1    everything I need at my disposal for an ultimate conclusion.

2    And then I would probably go up and have a conference with

3    Judge Jackson and so we decide this together, so that we can

4    save you an appeal.  But I think we would want to sit down

5    with the documents, with your briefs, and sort of hash it

6    out together.

7              MR. SCHAPIRO:  Your Honor, that's fine with us.

8    And in that regard, I would just -- because I don't think I

9    need to argue the Kovel point here.  And now I would just

10   respectfully point the Court to our arguments on it in the

11   reply brief.  We cite you a Chevron case and a San Pedro

12   case and distinguishes the Gucci case, so I -- which I think

13   shows that Kovel absolutely doesn't apply here.

14             But that -- you know, that's easy to read, their

15   brief, and they make a robust argument about why it does.

16   And, of course, Your Honor and Judge Jackson can decide

17   that.

18             I wanted to raise one issue, though, and that is:

19   The deposition of RIAA is taking place a week from tomorrow,

20   may 7.  And so if it's possible, we would appreciate a

21   resolution -- obviously, it's not our place to dictate to

22   the Court, but a resolution sooner rather than later,

23   because these are documents we would need to use in the

24   deposition.

25             And in that regard -- and I think this goes, to

1    some extent, to the merits -- as we pointed out in our

2    brief, Special Master Rodriguez did order -- did approve our

3    30(b)(6) topic for RIAA that includes the communications

4    about the 2016 project.

5          So we're allowed to ask about this at the

6    deposition, which, to me, makes me wonder why we shouldn't

7    -- because this -- why that doesn't already answer the

8    document question?  Unless what's going to happen is, we'll

9    get to the deposition without documents, we would ask about

10   these things, and the witness would be instructed not to

11   answer.

12         I don't know if that's what the attorneys on the

13   other side are seeking to do.  In any event, (inaudible)

14   RIAA deposition.

15         MR. GOULD:  So --

16         THE COURT:  Well, let me just tell you from our

17   internal scheduling perspective, I kind of pulled a rabbit

18   out of a hat and potentially settled a case, a 14-year-old

19   case that Judge Jackson was going to try next week.

20         So there would be time for us to do this Monday, I

21   believe, if Jeff thinks he could accomplish the task by

22   then.  And I'll just take all of the briefs and materials

23   and Judge Jackson and I will discuss everything that you

24   guys have argued and -- I mean, it may end up being

25   make-work for the plaintiffs, because if we agree that

1   they're privileged, then the work was unnecessary.  But if

2   we agree that something ought to be produced, then I think

3   that work could turn out to be very valuable.

4          MR. GOULD:  So, Your Honor, we're happy to work

5   with you on a process.  I'll -- I suspect Monday is

6   workable.  I will caucus with my team and promptly reach out

7   to yourself and Mr. Schapiro if, on caucusing after this

8   call, I determine -- we determine that Monday is not

9   workable, but I think we could -- likely could do that.

10         But let me just address a couple of other points:

11         Number one, this notion that they need -- they

12  need to know what MarkMonitor was doing to ask RIAA is a

13  little bit of a disconnect.  I mean, I understand it for the

14  MarkMonitor deposition, not so much for the RIAA deposition,

15  in terms of the urgency.

16         Number two, Mr. Schapiro referenced his reply

17  brief.  Obviously, we have not submitted a surreply and the

18  Kovel issues are quite nuanced and the parties have a strong

19  disagreement about the scope of the Kovel doctrine and how

20  it applies here.

21         And so I feel compelled, Your Honor, to build a

22  record here since we do not have a surreply and addressed

23  specifically the points that Mr. Schapiro raised.

24         So we all know the Kovel doctrine at a high level

25  and the parties dispute the narrow scope or broad scope.  We

1    cite a case, they have cited cases.  He referenced your

2    Chevron case from 2010.  Notably, that was before the

3    amendment to the Federal Rules that quite narrowly

4    conscripted -- constricted the discoverability of

5    communications with testifying experts, number one.

6            And number two, we -- you may -- you probably

7    remember the case.  I mean, it was this tortured history of

8    bilateral proceedings here and in Ecuador.  And the question

9    was whether the US folks had, you know, perpetrated some

10   sort of fraud and plagiary in, you know, stacking the deck

11   for a supposedly neutral court-appointed -- neutral in an

12   Ecuadorian procedure.

13           I mean, it's so distinguishable that, you know, I

14   -- and don't take this as a jab, Your Honor.  You've got a

15   good sense of humor, so I think you'll get it.  But like,

16   it's that classic case of bad facts make bad law.  I just --

17   there's no -- there's no applicability to that case to the

18   issues here.  None at all.

19           I understand why they cited it.  They wrote a good

20   brief.  I scratched my head over it a bit, but like you've

21   got to read the case in context, right?

22           And then, you know, by contract -- contrast, look

23   at the Gucci case that we cite out of the Southern District

24   of New York, 271 F.R.D. 58.  That case could not be more on

25   point, okay?

32

1              In that case, an attorney directed an investigator

2    in a presuit fact investigation into potential trademark

3    claims.  And the Court found those communications between

4    outside counsel and the investigator privileged, because the

5    investigator, quote, acted at the direction of counsel to

6    assist in-house and outside counsel to prepare for

7    litigation.

8              Importantly, and this goes to the (inaudible)

9    broad question about Kovel.  That investigator wasn't acting

10   as a translator or interpreter, as Charter claims it must be

11   here.  They conducted a fact investigation to inform legal

12   advice for litigation claims.  And that investigator even

13   testified in the case.

14             It's so closely on point, I encourage you to read

15   it.  But like MarkMonitor here, the Court there found the

16   investigator, quote, played an integral role in providing

17   hands-on assistance to outside counsel in gathering

18   evidence.  And the Court held those communications were,

19   quote, consistent with the rationale of the privilege and

20   reflect the reality that adequate legal representation often

21   necessitates the assistance of skilled practitioners in

22   various fields.  I mean, they -- it's precisely the point

23   here.

24             Gucci even says Kovel has been construed broadly

25   to include investigators and the like.

1          THE COURT:  Yeah, I'll just -- hold on.  I'll just

2     warn you, Jeff, that, you know, lots of district judges

3     don't view another district judge's opinion as that

4     persuasive.

5          So I'm just warning you in advance that that could

6     happen, because Judge Jackson's been a judge for a very long

7     time, and he probably has a very informed opinion about most

8     things.

9          MR. SCHAPIRO:  So, Your Honor, I --

10          THE COURT:  Wait, wait.  Let me wrap up with Jeff.

11     Jeff, I -- if I'm putting a burden on you to -- do you

12     understand what I want you to do by gray-scaling?

13     Gray-scaling would be what you're actually proposing to

14     redact in the event that you lose the ruling, right?

15          MR. GOULD:  So we would gray-scale out what we

16     purport to maintain as, you know, opinion work product,

17     mental impressions of counsel?

18          THE COURT:  Yes.  And you also --

19          MR. GOULD:  The why -- so not the what and how and

20     when; but the why?

21          THE COURT:  Yes, exactly.  And since I'm putting

22     that burden on you, you can file a surreply.  When can you

23     get that in?  Well, I'm telling you I'm probably going up

24     Monday to talk to him.

25          So if you want it to be -- to matter, you've got

1    to do it by Monday.

2            MR. GOULD:  Okay.  If you -- if we're going to

3    submit one, we'll submit it by close of business, Mountain

4    Time, Monday.

5            THE COURT:  Okay.

6            MR. SCHAPIRO:  Won't close of business make it

7    hard to -- well, okay.  Not up to me.

8            Your Honor, my screen is frozen.  Are others able

9    to hear me?

10           THE COURT:  Yes.

11           MR. GOULD:  Yes.

12           MR. SCHAPIRO:  Okay.  Just two words since we're

13   not going to get sur-surreply on this.

14           About Gucci, the Gucci decision from the Southern

15   District of New York, 2010, involved the party's in-house

16   counsel working with an affiliate's employee to gather

17   information that was in the party's possession:  Employee's

18   statements.  And the quotation that Mr. Gould read, he

19   didn't read to the end of the quote.

20           It said:  . . . to gathering -- gather evidence

21   from Gucci.  So he was gathering evidence within the party.

22           I think a more -- and as I was starting to say

23   earlier, I know we're not in the Southern District, nor in

24   another circuit.  I know we're in the District of Jackson.

25           But the second circuit -- I would -- you know, to

1   the extent that we're looking for a recent case that is more

2   authoritative than Gucci, I would direct Your Honor to the

3   Sampedro, S-A-M-P-E-D-R-O, case cited in our briefs.  That's

4   818 F. Appx 14.

5           It is a Second Circuit 2020 case, which says,

6   quite clearly:  The privilege does not extend to

7   communications where the third party merely provides

8   information -- and here I'm paraphrasing -- that the client

9   -- and I'll stop paraphrasing -- information that the

10  clients did not have for the lawyer to advise his client

11  about the legal and financial implications of an action.

12  That's the situation -- that's 2020 Second Circuit.

13          And so if we're going to be going out of circuit,

14  I would take the 2020 Second Circuit over the 2010 Southern

15  District of New York, which dealt with just searching

16  in-house anyway.

17          But anyway, that's where we are.  We'll take a

18  sur-surreply if you're in a generous mood.

19          MR. GOULD:  Right.

20          THE COURT:  Well, there's just no time, but yeah.

21  I'm in a generous mood, but that's a bridge too far.

22          Go ahead, Jeff.

23          MR. GOULD:  Yeah, I mean, look, I think the

24  parties all agree, Your Honor, that the cases go both ways.

25  And we see that Judge Jackson has strong and sound

1   independent judgment and he and you together will decide

2   whether you -- you know, whether you like my version or Mr.

3   Schapiro's version.  I get it.  I encourage you to pick

4   ours.

5           Just trying to think, Your Honor, if I missed

6   anything.

7           MR. SCHAPIRO:  Well, we have the request for the

8   O&Z materials to be logged, the second part of our request,

9   which I suppose can be decided on the papers if you and

10  Judge Jackson are wanting to (inaudible), which I'd be happy

11  to address, as well.

12          MR. GOULD:  I'd like an opportunity to speak on

13  this one, Your Honor, since we haven't filed a reply.

14          You know, this has gone  on again and again and

15  again.  Another example:  Rinse, repeat.  Rinse, repeat.

16  Denied multiple times, twice on papers by Ms. Rodriguez,

17  once you were asked to review a document that's also the

18  subject of this motion in-camera.  And so I'd -- a preview

19  of your thinking in denying this motion, you didn't even

20  look at the documents in-camera.  You said:  I haven't heard

21  anything sufficient to require in-camera.

22          Charter didn't appeal any of these rulings,

23  neither of the written rulings by Ms. Rodriguez, nor your

24  own.

25          You know, and, again, it ignores the parties'

1   longstanding agreement not to log outside counsel documents

2   on their -- you know, I think that should be the end of it,

3   but that should be the end of it.

4           If you agree, I'll stop.  If you want to hear more

5   for -- I've got a little more for you.

6           MR. SCHAPIRO:  And --

7           THE COURT:  And the date -- wait, hold on.

8           The date of the communications run from when to

9   when?

10          MR. GOULD:  They are seeking communications from

11  2012 through the filing of the complaint on 2019 --

12          THE COURT:  And --

13          MR. GOULD:  -- and we've made clear, and the

14  record is very clear, that this hash download project was,

15  you know, contract January 2016, hash report; conclusion of

16  the project, February 2016.  And the hard drive of

17  downloaded files from that is nothing dated beyond the May

18  2016 claim period.

19          Charter didn't rebut that in their reply brief,

20  Your Honor.  That's meaningful.  They would have sure told

21  you if there was stuff on that drive and stuff that

22  post-dated it.

23          And then, lastly, Ms. Rodriguez, you know, she

24  ruled what we view inconsistently.  She said:  We don't need

25  -- the RIAA doesn't have to prove documents after 2016, but

1   it does have to prepare a witness on nonprivileged

2   communications after 2016.

3             We pointed out that inconsistency.  She didn't

4   agree with me -- agree with us.  And so RIAA went back and

5   looked for communications about the hash download project

6   all the way to the filing of the complaint in 2019 and came

7   up empty.

8             So this is really expedition -- the definition of

9   a fishing expedition.  They know the project concluded in

10  early 2016.  They know that RIAA has looked for documents of

11  this nature and represented that it found none.  And now

12  they continue to pound and pound for more.

13            THE COURT:  Well, that's something a judge always

14  likes to hear that:  Regardless of our arguments, Your

15  Honor, there's no responsive documents, that truly is the

16  end of the matter.  So if you've got that to say, then say

17  it.

18            MR. GOULD:  Well, I -- he's asking for custodial

19  e-mails from Oppenheim & Zebrak.  And our whole pitch here,

20  Your Honor, is that that's an inappropriate request, because

21  Rule 26 at the gate says:  Only that which is likely to lead

22  to relevant non-privileged information.  And they're saying:

23  We need O&Z's log, because they can't get it elsewhere,

24  that's not the analysis.

25            The analysis is 26(b)(1):  Likely to lead to

1    relevant non-privileged information.

2            THE COURT:  So --

3            MR. GOULD:  In the midst of a furious discovery,

4    you know, March to get depositions underway, requiring O&Z

5    to search our files, it's improper.  It's a distraction.

6    It's a bridge too far.

7            MR. SCHAPIRO:  So, Your Honor, the Special Master

8    had indicated, and initially denied our request to -- for --

9    to have these materials logged or to have -- or to obtain

10   materials if they weren't privileged, because she's

11   pertaining to the 2016 project.  But yes, after 2016,

12   because she's, Well, you can more easily get them elsewhere

13   from MarkMonitor or from RIAA.

14           But it turns out that MarkMonitor and RIAA don't

15   not have these, in part, because there was not a privilege

16   log put in place until, apparently, 2018.

17           So O&Z, in this case, is directing the

18   reconstruction project.  No one would say that MarkMonitor

19   shouldn't have, at least, logged these materials; but

20   they've certified that they don't have them, because they

21   didn't get a litigation hold until two years later.

22           The Special Master says:  Go to other sources.

23           We went.  We did what she said.  They have

24   nothing.

25           So we're seeking these from O&Z.  They are

1    communications to an outside party.  It's certainly not

2    communications to a client, but if they think they are --

3    they're privileged, they should at least log them.  That's

4    all we're asking for.

5            MR. GOULD:  So we just heard Mr. Schapiro say

6    he's not looking for a log of O&Z's communications with

7    plaintiffs about this.  And we also heard him say that he

8    can't get -- or there aren't RIAA communications about this,

9    but there is a log that's at issue on your desk right now,

10   Your Honor, flatly contradicts that.

11           There's 37 entries they've challenged from the

12   December 2015 through May of 2016 that show that MarkMonitor

13   and RIAA preserved its e-mails, including those with

14   MarkMonitor.

15           So the only thread that has any traction, and we

16   think it should be denied for all of the reasons I've said,

17   is this notion of a -- they couldn't get elsewhere is, maybe

18   those communications solely between O&Z and Mark Monitor,

19   but we don't even think that's appropriate here.

20           THE COURT:  Well, let me --

21           MR. GOULD:  (Inaudible).

22           THE COURT:  Let me understand the fundamental

23   premise again regarding, at least, communications with Mark

24   Monitor.

25           So go back to 2013, whenever, and O&Z -- I mean,

1    was O&Z communicating with MarkMonitor or Audible Magic in

2    2012 to 2016, I guess?

3            MR. GOULD:  So the notice program was 2012 to 2015

4    and the answer is no, for that period.  It was -- I don't

5    remember the exact date.  But it's like right around the 1st

6    of January, 2016.  I might be off by a couple of dates here

7    or there.  But it's basically the beginning of 2016,

8    memorialized on January 29, 2016 contract where RIAA

9    retained MarkMonitor.

10            It was a one-month program.  And as we said all

11    along, O&Z, as counsel to plaintiffs, and RIAA, as counsel

12    to plaintiffs -- their legal department as counsel to

13    plaintiffs, worked with Mark Monitor, direct -- hired and

14    directed Mark Monitor for this project, right?

15            And the RIAA has logged and produced

16    communications between RIAA and MarkMonitor and Oppenheim &

17    Zebrak from early 2016.

18            So what Mr. Schapiro is relying on for, We can't

19    get it elsewhere, at most, could only be communications

20    solely between O&Z and MarkMonitor.

21            THE COURT:  So just as a general proposition, if

22    they -- if a company decides to use general outside counsel,

23    litigation counsel, to negotiate with a third party, the

24    communications between outside counsel and the client, sure,

25    privileged.  As a general matter, why should the

1   communications between the outside counsel and the third

2   party be privileged?

3           MR. GOULD:  This goes squarely back to Kovel, Your

4   Honor, and work product.

5           So O&Z and RIAA, as counsel, retained MarkMonitor,

6   directed MarkMonitor, and required the assistance and

7   technical expertise of MarkMonitor, expressly for a project

8   undertaken in anticipation of litigation, to inform their

9   legal advice to plaintiffs about who to sue, on what claims

10  to sue, and on what works to sue.

11          I mean, I don't dispute this kind of general

12  principle that arm's length's negotiations typically are not

13  privileged, but this is all under the umbrella of work

14  product in anticipation of litigation.

15          THE COURT:  But what Andrew said, the case you

16  rely on from New York, that was a company retaining somebody

17  to help find its own information within.  The -- that seems

18  a little different than scouring the Internet for

19  information.

20          I mean, that is -- that sounds like a material

21  distinction between this and that case.  Do you -- I take it

22  you don't agree, of course?

23          MR. GOULD:  I don't agree, Your Honor.  I think

24  that's a distinction without a difference.

25          In both cases, litigation counsel hired an

1   investigator to develop facts that the attorneys needed to

2   inform their legal advice and plan for litigation.

3            THE COURT:  Okay.  Well, I'm not going to rule, in

4   part, anyway, because I'm going to talk with Judge Jackson

5   about the whole motion.

6            So have you all said what you need to on the O&Z

7   documents?

8            MR. GOULD:  I would add one thing, Your Honor:

9            There was an agreement by the parties years ago to

10  not log outside counsel --

11           THE COURT:  Is it written?

12           MR. GOULD:  -- documents.  And this --

13           THE COURT:  Jeff.

14           MR. GOULD:  And Mr. Schapiro and (inaudible) have

15  relied on that --

16           THE COURT:  Is he -- Jeff, is the agreement

17  written?

18           MR. GOULD:  Yes.  It's cited in our brief --

19  opposition brief, with letters where Charter proposed that

20  and the plaintiffs accepted it.

21           THE COURT:  Well, what --

22           MR. SCHAPIRO:  Yeah, yeah.

23           So Your Honor, that's --

24           THE COURT:  And let me look at it first.  What's

25  the ECF designation?

1          MR. GOULD:  It is 449 and it's page 16, the

2    paragraph beginning, "Second," and it cites to Exhibit 6 and

3    7.

4          THE COURT:  Exhibit 6 and 7 to what?

5          MR. GOULD:  To Oral 39.

6          THE COURT:  I don't see an Exhibit 6 and 7.  I see

7    an Exhibit 4 --

8          MR. GOULD:  You know what?  449 might be the

9    sealed version.  I apologize, give me one sec.

10          THE COURT:  Ah, is it the 448 then?

11          MR. GOULD:  Most likely.

12          THE COURT:  And it's Exhibit 6, you say?

13          MR. GOULD:  6 is where Charter proposes that and 7

14   is where plaintiffs agree.  These are long letters.  At page

15   2 of exhibits -- oh, we highlighted it.  Look at that.

16          THE COURT:  So you're relying on the:  Need not

17   log any documents authored by outside counsel and also need

18   not log privileged documents following the claim period?

19   Those are the two provisions you're relying on?

20          MR. GOULD:  Yes.

21          THE COURT:  And then that was an offer -- that was

22   a letter discussing an offer.  And you think that Exhibit 7

23   is the acceptance?

24          MR. GOULD:  Correct.  Exhibit 7, the -- page 3 and

25   4.  It's also highlighted.

1          MR. SCHAPIRO:  I'm prepared to respond whenever

2    you're ready, Your Honor.

3          THE COURT:  I'm ready.

4          MR. SCHAPIRO:  So, Your Honor, I did -- this is

5    with regard to requests directed to a party.  This is

6    between the parties, the plaintiffs and the defendants, in

7    this case.

8          What we are seeking here are documents from RIAA,

9    not a party and they're within the claim period.  We've both

10   honored this, generally.

11         Now, in the case -- with the case of the ESI, I

12   think, as you'll recall, we had to turn over some documents

13   authored by counsel and pull back the curtain somewhat.  And

14   that makes sense, because there's some circumstances where

15   you say, All right, well, in this circumstance, there's a

16   reason to look behind the curtain.

17         In this case, we -- these are documents that we

18   essentially were seeking from the parties, but the -- from

19   the RIAA, but they don't have them -- sorry, and

20   MarkMonitor.

21         So they don't exist.  So we're down to the people

22   who would have them, which is O&Z.  This is -- has nothing

23   to do with what the parties -- we're not asking that

24   communications between O&Z and Sony or O&Z and Universal be

25   logged.  This is a different species entirely.

1          THE COURT:  Okay.  What else, Jeff?

2          MR. OPPENHEIM:  Jeff, you're muted.  Jeff, I

3     believe you're muted.

4          MR. GOULD:  Sorry.  Thank you.  There's a little

5     bit of double talk here, Your Honor.

6          When it suits Charter, O&Z is an agent of

7     plaintiffs and encompassed by document requests to

8     plaintiffs.  When it does not suit Charter, O&Z is not an

9     agent of plaintiffs required to log -- permitted to rely on

10    an agreement between the parties.  It's -- it doesn't fit.

11         And, lastly, you know, look, Mr. Schapiro's a

12    straight shooter.  I get it.  He's bobbing and weaving here.

13         At some point we have to be able to rely on a

14    representation and an agreement between the parties.  It --

15    I don't need to keep coming back to that time and time

16    again, but sometime -- at some point, you know?

17         THE COURT:  Okay.  Understood.  We good?  Both

18    sides?

19         UNIDENTIFIED:  Andy, you're on mute.  Andy -- I

20    think Andy was trying to say something.

21         MR. SCHAPIRO:  Sorry, yeah.  I was just saying,

22    Your Honor, for the reasons I stated and for the reasons in

23    our reply brief, we don't think what we're seeking is

24    inconsistent with, either the agreement or the practice of

25    the parties, thus far.  But here we are.

1            THE COURT:  Yep --

2            MR. SCHAPIRO:  And we addressed it in our brief.

3            MR. GOULD:  Your Honor, one last point, at the

4   risk of overstaying my welcome.

5            You're familiar with the Winston & Strawn memos on

6   ESI -- the spoliation issue.  You can be sure that Winston &

7   Strawn has not logged its internal or external e-mails.  And

8   in the event that there is an order here for O&Z to log its

9   external communications about an investigation that Charter

10  has great interest in, you can be quite sure it's likely to

11  be met with a reciprocal request that Winston & Strawn log

12  its documents.

13           I don't say that as a threat.  And if it's taken

14  as that, I deeply apologize.  I know it sounds like one

15  coming out.  It's just we've got to live in a world where

16  fair is fair.  So if it's -- what's good for the goose is

17  good for the gander.

18           THE COURT:  That's the rule.  Sometimes --

19           MR. SCHAPIRO:  Yes.  And if and when it comes to

20  that, we will explain why we are not the gander in this

21  circumstance.

22           THE COURT:  I'm sure you will.

23           MR. SCHAPIRO:  -- whatever a gander may be.

24           THE COURT:  All right.

25           Well, Jeff, get your stuff in and I'll be back in

1    touch first part of next week, okay?

2            MR. OPPENHEIM:  Your Honor --

3            THE COURT:  Yeah.

4            MR. OPPENHEIM:  -- before -- this is Matt

5    Oppenheim.

6            Before we leave, on an entirely separate issue,

7    there are two issues which we are in the process of meeting

8    and conferring with opposing counsel on that relate to a

9    deposition that is currently scheduled to go forward a week

10   from tomorrow.

11           It's not the RIAA deposition; it's the deposition

12   of Colton Mabb, who's name I'm sure you've heard many times.

13           We may resolve them through meet and confer, but I

14   am somewhat skeptical.  And if that's the case, we'd like to

15   be able to create a process with you, Your Honor, to reach a

16   quick resolution.

17           Would it be possible to agree on a simultaneous

18   submission on Monday of two-page briefs, or something akin

19   to that, so that we can try to get resolution in time?

20           THE COURT:  Well, I'm not in favor of it, but I'm

21   not going to prevent it either.

22           MR. OPPENHEIM:  I guess I'm looking for what you

23   would be in favor of, Your Honor.

24           THE COURT:  That you guys settle this case.

25           So, yeah, and that's fine with me.  I mean, you

1    know I've made myself available to you guys on, you know, an

2    hour's notice, a day's notice.  So I'll continue to be -- to

3    do that.

4           Okay?

5           MR. SCHAPIRO:  And, Your Honor, just to be clear:

6    We should submit those to you?  I understand the Special

7    Master had her hearing yesterday.  So should we just bring

8    anything -- everything to you from here on in or --

9           THE COURT:  I think, regrettably, that's the way

10   it has to be.

11          MR. SCHAPIRO:  All right.

12          THE COURT:  Can I have the same rate put in trust?

13          MR. GOULD:  Your Honor, is there a --

14          THE COURT:  With a balloon payment on December 26,

15   2024?

16          MR. GOULD:  Your compensation will be that you can

17   buy Quinn lunch, Your Honor.

18          MR. SCHAPIRO:  No.

19          MR. GOULD:  Lynn, you're still not laughing at

20   that joke.

21          MR. SCHAPIRO:  Your Honor --

22          MS. BREWER:  I've always laughed at that joke and

23   I'm offended nobody noticed that I ended my e-mail

24   (inaudible) but if you have happen to look at it, you'll see

25   there was humor in it.

1           MR. OPPENHEIM:  Your Honor, would a submission by

2    1:00 p.m. Mountain Time on Monday, simultaneous submission,

3    work for you?

4           THE COURT:  Yeah, that's fine.

5           MR. OPPENHEIM:  Okay.

6           THE COURT:  All right.

7           MR. OPPENHEIM:  Very good.

8           MR. SCHAPIRO:  (Inaudible).

9           THE COURT:  Okay.  Thank you all.  Take care.

10           (Whereupon, the within hearing was then in

11    conclusion at 10:44 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

51

```
 1                    TRANSCRIBER'S CERTIFICATION

 2    I certify that the foregoing is a correct transcript to the

 3    best of my ability to hear and understand the audio

 4    recording and based on the quality of the audio recording

 5    from the above-entitled matter.

 6

 7    /s/ Dyann Labo                    April 30, 2021

 8    Signature of Transcriber              Date

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com