1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
    Case No. 19-cv-874-RBJ-MEH
 3  _____

 4  WARNER RECORDS, INC., et al.,

 5       Plaintiffs,

 6  vs.

 7  CHARTER COMMUNICATIONS, INC.,

 8       Defendant.
    _____
 9

10          Proceedings before MICHAEL E. HEGARTY, United

11  States Magistrate Judge, United States District Court for the

12  District of Colorado, commencing at 3:27 p.m., May 25, 2021,

13  in the United States Courthouse, Denver, Colorado.

14  _____

15  WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE HEREIN

16  TYPOGRAPHICALLY TRANSCRIBED. . .

17  _____

18                       APPEARANCES

19          JONATHAN M. SPERLING, MATTHEW J. OPPENHEIMER,

20  ALEXANDER KAPLAN, ANDERS LINEROT and JEFF GOULD, Attorneys at

21  Law, appearing for the Plaintiffs.

22          ANDREW H. SCHAPIRO, DYLAN SCHER, TODD ANTEN and

23  LINDA BREWER, Attorneys at Law, appearing for the Defendant.

24  _____

25                    DISCOVERY CONFERENCE
```

```
 1                    P R O C E E D I N G S

 2            (Whereupon, the within electronically recorded

 3    proceedings are herein transcribed, pursuant to order of

 4    counsel.)

 5            THE COURT:  Is the plaintiff ready?

 6            MR. OPPENHEIM:  We are, Your Honor.

 7            THE COURT:  Make your appearance, please.

 8            MR. OPPENHEIM:  On behalf of plaintiffs, we've got

 9    Matt Oppenheim, Alex Kaplan from Oppenheim & Zebrak, among

10    others by telephone, and Jonathan Sperling from Covington

11    Burling.

12            THE COURT:  Thank you.  Is the defense ready to

13    proceed?

14            MR. SCHAPIRO:  We are, Your Honor.

15            Andrew Schapiro for Charter from Quinn Emanuel.

16    And participating, or at least on the meeting, are Todd Anten

17    and Dylan Scher, two of my colleagues.  There may be others

18    on the phone.

19            THE COURT:  Okay.  Let's do our best to keep this

20    succinct, as far as each argument, not be repetitive.  I may

21    interrupt you if I feel you're carrying on.  The more I --

22    time I spend on the case, I think the quicker of a learner

23    I'm becoming.  I'm not guaranteed that I understand

24    everything that you're talking about.  If I don't, I'll

25    certainly ask questions.
```

3

1          I think in the spirit of first-in/first-out, the

2    first message I have is from Kadie, so I don't know if

3    Kadie's on the line or who's going to argue that -- the

4    elements in that one.  Who's going to argue that, Mr.

5    Schapiro?  You?

6          MR. SCHAPIRO:  Yeah, I guess I will, because Katie

7    -- Katie is in a deposition today.

8          THE COURT:  All right.

9          MR. SCHAPIRO:  So this is the issue about the

10   financial data and streaming revenues that we're seeking from

11   the plaintiffs.  And I think that the important thing to bear

12   in mind here is we're talking about questions that we wanted

13   to ask in a deposition, matters for which we sought to have

14   30(b)(6) witnesses prepared.  And the only documents that are

15   really at issue here are some documents that we used to

16   refresh the recollection of those witnesses.

17          So much of the written answer that Mr. Kaplan sent

18   in is, essentially, you know, an argument that's set to --

19   it's an argument against document requests.  But it's not

20   unusual in a case, in a matter that you'll get some documents

21   and then you'll want to dig further or in a different

22   direction with a witness at a deposition.

23          And one of the topics here was Topic 20 of our

24   30(b)(6) notice, which it asks for each plaintiff to be

25   prepared to produce one or more persons to testify generally

4

1    as to nonprivileged discoverable information regarding their

2    annual streaming revenues from 2012 through 2019.  That was

3    the topic as agreed upon.

4           The plaintiffs agreed to testify to this and they,

5    in a couple of these instances -- I won't go over everything

6    in our e-mail to you, because it's redundant -- then came

7    back and said, in one instance, three days before the

8    deposition, Oh, due to a technical error -- a clerical error,

9    we want to amend our agreement and amend our response and we

10   instead believe we should only be required to testify to

11   streaming revenues for this period to the extent reflected in

12   documents produced in discovery.

13          Well, we didn't agree to that.  We said, Well, wait

14   a minute, it's three days before the deposition.  You can't

15   suddenly narrow the topic.  And then in each of these

16   instances that we -- that my colleague, Katie, notes in the

17   e-mail, the witness was not adequately prepared to testify as

18   to the streaming revenues.  Her -- let me think.

19          So we think that they should put up witnesses who

20   are able to actually answer the topic as the topic was

21   originally agreed upon.

22          As to the final point about the documents used to

23   refresh recollection, I think we all agree that this is -- I

24   mean that under Rule of Evidence 6.12(2) is, you know,

25   essentially, a matter of your discretion.  But here these

1    documents that Mr. Flacht (ph) and Kafora (ph), two of the

2    witnesses who testified, said they relied on to prepare for

3    the deposition are directly relevant to their stream

4    revenues.

5            There should be no burden.  They looked at these

6    documents in preparing for their depositions.  So we're

7    requesting that production of the documents, as described in

8    my colleague's e-mail.

9            THE COURT:  So show me the paragraph.

10           MR. SCHAPIRO:  Sure.  This is Ms. Ackojan's (ph)

11   e-mail towards the bottom, it would be the fourth to the last

12   paragraph, stating:  As detailed below.  And then, actually,

13   it would be the next one:  Charter requests the production of

14   documents Mr. Flacht described as Warner's US financial

15   statements, which were not produced in the case, nor

16   publically available, and which he reviewed in preparation

17   for his deposition.  And then there's a cite to the

18   transcript.

19           And then in the next paragraph, we make a similar

20   request for Mr. Kafora, who admitted he relied on certain

21   similar documents in his preparation for Topic Number 28,

22   which requires -- which relates to plaintiffs' streaming

23   revenues.

24           He admitted several times, as she says here, that

25   we couldn't get this from the financial documents that had

1    already been produced.

2            THE COURT:  Understood.  Response?

3            MR. KAPLAN:  Yes, Judge Hegarty.  This is Alex

4    Kaplan.  Can you hear me okay?

5            THE COURT:  Yes.

6            MR. KAPLAN:  Okay.  Thank you, Judge.

7            There's multiple different issues here and

8    different things that Charter is really seeking, but it does

9    all go to the financial information, both testimony and

10   documents.  And we have to start with what was agreed upon

11   and ordered by the Special Master over a year ago when there

12   was a dispute over what financial documents that the

13   plaintiffs ultimately had to produce.  And the answer at the

14   end of the day was what we called the top-line financial

15   information.  And it -- and in my e-mail response, I quote

16   some language from the hearing where we all agreed that this

17   top-line financial information was not going to include

18   distribution-channel-by-distribution-channel information and,

19   specifically, information that would break up streaming.

20   That's what we had said.  Ms. Rodriguez said, Yes, that's my

21   understanding as well.  And Ms. Ranahan, who was representing

22   Charter on that call, said that was her understanding too.

23            And so what was produced in the case, Your Honor,

24   were the top-line financial information that didn't break out

25   the streaming revenues.  And that's what Charter had and

1    that's what we have.

2         So if we fast-forward when -- more than a year to

3    these 30(b)(6) depositions and on the financial topics, they

4    did have a topic that asked for testimony regarding top

5    annual streaming revenues for each of the six plaintiff

6    groups.  We did agree to put up a witness.

7         There is some dispute over the scope of the topics.

8    For four of the six plaintiff groups, we had responded that

9    we would put up a witness to testify to annual streaming

10   revenues generally, to the extent reflected in the documents

11   we produced.

12        For the Sony publisher and for the Warner

13   publishers, that language at the end, "to the extent

14   referenced in the documents," was omitted.  As we had told

15   Charter, that was by mistake and that was, to us, obvious,

16   because the four other responses said, "to the extent

17   produced."

18        But even leaving that aside for the moment, Your

19   Honor, the question is:  What does it mean for our witnesses

20   to be prepared to testify to the financial information here

21   and to the streaming information?

22        And so what Charter is saying is they really should

23   be testifying -- they should be prepared to testify beyond

24   what's in the documents that we were ordered to produce and

25   that everyone agreed would be produced here.  And to us, that

8

1   doesn't make sense.  How do we be asked to prepare witnesses

2   on documents that we weren't ordered to produce?

3           So we go into the depositions and our witnesses are

4   there to testify and different ones knew more than others

5   about streaming revenue.  In our view, certainly, they were

6   all prepared to testify generally to annual streaming

7   revenues.  And, again, that's what we committed to.  And so

8   we believe our people were prepared and did give the

9   testimony sought.

10          But there are four different things, for lack of a

11  better word here, that Charter wants here.  One, they want

12  more testimony from the Sony Music Publishing 30(b)(6)

13  designee Amy Cranford (ph), and specifically they want

14  testimony on annual streaming revenues for the years 2012 to

15  2014.

16          And this is addressed in -- I think it's paragraph

17  A of Ms. -- of John's e-mail and one in my e-mail about

18  midway through.  And testimony from the witness here was that

19  the company doesn't keep, for 2012 to 2014, the information

20  on streaming revenues that Charter seeks, and that is why she

21  couldn't testify with that information.

22          She was able to give them the information from 2015

23  going forward, but not for 2012 through 2014.  And then said

24  on the record that that information isn't available through

25  the Sony Publisher Systems.  And there was a bunch of back

1  and forth between the lawyers, as well, making clear that it

2  wasn't available.  So we can't have someone testify to

3  information that's not available, Your Honor.

4      So that's the first piece of this for the Sony

5  Music Publisher 30(b)(6) testimony that Charter wants.

6      The second piece was they wanted testimony --

7  additional testimony from the Warner Music Publishing

8  plaintiffs on the annual streaming revenues.  And they wanted

9  it on a plaintiff-by-plaintiff basis or what they called an

10 entity-by-entity basis.  Your Honor may recall that there are

11 a number of different entities that hold the copyrights for

12 each of the major plaintiffs in the case.

13     So for the Warner Music Publishers, there were nine

14 different entities that hold the copyrights, in general, for

15 the Warner Music Publishing plaintiffs.

16     The testimony was very clear, the information on

17 any types of revenues, including streaming revenues, is not

18 kept in the system on an entity-by-entity basis and,

19 therefore, the witness couldn't testify to what the revenues

20 were for any of those specific entities or even for all nine

21 of them together, because the information just doesn't exist

22 in Warner's system that way.

23     What does exist is the companywide for all of the

24 Warner Music Publishing entities.  That information exists.

25 And the witness said that if he was shown the documents that

1   were produced, these -- the public documents, that he could

2   testify and give information that they wanted.  But they

3   never asked those questions specific to the documents and the

4   information that he was able to provide.  And now, they're

5   asking for more testimony from him on information that he

6   testified doesn't exist.

7          So let me pause there and see if Your Honor has any

8   questions on those two related subjects.

9          THE COURT:  Yes.  First of all, their initial

10  letter to -- e-mail to me said they only had 2015 and 2019

11  from Ms. Cranford.  You just stated that they had 2015 to

12  2019 inclusive.  So get -- tell me about that discrepancy,

13  please.

14         MR. KAPLAN:  My reading of their e-mail, Your

15  Honor, was that they were able to have Ms. Cranford give them

16  the information for each of the years between 2016 and 2019.

17         THE COURT:  Where are you seeing that, please?

18  Read the sentence you're relying on.

19         MR. KAPLAN:  Well, I take it, Your Honor, because

20  what they were asking for ultimately was the information from

21  2012 through 2015.  And I looked back at the transcript and

22  she had gotten -- so there was a break taken in this

23  deposition, Your Honor, when Charter was pushing for this

24  (inaudible) information.  And they took a break and Ms.

25  Cranford got information from someone at the company to give

1   them the specific streaming revenue for the Sony Music

2   Publishers for 2015 to 2019.  And then they said, Well, what

3   about 2012 to 2014?  And she said, My source indicates that

4   that information is not available in our systems.

5           I could quote a transcript page, but I don't think

6   Your Honor has the deposition transcripts.

7           THE COURT:  No, but they did quote a transcript

8   page.  They said the question, after she gave 2015 and 2019

9   was, "Besides those two statistics that you just gave me, do

10  you have any knowledge of 2012 to 2019?"

11          Now Andrew, is that still the case?

12          MR. SCHAPIRO:  Is what still the case?  That that's

13  what the transcript says?

14          THE COURT:  No.

15          MR. SCHAPIRO:  Yes.

16          THE COURT:  That that's what you're asserting.

17  Because Alex just said she gave you 2015 to 2019.  You said

18  she gave 2015 and 2019 in your -- in Katie's e-mail.

19          MR. SCHAPIRO:  Let me check with a colleague.  This

20  will just take one moment.

21          THE COURT:  Okay.

22          MR. KAPLAN:  And, well -- I mean, while Mr.

23  Schapiro is checking, I mean, I can just point -- some of

24  this is confidential information, Your Honor, in these

25  transcripts.  So I'm not announcing the numbers out loud

1    here.

2              But for Mr. Schapiro's benefit, I could tell him

3    that in the Cranford transcript, it looks like, on page

4    approximately 136 and going forward, there's information that

5    they were looking for on streaming revenues for the fiscal

6    years of 2015, 2016, 2017, 2018, and 2019.

7              THE COURT:  Okay.  Stop there, please.

8              MR. KAPLAN:  Yes.

9              THE COURT:  Let's let Andrew hear from his people.

10             (Pause)

11             MR. SCHAPIRO:  So it's taking a second here.

12             But look, if Mr. Kaplan says that it is claimed

13   from the transcript that it covered all those years and not

14   just two years, I'm not in a -- I'm not going to dispute that

15   if that's what the transcript says.  Or I can come back at

16   the end and say --

17             THE COURT:  Yeah.  So, Andrew, just a second.  The

18   effect of your not disputing it is going to lead me to

19   another statement.  So you better make sure what you're

20   saying.

21             MR. SCHAPIRO:  Oh, yeah.  Actually, you know what?

22   Sorry.

23             I'm looking at the transcript now and I won't give

24   away anything that's -- that is confidential, as far as I

25   know.  But that it was only 2015 and 2019.

1          "Question:  Are you aware of any trends over time

2     in the Sony Music Publishing plaintiffs' annually US

3     streaming revenues between 2012 to 2019?"  That's page 124 --

4          THE COURT:  No, no, that I know.  But Alex said a

5     little break was taken, she was reeducated by somebody and

6     came back and supplemented.  So look at 136.

7          Can you turn on those screens for these guys?

8          MR. KAPLAN:  Okay.  And, specifically, 137 and 138

9     carry on with the years.

10          MR. SCHAPIRO:  Right, I see, I was just looking.  I

11     think Mr. Kaplan is right.  So --

12          THE COURT:  Okay.  So, Andrew, I've invited

13     everybody to be a little bit informal with me, but I'm not

14     inviting anybody to be less than absolutely complete.  And so

15     you've got to impress upon your people that if they're going

16     to put something to me in any form, whether it's a motion or

17     an e-mail, that they need to be right about it, because I

18     react based on what I read and I then proceed at a pace I

19     think appropriate.

20          So words mean something, all right?

21          MR. SCHAPIRO:  That's totally appropriate.  And I

22     apologize, Your Honor.

23          THE COURT:  So I need you to respond first to the

24     premise that Alex put forward, that a witness can only give

25     you what exists and no judge will order anybody to

1    manufacture facts.  So he's saying it doesn't exist for 2012

2    to 2014 in the form that you want.

3          Your response?

4          MR. SCHAPIRO:  So, I guess the question would have

5    to be that, what is meant by "in the form that we want"?

6          You know, for example, Mr. Kafora didn't have the

7    information initially.  And then, I believe just -- and my

8    colleague, Ms. Brewer, can jump in if I'm misstating this,

9    because she took that deposition -- was able with a simple

10   phonecall, to get this breakdown of information.

11         If there are two of the witnesses here who are not

12   able to get that information, and it's more than telling me

13   that there's a question, does that mean, Okay, we just don't

14   have it in a particular document, but I --

15         THE COURT:  No, no, no.  Hold on, Andrew.  Hold on,

16   Andrew.  I understand what you're saying.

17         I'm assuming, based on my prior experience with you

18   guys, what Alex is saying is, they have engaged in a

19   reasonable investigation about the scope of what they might

20   have.  And it's just not a guess; after reasonable

21   investigation, it doesn't exist.  Alex will correct me if I'm

22   wrong.

23         MR. SCHAPIRO:  But may I just ask a clarification

24   and then Mr. Kaplan can clarify and maybe we're -- you know,

25   maybe that will resolve this.

15

1           But they're --

2           THE COURT:  But is that --

3           MR. SCHAPIRO:  You could say -- you could say, we

4    don't have documents that we keep in this form, but that

5    doesn't mean that you can't educate a 30(b)(6) witness on the

6    topic readily and quickly.

7           THE COURT:  No, no.  What he said, Andrew, was, We

8    do -- they did not track the information in that manner for

9    2012 to 2014.  That's what he told me.

10          So -- Alex, is that what you told me?

11          MR. KAPLAN:  Yeah.  And to be specific and so we're

12   all looking at the same thing, we put the relevant testimony

13   here, Your Honor, in the e-mail I sent.  It's about midway

14   through my e-mail at that paragraph numbered 1.

15          And if Mr. Schapiro is looking at the transcript,

16   it's at the bottom of page 140 of the transcript and goes on

17   to 141.  And the witness, during the break, asked the vice

18   president of finance for the annual information.  And she got

19   the information from him from 2015 to 2019 and then was told

20   by him that it doesn't exist in that aggregated, annual

21   format.

22          THE COURT:  Well, but, no, I'm sorry.  The words

23   used were "not readily available."  So that kind of leans

24   towards Andrew's point.  I thought you told me it wasn't even

25   tracked that way.

1          "Not readily available" means we have to jump

2     through some hoops, but can get it.  That's my understanding

3     of that term.

4          So which is it?

5          MR. KAPLAN:  No -- well, my understanding of "not

6     readily available" -- and this is, of course, the witness

7     who's giving the testimony's almost translation of what she

8     heard from her vice president of finance -- is that they

9     don't have the annual streaming information together in

10    revenues for those years, 2012 to 2014, and it may be because

11    of different other publishing entities were merged into the

12    main Sony ATV at the time.

13         On that, Your Honor, I'm not 100 percent sure, but

14    when this person went to look up the annual streaming

15    revenues for the years, the information was only kept by year

16    for 2015 through 2019 and wasn't kept by year 2012 to 2014.

17         THE COURT:  Okay.  So what I'm going to say is that

18    if it can be gathered and determined with a total of ten

19    hours or less, I would like it done.  So if not, then not.

20         Okay?

21         MR. KAPLAN:  And -- so if it can be gathered and

22    determined, Your Honor, in ten hours or less, what the

23    aggregate information -- I'm sorry, what the aggregate

24    streaming revenue is for 2012 to 2014, we should put that

25    together.  And can we just produce that --

1            THE COURT:  Yes.

2            MR. KAPLAN:  -- instead of having a witness sit

3  again?

4            THE COURT:  You can just produce it.  So the

5  question that I'm reading was:  Whether there's streaming

6  revenue of a percentage of total revenue for fiscal years

7  2012 through 2014.  Okay?

8            MR. KAPLAN:  Okay.  So we will see if it's able to

9  be gathered in ten hours or less, Your Honor.

10           THE COURT:  Okay.

11           MR. KAPLAN:  And if it is, we will produce it.

12           THE COURT:  All right.  The second thing was, I

13  didn't hear Andrew talk about Warner.  Alex did.

14           So, Andrew, are you seeking something from a Warner

15  representative at the moment?

16           MR. SCHAPIRO:  Well, we are.  But, you know, I'm

17  reading the room here and I guess I have to seek your

18  guidance.

19           I think it would be -- it would seem fair and

20  appropriate for us to have the same ruling applied to Warner.

21           Now, Mr. Woirhay's -- I'm not sure if I'm

22  pronouncing it right, but for any future court reporter,

23  W-O-I-R-H-A-Y-E -- was a Warner witness.  And I see here Mr.

24  Kaplan cites to testimony from him that it could take months

25  to a year to try to assemble revenues.

1              I mean, I think it would -- we would be satisfied,

2    because this is information that our experts need and that's

3    why it's sort of coming to the fore now here, Your Honor.  If

4    it turns out that they can't pull it together in ten hours,

5    then we would accept that.

6              THE COURT:  Okay.  Please determine that, Alex.

7              MR. KAPLAN:  Well, I can -- Your Honor, that I can

8    speak to.  Because we really spent a long time in this

9    deposition and Mr. Schapiro is right, it's the testimony from

10   the witness who said it would -- I'm reading from the

11   transcript here, Your Honor.

12             THE COURT:  You don't have to.  I accept your

13   proffer.  All right?

14             MR. KAPLAN:  Thank you.

15             THE COURT:  And so that's a resolved issue and no

16   further work needs to be done on that.

17             Now, you premised, Alex, your comments with orders

18   that Ms. Rodriguez made and I'm fine with those orders.  But

19   as a means of -- so I think the agreed-upon 30(b)(6) topic is

20   proper.  And so in lieu of pressing the issue, Charter has

21   agreed to the testimony, but I don't want to have to go back

22   on Ms. Rodriguez's order by saying that the plaintiffs want

23   it both ways:  Both not to produce documents and not to

24   provide testimony.

25             So let's don't go there, because then it might open

1    up some document production.  Okay?

2              MR. KAPLAN:  Understood, Your Honor.  I think for

3    -- I -- it sounds, to me, like we're resolved on the Sony

4    Music Publishing/Cranford issue and the -- and we'll find the

5    information, if we can, in less than ten hours and turn it

6    over.

7              It's -- as we've said, we can find it for the

8    Warner Music Publishers in less than months and so it sounds

9    like we're set there.

10             THE COURT:  Yes.

11             MR. KAPLAN:  And so then the last point that was --

12   that is in Ms. Ackojan's e-mail and that Mr. Schapiro talked

13   about, were with respect to the Sony Record Label witness,

14   Yoka Fora (ph) and the Warner Record Label witness, Matt

15   Fracht.

16             And what they were asking for there were documents

17   that the witnesses said they looked at before the deposition

18   and -- but what they aren't saying is that the witnesses

19   weren't able to actually provide the testimony in the

20   30(b)(6) topics.  And that's either revenue information for

21   the plaintiffs or the streaming information for the

22   plaintiffs, and so they were able to testify to that

23   information.

24             And so in that case, we didn't produce any more

25   documents than we had to, as ordered by Ms. Rodriguez; but

1  those witnesses were able to testify and Charter's e-mail

2  doesn't say that they weren't able to get any testimony that

3  they needed from the revenues or streaming.  And so there, as

4  I said, I believe we've met our obligations.  And they're not

5  saying that they don't have the testimony that they needed

6  within the scope of those topics.

7            THE COURT:  Okay.  So let's start with the basic

8  premise that might have to be adjusted here and that is, it

9  is not an improper question at a deposition to ask a witness

10 what they relied on in preparing for the deposition.

11           You agree with that, don't you?

12           MR. KAPLAN:  Yes.

13           THE COURT:  And it's not an improper question to

14 say, I'd like to look at those documents that you looked at

15 in preparing for your deposition.  That's not an uncommon

16 thing either, correct?

17           MR. KAPLAN:  I mean, it's not uncommon, but the

18 difference here, Your Honor --

19           THE COURT:  No, no, no.  Just -- let's go one step

20 at a time.

21           MR. KAPLAN:  Okay.

22           THE COURT:  That's not uncommon, is it?

23           MR. KAPLAN:  That is not uncommon, Your Honor.

24           THE COURT:  All right.  But in this case, maybe

25 some or all of the documents that they looked had previously

1   been ordered by the Special Master to not have to be

2   produced, correct?

3            MR. KAPLAN:  Correct.

4            THE COURT:  Okay.  So I can accept that and there

5   is a possibility that during the deponent's testimony a door

6   could be opened that might change that, depending on how the

7   witness testifies or whether they can recollect enough to

8   satisfy the fact-finding need of the defense.

9            So that's where the whole rub is going to be and

10  this discussion right now is, was it fulsome enough of a

11  covering of the topic to provide Charter what they need,

12  despite the Special Master's ruling that the documents aren't

13  a subject of any -- of a proper request for production?

14           So I guess I'd like to hear first from Mr. Schapiro

15  on that.

16           MR. SCHAPIRO:  Sure.

17           So I think the framework you've described is

18  exactly right.  And let's imagine that we were taking this

19  deposition and there were no prior -- there were no document

20  requests.  Okay, we had a case and we were just taking a

21  deposition.  We would, nevertheless, be entitled to ask -- to

22  seek, at least, and the Court would be well within its

23  discretion to order the production of documents that the

24  witness looked at to refresh his or her recollection.

25           It's not just to get the documents, but it's to be

 1    able to see more -- to assess that testimony and to see more

 2    granularly what the witnesses testified about.  This witness

 3    testified -- was able to testify, though, it was his

 4    recollection, and it wasn't precise.

 5         I think the situation will be different if Ms.

 6    Rodriguez had ordered, somehow, that these documents were,

 7    you know, somehow privileged or highly sensitive.  And then

 8    one might say, All right, well, weighing the balance, I'm not

 9    sure they should be turned over.

10         But the only reason that they -- that documents

11    initially weren't ordered turned over in this regard is I

12    think she believes that what we were getting already would be

13    adequate, but that's not a reason to bar us from seeing a

14    document that already exists.

15         So the burden is zero, as to which there's no

16    privilege or, you know, super high sensitivity not covered by

17    a protective order and that a witness in a deposition

18    admitted he used to refresh his recollection.  It's not a big

19    ask.

20         THE COURT:  Right.  But it -- but the question is:

21    Can you point to gaps in the witness' testimony that he

22    should have known that were covered by the topic and,

23    therefore, reasonably could make those documents subject to

24    discovery?

25         MR. SCHAPIRO:  I will -- and again, I'll just ask

1   my team, or maybe Ms. Brewer, who took one of those

2   depositions on Kafora.  But I would also say, Your Honor,

3   even if there's not a gap, I think we're still entitled --

4   and I think there is a gap, at least on Kafora.  But I think

5   we're still entitled to those documents, because you don't

6   always have to take a witness' testimony -- that if he admits

7   that he didn't recall and then later had to have his

8   recollection refreshed, you can see what he used to refresh

9   his recollection.  It's a way of assessing the testimony.

10  It's not just filling the gap.

11          But --

12          THE COURT:  But this is not --

13          MR. SCHAPIRO:  -- I'll ask Ms. Brewer --

14          THE COURT:  Yeah, this is not unique, because the

15  topic we just covered was streaming revenue.  Those documents

16  were ordered not produced, but yet, you did give a 30(b)(6)

17  topic.  Percentages were given to you.  Those were supported

18  by some underlying documentation that I presume you didn't

19  get because of an order -- am I -- are you getting -- am I

20  fading in and out on you guys?

21          MR. KAPLAN:  It's not bad.  There's slight

22  distortion, but we can understand just fine.

23          THE COURT:  Okay.  I feel like sometimes my voice

24  is not being projected, so you're not hearing it.

25          But so, at least, with that streaming topic you got

24

1    the 30(b)(6) testimony and not necessarily documents, which

2    I'm okay with, as long as it gives you the ammunition you

3    need.

4            There is -- even with this kind of case, especially

5    at the end of discovery, there is the concept of

6    proportionality and balancing that I need to engage in to see

7    if it was really worthwhile.  Because I -- we're way past the

8    time of making each of you produce more documents, just

9    because you'd like to see it or some other reason, or you

10   just want every scrap of paper that you can get.

11           It needs to be -- there's a heightened level of

12   materiality and need at this point in the case than there

13   would have been before.

14           So do you want to endeavor to articulate the need,

15   in addition to the testimony that you got, which you have not

16   yet shown me, had gaps?

17           MR. SCHAPIRO:  I would like Linda to talk, at

18   least, about Kafora.  And we -- by the way, we embrace Your

19   Honor's framing because I know we both have issues right now

20   to hear at the end of discovery where both sides are seeking

21   additional materials.

22           MS. BREWER:  Sure.  Good afternoon, Your Honor.  So

23   --

24           THE COURT:  Afternoon.

25           MS. BREWER:  -- with respect to Mr. Kafora's

25

1   testimony, what he disclosed is that he was testifying from

2   memory, from a document that he actually asked to be prepared

3   so that he could testify.  Because when he looked at the

4   documents that were produced in the case, it didn't -- in his

5   view, (inaudible) with the information he would need to

6   answer the questions.  And since he didn't have the document

7   in front of him, because he didn't take it to the deposition,

8   it was his recollection, which I understand Your Honor's

9   point of view is, in some cases, you know -- however, in

10  instances of financial matters, precision is important.

11          It's important for experts.  It's important that

12  they are getting accurate numbers so that they're not exposed

13  to criticism based on reliance of generalities or rough

14  numbers that could be (inaudible).

15          So for the two witnesses that we're discussing now,

16  it we thought it was a fairly uncontroversial ask, since it

17  wasn't a document that was prepared by a lawyer, it was

18  prepared by a (inaudible) person.  In the instance of Mr.

19  Kafora, it was what he felt he needed and able to interpret

20  the document that was produced, and --

21          THE COURT:  Linda.  Linda, hold on.

22          MS. BREWER:  (Inaudible).

23          THE COURT:  If you move back about two inches, your

24  voice sounds a lot better than when you're close.  So why

25  don't you back up a little bit from whatever you're talking

1   into.  At least that's what it --

2          MS. BREWER:  Okay.

3          THE COURT:  I'm perceiving that it -- the farther

4   away you are from the microphone, the better we can hear you.

5   Okay?

6          MS. BREWER:  Okay.  Would you like me to repeat

7   anything that I've said?

8          THE COURT:  No.  Back up a little bit more, please.

9   You're muffled.  Try that.

10          MS. BREWER:  Okay.  All right.  Let me know if you

11   want me to -- since I don't know if you could not hear the --

12          THE COURT:  No, I could hear you.  It was just

13   muffled.

14          Okay.  So the -- are you on this one too, Alex?

15          MR. KAPLAN:  I am, Your Honor.

16          THE COURT:  Okay.  So the concept that you've just

17   been given was that there was a document that was prepared at

18   the deponent's direction from a nonlawyer and he used it --

19   said that he needed it to prepare for his deposition and he

20   used it in preparing for his deposition.  Is all that true?

21          MR. KAPLAN:  So I have to follow Mr. Schapiro's

22   lead here for a moment and see if a member of my team can

23   answer that question, because I wasn't present in that

24   deposition and I would ask my colleagues to let me know.

25          THE COURT:  That's fine.

1          MR. KAPLAN:  And if I could just address, in the

2    meantime there, some of the other points here, Your Honor.

3    So I didn't hear from either Mr. Schapiro or Ms. Brewer a

4    single question that either Mr. Kafora or Mr. Flacht for

5    Warner couldn't answer.  They were able to give the

6    testimony.  And by the way, it's not all from memory.

7          I mean, there are documents that they were looking

8    at.  They did produce financial documents and they were able

9    to look at those documents to give answers, even if it was

10   percentages of the numbers in those documents that --

11         THE COURT:  No, I would say -- I would hope that

12   the vast majority of a 30(b)(6) witness is going to come from

13   them being educated in preparation for the deposition and not

14   from memory.  So I accept that as a premise.

15         MR. KAPLAN:  Right, Your Honor.  So I haven't --

16   there's no information in the questions that Charter had said

17   they didn't receive.  And again, we do have this particular

18   situation where we're not just going into a deposition with

19   no prior orders.  There was the order and it was hotly

20   litigated before Ms. Rodriguez that we didn't have to go and

21   produce, you know, detailed financial revenue, including on

22   streaming.

23         And this -- by the way, this isn't a situation

24   where in the middle of the deposition, you know, these

25   witnesses have to go check on something.  This is information

1   that they looked at before the deposition to come in and

2   testify.  And so I just -- I haven't heard any discovery

3   within the 30(b)(6) topics and particular questions that the

4   plaintiffs were not able to answer and so it seems to me that

5   the standard under FRE 6.12(a)(2) is not met here.

6          THE COURT:  Okay, but I still want to know the

7   answer to my question.

8          MR. KAPLAN:  Yes, on Mr. Kafora?

9          THE COURT:  Yes.

10          MR. KAPLAN:  And those documents?  Just give me a

11   moment so I can find it.  Your Honor, as best I can tell, Mr.

12   Kafora did ask someone to pull streaming revenue so that he

13   could educate himself, but then that's what he did.  He

14   educated himself and he gave the testimony.  And so they're

15   not saying that the testimony isn't sufficient, they're just

16   saying they want more documents, the very documents that the

17   special master had said we didn't have to produce.

18          THE COURT:  Now -- well, though, I think the

19   documents you didn't have to produce were the documents --

20   the source documents from which the doc preparation was

21   prepared and so I disagree on that.  And, you know, so

22   streaming revenue is exact -- what you just said was the

23   Special Master said you don't have to produce high-level

24   financial records.  What you just said about what the

25   deponent asked for and reviewed was streaming revenue.

1            If all that is true, then I want it produced,

2   absent any claim of privilege.

3            MR. KAPLAN:  No.  I think, respectfully, Your

4   Honor, you may have it backwards.  What the Special Master

5   said is that what we have to produce is the top-level

6   financial information --

7            THE COURT:  Oh, okay.  Okay.

8            MR. KAPLAN:  -- and not the specific streaming

9   revenues.

10           THE COURT:  Okay.

11           MR. KAPLAN:  And so we did not produce the specific

12   streaming revenues.

13           THE COURT:  Okay.  Hold on.  Is that correct,

14   Andrew?

15           MR. SCHAPIRO:  Yeah.  Yeah, it is.

16           THE COURT:  Okay.  Then it's --

17           MS. BREWER:  Well, no.  I would clarify, she said,

18   Including streaming.  So if you look at the quote that Mr.

19   Kaplan has cited from that April transcript, it was

20   understood by the Special Master that that information could

21   be gleaned from the (inaudible) --

22           THE COURT:  Okay.

23           MS. BREWER:  -- that were produced.

24           THE COURT:  Again, you're muffled.  What are you

25   pointing to, Linda?

1          MR. SCHAPIRO:  So I --

2          MS. BREWER:  I did -- go ahead, Andy.

3          MR. SCHAPIRO:  No, I was going to say, I might as

4    well, just because I have better audio here.  So the question

5    -- and this is the reason why I think the Special Master

6    ruling really isn't dispositive in any way on this.  She

7    said, My understanding -- this is on the first page of Mr.

8    Kaplan's e-mail --

9          THE COURT:  I got it.

10          MR. SCHAPIRO:  -- quoting --

11          THE COURT:  Okay.

12          MR. SCHAPIRO:  -- from the transcript.  She says,

13    That's my understanding as well.  What we're looking at here

14    is three years of top-end annual financials.  That's why a

15    moment ago, I said, Yes, excuse me.

16          But she says, For each time plaintiff that includes

17    streaming revenues, okay?  So that is why Linda, I think,

18    correctly is saying, although I saw Mr. Oppenheim shaking his

19    head, that we're saying that presumably the Special Master

20    believed, Okay, well you'll be able to discern streaming

21    revenues from this.

22          But either way, the reason that the Special Master,

23    I believe, ruled the way she did - it's not that there's

24    something magical or overly sensitive about documents such as

25    the ones that the witness reviewed during the 30(b)(6), it

1    was rather that she didn't want to make them go to the

2    trouble of producing them, but now we know there is such a

3    document, we know that there's a witness who was supposed to

4    be testifying on this topic and he looked at something

5    specific that would be of use to our experts.

6            So we don't think it would be a -- it wouldn't --

7    we think it would be entirely appropriate to have that

8    produced and no burden on the other side.

9            MR. KAPLAN:  But, Your Honor, if you would look at

10   the full quote, and this is at the beginning of my e-mail and

11   the back and forth, it's very clear that we were not supposed

12   to be producing standalone streaming information and that the

13   Special Master wasn't ruling on burden.  She was ruling on

14   relevance.  And I can read it out loud, Your Honor.

15           THE COURT:  I'm going to go to the --

16           MR. KAPLAN:  (Inaudible).

17           THE COURT:  -- source.  Give me the ECF number for

18   that, please.

19           MR. KAPLAN:  For the hearing transcript, Your

20   Honor?

21           THE COURT:  Yes.

22           MR. KAPLAN:  Give me one moment, please.

23           MR. OPPENHEIM:  Are the Special Master transcripts

24   on ECF?

25           THE COURT:  I think they might be, but I'm not

1   sure.

2          MR. OPPENHEIM:  If not, we could e-mail it to you,

3   Your Honor, I'm sure.

4          THE COURT:  I understand.  What's the date of the

5   hearing?

6          MR. KAPLAN:  The hearing --

7          MR. SCHAPIRO:  (Inaudible) 2020.  Oh, I'm sorry.

8   April 17.  April 17, 2020.

9          MS. BREWER:  I don't believe the hearing transcript

10  is a document.

11         THE COURT:  You don't?

12         MS. BREWER:  No.

13         THE COURT:  All right.  I'm concerned --

14         MR. KAPLAN:  I realize that those --

15         THE COURT:  Could we screen share if somebody has

16  it pulled up, please?

17         MR. KAPLAN:  Yeah.  I may be able to do that in

18  just a moment here, Your Honor.

19         THE COURT:  Well, if there's an eager beaver

20  associate who wants to prove themselves, they can turn their

21  video on and screenshare.

22         MR. KAPLAN:  All right, let me see.  I just haven't

23  screenshared with this format.

24         MR. OPPENHEIM:  Somebody just responded from our

25  team that they have it, they can (inaudible) bottom screen

1   button; is that correct?  Double-square button, maybe?

2           THE COURT:  Double-square -- double-rectangle

3   button, I think.

4           MR. OPPENHEIM:  Is it showing up?

5           MR. SCHAPIRO:  No, we're not seeing it.  Your

6   Honor, can I suggest we might actually be in agreement about

7   what the transcript said, roughly, and that is that -- I

8   mean, I think what Mr. Kaplan said a moment ago may be

9   correct that whatever the way the parties framed it, Ms.

10  Rodriguez thought, Well, that doesn't really seem relevant,

11  give them annual financials that will show economic

12  performance and then, you know, that will include streaming

13  revenues.

14          What --

15          THE COURT:  Which means --

16          MR. SCHAPIRO:  -- whatever --

17          THE COURT:  That means the streaming revenues would

18  be buried somewhere in there, but not segregable, correct?

19          MR. SCHAPIRO:  Yeah.  If --

20          THE COURT:  Okay.

21          MR. SCHAPIRO:  If it turns out that her, you know

22  -- and we now know, I mean, I don't think there's any dispute

23  that we're entitled to ask these questions of the witness.

24  So it's not as if we were asking about something off-base.  I

25  mean, if we were asking about something and seeking

1    information that we're entitled to seek and that is relevant

2    and that our experts want --

3             THE COURT:  Yeah.

4             MR. SCHAPIRO:  -- I don't think there's a

5    (inaudible) way to draw a line between the document the

6    witness looked at and the testimony the witness gave.

7             THE COURT:  I'm fine with what I ruled before, even

8    though I got the underlying facts incorrect.  I'm not dealing

9    with, here, a whole segment of documents that were ordered

10   not to be produced.  I'm dealing with, under 6.12, the

11   discretion to order a particular document that was used by

12   the deponent in preparing for a deposition.

13            I think this is as efficient case where that's

14   appropriate.  So therefore, I'm -- I want it to be produced,

15   okay?

16            MR. SCHAPIRO:  Thank you, Judge.

17            THE COURT:  Now, let's turn to the more serious of

18   the e-mails and that's Mr. Oppenheim's, which I consider to

19   be of -- one of the most significant allegations made to me

20   while I've been presiding over the case.

21            I understand the import of everything he said.  I

22   don't need him to argue it.  I don't have a written response,

23   which is fine.  That's not going to prejudice Charter, but I

24   need to know some specific answers and who's going to address

25   this for Charter.

35

1              MR. SCHAPIRO:  I think this is also on me, although
2    it is possible my colleague, David Eiseman who may have
3    joined the call, may chime in here and there as well.
4              THE COURT:  Okay.  And so this may actually
5    necessitate something in writing.  Let's see where it goes.
6              So first of all, Mr. Schapiro, prior to May 21,
7    2021, can you point me to any discovery disclosure in any
8    manner in which Charter revealed the existence of a DMCA
9    executive steering committee?
10             MR. SCHAPIRO:  I do not know.  And so I apologize,
11   and this (inaudible) one where we probably want to put
12   something in writing, but I can give one background fact that
13   I think and hope will cause you to revisit your view that
14   this is one of the most serious matters in the case, and that
15   is that the DMCA steering committee, which did come into
16   existence before the end of the claims period, was focused
17   entirely on these post-claim period changes that eventually
18   occurred and that Your Honor had already ruled are not --
19   that are privileged in this case.
20             So this was a committee that was meeting in
21   connection and in conjunction with the merger of Time Warner
22   and Charter and deciding what to do going forward.  None of
23   its recommendations or decisions came into effect, as I
24   understand it, until August of 2016, well after the end of
25   the claims period here, and as with so many other issues that

1  have come up in this case and ruled by you to not be relevant

2  here.

3           THE COURT:  Okay.  So every -- not every -- many

4  committees have a date of birth.  What do you think the date

5  of birth of this committee is?

6           MR. SCHAPIRO:  Yeah, I am -- I am probably not the

7  person to answer that, but I think it's in the -- it's in

8  early 2016, the spring of 2016.

9           MR. SPERLING:  Your Honor, I can --

10          MR. SCHAPIRO:  (Inaudible) --

11          MR. SPERLING:  I can address what the witness said.

12  Your Honor, it's Jonathan.

13          The witness testified that by January of 2016, the

14  committee was in existence.  That's five months before the

15  close of discovery.  And I don't want to belabor the point,

16  because --

17          THE COURT:  Claims period.  Claims period,

18  Jonathan.

19          MR. SPERLING:  Yeah, the claims period, correct,

20  and I don't want to belabor the point, because I get that the

21  Court gets it, but it's not relevant whether the changes that

22  they considered were --

23          THE COURT:  I don't need that, Jonathan.  I

24  understand.  So here's the thing, Andrew.  It is most

25  certainly a relevant issue in this case what Charter did with

37

1    regard to DMCA during the claims period.  You agree with

2    that, correct?

3              MR. SCHAPIRO:  I do.

4              THE COURT:  And so did -- I know that this topic

5    has been the subject of more than one hearing.  E-mail

6    traffic, memos of persons who recognize that DMCA is an issue

7    and what their views on it are and, obviously, the higher the

8    food chain, the more any such opinion or expression of belief

9    is going to be relevant at trial.

10             So like it or not, Charter's conduct will be on

11   trial in this case and discussions of that nature prior to

12   the expiration of the claims period, regardless of whether it

13   resulted in a particular finding, recommendation, policy

14   change, the mere discussion appears to be precisely the kind

15   of document that plaintiffs have sought in one or more

16   document requests.

17             I don't think that can be reasonably disputed.  So

18   I think that what I can believe is that this is new to the

19   lawyers litigating the case.  In fact, this doesn't shock me.

20   This is what discovery is for.

21             If we all had all of our information right up

22   front, we wouldn't take depositions, we wouldn't need

23   document requests, we wouldn't need interrogatories.  We have

24   the whole record before us.  Discovery is designed to

25   discover and elicit new information and good lawyers do

1   exactly that.

2          So the fact that Andrew or his team or any other

3   outside counsel maybe didn't know about this before, and

4   therefore didn't disclose it, is not shocking to me or even

5   call -- calls into question any ethics issues.  Maybe the

6   interaction between outside counsel and Charter's in-house

7   counsel and operating personnel and the fact that they should

8   have recalled this committee when reacting to discovery

9   requests made by the plaintiffs, that's a little more

10  concerning to me than it is for outside counsel not to know

11  about it and not to have prepared witnesses ahead of time,

12  because frankly, an outside attorney can only be as good as

13  their client has permitted them to be in terms of disclosure.

14         So that's a premise that I'm operating off of.  I

15  think that at least an appropriate response would be, We

16  didn't know about it either before this, we agree that it

17  sounds relevant, we're going to track it down and produce

18  whatever we can with regard to the committee and its

19  communications by its members, and actually who the

20  composition is of the committee, unless you can tell me that

21  this is a red herring, which it doesn't appear to be on the

22  surface.

23         So Andrew, the ball is in your court.

24         MR. SCHAPIRO:  Yeah.  So I don't think it's a red

25  herring entirely and I want to flag a compromise.  Again,

1    someone from my team will tell me if I'm wrong, but I

2    compromise that we propose -- and I don't think we had a

3    chance to hear back from the plaintiffs on it, because we

4    sent this over last night in response to an e-mail they sent

5    us.

6            So we would be -- you know, to resolve these

7    issues, we would agree to search for and produce what are

8    called monthly reports that Ms. Haynes testified that she

9    sent to Ms. Deparard (ph) -- this came up in the deposition

10   -- that referenced Charter's DMCA efforts and are not

11   privileged during the time period.  We would review and

12   produce any such materials.  I think we can do that by the

13   end of this week or the weekend.  And if this affects Mr.

14   Webber's (ph) deposition, because they were concerned about

15   that, we would agree to allow them to take Mr. Webber's

16   deposition the following week in despite the close of

17   discovery.

18           I don't know if that resolves at least some of it

19   or -- if that's only part of it, but yes, I hear what you're

20   saying.

21           THE COURT:  Okay.  I don't think it -- I'm not

22   going to speak for the plaintiffs, but I can imagine it's not

23   going to slay their thirst to receive only monthly reports.

24   It was clear -- they can accept that, and that's fine, and I

25   may even not go any farther than that, but I think it's clear

1   from their message that they sent to me that they're going to

2   want a search for e-mails between and among committee members

3   on the topics that the committee was addressing.

4           So -- but let me hear from the plaintiffs.

5           MR. SPERLING:  Good afternoon, Your Honor.  It's

6   Jonathan again.

7           You have it right.  In addition, the compromise is

8   not even a compromise.  Monthly reports that Mr. Schapiro are

9   referring to are on totally unrelated.  Those are monthly

10  reports that Ms. Haynes prepared and sent to her direct

11  superior years before this committee was formed.  Those

12  monthly reports have nothing to do with the work of the

13  committee, except insofar as they may also (inaudible) on

14  DMCA issues.

15          So the compromise is not even a compromise.

16  They're offering a different (inaudible).  We need to address

17  that issue as well and then produce those monthly reports

18  without any conditions attached.

19          That's -- the Court has it exactly right with

20  respect to the DMCA (inaudible).  Let me just add two things,

21  Your Honor, and I don't want to belabor an issue (inaudible),

22  but when Your Honor said it doesn't call into question any

23  (inaudible), certainly don't know the allocation of

24  responsibilities of what happened between Charter's

25  employees and their outside counsel, but somebody, Your Honor

1  -- somebody here attempted to defeat the fundamental truth

2  seeking function of discovery.

3        The documents of course are critical, but the

4  starting point even before the documents, Your Honor, is the

5  very first interrogatory that we posed and that interrogatory

6  asked them to identify all persons, current and former

7  employees, with responsibility for designing, developing, or

8  implementing their policies and protocols for addressing

9  alleged copyright violations through Charter's network, and

10  they gave us an interrogatory response.

11        And we should slow things down here, Your Honor.

12  When they responded to that interrogatory and they didn't

13  identify the members of that committee, that wasn't an

14  oversight.  Somebody involved in the process may not have

15  known, but somebody involved in that process stopped and

16  thought and made a decision not to disclose the members of

17  this committee, with an eye to the consequences of what would

18  happen if those individuals were deposed.  It is -- it's

19  shocking, Your Honor, and we'll leave for another day the

20  issue of whose ethics were called into question, but somebody

21  here misbehaved, Your Honor, in a very grave way.  In a way

22  that was designed -- as Your Honor said, this is what

23  discovery is for and somebody decided they'd give us an

24  interrogatory response which was false.

25        And so the Court has it right.  We need all the

1   communications among the members of the committee concerning

2   the work of the committee.  We need, given our deadlines, a

3   clear deadline for completion of that, including a final

4   privilege log of any such documents that (inaudible) looked

5   over, and we need to defer the deposition of Mr. Webber, who

6   was on that committee, until we get the documents that were

7   concealed from us until now about the work that he and that

8   committee did on (inaudible).

9           THE COURT:  Okay, so stop there.

10          MR. SPERLING:  As the Court can tell, I'm a bit

11   worked up.  I'll leave it there.

12          THE COURT:  And that's fine.  I want you to -- and

13   by the way, you're breaking up a little bit too.  I'm not

14   sure whether it's because I'm not muted or someone else is

15   not muted.

16          So let me just express this.  Again, I'm going to

17   reiterate that I'm not thrashing about looking for someone to

18   punish right now.  What I do want to see, based on my

19   understanding right now, is the plaintiffs' request to be met

20   and for that search to be done.  And I just want to encourage

21   you, Andrew, as captain of the ship, which you apparently

22   are, that we cannot repeat lessons that we've known since at

23   least 1972.  Okay, Andrew?

24          MR. SCHAPIRO:  Yes, Your Honor.

25          THE COURT:  All right.

1          MR. SCHAPIRO:  And I will say my understanding

2    here, without revealing anything privileged, is that there's

3    always been an understanding that there were certain legal

4    investigations into post-claims period changes, most of which

5    have resolved to -- in fights over privilege or privileged

6    logs.  There was not an understanding that there was a

7    specific committee.

8          My expectation is that the vast bulk of these

9    documents are going to be privileged, but we're -- we

10   absolutely take your point and we're going to go fix any

11   mistake that was made and review the documents that you

12   direct us to review and log what needs to be logged and

13   produce what should be produced.

14         THE COURT:  Okay.  Did you -- well, nevermind.  So

15   did you understand everything that Jonathan just said as far

16   as what they're seeking?  I think it's outlined in their

17   message, too.

18         MR. SCHAPIRO:  I'm not sure I understood everything

19   he was saying, other than he was unhappy with us, but I have

20   the e-mail and if we can go by that, but I just want to, if

21   you don't mind, text with some of the people who will be

22   doing the actual reviewing to make sure I'm not agreeing to

23   anything that's not feasible or that somehow needs to be

24   discussed with you.

25         THE COURT:  Okay.  While you're texting, I'm going

1    to ask Jonathan to tick off the enumerated documents -- or

2    discovery requests he's now making and make them as

3    (inaudible) as you can --

4            MR. SCHAPIRO:  Sure.

5            THE COURT:  -- but whatever you need, Jonathan, you

6    have to tell me right now, because I want Andrew --

7            MR. SCHAPIRO:  Your Honor, before we do that, just

8    one thing, which is -- one thing that we would want to make

9    clear is that the cutoff of the -- because this committee, as

10   I said, did -- it was focused on and continuing to do work

11   well past the cutoff or the claims period, that whatever

12   we're reviewing and producing is cut off on May 17, 2016,

13   that are not going into later work of the committee.

14           THE COURT:  At the moment, that's true.  We'll keep

15   the bullpen ready on anything else, but at the moment, that's

16   true.  Okay?

17           MR. KAPLAN:  Okay.

18           THE COURT:  Please, Jonathan, succinctly and

19   accurately.

20           MR. SPERLING:  Yeah, so I'll try to be really

21   precise and succinct, Your Honor.

22           First, Charter should be required to identify each

23   member of the DMCA executive steering committee.  Second,

24   Charter should be required to search its documents of each

25   member of the DMCA executive steering committee and anyone

45

1    that was responsible for maintaining records for the DMCA

2    executive steering committee.

3              THE COURT:  For what, though?  What's the search

4    for?

5              MR. SPERLING:  The search is for documents

6    responsive to our pending request.  We're not posing a new

7    request, Your Honor.  Candidly, I can't imagine, Your Honor,

8    given that it was a committee about DMCA, that it would have

9    many, if any, documents that are not responsive to our

10   document request.  They have (inaudible) narrowed, long

11   series of negotiations and orders by the Special Master and

12   by you and those can be applied electronically and those are

13   the requests they should apply to the documents related to

14   these individuals.

15             THE COURT:  Okay.  So all you're asking there in

16   that is to take existing document requests, look at potential

17   new sources of documents, and search, correct?

18             MR. SPERLING:  And of course produce a log, Your

19   Honor.

20             THE COURT:  Understood.  Okay, that's two.

21             MR. SPERLING:  Third, Ms. Haynes in her deposition

22   also identified (inaudible) committee, security executive

23   steering committee, (inaudible) DMCA (inaudible) and she

24   testified that there was definitely e-mails about DMCA with

25   the members of that committee.

1        Therefore, the same approach should be taken with

2   the members of the Security Executive Steering committee.

3   They should be identified, their documents should be

4   searched, and responsive documents should be produced.

5        THE COURT:  Okay.

6        MR. SPERLING:  I would say, Your Honor, just going

7   back on the DMCA committee for a second, I'm happy with an

8   alternative approach, given the subject matter of the DMCA

9   committee and (inaudible) DMCA.  They can just produce all

10  the documents subject to logging those that are allegedly

11  (inaudible).

12       THE COURT:  All right.  Is that it?

13       MR. SPERLING:  That's it with respect to those two

14  committees, Your Honor.  Now, Mr. Schapiro raised one more

15  item, which was that Ms. Haynes earlier sent monthly reports

16  to her superior (inaudible) Stevens.  While he left the

17  company some time ago, she said they were all sent to his

18  assistant.  None of the people that she reported to

19  (inaudible) had their documents searched, that the assistant,

20  Ms. Deparard (ph) is still at the company.

21       So Charter's offer should be that they be required

22  (inaudible) without the conditions that they try to

23  (inaudible), they should search Ms. Deparard's documents for

24  the monthly reports from Ms. Haynes and produce those.

25       Finally, Your Honor, we need a deadline for that

1    production and for the log and we need a timeframe for Mr.

2    Webber's deposition following the completion (inaudible).

3            THE COURT:  Okay.  Well, I think the timeframe --

4    is two weeks, Andrew, okay for the actual searches?

5            MR. SCHAPIRO:  For the searches or the production

6    as well?  Because this -- ten or twenty custodians across all

7    search terms, which, you know, as you might imagine is -- and

8    logging, which is --

9            THE COURT:  Well -- so if you're going to spend two

10   weeks searching, each time you do the search and something

11   responsive comes up, you're going to print it off.  So I --

12   it seems like to me searching and printing off either -- or

13   downloading is the same thing.  Thereafter, the only thing

14   that needs to be done is a review.

15           So I'll give you two weeks to complete the search

16   and the accumulation and then one more week to produce.  So

17   that's three weeks from today.

18           MR. SCHAPIRO:  So Your Honor, I -- yes, first.

19   Secondly, if I may just reserve one right, which is, after

20   talking to the -- you know, the people who do the actual

21   document review, it turns out there's something about the

22   burden or the feasibility that I am overlooking, I may -- we

23   may shoot back to you an e-mail or a letter tomorrow if

24   there's something about burden that makes that impossible.

25           THE COURT:  Okay, but --

1          MR. SPERLING:  Your Honor, one way to solve the

2    burden is to just do a privilege review, certainly with

3    respect DMCA committee (inaudible) and just produce it all,

4    subject to the privilege.

5          THE COURT:  Yeah, I don't -- I'm not in favor of

6    that, because then I have to fight about the clawback and

7    documents dribbling in a year later that people think are

8    privileged, but they didn't think were privileged before.

9    It's not my best option.

10         So --

11         MR. SPERLING:  Well, they have to do the privilege

12   review anyway, Your Honor.  All I'm suggesting is that they

13   cut out the step of applying search terms with the vendor and

14   then doing a responsiveness review --

15         MR. SCHAPIRO:  Yeah, and we're --

16         MR. SPERLING:  -- (Inaudible) --

17         MR. SCHAPIRO:  We're not going to do that --

18         MR. SPERLING:  Hold on one second, Andy.  Hold on

19   one second.

20         If the DMCA committee -- I mean, I understand -- I

21   get the privilege point, but after you do the privilege

22   review, then just produce the documents, for crying out loud.

23   And I get it, Your Honor, they need time, but if we

24   (inaudible) this out three weeks until we get the documents,

25   then another week before we're in a position to depose Mr.

49

1    Webber -- and that puts a big burden on us, right?  They get

2    three weeks to produce the documents and then we have a few

3    days to digest them to take a deposition of Mr. Webber.

4            Who knows at that point whether the documents will

5    identify other deponents who we never knew about and we have

6    to come back to and say, Your Honor, here's the case of why

7    that person has got to be deposed and then we're on the door

8    step of Warner's summary judgment motions, Your Honor.

9            THE COURT:  Okay.  So I want it to be a rolling

10   production.  I want the first documents produced no later

11   than a week from today.  Okay?  And so -- and I'm sorry, but

12   you're just going to have to adjust as far as the timing of

13   the Webber deposition.  I've got to keep this case moving

14   along.

15           Okay?

16           MR. SPERLING:  Understood, Your Honor.

17           THE COURT:  And Andrew, if you come across issues

18   such as, Oh my gosh, she was wrong, there was never such a

19   committee or whatever, I don't want you to sit on it.  You've

20   got to convene a meeting right away, okay?

21           MR. SCHAPIRO:  Yes.  You mean a meeting of us and

22   you and plaintiffs?

23           THE COURT:  No.

24           MR. SCHAPIRO:  Yes, of course.

25           THE COURT:  Starting with you and plaintiff, but

1    based on prior history, I think it will morph into a meeting

2    that I'm involved in, but if you can work it out on your own,

3    that's fine.

4         MR. SPERLING:  And Your Honor, just for absolute

5    clarity, we understand that their final privilege log is due

6    on the same date that (inaudible) --

7         THE COURT:  Yes.

8         MR. SPERLING:  -- is that correct?

9         THE COURT:  Yes.

10        MR. SPERLING:  Thank you, Your Honor.

11        THE COURT:  All right.  Did we exhaust Mr.

12   Oppenheim's e-mail yet?

13        MR. SPERLING:  No, but I'm going to hand the rest

14   of the issues to Mr. Oppenheim so that he can do so, Your

15   Honor.

16        THE COURT:  Okay.

17        MR. OPPENHEIM:  So, Your Honor, the next issue is

18   the issue D on my e-mail and here, you'll recall that we took

19   the deposition of a 30(b)(6) witness, Michael Hanerhan (ph),

20   who was designated by Charter to testify on issues associated

21   with CATS, which is their electronic database system for

22   tracking infringement.  And Mr. Hanerhan was a gentleman and

23   a delightful individual.

24        Unfortunately, Mr. Hanerhan had no responsibility

25   or involvement with the CATS system as of the end of 2011,

1    and so they put up a witness who could not speak to many of

2    the issues related to CATS at the time of the claims period.

3    And he identified that there were two individuals who were

4    deeply involved for the claims period.

5          The first was an individual by the name of Mr.

6    Schmucher -- Schmucher -- Schmucher (ph) -- I apologize if

7    I've mispronounced his name.  This is a name we had never

8    ever heard before, and he had responsibility for managing the

9    CATS system from 2012 to 2016.  I understand he is still a

10   Charter employee.  He was not disclosed in response to

11   Interrogatory Number 1, which Jonathan described earlier,

12   which was promulgated two years ago, Your Honor.

13         So they didn't disclose Mr. Schmucher, they didn't

14   list him as a custodian, his documents have been -- not been

15   searched, and he was not consulted by Mr. Hanerhan in advance

16   of the deposition.

17         The other individual is an individual by the name

18   of Mr. Burrows (ph) and Mr. Burrows, similarly, was not

19   disclosed on Interrogatory Number 1.  I -- he also -- while

20   his name did appear every once in awhile in documents, he was

21   never disclosed that he had -- was one of the people that had

22   primary responsibility for the CATS system during this period

23   and he was not the (inaudible) of the custodian.

24         We're not at this point asking to revisit the

25   30(b)(6) deposition, though there were numerous topics that

1   Mr. Hanerhan could not speak to.  We are -- we want to try to

2   avoid that if we can.

3          The first step is the documents need to be

4   produced.  If those documents reveal things that require that

5   -- a deposition of one of those individuals, we will be back

6   to you as quickly as we can, but at a minimum, these

7   individuals should have been disclosed two years ago and

8   their documents should have been searched and it's critical

9   because there are key issues with respect to how the CATS

10  system operated during the claims period that Mr. Hanerhan

11  could not speak to.

12          THE COURT:  Thank you.

13          MR. SCHAPIRO:  So -- I was on mute.  So Your Honor

14  will recall that the plaintiffs came to you asking to take a

15  12-hour deposition of Colin Mabb not too long ago -- a few

16  weeks ago -- and one of the reasons they asked for that --

17  and Your Honor said, Okay, keep it to nine or ten hours, do

18  it all in one day.

19          THE COURT:  I think it was 13 hours that they asked

20  for.

21          MR. SCHAPIRO:  It was a lot of hours, whatever it

22  was.

23          THE COURT:  Right.

24          MR. SCHAPIRO:  And you gave them an extra length

25  deposition, a colleague of mine sat with Mr. Mabb from 8:00

53

 1   in the morning until, you know, 9:00 at night or something

 2   like that, you know, although with breaks.  And one of the

 3   reasons -- one of the primary reasons that the plaintiff

 4   sought that deposition was they said Mr. Mabb is far better

 5   situated than the upcoming 30(b)(6) witness, Mr. Hanerhan, to

 6   address issues about the CATS system.

 7          And we let them take as much time as they wanted

 8   with Mabb.  No one cut them off after they went over ten

 9   hours -- I think it was 10 1/2 hours on the record -- so that

10   they couldn't come back and say, Well, we didn't have a

11   chance to ask about everything we wanted to ask about.  And

12   it is -- sure, that on a handful of questions Mr. Hanerhan

13   wasn't able to answer everything, but over the course of a

14   seven-hour deposition, he was an awfully good and well

15   prepared 30(b)(6) witness.

16          So there are two different issues.  There's did he

17   know what he needed to know and what do you we do about Mr.

18   Schmucher and Mr. Burrows.  And, you know, respectfully, I do

19   think this is an instance where it's just too late.  There

20   are strategic decisions that lawyers have to make all the

21   time about when do you take a deposition, how long do you

22   wait.  And often we wait until late in the discovery period,

23   because you want to have all the documents, but when you do

24   that there's also a risk that in taking the deposition,

25   you'll hear about some other things and say, Boy, I'd like to

1   get some documents on that too, but you're bumping up against

2   the end of fact discovery, and for that reason, sometimes you

3   take depositions earlier.  Sometimes you take them later.

4         Mr. Burrows, as Mr. Oppenheim admits, was

5   identified on other documents about the CATS system.  If they

6   were interested, they could have sought written discovery at

7   an appropriate -- during an appropriate time frame.

8         Mr. Schmucker, my understanding is, is a relatively

9   low-level technician whose name was brought up with regard to

10  some technical aspects of CATS that had -- would have far

11  less relevant knowledge than Mr. Mabb and Mr. Hanerhan.  We

12  offered, when the plaintiffs raised this issue with us, to

13  designate -- to allow them to designate testimony of Mr. Mabb

14  as 30(b)(6) testimony, if their view was, Well, Hanerhan was

15  the 30(b)(6).  They asked Mr. Mabb a bunch of questions about

16  the CATS system and if they want, we're happy to say that can

17  be 30(b)(6).

18        But it's too late now to say, you know, here's

19  another person whose name was mentioned in a deposition that

20  we took two weeks before the close of fact discovery.  I'm

21  allowing you to add yet another custodian -- or two

22  custodians and do searches across all of those documents.

23        It's disproportionate.

24        THE COURT:  Okay.  I --

25        MR. OPPENHEIM:  Your Honor --

```
 1              THE COURT:  No, I don't need to hear any more.  So
 2   I think the request from the plaintiffs is fairly
 3   conservative.  They're not asking for any more deposition
 4   testimony.  They're just asking that the files of two people
 5   be searched.  It's discreet, it's segregated, it's not
 6   disproportional and so I would like that to be done, but only
 7   for truly relevant documents.
 8              I mean -- and I don't how to enforce that one,
 9   unfortunately, because so many of the documents I know that's
10   been exchanged may have fallen within a document request, but
11   it's just -- has absolutely no value to the case.  So I don't
12   know how to police that one.
13              MR. SCHAPIRO:  I have a proposal in that regard,
14   Your Honor.
15              THE COURT:  Go ahead.
16              MR. SCHAPIRO:  So this is about the CATS system and
17   we just received -- we received a recent discovery request
18   from the plaintiffs about CATS and CATS data loss, which is
19   the -- where this topic came up.
20              So we can search for documents in response to their
21   latest discovery request, which I think would be, you know, a
22   fair compromise here.
23              MR. OPPENHEIM:  Your Honor, that is a different
24   request and that's -- and they should have to respond to that
25   request.  What we're asking for here is documents related to
```

1    two witnesses they should have disclosed two years ago.

2          Mr. Schmucher was not a low-level person, as Mr.

3    Schapiro describes.  According to Mr. Hanerhan, he took over

4    Mr. Hanerhan's job and he was the manager or the supervisor

5    of the team that oversaw the CATS system.

6          THE COURT:  Okay.  So, Matt, hold on --

7          MR. OPPENHEIM:  So --

8          THE COURT:  -- hold on.  I need you or someone

9    who's listening to draft a specific request and run it by me

10   and I'll either approve or modify.  Okay?

11         MR. OPPENHEIM:  Very well, Your Honor.

12         THE COURT:  And we're going to do it right now.

13         MR. OPPENHEIM:  Should we send that to you --

14         THE COURT:  Oh, no.  You can read it as soon as

15   it's ready.

16         MR. OPPENHEIM:  Oh, you want us to do it on the

17   fly?

18         THE COURT:  I'm not going -- you said the word on

19   the fly.  I would agree it's under the gun, but not on the

20   fly.

21         MR. OPPENHEIM:  So can -- while my very capable

22   team is drafting, should we turn to the next issue and we

23   come back to that?

24         THE COURT:  Yes.

25         MR. OPPENHEIM:  Excellent.  Interrogatory Number

1    14.

2            Your Honor, in Interrogatory 14, we asked Charter

3    to identify customer-facing actions that it took in response

4    to infringement notices.  And there was -- there was back and

5    forth with the Special Master on this interrogatory and the

6    Special Master ordered Charter to disclose, ultimately, the

7    information relied upon by Charter to respond to these

8    interrogatories and Charter represented to the plaintiffs

9    that -- with respect to the numbers of notices forwarded,

10   that it is a summation of certain rows within the metrics

11   reports that you know all too well.

12           What we learned at Ms. Haynes' testimony last week,

13   was that those rows actually include things that are not what

14   they purport to be, and let me explain what that means.  When

15   we asked for customer-facing actions, we asked for those

16   things that Charter did vis-a-vis their customers.  We wanted

17   to know the instances where they sent a letter, a postcard,

18   or an e-mail to a customer in response to an infringement

19   notice.

20           What Charter has done is they have included a list

21   of all the notices that they put up on their website.  They

22   did not limit it to customer-facing actions.  They included

23   everything that they put on their website.  Now, that is not

24   a customer-facing action.  So in other words, they had a

25   process where if they received multiple infringement notices

1   with respect to the same subscriber -- let's say they

2   received 20 of them in a several day period.  They would

3   forward one postcard to that subscriber and close 19 more.

4   So the interrogatory should include that as one.  What

5   Charter has done is included it as 20 and that's not what the

6   plaintiffs asked for.

7           So we can fight over whether what Charter did by

8   putting infringement notices up on the website was proper or

9   not in front of the jury, but the data is the data and

10  plaintiffs want the data, the information about how many

11  times did Charter reach out and touch a customer with respect

12  to an infringement notice.

13          It's a simple question.  We've asked multiple times

14  for this to be corrected and only now did we realize that the

15  correction that they gave us is not accurate and we would

16  like accurate responses.

17          THE COURT:  Do you have the basis -- you know,

18  we've talked a lot today and in the past about the way

19  information was tracked by both plaintiffs and defendant.

20          Do you have a good faith basis for knowing that

21  that information is readily available?

22          MR. OPPENHEIM:  Are you asking --

23          THE COURT:  Yes.

24          MR. OPPENHEIM:  Are you asking plaintiffs or --

25          THE COURT:  No.

59

 1           MR. OPPENHEIM:  It absolutely should be, right?
 2   They should have records of every postcard they sent and
 3   every e-mail they sent.  And I --
 4           THE COURT:  Why?  I don't -- I think you should
 5   have -- I think your plaintiffs should have had a record of
 6   how much of their income is streaming, but they don't.  So it
 7   doesn't matter what I think or what you think, it matters
 8   what exists.  And so do you know that that kind of
 9   information exists?
10           MR. OPPENHEIM:  Well, so if it doesn't, then they
11   should respond to the interrogatory and say, We didn't track
12   this information.  They shouldn't give us false information.
13           So I -- Your Honor, I don't want to presuppose what
14   the answer is.  I can presuppose what it should be.  They
15   should track it, they should have it, they should be able to
16   compile it.  I -- that I am certain about.  Whether they did
17   or they didn't, I don't know, but they haven't answered that.
18           THE COURT:  Understood.  Andrew?
19           MR. SCHAPIRO:  So, first of all, with regard to
20   whether this is customer facing or not, I'm truly puzzled and
21   I feel like if we had given the opposite answer, they --
22   they'd be chastising us for that.  Now, you know how
23   sometimes from your bank, you'll get a notification that
24   says, you have a secure message or you have six secure
25   messages, whatever it is and it sends you to a website?

60

 1    These are customer-facing actions.  We notify people by

 2    postcard or earlier -- at other times by other means and

 3    said, You have -- you have been accused of infringement and

 4    go to this website, and they go to the website and the

 5    notices were up.

 6              THE COURT:  Okay.  So stop there, Andrew.  Just

 7    today, Matt, I got a message from Blue Cross and Blue Shield

 8    saying I have a new message on my account, but I have to get

 9    out, log into Blue Cross and Blue Shield and go and find it,

10    but I would define that, just as Andrew did, as a

11    customer-facing notice.  They sent that e-mail to me, to my

12    e-mail on record, to no one else on -- that particular e-mail

13    that went to me, and if I log into that website, I find

14    information about me only.

15              Are you calling that a customer-facing action or

16    not?

17              MR. OPPENHEIM:  So Your Honor, there are two terms

18    here that are at issue.  The one is customer-facing action.

19    So if you -- and the other term is notices forwarded.  So I

20    -- so customer-facing action, Your Honor, I would say that if

21    you receive a notice from the -- I shouldn't say notice -- a

22    message from the bank or from Care First that you have a

23    notice -- that you have something in an e-mail box, a secure

24    e-mail box, and there are three things in that secure e-mail

25    box, that's -- from my perspective, that's one

1   customer-facing action.

2          But I also think -- the second issue is notices

3   forwarded, how many notices did they actually forward.  And

4   we asked that and they keep giving the information from --

5   based on the total number of tickets or infringement notices

6   that they've put up on the website.  That's not notices

7   forwarded, Your Honor, right?

8          These are simple terms.  Everybody -- we know what

9   we want, they know what we want.  Andrew can argue to the

10  jury that their system worked and it was great and it was

11  fair and we'll point out that, what, 5 percent of the notices

12  were ever viewed by the subscribers when they instituted this

13  as a -- we put all of that in front of the jury, but for the

14  moment we have a right to the data if they have it.

15         How many times did they actually reach out to the

16  customer and forward a notice?  How many times did they send

17  a postcard?

18         THE COURT:  Okay.

19         MR. OPPENHEIM:  How many times did they send an

20  e-mail?

21         THE COURT:  Stop there.  Andrew --

22         MR. SCHAPIRO:  Your Honor, they --

23         THE COURT:  -- do you have any questions -- first

24  of all, before you give any responses to what you believe

25  your position -- what your position is on the request, do you

1    understand the request as just defined by Matt?

2         MR. SCHAPIRO:  I believe I do, and I believe that

3    either we're talking past each other or Mr. Oppenheim is

4    unaware of something, which is that as far as I know, they

5    have -- there are two different questions:  What data do they

6    have so that they can make whatever arguments that they want

7    and do we have to agree with their characterization of what's

8    a customer-facing action or not?  And my understanding is

9    that from the metric report that we've given in the metric

10   report interrogatory responses, they have the information

11   that he's just asked for, which was how many times and in

12   what way did you contact customers.

13        They want us to say that we -- if we told someone,

14   they'll -- you know, you've been accused of copyright

15   infringement and send them to a website where there are four

16   notices, they don't want us to say, We forwarded four

17   notices.  We did forward four notices, but that's neither

18   here nor there.  They can argue in front of the jury that

19   that doesn't count as forwarding four notices, and we can

20   say, Yes, it does, but my understanding is we're all talking

21   about the same data and it's just what label you put on it.

22        THE COURT:  Okay, wait a second.  So let me ask you

23   this:  You think they have all the information they need to

24   determine that you sent one direct communication, but

25   informed the recipient of a place where they could go and

63

1    then if they went there, they found five notices; is that

2    what you are saying?

3                MR. SCHAPIRO:  Yes.

4                THE COURT:  That the plaintiffs can determine that

5    right now?

6                MR. SCHAPIRO:  Yes.

7                THE COURT:  Okay.  And Matt, what's your response?

8                MR. OPPENHEIM:  So my response is:  Where?  Because

9    I -- none of us know where that is.  And in fact, I think

10   when we've asked witnesses, I don't think they've been able

11   to tell us that.  But going back to what Andrew said a moment

12   ago, Your Honor, we defined in the interrogatory what a

13   customer-facing action was and they didn't object to the

14   deposition -- to the definition that we put in there.

15               THE COURT:  Read it.

16               MR. OPPENHEIM:  And they --

17               THE COURT:  Read it.

18               MR. OPPENHEIM:  And I'll read it to you, if you

19   want, Your Honor, but --

20               THE COURT:  I do.

21               MR. OPPENHEIM:  -- it's very clear it's not what

22   Andrew says.

23               THE COURT:  Read it.

24               MR. OPPENHEIM:  "So the term customer-facing action

25   shall mean any action that you directed to a subscriber as a

1   result of having received an infringement notice, including

2   forwarding a copy of the infringement notice to the

3   subscriber, sending the subscriber a warning in response to

4   receiving an infringement notice, suspending, slowing, or

5   otherwise adversely affecting the subscriber's internet

6   access, or disconnecting, or terminating the subscriber's

7   internet service."

8          So they then responded by saying -- they

9   represented to us that the number of, quote, notices forward

10  is a summation of the rows of 10, 16, 21, and 24 from the

11  CATS summary statistics.  That is the metrics for this, but

12  that's not accurate.  Notices forwarded -- if you add up

13  those rows, it includes everything that was on the website,

14  not notices forwarded.

15         So if Andrew can point us to where notices

16  forwarded can be found, this issue goes away, but we've been

17  asking and asking and asking, and Charter has refused to give

18  us -- to point us to that data.

19         THE COURT:  Well, I am going to have you engage

20  with Andrew right now in a direct conversation, which I will

21  watch.  I want you to just resolve this, please.

22         I'll listen, and if I need to make a ruling at the

23  end of your conversation with Andrew, I will.  Please

24  proceed.

25         MR. SCHAPIRO:  Hi, Matt.  I am told, and I may

1    invite someone else from our team to join, that you have the

2    ticket data and you have the metrics reports.  What we seem

3    to be arm wrestling about here is what it means to forward a

4    notice.  And just so that you and your experts are not

5    confused, and so you can make whatever arguments you want to

6    make to the jury, our position is, and I think it's a -- it's

7    the correct position, that when we send someone to a website

8    that contains five notices from your clients, we have

9    forwarded five notices.  I think you want us to say, in an

10   interrogatory as a sworn statement or something so that you

11   can point to it in some way, that we only forwarded one

12   notice by doing that.

13          We don't agree with that, but we don't think it

14   disables you from deriving whatever data you want or making

15   whatever arguments you want.

16          MR. OPPENHEIM:  So Andy, we know the number of

17   infringement notices Charter received as a result of -- from

18   the metric reports.  We're not asking that.  What we want to

19   know is what you did vis-a-vis customers.  Not what you put

20   on your website that they might log in and see.  And we

21   cannot find that in the metrics reports and, in fact, when we

22   asked Ms. Haynes whether that was there, I believe that she

23   said that the -- that's not what those statistics or those

24   numbers represent.

25          As for the -- so you said there were two places.

66

1    One was the metrics reports and the other was the ticket

2    data.  As you know, we only have ticket data for somewhere

3    between 6 and 11 percent of the notices we sent, let alone

4    all the others.  So the ticket data is not going to tell us

5    this.

6          If your answer is that you cannot identify how many

7    postcards or -- excuse me, how many notices you forwarded,

8    then that should be your under oath answer, that Charter does

9    not know.

10         MR. SCHAPIRO:  I think -- so our under oath answer

11   is we do know and we have -- when we sent -- when we batched

12   four notices, we were forwarding four notices.  If you're

13   trying to derive how many times we, in your words -- separate

14   times we touched a customer, the ticket data, as far as I

15   recall, shows whether we're batching or not.

16         So you have that data, but you can't force us to

17   say that getting -- putting forth under oath, something that

18   we don't believe, which is that you want us to say that

19   directing someone to four notices by sending them to our

20   website is not forwarding four notices and I don't think we

21   can say that.

22         MR. SPERLING:  I have a question and I apologize,

23   but Your Honor, I think it will help us try and reach

24   resolute.  Here's my question.  I think you know that Charter

25   -- and Ms. Haynes admitted to this on Friday -- that Charter,

1    for subscribers for whom it couldn't find an e-mail address,

2    sent postcards, right?

3             MR. SCHAPIRO:  Yes.

4             MR. SPERLING:  And the postcards directed

5    subscribers to the website, right?

6             MR. SCHAPIRO:  They did.

7             MR. SPERLING:  And there was a period of time

8    during which a party would send a single postcard, even per

9    month, per subscriber, no matter how many open tickets the

10   subscriber had, right?

11            MR. SCHAPIRO:  That I -- I can't tell you whether

12   per month or whatever, but --

13            MR. SPERLING:  Okay.  So I'll represent to you in

14   good faith, and your team will obviously correct me for you

15   if they think I'm wrong, that over time Charter reached a

16   point where they sent one postcard per subscriber per month.

17            Now, based on what you've described, that postcard

18   mailing is a forwarding of a notice, and if the subscriber

19   was the subject of 1000 notices covered by that one postcard,

20   that should count as 1000 notices forwarded, right?

21            MR. SCHAPIRO:  Posting the multiple notices on the

22   website and directing the client -- the customer to the

23   website is forwarding the notices.

24            MR. SPERLING:  Okay, but when you guys gave us the

25   notices-forwarded number, you didn't include postcard.  So

1   there is an internal inconsistency.  You excluded postcards,

2   which according to the rationale you're stating now, would

3   count toward notices forward.

4           MR. SCHAPIRO:  No, I couldn't --

5           MR. SPERLING:  But you included other kinds of

6   tickets --

7           MR. SCHAPIRO:  I think --

8           MR. SPERLING:  -- that likewise were never

9   individually sent to the customer.

10          MR. SCHAPIRO:  I don't think you heard me.  So I

11  said, Directing a -- including four notices or whatever it

12  might be -- ten notices on the website, and directing the

13  customer to the website is forwarding ten notices.  Not 11 --

14  it's not 11 like the postcard does.  It's neither 11 nor one

15  -- and nor is it one.  It's not one, the postcard, it's not

16  11 counting the postcard.  It's ten, but either way, you now

17  know what we think and you now know where the numbers are and

18  what the numbers are.  So you can make whatever arguments you

19  want.  It's --

20          MR. SPERLING:  So --

21          MR. SCHAPIRO:  -- (inaudible) interrogatory in a

22  way that it's your framing.

23          MR. SPERLING:  So the problem, Andrew, is you -- we

24  don't have the data to answer the question we want to answer.

25  We only have the data you want to -- for the question you

1    want us to answer or you want to answer, because if we look

2    at the ticket data, it only goes back to November, 2014.  The

3    metrics reports go back further.  So you've counted

4    everything you've posted to a website as though it was

5    customer facing and it was a forwarded notice, and you say,

6    Well, you can figure it out from the ticket data how many we

7    actually sent, and the answer is we can't, because you don't

8    have that ticket data.  You don't have ticket data that

9    predates November 2014.  That's the first problem.

10          The second problem is that your ticket data

11   actually is not accurate, because you would export postcards

12   to be sent out of the CATS system and then batch them outside

13   of the system and you wouldn't go back and necessarily change

14   the designation from PC warning to batching, because the

15   batching was done external to CATS.

16          So there are two problems with what you've

17   suggested.  So our question is, How do we get the information

18   that we want?  And if the answer is you don't have it, then

19   you should -- then Charter should give us an interrogatory

20   response that says, We do not have the data that would

21   indicate how many times in response to -- how many notices

22   that we actually sent a postcard or an e-mail forwarding a

23   notice.

24          So that's it.

25          MR. SCHAPIRO:  So --

1        MR. SPERLING:  Let us make the argument.  You -- we

2    get it, you -- what argument you want to make.  You have to

3    let us make the argument we want to make.

4        MR. SCHAPIRO:  Yeah, I don't see how you're

5    disabled from making the argument and I believe we're at an

6    impasse.  You know what we did.  We know what you're asking.

7    There's -- you know, you'll certainly be able to show at

8    trial that we put a bunch of notices on a website.  We think

9    that's forwarding that and fulfilling our obligations.  You

10   think it's not.

11       You'll be able to show that we've batched at times

12   and we didn't batch at times.  You can show what you want

13   with that.  You'll be able to show we sent a certain number

14   of (inaudible).  It's true, we don't agree that there's not

15   ticket data from certain periods of time and you can make

16   whatever arguments you want from that, but --

17       THE COURT:  Okay.  So Andrew, what I'm hearing is

18   -- I don't hear you talking past each other.  I hear you

19   disagreeing on what they can do with the data that they have.

20   And what Matt is saying they can't do is count the number of

21   what -- the term you used, "directing the customer."  They

22   can't count the times you directed the customer somewhere and

23   you say they can.  And so I need you to show Matt and

24   Jonathan where they will find each instance in which you

25   directed the customer and then that direction may be to 10

1    notices, 20 notices, 30 notices or whatever, but at least

2    they were able to count the times you directed the customer.

3              That's what I want you to tell them how they can

4    find that.

5              MR. SCHAPIRO:  Okay.  Can we do that offline or

6    over the next 12 hours, Your Honor?  I --

7              THE COURT:  You can, you can, but I'm telling you

8    at the moment, I agree that both of you should be able to

9    argue what you want, but you need the same source information

10   from which you can make the argument and Matt is saying he

11   doesn't have it, and I, you know, have no reason to --

12             MR. SCHAPIRO:  I believe he does and the

13   complexities of either -- of trying to get the right

14   documents here and putting them up on screenshare is complex.

15   And Matt, I'm happy to --

16             THE COURT:  Okay.

17             MR. SCHAPIRO:  -- meet you at a mutually convenient

18   time in the next 12 hours, or better yet, have our seconds

19   meet and I think we can show you what exactly that --

20             THE COURT:  I want you to do that, but my belief

21   right now is that they're entitled to what they're asking

22   for.  I just want you to show them how they can do it, and if

23   they can't do it, you do it and if you can't do it, you tell

24   them.  Those are the three options.  Okay?

25             MR. SCHAPIRO:  Got it.

72

1              MR. OPPENHEIM:  So Your Honor, thank you, very

2    useful.  Happy to do that.

3              As you know, all of our expert reports are due on

4    Thursday, two days from now, and not having this information

5    -- if we have to do calculations on what Andrew is going to

6    tell us, the ability to do that within 24 hours or 48 hours

7    is going to be impossible.  So --

8              THE COURT:  I understand.  So let's wait for --

9              MR. SCHAPIRO:  Your Honor, I'm sorry they couldn't

10   figure it out before, but --

11             MR. OPPENHEIM:  We've been asking -- I could --

12             THE COURT:  Matt --

13             MR. OPPENHEIM:  If you want, Your Honor --

14             THE COURT:  -- I don't need it --

15             MR. OPPENHEIM:  -- I can tell you we've been --

16             THE COURT:  -- I don't need it.

17             MR. OPPENHEIM:  -- asking for this for six months.

18             THE COURT:  I don't need it.  Let's cross that

19   bridge when we get to it, but I want your experts to try and

20   do as much as they can in their first report without having

21   to supplement.  Okay?

22             Let's move to the next issue.

23             MR. OPPENHEIM:  Absolutely, Your Honor.

24             THE COURT:  All right.

25             MR. OPPENHEIM:  The last issue, Your Honor, is --

1   and, of course, we'll have to come back to the language on

2   Burrows and Schmucher, but the last issue is the Mr. Brockle

3   (ph) deposition.  We rudely interrupted your vacation during

4   that deposition, you might recall, when Mr. Anten asserted --

5   who was representing both Mr. Brockle and Charter, interposed

6   an instruction not to answer about preparation that was done

7   with Mr. Abramov.

8           We've laid out in the e-mail to you, Your Honor,

9   what happened during that hearing with you, but you indicated

10  that there was no privilege for the preparation sessions that

11  Mr. Abramov was present at.  You indicated that there -- you

12  know, the risk was obvious, that the in-house counsel was

13  trying to somehow impact a former employee's testimony and we

14  had a fair right to inquire.  It was very, a fair

15  examination, I believe was your language.

16          After you gave your ruling, Your Honor, Mr. Anten

17  then asked a question about a hypothetical situation and you

18  reserved on it, because it was a harder question, but you

19  told Mr. Anten that if he instructed Mr. Brockle not to

20  respond, that we would revisit it in briefing and then that

21  fees would be assessed.

22          Well, that issue did not arise, but there were

23  multiple instructions not to answer after we got off the

24  phone with you, including one that wasn't even a privilege

25  basis.  So what we learned after you got off the phone is

1   that in fact, Mr. Abramov had been in correspondence with Mr.

2   Brockle for over a year and we asked for the production of

3   those e-mails.  They've refused.

4          First they said, Well, they're not responsive, so

5   we issued a subpoena to Mr. Brockle, even though we don't

6   think there's really any need for it; it's obviously

7   relevant.  But in your deposition, I said, Well, you've got

8   those e-mails in front of you, could you please describe them

9   for me.  And there was an instruction not to answer.

10         Now obviously, if there was no privilege with

11  respect to preparation with Mr. Abramov, there's no privilege

12  with respect to the communications with Mr. Abramov.  So

13  that's the first two of the four issues.

14         Then there -- I asked a question -- and I'm trying

15  to go through this quickly, so if you want me to back up and

16  go into a little more detail, I'm happy to.  But I asked a

17  question that was very clearly targeting nonprivileged

18  information.  I asked Mr. Brockle if he had ever had purely

19  operational discussions with legal, and he said, Yes.  And I

20  asked him to describe those.  And Mr. Anten interrupted to

21  interpose an objection and said, Well, to the extent that

22  those conversations Mr. Brockle was involved, any provision

23  of legal guidance, you know, I'll instruct you not to answer.

24  And then the witness, of course, after the long interruption

25  forgot the question and asked me to read the question again,

1    so I did.  And Mr. Anten insisted on doing it again, the very

2    lengthy objection, the exact same one.

3           All was interposed for the express purpose of

4    instructing our getting any answer.  And it worked, because

5    what Mr. Brockle then said was, Well, I heed my -- I can't

6    answer that.  I heed my lawyer's advice.  That was improper

7    in my mind, Your Honor.  The question was very clearly

8    directed to only obtain nonprivileged information.

9           And last but not least --

10          THE COURT:  Wait a second.  You said -- he said, My

11   lawyer?  Was Anten representing him?

12          MR. OPPENHEIM:  So there was some confusion about

13   this at the beginning of the deposition.  Mr. Brockle said no

14   and he said he hadn't -- he had not signed a retainer letter,

15   he had not retained Quinn Emanuel, he was not paying Quinn

16   Emanuel, and so I began the deposition on the assumption that

17   Mr. Anten was just there on behalf of Charter, which actually

18   I think maybe even in the appearances that's what Mr. Anten

19   had said.

20          In any event, later on, Mr. Brockle came back and

21   said, Oh, no, no, let me correct that.  Yes, Mr. Anten is

22   representing me here today.  So there was a little confusion

23   over that.

24          Last, but not least, Your Honor, I was asking Mr.

25   Brockle some questions about whether -- about suspensions and

1    terminations, and he said, you know, Until there was a policy

2    change, I didn't do that.  And I said, Well, when was the

3    policy change?  And he said, Sometime in 2016.  And I said,

4    Well, do you recall when in 2016?  And he says, No, I don't.

5    I asked him, I believe, multiple times.  He said he didn't

6    know.

7             And I said, Well, what happened as a result of the

8    policy change?  And at that point, Mr. Anten interrupted and

9    directed Mr. Brockle not to answer the question.  And Mr.

10   Anten then said, Well, you know, Mr. Oppenheim, that that

11   happened after the claims period.  So you're not permitted to

12   ask these questions.

13            Your Honor, I don't know what Mr. Brockle was

14   thinking.  That's why you take the deposition.  I don't know

15   when these policy changes were.  For all I know, they

16   occurred before, but that's why you take the deposition.  And

17   if it were -- if it turns out that Mr. Brockle could then

18   later say, because he saw a document or something, that it

19   was after the claims period, you know, they will say, okay,

20   it's not admissible and we could fight over that.  But we

21   don't get to give an instruction during the deposition to not

22   answer questions and then direct the witness through your

23   objection that it happened after the claims period, which is

24   what Mr. Anten did.

25            So Your Honor, I think I've kind of laid out the

1    facts.  I've tried to do it in short, but what happened in

2    that deposition was not appropriate.

3           THE COURT:  Okay.  So let me, again, start with

4    some premises that at least I've always operated under, and

5    if I'm wrong, I know somebody will tell me.

6           Number one, you can instruct a witness not to

7    answer on the basis of privilege and that alone.  The fact

8    that everybody in the world should know that the person

9    taking the deposition has just asked a question that's not

10   relevant or that's been excluded from discovery is, I'm

11   sorry, simply not a basis to instruct not to answer.  It

12   might be a basis for calling me, which you already had and

13   which I took the phone call, but it's not a basis for

14   instructing not to answer.

15          If that has been abusive deposition conduct, then

16   the defending party can seek a sanction for the attorney

17   going outside -- clearly outside the bounds of relevance as

18   the Court has ordered, but it -- and this is the whole reason

19   why we don't instruct witnesses not to answer.  If you do

20   answer it, then I can sanction.  If you don't answer it, then

21   I don't know what the answer would be and then we may have to

22   have redeposition and that's inefficient.

23          So it's best to potentially request that this

24   particular section of the deposition be restricted and that

25   you're going to allow the answers, because you can't instruct

1    the witness not to answer, but -- I mean, does anybody

2    believe that you can instruct a witness not to answer on the

3    basis of relevance?

4              Do you believe that, Andrew?

5              MR. SCHAPIRO:  Mr. Anten is going to be --

6              THE COURT:  Okay.  Mr. Anten, do you believe --

7              MR. ANTEN:  I'm the one who's going to be -- good

8    evening, and I'm the one who's going to be addressing some of

9    these.

10             THE COURT:  Okay.

11             MR. ANTEN:  And I don't know if you want me to do

12   them all at once or to address --

13             THE COURT:  No, I want you to address that.

14             MR. ANTEN:  -- this piece --

15             THE COURT:  Do you think it's proper to instruct a

16   witness not to answer on the basis of relevance?

17             MR. ANTEN:  Oh, absolutely not, but the witness did

18   answer.  I have to take issue with how this -- how this was

19   put forth to you, Your Honor, because I'm looking at the

20   transcript right now and Mr. Brockle answered multiple

21   questions about the DMCA policy changes in 2016, and I'm just

22   going to -- I can give you a few examples, if you like, but

23   he asked him what the policy changes were in 2016.  Mr.

24   Brockle said it involved an escalated response.

25             So these questions -- we had some disagreements at

1  the beginning, but then Mr. Brockle did, in fact, answer

2  these questions about DMCA policy changes.  At one point

3  during this discussion, Mr. Brockle got confused, because

4  he's a 20 -- or I think he's a 30-year-old customer service

5  rep and he started saying that he wasn't sure if he could

6  answer certain questions based on privilege.  And I offered

7  to Mr. Oppenheim to, under Local Rule 30.3, go off the record

8  with Mr. Brockle to explain the -- to understand the basis of

9  his concern and to explain it to him and Mr. Oppenheim

10  wouldn't even allow me to do that.

11         So this isn't about instructions not to answer

12  questions that aren't relevant to the extent that there are

13  many questions about the DMCA policy changes, which he

14  answered -- he even answered, by the way, Your Honor.  He

15  answered how he learned about them, in meetings.  And Mr.

16  Oppenheim then said, Who did you learn these questions from?

17  And he said, Mary Haynes, who was going to be deposed just a

18  couple of days later.

19         I do have to say, Your Honor, in full candor, that

20  I believe that there was a question that went to why the

21  changes were being made, and if I wasn't clear in my

22  objection and not making clear that that was based on

23  privilege, I will (inaudible), but the only question where I

24  instructed him not to answer directly were questions on why

25  the DMCA changes were being made in 2016, at least looking at

1   the transcript right now.

2           I'm not sure if you want me to address the other

3   positions too, but --

4           THE COURT:  No, that's fine.

5           MR. ANTEN:  -- that's what comes with that.

6           THE COURT:  I assume that you had prior knowledge

7   that the question of why those changes were made inherently

8   involved privileged communications.  Is that -- I am assuming

9   that you brought that knowledge with you to the deposition?

10          MR. ANTEN:  Are you talking to me or --

11          THE COURT:  Yes, Mr. Anten.

12          MR. ANTEN:  -- are you talking to -- yes.  Yes, I

13  was aware that the changes to the DMCA policy in 2016 could

14  implicate privileged communication, which is --

15          THE COURT:  Well, could --

16          MR. ANTEN:  -- why I made those instructions.

17          THE COURT:  -- kind of is different than

18  necessarily would.  So which do you think -- did you think it

19  was?  That it could implicate or necessarily did implicate?

20          MR. ANTEN:  Well, in part, it depends on the

21  witness.  I know that this question has been asked in other

22  depositions with other witnesses.  This isn't the only abuse

23  team member that had been deposed.  I think there was six or

24  seven, including his supervisor, Mary Haynes, and others.  So

25  this has been well tread ground.

1             THE COURT:  And so --

2             MR. ANTEN:  But I do want to make clear that if my

3    objection was unclear.  The only question in which I

4    interposed this was as to why the changes, not the facts of

5    what changes there were or any other circumstances.

6             THE COURT:  And was it at that time that you

7    offered to talk to the witness to determine whether it was

8    going to involve privileged information and the -- and who

9    was taking the deposition?  Was it Matt?

10            MR. OPPENHEIM:  Yes, Your Honor, and I was taking

11   the deposition.  The question I asked was -- I asked:  And

12   when she -- referring to Mary Haynes -- announced these

13   changes, did she explain why the changes were being made?  So

14   Mary Haynes is not a lawyer.  She's a (inaudible), right?

15            Mr. Anten says, Mr. Brockle, I'm going to instruct

16   you not to answer that question.  Mr. Oppenheim, you're aware

17   of the rulings in this case about the relevant claims period

18   and what you are allowed to seek in discovery after that

19   claims period.  So Mr. Brockle, I instruct you not to answer

20   that question.

21            I responded:  Mr. Anten, I don't have any date from

22   him.  How can I possibly know it's within the claims period

23   or not?  And I need to understand what it is.  So there is no

24   protective order in place and it is not privileged material.

25   So Mr. Brockle, you may answer the question.

1          Mr. Anten said, My objection stands, Mr. Oppenheim,

2     and it goes on.

3          It was very clear that there was an -- there was no

4     date associated with the policy changes.  I was not inquiring

5     about anything that would be covered by privilege.  This was

6     a meeting.  Mary Haynes was directing the operational people,

7     sometimes in 2016, on how to handle something differently.

8          THE COURT:  Read your -- read the beginning of that

9     again.  Read your question alone.

10          MR. OPPENHEIM:  Yeah.  "And when she announced

11     these changes, did she explain why the changes were being

12     made?"

13          THE COURT:  Okay.  Mr. Anten, that is a yes-or-no

14     question, would you agree?

15          MR. ANTEN:  I would agree, Your Honor.

16          THE COURT:  So your objection to that was improper.

17     The next question may have been an improper question.  That

18     was not, because it did not ask to disclose any factual

19     information.  Just whether that discussion occurred.

20          Do you understand that now?

21          MR. ANTEN:  I agree, Your Honor.  I -- that is why

22     I disclosed -- I completely understand that that question, as

23     it was treading into there, that that particular yes-or-no

24     question was capable of being responded to.

25          THE COURT:  Okay, thank you.  I appreciate your

83

 1    honesty.

 2              All right, so --

 3              MR. ANTEN:  It --

 4              THE COURT:  Go ahead.

 5              MR. ANTEN:  Would you like me to address the other

 6    issues also, Your Honor?  Just because --

 7              THE COURT:  Well, let's --

 8              MR. ANTEN:  -- I know that there's a lot --

 9              THE COURT:  -- deal with these one at a time.  So

10    --

11              MR. ANTEN:  Okay.

12              THE COURT:  -- I mean, that --

13              MR. ANTEN:  You know, can I just make one last

14    point about this?

15              THE COURT:  Go ahead.

16              MR. ANTEN:  It will be fast.  Okay, I will be fast.

17    I just want to make the last point that Mr. Brockle is one of

18    six or so abuse team members who have answered questions

19    about this.  He's a third-party former employee who hasn't

20    worked there for three years.  And to the extent that that

21    one question is the one that gives pause, and I am not

22    discounting it, I understand it, but given -- and I can cite

23    case law for this, if you'd like, but given the needs of the

24    case, we're at the end of discovery, it's -- and the level of

25    materiality where we're talking about, you know, the time

1   period that we are, to reopen a deposition to just have him

2   this question, Yes or no, that others have already answered,

3   seems to be disproportionate to having Mr. Brockle come back.

4          THE COURT:  Right, but you --

5          MR. ANTEN:  I don't want to --

6          THE COURT:  -- you're jumping -- hold on --

7          MR. ANTEN:  -- (inaudible) anything until we're

8   done.

9          THE COURT:  Yep, Mr. Anten, hold on.  You're

10  jumping to an endgame and an assumption that's not fair to

11  make.

12         MR. ANTEN:  Okay.

13         THE COURT:  All I said was that that question

14  deserves answering.  I didn't say how it was going to be

15  answered, okay?  So -- and unfortunately, by the way, yeah,

16  but is not a good way to address something that went wrong.

17         So --

18         MR. ANTEN:  I understand.

19         THE COURT:  All right.  That question has to be

20  answered.  Let it be answered in writing.  That's fine, but

21  let's assume the answer is yes.  Matt, make your argument

22  about what happens then.

23         MR. OPPENHEIM:  All right.  I would ask, right, the

24  next question, right, which is:  Why were the changes -- why

25  did you understand the changes were being made?  Was there

85

 1    any written material given to you?  Right?  I'd ask those

 2    kinds of questions.

 3            Did you -- did Charter indicate that there was a

 4    different view of how -- of notices they were receiving?  I

 5    mean, there is lots of followup that would come from it.

 6            And here's one of the critical issues, Your Honor,

 7    that we're going to get at -- get into here; that throughout

 8    these depositions, the witnesses have been trained to answer

 9    that all of these notices were mere allegations, mere

10    allegations.  And what I believe happened is that in 2016,

11    they didn't treat them as mere allegations, but the notices

12    were exactly the same.  And so the effect of this cutoff is

13    to allow them to put forward this fiction that has been

14    trained merely by virtue of witness preparation, right?

15            They -- and some -- it's almost laughable sometimes

16    how the witnesses thrown in the word "allegation" every

17    chance that they can, because they've been told to do that.

18    Sometimes it doesn't even make sense where they put it into

19    the sentence.

20            So we want to understand exactly what they were

21    telling the line-level operations people they should be doing

22    and why and that shouldn't be privileged.  That's operational

23    in nature.

24            THE COURT:  Well --

25            MR. ANTEN:  Your Honor, may I just respond very

1    quickly.  Mr. Oppenheim did ask Mr. Brockle, When the policy

2    changed, was this something that was reflected in documents

3    you received or training you received?  And when Mr. Brockle

4    asked, When the process changed, Mr. Oppenheim said, Right.

5    Let me ask you this:  How did you learn there was a process

6    change removed?  And I didn't stop him from answering the

7    question.

8            These questions that Mr. Oppenheim described have

9    nothing to do with the who, what, when, where, which he was

10   -- Mr. Brockle was permitted to respond to.

11           If Mr. Brockle were to -- and Mr. Oppenheim were to

12   ask why the change was made, of course I would instruct him

13   to not disclose any privileged information, but otherwise

14   respond to the best that he could, but it doesn't open -- it

15   doesn't open the universe to asking about the DMCA policy

16   changes, which he had the opportunity to do already.

17           I'm not going to address Mr. Oppenheim's discussion

18   about allegations, because I don't think that's before you.

19           THE COURT:  Okay.  So jumping on your invitation

20   that witnesses should testify who, what, when, where, and

21   why, if Mr. Oppenheim is right in any sense that witnesses

22   are parroting a commentary that things are mere allegations,

23   that is not appropriate for witnesses to do, because it

24   doesn't involve who, what, when, where, and why.

25           Witnesses should testify to what they know, but

1    they shouldn't give opinions on whether it's important or

2    whether it's a mere allegation or whatever.  Just tell us

3    what you know.  I'm counting on you guys to enforce that

4    going into the future.  Okay?

5            I just -- each witness doesn't need to present

6    either plaintiff's or defendant's position in their

7    depositions.  They simply need to answer the questions that

8    are asked.  That's number one.

9            Number two, I will -- do you guys -- can these

10   things be recorded on your end, these videos that we're doing

11   right now?

12           MR. OPPENHEIM:  You --

13           MR. ANTEN:  Your Honor, I don't think we have the

14   capacity to record on the Court's system.  If we were to use

15   another system provided by the parties, we certainly could do

16   that.

17           THE COURT:  Okay.  So I'm willing to -- I mean, was

18   this -- the deposition was -- was the deposition remote,

19   anyway, of this --

20           MR. OPPENHEIM:  Yes.

21           THE COURT:  All right.  So I'm willing to preside

22   over a brief continuation of the deposition and make rulings

23   as necessary.  It should be very, very short.  It's not going

24   to be disproportionate.

25           I just want to bury this issue, you know, because

88

1   it's directly in front of me.  So arrange it --

2           MR. ANTEN:  Your Honor?

3           THE COURT:  Yes, go ahead.

4           MR. ANTEN:  I was just going to say, Your Honor,

5   just so that I'm clear about this, because it seems like we

6   all need discrete rules, the one question that I didn't

7   permit to answer was why the -- if he knew as a matter of yes

8   or no why the change was made, and I presumed that Mr.

9   Oppenheim would then say -- ask the question:  Tell me why

10  the change was made, but all of the other questions about the

11  DMCA policy change, he was allowed to ask and he did in fact

12  ask.

13          So I would suggest, respectfully -- because Mr.

14  Brockle doesn't even work at Charter.  He has a 9:00-to-5:00

15  job at a completely -- you know, at a completely different

16  place for three years.  Let's first try it in writing, the

17  answer of the yes or no, and then as to then why, let him

18  provide an answer in writing that doesn't implicate any

19  privileged information, and then we can see where we go from

20  there before we open any -- at the very end of discovery,

21  another deposition.

22          THE COURT:  Understood.

23          MR. ANTEN:  That is my recommendation, Your Honor.

24          THE COURT:  Yeah, that's a good point, but it's not

25  the way I'm going to go on that one.  And if you think that a

1    question has been asked and answered, you may assert that

2    objection and state that the witness has already answered

3    that question, and if I believe he has, that's fine.  You can

4    go ahead and forward me a transcript of his deposition ahead

5    of time so you can point out to me where it was asked and

6    answered.  Okay?  And this shouldn't take more than a couple

7    of minutes and we'll get past that issue.  Okay?

8             MR. OPPENHEIM:  Your Honor, and what I hope is not

9    going to happen is Mr. Anten is sitting down with Mr. Brockle

10   in advance of the deposition and giving him the date on which

11   this policy change happened and then argue, Well, you can't

12   ask any questions about it.

13            THE COURT:  Well, no -- and so here's the thing:  A

14   witness has to testify from their memory.  So if he gives you

15   a date, you can ask him, How do you know that?  I remember

16   it.  I mean, he's going to be under oath.  He's going to be

17   under penalty of perjury.  I expect him to answer truthfully.

18            So I'm not worried about that, okay?

19            MR. OPPENHEIM:  Very well.

20            MR. ANTEN:  And just -- and I mean, I'm not trying

21   to test your patience, Your Honor, but just because Mr.

22   Oppenheim already had all of the opportunity in the world to

23   ask all of the who, what, when, where, it was just the why, I

24   just want to make clear that Mr. Oppenheim has the

25   opportunity to ask the why, but not to go and ask any

1    questions that he just didn't think of the first time around,

2    because he wants to now get more information that he didn't

3    think to ask about the first time.

4           That's my concern.  That's just a cumulative

5    deposition when he was never instructed not to answer.

6           THE COURT:  I understand.  If you think that the

7    questions -- any question that he asks is materially

8    different than any topic that he attempted or did cover at

9    his deposition, that this is a new thought and he doesn't get

10   a second bite at the apple, I will agree with you and I will

11   direct the witness not to answer.  Okay?  Or I'll sustain an

12   objection that you make to the question.  So just be

13   prepared.

14          All right, are we ready --

15          MR. OPPENHEIM:  So to (inaudible) this topic up,

16   Your Honor, if Charter produces the ten e-mails that Mr.

17   Brockle had with Mr. Abramov in advance of that deposition,

18   we can deal with that issue there -- during that deposition

19   as well.

20          MR. ANTEN:  Your Honor, I would, of course, like to

21   be heard on to Mr. Oppenheim's request that we produce

22   privileged communications.

23          THE COURT:  Okay.

24          MR. ANTEN:  So is this an appropriate time?

25          THE COURT:  Yeah, hold on.  I have to take a quick

1   phone call.  I'll be back in two minutes.  Take the time to

2   use the restroom if you need to, okay?

3           (Recess was taken.)

4           THE COURT:  Where's the video?  Okay.  So I have to

5   pick up a car at Goodyear in 20 minutes and it's about a

6   five-minute walk, so you guys have 15 minutes and then we've

7   got to go off or else I'm not going to be able to drive 10

8   miles home.

9           Okay.  The issue pending, Mr. Anten, was what?

10  What did you just raise?

11          MR. ANTEN:  So there's two other issues that are

12  pending.  The first is the documents that Mr. Brockle -- the

13  e-mail communications that he had --

14          THE COURT:  Okay, and why do you --

15          MR. ANTEN:  -- before any deposition preparation.

16          THE COURT:  Explain your claim of privilege as far

17  as --

18          MR. ANTEN:  Sure.

19          THE COURT:  -- communications between Mr. Brockle

20  and Mr. Abramov.

21          MR. ANTEN:  Absolutely.  Well, as you know, Your

22  Honor, when you made your telephonic conference call, you had

23  noted that you hadn't done any research on the issue and you

24  would have to research it because it's so important to make

25  sure that we get privilege calls right.

1          We did that research, Your Honor, and the case law

2    is overwhelmingly in favor that communications between

3    in-house counsel and a former employee are privileged when

4    you are discussing matters that have to do with that

5    employee's employment.  I can read many cases to you.  I'm

6    just going to tell you three quick ones, just so that you can

7    get a sense.

8          For example, County of Cook vs. (inaudible) and

9    Company, 2021 Westlaw 809730 at page 3.  That's the Northern

10   District of Illinois from March 3, 2021, this year.  It says

11   that the County's counsel litigation-related communications

12   with a former employee about matters to which he was a

13   percipient witness while a County employee are protected by

14   privilege.

15         Another case, Vignetti vs. Metalogics (ph), 2020

16   WestLaw 5634349, D. Mass, September 21, 2020.  Those Courts

17   were to address whether privilege extends to former employees

18   have largely concluded that it does.

19         One last one I'll just give you is Misner vs.

20   Puffer (ph), 2008 WestLaw 11380016, District of Utah on June

21   19, 2009.  The attorney/client privilege applies to

22   confidential communications concerning matters within the

23   scope of the employee's corporate duties, whether or not they

24   are currently employed.

25         One last point I'll bring up is that even the case

1   law that Mr. Oppenheim cited to you today agrees with this.

2   This is the case Infosystems vs. Ceridian Corporation, which

3   he cited to you.  It does start off that former employees are

4   generally treated like third-party witnesses, but the case

5   then says in the very next sentence:  There are exceptions to

6   this general rule.  One of those exceptions are the present

7   day communication concerns -- when the present day

8   communication concerns a confidential matter that was

9   uniquely within the knowledge of the former employee when he

10   worked for the (inaudible) corporation, (inaudible) counsel's

11   communication with former employee must (inaudible) in order

12   for meaningful fact-gathering to occur.

13           And so what we suggest, Your Honor, rather than get

14   (inaudible) into this is that you look at these e-mails in

15   camera and you will see that putting aside -- to use the

16   language of your May 5, 2021 --

17           THE COURT:  Go ahead.  I don't need to hear any

18   more --

19           MR. ANTEN:  -- just to have any materiality --

20           THE COURT:  Mr. Anten.  Mr. Anten, hold on.

21           MR. ANTEN:  I'm sorry?

22           THE COURT:  Send them in to my chambers, okay?  I

23   will tell you that there's a Colorado Ethics opinion that

24   finds that such a privilege belongs only to supervisory

25   people while they were employed with the client who had the

94

1    ability to bind the corporation.  It would not have applied

2    to lower-level employees who were not supervisors and could

3    not bind the corporation, but in any event, send the e-mails

4    in to me.  Okay?

5         MR. ANTEN:  Sure.  And I will also just let you

6    know that Mr. Kirill is the one who he was speaking with, and

7    so Mr. Kirill, as the in-house counsel, is somebody who can

8    claim that privilege.

9         THE COURT:  Okay.

10         MR. ANTEN:  I'll let you go, because I know you

11    have to get your car, but the last point that Mr. Oppenheim

12    raised, and I just want to make sure that we address this, is

13    that he addressed these -- my instructions for Mr. Brockle

14    when I cautioned him to not reveal privileged communication

15    when he was asking about, quote/unquote, operational issues,

16    but every question that Mr. Oppenheim asked about these were

17    about communications, to use Mr. Oppenheim's terms, with the

18    legal team.  And again, this is a 30-year-old nonlawyer who

19    was in customer service.  For me to instruct him to be

20    careful to not reveal privileged communications when

21    confronted -- when answering a question that is specifically

22    about his communications with the legal team is entirely

23    proper.  And Mr. Brockle, in fact, did answer, substantively,

24    several communications about operational issues, even when I

25    gave that instruction.

1           So to suggest that this was some form of coaching

2    or to warn a witness to not divulge confidential, privileged

3    information when the question is about the legal team seems

4    to be appropriate and --

5           THE COURT:  Okay.

6           MR. ANTEN:  -- I want to make sure that that's not

7    part of the scope of whatever redeposition there might be.

8           THE COURT:  All right.  Well, just send the

9    transcript in whenever you have it.  I will read the whole

10   deposition, so I will get a good feel for what everyone is

11   talking about.

12          All right.  Are you ready to read me the request?

13          MR. OPPENHEIM:  Yes, I guess, Your Honor.

14          All -- so documents related to the purpose,

15   functionality, capability, and operation of the CATS system,

16   including -- including retention and preservation of CATS

17   ticket data.

18          THE COURT:  That's pretty basic.  Response, please.

19          MR. SCHAPIRO:  Unless somebody on my side is

20   screaming, I think we can run that search.

21          THE COURT:  Okay, let's do it.  All right.  So get

22   back to me --

23          MR. SCHAPIRO:  Oh, limited to the --

24          THE COURT:  The two people?

25          MR. SCHAPIRO:  -- you know, the proper period --

96

1    claims period.

2            THE COURT:  Right.  Yes.  Jonathan is just -- gave

3    away the ball by saying -- by nodding yes, so -- okay.

4            MR. SPERLING:  We're reasonable people, Your Honor.

5            MR. SCHAPIRO:  Could I ask -- just ask Mr.

6    Oppenheim to repeat that more slowly one more time so --

7            THE COURT:  He will send it to you.  He'll e-mail

8    it to you.

9            MR. OPPENHEIM:  We'll e-mail it you, Andrew.

10           MR. SCHAPIRO:  Okay.  No changes, Matt.

11           THE COURT:  We have the record, Andrew.  If he

12   changes it, that's going to be easy for me.  Okay?

13           MR. OPPENHEIM:  That's assuming I can remember what

14   I said.

15           THE COURT:  Well, you read it off of something,

16   didn't you?

17           MR. OPPENHEIM:  I had to ad lib a little.

18           THE COURT:  Of course you did.

19           MR. OPPENHEIM:  We'll get it.

20           THE COURT:  You could not resist.

21           Okay.  Are we good for right now?

22           MR. SPERLING:  Your Honor, one very last thing.

23   You gave a timeline for Charter's production of the documents

24   that we discussed.  With respect to identification of the

25   members of these two executive steering committees, the DMCA

 1    Executive Steering committee and the Security Executive

 2    Steering committee, could we just have that by, you know, the

 3    day after tomorrow?  It shouldn't be complicated to just

 4    identify --

 5            THE COURT:  It shouldn't be, I agree.  Friday is

 6    fine.  Okay?

 7            MR. SPERLING:  Thank you, Your Honor.

 8            THE COURT:  And remember, Monday is -- is Monday a

 9    holiday?  Monday is a holiday.

10            All right -- okay.  We're in the record -- we're

11    off the record until further notice.  Thank you all.

12            (Whereupon, the within hearing was then in

13    conclusion at 5:46 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   TRANSCRIBER'S CERTIFICATION

 2    I certify that the foregoing is a correct transcript to the

 3    best of my ability to hear and understand the audio recording

 4    and based on the quality of the audio recording from the

 5    above-entitled matter.

 6

 7    /s/ Dyann Labo                    June 2, 2021

 8    Signature of Transcriber          Date

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```