**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543 | TEL (213) 443-3000 FAX (213) 443-3100

July 15, 2021

WRITER'S EMAIL ADDRESS
andrewschapiro@quinnemanuel.com

Magistrate Judge Michael E. Hegarty
michael_e_hegarty@cod.uscourts.gov

Re: *Warner Records, Inc., et al. v. Charter Communications, Inc.*, 19-cv-00874-RBJ-MEH
Plaintiffs' Motion to Compel Additional Documents, Custodians, and Depositions

Dear Judge Hegarty:

Charter objects to Plaintiffs' expedited motion seeking additional extensive document searches and review, new custodians, and additional depositions. Charter responds as follows to Plaintiffs' July 14, 2021 submission.[1]

*Additional Document Collection and Review*

Charter has made a tremendous effort to respond to Plaintiffs' discovery requests over the past two years. Plaintiffs propounded 146 requests for production over the course of this case (in addition to 25 requests specifically aimed at ESI loss issues). Plaintiffs have also sent hundreds of emails with informal follow-up requests, including hundreds of requests for additional searches and reviews, that Charter has worked diligently to provide. During the course of this case, Charter has searched the files of well over 50 custodians, reviewed over four hundred thousand documents, produced nearly one hundred thousand documents, made itself and its employees available for over 80 hours of depositions, and has expended significant time and effort into providing Plaintiffs with supplemental information beyond what is required under the Federal Rules. The parties and the Court have spent countless hours resolving disputes, many of which resulted in rulings that narrowed the discovery sought by Plaintiffs—rulings that Plaintiffs are now attempting to evade by reopening and expanding discovery far beyond what the parties' negotiated agreements and Court's orders permitted. Nor is there any indication that Plaintiffs' relentless campaign is coming to a close. Indeed, when asked if our agreement to run additional targeted searches[2] would resolve

---

[1] Due to the number of documents cited within, Charter has not attached these documents to its submission, but will promptly deliver to the Court any cited documents or testimony on request.

[2] Charter attempted to resolve Plaintiffs' specific requests informally by suggesting that it conduct narrow, targeted searches for specifically identified documents that are responsive to pending requests for production. Plaintiffs responded to Charter's offer yesterday by sending a list of additional demands that Charter collect, search and review "all documents" related to a dozen categories of information, agree to run Plaintiffs' unilaterally-imposed search terms, agree to search multiple repositories for historical data and personnel files, collect and review and produce time entry data from employees going back to 2012, produce "all" drafts of presentations and other documents, and produce (or log) "all documents related to discussions" with "Legal" regarding certain topics. Charter requested that Plaintiffs substantiate the need for these documents for expert rebuttal, or consider narrowing the requests, but Plaintiffs refused to do so.

quinn emanuel urquhart & sullivan, llp

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE | BOSTON | SALT LAKE CITY
LONDON | TOKYO | MANNHEIM | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH | SHANGHAI | PERTH | STUTTGART

Plaintiffs' concerns, Plaintiffs suggested they will have continuing requests for follow-up document searches, custodians, and depositions as a result of any further productions.

Plaintiffs have ignored this Court's May 25th guidance on these matters that there must be a "heightened level of materiality and need at this point" to justify further document discovery at this stage of the case. May 25, 2021 Hrg. Tr. 23:23-24:16. As detailed below, Plaintiffs provide *no evidence* of materiality or need; instead, their requests are aimed at reopening previously-limited discovery, expanding previous discovery requests beyond the parties' original agreements, and providing a false basis for further follow-on requests and depositions in order to extend the schedule in this case and tie up resources during a critical stage in the sister action in Florida where the parties have recently begun preparing for and taking depositions. Most importantly, however, the discovery sought is cumulative of what has already been provided, has no relevance to expert reports, and is not material to Plaintiffs' case, if relevant at all. *See, e.g., Allwig v. United Airlines, Inc.*, 2015 WL 3777371, at *2, 4 (D. Colo. June 15, 2015) (denying motion to compel discovery filed four days after the discovery cut-off on suspicion that the opposing party was playing "hide the ball").

Each of Plaintiffs' requests is addressed below.

**The "Copyright Infringement Enhancements" project request submitted by Mary Haynes around April 2016 (and any related drafts), and all documents related to Scott Weber serving as the "Executive Sponsor" for the project.** *See* **CHA_00143323.**

**All documents related to the "DMCA/MPAA Project," (***see* **CHA_00144656) including any presentation decks, presentation notes, or meeting notes related to the project.**

From the beginning of this case, Plaintiffs have attempted to obtain discovery into Charter's post-claims period actions with respect to its copyright program, including communications and documents related to potential changes in that program that did not take place until after the discovery period, after Plaintiffs threatened litigation, and during Charter's merger with TWC. Despite the fact that discovery into post-claims period actions has been strictly cabined in this case[3], Plaintiffs renewed their request for these documents on May 25 when they demanded Charter add as custodians all individuals tasked with evaluating these post-discovery period changes, and search their files for all previously-submitted document requests. In response to this Court's order, Charter added 12 new custodians and reviewed tens of thousands of documents for additional material surrounding these initial discussions in May 2016. Now Plaintiffs seek to expand this request yet again, asking that Charter run new search terms for the same documents and explore additional custodians and repositories. Given the minimal relevance and questionable admissibility of this material, and the significant burdens it would impose on Charter to conduct yet another review for these materials (many of which implicate privilege), Charter objects to these requests as untimely, cumulative, disproportionate, and unduly burdensome.

---

[3] *See, e.g.*, March 18, 2021 Hrg. Tr. at 46:12-14 (Judge Hegarty: "I'm fairly confident in not permitting any more discovery that involves anything after [May] 2016.")

**All documents related to the discussions "with stakeholders (Care, Legal, Programming, Gov Relat) whether Charter should sign on to industry DMCA compliance program." *See* CHA_00143347.**

This request is also redundant of previous requests, including RFP 37 that sought policies and procedures that Charter considered implementing against its subscribers in response to copyright infringement. Charter has already applied *Plaintiffs' search terms* regarding RFP 37 to the agreed custodians in this case and produced the resulting responsive documents. Plaintiffs' expanded request now seeks information specific to whether Charter considered joining the Copyright Alert System ("CAS"). Notably, *Plaintiffs did not seek any discovery regarding CAS until now*; likely because Plaintiffs vigorously opposed any such discovery *from Charter*—an opposition premised on misrepresentation to the Court regarding CAS.[4] It also specifically requests Charter search for and review and log "all documents" related to discussions with "Legal", which would be unduly burdensome given the high likelihood that the documents sought are privileged. Plaintiffs' request is untimely, cumulative, disproportionate, and unduly burdensome, and Charter objects.

**All documents related to the "2013 CATS Development - DMCA Graduated Enforcement" project, including all time and billing records. *See* CHA_00143355.**

**Documents, including time and billing records (*see* CHA_00143355), concerning IPv6 and peer-to-peer capabilities (*see* CHA_00142961).**

Charter has already searched custodial files and related repositories and produced tens of thousands of documents responsive to Plaintiffs' specific RFPs regarding CATS, Charter's enforcement practices and procedures, peer-to-peer filesharing, and IPv6[5]. Several of these requests were previously limited by court order or party agreement, and the searches Charter performed utilized *Plaintiffs' agreed search terms* against the agreed custodians. Plaintiffs have provided no basis to expand these requests now, or to justify Charter needing to search for and pull historical time-entry data from nearly ten years ago. Plaintiffs' requests are untimely, cumulative, disproportionate, and unduly burdensome, and thus Charter objects.

---

[4] Plaintiffs' opposition to discovery into CAS was premised on a misrepresentation to the Court that the CAS system was different from the system used to generate notices from Charter. *See e.g.*, Oct. 9, 2020 Gould Ltr. to Special Master Rodriguez, 1 ("[T]he Order to produce documents concerning the technology used in the Copyright Alert System (CAS) rests on the faulty assumption that the MarkMonitor system used in CAS is the same as the MarkMonitor system used in the RIAA notice program."); Oct. 16, 2020 Gould Ltr. to Special Master Rodriguez, 5-6. In deposition, however, the RIAA attorney in charge of the program unequivocally confirmed that "the MarkMonitor process that was used during the period of CAS notices is the same that was used for other ISPs." 5/18/21 Victoria Sheckler Depo. Tr. at 60:11-13. Counsel has refused to provide any explanation for the discrepancy.

[5] Internet Protocol version 6 (IPv6) is the most recent version of the Internet Protocol (IP), the communications protocol that provides an identification and location system for computers on networks and routes traffic across the Internet.

**"IT Objectives" slide decks for 2013 to 2016.** *See* **CHA_00143054 (2012 version of the deck, which discusses Charter's DMCA program).**

The sole basis for this request is a single paragraph in a 63 page draft presentation that provided an overview of Charter's DMCA program efforts in *2011* in the context of a global IT update. The presentation itself is dated outside the discovery period, but it was produced because it was attached to a responsive document dated within the discovery period. Charter agreed to run a targeted search for these slide decks from later years if it would resolve Plaintiffs' concerns, but Plaintiffs demanded that Charter run searches using extremely broad terms including "IT w/5 objectives", "Information Technology w/5 objectives", "Information Technology w/5 strategic priorities" across both custodial data and IT repositories. Plaintiffs' request is untimely, cumulative, disproportionate, and unduly burdensome, and thus Charter objects.

**All drafts and final versions of Charter's "Solution Design for DMCA Notices Portal."** *See* **CHA_00141905.**

Plaintiffs have been aware from the inception in this case that Charter delivered DMCA notices via a web portal, and Charter produced numerous documents discussing the use of and the technical components of the portal in 2020, in response to Plaintiffs' RFPs. *See e.g.*, CHA_00000022, CHA_00080665, CHA_00080710, CHA_00087853, CHA_00087856, and CHA_00089602. Notably, there has been no RFP specifically requesting documents related to the portal, but Charter applied the parties' agreed search terms for more broadly relevant requests and produced responsive documents regarding the portal identified through those and other related responsiveness reviews.

Charter again agreed to run targeted searches for this specific document if it would resolve Plaintiffs' concerns, but Plaintiffs demanded that Charter run overbroad terms that go far beyond Plaintiffs' request, including "notices.charter.com" and "notices portal", among others. There is no basis to expand discovery by requiring Charter to run new, overly broad search terms for additional cumulative documents at this stage in the case. Plaintiffs' request is untimely, cumulative, disproportionate, and unduly burdensome, and thus Charter objects.

**"Goals and Accomplishments," "Bonus Plans," "Job Specific Goals," or related documents for Charter employees or contractors that reference DMCA notices.** *See* **CHA_00138271.**

Plaintiffs have articulated no basis for this request, for which they demand Charter conduct an exhaustive search of its personnel files. Charter has searched the relevant custodians' files for documents responsive to Plaintiffs' broader requests and produced the material identified. Plaintiffs' request is untimely, cumulative, disproportionate, and unduly burdensome, and thus Charter objects.

**All documents related to the "Network Intelligence" project (aka "Angry Parrot" project) described in CHA_00144070, including all documents saved on the "COIN site" regarding the project.**

Plaintiffs base this request on a draft proposal that suggested that Charter intended to move to a "Network Intelligence solution" by which it can better manage its network and traffic. Plaintiffs have propounded written and document discovery into Charter's use of network management tools

to enforce its Acceptable Use Policy ("AUP"), including RFP 142 which specifically requested documents "sufficient to show Charter's policies and practices relating to monitoring, reviewing, or inspecting Charter's internet services, including through deep packet inspection or other network management or monitoring tools or services, for uses that violate Charter's DMCA, copyright-infringement, and Acceptable Use policies." This request was further narrowed at the March 26, 2021 hearing by Special Master Rodriguez to documents "sufficient to show" Charter's "policies and procedures" regarding such monitoring for AUP violations. 28:14-28:19, 3/26/2021 (SM: "What you're asking for is the actual policies and procedures?" Mr. Gould: "Correct."). There is no basis for Plaintiffs' expansion of this request to encompass "all documents" related to Charter's general network intelligence planning. Charter searched for and produced documents responsive to Plaintiffs' actual requests for production. Plaintiffs' request is untimely, cumulative, disproportionate, and unduly burdensome, and thus Charter objects.

**All documents related to the policy changes referenced on CHA_00144220, including all documents concerning discussion of those changes at Charter's "General Product Meetings" (*e.g.*, presentation decks, presentation notes, and meeting notes).**

Plaintiffs request "all documents" regarding policy changes to dozens of Charter policies that were discussed at a meeting with Charter's General Counsel, Rick Dykhouse. The Special Master specifically ordered that Charter was not required to produce drafts of policies. ECF 181. Charter has already searched for and produced documents responsive to Plaintiffs' requests that called for documents and communications related to discussions of relevant policy changes, including by running Plaintiffs' agreed terms. The additional searches Plaintiffs are now requesting would be unduly burdensome given the high likelihood that many of the documents sought would be subject to privilege. Plaintiffs' request is untimely, cumulative, disproportionate, and unduly burdensome, and thus Charter objects.

**All documents related to Charter's "long-term Internet speed strategy" (*see* CHA_00144220) that mention peer-to-peer use or downloading of media files.**

Plaintiffs have propounded specific requests for production for marketing materials and discussions of peer-to-peer usage. *See, e.g.*, RFP 41. Based on the breadth of the materials sought, these requests and searches have been limited by court order[6], and party agreement. Indeed, Charter performed *additional* searches for these documents leading up to the February 22-23, 2021 discovery hearings and Plaintiffs represented that these efforts would satisfy RFP 41. Charter searched its marketing department's files, consumer insights, the agreed-on custodians, and other repositories for responsive information and produced the responsive materials it located. Plaintiffs' expanded request for "all documents" related to Charter's "internet speed strategy" that even mention the downloading of "media files" or peer-to-peer use is wildly overbroad. Plaintiffs' request is untimely, cumulative, disproportionate, and unduly burdensome, and Charter objects.

---

[6] Plaintiffs' request was narrowed by the Special Master to the "specific request of advertising or marketing materials related to services to download or obtain music, especially including speeds at which music can be downloaded using your network." *See* May 18, 2020 Hr'g. Tr. at 180:2-6. Moreover, Plaintiffs represented that they were requesting only that Charter "take a look" in its marketing repositories for such materials. *Id.* at 176:1-7.

5

**All documents concerning the consideration, analysis, or potential adoption of "sandboxing," "a penalty box," "special processing site," "special . . . modem," "walled garden," "browser messaging," or certain "DMCA triggers" in relation to peer-to-peer use and/or infringement notices (*see* CHA_00144243, CHA_00144656).**

The documents cited relate to Charter and TWC's merger and technical considerations related to the combination of the two ISPs. The terms proposed are overbroad and hit on over 100,000 documents, because they include references to technical mechanisms employed throughout the two ISPs that are unrelated to Charter's DMCA enforcement procedures. Charter has searched for and produced documents responsive to Plaintiffs' requests about the methods Charter employed to address AUP violations, which included running Plaintiffs' agreed terms related to "walled gardens" and other mechanisms. Plaintiffs' request is untimely, cumulative, disproportionate, and unduly burdensome, and thus Charter objects.

*Requests for Additional Depositions*

**Jay Rolls**

On July 10, 2021—after the close of fact discovery—Plaintiffs personally served Charter's former Chief Technical Officer Jay Rolls with a deposition subpoena. Plaintiffs provided ***no advance notice to Charter*** that they intended to seek his deposition, despite the fact that Charter has represented every former employee to give testimony in this case. In doing so, Plaintiffs violated the scheduling order in this case, as well as the District of Colorado Local Rules governing the notice requirements for depostions. Dkt. 490; D.C.Colo.LCivR 30.1. Plaintiffs' sole justification for its request is an email dated May 11, 2016—six days before the end of the discovery period— discussing Charter's integration with TWC. As noted above, any potential changes to Charter's DMCA efforts that were discussed in the context of the merger and after being threatened with litigation by Plaintiffs were not implemented until after the discovery period. Charter objects to Plaintiffs' request for Mr. Rolls' deposition as untimely, unduly burdernsome, and disproportionate in that Plaintiffs are seeking to elicit testimony about Charter's actions outside the relevant discovery period.

**Laurie Rowlett**

As former Special Master Rodriguez previously instructed Plaintiffs in connection with a similar demand Plaintiffs made to open another fact deposition, a document "would have to be something very significant …to consider reopening a fact witness deposition at this stage." *See* May 6, 2021 Hrg. Tr. 64:14-16. Plaintiffs have not and cannot set forth any justification for why this document is "very significant" and a basis to re-open a deposition after the close of fact discovery. Plaintiffs already questioned Ms. Rowlett on her understanding of her performance metrics, and her "self-review" discussing general information about her job duties and performance—wholly duplicative of information that has been in Plaintiffs' possession since 2020—is not a basis to bring an individual employee back for a second deposition after the close of fact discovery.

*Additional 30(b)(6) Deposition Requests*

**Charter's design of the DMCA Notices Portal, including the decisionmaking process that led to its creation.** *See* CHA_00141904.

6

As noted above in response to Plaintiffs' similar document request, Plaintiffs have no explanation for why they did not elicit this testimony during the fact discovery period. The portal falls under the language of more than a half-dozen 30(b)(6) Topics testified to by Ms. Haynes including Topics 4, 7, 8, 10, 27, 28, 35, 38, and 40. Plaintiffs already sought testimony about why the portal was implemented and how it functioned (*see, e.g.*, 5/21/21 Mary Haynes Depo. Tr. 83:5-22, 112:8-115:10, 134:2-20, 245:7-246:25), and had the opportunity to depose Laurie Rowlett—the "Campaign Owner" of the portal—as well as Colton Mabb and others, about the portal. Thus, this request is clearly an attempt to undermine the deposition limits set forth in FRCP 30(d)(1). Plaintiffs have not shown cause to justify an additional deposition.

**Charter's "Cyber Attack Defense" presentations, including all individuals involved with the presentations and in attendance at the presentations, and all information about Charter's DMCA program included in the presentation decks and discussed during the presentations.** *See* **CHA_00143001.**

This 51 page presentation contains a high-level overview of the function of the department that handles Charter's DMCA enforcement efforts and includes no novel information regarding the DMCA warranting any further 30(b)(6) testimony. With respect to the DMCA, the presentation merely succinctly summarizes generic information long known to Plaintiffs. For example, Plaintiffs are aware that Charter processed a large volume of notices, sought strategies to reduce notice volume, and that many of the notices Charter received requested settlement payments. *See, e.g.* CHA_00128585, CHA_00131978, CHA_00100691, CHA_00116573, CHA_00128006, CHA_00088316, CHA_00131469, CHA_00134614. *See also* 2/23/21 Hrg. Tr. 12:10-12:14; 1/19/21 Hrg. Tr. 29:7-29:16; 4/26/21 Hrg. Tr. 18:15-18:21; 3/9/21 Hrg. Tr. 32:24-33:7. Plaintiffs have already sought related testimony. *See e.g.* 5/17/21 T. Brockel Depo. Tr. 286:19-287:7; 5/12/21 M. Hanrahan Depo. Tr. 44:5-45:21, 48:16-50:11, 130:6-131:19, 161:22-25, 163:7-13, 249:22-250:24; 5/21/21 M. Haynes Depo. Tr. 91:4-18, 92:10-15, 247:23-248:1, 250:1-5. Plaintiffs have not shown cause to justify an additional deposition.

**Charter's marketing of IPv6 to its customers, including its statement that IPV6 would provide "[b]etter peer-to-peer capabilities," and any other communications to Charter's customers about peer-to-peer usage with IPV6.** *See* **CHA_00142961.**

Plaintiffs received documents discussing Charter's plans to adopt the new IPv6 standard in 2020. *See e.g.* CHA_00083324, CHA_00085584, CHA_00085675, and CHA_00085677. Plaintiffs have already deposed Mr. Leonard as a 30(b)(6) witness on six Topics which cover Charter's marketing. Plaintiffs have not provided any cause to justify an additional 30(b)(6) deposition.

*Issues Related to Discovery Into CATS*

Plaintiffs' sudden fixation on discovery into CATS and purported urgency with which it must proceed is at odds with their approach to discovery on this issue during the appropriate time period for fact discovery. For instance, the Special Master noted that Plaintiffs "did not challenge [Charter's] objections" to their RFP No. 26 that sought documents related to CATS. Dkt. 261 at 20. Charter's objections to this RFP and the sufficiency of its CATS-related production were not raised in the context of the February 22-23 discovery conference, despite Plaintiffs demanding (and Charter largely agreeing to) conduct dozens of new searches and other reviews leading up to

that conference. Indeed, Plaintiffs did not pursue further discovery of CATS documentation until this Court repeatedly expressed skepticism regarding Plaintiffs' "Mingus Hold" ESI loss theory at the February 22-23 discovery conference and Plaintiffs altered their position to rely on a newly-minted theory that a greater subset of Charter's ticket data should have been preserved pursuant to an unrelated 2012 legal hold.

Accordingly, at the very end of the discovery period, *on April 28, 2021*, Plaintiffs issued a new request for production specific to CATS data preservation. Plaintiffs' Request for Production No. 146 sought "Documents regarding Charter's 'upgrad[e] to the new CATS hardware (VM)' referenced on CHA_00102758, including any documents related to Charter's 'purg[ing]' of CATS data (see CHA_00134440)". Charter's objections and responses were served on May 28, 2021. Given the late timing of Plaintiffs' requests and the then-current case schedule, Charter expedited its review in tandem with preparing its objections and produced 1,164 documents responsive to these requests on June 2.

At the May 25 conference before this Court, Plaintiffs suggested that Charter did not previously disclose key witnesses with knowledge of CATS and continue to push this narrative in their recent submission. But Charter included Matt Nelson, who was the *primary* "IT" side engineer with CATS responsibilities in its June 2019 disclosures. Plaintiffs inexplicably did not depose him. Instead, Plaintiffs point to testimony from Mr. Hanrahan where he mentioned the names of several *other* IT engineers who also had CATS responsibilities. These included Brian Burroughs and his supervisor Jim Smith. Hanrahan testified that these individuals were IT employees, involved in the "physical operation of the system and deciding if it needed more hardware or faster CPUs or more disk space", in contrast with the "business use" of the tool, which was controlled by security operations (Mr. Mabb and others). 5/12/21 M. Hanrahan Dep. Tr. at 119:19-120:4, 286:5-8; 30:4-12.

Plaintiffs' claim that they need this "essential" late discovery is belied by the fact that they never even attempted to seek it from the individual with the most knowledge on these matters. Further, documents detailing the roles of Burroughs and Smith have been in Plaintiffs' possession since at least October 2020. It is only recently that, despite documents showing the roles of these individuals and others with similar roles having already been disclosed, Plaintiffs used the reference to these employees to argue that they need further documents and depositions beyond the fact discovery deadline. This request should be rejected. *See AssociationVoice, Inc. v. Athomenet, Inc.*, 2011 WL 2297677, at *4 (D. Colo. June 9, 2011) (Hegarty, J.) (denying motion to re-open discovery finding that the discovery sought was "foreseeable"). Not only was the supposed need for the discovery foreseeable, Plaintiffs' request is not aimed at discovering relevant evidence, as Plaintiffs' inquiries are all aimed at discovery into the hold as it existed in 2012, well before Charter was on notice of Plaintiffs' claims. Feb. 22, 2021 Hrg. Tr. at 208:18-209:1 (Court: "it's just what they actually did after March of 2016 that's going to matter on any motion.")

**Brian Burroughs**

Mr. Burroughs' involvement in CATS has been clear to Plaintiffs since at least October 2020. Indeed, Bryan Burroughs ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ and were

produced last year. *See, e.g.* CHA_00079889 (May 4, 2012); CHA_00080071 (Sept. 26, 2012); CHA_00080265 (Feb. 6, 2013); CHA_00081595 (March 28, 2014); CHA_00086849 (Sept. 24, 2014). And these reports, which detail various daily metrics related to CATS, are far from the only documents Plaintiffs have had since last year identifying Mr. Burroughs's involvement. *See e.g.* CHA_00085358 (email chain with Mr. Burroughs included ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); CHA_00084942 (email from Mr. Burroughs ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); CHA_00079657 (email in which Mr. Burroughs ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. These documents are only a sample, but make clear that Plaintiffs have known (or should have known) of Mr. Burroughs's involvement at least as early as October 2020, and cannot claim the recent deposition of Mr. Hanrahan or document production are grounds for re-opening Plaintiffs' decision not to depose him. Nor have Plaintiffs provided any explanation of why they did not seek to depose Mr. Burroughs' counterpart Matt Nelson, the IT engineer that Charter disclosed that had primary responsibility for the IT side of CATS.

**Jim Smith**

Similarly, Plaintiffs' purported surprise regarding Jim Smith's involvement in the IT side of CATS is also contradicted by documents Charter produced last year. *See, e.g.*, CHA_00082479 (Nelson and Smith discussing CATS browser based messaging); CHA_00083741 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); CHA_00083324 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Again, despite Charter including Matt Nelson as a person with knowledge, Plaintiffs did not seek to add Mr. Nelson as a document custodian or notice him for deposition. Their request to now add Mr. Smith as a custodian—the supervisor of various engineers that interacted with CATS—after the close of fact discovery is not supported or warranted, and any relevant documents in Mr. Smith's files would have been captured in the files of Matt Nelson and Brian Burroughs and produced in response to Plaintiffs' CATS requests for production.

**Plaintiffs' Request for Additional CATS 30(b)(6) Testimony Should Be Denied**

Charter does not agree to produce a new 30(b)(6) witness nor that one is necessary. Mr. Hanrahan is the Vice President of IT Architecture at Charter and assisted in developing the CATS system for Charter's use. He was intimately familiar with CATS and provided extensive testimony on its operation, including its operation during the claims period. Hanrahan was prepared to testify as to CATS topics such as the overall process of complaint handling in CATS, 135:15-137:18, 142:12-145:9, the way in which CATS matched the IP addresses on incoming copyright notices with subscriber account numbers, 189:23-192:8, the method by which Charter monitored the email address for incoming copyright notices, 155:22-158:18, technical processes for closing CATS tickets, 197:6-23, the use of "test buckets" to test the CATS system, 153:16-154:11, the capabilities of the CATS system with respect to suspending users, 146:21-147:18, and ways that CATS was modified from the version originally used by Cox, 141:5-142:4. Plaintiffs have also had the opportunity to take an over-length deposition of Mr. Mabb, which Plaintiffs sought and received specifically because Plaintiffs' believed Mr. Mabb had, among other things, knowledge about CATS that Mr. Hanrahan might not. Charter also offered to designate portions of Mr. Mabb's testimony as corporate testimony, but Plaintiffs did not respond to Charter's offer or explain what testimony they were still lacking. There are no grounds for an additional deposition.

*Plaintiffs' Privilege Log Challenges*

**Operational Communications**

Plaintiffs challenge several privilege log entries on the grounds that the communications relate to "operational" subjects. However, nothing prevents an entity from seeking legal advice related to subjects such as Charter's "Network Intelligence" or its "DMCA/MPAA" evaluation. Plaintiffs point to other documents reflecting these discussions, claiming that the discussions are operational in nature. This is, of course because Charter appropriately produced operational documents while withholding a more limited set of documents related to legal advice. Charter's production of documents related to the operational aspects of these projects in no way removes its ability to appropriately protect attorney-client privileged material related to them.

**Communications With Time Warner Cable Regarding the Copyright Program**

Entries 103-105 reflect communications between Charter and Jeff Zimmerman, Time Warner Cable's Deputy General Counsel. These emails occurred after the merger agreement was signed but before the merger was consummated. During this period, Charter and Time Warner shared common legal interests, including but not limited to the common interest in the operation of the entities' copyright programs to minimize any potential liability related to the DMCA. Attorney-client privileged advice regarding this topic of common interest may be shared between the entities without waiver of privilege. *See, e.g., In re JP Morgan Chase & Co. Sec. Litig.*, 2007 WL 2363311, at *5-6 (N.D. Ill. Aug. 13, 2007) (holding a common interest may exist between merger agreement and consummation). Contrary to Plaintiffs' arguments, the application of the common interest doctrine is not limited to situations of joint defense in the face of pending or anticipated litigation. "The common interest doctrine applies even when there is no pending litigation and includes information shared during a common enterprise." *Minez v. Liberty Ins. Corp.*, 2015 WL 5915415, at *5 (D. Colo. Oct. 9, 2015). It applies "to communications given in confidence and intended, and reasonably believed, to be part of an ongoing and joint effort to set up a common legal strategy." *Id*. As Charter explained to Plaintiffs, Charter and Time Warner Cable, with whom it was about to merge, shared a common legal interest in the ongoing operation of their respective (and soon to be joint) copyright programs and could share related legal advice, in an effort to set up and maintain a common legal strategy intended to minimize legal risks.

Charter respectfully requests that Plaintiffs' motion for additional discovery be denied.

Respectfully submitted,

/s/ *Andrew Schapiro*
Andrew Schapiro