# Exhibit 6

399

```
             UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF VIRGINIA
                  Alexandria Division



--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
             Plaintiffs,        :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
             Defendants.        :
                                :
--------------------------------:




                    VOLUME  3  (A.M. Portion)




                     TRIAL TRANSCRIPT

                    December 4, 2019

          Before:  Liam O'Grady, USDC Judge


                     And a Jury
```

1              James, can we get slide 15 from

2   Ms. Frederiksen-Cross's deck up?

3              This is the verification module, right?

4   A.   Correct.

5   Q.   First I just wanted to make sure -- and this is partly

6   going back to our checklist -- when it says that there's a

7   download of full files, that's the step you reference there in

8   the middle.

9   A.   Yes.

10  Q.   Those are the files that are on that hard drive that we

11  were talking about before?  Is that your understanding?

12  A.   The files on the hard drive were produced, it's my

13  understanding, by MarkMonitor, and they are downloaded files,

14  yes.

15  Q.   Right.  They're the files that were captured during that

16  downloading step in the process?

17  A.   Yeah.  They are the files associated with the known

18  infringing hashes, the ones that have been verified.  It's my

19  understanding that MarkMonitor captures new files whenever

20  they encounter them, but I think that all of them on that hard

21  disc, it's my understanding, are ones that have already been

22  through the verification process.

23  Q.   And so that actually raises two questions.  The first is

24  those are the files that are sent to Audible Magic, right, or

25  the files that are fingerprinted and the fingerprints are sent

1    to Audible Magic?

2    A.   They are files who would have been fingerprinted at some

3    point in time and gone to Audible Magic or at least copies of

4    those files.  I imagine they were just copied from the system

5    onto the hard drive.

6    Q.   Okay.  And then --

7    A.   And if I can clarify, I'm just -- these are not the

8    reference files.  They are the files that were unknown and

9    were identified just for the jury's benefit.

10   Q.   Right.  These are the -- these are the files that

11   MarkMonitor finds out on the internet, it downloads them onto

12   a hard drive at its system, it fingerprints them and sends

13   that fingerprint to Audible Magic for matching, right?

14   A.   And gets back a confirmation, yes.

15   Q.   Well, or a disconfirmation, depending.

16   A.   Yeah.  Thank you.

17   Q.   Okay.  And that's what's on the hard drive.  The ones

18   that were downloaded, matched, those were all saved to the

19   hard drive, and that's what you inspected?

20   A.   Yeah.  A copy of those files are on the hard drive.

21   Q.   Now, when Mark -- I'm sorry, when Audible Magic does its

22   matching of the fingerprints, you're aware that there are a

23   variety of levels of matching that Audible Magic can perform.

24   There's Level 1, Level 2, Level 3, I think, are the poetically

25   named choices.

B. Frederiksen-Cross - Cross

537

1    ours with them this morning.  This is a live demonstration.

2                THE COURT:  That's what I said.  I assume you shared

3    with them --

4                MR. ZEBRAK:  Yes, sir.

5                THE COURT:  Okay.  I mumble also, so I apologize.

6                MR. ZEBRAK:  No, that's my fault.

7                THE COURT:  So let's do that.  Before we resume,

8    let's -- you know, if you need to eat the ham sandwich out on

9    the courthouse steps, then let's get that done so that we can

10   come back at 5 minutes to two.

11               Mr. Buchanan, if you want to address that -- the

12   issue you raised this morning, we can do that right away when

13   we come back as well.  Okay?

14               MR. OPPENHEIM:  Thank you.

15               THE COURT:  All right.  We're in recess.

16               NOTE:  At this point, the December 4, 2019, morning

17   portion of the case is concluded.

18
                        CERTIFICATE OF COURT REPORTERS
19

20               We certify that the foregoing is a true and
              accurate transcription of our stenographic notes.
21

22                        /s/  Norman B. Linnell
                     Norman B. Linnell, RPR, CM, VCE, FCRR
23

24                        /s/  Anneliese J. Thomson
                     Anneliese J. Thomson, RDR, CRR
25

538

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
             Plaintiffs,       :
                               :
     -vs-                       :    Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
             Defendants.        :
                               :
-------------------------------:
```

VOLUME  3  (P.M. Portion)

TRIAL TRANSCRIPT

December 4, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

S. Bahun - Direct

638

1    notice gets sent out to the ISP of the peer that we've observed

2    or collected.

3    Q.   And would that notice also sometimes be called an

4    infringement notice?

5    A.   Yes.  Sorry, yeah, infringement notice.

6    Q.   And in the case of RIAA, how would the infringement notice

7    be sent?

8    A.   In the case of this program we're talking about, we were

9    sending them through e-mail.

16:55:07 10  Q.   And who was the sender?

11   A.   MarkMonitor.

12   Q.   Did the RIAA participate in that process?

13   A.   They, I believe, provided us with an e-mail address that

14   they wanted us to send it from.  But we were the ones carrying

15   out the actual sending of the notices.

16   Q.   And was that e-mail address a MarkMonitor address or an

17   RIAA address?

18   A.   I believe it was an -- yeah, it was an RIAA address.

19   Q.   Let me turn to the records that you kept for this process.

16:55:43 20       I believe PX-11 is already in evidence, Your Honor.

21   I'd ask to publish.

22       THE COURT:  Yes, go ahead.  You may publish any

23   exhibit that's already in evidence that you choose.

24       MR. OPPENHEIM:  Thank you, Your Honor.

25   BY MR. OPPENHEIM: (Continuing)

S. Bahun - Direct

639

1    Q.    Do you recognize this document?

2    A.    Yes.

3    Q.    And can you just briefly -- is this a MarkMonitor

4    document?

5    A.    Yes.  This is a spreadsheet that we produced containing

6    the records of all of the song files that we downloaded and

7    verified using Audible Magic.

8    Q.    Okay.  I see there are four tabs.

9    A.    Yes.

16:56:33 10   Q.    And they relate to each of the networks; is that right?

11   A.    Correct.

12   Q.    If we look through the four tabs, would they generally

13   look similar?

14   A.    Yes.

15   Q.    Okay.  Can you just quickly walk across this spreadsheet

16   and describe what's in it.

17   A.    Sure.  So we're on the first tab, meaning BitTorrent.  So

18   all of these files were downloaded from BitTorrent.

19          The first column is a Torrent ID, it's just a unique

16:57:09 20   identifier that we attach to a specific torrent file.

21          The next column is Info Hash.  So this is the SHA-1

22   hash value or the unique identifier for the torrent.

23          The next column is Matched As.  This shows you the

24   key words that we matched when we were looking for the

25   potentially infringing file.

S. Bahun - Direct

642

1    bundled together in a single torrent.

2            So for purposes of displaying the data in this

3    spreadsheet, each row represents an individual song, but this

4    whole group was part of one torrent that you could download on

5    BitTorrent.

6    Q.   So all of these Black Sabbath recordings would have been

7    in a single torrent?

8    A.   Yes.

9    Q.   Okay.  Next column, please.

17:00:39 10  A.   Next is the Torrent Name.  So this is the name of the

11   torrent file that would allow the user to download the content.

12   Q.   Now, that again -- is that generated by Audible Magic?

13   A.   No.  That's a value that we capture when we collect it.

14   Q.   When you say "we capture it," it's not created by

15   MarkMonitor, is it?

16   A.   Not created, no.  It's an existing name of a file when we

17   discover it on BitTorrent.

18   Q.   Is it only as reliable as the user who named it?

19   A.   Yes.

17:01:08 20  Q.   Okay.  Next column.

21   A.   The next is -- actually the next four are values that we

22   capture from Audible Magic.  Audible Magic provides these to

23   us.  So the first is the Audible Magic info ID, which is a

24   unique identifier.  And then they give us artist, track, and

25   album.

S. Bahun - Direct

643

1          So these are kind of what they have confirmed the

2   file as being.

3   Q.   Now, for the recordings on this spreadsheet, listed on

4   this spreadsheet, did MarkMonitor -- does MarkMonitor have

5   copies of them?

6   A.   Yes, we have, I believe, most of the songs that are in

7   this spreadsheet, they're -- we have copies of the songs, yeah.

8   Q.   And were those produced in this case?

9   A.   Yes.

17:02:01  10   Q.   Your Honor -- and how -- just how were they produced?

11   A.   So we provided a drive, a hard drive containing all of the

12   music files related, yeah.

13          MR. OPPENHEIM:  Actually, can we open -- which is the

14   directory of the hard drive?  16, I think 16 is in.  So publish

15   PX-16, please.

16          THE COURT:  Is that in?  Is that already admitted?

17          MR. OPPENHEIM:  I thought it was if I -- yes?  Yes.

18          THE COURT:  Okay.

19          MR. OPPENHEIM:  I believe it's in.

17:02:42  20          MR. BRODY:  The directory is in, yes.

21          MR. OPPENHEIM:  Is this it?  I am sorry.  I am having

22   trouble seeing it.

23   BY MR. OPPENHEIM: (Continuing)

24   Q.   Do you recognize this?

25   A.   Yes.

S. Bahun - Direct

647

1    and say, you don't have everything, or you have at too much,

2    but that is entirely up to him.

3         THE COURT:  He doesn't want you to represent on

4    direct examination that it contains everything.

5         MR. OPPENHEIM:  I don't believe I have.

6         THE COURT:  I know you haven't so far.

7         MR. OPPENHEIM:  Okay.

8         MR. ELKIN:  Your Honor, just one point.  One issue

9    that we have with regard to the hard drive is that there hasn't

17:07:21 10    been any evidence that anyone at MarkMonitor has actually

11    listened to what it is.

12         There has been no foundation that Mr. Bahun has even

13    listened to what it is being offered for.  I think there is a

14    foundational issue that I did address at summary judgment that

15    I don't think this testimony has overcome.

16         MR. OPPENHEIM:  Every one of the files went through

17    Audible Magic, which did essentially the equivalent of a

18    digital listening.  And Mr. McMullan testified that he listened

19    to a sample of them.  And other witnesses -- as did -- excuse

17:07:57 20    me -- Barbara Frederiksen-Cross said she did.  So did

21    Mr. Kokakis.

22         So that is simply not accurate.

23         MR. BRODY:  At the same time, during

24    Ms. Frederiksen-Cross' examination, we saw examples where the

25    files that were identified in 16, the Audible Magic

S. Bahun - Direct

648

1    spreadsheet, didn't match what was on that spreadsheet.

2              So, you know, it's --

3              THE COURT:  Your exception is noted.  I am going to

4    let it in.  You clear up the fact that it -- what it is and

5    what -- where it came from.  And I think that's sufficient.

6              All right.  Your exceptions are noted.

7              MR. ELKIN:  Thank you.

8              NOTE:  The sidebar discussion is concluded; whereupon

9    the case continues before the jury as follows:

17:09:23 10   BEFORE THE JURY

11             THE COURT:  All right.  That exhibit will be

12   received.

13             And please proceed.

14             MR. OPPENHEIM:  Mr. Duval, can you bring up PX 39.  I

15   will apologize in advance, it's not a document.  It's a big

16   hard drive of music files.

17             THE COURT:  Okay.

18   BY MR. OPPENHEIM: (Continuing)

19   Q.   Do you recognize this directory, Mr. Bahun?

17:09:48 20   A.   Yes.

21   Q.   And do you know where this -- and do you know what's

22   within this directory?

23   A.   Yes.  So there is -- we've organized it by a series of

24   folders.  And inside of each folder are the song files that

25   were downloaded from the corresponding peer-to-peer networks.

S. Bahun - Direct

649

1    Q.    And was this produced by MarkMonitor?

2    A.    Yes.

3    Q.    Can we -- so it looks like that there is one folder that

4    is labeled Ares; is that right?

5    A.    Correct.

6    Q.    Mr. Duval, could you just open that, please.

7          Can you describe what's in this file, please, or this

8    folder.

9    A.    Yes.  For Ares, there were four audio files that we

17:10:51 10   downloaded and placed on the drive.  So, yeah, there's -- you

11   see four separate MP3 files here.

12   Q.    Okay.  Can we go back to the main directory, Mr. Duval.

13         And there are a lot of BitTorrent ones, just like

14   No. 7, let's go down.

15         And so, what is this we are seeing right now,

16   Mr. Bahun?

17   A.    Yes.  So BitTorrent functions a little bit differently.

18   You will see some differences by peer-to-peer network.  And so,

19   for BitTorrent, within each folder there is an individual

17:11:27 20   folder named what the hash value is for the infringing file.

21         So if you open one of those, inside you will see, in

22   this case, two files.  There could be multiple though.  If you

23   have a -- if you have a full album or something like that, you

24   may see a whole -- a larger set of files.

25         In this particular case, you see the MP3 file and



673

CERTIFICATE OF COURT REPORTERS


        We certify that the foregoing is a true and
    accurate transcription of our stenographic notes.




                    /s/  Norman B. Linnell
                Norman B. Linnell, RPR, CM, VCE, FCRR




                    /s/  Anneliese J. Thomson
                Anneliese J. Thomson, RDR, CRR

674

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
     -vs-                      :     Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

<u>VOLUME  4   (A.M. Portion)</u>

TRIAL TRANSCRIPT

December 5, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

Case No. 1:19-cv-00874-RBJ-MEH   Document 522-8   filed 09/21/21   USDC Colorado   pg 16
of 26
Case 1:18-cv-00950-LO-JFA   Document 639   Filed 12/10/19   Page 32 of 133 PageID# 26367

S. Bahun - Cross

705

1    program, right?

2    A.   I know that -- I know that that was the type that was

3    being used, yes.

4    Q.   And they selected Level 3 for the CAS program, correct?

5    A.   I believe so.

6    Q.   Do you know why the RIAA chose a higher level for CAS than

7    it chose for Cox?

8    A.   No.

9                MR. OPPENHEIM:   Objection to the use of the term

09:46:17 10   "higher."   He hasn't established that Level 3 was higher than

11   Level 1.

12               THE COURT:   All right.   Sustained.   He's --

13   BY MR. BRODY:  (Continuing)

14   Q.   Do you know why RIAA chose Level 3 for CAS and Level 1 for

15   Cox?

16   A.   No.

17   Q.   I want to ask a series of questions that kind of start

18   with the hard drive that we looked at yesterday.

19               We played some songs off a hard drive that you folks

09:47:02 20   created, and I think that's Exhibit -- Plaintiff's Exhibit 39.

21               Do you recall that generally?

22   A.   Yes.

23   Q.   Okay.   When was that hard drive created?   When were those

24   songs put on that hard drive?

25   A.   I believe it was -- I can't tell you for certain, but I

Case No. 1:19-cv-00874-RBJ-MEH   Document 522-8   filed 09/21/21   USDC Colorado   pg 17
of 26
Case 1:18-cv-00950-LO-JFA   Document 639   Filed 12/10/19   Page 33 of 133 PageID# 26368

S. Bahun - Cross

706

1   think it was the end of 2015, beginning of 2016, around that

2   time frame.

3   Q.   So that would have been two years after the end of the

4   notice period here?

5   A.   Yes.

6            MR. BRODY:  Your Honor, may I approach the bench?

7            THE COURT:  Yes, sir.

8            NOTE:  A sidebar discussion is had between the Court

9   and counsel out of the hearing of the jury as follows:

09:47:54 10   AT SIDEBAR

11            THE COURT:  All right.

12            MR. BRODY:  Your Honor, I move to strike Exhibit 39.

13            It was identified as copies of the recordings that

14   were downloaded, but it obviously was made two years after they

15   were downloading the files.

16            MR. OPPENHEIM:  That's not what he asked the -- I'm

17   sorry, Your Honor.  I didn't mean to interrupt you.

18            THE COURT:  Well, that's an insufficient basis for

19   striking it.  Just the timing of when it was made doesn't make

09:48:20 20   it any more or any less reliable unless you can establish that,

21   right?

22            MR. BRODY:  Maybe I misunderstood, but I thought the

23   testimony was that these were the files that they downloaded

24   and then sent to Audible Magic and then, you know, put in the

25   notices.  So these were supposed to be, if we want to know what

Case No. 1:19-cv-00874-RBJ-MEH   Document 522-8   filed 09/21/21   USDC Colorado   pg 18
of 26
Case 1:18-cv-00950-LO-JFA   Document 639   Filed 12/10/19   Page 34 of 133 PageID# 26369

S. Bahun - Cross

707

1    Audible Magic checked, we're supposed to be able to listen to

2    these files.  But that can't be the case because they were --

3    the files were made and saved two years after, four years after

4    the notices were sent.  And they were submitted to Audible

5    Magic.

6              MR. OPPENHEIM:  First off, the infringing recordings

7    aren't submitted to Audible Magic.  So that's incorrect.

8              MR. BRODY:  The fingerprints, I'm sorry.

9              MR. OPPENHEIM:  But all he asked the witness was when

09:49:02 10   were these put on the hard drive.

11             THE COURT:  Right.

12             MR. OPPENHEIM:  He hasn't established anything that

13   he just said.

14             THE COURT:  That's an insufficient basis.  Your

15   motion is denied.  Your exception is noted.

16             MR. BRODY:  Okay.

17             THE COURT:  I mean, if you want to continue to a

18   probe further --

19             MR. BRODY:  I will.

09:49:17 20             THE COURT:  -- that's fine.

21             MR. BRODY:  We'll find out.

22             THE COURT:  Okay.  Thank you.

23             NOTE:  The sidebar discussion is concluded; whereupon

24   the case continues before the jury as follows:

25   BEFORE THE JURY

S. Bahun - Cross

708

```
 1              THE COURT:  All right, please proceed.
 2     BY MR. BRODY:  (Continuing)
 3     Q.   Mr. Bahun, how did the files get onto the hard drive?
 4     Audible Magic -- I am sorry -- MarkMonitor put them there?
 5     A.   Yes.
 6     Q.   And where did you put them there from?  Where were they
 7     when you put them there?
 8     A.   One of our systems where we would -- where we would have
 9     stored the files.
10     Q.   Okay.  So you had them -- and when did they go onto your
11     system?
12     A.   I'm sorry, I don't quite understand the question.
13     Q.   You said that they were -- they would have come from some
14     place in your system where you stored the files.  I just wanted
15     to know when they were stored on your system, wherever they
16     were stored.
17     A.   I don't know the exact date.  I mean, they would have been
18     different dates.
19     Q.   Would they have been stored on the system when they were
20     first downloaded from the Internet -- from a peer-to-peer
21     network?
22     A.   Possibly some of them.  I don't recall the specific
23     details.  I mean, they are -- they are the files based on the
24     hash value, you can determine that.
25     Q.   I understand.  I mean, they are files and they have hash
```

09:50:11 at line 10
09:50:46 at line 20

S. Bahun - Cross

709

1   value and, you know, that matches or it doesn't.

2           What I was trying to ask and understand was where

3   they -- how you came to possess them?

4   A.   So we downloaded them from the peer-to-peer networks.

5   Q.   And you downloaded them at different times?

6   A.   Yes.

7   Q.   Some of them were downloaded the first time you found a

8   file, and some of them were downloaded at other times?

9   A.   Yes.

09:51:43 10   Q.   And I think you said you weren't sure what those other

11   times might have been?

12   A.   Right.  And some files are downloaded multiple times, you

13   know, throughout the course of the time period we are talking

14   about.

15           MR. BRODY:  Your Honor, I would renew my objection.

16           THE COURT:  Denied.

17   BY MR. BRODY: (Continuing)

18   Q.   Now, the files that you downloaded and stored on your

19   system, were some of them downloaded from BitTorrent?

09:52:27 20   A.   Yes.

21   Q.   Were some of them downloaded from eDonkey?

22   A.   Yes.

23   Q.   Were some of them downloaded from Gnutella?

24   A.   Yes.  I don't think that any of the Gnutella files -- in

25   the form that we produced the drive, I don't think there were

Case No. 1:19-cv-00874-RBJ-MEH   Document 522-8   filed 09/21/21   USDC Colorado   pg 21
of 26
Case 1:18-cv-00950-LO-JFA   Document 639   Filed 12/10/19   Page 115 of 133 PageID# 26450

S. Bahun - Redirect

788

1    Q.    Dr. McCabe, let's turn to the first slide.  I believe you

2    said you did -- you had two assignments in this case, a works

3    in suit analysis and a repeat infringer analysis, correct?

4    A.    That's correct.

5    Q.    Okay.  So let's review assignment one, the works in suit

6    analysis.  Would you explain to the jury what your assignment

7    was with respect to the works in suit analysis.

8    A.    Yeah, so the first line below the title defines the scope

9    of my analysis.  Sometimes we -- or I would call that a frame,

12:29:04 10   it's a statistical term.  So the frame here is what are called

11   the works in suit.  And there are 10,017 of those works.

12              There are four icons below that.  And these are the

13   requirements that I used or applied to accomplish the works in

14   suit task.

15              So the first requirement is that the work -- and this

16   is analysis about the works in suit.  Again, it's the 10,017

17   works that we're talking about.  So that work must in an

18   infringement notice -- an infringement notice during the claim

19   period.

12:29:54 20   The second is that the work in suit should be in a

21   notice that is the third or later notice for a particular

22   subscriber.

23              In other words, I labeled the notices as a first, a

24   second, a third, et cetera.  So I only looked at third or later

25   notices.

S. Bahun - Redirect

789

1    Next, the infringing notice must contain the work in

2    suit.

3    And the fourth requirement is that the infringing

4    file is on a hard drive that was created by MarkMonitor.

5    Q.   Dr. McCabe, I would like to draw your attention to the

6    third bullet.  A moment ago I believe you said the infringed --

7    well, could you explain what that third bullet is in a little

8    more detail.

9    A.   Yes.  So the notice contains information.  And the

12:30:54 10   information, depending upon the protocol, points either to one

11   work in suit or it can -- in the case of BitTorrent, it can

12   refer to a collection of works.

13   Q.   What is the significance to the reference to "infringing

14   file" in that third bullet?

15   A.   The infringing file is part of the notice.  And that

16   points to -- through these hashes, it points -- it gets us to

17   the works in suit.

18   Q.   Do you have an understanding as to whether the infringing

19   file is identified in the notice?

12:31:34 20   A.   Yes, it is.

21   Q.   And by the way, when we talk about notices, what are we

22   referring to here?

23   A.   They are the e-mails sent by MarkMonitor to Cox.

24   Q.   Okay.  And were you able to form any -- and, first of all,

25   you said that you're not providing any -- you're not testifying

S. Bahun - Redirect

791

1          So on this slide, the claim period is denoted or

2   described by the yellow bar at the top.  It starts February 1,

3   2013, and ends November 26, 2014.

4          And the checkmark means that all of the 10,017 works

5   in suit did correspond to a notice during this claims period.

6   Q.   Was the claim period the same claim period for every

7   single plaintiff group in this case?

8   A.   No.  There is a note below the bars for the years that --

9   for the Sony ATM/EMI claims, the start of the claim period was

12:34:24 10   August 1, 2013, rather than February 1, 2013.  But that period

11   was the same, the ending date of the claims period for Sony

12   ATM/EMI was the same as for all the others.

13   Q.   And, Dr. McCabe, would you briefly walk the jury through

14   the remaining three checked boxes on this slide.

15   A.   Yes.  So the second is that -- this issue of the third or

16   later notice for a particular subscriber.  So that was

17   satisfied for all of the 10,017 works.

18          That the infringing file in the notice contains the

19   work in suit.

12:35:11 20          And that there is a copy of the work on a hard drive

21   created by MarkMonitor.

22          So all of these -- the four requirements are

23   satisfied.  And the term I'm using is that means those works in

24   suit were qualified.

25   Q.   Dr. McCabe, what data sources did you use for your

S. Bahun - Redirect

792

1    analysis in this case?

2    A.   Yes, I think I prepared a slide for that.  That should be

3    the next one.

4    Q.   Or actually, Dr. McCabe, let me ask you a question.  A

5    moment ago when you were explaining each of the four

6    requirements for your analyses were satisfied, you used the

7    term "qualified."

8         What does that mean?

9    A.   It basically means that the work in suit is connected to a

12:36:23 10   notice.  So we could view it the other way around.  You start

11   with the notice, it points to the work in suit.  So there is a

12   direct connection between those two.

13        And that's what I'm calling qualified, that I can

14   draw the link from the notice to the work in suit.

15   Q.   Okay.  Well, let's turn back to your data sources, and I

16   can ask you a few questions about that.

17        So what is being depicted in the left column with

18   respect to data sources?

19   A.   The left column describes the source of the data sets.  So

12:37:04 20   there are three sources, MarkMonitor, Cox, and the plaintiffs.

21   Q.   And what data from MarkMonitor was within your analysis in

22   this matter?

23   A.   So MarkMonitor is the top data source there.  And there

24   are three files listed to the right.  The first is the notices

25   or the -- actually, I didn't have the notices, but I had a file

S. Bahun - Redirect

793

1    that lists the notices and the information contained in each

2    notice.  So all that -- these are all data files that I had.

3              So there is a file for notices from MarkMonitor.

4    There is a file for the downloads that MarkMonitor downloaded.

5    And there is a file from MarkMonitor about the Audible Magic

6    procedure or connections to go from hashes to works.

7    Q.   And what is depicted with respect to Cox in terms of data

8    from Cox that you considered within your analysis?

9    A.   So Cox also provided three data sets.  The first one

12:38:25 10   listed there is subscriber identification.  So the Cox CATS

11   system has identifiers for subscribers.  It was necessary to

12   have that information to be able to perform my analysis.

13             So it's the file itself connected subscriber IDs with

14   notices.

15             The second file is what I have called the ticket

16   file.  It's the large file that contains the tickets that Cox

17   recorded in their CATS system.

18             And the third is a file that identifies Cox

19   subscribers as -- I used it to distinguish residential from

12:39:17 20   business subscribers.

21   Q.   And when you say the third file, was that the billing

22   information file?

23   A.   I am sorry, the billing information file, yes.

24   Q.   And, finally, to the right of plaintiffs, there is an

25   Exhibit A and B.  What are those two files?

S. Bahun - Redirect

806

1    the Court to consider how that -- how we proceed.

2         THE COURT:  Yeah.  If putting this video on before

3    those witnesses involves having that jury sit and twiddle their

4    thumbs while we're going through objections, then I'm not going

5    to permit it.  We're going to do it with live witnesses.

6         And after they're done, after we send the jury home,

7    we can go through the deposition designation objections.

8         This case has been going on a long time, and the last

9    thing that I'm going to permit is us to have the jury sitting

13:01:52 10   around while we're yakking about whether something is

11   objectionable.

12        So thank you for bringing that to my attention.

13        All right.  So I have a plea.  The defendant is in

14   custody.  So the, you know, pencils and that kind of stuff

15   probably aren't a good idea.

16        All right.  We're in recess.

17        NOTE:  The morning portion of the case on December 5,

18   2019, is concluded.
                ------------------------------------------

19
                    CERTIFICATE OF COURT REPORTERS
20

21        We certify that the foregoing is a true and
             accurate transcription of our stenographic notes.
22

23              /s/  Norman B. Linnell
             Norman B. Linnell, RPR, CM, VCE, FCRR
24

25              /s/  Anneliese J. Thomson
             Anneliese J. Thomson, RDR, CRR