# Exhibit 17

1

```
 1         IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
 2
    Case No. 19-cv-874-RBJ-MEH
 3  _____

 4  WARNER RECORDS, INC., et al.,

 5       Plaintiffs,

 6  vs.

 7  CHARTER COMMUNICATIONS, INC.,

 8       Defendant.
    _____
 9

10           Proceedings before MICHAEL E. HEGARTY, United

11  States Magistrate Judge, United States District Court for the

12  District of Colorado, and REGINA M. RODRIGUEZ,

13  Court-Appointed Special Master, commencing at 9:18 a.m.,

14  February 23, 2021, in the United States Courthouse, Denver,

15  Colorado.
16  _____

17  WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE HEREIN
    TYPOGRAPHICALLY TRANSCRIBED. . .
18  _____

19                           APPEARANCES

20         JONATHAN M. SPERLING, JEFFREY M. GOULD, SHIRA

21  POLIAK, MATTHEW J.  OPPENHEIM, ALEX KAPLAN, STACEY GRIGSBY,

22  ANDERS LIDEROT, J. HARDER EHLERS, Attorneys at Law, appearing

23  for the Plaintiffs.

24  _____

25       IN COURT HEARING: UNRESOLVED DISCOVERY DISPUTES
```

1 first time -- if I can approach again, Your Honor.  The first
2 document we handed to you, Your Honor, is the actual
3 privilege log produced by MarkMonitor.
4             The second document is the same document
5 reformatted with headings and we put in, obviously, lines so
6 that it can be easier to follow.
7             So what does this say, okay?  So what is
8 illuminating?  Several things about this log.
9             The first thing is that if you look at the second,
10 the third, the fourth entry, right, Audible Magic apparently
11 put a legal hold in place at the request of Oppenheim &
12 Zebrak in July of 2018, two years after they were first
13 retained to do this work -- two years after they were
14 retained to do this work -- right.
15             THE COURT:  Well --
16             MR. ROSENTHAL:  And what else do we know, Your
17 Honor --
18             THE COURT:  Well, they're talking about it two
19 years later, but are you saying that's only when the hold
20 arose?
21             MR. ROSENTHAL:  That's -- we just got this
22 privilege log on Friday.
23             THE COURT:  Well, I know, but just because they're
24 talking about it doesn't mean the hold hasn't been there for
25 a while, right?

60

1  that is getting blended and confused that is critical to
2  understand.
3         And that is, on the one hand, Your Honors, between
4  the 2012 to 2015 notice program -- 2012 to 2015 notice
5  program, on the one hand, and the 2016 efforts undertaken in
6  anticipation of litigation, the two projects are both
7  involved in this case, but they were separate projects with a
8  distinct delineation between them.  And it's important Your
9  Honors under that distinction.
10         And so if you'll listen, I would like to explain
11  how this narrative unfolds.
12         From 2012 to 2015 the IRAA, through MarkMonitor,
13  detected infringement on peer-to-peer networks and sent
14  infringement notices to Charter and other ISPs.  The
15  purpose -- this is really important.  The purpose of the
16  notice program was to provide notice, to provide notice to
17  Charter of specific instances of infringement by subscribers
18  on its network.  Because only Charter knows who those
19  subscribers are and only Charter could do something about it
20  by informing them and working with them to stop further
21  infringements.  The 2012 to 2015, a notice program.
22         They did this -- this was not a litigation program.
23  They did this.  But with MarkMonitor, there were two
24  fundamental important parts of the monitoring and detection
25  system.  Two pieces.

1  continuation of what had been done previously, but with a
2  little more kind of boundary on the front and back end.
3            THE COURT:  Okay.
4            MR. GOULD:  Between 2012 and 2015 MarkMonitor had a
5  contract with RIAA; sends notice based on the detection of
6  infringing files and infringements by Charter subscribers.
7            No litigation yet.  End of 2015, the BMG trial is
8  hot.  A verdict in that case was December 2015.
9            Unsurprisingly, the record companies and publishers
10 represented in this case began to think carefully about
11 what -- what they might be able to do to enforce their rights
12 and detect -- deter piracy in a same vein and in January of
13 2016, started looking at the body of evidence generated over
14 those prior years, okay.
15           Okay, (inaudible) me about some chapters.  Chapter
16 1 is the 2012 to 2015 notice program.  That ends.  BMG case
17 goes to trial.  Summary judgment (inaudible) and a verdict
18 for BMG.
19           January 2016, the group, many of whom are
20 represented in this case, start thinking about what they can
21 do for litigation and look at the body of evidence and
22 detections of infringement from the Chapter 1 period.  And
23 based on that analysis, which was conducted by counsel and at
24 the direction of counsel, determined that there may be good
25 claims.  Those claims have arisen in the Cox case and in this

1  case and in the Bright House case.

2  THE COURT: So all those notices listed from 2012

3  and 2015 weren't done with the idea that we're going to sue

4  somebody just in the general sense and foreseeing your rights

5  and telling people to stop?

6  MR. GOULD: That's exactly right, Your Honor.

7  That's exactly right.

8  The nature of the notice program is that we are

9  giving you notice that you can do something about it, and had

10 you done something about it, Charter, there would have been

11 no need for litigation that.

12 That very issue, Your Honor, was teed up expressly

13 by the Court in Virginia, because the Winston attorneys, who

14 are arguing today, made arguments that MarkMonitor and

15 plaintiffs had spoliated evidence from 2012 to 2015. And the

16 magistrate in that court, Your Honor -- and I can share the

17 opinion with you -- found that there was no work product and,

18 therefore, no requirement to retain documents in anticipation

19 of litigation during the 2012-2015 period.

20 So you don't need to take just my word for it. You

21 can take the guidance from the Magistrate in Virginia who

22 heard all of these arguments. Big chess meeting, a

23 spoliation from 2012 to 2015 and gave it the back of the

24 hand, because there was nothing -- there was no "there"

25 there, okay.

66

1       That brings us to 2016, Chapter 2.  Look at the
2  body of evidence that generated over these prior years and
3  determine, Wow, they really did nothing.  Charter did
4  nothing.  Their recidivism was off the charts.  We're going
5  to go forward with litigation.
6       In that very month, January of 2016, at direction
7  of counsel, RIAA and MarkMonitor entered the Statement of
8  Work that Mr. Rosenthal presented today.  A short (inaudible)
9  that has -- asks MarkMonitor to go look for and download
10 files associated with infringing hashes.  That contract, Your
11 Honor, on its face says, "anticipation of litigation."
12      Chapter 1, notice program, no litigation.  Chapter
13 2, hash download program, litigation.  So the notion out of
14 the gate that there is anything untoward or spoliation or
15 failure to obtain something from the notice program is simply
16 a nonstarter.  It has no -- it has no merit, it's a
17 distraction, and it's contrary to the facts and prior
18 findings of other courts.
19      THE COURT:  Well, okay, but you are suing for the
20 period 20-, what, '13 to '16?
21      MR. GOULD:  The claim period, yes, March 2013 to
22 mid-2016.
23      THE COURT:  So it is true that whatever MarkMonitor
24 was doing between 2012 and 2015 involved information that's
25 relevant to this case, correct?

1         MR. GOULD:  -- Your Honor, I think Mr. Oppenheim
2   needs one minute to get back to (inaudible).  If you'll
3   indulge me, can I please check with him.
4         THE COURT:  Well, I see him.
5         MR. GOULD:  Oh, then I'm mistaken.  Never mind.
6         THE COURT:  Yeah.
7         MR. OPPENHEIM:  I'm here.  I was being unusually
8   quiet.
9         THE COURT:  All right, that's about to change.  All
10  right.
11        So our determination -- and I know you'll believe
12  you have a bigger basis to appeal, and I'm positive there
13  will be one, which is fine, because judges get appealed all
14  the time and reversed and affirmed -- and that is, we're
15  suspect of the work product claim, we're concerned about the
16  loss of data.  By plaintiffs' own admission, the defense
17  doesn't have the same body of information from which they
18  could re-create the effort and we believe that the Hash
19  Report should be produced.
20        Okay, what's the next issue?
21        MR. GOULD:  Your Honor, may I ask, notwithstanding
22  Mr. Rosenthal's discontent, a clarifying question?  When you
23  say that concerned about loss of data, could you clarify what
24  you have in mind, because we're not aware of any.
25        THE COURT:  Well, it was our understanding that

110

1    MarkMonitor did not keep some of the results of the work that

2    they did in 2016.

3           MR. GOULD:  That's not correct.

4           THE COURT:  Is that your understanding?

5           MR. ROSENTHAL:  Audible Magic.

6           THE COURT:  Audible Magic.  Somebody didn't.

7           MR. ROSENTHAL:  And then -- and then --

8           THE COURT:  What about Audible Magic?

9           SPECIAL MASTER:  Can I --

10          MR. GOULD:  Audible Magic disclosed recently that

11   they could not find the lookups that pertain to this project,

12   that's correct.

13          MR. ROSENTHAL:  So we have a couple of things.

14   One, we have of the Audible Magic data.  Two, we have a legal

15   hold that did not go into place until 2018, even though they

16   were -- MarkMonitor was retained in 2016.  They have not

17   logged a single e-mail in that time period.  So we believe

18   that information has either been lost or hasn't been logged.

19   We would like it all logged so we can make an evaluation as

20   to whether or not it was lost or not.

21          SPECIAL MASTER:  Okay.  Let us just deal with the

22   first issue, which is the request for the Hash Report, the

23   full Hash Report.  Our order is that the Hash Report should

24   be produced.

25          Number one, we do believe that the claim of work

```
1                TRANSCRIBER'S CERTIFICATION
2    I certify that the foregoing is a correct transcript to the
3    best of my ability to hear and understand the audio recording
4    and based on the quality of the audio recording from the
5    above-entitled matter.
6
7    /s/ Dyann Labo                    March 1, 2021
8    Signature of Transcriber          Date
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```