# Exhibit II

EXHIBIT C

ATTORNEYS' EYES ONLY

Page 1

1                  UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF COLORADO

3

4

     WARNER RECORDS INC. (F/K/A       )

5    WARNER BROS. RECORDS, INC.), ET )

     AL.,                             )

6                                     )

             PLAINTIFFS,              )

7                                     ) CASE NO.

             VS.                      ) 19-cv-00874

8                                     ) RBJ-MEH

     CHARTER COMMUNICATIONS, INC.,    )

9                                     )

             DEFENDANTS.              )

10   _____)

11

12

13             * * * ATTORNEYS' EYES ONLY * * *

14

15              REMOTE PROCEEDINGS OF THE

16           VIDEOTAPED EXPERT DEPOSITION OF

17                 GEORGE STRONG, JR.

18              FRIDAY, OCTOBER 15, 2021

19

20

21

22   JOB NO.  4848551

23   REPORTED BY KIMBERLY EDELEN,

24   CSR. NO. 9042, CRR, RPR.

25   PAGES 1 - 260

ATTORNEYS' EYES ONLY

Page 5

1    please state your name and the firm you represent.

2           MS. GRIGSBY:  Stacey Grigsby of Covington &

3    Burling representing the plaintiff.  I'm joined by

4    Anders Linderot, as well as Elizabeth Archer, also

5    of Covington & Burling.

6           MR. EISEMAN:  David Eiseman from Quinn

7    Emanuel on behalf of defendant Charter

8    Communications.  With me is Dylan Scher, and I

9    believe my colleague Todd Anten may join later.

10          THE VIDEOGRAPHER:  Thank you.

11          THE REPORTER:  Do the parties stipulate the

12   court reporter may swear in the witness remotely?

13          MR. EISEMAN:  Yes.

14          MS. GRIGSBY:  Yes.

15          THE REPORTER:  Mr. Strong, would you raise

16   your right hand, please.

17          You do solemnly swear the testimony you're

18   about to give shall be the truth, the whole truth

19   and nothing but the truth?

20          THE WITNESS:  I do.

21          THE REPORTER:  Thank you.

22

23                      EXAMINATION

24   BY MS. GRIGSBY:

25       Q    Good morning, Mr. Strong.

ATTORNEYS' EYES ONLY

Page 26

1    discussed, are there any other cases where you

2    provided testimony concerning the cost to the music

3    industry of unlawfully downloaded music?

4        A    Can I -- can I have that back again.

5    Something about the music industry confused me.

6        Q    Sure.

7             So other than the cases we discussed, are

8    there other cases where you testified about the cost

9    or damages to the music industry as a plaintiff of

10   unlawfully downloading music?

11           MR. EISEMAN:  Objection as to form.

12           THE WITNESS:  Yeah.  I can't remember --

13   let me tighten it up a little.

14           To the music industry, as either a

15   plaintiff or a defendant, did I address any issues

16   of damages in the music industry, and I can't

17   remember any as I sit here, no.

18   BY MS. GRIGSBY:

19       Q    And my question was a little bit more

20   narrow, which is testifying about the music industry

21   as a plaintiff or defendant, the issue of damages

22   where there was an allegation that there was

23   unlawfully downloaded music.

24           MR. EISEMAN:  Objection as to form.

25           THE WITNESS:  Yeah.  That's got to be

ATTORNEYS' EYES ONLY

Page 27

1   compound.

2          But the -- yeah, I don't remember, again,

3   to either a plaintiff or defendant in the music

4   industry addressing damages, as you say costs.  But

5   that could well be the case because, as I think I

6   testified earlier, this -- the resume is intended to

7   represent those cases that are ripened to an event

8   of testimony, either deposition, trial, et cetera.

9   So I could have been engaged.

10          I mean, I live in Los Angeles, sort of the

11  entertainment capital of the world, and I could have

12  been engaged to address that issue without actually

13  ending in testimony.  So with that caveat, I can't

14  remember any.

15  BY MS. GRIGSBY:

16     Q    And in any of these cases, have you

17  provided testimony about what policies internet

18  service providers should adopt to try to prevent

19  online piracy?

20     A    No.  That would be outside my purview.  I

21  mean, I'm a damages witness, so I generally address

22  economic impacts of certain actions and related

23  issues along the lines of that financial impact.

24          What you're describing is what I will term

25  a liability issue, and I don't address liability

ATTORNEYS' EYES ONLY

Page 28

1    issues.



ATTORNEYS' EYES ONLY



ATTORNEYS' EYES ONLY



Page 33

1 ████████████████████████████████████████

2 ████████████████████████████████████████

3 ███████████████████████████

4 ██ ███████████████████████████████████

5 █████████████████████████████████████████

6 ███████████████████

7      Q     Have you received payments directly or

8  indirectly from companies in the music industry?

9      A     I think the answer to that is no.

10  Although, because while I have been engaged by

11  people in the music industry, LimeWire is one we

12  mentioned, that compensate -- they compensated

13  Pricewaterhouse at the time, and I was paid a salary

14  that really wasn't dependent directly on that

15  particular case.

16           So in an indirect fashion, I, you know,

17  could have received compensation attributable to the

18  industry.  But, again, that would have been my role

19  as a partner.

20      Q     And I want to talk a little bit about your

21  expertise.

22           Do you consider yourself an expert in

23  copyright law?

24      A     No.  Well, let me be clear.  Even though I

25  have, you know, a license to practice law in

ATTORNEYS' EYES ONLY

Page 34

1  California, I don't practice law in this

2  environment.  And none of my opinions should be

3  deemed to be the practice of law.

4      Q    Do you consider yourself an expert in the

5  cable and ISP industry?

6      A    No, not per se.  I mean -- the answer is

7  no, I don't consider myself -- I'm a damages expert,

8  basically.  And industry expertise I generally leave

9  almost always to others unless it gets -- well, I

10  can't think of an exception, so...

11     Q    Do you consider yourself an expert in

12  consumer behavior?

13     A    Not as that phrase is used as a defined

14  subset of a marketing discipline, no, I don't.

15     Q    Do you consider yourself an expert in the

16  music industry?

17     A    Per se, no, I don't.

18     Q    Do you consider yourself to be an expert in

19  peer-to-peer file sharing?

20     A    Well, as you know, I've had some experience

21  with that circumstance in the LimeWire case in

22  particular, but I don't consider myself an expert in

23  that industry, no.

24     Q    So you do not consider yourself to be an

25  expert in peer-to-peer file sharing; is that right?

ATTORNEYS' EYES ONLY

Page 35

1      A    As an industry, no, I don't.

2      Q    Have you published any papers, articles or

3   other writings on the music industry?

4      A    No, I don't think so.

5      Q    Have you -- sorry.  I didn't mean to

6   interrupt.

7      A    No.  That's okay.  It takes me a little

8   longer to formulate a thought, you know.

9      Q    Oh, it's fine.  And it's a little bit tough

10   online because, you know, there's no physical cue

11   when someone is about to speak.

12      A    That's true.

13      Q    Have you published any papers, articles or

14   writings on cable or the ISP industry?

15      A    No, I have not.

16      Q    Have you published any papers, articles or

17   other writings on the telecommunications industry?

18      A    No, I have not.

19      Q    Have you published any papers, articles or

20   other writings on peer-to-peer file sharing?

21      A    No, I have not.

22      Q    Have you published anything on copyright

23   law?

24      A    Yes.  As it pertains to damages, I

25   coauthored, I believe, an article in the Litigation

ATTORNEYS' EYES ONLY

Page 36

1    Services Handbook on damages in copyright,

2    trademark, trade secret and maybe we later added

3    unfair competition, but I don't know.

4         But that necessarily involved a look at the

5    framework for damages witnesses that the law

6    provides.  So you will see in that article

7    reference Steven Slootlinen (phonetic) comes to mind

8    as one of the cases that we cite, but not in the

9    sense of rendering a legal opinion on its

10   appropriateness, but as a framework that should be

11   used by damages witnesses in addressing damages

12   because the framework is -- is important to

13   understand to calculate damages that are responsive

14   to the operative law.

15        Q    So I just want to refer to Page 19 of your

16   CV, and that has "Publications" in the header.

17        A    Okay.

18        Q    So when you are talking about the article

19   in the Litigation Services Handbook on damages and

20   copyright and trademark, trade secret law, is that

21   one of the publications that is referenced -- the

22   four publications that is referenced on Page 19 of

23   your CV?

24        A    It is.  It's the third one down.

25        Q    And so that is "Damages Issues of

Case 1:19-cv-00874-RBJ-MEH Document 547-96 Filed 11/12/21 USDC Colorado Page 14 of 85



ATTORNEYS' EYES ONLY

Page 78



23    Q    Okay.  So it's fair to say that you may

24  have reviewed Oberholzer-Gee and Pratt independent

25  of this discussion you had with Dr. Sinnreich,

ATTORNEYS' EYES ONLY

Page 79

1   correct?

2       A    Yeah.  And several -- and several others.

3            But, yeah, if we cite them, then I've at

4   least, you know, looked at them, some in more

5   cursory fashion than others.  And you'll see a lot

6   of the same kinds of articles that he recites are

7   included in our report as well.

8            So I have seen, you know, some of the same

9   material that he used.

10      Q    And did you do anything to verify or test

11  the methodology that Oberholzer-Gee or Pratt used in

12  their reports or studies?

13      A    Well, I mean, analytically, probably no.

14  But, you know, I've reviewed a whole host of these

15  materials and some are confirming and some aren't.

16  And to the degree that, you know, not relying on a

17  single article but, in fact, reviewing several is

18  confirming of various theses that, yeah, I did that.

19           I mean, Dr. Furchtgott-Roth said, you know,

20  he used a similar technique in that he read

21  carefully, I mean, some of the reports now.  So,

22  yeah, I read other reports.  And although I don't

23  regard that as an analytical procedure confirming

24  what they did, it is either confirming or not in

25  that they're -- you can see either a consensus or

Page 80

1    not.

2         And there doesn't appear to be much of a

3    consensus, in other words, and the -- and the

4    coefficients you put on the three buckets might vary

5    from what Dr. Sinnreich has concluded.  Those three

6    possibilities exist elsewhere in the literature.

7         Q    And so in terms of reading the articles,

8    the host of articles concerning the potential

9    benefit of P2P, again, apart from that, did you do

10   anything to analyze the methodologies used by the

11   articles' authors?

12        A    Yeah, I -- no.  Analytically, I don't think

13   so.

14   [REDACTED]

ATTORNEYS' EYES ONLY

Page 81



21      Q    Are you aware of any criticisms by

22    academics of Oberholzer-Gee's studies and their

23    methodologies?

24      A    Yes.

25         (Simultaneous cross talk.)

Page 82

```
 1              MR. EISEMAN:  Objection as to form.

 2              THE WITNESS:  Sorry.  Sorry.  Sorry.

 3     Sorry.  I'll let you finish the objection.  Sorry.

 4              MR. EISEMAN:  It was just as to form.

 5              THE WITNESS:  Oh, okay.

 6              Yeah.  Well, all of them, you know, have

 7     certain flaws, some of them admitted, some of them

 8     not.  And my overarching sort of criticism -- and

 9     it's not a criticism because the focus of their

10     study was not intended to cover offsetting benefits.

11              That's more of an issue for somebody

12     performing my role in which I have to assess what

13     the net economic effect of this and what's its

14     impact on their propensity to buy.

15              And so -- but, yeah, I'm aware of the --

16     sorry.  That was long-winded.  I'm aware of the

17     criticism of Oberholzer-Gee, yes.

18     BY MS. GRIGSBY:

19
```

ATTORNEYS' EYES ONLY

Page 83



Case 1:19-cv-00874-REJMEH Document 547-96 Filed 11/19/21 USDC Colorado Page 21 of 85



ATTORNEYS' EYES ONLY

Page 85



18      Q    And you mentioned a couple of times prior

19   court decisions.  Do you consider prior court

20   decisions that have not been overturned something

21   that is reliable or confirmation of the way

22   copyright infringement damages should be analyzed?

23           MR. EISEMAN:  Objection as to form.

24           THE WITNESS:  Yeah.  That may call for a

25   legal conclusion, too, in the following sense.

Page 86

1   Look, I look at either court decisions or things

2   like this Commerce Department articulation of

3   factors as providing structure and actually

4   requirements of a damages claim and what it has

5   to -- the requirements it must meet; not unlike

6   Section 504 of the U.S. Code which sets out, you

7   know, the damages standards to which I have to

8   adhere in -- in calculating damages.

9        So court decisions and -- and, you know,

10  other articles provide a framework for me.  I'm not

11  assessing whether they were, you know, reviewed or

12  not.  These are court decisions that provide some

13  framework.

14       And it turns out the Colorado decisions are

15  very confirmatory of the factors and are factors

16  that are included within.  There are only three of

17  them, but they're included within the nine from the

18  white paper.

19       So there's a -- a convergence of thought in

20  terms of what -- what would provide a proportional

21  remedy in an environment or especially in cases of

22  multiple works like this one, a rather formulaic

23  solution articulated by the statutory damages remedy

24  can be disproportionate to the actual harm or gain.

25  And that notion is, I think, carried throughout all

ATTORNEYS' EYES ONLY

Page 87

1    it.

2            Yeah.  Beyond that, they set a framework

3    for me.  I -- I'm not opining -- you know, certainly

4    not opining legally one way or the other whether

5    they're good, bad or indifferent.

6    BY MS. GRIGSBY:

7        Q    And you referred just now to Dr. Sinnreich

8    as a music industry expert; is that right?

9        A    That's my understanding, yes.

10       Q    So it's fair to say you're considering him

11   a music industry expert?

12       A    Well, he's -- yeah.  His -- his -- he's in

13   the -- it's probably more internet than it is music,

14   but he's got some knowledge in the music business as

15   well.  He studied the P2P file sharing which is in

16   the music industry.

17           I mean, that's what his research was in,

18   so -- I mean, I have -- yeah.  Yeah, he's an expert

19   in a number of fields.

20       Q    And what led you to the conclusion that

21   Dr. Sinnreich is an expert in a number of fields?

22       A    Well, I read -- I read his report.  I read

23   his resume.  I talked to him.  I -- you know, that's

24   enough for me.

25       Q    Did you do anything independently to

ATTORNEYS' EYES ONLY

Page 88

1    analyze the reliability of his conclusions?

2        A    Well, technically, no, because that wasn't

3    my charge.  But as I said, I've read -- you know, I

4    read some of the articles upon which he relies.  I

5    read, you know, other reports.

6            I mean, his -- his opinions articulated in

7    his reports come to me in the context of lots of

8    other material and different people have different

9    opinions.  But, yeah, I -- based on that, I have no

10   reason to doubt his expertise as a -- certainly as

11   an internet analyst and -- and with some music

12   industry background.

13       Q    Are you aware of any instances where courts

14   have excluded in whole or in part Dr. Sinnreich's

15   testimony on the music industry?

16       A    I'm not.

17       Q    Are you aware of any instances where courts

18   have excluded in whole or in part Dr. Sinnreich's

19   testimony on the benefit of P2P file sharing?

20       A    I'm not.

21       Q    If you were aware that a court had excluded

22   Dr. Sinnreich's opinions in whole or in part, would

23   that change your analysis of Dr. Sinnreich's

24   reliability?

25           MR. EISEMAN:  Objection as to form.

Page 89

```
 1              THE WITNESS:  I don't see how because, you
 2    know, facts and circumstances dictate opinions in
 3    very particular cases.  And my role is not to
 4    assess, you know, how a court's decision in one case
 5    might have impacted his credibility in this one.  So
 6    that would be beyond my purview, frankly.
 7    BY MS. GRIGSBY:
 8       Q    Well, if you were aware a court had
 9    excluded Dr. Sinnreich's opinions in whole or in
10    part, would that change your analysis of the
11    reliability of Dr. Sinnreich's analyses?
12              MR. EISEMAN:  Objection as to form.
13              THE WITNESS:  Yeah.  That was confusing.
14    Can you give me that again or maybe rephrase,
15    because that was an analysis of his reliability
16    and --
17    BY MS. GRIGSBY:
18       Q    Sure.
19       A    -- I don't analyze --
20       Q    Sure.
21       A    I don't analyze reliability much, so...
22       Q    Well, if you were aware that a court had
23    excluded Dr. Sinnreich either in -- Sinnreich's
24    opinions, either in whole or in part, would you
25    still feel comfortable relying on his music industry
```

ATTORNEYS' EYES ONLY

Page 90

1   expertise?

2          MR. EISEMAN:  Objection as to form and also

3   asked and answered.

4          THE WITNESS:  Yeah.  Again, that -- that

5   one decision in one particular case on one

6   particular set of facts wouldn't cause me to, you

7   know, disregard or -- I just -- I don't see how that

8   would be important in my relying on his opinion in

9   this case in this set of facts.

10  BY MS. GRIGSBY:

11     Q    And if in this case Dr. Sinnreich's

12  opinions are found to be either excluded or

13  unreliable, would that change any of your analyses?

14         MR. EISEMAN:  Objection as to form.

15         THE WITNESS:  Well, that's a better

16  question and it might, depending upon what part, you

17  know, it was -- for example, many of these

18  assumptions, I tried to gather several forms of

19  support.  And the primary one is analytically, I

20  think, it's -- it's reliable because I propose it as

21  a -- as an element of a damages claim where I can

22  rely on my own expertise.

23         To the degree that I find confirmation from

24  Dr. Sinnreich, usually I have other forms of

25  confirmation.  So I'm not sure it's a quinae --

ATTORNEYS' EYES ONLY

Page 91

1  sine qua non for my -- in fact, it wouldn't be for

2  my opinion.  It would depend on, again, the facts

3  and the -- how narrow the exclusion is and what it

4  related to and a whole bunch of other things.

5  BY MS. GRIGSBY:

6      Q    Well, I mean, if Dr. Sinnreich's opinions

7  were excluded here, would you have to at least

8  analyze the support for the 16 footnotes in your

9  rebuttal report that cite to Dr. Sinnreich?

10           MR. EISEMAN:  Objection as to form.

11           THE WITNESS:  Well, I might look at what

12  exactly it was and whether it was germane to the

13  support that it gave me in the context of all the

14  other support that I have.  So, yeah, I'd probably

15  look at it.

16  BY MS. GRIGSBY:

17      Q    And if Dr. Sinnreich were excluded here or

18  some of his opinions were excluded, you would have

19  to look at least in the context of this case as to

20  whether you would have to revise the 33 footnotes in

21  your rebuttal report that rely on Dr. Sinnreich,

22  correct?

23           MR. EISEMAN:  Object -- objection as to

24  form.

25           THE WITNESS:  Well, in an abundance of

ATTORNEYS' EYES ONLY

Page 92

1    caution, I would -- I would probably look to see

2    what impact it had.  It doesn't -- I mean, so, yeah,

3    I'd probably look.

4    BY MS. GRIGSBY:

5         Q    And if Dr. Sinnreich were excluded here,

6    then your analysis could change, correct?

7         A    Well, potentially.  It would depend on, you

8    know, whether other confirming collateral sources

9    for the footnote, whether the footnote, you know,

10   was important, whether it's -- a large part of my

11   report is, shall I say, contextual in nature, and

12   that's not germane to the -- the actual calculation

13   from whence my primary opinion flows.

14            So, yeah, I -- I mean, I'd look and see

15   what the nature of it was and what particular

16   footnote and what it was supporting and it may or

17   may not impact any opinion.

18        Q    And just to put a finer point on it, in

19   your rebuttal report, which is Exhibit 314, you have

20   176 footnotes; is that correct?

21        A    I haven't looked, but there are a lot,

22   yeah.

23        Q    So, you know, hopefully I haven't missed

24   one, but let's just call it 180.

25            So you have about 180 footnotes, correct?

ATTORNEYS' EYES ONLY

Page 93

1      A     If you represent that, I'll accept it, yep.

2      Q     So if there are roughly 180 footnotes in

3  your report and Dr. Sinnreich is cited in 33 of

4  them, doesn't that mean that if Dr. Sinnreich's

5  opinion is excluded, that in roughly one-sixth of

6  the footnotes, you would have to consider whether to

7  change the support you have, correct?

8            MR. EISEMAN:  Objection as to form.

9            THE WITNESS:  Yeah, and I don't know that,

10  you know, a ratio carries with it the significance

11  of each footnote.  In other words, that implies that

12  all footnotes are equal and they're not.  They're

13  clearly not.

14            And if the 33 relate to the more

15  contextual, you know, aspect of my report, it may be

16  of little moment in terms of my ultimate conclusion.

17            I mean, I would probably look at, if -- if

18  it were excluded and -- or parts of his testimony

19  were excluded and parts of it are in a footnote, I'd

20  look to see where it was.  And if it were something

21  that were less important, it would have little, if

22  any, moment.

23            If it were not, then -- and it were

24  addressing something more elemental, then I would

25  see what other confirmation that I had and whether

ATTORNEYS' EYES ONLY

Page 96

1    determined that "works" is to be defined as those

2    sound recordings and musical compositions, but to

3    treat the areas or the individual sound recordings

4    which also incorporate a musical composition as a

5    single work, then what would be the total and

6    moreover, what would be the distribution between

7    those three buckets.  That's sound recordings

8    without overlaps, musical compositions without

9    overlaps, and then third, overlaps which treat the

10   combination as one.

11       Q    And can you tell me what your methodology

12   was for determining there was an overlap between a

13   sound recording and a composition?

14       A    Yeah.  The simple answer is an

15   interrogatory response.  I think it's Interrogatory

16   No. 13.  It's cited.

17           And moreover, I think we gave you a

18   technical appendix which explains the methodology

19   for not only this, but for the -- the next topic,

20   which is how do you -- how do you assess the

21   treatment of albums, if albums are to be regarded as

22   a single work-in-suit as opposed to the tracks

23   contained therein.

24       Q    So the track album, yeah.  I was getting to

25   that, too.

Page 97

1    So Charter's counsel also asked you to

2  determine the number of works-in-suit if when

3  treated all songs -- all songs released on an album

4  registered as a compilation as a single work,

5  correct?

6    A    Yeah.  Yeah.  That's better said than I

7  did.

8    Q    Well, it is basically what you said in your

9  Paragraph 21, so...

10    A    Oh.

11    Q    Okay.  And so in Footnote 42 you say "I

12  understand that all songs on an album and registered

13  as a compilation are to be treated as a single work

14  for the purposes of awarding statutory damages."

15    Again, apart from counsel's direction, what

16  is that understanding based on?

17    A    Well, counsel's direct -- I have no

18  independent reason to do that.  I mean, I -- as far

19  as I'm concerned, that's a legal issue, whether --

20  and I would say feeds into statutory damages.  I

21  assume that's where this is going.

22    But whether legally, you know, the work is

23  to be considered one if it combines both is not an

24  issue that I opined upon or dealt with.  This is a

25  calculation performed at the behest of the lawyers.

Page 98

1      Q    So just to be clear, you are not opining on

2   what the correct number of works-in-suit are or is

3   for the purposes of calculating statutory damages in

4   this case?

5      A    I -- I'm not.  That's well beyond my

6   purview.

7      Q    All right.  So now I would like to look at

8   Exhibit 3B on your rebuttal report.

9      A    Oh, rebut -- okay.  I keep forgetting this,

10   the first one.  Yeah.  Okay.

11     Q    You got there more quickly than I did.

12

Case 1:19-cv-00874-REB-MEH Document 547-96 Filed 11/29/21 USDC Colorado Page 34 of 85



ATTORNEYS' EYES ONLY

Page 104

1    ███████████████████████████████████

██   ███████████████████████████████████████

3         MS. GRIGSBY:  Actually, is now a good time

4    for another just five-minute break?

5              THE WITNESS:  Well, anytime.

6         MR. EISEMAN:  Fine by me.

7         MS. GRIGSBY:  Okay.  Let's take --

8         THE VIDEOGRAPHER:  Going off record.  The

9    time is 10:48 a.m.

10        (Off the record from 10:48 - 10:58 a.m.)

11        THE VIDEOGRAPHER:  We are back on the

12   record.  The time is 10:58 a.m.

13   BY MS. GRIGSBY:

14        █  ████████████████████████████████

██   ██████████████████████████

██        █  ████████████████████████

██   █████████████████████████████████

██   ██████████████████████████████████

██   ████████████████████████████████████████

██   ███████████████████████████████████

██   ████████████████████████████████

██   █████████████████████████

██   ██████████████████████████████████████

██   ████████████████

25   ███

17    Q    Right.  Okay.

18         Now, Mr. Strong, do you consider yourself

19    an economist?

20    A    Well, I -- as you know, I have an economics

21    degree from Yale, which has a pretty decent

22    economics department.  I have an MBA from Harvard

23    where my area of concentration was managerial

24    economics.  I use economics as a damages analyst,

25    which is what I do consider myself to be, but I'm

ATTORNEYS' EYES ONLY

Page 106

1   also a certified public accountant, and there are

2   many aspects of damage claim that require cost

3   analysis, not -- including this one, and there's

4   probably more financial analysis involved in damage

5   claims than anything else.

6           So to the degree that I need economics, I

7   have both an educational and experiential background

8   in it.  What I do is not what many economists do.

9   I'm a damages analyst, so I guess I'm an economist

10  to the extent that I need to be to be a damages

11  analyst.

12      Q    Have you published any papers in economic

13  journals?

14      A    No, I haven't.

15      Q    Are you a member of the American Economic

16  Association?

17      A    I'm not.

18      Q    And I know you have been certified as a

19  public accountant; is that correct?

20      A    I have, yes.

21      Q    Are you currently certified as a CPA?

22      A    I am.

23      Q    Okay.

24      A    In California.  No longer in Hawaii, sadly.

25      Q    Okay.  You offer the opinion in your report

ATTORNEYS' EYES ONLY

Page 107

1    that Dr. Furchtgott-Roth's assessment does not

2    inform a showing of harm to plaintiffs; is that

3    right?

4        A    Correct.

5        Q    And, in particular, do you understand that

6    Dr. Furchtgott-Roth refers to three attributes of

7    property?

8        A    I do.

9        Q    And those are exclusivity of rights to

10   choose the use of a resource, right, exclusivity of

11   rights to services of a resource, and rights to

12   exchange the resource at a mutually -- at mutually

13   agreeable terms; is that right?

14       A    This comes from an economist that he

15   recites, Dr. Elkins, I remember or something to that

16   effect, yeah.

17       Q    Uh-huh.

18           And your conclusion is that these

19   attributes of property are not informative with

20   respect to harm to plaintiffs from the alleged

21   infringements by Charter subscribers; is that right?

22       A    Certainly not within the context of the

23   damage claim which is what we're doing here.  Yeah,

24   no, I'm not.

25       Q    And how did you reach that conclusion?

ATTORNEYS' EYES ONLY

Page 108

```
 1      A    I just looked at them.  In other words, I
 2   refer to that Dr. Furchtgott-Roth referred to the
 3   actual standards of either Section 504 which are the
 4   standards of copyright infringement, one of which is
 5   actual harm.
 6           And if you want to probe actual harm, you
 7   can look to other literature which would describe a
 8   model that says -- it either compares the actual
 9   world to the but-for world, a world either absent
10   infringement, or the second possible act is the
11   nonact of failure to terminate.
12           Moreover that -- that harm requires a
13   causation element from the act to the change in
14   economic circumstances.  None of those factors has
15   Dr. Furchtgott-Roth considered.
16      Q    And is it your understanding that
17   Dr. Furchtgott-Roth opines on the actual harm and
18   gains to Charter?
19      A    No, he does not.  He says it's impossible.
20      Q    And in your experience as a damages expert,
21   is there -- are there cases where it is impossible
22   to construct a but-for world?
23           MR. EISEMAN:  Objection as to form.
24           THE WITNESS:  Yes, there are.
25   \\\
```

Page 109

1    BY MS. GRIGSBY:

2        Q    And what are the circumstances where it

3    would be impossible to construct a but-for world?

4              MR. EISEMAN:  Objection as to form.

5              MS. GRIGSBY:  Sorry.

6              THE WITNESS:  In some cases, the framework

7    that we inherit as damages witnesses has been

8    delineated by legal standards.

9              For example, if, in fact, there -- the

10   easiest one is there -- in establishing causations,

11   there are -- there are events that are causes in

12   fact that the law has circumscribed and limited to

13   proximate cause.  In other words, there is a limit

14   beyond which the law will not allow damages to look.

15             Like are you -- there are cases, you know,

16   describing proximate cause ad nauseam.  As damages

17   witnesses, we don't opine on the appropriateness of

18   that.  We inherit those.  They delineate it.

19             We're also subject to a requirement of

20   reasonable but not perfect certainty in terms of

21   calculating.  So there might well be damages that

22   exceed either the proximate cause limit or exceed

23   the reasonable certainty limit that you could tie

24   under a cause in fact, otherwise known as but-for

25   causation, that the law has circumscribed, has said

ATTORNEYS' EYES ONLY

Page 139

1   and that could be bigger.  I mean, I -- percentage

2   is what I'm focusing on here, not the absolute

3   value, A.  And B, again, this is contextual.  It has

4   nothing to do with the calculation of damages or

5   harm that I provided.

6       Q    And here I should -- yes, I'm focusing on

7   percentage for my questions here.

8       A    Okay.

9       Q    I'm not talking about aggregate.  So I

10  mean, I think the question really is that you're

11  using 3 percent here.  Are you using it to show that

12  a significant percentage of consumers are consuming

13  music and discovering music through P2P or are you

14  using it to show it's a very small number -- a small

15  percentage of consumers?

16      A    Oh.  Well, the suggestion of the adjective

17  "only" would -- would infer, at least, that it's

18  relatively small.  And I think that's a static

19  number.  And the -- the real question is it's been

20  declining.  The dynamic aspect is probably more

21  important than the absolute number.

22           But to your question, I think 3 percent is

23  relatively small, so compared to the 97 percent of

24  other uses, yeah.

25      Q    And is it your understanding that music

ATTORNEYS' EYES ONLY

Page 140

1   consumption is different than music discovery, as

2   used here?

3       A    Well, that's what it says.  I can't tell

4   you offhand.  Unless it's an indication of people

5   who respond to a survey as to what they'd like to

6   see.  Yeah, I don't know that I made that

7   distinction.

8       Q    And may -- I guess a better question is,

9   what do you understand music consumption and

10  discovery to mean, as used here in Paragraph 20 of

11  your report?

12      A    Oh.  That their overall use, whether they

13  discovered music and didn't consume it or consumed

14  it without discovery, I didn't make a distinction.

15      Q    And do you consider Nielsen a reliable

16  source of information here?

17      A    Well, I have -- I have no understanding of

18  Nielsen -- Nielsen's reputation nor need -- and

19  seeing, you know, are reliable enough to cite, so

20  that's all I know about it.

21      Q    And if this number, the 3 percent, were

22  inaccurate, would your contextual statement in

23  Paragraph 20 change?

24          MR. EISEMAN:  Objection as to form.

25          THE WITNESS:  I don't think so.  I mean,

ATTORNEYS' EYES ONLY

Page 141

1    primarily, as I said, Dr. Sinnreich said this and I

2    think if we didn't get it from his report, we found

3    it in some other way.

4           There's a lot of support for the notion

5    that P2P file sharing was being reduced throughout

6    this period of time as people discovered other

7    sources of music.  I mean, streaming and ad-based

8    subscriptions have revolutionized the business, even

9    in the '13 through '16 period of time.  So I

10   don't -- I mean, this one cite wouldn't probably

11   change that contextual statement, not opinion.

12   BY MS. GRIGSBY:

13      Q    And why are you citing Nielsen here?  Why

14   did you decide to cite Nielsen here?

15      A    I think we found it appeared to be

16   consistent with what Dr. Sinnreich concluded, and,

17   other than that, I couldn't tell you.

18      Q    Have you seen any other sources that

19   indicate that the 3 percent number from Nielsen

20   applies just to music discovery?

21      A    I haven't.

22           MS. GRIGSBY:  Can we pull up Tab 14, which

23   I guess would be Exhibit 318.

24           THE WITNESS:  3- --

25           MS. GRIGSBY:  Oh, it's not up yet.  We're

Page 142

1   going to try to pull this up in Exhibit Share.

2                (Deposition Exhibit 318

3             was marked for identification.)

4         THE WITNESS:  Is this in my report?

5   BY MS. GRIGSBY:

6        Q    No.  I'm pulling up, I think, the Nielsen

7   report that you cite --

8        A    Oh.

9        Q    -- as Exhibit 318.

10       A    Okay.  And that's 317?

11       Q    No.  318.  So it hasn't loaded yet.  It's

12   coming.

13       A    Oh, okay.  Sorry.

14       Q    Are you able to see it yet, Mr. Strong?

15       A    No.  Let's see.  Oh, here it is.  Okay.  I

16   got it.

17       Q    So, Mr. Strong, I'm showing you what's been

18   marked as Plaintiffs' Exhibit 318.  Is this the

19   "Nielsen Music Year-End Report" that you reviewed

20   for your rebuttal report?

21       A    I think so.

22       Q    Okay.  And then I just want to direct you

23   to Page 23, I believe.

24       A    Okay.  I'm at 23.

25       Q    So are you relying on this graphic in the

ATTORNEYS' EYES ONLY

Page 179

1 ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

5   BY MS. GRIGSBY:

6       Q    Okay.  Let's look at Exhibit 315, which is

7   your second rebuttal report.  All right.  So I'm

8   looking at paragraph -- I think it is 5.b -- I'm

9   sorry.  6.b.

10      A    Paragraph 6.

11      Q    b on Page 2.

12      A    Oh, okay.

13      Q    Uh-huh.

14      A    Uh-huh.

15  █   ████████████████████████████

██  ████████████████████████████████████

██  ████████████████████████████████████████

██  ████████████████████████████████████████

██  ████████████████████████████████████████

██  ██████████████████████████████████████

██  ████████████████████████████

██        ████████████████████

██  █   ██████

24      Q    Did I read that correctly?

25      A    Yes.

ATTORNEYS' EYES ONLY

Page 180



19          MR. EISEMAN:  Objection as to form.

20          MS. GRIGSBY:  Yeah.

21     BY MS. GRIGSBY:

22          Q    You can answer.

23

Case No. 1:19-cv-00874-RBJ-MEH Document 547-6 Filed 11/22/21 USDC Colorado Page 47 of 85



```
5    Q    Uh-huh.

6    A    Okay.

7         MR. EISEMAN:  Oh, to the extent part of

8    your next question is going to be about whether he's

9    testified about it or not, I'm going to object.  So

10   maybe you should just ask a different question

11   without it relating.

12        MS. GRIGSBY:  No.  Wait for the question

13   and then you'll -- then you can decide whether you

14   want to object or not.

15        MR. EISEMAN:  Right.

16        MS. GRIGSBY:  Okay.  So --

17        MR. EISEMAN:  Well --

18        MS. GRIGSBY:  Yeah.  Just wait for the

19   question and you can decide whether you want to

20   object or not.

21   BY MS. GRIGSBY:
```



ATTORNEYS' EYES ONLY

Page 192



Case 1:19-cv-00874-REB-MEH Document 547-96 Filed 11/21/20 USDC Colorado Page 51 of 85



ATTORNEYS' EYES ONLY

Page 194



ATTORNEYS' EYES ONLY

Page 195



Case 1:19-cv-00874-RBJ-MEH Document 547-9 Filed 11/29/21 USDC Colorado Page 54 of 85



Case 1:19-cv-00874-RBJ-MEH Document 547-6 Filed 11/22/21 USDC Colorado Page 55 of 85



ATTORNEYS' EYES ONLY

Page 198



Case 1:19-cv-00874-RBJ-MEH Document 547-96 filed 11/22/21 USDC Colorado Page 57 of 85



ATTORNEYS' EYES ONLY

Page 200



ATTORNEYS' EYES ONLY

Page 201

13        MS. GRIGSBY:  Is now a good time for

14   another ten-minute break?  I don't know if we've

15   been going an hour, but it feels like it.

16        MR. EISEMAN:  We've been going an hour and

17   12 minutes, so this would be a good time.

18        MS. GRIGSBY:  Not that you've been

19   counting, right?

20        MR. EISEMAN:  I've got a clock in front of

21   me.  I have this little clock on my computer.

22        THE VIDEOGRAPHER:  Shall I go off the

23   record?

24        MS. GRIGSBY:  Yes, please.  Sorry.

25        THE VIDEOGRAPHER:  Going off the record,

ATTORNEYS' EYES ONLY

Page 202

1    the time is 2:12 p.m.

2              (Off the record from 2:12 - 2:26 p.m.)

3              THE VIDEOGRAPHER:  We are back on the

4    record.  The time is 2:26 p.m.

5    BY MS. GRIGSBY:

6         Q    Mr. Strong, I was wondering if I could

7    direct your attention to Page 27 of your rebuttal

8    report, which is Exhibit 314, and here I'm looking

9    at Paragraph 74.

10        A    Okay.

11        Q    So in Paragraph 74, you say "For

12   plaintiffs' profit margin, I considered three

13   potential options:  The first, their average gross

14   profit margin (i.e.,        ); second, their average

15   operating profit margin (i.e.,         ); and (3), a

16   Warner Music Group Recorded Music average profit

17   margin (i.e.,        )."

18             Do you see that?

19        A    I do.

20        Q    In order to estimate plaintiffs' profit per

21   track, are you using the        percent profit margin?

22        A    Yes, as is evidenced, I think, in...

23        Q    The next sentence.

24        A    Oh, sorry.  Yeah.  In an exhibit -- are you

25   going to go to an exhibit?

Case 1:19-cv-00874-REB-MEH Document 547-1 Filed 11/22/21 USDC Colorado Page 61 of 85



ATTORNEYS' EYES ONLY

Page 230



ATTORNEYS' EYES ONLY

Page 231



ATTORNEYS' EYES ONLY

Page 232



Case No. 1:19-cv-00874-REB-MEH Document 547-96 filed 11/29/21 USDC Colorado pg 65 of 85



ATTORNEYS' EYES ONLY

Page 234



ATTORNEYS' EYES ONLY

Page 235



Case 1:19-cv-00874-REB-MEH Document 547-6 Filed 11/22/21 USDC Colorado Page 68 of 85



Case 1:19-cv-00874-REJM-MEH Document 547-96 Filed 11/12/29/21 USDC Colorado Page 69 of 885

Page 237



Case 1:19-cv-00874-REB-MEH Document 547-96 Filed 11/22/21 USDC Colorado Page 70 of 85



ATTORNEYS' EYES ONLY

Page 239



ATTORNEYS' EYES ONLY

Page 240



ATTORNEYS' EYES ONLY

Page 241



ATTORNEYS' EYES ONLY

Page 242



Case 1:19-cv-00874-RBJ-MEH Document 547-96 filed 11/15/21 USDC Colorado Page 75 of 85



ATTORNEYS' EYES ONLY

Page 244

▮    ▮        ████████████████████████

▮        ████████████████

▮    ▮        ████████████████████████

▮    ████████████████████████████████

▮    ████████████████████████████████

▮    ████████████████

▮    ▮        ████████████████████████

▮    ████████████

9        Q    Okay.  You look a little tired.  Do you

10   want to take a five-minute break?

11       A    Sure.

12            MS. GRIGSBY:  Okay.

13            THE VIDEOGRAPHER:  We're going off the

14   record.  The time is 3:32 p.m.

15            (Off the record from 3:32 - 3:39 p.m.)

16            THE VIDEOGRAPHER:  We're back on the

17   record.  The time is 3:39 p.m.

18   BY MS. GRIGSBY:

19       Q    Mr. Strong, I want to look again at your

20   second rebuttal report which is Exhibit 315.

21       A    Okay.

22       Q    Okay.  In your second rebuttal report on

23   Page 8, do you see Table 2?

24       A    Page 8.  Yeah, the last page, right.

25       Q    Okay.  So this table is entitled

Page 252

1  45 percent.  I don't know if that's good -- you

2  know, I -- that's his conclusion.

3         And there are other people who say no, it's

4  substitutable, and if you sample music, you thus

5  don't have to buy it.

6         Okay.  So that's an open question.

7  BY MS. GRIGSBY:

8     Q    But again, I'm curious, what is your basis

9  for saying that there is any source to show that

10  people who sampled music went out and bought more

11  than they otherwise would?

12    A    Dr. Sinnreich, as I've said before, is one.

13  And the -- not only based on his own research --

14         (Clarification by the Reporter.)

15         THE WITNESS:  Sure.

16         Yeah.  As I said before, it's

17  Dr. Sinnreich, and his -- not only his own personal

18  research but his review of other articles that

19  address the same question.

20         And he says there just is no consensus.

21  Some say positive.  Some say negative.  And some say

22  neutral.  So it's a mix.

23  BY MS. GRIGSBY:

24    Q    Well, a person who likes music would

25  probably be more likely to go out and purchase music

ATTORNEYS' EYES ONLY

Page 253

1   than a person who doesn't like music, correct?

2           MR. EISEMAN:  Objection as to form.

3           THE WITNESS:  I don't -- I don't know that

4   I have any trouble with that.  But that -- yeah.

5   But that having -- I don't see how that fits.  I

6   mean, why -- that's true.  Okay.  I can see that,

7   but...

8   BY MS. GRIGSBY:

9       Q    Well, a person who likes music is probably

10  more likely to use BitTorrent than a person who does

11  not care about music at all, correct?

12      A    I don't know that I can say that either,

13  and I'm the wrong person to ask that.  That requires

14  a music industry -- that seems to me at a

15  professional industry, a music industry background.

16  And I -- you know, could be people are -- look, I

17  don't want to speculate because I'm not a music

18  expert, so...

19      Q    Well, I don't want you to speculate either,

20  but I am trying to understand whether a person who

21  does not like music, you would expect that person to

22  use BitTorrent to download copyrighted music?

23          MR. EISEMAN:  Objection as to form.

24          THE WITNESS:  Well, yeah, just intuitively,

25  I probably wouldn't, but it depends.  If they --

ATTORNEYS' EYES ONLY

Page 254

1    yeah.  I -- again, I'm not here to speculate on

2    that.  I don't know.

3    BY MS. GRIGSBY:

4        Q    I mean, it would be a little bit irrational

5    to believe that a person who doesn't like music

6    would be downloading copyrighted music on

7    BitTorrent, correct?

8             MR. EISEMAN:  Objection as to form.

9             THE WITNESS:  Well, a lot of people --

10   look, I'm sure a lot of people didn't like rock

11   music until they saw the Beatles.  Who knows.

12   BY MS. GRIGSBY:

13       Q    So aside from Dr. Sinnreich, what else are

14   you relying on to find -- to say that plaintiffs --

15   without such a conclusion, plaintiffs have suffered

16   no harm through diverted or lost sales?

17       A    Well, again, the body of the materials that

18   he refers to, I have read as well.  And -- or not

19   all of them but some of them, which confirm the

20   notion that -- and most of them just argue about the

21   magnitude of any harm, and a few of them, including

22   even some executives in the music industry, have --

23   have commented that there may be something positive

24   to this.

25             So, you know, there's an entire body of

Page 261

1    not anywhere in the range of statutory damages, so

2    you can't include that in the same sentence.

3              I'm estimating actual harm and -- and gain

4    and comparing those in the last chart that I have in

5    this document, and pointing out that they're quite

6    different.  And the actual harm and gain, either

7    one, are dramatically lower than even the minimum

8    level under calculation and statutory damages.

9    That's it.

10   Q    And here, I'm not referring to the harm or

11   gain.  I am just referring to statutory damages.

12   A    Okay.  Then I don't -- I mean, they --

13   well, the minimum is a function of works and it's

14   true that I can't calculate the statutory minimum --

15   minima, I should say, under various assumptions in

16   Table 5 on Page 36.  So that -- and that's just a

17   calculation, frankly.

18   Q    Right.  You perform the calculation and

19   that has to be based on the number of works-in-suit,

20   correct?

21   A    Correct.

22   Q    Now, in Paragraph 44 you say "The enormity

23   of total potential damages per this formula,

24   especially in a multiple works situation as we have

25   here involving an ISP, means that a damages expert

Page 262

1    should make efforts to determine the harm actually

2    suffered by the plaintiff, including by arriving at

3    an approximation or range that can reasonably inform

4    the actual harm at issue."

5            Is that what that says?

6        A    Yes.  No.  You read that correctly.

7        Q    What's the basis for that opinion?

8        A    It's a re-articulation of Factor 7 under

9    the Department of Commerce's white paper that

10   says -- that basically says the same thing, and that

11   is that it -- the -- the statutory -- the level of

12   statutory damages should be commensurate with the

13   level of actual harm, and it may actually say or

14   gain.  But that notion is conveyed somewhere.

15       Q    And towards the end of the report, you

16   write in Paragraph 98, starts on Page 38.

17       A    Yes.  I'm there.

18       Q    "For the third factor, deterrence of a

19   willful violation, I understand that courts in

20   Colorado (as well as other jurisdictions) have

21   awarded statutory damages in cases involving musical

22   works that are between two and three times license

23   fees.  I understand that this multiplier would apply

24   to actual harm, (that is the amount the defendant

25   would have to pay)."

ATTORNEYS' EYES ONLY

Page 263

1          Do you see that?

2     A    Right.

3     Q    And you call this the three times

4  deterrence multiplier, correct?

5     A    I do.

6     Q    And in this you say cite three primary

7  cases; is that right?

8     A    I do.

9     Q    Are there additional cases that you're

10  relying on for this understanding?

11     A    No.  No.  I -- no.  I don't have any.

12     Q    Okay.  And the three cases you cite for

13  your -- in your report are where -- for the three

14  times deterrence multiplier, this is where there was

15  copyright infringement where someone failed to

16  obtain an otherwise available license, correct?

17     A    Yeah.  I think that's the basic fact

18  pattern.

Case No. 1:19-cv-00874-REJ-MEH Document 547-9 filed 11/11/21 USDC Colorado Page 83 of 85

Page 264



25          MS. GRIGSBY:  I actually think I am nearly

ATTORNEYS' EYES ONLY

Page 265

1  towards the end.  If I could just take five more

2  minutes off the record, then I think we can probably

3  wrap up.

4          MR. EISEMAN:  Sure.

5          THE WITNESS:  Okay.

6          THE VIDEOGRAPHER:  Okay.  We're going off

7  the record.  The time is 4:13 p.m.

8          (Off the record from 4:13 - 4:18 p.m.)

9          THE VIDEOGRAPHER:  We are back on the

10 record.  The time is 4:18 p.m.

11 BY MS. GRIGSBY:

12     Q   Okay, Mr. Strong.  I just have very few

13 questions.

14         So I am looking at Page 39 and 40 and -- of

15 your report, which is the distribution analyses of

16 RIAA notices and works-in-suit across Charter

17 subscribers.

18     A   Okay.

Page 268

```
 1   STATE OF CALIFORNIA        )
 2   COUNTY OF LOS ANGELES      )    ss.

 3

 4        I, Kimberly A. Edelen, C.S.R. No. 9042, in and
 5   for the State of California, do hereby certify:
 6        That prior to being examined, the witness named
 7   in the foregoing deposition was by me duly sworn to
 8   testify the truth, the whole truth and nothing but
 9   the truth;
10        That said deposition was taken down by me in
11   shorthand at the time and place therein named, and
12   thereafter reduced to typewriting under my
13   direction, and the same is a true, correct and
14   complete transcript of said proceedings;
15        That if the foregoing pertains to the original
16   transcript of a deposition in a Federal Case, before
17   completion of the proceedings, review of the
18   transcript { } was {X} was not requested.
19        I further certify that I am not interested in
20   the event of the action.
21        Witness my hand this 20th day of October,
22   2021.

23

24
          KIMBERLY A. EDELEN, C.S.R. NO. 9042

25
```