# Exhibit IX

# EXHIBIT E

Page 1

1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2              IN THE UNITED STATES DISTRICT COURT

3                 FOR THE DISTRICT OF COLORADO

4

5     WARNER RECORDS, INC., et al.,

6                    Plaintiffs,

7          vs.            Case No. 1:19-cv-00874-RBJ-MEH

8     CHARTER COMMUNICATIONS, INC.,                    ,

9                    Defendant.

10    _____

11

12

13          The Zoom Videoconference/Videotape Deposition

14          of HAROLD W. FURCHTGOTT-ROTH, Ph.D.,

15          Commencing at 10:03 a.m. Eastern Standard Time,

16          Tuesday, October 12, 2021,

17          Before Stenographic Shorthand Reporter,

18          Lori Ann Baldwin, CSR-5207, RPR, CRR.

19

20

21

22

23

24

25

Case No. 1:19-cv-08721-VEC-MEH Document 552-6 Filed 11/15/22 USDC Colorado Page 4 of 32

Page 20

BY MR. EISEMAN:

Q.   So you can answer the question.

A.   No.  My, when a case concludes, I usually just get rid
     of all the documents associated with it.

Q.   Did the -- had the case concluded before you served
     your draft report, is that right?

A.   Yes.

Q.   In, in the copyright infringement damages opinions you
     were planning to, to offer in that case, were you
     testifying about actual damages versus statutory
     damages?

               (Court Reporter appeals at 10:22 a.m.)

A.   My recollection is that it was headed towards
     statutory damages.

BY MR. EISEMAN:

Q.   And did you offer an amount of statutory damages that
     you believe should be awarded in that case?

A.   No.

Q.   Did you analyze the factors that courts look at in
     awarding statutory damages in your draft report?

A.   You're going back ten years; a draft report I don't
     recall exactly what was in it.

Q.   Prior to this case, have you offered opinions about
     peer-to-peer file sharing?

A.   Not that I recall.

Case No. 1:19-cv-00874-RBJ-MEH Document 552-9 Filed 11/15/2021 USDC Colorado Page 5 of 32

1    Q.   Prior to this case, have you offered opinions about

2         the effects of piracy due to peer-to-peer file

3         sharing?

4                MS. GRIGSBY:  Objection to form.

5    A.   No, not that I recall.

6    BY SPEAKER 1:

7    Q.   You are not a lawyer, correct?

8    A.   That's correct.

9    Q.   You do not have a law degree, do you?

10   A.   No.

11   Q.   And you confirmed in this case that you are not a

12        legal expert, correct?

13   A.   That's correct.

14   Q.   You're not offering expert opinions on copyright law

15        in this case, are you?

16   A.   No.

17   Q.   Have you ever taken a course on copyright law?

18   A.   No.

19   Q.   You do not consider yourself an expert in the music

20        industry, do you?

21   A.   No.

22   Q.   You've never been paid to perform as a musician, have

23        you?

24   A.   No.

25   Q.   You have never been employed by a record label or

Case No. 1:19-cv-01987-RBJ-MEH Document 552-6 Filed 11/15/21 USDC Colorado Page 6 of 32

```
                                                    Page 22
  1          music publisher, have you?
  2     A.   No.
  3     Q.   You've never worked in the music industry in a music
  4          production capacity, have you?
  5     A.   No.
  6     Q.   Have you ever taken courses concerning the music
  7          industry?
  8     A.   Courses concerning the music industry, no.
  9     Q.   You do not consider yourself an expert in music
 10          licensing issues, do you?
 11     A.   I'm familiar with music licensing issues but I don't
 12          claim expertise in that area; and same, I'm familiar
 13          with the music industry, but again, I don't claim
 14          expertise.
 15     Q.   Have you ever negotiated a music license?
 16     A.   No.
 17     Q.   You do not consider yourself an expert in music
 18          industry-related contracts, do you?
 19     A.   No.
 20     Q.   Have you ever negotiated a music industry-related
 21          contract?
 22     A.   No.
 23     Q.   You are not a musicologist, are you?
 24     A.   No.
 25                    MS. GRIGSBY:  Objection to form.
```

Case No. 19-cv-00874-RBJ-MEH Document 552-69 Filed 11/15/21 USDC Colorado Page 7 of 32

1    BY MR. EISEMAN:

2    Q.   You are not an accountant, are you?

3    A.   No.

4    Q.   Prior to this case, have you offered opinions in cases

5         involving the music industry?

6    A.   No.

7    Q.   Prior to this case, have you offered opinions about

8         the effect of peer-to-peer file sharing on the music

9         industry?

10   A.   No.

11   Q.   Have you ever published a paper, article or other

12        writing about the music industry?

13   A.   Yes.

14   Q.   And how, how, how many times have you published such a

15        paper or article or other writing?

16   A.   On, I published several papers on the broader

17        copyright industry and their contributions to the

18        U.S. economy.  I've written thought pieces on

19        copyright law, some of which specifically are, are,

20        copyright industry, I'll put it that way, over the

21        past few decades.

22             So yes, I have written about copyright

23        industries including the music industry.

24   Q.   What specific paper can you recall writing about the

25        music industry specifically?

Page 24

1   A.   About the music industry, not as part of the copyright

2        industry, I'm not sure that I have.

3   Q.   And when you say you've written about the music

4        industry as part of the copyright industries, can you

5        explain to me what you mean by that?

6   A.   Yes.  In the late '80s and early '90s, I co-authored a

7        series of papers on the economic contribution of the

8        copyright industry to the U.S. economy.  I developed a

9        method for measuring that and it's published annually,

10       including the contribution of the music industry.  And

11       the successors of those papers are still being

12       published today --

13  Q.   Since -- sorry.  Go ahead.

14  A.   Then, for many years, I was a columnist for New York

15       Song (ph) for Forbes.com and I would occasionally

16       write about issues related to, to copyright

17       industries.

18            I wrote a fun piece about the Supreme

19       Court's Eldridge -- Eldred decision on extension of

20       copyright claim.  So over the several years, I've

21       written several things about, about the copyright

22       industry.

23  Q.   The articles that you said you co-authored in the late

24       '80s or early '90s, were those co-authored with Kirk

25       Arner?

Case No. 1:19-cv-09070-RMI-MEH Document 552-590 Filed 11/15/22/29/23 USDC Colorado Page 9 of 32

1    A.   No.

2    Q.   Who were, who was your co-author on those studies?

3    A.   Steve Siwek.

4    Q.   Are those, are those studies listed on your CV that

5         you submitted in the case?

6    A.   Yes.

7    Q.   The studies that you just told us about, they are not

8         specific to music, correct?

9    A.   Correct.

10   Q.   And, and are all the thought pieces that you said in

11        some way related to copyright industries also listed

12        on your CV?

13   A.   Yes.

14   Q.   What, what -- describe for us what a copyright

15        industry is.

16   A.   Well, that was the, one of the issues that I had to

17        address back in the late '80s to early '90s, what,

18        what is a copyright industry.  I divided them into

19        four categories, four copyright industries, industries

20        that were copyrighted, a very central part of the

21        industry; and that would include music, software, book

22        publishing, motion pictures, and probably a couple of

23        others as well.

24             Then there were the copyright-related

25        industries, industries that depend on inputs from

Case No. 19-cv-01008-JRB-HMED Document 552-590 Filed 11/29/25 USDC Colorado Page 9 of 32

1        copyright, core copyright industries and related

2        industries, as I recall, would have been much of the

3        computer industry. And then there were copyright

4        distribution industries which would be wholesale and

5        retail.

6  Q.   The study that you wrote with Mr. Siwek, were those

7        about copyright industries generally or specifically

8        about the music industry?

9  A.   About copyright industries generally.

10  Q.   Did you draw any conclusions about the music industry

11        in your publications with Mr. Siwek?

12            MS. GRIGSBY: Objection to form.

13  A.   Yeah, that's a bit vague. Conclusions about -- we

14        concluded that the copyright industries were important

15        to the U.S. economy and that they were a source of

16        growth.

17            (Court reporter appeals at 10:30 a.m.)

18  A.   Growth. Growth for the U.S. economy.

19  BY MR. EISEMAN:

20  Q.   Since the late '80s and '90s when you published those

21        studies with Mr. Siwek, have you written about

22        copyright industries relating to music specifically?

23            MS. GRIGSBY: Objection to form.

24  A.   I have written about copyright industries. I don't

25        know that, anything specific to just the music

Case No. 1:19-cv-00874-RBJ-MEH Document 552-10 filed 11/15/21 USDC Colorado page 1 of 32

```
 1      industry.
 2   BY MR. EISEMAN:
 3   Q.   You did not consider yourself an expert in conducting
 4        consumer surveys, do you?
 5   A.   No.
 6   Q.   You've never conducted a survey on the music industry?
 7   A.   No.
 8   Q.   Have you ever conducted a survey on consumer
 9        purchasing behavior of, of music?
10   A.   No.
11   Q.   Have you ever conducted a survey on consumer use of
12        peer-to-peer services?
13   A.   No.
14   Q.   You are not an engineer, are you?
15   A.   No.
16   Q.   You do not have a computer science degree, do you?
17   A.   No.
18   Q.   You do not consider yourself an expert on how
19        peer-to-peer distribution services function from a
20        technological perspective, do you?
21   A.   No.
22   Q.   Prior to this case, had you ever conducted an analysis
23        of the impact of peer-to-peer file sharing on the
24        music industry?
25   A.   No.
```

Case No. 1:19-cv-00874-RBJ-MEH Document 552-90 Filed 11/22/21 USDC Colorado Page 12 of 32

1    Q.   Have you ever published an article about the impact of

2         peer-to-peer file sharing on the music industry?

3    A.   No.

4    Q.   Have you ever conducted a survey on the impact of

5         consumer use of peer-to-peer file sharing on the music

6         industry?

7    A.   No.

8    Q.   Have you ever participated in peer review of another

9         individual's article about the impact of

10        peer-to-peer -- peer-to-peer file sharing on the music

11        industry?

12    A.   No.

13    Q.   And do you ever personally use a peer-to-peer file

14        sharing distribution service?

15    A.   No.

16              MS. GRIGSBY:  Objection to form -- sorry,

17        objection to form.  Go ahead.

18  BY MR. EISEMAN:

19    Q.   You do not have a degree in marketing, do you?

20    A.   No.

21    Q.   You are not offering any opinions in this case as an

22        expert in marketing, are you?

23    A.   No.

24    Q.   You do not have a degree in advertising, do you?

25    A.   No.

Case No. 1:19-cv-07071-RBJ-MEH Document 552-6 Filed 11/15/21 USDC Colorado Page 12 of 32

```
 1    Q.    You're not offering any opinion in this case as an
 2          expert in advertising, are you?
 3    A.    No.
 4    Q.    You do not have a degree in consumer psychology, do
 5          you?
 6    A.    No.
 7    Q.    You are not offering any opinions in this case as an
 8          expert in consumer psychology, are you?
 9    A.    No.
10    Q.    On your CV, you state that you are an adjunct
11          professor at Brooklyn Law School, correct?
12    A.    Yes.
13    Q.    Is that full time or part time employment?
14    A.    Part time.
15    Q.    Is that your primary employment?
16    A.    No.
17                    MS. GRIGSBY:  Objection to form.
18    BY MR. EISEMAN:
19    Q.    Is your primary employment serving as an expert
20          witness?
21                    MS. GRIGSBY:  Objection to form.
22    A.    No.
23    BY MR. EISEMAN:
24    Q.    What's your primary employment as of today?
25    A.    I would say it's Furchtgott-Roth Economic Enterprises
```

Case No. 1:19-cv-00874-RBJ-MEH   Document 552-9   Filed 05/22/21   USDC Colorado   Page 14 of 32

1        case are the subject of valid copyright registrations,

2        are you?

3    A.  No.

4    Q.  You are not offering opinions about whether Charter

5        did or did not commit copyright infringement, are you?

6    A.  No.

7    Q.  You are not offering opinions about whether Charter

8        did or did not commit contributory copyright

9        infringement, are you?

10   A.  No.

11   Q.  You are not offering opinions about whether Charter is

12       or is not vicariously liabil -- liable for any

13       copyright infringement in this case, are you?

14   A.  No.

15   Q.  You are not offering opinions about whether Charter

16       subscribed or did or did not commit copyright

17       infringement, are you?

18   A.  No.

19   Q.  You are not offering opinions about whether Charter or

20       was not aware of specific -- specific subscribers

21       engaging in copyright infringement on Charter's

22       network, are you?

23   A.  I, I may have cited some documents related to that but

24       I'm, I'm not offering opinions as to Charter's

25       knowledge or state of mind.

1    Q.   So the, the answer is you are not offering opinions

2        about whether Charter was or was not aware of specific

3        subscribers engaging in copyright infringement on

4        Charter's network, are you?

5    A.   It's, it's, an assumption of my work.  I'm not

6        offering an opinion about what they actually knew.

7    Q.   And the assumptions that you are making was made

8        because the plaintiffs' lawyers asked you to make that

9        assumption, correct?

10           MS. GRIGSBY:  Objection to form,

11       foundation.

12   A.   It's part of the documents I reviewed so I wasn't

13       asked to make specific assumptions about that.

14  BY MR. EISEMAN:

15   Q.   But you're not offering an opinion about Charter's

16       state of mind in this case, are you?

17   A.   No.

18   Q.   You are not offering opinions on whether a particular

19       Charter subscriber engaged in copyright infringement

20       on Charter's network, are you?

21   A.   About whether that meant some technical definition of

22       infringement, no.

23   Q.   Do, do you understand that plaintiffs' claims against

24       Charter in this case cover a limited party of time?

25   A.   Yes.

Case No. 1:19-cv-00874-RBJ-MEH Document 552-69 Filed 11/15/21 USDC Colorado Page 16 of 32

1    Q.    What is that period of time?

2    A.    The claims period is from part of the spring of 2013

3         through the spring of 2016.  The initial date varies

4         slightly for different plaintiffs.

5    Q.    The, the dates are March 24th, 2013 through May 17th,

6         2016, correct?

7    A.    That sounds right.

8    Q.    If, if I refer to the "claims period" during the rest

9         of the deposition, will you understand that I'm

10        talking about the date or the time period March 24th,

11        2013 through May 17th, 2016?

12    A.    Yes.

13    Q.    You're not offering opinions about any harm allegedly

14        suffered by plaintiffs as a result of Charter

15        subscribers' use of peer-to-peer services outside of

16        the claims period, are you?

17    A.    No.

18    Q.    So that would include any harm that plaintiffs may

19        have suffered before the claims period or after the

20        claims period, correct?

21    A.    Yes, that's correct.  Let me be clear to the extent

22        that there were -- essentially, that's, that's right.

23              I was just going to clarify that to the

24        extent there's infringement that continues as a result

25        of the initial infringement by Charter subscribers

Case No. 19-cv-00874-RBJ-MEH Document 552-6 Filed 11/15/21 USDC Colorado Page 17 of 32

```
 1          during the claims period, there could be lasting

 2          effects from that particular from that infringement

 3          after the claims period that, that might get captured

 4          in that as well.

 5    Q.    Well, first of all, you are not offering any opinions

 6          about whether there has or has not been any copyright

 7          infringement in this case, correct?

 8    A.    That's correct.

 9    Q.    And to the extent that you are offering opinions about

10          any harm suffered allegedly by the plaintiffs, you are

11          not offering opinions that any harm should be, that

12          any harm after the claims period should be included in

13          the damages calculation in this case, are you?

14                    MS. GRIGSBY:  Objection to form,

15          foundation.

16    A.    As I understand it, the, the claims that Charter did

17          not provide sufficient enforcement when presented with

18          information about infringement claims during the

19          claims period, it is possible that some of the harms

20          that resulted from the, the failure to act during the

21          claims period may have had some continuing effect

22          after the patterns here.

23    BY MR. EISEMAN:

24    Q.    But you understand that your opinions in this case are

25          limited to any harm allegedly suffered during the
```

Case No. 1:19-cv-00874-RBJ-MEH Document 552-690 Filed 11/05/21 USDC Colorado Page 17 of 832

1    Q.    Have you seen --

2    A.    -- how many times.

3    Q.    Have you seen any evidence in the record showing that

4          a single one of plaintiffs' works covered by the

5          notices in this case was used to generate a single

6          copy?

7                   MS. GRIGSBY:  Objection to form.

8    A.    I'd have to believe something very strange.  I'd have

9          to believe that a work was placed on a P2P network and

10         no one ever copied it and it just sat there forever

11         without any, any attention given to it and it was

12         placed there for, for no particular reason.  So no, I

13         don't know how many copies were made but I'd have to

14         believe something very surprising to believe that, in

15         each and every instance, there were no copies made.

16   BY MR. EISEMAN:

17   Q.    You don't know if any copies were made, correct?

18                  MS. GRIGSBY:  Objection to form.

19   A.    That outcome just seems really very difficult to, to

20         believe, that this would be placed there for, for no

21         one to copy -- it was placed there to be copied and no

22         one copied it.

23   BY MR. EISEMAN:

24   Q.    You told us earlier you're not an expert on

25         peer-to-peer technology, correct?

Case No. 1:19-cv-00874-RBJ-MEH Document 552-69 Filed 11/15/21 USDC Colorado Page 19 of 32

1    A.    That's correct.

2    Q.    And, and so that your opinions in this case about the

3          use of peer-to-peer technology are not based on any

4          expertise you bring to the case, right?

5    A.    They're not based on direct expertise but, you know, I

6          can read things and, and make inferences based on

7          them.  I'm not limited in any way.

8    Q.    Have you seen any documentary events in the case

9          demonstrating a single one of plaintiffs' copyrighted

10        works was shared by a Charter subscriber's computer

11        with any other computers during the claims period?

12                MS. GRIGSBY:  And objection to form,

13        foundation.

14    A.    The copyrighted works listed in the infringement

15        notices were made available for copying.  I, I don't

21    BY MR. EISEMAN:

22    Q.    I'm not, I'm not asking you to give us your

23        assumptions.  I'm asking you to tell us if you've seen

24        any evidence, documentary or otherwise, showing that

25        downloads actually occurred of any of the plaintiffs'

Case No. 1:19-cv-00874-RBJ-MEH Document 552-9 Filed 11/15/21 USDC Colorado Page 20 of 32

```
                                                  Page 110
 1         industry, are you?
 2    A.   No.
 3    Q.   So you, you don't have a basis to opine as to whether
 4         or not people who use peer-to-peer networks could
 5         learn of music for the first time through the music
 6         peer-to-peer networks, right?
 7                   MS. GRIGSBY:  Objection; form, foundation.
 8    A.   I may not be an expert but I can read.  And you know,
 9         this is based on my reading of the reports that are
10         cited, that are cited in my reports.
11    BY MR. EISEMAN:
12    Q.   Um --
13    A.   And are cited in Dr. Sinnreich's report.
14    Q.   Peer-to-peer file sharing of a musical work can
15         increase the sales of that work, would you agree with
16         that?
17                   MS. GRIGSBY:  Objection; foundation.
18    A.   There's hardly any evidence of that.  And, and the
19         evidence there is dated and is completely outweighed
20         by studies that reach the opposite conclusion.
21    BY MR. EISEMAN:
22    Q.   Would you agree that peer-to-peer file sharing of a
23         musical work can promote interest in attending live
24         concerts?
25                   MS. GRIGSBY:  Again, objection; foundation.
```

Page 125

1  Q.   When you say "from others" what do you mean?

8                   MS. GRIGSBY:   Objection to form.

9  A.   They are two -- the, it's the direct benefit relative

10      to the plaintiffs and then there's the general benefit

11      by not taking action, benefits with respect to all.

12  BY MR. EISEMAN:

1    A.    Yes.

2    Q.    How did you go about getting the articles that you

3          summarized in that exhibit?

4    A.    I did a literature review myself and I asked the

5          Analysis Group to pull together articles that looked

6          at the question of the effect of file sharing on sales

7          of, in the music industry.

8    Q.    When you say "I did a literature review myself", what

9          does that mean?

10   A.    That means I, I went to a social science research

11         network and, and put in some terms and looked around

12         for some articles.  But primarily, I relied on the

13         Analysis Group to do the literature search but I, I

14         did one on my own.

15   Q.    Have you read any of the articles you cite to in

16         Exhibit V.3.i prior to being retained in this case?

17   A.    I -- no, I don't think so.

18   Q.    Have you studied the effect of peer-to -- peer-to-peer

19         file sharing on music sales before being retained in

20         this case?

21   A.    No.

22   Q.    In your exhibit, have you a column that talks, that is

23         entitled Main Findings.  Do you see that?

24   A.    Yes.

25   Q.    Who prepared the summaries that are contained in the

1       main findings column of your exhibit?

2   A.   The Analysis Group did.

3   Q.   In reviewing the literature that the Analysis Group

4       provided to you, did you come across any literature

5       that you decided not to include?

6   A.   There was one article that I excluded because the

7       authors dramatically changed their position over time.

8       And that was Oberholzer-Gee and Strumpf.  They had --

9             (Court Reporter appeals at 4:59 p.m.)

10  A.   You're right.  This is very difficult to spell.  So

11      the first is Oberholzer-Gee.  So it's

12      O-B-E-R-H-O-L-Z-E-R-hyphen-Gee, G-E-E.  It's not quite

13      as bad as Furchtgott-Roth but it's, it's a long name.

14      And the second author is Strumpf, S-T-R-U-M-P-F.  So a

15      lot of German background there.

16           They had two prior articles, one 2007 and

17      another 2010.  The 2010 is very similar to the 2016.

18      And the, the 2007 found no effect.  That article got

19      attacked by a lot of academics.

20           And then by 2010, Oberholzer-Gee kind of

21      shifts from finding no effect to sort of saying, yes,

22      it's about a twenty percent effect of file sharing on

23      reduced music sales.  And, and I consciously left that

24      one out simply because I thought the authors had

25      changed their mind, you know.  Maybe in retrospect, I

```
 1        should have left it in.  That's the only one that I, I
 2        struck.
 3   BY MR. EISEMAN:
 4   Q.   What if anything did you do to satisfy yourself that
 5        each article cited in Exhibit V.3.1 is accurate?
 6   A.   V.3 -- V.3.1?
 7   Q.   Oh, sorry.  No, you're right, V.3, I guess.
 8   A.   Well, with the exception of the Siwek paper, these
 9        are -- well, let me, yeah, with the exception of the
10        Siwek paper, and subsequent -- well, a couple of these
11        others at the time were not published in peer-reviewed
12        journals but I believe all of these ultimately were,
13        or some form of these papers were ultimately published
14        in peer-reviewed journals.  So someone has, has, in
15        fact, reviewed, reviewed the results.
16             The one that is not is the, the Siwek study
17        and that one is the only one that really focuses on
18        the, the costs of piracy on, on the recording
19        industry.  I looked.  I couldn't find any other
20        article that really frames, frames it in the same way
21        that, that Siwek does.
22   Q.   My, my question is what you did to satisfy yourself
23        that each article was reliable and accurate, so let me
24        ask it again.
25   A.   Yeah.
```

Case No. 1:19-cv-00874-RBJ-MEH Document 552-690 Filed 11/15/2021 USDC Colorado Page 25 of 32

Page 233

1   Q.   Other than reading the article --

2   A.   Right.

3   Q.   -- and having the Analysis Group summarize it in the

4        exhibit, what, if anything, did you do to satisfy

5        yourself that each article cited is accurate and

6        reliable?

7   A.   I, I read it closely.  That's what I did.

8   Q.   Did you contact the authors of the articles to ask for

9        any underlying data that was cited in the articles?

10  A.   No, I did not.

11  Q.   And I gather you didn't review the underlying data

12       cited in the articles?

13  A.   No, I did not.

14  Q.   Did you take any step to determine whether the authors

15       of the articles had -- well, let me strike that.

16            Would you agree as a general matter that an

17       article presented in a self-published blog post is

18       less reliable than an article published in a

19       peer-reviewed journal?

20  A.   Yes, although if the article cited in the blog post

21       ultimately gets published in the peer-reviewed

22       journal, I think there's some value in it.

23  Q.   If you could turn to paragraph 71 of your opening

24       report.  Are you there?

25  A.   Yes.

Case No. 1:19-cv-00874-RBJ-MEH Document 552-6 Filed 11/22/21 USDC Colorado Page 26 of 32

Page 234

1    Q.   Hold on one second.  In paragraph 71, you state, and

2    ████████████████    █████████████████████████

3    ███████████████████████████████████████████████

4    ███████████████████████████████████████████████

5    ███████████████████████████████████████

6    A.   Correct.

7    Q.   Would you agree that having fast upload and download

8         times is something that any Internet customer would

9         find attractive?

10   A.   I think that's definitely true today.  I would say

11        during the claims period there really wasn't a lot of

12        upload traffic.  You didn't have a lot of, there

13        wasn't, there weren't Zoom meetings as we're having

14        right now.  Uploaded traffic in, during the claims

15        period was, it really wasn't a lot.  And people would

16        send e-mails.  People would do things like that.  And

17        that's why you see the, the BitTorrent is a very large

18        percentage of upload traffic because there's, it

19        really wasn't a lot.

20             The, the definition of broadband at the

21        time from the FCC was completely asymmetric.  It was

22        25 Megahertz down, 3 Megahertz up.  That's because

23        there just really wasn't a lot of download traff -- a

24        lot of upload traffic.  ISPs configured their networks

25        to be primarily downstream.  That's because that's

Case No. 19-cv-00874-RBJ-MEH Document 552-69 Filed 11/25/21 USDC Colorado Page 27 of 32

1        where most of the demand was.

2                    Having said that, yeah, there, there are

3        customers who would want to, to upload some, some

4        information.

5   Q.   During the claims period, Charter customers could use

6        fast upload and download times for all kinds of

7        non-infringing reasons, correct?

8   A.   Correct.

9   Q.   And a fast Internet speed is something that would be

10       attractive to all Charter customers during the claims

11       period, correct?

12  A.   Yes.

13                   MS. GRIGSBY:  Objection; form.

14  BY MR. EISEMAN:

15  Q.   People can use fast Internet speeds and they did so

16       during the claims period for all kinds of

17       non-infringing reasons, correct?

18                   MS. GRIGSBY:  Objection; form, foundation.

19  A.   Yes is the answer.

20  BY MR. EISEMAN:

21  Q.   In your work in this case, how many Charter

22       advertisements did you review in connection with the

23       formulation of your opinions?

24  A.   Just a, just a handful.  Just a handful.

25  Q.   Less than five then?

Page 236

1    A.   Probably about five.

2    Q.   Do you know the extent to which those advertisements

3         were distributed?

4    A.   Offhand, no.

5    Q.   Were they television, radio, print or Internet ads?

6    A.   As I sit here, I don't recall.  I mean, I would, I saw

7         the kind of the printed version, whether they were

8         initially television or radio, that, I don't recall.

9    Q.   Do you know the geographical location where the

10        advertisements were distributed?

11   A.   No, but presumably in the areas where Charter had

12        offered services.  They wouldn't offer it in every

13        geographic area.

14   Q.   And you don't know which of the geographic locations

15        that Charter was operating in that these

16        advertisements were distributed in, correct?

17             MS. GRIGSBY:  Objection; foundation.

18   A.   Correct.

19   BY MR. EISEMAN:

20   Q.   Do you know how frequently the advertisements that you

21        looked at were distributed?

22   A.   I'm sorry, what was the question?

23   Q.   Do you know how frequently the five or so

24        advertisements you looked at were distributed?

25   A.   I, I don't recall.  I might have had that information.

Case No. 1:19-cv-00874-RBJ-MEH Document 552-6 Filed 11/22/21 USDC Colorado Page 28 of
32

1       I just, I haven't focused on it in a while.

2   Q.  Do you know over what period of time the

3       advertisements were distributed?

4   A.  Again, I might have that information.  I just, I have

5       no reviewed that recently.

6   Q.  Sitting here right now, do you know if the

7       advertisements that you reviewed were distributed at

8       all?

9               MS. GRIGSBY:  Objection; form, foundation.

10  A.  Yes, I have no reason to believe they, they weren't

11      actually used.  I don't think these were just drafts

12      if that's what you mean.

13  BY MR. EISEMAN:

14  Q.  Do you know if they were drafts or not?

15              MS. GRIGSBY:  So I'm going to put on the

16      record, if these advertisements were just drafts then

17      I would like at least Charter to indicate --

18              MR. EISEMAN:  Wait, wait, wait, wait, wait.

19      You can't testify.  You're, you're not testifying.

20              MS. GRIGSBY:  Well, then, I'm asking, I

21      would like a sidebar in terms of what Charter has

22      produced in this case if that is the case.

23              MR. EISEMAN:  No, no, no.  No.  We're not

24      having a sidebar.  I'm asking your expert some

25      questions.

Case No. 1:19-cv-00874-RBJ-MEH   Document 552-6   Filed 11/15/2021   USDC Colorado   Page 30 of 32

1      notice.  I just asked you about what you did or didn't

2      do.  So let me ask you again.

3  A.   Okay.

4  Q.   Nowhere in any of the other reports you've submitted

5      in this case, do you set forth an economic incentive

6      analysis that focuses only on Charter subscribers

7      accused of being repeat infringers in this case,

8      correct?

9            MS. GRIGSBY:  Objection to form.

10  A.   I mean, I think you could say the, the narrower

11      analyses just of the, just the, the music infringing

12      subscribers could be viewed as an analysis to Charter

13      but the --

14  BY MR. EISEMAN:

15  Q.   Go ahead.

16  A.   -- but the discussion of the overall incentives is

17      based on the overall, the, the, the behavior or

18      conduct with respect to infringement notices.

19  Q.   You don't offer any opinion in any of your four

20      reports estimating the economic incentive to Charter

21      to obtain the Charter subscribers accused only of

22      being repeat infringers with respect to plaintiffs'

23      copyrighted works, correct?

24  A.   I think that's accurate.  That's accurate.

25            MR. EISEMAN:  Thank you very much.  That's,

Page 261

1     those are all the questions I have.

2                THE WITNESS:  And thank you for finishing

3     when you did.  We're, we're, yeah, glad to be done.

4     Thanks.

5                MS. GRIGSBY:  Yeah.  No questions from me.

6     Thank you.

7                MR. EISEMAN:  All right.  Why don't we go

8     off the record?

9                VIDEO TECHNICIAN:  This marks the end of

10    the deposition.  Going off the record.  The time is

11    5:53 p.m.

12                (Zoom Videoconferenced/Videotaped

13    Deposition concluded at 5:53 p.m.  Signature of the

14    witness was requested.)

15

16

17

18

19

20

21

22

23

24

25

Case No. 1:19-cv-00874-RBJ-MEH Document 551-690 Filed 11/05/2925 USDC Colorado Page 32 of 832

1                CERTIFICATE OF NOTARY

2    STATE OF MICHIGAN )

3                     ) SS

4    COUNTY OF OAKLAND )

5

6            I, Lori Ann Baldwin certify that this Zoom

7        Videoconferenced/Videotaped deposition was taken

8        before me on the date hereinbefore set forth; that the

9        foregoing questions and answers were recorded by me

10       stenographically and reduced to computer

11       transcription; that this is a true, full and correct

12       transcript of my stenographic notes so taken; and that

13       I am not related to, nor of counsel to, either party

14       nor interested in the event of this cause.

15

16

17

18           *Lori Baldwin*

19           Lori Ann Baldwin, CSR-5207, RPR, CRR

20           Notary Public,

21           Oakland County, Michigan

22       My Commission expires:  December 21, 2025

23

24

25