# Exhibit XI

# EXHIBIT C

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1    **HIGHLY CONFIDENTIAL**.

2    **ATTORNEY'S EYES ONLY**

3    **SOURCE CODE**

4

5              UNITED STATES DISTRICT COURT

6              FOR THE DISTRICT OF COLORADO

7              Case No. 1:19-cv-00874-RBJ-MEH

8

9    WARNER RECORDS INC., et al.,

10

                   Plaintiffs,

11

12        -against-

13

     CHARTER COMMUNICATIONS, INC.,

14

15                 Defendant.

16   -----------------------------------

17      VIDEOTAPED DEPOSITION OF TERRENCE McGARTY, Ph.D.

                 WEDNESDAY, OCTOBER 6, 2021

18

19            Videotaped deposition of TERRENCE

20   McGARTY, Ph.D., in the above-mentioned matter before

21   Jomanna DeRosa, a Certified Court Reporter (License

22   No.30XI00188500), and Notary Public of the State of

23   New Jersey, taken via Zoom at 24 Woodbine Road,

24   Florham Park, New Jersey 07932 on Wednesday, October

25   6, 2021 commencing at 9:04 a.m.

Page 6

1   located right now?

2         A.      In New Jersey.

3         Q.      Is anyone else in the room with you?

4         A.      No one in the room.

5         Q.      And do you have any electronic devices

6   available to you, like your cell phone?

7         A.      My mobile phone is turned off.  No other

8   devices are on or active.  I will close down one -- I

9   assume I have to leave -- do I leave my browser on

10  while I have this or can I turn the browser off

11  too -- no, I need the browser for the documents.

12        Q.      You'll probably need that for the

13  exhibit share.  Just to confirm, you're not going to

14  communicate with anybody today, other than on the

15  record at the deposition.  Is that correct?

16        A.      That's correct.

17        Q.      Thank you.  And do you have any

18  documents in the room for you to refer from?

19        A.      The room has documents.  It's my office,

20  but I will not be referring to any of the documents

21  in this room.

22        Q.      Okay.  And can you briefly describe the

23  nature of your current employment?

24        A.      I'm managing partner of Telmarc Group,

25  T-E-L-M-A-R-C.  It's an LLC operating in New Jersey,

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 7

1    but Delaware certified.

2         Q.    And how long have you held that role?

3         A.    Oh, Telmarc was founded in 1984, so I've

4    been in and out of that for that period of time.

5         Q.    And what are your primary

6    responsibilities in that role?

7         A.    We're slowly -- we were a technology

8    investment and management company.  We've invested

9    and started about 30 companies over that period of

10   time.  We're now slowly closing the investments down.

11   We've not done anything in about two and a half or

12   three years, especially during the pandemic.  We're

13   slowly closing it down.

14        Q.    Okay, and how many hours a week would

15   you say you dedicate to those responsibilities?

16        A.    On the Telmarc side, maybe ten hours a

17   week, not much.

18        Q.    And what's your annual salary from that

19   position, approximately?

20              MR. MILLER:  Objection.

21              THE WITNESS:  Salary?

22

23   BY MS. HUEBERT:

24        Q.    Yes.

25        A.    Never taken a salary.

Page 8

1      Q.      And do you take distributions?

2      A.      Yes, distributions occur.

3      Q.      And what is your annual income

4  approximately from Telmarc?

5              MR. MILLER:  Objection.

6              THE WITNESS:  Probably a couple 100,000.

7  I'm not sure.

8

9  BY MS. HUEBERT:

10     Q.      Other than your expert work, do you have

11 any other type of employment or income that comes in

12 regularly for you?

13     A.      I spend a lot of my time now in

14 philanthropic efforts doing cancer research at

15 Columbia/Presbyterian and MIT, which is most of my

16 time.

17     Q.      Are you compensated for those efforts?

18     A.      No, just the opposite.  I compensate

19 them.  That's the definition of philanthropy.

20     Q.      Does Telmarc hold any equity positions

21 for any internet service providers?

22     A.      No, as a matter of fact, all of our

23 positions have been liquidated.

24     Q.      And approximately, how much a year do

25 you make from your expert work?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 26

1    of a Hua Wei relationship.

2

3    BY MS. HUEBERT:

4         Q.    So neither of those entities ultimately

5    became operational in the sense that it delivered

6    services to customers?

7         A.    We delivered prototype services to

8    customers.  In the Linear A case, we had -- we did

9    Key, New Hampshire and Newburyport, Massachusetts and

10   we may have had 50 or 100 people trying it out to

11   make sure it worked, but we just could not get the

12   handsets properly deployed.  We were ten years too

13   early.  Welcome to venture business.

14        Q.    So it is fair to say that you don't have

15   direct experience in implementing a DMCA policy for

16   an ISP.  Correct?

17             MR. MILLER:  Objection.

18             THE WITNESS:  Correct.

19

20   BY MS. HUEBERT:

21        Q.    And when was the last time you worked in

22   management or operations for an ISP?

23        A.    It would be ten years ago.

24        Q.    So 2011?

25        A.    2010.

Case No. 19-cv-07016-BU-MEJ Document 554-89 Filed 11/05/21 DC Colorado Page 8 of 122

1    Q.    And since that time, have you received

2  any technical training or taken any courses related

3  to ISP operations or management?

4              MR. MILLER:  Objection.

5              THE WITNESS:  I've looked at several

6  dozen companies we considered investing in, and using

7  my prior experience and knowledge, I had to consider

8  their proposed networks and services.  So from an

9  investor perspective who had, you know, 45 years

10  worth of operational experience, I continued it

11  through looking -- and doing due diligence on those

12  investment opportunities.

13

14  BY MS. HUEBERT:

15    Q.    Okay, is there anything else?

16              MR. MILLER:  Objection.

17              THE WITNESS:  No.

18

19  BY MS. HUEBERT:

20    Q.    And have you ever been responsible for

21  the deployment of deep packet inspection technology

22  across an ISP?

23              MR. MILLER:  Objection.

24              THE WITNESS:  The answer to that is

25  complex.  In my European network, Zephyr, which we

Case No. 3:19-cv-07071-SI-MEJ Document 554-89 Filed 11/15/22 SDO Collaboration Page 9 of 122

Page 28

1    built out from Germany through Russia and down

2    through Greece and all through central and eastern

3    Europe, we did employ versions of deep packet

4    inspection in terms of the integrity of certain of

5    the network operations, all right.  So for example,

6    in light sick, we would check out certain packets

7    because our concern, especially after 9/11, was were

8    we getting traffic from certain of the old Soviet

9    states, so our network became a significant factor in

10   terms of monitoring IP traffic in and out of those

11   marketplaces.  Getting into any further detail would

12   be complex.

13

14   BY MS. HUEBERT:

15        Q.     And what time period would this be?

16        A.     This would be 2001 through 2004.

17        Q.     Okay.  And what kind of monitoring of

18   packets did you employ on the network for those

19   purposes?

20        A.     Without getting into too detailed

21   specific, if I may, our interest is who was sending

22   the message, who was the message going to, so looking

23   at IP addresses, the headers.  The frequency of the

24   messages, the length of the messages, items of that

25   type.  Frequently, the inards of the messages were

Case No. 1:19-cv-00874-RBJ-MEH Document 554-90 Filed 11/29/21 USDC Colorado Page 9 10 of 122

1    the deployment of walled gardens across an ISP?

2                    MR. MILLER:  Objection.

3                    THE WITNESS:  No.

4

5    BY MS. HUEBERT:

6         Q.    Have you -- do any of your books address

7    copyright infringement or the piracy of copyrighted

8    works on ISP networks?

9         A.    No.

10        Q.    Do any of your articles address

11   copyright infringement or the piracy of copyrighted

12   works on ISP networks?

13        A.    No.

14        Q.    Have you published any articles since

15   2007?

16        A.    Have I published any articles since

17   when?

18        Q.    2007.

19        A.    No, most of my focus has been

20   independently doing research.  I moved basically over

21   into the cancer area again.  So if you look at most

22   of my documents since that period of time when we

23   sold the company in '04/'05, I went up to MIT from

24   2005 to 2012.  On again off again, I had a group of

25   doctoral students and I started moving over into the

Case No. 1:19-cv-00874-RBJ-MEH Document 654-90 Filed 05/29/21 USDC Colorado Page 11 of 122

Page 35

1    genomic space.

2          Q.      Thank you.  And following up to that, on

3    page 14, you have a list of technical reports from

4    the past 12 years?

5          A.      Correct.

6          Q.      Let me know when you're there.

7          A.      I'm there.

8                  MR. MILLER:  Page 14 of what, Allison?

9                  THE WITNESS:  Of my CV?

10                 MS. HUEBERT:  Yes.

11

12   BY MS. HUEBERT:

13         Q.      So I just wanted to ask, you refer here

14   to "technical reports that we have written."  Are you

15   the author of these reports?

16         A.      I'm the sole author of all of those

17   reports.

18         Q.      So it's the royal "we," so to speak?

19         A.      It's too much time in academia, as we

20   can see.

21         Q.      And these are, as you said before,

22   primarily related to medical research.  Correct?

23         A.      If you go through this, there's a lot

24   that we've been doing over that period of time.

25         Q.      And none of these reports in the past 12

Case No. 1:19-cv-00874-RBJ-MEH Document 554-89 Filed 11/15/22 USDC Colorado Page 12 of 122

Page 36

1  years address operations or capabilities of an ISP.

2  Correct?

3          A.     Correct.

4          Q.     Have you ever taught any courses on

5  copyright infringement on the internet?

6          A.     Copyright infringements on the internet?

7          Q.     Correct.

8          A.     No.

9          Q.     Or an ISP response to copyright

10  infringement on the network?

11              MR. MILLER:  Objection.

12              THE WITNESS:  No.

13

14  BY MS. HUEBERT:

15          Q.     And have you supervised any search to

16  that effect?

17              MR. MILLER:  Objection.

18              THE WITNESS:  Research with regards to

19  copyright infringement on the internet?

20

21  BY MS. HUEBERT:

22          Q.     Or research regarding an internet

23  service provider's responsibility to respond to

24  copyright infringement on a network?

25              MR. MILLER:  Objection.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1              THE WITNESS:  Is that independent of the

2     current and prior cases I've examined?

3

4     BY MS. HUEBERT:

5          Q.    Yes, putting aside your work for the

6     plaintiffs, other than that.

7          A.    No.

8          Q.    But you have testified on behalf of the

9     plaintiffs in this case in three other cases, BMG v.

10    Cox, UMG v. Grande, and Sony v. Cox.  Correct?

11              MR. MILLER:  Objection.

12              THE WITNESS:  Correct.

13

14    BY MS. HUEBERT:

15         Q.    And the subject of your testimony in

16    those cases was similar to the subject of your

17    testimony in this case?

18              MR. MILLER:  Objection.

19              THE WITNESS:  Very similar, I believe.

20

21    BY MS. HUEBERT:

22         Q.    And other than those cases on behalf of

23    the plaintiffs, you haven't provided any expert

24    testimony related to copy infringement on ISP

25    networks.  Correct?

Case No. 1:19-cv-00874-RBJ-MEH Document 554-89 Filed 11/15/21 USDC Colorado Page 14 of 122

Page 43

1    opinions in this matter; are you?

2          A.    Not at all.

3          Q.    And there's nothing in your reports that

4    identifies a specific set of actions that plaintiffs

5    would agree are sufficient for avoiding liability for

6    copyright infringement.  Correct?

7                MR. MILLER:  Objection.

8                THE WITNESS:  I'm not opining on what

9    Charter should be doing in this case.  I am examining

10   it solely from a holistic operational perspective

11   based upon my experience.

12

13   BY MS. HUEBERT:

14         Q.    So putting aside Charter specifically,

15   there's nothing in your reports that identifies a

16   specific set of actions that an ISP could perform

17   that would be sufficient for avoiding liability for

18   copyright infringement?

19               MR. MILLER:  Objection.

20               THE WITNESS:  I'm not giving any

21   specifics that they should perform.

22               What I do say in the report, using my

23   experience in the area where there are legal

24   strictures, is that there are certain processes that

25   get put in place, which always require continual

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1  auditing and analysis of the results.  So we're

2  typically looking at the results that occur, and

3  without seeing specific data, I can't opine one way

4  or the other with regards to what Charter should do.

5

6  BY MS. HUEBERT:

7       Q.    And you don't opine, one way or another,

8  as to what an ISP should do to avoid liability for

9  copyright infringement.  Correct?

10            MR. MILLER:  Objection.

11            THE WITNESS:  I don't make a

12  recommendation or I'm not opining one way or the

13  other as to what the specifics of an ISP should do to

14  avoid copyright infringement, other than doing

15  something.

16

17  BY MS. HUEBERT:

18       Q.    And you're not offering an opinion about

19  when the appropriate point would be to terminate an

20  ISP subscriber for alleged copyright infringement.

21  Correct?

22            MR. MILLER:  Objection.

23            THE WITNESS:  In this particular case,

24  the decision to terminate at some point lies with the

25  ISP.

Case No. 1:19-cv-00874-RBJ-MEH   Document 554-90   filed 11/05/21   USDC Colorado   pg 16 of 122

1

2    BY MS. HUEBERT:

3         Q.    Correct, I'm asking about your opinions

4    though.  So you're not offering an opinion about when

5    the appropriate point would be to terminate a

6    subscriber's internet access for alleged copyright

7    infringement.  Correct?

8              MR. MILLER:  Objection.

9              THE WITNESS:  I -- again, just to

10   reiterate, that decision as to when to terminate a

11   customer on the basis of a copyright infringement is

12   solely the decision of the carrier, namely the ISP.

13

14   BY MS. HUEBERT:

15        Q.    So you're not offering an opinion on

16   that subject then.  Correct?

17        A.    I'm not offering an opinion with regards

18   to some specific event that demands that the ISP

19   terminate a customer.

20        Q.    Okay, thank you.  And you're not

21   offering an opinion on the proper definition of

22   repeat infringer or habitual user.  Correct?

23             MR. MILLER:  Objection.

24             THE WITNESS:  I'm not offering an

25   opinion with regards to how an individual ISP decides

Case No. 1:19-cv-00874-RBJ-MEH Document 554-90 Filed 11/15/21 USDC Colorado Page 17 of 122

1    what behavior constitutes repeat infringer and

2    ultimately could result in termination.

3

4    BY MS. HUEBERT:

5         Q.    And you're not offering an opinion on

6    the best way for an ISP to curb copyright

7    infringement on their network.  Correct?

8                   MR. MILLER:  Objection.

9                   THE WITNESS:  Consistent with my prior

10   answers, I'm not offering an opinion about the best

11   or optimum or ideal or required way that every ISP

12   should follow with regards to repeat infringers

13   and/or termination thereof.

14

15   BY MS. HUEBERT:

16        Q.    So it would be fair to say that you're

17   not offering an opinion about what Charter's policies

18   and procedures with respect to copyright infringement

19   should have been?

20                  MR. MILLER:  Objection.

21                  THE WITNESS:  I'm not offering an

22   opinion with regards to any of the specifics that

23   Charter should have taken with regards to dealing

24   with copyright infringement and termination.

25

Case No. 1:19-cv-00874-RBJ-MEH Document 554-39 Filed 11/22/21 USDC Colorado Page 18 of 122

1    Mischaracterizes the witness's testimony.

2              THE WITNESS:  What I'm saying is that I

3    don't know of any technical or operational way in

4    which Charter could do that.  There may be ways in

5    which you can influence people to do it.  That's not

6    within my purview.

7              MS. HUEBERT:  Thank you.

8

9    BY MS. HUEBERT:

10        Q.    Did you in the course of your work

11   compare Charter's implementation efforts related to

12   its policies and procedures to any other ISP?

13             MR. MILLER:  Objection.

14             THE WITNESS:  In doing this opinion, I

15   tried to put -- I put blinders on that said I'm just

16   going to focus upon Charter's functions, and I did

17   not want to incorporate anything that I may have

18   learned or become of aware of from other ISPs.

19             THE VIDEOGRAPHER:  The time is

20   approximately 10:13.  We're going off the video

21   record.

22

23             (Whereupon, a brief recess was taken off

24   the record.)

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 109

1        THE WITNESS:  I have no knowledge of

2    that, if I understand the question.

3

4    BY MS. HUEBERT:

5        Q.    And you're not offering any opinions to

6    that effect then?

7            MR. MILLER:  Objection.

8            THE WITNESS:  I believe that's the case.

9

10   BY MS. HUEBERT:

19       Q.    And in your previous operational

20   experience, are you familiar with the use of secure

21   messaging to deliver notices to customers?

22       A.    Yes, I am.

23       Q.    Is that a standard business practice in

24   your experience?

25       A.    It depends on the operation that you're

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 110

1    involved in.  It's common.  Common may not be

2    standard.

3         Q.    If Charter wanted to ensure that a

4    notice reached an account holder with control over

5    the account versus being deleted or started by a

6    teenager in the household, would requiring the

7    account holder to log in to view the security notice

8    be a reasonable means of effectuating the same?

9              MR. MILLER:  Objection.  Foundation.

10             THE WITNESS:  Again, Charter gets to

11   decide what it wants to do and how it wants to do it.

12   I'm not opining on reasonableness.

13

14   BY MS. HUEBERT:

15        Q.    In paragraph 29, you note that the

16   notices portal required users to have computers that

17   meet basic technical requirements, such as having

18   enabled JavaScript.  Do you know what it means to

19   have JavaScript enabled on your browser?

20        A.    JavaScript is a software program that

21   allows the ability to demonstrate different formats,

22   displays, whatever.  Typically, Java is updated on a

23   computer once you install it.  It's not used as much

24   now, but I'm somewhat familiar with JavaScript when

25   it was first developed by Sun probably 20 or 25 years

Page 111

1  ago.

2        Q.      And during the claims period, would it

3  be fair to say that a vast majority of internet users

4  used JavaScript-enabled browsers?

5        A.      I would say during this time period,

6  it's fair to say that JavaScript was quite common.

7        Q.      And you understand that all websites

8  require end users to have computers equipped with

9  basic technical requirements in order to be properly

10 viewed.  Correct?

11              MR. MILLER:  Objection.

12              THE WITNESS:  All computers are required

13 to have what?  Let me see if I can understand that.

14

15 BY MS. HUEBERT:

16       Q.      Sure.  It's your understanding that all

17 websites require end users to have computers equipped

18 with basic technical requirements in order to be

19 viewed?

20              MR. MILLER:  Objection.

21              THE WITNESS:  That is a fair statement,

22 correct.

23

24 BY MS. HUEBERT:

25       Q.      Is it your opinion that during the

Case No. 19-cv-00874-RBJ-MEH Document 554-89 Filed 11/15/21 USDC Colorado Page 22 of 122

Page 112

1    claims period in this case that the requirement of

2    having a computer with certain basic technical

3    requirements, such as enabled JavaScript, impose a

4    significant barrier to the average high-speed

5    internet users ability to view their account

6    information online?

7                    MR. MILLER:  Objection.  Foundation.

8                    THE WITNESS:  One of the problems you

9    have frequently is many of these users are neophytes

10   to the system.  Their children may know it better

11   than anybody else.  Some of the systems could be

12   quite limited.  Some of the systems could be quite

13   old.  You can't make a general statement that

14   everybody has both the technical competence and the

15   technology, which is totally up to date.

16

17   BY MS. HUEBERT:

18        Q.    Sure.  But do you have an opinion here

19   as to whether or not the requirement of having basic

20   technical requirements or JavaScript in order to use

21   Charter's website would have imposed some type of

22   barrier for the average user to access their account

23   information?

24                    MR. MILLER:  Objection.  Foundation.

25                    THE WITNESS:  If you read the last

Page 113

1    sentence of 29, I think the issue there is it may

2    have delimited certain users, and take a look at

3    footnote 30, okay.  This goes back to that specific

4    e-mail, and the issue there is how does Charter get

5    those notices directly out to the customer.  Again,

6    that's within the purview of Charter.  Some users may

7    be unable to grasp those notices.  I don't know.

8    That's kind of what the statement is making.

9

10   BY MS. HUEBERT:

11       Q.     Okay, but you didn't do any

12   investigation as to whether or not this imposed some

13   kind of unreasonable technical barrier to the average

14   technical user?

15       A.     I'm not aware of detailed demographics

16   with regards to what people have what capabilities at

17   that time.

18       Q.     And as source material for this is

19   actually a guide for customer service agents to help

20   explain to people how to make sure their browser

21   meets the requirements necessary to log on to

22   Charter's website?

23             MR. MILLER:  Objection.

24             THE WITNESS:  I've seen the documents on

25   Charter's website that basically assists the user in

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 114

1    being able to do this.

2



Case No. 1:19-cv-00874-RBJ-MEH Document 554-90 Filed 05/12/21 USDC Colorado Page 2 of 122



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Case No. 19-cv-00874-RBJ-MEH Document 554-89 Filed 11/15/21 USDC Colorado Page 27 of 122

Page 139

```
1    that if you -- if you're told that this customer may
2    have infringed and infringed using BitTorrent and a
3    peer-to-peer protocol, then correlated or
4    corroborated gets into the issue of well, it walks
5    like a duck, talks like a duck, looks like a duck,
6    but I can't sequence DNA and tell you definitively
7    that it's a duck because I can't get inside that
8    package.  What they can do is see the size of the
9    packet, the from and to, the frequency of the packet,
10   the port that's being used, which identifies the
11   application.  Those types of pieces of information
12   correlate with the fact that that could very well be
13   a BitTorrent packet, and if that customer has been
14   indicated as a copyright violation, it could give
15   you -- it could corroborate the claim, and by itself,
16   it would not be dispositive.
17        Q.    And this would be forward looking,
18   right, if looking at what a subscriber does after
19   Charter receives a notice.  Do you understand Charter
20   had the capability of looking back to what they were
21   doing at the time?
22        A.    It's ex post facto, not a priori -- ex
23   post facto.
24        Q.    For the benefit of all of us that didn't
25   take Latin in grade school, can you explain that
```

Case No. 19-cv-00874-RBJ-MEH Document 554-90 Filed 11/15/21 USDC Colorado Page 28 of 122

Page 140

1    answer more in layman's terms?  Charter doesn't have

2    any capability of looking back to see what a

3    subscriber did on a certain date or time.  Correct?

4         A.    Charter could look at the packets after

5    the fact, right, at which point they have been

6    notified.  They could not anticipate or look at

7    packets before the fact.

8         Q.    So they wouldn't be able to go back and

9    see what the subscriber was doing at the date and

10   time the notice alleged that they may have been

11   offered copyrighted material for sharing?

12             MR. MILLER:  Objection.

13             THE WITNESS:  Those packets would have

14   gone by, and unless -- what they could do is look at

15   that subscriber after having been notified and that

16   subscriber's ongoing subsequent behavior and to see

17   if it's consistent with someone deploying a

18   peer-to-peer, specifically BitTorrent.

19

20   BY MS. HUEBERT:

21        Q.    But they couldn't look at that

22   subsequent behavior and identify any actual

23   infringing activities based on the information that

24   Charter had available to it.  Correct?

25        A.    They would not have the capability to go

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 141

1    inside that packet and ascertain what that content

2    meant.

3          Q.     Are you aware of any court decision

4    suggesting that evidence -- are you aware of any

5    court decisions suggesting that evidence of the use

6    of peer-to-peer protocols alone is sufficient to

7    sustain a legal claim against an individual for

8    copyright infringement?

9                MR. MILLER:  Objection.  Calls for a

10   legal conclusion.

11               THE WITNESS:  No.

12

13   BY MS. HUEBERT:

14         Q.     And subscribers, again, could and did

15   use BitTorrent and other peer-to-peer protocols for

16   completely legal purposes.  Correct?

17               MR. MILLER:  Objection.

18               THE WITNESS:  Yes, they can be.

19

20   BY MS. HUEBERT:

21         Q.     In paragraph 36, you describe deep

22   packet inspection or DPI technology.  DPI allows an

23   ISP to monitor certain information about the traffic

24   on its network.  Correct?

25         A.     That's correct.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 142

1    Q.    And through that monitoring, DPI

2  providers can provide some insight as to traffic that

3  looks consistent with peer-to-peer protocol use.

4  Correct?

5    A.    That's correct.

6    Q.    Do you know if the capabilities DPI

7  providers during the relevant time period allowed for

8  an exact identification of what is and what is not

9  peer-to-peer?

10           THE WITNESS:  Corey, it's okay?

11           MR. MILLER:  Yes, you can answer.

12           THE WITNESS:  During this time period,

13  what they do is they look at the headers, they look

14  at ports, they look at the frequency of the packets,

15  they look at the length of the packets, and it

16  becomes, again, one of those walks like a duck, talks

17  like a duck, looks like a duck, okay, and most likely

18  it's a BitTorrent packet, okay.  So the question is:

19  Is it dispositive?  No.  Is it corroborative?  Most

20  likely.

21

22  BY MS. HUEBERT:

23    Q.    During the claims period, do you have an

24  understanding as to what would have been required of

25  an ISP to implement DPI such that it could obtain

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    information related to peer-to-peer use about every

2    packet stream going through it and tie that

3    information back to individual subscribers?

4                    MR. MILLER:  Objection.

5                    THE WITNESS:  Are you reading a sentence

6    or is that a separate question?

7

8    BY MS. HUEBERT:

9         Q.      It's a question.

10        A.      Okay, could you repeat it again?  I'm

11   sorry.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 144

10

11    BY MS. HUEBERT:

12          Q.      And the experience that you refer to in

13    your answer on the European networks, what time

14    period was that?

15          A.      That would have been 2001 to 2004.

16          Q.      And are you familiar with the type of

17    DPI technology available to ISPs Charter's size and

18    scope during the claims period in this case?

19          A.      I'm familiar with Cisco.  We had a Cisco

20    network.  We had a modified Cisco network, if I could

21    say so, and we had some special equipment that we put

22    on the network for the use of identification.

23          Q.      And what are you referring to?  Are you

24    referring to the 2001 to 2004 time frame?

25          A.      2001 to 2004.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 145

1      Q.    So you understand that the claims period

2   in this case is 2013 to 2016?

3      A.    And I'm certain things have improved

4   dramatically in the ten years.

5      Q.    So you would probably expect a less

6   available and how it works, but it changed quite a

7   bit during that time?

8      A.    Fundamentally, it's the same, but yes,

9   the point is the chips get a lot faster.  The issues

10  in terms of what you're looking for basically remain

11  the same.  The other issue now, for example, in

12  today's network, besides speed, they use AI, which

13  assists in the identification in a much more rapid

14  manner.

15     Q.    Are you talking about 2021?

16     A.    Well, I'm saying today's 2021 is

17  infinitely better than what I was doing in 2015, for

18  example.  In 2015, you could identify a great detail,

19  as indicated in many of the reports that I reviewed

20  in preparation for the opinion.

21     Q.    Just to make clear, you didn't -- you

22  don't have an opinion as to whether or not any of

23  these specific solutions were technically feasible

24  for Charter during the relevant time period?

25            MR. MILLER:  Objection.

Case No. 1:19-cv-00874-RBJ-MEH Document 554-90 Filed 11/15/21 USDC Colorado Page 34 of 122

Page 146

1          THE WITNESS:  Two part answer.  One,

2   from the record, it's clear that the technology was

3   available and operational during this time period.

4   The application of that technology to the Charter

5   network, all right, in toto is not something that I

6   examined.

7

8   BY MS. HUEBERT:

9       Q.    And when you say it's clear from the

10  record that the technology was available and

11  operational during this time period, is it your

12  statement that you believe that the technology was

13  available and operational such that it could be

14  implemented across Charter's entire network had it

15  chosen to do so?

16          MR. MILLER:  Objection.

17          THE WITNESS:  I'm saying as an existence

18  proof to a limited scale in that time frame, it

19  demonstrated the use of that technology.

20          But the second part of my prior answer

21  was with regards to putting it across Charter's

22  entire network, I was not asked to do that, nor did I

23  consider that as part of my opinion; an actual

24  physical implementation.

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 147

1   BY MS. HUEBERT:

2       Q.      As opposed to another kind of

3   implementation?

4       A.      Metaphysical?  No.

5       Q.      I'm just trying to understand you

6   qualifying your answer.

7       A.      How would you physically implement it,

8   what would put you where, how, what programs would

9   you change.  That's the physical --

10      Q.      You didn't consider that for purposes of

11  your opinion?

12      A.      I didn't consider that for my opinion on

13  the build out on Charter's network.

14      Q.      And did you do any independent

15  investigation as to what DPI capabilities were

16  available or used by ISPs generally during the claims

17  period in this case?

18      A.      Was I aware of what the DPI capability

19  was for all ISPs during this time period?

20      Q.      For any other ISP.

21      A.      I was aware that DPI was used across

22  many systems in this time period from things that

23  I've learned external to any of the cases, and it was

24  a tool that, in that time period, was focused in many

25  ways on network performance and network provisioning

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 148

1    and network growth.  So, for example, when we ran

2    networks, we had a network operation center, and the

3    important thing we would want to know is how much

4    more capacity do I have to put in, what are the major

5    users, who is using the services for what purposes,

6    how frequently, what's our peak hour, how many users

7    on, how much data rate in the peak hour, because this

8    all got into us deciding, for example, in Frankfurt,

9    how did I connect into the backbone of the internet,

10   did I need another hub in Vienna or something like

11   that.  So those types of technologies in this time

12   frame became very useful for characterizing an ISP's

13   traffic, traffic demands, growth, and performance

14   capability.

www.veritext.com                                                    888-391-3376

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 149



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 150



22

23    BY MS. HUEBERT:

24          Q.    And do you think it would have been

25    appropriate or legal for an ISP to throttle

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 167



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 168



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 191



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 192



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 193

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 194



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 195



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 196



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 197



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 198



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 199



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 200



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 202



Page 210

```
 1         Q.     Why don't you bring up your expert
 2    report and turn to page 44 to see that we're
 3    discussing the same article?
 4         A.     What page is it on?
 5         Q.     On the PDF I have open, it's 44.
 6         A.     Page 44?
 7         Q.     Uh-huh.
 8         A.     Got you.
 9         Q.     Do you see this article --
10         A.     It's the one above the 2006 article.
11         Q.     So you agree that this article is one of
12    the documents that you considered?
13         A.     There were two of them that were there,
14    and I was confusing it with the earlier version.
15    Yep, go ahead.
16         Q.     So if you can go back to Exhibit 10 -- I
17    mean Exhibit 9.
18         A.     What part of it are you pointing me to?
19         Q.     We'll go through it here.  If you could
20    scroll down to the second page, there's an
21    introduction.
22         A.     Okay.
23         Q.     Do you see approximately the third
24    sentence, it says:
25                "Peer-to-peer traffic has made up almost
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 211

1    one-third of the world's internet traffic for the

2    last few years."

3              A.      Correct.

4              Q.      Do you have any reason to dispute that

5    statement?

6              A.      Not at all.

7              Q.      And this article was published in

8    January of 2014.  Correct?

9              A.      Correct.

10             Q.      And the next sentence, he states:

11                     "When demand on limited network

12   resources from all network traffic, including P2P,

13   becomes too high, quality of service is degraded for

14   some or all traffic."

15                     Is that true, to your knowledge?

16             A.      It's a debatable conclusion in the sense

17   that the connection of, say, the Charter networks to

18   the internet backbone, which is the key issue, is if

19   Charter decides to buy 60 gigabits per second of

20   access and suddenly you end up with lots of

21   peer-to-peer traffic, it could degrade the capability

22   of other people trying to share that 60 gigabits per

23   second backbone.  It would mean that Charter would

24   then have to upgrade to, let's say, 100 gigabits per

25   second.  It puts an additional load on the network,

Page 212

1    but at the same time, it means that the carrier can

2    adjust for that by adjusting their Tier 1 interface,

3    all right.  So I mean, it's on the one hand on the

4    other hand type of an argument.  If you can keep up

5    with the capacity requirements demanded from the

6    users, then in effect, you will not see degradation

7    of that network capacity.

8         Q.    Okay, if you scroll to the next page, I

9    believe it's second to the last sentence, I note that

10   wrongful terminations --

11        A.    On page 3?

12        Q.    Yes.

13        A.    First paragraph?

14        Q.    It's the second to last sentence.

15   They're discussing ISPs obligations and the

16   respective termination of subscribers accused of

17   copyright infringement, and he notes --

18        A.    I'm sorry, the second to the last

19   sentence on page 3?

20        Q.    The first paragraph of page 3.

21        A.    Makes a big difference.  "As another

22   example, requires ISPs to terminate service repeat

23   infringers if the ISPs are to avoid liability"?

24        Q.    And the second part of that sentence --

25        A.    "But accordingly"?

Page 213

1      A.    Yes.

2      Q.    "Wrongful terminations might themselves

3  create the potential for provider liability to

4  customers for breach of contract, which creates a

5  dilemma for ISPs when knowledge is 100 percent

6  certain."

7      Q.    Do you disagree with this statement?

8          MR. MILLER:  Objection.  Calls for a

9  legal conclusion.  And just so the record is clear,

10 the previous statement was the witness reading from

11 the document.  It was not his own testimony.

12         THE WITNESS:  Correct.  I know Tom

13 Frieden who is involved in writing this.  This is a

14 legal conclusion, and I don't have the ability to

15 give you a dispositive answer with regard to that

16 legal result.  I know just from experience on

17 contracts, you've got to be very careful.  Whether

18 this is the case or not, I don't know.

19

20 BY MS. HUEBERT:

21     Q.    But you put yourself out as an expert on

22 crafting policies and procedures for ISPs to address

23 legal challenges on regulatory environment.  You

24 don't have -- do you have any reason to disagree with

25 the statement that wrongful terminations might create

Page 214

1  the potential for provider liability to customers for

2  breach of contract which creates a dilemma for ISPs

3  when knowledge is less than 100 percent certain?

4          MR. MILLER:  Objection.  Calls for a

5  legal conclusion.  Asked and answered.

6          THE WITNESS:  I specifically have stated

7  that my general approach to this and what I've seen

8  broadly is that the first thing we'll do is go out

9  and speak to counsel and get legal advice.  So I

10  don't start in the middle of the process.  I always

11  have to go back to the beginning and seek advice of

12  counsel as to whether or not what we're doing

13  subjects ourselves to potential liability, right,

14  which is why in my previous discussion when I was

15  talking about the AUP, I made the explicit comment

16  that if you're going to terminate somebody, you

17  should at least tell them what the conditions under

18  which they're getting terminated, whereas on the

19  Charter AUP that we discussed this morning, it was a

20  close-to-the-vessel thing that somehow or another,

21  we'll make the decision and then Charter will

22  terminate somebody not fully understanding the

23  conditions under which that termination would be

24  effected.

25          In this particular thing here, it would

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    imply -- it gets into this issue of what does the AUP

2    say.  If the AUP says oh, by the way, if you get X

3    number of complaints, we're going to tell you to

4    stop.  If you don't stop, then we will terminate you.

5    So that's an explicit identification of a policy

6    under which termination occurs, and that then becomes

7    part of the customer contract.

8

9    BY MS. HUEBERT:

10        Q.    In your experience as an expert in this

11   area, have you ever encountered a situation where

12   legal guidance as to what the law required was not

13   clear?

14              MR. MILLER:  Objection.  You can answer

15   the question, although I will instruct you that in

16   doing so, you should not reveal the substance of any

17   legal advice you have been previously provided by

18   other counsel.

19              THE WITNESS:  I'm trying to think.  I

20   try to deal with counsel upfront to the point at

21   which I get a reasonably safe level of clarity as to

22   what I must do, all right.  I can't think offhand of

23   a situation where I was left in an ambiguous

24   situation, all right.  Probably the most difficult

25   one I have ever had to deal with was the foreign

Case No. 1:19-cv-08848-RMJ-MEH Document 554-90 Filed 11/15/22 USDC Colorado Page 59 of 122

1  corrupt practices act and its strictures, and I

2  religiously adhered to the most conservative position

3  in dealing with our partners in that sense, because

4  the last thing you want to do is find that when

5  you're going through a liquidity event, your due

6  diligence pops up something that is inappropriate.

7  So in terms of your question, I can't think of a

8  specific one where ambiguity was a significant

9  factor.

10

11 BY MS. HUEBERT:

12      Q.    In your experience involving policies

13 and procedures for companies and ISPs, have you ever

14 encountered a situation where laws and regulations

15 seemingly conflict?

16      A.    Welcome to the United States.  There can

17 be conflict of laws.  Part of law school 101 is how

18 do you deal with conflict of laws.  It's not

19 something that I'm an expert in, and again, I would

20 go and seek advice of counsel and -- to finish that

21 off, I can't think of a specific case where I have

22 had a conflict of law or conflict of law or

23 principles involved.

24      Q.    I'll direct your attention to the

25 next -- to page 5.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 217

1     A.     Okay.

2     Q.     First full or second sentence in the top

3  paragraph.

4          "Uses for both punishment and warnings

5  are similar in that they require the technical

6  ability to identify specific individuals, but the

7  occasional false accusation would be a serious

8  problem for the former and not for the latter.  For a

9  similar reason, punishment requires reliable

10  identification of content to show that it is

11  copyrighted, whereas warnings could be issued to P2P

12  users, even when there is uncertainty over whether is

13  copyrighted."

14          Do you disagree with that statement?

15          MR. MILLER:  Objection.

16          THE WITNESS:  Well, this is a policy

17  paper for discussion.  I published in this journal,

18  so I kind of know what it does.  The issue here is

19  this is his opinion, all right, and punishment

20  requires reliable identification, which if you take a

21  look at these infringement notices, they provide IP,

22  time, date, what's been infringed upon, and it's

23  subject to perjury.  So there's some -- in my opinion

24  as an operator, and it's not a legal opinion, there's

25  some substantial validity with regard to those

Page 218

1    notices.

2              Now, providing warning to P2P users just

3    because they're P2P users, that's not clear to me if

4    that's something you want to get involved in.  Just

5    because someone is using a peer-to-peer, I'm not

6    talking about specifically a BitTorrent thing, which

7    has a notorious reputation, but I'm talking about

8    general peer-to-peer.  We used peer-to-peer as an

9    integral part of network operations.  You know, I

10   wouldn't want to go warn somebody just because we're

11   doing that.  So from my perspective, I agree I guess

12   with the first part of the sentence in the sense of

13   the reliable identification.  The second part, I

14   would be a little uncomfortable with just monitoring

15   all peer-to-peer traffic without any basis upon which

16   to do so.

17

18   BY MS. HUEBERT:

19        Q.    If you scroll down to the last paragraph

20   on this page.

21        A.    "Although the paper focuses"?

22        Q.    "Although the paper focuses on the

23   effectiveness of detecting technology and its policy

24   implications, there are other factors that must be

25   considered when deciding on the suitability of any of

Case No. 1:19-cv-00874-RBJ-MEH Document 554-9 Filed 11/15/21 USDC Colorado Page 62 of 122

Page 219

1    these technologies.  These include the privacy issues

2    that come with any form of observation, total system

3    cost, and the magnitude of the problem the detection

4    is supposed to solve.  If detection leads to

5    punishment, as some propose for copyright

6    enforcement, then there is also a need for a just

7    system of due proceeds for contested cases."

8              Do you agree with this statement?

9              MR. MILLER:  Objection.

10

11   BY MS. HUEBERT:

12       Q.    That these factors should be considered?

13       A.    Let me go through it and give you my

14   opinion.

15              "Although the paper focuses on the

16   effectiveness of detection technology and its policy

17   implications, there are other factors that must be

18   considered before deciding on the suitability of any

19   of these technologies."

20              That's always the case.

21              "These include privacy issues," which in

22   my earlier discussion, well, you can look at the from

23   and to and the outside of the package, but you

24   shouldn't be touching anything on the inside.

25              The second, "with any form of

Case No. 1:19-cv-00874-RBJ-MEH Document 554-90 Filed 05/22/21 USDC Colorado Page 63 of 122

Page 220

1    observation, total system cost," that's an issue of

2    how you best design and architect the system and what

3    is the total system cost.  Clearly, if it's a billion

4    dollars to do the system, you've got to start

5    thinking of other alternatives.  If you can do at a

6    much more moderate level of cost, and I have no basis

7    to make an opinion one way are the other, then you

8    consider those alternatives.

9            And then "if the detection leads to

10   punishment, as some propose for copyright

11   enforcement," the issue of due process.  Again, I'm

12   not an attorney and I'm not an expert in the DMCA,

13   but I believe the DMCA does include provisions for

14   remedial action, okay.  So that is sort of my reading

15   on this sentence that you questioned me about.

16       Q.    If you could turn to page 9.

17       A.    Nine?  Page 9?

18       Q.    Page 9.

19       A.    I'm there.

20       Q.    So are you familiar with swarm

21   infiltration that is a method of detecting potential

22   copyright infringement on the internet?

23       A.    It's also a method of warfare.  I'm not

24   technically up-to-speed on swarm infiltration.

25       Q.    He states here:

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 233



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 234



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 235



25

Page 236

9   new dispute with Charter about plaintiffs in this

10  case and further actions taking place after 2016?

11              MR. MILLER:  Let me think about that.

12              THE WITNESS:  I'm sorry, the dispute wit

13  Charter after?

14

15  BY MS. HUEBERT:

16      Q.    Are you aware that plaintiffs have

17  brought another lawsuit against Charter for actions

18  they took after 2016?

19      A.    The start of the current litigation was

20  after this period, is that what you're saying?

21      Q.    Are you aware that plaintiffs in this

22  case recently filed a new lawsuit against Charter for

23  activities taking place after May 17th, 2016?

24      A.    I'm not privy to the details of that

25  complaint.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 237

1      Q.      So you were not retained as an expert in

2  that matter?

3              MR. MILLER:  Objection.  There's a

4  process for Charter too for disclosure of experts who

5  have been retained and this deposition is not an

6  opportunity for you to do an end run around that

7  process.

8              MS. HUEBERT:  I can probably clean it

9  up.

10

11  BY MS. HUEBERT:

12     Q.      You're not offering any opinions based

13  on anything that Charter did after May 17th, 2016.

14  Correct?

15     A.      That's correct.

16     Q.      And you don't have any knowledge as to

17  Charter's policies and procedures after May 17th,

18  2016.  Correct?

19     A.      That's correct.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 238



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 239



Case 1:19-cv-00874-RBJ-MEH Document 554-90 Filed 11/05/21 USDC Colorado Page 71 of 122

Page 240



25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 241



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 242



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 243



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 244



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 245



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 246



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 247



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 248



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 249



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 250



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 251



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 252



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 253



20          THE VIDEOGRAPHER:  The time is 4:15.

21    We're going off the video record.

22

23          (Whereupon, a brief recess was taken off

24    the record.)

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 254

1          THE VIDEOGRAPHER:  The time is 4:17.

2    We're back on the video record.

3



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 255



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 256



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 257



Page 258

12      Q.      Is it your opinion that for an ISP to
13    adequately comply with the DMCA, it would need to
14    identify and terminate repeat infringers?
15      A.      It's my opinion that there's a process
16    that I've observed and employed myself over and over
17    again when there is a legal restriction or
18    requirement, that one starts by getting advice from
19    the attorneys on how best to deal with that.  It gets
20    followed then by the development a policy on how
21    we're going to deal with it and then a set of
22    processes and procedures, and in this particular
23    case, the next step would be developing an AUP so
24    that you notify your subscribers accordingly, and
25    then you employ the system to monitor whatever sort

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 259

1  of complaints may be coming in, take actions on those

2  accordingly, and most importantly as an ongoing

3  process, you order and assess its performance.  I've

4  employed this sequence of events myself over and over

5  again.  I've seen them in Nynex, Verizon, and a whole

6  bunch of other companies I've been associated with.

7              MR. MILLER:  I'll note my objection to

8  the previous question.

9

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 260



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 261

1    one of auditing the operations to see how they work



Page 262

1 ███████████████████████████████████████

2 ██████████████████████    ████████████

3

4         (Whereupon, a brief recess was taken off

5 the record.)

6

7         THE VIDEOGRAPHER:  The time is 4:29.

8 I've got to restart it.

9

10         (Whereupon, a brief recess was taken off

11 the record.)

12

13         THE VIDEOGRAPHER:  The time is 4:31.

14 We're back on the video record.

15

16 ████████████████

17 ████    ████████████████████████████

18 ████████████████████████████████████

19 ████████████████████████████████

20 ██████████████████████████

21       █████████    ████████    ██████

22 ██████████

23       ████████████    ████████████

24 ██████████████████████████████████████

25 ███████████████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 263



Page 264



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 265



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 266

Case 1:19-cv-00874-RBJ-MEH Document 554-30 Filed 11/05/21 USDC Colorado Page 98 of 122



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 268



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 269



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 270



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 271



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 273



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 274



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 275



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page  276



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 277

10      A.      I don't recall.

11              THE VIDEOGRAPHER:   The time is 4:50.

12      We're going off the video record.

13

14              (Whereupon, a brief recess was taken off

15      the record.)

16

17              THE VIDEOGRAPHER:   The time is 5:02.

18      We're back on the video record.

19

20      BY MS. HUEBERT:

21      Q.      Mr. McGarty, I would like to direct your

22      attention down to documents considered section of

23      your report, page 1 of three, attachment three.  Do

24      you have that?

25      A.      That's the second exhibit?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 278

1     Q.     This is your expert report, the

2  documents considered in attachment three.

3     A.     Okay.  Yes, the supplemental is there.

4     Q.     Are you looking at your supplemental

5  report or your opening report?

6     A.     I'm looking at attachment three,

7  documents considered, case documents.

8     Q.     Okay.  And I note that it does not

9  include Charter's responses to plaintiffs seventh set

10  of interrogatories.  Correct?

11     A.     I see that, yes.

12     Q.     No, you don't see that there.  Correct?

13     A.     I'm sorry?

14     Q.     Does that list include Charter's

15  responses to plaintiffs seventh set of

16  interrogatories?

17     A.     It includes Charter's fourth

18  supplemental response to the second set.  Is that

19  what you're talking about?

20     Q.     No, the seventh set.

21     A.     I don't see that.

22     Q.     Okay.  So let's go to exhibit --

23          MS. HUEBERT:  Is that loaded, Gracie?

24          (Whereupon, Exhibit 13 is marked for

25  identification.)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 313

1  prepared to make in this case?

2        A.    It's just my experience of -- of having

3  gone around BitTorrent.

4        Q.    So, you're not -- you're not expecting

5  to testify to the percentage of users that use

6  BitTorrent for the transfer of copyrighted material.

7  Correct?

8        A.    I'm not an expert in BitTorrent.  I'm

9  aware of it.  I've actually tried downloading it

10  once, but then I stopped from ever using it because I

11  was advised about its problems.

12        Q.    Okay, and so you don't have an expert

13  understanding that would allow you to competently

14  testify that BitTorrent is almost exclusively used

15  for the transfer of copyrighted content.  Is that

16  fair?

17             MR. MILLER:  Objection.

18  Mischaracterizes the witness's testimony.

19             THE WITNESS:  In my experience and

20  discussion with colleagues and people that are aware

21  of BitTorrent and having read through the literature,

22  it appears to me that it was something that was

23  exclusively used for copyright downloading.

24

25  BY MS. HUEBERT:

Page 314

1    Q.    Could you point me to the literature

2  that supports your opinion that BitTorrent was

3  exclusively used for the transfer of copyrighted

4  material?

5    A.    Many of the things that I read about

6  BitTorrent said it, Gnutella, and others similar to

7  it were almost exclusively used for copyright

8  infringement.

9    Q.    Can you point me to any authority that

10  makes that claim?

11    A.    I would have to go back and look at my

12  records.  I don't have it off the top of my head.

13    Q.    But that was not encompassed in your

14  report in this case?

15    A.    It was not in my report, no.

16    Q.    And it's based also on your

17  conversations with colleagues and their personal

18  experience?

19    A.    My students and colleagues, particularly

20  students who in this time frame were very well aware

21  of BitTorrent, and I remember conversations with them

22  as we did the Linear A approach to peer-to-peer and

23  when my graduate students were doing some of the ARPA

24  work.

25    Q.    But you're talking about their personal

Page 315

1    experience, but not some scholarly study on the

2    experiences of BitTorrent?

3               MR. MILLER:  Objection.

4               THE WITNESS:  Some of it was downloading

5    material.

6

7    BY MS. HUEBERT:

8         Q.    In your -- so your students were

9    downloading copyrighted material off BitTorrent?

10        A.    I think some of the students in the

11   group -- this is MIT and they're going to do

12   anything.

13        Q.    Did you tell them they shouldn't be

14   doing that?

15        A.    I didn't think of it at the time.  I was

16   there guiding their technical expertise, not their

17   moral virtue.

18        Q.    And you're not an expert on BitTorrent.

19   Correct?

20        A.    Excuse me?

21        Q.    You're not an expert on BitTorrent?

22        A.    No.

23        Q.    And you're not an expert on Gnutella?

24        A.    No.

25        Q.    Or any specific file sharing protocol.

Page 316

1   Correct?

2           A.      Any of the ones associated with this I'm

3   not an expert on at all.

4           Q.      So it's your fact testimony on the

5   percentage of people sharing copyrighted files on

6   BitTorrent.  Correct?

7                   MR. MILLER:  Objection.

8                   THE WITNESS:  That's correct.

9

10  BY MS. HUEBERT:

11          Q.      And you did issue a supplemental expert

12  report in this case.  Correct?

13          A.      That's correct.

14          Q.      And that would be Exhibit 2?

15          A.      That's correct.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 324



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 325



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 326



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 327



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 328



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 329



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 330



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 336

1    copyright notices?

2            MR. MILLER:  Objection.  Asked and

3    answered many, many times.

4            THE WITNESS:  I believe I answered that

5    on multiple repeated occasions.

6

7    BY MS. HUEBERT:

8        Q.    What was your answer?

9        A.    Charter decides how it wants to run its

10   own business.  I'm not opining on specific operations

11   with regard to Charter.

12           MS. HUEBERT:  Thank you.  No further

13   questions.  I appreciate everyone's time.

14           MR. MILLER:  Thank you.

15           THE VIDEOGRAPHER:  The time is 6:36.

16   We're going off the video record.

17

18           (Whereupon, the deposition was concluded

19   at 6:36 p.m.)

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 337

1                         CERTIFICATE

2

3

4             I, JOMANNA DEROSA, a Certified Court

5    Reporter and Notary Public of the State of New

6    Jersey, do hereby certify that the foregoing is a

7    true and accurate transcript of the testimony as

8    taken stenographically and digitally at the time,

9    place and on the date hereinbefore set forth, to the

10   best of my ability.

11

12

13        I DO FURTHER CERTIFY that I am neither a

14   relative nor employee nor attorney nor counsel of any

15   of the parties to this action, and that I am neither

16   a relative nor employee of such attorney or counsel,

17   and that I am not financially interested in the

18   action.

19

20

21                    JOMANNA DEROSA

22                    JOMANNA DEROSA, C.C.R.

                      License No. 30XI00188500

23                    Notary Public of the

                      State of New Jersey

24

25