# Exhibit XII

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-00874-RBJ-MEH

WARNER RECORDS INC., et al.,

     Plaintiffs,

v.

CHARTER COMMUNICATIONS, INC.,

     Defendant.

---

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

---

For years, Charter has systematically helped its subscribers engage in massive copyright infringement. Charter knew it had users who were repeat infringers. Charter knew it was receiving millions of infringement notices from copyright owners. Charter knew the law required it to do something about the infringement on its network. And Charter had the right and ability to stop it. Yet, Charter did nothing—other than pocket millions of dollars a month in subscription fees from those repeat infringers.

Plaintiffs, the world's leading record companies and music publishers, seek redress for the infringement of over 10,000 of their copyrighted musical works. Since 2012, hundreds of thousands of Charter subscribers have illegally downloaded and distributed Plaintiffs' music through online file-sharing programs like BitTorrent. Pursuant to the Digital Millennium Copyright Act ("DMCA"), Plaintiffs provided Charter with clear notice of this illegal activity, sending Charter ██████████████ from 2012-2015, identifying specific IP addresses from which Charter could identify its subscriber accounts that were infringing. Despite knowing of this infringement, and that it violated the law and Charter's terms of service, Charter chose to continue

facilitating its subscribers' infringement by providing known repeat infringers ongoing access to Charter's high-speed internet service, which those subscribers used to infringe Plaintiffs' works.

Charter knew the identities of its infringing subscribers because it tracked the notices it received, enabling it to identify prior and subsequent infringement notices for any particular subscriber. Thus, Charter knew that specific subscribers had been the subject of thousands or even tens of thousands of notices. For example, ████████████████████████████████ ████████████████████████████████. ████████████████████████ ████████████████████████████████████.

Based on this knowledge, Charter had an obligation to take steps to stop, reduce, or address in some meaningful way its subscribers' infringing behavior. But Charter did not. ██████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████. ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████.

The reason Charter did nothing to curtail its subscribers' infringement is simple: by turning a blind eye and facilitating the infringement, Charter reaped millions of dollars in subscription fees that it would have lost if it terminated the infringing subscribers' accounts.

Charter easily could have avoided all monetary liability for copyright infringement had it simply complied with the safe harbor that Congress included in the DMCA for cases just like this. Charter merely needed to adopt and reasonably implement a repeat infringer policy that provided for termination in appropriate circumstances, and communicate that policy to its subscribers. 17 U.S.C. § 512(i). Instead, Charter implemented a policy and practice of ignoring repeat infringers—never terminating their service. Charter admitted as much when it withdrew its safe harbor defense following the close of fact discovery. ECF No. 528. As a result of its deliberate choices, Charter forfeited the possibility of immunity from Plaintiffs' copyright infringement claims.

Against that backdrop, the purpose of this motion is to narrow the issues for trial and streamline the presentation of the evidence to the jury in two significant areas:

*First*, this motion seeks to resolve two foundational issues not subject to any reasonable dispute: (1) Plaintiffs own or control the copyright in each work identified in their accompanying declarations, each of which has been validly registered; and (2) the files that Plaintiffs contend Charter's subscribers distributed and are infringing do indeed contain copies of Plaintiffs' works. Resolving these issues now will streamline trial, sparing the jury from days of tedious, unrefuted evidence concerning each of the 10,000-plus Plaintiffs' works.

*Second*, Plaintiffs seek summary judgment finding that they have established (i) both the knowledge and material contribution elements necessary to hold Charter liable for contributory infringement, and (ii) the right and ability to control element required to establish vicarious liability. Plaintiffs leave for trial proving direct infringement and the remaining element to establish vicarious liability, direct financial benefit.

## STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF")

### A.     Ownership of Plaintiffs' Works

1.      Plaintiffs own, or have an exclusive license to, the rights under the Copyright Act to reproduce and distribute each of the copyrighted works identified in the Appendices to their respective declarations ("Plaintiffs' Works").  *See generally* Blietz Declaration ("Decl."); Kokakis Decl.; Leak Decl.; McMullan Decl.; Patel Decl.; Parry Decl.

2.      Plaintiffs' Works are validly registered with the Copyright Office, as evidenced by a registration certificate or a print-out of the registration information from the Copyright Office's official public catalog for each of Plaintiffs' Works.  Blietz Decl. ¶¶ 6, 9; Kokakis Decl. ¶¶ 6, 8; Leak Decl. ¶¶ 5, 8; McMullan Decl. ¶¶ 5, 8; Patel Decl. ¶¶ 5, 7; Parry Decl. ¶¶ 5, 8; *see also* Request for Judicial Notice, filed herewith, ECF No. 548.

### B.     Plaintiffs Provided Notice of Infringement to Charter

3.      Charter Communications, Inc. is an Internet Service Provider ("ISP") that markets and sells high-speed internet services on its network to over 29 million customers.  Kaplan Ex. 27.

4.      Plaintiffs have not authorized Charter, or its subscribers, to make the reproductions or distributions of Plaintiffs' Works at issue here.  Blietz Decl. ¶ 10; Kokakis Decl. ¶ 9; Leak Decl. ¶ 9; McMullan Decl. ¶ 9; Patel Decl. ¶ 8; Parry Decl. ¶ 9.

5.      In an effort to combat online piracy, the record company Plaintiffs authorized their trade association, the Recording Industry Association of America ("RIAA"), to conduct certain anti-piracy activities as to infringement on BitTorrent, Gnutella, eDonkey, and Ares peer-to-peer ("P2P") networks.  Leak Decl. ¶ 4; McMullan Decl. ¶ 4; Parry Decl. ¶ 4.

6.      The RIAA retained a company called MarkMonitor to scan P2P networks for unauthorized distribution of Plaintiffs' Works and send notices to applicable ISPs.  ███████

4

███████ MarkMonitor has been verifying infringement of works for RIAA.  Bahun Decl. ¶¶ 7, 15.

7.        ████████████        process  was  as  follows:  ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████        Bahun Decl. ¶ 15.

8.        A cryptographic hash value is an alphanumerical representation of the contents of a digital file.  Frederiksen-Cross Decl. ¶ 5.  Identical files will have the same hash value, as Charter's expert Kevin Almeroth agrees.  Kaplan Decl. Ex. 6 (Tr. 145:7-9 ("If you have two different files and they are identical, they have the same hash values, so one is essentially a copy of the other . . . .")).  *See also* Bahun Decl. ¶¶ 10-11; Frederiksen-Cross Decl. ¶¶ 5-11.

9.        ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████        Bahun Decl. ¶ 12-17.

10.        The infringement notices MarkMonitor sent to Charter contained, *inter alia*, (i) an identification of the Charter subscriber by IP address, (ii) the specific date and time of the infringing act, (iii) the name of the infringing file, (iv) a cryptographic hash value identifying the infringing file, (v) a representative sample of what was infringed by song title, and (vi) the P2P network on which the infringement was detected.  Bahun Decl. ¶ 21; Kaplan Ex. 31.

11.        ████████████████████████████████████████████████

████████████████████        Bahun Decl. ¶ 18; Kaplan Ex. 28.

12.        ████████████████████████████████████████████████

5

████████████████████████████████████████████████████████████████████

██████████████████████████████████████     Bahun Decl. ¶¶ 20, 23.

13.     ████████████████████████████████████████████████████

█████████████████████████████     Frederiksen-Cross Decl. ¶¶ 12-14.

14.     For this litigation, seven expert audio engineers conducted a critical listening analysis comparing the audio recordings at issue, *i.e.*, comparing copies of Plaintiffs' Works (SUMF ¶ 1) to files ██████████████████ (*id*. ¶¶ 12-13).  They confirmed that each of Plaintiffs' Works was copied, in whole or substantial part, in files █████████████████ Burst Decl. ¶ 21; Cass Decl. ¶ 21; Cheriff Decl. ¶ 20; Gilchrest Decl. ¶ 21; Lai-Tremewan Decl ¶ 20; Maltas Decl. ¶ 20; Wineman Decl. ¶ 21; *see also* Buchan Decl. ¶¶ 10-12 & Exs. 2A-2B.

15.     Prof. Paul Geluso, an expert audio engineer and Director of Music Technology at New York University, also conducted waveform and spectrogram analysis comparing Plaintiffs' Works (SUMF ¶ 1) to files ██████████████████ (*id*. ¶¶ 12-13), as well as critical listening. He likewise concluded that files ██████████████████ contained, in whole or substantial part, copies of Plaintiffs' Works.  Geluso Decl. ¶ 65; Buchan Decl. ¶¶ 10-12 & Exs. 2A-2B.

C.     **Charter's Receipt and Tracking of Plaintiffs' Notices**

16.     During the Claim Period, ████████████████████████████████

████████████████, including those from Plaintiffs.  Kaplan Ex. 2 (Interrog. 13).

17.     Upon receipt of MarkMonitor's notices, ████████████████████

████████████████████████████████████████████████████████████████████

████     Kaplan Exs. 7 (Hanrahan Tr. 142:12-20, 144:25-145:9), 8 (Haynes Tr. 228:16-229:1).

18.     ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████



███████████████████████████████████████████████████
████████████████████████████████████ Kaplan Ex. 9 (Jones Tr. 64:20-65:12).

███████████████████████████████████████████████████
███ *Id*. Ex. 10 (McNeil Tr. 134:25-135:5). ███████████████████████
████████████████████████████ *Id*. Ex. 13 (Stewart Tr. 226:17-227:3).

19.     Before and during the Claim Period, ███████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████ Kaplan Exs. 24 (at 4, 6), 8 (Haynes Tr. 240:8-241:17).
███████████████████████████████████████████████████
██████████████████████████████ *Id*. Ex. 22. ██████████████████
███████████████████████████████████████████████████
██████████████████ *Id*. Ex. 25 (at 138002).

20.     ███████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████ Kaplan Exs. 7 (Hanrahan Tr. 40:19-
41:1), 8 (Haynes Tr. 57:13-58:13), 21 (Stewart Tr. 27:17-29:20). ████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████████ *Id*. Exs. 11

(Rolls Tr. 199:8-22, 201:10-22), 12 (Rowlett Tr. 203:9-204:1).

21.     In June 2012, a Charter employee wrote of this process: 

Kaplan Ex. 18.

22.     As the Claim Period progressed,

Kaplan Ex. 8 (Haynes Tr. 84:7-86:19).

Kaplan Ex. 13 (Stewart Tr. 150:19-151:3).

Kaplan Ex. 8 (Haynes Tr. 104:6-107:16).

23.

Kaplan Ex. 8 (Haynes Tr. 88:13-21; 96:20-97:6).

*Id*. (Haynes Tr. 224:10-16).

*Id*. (Haynes Tr. 97:7-98:15; 101:18-24).

24.

*Id*. (Haynes Tr. 98:16-21).

25.



Kaplan Exs. 2 (Interrog. 13), 24 (at 4, 7), 8 (Haynes Tr. 244:4-246:24).

**D.**

26.     Charter's Acceptable Use Policy ("AUP"), to which all subscribers agreed as a condition to using Charter's internet service, prohibited subscribers from using the service to infringe copyrights or violate the law.  One version of the AUP during the Claim Period stated, "[i]f Charter receives more than one notice alleging copyright infringement on the Customer's part, *Customer may be deemed a 'repeat copyright infringer*.' Charter reserves the right to terminate the accounts . . . of repeat copyright infringers."  Kaplan Ex. 16 (emphasis added).

27.     During the Claim Period,

Kaplan Exs. 4 (RFA 4), 2 (Interrog. 14).

28.     In contrast,

Kaplan Ex. 1 (Interrog. 12).

29.

Kaplan Ex. 3 (Interrog. 16).

30.

Kaplan Exs. 5 (RFA 14), 13 (Stewart Tr. 244:23-246:19), 15, 17 (at 80432), 19, 20, 21, 23.

31.  Kaplan Exs. 13 (Stewart Tr. 297:18-299:16), 9 (Jones Tr. 128:10-23).

32. Kaplan Exs. 4 (RFA 6), 8 (Haynes Tr. 188:1-189:8).

33. Kaplan Exs. 8 (Haynes Tr. 164:20-165:21), 14 (Taylor Tr. 47:4-49:16, 142:11-143:14, 148:10-150:13).

34. Kaplan Exs. 14 (Taylor Tr. 58:12-17), 26 (at 143335).

*Id.* Exs. 8 (Haynes Tr. 187:8-25), 14 (Taylor Tr. 58:19-59:2).

35. Kaplan Exs. 5 (RFA 18), 7 (Hanrahan Tr. 270:7–271:21, 284:18–285:25).

Plaintiffs address this issue in a separate motion pursuant to Fed. R. Civ. P. 37 to be filed shortly.

## **LEGAL STANDARD**

A party may move for summary judgment as to a "part of each claim or defense." Fed. R. Civ. P. 56(a). A court may also grant summary judgment on a discrete factual issue over which

no material dispute exists. *United States v. Pioneer Nat. Res. Co.*, 309 F. Supp. 3d 923, 925 & n.1 (D. Colo. 2018) (adjudicating issue of corporate successor liability and observing that "[t]he freedom to use summary judgment procedure to address issues or elements of a claim is an important feature of Rule 56, making it a much more useful case management device") (quoting Moore's Federal Practice). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must make a showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden then shifts to the non-movant to "come forward with 'specific facts showing there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ARGUMENT

### I. PLAINTIFFS OWN THE WORKS IN SUIT, AND EACH IS COPIED IN THE FILES MARKMONITOR DOWNLOADED FROM P2P NETWORKS.

#### A. Plaintiffs Own or Control Exclusive Rights in Each of Plaintiffs' Works.

A plaintiff may sue for copyright infringement if it is the "legal or beneficial owner" of the exclusive right (or rights) alleged to have been infringed in the pertinent work. 17 U.S.C. § 501(b); *see also Righthaven LLC v. Wolf*, 813 F. Supp. 2d 1265, 1271–72 (D. Colo. 2011). "A copyright registration certificate is prima facie evidence of the facts stated therein, including evidence of ownership." *Cent. Tel. Co. of Va. v. Johnson Publ'g Co.*, 526 F. Supp. 838, 842 (D. Colo. 1981) (citing 17 U.S.C. § 410(c)). "In addition to evidence of the copyright registrations, courts consider other indicia of ownership … [including] 'the parties' intent and the terms of transfer agreements and other documents establishing a chain of title.'" *Sony Music Entm't v. Cox Commc'ns, Inc.*, 426 F. Supp. 3d 217, 224 (E.D. Va. 2019) ("*Sony v. Cox*") (holding that "'chain[s] of title' include

acquisitions of ownership as well as exclusive licenses") (citing cases).

Plaintiffs have proven that they own or control the exclusive rights under copyright for each of Plaintiffs' Works. Plaintiffs have either produced the registration certificate itself or a printout of the registration information from the Copyright Office's official public catalog. SUMF ¶ 2. For the majority of Plaintiffs' Works, the registration lists a Plaintiff as a named claimant. *Id.* As to the remainder, the copyright registration lists a predecessor of a named Plaintiff as the claimant, or Plaintiffs acquired their rights from a third party or foreign affiliate, as evidenced by Plaintiffs' declarations and exhibits thereto in support of this motion. SUMF ¶¶ 1-2. Accordingly, Plaintiffs' *prima facie* ownership of Plaintiffs' Works has been established. *See BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 644–53 (E.D. Va. 2015); *Sony v. Cox*, 426 F. Supp. 3d at 223–29. It is now Charter's burden to overcome that presumption and submit evidence sufficient to raise a genuine triable issue. *Matsushita*, 475 U.S. at 586.

### B. The Files that Plaintiffs Contend Charter Subscribers Unlawfully Distributed Contain Copies of Plaintiffs' Works.

Downloading and distributing copyrighted music via P2P networks without authorization constitute direct copyright infringement, violating the exclusive rights of reproduction and distribution, respectively. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 920 (2005) ("although [P2P] networks … can be used to share any type of digital file, [users] have prominently employed those networks in sharing copyrighted music and video files without authorization"); *In re Aimster Copyright Litig.*, 334 F.3d 643, 645 (7th Cir. 2003) ("Teenagers and young adults who have access to the Internet like to swap computer files containing popular music. If the music is copyrighted, such swapping, which involves making and transmitting a digital copy of the music, infringes copyright."). Thus, to establish direct infringement, Plaintiffs need only to show that (i) Charter subscribers downloaded or distributed files, and (ii) those files contain

unauthorized copies of Plaintiffs' Works.  *Id.*

At trial, Plaintiffs will prove the first component—that Charter subscribers *copied or distributed* the files that MarkMonitor ███████████████████████████████████████

For now, Plaintiffs seek partial summary judgment only regarding the second component:  that each of Plaintiffs' Works is *included* in one or more of those files.  This important factual issue is ripe for determination by the Court, which will streamline the presentation of evidence and issues for the jury, and avoid the need to offer voluminous evidence showing the identity between thousands of works and the corresponding files that Plaintiffs contend Charter subscribers copied and distributed.  At trial, Charter may still dispute whether its subscribers distributed these files. But there can be no dispute that the files contain copies of Plaintiffs' Works.

Each infringement notice that MarkMonitor sent to Charter detailed the infringement at issue.  That information included the name of the file and its cryptographic hash value.  SUMF ¶ 10.  The cryptographic hash value for a file is unique.  What that means is that any two files with the same cryptographic hash value are identical, down to the very last bit in the file.  *Id.* ¶ 8.

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

The undisputed evidence establishes that these files contain Plaintiffs' Works.

*First*, Plaintiffs produced in discovery, and have identified here by Bates number, authentic digital copies of Plaintiffs' Works.  *Id.* ¶ 1.  *Second*, two different types of experts—seven audio engineers who engaged in critical listening, and one who performed both critical listening and

waveform and spectrogram analysis—compared each of those authentic copies of Plaintiffs' Works to an individual digital audio file ██████████████████ (identified by the file's hash value). They concluded in each instance that the files █████████████████ contain, in whole or substantial part, copies of Plaintiffs' Works. *Id*. ¶¶ 1, 12-15.

Charter brought forward no contrary evidence—either in the form of rebuttal expert testimony, documentary evidence, or lay testimony. Thus, the uncontroverted evidence shows that each of Plaintiffs' Works is contained in the files that ████████████████████████ ████████████████████ Accordingly, the Court should grant summary judgment to Plaintiffs finding that each of Plaintiffs' Works is copied ████████████████████████ ████████████████ to the accompanying Declaration of Kristofer Buchan.

## II. PLAINTIFFS HAVE ESTABLISHED BOTH ELEMENTS OF CONTRIBUTORY INFRINGEMENT.

"[C]ontributory liability attaches when the defendant causes or materially contributes to another's infringing activities and knows of the infringement." *Diversey v. Schmidly*, 738 F.3d 1196, 1204 (10th Cir. 2013). It is undisputed that Charter had knowledge of the identities of specific subscribers who were infringing Plaintiffs' Works, and continued to provide them the internet service required for their continued infringement, rather than doing something to stop or limit it. While Plaintiffs do not seek summary judgment on the underlying direct infringement claims for which Charter is contributorily liable, the Court can nevertheless determine that there are no disputed material facts on the elements that establish contributory liability. *See, e.g.*, *Sony v. Cox*, 426 F. Supp. 3d at 233 (denying summary judgment on direct infringement and holding, nevertheless, that "Plaintiffs have established the knowledge element of contributory liability by showing knowledge of specific conduct which allegedly infringed all sound recordings and musical compositions identified in suit. No genuine issue of material fact remains.").

## A.      **Charter Had Requisite Knowledge of Infringement.**

The Tenth Circuit has not decided whether the knowledge element of contributory liability requires a showing of actual knowledge of infringement, or whether constructive knowledge is sufficient. District courts within the Circuit, however, have found either sufficient to hold a party contributorily liable. *See, e.g.*, *Hermeris, Inc. v. Brandenburg*, 2011 WL 231463, at *3 (D. Kan. Jan. 23, 2011) ("Plaintiff may establish defendant's knowledge by showing either actual or constructive knowledge of the direct infringement."). The circuit courts that have considered the question are split as to whether constructive knowledge suffices,[1] but the undisputed evidence here establishes that Charter had knowledge of its subscribers' infringement under either standard.

In a materially identical case against another ISP, the Fourth Circuit, applying the actual knowledge standard, held that it "requires a defendant to have specific enough knowledge of infringement that the defendant could *do* something about it." *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 311–12 (4th Cir. 2018) ("*BMG*"). The Fourth Circuit went on to hold that an ISP's knowledge that a subscriber repeatedly infringed gives rise to a presumption of knowledge that they will infringe again, and of intent by the ISP to cause additional infringements. *Id*. at 307–08. The court provided the following illustration:

> Consider a company that leases VCRs, learns that specific customers use their VCRs to infringe, but nonetheless renews the lease to those infringing customers. Given those facts, the company knows that its action—renewing the lease of the VCR to these specific customers—is substantially certain to result in infringement, and so an intent to cause infringement may be presumed.

*Id*. at 308 (citing *Perfect 10 v. Amazon.com*, 508 F.3d 1146, 1172 (9th Cir. 2007)).

---

[1] *Compare Aimster*, 334 F.3d at 650 ("it may be enough that the defendant *should* have known of the direct infringement"), *and A&M Records, Inc*. *v*. *Napster*, *Inc*., 239 F.3d 1004, 1020 (9th Cir. 2001) ("Contributory liability requires that the secondary infringer 'know or have reason to know' of direct infringement."), *with BMG*, 881 F.3d at 308 (rejecting constructive knowledge standard; holding that contributory infringement requires showing of actual knowledge or willful blindness).

In *Sony v. Cox*, applying the *BMG* standard to nearly identical facts and based on the very same notice program Plaintiffs used here, the Eastern District of Virginia granted summary judgment on knowledge, concluding that,

> [Plaintiffs'] notices accomplished far more than telling Cox that *some number* of subscribers were infringing. They told Cox *which ones* [were infringing]. The standard is focused on the subscriber, not the particular works infringed, and the specific instance of infringement guides service providers to the source.

426 F. Supp. 3d at 233. In an earlier discovery ruling, this Court observed, without discussion, that providing notice of the specific works infringed "is fundamental to Plaintiffs claims." ECF No. 284, at 8. But Plaintiffs respectfully submit that, as per the Fourth Circuit's *BMG* decision and the *Sony v. Cox* ruling, providing notice of specific acts of infringement by specific subscribers establishes the requisite knowledge because it enables the ISP to "*do* something" about it. *BMG*, 881 F.3d at 311–12.

Precisely as in *Sony v. Cox*, to the extent Plaintiffs establish direct infringement, their notices informed Charter of specific instances of specific subscribers using its internet service to infringe Plaintiffs' Works. Those notices included, *inter alia*, identification of a specific Charter subscriber, the subscriber's IP address, a date and time stamp of the infringing conduct, and the hash value pertaining to the underlying infringing file. SUMF ¶ 10.



*Id*. ¶ 17.

*Id*. ¶ 18. Thus, for example,

. *Id*. ¶ 19.

Accordingly, while Plaintiffs still need to establish the direct infringements identified in the notices, Charter had actual knowledge of such ongoing infringement by specific Charter

16

subscribers. Armed with the foregoing actual knowledge of infringement of Plaintiffs' Works by its subscribers, Charter "could *do* something about it," *BMG*, 881 F.3d at 311–12, *i.e.*, throttle, suspend, or terminate the infringing subscribers' service pursuant to Charter's AUP. SUMF ¶¶ 26, 28–30, 32. *Sony v. Cox*, 426 F. Supp. 3d at 232 ("[B]ecause [the ISP] maintained the ability to suspend or terminate these infringing accounts, this was 'specific enough knowledge of infringement that the defendants could *do* something about it."). ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████ SUMF ¶ 34.

The Eastern District of Virginia twice held that DMCA-compliant infringement notices are sufficient to establish a defendant's knowledge for purposes of contributory infringement. *Sony v. Cox*, 426 F. Supp. 3d at 232 ("Based on the level of detail included in the notices directed at Cox and its subscribers, there is no doubt that Defendants had more than just 'generalized knowledge' of infringement."); *BMG v. Cox*, 149 F. Supp. 3d at 671 ("Despite Cox's arguments to the contrary, DMCA-compliant notices are evidence of knowledge."). This Court should reach the same conclusion and grant partial summary judgment that, to the extent Plaintiffs establish the direct infringements described in their notices, Charter had knowledge of such infringements.

### B.    Charter Materially Contributed to its Subscribers' Infringement.

"There can be no question that the provision of high-speed internet service materially contributes to infringement via BitTorrent and that [ISP] had the means to withhold that assistance upon learning of specific infringing activity." *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 199 F. Supp. 3d 958, 979 (E.D. Va. 2016) (reversed in part and remanded for new trial on other grounds). This ruling follows the widely-accepted principle that "providing the site and

facilities for known infringing activity is sufficient to establish contributory liability." *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996).

"Although the Tenth Circuit has not addressed contributory liability for copyright infringement in the context of computer system operators, the Ninth Circuit has articulated a specific test for determining liability in such cases." *Tomelleri v. Zazzle, Inc.*, 2015 WL 8375083, at *14 (D. Kan. Dec. 9, 2015) (citing *Perfect 10*, 508 F.3d at 1172). Applying that test in an analogous context to here, the Ninth Circuit in *Perfect 10* held that,

> Google substantially assists websites to distribute their infringing copies to a worldwide market and assists a worldwide audience of users to access infringing materials . . . [and] could be held contributorily liable if it had knowledge that infringing . . . images were available using its search engine, could take simple measures to prevent further damage to [plaintiffs'] copyrighted works, and failed to take such steps.

508 F.3d at 1172.[2] *See also BMG*, 881 F.3d at 306–08, 311–12 (explaining that Cox could be found liable for contributory infringement for continuing to provide internet service to its subscribers who were the subject of infringement notices if Cox had specific enough knowledge of infringement that it could do something about it; remanding on other grounds).

The undisputed facts here show that 

SUMF

¶¶ 26-33.

*Id.* ¶¶ 20-

---

[2] A court in the District of Utah recently declined to adopt the Ninth Circuit's standard in *Perfect 10* in an opinion with sparse analysis dismissing a *pro se* plaintiff's infringement claim. *See Greer v. Moon*, No. 20-cv-00647, 2021 WL 4291197, at *3 (D. Utah Sept. 21, 2021).

21. Even worse, over the course of the Claim Period, ████████████

████████████████████████████████████████████

████████████ *Id.* ¶¶ 22-25. ████████████████████████

████████████████ *BMG*, 881 F.3d at 311–12. As the *Grande* court held in the same context, "it is beyond debate that Grande's continuing provision of internet services to customers who engage in repeated copyright infringement substantially facilitates access to and the distribution of infringing materials." *UMG Recordings, Inc. v. Grande Commc'ns Networks, Inc.*, 384 F. Supp. 3d 743, 768 (W.D. Tex. 2019). On this record, it is indisputable that Charter materially contributed to its subscribers' infringement of Plaintiffs' Works.

## III.  CHARTER HAD THE RIGHT AND ABILITY TO CONTROL ITS SUBSCRIBERS' INFRINGING ACTIVITY

It is well-established that the right and ability "to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." *Napster*, 239 F.3d at 1023. In denying Charter's motion to dismiss, this Court already held that,

> [i]n order to meet the supervision and control prong, the defendant must only exercise the ability "to stop or limit the directly infringing conduct." Charter can "stop or limit" infringement of plaintiffs works by terminating those users about whom it is notified.

*Warner Records Inc. v. Charter Commc'ns, Inc.*, 454 F. Supp. 3d 1069, 1078 (D. Colo. 2020) (citing cases); *see also BMG v. Cox*, 149 F. Supp. 3d at 674 ("File-sharing programs are completely dependent on the internet to facilitate the download and upload of files"; thus an ISP's termination of user accounts "stops or limits infringement."). Charter's AUP indisputably reserves to Charter the right to terminate its subscribers' access to its internet service, and ████████████

████████████████████████████████████████████

████████████████████████████████████. SUMF ¶¶ 26, 28, 29.

19

As this Court already found, that subscribers can use "other forms of internet access to infringe" does not mean that Charter lacks the ability to supervise or control the infringing activity on its service. *Charter*, 454 F. Supp. 3d at 1078.

## CONCLUSION

For the foregoing reasons, the Court should grant partial summary judgment in Plaintiffs' favor, and against Charter, specifically that: (1) Plaintiffs own or control exclusive rights under 17 U.S.C. § 106 to Plaintiffs' Works and each is validly registered; (2) each of Plaintiffs Works is copied in the corresponding file on the MarkMonitor hard drive set forth in Exs. 2A and 2B to the Buchan Declaration; (3) Charter had knowledge of, and materially contributed to, its subscribers' direct infringement; and (4) Charter had a right and ability to control its subscribers' direct infringement.

Dated:  November 15, 2021

Jonathan M. Sperling
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
jsperling@cov.com

Neema T. Sahni
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
nsahni@cov.com

*/s/ Matthew J. Oppenheim*

Matthew J. Oppenheim
Jeffrey M. Gould
Alexander Kaplan
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave. NW, 5th Floor
Washington, DC 20016
Telephone: (202) 621-9027
matt@oandzlaw.com
jeff@oandzlaw.com
alex@oandzlaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2021, I caused the foregoing document and all supporting materials thereto to be filed electronically using the CM/ECF system.

*/s/ Matthew J. Oppenheim*