# Exhibit XXVIII

# Exhibit 4

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF COLORADO
 3
   WARNER RECORDS INC., et al.,  )
 4                               ) Civil Action No.
            Plaintiffs,          ) 1:19-cv-00874
 5                               )
       v.                        )
 6                               )
   CHARTER COMMUNICATIONS, INC., )
 7                               )
            Defendant.           )
 8 ------------------------------)
 9
10                     - - -
11           TUESDAY, SEPTEMBER 28, 2021
12                     - - -
13 **CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
14
15    Remote Videotaped Deposition of KEVIN ALMEROTH,
16 PH.D., beginning at 9:14 a.m., before Nancy J. Martin,
17 a Registered Merit Reporter, Certified Shorthand
18 Reporter.
19
20
21
22
23
24
25
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 86

1 Page 2, it's got a short paragraph about your opinions
2 and testimony.
3    A. I'm loading it now. I've downloaded it. I
4 have it open. Bottom of Page 2. I'm here.
5    MS. CLARK: I'm super sorry. For some
6 reason, it's taking time for mine to open.
7    MR. GOULD: Let me know when you've read that
8 paragraph.
9    (The witness reviewed Exhibit 278.)
10    THE WITNESS: All right. I've read it.
11 BY MR. GOULD:
12    Q. So the Cox court excluded your testimony
13 opinions regarding the reasonableness of the ISP
14 infringement policies; correct?
15    A. I see that sentence.
16    Q. And the court in Cox determined you're not
17 qualified to give that opinion; correct?
18    MS. CLARK: Object to form.
19    THE WITNESS: I see your sentence. The point
20 is I have a sentence after that which is the questions
21 of reasonableness are part of the jury's fact finding
22 role.
23 BY MR. GOULD:
24    Q. Would you agree with me that the Cox court --
25 the Sony vs. Cox court determined that you're not

Page 87

1 qualified to give an opinion regarding the
2 reasonableness of ISP infringement policies; correct?
3    MS. CLARK: Object to form.
4    THE WITNESS: No. It's with respect to
5 whether or not that opinion would usurp the jury's
6 fact finding role. So it didn't go to my
7 understandings of technical qualifications as to the
8 opinion, but the aspects of that that would relate to
9 what the jury had to determine.
10 BY MR. GOULD:
11    Q. Okay. This order says that the Cox court
12 excluded your testimony regarding the reasonableness
13 of the ISP infringement policies because the court
14 found that you're not qualified to give that opinion;
15 correct?
16    MS. CLARK: Object to form.
17    THE WITNESS: I think you're only reading one
18 sentence in the paragraph, and I think that one
19 sentence doesn't accurately reflect what -- the basis
20 for the court's opinion, which continues on in the
21 next sentence.
22 BY MR. GOULD:
23    Q. Let me read you the sentence. I'll ask you
24 if I read it correctly.
25    The motion to exclude Dr. Almeroth's

Page 88

1 "testimony regarding the reasonableness of the ISP
2 infringement policies is granted, as Dr. Almeroth is
3 not qualified to give that opinion."
4    Did I read that correctly?
5    MS. CLARK: Object to form. Mischaracterizes
6 the record.
7    THE WITNESS: No, you didn't read it
8 correctly, actually.
9 BY MR. GOULD:
10    Q. Okay. "Opining on questions of
11 reasonableness would usurp the jury's factfinding
12 role." Did I read that correctly?
13    A. I believe you did.
14    Q. Okay. Let's try the first once again. This
15 sentence refers to the Sony court's treatment of how
16 to handle your opinions and testimony in the Sony vs.
17 Cox case; correct?
18    A. This particular sentence is describing
19 whether or not, at least as it relates to the
20 reasonableness of the ISP infringement policies to the
21 extent it overlaps with the jury's fact finding role.
22    Q. So somehow we disagree that the court
23 excluded your testimony regarding the reasonableness
24 of infringement policies based on the court's finding
25 that you're not qualified to give that opinion. I

Page 89

1 guess we disagree?
2    A. I mean I think the order says what the order
3 says, and it seems like you're twisting it to suggest
4 that the basis for offering that opinion was based on
5 some sort of technical qualification as to -- as
6 opposed to the court's belief that the reasonableness
7 was a question in that case that was for the jury to
8 determine.
9    But with respect to whether or not I had the
10 technical qualifications to opine on the
11 reasonableness of a response mechanism is not the way
12 that I read these particular sentences.
13    Q. Okay. You can set that aside. I don't know
14 how you'd do that digitally.
15    Dr. Almeroth, have you ever drafted an
16 acceptable use policy for an ISP?
17    A. For a particular commercial ISP, I don't
18 recall that I have ever developed a draft of that
19 acceptable use policy.
20    Q. Have you ever been involved in developing an
21 acceptable use policy for an ISP?
22    A. I'm not sure if my experience would qualify.
23 I worked closely with the UCSB campuses that relates
24 to things around acceptable use. There's an
25 information technology board for the campus, and that

23 (Pages 86 - 89)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 90

1 discusses things like acceptable use policies. The
2 campus provides service. I'm not sure it's in the
3 same category of an ISP, say like Cox, but we do have
4 users and there is a network. So I would point to
5 that as potentially being related.
6    Q. It may have been involved in A&P development
7 for college campus?
8    A. As an example of the type of service
9 provider, that's one example I can think of sitting
10 here right now.
11    Q. But not for a commercial ISP?
12    A. If you mean a commercial ISP, I can't think
13 of an instance. The policies aren't too dissimilar,
14 though.
15    Q. Have you ever been involved in designing an
16 ISP's response program for responding to copyright
17 infringement notices?
18    A. If you mean specifically software like CATS,
19 not in the specific context of, say, copyright
20 notices, but I think I've testified to having
21 experience with sort of error tracking, notice
22 tracking, network monitoring, troubleshooting, trouble
23 tickets, responses, those kinds of things.
24    Q. So just so the question and answer is clear
25 on working on or developing a copyright infringement

Page 91

1 response program, it sounds like you've never been
2 involved in deciding an ISP's copyright infringement
3 responses program?
4    MS. CLARK: Object to form.
5    THE WITNESS: Not something that specific,
6 but I think my last answer alluded to underlying
7 technology that has significant technical parallels to
8 your particular question.
9 BY MR. GOULD:
10    Q. What about involvement in developing or
11 designing sort of the policy-type decisions about what
12 kind of actions to take in response to copyright
13 infringement notices. I'm not talking about the
14 technology but the decisions about what we want to do.
15    A. Yes.
16    Q. "Yes," what?
17    A. Yes, I have.
18    Q. Where have you been involved in that matter?
19    A. In the context of this information technology
20 board that I've referenced at UCSB, both as a formal
21 member and then also someone who has collaborated with
22 the information technology group at UCSB. And also,
23 even some of the policy questions start to touch on
24 some of the research that I was looking at as it
25 relates to peer-to-peer.

Page 92

1    Q. You're saying that you were involved at UCSB
2 in helping design a copyright infringement program?
3    MS. CLARK: Object to form.
4    THE WITNESS: I'm not sure what that
5 characterization would encompass, but certainly, I
6 think as I've testified to, my involvement in the
7 information technology board and the relationships
8 that I had and some of the research that I was doing
9 certainly seems to fall within that general
10 characterization.
11 BY MR. GOULD:
12    Q. And was that involvement based on your
13 capacity on advising as to technical capabilities?
14    A. I would say that would be at least part of
15 the reason I was invited to be on this particular
16 board, but I can't say that that qualification was the
17 exclusion -- exclusive reason I was invited.
18    MS. CLARK: I'm so sorry, Jeff. When we get
19 a chance, can we break for lunch? My food got
20 delivered downstairs, and I need to pick it up.
21    MR. GOULD: Okay. Let's go off the record.
22    THE VIDEOGRAPHER: This marks the end of
23 Media No. 2. Going off the record at 11:51 a.m.
24    (A recess was taken from 11:51 a.m.
25    to 12:02 p.m.)

Page 93

1    THE VIDEOGRAPHER: This marks the beginning
2 of Media No. 3. Going back on the record at
3 12:02 p.m.
4 BY MR. GOULD:
5    Q. Dr. Almeroth, what is the purpose of the
6 technology board at UCSB?
7    A. So the technology board involves faculty and
8 people from information technology, the group. So
9 it's kind of the liaison among different stakeholders
10 to help develop policies or procedures,
11 recommendations for what the campus infrastructure
12 should support.
13    Q. Is the technology board at CSUSB responsible
14 for developing a DMCA compliance program?
15    A. With respect to its responsibility in that
16 aspect, I don't know if I can give you any more of a
17 specific answer. It's certainly a topic that I
18 discussed with members of the board, especially as it
19 related to my research and areas that I was attempting
20 to pursue for research as early as the early 2000's.
21    Q. To your knowledge, does UCSB have a DMCA
22 compliance program of some sort?
23    A. I believe they use the safe harbor provision.
24 In terms of what that entails, I don't remember the
25 specific details. It's been a few years since I've

Veritext Legal Solutions
www.veritext.com     888-391-3376

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 94

1 been involved with that board.
2    Q. So that was my next question. Do you
3 remember any of the terms of the UCSB compliance
4 program, DMCA compliance program?
5    A. Not really anything specific. I think it was
6 something that I worked on kind of -- well,
7 informally, in the early 2000's that I was officially
8 on the board, and then just continued contacts with
9 those people probably for the next six or seven years
10 or so.
11    Q. How much time would you say you spent as part
12 of the UCSB technology board working on issues related
13 to DMCA issues?
14    A. I have no real way to compute an estimate.
15    Q. Is there a written policy or set of
16 procedures at UCSB for responding to DMCA notices by
17 the university?
18    A. I suspect there is. I'm not sure where it
19 would be.
20    Q. Do you know if UCSB terminates service of, I
21 guess it would be students or either of its Internet
22 service in response to the DMCA infringement notices?
23    A. I don't recall that they do. Obviously, it
24 would be a fairly drastic step for students and staff,
25 faculty.

Page 95

1    Q. Do you recall any of the steps that the
2 university takes or took in response to notices of
3 copyright infringement concerning users on its
4 network?
5    A. My recollection is there was at least a
6 series of notifications. I don't really remember what
7 the details were.
8    Q. And what was your involvement in designing
9 that -- those policies and procedures?
10    A. I think to the extent that there are any
11 issues raised, either informational or soliciting
12 feedback to the ITB, I would have provided faculty
13 information opinion.
14    Q. What does "ITB" stand for? You may have said
15 it and I missed it.
16    A. Yeah, it's the information technology board.
17    Q. Have you ever worked on developing a DMCA
18 compliance program for a commercialize ISP?
19    A. So I think similar to questions you asked
20 like that before the break, I'm not sure what that
21 would encompass. According to my experience at UCSB
22 as potentially being relevant and depending on your
23 definition of an Internet service provider, it might
24 be more relevant but directly responsive. So I point
25 you to that same level of expertise -- I'm sorry,

Page 96

1 experience in response to your question.
2    Q. I'm asking about a commercial ISP, not a
3 university. So with that clarification, have you ever
4 been involved in developing or designing a DMCA
5 compliance program for a commercial ISP?
6    A. I'm not sure what distinction that would
7 create, but I would still draw on the same level of
8 experience and then tie that to other experiences I've
9 had with ISPs over the years.
10    Q. So your experience designing or developing a
11 DMCA program or involvement in that is limited to
12 working the technology board for the university?
13        MS. CLARK: Object to form. Mischaracterizes
14 the record.
15        THE WITNESS: No, I don't think that's quite
16 right.
17 BY MR. GOULD:
18    Q. Can you identify any other instance besides
19 the university?
20    A. So there's the university activity, and then
21 there's just sort of generally, the technology that
22 would underlie kind of the scope of your question. So
23 I worked with ISPs in a number of different ways over
24 the years. So I mean I point to all that experience
25 as being related or relevant to your question.

Page 97

1       If you're asking for something hyper
2 specific, say an ISP or using Charter as an example,
3 then no, I don't think I worked specifically on their
4 DMCA policies.
5    Q. Your opinions here are concerning technical
6 matters in the case; correct?
7    A. I think my opinions are what they are in the
8 reports. I think the reports speak for themselves. I
9 think generally, they are technical in nature, but I'm
10 not sure I would characterize them as exclusively
11 technical. I'm not sure what the -- that term would
12 essentially encompass. So I defer to the opinions of
13 the report and say it speaks for itself.



Veritext Legal Solutions

www.veritext.com                                          888-391-3376

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 106

1  think we had in Los Angeles as part of the media,
2  arts, and technology program at UCSB to kind of pitch
3  to them on a proposal where we could develop, we'd
4  research some techniques to do that kind of
5  monitoring. So that was essentially the scope of what
6  we were describing.
7      Q. Did you conduct that kind of monitoring you
8  described?
9      A. We ended up not. We didn't get the project
10 funded in part because at the time, Time Warner was
11 sort of a very traditional media-oriented company, and
12 they weren't interested in understanding the role that
13 the Internet could have in kind of the use of that
14 technology.
15        So we ended up skipping that step of the
16 research and starting on techniques to use
17 peer-to-peer that I mentioned earlier; efficiency,
18 improved service offerings, et cetera.
19     Q. Any of your ideas for using peer-to-peer or
20 delivering at least copyrighted content ever come to
21 fruit?
22     A. It's hard to say if the genesis for some of
23 the services that exist today were ever rooted in my
24 particular contributions or the contributions of my
25 graduate students and I, but I think that certainly

Page 107

1  services today that exchange peer-to-peer content as
2  part of a service offering as an alternative to have a
3  traditional client server architecture were at least
4  things that we were proposing in some of the papers
5  that we had published.
6      Q. You're not a lawyer, Mr. Almeroth?
7      A. I'm not a lawyer.
8      Q. And you're not offering any legal opinions in
9  this matter, are you?
10     A. I don't believe I'm offering any legal
11 opinions, but again, I would defer to what the
12 opinions are in the report since I'm not exactly sure
13 what the scope of that characterization would include.
14     Q. You're not offering an opinion on whether
15 Charter subscribers infringed claims of copyright?
16        MS. CLARK: Object to form.
17        THE WITNESS: I don't think so, if I
18 understand the question correctly. But again, I'm not
19 sure the extent to which that characterization would
20 overlap the opinions that are in the report. So I
21 would defer to what the reports say.
22 BY MR. GOULD:
23     Q. I don't understand.
24        Are you offering an opinion on whether
25 Charter subscribers infringed claims of copyright?

Page 108

1       MS. CLARK: Objection to form.
2  BY MR. GOULD:
3      Q. It's a "yes" or "no" question.
4      A. Well, I'm not sure what the scope of that
5  characterization would be. So again, I mean I've got
6  opinions that are in the -- in the reports. I don't
7  have them all memorized, and I understand this isn't a
8  memory contest. Those are the opinions that I'm
9  offering.
10     Q. Are you --
11     A. Let me finish, please.
12        I don't think those opinions go to whether or
13 not there are particular instances of copyright
14 infringement or not. I don't think that was the focus
15 of my report. But again, whether or not there are any
16 opinions that could fall within a characterization
17 like that, it's hard for me to say because I don't
18 have the reports memorized.

Page 109

[redacted]

28 (Pages 106 - 109)



Page 122



6  Q. Have you ever evaluated the effectiveness of
7  an ISP's DMCA compliance program?
8  A. After DMCA? I don't believe I'm doing it
9  here, but, again, I would defer to the report. I
10 don't have the Cox report memorized. So similarly, I
11 don't know if there's some opinion with respect to
12 effectiveness in that report.
13  Q. Apart from your qualification about what
14 might be in the Cox report that you can't recall, have
15 you ever otherwise evaluated the effectiveness of an
16 ISP's DMCA compliance program?
17  A. Setting aside the two cases that we've been
18 talking about, and also setting aside any work I've
19 done at UCSB, I don't think so. I don't think
20 anything comes to mind.
21  Q. What work did you do at UCSB to evaluate the
22 effectiveness of UCSB's DMCA compliance program?
23  A. So that's work that I testified about
24 earlier. Again, I'm not sure if the scope of your
25 question would overlap with the work that I've done at

Page 123

1 UCSB, but I would point to that as potentially being
2 relevant. I'm not exactly sure what this question
3 covers or not.
4  Q. Do you recall undertaking any analysis of
5 UCSB's DMCA compliance program to assess its
6 effectiveness at reducing infringement?
7  A. It's been a while. I don't recall
8 specifically. We might have been doing things like
9 that.
10  Q. Nothing specific comes to mind?
11  A. No. Other than -- well, I mean the idea that
12 it was certainly a concern of the campus, certainly
13 with respect to reaching out to students. Usually it
14 was students. Sometimes it was other staff. Staff or
15 faculty. I think that my recollection is that when
16 notices that were sent tended to be fairly effective.
17  (The Reporter requested clarification.)
18 BY MR. GOULD:
19  Q. Dr. Almeroth, you don't have a business
20 degree or an M.B.A.; correct?
21  A. No. Not in terms of my formal education.
22  Q. And have you ever worked in purchasing for
23 any company?
24  A. That's a fairly broad question. I can think
25 of examples where I have.

Page 124

1  Q. Such as?
2  A. For UCSB. For Georgia Tech. For my own lab.
3 For companies like Santa Barbara Labs. Issues of
4 procurement and consulting that I've done. Purchasing
5 in those instances.
6  Q. Have you ever managed a budget for an ISP?
7  A. For an ISP, at least Charter is an example.
8 No, I don't think I've done an ISP like that.
9  Q. Have you ever reviewed financial statements
10 of Charter?
11  A. Of Charter? To the extent that they were in
12 some of the 10-K filings that were referenced by
13 Mr. McGarty or any other witnesses as part of the
14 materials I considered, then the answer would be yes.
15  Q. I'm sorry. Are you saying that MKs are
16 referenced in McGarty's report, and you reviewed
17 those?
18  A. That is my recollection. If not in his
19 report, I believe they're referenced in some report
20 I've reviewed or were the subject of some testimony.
21  Q. Do you know anything about Charter's revenues
22 in the 2012 to 2016 time frame?
23  A. As I sit here now, I don't recall any
24 specific knowledge.
25  Q. What about profits?

Page 125

1  A. Same. Same answer.
2  Q. And expenses? Do you have any knowledge of
3 Charter's expenses in the 2012 to 2016 time frame?
4  A. Same answer.



32 (Pages 122 - 125)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



33 (Pages 126 - 129)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



34 (Pages 130 - 133)



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 266



Page 267

22  MS. CLARK: Thank you so much. I don't have
23  anything. I suppose we can provisionally designate
24  the report as under the protective order. I haven't
25  actually gone back to look to see if there's anything

Page 268

1  in the transcript. I haven't actually gone back to
2  see if there's anything actually confidential, but
3  we'll designate it for now and review it later.
4      MR. GOULD: Dr. Almeroth, I want to thank you
5  for your time. It's nice chatting with you.
6      MS. CLARK: Thanks, guys. I hope you feel
7  better, Nancy.
8      REPORTER MARTIN: Thank you so much. I
9  appreciate that.
10      THE VIDEOGRAPHER: We are off the record at
11  6:12 p.m., and this concludes today's testimony given
12  by Dr. Kevin Almeroth. The total number of media used
13  was seven and will be retained by Veritext Legal
14  Solutions.
15      Thanks. Sorry.
16      (Witness excused.)
17      (Deposition concluded at 6:12 P.M.)

Page 269

1           C E R T I F I C A T E
2    I do hereby certify that the aforesaid testimony
3  was taken before me, pursuant to notice, at the time
4  and place indicated; that said deponent was by me duly
5  sworn to tell the truth, the whole truth, and nothing
6  but the truth; that the testimony of said deponent was
7  correctly recorded in machine shorthand by me and
8  thereafter transcribed under my supervision with
9  computer-aided transcription; that the deposition is a
10  true and correct record of the testimony given by the
11  witness; and that I am neither of counsel nor kin to
12  any party in said action, nor interested in the
13  outcome thereof.
14
15  _____
      Nancy J. Martin, RMR, CSR
16
17  Dated: October 1, 2021
18
19
20
21  (The foregoing certification of this transcript does
22  not apply to any reproduction of the same by any
23  means, unless under the direct control and/or
24  supervision of the certifying shorthand reporter.)
25