# Exhibit XXX

# Exhibit 3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

WARNER RECORDS, INC., et al., )
)
Plaintiffs, )
) Case No.
vs. ) 1:19-cv-00874-RBJ-MEH
)
CHARTER COMMUNICATIONS, INC., )
)
Defendant. )

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Videotaped deposition of SANDEEP CHATTERJEE, PH.D., taken remotely before NADINE J. WATTS, CSR, RPR, and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, commencing at 9:35 a.m. Central Standard Time on the 5th day of October, A.D., 2021.

Page 42

[redacted]

Page 43

[redacted]

Q I want to ask you some additional questions about your background, and I'm going to focus on audio fingerprinting technology. Do you have any education -- any background or education in audio fingerprinting?

A I think that's a very broad question. You can do fingerprinting in a lot of different ways. For example, you can take an audio file and run a hash algorithm on it and you can state that is a fingerprint.

So to the extent that you're asking have I done hashes, yes, I am familiar with hashes, both from an academic, educational perspective, as well as from a real-world professional perspective.

Q You're familiar with the Audible Magic content identification service through this case?

A Yes, I have reviewed their source code. I think I mentioned that I also went to an inspection as well.

Q So let me back up actually, just picking up on one thing you said. You described a hash of an audio file. One way to describe that is a fingerprint?

Page 44

A Depending on the hash algorithm used, yes, people do refer to hashes sometimes as fingerprints.

Q Do you have any background in audio content identification specifically?

A If you're asking do I listen to music, yes, I listen to music, and I can tell you if I've heard a song before or something like that. So, yes.

Q What kind of music do you like?

A I think it's changed as I've gotten older. I like slower, less louder music as I've gotten older. But, yes, I think I like like just like jazz and things like that now days more than I did before.

Q So I wasn't asking you if you were listening to music, but I'm glad to hear you're a music fan. Maybe it's important obviously. I'm talking about audio content identification through software.

So prior to this case do you have any background with the technology of identifying audio content through a technical analysis of digital audio files?

A I believe I've known that there are different techniques of, for example, performing 48 transforms and things like that on different types of input. There are different ways of analyzing frequencies that are in

Page 45

music. So from that perspective, from a basic perspective, from an educational perspective, yes, I do have that background.

With regards to the specific Audible Magic technology, no. Prior to working on this case and prior to looking at Audible Magic, I was not familiar with Audible Magic's specific technology.

Q So you've heard of or you're aware of technology that exists for audio content -- for identifying audio content through technical analysis. And prior to this case you have not personally had any experience with those matters?

A I think you summarized it correctly, but I do want to clarify. I wasn't saying specifically with regards to audio identification. I'm simply saying that I believe it's fundamental basic technology that you can analyze audio files, whether it's music or voice, to try to identify, for example, a speaker or to try to match up text that a speaker may be trying to say.

So what I was essentially saying was that I believe it's pretty well and -- well-understood that you can look at different frequencies. There are different things you can look at, whether it's an audio file, whether it's a music file, whether it's a voice file.

You can perform different analyses and different types of analyses. That's what I'm stating. So, for example, voice recognition or identifying who's speaking.

So, yes, in general, there is technology that has existed, technology to allow people to identify audio information.

Q Prior to your work on this case, you've had no experience working on those types of software or technologies?

A With regards to music files, I would tend to agree with you. But I did look into voice recognition technologies. I have known about it. For example, Nuance and how that system works. So, yes, I do have quite a lot of experience with regards to audio technologies and audio analysis.

Specifically with regards to music, I -- off the top of my head, I can't think of anything specifically. But with regards to audio in general, I have significant experience prior to this case.

Q Have you ever developed an algorithm for audio content identification prior to your work on this matter?

A I think I just answered that, yes, I have worked on, for example, voice recognition, identifying who is

speaking and also trying to determine what was said from a dictionary of potential terms.

Q Any experience prior to this matter with software matching digital fingerprints of different files?

A I'm sorry, I think you broke up on me a little bit at the end. Can you repeat that please?

Q Any experience prior to this matter with software matching digital fingerprints of different files?

A Yes. So in terms of fingerprints, like I mentioned, hashing. I also have significant experience with actual fingerprints, digital versions of actual fingerprints.

We've built one of the first mobile banking systems in the world. And so we used actual fingerprints so the person that -- the person who wants to withdraw money from a bank or deposit money into the bank, they would put their finger onto an electronic reader and the information would have to be matched, so -- And then, like I also mentioned, with regards to hashing technologies and determining whether two different hashes are the same and whether the underlying content or the data are related or unrelated.

Q But no prior experience matching audio fingerprints based on acoustic properties of digital audio, correct?

A Again, I think I answered this with regards to when I talked about voice recognition. I say voice. It falls within audio.

If you're -- I believe I also answered, if you're asking me specifically with regards to music, off the top of my head, I don't recall that. But within audio, which includes voice, I do have significant experience, not only from my Ph.D. work, as well as in later professional work as well.

Q Do you have any familiarity with Audible Magic's reputation in the content protection space?

A Did you say reputation?

Q Yes.

A Are you asking me within the context of this case or prior to this case?

Q Within the content protection space.

A Right, but, I mean, are you asking within this -- Like what I've learned through this case or prior to this case?

Q Well, I'm wondering if you have -- have any -- Strike that.

Are you familiar with Audio -- Audible Magic's reputation within the content protection space as a service and tool that's used by, you know, companies and entities in the marketplace?

A So within the information that I've looked at in this case, I do understand that RIAA works with MarkMonitor, and MarkMonitor works with Audible Magic. So from that perspective, they are used.

So I think you didn't really answer my question on clarifying what your question was, whether you're asking prior to my involvement in this case or after. But I think I answered your question based on after being retained in this case.

Q You read Mr. Ikezoye's deposition? He's the Audible Magic CEO. It was cited in your report.

A Yes, I have reviewed it. Yes.

work.
Q And there's no summary in your report of how the KaZaA technology works, correct?
A I don't believe I summarized the KaZaA technology. Yes, I believe you're correct.
Q And nothing in your report discusses how KaZaA's protocol compares to BitTorrent, Gnutella, eDonkey, or Ares, correct?
A I don't believe that I did a comparison between the minute differences that KaZaA has as a peer-to-peer technology with other similar peer-to-peer technologies, like BitTorrent, Ares, Gnutella, and eDonkey.

Q I want to talk a little bit about hash or hash value. What is a hash of a control file?
A A hash is essentially an algorithm that you can run on a digital file, the bits of a digital file, and then, depending on the specific algorithm, you'll get a representation of that -- of the contents of that file.
So, for example, the algorithm may take a large 25 megabyte file and then it will output a -- you know, a quarter of a kilobyte representation. So it's essentially an algorithm that's run on a file and the output of the algorithm is referred to as the hash value.
Q It's a unique alphanumeric value representing the contents of a file?
A Well, I think it depends on the actual hash algorithm, how unique or not it is. But if you were to say for a cryptographic hash, like a good crypto -- sorry, a good cryptographic hash, I would tend to agree with you, that if you run that same algorithm on one file and you run that same algorithm, that same hash algorithm, on the same file again, you're going to get the same output value.
Q That's true if you run the algorithm on an

identical copy of the same file as well?
A Yes.
Q You said a good cryptographic hash. What did you mean by a good cryptographic hash?
A So hashing technologies are oftentimes used in cryptography. In fact, one of the professors at MIT, Ron Rivess, I believe he invented some of these cryptographic technologies. And so one example is MD4, which was an early hash algorithm, and I believe Ron Rivess is the one that invented MD4 and he was -- His office was right down the hall from mine.
So cryptographic hashes are important in cryptography applications where you cannot determine the original contents from the hash value. And another key requirement is that there not be collisions, that you -- when you have two different input values, they should result in two different output values.
Q Are you aware of any instances of hash collision that you just described?
A I am. I believe MD4, you can have collisions pretty regularly. So, yes, MD4 is one example.
Q Okay. Well, we may come back to that.
At a high level, a hash algorithm can be used as a unique identifying reference for a file?

A It -- I think a good hashing algorithm can -- Like I mentioned, the same input would result in the same output.
Q Do you contend that any of the hash algorithms that are at issue in this case are not good hash algorithms?
A Well, like I mentioned, MD4 I think is well-understood that it's not the greatest hashing algorithm. And I think, as I explained in my report, eDonkey is based on MD4. It's not directly MD4. EDonkey calculates multiple MD4s and not simply a standard MD4. But -- And also SHA-1, I believe it has been shown to have at least one collision, but I -- I would tend to agree with you that SHA-1 is a reasonably good -- it's a good hash algorithm.
Q The hash collision for Shaw, that's the one lab-generated instance that Ms. Frederiksen-Cross describes in her report? Is that the one you're referring to?
A Yes. I don't recall off the top of my head if there were more, but I believe it's simply, at most, four. A SHA-1, I believe it's like one or a very low number of collisions that have been shown. But, like I mentioned, I believe SHA-1 is a good algorithm.

Q And the modified hash that you described for eDonkey you reference in paragraph 61 of your report is sometimes referred to as an ED2K hash, correct?

A Yes.

Q The hash is determined -- Strike that.

The hash for a file is determined by an algorithm based on the binary contents of the file, correct?

A I'm sorry, say that again. I didn't understand your question.

Q An algorithm determines the hash based on the binary contents of the file?

A Yes, the input to the algorithm would be the binary bits and bytes of the file. And the algorithm is simply the calculations that are performed on those bits and bytes, and the output is the hash value.

Q And the hash value -- the algorithmic hash value is not determined based on external data, such as -- Strike that. Let me try it again.

The hash value is not determined by external metadata, such as a file name?

A Well, you could have -- you could use the file name or you could use other metadata if you wanted to. But, typically, when you're talking about computing a

hash of a file, you're typically talking about the contents of the file, not -- not the file name or other metadata. But just to be clear, you can do whatever you want with the -- with a hash algorithm.

[redacted]

Q So if the contents of the file change and you get the hash, you'll get a different hash, right?

A With the caveat that if you're talking about a good hash algorithm, for example, like SHA-1, yes. If the contents of a file are between two different files, they're different, the output resultant hash value would be different.

Q And so even if one bit or byte of the binary

content of the file changes, then you get a different hash, right?

A Yes, even if one bit changes, you would have a different byte, which would result in a different hash.

Q But if two different digital files have the same hash value, that means the files have the same content, correct?

A Again, with the caveat if you're talking about like a good hash, like SHA-1 or other things, and if you actually calculate a hash on two different files -- say if you actually run the hash algorithm on file A and you run the same algorithm on file B, then they should have the same resultant hash value.

Q Dr. Chatterjee, you keep referencing good hash algorithm. I want to make sure that we're just using the same language throughout the day. So I'm talking about the SHA-1 hashes, which you've agreed is a good cryptographic hash algorithm, correct?

A Yes, it's regarded as a good hash. And, like I mentioned, I think there's only been one or a very low handful of collisions that have been identified for SHA-1. So, yes, it is a good algorithm.

Q Are you contending that any of the hash algorithms that are used and at issue in this case are

something other than good hash algorithms?

A When you say am I contending, like from a technical perspective? I think I've explained to you that MD4 is not well-regarded as a good hash algorithm. I'm not contending that ED2K, which is based on MD4, is good or bad.

So I think from a technical perspective I do have a contention that MD4 is not the greatest hash. But I think for purposes of my report, or of my two reports, I'm not really contending those. But from a technical perspective, yes, MD4 may not be the best hash.

Q You mentioned the infohash. Infohash is used in the BitTorrent protocol, correct?

A Yes.

Q And infohash is a unique hash identifier for a torrent, correct?

A The infohash is a hash over the info portion of the dot-torrent file. That's all it is.

Q Turn to page -- paragraph 164 of your report. You say in the second line, each torrent has a unique identifier, which is known as infohash, correct?

A And then I state, and it is a SHA-1 hash calculated over a portion of the torrent file for a

hash value is the same, that doesn't tell you anything.
Like I have explained to you, if you calculate the hash over the original file and then you calculate the hash over the second file and the resulting hash values are the same, then it tells you something. But simply looking at a hash doesn't tell you anything. That's basic computer science information or knowledge.
Q So as a practical matter, two files that calculate the same hash value are identical, correct?
A If you calculate using the same hash algorithm on two different files and the resulting hash values are the same, yes, it tells you something, that the files are the same.
Q You're aware, Dr. Chatterjee, that BitTorrent relies on the use of hashes?
A BitTorrent, like other P2P protocols, do use hashes. I agree with you.
Q And, in fact, the use of hashes is built into the very core functionality of the BitTorrent system?
A It's part of the protocol. I don't really know what you mean by the core functionality. But, yes, hashes are used as part of the protocol.
And one of the reasons and -- One of the reasons hashes are used is because within peer-to-peer

protocols and networks there is a lot of fakes and the information that clients and peers report is oftentimes untrue, and, therefore, hashes allow that kind of check, which is necessary in a peer-to-peer network and peer-to-peer protocols.
Q Hash values are how the BitTorrent system associates users downloading and distributing files, correct?
A There is an infohash that can be used to identify the info portion of a dot-torrent file. If that was your question, yes, I agree with what I just stated.
Q BitTorrent clients request files by hash, correct?
A A BitTorrent client can request from another client or another peer. It can use infohash to request a file, like the payload, and -- But, like I said, just because a peer states that it has that particular info hash means nothing. It has to be confirmed and corroborated by actually downloading, calculating the hash, and then also even checking the actual payload, the contents of the file.
Q When a peer receives -- requests and receives pieces in BitTorrent, the BitTorrent client checks the

hashes to confirm they got the right thing, correct?
A Well, just like we've talked about, there are multiple different hashes that are used in BitTorrent. The infohash is the hash over the info portion of the dot-torrent file. There are things called piecehashes, which are hashes over specific pieces. And so there are two different types of hashes that are used in BitTorrent.
Q When a BitTorrent peer requests and receives a piece, the BitTorrent client checks the piecehash to confirm that it got the right thing, correct?
A Calculating the piecehash over the piece that it receives and then comparing it to the piecehash that's in the dot-torrent file simply shows that the piecehashes match. It doesn't show that the piece that was received is actually a piece of the content that the dot-torrent file claims that it's for.
Q If the piece is verified, then the peer begins to share that piece, correct?
A If a -- A peer can upload pieces after it has downloaded it and even after calculating the piecehash.
Q In fact, the default automated function of the BitTorrent protocol is once you download and verify a piece, you begin sharing it, correct?

A It's not that you begin sharing it. You can. Like the technology can if somebody requests it. It's not that -- it's not that once you download a piece, you don't like shove it down people's throats. You simply -- Depending on the client and how that client is implemented, it can respond to a request from another peer.
Q I think you're making the distinction that it goes into the shared file folder for other peers to get it if they want it is your -- I think that's the distinction you're making, right?
A Yes, that it -- that piece is -- can be available if another peer requests it. But, like I've stated, that does not mean that it's actually a piece of what that dot-torrent file claims that it's a piece of.
Q And if the peer -- Strike that.
If upon receipt of the piece the hash does not match the expected hashpiece, then the BitTorrent client discards that piece, correct, discards the downloaded piece?
A It can, depending on the client and the client implementation. Yes, if it computes the piecehash and the piecehash does not match what the dot-torrent file states, it can discard it.

[redacted]

[redacted]

MR. GOULD: Q You keep talking about anonymous peers. We're talking about Charter subscribers associated with IP addresses, correct?

A Yes, these are peers that have an IP address that -- and my understanding is that Charter assigns IP address using the XCP.

Q And Charter is aware of who its subscribers are, you would agree, correct?

A I would think that they know.

Q They have to open up accounts with Charter and give them -- customers have to give Charter information about who they are?

A I've never had an account with Charter, but I would believe that that's how it would probably have to happen.

Q You had to provide some personal identifying information to your ISP; isn't that right, sir?

A Yes, you have to identify yourself, for example, maybe by address or e-mail address. You need to provide some information.

Q Your name as well?

A Again, I don't know what Charter requires. I believe that's probably part of the form that you would fill out.

Q So the anonymous peers you keep referring to are known Charter subscribers, correct?

A Well, peers is a term used within P2P networks. So these are anonymous peers in that I don't know who they are, MarkMonitor doesn't know who they are either. And the client is the actual software running on those computers. So they are anonymous in that we don't know what software they're actually running.

Q And so by anonymous, you mean the only one that knows who these subscriber accounts are is Charter?

A No, we're not talking about the user. We're talking about the peers and the clients are anonymous. In terms of knowing what software is being run on a particular PC -- For example, I may have Microsoft Word loaded on my PC. That does not mean that an ISP knows that I'm running Microsoft Word.

[redacted]

Page 146

MR. GOULD: Q Assume that MarkMonitor downloaded and verified a file -- You know, let me regroup a little bit.

We've been going about an hour. Why don't we take a little break.

MR. HAMSTRA: Okay.

THE WITNESS: Sure.

MR. GOULD: I can use a short break.

THE VIDEOGRAPHER: The time is approximately 2:31 p.m. We're going off the video record.

(Recess was taken.)

THE VIDEOGRAPHER: The time is approximately 2:43 p.m. We are back on the video record. Go ahead.

Page 147

Page 148

Page 149



Page 152
Page 151
Page 153

39 (Pages 150 - 153)

Veritext Legal Solutions

www.veritext.com 888-391-3376

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 154

[redacted]

Page 155

[redacted]

Page 156

[redacted]

Page 157

[redacted]

40 (Pages 154 - 157)

Veritext Legal Solutions

www.veritext.com 888-391-3376

[redacted]

[redacted]

Going about halfway down, you cite an article or a publication by Liang, et al., entitled Pollution in P2P File-Sharing Systems. Do you see that?

A I do.

Q Do you see that article was published in 2005?

A I see that.

Q And then Shin, et al., Malware Prevalence in the KaZaA File-Sharing Network. You see that was published in October of 2006?

A I see that.

Q And the next one down, Kryczka, et al., Fake Detector, A Measurement-Based Tool to Get Rid Out of

Fake Content in Your BitTorrent Downloads. And that's published in May of 2011.

A I see that.

Q And then Santos, et al., FUNNEL: Choking Polluters in BitTorrent File-Sharing Communities, and that's dated 2011 also.

A I see that.

Q And then on the next page there's an article cited by Cuevas, C-U-E-V-A-S, et al., Is Content Publishing in BitTorrent Altruistic or Profit-Driven, and that's dated 2010, correct?

A Yes.

Q And then Kryczka -- another Kryczka article, this one called TorrentGuard, Stopping Scam and Malware Distribution in the BitTorrent Ecosystem. Do you see there's two dates there, February 2014 and April 19th, 2012?

A I see that.

Q You understand that to mean this article was first published on April 19th, 2012 and then included in this computer network's volume in February of 2014?

A I believe that's correct, yes.

Q Okay. And then the next one, Montassier, Content Pollution Quantification in Large P2P Networks,

A Measurement Study on KAD. And that was published in 2011.

A Yes, I see that.

Q And then the last one, Liberatore, et al., Forensic Investigation of Peer-To-Peer File-Sharing Networks, and that one's dated 2010. Do you see that?

A I do.

MR. GOULD: Andrew, could you please pull up the Kryczka TorrentGuard article for me. That will be the next exhibit.

And while he's doing that, you're aware, Dr. Chatterjee, that the claim period in this case is March 2013 through May 2016?

A Yes.

Q And all eight articles we just looked at that you discussed in your report regarding pollution are published before the claim period?

A I think based on the dates that you read out to me, they are before the -- the date period. But at the same time, I believe it's very clear that these -- the issues that these articles were discussing were continued even into 2012, 2013, 2014, 2015 and onwards even.

So these articles are talking about technology

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 166

issues, as well as people's behavior issues, and these things continued on throughout the 2013, 2016 period.

Page 167

Q Could you go back to your Exhibit Share please and open up Exhibit 286. This is the -- Exhibit 286 is the Kryczka TorrentGuard article that you've cited in

Page 168

your report.

(Document marked as Deposition Exhibit 286 for identification.)

Q Do you see that?

A It's still loading for me. Okay. Now I've got it. Okay.

Q Scroll to page 4 of the report under the subheader Dataset Description. It's actually highlighted here.

A Okay. I see that.

Q Do you see it says, we have applied the described methodology between April 30th, 2011 and May 13th, 2011, in addition to five days of warmup phase dedicated to identifying the initial fake publishers' IP addresses? Do you see that?

A I do. It's highlighted as you indicated.

MR. HAMSTRA: I'll just note an objection for the record that the numbering doesn't appear to track the numbering on the citation in Dr. Chatterjee's report. But you can continue, Mr. Gould.

MR. GOULD: What are you referencing, Nate, please?

MR. HAMSTRA: There's a reference in his report to something appearing at pages 77 through 90, and this does not have that pagination. I'm not sure if there

Page 169

were multiple versions or what. But I'm just stating something for the record.

MR. GOULD: Sure. Noted. And I'll just say for the record this is the copy of the Kryczka TorrentGuard article that defendants produced in connection with Mr. Chatterjee's report, including his reliance materials.

MR. HAMSTRA: Okay.

MR. GOULD: Q And you see, Dr. Chatterjee, on the left vertical column of page 1 it's got a CSCR date of April 19th, 2012?

A On page 1, on the cover page?

Q Yes, there's a vertical box that has the April 2012 date.

A Oh, okay. On the far left?

Q Do you see that?

A Yes. On the far left written vertically?

Q And if you look back at your report, on the very last page, the Kryczka article is described as CSCR April 19th, 2012.

A Okay. I see it, April 19, 2012.

Q I want to turn to your rebuttal report, which is Exhibit 284. Again, I want to go to the reliance materials -- excuse me, the materials considered at the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 170

last couple of pages. Let me know when you're there.
A I'm on the last page of the materials considered of my rebuttal report.
Q So you cited a couple of the same reports a second time, the Liang article from 2005, towards the bottom, then on the next page the Kryczka article we just looked at, analyzing data from 2011 and published in 2012, and the Cuevas article from 2010. Do you see that?
A I see the Cuevas article, yes.
Q And then there's two additional articles listed on that prior page. The first one is Dhungel, D-H-U-N-G-E-L, A Measurement Study of Attacks on BitTorrent Leachers. You see that was published in February of 2008?
A Okay. I see that.
Q And then right below that there's an article by someone named Balhara, B-A-L-H-A-R-A.
A I see that.
Q A Review on Torrent and Torrent Poisoning Over the Internet. And this one, you see, is dated January 2016.
A I see that.
Q I want to take a look at that Balhara article

Page 171

briefly. That should be in your Exhibit Share, Exhibit 287.
(Document marked as Deposition Exhibit 287 for identification.)
A Okay.
Q Exhibit 287 is the article by Pooja Balhara, A Review of Torrent and Torrent Poisoning Over the Internet. And if you can just scroll to the very last page to begin. Sorry, the second-to-the-last page, there's a section called References.
A Okay. I see that.
Q You see that all 10 references in this Balhara article at Exhibit 287 are dated between 2007 and 2010?
A I quickly skimmed through them. It seems like the references that are cited by this paper are dated 2007 to 2010.

Page 172

t

Page 173

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 174

[redacted]

Page 175

[redacted]

Page 176

[redacted]

Page 177

[redacted]

45 (Pages 174 - 177)

Veritext Legal Solutions

www.veritext.com 888-391-3376

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 214

[redacted]

Page 215

[redacted]

Page 216

[redacted]

Page 217

[redacted]

55 (Pages 214 - 217)

Veritext Legal Solutions

www.veritext.com 888-391-3376

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 218

[redacted]

Page 219

[redacted]

Page 220

[redacted]

Page 221

[redacted]

56 (Pages 218 - 221)

Veritext Legal Solutions
www.veritext.com 888-391-3376



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 222
Page 224
Page 223
Page 225

57 (Pages 222 - 225)

Veritext Legal Solutions
www.veritext.com 888-391-3376

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 230
Page 232
Page 231
Page 233

59 (Pages 230 - 233)

Veritext Legal Solutions
www.veritext.com 888-391-3376

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 238

[redacted]

Page 239

[redacted]

Page 240

[redacted]

Page 241

[redacted]

61 (Pages 238 - 241)

Veritext Legal Solutions

www.veritext.com 888-391-3376

█████████████████████████

█████████████████████████

█████

MR. GOULD: I have no further questions. Dr. Chatterjee, thank you for your time. I appreciate it.

MR. HAMSTRA: I will -- I don't have any further questions. I will reserve signature.

I think we should probably designate this, at least provisionally, as Highly Confidential, Attorneys' Eyes Only for the third-party evidence discussed.

THE VIDEOGRAPHER: Okay. The time is approximately 6:16 p.m. We are going off the video record.

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

The within and foregoing deposition of the aforementioned witness was taken before NADINE J. WATTS, CSR, RPR and Notary Public, at the place, date and time aforementioned.

There were present during the taking of the deposition the previously named counsel.

The said witness was first duly sworn and was then examined upon oral interrogatories; the questions and answers were taken down in shorthand by the undersigned, acting as stenographer and Notary Public; and the within and foregoing is a true, accurate and complete record of all of the questions asked of and answers made by the forementioned witness, at the time and place hereinabove referred to.

The signature of the witness was not waived, and the deposition was submitted, pursuant to Rules 30(e) of the Rules of Civil Procedure for the United States District Courts, to the deponent per copy of the attached letter.

The undersigned is not interested in the within case, nor of kin or counsel to any of the parties.

Witness my official signature and seal as Notary Public in and for Cook County, Illinois on this 8th day of October, A.D. 2021.

Nadine J. Watts
NADINE J. WATTS, CSR, RPR
License No. 084-002736
Notary Public
One North Franklin Street
Suite 3000
Chicago, Illinois 60606
Phone: (312) 442-9087

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

October 8, 2021

To: NATHAN M. HAMSTRA

Case Name: Warner Records, Inc., et al. v. Charter Communications, Inc.

Veritext Reference Number: 4822026

Witness: Sandeep Chatterjee, Ph.D. Deposition Date: 10/5/2021

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown

above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA