# Exhibit XXXV

# Exhibit 2

1          UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF COLORADO

2

3

4    WARNER RECORDS, INC.,        )

                                  )

5          Plaintiff,             )

                                  )

6    v.                           ) Civil Action No.

                                  ) 1:19-cv-00874

7    CHARTER COMMUNICATIONS       )

     INC.,                        )

8                                 )

                  Defendant.      )

9

10

11

12

13

14

15

16

17

18       VIDEOTAPED ZOOM REALTIME DEPOSITION of ARAM

19   SINNREICH, Ph.D., a Witness, taken on behalf of

20   the Plaintiffs before Peggy E. Corbett, CSR, CCR,

21   RDR, pursuant to Notice on the 6th day of

22   October, 2021, at the office of the witness, 9621

23   Lorain Avenue, Silver Spring, Maryland 20910.

24

25

Page 2

```
 1         A P P E A R A N C E S
 2  APPEARING FOR THE PLAINTIFFS:
 3     Mr. Matthew Oppenheim
       Ms. Kellyn Goler
 4     OPPENHEIM + ZEBRAK LLP
       4530 Wisconsin Avenue NW
 5     Fifth Floor
       Washington, D.C. 20016
 6     202.450.3958
       matt@oandzlaw.com
 7     kellyn@oandzlaw.com
 8  APPEARING FOR THE DEFENDANTS:
 9     Mr. Andrew Schapiro
       QUINN EMANUEL URQUHART & SULLIVAN LLP
10     191 North Wacker Drive
       Suite 2700
11     Chicago IL 60606
       312.705.7400
12     andrewschapiro@quinnemanuel.com
          and
13     Mr. Todd Anten
       Mr. Dylan Scher
14     51 Madison Avenue
       22nd Floor
15     New York, New York 10010
       212.849.7000
16     toddanten@quinnemanuel.com
       dylanscher@quinnemanuel.com
17
    VIDEOGRAPHER:  Mr. Michael Alexander
18
       I N D E X
19  WITNESS:                          PAGE
    ARAM SINNREICH, Ph.D.
20  EXAMINATION BY MR. OPPENHEIM         5
    EXAMINATION BY MR. SCHAPIRO        280
21  FURTHER EXAMINATION BY MR. OPPENHEIM  300
    CERTIFICATE                        312
22
       E X H I B I T S
23  NO.      DESCRIPTION            PAGE
24  EXHIBIT 289  Expert Report of    30
       Dr. Aram Sinnreich
25       May 27, 2021
```

Page 3

```
 1  EXHIBIT 290  Expert Rebuttal Report   31
       of Dr. Aram Sinnreich
 2       June 28, 2021
    EXHIBIT 291  Excel Spreadsheet,      108
 3       Business Cycle
       Expansions and
 4       Contractions
    EXHIBIT 292  US Business Cycle       108
 5       Expansions and
       Contractions
 6  EXHIBIT 293  Shkeler Exhibit 8       127
    EXHIBIT 294  Digital Music           133
 7       Subscriptions Report
    EXHIBIT 295  Artist Managers Call    210
 8       Out Sony Following
       Spotify Contract Leak,
 9       Sony Responds That It
       Pays
10  EXHIBIT 296  Article, Universal:     210
       Yes, We Share Digital
11       Breakage Money With Our
       Artists
12  EXHIBIT 297  Article, Warner Pays    211
       Artists Share of
13       Spotify advances...and
       has for 6 years
14  EXHIBIT 298  Book, "The Piracy       289
       Crusade"
15
    Reporter's Note:  The original exhibits were
16  submitted to the court reporter for copying and
    distribution with retention by Mr. Oppenheim
17  thereafter.
18
19
20
21
22
23
24
25
```

Page 4

```
 1     (Deposition commenced at 9:33 a.m. Eastern)
 2         THE VIDEOGRAPHER:  We are now on
 3  the record.  Today's date is October 6th, 2021,
 4  and the time on the monitor is 9:33 a.m.  This is
 5  the remote video deposition of Dr. Aram Sinnreich
 6  in the matter of Warner Records, Incorporated vs.
 7  Charter Communications, Incorporated.
 8         THE WITNESS:  I'm sorry to
 9  interrupt.  The first name for the record is
10  Aram, A-r-a-m.
11         THE VIDEOGRAPHER:  Okay, my
12  mistake.  This is a remote video deposition of
13  Dr. Aram Sinnreich in the matter of Warner
14  Records, Incorporated vs. Charter Communications,
15  Incorporated filed in the United States District
16  Court for the District of Colorado, Case Number
17  1:19-cv-00874.  The court reporter is Peggy
18  Corbett and I am the videographer, Michael
19  Alexander, both with Veritext Legal Solutions.
20         Beginning with the noticing attorney,
21  counsel and all present please state your
22  appearances and affiliations for the record.
23         MR. OPPENHEIM:  Good morning.  This
24  is Matt Oppenheim, and I am here with my
25  colleague Kellyn Goler for the firm Oppenheim and
```

Page 5

```
 1  Zebrak on behalf of the plaintiffs.
 2         MR. SCHAPIRO:  Good morning, I'm
 3  Andrew Schapiro joined by my colleagues Todd
 4  Anten and Dylan Scher.  We are with the law firm
 5  Quinn Emanuel Urquhart & Sullivan.
 6         THE VIDEOGRAPHER:  Would the court
 7  reporter please swear in the witness.
 8         ARAM SINNREICH, Ph.D.,
 9  a Witness, being first duly sworn, testified
10  under oath as follows:
11         EXAMINATION
12  BY MR. OPPENHEIM:
13     Q.  Good morning, Mr. Sinnreich.  I
14  introduced myself to you earlier but I'll do it
15  again now since we're on the record.  My name is
16  Matt Oppenheim.  I am counsel for the plaintiffs
17  in this case, and will be taking your deposition
18  today.  I appreciate your participating in this.
19         Before we get going, I know I asked you
20  earlier off the record but can you hear us and
21  see us okay?
22     A.  Yes, I can.
23     Q.  And do you have any other technological
24  devices open other than the Zoom screen and the
25  screen to see exhibits?
```

2 (Pages 2 - 5)

Page 6

1    A.  No, I don't.
2    Q.  Okay.  Do you have -- obviously, you're
3  watching on your computer.  Do you have instant
4  messaging or e-mails popping up?
5    A.  No.
6    Q.  Have you closed those functions?
7    A.  Yes.
8    Q.  Okay, excellent.  You don't have a
9  cellphone by you?
10    A.  I have a cellphone that's turned off by
11  me.
12    Q.  Very well.  And in terms of written
13  materials that are close by, what -- I know you
14  have a lot of books behind, you but what do you
15  have on your desk at the moment?
16    A.  Currently I have printed out copies of
17  my expert report and my expert rebuttal report.
18    Q.  Okay, if you could just put those aside
19  we'll use the versions that are on the screen
20  today so hopefully you won't need those.
21      I see you file just the same way I do.
22  Excellent.
23      Now I know you have been deposed before
24  but let me briefly go over the process today.
25  You know, obviously, I'll be asking the

Page 7

1  questions, you're the witness, you'll be
2  answering the questions, and our court reporter
3  Peggy is going to transcribe our conversation.
4      There are a couple of things that you
5  and I can do that will make it a lot easier for
6  her.  The first is to wait for each other to
7  finish our questions and our answers before the
8  other speaks.  That way she doesn't have to try
9  to transcribe both of us simultaneously, and she
10  gets a complete back and forth question and
11  answer set.
12      The other thing is that to suspend some
13  of the things we normally do in conversations, so
14  when we ask -- when I ask you a yes or no
15  question, if you could provide a "yes" or "no"
16  answer as opposed to "uh-huh" or "huh-uh," which
17  when transcribed look exactly the same.  Also if
18  you could avoid nodding your head, because that
19  also doesn't show up on the record.  Does all of
20  that make sense to you?
21    A.  Yes.
22    Q.  Okay.  During the course of the
23  deposition your counsel, Mr. Schapiro, may from
24  time to time interject an objection.  The fact
25  that he interjects an objection doesn't mean you

Page 8

1  don't answer the question.  You should go ahead
2  and answer it, and the deposition -- or excuse
3  me, the objection will be preserved for the judge
4  at a later time, if necessary.  Do you understand
5  that?
6    A.  Yes.
7    Q.  Okay.  A moment ago you took an oath.
8  Do you recall that?
9    A.  Yes.
10    Q.  And that oath required you to tell the
11  truth, the same way you would be required to tell
12  the truth if you were sitting in a courtroom next
13  to a judge or in front of a jury.  Do you
14  understand that?
15    A.  Yes.
16    Q.  Any reason you would have any difficulty
17  abiding by that oath today?
18    A.  No.
19    Q.  Now Mr. Sinnreich just by way of
20  background you're not an economist, correct?
21    A.  Correct.
22    Q.  And you're not an engineer, right?
23    A.  Correct.
24    Q.  You are not a lawyer, right?
25    A.  Correct.

Page 9

1    Q.  You have never attended law school,
2  right?
3    A.  Correct.
4    Q.  You are not a musicologist, are you?
5    A.  No.
6    Q.  You are not an accountant, right?
7    A.  Correct.
8    Q.  You don't have a business major, do you?
9    A.  No.
10    Q.  You have never worked for a record
11  company, correct?
12    A.  Incorrect.
13    Q.  And in what way -- well, let me ask you
14  the question differently.  Have you ever been
15  employed by a record company?
16    A.  Yes.
17    Q.  Okay.  How have you been employed by a
18  record company?
19    A.  I was an intern at SBK Records.
20    Q.  What is SBK Records?
21    A.  SBK Records was a major record label in
22  the 1990s.
23    Q.  Okay.  How long were you an intern at
24  SBK Records?
25    A.  Maybe a month.

3 (Pages 6 - 9)

1    Q.  Is that one month experience your sole
2 time working for a record company?
3    A.  It's my sole time as the employee of a
4 record company.
5    Q.  And how old were you when you were an
6 intern at SBK Records?
7    A.  About 21.
8    Q.  And have you ever worked for a music
9 publisher?
10    A.  Yes.
11    Q.  Have you ever been employed by a music
12 publisher?
13    A.  Yes.
14    Q.  Okay.  When were you employed by a music
15 publisher?
16    A.  I have been the co-owner of a music
17 publisher for several decades.
18    Q.  And what is the name of the music
19 publisher you own?
20    A.  Sincerest Publishing.
21    Q.  And how much of Sincerest Publishing do
22 you own?
23    A.  One third.
24    Q.  And who are the other owners?
25    A.  Janea Best and Todd Nocera.

1    Q.  And how many compositions does Sincerest
2 Publishing own or administer?
3    A.  Something in the range of 60 or 70.
4    Q.  And are you an author or co-author on
5 all of those?
6    A.  No.
7    Q.  How was Sincerest Publishing formed?
8       MR. SCHAPIRO:  Objection, vague.
9    Q.  (BY MR. OPPENHEIM)  I'll provide a
10 clearer question.  Can you just describe the
11 circumstances under which you created Sincerest
12 Publishing?
13    A.  It was many years ago, so I don't
14 remember precisely, but to the best of my memory
15 Best ,Nocera and I formed it when we first
16 released the first album by Brave New Girl that
17 we collaborated on.
18    Q.  So you initially created this music
19 publisher in order to own or administer the
20 rights to works that you had contributed to?
21    A.  Correct.
22    Q.  And does this music publishing entity
23 own any rights for any individuals other than the
24 owners?
25       MR. SCHAPIRO:  Objection,

1 ambiguous.
2    A.  I'm not certain.
3    Q.  (BY MR. OPPENHEIM)  Let me clarify the
4 question.  Does the music publishing entity own
5 or administer any music publishing rights for any
6 individuals or entities other than the owners of
7 Sincerest Publishing?
8    A.  I'm not certain, but I don't believe so.
9    Q.  Now you're a professor of
10 communications, correct?
11    A.  Yes.
12    Q.  And you claim to be a professional
13 musician; is that right?
14    A.  I am a professional musician.
15    Q.  Have you ever sought to be signed to a
16 major record label?
17    A.  No.
18    Q.  Has any band you've played in ever
19 sought to be signed by a major record label?
20       MR. SCHAPIRO:  Objection,
21 ambiguous.
22    A.  I don't know.
23    Q.  (BY MR. OPPENHEIM)  Have you or any of
24 your band mates -- strike that.  You know what I
25 mean by the term "band mates"?

1    A.  I believe so.
2    Q.  Okay, people who play in a band with
3 you.  Can we agree that band mates is a reference
4 to people who play in a band with you?
5    A.  Yes.
6    Q.  Have you or any of your band mates ever
7 submitted a demo tape or file to a record label?
8    A.  Yes.
9    Q.  Okay, can you describe that, please.
10    A.  It's something that happened on
11 multiple occasions over multiple decades, so it
12 would be difficult to describe one emblematic
13 instance.
14    Q.  Were you the individual who submitted
15 the demo tape or file to the record label or was
16 it one of your band mates?
17       MR. SCHAPIRO:  Objection, misstates
18 the prior testimony.
19    A.  The circumstances are varied.
20    Q.  (BY MR. OPPENHEIM)  I'm just trying to
21 understand whether you actually submitted the
22 demo tape to the record label.
23    A.  It's not a "yes" or "no" question.
24    Q.  Why is it not a "yes" or "no" question?
25    A.  Well, for instance, I've just been

**Page 14**

1  offered a record contract with a label called GMO
2  records.  I didn't submit a demo to the label.
3  The way that we ended up getting offered a
4  contract was the producer of the album had worked
5  previously with the label and shared some mixes
6  with the label, and then we were contacted by the
7  head of A & R.
8        That has happened in the past, as well.
9  The process of submitting a demo is not to my
10  understanding typically the route to a record
11  label contract.
12     Q.  GMO records is not considered one of the
13  major record companies or label that is part of a
14  major record company, correct?
15        MR. SCHAPIRO:  Objection to the
16     form.
17     A.  GMO records is not a major record label.
18     Q.  (BY MR. OPPENHEIM)  Are you going to
19  sign a recording agreement with GMO records?
20     A.  If my band mate and I are happy with the
21  terms of the contract, probably.
22     Q.  And is there a proposed contract that
23  have been sent to you?
24     A.  Terms have been sent to us, but not a
25  finalized contract.

**Page 15**

1     Q.  Can you describe what those terms are,
2  please.
3        MR. SCHAPIRO:  Objection,
4  ambiguous, vague.
5     A.  I don't remember the specifics, because
6  as you know there are many different aspects to a
7  recording contract, but the royalty share is
8  50/50 between the artist and the label, and I
9  believe we would use the label's publishing
10  company for publishing outside of North America.
11     Q.  (BY MR. OPPENHEIM)  Would you be paid in
12  advance?
13     A.  That is something we're still looking
14  at.
15     Q.  Have you asked for one?
16     A.  Yes.
17     Q.  Why do you want an advance?
18     A.  Money in your pocket is better than
19  money promised.
20     Q.  If your recordings do not generate
21  royalties sufficient to offset the advance would
22  you expect to pay the advance back to the record
23  label?
24     A.  No.
25     Q.  Why not?

**Page 16**

1     A.  That would not be an acceptable term.
2     Q.  You want the record company to take on
3  the risk; is that right?
4     A.  Yes.
5     Q.  What have you done as a professional
6  musician in the last 12 months?
7     A.  I've performed maybe 20 times.  I
8  recorded an album.  I've released several
9  singles.  I contributed to maybe a dozen
10  recordings by other artists.  I've sold
11  merchandise.  I've licensed songs for use in
12  film.  I've released an album of remixes and
13  sundry other things.
14     Q.  Have you rehearsed?
15     A.  Yes.
16     Q.  How often do you rehearse?
17     A.  Individually or with other musicians?
18     Q.  That's a good distinction.  Can you just
19  give me both?
20     A.  I rehearse individually roughly five
21  times a week, and with other musicians roughly
22  once or twice a week.
23     Q.  When you rehearse individually, how long
24  usually do you do that for?
25     A.  60 to 90 minutes.

**Page 17**

1     Q.  And the last year that you described, is
2  that fairly typical for your activity in any
3  given year as a musician?
4        MR. SCHAPIRO:  Objection to the
5  form of the question.
6     A.  All of the activities fluctuate, but
7  yes, in aggregate.
8     Q.  (BY MR. OPPENHEIM)  You said that you
9  release remixes and recorded an album, recorded
10  some singles.  Have you registered any sound
11  recordings with the copyright office?
12     A.  No.
13     Q.  Have you registered any compositions
14  with the copyright office?
15     A.  No.
16     Q.  Has anybody registered sound recordings
17  or compositions with the copyright office on you
18  or your band's behalf?
19     A.  I don't know.
20     Q.  How much -- how many hours would you say
21  in a given week do you spend as a musician?
22        MR. SCHAPIRO:  Objection,
23  ambiguous.
24     A.  Can you be more specific?
25     Q.  (BY MR. OPPENHEIM)  In an average week,

5 (Pages 14 - 17)

| | |
|---|---|
| Page 30 | Page 32 |

**Page 30**

1    Q.   Have you said anything negative about
2 them in the past?
3    A.   It's entirely possible.
4    Q.   Why is it possible?
5    A.   Part of my role as a media educator and
6 critic is to point out and critique unethical
7 behaviors by companies and public individuals.
8    Q.   Do you think the major record companies
9 and the major music publishers are unethical?
10    A.   Sometimes.
11    Q.   Have you ever been the subject of a DMCA
12 notice?
13    A.   Not that I recall.
14       (Exhibit 289 was marked by the
15 reporter for identification.)
16    Q.   (BY MR. OPPENHEIM)  I'd like to mark two
17 exhibits here, if you can look in your Exhibit
18 Share folder, Mr. Sinnreich, you'll see an
19 Exhibit 289.  Can you open that, please.  So this
20 is Plaintiffs' Exhibit 289.  Let me know when you
21 have it open, Andy, you as well, please, just to
22 make sure we're all functioning here.
23       MR. SCHAPIRO:  I have it.
24    Q.   (BY MR. OPPENHEIM)  Great.
25    A.   I have it.

**Page 31**

1    Q.   Is this a copy of the expert report you
2 prepared for this case, Mr. Sinnreich?
3    A.   It appears to be, yes.
4       (Exhibit 290 was marked by the
5 reporter for identification.)
6    Q.   (BY MR. OPPENHEIM)  And then let's open
7 Exhibit 290, please, and take a look at that.
8 Let me know when you have it open.
9    A.   I have it open.
10    Q.   Okay.  And is this a copy of the
11 rebuttal report that you authored in this case?
12    A.   It appears to be, yes.
13    Q.   Let's go back to the first report if we
14 could and just turn to the second page.  This is
15 Exhibit 289.
16    A.   Are you asking me to open the second
17 page of the .pdf or the page marked Page 2?
18    Q.   Good question, the second page of the
19 .pdf please, the Table Of Contents.  Actually let
20 me ask you one other question first.  Have you
21 issued any reports in this case other than these
22 two reports?
23    A.   No.
24    Q.   Are all of the opinions that you're
25 offering in this case contained within those two

**Page 32**

1 reports?
2       MR. SCHAPIRO:  Object to the form.
3    A.   Yes.
4    Q.   (BY MR. OPPENHEIM)  And looking at the
5 Table of Contents of plaintiffs' Exhibit 289,
6 your opening report, it lists five primary
7 opinions; is that correct?
8    A.   Yes.
9    Q.   And these are the five primary opinions
10 you're offering in the case; is that correct?
11    A.   In addition to the opinions outlined in
12 my rebuttal report, yes.
13    Q.   But those opinions are limited to
14 rebutting opinions provided by plaintiffs'
15 experts in the case, correct?
16    A.   Yes.
17    Q.   So I want to make sure I understand what
18 you are and are not opining on in this case.  Are
19 you opining in any way on whether plaintiffs own
20 the works at issue in this case?
21    A.   No.
22    Q.   Are you opining on whether or not the
23 plaintiffs have properly registered those works
24 with the copyright office?
25    A.   No.

**Page 33**

1    Q.   Are you opining on whether Charter's
2 subscribers engaged in copyright infringement or
3 not?
4    A.   No.
5    Q.   Are you opining on whether plaintiffs'
6 sent 704,355 DMC notices to Charter for purposes
7 of this case?
8    A.   No.
9    Q.   Are you opining on whether or not
10 Charter was aware of on-going infringement on its
11 network?
12       MR. SCHAPIRO:  Objection to the
13 form.
14    A.   No.
15    Q.   (BY MR. OPPENHEIM)  Are you opining on
16 whether Charter was aware of specific users
17 engaging in repeated infringement on its network?
18    A.   No.
19    Q.   Are you opining on whether Charter
20 provided repeat infringers with access to its
21 high-speed network?
22    A.   No.
23    Q.   Are you opining on whether Charter
24 profited from infringement or not on its network?
25    A.   I don't understand the question.

9 (Pages 30 - 33)



Page 34

1    Q.  Well, do you have -- have you offered an
2 opinion in this case on whether or not Charter
3 profited by having infringement on its network?
4    A.  No.
5    Q.  Are you opining on whether infringers --
6 strike that.  Are you opining on whether
7 peer-to-peer infringers were drawn to Charter's
8 network because of its failure to police
9 infringement?
10    A.  I question the underlying premise of the
11 question.
12    Q.  But you're not offering an opinion on
13 the subject, are you?
14    A.  I do offer an opinion as regards the
15 messaging in Charter's market materials.
16    Q.  And which of your opinions in Exhibit
17 289 do you speak to the messaging in Charter's
18 marketing materials?
19    A.  If I remember correctly that opinion was
20 offered in the rebuttal report.
21    Q.  Are you opining on what Charter's
22 policies were towards copyright infringement?
23    A.  No.
24    Q.  Are you opining on how Charter
25 implemented its policies towards copyright

Page 35

1 infringement?
2    A.  No.
3    Q.  Are you opining on what legal rights
4 Charter had, visa-a-vis its customers who were
5 engaging in infringement?
6    A.  No.
7    Q.  Is it fair to say that your opinions
8 speak to either the harm done to the plaintiffs
9 from peer-to-peer infringement or what the law
10 should be in your mind?
11      MR. SCHAPIRO:  Objection to the
12 form of the question.
13    A.  No.

Page 36

18    Q.  Mr. Sinnreich, do you have a view about
19 internet service providers like Charter
20 Communications?
21      MR. SCHAPIRO:  Objection, vague.
22    A.  Can you be more specific, please?
23    Q.  (BY MR. OPPENHEIM)  Do you have a
24 personal view whether you like or dislike
25 internet service providers like Charter

Page 37

1 Communications?
2    A.  I don't have an emotional relationship
3 with corporations.

10 (Pages 34 - 37)

Page 130

1 findings.
2 Q. But the question is whether or not you
3 believe it is reliable, because you're the one
4 citing it in your report, right?
5 A. Yes.
6 Q. Do you believe this study, this report
7 is reliable?
8 A. To an extent.
9 Q. Okay, so what does that mean?
10 A. Well, the more I know about their
11 methods and data, and what their top line
12 representation of the data means, the more I can
13 make a judgment as to its reliability.
14 Q. Well, Mr. Sinnreich, I'm asking you
15 since you included it in your report, did you
16 believe at the time that you included it that the
17 study was reliable?
18 A. To the extent to support the point that
19 I was making in my report, I did.



13 A. Well, there's information at the bottom
14 of the slide describing the data. I can't read
15 it in this copy.
16 I believe that this is a lower quality
17 version than what was produced to me, but I can't
18 be certain about that.
19 Q. Do you have a reason to believe that
20 there are two different surveys referenced here?
21 A. No.
22 Q. So is there any reason to believe that
23 the survey was reliable for one purpose, that you
24 want to cite it for, but not reliable for another
25 purpose that you don't want to cite it for?

Page 132

1 A. No. As I testified, it's reliable to
2 the extent that I understand what the data are
3 and what the analysis of the data says.
4 Q. But as you sit here today you don't know
5 whether -- what the data set was for the point
6 that you include in your report; is that correct?
7 A. I cannot at the moment read the small
8 text at the bottom of the slide, so I can rely
9 upon the data on this slide to the extent that I
10 can understand who the population was and what
11 the cited figures purport to describe. I can't
12 rely on it past that point.
13 Q. Let me close that exhibit, please. One
14 moment. I'm just trying to grab an exhibit.
15 Okay. To support your opinion that the music
16 industry -- yeah. Excuse me. Strike that. To
17 support your opinion that music industry revenues
18 did not decline as a result of peer-to-peer, you
19 point to a survey that you did in the year 2000
20 when you worked for Jupiter; is that correct?
21 A. I refer to a research report that I
22 published based on a survey fielded in 2000 while
23 I was working at Jupiter.
24 Q. And is that research report titled,
25 "Digital Music Subscriptions"?

Page 133

1 A. I believe that's part of the title of
2 the report.
3 (Exhibit 294 was marked by the
4 reporter for identification.)
5 Q. (BY MR. OPPENHEIM) Okay. Let's take a
6 look at Exhibit 294, please. You may have to
7 refresh to get it to come up.
8 A. I've got it.
9 Q. Okay.
10 MR. OPPENHEIM: Andy, do you have
11 it?
12 A. Now I do, yes.
13 Q. (BY MR. OPPENHEIM) So this is
14 Plaintiff's Exhibit 294. Do you recognize this
15 document, Mr. Sinnreich?
16 A. Yes.
17 Q. What is it?
18 A. This appears to be a full .pdf of a
19 research report that I served as an the principal
20 analyst on while I worked at Jupiter Research in
21 the year 2000.
22 Q. And is this the research report you were
23 referring to a moment ago?
24 A. Yes.
25 Q. And this research report contains an

34 (Pages 130 - 133)

Page 134

1 analysis of a consumer survey that was done; is
2 that correct?
3    A.  Yes.
4    Q.  Do you have any of the underlying
5 documents from the survey?
6    A.  What do you mean by "underlying
7 documents"?
8    Q.  Do you have the protocols that were
9 used?
10    A.  No.
11    Q.  Do you have a copy of the survey
12 instruments?
13    A.  Partial.
14    Q.  What do you mean by "partial"?
15    A.  I have a document that contains some of
16 the questions that were asked on the survey.
17    Q.  Do you have a list of all of the
18 questions?
19    A.  I don't know.



Page 136

18    Q.  Jupiter Communications doesn't exist any
19 more, does it?
20    A.  I'm not sure whether --
21    Q.  Excuse me, it's Jupiter Research.  I
22 apologize.  I got the name wrong.  Go ahead.
23       Jupiter Research doesn't exist any more,
24 does it?
25    A.  Not as a standalone company.

3       MR. SCHAPIRO:  That's for us to
4 decide, so we can take that up later.
5       MR. OPPENHEIM:  Well, I'm asking
6 the witness if he has an objection.
7       MR. SCHAPIRO:  He's not qualified
8 to make an objection, unless you're using the
9 word "objection" to mean something else.

Page 137

1    Q.  Do you have any of the programming
2 instructions?
3    A.  No.
4    Q.  Do you know whether or not the survey
5 included screener questions?
6    A.  I could not tell you for certain.
7    Q.  Do you know whether you would have the
8 screener questions?
9    A.  I personally did not field this, and
10 it's very unlikely that I would have the screener
11 questions that were used to select the response.
12    Q.  Who fielded the survey?
13    A.  Are we talking about the survey cited in
14 this report?
15    Q.  Yes.
16    A.  It was fielded by a research firm called
17 NFO.
18    Q.  Who constructed the survey?
19    A.  It was constructed by most of the people
20 who appear in the masthead of this report, and
21 then it was -- if you consider this part of
22 construction, it was programmed by NFO.
23    Q.  And were you one of the people who
24 constructed the survey?
25    A.  Yes.

25 reason that you wouldn't want to provide the



Page 138

1    Q.  In fact, you were the lead on this,
2  weren't you?
3    A.  Yes.

Page 140

10    Q.  And that website was subject to a
11  significant amount of litigation, was it not?
12    A.  It was subject to litigation.
13    Q.  In fact -- sorry, go ahead.
14    A.  "Significant" is a value judgment.
15    Q.  Okay.  Michael Robertson was the founder
16  of MP3.com, right?
17    A.  To the best of my knowledge, he was.
18    Q.  He and MP3.com as a company were sued by
19  every one of the major record companies, correct?
20    A.  That is how I remember it.
21    Q.  And he and MP3.com were found liable for
22  copyright infringement, correct?
23    A.  I do remember the litigation ending in a
24  way that had a large dollar figure attached to
25  it.  I can't tell you sitting here for certain

Page 139

Page 141

1  whether it was an award or a settlement.
2    Q.  You don't recall Judge Rakoff in the
3  Southern District of New York issuing a lengthy
4  opinion opining that MP3.com had engaged in
5  direct copyright infringement?
6        MR. SCHAPIRO:  Objection, asked and
7  answered, improper testifying by the attorney.
8    Q.  (BY MR. OPPENHEIM)  Does that refresh
9  your recollection?
10    A.  I cannot tell you definitively that
11  that's what happened.

36 (Pages 138 - 141)



Page 142

Page 144

18   Q.   Do you have any specialized training in
19 how to design and administer a consumer survey?
20   A.   Yes.
21   Q.   What is that training?
22   A.   Well, I learned both through an
23 apprenticeship at Jupiter, and also through
24 taking quantitative research methods, classes as
25 a graduate student.

Page 143

Page 145

1   Q.   How many surveys have you overseen in
2 your career, consumer surveys?
3   A.   I don't know.
4   Q.   Can you think of any beyond this one
5 that we're discussing?
6   A.   Yes.
7   Q.   Had you done any prior to this one in
8 2000?
9   A.   Yes.
10   Q.   How many?
11   A.   I would say over the course of my career
12 I have overseen scores, if not hundreds of
13 surveys, whose respondents were consumers.
14   Q.   Were those generalized consumer surveys?
15   A.   I don't know what that is.
16   Q.   Well, if you surveyed the students in
17 your class they would arguably be consumers, and
18 you could include that in your answer.  Is that
19 what you're including?
20   A.   I have never surveyed the students in my
21 class.
22   Q.   So when you say you've overseen scores,
23 if not hundreds of surveys whose respondents were
24 consumers, is that different than to say you've
25 overseen scores of consumer surveys?

37 (Pages 142 - 145)

Page 146

1    A.  These are vague terms.  I'm not sure
2  what you're asking me.
3    Q.  Is there a distinction between what
4  professionals would call, consider a consumer
5  survey, and what you just described, which are
6  surveys whose respondents were consumers?
7    A.  I see.  Let me be more clear.  I have
8  overseen scores and possibly hundreds of surveys
9  of individuals that -- whose research focus
10  included, at least in part, their beliefs and
11  behaviors as regards to the marketplace.
12    Q.  Do you teach consumer behavior as a
13  professor?
14    A.  Sometimes.
15    Q.  Have you ever published a book on
16  consumer behavior?
17    A.  I have included my data and analyses of
18  consumer behavior in books and book chapters that
19  I have published.
20    Q.  Are you familiar with the book that's
21  authored by Shari Diamond titled, "Reference
22  Manual on Scientific Evidence"?
23    A.  Not off the top of my head.
24    Q.  So you don't know whether or not you
25  abided by the principles set forth in there on

Page 147

1  how to construct a reliable consumer survey?
2    A.  Sitting here today, I could not say
3  "yes" or "no."
4    Q.  So the surveys that -- the survey that's
5  referenced in this 2000 report covered 13 years
6  before the claims in this case, correct?
7    A.  More or less, correct.
8    Q.  And in that 13-year period, between 2000
9  and 2013, there were a lot of technological
10  changes in the music in the internet industries,
11  correct?
12    A.  Yes.
13    Q.  Napster grew substantially, and then was
14  taken down by a Federal court, right, in that
15  period?
16    A.  It was found liable by a Federal Court.
17    Q.  And in 2000 when you did the survey
18  BitTorrent didn't exist yet, right?
19    A.  Sitting here today I cannot tell you
20  that the date on which Lyon Cohen first created
21  the BitTorrent protocol.
22    Q.  BitTorrent wasn't being used widely at
23  the time that you did your survey in 2000,
24  correct?
25    A.  Correct.

Page 148

1    Q.  Nor was eDonkey, right?
2    A.  I don't remember the date on which
3  eDonkey became a popular file sharing protocol.
4    Q.  But you can't say that it was in place
5  at the time of your survey, can you?
6    A.  I don't specifically recall eDonkey
7  being in place at that time.
8    Q.  What about Aresis?
9    A.  Same answer.
10    Q.  What about Gnutella?
11    A.  I believe that Gnutella may have been in
12  place at that time.
13    Q.  But it wasn't being widely used, was it?
14    A.  I would have to review the data.
15    Q.  There were very few digital download
16  services in the year 2000, correct?
17    A.  My memory is that following the
18  unexpected success of Napster with consumers,
19  there was a sudden explosion in the number of
20  file sharing protocols and networks made
21  available in the following year.
22    Q.  In the year 2000, iTunes didn't exist,
23  right?
24    A.  The software iTunes did exist.  The
25  iTunes music store did not.

Page 149

1    Q.  Nor did Amazon's music store, correct?
2    A.  Amazon, I believe, was selling CDs and
3  maybe even had already acquired CD Now by that
4  point, but they were not selling MP3s.
5    Q.  They were not selling digital downloads,
6  correct?
7    A.  To the best of my recollection, they
8  were not.
9    Q.  So at the time that you did this survey
10  there were very few digital download services
11  being used by consumers, correct?
12    A.  Digital downloads accounted for a very
13  small portion of music sales at that period in
14  time.
15    Q.  Are you as an expert in this case
16  claiming that the survey that you conducted in
17  the year 2000 was still applicable to music
18  consumers for the period of 2013 to 2016?
19    A.  I did not cite the survey in my report.
20  I cited the Jupiter report.
21    Q.  And the Jupiter report relies in some
22  measure, some extensive measure on that consumer
23  survey, correct?
24    A.  Yes.
25    Q.  And you cite that Jupiter report I think

38 (Pages 146 - 149)

Page 150

1 you just said, right?
2     A.  Correct.
3     Q.  So I'll ask you that question again, do
4 you believe that the consumer survey that you did
5 in the year 2000 was still an applicable --
6 strike that.
7         Do you believe that the consumer survey
8 that you did in the year 2000 reflected music
9 consumers' views in the years 2013 to 2016?
10     A.  No.
11     Q.  And do you believe that the report that
12 you did that relies on that consumer survey was
13 applicable or is applicable to what consumers
14 were doing in 2013 to '16?
15     A.  To an extent.
16     Q.  To what extent?
17     A.  Most research is used for years
18 subsequent to its publication as an indication of
19 how its subjects behave.
20     Q.  Did you do -- I'm sorry, I thought you
21 were done.  Please continue.
22     A.  The longer it's been since publication,
23 the fewer inferences you can make about its
24 applicability.
25     Q.  When you cited it in your report, had

Page 151

1 you done any follow-up consumer survey research
2 to determine whether or not the conclusions that
3 you came to in the year 2000 were still
4 applicable in the years 2013 to '16?
5         MR. SCHAPIRO:  Objection, misstates
6 the record.
7     A.  Would you mind repeating the question,
8 please.
9     Q.  (BY MR. OPPENHEIM)  When you cited the
10 Jupiter Research report in your expert report,
11 had you done any follow-up consumer research or
12 surveys to determine whether or not the
13 conclusions in the Jupiter Research report were
14 still applicable 13 years later?
15     A.  I have, in the years since publishing
16 the Jupiter report, fielded several surveys that
17 explored file sharing as one of many on-line
18 behaviors, but I have not published a report that
19 is a follow-up to the Jupiter report.
20     Q.  And you don't cite any of those other
21 surveys in your expert report, do you?
22     A.  No.  Mind if we take a quick break?  Do
23 you want to finish up this line of questioning
24 and then we can take a break?
25         MR. OPPENHEIM:  That's fine.  Let's

Page 152

1 go off the record.
2         THE VIDEOGRAPHER:  Going off the
3 record.  The time on the monitor, 2:22 p.m.
4         (Recess)
5         THE VIDEOGRAPHER:  We're back on
6 the record.  Time on the monitor 2:33 p.m.
7     Q.  (BY MR. OPPENHEIM)  Mr. Sinnreich, can I
8 ask you to turn to Page 24 of Exhibit 294, and
9 I'm referring to the page numbers of the report,
10 not the .pdf page numbers, and it's a page at the
11 top of which it says "Report Methodology."
12     A.  I'm looking at it now.
13     Q.  Okay.  And halfway down that page
14 there's a section that says Consumer Surveys,
15 right?
16     A.  Yes.
17     Q.  Within that paragraph there is the
18 following sentence, "The sample was carefully
19 weighted by a series of demographic and
20 behavioral characteristics to ensure that it was
21 representative of the online population."  Do you
22 see that?
23     A.  Yes.
24     Q.  How was that weighting accomplished?
25     A.  I could not tell you specifically how it

Page 153

1 was accomplished in this case, because it was
2 performed by other analysts 20 years ago, but I
3 can speak more generally to how weighting works
4 in analogous contexts, if you like.
5     Q.  So I'm interested in what was done in
6 this specific survey.  Do you have any documents
7 which would show what weighting was done in this
8 survey?
9     A.  Only the information available in the
10 report.
11     Q.  Further down in that paragraph it says:
12 "Additionally, Jupiter took the unconventional
13 step of weighting the data by online tenure and
14 AOL use, two key determinates of on-line
15 behavior;" do you see that?
16     A.  Yes.
17     Q.  And do you know how that weighting was
18 done?
19     A.  Yes, it says so right in this paragraph.
20     Q.  Well, how was that weighting actually
21 calculated, do you know?
22     A.  Yes.
23     Q.  Okay, how?
24     A.  So there was a larger survey done on a
25 quarterly basis of over 30,000 US households, and

39 (Pages 150 - 153)

Page 154

1 that survey established baseline levels of
2 demographic and psychographic factors, and
3 analyzed data to figure out what major
4 independent variables were that could bias the
5 data, and then the smaller survey was
6 mathematically reweighted in order to correct for
7 the disparities in these variables between the
8 larger and the smaller survey.
9     Q.   Does this mean that there was a
10 correction done to give extra weight to AOL users
11 as compared to non-AOL users?
12     A.   Sitting here today, I could not tell
13 you.
14     Q.   So you don't know whether it was
15 weighted in favor of AOL users or against AOL
16 users?
17     A.   All I know is based on this and my
18 memories of working at Jupiter is that it was
19 weighted so that the percentage of AOL users
20 conforms with the percentage in the larger
21 population as reflected in the larger survey.
22     Q.   But you can't tell us how that weighting
23 was actually accomplished, correct?
24     A.   Mathematically, no.
25     Q.   Okay.  And do you have any documentation

Page 155

1 that would demonstrate how that weighting was
2 done?
3     A.   No.
4     Q.   You know, this survey excluded everybody
5 who was under 18; is that correct?
6     A.   I believe that the survey included
7 adults 18 and up, but I would need to look more
8 closely to be certain.
9     Q.   Music consumers include a lot of people
10 who are under the age of 18, correct?
11     A.   Yes.
12     Q.   And so those people were excluded from
13 the survey.
14     A.   To the best of my knowledge the survey
15 does not represent populations below the age of
16 18.
17     Q.   And in the year 2000, many of the early
18 adopters of peer-to-peer file sharing were
19 generally younger, correct?
20     A.   I don't have data to confirm or deny
21 that characterization.
22     Q.   So are you telling me that you think
23 that 50 year-olds were as likely to be using P2P
24 file sharing in the year 2000 as 17 years-old?
25         MR. SCHAPIRO:  Objection.

Page 156

1     A.   I don't know.
2     Q.   (BY MR. OPPENHEIM)  You don't know?
3     A.   I don't know.
4     Q.   If you did believe that file sharing,
5 the early adopters of peer-to-peer file sharing
6 included more people who were under the age of
7 18, that would go to the reliability of your
8 study, correct?
9     A.   No.
10     Q.   Why not?
11     A.   It would go to the generalizability of
12 the study, but not to the reliability of the
13 study.
14     Q.   I'm sorry, could you say that again?
15     A.   It would go to the generalizability of
16 the study, but not to the reliability of the
17 study.
18     Q.   Did the survey attempt to quantify, to
19 quantify the impact of P2P to music sales?
20     A.   It depends on your definition of those
21 two factors.  What it specifically quantified was
22 the causal relationship between Napster usage and
23 music purchasing changes by consumers.
24     Q.   The survey didn't attempt to quantify
25 how much a particular peer-to-peer file sharer

Page 157

1 decreased their music consumption, did it?
2     A.   Yes.
3     Q.   You're saying it did?
4     A.   Yes.
5     Q.   So the survey asked file sharers who
6 said that they were buying less music, it asked
7 them how much less music they were buying?
8     A.   There was a question on the survey that
9 asked people about the degree to which they had
10 increased or decreased their music purchasing
11 behaviors, and that included, but was not limited
12 to respondents who said that they used file
13 sharing software.
14     Q.   And when you say "the degree to which,"
15 is that asking the survey respondents to provide
16 some numerical number?
17     A.   No.  That would not yield a reliable
18 result.
19     Q.   So when you say the degree to which, you
20 meant to ask them whether, for example, they
21 decreased their music consuming by a little or by
22 a lot?
23         MR. SCHAPIRO:  Object to the form
24 of the question.
25     Q.   (BY MR. OPPENHEIM)  Is that right?

40 (Pages 154 - 157)

Page 158

1 A. That is directionally accurate. I don't
2 believe that was the exact verbiage used in the
3 survey, and I'm not sure that the number of
4 options was that constrained.
5 Q. Okay. Well, what was the exact verbiage
6 and what were the options?
7 A. I don't have a copy of the survey
8 instrument to refer to, but I remember
9 directionally that that question existed and how
10 it was structured.
11 Q. And do you remember all of the results?
12 A. Some of them are --
13 Q. Go ahead.
14 A. Some of them are referred to in this
15 report, but I don't remember the results
16 independently of the analysis that we published.
17 Q. So assuming they didn't attempt to
18 determine whether the aggregate decrease in
19 spending by those who claimed to spend less was
20 greater than the aggregate increase for those who
21 claimed to buy more, correct?
22 MR. SCHAPIRO: Objection,
23 foundation.
24 A. There was not a reliable way to
25 comprehensively compare those two aggregates in a

Page 159

1 numerical fashion.
2 Q. (BY MR. OPPENHEIM) So the answer to my
3 question is yes, that's correct?
4 A. The answer is more complicated than your
5 phrasing would suggest.
6 Q. Well, I asked you whether the statement
7 that I made was correct or not correct, and the
8 survey attempt to do a particular thing, and I
9 thought you answered that it couldn't. Does that
10 mean that you didn't?
11 MR. SCHAPIRO: Objection to the
12 form of the question.
13 MR. OPPENHEIM: I agree it's an
14 objectionable form of the question, but I think
15 he understands it.
16 A. Would you like to reframe the question?
17 Q. (BY MR. OPPENHEIM) All I want to know
18 is whether you attempted to quantify whether the
19 decrease, the overall decrease exceeded the
20 overall increase. I think the answer that you
21 gave is, "No, we didn't," but your answer wasn't
22 a "yes" or "no" answer.
23 A. No.
24 Q. As in: No, we didn't?
25 A. We did not quantify which aggregate was

Page 160

1 greater, the aggregate increase spend or the
2 aggregate decrease spend, because it was not
3 something that we could reliably quantify.
4 Q. You can close that exhibit, please. I'd
5 like you to go back to your first report if you
6 would, please, and I'd like you to look at your
7 second opinion which I believe begins on Page 6
8 by the page numbering of your document or
9 actually it's the first argument, first opinion.
10 A. Are you referring to the opinion that
11 begins, "The structural shift..."?
12 Q. Yes.
13 A. I'm looking at it.
14 Q. Okay. So this opinion -- so this is
15 your first opinion, and in this opinion you title
16 it, "The structural shift in the music industry
17 was not attributable to piracy, and broadband
18 services have been a boon to music sellers."
19 Where in your opinion do you provide
20 support for the argument that broadband services
21 were a boon to music sellers?
22 A. At several points. The paragraph that
23 begins, "Around the turn," lists several growth
24 areas for the music industry during this period
25 that are reliant upon the growth of broadband

Page 161

1 internet for their existence.
2 Q. Anywhere else?
3 A. The next paragraph.
4 Q. And where in that paragraph?
5 A. The entire paragraph speaks to this
6 point.
7 Q. I'd like to turn to your second opinion,
8 please, which begins on Page 14. Can you read
9 the title of that opinion, please?
10 A. "The Music Industry Scapegoats 'Piracy'
11 for Its Own Strategic Missteps."
12 Q. How do you define scapegoats here?
13 A. Falsely identifying a principal causal
14 factor.
15 Q. Is that a reference to blaming others
16 for your own failings?
17 A. I don't really think that's a useful
18 framework to use for this analysis.
19 Q. Well, you do believe that the music --
20 part of your opinion here is that the music
21 industry is blaming others for its own failings,
22 right?
23 A. Well, as I say elsewhere in my report
24 the music industry is not a single static entity.
25 It's not a person pointing a finger at another

41 (Pages 158 - 161)

Page 162

1 person, but the music industry in aggregate has
2 invested a lot in constructing a narrative in
3 which file sharing is a principal causal factor
4 in its alleged economic harms, and I dispute that
5 narrative on the merits.
6    Q.   In fact, you've repeatedly said that the
7 music industry blames others for it own failings.
8 You've said that publically and you have
9 published that, right?
10    A.   Yeah, it's shorthand for a larger and
11 more complex process, but directionally that is
12 accurate.
13    Q.   And you believe that this narrative is
14 is something that the industry has constructed and
15 has promoted; is that right?
16    A.   Broadly speaking, yes.
17    Q.   And you've said in your publications,
18 right, that the music industry has constructed
19 this narrative and promoted it aggressively,
20 right?
21    A.   Broadly speaking, yes.
22    Q.   And when you say this, are you saying
23 that this scapegoating has been done
24 intentionally by the industry?
25    A.   I don't have enough data to

Page 163

1 comprehensively ascribe intent to the entire
2 industry.
3    Q.   Do you ascribe intent to anybody?
4        MR. SCHAPIRO:  Object to the form.
5 Well, strike that.  Objection to the question,
6 vague.
7    A.   There are particular data points that I
8 can attest to, such as the RAA's public awareness
9 campaign about P2P in the mid-2000s, in which
10 significant resources were dedicated to promoting
11 this narrative, without taking into account
12 widely acknowledged counter-narratives that were
13 both known and embraced by certain people within
14 the music industry.
15    Q.   (BY MR. OPPENHEIM)  Are you referring to
16 the public awareness campaign that included some
17 videos of artists speaking out about the use of
18 P2P file sharing?
19    A.   To the best of my memory, yes.
20    Q.   And what part of that narrative do you
21 believe was false?
22    A.   There were several elements of that
23 public awareness campaign, and many of them
24 promoted a narrative in which peer-to-peer file
25 sharing was the sole or the principal cause of

Page 164

1 economic harm in that era to the recording
2 industry and its creative professionals.
3    Q.   Are you saying that was what was in
4 those videos of the artists?
5    A.   I'm saying that was a narrative that was
6 promoted in several elements of the concerted
7 public awareness campaign during that era.
8    Q.   Other than the narrative that
9 peer-to-peer file sharing was the sole or the
10 principal cause of economic harm in that era,
11 what other aspects of the narrative were being
12 pushed that were false?
13    A.   I don't believe my opinion in this case
14 is that everything in the narrative is false.
15 It's that one factor that's being scapegoated to
16 the exclusion of other factors for strategic and
17 reputational purposes.
18    Q.   Well, was there anything that the
19 industry was saying in this narrative that you
20 believe was false?
21    A.   Yes.
22    Q.   What?
23    A.   That peer-to-peer file sharing was the
24 sole or principal factor contributing to any
25 economic harms experienced by music industry

Page 165

1 organizations or creative professionals during
2 this period.
3    Q.   Was there anything else that the
4 industry said as part of this narrative that you
5 believe was false, beyond that?
6    A.   Are we still referring to my opinion
7 that the music industry scapegoats 'piracy for
8 its own strategic missteps?
9    Q.   Yes.
10    A.   In that case it's not a question of true
11 or false.  It's a question of framing.  The point
12 that I'm trying to make with this opinion is that
13 the term "piracy" is used to create a pejorative
14 opinion about technologies, business models and
15 cultural practices that threaten certain powerful
16 companies' dominance in the music industry, or
17 perceive to threaten that dominance, and that
18 that term does not always correspondence with the
19 legal or economic realities of the use of those
20 new technologies and cultural practices.
21    Q.   In your report you describe that --
22 strike that.  One moment.  In the report, in your
23 expert report you describe that the narrative has
24 led plaintiffs in this case to have received
25 billions of dollars in legal settlements, damage

42 (Pages 162 - 165)

Page 190

1    A.  I am familiar with his credentials, yes.
2    Q.  Do you believe that you have more
3  experience representing industry artists than Don
4  Passman?
5    A.  No.
6    Q.  Do you know, do you believe that you
7  know what music industry contracts look like
8  better than Don Passman?
9    A.  Some of them.
10    Q.  So do you believe you understand certain
11  music industry contracts better than Don Passman?
12    A.  I believe there are contracts that I
13  have seen that he has not seen.
14    Q.  How many contracts for the works in this
15  case have you reviewed?
16    A.  I don't know.
17    Q.  Have you reviewed any of the contracts
18  for the copyrighted works in this case?
19    A.  Possibly.
20    Q.  Which ones?
21    A.  I don't know.
22    Q.  Can you identify even a single artist
23  who's in this case whose contract you have
24  reviewed?
25    A.  Yes.

Page 191

1    Q.  Which one?
2    A.  Kanye West.
3    Q.  And have you reviewed the entirety of
4  Kanye West's contracts?
5    A.  To the best of my ability within a
6  constrained period of time, yes.
7    Q.  Do you represent Kanye West?
8    A.  No.
9    Q.  Okay.  In what context did you review
10  Kanye West's contracts?
11    A.  Not so long ago he published several of
12  them on social media and I downloaded them and
13  reviewed them at that time.
14    Q.  So you don't know if you reviewed them
15  all?
16    A.  No.
17    Q.  You only know what he decided to
18  release, right?
19    A.  Correct.
20    Q.  Okay.  Any other artists in this case
21  whose contracts you think you have reviewed?
22    A.  Nobody who specifically comes to mind.
23    Q.  When you refer to the music industry as
24  being an exploitive industry, there are really
25  two different sets of companies, right; there are

Page 192

1  record companies and music publishers; is that
2  fair?
3    A.  Those are the two types of companies
4  represented by the plaintiffs.
5    Q.  And are you including both of those sets
6  of companies in your claim that the music
7  industry is an exploitive industry?
8    A.  Both sets of companies have been
9  credibly accused of exploitive business practices
10  and labor relations by other professionals.
11    Q.  I'm not asking what others have said;
12  I'm asking what your opinion is, Mr. Sinnreich.
13    A.  I'm not making a blanket statement about
14  all of the companies represented by these
15  sectors, but yes, historically speaking, as I
16  position it in within my report, both record
17  labels and music publishers have behaved
18  exploitively with regards to their creative
19  laborers.
20    Q.  So it's your opinion that the record
21  companies and music publishers in this case have
22  acted in a highly exploitive way; is that what
23  you're saying?
24        MR. SCHAPIRO:  Objection to the
25  form of the question.

Page 193

1    A.  At times, yes.
2    Q.  (BY MR. OPPENHEIM)  Have they done so
3  with respect to any of the artists or songwriters
4  whose works are in this case?
5    A.  I would have to review the list of
6  artists and songwriters to know whether I can
7  render an opinion in answer to that question.
8    Q.  Well, did you review that list when you
9  included the opinion in your expert report?
10        MR. SCHAPIRO:  Objection, misstates
11  the opinion.
12    A.  I reviewed the list of allegedly
13  infringed works during the process of preparing
14  my report.
15    Q.  (BY MR. OPPENHEIM)  And when you
16  included in your report the opinion that the
17  music industry is exploitive of creative labor,
18  were you specifically referencing any of the
19  plaintiffs in this case with respect to any of
20  the artists or songwriters whose works are in
21  this case?
22        MR. SCHAPIRO:  Objection, compound.
23    A.  Yes.
24    Q.  (BY MR. OPPENHEIM)  Okay.  Which ones?
25    A.  I mention several artists and composers

49 (Pages 190 - 193)

Page 218

1　gets another royalty check?
2　　A.　No.
3　　Q.　You include in your opinion the
4　statement that signed artists are prevented from
5　participating in the broader labor market, even
6　during long periods in which they are not being
7　paid by the record labels, right?
8　　A.　Yes.
9　　Q.　The artists are only precluded from
10　doing recordings with other record companies,
11　right?
12　　A.　It depends on the nature of their
13　contract.
14　　Q.　The artist is still free to compose,
15　right?
16　　A.　It depends on the specificities of the
17　contract.
18　　Q.　If it's not a 360 deal, of which I will
19　tell you there are very few and the witnesses
20　will testify there are very few, if it's not a
21　360 deal, an artist who signs a recording
22　contract is free to compose and sell those
23　compositions, correct?
24　　A.　Yes.
25　　Q.　The artist is free to perform publically

Page 219

1　and be paid for those performances, correct?
2　　A.　It depends on the specificities.　360
3　deals are not the only constraints on artists'
4　ability to pursue other sources of revenue.
5　　　　MR. SCHAPIRO:　Apologies, Matt, my
6　LiveNotes froze.　Is your LiveNote working?　I've
7　refreshed.
8　　　　(Off-the-record discussion.)
9　　　　MR. SCHAPIRO:　Go ahead, that's
10　fine, but just two, a couple more questions, but
11　ask them slowly so that I don't have to go back
12　and look at the transcript.
13　　Q.　(BY MR. OPPENHEIM)　To the extent that
14　an artist is prevented from participating in the
15　broader labor market, it's only because they have
16　agreed in a contract with the record company not
17　to, right?
18　　A.　The record label's ability.
19　　Q.　Hold on a second.　Peggy, are you good?
20　I'm sorry, Mr. Sinnreich.
21　　　　(Off-the-record discussion.)
22　　Q.　(BY MR. OPPENHEIM)　One last question,
23　Peggy, and then you can call them.　Okay, I
24　apologize, Mr. Sinnreich.　I'll ask the question
25　again, I don't guarantee it will be exactly the

Page 220

1　same.
2　　　　The only reason that recording artists
3　would be prevented from participating in the
4　broader labor market, as you've described in your
5　report, is because the artist agrees not to
6　participate in the broader labor market in some
7　way, right?
8　　A.　Are you referring to the terms of the
9　recording contract?
10　　Q.　Yes.
11　　A.　That is the principal obstruction to
12　their participating in the broader labor market,
13　correct.
14　　Q.　Okay.　Let's go off the record, if you
15　wouldn't mind.
16　　　　THE VIDEOGRAPHER:　Okay.　Going off
17　the record.　The time on the monitor, 4:16 p.m.
18　　　　(Brief recess taken.)
19　　　　THE VIDEOGRAPHER:　Okay, we're back
20　on the record.　The time on the monitor, 4:34
21　p.m.
22　　Q.　(BY MR. OPPENHEIM)　Mr. Sinnreich, I
23　believe you testified earlier that you don't know
24　how many publishing agreements, recording
25　contracts on 360 deals you have reviewed; is that

Page 221

1　correct?
2　　A.　Yes.
3　　Q.　Can you say that you reviewed more than
4　10 of each?
5　　A.　No.
6　　Q.　Do you believe that you have reviewed a
7　sufficient number of publishing agreements and
8　recording contracts to say that you have reviewed
9　what would be a representative sample of those
10　types of agreements that the majors entered into?
11　　A.　Not from a statistical standpoint.
12　　Q.　In your expert report you reference
13　several different instances in which record
14　company contracts are compared to slavery.　Do
15　you recall that?
16　　A.　Yes.
17　　Q.　Including the artist Kanye, Michael
18　Jackson and Prince, right?
19　　A.　Yes.
20　　Q.　What slaves have endured has been
21　horrific, including physical beatings, forced
22　labor, loss of basic human rights, loss of
23　family, starvation, substandard housing, the list
24　could go on and on, would you agree?
25　　A.　Yes.

56 (Pages 218 - 221)

Page 222

1  Q.  It's not appropriate to compare
2  recording artists or songwriters to slaves, is
3  it?
4  A.  It's not my place to say.
5  Q.  Well, you included it in your report,
6  Mr. Sinnreich.  Do you intend to testify that
7  record companies and music publishers are akin to
8  slave owners?
9  A.  No.
10  Q.  Do you intend to testify that there is
11  any credibility to accusations that others have
12  made that record companies and music publishers
13  are akin to slave owners?
14  A.  It's not my place to say.
15  Q.  So you do intend to relay the
16  accusations of others in this -- I'll make this
17  simple.  You can withdraw it or you can explain
18  how you intend to tell the judge and the jury in
19  this case that there's any credibility to the
20  accusation of record companies or music
21  publishers being akin to slave owners.
22      MR. SCHAPIRO:  Objection, you don't
23  have to tell him what your testimony in court
24  will be, and you don't have to withdraw anything.
25  Q.  (BY MR. OPPENHEIM)  Mr. Sinnreich, would

Page 223

1  you compare record companies and music publishers
2  to slave owners?
3  A.  In what respect?
4  Q.  In any respect.
5  A.  It's complex.  The 1619 podcast did a
6  good job of showing how historically management
7  structures in corporate America owe origins to
8  control structures on slave plantations in the
9  American South.  That's a form of comparison that
10  I think is elucidative and pointed.
11      I certainly would not make any
12  comparison that would belittle the pains and
13  privations felt by slaves in the American South.

Page 224

13  Q.  Are you familiar with record companies
14  engaging in violations of privacy?
15  A.  Not off the top of my head.
16  Q.  What portion of artists have accused
17  record companies and music publishers of being
18  like slave owners?
19  A.  I don't know.
20  Q.  You said there was a litany.  Are there
21  any more than the ones you describe in your
22  report?
23  A.  Yes.
24  Q.  Who beyond Kanye and Michael Jackson and
25  Prince?

Page 225

1  A.  May I refer to my report?
2  Q.  Well, you can't say off the top of your
3  head?
4  A.  I remember some of them, like Kesha and
5  McGame but I don't remember all of them.
6  Q.  Okay.  So are there any that are not
7  listed in your report?
8  A.  Yes.
9  Q.  Okay, who are they?
10  A.  More than I can name before you thinking
11  off the top of my head I remember some very
12  poignant De La Soul lyrics comparing record label
13  contracts to slavery that I didn't cite in my
14  report.  I also remember Chuck D from Public
15  Enemy.
16  Q.  There's a reputable source.
17  A.  Can I refer you to my report?
18  Q.  Mr. Sinnreich, are you referring to any
19  instances of a record company physically beating
20  an artist?
21      MR. SCHAPIRO:  Objection.
22  A.  I have heard some stories that matched
23  that description over the years.
24  Q.  (BY MR. OPPENHEIM)  Okay.  Please
25  describe what facts you're aware of, of a record

57 (Pages 222 - 225)

Page 226

1 company, individual, employee physically beating
2 an artist.
3    A.   I would need to review the specificities
4 before I attest to them under oath.
5    Q.   Well, where would you review those
6 specificities?
7    A.   Reportage surrounding legal complaints,
8 recording industry histories and biographies and
9 elsewhere.
10    Q.   Do you intend to testify that record
11 companies -- strike that.  Are you aware of any
12 plaintiff record companies ever physically
13 beating their artists?
14    A.   Do you mean individuals employed by the
15 record companies or do you mean the corporate
16 entity itself?
17    Q.   The individuals employed by the record
18 companies.
19    A.   Not off the top of my head.
20    Q.   All right.  Are you aware of any
21 situation where the record companies in this case
22 provided artists with substandard housing or
23 limited food and water?
24    A.   Not to my knowledge.
25    Q.   Are you aware of the plaintiffs in this

Page 227

1 case ever depriving an artist of their families?
2    A.   No.
3    Q.   In fact, artists that have been signed
4 to the major record companies in this case get
5 paid for their services.  Whether or not you
6 agree that it's enough, they do get paid, right?
7    A.   As we discussed, the artist who signs
8 the contract typically receives some kind of
9 advance.
10    Q.   And as we discussed, the artist doesn't
11 have to sign the contract, right?
12    A.   In most cases nobody is putting a gun to
13 their head.
14    Q.   But slaves, there was a gun to their
15 head literally, right?
16    A.   In some cases, yes.
17    Q.   So comparing record companies to slave
18 owners is an absurd comparison, isn't it?
19    A.   It's not my place to judge.
20    Q.   But it is your opinion that the
21 accusations are credible enough for you to
22 include them in what you were prepared to testify
23 to; is that correct?
24        MR. SCHAPIRO:  Objection, asked and
25 answered twice.

Page 228

1    A.   Yes.
2    Q.   (BY MR. OPPENHEIM)  I want to talk about
3 Kanye West for a moment.  I think you said you've
4 seen some of Kanye's contracts; is that right?
5    A.   Yes.
6    Q.   But you haven't seen the entirety of the
7 contracts that he's entered into either with his
8 record company or music publisher, right?
9    A.   No.
10    Q.   Are you aware that Kanye is a
11 billionaire, with a "b"?
12    A.   I am not privy to his personal finances.
13    Q.   You wouldn't dispute that he is
14 ultra-wealthy, would you?
15    A.   No.
16    Q.   And so you've read some tweets that
17 Kanye put out complaining about his agreements
18 with Universal and Sony/ATV, right?
19    A.   I have.
20    Q.   Even after he put out those tweets, he's
21 continued to do business with both Universal and
22 Sony/ATV, correct?
23    A.   To the best of my knowledge, yes.
24    Q.   And you don't know what the resolution
25 was to his tweets, do you?

Page 229

1        MR. SCHAPIRO:  Objection to the
2 form of the question.
3    A.   I'm not even sure what a resolution to a
4 tweet means.
5    Q.   (BY MR. OPPENHEIM)  Well, the tweet was
6 complaining about certain conduct by the record
7 companies and the music publishers, right?
8    A.   Yes.
9    Q.   And you don't know whether there was a
10 resolution of those complaints, do you?
11    A.   I'm not sure what a resolution would
12 mean in that context.
13    Q.   All you've done is, sir, the only thing
14 you know about Kanye is what you have read on
15 Twitter; is that fair?
16    A.   No.
17    Q.   What else do you know about Kanye's
18 relationship with Universal or Sony/ATV?
19    A.   I know what I have read in Music Press
20 and I know what I read in his leaked contracts.
21    Q.   And do you believe his leaked contract
22 was unfair to him?
23    A.   I don't have an opinion about that.
24    Q.   How much did Kanye get paid as an
25 advance in his leaked contract?

58 (Pages 226 - 229)

Page 238



18    Q.   The fourth opinion that you offer in
19  your report is that P2P is a neutral platform
20  with non-infringing uses, correct?
21    A.   I would have to refer to my report to
22  make sure that that is the fourth opinion, but
23  that sounds like generally the gist of one of the
24  opinions that I offer.
25    Q.   And you offered a similar opinion in the

Page 239

1  LimeWire case, correct?
2    A.   To the best of my recollection, yes.
3    Q.   And your opinion was that LimeWire had
4  substantial non-infringing uses, correct?
5    A.   I don't recall exactly how I phrased the
6  opinion, but that accords with my memory in a
7  general sense, yes.
8    Q.   And you offered an opinion in the
9  Grokster case claiming that the peer-to-peer
10  networks in that case had substantial
11  non-infringing uses, correct?
12    A.   To the best of my recollection, I did.
13    Q.   And you have never done a study to
14  quantify the extent of the supposed
15  non-infringing uses on those networks, have you?
16    A.   I'm not sure what that even means.  What
17  is the unit that would be quantifying such a
18  study?
19    Q.   You have never attempted to quantify the
20  number of what you would call non-infringing uses
21  that the peer-to-peer networks were being put to,
22  compared to infringing uses, correct?
23    A.   To my knowledge there's not an empirical
24  way to investigate that question.
25    Q.   Well, the Supreme Court rejected your

Page 240

1  opinion, did it not?
2        MR. SCHAPIRO:  Objection
3  foundation.
4    A.   Are you asking me to make a legal
5  opinion?
6    Q.   (BY MR. OPPENHEIM)  No, I'm not asking
7  for a legal opinion.  I'm asking whether or not
8  the Supreme Court of the United States, when they
9  opined in the Grokster case, whether they adopted
10  or rejected your view.
11        MR. SCHAPIRO:  Objection, calls for
12  an interpretation of a U.S. Supreme Court case,
13  for which this witness is not alluded.
14    A.   My understanding is that the standard,
15  the legal standard by which the Supreme Court
16  found Grokster liable, was not either supporting
17  or refuting my opinion in that case.
18    Q.   (BY MR. OPPENHEIM)  The Supreme Court
19  ruled in that case on a 9-0 basis, right?
20        MR. SCHAPIRO:  Objection,
21  foundation.
22    Q.   (BY MR. OPPENHEIM)  Yes?
23    A.   To the best of my memory, that's
24  accurate.
25    Q.   That means that all 9 of the justices

Page 241

1  were unanimous in ruling in favor of the
2  plaintiffs, correct?
3    A.   I would have to review the legal record
4  to affirm that that's true.
5    Q.   Did you read the Grokster decision when
6  it came out?
7    A.   Yes.
8    Q.   And do you recall the Grokster decision
9  saying, "MGM's evidence gives reason to think
10  that the vast majority of users' downloads aren't
11  actual infringement, and because well over 100
12  million of copies of the software in question are
13  known to have been downloaded, and billions of
14  files are shared across the fast track and
15  tele-network each month, the probable scope of
16  copyright infringement is staggering"?
17    A.   I remember language to that effect.
18    Q.   Do you believe that the Supreme Court
19  was wrong?
20        MR. SCHAPIRO:  Objection,
21  argumentative, silly.
22    A.   I'm not offering any legal opinions as
23  to the correctness of decisions by judges in this
24  case.
25    Q.   (BY MR. OPPENHEIM)  I'm not asking you

61 (Pages 238 - 241)



**Page 246**

1    Q.  BitTorrent, Inc. is something different
2 than the BitTorrent network, correct?
3    A.  Yes.
4    Q.  Can you describe that distinction?
5    A.  The BitTorrent network is an ad hoc
6 dynamic file sharing network comprised of users
7 employing the BitTorrent protocol, and
8 BitTorrent, Inc. is a private company that
9 develops service businesses and distributes
10 software that rely on the BitTorrent protocol.
11    Q.  The BitTorrent network can function
12 without BitTorrent, Inc., correct?
13       MR. SCHAPIRO:  Objection, vague,
14 ambiguous.
15    A.  Correct.
16    Q.  (BY MR. OPPENHEIM)  I don't think we got
17 your answer. I'm sorry, Mr. Sinnreich.
18    A.  Yes.
19    Q.  Okay. Are you aware of whether any of
20 the record companies in this case ever entered
21 into a contract with BitTorrent, Inc.?
22    A.  No.
23    Q.  Are you aware of whether any of the
24 music publishers in this case ever entered into a
25 contract with BitTorrent, Inc.?

**Page 248**



22    Q.  In your opinion, I believe you
23 referenced Moby's use of the BitTorrent bundle,
24 correct?
25    A.  Yes.

**Page 247**

1    A.  No.

**Page 249**

1    Q.  And in your opinion you indicate that
2 that bundle led directly to hundreds of thousands
3 of sales on iTunes, and half a million new
4 mailing list members; is that right?
5    A.  That is what is reported, yes.
6    Q.  What is your basis for that conclusion?
7    A.  May I investigate the citation in my
8 report?
9    Q.  Okay. Have you had an opportunity,
10 Mr. Sinnreich, to find it in your report?
11    A.  I'm reviewing it right now.
12    Q.  I believe it appears on Page 22, if that
13 helps.
14    A.  My source is the -- my sources are cited
15 in Footnotes 51 and 52, specifically, Adam
16 Sandiford's reflection that Moby recently had
17 successfulness, and the PC World article citing
18 specific figures regarding iTunes' sales and
19 mailing lists additions.
20    Q.  Do you know whether PC World actually
21 reviewed that data, or whether they just
22 published what somebody told them?
23    A.  I have no basis upon which to make that
24 judgment.
25    Q.  Do you know whether the PC World article

63 (Pages 246 - 249)

Page 258

1 else thinks. I want to know what you think.
2         MR. SCHAPIRO: Objection. The
3 witness' belief is informed by what somebody else
4 thinks. He can answer however he wants.
5         This is my objection, if the witness is
6 fully informed.
7    A.   The term human rights violation refers
8 to an existing independent set of principles such
9 as the UN Declaration of Human Rights, so to say
10 whether a particular act is a violation of human
11 rights is, itself, dependent on a third-party's
12 definition of what constitutes a human right, so
13 I can't answer that question without referring to
14 third parties' opinions.
15    Q.   (BY MR. OPPENHEIM) When you opine in
16 this report that terminating -- excuse me, that
17 disconnecting people from the internet without
18 their consent is a human rights violation, that's
19 not your opinion?
20         MR. SCHAPIRO: Objection
21 mischaracterizes the testimony, and yes, asked
22 and answered.
23    A.   Would you like to direct me to a
24 specific passage in my report and I'd be happy to
25 provide you with a more comprehensive

Page 259

1 understanding of what it means?
2    Q.   (BY MR. OPPENHEIM) I'm not interested
3 in having you read to me the report. I'm
4 interested in understanding whether or not you
5 believe -- strike that. Let's back that up.
6         Do you believe that an internet service
7 provider has the legal right to terminate a
8 repeat infringer on their network?
9    A.   That is a legal opinion I am not
10 offering in this case.
11    Q.   Do you believe that an internet service
12 provider has the right to terminate somebody's
13 service for failure to pay their bill?
14         MR. SCHAPIRO: Objection, calls for
15 a legal conclusion.
16    A.   Again that's a legal opinion that I have
17 not weighed in on in this case.
18    Q.   (BY MR. OPPENHEIM) So you're not
19 opining one way or the other necessarily that
20 terminating a repeat infringer, a repeat
21 infringer's internet service is a human rights
22 violation. You're saying that it may or may not
23 be; is that correct?
24    A.   No.
25    Q.   How is that incorrect?

Page 260

1    A.   When you ask questions that are framed
2 in terms of whether a company has the right to do
3 X or whether Y is a human rights violation, those
4 refer to third-party standards, and not to my
5 personal intuitive opinion.
6         You can ask me how I interpret the
7 application of those third-party standards to
8 particularities, but that's a different question.
9    Q.   Do you believe, is it your opinion that
10 the United Nations has -- strike that.
11         The United Nations report that you
12 reference in your report is a 2011 report by what
13 they referred to as the special rapporteur; is
14 that correct?
15    A.   Yes.
16    Q.   And in that report -- strike that. You
17 don't actually cite to the special rapporteur's
18 report in your expert report. You actually cite
19 to a one-page article from a Wired magazine,
20 correct?
21    A.   Yes.
22    Q.   Have you actually reviewed the UN
23 report?
24    A.   Yes.
25    Q.   And that report was actually submitted

Page 261

1 by an individual by the name of Frank LaRue, a
2 Guatemalan labor lawyer, correct?
3    A.   I don't recall. It's been about a
4 decade since I reviewed it.
5    Q.   And that report made 88 recommendations
6 to the United Nations, correct?
7    A.   I don't recall the specifics. It's been
8 about a decade since I reviewed that.
9    Q.   That report that was submitted in 2011,
10 do you know whether that report was acted on when
11 it was submitted?
12    A.   The process of integrating internet
13 access into the human rights framework is an
14 ongoing process, and the reason that I mentioned
15 the 2016 resolution is because that was an
16 important benchmark in that on-going process.
17    Q.   We'll get to the 2016 resolution, but as
18 of 2011 it was simply a report issued by a lawyer
19 to the United Nations, correct?
20         MR. SCHAPIRO: Objection to the
21 form of the question.
22    A.   I would have to review the document to
23 ascertain whether that's a correct
24 characterization.
25    Q.   (BY MR. OPPENHEIM) You don't know as

66 (Pages 258 - 261)

Page 262

1  you sit here; is that right?
2      A.  Correct.
3      Q.  And that report simply said that the
4  special rapporteur the lawyer submitted was
5  alarmed by proposals to disconnect users from
6  internet access if they violate intellectual
7  property rights, right?
8      A.  That is not my memory of the report, no.
9      Q.  That report does not say that
10  disconnecting for intellectual property rights
11  was a human rights violation, does it?
12      A.  If you would like to show me in the
13  report, I'd be happy to describe my
14  interpretation of that, too.
15      Q.  Well, you don't even cite the report in
16  your report.  You cite to a one-page article from
17  Wired magazine.
18          MR. SCHAPIRO:  Objection, you've
19  asked him about what the report says, and he
20  says:  "Well, show me the report and I'll tell
21  you."  It's not a memory test.
22      Q.  (BY MR. OPPENHEIM)  Well, it is.  You're
23  an expert, Mr. Sinnreich.  Can you testify as to
24  whether or not the 2011 report actually called
25  termination of internet service for IP violations

Page 263

1  a human rights violation?
2      A.  Not without reviewing the actual text of
3  the report, no.
4      Q.  Okay.  And at the same time that that
5  report was issued, the United Nations actually
6  entered into an anti-counterfeiting trade
7  agreement, correct?
8      A.  Yes.
9      Q.  And that was in 2011, right?
10      A.  It was roughly the same period of time.
11      Q.  And that agreement which was actually
12  entered into, as opposed to a report that was
13  issued to the United Nations, provided that each
14  party should ensure that enforcement procedures
15  are available under its law so as to permit
16  effective action against acts of infringement of
17  intellectual property rights which take place in
18  the digital environment, right?
19      A.  And you're referring to ACTA?
20      Q.  Yes.
21      A.  ACTA was not ultimately ratified by
22  enough members to become binding.
23      Q.  But it was actually passed by the United
24  Nations, correct?
25      A.  You're trying to draw -- you're

Page 264

1  suggesting a procedural distinction that confers
2  legitimacy on one document and removes it from
3  the other, but I don't think that's an actual
4  framework.
5      Q.  I'm just asking you procedurally ACTA
6  was passed by the United Nations, correct?
7      A.  The UN, I believe, was a signatory to
8  ACTA.
9      Q.  Okay.  The 2011 UN report was not passed
10  by the United Nations, was it?
11      A.  It's not a comparable process.
12      Q.  Right, because the 2011 report you
13  reference is just a submission by a lawyer who
14  was appointed to submit on certain issues,
15  correct?
16      A.  They are both policy documents that were
17  part of a larger debate unfolding on a global
18  scale at that time about the appropriate balance
19  of powers, rights and responsibilities
20  surrounding the use of the internet for
21  democratic processes and cultural processes.
22          Neither of them is a binding document in
23  a legal sense, but both of them were highly
24  visible contributions to that debate.
25      Q.  Well, the United Nations didn't act on

Page 265

1  the special rapporteur's report until 2016,
2  correct?
3      A.  That was one of the ways in which the UN
4  has acted on that particular element of the
5  debate.
6      Q.  And what the UN did was a non-binding
7  resolution, correct?
8      A.  That is typical of the UN, but yes, that
9  is correct.
10      Q.  Well, the anti-counterfeiting trade
11  agreement was not a non-binding resolution,
12  correct?
13      A.  It was also not enacted.
14      Q.  It was passed by the United Nations and
15  they signed it, as opposed to the non-binding
16  resolution related to the special rapporteur's
17  report, correct?
18          MR. SCHAPIRO:  Objection to the
19  form of the question.
20      A.  I think we're getting into the weeds
21  here.
22      Q.  (BY MR. OPPENHEIM)  Did I accurately
23  describe the procedure?
24          MR. SCHAPIRO:  Same objection.
25      A.  I would have to review the particulars

67 (Pages 262 - 265)



Page 266

1 to affirm that that's the case.
2    Q.  (BY MR. OPPENHEIM)  And the non-binding
3 resolution that was finally passed only condemned
4 violations where states, that is governmental
5 entities disrupted internet access, correct?
6    A.  I believe that's an accurate description
7 of the meaning of the resolution.

Page 270



10    Q.  But you are familiar with the DMCA which
11 has an explicit provision for
12 counter-notifications, correct?
13    A.  My understanding is that the DMCA is not
14 an issue in this case.
15    Q.  But you do understand that the record
16 company sent over 700,000 DMCA notices to
17 Charter, correct?
18    A.  I have seen notices that alluded to that
19 way in court filings.  I have not had the
20 opportunity to examine those notices so I'm not
21 sure whether I would characterizing them that
22 way.
23    Q.  Let's go off the record and take a short
24 break.
25    A.  Okay.

Page 271

1       THE VIDEOGRAPHER:  Going off the
2 record.  The time on the monitor, 5:52 p.m.
3       (Recess)
4       THE VIDEOGRAPHER:  Back on the
5 record.  Time on the monitor is 6:03 p.m.
6    Q.  (BY MR. OPPENHEIM)  In your rebuttal
7 report, Mr. Sinnreich, you opine that DMCA
8 takedown requests are frequently inaccurate or in
9 error.
10       Do you have any evidence that any of the
11 DMCA takedowns in this case were inaccurate or in
12 error?
13    A.  I have no basis on which to judge their
14 accuracy.
15    Q.  And you haven't attempted to do so, have
16 you?
17    A.  No, I have not reviewed the notices in
18 this case.
19    Q.  And you further opine in your rebuttal
20 report that DMCA takedown provisions are
21 sometimes abused for anti-competitive or
22 sensorius purposes.  Do you have any evidence to
23 indicate that the DMCA notices at issue in this
24 case were issued for anti-competitive or
25 sensorius purposes?

Page 272

1    A.  No.
2    Q.  In your rebuttal report you also
3 reference a reputation management company by the
4 name of PimEyes, P-i-m-E-y-e-s for the court
5 reporter, that is issuing DMCA takedown requests
6 to do what you call is censor unwarranted
7 publicity on behalf of people who appear in
8 audio-visual materials without their consent.  Do
9 you recall that?
10    A.  Yes.
11    Q.  You're familiar with what's called a
12 right of publicity, are you not?
13    A.  Yes.
14    Q.  Is it possible that PimEyes issues
15 notices on the basis of a violation of somebody's
16 right of publicity?
17    A.  No.
18    Q.  Why is that not possible?
19    A.  Are you asking me to render a legal
20 opinion?
21    Q.  Well, you answered the question no, so
22 I'm asking you to explain your answer.
23    A.  The notice and takedown provisions of
24 the DMCA are part of the copyright.  Rights of
25 publicity are a separate area of the law, and in

Page 273

1 fact, as you alluded to before, there's a big
2 difference between State law and Federal law.
3    Q.  Do you know whether when PIM eyes issues
4 a takedown notice, whether they call it a DMCA
5 notice, as opposed to just a takedown notice?
6    A.  I would have to reference my original
7 sources, but my memory is that they specifically
8 cite the DMCA as the authority under which they
9 issue takedown notices.
10    Q.  Are you aware of whether notices from
11 PIM eyes are an issue with this case at all?
12    A.  Not to my knowledge.
13    Q.  In your report you cite an article
14 published by Professors Oberholzer-Gee and
15 Strumpf to support your opinion that peer-to-peer
16 was not a cause of the decline in music industry
17 revenues, correct?
18    A.  Broadly speaking, yes.
19    Q.  They actually issued an initial report
20 in 2010 and then issued a follow-up report or
21 article in 2016, correct?
22    A.  Broadly speaking, correct.
23    Q.  And in that follow-up article in 2016,
24 didn't they come to the conclusion that most
25 studies find that file sharing displaced some

69 (Pages 270 - 273)

Page 310

1 and Footnote 31 will take me to what?
2    A.  Presumably to the Los Angeles Times
3 article in question.
4    Q.  Okay, and do you have a copy of that Los
5 Angeles Times article?
6    A.  Probably somewhere in my files, yes.
7    Q.  Okay.  You didn't produce that or
8 reference it directly in your report, did you?
9    A.  No, I referenced my book.  Any time we
10 reference an academic book, we're incorporating
11 its summary of its sources cited, and the
12 presumption of credibility, I believe, should be
13 given to that book, unless you have a reason not
14 to.
15    Q.  I can't find the LA Times quote, so I'd
16 ask that you please produce the LA Times article.
17       MR. SCHAPIRO:  I'll take that under
18 advisement.
19    Q.  (BY MR. OPPENHEIM)  The last question,
20 and I know you need to go, Mr. Sinnreich, and
21 that is you say that the RAA was a client, RAA
22 and some of its members were clients of Jupiter
23 Research.  That just means that they were signed
24 up to receive Jupiter Research reports, correct?
25    A.  No.

Page 311

1    Q.  They didn't add -- the RAA and its
2 members never asked Jupiter Research to advise it
3 on any particular issues, did it?
4    A.  Yes.
5    Q.  Okay.  What issues did the RAA retain
6 Jupiter Research to advise it on?
7    A.  I remember multiple one-on-ones or small
8 room consulting sessions with RAA members
9 regarding strategic decision-making around the
10 digital music space.
11    Q.  And the RAA actually eventually fired
12 Jupiter and you because they disagreed with your
13 conclusions, correct?
14    A.  I have no idea.
15       MR. OPPENHEIM:  Okay.  I have no
16 further questions.
17       MR. SCHAPIRO:  Nor do we.  I'm
18 happy to go off the record.
19       THE VIDEOGRAPHER:  Okay.  This
20 concludes today's testimony.  Time on the monitor
21 7:07 p.m.  We're off the record.
22       (Deposition ended at 7:07 p.m.)
23
24
25

Page 312

1       C E R T I F I C A T E
2
3       I, Peggy E. Corbett, a Certified Court
4 Reporter of the State of Missouri, do hereby
5 certify:
6       That prior to being examined the witness
7 was by me duly sworn;
8       That said deposition was taken down by
9 me in shorthand at the time and place
10 hereinbefore stated and was thereafter reduced to
11 writing under my direction;
12       That I am not a relative or employee or
13 attorney or counsel of any of the parties, or a
14 relative or employee of such attorney or counsel,
15 or financially interested in the action.
16       WITNESS my hand and seal this 11th day
17 of October, 2021.
18
19
20       _Peggy E. Corbett_
          PEGGY E. CORBETT,
          CCR No. 143, RDR, CRR
21
22
23
24
25

Page 313

1       Veritext Legal Solutions
          1100 Superior Ave
2          Suite 1820
          Cleveland, Ohio 44114
3       Phone: 216-523-1313
4
5 October 11, 2021
6 To: Andrew Schapiro, Esq.
7 Case Name: Warner Records, Inc. v. Charter Communications Inc.
8 Veritext Reference Number: 4837484
9 Witness:  Aram Sinnreich, Ph.D.      Deposition Date:  10/6/2021
10 Dear Sir/Madam:
11 Enclosed please find a deposition transcript.  Please have the witness
12 review the transcript and note any changes or corrections on the
13 included errata sheet, indicating the page, line number, change, and
14 the reason for the change.  Have the witness' signature notarized and
15 forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext.com.
18 If the errata is not returned within thirty days of your receipt of
19 this letter, the reading and signing will be deemed waived.
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA

79 (Pages 310 - 313)