# Exhibit XXXVI

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-00874-RBJ-MEH

WARNER RECORDS INC, et al.,

     Plaintiffs,

v.

CHARTER COMMUNICATIONS, INC.,

     Defendant.

*DAUBERT HEARING REQUESTED*

---

## PLAINTIFFS' MOTION TO EXCLUDE OR LIMIT EXPERT TESTIMONY
## OF DR. KARL SNOW

---

The size and scope of this case have led the parties to produce large quantities of data. Both sides have retained experts to help the jury make sense of that data. Charter served three expert reports from Dr. Karl Snow, an economist and statistician, in which Dr. Snow analyzes various datasets and also purports to rebut the analyses of Plaintiffs' experts.[1] Some of Dr. Snow's opinions are anodyne and unobjectionable; others are misguided and incorrect, as Plaintiffs will show at trial. This motion does not address those opinions.

Rather, this motion seeks to exclude only Dr. Snow's most egregious errors. In one instance, Dr. Snow opines on issues outside his expertise and reaches conclusions that are not just wrong and unsupported but mathematically impossible. In another, Dr. Snow offers opinions that lack any foundation in the facts of this case. Those opinions will not assist the jury in understanding the evidence and should be excluded.

---

[1] Declaration of Corey Miller ("Miller Decl.") Ex. 1 (May 27, 2021 Expert Report of Karl N. Snow, Ph.D. ("Snow Rept."); Miller Decl. Ex. 2 (June 28, 2021 Expert Rebuttal Report of Karl N. Snow, Ph.D. ("Snow Rebuttal Rept.")); Miller Decl. Ex. 3 (Sept. 3, 2021 Surrebuttal Report of Karl N. Snow, Ph.D. ("Snow Surrebuttal Report")).

Finally, in various portions of his reports, Dr. Snow purports to interpret and explain the significance of his data analysis. At his deposition, recognizing that he lacked the relevant expertise necessary to opine on the significance of his analysis, Dr. Snow disclaimed these opinions and claimed to be merely analyzing data or speculating. Dr. Snow should be held to these disclaimers and those opinions should be excluded.

## LEGAL STANDARD

Under Federal Rule of Evidence Rule 702, an expert qualified "by knowledge, skill, experience, training, or education" may provide opinion testimony if it (1) is helpful to the jury; (2) is based on sufficient facts or data; (3) is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods to the facts of the case.

Trial courts act as gatekeepers to ensure that expert testimony is relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 597 (1993). Expert opinions are relevant if they would "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 591. They are reliable if the expert is qualified and his or her opinions are "scientifically valid" and based on "reasoning or methodology [that] properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 593. As a gatekeeper, the Court must assess the "reasoning and methodology underlying the expert's opinion" and determine "whether it is scientifically valid and applicable to a particular set of facts." *Blotcher v. Stewart*, 45 F. Supp. 3d 1274, 1278 (D. Colo. 2014) (Jackson, J.) (quoting *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000)).

Even if relevant, "[e]xpert testimony, like any other evidence, is subject to exclusion if it fails the Fed. R. Evid. 403 balancing test." *Thompson v. State Farm Fire & Cas. Co.*, 34 F.3d 932, 941 (10th Cir. 1994). The proponent of expert testimony has the burden of establishing by a

2

preponderance of the evidence that the testimony is admissible.  *United States v. Nacchio*, 555

F.3d 1234, 1241, 1251 (10th Cir. 2009); *Salvatore v. Pingel*, No. 08-cv-00312-BNB-KMT, 2010

WL 11590318, at *4 (D. Colo. Mar. 12, 2010).

I.   **Dr. Snow's opinion that relying on Mr. Geluso's and the Listeners' verifications of the works in suit is inappropriate should be excluded because Dr. Snow does not challenge Mr. Geluso's and the Listeners' methods or conclusions, and Dr. Snow's conclusion is mathematically impossible.**

Plaintiffs served expert reports from Paul Geluso and seven Listener Experts[2]

(collectively, "Mr. Geluso and the Listeners"), who opined that files MarkMonitor downloaded

in 2016 contain, in whole or in part, copies of Plaintiffs' authentic works provided by Plaintiffs.

Plaintiffs' statistical expert, Kristoffer Buchan, then relied on an index that Mr. Geluso and the

Listener Experts provided, which "match[es] . . . files containing a Work-in-Suit ("Genuine

Files") with infringing files on the MarkMonitor Hard Drive . . . ."  Miller Decl. Ex. 4 ¶ 56 (May

27, 2021 Expert Report of Kristoffer Buchan ("Buchan Report")).

Dr. Snow's rebuttal report criticizes Mr. Buchan's reliance on Mr. Geluso and the

Listeners, on the grounds that their opinions "do not provide an appropriate basis for determining

whether Charters' subscribers possessed infringing copies of Plaintiffs' works in suit."  Snow

Rebuttal Rept. ¶ 36.  Dr. Snow's opinion should be excluded because he lacks the relevant

expertise to offer this opinion, offers irrelevant criticism, and relies on assumptions that lead to

mathematically impossible results.

Dr. Snow lacks any relevant expertise to criticize reliance on Mr. Geluso and the

Listeners.  The Listeners engaged in "a critical listening analysis comparing certain collections of

digital music files with each other to determine if their contents are the same . . . ."  Miller Decl.

---

[2] The seven Listener Experts are Charles Burst, Andrew Cass, Jake Cheriff, Katie Gilchrest, Eleni Maltas, Yi-Wen Lai-Tremewan, and Rebekah Wineman.

Case 1:19-cv-00874-RBJ-MEH Document 560-37 filed 11/29/21 USDC Colorado Page 4 of 15
Case No. 1:19-cv-00874-RBJ-MEH Document 590-3 filed 11/02/21 USDC Colorado Page 4 of 15
of 16

Ex. 5 ¶ 2 (May 27, 2021 Expert Report of Charles Burst).  Similarly, Mr. Geluso "conducted

critical listening, waveform, and spectral analysis . . . ."  Miller Decl. Ex. 6 ¶ 3 (May 27, 2021

Expert Report of Paul Geluso).  While Dr. Snow opines that relying on Mr. Geluso and the

Listeners' verifications is "not appropriate," he does not contend that Mr. Geluso's and the

Listeners' methods or conclusions were inappropriate, unsupported, or incorrect.  Miller Decl.

Ex. 7 25:1-9 (Oct. 12, 2021 Karl N. Snow, Ph.D. Deposition Transcript ("Snow Tr.")).  Nor, as

Dr. Snow admits, would he be qualified to do so, as he has no relevant expertise.  *Id.* 24:20-25:9;

201:1-17.  Without any basis or expertise to opine on the analyses Mr. Geluso and the Listeners

conducted, Dr. Snow has no basis to conclude that relying on their conclusions is inappropriate.

Rather than criticize Mr. Geluso's and the Listeners' work, Dr. Snow attacks Mr.

Buchan's reliance on that work on four other grounds, each of which is either irrelevant or relies

on assumptions that lead to mathematically impossible results.



*First*, Dr. Snow criticizes Mr. Buchan's reliance on Mr. Geluso and the Listeners by

citing the fact that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Snow Rebuttal Rept. ¶¶ 37-39.  But this is irrelevant: that

Mr. Geluso and the Listeners ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮, and Dr. Snow never explains how one could bear on the other.

*Second*, Dr. Snow observes that Mr. Geluso and the Listeners did not verify any files ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id*. ¶ 40.  Again, this is irrelevant: *when* Mr. Geluso and

the Listeners conducted their verifications does not affect whether the matches Mr. Geluso and

the Listeners verified actually *are* matches.

*Third*, Dr. Snow opines that relying on Mr. Geluso's and the Listeners' verifications is

inappropriate because, in Dr. Snow's view, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4



███████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████ " *Id.* ¶ 41.  Dr. Snow refers here to t█████████████████

██████████.  First, he refers to files that █████████████████████████████████

█████████████████████████████████████████████████████. Snow Rept.

¶¶ 27-28.  ██████████████████████████████████████████████████

███████████████ *Id.* ¶¶ 68, 71.  Second, Dr. Snow refers to files that █████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████ *Id.* ¶ 119.

Dr. Snow opines that ████████████████████████████████████

█████████████████████████████████████████████████████████

Snow Rebuttal Rept. ¶ 42.  The sole basis for this opinion is that, █████████████████

█████████████████████████████████████████████████████████

████████████████████████████ *Id.* ¶ 42.  ████████████████████

█████████████████████████████████████████████████████████

██████████████ Snow Tr. 191:5-16.

This observation is an insufficient factual foundation to support Dr. Snow's conclusion

that ████████████████████████████████████████████████████████

Dr. Snow does not dispute that ██████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████ A cryptographic hash value is the result of a

mathematical function; it is a mathematical fact that, when two files have the same hash value,

their contents are the same.  Nov. 14, 2021 Decl. of Barbara Frederiksen-Cross in Supp. of Pls.'

Mot. for Summary Judgment ¶¶ 5-11 ("Frederiksen-Cross Decl.").  Charter's two technical

experts admitted this: "Q. So as a practical matter, two files that calculate the same hash value

are identical, correct?  A. If you calculate using the same hash algorithm on two different files

and the resulting hash values are the same, yes, it tells you something, that the files are the

same."  Miller Decl. Ex. 8 84:5-13, 90:8-13 (Oct. 5, 2021 Sandeep Chatterjee, Ph.D., Deposition

Transcript); Miller Decl. Ex. 9 145:7-9 (Sept. 28, 2021 Kevin Almeroth, Ph.D. Deposition

transcript) ("If you have two different files and they are identical, they have the same hash

values, so one is essentially a copy of the other.").  Dr. Snow does not dispute this fact.  Snow

Tr. 149:22-150:9, 186:1-6; 190:5-12.  Accordingly, as a matter of mathematical fact, █████████

████████████████████████████████████████████████████████████████████████████████████

███████████████████

      Dr. Snow ignores this basic mathematical truth and claims otherwise: █████████

████████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████████████████████  Snow Rebuttal Rept. ¶ 42 (emphasis added).  These

three assumptions, taken together, lead to the absurd conclusion that ███████████████

████████████████████████████████████████████████████████████████████████████████████

█████████████████████████  As Charter's technical experts agreed, this is impossible. ████████

████████████████████████████████████



Snow Tr. 193:1-6.  Because Dr. Snow's conclusion is impossible, his testimony is not reliable

and would not assist the jury.

*Fourth*, Dr. Snow observes that, of the files Mr. Geluso and the Listeners verified that

Snow Rebuttal Rept. ¶ 45.  Dr. Snow

claims this fact highlights

*Id.* ¶ 43.

Again, this observation does not support Dr. Snow's conclusion that reliance on Mr.

Geluso's and the Listeners' verifications is inappropriate.  Dr. Snow's theory appears to be that

Dr. Snow suggests this conflict means that

Dr. Snow's conclusion again ignores the undisputed fact that

Dr. Snow never explains, because he cannot,

how two files with the same hash values can nevertheless be different.  The supposed conflict Dr.

Snow invents only results from Dr. Snow's assuming—without any support—

in which case Dr. Snow's supposed conflict

7

evaporates. ████████████████████████████████████████

██████████████████████ Miller Decl. Ex. 10 112:5-17 (Jan. 22, 2021 30(b)(6)

Deposition of Vance Ikezoye ("Ikezoye Tr.")). ███████████████████████ ████



██████████████████ Snow Rept. ¶ 95; *see also* Ikezoye Tr. 203:15-21. ██████████

██████████████████ ████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ Snow Tr. 133:11-20.

Dr. Snow has no basis to criticize Mr. Geluso's and the Listeners' methods and

conclusions. And he has no basis to conclude that files with the same hashes have different

content. Accordingly, Dr. Snow has no basis to conclude that Mr. Buchan's reliance on Mr.

Geluso's and the Listeners' verifications is inappropriate.

II. **Dr. Snow's analysis of Plaintiffs' notice data regarding "duplicative notices" should be excluded because it lacks any factual foundation in the record and relies on unsupported assumptions.**

A. **Dr. Snow defines a "duplicative notice" as a notice for the same subscriber and infringing file.**



██████ Snow Rept. ¶ 25. Each notice identified, among other things ██████████████

████████████████████████████████████████████████████

██████████████████████████ *Id.* The hashtext is a unique, cryptographic

alphanumerical representation of the contents of a digital file; as a mathematical matter, identical

files will have the same hash value. Frederiksen-Cross Decl. ¶¶ 5-11. Dr. Snow defines a

"duplicative notice" as a notice sent for the same subscriber and infringing file as a previous

8

notice, *i.e.*, a notice with (i) the same IP address and (ii) same hashtext as a previous notice. Snow Rept. ¶ 26.

Dr. Snow's analysis of duplicative notices has three parts, all of which should be excluded because they lack a factual foundation in the record. First, Dr. Snow analyzes where duplicative notices appear in Plaintiffs' notice data. *Id.* ¶¶ 33-37. For example, he calculates the percentage of Plaintiffs' notices that constitute duplicative notices, the proportion of duplicative notices sent by Plaintiffs to each IP address, and the number of days between duplicative notices. *Id.* ¶¶ 35-37. Second, Dr. Snow analyzes "the implications of duplicative notices for notice counts as well as duration for noticed subscribers." *Id.* ¶¶ 52-58. In this analysis, Dr. Snow removes all duplicative notices from Plaintiffs' notice data and then recalculates statistics about Plaintiffs' notices, such as the number of notices per IP address. Third, in his rebuttal and surrebuttal reports, Dr. Snow criticizes Plaintiffs' experts, Kristoffer Buchan and Barbara Frederiksen-Cross, for not excluding duplicative notices from their analyses. Snow Rebuttal Rept. ¶¶ 22-27, 31-32, 48, 52, 62; Snow Surrebuttal Report ¶¶ 40-43.

### B. Dr. Snow's analysis of duplicative notices lacks any factual foundation.

Dr. Snow identifies no factual basis establishing the relevance of his analysis of duplicative notices. It therefore will not assist the jury and should be excluded. "[E]xpert testimony . . . must be accompanied by a sufficient factual foundation before it can be submitted to the jury." *Greig v. Botros*, 525 F.App'x 781, 793 (10th Cir. 2013) (affirming exclusion of expert testimony where expert provided no factual foundation for the expert's analysis) (internal quotation marks omitted); *Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1213 (10th Cir. 2004) (holding that expert's opinion regarding source of fire was unreliable because expert made assumptions about ballast temperature that were not supported by evidence); *see also Mueller v. Swift*, 2017 WL 3175798, at *4 (D. Colo. July 25, 2017) (citing cases "that expert opinions may

9

be inadmissible when they are based on assumptions regarding empirical or objective facts that
are demonstrably false or entirely unsupported by record evidence.").

Dr. Snow does not cite any facts showing what subscriber activity a duplicative notice
supposedly represents.  Instead, Dr. Snow tries to justify his duplicative notices analysis with
pure speculation about what duplicative notes *could* represent:



Snow Rept. ¶ 26 (emphasis added).  This speculation cannot justify Dr. Snow's analysis because
his assertions lack *any* evidentiary support.  Dr. Snow does not cite to anything in the record to
support his claim that ███████████████████████████████████████████████

██████████  Nor does he cite to or state any reliance on any other expert's opinion.  Without
such evidentiary support, Dr. Snow's duplicative notices analysis lacks any factual foundation.
Without a basis to establish the meaning of duplicative notices in terms of subscriber activity, his
duplicative notice analysis will not assist the jury in any way.

Moreover, Dr. Snow has no relevant expertise to opine on what type of subscriber
conduct MarkMonitor's infringement notices represent.  At his deposition, Dr. Snow described
his relevant expertise as "statistical and econometric analysis, which is sort of more just broad
data analysis, and . . .  various areas related to financial economics."  Snow Tr. 22:11-19.  He
admitted that he is not offering any opinions on computer science, the technology of how peer-
to-peer networks function, or how antipiracy detection technologies work.  *Id*. 22:20-23:6, 24:3-
7.  He further admitted, ████████████████████████████████████████████████

10



*Id*. 44:21-45:6, 47:9-13.  He also admitted that

he is

*Id*. 47:25-48:4.  Dr. Snow's non-

expert, unsupported speculation about                                                    cannot justify

his analysis and would only mislead the jury.

Further, even if Dr. Snow had a sufficient basis for these opinions (and he does not), his

claims still would not justify his analysis.  Dr. Snow suggests that

but his statistical analysis excludes

Dr. Snow presents zero support for this latter proposition, yet his

analysis rests on precisely that assumption.  Because Dr. Snow cannot support his assumption

that

his analysis must be excluded.  *See Foster v. USIC Locating Servs., LLC*, Case No. 16-2174-CM,

2018 WL 3757577, at *3 (D. Kan. Aug. 8, 2018) (excluding opinion as lacking "sufficient

factual foundation").

Dr. Snow's assumption further reveals its unsoundness in the extreme results it produces.

"[A]n expert's conclusions are not immune from scrutiny: 'A court may conclude that there is

simply too great an analytical gap between the data and the opinion proffered.'"  *Dodge v. Cotter

Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136,

146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district

court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the

expert."). Because Dr. Snow 

████████████████████████████████████ Snow Tr.

49:20-25. ██████████████ ████████████████████████

████████████████████████ *Id*. 239:23-240:20, 241:20-243:10. ██████████████

████████████████████████████████████. *Id*. 50:8-10. Dr.

Snow's speculation that ██████████████████████████████████

████████████████████████████ ██████████████

████████████████████████ His opinion should be excluded.

### III.    Dr. Snow's opinions should be limited to analyzing data, and his attempts to interpret the data and explain its significance that he disclaimed should be excluded.

In multiple places in his report, Dr. Snow analyzes data and offers affirmative opinions

purporting to interpret and explain the significance of his analysis. At his deposition, Dr. Snow

walked-back these claims and confirmed that he was *not* offering opinions regarding the

significance of his conclusions, but merely opining as to what the data showed. This was wise,

because Dr. Snow lacks the relevant expertise to interpret the data and explain its significance.

Snow Tr. 22:11-23:6, 24:3-7. Dr. Snow should be held to that more limited position and be

precluded from offering testimony or opinions that he disclaimed in his deposition.

*First*, in his report, Dr. Snow opines regarding his analysis of MarkMonitor and Audible

Magic data that, ██████████████████████████████████████

████████████████████████████████████████████████

Snow Rept. ¶ 81. In support, Dr. Snow points to instances in which ██████████

████████████████████████████████████████████

██████████ *Id*. ¶¶ 82-99. At his deposition, Dr. Snow admitted that he was not

affirmatively opining ████████████████████████████████

12



██████████████████████████████████████████████████████████████ Snow Tr. 227:25-228:4 (emphasis added).  Moreover, Dr. Snow has no expertise regarding how MarkMonitor's or Audible Magic's processes worked or how the datasets he analyzed were created.  Accordingly, while Dr. Snow can opine as to what is or is not present in certain datasets, Dr. Snow's opinion that, "██████████████████████████████████ should be excluded.

*Second*, in his report, Dr. Snow opines that ████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ █████████████████████████████████ Snow Rept. ¶ 116.  Dr. Snow's basis for this opinion is that, in some instances, ███████████████████████████████ ██████████████████████████████████████████████████████████████ Snow Tr. 135:5-16.  At his deposition, Dr. Snow admitted that he was opining only on the extent to which ██████████████████████████████████████████████ and *not* offering any opinion on that data's significance, stating, "[t]hat, I can't testify to. . . .  I'm not opining on what this data means *per se*."  *Id.* 137:8-19.  ██████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████ Accordingly, while Dr. Snow may testify on what the data show, he should be precluded from opining about its significance.

13

*Third*, on BitTorrent, the file being downloaded is called a "torrent," which typically is a package containing multiple files.  Snow Rept. ¶¶ 25 n.15, 60.



" *Id*. ¶ 96.  Dr. Snow then speculates that,

" *Id.*

Snow Tr. 117:1-6.  Again, Dr. Snow does not have the relevant expertise to opine

Dr. Snow's speculation should be excluded.

**CONCLUSION**

Dr. Snow's opinions concerning (i) Mr. Buchan's reliance on Mr. Geluso's and the Listeners' verifications and (ii) duplicative notices lack a sufficient factual foundation, are not reliable, and will not be helpful to the jury.  Further, where Dr. Snow should be precluded from offering at trial several opinions that he subsequently disclaimed in his deposition, as set forth above.  For the reasons set forth herein, such opinions and testimony should be excluded.

Dated: November 15, 2021                    */s/ Jeffrey M. Gould*

Jonathan M. Sperling                         Matthew J. Oppenheim
COVINGTON & BURLING LLP              Scott A. Zebrak
The New York Times Building               Jeffrey M. Gould
620 Eighth Avenue                              Alexander Kaplan

14

New York, NY 10018-1405
Telephone: (212) 841-1000
jsperling@cov.com

Mitchell A. Kamin
Neema T. Sahni
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
mkamin@cov.com
nsahni@cov.com

OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave. NW, 5th Floor
Washington, DC 20016
Telephone: (202) 621-9027
matt@oandzlaw.com
scott@oandzlaw.com
jeff@oandzlaw.com
alex@oandzlaw.com

Janette L. Ferguson, Esq.
WILLIAMS WEESE PEPPLE &
FERGUSON, P.C.
1801 California Street, Suite 3400
Denver, CO 80202
Telephone: (303) 861-2828
jferguson@williamsweese.com

*Attorneys for Plaintiffs*

## LOCAL CIVIL RULE 7.1(a) CERTIFICATION

The parties conferred by phone on November 10, 2021 regarding the issues raised by this motion and could not reach agreement.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 15, 2021, I caused the foregoing document and all supporting materials thereto to be filed electronically using the CM/ECF system.

*/s/ Jeffrey M. Gould*

15