**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-00874-RBJ-MEH

WARNER RECORDS INC., *et al.*,

    Plaintiffs,

v.

CHARTER COMMUNICATIONS, INC.,

    Defendant.

**PLAINTIFFS' OPPOSITION TO DEFENDANT CHARTER'S MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF PAUL GELUSO AND THE "LISTENERS"**

Charter's motion to exclude the proposed testimony of Plaintiffs' expert audio engineers is partially moot, and otherwise meritless.

As set forth in Plaintiffs' Motion for Summary Judgment, to establish direct infringement, Plaintiffs must show that (i) Charter subscribers downloaded or distributed files, which files (ii) contain unauthorized copies of Plaintiffs' works. Dkt. 555. To establish the second component—that the audio files allegedly distributed and reproduced by Charter subscribers contain copies of Plaintiffs' works—Plaintiffs retained expert audio engineers to analyze more than 14,000 pairs of audio files. Each pair consisted of a file that Plaintiffs will establish is an authentic copy of a work in suit, and a file that Plaintiffs will establish was downloaded and/or distributed by a Charter subscriber. The purpose of this analysis was to establish that, in each instance, the latter file is a copy of the former in whole or substantial part.

Plaintiffs' experts performed two kinds of analyses. Professor Paul Geluso visually analyzed waveforms and spectrograms representing the sounds for many thousands of file pairs, while performing a critical listening analysis on exemplary portions of those pairs. Seven other audio engineers (the "Critical Listening Experts") performed a critical listening analysis on entire audio files in their respective file pair sets, which sets ranged from approximately 1,300 to 2,500 file pairs each. While each expert audio engineer analyzed a different set of file pairs, they all concluded that each and every file pair they analyzed was a copy, in whole or substantial part. To the extent necessary, the testimony of these experts would streamline voluminous infringement evidence for the jury, and assist the jury in understanding a fundamental issue in this case. These opinions fall squarely within the bounds and purpose of Rule 702.

Charter's motion does not dispute the relevance of these opinions or these experts' professional qualifications. Nor has Charter offered anything to controvert their conclusions: it has not identified a single non-matching file pair and has offered no rebuttal experts on the issue. And as to the Critical Listening Experts (as opposed to Prof. Geluso), Charter's motion also does not criticize any aspect of the experts' processes or methodologies; it raises only disputes as to the manner in which those experts' conclusions may be presented at trial. Given the lack of any substantive or methodological dispute, Plaintiffs are entitled to summary judgment that the files analyzed by the Critical Listening Experts do indeed contain copies of Plaintiffs' works. If partial summary judgment is granted, then there is no need to call *any* of the Critical Listening Experts to testify at trial, and Charter's motion is moot as to those experts.

In any event, none of the four arguments in Charter's motion warrants any relief.

*First*, Charter asserts that Prof. Geluso and the Critical Listening Experts "should not be permitted to testify about whether any of the audio files they listened to (a) are copies of works-in-suit; (b) are owned by Plaintiffs; (c) were 'distributed' on Charter's network; or (d) were downloaded by MarkMonitor." Dkt. 553 at 11. Plaintiffs agree—they are not relying on these experts to prove any of those facts.

*Second*, Charter seeks to exclude the testimony of Critical Listening Expert Yi-Wen Lai-Tremewan to the extent that he would adopt the analyses and conclusions of the six other Critical Listening Experts. In the event that any Critical Listening Expert testimony is required at trial, however, it would be far more efficient to offer one witness rather than seven. Mr. Lai-Tremewan should be permitted to offer testimony adopting the other Critical Listening Experts' conclusions on the basis of his review of these other experts and their work.

*Third*, Charter challenges the proposed expert testimony of Prof. Geluso because he relied in part on observations made by his assistants. Though Charter quibbles about the extent of Prof. Geluso's oversight of his assistants, it admits that he exercised such oversight. That is fatal to Charter's motion. Prof. Geluso selected his assistants based on his deep familiarity with them and their qualifications. He hired, paid, and trained them. He chose a multi-step process that they followed, met with them constantly throughout the course of their work, reviewed subsets of their work, and confirmed that their findings overall were in line with his. To the extent Prof. Geluso's testimony is necessary at trial (despite Charter's failure to dispute any of his conclusions), Charter will be free to make whatever arguments it wants about the weight the jury should accord his testimony. But the law does not permit preclusion of his testimony because he had assistants working under his direction, as is commonplace for experts.

3

*Finally*, Charter asserts that it would be cumulative and prejudicial to allow all of Plaintiffs' expert audio engineers to testify "on the same topic." Dkt. 553 at 2.  In other words, Charter argues both that Plaintiffs cannot have one Critical Listening Expert testify regarding the conclusions of all of them, but also that each cannot testify individually—even though Charter identifies no flaw in their qualifications, methodology, or conclusions.  This argument, which is clearly designed to prevent Plaintiffs from presenting their case, fails for at least two reasons.  For one thing, Charter is wrong that these experts are testifying "on the same topic."  They analyzed different sets of files and, given the volume of infringing files found on Charter's network, no single expert could possibly have analyzed every single file pair at issue.  Further, Prof. Geluso and the Critical Listening Experts applied different methodologies.  In addition, any concern regarding cumulative testimony is properly addressed by instructions at trial, not by the wholesale preclusion of non-overlapping testimony.

Charter's motion should be denied in its entirety.

## ARGUMENT

**I.      Plaintiffs' Expert Audio Engineers Are Not Testifying to the Provenance of Files.**

Charter asserts that Prof. Geluso and the Critical Listening Experts "should not be permitted to testify about whether any of the audio files they listened to (a) are copies of works-in-suit; (b) are owned by Plaintiffs; (c) were 'distributed' on Charter's network; or (d) were downloaded by MarkMonitor." Dkt. 553 at 11.  This is a non-issue.  These experts do not purport, and are not being offered, to testify as to these facts.  To the extent necessary, other witnesses have established, and will establish, the provenance of the relevant files.  *See generally* Dkt. 555-33–555-38, 555-63 ¶ 23.

## II.     Mr. Lai-Tremewan Can Adopt the Opinions of Other Critical Listening Experts.

Mr. Lai-Tremewan and the six other Critical Listening Experts are all professional audio engineers who performed the same "critical listening analysis" on different sets of audio file pairs. Individually, each reviewed between approximately 1,300 and 2,500 file pairs, collectively totaling more than 13,000 pairs. With the goal of improving trial efficiency, at counsel's request, Mr. Lai-Tremewan undertook efforts that enabled him to adopt the conclusions of the other Critical Listening Experts, so that just one of the Critical Listening Experts could present the jury with the findings of the group, rather than having seven experts take the stand, be qualified, and testify as to the same methodology they applied to their respective file pairs. Charter acknowledges this efficiency in its supporting brief.[1]

Charter seeks to exclude Mr. Lai-Tremewan's testimony only to the extent that he would adopt the conclusions of the other Critical Listening Experts. Charter's motion should be denied as moot and unsupported in the law.

*First*, as noted above, the issue is moot. Charter's sole challenge to the methodology or process underlying the expert audio engineers' conclusions relates to those of Prof. Geluso (as discussed more fully below). As to the Critical Listening Experts, Charter's motion is addressed solely to how their testimony will be presented at trial. And because Charter has not offered any evidence to controvert these experts' conclusions that each pair is a copy, partial summary judgment is warranted as to each of the 13,000 file pairs that the Critical Listening Experts reviewed. In such case, none of the Critical Listening Experts would need to testify at trial.

---

[1] "Of course, if Mr. Lai-Tremewan is permitted to adopt the opinions of the other Listeners, there would be no need for the other Listeners to testify at all, as their testimony would be cumulative." Dkt. 553 at 11 n.6.

5

*Second*, Charter's argument lacks merit in any event. Relying on an unpublished Oklahoma district court decision, *Mooring Cap. Fund, LLC v. Phoenix Cent., Inc.*, 2009 WL 4263359 (W.D. Okla. Feb. 12, 2009), Charter argues that "an expert may not simply repeat or adopt the findings of another expert without attempting to assess the validity of that expert's opinions." Dkt. 553 at 10–11. Because Mr. Lai-Tremewan *did* assess the validity of the other Critical Listening Experts' opinions, *Mooring* does not apply.

In *Mooring*, the court partially excluded testimony from the defendants' damages expert because his estimated real estate damages were "substantially based on, and simply recapitulations of, information he ha[d] been provided by defendants, rather than anything that he ha[d] generated or that [we]re the result of his professional expertise." 2009 WL 4263359, at *2. According to the *Mooring* court, the expert was essentially "a statistician or mathematician applying the principles of those disciplines in various business and economic settings," who lacked background or training in real estate development, appraisal, and finance necessary to evaluate the information he was provided. *Id.* at *4. In particular, he relied on an appraisal supplied by defendants even though he could not, and did not, "evaluate the methods employed in the appraisal or . . . evaluate its applicability to the present circumstances." *Id.* at *5.

Unlike the damages expert in *Mooring*, Mr. Lai-Tremewan is an expert in the same field as the other Critical Listening Experts: each is an expert in audio engineering, which Charter does not dispute. *Compare* Dkt. 553-4 (Lai-Tremewan Rep.) ¶¶ 1, 4–5, *with, e.g.,* Dkt. 553-6 (Burst Rep.) ¶¶ 1, 4–6; Dkt. 553-10 (Wineman Rep.) ¶¶ 1, 4–6. Mr. Lai-Tremewan applied the same "critical listening" methodology as the six other Critical Listening Experts (*i.e.*, they all listened to the files in their entirety, while professionally evaluating sonic attributes such as

6

pitch, timbre, loudness, and duration), which is an industry-standard practice that Charter does not dispute. *See, e.g.*, Dkt. 553-4, 553-6, 553-10 ¶¶ 9–11.  Mr. Lai-Tremewan was well qualified to evaluate their opinions, and he undertook significant efforts to do so.  He familiarized himself with the other Critical Listening Experts' qualifications, equipment, processes, analyses, and conclusions through multiple group and individual meetings; he conducted live comparisons with each of the other Critical Listening Experts, reviewed a randomized sample of each of their comparisons, and reviewed their reports and appendices.  *See, e.g.*, Dkt. 553-4 ¶¶ 8, 22; Pl. Ex. 1[2] (Lai-Tremewan Tr.) at 16:24–17:22, 102:11–104:18, 107:17–112:20, 121:7–122:17.

Charter concedes that, unlike the expert in *Mooring*, Mr. Lai-Tremewan made an effort to evaluate the opinions of the other Critical Listening Experts.  *See* Dkt. 553 at 5.  Charter disputes only the adequacy of that effort, but that goes to weight, not admissibility.  *See, e.g.*, *Beebe v. Colorado*, 2019 WL 6044742, at *7 (D. Colo. Nov. 15, 2019) (denying motion to exclude expert testimony, noting "[c]hallenges to the factual basis of an expert opinion go to the credibility of the testimony, not the admissibility"); *NetQuote, Inc. v. Byrd*, 2008 WL 2442048, at *9 (D. Colo. Apr. 29, 2008), report and recommendation adopted in part, 2008 WL 2442046 (D. Colo. June 13, 2008); *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017).

### III.  Prof. Geluso Properly Relied on Assistants.

Charter seeks to preclude Prof. Geluso from testifying about audio file pairs reviewed by his assistants.  Charter's motion misunderstands the facts and the law, and should be denied.

---

[2] "Pl. Ex. __" refers to exhibits to the Declaration of Phil Hill, filed concurrently herewith.

### A. Prof. Geluso Was Entitled to Rely on the Observations of Assistants Working at His Direction, on Matters Within His Expertise.

"An expert witness is permitted to use assistants in formulating his expert opinion, and normally they need not themselves testify." *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002); *accord Stephenson v. Honeywell Int'l, Inc.*, 703 F. Supp. 2d 1250, 1255 (D. Kan. 2010) (citing *Dura* and denying motion to exclude); *Trinity Med. Servs., LLC v. Merge Healthcare Sols., Inc.*, 2020 WL 1307046, at *7 (M.D. La. Mar. 19, 2020) (denying motion to exclude, noting "[t]he modern view recognizes that experts often rely on facts and data supplied by third parties . . . includ[ing] relying on analyses performed by one's assistants"); *Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 644–45 (S.D.N.Y. 2012) ("An expert is permitted to rely on assistance from others who work with him.").

"There is no rule prohibiting an expert's use of assistants if the ultimate opinions are those of the expert and he is qualified to give those opinions." *Stephenson*, 703 F. Supp. 2d at 1255. Thus, courts routinely admit expert opinions and testimony that rely on analyses performed by assistants. *See, e.g.*, *id.* (denying motion to exclude expert testimony relying on data generated by an assistant); *Derrickson v. Circuit City Stores, Inc.*, 1999 WL 1456538, at *7 (D. Md. Mar. 19, 1999) (denying motion to exclude expert testimony relying on data tables "subjected to various selection, aggregation and weighting processes performed by [the expert's] assistant" at his direction); *McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 30, 36–37 (D.D.C. 2004) (denying motion to exclude expert testimony relying on program developed by assistants to generate expert analysis). "Where the expert was directly involved in the research, analysis or drafting of the report, even with substantial assistance from a colleague or associate,

8

his involvement in and knowledge of the report are matters of weight, not admissibility." *Lee Valley Tools, Ltd. v. Indus. Blade Co.*, 288 F.R.D. 254, 266 (W.D.N.Y. 2013).

Here, Prof. Geluso properly relied on the work of his assistants, and their involvement in connection with his assignment is not grounds for exclusion. Prof. Geluso is the Program Director of the Music Technology Department at New York University, and has more than 25 years' experience as a professional audio engineer. Dkt. 553-2 (Geluso Rep.) ¶ 1. Plaintiffs retained Prof. Geluso to analyze many thousands of file pairs to determine whether the same recording was embodied in both files. *See id.* ¶ 2. Prof. Geluso selected industry-standard methodologies and professional audio tools, including critical listening, waveform, and spectrogram analysis, and a process that applies spectrogram analysis to both files in their entirety, and, in at least three corresponding locations in the file pairs (*i.e.*, beginning, middle, end), a dynamic visual analysis of waveforms and spectrograms with critical listening.[3] *See, e.g.*, *id.* ¶¶ 47–80; Pl. Ex. 2 (Geluso Tr.) at 81:9–83:13, 103:6–105:10, 175:1–176:15.

As Prof. Geluso disclosed in his report and testified at his deposition, he was assisted by a team of two professional audio engineers, working under his direction and supervision, and the review was divided among the three of them. *See, e.g.*, Dkt. 553-2 (Geluso Rep.) ¶¶ 50 n.17, 81; Dkt. 553-3 (Geluso Tr.) at 123:17–125:19; Pl. Ex. 2 (Geluso Tr.) at 30:19–32:16. As he testified, Prof. Geluso was very familiar with these audio engineers, Mike Tierney and Charles Mueller, and their qualifications. He educated them on audio engineering when they were students in his NYU program, he knew about their extensive professional work as audio

---

[3] A "waveform" is a graphical representation of sound that shows changes in amplitude (*e.g.*, loudness) over time; a "spectrogram" is another graphical representation that shows changes in both amplitude and frequency (*e.g.*, pitch) over time. *See, e.g.*, Dkt. 553-2. ¶¶ 20–30.

9

engineers, and he was personally familiar with the quality of their work. *See, e.g.*, Pl. Ex. 2 (Geluso Tr.) at 32:17–34:5. Charter offers no evidence even suggesting that there is anything atypical about professional audio engineers using assistants. In fact, it is common in the audio engineering field to use assistant audio engineers, Prof. Geluso has regularly used assistant audio engineers during his long professional career, and Prof. Geluso previously hired and worked with Mr. Tierney and Mr. Mueller as his assistant audio engineers in the ordinary course of his non-litigation audio work. Decl. of P. Geluso, filed concurrently ("Geluso Decl."), ¶¶ 3–7. Prof. Geluso personally selected and hired his assistants, and his company invoiced for their work and paid them. *See id.*; Dkt. 553-3 (Geluso Tr.) at 30:23–25; Pl. Ex. 2 (Geluso Tr.) at 76:2–22.

Charter concedes that Prof. Geluso selected the methodologies that he and his assistants followed, and that Prof. Geluso met regularly with his assistants as they executed them. Dkt. 553 at 7. Prof. Geluso designed the process after personally analyzing an initial subset. *See, e.g.*, Pl. Ex. 2 (Geluso Tr.) at 119:5–24, 136:16–21, 182:17–23. He met with his assistants to train them and work through examples, and held regular meetings with them no less than bi-weekly. *See* Dkt. 553-3 (Geluso Tr.) at 124:19–127:24, 142:14–143:10. Prof. Geluso personally reviewed a subset of file pairs his assistants reviewed, and also confirmed that their overall observations "were always in line with what [he] was observing." *Id.* at 142:14–143:10; *see also id.* at 124:19–125:19. Based on all this, Prof. Geluso—*not his assistants*—ultimately concluded that "without question, the performances and sounds embodied in the [asserted files] were embodied, in whole or substantial part, in all of the [peer-to-peer files]" he reviewed. Dkt. 553-2 ¶ 81.

### B. Charter's Arguments to the Contrary Misread the Law.

Charter asserts that Prof. Geluso cannot testify about the work his assistants performed because "he did not observe those analyses and so did not critically evaluate their work." Dkt. 553 at 5–6. This is wrong in at least three respects.

*First*, contrary to Charter's assertions, Rule 703 allows Prof. Geluso to base his opinions on facts or data that he "has been made aware of." He is not limited to facts or data that he personally observed, and such facts or data need not otherwise be admissible if experts in the field would reasonably rely on them. Fed. R. Evid. 703; *see also*, *Trinity Med.*, 2020 WL 1307046, at *7 (collecting cases). Charter has offered no evidence suggesting that Prof. Geluso's approach was unreasonable in his field (indeed, Charter did not even retain a rebuttal expert). To the contrary, as noted above, it is common in the audio engineering field to use assistants. Geluso Decl. ¶¶ 3–7.

*Second*, Charter bases its argument on cases in which the testifying expert attempted to import conclusions reached by third parties who had expertise in a *different field* from that of the testifying expert, such that the testifying expert could only "parrot" those conclusions.[4] *See* 29 Charles A. Wright & Victor J. Gold, Fed. Prac. & Proc. § 6274 (2d ed. West 2021) ("A court also may reject expert testimony under Rule 703 where the witness relies on the findings of an

---

[4] *See Beck's Off. Furniture & Supplies, Inc. v. Haworth, Inc.*, 94 F.3d 655. 655 (10th Cir. 1996) (abuse of discretion to admit damages expert's financial calculations based on unsigned valuation reports that were admittedly "unreliable" and without which he would have been "unable to give any figure for the value of the business"); *In re TMI Litig.*, 193 F.3d 613, 714–15 (3d Cir. 1999) (putative expert opined on radiation exposure risk, but "rel[ied] blindly upon the conclusions generated by [p]laintiffs' other experts" on matters as to which he lacked expertise); *Mooring*, 2009 WL 4263359, at *2–6 (precluding damages expert from testifying about the accuracy of third-party projections because he lacked expertise necessary to evaluate them).

expert in a different field and, because the witness is not an expert in that field, can only parrot and not critically evaluate those findings."). Charter also cites cases in which the expert unthinkingly copied opinions of unrelated third-party experts without any basis for adopting their opinions.[5] That is not the case here. Prof. Geluso personally selected and hired his assistants to work for him. He is an expert in the same field—audio engineering—as his assistants. And Prof. Geluso himself selected the methodologies that he and his assistants applied, trained them to execute his process, met regularly with them, and checked subsets of their work.

*Third*, Charter cannot claim that Prof. Geluso failed to exercise any oversight, and instead challenges only the quality of that oversight. But that, again, is a matter of weight, not admissibility. *See, e.g.*, *Beebe*, 2019 WL 6044742, at *7; *NetQuote*, 2008 WL 2442048, at *9; *Bresler*, 855 F.3d at 195; *Structural Polymer Grp., Ltd. v. Zoltek, Corp.*, 543 F.3d 987, 997 (8th Cir. 2008). Thus, it is not grounds for exclusion that Prof. Geluso could not recall in real time at his deposition the three exemplary locations that he or his assistants subjected to dynamic spectrogram and waveform analysis for each of the many thousands of file pairs. *See* Dkt. 553 at 8. Nor would it be grounds for exclusion if, as Charter suggests, "Mr. Tierney and Mr. Mueller twice reviewed *identical* audio file pairs but recorded *different* conclusions." *Id.* (emphasis in original). Charter concedes that it does not actually know who reviewed these pairs, and acknowledges that Prof. Geluso may have reviewed them all. *See id*. Further, Charter is wrong

---

[5] In *Hunt v. McNeil Consumer Healthcare*, 297 F.R.D. 268 (E.D. La. 2014), the challenged expert admitted "that the majority of his report was copied verbatim from other reports," and conceded that "he did not read most of the material cited in the opinions nor verify the data referenced therein." *Id.* at 275. Similarly, in *Beyer v. Anchor Insulation Co.*, 238 F. Supp. 3d 270 (D. Conn. 2017), the challenged expert copied passages from a consulting expert's draft report and could not articulate any other basis for his conclusions. *Id.* at 285, 287–88.

that these notations reflect "different conclusions." As Prof. Geluso explained, the *conclusion* is that each and every file pair contains the same recording, in whole or substantial part. *See, e.g.*, Dkt. 553-2 ¶ 81. The notations are "just observations we made," Dkt. 553-3 at 261:22–262:21, not conclusions as to whether "there's a copy in whole or substantial part," Pl. Ex. 2 (Geluso Tr.) at 118:17–119:5. And in any event, the notations "aren't mutually exclusive, so something could have two properties." Dkt. 553-3 at 256:6–17. Tellingly, Charter does not argue that any observations, or any of the conclusions, were wrong.

## IV. The Expert Audio Engineers' Testimony Is Not Cumulative.

Charter asserts that Prof. Geluso and the Critical Listening Experts would provide cumulative testimony, and that it would be prejudicial for all eight of them to testify at trial. Dkt. 553 at 2. Given Charter's argument that Mr. Lai-Tremewan also should be barred from adopting the conclusions of the other Critical Listening Experts, Charter essentially asks the Court to rule that Plaintiffs were required to have a single Critical Listening Expert analyze more than 13,000 pairs of audio files they collectively reviewed (roughly equivalent to 1,200 to 1,750 hours of work), in order to establish a fact as to which Charter has offered no contrary evidence. *See, e.g.*, Dkt. 553-12 (Cass Tr.) at 52:4–7; Pl. Ex. 3 (Maltas Tr.) at 71:8–15; Pl. Ex. 4 (Burst Tr.) at 65:18–22; Pl. Ex. 5 (Gilchrest Tr.) at 58:22–25; Pl. Ex. 1 (Lai-Tremewan Tr.) at 50:21–51:1; Pl. Ex. 6 (Wineman Tr.) at 24:6–15; Pl. Ex. 7 (Cheriff Tr.) at 52:3–7. Charter is wrong.

To the extent the issue is not mooted by Plaintiffs' Motion for Summary Judgment, Plaintiffs would call all eight expert audio engineers to testify at trial only if Mr. Lai-Tremewan were not permitted to adopt and testify to the opinions of the other Critical Listening Experts. Even then, the expert audio engineers' testimony would not be cumulative. First, each reviewed

13

different sets of file pairs. Second, while Prof. Geluso's file pairs partially overlapped with some of the Critical Listening Experts, he evaluated his file pairs using a different methodology: while the Critical Listening Experts performed critical listening over the entirety of each file in a given pair, *see, e.g.*, Dkt. 553-4 (Lai-Tremewan Rep.) ¶¶ 9–10, Prof. Geluso performed spectrogram analysis over the entire file pair, and, in at least three exemplary locations, performed dynamic visual spectrogram and waveform analysis while also performing critical listening, *see* Dkt. 553-2 (Geluso Rep.) ¶¶ 47–80; Pl. Ex. 2 (Geluso Tr.) at 81:9–83:13, 103:6–105:10, 175:1–176:15.

Charter's cases do not support exclusion on these facts. Each of Charter's cases address the situation in which experts offer identical or virtually identical opinions about *the same facts*. *See Stricklin v. Bordelon*, 2021 WL 2375868, at *3 (D. Colo. June 10, 2021) (precluding "nearly identical testimony" from three experts on standard of care); *Sunstar, Inc. v. Alberto-Culver Co.*, 2004 WL 1899927, at *25 (N.D. Ill. Aug. 23, 2004) (precluding testimony of two experts on the same aspects of Japanese contract law, but clarifying that "this does not mean that [defendant] is limited to one testifying expert regarding Japanese law; it is limited to one testifying expert on each subject of Japanese law"); *see generally Price v. Fox Ent. Grp., Inc.*, 499 F. Supp. 2d 382 (S.D.N.Y. 2007) (limiting defendants to one expert on the similarities between the only two movies at issue). Here, the expert audio engineers applied different methodologies to *different facts* (*i.e.*, different sets of underlying works and copies from peer-to-peer networks).

Further, in *Sunstar*, the court noted that it was limiting the number of experts merely as a matter of trial administration, and "there is no general practice or rule that prohibits a party from identifying . . . more than one testifying expert on a subject and reserving for later the decision as to which one to use at trial." 2004 WL 1899927, at *24. Here, as in *Sunstar*, Charter's supposed

14

concerns about potential cumulativeness are premature and properly addressed at trial with appropriate instructions. *See also Ulibarri v. City & Cnty. of Denver*, 2012 WL 12538509, at *2 (D. Colo. Feb. 23, 2012) (denying motion to exclude witness, noting "[t]he Court is not going to determine in advance of trial whether cumulative testimony is offered or contemplated").

Finally, Charter asserts that Plaintiffs did not need multiple expert audio engineers to address the massive volume of file pairs at issue because Prof. Geluso testified, in the abstract, that he and his assistants would have done additional work if requested. Dkt. 553 at 14 n.8. But Prof. Geluso's willingness to do *some* unspecified additional work is of course not tantamount to an admission that he could somehow have undertaken, on this case schedule, hundreds of hours of additional work that would have been necessary to replicate the Critical Listening Experts' analysis. In any event, the law does not require him to have done so.

## CONCLUSION

In light of the foregoing, Charter's motion should be denied in its entirety.

Dated:  December 20, 2021

Matthew J. Oppenheim
Jeffrey M. Gould
Alexander Kaplan
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave. NW, 5th Floor
Washington, DC 20016
Telephone: (202) 621-9027
matt@oandzlaw.com
jeff@oandzlaw.com
alex@oandzlaw.com

*/s/ Jonathan M. Sperling*

Jonathan M. Sperling
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
jsperling@cov.com

Neema T. Sahni
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
nsahni@cov.com

*Attorneys for Plaintiffs*

15