# PLAINTIFFS' EXHIBIT 1

Page 1

1      IN THE UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF COLORADO
3   --------------------------------*
4   WARNER RECORDS INC., et al.,
5                    Plaintiffs,   Civil Action No.:
6        vs.                       1:19-cv-00874
7   CHARTER COMMUNICATIONS, INC.,
8                    Defendant.
9   --------------------------------*
10          STENOGRAPHIC AND VIDEO-RECORDED
11           REMOTE VIRTUAL DEPOSITION OF
12                 YI-WEN LAI-TREMEWAN
13              Friday, August 20, 2021
14                    12:07 p.m.
15
16
17
18
19  Reported by:
20  Josephine H. Fassett, RPR, CCR
21  Job No. 4761709
22
23
24
25

Page 14

1 preparation for this deposition?
2  A. My report.
3  Q. Anything else?
4    MR. SHAFROTH: I'm going to instruct
5  the witness not to identify any particular
6  documents that your attorneys may have
7  selected to show you as part of the legal
8  strategy for the case, that would be
9  attorney work product. You can answer yes
10 or no as to whether you reviewed documents.
11 A. I reviewed documents.
12 Q. Did any of those documents refresh your
13 recollection about topics that you previously had
14 knowledge about?
15 A. No.
16 Q. Did you review any deposition testimony?
17 A. No.
18 Q. Were you told about any deposition
19 testimony?
20   MR. SHAFROTH: Objection. The
21   question calls for privileged information
22   and attorney work product and instruct the
23   witness not to answer.
24 Q. Are you going to take your counsel's
25 instruction?

Page 15

1  A. Yes.
2  Q. Do you know about what was said at any
3 previous depositions in this case?
4    MR. SHAFROTH: I instruct the witness,
5    to the extent you have any understanding or
6    responsive information to that question
7    that came to you through the course of
8    privileged discussions with counsel you
9    omit that from your answer. To the extent
10   you have any responsive information that
11   you received otherwise, not from attorneys,
12   you're welcome to share that if it exists.
13 A. I don't think I have anything to share.
14 Q. Are you --
15   MR. SCHER: Nate, are you instructing
16   him not to answer yes or no whether or not
17   he knows about what was said at a previous
18   deposition?
19   MR. SHAFROTH: I'm sure there's one
20   particular deposition you're asking about
21   and that, therefore, goes to the content of
22   the selection of materials we may or may
23   not have chosen to share with him, which is
24   unbook work product, which I'm sure you
25   probably know.

Page 16

1 BY MR. SCHER:
2  Q. So, Mr. Tremewan, are you accepting --
3 taking your counsel's instruction not to answer my
4 question?
5  A. Yes.
6  Q. Outside of the context of your
7 deposition preparation, have you discussed any
8 matter relating to this case with anyone?
9  A. No.
10   MR. SHAFROTH: Objection. Vague.
11 A. Sorry, yeah, I should clarify. Are you
12 referring to anything to do with this case in
13 terms of the work that we carried out?
14 Q. Correct. My question is: At any time
15 related to work carried out in relation to this
16 case, have you spoken to another individual?
17 A. Sorry. Yes, I have. Yeah.
18 Q. And who have you spoken to about this
19 case?
20 A. Counsel and the other listeners on our
21 team.
22 Q. Did you speak with Paul Geluso at all?
23 A. No, I did not.
24 Q. How many times did you speak with the
25 other listeners on your team?

Page 17

1  A. Off the top of my head, I would have to
2 say between five and ten times.
3  Q. How many times did you speak to the
4 other listeners on your team as a group?
5  A. Probably on the lower end of that, so at
6 around five or six, somewhere in that vicinity.
7  Q. And how many times out of those five or
8 six were counsel present?
9  A. As a group, all of them.
10 Q. And did any of those conversations
11 concern facts or data you considered in connection
12 with your work on this case?
13 A. Sorry, could you repeat that?
14 Q. Did any of those conversations concern
15 facts or data you considered in connection with
16 your work on this case?
17 A. Yes, I would say so.
18 Q. And what were those facts?
19 A. The calls were mostly check-in calls to
20 make sure that we were carrying out the work
21 effectively, so we may have discussed example
22 cases of comparisons that we carried out.
23 Q. Any other facts or data?
24 A. Not so far as I can recall.
25 Q. Do you recall any specific example cases

5 (Pages 14 - 17)

Page 50

1  Q. Were you given any other instructions?
2  A. Not that I can recall.
3  Q. How was the critical listening
4  assignment conveyed to you, was it verbally or was
5  it in writing?
6  A. I believe verbally.
7  Q. Were you told alone or were you told in
8  a group?
9  A. Possibly both.
10 Q. Do you recall if you were told alone
11 first or if you were in a group first?
12 A. I believe alone first.
13 Q. Why do you say that?
14 A. I remember receiving an initial phone
15 call on my own.
16 Q. And who was that from?
17 A. From the attorney, Phil.
18 Q. And then some time after that you had a
19 group call with the other listeners?
20 A. That's correct.
21 Q. You said you spent about a hundred to
22 two hundred hours conducting a critical listening
23 analysis to compare the two sets of digital files,
24 correct?
25 A. Yes. It may have been slightly more

Page 51

1  than that, I can't exactly recall.
2  Q. Do you recall what date you began doing
3  this analysis?
4  A. Again, not off the top of my head, but
5  sometime in early 2021.
6  Q. Do you know what month it was?
7  A. Not exactly off the top of my head.
8  Q. Was it after March?
9  A. I would believe so, yeah.
10 Q. So it was maybe in April or May?
11 A. That could be the case.
12 Q. Did you start in June?
13 A. I don't believe so.
14 Q. How long did it take you to complete
15 this analysis?
16 A. Approximately seven weeks, I believe.
17 Q. During those seven weeks, how many hours
18 per week were you conducting your critical
19 listening analysis?
20 A. Anywhere in the vicinity of 20 hours to
21 upwards of 40, 50 hours.
22 Q. Do you have a sense of how many songs
23 you listened to each week?
24 A. I don't think I could say.
25 Q. Were you working at all during that

Page 52

1  seven-week time period?
2  A. Yes, I was.
3  Q. Did you have any freelance work during
4  that time period?
5  A. Yes, I believe so.
6  Q. Do you recall what it was?
7     THE VIDEOGRAPHER: Our witness locked
8  up. I just want to give him a second to
9  see if he comes back.
10    MR. SCHER: Okay.
11    THE WITNESS: Sorry. I think I lost
12 connection there for a second.
13    THE VIDEOGRAPHER: Yeah, you did. You
14 locked up but we're still on the record.
15    THE WITNESS: Cool. Did you catch any
16 of what I said?
17 A. So I don't exactly recall what the
18 freelance work was.
19 Q. Do you recall if any of the freelance
20 work took you out of New York?
21 A. I believe it didn't.
22 Q. And you were also working at NYU at that
23 time?
24 A. Yes, that's right.
25 Q. Counsel provided the two sets of digital

Page 53

1  files for your analysis, correct?
2  A. Yes, that's correct.
3  Q. Do you know how they chose those files?
4  A. No, I don't believe so.
5  Q. Do you know where the files were
6  downloaded from?
7  A. No, I don't believe so.
8  Q. If we turn back to Paragraph 7, your
9  next sentence reads: "Specifically, I was asked
10 to listen to file pairs to determine whether audio
11 files in one set of files (the Target Set or
12 Target Files) is a copy, in whole or in
13 substantial part, of recorded music that is
14 contained in audio files from another set of files
15 (the Source Set or Source Files)." Do you see
16 that?
17 A. Yes, I do.
18 Q. What do you mean by "copy"?
19 A. In this case, essentially the same
20 recording.
21 Q. So you mean the two files sound the
22 same?
23 A. Within certain bounds.
24 Q. What do you mean "within certain
25 bounds"?

14 (Pages 50 - 53)

Page 102

1  (Whereupon, off the record.)
2  (Whereupon, resumed.)
3  THE VIDEOGRAPHER: The time is 3:46.
4  We're back on the record beginning Media
5  File 4.
6  BY MR. SCHER:
7  Q. All right. Let's turn to Paragraph 8 of
8  Exhibit 3. Let me know when you're there.
9  A. Yes, I see it.
10  Q. Can you read this paragraph?
11  A. "Further, I directed and supervised the
12  critical listing analysis of Mses. Maltas,
13  Wineman, and Gilchrest, and Mssrs. Cheriff, Burst,
14  and Cass, who are other expert witnesses
15  performing the same analysis for their respective
16  Source Sets and Target Sets. Specifically, I
17  provided direction and guidance, checked in
18  periodically, observed and supervised portions of
19  their critical listing analysis, performed
20  spot-checks of their analysis, and confirmed their
21  conclusions."
22  Q. All right. How did you provide
23  direction and guidance?
24  A. It was mainly to do with workflow and
25  efficiency, so I made sure that they knew how to

Page 103

1  locate the files effectively and -- that was
2  mostly it, yeah.
3  Q. Was it difficult to locate the files?
4  A. Surprisingly, it wasn't that
5  straightforward, yes.
6  Q. And why was that?
7  A. The identifiers we had to use were quite
8  long, so sometimes they can get a little
9  confusing, but once the proper processes are in
10  place, it's fine.
11  Q. And what were those proper processes?
12  A. As I alluded to earlier, using the Go to
13  Folder function in the Finder.
14  Q. So is that the instruction that you were
15  providing?
16  A. Some of the time, depending on if they
17  needed help or not.
18  Q. Any other kinds of guidance?
19  A. I can't think of anything off the top of
20  my head. I recommended using VLC, the same media
21  player that I used, but each person had their own
22  opinion on that, so.
23  Q. Why did you recommend your media player?
24  A. I found it worked well for me and it's
25  compatible with a wide range of audio files.

Page 104

1  Q. Were the source and target files a large
2  range of audio files?
3  A. I would say so.
4  Q. They weren't all MP3's?
5  A. For the most part they were, but there
6  were a few others as well.
7  Q. Did you provide any other listeners with
8  instructions about how to conduct the critical
9  listening analysis?
10  A. No, I wouldn't say so.
11  Q. Aside from the media player, did you
12  tell anyone what equipment to use?
13  A. No. I ensured that they had the proper
14  equipment, but it was ultimately up to them.
15  Q. And how did you determine what equipment
16  was proper and what wasn't?
17  A. As long as it was professional grade
18  audio equipment, it was, it was fine.
19  Q. What audio equipment did you use for
20  your critical listening analysis?
21  A. I used my studio monitors which are
22  Dynaudio LYD 7's. And I also used headphones, the
23  Audio-Technica ATH-M50's.
24  Q. So for some audio files you used
25  headphones and for others you used speakers?

Page 105

1  A. That's correct.
2  Q. And how did you decide whether you were
3  going to use headphones or speakers for a
4  particular set of audio files?
5  A. Well, since the project continued over a
6  number of weeks, I wasn't always in my studio
7  where my studio monitors are located, so I would
8  use my headphones in that case.
9  Q. Aside from your study, where else did
10  you conduct your critical listening analysis?
11  A. I can't recall exactly. Possibly at
12  NYU.
13  Q. Anywhere else?
14  A. I don't remember anywhere else off the
15  top of my head.
16  Q. And if you were conducting the analysis
17  at NYU, you would have plugged your headphones
18  into your laptop?
19  A. That's correct.
20  Q. Do you recall what room you were in when
21  you conducted the analysis?
22  A. It either would have been one of the
23  recording studios there or in my office.
24  Q. When you're providing direction and
25  guidance to the other listeners, did you ever ask

27 (Pages 102 - 105)

Page 106
1  one of the other listeners to redo any of their
2  analysis?
3      A.  No, I don't believe so.
4      Q.  Did you ever disagree with any analysis
5  from another listener?
6      A.  No, I don't believe so.
7      Q.  What did you mean that you checked in
8  periodically with other listeners?
9      A.  It usually took the form of a weekly
10 Zoom call.
11     Q.  And what were generally discussed on
12 those Zoom calls?
13     A.  Progress.  Just making sure that we were
14 up to speed with getting through the comparisons.
15     Q.  Anything else?
16     A.  As I said earlier, making sure that they
17 were carrying out the work effectively and were
18 finding -- locating the files and everything was
19 running smoothly on their end.
20     Q.  Did you ever think anyone was carrying
21 out the work ineffectively?
22     A.  No, I did not.
23     Q.  Did you have to report your progress to
24 anybody?
25     A.  Insofar that counsel had the ability to

Page 107
1  monitor our progress, yes.
2      Q.  Do you mean that counsel could monitor
3  your progress at any time or that you could have
4  communicated with them?
5      A.  Well, we had periodic check-ins with, as
6  I said, as a group, as a group, which included
7  with counsel, so they could ask us on our -- on
8  how we were doing, the progress, which included
9  asking me.
10     Q.  Okay.  So you were referring to the
11 group calls with the listeners and counsel?
12     A.  Sure.  And they could have checked up on
13 me at any time if they chose to.
14     Q.  Did you do any of your supervisory work
15 over email?
16     A.  Other than scheduling calls, no.
17     Q.  You said that you observed and
18 supervised portions of the other listeners'
19 critical listening analysis, how did you do that?
20     A.  It was via Zoom using screen share.
21     Q.  How could you monitor critical listening
22 analysis by using screen share?
23     A.  So in Zoom there's an audio sharing
24 function as well, so you can listen directly to
25 the audio feed from the other person's computer

Page 108
1  without using those speakers or microphone.
2      Q.  And that didn't raise any issues to you
3  relating to the quality of the files?
4      A.  No.
5      Q.  Would you listen to audio file pairs
6  that had already been reviewed or that had not yet
7  been reviewed?
8      A.  I believe there may have been some of
9  each, I don't exactly recall.
10     Q.  Today you can't say whether you listened
11 to audio file pairs that had already been reviewed
12 by any particular listener, correct?
13     A.  I believe I did do that at least once.
14     Q.  With each listener?
15     A.  Again, I'm not entirely sure, but we
16 definitely reviewed comparisons.  Whether they had
17 been previously done or we did them live was --
18 I'm not entirely sure.
19     Q.  So you don't know whether or not you
20 reviewed comparisons with Ms. Maltas that she
21 completed before your check-in?
22     A.  I can't say for sure that.  The main
23 thing was to make sure that we both arrived at the
24 same conclusion regardless of when we arrived at
25 that conclusion.

Page 109
1      Q.  And you don't know whether or not you
2  reviewed audio file pairs with Ms. Wineman that
3  she completed before your check-in?
4      A.  With your phrasing are you referring
5  to -- I obviously reviewed their reports before
6  submitting, right, my report, so I reviewed
7  comparisons in that sense that she had already
8  completed.
9      Q.  Can you quantify the portions of
10 critical listening analysis that you observed?
11     A.  Can you repeat that?
12     Q.  Can you quantify the portion of critical
13 listening analysis that you observed?
14         MR. SHAFROTH:  Objection.
15     A.  Are you referring to -- I didn't review
16 a portion of critical listening, I reviewed an
17 entire critical listening process for a comparison
18 or two depending on the portion.
19     Q.  Okay.  I was just reading from your
20 report.  You said you observed and supervised
21 portions of their critical listening analysis, so
22 I was wondering if you could quantify that for me.
23     A.  I think that's referring to portions of
24 the entire scope of work that they engaged in
25 rather than a specific part of the critical

28 (Pages 106 - 109)

Page 110

1 listening. So the portion of their entire work
2 that I reviewed would be -- I wouldn't be able to
3 put a number on it, but maybe between five and ten
4 files each comparison speech.
5     Q. So you looked at between five and ten
6 audio file pairs for each of a listener before the
7 final reports were submitted, correct?
8     A. Yes, that's right.
9     Q. You did not look at more than a dozen
10 audio file pairs for each of the listeners before
11 the final reports were submitted, correct?
12     A. I would say that's probably correct.
13     Q. How many audio file pairs did you listen
14 to with other listeners before they finalized
15 their reports?
16     A. With the other listener present?
17     Q. Yes.
18     A. One or two for each.
19     Q. And did you do that at the start of
20 everyone's critical listening analysis?
21     A. It was some -- sometime in the middle.
22     Q. And how many files, how many audio file
23 pairs did you listen to from other listeners after
24 the other listeners had completed their projects?
25     A. Around five per person.

Page 111

1     Q. So you listened to no more than five per
2 person while the other listeners were completing
3 their projects?
4     A. So during the listening process I
5 listened to maybe one or two live with the other
6 listeners, if that's what you're referring to,
7 yeah.
8     Q. Yeah. And did you listen to any other
9 of their audio file pairs during the time period
10 that they were working on their projects?
11     A. The other comparisons I listened to were
12 towards the end, but yeah, before their reports
13 were submitted.
14     Q. And you didn't suggest any changes based
15 off the pairs you listened to towards the end,
16 correct?
17     A. That's correct.
18     Q. You said you performed spot-checks of
19 the other listeners analysis. What do you mean by
20 spot-check?
21     A. That's the live comparisons that we did
22 together.
23     Q. So is that the same as observe and
24 supervise portions of their critical listening
25 analysis?

Page 112

1     A. Well, I guess also with spot-checks I
2 made sure that -- well, no, I guess, yeah, those
3 are, those are like.
4     Q. And those spot-checks occurred near the
5 beginning of the project and as the projects were
6 being completed, correct?
7     A. Yeah, I would say towards the middle and
8 end for both.
9     Q. And you didn't disagree with any
10 assessments made by any of the other listener
11 experts?
12     A. That's correct.
13     Q. What do you mean that you confirmed the
14 other listeners' conclusions?
15     A. I made sure that I reached the same
16 conclusion that they did.
17     Q. Did you have to alter any of your
18 analysis to make sure you reached the same
19 conclusion that they did?
20     A. No, I did not.
21     Q. Did you provide direction and guidance
22 in any other way to the other listeners?
23     A. Not that I can recall.
24     Q. Did you take any notes related to your
25 spot-checks?

Page 113

1     A. No, I don't think so.
2     Q. Did you take any notes related to your
3 observing and supervising portions of critical
4 listening analysis?
5     A. No, I don't think so.
6     Q. Did you take any notes whatsoever in
7 your supervisory role?
8     A. No, I don't think so.
9     Q. Let's go to Paragraph 22. Let me know
10 when you're there.
11     A. Yep, I'm there.
12     Q. You wrote: "I regularly communicated
13 with," how do you pronounce that word?
14     A. Mses. Maltas.
15     Q. Maltas, Wineman, and Gilchrest, and
16 what's this word?
17     A. Mssrs. Mssrs.
18     Q. Do you not know how to pronounce that
19 word?
20     A. I mean, it's formal terminology that I'm
21 use to seeing written down rather than spoken out
22 loud.
23     Q. Okay. Yeah, I don't use, I don't use
24 that term either. Okay.
25         "Cheriff, Burst, and Cass regarding

29 (Pages 110 - 113)

Page 118

1 qualifications, processes, and equipment, do you
2 recall any other topics you discussed with any of
3 the other listeners?
4     A.  I wouldn't be able to say off the top of
5 my head.
6     Q.  Now, earlier you discussed workflow
7 issues.  Do you recall what workflow issues you
8 discussed with the other listeners?
9     A.  Simply just variations on locating the
10 files and playing them.
11     Q.  Do you recall if anyone had trouble
12 playing the files?
13     A.  I think there may have been one or two
14 cases where there were FLAC files, F-L-A-C files,
15 which are not generally played by mainstream media
16 software like iTunes so, you know, in that case I
17 would recommend VLC for that.
18     Q.  Do you recall -- strike that.
19         Did you have any role in determining how
20 many audio file pairs each listener would
21 consider?
22     A.  No, that was all done by counsel.
23     Q.  Was that done at the outset of the
24 project?
25     A.  I wouldn't know.

Page 119

1     Q.  You listened to roughly 1800 audio
2 files, correct?
3     A.  I believe that's the rough number of
4 comparisons I did, so the number of audio files
5 would actually be more.
6     Q.  Sure.  You listened to roughly 1800
7 audio comparisons, correct?
8     A.  Yes, that's right.
9     Q.  When you started your critical listening
10 analysis, did you know you would be completing
11 roughly 1800 audio file comparisons?
12     A.  I believe there was maybe a ballpark
13 figure, but I didn't know 1800 was going to be the
14 number.
15     Q.  Did some people review more files
16 because they were able to work more efficiently?
17     A.  I'm not sure if that was the reason, but
18 there was certainly some people that had more
19 files than others.
20     Q.  And were you generally aware of how many
21 files each other listener was supposed to
22 consider?
23     A.  Not really, no.
24     Q.  So how are you making sure that each
25 other listener was making proper progress on their

Page 120

1 project?
2     A.  They would have told me how far they
3 thought they had gotten and how far they thought
4 they needed to go, but I wouldn't be able to tell
5 you the numbers for each person off the top of my
6 head.
7     Q.  Did anyone express concerns related to
8 their ability to complete their project?
9     A.  I guess the time, the time span was a
10 little bit tight at times, but everyone was fine
11 to complete on time in the end.
12     Q.  Do you recall which particular listeners
13 thought that they were tight on time?
14     A.  No, I wouldn't be able to say.
15     Q.  Would you be able to exclude any of the
16 listeners from that group?
17     A.  I think it really depended on the time
18 period at which we were talking because each
19 person had a different schedule for each week.
20 So, you know, even I had some moments where I had
21 a full schedule for that week but then I had an
22 empty schedule the week after, so it just depended
23 very much on a lot of factors.
24     Q.  And when you're referring to the
25 schedule, you're referring to people's personal

Page 121

1 schedule like work and family commitments,
2 correct?
3     A.  That's right.
4     Q.  Okay.  Let's take a look at Paragraph 22
5 again.
6     A.  Uh-hum.
7     Q.  You wrote:  "I also reviewed their
8 reports and appendices thereto, identified in
9 Appendices C to H hereto.  I agree with their
10 determinations and adopt their findings as my
11 own."  Do you see that?
12     A.  Yes, I do.
13     Q.  So your review of each other listeners'
14 comparisons were based on roughly 10 audio file
15 comparisons each; is that correct?
16     A.  And also their reports.
17     Q.  So you read through each of their
18 reports?
19     A.  That's right.
20     Q.  And then did you look closely at their
21 appendices at all?
22     A.  I wouldn't say closely, no.
23     Q.  And how closely did you read their
24 reports?
25     A.  Closely enough to satisfy my own

Page 122

1 judgment.
2    Q.   And then if we look at your
3 Paragraph 24, you wrote: "I further conclude that
4 each and every Target File is a copy, in whole or
5 substantial part, of the corresponding Source File
6 identified in Appendices C through H."  Do you see
7 that?
8    A.   I do.
9    Q.   You didn't listen to each and every
10 source file and target file that the other
11 listener experts listened to, correct?
12    A.   That's correct.
13    Q.   So how were you able to conclude that
14 each and every audio file pair is a copy?
15    A.   Based on their qualifications and the
16 check-in's that we did and the randomized samples
17 that I did of each of their work.
18    Q.   Did anything else inform your
19 conclusion?
20    A.   Nothing comes to mind immediately.
21    Q.   You don't know where the files that the
22 other listeners considered were downloaded from
23 before they were given to the other listeners,
24 correct?
25    A.   That's correct.

Page 123

1    Q.   And you don't know when the files that
2 the other listeners considered were downloaded
3 before they were given to the other listeners,
4 correct?
5    A.   Correct.
6    Q.   And you don't know who downloaded those
7 files before they were given to the other
8 listeners, correct?
9    A.   That's correct.
10    Q.   And you don't know whether MarkMonitor
11 ever compared copies of those exact files to
12 copyrighted works, correct?
13    A.   That's correct.
14    Q.   And you don't know whether Audible Magic
15 ever compared copies of those exact files to
16 copyrighted works, correct?
17    A.   Correct.
18    Q.   And you don't know whether or not there
19 are other duplicative files in the various
20 Appendix B's of the other listeners' reports,
21 correct?
22    A.   Sorry, could you repeat that?
23    Q.   You don't know whether or not there are
24 other duplicative rows and files in the appendices
25 of the other listeners' reports?

Page 124

1    A.   Yeah, I couldn't say for certain.
2    Q.   Could you say for certain whether or not
3 each listener listened to their own independent
4 set of files?
5    A.   I would imagine so, I have no reason to
6 believe otherwise.
7    Q.   But you can't say for certain that one
8 audio file pair that you listened to perhaps
9 wasn't also listened to by Mr. Cass?
10    A.   I would have no way of knowing.
11    Q.   And that's not something you ever tried
12 to figure out, correct?
13    A.   Nope.
14    Q.   Do you have an understanding of why you
15 were chosen to be the supervisor of the other
16 experts' critical listening analysis?
17    A.   I suppose so.
18    Q.   Why do you think that is?
19    A.   The counsel liked the work ethnic that I
20 had and my communication skills.
21    Q.   Were you chosen as the supervisor prior
22 to the start of the critical listening analysis
23 project?
24    A.   I don't believe so.
25    Q.   When did you find out that -- strike

Page 125

1 that.
2        When were you offered the role to take
3 on a supervisory position in this project?
4    A.   Maybe a week or two after commencing.
5    Q.   So you had already started your critical
6 listening analysis project when you became
7 supervisor?
8    A.   I believe so.
9    Q.   And when you became a supervisor, some
10 of the other listeners had also already started
11 their critical listening analysis project,
12 correct?
13    A.   I believe so.
14    Q.   And prior to that no one had given you
15 any instruction on how to actually conduct the
16 critical listening aspect of the project, correct?
17    A.   Aside from my learnings in the master's
18 program, no.
19    Q.   Do you recall earlier today you
20 mentioned that you were not certain whether or not
21 the duplicative rows that you looked at were
22 included in the 1,859 pairs of audio comparisons
23 that you performed?
24    A.   Yes, I remember that.
25        MR. SCHER:  I am going to introduce

32 (Pages 122 - 125)

Page 130

1  listening analysis, you used a spreadsheet showing
2  which audio files to compare that was provided to
3  you by counsel, correct?
4      A.  Yes, that's correct.
5      Q.  And when you were checking the work of
6  other listeners, you looked at similar
7  spreadsheets provided by counsel showing which
8  audio files they were supposed to compare, right?
9      A.  Yes, only what was displayed on the Zoom
10 screen share.
11     Q.  They never emailed you those files,
12 correct?
13     A.  That's correct.
14         MR. SCHER:  Okay.  Nate, we're going
15 to just call for the production of any
16 spreadsheets or worksheets that were used
17 in connection with Mr. Tremewan's report.
18         MR. SHAFROTH:  Okay.  The testimony
19 you've gotten certainly doesn't support
20 that since the testimony was that
21 everything that he actually relied on in
22 forming his opinions is included in the
23 report and the appendix -- appendices to
24 his report.  So there's no other reliance
25 material and/or reliance materials or

Page 131

1  materials considered in forming the
2  opinions are all that you're entitled to,
3  and you've got them already, so we won't be
4  producing those.
5          MR. SCHER:  Okay.  Well, we can agree
6  to disagree about that.
7          I have no further questions today, but
8  we're going to keep the deposition open,
9  including based on the documents that we
10 believe ought to be produced and what we
11 believe are improper instructions not to
12 answer.
13         MR. SHAFROTH:  I have no redirect.
14         And for our part, we of course
15 consider the deposition closed and you'll
16 have to file a motion if you want a new
17 deposition.  We disagree on the substance,
18 but we will --
19         MR. SCHER:  Thank you.
20         THE VIDEOGRAPHER:  Thank you.
21         Okay.  The time is 4:50.  We're going
22 off the record.  This is the end of Media
23 File 5.  And that concludes today's
24 proceeding.  Thank you.
25         MR. SHAFROTH:  Thanks everyone.

Page 132

1          MR. SCHER:  Thanks everyone.
2          (Whereupon, off the record.)
3          (Whereupon, stenographic and
4  video-recorded deposition adjourned 4:50
5  p.m.)

Page 133

            C E R T I F I C A T E
     I, JOSEPHINE H. FASSETT, a Registered
Professional Reporter, Certified Court Reporter, and
Notary Public within and for the State of New York
and New Jersey, do hereby certify that the witness,
whose stenographic remote virtual deposition is
hereinbefore set forth, was first duly sworn by me
on the date indicated, and that the foregoing
stenographic remote virtual deposition is a true and
accurate record of the testimony given by such
witness.
     I FURTHER CERTIFY that I am not employed by nor
related to any of the parties to this action by
blood or marriage, and that I am in no way
interested in the outcome of this matter.
     IN WITNESS WHEREOF, I have subscribed my hand
this 25th day of August 2021.

         JOSEPHINE H. FASSETT, CCR, RPR
         NCRA License No. 32148
         CCR License No. 30XI00098400
         New York Notary Public
         New Jersey Notary Public