# PLAINTIFFS' EXHIBIT 2

Page 1

```
 1   UNITED STATES DISTRICT COURT
 2   FOR THE DISTRICT OF COLORADO
 3   ------------------------------ X
     WARNER RECORDS INC., et al.,
 4
                 Plaintiffs,
 5                                   No.
           vs.                       19-cv-00874-
 6                                   RBJ-MEH
 7   CHARTER COMMUNICATIONS, INC.,
 8               Defendant.
     ------------------------------ X
 9
10               October 14, 2021
11               1:18 p.m.
12
13        Deposition of PROFESSOR PAUL
14   GELUSO, held via Zoom at The New York Times
15   Building, 620 Eighth Avenue, New York, New
16   York, pursuant to Notice, before Theresa
17   Tramondo, AOS, CLR, a Notary Public of the
18   State of New York.
19
20
21
22
23   Reported by:
24   THERESA TRAMONDO, AOS, CLR
25   JOB NO. MW4846473
```

Page 30

1  attorneys and two audio engineers, did you
2  work with anyone else with respect to any
3  other matter related to this lawsuit?
4      MR. SHAFROTH:  Objection, vague.
5      A.   I had some -- as I mentioned in
6  the report, some of the tasks of setting up
7  the SR files was automated through
8  custom-made software that I had programmed
9  for me at my specification.
10     Q.   And who did that programming?
11     A.   Dr. Schuyler R. Quackenbush.
12     Q.   And where does Dr. Quackenbush
13 work?
14     A.   He lives in New Jersey.  I imagine
15 that's where he works.
16     Q.   He doesn't work at NYU?
17     A.   He has a course there.  He teaches
18 a C programming class there.
19     Q.   And what were the names of the two
20 audio engineers that you worked with?
21     A.   Michael Tierney and
22 Charles Mueller.
23     Q.   And who selected the two audio
24 engineers that you worked with?
25     A.   I did.

Page 31

1      Q.   And how did you find them?
2      A.   I've known both of them at least
3  five years.  They both attended my program
4  at NYU and I've kept in touch with them
5  through their subsequent professional
6  careers.
7      Q.   How specifically did you get in
8  contact with them?
9      A.   I reached out to both of them
10 initially via e-mail, to the best of my
11 recollection, yeah.
12     Q.   What role did Mr. Tierney have in
13 relation to your work in this matter?
14     A.   Well, as explained in my report,
15 there was a three-part process at which the
16 FAL (phonetic) comparisons underwent
17 critical listening, waveform, spectral
18 analysis.  And Mr. Tierney helped me with
19 those tasks on a portion of the total number
20 of files we looked at.
21     Q.   So Mr. Tierney reviewed a subset
22 of the audio files referenced in your
23 report?
24     A.   Yes.  Based on my methodology he
25 reviewed a subset, like you said.

Page 32

1      Q.   Did he do anything else?
2      A.   He reviewed a subset and shared
3  his observations with me.
4      Q.   What about Mr. Mueller, what did
5  he do?
6      A.   Had a similar role, same role.
7      Q.   So both Mr. Tierney and
8  Mr. Mueller reviewed a subset of the audio
9  files referenced in your report and shared
10 their observations with you; is that
11 correct?
12     A.   That's correct.
13     Q.   Did either of them do anything
14 else?
15     A.   No, that's a good description of
16 their work.
17     Q.   Do you know Mr. Tierney's
18 qualifications to do that kind of work?
19     A.   Oh, yes.  He's a highly skilled
20 musician and sound engineer.  He's worked on
21 some Grammy-nominated records, very good
22 years.  I'm very familiar with his level of
23 work.  He engineered many sessions at NYU.
24 I know about his tasks.  He was more than
25 qualified to do what was asked.

Page 33

1      Q.   And he had been one of your
2  students?
3      A.   Yes, he was.  When he was a
4  master student, he took a course with me,
5  yes.
6      Q.   Do you know what Grammy-nominated
7  records he has worked on?
8      A.   You can see on his Web page.  I'm
9  forgetting who the -- Judy Collins, I
10 believe, was one.  And I'm forgetting the
11 other one.
12     Q.   Do you know if he's currently
13 employed?
14     A.   He is self-employed.  He's got an
15 active freelance business.  And he's also
16 currently teaching a course at NYU on ear
17 training and critical listening.
18     Q.   What about Mr. Mueller, what are
19 his qualifications?
20     A.   Similar.  He was also a master
21 student, worked in the studios at NYU.
22 Fantastic audio engineer.  I believe he
23 worked at SSL.  They're the largest
24 manufacturer of consoles in the world
25 perhaps.  Also has a very active music and

Page 34

1  sound recording, you know, music production,
2  music recording freelance.  And he's also
3  teaching a course at NYU, both graduate
4  and undergraduate, fundamentals of music
5  technology course.
6      Q.   Sitting here today, is there
7  anything that you're leaving out about
8  Mr. Tierney or Mr. Mueller's qualifications?
9          MR. SHAFROTH:  Objection to form.
10     A.   That's -- I'm sure I'm missing
11 something in their resume.  I don't know
12 every project they've worked on verbatim at
13 the moment.  I'm not sure what your question
14 is asking.
15     Q.   You didn't mention either
16 Mr. Tierney or Mr. Mueller by name in your
17 report, did you?
18     A.   I did not.
19     Q.   And you didn't mention their
20 qualifications in your report?
21     A.   Correct.  Well, no -- no,
22 actually.  Well, I said they're professional
23 audio engineers, I think, in my report,
24 something like that.
25     Q.   And why didn't you mention them

Page 35

1  specifically in your report?
2      A.   Well, it was my report, my -- I
3  wrote the report myself.  They didn't --
4  they didn't write the report.  I didn't feel
5  it was necessary.
6      Q.   They're not testifying in this
7  lawsuit, correct?
8      A.   Not to my knowledge.
9      Q.   And they didn't submit a report,
10 correct?
11     A.   No, they didn't write a report.
12     Q.   How many times have you submitted
13 an expert report where you've worked with
14 other audio engineers?
15     A.   This is the first time.
16     Q.   And you said you submitted about
17 17 expert reports, correct?
18     A.   Correct.
19     Q.   And who selected Mr. -- or
20 Dr. Quackenbush to work with you?
21     A.   I did.
22     Q.   And how did you find him?
23     A.   I've known Dr. Quackenbush
24 since -- I think our first acquaintance was
25 in the late '90s, and he's a bit of an

Page 36

1  internationally known expert in the area.
2  He was a researcher at Bell Labs, has a
3  Ph.D. in electrical engineering from
4  Princeton.  And he's also head of the MPEG
5  Group, was one of the coauthors of the
6  original MPEG spec, and so on.  He's a very
7  well-known individual in our community.
8      Q.   And he works with you at NYU?
9      A.   He's an adjunct, teaching a
10 course, yes, C programming.
11     Q.   And how did you get in contact
12 with him?
13     A.   I'm forgetting whether it was an
14 e-mail or a phone call.
15     Q.   And what role did he have in this
16 lawsuit?
17     A.   In my report I explained the
18 process of preparing the files for
19 evaluation, and it's a manual process where
20 the files are prepared so they can be
21 compared much in the way that you would, you
22 know, put two photos on the same page to
23 look at them.  He helped get them ready for
24 analysis.  And that's something that can be
25 done manually, and I figured it could just

Page 37

1  as well be done by some software, so I
2  contracted him, I guess, to write some
3  software to automate the process due to
4  the large number of files we had to look at.
5      Q.   You referred to him as a vendor
6  in your report, correct?
7      A.   Yes.
8      Q.   Why did you do that?
9      A.   I thought that would appropriately
10 describe his -- you know, his function in
11 what he did.
12     Q.   Why do you think calling him a
13 vendor is an appropriate way to describe
14 Dr. Quackenbush?
15         MR. SHAFROTH:  Objection, asked
16 and answered.
17     A.   Oh, he performed a service for me.
18 I believe when someone performs a service,
19 you could call them a vendor.
20     Q.   Why didn't you call Mr. Tierney
21 and Mr. Mueller vendors?
22         MR. SHAFROTH:  Objection to form.
23     A.   It didn't feel like the
24 appropriate word to describe their
25 participation.  I didn't consider calling

10 (Pages 34 - 37)

Page 74

1  If -- who owns the -- I don't talk about
2  specifically who owns what.  That's -- I'm
3  taking that on, you know, attorneys told me
4  who owns what, but I am opining that
5  something was copied or -- well, nothing was
6  copied that I found actually, but if I
7  found something, I would say that, but I
8  didn't.  So I guess I don't understand the
9  question.  I mean, I am opining on whether
10 something was copied or not.  Who owns it,
11 I'm just taking that on face value from what
12 attorneys have told me.
13      Q.   Sure.  So your opinion is limited
14 to whether or not, you know, sets of files
15 are copies of each other, correct?
16      A.   Correct, that's the scope of my
17 report, yes.
18      Q.   Your report doesn't take the next
19 step and say that any particular copying is
20 copyright infringement, correct?
21      A.   In the -- well, it's implied if
22 there's a copy, there's a copyright issue.
23 But I think your question is asking me am I
24 making a legal conclusion or opining on who
25 owns what, which I've already said

Page 75

1  I -- that's outside the scope of my report.
2       Q.   Okay.  Let's take a look at
3  Exhibit 2, paragraph 8.
4       A.   Okay.
5       Q.   Let me know when you're there.
6       A.   I'm there, yeah.
7       Q.   If you look at paragraph 8 of
8  your amended report, it says you're being
9  paid $350 per hour for report writing; is
10 that correct?
11      A.   That's correct.
12      Q.   And $450 per hour for testimony?
13      A.   Yes, that's correct.
14      Q.   So you're being paid $450 per hour
15 for your testimony today, right?
16      A.   Correct.
17      Q.   And is that the rate you're being
18 paid at for your deposition preparation?
19      A.   I haven't made the bill for that
20 yet.  That was mentioned, that I could bill
21 that rate if I choose to.  That's at my
22 discretion.  I haven't decided yet.
23      Q.   Okay.  And when you wrote $350 per
24 hour for report writing, that also included
25 any analysis related to the report, correct?

Page 76

1       A.   That is correct.
2       Q.   Are you being paid directly?
3       A.   What do you mean by "directly"?
4       Q.   Are the checks being written to
5  you?
6       A.   To my company.
7       Q.   And what's your company?
8       A.   PAG Sound Services Incorporated.
9       Q.   And who is paying your company?
10      A.   I receive payment directly from
11 the -- from three record labels.
12      Q.   And who are those record labels?
13      A.   Warner, UMG, and I -- I have to
14 check.  I think it's Sony is the other one.
15      Q.   Do you know how Mr. Tierney and
16 Mueller are being paid?
17      A.   Yes.
18      Q.   How are they being paid?
19      A.   By PAG Sound Services.
20      Q.   So your company is paying their
21 rates?
22      A.   Correct.
23      Q.   What are their rates for this
24 case?
25      A.   $100 per hour.

Page 77

1       Q.   Overall, how much is PAG Sound
2  Services being paid for working this case?
3       A.   Oh, I haven't finished my billing
4  yet.
5       Q.   How much has PAG Sound Services
6  been paid?
7       A.   [REDACTED]
8       Q.   And did PAG Sound Services send
9  invoices to the three record labels for its
10 work in this matter?
11      A.   Yes.
12      Q.   Are those invoices in writing?
13      A.   PDF form.
14      Q.   Did they detail the services
15 performed?
16      A.   Just the hourly amount sound
17 recording analysis.
18      Q.   Is there any additional
19 information on those invoices?
20      A.   I don't believe so.
21      Q.   Do you have copies of those
22 invoices?
23      A.   Yes.
24      Q.   [REDACTED]
25 [REDACTED]

20 (Pages 74 - 77)

Page 78

1  A.  ▮
2  Q.  Prior to this case, what is the
3  most you ever billed for your expert work in
4  a case?
5  A.  ▮
6  ▮
7  ▮
8  Q.  How many total hours have you
9  worked on this case?
10  A.  I haven't -- I haven't totaled it
11  up yet.
12  Q.  Do you have a ballpark estimate of
13  how many hours you worked on this case?
14  A.  Estimate?  Sitting here, I'm just
15  trying to do the math in my head.  Yeah, I'd
16  just really be putting out a very general
17  ballpark at this moment.
18  Q.  Do you have a ballpark estimate
19  for how many hours you spent analyzing pairs
20  of digital music files to determine whether
21  one was a copy of another?
22  A.  It was in the hundreds.
23  Q.  Do you have a ballpark estimate
24  for how many hours Mr. Tierney spent doing
25  analysis for this case?

Page 79

1  A.  Probably in the hundreds as well.
2  Q.  When you say "in the hundreds," do
3  you mean between one and two hundred?
4  A.  Yes.
5  Q.  Do you have a ballpark estimate
6  for how many hours Mr. Mueller spent doing
7  analysis for this case?
8  A.  He did -- Mike did more than
9  Charles, but in the same ballpark.
10  Q.  Aside from you, Mike and Charles,
11  is your company paying anyone else for work
12  related to this case?
13  A.  We paid Schuyler for the custom
14  software he made for us.
15  Q.  Anyone else?
16  A.  No.
17  Q.  Is there any work in this case
18  that your company is not -- strike that.
19       Is there any work on this case
20  that your company is being paid for aside
21  from time spent doing analysis, time
22  preparing your expert report or time
23  preparing for your deposition?
24  A.  Could you ask the first part of
25  the question again?

Page 80

1  Q.  Is there any work on this case
2  that your company is being paid for, putting
3  aside the time you spent doing the sound
4  analysis, the time you spent preparing for
5  your -- time preparing the expert report or
6  the time preparing for your deposition?
7  A.  No.  I guess the deposition
8  itself today that -- I'm not sure who pays
9  for that at the moment, but...
10  Q.  ▮
11  ▮
12  A.  ▮
13  ▮
14  Q.  ▮
15  ▮
16  ▮
17  A.  ▮
18  ▮
19  ▮
20  Q.  ▮
21  ▮
22  A.  ▮
23  ▮
24  Q.  ▮
25  ▮

Page 81

1  A.  ▮
2  ▮
3  ▮
4  Q.  But you don't expect to be doing
5  any additional work on this particular case
6  after today; is that correct?
7  A.  There hasn't been any -- I
8  haven't been asked about that.
9  Q.  In your report you discuss three
10  methods of analysis that you've used; is
11  that correct?
12  A.  I do.
13  Q.  And one is critical listening?
14  A.  Is that a question?
15  Q.  Yes.
16  A.  What's the question, please?
17  Q.  One of those methods is critical
18  listening, correct?
19  A.  That doesn't sound like a
20  question.  Okay.  Yes, correct.
21  Q.  And how would you define "critical
22  listening"?
23  A.  "Critical listening," a compact
24  definition would be -- is the way trained
25  professionals in audio listen versus the way



21 (Pages 78 - 81)

Page 82

1  a lay listener would listen, in the way that
2  a lay listener listens for entertainment
3  typically for relaxation or any of these
4  things; whereas, a professional is listening
5  to the building blocks or sonic elements
6  of the sound, so they listen in a different
7  way, those elements being -- including
8  frequency, timbre, loudness, spatial
9  qualities, distortion, et cetera.  So it's a
10  different way of listening than, let's say,
11  a lay listener would listen.
12      Q.   A second method of analysis you
13  discussed is waveform comparison; is that
14  correct?
15      A.   That is correct.
16      Q.   Can you give a compact definition
17  of waveform analysis?
18      A.   Sure.  We have acoustic sound in
19  the air.  There's a microphone picks up
20  variations in sound pressure, creates what
21  we call a sound signal, which is a varying
22  signal, which is amplitude over time, and
23  that can be observed on an oscilloscope or
24  on a -- some software designed to analyze
25  sound recordings, and this can be a very

Page 83

1  informative way to compare two sound
2  recordings.  So it's a two-dimensional plot,
3  amplitude versus time.
4      Q.   And the third form of analysis you
5  discussed is spectrogram analysis; is that
6  correct?
7      A.   That's correct.
8      Q.   And can you give a compact
9  definition of spectrogram analysis?
10      A.   Well, whereas waveform analysis
11  is -- it displays two properties, spectral
12  can display three properties at one time;
13  spectral bands, intensity and time.
14      Q.   If you turn to paragraph 13 of
15  your report, you'll see that you wrote,
16  "Each of these techniques are used regularly
17  in litigations to authenticate and analyze
18  sound recordings as well."  Do you see that?
19      A.   Yes, I do.
20      Q.   How many copyright lawsuits are
21  you aware of where an expert testified in
22  court using any of these methods?
23      A.   Well, I have personally twice.
24  And all the cases I've listed involve some
25  combination of these three techniques.  And

Page 84

1  I would gather to say, in my career every
2  case I've used has used some combination of
3  these three techniques.
4      Q.   Sure.  So I'm just asking about
5  lawsuits where you're aware of an expert
6  testifying in court.  So you've testified
7  in court using these methods twice,
8  correct?
9      A.   In front of a judge and -- yes, in
10  front of a judge I have twice.
11      Q.   Aside from those two instances,
12  are you aware of any other lawsuits where
13  anyone testified in front of a judge using
14  any of these methods of analysis?
15      A.   Well, I know other experts are
16  regularly using these.  I don't have -- I
17  wasn't there in court watching them talk
18  about it, but I'm aware that people like
19  Randy Begault, for example, a very
20  well-known music forensic expert, has
21  testified on the other side of me.  And I've
22  seen other expert reports using these
23  methods as well.
24           But as far as firsthand knowledge
25  of standing in front of a judge, sitting

Page 85

1  here today, I just only have firsthand
2  knowledge of my two times.
3      Q.   So, sitting here today, the only
4  two examples that you could point to of an
5  expert testifying in court using any of
6  these methods are the two times where
7  you've testified in court; is that correct?
8      A.   With firsthand knowledge,
9  correct.
10      Q.   Do you have any second- or
11  third-hand knowledge of any specific
12  examples of an expert testifying in court
13  using any of these methods?
14      A.   I know other experts use these
15  methods.  I imagine they're in court, but I
16  don't have any very specific court cases I
17  could name for you right here.
18      Q.   And you didn't name any in your
19  report; is that correct?
20      A.   That's correct.
21      Q.   Okay.  If we turn back to
22  paragraph 13, you write, "For example,
23  forensic examiners also have long used these
24  techniques to authenticate and compare sound
25  recordings," do you see that?

22 (Pages 82 - 85)

Page 102

1 to determine if the contents of one were
2 copied in whole or in substantial part in
3 the other"?
4     A.   Yes, I see that.
5     Q.   When were you asked to perform
6 this analysis?
7     A.   Well, from the first time I was
8 contacted, I understood this was the
9 tasks at hand.
10    Q.   Who asked you to perform this
11 analysis?
12    A.   Initially, I don't recall the
13 attorneys I was talking to on that first.  I
14 don't remember whether Phil and Nate were
15 involved that early on, but counsel in
16 general.  That was my assignment.
17    Q.   And counsel provided you with two
18 sets of files to conduct your analysis,
19 correct?
20    A.   That is correct.
21    Q.   Do you know how they chose those
22 files?
23    A.   No.
24    Q.   Do you know where those files were
25 downloaded from?

Page 103

1     A.   I do not.
2     Q.   When you got this assignment, did
3 you have a predisposed view of how your
4 analysis was going to come out?
5     A.   Of course not.
6     Q.   When you got this assignment, did
7 anyone tell you what methods to use to
8 conduct the analysis, or was it up to you?
9     A.   It was up to me.
10    Q.   When you set about to do your
11 analysis, what methods did you consider to
12 compare the two sets of files?
13    A.   As laid out in my report, three
14 types, critical listening, waveform
15 comparison and spectral analysis.
16    Q.   Did you consider any methods and
17 then reject them?
18    A.   No.
19    Q.   What's a "phase inversion test"?
20    A.   A "phase inversion test" is
21 when -- and if we had a bit-for-bit copy and
22 we basically made mirror image of one of the
23 files and then added those two files
24 together, if they were bit-for-bit copies
25 the result would be zero, say, for some

Page 104

1 artifact.  So people -- you know, people use
2 that for -- you know, that would be one way,
3 one telltale that you may have a bit-for-bit
4 copy of your hands.
5     Q.   And you didn't think that test was
6 appropriate for this analysis?
7     A.   No, because we were not looking
8 for bit-for-bit copies.  We were just
9 looking for copies in the sense of, you
10 know, what's normal when a file is
11 transferred via, you know, analog to digital
12 or, you know, one's MP3, one's a wave, or a
13 DJ has it on the turntable and changes the
14 pitch, or it's been edited or something like
15 that.  I didn't feel like, you know, that
16 was appropriate for this task.
17    Q.   Were you given instructions on how
18 to conduct your analysis?
19    A.   No, the analysis as put forth in
20 my report is of my design.
21    Q.   You were not given any
22 instructions on how to conduct critical
23 listening analysis, correct?
24    A.   No.
25    Q.   You were not given instructions on

Page 105

1 how to conduct waveform comparison, correct?
2     A.   That's correct.
3     Q.   You were not given instructions on
4 how to conduct spectrogram analysis,
5 correct?
6     A.   That's correct.
7     Q.   Were you given any instructions
8 about your analysis?
9     A.   No, the methods of analysis
10 were at my discretion.
11    Q.   If you look at the next paragraph,
12 paragraph 48, could you read that paragraph
13 to me.
14    A.   "The first set of files are
15 identified in Column B in Appendix B.  These
16 files were provided to me by counsel over a
17 secured FTP server.  These files were
18 identified to me as true and correct copies
19 of commercially released sound recordings in
20 suit owned by the plaintiffs in this case.
21 I assume this to be true.  I refer to this
22 first set of files as the source set, and
23 each a source file."
24    Q.   What is the basis for your belief
25 that the source set was made up of

Page 118

1  given contain any additional facts or data
2  you considered in connection with your work
3  in this case?
4      A.   Which spreadsheet are you talking
5  about, the first version of this?
6      Q.   The first version of Appendix B.
7      A.   It was a long time ago.  I don't
8  recall the columns, but I believe all the
9  columns that were on that initial version
10 are still present here.
11     Q.   And it's your testimony that you
12 decided how the analysis for your report
13 would be done, correct?
14     A.   The methods were -- yeah, they
15 were prescribed by me as explained in detail
16 in my report.
17     Q.   And you decided what particular
18 elements of the dual audio files should be
19 kept track of in Appendix B?
20     A.   Well, the overarching -- the
21 overarching analysis is, as I state in the
22 report, that the target contained the source
23 in whole or in part, and these columns
24 simply reflect observations made while
25 making that determination.  So essentially

Page 119

1  any box in those -- any check mark or one in
2  those columns to the right indicate that
3  there's a copy in whole or in part.  And
4  these were just added observations.
5      Q.   Does your Appendix B show all of
6  the observations that were made about each
7  dual audio track?
8      A.   Those are the observations we
9  recorded.
10     Q.   And why --
11     A.   There might have been other
12 observations they made that didn't, you
13 know, I don't know, they liked the song or
14 the vocal sounds cool, or I mean, you know,
15 there are a lot of observations made.  I --
16 after doing several hundred of them myself,
17 I felt like, you know, this was a level of
18 detail appropriate for the Court, you know,
19 it might be of interest.  But again, the
20 overarching decision was whether one
21 contained a copy or not, and these were -- I
22 wanted to add a little higher level of
23 detail than just there's a copy or there
24 isn't a copy, so I created these columns.
25     Q.   Did you or your team find any

Page 120

1  errors in the spreadsheet that you were
2  working from?
3          MR. SHAFROTH:  Objection.
4      A.   No.
5          MR. SHAFROTH:  Vague.
6      A.   Could you ask the question again,
7  I'm sorry.
8      Q.   The question was:  Did you or
9  your team find any errors in the
10 spreadsheet that you were working from?
11     A.   I don't recall any issues with the
12 spreadsheet.
13     Q.   Did you or your team review any
14 audio files and then realize that
15 duplicative target files appeared later in
16 the spreadsheet?
17     A.   No.
18     Q.   Is it your testimony that each
19 target file appears just once in your
20 corrected Appendix B?
21         MR. SHAFROTH:  Objection,
22 misstates the testimony.
23     A.   No, that's not what I'm saying.
24 I'm saying we didn't run a check.
25     Q.   Was it important to you that each

Page 121

1  target file was unique?
2      A.   No.  I was tasked with filing
3  third column, filing fourth column, you
4  know, are these -- you know, is the -- you
5  know, the master question is the source in
6  the target.  I did notice, you know, I heard
7  the same song again several times.  It
8  didn't -- you know, it doesn't affect my
9  work.  I was just asked to compared this
10 file to that file and I did -- you know, I
11 did hear -- of course I heard the same tune
12 a few times, but I didn't -- but that's
13 okay.  That's part of my -- part of my
14 analysis.  I wasn't instructed, you know, if
15 you hear the same song, let us know.  I was
16 just going on what was given to me.
17     Q.   Did you listen to any additional
18 pairs of files that are not currently
19 reflected on your corrected Appendix B?
20     A.   I don't believe so.  I was working
21 from the spreadsheet, so my assumption is
22 they're all here.
23     Q.   Did your team listen to any
24 additional pairs of files that are not
25 currently reflected on this spreadsheet?

31 (Pages 118 - 121)

Page 134

1 copy of the source, in whole or in part;
2 that's the overarching observation.
3     And the other observations were,
4 you know, just more -- those were the types
5 of things we were seeing, whether it was a
6 DJ shoutout or an edit or phase-locked or
7 someone we were noting, things we were
8 seeing.
9    Q.   Did you ever discuss whether or
10 not the presence of particular elements such
11 as a DJ shoutout raised any questions about
12 whether a target file truly was a copy of a
13 source file?
14    A.   Well, that would be in my report
15 as, I believe, stated.  If the source file
16 was embodied in part or in whole into the
17 target file, you know, a DJ shoutout would
18 not render it not a copy or a copy in part
19 or in whole.  So if the source file was in
20 the target file and if it's a DJ shoutout,
21 it's still what we were calling a copy in
22 part or in whole.
23    Q.   Was that question or a similar
24 question ever raised on any of your weekly
25 check-ins?

Page 135

1    A.   What question are you talking
2 about?
3    Q.   Whether or not the presence of
4 something like a DJ shoutout or the remixing
5 of a track meant that a target file was a
6 copy or not a copy of a source file.
7    A.   Well, that was, you know, my
8 method, my determination.  I wanted to know
9 if they -- obviously if they didn't see
10 any copying, they shouldn't check any box.
11 So those were the observations they were
12 making, so I'm not sure of your question.
13 You're saying -- I made the determination
14 that that was still indeed a copy.  That
15 wasn't their determination.  If they didn't
16 see any of those things, then there would be
17 no check box and that would signal to me
18 that there was no copy.
19    Q.   And you made that determination
20 before the analysis began?
21    A.   What determination?
22    Q.   That the presence of a DJ shoutout
23 would not render a target file to be not a
24 copy of a source file.
25    A.   Well, I talked with the counsel

Page 136

1 and that was within the scope of what I was
2 doing, so my report talks about copying and
3 what my determination of a copy is very
4 clearly.  So when we talk about differences,
5 DJ shoutouts, signal-to-noise ratio, dynamic
6 remix, you know, I explain in my report for
7 the reader and for the Court to see what
8 my determination was, which was the
9 methodology I determined.  I'm not -- I
10 guess I'm not answering your question.
11     Of course, that was determined,
12 you know, as we went into the -- started the
13 sequence.
14    Q.   So it was not determined after you
15 began your analysis?
16    A.   Well, I did a -- you know, when I
17 got the -- when I initially got them, I
18 looked at a hundred or so, I forgot how
19 many, just to see what type of -- what
20 observation that I was hearing and discussed
21 it with counsel and --
22     You know, in my work as an expert
23 witness, a DJ shoutout would not preclude
24 some issue with copyright.  So the
25 decision -- you know, I guess, thinking

Page 137

1 back, I made the decision of what's a copy
2 or not based on my work in the field.
3     You know, I would get called in on
4 a case, let's say it's not unreasonable that
5 there's a remix and someone wants to know,
6 hey, is this an issue because my source file
7 is in their target file using the same
8 language.  I know that's something that, you
9 know, is considered copying in the industry.
10 So I had an idea of what copying was before
11 we started.
12     The type of copying we were seeing
13 I didn't know until I looked at some of
14 them, because I -- you know, I just didn't
15 know what these files were that I was
16 presented with.  You know, here's a source,
17 here's a target, and I looked at a couple of
18 them, created the check boxes to make, you
19 know -- so someone could review our work and
20 see what observations we made.
21    Q.   Sure.  Those decisions were not
22 made based on any copyright statutes or
23 judicial decisions about copyright law,
24 correct?
25    A.   Well, I would say it's related to

35 (Pages 134 - 137)

Page 174

1 that a target file was a copy of a source
2 file if you didn't yourself zoom in and out
3 of the waveform and spectrogram?
4     A.   Give me an example.
5     Q.   If one of the other audio
6 engineers that you worked with looks at the
7 waveform and spectrogram, but you never did,
8 could you conclude that the target file they
9 were looking at was a copy of the source
10 file?
11    A.   Well, we've been through this.
12 They were following my methods.  And I have
13 utmost in confidence, and this isn't a
14 difficult task.  So they were given very
15 clear instructions.  And I didn't have my
16 hand on the mouse, but they were following
17 my three-part methods, and given their
18 experience and what I was asked to do, I
19 have absolute confidence in what they did.
20 I'm not sure what you're asking.
21    Q.   We covered this a little bit
22 before, but you and the other audio
23 engineers did not always listen to the
24 entirety of each audio file, correct?
25    A.   That's correct.

Page 175

1     Q.   You would listen to the portions
2 of the audio files that you thought were the
3 most relevant to making a determination?
4     A.   Well, it's a three-part analysis,
5 and you can learn different aspects from
6 different aspects -- different aspects from
7 different observations.  So as I put in my
8 report, I give a nice example where critical
9 listening could involve listening to a few
10 bars, making an inventory of instruments,
11 noting -- critically listening to those
12 instruments, now repeating the process in
13 the second file, and, you know, comparing
14 the results going back and forth and so on.
15         For our purposes doing that for a
16 portion, and the portion comes up, yeah,
17 it's the same artist, same drum sound, same
18 guitar sound, so on, and we do that in a
19 couple of spots.  That coupled with viewing
20 the entire spectrogram in both faded out --
21 I'm sorry, zoomed out and also zoomed in,
22 scanning through the whole program, combined
23 with looking at the waveforms to check for
24 matches there, the three processes work
25 together and form different things.  Looking

Page 176

1 at the waveform, you can't tell it's Bruce
2 Springsteen, but listening you can.
3         So the processes perform different
4 functions, and with our methodology it
5 wasn't necessary to listen to the entire
6 file.  I was confident with our method of
7 using portions to identify the artist and
8 the same type of production and so on.
9     Q.   You testified earlier that each
10 audio file was listened to at least about 30
11 to 40 seconds; is that right?
12    A.   Yeah, that's an estimate.
13    Q.   And some audio files you listened
14 to the whole thing; is that correct?
15    A.   That's correct.
16    Q.   Could you sort of ballpark an
17 average of how much each audio file was
18 listened to?
19    A.   I think you just did.
20         MR. SHAFROTH:  Objection, asked
21 and answered.
22    Q.   Was it more common for you to
23 listen to 30 or 40 seconds of an audio file
24 or more common for you to listen to two
25 minutes of an audio file?

Page 177

1     A.   Well, those are the two -- those
2 are the two extremes, maximum/minimum.
3     Q.   Well, was one more common than the
4 other?
5     A.   Well, the average lied above the
6 minimum and below the maximum.  Yeah, the
7 average lied between listening to all of it
8 or listening to, as we mentioned, 30 to 40
9 second portion, and -- yeah.
10        So I don't understand the
11 question.
12    Q.   So you didn't keep track of how
13 much each audio file was listened to,
14 correct?
15    A.   Correct, we didn't notate that.
16    Q.   Let's jump to paragraph 81.  Let
17 me know when you're there.
18    A.   Okay.
19    Q.   The first sentence says, "Using
20 critical listening, waveform and spectrogram
21 analysis, I and my team compared each source
22 sound recording to the corresponding target
23 sound recording with great care," do you see
24 that?
25    A.   I do.

Page 182

1 methodology, which has checkpoints built
2 into it because it's a three-part
3 evaluation.  So I feel my method is
4 bulletproof, if you will, and if they
5 followed it, I have absolute confidence.
6 You know, verification -- I'm not sure what
7 you mean by "verification."
8     Q.   The next sentence in paragraph 81
9 says, "This analysis took place over eight
10 weeks and was divided among three
11 professional audio engineers," do you see
12 that?
13     A.   I do.
14     Q.   Do you recall when exactly you
15 began the analysis to compare two sets of
16 digital files?
17     A.   Well, it was a long process of,
18 excuse me, like we spoke about, I was given,
19 excuse me, an initial set, which I did all
20 on my own, and then I brought in Mike and
21 Charles, once I was sure I had -- I
22 understood what the task at hand was and
23 verified that my system was working well.
24          So that took place, you know,
25 between, you know, the first of the year

Page 183

1 until we handed in the report.
2          The bulk -- this is referring to
3 the bulk of the work was approximately eight
4 weeks out from maybe -- let's say, you know,
5 the report was handed in, they finished up
6 their work about a week before or so and
7 then I was working on the report.  So we
8 could do the math and figure it out.  About
9 nine weeks before the report was handed in
10 is when we got into the bulk of the
11 analysis; although, my analysis started
12 before that.
13     Q.   Sure.  So this eight weeks refers
14 to, you know, the eight or nine weeks prior
15 to when you submitted your report, correct?
16     A.   That's what I'm referring to here,
17 yes.
18     Q.   Do you know how many audio file
19 pairs were reviewed each week over the
20 course of these eight weeks?
21     A.   Per week, I mean, sitting here,
22 no.  I mean, we could do some math on a
23 napkin and approximate it.  The weeks
24 were -- it was fairly evenly distributed
25 amongst the weeks.

Page 184

1     Q.   But you don't have a way to tell
2 me how many you reviewed in the first week
3 or how many Mr. Tierney reviewed in the
4 first week, correct?
5     A.   I don't have that documented
6 sitting here.
7     Q.   And you also don't have the
8 ability to tell me how many hours you or any
9 of the particular audio engineers spent in
10 any particular week, do you?
11     A.   Sitting here, I would -- I would
12 just do some math to figure it out, but I
13 don't have any stats for you right here.
14     Q.   Sitting here can you identify when
15 particular audio file pairs were reviewed?
16     A.   Well, as we discussed, the bulk of
17 them was over this eight-week period as I
18 put forth in my report.  That's accurate.
19 Although, I started perhaps a little before
20 that with like a sample set.
21     Q.   Sure.  So let me rephrase that.
22          If I picked out a particular page
23 of your Appendix B, would you be able to
24 tell me what week they were reviewed in?
25     A.   Sitting here, no.

Page 185

1     Q.   And you wouldn't be able to tell
2 me who in particular reviewed any audio file
3 pair, correct?
4     A.   Sitting here today, no.
5     Q.   So the next sentence in paragraph
6 81 says, "I found that, without question,
7 the performances and sounds embodied in the
8 source sound recordings," I think that's a
9 typo and should say, "were embodied," "in
10 whole or substantial part, in all of the
11 target recordings listed in Appendix B"; is
12 that correct?
13     A.   Yes.
14     Q.   You can't tell who downloaded the
15 files just by listening to them, correct?
16     A.   I'm not sure what you're asking
17 me.
18          MR. SHAFROTH:  Objection, vague.
19     Q.   My question was:  You can't tell
20 who downloaded the files just by listening
21 to them, correct?
22     A.   Could you give me an example?  I
23 don't --
24          MR. SHAFROTH:  Just for the
25 record, I have an objection, vague.

Page 266

1  don't write reports, you get paid for some
2  of those opinions, correct?
3     A.    More often -- more often not than
4  I do.
5     Q.    As part of your job as professor,
6  you evaluate student work, correct?
7     A.    Certainly.
8     Q.    Do you evaluate written work?
9     A.    Yes.
10    Q.    If seven of your students handed
11 in a paper with identical paragraphs, would
12 you question the extent to which they wrote
13 their papers?
14    A.    Sounds like a case of plagiarism
15 that you're discussing.  What's the -- oh,
16 never mind, you're asking the questions.
17         MR. SCHER:  Sure, let's go off the
18 record.  I might be done actually.
19         THE VIDEOGRAPHER:  The time is
20 9:58 and we're now off the record.
21         (Recess.)
22         THE VIDEOGRAPHER:  The time is
23 10:02 and we are now back on the record.
24         MR. SCHER:  I have no further
25 questions.

Page 267

1          MR. SHAFROTH:  I do not have any
2  questions.
3          MR. HILL:  No, I do not.  Thank
4  you.
5          THE VIDEOGRAPHER:  The time is
6  10:03 and we are now off the record.
7          MR. SCHER:  I took a realtime
8  link, I want rough and I get a three-day
9  expedite.
10         MR. SHAFROTH:  Realtime and rough
11 and three day.
12         (Time noted:  10:03 p.m.)
13         _____
14             PAUL GELUSO
15
16 Subscribed and sworn to before me
17 this ___ day of _____, 202_.
18
19 _____
20     Notary Public
21
22
23
24
25

Page 268

1       C E R T I F I C A T E
2  STATE OF NEW YORK   )
3              : ss.
4  COUNTY OF NEW YORK  )
5
6          I, THERESA TRAMONDO, a Notary
7  Public within and for the State of New York,
8  do hereby certify:
9          That PAUL GELUSO, the witness
10 whose deposition is hereinbefore set forth,
11 was duly sworn by me and that such
12 deposition is a true record of the testimony
13 given by the witness.
14         I further certify that I am not
15 related to any of the parties to this action
16 by blood or marriage, and that I am in no
17 way interested in the outcome of this
18 matter.
19         IN WITNESS WHEREOF, I have
20 hereunto set my hand this 18th day of
21 October, 2021.
22
23         *[signature: Theresa Tramondo]*
24            THERESA TRAMONDO
25

Page 269

1  ------------- I N D E X --------------
2  WITNESS     EXAMINATION BY      PAGE
3  P. GELUSO   MR. SCHER           6
4
5  -------- INFORMATION REQUESTS ---------
6  DIRECTIONS:  (NONE)
7  RULINGS:  (NONE)
8  TO BE FURNISHED:  (NONE)
9  REQUESTS:  (NONE)
10 MOTIONS:  (NONE)
11 CONFIDENTIAL:  (NONE)
12
13 -------------- EXHIBITS ---------------
14 EXHIBIT GELUSO                FOR ID.
15
16   Exhibit Geluso 1, Tab 1, 538        59
17   pages, copy of the Expert Report
18   of Paul Geluso, dated 5/27/2021,
19   no Bates stamps
20   Exhibit Geluso 2, Tab 2, 538        65
21   pages, Amended Expert Report of
22   Paul Geluso, dated 6/18/2021, no
23   Bates stamps
24   Exhibit Geluso 3, document,        215
25   filing in case Bassil versus