# Plaintiffs' Exhibit 7

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

WARNER RECORDS, INC., et al.,       )
                                    )
        Plaintiffs,                 )
                                    )   Case No.
    vs.                             )   1:19-cv-00874-RBJ-MEH
                                    )
CHARTER COMMUNICATIONS, INC.,       )
                                    )
        Defendant.                  )

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Videotaped deposition of SANDEEP CHATTERJEE, PH.D., taken remotely before NADINE J. WATTS, CSR, RPR, and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, commencing at 9:35 a.m. Central Standard Time on the 5th day of October, A.D., 2021.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 42

1 THE WITNESS: So I think what I'm stating, and I
2 used the word reliable in my report, and I think I used
3 the word reliable to explain this to you, from a
4 technical perspective what the MarkMonitor system did
5 is -- does not reliably indicate anything. It does not
6 indicate that the -- that the peer was actually in
7 possession of anything. It does not indicate reliably
8 that the peer was, using your words, sharing anything.
9     And so it simply goes to the technology and
10 the technical analysis that I did, and, again, as
11 confirmed by Dr. -- or Ms. Frederiksen-Cross, that what
12 the notices purport to say, how the technology -- the
13 MarkMonitor technology purports to act, and what the
14 actual system does and what the notices actually show
15 are two different things.
16     MR. GOULD: Q   So we're going to get into this a
17 fair bit. So I'll try and just touch on it briefly
18 here. But I think what you're saying, and this is
19 consistent with what you've written, Dr. Chatterjee, is
20 something maybe a little different than the notices are
21 wrong, but you didn't see sufficient information to
22 confirm that the notices were right; am I characterizing
23 that correctly or fairly?
24     A   Basically the notices do not show what they

Page 43

1 purport to show. So, in a sense, yes, I agree with you.
2 I'm not sure exactly the language that you used. But
3 like I've explained, the notices, what they're supposed
4 to show or purport to show are not what they actually
5 show.
6     Q   I want to ask you some additional questions
7 about your background, and I'm going to focus on audio
8 fingerprinting technology. Do you have any education --
9 any background or education in audio fingerprinting?
10     A   I think that's a very broad question. You can
11 do fingerprinting in a lot of different ways. For
12 example, you can take an audio file and run a hash
13 algorithm on it and you can state that is a fingerprint.
14     So to the extent that you're asking have I done
15 hashes, yes, I am familiar with hashes, both from an
16 academic, educational perspective, as well as from a
17 real-world professional perspective.
18     Q   You're familiar with the Audible Magic content
19 identification service through this case?
20     A   Yes, I have reviewed their source code. I think
21 I mentioned that I also went to an inspection as well.
22     Q   So let me back up actually, just picking up on
23 one thing you said. You described a hash of an audio
24 file. One way to describe that is a fingerprint?

Page 44

1     A   Depending on the hash algorithm used, yes,
2 people do refer to hashes sometimes as fingerprints.
3     Q   Do you have any background in audio content
4 identification specifically?
5     A   If you're asking do I listen to music, yes, I
6 listen to music, and I can tell you if I've heard a song
7 before or something like that. So, yes.
8     Q   What kind of music do you like?
9     A   I think it's changed as I've gotten older. I
10 like slower, less louder music as I've gotten older.
11 But, yes, I think I like like just like jazz and things
12 like that now days more than I did before.
13     Q   So I wasn't asking you if you were listening to
14 music, but I'm glad to hear you're a music fan. Maybe
15 it's important obviously. I'm talking about audio
16 content identification through software.
17     So prior to this case do you have any
18 background with the technology of identifying audio
19 content through a technical analysis of digital audio
20 files?
21     A   I believe I've known that there are different
22 techniques of, for example, performing 48 transforms and
23 things like that on different types of input. There are
24 different ways of analyzing frequencies that are in

Page 45

1 music. So from that perspective, from a basic
2 perspective, from an educational perspective, yes, I do
3 have that background.
4     With regards to the specific Audible Magic
5 technology, no. Prior to working on this case and prior
6 to looking at Audible Magic, I was not familiar with
7 Audible Magic's specific technology.
8     Q   So you've heard of or you're aware of technology
9 that exists for audio content -- for identifying audio
10 content through technical analysis. And prior to this
11 case you have not personally had any experience with
12 those matters?
13     A   I think you summarized it correctly, but I do
14 want to clarify. I wasn't saying specifically with
15 regards to audio identification. I'm simply saying that
16 I believe it's fundamental basic technology that you can
17 analyze audio files, whether it's music or voice, to try
18 to identify, for example, a speaker or to try to match
19 up text that a speaker may be trying to say.
20     So what I was essentially saying was that I
21 believe it's pretty well and -- well-understood that you
22 can look at different frequencies. There are different
23 things you can look at, whether it's an audio file,
24 whether it's a music file, whether it's a voice file.

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 82

1  Q   And the modified hash that you described for
2  eDonkey you reference in paragraph 61 of your report is
3  sometimes referred to as an ED2K hash, correct?
4  A   Yes.
5  Q   The hash is determined -- Strike that.
6      The hash for a file is determined by an
7  algorithm based on the binary contents of the file,
8  correct?
9  A   I'm sorry, say that again.  I didn't understand
10 your question.
11 Q   An algorithm determines the hash based on the
12 binary contents of the file?
13 A   Yes, the input to the algorithm would be the
14 binary bits and bytes of the file.  And the algorithm is
15 simply the calculations that are performed on those bits
16 and bytes, and the output is the hash value.
17 Q   And the hash value -- the algorithmic hash value
18 is not determined based on external data, such as --
19 Strike that.  Let me try it again.
20     The hash value is not determined by external
21 metadata, such as a file name?
22 A   Well, you could have -- you could use the file
23 name or you could use other metadata if you wanted to.
24 But, typically, when you're talking about computing a

Page 83

1  hash of a file, you're typically talking about the
2  contents of the file, not -- not the file name or other
3  metadata.  But just to be clear, you can do whatever you
4  want with the -- with a hash algorithm.
5  Q   You don't contend that the hashes that
6  MarkMonitor used for detection purposes were based on
7  external metadata, such as file name, do you?
8  A   Well, there are a lot of hashes that are
9  involved in the BitTorrent protocol.  We've -- I believe
10 my report talks about it.  But there is something called
11 an infohash, which is the hash over a particular portion
12 of the dot-torrent file.  But if you're talking about
13 the SHA-1 hash of the actual payload, the content, my
14 understanding is that it's the actual contents, what
15 you're saying as the binary bits and bytes.  That is my
16 understanding.
17 Q   So if the contents of the file change and you
18 get the hash, you'll get a different hash, right?
19 A   With the caveat that if you're talking about a
20 good hash algorithm, for example, like SHA-1, yes.  If
21 the contents of a file are between two different files,
22 they're different, the output resultant hash value would
23 be different.
24 Q   And so even if one bit or byte of the binary

Page 84

1  content of the file changes, then you get a different
2  hash, right?
3  A   Yes, even if one bit changes, you would have a
4  different byte, which would result in a different hash.
5  Q   But if two different digital files have the same
6  hash value, that means the files have the same content,
7  correct?
8  A   Again, with the caveat if you're talking about
9  like a good hash, like SHA-1 or other things, and if you
10 actually calculate a hash on two different files -- say
11 if you actually run the hash algorithm on file A and you
12 run the same algorithm on file B, then they should have
13 the same resultant hash value.
14 Q   Dr. Chatterjee, you keep referencing good hash
15 algorithm.  I want to make sure that we're just using
16 the same language throughout the day.  So I'm talking
17 about the SHA-1 hashes, which you've agreed is a good
18 cryptographic hash algorithm, correct?
19 A   Yes, it's regarded as a good hash.  And, like I
20 mentioned, I think there's only been one or a very low
21 handful of collisions that have been identified for
22 SHA-1.  So, yes, it is a good algorithm.
23 Q   Are you contending that any of the hash
24 algorithms that are used and at issue in this case are

Page 85

1  something other than good hash algorithms?
2  A   When you say am I contending, like from a
3  technical perspective?  I think I've explained to you
4  that MD4 is not well-regarded as a good hash algorithm.
5  I'm not contending that ED2K, which is based on MD4, is
6  good or bad.
7      So I think from a technical perspective I do
8  have a contention that MD4 is not the greatest hash.
9  But I think for purposes of my report, or of my two
10 reports, I'm not really contending those.  But from a
11 technical perspective, yes, MD4 may not be the best
12 hash.
13 Q   You mentioned the infohash.  Infohash is used in
14 the BitTorrent protocol, correct?
15 A   Yes.
16 Q   And infohash is a unique hash identifier for a
17 torrent, correct?
18 A   The infohash is a hash over the info portion of
19 the dot-torrent file.  That's all it is.
20 Q   Turn to page -- paragraph 164 of your report.
21 You say in the second line, each torrent has a unique
22 identifier, which is known as infohash, correct?
23 A   And then I state, and it is a SHA-1 hash
24 calculated over a portion of the torrent file for a

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 246

1 pointing to this single document.  There are a lot of
2 other documents and -- that I've cited to in my two
3 reports.
4     MR. GOULD:  I have no further questions.  Dr.
5 Chatterjee, thank you for your time.  I appreciate it.
6     MR. HAMSTRA:  I will -- I don't have any further
7 questions.  I will reserve signature.
8     I think we should probably designate this, at
9 least provisionally, as Highly Confidential, Attorneys'
10 Eyes Only for the third-party evidence discussed.
11     THE VIDEOGRAPHER:  Okay.  The time is approximately
12 6:16 p.m.  We are going off the video record.

Page 247

1 STATE OF ILLINOIS  )
            ) SS:
2 COUNTY OF C O O K  )
3     The within and foregoing deposition of the
4 aforementioned witness was taken before NADINE J. WATTS,
5 CSR, RPR and Notary Public, at the place, date and time
6 aforementioned.
7     There were present during the taking of the
8 deposition the previously named counsel.
9     The said witness was first duly sworn and was
10 then examined upon oral interrogatories; the questions
11 and answers were taken down in shorthand by the
12 undersigned, acting as stenographer and Notary Public;
13 and the within and foregoing is a true, accurate and
14 complete record of all of the questions asked of and
15 answers made by the forementioned witness, at the time
16 and place hereinabove referred to.
17     The signature of the witness was not waived,
18 and the deposition was submitted, pursuant to Rules
19 30(e) of the Rules of Civil Procedure for the United
20 States District Courts, to the deponent per copy of the
21 attached letter.
22     The undersigned is not interested in the
23 within case, nor of kin or counsel to any of the
24 parties.

Page 248

1     Witness my official signature and seal as
2 Notary Public in and for Cook County, Illinois on this
3 8th day of October, A.D. 2021.
4
5     *(signature: Nadine J. Watts)*
    NADINE J. WATTS, CSR, RPR
6     License No. 084-002736
    Notary Public
7     One North Franklin Street
    Suite 3000
8     Chicago, Illinois 60606
    Phone:  (312) 442-9087

Page 249

1     Veritext Legal Solutions
    1100 Superior Ave
2     Suite 1820
    Cleveland, Ohio 44114
3     Phone: 216-523-1313
4
    October 8, 2021
5
    To: NATHAN M. HAMSTRA
6
    Case Name: Warner Records, Inc., et al. v. Charter Communications,
7 Inc.
8 Veritext Reference Number: 4822026
9 Witness: Sandeep Chatterjee, Ph.D.   Deposition Date:  10/5/2021
10
    Dear Sir/Madam:
11
12 Enclosed please find a deposition transcript.  Please have the witness
13 review the transcript and note any changes or corrections on the
14 included errata sheet, indicating the page, line number, change, and
15 the reason for the change.  Have the witness' signature notarized and
16 forward the completed page(s) back to us at the Production address
    shown
17
    above, or email to production-midwest@veritext.com.
18
19 If the errata is not returned within thirty days of your receipt of
20 this letter, the reading and signing will be deemed waived.
21
    Sincerely,
22
    Production Department
23
24 NO NOTARY REQUIRED IN CA