# Plaintiffs' Exhibit 11



# Evaluation of the MarkMonitor AntiPiracy System
*December 5th 2013*

## Overview
The Center for Copyright Information (**CCI**) has requested an independent review of MarkMonitor's AntiPiracy system, used to automatically detect and send notices of unauthorized distribution of copyrighted materials over various popular file-sharing mechanisms such as eDonkey, Gnutella, Ares, and BitTorrent. A primary goal of this system is to detect and notify as many alleged infringers as possible while never producing infringement notices for people who are not distributing copyrighted material. The content owners desire that independent review be done to ensure the "accuracy and security" of the methodologies employed.

The system was previously evaluated by Stroz Friedberg and a report was produced outlining various goals and methods of the evaluation as well as conclusions reached as a result of the evaluation. For various reasons, the present report has been requested by CCI as a means of determining the validity and completeness of these earlier findings.

This document explores the MarkMonitor system along the following fundamental axes as guided by the Memorandum of Understanding:
- **Design** of the system in accordance with stated accuracy goals,
- **Security** of personally identifying information and protected content,
- **Reliability** and robustness of implementation, and
- **Verifiability** of collected materials.

As described in further detail in this document, we have found that the AntiPiracy system
- Is designed to correctly identify file sharing without generating false positives,
- Undergoes testing to increase confidence in the implementation of the design, and
- Generates thorough case data for alleged infringement tracking.

There are, however, aspects of the system that we believe must be improved:
- Consistent and regular end-to-end (whole-system) testing,
- Improved verification approaches, including tamper-evident infringement case data,
- Tighter and more principled controls over employee access to sensitive data.

## Materials Relied Upon
As source material for this report, Harbor Labs has been provided the following:
- The Memorandum of Understanding (**MOU**),
- The unredacted Stroz Report,
- MarkMonitor system design documentation, and
- Interviews with Mark Monitor and CCI staff.

3 Thornhaugh Ct., Baltimore, MD 21208  
PHONE 410-415-3305  
FAX 410-264-2406  
WEB www.harborlabs.com

# Background

The MPAA and RIAA (**Owners**) have a vested interest in detecting and sending notice of alleged infringement activity, particularly via file sharing and uploading. To this end, they make use of a system developed and maintained by MarkMonitor that automates much of the detection and notification process.

Among the system desiderata are the discovery of as much allegedly infringing activity as possible (high recall) and zero tolerance for incorrect notices sent to innocent internet users (high precision). Such a system has many moving parts, involves human activity and judgment, and stores and maintains both copyrighted and sensitive data. As such, it has been represented by the CCI that the importance of high precision and data security generally outweigh considerations of high recall, and the content of this report will reflect that.

We assume that the reader has read at least the publicly-available redacted Stroz Report, and will therefore be able to note the places where this report diverges from it without explicit assistance.

## The MarkMonitor AntiPiracy System

The MarkMonitor AntiPiracy system is designed to monitor popular peer-to-peer networks, discover and verify copyrighted materials, and generate evidence of infringement. In this section, we briefly provide a high-level description of how this system works.

### Query Generation and Search

On a periodic basis, Owners send new titles targeted for monitoring and notice generation. Using keywords derived from these titles, MarkMonitor employs a variety of search methods to search the Internet for shared copyrighted content.

When new content is matched, automated P2P network scanning agents can begin tracking it immediately. However, unless the content is verified as described in the following section, it cannot be used to generate infringement notices.

### Unverified Content

The first time new content is matched based on a search query, MarkMonitor analysts download the entire content using standard client software to determine if it is a targeted copyrighted work. MarkMonitor engineers clarified how content is determined to be new. When a new torrent file is discovered, based on its unique info hash, it is checked against other torrent files in a database. If the torrent file is new, the content is considered to be unverified and the complete content file must be downloaded.

Once the content file is downloaded, a complete SHA-1 hash of the content is stored together with the torrent file and information about the time and location of collection. An entry is then made in a database indicating that the content is not yet verified. Note that, for the sake of clarity and precision, we will refer to the hash of the creative content as the "content hash".

If the content hash of a newly downloaded work matches a previous content hash, the two files (and their torrent files) are also associated. If new content matches previously verified works, the new content is also determined to be verified.

When new content cannot be verified from previous content, MarkMonitor analysts are required to perform a verification process. In the case of audio files, verification is performed by Audible Magic audio fingerprinting software. In the case of video, the verification is performed by a staff member watching substantial selected portions of the content. When the video length is less than 45 minutes, this involves viewing the entire content.

Based on the verification process, the content is marked appropriately in the database, e.g., as "Verified" or "Fake".

### Evidence Collection and Notifications

MarkMonitor P2P collection agents join BitTorrent networks and attempt to download at least one full BitTorrent piece from a peer node. It hashes the piece and verifies that it is correct based on the expected hash listed in the torrent file. The agent also collects information about the peer and stores this data in MarkMonitor's central database.

The case for infringement is built by ensuring that the suspected IP address is reachable, is running a file-sharing client, and is making the suspected content available. Once that verification is provided, with logging of times, locations, and packet exchanges attached, a notice containing relevant information is generated that is sent to the ISP that owns the suspected IP address. The ISP then generates an alert from this information and attempts to send it to the appropriate customer.

### Accuracy Metrics

The MarkMonitor system is fundamentally an *information retrieval* system: its purpose is to collect a particular kind of information, and it has an embedded notion of "desirable" and "not desirable" (alternatively "useful" and "indifferent") data. The behavior of information retrieval systems is normally measured and reported in terms of *precision and recall*.

A system with high *recall* will tend to find most of the desired information available while passing over very little of it. A system with high *precision* is one in which the majority of the information obtained is deemed desirable or useful.

Taken separately, these measures are not generally useful. A system with perfect recall and no care for precision might, for example, simply collect virtually *everything* indiscriminately. A system with perfect precision but no consideration for recall might collect virtually *nothing*, or at least be overly selective and miss large amounts of useful information. Thus, it is important that both measures be used together when validating the behavior and effectiveness of an information retrieval system. As these are well-studied and well-understood concepts in the field of information retrieval, there is little need to reinvent them.

One of the goals of the MarkMonitor system as stated by the CCI and the MOU is "accuracy": to build as many valid infringement cases as possible, while never producing an erroneous or misdirected notice. Stated more precisely in standard information retrieval terms, it would be defined thus:

> ***Accuracy: high recall is desired, perfect precision is required.***

This is the definition that will be used for the purposes of this report, as it clarifies the kinds of measurements necessary to make any kind of meaningful statement about system accuracy.

# Findings

We have reviewed the provided materials and information and, to the extent possible, made determinations about how the AntiPiracy system works as well as the practices and policies that surround its operation. Our findings are divided into several categories, detailed below.

## Design

Based on the materials and information provided, we believe that the design of the MarkMonitor AntiPiracy system meets CCI's goal of perfect precision under certain assumptions, stated below. So long as these assumptions are valid, correct implementations based on this design will identify verified, targeted content uploaded by BitTorrent peers.

The following conditions are assumed for the correctness of the design:
1. All content marked in the database as "verified" is, in fact, property of the Owners targeted for enforcement,
2. The same torrent file (or a torrent file with a matching info hash) that was used to download the content for the verification step is also used for downloading a complete piece from a file sharer for the evidence generation step, and
3. The software, databases, and so forth are functioning correctly and not subject to tampering or corruption.

Under these conditions, the hash of the piece the agent downloads is verified against the expected hash of that piece from the torrent file. Any mismatch is rejected. Moreover, these assumptions guarantee that same expected hash from the torrent file was used to verify the piece that was downloaded and verified by MarkMonitor analysts. Accordingly, the uploaded piece must be the same as the piece from the verified file.

A correct design does not guarantee correctness of outcomes, as noted in our assumptions. CCI has represented to us that, while an appeals process exists for users who believe that they have incorrectly received a notice, never in the history of the system's operation has a single successful appeal been filed that accused the MarkMonitor system of content misidentification. This is a good sign that precision desiderata are currently realized, and is likely due to the fact that precision was part of the original design parameters of the system as described above.

To our knowledge, however, CCI's appeal record is the only potentially actionable measure of precision present in the operation of the system: MarkMonitor does not appear to collect or monitor other precision-relevant metrics on the live system, and this is consistent with the information we have obtained in communications with MarkMonitor staff. This is important because it means that precision problems (leading to misidentification of content or potential infringers) can *only* be identified post facto: the damage will have already been done.

## Security

The MarkMonitor system touches essentially two types of data that require security: copyrighted or otherwise privately-controlled content, and Sensitive Data (defined below). Both types of information are important and access to them should be both secure and auditable according to the MOU.

Perfect data security is generally impossible to achieve when that data must be accessed in order for functions to be performed, and the MarkMonitor system is no exception: the data must be useable to some extent by human reviewers, automated agents, and company employees. Opportunities for exploitation or inappropriate acquisition of sensitive information occur at every point in a system where information crosses established security boundaries or is otherwise made accessible.

### Copyrighted Content

At least some of the content that the MarkMonitor system collects from file sharing networks is copyrighted. This content is stored in a database or repository with metadata such as file and file portion hashes, titles, and review status markers. Storing content and information in this way allows for verification by human review as well as more efficient subsequent discovery of potentially infringing uploads.

MarkMonitor has direct oversight from the Owners, who control some of the content that has been downloaded into the MarkMonitor database. This direct relationship is a natural motivator to focus on protecting the data that these parties own. As reported to us by MarkMonitor employees, only employees of MarkMonitor have access to any of the data in the database, and to the collection agents operating in the field.

This is a reasonable security measure to take, as it limits the potential attack surface for obtaining copyrighted content illegitimately. That said, the attack surface may still be unnecessarily large.

### Sensitive Data

In evaluating issues of privacy with the MarkMonitor system, we recognize that there are a number of terms that can have specialized meanings beyond their normal definitions. The term "sensitive," for example, can have industry and legal ramifications. In another example, we are aware that the question of whether IP addresses are Personally Identifiable Information (PII) is the subject of significant debate among security researchers, various courts, and the public square. We take no such position on these legal and industry definitions. Our goal is simply the identification of privacy failure in practice, regardless of the terms applied.

Accordingly, we will describe the data collected by MarkMonitor as "sensitive" in the ordinary and common use of the word. Such data has the potential for use in violating privacy and must be treated with care.

It should be noted that MarkMonitor is collecting data that is freely shared on a peer-to-peer network. It is possible for anyone to connect to a BitTorrent network, for example, and collect the kind of data that MarkMonitor uses in generating its infringement allegations. However, there are at least two reasons why MarkMonitor's data collection is a greater potential privacy threat than anything collected by an individual.

The first reason is simply the size of the collection. Data in aggregate is often capable of piercing anonymity even when the individual pieces of information cannot. Sundry security researchers have demonstrated how individuals can be identified from aggregated "anonymized" information.

The second reason is MarkMonitor's working relationship with ISPs. MarkMonitor by itself may be unable to identify an individual from an IP address, but MarkMonitor and the ISP together potentially can.

We believe that MarkMonitor as a corporate entity will abide by its contractual obligations to not misuse the information it collects. However, a single disaffected employee with a colluding contact at an ISP could easily identify individual users and their viewing habits for use in blackmail, public shaming, and so forth without the data breach even being detected, much less traced. Other than the very sensible "employees-only" policy of access, MarkMonitor has indicated that no other controls are in place to explicitly protect the data it collects within the company. As represented, all internal employees can view and access collected data, and there do not appear to be policies in place to control or educate employees about data handling.

In an example of how data flow within the company is not controlled, we note that MarkMonitor maintains a bug database that is accessible and visible across the company and is used by both the engineering and operations team. Bug reports from the field typically include contextual data including input data, output data, and even internal memory dumps. In other words, it is highly likely that the bug reports from the operations team will at least occasionally include the sensitive data we have been discussing.

To mitigate these risks, the data collected by MarkMonitor must be subjected to a rigorous data access control, both by policy and technical enforcement. This rigor should also be applied to data retention.

## Reliability

While the design of the MarkMonitor identification system is apparently precise under stated assumptions, the practical accuracy of the system is determined by the reliability of the software, which can affect the validity of those assumptions. System reliability typically has many facets, although many are not germane to our analysis. In the context of reliably maintaining system precision, the MarkMonitor AntiPiracy system must provide:
- Correct results even at operational extremes,
- Appropriate responses for unexpected events or combinations of events,
- Internal observation of system behavior to catch failures, and
- Sufficient resilience to error introduced by changing requirements.

The most essential mechanism for ensuring this form of reliability is software testing. We interviewed the MarkMonitor technical staff at multiple levels about their testing policies and practices. In particular, we investigated whether MarkMonitor performed both unit tests and whole-system tests as well as whether such tests covered negative testing, boundary testing, regression testing, and "known answer" testing.

### Unit Testing

According to MarkMonitor technical staff, all software teams have an engineer assigned to manage the QA for their group. This engineer ensures that sufficient unit tests are written for all modules. The unit tests are run by a testing framework whenever there is a new build and must pass all tests to move forward.

6

The unit tests for these modules include negative tests, boundary tests, known-answer tests, and are obviously used for regression checks in the build system. MarkMonitor staff indicated that they were aware of MOU requirements and incorporated those requirements into their software implementation and testing.

### Whole-System Testing

MarkMonitor currently has no periodic whole-system test mechanism. They do occasionally perform such whole-system end-to-end tests, but infrequently and without repeatable, controlled conditions (e.g., where agents would run in a controlled environment with mocked torrent clients serving known content with predictable characteristics designed to exercise different features of the system). Thus, they rely wholly on the aforementioned unit testing and on live-traffic tests to determine whether a new agent deployment is functioning properly.

### Canary Testing

MarkMonitor has described a process by which new agents are tested on live traffic and manually monitored to observe whether behavior is correct enough for a launch. Due to a convergence of many factors, including launch deadlines, an agent slated for this kind of review is typically tested for 3-4 days in the wild before it can begin sending notices.

In the event that an agent behaves in an unexpected or incorrect manner, it is observed for a longer period of time in an effort to discover the cause of the problems observed. It is then replaced with a new candidate agent. This process repeats until arriving at a functional state.

We believe this approach to testing to be sound in theory. In application, however, we felt that there were several potential issues.

First, canary tests appeared to be performed manually in an *ad hoc* fashion. It was not clear to us that these tests were part of a fixed release policy.

Second, it is also unclear exactly what criteria are used to determine that an agent is functioning adequately in the field. In our interviews, MarkMonitor technical staff focused their responses on agent stability (e.g., failure to crash) and on the continuity of the case volume generated by the agent.

Accordingly, the canary testing performed by MarkMonitor may miss false positives produced by an agent when more closely-watched behavior appears similar to existing agents.

## Verifiability

The MarkMonitor AntiPiracy system has multiple mechanisms in place to ensure that tracked content is verified to be targeted and additional mechanisms that bolster the verifiability of the infringement allegations.

Ensuring that content is correctly verified is a necessary precursor to precision as described in previous sections. The reliability of the results of the entire AntiPiracy system rest on the correctness of content

verification. The mechanism for verifying content varies by media type and media size.

In the case of audio files, MarkMonitor relies on a system known as Audible Magic to verify the content. If any vulnerabilities are discovered in Audible Magic, MarkMonitor will inherit such vulnerabilities, and thus may misidentify benign content as notice-eligible.

In the case of video files less than 45 minutes in length, MarkMonitor policy dictates that an analyst watch the entire video. If the video is longer than 45 minutes, MarkMonitor analysts review parts of the file in whole, and "scan" the remainder. In particular, they
- Review at least 10 minutes of the video file at the beginning, middle, and end of the file – including reviewing all titles and all credits,
- Review at least 2 full minutes of content selected from each 10 minutes of remaining content of the file – up to and including the entire file, and
- Scan the entire file, a process described to us as being similar to watching a video on "fast forward".

Provided that this process is followed correctly, we believe that a file can be accepted as notice-eligible with very high confidence.

One potential issue with verification lies in how it is recorded in the system. According to MarkMonitor documentation, an analyst records this information manually. This mechanism is subject to human error and, in a worst-case scenario, tampering by a compromised employee. Specific recommendations are given below that could mitigate this.

Verification of the alleged infringer is a more automated process, and generally involves capturing information about the peer from whom targeted content was downloaded. This information, including IP address, P2P client, date, and so forth are recorded and stored in a database.

From a forensics point of view, one area where the entire verification process is lacking is the tying together of all of these verification pieces. For example, there is no mechanism in place that allows MarkMonitor to backtrack, in a tamper resistant way, from a dispatched infringement notification all the way to the reviewer that verified the content.

## Recommendations

According to the information available to us during the review process, the MarkMonitor AntiPiracy system appears to be operating generally within the parameters set forth within the MOU. That said, there are some areas that call into question the long-term success of the system as currently operated. Each of these will receive its own subsection below.

### Testing

Not enough can be said about the essential role of testing in the MarkMonitor AntiPiracy system. Currently, the system design and implementation appear to be consistent with the stated goals of accuracy, and precision is built into the underlying design. Furthermore, the fact that no successful appeals have been made on the grounds of misidentified content is an additional encouraging sign that the requirement of zero false positives (perfect precision) is currently being met.

Practical accuracy also depends on the correctness of the software and on the policies that affect the validity of assumptions. Testing, in many ways, is the "ground zero" for ensuring the ongoing correctness of the system.

### Unit Testing

We believe that the unit testing described to us by the MarkMonitor technical staff is largely sufficient. A QA engineer ensures that modules have sufficient unit tests including negative tests, boundary tests, and so forth. Our only recommendation in this area is that the unit tests that affect allegations of infringement receive extra attention in their design.

For example, every element of the design examined in this report must be tested. There must be unit tests validating the correctness of the SHA-1 check on the downloaded pieces. There must be a test ensuring that only content marked as verified in the database can generate infringement case reports. There must similarly be a test that the torrent file used to download the verified content is the same (or has the same info hash) as the torrent file used to track alleged infringers.

### Whole-System Testing

In contrast with the description of the unit testing policies and practices, the approach at MarkMonitor for whole-system testing appears to be inadequate. In our interviews with MarkMonitor, they indicated that testing is almost entirely focused on "positive" outcomes: new agent code is tested for a continued high level of infringement case reports and the central systems are tested to handle the case load.

Positive tests or experiments typically exercise only the expected information path for the system's primary function. MarkMonitor has represented that it does not perform whole system tests that would be capable of demonstrating that incorrect content will not pass verification, or that any kind of exceptional circumstances will be properly handled.

For example, when new agents are released, they should, at the very least, be tested against a dishonest BitTorrent client that uploads incorrect pieces. The MarkMonitor design should catch these faulty pieces during the check of the SHA-1 hash; an end-to-end test where this behavior is verified is essential.

Another example is testing the conjunction of requirements for generating an infringement notice. For example, MarkMonitor requires that at least one full BitTorrent piece be downloaded (this is essential for accuracy). It also requires that some specified *percentage* of the data be downloaded. In addition to these, an agent should be subjected to a test where it receives a full piece but not enough of the download, and a test where it receives enough of the download but never a full and complete piece. In both of these cases, such tests would verify that the agent cannot generate an infringement report.

Furthermore, we recommend that the canary testing occasionally performed by MarkMonitor be codified by policy into a requirement for agent release. Moreover, the canary test must include some check to ensure that all infringement reports that would have been generated meet the requirements of the design (e.g., the content was verified, the pieces downloaded were accurate, etc.).

**Additional Testing Considerations**

We asked, as part of our interviews with MarkMonitor, about criteria employed for determining whether new agent code should be deployed. The consistent answer received was that agents are deployed when they are capturing data from file-sharing networks quickly enough while not causing undue load to central systems. Pressing on the system stability issue produced similar responses, namely that the system has been running for a long time and it continues to produce many reports of alleged infringement. While this response is reasonable in that it calls upon past data to aid in making future predictions about system behavior, relying solely on past performance can open the door for future surprises.

To be absolutely clear, we are not saying that any part of MarkMonitor, be it management, engineering, or operational staff, believes that inaccuracy is acceptable. We are simply observing that tests of accuracy appear to receive less explicit attention and forethought than tests of recall and architectural stability.

It is a fact that any development process will eventually introduce errors in implementation and in the evolution of the design. Such errors are unpredictable, both in what triggers them as well as in their effect on the system. Worse, errors can emerge a long time after the software enters active operation because of changing environment and use patterns. There exists a long and growing list of well-documented software systems that unexpectedly failed after long periods of correct operation.

In order to maintain the high confidence of the MarkMonitor AntiPiracy system now and in the future, we recommend that MarkMonitor expand their existing testing approach. Significant research by the reliability community has identified various sound approaches that ameliorate the risk of unforeseen failures from "sleeping" errors. Accordingly, we recommend that MarkMonitor have their testing policy and implementation reviewed by outside experts in software reliability. Such experts could also provide additional training to the QA staff if necessary.

## Verifiability

Because so much of the correctness of the MarkMonitor AntiPiracy system relies on correct content verification, MarkMonitor should pay particular attention to strengthening this mechanism. We recommend that two analysts independently review the content to ensure that the verification takes place, and that it was performed correctly.

For purposes of forensics, we also believe that MarkMonitor should be able to trace every step of the case-building and notification process in a tamper-resistant fashion. As an incomplete but illustrative example we identify the following possibilities:
- Require that the content reviewers digitally sign a statement that they reviewed the work at a specific time with a specific outcome, and store the statement in the database,
- Digitally sign the torrent file used to download the verified work,
- Digitally sign the torrent file used to identify alleged infringers, and
- Store the evidence packages in a tamper evident (preferably tamper resistant) manner such that it would be impossible to undetectably alter the package after the corresponding infringement notification is transmitted.

## Security Policy

To the extent that we have understood the information provided to us in direct communications with MarkMonitor, it appears that a simple data security policy is in place: only MarkMonitor staff has access to

the centralized database, which contains both copyrighted content (either owned or not owned by the Owners), and sensitive data coupled with allegations of illegal activity.

While this is a simple and easily-enforced security policy, it is likely to be insufficient, particularly where sensitive data is concerned. This sensitive data is coupled in many cases with allegations of wrongdoing. This opens up the possibility of opportunistic or disgruntled employees obtaining data to use, e.g., as blackmail, with predictably disastrous results.

To the extent that the simple security policy outlined above is, as represented to us, the only such policy, the security measures on sensitive data and infringement report generation should be increased and the number of people in the company with access to it strictly limited to employees periodically trained in the proper handling of that data.

Additionally, not all content stored in the repository is necessarily copyrighted by the Owners to whom MarkMonitor is contractually obligated and from whom MarkMonitor has received permission to collect such data. Some data, particularly that which is marked "Fake" for various reasons, will be at least implicitly copyrighted by other individuals who have not necessarily authorized its distribution. A simple example would be of a home video shared by an unauthorized party and subsequently picked up by the MarkMonitor agents.

While the lack of further distribution is helpful in this case, it is not necessarily sufficient to avoid all potential trouble from such collection, e.g., bad press due to the discovery that content owners are downloading content that does not belong to them. There are other potentially unsavory outcomes, as well.

Thus, access to copyrighted data should also be strictly controlled and limited to those who have been trained in proper care and handling of that data, with reasonable time restrictions and retention policies in place.

## Conclusions

The MarkMonitor AntiPiracy system as set forth in this report has been designed with accuracy in mind, and the evidence currently available suggests that it is and has been functioning within the established parameters.

The continued successful operation of the system, as well as assurance of data security and customer privacy, will depend to a large extent on the improvements recommended in this report. These include such things as tighter and more principled access controls, a more complete testing plan for new software releases, the collection and monitoring of precision-relevant metrics, and improved communication between the CCI and MarkMonitor on an ongoing basis. Additionally, careful ongoing consideration should be given to measurements of performance, both of the system and of the employees who maintain it, so as to ensure that precision is incentivized to the same extent as recall.

It is our belief that stable operation has been reached for the MarkMonitor AntiPiracy system, and that the achievement of more defensible and correct handling of security and report generation is straightforward.