# EXHIBIT II

# PLAINTIFFS' EXHIBIT 1

Case No. 1:19-cv-00874-RBJ-MEH Document 660 Filed 12/01/21 USDC Colorado Page 1 of 17

1  UNITED STATES DISTRICT COURT
   DISTRICT OF COLORADO
2

   Case No. 19-cv-00874-RBJ-MEH
3

4  WARNER RECORDS, INC., (f/k/a Warner Bros.
   Records, Inc.), et al.,
5
        Plaintiffs,
6
   vs.
7
   CHARTER COMMUNICATIONS, INC.,
8
           Defendant.
9
10          CONFIDENTIAL - ATTORNEYS' EYES ONLY
11   VIDEO VIDEOCONFERENCE RULE 30(b)(6) DEPOSITION OF
        CHARTER COMMUNICATIONS, INC. by MARY HAYNES
12                    May 21, 2021
   _____
13
14
15
16
17
18
19
20
21
22
23
24
25

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 18

1    A.  I don't know.
2    Q.  (BY MR. SPERLING) Ms. Haynes, have you
3 had any discussions with anybody -- this is a
4 yes-or-no question. Have you had any discussions with
5 anybody about whether you will testify at the trial of
6 this matter?
7    A.  No.
8    MR. EISEMAN: I think that was an
9 improper question, and I would instruct her not to
10 answer that, but she's already gone ahead and answered
11 it, so you can move on. I don't think that was a
12 proper question, Mr. Sperling.
13    MR. SPERLING: Yeah, I think it was,
14 David, and I'll tell you that your colleagues have
15 posed that same question at depositions of Plaintiffs,
16 so we don't need to dwell on it.
17    Q.  (BY MR. SPERLING) Ms. Haynes, when did
18 you first come to work at Charter?
19    A.  I joined Charter in August of 2013.
20    Q.  Where did you work prior to joining
21 Charter?
22    A.  I was the chief security officer for
23 Westar Energy.
24    Q.  And at a high level, what sort of job
25 responsibilities did you have as chief security

Page 19

1 officer at Westar Energy?
2    A.  I was responsible for both physical and
3 cyber security.
4    Q.  How long had you been chief security
5 officer at Westar Energy -- at Westar Energy before
6 joining Charter?
7    A.  I was at Westar for only eight months.
8    Q.  And what position did you hold before
9 joining Westar?
10    A.  I was a senior manager at Century Link.
11    Q.  What sort of business is Century Link?
12    A.  Century Link is a telecommunications
13 provider.
14    Q.  And broadly, what were your
15 responsibilities as a senior manager at Century Link?
16    A.  Cyber security.
17    Q.  What was your title when you were first
18 hired into Charter in August of 2013?
19    A.  Senior director.
20    Q.  And what group or division of Charter
21 were you hired into?
22    A.  Network operations.
23    Q.  When you first joined Charter as a
24 senior director, who did you report to?
25    A.  Dennis Stevens.

Page 20

1    Q.  At some point, were you promoted from
2 being senior director?
3    A.  Yes.
4    Q.  When?
5    A.  It would have been in 2017.
6    (At this time Ms. Golinveaux entered the
7 proceedings.)
8    Q.  And what was your new title when you
9 were promoted?
10    A.  Vice president.
11    Q.  Have you been promoted since then?
12    A.  Yes.
13    Q.  When?
14    A.  2020.
15    Q.  What was your title after that
16 promotion?
17    A.  Vice president II.
18    Q.  Is that vice president followed by the
19 number 2?
20    A.  The alpha characters 2.
21    Q.  Like II?
22    A.  II, yes.
23    Q.  Is that the same title you have today?
24    A.  Yes.
25    Q.  And have you worked in network

Page 21

1 operations throughout your tenure at Charter?
2    A.  Yes.
3    Q.  At some point, did your direct report
4 change from being Mr. Stevens?
5    A.  Yes.
6    Q.  Okay. When was that?
7    A.  2014.
8    Q.  Do you remember roughly when in 2014?
9    A.  Not exactly, no.
10    Q.  No. Do you recall whether it was the
11 first half or the second half of the year?
12    A.  Second half.
13    Q.  When that change happened, who did you
14 begin reporting to?
15    A.  Scott Weber.
16    Q.  Why did your reporting responsibilities
17 change in the second half of 2014?
18    A.  Can you repeat the question?
19    Q.  Yes. Why did you stop reporting to
20 Mr. Stevens and start reporting to Mr. Weber?
21    A.  Mr. Stevens resigned from Charter.
22    Q.  What was Mr. Weber's title when you
23 started reporting to him?
24    A.  His title would have been executive vice
25 president.

6 (Pages 18 - 21)

Page 22

1  Q. Is that executive vice president for
2 network operations?
3  A. Yes.
4  Q. Did Mr. Weber replace Mr. Stevens in
5 that position?
6  A. No. He was temporarily -- I temporarily
7 reported to Mr. Weber.
8  Q. So I want to make sure I have it clear.
9 When you first joined Charter in August of 2013, you
10 were reporting to Dennis Stevens, right?
11  A. Yes.
12  Q. And he was executive vice president for
13 network operations, right?
14  A. No.
15  Q. Okay. What -- I may have gotten my
16 questions mixed up, so let me ask again. When you
17 were reporting to Mr. Stevens, what was his title?
18  A. Mr. Stevens' title was vice president.
19  Q. Then when he resigned and you started
20 reporting to Mr. Weber, Mr. Weber's title at the time
21 was executive vice president?
22  A. Yes.
23  Q. For roughly how long did you report
24 directly to Mr. Weber?
25  A. At roughly, maybe four to six months.

Page 23

1  Q. And then who did you start reporting to
2 after that?
3   MR. EISEMAN: Objection as to form.
4  A. I reported to Charlotte Field.
5  Q. (BY MR. SPERLING) What was Ms. Field's
6 title when you started reporting to her?
7  A. Her title was senior vice president.
8  Q. Do you still report to Ms. Field today?
9  A. Yes, I do.
10  Q. When you first began reporting to
11 Ms. Field, did she report directly to Scott Weber?
12  A. Yes.
13  Q. Does she report to Mr. Weber today?
14  A. No.
15  Q. When did she stop reporting to
16 Mr. Weber?
17   MR. EISEMAN: Objection as to form.
18  A. In 2020.
19  Q. (BY MR. SPERLING) And who does she
20 report to today?
21  A. Magesh Srinivasan.
22  Q. Can you spell that for our court
23 reporter, if you know the spelling?
24  A. Magesh is spelled M-a-g-e-s-h, and
25 Srinivasan is spelled S-r-i-n-i-v-a-s-a-n.

Page 24

1  Q. And is he today the executive vice
2 president for network operations?
3  A. Yes.
4  Q. When you first joined Charter in August
5 of 2013, were you responsible for overseeing the SSST?
6  A. When I was first hired, I was not aware
7 that I would have the SSST.
8  Q. From the day that you joined Charter,
9 did you nonetheless have oversight responsibility for
10 the SSST?
11  A. I did.
12  Q. What does SSST stand for?
13  A. Subscriber services security team.
14  Q. And is the SSST sometimes called the
15 SRT?
16   MR. EISEMAN: Objection as to form.
17  A. I'm not familiar with the acronym SRT.
18  Q. (BY MR. SPERLING) You've never heard of
19 the SRT, or security response team, at Charter?
20  A. We technically did not have a team
21 called security response team.
22  Q. Why did you use the word "technically"
23 in the response you just gave me?
24  A. I believe you're referring to a
25 different group that had a different name.

Page 25

1  Q. You testified a few minutes ago that
2 when you were first hired you weren't aware that you
3 would have responsibility for the SSST; is that right?
4  A. Yes.
5  Q. When did you learn that you, in fact,
6 had responsibility for the SSST?
7  A. That was at the end of my first week.
8  Q. When did you learn that one of the
9 responsibilities of the SSST was to respond to
10 so-called DMCA notices?
11  A. On the day that I learned I was picking
12 up the team.
13  Q. Did you have any prior experience
14 working with DMCA notices before joining Charter?
15  A. Not directly.
16  Q. Did you have indirect experience working
17 with DMCA notices before joining Charter?
18  A. Yes.
19  Q. What was that experience?
20  A. It was done in the department that I was
21 part of.
22  Q. At a prior employer?
23  A. Yes.
24  Q. Was that at Century Link?
25  A. Yes.

Page 26

1  Q.  When you were at Century Link, did you
2 have any responsibility for responding to DMC notices?
3      MR. EISEMAN:  Objection as to form.
4  A.  No.
5  Q.  (BY MR. SPERLING)  When you were at
6 Century Link, did you have any responsibility for
7 handling DMC notices?
8      MR. EISEMAN:  Objection as to form.
9  A.  No.
10  Q.  (BY MR. SPERLING)  And when you were at
11 Century Link, did you have any responsibility for
12 customer interactions related to DMC notices?
13      MR. EISEMAN:  Objection as to form.
14  A.  No.
15  Q.  (BY MR. SPERLING)  Are you currently the
16 DMCA agent for Charter?
17  A.  Yes.
18  Q.  What are your responsibilities as DMC
19 agent?
20      MR. EISEMAN:  Objection as to form and
21 beyond the scope of the notice topics.
22  A.  Customers may send counterclaims to the
23 DMC agent.  I review those claims and provide them to
24 my team for customer contact.
25  Q.  (BY MR. SPERLING)  Who on your team do

Page 27

1 you provide those to?
2  A.  Tim Frendberg.
3  Q.  When you joined Charter, who managed the
4 SSS team?
5  A.  The manager of the SSS team was Tammy
6 Stewart.
7  Q.  And Stewart report to Laurie Rowlett at
8 that time?
9  A.  Yes.
10  Q.  Did Ms. Rowlett have responsibilities
11 beyond the SSST at that time?
12      MR. EISEMAN:  Objection as to form.
13  A.  Yes.
14  Q.  (BY MR. SPERLING)  I asked you before
15 about DMC notices.  Prior to joining Charter, did any
16 of your prior work involve handling allegations of
17 copyright infringement?
18      MR. EISEMAN:  Objection as to form and
19 beyond the scope of the noticed topics.
20  A.  I'm sorry.  You cut out.  Can you repeat
21 that question?
22  Q.  (BY MR. SPERLING)  Sure.  Before you
23 joined Charter, did any of your prior work experience
24 involve handling allegations of copyright
25 infringement?

Page 28

1      MR. EISEMAN:  Same objections.
2  A.  No.
3  Q.  (BY MR. SPERLING)  Between -- when you
4 joined Charter in May of 2016, how frequently did you
5 speak to Mr. Stevens about issues related to DMC
6 notices or copyright infringement?
7      MR. EISEMAN:  Objection as to form.
8  A.  I would say on a monthly basis is what I
9 can remember.
10  Q.  (BY MR. SPERLING)  Did you have a
11 monthly meeting with Mr. Stevens?
12      MR. EISEMAN:  Objection as to form.
13  A.  Yes.
14  Q.  (BY MR. SPERLING)  Did you have a
15 monthly meeting with Mr. Stevens that was specific to
16 DMC notices?
17  A.  I don't recall having a meeting just on
18 DMC notices.
19  Q.  Did you have a monthly meeting with
20 Mr. Stevens that was specific to the work of the SSS
21 team?
22  A.  I don't remember.
23  Q.  Once you started reporting to Mr. Weber,
24 how frequently did you meet with him regarding issues
25 related to DMC notices or copyright infringement?

Page 29

1      MR. EISEMAN:  Objection as to form.
2  A.  I don't recall.
3  Q.  (BY MR. SPERLING)  Did you have monthly
4 meetings with Mr. Weber during the period that you
5 reported directly to him?
6  A.  No.
7  Q.  Did you have any in-person meetings with
8 Mr. Weber during the period that you reported directly
9 to him?
10  A.  Yes.
11  Q.  Did any of those meetings include
12 discussions of DMC notices or copyright infringement?
13      MR. EISEMAN:  Objection as to form.
14  A.  I don't recall.
15  Q.  (BY MR. SPERLING)  How frequently do you
16 meet with Ms. Field?
17      MR. EISEMAN:  Objection as to form.
18  A.  As needed.
19  Q.  (BY MR. SPERLING)  Do you have set
20 monthly or weekly meetings with Ms. Field?
21  A.  The only set meeting is her weekly staff
22 meeting.
23  Q.  Has that been true throughout the period
24 that you reported to Ms. Field, that the only set
25 meeting you had with her is her weekly staff meeting?

CONFIDENTIAL - ATTORNEYS' EYES ONLY



15 (Pages 54 - 57)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 58

1  A.  I'm sorry.  Can you repeat that?
2



Veritext Legal Solutions
www.veritext.com                                    888-391-3376

Case 1:19-cv-00874-RBJ-MEH Document 266 Filed 12/01/21 USDC Colorado Page 9 of 17

CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 62

17 (Pages 62 - 65)

Page 82

[redacted]

Page 84

1 A. I'd have to look at the postcard again.
2 Do you have a copy of that exhibit?
3 Q. I do. I'll tell you what. I'm going to
4 come back to that question, and we can look at that
5 together.
6 A. Okay.

[redacted]

9 MR. EISEMAN: Mr. Sperling, we've been
10 going more than an hour, so when you have a convenient
11 breaking point, let's take a break.
12 MR. SPERLING: Let's get through this,
13 and then we can go off the record.

[redacted]

22 (Pages 82 - 85)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 98

22  Q. If you could look in your folder, you
23 should have Exhibit 81 there.
24  A. Exhibit? Which exhibit?
25  Q. Exhibit 81, so it won't be at the

Page 99

1 bottom. It'll just show up in the numerical sequence.
2  A. Okay, I have that exhibit.

Page 100

17  MR. EISEMAN: Objection to the form.
18 And, Mr. Sperling, the witness asked you if she could
19 look at the document. So I think you should give her
20 an opportunity to look at the document.
21  Q. (BY MR. SPERLING) Ms. Haynes, are you
22 reviewing the document?
23  A. Yes, I am.
24  Q. Okay. Just let me know when you're
25 done.

Page 101

1  A. Okay, I've reviewed the document.
2  Q. Okay. So you can go back to the page
3 with the Bates number ending in 391 in the bottom
4 right.
5  A. Okay.

26 (Pages 98 - 101)



Page 106

21    MR. EISEMAN: Objection as to form.
22  Q.  (BY MR. SPERLING) Here, I'll ask the
23 question differently, and your counsel can instruct
24 you and not object to my question.

3    MR. EISEMAN: Objection as to form.
4 Ms. Haynes, I'd caution you not to reveal any
5 attorney-client communications you had in responding
6 to this question.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 110

19  MR. SPERLING: Why don't we go off the
20  record for just a couple of minutes, take a short
21  break.
22      THE VIDEOGRAPHER: We are going off the
23  record at 10:16 a.m.
24      (Recess taken, after which time Ms. Rose
25  was not present.)

Page 111

1       THE VIDEOGRAPHER: We're going back on
2  the record at 10:21 a.m.



29 (Pages 110 - 113)

CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 158

[text redacted]

Page 159

1    MR. EISEMAN: You know what?
2  Ms. Haynes, look at the document for context.
3    Q. (BY MR. SPERLING) Of course.
4    A. Yes, I'll need to look at the document.
5  I don't know what this is referring to at all.
6    MR. EISEMAN: And while she's doing
7  that, Mr. Sperling, I'm not going to object to your
8  use of this document because it's within the discovery
9  period, but to the extent you are going to question

14  objection on that, right?
15    MR. SPERLING: I'm happy if you have a
16  standing objection.
17    MR. EISEMAN: Thank you.
18    A. Okay. I have reviewed the document.

Veritext Legal Solutions
www.veritext.com                                         888-391-3376



```
 3    Q.   Oh, wow.  Maybe I did.  My apologies.
 4   Let me try again.
 5        MR. SPERLING:  And apologies also to our
 6   court reporter who I falsely accused of taking
 7   something down incorrectly.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 250

17  MR. EISEMAN: Same objections, and
18  you're also beyond seven hours, Mr. Sperling.
19  MR. SPERLING: Okay. I'll wrap up.

22  MR. EISEMAN: This should be your last
23  question.
24  MR. SPERLING: David, I understand we're
25  over seven hours. I have one more question to ask,

Page 252

1  once we resolve the question about this pending deck.
2  I'd ask the same indulgence as we've given in
3  comparable circumstances.

14  MR. SPERLING: I have no further
15  questions given that we're past the seven-hour mark.
16  MR. EISEMAN: I have a few questions,
17  Ms. Haynes.
18  EXAMINATION
19  BY MR. EISEMAN:
20  Q. Ms. Haynes, this morning, Mr. Sperling

7  Q. All right. If you could go to your
8  exhibit folder and there should be -- hold on. Excuse
9  me. There should be a new exhibit down at the bottom.
10 It's Exhibit 217.
11  MS. ROSE: Yes. I put it in there. It
12 just says 220.
13  (Deposition Exhibit 220 was marked.)
14  Q. (BY MR. EISEMAN) It's Exhibit 220. If
15 you could open up Exhibit 220 and let me know when
16 you've done that.
17  A. I have a copy of that, yes.
18  Q. All right. And that's -- for the
19 record, it's a document that's Bates-labeled Charter
20 00036077.

253)

CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 254

Page 256

1     EXAMINATION
2  BY MR. SPERLING:
3     Q.  Ms. Haynes, had you ever seen
4  Exhibit 220 before today?

16    Q.  Did you -- just yes or no.  Did you
17 discuss with your counsel before he just conducted
18 that examination the questions and answers that he put
19 to you and that you would provide?
20    A.  No, we did not discuss the questions he
21 just put forth.
22    Q.  Did you discuss the subject matter of
23 the examination just conducted during any of the
24 breaks today?
25    A.  The only thing we discussed was he was

Page 257

3        (Deposition Exhibit 207 was marked.)
4     Q.  Let me ask you to open Exhibit 207 in
5  your folder, please.
6     A.  Okay, I have that open.

23      MR. EISEMAN:  Thank you.  Those are the
24 only questions I have.
25      MR. SPERLING:  A short redirect.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 258

[REDACTED lines 1-4]

5  MR. SPERLING: No further questions.
6  Thank you.
7  THE VIDEOGRAPHER: David, did you have
8  any? I just want to make sure before I --
9  MR. EISEMAN: No, I have no further
10 questions of the witness.
11 MR. SPERLING: This concludes the
12 videotaped deposition of Mary Haynes. We're going off
13 the record at 4:26 p.m.
14 WHEREUPON, the foregoing deposition was
15 concluded at the hour of 4:26 p.m. Total time on the
16 record was 7 hours and 14 minutes.
17   *   *   *   *   *

Page 259

1           REPORTER'S CERTIFICATE
2
3  I, Sandra L. Bray, Registered Diplomate
4  Reporter, Certified Realtime Reporter, and Notary
5  Public within and for the State of Colorado,
6  commissioned to administer oaths, do hereby certify
7  that previous to the commencement of the examination,
8  the witness was duly sworn by me to testify the truth
9  in relation to matters in controversy between the said
10 parties; that the said deposition was taken in
11 stenotype by me at the time and place aforesaid and
12 was thereafter reduced to typewritten form by me; and
13 that the foregoing is a true and correct transcript of
14 my stenotype notes thereof.
15 That I am not an attorney nor counsel
16 nor in any way connected with any attorney or counsel
17 for any of the parties to said action nor otherwise
18 interested in the outcome of this action.
19 My commission expires: January 17, 2024.
20
21
22
                    Sandra L. Bray
23                  Registered Diplomate Reporter
                    Certified Realtime Reporter
24                  and Notary Public
25

Page 260

1  Veritext Legal Solutions
   1100 Superior Ave
2  Suite 1820
   Cleveland, Ohio 44114
3  Phone: 216-523-1313
4
5  May 26, 2021
6  To: Ms. Eiseman

   Case Name: Warner Records, Inc., Et Al. v. Charter Communications,
7  Inc.
8  Veritext Reference Number: 4593611
9  Witness: Mary Haynes, 30(b)(6)    Deposition Date: 5/21/2021
10
   Dear Sir/Madam:
11
12 Enclosed please find a deposition transcript. Please have the witness
13 review the transcript and note any changes or corrections on the
14 included errata sheet, indicating the page, line number, change, and
15 the reason for the change. Have the witness' signature notarized and
16 forward the completed page(s) back to us at the Production address
   shown
17
   above, or email to production-midwest@veritext.com.
18
19 If the errata is not returned within thirty days of your receipt of
20 this letter, the reading and signing will be deemed waived.
21
   Sincerely,
22
   Production Department
23
24
25 NO NOTARY REQUIRED IN CA

Page 261

1       DEPOSITION REVIEW
        CERTIFICATION OF WITNESS
2
        ASSIGNMENT REFERENCE NO: 4593611
3       CASE NAME: Warner Records, Inc., Et Al. v. Charter
   Communications, Inc.
   DATE OF DEPOSITION: 5/21/2021
4  WITNESS' NAME: Mary Haynes, 30(b)(6)
5       In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7       I have made no changes to the testimony
   as transcribed by the court reporter.
8
                              _____
9  Date         Mary Haynes, 30(b)(6)
10      Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
        They have read the transcript;
13      They signed the foregoing Sworn
           Statement; and
14      Their execution of this Statement is of
           their free act and deed.
15
        I have affixed my name and official seal
16
   this _____ day of _____, 20___.
17
        _____
18      Notary Public
19      _____
        Commission Expiration Date
20
21
22
23
24
25

66 (Pages 258 - 261)

Veritext Legal Solutions

www.veritext.com                                    888-391-3376