# Exhibit XV

# Exhibit 1

Case 1:19-cv-00874-RBJ-MEH Document 684-1 Filed 12/20/21 USDC Colorado Page 2 of 9
Case 1:19-cv-10067-RBJ-MEH Document 606-26 Filed 10/20/22 US DC Colorado Page 2 of 10

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1  **HIGHLY CONFIDENTIAL**.
2  **ATTORNEY'S EYES ONLY**
3  **SOURCE CODE**
4
5           UNITED STATES DISTRICT COURT
6           FOR THE DISTRICT OF COLORADO
7           Case No. 1:19-cv-00874-RBJ-MEH
8
9  WARNER RECORDS INC., et al.,
10
              Plaintiffs,
11
12       -against-
13
   CHARTER COMMUNICATIONS, INC.,
14
15            Defendant.
16 ------------------------------------
17    VIDEOTAPED DEPOSITION OF TERRENCE McGARTY, Ph.D.
              WEDNESDAY, OCTOBER 6, 2021
18
19           Videotaped deposition of TERRENCE
20 McGARTY, Ph.D., in the above-mentioned matter before
21 Jomanna DeRosa, a Certified Court Reporter (License
22 No.30XI00188500), and Notary Public of the State of
23 New Jersey, taken via Zoom at 24 Woodbine Road,
24 Florham Park, New Jersey 07932 on Wednesday, October
25 6, 2021 commencing at 9:04 a.m.

Page 26

1 of a Hua Wei relationship.
2
3 BY MS. HUEBERT:
4    Q.    So neither of those entities ultimately
5 became operational in the sense that it delivered
6 services to customers?
7    A.    We delivered prototype services to
8 customers. In the Linear A case, we had -- we did
9 Key, New Hampshire and Newburyport, Massachusetts and
10 we may have had 50 or 100 people trying it out to
11 make sure it worked, but we just could not get the
12 handsets properly deployed. We were ten years too
13 early. Welcome to venture business.
14    Q.    So it is fair to say that you don't have
15 direct experience in implementing a DMCA policy for
16 an ISP. Correct?
17        MR. MILLER: Objection.
18        THE WITNESS: Correct.
19
20 BY MS. HUEBERT:
21    Q.    And when was the last time you worked in
22 management or operations for an ISP?
23    A.    It would be ten years ago.
24    Q.    So 2011?
25    A.    2010.

Page 27

1    Q.    And since that time, have you received
2 any technical training or taken any courses related
3 to ISP operations or management?
4        MR. MILLER: Objection.
5        THE WITNESS: I've looked at several
6 dozen companies we considered investing in, and using
7 my prior experience and knowledge, I had to consider
8 their proposed networks and services. So from an
9 investor perspective who had, you know, 45 years
10 worth of operational experience, I continued it
11 through looking -- and doing due diligence on those
12 investment opportunities.
13
14 BY MS. HUEBERT:
15    Q.    Okay, is there anything else?
16        MR. MILLER: Objection.
17        THE WITNESS: No.
18
19 BY MS. HUEBERT:
20    Q.    And have you ever been responsible for
21 the deployment of deep packet inspection technology
22 across an ISP?
23        MR. MILLER: Objection.
24        THE WITNESS: The answer to that is
25 complex. In my European network, Zephyr, which we

Page 28

1 built out from Germany through Russia and down
2 through Greece and all through central and eastern
3 Europe, we did employ versions of deep packet
4 inspection in terms of the integrity of certain of
5 the network operations, all right. So for example,
6 in light sick, we would check out certain packets
7 because our concern, especially after 9/11, was were
8 we getting traffic from certain of the old Soviet
9 states, so our network became a significant factor in
10 terms of monitoring IP traffic in and out of those
11 marketplaces. Getting into any further detail would
12 be complex.
13
14 BY MS. HUEBERT:
15    Q.    And what time period would this be?
16    A.    This would be 2001 through 2004.
17    Q.    Okay. And what kind of monitoring of
18 packets did you employ on the network for those
19 purposes?
20    A.    Without getting into too detailed
21 specific, if I may, our interest is who was sending
22 the message, who was the message going to, so looking
23 at IP addresses, the headers. The frequency of the
24 messages, the length of the messages, items of that
25 type. Frequently, the inards of the messages were

Page 29

1 themselves encrypted. So as best we could do is look
2 at the periphery, which was ports and IP to and IP
3 from and MAC addresses and things of that type.
4    Q.    And for those unencrypted transmissions,
5 were you able to view the content as well?
6        MR. MILLER: Objection.
7        THE WITNESS: I'm sorry, could I do
8 response time?
9
10 BY MS. HUEBERT:
11    Q.    I'm sorry. For unencrypted
12 transmissions, did you have insight into the content
13 of those transmissions?
14        MR. MILLER: Objection.
15        THE WITNESS: I don't understand the
16 question. Did I do response times? That's what it
17 sounds like.
18
19 BY MS. HUEBERT:
20    Q.    No, sorry. For unencrypted
21 transmissions --
22    A.    Right.
23    Q.    -- did you have insight into the content
24 of those transmissions?
25    A.    We avoided -- in our side of the

Page 182

[Lines 1-25 redacted]

Page 183

[Lines 1-5 redacted]
6  Q. So if you were hired by Charter to
7 implement Sandvine across the network, do you think
8 that you could achieve some cost savings there?
9       MR. MILLER: Objection.
10      THE WITNESS: Charter hires the people
11 it hires, and I have a different experience base than
12 other people and I just bring that to network design.
13
14 BY MS. HUEBERT:
15  Q. Have you ever designed a network capable
16 of handling millions and millions of network users?
17  A. Yes.
18  Q. Where?
19  A. It went from Moscow through Poland,
20 through the Czech Republic, through the Slovak
21 Republic, through Hungary, through Bulgaria, through
22 Romania, part of Ukraine, down into Greece.
23  Q. And that was an operational ISP serving
24 millions of customers?
25  A. We had a lot of customers on those

Page 184

1 networks.
2  Q. And what time period was this?
3  A. From 1997 through 2004.
4  Q. Okay. But you don't have a basis or an
5 understanding of how Charter's network architect
6 operates?
7  A. I'm not privy to Charter's network.
[Lines 8-15 redacted]
16 BY MS. HUEBERT:
17  Q. Do you think that deployment of Sandvine
18 across Charter's network could lead to network
19 instability and core performance that would impact
20 other users of Charter's network?
21      MR. MILLER: Objection.
22      THE WITNESS: DPI is a mildly -- I won't
23 use -- it's a technology that looks at the packets as
24 they're going through, all right, and depending on
25 how you configure these, you don't necessarily want

Page 185

1 it to look at every packet. You'd like it to be able
2 to look at the packets from the target customer that
3 you're trying to examine their behavior in. Okay?
4 So there are various ways in which you can design the
5 network so that you're offloading the DPI load into
6 another set of processors if it's limited. If only
7 one percent of your customers are of interest or
8 less, frequently what you do is you send those
9 customers packets to a separate node, different
10 router, and that's where you deploy the DPI. So
11 you're examining primarily the customers at question.
12      The issue of stability of the network,
13 again, I don't know exactly what that stability means
14 in an IP network, it will slow things down. That's
15 one way to characterize it. So the question is you
16 have to scale it appropriately so you don't impact
17 the throughput of the network, right. In terms of
18 stability, again, it's a term of art. I don't
19 understand that in an IP network. It means things
20 start to go crazy, and I don't know what it means.
21
22 BY MS. HUEBERT:
23  Q. Well, slowing it down is probably a fair
24 example at least. In your experience, does the
25 inclusion of DPI technology have the potential for

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 306

1  No. 8.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 308

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 307

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 309

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

78 (Pages 306 - 309)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Page 310 | Page 312 |

Page 312

```
 1  it.
 2      Q.   Did you end up actually testifying at
 3  the BMG v. Cox trial?
 4      A.   Yes, I did.
 5           MR. MILLER:  I have no further questions
 6  at this time.
 7           MS. HUEBERT:  Okay, I have a few.  Thank
 8  you.
 9
10  REDIRECT EXAMINATION
11  BY MS. HUEBERT:
12      Q.   Dr. McGarty, you testified that
13  BitTorrent is almost exclusively used for the
14  transfer of copyrighted material.  Do you recall
15  that?
16      A.   Yes, I do.
17      Q.   What's the basis for your understanding?
18      A.   Having read the literature, having
19  spoken to colleagues that "have had their children
20  use it," and there was a broad discussion of that in
21  both the technical and professional literature.
22      Q.   And do you make that statement in your
23  report?
24      A.   No, I did not.
25      Q.   Okay, so that's not an opinion you're
```

Page 311

```
 6           THE VIDEOGRAPHER:  The time is 5:56.
 7  We're going off the video record.
 8
 9           (Whereupon, a brief recess was taken off
10  the record.)
11
12           THE VIDEOGRAPHER:  The time is 5:58.
13  We're back on video record.
14
15  BY MR. MILLER:
16      Q.   Could you please open Exhibit 15?
17      A.   Exhibit 15?
18      Q.   Yes.
19      A.   This is the BMG exhibit?
20      Q.   Yes.  Do you recall looking at this
21  document earlier today?
22      A.   Yes, I do.
23      Q.   Does this document explain why Cox's
24  motion to exclude your testimony was granted in part?
25      A.   Not to my knowledge.  I looked through
```

Page 313

```
 1  prepared to make in this case?
 2      A.   It's just my experience of -- of having
 3  gone around BitTorrent.
 4      Q.   So, you're not -- you're not expecting
 5  to testify to the percentage of users that use
 6  BitTorrent for the transfer of copyrighted material.
 7  Correct?
 8      A.   I'm not an expert in BitTorrent.  I'm
 9  aware of it.  I've actually tried downloading it
10  once, but then I stopped from ever using it because I
11  was advised about its problems.
12      Q.   Okay, and so you don't have an expert
13  understanding that would allow you to competently
14  testify that BitTorrent is almost exclusively used
15  for the transfer of copyrighted content.  Is that
16  fair?
17           MR. MILLER:  Objection.
18  Mischaracterizes the witness's testimony.
19           THE WITNESS:  In my experience and
20  discussion with colleagues and people that are aware
21  of BitTorrent and having read through the literature,
22  it appears to me that it was something that was
23  exclusively used for copyright downloading.
24
25  BY MS. HUEBERT:
```

Page 334

1 [redacted]
2
3
4
5 BY MS. HUEBERT:
6  Q. In your earlier position, you dealt with
7 issues related to call volume in one of your previous
8 roles. Correct?
9  MR. MILLER: Objection.
10  THE WITNESS: Yes.
11
12 BY MS. HUEBERT:
13  Q. And call volume was an issue that caused
14 a lot of resources and expenses for your company.
15 Correct?
16  MR. MILLER: Objection. This is way
17 outside the scope of cross.
18  MS. HUEBERT: It's not outside the
19 scope, but thank you.
20  THE WITNESS: The last time I've run
21 several call centers and what you try to do is manage
22 the call centers from two perspectives one is deal
23 with the customer in a positive manner and two to
24 sort of manage your expenses because they can be a
25 very expensive element of the operations of your

Page 335

1 business and call centers, from my perspective were
2 things where we found out where we had problems in
3 our delivery of service and, you know, made decisions
4 accordingly and how to improve the service. Call
5 centers are where the customers complained or sought
6 remedy of an issue and at the same time were issues
7 where we could ascertain new issues about the
8 effective operation of the business.
9
10 BY MS. HUEBERT:
11  Q. Given the number of copyright notices
12 that you understand that Charter received during the
13 relevant period, do you think it would have been
14 practical or simple for Charter to have attempted to
15 take inbound calls from each and every notice
16 recipient?
17  MR. MILLER: Objection. Calls for
18 speculation. Way outside the scope of redirect.
19  THE WITNESS: How Charter decide to say
20 run its business is again Charter's decision.
21
22 BY MS. HUEBERT:
23  Q. So you're not offering any opinions
24 again in combatting copyright infringement on its
25 network including worse than for the receipt of

Page 336

1 copyright notices?
2  MR. MILLER: Objection. Asked and
3 answered many, many times.
4  THE WITNESS: I believe I answered that
5 on multiple repeated occasions.
6
7 BY MS. HUEBERT:
8  Q. What was your answer?
9  A. Charter decides how it wants to run its
10 own business. I'm not opining on specific operations
11 with regard to Charter.
12  MS. HUEBERT: Thank you. No further
13 questions. I appreciate everyone's time.
14  MR. MILLER: Thank you.
15  THE VIDEOGRAPHER: The time is 6:36.
16 We're going off the video record.
17
18  (Whereupon, the deposition was concluded
19 at 6:36 p.m.)

Page 337

1  CERTIFICATE
2
3
4  I, JOMANNA DEROSA, a Certified Court
5 Reporter and Notary Public of the State of New
6 Jersey, do hereby certify that the foregoing is a
7 true and accurate transcript of the testimony as
8 taken stenographically and digitally at the time,
9 place and on the date hereinbefore set forth, to the
10 best of my ability.
11
12
13  I DO FURTHER CERTIFY that I am neither a
14 relative nor employee nor attorney nor counsel of any
15 of the parties to this action, and that I am neither
16 a relative nor employee of such attorney or counsel,
17 and that I am not financially interested in the
18 action.
19
20
21
22  *Jomanna DeRosa*
   JOMANNA DEROSA, C.C.R.
   License No. 30XI00188500
23  Notary Public of the
   State of New Jersey
24
25

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.