# Exhibit XIX

# EXHIBIT D

Page 1

1            UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO
2

3

4    WARNER RECORDS, INC.,        )
                                  )
5            Plaintiff,           )
                                  )
6    v.                           ) Civil Action No.
                                  ) 1:19-cv-00874
7    CHARTER COMMUNICATIONS       )
     INC.,                        )
8                                 )
             Defendant.           )
9

10

11

12

13

14

15

16

17

18       VIDEOTAPED ZOOM REALTIME DEPOSITION of ARAM
19   SINNREICH, Ph.D., a Witness, taken on behalf of
20   the Plaintiffs before Peggy E. Corbett, CSR, CCR,
21   RDR, pursuant to Notice on the 6th day of
22   October, 2021, at the office of the witness, 9621
23   Lorain Avenue, Silver Spring, Maryland 20910.
24

25

1



Page 144



18      Q.   Do you have any specialized training in

19   how to design and administer a consumer survey?

20      A.   Yes.

21      Q.   What is that training?

22      A.   Well, I learned both through an

23   apprenticeship at Jupiter, and also through

24   taking quantitative research methods, classes as

25   a graduate student.

Case No. 19-cv-07071-SI-SVK Document 601-6 Filed 12/02/23 Page 6 of 445

1    Q.   Nor did Amazon's music store, correct?

2    A.   Amazon, I believe, was selling CDs and

3    maybe even had already acquired CD Now by that

4    point, but they were not selling MP3s.

5    Q.   They were not selling digital downloads,

6    correct?

7    A.   To the best of my recollection, they

8    were not.

9    Q.   So at the time that you did this survey

10   there were very few digital download services

11   being used by consumers, correct?

12   A.   Digital downloads accounted for a very

13   small portion of music sales at that period in

14   time.

15   Q.   Are you as an expert in this case

16   claiming that the survey that you conducted in

17   the year 2000 was still applicable to music

18   consumers for the period of 2013 to 2016?

19   A.   I did not cite the survey in my report.

20   I cited the Jupiter report.

21   Q.   And the Jupiter report relies in some

22   measure, some extensive measure on that consumer

23   survey, correct?

24   A.   Yes.

25   Q.   And you cite that Jupiter report I think

Case No. 19-cv-08074-BU-RFJ-MED Document 09-684-20 Filed 12/02/23 DC-SDC Colorado Page 7 of 445

1  you just said, right?

2      A.    Correct.

3      Q.    So I'll ask you that question again, do

4  you believe that the consumer survey that you did

5  in the year 2000 was still an applicable --

6  strike that.

7            Do you believe that the consumer survey

8  that you did in the year 2000 reflected music

9  consumers' views in the years 2013 to 2016?

10     A.    No.

11     Q.    And do you believe that the report that

12  you did that relies on that consumer survey was

13  applicable or is applicable to what consumers

14  were doing in 2013 to '16?

15     A.    To an extent.

16     Q.    To what extent?

17     A.    Most research is used for years

18  subsequent to its publication as an indication of

19  how its subjects behave.

20     Q.    Did you do -- I'm sorry, I thought you

21  were done.  Please continue.

22     A.    The longer it's been since publication,

23  the fewer inferences you can make about its

24  applicability.

25     Q.    When you cited it in your report, had

Case No. 1:19-cv-00874-RBJ-MEH Document 601-684-20 Filed 12/07/2023 USDC Colorado Page 7 of 445

1  show how those variables changed over time,

2  right?

3      A.   No.

4      Q.   No, that's not right, or yes, it is

5  right?

6      A.   I do not show how those variables have

7  changed over time.

8      Q.   So you don't have a directional gauge,

9  right?

10     A.   Not available to me, no.

11     Q.   You claim that the music industry is a

12 highly exploitive industry in which a tiny

13 portion of revenues trickle down to creative

14 laborers, right?

15     A.   More or less.

16     Q.   And you claim that the artists generally

17 contract for a royalty rate of between 10 and 20

18 percent of wholesale cost of music, and that that

19 amount can be cut by as much as half, entitling

20 artists to only a single digit royalty payment,

21 right?

22     A.   There is a good deal of published

23 research supporting that analysis, and I believe

24 it.

25     Q.   Among the sources that you cite in this

Case No. 91-cv-1908-TWR-MEJ Document 684-20 Filed 12/00/23 USDC Colorado Page 9 of 445

1  section of the brief is Don Passman's book, "All

2  You Need to Know in the Music Industry," correct?

3       A.   Yes.

4       Q.   You would agree that Passman is a

5  reliable source, correct?

6       A.   Yes, one of the most relied upon

7  sources.

8       Q.   In fact, you've publically said, "He

9  literally wrote the book on the music industry,"

10  right?

11       A.   I have no memory of saying that.

12       Q.   Do you doubt that you have said that

13  pubically?

14       A.   No.

15            MR. SCHAPIRO:   Objection to the

16  form of the question.

17       Q.   (BY MR. OPPENHEIM)   Don Passman

18  represents artists that include Taylor Swift,

19  Stevie Wonder, Adelle, Paul Simon, Janet Jackson,

20  REM, Green Day, Pink, among others, right?

21       A.   I'm not familiar with his list of

22  clientele specifically.

23       Q.   But you are familiar with the fact that

24  Don Passman represents some of the biggest

25  musical artists of our generation, right?

Case No. 1:19-cv-08097-RBBJRBE-MEDoDcoument 600954 Filed 02/02/22/23 DOSC Colorado Page 9 10 of 445

1      A.    I am familiar with his credentials, yes.

2      Q.    Do you believe that you have more

3  experience representing industry artists than Don

4  Passman?

5      A.    No.

6      Q.    Do you know, do you believe that you

7  know what music industry contracts look like

8  better than Don Passman?

9      A.    Some of them.

10     Q.    So do you believe you understand certain

11  music industry contracts better than Don Passman?

12     A.    I believe there are contracts that I

13  have seen that he has not seen.

14     Q.    How many contracts for the works in this

15  case have you reviewed?

16     A.    I don't know.

17     Q.    Have you reviewed any of the contracts

18  for the copyrighted works in this case?

19     A.    Possibly.

20     Q.    Which ones?

21     A.    I don't know.

22     Q.    Can you identify even a single artist

23  who's in this case whose contract you have

24  reviewed?

25     A.    Yes.

Case 1:91-cv-09087-RBJ-MEH Document 609-684-20 Filed 12/00/02/02/23 DCSD Colorado Page 11 of 445

1     Q.   Which one?

2     A.   Kanye West.

3     Q.   And have you reviewed the entirety of

4  Kanye West's contracts?

5     A.   To the best of my ability within a

6  constrained period of time, yes.

7     Q.   Do you represent Kanye West?

8     A.   No.

9     Q.   Okay.  In what context did you review

10  Kanye West's contracts?

11     A.   Not so long ago he published several of

12  them on social media and I downloaded them and

13  reviewed them at that time.

14     Q.   So you don't know if you reviewed them

15  all?

16     A.   No.

17     Q.   You only know what he decided to

18  release, right?

19     A.   Correct.

20     Q.   Okay.  Any other artists in this case

21  whose contracts you think you have reviewed?

22     A.   Nobody who specifically comes to mind.

23     Q.   When you refer to the music industry as

24  being an exploitive industry, there are really

25  two different sets of companies, right; there are

Page 192

1  record companies and music publishers; is that

2  fair?

3      A.   Those are the two types of companies

4  represented by the plaintiffs.

5



Page 194

1  ███████████████████████

2      Q.   Those are the only ones?

3      A.   My opinion is about the normative

4  practices and relations within the industry, not

5  about the individual relationships between the

6  creative professionals whose works are reflected

7  in the list of alleged infringements and the

8  plaintiffs specifically.

9      Q.   Let's talk about the normative practices

10  and relations, and let's start with music

11  publishers.  A songwriter doesn't have to sign a

12  deal with a music publisher, do they?

13      A.   Not a specific music publisher.

14      Q.   Or any music publisher, do they?

15      A.   It's much more difficult to collect

16  certain kinds of royalties without a music

17  publisher, so there's a strong incentive to sign

18  with a music publisher.

19      Q.   They don't have to, right?

20      A.   Nobody is putting a gun to their head to

21  my knowledge.

22      Q.   And if they do decide to sign on with a

23  music publisher, there are hundreds or even

24  thousands of music publishers in the United

25  States they could sign with, right?

Case No. 1:19-cv-00874-RBJ-MEH Document 609-684-12ed 1/20/22/23 USDC Colorado Page 15 of 445

1      A.   I don't know the number of music

2  publishers in the United States.

3      Q.   It's a large number, is it not?

4           MR. SCHAPIRO:   Objection to the

5  form of the question.

6      A.   I couldn't tell you the -- I could not

7  tell you the precise number and I'm not sure what

8  you mean by the word "large."

9      Q.   (BY MR. OPPENHEIM)   So Mr. Sinnreich, a

10  songwriter could choose to sign with any one of a

11  number of music publishers, if they decide they

12  want to do so, right?

13      A.   It depends on the specifics of the case.

14      Q.   In what situation does a songwriter not

15  have a choice about what music publisher they are

16  going to sign with?

17      A.   There are many documented cases in which

18  songwriters are coerced into signing with a

19  specific publisher or threatened with not being

20  able to license their work.

21      Q.   Do you have any facts to support the

22  claim that the plaintiffs in this case engaged in

23  that?

24      A.   Not that I can recall off the top of my

25  head.

Case No. 1:19-cv-00874-RBJ-MEH Document 609-684-20 Filed 12/00/21 02/23 USDC Colorado Page 16 of 45

1    Q.    How many music publishing agreements

2  have you reviewed in your lifetime?

3    A.    I don't know.

4    Q.    What is the range of royalty rates that

5  you have seen in songwriter agreements?

6    A.    I could not tell you specifically.

7    Q.    Well, Don Passman says on Page 277 of

8  his book, "The most common starting deals are 75

9  percent, but if you've got enough heat and

10  bargaining power, you can get up to 90 percent,

11  (rarely more, unless you are the most mega of

12  stars)."

13        Do you have any reason to disagree with

14  what Don Passman said in his book about the

15  starting point on royalty rates for songwriter

16  agreements?

17            MR. SCHAPIRO:  Objection, lack of

18  foundation.

19    A.    It's an incomplete excerpt.  My memory

20  of Don Passman's discussion in Music Publishing

21  is that it nets out closer to about 50 percent,

22  but I have no reason to dispute the veracity of

23  his analysis or claims as a whole.

24    Q.    (BY MR. OPPENHEIM)  But in your report

25  you reference 10 to 20 percent, and then you say

Case No. 1:19-cv-00874-RBJ-MEH   Document 684-20   Filed 12/02/21   USDC Colorado   Page 17 of 45

1  it gets cut in half to single digits.  You don't

2  reference 75 or 50 percent, do you?

3     A.   Are you talking about music publishing

4  contracts or recording contracts, because those

5  are two different things with two very different

6  royalty rates.

7     Q.   So are you saying that in your report

8  when you reference a rate of between 10 and 20

9  percent, that you're only referring to record

10  company contracts?

11     A.   I used the term "artist" in that

12  sentence, which is typically the way that we

13  refer to people who sign recording contracts.

14     Q.   Okay.  So although you're condemning

15  music publishers as being exploitive, you don't

16  include the fact that between 75 and 90 percent

17  of the royalties that music publishers collect

18  generally go to the songwriters in your report;

19  is that right?

20           MR. SCHAPIRO:  Objection to the

21  form of the question.

22     A.   I don't think that's a fair and accurate

23  description of Don Passman's analysis of music

24  publishing.

25     Q.   (BY MR. OPPENHEIM)  Did you review the

Case No. 1:19-cv-00874-RBJ-MEH Document 601-684-20 filed 12/02/22123 DC Slo Colorado Page 1716 of 445

1   publisher of financial documents in this case?

2       A.   I don't believe I cited any such

3   document in my report.

4       Q.   That didn't answer my question.

5       A.   I only reviewed the documents that I've

6   cited in my report in connection with my opinions

7   in this case.

8       Q.   So you didn't bother to review the Music

9   Publisher documents to see what percentage of the

10  revenues they collected went to songwriters; is

11  that what you're saying?

12      A.   I was not given access to those

13  documents.

14      Q.   Did you ask for them?

15      A.   No.

16      Q.   Let's turn to the record companies.  How

17  many record company contracts have you reviewed

18  in your lifetime?

19      A.   I don't know.

20      Q.   Other than Kanye West, have you reviewed

21  any other record company contracts for artists in

22  this case?

23      A.   Artists cited in the list of alleged

24  infringements?

25      Q.   Correct.

Case No. 1:19-cv-00874-RBJ-MEH Document 609-684-20 Filed 12/02/22 12/03/22 DC USDC Colorado Page 19 of 445

1      A.   I would have to review the list to give

2  you an accurate answer.

3      Q.   Okay.  I think you said you reviewed it

4  before you gave your opinion.  When you gave your

5  opinion about the music industry being highly

6  exploitive, excuse me, the music industry

7  exploiting of creative labor, did you have any

8  particular artist in this case in mind?

9      A.   No.

10      Q.   And like songwriters, recording artists

11  have a choice about whether or not to enter into

12  a contract with a record label, right?

13      A.   It depends on the specificities of the

14  situation.

15      Q.   In what situation does a recording

16  artist have to sign a contract with a record

17  company?

18      A.   It's not a binary "have to, can't."

19  There are various forms of persuasion and

20  coercion that can be brought to bear in various

21  situations.

22      Q.   But if a recording artist is persuaded

23  to sign a record company contract, that's not

24  exploitation; that's persuasion, right?

25           MR. SCHAPIRO:  Object to the form

Case No. 19-cv-9066-DRB-MEH Document 601-684 Filed 12/07/2023 12/01/23 DOJ Colorado Page 20 of 445

1    of the question.

2         A.    I'm not characterizing a requirement

3    that recording artists sign a given record label

4    contract as the definition of exploitation.

5         Q.    (BY MR. OPPENHEIM)  But artists can

6    choose whether or not to sign a record company

7    contract or not, right?

8         A.    If you want to boil it down to a binary

9    yes or no, then yes, they can choose not to sign

10   a record company contract.

11        Q.    But, in fact, most artists still want a

12   record company deal, right?

13        A.    I don't have the basis upon which to say

14   what most artists want.

15        Q.    Well, Don Passman on Page 77 of his book

16   that you cite says:  "As of this writing most

17   mainstream artists still want to sign to a record

18   company.  Apart from guaranteeing you money (so

19   you can avoid sleeping on park benches while

20   creating your music), the record companies have

21   the resources to get your music heard above the

22   noise of all the other artists out there.  They

23   have staffs of people with experience in

24   marketing and promotion, relationships with

25   streaming services that can get your music

Case No. 1:19-cv-00874-RBJ-MEH Document 609-684 Filed 12/03/21 12/23 USDC Colorado Page 21 of 45

1  featured, and radio relationships that can get

2  you air play.  Also the major labels have massive

3  amounts of data from all over the world which

4  they use to develop strategies.  So for these

5  reasons, a lot of artists choose to go the label

6  route, and these even includes artists that do

7  quite well on their own."

8      Do you dispute with Don Passman's

9  conclusion that most mainstream artists still

10  want to sign to a record label?

11      MR. SCHAPIRO:  Objection, that was

12  a whole paragraph.

13      A.  I have no basis upon which to dispute

14  the excerpt from Passman's book?

15      Q.  (BY MR. OPPENHEIM)  And when a recording

16  artist chooses to sign with a record company,

17  they can retain the services of a lawyer to

18  represent them, right?

19      A.  Correct.

20      Q.  And in fact, most artists are

21  represented by counsel when they negotiate a deal

22  with a record label, correct?

23      A.  I am not privy to those relationships,

24  and there's no way for me to answer.

25      Q.  And, in fact, those attorneys are quite

Case No. 1:19-cv-00874-RBJ-MEH   Document 601-684-20   Filed 12/00/21 0/23   USDC Colorado   Page 22 of 445

1   powerful in the negotiations, aren't they?

2       A.   I'm assuming that they are.

3                MR. SCHAPIRO:  Hold on, objection,

4   vague and ambiguous.

5       A.   Can you rephrase your question, please.

6       Q.   (BY MR. OPPENHEIM)  And those attorneys

7   that recording artists retain to negotiate with

8   record labels often have quite a bit of power,

9   don't they?

10      A.   There is a small number of record

11  industry attorneys representing a small portion

12  of recording artists who have what is reported to

13  be a significant amount of power in the recording

14  industry.

15      Q.   So if Don Passman wrote that the lawyers

16  have evolved into one of the most powerful groups

17  in the industry, you wouldn't have a basis to

18  dispute that, would you?

19      A.   I think, I would have to evaluate the

20  context of the passage that you're quoting.  My

21  personal experience, having analyzed the industry

22  for decades, is that the Legal Departments at

23  record labels have become more powerful over the

24  course of that period in time.

25      Q.   So you disagree with Don Passman?

1    MR. SCHAPIRO:  Objection, form of

2    the question.

3         A.   I did not say that I disagree with Don

4    Passman.  I'm not sure why you did.

5         Q.   (BY MR. OPPENHEIM)  So your opinion is

6    that artists generally contract for a royalty

7    rate between 10 and 20 percent of wholesale

8    music, wholesale cost of music, right?

9         A.   That's my understanding.

10        Q.   Okay.  If Don Passman wrote on Page 92

11   of his book that the rate is 15 to 17 percent for

12   new artists, 17 to 20 percent for more

13   established artists, and over 20 percent for

14   superstar artists, would you disagree with him?

15        A.   No.

16        Q.   So the range is between 15 and 20 plus

17   percent, correct?

18        A.   The range is even broader than that.

19   The superstar list that he's referring to who get

20   more than 20 percent are a fraction of the

21   percentage of artists.  They are statistically

22   irrelevant.

23             MR. SCHAPIRO:  Objection.  Can I

24   just interject about the transcript, the

25   transcript of your question, Matt, said "so the

Case No. 1:19-cv-00874-RBJ-MEH Document 604-20 filed 12/02/21 USDC Colorado page 23 of 45

1  range is between 50 and 20 plus percent."  I

2  heard 15.

3           MR. OPPENHEIM:  Yeah, that's what I

4  said, so Peggy, will you correct that, please.

5           THE REPORTER:  I have written that,

6  but unfortunately when I make a correction on

7  this end, it doesn't come to your end, so sorry.

8           MR. SCHAPIRO:  Oh, okay.

9      Q.  (BY MR. OPPENHEIM)  That's fine.  I just

10  want to make sure, because I agree with Andrew,

11  that would be a fairly dramatic transcript issue.

12          So Mr. Sinnreich, you said that the

13  superstar list of artists who get more than 20

14  percent is only a fraction of a percentage of

15  artists.  I think that's what you just said,

16  right?

17     A.  By definition, yes, that's what a

18  superstar is.

19     Q.  Would you include Adelle as a superstar

20  artist?

21     A.  Yes.

22     Q.  She's in this case, right?

23     A.  I would have to review the exhibit

24  listing the list of allegedly infringed works.

25     Q.  How about Beyoncé, is she a superstar

Page 205

1    artist?

2        A.    Yes.

3        Q.    I'll represent to you she is in this

4    case.  How about Whitney Houston, is she a

5    superstar artist?

6        A.    I'm not sure what her current sales

7    figures are, but she has been a superstar artist.

8        Q.    I'll represent to you she's in this

9    case.  How about Pink?  Is she a superstar

10   artist?

11       A.    That's an interesting question.  I'm not

12   sure whether she meets the description of

13   superstar artist that Passman was using in that

14   passage.

15       Q.    How about Maroon 5?

16       A.    What's your question?

17       Q.    Are they a superstar artist?

18       A.    They were for a period of time.

19       Q.    During the period of 2013 to 2016, say

20   in the claims period of this case?

21       A.    I would have to review the industry data

22   to be certain, but it's possible.

23       Q.    How about Prince?  Was he a superstar

24   artist during that period?

25       A.    That's also an interesting question.

                                                    Page 206

1    Yeah, I would say that he counts.
2         Q.   How about -- I'm sorry, go ahead,
3    please.
4         A.   Well, Prince very famously had a
5    contentious relationship with his labels, and I
6    think the details of his contractual
7    relationships with the labels, for that reason is
8    non-representative.
9         Q.   How about Michael Jackson?  Was he a
10   superstar artist?
11        A.   He was.
12        Q.   He is in this case.  Now in your report
13   you don't describe escalations, do you?
14        A.   No.
15        Q.   And in fact, artists' contracts
16   generally include escalations, right?
17        A.   I know that it's something that appears
18   in some artists' contracts and not in others.
19        Q.   And that would increase the royalty rate
20   that an artist receives, right?
21        A.   By definition.
22        Q.   And then you opine that quote:
23   "Contractual clauses regarding issues like
24   packaging, free goods, reserves, and breakage can
25   cut the effective royalty by as much as half,

Case No. 1:19-cv-00874-RBJ-MEH Document 609-684 Filed 12/02/23 USDC Colorado Page 27 of 445

1  entitling artists to only single-digit

2  percentages."

3          For contracts that were entered into

4  during the digital age, is that true?

5      A.   I know that clauses like breakage and

6  packaging have evolved in the digital age.  Free

7  goods and reserves I believe are still fairly

8  frequently included in such contracts.

9          Nowadays there's something called

10  digital breakage that I don't think I mentioned,

11  and there are clauses like new technology

12  investments that have in some cases replaced

13  packaging, but these are just emblematic.  There

14  are a wide variety of clauses that can, and

15  argues to effectively cut royalty rates paid out

16  to artists who sign these contracts.

17      Q.   Free goods is not a position that are in

18  modern artists' contracts, correct?

19      A.   I don't have a basis on which to say

20  that they are no longer included in contracts.

21      Q.   Do you have a basis to say that the free

22  goods provisions remain in contracts?

23      A.   I have signed contracts with book

24  publishers in recent years that included free

25  goods clauses and I have not heard or seen

Case No. 1:19-cv-00874-RBJ-MEH Document 604-26 Filed 12/20/21 USDC Colorado Page 2 of 45

1 evidence that free goods clauses have been

2 eradicated from recording contracts.

3          But if you represent to me that they

4 have, I have no reason to dispute that.

5     Q.   What music contracts for any major

6 labels have you reviewed so that you have a basis

7 to opine on packaging free goods, reserves and

8 breakage clauses?

9          MR. SCHAPIRO:   Objection to the

10 premise of the question.

11     A.   The basis of my citation to those

12 clauses is the Don Passman Chapter 8, which I

13 cite in Footnote 34 of my report, but I have also

14 reviewed over the years a fair number of

15 contracts that have included such clauses.

16     Q.   (BY MR. OPPENHEIM)   Contracts with major

17 record companies?

18     A.   Yes, among others.

19     Q.   For what artists?

20     A.   I don't remember most of them

21 specifically off the top of my head.  I remember

22 Kenny Rogers' contract, I remember the Kanye West

23 contract.  I've also seen contracts that were not

24 published, but were that artists and artist

25 representative have shown me over the years, some

1  of them with major labels.

2      Q.    Okay, which labels?

3      A.    I can't recall them off the top of my

4  head.

5      Q.    A moment ago you said that there was no

6  more breakage in the old sense in contracts, but

7  there was a new sense of breakage in the

8  agreements, or something to that effect; is that

9  right?

10     A.    There's a term called digital breakage

11  which has been used over the past decade or so.

12     Q.    And you, in fact, referenced that in

13  your opinion, right, as unallocated advances?

14     A.    I believe so, yes.

15     Q.    Isn't it, in fact, true that unallocated

16  advances from DSPs are always shared with the

17  artists?

18     A.    That's not what the testimony before

19  Congress that I cite says.

20     Q.    So what testimony are you relying on?

21     A.    I'm going to have to look through my

22  report and find it, but there was testimony from

23  2014 by the then head OF, I believe it was A2IM,

24  talking about digital breakage.  It would be

25  listed in my rebuttal report.  I don't see it

Case No. 1:19-cv-00874-RBJ-MEH   Document 684-20   Filed 12/02/21   USDC Colorado   Page 30 of 45

1  which I have interviewed the music industry

2  attorneys who have reported the same thing to me.

3      Q.   Wasn't it widespread outcry that they

4  didn't know that they were getting paid breakage,

5  not that they weren't getting paid breakage?

6          MR. SCHAPIRO:   Objection,

7  foundation.

8      A.   You would have to look at a specific

9  instance of the outcry to answer that question.

10     Q.   (BY MR. OPPENHEIM)  Looking at the

11  artists whose works are in this case, can you

12  identify a single one that received a single

13  digit royalty rate?

14     A.   Do you mean an effective royalty rate

15  that's in the single digits?

16     Q.   Yes.

17     A.   Not specifically, no.

18     Q.   So you also opined that over the last 15

19  years most of the record company contracts have

20  been 360 deals, right?

21     A.   Yes.

22     Q.   How many 360 deals have you reviewed?

23     A.   I don't know.

24     Q.   Do you know what percentage of new

25  contracts are 360 deals?

Case No. 1:19-cv-00874-RBJ-MEH Document 684-20 Filed 12/20/23 USDC Colorado Page 31 of 445

Page 214

1    A.   I don't know specifically, no.

2    ████  █████████████████████████████

█████████████████████████████████████

██████

████  ████████████████████████████

███████████████████████████████

██████████████████████████████

████  ████████████████████████████

████  ███████████  ██████████████████

█████████████████████████████████████

████████████████████████████

████  █████████████████████████████

███████████████████████████

███████████████

15   Q.   So you opine in your report that many

16   artists rarely get a royalty check, correct?

17   A.   I opine that by the recording industry's

18   own contractual logic and public statements, it's

19   a logical proposition that the majority do not

20   receive a royalty check subsequent to the initial

21   advance.

22   Q.   And you don't include in your report a

23   statement subsequent to the initial advance, do

24   you?

25   A.   I don't recall.

Case No. 1:19-cv-08030-RA-MEH Document 601-684-2 Filed 12/07/21 12/23 DC USDC Colorado Page 8132 of 145

1    Q.    Okay.  But most artists do get an

2  advance, right?

3    A.    I am not privy to the totality of the

4  record contracts.

5    Q.    But based on the record contracts that

6  you have reviewed, isn't it, in fact, true, that

7  virtually every artist gets paid an advance?

8    A.    That's my experience, yes.

9    Q.    And that means that the record company

10  is assuming the risk that the recordings will not

11  generate revenue, right?

12    A.    In theory, yes.

13    Q.    And so if an artist never gets a royalty

14  payment, it simply means that the advance was

15  larger than the royalties would have been, right?

16    A.    No.

17    Q.    Why not?  How is that wrong?

18    A.    It's wrong because it's been a

19  historically common practice in the recording

20  industries to organize expenditures and

21  accounting in a way that reshifts the risk onto

22  the recording artist and guarantees profitability

23  for the label.

24    Q.    Can you describe factually how that's

25  happened to any of the artists in this case?

Page 216

1     A.    Not specifically, no.

2     Q.    When a record company pays an advance,

3  do they ask the artist to pay it back if the

4  album does not generate the revenues sufficient

5  to justify the advance?

6     A.    In some ways, yes.

7     Q.    How?

8     A.    For instance, through

9  cross-collateralization.

10     Q.    Explain how that works.

11     A.    Cross-collateralization is the future of

12  multi-album deals in which labels have the right

13  to recoup on their accounting losses associated

14  with earlier releases before counting revenues

15  towards recoupments on the most recent albums.

16     Q.    So you're just saying that the advance

17  applies to all the albums that are subject to the

18  record deal, not just one album, right?

19     A.    That's not what I said.

20     Q.    But isn't that effectively what you're

21  saying?

22     A.    You prompted me with a question whether

23  there were contracts that required artists to pay

24  back unrecouped expenditures on their releases,

25  and I said yes, and then mentioned

Case No. 1:19-cv-00874-RBJ-MEH Document 609-64 Filed 12/02/22 USDC Colorado Page 34 of 45

1  cross-collateralization as an example of how that

2  works.

3      Q.    In that situation, the artist never

4  writes a check, wires money, or hands over cash

5  to the record company to pay back the advance,

6  right?

7                MR. SCHAPIRO:  Objection to the

8  form of the question.

9      A.    I'm not aware of that having taken

10 place.

11     Q.    (BY MR. OPPENHEIM)  All they are doing

12 is applying the advance to the royalties of an

13 album in the deal, right?

14     A.    A single contract governs the economic

15 relations between a record label and the artist

16 spanning several releases in those cases.

17     Q.    Do you believe it's unfair that an

18 artist who receives a half a million-dollar

19 advance but only sells $200,000 worth of music

20 doesn't receive any royalty checks?

21     A.    It depends on the other revenue streams

22 associated with that piece of music.

23     Q.    If the $200,000 covers all of the

24 revenue from all of the different sources, do you

25 believe that it's unfair that the artist never

1  gets another royalty check?

2      A.   No.

3      Q.   You include in your opinion the

4  statement that signed artists are prevented from

5  participating in the broader labor market, even

6  during long periods in which they are not being

7  paid by the record labels, right?

8      A.   Yes.

9      Q.   The artists are only precluded from

10  doing recordings with other record companies,

11  right?

12     A.   It depends on the nature of their

13  contract.

14     Q.   The artist is still free to compose,

15  right?

16     A.   It depends on the specificities of the

17  contract.

18     Q.   If it's not a 360 deal, of which I will

19  tell you there are very few and the witnesses

20  will testify there are very few, if it's not a

21  360 deal, an artist who signs a recording

22  contract is free to compose and sell those

23  compositions, correct?

24     A.   Yes.

25     Q.   The artist is free to perform publically

Case No. 1:19-cv-00874-RBJ-MEH Document 604-20 Filed 12/02/2223 USDC Colorado Page 36 of 45

1  and be paid for those performances, correct?

2      A.   It depends on the specificities.  360

3  deals are not the only constraints on artists'

4  ability to pursue other sources of revenue.

5              MR. SCHAPIRO:  Apologies, Matt, my

6  LiveNotes froze.  Is your LiveNote working?  I've

7  refreshed.

8              (Off-the-record discussion.)

9              MR. SCHAPIRO:  Go ahead, that's

10 fine, but just two, a couple more questions, but

11 ask them slowly so that I don't have to go back

12 and look at the transcript.

13     Q.   (BY MR. OPPENHEIM)  To the extent that

14 an artist is prevented from participating in the

15 broader labor market, it's only because they have

16 agreed in a contract with the record company not

17 to, right?

18     A.   The record label's ability.

19     Q.   Hold on a second.  Peggy, are you good?

20 I'm sorry, Mr. Sinnreich.

21             (Off-the-record discussion.)

22     Q.   (BY MR. OPPENHEIM)  One last question,

23 Peggy, and then you can call them.  Okay, I

24 apologize, Mr. Sinnreich.  I'll ask the question

25 again, I don't guarantee it will be exactly the

Page 220

1  same.

2        The only reason that recording artists

3  would be prevented from participating in the

4  broader labor market, as you've described in your

5  report, is because the artist agrees not to

6  participate in the broader labor market in some

7  way, right?

8      A.   Are you referring to the terms of the

9  recording contract?

10     Q.   Yes.

11     A.   That is the principal obstruction to

12 their participating in the broader labor market,

13 correct.

14     Q.   Okay.  Let's go off the record, if you

15 wouldn't mind.

16              THE VIDEOGRAPHER:  Okay.  Going off

17 the record.  The time on the monitor, 4:16 p.m.

18                (Brief recess taken.)

19              THE VIDEOGRAPHER:  Okay, we're back

20 on the record.  The time on the monitor, 4:34

21 p.m.

22     Q.   (BY MR. OPPENHEIM)  Mr. Sinnreich, I

23 believe you testified earlier that you don't know

24 how many publishing agreements, recording

25 contracts on 360 deals you have reviewed; is that

Case No. 1:19-cv-00874-RBJ-MEH Document 609-684-20 Filed 12/00/2012/23 DC SD Colorado Page 38 of 445

1    A.   When you ask questions that are framed

2  in terms of whether a company has the right to do

3  X or whether Y is a human rights violation, those

4  refer to third-party standards, and not to my

5  personal intuitive opinion.

6        You can ask me how I interpret the

7  application of those third-party standards to

8  particularities, but that's a different question.

9    Q.   Do you believe, is it your opinion that

10  the United Nations has -- strike that.

11        The United Nations report that you

12  reference in your report is a 2011 report by what

13  they referred to as the special rapporteur; is

14  that correct?

15    A.   Yes.

16    Q.   And in that report -- strike that.  You

17  don't actually cite to the special rapporteur's

18  report in your expert report.  You actually cite

19  to a one-page article from a Wired magazine,

20  correct?

21    A.   Yes.

22    Q.   Have you actually reviewed the UN

23  report?

24    A.   Yes.

25    Q.   And that report was actually submitted

Case No. 1:19-cv-00874-RBJ-MEH Document 691-684 Filed 12/02/21 USDC Colorado Page 39 of 445

1    Q.   (BY MR. SCHAPIRO)  You'll recall that

2  Mr. Oppenheim asked you some questions about the

3  Jupiter report; do you remember that?

4    A.   Yes.

5    Q.   Did you do a follow-up report in 2002?

6    A.   Yes.

7    Q.   And do you cite to that 2002 study in

8  your expert report in this case?

9    A.   Yes.

10    Q.   And was that 2002 study an analysis of

11  new survey data or the same survey data that was

12  the subject of the 2000 report?

13    A.   It was an analysis of new survey data

14  that did not appear in the first report.

15    Q.   And you will recall some questions about

16  causation in the first part of the deposition.

17  Do you remember that?

18    A.   Yes.

19    Q.   For your findings of causation in the

20  Jupiter Research 2000 study, what form of

21  statistical analysis did you use to determine a

22  causal relationship?

23           MR. OPPENHEIM:  Objection.

24    A.   We used a statistical tool called

25  Regression Analysis.

Case No. 1:19-cv-00874-RBJ-MEH Document 601-20 Filed 12/02/22 USDC Colorado Page 40 of 45

1    Q.   (BY MR. SCHAPIRO)  And how about for the

2    2002 study?  What form of statistical analysis,

3    Professor Sinnreich, did you use to determine a

4    causal relationship?

5    A.   We used regression in that case, as

6    well, although there it was multiple regression

7    because there were several factors being

8    evaluated in relationship to one another.

9    Q.   And is that an accepted method in your

10   field for reaching a conclusion about a causal

11   relationship?

12   A.   Yeah.  Regression is typically

13   understood as the simplest route to establishing

14   a statistical proxy for causation between two or

15   more variables.

16   Q.   Do you recall earlier in the deposition

17   there were some questions about record label

18   price fixing; do you remember that?

19   A.   I do.

20   Q.   And Mr. Oppenheim was pressing you on

21   whether or not there had been -- what type of

22   finding there had been, or what the basis for

23   your belief was; do you remember that?

24   A.   I do.

25   Q.   And you said that you would need to look

Case No. 1:19-cv-08701-RMB-MEH Document 608-684-10 Filed 12/02/23 CSO Colorado Page 41 of 45

1      Q.   They didn't add -- the RAA and its

2  members never asked Jupiter Research to advise it

3  on any particular issues, did it?

4      A.   Yes.

5      Q.   Okay.  What issues did the RAA retain

6  Jupiter Research to advise it on?

7      A.   I remember multiple one-on-ones or small

8  room consulting sessions with RAA members

9  regarding strategic decision-making around the

10 digital music space.

11     Q.   And the RAA actually eventually fired

12 Jupiter and you because they disagreed with your

13 conclusions, correct?

14     A.   I have no idea.

15          MR. OPPENHEIM:  Okay.  I have no

16 further questions.

17          MR. SCHAPIRO:  Nor do we.  I'm

18 happy to go off the record.

19          THE VIDEOGRAPHER:  Okay.  This

20 concludes today's testimony.  Time on the monitor

21 7:07 p.m.  We're off the record.

22          (Deposition ended at 7:07 p.m.)

23

24

25

Page 312

                    C E R T I F I C A T E

        I, Peggy E. Corbett, a Certified Court
Reporter of the State of Missouri, do hereby
certify:

        That prior to being examined the witness
was by me duly sworn;

        That said deposition was taken down by
me in shorthand at the time and place
hereinbefore stated and was thereafter reduced to
writing under my direction;

        That I am not a relative or employee or
attorney or counsel of any of the parties, or a
relative or employee of such attorney or counsel,
or financially interested in the action.

        WITNESS my hand and seal this 11th day
of October, 2021.


                    PEGGY E. CORBETT,
                    CCR No. 143, RDR, CRR

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| WARNER RECORDS INC. (f/k/a/ Warner Bros. Records, Inc.), *et al*., <br><br> *Plaintiffs*, <br><br> v. <br><br> CHARTER COMMUNICATIONS, INC. <br><br> *Defendant*. | Case No. 19-cv-00874-RBJ-MEH |

**Errata Sheet for the Deposition of Aram Sinnreich (October 6, 2021)**

| Page | Line(s) | Now Reads | Should Read | Reason: 1=clarify the record; 2=conform to the facts; 3=correct transcription errors |
|---|---|---|---|---|
| 10 | 25 | Janea | Dunia | 3 |
| 34 | 15 | market | marketing | 3 |
| 35 | 19 | what we refer | what you refer | 3 |
| 39 | 7 | per bid | per bit | 3 |
| 43 | 14 | their case | the case | 3 |
| 43 | 23 | forum | fora | 3 |
| 43 | 25 | merits | merit | 3 |
| 53 | 8 | de minimus | de minimis | 3 |
| 55 | 1 | work of | word of | 3 |
| 71 | 21 | income on consumer | income or consumer | 3 |
| 74 | 19 | visa-a-vis | vis-à-vis | 3 |
| 78 | 23 | for by sales | for by singles | 3 |
| 88 | 13 | within | with an | 3 |
| 95 | 1 | interactive | interacting | 3 |
| 95 | 4 | discretant | discrete | 1 |
| 98 | 9 | you question | your question | 3 |
| 116 | 19 | the hard drive | my hard drive | 3 |
| 118 | 6 | the larger portion | a larger portion | 3 |
| 119 | 3 | piracy summary Crusade | Piracy Crusade | 3 |
| 120 | 12 | value on | value of | 3 |
| 120 | 16 | enumerable | innumerable | 3 |
| 120 | 17 | filtered | fielded | 3 |
| 121 | 2 | enumerable | innumerable | 3 |

03319-00007/13017250.1

| Page | Line(s) | Now Reads | Should Read | Reason: 1=clarify the record; 2=conform to the facts; 3=correct transcription errors |
|---|---|---|---|---|
| 121 | 5 | an operation was | it operationalizes | 3 |
| 127 | 12 | Shekler | Sheckler | 3 |
| 147 | 20 | Lyon | Bram | 3 |
| 163 | 8 | RAA's | RIAA's | 3 |
| 165 | 17 | perceive | are perceived | 3 |
| 165 | 18 | correspondence | correspond | 3 |
| 172 | 16 | major artists | major labels | 1 |
| 174 | 13 | Jamie Thomas Rassin | Jammie Thomas-Rasset | 1 |
| 175 | 1, 3 | Tannenbaum | Tenenbaum | 1 |
| 186 | 1 | services | sources | 3 |
| 186 | 20 | many | major | 3 |
| 203 | 20 | fraction of the | fraction of a | 3 |
| 204 | 19 | Adelle | Adele | 3 |
| 207 | 15 | argues to | arguably do | 3 |
| 216 | 11 | the future | a feature | 3 |
| 225 | 5 | McGame | The Game | 3 |
| 232 | 7 | exploited with | exploitative | 3 |
| 244 | 11 | loads | nodes | 3 |
| 249 | 15 | Adam | Theda | 3 |
| 249 | 17 | successfulness | success with it | 3 |
| 255-256 | 25-2 | the "software" being in its timely usage, where it's used primarily with words like application | "software" in its common usage, where it's understood primarily as an application | 1 |
| 266 | 21 | August | august | 3 |
| 266 | 22 | anything | something | 3 |
| 268 | 13 | things | framings | 3 |
| 270 | 21 | characterizing | characterize | 3 |
| 279 | 9 | line reviewers | blind reviewers | 3 |
| 285 | 25 | services | sources | 3 |
| 291 | 19-20 | for reporting industry-wide abuse | for record industry revenues | 3 |
| 297 | 2 | MWMG's North America | WMG's North American | 3 |
| 297 | 15-16 | Brittany Spears, the Back Street Boys and In Sync | Britney Spears, the Backstreet Boys and 'NSync | 3 |
| 297 | 18 | pockets | pop hits | 3 |
| 303 | 9 & 12 | MPV | NPD | 3 |
| 305 | 18 | through | who | 3 |

| Page | Line(s) | Now Reads | Should Read | Reason: 1=clarify the record; 2=conform to the facts; 3=correct transcription errors |
|------|---------|-----------|-------------|-------------------------------------------------------------------------------------|
| 306 | 1 | act like | a result like | 3 |
| 306 | 10 | any | an enormous | 3 |
| 308 | 12 | services | sources | 3 |
| 311 | 1 | RAA | RIAA | 3 |

Date: ___11/9/21___          Signature: _____