# Exhibit XXIII

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

WARNER RECORDS INC., *et al.*,

    Plaintiffs,

v.

CHARTER COMMUNICATIONS, INC.,

    Defendant.

Case No. 1:19-cv-00874-RBJ-MEH

## CHARTER'S RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE OR LIMIT EXPERT TESTIMONY OF DR. KARL SNOW

Dr. Karl Snow holds a master's degree and a doctorate degree in economics from the University of Chicago, with an emphasis on finance and econometrics, which is a statistical analysis applied to economics. Dkt. 560-2 ("Snow Rep.") ¶ 2. He has taught finance and statistics at multiple universities and is currently a partner at Bates White LLC, an economic consulting firm that specializes in advanced statistical, financial, and economic analyses. *Id.* ¶¶ 1, 3. He has testified as an expert more than 20 times in the past four years. *Id.* App'x B. Dr. Snow's testimony is relevant to a core disputed issue in this litigation: the lack of integrity of Plaintiffs' purported proof of direct infringement.

In the event Plaintiffs' indirect infringement claims survive summary judgment, Plaintiffs must prove at trial that Charter's subscribers directly infringed Plaintiffs' copyrights. However, Plaintiffs lack the contemporaneous evidence necessary to do so ███████████████████████████████████████████████████████████████████████████████████████. If the Court permits, Plaintiffs intend to "cure" these significant evidentiary gaps through a highly technical, multi-step chain of evidence that simply falls apart on examination. Dr. Snow's opinions

1

lay bare the significant flaws in that chain of evidence. His opinions also shed light on the substantial duplication of notices that provide the foundation for Plaintiffs' inflated damages claims.

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████, and deflate Plaintiffs' damages base, it may come as no surprise that Dr. Snow's opinions are hotly contested. But blistering disagreement with an expert's opinions is not the proper basis for exclusion. Dr. Snow is not only eminently qualified to offer a statistical analysis of the complicated data sets at issue in this case, but his opinions will unquestionably aid the jury █████████████

████████████████████████████████████████████ and inflated damages base. Given the magnitude of the claims asserted against Charter, it is essential for the jury to hear a truthful and accurate portrayal of the relevant facts. Admission of Dr. Snow's testimony is therefore critical to ensuring a fair trial.

Because Dr. Snow's opinions are highly relevant and reliably grounded in a competent, statistical analysis of Plaintiffs' evidence, the testimony should be admitted under Federal Rules of Evidence 401 and 702, and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Plaintiffs' Motion to Exclude or Limit Expert Testimony of Dr. Karl Snow should be denied.

## BACKGROUND

In 2011, Plaintiffs retained MarkMonitor, Inc. ("MarkMonitor") to scan peer-to-peer ("P2P") networks for suspected copyright infringement and to generate notices to Charter, all for use in anticipated litigation as Plaintiffs' direct infringement proof. ████████████████

███████████████████████████████████████████████████████████████████████

2

██████████ *See* Dkt. 593 ("Charter's Spoliation Mot.") at 3-8. ██████████

██████████████████████████████████████████████████████████████ To understand the import of Dr. Snow's opinions, it is essential to understand this chain of evidence and its flaws. A high level overview is provided below.

**I.     THE 2012-2015 NOTICE PROGRAM**

From 2012-2015, MarkMonitor monitored P2P networks, purportedly to identify P2P file-sharing of Plaintiffs' copyrighted works. ██████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████

MarkMonitor then sent Plaintiffs' notices of alleged infringement to Charter, associated with the IP addresses of allegedly infringing Charter customers ("copyright notices"). These copyright notices are allegations of infringement with a file name, date, time, and IP address, and comprise a data set referred to as "Plaintiffs' Notice Data." *Id.* ¶ 25. ██████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████

3

[redacted]

## II. THE 2016 "DOWNLOAD PROJECT"

[redacted]

███████████████████████████████████████████████████████

### III. THE REPORTS OF MR. GELUSO AND THE "LISTENERS"

██████████████████████████████████████████

██████████████████████████████████████ To do this, Plaintiffs retained an audio engineer named Paul Geluso, and a set of consultants working under him, who are colloquially referred to in this litigation as the "Listeners." ████████████████████████████

████████████████████████████████████████████

██████████████████████████████████"[1]  Dkt. 560-7 ("Geluso Rep.") ¶ 2. ███████████████████████████████████████████

████████████████████████████████████████████

█████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[1] By their own admission, this analysis was incomplete and not all files were listened to or matched. Charter has challenged this inherently defective analysis in its currently pending Motion to Exclude the Opinions and Testimony of Paul Geluso and the Listeners. *See* Dkt. 553.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

### IV. PLAINTIFFS' DUPLICATIVE NOTICES

In addition to the analyses described above, ███████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████ Snow Rep. ¶¶ 16, 54. Dr. Snow's testimony on this point directly refutes Plaintiffs' theory that the volume of notices sent is indicative of the extent of alleged infringement on Charter's network.

## ARGUMENT

### I. DR. SNOW'S CRITICISM OF PLAINTIFFS' RELIANCE ON THE LISTENERS IS SOUND

In their Motion, Plaintiffs first take issue with Dr. Snow's discussion of the work performed by Mr. Geluso and the Listeners. ███████████████████████

███████████████████████████████████████

██████████████████████████ Plaintiffs incorrectly frame this as an attack on the actual matching process undertaken by the Listeners, which they claim Dr. Snow is not qualified to do. Dkt. 560 ("Mot.") at 4. But Dr. Snow ████████████████

███████████████████████████████████████

6

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████ For the reasons set forth below, that opinion and the analysis supporting it are admissible.

    **A.**    <u>**Files the Listeners Did Not Listen To**</u>

Plaintiffs acknowledge "that Mr. Geluso and the Listeners did not verify all files" but argue that this "has no bearing on the validity or reliability of the matches they did verify" and therefore Dr. Snow should be silenced from offering any opinions on the subject at all. Mot. 4. But Dr. Snow ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████ Dr. Snow's analysis is necessary to expose the flaws in Mr. Buchan's analysis. Dr. Snow's testimony should be admitted to ensure a fair and balanced trial presentation.

    **B.**    <u>**The Listeners Did Not Actually Verify the Files Downloaded in 2012-2015**</u>

Plaintiffs also argue that Dr. Snow should not be permitted to comment on the analysis of Mr. Geluso and the Listeners because the issue of "*when* Mr. Geluso and the Listeners conducted their verifications does not affect whether the matches Mr. Geluso and the Listeners verified actually are matches." Mot. 4. But again, Dr. Snow ███████████████████████████████

█████████████ ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

7

███████████████████████████████

███████████████████████████████ *Id.* ¶ 39 n.58. This analysis further illustrates the flaws in Plaintiffs'

chain of evidence, and should be deemed admissible to ensure a fair trial.

## II. DR. SNOW'S ANALYSIS OF THE AUDIBLE MAGIC MATCHING PROCESS ILLUMINATES THE UNEXPLAINED FLAWS IN PLAINTIFFS' EVIDENCE

Just as Plaintiffs misrepresent Dr. Snow's critique of Mr. Geluso and the Listeners, they also misstate his opinions regarding the Audible Magic matching process. Mot. 5-8. ███████

███████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███ In their Motion, Plaintiffs do not factually contest any of the above analyses.

████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
██████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████

9

Plaintiffs claim this to be an "absurd" conclusion, as it is a "mathematical fact" that files with the same hash values are the same. Mot. 6. But this does not render Dr. Snow's testimony unreliable, as Plaintiffs claim. ███████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████

██████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

10

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████

Any of the above options might explain the paradox in the data uncovered by Dr. Snow, and none are "mathematically impossible," as Plaintiffs claim. In any event, there is no dispute about the accuracy or the methodology of Dr. Snow's calculation quantifying the anomaly, and, hence, no basis for Plaintiffs' argument that Dr. Snow's analysis is unreliable. ██████████

████████████████████████████████████████████

█████████████████████████ leaving the ultimate resolution of this issue to the fact finder.

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████

---

[2] As for the "spoofing" option, Dr. Chatterjee explains that it was common for Internet trolls to create fake versions of popular files to induce innocent P2P users to unintentionally download malware and, depending on various factors, relevant data shows that this pollution could constitute as much as 70% (and not less than 20%) of the content in a P2P system. Dkt. 558-2 ("Chatterjee Rep.") ¶¶ 71-104.

11

### III. DR. SNOW'S OPINIONS ABOUT PLAINTIFFS' DUPLICATE NOTICES ARE ADMISSIBLE

At its core, Plaintiffs' case is premised not just on the mere fact that copyright notices were sent to Charter during the Claims Period, but on the sheer *number* of notices sent. It is therefore critical to Charter's defense to have a qualified expert who can analyze the data sets and put the purported volume in appropriate context for the jury. The jury should be permitted to hear that a

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████[3]

Dr. Snow has conducted a straightforward analysis of Plaintiffs' Notice Data and Charter's ticket data and has offered opinions regarding certain observable patterns. Snow Rep. ¶ 31. ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████ A fact finder may understandably feel differently about a subscriber who received 50 notices all for the same file within a short time period, versus simply hearing that the subscriber received 50 copyright notices. *Id.* ¶ 34.

---

[3] Although Plaintiffs point out that some of the "duplicative" notices were more widely separated in time, ████████████████████████████
████████████████████ Snow Rep. ¶¶ 34-35. If Plaintiffs wish to quibble with this point, they are free to cross-examine Dr. Snow at trial.

Plaintiffs do not dispute the accuracy of Dr. Snow's analysis. They do not claim that the numbers and percentages cited in Dr. Snow's report are incorrect. Rather, they wrongly contend that he provides "no factual basis establishing the relevance of his analysis." Mot. 9. But this makes no sense, as Dr. Snow's analysis is based entirely on the data sets in the record, and he derives all of his statistics from the patterns observed from that data. At trial, Plaintiffs will undoubtedly trumpet the fact that over ████ copyright notices were sent to Charter. The jury is entitled to understand what these notices do——and do not——represent.

Plaintiffs' ancillary argument that Dr. Snow's analysis should be excluded because he has no "basis to establish the meaning of duplicative notices in terms of subscriber activity" is also misplaced. Mot. 10. Dr. Snow does not intend to offer opinions about actual subscriber activity.[4] His opinions are limited to a statistical analysis of the distribution of notices across certain hash texts and IP addresses. Accordingly, this argument is inaccurate, and does not provide a proper basis to exclude Dr. Snow's testimony.

## IV.   DR. SNOW'S OPINIONS ARE LIMITED TO ANALYZING DATA

The final portion of Plaintiffs' Motion amounts to a request that Dr. Snow be precluded from offering opinions he is not actually offering. In fact, Dr. Snow's opinions are ████ ████████████████████████████████████████████, and are supported by

---

[4] Plaintiffs also complain that Dr. Snow is improperly opining on subscriber activity. Mot. 10 (citing Snow Rep. ¶ 26). But the paragraph of his report that Plaintiffs cite, which is background and not the substance of Dr. Snow's analysis, amounts to nothing more than an explanation of how MarkMonitor sent its notices. Snow Rep. ¶ 26. Far from lacking in foundation, this is merely a simplified explanation of the process laid out at length in the report of Plaintiffs' putative expert, Ms. Frederiksen-Cross. Frederiksen-Cross Rep. ¶¶ 77-106.

13

explanations sufficient for the factfinder to understand the sources of the data and the analyses performed. The three examples in Plaintiffs' Motion all follow this pattern.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Mot. 12. As such, there is nothing to exclude. ████████████████████████████

████████████████████████ does not render it inadmissible, when it is relevant and well within his expertise.

Second, there is nothing inadmissible about the fact that ████████████████

████████████████████████████████████████████████████████████

████████████ Mot. 13 (citing Snow Rep. ¶ 116). That this occurred is a simple and factual observation. In Dr. Snow's deposition, he made clear that ████████████████

████ Dkt. 560-8 ("Snow Tr.") 137:18-19. Again, there is no objectionable opinion to exclude.

Third, ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ Snow Tr. 117:1-6. Therefore, no exclusion is necessary here either.

14

## CONCLUSION

WHEREFORE, for all the foregoing reasons, Charter respectfully requests that the Court deny Plaintiffs' Motion to Exclude or Limit Expert Testimony of Dr. Karl Snow.

Dated: December 20, 2021

Respectfully submitted,

/s/ Andrew Schapiro

| | |
|---|---|
| Charles K. Verhoeven<br>David Eiseman<br>Linda J. Brewer<br>QUINN EMANUEL URQUHART &<br>SULLIVAN, LLP<br>50 California Street, 22nd Floor<br>San Francisco, CA 94111<br>(415) 875-6600 (telephone)<br>Email: charlesverhoeven@quinnemanuel.com<br>Email: davideiseman@quinnemanuel.com<br>Email: lindabrewer@quinnemanuel.com<br><br>Jennifer A. Golinveaux<br>WINSTON & STRAWN LLP<br>101 California Street, 35th Floor<br>San Francisco, CA 94111<br>(415) 591-1506 (telephone)<br>Email: jgolinveaux@winston.com<br><br>Michael S. Elkin<br>WINSTON & STRAWN LLP<br>200 Park Avenue<br>New York, NY 10166<br>(212) 294-6700 (telephone)<br>Email: melkin@winston.com | Andrew H. Schapiro<br>Nathan Hamstra<br>QUINN EMANUEL URQUHART &<br>SULLIVAN, LLP<br>191 N. Wacker Drive, Suite 2700<br>Chicago, IL 60606<br>(312) 705-7400 (telephone)<br>Email: andrewschapiro@quinnemanuel.com<br>Email: nathanhamstra@quinnemanuel.com<br><br>Todd Anten<br>Jessica Rose<br>QUINN EMANUEL URQUHART &<br>SULLIVAN, LLP<br>51 Madison Avenue, 22nd Floor<br>New York, NY 10010<br>(212) 849-7000 (telephone)<br>Email: toddanten@quinnemanuel.com<br>Email: jessicarose@quinnemanuel.com<br><br>Craig D. Joyce<br>Fairfield and Woods, P.C.<br>1801 California Street, Suite 2600<br>Denver, CO 80202<br>(303) 830-2400 (telephone)<br>Email: cjoyce@fwlaw.com<br><br>*Counsel for Charter Communications, Inc.* |