# Exhibit XXIV

Exhibit C

HIGHLY CONFIDENTIAL

Page 1

1                    UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF COLORADO

3

4    WARNER RECORDS INC., et al.,

5                      Plaintiffs,

6         vs.                    Case No. 1:19-cv-00874-RBJ-MEH

7                                Hon. R. Brooke Jackson

8    CHARTER COMMUNICATIONS, INC.,

9                      Defendant.

10    _____

11

12                    **HIGHLY CONFIDENTIAL**

13

14

15        The Videotape Deposition of WAYNE C. COLEMAN, CPA

16        Taken Via Remote Zoom Videoconference

17        Commencing at 9:34 a.m.

18        Thursday, October 14, 2021

19        Stenographically reported by:

20        Joanne Marie Bugg, CSR-2592, RPR, RMR, CRR

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 2

1 APPEARANCES:
2 JONATHAN M. SPERLING
3 SARA J. DENNIS
4 Covington & Burling LLP
5 620 Eighth Avenue
6 New York, New York 10018
7 212.841.1000
8 jsperling@cov.com
9 sdennis@cov.com
10     Appearing on behalf of the Plaintiffs.
11
12 LINDA J. BREWER
13 DAVID D. DOAK
14 Quinn Emanuel Urquhart & Sullivan, LLP
15 50 California Street, 22nd Floor
16 San Francisco, California 94111
17 415.875.6600
18 lindabrewer@quinnemanuel.com
19 daviddoak@quinnemanuel.com
20     Appearing on behalf of the Defendant.
21
22 ALSO APPEARING VIA ZOOM VIDEOCONFERENCE:
23 David Jacoby, Esq.
24 Justin Bond - Videographer
25

Page 3

1         TABLE OF CONTENTS
2
3 WITNESS                    PAGE
4 WAYNE C. COLEMAN, CPA
5
6 EXAMINATION BY MR. SPERLING:        5
7
8         EXHIBITS
9
10 EXHIBIT                   PAGE
11 (Exhibits attached to transcript.)
12
13 DEPOSITION EXHIBIT 309        8
14 May 27, 2021 Wayne C. Coleman, CPA Report
15 DEPOSITION EXHIBIT 310        160
16 June 14, 2002 ████████████████
17 PL_CH_0009898 - PL_CH_0009973
18 DEPOSITION EXHIBIT 311        163
19 August 13, 1991 Agreement
20 PL_CH_0006805 - PL_CH_0006900
21 DEPOSITION EXHIBIT 312        169
22 Exclusive Recording Agreement
23 PL_CH_0006390 - PL_CH_0006408
24 DEPOSITION EXHIBIT 313        171
25 Agreement with ████████ PL_CH_0005517 - PL_CH_0005561

Page 4

1 Zoom Videoconference
2 Thursday, October 14, 2021
3 9:34 a.m.
4
5         VIDEO TECHNICIAN:  Good morning.  Today is
6 October 14th, 2021. We are on the record at 9:34 a.m.
7 Today we'll take a videotaped deposition in Case Number
8 19-cv-00874-RBJ.
9         This deposition is being held remotely.
10 Counsel, please state your appearance and affiliation
11 for the record.
12         MR. SPERLING:  For the plaintiffs, Jonathan
13 Sperling and Sarah Dennis of Covington & Burling.  Also
14 in attendance for the plaintiffs David Jacoby for
15 plaintiff Sony Music Entertainment.
16         MS. BREWER:  Linda Brewer of Quinn Emanuel
17 on behalf of defendant, Charter, and on behalf of the
18 witness, Mr. Coleman.  And also present today is David
19 Doak of Quinn Emanuel.
20         VIDEO TECHNICIAN:  Thank you.  Would you
21 please swear the witness.
22         WAYNE C. COLEMAN, CPA
23 was thereupon called as a witness herein, and after
24 having first been duly sworn to testify to the truth,
25 the whole truth and nothing but the truth by the

Page 5

1 stenographer, was examined and testified as follows:
2         EXAMINATION
3 BY MR. SPERLING:
4 Q.  Good morning, Mr. Coleman. I know we met a moment ago
5     off the record, but I'm going to introduce myself to
6     you here.  My name's Jonathan Sperling. I represent the
7     plaintiffs in this lawsuit.
8         Mr. Coleman, I take it you've been deposed
9     before; is that right?
10 A.  That's correct.
11 Q.  About how many times have you been deposed before?
12 A.  I think about 35 times or so.
13 Q.  And how many times have you testified in court
14     previously?
15 A.  Something less than that, but quite a few times.
16 Q.  You'd say more than 10 times?
17 A.  Yes.
18 Q.  More than 20, sir?
19 A.  Probably around 20.
20 Q.  Well, you're an experienced witness, but I'm going to
21     remind you about the ground rules nonetheless, Mr.
22     Coleman. First of all, you understand that you're
23     testifying under oath just as if you've been sworn in
24     court, correct?
25 A.  I do.

Veritext Legal Solutions

HIGHLY CONFIDENTIAL

1  Q.  How many discussions did you have with counsel to
2     prepare for today's deposition?
3  A.  I had two discussions.
4  Q.  When were those, sir?
5  A.  One was on Monday. And the second one was on Wednesday,
6     yesterday.
7  Q.  How long was the first discussion?
8  A.  I think about an hour, hour and a half.
9  Q.  And how long was the discussion yesterday?
10 A.  It was in two parts. I think an hour and a half, maybe
11    two hours at the beginning, and half an hour to an hour
12    the second time.
13 Q.  Who participated in those meetings that you had with
14    counsel?
15 A.  I primarily participated. There were a couple of times
16    I brought my partner, Darla Crain, in.
17 Q.  And what about counsel? What specific individuals
18    participated in the meeting?
19 A.  David Doak, and Linda as well.
20 Q.  Linda Brewer, is that who you're referring to?
21 A.  Brewer, yes, sorry.
22 Q.  All right. Mr. Coleman, is Exhibit 309 a copy of the
23    expert report that you've submitted in this matter?
24 A.  It is.
25 Q.  You were asked to opine on the three issues that are

1     set forth on page five of that report; is that correct?
2  A.  That's correct.
3  Q.  Were you asked to opine on anything other than the
4     three issues identified on page five of your report?
5  A.  I was not.
6  Q.  Okay. You're not offering any opinion in this case
7     regarding copyright infringement, correct?
8  A.  I am not.
9  Q.  You're not offering any opinion in this case regarding
10    plaintiffs' ownership of any copyrights, correct?
11 A.  Correct.
12 Q.  You're not offering an opinion regarding direct
13    infringement of plaintiffs' copyrights by Charter
14    subscribers, correct?
15 A.  Correct.
16 Q.  And you're not offering any opinion about any secondary
17    copyright infringement by Charter, right?
18 A.  Correct.
19 Q.  You're not offering opinion about Charter's knowledge
20    or awareness of any copyright infringement going on on
21    its network, correct?
22 A.  Correct.
23 Q.  You're not offering Charter's material contribution to
24    any infringement going on on its network, correct?
25 A.  Correct.

1  Q.  You're not offering an opinion about any notices of
2     infringement that were sent to Charter; is that right?
3         MS. BREWER: Object to form.
4  A.  Correct.
5  BY MR. SPERLING:
6  Q.  You're not offering an opinion about Charter's right
7     and ability to control infringing activity on its
8     network, correct?
9         MS. BREWER: Object to form.
10 A.  Correct.
11 BY MR. SPERLING:
12 Q.  You're not offering opinion about Charter's direct
13    financial benefit from infringing activity on its
14    network, correct?
15        MS. BREWER: Object to form.
16 A.  Correct.
17 BY MR. SPERLING:
18 Q.  You're not offering an opinion about any of Charter's
19    defenses or affirmative defenses in this case, right?
20 A.  Correct.
21 Q.  Are you offering opinion about whether Charter --
22    whether an infringement by Charter or its subscribers
23    was innocent?
24        MS. BREWER: Object to form.
25 A.  No.

1  BY MR. SPERLING:
2  Q.  You're not offering any opinion about any
3     non-infringing use of Charter's internet service,
4     correct?
5  A.  Correct.
6  Q.  You're not offering any opinion about copyright misuse
7     by plaintiffs, correct?
8         MS. BREWER: Object to form.
9  A.  I'm not sure I understand the question.
10 BY MR. SPERLING:
11 Q.  Are you offering opinions, sir, about any misuse by any
12    plaintiff in this case of their copyrights?
13        MS. BREWER: Object to form.
14 A.  Only to the extent that there were underpayments that I
15    discussed in my opinions.
16 BY MR. SPERLING:
17 Q.  Okay. And by that you mean underpayments by plaintiffs
18    to artists or songwriters; is that correct?
19 A.  Correct.
20 Q.  Mr. Coleman, give me just a moment. There's no need
21    for us to go off the record.
22        Mr. Coleman, you're not offering any opinion
23    in this matter regarding plaintiffs' mitigation of
24    damages, correct?
25        MS. BREWER: Object to form.

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL

<table>
<tr><td>

Page 14

1  A.  Correct.
2  BY MR. SPERLING:
3  Q.  You're not offering an opinion about whether plaintiffs
4  are estopped from asserting any of their claims in this
5  case, correct?
6      MS. BREWER:  Object to form.
7  A.  Correct.
8  BY MR. SPERLING:
9  Q.  You're not offering an opinion about the validity or
10  accuracy of any plaintiffs' copyright registrations,
11  correct?
12  A.  Only to the extent that it may result in underpayments
13  to the clients.
14  Q.  Mr. Coleman, your report doesn't offer any opinion
15  about whether any copyright registration by any
16  plaintiff in this case was inaccurate or invalid; isn't
17  that right?
18      MS. BREWER:  Object to form.
19  A.  I have to look back at my report. There are times when
20  record companies and publishers incorrectly register
21  the -- and especially publishers to copyright.  To the
22  extent that that's done, and there is a claim for
23  underpayment, we disclose that in our audits.
24  BY MR. SPERLING:
25  Q.  Thank you, sir. But that's not my question. My question

</td><td>

Page 16

1      damages in this case, are you?
2  A.  No.
3      MS. BREWER:  Object to form.
4  A.  Sorry.
5      MS. BREWER:  That's okay. Drink more coffee
6  on my end.
7  BY MR. SPERLING:
8  Q.  And you're not offering an opinion about plaintiffs'
9  lost profits, correct?
10      MS. BREWER:  Object to --
11  BY MR. SPERLING:
12  Q.  I'll restate the question.  You're not offering an
13  opinion about plaintiffs' lost profits as a result of
14  infringement occurring on Charter's network, correct?
15      MS. BREWER:  Object to form.
16  A.  Correct.
17  BY MR. SPERLING:
18  Q.  You're not offering an opinion about plaintiffs' lost
19  license fees resulting from infringement going on on
20  Charter's network, correct?
21  A.  Correct.
22      MS. BREWER:  Object to form.
23  A.  Sorry.
24  BY MR. SPERLING:
25  Q.  You're not offering an opinion about any expenses that

</td></tr>
<tr><td>

Page 15

1  is about the report that you submitted in this matter.
2  Your report doesn't offer an opinion as to whether any
3  copyright registration by plaintiffs was inaccurate or
4  invalid, does it?
5  A.  No, it does not.
6  Q.  You're not offering an opinion about plaintiffs'
7  compliance with any formalities regarding the
8  registration of copyrights, correct?
9      MS. BREWER: Object to form.
10  A.  I am not.
11  BY MR. SPERLING:
12  Q.  You're not offering an opinion about Charter's action
13  or inaction in response to notices of infringement of
14  plaintiffs' works, correct?
15  A.  Correct.
16  Q.  You're not offering an opinion about Charter's
17  willfulness with respect to any infringing activity by
18  Charter, right?
19      MS. BREWER:  Object to form.
20  A.  Correct.
21  BY MR. SPERLING:
22  Q.  In this case, you didn't perform a damages calculation,
23  did you?
24  A.  Could you explain or repeat that question?
25  Q.  Sure. You're not offering an opinion about plaintiffs'

</td><td>

Page 17

1  Charter saved as a result of the infringements at issue
2  in this case, right?
3      MS. BREWER:  Object to form.
4  A.  Correct.
5  BY MR. SPERLING:
6  Q.  And you're not offering an opinion about any profits
7  that Charter earned as a result of the infringements
8  alleged in this case, correct?
9      MS. BREWER:  Object to form.
10  A.  Correct.
11  BY MR. SPERLING:
12  Q.  You're not offering an opinion about the need to defer
13  future infringement by Charter, right?
14      MS. BREWER:  Object to form.
15  A.  Correct.
16  BY MR. SPERLING:
17  Q.  You're not offering an opinion about the need to defer
18  future infringement by other similarly situated
19  internet service providers, correct?
20      MS. BREWER:  Object to form.
21  A.  Correct.
22  BY MR. SPERLING:
23  Q.  You're not offering an opinion as to whether plaintiffs
24  typically share recoveries from piracy lawsuits with
25  their artists and songwriters, are you?

</td></tr>
</table>

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL

Page 18

1        MS. BREWER: Object to form.
2  A.  To the extent that plaintiffs have received income that
3     has not been quantified or allocated by title, and has
4     not been paid to the artists or writers, then those
5     claims would have been included in the ones that I
6     delineated in my report.
7  BY MR. SPERLING:
8  Q.  I'm not sure I understood your answer, sir. So let me
9     ask the question again. I'll try to ask it a little
10    bit differently. Your report does not offer any opinion
11    one way or the other, does it, on whether as a matter
12    of practice, plaintiffs share with their artists and
13    songwriters recoveries that plaintiffs get from piracy
14    lawsuits?
15       MS. BREWER: Object to form.
16 A.  I will look back at my report for a second. On page 15
17    of my report, I discussed third party settlement that
18    company allocates by artist percentage of revenue
19    excludes revenue the record company considers not
20    royalty bearing. So to the extent any claims are
21    payments from piracy, it fits into that description,
22    and it's in my report.
23 BY MR. SPERLING:
24 Q.  Well, the answer you just gave me, sir, is dependent on
25    something you don't know the answer to, right?

Page 19

1        MS. BREWER: Object to form.
2  BY MR. SPERLING:
3  Q.  I'm sorry. I couldn't hear your answer, sir.
4  A.  Correct.
5  Q.  And the thing that you don't know the answer to is
6     whether plaintiffs do or don't share recoveries from
7     piracy lawsuits with their artists and songwriters,
8     right?
9        MS. BREWER: Object to form.
10 A.  I know of -- now, that's correct. That's correct.
11 BY MR. SPERLING:
12 Q.  And so you're not offering an opinion on that thing
13    that you don't know the answer to, right?
14       MS. BREWER: Object to form.
15 A.  I'm not sure I understand your question. I think I
16    answered.
17 BY MR. SPERLING:
18 Q.  Fair enough. I'll ask you a different question, sir.
19    You're not offering an opinion in this case on whether
20    piracy negatively impacts artists and songwriters, are
21    you?
22       MS. BREWER: Object to form.
23 A.  I'm not, that's correct.
24 BY MR. SPERLING:
25 Q.  And you're not offering an opinion in this case on

Page 20

1     whether piracy negatively impacts the ability of
2     artists, songwriters or plaintiffs to create and
3     deliver their music to the public, right?
4  A.  Correct.
5  Q.  Mr. Coleman, in your report you say that you have over
6     49 years of experience as a royalty auditor, business
7     manager, tour accountant, valuator, author, consultant
8     and expert witness; is that right?
9  A.  That's correct.
10 Q.  In what years did you work as a business manager in the
11    music business?
12 A.  From '71 to '91, and then on and off I've had clients
13    since then up to today.
14 Q.  Over the past 30 years, has the bulk of your work
15    consisted of royalty audits?
16       MS. BREWER: Object to form.
17 A.  I wouldn't say the bulk of work, no, no. I would say
18    most of it, but a lot of work is in the other
19    categories of that I mentioned already.
20 BY MR. SPERLING:
21 Q.  Okay. Did I hear you correctly, sir, did you just say
22    that most of your work over the last 30 years is as a
23    royalty auditor?
24       MS. BREWER: Object to form.
25 A.  I would say that the largest percentage of my work, if

Page 21

1     I were to divide it up between auditing, consulting,
2     litigation support valuations, mismanagement, the
3     largest percentage has been in royalty compliance
4     audit.
5  BY MR. SPERLING:
6  Q.  Sir, you have a BS degree in accounting from
7     Mississippi State University; is that correct?
8  A.  That's correct.
9  Q.  Do you have any other degrees, sir?
10 A.  I have an honorary doctorate degree.
11 Q.  From what institution, sir?
12 A.  From Missouri Valley.
13 Q.  Is that the full name of the institution, sir, Missouri
14    Valley?
15 A.  It's changed names, but I think it was -- it's now
16    Missouri Valley University.
17 Q.  What was your first job as an accountant, sir?
18 A.  First job was with Touche Ross & Company in Memphis,
19    Tennessee.
20 Q.  What were your primary responsibilities in that role?
21 A.  Auditing.
22 Q.  Did any of that work involve royalty audits in the
23    music industry?
24 A.  It did not.
25 Q.  How long did you work at Touche Ross?

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL

1   A.   My understanding of a penny rate is a flat rate that's
2        received, or a formula that comes out with a royalty,
3        which is no less than a certain penny rate.
4   BY MR. SPERLING:
5   Q.   Have you ever heard of the expression penny rate used
6        any other way, sir?
7        MS. BREWER:  Object to form.
8   A.   I don't recall.
9   BY MR. SPERLING:
10  Q.   Ever heard of the term penny rate used to describe the
11       net amount of dollars and cents that a royalty
12       recipient will receive with respect to a distribution
13       of a particular unit?
14       MS. BREWER:  Object to form.
15  A.   Are you referring to a guaranteed penny rate?
16  BY MR. SPERLING:
17  Q.   No, I'm not, sir. I'm referring to a calculation in
18       which one takes a royalty rate, multiplies it by a
19       revenue or price, multiplies it by any applicable
20       deductions or escalations, and ends up with an
21       applicable number of dollars and cents for each unit.
22       Have you ever heard that process, or the end result of
23       that process described as a penny rate?
24       MS. BREWER:  Object to form.
25  A.   No, I have not.

1   BY MR. SPERLING:
2   Q.   You mentioned that you've conferred with attorneys
3        who've been negotiating recording contracts.  When is
4        the last time that you did that?
5   A.   This year.
6   Q.   And who was the artist or songwriter that was going to
7        be a party to that agreement?
8   A.   I'm not at liberty to say.
9   Q.   Sir, I'm not asking you to identify the financial terms
10       of that agreement right now. I'm merely asking you to
11       identify the artist or songwriter whose potential
12       agreement you consulted on?
13  A.   I understand the question, but I'm not able to answer
14       that question. I'm restricted from doing so.
15  Q.   Do you understand, sir, that there's a protective order
16       in this case that allows counsel for Charter to
17       designate your testimony as confidential if need be?
18       MS. BREWER:  Object to form. Jonathan, I
19       understand what you're getting at, but if he currently
20       feels like he is not at liberty to disclose that
21       information because of the third party contract, then
22       that is his answer. And if we need to take it up on a
23       break, or after the deposition, I'm happy to do that.
24       But he's going to have to abide by what he believes to
25       be his contractual obligations.

1   BY MR. SPERLING:
2   Q.   Mr. Coleman, are you, in fact, subject to a contractual
3        obligation not to disclose the identity of the party
4        for whom you were consulting or providing advice?
5   A.   I am.
6   Q.   When's the last time you were involved in a negotiation
7        recording agreement before that instance this year?
8   A.   I've been consulted about recording agreements from
9        time to time by different clients forever.
10  Q.   Well, when was the last instance before the one that
11       you just described, sir?
12  A.   Probably a few years ago with the Kiss agreements.
13  Q.   Those were agreements between Kiss and who, sir?
14  A.   Kiss and Universal.
15  Q.   Have you ever negotiated a recording agreement on
16       behalf of a record label, sir, rather than on behalf on
17       an artist?
18  A.   I have not.
19  Q.   Have you ever negotiated a publishing agreement for a
20       songwriter?
21       MS. BREWER:  Object to form.
22  A.   Not by myself. I've participated with the attorney in
23       negotiating those agreements.
24  BY MR. SPERLING:
25  Q.   Is it your experience that artists and songwriters are

1        typically, if not always, represented by attorneys in
2        negotiating their agreements with record labels or
3        publishers?
4        MS. BREWER:  Object to form.
5   A.   Mostly in my experience they've been represented by
6        attorneys.
7   BY MR. SPERLING:
8   Q.   So how many times would you say you've participated
9        with attorneys in negotiating publishing agreements for
10       songwriters?
11       MS. BREWER:  Object to form.
12  A.   I don't really know, but multiple times.
13  BY MR. SPERLING:
14  Q.   Okay. More or fewer than 10 times, sir?
15  A.   More than 10.
16  Q.   More or fewer than 20 times, sir?
17  A.   More than 20.
18  Q.   More than 30, sir?
19  A.   I don't know.
20  Q.   Is your best guess somewhere between 20 and 30?
21  A.   That, yes.
22  Q.   Have you ever published -- excuse me. Have you ever
23       negotiated an administration agreement for a songwriter
24       as opposed to a publishing agreement?
25       MS. BREWER:  Object to form.

HIGHLY CONFIDENTIAL

Page 38

1  A.  I've been part of the negotiations, yes.
2  BY MR. SPERLING:
3  Q.  And how many times have you done that, sir?
4  A.  That's part of that 20 to 30 count that we talked
5      about.
6  Q.  So the 20 to 30 is the total number of agreements on
7      which you've consulted for songwriters; is that right?
8  A.  It can be more than that.  I just -- I really don't
9      recall.
10  Q.  I think you testified a minute ago that that was your
11     best guess between 20 and 30; is that right?
12  A.  That's correct.
13         MS. BREWER:  Object to form.
14  BY MR. SPERLING:
15  Q.  And just for clarification, I'm trying to make sure I
16     understand.  That number that you're estimating between
17     20 and 30 is inclusive of both publishing and
18     administration agreements on behalf of songwriters; is
19     that right?
20  A.  Yes.
21         MS. BREWER:  Object to form.
22  A.  Sorry.
23  BY MR. SPERLING:
24  Q.  Have you ever negotiated a distribution agreement on
25     behalf of a record label?

Page 39

1         MS. BREWER:  Object to form.
2  A.  I have participated in those negotiations.
3  BY MR. SPERLING:
4  Q.  With whom have you participated in such negotiations?
5  A.  With a small independent label.  I think the name was
6      United Pursuit.
7  Q.  And when was that, sir?
8  A.  That would have been some time in the last 10 years.
9  Q.  And who was the counterparty to that agreement, do you
10     recall, sir?
11  A.  I think it was Orchid.
12  Q.  Have you ever negotiated a distribution agreement on
13     behalf of a music publisher?
14  A.  Would you repeat that?
15  Q.  Sure.  Have you ever negotiated a distribution agreement
16     on behalf of a publisher as opposed to a record label?
17  A.  Not that I recall.
18  Q.  Have you ever negotiated a distribution agreement on
19     behalf of a distributor on the other side of the table
20     from a music publisher or record label?
21  A.  No.
22  Q.  Mr. Coleman, when you work as a royalty auditor, you're
23     engaged by a particular client to audit the royalties
24     paid to that client; is that correct?
25  A.  That's correct.

Page 40

1  Q.  Your work doesn't involve selecting among a group of
2      royalty recipients to determine for which of those
3      royalty recipients you're going to perform royalty
4      calculations, and for which you're not, right?
5         MS. BREWER:  Object to form.
6  A.  Please repeat that question.
7  BY MR. SPERLING:
8  Q.  Sure.  When you're engaged by a client to conduct a
9      royalty audit, your work doesn't involve identifying
10     which among a group of royalty recipients you're going
11     to perform royalty calculations for, right?
12         MS. BREWER:  Object to form.
13  A.  If I was engaged by a -- an artist, or a writer, that
14     question would not come up.  If I'm engaged by a record
15     company, or a publisher, I mean, clearly that would be
16     part of the -- part of the process is to identify those
17     and select for detailed examination.
18  BY MR. SPERLING:
19  Q.  When's the last time you were engaged by a record label
20     or publisher for that purpose?
21  A.  Probably in the 1990s to mid 2000s.
22  Q.  And when you conduct -- when you conducted that
23     activity decades ago, what was the process that you
24     used to identify those that you were going to select
25     for detailed examination?

Page 41

1         MS. BREWER:  Object to form.
2  A.  Our process, and I don't recall the exact process back
3      in those days.  But if we're selecting artists, let's
4      say, for examination, we're going to take some that are
5      certainly part of the high earners, and we're going to
6      take some that are middle, and some that are low.
7  BY MR. SPERLING:
8  Q.  And determining who is a high, middle or low earner, I
9      take it you look at their actual earnings; is that
10     correct?
11  A.  The actual reportings that my client had received.
12  Q.  Let's go back to the situation where you're performing
13     an audit on behalf of -- well, strike that.
14         With respect to any royalty recipient, when
15     you conduct an audit of the royalties paid to that
16     recipient, your work takes into account all of the
17     agreements that are in effect during the period under
18     audit, correct?
19         MS. BREWER:  Object to form.
20  A.  Could you repeat that, please.
21  BY MR. SPERLING:
22  Q.  Sure.  When you're conducting a royalty audit for a
23     client, your work doesn't involve selecting among the
24     agreements in effect between the royalty recipient, and
25     the royalty obligor, which ones to look at, and which

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL

1 Q. And so do you understand that Quinn Emanuel is
2    representing you personally as your attorney today?
3         MS. BREWER: Object to form.
4 A. That's my understanding.
5 BY MR. SPERLING:
6 Q. Okay. Mr. Coleman, let's go back to your report. Your
7    report describes the process by which you identified
8    certain agreements produced in this litigation in order
9    to review, correct?
10 A. Correct.
11 Q. And your report describes certain calculations that
12    you've performed in order to illustrate the effect of
13    the terms of those agreements, correct?
14 A. Correct.
15 Q. And the outcome or output of those calculations is
16    contained in Exhibits B, C and D to your report,
17    correct?
18         MR. SPERLING: Object to form.
19 A. Correct.
20 BY MR. SPERLING:
21 Q. And aside from the application of the terms of the
22    agreements -- strike that.
23         Aside from the calculations that you've
24    performed in order to demonstrate the effect of the
25    terms of those agreements, is there any other analysis

1    that you performed in connection with providing your
2    opinions in this case?
3         MS. BREWER: Object to form. Asked and
4    answered.
5 A. I relied upon my 49 years of experience for my opinions
6    in this report.
7 BY MR. SPERLING:
8 Q. And aside from your 49 years experience -- excuse me.
9    Are you all right, sir?
10 A. I'm fine.
11 Q. Aside from your 49 years of experience, and the
12    calculations that you performed in order to demonstrate
13    the effect of the agreements that you selected for
14    analysis, is there any other analysis that you
15    performed in connection with providing your opinions in
16    this case?
17         MS. BREWER: Object to form.
18 A. How are you using the term analysis?
19 BY MR. SPERLING:
20 Q. I want to know whether there's some process that you
21    followed, sir, of assessing or evaluating data that led
22    to a result. And so my question is aside from your
23    experience, and from the calculations that you
24    performed to illustrate the terms of certain agreements
25    as set forth in Exhibits, B, C and D to your report,

1    did you conduct any assessment or valuation of data or
2    information that led you to the opinions set forth in
3    your report?
4         MS. BREWER: Object to form.
5 A. I believe my report discusses the procedures that I
6    use.
7 BY MR. SPERLING:
8 Q. And, sir, I'm entitled to ask you questions and make
9    sure that we have a clear testimonial record as well.
10    So, unfortunately, I'm entitled to a question -- excuse
11    me. I'm entitled to an answer to my question rather
12    than you just saying, well, whatever's in the report.
13    So my question again, sir, is aside from reliance on
14    your experience, and aside from the calculations set
15    forth in Exhibits B, C and D to your report, is there
16    any other analysis that you performed in order to reach
17    the opinions that you've offered in this case?
18         MR. SPERLING: Object to form. Move to strike
19    counsel's commentary that preceded the question.
20 A. Well, the report states in section four the information
21    I considered, various documents. I'd like to add my
22    own experience in the entertainment industry which I
23    relied upon. I think that's pretty clear.
24 BY MR. SPERLING:
25 Q. Is that the conclusion of your answer, sir?

1 A. If you give me a second to look back at my report, I'll
2    just make sure that's it. That's my answer.
3 BY MR. SPERLING:
4 Q. And aside from that, there is no other analysis that
5    you performed in order to reach the opinions that you
6    offered in this case, correct?
7 A. Nothing other than what I presented in my report.
8 Q. All right, sir. I don't want to have to call our judge
9    and detain you further. Can you identify any analysis
10    that you performed in support of your opinions in this
11    case aside from the application of your general
12    experience, and the calculations set forth in Exhibits
13    B, C and D to your report?
14         MS. BREWER: Object to form. Move to strike
15    the commentary that preceded the question.
16 A. I think the word that I'm confused about is analysis.
17    And the analysis, the audit findings that we had for 49
18    years, the analysis of the agreements that we looked
19    at, is all presented in this report.
20 BY MR. SPERLING:
21 Q. Your report doesn't identify any audit findings that
22    you relied on in connection with your opinions, does
23    it?
24         MS. BREWER: Object to form.
25 A. The report identifies underpayments by record companies

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

1 underpayment in the answer. So can you define the word
2 underpayment as you use it without using the word
3 underpayment as part of the definition?
4      MS. BREWER: Object to form. Asked and
5 answered.
6 A. I can't. What I'm referring to is instances where the
7 terms of the agreement may have been applied correctly
8 per the agreement, but applied to the wrong revenue
9 base, a base that was incomplete, did not contain all
10 of the revenue that was received.
11 BY MR. SPERLING:
12 Q. What instances did you identify of royalty terms being
13 applied to the wrong revenue base?
14 A. Well, in my report, I've certainly identified areas
15 where record companies and publishers receive income,
16 receive guaranteed payments as an example, receive
17 black payments as an example, where they do not share
18 them with the artist or the writer.
19 BY MR. SPERLING:
20 Q. Mr. Coleman, in connection with your report, did you
21 identify any instance of an artist or songwriter whose
22 work is at issue in this case who was paid less than
23 100 percent of the royalties due to them?
24      MS. BREWER: Object to form.
25 A. The categories of underpayments that I've listed in my

1 report are pretty much across the board. One specific
2 area that has been underpaid or underreported out of
3 all the ones I've listed here, some of those most
4 definitely will apply to the artist whose contracts we
5 have listed in our B and C.
6 Q. Mr. Coleman, you had access to some agreements here,
7 correct?
8 A. Correct.
9 Q. You didn't have access to any revenue data to which the
10 royalty terms of those agreements would be applied, did
11 you?
12 A. I did not.
13 Q. And you didn't have access to any information showing
14 how royalties had actually been reported to any of the
15 artists or songwriters whose works are at issue in this
16 case, did you?
17 A. I did not.
18 Q. And as a result, you did not identify any actual
19 instance of any underpayment of royalties to any artist
20 or songwriter whose works are at issue in this case,
21 did you?
22      MS. BREWER: Object to form.
23 A. Well, I think that's where we differ in that my opinion
24 of underpayment or underreporting are pretty much
25 widely used in the accountings from record companies

1 and publishers.
2 BY MR. SPERLING:
3 Q. And that statement, sir -- sorry. Go ahead.
4 A. Not all of them, but some of those I would expect to
5 find in the artists or writers' statements and payments
6 that they receive.
7 Q. But you didn't perform an analysis that allowed you to
8 find any such instance, did you?
9      MS. BREWER: Object to form.
10 A. Are you asking me did I analyze the royalty statements
11 on these artists and writers I looked at? Is that what
12 you're asking?
13 BY MR. SPERLING:
14 Q. No. You already told me that you didn't do that, did
15 you, sir?
16 A. I did not do that.
17 Q. My question is different. My question is can you please
18 point me to where your report you identify any actual
19 instance of an underpayment of royalties to an artist
20 or songwriter whose works are at issue in this case?
21 A. I guess where the confusion comes from me is that the
22 instances of underpayments that I've delineated in this
23 report would apply to most artists and writers, and
24 certainly to the artists and writers that we used as
25 examples in this report. I did not look at their

1 royalty statements, so we did not identify
2 underpayments per the royalty statements for these
3 particular artists and writers.
4 Q. Okay. Why don't we talk about the procedures that you
5 did perform. You first -- so before I do that, Mr.
6 Coleman, remind me, please, are you being compensated
7 for your work as an expert in this case?
8 A. I am.
9 Q. At what rate are you being compensated, sir?
10 A. At $500 and $700. $500 for the analysis. $700 for the
11 depositions and court appearance.
12 Q. And is the $500 hourly rate for the analysis applicable
13 to your work or to work by your employees or both?
14 A. My partner, Darla Crain, also worked on this
15 engagement. She's at $400 and $600.
16 Q. How many hours did Ms. Crain work on preparing your
17 report?
18 A. I don't know.
19 Q. How many hours did you work on the report, sir?
20 A. I don't know that either.
21 Q. Who spent more time on the report, Ms. Crain or you?
22      MS. BREWER: Object to form.
23 A. I spent more time.
24 BY MR. SPERLING:
25 Q. Did anybody else spend time preparing this report other

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL

Page 86

1 than you and Ms. Crain?
2 MS. BREWER: Object to form.
3 A. We had some other senior analysts do some research for
4 us, but they were not part of the actual engagement
5 itself. They did not work on the report.
6 BY MR. SPERLING:
7 Q. Who spent more time drafting the report, you or
8 Ms. Crain?
9 MS. BREWER: Object to form.
10 A. I would say that's probably equal.
11 BY MR. SPERLING:
12 Q. Who spent more time putting together the exhibits to
13 the report, you or Ms. Crain?
14 MS. BREWER: Object to form.
15 A. That would be equal as well.
16 BY MR. SPERLING:
17 Q. Who spent more time performing the analysis that's set
18 forth in the exhibits to the report, you or Ms. Crain?
19 MS. BREWER: Object to form.
20 A. Ms. Crain would have spent more time researching the
21 database, but we spent equal time in the analysis.
22 BY MR. SPERLING:
23 Q. So to perform your analysis, you identified a selection
24 of plaintiffs' artists and songwriter agreements to
25 analyze in connection with your opinions, right?

Page 87

1 A. Correct.
2 Q. And the artist agreements that you analyzed are
3 identified in your Exhibit B; is that right?
4 A. Was more of those, but the analysis, for example, are
5 the ones in B and C.
6 Q. How many others did you look at? Strike that.
7 How many other recording artist agreements
8 did you look at aside from those identified in Exhibit
9 B?
10 MS. BREWER: Object to form.
11 A. We looked at about 370 agreements. We used for
12 analysis, let's see, about 148, and we found that many
13 of those were duplicate, meaning they were standard
14 agreements, boilerplate language, so we cut those down
15 for report purposes to the 10, I believe it's 10, that
16 we have in our exhibit.
17 BY MR. SPERLING:
18 Q. So in determining which 10 to include in Exhibit B, you
19 first performed an analysis of 148; is that right?
20 A. Well, when I say analysis, we looked at those 148. We
21 didn't do the detailed analysis as shown in the
22 exhibits. But we simply liked to see if they had the
23 similar type of language.
24 Q. Well, first of all, you mentioned looking at 370
25 agreements; is that correct?

Page 88

1 A. Correct.
2 Q. What was the process by which you got from 370 down to
3 148?
4 A. Quite a few of the 370 were not agreements at all. They
5 were copyright renewal forms. They were licensee
6 agreements. They were other documents that were called
7 agreements, or identified as agreements, but really
8 were not.
9 Q. And so then you substantively reviewed 148 agreements;
10 is that correct?
11 A. Right. And that number's because we wanted some from
12 Universal, Sony and from Warners.
13 Q. And after performing that review, you selected the 10
14 for which you present calculations in Exhibit B to your
15 report, correct?
16 A. That's correct.
17 Q. Did you perform calculations under the terms of any
18 recording agreements other than the 10 set forth in
19 Exhibit B?
20 A. Only for the writers, but no.
21 Q. And the songwriter agreements for which you performed
22 calculations are identified in Exhibit C, correct?
23 A. Correct.
24 Q. How many songwriter agreements did you analyze before
25 settling on those set forth in Exhibit C for

Page 89

1 performance of your calculations?
2 A. That was actually 369, and we -- I think we cut those
3 down to 101, and then down to the nine that we had as
4 examples.
5 Q. So you reviewed the substantive terms of a 101
6 agreements, and from those selected nine to perform
7 calculations under; is that correct?
8 A. Correct.
9 Q. Is there a list of the 148 recording agreements that
10 you substantively reviewed?
11 MS. BREWER: Object to form.
12 A. I think that could be retrieved or created. I don't
13 have a list today, no.
14 BY MR. SPERLING:
15 Q. And it's not included in your report, right?
16 A. It's not.
17 Q. And is there a list of the 101 songwriter agreements
18 that you reviewed before settling on the nine for which
19 you presented calculations in your report?
20 MS. BREWER: Object to form.
21 A. There's not a list as of today.
22 BY MR. SPERLING:
23 Q. And it's not contained in your report, right?
24 A. Correct.
25 Q. So you performed calculations on a selection of 19

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL

|  | Page 90 |
|---|---|
| 1 | total artist and songwriter agreements, right? |
| 2 | A. Correct. |
| 3 | Q. That's 10 recording artists and nine songwriters; is |
| 4 | that right? |
| 5 | A. That's right. |
| 6 | Q. To the extent your opinion is based on the analysis of |
| 7 | any other agreements, those agreements are not |
| 8 | identified in your report, correct? |
| 9 | MS. BREWER: Object to form. |
| 10 | A. My opinion is based on the documents I presented in the |
| 11 | report. |
| 12 | BY MR. SPERLING: |
| 13 | Q. I understand, sir. But your -- to the extent that your |
| 14 | opinion is based on analysis of 101 songwriter |
| 15 | agreements, those 101 agreements are not identified in |
| 16 | your report, right? |
| 17 | MS. BREWER: Object to form. |
| 18 | A. I didn't analyze those agreements. I reviewed the |
| 19 | agreements. There's a difference. |
| 20 | BY MR. SPERLING: |
| 21 | Q. Okay. So your opinion is not based on an analysis of |
| 22 | those 101 songwriter agreements; is that correct? |
| 23 | MS. BREWER: Object to form. |
| 24 | A. That's correct. |
| 25 | BY MR. SPERLING: |

Page 91

1 Q. And I take it likewise your opinion is not based on an
2 analysis of the 148 recording agreements that you
3 referred to, right?
4 MS. BREWER: Object to form.
5 A. Correct.
6 BY MR. SPERLING:
7 Q. Your report says that you selected for each of those 19
8 artists and songwriters the earliest dated agreements
9 that were available; is that right?
10 A. Correct.
11 Q. And in your view, the early agreements likely reflect
12 lower royalty rates than any later agreements with the
13 same artists or songwriters; is that right?
14 A. That was my presumption.
15 Q. Your report says that you selected -- let me turn to
16 your report, sir. If you could go to page eight,
17 paragraph E2, do you have that in front of you, sir?
18 A. I do.
19 Q. You say I selected artists and songwriters whom I
20 understood to be very popular and who likely generated
21 higher revenue, artists whom I understand to be less
22 popular and who were less likely to generate high
23 revenue, and artists who do not clearly fall into
24 either of the foregoing categories; is that right?
25 A. That's correct.

Page 92

1 Q. And then in paragraph E3 you say that your assessment
2 popularity was based on, "My professional expert
3 understanding and extensive experience in the music
4 industry." Do you see that?
5 A. I do.
6 Q. In what way did your -- what expert understanding did
7 you rely on to assess popularity?
8 A. Well, the fact that this goes on to talk about the RIAA
9 and charting as well.
10 Q. It does, and I'll ask you about that, sir. I don't mean
11 to exclude it.
12 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17 ▮▮▮▮▮▮▮▮▮▮
18 Q. I'm not sure I understood your answer, sir. What expert
19 understanding did you bring to bear to determine who's
20 popular?
21 A. Based on my professional expert understanding and
22 experience would be based upon the charts that I
23 reviewed, the accountings that I've seen from these
24 various companies, and the ranking that we saw from the
25 Cox case as to whether these were high earners, medium

Page 93

1 or low based on the data.
2 Q. So I want to break down this component, sir. You didn't
3 see any actual royalty accountings in this case, right?
4 A. Correct.
5 Q. And we'll talk about your assessment of charts and the
6 like separately. But one of the bases that you identify
7 for determining who's popular is your expert
8 understanding. And so my question is what expert
9 understanding do you bring to bear that helps one
10 determine who's popular and who's not?
11 MS. BREWER: Object to the form and to the
12 commentary.
13 A. On a simple basis, when I look at the data we receive,
14 certainly in the Cox case where we sorted the songs by
15 high, medium and low earnings, and the fact that I've
16 been doing this for quite some time. I'm familiar with
17 some of the artists that -- with the artists that we
18 listed, we simply chose those as examples, because we
19 knew that they fit into those categories we talked
20 about.
21 BY MR. SPERLING:
22 Q. Mr. Coleman, I'm sorry, sir. Are you still speaking?
23 A. I'm done now.
24 Q. How does your experience in the music industry make you
25 any better than a lay person at assessing who's

24 (Pages 90 - 93)

Page 102

1  you actually relied on other than what was reflected in
2  the single revenue spreadsheet offered in the Cox case?
3        MS. BREWER: Object to form.
4  A.  Mainly it was Cox and my experience in identifying any
5  of these songwriters.
6  BY MR. SPERLING:
7  Q.  And is there any specific experience that you can point
8  to that wouldn't be shared by any lay person off the
9  street that bore on your determination of which
10  songwriters were or were not popular?
11        MS. BREWER: Object to form.
12  A.  We mainly used the Cox analysis. Let's make sure that
13  they were included in this case, and that's primarily
14  what we used to pick the songwriters.
15  BY MR. SPERLING:
16  Q.  You assert in your report that most agreements are
17  originally executed when the artist and/or songwriter
18  are not yet popular; is that right?
19  A.  That's correct.
20  Q.  You're talking about the first agreement an artist ever
21  signs with anybody, right?
22  A.  Correct.
23  Q.  Often artists and songwriters will switch labels or
24  publishers, correct?
25  A.  Correct.

Page 103

1        MS. BREWER: Object.
2  BY MR. SPERLING:
3  Q.  And that can happen after they become popular, right?
4        MS. BREWER: Object to form.
5  BY MR. SPERLING:
6  Q.  The question is that can happen after they become
7  popular, right?
8        MS. BREWER: Object to form.
9  A.  Sorry. Right.
10  BY MR. SPERLING:
11  Q.  And when that happens, their first agreement with the
12  new label, or the new publisher, is executed when
13  they're already a popular act or songwriter, right?
14        MS. BREWER: Object to form.
15  A.  That's one scenario, certainly.
16  BY MR. SPERLING:
17  Q.  Do you know how many of the agreements produced in this
18  case fall into that scenario?
19        MS. BREWER: Object to form.
20  A.  I don't.
21  BY MR. SPERLING:
22  Q.  Let me take you, please, to page seven of your report.
23  In performing your calculations, you didn't necessarily
24  have a complete set of the applicable agreements
25  between plaintiffs and a given artist or songwriter,

Page 104

1  right?
2  A.  That's correct. That's correct. I answered that.
3  Q.  You describe your sample of 10 recording agreements and
4  nine songwriter agreements as an illustrative sample,
5  right?
6  A.  Examples.
7  Q.  Are you on page seven of your report, sir?
8  A.  I am.
9  Q.  In the carryover paragraph at the top of the page
10  beginning on the third line do you see the sentence
11  that reads, "Nonetheless, plaintiffs produced, and I
12  reviewed a sufficient number of agreements to comprise
13  an illustrative sample and for me to form, based on my
14  professional judgment and experience, the opinions set
15  forth in this report."
16  A.  I do.
17  Q.  And is it correct that you viewed these 19 agreements
18  as an illustrative sample?
19  A.  Illustrated for examples.
20  Q.  And you say that the sample of 10 artist agreements is
21  sufficient for you to form the opinions in your report;
22  is that right?
23  A.  That's correct.
24  Q.  What methodology did you use to determine that these 10
25  artist agreements were sufficient to form the opinions

Page 105

1  in your report?
2  A.  Well, two things. One, again, based on my experience in
3  auditing these companies for 49 years.
4        Secondly, many of the agreements that we
5  looked at out of the ones that we told you about
6  earlier were similar, if not duplicated, in the
7  agreements that we chose to do the illustration or
8  examples.
9  Q.  Are you referring to the 149 artist agreements, excuse
10  me, 148 artist agreements that are not identified in
11  your report?
12  A.  That's correct.
13  Q.  You're not opining that the 10 artist agreements that
14  you selected are representative on a statistical basis,
15  are you?
16  A.  No.
17  Q.  And with respect to the nine songwriter agreements that
18  you selected also, you're not opining that they're
19  representative on a statistical basis, correct?
20  A.  Correct.
21  Q.  Is your view that they are sufficient to be
22  illustrative based on your review of the 101 songwriter
23  agreements that you referred to earlier that are
24  identified in your report?
25  A.  My review of the agreements and my experience.

27 (Pages 102 - 105)

HIGHLY CONFIDENTIAL

Page 106

1  Q.  Given that you didn't necessarily have all the
2      contracts at issue for these artists and songwriters,
3      is there some methodology that you used to correct for
4      potential gaps in what you had?
5          MS. BREWER:  Object to form.
6  A.  I don't recall.
7  BY MR. SPERLING:
8  Q.  With respect to Sony Music Entertainment, the record
9      company, how many royalty audits have you conducted
10     within the past 20 years?
11 A.  Of the record company 20 years, probably 30, 40.
12 Q.  How many audits?
13 A.  I'd say 20 to 40, I would say.
14 Q.  Can you identify any specific audits of Sony Music
15     Entertainment you've conducted within the past 20
16     years?
17 A.  I can. I usually don't disclose that because we sign
18     NDA agreements that usually prohibit us from disclosing
19     that the audit took place.
20 Q.  But you understand that I'm counsel for Sony Music
21     Entertainment in this case, correct?
22 A.  I do.
23         MS. BREWER:  Object to form.
24 BY MR. SPERLING:
25 Q.  And so you can disclose it to me because I'm them for

Page 107

1      these purposes.  So let me ask the question again. Can
2      you identify the specific audits that you conducted of
3      Sony Music Entertainment within the past 20 years?
4          MS. BREWER:  Object to form.  And I'm going
5      to note that Mr. Coleman had expressed that he might
6      have a contractual obligation that he can't violate. I
7      understand the point that you made about Sony Music
8      Entertainment, but there are other entities that are
9      plaintiffs in this case.  And if Mr. Coleman cannot
10     answer the question because he has concerns about a
11     contractual obligation, Mr. Coleman you should state
12     that for the record.
13 A.  And that is my concern I have NDA agreements.
14 BY MR. SPERLING:
15 Q.  And so your position, sir, is that in a lawsuit brought
16     by Sony Music Entertainment, you're not going to
17     identify an audit that you conducted of Sony Music
18     Entertainment; is that correct?
19 A.  Those NDA agreements also represent the artist as well,
20     so I can see what the restrictions are.
21 Q.  Mr. Coleman, when you conduct an audit on behalf of an
22     artist of a record company, the fact of the audit is
23     known to the artist and to the record company, isn't
24     it?
25         MS. BREWER:  Object to the form.

Page 108

1  A.  Correct.
2  BY MR. SPERLING:
3  Q.  So it's not a secret to the record company that you're
4      auditing on behalf of the artist, right?
5          MS. BREWER:  Object to form.
6  A.  I hope not.
7  BY MR. SPERLING:
8  Q.  And it's not a secret to the artist that you're
9      auditing the record company, right?
10 A.  It is not.
11 Q.  So whose confidentiality is exactly implicated by
12     telling counsel for Sony Music in a lawsuit brought by
13     Sony Music what audits you claim to have conducted of
14     Sony Music?
15         MS. BREWER:  Object to form.
16 A.  Again, I'd have to look at those agreements and see
17     what the restrictions are before I disclose that.
18 BY MR. SPERLING:
19 Q.  Sitting here today for whatever reason, you're not
20     capable of identifying any audit that you conducted of
21     Sony Music Entertainment within the past 20 years; is
22     that right?
23         MS. BREWER:  Object to form.
24 A.  I'm not sure what you mean by capable. I'm certainly
25     capable of identifying those.

Page 109

1  BY MR. SPERLING:
2  Q.  But you refuse to; is that right?
3          MS. BREWER:  Object to form.
4      Mischaracterizes the witness's testimony.
5  A.  I would be glad to identify those, but I need to check
6      the NDA agreements first.
7  BY MR. SPERLING:
8  Q.  How many audits have you conducted of Universal Music
9      Group, the record company, over the past 20 years?
10 A.  Probably the same amount.
11 Q.  On behalf of whom?
12 A.  Various artists.
13 Q.  Can you identify them, sir?
14 A.  The same issue there.
15 Q.  How many audits have you conducted of Warner Music
16     Group and its affiliated record labels over the past 20
17     years?
18 A.  That I don't know. Less than the others.
19 Q.  And on behalf of whom have you conducted any such
20     audits within the past 20 years?
21 A.  On behalf of record companies.  On behalf of a joint
22     venture.  On behalf of the artists as well.  I think
23     that's it.
24 Q.  Can you identify the record companies, joint venture,
25     artists to whom you're referring?

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL

1   A.  Not until I review those NDA agreements.
2   Q.  How many audits have you conducted of Sony Music
3     Publishing, previously known as Sony/ATV, and its
4     predecessor entities over the past 20 years?
5   A.  Probably more than any other company.
6   Q.  How many is that, sir?
7   A.  And I'm not sure. Maybe 20 to 40. Maybe more. Quite a
8     few.
9   Q.  On behalf of whom?
10  A.  Songwriters primarily, but also of a copublishing
11     company, too.
12  Q.  Are you prepared to identify any of them, sir?
13  A.  I'm not.
14  Q.  And would the same be true with respect to any audits
15     you've conducted of Universal Music Publishing Group,
16     or Warner Chappell Music Publishing?
17  A.  That's correct.
18  Q.  So let's go back to the 19 artists and songwriter
19     agreements you reviewed in connection with your report
20     for which you provided calculations in connection with
21     your report. You are aware that plaintiffs have
22     produced songwriter administration agreements in this
23     case, right?
24  A.  I am.
25  Q.  And I think you state in your report that

1     administration agreements are "common agreements"
2     between music publishers and songwriters, right?
3   A.  They are.
4   Q.  And the terms of administration agreements differ in
5     their nature from those in publishing agreements,
6     right?
7         MS. BREWER: Object to form.
8   A.  Differ from full publishing agreements, yes.
9  BY MR. SPERLING:
10  Q.  And they differ from the terms of copublishing
11     agreements also, right?
12        MS. BREWER: Objection.
13  A.  Correct.
14  BY MR. SPERLING:
15  Q.  And, in fact, in your report, you state that
16     songwriters who enter into administration agreements
17     experience benefits that songwriters or parties to
18     other kinds of agreements and publishers don't, right?
19  A.  Correct.
20  Q.  None of the nine songwriter agreements that you chose
21     to write calculations for are administration
22     agreements, correct?
23  A.  I do not believe so.
24  Q.  Are you aware that plaintiffs have produced certain
25     joint venture agreements in this case?

1   A.  I am aware.
2   Q.  And your report says that joint venture agreements are
3     "common agreements" between recording companies and
4     artists, right?
5   A.  They are, yes.
6   Q.  And you would agree that the terms of joint venture
7     agreements differ from a straightforward recording
8     contract, right?
9        MS. BREWER: Object to form.
10  A.  Right.
11  BY MR. SPERLING:
12  Q.  And you indicate in your report that artists who enter
13     into joint venture agreements experience certain
14     benefits that aren't experienced by parties who sign
15     recording agreements, right?
16  A.  Correct.
17  Q.  But you did not include any joint venture agreements
18     among the nineteen agreements for which you performed
19     calculations in Exhibits B and C to your report,
20     correct?
21  A.  Correct.
22  Q.  Are you aware that plaintiffs have produced profit
23     share agreements in this case?
24  A.  I don't recall.
25  Q.  But you didn't include, regardless, any profit share

1     agreements among the 19 agreements for which you
2     performed calculations in this case, right?
3   A.  Right.
4        MS. BREWER: Object.
5   A.  Sorry.
6        MR. SPERLING: Let's go off the record for
7     just a moment.
8        VIDEO TECHNICIAN: We're off the record at
9     12:37.
10       (Break at 12:37 p.m.)
11       (Back on the record at 1:26 p.m.)
12       VIDEO TECHNICIAN: We're back on the record
13     at 1:26.
14  BY MR. SPERLING:
15  Q.  Mr. Coleman, let me take you back to your selection of
16     the 19 agreements for which you performed calculations
17     in Exhibits B and C to your report. How many of the
18     agreements that you looked at fell into the category of
19     high popularity or high earners when you were going
20     about selecting these 19?
21        MS. BREWER: Object to form.
22  A.  Not sure how many. I don't recall.
23  BY MR. SPERLING:
24  Q.  And of the 19 that you selected, how many of those fell
25     into the high popularity category?

HIGHLY CONFIDENTIAL

Page 114

1 ███████████████████████
2 █
3 █ ████████████████████████
4 █
5 █ ██████████████████████
6 █
7 █ █████████████████████

8 Q. So you're not sure. Let's start with the recording
9    agreements. Out of the 148 that you looked at, you're
10   not sure how many fell into the high popularity
11   category; is that right?
12       MS. BREWER: Object to form.
13 A. I don't recall how many were high or low.
14 BY MR. SPERLING:
15 Q. And you're not certain of the 10 recording agreements
16   that you selected which ones fell into the high
17   popularity category; is that right?
18 A. That's correct. I don't recall that.
19 Q. And whichever of the 10 recording agreements that you
20   selected you did deem to be highly popular, how did you
21   go about choosing those among whatever the overall
22   group of high popular agreements was that you
23   identified?
24       MS. BREWER: Object to form.
25 A. I simply looked at the agreements themselves to see if

Page 115

1    they had the standard boilerplate language or similar
2    language, and I picked out the ones I used in my
3    example. So it was not from cherry picking. It wasn't
4    from necessarily excluding something for a different
5    reason. It was simply I was looking to do an example,
6    and those were the ones I picked.
7 BY MR. SPERLING:
8 Q. So you were looking for particular kinds of language,
9    and you picked the examples that contain that language;
10   is that right?
11 A. That's not right, no.
12 Q. So you testified a moment ago that you looked to see if
13   they had the standard boilerplate language or similar
14   language. And I picked out the ones I used in my
15   example. Were you trying to select those that had what
16   you call standard boilerplate language or similar
17   language?
18       MS. BREWER: Object to form.
19 A. Trying to reduce the sample size to something
20   manageable. And if I found, let's say, 10 agreements,
21   10 different artists that had pretty much the same
22   type of agreement with the standard boilerplate, maybe
23   different royalty rates, but certainly the deductions
24   and so forth were similar, I didn't need to do all 10
25   of those. They were pretty much the same. I only picked

Page 116

1    one.
2 BY MR. SPERLING:
3 Q. I see. But you didn't --
4       MS. BREWER: I'm sorry. Mr. Sperling,
5    before your next question, a couple of times in the
6    deposition today there've been email what sounds like
7    email chimes which are in some instances happening
8    while you're asking a question, or Mr. Coleman
9    is testifying, which I think is going to interfere
10   potentially with the transcript or the recording. It's
11   not happening on my end. Mr. Coleman doesn't have
12   anything open. I don't know who it's originating from.
13   But I'm just making and ask if that person could
14   silence their device I'd appreciate it.
15       MR. SPERLING: It's possible that it's me,
16   Ms. Brewer, and if a calendar invitation arrives, it
17   would take me a while to figure out how to turn that
18   off.
19       MS. BREWER: Understood.
20       MR. SPERLING: I can't mute the volume,
21   because then I wouldn't be able to hear Mr. Coleman or
22   your objections.
23       MS. BREWER: Fair enough.
24       MR. SPERLING: Why don't we try and
25   continue. And if we find it's a distraction, on the

Page 117

1    next break I'll try to see if it isn't back on my end.
2       MS. BREWER: Thank you.
3 BY MR. SPERLING:
4 Q. So Mr. Coleman, let me see if I have this right. You
5    didn't define categories of types of terms, and group
6    the contracts into those categories, did you?
7 A. I did not.
8 Q. And so it's like we can identify which agreements you
9    deemed to be -- have substantially similar language to
10   which other agreements, right?
11       MS. BREWER: Object to form.
12 A. You need to repeat that, please.
13 BY MR. SPERLING:
14 Q. Yeah, sure. So if I understood you correctly, you
15   looked at various agreements. And in instances where
16   you thought that some agreements were substantially
17   similar to others, you would pick only one of them to
18   avoid overlap. Am I getting that correctly?
19       MS. BREWER: Object to form.
20 A. That's correct.
21 BY MR. SPERLING:
22 Q. But you don't have a record of which ones you deemed
23   similar to which, right?
24 A. No.
25 Q. And you didn't group them into distinct categories for

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL

Page 118

1    that purpose, right?
2  A.  I did not.
3  Q.  And is the same true of the process by which you
4    selected the songwriter agreements?
5  A.  That's correct.
6  Q.  And just so that we're clear, that means that you don't
7    recall exactly how many you identified as being highly
8    popular songwriters?
9  A.  I don't.
10  Q.  You don't remember exactly how many you identified as
11    being of low popularity or in between, right?
12  A.  Correct.
13  Q.  And in determining which songwriter agreements to
14    select from each of those categories, you likewise
15    tried to avoid overlap among the types of terms between
16    agreements; is that right?
17        MS. BREWER:  Object to form.
18  A.  I tried.
19  BY MR. SPERLING:
20  Q.  But in undertaking that, you didn't group the
21    agreements into categories, right?
22  A.  Correct.
23  Q.  And you don't have a record of which ones you deemed to
24    be substantially similar to which others, right?
25  A.  Right.

Page 119

1  Q.  Let's talk about the calculations that you performed in
2    Exhibits B and C to your report. Those calculations
3    apply the royalty terms of the 19 agreements that are
4    identified there to a set of hypothetical circumstances
5    that you defined, right?
6        MS. BREWER:  Object to form.
7  A.  Right.
8  BY MR. SPERLING:
9  Q.  I'm sorry. I just couldn't hear your answer, sir.
10  A.  That's correct.
11  Q.  And it reflects what you believe is a straight
12    application of the relevant contracts to that set of
13    hypothetical circumstances, right?
14  A.  I'm not sure what you mean by that.
15  Q.  In performing the calculations reflected in Exhibits B
16    and C, you applied the terms of the contracts as you
17    understood them to the set of hypothetical facts that
18    you were using for purposes of those calculations,
19    right?
20  A.  Right.
21  Q.  So your calculations reflect your effort to identify
22    what would be a correct application of the terms of the
23    recording contract to that set of hypothetical facts,
24    right?
25  A.  If you mean by correct that that's where -- how I

Page 120

1    thought that these royalties should be calculated, then
2    I would say yes.
3  Q.  Okay. You assumed a royalty base price for an album or
4    album before deductions in Exhibit B is $10 for
5    physical product, $12.50 for digital download, and
6    $5.31 for streaming; is that right?
7  A.  Let me take a look.
8  Q.  Sure. And if it helps, I'm getting that from page 16 of
9    your report.
10  A.  Okay.
11  Q.  Paragraph 8A.
12  A.  Okay. Okay. Let me see what the schedules say. Would
13    you repeat your question, please.
14  Q.  Sure. For purposes of your calculations in Exhibit B,
15    you assumed a price or royalty base price for an album,
16    or album before deductions, of $10 for physical
17    product, $12.50 for digital download, and $5.31 for
18    streaming; is that right?
19  A.  That's right.
20  Q.  Did you refer to any reference materials of any kind in
21    settling upon these assumed prices?
22        MS. BREWER:  Object to form.
23  A.  The pricing was based on my own experience. The
24    allocation between the different types of distribution
25    was selected from the RIAA.

Page 121

1  BY MR. SPERLING:
2  Q.  Okay. So let's take those one part at a time. With
3    respect to the pricing, did you rely on any objective
4    sources of data in settling on those prices?
5  A.  It's going from my own experience.
6  Q.  And not from anywhere else, right?
7  A.  Well --
8        MS. BREWER:  Object to form. Go ahead. Go
9    ahead.
10  A.  The pricing per the $10, from my experience, would be a
11    range of seven to as much as $16 to $17. The record,
12    the pricing on the downloads can be as much as $1.99.
13    And the pricing on the streaming we get from a analysis
14    that shows us what an average streaming rate would be.
15    There's a footnote for that. Let's see what that says.
16    Okay. That's all of it.
17  BY MR. SPERLING:
18  Q.  So you say the price on the download's going to be as
19    much as $1.99. That's for a single track download,
20    right?
21  A.  Correct.
22  Q.  So that would be $19.99 for an album if you assume 10
23    songs to an album, correct?
24  A.  If we used $1.99, yes.
25  Q.  And are there any reference materials or industry

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL

Page 122

1 standard practices that you relied upon in choosing the
2 assumed prices that you used as set forth in paragraph
3 8A of your report?
4 A. That's based on my experience.
5 Q. You assume that each album had 10 songs, right?
6 A. Correct.
7 Q. It's possible to investigate and determine the actual
8 number of tracks on each of the applicable albums,
9 right?
10 A. Correct.
11 Q. That information's not particularly hard to find, is
12 it?
13 A. No.
14 Q. But you did not investigate that, correct?
15 A. No.
16     MS. BREWER: Object.
17 A. Sorry.
18 BY MR. SPERLING:
19 Q. You also assumed a range of percentages for cost of
20 goods sold for record companies, right?
21 A. I did.
22 Q. And that includes manufacturing distributions and other
23 costs, correct?
24 A. Well, costs that go into gross margin, yes.
25 Q. What's your definition of gross margin, sir?

Page 123

1 A. Well, it is gross -- it is gross sales minus
2 manufacturing and distribution. Some companies may put
3 other costs in there. It all depends. Primarily based
4 on my experience, it comes down to, I think I say here,
5 45 to 50 percent. Somewhere in this report it talks
6 about that.
7 Q. And is that figure also based on your experience?
8 A. Yes, it is.
9 Q. And it's not based on reference to any particular
10 documentary sources of information, right?
11     MS. BREWER: Object to form.
12 A. Are you referring to public records?
13 BY MR. SPERLING:
14 Q. Any records that you relied upon in preparing your
15 report.
16 A. It's based on my experience.
17 Q. And nothing other than your experience, right?
18     MS. BREWER: Object to form.
19 A. Correct.
20 BY MR. SPERLING:
21 Q. And you didn't have at your disposal any actual figures
22 regarding actual costs of goods sold for use in your
23 calculations, right?
24 A. Not from Sony, or Warner Brothers, or Universal, no.
25 Q. So not from any of the plaintiffs in this case?

Page 124

1 A. Correct.
2 Q. For purposes of your calculations in Exhibits B and C,
3 you assumed unit sales of 100,000 units, right?
4 A. Correct.
5 Q. And you chose that number because it was, "Plausible in
6 this context and easy to work with", right?
7 A. Correct.
8 Q. Did you choose it for any reason other than that it's
9 plausible in this context and easy to work with?
10 A. And easy to demonstrate. Easy to show us an example.
11 Q. Some of the agreements that you looked at in connection
12 with your engagement in this matter included royalty
13 escalation clauses, right?
14 A. They did.
15 Q. And royalty escalation clauses increase the royalty
16 rate payable to an artist or songwriter as certain
17 sales thresholds are reached, correct?
18     MS. BREWER: Objection.
19 A. Correct.
20 BY MR. SPERLING:
21 Q. And by assuming unit sales of 100,000, you ensured that
22 those royalty escalations would not come into effect,
23 right?
24 A. I did not.
25 Q. I want to make sure we're not talking past each other.

Page 125

1 Are you saying that your number did provide for royalty
2 escalations to be triggered?
3 A. I'm saying I chose a number of 100,000 for
4 demonstration purposes for the example. I did not go
5 higher simply because I didn't want to confuse my
6 examples with more calculations.
7 Q. But had you gone higher, in some instances the
8 applicable royalty rate, unless the royalty's paid to
9 the artist or songwriter, would have been greater,
10 right?
11     MS. BREWER: Object to form.
12 A. Both sides would have been greater, but the gross
13 margin to the record company, so the total amount they
14 received, and the royalties that the artist are going
15 to receive would have been greater.
16 BY MR. SPERLING:
17 Q. Fair enough, sir. But also the allocation as between
18 the record company or publisher on the one hand, and
19 the recording artists or songwriter on the other also
20 would have shifted in the direction of the artist or
21 songwriter by virtue of a higher royalty rate, correct?
22     MS. BREWER: Object to form.
23 A. Correct.
24 BY MR. SPERLING:
25 Q. And the effect of that is not reflected in your

32 (Pages 122 - 125)



Page 126

1 calculations since you chose to work with unit sales of
2 100,000, right?
3 A. The effect of higher sales, and including escalations
4 in those sales, was not included in my calculation.
5

Page 127

Page 128

Page 129

17 BY MR. SPERLING:
18 Q. So then I think the other thing that you said you
19 relied on was allocation percentages recorded by the
20 RIAA; is that right?
21 A. Yes.
22 Q. And you used allocation percentages reported by the
23 RIAA to allocate 100,000 units sold, or the assumed
24 100,000 units sold, as between physical to doing
25 downloads and streaming, right?

33 (Pages 126 - 129)

HIGHLY CONFIDENTIAL

1 A. Right.
2 Q. The RIAA figures that you relied on identified
3    allocation among those different media by revenue,
4    correct?
5         MS. BREWER: Object to form.
6 A. I believe that's correct.
7 BY MR. SPERLING:
8 Q. They don't break down -- excuse me. Strike that.
9         The RIAA figures that you looked at don't
10    break down industry wide distribution among media by
11    number of units sold, right?
12         MS. BREWER: Object to form.
13 A. I'm not -- I'm not sure of your question. Please repeat
14    it.
15 BY MR. SPERLING:
16 Q. Let me try it again. The RIAA figures that you looked
17    at show allocation as between physical products,
18    digital downloads, and streaming, right?
19 A. Right.
20 Q. But they show that allocation on the basis of revenue,
21    correct?
22 A. Correct.
23 Q. They don't show on the basis of units sold, correct?
24 A. That's correct.
25 Q. And units sold in one medium doesn't generate the same

1    revenue as a unit sold in another medium, right?
2         MS. BREWER: Object to form.
3 A. That's correct.
4 BY MR. SPERLING:
5 Q. So you used the revenue allocation identified by the
6    RIAA as the basis for the unit allocation in your
7    calculations, right?
8 A. I did.
9 Q. The revenue data that you used for the RIAA was for
10    2016 only, right?
11 A. I believe that's true. Let me just look it up. I
12    assessed 2017. We used '16.
13 Q. You didn't -- sorry. Go ahead, sir.
14 A. We used '16, yes.
15 Q. And you didn't use the data for any other year,
16    correct?
17 A. Correct.
18 Q. Why?
19 A. These were examples.
20 Q. Did you conduct any calculations with respect to the 19
21    agreements that are identified in Exhibit B and C using
22    different assumptions than the assumptions that are
23    reflected in your report here?
24         MS. BREWER: Object to form.
25 A. I did not.

1 BY MR. SPERLING:
2 Q. And do you understand when I asked whether you did, I'm
3    asking not only about you, but about anybody that was
4    working with or for you in connection with preparing
5    your report?
6 A. They did not.
7 Q. Let me take you, please, sir, to Exhibit F in your
8    report.
9 A. I don't seem to have a copy of that with me. I think
10    it's the list of documents, isn't it?
11 Q. So if you go to your screen, sir, hopefully you still
12    have access to Exhibit 309.
13 A. Okay. One second. Okay. I have it.
14 Q. You have it?
15 A. Yeah.
16 Q. With respect to the agreements identified in Exhibit F,
17    can you identify what you did in order to reach the
18    conclusions set forth in your report other than perform
19    the calculations that are set forth in Exhibits B, C
20    and D?
21         MS. BREWER: Object to form.
22 A. The agreements that are listed here we've reviewed to
23    see what it was, meaning we determined that these were
24    not all agreements. These were copyright notices and
25    other types of documents that were mislabeled as

1    agreements. So what we did from this point is that we
2    went back to the attorneys using the Cox information,
3    and asked for agreements from the chain of title, which
4    they had. And when they produced those agreements to
5    us, those are the agreements that we looked at 370, and
6    the 369 I told you earlier. But that was the beginning
7    process of our selection of the 19 that were used in
8    these examples.
9 BY MR. SPERLING:
10 Q. And is there anything that you did with the 370 and 369
11    that you just referred to in order to reach your
12    conclusions as reflected in your report, aside from the
13    calculations that are set forth in Exhibits B, C and D?
14         MS. BREWER: Object to form. Go ahead.
15 A. I looked at those, obviously, and then from there sort
16    of thinned down to -- and I wanted to make sure of them
17    first and most importantly that I had agreements from
18    each company from Universal, from Sony and from Warner
19    Brothers. And so one of the big decisions was to look
20    through the agreements and make sure that the ones I
21    was looking at were a sampling from each company.
22         Next process was to look and see if they
23    were high, medium or low. And if they were, in fact,
24    similar language and terms that I could reduce those
25    down to the 19 that we have in this report. That I have

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL

Page 134

1    in this report.
2 BY MR. SPERLING:
3  Q.  Thank you, sir. That was helpful. And aside from what
4     you just described in that answer, is there anything
5     that you did with the agreements in order to reach your
6     conclusions as set forth in your report other than
7     perform the calculations that are set forth in Exhibits
8     B, C and D?
9  A.  I'm not sure I understand the question. Could you
10    repeat that?
11 Q.  Sure. Aside from what you just described in your
12    preceding answer, your immediately preceding answer, is
13    there anything that you did with the agreements in
14    order to reach the conclusions sent forth in your
15    report other than perform the calculations set forth in
16    Exhibits B and C and D?
17       MS. BREWER:  Object to form.
18 A.  I could look back at the procedures we did in the
19    report, but that I believe is the explanation of what I
20    did.
21 BY MR. SPERLING:
22 Q.  And I'm sorry to belabor it, but I'm not sure I
23    understand you completely. When you say that you
24    believe is the explanation of what you did, what are
25    you referring to by the word that?

Page 135

1  A.  That's how I actually reviewed these agreements, and
2     how I determined which ones to use in the examples.
3  Q.  Okay. So let me ask again. I apologize. The fault is
4     mine for asking questions that aren't maybe as clear as
5     they should be.
6        You made sure that you had agreements with
7     each of the applicable companies, correct?
8  A.  That's correct.
9  Q.  And then you went through to sort the agreements into
10    the high, medium and low categories that you described
11    earlier, correct?
12 A.  Correct.
13 Q.  And then you went through the process of identifying
14    those that had similar language and terms in order to
15    reduce the set down to the 19 that you performed
16    calculations for, correct?
17 A.  Correct.
18 Q.  Is there anything that you did with those with the
19    agreements to inform the opinions set forth in your
20    report aside from that, and perform the calculations
21    that are contained in Exhibits B, C and D to the
22    report?
23       MS. BREWER:  Object to form.
24 A.  I don't believe there's anything else.
25 BY MR. SPERLING:

Page 136

1  Q.  Okay. Let me take you, please, to page 11 of your
2     report. Are you on that page, sir?
3  A.  I am.
4  Q.  Do you see the end of the second paragraph says, "The
5     following are typical deductions applied to artist
6     royalties."?
7  A.  I see that.
8  Q.  Thank you. Are each of the items A through F that
9     follow that paragraph deductions that are provided for
10    contractually?
11       MS. BREWER:  Object to form.
12 A.  Those deductions are made -- had been an agreement.
13 BY MR. SPERLING:
14 Q.  I'm sorry, sir. I just couldn't hear your answer.
15    Could you repeat it?
16 A.  Yes. These deductions are typical deductions that we
17    have seen in the agreements and the accountings to the
18    artist. Not all artists, but we see those.
19 Q.  And when they appear in agreements with artists or
20    songwriters, you're not asserting that record companies
21    or publishers don't have the right to enforce those
22    terms, are you?
23       MS. BREWER:  Object to form.
24 A.  I am not.
25 BY MR. SPERLING:

Page 137

1  Q.  Let me take you to item G in that list on page 12.
2     Earnings from micro-pennies. Do you see that?
3  A.  I do.
4  Q.  Because you didn't have any actual revenue or royalty
5     data to work with in this case, you didn't identify any
6     specific instance of unpaid micro-pennies with respect
7     to any of the artists or songwriters whose works are at
8     issue here, correct?
9  A.  That's correct.
10 Q.  Do you see the bottom page 12 you then talk about
11    typical deductions to songwriter royalties?
12 A.  I do.
13 Q.  And in each of subparagraphs A through G you cite to
14    one or more of the nine songwriter agreements in
15    Exhibit C to show where those provisions -- strike
16    that.
17       I'm going to start this one over. For each
18    of the items in subparagraphs A through G you cite to
19    one or more of the songwriter agreements that appear in
20    Exhibit C as examples of contracts that would include
21    these terms, right?
22 A.  Right.
23 Q.  Recording agreements typically don't include provisions
24    requiring the record company to pay so-called breakage
25    to artists, correct?

35 (Pages 134 - 137)

HIGHLY CONFIDENTIAL

Page 138

1   MS. BREWER: Object to form.
2   A. Many recording agreements don't require breakage
3   payments.
4   BY MR. SPERLING:
5   Q. And to make sure we're talking about the same thing, is
6   breakage the amount of an advance or guaranteed payment
7   from a distributor of the record company that exceeds
8   royalties earned from distribution of the copyrighted
9   works?
10   MS. BREWER: Object to form.
11   A. That's the definition that I've used in this report.
12   BY MR. SPERLING:
13   Q. And publishing agreements ordinarily don't provide --
14   well, strike that.
15   Songwriter agreements ordinarily don't
16   provide for songwriters to be paid breakage, correct?
17   MS. BREWER: Object to form.
18   A. That is correct.
19   BY MR. SPERLING:
20   Q. Recording agreements typically don't provide for
21   artists to receive a share of the proceeds that record
22   companies earn from selling equity in companies that
23   the record companies have invested in, right?
24   MS. BREWER: Object to form.
25   A. Did you say typically?

Page 139

1   BY MR. SPERLING:
2   Q. I did.
3   A. That's correct.
4   Q. And the same is true for songwriter agreements, right?
5   A. Right.
6   MS. BREWER: Object to form.
7   A. Sorry.
8   BY MR. SPERLING:
9   Q. And recording agreements typically don't provide for
10   plaintiffs to pay artists a share of recoveries from
11   piracy lawsuits, right?
12   MS. BREWER: Object to form.
13   A. Correct.
14   BY MR. SPERLING:
15   Q. And the same is true for songwriter agreements and
16   publishers, right?
17   A. If you're referring to typically, I'd say yes, that's
18   correct.
19   Q. If we go back to page 14 of your report beginning
20   paragraph seven on the bottom, excuse me, paragraph six
21   towards the top, you identify what you describe as
22   underreportings that are typically found, right?
23   A. Correct.
24   Q. And that's based on your experience; is that correct?
25   A. That's correct.

Page 140

1   Q. But there's no analysis that you performed specific to
2   this case that identify any specific instances of those
3   underreportings, right?
4   MS. BREWER: Object to form.
5   A. If you're referring to did we analyze the royalty
6   statement for these artists and songwriters, the
7   answer's no.
8   BY MR. SPERLING:
9   Q. And you can't identify a specific instance of an
10   underreporting without analyzing the royalty
11   statements, right?
12   MS. BREWER: Object to form.
13   A. There may be other ways to identify those without the
14   royalty statement, but we have not done that.
15   BY MR. SPERLING:
16   Q. So now if we go to paragraph seven on the bottom of
17   page 14, you identify sources of revenue that are not
18   always shared with the artists and songwriters,
19   correct?
20   A. Correct.
21   Q. And the first example you identify are suspense
22   accounts, right?
23   A. Right.
24   Q. But you didn't have the ability to make any
25   determination here whether there are any unpaid

Page 141

1   royalties due to items in suspense accounts with
2   respect to any of the artists or songwriters whose
3   works are at issue here, right?
4   MS. BREWER: Object to form.
5   A. In this case, I know that every record company, and
6   every publisher, at least the three that are Universal,
7   Sony and Warner, have suspense accounts that are
8   substantial. And every time we do an audit we find
9   unpaid royalties for our clients.
10   BY MR. SPERLING:
11   Q. My question's a little different. Did you identify in
12   the course of preparing your opinion in this case any
13   such unpaid royalties with respect to any artist or
14   songwriter whose works are at issue here?
15   MS. BREWER: Object to form.
16   A. I did not quantify a suspense claim for the agreements
17   that I reviewed.
18   BY MR. SPERLING:
19   Q. Let me try to do this efficiently. With respect to each
20   of the items A through K under paragraph seven in your
21   report, on pages 15 and 16 of the report, you didn't
22   identify any specific --
23   A. Sorry.
24   Q. You didn't identify any specific instance of the issue
25   that you identified that related to any of the artists

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL

Page 142

1    or songwriters whose works are at issue here, right?
2        MS. BREWER: Object to form.
3  A.  If you are asking if I calculated any claims, or any
4    particular item as artist or writer identified in this
5    report, I did not.
6  BY MR. SPERLING:
7  Q.  And not only did you not calculate a claim, you didn't
8    identify a specific instance in which there would be a
9    basis for a claim, right?
10        MS. BREWER: Object to form.
11  A.  Each of these items that I've listed here certainly
12    would be subject to underreportings for an artist or
13    writer from the three companies. I did not calculate
14    any underpayments for these artists or writers.
15  BY MR. SPERLING:
16  Q.  Well, let's start with subparagraph A at the top of
17    page 15. For which artists or songwriters whose works
18    are at issue in this case did you identify amounts held
19    in suspense accounts as part of your work preparing
20    your opinion in this matter?
21  A.  None.
22  Q.  Let's go to paragraph B on page 15. For which artists
23    or songwriters whose works are at issue in this case
24    did you identify as part of your expert opinion third
25    party settlements that were not shared with the artist

Page 143

1    or songwriter?
2        MS. BREWER: Object to form.
3  A.  None.
4  BY MR. SPERLING:
5  Q.  For which artists or songwriter, songwriters, whose
6    works are at issue in this case did you identify black
7    box accountings for which royalties were not paid?
8        MS. BREWER: Object to form.
9  A.  None.
10  BY MR. SPERLING:
11  Q.  I skipped over Paragraph C and D. Those paragraphs
12    refer to certain kinds of contractual provisions,
13    correct?
14  A.  They do.
15  Q.  They don't refer to instances in which you assert that
16    record companies or publishers don't pay amounts that
17    they're contractually obligated to pay, right?
18        MS. BREWER: Object to form.
19  A.  That's correct.
20  BY MR. SPERLING:
21  Q.  For which artists and songwriters whose works are at
22    issue in this case did you identify any foreign public
23    performance fees or income that should have been shared
24    with them, but was not?
25        MS. BREWER: Object to form.

Page 144

1  A.  I did not. None.
2  BY MR. SPERLING:
3  Q.  The next item is digital breakage. You testified
4    earlier that both recording contracts and songwriter
5    agreements typically don't have provisions requiring
6    that breakage be paid to the artist or songwriter,
7    correct?
8  A.  Correct.
9  Q.  But every one of the major record companies and
10    publishers has a policy of paying breakage to artists
11    nonetheless; isn't that right?
12        MS. BREWER: Object to form.
13  A.  Some digital breakage is being paid, yes.
14  BY MR. SPERLING:
15  Q.  And that's being paid even though there's no
16    contractual obligation in most instances to pay it,
17    right?
18        MS. BREWER: Object to form.
19  A.  That's my understanding.
20        STENOGRAPHER: I didn't hear that last
21    answer.
22  A.  That's my understanding. Sorry.
23  BY MR. SPERLING:
24  Q.  And that would be an example of the record companies
25    and publishers acting solely for the financial benefit

Page 145

1    of their artists and songwriters, and not for their own
2    financial benefit, right?
3        MS. BREWER: Object to form.
4  A.  I have no opinion on that.
5  BY MR. SPERLING:
6  Q.  Can you explain what you're referring to in paragraph H
7    on 15 regarding DART royalties?
8  A.  This is a royalty that's almost nonexistent today, but
9    at one time when blank tapes were sold, or blank CDs,
10    DVDs were sold, there was actually a royalty that was
11    assessed to those blanks being sold. And those
12    royalties were payable to record companies and
13    publishers. Very small number.
14  Q.  Very small today, correct?
15  A.  Correct.
16  Q.  And you did not identify any instance of an artist or
17    songwriter who should have been paid a portion of DART
18    royalties, but wasn't, right?
19  A.  I didn't review any statements to see if they'd been
20    paid these royalties or not.
21  Q.  Let me take you to the top of page 16. I is another
22    example of breakage, correct?
23  A.  That's correct.
24  Q.  And with respect to item J, you didn't identify any
25    instance in which an artist or songwriter whose works

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL

Page 146

1   are at issue here was entitled to receive a royalty in
2   connection with such payments, but did not, right?
3 A. I did not.
4 Q. And you didn't identify with respect to any artist or
5   songwriter whose works are at issue here any royalties
6   that should have been paid, but were not in connection
7   with other income not allocated by song title as
8   identified in paragraph J, correct?
9 A. I did not.
10 Q. Let me take you, please, to page 18 of your report,
11   sir. Do you see heading nine opinions?
12 A. I do.
13 Q. Let me point you to opinion one. You say, "Contrary to
14   their representations in this litigation, plaintiffs
15   take positions against their artists' and songwriters'
16   interests, for their own financial benefit, as a matter
17   of common practice." Do you see that?
18 A. I do.
19 Q. What representations in this litigation are you
20   referring to?
21 A. I reviewed the complaint, and I also looked at some
22   trial testimony from the Cox, and it was my
23   understanding that the plaintiffs are saying that they
24   are acting on behalf and to the benefit of the artists'
25   and songwriters' interests.

Page 147

1      MS. BREWER: Jonathan, I'm so sorry, but I
2   need a comfort break when you're at a stopping point.
3      MR. SPERLING: Yeah, can you manage two more
4   minutes?
5      MS. BREWER: Yes.
6 BY MR. SPERLING:
7 Q. Okay. What specifically did you see in the complaint
8   in this case that you are referring to in your opinion
9   number one on page 18 of your report?
10 A. I don't remember the exact clause, but I think in the
11   first amended complaint it was paragraph 101 or 102.
12 Q. With respect to the specific agreements that you
13   analyzed in Exhibits B and C to your report, all that
14   you did is identify contractual terms that allocate
15   certain revenue as between the record company and
16   publisher on the one hand, and the artist or songwriter
17   on the other, correct?
18      MS. BREWER: Object to form.
19 A. I'm not sure that's all I did, but that certainly was
20   what was exhibited in those schedules that were
21   prepared.
22 BY MR. SPERLING:
23 Q. Is there any feature of the agreements that you
24   analyzed in Exhibits B and C to your report that shows
25   plaintiffs taking positions against their artists'

Page 148

1   songwriters' interests for their own financial benefit
2   other than contractually agreed provisions that
3   allocate money as between one side and the other?
4      MS. BREWER: Object to form.
5 A. The deductions that we put in the analysis are mostly
6   contractual. Not always, but things like the
7   equivalency fees, those are not always contractual.
8   Other deductions from foreign sources is not always
9   contractual.
10 BY MR. SPERLING:
11 Q. But the only deductions that you included in your
12   calculations in Exhibits B and C were those that you
13   identified in the contracts, correct?
14 A. I believe that's true.
15 Q. And so is there any feature of those agreements, the
16   one that you -- the ones that you analyzed in Exhibits
17   B and C to your report that shows plaintiffs taking
18   positions against their artists' and songwriters'
19   interests other than contractually agreed provisions
20   that allocate monies between one side and the other?
21      MS. BREWER: Object to form.
22 A. Would you repeat that, please.
23 BY MR. SPERLING:
24 Q. I will. I lost track of Ms. Brewer's needs, so I want
25   to make sure that we're okay repeating this question,

Page 149

1   and then we can close this out and take a break.
2      MS. BREWER: Okay. Thank you.
3 BY MR. SPERLING:
4 Q. Is there any feature of the agreements that you
5   analyzed in Exhibits B and C that shows plaintiffs
6   taking positions against the interests of their artists
7   and songwriters, and for their own financial benefit,
8   other than contractually agreed provisions that
9   allocate money as between one side or the other?
10      MS. BREWER: Object to form.
11 A. I don't believe so.
12      MR. SPERLING: Okay. Let's go off the record
13   and take the break that Ms. Brewer asked for.
14      VIDEO TECHNICIAN: We're off the record at
15   2:25.
16      (Break at 2:25 p.m.)
17      (Back on the record at 2:32 p.m.)
18      VIDEO TECHNICIAN: Back on the record at
19   2:32.
20 BY MR. SPERLING:
21 Q. Mr. Coleman, let me take you, if I could, back to page
22   15 of your report.
23 A. Yes.
24

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL



Page 150

16  BY MR. SPERLING:

17  Q.  You're aware, aren't you, that the major record labels

18      have shared hundreds of millions of dollars in proceeds

19      from their sale of equity in Spotify with their artists

20      and songwriters, right?

21          MS. BREWER:  Object to form.

22  A.  Correct.

23  BY MR. SPERLING:

24  Q.  And I refer to the record labels, but it's true for

25      publishers as well, right?

Page 151

1          MS. BREWER:  Object to form.

2  A.  That's correct.

3  BY MR. SPERLING:

4  Q.  And that's something that accrues to the financial

5      benefit of artists and songwriters, right?

6          MS. BREWER:  Object to form.

7  A.  Additional payments certainly accrue to their benefit.

8  BY MR. SPERLING:

9  Q.  And to the detriment of the record labels and

10     publishers that are paying it out, right?

11         MS. BREWER:  Object to form.

12  A.  I don't have an opinion on that.

13  BY MR. SPERLING:

14  Q.  Are you saying that you're not able to form a view

15      whether somebody paying out money that they don't

16      contractually owe is to their financial detriment?

17         MS. BREWER:  Object to form.

18  A.  I'm saying that I don't know all the facts in that

19      matter to make a judgment for an opinion.

20  BY MR. SPERLING:

21  Q.  Bear with me just a moment, please, Mr. Coleman. Let me

22      take you, please, to Exhibit B in your report. Take

23      you, please, to Exhibit B8. It should say page 70 of 94

24      at the bottom.

25  A.  I have it.

Page 152

Page 153

Veritext Legal Solutions

www.veritext.com                                    888-391-3376

HIGHLY CONFIDENTIAL



Veritext Legal Solutions

www.veritext.com                                                    888-391-3376

HIGHLY CONFIDENTIAL



**Page 158**

**Page 159**

**Page 160**

15      PL_CH_0009898 - PL_CH_0009973
16      3:50 p.m.
17  BY MR. SPERLING:
18  Q.  I'm going to ask you to look at another document.
19      You'll have to go back to your screen for this. If we
20      could mark, please, tab three as Exhibit 310.
21  A.  Do I need to do something to find that?
22  Q.  You need to go to your marked exhibits folder.
23  A.  Okay. I'm going to have to get Ms. Crain to help me
24      pull that up.
25          MS. BREWER:  If you hit refresh on the

**Page 161**

1       browser, then that often does the trick in making it
2       appear, because it won't populate without that refresh
3       action.
4   A.  Okay.
5   BY MR. SPERLING:
6   Q.  Ms. Brewer's advice, of course, is spot on, but will
7       only work if you're in the marked exhibits folder only
8       already.
9           MS. BREWER:  True.
10  A.  Which I'm not, so let me just get some help to bring
11      that up.
12          MS. BREWER:  Do you want to, Jonathan, go
13      off the record for a second?
14          MR. SPERLING:  Yeah.
15          MS. BREWER:  Okay.
16          MR. SPERLING:  Why don't we do that.
17          VIDEO TECHNICIAN:  We'll go off the record
18      at 2:52.
19          (Break at 2:52 p.m.)
20          (Back on the record at 2:55 p.m.)
21          VIDEO TECHNICIAN:  Back on the record at
22      2:55.
23  BY MR. SPERLING:
24  Q.  Mr. Coleman, do you have Exhibit 310 in front of you?
25  A.  I do.

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL



Page 162

Page 164

19  Q.  Okay.  If you can go back to your screen, you'll want
20      to hit the back arrow which will take you back to the
21      marked exhibits folder.
22  A.  I'm there.
23  Q.  And then if you refresh that folder.
24  A.  Okay.
25  Q.  You should have an Exhibit 311.

Page 163

Page 165

1   A.  So where do you hit refresh?  Maybe that's what I'm not
2       doing.
3   Q.  Yeah, as an alternative, you could just click into
4       another folder, and then back into the marked exhibits
5       folder. That should have the same effect.
6   A.  Okay.  Let's do that.
7   Q.  Do you see Exhibit 311 now, sir?
8   A.  Nope, I don't. I'll get my partner to show me one more
9       time. Maybe we can shortcut this.
10          MR. SPERLING:  Sure. Why don't we just go
11      off the record while you do that.
12          VIDEO TECHNICIAN:  We're off the record
13      3:01.
14          (Break at 3:01 p.m.)
15          (Back on the record at 3:03 p.m.)
16          VIDEO TECHNICIAN:  Back on the record 3:03.
17  BY MR. SPERLING:
18  Q.  Mr. Coleman, do you have Exhibit 311 on the screen in
19      front of you?
20  A.  I do.

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL



Veritext Legal Solutions

HIGHLY CONFIDENTIAL



HIGHLY CONFIDENTIAL



Veritext Legal Solutions

HIGHLY CONFIDENTIAL



Page 178

Page 180

Page 179

Page 181

**Page 180**

21       MR. SPERLING:  Why don't we go off the
22  record and take a break.
23       VIDEO TECHNICIAN:  We'll go off the record
24  at 3:28.
25       (Break at 3:28 p.m.)

**Page 181**

1       (Back on the record at 3:40 p.m.)
2       VIDEO TECHNICIAN:  Back on the record at
3  3:40.
4 BY MR. SPERLING:
5 Q.  Mr. Coleman, if I could take you, please, to page 22 of
6    your report.
7 A.  I'm there.
8 Q.  You see opinion three at the top of that page?
9 A.  I do.
10 Q.  Opinion three says, "It is my opinion that artists and
11    songwriters who generate lower amounts of revenue for
12    plaintiffs or are otherwise less popular routinely
13    receive less favorable terms in their agreements with
14    plaintiffs and less favorable treatment by plaintiffs
15    in their royalty accountings."  Do you see that?
16 A.  I do.
17 Q.  You understand, don't you, that most artists and
18    songwriters that have signed agreements with record
19    companies or publishers end up being money losers for
20    the record companies and publishers?
21       MS. BREWER:  Object to form.
22 A.  I have no opinion on that.
23 BY MR. SPERLING:
24 Q.  Don't you know it to be true that the majority of
25    recording agreements turn out to be money losers for

46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL

1     record companies?
2 A.  Again, I have no opinion on that.
3 Q.  Don't you know it to be true that the majority of
4     songwriter agreements turn out to be money losers for
5     the publishers?
6         MS. BREWER:  Object to form.
7 A.  I have no opinion on that.
8 BY MR. SPERLING:
9 Q.  New artists are untested, by definition, in terms of
10     whether they will turn out to be profitable for a
11     record company or publisher, right?
12         MS. BREWER:  Object to form.
13 A.  I would presume so.
14 BY MR. SPERLING:
15 Q.  And there's less competition in the marketplace to sign
16     somebody whose profit ability is unproven, than there
17     is to sign somebody who's demonstrated their ability to
18     generate a profit, right?
19         MS. BREWER:  Object to form.
20 A.  I would say that's correct.
21 BY MR. SPERLING:
22 Q.  Less competition means less demand for those artists
23     who are still unproven, right?
24         MS. BREWER:  Object to form.
25 A.  I think that's correct.

1 BY MR. SPERLING:
2 Q.  All things being equal, when there's less demand for a
3     good or service, the price tends to do what?
4         MS. BREWER:  Object to form.
5 A.  If you're asking me if it's usually a lower price,
6     that's usually correct.
7 BY MR. SPERLING:
8 Q.  Once an artist or songwriter has proven themself to be
9     profitable, there's more competition to sign them,
10     right?
11         MS. BREWER:  Object to form.
12 A.  I presume that to be correct.
13 BY MR. SPERLING:
14 Q.  More competition just means more demand for their
15     services, right?
16         MS. BREWER:  Object to form.
17 A.  That's correct.
18 BY MR. SPERLING:
19 Q.  And all other things being equal, when there's more
20     demand for a good or service, the price tends to go up,
21     right?
22 A.  I believe that's correct.
23 Q.  Is your opinion three intended to express anything
24     other than that basic economic principle that we just
25     discussed?

1         MS. BREWER:  Object to form.
2 A.  The opinion in three discusses the fact that the
3     artists and songwriters who generate the lower amount
4     of revenue get less favorable terms. And we also find,
5     and it's part of this opinion, too, is that the payment
6     to these artists and writers receive less attention.
7     And, in fact, we find quite a few of these that don't
8     receive payment at all on the lower amounts. So
9     that's -- that's part of this opinion three.
10 Q.  Let's take each of those step by step. With respect to
11     the more favorable terms, isn't it true that you're
12     just expressing the idea that artists who've shown
13     themselves to be profitable are able to command higher
14     price and better terms in the marketplace?
15         MS. BREWER:  Object to form.
16 A.  That is correct.
17 BY MR. SPERLING:
18 Q.  With respect to the payments to artist and writers who
19     are less successful, receiving less attention, what do
20     you mean?
21 A.  I mean that on the artists and songwriters that have a
22     lower revenue, quite often are not reported, too, at
23     all, and certainly not paid properly. They're just
24     ignored. Some cases the lower ones are put on a no pay
25     basis for years, and never get paid until we conduct an

1     audit and open that pipeline up again.
2 Q.  And with respect to that second half of this opinion
3     three, you didn't identify any instance -- specific
4     instances of that happening with respect to any of the
5     artists or songwriters whose works are at issue in this
6     case, right?
7         MS. BREWER:  Object to form.
8 A.  I did not.
9 BY MR. SPERLING:
10  ████████████████████████
   █  ████████████████████████████
   █  ██████████████████████
   █  ██████████████████
   █  ████████
17 Q.  Bear with me for just a moment. All right. Mr. Coleman,
18     in your report you refer to the books and records made
19     available to audit having diminished over time. Do you
20     recall that?
21 A.  I do.
22 Q.  And in many instances, the recording agreements
23     actually define the scope of the books and records
24     available for audit, correct?
25         MS. BREWER:  Object to form.

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL

Page 186

1  A.  That's correct.
2  BY MR. SPERLING:
3  Q.  I'm sorry. I couldn't hear your response, sir.
4  A.  That's correct.
5      MR. SPERLING:  I know we've only been back
6  on the record for eight minutes, but why don't we go
7  back off. I'll explain why in a moment off the record.
8      VIDEO TECHNICIAN:  Okay.  We'll go off the
9  record at 3:48.
10     (Break at 3:48 p.m.)
11     (Back on the record at 3:53 p.m.)
12     VIDEO TECHNICIAN:  We're back on the record
13  at 3:53.
14     MR. SPERLING:  Thank you, Mr. Coleman. I
15  have no further questions.
16 A.  Thank you.
17     MS. BREWER:  All right. I have no questions.
18 So that concludes the deposition. Thank you, Mr.
19 Coleman.
20 A.  Thank you. Thank you all.
21     MR. SPERLING:  Let's go off the record.
22     VIDEO TECHNICIAN:  We'll go off the record
23 at 3:54.
24     (Deposition concluded at 3:54 p.m.,
25     signature of the witness was requested.)

Page 187

1 WARNER RECORDS, INC., et al.,
2          Plaintiffs,
3      vs.        Case No. 1:19-cv-00874-RBJ-MEH
4 CHARTER COMMUNICATIONS, INC,
5          Defendant.
6 _____/
7
8      VERIFICATION OF DEPONENT
9
10     I, having read the foregoing deposition
11 consisting of my testimony at the aforementioned time
12 and place, do hereby attest to the correctness and
13 truthfulness of the transcript.
14
15      Joann M. Bugg
16
17      WAYNE C. COLEMAN, CPA
18      Dated:
19
20
21
22
23
24
25

Page 188

1      CERTIFICATE OF NOTARY
2 STATE OF MICHIGAN  )
3          ) SS
4 COUNTY OF WAYNE   )
5
6      I, Joanne Marie Bugg, certify that this
7 remote deposition was taken before me on the date
8 hereinbefore set forth; that the foregoing questions
9 and answers were recorded by me stenographically and
10 reduced to computer transcription; that this is a true,
11 full and correct transcript of my stenographic notes so
12 taken; and that I am not related to, nor of counsel to,
13 either party nor interested in the event of this cause.
14
15
16
17
18
19      Joann M. Bugg
20      Joanne Marie Bugg, CSR-2592
21      Wayne County, Michigan
22      My Commission expires: 2-26-2025
23
24
25

Page 189

1        Veritext Legal Solutions
           1100 Superior Ave
2            Suite 1820
           Cleveland, Ohio 44114
3          Phone: 216-523-1313
4
  October 19, 2021
5
  To: Linda J. Brewer, Esq.
6
  Case Name: Warner Records, Inc., et al. v. Charter Communications,
7 Inc.
8 Veritext Reference Number: 4846316
9 Witness:  Wayne C. Coleman , CPA      Deposition Date:  10/14/2021
10
  Dear Sir/Madam:
11
12 Enclosed please find a deposition transcript.  Please have the witness
13 review the transcript and note any changes or corrections on the
14 included errata sheet, indicating the page, line number, change, and
15 the reason for the change.  Have the witness' signature notarized and
16 forward the completed page(s) back to us at the Production address
  shown
17
  above, or email to production-midwest@veritext.com.
18
19 If the errata is not returned within thirty days of your receipt of
20 this letter, the reading and signing will be deemed waived.
21
  Sincerely,
22
  Production Department
23
24
25 NO NOTARY REQUIRED IN CA

48 (Pages 186 - 189)