# Exhibit XXV

Case No. 1:19-cv-00874-RBJ-MEH Document 684-2 Filed 12/20/22 USDC Colorado Page 1 of 15
Case 1:19-cv-00874-RBJ-MEH Document 684 Filed 02/10/22 USDC Colorado Page 1 of 16
of 16

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-00874-RBJ-MEH

WARNER RECORDS INC, et al.,

    Plaintiffs,

v.

CHARTER COMMUNICATIONS, INC.,

    Defendant.

___

## PLAINTIFFS' OPPOSITION TO CHARTER'S MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF DR. ON AMIER

___

    Charter proffers Dr. Aram Sinnreich as a putative expert to opine, among other things, that peer-to-peer ("P2P") file sharing has helped, rather than harmed, the music industry. That opinion is based primarily on two surveys Dr. Sinnreich oversaw and published while working for Jupiter Research (the "Jupiter Reports"). Dr. Sinnreich contends that the Jupiter Reports "found that P2P was helping boost music sales."[1] Plaintiffs have moved to exclude Dr. Sinnreich's opinion based on the Jupiter Reports, and other of his opinions. ECF No. 559. Plaintiffs also retained Dr. On Amir as a rebuttal expert to offer opinions on "the survey research conducted and explained in [the] two Jupiter Research Reports authored by Dr. Sinnreich . . . and to opine on the reliability of the conclusions in Dr. Sinnreich's Report that were drawn from those survey studies."[2] Charter seeks to exclude Dr. Amir as unqualified and for offering allegedly speculative opinions. Charter

___

[1] ECF No. 550-2 (May 27, 2021 Expert Report of Dr. Aram Sinnreich ("Sinnreich Rept.")) at 16. All pin citations to materials filed on ECF are to the page numbers indicated in the ECF stamp.
[2] ECF No. 550-3 (June 28, 2021 Expert Report of Professor On Amir ("Amir Rept.")) ¶ 9.

is wrong in all regards.

Dr. Amir is highly qualified to render expert opinions on Dr. Sinnreich's consumer survey research and the conclusions Dr. Sinnreich has drawn from them in this case.[3] Dr. Amir has been a professor of marketing for the past 18 years. He received his Ph.D. in Management Science and Marketing from Massachusetts Institute of Technology, was an Assistant Professor of Marketing at Yale University, and then helped found the Rady School of Management at the University of California at San Diego, where he is currently a Professor of Marketing and Associate Dean. Dr. Amir has designed and conducted hundreds of consumer surveys as an academic and business consultant, and has testified in multiple other cases in federal courts as a survey expert. Amir Rept. App'x A (Curriculum Vitae).

Here, Dr. Amir reviewed and analyzed the Jupiter Reports and the opinions and conclusions that Dr. Sinnreich Report drew from them. Dr. Amir concluded—applying his expertise and twenty years of experience in consumer research and survey design—that the opinions in the Sinnreich Report based on the Jupiter Reports and underlying surveys ("Jupiter Surveys"), are fundamentally and fatally flawed.

Charter argues that Dr. Amir has no specialized training or expertise in the music industry and should therefore be excluded. Dr. Amir, however, is not opining on the music industry; he is opining on the scientific reliability of the consumer research results in the Jupiter Reports and Dr. Sinnreich's conclusions therefrom. Dr. Amir, as a recognized expert in consumer and survey research, is highly qualified to offer the opinions in the Amir Report.

---

[3] In its Motion, Charter repeatedly refers to Dr. Amir as "Mr. Amir," as Charter's counsel repeatedly did during Dr. Amir's deposition. *See* Declaration of Alexander Kaplan ("Kaplan Decl."), Ex. 1 (Oct. 8, 2021 O. Amir Deposition Tr. ("Amir Tr.")) 68:5–9.

2

Charter further argues that Dr. Amir's opinions are improper speculation because he did not review the underlying survey documentation or the Jupiter Survey itself. This argument is meritless and ignores Dr. Amir's detailed analysis of the information disclosed in the Jupiter Reports, and his well-founded critique of the undisclosed Jupiter Surveys as failing to apply best survey practices.

In any event, the only reason Dr. Amir did not see the Jupiter Survey documents is because ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Mot. at 5 n.2. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ the Jupiter Reports "themselves provide sufficient information regarding the methodology and results of those studies." Kaplan Decl. Ex. 2 at 1. Charter's circular argument that the Jupiter Surveys are unnecessary to consider the reliability of the Jupiter Reports, but that Dr. Amir must be excluded because he has not reviewed the Jupiter Surveys, is spurious and should be rejected.

Charter's Motion must be denied.[4]

## BACKGROUND

Dr. Sinnreich opines that peer-to-peer file sharing ("P2P") has not harmed the music industry, and, in fact, has been "overwhelmingly beneficial." *See* Sinnreich Rept. at 16. To support that opinion, Dr. Sinnreich relies on research he conducted and published in the Jupiter Reports. *Id.* (citing ECF No. 550-4 ("2000 Jupiter Rept.") and ECF No. 550-5 ("2002 Jupiter Rept.")). Dr. Sinnreich claims that the Jupiter Reports, which digest and report on the results of

---

[4] If the Court grants Plaintiffs' motion to exclude Dr. Sinnreich's opinions and testimony regarding the Jupiter Reports and underlying surveys (ECF No. 559), the need for Dr. Amir's testimony would be obviated.

surveys that were conducted in 2000 and 2001—more than a decade before the Claims Period at issue in this case—found that P2P usage was "helping boost music sales." Sinnreich Rept. at 16. The Jupiter Reports cite to and rely on data collected from the Jupiter Surveys.

Charter produced the Jupiter Reports, but not the Jupiter Surveys or any of the survey materials. Plaintiffs requested production of all documents in Dr. Sinnreich's possession, custody, or control "reflecting the research, assessment, or analysis cited in, referred to, or relied upon" by the Jupiter Reports. Kaplan Decl. Ex. 2 at 2. ████████████████████████ the Jupiter Reports "themselves provide sufficient information regarding the methodology and results of those studies . . . ." *Id.* at 1.

Dr. Amir reviewed Dr. Sinnreich's expert report, the two Jupiter Reports cited therein, and academic research and publications Dr. Amir selected that were relevant to the science of surveys and consumer behavior. Amir Rept. App'x C. Based on those materials and his two decades of experience in the field, Dr. Amir concluded that the Jupiter Reports do not support the conclusion that piracy benefits music companies. Dr. Amir summarized his opinions, as follows:

- The Jupiter Research surveys reflect self-reported data on respondents' behaviors and purchasing decisions. It is well known that such self-reported data are often flawed and inaccurate, particularly when the questions relate to sensitive topics, including immoral or illegal activities. ("Opinion 1")

- The Jupiter Research surveys were conducted in 2000 and 2001, well before the Claims Period at issue in this case (*i.e.,* 2013-2016); considering the significant changes that technology has brought to consumer behavior in the music industry between these years, any findings from these studies are of limited value, if any, to understanding consumer behavior and purchasing decisions during the Claims Period. In other words, the surveys essentially target the wrong survey universe. ("Opinion 2")

- Dr. Sinnreich inappropriately infers causation from correlation, drawing misleading and unsupported conclusions from the two Jupiter Research studies; namely, that P2P file sharing is beneficial for music companies based on an observed correlation

4

   between P2P usage and self-reported increases in paid music consumption. ("Opinion 3")

- Dr. Sinnreich's conclusions fail to account for methodological flaws in the Jupiter Research studies that would have overestimated the beneficial impact, if any, of piracy on paid music consumption. More specifically, the Jupiter Research studies do not account for the underlying heterogeneity in consumer preferences for music consumption and they do not analyze the aggregate impact on music consumption accounting for different changes in music consumption between those who increase consumption and those who decrease consumption. Younger age groups, who are less likely to pair P2P usage with an increase in paid music consumption, are also underrepresented in the two studies. ("Opinion 4")

- It is unclear whether the Jupiter Research surveys were conducted according to survey best practices. In particular, the surveys may or may not have been pretested, and they appeared to ask unclear and leading questions, errors that would undermine the reliability of the reported results. ("Opinion 5")

Amir Rept. ¶ 11.

## ARGUMENT

### I. Dr. Amir Is an Expert in Consumer Research and Marketing and Needs No Specialized Experience in Music to Opine on the Jupiter Reports.

Charter argues that, despite Dr. Amir's undisputed expertise as an expert in consumer research and surveys, he is unqualified to testify under Fed. R. Evid. 702 because he has no specialized expertise in the music industry. Mot. at 7. Charter is wrong. The fact that the Jupiter Reports and underlying surveys concerned consumer behavior regarding music consumption or the music industry is irrelevant to whether Dr. Amir is qualified to offer opinions on the reliability of the purported takeaways from the survey questions or the survey methodology. Dr. Amir has extensive experience in consumer surveys and marketing research, and may therefore opine on the scientific reliability of the Jupiter Surveys without regard to the specific subject matter. *See, e.g.*, *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1126 (D. Colo. 2006) (finding that experts were qualified to design and conduct public opinion survey even though they were not subject-

5

matter experts in real estate valuation); *Edmondson v. Caliente Resorts, LLC*, 2017 WL 10591833, at *10 (M.D. Fla. Aug. 31, 2017) (finding that expert was "qualified in the field of marketing research and conducting survey evidence" even though he "d[id] not focus all of his professional work on Lanham Act cases, [because] such is not required"). As Dr. Amir explained, "I'm [an] expert on survey research and consumer research and market research and this falls well within my expertise." *See* Amir Tr. 49:2–4.

Contrary to Charter's claims, Dr. Amir is not offering *ipse dixit* or "personal beliefs." Mot. at 9–10. To support his opinions, Dr. Amir cites numerous peer-reviewed, academic sources, including Shari S. Diamond's chapter titled "Reference Guide to Survey Research" in her book, *Reference Manual on Scientific Evidence: Third Edition* (2011), which courts often cite when analyzing survey research and expert testimony. *See, e.g.*, *Cook*, 580 F. Supp. 2d at 1127 (citing Diamond); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 595–96, 602, 604 (S.D.N.Y. 2007) (same). Surprisingly, Dr. Sinnreich was not familiar with the Diamond treatise. Kaplan Decl. Ex. 3 (Oct. 6, 2021 A. Sinnreich Deposition Tr. ("Sinnreich Tr.")) 146:20–23.

## II. Dr. Amir May Rebut Dr. Sinnreich's Opinions Even Though Charter Prevented Him from Reviewing the Jupiter Survey Documents.

Charter argues that it is improper for an expert witness to criticize a survey and its results where the expert did not conduct the survey himself. Mot. at 7. But courts routinely allow expert witnesses to opine on the reliability of surveys conducted by other experts. *See, e.g.*, *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 2010 WL 3397358, at *4–6 (N.D. Ill. Aug. 24, 2010) (holding that plaintiff's expert used reliable methodology when he analyzed defendant's surveys and reports, rather than conducting new surveys, to support opinion in Lanham Act case); *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1324–25 (N.D. Ga. 2008) (holding that plaintiff's rebuttal

6

expert was qualified to testify about the reliability of survey methodology used by defendant's expert, and that rebuttal expert's testimony was reliable).

Next Charter argues that because Dr. Amir has not reviewed the Jupiter Surveys or underlying data, he may not be admitted as an expert to rebut Dr. Sinnreich's opinions that rely on the Jupiter Reports. Mot. at 7. Charter's arguments are meritless and internally inconsistent.

*First*, as discussed above,  Dr. Sinnreich admitted in his deposition that ███. Plaintiffs' counsel objected on the record to this tactic and Charter stood by its position. *See* Amir Tr. 160:4–16. The Court should not countenance litigation tactics of this sort.

*Second*, Charter argues that Dr. Amir's opinions concerning the Jupiter Surveys are not relevant to Dr. Sinnreich's opinions because Dr. Sinnreich is relying only on the Jupiter Report and "is not relying on the Jupiter surveys themselves as foundation for his opinion." Mot. at 5. This is nonsensical. The Jupiter Reports are reports of the Jupiter Surveys, and the sole reason Dr.

---

[5] Charter's citations to Dr. Amir's testimony leaves out much of his answers where he is clear that everything he reviewed regarding the Jupiter Surveys indicated that the survey design indeed suffered from the flaws he identified. *See, e.g.*, Amir Tr. 122:1–24 ("███"); *id.* 145:3–146:9 ███.

7

Sinnreich cites the Jupiter Reports is to discuss the results of the Jupiter Surveys regarding the impact of P2P filesharing on music sales. *See* 2000 Jupiter Rept. at 30 (explaining that the Jupiter Report was based on a "44-question survey"); 2002 Jupiter Rept. at 3 ("Jupiter reexamined effects of file sharing . . . based on a survey of online music fans"); Sinnreich Tr. 149:15–150:1 ("the Jupiter report relies in . . . some extensive measure on [the] consumer survey").

For example, Dr. Sinnreich's opinions that (i) "the [Jupiter] report found that P2P was helping boost music sales" and (ii) that P2P users "were 45% more likely than otherwise identical consumers . . . to have increased their music purchasing expenditures over the previous year" (Sinnreich Rept. at 16) *come directly from the survey data*, as the Jupiter Reports show:

> What impact, if any, does networked music sharing actually have on the sale of recorded music? A Jupiter Consumer Survey addressed this question through a survey of over 2,200 online music fans (defined as users who have visited a music-related site in the last 12 months). Respondents were asked if their music consumption habits had increased, decreased, or stayed the same since they began visiting online music sites. . . . Using a separate question regarding Napster usage to cross-tabulate, Jupiter found that Napster users were 45 percent more likely to have increased their music purchasing habits than online music fans who don't use the software were.

2000 Jupiter Rept. at 9.

Charter inconsistently claims that Dr. Sinnreich may discuss, analyze, and draw conclusions from the survey results without reference to the underlying survey documentation, but Dr. Amir may not rebut those opinions without review of the surveys. Mot. at 5–6. There is no basis to treat these experts differently and the Court should not countenance Charter's position.

*Third*, and relatedly, ▮▮▮▮▮▮▮▮▮▮▮▮ "the articles themselves [i.e., Jupiter Reports] provide sufficient information regarding the methodology and results of those studies." Ex. 2 at 1. If so, then the Jupiter Reports also

8

provide sufficient information to enable Dr. Amir to critique the Surveys' methodology. Charter cannot have it both ways.

### III. Dr. Amir's Opinions Are Based on His Analysis of the Jupiter Reports and Widely Accepted Consumer Research and Survey Principles.

Charter argues that Dr. Amir's opinions are based on "speculative theories" and assumptions not drawn from the Jupiter Reports or anywhere else. Mot. at 7–8. That is false. His opinions are based on his identification of fatal flaws in the Jupiter Reports and Dr. Sinnreich's incorrect conclusions drawn from the Jupiter Reports.

Charter lists multiple examples of Dr. Amir's opinions that it deems speculative and lacking a basis in methodology. But Dr. Amir's opinions lack any speculation, as set forth below, and Charter's criticism all goes to weight, not admissibility.

**Opinion 1**: *The Jupiter Reports' reliance on self-reported behavior, particularly concerning illegal file sharing, renders the data inherently unreliable*. Amir Rept. § III.A.

Charter does not dispute (i) that the Jupiter Surveys asked respondents to self-report about their use of P2P file sharing or music purchasing habits, (ii) that Dr. Amir is correct that self-reported data are often flawed or inaccurate, or (iii) that this is particularly true with respect to self-reporting on immoral or illegal activities. Amir Rept. ¶¶ 15–17. Charter nevertheless claims that Dr. Amir "has no reliable basis to conclude that P2P sharing was widely considered 'illegal'" at the time of the Jupiter Surveys, citing to four lines of Dr. Amir's deposition transcript. Mot. at 8. But Charter excludes pages of Dr. Amir's testimony, noting that it was "widely known" that downloading music using the Napster file sharing service was "illegal." Amir Tr. 58:14-60:12. Charter does not deny that this is accurate, and the Jupiter Reports themselves confirm it to be true.

9

The 2000 Jupiter Report was published a month after the court in *Napster* found the notorious filesharing service to be illegal. *See A & M Records, Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896 (N.D. Cal. 2000), *aff'd in part, rev'd in part*, 239 F.3d 1004 (9th Cir. 2001). The 2000 Jupiter Report acknowledges the extensive popularity of Napster at the time and the finding that it was an illegal service. *See* 2000 Jupiter Rept. at 7 ("Napster stunned the recording industry by building a registered user base of over 20 million online music fans in under a year"); *id.* at 16 (noting that "labels have had some success litigating against companies such as Napster"); *see also* Sinnreich Tr. 147:13–16 (Napster was "found liable by a Federal Court"). And the 2002 Jupiter Report refers to filesharing as thievery. 2002 Jupiter Rept. at 3 ("Jupiter reexamined effects of file sharing and other potentially theft-enabling technologies on music spending.").

There is nothing speculative about Dr. Amir's Opinion 1. Indeed, as the Amir Report points out, Dr. Sinnreich relies on literature making the very same point: "Even the economists Oberholzer-Gee and Strumpf acknowledge in their 2016 paper that Dr. Sinnreich relies on, 'Respondents are unlikely to be truthful when discussing illegal activities, and those who volunteer answers [...] are unlikely to be representative of the actual file sharing population.'" *See* Amir Rept. ¶ 15 & n.27 (quoting article cited in Sinnreich Rept.).

**Opinion 2**: *Because the Jupiter Reports and Surveys researched consumer behavior in 2000–2001, the findings are of limited value, if any, to understanding consumer behavior and music purchasing decisions during the 2013–2016 period relevant to this case.* Amir Rept. § III.B.

Charter does not, and cannot, argue that Dr. Amir's Opinion 2 is incorrect, or that significant changes in technology and the availability of music over the internet (legally and illegally) between 2000–2016 did not affect music purchasing habits. *See* Amir Rept. ¶¶ 18–21.

10

Indeed, Dr. Sinnreich admitted he did not believe the Jupiter Surveys reflected music consumers' views during the 2013–2016 Claims Period. Sinnreich. Tr. 150:7–10; *id.* 147:4–149:14.

Instead, Charter argues that Dr. Amir is "wholly unqualified" to offer Opinion 2 because he lacks experience in the music industry. Mot. at 9. Because the facts on which Dr. Amir is relying in forming his opinion are not in dispute and are amply supported by the sources cited in Dr. Amir's Report, *see* Amir Rept. ¶¶ 18–21 & nn.35–45, Charter's point is hollow. *See Eclipse Elecs. v. Chubb Corp.*, 176 F. Supp. 2d 406, 412 (E.D. Pa. 2001) ("[An expert] may rely on the research, studies, and expertise of others, so long as they are of the sort of information regularly relied on by experts in the field.").

Dr. Amir's Opinion 2, in the parlance of survey design, is that the Jupiter Surveys target the wrong "universe" of respondents. As he explained: "Surveying music consumers in the early 2000s to understand consumer behavior more than a decade later is akin to surveying the wrong universe of respondents—a fatal flaw in survey research." Amir Rept. ¶ 21. Many courts, including the Tenth Circuit, have recognized that an improper survey universe is a reason to exclude survey opinions. *See, e.g.*, *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1544 (10th Cir. 1996) ("The survey should sample an adequate or proper universe of respondents. . . . The district court should exclude the survey 'when the sample is clearly not representative of the universe it is intended to reflect.'"); *Citizen Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*, 2003 WL 24010950, at *3–5 (W.D. Pa. Apr. 23, 2003) (concluding that a survey was "fatally flawed due to an irrelevant and improper universe, such that it must be excluded from evidence at trial").

11

**Opinion 3**: *The Jupiter Reports did not find a causal relationship between the use of P2P file sharing and an increase in legal music consumption, as the Sinnreich Report incorrectly opines*. Amir Rept. § III.C.

Charter argues that Dr. Amir "wrongly guesses that the Jupiter Reports were based on a correlation analysis" and that Dr. Amir's testimony therefore should be excluded. Mot. at 8. Dr. Amir was not guessing. As his report says, the 2002 Jupiter Report itself "acknowledged that 'the data above showed a statistical *correlation*, rather than a direct *causal* relationship.'" Amir Rept. ¶ 22 (quoting 2002 Jupiter Rept. at 6) (emphasis added). Dr. Amir explains why it was improper for Dr. Sinnreich to draw causal conclusions from correlative findings and that the Jupiter Reports demonstrate why the reports were not finding causal relationships. *Id*. ¶¶ 23–25.

Despite that the Jupiter Reports acknowledge they do not establish a causal relationship between the use of P2P filesharing and increased legal consumption of music, Charter asserts that they used a regression analysis to draw causal inferences. Mot. at 8. The Jupiter Reports make no mention of a regression analysis, including in the section describing the "Report Methodology." *See* 2000 Jupiter Rept. at 30–31. It is simply Dr. Sinnreich's opinion that he used a regression analysis and that analysis established causation. Dr. Amir disagrees with that opinion. Amir Tr. 103:18–104:24. The fact that Charter's expert's opinion can be rebutted is precisely why Dr. Amir must be permitted to testify for Plaintiffs on this issue.

**Opinion 4**: *The Jupiter Reports would have overestimated the beneficial impact, if any, of P2P file sharing on paid music consumption*. Amir Rept. § III.D.

Charter's motion does not dispute or even address the validity of Dr. Amir's Opinion 4 (Amir Rept. ¶¶ 26–28). Thus, there is no basis to exclude it.

**Opinion 5**: *It is unclear whether the Jupiter Reports were conducted according to survey best practices and appeared to contain errors that would undermine the reliability of the reported results*. Amir Rept. § IV.

The bulk of Charter's Motion focuses on Opinion 5. *See* Mot. at 7–8 (citing repeatedly to Amir Rept. ¶¶ 30–34). First, Dr. Amir's opinions here are not speculative. Dr. Amir opined that, based on the information available to him, the Jupiter Surveys appeared to suffer from design flaws that render its results unreliable. *See* Amir Rept. ¶ 34 ("[F]rom the limited information available to me, it is unclear whether the [Jupiter] surveys follow best practices—errors that would render any findings flawed and unreliable.").

It is Dr. Sinnreich and Charter that are relying on the Jupiter Surveys through the Jupiter Reports to establish that the use of P2P file sharing was beneficial to the music industry during the Claims Period. Dr. Amir's Opinion 5 explains why Dr. Sinnreich's reliance is misplaced and casts serious doubt that the surveys were conducted properly, based on all of the information available to him and on the standards set forth in the Diamond treatise. *See* Amir Rept. § IV & nn.68–78. This is the role of a survey expert. Dr. Sinnreich's deposition testimony confirms that Dr. Amir's opinions are correct. █████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████ as Dr. Amir opines is proper (Amir Rept. ¶¶ 30, 32).

To the extent Charter argues Dr. Amir's Opinion 5 is improperly speculative because Dr. Amir could not review the underlying survey materials, █████████████████████

13

██████████████████████████████████████████ cannot result in the exclusion of Plaintiffs' expert.[6]

In sum, Charter may disagree with Dr. Amir's critiques, but all of those critiques go to weight, not admissibility.

## IV. Dr. Amir's Testimony Would Not Violate Fed. R. Evid. 403.

Charter's complaint that Dr. Amir's testimony would be cumulative and prejudicial misses the mark. Dr. Amir seeks to offer specific testimony regarding the scientific reliability of the Jupiter Surveys and their applicability to the facts of this case. His testimony will assist the jury by helping them understand complicated concepts relating to survey methodology and how researchers may properly draw conclusions about causation through surveys. As set forth above, Courts regularly recognize this and permit expert witnesses to testify regarding the sufficiency and reliability of surveys. Such testimony will matter to the jury in this case, which must evaluate the harm P2P file sharing over Charter's network caused Plaintiffs to incur.

Moreover, Dr. Amir's testimony is not cumulative because Plaintiffs have offered no other expert to provide the opinions that Dr. Amir offers in his report—namely, testimony regarding the deficiencies and unreliability of the Jupiter Reports and Dr. Sinnreich's conclusions therefrom. Charter identifies no overlap (nor could it) between Dr. Amir's report and the report of Dr. Harold Furchtgott-Roth, who submitted an expert report to rebut other opinions offered by Dr. Sinnreich. Indeed, Charter recognizes the narrowness of Dr. Amir's opinions, noting that it "is limited to a single topic: criticizing Dr. Sinnreich's reliance on the surveys referenced in the Jupiter Reports."

---

[6] It is important to note that Opinion 5 and the failure of the Jupiter Surveys to follow best practices is an independent critique of Dr. Sinnreich's opinions, and Dr. Amir's Opinions 1–4 are reached and stand independent of his Opinion 5.

14

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Charter's motion to exclude the opinions and testimony of Dr. On Amir.

Dated:  December 20, 2021                               Respectfully submitted,

Jonathan M. Sperling                                    */s/ Jeffrey M. Gould*
COVINGTON & BURLING LLP
The New York Times Building                             Matthew J. Oppenheim
620 Eighth Avenue                                       Jeffrey M. Gould
New York, NY 10018-1405                                 Alexander Kaplan
Telephone: (212) 841-1000                               OPPENHEIM + ZEBRAK, LLP
jsperling@cov.com                                       4530 Wisconsin Ave. NW, 5th Floor
                                                        Washington, DC 20016
Neema T. Sahni                                          Telephone: (202) 621-9027
COVINGTON & BURLING LLP                                 matt@oandzlaw.com
1999 Avenue of the Stars, Suite 3500                    jeff@oandzlaw.com
Los Angeles, CA 90067-4643                              alex@oandzlaw.com
Telephone: (424) 332-4800
nsahni@cov.com                                          *Attorneys for Plaintiffs*