# Exhibit XXVI

# Exhibit 3

Page 1

1        UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF COLORADO
2
3
4  WARNER RECORDS, INC.,     )
                                 )
5       Plaintiff,        )
                                 )
6  v.                     ) Civil Action No.
                                 ) 1:19-cv-00874
7  CHARTER COMMUNICATIONS    )
 INC.,                   )
8                                  )
          Defendant.       )
9
10
11
12
13
14
15
16
17
18     VIDEOTAPED ZOOM REALTIME DEPOSITION of ARAM
19  SINNREICH, Ph.D., a Witness, taken on behalf of
20  the Plaintiffs before Peggy E. Corbett, CSR, CCR,
21  RDR, pursuant to Notice on the 6th day of
22  October, 2021, at the office of the witness, 9621
23  Lorain Avenue, Silver Spring, Maryland 20910.
24
25

|  | Page 2 |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | APPEARING FOR THE PLAINTIFFS: |
| 3 | Mr. Matthew Oppenheim |
|  | Ms. Kellyn Goler |
| 4 | OPPENHEIM + ZEBRAK LLP |
|  | 4530 Wisconsin Avenue NW |
| 5 | Fifth Floor |
|  | Washington, D.C. 20016 |
| 6 | 202.450.3958 |
|  | matt@oandzlaw.com |
| 7 | kellyn@oandzlaw.com |
| 8 | APPEARING FOR THE DEFENDANTS: |
| 9 | Mr. Andrew Schapiro |
|  | QUINN EMANUEL URQUHART & SULLIVAN LLP |
| 10 | 191 North Wacker Drive |
|  | Suite 2700 |
| 11 | Chicago IL 60606 |
|  | 312.705.7400 |
| 12 | andrewschapiro@quinnemanuel.com |
|  | and |
| 13 | Mr. Todd Anten |
|  | Mr. Dylan Scher |
| 14 | 51 Madison Avenue |
|  | 22nd Floor |
| 15 | New York, New York 10010 |
|  | 212.849.7000 |
| 16 | toddanten@quinnemanuel.com |
|  | dylanscher@quinnemanuel.com |
| 17 |  |
|  | VIDEOGRAPHER: Mr. Michael Alexander |
| 18 |  |
|  | I N D E X |
| 19 | WITNESS: PAGE |
|  | ARAM SINNREICH, Ph.D. |
| 20 | EXAMINATION BY MR. OPPENHEIM 5 |
|  | EXAMINATION BY MR. SCHAPIRO 280 |
| 21 | FURTHER EXAMINATION BY MR. OPPENHEIM 300 |
|  | CERTIFICATE 312 |
| 22 |  |
|  | E X H I B I T S |
| 23 | NO. DESCRIPTION PAGE |
| 24 | EXHIBIT 289 Expert Report of 30 |
|  | Dr. Aram Sinnreich |
| 25 | May 27, 2021 |

|  | Page 3 |
|---|---|
| 1 | EXHIBIT 290 Expert Rebuttal Report 31 |
|  | of Dr. Aram Sinnreich |
| 2 | June 28, 2021 |
|  | EXHIBIT 291 Excel Spreadsheet, 108 |
| 3 | Business Cycle |
|  | Expansions and |
| 4 | Contractions |
|  | EXHIBIT 292 US Business Cycle 108 |
| 5 | Expansions and |
|  | Contractions |
| 6 | EXHIBIT 293 Shekler Exhibit 8 127 |
|  | EXHIBIT 294 Digital Music 133 |
| 7 | Subscriptions Report |
|  | EXHIBIT 295 Artist Managers Call 210 |
| 8 | Out Sony Following |
|  | Spotify Contract Leak, |
| 9 | Sony Responds That It |
|  | Pays |
| 10 | EXHIBIT 296 Article, Universal: 210 |
|  | Yes, We Share Digital |
| 11 | Breakage Money With Our |
|  | Artists |
| 12 | EXHIBIT 297 Article, Warner Pays 211 |
|  | Artists Share of |
| 13 | Spotify advances...and |
|  | has for 6 years |
| 14 | EXHIBIT 298 Book, "The Piracy 289 |
|  | Crusade" |
| 15 |  |
|  | Reporter's Note: The original exhibits were |
| 16 | submitted to the court reporter for copying and |
|  | distribution with retention by Mr. Oppenheim |
| 17 | thereafter. |

|  | Page 4 |
|---|---|
| 1 | (Deposition commenced at 9:33 a.m. Eastern) |
| 2 | THE VIDEOGRAPHER: We are now on |
| 3 | the record. Today's date is October 6th, 2021, |
| 4 | and the time on the monitor is 9:33 a.m. This is |
| 5 | the remote video deposition of Dr. Aram Sinnreich |
| 6 | in the matter of Warner Records, Incorporated vs. |
| 7 | Charter Communications, Incorporated. |
| 8 | THE WITNESS: I'm sorry to |
| 9 | interrupt. The first name for the record is |
| 10 | Aram, A-r-a-m. |
| 11 | THE VIDEOGRAPHER: Okay, my |
| 12 | mistake. This is a remote video deposition of |
| 13 | Dr. Aram Sinnreich in the matter of Warner |
| 14 | Records, Incorporated vs. Charter Communications, |
| 15 | Incorporated filed in the United States District |
| 16 | Court for the District of Colorado, Case Number |
| 17 | 1:19-cv-00874. The court reporter is Peggy |
| 18 | Corbett and I am the videographer, Michael |
| 19 | Alexander, both with Veritext Legal Solutions. |
| 20 | Beginning with the noticing attorney, |
| 21 | counsel and all present please state your |
| 22 | appearances and affiliations for the record. |
| 23 | MR. OPPENHEIM: Good morning. This |
| 24 | is Matt Oppenheim, and I am here with my |
| 25 | colleague Kellyn Goler for the firm Oppenheim and |

|  | Page 5 |
|---|---|
| 1 | Zebrak on behalf of the plaintiffs. |
| 2 | MR. SCHAPIRO: Good morning, I'm |
| 3 | Andrew Schapiro joined by my colleagues Todd |
| 4 | Anten and Dylan Scher. We are with the law firm |
| 5 | Quinn Emanuel Urquhart & Sullivan. |
| 6 | THE VIDEOGRAPHER: Would the court |
| 7 | reporter please swear in the witness. |
| 8 | ARAM SINNREICH, Ph.D., |
| 9 | a Witness, being first duly sworn, testified |
| 10 | under oath as follows: |
| 11 | EXAMINATION |
| 12 | BY MR. OPPENHEIM: |
| 13 | Q. Good morning, Mr. Sinnreich. I |
| 14 | introduced myself to you earlier but I'll do it |
| 15 | again now since we're on the record. My name is |
| 16 | Matt Oppenheim. I am counsel for the plaintiffs |
| 17 | in this case, and will be taking your deposition |
| 18 | today. I appreciate your participating in this. |
| 19 | Before we get going, I know I asked you |
| 20 | earlier off the record but can you hear us and |
| 21 | see us okay? |
| 22 | A. Yes, I can. |
| 23 | Q. And do you have any other technological |
| 24 | devices open other than the Zoom screen and the |
| 25 | screen to see exhibits? |

2 (Pages 2 - 5)

<mark>Page 134</mark>
1 analysis of a consumer survey that was done; is
2 that correct?
3    A. Yes.
4    Q. Do you have any of the underlying
5 documents from the survey?
6    A. What do you mean by "underlying
7 documents"?
8    Q. Do you have the protocols that were
9 used?
10    A. No.
11    Q. Do you have a copy of the survey
12 instruments?
13    A. Partial.
14    Q. What do you mean by "partial"?
15    A. I have a document that contains some of
16 the questions that were asked on the survey.
17    Q. Do you have a list of all of the
18 questions?
19    A. I don't know.
20 [REDACTED]
21 [REDACTED]
22 [REDACTED]
23 [REDACTED]
24 [REDACTED]
25 [REDACTED]



**Page 135**
1 [REDACTED]
2 [REDACTED]
3      MR. SCHAPIRO: That's for us to
4 decide, so we can take that up later.
5      MR. OPPENHEIM: Well, I'm asking
6 the witness if he has an objection.
7      MR. SCHAPIRO: He's not qualified
8 to make an objection, unless you're using the
9 word "objection" to mean something else.
10-25 [REDACTED]

**Page 136**
1-17 [REDACTED]
18    Q. Jupiter Communications doesn't exist any
19 more, does it?
20    A. I'm not sure whether --
21    Q. Excuse me, it's Jupiter Research. I
22 apologize. I got the name wrong. Go ahead.
23      Jupiter Research doesn't exist any more,
24 does it?
25    A. Not as a standalone company.

**Page 137**
1    Q. Do you have any of the programming
2 instructions?
3    A. No.
4    Q. Do you know whether or not the survey
5 included screener questions?
6    A. I could not tell you for certain.
7    Q. Do you know whether you would have the
8 screener questions?
9    A. I personally did not field this, and
10 it's very unlikely that I would have the screener
11 questions that were used to select the response.
12    Q. Who fielded the survey?
13    A. Are we talking about the survey cited in
14 this report?
15    Q. Yes.
16    A. It was fielded by a research firm called
17 NFO.
18    Q. Who constructed the survey?
19    A. It was constructed by most of the people
20 who appear in the masthead of this report, and
21 then it was -- if you consider this part of
22 construction, it was programmed by NFO.
23    Q. And were you one of the people who
24 constructed the survey?
25    A. Yes.

<mark>35 (Pages 134 - 137)</mark>

|  |  |
|---|---|
| Page 138 | Page 140 |
| 1  Q. In fact, you were the lead on this, | |
| 2 weren't you? | |
| 3  A. Yes. | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | 10  Q. And that website was subject to a |
| 11 | 11 significant amount of litigation, was it not? |
| 12 | 12  A. It was subject to litigation. |
| 13 | 13  Q. In fact -- sorry, go ahead. |
| 14 | 14  A. "Significant" is a value judgment. |
| 15 | 15  Q. Okay. Michael Robertson was the founder |
| 16 | 16 of MP3.com, right? |
| 17 | 17  A. To the best of my knowledge, he was. |
| 18 | 18  Q. He and MP3.com as a company were sued by |
| 19 | 19 every one of the major record companies, correct? |
| 20 | 20  A. That is how I remember it. |
| 21 | 21  Q. And he and MP3.com were found liable for |
| 22 | 22 copyright infringement, correct? |
| 23 | 23  A. I do remember the litigation ending in a |
| 24 | 24 way that had a large dollar figure attached to |
| 25 | 25 it. I can't tell you sitting here for certain |
| Page 139 | Page 141 |
| | 1 whether it was an award or a settlement. |
| | 2  Q. You don't recall Judge Rakoff in the |
| | 3 Southern District of New York issuing a lengthy |
| | 4 opinion opining that MP3.com had engaged in |
| | 5 direct copyright infringement? |
| | 6     MR. SCHAPIRO: Objection, asked and |
| | 7 answered, improper testifying by the attorney. |
| | 8  Q. (BY MR. OPPENHEIM) Does that refresh |
| | 9 your recollection? |
| | 10  A. I cannot tell you definitively that |
| | 11 that's what happened. |
| | 12 |
| | 13 |
| | 14 |
| | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| | 25 |

36 (Pages 138 - 141)

Page 142

[redacted]

Page 143

[redacted]

Page 144

18  Q.  Do you have any specialized training in
19 how to design and administer a consumer survey?
20  A.  Yes.
21  Q.  What is that training?
22  A.  Well, I learned both through an
23 apprenticeship at Jupiter, and also through
24 taking quantitative research methods, classes as
25 a graduate student.

Page 145

1  Q.  How many surveys have you overseen in
2 your career, consumer surveys?
3  A.  I don't know.
4  Q.  Can you think of any beyond this one
5 that we're discussing?
6  A.  Yes.
7  Q.  Had you done any prior to this one in
8 2000?
9  A.  Yes.
10  Q.  How many?
11  A.  I would say over the course of my career
12 I have overseen scores, if not hundreds of
13 surveys, whose respondents were consumers.
14  Q.  Were those generalized consumer surveys?
15  A.  I don't know what that is.
16  Q.  Well, if you surveyed the students in
17 your class they would arguably be consumers, and
18 you could include that in your answer.  Is that
19 what you're including?
20  A.  I have never surveyed the students in my
21 class.
22  Q.  So when you say you've overseen scores,
23 if not hundreds of surveys whose respondents were
24 consumers, is that different than to say you've
25 overseen scores of consumer surveys?

37 (Pages 142 - 145)

| Page 146 | Page 148 |
|---|---|
| 1  A. These are vague terms. I'm not sure<br>2 what you're asking me.<br>3  Q. Is there a distinction between what<br>4 professionals would call, consider a consumer<br>5 survey, and what you just described, which are<br>6 surveys whose respondents were consumers?<br>7  A. I see. Let me be more clear. I have<br>8 overseen scores and possibly hundreds of surveys<br>9 of individuals that -- whose research focus<br>10 included, at least in part, their beliefs and<br>11 behaviors as regards to the marketplace.<br>12  Q. Do you teach consumer behavior as a<br>13 professor?<br>14  A. Sometimes.<br>15  Q. Have you ever published a book on<br>16 consumer behavior?<br>17  A. I have included my data and analyses of<br>18 consumer behavior in books and book chapters that<br>19 I have published.<br>20  Q. Are you familiar with the book that's<br>21 authored by Shari Diamond titled, "Reference<br>22 Manual on Scientific Evidence"?<br>23  A. Not off the top of my head.<br>24  Q. So you don't know whether or not you<br>25 abided by the principles set forth in there on | 1  Q. Nor was eDonkey, right?<br>2  A. I don't remember the date on which<br>3 eDonkey became a popular file sharing protocol.<br>4  Q. But you can't say that it was in place<br>5 at the time of your survey, can you?<br>6  A. I don't specifically recall eDonkey<br>7 being in place at that time.<br>8  Q. What about Aresis?<br>9  A. Same answer.<br>10  Q. What about Gnutella?<br>11  A. I believe that Gnutella may have been in<br>12 place at that time.<br>13  Q. But it wasn't being widely used, was it?<br>14  A. I would have to review the data.<br>15  Q. There were very few digital download<br>16 services in the year 2000, correct?<br>17  A. My memory is that following the<br>18 unexpected success of Napster with consumers,<br>19 there was a sudden explosion in the number of<br>20 file sharing protocols and networks made<br>21 available in the following year.<br>22  Q. In the year 2000, iTunes didn't exist,<br>23 right?<br>24  A. The software iTunes did exist. The<br>25 iTunes music store did not. |
| Page 147 | Page 149 |
| 1 how to construct a reliable consumer survey?<br>2  A. Sitting here today, I could not say<br>3 "yes" or "no."<br>4  Q. So the surveys that -- the survey that's<br>5 referenced in this 2000 report covered 13 years<br>6 before the claims in this case, correct?<br>7  A. More or less, correct.<br>8  Q. And in that 13-year period, between 2000<br>9 and 2013, there were a lot of technological<br>10 changes in the music in the internet industries,<br>11 correct?<br>12  A. Yes.<br>13  Q. Napster grew substantially, and then was<br>14 taken down by a Federal court, right, in that<br>15 period?<br>16  A. It was found liable by a Federal Court.<br>17  Q. And in 2000 when you did the survey<br>18 BitTorrent didn't exist yet, right?<br>19  A. Sitting here today I cannot tell you<br>20 that the date on which Lyon Cohen first created<br>21 the BitTorrent protocol.<br>22  Q. BitTorrent wasn't being used widely at<br>23 the time that you did your survey in 2000,<br>24 correct?<br>25  A. Correct. | 1  Q. Nor did Amazon's music store, correct?<br>2  A. Amazon, I believe, was selling CDs and<br>3 maybe even had already acquired CD Now by that<br>4 point, but they were not selling MP3s.<br>5  Q. They were not selling digital downloads,<br>6 correct?<br>7  A. To the best of my recollection, they<br>8 were not.<br>9  Q. So at the time that you did this survey<br>10 there were very few digital download services<br>11 being used by consumers, correct?<br>12  A. Digital downloads accounted for a very<br>13 small portion of music sales at that period in<br>14 time.<br>15  Q. Are you as an expert in this case<br>16 claiming that the survey that you conducted in<br>17 the year 2000 was still applicable to music<br>18 consumers for the period of 2013 to 2016?<br>19  A. I did not cite the survey in my report.<br>20 I cited the Jupiter report.<br>21  Q. And the Jupiter report relies in some<br>22 measure, some extensive measure on that consumer<br>23 survey, correct?<br>24  A. Yes.<br>25  Q. And you cite that Jupiter report I think |

38 (Pages 146 - 149)

| Page 150 | Page 152 |
|---|---|
| 1  you just said, right?<br>2  A.  Correct.<br>3  Q.  So I'll ask you that question again, do<br>4  you believe that the consumer survey that you did<br>5  in the year 2000 was still an applicable --<br>6  strike that.<br>7      Do you believe that the consumer survey<br>8  that you did in the year 2000 reflected music<br>9  consumers' views in the years 2013 to 2016?<br>10  A.  No.<br>11  Q.  And do you believe that the report that<br>12  you did that relies on that consumer survey was<br>13  applicable or is applicable to what consumers<br>14  were doing in 2013 to '16?<br>15  A.  To an extent.<br>16  Q.  To what extent?<br>17  A.  Most research is used for years<br>18  subsequent to its publication as an indication of<br>19  how its subjects behave.<br>20  Q.  Did you do -- I'm sorry, I thought you<br>21  were done.  Please continue.<br>22  A.  The longer it's been since publication,<br>23  the fewer inferences you can make about its<br>24  applicability.<br>25  Q.  When you cited it in your report, had | 1  go off the record.<br>2      THE VIDEOGRAPHER:  Going off the<br>3  record.  The time on the monitor, 2:22 p.m.<br>4      (Recess)<br>5      THE VIDEOGRAPHER:  We're back on<br>6  the record.  Time on the monitor 2:33 p.m.<br>7  Q.  (BY MR. OPPENHEIM)  Mr. Sinnreich, can I<br>8  ask you to turn to Page 24 of Exhibit 294, and<br>9  I'm referring to the page numbers of the report,<br>10  not the .pdf page numbers, and it's a page at the<br>11  top of which it says "Report Methodology."<br>12  A.  I'm looking at it now.<br>13  Q.  Okay.  And halfway down that page<br>14  there's a section that says Consumer Surveys,<br>15  right?<br>16  A.  Yes.<br>17  Q.  Within that paragraph there is the<br>18  following sentence, "The sample was carefully<br>19  weighted by a series of demographic and<br>20  behavioral characteristics to ensure that it was<br>21  representative of the online population."  Do you<br>22  see that?<br>23  A.  Yes.<br>24  Q.  How was that weighting accomplished?<br>25  A.  I could not tell you specifically how it |
| Page 151 | Page 153 |
| 1  you done any follow-up consumer survey research<br>2  to determine whether or not the conclusions that<br>3  you came to in the year 2000 were still<br>4  applicable in the years 2013 to '16?<br>5      MR. SCHAPIRO:  Objection, misstates<br>6  the record.<br>7  A.  Would you mind repeating the question,<br>8  please.<br>9  Q.  (BY MR. OPPENHEIM)  When you cited the<br>10  Jupiter Research report in your expert report,<br>11  had you done any follow-up consumer research or<br>12  surveys to determine whether or not the<br>13  conclusions in the Jupiter Research report were<br>14  still applicable 13 years later?<br>15  A.  I have, in the years since publishing<br>16  the Jupiter report, fielded several surveys that<br>17  explored file sharing as one of many on-line<br>18  behaviors, but I have not published a report that<br>19  is a follow-up to the Jupiter report.<br>20  Q.  And you don't cite any of those other<br>21  surveys in your expert report, do you?<br>22  A.  No.  Mind if we take a quick break?  Do<br>23  you want to finish up this line of questioning<br>24  and then we can take a break?<br>25      MR. OPPENHEIM:  That's fine.  Let's | 1  was accomplished in this case, because it was<br>2  performed by other analysts 20 years ago, but I<br>3  can speak more generally to how weighting works<br>4  in analogous contexts, if you like.<br>5  Q.  So I'm interested in what was done in<br>6  this specific survey.  Do you have any documents<br>7  which would show what weighting was done in this<br>8  survey?<br>9  A.  Only the information available in the<br>10  report.<br>11  Q.  Further down in that paragraph it says:<br>12  "Additionally, Jupiter took the unconventional<br>13  step of weighting the data by online tenure and<br>14  AOL use, two key determinates of on-line<br>15  behavior;" do you see that?<br>16  A.  Yes.<br>17  Q.  And do you know how that weighting was<br>18  done?<br>19  A.  Yes, it says so right in this paragraph.<br>20  Q.  Well, how was that weighting actually<br>21  calculated, do you know?<br>22  A.  Yes.<br>23  Q.  Okay, how?<br>24  A.  So there was a larger survey done on a<br>25  quarterly basis of over 30,000 US households, and |

| | |
|---|---|
| Page 310<br>1 and Footnote 31 will take me to what?<br>2  A. Presumably to the Los Angeles Times<br>3 article in question.<br>4  Q. Okay, and do you have a copy of that Los<br>5 Angeles Times article?<br>6  A. Probably somewhere in my files, yes.<br>7  Q. Okay. You didn't produce that or<br>8 reference it directly in your report, did you?<br>9  A. No, I referenced my book. Any time we<br>10 reference an academic book, we're incorporating<br>11 its summary of its sources cited, and the<br>12 presumption of credibility, I believe, should be<br>13 given to that book, unless you have a reason not<br>14 to.<br>15  Q. I can't find the LA Times quote, so I'd<br>16 ask that you please produce the LA Times article.<br>17     MR. SCHAPIRO: I'll take that under<br>18 advisement.<br>19  Q. (BY MR. OPPENHEIM) The last question,<br>20 and I know you need to go, Mr. Sinnreich, and<br>21 that is you say that the RAA was a client, RAA<br>22 and some of its members were clients of Jupiter<br>23 Research. That just means that they were signed<br>24 up to receive Jupiter Research reports, correct?<br>25  A. No. | Page 312<br>1     C E R T I F I C A T E<br>2<br>3     I, Peggy E. Corbett, a Certified Court<br>4 Reporter of the State of Missouri, do hereby<br>5 certify:<br>6     That prior to being examined the witness<br>7 was by me duly sworn;<br>8     That said deposition was taken down by<br>9 me in shorthand at the time and place<br>10 hereinbefore stated and was thereafter reduced to<br>11 writing under my direction;<br>12     That I am not a relative or employee or<br>13 attorney or counsel of any of the parties, or a<br>14 relative or employee of such attorney or counsel,<br>15 or financially interested in the action.<br>16     WITNESS my hand and seal this 11th day<br>17 of October, 2021.<br>18<br>19<br>20     PEGGY E. CORBETT,<br>       CCR No. 143, RDR, CRR<br>21<br>22<br>23<br>24<br>25 |
| Page 311<br>1  Q. They didn't add -- the RAA and its<br>2 members never asked Jupiter Research to advise it<br>3 on any particular issues, did it?<br>4  A. Yes.<br>5  Q. Okay. What issues did the RAA retain<br>6 Jupiter Research to advise it on?<br>7  A. I remember multiple one-on-ones or small<br>8 room consulting sessions with RAA members<br>9 regarding strategic decision-making around the<br>10 digital music space.<br>11  Q. And the RAA actually eventually fired<br>12 Jupiter and you because they disagreed with your<br>13 conclusions, correct?<br>14  A. I have no idea.<br>15     MR. OPPENHEIM: Okay. I have no<br>16 further questions.<br>17     MR. SCHAPIRO: Nor do we. I'm<br>18 happy to go off the record.<br>19     THE VIDEOGRAPHER: Okay. This<br>20 concludes today's testimony. Time on the monitor<br>21 7:07 p.m. We're off the record.<br>22     (Deposition ended at 7:07 p.m.)<br>23<br>24<br>25 | Page 313<br>1   Veritext Legal Solutions<br>     1100 Superior Ave<br>2     Suite 1820<br>   Cleveland, Ohio 44114<br>3   Phone: 216-523-1313<br>4<br>  October 11, 2021<br>5<br>  To: Andrew Schapiro, Esq.<br>6<br>  Case Name: Warner Records, Inc. v. Charter Communications Inc.<br>7<br>  Veritext Reference Number: 4837484<br>8<br>  Witness: Aram Sinnreich, Ph.D.    Deposition Date: 10/6/2021<br>9<br>10 Dear Sir/Madam:<br>11<br>  Enclosed please find a deposition transcript. Please have the witness<br>12<br>  review the transcript and note any changes or corrections on the<br>13<br>  included errata sheet, indicating the page, line number, change, and<br>14<br>  the reason for the change. Have the witness' signature notarized and<br>15<br>  forward the completed page(s) back to us at the Production address<br>16 shown<br>17 above, or email to production-midwest@veritext.com.<br>18<br>  If the errata is not returned within thirty days of your receipt of<br>19<br>  this letter, the reading and signing will be deemed waived.<br>20<br>21 Sincerely,<br>22 Production Department<br>23<br>24<br>25 NO NOTARY REQUIRED IN CA |

Veritext Legal Solutions
www.veritext.com                                      888-391-3376