# Exhibit XXVII

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-00874-RBJ-MEH

WARNER RECORDS INC., et al.,

      Plaintiffs,

v.

CHARTER COMMUNICATIONS, INC.,

      Defendant.

---

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
CHARTER'S MOTION FOR SUMMARY JUDGMENT**

---

      Charter's Motion suffers from two fatal flaws: (i) it fundamentally misunderstands the law governing contributory copyright infringement, vicarious liability, and statutory damages; and (ii) it studiously avoids the uncontroverted facts that establish Charter's liability.

      *First*, Charter advances a standard to establish contributory infringement rejected by every court to address the liability of an ISP, such as Charter, that continues to provide internet service to known, repeat infringers. Under any proper standard, the record contains more than sufficient evidence for a jury to find liability.

      *Second*, on vicarious liability, Charter asks this Court to reject the holdings of every court—including this one—that a service provider has the right and ability to control copyright infringement by its subscribers where its terms of service expressly allow it to terminate users who repeatedly infringe. Charter also misstates the law on the element of direct financial benefit. The law does not require a plaintiff to establish "draw" to prove direct financial benefit. It also does not require under a draw theory that (i) the infringing activity be the "main" draw of the service,

1

or (ii) those seeking to infringe are drawn to the defendant's service over the service of some other provider. Here too, the record contains ample evidence demonstrating direct financial benefit.

*Third*, in a bid to drastically reduce the damages it faces, Charter argues that Plaintiffs are precluded from recovering for each of the separate works infringed by Charter's subscribers. As detailed below, that argument misreads the Copyright Act and case law applying it.

*Finally*, Charter submits few facts to support its legal arguments. Those that it does put forward (i) are very much disputed, and (ii) as set forth in the accompanying Motion to Strike (Dkt. 608), are proffered by way of two declarations that are almost entirely inadmissible.

On this record, and for the reasons set forth in Plaintiffs' Motion for Partial Summary Judgment ("Pl. MSJ" Dkt. 555), Charter's Motion should be denied in its entirety.

## RESPONSE TO CHARTER'S "UNDISPUTED FACTS"[1]

Charter admits that it received over ███ infringement notices from Plaintiffs during the Claim Period, ████████ notices—not "complaints," as Charter calls them (Disp. 3)— sent by rightsholders overall. Mot. at 2-3. Contrary to Charter's assertions, Plaintiffs' notices unequivocally stated that Charter's subscribers were infringing Plaintiffs' works, including that Plaintiffs had "identified a user on [Charter's] network reproducing or distributing an unauthorized copy of a copyrighted sound recording," and that the identified "Internet account was used to illegally copy and/or distribute copyrighted music," among other statements providing notice of

---

[1] "Disp. #" refers to the sentence(s) in Charter's "Undisputed Facts" that contain the facts Plaintiffs are disputing here. Plaintiffs have numbered those sentences in Ex. 1 to the accompanying Declaration of Jeffrey M. Gould ("Gould Decl.") and included a chart that indicates each of the sentences Plaintiffs are disputing (*id.* Ex. 2). Reference to undisputed material facts set forth in Plaintiffs' MSJ that dispute Charter's "Undisputed Facts" are indicated by "Pl. SUMF ¶ #". Capitalized terms, unless defined herein, take the meaning ascribed in Plaintiffs' MSJ.

the infringement.  Haynes Decl. (Dkt. 549-1) Ex. A (Disp. 13).

Charter baldly asserts that only a "  " (Mot. at 3).  Charter should be precluded from making " argument given that . *See* Dkt. 592 at 14.  But even the documents that were produced evidence . Pl. SUMF ¶¶ 18, 19 (Disp. 14). . Declaration of Kristofer Buchan, filed herewith, ¶ 5, Ex. 1 (Disp. 14).

Charter asserts now that it " (Mot. at 2, 3).  But this is a *post hoc* rationalization constructed by lawyers.  Charter's contemporaneous documents and employees' testimony show that ."  Gould Decl. Exs. 3 (Rowlett Tr. 130:22-131:17, 147:2-13), 4 (Jones Tr. 164:2-5), 15 (at "Overview") (Disp. 4, 15).  Indeed, . *Id*. Exs. 4 (Jones Tr. 163:1-6), 5 (Taylor Tr. 47:4-8), 6 (Brockel Tr. 251:25-252:8), 16, 18, 20, 22 (Disp. 4, 15).  Charter claims that . (Disp. 16).  In all events,

███████████████████████████████████████████████████████ (Disp. 16).

Charter's assertion that its goal was to "discourage and prevent copyright infringement" is revisionism not supported by any evidence. Charter asserts that its process to "educate" its subscribers about the notices and consequences of copyright infringement was undertaken "at great expense," but provides no evidence of that expense. (Disp. 5, 6). The record actually shows that ██████████████████████████████ (Gould Decl. Exs. 7 (Haynes Tr. 119:10-122:15), 24 (at -343), 25 (at -939), 26 (at -420)) and █████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████ Pl. SUMF ¶¶ 20-25 (Disp. 4, 5, 6, 17). Charter's decision ██████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████ eviscerates Charter's assertion that its goal was to "discourage and prevent copyright infringement." Pl. SUMF ¶¶ 18-21, 26-33; Gould Decl. Exs 16-23 (Disp. 4, 5, 6, 14).

Charter justifies its impotent response to infringement notices by claiming that it modelled its program on the Copyright Alert System ("CAS"). Charter's "evidence" on this point, however, consists entirely of hearsay and unauthenticated documents, and must be disregarded as set forth in the accompanying Motion to Strike.[2] In all events, ██████████████████████████ ████████████████████████████████████████████████████ ████████████████ Gould Decl. Exs. 8 (Marks Tr. 266:18-267:12), 9 (Lesser Tr. 113:14-16),

---

[2] Charter offers a declaration from Mary Haynes, who claims CAS was the model for Charter's program. This testimony must be stricken (along with Schapiro Decl. Exs. B, C) because Haynes' account of the CAS program is improper hearsay, is not based on personal knowledge, and is inconsistent with her Rule 30(b)(6) deposition testimony. *See* Mot. to Strike at 8-13 (Disp. 8-11). There is otherwise no evidence that Charter modeled its program on CAS.

10 (Benjamin Tr. 133:7-14), 11 (McMullan Tr. 154:10-24), 12 (Bell Tr. 117:20-118:5), 13 (Leak Tr. 179:23-180:6) (Disp. 7–8). Charter declined to participate in CAS. Mot. at 2. As this Court previously found: "The CAS agreements were negotiated compromises. It is difficult for me to see how what plaintiffs were willing to accept from those providers in that context is relevant to Charter's legal obligations in this case." Dkt. 159 at 7. Indeed, ██████████████████

████████████████████████████████████████████████████████████████████

Gould Decl. Ex. 13 (Leak Tr. 179:14-21), Ex. 8 (Marks Tr. 278:4-11) (Disp. 10). It is undisputed that ███████████████████████████████████████████████████████████

## ARGUMENT

### I.    CHARTER IS LIABLE FOR CONTRIBUTORY INFRINGEMENT.

As set forth in Plaintiffs' MSJ, "contributory liability attaches when the defendant causes or materially contributes to another's infringing activities and knows of the infringement." *Diversey v. Schmidly*, 738 F.3d 1196, 1204 (10th Cir. 2013). Charter argues that because its service is capable of substantial non-infringing uses, Plaintiffs must prove that Charter intended its customers to engage in copyright infringement, citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) ("*Grokster*"). Charter misreads *Grokster*. Although some courts have assumed otherwise, properly analyzed, intent is required only for an inducement claim (which was the claim at issue in *Grokster*), not for a material contribution claim, as is asserted here. But even accepting *arguendo* that Plaintiffs must prove intent, Charter's argument is predicated on ignoring *Grokster*'s instruction that intent is determined by reference to traditional common-law rules. As every court to consider the matter has held, *Grokster*'s standard is met under those rules when an ISP continues to provide service to known infringing subscribers. And

here, the irrefutable evidence is that Charter did just that.

A.    **The Continued Provision of Service to Known Repeat Infringers Gives Rise to Contributory Liability.**

Charter concedes that the fact that its service has substantial non-infringing uses does not shield it from liability.  Indeed, as the Fourth Circuit held, "this argument is meritless." *BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293 (4th Cir. 2018) ("*BMG*").  Instead, Charter argues that Plaintiffs must prove that it *intended* to foster copyright infringement.  Charter claims that absent such intent, it is immune under the Supreme Court's earlier decision in *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ("*Sony*").

But Charter is also forced to concede that every court to consider the issue has concluded that such intent is properly imputed to ISPs that continue to provide service to known repeat infringers.  *See* Mot. at 7 (*citing BMG*, 881 F.3d at 307-08*; UMG Recordings, Inc. v. RCN Telecom Servs., LLC*, 2020 WL 5204067, at *9 (D.N.J. Aug. 31, 2020); *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 384 F. Supp. 3d 743, 767–68 (W.D. Tex. 2019)).

In arguing to the contrary, Charter ignores that "*Grokster* also directs us to analyze contributory liability in light of 'rules of fault-based liability derived from the common law.'" *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1170 (9th Cir. 2007) (quoting *Grokster*, 545 U.S. at 934-35); *BMG*, 881 F.3d at 307 (same).  Critically, "common law principles establish that intent may be imputed." *Perfect 10*, 508 F.3d at 1171.  "The most relevant of these common law rules is that if a person 'knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.'" *BMG*, 881 F.3d at 307 (quoting Restatement (Second) of Torts § 8A cmt. B); *see also Perfect 10*, 508 F.3d at 1171 ("Tort law ordinarily imputes to an actor the intention to cause the

6

natural and probable consequences of his conduct.").

Accordingly, "under *Grokster* an actor may be contributorily liable . . . if the actor knowingly takes steps that are substantially certain to result in such direct infringement." *Id.*; *see also Disney Enters., Inc. v. Hotfile Corp.*, 2013 WL 6336286, at *35 (S.D. Fla. Sept. 20, 2013) ("[W]here traditional principles permit a court to impute intent—for instance, where the defendant knows of specific infringing content available on its system yet fails to remove it—that defendant may be liable, by operation of law, just as if he had actually intended to infringe under *Grokster.*").

Applying those principles in *BMG*, the Fourth Circuit held that where the seller of a product with lawful uses knows that the buyer will use it to infringe "the seller intends to cause infringement just as much as a seller who provides a product that has exclusively unlawful uses." 881 F.3d at 306, 307. The court then applied that principle to cases "that involve subscription services or rentals, rather than one-time sales," *id.* at 308—*i.e.*, the internet service that Cox provided to its subscribers*,* and that Charter provides here. The *BMG* court distinguished the manufacturer in *Sony*, which knew only that some unidentified buyers might infringe, from an ISP that learns that *specific* customers are using the service to infringe. Where the ISP nonetheless continues to provide the service to those customers, it may be presumed to intend the infringement because it knows that continuing to provide service is substantially certain to result in infringement. *Id.*; *see also Grande*, 384 F. Supp. 3d at 767-68 (denying summary judgment to ISP based on its "continuing provision of internet service to customers who engage in repeated copyright infringement," in light of evidence that would allow a jury to find that ISP "had actual knowledge of specific infringement on the part of specific customers"); *RCN Telecom*, 2020 WL 5204067, at *9 ("ISP's failure to take remedial action against repeat copyright infringers is

7

tantamount to encouraging infringement").

Charter cites a string of cases for the point that *Grokster* requires proof of a defendant's intent to cause infringement (*see* Mot. at 6-7), including *Greer v. Moon*, 2021 WL 4291197, at *3 (D. Utah Sept. 21, 2021), which dismissed a *pro se* plaintiff's infringement claim. But, with one exception,[3] those cases do not acknowledge *Grokster*'s directive that intent is determined by traditional common law rules. Nor do they engage with the application of those rules to conduct like Charter's here, as the courts did in *BMG*, *Grande*, and *RCN Telecom*. Instead, Charter mischaracterizes these latter cases as holding that an ISP can be held liable merely for not terminating service to "customers accused of infringement." But they hold nothing of the sort; instead, they limit liability to ISPs that fail to terminate or disrupt the service of customers who the ISP *knows* are infringing. As detailed in the next section, the evidence of such knowledge by Charter is substantial.

### B. Charter Knowingly Provided its Service to Repeat-Infringing Subscribers.

**1.** Charter contends that the copyright infringement notices Plaintiffs sent to Charter did not provide it with actual knowledge of the infringement being committed by the subject subscribers. Its two arguments are refuted by undisputed, contemporaneous evidence.[4]

---

[3] *Cobbler Nev. LLC v. Gonzales* properly recognizes that contributory liability should be analyzed "in light of 'rules of fault-based liability derived from the common law,' and common law principles establish that intent may be imputed." 901 F.3d 1142, 1148 (9th Cir. 2018) (citing *Perfect 10*, 508 F.3d at 1170-71). However, as multiple courts have recognized, *Cobbler* is a case brought against an ISP *subscriber* and is irrelevant to contributory infringement claims against ISPs. *See Grande*, 384 F. Supp. 3d at 767 n.6; *RCN Telecom*, 2020 WL 5204067, at *10 n.5.

[4] District courts within the Tenth Circuit do not require actual knowledge of infringement; rather, constructive knowledge will suffice. *See Viesti Assocs., Inc. v. Pearson Educ., Inc.*, 2013 WL 4052024, at *7 (D. Colo. Aug. 12, 2013) (citing *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 751 (S.D.N.Y. 2012)); *see also* Pl. MSJ at 15.

*First*, Charter argues that Plaintiffs' notices do not unequivocally assert that the Charter subscriber is liable for copyright infringement; rather, they state only that the subscriber "may be liable for infringing activity occurring on your network." Mot. at 9. But the notices repeatedly informed Charter without qualification that infringement had occurred. The preceding sentence in the notice states unequivocally: "**we have identified a user on your network reproducing or distributing an unauthorized copy** of a copyrighted sound recording." Haynes Decl. Ex. A (emphasis added). And the sentence immediately following Charter's cherry-picked passage provides further certainty: "If you are an Internet subscriber (user), you have received this letter because **your Internet account was used to illegally copy and/or distribute copyrighted music over the Internet** through a peer to peer application." *Id*. (emphasis added). The notice then explains that the U.S. Supreme Court has "affirmed that uploading and downloading copyrighted works without the copyright owner's permission is clearly illegal" and "attache[s] below the details of the illegal file-sharing, including the time, date, and a sampling of the music shared." *Id*. Taken as a whole, Plaintiffs' notices unequivocally informed Charter that the subscriber was engaged in illegal, unauthorized reproduction and distribution of music.

*Second*, Charter argues that it had ███████████████████████████████ ████████████  Mot. at 9-10. But this assertion starts from a false premise; Charter identifies no basis for why ████████████████████████████████████████████ ████████████████████████  Courts have held that receipt of infringement notices such as those Plaintiffs sent to Charter here are sufficient to grant plaintiffs summary judgment on the knowledge prong, *Sony Music Ent. v. Cox Commc'ns, Inc.*, 426 F. Supp. 3d 217, 232–33 (E.D. Va. 2019) (involving notices with same "may be liable" language), and to deny an

9

ISP summary judgment on the element of knowledge, *Grande*, 384 F. Supp. 3d at 768.[5]

Charter's own documents and testimony confirm that  Gould Decl. Exs. 3 (Rowlett Tr. 130:22-131:17, 147:2-13), 4 (Jones Tr. 164:2-5), 15 (at "Overview"); *see also id.* Exs. 4 (Jones Tr. 163:1-6), 5 (Taylor Tr. 47:4-8), 6 (Brockel Tr. 251:25-252:8), 16, 18, 20, 22. Indeed,

Pl. SUMF ¶ 34. Finally, while Charter asserts that hese assertions are hearsay and thus are not evidence. *See* Mot. to Strike. In any event, these responses, .

**2.** Charter also argues that even if it knew of specific repeat infringers, it did not know that they "would continue to receive notices in the future because they had received notices in the past." Mot. at 10. In other words, Charter argues that there is *no* evidence from which to conclude that it was "substantially certain" that repeat infringers would infringe again. This argument is directly contrary to *BMG*, *Perfect 10*, *Grande,* and *RCN*.

---

[5] Charter cites *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1105-06 (W.D. Wash. 2004) for the proposition that notices do not provide knowledge. If anything, *Corbis* supports Plaintiffs. The court there noted that the plaintiff "chose not to address the copyright infringement issues through the DMCA's notice provisions," and that choice "stripped it of the *most powerful evidence of a service provider's knowledge*—actual notice of infringement from the copyright holder." *Id.* at 1107 (emphasis added).

The undisputed evidence establishes that Charter knew ███████████████

██████████████████████████████████████████████████████

████████████████████████████████. *See* Pl. SUMF ¶ 19.  In other

words, ██████████████████████████████████████.  In

some instances, ████████████████████████████████. Gould Decl.

Exs. 16-23. █████████████████████████████

███████████████████. Pl. SUMF ¶ 21. █████████████████

██████████████████████████████████████████████

████████████████ (*id*. ¶ 25). █████████████████████

████████████████. *Id*. Thus, Charter's *ipse dixit* avowal that it "had every reason to

expect the notice-generating behavior would cease once customers were informed and educated

about the problem" (Mot. at 10) is contradicted by the undisputed evidence.

    **3.**  Even absent basic imputation principles, the futility of Charter's motion is demonstrated

by comparison to the evidence establishing liability in *Grokster* itself.  There, "three features of

th[e] evidence of intent [we]re particularly notable."  545 U.S. at 939.  "First, each company

showed itself to be aiming to satisfy a known source of demand for copyright infringement."  *Id.*

There is similar evidence here.  Charter knew that P2P was used principally for copyright

infringement. Gould Decl. Ex. 5 (Taylor Tr. 158:21-159:13). █████████████████

██████████████████████████████. Dkt. 554 at 13-14; Gould Decl. Ex. 14

(Weber Tr. at 38:8-39:25, 42:1-52:7, 72:8-75:22, 98:22-104:6).  And Charter's EVP of Network

Operations admitted that ████████████████████████████████████

████████████████████████." *Id.* at 32:6-33:12.  That is the essence of "aiming to

satisfy a known demand for copyright infringement." *Grokster*, 545 U.S. at 939.

"Second, this evidence of unlawful objective is given added significance" because the defendants did not "attempt[] to develop filtering tools or other mechanisms to diminish the infringing activity using their software." *Grokster*, 545 U.S. at 939. ███████████████

████████████████████████████████████████████

████████████████████████████████ (Pl. SUMF ¶¶ 27, 30-33), ███

████████████████████████████████████

Gould Decl. Ex. 7 (Haynes Tr. 84:12-85:8, 108:11-110:14).

"Third . . . the commercial sense of [defendants'] enterprise turns on high-volume use, which the record shows is infringing." *Grokster*, 545 U.S. at 939-40. The same evidence exists here, ████████████████████████████████████████████████

████████ Declaration of Harold Furchtgott-Roth, filed herewith, ¶ 4, Ex. 1 at ¶¶ 84-88; *see also* Gould Decl. Ex. 28. Charter's Motion on contributory infringement should be denied and Plaintiffs' Motion granted.

## II. CHARTER IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' VICARIOUS LIABILITY CLAIM.

A defendant is vicariously liable for copyright infringement where it "has the right and ability to supervise the infringing activity" and has a "direct financial interest" in the infringement. *Diversey*, 738 F.3d at 1204 (citation omitted). Charter's argument that there is no evidence to support the claim misapprehends the law and the record.

### A. Plaintiffs Have Established That Charter Has the Right and Ability to Supervise Its Users' Infringing Conduct.

Charter argues that Plaintiffs cannot prove that it had the ability to supervise its subscribers'

infringing activity because Charter ███████████████████████████ Mot. at

14. This Court has already twice rejected this argument, establishing the law of the case:

> Charter does not argue that it lacked the ability to terminate some users, such as
> those identified in plaintiffs' infringement notices, and that is enough. In order to
> meet the supervision and control prong, the defendant must only exercise the ability
> "to stop or limit the directly infringing conduct."

*Warner Recs. Inc. v. Charter Commc'ns, Inc.*, 454 F. Supp. 3d 1069, 1078 (D. Colo. 2020)

(*Charter I*) (citing cases); *see also Charter II,* Dkt. 46 ("The Court has no reason to rule differently

on the motion to dismiss"); *Animal Care Sys., Inc. v. Hydropac/Lab Prods., Inc.*, 2015 WL

1469513, at *5 (D. Colo. Mar. 26, 2015) (applying law of the case doctrine). Every other court to

consider the argument Charter advances has likewise rejected it.[6] Plaintiffs refer the Court to their

MSJ, which sets forth the evidence meeting the above legal standard and establishing that Charter

could and did block its subscribers from the internet. Pl. MSJ at 19-20 & SUMF ¶¶ 28-34.

### B. The Evidence Establishes that Charter Receives a Direct Financial Benefit from Its Users' Infringement.

This Court has also twice established the standard for what may constitute a draw sufficient

to show that Charter incurred a "direct financial benefit" from the infringing activity: "Infringing

activity . . . may [] be one among several draws to Charter's services . . . [and that] would be

sufficient." *Charter I*, 454 F. Supp. 3d at 1074 (rejecting Charter's "main draw" position that it

takes again here); *Charter II,* Dkt. 46 ("The Court has no reason to rule differently on the motion

---

[6] *See, e.g.*, *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001) (the right and
ability "to block infringers' access to a particular environment for any reason whatsoever is
evidence of the right and ability to supervise"); *UMG Recordings, Inc. v. Grande Commc'ns
Networks, LLC*, 2018 WL 1096871, at *10 (W.D. Tex. Feb. 28, 2018) ("[ISP] can stop or limit the
infringing conduct by terminating its subscribers' internet access"); *Capitol Recs., LLC v. Escape
Media Grp., Inc.*, 2015 WL 1402049, at *42 (S.D.N.Y. Mar. 25, 2015) (ability to block access is
satisfied where service provider has contractual right to "terminate [users'] accounts").

to dismiss," recognizing Charter's reliance on the decision in *UMG Recordings, Inc. v. Bright House Networks, LLC*, 2020 WL 3957675 (M.D. Fla. July 8, 2020).).

    *1.    The Record Contains Evidence Establishing Draw.*

Charter incorrectly argues that Plaintiffs cannot cite to any evidence that the ability to infringe was a draw to Charter subscribers.



Dkt. 554 at 13-14; Gould Decl. Ex. 14 (Weber Tr. at 38:8-39:25, 42:1-52:7, 72:8-75:22, 98:22-104:6).

*Id.* at 32:6-33:12.

*Id.* at 72:8-75:22.   Charter also sought to attract infringing subscribers by advertising that the company's high-speed service enables subscribers to "download 8 of your favorite songs" in "seconds."  Gould Decl. Exs. 29-32.

In denying Charter's motion to dismiss and addressing Plaintiffs' allegations before the above evidence was revealed in discovery, the Court ruled,

> I agree with plaintiffs that the volume and popularity of plaintiffs' copyrighted works, the commonality of infringing downloading, and the frequency that plaintiffs' works in particular are downloaded allow for the reasonable inference that at least some of Charter's subscribers were drawn by the ability to infringe on plaintiffs' works.

*Charter I*, 454 F. Supp. 3d at 1078.  Taken together, the above evidence makes clear that the Court's conclusion then has been proven true now:  Infringement using P2P protocols was

common on Charter's network and Charter subscribers utilized Charter's network to pirate Plaintiffs' works on a staggering scale, as evidenced by the more than ███████ notices of infringement of Plaintiffs' works between 2012 and 2015 (SUMF ¶¶ 9-11), and the more than 11,000 works that were infringed in this case. A reasonable jury could (and likely will) easily conclude based on the foregoing evidence that Charter subscribers, including those who were the subject of Plaintiffs' notices, were drawn to Charter's service to pirate Plaintiffs' music.[7]

A reasonable jury could also readily conclude that the lack of any consequences for infringement on Charter's network drew subscribers to use the network for that purpose. Indeed,



. Gould Decl. Ex. 27 ("███████████████████████████████████████████████████").

Charter argues that Plaintiffs cannot show that consumers were drawn to its service over that of another ISP. Mot. 12-13. But Charter cites no case holding that draw means attracting infringers to the defendant's service *over* another's. That is not the law; any such rule would mean that multiple vendors offering the same product or service could get away with behavior that otherwise would amount to vicarious infringement.

> ### 2.    The Record Contains Evidence of a Direct Financial Benefit Based on the Economic Incentive Theory.

Draw is one way, but not the only way, to show direct financial benefit. The court in

---

[7] Charter argues that "the draw must be 'the infringing products' themselves." Mot. at 12. However, Charter cites to *Adobe Systems Inc. v. Canus Prods., Inc.*, 173 F. Supp. 2d 1044, 1051 (C.D. Cal. 2001)—which was *superseded* by the Ninth Circuit in *Ellison v. Robertson*, 357 F.3d 1072, 1078–79 & n.9 (9th Cir. 2004). *Ellison* established that it is the "*availability* of infringing material" that acts as a draw, *id.* at 1078 (emphasis added), as Charter recognizes (Mot. at 12).

*Ellison v. Robertson*, held that "draw" is "sufficient to state the financial benefit element of the claim for vicarious liability," not that it is *necessary*. 357 F.3d 1072, 1078 (9th Cir. 2004) (emphasis added); *see also, e.g.*, *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263 (9th Cir. 1996) (discussing concept of draw only *after* finding sufficient allegations of direct financial benefit); *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 308 (2d Cir. 1963) (department store liable for sale of pirated records by concessionaire because store profited from concessionaire's sales); *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc*, 443 F.2d 1159, 1163 (2nd Cir. 1971) (promoter held liable because it received a fee from the infringer, even though the fee did not vary based on the amount of infringement). The undisputed evidence shows that Charter receives a direct financial benefit from its users' misconduct because it derives substantial revenue from infringing users and has an economic incentive not to terminate their accounts.

The evidence shows that Charter received a direct financial benefit of  . Furchtgott-Roth Decl. ¶ 4, Ex. 1 at 34. In contrast,

Pl. SUMF ¶ 28. A jury could easily conclude from these facts that Charter has an obvious and direct financial incentive to tolerate—and, indeed, encourage—the infringement. *See A&M Recs. Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896, 921 (N.D. Cal. 2000) (direct financial benefit requires that "the defendant has economic incentives for tolerating unlawful behavior"), *rev'd on other grounds*, 239 F.3d 1004 (9th Cir. 2001); *Hotfile*, 2013 WL 6336286, at *38-39 (rejecting argument that a direct financial benefit cannot result from a fixed rate subscription service).

III. **CHARTER'S ARGUMENTS ON STATUTORY DAMAGES ARE WRONG.**

A. **The Copyright Act Does Not Limit Plaintiffs to One Award of Statutory Damages for Sound Recordings Also Issued as Part of an Album.**

Without citing a single case to support the proposition, Charter argues that all of Plaintiffs' sound recordings that were registered and issued as albums warrant only a single statutory damages award per album. Based on this argument, Charter seeks to drastically reduce the number of works in the case from ████████. Mot. at 19. Charter is wrong on the law and concedes, as it must, that "several courts" have disagreed with its position. Mot. at 18.

Charter argues that (i) albums are compilations, and (ii) under the Copyright Act, all parts of a compilation constitute one work for purposes of statutory damages. Mot. at 18 (citing 17 U.S.C. § 504(c)(1)). The case law says otherwise. For purposes of statutory damages, even where the works at issue are part of a compilation, whether each separate work is entitled to a separate statutory damages award is determined by whether the work has an "independent economic value and is, in itself, viable." *MacAlmon Music, LLC v. Maurice Sklar Ministries, Inc.*, 2015 WL 794328, at *5 (D. Colo. Feb. 4, 2015) (citing cases).

While the Tenth Circuit has not yet considered whether to adopt the independent economic value test, that test represents the majority view. *See Sullivan v. Flora, Inc.*, 936 F.3d 562, 569-71 (7th Cir. 2019) (confronting the circuit split and following the broader approach also followed by the First, Ninth, Eleventh, and D.C. Circuits). In addition, while the Second Circuit has not adopted the independent economic value test, it similarly looks to whether the copyright holder makes works in a compilation available on an individual basis. *See EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 101 (2d Cir. 2016).

Multiple courts have ruled that a plaintiff can be awarded statutory damages for each sound

recording, even where those recordings were at some point included together on an album. This includes cases on which Charter relies, *see id.* (affirming "separate statutory damages awards for songs that the plaintiffs issued as singles, even if those songs were also made available on albums"). *See also BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 199 F. Supp. 3d 958, 984 (E.D. Va. 2015) ("Nothing in the Copyright Act bars a plaintiff from recovering a statutory damage award for a sound recording issued as an individual track, simply because that plaintiff, at some point in time also included that sound recording as part of an album or other compilation.") (quoting *Arista Recs., LLC v. Lime Grp, LLC*, 2011 WL 1311771, at *2–3 (S.D.N.Y. Apr. 4, 2011)); *id.* at *4 (allowing statutory damages for tracks issued as individual recordings at the time they were infringed even if they were also included on albums).

Charter has come forward with no evidence that the sound recordings in suit were not made available for purchase or license individually. The undisputed evidence reflects the opposite: that the sound recordings in suit were individually available for download or streaming on multiple, authorized services, during the Claim Period. Gould Decl. Exs. 33-35.

**B.     The Copyright Act Does Not Prohibit Separate Statutory Awards for Separately-Owned Sound Recordings and Underlying Compositions.**

The Record Company Plaintiffs and Music Publisher Plaintiffs are separate companies that own different types of copyrighted works. *See* 17 U.S.C. § 102(a)(2) & (a)(7) (listing "musical works" and "sound recordings" as different types of works); *Newton v. Diamond*, 204 F. Supp. 2d 1244, 1248-49 (C.D. Cal. 2002) ("Sound recordings and their underlying musical compositions are separate works with their own distinct copyrights.").

Nonetheless, Charter asks this Court to grant summary judgment precluding Plaintiffs from recovering separate statutory damages awards for a sound recording and the underlying

18

composition on the grounds that the recording is a derivative work of the composition and the statute states that "all parts of a ... derivative work constitute one work." 17 U.S.C. § 504(c)(1).[8] The plain statutory text, however, including the repeated use of the singular term "copyright owner" throughout Section 504, demonstrates that the single-recovery rule applies only where the multiple copyrights have a single owner. Here, by contrast, the owner of the copyright in and to the sound recording (*i.e.*, a Record Company Plaintiff) is different from the owner of the copyright in and to the musical composition (*i.e.*, a Music Publisher Plaintiff). Pl. SUMF ¶ 1.

Charter cites the Second Circuit case, *EMI Christian Music Grp.*, 844 F. 3d at 94-95, which held that the derivative work (*i.e.*, sound recording) and underlying work (*i.e.*, musical composition) are "one work" for statutory damages even if owned separately. *EMI* considered the statutory text but did not account at all for Congress' deliberate decision to repeatedly use the singular term "copyright owner." The Court should apply the statutory text as written.

Because the "one work" language, however interpreted, applies only to a single lawsuit ("for all infringements in the action"), 17 U.S.C. § 504(c), Charter's construction would also lead to absurd results. Under Charter's reading, the owner of a musical composition and the owner of the derivative sound recording for that composition could sidestep the outcome that Charter seeks by bringing separate lawsuits. Such a rule—rights holders suing separately each can recover their own statutory damages award, but those suing in the same action are limited to a single award— would do nothing but increase burdens on the courts and the parties. *Teevee Toons, Inc. v. MP3.com, Inc.*, 134 F. Supp. 2d 546, 548 (S.D.N.Y. 2001) (holding that Congress meant to

---

[8] Charter recognizes that in asking the Court to decide this issue now there is a factual dispute as to the number of overlapping sound recordings and musical compositions. Mot. at 18 n.8. That is a separate reason to deny summary judgment on this issue.

19

preclude only a single plaintiff from recovering multiple statutory damages for infringements of different versions of a single work), *disagreed with by EMI Christian Music Grp.*, 844 F. 3d at 95.

### C.   Charter Has Failed to Establish That Any Work Was Not Timely Registered.

Charter asserts that ▮ of Plaintiffs' works were not registered in time for Plaintiffs to obtain statutory damages. But this argument rests entirely on an impermissible attorney summary that presents an analysis of the works, their purported registrations, and information purportedly collected from Plaintiffs' notices. *See* Schapiro Decl. ¶ 8 & Ex. F. Because the declaration and exhibit are inadmissible, Charter's entire argument as to these works is bereft of any factual support. *See* Mot. to Strike at 13-14. Even if admitted, Ex. F identifies only the first notice for each work at issue, and does not establish that there were no infringement notices following registration.

## CONCLUSION

For the foregoing reasons, Charter's Motion should be denied in its entirety.

Dated:  December 20, 2021

Jonathan M. Sperling
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
jsperling@cov.com

Neema T. Sahni
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
nsahni@cov.com

Respectfully submitted,

 */s/ Matthew J. Oppenheim*
Matthew J. Oppenheim
Jeffrey M. Gould
Alexander Kaplan
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave. NW, 5th Fl.
Washington, DC 20016
Telephone: (202) 621-9027
matt@oandzlaw.com
jeff@oandzlaw.com
alex@oandzlaw.com

*Attorneys for Plaintiffs*