# Exhibit XXVIII

# Plaintiffs' Exhibit 1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| WARNER RECORDS INC., *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>CHARTER COMMUNICATIONS, INC.,<br><br>*Defendant*. | Case No. 19-cv-00874-RBJ-MEH |

## CHARTER'S MOTION FOR SUMMARY JUDGMENT

After years of discovery and motion practice—all at a staggering cost to the parties and the judicial system—there is no evidence to support a finding of liability against Charter on either count in the Complaint. *First*, under binding Supreme Court precedent, Plaintiffs must show that Charter's objective in providing Internet service to allegedly offending customers was to cause copyright infringement. There is no evidence to support such a finding. *Second*, there is no evidence that subscribers chose Charter's Internet service over competing services for the purpose of infringing Plaintiffs' copyrights, nor is there any evidence that Charter has control over what its customers do online. *Finally*, in the event the case is not dismissed entirely for failure to prove liability, Plaintiffs are not entitled to statutory damages for a substantial portion of the copyrighted works asserted in the Complaint. Summary judgment in Charter's favor on these damages-related issues will greatly reduce the scope and complexity of the case for trial.

## UNDISPUTED FACTS

Charter is a cable company that provides customers with a connection to the Internet for a monthly fee. Declaration of Mary Haynes ("Haynes Decl.") ¶ 3. During the relevant period, Charter provided Internet access to ███████████████████████ and hundreds



of thousands of businesses, in geographic regions across the country.  *Id*. ¶¶ 4-6.  ███████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████  *Id*. ¶¶ 7-8.  Although Charter could not verify the allegations in

the notices, it took them seriously.  *Id*. ¶¶ 9-11; 37.  At great expense, Charter implemented a

program to track all the copyright notices it received, inform customers about the allegations

contained in the notices, and educate customers about the consequences of copyright infringement.

*Id*. ¶¶ 11-13; 21-40.  The goal of Charter's program was to discourage and prevent copyright

infringement online.  *Id*. ¶¶ 12-13; 41-42.

      Charter's program for addressing allegations of copyright infringement was designed to

comport with industry standards.  Haynes Decl. ¶ 14.  In 2011, members of the movie, television,

music and Internet service provider communities announced the creation of the Copyright Alert

System ("CAS")—a set of "best practices" for ISPs to follow when handling copyright complaints.

*Id*. ¶¶ 15-16; Declaration of Andrew H. Schapiro ("Schapiro Decl.") Ex. B.  The cornerstone of

the CAS program was customer education, and it was based on data showing that most Internet

subscribers, once informed about the alleged content theft and its possible consequences, would

take steps to ensure that the misconduct did not happen again.  Haynes Decl. ¶ 16; Schapiro Decl.

Exs. B, C.  Importantly, CAS did not require a provider to terminate customer accounts based

solely on the receipt of repeated notices of alleged infringement.  *Id*.; Haynes Decl. ¶ 17.  Although

Charter was not itself a participant in the CAS program, its copyright notice program tracked CAS

by using information and education to mitigate online infringement.  *Id*. ¶¶ 18-20.

      Plaintiffs claim to have sent Charter ███████████ notices of alleged infringement

from January 2012 to May 2016.  The notices informed Charter that a customer "may be liable" for acts of infringement:

> If you are an Internet Service Provider (ISP), you have received this letter because we have identified a user on your network reproducing and/or distributing an unauthorized copy of a copyrighted sound recording(s).  *This letter constitutes notice to you that this user may be liable for infringing activity occurring on your network.*

Haynes Decl. ¶¶ 43-46; Ex A (emphasis added).  Plaintiffs fault Charter for



. But Plaintiffs do not dispute that ████████████████████████████████████████████████████████████. At the same time, ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ *Id*. ¶¶ 31-35. ████████ ████████████████████████████████████████████████████████████████ ████████████████ *Id*.

## ARGUMENT[1]

Charter moves for summary judgment on three discrete issues, each of which would reduce the scope of (if not eliminate entirely) a potential trial: (1) Plaintiffs' failure to support a claim of contributory infringement; (2) Plaintiffs' failure to support a claim of vicarious infringement; and (3) legal issues surrounding how many works are at issue, which do not turn on disputed facts.  *See Willner v. Budig*, 848 F.2d 1032, 1035 (10th Cir. 1988) (summary judgment appropriate based on absence of evidence necessary to establish all elements of plaintiff's claim); *Lawmaster v. Ward*,

---

[1]  By email dated January 6, 2021, Magistrate Judge Michael Hegarty informed the parties that after consultation with Judge Jackson, the Court agreed (at the parties' request) to dispense with the pre-briefing letter requirement that is normally a prerequisite to filing dispositive motions. Schapiro Decl. Ex. A.

125 F.3d 1341, 1347 (10th Cir. 1997) ("an issue of material fact is genuine only if the nonmovant

presents facts such that a reasonable jury could find in favor of the nonmovant").

## I.     PLAINTIFFS CANNOT PROVE CONTRIBUTORY INFRINGEMENT

Plaintiffs contend that Charter is liable for contributory copyright infringement merely

because ███████████████████████████████████████████████

██████████████████████. But under binding Supreme Court precedent, Plaintiffs are required to

prove that Charter provided service to these customers *with the object* of fostering infringement.

Plaintiffs cannot do so.

### A.     To Establish Contributory Infringement, Plaintiffs Must Show That Charter *Intended* To Cause Infringement

In general, "[t]o state a claim of contributory copyright infringement, a plaintiff must allege

that the defendant 'with knowledge of the infringing activity' induced, caused, or materially

contributed to the infringing conduct of another." *Viesti Assocs., Inc. v. Pearson Educ., Inc.*, 2013

WL 4052024, at *7 (D. Colo. Aug. 12, 2013). However, the Supreme Court's rulings in *Metro-*

*Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) (*"Grokster"*) and *Sony Corp.*

*of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ("*Sony*") limited the circumstances

under which a claim of contributory infringement can lie against a party selling a product or service

capable of substantial noninfringing use. *Grokster* held that the mere sale of a product or service

"capable of both lawful and unlawful use" does not constitute contributory infringement unless

there is additional evidence that the defendant acted "*with the object* of promoting its use to

infringe copyright, as shown by clear expression or other affirmative steps taken to foster

infringement." 545 U.S. at 918-19 (emphasis added). It is insufficient to premise a contributory

liability claim on "mere knowledge of infringing potential or of actual infringing uses." *Id.* at 937.

Rather, to prevail on a claim for contributory infringement, a plaintiff must prove the defendant

distributed a device or service with the *intent* of fostering infringement:

> [O]ne who distributes a device [or service] with the *object* of promoting its use to infringe copyright, as shown by *clear expression* or other *affirmative steps* taken to foster infringement, is liable for the resulting acts of infringement by third parties. We are, of course, mindful of the need to keep from trenching on regular commerce or discouraging the development of technologies with lawful and unlawful potential. Accordingly, just as *Sony* did not find intentional inducement despite the knowledge of the VCR manufacturer that its device could be used to infringe, 464 U.S., at 439, n. 19, 104 S.Ct. 774, *mere knowledge of infringing potential or of actual infringing uses would not be enough* here to subject a distributor to liability. *Nor would ordinary acts incident to product distribution*, such as offering customers technical support or product updates, support liability in themselves. The inducement rule, instead, premises liability on *purposeful, culpable expression and conduct*, and thus does nothing to compromise legitimate commerce or discourage innovation having a lawful promise.

*Id.* at 936-37 (emphasis added).

When considering a contributory liability claim against Sony based on the allegation that

"some individuals had used [Sony's] Betamax video tape recorders (VTR's) to record some of

respondents' copyrighted works which had been exhibited on commercially sponsored television,"

the Supreme Court ruled that "the sale of copying equipment, like the sale of other articles of

commerce, does not constitute contributory infringement if the product is widely used for

legitimate, unobjectionable purposes.  Indeed, it need merely be capable of substantial

noninfringing uses." *Sony*, 464 U.S. at 420, 442.

The defendants in *Grokster*, who distributed free computer software, presented a different

scenario: their "business models … confirm[ed] that their *principal object* was use of their

software to download copyrighted works."  *Grokster*, 545 U.S. at 926 (emphasis added).  Each

defendant "showed itself to be aiming to satisfy a known source of demand for copyright

infringement, the market comprising former Napster users," and, indeed, brazenly designed their

entire products and customer outreach around attracting these known infringers. *Id.* at 939. In fashioning a rule for such circumstances, the Court made clear that "in the absence of other evidence of intent, a court would be unable to find contributory infringement liability merely based on a failure to take affirmative steps to prevent infringement, if the device otherwise was capable of substantial noninfringing uses." *Id.* at 939 n.12.

Summarizing the Court's holding in her concurrence, Justice Ginsburg described the two ways in which a plaintiff can state a contributory infringement claim where the defendant offers a product or service with substantial noninfringing uses: (1) by "actively encouraging (or inducing) infringement through specific acts (as the Court's opinion develops)" or (2) by "distributing a product distributees use to infringe copyrights, *if the product is not capable of 'substantial' or 'commercially significant'* noninfringing uses." *Id.* at 942 (emphasis added). District courts in the Tenth Circuit have correctly applied *Grokster* to require proof of the defendant's intent to cause infringement. *See, e.g.*, *Greer v. Moon*, 2021 WL 4291197, at *3 (D. Utah Sept. 21, 2021) ("It is not enough for contributory liability for a defendant to have merely 'permitted' the infringing material to remain on the website, without having 'induced or encouraged' the initial infringement.") (brackets omitted); *Viesti*, 2013 WL 4052024, at *7 (dismissing contributory claim because "there [we]re no factual assertions describing how [the defendant] enabled, induced, or facilitated the infringement of the photographs"). Decisions from other Circuits are in accord. *See, e.g.*, *Cobbler Nev., LLC v. Gonzales*, 901 F.3d 1142, 1147-49 (9th Cir. 2018) (affirming dismissal of contributory copyright claim under *Grokster* and holding that "a failure to take affirmative steps to prevent infringement alone cannot trigger liability") (quotations omitted); *Dallas Buyers Club, LLC v. Doughty*, 2016 WL 1690090, at *9 (D. Or. Apr. 27, 2016) ("[Defendant] did not promote

6

the use of his Internet service to infringe [plaintiff's] copyright and is therefore not liable for contributory infringement. … [Plaintiff's] theory of contributory infringement is precluded by the Supreme Court's holding in *Grokster*."); *Space Coast Bus., LLC v. Coastal Media Assocs., LLC*, 2011 WL 13299573, at *2 (M.D. Fla. July 6, 2011) (dismissing claim where plaintiff failed to allege "what steps [defendant] took to induce or encourage [the] … infringements").

Some courts have incorrectly applied *Grokster* in cases involving ISPs that, like Charter, merely provide a connection to the Internet, finding that a failure to terminate the Internet access of specific customer accounts accused of infringement could be evidence of the ISP's intent to promote infringement. *See, e.g.*, *BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns Inc.*, 881 F.3d 293, 307-08 (4th Cir. 2018); *UMG Recs., Inc. v. RCN Telecom Servs., LLC*, 2020 WL 5204067, at *8-9 (D.N.J. Aug. 31, 2020); *UMG Recs., Inc. v. Grande Commc'ns Networks, LLC*, 384 F. Supp. 3d 743, 767 (W.D. Tex. 2019). These decisions, however, cannot be reconciled with *Grokster*'s holding that contributory liability exists only where there is evidence that it was a defendant's intended purpose—its *objective*—to cause infringement, as shown by clear expression or affirmative acts. Indeed, *Grokster* distinguished such a situation from *Sony*, which had "barred secondary liability based on presuming or imputing intent to cause infringement solely from the design or distribution of a product capable of substantial lawful use, which the distributor *knows is in fact* used for infringement." 545 U.S. at 933 (emphasis added); *see also id*. at 937 (liability cannot be premised on "mere knowledge of infringing potential *or of actual infringing uses*") (emphasis added). *Grokster* also cautions that liability may not be based on a failure to prevent infringement. *Id*. at 939 n.12 ("[I]n the absence of other evidence of intent, a court would be

unable to find contributory infringement liability merely based on a failure to take affirmative steps to prevent infringement … Such a holding would tread too close to the *Sony* safe harbor.").

*Grokster* requires something more. And that something more must be evidence of "affirmative steps" or "clear expression" showing *intent to cause infringement*. *Id.* at 919. A correct application of *Grokster* forecloses the possibility that an ISP's policy not to terminate Internet access for customers accused of infringement can establish liability.

### B.    Plaintiffs Cannot Prove That Charter Intended To Cause Infringement

The record contains no evidence whatsoever that Charter supplied Internet service with the object of fostering copyright infringement. To the contrary, Charter employed robust processes to ensure that subscribers were informed of infringement accusations by rightsholders and educated about copyright infringement on the Internet—all in an effort to discourage and prevent future infringement. *See generally* Haynes Decl. In addition, Charter's program to curb infringement was modeled after the Copyright Alert System ("CAS")—a framework of best practices for handling allegations of copyright infringement endorsed by members of the movie, television, music—including the Plaintiffs in this case—and Internet service provider communities. *Id.* ¶¶ 14-40; Schapiro Decl. Exs. B, C. Like Charter's program, the cornerstone of the CAS program was customer education. Haynes Decl. ¶ 16; Schapiro Decl. Exs. B, C. ████████████████████████ CAS did not require ISPs to terminate customers based only on the receipt of notices from rights holders. Haynes Decl. ¶ 17; Schapiro Decl. Exs. B, C. ███████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ Haynes Decl. ¶¶ 31-35, Exs. B, C. In short, there is no evidence that

███████████████████████████████████████████████ customers was adopted with the intent to promote infringement, and no reasonable juror could conclude that it was.

### C.    Charter Did Not Have Actual Knowledge Of The Infringement

Even if Plaintiffs did not have to satisfy *Grokster's* intent requirement, Plaintiffs' contributory infringement claim would still fail because Charter did not have actual knowledge of the alleged infringement. The only possible evidence of actual knowledge comes from "infringement notices" Plaintiffs sent Charter. No reasonable juror could find that those notices conferred actual knowledge that customers had in fact infringed in the past, let alone that they would do so in the future—which is the relevant test under the standard Plaintiffs have espoused.

As an initial matter, the allegations in Plaintiffs' "infringement notices" are not sufficient to confer actual knowledge of any infringement on Charter given that *they do not even assert that Charters' subscribers are liable for copyright infringement.* Rather, the notices say that the customer "may be" (and hence may not be) liable for infringing activity. The portion of Plaintiffs' notices specifically directed to Charter says: "This letter constitutes notice to you that this user *may be* liable for infringing activity occurring on your network." Haynes Decl. Ex. A (emphasis added). This equivocal language does not give Charter actual knowledge of infringement.

Furthermore, the receipt of notices by a cable company like Charter—which merely provides a *connection to the Internet* and does not itself host the allegedly infringing content— cannot be the basis of actual knowledge of infringement. This is because ████████████ ██████████████████████████ Haynes Decl. ¶¶ 9-11; *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1105-06 (W.D. Wash. 2004) ("Actual knowledge of blatant, repeat infringement cannot be imputed merely from the receipt of notices of infringement. Instead, there must be

additional evidence available to the service provider to buttress the claim of infringement supplied by the notices.").

Charter cannot, for example,



.

Plaintiffs' theory that Charter "knew" customers would continue to receive notices in the future because they had received notices in the past also is unsupported by the record. At the same time Charter was receiving notices from Plaintiffs alleging that its customers "may be liable" for infringement, █████████████████████████████████████████████████████████████████████████. Haynes Decl. ¶¶ 31-35; Exs. B, C. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *Id.* Moreover, given Charter's robust program for informing and educating notice recipients about copyright infringement—*the entire point of which was to change behavior to prevent notices of infringement from issuing in the future*—Charter had every reason to expect the notice-generating behavior would cease once customers were informed and educated about the problem, given that the industry's best practices at the time were premised on this principle. Haynes Decl. ¶¶ 14-20; Schapiro Decl. Ex. B ("Data suggest that, once informed about the alleged content theft and its possible consequences, most Internet subscribers will quickly take steps to ensure that the theft doesn't happen again."). Indeed, █████████████████████

████████████████████████████████████████████ demonstrates
that Charter's efforts were succeeding.  Haynes Decl. Exs. B, C.  Under these circumstances, no
reasonable jury could conclude that Charter had actual knowledge that these customers would
continue to receive notices in the future.  *See Knowledge*, BLACK'S LAW DICTIONARY (11th ed.
2019) ("An awareness or understanding of a fact or circumstance; a state of mind in which a person
has no substantial doubt about the existence of a fact.").

Accordingly, because Plaintiffs cannot prove that Charter had the requisite intent to cause
infringement or actual knowledge of the alleged infringement itself, summary judgment should be
entered for Charter on Plaintiffs' contributory liability claim.

## II.     PLAINTIFFS CANNOT PROVE VICARIOUS INFRINGEMENT

Plaintiffs' claim for vicarious copyright infringement also fails.  To establish vicarious
infringement, Plaintiffs must prove both that Charter: (i) "possessed a direct financial interest in
the exploited copyrighted materials"; and (ii) "had the right and ability to supervise the infringing
activity or infringer."  *Shell v. Am. Fam. Rts. Ass'n*, 2010 WL 1348548, at *16 (D. Colo. Mar. 31,
2010).  Plaintiffs cannot prove either element.

### A.     Plaintiffs Cannot Prove That Charter Had A Direct Financial Interest

Proving vicarious liability requires showing that Charter had a direct financial interest in
the copyrighted works at issue.  *Id.*; *see also Grokster*, 545 U.S. at 930 n.9 (defendant must "profit[]
directly from the infringement").  "The essential aspect of the 'direct financial benefit' inquiry is
whether there is a causal relationship between the infringing activity and any financial benefit a
defendant reaps."  *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004).  Further, the "direct
financial interest" cannot be "just an added benefit."  *Id.*   Plaintiffs' allegations that Charter

received a "direct financial benefit from its customers' infringement" (First Am. Compl. ¶¶ 4, 115) were rejected in a substantially identical case, *see UMG Recs., Inc. v. Bright House Networks, LLC*, 2020 WL 3957675, at *3-*7 (M.D. Fla. July 8, 2020), and have not been substantiated by the record in this case.[2]

There is no evidence that Charter's subscribers were drawn to Charter's services—in whole or in part—to infringe Plaintiffs' works. After years of scorched-earth discovery, Plaintiffs cannot point to any evidence that customers chose Charter's services over other ISPs for the purpose of infringing, or that customers perceived the ability to infringe Plaintiffs' copyrights using Charter's services as an added benefit. For instance, there is no testimony from Charter's subscribers indicating they were drawn to Charter's Internet services to infringe at all—much less to infringe *Plaintiffs'* works. Nor are there documents or testimony showing that Charter courted would-be copyright infringers—because it did not do so. Haynes Decl. ¶¶ 41-42. This lack of evidence is fatal to Plaintiffs' claim because, as this Court has acknowledged (Dkt. 157 at 6), the law requires that the draw must be "the infringing products" themselves. *See Adobe Sys. Inc. v. Canus Prods., Inc.*, 173 F. Supp. 2d 1044, 1051 (C.D. Cal. 2001); *see also Ellison*, 357 F.3d at 1078 ("Financial benefit exists where the availability of infringing material acts as a 'draw' for customers.") (quotations omitted).

Plaintiffs' case is premised on the unsubstantiated assumption that would-be copyright infringers were attracted to Charter—as opposed to other Internet providers—because it advertised

---

[2]   Charter is mindful that this Court previously denied its motion to dismiss Plaintiffs' vicarious liability claim. Dkt. 157. While Charter respectfully disagrees with that ruling, even if Plaintiffs adequately alleged vicarious liability at the pleading stage, they have failed to create a genuine issue of material fact on the issue such that a reasonable juror could find Charter liable at trial.

fast Internet services.  But high-speed access is a feature that all subscribers desire and all ISPs tout.  *See Bright House*, 2020 WL 3957675, at *5 (rejecting "dog-whistle theory" that defendant "advertises faster internet speeds to surreptitiously entice the prospective infringer").  There is no proof whatsoever "that an internet thief would be 'drawn' by the efficiency of internet service any more than the average law-abiding purchaser of copyrighted content.  All users presumably seek faster, more reliable internet service."  *Id.*  Similarly, the record contains no evidence supporting the theory that advertising the ability to "download 8 songs in 3 seconds" (First Am. Compl. ¶ 85) should be understood as an appeal to download *infringing* songs, as opposed to lawfully sourced music—because both acts require access to the Internet.  Plaintiffs' allegations that Charter "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓" and "condoned [subscribers'] illegal activity" fare no better, as Plaintiffs have no evidence that Charter's purported conduct was different from that of other ISPs, or that consumers sought out Charter's services in particular (as compared to competing services) to infringe Plaintiffs' copyrights.  First Am. Compl. ¶¶ 87, 115.[3]

Nor could any reasonable jury find that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ was a "draw" to would-be infringers.  The industry standard at the time—and the practice employed by most ISPs—was ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  Haynes Decl. ¶¶ 14-40; Schapiro Decl. Exs. B, C.

---

[3]  At most, Plaintiffs' purported draw is no more than an "added benefit," something that *Ellison* and other caselaw on which Plaintiffs rely state is inadequate.  357 F.3d at 1079; *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 674 (9th Cir. 2017).  As over a dozen leading intellectual law professors explained in the ongoing *Sony Music Entertainment v. Cox Communications, Inc.* appeal, it is "access to th[e online] universe [that] is the draw for subscribers," while accessing copyrighted material serves, at best, as "an added benefit to a subscription … [that] is insufficient to act as a draw."  Br. of *Amici Curiae* Intell. Prop. L. Professors at 6, No. 21-1168 (4th Cir. June 1, 2021), ECF 33-1 ("Profs. Br.") (quotation omitted).

**B.** **Plaintiffs Cannot Prove Charter Had The Right And Ability To Supervise Its Users' Conduct On The Internet**

Plaintiffs must also prove that Charter "had the right and ability to supervise the infringing activity or infringer." *Shell*, 2010 WL 1348548, at *16. There is no such evidence. ███████

███████████████████████████████████████████████████████████████

████████████████████████████████████ Haynes Decl. ¶ 9-11.

Charter did not have the "technical ability to screen out" infringing content. *VHT, Inc. v. Zillow Grp. Inc.*, 918 F.3d 723, 746 (9th Cir. 2019); Haynes Decl. ¶¶ 9-11. Nor did Charter have access to the computers of its subscribers or control of what was stored on them. *Id*.

The ability to *terminate* customers' access to the Internet is not equivalent to the ability to *supervise* subscribers' activity as it occurs. Every ISP has the power to turn off subscribers' service, much like an electric company can turn off a customer's electricity. But neither Charter nor the electric company has the ability to *supervise* what customers actually do with the service as they are doing it. Evidence of Charter's ability to terminate is not enough to defeat summary judgment on Plaintiffs' vicarious liability claim. *See Routt v. Amazon.com, Inc.*, 584 F. App'x 713, 715-16 (9th Cir. 2014) ("while Amazon may have had the right and ability to terminate the accounts of the infringing Associates, Routt has not adequately alleged that Amazon exercises any direct control over those Associates' activities"); *Music Force, LLC v. Sony Music Holdings Inc.*, 2020 WL 5733258, at *3 (C.D. Cal. Aug. 12, 2020) ("[T]he right to terminate services or a contract with an infringer does not amount 'to a right and ability to supervise the infringing conduct.'").

Although there are cases "in which ISPs were found to have the practical ability to stop or limit infringement" based on termination, Dkt. 157 at 13 (collecting cases), those courts did not find that ISPs can actively supervise the alleged infringement as it occurs, as opposed to later

14

taking the draconian remedy of terminating an account.[4]  In *UMG Recs., Inc. v. Grande Commc'ns Networks, LLC*, which *dismissed* Plaintiffs' vicarious liability claim for failure to plead a direct financial benefit, the Court barely addressed the supervision issue, finding without analysis that the defendant's ability to "stop or limit the infringing conduct by terminating its subscribers' internet access" was "sufficient to state a claim."  2018 WL 1096871, at *10 (W.D. Tex. Feb. 28, 2018) *report and recommendation adopted*, 2018 WL 1905124 (W.D. Tex. Mar. 28, 2018).  This latter conclusion was wrong and unnecessary to the ultimate outcome of Plaintiffs' vicarious liability claim—and in any event by its terms applies only at the motion to dismiss stage.  *Grande* cited to *Perfect 10 v. Amazon.com*, 487 F.3d 701, 730 (9th Cir. 2007) which held that "under *Grokster*, a defendant exercises control over a direct infringer when he has both a legal right to stop or limit the *directly infringing conduct*, as well as the practical ability to do so."  *Id.* (emphasis added); *see also Perfect 10*, 508 F.3d at 1173 (same).

It is not disputed that Charter cannot control the actions of its users on the Internet.  Haynes Decl. ¶¶ 9-11.  All Charter can control is whether it provides those customers with the ability to get online.  *Id.*  That is not sufficient to find that Charter has the practical ability to supervise its users' conduct such that Charter should be held responsible for it.  *Routt*, 584 F. App'x at 715-16; *Music Force*, 2020 WL 5733258 at *3.  Plaintiffs cannot prove that Charter either received a direct

---

[4]    Indeed, the logical extension of these rulings is that all ISPs would always have the right and ability to supervise any alleged infringing activity or infringer that took place on the Internet.  This renders the "supervision" prong of the vicarious infringement test meaningless, and would both unmoor the vicarious liability doctrine from its *respondeat superior* roots and require ISPs to disconnect an entire household's or business's Internet service if *one* member of that household or business is repeatedly accused of infringement—on pain of up to $150,000 in damages per work alleged to be infringed.

financial benefit from the alleged infringement or that it controlled the infringing activity, and accordingly summary judgment should be entered for Charter on the vicarious liability claim.

## III.  PLAINTIFFS ARE LIMITED AS A MATTER OF LAW IN THE NUMBER OF WORKS ELIGIBLE FOR A STATUTORY DAMAGES AWARD

As their sole form of monetary damages, Plaintiffs have elected to seek "an award of statutory damages for all infringements involved in the action[] with respect to any one work."  17 U.S.C. § 504(c)(1).[5]  While Plaintiffs list 6,963 sound recordings and 4,064 musical compositions in the exhibits to the First Amended Complaint (totaling 11,027 asserted works), there are legal limitations on how to count the number of "works" that are eligible for statutory damages.

### A.  The Copyright Act Limits Plaintiffs To One Award Of Statutory Damages Per Recording/Composition Pair

The Copyright Act instructs that "all the parts of a … derivative work constitute one work."  17 U.S.C. § 504(c)(1).  A derivative work is defined as "a work based upon one or more preexisting works, *such as a … sound recording*."  *Id.* § 101 (emphasis added); *cf. Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1197 (10th Cir. 2005) ("[a] sound recording is a derivative work in relation to the musical work recorded therein") (quoting NIMMER ON COPYRIGHT § 2.10[A] n.8).  That is, a particular recording of a song is a derivative work of the composition on which it is based.  For example, Whitney Houston's recording of "I Will Always Love You" is a derivative work in relation to the original musical composition of "I Will Always Love You" by Dolly Parton.

The text of § 504(c)(1) and § 101 requires that where Plaintiffs assert infringement of a sound recording that is derivative of an asserted musical composition, that pair must be counted

---

[5]  Plaintiffs' election of statutory damages is irrevocable.  *See, e.g.*, *Latin Am. Music Co. v. Spanish Broad. Sys., Inc.,* 866 F. Supp. 780, 782 (S.D.N.Y. 1994); 6 PATRY ON COPYRIGHT § 22:173 (an election of statutory damages "may not be revoked").

as a single "work" for the purposes of a statutory damages award.  *See, e.g.*, *Capitol Rec., Inc. v. MP3tunes, LLC*, 28 F. Supp. 3d 190, 192 (S.D.N.Y. 2014) ("when [infringers] infringed the copyright covering a sound recording and musical composition for the same song, they infringed *only one work* because the infringement was directed at the sound recording and the musical composition was not exploited separately") (emphasis added); *Spooner v EEN, Inc.*, 2010 WL 1930239, at *4 (D. Me. May 11, 2010) (musical composition and sound recording "one work" for statutory damages); 6 PATRY ON COPYRIGHT § 22:186 ("[s]ound recordings are defined in section 101 as species of derivative work of the underlying musical composition, and, as such, both fall within the one work, one award rule for statutory damages that only award[s] for infringement of both works"); 4 NIMMER ON COPYRIGHT § 14.04[E][1][b] (2021) (similar).[6]

It makes no difference whether the copyrights for a recording and a composition are owned by different plaintiffs; only one award per "work" is permitted, regardless of ownership.  *See EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 94 (2d Cir. 2016) (affirming that "plaintiffs could recover only one statutory damages award for a musical composition and its corresponding sound recording, even where the composition and the recording were owned by

---

[6]  Because the plain text alone directs this outcome, the Court need go no further.  Should any doubt exist, the legislative history of § 504(c) confirms that, for the purpose of statutory damages, a musical composition and any derivative sound recordings constitute one "work."  *See* H.R. Rep. No. 94-1476, at 162 (1976); S. Rep. No. 94-473, at 144 (1975).  Both the House and Senate Reports emphasize that "all the parts of a compilation or derivative work constitute one work," even when "they are regarded as independent works for other purposes."  *Id.*

separate plaintiffs" because "a plain reading of the Copyright Act's text supports [that] conclusion").[7]

Resolution of this legal issue in Charter's favor will reduce the number of "works" in the case from 11,027 to 8,195.  First Am. Compl. Exs. A, B; Schapiro Decl. ¶ 5, Ex. D.[8]

### B.   The Copyright Act Limits Plaintiffs To One Award Of Statutory Damages For Sound Recordings Issued On A Registered Album

There is no dispute that many of the asserted sound recordings were registered and issued as albums.  The Copyright Act instructs that, for the purposes of a statutory damages award, "all the parts of a compilation … constitute one work."  17 U.S.C. § 504(c)(1).  This definition includes works "in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective work."  *Id.*  An album fits squarely within the definition of a compilation.  Thus, where multiple recordings appear on a single album, Plaintiffs are limited to a single award of statutory damages *per album*, and cannot seek statutory damages for individual songs that were issued on an album.  The Copyright Act provides for no exception.

Although several courts have eschewed the mandate of § 504(c)(1) in favor of a judicially created "independent economic value" test (or other similar tests) that creates an exception to the statutory rule, this Court should decline to follow their lead.  These decisions cannot be squared

---

[7]    As far as Charter is aware, only one court has held that separate statutory damages may be awarded for a composition and a recording if different plaintiffs owned the copyrights. *See Teevee Toons, Inc. v. MP3.com, Inc.*, 134 F. Supp. 2d 546, 548 (S.D.N.Y. 2001).  But the Second Circuit later expressly rejected *Teevee Toons* in 2016. *See EMI Christian Music Grp.*, 844 F.3d at 95.

[8]   Although Charter has used information provided by Plaintiffs for these calculations, the parties may disagree on the precise number of works implicated by each of the damages related issues raised in this motion.  Accordingly, Charter proposes that after the Court rules on the legal issues presented in this motion the parties meet and confer with the goal of stipulating to the number of "works" eligible for statutory damages.

with Congressional intent as reflected in the statutory text. *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1010 (2017) ("We [] begin and end our inquiry with the text.").

Resolution of this legal issue in Charter's favor will reduce the number of "works" in the case from █████████ First Am. Compl. Exs. A, B; Schapiro Decl. ¶ 6, Ex. E. Counting as "compilations" all the works Plaintiffs registered as "works made for hire," which they must be under the Copyright Act, *see* 17 U.S.C. § 101 (definition of "work made for hire"); U.S. Copyright Office, Circular 30, *Works Made for Hire* 2-3 (Rev. Mar. 2021), https://copyright.gov/circs/circ30.pdf, would further reduce the number of "works" to ████.[9] Schapiro Decl. ¶ 10.

## C. Plaintiffs Cannot Recover For Works That Were Not Timely Registered

Finally, the Court should preclude Plaintiffs from recovering statutory damages for works that were not timely registered with the Copyright Office—a precondition for such an award. A copyright holder may seek statutory damages only if it registers the work either: (1) before the alleged infringement; or (2) within three months of first publication. 17 U.S.C. § 412(2); *see also Grady v. Swisher*, 2014 WL 3562794, at *14 (D. Colo. July 18, 2014) (directing "mandatory denial" of statutory damages on such grounds); *Shell v. Henderson*, 2013 WL 2394935, at *3 (D. Colo. May 31, 2013) ("an author's failure to register a copyrighted work until after infringement has already begun operates to deprive the author of … the right to obtain statutory damages"). ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[9]  Resolution of the legal issues identified in Section III. A and B in Charter's favor will reduce the number of "works" identified in the Complaint that qualify for statutory damages from ██████ ████. Schapiro Decl. ¶ 7.

Those ■ works therefore are not eligible for statutory damages.  Schapiro Decl. ¶¶ 8-9,  Exs. F-H.

## CONCLUSION

WHEREFORE, for all the foregoing reasons, Charter respectfully requests that the Court grant its motion for summary judgment.

Dated:  November 15, 2021

Charles K. Verhoeven
David Eiseman
Linda J. Brewer
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600 (telephone)
Email: charlesverhoeven@quinnemanuel.com
Email: davideiseman@quinnemanuel.com
Email: lindabrewer@quinnemanuel.com

Jennifer A. Golinveaux
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA 94111
(415) 591-1506 (telephone)
Email: jgolinveaux@winston.com

Michael S. Elkin
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
(212) 294-6700 (telephone)
Email: melkin@winston.com

Respectfully submitted,
By: /s/ *Andrew H. Schapiro*
Andrew H. Schapiro
Nathan Hamstra
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400 (telephone)
Email: andrewschapiro@quinnemanuel.com
Email: nathanhamstra@quinnemanuel.com

Todd Anten
Jessica Rose
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000 (telephone)
Email: toddanten@quinnemanuel.com
Email: jessicarose@quinnemanuel.com

Craig D. Joyce
Fairfield and Woods, P.C.
1801 California Street, Suite 2600
Denver, CO 80202
(303) 830-2400 (telephone)
Email: cjoyce@fwlaw.com

*Counsel for Charter Communications, Inc.*