# Exhibit XLIV

# Plaintiffs' Exhibit 7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

```
WARNER RECORDS INC., et al.,   )
                               ) Civil Action No.
          Plaintiffs,          ) 1:19-cv-00874
                               )
     v.                        )
                               )
CHARTER COMMUNICATIONS, INC., )
                               )
          Defendant.           )
------------------------------)
```

\- - -

TUESDAY, SEPTEMBER 28, 2021

\- - -

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

Remote Videotaped Deposition of KEVIN ALMEROTH, PH.D., beginning at 9:14 a.m., before Nancy J. Martin, a Registered Merit Reporter, Certified Shorthand Reporter.

[redacted]

[redacted]

BY MR. GOULD:
Q. Are you offering an opinion --
A. Let me finish, please.
MS. CLARK: Are you guys catching that feedback? Sorry. It's starting to distort the questions a little bit.
REPORTER MARTIN: Yeah, I'm hearing it a lot.
MS. CLARK: It's getting worse.
MR. GOULD: Why don't we go off the record for a second.
THE VIDEOGRAPHER: Going off the record. It's 12:12 p.m.
(A recess was taken from 12:12 p.m.

to 12:18 p.m.)
THE VIDEOGRAPHER: Going back on the record at 12:18 p.m.
THE WITNESS: Just so it was clear, I think we stopped mid-answer.
BY MR. GOULD:
Q. Okay. Go ahead.

[redacted]

[redacted]

[redacted]

Q. Apart from the field of networking and network security, is there anything else you claim to have an expertise in for purposes of your opinions in this case?

A. For purposes of these opinions, I've got a

lot of relevant experience I can certainly go through if you'd like me to. But I think as a general sense, I believe I have expertise for all of the opinions that are contained within Exhibits 275 and 276.

Q. What is the basis for the expertise on the opinions provided in the two reports besides networking and network security?

A. So again, I think I characterize networking and network security as kind of the overarching areas. Let me sort of break it down a little bit.

I mentioned previously network monitoring and network management. I've been doing research in those areas, as well as having practical experience within all sorts of different kinds of networks, at least some of which I would consider to be commercial ISPs.

There's also the areas of peer-to-peer networking, peer-to-peer file sharing, both in the context of how it works technically, research to advance the state of the art, and then also discussing these issues with ISPs.

So between peer-to-peer, the exchange of multimedia traffic is another area of expertise, copyright and digital material, including songs, videos, cartoons, content from content owners. And then network monitoring, network management, network

provisioning for all types of networks, including large service providers, like Charter as an example.

Q. You said there's areas of peer-to-peer networking, peer-to-peer file sharing. In the context of how it works technically, research advanced in the art and also discussing these issues with ISPs. What discussions have you had with ISPs?

A. So part of the research area that I was looking to pursue, I think in the early 2000's, as peer-to-peer was becoming a viable alternative to, say, a client server-based architectures, I had had meetings with -- I believe it was AOL. I think it was right after it had been acquired by Time Warner. And part of what we were pitching is a research idea was trying to find ways in which peer-to-peer was used and to the degree that it would affect -- at the time, we were proposing things like revenues generated by movie theatres, or at least, you know, how many tickets were sold at movie theatres and trying to track different genres in the prevalence of copyrighted material on peer-to-peer networks as a basis for how that would impact the stakeholders.

And the reason for that was then to if we had some measure of what that was, we could then provide a basis for justifying research to take advantage of

those technologies.

So, for example, later, I worked with a company called Digital Fountain that was looking at ways of disseminating files, audio, video files efficiently. And one of the things that we were actually looking to do in that company was get permission to disseminate the trailer for Star Wars, The Phantom Menace as a mechanism to support or validate the technology that that company was looking at.

So, you know, kind of over the years looking at the evolution of peer-to-peer and continuing to find reasonable uses for the technology, including things that, you know, content owners could take advantage of to improve their efficiency, service offerings, et cetera.

Q. You said one of the things that you were involved in was trying to track different genres in the prevalence of copyrighted material on peer-to-peer networks and the basis for how that would impact stakeholders. What was your involvement or experience with that issue?

A. So that was specifically a proposal that we put to, as I said, it was AOL, but I think there were also some Time Warner people. It was a meeting, I

Page 266

Page 267

MS. CLARK: Thank you so much. I don't have anything. I suppose we can provisionally designate the report as under the protective order. I haven't actually gone back to look to see if there's anything

Page 268

in the transcript. I haven't actually gone back to see if there's anything actually confidential, but we'll designate it for now and review it later.

MR. GOULD: Dr. Almeroth, I want to thank you for your time. It's nice chatting with you.

MS. CLARK: Thanks, guys. I hope you feel better, Nancy.

REPORTER MARTIN: Thank you so much. I appreciate that.

THE VIDEOGRAPHER: We are off the record at 6:12 p.m., and this concludes today's testimony given by Dr. Kevin Almeroth. The total number of media used was seven and will be retained by Veritext Legal Solutions.

Thanks. Sorry.

(Witness excused.)

(Deposition concluded at 6:12 P.M.)

Page 269

CERTIFICATE

I do hereby certify that the aforesaid testimony was taken before me, pursuant to notice, at the time and place indicated; that said deponent was by me duly sworn to tell the truth, the whole truth, and nothing but the truth; that the testimony of said deponent was correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription; that the deposition is a true and correct record of the testimony given by the witness; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

Nancy J. Martin, RMR, CSR

Dated: October 1, 2021

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying shorthand reporter.)