# Exhibit XLVI

# Exhibit 13

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

1

2

3

4   WARNER RECORDS, INC., et al.,      )
                                       )
5           Plaintiffs,                )
                                       )        Case No.
6       vs.                            )  1:19-cv-00874-RBJ-MEH
                                       )
7   CHARTER COMMUNICATIONS, INC.,      )
                                       )
8           Defendant.                 )

9

10

11      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

12

13          Videotaped deposition of SANDEEP CHATTERJEE,

14   PH.D., taken remotely before NADINE J. WATTS, CSR, RPR,

15   and Notary Public, pursuant to the Federal Rules of

16   Civil Procedure for the United States District Courts

17   pertaining to the taking of depositions, commencing at

18   9:35 a.m. Central Standard Time on the 5th day of

19   October, A.D., 2021.

20

21

22

23

24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 42

Page 43

6   Q  I want to ask you some additional questions
7 about your background, and I'm going to focus on audio
8 fingerprinting technology. Do you have any education --
9 any background or education in audio fingerprinting?
10   A  I think that's a very broad question. You can
11 do fingerprinting in a lot of different ways. For
12 example, you can take an audio file and run a hash
13 algorithm on it and you can state that is a fingerprint.
14     So to the extent that you're asking have I done
15 hashes, yes, I am familiar with hashes, both from an
16 academic, educational perspective, as well as from a
17 real-world professional perspective.
18   Q  You're familiar with the Audible Magic content
19 identification service through this case?
20   A  Yes, I have reviewed their source code. I think
21 I mentioned that I also went to an inspection as well.
22   Q  So let me back up actually, just picking up on
23 one thing you said. You described a hash of an audio
24 file. One way to describe that is a fingerprint?

Page 44

1   A  Depending on the hash algorithm used, yes,
2 people do refer to hashes sometimes as fingerprints.
3   Q  Do you have any background in audio content
4 identification specifically?
5   A  If you're asking do I listen to music, yes, I
6 listen to music, and I can tell you if I've heard a song
7 before or something like that. So, yes.
8   Q  What kind of music do you like?
9   A  I think it's changed as I've gotten older. I
10 like slower, less louder music as I've gotten older.
11 But, yes, I think I like like just like jazz and things
12 like that now days more than I did before.
13   Q  So I wasn't asking you if you were listening to
14 music, but I'm glad to hear you're a music fan. Maybe
15 it's important obviously. I'm talking about audio
16 content identification from software.
17     So prior to this case do you have any
18 background with the technology of identifying audio
19 content through a technical analysis of digital audio
20 files?
21   A  I believe I've known that there are different
22 techniques of, for example, performing 48 transforms and
23 things like that on different types of input. There are
24 different ways of analyzing frequencies that are in

Page 45

1 music. So from that perspective, from a basic
2 perspective, from an educational perspective, yes, I do
3 have that background.
4     With regards to the specific Audible Magic
5 technology, no. Prior to working on this case and prior
6 to looking at Audible Magic, I was not familiar with
7 Audible Magic's specific technology.
8   Q  So you've heard of or you're aware of technology
9 that exists for audio content -- for identifying audio
10 content through technical analysis. And prior to this
11 case you have not personally had any experience with
12 those matters?
13   A  I think you summarized it correctly, but I do
14 want to clarify. I wasn't saying specifically with
15 regards to audio identification. I'm simply saying that
16 I believe it's fundamental basic technology that you can
17 analyze audio files, whether it's music or voice, to try
18 to identify, for example, a speaker or to try to match
19 up text that a speaker may be trying to say.
20     So what I was essentially saying was that I
21 believe it's pretty well and -- well-understood that you
22 can look at different frequencies. There are different
23 things you can look at, whether it's an audio file,
24 whether it's a music file, whether it's a voice file.

12 (Pages 42 - 45)

Page 46

You can perform different analyses and different types of analyses. That's what I'm stating. So, for example, voice recognition or identifying who's speaking.

So, yes, in general, there is technology that has existed, technology to allow people to identify audio information.

Q Prior to your work on this case, you've had no experience working on those types of software or technologies?

A With regards to music files, I would tend to agree with you. But I did look into voice recognition technologies. I have known about it. For example, Nuance and how that system works. So, yes, I do have quite a lot of experience with regards to audio technologies and audio analysis.

Specifically with regards to music, I -- off the top of my head, I can't think of anything specifically. But with regards to audio in general, I have significant experience prior to this case.

Q Have you ever developed an algorithm for audio content identification prior to your work on this matter?

A I think I just answered that, yes, I have worked on, for example, voice recognition, identifying who is

Page 47

speaking and also trying to determine what was said from a dictionary of potential terms.

Q Any experience prior to this matter with software matching digital fingerprints of different files?

A I'm sorry, I think you broke up on me a little bit at the end. Can you repeat that please?

Q Any experience prior to this matter with software matching digital fingerprints of different files?

A Yes. So in terms of fingerprints, like I mentioned, hashing. I also have significant experience with actual fingerprints, digital versions of actual fingerprints.

We've built one of the first mobile banking systems in the world. And so we used actual fingerprints so the person that -- the person who wants to withdraw money from a bank or deposit money into the bank, they would put their finger onto an electronic reader and the information would have to be matched, so -- And then, like I also mentioned, with regards to hashing technologies and determining whether two different hashes are the same and whether the underlying content or the data are related or unrelated.

Page 48

Q But no prior experience matching audio fingerprints based on acoustic properties of digital audio, correct?

A Again, I think I answered this with regards to when I talked about voice recognition. I say voice. It falls within audio.

If you're -- I believe I also answered, if you're asking me specifically with regards to music, off the top of my head, I don't recall that. But within audio, which includes voice, I do have significant experience, not only from my Ph.D. work, as well as in later professional work as well.

Q Do you have any familiarity with Audible Magic's reputation in the content protection space?

A Did you say reputation?

Q Yes.

A Are you asking me within the context of this case or prior to this case?

Q Within the content protection space.

A Right, but, I mean, are you asking within this -- Like what I've learned through this case or prior to this case?

Q Well, I'm wondering if you have -- have any -- Strike that.

Page 49

Are you familiar with Audio -- Audible Magic's reputation within the content protection space as a service and tool that's used by, you know, companies and entities in the marketplace?

A So within the information that I've looked at in this case, I do understand that RIAA works with MarkMonitor, and MarkMonitor works with Audible Magic. So from that perspective, they are used.

So I think you didn't really answer my question on clarifying what your question was, whether you're asking prior to my involvement in this case or after. But I think I answered your question based on after being retained in this case.

Q You read Mr. Ikezoye's deposition? He's the Audible Magic CEO. It was cited in your report.

A Yes, I have reviewed it. Yes.

[redacted]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 66

1 reference for the discussion?
2    A  Which program or application?
3    Q  Whatever you were -- The research and
4 applications of these intelligent environment
5 technologies that you described in paragraph 17 of your
6 report.
7    A  I don't think it had a name.  We were -- Like I
8 just told you, like an intelligent doll.  So maybe you
9 can call it an intelligent doll.
10    Q  So I want to understand the use of peer-to-peer
11 for the intelligent doll.  You said in paragraph 17 that
12 this included sourcing content from peer-to-peer
13 networks.
14       Are you saying that you used peer-to-peer to
15 source content for your application or that you designed
16 an application through which consumers would source
17 content from peer-to-peer?
18    A  I'm not sure I understand your -- the
19 distinction that you're making with consumers.  Like
20 I -- My team and I at MIT, and also elsewhere, we
21 developed the technology, and then we would -- in order
22 to prove that the technology worked, we would also of
23 course have to test it.
24       And so we would also, you know, make up

Page 67

1 stories and things like that and say it through the
2 doll, and then the other doll on the other site would be
3 able to connect to that network and source the content,
4 that story, and then articulate it.  But the ultimate
5 point was that end users, for example, consumers and
6 what you're saying would be able to do exactly the same
7 thing.
8    Q  So maybe I'm missing something.  But what was
9 the use of peer-to-peer for that project or application?
10    A  The use of peer-to-peer was to -- like I said,
11 to source content.  So there would be a community of
12 these intelligent dolls and -- So the members of the
13 community could create content, which would then be
14 available to other intelligent dolls.
15    Q  And what peer-to-peer protocol was used for the
16 intelligent doll application?
17    A  Well, it -- Sorry.  It was basically our own.
18 This is around the time that Napster had come out and we
19 were looking at it, like I believe a lot of people were
20 looking at Napster and the new peer-to-peer technology.
21 And so we developed our own simplified technology
22 because we did not want to -- These are intelligent
23 dolls.  You don't have lots of competing power.  You
24 don't have lots of resources.  So we looked at how do

Page 68

1 you use a lightweight peer-to-peer protocol to allow
2 this to happen.
3    Q  So your devices had their own I guess
4 proprietary P2P network, essentially a closed system?
5    A  For that application, yes.
6    Q  And how many users were a part of that -- those
7 systems that you've just described?
8    A  Well, again, this is related to my Ph.D. work.
9 It's not a -- it's not a commercial system.  We did spin
10 it out into a company and we were working with Hasbro on
11 it, but then ultimately the dot-com issue happened in
12 the 1999, 2000 timeframe and things kind of stopped
13 after that point.
14    Q  So was this closed system that you designed ever
15 operational beyond the lab?
16    A  Well, like I mentioned, we spun it out of MIT to
17 start a company, and that's listed in my CV.  And that
18 company was the one that was, in partnership with
19 Hasbro, to develop it on a larger scale.  Obviously,
20 like a commercial scale.  But because of the events
21 related to the dot-com stock market blowup and all of
22 the unfortunate stuff that happened back then, it never
23 made it out into an actual intelligent doll that people
24 could buy at Toys R Us or other stores.

Page 69

1    Q  And that project for the intelligent doll had
2 nothing to do with music, correct?
3    A  Well, you could like sing and things like that,
4 but, yes, it's not -- it's not related to Rihanna or
5 somebody singing a song.
6    Q  So apart from the intelligent doll work you've
7 described, research and development you've described,
8 anything else in your report that references experience
9 or background with peer-to-peer?
10    A  Well, I have experience with BitTorrent later
11 on.  We -- Like I said, peer-to-peer is a very
12 interesting technology architecture because it removes
13 the centralized bottleneck of a server.  So peer-to-peer
14 is a -- from a technology perspective, an interesting
15 and innovative way of doing things.
16       So there was a lot of interest in the
17 technology research community to look into it.  And so I
18 have looked at BitTorrent.  Like I mentioned, I've
19 played around with the open source code that was
20 available later on.  So I have a lot of experience with
21 BitTorrent and peer-to-peer, both from a protocol
22 perspective, as well as a client perspective.
23    Q  Are there any additional professional
24 experiences or -- Strike that.

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 78

1 work.
2    Q   And there's no summary in your report of how the
3 KaZaA technology works, correct?
4    A   I don't believe I summarized the KaZaA
5 technology.  Yes, I believe you're correct.
6    Q   And nothing in your report discusses how KaZaA's
7 protocol compares to BitTorrent, Gnutella, eDonkey, or
8 Ares, correct?
9    A   I don't believe that I did a comparison between
10 the minute differences that KaZaA has as a peer-to-peer
11 technology with other similar peer-to-peer technologies,
12 like BitTorrent, Ares, Gnutella, and eDonkey.



Page 79

2    Q   I want to talk a little bit about hash or hash
3 value.  What is a hash of a control file?
4    A   A hash is essentially an algorithm that you can
5 run on a digital file, the bits of a digital file, and
6 then, depending on the specific algorithm, you'll get a
7 representation of that -- of the contents of that file.
8       So, for example, the algorithm may take a large
9 25 megabyte file and then it will output a -- you know,
10 a quarter of a kilobyte representation.  So it's
11 essentially an algorithm that's run on a file and the
12 output of the algorithm is referred to as the hash
13 value.
14    Q   It's a unique alphanumeric value representing
15 the contents of a file?
16    A   Well, I think it depends on the actual hash
17 algorithm, how unique or not it is.  But if you were to
18 say for a cryptographic hash, like a good crypto --
19 sorry, a good cryptographic hash, I would tend to agree
20 with you, that if you run that same algorithm on one
21 file and you run that same algorithm, that same hash
22 algorithm, on the same file again, you're going to get
23 the same output value.
24    Q   That's true if you run the algorithm on an

Page 80

1 identical copy of the same file as well?
2    A   Yes.
3    Q   You said a good cryptographic hash.  What did
4 you mean by a good cryptographic hash?
5    A   So hashing technologies are oftentimes used in
6 cryptography.  In fact, one of the professors at MIT,
7 Ron Rivess, I believe he invented some of these
8 cryptographic technologies.  And so one example is MD4,
9 which was an early hash algorithm, and I believe Ron
10 Rivess is the one that invented MD4 and he was -- His
11 office was right down the hall from mine.
12       So cryptographic hashes are important in
13 cryptography applications where you cannot determine the
14 original contents from the hash value.  And another key
15 requirement is that there not be collisions, that you --
16 when you have two different input values, they should
17 result in two different output values.
18    Q   Are you aware of any instances of hash collision
19 that you just described?
20    A   I am.  I believe MD4, you can have collisions
21 pretty regularly.  So, yes, MD4 is one example.
22    Q   Okay.  Well, we may come back to that.
23       At a high level, a hash algorithm can be used
24 as a unique identifying reference for a file?

Page 81

1    A   It -- I think a good hashing algorithm can --
2 Like I mentioned, the same input would result in the
3 same output.
4    Q   Do you contend that any of the hash algorithms
5 that are at issue in this case are not good hash
6 algorithms?
7    A   Well, like I mentioned, MD4 I think is
8 well-understood that it's not the greatest hashing
9 algorithm.  And I think, as I explained in my report,
10 eDonkey is based on MD4.  It's not directly MD4.
11 EDonkey calculates multiple MD4s and not simply a
12 standard MD4.  But -- And also SHA-1, I believe it has
13 been shown to have at least one collision, but I -- I
14 would tend to agree with you that SHA-1 is a reasonably
15 good -- it's a good hash algorithm.
16    Q   The hash collision for Shaw, that's the one
17 lab-generated instance that Ms. Frederiksen-Cross
18 describes in her report?  Is that the one you're
19 referring to?
20    A   Yes.  I don't recall off the top of my head if
21 there were more, but I believe it's simply, at most,
22 four.  A SHA-1, I believe it's like one or a very low
23 number of collisions that have been shown.  But, like I
24 mentioned, I believe SHA-1 is a good algorithm.

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 82

1   Q   And the modified hash that you described for
2   eDonkey you reference in paragraph 61 of your report is
3   sometimes referred to as an ED2K hash, correct?
4   A   Yes.
5   Q   The hash is determined -- Strike that.
6       The hash for a file is determined by an
7   algorithm based on the binary contents of the file,
8   correct?
9   A   I'm sorry, say that again.  I didn't understand
10  your question.
11  Q   An algorithm determines the hash based on the
12  binary contents of the file?
13  A   Yes, the input to the algorithm would be the
14  binary bits and bytes of the file.  And the algorithm is
15  simply the calculations that are performed on those bits
16  and bytes, and the output is the hash value.
17  Q   And the hash value -- the algorithmic hash value
18  is not determined based on external data, such as --
19  Strike that.  Let me try it again.
20      The hash value is not determined by external
21  metadata, such as a file name?
22  A   Well, you could have -- you could use the file
23  name or you could use other metadata if you wanted to.
24  But, typically, when you're talking about computing a

Page 83

1   hash of a file, you're typically talking about the
2   contents of the file, not -- not the file name or other
3   metadata.  But just to be clear, you can do whatever you
4   want with the -- with a hash algorithm.
5   ███████████████████████████████
6   █████████████████████████████████████████████
7   ███████████████████████████████████
8   ██████████████████████████████████
9   █████████████████████████████████████████
10  ██████████████████████████████████████████
11  ████████████████████████████████████
12  ██████████████████████████████████████
13  ██████████████████████████████████████
14  ████████████████████
17  Q   So if the contents of the file change and you
18  get the hash, you'll get a different hash, right?
19  A   With the caveat that if you're talking about a
20  good hash algorithm, for example, like SHA-1, yes.  If
21  the contents of a file are between two different files,
22  they're different, the output resultant hash value would
23  be different.
24  Q   And so even if one bit or byte of the binary

Page 84

1   content of the file changes, then you get a different
2   hash, right?
3   A   Yes, even if one bit changes, you would have a
4   different byte, which would result in a different hash.
5   Q   But if two different digital files have the same
6   hash value, that means the files have the same content,
7   correct?
8   A   Again, with the caveat if you're talking about
9   like a good hash, like SHA-1 or other things, and if you
10  actually calculate a hash on two different files -- say
11  if you actually run the hash algorithm on file A and you
12  run the same algorithm on file B, then they should have
13  the same resultant hash value.
14  Q   Dr. Chatterjee, you keep referencing good hash
15  algorithm.  I want to make sure that we're just using
16  the same language throughout the day.  So I'm talking
17  about the SHA-1 hashes, which you've agreed is a good
18  cryptographic hash algorithm, correct?
19  A   Yes, it's regarded as a good hash.  And, like I
20  mentioned, I think there's only been one or a very low
21  handful of collisions that have been identified for
22  SHA-1.  So, yes, it is a good algorithm.
23  Q   Are you contending that any of the hash
24  algorithms that are used and at issue in this case are

Page 85

1   something other than good hash algorithms?
2   A   When you say am I contending, like from a
3   technical perspective?  I think I've explained to you
4   that MD4 is not well-regarded as a good hash algorithm.
5   I'm not contending that ED2K, which is based on MD4, is
6   good or bad.
7       So I think from a technical perspective I do
8   have a contention that MD4 is not the greatest hash.
9   But I think for purposes of my report, or of my two
10  reports, I'm not really contending those.  But from a
11  technical perspective, yes, MD4 may not be the best
12  hash.
13  Q   You mentioned the infohash.  Infohash is used in
14  the BitTorrent protocol, correct?
15  A   Yes.
16  Q   And infohash is a unique hash identifier for a
17  torrent, correct?
18  A   The infohash is a hash over the info portion of
19  the dot-torrent file.  That's all it is.
20  Q   Turn to page -- paragraph 164 of your report.
21  You say in the second line, each torrent has a unique
22  identifier, which is known as infohash, correct?
23  A   And then I state, and it is a SHA-1 hash
24  calculated over a portion of the torrent file for a

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 90

1 hash value is the same, that doesn't tell you anything.
2       Like I have explained to you, if you calculate
3 the hash over the original file and then you calculate
4 the hash over the second file and the resulting hash
5 values are the same, then it tells you something. But
6 simply looking at a hash doesn't tell you anything.
7 That's basic computer science information or knowledge.
8   Q  So as a practical matter, two files that
9 calculate the same hash value are identical, correct?
10  A  If you calculate using the same hash algorithm
11 on two different files and the resulting hash values are
12 the same, yes, it tells you something, that the files
13 are the same.
14  Q  You're aware, Dr. Chatterjee, that BitTorrent
15 relies on the use of hashes?
16  A  BitTorrent, like other P2P protocols, do use
17 hashes.  I agree with you.
18  Q  And, in fact, the use of hashes is built into
19 the very core functionality of the BitTorrent system?
20  A  It's part of the protocol.  I don't really know
21 what you mean by the core functionality.  But, yes,
22 hashes are used as part of the protocol.
23       And one of the reasons and -- One of the
24 reasons hashes are used is because within peer-to-peer

Page 91

1 protocols and networks there is a lot of fakes and the
2 information that clients and peers report is oftentimes
3 untrue, and, therefore, hashes allow that kind of check,
4 which is necessary in a peer-to-peer network and
5 peer-to-peer protocols.
6   Q  Hash values are how the BitTorrent system
7 associates users downloading and distributing files,
8 correct?
9   A  There is an infohash that can be used to
10 identify the info portion of a dot-torrent file.  If
11 that was your question, yes, I agree with what I just
12 stated.
13  Q  BitTorrent clients request files by hash,
14 correct?
15  A  A BitTorrent client can request from another
16 client or another peer.  It can use infohash to request
17 a file, like the payload, and -- But, like I said, just
18 because a peer states that it has that particular info
19 hash means nothing.  It has to be confirmed and
20 corroborated by actually downloading, calculating the
21 hash, and then also even checking the actual payload,
22 the contents of the file.
23  Q  When a peer receives -- requests and receives
24 pieces in BitTorrent, the BitTorrent client checks the

Page 92

1 hashes to confirm they got the right thing, correct?
2   A  Well, just like we've talked about, there are
3 multiple different hashes that are used in BitTorrent.
4 The infohash is the hash over the info portion of the
5 dot-torrent file.  There are things called piecehashes,
6 which are hashes over specific pieces.  And so there are
7 two different types of hashes that are used in
8 BitTorrent.
9   Q  When a BitTorrent peer requests and receives a
10 piece, the BitTorrent client checks the piecehash to
11 confirm that it got the right thing, correct?
12  A  Calculating the piecehash over the piece that it
13 receives and then comparing it to the piecehash that's
14 in the dot-torrent file simply shows that the
15 piecehashes match.  It doesn't show that the piece that
16 was received is actually a piece of the content that the
17 dot-torrent file claims that it's for.
18  Q  If the piece is verified, then the peer begins
19 to share that piece, correct?
20  A  If a -- A peer can upload pieces after it has
21 downloaded it and even after calculating the piecehash.
22  Q  In fact, the default automated function of the
23 BitTorrent protocol is once you download and verify a
24 piece, you begin sharing it, correct?

Page 93

1   A  It's not that you begin sharing it.  You can.
2 Like the technology can if somebody requests it.  It's
3 not that -- it's not that once you download a piece, you
4 don't like shove it down people's throats.  You
5 simply -- Depending on the client and how that client is
6 implemented, it can respond to a request from another
7 peer.
8   Q  I think you're making the distinction that it
9 goes into the shared file folder for other peers to get
10 it if they want it is your -- I think that's the
11 distinction you're making, right?
12  A  Yes, that it -- that piece is -- can be
13 available if another peer requests it.  But, like I've
14 stated, that does not mean that it's actually a piece of
15 what that dot-torrent file claims that it's a piece of.
16  Q  And if the peer -- Strike that.
17       If upon receipt of the piece the hash does not
18 match the expected hashpiece, then the BitTorrent client
19 discards that piece, correct, discards the downloaded
20 piece?
21  A  It can, depending on the client and the client
22 implementation.  Yes, if it computes the piecehash and
23 the piecehash does not match what the dot-torrent file
24 states, it can discard it.

24 (Pages 90 - 93)

Case No. 19-cv-00874-RBJ-MEB Document 642-4 filed 11/02/23 USDC Colorado Page 10 of 234



Page 138

Page 140

1    A  I would think that they know.

2    Q  They have to open up accounts with Charter and

3  give them -- customers have to give Charter information

4  about who they are?

5    A  I've never had an account with Charter, but I

6  would believe that that's how it would probably have to

7  happen.

8    Q  You had to provide some personal identifying

9  information to your ISP; isn't that right, sir?

10    A  Yes, you have to identify yourself, for example,

11  maybe by address or e-mail address.  You need to provide

12  some information.

13    Q  Your name as well?

14    A  Again, I don't know what Charter requires.  I

15  believe that's probably part of the form that you would

16  fill out.

17    Q  So the anonymous peers you keep referring to are

18  known Charter subscribers, correct?

19    A  Well, peers is a term used within P2P networks.

20  So these are anonymous peers in that I don't know who

21  they are, MarkMonitor doesn't know who they are either.

22  And the client is the actual software running on those

23  computers.  So they are anonymous in that we don't know

24  what software they're actually running.

Page 139

Page 141

1    Q  And so by anonymous, you mean the only one that

2  knows who these subscriber accounts are is Charter?

3    A  No, we're not talking about the user.  We're

4  talking about the peers and the clients are anonymous.

5  In terms of knowing what software is being run on a

6  particular PC -- For example, I may have Microsoft Word

7  loaded on my PC.  That does not mean that an ISP knows

8  that I'm running Microsoft Word.

17    MR. GOULD:  Q  You keep talking about anonymous

18  peers.  We're talking about Charter subscribers

19  associated with IP addresses, correct?

20    A  Yes, these are peers that have an IP address

21  that -- and my understanding is that Charter assigns IP

22  address using the XCP.

23    Q  And Charter is aware of who its subscribers are,

24  you would agree, correct?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 146

1  protocols of peer-to-peer, together with my experience,

2  that peer-to-peer networks have a lot of fakes, together

3  with the articles and things that I've pointed out to,

4  and even others pointed to articles that demonstrate

5  that there are fakes on peer-to-peer networks.

6       MR. GOULD:  Q   Assume that MarkMonitor downloaded

7  and verified a file -- You know, let me regroup a little

8  bit.

9            We've been going about an hour.  Why don't we

10 take a little break.

11      MR. HAMSTRA:  Okay.

12      THE WITNESS:  Sure.

13      MR. GOULD:  I can use a short break.

14      THE VIDEOGRAPHER:  The time is approximately 2:31

15 p.m.  We're going off the video record.

16           (Recess was taken.)

17      THE VIDEOGRAPHER:  The time is approximately 2:43

18 p.m.  We are back on the video record.  Go ahead.

Veritext Legal Solutions

www.veritext.com                                          888-391-3376

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
www.veritext.com                                    888-391-3376

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 162

1 interchangeably.
2        You described metadata poisoning as maybe
3 applying to a file name or a hash. You described decoys
4 as advertising something that's different than the file.
5 I just -- Is there a way that you can crystallize for me
6 what it is you contend these different terms mean?
7    A  Well, there is a little bit of gray area between
8 these different types of pollution. For example, even
9 if you look at this paragraph that we're looking at
10 where it's talking about decoys and then it says same or
11 similar metadata, that kind of gets at what you're
12 saying, that there is some overlap between different
13 types of content pollution.
14        But the bottom line is that there is pollution.
15 Whether there is some overlap between how these
16 different pollution activities are performed, that's
17 beside the point. The point is that there is pollution
18 on these P2P networks. It's well-known. It's
19 well-understood.
20    Q  Okay. I want to look briefly at the Materials
21 Considered section of your report please, your opening
22 report. It's the very last two pages. Let me know when
23 you're there.
24    A  The last two pages meaning Section 7 --

Page 163

1    Q  Yes, sir.
2    A  -- Other Documents?
3    Q  And I want to look briefly at the articles cited
4 in your report on these pollution issues that are
5 referenced in paragraphs 71 through 104.
6    A  So you want me to go back to paragraph 71?
7    Q  No. I've looked at the report and what I
8 determined is the easiest, quickest way to do this would
9 be to go through the Materials Considered section, to
10 look at the report titles and information on them. But
11 certainly if you need to go back and look at where you
12 cite them, that's fine.
13        Going about halfway down, you cite an article
14 or a publication by Liang, et al., entitled Pollution in
15 P2P File-Sharing Systems. Do you see that?
16    A  I do.
17    Q  Do you see that article was published in 2005?
18    A  I see that.
19    Q  And then Shin, et al., Malware Prevalence in the
20 KaZaA File-Sharing Network. You see that was published
21 in October of 2006?
22    A  I see that.
23    Q  And the next one down, Kryczka, et al., Fake
24 Detector, A Measurement-Based Tool to Get Rid Out of

Page 164

1 Fake Content in Your BitTorrent Downloads. And that's
2 published in May of 2011.
3    A  I see that.
4    Q  And then Santos, et al., FUNNEL: Choking
5 Polluters in BitTorrent File-Sharing Communities, and
6 that's dated 2011 also.
7    A  I see that.
8    Q  And then on the next page there's an article
9 cited by Cuevas, C-U-E-V-A-S, et al., Is Content
10 Publishing in BitTorrent Altruistic or Profit-Driven,
11 and that's dated 2010, correct?
12    A  Yes.
13    Q  And then Kryczka -- another Kryczka article,
14 this one called TorrentGuard, Stopping Scam and Malware
15 Distribution in the BitTorrent Ecosystem. Do you see
16 there's two dates there, February 2014 and April 19th,
17 2012?
18    A  I see that.
19    Q  You understand that to mean this article was
20 first published on April 19th, 2012 and then included in
21 this computer network's volume in February of 2014?
22    A  I believe that's correct, yes.
23    Q  Okay. And then the next one, Montassier,
24 Content Pollution Quantification in Large P2P Networks,

Page 165

1 A Measurement Study on KAD. And that was published in
2 2011.
3    A  Yes, I see that.
4    Q  And then the last one, Liberatore, et al.,
5 Forensic Investigation of Peer-To-Peer File-Sharing
6 Networks, and that one's dated 2010. Do you see that?
7    A  I do.
8    MR. GOULD: Andrew, could you please pull up the
9 Kryczka TorrentGuard article for me. That will be the
10 next exhibit.
11        And while he's doing that, you're aware, Dr.
12 Chatterjee, that the claim period in this case is March
13 2013 through May 2016?
14    A  Yes.
15    Q  And all eight articles we just looked at that
16 you discussed in your report regarding pollution are
17 published before the claim period?
18    A  I think based on the dates that you read out to
19 me, they are before the -- the date period. But at the
20 same time, I believe it's very clear that these -- the
21 issues that these articles were discussing were
22 continued even into 2012, 2013, 2014, 2015 and onwards
23 even.
24        So these articles are talking about technology

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 166

1 issues, as well as people's behavior issues, and these
2 things continued on throughout the 2013, 2016 period.
3    Q  None of those -- none of the reports you cite in
4 your report talk about pollution in the years that you
5 just described, do they, 2012 through 2015 and onwards?
6    A  Well, like you, yourself, pointed out, that
7 second Kryczka paper was published in 2014.  And what I
8 explained to you right now is precisely the point, that
9 these activities that were happening in these
10 peer-to-peer networks did not suddenly stop in 2013
11 onwards.  They continued, and it's well-known that they
12 continue.
13    Q  Can you point to something in your report that
14 supports your contention that the pollution you've
15 described in these reports predated the claim period
16 continued into the claim period?
17    A  I can.  Even Ms. Frederiksen-Cross states this.
18    Q  Okay.  Point to me in your report where you
19 cited something that describes peer-to-peer from these
20 pre-claim period articles that occurred in the claim
21 period.
22    A  Well, if you're asking did I point to articles
23 during -- that were published in 2013 or '14, you,
24 yourself, pointed to that February 2014 article.  But

Page 167

1 what I've explained to you is that the activities that
2 these articles described continued on.  And I explained
3 to you also that even Ms. Frederiksen-Cross, she states
4 this as well.
5       For example, in her own report,
6 Ms. Frederiksen-Cross talks about lazy bitfield, and she
7 states that lazy bitfield happens in order to get around
8 antipiracy activities.  So in her own report, where she
9 is -- where she is talking about the lazy bitfield, she,
10 herself, is stating that there were antipiracy
11 activities going on in these networks, specifically on
12 the BitTorrent network.
13       So this is based on my understanding of the
14 technology, my understanding of how these technologies
15 work, how these peer-to-peer networks work, the purpose
16 behind the technologies, and the need to weed out fakes.
17 And like I'm stating, Ms. Frederiksen-Cross even talks
18 about these antipiracy activities that were happening on
19 BitTorrent and how lazy bitfield was used by some
20 clients for that purpose, to get around these antipiracy
21 activities that were happening.
22    Q  Could you go back to your Exhibit Share please
23 and open up Exhibit 286.  This is the -- Exhibit 286 is
24 the Kryczka TorrentGuard article that you've cited in

Page 168

1 your report.
2       (Document marked as Deposition
3       Exhibit 286 for identification.)
4    Q  Do you see that?
5    A  It's still loading for me.  Okay.  Now I've got
6 it.  Okay.
7    Q  Scroll to page 4 of the report under the
8 subheader Dataset Description.  It's actually
9 highlighted here.
10    A  Okay.  I see that.
11    Q  Do you see it says, we have applied the
12 described methodology between April 30th, 2011 and
13 May 13th, 2011, in addition to five days of warmup phase
14 dedicated to identifying the initial fake publishers' IP
15 addresses?  Do you see that?
16    A  I do.  It's highlighted as you indicated.
17    MR. HAMSTRA:  I'll just note an objection for the
18 record that the numbering doesn't appear to track the
19 numbering on the citation in Dr. Chatterjee's report.
20 But you can continue, Mr. Gould.
21    MR. GOULD:  What are you referencing, Nate, please?
22    MR. HAMSTRA:  There's a reference in his report to
23 something appearing at pages 77 through 90, and this
24 does not have that pagination.  I'm not sure if there

Page 169

1 were multiple versions or what.  But I'm just stating
2 something for the record.
3    MR. GOULD:  Sure.  Noted.  And I'll just say for the
4 record this is the copy of the Kryczka TorrentGuard
5 article that defendants produced in connection with
6 Mr. Chatterjee's report, including his reliance
7 materials.
8    MR. HAMSTRA:  Okay.
9    MR. GOULD:  Q  And you see, Dr. Chatterjee, on the
10 left vertical column of page 1 it's got a CSCR date of
11 April 19th, 2012?
12    A  On page 1, on the cover page?
13    Q  Yes, there's a vertical box that has the April
14 2012 date.
15    A  Oh, okay.  On the far left?
16    Q  Do you see that?
17    A  Yes.  On the far left written vertically?
18    Q  And if you look back at your report, on the very
19 last page, the Kryczka article is described as CSCR
20 April 19th, 2012.
21    A  Okay.  I see it, April 19, 2012.
22    Q  I want to turn to your rebuttal report, which is
23 Exhibit 284.  Again, I want to go to the reliance
24 materials -- excuse me, the materials considered at the

43 (Pages 166 - 169)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 170

1 last couple of pages. Let me know when you're there.

2     A  I'm on the last page of the materials considered

3 of my rebuttal report.

4     Q  So you cited a couple of the same reports a

5 second time, the Liang article from 2005, towards the

6 bottom, then on the next page the Kryczka article we

7 just looked at, analyzing data from 2011 and published

8 in 2012, and the Cuevas article from 2010.  Do you see

9 that?

10     A  I see the Cuevas article, yes.

11     Q  And then there's two additional articles listed

12 on that prior page.  The first one is Dhungel,

13 D-H-U-N-G-E-L, A Measurement Study of Attacks on

14 BitTorrent Leachers.  You see that was published in

15 February of 2008?

16     A  Okay.  I see that.

17     Q  And then right below that there's an article by

18 someone named Balhara, B-A-L-H-A-R-A.

19     A  I see that.

20     Q  A Review on Torrent and Torrent Poisoning Over

21 the Internet.  And this one, you see, is dated January

22 2016.

23     A  I see that.

24     Q  I want to take a look at that Balhara article

Page 171

1 briefly.  That should be in your Exhibit Share, Exhibit

2 287.

3          (Document marked as Deposition

4          Exhibit 287 for identification.)

5     A  Okay.

6     Q  Exhibit 287 is the article by Pooja Balhara, A

7 Review of Torrent and Torrent Poisoning Over the

8 Internet.  And if you can just scroll to the very last

9 page to begin.  Sorry, the second-to-the-last page,

10 there's a section called References.

11     A  Okay.  I see that.

12     Q  You see that all 10 references in this Balhara

13 article at Exhibit 287 are dated between 2007 and 2010?

14     A  I quickly skimmed through them.  It seems like

15 the references that are cited by this paper are dated

16 2007 to 2010.

Page 172

Page 173

18     Q  What's the prevalence of fake files or decoys or

19 pollution in the -- during the 2013 to 2016 period?

20     A  That it existed.

21     Q  What is the prevalence, how frequently did that

22 occur in the 2012 to 2016 period?

23     A  Off the top of my head, I don't remember and --

24 But the point is, and I've made this point a number of

44 (Pages 170 - 173)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 174

1 times for you already, that the point is that it's
2 well-known, it's well-understood, Ms. Frederiksen-Cross
3 even talks about it, that there are fakes, there are
4 jamming activities, there are content pollution,
5 metadata pollution, index pollution that happens and has
6 continued to happen --
7   Q  I got it.
8   A  That's the fundamental point.

Veritext Legal Solutions

www.veritext.com      888-391-3376

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
www.veritext.com                    888-391-3376

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
www.veritext.com                                    888-391-3376

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
www.veritext.com                                    888-391-3376

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions

www.veritext.com                                                     888-391-3376

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 246

███████████████████████████

███████████████████████████

████████

4    MR. GOULD:  I have no further questions.  Dr.

5 Chatterjee, thank you for your time.  I appreciate it.

6    MR. HAMSTRA:  I will -- I don't have any further

7 questions.  I will reserve signature.

8        I think we should probably designate this, at

9 least provisionally, as Highly Confidential, Attorneys'

10 Eyes Only for the third-party evidence discussed.

11    THE VIDEOGRAPHER:  Okay.  The time is approximately

12 6:16 p.m.  We are going off the video record.

13

14

15

16

17

18

19

20

21

22

23

24

Page 248

1        Witness my official signature and seal as

2 Notary Public in and for Cook County, Illinois on this

3 8th day of October, A.D. 2021.

4

5        *Nadine J. Watts*

          NADINE J. WATTS, CSR, RPR

6        License No. 084-002736

         Notary Public

7        One North Franklin Street

         Suite 3000

8        Chicago, Illinois 60606

         Phone:  (312) 442-9087

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 247

1 STATE OF ILLINOIS  )

                     )  SS:

2 COUNTY OF C O O K  )

3        The within and foregoing deposition of the

4 aforementioned witness was taken before NADINE J. WATTS,

5 CSR, RPR and Notary Public, at the place, date and time

6 aforementioned.

7        There were present during the taking of the

8 deposition the previously named counsel.

9        The said witness was first duly sworn and was

10 then examined upon oral interrogatories; the questions

11 and answers were taken down in shorthand by the

12 undersigned, acting as stenographer and Notary Public;

13 and the within and foregoing is a true, accurate and

14 complete record of all of the questions asked of and

15 answers made by the forementioned witness, at the time

16 and place hereinabove referred to.

17        The signature of the witness was not waived,

18 and the deposition was submitted, pursuant to Rules

19 30(e) of the Rules of Civil Procedure for the United

20 States District Courts, to the deponent per copy of the

21 attached letter.

22        The undersigned is not interested in the

23 within case, nor of kin or counsel to any of the

24 parties.

Page 249

1            Veritext Legal Solutions

             1100 Superior Ave

2            Suite 1820

             Cleveland, Ohio 44114

3            Phone: 216-523-1313

4 October 8, 2021

5 To: NATHAN M. HAMSTRA

6 Case Name: Warner Records, Inc., et al. v. Charter Communications,

7 Inc.

8 Veritext Reference Number: 4822026

9 Witness:  Sandeep Chatterjee, Ph.D.   Deposition Date:  10/5/2021

10

   Dear Sir/Madam:

11

12 Enclosed please find a deposition transcript.  Please have the witness

13 review the transcript and note any changes or corrections on the

14 included errata sheet, indicating the page, line number, change, and

15 the reason for the change.  Have the witness' signature notarized and

16 forward the completed page(s) back to us at the Production address

   shown

17

   above, or email to production-midwest@veritext.com.

18

19 If the errata is not returned within thirty days of your receipt of

20 this letter, the reading and signing will be deemed waived.

21

   Sincerely,

22

   Production Department

23

24 NO NOTARY REQUIRED IN CA

63 (Pages 246 - 249)