# Exhibit XLVIII

# Plaintiffs' Exhibit 6

Page 1

1      UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF COLORADO
2
3
4  WARNER RECORDS, INC.,       )
                               )
5         Plaintiff,           )
                               )
6  v.                          ) Civil Action No.
                               ) 1:19-cv-00874
7  CHARTER COMMUNICATIONS      )
   INC.,                       )
8                              )
         Defendant.            )
9
10
11
12
13
14
15
16
17
18      VIDEOTAPED ZOOM REALTIME DEPOSITION of ARAM
19  SINNREICH, Ph.D., a Witness, taken on behalf of
20  the Plaintiffs before Peggy E. Corbett, CSR, CCR,
21  RDR, pursuant to Notice on the 6th day of
22  October, 2021, at the office of the witness, 9621
23  Lorain Avenue, Silver Spring, Maryland 20910.
24
25

Page 130
1  findings.
2     Q.  But the question is whether or not you
3  believe it is reliable, because you're the one
4  citing it in your report, right?
5     A.  Yes.
6     Q.  Do you believe this study, this report
7  is reliable?
8     A.  To an extent.
9     Q.  Okay, so what does that mean?
10    A.  Well, the more I know about their
11 methods and data, and what their top line
12 representation of the data means, the more I can
13 make a judgment as to its reliability.
14    Q.  Well, Mr. Sinnreich, I'm asking you
15 since you included it in your report, did you
16 believe at the time that you included it that the
17 study was reliable?
18    A.  To the extent to support the point that
19 I was making in my report, I did.
20 

Page 131
1  
22    Q.  So is there any reason to believe that
23 the survey was reliable for one purpose, that you
24 want to cite it for, but not reliable for another
25 purpose that you don't want to cite it for?

Page 132
1     A.  No.  As I testified, it's reliable to
2  the extent that I understand what the data are
3  and what the analysis of the data says.
4     Q.  But as you sit here today you don't know
5  whether -- what the data set was for the point
6  that you include in your report; is that correct?
7     A.  I cannot at the moment read the small
8  text at the bottom of the slide, so I can rely
9  upon the data on this slide to the extent that I
10 can understand who the population was and what
11 the cited figures purport to describe.  I can't
12 rely on it past that point.
13    Q.  Let me close that exhibit, please.  One
14 moment.  I'm just trying to grab an exhibit.
15 Okay.  To support your opinion that the music
16 industry -- yeah.  Excuse me.  Strike that.  To
17 support your opinion that music industry revenues
18 did not decline as a result of peer-to-peer, you
19 point to a survey that you did in the year 2000
20 when you worked for Jupiter; is that correct?
21    A.  I refer to a research report that I
22 published based on a survey fielded in 2000 while
23 I was working at Jupiter.
24    Q.  And is that research report titled,
25 "Digital Music Subscriptions"?

Page 133
1     A.  I believe that's part of the title of
2  the report.
3         (Exhibit 294 was marked by the
4  reporter for identification.)
5     Q.  (BY MR. OPPENHEIM)  Okay.  Let's take a
6  look at Exhibit 294, please.  You may have to
7  refresh to get it to come up.
8     A.  I've got it.
9     Q.  Okay.
10        MR. OPPENHEIM:  Andy, do you have
11 it?
12    A.  Now I do, yes.
13    Q.  (BY MR. OPPENHEIM)  So this is
14 Plaintiff's Exhibit 294.  Do you recognize this
15 document, Mr. Sinnreich?
16    A.  Yes.
17    Q.  What is it?
18    A.  This appears to be a full .pdf of a
19 research report that I served as an the principal
20 analyst on while I worked at Jupiter Research in
21 the year 2000.
22    Q.  And is this the research report you were
23 referring to a moment ago?
24    A.  Yes.
25    Q.  And this research report contains an

34 (Pages 130 - 133)

| Page 134 | Page 136 |
|---|---|
| 1 analysis of a consumer survey that was done; is<br>2 that correct?<br>3    A. Yes.<br>4    Q. Do you have any of the underlying<br>5 documents from the survey?<br>6    A. What do you mean by "underlying<br>7 documents"?<br>8    Q. Do you have the protocols that were<br>9 used?<br>10   A. No.<br>11   Q. Do you have a copy of the survey<br>12 instruments?<br>13   A. Partial.<br>14   Q. What do you mean by "partial"?<br>15   A. I have a document that contains some of<br>16 the questions that were asked on the survey.<br>17   Q. Do you have a list of all of the<br>18 questions?<br>19   A. I don't know. | 18   Q. Jupiter Communications doesn't exist any<br>19 more, does it?<br>20   A. I'm not sure whether --<br>21   Q. Excuse me, it's Jupiter Research. I<br>22 apologize. I got the name wrong. Go ahead.<br>23      Jupiter Research doesn't exist any more,<br>24 does it?<br>25   A. Not as a standalone company. |
| Page 135 | Page 137 |
| 3      MR. SCHAPIRO: That's for us to<br>4 decide, so we can take that up later.<br>5      MR. OPPENHEIM: Well, I'm asking<br>6 the witness if he has an objection.<br>7      MR. SCHAPIRO: He's not qualified<br>8 to make an objection, unless you're using the<br>9 word "objection" to mean something else. | 1   Q. Do you have any of the programming<br>2 instructions?<br>3   A. No.<br>4   Q. Do you know whether or not the survey<br>5 included screener questions?<br>6   A. I could not tell you for certain.<br>7   Q. Do you know whether you would have the<br>8 screener questions?<br>9   A. I personally did not field this, and<br>10 it's very unlikely that I would have the screener<br>11 questions that were used to select the response.<br>12   Q. Who fielded the survey?<br>13   A. Are we talking about the survey cited in<br>14 this report?<br>15   Q. Yes.<br>16   A. It was fielded by a research firm called<br>17 NFO.<br>18   Q. Who constructed the survey?<br>19   A. It was constructed by most of the people<br>20 who appear in the masthead of this report, and<br>21 then it was -- if you consider this part of<br>22 construction, it was programmed by NFO.<br>23   Q. And were you one of the people who<br>24 constructed the survey?<br>25   A. Yes. |



Case 1:19-cv-08871-JMF-MEH Document 643-4 Filed 09/22/23 USDC Colorado Page 6 of 14

| Page 138 | Page 140 |
|---|---|
| 1  Q.  In fact, you were the lead on this,<br>2  weren't you?<br>3     A.  Yes.<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25 | 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10     Q.  And that website was subject to a<br>11  significant amount of litigation, was it not?<br>12     A.  It was subject to litigation.<br>13     Q.  In fact -- sorry, go ahead.<br>14     A.  "Significant" is a value judgment.<br>15     Q.  Okay.  Michael Robertson was the founder<br>16  of MP3.com, right?<br>17     A.  To the best of my knowledge, he was.<br>18     Q.  He and MP3.com as a company were sued by<br>19  every one of the major record companies, correct?<br>20     A.  That is how I remember it.<br>21     Q.  And he and MP3.com were found liable for<br>22  copyright infringement, correct?<br>23     A.  I do remember the litigation ending in a<br>24  way that had a large dollar figure attached to<br>25  it.  I can't tell you sitting here for certain |

| Page 139 | Page 141 |
|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25 | 1  whether it was an award or a settlement.<br>2     Q.  You don't recall Judge Rakoff in the<br>3  Southern District of New York issuing a lengthy<br>4  opinion opining that MP3.com had engaged in<br>5  direct copyright infringement?<br>6           MR. SCHAPIRO:  Objection, asked and<br>7  answered, improper testifying by the attorney.<br>8     Q.  (BY MR. OPPENHEIM)  Does that refresh<br>9  your recollection?<br>10    A.  I cannot tell you definitively that<br>11  that's what happened.<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25 |

36 (Pages 138 - 141)

Veritext Legal Solutions

www.veritext.com                                                              888-391-3376

Page 194

1 by name in the report.
2  Q. Those are the only ones?
3  A. My opinion is about the normative
4 practices and relations within the industry, not
5 about the individual relationships between the
6 creative professionals whose works are reflected
7 in the list of alleged infringements and the
8 plaintiffs specifically.
9  Q. Let's talk about the normative practices
10 and relations, and let's start with music
11 publishers. A songwriter doesn't have to sign a
12 deal with a music publisher, do they?
13  A. Not a specific music publisher.
14  Q. Or any music publisher, do they?
15  A. It's much more difficult to collect
16 certain kinds of royalties without a music
17 publisher, so there's a strong incentive to sign
18 with a music publisher.
19  Q. They don't have to, right?
20  A. Nobody is putting a gun to their head to
21 my knowledge.
22  Q. And if they do decide to sign on with a
23 music publisher, there are hundreds or even
24 thousands of music publishers in the United
25 States they could sign with, right?

Page 195

1  A. I don't know the number of music
2 publishers in the United States.
3  Q. It's a large number, is it not?
4      MR. SCHAPIRO: Objection to the
5 form of the question.
6  A. I couldn't tell you the -- I could not
7 tell you the precise number and I'm not sure what
8 you mean by the word "large."
9  Q. (BY MR. OPPENHEIM) So Mr. Sinnreich, a
10 songwriter could choose to sign with any one of a
11 number of music publishers, if they decide they
12 want to do so, right?
13  A. It depends on the specifics of the case.
14  Q. In what situation does a songwriter not
15 have a choice about what music publisher they are
16 going to sign with?
17  A. There are many documented cases in which
18 songwriters are coerced into signing with a
19 specific publisher or threatened with not being
20 able to license their work.
21  Q. Do you have any facts to support the
22 claim that the plaintiffs in this case engaged in
23 that?
24  A. Not that I can recall off the top of my
25 head.

Page 196

1  Q. How many music publishing agreements
2 have you reviewed in your lifetime?
3  A. I don't know.
4  Q. What is the range of royalty rates that
5 you have seen in songwriter agreements?
6  A. I could not tell you specifically.
7  Q. Well, Don Passman says on Page 277 of
8 his book, "The most common starting deals are 75
9 percent, but if you've got enough heat and
10 bargaining power, you can get up to 90 percent,
11 (rarely more, unless you are the most mega of
12 stars)."
13     Do you have any reason to disagree with
14 what Don Passman said in his book about the
15 starting point on royalty rates for songwriter
16 agreements?
17     MR. SCHAPIRO: Objection, lack of
18 foundation.
19  A. It's an incomplete excerpt. My memory
20 of Don Passman's discussion in Music Publishing
21 is that it nets out closer to about 50 percent,
22 but I have no reason to dispute the veracity of
23 his analysis or claims as a whole.
24  Q. (BY MR. OPPENHEIM) But in your report
25 you reference 10 to 20 percent, and then you say

Page 197

1 it gets cut in half to single digits. You don't
2 reference 75 or 50 percent, do you?
3  A. Are you talking about music publishing
4 contracts or recording contracts, because those
5 are two different things with two very different
6 royalty rates.
7  Q. So are you saying that in your report
8 when you reference a rate of between 10 and 20
9 percent, that you're only referring to record
10 company contracts?
11  A. I used the term "artist" in that
12 sentence, which is typically the way that we
13 refer to people who sign recording contracts.
14  Q. Okay. So although you're condemning
15 music publishers as being exploitive, you don't
16 include the fact that between 75 and 90 percent
17 of the royalties that music publishers collect
18 generally go to the songwriters in your report;
19 is that right?
20     MR. SCHAPIRO: Objection to the
21 form of the question.
22  A. I don't think that's a fair and accurate
23 description of Don Passman's analysis of music
24 publishing.
25  Q. (BY MR. OPPENHEIM) Did you review the

Page 198

1 publisher of financial documents in this case?
2    A.  I don't believe I cited any such
3 document in my report.
4    Q.  That didn't answer my question.
5    A.  I only reviewed the documents that I've
6 cited in my report in connection with my opinions
7 in this case.
8    Q.  So you didn't bother to review the Music
9 Publisher documents to see what percentage of the
10 revenues they collected went to songwriters; is
11 that what you're saying?
12   A.  I was not given access to those
13 documents.
14   Q.  Did you ask for them?
15   A.  No.
16   Q.  Let's turn to the record companies. How
17 many record company contracts have you reviewed
18 in your lifetime?
19   A.  I don't know.
20   Q.  Other than Kanye West, have you reviewed
21 any other record company contracts for artists in
22 this case?
23   A.  Artists cited in the list of alleged
24 infringements?
25   Q.  Correct.

Page 199

1    A.  I would have to review the list to give
2 you an accurate answer.
3    Q.  Okay. I think you said you reviewed it
4 before you gave your opinion. When you gave your
5 opinion about the music industry being highly
6 exploitive, excuse me, the music industry
7 exploiting of creative labor, did you have any
8 particular artist in this case in mind?
9    A.  No.
10   Q.  And like songwriters, recording artists
11 have a choice about whether or not to enter into
12 a contract with a record label, right?
13   A.  It depends on the specificities of the
14 situation.
15   Q.  In what situation does a recording
16 artist have to sign a contract with a record
17 company?
18   A.  It's not a binary "have to, can't."
19 There are various forms of persuasion and
20 coercion that can be brought to bear in various
21 situations.
22   Q.  But if a recording artist is persuaded
23 to sign a record company contract, that's not
24 exploitation; that's persuasion, right?
25        MR. SCHAPIRO: Object to the form

Page 200

1 of the question.
2    A.  I'm not characterizing a requirement
3 that recording artists sign a given record label
4 contract as the definition of exploitation.
5    Q.  (BY MR. OPPENHEIM) But artists can
6 choose whether or not to sign a record company
7 contract or not, right?
8    A.  If you want to boil it down to a binary
9 yes or no, then yes, they can choose not to sign
10 a record company contract.
11   Q.  But, in fact, most artists still want a
12 record company deal, right?
13   A.  I don't have the basis upon which to say
14 what most artists want.
15   Q.  Well, Don Passman on Page 77 of his book
16 that you cite says: "As of this writing most
17 mainstream artists still want to sign to a record
18 company. Apart from guaranteeing you money (so
19 you can avoid sleeping on park benches while
20 creating your music), the record companies have
21 the resources to get your music heard above the
22 noise of all the other artists out there. They
23 have staffs of people with experience in
24 marketing and promotion, relationships with
25 streaming services that can get your music

Page 201

1 featured, and radio relationships that can get
2 you air play. Also the major labels have massive
3 amounts of data from all over the world which
4 they use to develop strategies. So for these
5 reasons, a lot of artists choose to go the label
6 route, and these even includes artists that do
7 quite well on their own."
8        Do you dispute with Don Passman's
9 conclusion that most mainstream artists still
10 want to sign to a record label?
11       MR. SCHAPIRO: Objection, that was
12 a whole paragraph.
13   A.  I have no basis upon which to dispute
14 the excerpt from Passman's book?
15   Q.  (BY MR. OPPENHEIM) And when a recording
16 artist chooses to sign with a record company,
17 they can retain the services of a lawyer to
18 represent them, right?
19   A.  Correct.
20   Q.  And in fact, most artists are
21 represented by counsel when they negotiate a deal
22 with a record label, correct?
23   A.  I am not privy to those relationships,
24 and there's no way for me to answer.
25   Q.  And, in fact, those attorneys are quite

Page 202

1 powerful in the negotiations, aren't they?
2    A.  I'm assuming that they are.
3        MR. SCHAPIRO:  Hold on, objection,
4 vague and ambiguous.
5    A.  Can you rephrase your question, please.
6    Q.  (BY MR. OPPENHEIM)  And those attorneys
7 that recording artists retain to negotiate with
8 record labels often have quite a bit of power,
9 don't they?
10   A.  There is a small number of record
11 industry attorneys representing a small portion
12 of recording artists who have what is reported to
13 be a significant amount of power in the recording
14 industry.
15   Q.  So if Don Passman wrote that the lawyers
16 have evolved into one of the most powerful groups
17 in the industry, you wouldn't have a basis to
18 dispute that, would you?
19   A.  I think, I would have to evaluate the
20 context of the passage that you're quoting.  My
21 personal experience, having analyzed the industry
22 for decades, is that the Legal Departments at
23 record labels have become more powerful over the
24 course of that period in time.
25   Q.  So you disagree with Don Passman?

Page 203

1        MR. SCHAPIRO:  Objection, form of
2 the question.
3    A.  I did not say that I disagree with Don
4 Passman.  I'm not sure why you did.
5    Q.  (BY MR. OPPENHEIM)  So your opinion is
6 that artists generally contract for a royalty
7 rate between 10 and 20 percent of wholesale
8 music, wholesale cost of music, right?
9    A.  That's my understanding.
10   Q.  Okay.  If Don Passman wrote on Page 92
11 of his book that the rate is 15 to 17 percent for
12 new artists, 17 to 20 percent for more
13 established artists, and over 20 percent for
14 superstar artists, would you disagree with him?
15   A.  No.
16   Q.  So the range is between 15 and 20 plus
17 percent, correct?
18   A.  The range is even broader than that.
19 The superstar list that he's referring to who get
20 more than 20 percent are a fraction of the
21 percentage of artists.  They are statistically
22 irrelevant.
23       MR. SCHAPIRO:  Objection.  Can I
24 just interject about the transcript, the
25 transcript of your question, Matt, said "so the

Page 204

1 range is between 50 and 20 plus percent."  I
2 heard 15.
3        MR. OPPENHEIM:  Yeah, that's what I
4 said, so Peggy, will you correct that, please.
5        THE REPORTER:  I have written that,
6 but unfortunately when I make a correction on
7 this end, it doesn't come to your end, so sorry.
8        MR. SCHAPIRO:  Oh, okay.
9    Q.  (BY MR. OPPENHEIM)  That's fine.  I just
10 want to make sure, because I agree with Andrew,
11 that would be a fairly dramatic transcript issue.
12       So Mr. Sinnreich, you said that the
13 superstar list of artists who get more than 20
14 percent is only a fraction of a percentage of
15 artists.  I think that's what you just said,
16 right?
17   A.  By definition, yes, that's what a
18 superstar is.
19   Q.  Would you include Adelle as a superstar
20 artist?
21   A.  Yes.
22   Q.  She's in this case, right?
23   A.  I would have to review the exhibit
24 listing the list of allegedly infringed works.
25   Q.  How about Beyoncé, is she a superstar

Page 205

1 artist?
2    A.  Yes.
3    Q.  I'll represent to you she is in this
4 case.  How about Whitney Houston, is she a
5 superstar artist?
6    A.  I'm not sure what her current sales
7 figures are, but she has been a superstar artist.
8    Q.  I'll represent to you she's in this
9 case.  How about Pink?  Is she a superstar
10 artist?
11   A.  That's an interesting question.  I'm not
12 sure whether she meets the description of
13 superstar artist that Passman was using in that
14 passage.
15   Q.  How about Maroon 5?
16   A.  What's your question?
17   Q.  Are they a superstar artist?
18   A.  They were for a period of time.
19   Q.  During the period of 2013 to 2016, say
20 in the claims period of this case?
21   A.  I would have to review the industry data
22 to be certain, but it's possible.
23   Q.  How about Prince?  Was he a superstar
24 artist during that period?
25   A.  That's also an interesting question.

Page 206
1  Yeah, I would say that he counts.
2      Q.  How about -- I'm sorry, go ahead,
3  please.
4      A.  Well, Prince very famously had a
5  contentious relationship with his labels, and I
6  think the details of his contractual
7  relationships with the labels, for that reason is
8  non-representative.
9      Q.  How about Michael Jackson?  Was he a
10 superstar artist?
11     A.  He was.
12     Q.  He is in this case.  Now in your report
13 you don't describe escalations, do you?
14     A.  No.
15     Q.  And in fact, artists' contracts
16 generally include escalations, right?
17     A.  I know that it's something that appears
18 in some artists' contracts and not in others.
19     Q.  And that would increase the royalty rate
20 that an artist receives, right?
21     A.  By definition.
22     Q.  And then you opine that quote:
23 "Contractual clauses regarding issues like
24 packaging, free goods, reserves, and breakage can
25 cut the effective royalty by as much as half,

Page 207
1  entitling artists to only single-digit
2  percentages."
3         For contracts that were entered into
4  during the digital age, is that true?
5      A.  I know that clauses like breakage and
6  packaging have evolved in the digital age.  Free
7  goods and reserves I believe are still fairly
8  frequently included in such contracts.
9         Nowadays there's something called
10 digital breakage that I don't think I mentioned,
11 and there are clauses like new technology
12 investments that have in some cases replaced
13 packaging, but these are just emblematic.  There
14 are a wide variety of clauses that can, and
15 argues to effectively cut royalty rates paid out
16 to artists who sign these contracts.
17     Q.  Free goods is not a position that are in
18 modern artists' contracts, correct?
19     A.  I don't have a basis on which to say
20 that they are no longer included in contracts.
21     Q.  Do you have a basis to say that the free
22 goods provisions remain in contracts?
23     A.  I have signed contracts with book
24 publishers in recent years that included free
25 goods clauses and I have not heard or seen

Page 208
1  evidence that free goods clauses have been
2  eradicated from recording contracts.
3         But if you represent to me that they
4  have, I have no reason to dispute that.
5      Q.  What music contracts for any major
6  labels have you reviewed so that you have a basis
7  to opine on packaging free goods, reserves and
8  breakage clauses?
9         MR. SCHAPIRO:  Objection to the
10 premise of the question.
11     A.  The basis of my citation to those
12 clauses is the Don Passman Chapter 8, which I
13 cite in Footnote 34 of my report, but I have also
14 reviewed over the years a fair number of
15 contracts that have included such clauses.
16     Q.  (BY MR. OPPENHEIM)  Contracts with major
17 record companies?
18     A.  Yes, among others.
19     Q.  For what artists?
20     A.  I don't remember most of them
21 specifically off the top of my head.  I remember
22 Kenny Rogers' contract, I remember the Kanye West
23 contract.  I've also seen contracts that were not
24 published, but were that artists and artist
25 representative have shown me over the years, some

Page 209
1  of them with major labels.
2      Q.  Okay, which labels?
3      A.  I can't recall them off the top of my
4  head.
5      Q.  A moment ago you said that there was no
6  more breakage in the old sense in contracts, but
7  there was a new sense of breakage in the
8  agreements, or something to that effect; is that
9  right?
10     A.  There's a term called digital breakage
11 which has been used over the past decade or so.
12     Q.  And you, in fact, referenced that in
13 your opinion, right, as unallocated advances?
14     A.  I believe so, yes.
15     Q.  Isn't it, in fact, true that unallocated
16 advances from DSPs are always shared with the
17 artists?
18     A.  That's not what the testimony before
19 Congress that I cite says.
20     Q.  So what testimony are you relying on?
21     A.  I'm going to have to look through my
22 report and find it, but there was testimony from
23 2014 by the then head OF, I believe it was A2IM,
24 talking about digital breakage.  It would be
25 listed in my rebuttal report.  I don't see it

53 (Pages 206 - 209)

|  | Page 210 |  | Page 212 |
|---|---|---|---|
| 1 | here. | 1 | its acts," and then they even show the |
| 2 | Q. Isn't it, in fact, true that all of the | 2 | distribution of the breakage, right? |
| 3 | three major record companies have publically | 3 | A. For a specific act, yes. |
| 4 | stated that they share all unallocated advances | 4 | Q. And then later on Page 3 in bold it |
| 5 | with artists? | 5 | says, "Warner Music shares all advances, minimum |
| 6 | A. I don't know. | 6 | guarantees and flat fees with its artists," |
| 7 | (Exhibit 295 was marked by the | 7 | right? |
| 8 | reporter for identification.) | 8 | A. I see that the article says that. |
| 9 | Q. (BY MR. OPPENHEIM) Let's look at | 9 | Q. And then it goes on to say, "This policy |
| 10 | Exhibit 295, please. This is an article from | 10 | has been in effect at Warner Music since 2009," |
| 11 | Billboard on the bottom of the third page: "Sony | 11 | correct? |
| 12 | Music responded to a request by Billboard with a | 12 | A. It does say that. |
| 13 | statement on the company's policy on breakage, | 13 | Q. Do you have any reason to dispute the |
| 14 | the term given to revenue from the recording | 14 | three articles you just read which they quote |
| 15 | business that is not designated for artists and | 15 | representatives of all three major record |
| 16 | is able to be 'grabbed' by labels. Sony Music | 16 | companies saying that they share breakage with |
| 17 | historically has shared digital breakage with its | 17 | their artists? |
| 18 | artists, and voluntarily credits breakage from | 18 | A. Yes. |
| 19 | all digital services to artist accounts." That's | 19 | Q. And what -- how can you -- why do you |
| 20 | what it says, right? | 20 | dispute? What is your basis for disputing those |
| 21 | A. It does say that. I see it. | 21 | exhibits? |
| 22 | (Exhibit 296 was marked by the | 22 | A. What prompted these articles was |
| 23 | reporter for identification.) | 23 | widespread outcry by artists that they were not |
| 24 | Q. (BY MR. OPPENHEIM) Okay. Let's go to | 24 | being compensated for digital breakage, and in |
| 25 | Exhibit 296, please. This is an article from | 25 | addition to that, I have published research in |

|  | Page 211 |  | Page 213 |
|---|---|---|---|
| 1 | Music Business World, correct? The very first | 1 | which I have interviewed the music industry |
| 2 | paragraph it says: "Universal Music Group has | 2 | attorneys who have reported the same thing to me. |
| 3 | confirmed to MBW," referring to Music Business | 3 | Q. Wasn't it widespread outcry that they |
| 4 | World, "that it shares advances and 'breakage' | 4 | didn't know that they were getting paid breakage, |
| 5 | cash from the likes of Spotify and YouTube with | 5 | not that they weren't getting paid breakage? |
| 6 | its artists as a matter of business policy." | 6 | MR. SCHAPIRO: Objection, |
| 7 | Right, that's what it says? | 7 | foundation. |
| 8 | A. It says they assign surplus income in | 8 | A. You would have to look at a specific |
| 9 | 2015 to their acts. | 9 | instance of the outcry to answer that question. |
| 10 | Q. The next paragraph says: "All three | 10 | Q. (BY MR. OPPENHEIM) Looking at the |
| 11 | major recorded music companies have now | 11 | artists whose works are in this case, can you |
| 12 | guaranteed that, in 2015 at least, they assign | 12 | identify a single one that received a single |
| 13 | surplus income from much-discussed 'minimum | 13 | digit royalty rate? |
| 14 | revenue guarantees' to their acts." Right? | 14 | A. Do you mean an effective royalty rate |
| 15 | A. I don't see where it says that. Oh, I | 15 | that's in the single digits? |
| 16 | see. It says that, yes. | 16 | Q. Yes. |
| 17 | (Exhibit 297 was marked by the | 17 | A. Not specifically, no. |
| 18 | reporter for identification.) | 18 | Q. So you also opined that over the last 15 |
| 19 | Q. (BY MR. OPPENHEIM) And then if you go | 19 | years most of the record company contracts have |
| 20 | to the next exhibit, Exhibit 297, which is | 20 | been 360 deals, right? |
| 21 | another Music Business World article, it says | 21 | A. Yes. |
| 22 | here, "In the case of Warner Music Group MBW has | 22 | Q. How many 360 deals have you reviewed? |
| 23 | discovered it's a robust 'not guilty.' The | 23 | A. I don't know. |
| 24 | world's third biggest record company is | 24 | Q. Do you know what percentage of new |
| 25 | distributing at least a portion of this money to | 25 | contracts are 360 deals? |

| | |
|---|---|
| Page 214<br>1  A. I don't know specifically, no.<br>[redacted lines 2-14]<br>15  Q. So you opine in your report that many<br>16 artists rarely get a royalty check, correct?<br>17  A. I opine that by the recording industry's<br>18 own contractual logic and public statements, it's<br>19 a logical proposition that the majority do not<br>20 receive a royalty check subsequent to the initial<br>21 advance.<br>22  Q. And you don't include in your report a<br>23 statement subsequent to the initial advance, do<br>24 you?<br>25  A. I don't recall. | Page 216<br>1  A. Not specifically, no.<br>2  Q. When a record company pays an advance,<br>3 do they ask the artist to pay it back if the<br>4 album does not generate the revenues sufficient<br>5 to justify the advance?<br>6  A. In some ways, yes.<br>7  Q. How?<br>8  A. For instance, through<br>9 cross-collateralization.<br>10  Q. Explain how that works.<br>11  A. Cross-collateralization is the future of<br>12 multi-album deals in which labels have the right<br>13 to recoup on their accounting losses associated<br>14 with earlier releases before counting revenues<br>15 towards recoupments on the most recent albums.<br>16  Q. So you're just saying that the advance<br>17 applies to all the albums that are subject to the<br>18 record deal, not just one album, right?<br>19  A. That's not what I said.<br>20  Q. But isn't that effectively what you're<br>21 saying?<br>22  A. You prompted me with a question whether<br>23 there were contracts that required artists to pay<br>24 back unrecouped expenditures on their releases,<br>25 and I said yes, and then mentioned |
| Page 215<br>1  Q. Okay. But most artists do get an<br>2 advance, right?<br>3  A. I am not privy to the totality of the<br>4 record contracts.<br>5  Q. But based on the record contracts that<br>6 you have reviewed, isn't it, in fact, true, that<br>7 virtually every artist gets paid an advance?<br>8  A. That's my experience, yes.<br>9  Q. And that means that the record company<br>10 is assuming the risk that the recordings will not<br>11 generate revenue, right?<br>12  A. In theory, yes.<br>13  Q. And so if an artist never gets a royalty<br>14 payment, it simply means that the advance was<br>15 larger than the royalties would have been, right?<br>16  A. No.<br>17  Q. Why not? How is that wrong?<br>18  A. It's wrong because it's been a<br>19 historically common practice in the recording<br>20 industries to organize expenditures and<br>21 accounting in a way that reshifts the risk onto<br>22 the recording artist and guarantees profitability<br>23 for the label.<br>24  Q. Can you describe factually how that's<br>25 happened to any of the artists in this case? | Page 217<br>1 cross-collateralization as an example of how that<br>2 works.<br>3  Q. In that situation, the artist never<br>4 writes a check, wires money, or hands over cash<br>5 to the record company to pay back the advance,<br>6 right?<br>7       MR. SCHAPIRO: Objection to the<br>8 form of the question.<br>9  A. I'm not aware of that having taken<br>10 place.<br>11  Q. (BY MR. OPPENHEIM) All they are doing<br>12 is applying the advance to the royalties of an<br>13 album in the deal, right?<br>14  A. A single contract governs the economic<br>15 relations between a record label and the artist<br>16 spanning several releases in those cases.<br>17  Q. Do you believe it's unfair that an<br>18 artist who receives a half a million-dollar<br>19 advance but only sells $200,000 worth of music<br>20 doesn't receive any royalty checks?<br>21  A. It depends on the other revenue streams<br>22 associated with that piece of music.<br>23  Q. If the $200,000 covers all of the<br>24 revenue from all of the different sources, do you<br>25 believe that it's unfair that the artist never |

| | |
|---|---|
| Page 218 | Page 220 |
| 1 gets another royalty check? | 1 same. |
| 2  A.  No. | 2      The only reason that recording artists |
| 3  Q.  You include in your opinion the | 3 would be prevented from participating in the |
| 4 statement that signed artists are prevented from | 4 broader labor market, as you've described in your |
| 5 participating in the broader labor market, even | 5 report, is because the artist agrees not to |
| 6 during long periods in which they are not being | 6 participate in the broader labor market in some |
| 7 paid by the record labels, right? | 7 way, right? |
| 8  A.  Yes. | 8  A.  Are you referring to the terms of the |
| 9  Q.  The artists are only precluded from | 9 recording contract? |
| 10 doing recordings with other record companies, | 10  Q.  Yes. |
| 11 right? | 11  A.  That is the principal obstruction to |
| 12  A.  It depends on the nature of their | 12 their participating in the broader labor market, |
| 13 contract. | 13 correct. |
| 14  Q.  The artist is still free to compose, | 14  Q.  Okay.  Let's go off the record, if you |
| 15 right? | 15 wouldn't mind. |
| 16  A.  It depends on the specificities of the | 16      THE VIDEOGRAPHER:  Okay.  Going off |
| 17 contract. | 17 the record.  The time on the monitor, 4:16 p.m. |
| 18  Q.  If it's not a 360 deal, of which I will | 18      (Brief recess taken.) |
| 19 tell you there are very few and the witnesses | 19      THE VIDEOGRAPHER:  Okay, we're back |
| 20 will testify there are very few, if it's not a | 20 on the record.  The time on the monitor, 4:34 |
| 21 360 deal, an artist who signs a recording | 21 p.m. |
| 22 contract is free to compose and sell those | 22  Q.  (BY MR. OPPENHEIM)  Mr. Sinnreich, I |
| 23 compositions, correct? | 23 believe you testified earlier that you don't know |
| 24  A.  Yes. | 24 how many publishing agreements, recording |
| 25  Q.  The artist is free to perform publically | 25 contracts on 360 deals you have reviewed; is that |
| Page 219 | Page 221 |
| 1 and be paid for those performances, correct? | 1 correct? |
| 2  A.  It depends on the specificities.  360 | 2  A.  Yes. |
| 3 deals are not the only constraints on artists' | 3  Q.  Can you say that you reviewed more than |
| 4 ability to pursue other sources of revenue. | 4 10 of each? |
| 5      MR. SCHAPIRO:  Apologies, Matt, my | 5  A.  No. |
| 6 LiveNotes froze.  Is your LiveNote working?  I've | 6  Q.  Do you believe that you have reviewed a |
| 7 refreshed. | 7 sufficient number of publishing agreements and |
| 8      (Off-the-record discussion.) | 8 recording contracts to say that you have reviewed |
| 9      MR. SCHAPIRO:  Go ahead, that's | 9 what would be a representative sample of those |
| 10 fine, but just two, a couple more questions, but | 10 types of agreements that the majors entered into? |
| 11 ask them slowly so that I don't have to go back | 11  A.  Not from a statistical standpoint. |
| 12 and look at the transcript. | 12  |
| 13  Q.  (BY MR. OPPENHEIM)  To the extent that | |
| 14 an artist is prevented from participating in the | |
| 15 broader labor market, it's only because they have | |
| 16 agreed in a contract with the record company not | |
| 17 to, right? | |
| 18  A.  The record label's ability. | |
| 19  Q.  Hold on a second.  Peggy, are you good? | |
| 20 I'm sorry, Mr. Sinnreich. | |
| 21      (Off-the-record discussion.) | |
| 22  Q.  (BY MR. OPPENHEIM)  One last question, | |
| 23 Peggy, and then you can call them.  Okay, I | |
| 24 apologize, Mr. Sinnreich.  I'll ask the question | |
| 25 again, I don't guarantee it will be exactly the | |

Page 310

1 and Footnote 31 will take me to what?
2   A.  Presumably to the Los Angeles Times
3 article in question.
4   Q.  Okay, and do you have a copy of that Los
5 Angeles Times article?
6   A.  Probably somewhere in my files, yes.
7   Q.  Okay.  You didn't produce that or
8 reference it directly in your report, did you?
9   A.  No, I referenced my book.  Any time we
10 reference an academic book, we're incorporating
11 its summary of its sources cited, and the
12 presumption of credibility, I believe, should be
13 given to that book, unless you have a reason not
14 to.
15   Q.  I can't find the LA Times quote, so I'd
16 ask that you please produce the LA Times article.
17       MR. SCHAPIRO:  I'll take that under
18 advisement.
19   Q.  (BY MR. OPPENHEIM)  The last question,
20 and I know you need to go, Mr. Sinnreich, and
21 that is you say that the RAA was a client, RAA
22 and some of its members were clients of Jupiter
23 Research.  That just means that they were signed
24 up to receive Jupiter Research reports, correct?
25   A.  No.

Page 311

1   Q.  They didn't add -- the RAA and its
2 members never asked Jupiter Research to advise it
3 on any particular issues, did it?
4   A.  Yes.
5   Q.  Okay.  What issues did the RAA retain
6 Jupiter Research to advise it on?
7   A.  I remember multiple one-on-ones or small
8 room consulting sessions with RAA members
9 regarding strategic decision-making around the
10 digital music space.
11   Q.  And the RAA actually eventually fired
12 Jupiter and you because they disagreed with your
13 conclusions, correct?
14   A.  I have no idea.
15       MR. OPPENHEIM:  Okay.  I have no
16 further questions.
17       MR. SCHAPIRO:  Nor do we.  I'm
18 happy to go off the record.
19       THE VIDEOGRAPHER:  Okay.  This
20 concludes today's testimony.  Time on the monitor
21 7:07 p.m.  We're off the record.
22       (Deposition ended at 7:07 p.m.)
23
24
25

Page 312

1         C E R T I F I C A T E
2
3       I, Peggy E. Corbett, a Certified Court
4 Reporter of the State of Missouri, do hereby
5 certify:
6       That prior to being examined the witness
7 was by me duly sworn;
8       That said deposition was taken down by
9 me in shorthand at the time and place
10 hereinbefore stated and was thereafter reduced to
11 writing under my direction;
12       That I am not a relative or employee or
13 attorney or counsel of any of the parties, or a
14 relative or employee of such attorney or counsel,
15 or financially interested in the action.
16       WITNESS my hand and seal this 11th day
17 of October, 2021.
18
19
                    *Peggy E. Corbett*
20            PEGGY E. CORBETT,
            CCR No. 143, RDR, CRR
21
22
23
24
25

Page 313

1           Veritext Legal Solutions
            1100 Superior Ave
2              Suite 1820
            Cleveland, Ohio 44114
3           Phone: 216-523-1313
4
  October 11, 2021
5
  To: Andrew Schapiro, Esq.
6
  Case Name: Warner Records, Inc. v. Charter Communications Inc.
7
  Veritext Reference Number: 4837484
8
  Witness:  Aram Sinnreich, Ph.D.      Deposition Date:  10/6/2021
9
10 Dear Sir/Madam:
11
  Enclosed please find a deposition transcript.  Please have the witness
12
  review the transcript and note any changes or corrections on the
13
  included errata sheet, indicating the page, line number, change, and
14
  the reason for the change.  Have the witness' signature notarized and
15
  forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext.com.
18
  If the errata is not returned within thirty days of your receipt of
19
  this letter, the reading and signing will be deemed waived.
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA