# Exhibit LIII

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

WARNER RECORDS INC., *et al.*,

   *Plaintiffs*,

v.

CHARTER COMMUNICATIONS, INC.,

   *Defendant*.

Case No. 19-cv-00874-RBJ-MEH

**CHARTER'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

It is one thing to make allegations that survive dismissal at the pleading stage. It is another to be able to *prove* those allegations. After years of discovery, Plaintiffs cannot do so. On the contributory infringement claim, there is no evidence that Charter's intent was to foster infringement—much less evidence of intent in the form of "clear expression" or "affirmative steps." On the vicarious liability claim, there is no evidence that Charter received a direct financial benefit from the alleged infringement—no emails, no documents, no testimony from customers, *nothing at all*—that could establish that customers were drawn to Charter's services to infringe Plaintiffs' copyrights. The Court should grant Charter's motion and dismiss both copyright claims because no reasonable jury could find Charter liable on either count.

**I.    CHARTER IS NOT LIABLE FOR CONTRIBUTORY INFRINGEMENT**

   **A.    Plaintiffs' Legal Arguments About *Grokster* Are Wrong**

Plaintiffs misread *Grokster* and misapply its teachings. *First*, Plaintiffs argue that "intent is required only for an inducement claim … not for a material contribution claim." Opp. 5. There is no support for this argument in *Grokster* itself, and Plaintiffs cite no authority supporting their interpretation. Indeed, a simple review of the record in *Grokster* reveals that the Supreme Court

1

*rejected* such a rule where a defendant's liability is premised on distribution of a product or service with substantial noninfringing uses.[1] *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 919, 937, 939 n.12 (2005). Justice Ginsburg's concurrence confirms that point, listing the two and only two ways a defendant offering a product or service used to infringe becomes liable for contributory infringement: by "actively encouraging (or inducing) infringement through specific acts (as the Court's opinion develops)" or "distributing a product distributees use to infringe copyrights, if the product is not capable of 'substantial' or 'commercially significant' noninfringing uses." *Id.* at 942. Plaintiffs do not address this clear statement in their brief.

*Second*, Plaintiffs argue that intent to cause infringement need not be proven through "clear expression" or "affirmative steps" as *Grokster* directs, *id*. at 936-37, but rather may be "imputed" to Charter from its purported "substantial[] certain[ty]" that customers accused of infringing in the past would infringe again in the future. Opp. 6-8. This reading of *Grokster* is incorrect, and is precisely where the out-of-circuit courts cited by Plaintiffs faltered. *Grokster* holds the opposite—that where a defendant provides a service with a substantial noninfringing use (such as access to the Internet), intent to cause infringement *cannot be imputed by the mere provision of services to customers*—even if the defendant *knows* that some customers use the service to infringe. The non-

---

[1] The *Grokster* petitioners made two alternative arguments, urging the Supreme Court to allow liability based on Grokster's knowledge of infringement and continued "creation and operation of [its] services" (in other words, actual knowledge plus material contribution) *or* evidence showing Grokster intended to cause infringement. Br. for Pet'rs, 2005 WL 166587, at *24-27 (Jan. 24, 2005). Presented with both arguments, the Supreme Court held that where a defendant offers a product or service with a substantial noninfringing use, liability for contributory infringement lies if there is evidence of "affirmative steps" or "clear expression" by the defendant to foster infringement. 545 U.S. at 919. The Court further explained: a defendant's knowledge that the product or service *will in fact be used to infringe* is not enough on its own. *Id*. at 937, 939 n.12.

2

binding decisions cited by Plaintiffs cannot be reconciled with the Supreme Court's clear holding that liability exists only where there is evidence that it was a defendant's intended purpose—its *objective*—to foster infringement, as shown by *clear expression* or *affirmative steps*.

Nor can an intent to infringe be "imputed" from a defendant's continued provision of services to its subscribers after receiving notices alleging infringement by specific subscribers. Opp. 7-8. That very argument was presented to the Supreme Court in *Grokster*, and the Court *declined to adopt it*. The motion picture studio and recording company petitioners in *Grokster* argued—*exactly as Plaintiffs do here*—that the defendants should be liable because they continued to provide services to customers after receiving notices alleging infringement from the plaintiffs.[2] Br. for Pet'rs, 2005 WL 166587, at *8-9 (Jan. 24, 2005) ("Ignoring the notices, Grokster and StreamCast continued to provide the software, updates, and network maintenance needed for new users to join and old users to access the services."). Nevertheless, the Court held that intent to foster infringement must be proven with "clear expression" or "affirmative steps"—*not* imputed through a failure to terminate subscribers' access to an otherwise lawful service based on notices from copyright holders. *See* 545 U.S. at 937, 939 n.12. The Tenth Circuit has not adopted Plaintiffs' flawed reading of *Grokster*, and this Court should decline to do so.

### B. Plaintiffs Cannot Prove That Charter Intended To Cause Infringement

Plaintiffs' contributory infringement claim must be dismissed because there is no evidence that Charter intended to cause infringement. The record contains no emails, policy documents,

---

[2] The *Grokster* defendants were sent "notices identifying by file name, user name, and IP address over 8 million infringing files available on their systems, which represent infringement of more than 80,000 different sound recordings." Br. for Pet'rs, 2005 WL 166587, at *8 (quotations omitted).

3

presentations, or testimony that Charter had an objective to encourage infringement—because it did not. Dkt. 549-1 ("Haynes Decl.") ¶¶ 41-42. There is no "clear expression," nor "affirmative steps." There is no evidence that Charter shared subscribers' alleged desire to infringe. Rather, the undisputed facts demonstrate that ▌

▌

▌. Haynes Decl. ¶¶ 7-30, 41-42; Second Declaration of Mary Haynes ("2d Haynes Decl.") ¶¶ 3-4.

No facts cited by Plaintiffs could establish that Charter *intended* to cause infringement. *First*, Charter's reasonable policy ▌

▌ is not *in and of itself* evidence of a desire to participate in or benefit from the alleged infringement. Haynes Decl. ¶¶ 36-42; 2d Haynes Decl. ¶ 10. Additional evidence is necessary to draw an inference of intent—but there is none in the record. *Second*, that ▌

▌

▌

▌.[3] This statistic is not evidence of an intent to infringe; Charter's anti-infringement efforts were directed at these very subscribers. Haynes Decl. ¶¶ 7-30; 2d Haynes Decl. ¶¶ 3-4. Plaintiffs also criticize Charter's anti-infringement program (Opp. 11), but Plaintiffs' belief that Charter should have taken additional or different steps does not convert Charter's good faith efforts to curb infringement into bad intent.

---

[3] These numbers reflect subscribers who received notices from *all rightsholders*, not just from Plaintiffs. 2d Haynes Decl. ¶ 12.

4

Plaintiffs try without success to shoehorn the facts here into the categories of intent evidence identified in *Grokster*. Opp. 11-12. Plaintiffs first posit that Charter, like the *Grokster* defendants, was "aiming to satisfy a known source of demand for copyright infringement," but there is no evidence that Charter specifically targeted copyright infringers. *Id.* at 11. Plaintiffs next argue that Charter, like the *Grokster* defendants, " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, but this ignores Charter's anti-infringement program, which actively discouraged infringement. *Id.* at 12 (quotations omitted); Mot. 2-3, 8-9. Finally, Plaintiffs make the specious argument that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮s, an intent to foster infringement may be inferred. Opp. 12. But *Grokster* says that absent other evidence of intent to infringe, such an inference is not appropriate. 545 U.S. at 940 ("This evidence alone would not justify an inference of unlawful intent.").

### C. <u>Charter Did Not Have Actual Knowledge Of The Alleged Infringement</u>

The record also cannot establish that Charter had actual knowledge of the alleged infringement. Plaintiffs' theory is that Charter's receipt of notices alleging *past* infringement suffices to establish its actual knowledge of *future* infringement. Opp. 10-11. Logically, this argument is flawed. *See Millennium Funding, Inc. v. 1701 Mgmt. LLC*, 2021 WL 5882999, at \*13 (S.D. Fla. Dec. 13, 2021) (copyright notices do not give notice of any specific acts of infringement that are actually occurring) (quoting *ALS Scan, Inc. v. Steadfast Networks, LLC*, 819 F. App'x 522, 524 (9th Cir. 2020)). Moreover, the record does not support the conclusion that Charter *knew* (or was *substantially certain*) that if a subscriber received one notice it would receive others. If anything, Charter could have substantial confidence that a subscriber who received a few notices

5

would *not* infringe in the future, as research touted in CAS press releases stated that most subscribers would stop infringing after being notified. Haynes Decl. ¶ 16; Dkts. 601-19, 601-20 (Affidavit of Duncan Hall, Ex. A). Moreover, ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Haynes Decl. ¶¶ 31-35, Exs. B, C; 2d Haynes Decl. ¶¶ 5-9.

## II. CHARTER IS NOT LIABLE FOR VICARIOUS INFRINGEMENT

### A. Plaintiffs Cannot Show Charter Received Any Direct Financial Benefit

Plaintiffs present two theories of how Charter received a "direct financial benefit" from its subscribers' alleged infringement, neither of which is supported by the record. Opp. 13-16. Plaintiffs first argue subscribers were drawn to Charter to "pirate" Plaintiffs' works because Charter's network supported the use of BitTorrent protocol. Opp. 14-15. There is no evidence that Charter customers were *in fact* drawn to Charter's services for this reason. Literally none.[4] Plaintiffs argue that the mere fact that Charter's customers use BitTorrent protocol is evidence that those customers purchased Charter's services *for that purpose*, as opposed to any of the infinite number of other purposes for which one uses the Internet—but that is pure speculation. Further, every ISP supports the use of BitTorrent protocol by subscribers—and it has many lawful uses. 2d Haynes Decl. ¶ 11. Plaintiffs' arguments render the concept of "draw" meaningless.

As "evidence" of a "draw" to infringe, Plaintiffs point to the same advertisement they quoted in their Complaint, which touts the ability to download eight songs in eleven seconds. Opp.

---

[4] Plaintiffs cannot avoid this by pointing to the allegedly "staggering" scale of infringement on Charter's network, since no matter how many subscribers (purportedly) infringed after they purchased Internet service, that volume says nothing about *why* they purchased service. Opp. 15.

6

14. No reasonable jury could conclude that this single statement—which advertises a lawful activity upon which Plaintiffs' own business relies—is an appeal to would-be infringers, especially because there is no *other* evidence supporting that inference. Indeed, this statement is included in a five-page spread that similarly advertises other lawful activities, like the ability to quickly download "photos from family and friends" and access TV and movies through branded offerings like ESPN and YouTube. Dkts. 614-30 to 614-33. Plaintiffs also argue that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ customers were "drawn" to Charter's service. Opp. 15. That is pure unsupported conjecture. There is no evidence that even a single customer was drawn to Charter because of its anti-infringement practices.

Plaintiffs also argue that they need not prove customers were drawn to Charter's services over those of other ISPs. *See* Mot. 12-13. But the basic premise of a "draw" is that a customer selects one service, and not another, due to the allure of that service; if there was no difference between Charter and other ISPs in the eyes of would-be infringers (and there is no evidence that there was), then the infringers could not have been "drawn" to Charter. Certainly the Internet *itself* cannot be the "draw," or this element would always be satisfied for every ISP.[5]

As a backstop, Plaintiffs assert that they can prevail based on an "economic incentive theory" that is not articulated anywhere in the law. Opp. 15-16. Plaintiffs cite *no* case that holds a draw is not necessary, and their own Internet-age cases all rely on the "draw" theory. *See Disney*

---

[5] Plaintiffs are wrong that issues related to direct financial benefit were already resolved by the Court's order on Charter's motion to dismiss in *Charter II*. Opp. 13. The Court expressly stated that it "will address the issues, notably including what has or has not been developed in discovery, on motions for summary judgment in *Warner*." *UMG Recs., Inc. v. Charter Commc'ns, Inc.*, No. 1:21-cv-02020-RBJ-MEH, Dkt. 46 (Nov. 22, 2021). Those issues are now presented to the Court.

7

*Enters., Inc. v. Hotfile Corp.*, 2013 WL 6336286, at *39 (S.D. Fla. Sept. 20, 2013) (defendant "financially benefitted from [infringement] by attracting some users"); *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001) (affirming solely on grounds of "draw"). Instead, Plaintiffs point to early vicarious liability cases that predate the Internet and the development of "draw" as the standard for evaluating direct financial benefit in cases dealing with digital services. Opp. 16. As this Court held, "reliance on [such] cases is misplaced given that more recent and more applicable ISP, website host, and downloading service cases are available." Dkt. 157 at 10; *cf. UMG Recs., Inc. v. Bright House Networks, LLC*, 2020 WL 3957675, at *6 (M.D. Fla. July 8, 2020) (considering earlier cases and holding "'an economic incentive to tolerate infringing content,' standing alone" is not "sufficient to establish a direct financial benefit").

Plaintiffs' "economic incentive" argument—that Charter received subscription fees for Internet service from infringers and therefore Charter financially benefitted—allows too distant a relationship between infringement and proceeds, and reads the requirement that the financial benefit be "direct" out of the law. *See Grokster*, 545 U.S. at 930 n.9 (requiring that defendant "profit[] directly from the infringement"). In Plaintiffs' view, *any* company charging a monthly fee for *any* lawful service used to infringe would qualify. That is not the law.

### B. Charter Could Not Supervise The Conduct Of Its Subscribers

Plaintiffs do not dispute that Charter did not ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. Mot. 14-16. Thus, Charter did not have the "right and ability to supervise the direct infringer," as required under the law. *Grokster*, 545 U.S. at 930 n.9; *see also VHT, Inc. v. Zillow Grp. Inc.*, 918 F.3d 723, 746 (9th Cir. 2019) ("technical ability to screen out" infringing content dispositive for vicarious liability claim). The ability to *terminate* customers' Internet services is

8

not, as Plaintiffs wrongly suggest, equivalent to the ability to *supervise* subscribers' activities. Every ISP can turn off subscribers' service, much like an electric company can turn off customers' electricity. But neither Charter nor the electric company has the ability to supervise what its customers actually do with the services. *See* Mot. 14-16.[6] The cases cited by Plaintiffs, holding that termination by an ISP is equivalent to supervision of the directly infringing conduct as a matter of law, stretch the doctrine of vicarious liability too far, unmooring it from its *respondeat superior* roots. Opp. 13 n.6. Under this reading, the "right and ability to supervise" prong is rendered moot, because all service providers (in any industry) can always decline to provide service.

### III. THE NUMBER OF WORKS ELIGIBLE FOR AN AWARD SHOULD BE LIMITED

In response to Charter's extensive authority establishing that a recording/composition pair must count as one work for purposes of statutory damages, Plaintiffs make one point: that the Act uses the term "copyright owner," and not "owners," and therefore "the single-recovery rule applies only where the multiple copyrights have a single owner." Opp. 18-19. Plaintiffs cite no court, scholar, or other authority that has taken their view. Plaintiffs' sole case citation is a district court opinion that was expressly rejected. *See* Mot. 18 n.7.

Finally, on the ■ works not timely registered, Plaintiffs quibble that Charter "does not establish that there were no … notices following registration." Opp. 20. Although it is *Plaintiffs'* burden to prove that the registrations were valid, Charter submits with this Reply a declaration

---

[6] Plaintiffs are wrong that the Court's opinion on the motion to dismiss is "law of the case" that dictates the outcome on summary judgment. Opp. 13. This doctrine is "discretionary rather than mandatory," and district courts are "free to reconsider their earlier interlocutory orders." *Been v. O.K. Indus, Inc.*, 495 F.3d 1217, 1224-25 (10th Cir. 2007) (affirming district court resolving same issue differently at Rule 12 and summary judgment phases) (quotations omitted); *see also Charter II*, Dkt. 46 (Court would address issues raised by Charter in its motions to dismiss, "notably including what has or has not been developed in discovery, on motions for summary judgment").

9

showing that even the *last* notice pre-dates registration. Second Declaration of Andrew H. Schapiro, Ex. A.

## CONCLUSION

Charter respectfully requests that the Court grant its motion for summary judgment.

Dated: January 19, 2022

Charles K. Verhoeven
David Eiseman
Linda J. Brewer
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600 (telephone)
Email: charlesverhoeven@quinnemanuel.com
Email: davideiseman@quinnemanuel.com
Email: lindabrewer@quinnemanuel.com

Jennifer A. Golinveaux
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA 94111
(415) 591-1506 (telephone)
Email: jgolinveaux@winston.com

Michael S. Elkin
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
(212) 294-6700 (telephone)
Email: melkin@winston.com

Respectfully submitted,

By: /s/ *Andrew H. Schapiro*
Andrew H. Schapiro
Nathan Hamstra
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400 (telephone)
Email: andrewschapiro@quinnemanuel.com
Email: nathanhamstra@quinnemanuel.com

Todd Anten
Jessica Rose
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000 (telephone)
Email: toddanten@quinnemanuel.com
Email: jessicarose@quinnemanuel.com

Craig D. Joyce
Fairfield and Woods, P.C.
1801 California Street, Suite 2600
Denver, CO 80202
(303) 830-2400 (telephone)
Email: cjoyce@fwlaw.com

*Counsel for Charter Communications, Inc.*