# Exhibit I

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-00874-RBJ-MEH

WARNER RECORDS INC. et al.,

Plaintiffs,

v.

CHARTER COMMUNICATIONS, INC.,

Defendant.

---

## PLAINTIFFS' OPPOSITION TO CHARTER'S MOTION FOR CURATIVE MEASURES AND SANCTIONS FOR PLAINTIFFS' SPOLIATION OF EVIDENCE

---

There can be no real dispute that Charter's subscribers were infringing Plaintiffs' copyrights in mass or that Charter knew and did nothing to stop it. Nor is there any dispute that the audio files that Charter's subscribers downloaded and distributed contained Plaintiffs' copyrighted music and are infringing—indeed, Plaintiffs moved for partial summary judgment on this issue and Charter offered no contrary evidence. ECF 555 at 12-14; ECF 601 at 18-20.

Unable to *dispute* Plaintiffs' evidence of direct infringement, Charter now seeks to *exclude* it by complaining of ordinary-course—and inconsequential—deletion of other documents long before a duty to preserve arose. To do so, Charter presents a revisionist history of Plaintiffs' motivation for sending infringement notices, when Plaintiffs anticipated litigation, why MarkMonitor retained certain documents and not others, and alleged shortcomings in MarkMonitor's technical records.

Among other things, Charter claims that Plaintiffs spent "a decade" compiling evidence

"to assert claims against Charter." But the reality is that Plaintiffs sent notices to Charter for years in order to *avoid* the need for litigation, not in anticipation of it. Charter contends that Plaintiffs "selectively preserved" evidence, but in truth MarkMonitor retained everything required under the relevant contracts and necessary for sending notices. As detailed below, the notion that Plaintiffs cherry-picked only favorable evidence to retain has no basis in fact.

Even more egregious is Charter's repeated assertion that Plaintiffs' 2016 process of downloading files was an attempt to "recreate" missing or deleted evidence. It is undisputed that Plaintiffs sent notices from 2012-2015 identifying infringing files by their unique hash value, and it is undisputed that when Plaintiffs later went to prepare for suit, they gathered copies of files with the same unique hashes. That *collection* of evidence is what Charter insists on erroneously characterizing as "creation" or "recreation."

Against this backdrop, Charter's motion should be denied.

*First*, while fully half of Charter's spoliation allegations concern documents deleted in the ordinary course before January 2016, Charter fails to show—and cannot show—that Plaintiffs reasonably anticipated litigation until then. The *Sony v. Cox* court considered many of these same issues on Cox's similar spoliation motion and expressly found that during the same 2012-2015 notice program at issue here, Plaintiffs did *not* anticipate litigation, there was *no duty* to preserve anything more than the contracts governing the program outlined, Plaintiffs' retention efforts were *reasonable*, and there was *no* intent to deprive. Ex. 1 at 76:8-77:12 (Sept. 27, 2019 Cox Hr'g Tr.).[1] Those rulings apply equally here.

*Second*, Charter fails to demonstrate any meaningful prejudice caused by the loss of

---

[1] Exhibits are attached to the Declaration of Jeffrey M. Gould.

information after January 2016.  Charter complains that it is missing certain information from

Audible Magic and a small piece of computer source code that MarkMonitor used to interface

with Audible Magic in 2016.  Those two items are only relevant insofar as they identify what

sound recordings the 2016 downloads contain.  But because Charter has copies of the *actual* files

downloaded in 2016, there is no prejudice.  Charter can do any analysis it wants on those files—

including analyzing them with a content identification service like Audible Magic or listening to

them, as Plaintiffs' experts have done.  Moreover, MarkMonitor recently located one of the two

pieces of missing source code, and always retained a materially similar version of the other from

late 2016 (which Charter never asked to review).  With 10 months still before trial, MarkMonitor

has offered to promptly make both available for inspection, curing any theoretical prejudice.

*Third*, Charter's requested relief—including exclusion of all materials from the 2016

download project and all opinion testimony based thereon—is not logically connected, and is

grossly disproportionate, to any harm to Charter.  Rule 37(e) makes clear that any spoliation

sanction should be "no greater than necessary to cure the prejudice," of which Charter shows

virtually none.  Plaintiffs' case, however, relies heavily on the 2016 downloads, and Plaintiffs'

experts rely on them.  In seeking to preclude *everything* from the 2016 download project, Charter

seeks highly detrimental sanctions that are not tied to the alleged spoliation or harm.

## BACKGROUND

I. **From 2012-2015, RIAA engaged MarkMonitor for a Notice Program, not a litigation program.**

A. **The 2011 Master Agreement did not direct MarkMonitor to do any work.**

In an effort to combat online piracy, the Record Company Plaintiffs' trade association,

RIAA, hired MarkMonitor to send copyright infringement notices to ISPs.[2]  Marks Decl. ¶¶ 2, 5.

In December 2011, RIAA and MarkMonitor (then known as DtecNet) entered into a Master

Agreement, setting the framework for RIAA "to obtain from [MarkMonitor] certain services

('Services') as described in one or more statements of work (each a 'SOW')."  ECF 593-2 at 1

("2011 MSA").  The Master Agreement did not specify any work for MarkMonitor to do.

Rather, "[f]or each project requiring Services and/or Technology, the parties will execute" an

SOW, and "[e]ach SOW will specify the Services to be delivered to RIAA by [MarkMonitor] as

well as any timelines, payment terms and other project-specific details."  *Id.* at 4.

### B.  The 2012-2015 Statements of Work directed MarkMonitor to provide a "P2P notice program," not a litigation program.

RIAA and MarkMonitor then entered into an SOW each year from 2012-2015 setting

forth the services MarkMonitor would perform in connection with a "P2P notice program," not a

litigation program.  ECF 593-4 at 1 ("2012 SOW")[3]; Marks Decl. ¶ 6.  The purpose of the 2012-

2015 RIAA Notice Program was to provide *notice* to ISPs, like Charter, of specific instances of

infringement by IP addresses so that the ISPs could take appropriate action, since only the ISPs

know which subscribers are associated with which IP addresses.  Marks Decl. ¶ 6; McMullan

Decl. ¶ 5; Leak Decl. ¶ 5; Cohen Decl. ¶ 5.  The 2012-2015 SOWs defined the "Monitoring and

Notice sending" services, and made a clear distinction between "notice" and "litigation"

programs by expressly provided that the parties "will enter into a separate SOW, if mutually

agreeable" concerning, among other things, a "corporate p2p litigation program."  2012 SOW at

---

[2] The Music Publisher Plaintiffs are not members of RIAA.  Marks Decl. ¶ 3.

[3] As Charter notes (Mot. at n.2), the 2012, 2013, 2014 and 2015 SOWs are nearly identical.

23.  The parties never entered into such a litigation program.  Marks Decl. ¶ 6.

Under the 2012-2015 SOWs, MarkMonitor agreed to maintain (i) a "Verified Hash Database" to "record the hash values of all titles to build a database of infringing titles,"[4] and (ii) a "File Database" to "capture and maintain . . . all other pertinent details concerning the identified infringement and related notices ('evidence packages')."[5]  2012 SOW at 24-25, 34. The 2012-2015 SOWs detail, in turn, the "Data Capture and Storage" requirements for "certain data to be captured and maintained" in those databases.  *Id.*  The list of 19 items includes the ISP name, IP address and port number of the infringer, P2P network used, name of the infringing file (based on file name or hash value), verified hash value of the infringing file, date and time the infringement was detected, log files associated with evidence packages, full repertoire details (including artist name and track), and several other categories.  *Id.* at 33-34.

With two exceptions, MarkMonitor collected, retained, and has produced *every* item listed.[6]  The 2012-2015 SOWs did *not* obligate MarkMonitor to retain *any* of the documents, files, or source code that Charter alleges were spoliated.

---

[4] A "hash" or "hash value" is a unique identifier generated by a cryptographic algorithm for a specific file that acts as a file's "digital fingerprint."  Files with the same hash value are identical.

[5] Each "Evidence Package" contains six computer log files evidencing, among other things, the steps of MarkMonitor's investigation, MarkMonitor's communications with infringing peers, the list of files shared, and the trace route mapping the flow of connections between MarkMonitor and the infringing peer.  Ex. 2 at 652:3-657:21 (*Cox* Trial Tr.); *see also* 2012 SOW at MM 33.

[6] One item listed—screen shots evidencing MarkMonitor downloading from peers—was never generated because the service MarkMonitor provided involved hash matching rather than downloading.  Additionally, a number of evidence packages, nearly all of which pre-date the Claim Period, were lost in an inadvertent, unrecoverable hard drive failure.  Bahun Decl. ¶ 21. Neither item is a subject of Charter's motion.

5

### C. MarkMonitor's process for detecting infringement and sending notices.

In order to assess Charter's spoliation allegations, it is critical to understand MarkMonitor's process for detecting and noticing infringement on P2P networks at this time.

*File verification*: On the first instance of encountering a potentially infringing file, MarkMonitor downloaded the full file. It then used digital fingerprinting technology from Audible Magic, a leading content recognition service, to identify the file's contents by artist and title. Bahun Decl. ¶¶ 14-15. Audible Magic provided MarkMonitor a Software Development Kit ("SDK") that "makes it easy for developers to incorporate content identification into any application or device." Ex. 3 at 66920. MarkMonitor used the SDK to program a "wrapper"— *i.e.*, a small application "to process the file and send them to the Audible Magic service and receive results from them and pass that information and put it into our database." Ex. 4 (May 11, 2021 S. Paszkowski Dep. Tr. ("Paszkowski Tr.")) at 37:5-10. For each file that Audible Magic verified as one of Plaintiffs' copyrighted works, MarkMonitor logged in its database (i) the file's unique hash value and (ii) information from Audible Magic identifying the artist, track and album for the copyrighted works contained in the infringing file. Bahun Decl. ¶ 15.

*Infringement verification*: To detect P2P users infringing Plaintiffs' works, MarkMonitor's proprietary system connected with P2P users, including Charter subscribers, to confirm that the subscriber was online, running a file-sharing program, and in the process of distributing a confirmed infringing file, identified by its unique hash value. Bahun Decl. ¶ 18. MarkMonitor relied on the file's hash value to confirm that the file was identical to one that MarkMonitor verified was infringing using Audible Magic. Bahun Decl. ¶¶ 16-18; Paszkowski Tr. at 166:19-167:2; Ex. 5 (May 8, 2021 S. Marks Dep. Tr. ("Marks Tr.")) at 212:8-19.

All the technical experts in this case, including Charter's, agree that hash values reliably determine that one file is an exact copy of another—*i.e.*, that two files with the same hash value are identical and have the same contents. ECF 555-64 at 5-11 (Frederiksen-Cross Decl.); Ex. 6 (Sept. 28, 2021 K. Almeroth Dep. Tr.) at 145:7-9 ("If you have two different files and they are identical, they have the same hash values, so one is essentially a copy of the other"); Ex. 7 (Oct. 5, 2021 S. Chatterjee Dep. Tr.) at 43:22-44:2, 83:17-84:4.

*Notices*. Through this process, MarkMonitor sent millions of notices to ISPs from January 2012 through March 31, 2015, including ██████ notices to Charter. Bahun Decl. ¶ 20. The notices to Charter identified the subscriber by IP address, the date and time of the infringing act, the name of the file containing the infringing recordings, a hash value uniquely identifying that file, a representative sample of what was infringed listed by title and artist, and the P2P network used. Bahun Decl. ¶ 20. MarkMonitor saved records of these detections and these notices in the above-referenced File Database. Bahun Decl. ¶ 20.

In discovery, MarkMonitor produced from its Verified Hash and File Databases all the records that it agreed to maintain under the 2012-2015 SOWs, consistent with the parties' requests and responses.

## II. In the aftermath of the *BMG v. Cox* verdict, RIAA and MarkMonitor entered into the 2016 SOW expressly in anticipation of litigation.

For the 2012 Notice Program, MarkMonitor's last notice to Charter was dated March 31, 2015. On December 17, 2015, a jury in *BMG v. Cox* found Cox contributorily liable for its subscribers' infringements of musical works on P2P networks. Mot. at 6. That case was the first of its kind to establish the liability of an ISP for such claims. Thereafter, in early 2016, Plaintiffs and RIAA analyzed the data generated by the 2012-2015 RIAA Notice Program,

including the notices sent to Charter, in a new light.  Marks Decl. ¶ 7; McMullan Decl. ¶ 6;

Leak Decl. ¶ 6; Cohen Decl. ¶ 6.  Only then—in January 2016—did Plaintiffs begin to

reasonably anticipate litigation.  *Id.*; Marks Tr. at 220:16-221:3.

Accordingly, in January 2016, RIAA and MarkMonitor entered into a new SOW, this

time expressly "in anticipation of litigation."  Marks Decl. ¶ 8; ECF 593-21 at 90 ("2016

SOW").  MarkMonitor was to attempt to download files associated with up to 7,200 hashes.

2016 SOW at 90.  Plaintiffs' counsel selected the hashes based on analysis of data generated by

the 2012-2015 Notice Program.  Marks Decl. ¶ 8.  Downloaded files would be analyzed using

Audible Magic's identification tool.  2016 SOW.  MarkMonitor recorded Audible Magic's

identification of artist, track, and album for downloaded files that matched to Plaintiffs' works,

and noted where no match was found.  Bahun Decl. ¶ 11.  This process of gathering files with

hashes corresponding to notices helped inform counsel how best to assert Plaintiffs' claims,

including by conservatively limiting claims to those for which they had 2016 downloads.

In discovery, Plaintiffs produced the following from the 2016 download project:

- A hard drive containing all the downloaded hash files from the 2016 SOW.  For each recording in suit, these files match to infringement notices by hash value.  Anyone with the hard drive can listen to the audio recordings it contains.

- PCAP files (or packet capture logs) showing when and where the files associated with the hashes in the 2016 SOW were downloaded.

- A spreadsheet known as the "Hash Report," showing (i) the hashes MarkMonitor searched for pursuant to the 2016 SOW, (ii) which hashes MarkMonitor downloaded, (iii) Audible Magic's verified matches identifying the artist, track and album, and (iv) which files Audible Magic did not match.

Gould Decl. ¶ 6; Bahun Decl. ¶¶ 10-11.

### III.  Charter's Motion.

Charter alleges that Plaintiffs anticipated litigation as early as December 2011 and

spoliated the following five items:

1. MarkMonitor's initial audio file downloads that were verified by Audible Magic between 2008 and 2015 ("Song Files");

2. Audible Magic's "complete responses" to MarkMonitor, including ISRCs for verified files, both before and after January 2016 ("Audible Magic Responses");

3. MarkMonitor records of files it identified as suspected copyrighted works before 2016 that were not verified by Audible Magic ("Unverified Song Files");

4. Operable portions of source code used by MarkMonitor for Audible Magic file verification, during the 2012-2015 Notice Program and the 2016 download project ("Partial Source Code"); and

5. Emails of Sam Bahun, MarkMonitor's former Director of Strategic Accounts, who was involved in the Notice Program and resigned from MarkMonitor in 2017, then rejoined the company in 2018.

Mot. at 5. Charter generically contends that this has "limited [] its ability to challenge the reliability of the notices and their applicability to the songs downloaded in 2016." Mot. at 2, 12.

## **LEGAL STANDARD**

Rule 37 provides two remedial schemes. Under Rule 37(e)(1), the Court may sanction a party only where: (1) that party had a duty to preserve in anticipation of litigation, (2) a loss occurred because that "party failed to take reasonable steps to preserve it," (3) the information "cannot be restored or replaced through additional discovery," and (4) there is "prejudice to another party from [the] loss of the information." Fed. R. Civ. P. 37(e)(1). Upon such findings, the Court "may order measures no greater than necessary to cure the prejudice." *Id.* Rule 37(e)(2) creates a separate remedy upon a showing of bad faith. Thus, if a "party acted with the intent to deprive another party of the information's use in the litigation," the Court may, among other things, "presume that the lost information was unfavorable" and "instruct the jury that it may or must presume the information was unfavorable to the party."

## ARGUMENT

### I.    Plaintiffs had no duty to preserve prior to January 2016.

Rule 37(e) "does not apply when information is lost before a duty to preserve arises."

Fed. R. Civ. P. 37(e), 2015 Advisory Committee notes.  Under Tenth Circuit law, "a party has a

duty to preserve evidence [when] it knew, or should have known, that litigation was imminent."

*Equal Emp. Opportunity Comm'n v. JetStream Ground Servs., Inc.,* 878 F.3d 960, 964 (10th Cir.

2017); *see also Aqua-Hot Heating Sys., Inc. v. Gorman-Rupp Co.*, 2018 WL 6249886, at *12 (D.

Colo. Nov. 29, 2018) (Jackson, J.) (holding "plaintiff has met the objective standard of showing

that litigation was not imminent until early 2017" because "it had no intention of suing defendant

until early 2017").  A theoretical possibility of litigation does not mean litigation is imminent.

*See Salvatore v. Pingel*, 2009 WL 943713, at *4 (D. Colo. Apr. 6, 2009) (duty to preserve

"should require more than a mere possibility of litigation") (quoting *Cache La Poudre Feeds,*

*LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 621 (D. Colo. 2007)).

#### A.    Charter has not shown (and cannot show) that litigation was imminent before January 2016.

Charter argues that Plaintiffs anticipated litigation earlier than January 2016 because the

2011 Master Agreement and 2012-2015 SOWs include records-retention terms and reference the

theoretical possibility of litigation.  Mot. at 2-3, 8.  But Charter's cherry-picked language and

spliced quotes ignore the interrelated context and purpose of the agreements, which make clear

that the 2012-2015 program did *not* anticipate litigation.

The 2011 Master Agreement merely provides a framework for potential future services,

which the parties agreed to define in separate, later-executed SOWs.  2011 MSA at 4.  The

governing SOWs, in turn, established a "P2P notice program" and expressly provided that the

parties would enter into a separate SOW if a "p2p litigation program" was desired. 2012 SOW at MM 23; Marks Decl. ¶ 6. That never occurred. Marks Decl. ¶ 6. The parties knew how to draft an agreement in anticipation of litigation and did just that in the 2016 SOW.[7]

The purpose of the 2012-2015 Notice Program was to *avoid* litigation against P2P end-users by providing ISPs with the information necessary to address their subscribers' infringing activity. Marks Decl. ¶ 6; McMullan Decl. ¶ 5; Leak Decl. ¶ 5; Cohen Decl. ¶ 5; Marks Tr. 220:16-221:2. The hope was that ISPs, including Charter, would abide by their legal obligations and do something about it. *Id.* Had Charter acted responsibly in response to knowledge of infringement on its network, Plaintiffs would not have needed to file this lawsuit. *Id.*

Nor does a contractual provision requiring MarkMonitor to keep copies of evidence *ipso facto* mean that litigation was imminent. *See* Fed. R. Civ. P. 37, 2015 Advisory Committee notes ("The fact that a party had an independent obligation to preserve information does not necessarily mean that it had such a duty with respect to the litigation[.]"); *Johnson v. Liberty Mut. Fire Ins. Co.*, 648 F.3d 1162, 1165 (10th Cir. 2011) (Gorsuch, J.) (rejecting that "adoption of an internal retention policy establishes that it did foresee or should have foreseen" litigation).[8]

---

[7] Charter cites two privilege log entries dated June 2012 and two entries dates January 2014 concerning potential "litigation targets" to support its speculation that Plaintiffs anticipated litigation based on the Notice Program years earlier. Mot. at 4. Charter's speculation is unfounded and incorrect. Plaintiffs are willing to provide the referenced documents for *in camera* review to demonstrate that those emails do not suggest that Plaintiffs anticipated litigation against ISPs in that time frame.

[8] It is undisputed that only the Record Company Plaintiffs (and not the Music Publisher Plaintiffs) are RIAA members, and that RIAA entered these contracts on behalf of the Record Company Plaintiffs only. Charter does not argue, nor could it, that a preservation duty arising from RIAA's contracts for the *Record Company Plaintiffs* attaches to the *Music Publisher Plaintiffs*, or that the Music Publisher Plaintiffs anticipated litigation in 2011.

Because no preservation duty attached during the 2012-2015 Notice Program, Charter's spoliation allegations fail as to those documents deleted in the ordinary course prior to 2016. *See Aqua-Hot Heating,* 2018 WL 6249886, at *12 (Jackson, J.). This includes: (i) the Song Files, (ii) Audible Magic Responses prior to January 2016, and (iii) Unverified Song Files.

> **B. The *Sony v. Cox* court rejected the exact same argument that a preservation duty arose during the 2012-2015 Notice Program.**

The court in *Sony v. Cox* rejected Cox's spoliation motion that argued, as Charter does here, that Plaintiffs had a duty to preserve evidence during the same 2012-2015 RIAA Notice Program. Mot. for Sanctions, *Sony Music Entm't v. Cox Commc'ns, Inc.*, No. 1:18-cv-950, ECF 238 at 18-19 (E.D. Va.). On full briefing and a hearing, the court found no duty to preserve:

> I do not find at this point in time that in the 2013/2014 time frame, that there was necessarily an anticipation of this litigation or this type of litigation that would require one to keep every piece of information relating to every examination, work, verification, or whatever of the various notices that were sent out during that time period. . . .
>
> So as an initial matter, I find at this point in time that there really wasn't a duty to preserve any more of the information than what was outlined in the Statement of Work, and that has been produced.

Ex. 1 at 76:8-77:12 (also finding Plaintiffs' efforts to retain were reasonable and finding no intent to deprive). To dull the effect of this persuasive precedent, Charter argues that the *Cox* court did not consider the 2016 SOW. Mot. at 8 n.11. But that *2016* SOW has no bearing on whether a duty to preserve arose during the *2012-2015* Notice Program. If anything, the 2016 SOW confirms that the parties knew how to make clear when litigation was anticipated.

II.   **RIAA and MarkMonitor took reasonable steps to ensure relevant data was preserved and Charter fails to show any culpable conduct.**

A.   **Prior to January 2016, MarkMonitor took reasonable steps by adhering to its contractual obligations to preserve evidence generated in the Notice Program.**

Notwithstanding that no preservation duty arose before January 2016, RIAA still took reasonable steps on behalf of the Record Company Plaintiffs to ensure that MarkMonitor preserved data from the 2012-2015 Notice Program. *See* Fed. R. Civ. P. 37, 2015 Advisory Committee notes (Rule 37(e) "recognizes that 'reasonable steps' to preserve suffice; it does not call for perfection"). RIAA contractually required MarkMonitor in annual contracts from 2012-2015 to save substantial evidence generated in the Notice Program, and MarkMonitor did so, consistent with that obligation. On this basis, the *Cox* court concluded that "the reasonableness of the party in this, [they] state they had an agreement, they expected MarkMonitor to agree by it. They did do it, it seems reasonable. So I think it has been reasonable." Ex. 1 at 77:3-6.

Ignoring this, Charter contends that Plaintiffs acted unreasonably in sending MarkMonitor a litigation hold in 2018 instead of 2011 or 2012. Mot. at 9. But Charter cannot explain how sending a legal hold earlier would have been a "reasonable step" to preserve, while contractually obligating MarkMonitor to save data from the Notice Program would not. As the *Cox* court found, the information RIAA required MarkMonitor to preserve *was* reasonable.

Charter next contends that it was unreasonable for RIAA to permit MarkMonitor to delete the Song Files (*i.e.*, the initial downloads) after Audible Magic verified their contents and MarkMonitor recorded those results. Mot. at 9. But there was no reason to save the Song Files because once Audible Magic verified a file's contents by artist and track:

> [W]e had our cryptographic value of the file. And then whenever we had that, we know that this is the file. And if we encountered it in the future, it would still be

the same file, the same content, and it would still relate to the same information
from Audible Magic.

Paszkowski Tr. at 166:19-167:2; Marks Tr. at 212:8-19 ("[A]t that point, you didn't need [the

Song File] for purposes of the notice program" because MarkMonitor "put the hash in a database

of hashes that they would then use to go out and identify instances of infringement of that

recording, at least pursuant to that hash.").

Nor was there any reason to save superfluous information from Audible Magic, such as

international standard recording codes ("RIAA") or other identifiers.  MarkMonitor retained the

information from Audible Magic that it needed for the Notice Program: whether a match was

found and, if so, the artist, track, and album.  Bahun Decl. ¶ 15.  And, of course, no preservation

duty attached at this time anyway.

### B. After January 2016, RIAA and MarkMonitor took reasonable steps to preserve by contractually requiring MarkMonitor to preserve evidence in anticipation of litigation.

Charter claims that Plaintiffs acted unreasonably by not issuing a litigation hold to

MarkMonitor and Audible Magic in early 2016.  But that is also of no consequence.  RIAA and

MarkMonitor took reasonable steps to preserve after January 2016 by entering into an SOW in

anticipation of litigation with data capture obligations.  MarkMonitor preserved the information

required by the 2016 SOW, including the list of hashes searched for; the downloaded files

corresponding to those hashes; PCAP files showing when and where the files were downloaded;

Audible Magic's identification of files by artist, track and album; records showing files that

Audible Magic did not match to Plaintiffs' copyrighted works; and the Hash Report compiling

all of this information.  Charter thus has all relevant information from the 2016 project.

That Charter wishes more information was saved does not render the preservation steps

unreasonable.  *See School-Link Techs., Inc. v. Applied Res., Inc.*, 2007 WL 677647, at *3 (D.

Kan. Feb. 28, 2007) (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y.

2003)) ("[A] corporation, upon recognizing the threat of litigation, need not preserve 'every

shred of paper, every e-mail or electronic document, and every backup tape.'"); *see also* Fed. R.

Civ. P. 37, 2015 Advisory Committee notes (reasonable steps "does not call for perfection").

### III.    Charter fails to demonstrate prejudice because the lost data can either be replaced or is minimally relevant.

The allegedly spoliated data does not matter to Charter's cause and thus cannot be the

basis for a spoliation sanction.  To trigger spoliation sanctions, "[t]he prejudice must be actual,

rather than merely theoretical." *Zbylski v. Douglas Cty. Sch. Dist.*, 154 F. Supp. 3d 1146, 1171

(D. Colo. 2015).  "[T]he burden is on the aggrieved party to establish a reasonable possibility,

based on concrete evidence rather than a fertile imagination, that access to the lost material

would have produced evidence favorable to his cause." *Salvatore*, 2009 WL 943713, at *10

(quoting *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 167 F.R.D. 90, 104 (D. Colo. 1996)).

***No duty, no prejudice***.  Charter suffered no prejudice from deletion of Song Files,

Audible Magic Responses, or Unverified Song Files through 2015, as Plaintiffs had no duty to

preserve until January 2016.  *Aqua-Hot Heating Systems* is instructive.  2018 WL 6249886, at

*12 (Jackson, J.).  After customers complained of pump failures in the heating systems plaintiff

sold, plaintiff collected 1,006 of those pumps for inspection and retained only 504 of those

collected.  In plaintiff's suit against the pump manufacturer alleging 5,223 defective pumps,

defendant sought to exclude on spoliation grounds "any evidence regarding the missing pumps

that defendant was unable to inspect." *Id.*  Judge Jackson denied the motion, finding no duty to

preserve, and concluding that "defendant will not be substantially prejudiced" by "allow[ing]

evidence to be presented at trial regarding all 5,223 defective pumps" because the "jury can evaluate plaintiff's decision" regarding what to retain. *Id.*

Any relevant prejudice for purposes of Charter's motion must be tied to the 2016 download project or deletions after 2016. This Charter cannot show.

*2016 Audible Magic Responses*. Charter cannot show any prejudice from the absence of complete Audible Magic Responses from 2016. Charter has copies of the *actual 2016 files* and can analyze them any way it wants—including through Audible Magic or another content identification service, such as Shazam, SoundHound or AcoustID, to identify their contents. Or it could listen to the files and compare them to authentic copies of Plaintiffs' copyrighted works, as Plaintiffs' audio experts and sound engineers have done. Charter has chosen not to do any of that, even in response to Plaintiffs' experts identifying each 2016 download that contains a copy of one of Plaintiffs' works. Tellingly, in summary judgment briefing, Charter has not disputed even *one* of Plaintiffs' experts' conclusions identifying those songs. ECF 601 at 18-20.

In any event, even if Charter needed to know the results of the 2016 Audible Magic look-ups, Plaintiffs produced in the Hash Report the only theoretically relevant information—Audible Magic's identification of artist and track for each file, or confirmation that it found no match. Charter complains that ISRCs and Audible Magic's internal database identifier are missing. Yet Charter has not shown that it suffered any prejudice tied to those missing items.

*Partial Source Code Wrapper*. Charter cannot show prejudice by the absence of the Partial Source Code wrapper that MarkMonitor used to access Audible Magic. *First*, Charter overstates the complexity and importance of this wrapper. The Partial Source Code merely interfaces with *Audible Magic's substantive code*, which was produced. It is *Audible Magic's*

*substantive code*, not MarkMonitor's wrapper, that creates the fingerprints, conducts the matching algorithm, and generates a response. Paszkowski Decl. ¶¶ 6-7. Plaintiffs' technical expert described it as "very simple code that serves a very limited function, as a wrapper for submitting requests and receipt of responses from the Audible Magic API." ECF 556-2 at ¶ 104. MarkMonitor's engineer explained that it is "just this application that wraps around Audible Magic. Audible Magic is doing all the work. . . . Processing the fingerprints, the reference files, and then providing us results back." Paszkowski Tr. at 164:11-16.

*Second*, MarkMonitor recently located the Source Code wrapper from the relevant period for one of two missing pieces, and the second piece (with only non-material changes from the version used in 2012 through early 2016) has always existed as of December 2016. Paszkowski Decl. ¶¶ 7, 10-12; *see also* Ex. 8 (May 13, 2021 S. Bahun Dep. Tr. ("Bahun Tr.")) at 196:2-199:11. MarkMonitor has agreed to make both available for Charter's prompt inspection, which would alleviate any theoretical prejudice.[9]

**Bahun emails**. Charter's complaint that it does not have Mr. Bahun's pre-2017 emails, "including with RIAA," Mot. at 12, ignores that more than 100 emails with Mr. Bahun have been produced or logged by RIAA, Plaintiffs and Audible Magic. Gould Decl. ¶ 5. Charter has no basis to claim that any missing emails "would have contained any communications questioning whether the software was accurate and effective." Mot. at 12. The opposite is more likely true, and Charter has studies from two independent consultants evaluating and confirming the reliability of the MarkMonitor system. *See* Exs. 10, 11. Charter's claim is rank speculation,

---

[9] On January 5, 2022, Plaintiffs' counsel learned that on November 4, 2021, MarkMonitor located one of the two missing pieces of source code. Plaintiffs immediately notified Charter. Gould Decl. ¶ 4, Ex. 9 (Email from J. Gould).

based on a "fertile imagination."  *Salvatore*, 2009 WL 943713, at *10.

## IV.  Charter's proposed remedies are disconnected from and grossly disproportionate to the alleged spoliation and harm.

"The two most important factors in determining spoliation sanctions are culpability of

the offending party and actual prejudice to the other party."  *McGee v. Pacheco*, 2021 WL

2104831, at *5 (D. Colo. May 25, 2021).  Rule 37(e)(1) grants courts discretion to order

sanctions "no greater than necessary to cure the prejudice," and "does not require the court to

adopt measures to cure every possible prejudicial effect."  2015 Advisory Committee notes.

Here, there is no culpability for anything deleted prior to January 2016 and thus no

cognizable harm to remedy.  And, even assuming *arguendo* some culpability for information

deleted after January 2016, there is no non-speculative harm caused by it, as explained above.

Against this backdrop, no sanction of any kind is warranted.

Yet Charter proposes multiple draconian remedies completely untethered to the alleged

spoliation and harm.  With the thin reed of an inconsequential Source Code wrapper and

superfluous information from Audible Magic's 2016 Responses, Charter seeks "at a minimum,"

(i) preclusion of *all* materials generated from the 2016 download project, including the

downloads and "any opinion testimony based on those materials," (ii) to present evidence and

argument regarding Plaintiffs' failure to preserve, and (iii) a jury instruction regarding Plaintiffs'

spoliation and their "attempts to recreate the materials."  Mot. at 13.

Charter's requested preclusion would be highly detrimental to Plaintiffs' case.  The 2016

downloads crucially link files shared by Charter's subscribers and Plaintiffs' copyrighted works.

Charter's requested remedy would exclude not only the music files, but also testimony from

(i) Plaintiffs' audio experts and sound engineers who listened to the files and determined they

contain copies of Plaintiffs' works, (ii) Plaintiffs' technical expert who calculated hashes of the files, and (iii) Plaintiffs' data expert who connected several data sets to conclude that Plaintiffs' notices reference the 2016 downloads containing works in suit. *See* ECF 555 at 12-14.

Precluding the 2016 downloads, and opinions based on them, is not a proportionate remedy for the inconsequential lost 2016 data. Charter complains that in 2016, MarkMonitor did not save full Audible Magic Responses or the Source Code wrapper. At most, that could support precluding the 2016 *Audible Magic results*, but not the *music files* themselves, which Plaintiffs have and can examine to determine whether they are infringing. Charter's preclusion request is entirely strategic—intended to compensate for the fact that the music files indisputably *are* infringing—and both unmoored from and disproportionate to any harm given no credible allegation of bad faith, no non-speculative harm, and the importance of the evidence to the case.

Charter also has not shown harm sufficient to warrant presentation of spoliation evidence or an instruction on Plaintiffs' alleged "recreation" of evidence. Plaintiffs had no obligation to retain the Song Files. And Plaintiffs never "recreated" anything, no matter how many times Charter uses that word; they merely gathered other copies of those files, bearing the same unique hashes. The sole case Charter cites in support this remedy only proves the points. There, in *Emuveyan v. Ewing*, the court found defendants had "significantly altered the human resources file by creating an additional document" and backdating it to "appear[] to be contemporaneously written." 2021 WL 3617423, at *11 (D. Utah Aug. 16, 2021). Nothing like that happened here.

Charter has wholly failed to demonstrate any bad-faith intent to deprive as Rule 37(e)(2) requires for an adverse instruction. Mot. at 14. Lacking any actual evidence of bad faith, Charter summarily concludes that Plaintiffs *must* have intended to deprive them of favorable

evidence.  But inferring an intent to deprive from the mere fact of the deletion itself would render

Rule 37(e)(2)'s intent-to-deprive requirement a nullity.  Courts reject Charter's approach,

reserving adverse inference instructions for severely culpable misconduct simply not present

here.  *See, e.g.*, *Henning v. Union Pac. R. Co.*, 530 F.3d 1206, 1219-20 (10th Cir. 2008) (because

an adverse inference "is a powerful sanction" and "'brands one party as a bad actor' . . . courts

require evidence of intentional destruction or bad faith") (quoting *Morris v. Union Pac. R.R.*, 373

F.3d 896, 900-01 (8th Cir. 2004)).

## **CONCLUSION**

For the foregoing reasons, Charter's motion should be denied in its entirety.

Dated: January 7, 2022

Jonathan M. Sperling
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
jsperling@cov.com

Neema T. Sahni
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Ste. 3500
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
mkamin@cov.com
nsahni@cov.com

Respectfully submitted,

*/s/  Matthew J. Oppenheim*
Matthew J. Oppenheim
Jeffrey M. Gould
Alexander Kaplan
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave. NW, 5th Fl.
Washington, DC 20016
Telephone: (202) 621-9027
matt@oandzlaw.com
jeff@oandzlaw.com
alex@oandzlaw.com

Janette L. Ferguson, Esq.
WILLIAMS WEESE PEPPLE & FERGUSON
1801 California Street, Suite 3400
Denver, CO 80202
Telephone: (303) 861-2828
jferguson@williamsweese.com

*Attorneys for Plaintiffs*