# Exhibit III

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-00874-RBJ-MEH

WARNER RECORDS INC., et al.,

Plaintiffs,

v.

CHARTER COMMUNICATIONS, INC.,

Defendant.

## DECLARATION OF SAM BAHUN

I, Sam Bahun, hereby declare pursuant to 28 U.S.C. § 1746 that the following statements are true and correct to the best of my personal knowledge and belief:

### Introduction

1. I am the former Director of Strategic Accounts of MarkMonitor, Inc., now known as OpSec Security Group (along with its predecessor, DtecNet Inc. collectively referred to herein as "MarkMonitor"), a company that, among other things, monitors online networks for infringing content. I have personal knowledge of the facts set forth herein and, if necessary, I would and could competently testify thereto if called as a witness in this matter. I submit this declaration in support of Plaintiffs' Opposition to Charter's Motion For Curative Measures and Sanctions For Plaintiffs' Spoliation of Evidence.

2. MarkMonitor is widely recognized as the global leader in enterprise brand protection, including various aspects of intellectual property infringement. Over half of the Fortune 100 companies, as well as over 1,300+ customers in over 50 countries, including leaders

in the technology, fashion, sports, entertainment, pharmaceuticals, media, automotive and healthcare industries, rely on MarkMonitor to help them protect their brands and content online.

3. I have approximately 17 years of experience working within the anti-piracy industry, including in working with technical staff on anti-piracy services. The anti-piracy work I have been closely involved with includes monitoring of infringement on peer-to-peer networks on behalf of the movie, music, software, publishing, professional sports, and video game industries.

4. Depending on our customers' needs, MarkMonitor provides antipiracy solutions through detection, verification, enforcement and remediation, and analytics. In my duties at MarkMonitor, I have been closely involved with work that MarkMonitor has done for the Recording Industry Association of America ("RIAA") and the music industry more generally, related to detecting the online unauthorized distribution of sound recordings belonging to RIAA member companies (the "Record Companies").

## MarkMonitor Takes Preservation Obligations Seriously

5. MarkMonitor takes preservation obligations very seriously. At all times when MarkMonitor collects data concerning infringement, it preserves evidence in a way that allows content owners to protect their rights and pursue enforcement, should they decide to do so. That is true in all cases, including in connection with MarkMonitor's work for RIAA at issue in this case.

6. MarkMonitor and RIAA entered several agreements concerning the infringement 2012-2015 notice program at issue in this case ("Notice Program"). RIAA retained MarkMonitor to use MarkMonitor's proprietary system ("MarkMonitor System") to monitor four popular P2P networks: BitTorrent, eDonkey, Gnutella, and Ares. MarkMonitor was retained to

2

identify the copying and distribution on those P2P networks of copyrighted music specified by the RIAA, record information documenting what was observed, and send infringement notices to ISPs, including Charter. At all pertinent times, MarkMonitor understood that the purpose of the notice program was to provide notice to ISPs (including Charter) of specific instances of infringement by IP addresses so that the ISPs could take appropriate action, since only the ISPs know which subscribers are associated with which IP addresses. MarkMonitor performed such services dating back to 2008 and continuing through March 2015.

7. In December 2011, RIAA and MarkMonitor entered into a Master Services Agreement ("MSA"). The MSA itself did not specify any work for MarkMonitor to do. It merely set forth a framework for RIAA's retention of MarkMonitor. Subsequent statements of work would describe and set forth the work that MarkMonitor would do.

8. Each year from 2012-2015, MarkMonitor and RIAA entered a materially similar Statement of Work ("SOW"). The 2012 SOW set forth the details of RIAA's "P2P notice program." That Notice Program involved sending notices to many ISPs, not just Charter, and distinguished between "notice" and "litigation" programs.

9. At no point prior to early 2016 did MarkMonitor have an understanding that RIAA or Plaintiffs in this case anticipated litigation against Charter or any other ISP using the MarkMonitor data generated in connection with the 2012-2015 RIAA Notice Program.

10. RIAA and MarkMonitor entered into a separate SOW "in anticipation of litigation" in January 2016. Pursuant to the 2016 SOW, MarkMonitor downloaded certain files identified by their unique hash values, which had previously been referenced in notices MarkMonitor sent to Charter or other ISPs, on behalf of the RIAA. I understand these files have been produced in this litigation on a hard drive identified as MARKMONITOR-HD-001.

3

MarkMonitor downloaded these files from P2P networks. The audio files on the hard drive match to infringement notices by hash value. The hash values appear on the hard drive as folder names or within filenames. MarkMonitor's P2P interactions with peers during this download process were captured in PCAP files (sometimes referred to as "packet capture logs"), which were also preserved and included on the hard drive produced in this case.

11. In addition to downloading files, the 2016 SOW provided for MarkMonitor to submit the downloaded files to Audible Magic, similar to the process described below under File Verification. For each downloaded file, MarkMonitor calculated the hash of the file, submitted the file to Audible Magic's content identification service, and recorded the artist, track, and album values returned by Audible Magic, as well as instances where Audible Magic found no match. The results of this process were recorded in a document that is sometimes called the "Hash Report," which I understand has been produced in this case.

12. Based on my experience working with RIAA over many years, I believe I would know if MarkMonitor's P2P infringement detection, verification and/or notice data was used, or was to be used, in litigation. To my knowledge, the Plaintiffs' case against Cox Communications, Inc. filed in July 2018 was the first lawsuit in which the data MarkMonitor collected in the RIAA Notice Program was used for litigation.

### File Verification

13. Starting in 2008, on behalf of RIAA, MarkMonitor began monitoring for potentially infringing files being copied and distributed on P2P networks and sending infringement notices to certain ISPs.

14. In connection with that process, from 2008 through the Claim Period, MarkMonitor verified that suspected unauthorized files being distributed through P2P networks

4

contained the copyrighted sound recordings belonging to the Record Companies. Upon the first instance of encountering a potentially infringing file, MarkMonitor downloaded the full file. For scalability and accuracy purposes, it then used digital fingerprinting technology from Audible Magic, a leading content recognition service, to identify the file's contents. The Audible Magic verification happened contemporaneously to the time the suspected infringing file was first found. The Audible Magic audio fingerprinting technology generates a small fingerprint of the acoustical contents of the file and then compares that fingerprint against its database of fingerprints of known, identified audio works (also known as "reference fingerprints").

15. Whether a suspected infringing file matches a legitimate copy of a copyrighted sound recording is a "yes/no" question. It is either a match or not a match. When Audible Magic positively identified the contents of a file as a match to a Record Companies' copyrighted work, Audible Magic's confirmation identified the music by indicating the artist, track, and album. MarkMonitor stored the cryptographic hash value (i.e., unique identifier) of the file and Audible Magic's identification of the music—i.e., artist, track, and album—in an internal database. That is all the information needed to confirm that the suspected infringing file matches a copyrighted work.

16. Each time MarkMonitor detected an instance of a peer distributing the file, it was verified as identical through cryptographic hash matching, which confirmed the file was reviewed and verified. If the hash value of the peer's file was in MarkMonitor's internal records of confirmed infringing files, then the case file data mentioned above would be eligible to generate a notice.

5

## Detection and Data Collection

17. The search process and functionality of the MarkMonitor System varied slightly by P2P network. But all essentially functioned on the P2P network as a standard peer and communicated and downloaded data from other peers. Using the specific protocol of each of the four networks mentioned above, MarkMonitor's System collected data documenting instances of users, including Charter subscribers, downloading and distributing digital files with music belonging to the Record Companies.

18. MarkMonitor's System identified Charter users active on the P2P network distributing copies of confirmed infringing digital files identified by hash value. Through the process of connecting and communicating with those peers, in the same vein as any other regular peer, MarkMonitor's System automatically collected data about that person's file-sharing activity, which MarkMonitor stored within "case files" or "evidence packages." MarkMonitor's evidence packages include (among other things): a timestamp with the date and time of the event; the IP address of the peer; Internet Service Provider ("ISP") information associated with the IP address; P2P protocol used; port of the peer; and hash value pertaining to the file.

## Notice Sending

19. Once a case file was gathered and the suspect file verified through hash matching, the notice sending process began. MarkMonitor's System automatically generated and sent a notice reporting the infringing user to Charter. MarkMonitor sent the notices to ISPs by email. After a notice was sent, the notice, evidence package, and underlying data were preserved in MarkMonitor's systems.

20. From the period of January 2, 2012 to March 31, 2015, MarkMonitor sent millions of infringement notices to ISPs on behalf of the RIAA, including ▮▮▮▮▮▮▮▮▮

6

notices to Charter. Each notice issued under penalty of perjury with the information required under the Digital Millennium Copyright Act and under the name of the RIAA. Each notice identified a subscriber by IP address, the date and time of the infringing act, the name of the file containing the infringing recording(s), a hash value uniquely identifying the file, a representative sample of what was infringed listed by title and artist, and the P2P network on which the infringing activity was detected. MarkMonitor saved records of these detections and these notices in its database.

21. At some point prior to 2016, one of MarkMonitor's hard drives storing some evidence packages and related notices failed. Despite MarkMonitor's best efforts to retrieve the data, some of the case files relating to notices to Charter were lost by this inadvertent hard drive failure. I understand that nearly all those files relate to notices sent before the claim period beginning in March 2013. Data from those files had been previously preserved in MarkMonitor's database and was extracted and produced in this case.

22. On January 4, 2022, I spoke with Slawomir Paszkowski. At that time, I was first informed that MarkMonitor may have located in its possession portions of source code not previously located and produced in this litigation, despite diligent searches. I immediately contacted MarkMonitor and Plaintiffs' counsel about this possibility. The next day, on January 5, 2022, I participated on a videoconference with several current and former MarkMonitor employees and Plaintiffs' counsel. On this videoconference, it was confirmed to me for the first time that MarkMonitor has in its possession source code for a program called File Hash Manager dating to 2012.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

7

Executed in Tipp City, OH this 7th day of January, 2022

_Sam Bahun_

8