# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


UMG RECORDINGS, INC., et al.,   )
                                )
            Plaintiffs,         )
                                )
                                )   CASE NO.
        VS.                     )   8:19-CV-00710-MSS-TGW
                                )
                                )
BRIGHT HOUSE NETWORKS, LLC.,    )
                                )
            Defendant.          )

_____

MOTION HEARING – VOLUME I
BEFORE THE HONORABLE MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

MAY 25, 2022
9:12 A.M.
TAMPA, FLORIDA
_____







        Proceedings transcribed via courtroom digital audio
recording by transcriptionist using computer-aided
transcription.
_____

DAVID J. COLLIER, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER
801 NORTH FLORIDA AVENUE, 7TH FLOOR
TAMPA, FLORIDA  33602

1    **APPEARANCES:**

2

3    **FOR THE PLAINTIFFS:**

4

5            *Matthew J. Oppenheim*
         *Jeffrey M. Gould*
6            *Corey Miller*
         *Kellyn M. Goler*
7            *Alexander Kaplan*
         Oppenheim & Zebrak, LLP
8            4530 Wisconsin Avenue, NW
         5th Floor
9            Washington, D.C.  20016
         (202) 450-3958

10

11

12            *David Christopher Banker*
         Bush Ross, P.A.
13            1801 North Highland Avenue
         Tampa, Florida  33602-2656
14            (813) 224-9255

15

16            *Jonathan M. Sperling*
         *Sara J. Dennis*
17            *Anders Linderot*
         Covington & Burling, LLP
18            620 Eighth Avenue, 43rd Floor
         New York, New York  10018-1405
19            (212) 841-1000

20

21            *Neema T. Sahni*
         Covington & Burling, LLP
22            1999 Avenue of the Stars, Suite 3500
         Los Angeles, California  90067-4343
         (424) 332-4800

23

24

25

```
 1              THE WITNESS:  Thank you, Your Honor.

 2              THE COURT:  All right.  We'll take a brief 15 minute

 3    break and come back and the Court will address its decision on

 4    Sinnreich and then we'll move to the next witness.

 5                             - - - - -

 6              (Recess at 11:31 a.m. until 11:50 a.m.)

 7                             - - - - -

 8              THE COURT:  The Court has reviewed the parties'

 9    submissions, I've heard the testimony of this witness, and

10    I determine that Dr. Sinnreich's primary opinions that will be

11    permitted to be offered include opinion number 1, The

12    Structural Shift in the Music Industry Was Not Attributable to

13    "Piracy," and Broadband Services Have Been a Boon to Music

14    Sellers; 2, The Music Industry Scapegoats "Piracy" for Its Own

15    Strategic Missteps; 4, that P2P is a Neutral Platform with

16    Extensive Non-Infringing Uses; and the Internet Access Is a

17    Vital Public Resource.

18              The extent to which he will be allowed to testify

19    about the music industry being exploitative of creative labor

20    is going to be driven largely by any primary argument that the

21    music industry/plaintiffs are altruistic, paternalistic

22    entities seeking to protect the interests of creative labor.

23    And the Court is holding on the question of whether termination

24    is an unnecessary and disproportionate response to allegations

25    of infringement as a -- can you hold the paper a second?  As a
```

 1    possible area of testimony, because I'm a little bit concerned

 2    about it being sort of an attack on the statute, and I will

 3    follow up with the parties if I need to and review the

 4    materials in more depth with respect to whether I think that's

 5    a permissible opinion to offer, because as you know, I'm going

 6    to instruct the jury that here is what the law is and they have

 7    to follow the law whether they agree or disagree with the law,

 8    and if the law says you don't get the benefit of not

 9    terminating someone known to you to be infringing, or if you

10    need to have systems in place to protect against that, then I'm

11    not sure the jury can be told, but you know what, wink wink,

12    nod nod, termination is overreach or disproportionate.  So I'll

13    take a look at that question, but the other questions, the

14    Court's ruling is as stated.

15          The Court will allow him to challenge regarding

16    Furchtgott in the normal way that experts challenge each

17    other's methodology.

18          Please call your next witness or make your next

19    argument.

20          Who is up next?

21          MR. OPPENHEIM:  Your Honor, I believe that Dr. Amir

22    is up next.  He is a rebuttal witness on the issue of the

23    surveys that Dr. Sinnreich proffered, so we would call him,

24    Your Honor.

25          THE COURT:  Please come forward to be sworn.

 1    reports of the survey.

 2           MR. OPPENHEIM:  You're right.

 3           THE COURT:  And as I understand it, no one moved to

 4    compel the production of the survey from a third party or from

 5    the defense in the case.

 6           MR. OPPENHEIM:  Your Honor, we repeatedly sought the

 7    survey --

 8           THE COURT:  Moved to compel.

 9           MR. OPPENHEIM:  I don't recall offhand whether or not

10    we moved to compel it.  We were told by Dr. Sinnreich he didn't

11    believe it existed.  He had a binder of materials we requested

12    repeatedly --

13           THE COURT:  Well, we know that you all know how to

14    file motions when you want some relief.

15           All right.  Thank you.

16           MR. OPPENHEIM:  Thank you, Your Honor.

17           THE COURT:  We'll take the lunch break at this point,

18    come back at, say, quarter to 2:00 and resume again.

19           We're in recess.

20                          - - - - -

21           (Recess at 12:44 p.m. until 1:46 p.m.)

22                          - - - - -

23           THE COURT:  All right.  The Court orders that

24    Dr. On Amir will not be allowed to testify in the case.  His

25    opinion is largely an opinion that speaks to the validity of

1   the surveys that underlie the Jupiter reports.  He may be right

2   that the survey wasn't conducted properly, but he hasn't seen

3   the surveys, he hasn't seen the background material for the

4   surveys, and his suppositions with respect to how they were

5   conducted are just that, suppositions.  No one has demanded

6   their production or even the production of the notebook

7   material that Dr. Sinnreich claims to have in his possession.

8           Dr. Amir is an expert in surveys, he's not an expert

9   in the music industry, and he's essentially saying

10  Dr. Sinnreich couldn't rely on surveys -- I'm sorry, couldn't

11  rely on reports that were based on surveys even though those

12  reports are peer-reviewed and tested.  I can think of any

13  number of instances in which an expert would rely on a report

14  that may later be challenged by someone as invalid based upon

15  the underlying survey on which the report is based, and if

16  someone wanted to do that, they would need to come forward with

17  some evidence as to the invalidity of the survey on which the

18  report was based in order to challenge the report, and Dr. Amir

19  hasn't done that.

20          Plaintiff is free to cross-examine Dr. Sinnreich on

21  other issues related to his reliance on the report, such as the

22  temporal relevance of the reports, the language of the reports

23  themselves, but they can't call an expert in surveys and have

24  him render an opinion as to the invalidity of the underlying

25  survey without having him do the work, and so the Court would

1    exclude Dr. On Amir.

2         Yes, sir.

3         MR. OPPENHEIM:  Your Honor, you asked a question

4    prior to the lunch break about the plaintiffs' efforts to

5    obtain the surveys, and there -- I didn't have a complete

6    answer for you then.  I did want to inform you of that and ask

7    one question.

8         We did subpoena Jupiter for the surveys.  They

9    indicated to us they did not have them.  So we did attempt to

10   get them.  They were not available.

11        Your Honor indicated that the surveys -- the reports,

12   excuse me, were peer-reviewed.  I don't believe there's any

13   evidence of that at all, and I don't believe that's the case.

14        I do have one question for you.  Dr. Amir did review

15   the reports, the reports are about consumer surveys, and part

16   of his expert opinion is about the Jupiter reports.  Can he

17   testify as to the Jupiter reports and not the surveys?

18        THE COURT:  No.

19        MR. OPPENHEIM:  Very well, Your Honor.

20        THE COURT:  Now, the question about whether or not

21   the reports were peer-reviewed I'm curious about, but I think

22   that would go to Dr. Sinnreich's opinion, about which he could

23   be cross-examined.  It doesn't go to the question of Dr. Amir.

24        MR. OPPENHEIM:  So --

25        THE COURT:  Thank you.

1       MR. OPPENHEIM:  Yes.  I mean, Your Honor, on that

2   very narrow issue, could we submit a two page or three page

3   submission to the Court on the issue for purposes of

4   Dr. Sinnreich's testimony?

5       THE COURT:  No, sir.

6       MR. OPPENHEIM:  Very well.

7       THE COURT:  The parties should also keep in mind that

8   this case is going to be tried, and when a witness is called in

9   the course of a case and some testimony that witness gives with

10  respect to some opinion he purports to offer doesn't match up

11  with the evidence, there's nothing to stop a party from moving

12  at that time to say the doctor has now admitted XYZ and

13  therefore the Court should strike that testimony, or the doctor

14  has in the interim admitted XYZ, the Court should not allow it,

15  but on what I have in front of me, it's not proper to do that,

16  and I haven't seen anything that would support disallowance as

17  to Sinnreich.

18      Who is next up, and as to which witness?

19      MR. GOULD:  Your Honor, I think the next motion on

20  the docket is the motion to strike plaintiffs' expert,

21  Ms. Barbara Frederiksen-Cross.  The plaintiffs would call

22  Ms. Frederiksen-Cross.

23      THE COURT:  All right.  Let me here from the

24  plaintiff.

25      Do you want to call this witness?

BARBARA FREDERIKSEN-CROSS - MAY 25, 2022          167
Cross-Examination by Mr. Verhoeven

1  A      Yes, I do.

2  Q      Why couldn't you say that instead of infringing peer

3  collection verification?  Your own counsel put it up there as a

4  summary of your opinion.  Could you say that?

5  A      I suppose I could have chosen those words.

6  Q      Right.  And don't you think by using the word

7  "infringement" hundreds of times like you do in your report,

8  when you have no opinion on infringement, that that might

9  mislead the jury into thinking that you have an opinion on

10  infringement?

11  A      I'm sure that if Her Honor finds that word offensive she

12  will instruct me not to use it during my testimony.  I'm sure

13  you can move for such an instruction.  I used the language that

14  was most commonly used in the MarkMonitor system I was

15  analyzing.  They call it repeat infringer, they call it

16  infringement report, they called them infringement notices, and

17  they call their software Infringement Finder when they refer to

18  that software, so that is how I think of that software in terms

19  of using that word.  They don't call it copying and peer

20  finder.

21  Q      You mentioned in paragraph 32 of your report -- you

22  referred -- let's go through the tools you're talking about.

23          In paragraph 32 of your report you mention Cisco's

24  NetFlow product that can be used to analyze BitTorrent traffic

25  in a network, right?

BARBARA FREDERIKSEN-CROSS - MAY 25, 2022        168
Cross-Examination by Mr. Verhoeven

```
1    A    Yes.

2    Q    Are you withdrawing that paragraph from your report?

3    A    It is my understanding --

4              THE COURT:  Yes or no?

5    A    It's my understanding that I won't be asked to testify

6    about NetFlow, but this is in the background section of the

7    report, I think.  Let me just orient to where I am.

8              THE COURT:  Counsel, are you withdrawing that

9    paragraph?

10             MR. GOULD:  There's no intention to elicit testimony

11   from her on the stand at trial.

12             THE COURT:  Is that a yes or a no?

13             MR. GOULD:  Yes, Your Honor.

14             THE COURT:  All right.

15   BY MR. VERHOEVEN:

16   Q    Okay.  So let's look at the next paragraph, paragraph 34

17   of your report.  There you refer to the Sandvine, right?

18   A    Yes.

19   Q    This is not being withdrawn, this paragraph?

20   A    Again, this is in the background of technologies related

21   to ways that individuals can detect or shape traffic.

22   I haven't had a discussion with Counsel about whether I'll be

23   asked to testify about Sandvine's capabilities or not.

24   Q    You don't have any experience with Cisco's NetFlow product

25   that you mentioned in paragraph 32, do you?
```

BARBARA FREDERIKSEN-CROSS - MAY 25, 2022          169
Cross-Examination by Mr. Verhoeven

1   A    I have fairly extensive experience analyzing data produced

2   by NetFlow.  I haven't participated in creating that product

3   nor have I installed it.  I have worked with the data that it

4   produces on systems.

5   Q    And your CV does not mention any experience with Sandvine,

6   which you purport to provide an opinion for in paragraph 34 of

7   your report, correct?

8   A    I note in paragraph 34 that Sandvine is a cus -- is a

9   system that provides customer network bandwidth management, I'm

10  familiar with those capabilities from other litigation, and

11  again, I don't believe that I have any opinion in this report

12  that is specifically addressed to whether or not Bright House

13  should have used Sandvine or could have.  I wasn't given a full

14  list of the Bright House tools that they had at their disposal.

15           THE COURT:  So, Counsel, is Sandvine going to be

16  discussed in her testimony?  Paragraph 34.

17           MR. GOULD:  No, Your Honor.

18  BY MR. VERHOEVEN:

19  Q    Let's go to another portion of your report at paragraph

20  86.  Back to -- this is where we were.  I apologize.  Let's go

21  back to it.

22           Now, you discuss in your report -- actually, let's go

23  to 107, please, paragraph 107.

24           You discuss in your report a 2010 document from

25  MovieLabs -- excuse me, Your Honor -- MovieLabs titled Levels

 1    don't have any ability to cross-examine, these aren't witnesses

 2    we can compel to come to trial, and in my experience most

 3    judges I deal with, they want the -- if you're going to give an

 4    opinion for the truth of the matter that's important, they want

 5    the percipient witness to lay the foundation, not the expert,

 6    and if they do that we will withdraw our objections because it

 7    will be based on actual testimony we can cross-examine, but

 8    otherwise we object.  Thank you.

 9               THE COURT:  Yes, sir.

10          MR. GOULD:  Two things briefly, Your Honor, to

11    respond to him, Mr. Verhoeven, excuse me, and make one

12    additional point.

13               Experts rely on hearsay all the time.

14               THE COURT:  Experts don't rely on random people they

15    talk to on the street.  Experts can rely on hearsay that has

16    some indicia of reliability, like a book or peer-reviewed study

17    or content-based determination or an expert with whom they

18    work, but you can't go talk to an industry individual and say,

19    well, what do you think, outside the context of a deposition,

20    and allow that to form the basis of your opinion, unless that

21    person has been offered to testify as to that issue.  These

22    people, at least two of them, testified and didn't testify to

23    this material that she asked them in a private conversation

24    with counsel with no opportunity for the defense to cross, and

25    they sound like they might be interested in the outcome of this

 1   case and therefore interested in the answers that they gave,

 2   which calls into further question their reliability from a

 3   hearsay standpoint for which the Court would permit an expert

 4   to sort of jump over the hearsay rule.  We do that, and it's

 5   because an expert relies on things that happen in the universe

 6   without that expert sort of triggering that to happen for the

 7   purpose of informing the litigation, any more than the

 8   defendant could go get an expert to say, oh, we never infringe

 9   and we have things in place that I can tell you would establish

10   that we never allow anybody to do any peer-to-peer, and then

11   their expert testifies that that's what happened.

12          This individual talked to people outside the presence

13   of counsel to get information to help inform her opinion

14   because those questions weren't asked at deposition, and I'm

15   not going to allow her to rely on that in this case to inform

16   her opinion, and counsel has offered to let them come and lay a

17   foundation, but discovery is over, and I'm not going to start

18   adding discovery on top on this case and I'm not going to

19   consider any opinion that is offered in support of summary

20   judgment where no foundation is laid.

21          MR. GOULD:  To the extent --

22          THE COURT:  So no to hearsay.

23          MR. GOULD:  Excuse me, Your Honor.

24          To the extent the witnesses show up at trial and can

25   lay a foundation, I presume Ms. Frederiksen-Cross would be

 1    permitted to rely on statements?

 2            THE COURT:  Have they been listed as witnesses in the

 3    course of the discovery as people with knowledge in the case?

 4            MR. GOULD:  Yes.

 5            THE COURT:  Well, that a fight you'll have at trial

 6    when you give me your witness list, but as it relates to the

 7    summary judgment motion, is her opinion on this point pertinent

 8    to overcoming summary judgment?

 9            MR. GOULD:  No, I don't believe so, Your Honor.  We

10    haven't moved for summary judgment on direct infringement.

11            THE COURT:  All right.

12            MR. GOULD:  So I don't think it would be an issue for

13    summary judgment.  So I understand your position, we will

14    certainly respect it and duly note it and plan with that in

15    mind going forward, and to the extent we hope to have

16    Ms. Frederiksen-Cross rely on those, we would certainly intend

17    to sponsor them through a knowledgeable witness that would be

18    available for cross-examination.

19            The other point I wanted to make is the motion

20    against Ms. Frederiksen-Cross was as to her credentials and her

21    methodology, in primary part, and the bulk of Mr. Verhoeven's

22    exam was to demonstrate why her conclusions should not be

23    accepted.  That's different than the motion as drafted.

24    There's nothing demonstrated as unreliable about her

25    methodology of applying her 47, 48 years of expertise against a

 1  witnesses for MarkMonitor or Audible respectively.

 2          THE COURT:  In this case or carried over from *Charter*

 3  to here or both?

 4          MR. GOULD:  Correct.  As well as Steve Marks, the

 5  General Counsel of the RIAA.

 6          THE COURT:  But not asked these questions that they

 7  had this side conversation about?

 8          MR. GOULD:  It seems that way.

 9          THE COURT:  Well, okay.  I suppose you're not the

10  lawyer that was there.

11          MR. GOULD:  I was probably at most of those.

12          THE COURT:  All right.  Those, I mean these private

13  conversations.

14          MR. GOULD:  Um, I may have been at one of them.

15  I don't believe I was at most of them.

16          THE COURT:  All right.  Well, the one thing I can

17  decide before we take the break is that Dr. Frederiksen-Cross's

18  opinion, if it is allowed, will need to be sanitized from the

19  use of "infringement" or "infringing" or "abusers."  We know

20  she can do that because in her formal opinion Counsel asked her

21  at the very last end of her testimony, she had done it, all

22  except for in one instance, and so she needs to do that, in the

23  same way that if this were a case involving an alleged

24  predator, child predator, I wouldn't let people refer to the

25  person as that even though their systems and analytical

1   framework would describe itself as To Catch a Predator,

2   I wouldn't let them use that language in describing copying

3   or -- in this case copying, in that case predatory behavior.

4   So she'll sanitize her report so that she does not refer to it

5   in her conclusive way as infringing or abusing or repeat

6   infringers, and so that's the one thing we can decide.

7          The fact that she doesn't have a Ph.D., a Master's or

8   a B.A. or B.S. degree doesn't preclude her from testifying with

9   qualifications built on a life of experience as a matter of

10  law, so those are not preclusive of her testifying.

11         I won't let her rely on hearsay if no foundation is

12  made by the calling of those witnesses that are necessary in

13  the course of the trial, so if she's going to testify about

14  something they said then she's going to need to be at trial

15  when they testify and then be able to say she's heard them, if

16  the Court finds that they said what she claims they were going

17  to say.

18         And I guess I'll have to hold on her methodology,

19  because her methodology is not consistent with what counsel

20  says her methodology was, and I don't know what to do with that

21  before we hear from MarkMonitor.

22         MR. GOULD:  Just two clarifying questions,

23  Your Honor.  First, I'm not sure I understand what you mean

24  that her methodology was not consistent --

25         THE COURT:  We just went through that.  You just

1  stood up there and said it's my fault, I didn't ask her all the

2  right startup questions, and so she said that there is no

3  comparison material by which to confirm hashtag to hashtag, she

4  said it three times, and so --

5          MR. GOULD:  So may I ask permission, Your Honor, to

6  re-call the witness for five minutes?

7          THE COURT:  No, sir.  No, you may not.

8          MR. GOULD:  I'll just make a record that the opinions

9  expressed in her report is very clear on this issue of --

10         THE COURT:  But that's why you call her at a Daubert

11 hearing, to see what she's going to say when she's in the

12 courtroom and she's under oath and she has to say what she has

13 to say in front of a whole courtroom full of people, including

14 a judge, and she said what she said, and I believe she was

15 trying to be honest.

16         MR. GOULD:  So --

17         THE COURT:  And so I will evaluate what she said

18 against what MarkMonitor says and I will give you a decision

19 about what to do with this witness's testimony.

20         MR. GOULD:  Thank you, Your Honor.  Just last point

21 of clarification.  The questions asked about did MarkMonitor do

22 a download were specific as to the connection and handshake

23 with the Bright House peer at the time that the notice was --

24 notice information was collected and generated, and the initial

25 download came at a different point in time and was used to

1 verify the file from which the hash was later compared.

2          THE COURT:  Is that a question?

3          MR. GOULD:  No, it's a clarification, Your Honor.

4 I appreciate your time.  Thank you.

5          THE COURT:  Thank you.

6          MR. OPPENHEIM:  Your Honor, if I may.  This is,

7 I think, really important, and I apologize for burdening the

8 Court again with another lawyer.

9          MR. VERHOEVEN:  Your know, I object to this serial --

10          THE COURT:  Sustained.

11          MR. VERHOEVEN:  -- argument.

12          THE COURT:  Counsel, I was very clear.

13          MR. OPPENHEIM:  I'm sorry.  I didn't hear you.

14          THE COURT:  I was very clear on procedure, and there

15 are -- your counsel was amply prepared and he asked all the

16 right questions, he just didn't elicit the answer he wanted,

17 and so I will listen to what MarkMonitor has to say, if they're

18 going to be called, and then we'll make a decision.

19          MR. OPPENHEIM:  We had a telephonic conference last

20 week, Your Honor, where you specifically instructed us to limit

21 our Direct to the issues on the Daubert motions.  We did not go

22 through the entirety of Ms. Frederiksen-Cross's testimony.  It

23 would have taken four or five hours.  So we tried to narrow it

24 to what we believed their motion was.  I don't believe that her

25 testimony was inconsistent with what I said.

1        The questions -- you have to listen very clearly,

2   carefully to what Mr. Verhoeven asked.  He asked about

3   comparing the content file.  So I don't believe that she was

4   inconsistent, and I think it would be -- for us to have put on

5   a witness in short form fashion according to what we understood

6   your instructions to be and then to say that that witness

7   potentially can't testify because we didn't put on the complete

8   testimony that is contained in her report I think would be

9   unfairly prejudicial.  We tried our best, Your Honor, to follow

10  your direction.

11        Thank you.

12        MR. VERHOEVEN:  Your Honor, continued objection to

13  this.

14        THE COURT:  The Court allowed substantial leeway in

15  Redirect of this witness, and I'm not really sure that there

16  was anything else Counsel could have done to elicit a different

17  response other than to lead her, and my procedural concern is

18  not as to how much you covered with the witness, my procedural

19  concern is the parties selected who they wanted to be the

20  proffering attorney for this witness and that proffering

21  attorney has been given substantial leeway to inquire of the

22  witness, to reinquire of the witness, to make argument to the

23  Court, and now he's asked you, Mr. Oppenheim, to stand in and

24  to assist, and we would be here for the whole length of the

25  trial if we did that on these witnesses.

1            MR. OPPENHEIM:  I appreciate your indulgence on that,

2   Your Honor.  As the lead counsel in the case, there are times

3   where I feel it's useful for me to provide the Court with at

4   least some of the plaintiffs' direction, and I appreciate your

5   indulgence in letting me do that.  I -- no intent to offend or

6   step on anybody's toes, but I do think it's a critical point

7   that we tried to follow the Court's directions and I don't

8   believe her testimony was inconsistent in any way with what

9   MarkMonitor will testify to.

10           Thank you, Your Honor.

11           THE COURT:  Who is the next witness?

12           MR. SCHAPIRO:  Your Honor, would you like us to

13   proceed with our next witness?

14           THE COURT:  Who would that be?

15           MR. SCHAPIRO:  It would be Dr. Sandeep Chatterjee.

16           THE COURT:  The plaintiff stipulated to

17   Sandeep Chatterjee's authority and qualification to testify,

18   I believe, in the *Charter* case and that he was -- is it a she

19   or he?

20           MR. SCHAPIRO:  It's a he, Your Honor.  They did at

21   least as to the workings of peer-to-peer mechanisms, which is

22   one reason we're puzzled about why they're challenging it here,

23   but here we are.

24           THE COURT:  So what is the new challenge?

25           And, Mr. Oppenheim, are you making this argument?