IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge R. Brooke Jackson

Civil Action No. 19-cv-00874-RBJ-MEH

WARNER RECORDS INC., et al

    Plaintiffs,

v.

CHARTER COMMUNICATIONS, INC.,

    Defendant.

---

## ORDER on RULE 702 MOTIONS

---

This order addresses twelve motions to exclude expert testimony under Rule 702 of the Federal Rules of Evidence.  The parties have waived hearings on these motions.

## I.  BACKGROUND

Plaintiffs are a collection of record companies and music publishers that produce and distribute commercial musical compositions and sound recordings.  Defendant Charter Communications, Inc. ("Charter") is an internet service provider.  Plaintiffs allege that Charter has facilitated subscribers' pirating of plaintiffs' copyrighted works.

## II.  STANDARDS GOVERNING EXPERT TESTIMONY

Under Rule 702 of the Federal Rules of Evidence, a qualified expert may provide opinion testimony if his or her specialized knowledge would assist the jury in doing its job (factfinding), and the opinions are based on sufficient facts and reliable methods properly applied to the facts.  Put another way, the evidence must be both relevant and reliable.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).  Expert opinions are relevant if they would

1

"help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 591.  They are reliable if, in addition to the expert being qualified, his opinions are "scientifically valid" and based on "reasoning or methodology [that] properly can be applied to the facts in issue."  *Daubert*, 509 U.S. at 593.

The proponent of expert testimony has the burden to show that the testimony is admissible.  *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).  The trial court plays a "gatekeeping" role that involves an assessment of the "reasoning and methodology underlying the expert's opinion" and a determination of "whether it is scientifically valid and applicable to a particular set of facts."  *Goebel v. Denver and Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000).  However, the trial court has discretion as to how to perform this gatekeeping function.  *Id.*  It is not a role that emphasizes exclusion of expert testimony.  *See Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1082 (D. Colo. 2006) (Rule 702 "was intended to relax traditional barriers to the admission of expert opinion testimony").

## MOTIONS

**A.  Plaintiffs' Motion to Exclude Certain Expert Testimony of George Strong, ECF No. 563 (ECF No. 547 is the restricted version):  DENIED.**

Mr. Strong is a CPA with an undergraduate degree in economics and an MBA.  He is certified in financial forensics and has provided damages opinions in numerous cases, including copyright cases.  His expertise and experience in doing damages calculations have not been challenged.  I have reviewed his "rebuttal report," ECF No. 547-2, and his "second rebuttal report," ECF No. 547-3.  His opinions concern the damages claimed by the plaintiffs, including the opinions expressed in the reports of plaintiff's economic experts Furchtgott-Roth and Buchan.

2

1. <u>Objections in General</u>.

Plaintiffs categorize Mr. Strong's opinions as falling into four general subject areas. *See* ECF No. 547 at 3. I list and briefly discuss these four areas before turning to the specific objections.

a. Damages analysis. I find that Mr. Strong's damages opinions are consistent with his qualifications and typical of what economists, CPA's, and other damages experts do.

b. Calculation of the number of works-in-suit. The methodology for calculating the number of works in suit is disputed and is not within Mr. Strong's expertise. Mr. Strong apparently was provided with what he assumed to be true for purposes of his calculations.

c. A critique of Dr. Furchtgott-Roth's reports. He is qualified to comment on his counterpart's damages analysis (and vice-versa).

d. The music industry and how it was impacted – Mr. Strong does not profess to be an expert about the music industry. To the extent such expertise is necessary to his damages calculations, he necessarily must rely on assumptions provided by others. The assumptions are fair game for cross-examination and opposing expert testimony.

2. <u>Legal Opinions</u>.

Turning to plaintiffs' more specific arguments, they first object to Mr. Strong's testifying about the law. *See* ECF No. 547 at 4-8. I agree that he may not express opinions about what the law is, notwithstanding that he also has a law degree. Thus, for example, he may not opine on what the statutory or case law is concerning the measure of "statutory damages" in a copyright

infringement case.  He may not lecture about what Colorado courts have done in other cases.
Determination of the applicable law is the sole function of the Court.

However, I cannot expect an expert to provide a damages calculation if he is not provided
with information concerning the measure of damages.  It is reasonable for Mr. Strong to have
based the opinions in his report on assumptions about the measure of damages that were
provided to him.  Those assumptions are fair game for cross-examination.  Notably, plaintiffs
have not, at least in this motion, clarified what they believe the measure of damages should be
other than by citing the Patry treatise which lists factors that can be considered, and by asserting
that "the range of statutory damages is set by statute." *See id.* at 5.

Plaintiffs argue that Mr. Strong cannot provide a legal opinion on the number of works-
in-suit.  I agree, but I do not read his reports as his having done that.  At paragraph 21 of the
rebuttal report he breaks the claimed 11,027 works down into three categories.  He was provided
the three categories, and I presume that someone besides Mr. Strong (at $985 per hour) divided
those works into the three categories.  Similarly, someone asked him to assume that all songs on
an album constitute a single work and, presumably, provided the numbers that correspond to that
assumption.  Plaintiffs can challenge the accuracy of the categories and the underlying numbers.
But so long as Mr. Strong confines his opinions to the financial implications of the numbers
without commenting about whether the categories or numbers make sense from a music industry
point of view, there is no Rule 702 basis to exclude them.

Plaintiffs argue that Mr. Strong's comments on Dr. Furchtgott-Roth's analysis are
impermissible legal opinions  I disagree.  Beginning with paragraph 26 of his report, Mr. Strong
comments on the lack of evidence in Dr. Furchtgott-Roth's reports of harm to plaintiffs, and he
expresses his opinion that Dr. Furchtgott-Roth's opinions about Charter's economic incentives to

retain subscribers are not valid.  These opinions appear to fit within Mr. Strong's expertise as a damages expert.  He can also point out inconsistencies in assumptions relied upon by Dr. Furchtgott-Roth and assumptions on which Mr. Strong relied without commenting on which set of assumptions is correct.

3. Methodology.

Plaintiffs' next argue that Mr. Strong's opinions on gains to Charter and actual harm to plaintiffs are unreliable because they are contradicted by the evidence and rest on flawed methodology.  ECF No. 547 at 8.  The fact that opinions are contradicted by other evidence is why we have trials, not a reason to exclude evidence.  That the opinions might be based on unreasonable assumptions is the grist of cross-examination and opposing testimony.

As for methodology, plaintiffs assert, but have not shown, that Mr. Strong's methodology "suffers from three primary flaws," i.e., not accounting for "bundling," improper apportionment of subscription fees, and improper apportionment of peer-to-peer traffic.  *Id.* at 9.  But plaintiffs provide no qualified opinion that these supposed flaws render Mr. Strong's opinions so unusual or out of step with proper economic analysis as to be unworthy of being heard.  They provide no expert opinion evidence attacking Mr. Strong's methodology.  Rather, the motion expresses the views of counsel that Mr. Strong's methodology is fatally flawed.  They can point out Mr. Strong's alleged errors though cross-examination and adverse testimony at trial.

4. Music Industry Expertise.

As I have said, Mr. Strong cannot express opinions on the music industry, file-sharing technology, or piracy as such, nor can he express opinions on the quality of the opinions of experts outside his area of expertise, such as Dr. Sinnreich.  Again, however, to the extent he

needs to make assumptions about certain matters in order to do a damages calculation, he may do so long as it is clear that he is assuming facts in order to make economic calculations and not commenting on the validity of the assumed facts.  That is typical of economic expert testimony and is challengeable by challenging the underlying assumptions that were used by the economist.

For example, in paragraphs 13, 14 and the first sentence of paragraph 15 of his rebuttal report, Mr. Strong expressly makes assumptions based on information in the reports of Dr. Sinnreich.  ECF No. 547-2 at 8.  However, the second sentence of paragraph 15 purports to express information known by Mr. Strong that does not fall within his expertise.  In paragraphs 22 and 23, *id.* at 11-12, Mr. Strong mentions the different approaches of Mr. Buchan and Dr. Snow to the identification of "repeat infringers."  Mr. Strong does not have expertise in determining what should be classified as a repeat infringer, nor does he attempt to express an opinion about that.  He can, however, calculate the average number of tracks per alleged infringer, as he did in paragraph 24, using either expert's numbers of repeat infringers.

Beginning at paragraph 43 Mr. Strong explains how he believes actual harm to the plaintiffs and profits to the defendant should be determined.  *Id.* at 19.  These opinions are within Mr. Strong's expertise.  However, there are isolated examples of opinions that are not within his expertise, such as in paragraph 56: "while available at no cost, it is likely that a meaningful portion of consumers downloaded many songs that they likely would never have purchased if not for the availability and use of various P2P file-sharing programs."  *Id.* at 23.  Mr. Strong lacks the expertise to express this opinion (actually, to speculate about what he labels in the next sentence as a "fact").

5.  <u>Second Rebuttal Report</u>.

Mr. Strong's second rebuttal report responds to Dr. Furchtgott-Roth's supplemental report of September 3, 2021.  ECF No. 547-3.  It essentially states that the supplemental report does not alter the opinions expressed in Mr. Strong's rebuttal report.

6.  <u>Conclusion</u>.

I have provided examples but have not addressed his reports on a sentence by sentence basis, nor did the plaintiffs do that in their motion.  The lawyers can apply the concepts discussed in this order to Mr. Strong's opinions, and lingering evidentiary disputes can be determined in the context of the evidence and arguments presented at trial.  The motion is denied.

**B.  <u>Charter's Motion to Exclude the Opinions and Testimony of On Amir, ECF No. 565 (ECF No. 550 is the restricted version): GRANTED</u>.**

I have read Professor Amir's report, ECF No. 550-3, and the parties' briefs.  I have also read Judge Scriven's order in *UMG, Recordings, Inc. v. Bright House Networks, LLC*, No. 8:19-cv-710-MSS-TGW, filed in the present case at ECF No. 763-1.  Bright House Networks was purchased by Charter in or about 2015, and the issues in that case are similar to the issues in the present case.  Prof. Amir's report in this case appears from Judge Scriven's order to be the same or a similar report to that filed in the present case.  *See id.* at 3.  I agree with Judge Scriven's analysis and conclusion that it should be excluded.

**C.  Charter's Motion to Exclude the Opinions and Testimony of Kristofer Buchan, ECF No. 566 (ECF No. 551 is the restricted version): DENIED.**

I have read the report, ECF No. 551-2; supplemental report, ECF No. 551-3; and rebuttal report, ECF No. 551-4, as well as the parties' briefs.  Prof. Buchan is a financial and economic consultant who specializes in data analysis.  Charter objects to his use of such terms as "infringement" and "repeat infringers," arguing that Prof. Buchan does not have expertise in identification of infringement or infringers.  I do not find from my review of his reports that he is expressing opinions, legal or otherwise, about what constitutes infringement.  Rather, he is using terms that are common to this litigation, and which he has defined, to facilitate application of his analysis to data provided to him.  In his deposition he confirmed that he will not offer opinions as to whether Charter subscribers have infringed copyrights, and that he has no opinion as to whether plaintiffs' vendor MarkMonitor actually detected copyright infringement before sending infringement notices to Charter.

Charter can easily point out through cross-examination what Prof. Buchan is and is not saying about "infringers" and "repeat infringers."  Counsel can challenge Prof. Buchan's definitions through cross-examination and through Charter's own experts opinions (if disclosed in their experts reports).  I do not find that counsel have raised a legitimate objection to the testimony under Rule 702 or Rule 403.

I have also reviewed Judge Scriven's order with respect to Prof. Buchan.  ECF No. 763-1 at 6.  She indicates that the parties will "withdraw" paragraphs 19-23 and 28-29 of Prof. Buchan's original report (which describe background information that will presumably be provided by other witnesses), and that they will "sanitize his reports relating to his use of the

terms "piracy," "infringed," "infringers" and "repeat infringers." *Id.* I interpret the latter to mean that the parties have agreed that Prof. Buchan will moderate his use of those terms in his trial testimony in some way. Frankly, I am not clear as to why he should be precluded from using terms that are common to the case. However, because the parties have stipulated to these changes in the related case, I have no reason to object to the stipulation as applied to the present case.

### D. Charter's Motion to Exclude the Opinions and Testimony of Harold Furchtgott-Roth, ECF No. 567 (ECF No. 552 is the restricted version): GRANTED IN PART and DENIED IN PART.

Prof. Furchtgott-Roth is an economist whose background includes, among other things, founding the Center for the Economics of the Internet and service as a commissioner of the Federal Communications Commission. He is an adjunct professor at the Brooklyn Law School where he teaches law relating to communications and copyrights. I have read his report, ECF No. 552-2 and the briefs. He has also issued three additional reports rebutting opinions of various defense experts. However, the pending motion focuses on the initial report.

Prof. Furchtgott Roth was retained by plaintiffs as a damages expert, i.e., "to evaluate the harms that the Plaintiffs experienced as a consequence of the alleged infringement of Plaintiffs' copyrighted works by Charter customers" and "to evaluate Charter's economic and financial incentives to retain infringing subscribers." *Id.* at 7-8. In a summary he lists five opinions, one of which has three subparts. *Id.* at 8-9. Charter expresses five main objections, which I consider in turn.

First, Charter argues that Prof. Furchtgott-Roth is not an expert in the music industry, peer-to-peer file sharing, or music piracy. I agree in part. He does not purport to be an expert in

the music industry.  Moreover, his general opinions that the music is an important component of the American economy, and that piracy is harmful, are obvious to lay persons without the imprimatur of an expert opinion.  Therefore, they are not relevant within the meaning of Rule 702.

However, based on his report, it is clear that Prof. Furchtgott-Roth has expertise related to copyrights.  His discussion of copyrights and their importance appears to be within his expertise and would be helpful to lay jurors.  So too with respect to his description of the Internet and ISPs in general.  Prof. Furchtgott-Roth does not profess to be an expert in peer-to-peer technology as such.  However, he has studied the manner in which peer-to-peer technology can facilitate infringement (and to some extent how it has impacted Charter, per the Sandvine study and related reports), and those opinions appear to be based on a proper foundation.  It is not unusual or inappropriate for experts to refer to studies that support their testimony, so long as the studies relate to the expert's areas of expertise.

I caution counsel, however, that if they plan to present other witnesses to discuss how peer-to-peer technology impacts the music industry and Charter in particular, and who might have greater knowledge and/or expertise in the subjects than Prof. Furchtgott-Roth, they should avoid duplicative testimony.  That caution applies generally to all witnesses.  Jurors whom I have interviewed over the years consistently and appropriately complain about redundancy and duplication ("Do they think we're stupid?"  "We got it the first time.").  Counsel should anticipate that the Court will have a short leash when it comes to duplicative testimony at this trial.

Second, Charter claims that Prof. Furchtgott-Roth's opinions about Charter's "revenues and profits" are irrelevant because they are not tied to the alleged infringing activity in this case.

10

This concerned Judge Scriven who concluded that he may not testify about estimated total revenue from subscribers who received infringement notices because the notices were not limited to the notices complained of in that case.  ECF No. 763-1 at 8.  I agree that this affects the relevance of the testimony, but it also puts the present case into the context of the plaintiffs' infringement problems as a whole.  I am not yet convinced that the potential for unfair prejudice substantially outweighs the probative value.  Defense counsel can point out the "inflated" component if plaintiffs do not do so themselves.

Third, Charter argues that Prof. Furchtgott-Roth should not be permitted to speculate about Charter's incentives to retain infringing subscribers.  I agree that the professor cannot discuss the state of mind of Charter's personnel, but I do not interpret that section of his report, ECF No. 552-2 at 39-46, as an attempt to do so.  Rather, he is discussing economic incentives that could potentially motivate actions, i.e., termination of subscribers would reduce revenues and profits and potentially increase costs associated with the termination process.  *See* ECF 552-2 at 39.  The bigger problem here as I see it is that lay jurors do not need an economist to tell them that retaining customers generates more revenue for a business, and that terminating subscribers would reduce revenues and potentially expose the company to push back from terminated subscribers.  At this point I do not know how Prof. Furchtgott-Roth's testimony on these points would tell the jurors something they need expert testimony to understand.

Fourth, Charter objects to Prof. Furchtgott-Roth's opinions about, and interpretation of, Charter's advertising.  Again, he cannot speculate about the state of mind of Charter's personnel, but he can express his opinion that Charter's advertisements highlighted upload and download speeds; and that this would be valuable to subscribers who wish to infringe.  *See id.* at 38-39.

11

Finally, Charter argues that Prof. Furchtgott-Roth should not be permitted to express legal opinions. I agree that he may not express opinions about what the applicable law is. I also agree that he cannot express opinions on whether subscribers infringed copyrights or committed piracy. It does not appear that this was his intention. He, like Mr. Strong, at times assumed that infringement or liability occurred for purposes of his economic opinions. The assumptions are fair game for cross-examination and opposing testimony.

### E. **Charter's Motion to Exclude the Opinions and Testimony of Paul Geluso and the "Listeners," ECF No. 568 (ECF No. 553 is the restricted version): DENIED.**

Mr. Geluso is an Electrical Engineer who specializes in music technology. He is an Assistant Music Professor and the Program Director of the Music Technology Department at New York University. He has taught and lectured on such topics as analog and digital electronics, signal processing, electronic music, virtual instruments, sampling, synthesizing, acoustics, sound processing and mixing, forensic analysis, and critical listening. He is also a producer, editor and performer of music, and his expertise extends to a wide variety of types of music, from classical to rock, hip-hop to jazz.

He brought his experience and expertise to bear on what might seem to be a task as to which reasonable litigants would stipulate: listening to close to 14,000 pairs of musical recordings, one set said to be an authorized copy and the other said to be a copy downloaded on Charter's network (the "target files") to determine whether they are the same. This seemingly daunting task (in terms of time and perhaps physical and mental pain and suffering) was ameliorated somewhat by the assistance of highly skilled "listeners" (and by the fact that Mr. Geluso was paid $350 an hour to listen to music). He and his team employed three techniques: crucial listening, waveform, and spectral analysis to reach and corroborate their conclusions,

which were that all but 609 of the recordings in the respective pairs were identical.  Even as to the 609 outliers, he found that the target files contained portions of the authorized source track. ECF No. 553-2 at 35-36.

Without belaboring discussion of this dispute, I conclude that I agree with Judge Scriven's analysis in the *Bright House Networks* case.  Subject to certain foundational requirement listed in her order, ECF No. 763-1 at 7, Mr. Geluso's opinions are relevant, reliable, and admissible.

### F.  Charter's Motion to Exclude the Opinions and Testimony of Terrence P. McGarty, ECF No. 569 (ECF No. 554 is the restricted version): GRANTED IN PART and DENIED IN PART.

Dr. McGarty obtained a Ph.D. in Electrical Engineering and Computer Science from MIT.  He has had extensive and high-level experience in both the technical and the business sides of Internet-related subjects, including general knowledge and experience with peer-to-peer technology and applications such as BitTorrent.  In his initial report, ECF No. 554-2, he provides the following opinions: (1) Charter's ISP services facilitate peer-to-peer distribution and theft by its subscribers of copyright-protected works; (2) Charter had an Acceptable Use Policy ("AUP") the prohibited its customers from copyright infringement as well as other violations of Charter's terms of service; (3) despite its technical and practical ability to do so, Charter did not enforce the AUP vis-à-vis subscribers who used its services to infringe copyrights other than by sending notices; it could have but did not suspend or terminate repeat violators or otherwise comply with generally accepted business practices for legal and regulatory compliance; but (4) Charter did enforce other violations of the AUP.  *Id.* at 7.

Charter characterizes Dr. McGarty as a "professional witness" who has not done much relevant research or business work since 2008 and asserts that his opinions are "attorney-manufactured arguments about core issues in the case, based on an unreliable and inaccurate compilation of purported 'facts.'"  ECF No. 554 at 1-2.  Beyond the rhetoric, however, the motion focuses on Dr. McGarty's qualification to opine on "Deep Packet Inspection ("DPI") technology;"  *Id.* at 3-8; generally accepted business policies and procedures, *id.* at 8-10; Charter's handling of copyright infringement notices compared to other violations of its AUP program, *id.* at 11-12; and his "improper narrative."  *Id.* at 12-15.  My findings and conclusions follow.

1.  <u>DPI technology</u>.

Charter cites Dr. McGarty's deposition where he acknowledged that he is not "a broad-based expert on DPI technology;" or on " the operational functions of Sandvine" (a DPI provider); or on whether Charter was capable of implementing Sandvine.  *Id.* at 4.  Charter also downplays Dr. McGarty's claim to having considerable experience with (and to have written about) peer-to-peer technologies and applications because Dr. McGarty admitted in his deposition that he is not an expert in the peer-to-peer protocols associated with this case.  *Id.* at 5. Charter criticizes the rebuttal report's suggestion that Charter could have utilized DPI technology to help monitor subscribers' infringing activity for the same reason – he is not qualified to express the opinions.

I find that the quote about not being a "broad-based expert" was taken out of context.  As plaintiffs point out, in the same sentence Dr. McGarty indicated that he is aware of the technical aspects of DPI.  His company Zephyr used DPI.  ECF No. 606 at 2.  His role is to explain in general what DPI is; to point out that Charter in fact used DPI during the relevant period; and to

explain how Charter could have used DPI to monitor infringement.  While Dr. McGarty might not be a "broad-based expert" in DPI, I find that he has ample qualifications and experience to inform jurors about the subject at a general level.

2.   Generally accepted business practices.

In addition to arguing that Dr. McGarty lacks the expertise necessary to comment on the sufficiency of Charter's "copyright program," Charter claims that any opinion about the sufficiency of Charter's response to notices of subscriber infringement is an improper legal argument; that it is irrelevant because Charter has withdrawn its safe harbor defense; and that Dr. McGarty's opinion about the reasonableness of another ISP's response to copyright infringement was excluded in the *Cox* case.  *Id.* at 8-10.  Counsel asserts that Dr. McGarty's "framework appeals to be entirely fabricated for the purpose of shoehorning into his opinion Plaintiffs' anticipated arguments on an ultimate legal issue."  *Id.* at 10.  I find this description to be unnecessary and inappropriate, but I agree that Dr. McGarty's framework should be excluded. This appears to be a unique and personal practice, not something that would assist jurors in understanding general or accepted business practices that Charter should have known of and implemented in order to comply with the DMCA.[1]

3.   Comparative responses to AUP violations.

Charter claims that Dr. McGarty's opinion about the severity of Charter's response to non-copyright violations of the AUP is exaggerated in view of Charter's evidence that it only

---

[1] I did read Judge O'Grady's order in *BMG Rights Mgmt. LLC v. Cox Commc'ns, Inc.,* No. 1:14-CV-1611 (E.D. Va. Nov. 25, 2015) (ECF No. 691 in that case).  The order itself is brief and grants in part Cox's motion to exclude Dr. McGarty's opinions in that case, without setting forth the court's reasoning.  I also read the motion and its supporting brief in that case, which provided context for the order.  It appears that the court's conclusion regarding the "framework" opinion was similar to mine.

terminated one subscriber during the claims period.  More broadly, it condemns Dr. McGarty's opinions concerning Charter's response as conclusory and unsupported by facts.  ECF No. 554 at 11-12.

This appears mostly to be a debate about what is a "meaningful" consequence for violation of the AUP.  Dr. McGarty's opinion essentially is that a "meaningful" consequence to an ISP subscriber would be suspension or termination of service.  I find that he has the background and experience to express that opinion.  It does not appear to be disputed that Charter has imposed meaningful consequences, so defined, on at least some non-copyright violators but not on subscribers whom it has been informed are repeat copyright infringers.  That is relevant information, and if Charter is not prepared to stipulate to the facts, I do not find a basis in Rule 702 to exclude his testimony as the context in which he is expressing his opinion on consequences.

    4.   Improper narrative.

This is a somewhat vague challenge to what the motion calls "a lengthy and misleading narrative regarding technology used on Charter's network and Charter's policies and procedures for addressing copyright on its network."  ECF No. 554 at 12.  It stresses Dr. McGarty's deposition testimony that he is not opining on the reasonableness of Charter's policies or procedures for addressing allegations of copyright infringement and argues that his admission should also be grounds to exclude other observations that he makes about Charter's programs and practices that Charter does not dispute.  *Id.* at 13.  Charter argues that this narrative is not relevant because it could not "possibly provide any assistance to a jury in determining any matter *in dispute*."  *Id.* at 14 (emphasis in original).

Plaintiffs respond that Dr. McGarty's "narrative" provides support and context for his opinions.  To the extent that the narrative provides context for his "framework" opinion, as indicated in the response, ECF No. 606 at 13, it is not relevant context.  On the other hand, to the extent that the "narrative" is providing general information about the Internet, the significance of high speed internet service, and how it facilitates peer-to-peer activity, I find that it would be helpful to lay jurors.  Beyond that, I cannot evaluate the objection based on the motion and briefs and will do so in the context of the evidence and arguments presented at trial.

### G.  Charter's Motion to Exclude the Opinions and Testimony of Barbara Frederiksen-Cross, ECF No. 571 (ECF No. 556 is the restricted version): GRANTED IN PART and DENIED IN PART.

Ms. Frederiksen-Cross has an Associate of Applied Science degree in Computer Programing and 47 years' experience in the computer industry, including extensive experience with coding and software generally, and also including experience with peer-to-peer applications.  *See* ECF Nos. 556-2 at 5-7; ECF No. 556-4 at 4-6.  She has generated two lengthy reports: ECF No. 556-2 (111 pages); ECF No. 556-3 (51 pages).  Her opinions generally concern the work of MarkMonitor on behalf of the plaintiffs, i.e., that MarkMonitor's methodology for detecting peer-to-peer distribution of plaintiffs' copyrighted works is reliable; that the notices MarkMonitor sent to Charter enabled Charter to identify and contact infringing subscribers, including subscribers who were sent multiple DMCA notices; that Charter's CATS system reduced and ultimately terminated the forwarding of notices of infringement to subscribers and substituted email notification that were not effective; that Charter treated non-copyright and copyright subscribers who violated its policies differently; and that Charter had various options

including but not limited to suspension or termination of service to discourage offenders.  *See* ECF No. 556-2 at 9-11.

Charter objects to her qualifications for multiple reasons.  Ms. Frederiksen-Cross only has an associate degree from a community college; the additional training she has had is unclear; she does not have any "relevant" certification; she is employed in "a two-person operation that exists to provide expert testimony regarding forensic software analysis;" her testimony has been excluded by courts in the past.  ECF No. 556 at 2.[2]  Beyond these general objections, Charter argues that (1) Ms. Frederiksen-Cross's expertise with peer-to-peer networks is limited and does not qualify her to express opinions on the reliability of MarkMonitor's system for detecting copyright infringement or Charter's notice-processing system, *id.* at 3-6; her improper factual narratives should be excluded, as they are based on inaccurate and incomplete understanding of the facts, *id.* at 7-8; she may not serve as a conduit for undisclosed fact testimony, *id.* at 9-11; and she should be precluded from using the terms "repeat infringers" and "infringement."  *Id.* at 11-13.

These objections and the reports to which Charter objects appear to be the same as or similar to Ms. Frederiksen-Cross's reports and Charter's objections thereto in the *Bright House Networks* case.  I agree with Judge Scriven that her lack of a Ph.D., Master's, B.A., or B.S. does not preclude her from offering expert opinions based on her experience.  *See* ECF No. 763-1 at 5.  That is clearly established in Rule 702, and as we have seen in reverse with Dr. McGarty, the possession of prestigious academic degrees and credentials does not immunize a potential expert from Charter's challenges.  I agree with Charter, however – and with Judge Scriven's implicit

---

[2] Ms. Frederiksen-Cross notes that she has been admitted as an expert in computer software and related subjects multiple times, including in the *Cox* cases in the Eastern District of Virginia.  ECF No. 556-4 at 12-15.

acknowledgement -- that Rule 703 has its limits.  The facts on which an expert bases her opinions need not be admissible if experts in the field underlineeddon reasonably rely on such facts.  Moreover, whether the underlying facts may be disclosed to the jury is a separate question that requires balance of probative value against unfair prejudice.

I also agree with Judge Scriven that Ms. Frederiksen-Cross cannot comment on portions of MarkMonitor's code that were located after her report.  *Id.*  Where I tend to part company with Judge Scriven slightly concerns the use of such terms as infringement, repeat infringers, and the like.  It depends on the context.  These are common terms in this case and will be used by multiple witnesses, counsel, and the Court.  So long as Ms. Frederiksen-Cross makes it clear that she is not making a judgment on whether infringement occurred, whether someone is an infringer, etc., but instead is using these terms as a shorthand means of referencing what the plaintiffs have alleged, I am unlikely to have a problem with it.  Jurors are much smarter than lawyers given them credit for.  I am quite sure that the jurors in this case will be able to understand the difference an allegation and a proven fact.

**H.  Plaintiffs' Motion to Exclude or Limit Certain Expert Testimony and Opinions by Dr. Kevin Almeroth, ECF No. 572 (ECF No. 557 is the restricted version): GRANTED IN PART and DENIED IN PART.**

This time it is plaintiffs who engage in unnecessary disparagement, labeling Dr. Almeroth as "the epitome of a professional testifier."  ECF No. 557 at 1.  That he has testified frequently in depositions and trials does not prove that his testimony is not credible.

Dr. Almeroth is a professor or professor emeritus of computer science at the University of California, Santa Barbara.  He has BS, MS, and Ph.D. degrees in computer science.  He describes a wide variety of research interests, teaching assignments, and projects in which he has

19

been involved in the areas of network architectures and delivery systems (including network security). ECF No. 557-2 at 5-14. He has prepared two reports, the first responding to aspects of the McGarty and Frederiksen-Cross reports, and the second focusing on Dr. McGarty's supplemental report. ECF Nos. 557-2 and 557-7. The gist of his opinions, described in the summary section of his initial report, is that the measures that Dr. McGarty and Ms. Frederiksen-Cross have indicated Charter could have taken in response to plaintiffs' infringement notices are not technically feasible or practical, and they either ignore or mistakenly describe what Charter did and the reasons it provided for its actions. ECF No. 557-2 at 14-16.

Plaintiffs first argue that Dr. Almeroth's opinions amount to telling the jury that Charter's decision not to implement certain procedures was reasonable, and that the judge in *Sony v. Cox* excluded a similar opinion, finding that Dr. Almeroth was not qualified to express that opinion because "[o]pining on questions of reasonableness would usurp the jury's factfinding role." *See* ECF No. 557 at 2 (citing *Sony Music Ent. V. Cox Commc'ns,* No. 1:18-cv-950, 2019 WL 9088257, at *1 (E.D. Va. Nov. 19, 2019)). I respectfully disagree that an expert's opinion on reasonableness is necessarily improper. *See* Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."). In any event, Dr. Almeroth expressly states, "[o]f note, I am not offering any opinions regarding the ultimate question of reasonableness of Charter's response to Plaintiffs' DMCA notices or the DMCA notices of any other company/rights holder." ECF No 557-2 at 4. This disclaimer has the appearance of a lawyer-stimulated response to Judge O'Grady's order. I will hold Dr. Almeroth to his disclaimer.

Second, plaintiffs argue that Dr. Almeroth's criticism of plaintiffs' experts for not opining that their recommended procedures would have been effective is not a proper subject for

expert opinion.   I disagree, and it appears that Judge Scriven also disagreed with this argument. *See* ECF No. 763-1 at 7-8.

Third, plaintiffs object to his opinions concerning neutrality laws and human rights.  I join Judge Scriven in excluding those opinions.  *See id.* at 8.

Finally, plaintiffs object to Dr. Almeroth's testimony about the importance of internet access to modern life, arguing that this opinion does not require specialized knowledge or expertise.  ECF No. 557 at 2.  I agree.

I. **Plaintiffs' Motion to Exclude or Limit Expert Testimony of Dr. Sandeep Chatterjee, ECF No. 573 (ECF No. 558 is the restricted version): GRANTED IN PART and DENIED IN PART.**

Dr. Chatterjee has B.S., M.S., and PhD. degrees in computer science.  He is the CEO of a technology consulting company.  He has been recognized as a leader and innovator in technology, and his extensive experience in technology includes software systems and business applications of technology, including system security.  ECF No. 558-2 at 7-11.  His opinions focus on MarkMonitor's work.  In summary, he believes that MarkMonitor's notices to Charter of alleged infringement are not reliable due to multiple shortcomings in its system: failure to retain source code, failure to verify files/torrents subject to the notices, failure to verify the connection of files to particular sound recordings and musical compositions, and failure to download content from a peer before generating a notice.  ECF No. 558-2 at 6-7.  Plaintiffs counter with five objections, which I address in turn.

First, plaintiffs assert that Dr. Chatterjee lacks the expertise necessary to provide an opinion concerning "fake files" in peer-to-peer networks.  These are files that are corrupted and

unplayable, some of which apparently were disseminated by plaintiffs themselves in an effort to discourage illegal downloading.  Dr. Chatterjee criticizes MarkMonitor for its failure to verify that its infringement notices were linked to legitimate files rather than to these fake files.  Charter counters that Dr. Chatterjee has the technical expertise to understand peer-to-peer networks, and that he relied on peer-reviewed articles that described the fake file phenomenon.  ECF No. 607 at 3.  As I have noted earlier in this order, it is neither unusual nor improper for an expert to rely on studies in scientific literature (as well as documents from this case) in forming opinions. Plaintiffs have not shown that Dr. Chatterjee lacks sufficient expertise.  His alleged "crucial errors" can be pointed out in cross-examination or by plaintiffs' experts such as Ms. Frederiksen-Cross.

Second, plaintiff contends that Dr. Chatterjee's opinions on the correlation of MarkMonitor's hard drive to plaintiffs' works will mislead the jury, *id.* at 7-9.  However, as I have said, lawyers tend to greatly underestimate the intelligence of jurors.  If plaintiffs' counsel seriously believe that the jurors might be misled, then it is their job to clarify and to point out errors.  I am not convinced that Dr. Chatterjee's opinions, whether right or wrong, will mislead the jury.

Third, plaintiffs claim that Dr. Chatterjee's opinion that MarkMonitor did not verify the files subject to the infringement notices sent to Charter is based on "obviously flawed assumptions."  *Id.* at 9-11.  Errors in assumptions made by the witness may be pointed out in cross-examination; and if this is done effectively, it will undermine the credibility of opinions based on those incorrect assumptions.

Fourth, plaintiffs object to Dr. Chatterjee's opinion that MarkMonitor and Audible Magic cannot identify specific recordings because he lacks music industry knowledge and relies on

unreliable assumptions, *id.* at 11-13. I do not see this as a music industry issue. Rather, it is a technology issue. Again, the assumptions may be challenged on cross-examination or by plaintiffs' expert (assuming proper disclosure of the expert's opinions). A knowledgeable witness from MarkMonitor could also discuss MarkMonitor's work.

Finally, plaintiffs contend that Dr. Chatterjee is not qualified to analyze plaintiffs' use of peer-to-peer networks and, therefore, he improperly summarizes and vouches for facts provided by a letter and deposition testimony provided by a Mr. Mason, *id.* at 13-15. Here I agree with plaintiffs. I do not understand why plaintiffs are concerned about the jury's learning that peer-to-peer networks can be and are used beneficially. Perhaps this is an example of attacking an opinion just because it is the opposing expert's opinion. But this does not appear to be a proper application of Rule 703. Mr. Mason's statements, if relevant at all, should come from Mr. Mason.

Overall, I agree with Judge Scriven that Dr. Chatterjee is qualified to issue opinions on the issues for which he is being proffered." *See* ECF No. 763-1 at 5. I have noted the one area where I sustain plaintiffs' objection.

**J.   Plaintiffs' Motion to Exclude or Limit Certain Expert Opinions and Testimony of Dr. Aram Sinnreich, ECF No. 574 (ECF No. 559 is the restricted version): GRANTED IN PART and DENIED IN PART.**

Dr. Sinnreich is a professor at American University's School of Communications. He has taught classes and has both written and presented extensively about the music industry, including digital music technology, internet platforms, sharing, and piracy. He is a professional musician (bass, guitar) and composer as well. He has been recognized as a music industry expert. *See, e.g., Arista Records LLC v. Lime Group LLC,* No. 06CV5936(KMW), 2011 WL

23

167496, at **14-18 (S.D.N.Y. May 2, 2011).  Generally speaking, Judge Scriven rejected plaintiffs' challenges to his opinions in the *Bright House Networks* case.  ECF No. 763-1 at 3-4. Although plaintiffs state that Dr. Sinnreich has "expertise in almost nothing," ECF No. 559 at 1, the record before me is to the contrary.

Dr. Sinnreich's opinions, in summary, are that (1) peer-to-peer file sharing and piracy were not responsible for the downturn in the music industry in the 2000s; (2) the industry uses piracy as a scapegoat for its own failure to adapt to technological and cultural changes; (3) plaintiffs' statements that they are suing on behalf of the creators of the music is belied by the industry's exploitation of the musicians; (4) there are beneficial uses of peer-to-peer file sharing; and (5) termination of access to the Internet would be deeply damaging and disproportionate to infringement.  *See* ECF No. 559-2 at 7-8.

Plaintiffs state that they do not object to his testimony that declines in the music industry in the 2000s resulted from factors other than piracy.  Similarly, they do not object to his providing opinions on the evolution of the industry.  *See* ECF No. 559 at 2.  I turn then to the topics to which plaintiffs do object.

First, they object to his opinion that the music industry exploits creative labor and point out that in the *Arista Records* case the court "precluded Dr. Sinnreich from offering essentially the same opinion." *Id.* at 5.  In that case Dr. Sinnreich's report included comments of recording artists that were critical of recording companies, and he discussed "the degree to which the major record labels 'have been consistently criticized for unfair or unethical business relations with their artists.'"  2011 WL 1674796, at *20.  The court concluded,

> Testimony about relations between recording companies and artists is likely to be excluded.  This case concerns Defendants' inducement of copyright infringement of Plaintiffs' works.  Any relevance of the nature of the relations between

recording companies and artists is likely to be substantially outweighed by the danger of unfair prejudice to Plaintiffs.

*Id.*

I agree that the relevance of this type of opinion testimony is marginal, and that it is excludable under Rule 403.  However, the key is in the plaintiffs' hands.  If plaintiffs or their counsel wish to boast that they are suing on behalf of, or to benefit, the artists who create and perform the music, then they are potentially opening the door to "the other side of the story." Plaintiffs will have to take the bad with the good if they decide to go down that path.  My advice here and later with respect to Mr. Coleman is for plaintiffs to stick to what the case is about – infringement of copyrights by Charter's subscribers and whether Charter is liable for it.

Plaintiffs' second objection it to Dr. Sinnreich's opinion that the music industry scapegoats piracy.  As I understand it, the substance of the opinion is that infringement due to peer-to-peer sharing is a relatively small cause of the industry's economic problems in comparison to other factors such as the industry's failure to adapt to technological and cultural changes; and, therefore, that plaintiffs' casting the blame primarily on piracy (if they do) is inaccurate.  It seems quite similar to one of the opinions to which plaintiffs are not objecting.  In any event, he is qualified to express that opinion, and it is fair rebuttal if plaintiffs blame piracy for their economic woes.  I do agree that references to money allegedly received by plaintiffs in litigation settlements and damages awards is excludable under Rule 403.

The third objection focuses on two things: Dr. Sinnreich's opinion that peer-to-peering has been beneficial to the music industry; and his proposed testimony about plaintiffs' having engaged in price fixing.  Testimony about alleged price fixing is marginally relevant at best, and any relevance is substantially outweighed by the danger of unfair prejudice.

As for his opinions on beneficial applications of peer-to-peer file sharing, plaintiffs focus on two studies on which Dr. Sinnreich relies. He was the lead analysist for a survey conducted by Jupiter Research in 2000. His specific role in Jupiter's 2002 follow up report is not clear to me at this time. I ordinarily would not have an objection to his reliance on those reports so long as he can provide a proper foundation under Rule 703.

The problem is that Charter has not produced the data on which the surveys' conclusions rested. There is some suggestion that Charter has not produced the survey reports either, but I must be misunderstanding plaintiffs' point here, because plaintiffs have themselves provided the Court with the 2000 report, ECF No. 559-5; and Charter claims to have provided both reports. Charter states that Dr. Sinnreich cannot provide the underlying data because it belongs to Jupiter, his former employer. ECF No. 550 at 5, n.2. Charter further indicates that plaintiffs subpoenaed Jupiter's successor, Forrester Research, Inc., but Forrester could not locate the data. *Id.* It is somewhat difficult to believe that Dr. Sinnreich could not get his hands on the underlying data if it exists. But unless plaintiffs have some basis to question the credibility of his statements to the contrary, I will not exclude his reliance on the reports for his opinion. He will, of course, have to provide an appropriate foundation under Rule 703.

Fourth, plaintiffs object to testimony that peer-to-peer file sharing has "substantial non-infringing uses," claiming that Dr. Sinnreich has no evidentiary support for this opinion, and that it amounts to a legal opinion. Plaintiffs argue that similar testimony by Dr. Sinnreich was excluded in *Arista Records* and discredited in *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,* 545 U.S. 913, 940 (2005). I disagree. In *Arista Records* Judge Wood reserved judgment on whether that Dr. Sinnreich's proposed testimony relaying various artists' positive views of file sharing would be admitted. She noted her understanding that plaintiffs might call witnesses to

testify about specific artists' views of the adverse impact file sharing had had on their livelihood, but that if plaintiffs did not present such testimony, then Dr. Sinnreich's opposite testimony would have limited relevance and probably would be excluded. 2011 WL 1674796 at *20.  In *Grokster* the majority opinion at 919-920, and Justice Ginsberg's concurrence at 946-48, and Justice Breyer's concurrence at 954-55, all acknowledged evidence that there are non-infringing uses of peer-to-peer software.  The Court finds that Dr. Sinnreich's opinion about beneficial uses is not an improper legal opinion, and that he has both a basis and the expertise to express the opinion.

Finally, however, the Court excludes Dr. Sinnreich's opinions that suspension or termination of service is too harsh a penalty.  The jurors do not need Dr. Sinnreich to tell them that access to the Internet is important.  It is not Dr. Sinnreich's place to determine the consequence of the infringement, i.e., to weigh or compare the harm done to plaintiffs by infringing subscribers versus loss of access to Charter's service.  We are not talking about mere disconnection of an individual without his consent.  Rather, we are talking about the imposition of a consequence for repeated use of the service to carry out illegal downloading of plaintiffs' works when the sending of notices has proven to be insufficient.  Moreover, a significant purpose of suspension or termination of service could have the added benefit of discouraging infringement by other subscribers.

**K.  Plaintiffs' Motion to Exclude or Limit Expert Testimony of Dr. Karl Snow, ECF No. 575 (ECF No. 560 is the restricted version): GRANTED IN PART and DENIED IN PART.**

Dr. Snow is an economist presently associated with an economic consulting firm in Washington, D.C.  ECF No. 560-2 at 5.  In the past he has taught finance and statistics courses at

several universities, and like most of the other experts in the case, he has presented at seminars and published papers relevant to his field in peer-reviewed journals.  He has prepared an initial report, *id.,* and two rebuttal reports.  ECF No. 560-3 and ECF No. 560-4.  As with several of the experts discussed in this order, Dr. Snow also submitted a report or reports in the *Bright House Networks* case.  Plaintiffs moved to exclude his prospective testimony.  With one exception, Judge Scriven denied the motion.  *See* ECF No. 763-1 at 6.

Dr. Snow's assignment, as he describes it, was to examine patterns within the notices of infringement sent by plaintiffs to Charter and the reliability of the data.  ECF No. 560-2 at 8.  He has developed several opinions: (1) 53.3% of the notices were duplicative; (2) the majority of the subscribers received one notice; three out of four noticed subscribers received no more than three notices; nearly two-thirds of noticed subscribers received their first and last notices within seven days; (3) plaintiffs' notice count per month declined over the claims period at a compounded average monthly rate of 4.8%; (4) the notice count is not necessarily reliable due to duplication; and (5) plaintiffs' file-verification records are "incomplete, inconsistent, and unreliable" for several reasons.  *Id.* at 8-10.  Many of these "opinions" appear to be facts, albeit apparently disputed facts.  For example, whether notices were duplicative is a fact; the number of subscribers who were sent only one notice, or no more than three notices, is a fact; the monthly count of notices is a fact.  Unless there are good reasons to dispute these facts, they should have been stipulated.

Plaintiffs state that they only seek to exclude "Dr. Snow's most egregious errors."  ECF No. 560 at 1.  These "egregious errors" are:

    1.  <u>Reliance on Mr. Geluso and the Listeners' Verifications</u>.

In a rebuttal report Dr. Snow criticizes Prof. Buchan's reliance on the reports of Mr. Geluso and the "listeners."  *See* ECF No 560-3 at 23-27.  *See also* ECF No. 560-4 at 7-8, 11-14, 17-18.  Neither Prof. Buchan nor Dr. Snow has the expertise to evaluate the listening work performed by Mr. Geluso and his team, and neither of them does so.  Rather, Dr. Snow is critical of the work of plaintiffs' economist/statistician, Prof. Buchan, for relying on the Geluso team's work.  His reasons are based on his analysis that the recordings the Geluso team examined did not include the torrents that were the subject of the majority of the notices of infringement, and that they only listened to a relatively small subset of the files subject to the notices.  *Id.* at 24.  He has the expertise to express those opinions.

    2.  <u>Analysis of Duplicative Notice Data</u>.

    3.  <u>Interpretation of Data</u>.

I do not find a reason to exclude Dr. Snow's opinions about duplicative data or interpretation of data.  His opinions on those subjects fall within the expertise of an economist/statistician; and plaintiffs have not questioned his qualifications as either an economist or a statistician.  I was not able to find the sentence excluded by Judge Scriven, and I therefore assume that the reports submitted in the *Bright House Networks* case might not have been identical to the reports in the present case.

**L.  Plaintiffs' Motion to Exclude or Limit Expert Testimony of Wayne C. Coleman, ECF No. 576 (ECF No. 561 is the restricted version): GRANTED.**

Mr. Coleman is a CPA with a lengthy history in the music industry, including royalty compliance and business management for various artists and labels.  ECF No. 561-2 at 4-5.  His role appears to be to criticize plaintiffs.  His opinions are that (1) plaintiffs routinely take positions contrary to the interests of their artists and songwriters; (2) most of their artists and songwriters receive a small share of the revenue from their recordings and compositions than do the plaintiffs; (3) artists and songwriters who generate less revenue are treated less favorably by the plaintiffs.  *Id.* at 6.

As I said earlier in this order, unless plaintiffs open the door with claims that they are suing on behalf of the artists and songwriters, then these opinions will not come into the evidence at trial.  This does not mean that plaintiffs cannot tout the quality of the works or the significance of enforcing copyrights.  It means that plaintiffs cannot portray themselves as the champions of the artists without opening the door to contrary evidence.  The issue in the case is whether Charter is liable for its subscribers' repeated infringement of plaintiffs' copyrights, not whether plaintiffs or Charter are good guys.  It might be that neither side would like the answer if that were a relevant question.

**ORDER**

1.  ECF No 547/563 is DENIED.

2.  ECF No. 550/565 is GRANTED.

3.  ECF No 551/566 is DENIED.

4.  ECF No. 552/567 is GRANTED IN PART and DENIED IN PART.

5.  ECF No. 553/568 is DENIED.

6.  ECF No. 554/569 is GRANTED IN PART and DENIED IN PART.

7.  ECF No. 556/571 is GRANTED IN PART and DENIED IN PART.

8.  ECF No. 557/572 is GRANTED IN PART and DENIED IN PART.

9.  ECF No. 558/573 is GRANTED IN PART and DENIED IN PART.

10.  ECF No. 559/574 is GRANTED IN PART and DENIED IN PART.

11.  ECF No. 560/575 is GRANTED IN PART and DENIED IN PART.

12.  ECF No. 561/576 is GRANTED.

DATED this 12th day of July, 2022.

BY THE COURT:

_____
R. Brooke Jackson
Senior United States District Judge